Gerald M. Salcido (11956)
jerry@salcidolaw.com
SALCIDO LAW FIRM PLLC
43 W 9000 S Ste B
Sandy UT 84070
801.413.1753 Phone
801.618.1380 Fax

Attorneys for W. Clark Aposhian

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRCT COURT OF UTAH CETNRAL DIVISION

| | |
|---|---|
| W. CLARK APOSHIAN, | CIVIL ACTION NO.: |
| Plaintiff, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| MATTHEW WHITAKER ACTING ATTORNEY GERNAL OF THE UNITED STATES, | |
| & | |
| UNITED STATES DEPARTMENT OF JUSTICE | |
| & | |
| THOMAS E BRANDON ACTING DIRECTOR BUREAU OF ALCHOL, TOBACCO, FIREARMS AND EXPLOSIVES | |
| & | |
| BUREAU OF ALCHOL, TOBACCO, FIREARMS AND EXPLOSIVES | |
| Defendants. | |

## COMPLAINT

Plaintiff, by his attorneys Caleb Kruckenberg and Steve Simpson of the New Civil Liberties Alliance and local counsel Gerald M. Salcido, hereby alleges the following:

## PRELIMINARY STATEMENT

The U.S. Constitution vests "*All* legislative Powers" in the Congress and directs that the President "shall take Care that the Laws be faithfully executed … ." U.S. Const. art I, § 1, and art. II, § 3 (emphasis added). It is therefore a basic tenet of our government that the Executive Branch may not, on its own, rewrite the law as it sees fit.

The Department of Justice and the Bureau of Alcohol, Tobacco, Firearms and Explosives, have violated this basic premise of our Constitution by issuing the "Bump-Stock-Type Devices" Final Rule. Contrary to statutory language enacted by Congress (and signed by the President), and circumventing Congressional efforts to revise that language, this rule is scheduled to make hundreds of thousands of law-abiding Americans into felons in defiance of constitutional restraints on executive power. Whatever the merits of such a law, the Final Rule violates the fundamental constitutional order and thus cannot be tolerated.

Plaintiff, W. Clark Aposhian, like hundreds of thousands of his fellow Americans, legally purchased a bump-stock device with the ATF's express approval. And even though the law written by Congress has not changed, the Department of Justice has ordered Mr. Aposhian to destroy or surrender his device or face criminal prosecution. The Constitution does not permit such lawmaking by executive fiat, and the rule must be permanently enjoined.

## PARTIES

1. Plaintiff, W. Clark Aposhian, is a natural person and a resident of the State of Utah.

2

2.     Mr. Aposhian is a law-abiding person and has no disqualification that would prevent him from lawfully owning or operating a firearm and related accessories.

3.     Mr. Aposhian lawfully acquired a Slide Fire bump-stock device, which had been approved for sale by the Bureau of Alcohol, Tobacco, Firearms and Explosives, for use in recreational shooting and target practice.

4.     Mr. Aposhian currently owns a "Slide Fire" bump-stock device, which has been banned by a final rule issued by the Department of Justice and the Bureau of Alcohol, Tobacco, Firearms and Explosives, which will become effective on March 26, 2019. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018).

5.     The Final Rule directs Mr. Aposhian to destroy or surrender his Slide Fire device by the effective date of the rule.

6.     Defendant Matthew Whitaker, Acting Attorney General of the United States, is the acting head of the Department of Justice.

7.     Defendant Acting AG Whitaker is sued in his official capacity.

8.     Defendant United States Department of Justice is an agency of the United States, which is partially responsible for the administration and enforcement of the National Firearms Act and the Gun Control Act.

9.     Defendant Thomas E. Brandon, Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, is the acting head of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

10.     Defendant Acting Director Brandon is sued in his official capacity.

11.     Defendant the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is an agency of the United States, which is partially responsible for the administration and enforcement of the National Firearms Act and the Gun Control Act.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

13.     This Court has the authority to grant an injunction in this matter pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1)(C) because Mr. Aposhian resides in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because the property at issue in this action is situated in this judicial district.

## STATEMENT OF FACTS

### I. LEGAL BACKGROUND

### A. The Relevant Statutes

15.     In 1934 Congress passed the National Firearms Act (NFA), which regulated firearms under Congress' power to lay and collect taxes. *See United States v. Dalton*, 960 F.2d 121, 124 (10th Cir. 1992).

16.     Under the NFA, Congress criminalized the possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law. *See* 26 U.S.C. §§ 5812(a) (registration prohibited "if the transfer, receipt, or possession of the firearm would place the transferee in violation of law"), 5861 (prohibited acts).

17.     In 1968, Congress passed the Gun Control Act (GCA) criminalizing possession of firearms for certain classes of people. *See* 18 U.S.C. § 921 *et seq*.

18.     Beginning in 1986, Congress amended the GCA, prospectively outlawing most machineguns and simultaneously making it unlawful for any person to register those weapons. *Dalton*, 960 F.2d at 122-23.

19.     Today, with limited exceptions for governmental actors and machineguns that were in existence and registered prior to the effective date of the statute, May 19, 1986, it is a federal felony offense for any person to "transfer or possess a machinegun." 18 U.S.C. § 922(o).

20.     This offense is punishable by up to 10 years in federal prison for first-time offenders. 18 U.S.C. § 924(a)(2).

21.     As defined by Congress, under both the GCA and NFA, the term "machinegun" "means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(23) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act.").

22.     The President is also empowered by the Arms Export Control Act of 1976, 22 U.S.C. § 2778, to limit the import and export of certain firearms. This law restricts the import and export of "machineguns" by reference to both the GCA and the NFA. 27 C.F.R. § 447.2(a); *see*

5

*also* 27 C.F.R. § 447.21 (U.S. Munitions Import List, Category I(b) ("Machineguns, submachineguns, machine pistols and fully automatic rifles")).

### B. Delegation of Statutory Authority

23.     With respect to the NFA, Congress provided that the Secretary of the Treasury was tasked with "the administration and enforcement" of the statute, while the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), under the authority of the Attorney General, was tasked with issuing certain "rulings and interpretations" related to the NFA's requirements. 26 U.S.C. § 7801(a)(2)(B).

24.     Congress has therefore purported to give the ATF the "enforcement power to interpret" the NFA. *York v. Secretary of Treasury*, 774 F.2d 417, 419 (10th Cir. 1985).

25.     Congress also granted the Secretary of the Treasury the authority to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a).

26.     The ATF was under the supervision of the Department of Treasury prior to 2002, but it now operates under the authority of the Attorney General. *See* 26 U.S.C. § 7801(a) (outlining distinct NFA authority after 2002).

27.     Neither the Attorney General nor the ATF has been delegated substantive rulemaking authority under the NFA.

28.     With respect to the GCA, Congress granted the Attorney General the authority to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA. 18 U.S.C. § 926(a). This authority had previously belonged to the Secretary of the

Treasury. *See* Pub.L. 107-296, Title XI, § 1112(f)(6), Nov. 25, 2002, 116 Stat. 2276

(transferring Secretary's authority to the Attorney General).

29.    The Attorney General has delegated his authority under the GCA to the ATF. 28 C.F.R.

§ 0.130(a)(1).

30.    The Attorney General has also delegated his purported authority under the NFA to the

ATF. 28 C.F.R. § 0.130(a)(2).

31.    The ATF has promulgated regulations related to the NFA at 27 C.F.R. § 479.1 and

related to the GCA at 27 C.F.R. § 478.1.

32.    As relevant here, in 1986 the ATF, acting through the Department of the Treasury, set out

a definition of "machinegun" under both the NFA and GCA, in reliance on the Secretary of

Treasury's delegated authority under 18 U.S.C. § 926. *Commerce in Firearms and Ammunition;*

*Temporary Rule*, 51 Fed. Reg. 39612, 39613 (Oct. 29, 1986).

33.    The ATF's definition for purposes of both acts was identical to the definition found in the

statute. *See* 27 C.F.R. §§ 478.11 (GCA), 479.11 (NFA).

34.    The ATF has also defined "machinegun" for purposes of the Arms Export Control Act,

and it has relied on its putative underlying authority to define the term under 18 U.S.C. § 926.

35.    Under this regulation a "'machinegun', 'machine pistol', 'submachinegun', or 'automatic

rifle' is a firearm originally designed to fire, or capable of being fired fully automatically by a

single pull of the trigger." 27 C.F.R. § 447.11.

### C. ATF Classifications

36.    The ATF Firearms and Ammunition Technology Division (FATD) is a division of the

ATF responsible for technical determinations concerning types of firearms approved for

importation into the United States and for rendering opinions regarding the classification of suspected illegal firearms and newly designed firearms.

37.     Within FATD, the Firearms Technology Industry Services Branch (FTISB, and formerly the Firearms Technology Branch (FTB)) responds to industry requests regarding importation evaluations and domestic manufacturing examinations.

38.     These entities provide guidance to the industry, by evaluating and classifying items submitted as either being a firearm, an NFA firearm, or not subject to the jurisdiction of the ATF.

39.     Individuals may submit letter requests to the ATF to clarify what laws and regulations the items may or may not be subject to.

40.     ATF makes classifications based on the most current laws and regulations at the time of submission and on the results of physical examination of that specific item.

41.     Classifications are memorialized via a letter from the ATF, and each letter is particular to the item submitted for evaluation.

## II. ATF'S PREVIOUS ACTIONS REGARDING BUMP STOCKS

### A. ATF's Approval of the Slide Fire Device

42.     "Bump fire" is a shooting technique where a user of a firearm quickly engages the trigger of a semiautomatic weapon, resulting in rapid fire.

43.     As described by the ATF in a 2006 letter ruling, "'bump fire' is a vernacular used in the firearms culture … meaning rapid manual trigger manipulation to simulate automatic fire." (underline in original).

44.     The ATF continued in its ruling, "As long as you must consciously pull the trigger for each shot of the 'bump fire' operation, you are simply firing a semiautomatic weapon in a rapid manner and are not violating any Federal firearm laws or regulations."

45.     Bump fire requires two-handed operation of a firearm, where the shooter engages the trigger with a shooting hand, while simultaneously applying forward pressure with the other hand.

46.     As the ATF has explained, "bump-stock-type devices" are a type of firearm stock that allows the firearm to slide back-and-forth freely in the shooter's hands. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514, 66516 (Dec. 26, 2018) (hereinafter, *Final Rule*).

47.     According to the ATF, when using a bump stock, a shooter rests his trigger finger on a plastic ledge that is part of the bump stock (and not on the trigger), with that dominant hand holding the stock firmly against his shoulder.

48.     Then, while "maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's ledge with constant rearward pressure[,]" the shooter engages the trigger. *Final Rule*, 83 Fed. Reg. at 66518.

49.     The recoil from the initial shot pushes the firearm rearward and causes the trigger to lose contact with the finger and manually reset. *Final Rule*, 83 Fed. Reg. at 66516-17.

50.     By applying continuous forward pressure with the non-trigger hand, the shooter is able to force the trigger back into his trigger finger, and thus "re-engages by 'bumping' the shooter's stationary finger" into the trigger. *Final Rule*, 83 Fed. Reg. at 66516.

51.     The "Slide Fire" is a type of bump stock that was commercially available in the United States starting in 2010.

52.     The Slide Fire device is a "hollow shoulder stock intended to be installed over the rear of an AR-15," and is "intended to assist persons whose hands have limited mobility to 'bump-fire' an AR-15 type rifle." John R. Spencer, Chief, Firearms Technology Branch, *Slide Fire Approval* (June 7, 2010) (Slide Fire Approval).

53.     "The stock has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed." *Slide Fire Approval*.

54.     "In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand." *Slide Fire Approval*.

55.     In reliance on this approval, Mr. Aposhian lawfully purchased a Slide Fire bump stock prior to its classification as a machinegun.

56.     Mr. Aposhian continues to own a Slide Fire bump stock for personal use.

**B. ATF's Approval of Other Bump Stocks**

57.     The ATF has consistently determined that bump stocks, including the Slide Fire, are not machineguns under the relevant statutory definition, and it had never concluded otherwise.

58.     In 2003, the ATF determined that a device called the "Akins Accelerator," which used recoil springs to mechanically increase a firearm's firing rate, was not a machinegun. *See Akins v. United States*, 82 Fed. Cl. 619, 621 (Ct. Cl. 2008).

59.     Then, on "November 22, 2006, more than three years after ATF's initial classification," the ATF reversed course and declared the Akins Accelerator to be a machinegun. *Id.* at 621.

60.     On December 13, 2006, the ATF followed up the Akins letters by issuing ATF Ruling 2006-2, which classified as a machinegun any device that, "when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the

ammunition supply is exhausted." *Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm*, ATF Rul. 2006-2, at 3 (Dec. 13, 2006) (ATF Rul. 2006-2).

61.     The ATF focused on the statutory phrase "single pull of the trigger," and held that the Akins Accelerator was a machinegun because "when activated by a single pull of the trigger, [it] initiates an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." ATF Rul. 2006-2, at 2-3.

62.     In reaching this conclusion, the ATF highlighted the effect of the Akins Accelerator's recoil spring:

> A shooter pulls the trigger which causes the firearm to discharge. As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock. The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed. Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger. Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed.

ATF Rul. 2006-2, at 2.

63.     After ATF Ruling 2006-02 was issued, manufacturers requested classification of bump-stock devices that did not use a spring to mechanically cause the trigger to contact the shooter's finger.

64.     In every case since Ruling 2006-02, the ATF concluded that bump-stock devices that did not use a spring were not machineguns under the statutory definitions.

65.     Since issuing Ruling 2006-02, the ATF has never interpreted the statutory definition of machinegun to encompass bump stocks that rely exclusively on the shooter's physical manipulation of the trigger, instead of a spring mechanism.

66.     On June 18, 2008, the ATF approved a bump-stock device that allowed the shooter to use the firearm's recoil to force the trigger back against the shooter's finger, without utilizing a spring.

67.     As described by the ATF, if an "*intermediate* amount of pressure is applied to the fore-end [of the firearm] with the support hand, the shoulder stock device will recoil forward far enough to allow the trigger to mechanically reset." (emphasis in original).

68.     So long as the shooter "[c]ontinued intermediate pressure" "to the fore-end," the recoil would "push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired."

69.     The ATF concluded this did not meet the statutory definition because "every subsequent shot depends on the shooter applying the appropriate amount of forward pressure to the fore-end and timing it to contact the trigger finger of the firing hand," and "each shot [was] fired by a single function of the trigger" because "the shooter pulls the firearm forward to fire each shot."

70.     Since the June 18, 2008 letter ruling, the ATF has issued approvals for at least 11 additional bump-stock devices that did not utilize springs.

71.     On June 26, 2008, the ATF approved a bump-stock device because "the absence of an accelerator spring … prevents the device from operating automatically" and thus was not a machinegun.

72.     On June 7, 2010, the ATF concluded that the Slide Fire bump stock, which is the type owned by Plaintiff, "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed."

73.     Accordingly, the ATF said that the Slide Fire "is a firearm part and is not regulated as a firearm under Gun Control Act or the National Firearm Act."

12

74.     On May 25, 2011, the ATF approved a stock designed to fit over a rifle and allow the rifle "to reciprocate back and forth in a linear motion," because the "absence of an accelerator spring or similar component in the submitted device prevents the device from operating automatically as described in ATF Ruling 2006-2."

75.     On March 9, 2011, the ATF approved "a sliding shoulder-stock type buffer-tube assembly" fitted over a rifle because it "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function."

76.     On April 2, 2012, the ATF approved a "plastic shoulder stock designed to function on an AR-15 type rifle" because it too required the application of "the appropriate amount of forward pressure to the fore-end," and thus was "incapable of initiating an automatic firing cycle."

77.     On July 9, 2012, the ATF approved a "replacement shoulder stock for a Saiga-12 type shotgun" which "allows the shotgun to slide back and forth, independently of the shoulder stock and pistol grip," and found that it "is a firearm part and is not regulated."

78.     On July 13, 2012, the ATF approved a "'bump fire' type stock designed for use with a semiautomatic AK-pattern type rifle," which allowed the rifle "to reciprocate back and forth in a linear motion," and found it was "NOT a machinegun under the NFA … or the GCA."

79.     On February 11, 2013, the ATF approved the "Bumpski" bump fire stock and, for the same reasons as above, concluded that "it is NOT a machinegun under the NFA … or the GCA."

80.     On May 1, 2013, the ATF approved the "HailStorm" "'bump-fire' type stock," once again because the device lacked "any operating springs, bands, or other parts which would permit automatic firing."

81.     On September 14, 2015, the ATF approved yet another bump-stock device because it too required manual input from the shooter and lacked springs or other similar parts.

82.     Finally, on April 6, 2017, the ATF again approved a "Bump Fire Stock" because, like all the others, the device required manual input from the shooter and lacked springs or other similar parts.

83.     Indeed, the ATF's position on these devices was so well established that on April 16, 2013, Richard W. Marianos, ATF Assistant Director for Public and Governmental Affairs, rejected a congressional request to reclassify bump stocks as machineguns.

84.     The ATF explained that, in the past, the "Akins Accelerator incorporated a mechanism to automatically reset and activate the fire-control components of a firearm," whereas modern bump stocks like "the Slide Fire Solutions stock," "require[] continuous multiple inputs by the user for each successive shot." Letter from Richard W. Marianos, ATF Assistant Director Public and Governmental Affairs, to Representative Ed Perlmutter, at 1-2 (Apr. 16, 2013).

85.     The ATF noted that bump fire stocks "do not fall within any of the classifications for firearm contained in Federal law" and the "ATF does not have the authority to restrict their lawful possession, use, or transfer." *Id*. at 2.

### III. ATF'S AND CONGRESS' ACTIONS FOLLOWING THE LAS VEGAS SHOOTING

86.     On October 1, 2017, a shooter opened fire on a large crowd of people in Las Vegas, Nevada, killing 58 people and injuring hundreds of others. *Final Rule*, 83 Fed. Reg. at 66516.

87.     Some of the firearms found at the scene reportedly were equipped with bump fire stocks.

88.     Following the Las Vegas mass shooting, there was significant political pressure on the ATF, Congress, and the Trump Administration to ban the ownership of bump stocks.

89.     Nevertheless, the ATF continued to insist that it had no legal authority to regulate bump stocks, consistent with more than 15 years of agency precedent, spanning three presidential administrations.

90.     On October 2, 2017, ATF Acting Director Thomas Brandon sent an email to a subordinate, asking "are these [bump stocks] 'ATF approved' as advertised?"

91.     On October 2, 2017, Acting Director Brandon received a reply that said, "They are approved as advertised as long as an individual doesn't perform additional modifications to the firearm."

92.     On October 4, 2017, Representative David Cicilline proposed H.R. 3947, "The Automatic Gunfire Prevention Act," which would have amended the GCA to prohibit any "trigger crank, a bump-fire device, or any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun."

93.     H.R. 3947 was never advanced in the House and lapsed with the conclusion of the 115th Congress.

94.     Also on October 4, 2017, Senator Dianne Feinstein proposed S. 1916, which was identical to H.R. 3947.

95.     On October 10, 2017, Representative Carlos Curbelo proposed H.R. 3999, which would have amended the GCA to prohibit bump-stock devices.

96.     The bill, which apparently recognized that bump stocks could not be classified as machineguns, would have added a new prohibition to the GCA for "any part or combination of parts that is designed and functions to increase the rate of fire of a semiautomatic rifle but does not convert the semiautomatic rifle into a machinegun."

97.     H.R. 3999 was never advanced in the House and lapsed with the conclusion of the 115th Congress.

98.     On October 31, 2017, Representative Brian Fitzpatrick introduced H.R. 4168, "Closing the Bump-Stock Loophole Act," to amend the NFA to require registration of any "reciprocating stock, or any other device which is designed to accelerate substantially the rate of fire of a semiautomatic weapon."

99.     H.R. 4168 also failed to advance in the House and expired with the conclusion of the 115th Congress.

100.    On December 26, 2017, after President Donald J. Trump asked his administration to review how bump stocks and similar devices were regulated, the ATF issued an "Advance Notice of Proposed Rulemaking" (ANPRM) asking for public comment as to whether bump stocks had been properly classified as "accessories" under federal law. 82 Fed. Reg. 60929 (Dec. 26, 2017).

101.    On February 20, 2018, President Trump issued a memorandum titled, "Presidential Memorandum on the Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices."

102.    In the memorandum President Trump "direct[ed] the Department of Justice to dedicate all available resources" "to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns" as "expeditiously as possible."

103.    On February 20, 2018, Senator Feinstein issued a press release in response to the presidential memo, which said, "The ATF currently lacks authority under the law to ban bump stocks. The agency made this clear in a 2013 letter to Congress, writing that 'stocks of this type are not subject to the provisions of federal firearms statutes.' The ATF director said the same

thing to police chiefs a few months ago, which they confirmed in an open Judiciary Committee hearing."

104.    On February 28, 2018, Senator Jeff Flake introduced S. 2475, the "Banning Unlawful Machinegun Parts Act of 2018," which would have amended both the NFA and the GCA to prospectively ban any unregistered device that "materially increases the rate of fire of the firearm" or "approximates the action or rate of fire of a machinegun."

105.    Like H.R. 3947 and H.R. 3999, this legislation recognized that such devices were "not a machinegun" under existing definitions.

106.    S. 2475 did not advance in the Senate and expired at the conclusion of the 115th Congress.

107.    On March 14, 2018, the Senate Judiciary Committee held a hearing where it considered Senator Feinstein's bump-stock legislation.

108.    At the hearing ATF Acting Director Brandon testified that legislation would be "clearly the best route" to attempt to regulate bump stocks, even though the ATF had by then already issued the ANPRM.

109.    Acting Director Brandon also testified that on October 1, 2017, he had consulted with "technical experts," "firearms experts" and "lawyers" within the ATF, and the consensus within the agency was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act."

110.    Acting Director Brandon testified, however, that he had since changed his position based on input from the Attorney General.

111.    S. 1916 did not advance from the Judiciary Committee and expired at the conclusion of the 115th Congress.

112.   Senator Feinstein issued a statement on March 23, 2018, saying in full:

Until today, the ATF has consistently stated that bump stocks could not be banned through regulation because they do not fall under the legal definition of a machine gun.

Now, the department has done an about face, claiming that bump stocks do fall under the legal definition of a machine gun and it can ban them through regulations. The fact that ATF said as recently as April 2017 that it lacks this authority gives the gun lobby and its allies even more reason to file a lawsuit to block the regulations.

Unbelievably, the regulation hinges on a dubious analysis claiming that bumping the trigger is not the same as pulling it. The gun lobby and manufacturers will have a field day with this reasoning. What's more, the regulation does not ban all devices that accelerate a semi-automatic weapons rate of fire to that of a machine gun.

Both Justice Department and ATF lawyers know that legislation is the only way to ban bump stocks. The law has not changed since 1986, and it must be amended to cover bump stocks and other dangerous devices like trigger cranks. Our bill does this—the regulation does not.

113.   Thus, even in the aftermath of the Las Vegas shooting, the ATF and Congress all maintained that bump stocks could not be deemed machineguns under existing federal law.

### IV. THE FINAL RULE

114.   On March 29, 2018, the ATF issued a "Notice of Proposed Rulemaking," (NPRM) proposing to classify bump stocks as machineguns, and to make amendments to ATF's definitions of machinegun in the Code of Federal Regulations. 83 Fed. Reg. 13442 (Mar. 29, 2018).

115.   The NPRM recounted how it had been issued "in response" to correspondence it had received "from members of the United States Senate and the United States House of Representatives, as well as nongovernmental organizations," and at the prompting of President Trump in his presidential memorandum, all "[f]ollowing the mass shooting in Las Vegas on October 1, 2017." 83 Fed. Reg. at 13443, 13446.

116.   On December 26, 2018, the Attorney General and the ATF issued their Final Rule. 83 Fed. Reg. at 66514.

117.   The Final Rule amends the statutory definition of a "machinegun" by amending three regulations, namely 27 C.F.R. §§ 447.11, 478.11 and 479.11.

118.   The amendment to Section 447.11 modifies the definition of "machinegun" under the Arms Export Control Act, 22 U.S.C. § 2778, pursuant to the President's authority to designate items on the United States Munitions List. *Final Rule*, 83 Fed. Reg. at 66553-54.

119.   The amendment to Section 478.11 modifies the definition of machinegun under the GCA, purportedly under the Attorney General's authority set out in 18 U.S.C. § 926(a). *Final Rule*, 83 Fed. Reg. at 66554.

120.   The amendment to Section 479.11 modifies the definition of machinegun under the NFA, purportedly under the authorization of 26 U.S.C. § 7805. *Final Rule*, 83 Fed. Reg. at 66554.

121.   Under the final rule all three definitions are the same.

122.   For all provisions, a "machinegun" means any weapon

> which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means *a single pull of the trigger* and analogous motions. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed *so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter*.

*Final Rule*, 83 Fed. Reg. at 66553-54 (emphasis added).

123.   Because these devices had been previously approved by the ATF for sale, "current possessors of these devices will be required to destroy the devices or abandon them at an ATF office prior to the effective date of the rule." *Final Rule*, 83 Fed. Reg. at 66514.

124.   The rule is scheduled to take effect on March 26, 2019. *Final Rule*, 83 Fed. Reg. at 66555.

125.   The ATF has estimated that as many as 520,000 bump-stock devices were sold legally between 2010 and 2018, each at a price of between $179.95 and $425.95. *Final Rule*, 83 Fed. Reg. at 66547.

126.   In total, the ATF has estimated that Americans spent $102.5 million on the purchase of these devices, all of which have now been ordered to be destroyed or surrendered to the ATF. *Final Rule*, 83 Fed. Reg. at 66547.

### COUNT I—VIOLATION OF U.S. CONSTITUTION, ARTICLE I, § 1— THE DEFENDANTS LACKED STATUTORY AUTHORITY TO ISSUE THE FINAL RULE PLAINTIFF V. DEFENDANTS

127.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

128.   Article I, § 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

129.   No agency has any inherent power to make law, and "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

130.   Congress did not prohibit the possession of bump-stock devices, including the Slide Fire, by statute.

131.   Congress gave only the Secretary of the Treasury substantive rulemaking authority under the National Firearms Act.

132.   Neither the Attorney General nor the Bureau of Alcohol, Tobacco, Firearms and Explosives has any substantive rulemaking authority under the NFA.

133.   The Final Rule, which was issued by the ATF and signed by the Acting Attorney General, purports to rewrite the definition of "machinegun" set out in the NFA.

134.   The Secretary of the Treasury has not approved the Final Rule.

135.   The Final Rule was issued without any statutory authority and therefore violates Article I, § 1 of the U.S. Constitution.

136.   As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring enforcement of the Final Rule against him and all those similarly situated within the jurisdiction of the United States District Court for the District of Utah, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.


**COUNT II—VIOLATION OF U.S. CONSTITUTION, ARTICLES I, §§ 1, 7 AND II, § 3—
THE DEFENDANTS HAVE VIOLATED THEIR CONSTITUTIONAL OBLIGATIONS
BY AMENDING CONGRESSIONALLY-APPROVED STATUTES
PLAINTIFF V. DEFENDANTS**

137.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

138.   Article I, § 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

139.   Article I, § 7, Clauses 2 and 3 of the Constitution require that "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law."

140.    Article II, § 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed … ."

141.    A Court is constitutionally obligated to "reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n. 9 (1984); *see also Webster v. Luther*, 163 U.S. 331, 342 (1896) ("[T]his court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute.")

142.    Congress did not prohibit the possession of bump-stock devices, including the Slide Fire, by statute.

143.    Bump stocks are not regulated "machineguns" under the text of the National Firearms Act *or* the Gun Control Act.

144.    Both the National Firearms Act and the Gun Control Act were passed by both chambers of the Congress and presented to the President for approval.

145.    The Final Rule directly and deliberately conflicts with the statutory definition of a "machinegun" set out in 26 U.S.C. § 5845(b) and incorporated at 18 U.S.C. § 921(23).

146.    The Final Rule was not passed by either chamber of the Congress nor was it presented to the President for approval.

147.    Instead, the Final Rule was written and signed by the ATF and Acting Attorney General, neither of whom is politically accountable to the American people.

148.    The Final Rule conflicts with the statutory text and thus violates Article I, § 1 of the U.S. Constitution.

149.    The ATF and the Acting Attorney General have rejected their sworn obligation to take care that the laws are faithfully executed under Article II, § 3 of the U.S. Constitution because

they have promulgated the Final Rule in direct conflict with the statutory text passed by Congress.

150.   The ATF and the Acting Attorney General have evaded the bicameralism and presentment requirements set out in Article I, § 7 of the U.S. Constitution because they have amended Congressionally-approved statutes, which were passed in compliance with these procedures, without also following the required processes.

151.   The ATF and the Acting Attorney General have also evaded the bicameralism and presentment requirements set out in Article I, § 7 of the U.S. Constitution because Congress considered at least five different bills during the 115th Congress, which would have regulated bump stocks, but it did not enact any of them.

152.   Rather than allow the democratic process to function as the Constitution requires, the ATF and the Acting Attorney General promulgated the Final Rule without statutory input from Congress.

153.   As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring enforcement of the Final Rule against him and all those similarly situated within the jurisdiction of the United States District Court for the District of Utah, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT III—VIOLATION OF U.S. CONSTITUTION, ARTICLES I, § 1 AND II, § 3— NON-DIVESTMENT
## PLAINTIFF V. DEFENDANTS

154.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

155.   Article I, § 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

156.    Article II, § 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed … ."

157.    A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

158.    Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

159.    Neither the President no his subordinates, therefore, may exercise,  Congress' legislative power to declare entirely "what circumstances … should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418-19 (1935).

160.    Congress did not prohibit the possession of bump-stock devices, including the Slide Fire, by statute.

161.    Bump stocks are not regulated "machineguns" under the text of the National Firearms Act *or* the Gun Control Act.

162.    Ownership of the Slide Fire bump stock has not been prohibited by any act of Congress.

163.    Congress considered at least five different bills during the 115th Congress, which would have regulated bump stocks, but it did not enact any of them.

164.    The Acting Attorney General, at the President's direction, promulgated the Final Rule to criminalize conduct not covered by statute.

165.    The Attorney General is also tasked with enforcing and prosecuting violations of the NFA, the GCA, and the new requirements set out in the Final Rule. The Acting Attorney

24

General's statutory rewrite will make owners of the estimated 520,000 lawfully acquired bump stocks into felons, despite the lack of a statutory prohibition on these items.

166.   Congress did not divest itself of the authority to define the term "machinegun" under the NFA and GCA.

167.   Even if Congress wanted to divest itself of that authority, it could not do so because defining crimes is an essential legislative function reserved exclusively for Congress.

168.   Congress may not divest itself of the authority to define the term "machinegun" under the NFA and GCA, because doing so would allow the Executive Branch, not Congress, to define what circumstances will be made criminal.

169.   The Final Rule violated Article I, § 1 and Article II, § 3 of the U.S. Constitution because it improperly defined a crime even though Congress did not delegate the authority to define the term "machinegun."

170.   The Final Rule also violated Article I, § 1 and Article II, § 3 of the U.S. Constitution because, even if Congress attempted to divest itself of its legislative power, the Executive Branch may not rewrite criminal prohibitions in this fashion.

171.   As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring enforcement of the Final Rule against him and all those similarly situated within the jurisdiction of the United States District Court for the District of Utah, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT IV—VIOLATION OF U.S. CONSTITUTION, ARTICLES I, § 1 AND II, § 3— VIOLATION OF THE SEPARATION OF POWERS PLAINTIFF V. DEFENDANTS

172.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

173.   Article I, § 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

174.   Article II, § 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed … ."

175.   "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 756-57 (1996).

176.   Congress did not prohibit the possession of bump-stock devices, including the Slide Fire, by statute.

177.   Bump stocks are not regulated "machineguns" under the text of the National Firearms Act *or* the Gun Control Act.

178.   Ownership of the Slide Fire bump stock has not been prohibited by any act of Congress.

179.   Congress considered at least five different bills during the 115th Congress, which would have regulated bump stocks, but it did not enact any of them.

180.   The Acting Attorney General, at the President's direction, promulgated the Final Rule to criminalize conduct not covered by statute.

181.   The Attorney General is also tasked with enforcing and prosecuting violations of the NFA, the GCA, and the new requirements set out in the Final Rule.

182.   The Acting Attorney General's purported interpretation will make owners of the estimated 520,000 lawfully acquired bump stocks into felons, despite the lack of a statutory prohibition on these items.

183.    The Acting Attorney General may not define the scope of a criminal statute that he is tasked with enforcing, because that would combine the lawmaking and law-enforcing powers in the same person or entity—which violates the separation of powers.

184.    It is intolerable for the law-making and law-enforcing powers to be combined in the person of a single individual officeholder when criminal penalties are at stake.

185.    The Final Rule therefore violates the separation of powers established by Article I, § 1 and Article II, § 3 of the U.S. Constitution.

186.    As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring enforcement of the Final Rule against him and all those similarly situated within the jurisdiction of the United States District Court for the District of Utah, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.


## COUNT V—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C) – RULE IN EXCESS OF STATUTORY AUTHORITY PLAINTIFF V. DEFENDANTS

187.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

188.    Under the National Firearms Act, Congress provided the Attorney General with the authority to administer and enforce the statute. 26 U.S.C. § 7801(a)(1)(2)(A).

189.    Congress also provided the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), under the authority of the Attorney General, with the authority to issue certain "rulings and interpretations" related to the National Firearms Act's requirements. 26 U.S.C. § 7801(a)(2)(B).

190.    Congress granted the Secretary of the Treasury the authority to "prescribe all needful rules and regulations for the enforcement of [the National Firearms Act], including all rules and

regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a).

191.    Neither the Attorney General nor the ATF has any substantive rulemaking authority under 26 U.S.C. § 7805(a).

192.    With respect to the Gun Control Act, Congress granted the Attorney General the authority to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA. 18 U.S.C. § 926(a).

193.    This authority had previously belonged to the Secretary of the Treasury. *See* Pub.L. 107-296, Title XI, § 1112(f)(6), Nov. 25, 2002, 116 Stat. 2276 (transferring Secretary's authority to the Attorney General).

194.    The Attorney General has delegated his authority under the GCA to the ATF. 28 C.F.R. § 0.130(a)(1).

195.    The statutory definition of machinegun is set out in the NFA at 26 U.S.C. § 5845(b).

196.    The GCA incorporates that definition by reference at 18 U.S.C. § 921(23).

197.    The Final Rule, which was issued by the ATF and signed by the Acting Attorney General, purports to rewrite the definition of "machinegun" set out in the NFA at 26 U.S.C. § 5845(b).

198.    The Final Rule attempts to incorporate this rewritten definition by reference in the GCA.

199.    The Final Rule was issued under the Acting Attorney General's claimed authority under 18 U.S.C. § 926(a) and 26 U.S.C. §§ 7801(a)(2)(A), 7805(a).

200.    The Attorney General has no substantive rulemaking authority related to the NFA under 26 U.S.C. § 7805(a).

201.    Only the Secretary of the Treasury has substantive rulemaking authority related to the

NFA under 26 U.S.C. § 7805(a).

202.    The Secretary of the Treasury has not approved the Final Rule.

203.    The Attorney General's rulemaking authority under 18 U.S.C. § 926(a) cannot operate to

rewrite a separate statute under which the Attorney General has no substantive rulemaking

authority.

204.    The Attorney General's administrative and enforcement authority under 26 U.S.C.

§ 7801(a)(2)(A) does not allow the Attorney General to issue substantive rules.

205.    The ATF's interpretive authority under 26 U.S.C. § 7801(a)(2)(B) does not allow the

ATF to issue substantive rules.

206.    The Acting Attorney General lacks the statutory authority to issue the Final Rule,

revising the statutory definition found in 26 U.S.C. § 5845(b).

207.    The Final Rule was issued in excess of statutory authority and is therefore invalid.

208.    As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent

injunction barring enforcement of the Final Rule against him and all those similarly situated

within the jurisdiction of the United States District Court for the District of Utah, attorneys'

fees, expenses, costs and disbursements, and any other relief that may be appropriate.

**COUNT VI—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. §§ 706(2)(A), (C), RULE IN EXCESS OF STATUTORY AUTHORITY
AND OTHERWISE NOT IN ACCORDANCE WITH LAW
PLAINTIFF V. DEFENDANTS**

209.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth

herein.

210.    As defined by Congress, under both the GCA and NFA, the term "machinegun" "means

any weapon which shoots, is designed to shoot, or can be readily restored to shoot,

automatically more than one shot, without manual reloading, by a single function of the trigger.

The term shall also include the frame or receiver of any such weapon, any part designed and

intended solely and exclusively, or combination of parts designed and intended, for use in

converting a weapon into a machinegun, and any combination of parts from which a

machinegun can be assembled if such parts are in the possession or under the control of a

person." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(23) ("The term 'machinegun' has the

meaning given such term in section 5845(b) of the National Firearms Act.").

211.    The Supreme Court has explained that the term "automatically" means the firearm will

continue to fire rounds without additional "manual manipulation" by the operator after the

initiation of firing. *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994).

212.    The phrase "single function of the trigger" means the operator engages the triggering

mechanism through a single physical act.

213.    Courts have said that a "single function of the trigger" can be accomplished by any

physical manipulation that initiates a firing sequence, whether or not the shooter pulls a lever on

the firearm. *See United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002).

214.    A "single function of the trigger" means that the trigger does not mechanically reset

between shots.

215.    The Slide Fire bump-stock device is a hollow shoulder stock intended to be installed over

the rear of an AR-15, and it is intended to assist persons whose hands have limited mobility to

"bump-fire" an AR-15 type rifle.

216.    The stock has no automatically functioning mechanical parts or springs and performs no

automatic mechanical function when installed.

217.   In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand.

218.   The recoil from the initial shot pushes the firearm rearward and causes the trigger to lose contact with the finger and manually reset.

219.   By applying continuous forward pressure with the non-trigger hand, the shooter is able to force the trigger back into his trigger finger and thus re-engages by "bumping" the shooter's stationary finger into the trigger.

220.   Under the *statutory* definition, the Slide Fire bump stock is not a machinegun because it requires additional manual manipulation of the firearm by the operator to place another round in the chamber after each round is fired.

221.   Under the *statutory* definition, the Slide Fire bump stock is not a machinegun because it requires the shooter to manually engage a single function of the trigger for each round that is fired.

222.   Under the *statutory* definition, the Slide Fire bump stock is not a machinegun because the trigger mechanism manually resets between each round that is fired.

223.   The new rule defines a machinegun as any weapon

> which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger and analogous motions. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil

energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

*Final Rule*, 83 Fed. Reg. at 66553-54.

224.    The Final Rule conflicts with the statutory definition because it expands the definition of "automatically" to exclude any type of additional manual manipulation of the firearm by the operator that places another round in the chamber after each round is fired, other than the rearward action of the trigger mechanism.

225.    The Final Rule also conflicts with the statutory definition because it limits the definition of a "single function of the trigger" only to a "single pull of the trigger," even where a shooter can manually engage the trigger's function without "pulling" the trigger.

226.    The Final Rule further conflicts with the statutory definition because it expands the phrase "single function of the trigger" to include a series of shots between which the trigger function manually resets.

227.    The Final Rule is an unreasonable and arbitrary and capricious interpretation of the statutory definition because it expands the definition of "automatically" to ignore any type of additional manual manipulation of the firearm by the operator that places another round in the chamber after each round is fired, other than the rearward action of the trigger mechanism.

228.    The Final Rule is an unreasonable and arbitrary and capricious interpretation of the statutory definition because it limits the definition of a "single function of the trigger" only to a "single pull of the trigger," even where a shooter can manually cause the trigger's function without "pulling" the trigger.

229.    The Final Rule is an unreasonable and arbitrary and capricious interpretation of the statutory definition because it expands the phrase "single function of the trigger" to include a series of shots between which the trigger function manually resets.

230.    The Final Rule was issued in excess of statutory jurisdiction, authority, limitations and short of statutory right and is therefore invalid under 5 U.S.C. § 706(2)(C).

231.    The Final Rule is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and is therefore invalid under 5 U.S.C. § 706(2)(A).

232.    As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring enforcement of the Final Rule against him and all those similarly situated within the jurisdiction of the United States District Court for the District of Utah, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT VII—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A), RULE IS ARBITRARY AND CAPRICIOUS PLAINTIFF V. DEFENDANTS

233.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

234.    Prior to the Las Vegas shooting on October 1, 2017, the ATF had consistently and frequently insisted that that bump-fire stocks, "do not fall within any of the classifications for firearm contained in Federal law" and the "ATF does not have the authority to restrict their lawful possession, use, or transfer." Letter from Richard W. Marianos, ATF Assistant Director Public and Governmental Affairs, to Representative Ed Perlmutter, at 2 (Apr. 16, 2013).

235.    The FTB examined and reviewed the Slide Fire bump stock in 2010 and concluded that it was not a machinegun.

236.   The Slide Fire bump stock owned by Plaintiff is materially identical to the stock approved by the ATF in 2010.

237.   On October 1, 2017, ATF Acting Director Brandon consulted with "technical experts," "firearms experts" and "lawyers" within the ATF, who confirmed that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act."

238.   The ATF reconsidered its position only in response to directions from the President of the United States and the Department of Justice.

239.   The ATF did not conduct any additional technical analysis of bump stocks prior to issuing the Final Rule.

240.   The ATF did not reexamine the Slide Fire before promulgating the Final Rule.

241.   The ATF relied on factors which Congress had not intended it to consider when it promulgated the Final Rule because it addressed a purely political question not within the ATF's authority to consider.

242.   The ATF's Final Rule also runs counter to the evidence before the agency, and its reversal was not prompted by any new evidence.

243.   The ATF's Final Rule runs counter to the evidence before the agency, because it rejected the technical conclusions of its own experts at the insistence of the Department of Justice and the President.

244.   The ATF's Final Rule is not a product of the agency's expertise, because it contradicts the agency's expert conclusions going back to at least 2006.

245.   The ATF's Final Rule was issued after the Acting Attorney General overruled the ATF's technical determination in favor of a policy determination on which the ATF had no expertise.

246.   The Final Rule is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and is therefore invalid under 5 U.S.C. § 706(2)(A).

247.   As a result of the foregoing, Plaintiff is entitled to a declaratory judgment and permanent injunction barring enforcement of the Final Rule against him and all those similarly situated within the jurisdiction of the United States District Court for the District of Utah, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff Mr. Aposhian demands judgment against Defendants as follows:

(i) The issuance of a preliminary injunction prohibiting Defendants from enforcing the Final Rule against Plaintiff;

(ii) The issuance of a preliminary injunction prohibiting Defendants from enforcing the Final Rule against all persons similarly situated to the Plaintiff within the jurisdiction of the United States District Court for the District of Utah;

(iii) A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that the Final Rule promulgated by Defendants is unenforceable against Plaintiff;

(iv) A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that the Final Rule promulgated by Defendants is unenforceable against all persons similarly situated to the Plaintiff within the jurisdiction of the United States District Court for the District of Utah;

(v) The issuance of a permanent injunction prohibiting Defendants from enforcing the Final Rule against Plaintiff;

(vi) The issuance of a permanent injunction prohibiting Defendants from enforcing the

Final Rule against all persons similarly situated to the Plaintiff within the jurisdiction of the

United States District Court for the District of Utah;

(vii) An award of attorneys' fees and costs to Plaintiff; and

(viii) Any other relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.


January 16, 2019

Respectfully,

SALCIDO LAW FIRM PLLC


/s/ Gerald M. Salcido_____
LOCAL COUNSEL




*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
**Steve Simpson**
Senior Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
*Counsel for Plaintiff*
Application for Admission *Pro Hac
Vice* Pending