**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217

Counsel for Plaintiff
Admitted *pro hac vice*

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT COURT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| W. CLARK APOSHIAN, | CIVIL ACTION NO.: 2:19-cv-00037-JNP |
| Plaintiff, | **MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| MATTHEW WHITAKER ACTING ATTORNEY GENERAL OF THE UNITED STATES, et al. | |
| Defendants. | |

## I. RELIEF SOUGHT AND THE SPECIFIC GROUNDS FOR THE MOTION

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiff, W. Clark

Aposhian, moves for a preliminary injunction prohibiting Defendants, Matthew Whitaker,

Acting Attorney General of the United States, the United States Department of Justice, Thomas

E. Brandon, Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and

the Bureau of Alcohol, Tobacco, Firearms and Explosives, from enforcing the Final Rule, *Bump-*

*Stock-Type Devices*, 83 Fed. Reg. 66514, 66553-54 (Dec. 26, 2018), against him pending trial in

this matter.

1

Unless enjoined from enforcing the Final Rule, which becomes effective on March 26, 2019, Mr. Aposhian will be forced to either destroy or surrender his lawfully acquired property to the ATF or face criminal prosecution. The Final Rule was enacted in violation of constitutional limits on the government's authority as well as specific statutory limits on the ATF's authority, and Mr. Aposhian will likely succeed on the merits in this case. Finally, the balance of equities favors the injunction as Mr. Aposhian's interest in his constitutional and statutory rights vastly outweighs the government's interest in enacting the Final Rule without delay.

## II. FACTS

As set out in his Complaint, Plaintiff has been ordered by the Defendants to destroy or surrender a Slide Fire bump-stock device, which he legally purchased, by March 26, 2019, or face criminal prosecution.

Mr. Aposhian purchased his bump stock in reliance on the Bureau of Alcohol, Tobacco, Firearms and Explosive's prior determination that the device "is a firearm part and is not regulated as a firearm under [the] Gun Control Act or the National Firearms Act." Declaration of W. Clark Aposhian in Support of Plaintiff's Motion for Preliminary Injunction (Exhibit A); John R. Spencer, Chief, Firearms Technology Branch, *Slide Fire Approval Letter* (June 7, 2010) (Exhibit B). Mr. Aposhian continues to possess his Slide Fire device for lawful purposes. (Exhibit A.)

Despite the ATF's prior determination, the ATF issued a Final Rule on December 26, 2018, which altered the statutory definition of a prohibited "machinegun" to include the Slide Fire bump stock. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514, 66553-54 (Dec. 26, 2018). The Final Rule directs Mr. Aposhian "to destroy the device[] or abandon [it] at an ATF office prior

to" "March 26, 2019." *Id.* at 66514, 66555. If Mr. Aposhian continues to possess his Slide Fire bump stock after March 26, 2019, he faces potential criminal prosecution and a federal prison sentence of up to 10 years, pursuant to 18 U.S.C. §§ 922(o), 924(a)(2).

## III. ARGUMENT

Mr. Aposhian is entitled to a preliminary injunction if he shows: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). For the reasons that follow, Mr. Aposhian has satisfied all four elements of this test.

### A. Mr. Aposhian Is Likely to Prevail on the Merits

No agency has any inherent power to make law. Article I, § 1 of the U.S. Constitution vests "[a]ll legislative powers" in the Congress, and Article II, § 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed … ." Under this structure "the lawmaking function belongs to Congress … and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996). Further, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

The Administrative Procedure Act (APA) separately allows a Court to "hold unlawful and set aside" an agency's rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

In "review[ing] an agency's construction of [a] statute which it administers," the first question for the court is "whether Congress has directly spoken to the precise question at issue."

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter, for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Under this analysis, the court "must reject administrative constructions which are contrary to clear congressional intent," because the "judiciary is the final authority on issues of statutory construction." *Id.* at n. 9; *see also Webster v. Luther*, 163 U.S. 331, 342 (1896) ("[T]his court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute."). An agency interpretation is never valid if it is "arbitrary, capricious, or manifestly contrary to the statute." *In re FCC 11-161*, 753 F.3d 1015, 1041 (10th Cir. 2014).

The Final Rule is invalid because it was issued without statutory authorization, conflicts with statutory language, is an unreasonable agency interpretation of statutory language, and constitutes arbitrary and capricious agency activity. The Final Rule therefore constitutes an unconstitutional legislative act under Articles I, § 1 and II, § 3 of the U.S. Constitution and violates statutory limitations established by the Administrative Procedure Act.

**1. As Set Out in Counts I and V, the Final Rule Was Issued Without Statutory Authority, Violating Article I, § 1 and Article II, § 3 of the U.S. Constitution and 5 U.S.C. § 706(2)(C)**

In 1934 Congress passed the National Firearms Act (NFA), which regulated firearms under Congress' power to lay and collect taxes. *See United States v. Dalton*, 960 F.2d 121, 124 (10th Cir. 1992). Under the NFA, Congress criminalized the possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law. *See* 26 U.S.C. §§ 5812(a), 5861.

In 1968, Congress passed the Gun Control Act (GCA) criminalizing possession of firearms for certain classes of people. *See* 18 U.S.C. § 921 et seq. Congress later amended the

GCA prospectively outlawing most machineguns, and simultaneously making it unlawful for any person to register those machineguns. *Dalton*, 960 F.2d at 122-23. Today, with limited exceptions for governmental actors and machineguns that were in existence and registered prior to the effective date of the statute, May 19, 1986, it is a felony offense, punishable by up to 10 years in federal prison, for any person to "transfer or possess a machinegun." 18 U.S.C. §§ 922(o), 924(a)(2).

Congress set out a definition of "machinegun" in the NFA at 26 U.S.C. § 5845(b). This definition was then incorporated by reference into the GCA at 18 U.S.C. § 921(23).

Congress also attempted to delegate certain administrative powers under the NFA. First, Congress granted the Secretary of the Treasury the authority to "prescribe all needful rules and regulations for the enforcement of [the NFA], including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a). By contrast, Congress provided the Attorney General only with the authority to administer and enforce the NFA. 26 U.S.C. § 7801(a)(1)(2)(A). Congress also provided the ATF, under the authority of the Attorney General, with the authority to issue certain "rulings and interpretations" related to the NFA's requirements. 26 U.S.C. § 7801(a)(2)(B). Neither the Attorney General nor the ATF has any substantive rulemaking authority under 26 U.S.C. § 7805(a).

Congress attempted to delegate different administrative powers under the GCA. Congress granted the Attorney General the authority to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA. 18 U.S.C. § 926(a). This authority had previously belonged to the Secretary of the Treasury. *See* Pub.L. 107-296, Title XI, § 1112(f)(6), Nov. 25, 2002, 116 Stat. 2276 (transferring Secretary's authority to the Attorney General). The Attorney General has delegated his authority under the GCA to the ATF. 28 C.F.R.

§ 0.130(a)(1).

Even though neither the Attorney General nor the ATF has any substantive rulemaking authority under the NFA, the Final Rule attempts to rewrite the definition of "machinegun" set out in the NFA at 26 U.S.C. § 5845(b). The Final Rule was issued by the ATF and signed by the Acting Attorney General, but it was not approved or promulgated by the Secretary of the Treasury. *Final Rule*, 83 Fed. Reg. at 66514. Instead, the ATF relied on the Attorney General's authority "to promulgate regulations necessary to enforce provisions of the NFA and GCA" under "18 U.S.C. 926(a)" and "26 U.S.C. 7801(a)(2)(A), 7805(a)" as a basis of authority for issuing the Final Rule. *Id.* at 66515.

But the Attorney General *has no* substantive rulemaking authority under the NFA. First, the Attorney General has no substantive rulemaking authority under 26 U.S.C. § 7805(a) because that authority was never "expressly given" to him under Title 26. Indeed, the only power expressly given to the Attorney General or the ATF under the NFA was that of "administration and enforcement" of the statute and "interpretation[]" of its terms. 26 U.S.C. §§ 7801(a)(1)(2)(A), (a)(2)(B). Issuing a substantive rule that rewrites a statutory definition and creates half a million new felons is not an act of "administration and enforcement" that the Attorney General is empowered to undertake, nor is it an act of "interpretation[]" authorized to the ATF. The Acting Attorney General and ATF therefore had no power to issue the Final Rule as it relates to the NFA.

The Attorney General's authority under the GCA also cannot support the Final Rule. The GCA allows the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of" the GCA. 18 U.S.C. § 926(a). But the Final Rule alters the statutory text of the NFA, not just the GCA. Even if the Final Rule was "necessary" to carry out

the criminal statute, the definition of machinegun is not under this title. The Acting Attorney General's authority under Section 926(a) cannot allow him to rewrite the text of a separate statute, over which he has *not* been given any rulemaking authority.

None of the sources of authority cited in the Final Rule allow the Acting Attorney General to alter the definition of a "machinegun" in the NFA, and the Final Rule was therefore issued without statutory authorization. The Final Rule is unconstitutional under Articles I, § 1 and II, § 3 of the U.S. Constitution and is therefore void. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374.

### 2. As Set Out in Counts II and VI, the Final Rule Conflicts with the Statute, Violating Article I, § 1 and Article II, § 3 of the U.S. Constitution and 5 U.S.C. § 706(2)(C)

Congress' intent is clear, and the Final Rule runs counter to the language set out by Congress in the National Firearms Act. The Final Rule therefore conflicts with the plain language of the statute and is invalid under Articles I, § 1 and II, § 3 of the Constitution and under the APA.

The NFA requires that the weapon at issue be able to "to shoot, *automatically* more than one shot, without manual reloading, by a *single function of the trigger*." 26 U.S.C. § 5845(b) (emphasis added).

The Supreme Court has already explained that this language

> refer[s] to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire *until its trigger is released* or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act. We use the term 'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger, and *which requires no manual manipulation by the operator to place another round in the chamber after each round is fired*.

*Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994) (emphasis added).

A weapon functions "automatically" when it "discharge[s] multiple rounds" "as the result of a self-acting mechanism" "that is set in motion by a single function of the trigger and is accomplished without manual reloading." *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009).

The ATF has long recognized that a machinegun is a firearm that commences firing after the manual activation of a trigger, which then "initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted." *Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm*, ATF Rul. 2006-2, at 3 (Dec. 13, 2006) (Exhibit C). This does not include a firearm that "require[s] continuous multiple inputs by the user for each successive shot," even if the multiple user inputs are directed at parts of the firearm other than the trigger mechanism. Letter from Richard W. Marianos, ATF Assistant Director Public and Governmental Affairs, to Representative Ed Perlmutter, at 2 (Apr. 16, 2013) (Exhibit D).

The Final Rule changes the statutory terms and defines certain devices as machineguns even when they do not initiate an automatic firing cycle from a single function of a trigger. Machineguns fire more than once after a shooting engages the trigger mechanism once. But the Final Rule now says that machineguns also include firearms that fire only once after a single function of the trigger. To get to this outcome, the Final Rule simply disregards a shooter's manual manipulation of his firearm, even when it engages the trigger function between shots, so long as it is not the precise act of *pulling* the trigger lever. This new definition is invalid.

This new definition conflicts with the statute, first, because it improperly defines the term "automatically" to disregard a shooter's additional manual manipulation of the firearm. Instead of requiring that the firearm continuously operate without additional "manual manipulation by

8

the operator," *Staples*, 511 U.S. at 602 n. 1, the rule says that additional physical manipulation is irrelevant if it is not the "physical manipulation of the *trigger* by the shooter." *Final Rule*, 83 Fed. Reg. at 66553-54 (emphasis added). Bump stocks, which require the shooter to "maintain[] constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, and maintain[] the trigger finger on the device's extension ledge with constant rearward pressure," are now deemed machineguns by the Final Rule because the "shooter [allegedly] 'pulls' the trigger once." *Final Rule*, 83 Fed. Reg. at 66518, 66533.[1] The ATF now insists that the shooter's manual manipulation by the "the non-trigger hand" is insufficient. *Final Rule*, 83 Fed. Reg. at 66518, 66533.

But this view of what it means to automatically continue fire without additional physical manipulation cannot be reconciled with the statute. The text does not restrict where and how the additional manual manipulation occurs, it simply says that automatic fire occurs "automatically" after a "single function of the trigger." 26 U.S.C. § 5845(b). Limiting the meaning to ignore manual manipulation of any part other than the trigger conflicts with text and with prior court interpretation. Further, the ordinary definition of the term "automatic," refers only to the series of shots "set in motion by a single function of the trigger and [] accomplished without manual reloading." *Olofson*, 563 F.3d 652, 658. If a firearm requires separate physical input, even if not directed to the *trigger mechanism*, this still disrupts the automatic firing of each successive shot. (*See* Exhibit C at 2.) The new rule therefore is invalid for this reason.

Second, the rule improperly defines "single function of the trigger" to disregard mechanical resets of a trigger mechanism. The statute speaks to a series of shots initiated by the

---

[1] Mr. Aposhian does not agree that operating a bump stock involves only manual manipulation by the non-shooting hand. As the ATF recognized, operating a bump stock also requires the shooter to "re-engage [the trigger] by 'bumping' the shooter's stationary finger" into the trigger. *Final Rule*, 83 Fed. Reg. at 66516.

"single function of the trigger" and "automatically" continuing from that same physical act. 26

U.S.C. § 5845(b). This means the firearm "automatically continue[s] to fire *until its trigger is*

*released* or the ammunition is exhausted." *Staples*, 511 U.S. at 602 n. 1 (emphasis added). The

ATF has recognized that bump stocks are not machineguns, in part, because they allow the

trigger to "mechanically reset" between shots. John R. Spencer, Chief, Firearms Technology

Branch, *Approval Letter* at 2 (June 18, 2008) (Exhibit E). Each shot cannot therefore be said to

arise from a "single function." *Id.* While the ATF still agrees that bump stocks cause a firearm's

trigger to lose contact with the shooter's finger and manually reset, the new rule says that "the

trigger reset[]" is irrelevant unless the shooter provides "additional physical manipulation of the

*trigger*" between shots. *Final Rule*, 83 Fed. Reg. at 66516-17. But the statute's careful and

deliberate use of the phrase "single function of the trigger" does not allow the ATF to disregard

the mechanical significance of the trigger reset.

Finally, the new rule conflicts with the statutory language because it improperly limits the

phrase "single function of a trigger" to mean *only* "a single *pull* of the trigger" accomplished by

a single "physical manipulation of the trigger" by the shooter. The ATF's new definition would

discount additional functions of the trigger that are not accomplished by the shooter's actual

"pull" on the trigger mechanism.

The statute focuses on the trigger's "function," and it expressly encompasses conduct

beyond merely pulling a piece of metal. 26 U.S.C. § 5845(b). *Pulling* a trigger lever is certainly

one way that a trigger may function, but it is not the only way.

The ATF even noted in the Final Rule that "the courts have made clear that whether a

trigger is operated through a 'pull,' 'push,' or some other action such as a [*sic*] flipping a switch,

does not change the analysis of the functionality of a firearm." *Final Rule*, 83 Fed. Reg. at 66518

10

n. 5. What matters for the statutory analysis is whether a shooter performs a single act, which in turn causes more than one "function of the trigger." *See United States v. Akins*, 312 F. App'x 197, 200 (11th Cir. 2009) (unpublished) (device was a machinegun because, "[a]fter a single *application* of the trigger by a gunman, the Accelerator uses its internal spring and the force of recoil to fire continuously the rifle cradled inside until the gunman releases the trigger or the ammunition is exhausted") (emphasis added); *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (internal citation and quotation marks omitted) ("single function of the trigger" "implies no intent to restrict" the meaning to only encompass "pulling a small lever," and instead means any action that "initiated the firing sequence"); *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002) (minigun was machinegun because it fired automatically following a single activation of an electronic on-off switch).

The new rule, however, does what the ATF claims to have disavowed; it elevates one specific movement—a "pull of the trigger"—to a determinate place. If a shooter pulls only once, or perhaps not at all, but merely *pushes* a firearm with his non-trigger hand in a way that causes the trigger to function more than once, the new rule says he is firing a machinegun. The rule recognizes that bump stocks require the shooter to "re-engage[ the trigger] by 'bumping' the shooter's stationary finger" into the trigger by applying continuous forward pressure, but insists that this is not a "pull of the trigger" because it is not a *backward* action on the trigger lever. *Final Rule*, 83 Fed. Reg. at 66516. But a shooter can operate a firearm's trigger by repeatedly pushing the weapon *into* his stationary finger, whether or not he is using a bump stock. And this rule would absurdly consider such a *person* a machinegun if he did so.

Ultimately, the ATF has obliterated the statutory distinction between automatic and semi-automatic weapons that was set out by Congress. But Congress set out that distinction, and the

11

ATF cannot unilaterally alter the statute to serve its preferred policy objectives. The Final Rule is therefore invalid.

### 3. As Set Out in Count VI, the Final Rule Adopts an Unreasonable Interpretation of the Statute, Violating 5 U.S.C. § 706(2)

Even if this Court were to conclude that the rule is not in direct conflict with the statute, the ATF's construction of the definition of machinegun must still be set aside. The Court owes no deference to the ATF's construction of the NFA in this case. Further, even if the Court were to defer to the ATF's construction, it is so unreasonable that it still must be rejected.

*Chevron* deference is nothing more than "a rule of thumb, guiding courts in an effort to respect that leeway which Congress intended the agencies to have." *SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1364 (2018) (Breyer, J., dissent). And this "rule of thumb" gives way in a variety of contexts.

First, courts do not generally defer to an agency's unexplained change in interpretation. *See Watt v. Alaska*, 451 U.S. 259, 273 (1981) ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference."). This exception is because deference assumes that an agency has operated with a better understanding of the statute it has been tasked with administering than a court. *See Chevron*, 467 U.S. at 865 (deference is premised on assumption that agency "with great expertise and charged with responsibility for administering the provision would be in a better position to do so" than courts). But, "[u]nexplained inconsistency" signals something other than expertise. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., Inc.*, 545 U.S. 967, 981 (2005). Further, an agency must provide a "reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by [] prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

The Court owes no deference here because the ATF has not provided adequate justification for its shift in policy. As set out below, the ATF consistently interpreted the statutory language to exclude bump stocks for well over a decade, and did so even after the tragic Las Vegas shooting on October 1, 2017. This consistent history of interpretation across administrations of both political parties was based on the agency's physical examination of these devices and its expertise in the area. Suddenly, the ATF changed course without conducting additional physical examinations, and without providing adequate reasons for disregarding its prior interpretation. The new interpretation is therefore not owed any deference. *See Fox*, 556 U.S. at 516.

Second, the ATF disregarded its own expertise in writing the rule, and thus no deference is warranted for this reason as well. A Court does not owe an agency deference when it interprets a statute "not in [its] area of expertise." *United States v. Ochoa-Colchado*, 521 F.3d 1292, 1298 (10th Cir. 2008). But even after the Las Vegas shooting, ATF Acting Director Thomas E. Brandon consulted with "technical experts," "firearms experts" and "lawyers" within the ATF, and the consensus within the agency was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act." *See Something, Say Something: Oversight of the Parkland Shooting and Legislative Proposals to Improve School Safety: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (Mar. 14, 2018) (Judiciary Comm. Testimony) (testimony of Acting Director Brandon). Nevertheless, the agency issued the Final Rule at the insistence of the President and the Acting Attorney General, overruling the experts within the agency. *See id.* Because the ATF disavowed its own expertise in crafting the rule, it is not entitled to any deference. *See Ochoa-Colchado*, 521 F.3d at 1298.

13

Third, the ATF is owed no deference here because to do so would violate the separation of powers. A court owes no deference to a prosecutor's interpretation of a criminal law. *Abramski v. United States*, 134 S.Ct. 2259, 2274 (2014). Instead, "any ambiguity concerning the ambit of criminal statutes" is resolved "in favor of lenity." *Yates v. United States*, 135 S.Ct. 1074, 1088 (2015) (internal citation and quotation marks omitted). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

The Tenth Circuit, sitting *en banc*, has recognized that the rule of lenity limits deference to agency interpretation, and has required that agency interpretation not only be reasonable, but also "not in conflict with interpretive norms regarding criminal statutes." *N.L.R.B. v. Oklahoma Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir. 2003). To defer, in such instances, would "upend ordinary principles of interpretation" and allow "federal administrators [to] in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain." *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., statement regarding denial of certiorari, joined by Thomas, J.). The application of *Chevron* deference in such a setting "threatens a complete undermining of the Constitution's separation of powers, while the application of the rule of lenity preserves them by *maintaining the legislature as the creator of crimes*." *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1030 (6th Cir. 2016) (Sutton, J., concurring and dissenting in part) (emphasis added) *reversed on other grounds by* 137 S.Ct. 1562 (2017). As then-judge Gorsuch recognized, these separation of powers concerns are at their peak when a court is "required to overrule [its] own declarations about the meaning of existing law in favor of interpretations directed by executive agencies," pursuant to the doctrine set out in *Nat'l Cable &*

14

*Telecomm. Ass'n v. Brand X Internet Servs., Inc. Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1150 (10th Cir. 2016) (Gorsuch, J., concurring).

Here, *Chevron's* "rule of thumb" cannot empower the ATF to rewrite an ambiguous statute contrary to the rule of lenity, particularly when it would also overrule Supreme Court precedent in the process. A first-time offender faces up to ten years in federal prison for possessing a machinegun, 18 U.S.C. §§ 922(o), 924(a)(2), which reflects Congress' reasoned judgment about what penalties are appropriate for possessing certain types of prohibited weapons. But the Final Rule rejects Congress' view and rewrites the definition of what items are subject to those harsh criminal penalties. The rule of lenity, which this Court must apply, therefore commands that any ambiguity in the definition of machinegun "be construed narrowly" in favor of a potential criminal defendant. *See N.L.R.B.*, 332 F.3d at 1287 n. 5. This is constitutionally necessary to preserve fair notice of the law's reach and to prevent prosecutors from usurping legislative roles. *Esquivel-Quintana*, 810 F.3d at 1030 (Sutton, J., concurring and dissenting in part). Deferring to the ATF based on ambiguity in the definition would upend this rule and do so at the expense of prior court interpretations of the statute. *See Staples*, 511 U.S. at 602 n. 1; *Olofson*, 563 F.3d at 658; *Fleischli*, 305 F.3d at 655. This would allow the ATF and the Acting Attorney General to reinterpret a criminal statute against potential defendants, overruling Supreme Court precedent in the process, in defiance of the rule of lenity. Such an outcome would raise profound due process and separation of powers concerns. *See Gutierrez-Brizuela*, 834 F.3d at 1150 (Gorsuch, J., concurring); *Esquivel-Quintana*, 810 F.3d at 1030 (Sutton, J., concurring and dissenting in part).

The new rule is plainly unreasonable. The Final Rule rejects several criteria previously required for a firearm to have been deemed a machinegun under the most natural reading of the

statute. As described by the Supreme Court, a machinegun is activated "by a single function of the trigger" and continues firing "automatically" until the "ammunition supply is exhausted." *Staples*, 511 U.S. at 602 n. 1. A firearm does not meet this definition if either [1] the shooter is required to provide additional "manual manipulation" between shots; or [2] the trigger "mechanical[ly] reset[s]" between shots. *Id.*; (Exhibit E). Moreover, the requisite manipulation of the trigger can be accomplished in ways other than simply pulling a lever on the underside of a firearm. *Fleischli*, 305 F.3d at 655. Thus, the most natural reading of the statute has been the one adopted by the ATF itself since 2006—a machinegun continuously fires rounds following [1] a single function of the trigger, no matter how initiated, and [2] without additional manual manipulation, until the supply of ammunition is exhausted. (*See* Exhibits B, C, E.)

The new definition alters both conditions. The new rule says that a "single function of the trigger" actually means a "single pull of the trigger" at the exclusion of all other means of causing the trigger to function. *Final Rule*, 83 Fed. Reg. at 66553-54. The new rule also says that additional manual manipulation must be directed only to the act of pulling the trigger and cannot be any other form of physical activity. *Final Rule*, 83 Fed. Reg. at 66518, 66533. These limitations are not found anywhere in the statute and must be rejected.

Even if this court were to defer to the ATF's interpretation under *Chevron*, that interpretation goes so far beyond any rational understanding of the statutory text that it is unreasonable. Courts have not had trouble defining a machinegun under the NFA's terms, and the ATF has previously adopted a consistent and reasonable interpretation that respects the statutory language. The Final Rule, which conflicts with court interpretations and more than a decade of consistent ATF interpretation, is not reasonable.

### 4. As Set Out in Count VII, the Final Rule Is Arbitrary, Capricious, an Abuse of Discretion and Otherwise Not in Accordance with Law, Violating 5 U.S.C. § 706(2)(A)

A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[2] While this review is "necessarily narrow, it is not insubstantial." *Qwest Comms. Int'l, Inc. v. F.C.C.*, 398 F.3d 1222, 1229 (10th Cir. 2005). A Court is required to "engage in … a probing, in-depth review." *Id.* (internal citation and quotation marks omitted). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The ATF's actions here were invalid for three independent reasons. First, the ATF "relied on factors which Congress had not intended it to consider" in promulgating the Final Rule, because the rule was crafted in response to political pressure and not any legitimate interpretive analysis. Prior to the Las Vegas shooting on October 1, 2017, the ATF had consistently insisted that bump fire stocks, "do not fall within any of the classifications for firearm contained in Federal law" and the "ATF does not have the authority to restrict their lawful possession, use, or transfer." (Exhibit D at 1-2.) Immediately after the shooting, Acting Director Brandon consulted with "technical experts," "firearms experts" and "lawyers" within the ATF and the consensus within the agency was that "bump stocks" still "didn't fall within the Gun Control Act and the

---

[2] While courts review agency action for reasonableness using an arbitrary and capricious standard, and also use the same language for review under 5 U.S.C. § 706(2)(A), "the Venn diagram of the two inquiries is not a circle." Humane Society of the United States v. Zinke, 865 F.3d 585, 605 (D.C. Cir. 2017). Each inquiry is distinct, and agency action may be invalid under either form of review. Id.

National Firearms Act." Judiciary Comm. Testimony. Congress then tried, but ultimately failed, to pass at least five different bills that would have amended federal statutes to ban or regulate bump stocks during the 115th Congress.

The first time the ATF reconsidered its position came after the President directed it to do so. The ATF even acknowledged in its Notice of Proposed Rulemaking that it had acted on the President's direction to review the issue. 83 Fed. Reg. at 13443, 13446. Further, the President declared in a memorandum that he would accept nothing less than a "rule banning all devices that turn legal weapons into machineguns," which, in his view, included bump stocks. *Presidential Memorandum on the Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices* (Feb. 20, 2018). And Acting Director Brandon acknowledged in his testimony before the Senate Judiciary Committee that the interpretive change had come about at the behest of the Attorney General. Judiciary Comm. Testimony.

But an agency's consistent, reasonable, and textually-correct interpretation of a statute does not become invalid merely because it is unpopular, or because it would be more politically expedient for it to change. Agencies may fill appropriate gaps in statutes, but they cannot supplant Congress. *See Chevron*, 467 U.S. at 843 (an "agency" "must give effect to the unambiguously expressed intent of Congress"). Congress' failure to fix what the President viewed as an existing statutory problem is not a valid basis for an agency to disregard its own expertise and analysis in favor of an improper interpretation. Here, the ATF behaved like a political body, instead of an administrative one.

Next, the ATF's proffered explanation for the Final Rule runs counter to the evidence before the agency. It is telling that the firearms experts, who, in 2010, physically examined the Slide Fire device for approval without any outside or improper political pressure, readily

18

concluded that it was "a firearm part and is not regulated as a firearm under [the] Gun Control Act or the National Firearms Act," because it "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed." (Exhibit B.) The experts within the FATD said the Slide Fire was not a machinegun because it "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed," and "[i]n order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand." *Id*. The Slide Fire bump stock could not enable a shooter, therefore, to fire automatically and without additional manual manipulation of the firearm following the single function of a trigger. *Id*.

Neither the mechanism of the Slide Fire's operation nor the statutes at issue have changed since the 2010 approval. The only thing that has changed is the President's view that the ATF's prior interpretation is politically undesirable. But politics are not evidence, and the ATF's reconsideration of the Slide Fire was not based in any evidence put before the agency. The Final Rule is invalid for this reason as well.

Finally, the ATF acted improperly because the Final Rule is a repudiation of the agency's expertise. As discussed above, the consensus of the ATF's "technical experts," "firearms experts" and "lawyers" was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act." Judiciary Comm. Testimony. By rejecting its own expertise at the behest of the President and the Acting Attorney General, the ATF acted arbitrarily and capriciously in passing the Final Rule.

**B. Mr. Aposhian Will Suffer Irreparable Harm Without Preliminary Relief**

To satisfy the irreparable harm requirement, Mr. Aposhian need only demonstrate that absent a preliminary injunction, he is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (internal citation and quotation marks omitted). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (internal citation and quotation marks omitted).

Mr. Aposhian will suffer irreparable harm if the Court does not enjoin the defendants from enforcing the Final Rule. The Final Rule will go into effect on March 26, 2019, but, likely, a decision on the merits cannot be rendered before that date. If the Final Rule goes into effect as scheduled, however, Mr. Aposhian will be required to follow a rule that was issued in violation of constitutional limits set out in Articles I, § 1 and II, § 3 of the U.S. Constitution. Mr. Aposhian will therefore face an irreparable constitutional injury warranting an injunction. *See Kikumura*, 242 F.3d at 963.

**C. The Injunction Is Equitable and in the Public Interest**

A party seeking a preliminary injunction must demonstrate both "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (internal citation and quotation marks omitted). Moreover, a government's interest in enforcing regulations "pales in comparison" to either a plaintiff's "constitutional" or even "statutory rights." *Newland v.*

*Sebelius*, 881 F. Supp. 2d 1287, 1295 (D. Colo. 2012) (Kane, J.), *aff'd*, 542 F. App'x 706 (10th Cir. 2013). When an injunction "merely delay[s]" the effective date of a regulation, the government is "not prejudiced by a preliminary injunction," and the balance of equities tips in favor of a plaintiff. *Pennsylvania v. Trump*, 281 F.Supp.3d 553, 585 (E.D. Pa. 2017) (Beetlestone, J.)

The balance of equities tips heavily in favor of this injunction. Mr. Aposhian's interests involve both his constitutional rights to be bound only by laws issued by Congress and statutory limitations on the ATF's actions. If the Final Rule goes into effect as scheduled, he will be forced to abide by a law that is itself unlawful. On the other hand, the government faces only a delay in its Final Rule, which is a concern that "pales in comparison" to Mr. Aposhian's interests. *See Newland*, 881 F. Supp. 2d at 1295. The injunction should therefore be entered.

## IV. CONCLUSION

For the reasons set out above, the Court should preliminarily enjoin Defendants from enforcing the Final Rule against Mr. Aposhian.

January 17, 2019

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
**Steve Simpson**
Senior Litigation Counsel
New Civil Liberties Alliance

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

I certify that a copy of the foregoing was also served by registered or certified mail upon to the following:

Matthew G. Whitaker
Acting Attorney General of the U.S.
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Thomas E. Brandon
Acting Director
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, NE
Washington, DC 20226

John W. Huber
United States Attorney for the District of Utah
111 South Main Street
Suite 1800
Salt Lake City, Utah 84111-2176

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
Counsel for Plaintiff
Admitted *pro hac vice*