JOHN W. HUBER, United States Attorney (7226)
JEFFREY E. NELSON, Assistant United States Attorney (2386)
United States Attorney's Office
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176

JOSEPH H. HUNT, Assistant Attorney General, Civil Division
MATTHEW J. GLOVER, Counsel to the Assistant Attorney General, Civil Division
JOHN R. TYLER, Assistant Branch Director, Civil Division
ERIC J. SOSKIN, Senior Trial Counsel, Civil Division
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Room 12002
Washington, DC 20005
eric.soskin@usdoj.gov

Attorneys for the Defendants

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| W. CLARK APOSHIAN,<br><br>    Plaintiff,<br><br>    vs.<br><br>MATTHEW WHITAKER, Acting Attorney General of the United States, et al.,<br><br>    Defendants. | Case No. 2:19-cv-00037-JNP<br><br>**MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>District Judge Jill N. Parrish |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ........................................................3

A.    Statutory Framework for Regulation of Firearms ...........................................................3

B.    Regulatory Interpretation of Machine Gun Definition in Firearms Statutes ..................5

    1.    Past Regulation of Bump Stocks ................................................................................5

    2.    Development of the Challenged Final Rule ...............................................................6

    3.    The Final Rule ...........................................................................................................7

STANDARD OF REVIEW ....................................................................................................9

ARGUMENT ........................................................................................................................10

I.    Plaintiff Has Not Established a Likelihood of Success on His Claims. .............................10

    A.    The Final Rule Interprets "Single Function of the Trigger" and "Automatically" in
a Manner Consistent With Their Ordinary, Accepted Meaning. .............................11

        1.    A "Single Function" is Reasonable Interpreted As a "Single Pull" of the
Trigger. ....................................................................................................................11

        2.    "Automatically" is Reasonably Defined as "The Result of a Self-Acting or
Self-Regulating Mechanism . . . ." ..........................................................................13

    B.    The Final Rule Reasonably Applies Its Interpretations of "Automatically"
and "Single Function of the Trigger" To Classify Bump Stocks As Machine
Guns. .........................................................................................................................14

    C.    The Final Rule Does Not Rely on Factors which Congress Had Not Intended the
Department to Consider. ...........................................................................................18

    D.    The Department Acted Within Its Authority in Issuing the Final Rule. ..................21

II.    The Balance of Equities Does Not Tip in Plaintiff's Favor and an Injunction is Not in the
Public Interest. .................................................................................................................23

CONCLUSION .....................................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Akins v. U.S.*,

    312 F. App'x 197 (11th Cir. 2009) ........................................................... 6, 12, 22, 23

*Awad v. Ziriax*,

    670 F.3d 1111 (10th Cir. 2012) ............................................................ 25

*Burrage v. U.S.*,

    571 U.S. 204 (2014)............................................................................ 21

*Cure Land, LLC v. USDA*,

    2014 WL 12672681 (D. Colo. Aug. 14, 2014) (unpublished)................................. 19

*Dun & Bradstreet Corp. v. U.S. Postal Service*,

    946 F.2d 189 (2d Cir. 1991)................................................................... 20

*Evans v. Utah*,

    21 F. Supp. 3d 1192 (D. Utah 2014)........................................................ 10

*F.J. Vollmer Co. v. Higgins*,

    23 F.3d 448 (D.C. Cir. 1994) .................................................................. 5

*FCC v. Fox Television Stations*,

    556 U.S. 502 (2009)......................................................................... 16, 19

*Franklin v. D.C.*,

    163 F.3d 625 (D.C. Cir. 1998) ............................................................... 23

*Graham v. Henry*,

    2006 WL 2645130 (N.D. Ok. Sept. 14, 2006) (unpublished)................................. 24

*Gun South Inc. v. Brady,*

    877 F.2d 858 (11th Cir. 1989) ............................................................... 20
/seg>

*Lockheed Martin Corp. v. Dep't of Labor*,

    717 F.3d 1121 (10th Cir. 2013) ........................................................................ 16

*Morton v. Ruiz*,

    415 U.S. 199 (1974) ......................................................................................... 21

*Newland v. Sebelius*,

    881 F. Supp. 2d 1287 (D. Colo. 2012) ............................................................ 25

*Nken v. Holder*,

    556 U.S. 418 (2009) ......................................................................................... 23

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,

    342 F.3d 1170 (10th Cir. 2003) ....................................................................... 25

*Olenhouse v. Commodity Credit Corp.*,

    42 F.3d 1560 (10th Cir. 1994) ................................................................... 10, 23

*Penn. v. Mimms*,

    434 U.S. 106 (1977) ......................................................................................... 24

*Penn. v. Trump*,

    281 F. Supp. 3d 553, 585 (E.D. Pa. 2017) ...................................................... 25

*Planned Parenthood of Utah v. Herbert*,

    828 F.3d 1245 (10th Cir. 2016) ......................................................................... 9

*Pub. Svc. Co. of N.H. v. T. of W. Newbury*,

    835 F.2d 380 (1st Cir. 1987) ........................................................................... 24

*Qwest Corp. v. FCC*,

    689 F.3d 1214 (10th Cir. 2012) ....................................................................... 10

*Rosenberg v. Fleuti,*

    374 U.S. 449 (1963) ........................................................................................ 23

*Salt Lake Tribune Pub. Co. v. AT&T,*

    320 F.3d 1081 (10th Cir. 2003) ...................................................................... 24

*SCFC ILC, Inc. v. Visa USA, Inc.,*

    936 F.2d 1096 (10th Cir. 1991) ................................................................... 9, 10

*Siegel v. LePore,*

    234 F.3d 1163 (11th Cir. 2000) ...................................................................... 24

*Staples v. U.S.,*

    511 U.S. 600 (1994) ........................................................................... 11, 14, 18

*U.S. v. Apel,*

    571 U.S. 359 (2014) ........................................................................................ 21

*U.S. v. Atandi,*

    376 F.3d 1186 (10th Cir. 2004) ...................................................................... 22

*U.S. v. Brazeau,*

    237 F.3d 842 (7th Cir. 2001) .......................................................................... 20

*U.S. v. Denny,*

    441 F.3d 1220 (10th Cir. 2006) ...................................................................... 24

*U.S. v. Dodson,*

    519 F. App'x 344 (6th Cir. 2013) ..................................................................... 5

*U.S. v. Fleischli,*

    305 F.3d 643 (7th Cir. 2002) ..................................................................... 12, 13

*U.S. v. Haney*,

    264 F.3d 1161 (10th Cir. 2001) ................................................................. 5

*U.S. v. Jennings*,

    195 F.3d 795 (5th Cir. 1999) ................................................................. 18

*U.S. v. Olofson*,

    563 F.3d 652 (7th Cir. 2009) ................................................................. 13

*U.S. v. One TRW, Model M14, 7.62 Caliber Rifle*,

    441 F.3d 416 (6th Cir. 2006) ................................................................. 22

*U.S. v. RX Depot, Inc.*,

    297 F. Supp. 2d 1306 (N.D. Okla. 2003) ................................................. 25

*U.S. v. Spires*,

    755 F. Supp. 890 (C.D. Cal. 1991) ......................................................... 20

*U.S. v. Wonschik*,

    353 F.3d 1192 (10th Cir. 2004) ............................................................. 22

*Walshire v. U.S.*,

    288 F.3d 342 (8th Cir. 2002) ........................................................... 21, 22

*Warner v. Gross*,

    776 F.3d 721 (10th Cir. 2015) ............................................................... 9

*Whitmore v. Ark.*,

    495 U.S. 149 (1990) ............................................................................. 25

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) ........................................................................ 9, 23, 25

*York v. Sec'y of Treasury*,

    774 F.2d 417 (10th Cir. 1985) ............................................................................. 5, 23

**Statutes**

5 U.S.C. § 706(2) ................................................................................................ 10, 23

18 U.S.C. 926(a) ........................................................................................................ 5

18 U.S.C. Chapter 44 ................................................................................................. 3

18 U.S.C. § 921 .......................................................................................... 4, 5, 9, 17

18 U.S.C. § 922(o) ...................................................................................... 1, 3, 5, 21

26 U.S.C. 7801(a)(2)(A) ........................................................................................... 5

26 U.S.C. Chapter 53 ............................................................................................ 3, 4

26 U.S.C. § 5822 ....................................................................................................... 4

26 U.S.C. § 5841(c) .................................................................................................. 4

26 U.S.C. § 5845 ............................................................................................... passim

26 U.S.C. § 7801 ............................................................................................ 3, 5, 21

28 U.S.C. § 599A(c)(1) ............................................................................................. 3

N.Y. Penal Law § 265.00(21) (McKinney 2018) ................................................. 9, 17

Ohio Rev. Code Ann. § 2923.11 (West 2017) ....................................................... 9, 17

Pub. L. No. 785 ......................................................................................................... 4

Pub. L. No. 90-351 .................................................................................................... 4

Pub. L. 99-308 .................................................................................................. 3, 4, 22

Pub. L. 107-296 ......................................................................................................... 3

**Regulations**

27 CFR 447.11 ...................................................................................................... 2, 7

28 C.F.R. § 0.130 ........................................................................................... 3, 5

ATF Rul. 83-5 .................................................................................................... 23

ATF Rul. 2006-2 ............................................................................................. 6, 11

## Other Authorities

33 FR 18555 (Dec. 14, 1968) ............................................................................ 22

63 FR 35520 (June 30, 1998) ............................................................................ 22

81 FR 2658 (Jan. 15, 2016) ............................................................................... 22

82 FR 60929 (Dec. 26, 2017) .............................................................................. 7

83 FR 66514 (Dec. 26, 2018) ..................................................................... passim

83 FR 7949 (Feb. 20, 2018) .................................................................... 2, 7, 20

83 FR 13442 (Mar. 29, 2018) ...................................................................... 7, 24

1954 U.S.C.C.A.N. 4017 ..................................................................................... 4

1986 U.S.C.C.A.N. 1327 ................................................................... 4, 5, 18, 19

*H.R. 9066* ............................................................................................................ 6

*Implementing the Right to Keep and Bear Arms for Self-Defense*,

   56 UCLA L. Rev. 1443 (2009) ................................................................... 18

The Department of Justice ("DOJ") issued the Final Rule at issue in these cases, *Bump-Stock-Type Devices*, 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Final Rule"), to ensure that "bump stocks"—firearms attachments that, when employed, permit ordinary semi-automatic rifles to function as machine guns—are not used to circumvent 18 U.S.C. § 922(o), the statute prohibiting the manufacture and sale of new machine guns to the public.  By acting on a presidential instruction to adopt this Final Rule, DOJ has corrected a confusing and erroneous agency interpretation of Section 922(o), to the expected benefit of public safety.  Plaintiff seeks a preliminary injunction to keep the rule from going into effect, claiming that DOJ's actions are arbitrary and capricious under the Administrative Procedure Act ("APA") and that DOJ's interpretation of the statute is unreasonable, exceeds statutory authority, and contradicts the clear statutory language.  Because he cannot demonstrate a likelihood of success on these claims, Plaintiff's motion should be denied.

## INTRODUCTION

A bump stock is an apparatus used to replace the standard stock on an ordinary semi-automatic firearm, thereby allowing a shooter to use the weapon at a rate of fire similar to that of an automatic weapon, like a machine gun.  *See* 83 FR 66514.  Over the last decade, DOJ's Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has issued classification determinations concluding that certain models of these devices are lawful firearms parts, unregulated at the federal level.  Subsequently, many bump stocks have been readily available for private purchase, and hundreds of thousands have been sold.  On October 1, 2017, several rifles with attached bump stocks were used in a devastating attack on concertgoers in Las Vegas, Nevada, in which hundreds of rounds of ammunition were rapidly fired by the perpetrator at a large crowd, killing 58 people and wounding approximately 500.

Machine guns have long been regulated under the National Firearms Act of 1934 ("NFA"), and since passage of the Firearm Owners Protection Act of 1986 ("FOPA"), the sale of new machine guns to members of the public has been prohibited.  ATF has worked diligently to apply the definition of machine gun consistently to bump stocks.  In 2006, ATF concluded that one

model of bump stock, the "Akins Accelerator," was not a machine gun, then quickly recognized that its determination was in error and reversed itself.  Since 2008, ATF has concluded that some other bump stocks—which lacked a mechanical spring (or similar device) instrumental to the operation of the Akins Accelerator—were not machine guns.  These decisions included one classification of a device submitted by the same manufacturer as the bump stocks used by the Las Vegas perpetrator.

After the Las Vegas attack, members of Congress and the public asked ATF to re-examine its past classification decisions for bump stocks to determine whether those decisions had been correct.  In addition, President Trump instructed the Attorney General "to dedicate all available resources to…propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  Presidential Memorandum, *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 83 FR 7949 (Feb. 20, 2018) ("Definition of Machinegun"). The Department of Justice ("DOJ" or "Department") proceeded to issue a notice of proposed rulemaking ("NPRM"), collect and review over 186,000 comments, and ultimately, to announce the Final Rule, which amends the definition of "machinegun" in DOJ's regulations.[1]

The Department's actions are fully consistent with the text of the statute and the APA.  The statutory terms interpreted in the Final Rule ("automatically" and "single function of the trigger") are undefined in the statute, and the Department has reasonably interpreted those terms, applied those definitions to bump stocks, and corrected past classification errors in light of those new definitions, as an agency is entitled to do.  The Final Rule is therefore within DOJ's rulemaking authority and the contents of the rule are neither arbitrary nor capricious.  The Department's interpretation is fully consistent with the text of the statute: once definitions of the undefined terms in the statutory definition have been provided, the statute is reasonably interpreted to include bump stocks as machine guns.  Finally, it is entirely proper for the agency to have initiated a review of

---

[1] In this brief, except where directly quoting the statute or derivative interpretations, Defendants will use the ordinary spelling of "machine gun" as two words, rather than the single-word spelling used in federal statutes and regulations: "machinegun."  *See, e.g.*, 26 U.S.C. § 5845(b); 27 CFR 447.11.

past actions due to interest by the public and elected leaders, including the President.

For these reasons, and because Plaintiff has also not established that the other factors required for entry of a preliminary injunction have been met, no injunction should issue.

## STATUTORY AND REGULATORY BACKGROUND

### A. Statutory Framework for Regulation of Firearms

Over the last century, Congress has imposed increasingly strict regulations on machine guns as part of the interconnected framework of federal laws regulating the interstate firearm market. The Final Rule interprets provisions of three major firearms statutes: the Gun Control Act of 1968 ("GCA"), 18 U.S.C. Chapter 44; the National Firearms Act of 1934 ("NFA"), 26 U.S.C. Chapter 53; and the Firearm Owners Protection Act, (FOPA), Pub. L. 99-308, 100 Stat. 449. Together, these statutes generally prohibit the possession by members of the public of newly-manufactured machine guns and closely regulate the possession of machine guns manufactured prior to the effective date of the FOPA, which Congress allowed to continue lawfully. *See* 18 U.S.C. § 922(o). These statutes share a common definition of machine guns, and this case challenges DOJ's revision of that definition to clarify that the definition includes bump stocks.[2]

The NFA, the first major federal statute to regulate guns, required all persons engaged in the business of selling "firearms" (including machine guns)[3] and all firearms owners to register with the government, and subjected the making and sale of regulated firearms to a series of

---

[2] The Final Rule amends the regulations of ATF, which is charged with the administration and enforcement of the GCA and the NFA. The Final Rule was promulgated by the Attorney General and DOJ, who are responsible for overseeing ATF. *See* 28 C.F.R. § 0.130(a)(1). NFA provisions still refer to the "Secretary of the Treasury." *See* 26 U.S.C. Ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1).

[3] Although the NFA applies to "firearms," the term "firearms" is defined in the statute as a narrow set of dangerous weapons, not the full class of weapons labeled as "firearms" in ordinary parlance. *See* 26 U.S.C. § 5845. "Firearms" includes machine guns, short-barreled shotguns, short-barreled rifles, and several items that would not ordinarily be considered "firearms," such as silencers, rockets, and grenades. Thus, as a general matter, standard-length shotguns and rifles (including all semi-automatic rifles) and non-automatic handguns, are not "firearms" within the NFA's definition.

application and authorization requirements.[4]  *See* 26 U.S.C. Ch. 53.  The NFA targeted "lethal weapons . . . [that] could be used readily and efficiently by criminals."  H.R. Rep. No. 83-1337, at A395, *reprinted in* 1954 U.S.C.C.A.N. 4017, 4542.  Under the NFA, a "machinegun" is defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

In 1968, Congress passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime."  *See* 18 U.S.C. § 921 *et seq.*; S. Rep. No. 89-1866, at 1 (1966).  The GCA supplanted some prior firearms regulations, but exists alongside the NFA.  *See* Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968).  The GCA followed on the heels of other federal legislation that stressed Congress's findings of an extensive interstate commerce in firearms and the need for adequate federal control over such traffic. *See* Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, 82 Stat. 197 (1968).

In 1986, Congress again turned its attention to firearms, addressing, *inter alia*, the hazards of machine guns.  *See* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun limits as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns").  Congress therefore enacted the Firearms Owners' Protection Act of 1986 ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, intended "to strengthen the [GCA] to enhance the

---

[4] Congress passed the NFA pursuant to its taxation powers, and the NFA is codified in the Internal Revenue Code.  Chapter 53 specifies that each maker of a regulated firearm "shall, prior to . . . making [it] . . . obtain authorization," 26 U.S.C. § 5841(c), including by: (1) fil[ing] "a written application . . . to make and register the firearm"; (2) paying "any tax payable"; and (3) receiving approval from ATF.  26 U.S.C. § 5822.

4

ability of law enforcement to fight violent crime." H. R. Rep. No. 99-495, at 1, 1986

U.S.C.C.A.N. at 1327. Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA.

Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject

to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States
> or any department or agency thereof or a State . . .; or
>
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully
> possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2). The FOPA and GCA define the term "machinegun" by incorporating the

NFA's definition of the term. *See* 18 U.S.C. § 921(a)(23).[5]

### B. Regulatory Interpretation of Machine Gun Definition in Firearms Statutes

The Final Rule arises in part from the fact that Congress did not define the NFA terms

"automatically" and "single function of the trigger." Thus, DOJ is interpreting those terms in the

context of bump stocks, pursuant to delegated authority to promulgate regulations necessary to

enforce the GCA and NFA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a); 28 CFR

0.130(a)(1)-(2). Courts have recognized the leading regulatory role of DOJ and ATF with respect

to machine guns, including in the context of interpreting the definition of "machinegun" and

component terms such as "automatically." *See York v. Sec'y of Treasury*, 774 F.2d 417, 419-20

(10th Cir. 1985); *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449-51 (D.C. Cir. 1994) (upholding an

ATF determination regarding machine gun receivers); *U.S. v. Dodson*, 519 F. App'x 344, 348-49

& n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the definition of "machinegun").

#### 1. Past Regulation of Bump Stocks

In 2002 and 2004, a Florida inventor asked ATF whether the Akins Accelerator, a specific

model of a bump stock that "uses an internal spring and the force of recoil to reposition and refire

---

[5] The legislative history of the specific amendment that added § 922(o) is limited. Because "§
922(o) is closely intertwined with other federal gun legislation," however, the Courts of Appeals
"have referred to legislative history not only of § 922(o) itself, but also of other federal gun
legislation generally," finding that Congress need not "rearticulate its old findings every time it adds
an additional provision." *U.S. v. Haney*, 264 F.3d 1161, 1169 n.3 (10th Cir. 2001).

the rifle," would be classified as a machine gun under the NFA.  *Akins v. U.S.*, 312 F. App'x 197, 198 (11th Cir. 2009).  ATF tested a prototype of the device and, based on its interpretation of the statutory term "single function of the trigger" to refer to a single physical movement of the trigger, concluded it did not constitute a machine gun.  *Id.*  After receiving further requests to classify similar devices, ATF reversed its view, classifying the device as a machine gun.  In correcting its error, ATF determined that the phrase "single function of the trigger" is best interpreted as a "single pull of the trigger" by the shooter, not a single trigger motion.  ATF Rul. 2006-2, at 2 (citing *Nat'l Firearms Act: Hrg's Before the Comm. on Ways and Means, House of Rep's, Second Session H.R. 9066*, 73rd Cong., at 40 (1934) ("NFA Hrg.")), available at: https://go.usa.gov/xEDCC (last visited Jan. 29, 2019).  ATF then ordered the inventor "to register the devices he possessed or to surrender them," *Akins*, 312 F. App'x at 199, and issued a policy statement to explain that "devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns."  83 FR 66516.  The inventor sued, and ATF prevailed.  *Akins*, 312 F. App'x at 198.

ATF soon received classification requests for other devices that, unlike the Akins Accelerator, did not include internal springs.  In a series of classification decisions between 2008 and 2017, ATF concluded that such devices, including one submitted by the manufacturer of the bump stocks used by the Las Vegas perpetrator, were not machine guns.  Although ATF assessed these devices to act with a "single pull of the trigger," the bump stocks did not fire "automatically" because they lacked internal springs or other mechanical parts that channeled recoil energy.  83 FR 66517.  A consequence of this conclusion is that bump stocks fell outside the scope of federal firearms regulations, *see id.*, and became popular with those seeking lawful substitutes for the high rate of fire provided by machine guns.  An estimated 520,000 bump stocks were sold at an average price of approximately $300, many to individuals who, like Plaintiff, "purchased . . . in reliance on [ATF's] prior determination that the device is a firearm part."  Mot. at 2; *see* 83 FR 66538.

**2.  Development of the Challenged Final Rule**

The public attention given to bump stocks in the wake of their use by the Las Vegas

perpetrator led the Department to revisit its prior analysis of the terms used to define machine gun in 26 U.S.C. 5845(b), along with whether bump stocks properly should be classified as machine guns. *See* 83 FR 66516-17. As an initial step, ATF published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register. *See Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017). The ANPRM solicited comments concerning the market for bump stocks. *See id.* Specifically, the ANPRM asked a set of questions of manufacturers, consumers, and retailers regarding the cost of bump stocks, the number of sales, the cost of manufacturing, and input on the potential effect of a rulemaking prohibiting bump stocks. *See id.* at 60930-31. Public comment on the ANPRM concluded on January 25, 2018. *Id.* at 60929.

On February 20, 2018, the President issued a memorandum to then-Attorney General Jefferson B. Sessions III concerning bump stocks. *See Definition of Machinegun*, 83 FR 7949. The memorandum instructed DOJ, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.* Carrying out that directive, DOJ published an NPRM, proposing changes to the regulations in 27 CFR 447.11, 478.11, and 479.11 that would interpret the meaning of the terms "single function of the trigger" and "automatically." *See Bump-Stock-Type Devices*, 83 FR 13442 (Mar. 29, 2018). DOJ received "over 186,000 comments: on the NPRM, reviewed those comments, and drafted the Final Rule, addressing the comments raised. *Id.* at 66519; 66519; *see generally id.* at 66519-43. On December 18, 2018, DOJ announced the Final Rule, which was published in the Federal Register on December 26, 2018. *See id.*; *DOJ Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018), *available at*: https://go.usa.gov/xEDrx (last visited Jan. 15, 2019).

### 3. The Final Rule

The Final Rule sets forth DOJ's interpretations of the terms "single function of the trigger" and "automatically," clarifies for members of the public that bump stocks are machine guns, and

overrules ATF's prior, erroneous classification decisions treating bump stocks as unregulated firearms parts. *See* 83 FR 66516; 66531 (explaining that "the previous classification[s] . . . relied on the mistaken premise that . . . such devices do not enable 'automatic' firing"). The Final Rule also instructs "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office." *Id.* at 66549. Current owners of bump stocks have 90 days to comply in order to "avoid criminal liability."[6] *Id.* at 66530.

The analysis in the Final Rule mirrors that in the NPRM. First, consistent with ATF's position since 2006, the Final Rule explains that the Department is interpreting the phrase "single function of the trigger" to mean a "single pull of the trigger" as well as "analogous motions." *Id.* at 66515. In addition, to account for the manner in which firing is initiated by a single pull of the trigger, the Final Rule explains that it is clarifying the term "automatically." *Id.* Under the Department's interpretation set forth in the Final Rule, "automatically," in the context of the statutory definition of machine gun, means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* at 66554. The Final Rule explains that these definitions are being adopted because they "represent the best interpretation of the statute." *Id.* at 66521.

Relying on these definitions, the Final Rule sets forth the conclusion that "[t]he term 'machine gun' includes a [bump stock]." *Id.* at 66554. As the Final Rule explains, this clarification is needed because the firing sequence is "automatic" within that definition. *Id.* at 66531. This conclusion is based on the determination that, as long as: 1) the trigger finger remains stationary on the ledge provided by the design of the device; 2) the shooter maintains constant rearward pressure on the trigger; and 3) the shooter engages in constant forward pressure with the non-trigger hand on the rifle through the barrel-shroud or fore-grip; then, the firearm's recoil energy is harnessed in a continuous back-and-forth cycle. *Id.* at 66532. In this way, a bump stock constitutes a "self-regulating" or "self-acting" mechanism that allows the shooter to attain

---

[6] This 90 day period began upon publication in the Federal Register on December 26, 2018.

continuous firing after a single pull of the trigger.  *Id.*  Thus, bump stocks are machine guns because they convert an otherwise ordinary semiautomatic firearm[7] into a machine gun by acting as a self-regulating mechanism that, after a single pull of the trigger, harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter, so long as the shooter also maintains constant rearward pressure on the trigger and constant forward pressure with the non-trigger hand on the rifle through the barrel-shroud or fore-grip.  *See id.* at 66514, 66516.

In addition to setting forth the analysis above, the Final Rule describes and provides responses to the 186,000+ comments received on the NPRM.  *See* 83 FR at 66519-43.  It includes responses to comments similar to the arguments Plaintiff makes here.  *See id.*  Plaintiff does not allege that the Final Rule fails to respond to the comments received.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy."  *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015).  A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see* Mot. at 3.  "*Winter* requires a movant to establish each of the four preliminary injunction elements."  *Planned Parenthood of Utah v. Herbert*, 828 F.3d 1245, 1268 (10th Cir. 2016).  As the moving party, Plaintiff has the burden to establish that his "right to relief . . . [is] clear and unequivocal" through a

---

[7] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."  18 U.S.C. § 921(a) (28).  The term "semi-automatic firearm," is not specifically defined in federal law, but generally refers to any weapon that after a round of ammunition is fired, chambers the next round of ammunition and can then be fired with a separate pull of the trigger.  *See, e.g.*, Ohio Rev. Code Ann. § 2923.11 (West 2017) ("'Semi-automatic firearm' means any firearm designed or specially adapted to fire a single cartridge and . . . chamber a succeeding cartridge ready to fire, with a single function of the trigger"); N.Y. Penal Law § 265.00(21) (McKinney 2018) ("'Semiautomatic' means any repeating rifle, shotgun or pistol . . . which utilizes a portion of the energy of a firing cartridge or shell to extract the fired [round] . . . and chamber the next round, and… requires a separate pull of the trigger to fire each cartridge or shell").

demonstration of these elements.  *SCFC ILC, Inc. v. Visa USA*, *Inc*., 936 F.2d 1096, 1098 (10th

Cir. 1991); *see Evans v. Utah*, 21 F. Supp. 3d 1192, 1200 (D. Utah 2014).

<u>ARGUMENT</u>

**I.      Plaintiff Has Not Established a Likelihood of Success on His Claims.**

To succeed in his claims challenging the substance of the Final Rule, Plaintiff must

demonstrate that the Department's interpretations or analysis are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  The APA provides for

"a narrow standard of review" that ascertains whether the agency "examine[d] the relevant data

and articulate[d] a satisfactory explanation" for its actions.  *Qwest Corp. v. FCC*, 689 F.3d 1214,

1224 (10th Cir. 2012).  An agency decision will only be found "arbitrary or capricious if the

agency: (1) relied on factors which Congress had not intended it to consider; (2) entirely failed to

consider an important aspect of the problem; (3) offered an explanation for the decision that runs

counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise."  *Olenhouse v. Commodity Credit Corp*., 42

F.3d 1560, 1580 (10th Cir. 1994).  "This standard of review is not more searching where the

agency's decision is a change from prior policy"; however, an agency must offer a "reasoned

explanation for disregarding facts and circumstances that underlay or were engendered by the prior

policy."  *Qwest*, 689 F.3d at 1224-25.

Although Plaintiff places much emphasis on his claims that DOJ has exceeded its statutory

and constitutional authority, those claims are actually derivative of Plaintiff's APA claims.

Because the Department may promulgate reasonable definitions of terms that Congress has left

undefined and such actions are interpretive in nature, the Final Rule only exceeds statutory

authority or assumes Congress's legislative role if it is unlawful under the APA.  And because the

Department has acted reasonably in defining "single function of the trigger" and "automatically"

and has correctly applied those definitions to clarify that bump stocks are machine guns, it has

acted lawfully here.  Plaintiff therefore cannot establish a substantial likelihood of success.

**A.  The Final Rule Interprets "Single Function of the Trigger" and "Automatically" in a Manner Consistent With Their Ordinary, Accepted Meaning.**

**1.  A "Single Function" is Reasonable Interpreted As a "Single Pull" of the Trigger**.

The Final Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger," along with "analogous motions," explaining that this "is the best interpretation of the statute" and "reflect[s] ATF's position since 2006."  83 FR 66518.  "Pull the trigger" is the ordinary, accepted terminology for how to discharge the typical firearm in common use today, as well as in the era when the NFA was enacted.  *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); Dwight D. Eisenhower, *Address to the American Society of Newspaper Editors* (Apr. 17, 1958), in Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a trigger").  And this phrase has made it into common parlance as an idiom meaning "to make a final decision."  *See* Idioms, The Free Dictionary, "pull the trigger," *available at:* https://idioms.thefreedictionary.com/pull+the+trigger (last visited Jan. 29, 2018).  Recognizing the ubiquity of this usage, the Supreme Court has described a machine gun within the NFA's definition as one that "fires repeatedly with a single pull of the trigger." *Staples v. U.S.*, 511 U.S. 600, 602 n.1 (1994).

This interpretation of "single function of the trigger" formalizes longstanding interpretations by ATF, dating to the 2006 ruling that corrected the original misclassification of the Akins Accelerator.  *See* ATF Rul. 2006-2.  There, ATF concluded that a device "activated by a single pull of the trigger, initiat[ing] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted," should be classified as a machine gun.  The ruling noted, as the Final Rule does, that this "determination is consistent with the legislative history of the NFA."  *Id.*  In particular, Congress received testimony in 1934 that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns."  NFA Hrg. at 40.

11

The Final Rule's interpretation of "single function of the trigger" is also consistent with past judicial interpretations. In *U.S. v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit recognized that the definition of "single function of the trigger" reasonably encompassed "an electronic on-off switch rather than a more traditional mechanical trigger," thereby concluding that a "minigun" was a machinegun. In doing so, the Court rejected arguments that the minigun was not a machine gun because it was fired with an "electronic switch" rather than a traditional trigger. The "switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machine gun." *Id.* (superseded by statute). This illustrates the primacy of the shooter's action, not the "trigger," and in *Akins*, the Eleventh Circuit relied on *Fleischli* and the NFA's legislative history to conclude that the interpretation of "single function of the trigger" to mean a "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins*, 312 F. App'x at 200.

Plaintiff objects that the Final Rule's definition "improperly limits the phrase 'single function of a trigger'" because "[t]he statute focuses on the trigger's 'function,'" Mot. at 10, not the operation of the shooter's finger. But as *Fleischli* demonstrates, the meaning of "single function of the trigger" should not be so restricted, because that interpretation fails to account for other types of triggering devices. Both *Fleischli* and *Akins* properly concluded that, irrespective of the statute's use of "single function of the trigger," what matters is the initiation of firing by a single action of the shooter through a single pull of the trigger. This definition accords with the ordinary meaning of the term "function," which includes "any of a group of related actions contributing to a larger action." Webster's Ninth New Collegiate Dictionary, 498 (1986); *see also* Random House Thesaurus College Edition, 297 (1984) (a synonym of function is "act"). With regard to a bump stock under the Final Rule, the action or act is a "pull of the trigger."

Plaintiff also contends that the definition of "single function of the trigger" is improper because "[p]ulling a trigger lever is certainly one way that a trigger may function, but it is not the only way," Mot. at 10, and the definition privileges a "backward" pull over a "forward" push. Yet the Final Rule expressly interprets "pull" broadly to encompass other, analogous types of

"functions." 83 FR 66518 n.5; 83 FR 66534-35. Such "analogous motions" include a "push," the "flipping of a switch," or other reasonable interpretations. *See id.* The Final Rule adopted this broader interpretation of "pull" precisely for the reason urged by Plaintiff: to avoid "enabling persons to avoid the NFA" by reversing a trigger so that it is operated with a push or installing a switch or button to operate the trigger instead. 83 FR 66518 n.5 (citing *Fleischli*, 305 F.3d at 655-56). Thus, the Final Rule is clear that it has not improperly limited the meaning of "function."

### 2. "Automatically" is Reasonably Defined as "The Result of a Self-Acting or Self-Regulating Mechanism . . . ."

The Final Rule's interpretation of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger" also accords with the plain meaning of that term. 83 FR 66553-54. As the Final Rule explains, "'automatically' is the adverbial form of 'automatic," meaning '[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]'" 83 FR 66519 (quoting Webster's New International Dictionary 187 (2d ed. 1934); and citing 1 Oxford English Dictionary 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself.")). The application of the term "automatically" to cover a bump stock device that assists in the channeling of energy into the subsequent operation of the trigger, thereby relieving the shooter of the manual burden of doing so, is no different than other common uses of the term "automatic," such as an "automatic" transmission in a vehicle that relieves the driver from the manual burden of changing gears through a self-acting mechanism. And this is consistent with the definition employed by the Seventh Circuit Court of Appeals in interpreting the definition of machine gun in *U.S. v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). There, the Court explained that the statutory definitions works by "delineat[ing] how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." *Id.*

Plaintiff challenges this definition, contending that the Final Rule's definition of automatically improperly "disregards a shooter's manual manipulation of his firearm" away from

the trigger (*i.e.*, through the forward pressure with the non-trigger hand and rearward pressure on the extension ledge.)  Mot. at 8-9.  Contrary to Plaintiff's thesis that the "text does not restrict where and how the additional manual manipulation occurs," Mot. at 9, the Final Rule's focus on the trigger is a direct product of the statutory text, which defines a machine gun in terms of the "function" or "pull" of the *trigger*, not the shooter's actions on other parts of the firearm.  The exclusion of "physical manipulation" of other parts of the firearm from the definition of "automatically," *see* 83 FR at 66516, 66532, therefore does not "conflict[] with text." Mot. at 9.[8]

Finally, Plaintiff contends that the Final Rule's definition of "automatically" is incorrect because the "trigger reset" is "mechanical[ly] significan[t]," arguing that under the decision in *Staples*, the definition of an automatic firing sequence is limited to the period before a firearm's "trigger is released."  Mot. at 10 (citing *Staples*, 511 U.S. at 602 n.1).  Nothing in either the statute or *Staples* contradicts the definition of "automatically" in the Final Rule.  The same footnote in *Staples* emphasizes the centrality of a "single pull of the trigger," and the verb pull means:

> To exert upon (something) a force which tends to draw, drag, or snatch it towards oneself, or away from its present position (whether or not movement takes place); to drag or tug..."

*Pull, v.*, OED Online, Oxford University Press (Dec. 2018).

This definition makes clear that the relevant elements are the overall "exert[ion]" and its direction with regard to "its present position."  *Id*.  As long as a single, conscious "pull" of the finger is occurring, it is immaterial whether the "trigger is released" as long as the shooter does not carry out such a pull and "release" repeatedly.  Nothing in *Staples* is inconsistent with this analysis.

### B.  The Final Rule Reasonably Applies Its Interpretations of "Automatically" and "Single Function of the Trigger" To Classify Bump Stocks As Machine Guns.

The Final Rule's clarification that bump stocks are part of the regulatory definition of machine gun is also reasonable.  As the Department explained, incorporating the Final Rule's interpretations of "automatically" and "single function of the trigger" into Congress's definition of

---

[8] Plaintiff also asserts that this "conflict[s] with . . . court interpretation," but does not cite any judicial decision which requires that the definition of "automatically" account for manipulation of other parts of a firearm.  Mot. at 9.  While *Staples* discusses "manual manipulation," that analysis is limited to whether such is needed "to place another round in the chamber."  511 U.S. at 602, n.1.

machine gun logically supports the Final Rule's clarification of the definition of "machine gun" to make clear that a machine gun includes a bump stock.  The Final Rule's discussion of the mechanics of a bump stock, as installed on a commonly-owned semi-automatic firearm, demonstrates the correctness of this conclusion.

First, "[w]hen a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger," that action helps to initiate "a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger."  83 FR 66519.  As the Final Rule explains, this cycle requires several components to ensure that "a firing sequence that produces more than one shot" occurs.  *Id.*  One is that "the trigger finger remains stationary on the device's ledge."  *Id.*  Another is that "constant forward pressure" is maintained "with the non-trigger hand" on the appropriate part of the rifle.  83 FR 66518, 66532.  When those conditions are satisfied and "a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot."  83 FR 66519.  The "single pull of the trigger" is the shooter's initial, conscious finger movement to initiate the firing sequence.  83 FR 66532.  The "automatic" element is the assistance the bump stock provides in "directing the recoil energy of the discharged rounds into the space created by the sliding stock," which thereby "captures and harnesses" this energy.  *Id.*  The self-acting or self-regulating mechanism is the combination of the shooter's inputs on the trigger, the extension ledge, and the barrel shroud or fore-grip, along with the aforementioned "space" that provides a "constrained linear rearward and forward path[]," thereby harnessing the recoil energy.  *Id.*  Using this analysis, the Final Rule reasonably concludes that a bump stock is a machine gun.

Citing past ATF decisions, Plaintiff contends that this conclusion "runs counter to the language set out by Congress" because a firearm's "automatic firing cycle" cannot be interpreted to "require continuous multiple inputs by the user for each successive shot."  Mot. at 7, 8.  To describe these as "inputs," however, occludes the simplicity of how a shooter employs a bump stock.  As the Final Rule explains, the shooter uses his non-shooting hand to form part of the mechanism by which a bump stock "eliminate[s] the need for the shooter to manually capture,

15

harness, or otherwise utilize [the recoil] energy to fire additional rounds."  83 FR 66531-32.  The key innovation in a bump stock is that it provides an empty space, and this space functions as the self-regulating mechanism that helps a shooter channel recoil energy: in essence, the shooter holds the entire firearm steady with both hands, while it "bumps" the trigger against his finger while sliding in the confined space.  *Id.*  Nothing in the term "automatically" requires that a mechanism like a bump stock function without shooter involvement, but only that it do so with "little . . . human control."  *See automatic, adj.*, OED Online, Oxford University Press, (Dec. 2018 ("2b. Of a machine, appliance, etc.: that does not require an operator; that works by itself under fixed conditions, with little or no direct human control.").  And it is readily apparent in the operation of a bump stock that a self-regulating mechanism is facilitating "automatic" fire.  Plaintiff's assertion that the "continuous multiple inputs by the user" are inconsistent with "automatic" operation is erroneous.  Mot. at 8-10.

Nor do past interpretations by ATF have a bearing on the reasonableness of the analysis in the Final Rule.  "The Supreme Court has rejected the notion that an agency's interpretation of a statute it administers is to be regarded with skepticism when its position reflects a change in policy."  *Lockheed Martin Corp. v. Dep't of Labor*, 717 F.3d 1121 (10th Cir. 2013); *compare* Mot. at 8, 15.  When changing position, an agency must demonstrate "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which [a] conscious change of course adequately indicates."  *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).  Here, the Final Rule is "conscious [of the] change in course," *see, e.g.*, 83 FR 66517 & 66520, and it explains that the agency believes its revised analysis is better.  That is, "[w]hile the Department accepted the previous classification of some [bump stocks] as non-machineguns, it relied on the mistaken premise that the need for 'shooter . . . input' for firing with [bump stocks] means that such devices do not enable 'automatic' firing."  83 FR 66531.

In short, what has changed is that the Department has now supplied a definition for "automatically," and that definition helps clarify that a bump stock is a machine gun.  Much of ATF's past analysis of bump stocks focused, not on the meaning of the word "automatically" or on

16

whether a bump stock (when combined with a semiautomatic firearm) created a self-regulating system, but rather, whether particular parts—such as the Akins Accelerator's spring—that had previously facilitated automatic firing were present.  *See* 83 FR 66518 ("none of [ATF's past decisions] extensively examined the meaning of 'automatically.'").[9]  The Final Rule's treatment of bump stocks, which benefits from the definition of "automatically," is the better view.

The Final Rule also remains consistent with the term "semi-automatic" as defined in federal law, contrary to Plaintiff's analysis.  *See* Mot. at 11 (contending that the Final Rule "obliterated the statutory distinction between automatic and semi-automatic weapons").  The term "'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."  18 U.S.C. § 921(a)(28).[10]  Far from being in conflict, the definition of "machine gun" under the Final Rule harmonizes with this definition of "semi-automatic" by making clear that *both* definitions turn on whether a separate "pull of the trigger" causes one round, or more than one round, to be discharged.

Plaintiff is also incorrect in arguing that the "rule of lenity" requires that the statute be interpreted to exclude bump stocks, lest criminal defendants lack "fair notice of the law's reach."  *See* Mot. at 15.  The Supreme Court in *Staples* held that the *mens rea* requirements associated with the federal restriction on machine guns requires that "a defendant must know" that a firearm has been "brought . . . within the scope of the" NFA's definition of machinegun.  511 U.S. at 618-19.

---

[9] A comparable example would include the pulling of a long rope using a hand-over-hand motion. For example, if a boater brings aboard a line that is trailing in the water, he might employ both hands in sequence as he coils it.  Neither hand remains in constant contact with the rope, but it would be appropriate to describe his actions as pulling the line aboard in a single pull.

[10] The term "semi-automatic weapon firearm" is not specifically defined in federal law, but typically refers to a weapon that after a round of ammunition is fired, chambers the next round and can then be fired with a separate trigger pull.  *See, e.g.*, Ohio Rev. Code Ann. § 2923.11 (West 2017) ("'Semi-automatic firearm' means any firearm designed or specially adapted to fire a single cartridge and . . . chamber a succeeding cartridge ready to fire, with a single function of the trigger"); N.Y. Penal Law § 265.00(21) (McKinney 2018) ("'Semiautomatic' means any repeating rifle, shotgun or pistol . . . which utilizes a portion of the energy of a firing cartridge or shell to extract the fired [round] . . . and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge or shell").

*Staples* provides protection to those who relied on ATF's prior classification decisions from being unknowingly swept up as criminal defendants, and that possibility does not require the Department to interpret the statute differently.

**C. The Final Rule Does Not Rely on Factors which Congress Had Not Intended the Department to Consider.**

Far from having "relied on factors which Congress had not intended it to consider," Mot. at 17, the central premise of the Final Rule comes directly from Congress's mandate that dangerous, automatic weapons that readily produce high effective rates of fire should not be unregulated. "Machine guns are more dangerous in their likely effects than are those guns that are in common use among law-abiding citizens. They not only fire very quickly, but they are harder to shoot in a discriminating way, at least in their fully automatic mode." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1482 (2009). The principal advantage conferred by machine guns on shooters is the high rate of fire, and the value of this feature is to confer the ability to engage in suppressive fire across a wide area or to engage numerous targets at one time. In balancing these benefits with the obvious dangers of machine guns, Congress concluded at the time it adopted the NFA that "there is no reason why anyone except a law officer should have a machine gun." H.R. Rep. No. 73-1780, at 1 (1934); *see also* S. Rep. No. 82-1495, at 1-2 (1952) (explaining that the NFA had as its "principal purpose . . . to control the traffic in machine guns and sawed-off shotguns, the type of firearms commonly used by the gangster element."). Congress held the same view at the time of enactment of the GCA in 1968. *See U.S. v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (noting Congress's "specific declaration and finding that . . . machine guns . . . are primarily weapons of war" (quoting S. Rep. No. 90-1501, at 28 (1968))). And in adopting the FOPA in 1986, Congress continued to pay heed to the fact that law enforcement officers required "more effective protection . . . from the proliferation of machine guns." H.R. Rep. No. 99-495, at 2, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1328, 1333.[11]

---

[11] At the time, machine guns were being increasingly "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime." H.R. Rep. No. 99-495 at

It is not the case that "political" input from elected officials constitutes a "factor[] . . . Congress had not intended," and Plaintiff offers no case law to support this contention. Mot. at 17. The Supreme Court has recognized the converse proposition: that both "Presidential oversight" and "political pressure from Congress" are appropriate reasons for agency policy changes. *See Fox*, 556 U.S. at 523 (rejecting dissenting view that independent agencies should be "sheltered" from political influence); *accord Cure Land v. USDA*, 2014 WL 12672681 (D. Colo. Aug. 14, 2014) (unpublished) (an agency's "consideration of public comments and controversy" is not improper unless it is "in violation of a statutory requirement to only consider other factors"). Nor does the Final Rule attempt to conceal the role of public interest in prompting DOJ's reconsideration of past analyses and definitions. *See* 83 FR 66528 (acknowledging that the "Las Vegas attack brought attention to [bump stocks]" through "requests from Congress" and public groups).

In any case, the Final Rule specifically refutes Plaintiff's claim that the rule does not reflect "legitimate interpretive analysis," Mot. at 17, explaining that the Final Rule adopts the "best interpretation of the statute and . . . reflect[s] ATF's position since 2006." 83 FR 66518. The Final Rule is based on the need to "define[] the terms 'automatically' and 'single function of the trigger' to clarify the meaning of machinegun," in order to rectify the past classification errors stemming from the undefined nature of the term "automatically." *Id.* at 66528; *see id.* at 66529 ("the impetus for this rule is the Department's belief, after a detailed review, that [bump stocks] satisfy the statutory definition of 'machinegun.' . . . [and that it] must therefore classify devices that satisfy the statutory definition of 'machinegun' as machine guns"). As explained above, the Department's interpretive analysis reaches a reasonable conclusion, as the Presidential Memorandum directed. *See* 83 FR 7949 (requiring use of "the procedures the law prescribes" for rulemaking).

Plaintiff is also wrong when he argues that the Final Rule relied on a "factor[] Congress had not intended" by "repudiat[ng] the agency's expertise." Mot. at 19. Plaintiff highlights

4, 1986 U.S.C.C.A.N. at 1330. The strictures of the NFA and GCA had proven inadequate to protect the public from these weapons. As one senator explained, "[what] has changed . . . since the 1968 act . . . is that machine guns have become a far more serious law enforcement problem." 132 Cong. Rec. 9,602 (1986) (statement of Sen. Kennedy).

testimony by ATF Acting Director Thomas E. Brandon that, in the past, "technical experts,"
"firearms experts" and "lawyers" within ATF believed that bump stocks did not constitute machine
guns, but those officials reached their conclusions without the benefit of the definition of
"automatically" set forth in the Final Rule.  Here as well, Plaintiff can point to no case or other
authority (and no statutory requirement) stating that Congress intended DOJ to ignore the context
of revised statutory interpretations and to rely only on previous agency views.  Indeed, such a
position would vitiate the agency's authority "to reconsider and rectify errors" and to "undo what
is wrongfully done by virtue of its order."  *Gun South, Inc. v. Brady,* 877 F.2d 858, 862 (11th Cir.
1989); *see Dun & Bradstreet Corp. v. USPS,* 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely
accepted that an agency may, on its own initiative, reconsider its interim or . . . final decisions").

 Indeed, many of the comments to the NPRM highlighted that the application of the
definition in the Final Rule to bump stocks takes into account *precisely* the factors that Congress
considered in enacting the NFA, GCA, and FOPA.  Bump stocks enable shooters to fire semi-
automatic weapons automatically, achieving the same high effective rates of fire that Congress
sought to control in banning machine guns.  83 FR at 66516 (bump stocks "accelerate the . . . firing
rate" enabling shooters "to mimic automatic fire"); *see* 83 FR 66521 ("commenters opined that the
regulation . . . will have the same dramatic benefit originally intended by" the NFA and GCA); *see
U.S. v. Brazeau*, 237 F.3d 842, 845 (7th Cir. 2001) ("The point is that most firearms do not have to
be registered-only those that Congress found to be inherently dangerous."); *U.S. v. Spires*, 755 F.
Supp. 890, 892 (C.D. Cal. 1991) ("Congress believed these particular weapons, as opposed to
firearms in general, are extremely dangerous").  Many commenters highlighted the "particular risk
to large-scale public events, such as the Las Vegas concert" that bump stocks pose, as well as the
inherently dangerous nature of bump stocks because they impede a shooter's accuracy.  83 FR
66520.  Although it is the functioning of the firearm that is consistent with the definition of
machine gun, these other factors confirm that the Final Rule is within Congress's intent in
restricting machine guns.  *See* 18 U.S.C. § 922(o); If bump stocks continue to be misclassified as
unregulated items, the result would be to undercut Congress's purpose.  *See* 83 FR at 66520-21.

In this context, the Department's review of the correct classification of bump stocks reached a result fully consistent with Congress's actions in limiting private possession of newly-manufactured machine guns. The definition of "machinegun" in the GCA and NFA includes bump stocks because bump stocks convert an otherwise semiautomatic firearm into a machinegun. They act as a self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter, so long as the shooter maintains continued rearward pressure on the trigger and forward pressure on the barrel shroud or forestock. *See* 83 FR 66532. In short, because a bump stock enables most shooters to fire much faster by providing a mechanism that self-regulates the bump-fire process, a semi-automatic affixed with a bump stock is a machine gun: it "shoots automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

## D. The Department Acted Within Its Authority in Issuing the Final Rule.

"The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Where Congress has "fail[ed] to define a term," or left the term open to multiple interpretations, there is "an implicit legislative delegation of authority to . . . clarify the undefined term." *Walshire v. U.S.*, 288 F.3d 342, 347 (8th Cir. 2002). These general principles apply even in contexts, such as the interpretation of criminal statutes, in which agencies are not ordinarily entitled to deference, so long as the terms are given their "ordinary, accepted meaning." *Burrage v. U.S.*, 571 U.S. 204, 216 (2014); *see U.S. v. Apel*, 571 U.S. 359, 369 (2014) (Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference").

In addition, Congress has explicitly provided the Department with authority to issue definitions and interpretations under both the NFA and GCA. 26 U.S.C. § 7801(a)(2)(B) authorizes the Attorney General to make "rulings and interpretations" of the NFA's provisions as

part of his authority to enforce and administer the statute.[12]  The GCA similarly "delegate[s] authority to implement § 922(g)" through "such rules and regulations as are necessary."  *U.S. v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004) (quoting 18 U.S.C. § 926(a)).  Only the FOPA purports to limit ATF's authority, and it does so in hortatory terms, not in operative language.  *See* Pub. L. 99-308, 100 Stat. 449 at § 1(b) (finding that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law–abiding citizens with respect to . . . any . . . lawful activity").  ATF has routinely exercised these authorities to provide regulatory definitions of terms that Congress did not define.  *See, e.g.*, 33 FR 18555 (Dec. 14, 1968); 63 FR 35520 (June 30, 1998); 81 FR 2658 (Jan. 15, 2016) (defining "frame or receiver" and "manual reloading," terms in the NFA that Congress did not define); *U.S. v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 419 (6th Cir. 2006) (noting that the NFA does not define the phrases "designed to shoot" or "can be readily restored" in the definition of "machinegun"); *cf. U.S. v. Wonschik*, 353 F.3d 1192, 1197-98 (10th Cir. 2004) (recognizing "confusing" nature of separate part of "machinegun" definition).

Each of Plaintiff's arguments that the Department lacks the statutory and constitutional authority to adopt the Final Rule rests on the same faulty premise: that the Final Rule does more than "define a term" that Congress left undefined, or "clarify" the classification of bump stocks as machine guns in light of the new definitions.  *Walshire*, 288 F.3d at 347; *compare* 83 FR 66515.  Yet such definitions and clarifications form the entirety of the Final Rule.  Thus, contrary to Plaintiff's claim that the Final Rule improperly "rewrites a statutory definition," Mot. at 6, the Final Rule explains that "terms . . . that Congress did not define" are "necessary to explain and implement the statute."  83 FR 66527 (citing, *e.g.*, *Akins*, 312 F. App'x 197).[13]

---

[12] Plaintiff acknowledges that the Attorney General has such authority under the NFA, and that Congress transferred the functions of ATF from the Department of the Treasury to the Department of Justice in the Homeland Security Act of 2002.  *See* Mot. at 5.  It is therefore irrelevant that the Final Rule was issued without involvement of "the Secretary of the Treasury," Mot. at 6.

[13] Plaintiff's motion seeks to elevate his APA claims into constitutional violations, asserting that if the Department has exceeded the bounds of its authority under the GCA and NFA, the Rule is "unconstitutional."  *See* Mot. at 4, 7.  However, not every agency action that is improper under the APA rises to the level of a constitutional violation, and because the Department has relied on its

Both *York v. Sec'y of the Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985), and *Akins* confirm that the Department may exercise interpretive authority in this way.  In *York*, the Tenth Circuit upheld ATF's use of its "enforcement power to interpret 26 U.S.C. § 5845(b)," including to interpret the undefined statutory term "shoots automatically," to classify a specific model of carbine as a machine gun.  *See* 774 F.2d at 420; ATF Rul. 83-5, *available at*: https://www.atf.gov /file/55386/download.  The Court concluded that these actions constituted an "an administrative interpretation of an existing statute" within ATF's authority.  *York*, 774 F.2d at 421.  In *Akins* too, the reviewing court recognized ATF's interpretive authority over an undefined term: "single function of the trigger," the interpretation now being formalized.  *See Akins*, 312 F. App'x at 200.

In sum, the Department has both explicit and implicit authority to define the terms "single function of the trigger" and "automatically," and has reasonably supplied such definitions to reclassify bump stocks as unlawful machine guns.  Accordingly, Plaintiff has not established a substantial likelihood of success on the merits.

## II.    The Balance of Equities Does Not Tip in Plaintiff's Favor and an Injunction is Not in the Public Interest.

As Plaintiff acknowledges, the final two elements of the preliminary injunction analysis "merge when the Government is the opposing party."  Mot. at 20 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In considering these factors, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.  Implementation of the Final Rule serves important public values that outweigh the harm to Plaintiff of the loss of his bump stock.  Thus, the balance of equities here favors Defendants.[14]

---

statutory authority to promulgate the Rule, any judicial holding that it has exceeded its authority should rest on the APA, and not on the Constitution.  *See* 5 U.S.C. § 706(2) (authority for courts to "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority, or limitations"); *Olenhouse*, 42 F.3d at 1580 (citing *Rosenberg v. Fleuti*, 374 U.S. 449, 451 (1963)); *Franklin v. D.C.*, 163 F.3d 625, 637 n.12 (D.C. Cir. 1998) ("Courts do not"—should not— "adjudicate generalized claims of unconstitutionality, but rather resolve constitutional questions . . . to specific . . . claims asserted").

[14]  Defendants do not contest Plaintiff's assertion that he has "been ordered by the Defendants to destroy" (or abandon) a "bump-stock device, which he legally purchased, by March 26, 2019, or

23

First, the bump stock rule makes clear throughout that its adoption will likely promote public safety.  *See* 83 FR at at 66515 ("a desired outcome of this final rule is increased public safety"); *id.* at 66520 ("this rule reflects the public safety goals of the NFA and GCA"); *accord* NPRM, 83 FR at 13447 (reported use of bump stocks by Las Vegas perpetrator made "individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions— and made their potential to threaten public safety obvious").  This public safety benefit would be jeopardized by an injunction which would allow a terrorist or criminal to use a lawfully-possessed bump stock to carry out a large-scale attack.  For this reason, public safety tilts the equities in favor of Defendants, particularly here, where public safety is the mandate prescribed by Congress in the NFA and GCA.  *See Graham v. Henry*, 2006 WL 2645130 (N.D. Ok. Sept. 14, 2006) (unpublished) ("public safety concerns" and government's "duty to protect the public" support balancing the equities in favor of governmental defendants).

In addition, implementation of the Final Rule reflects a particularized interest in advancing the safety of law enforcement personnel because "[a] ban [on bump stocks] . . . could result in less danger to first responders when responding to incidents." 83 FR 66551.  The "public[] interest in the safety of . . . law enforcement officials is both legitimate and weighty." *U.S. v. Denny*, 441 F.3d 1220, 1225-26 (10th Cir. 2006) (quoting *Penn. v. Mimms*, 434 U.S. 106, 110 (1977)).  As with the interest in public safety, this interest would be disserved by an injunction, and this further tips the balance of the equities in favor of Defendants.

Finally, Congress's findings in adopting the GCA and NFA and instituting a general ban on the private acquisition of new machine guns illustrate that the public interest is in implementing

face criminal prosecution."  Mot. at 2.  Because "[i]rreparable harm, as the name suggests, is harm that cannot be undone," *Salt Lake Tribune Pub. Co. v. AT&T*, 320 F.3d 1081, 1105 (10th Cir. 2003), Defendants acknowledge that the irreparable harm prong of the preliminary injunction test is met here. However, Plaintiff is in error where he argues that the possibility that he "will be required to follow a rule that was issued in violation of constitutional limits set out in Articles I, § 1 and II, § 3 of the U.S. Constitution" automatically establishes irreparable harm.  Mot. at 20.  To the contrary, "[c]ases so holding . . . are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other" individual rights, not allegations related to constitutional structure like those presented by Plaintiff.  *Pub. Svc. Co. of N.H. v. T. of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987); *accord Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000).

congressional priorities and stopping the proliferation of machine guns, including bump stocks. *See, e.g.*, *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1190-91 (10th Cir. 2003) (congressional findings are an important factor in demonstrating public interests affected by preliminary injunction). The protection of the public and law enforcement officers from the proliferation of firepower in criminal hands is a consistent theme that runs through federal firearms legislation, including the NFA, GCA, and FOPA. *See generally supra* at 3-6. In weighing the public interest and balance of the equities at the preliminary injunction stage, "the Court must enforce the priorities of Congress," *U.S. v. RX Depot, Inc.*, 297 F. Supp. 2d 1306, 1310-11 (N.D. Okla. 2003), and grant substantial weight to the public safety priorities at issue here.

Plaintiff contends that the harm to the public interest is reduced by the fact that an injunction is sought "'merely [to] delay[]' the effective date of [the] regulation." Mot. at 20-21 (quoting *Penn. v. Trump*, 281 F. Supp. 3d 553, 585 (E.D. Pa. 2017)). But the authority cited by Plaintiff involved insurance regulations, not a restriction on dangerous weapons that risk mass casualties in a criminal or terrorist act. *See Newland*, 881 F. Supp. 2d at 1291-92. Nor is it the case that any alleged "violation of a party's constitutional rights" is dispositive of the public interest and balancing-of-equities analysis. *See* Mot. at 20 (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). Cases applying such a presumption have done so only when specific infringements on individual rights are asserted, not when, as here, a plaintiff has sought to bootstrap allegations of APA injury into a purported "constitutional harm." *See supra* n.16. Plaintiff's proposed far-reaching presumption would be wholly inconsistent with *Winter*'s admonition that a "preliminary injunction is an extraordinary remedy never awarded as of right," 555 U.S. 24, and would elevate an alleged "generalized interest . . . in constitutional governance," *Whitmore v. Ark.*, 495 U.S. 149, 160 (1990)—well-established to be inadequate for standing purposes—to satisfy the far-higher requirements needed to obtain a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for preliminary injunction should be denied.

DATED this 6th day of February, 2019          Respectfully submitted,

                                              JOHN W. HUBER
                                              United States Attorney

                                              JOSEPH H. HUNT
                                              Assistant Attorney General

                                              JOHN R. TYLER
                                              Assistant Branch Director

                                              MATTHEW J. GLOVER
                                              Counsel to the Assistant Attorney General

                                              JEFFREY E. NELSON
                                              Assistant United States Attorney

                                              _/s/ Eric J. Soskin_____
                                              ERIC J. SOSKIN
                                              Senior Trial Counsel

26