**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 5, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

---

W. CLARK APOSHIAN,

     Plaintiff - Appellant,

v.

ROBERT M. WILKINSON, Acting
Attorney General of the United States;
UNITED STATES DEPARTMENT OF
JUSTICE; REGINA LOMBARDO,
Acting Director Bureau of Alcohol
Tobacco Firearms and Explosives;
BUREAU OF ALCOHOL TOBACCO
FIREARMS AND EXPLOSIVES,

     Defendants - Appellees.*
------------------------------
CATO INSTITUTE AND FIREARMS
POLICY COALITION; DUE PROCESS
INSTITUTE,

     Amicus Curiae.

No. 19-4036
(D.C. No. 2:19-CV-00037-JNP-BCW)
(D. Utah)

---

**ORDER**

---

* Pursuant to Fed. R. App. P 43(c)(2), William Barr is replaced by Robert M. Wilkinson as Acting United States Attorney General, and Thomas E. Brandon is replaced by Regina Lombardo as Acting Director of the Bureau of Alcohol Tobacco Firearms and Explosives.

Before **TYMKOVICH**, Chief Judge, **BRISCOE, LUCERO**[**], **HARTZ, HOLMES, MATHESON, BACHARACH, PHILLIPS, MORITZ, EID**, and **CARSON**, Circuit Judges.[***]

On September 4, 2020, this court entered an order granting Appellant's *Petition for Rehearing En Banc.* Having now considered the parties' supplemental briefs and heard oral argument in this matter, a majority of the en banc panel has voted to vacate the September 4, 2020 order as improvidently granted. As a result, the court's September 4, 2020 order granting en banc rehearing is VACATED, the court's May 7, 2020 opinion is REINSTATED, and the Clerk shall reissue this court's judgment as of the date of this order.

Chief Judge Tymkovich, as well as Judges Hartz, Holmes, Eid and Carson would proceed with en banc rehearing. Chief Judge Tymkovich, Judge Hartz, Judge Eid, and Judge Carson have written separate dissents from this order, and each has joined in the others' dissents. Judge Holmes has also joined all dissents.

All pending motions for leave to file amicus briefs on rehearing are DENIED.

Entered for the Court,

CHRISTOPHER M. WOLPERT, Clerk

---

[**] The Honorable Carlos F. Lucero participated in the en banc court's consideration of this matter while still in active status. He took senior status effective February 1, 2021, but has participated fully in this order.

[***] The Honorable Carolyn B. McHugh is recused in this matter.

2

19-4036, *Aposhian v. Wilkinson, et al.*

**TYMKOVICH**, Chief Judge, joined by **HARTZ**, **HOLMES**, **EID**, and
**CARSON**, Circuit Judges, dissenting.

I dissent from the majority's decision to vacate the en banc order as
improvidently granted. The issues that initially led this court to grant en banc
rehearing remain unresolved and it is important that they be addressed to give
guidance to future panels and litigants. I write separately to identify why the
panel majority wrongly decided the case in the first place and why its opinion will
have deleterious effects going forward.

W. Clark Aposhian brought a pre-enforcement challenge to a rule
promulgated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)
that classifies bump stocks as machine guns[1] under the National Firearms Act
(NFA), 26 U.S.C. §§ 5801–5872. The Final Rule was promulgated to clarify the
definition of "machinegun" found in 26 U.S.C. § 5845(b). *See* 27 C.F.R.
§ 479.11. The Final Rule required owners of bump stocks to destroy them or
abandon them to the ATF by March 26, 2019. *See* Bump-Stock-Type Devices, 83
Fed. Reg. 66,514, 66,514 (Dec. 26, 2018) (Final Rule).

Mr. Aposhian sought a preliminary injunction from the district court to
prevent ATF from enforcing the Final Rule. The district court denied the motion
for a preliminary injunction, concluding Mr. Aposhian had not shown a likelihood

---

[1] I use the two-word spelling of machine gun except when quoting sources.

of success on the merits of his challenge.  Mr. Aposhian then filed an interlocutory appeal with this court.

The panel majority who considered the interlocutory appeal affirmed the district court.  *See Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020).  The panel agreed with the district court that Mr. Aposhian had not demonstrated a likelihood of succeeding on the merits of his claim.[2]  But it departed from the district court's reasoning.  While the district court had concluded the best reading of "machinegun" in § 5845(b) included bump stocks, the panel majority found the statute ambiguous.  *Id.* at 985–88.  Having identified an "ambiguity," the panel applied *Chevron* deference to the ATF's interpretation of § 5845(b).  *Id.* at 988.  Given this deference, Mr. Aposhian had no realistic path to success.  The panel found ATF's application of § 5845(b) to bump stocks to be a permissible reading of the statute and denied Mr. Aposhian's request for a preliminary injunction.

I believe the panel majority went looking for ambiguity where there was none.  Then, having found ambiguity, it unnecessarily placed a thumb on the scale for the government by invoking *Chevron* deference.  The panel majority did this

---

[2]  To prevail on a motion for a preliminary injunction, the movant must show "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

even though ATF maintained the statute was unambiguous and did not claim its interpretation was entitled to any special deference. The panel also applied *Chevron* even though ATF's Final Rule has criminal, as well as civil, consequences. In doing so, the panel majority further confused this court's law about whether *Chevron* can be waived and whether the rule of lenity can ever be used to resolve ambiguities when *Chevron* might also apply to statutes with criminal penalties. Now, by vacating the en banc order as improvidently granted, the court deprives us of the chance for much-needed clarity on these issues.

## I. Likelihood of Success on the Merits

As an initial matter, Mr. Aposhian has shown a likelihood of success on the merits. Section 5845(b) unambiguously excludes bump stocks from its ambit. And even if the statute is ambiguous, *Chevron* deference is inapplicable here for several reasons. First, the government consistently refused to invoke *Chevron* deference for its interpretation. That is a decision we should respect. And second, because the Final Rule interprets a statute with criminal consequences, we must resolve ambiguity through the rule of lenity before ever reaching for *Chevron*. The manner in which the panel majority addressed these issues is not only wrong, it creates an unfortunate amount of uncertainty for future litigants.

### A. Standard of Review

The standard for reviewing a district court's denial of a preliminary

injunction is abuse of discretion. *Fish v. Kobach*, 840 F.3d 710, 723 (2016). The

district court abuses its discretion when its decision is premised "on an erroneous

conclusion of law or where there is no rational basis in the evidence for the

ruling." *Id.* (internal quotation marks omitted). We evaluate the district court's

legal determinations de novo. *Id.*

### B. Statutory Framework

I am not the first to spill ink over this issue, so I will keep my description

of the statutory regime brief. *See Aposhian*, 958 F.3d 969; *see also Guedes v.

Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1 (D.C. Cir.

2019), *cert. denied*, 140 S. Ct. 789 (2020). The NFA, originally passed in 1934,

"imposes strict registration requirements on statutorily defined 'firearms.'"

*Staples v. United States*, 511 U.S. 600, 602 (1994). Machine guns are among

those firearms subject to regulation and registration under the NFA. *See* 26

U.S.C. § 5845(a). Under § 5845(b), a "machinegun" is "any weapon which

shoots, is designed to shoot, or can be readily restored to shoot, automatically

more than one shot, without manual reloading, by a single function of the

trigger." The statutory definition also includes "any part designed and intended

. . . for use in converting a weapon into a machinegun." *Id.*

-4-

The Gun Control Act of 1968 (GCA), as amended by the Firearm Owners'
Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449, incorporated the
NFA's definition of machine gun. 18 U.S.C. § 921(a)(23). These acts went
beyond mere regulation, criminalizing almost all possession of machine guns. *See*
*id.* at § 922(o)(1).

No such blanket prohibition exists for possession of semiautomatic rifles,
which require separate pulls of the trigger for each bullet fired. As a result,
firearm manufacturers have created accessories that allow a semiautomatic rifle to
increase the speed with which it can fire a single round. A bump stock is one
such accessory. It is intended to replace the rifle's standard stock, the part of the
rifle that usually rests against the shooter's shoulder. This frees "the weapon to
slide back and forth rapidly, harnessing the energy from the firearm's recoil either
through a mechanism like an internal spring or in conjunction with the shooter's
maintenance of pressure." Bump-Stock-Type Devices, 83 Fed. Reg. at 66,516.
For a non-mechanical bump stock—one without an internal spring—to work as
intended, the shooter must maintain backward pressure with his trigger finger and
forward pressure on the rifle's barrel with his non-trigger hand. The channeled
recoil from the bump stock then causes the trigger to reset and bump repeatedly
against the shooter's stationary trigger finger, resulting in a rate of fire
comparable to a machine gun.

ATF classified a bump stock device as a "machinegun" for the first time in

2006. Specifically, "ATF concluded that a device attached to a semiautomatic

firearm that uses an internal spring to harness the force of a firearm's recoil so

that the firearm shoots more than one shot with a single pull of the trigger is a

machinegun." *Id.* at 66,514. But over the next decade, ATF issued classification

decisions in which it repeatedly assured bump stock owners that non-mechanical

bump stocks were not machine guns as understood in § 5845(b). *Id.*

In 2017, a shooter used a non-mechanical bump stock to attack a large

crowd attending an outdoor concert in Las Vegas. Scores died and hundreds were

injured during this senseless act of violence. Following this tragic incident,

members of Congress and the President asked ATF to examine these past

classifications. *Id.* at 66,516. ATF reviewed its definition and then went through

the formal notice-and-comment process to update its understanding of what

qualifies as a machine gun. *Id.* at 66,517. The Final Rule clarified the definition

of "machinegun" in § 5845(b), stating

> [f]or purposes of this definition, the term
> "automatically" as it modifies "shoots, or can be readily
> restored to shoot," means functioning as the result of a
> self-acting or self-regulating mechanism that allows the
> firing of multiple rounds through a single function of the
> trigger; and "single function of the trigger" means a
> single pull of the trigger or analogous motions. The
> term "machine gun" includes a bump-stock-type-device,
> i.e., a device that allows a semi-automatic firearm to
> shoot more than one round with a single pull of the

-6-

> trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional manipulation of the trigger by the shooter.

27 C.F.R. § 479.11.

The Final Rule was set to take effect on March 26, 2019, at which point everyone who possessed a bump stock was supposed to destroy it or turn it over to ATF. Bump-Stock-Type Devices, 83 Fed. Reg. at 66,514.

### C. The Statute Is Unambiguous

Mr. Aposhian argued before the district court and the panel that ATF exceeded its authority by including bump stocks within the definition of "machinegun" in its Final Rule. Under the Administrative Procedure Act (APA), courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

When evaluating an agency's interpretation of a statute, we often afford its interpretation *Chevron* deference. *Chevron* requires courts to defer to an agency's interpretation of a statute "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat. Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). But such deference is not automatically warranted whenever an agency issues a statement regarding its understanding of a statute. Courts apply *Chevron* deference only "[i]f a statute is

-7-

ambiguous, and if the implementing agency's construction is reasonable." *Id.*
Here, § 5845(b) contains no ambiguity so "*Chevron* leaves the stage." *Epic Sys.*
*Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).

As a reminder, § 5845(b) defines a "machinegun" as "any weapon which
shoots, is designed to shoot, or can be readily restored to shoot, automatically
more than one shot, without manual reloading, by a single function of the
trigger." The question before the panel was whether this definition includes non-
mechanical bump stocks. The panel majority regarded two parts of the statutory
definition as sufficiently ambiguous for *Chevron* deference to apply: "single
function of the trigger" and "automatically."

*Chevron* deference "is not due unless a court, employing traditional tools of
statutory construction, is left with an unresolved ambiguity." *Epic Sys. Corp.*,
138 S. Ct. at 1630. Among other tools, this includes "examination of the statute's
text, structure, purpose, history, and relationship to other statutes" with an
emphasis on a word or phrase's "plain meaning." *Harbert v. Healthcare Servs.*
*Grp., Inc.*, 391 F.3d 1140, 1147, 1149 (10th Cir. 2004). The fact that self-
interested litigants disagree as to the meaning of a statute does not render it
ambiguous. *See In re Woolsey*, 696 F.3d 1266, 1273 (10th Cir. 2012) (explaining
that this is "an ailment surely afflicting most every statutory interpretation
question in our adversarial legal system").

The panel majority, however, evaded these rules of interpretation.  Rather than attempt to *resolve* ambiguity, the panel majority performed interpretive gymnastics to *create* ambiguity.  In truth, neither of the parties really dispute the *meaning* of any words or phrases in the statutory definition of "machinegun."  They dispute only whether the meaning encompasses bump stocks.  And the answer to that question is apparent on the face of the statute.

A "single function of the trigger" is not ambiguous.  At the time the NFA was passed, a "function" meant the "action" of the trigger.  Webster's New International Dictionary 1019 (2d ed. 1934).  The use of the word "function" continues to capture the different ways that triggers can work.  As the government explained in the Final Rule, triggers can initiate fire "by voice command, electronic switch, swipe on a touchscreen or pad, or any conceivable number of interfaces."  Bump-Stock-Devices, 83 Fed. Reg. at 66,534.  Whether a trigger is pushed, pulled, switched, or swiped, each involves a "single function."

The panel majority insists this language is ambiguous because "a single function of the trigger" can be interpreted to refer to the trigger or the shooter.  *See Aposhian*, 958 F.3d at 986 (arguing the statutory language "begs the question of whether 'function' requires our focus upon the movement of the trigger, or the movement of the trigger finger").  But the panel majority finds ambiguity where there is none.  The statute's plain language makes clear the "function" must be "*of*

-9-

*the trigger.*" 26 U.S.C. § 5845(b) (emphasis added). The statute speaks only to how the trigger acts, making no mention of the shooter.[3]

The statute's plain meaning unambiguously excludes bump stocks. A semiautomatic rifle, equipped with a bump stock, does not fire multiple shots by a single function of the trigger. "The trigger on that type of rifle must necessarily 'pull' backwards and release the rifle's hammer . . . every time that the rifle discharges . . . . The rifle cannot fire a second round until both the trigger and hammer reset." *Aposhian*, 958 F.3d at 995 (Carson, J., dissenting). Every shot requires the trigger to go through this full process again. The fact that a bump stock accelerates this process does not change the underlying fact that it requires multiple functions of the trigger to mimic a machine gun.

Likewise, "automatically" is not so ambiguous as to imply Congress intended ATF to engage in gap-filling. In fact, ATF disclaims any gap-filling in the Final Rule. *See* Bump-Stock-Type Devices, 83 Fed. Reg. at 66,519. Far from indicating any statutory ambiguity, ATF's proposed definition in the Final Rule "accords with the everyday understanding of the word 'automatic[ally].'"

---

[3] And the same is true of ATF's definition. *See Guedes*, 920 F.3d at 43 (Henderson, J., dissenting) ("The Rule's definition describes the 'motion' of the trigger, not of the trigger finger . . . . Indeed, nothing in the Rule's definition refers to a shooter's finger or a volitional action."). To consider the shooter or the trigger-finger in the statute or ATF's definition is to read in language that simply is not there.

*Guedes*, 920 F.3d at 31.  It defines "automatically" as "having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in the operation."  Bump-Stock-Type Devices, 83 Fed. Reg. at 66,519 (quoting Webster's New International Dictionary 187 (2d ed. 1934)).  Mr. Aposhian does not contest this definition.  Rather, he contests its application to bump stocks.

The panel majority unnecessarily abstracts "automatically" from the rest of the statutory language to render the word ambiguous.  The statute says a machine gun is designed to shoot "automatically more than one shot, without manual reloading, *by a single function of the trigger*."  26 U.S.C. § 5845(b) (emphasis added).  "Section 5845(b)'s awkward syntax does not equal ambiguity." *Guedes*, 920 F.3d at 183 (Henderson, J., dissenting).  The statute is unambiguous about what makes the firearm shoot automatically: the function of the trigger.  To track with the dictionary definition, the statute itself identifies the "predetermined point in the operation" at which the "self-regulating mechanism performs the required act."  If a single function of the trigger *and then some other input* is required to make the firearm shoot automatically, we are not talking about a "machinegun" as defined in § 5845(b).

The government conceded during the en banc oral argument that if a shooter pulls the trigger of a semiautomatic rifle equipped with a non-mechanical bump stock without doing anything else, the rifle will fire just one shot.  Oral

Arg. at 1:01:40, *Aposhian v. Rosen* (2021) (19-4036). That's why the statute is unambiguous. To make the firearm "shoot automatically more than one shot", the shooter must also be pulling forward on the barrel of the gun. Because a bump stock requires this extra physical input, it does not fall within the statutory requirement that the weapon shoot "automatically . . . by a single function of the trigger." 26 U.S.C. § 5845(b).

### D. Chevron *Does Not Apply Here*

#### 1. The Government Waived *Chevron*

Throughout litigation, the government has maintained that the Final Rule represents the best reading of § 5845(b). It has consistently refused to invoke *Chevron* deference. The panel majority paid no heed to this steadfast refusal. Instead, the panel majority scoured the briefs to justify bringing an uninvited guest to the statutory interpretation party.

According to the majority, all the court needs is an "invitation" to apply *Chevron* deference. *Aposhian*, 958 F.3d at 981–82. And that invitation can be brought by either party—it need not be brought by the government, whom *Chevron* benefits. In fact, even a brief argument in a footnote *opposing* the application of *Chevron* deference constitutes such an invitation. *Id.* (citing *TransAm Trucking, Inc. v. Admin. Review Bd.*, 833 F.3d 1206, 1212 n.4 (10th Cir. 2016)).

This theory of waiver is untenable. Under the panel majority's theory, a party that challenges an agency's interpretation of a rule is forced to dance around *Chevron*, even where the government has not invoked it. *Chevron* becomes the Lord Voldemort of administrative law, "the-case-which-must-not-be-named." And litigants bold enough to expressly oppose *Chevron* in their briefing will be left guessing whether their reference to the case was fleeting or perfunctory enough to avoid making an invitation. All the while, courts are given a troubling amount of freedom when deciding whether to use *Chevron*—discretion that will dictate the outcome in many cases.

Even the panel majority acknowledged it was unsure whether its invitation theory is correct. *See id.* at 982 n.6. And yet the en banc majority is perfectly content to leave this confusion in place. This failure to clarify our rule about whether *Chevron* can be waived has real implications for litigants and courts in our circuit. Plaintiffs challenging an agency's interpretation of a statute are left guessing how to approach a given case. Should they argue vigorously against *Chevron* in their briefing? Should they go to lengths to avoid mentioning *Chevron* and its progeny at all? Or are all such litigation decisions futile because a court can sua sponte apply *Chevron* whenever it pleases? The majority's decision to vacate the en banc order leaves us all without a clear answer.

-13-

For my part, I believe we must abide by the government's decision to forgo *Chevron* deference. I come to this conclusion for two reasons.

First, the normal rules that govern party presentation and waiver should apply to *Chevron*. "[W]hen a party chooses not to pursue a legal theory potentially available to it, we generally take the view that it is 'inappropriate' to pursue that theory in our opinions." *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1146 n.10 (10th Cir. 2010) (en banc). We refuse to consider arguments a party fails to make because we depend "on the adversarial process to test the issues for our decision" and are concerned "for the affected parties to whom we traditionally extend notice and an opportunity to be heard on issues that affect them." *Id.*[4]

---

[4] To be sure, courts treat some issues as non-waivable. For instance, parties typically cannot waive the proper standard of review. *See, e.g.*, *United States v. Fonseca*, 744 F.3d 675, 682 (10th Cir. 2014) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived.") (internal quotation marks omitted). Likewise, we are not bound by a party's failure to make an argument regarding statutory interpretation. *See Kamen v. Kemper Financial Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

But *Chevron* is neither a standard of review nor a canon of construction. The APA describes the appropriate standards of review for reviewing agency actions. *See* 5 U.S.C. § 706. *Chevron* is not among them. And unlike the traditional tools of statutory interpretation, *Chevron* is not concerned with ascertaining the fixed meaning of a statute. Once a statute is deemed ambiguous, a statute interpreted pursuant to *Chevron* can be understood in any number of ways that could change as the political winds blow.

Courts and parties undoubtedly benefit from this type of adversarial

presentation of *Chevron*. *Chevron*'s applicability in a given case is seldom

straightforward. *See Gonzalez v. Oregon*, 546 U.S. 243, 258 (2006) ("*Chevron*

deference, however, is not accorded merely because the statute is ambiguous and

an administrative official is involved."). Rather, whether *Chevron* applies is

often contested and unclear. Among the issues courts must consider is whether

the agency acted with the requisite formality, *see United States v. Mead Corp.*,

533 U.S. 218, 229–31 (2001), whether the statute deals with a major question

Congress would not have intended to delegate, *see King v. Burwell*, 576 U.S. 473,

485–86 (2015), and whether the agency has adopted a specific and consistent

position, *see Epic Sys. Corp.*, 138 S. Ct. at 1630. All this to say: it is often not

apparent at first blush whether *Chevron* should apply.

In practice, courts have applied the party-presentation rule to *Chevron*. The

Supreme Court has deemed *Chevron* to be waived when inadequately invoked.

*See, e.g.*, *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)

(concluding that when an agency does not ask for special deference to its

interpretation "we need not resolve the difficult issues regarding deference which

would be lurking in other circumstances"). We have followed the Court's lead in

our own practice. *Hydro Res.*, 608 F.3d at 1146 ("[W]e need not decide whether

EPA's interpretation of the statute is entitled to deference because, throughout the

proceedings before the panel and now the en banc court, EPA itself hasn't claimed any entitlement to deference."); *see also Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 n.18 (10th Cir. 2020) (same).

Second, when the government does not invoke *Chevron* as part of its litigation strategy, the preconditions for *Chevron* are not present. For *Chevron* to apply, two conditions must be met: (1) Congress must delegate authority to the agency to make rules carrying the force of law and (2) the agency's ensuing interpretation must be "promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. The agency's litigation position is no less an exercise of that authority than the agency's interpretation. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement regarding denial of certiorari) ("If the justification for *Chevron* is that policy choices should be left to the executive branch officials directly accountable to the people, then courts must equally respect the Executive's decision *not* to make policy choices in the interpretation of Congress's handiwork.") (internal quotation marks omitted) (emphasis in original).

Here, in promulgating the Final Rule, ATF insisted its definitions represented "the best interpretation" and accorded "with the plain meaning" of the

statute.[5] Bump-Stock-Type Devices, 83 Fed. Reg. at 66,521, 66,527. And during litigation, the government repeatedly disavowed *Chevron* deference. Aple. Br. at 16 ("[P]laintiff's discussion of *Chevron* deference has no bearing on the disposition of this suit."); *id.* at 36 ("[N]othing in the Rule suggest that its legality depends on the application of *Chevron* deference, or that the agency believed *Chevron* deference was required to uphold the rule."). ATF does not believe it promulgated the Final Rule pursuant to *Chevron*. If the agency disavows any reliance on *Chevron*, who are we to second-guess it?

Whether we view the issue as one of waiver or of *Chevron*'s applicability, the result is the same. We cannot sua sponte raise *Chevron* deference. In this case, that means we must do what courts have done for centuries and interpret the statute the old-fashioned way: de novo. As indicated above, doing so leads to a clear result: bump stocks are not machine guns.

### 2. The Rule of Lenity Resolves Any Ambiguity

Even if *Chevron* cannot be waived and is applicable here, it cannot and should not jump the line when courts interpret an ambiguous statute. As a reminder, *Chevron* only kicks in once the traditional tools of interpretation have been exhausted. *See Epic Sys. Corp.*, 138 S. Ct. at 1630. But the panel majority

---

[5] In the Final Rule, ATF invokes *Chevron* as a last resort, arguing "even if those terms are ambiguous, this rule rests on a reasonable construction of them." *Id.* at 66,527.

did not exhaust all the traditional tools. We still have one left in our toolbox: the
rule of lenity. And it "is more than up to the job of solving today's interpretive
puzzle." *Id.*

The rule of lenity is a substantive canon of construction applied in statutory
interpretation cases involving criminal laws. The rule dictates that "when there
are two rational readings of a criminal statute, one harsher than the other, we are
to choose the harsher only when Congress has spoken in clear and definite
language." *McNally v. United States*, 483 U.S. 350, 359–60 (1987); *see also
United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222 (1952) ("We
should not derive criminal outlawry from some ambiguous implication."). "To
invoke the rule, we must conclude that there is a grievous ambiguity or
uncertainty in the statute." *Muscarello v. United States*, 524 U.S. 125, 138
(1998). And the panel majority was correct in identifying it as a "rule of last
resort." *Aposhia*n, 958 F.3d at 978 n.4.

But it is not clear to me that the level of ambiguity required to invoke the
rule of lenity is any different from that necessary to invoke *Chevron*. And I am
admittedly lost as to why *Chevron* gets to cut in front of the rule of lenity in the
statutory interpretation line. *Chevron* is of recent provenance. It is a rule of
interpretive convenience, rooted in notions of agency expertise and political
accountability. *See Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467

-18-

U.S. 837, 865 (1984). The rule of lenity, by contrast, "provides a time-honored interpretive guideline." *Liparota v. United States*, 471 U.S. 419, 427 (1985). It addresses core constitutional concerns: fair notice and the separation of powers. *United States v. Kozminski*, 487 U.S. 931, 952 (1988); *see also United States v. Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C.J.) ("It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not the judicial department. It is the legislature . . . which is to define a crime, and ordain its punishment."). Applying *Chevron* deference to an agency's interpretation of a statute does not address either of those concerns.

Take the present case as an example. The definition of "machinegun" in § 5845(b) has both civil and criminal consequences. *See* 18 U.S.C. 922(o)(1) (making it unlawful to possess a machine gun). The rule of lenity applies to such statutes. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies."); *see also United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–18 (1992) (Breyer, J., plurality) ("The key to resolving the ambiguity lies in recognizing that although it is a tax statute we now construe in a civil setting, the NFA has criminal

-19-

consequences . . . . It is proper, therefore, to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor.").

Section 5845(b) as re-interpreted by ATF does not provide citizens with fair notice of what conduct is criminalized. When an agency can define criminal conduct, there is a genuine concern that "if [they] are free to ignore the rule of lenity, the state could make an act a crime in a remote statement issued by an administrative agency." *See Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 732 (6th Cir. 2013) (Sutton, J., concurring). The government insists fair notice concerns are not implicated here because the Final Rule is not tucked away in obscurity. Rather, the Final Rule went through notice and comment and is published in the Federal Register.

But this is cold comfort to a citizen tasked with conforming their conduct to the law. The government expects an uncommon level of acuity from average citizens to know that they must conform their conduct not to the statutory language, but to the interpretive gap-filling of an agency which may or may not be upheld by a court. Justice Gorsuch recently expressed this same concern regarding a case with nearly identical facts:

> How, in all this, can ordinary citizens be expected to keep up—required not only to conform their conduct to the fairest reading of the law they might expect from a neutral judge, but forced to guess whether the statute will be declared ambiguous; to guess again whether the agency's initial interpretation of the law will be declared

-20-

> "reasonable"; and to guess again whether a later and
> opposing agency interpretation will also be held
> "reasonable"?

*Guedes*, 140 S. Ct. at 790 (statement regarding denial of certiorari).  When an

agency plays pinball with a statute's interpretation, as the ATF has here, fair

notice cannot be said to exist.

Furthermore, the Final Rule violates the separation of powers.  It is not by

sheer happenstance or convenience that Congress writes the criminal laws.

Rather, "because of the seriousness of criminal penalties, and because criminal

punishment usually represents the moral condemnation of the community,

legislatures and not courts should define criminal activity." *United States v. Bass*,

404 U.S. 336, 348 (1971).  ATF has no authority to substitute its moral judgment

concerning what conduct is worthy of punishment for that of Congress.

And we should feel deep discomfort at allowing an agency to define the

very criminal rules it will enforce by implicit delegation.  Such a delegation

"turn[s] the normal construction of criminal statutes upside down, replacing the

doctrine of lenity with a doctrine of severity." *Carter*, 736 F.3d at 730 (Sutton,

J., concurring).[6] The delegation raises serious constitutional concerns by making ATF the expositor, executor, *and* interpreter of criminal laws.

Applying the rule of lenity to § 5845(b) would alleviate these concerns. The rule of lenity instructs us, when confronted with two possible understandings of a statute, to adopt the narrower construction. With the rule aiding our interpretation, § 5845(b) clearly answers the issue at hand: bump stocks do not fall within the definition of machine gun.

Still, the panel majority says the rule of lenity does not apply here.

In doing so, the panel majority fails to explain why the rule of lenity should receive such a disfavored status among the rules of construction. We have regularly applied similar substantive canons of construction before reaching *Chevron.* For instance, constitutional avoidance is a canon of construction that resolves statutory ambiguities to avoid potential constitutional issues. And like the rule of lenity, "the canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be

---

[6] Citing *United States v. Touby*, 500 U.S. 160 (1991), the government argues that it is well within Congress's power to give agencies the power to define crimes. But if Congress wants to give the executive branch discretion to define criminal conduct, it must speak "distinctly." *United States v. Grimaud*, 220 U.S. 506, 519 (1911). *Touby* involved such an express delegation of interpretive authority to the attorney general. Here, we are far removed from the statute at issue in *Touby*. We are having to infer from *ambiguity*, not an express delegation, that Congress implicitly authorized ATF to define criminal conduct.

susceptible of more than one construction." *Hernandez-Carrera v. Carlson*, 547

F.3d 1237, 1245 (10th Cir. 2008). And yet we have said "[i]t is well established

that the canon of constitutional avoidance does constrain an agency's discretion to

interpret statutory ambiguities, even when *Chevron* deference would otherwise be

due." *Id.* at 1249. We have done the same with other canons of construction.

*See, e.g.*, *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997)

(applying the canon of construction favoring Native Americans rather than

*Chevron*). Why should we favor some substantive canons over *Chevron* but not

the longstanding rule of lenity?

Faced with these conundrums, the panel majority looks to a footnote in a

Supreme Court opinion to serve as the lodestar for its reasoning. *See Babbitt v.

Sweet Home Chapter of Cmtys. for a Greater Ore.*, 515 U.S. 687, 704 n.18

(1995). In *Babbitt*, the Court was confronted with an agency's interpretation of a

statute that had both civil and criminal consequences. The majority applied

*Chevron* rather than the rule of lenity. In making this prioritization, Justice

Stevens wrote: "We have never suggested that the rule of lenity should provide

the standard for reviewing facial challenges to administrative regulations

whenever the governing statute authorizes criminal enforcement." *Id.* And he

went on to say "[e]ven if there exist regulations whose interpretations of statutory

criminal penalties provide such inadequate notice of potential liability as to

-23-

offend the rule of lenity, the 'harm' regulation, which has existed for two decades and gives fair warning of its consequences, cannot be one of them." *Id.* The majority takes this footnote and turns it into a categorical rule: "where a regulation is at issue, and the agency (here, ATF) has both civil and criminal enforcement authority, *Babbitt* suggests that *Chevron*, not the rule of lenity, should apply." *Aposhian*, 958 F.3d at 983.

The panel majority reads the *Babbitt* footnote for more than it is worth. *Babbitt* does not prevent us from applying the rule of lenity here for several reasons. First, Justice Steven's abbreviated reasoning did not create any binding rule about the relationship between lenity and *Chevron* in all circumstances. The footnote is composed of four sentences of reasoning. And it addresses only one of the concerns underlying the rule of lenity—fair notice—but not the other—the separation of powers. "[O]ne would have expected the Court to say more before allowing agencies to trump a doctrine Chief Justice Marshall described as 'perhaps not much less old than construction itself.'" *Carter*, 736 F.3d at 735 (Sutton, J., concurring) (quoting *Wiltberger*, 5 Wheat. at 95).

The post-*Babbitt* cases further punctuate the limits of the footnote. Several years after *Babbitt*, the Court declined to weigh in on the interaction between *Chevron* deference and the rule of lenity. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 n.8 (2001). And the Court's

most recent decisions have also indicated the government's interpretation of criminal laws should not receive deference. *See, e.g., United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."); *Abramski v. United States*, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for courts, not for the Government, to construe."). The panel majority acknowledges these statements by the Court, but insists *Chevron* deference was not in play in either *Apel* or *Abramski*. But the panel majority gives no reason, other than *Babbitt*'s allegedly categorical footnote, as to why we should treat any differently a case in which *Chevron* would otherwise be applicable.

Even if some binding rule about the rule of lenity and *Chevron* exists in *Babbitt*, that rule would not apply here. The regulation at issue in *Babbitt* had been on the books for twenty years. So, any concerns about fair warning were significantly diminished. The same cannot be said about ATF's Final Rule. For over a decade, ATF consistently reassured the owners of bump stocks that their property did not fall within the definition of "machinegun." Then, in just over a year, it performed an about-face on its own interpretation. The regulation at issue here does not fall within *Babbitt*'s purview.

\* \* \*

-25-

For all these reasons, Mr. Aposhian has demonstrated that his claim is likely to succeed.

## II. Irreparable Harm

Having already determined that Mr. Aposhian was not likely to succeed on the merits of his claim, the panel majority proceeded to the other prongs of the preliminary injunction test. But in doing so, it created further confusion.

In its briefing before the district court, the government conceded the second prong of the preliminary injunction test. The government "acknowledge[d] that the irreparable harm prong of the preliminary injunction test is met here." Aplt. App. 106. And the district court recognized and accepted this concession: "The parties do not dispute that Mr. Aposhian will experience irreparable harm if the injunction is denied." *Id.* at 131.

Yet, on appeal, the government argued it was not bound by this concession and the panel majority agreed. Untethered from what happened below, the panel majority concluded Mr. Aposhian had not shown irreparable harm—yet another reason to deny his request for a preliminary injunction. The panel cited *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004), to support its conclusion that a "stipulation without more is insufficient to support an irreparable harm finding." *Aposhian*, 958 F.3d at 990 (quoting *Dominion*, 356 F.3d at 1266).

I am not convinced. *Dominion* dealt explicitly with a *pre-litigation* contractual stipulation, not a formal concession by a party opposing a preliminary injunction. District courts are entirely capable of managing a preliminary injunction. And when a district court recognizes a formal concession by a party which relieves the other party of its burden, we as the appellate court are bound by that concession. *See Christian Legal Soc'y Chapter of the Univ. Of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 677 (2010) (explaining that "factual stipulations are formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact . . . . [A] judicial admission is conclusive in the case.") (internal quotation marks omitted).

It was improper for the panel majority to ignore the government's concession regarding irreparable harm. And it puts parties seeking preliminary injunctions in a bind. Can they no longer rely on an opposing party's concessions regarding any of the preliminary injunction prongs? After receiving a concession, can the opposing party simply sandbag the movant on appeal, demanding proof of a previously conceded prong? Indeed, the government can and does stipulate that all of the prongs of a preliminary injunction have been met when it consents to the entry of such an order. And this lack of clarity places the district court in an

impossible dilemma in the rush of injunctive litigation to decide what they can and cannot rely on in the parties' presentation of the case.

As with the *Chevron* issues discussed above, the en banc majority's decision to vacate the en banc order places litigants in an untenable position until we offer further clarity.

### III. Conclusion

Anyone who has seen a semiautomatic rifle equipped with a bump stock understands it increases the rate of lethal fire. But Congress did not define "machinegun" based upon the speed at which a firearm shoots or the firearm's potential for mass carnage. Section 5845(b) defined "machinegun" based on its mechanical operation. The language of that statute and that statute alone is what we must apply.

The en banc majority has done the circuit no favors today. By dismissing the en banc order, the majority perpetuates confusion on difficult issues in the circuit. We are left not knowing whether the government can waive *Chevron*, whether the rule of lenity can ever trump *Chevron*, and whether formal concessions concerning a preliminary injunction factor before the district court is binding. For the sake of courts and future litigants who must wade through the panel majority's reasoning, I can only hope we receive clarity on these issues sooner rather than later.

For the foregoing reasons, I dissent from the majority's decision to vacate

the en banc order.

19-4036, *Aposhian v. Wilkinson, et al.*

**HARTZ**, Circuit Judge, joined by **TYMKOVICH**, Chief Judge, and **HOLMES**, **EID**, and **CARSON**, Circuit Judges, dissenting.

I am disappointed that the majority of the en banc court has voted not to consider this matter. There are a variety of important issues raised in the appeal. The one of most interest to me is whether the doctrine of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), is at all in play.

The question here is whether a particular type of bump stock is a "machinegun" as defined by 26 U.S.C. § 5845(b). This is a matter of statutory interpretation, inherently a responsibility of the courts. As Chief Justice Marshall said more than two centuries ago, "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Perhaps that sentence has been quoted so much that it seems trite, but it is an essential starting point for the analysis in this appeal.

I say "starting point" because there are qualifications to the general rule. Any qualification, however, must be soundly grounded in a compelling rationale. One qualification has been recognized in *Chevron* and the multitude of cases expounding on it. Those cases inform us, instruct us, that in proper circumstances courts must defer to a government agency's interpretation of ambiguous statutory language. I question whether such circumstances are present here.

At the end of 2018 the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) promulgated a Final Rule interpreting the statutory definition of

"machinegun" to include bump stocks that the ATF had previously declared not to be machine guns. The panel majority in this case held that it should defer to the definition in the Final Rule under the *Chevron* doctrine. Its opinion carefully, and intelligently, analyzed the Rule and its history and concluded that it was a legislative rule compelling deference, rather than an interpretive rule entitled to no deference.

That opinion's analysis, however, strikes me as formalistic. It does not explain *why* this court should shirk its fundamental duty "to say what the law is." As I understand the *Chevron* line of cases, deference to an agency's interpretation of an ambiguous statute can be justified on either of two grounds. First, the statutory ambiguity may signal congressional intent to delegate policymaking authority to an agency within the bounds of the statutory language, and courts should defer to that policy choice. Second, the complexity or technical difficulty of the subject matter may suggest the wisdom of deferring to the experience and expertise of the agency in construing the statute. If, however, the agency's interpretation of the statute is based neither on a policy judgment nor the application of agency expertise, deference cannot be justified. In particular, if the agency has done nothing more than conduct an analysis typical of that performed by the judiciary, there is no reason to defer. To be sure, agency lawyers may well have legal minds superior to those of any member of the court construing the statute, but that does not excuse disobedience to Article III's requirements for one to be empowered to exercise the functions of a federal judge. *We* must be the ones to perform those tasks, although always grateful for assistance from the bar.

The Final Rule is solely the product of the ATF's performing a judge-like interpretation of the statutory language. The agency disclaimed any policy-making component to its analysis. Nor has it suggested that its departure from its prior publicly expressed views on the legality of bump stocks was based on any new expert knowledge or experience. *Chevron* deference is improper.

19-4036, *Aposhian v. Wilkinson, et al.*

**EID**, Circuit Judge, joined by **TYMKOVICH**, Chief Judge, and **HARTZ**, **HOLMES**, and **CARSON**, Circuit Judges, dissenting.

*Chevron* has no place in this case. At least four reasons support this conclusion. First, the statutory language is not ambiguous. *Ante,* at 9–12 (Tymkovich, C.J., dissenting); *post*, at 1–2 (Carson, J., dissenting). Second, even if the language were ambiguous, the agency offers up no particular expertise or policy insight to help resolve the ambiguity. *Ante,* at 1–3 (Hartz, J., dissenting). Third, any argument for deference is waived because the agency disavows reliance on *Chevron* altogether. *Ante,* at 12–17 (Tymkovich, C.J., dissenting); *post*, at 2–3 (Carson, J., dissenting). Finally, the criminal penalties at issue in this proceeding counsel against *Chevron*'s application. *Ante,* at 17–25 (Tymkovich, C.J., dissenting). I join my dissenting colleagues, and write briefly to elaborate on this latter point.

The panel majority rests the propriety of its application of *Chevron* in this context on footnote 18 of *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995). *Aposhian v. Barr*, 958 F.3d 969, 982–83 (10th Cir. 2020). In the footnote, the Supreme Court states that it has "never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement." *Babbitt*, 515 U.S. at 704 n.18. The panel majority interprets this footnote as a directive from the Court to apply *Chevron* in any case that involves both civil and criminal penalties. *Aposhian*, 958 F.3d at 983. But the footnote is not a mandate. Simply because the footnote may *allow*

application of *Chevron* when criminal penalties are involved does not mean that it

*commands* deference be applied. *Cf. ante*, at 24 (Tymkovich, C.J., dissenting)

(suggesting that the footnote does not create a categorical rule that *Chevron* trumps the

rule of lenity). Here, the fact that the statutory regime before us is predominantly

criminal in nature counsels against applying *Chevron*.

The Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 *et seq.,* as amended by

the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), imposes a

broad prohibition against owning a "machinegun," making it "unlawful for any person to

transfer or possess a machinegun." 18 U.S.C. § 922(o)(1); *see Guedes v. Bureau of

Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 36 (D.C. Cir. 2019) (Henderson,

J., concurring in part and dissenting in part) (explaining that "private ownership of

machine guns" is "effectively banned" by the GCA). And to enforce this prohibition, the

GCA renders such unlawful possession a felony punishable by up to *ten years of

imprisonment*. 18 U.S.C. § 924(a)(2). Thus, the definition of "machinegun"—which the

GCA incorporates by reference from the National Firearms Act ("NFA"), 26 U.S.C.

§§ 5801–5872, *see* 18 U.S.C. § 921(a)(23) (incorporating the NFA's definition into the

GCA)—has an enormous criminal impact. By contrast, the civil scope of the statutory

regime is quite limited. The GCA's prohibition on "machineguns" is subject to only two

extremely limited exceptions, for "machineguns" (1) "transfer[red] to or by, or

possess[ed] by or under the authority of" the federal or a state government, *id.*

§ 922(o)(2)(A), or (2) lawfully possessed before the prohibition went into effect, *id.*

§ 922(o)(2)(B). Only "machineguns" that fall within these narrow exceptions are subject

to civil consequences, and even then, the civil consequences are limited—the chief

consequence is a registration requirement. *See* 26 U.S.C. §§ 5841, 5845(a), (b). Given

the breadth of the criminal prohibition and the limited nature of the exceptions giving rise

to civil ramifications, I conclude that the statutory regime is predominately criminal.

Because this case involves a predominately criminal proceeding, I would hold that

the agency's interpretation of "machinegun" does not qualify for *Chevron* deference.

Criminal laws do not fall within the specialized expertise of any agency. True, the

executive branch enforces the federal criminal laws and prosecutes federal criminal cases.

But the Supreme Court has "never held that the Government's reading of a criminal

statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014).

Moreover, deferring to an agency's interpretation of a criminal statute would run

headlong into the constitutional concerns of fair notice and separation of powers. *Ante,* at

19–22 (Tymkovich, C.J., dissenting) (discussing concerns as related to the rule of lenity).

Indeed, the Court has made clear that "criminal laws are for courts, not for the

Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). The

panel majority recognizes the Court's statements but points out that they were made

outside of a "*Chevron*-eligible interpretation." *Aposhian*, 958 F.3d at 984 (internal

quotation mark omitted) (quoting *Guedes*, 920 F.3d at 25). That fact, however, does not

mean the principles can be disregarded.

*Chevron* does not apply inexorably. It is a presumption about congressional

intent, grounded in considerations such as agency expertise and the preference for leaving

policy choices to Executive Branch officials who are politically accountable. *Chevron*

*U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). When these essential premises are missing or there is otherwise reason to doubt that Congress intended to delegate authority to an agency, *Chevron* does not apply. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629–30 (2018). *See generally United States v. Mead Corp.*, 533 U.S. 218 (2001). Here, there is ample reason to doubt that Congress would have intended that deference be paid given the substantial criminal consequences at stake. Because the statutory regime at issue regulates primarily through a criminal prohibition with only limited civil ramifications, *Chevron* deference is misplaced. Accordingly, I respectfully dissent.

19-4036, *Aposhian v. Wilkinson, et al.*

**CARSON**, Circuit Judge, joined by **TYMKOVICH**, Chief Judge, and **HARTZ**, **HOLMES**, and **EID**, Circuit Judges, dissenting from the denial of rehearing *en banc*.

I join the well-reasoned dissents authored by Chief Judge Tymkovich, Judge Hartz and Judge Eid. I write separately to emphasize a few points from my dissent to the panel opinion.

I.

The National Firearms Act ("NFA") is not ambiguous. It has been on the books for nearly ninety years and its definition of a "machinegun" has proven workable. Indeed, until the Executive developed an unfavorable opinion of nonmechanical bumpstocks, the federal government blessed the devices as complying with the NFA on many occasions. A legal device can be used to perpetrate horrific acts, but that does not make it illegal and does not render the statutory definition allowing its possession ambiguous. The NFA makes illegal the ownership of "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The NFA speaks in terms of how a firearm functions, not its capability of firing rapidly or causing harm. As I explain more fully in my dissent to the panel opinion, a semi-automatic weapon equipped with a nonmechanical bumpstock requires the trigger to function each time it fires. And it does not keep firing "automatically" when the operator presses the trigger. So under the clear statutory language, a firearm equipped with a nonmechanical bumpstock is definitionally not a prohibited machinegun. The panel

majority, in my opinion, clearly erred by determining the NFA's definition of "machinegun" is ambiguous.

II.

I also question the Court's decision to vacate the en banc order when the parties' thorough briefing identified an apparent intracircuit conflict about whether the application of Chevron deference must be requested by the government in the first instance. That concerns me, especially given that both the Supreme Court and our Circuit have "often declined to apply Chevron deference when the government fails to invoke it" or otherwise rely on it. Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 140 S. Ct. 789, 790 (2020) (statement of Gorsuch, J., respecting denial of certiorari). See also, e.g., Hays Med. Ctr. v. Azar, 956 F.3d 1247, 1264 n.18 (10th Cir. 2020); Hydro Res., Inc. v. EPA, 608 F.3d 1131, 1146 (10th Cir. 2010). Indeed, as early as 2010, we put the burden of asking for Chevron deference on the government. Id.

But here the panel opinion ignores Hydro Resources and instead relies on our later decision in TransAm Trucking, Inc. v. U.S. Dep't of Lab. Admin. Rev. Bd., 833 F.3d 1206, 1212 n.4 (10th Cir. 2016), where we relied on Chevron with no government request that we do so. The panel's reliance on TransAm violates the venerable circuit rule that when faced with an intracircuit conflict, we should follow the earlier, settled precedent and not the later decided case. United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994). And if the court wishes to jettison the older line of cases in favor of more recent authority, that action requires invoking the machinery of the en banc court. C.f. United States v. Taylor, 828 F.2d 630, 633 (10th Cir. 1987) (obtaining en banc

2

review for rejecting the first published decision in favor of subsequent contrary authority).

The majority's application of Chevron with no government request that it do so is even more alarming in the context of this case. Here, the government *expressly disavowed* any reliance on Chevron and, in fact, asked the panel *not to apply it*.[1] "If the justification for Chevron is that '"policy choices" should be left to executive branch officials "directly accountable to the people,"' . . . then courts must equally respect the Executive's decision *not* to make policy choices in the interpretation of Congress's handiwork." Guedes, 140 S. Ct. at 790 (statement of Gorsuch, J., respecting denial of certiorari) (quoting Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1630 (2018)). Here, by turning a blind eye to the government's request and applying Chevron anyway, the majority—unfairly in my opinion—sealed Mr. Aposhian's fate by tipping the scales in favor of the government.

### III.

As a final point, I wish to emphasize that the panel majority (perhaps inadvertently) has increased the burden on district courts in the preliminary injunction context. Our preliminary injunction jurisprudence required Mr. Aposhian to demonstrate four things to the district court—one of which was that he would suffer irreparable harm if the injunction did not issue. As is common in litigation, the government conceded that

---

[1] The district court noted that the government "defendants went out of their way to avoid citing Chevron and its progeny and repeatedly stressed that they neither request nor believe their interpretations are entitled to any measure of deference."

if a preliminary injunction did not issue, Mr. Aposhian would suffer irreparable harm. He, therefore, presented no evidence on that issue and the district court denied the request for preliminary injunction based on another ground.

Despite the clarity with which the government conceded the irreparable harm element and Mr. Aposhian's reasonable reliance on that concession, the panel majority concluded that he failed to meet his burden, in part, because he did not show irreparable harm. I view the panel majority's conclusion as contrary to our caselaw, unfair, and as impeding judicial economy. Here's why.

Trial courts are busy places and their judges are tasked with making decisions and moving cases in a swift and efficient manner. To assist the administration of their busy dockets, judges encourage parties to focus on the areas in dispute. The parties in turn do things like stipulate to facts or concede certain elements of a claim. We, as an appellate court, encourage these practices and routinely hold parties to the stipulations and concessions they make in federal district courts. See, e.g., Johnson v. Spencer, 950 F.3d 680, 708 (10th Cir. 2020) (concluding that defendants who had relied on claim preclusion as a defense met their burden of proof on two of the three requisite elements because the opposing party "concede[d] . . . the second and third elements"); United States v. Sinks, 473 F.3d 1315, 1321 (10th Cir. 2007) (observing that the government can concede elements of the plain error standard of review, which a criminal defendant has the burden of proof to establish). We have even held, in the preliminary injunction context, that the parties can stipulate to the entry of a preliminary injunction—which necessarily means

4

they concede that the applicant can prove all the elements required to receive the injunction.[2]

As this shows, the panel's decision conflicts with our caselaw which allows the district court to accept as proven an element to which the opposing party stipulates. The panel's decision impedes judicial economy because going forward, parties will now have to spend time and resources proving elements about which there is no dispute. And it is unfair because the panel departed from common practice and our established caselaw with no notice to Mr. Aposhian.

---

[2] And this invites the question—if you can concede all the elements required for injunctive relief, why can't you concede just one? Obviously—you can.