CQ

CQ Congressional Transcripts
Mar 14 2018

[illegible text]

[illegible text]

[illegible text]

Mar 14 2018 hearing / test

---

Senate Judiciary Committee Holds Hearing on the Parkland Shooting and School Safety, Panels 2 and 3

LIST OF PANEL MEMBERS AND WITNESSES

GRASSLEY

And we're going to call our first panel. Before I introduce the first panel, I'll wait until your name gets up there so you know where you're going to sit. And -- but I'd like to have stand and I would like to swear you before you take a seat.

Do each of you affirm that the testimony you're about to give before the committee will be the truth, the whole truth, and nothing but the truth, so help you, God?

Thanks for each of you who are signing (ph) to that. Sit down. And I'm going to introduce you now before you speak. Mr. Brandon is the acting director of the Bureau of Alcohol, Tobacco, Firearms and Explosives. He began at this agency within the Department of Justice as a career special agent in Detroit in 1989. Mr. Brandon has also been in the United States Marines from 1978 to 1982.

David Bowdich is the acting deputy director of the Federal Bureau of Investigation. He began his career as a police officer in New Mexico in 1991 and then joined the FBI in 1995 as a special agent and served a SWAT team member.

Dr. Lina Alathari is the chief of the Secret Service's National Threat Assessment Center. Dr. Alathari received her PhD in cognitive psychology, 2002, and previously served as a supervisory research psychologists at this agency where she conducted research on threat assessment in cases of targeted violence. She is well known for providing guidance based on her research to the U.S. government agencies, international security agencies, schools and businesses.

I thank each of you for being here, and particularly for the time you had to prepare for our testimony and possible questions. Director Brandon, we'll begin with you and then Mr. Bowdich and then Dr. Alathari.

BRANDON

Chairman Grassley and Ranking Member Feinstein and members of the committee, thank you for the opportunity to appear before you today to discuss ATF's response to the shooting at the Marjory Stoneman Douglas High School in Parkland, Florida on February 14, 2018.

On behalf of the men and women of ATF, I extend deep felt condolences to the family, friends and loved ones of those who were killed or injured that day and to the survivors and their families. We have the utmost respect for the teachers, staff and students at the school and the bravery that they have demonstrated.

As you're aware, the Parkland shooting investigation is ongoing, and the alleged shooter has been charged in Florida state court. Because the investigation is ongoing and the case is pending in court, I am limited in the information I can provide today about that case, but I can generally outline ATF's role in supporting our local, state, and federal partners in the response to the shooting.

The first ATF agents responded to the high school within minutes of the shooting report. These agents assisted in clearing the building of students while the search for the gunman was ongoing, and in securing the scene. ATF quickly traced the firearm recovered at the school. It was an AR-15 type rifle, determining that the alleged shooter had obtained the rifle about a year ago from Federal Firearms Licensee.

ATF agents immediately responded to interview that FFL and secure additional evidence. In that process, they determined the FFL conducted the required background check prior to completing the sale, and the alleged shooter passed that check. While this process was ongoing, other ATF agents continued contacting other FFLs throughout the area to determine if the alleged shooter had acquired any other firearms to ensure that any such firearms were located and secured.

AR001080

As the investigation continued, ATF agents assisted in serving several search warrants, including at the alleged shooter's residence. These warrants resulted in the recovery of nine additional firearms, on which ATF also conducted urgent traces. Information from those traces resulted in ATF agents conducting additional interviews of the FFLs who sold those firearms, and securing additional evidence about those transactions.

Through this process, ATF helped identify all firearms known to have been purchased by the alleged shooter, and ensure that those firearms had been recovered and secured. ATF personnel engaged in the Parkland investigation has included more than 40 special agents, plus dozens of specialists and support staff from our tracing center, firearms forensics division from our Crime Gun Intelligence Centers.

The discussion following the Parkland shooting has focused on the unfortunate reality that law enforcement agencies had received several tips about the alleged shooter's mental health issues and possession of firearms. These disclosures are gut-wrenching for all law enforcement. We are universally committed to responding appropriately whenever information is received about the potential for violence.

As soon as I learned of the possibility that tip information from the public had not been effectively acted on, I ordered a review of ATF's policies and procedures for assessment and documentation of tips from the public.

At the time of the Parkland shooting, ATF's process for reviewing and acting on tips from the public had been in place for several years. That process includes direct tip calls to agents in our field divisions throughout the country, and tip information received through our toll-free national telephone tip lines, and through e-mail and online tip, and via text messages through a mobile device application that we deployed in 2016.

A duty agent in each field division is designated to document, assess, and investigate tips directly received in the field, while our Joint Support and Operations Center, which is staffed 24/7, is responsible for handling tips received through e-mail and text messages and for all tips received after business hours and on weekends.

While this process has served ATF well, following our internal review, we determined that our procedures could be improved by centralizing responsibilities for these functions in each field divisions, Crime Gun Intelligence Centers, and by leveraging new technologies.

Using existing resources, we quickly developed, and have now deployed -- actually last week -- an effective system, known as "rTip," to document, disseminate, and track tips we receive from the public, and have updated our protocols and policies to ensure consistent, effective follow-through on these tips.

Mr. Chairman and Members of the Committee, thank you again for the opportunity to discuss this matter with you today. But before I close, however, I would like to -- one last thought, while large-scale shootings understandably draw intense public scrutiny, violent crime involving firearms happens every single day, as you all know, in our cities and towns, large and small, across the Nation.

ATF's commitment to combating this daily carnage by using our expertise to be the best possible partner to our local, state, and federal law enforcement partners is unwavering. I can assure you that the men and women of ATF are ready and are working every day to find ways to the stop the daily toll of firearms-related deaths.

I'm happy to answer any questions that the committee may have. Thank you.

BOWDICH

Chairman Grassley, Ranking Member Feinstein, Members of this Committee, it is my privilege to appear before you today as the Deputy Director of the FBI. This is my first formal appearance before any congressional committee, and I wish that it were under different circumstances.

On February 14, 2018, at Marjory Stoneman Douglas High School in Parkland, Florida, a former student shot 17 innocent people and caused significant physical and emotional harm to countless others. This target -- this tragedy abruptly ended the lives of kids who had their lives and their dreams ahead of them, and stole their futures.

To the victims, friends -- and friends of those who were killed and injured on that day, Director Wray, myself, and the rest of the FBI extend our deepest sympathies to you. Though nothing can be said to undo the hurt and loss you all feel, please know that the FBI continues to work closely with our state and local law enforcement partners in Florida to ensure that justice will be served.

AR001081

Unfortunately, as was disclosed by the FBI shortly after this terrible incident, the FBI did receive two separate tips that we now know were related to the alleged shooter, Nikolas Cruz. As the FBI Director has made clear, the FBI could have and should have done more to investigate the information it was provided prior to the shooting. While we will never know if we could have prevented this tragedy, we clearly should have done more. Our investigation continues into exactly what the FBI knew prior to February 14, 2018 in what we did and what we did not do in response.

To summarize the results of our investigation to date, please let me quickly walk you -- walk the Committee through the relevant timeline as we understand it.

It is important to understand that the FBI receives tips from the public through our Public Access Line or PAL. The PAL is the FBI's central call center for all calls and electronic tips made to the FBI's 56 field offices.

The access line is responsible for receiving and vetting information from the public, then disseminating it to the field as actionable tips and leads for special agents and intelligence analysts to follow up on. To understand the volume of leads we receive, during 2017 alone, the PAL handled approximately 765,000 calls and 735,000 e-mail tips.

On September 25, 2017, we received an e-mail tip from a person in Mississippi who indicated that a person, unknown to him, posted on his YouTube channel, the following text, quote, "Im going to be a professional school shooter," end quote. The posting was from the username Nikolas Cruz.

In response to this tip, the PAL opened what the FBI calls a Guardian lead and assigned it to our Jackson Mississippi Field Office. Upon receipt of The Guardian lead, an FBI agent, along with a local task force officer, interviewed the tipster on October 2, 2017. At the time of this interview, the tipster provided a copy of a screen shot of the subject's post.

The agent conducted searches of both FBI databases and open sources, believing that the true poster -- the true identity of the poster could not be determined, the Guardian lead was closed on October 11, 2017, with no additional investigative activity.

A few months later, on January 5, 2018, the FBI received another tip by way of a call to the PAL from someone who herself as a close friend of the Cruz family. The caller provided information about Cruz to include the following, statements about Cruz harming himself and others references to ISIS, that he had threatened his mother with a rifle, that he had purchased several weapons, that he wanted to kill people, and she believed he was going to explode, that he was mutilating small animals, that the caller is concerned that Cruz might shoot up a school.

The caller also noted that Cruz was 18 years old but had the mental capacity of a 12- to 14-year-old. She indicated she was very concerned and had contacted the Parkland Police Department and just wanted someone to look into this matter.

Upon finishing this call, the FBI operator conducted a search of our databases and found the closed Guardian lead out of Mississippi. The operator then consulted with her supervisor and the matter was closed. The information was never forwarded to a field office or to any of our state and local partners for review or action. As the FBI learned of the Parkland shooting incident, our personnel e searched our buildings -- our holdings, rather, and discovered that the two tips.

This is not the kind of news I want to deliver to this committee, to the families, or to the public. But we are committed to transparency in all that we do on behalf of the American people. While I cannot fathom the anger and the sense of the loss of the victims' families and friends, I, again, want to express on behalf of the men and women of the FBI our deepest sympathies and regret.

When we make mistakes, we will not hide from them, and we are committed with your help to doing whatever is necessary to correct our mistakes and regardless -- and so that tragedies like this cannot be repeated.

Thank you and I look forward to your questions.

GRASSLEY

Thank you, Mr. Bowdich. Now, Dr. Alathari.

ALATHARI

AR001082

Good morning, Chairman Grassley, Ranking Member Feinstein, and distinguished Members of the Committee. I want to thank you for the opportunity to appear before you today to discuss school safety and the important work the Secret Service-NTAC program has done in the prevention of targeted violence.

On behalf of the men and women of the Secret Service and National Threat Assessment Center, I want to express my sincere sympathy to the victims and families impacted in both the tragic shooting at Marjory Stoneman Douglas High School in Parkland, Florida and the mental health clinicians killed last week at the Pathway Home veteran facility in California.

Over the last 20 years, our centers have been conducting research, training and consultation on the prevention of targeted violence. In fulfilling its congressionally authorized mission, NTAC has researched and published reports on attacks targeting government officials and facilities, public spaces, K-12 schools and institutions of higher education.

What we have learned from these efforts has enhanced our agency's own investigations to adapt to the changing dynamics of those who come to our attention and the risks they pose to the larger community. To address these emerging trends, our agency adopted its own operational protocols to ensure that we partner with state and local law enforcement and others to share information that we uncover during our investigations so that we might present a threat to the places where we work, live and learn.

Due to NTAC's expertise in studying school-based violence and the support of the Department of Homeland Security's efforts in this area, NTAC has recently initiated projects specifically related to school safety. The first will be the creation and distribution of an operational guide that will provide school personnel, law enforcement and others with guidance on the creation of comprehensive targeted violence prevention plans and schools.

We will also be conducting a new research study examining incidents of targeted school violence. The overall goal of these projects is to provide guidance to thousands of school personnel, law enforcement, and others with evidence-based best practices in prevention and early warning detection.

We know that NTAC's previous research has significant impact in this area. In 2002, in partnership with the Department of Education, NTAC released the Safe School Initiative Report that examined 37 incidents of K-12 school shootings. The findings of this report and the accompanying guide set the standard for the creation of threat assessment programs in schools.

As evidence of the immediate impact the study had following the release of the findings of the report as school in New Bedford, Massachusetts was able to use this information to react quickly when a student came with information about a potential attack. The administrators, teachers, resource officers and local police department were able to quickly identify the students involved in this alleged plot and make arrests.

Following the incident, the chief of police attributed the success of this coordinated effort to U.S. Secret Service recommendations based on the findings of the Safe School Initiative. In subsequent years, NTAC engaged in other activities related to school safety in collaboration with other federal agencies. All of the reports are available on the secretservice.gov website.

Based on our research, we know that threat assessment programs are most effective at reducing the risk of violence when implemented in a comprehensive manner. As outlined in more detail in my written testimony, the major functions of the school site assessment program are to identify students who are exhibiting concerning behavior, gather information, and assess whether they pose a risk of violence and identify intervention strategies to manage that risk.

Since the release of the SSI, NTAC has been providing in-depth trainings to school personnel, law enforcement officers, mental health professionals and others on the prevention of targeted school attacks. To date, NTAC has conducted 400 such training to over 93,000 attendees and we continue to do so.

We also provide consultations for schools, law enforcement and other agencies on the development of threat assessment programs tailored to their own missions and resources. The goal of NTAC's activities is to promote best practices, information sharing and the standardization of threat assessment.

Chairman Grassley, Ranking Member Feinstein, and distinguished members of the committee, the Secret Service thanks you for the opportunity to discuss the NTAC program and ways to prevent future acts of violence in our schools. I will be happy to answer any questions you may have.

AR001083

GRASSLEY

Before we start our five-minute round of questioning, I would like to make sure that some documents are inserted into the hearing record. I have six - first, a letter from Sandy Hook Promise, an organization formed in response to Sandy Hook massacre supporting threat assessment training and Senator Hatch's bill on school safety is an effective way of preventing school shootings; number two, a timeline for the shooter, Mr. Cruz' firearm purchase; number three, a copy of the Florida Department of Children and Family investigation into Cruz; four, a transcript of the FBI's January 5, 2018 call about Cruz; five, the Broward County sheriff call log regarding Cruz; the Broward County sheriff timeline of events on the day of the shooting.

And if there are no objections, I'd like submit these documents for the record. And then one other statement about the FBI and letters that we wrote to him on March 2, 2018, following up on the briefings of the FBI gave my staff on February 23, 2018.

I should say not just my staff but the staff of the entire committee, both Republican and Democrat. Although I requested a response by March 12, I have not received one. And I expect better from the FBI, especially when it comes to questions related to Parkland shooting and this hearing, and hopefully, the imminence and the necessity of passing some legislation quickly.

I will start my question and then Senator Feinstein and then I have a list of the Republicans and I'll ask Senator Feinstein to give me a list of the order of the Democrats. And we'll start Director Bowdich.

January 5, 2018 tip was so specific. It provided clear detail about Cruz' potential to be a school shooter. However, according to the briefings that you provided the committee ...

(UNKNOWN)
Sorry. Don't let it bother you.

GRASSLEY
I'm sorry.

(UNKNOWN)
Thank you.

GRASSLEY

however, according a briefing that you provided the committee, the FBI believed Cruz was a local matter, because the January 5, 2018 tipster said that she had called Parkland Police Department about Cruz. Did the FBI reach out to law enforcement to give them a warning about Cruz? And if not, why not? Push the red button.

BOWDICH

No, sir. We did not. I do not know why she -- the call taker did not do so. You know, she conferred with her supervisor and she made some sort of a presentation about what was contained in that call and a decision was made -- there was discussion about the fact that the local department had been notified. You are absolutely correct, Senator, the call was asked was very explicit. However, they made a decision to close it, no lead value and no call was made to the local jurisdiction.

GRASSLEY
Isn't (ph) an FBI employee considered to be diligent person?

BOWDICH
Senator, I don't know the employee personally.

GRASSLEY

And that is good enough. If you can't answer it, don't answer it. I think we ought to be finding out. Director Brandon, I want to ask you about bump stocks. In its advance notice of proposed rulemaking, the ATF proposed a rulemaking process, quote, "that would interpret statutory

AR001084

definition of machine-gun in the National Firearms Act and the Gun Control Act to clarify whether certain devices commonly known as bump fire stocks fall within that definition," end of quote

A few weeks ago, our president called for the ATF, quote, "to promote and rule banning all devices that turn legal weapons into machine guns," end of quote. Last Saturday, DOJ announced that the proposed regulation had been submitted to the White House for OMB to review it. Does the ATF propose regulation focused on bumps stocks or does not include other devices or how soon can we expect the bumps -- and how soon can we expect the bumps stock regulation to be promulgated?

### BRANDON

Senator, thank you for your question. And when I was here on December 6, I did inform the committee about the advance notice of proposed rulemaking being at OMB. And then when it was cleared, we would step on the gas. It was announced on September 26 for 30 days. We received 113,000 comments. Many didn't answer the questions that we asked. It was a market survey.

But following the Attorney General's direction and the president's, we have now at OMB, as you mentioned, a notice of proposed rulemaking that will deal with the bump stocks.

### GRASSLEY

Dr. Alathari, we proposed -- you have studied the issues of school safety for many years. In your opinion, what is the best way to prevent school shootings and how did you arrive at the conclusion you are going to tell us?

### ALATHARI

Based on our research and experience, threat assessment programs have been the standard for preventing these types of attacks, not just a physical place but now in the workplace and other places as well for the past 20 years.

We do believe that a comprehensive threat assessment program is the most effective method at reducing this violence. That program would offer schools the opportunities identify students who might be exhibiting concerning behavior, assess and gather information on this behavior, and come up with intervention strategies.

### GRASSLEY

Well, Dr. -- Director Bowdich, the next audit log can be used to flag extremely high risk subjects that have yet to actually commit a crime, but clear evidence exists that the individual wants to buy a firearm to commit a crime. Could the FBI have placed Cruz on the next audit log to monitor his firearm purchases in light of the threat that he wanted to kill people and shoot up the school? And if so, did the FBI place him on the audit log? And if you didn't, why not?

### BOWDICH

Senator, I'd have to look at could we have. I do know he was not placed on the next audit log. He purchased six weapons in addition to the one that he used in the shooting. All were legally purchased.

### GRASSLEY
I'm done. Senator Feinstein?

### FEINSTEIN

Thanks very much, Mr. Chairman. It's my understanding that under federal law, fugitives cannot legally purchase or possess guns. We've heard from local law enforcement that the Justice Department has issued a memo that forced the FBI next background check database to drop more than 500,000 names of fugitives with outstanding arrest warrants because it was uncertain whether those fugitives have fled across state lines.

Mr. Bowdich, can you describe why this determination was made by the Justice Department?

### BOWDICH

AR001085

Yes, ma'am. That was a decision that was made under the previous administration. It was the Department of Justice's Office of Legal Counsel that reviewed the law and believed that it needed to be interpreted so that if someone was a fugitive in a state there had to be indications that they had crossed state lines. Otherwise, they were not known to be a fugitive under the law in the way it was interpreted.

FEINSTEIN

We would appreciate seeing that opinion. Would you provide it for the committee, please?

BOWDICH

I would confer with Department of Justice. But yes, ma'am, I will ensure we get it to you.

FEINSTEIN

OK. Thank you. Following the murders of nine churchgoers at Emmanuel AME Church in South Carolina in 2015, the FBI admitted they did not properly obtain information regarding the gunman's drug arrest record, which should have been -- which should have prohibited him from buying a handgun.

The FBI apparently had not completed its review within three days because the dealer was legally permitted to complete the sale to the handgun -- to the gunman. As a result, nine were killed here.

There are two questions. Are there instances where state records or other records cannot be physically obtained within a three day delay period by the FBI? And in those instances, would it makes sense to eliminate the three-day requirement that allows a gun dealer to transfer a gun without a completed background check?

BOWDICH

Senator, it's a great question. And the decision on whether or not to eliminate is not ours. As you -- as I believe you know, a decision has to be made within three days to either proceed or not. After that, the firearms dealer has the option to proceed with it.

FEINSTEIN

That's what I was trying to say.

BOWDICH

Yes, ma'am.

FEINSTEIN

but maybe I didn't say it accurately.

BOWDICH

You're correct. Are there reasons? There's a variety of reasons why we cannot, at times, actually find the necessary amount of information to proceed. And in that case, that three-day expiration does take place. What we find is many of the big box sellers do not proceed after three days until we get them more information.

FEINSTEIN

Well, would it make sense for those who do proceed, regardless of the need for additional information, to extend that period for an additional period of time?

BOWDICH

I guess I will leave that to those that that actually make that decision on the face of it. It seems to me like ...

FEINSTEIN

But you're number two in the department?

BOWDICH

AR001086

Yes, ma'am.

FEINSTEIN
I mean, don't you have some input in these ...

BOWDICH
I do have some input, yes, ma'am. And I do believe that it would make sense, yes.

FEINSTEIN
Thank you. Thank you, Mr. Chairman. Senator?

GRASSLEY
Senator Cornyn?

CORNYN
I know we're all feeling an tremendous sense of urgency that doing something meaningful to prevent terrible mass shootings like this. And I do believe that it is important for us to do what we can do, as Senator Rubio said earlier and while we continue to debate to debate other things upon which there is not yet consensus.

But one of the things we can do because we have 69 senators who have co-sponsored a bill to improve the background check system, which -- as a result of the failure of federal agencies like the Department of Defense of the information that would have prevented the purchase of a gun at Sutherland Springs was not uploaded into the background check system.

The FBI's background check system is only as good as the information that's uploaded into it by the states and by federal agencies. And since the shooting at Sutherland Springs, 4,000 people with dishonorable discharges have been uploaded into the background check system that had not previously been loaded, which, of course, is a disqualifying factor under current law for purchasing a firearm if we could the Fix NICS bill today in the United States Senate.

We've heard what the ATF is doing on bump stocks and the president's commitment to make sure that those instruments can no longer be purchased without a regulation. We know that Senator Hatch has a school safety bill that many of us support that provides additional resources to help improve safety and harden those targets for potential shooters.

We know that Congress has passed a bill last December, called the 21st-Century Cures Act, which includes money to assist the states and operating assisted outpatient treatment programs, a civil court procedure by which judges can supervise the treatment of people with mental illness without civil commitment.

We know that Congress has passed and President Obama signed into law training -- money for training for active shooter training, which after the Columbine shooting law enforcement changed its tactics to go in and interact with the shooter to prevent additional killing.

And part of the bill that we passed, it's now been signed into law, would authorize the training of emergency medical officials to go in after the shooting site is secured because, as I learned, first, you have to stop the killing then you have to stop the dying where people who were injured. But if law enforcement doesn't go in and emergency medical technicians don't go in, obviously, the loss of life is going to be a much higher than it -- than it needs to be under the circumstances.

But it strikes me that we have a conundrum here and I'd like to get your comment on that law enforcement in America is trained to investigate and prosecute crimes, not pre-crime -- that is the stuff of movies -- but we still have to have some tools available to intervene when people demonstrates there is dangerousness to themselves and to others. And I do believe some of these tools do already exist like the assisted outpatient treatment procedure that Adam Lanza's mother could have used before he took her gun and killed her and then murdered those innocent children at the elementary school.

There are tools available, but they're not widely recognized. Law enforcement and communities need to be trained to take advantage of those. But in particular, I think here I agree with Senator Rubio, there was a catastrophic failure at every single level that occurred here, which made this shooting possible and we have to find a way to plug those holes.

AR001087

So, I would be interested in hearing, Mr. Bowdich and Ms -- Dr. Alathari, your comment about this conundrum between law enforcement being authorized to investigate and prosecute crimes but not pre-crime and the challenge of dealing with people who have demonstrable mental illness and should not legally, under current law, be able to purchase and possess firearms by giving access to them and committing crimes like this. Mr. Bowdich, do you have any thoughts?

BOWDICH

Thank you, Senator, for the question. So you're right. Pre-crime is the stuff of movies. I agree with you. However, one thing that we are charged with is protection of our country and our communities and sometimes that does take disruptions prior to the act.

Now, in this case and in many other cases, there are limitations for us and we know that. As I wanted to be fully transparent on, we made mistakes here, no question about that. That said, even had we done everything right, I'm not sure if we could stop this act, but it sure would have been nice to try. It sure would have been nice for our investigator to sit down in front of Mr. Cruz and actually have a discussion.

You made another great point during your -- during your narrative there about the systems, the NICS system, and how it's only as good as the information that goes into it. It's a good system. It's not perfect. But it's a good system. And what we're trying to do is work with our state and local counterparts to ensure that we have as full of participation in that system.

One of the great problems we have is dispositions of crimes. We're still lacking many of those throughout the country, but we are really -- the Attorney General recently put out some guidance for us to build and strengthen those partnerships to make sure that everyone understands the stakes of us lacking certain dispositions going into that system. I don't want to take up all the time, Senator.

CORNYN

Thank you. Doctor?

ALATHARI

Thank you, Senator, for that question. It's an interesting question because that's one of the main focus that my center does when we're training our own agency personnel as well as other federal, state, and local law enforcement on preventing various types of targeted violence.

One of the first things we talked about is the protective intelligence mission of the agency that is usually managed at headquarters, but the investigations are actually carried out by our global network of field offices everywhere.

And for the most part, when someone comes to the attention of the agency for an inappropriate interest or possibly threatening interest in one of our protectees (ph) or protected sites, they have not committed a crime.

And so, the goal of a protective intelligence investigation is to identify these people, assess why they engage in the behavior they brought them to our attention, and then come up with intervention strategies. A lot of times those intervention strategies cannot be about arrest because they have committed a crime. If they don't meet the threshold for an imminent danger of risk themselves or others, then they may not be able to get committed.

So, we work very closely with our partners in the community through our network of field offices and our agents out in the field by building liaisons, partners, identifying resources that we can offer these individuals so that it would mitigate the risk of them engaging in a harmful act to themselves or others.

CORNYN

Thank you. Thank you, Mr. Chairman.

LEAHY

Mr. Chairman, you know there is a discussion at the beginning of this, whether this was first time we held such hearing. Actually, we've had a lot of hearings on this issue. We've had a number (ph) when I was chairman on gun violence and actually advanced a meaningful legislation and universal background checks, school safety grants, straw purchasing, assault weapons bans.

AR001088

We received over 50 votes in the Senate. We're blocked from going further to be acted upon by the House. In those areas, we had to do a number -- I'm not sure why we haven't called it here, but the NRA (inaudible) the opposed universal background checks even though it was obvious from the evidence a lot of guns were being bought at gun shows and elsewhere, straw purchases and so on.

Let me -- you know, we talked about children being killed. What could be done to fix it? (Inaudible) the fact United States is unique in this thing. We cannot say -- we cannot say, "Oh, we're no different than the other." Let me show you a chart.

(UNKNOWN)

It's behind you.

LEAHY

OK. Look at these, the gun deaths per capita, the gun deaths for mental disorders. You know, we're off the charts in just one category, gun deaths. The assailant (ph) has mental issue. And I am so tired of people say with something like this happens, "Oh, this is not a time to talk about gun safety or gun legislation. We should say a prayer for the victim."

Of course, say a prayer for the victims. But don't claim it's just mental disorder. Look at these figures. Look at these figures. I mean, we're an outlier in this country. We have to do something about it. We have to do something in behalf of the children who might change our solidarity in my state of Vermont and every other state today.

Now, Mr. Brandon, I think of ATF and we worked with the ATF in my state of Vermont. I did when I was a prosecutor. I think that America would be shocked to your agency is forced to use a backwards paper only system to trace crime guns. Congress has forced you to act and get back to the 19th Century. You're prevented from electronically searching for records.

We have tried (inaudible) which we have to go through. I mean everything that is -- could be stored in something like this and yet you got a go if you can find the papers to it, and why? Because Congress had barred (ph) you to do it. These restrictions impacted the ability of the agents to do their jobs.

BRANDON

Thank you, Senator. And I may, really quick, I was told I may have misspoke when I answered the chairman's question about bump stocks. I may have said the September 26 is the date, but it was actually December 26. So, I apologize for that.

To answer your question on this, sir, that is the law and we comply with it.

LEAHY

I understand. But does that law make any sense? Would you be a lot better off if you can electronically search these records?

BRANDON

You know, any kind of protective agent knows you don't conduct in a criminal investigation -- time matters, getting accurate information can develop the critical lead. So, anything that can enhance that is beneficial for public safety.

LEAHY

So these -- having -- being forced to go through paper records touched down (ph) your ability to react?

BRANDON

Director, I can't -- Mr. Senator, is that optimum? No, but it's the law and we comply with the law.

LEAHY

We are changing the law because it makes no sense. It's like some in the House who wanted to force the ATF to conduct background investigations on felons to determine whether the firearms rights should be restored. Those background checks take between 48 and 100 hours. Is it not?

BRANDON

AR001089

Yes, sir.

LEAHY

And I'm the vice chairman of the Appropriations Committee. I know you're on a very tight budget. If you're going to do a detailed background checks you're talking about, you don't have it.

Let me ask you just one other question. (inaudible) individuals sell firearms online or at gun shows, elsewhere. They can do that without background checks. Is that correct?

BRANDON

That's correct, Senator, assuming they had federal farms licensee and they would be required then.

LEAHY

I am concerned about this. I know that Senator Feinstein asked about next (ph) background checks. I think Mr. Bowdich said that the justice department is talking to the FBI to remove the records of individuals with outstanding arrest warrants from their background check system, 500,000 individual.

Did you notify the states before you remove these individuals? You had these data for decades. Last year, they were removed. Did you tell the states you're doing that?

BOWDICH

Senator, I don't know the answer about when and how that messaging was done, but I can get back to you on that.

LEAHY

Great. I understand it was done last year and I understand that the states were not notified. And if I was in charge of law enforcement of the state, I'd be pretty upset. Thank you.

BOWDICH

Yes, sir.

GRAHAM

Thank you. Is it Mr. Bowdich? Is that right?

BOWDICH

Bowdich, sir.

GRAHAM

Bowdich. Thank you, sir. Do you know how many times local law enforcement met with Mr. Cruz prior to the shooting?

BOWDICH

I've heard of a variety of numbers. I believe it's between 30 and 40, sir.

GRAHAM

Could you get us that information?

BOWDICH

Yes, sir.

GRAHAM

OK. Now, is it Alathari? Is that right, your name?

AR001090

**ALATHARI**

It's Lina

**GRAHAM**

Lina. OK. All right. Lina

**ALATHARI**

That's close

**GRAHAM**

All right. The profile, the risk assessment, let's apply what you do with what we've learned here. How -- what happened here? How can you have 30 to 40 interventions? Was the man kicked out of school? Do we know?

**BOWDICH**

Yes, sir. He was.

**GRAHAM**

OK. So, the local cops meeting 30, 40 times. He's kicked out of school. Would you say there's system failure here when it comes to risk assessment?

**ALATHARI**

Senator, I can't offer you an opinion on something that I have not studied. All I can speak ...

**GRAHAM**

Just in general

**ALATHARI**

In general. I can speak to our own research and how we talk about that assessment

**GRAHAM**

How about yes?

**ALATHARI**

The -- this is a more comprehensive answer than that. In times ...

**GRAHAM**

I mean, why is yes not the right answer?

**ALATHARI**

Because I'm not familiar with ...

(CROSSTALK)

**GRAHAM**

He got kicked out of school. The cops go to your house 30 or 40 times because he's disruptive. Shouldn't that put you on somebody's risk assessment?

**ALATHARI**

AR001091

I can tell you that in situations that I've studied a lot of individuals that have engaged in these types of targeted attacks had engaging concerning behavior before they've come to the attention of law enforcement and others for these type of behavior. They elicited concern in the community.

And for the most part, the interventions varied on how people responded to them. Again, whether they had committed a crime or not, but they have risen to the level of imminent risk. I can't speak this particular case, but that's what we've seen before.

GRAHAM
Back to the FBI. When you got the call, you don't know why -- what did the supervisor tell the lady?

BOWDICH
Well, sir, we have -- Director Wray immediately launched an inspection team to our CJIS West Virginia facility.

GRAHAM
Is there an inspection over? Is it done?

BOWDICH
It continues. The inspection -- the report is being completed.

GRAHAM
Any preliminary findings?

BOWDICH
We do. We have a number of recommendations that came out.

GRAHAM
So, specifically, what made the supervisor believe you should pass this on?

BOWDICH
That's one of the recommendations that came out, is the fact that the way the call was presented between the call taker to her supervisor, we have two different recollections. So, we do not actually know what was presented. So, in the future, one of the recommendations is there will be more fidelity on how that was presented and more of a through.

(CROSSTALK)

GRAHAM
... nobody followed up and call the local cops, do you know this guy?

BOWDICH
No, sir.

GRAHAM
OK. Now, in terms of tools available to law enforcement, I've introduced legislation with Senator Blumenthal that allow law enforcement agencies to go to federal district judge or magistrate to petition for an extreme -- what do we call this thing -- risk protection order. We have to prove by a preponderance of the evidence that the person in question is an imminent threat to themselves or others.

Do you believe that would be a good tool to have available to the FBI and other law enforcement officers in situations like this?

BOWDICH
Senator, anytime we can get more data to make a better decision, I think that's a good tool.

GRAHAM

AR001092

Well, it's not data. This is going how do you use the data. I mean, would you support allowing federal judges and magistrates to receive requests from law enforcement officers like yourself to act and exports, say, fashion if the evidence, in your view, warrants going to the judge to say this person is a danger to themselves or others. Do you think that's a tool it would be beneficial to you?

### BOWDICH

Not having read the legislation that's proposed, it's hard for me to say yes or no. But based on the face of it, it certainly sounds like a sensible issue for us.

### GRAHAM

Are you aware of what Florida did regarding risk orders?

### BOWDICH

I am not, sir.

### GRAHAM

Mr. Brandon, you deal with guns all the time. Would you like a tool like this to deal with people when there is plenty of evidence from the community and law enforcement that this person is becoming mentally unstable, a danger to themselves or others? Do you think there is a gap in our law by not having a tool like this?

### BRANDON

Senator, thank you for the question. And as an expression in the law enforcement, it's healthy to be on the left side of boom, which is I think what the law you're saying so. I would welcome it as long as there was a process that -- where we could go and it's not a law enforcement officer making that decision but through a judge. I think it is a healthy for the public.

And to my job as an ATF agent in the street, I remember making -- getting a call and make it in a house, knocking on the door, talked our way in, and the guy was clearly mentally ill. And I went to a local sheriff, passed the information on for officer safety. And so, in that spirit, I did as much as I could with the information. I'm sure my law enforcement partners do the same. But to answer your question, I think it is healthy.

### GRAHAM

OK. And just my observation here is that the man did everything but take an ad out in the paper, "I'm going to kill somebody." We tell our citizens that if you see something say something. Well, doesn't it become an incumbent upon us as a society to do something, and that's what were trying to do this legislation is make sure that if you see something, say something. Your government actually can do something. Senator Blumenthal?

### BLUMENTHAL

Thanks, Mr. Chairman. I want to follow up on that line of questioning and I want to begin by expressing my respect and my gratitude to you as experienced law enforcement officials and your dedication to making America safer.

I want ask you to -- for the moment at least abandon euphemisms and jargon. And I know we're in a setting here where the temptation is to use both. But you've just been asked by Senator Graham about the legislation we have been introducing and it is attracting greater support that essentially would give you a tool to prevent that person when you know they are dangerous from having or buying a weapon of war, say something when you see something, but do something to protect the public. That's what America wants today.

And you know the people who work in your agencies on the streets want to prevent bloodshed and tragic death. Wouldn't it help for you to be able to go to a federal magistrate and say, "We just learned that there is this 18-year-old out there who is threatening to shoot up a school or shoot himself or shoot his mother and then killed 26 people in an elementary school?" We want to take his gun temporarily because we have more than ample cause to do it. Wouldn't that be helpful to you?

### BOWDICH

Senator, of course, it would. The way you just described it, absolutely. I'm always leery until I read something myself. So, I understand the full contents. But of course, the way you described it and the way Senator Graham described it, it sounds like very sensible legislation to me.

AR001093

**BLUMENTHAL**
Do you agree?

**BRANDON**
Yes, Senator, I do.

**BLUMENTHAL**
Ma'am, would you agree?

**ALATHARI**
Senator, I'm not a law enforcement official. I'm a researcher. So, I'll leave that to the subject matter experts.

**BLUMENTHAL**
You can still have an opinion?

**ALATHARI**
I can't offer you an opinion on something that I have no expertise.

**BLUMENTHAL**
Well, I'll go with the law enforcement folks.

**ALATHARI**
OK.

**BLUMENTHAL**
Mr. Brandon, are tips now required or information to be shared with other law enforcement officials at the state and local level?

**BRANDON**
Yes, Senator. And they always have been. I have anecdotal evidence. I won't take up the time here, but that's -- candid pictures (ph) get right to the locals and we embed with them and it is usually a local crime and we stay with them until our resources are no longer needed. And I'll just say that we standardized, streamlined and simplified our iTips after this incident to improve our own agency.

**BLUMENTHAL**
Thank you. With respect to bump stock, my understanding is that ATF at some point provided an opinion or stated its view that current authority was lacking for bump stocks to be banned. Is that correct?

**BRANDON**
Senator, when I first was with the tragedy on October 1st and dealing with bump stocks, internally within ATF from our technical experts, firearms experts, and our lawyers was that they didn't fall within the gun control at the National Firearms Act.

I have kept an open mind in the interest of public safety from the letters I received from both Republicans and Democrats, and to be candid with you, I went outside and over to DOJ and I said, "I don't want us to have tunnel vision."

And I'm being told one thing. And so, the Attorney General tasked the team to look at it. Since that time, the -- our experts, working with the DOJ experts, have led to the advancement from an advanced notice of proposed rulemaking now to a notice of proposed rulemaking that is currently sitting at the Office of Management and Budget.

**BLUMENTHAL**
So, that has not yet been issued, but it will take time.

**BRANDON**

AR001094

Correct, sir. It's the Administrative Procedures Act as you well know and it does take time.

BLUMENTHAL

And then it could be challenged court, correct?

BRANDON

Correct.

BLUMENTHAL

And in fact, as we sit here, everybody in this room wants to ban bump stocks. But the likelihood is there will be a challenge in court which ill delay implementation, correct?

BRANDON

I've been told that by some attorneys. Yes, sir.

BLUMENTHAL

Well, it's a near certainty given the likelihood of litigation around this topic. So, wouldn't it be simpler and more effective for there to be legislation banning bump stock?

BRANDON

Senator, in the same spirit of answering the question from the previous thing about the proposed statute, optimum answer for public safety, as a career guide 30 years of laws, is clearly the best route, but we're doing everything within the executive branch that we can do and ask through the Administrative Procedures Act to enhance public safety to keep an open mind about Bump stocks.

BLUMENTHAL

Thank you. And again, my thanks to each of you for your service coronation and thank you for answering my question. Thank you, Mr. Chairman.

KENNEDY

Thank you, Mr. Chairman. Director Brandon, you know what the word fulminating means?

BRANDON

Fulminating? To be honest, the stress of being here and at the moment.

KENNEDY

I didn't, either. I looked it up. It means raging against something. And raging can be cathartic, but can we agree that to solve a problem you have to actually do something?

BRANDON

Yes, sir.

KENNEDY

You're a marine, right?

BRANDON

I'm a former marine from 78 to 82, sir, enlisted.

KENNEDY

When you're a marine, what would happen if you just obey the direct order?

AR001095

BRANDON
You would be subject to the uniform code of military justice.

KENNEDY
That would inflict pain upon you, would they not? Not physical pain, but you'd be punished.

BRANDON
Yes, sir. In old school when I was in, sometimes you can catch one.

KENNEDY
Can we agree that the next database is only as good as the information in it?

BRANDON
Absolutely, sir. The information should be accurate, timely and relevant to make an important decision.

KENNEDY
Can we agree that we have federal and state workers whose job is to enter information in the database? Can we agree on that?

BRANDON
Yes, sir.

KENNEDY
Can we agree that some of our federal and state workers do a good job and some of the lousy job? Can we agree on that?

BRANDON
I would never sell any organization having 100 percent hitters (ph) as quality workers.

KENNEDY
OK. Can we agree that every one of America's governors cares about the database working?

BRANDON
I don't know all the governor, sir, but I would assume that the spirit they have leading their states would be the number one thing is to protect their people.

KENNEDY
Can we agree that the president genuinely cares about making sure the database works?

BRANDON
I was sitting in the room when he gave the order to the Attorney General in a memo. So, he seems quite intent on stepping on the gas.

KENNEDY
OK. I want to describe a scenario to you and get your opinion on. Let's supposed that the president and every governor America called in everyone of his -- or in the case of governors, her -- agency, and said, "Well, here is the deal. Some of our paperwork doing a good job getting information to the database. Some of them aren't. Within seven days, I want you to fix it."

Now, I haven't been up here very long, but I was in state government a long time. I feel pretty confident in saying at least one agency head is going to say, "Mr. President or governor, I can't do that. I don't have the money or someone put my priorities right now or I'm supposed to go on vacation next week, or can I have more time." Trust me, that will happen.

AR001096

That's the one you fire. And then the word goes forth that the boss is serious. And the information gets updated -- it gets uploaded. Can we agree, no disrespect anybody, that would be more effective than saying, "Pretty please with sugar on top, do your job. And if you don't, I might take away your bonus."

BRANDON

Yes, sir. situational leadership, depending on the situation, you have to direct. And I think that's to your point is that being directing on something that is important and important to everybody usually gets done.

KENNEDY

OK. Director Bowdich, I want to go to Southern Springs. Who in the Air Force didn't upload the information that they were supposed to?

BOWDICH

I don't know the answer, Senator.

KENNEDY

Do any of you know the answer?

BOWDICH

What I do know, Senator, is ...

KENNEDY

Just a second. Doc, do you know the answer?

ALATHARI

No, I don't.

KENNEDY

Do you know the answer, Director?

BOWDICH

No, sir.

KENNEDY

OK. It's been four and a half months, right? Do any of you know what happened to that person who didn't do his or her job?

BOWDICH

No, sir.

KENNEDY

I don't mean to denigrate anybody. Does anybody in your agency or in your research staff reached out to find out who it was and what happened to him?

BOWDICH

No, Senator. What I would tell you is that we have received extraordinary cooperation from the Air Force ...

KENNEDY

That's great. But do we know who did it and whether they -- there were consequences or they just put on double secret probation?

BOWDICH

Senator, it's not really something that I would have concerned. That's more of an internal agency matter.

AR001097

KENNEDY

OK. Thank you, Mr. Chairman.

GRAHAM

I have a letter requested to be introduced in the record from the American Federation of Teachers, National Education Association be entered without objection. Senator Durbin.

DURBIN

Thanks, Mr. Chairman. It has been a long time. I do not have a lot of memories about what it was like to be in the first grade. But do know this, my six-year-old granddaughter who goes through first grade public school in Brooklyn, New York, has memory of what happened after Parkland, Florida.

She told me about it. A teacher told the first-graders in her school, that if there is a shooter in your school, stay away from the windows and get down on the floor. Is there any sane person in America who believes that is what the founding fathers had in mind of the Second Amendment? That is why we're here today. That is why the students Parkland have inspired students across the United States of America to finally stand up and say to us, to the politicians enough, enough.

I just have to say and I put it in the straighter terms as I can. The 17 lives in Parkland, Florida are worth a lot more than the weak response we have heard from this Committee and from the President. I believe that 97 percent of the American people agree that we should have universal background checks to keep guns out of the hands of people who misuse them and the student's march we ought to will listen.

When overwhelmingly Americans say we have got to get rid of assault weapons and these high-capacity magazine clips, we ought to listen. When they tell us that the sale of long guns, rifles and others, the people under the age of 21 is dangerous, we ought to listen. Instead, what we have sadly are weak responses all around, and why, well, in a lucid moment a couple weeks ago, the President identified politicians are petrified by the National Rifle Association.

And the question we face, very honestly, is whether we're petrified by them. I am not. I do not get their money. I do not get their support, and I don't care to ever have it. And the question is whether even members of the NRA will step up and join us doing something about this. A lot of them have come to me privately and said we have got to do something.

Members of the NRA, they understand it. Let me ask you, Mr. Bowdich. I am sure for the families that are here what you said was heartbreaking. The tip sent to your agency did not result in follow-up. It didn't stop the Is Mr. Bowdich I am sure for the families that are here what you said was heartbreaking. The tip sent to your agency did not result in follow-up.

It didn't stop this Nikolas Cruz from his deadly rampage. But I did a calculation. Maybe I am wrong, unless you can tell me if I'm wrong on this. But in your testimony you suggested, the number of telephone calls and emails which the FBI receives, which purport to identify some threat, and as best I can determine, it is about 4100 a day every day of the year.

And the 160 staff people that you identified working in this agency receiving these calls would each receive each day 26 tips on possible threats. We have been meeting here for about 100 minutes and it strikes me that each one of those employees would have received five tips in the time that we've sitting here this morning.

Let me ask you this question. What authority does the FBI have to deny a gun sale to a person based on information that the person has threatened to commit a mass shooting if the person has not been convicted of a crime, or does not otherwise fall within prohibited categories from buying a gun under federal, state law.

BOWDICH

That's a good question, Senator. If I could return to two things, if I can quickly return to the call center, some of those calls are nuisance calls from repeat callers. So they can quickly sift through those. Others however, are very challenging for these folks to listen to. Sometimes someone will begin a conversation. I went out immediately after this and sat down and I listened to a number of our calls today, and sat with a few of our call takers to listen to those calls.

AR001098

They're challenging, and those folks they work hard out there, and they are making judgment decisions. In this case, we have been 100 percent clear. We do not believe the right decision was made.

**DURBIN**

In this case, clearly the FBI failed. What I am asking you is what authority does the FBI have under the circumstances I have just mentioned if they receiver credible threat that a person has threatened to commit a mass shooting.

**BOWDICH**

That's a good question. So we talked about -- I talked about this briefly earlier. Do I think we could have changed the course of the outcome here? I do not know. Again, anytime we can get in front of this person is a positive thing because he now knows the FBI is sitting down with me, sometimes along with a local detective to discuss these types of behaviors. As far as authorities, you purchase these weapons legally.

I do not know the mental health laws in the state of Florida, but it would have been sure a nice opportunity for us to get in front of them and take along a state or local officer so that even if we did not have the authority to do anything for him, we could have at least made sure that they know, now we know in hindsight, we do know that they knew about him as well.

**DURBIN**

What you just heard is a common sense suggestion to change the law, to put authority in the hands of the FBI and others so that they can stop someone who has threatened to commit a mass shooting. The laws in this country are not clear on the subject and they should be crystal clear, so should the laws when it comes to ATF that ties deliberately, ties the hands of this agency with paper records.

Do you why there are paper records? Because the gun lobby does not want an electronic background check, and you know why we do not share information on gun dealers in the suburbs of Chicago. They're flooding us with crime guns because the Tea Hard Amendment limits the distribution of that information, a law put in by the gun lobby.

This is our responsibility.

**GRASSLEY**

I'll pass until I've heard more about that testimony.

**LEE**

Thank you, Mr. Chairman. Thanks to all of you for being here today, and thanks for your willingness to testify. I want to start with you, Mr. Bowdich. Under a guidance document issued within the last few years by the U.S. Department of Education, public schools are discouraged from reporting potentially criminal conduct to police authorities.

In that criminal conduct that is included on the list, it includes a wide range of conduct, including of assault, threat, bullying, disruption on campus, drug use, drug possession, being under the influence, possession of drug paraphernalia, false accusations against school staff, fighting mutual combat, harassment, theft, trespassing, vandalism, and damage to property, a lot of the kinds of criminal activities one might expect to see from time to time at a school are on the list, on the list of things that schools are discouraged from sharing information and tips about what the police under this guidance document.

That there is, I understand it behind the guidance document and the policies that administrators do not want to create. In fact, want to combat what is sometimes referred to derisively as a school to prison pipeline. It's my understanding that Broward County, Florida, which includes Parkland is fairly heavily invested in this policy, that policies have been adopted within Broward County to comply with this and do not make these kinds of reports.

So under this new approach, out just in the last few years underwrote a guidance document from the U.S. Department of Education. Nikolas Cruz arguably committed what could easily be described as arrestable offenses on school campus, including assault, which in some cases, as you know can be a felony, and also including threatening teachers and apparently bringing ammunition onto school campus.

AR001099

Yet, he was never formally disciplined. I was never expelled, never taken into custody. Is there a chance in your judgment that the outcome of the tip vetting process might have been different? Have there been some sort of formal law enforcement record regarding Nikolas Cruz, especially with regard to arrestable offenses in some of these areas.

BOWDICH

Thank you, Senator. I have not seen the document that you are describing to me. I think if you look at this case and quite frankly, some of the other cases that are out there, we have some young, young men and women out there that are troubled. Now, trouble can come in many forms or fashions. Any time we have silos of information, I think it is dangerous.

You need a holistic approach to try to find the best solution we can within the law, not having read the document. I do not know enough about it. And I do not know if there was any discussion between Broward County Sheriff's Department and the schools in this case.

LEE

But in theory, if there had been a record, if it had been reported to police that this conduct had taken place might the tip vetting process have turned out differently.

BOWDICH

In theory, yes. And from prevention point of view, I do not think there is a downside to that.

LEE

I understand the FBI assigned separate teams, one team to review of phone tips and one to review online tips. This makes some sense. If I understand it correctly, you got a different kind of environment going on, with a phone tip you got someone who can interact with someone representing the government on the other line in real time, whereas online, it is just a one-way burst of communication and that is it.

How does the training differ between these two teams and how does the FBI measure and ensure the consistent review of across these two teams

BOWDICH

It's a great question, Senator. So you just brought up two separate issues, training and performance metrics. And we are looking at both of them. The training involves for those that are sitting there reviewing thousands upon thousands of electronic tips, they have what is called a Word Cloud. That Word Cloud is there looking through the emails to look for words like ISIS, bomb, shoot, those types of things, and that will help them begin to pull out golden pieces of these emails

Many of these emails are like the calls are nuisance emails and they can sift right through those, but some of them there is a judgment that has to be made. As far as the training for the call takers, it is very similar. It used to be a three-week training session. Today, it is an eight week training session and there is a much different protocol for those call takers today and much different training program.

And that is for good reason, because obviously there is some nuances when you are having a face-to-face with someone, there are some skill involved there as far as extracting information. We want to receive the call and we want to make sure that the caller is able to get out whatever they can, unless it's a nuisance caller.

But there is definitely a different nuance to their training. As far as the metrics that you describe, you asked about earlier, that is something we're looking at. So performances metrics, any type of metrics can be a very good thing. In this case, we're looking at how are we judging our call takers before and part of that was the speed at which they were taking their calls, and then how long it would take them to do their follow-up after they took the call and that follow-up could be database checks.

It could be scrubs of additional tips that they found. So we're not so sure that we did not potentially drive some behavior there that is not gait in a case like this. Certainly, you have to hold people accountable for their time while they are on the line, but that is something that we've asked our inspection team to look carefully at.

GRASSLEY
Senator Hirono

AR001100

HIRONO

Thank you. Mr. Chairman. Students in Parkland have inspired students all across the country and us to enact inaccessible gun legislation to protect our students in our communities. Students in Hawaii are participating in the 17 minute observation, as well as there are some 22 students who are visiting Washington, D.C. from high school in Kawai who will be joining the value in the capital steps.

So we should listen to the students and others throughout our country are asking us to take appropriate action. I did want to ask for clarification from you, Director Brandon. Can you clarify for me the proposed rule that you are putting out regarding bump stocks? Is it to ban bump stocks or is it to regulate them in some way?

BRANDON.

Senator, thank you for the question. Before and I said the Office of Management and Budget, and it would be to -- for bump fire devices to fall within the definition of machine gun on the National Firearms Act and Gun Control Act.

HIRONO

And therefore, if it's deemed such, then they would be banned.

BRANDON

That is correct, ma'am.

(CROSSTALK)

BRANDON

In 1986, you all passed a law that made it prohibited from machine guns before May 19th of 1986. They were grandfathered in. Anytime after that, unless it's for law enforcement or the military, they're banned.

HIRONO

So it still has to go through a review process before you propose a rule. So you would say that an outright ban legislatively is a better way to go. Dr. Alathari, by my calculations, the FBI receives about 4000 tips every day via phone, email, etcetera, but even when they receive a tip as specific as the one when they got about the Parkland shooter and even when they went out to investigate, they weren't able to make the right judgment.

And of course hindsight is 20/20, but is in your training could have done to help the FBI better adjust this threat or correctly address this threat.

ALATHARI

Senator, I am not familiar with the protocols that the FBI follows and the processes, so that is something I cannot comment specifically on that. But I can tell you that one of the main components of a comprehensive threat assessment program is to establish central reporting mechanism. That mechanism should be the sort of repository where the information comes then.

And the protocols that you will have to establish for a comprehensive program have to include roles and responsibilities of the team members how the information is shared, when the information that first comes in who gets it.

HIRONO

I understand all of the things that you have developed. So my question have you worked with the FBI regarding their eight weeks training for their -- for the people over there who take these calls.

ALATHARI

No, we have not, Senator.

HIRONO

Wouldn't it be a good thing to do since we have two agencies that could learn from each other?

AR001101

ALATHARI
We've collaborated with the FBI on other projects but not specifically this

HIRONO
Would you like to respond?

BOWDICH
Senator, absolutely. I think it is a great idea for us to ask the doctor to review our eight week training block

HIRONO
I would like to request that that happen ASAP. So again, for Dr. Alathari, you say that threat assessment is the most effective method to prevent school shootings, but wouldn't restricting or eliminating access to assault weapons designed only to kill change the nature of those assessments

If fewer people had these kinds of weapons, wouldn't that lower the likelihood of a mass shooting?

ALATHARI
Again, Senator that is not an area that I have studied. I can say that in the threat assessment program, when you are investigating a person who has come to attention, whether it is a student or a person in the community that might be at risk of engaging in something or had exhibited concerning behavior, there is a whole approach that we look at, including using a systems approach of interviewing people, gathering information

HIRONO
Excuse me, I am running out of time. Wouldn't your threat assessment change if people did not have assault weapons? Wouldn't the assessment be of a different nature than if you are confronted by someone with a handgun versus someone with an assault weapon?

ALATHARI
It depends on a constellation of factors, because when you are doing a threat assessment on someone that might be one piece of it, but it would not be the only piece

HIRONO
I understand that, but I would say would you acknowledge that would be an important piece.

ALATHARI
I would have to do more research on that.

HIRONO
Speaking of research, so there -- are you familiar with the Dickey Amendment?

ALATHARI
No, I am not

HIRONO
That was passed in Congress in 1996 that would prevent the Centers for Disease Control from doing any kind of study relating to gun violence. Do you think that makes sense that we actually have a law that prevents the Center for Disease Control to study the impact of gun violence in our country?

ALATHARI
I'm not familiar with that amendment, Senator, and I do not really know

AR001102

(CROSSTALK)

**HIRONO**

Our other two testifiers, are you familiar with the Dickey Amendment?

**BRANDON**

Ma'am, I'm not familiar with it

**HIRONO**

Well, I just explained what the amendment was. Do you have a response?

**BOWDICH**

Yes, ma'am, I am familiar with it. Just like I said with this, anytime you have good information to make good decisions, I mean that's a basic decision-making process. So the more you know, the more you can fix things and enhance public safety.

**HIRONO**

We do have a bill to eliminate the Dickey Amendment. That sounds like a good idea, thank you, Mr. Chairman.

**GRASSLEY**

Senator Cruz.

**CRUZ**

Thank you, Mr. Chairman, thank you to the witnesses for being here today. The American people are rightly horrified and outraged at the mass murders we have seen over and over again. Both at Parkland and at Sutherland Springs four months ago both of those murders were preventable and should have been prevented.

In my judgment, we have seen a catastrophic and systemic failure of law enforcement at every level. Mr. Bowdich, with regard to Parkland, do you agree that the FBI committed serious grave errors?

**BOWDICH**

Yes, sir, I do.

**CRUZ**

We know now that on September 24, 2017, a man tipped off the FBI that this shooter had posted on YouTube a message, saying "I am going to be a professional school shooter", and yet the FBI was not able to track down and identify that person. We know that subsequently, on January 5, 2018, another caller described the shooter as someone who wants to kill people, and yet in that instance the FBI did not even open an investigation one it

Why not?

**BOWDICH**

Senator, I share your frustration. I share your anger and I share your concern that this does not happen again. Why not, is what we're getting to by our inspection teams, we have one team from the counterterrorism division that looked at the Jackson incident, the Guardian league and how that was handled.

The second team was out in West Virginia and they're finalizing their reports that looked at the call center. The Jackson incident, there were two potential options available to us. One was at the investigators when they went after, they went out to interview the caller.

Had they decided to submit what was called a 2702 letter, it is not a compulsory process, but it is a letter where we go out to the provider and we ask for IP address information, had they done that

**CRUZ**

Did they have the posters nickname?

BOWDICH
They had the name only, yes

CRUZ
Did they Google that name?

BOWDICH
Yes, Senator. Well, I do not know if they Googled it. We know we conducted open source searches. We're still working through the audit trail the best we can

CRUZ
Do they have the location where the shooter was?

BOWDICH
We did not, sir. What the investigators did find -- the investigators to be clearer, both part of the joint terrorism task force at the time. One was an FBI agent. One was a local task force officer assigned to the JTTF. They went out and they interviewed the caller. At one point, they conducted social media checks or open source checks rather. They also conducted database checks

When they did, they found another Guardian lead from our Houston office, and that Guardian lead, the way they found it was the term school shooter came up. The agent called an agent directly in Houston, and they had a discussion about this, and what happened in Houston was the term school shooter was used as part of a joke on social media.

So they washed that complaint out. There was nothing to that. That was not related to Mr. Cruz. The agent had the option to write a letter or to file a 2702 letter with the provider. The provider then has the option to come back to us and say here is the IP address or not. If they choose not to, the second option would have been, could have been going to the U.S. attorney's office to try to seek a grand jury subpoena to compel

CRUZ
the FBI, these two complaints did not connect the two, is that correct?

BOWDICH
We did not connect, between the call center and the Jackson Guardian?

CRUZ
Correct

BOWDICH
Yes, sir. Actually, we did. But that was not done until January 5th. When January 5th, when our call taker received that call in West Virginia, she obviously received the information, she then conducted database checks. As she did so, she found another Guardian complaint, which was the one from September, which was sent to Jackson, Mississippi.

That complaint had initially come into our E-tip line and the employee did what they should.

CRUZ
Do you agree that at the outset that the FBI had made serious mistakes

BOWDICH
I believe there were judgment errors. There were judgments made

CRUZ

Has anyone been held accountable? Has anyone been reprimanded? Has anyone terminated?

BOWDICH
Senator, it is a good question. And the answer is they -- these employees have due process like everyone else.

CRUZ
So the answer is no.

BOWDICH
As of today, no, however.

CRUZ
Have the systems changed?

BOWDICH
We have an office of personal responsibility.

CRUZ
Have the systems changed?

BOWDICH
Some of the recommendations have been bridged, yes, Senator. So the inspection team made a number of recommendations.

CRUZ
Would you agree that local law enforcement likewise had systemic catastrophic failure. CNN reported there were 45 calls to the Broward County Sheriff's Department about this individual.

BOWDICH
Sir, I do not believe that is my job to talk about another agency's.

CRUZ
You're in law enforcement. You work with local law enforcement, 45 calls, complaints about fighting, throwing his mother against the wall, abusing animals, and local law enforcement did not do anything. Is that a systemic failure?

BOWDICH
Sir, I haven't been a local law enforcement officer before I came into the FBI. Those calls are all day and all night. I do not know the context.

(CROSSTALK)

CRUZ
-- Remaining outside and not going in and engaging the shooter. Is that a failure of law enforcement? Is that consistent with FBI protocol?

BOWDICH
I think I will let the public and the Broward County Sheriff's Department make that.

CRUZ
Is that consistent with FBI protocol?

BOWDICH
It is not.

AR001105

CRUZ

Thank you

GRASSLEY

Senator, your time is up. Senator Booker.

BOOKER

Thank you, Mr. Chairman. Mr. Brandon, how has Congress made more difficult for the ATF to do its job in making sure that firearms do not fall into the wrong hands.

BRANDON

Well, thank you for the question, Senator. You know it is -- any agency can do more with more as far as our appropriations right now, we're 20 million in the hole, for this FY under a continuing resolution. But the spirit of ATF is to do whatever we can to always protect the public and serve the public.

BOOKER

Sir, I'm sorry because I know your commitment. I was a local mayor. We did a joint task force with the ATF. And I am really been impressed with your agents and their commitment, but I cannot tell you how many people from your agency, this is the word they would almost often use is that your agency is starved for resources, and you could be doing a much better job in keeping guns out of the hands of criminals.

Local communities like mine, I live in the inner city of New Jersey. We see guns pouring into our communities and we have found that a significant number of them are coming from a very small group of retailers that sell to criminals or to (inaudible) you are aware of that, right?

BRANDON

Yes, sir.

BOOKER

And in fact, the data -- we know the research shows that 1 percent of licensed dealer supply a whopping 57 percent of the guns that are recovered crimes. You're aware of that, correct?

BRANDON

Yes, Senator. That is a story I think that is over 20 years old. I would not agree with that statistic today.

BOOKER

OK, but you know that it is probably -- you do agree that it's a small amount of retailers that are often providing illegal guns to sourcing legal guns. It's a small group. It is not the majority retailers but there are certain groups that are -- certain retailers that are more prone to give strong purchases and illegal purchases, yes?

BRANDON

Senator, most of the federal firearms licensees are very hard-working, law-abiding citizens. At the ATF, we developed six years ago a business model called Frontline. Its intelligence led, risk-based, so we look at all data to see who would be like your troubled dealers and we put them as a priority.

I established a top 100 list on FFLs to be inspected throughout the country every year. And so it feeds to what you are saying. It is like focused on the businesses that are not compliant with federal law, allegedly, and that we will target them for systematic inspections. And if the allegation is credible, we will go after them with the...

BOOKER

And with more resources, you could be doing more.

AR001106

**BRANDON**

I cannot sit up here and lie to whether you're Democrat or Republican. Yeah, sure, ATF we could do more and a lot of the police chiefs. And into your experience as mayor, I get hit up all the time, saying hey, just give me five more ATF agents here. Chicago.

(CROSSTALK)

**BOOKER**

I want to underline that, highlight it, which it is very frustrating for those folks who are trying to prevent crime in communities like mine with gun violence, who are overwhelmingly when I was mayor, we tried to look at it. Only one person committed a shooting with illegally purchased guns, that we have put tons of these illegal weapons pouring into our communities.

Another frustration is a TR amendment. You are familiar with how local law enforcement all over this country can understand that we can't get common sense trace data to find out where these guns are coming to try to shut off this spigot. Is that correct?

**BRANDON**

Yes, Senator. And to be fair, that there are some dealers that could be maligned by data when they're compliant with all federal laws, but just by where their business is and they could be doing everything correctly, and I know of instances of these inspections on paper, it would take someone like yourself, a Tom Brandon's Gun Shop is responsible for 1000 guns that trace back there.

I could be doing everything correctly and it just could be the volume that I am doing.

**BOOKER**

But we have issues of due process. But the problem we are seeing is just getting basic common sense, pragmatic data is very important to solving a problem. We have agencies that have been hamstrung on their ability to get common sense data. This is not a partisan issue. You don't need to be fair and balanced. People are trying to keep guns out of the hands of folks who are trying to do ill.

They need data. They need research. They need access to information and we're not seeing that.

**BRANDON**

Senator, I feel your pain because I never met a person in favor of gun violence, and I will share this with you. The departments are getting the data through an individual trace. I recommend that they establish their own database. They track all that and you would have all the data you're looking for, but we have to comply with the federal law and that is what we have.

**BOOKER**

And the point I guess I'm trying to make in conclusion is that we as the folks who are trying to keep safe should enable you with federal laws that will allow you to do your job. And local police forces in small communities in my state do not have the resources to create the kind of databases in at least in New York City has been able to do, but we can keep these guns of our streets because we can't get basic information so law enforcement can do their job.

And I appreciate you, sir. Again, your agency is incredible, such great officers, very brave men and women.

**BRANDON**

Senator, thank you for saying that because -- and like I said previously, they're on the street right now serving warrants with our federal, state, local law enforcement partners, putting their life of the line, notified something last night, but thank you. That means -- hearing that from you, all helps more for morale for ATF agents in the field, and so I sincerely thank you.

**BOOKER**

Thank you, sir.

**GRASSLEY**

Senator Harris.

AR001107

**HARRIS**

Thank you. I also want to recognize not only the hard work the men and women of each of your agencies, but the students who are out there right now protesting. They are mourning the loss of their classmates, and frankly, their innocence to some extent, knowing that they have to be prepared for what might be a massacre in their own schools.

But they are also protesting our inaction, the inaction of Congress, the United States Congress. And whether it is Sandy Hook or Sutherland Springs or Stoneman Douglas high school. I think all of these young people, these leaders are making very clear it's a false choice to suggest you are either in favor of the Second Amendment or you want to take everyone's guns away.

And right now, what we need is we need to have common sense gun safety laws in our country. And frankly, to get to that place. I would suggest that -- I do not think -- I don't know what we're waiting for. We do not need any more tragedies. We've seen some of the most tragic incidents that one could imagine, and we do not need any new ideas.

We got great ideas. What we need is we need the United States Congress to have the courage to act. And so you know, having said that, I am troubled by a suggestion that that has come from the administration that one solution might be that we arm teachers, and I just want to really understand what that might mean.

Let us break it down. So as a career prosecutor, I have worked with many communities where children go to sleep each night hearing gunfire. And so what we're proposing is that those children -- remember Sandy Hook, we're talking about six and seven-year-olds, so the children are supposed to go to school and look at the front of their class at their second grade teacher and she's going to be strapped with a gun.

I do not understand how that makes any sense. Let us also talk about in the context of the studies that have been conducted by the National Criminal Justice Resource Center, which is funded by the United States Department of Justice, which tells us that for trained law enforcement officials, they only hit of their intended target approximately 20 percent of the time.

So in an armed confrontation, they only hit their intended target approximately 20 percent of the time. Now we're talking about giving teachers some limited training on how to use a gun. I would suggest that their numbers aren't going to be better than that. And when we say we miss our intended target, we are necessarily also saying that there may be people that we hit that we did not intend to hit.

And if we're talking about a teacher in a classroom, that could very well be the other students. I would suggest be a bit smarter about what we really intend to be the focus of legislation and policy. And Director Bowdich, I would love your thoughts on that in terms of what that would result in if we're talking about limited training of teachers to be strapped with a gun, and what might be your concern about unintended consequences of a policy of that nature.

**BOWDICH**

Well, ma'am, I have spent my -- I share the outrage of these attacks, first off. And as a career law enforcement officer, both at the local and the federal level, I'm not a legislator, and I believe that as legislators ...

(CROSSTALK)

**HARRIS**

Is this is a practical matter? What are your thoughts? Is this a practical matter?

**BOWDICH**

I, like everyone else in the room have personal thoughts on things, but I am not here representing me. I am here representing the FBI. My thoughts are this is a matter for the legislators to take up and decide what the best solution is.

**HARRIS**

OK. I would suggest that your thoughts would be very relevant to the decisions we make, but we can have that conversation another time. I also have a concern when we talk about this at the impact of having armed teachers as it relates to African-American and Hispanic students. And here is why say that.

AR001108

There is an overwhelming body of evidence that shows that harsh disciplinary protocols disproportionately impact children of color. We know that in the studies that talk about what the rates are in terms of suspensions and expulsions from school. The FBI has done an extraordinary job, I think, of recognizing implicit bias among all professions, including law enforcement.

And I would suggest that it applies to all professions. Do you have any concerns about a policy that would result in arming teachers and the concern that we should make sure that if something like that were to occur that they would be trying implicit bias.

BOWDICH

Senator, it's a good question. I never really put the two together, but I have not seen the document that you're referencing. I think any -- whatever we decide, training is necessary on all fronts. The implicit bias training that we in the FBI administered two years ago is actually very important for the organization as a whole, both internally but also from the optics of the external as well.

HARRIS

And you've been a leader, the FBI has been a leader on recognizing we all carry implicit bias and it is important we are aware of it when we make decisions, especially exercise judgment that might result in harm or even death to another person. And so I applaud your leadership in that regard. My time is up. Thank you.

GRASSLEY

Senator Klobuchar.

KLOBUCHAR

Thank you very much Mr. Chairman, and thank you to all of you for your work. I want to ask, especially Mr. Bowdich if you could pass on to the Director. We are so pleased that there was a -- people were today arrested and charged in the bombing of the mosque in the Twin Cities, and that was a really horrific crime for the community. And we want to thank the FBI for your work.

BOWDICH

Thank you, Senator. If I could very quickly, there was also a tip that came in from our ATF partners that helped in the solution of that case. It was a joint investigation.

KLOBUCHAR

All right. Thank you. It was a really big deal in our community. Thank you to both agencies for your work on that. So I come from a big hunting state, Minnesota, and I always look at these proposals in front of us and say with this heart, my uncle Dick in his gear stand. And I do not think universal background checks would hurt.

I do not think the proposals we're talking about with assault weapons would hurt. And so I think I would start with that. I went to the meeting with the President and he looked right at me and I expect you guys to say this, and said that he favored universal background checks, that he wanted that mentioned to me bill done, and also that he wanted to do something on assault weapons.

And that just has not happened so far, and so if you feel frustration here, you hear it even more when you are out there with the students where I was just 10 minutes ago. And I was encouraged that he talked about the age limit, and we have seen businesses, including Dick's Sporting Goods and Walmart raising the age limit for purchases at their stores.

And so just to be clear, under current law, if an 18-year-old passes a background check at a licensed firearms dealership like the killer did in Florida, and buys multiple military style weapons, would the FBI have a record of this sale, Mr. Bowdich?

BOWDICH

Sorry, rookie mistake, Senator. If he purchased the weapons legally at 18 years old, we have a record, yes we do, yes, ma'am.

KLOBUCHAR

So you have a record. And that goes right into your system?

AR001109

**BOWDICH**

Well, that said, when there is a proceed, when people call in for a proceed and they receive a proceed to purchase that firearm or to sell that firearm rather, we have to get rid of that information within 24 hours by federal law.

**KLOBUCHAR**

So it does not stay in the system.

**BOWDICH**

Yes, ma'am.

**KLOBUCHAR**

So that's the problem. Could that be a problem if that's a law? So we could change the law so it would stay in the system. You don't have to give your own personal -- we could change the law is that right?

**BOWDICH**

Yes, ma'am.

**KLOBUCHAR**

All right. I think we should. One area where we should be able to find common ground is taking action to protect women who are at risk of violence from domestic abusers. When I was at the White House, I gave the President the figure that 6000 women died at the hands of their partners with guns and that that is more than the number of brave troops that we lost in Iraq and Afghanistan.

And one, the background check that would help a lot in domestic abuse cases, we've seen that in other states. But the other thing would be the bill that I have to extend protections to include dating partners and to brand those convicted of stalking misdemeanors from buying guns, a number of police organizations have supported this.

Can you talk about the connection between gun violence and domestic abuse?

**BRANDON**

Yes, ma'am. First of all, I share your concerns about the scourge of domestic violence. As far as the correlation, I do not have the studies of the data to back it. Certainly, any time you have the emotions that occur in some of those incidents, anytime there is a firearm in the mix. It can get 10 times worse very quickly.

**KLOBUCHAR**

OK. I want to turn to a 2016 report by the GAO, which found that the FBI took longer to deny a firearm purchase because of a misdemeanor domestic violence conviction than for any other prohibited category. The report found that only about 70 percent have NICS checks involving prohibiting domestic violence misdemeanors between '06 and '15, 2006 and 2015 were denied within 3 days.

That is disturbing since gun sales are allowed to go forward after three business days if a check is incomplete. Could you talk about why this might have happened with these longer processing times?

**BRANDON**

Senator, I have not seen that the document you have referenced. I would like to take that back to get you a better answer. I do not know the answer right now.

**KLOBUCHAR**

I would appreciate that because what it means is that roughly up to 30 percent of these gun purchases could have been allowed to go forward during this time, even though these people could been convicted of domestic violence misdemeanors. And the report, the GAO report, which is an official report found that this led to up to as many as 6700 firearms being transferred to people that should have been prohibited from owning a gun because of a domestic violence conviction.

AR001110

So though they're pretty astounding numbers, then I ask you to look into it and to get back to me.

BRANDON
Yes, ma'am.

KLOBUCHAR
Thank you.

GRASSLEY
Senator Whitehouse.

WHITEHOUSE
Thank you, Chairman. Mr. Bowdich, the gaps and misjudgments that you have described clearly did not provide the FBI's finest hour. But I do want to say that I think the clarity and candor of your recognition and acceptance of responsibility here and the quick response by Director Wray have been admirable. And I hope for some solace to people who've had concerns about what exactly transpired.

We look forward to your report. What I would like to specifically request of you is a clearer exposition of the data cloud that comes in through your power line and through other sources that must be reconciled into investigative judgments. Senator Durbin referenced 4100 calls per day figure.

You said that there is a certain amount of automatic, I guess automatic sorting that takes place for frequent flyers who you perhaps checked off as not being credible, so that that sorts itself down. I do not have very many minutes with you here, but if there is some sort of a diagram that we could look at that shows what the background blizzard of information looks like but what you are expected to make, determinations as to which data point is telling as to the prospect of a future crime would be helpful. I think for us to see that.

Do you have such a thing and could you provide it?

BOWDICH
I do not know that we have it, but I can find it and provide it, yes, sir.

WHITEHOUSE
Great.

BOWDICH
And the other thing I would offer, Senator to you and anyone else on this Committee is we are more than happy to actually walk you through the call center at any point. If I could very quickly, this center was built in January 2012. It was built because we had -- we were trying to save the field work, so we are trying to centralize and standardize the tips and leads that came in and then went out.

They have evolved that center doing a good job. It is not perfect, obviously, and we made a serious mistake here. However, one of things we have recently done to better develop that Word Cloud is we brought in the operator side from both the criminal investigative division and the counterterrorism division to have them look at the words and determine with the emerging trends and threats, do they currently have the right words associated with that cloud.

WHITEHOUSE
I would like to raise with you all a slightly different topic. One of the voices that have been most impressive and harrowing to me has been the voices of the trauma teams who had to deal with the effects of the high velocity ammunition that an AR15 propels. I think it is still a little fresh to be reading through those details, particularly some of the affected individuals who are here in the room.

But I would like to ask unanimous consent that several articles, like what I saw treating the victims from Parkland should change the debate on guns. Wounds from a military-style rifle are a ghastly thing to see in the New York Times. After the Las Vegas shooting massacre, survival can be excruciating from the Washington Post.

AR001111

And Parkland AR15 injuries harder to treat than handgun wounds, so I'd like to ask those articles to be made a matter of record is this proceeding, Mr Chairman

**GRASSLEY**
Without objection, so ordered

**WHITEHOUSE**
Thank you. It does seem that the ammunition involved played a significant role in the casualty count in a lot of these recent shootings. I'm wondering first Ms Alathari, in your work, Dr Alathari, excuse me. In your work, do you take into account instrumentalities in evaluating risk? Are you looking more for high risk actors?

**ALATHARI**
In terms of the research that we have done on multiple varieties of weapons were used, firearms were the most common, but we have also had knives, explosives, vehicles obviously. That has kind have been in the news lately

**WHITEHOUSE**
Does the category of ammunition that an AR15 launchers create a different level of safety risk than regular handgun ammunition in your estimation

**ALATHARI**
I cannot comment on that because that is not something that we came across in our resource

**WHITEHOUSE**
Would you take a look at that question and see if your research would support an answer to that question

**ALATHARI**
I can look into that, sir and see

**WHITEHOUSE**
I would appreciate that. And to Mr Bowdich, Mr Brandon, any observations with respect to the added trauma, harm, and fatality from that specific type of ammunition compared to regular handgun ammunition

**BRANDON**
Senator, thank you for the question. I have mentioned I was a young person in the Marines and I was trained on then the M-16, A1. The training I received was specifically the lethality. You could have a small projectile with a handgun, traveling at a high rate of speed, causing a major damage. And I do know from reading several reports that yourselves and also the handgun ammunition traveling at a much less. I think the 223 round goes about 3300 feet per second

And so the article you referenced was -- just picture a boat going through the water and is all separation that the projectile does not have to partition to do damage. And if it hits a certain organ say like the liver, you know you won't survive it. As whereas handgun ammunition, I have seen guys got shot in the leg you know and wait for EMTs, and I've also seen people shot with 223 rounds or 7.62 AK rounds and they were screaming

**WHITEHOUSE**
It's a qualitatively different injury

**BRANDON**
Yeah. And again, this is a science

**WHITEHOUSE**

AR001112

Yes. Thank you. My time has expired, Mr. Chairman. I appreciate it.

GRASSLEY

Senator Coons.

COONS

Thank you, Chairman Grassley, Ranking Member Feinstein, and my thanks to all the witnesses, to Mr. Brandon. Mr. Bowdich and Dr. Alathari, and to other federal law enforcement agencies and entities, DEA marshals. My hometown of Wilmington, Delaware has suffered through an epidemic of gun violence.

And we are grateful for the assistance we have gotten from federal law enforcement as we try and work federal, state, local, to really tackle gun violence in my hometown. I am also grateful to witnesses that will join us here in the third panel, Katherine Posada and Ryan Petty from Parkland, Florida, and to the young people, the teachers, the faculty, and the students all over the country who are raising their voices even now.

I have heard that high schools all up and down my state, middle schools, elementary schools have walked out this morning to demand action by all of us in Congress. From Claymont Elementary School to PS/2 Pond Middle School, to Concord High School, from Caesar Rodney, to Dover Middletown, to Newark's, to St. Mark's, we have dozens and dozens of schools across my small state were students are walking out to get our attention.

They are asking the adults to be the adults and to solve this problem. So I am grateful for their work. But I am also gravely concerned that we do not seem to be able to come together on proposals that have a reasonable chance of being enacted here. In February alone, 5 individuals under 21 were shot in my hometown, and these are not the subject of national exposes or great focus either in the New York Times or are on ABC News.

And it is just a reminder that in small cities and large cities and rural communities and urban communities across our country, week in and week out, gun violence takes lives. gun violence makes our nation one of the most violent, one of the most lethal on Earth. And there are things we can do together to address it.

I was grateful that Senator Toomey of Pennsylvania, my neighboring state join me to introduce two weeks ago a modest bipartisan proposal to better enforce existing laws. It is called the NICS Denial Act. It simply says that when someone who is a person prohibited goes in to a federally licensed firearm dealer and lies on their form, tries to buy a gun, and are denied that opportunity, that that should be reported to state and local law enforcement so they can take appropriate action.

Mr. Brandon or Mr. Bowdich, can I just start by asking is it a crime to try and buy a firearm if you're a person prohibited, if you are a convicted felon, adjudicated mentally ill, convicted domestic violence. That is a crime isn't it?

BRANDON

Senator, yes it is. We refer to it as Lie and Try.

BOWDICH

Yes, sir, it is. And the Attorney General just came out with guidance, where he is directing more efforts towards Lie and Buy efforts.

COONS

And if someone goes in and tries legally to buy a gun but they are denied the chance to get, is not that a great predictor that they are about to go try and get a gun another way, rather, through the straw purchaser, through theft, through some other illegal means.

BRANDON

Senator, in my experience, yes. Often we come across cases where if the persons denied and typically it is a younger female and offered some money that may be significant to that person who may be in a difficult situation and lies on the form and it's transferred over. We routinely get reports of us making arrests in those situations.

AR001113

#### COONS

so there were 120,000 cases in 2016 of folks who were prohibited, who went in, who tried who lied and tried. That would seem to me to be an important priority. I am pleased to hear that Attorney General Sessions is raising the profile of that. There were fewer than 32 cases even considered for federal prosecution.

And I think we ought to be providing greater resources to state and local enforcement, to federal law enforcement and pass this bill. It is a simple bipartisan bill. Let me ask a last question if I might, Mr. Brandon. Requests by the FBI to recover an unlawful firearm are particularly dangerous because they require an ATF agent to confront a prohibited person who is now known to be armed.

Would you agree with me that in cases where there is a NICS failure or someone who lies and tries and then goes and secures a firearm another way, these are particularly dangerous for ATF agents.

#### BRANDON

Yes, sir. You never know what you are up against.

#### COONS

Well, I will just say this in conclusion. It seems to me that the voices of students from across my state, from Parkland and from all over our country are asking us to find responsible ways to work together. Virtually, everyone in my colleagues who I have been with today has introduced bills that would tackle this problem from a wide range of areas.

This strikes me as one of a dozen, whether it is banning bomb stocks, whether it is limiting magazines, or whether it is making sure that the NICS system and background checks are made universal and effective. We should be doing this in the interests of our communities, our families, and our children. Thank you.

#### GRASSLEY

We have finished questioning of our panels. So you folks are free to go now and I'll call the second panel. And while the second panel is coming, I will introduce you. Ryan Petty is a father of four children, including Alayna Petty who lost her life at 14 years of age in that attack at the high school in Parkland.

Since the tragic shooting, Mr. Petty has engaged with lawmaker's in Florida and here in Washington, D.C. to pursue meaningful reforms that will keep our children safe and our schools secure. Mr. Petty's son, Patrick is also in attendance today.

Katherine Posada is a 10th Grade Teacher at Marjory Stoneman Douglas High School. She teaches language arts there. She was in the building during the attack and she took great action to keep her students safe. Michael Beckerman is the President and CEO of Internet Association, which includes Google and Facebook as his clients. Prior to joining the Association, Mr. Beckerman served 12 years as a Congressional Staff Member, serving as Deputy Staff Director and Chief Policy Advisor to the Chairman of the U.S. House Committee on Energy and Commerce.

And the for those of you involved in this tragedy, it has been expressed so many times our condolences and particularly to Mr. Petty and Ms. Posada for the traumatic experiences that you've gone through. I couldn't imagine what they are. But you are here to speak on those, so I'll start with you, Mr. Petty and then Ms. Posada and then Mr. Beckerman.

#### PETTY

Mr. Chairman, Madam Ranking Member and the Committee members, thank you for having me here today. I'd like to share a quick statement from the families then I will begin my personal statement. The families of the amazing children and teachers killed at Marjory Stoneman Douglas High School on Valentine's Day would like to recognize the first responders who were witnesses that day to an unspeakable evil.

Many acted heroically, putting themselves in harms way and saved many lives that day. Thank you. To the caring and gracious people of the cities of Parkland, Coral Springs, the citizens of our home state of Florida, and those across America who have shown support for us in our time of sorrow and loss, we can only say thank you.

AR001114

Please note that your kindness and support is deeply appreciated and has made a lasting impact on our lives. As families, we came from different backgrounds and we hold a variety of viewpoints. Yet, we united around the simple idea, our children and teachers should be safe at school. We rallied to the battle cry. This time must be different.

We came together to build on common ground and we made history in Florida by passing legislation to achieve a first step in just three weeks. It was a good start but it is not enough. There is much more to be done. Now to my personal statement, in a season of loss, it is difficult to find meaning in tragedy, the senseless murder of so many, including my own beloved daughter. Alayna tests the limits of faith and demands more endurance than we thought possible.

It is a test abruptly forced on us and we bear it the best we can. Each of us mothers, fathers, brothers, sisters, wives of those lost and loved strive to find that meaning. I believe we will be seeking it to the end of our days. However, our abiding faith tells us that our father in heaven has a plan, although the loss of our daughter, Alayna, was to us unforeseen, it was not a surprise to him.

This gives us comfort during this difficult time. We will not know what this all means until that time, but we know that this thing that has happened and what it does not mean. It does not mean evil will triumph. It does not mean we may do nothing. It does not mean we should turn it against one another.

We must not struggle over ashes in the shadow of our grief. So instead of the media-fed, activist-inflamed, and politically-aggravated den of the past month, I speak today about the real and substantive legislative and policy achievements we made in the state of Florida, earned at an unimaginable cost.

And I will share a few ideas on how the United States Congress can emulate and expand upon those accomplishments. The steps taken by Governor Scott and enacted by the Florida legislature have little to do with opportunistic agitation launched in the wake of the Parkland killings. They serve no political agenda, but they do serve the people's agenda because they build on common ground.

They are inclusive rather than divisive. Americans are deeply interested in safe schools, in caring communities, and in secure neighborhoods. As family of one of the victims, we have learned at a great personal cost that Americans can come together. Policy and political action ought to take their queues from this American majority.

We do not have to all agree on guns and we will not. But we can agree on the most fundamental things. We can agree that students and teachers should be safe. We can agree that schools should be secure. We can agree that law enforcement should be competent and must do its job. I want to focus on that last -- briefly on that last point, especially.

Nikolas Cruz in the deadly danger he posed were the worst kept secrets in Parkland, with one inexcusable exception. He was kept a secret from any of the parents, of the students, of Marjory Stoneman Douglas High School. Yet, every relevant authority knew he was deeply troubled with the potential for lethal violence.

The foster system knew it. The FBI knew it. The school district knew it, and the Broward County Sheriff's Department knew it. Yet, despite the fact that each of these agencies were fully authorized and empowered to take action well before tragedy struck, not one of them fulfilled their duty. The testament of their failure is 17 dead children and teachers, 17 more with life altering injuries, a burden we must bear forever.

Add to this failure, the failure to warn the parents of the students by this action or inaction, we were rendered powerless to fulfill our most sacred trust as parents to protect our children. Forgive me then, if I do if I do not believe government is the ultimate solution. Our trust in our institutions and in our officeholders is deeply shaken.

Our broken hearts cry out every moment of every day for the rest of our lives. So what is the solution? The legislation passed in Florida is a good start and there must be more done to secure our schools. Legislation being considered in this body will continue on the efforts begun in Florida. And I call on Congress to pass this legislation. Follow the lead of what has been accomplished in Florida, build on common ground.

But it is not the whole solution. The problem of man against evil is as old as humanity itself and we cannot face it alone. If we think of school violence as a disease, we would not just treat the symptoms or only don protective gear to avoid accidental exposure. We must learn to identify these troubled youth before they turn violent and get them the help they desperately need.

AR001115

We can look to programs like the SafeUT Program in Utah or the work being done by the L.A. County schools to identify potential threats. As we heard earlier, even the U.S. Secret Service has studied school shooters and defined six common characteristics which can aid in identification and interdiction.

Identification and interdiction has become my mission, not one that I ever wanted, but one I accept in Alayna's name. And I will see it through. Ultimately, this solution is not in any single policy, not in any piece of legislation, and not in any activists' fervent prescription. It is in our hearts. We can try to stop the next Nikolas Cruz with better screening, with competent law enforcement, and with better security.

Sometimes we will succeed. But sometimes those measures alone will fail. Where we really need to stop the next killer is in our homes, in our communities, and through our faith. The best defense against the next Nikolas Cruz is in building up strong families where love can be shown to a hurting child. It is in the care we show to a struggling or overwhelmed neighbor.

It is in the charity we extend to a stranger. It is in the comfort we give a wounded heart. It is in the kindness we show to an isolated, struggling young man. It is in the reflection of God that we have in ourselves. That is not within the power of this Congress or any body of man to give or command, but it is within each of us, and so we as a society understand that our efforts will continue to fall short.

It is my hope that senseless tragic events like the one that took my dear daughter will awaken people across our nation that we need to work collectively to create a significant cultural shift. I hope we do. If we do it will be the part of us that is most like Alayna. Thank you.

GRASSLEY
Thank you, Mr. Petty. Ms. Posada.

POSADA
Chairman Grassley, Ranking Member Feinstein, distinguished members of the Committee, thank you for inviting me here today. On Valentine's Day, my fourth English honor's class was discussing Act III of Shakespeare's Macbeth when the fire alarms sounded. We started to evacuate but we were quickly told that it was a code red, which means that there is threat to safety inside the school and everyone should shelter in place.

I never imagined that there was truly anything wrong. I got my students back into my classroom into the corner, where we could not be seen from the small window in the door, and waited for what I assumed was a drill to end. We had no idea that just a couple hundred yards away, Nikolas Cruz had just fired over 100 bullets from an AR15 assault style rifle, killing 17 people and injuring another 17.

Our first clue that something was really wrong was a phone call one of my students got from his sister who is in the freshman building. She told him she had seen someone with a gun in the hallway and heard several shots. My student, a six-foot tall football player starting crying, worried for his sister's safety.

I helped him calm down, reassuring him that if she could call him, it must mean that she was all right. I started to go into panic mode, but I struggled to keep it together for my students, knowing that if I lost it, they would lose it too. Then the texts started. Parents, neighbors, even almost strangers texted us, making sure we were OK, asking us what had happened.

We told them we were safe but we couldn't answer their other questions. We didn't know what was happening. Some of my students had left their cell phones on their desks, but I wouldn't let them across the room to get them. What if the shooter was in the hallway waiting to see movement in the classroom?

As a parent myself, I could only imagine the fear their parents must have been feeling not being able to get in touch with their kids. I texted their mother's from my own phone, assuring them that their children are OK, sending them pictures as proof. People from outside the school told us the rumors they were seeing on the news. There was an active shooter on our campus. At least two people were dead.

As time went on, the rumors changed. Police suspected that there were two or three shooters, none have been apprehended. The death toll kept rising, three dead, seven dead. I kept reminding my students that we couldn't believe everything we heard. No one seems to know what was really happening. The truth was that I did not want to believe it. I was in shock.

AR001116

I think we all were. We sat in the corner of my classroom until after five o'clock that day, trying to be as quiet as possible, trying to reassure our friends and family for our safety, and try not to panic. After what seemed like an eternity, we heard voices in the hallway outside my room. Men were shouting but we couldn't understand them. We did not know if they were the police or if they might be shooters.

We heard those trying keys in the door, a good sign, but I wonder if whoever it was had shot someone and stolen their keys. I stood up in front of my students and faced the door, hoping these would be the good guys. Thankfully, they were. My students and I were lucky that day. My classroom was on the opposite side of campus from the 1200 building.

And although we were terrified, we were never in any immediate danger. Others of course, were not so lucky. Not only did we lose 17 of our own, hundreds of others were scarred from this experience. Students in my other classes who were in the freshman building that day have shared some of their stories with me, and the things they saw and heard will stay with them forever.

Many of them saw friends die and had to step over bodies in pools of blood to get out of their classrooms. Loud noises, even the bells between classes make them jump. I had a girl ask me if she could stand with her back to the wall because she did not feel safe sitting at a desk in the middle of a classroom, not knowing what was behind her.

Dwayne Wade, a professional basketball player came to our school for what should have been a fun treat for the kids in the midst of their grief, but many were triggered by the shouts of excitement that erupted when he walked on campus. They were too similar to the screams of terror they heard just a few short weeks ago.

These kids will be dealing with this trauma for years to come. And yet, the Marjorie Stoneman Douglas students have been stronger than teenagers should ever have to be. They have gone through the worst, most traumatizing experience imaginable, and instead of collapsing under the immense pressure, they have focused on channeling their anger and grief into something positive.

And they have succeeded. They have succeeded in getting gun control legislation passed in Florida, a state that hadn't passed similar legislation in over two decades. The Marjorie Stoneman Douglas Act certainly is not perfect. The idea of putting more guns into schools in order to reduce gun violence seems to me like an idea that can only end in more tragedy.

But the many other provisions in the bill make it a great step in the right direction. And it proves that what I tell my students is true. Their actions can change the world. I got into teaching because I wanted to inspire students. But now they are inspiring me. The issues surrounding mass shootings in this country are complex, and to pretend otherwise is naive and continues to put the general public, especially our children in danger.

People have suggested that this is a mental health issue. Some have suggested that it is a school safety issue. I agree with both of those statements. We do need better resources for the mentally ill in our country, not just to prevent mass shootings, but to work together for a better quality of life for the thousands of people who suffer from mental illnesses.

We do need to increase safety in our schools to protect our children against those who would want to harm them. But to say that the issue of mass shootings is not also a gun issue is absurd. I cannot imagine a scenario in which Nikolas Cruz could have come to my school armed with a different type of weapon such as a knife and murdered 17 innocent people.

Some of the victims were shot three doors, or even through walls. A knife cannot do that. Even handgun would not able to cause such carnage. This style of gun he used has been a weapon of choice in so many mass shootings in recent history. How many innocent lives could have been saved if these weapons of war were not so readily available?

While increased funding for mental health programs and school security will no doubt have positive effects, mass shootings will not stop until we rid society of the weapons that make them possible. Please help us protect our children by addressing all facets of this issue, and considering common sense gun laws. Thank you.

GRASSLEY

Thank you, Ms. Posada, now Mr. Beckerman.

BECKERMAN

AR001117

Thank you, Chairman Grassley, Ranking Member Feinstein, and distinguished members of the Committee, thanks for the opportunity to have me here today. My name is Michael Beckerman. I'm the President and CEO of the Internet Association. Represent more of 40 of the world's leading Internet companies. The Internet Association, all of our members are horrified by the tragic shooting in Parkland, Florida and the violence experienced by the students and staff at Marjory Stoneman Douglas High School is something that no person should ever experience.

We're committed to doing what we can to help protect our communities from this sort of senseless violence and to support law enforcement and public safety agencies in their response. I remember vividly the Columbine shooting back in 1999. Since then, we have had too many school shootings. And I sincerely hope that Congress, law enforcement, and society at large can figure this problem out and put an end to it.

I was close to one of the survivors of the Columbine shooting, and I cannot even imagine the pain for people like Mr. Petty who lost his daughter or Ms. Posada, who had to stand there with her class and her students. I am truly humbled for sitting with both of you today. Thank you. I am here to talk about the ways that internet companies can serve as an early warning sign for friends, families, teachers, mental health professionals, and law enforcement.

In the ways our companies proactively work with law enforcement, prevent tragedies like this one. I am proud of the work that Internet Association members are doing and that they wanted their voice heard at this important hearing. We're part of the solution. Our members make efforts to find problematic content and remove it from the Internet and to identify threats, both on and off-line within the confines that are acceptable in our society of freedoms, individual privacy.

Cooperation with law enforcement is vital. In the specific case of Parkland shooting as noted by the earlier panel, authorities were alerted to the threat well in advance of the shooting. In appropriate circumstances, companies do disclose pertinent information to law enforcement, often proactively without being asked to do so.

Through both proactive and responsive disclosure mechanisms, internet companies have been able to vigorously support authorities around the world in responding to potential terrorist incidents, suicides, homicides, and to assist -- and to assist authorities as they investigate crimes. The industry's history of successful cooperation with law enforcement has helped save lives and bring criminals to justice.

Internet Association members have policies about what is and is not allowed on their platforms. These policies are the cornerstone of safety and security online. And while these policies do vary by company, they all prohibit content, including credible acts of violence, terrorist propaganda, and child exploitation.

Internet companies use a variety of tools and mechanisms to enforce these policies. One tool is artificial intelligence, which can automatically identify some types of violating content. While the efficacy of automated tools is constantly improving, challenges remain. Identifying problematic content often requires analyzing the relevant context. And we cannot rely on technology alone.

For example, an image of a terrorist could be used to promote a terror group or it could be part of a legitimate news article condemning the attack. Also, the phrase we're going to kill you could be a threat for law enforcement, or it could be competitive banter about sports teams and not a threat at all. And likewise, a photograph of a teenager with a gun could be threatening or could be from a family hunting trip or taken during a gun safety course.

While technologies like AI and machine learning can work well in some of these cases and others, particularly as it relates to images of people with guns and threats of gun violence. It just is not possible at this time for the algorithm, or even human reviewers that accompany always distinguish between what is harmless and what needs to be flagged for law enforcement.

In these cases, we depend on members of the community, particularly friends and family to contact law enforcement to provide context. Therefore, many companies, particularly in the social media space make it easy for users to report content that might violate these policies or violate the law.

Given the amount of content online, user reporting is essential to keeping everyone safe. Internet users understand and welcome this responsibility as our members receive millions of reports of potentially violated content each week, and the companies use teams and reviewers to analyze and respond appropriately to these reports.

AR001118

User reports to internet companies are not enough and we always encourage users to reach out directly to law enforcement if they become aware of threats of credible violence. And I cannot emphasize this point enough. You know your friends and families and members of the community better than AI or a person at an internet company can.

Thus, educating the public about these issues is crucial. We're going to do more to educate the public about these kinds of red flags. It may identify at risk individuals, and how to report them to law enforcement. In conclusion, again, I want to express how saddened we are by this shooting and the tragedies that have happen around our country.

I am proud though of our member companies taking a leadership role in this debate and working proactively to make our community safer. Thank you.

GRASSLEY

Thank you, Mr. Beckerman. And I'll start with you, Mr. Beckerman. Social media played a role in the tips received by the FBI in September 2017 and again January 2018. The shooter was active on a number of social media websites, such as YouTube and Instagram and his comments and postings on these sites prompted concerned members of the public to contact the FBI.

However, according to briefings provided to the Committee by Google and Facebook, the FBI never contacted these companies to ask for assistance in identifying the authors of these troubling posts. I'll have two questions. First one and then I will repeat the second one after you answer the first one.

What steps are internet and social media companies taking to proactively monitor threatening content posted to their services as opposed to relying on other users to bring such content to their attention?

BECKERMAN

Sure. I am speaking for all of our member companies have very strict community guidelines, and their three main mechanisms on identifying and removing that content. The first will be artificial intelligence, which is often good at identifying known images of violating content and often blocking it before it even reaches the platform.

The second are the teams of thousands of individuals throughout the country that are human eyes, that the companies reviewing this content. And the third mechanism is the ability for individual users to see that context of content and flag it for both companies and law enforcement.

GRASSLEY

OK. The Committee learned from YouTube, from the representative that the man who reported and flagged the shooters September 2017 post, which read, I want to be a professional school shooter did so under the heading of spam. What steps are internet and social media companies taking to offer additional categories, whereby users can more actively flag threatening or violent content and posts?

BECKERMAN

Thank you, Senator. I cannot get too much I guess into the specifics of that flag since there is an ongoing investigation. However, the options that do exist and that did exist for the moderator of that post to flag it, there was one that mentioned violence. It just so happened that the person clicked a box. It said spam, but there are options for violence and other content.

GRASSLEY

OK. Mr. Petty, in your written statement, you state that "the Americans aren't interested in surrendering or curtailing their constitutional rights." You also argued that Americans can agree on some fundamental principles, namely that students and teachers should be safe, schools should be secure, and law enforcement should be competent and do their job.

What in your view is the most effective way to prevent school shootings?

PETTY

My concern, Senator, is that we go down the path that we have gone down after every mass shooting in every school shooting and we inevitably end up in a debate over the Second Amendment. I have heard arguments already here today in front of this Committee. It is a topic

AR001119

that we do not all agree on. It is quite divisive. My view is that the best way we can prevent school shootings. First of all, I think the first step is to improve the security at our schools.

I think it's something that we can all agree on. The kids should be safe. The teachers should be safe. The parents shouldn't have to worry about sending their kids to school. I would like to see us act there first. And then beyond that, I really think the best way to -- despite what happened in Parkland, what we are learning, early identification and interdiction seems to me to be the best way to prevent these from happening.

And as a part of that, as I said my testimony, if we can identify these potential violent actors, these school shooters, and get them the help they need, help them understand who they are, and that they do not have to resort to violence. I think to me that is the best way to prevent these.

### GRASSLEY

My next question, you may have already answered by what you just said, but I thought I ought to have the benefit of your judgment since you've gone through such a tragedy if you had the best thing that Congress could do honor your daughter's latest and memory, or maybe you have already stated it.

### PETTY

That this never happens again.

### GRASSLEY

OK. I'd like to ask you another question. I understand that you have a background in technology. News accounts and transcripts released by the FBI inform us that the shooter made a number of alarming posts about. While social media companies have cooperated with all law enforcement and request related department shooting, it also appears that they did not tip law enforcement off about the alarming content.

In your view, how should tech companies respond to alarming content posted by their users? And then I'll go so Senator Feinstein.

### PETTY

I think it is a difficult question to answer. I appreciate the testimony that is given by Mr. Beckerman today that -- the first thing is to identify troubling content and then get it in front of -- as much as I trust and know that AI is improving, I still think at some point it needs to be viewed and reviewed in context by a human being, and then law enforcement needs to be informed, and hopefully they will do their job.

### GRASSLEY

Now, Senator Feinstein.

### FEINSTEIN

Thank you, Mr. Chairman. I want to make just one comment to Mr. Petty. And my heart and thoughts are with you, but I would make this comment. I went to public school, kindergarten through eighth grade. There was never such a thing as a shooting in school, and there was never such a thing as an assault weapon.

As long as you have these weapons easily available, I believe you cannot stop the shootings. And I have followed it as closely as I can for the last quarter of a century, reading everything, trying to be as educated as I might be. But I like to say to you that is really my conclusion. I have been asked to mention, and I have given letters to the Chairman from the National Teachers Unions to reference their concerns outlined in the possibility of teachers being armed.

And I would like to point out that the President of the American Federation of Teachers, Brandy Weingarten has said stated that they are strongly opposed, that they believe this proposal to harden schools and to arm teachers is straight out of the NRA playbook, and antithetical to the needs of children and ignores the purposes of public education.

Similarly, National Education Association President, Lily Garcia has said our students, and this is their position, need more books, art and music, nurses and school counselors. They do not need more guns in their classrooms. If I could ask the gentleman representing the internet companies, is there any content, threatening violence or killing that your industry would flag or takedown?

### BECKERMAN

AR001120

Absolutely  Our companies, the policies are very, very much by company and platform and what is appropriate, but all content threatening violence is in a violation of their policies and does get removed in time

**FEINSTEIN**
Are you telling me that companies, Twitter, Facebook, whatever it is, would take any threat down?

**BECKERMAN**
Senator, again it depends on the circumstances  I mentioned some of these things are very nuanced  There could be something, exact same text that could be a credible threat

**FEINSTEIN**
Well, today, how about the comment made by this shooter that they want -- he wanted to be a school shooter

**BECKERMAN**
That was removed

**FEINSTEIN**
The industry removed it?

**BECKERMAN**
It was removed by the person that was moderating that video

**FEINSTEIN**
Who would that be?

**BECKERMAN**
I want to be careful not to get too much into the details as they are obviously doing an investigation still, but as been reported publicly, the gentleman who had the video where the post was made, both flagged it and removed it before any action was taken  And also, he called law enforcement and flagged it for law enforcement as it was noted by the FBI in the previous panel

**FEINSTEIN**
Well, thank you  We will check that out  That is helpful to know  Ms  Posada, let me thank you for your career in education  and let me thank you for what you have gone through and your spirit and strength is very impressive  What lessons have you taken out of this with respect to what you believe we should do?

**POSADA**
Well, I do not think that there is a simple solution  I think if there were a simple solution, we would be here right now  We would've done it  There have been enough of these occurrences in our past that if it were simple to fix, it would've been done  And unfortunately, it is not, so I think that you know we do need more finding  We do need more communication between law enforcement and the different agencies of law enforcement, local, federal, also between technology companies, things like that

We have all of these resources  They are just not quite making the connections between them, and we need to figure out how we do that, what is the best way to do that  But the fact that these weapons are out there on our streets, that they exist, that they are -- that a 19-year-old can go into a gun store and buy a semi-automatic weapon and a high capacity

**FEINSTEIN**
Magazine

**POSADA**

AR001121

Magazine, thank you. The fact that he could do that is insane to me. That is something that people have access to. Whether you are mentally ill as this person may have been or not, no one needs that kind of weapon. There is no purpose to that kind of gun, other than to shoot as many bullets into people in a short amount of time as possible.

And I think until we take these guns away, there is really no way that we can completely prevent these things from happening, unfortunately.

FEINSTEIN
Thank you. Thank you, Mr. Chairman.

GRASSLEY
Senator Durbin.

DURBIN
Thanks, Mr. Chairman, and thanks to the panel. Mr. Petty, I wasn't here as you read your statement but I read it, and it's entirely. It is touching. And I know it came from your heart. And our hearts are with you and your family this time of loss. You talk about reaching out to people before. They've reached a point where they are dangerous, and thank you, that is a noble statement from a person who suffered, and as your family had suffered.

I am focusing on trauma, and the impact of trauma on children, and you may find gun violence in Chicago, and go into the jails, and ask about these teenagers. Almost all of them have been victims of violent trauma, or have witnessed trauma, and a change of mind, and they need help. I'm glad you made the point.

Ms. Posada, I want to ask you something you may not be able to answer, but I reflect on it a lot. Why -- why did this incident on February 14th have such an impact on America? It is not the first mass shooting by any means. It is not the first shooting in the school by any means. Sadly, it is not.

But this seems to have been the breaking point, the tipping point, and I don't know if it is because of the students at your school or America. What do you think is -- was it just this horrible thing occurred at a moment when people were open, or was it something special about the students in the circumstances?

POSADA
I think number one, the biggest difference has been our students. We come from the greatest school system, and our school -- you know, I am a proud teacher at our school and it is a wonderful school. We have excellent teachers. And they have prepared these kids. We didn't know we were preparing them for a tragedy like this.

We didn't know that we were preparing them to deal with this kind of thing on such a wide, you know, national scale, but we did. And the fact that they have been able to take this horrible event, and really find themselves called to make a difference. I think has been something that has made this -- this particular shooting different than the others.

Unfortunately, with you know in Sandy Hook, the -- the students there were too young to know what to do, or to be able to do anything. And I think that our students from Stoneman Douglas are very intelligent. They are very well spoken, as I think we have all seen.

And they are tired. They are tired of being under threat. They are tired of being attacked, and there standing up, and they are saying, you know, adults have failed us. Our system has failed asked, and we need to be the ones who are going to make the difference because no one has done it yet.

DURBIN
I hope that those students can, and those who believe in them will not give up the fight. Clearly, from what has been proposed by the president and even this committee, they are not ready to tackle obvious answers to some of these issues. We need to have more pressure.

I recall reading one of your students from the school at a television studio in New York a couple weeks ago, and I went up, and recognized him, and introduced myself, and he wasn't exactly in all of my office because the first thing he said was, do you take money from the National Rifle Association? And I said, no.

AR001122

He said, where do you get your money? And I though, interesting introduction to high school student, and I don't love to come questions I usually ran into. But their fearless approach it I'm sure turn some people off. But to me, it shows the seriousness of their commitment that they want to get to the bottom of this. They want answers. And they don't want political baloney, you know, too often, as well to get.

Mr. Beckerman, I just got a minute left. When I pulled out my iPhone and see my latest e-mail, down at the bottom as it suggested reply. I have two or three suggestive replies based on the content of the e-mail sent to me, something -- somebody and something, I am sure, with A.I. calls through enough words in my email to suggest a response, two or three responses.

And I figure, well that is interesting -- a little invasive, but interesting. Is that where we're headed in your industry in terms of these comments that are being made on the internet that should be taken seriously?

### BECKERMAN

Thank you, Senator. A.I. certainly is improving and can be used in cases like this to identify problematic content but certainly it's not there to build and know the context. Certainly the exact same phrasing can be used with something that's completely benign, and something that is threatening, and so still we do rely on human reviewers both of the companies, but also in cases like this, members of the community who were able to flag content, and we encourage them to do that.

### DURBIN

Thanks, Mr. Chairman.

### GRASSLEY

Senator Blumenthal. And after Senator Blumenthal, if they are here, it's Booker, and Harris, and Coons. I am going to step out from about three or four minutes. So when your five minutes are up, then Senator Harris should takeover.

### BLUMENTHAL:

We are on the honor system Mr. Chairman.

### GRASSLEY

Yes, sure. Listen, you are always on the honor system.

### FEINSTEIN

I have to leave.

### BLUMENTHAL

Thank you, Mr. Chairman.

### GRASSLEY

Go ahead. I will be right back.

### FEINSTEIN

OK.

### GRASSLEY

Go ahead, sir.

### BLUMENTHAL

Thank you. First of all, Mr. Petty, thank you so much for being here. I know that it involves reliving the pain and grief that you suffered in this very room when parents of the Sandy Hook victims came to talk to us about their grief and pain in similar testimony, and nothing happened.

AR001123

Congress has been complicit, and its complexity has continued to cause deaths every day -- 90 of them every day, this day in America on average. And my hope is that something has changed as beside, and not only because your students are intelligent and active, but the young people of America are saying enough is enough.

The sign that one of them carried the other day, our blood, your hands, and thousands of them today. I just left them out on the front steps of the capital demanding change. The title of this hearing is, see something, say something.

We have to do something, not just talk about it. Not just reality show rhetoric, which is respectfully what we are hearing from the White House instead of real action. Mr. Petty, in your remarks at your daughter's, you said about the shooter.

We wish and believe that if somebody had been able to put their arms around him, and shown him some compassion and love to the extent that would have enabled him to get some help. Things may have been very different last week.

I know how much courage and strength it must have taken to say those words, and how much faith. But one of the proposals that we have in the Congress now, Senator Graham and I have offered it, it would be a statute -- red flag statute at the federal level.

Similar of the one that Florida has adopted based on the Connecticut and Indiana models that prevent someone who is dangerous to himself or others from having, or buying weapons. In Connecticut's experience, more than half of the individuals whose guns are taken from them are able to receive mental health care.

So they become less dangerous to themselves, and hopefully, arms are put around them, speaking metaphorically in the way that you suggested perhaps it should be done or what should have been done for that individual.

So let me ask you whether you feel that this kind of red flag statute at the federal level similar to the one that Florida now has. But Florida is still in a handful minority of states that now have it, whether it would make sense at the federal.

PETTY:

I believe it would be in Florida. We call it the gun violence restraining order. I think the one of the things that could have made a big difference here was -- we've heard the testimony from the FBI. I have read the media reports about the response of the Broward Sheriff's office. They visited somewhere between 30 and 40 times, and that investigation will continue.

I believe that if we have had the ability to separate Mr. Cruz from his weapons, things could have been different -- things would have been different. The gun violence restraining order that we passed in Florida is a step in that direction, and I think it should be enacted at the federal level, absolutely.

BLUMENTHAL:

Thank you. Mr. Beckerman, let me ask you, is there any procedure among the companies that you represent for notifying law enforcement of the kind of information that would prove useful in issuing these orders, call them extreme risk protection orders, or restraining orders as they are called in Florida, so that law enforcement and maybe family members can take action?

BECKERMAN:

Absolutely. Our companies work very well with law enforcement, particularly in cases when there are threats of imminent violence, and obviously these are cases where that is.

And also I do believe that a social media can be an opportunity as an early warning sign with amenities cases where you can see someone in your community that maybe is having a cry for help or needs, as Mr. Petty said, love and compassion, and certainly you can flag these cases, and I think it is an opportunity that our companies are more than happy to work with the community, mental health professionals, and law-enforcement to make sure that happens.

BLUMENTHAL:

And is the more that can be done in that regard?

BECKERMAN:

AR001124

There is always more than -- that all of us can do. I do think the tools are in place particularly as it relates to getting information to law enforcement and to local communities off the platforms.

**BLUMENTHAL**
Thank you.

**BECKERMAN**
Thank you.

**BLUMENTHAL**
I think Senator Booker is after me.

**BOOKER**
Thank you very much. Ms. Posada -- Mr. Petty, I was very moved by your testimony and very grateful for you all having the courage in time of great pain in your lives, and the community's lives on the agony, and the trauma of what you all have been through is profound.

I listened to stories of, Ms. Posada, of -- when you're talking about what happens, even the aftermath on how cheering and yelling for NBA athlete shapes children how a loud noise makes folks jump, and what's painful for me as I listen to this is what you are talking about is something that I experience where I live.

I live in the city of low income community, where hearing gunfire is not a rare thing, and I have heard teachers tell me lots of stories about children, and their how parents were reaching out to me that the Fourth of July is not always the happiest time because of firecrackers going off, and kids who are traumatized by that.

I know in my personal life with the proliferation of guns in this country that in my neighborhood, you can jog around the community, and see shrines to children, and teenagers murdered, teddy bears, and candles, it is hard to avoid, as a mayor, I have stood on street corners with bodies still lying on the street. I have been in the aftermath of shootings, and always after they have happened.

I had a gruesome experience of having a 19-year-old die. As I vainly try to stop him from bleeding from multiple gunshot wounds, and I m an adult at that point, and in my -- I was writing about this recently. And my chief of staff -- I told him how after interviewing the police -- a police officer there, talking about how shaken I was.

He corrected and he said, you were shaken for a long, long time. You were different, he said to me. I hear calls never again, which I agree with a lot. But the problem is, is it's happening every day. Every day in our country, we are having people die.

But at the top of my block on Monday where I live, a young man that I know, Sean Smith was murdered by an automatic weapon. I've talked to his mother yesterday. I am going to the funeral on Friday. He and I lived together in a building for about the almost 10 years.

And his crew was a young man that he hung out in the lobby likes to play basketball with, just about all in are dead right now due to gun violence. And what hurts me so much is that we don't seem to have the moral urgency to do things that we see that are obvious to do.

Your testimony was painful to listen to, but here in Congress, I have been here for five years, multiple mass shootings, thousands of people in communities like mine have died, and we have done nothing, not one thing from better funding the ATF to enforce the laws that we already have, to banning weapons of mass destruction, to making universal background checks, things that are supported by over 80 percent of NRA members, we just haven't been able to do.

And I applaud local efforts and the courage of my police officers in my city, in my state. I applaud local efforts, but so many of these changes have to happen on the national level. And so, I am going to be back in my community for yet another boy in a box, where barely makes a headline, and doesn't even blip on the national news, and I can tell you right now from the 10-year-old killed in (Inaudible) a couple weeks ago, to a teenager killed in my city about a week ago, to Sean's family.

This is happening every single day. And so what I just want maybe the only question I have for the two of you is what do you say to a Congress? Right now you saw how quickly before the Florida legislature, at lease they did something. We don't have a scheduled vote. We don't have a bill that has moved out of the committee until before.

AR001125

Do you have any specific members -- I mean messages to the people here that are doing nothing, because the opposite of justice is not injustices in action, it is indifference, and is apathy. Do you have any message to this Congress who was prepared right now to do nothing in the face of the tragedies that we're seeing in your communities and mine?

### PETTY

Yes, my message is, this time it must be different. In Florida, I learned about another part of Broward County, not Parkland, but another area where the Congressman from that district told me the bullet holes in our school are on the outside, and I committed to him to work with him to figure out how to solve those problems in his neighborhood, too.

I don't want -- I don't want a mass shooting never happen in the school again. There are lots of communities that are suffering as you mentioned, Senator Booker, that don't get on the news, and don't get the attention that Parkland gets. And my heart goes out to those communities. So I'm going to work with my -- that representative.

This time it must be different. Focus please on the things that you can agree on. That was the difference in Florida. That was the difference. We didn't agree on everything. There are things that Republicans didn't like about the bill.

There were things Democrats didn't like about the bill, but rather than focusing on the political differences, they've focused on the common ground, and we took some ground in Florida. And I would urge the Congress here to take some ground. The Second Amendment fight will have -- will continue to have those -- we have plenty of time for those.

Take the ground that you can take. Secure the schools. Keep the kids safe. Keep guns away from people that shouldn't have them, and as Senator Blumenthal said, let us improve mental health. So we can put our arms around these kids before they turned violent.

### POSADA

I think my message would be very similar. This is not a partisan issue. This is -- you know, the children of Republicans are not immune to bullets. Anyone can fall victim to something like this. Parkland was named on February 13th -- the day before the shooting. Parkland was named the number one safest city in the State of Florida, and the next day this happened.

This could happen anywhere -- anywhere in the United States to anyone. And Congress to this point has allowing it to happen by their inaction. And you know as you said, they are complicit. Inaction is at this point, inexcusable. So we need to work together.

You know I tell my students all the time, we have lost the ability -- and I am sure people in this room know it more than the average person. We have lost the ability to listen. We have lost the ability to communicate civilly with someone and with whom we disagree.

We are very divided, and if you disagree with me, you must be a terrible person. We've got to stop that attitude, and we've got to be able to sit down at a table across from each other, and compromise on these issues or it's never going to stop. We will never solve this problem.

### GRASSLEY

Senator Harris

### HARRIS

Thank you, Mr. Petty. I am so sorry for your loss. And you are really the best of who you are in terms of the courage that you are showing in the face of your personal pain. And it is clear to me that you have decided that this will be a lifelong mission, and so I thank you, not only for the courage during these last couple of weeks. But what I am very clear will be years and years of your leadership, and advocacy on this.

Mr. Beckerman, so you talked about A.I. and I -- you know, the subject of A.I. or artificial intelligence is in some ways a complex one, and some ways not. In that artificial intelligence is basically a series of algorithms, which are -- will be relevant to the extent that there is a large amount of data that is available to then inform that intelligence to help us make the right decisions at the function of data.

So when we're talking about A.I., it really gave us king or queen I will say. And so we want -- and because the data gives us then, and gives A.I. the information that allows us to have some reference point based on experience so we can predict something that happens in the future, right? It is artificial intelligence.

AR001126

But it's just like teaching a child they are exposed to information the first time and the second time, and then they have a wealth of experience that allows them to make good decisions about what should be something that they should be afraid of, or something that they should be concerned about, same thing for A.I. data.

So you have heard testimony today about the Dickey Amendment. The Dickey Amendment was an outright prohibition on the research of gun violence, and yet we know that gun violence is among the least researched major causes of death in the United States. So my request of you is that you have mentioned your member organizations.

I am familiar with them. A lot of them are in California. And my request of you is that you will advocate that your member organizations strongly advocate for the repeal of the Dickey Amendment, so that you and we, can have the research and the data that is available if we just study this thing to help her in every sector, including with social media sites, having been data to inform A.I. to create algorithms to help us detect the difference between some kid who is saying you killed it because they did well, whether that high school basketball game, and the threat that you might actually be prepared to kill a classmate in school.

Will you be willing to make a commitment to advocate among your members that the Dickey Amendment be repealed, and also that we support the kind of what is happening as we heard earlier from the Secret Service, the National Threat Assessment Center to have what appears to be a renewed interest in studying this issue.

PETTY

Thank you, Senator. I appreciate that. The question -- we don't have a position in particular Dickey Amendment. I am not all that familiar with it. However, I can agree with you that in this context, and many others, that data is clean, and the more data we can have, the better it is for all of us.

HARRIS

So will you commit to taking it back to your members in a formal way, informing yourself and your members of the significance of the Dickey Amendment in terms of really not allowing us to have the research, and even for the data that we need to address the issue in a much more comprehensive way. In particular, through things like artificial intelligence which is part of how we will be more productive and effective at the policy and predictive policy.

PETTY

I will absolutely go back and take a look at it, and discuss with other members.

HARRIS

I appreciate that. Ms. Posada, again, you have been educated and obviously made a life commitment to teach our children, and to -- in that context, nurture their dreams and their spirit so that they can receive all of the education including Shakespeare, and we can debate how much I will apply to appeal of doing. But you are extraordinary with your courage, and I really do thank you for that.

And so you spoke of the students at Stoneman Douglas, and how extraordinary they are, and I could not agree more. I could not agree more. And so my question to you as an educator is we see all of these kids throughout the country today, while taking their 17 minutes to go and honor the young people who have die, and to commit themselves to being a part of the leadership on an issue like this.

What is your advice for us, the people who sit at this podium who had the big bully pulpits? We have all these microphones in front of us all the time. What is your advice to us about what we should be saying to them to harness that energy that they are showing, and that commitment they are showing to really believe in our democracy.

And that is where I find a great deal of optimism. These kids believe that if they speak out, and if they are heard and see, we will do something. That makes me optimistic about our future. But what is your advice to us about what we can say to encourage them and support them with their engagement?

POSADA

AR001127

Well I think my first, I guess, recommendation would be not to say anything but to listen. Listen to their concerns, listen to how they are feeling, don't dismiss them, I think that a lot of people have just said oh well, they are teenagers, what do they know. And I think that that is a mistake. So these -- although they are children, they are intelligent, and they know their minds.

And they will tell you what they think if let them. So that would be my first recommendation, but just to encourage them, I know that a lot of these kids have been attacked personally by people saying that they are not real, or that -- you know, I mean that type of thing, I think in the long-term may be very discouraging. So to keep that, you know, at a bare minimum, and just to allow them to speak their voice because they are prepared to really take this I think globally.

GRASSLEY
Senator Coons

HARRIS
I think Mr. Petty wanted to just add

GRASSLEY
He can sure do. Go ahead.

PETTY
I just -- I would

GRASSLEY
Sorry, I didn't see that.

PETTY

I would just add one thing to that. Please don't let them down. There was a stunt pulled in Tallahassee with the kids that didn't understand the procedural mechanisms in the legislature there. The Senate and the U.S. Congress are far more complex than Tallahassee.

I hate -- I hated to see the images of those kids disappointed because they were taken there for a photo-op and there was no chance of that particular amendment passing, so please be honest with them. Listen to them, but please be honest with them. They are our future. They need to know they can trust you.

HARRIS
Thank you. Thank you all.

GRASSLEY
Senator Coons. Senator Coons

COONS

Thank you, Chairman Grassley. I would like to thank my colleague for a line of questioning, and I'd like to continue that conversation with you if I could. Mr. Petty, thank you for coming to testify before us today. I agree with you that we need to keep faith with that action. I just want to ask you, and Ms. Posada, if I might. Given the law that was signed in Florida that tackles things a little bit from both sides, is in bold, is not big, does not do what I would like to see

But make some progress on the gun violence restraining order and three-day waiting period, raising the age to 21, and banning bump stock. Do you believe we should mirror the actions that were signed into law in Florida? Are there aspects of that you disagree with, or are those things you might support that would go beyond that?

PETTY

AR001128

It is a great question, and let me say one thing, there is -- there is the Walkout Movement. There is also a movement called Walk Up that I think should get equal airtime. The Walkout Movement is where students go and put their arms around with another student that is having trouble or is alone, or isn't eating a lot, doesn't have anybody to eat lunch with them.

And I would encourage students to not only walkout but walk up. Without getting into specifics, Senator, there were things about that legislation that I personally disagree with. There were things that other family members personally that that they disagreed with.

There was enough in common that we decided to set aside those differences and come together, and I think -- and I think we need to change. That to me is the model for going forward. There are things on the edges we always going to disagree with.

If we can just come together and say look -- and I think Ms. Posada said it well. We have got to quit impugning the motives of the other side. There are deeply held beliefs on both sides, and just because somebody holds a particular belief, it doesn't make them a bad person.

We have to talk to them, we have to listen to them, we have to find common ground, and we have to come together. There are a lot of things in front of this Congress that are common ground that should be done quickly, and then you can continue to debate the things that you don't have in common.

COONS

Thank you, Mr. Petty. My concern is that we will do nothing. The bill that I referenced before that I introduced with Senator Toomey is a modest and reasonable bipartisan effort to enforce existing law to make sure that when someone tries to buy gun is prohibited, that information share with state and local enforcement.

There is a dozen other proposals here that I think we should enact. Otherwise, we send -- we risk sending the message to families like yours, to you, to teachers, to faculty, to the students around the country that we're just not hearing them.

PETTY

And I would absolutely support what you are proposing.

COONS

Ms. Posada, let me ask you the same question, and thank you for your testimony today, and for your dedication to your students. My mother and grandmother both were public school teachers early in their careers. And I get a sense just how hard that job is. I also want to ask you the second question about the school safety.

There is a wide range of proposals from training teachers and arming teachers to trying to harden schools, but there is a company run by a high school classmate of mine at Hardwired that actually manufactures ballistic armor.

And they deployed in one school district in my home State of Delaware, Colonial School District, with the help of the State Senator Nick Harper (ph), clipboards and blackboards that look like any other clipboard or blackboard so they do not create a heightened sense of instability or insecurity, but they are ballistic protective material.

So it would allow an unexpected event with a shooter, it would allow a teacher or students to possibly exit with something between them and the shooter.

I didn't know if you had any views on whether what sorts of actions we should take to make schools safer, whether investing more in school counselors and mental health is the best path forward. Whether equipping and training teachers is better, or whether these kinds of investments in school systems that would make them safer is best. I'd welcome your input.

POSADA

I think the problem with a lot of the proposals that have been made as far as arming teachers, and what you just mentioned -- those things that you just mentioned, the biggest problem that I see with those things is the cost. We as a nation seem to constantly be unable to invest in education and the education of our children.

But we're willing to spend millions of dollars on, you know, arming teachers. For example, the building was just in Florida, I believe allocate $67 million to the potential of arming teachers. When I know that the teachers in Broward County until this year haven't had a raise for several

AR001129

years. So that is a large concern for me that that we seem to be willing to put lots of money towards things like that, but not towards education in general

I am personally, strongly opposed to arming teachers. I think that it will pose much more out of danger on a day-to-day basis to teachers and to students. In fact in the past few days, there has just been a teacher today in California accidentally discharged a gun and fire in a classroom, and injured a student.

Yesterday, a teacher in Utah accidentally discharged a firearm and injured herself. There were trained teachers who were allowed to carry those weapons. And just in two days, you know, these accidents have happened

So if we do this on a larger scale, I feel that those things would happen more and more. As far as, you know, the Kevlar bulletproof items -- sure that would be a good thing to be able to have. But I think investing in education in general is a much more important step for the nation as a whole.

COONS

Thank you, Ms. Posada. Mr. Petty -- as Mr. Petty mentioned, making sure that we are investing in school environments where there is limits on bullying and where there is resources, teachers and others for counseling, and to those who were isolator at the margins of school communities are more engaged or more supported is something that I would see real value in making school safer places, but also investing more on our teachers strike me as great priorities. Mr. Chairman, thank you so much for holding this hearing today, and thank you, and to all of our witnesses

GRASSLEY

And I have no more questions, and so we're done. But before you go, there is a couple things for housekeeping, number one would be that not everybody could come here, and for a committee of 21 members, there is probably 21 different reasons why people could be here and be here

So sometimes you get questions in writing, particularly from people that can't come. So I hope you will respond to those, and we'll keep the record open for about a week for people to submit questions as they want to. And obviously, all three of you should be staying, but I can't help but sense the difficulty for Mr. Petty and Ms. Posada to present their case because they have gone through so much

So, we thank you for doing that. And I think what the two of you have said that we need to come together in the Senate to find a common ground, and it seems to me like the bills that are revolving here, things to improve school safety, and that they get a gun out of the hands of dangerous people, and reducing school violence as a result are things that we ought to really find common ground on

Beyond that, obviously, we still have a responsibility to find common ground, but it seems like we are available ahead on some of these things very, very quickly. So thank you all very much, and the hearing is adjourned.

List of Panel Members and Witnesses

PANEL MEMBERS
SEN. CHARLES E. GRASSLEY, R-IOWA, CHAIRMAN

SEN. ORRIN G. HATCH, R-UTAH

SEN. LINDSEY GRAHAM, R-S.C.

SEN. JOHN CORNYN, R-TEXAS

SEN. MIKE LEE, R-UTAH

SEN. TED CRUZ, R-TEXAS

SEN. JEFF FLAKE, R-ARIZ

SEN. THOM TILLIS, R-N.C.

SEN. BEN SASSE, R-NEB.

AR001130

SEN. MICHAEL D. CRAPO, R-IDAHO

SEN. JOHN KENNEDY, R-LA

SEN. DIANNE FEINSTEIN, D-CALIF., RANKING MEMBER

SEN. PATRICK J. LEAHY, D-VT.

SEN. RICHARD J. DURBIN, D-ILL.

SEN. SHELDON WHITEHOUSE, D-R.I.

SEN. AMY KLOBUCHAR, D-MINN.

SEN. CHRIS COONS, D-DEL.

SEN. RICHARD BLUMENTHAL, D-CONN.

SEN. MAZIE K. HIRONO, D-HAWAII

SEN. CORY BOOKER, D-N.J.

SEN. KAMALA HARRIS, D-CALIF.

WITNESSES

THOMAS E. BRANDON, ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

DAVID L. BOWDICH, ACTING DEPUTY DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION

LINA ALATHARI, CHIEF OF THE U.S. SECRET SERVICE'S NATIONAL THREAT ASSESSMENT CENTER

RYAN PETTY, FATHER OF ALAINA PETTY, A STUDENT KILLED IN THE FEBRUARY 14 SHOOTING IN PARKLAND, FLA.

KATHERINE POSADA, LANGUAGE ARTS TEACHER AT MARJORY STONEMAN DOUGLAS HIGH SCHOOL, PARKLAND, FLA.

AND MICHAEL BECKERMAN, PRESIDENT AND CEO OF THE INTERNET ASSOCIATION, WASHINGTON, D.C., TESTIFY

**Testimony & Transcripts**
Complete written testimony for this event March 14, 2018

About House Committee on Homeland Security
Staff
Hearing
Transcripts
Testimony
Committee Reports
Associated Bills
Schedules
Markup
Amendments

© 2018 - CQ - Roll Call, Inc. - All Rights Reserved
1625 Eye Street, Suite 200, Washington, D.C. 20006-4681, 202.650.6500
About CQ   Help   Privacy Policy   Masthead   Terms & Conditions

AR001131



AR001132

Questions for the Record
Bureau of Alcohol, Tobacco, Firearms and Explosives
U.S. Department of Justice
"See Something, Say Something: Oversight of the Parkland Shooting and Legislative
Proposals to Improve School Safety"
Hearing Before the Committee on the Judiciary
United States Senate
March 14, 2018

AR001133

<u>Questions from Senator Durbin</u>

3. **President Trump said he wants to issue a regulation banning bump stocks, which enabled the shooter in Las Vegas last October to fire 1,100 rounds in just a few minutes and turn a concert into a war zone. Attorney General Sessions recently announced that the Justice Department has submitted a notice of proposed regulation to the Office of Management and Budget to clarify that bump stocks should be considered as prohibited machine guns. However, on January 30, 2017, President Trump issued an executive order stating that when an agency promulgates a new regulation, the agency must identify at least two existing regulations to be repealed.**

   a. **Is it your understanding that if ATF issues a new regulation banning bump stocks, ATF will be required to identify two other regulations for elimination? Or has this two-for-one requirement been waived for this particular regulatory effort?**

<u>Response</u>:

The requirements of Executive Order 13771, including its "two for one" provision, will be addressed if and when a final rule addressing bump stocks is promulgated.

   b. **If the Trump Administration does require ATF to repeal two existing gun regulations on the books, which regulations would ATF consider repealing?**

<u>Response</u>:

We are not in a position to identify specific regulatory provisions as of this writing.

   c. **Is repealing existing ATF regulations on the books an effective strategy to reduce gun violence?**

<u>Response</u>:

Public safety is always a primary consideration whenever ATF takes any action to regulate or deregulate under the authority provided by the Gun Control Act.

   d. **Why hasn't the Trump Administration supported a legislative approach to banning bump stocks, rather than pursuing a regulatory route that might require the repeal of other existing regulations on the books?**

<u>Response</u>:

Questions concerning the Administration's legislative agenda is outside of ATF's purview.

4. **If ATF issues a bump stock regulation and the gun lobby brings a lawsuit challenging the regulation, is it your understanding that the Trump Administration will defend the regulation in court against the gun lobby's challenge?**

4

**Response:**

The Department of Justice routinely defends regulations against such challenges brought in court.