

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Washington, DC 20226_

MAR **1 6** 2018

MEMORANDUM FOR THE ATTORNEY GENERAL

THROUGH:             THE DEPUTY ATTORNEY GENERAL

FROM:                Thomas E. Brandon
                     Deputy Director, Bureau of Alcohol, Tobacco, Firearms and
                     Explosives (ATF)

SUBJECT:             Notice of Proposed Rulemaking concerning Bump-Stock-
                     Type Devices

PURPOSE:             To propose clarifying that "bump-stock-type" devices are
                     machine guns as defined in title 27, Code of Federal
                     Regulations (CFR), parts 447, 478, and 479

TIMETABLE:           As soon as possible

SYNPOSIS:       On October 1, 2017, a shooter firing one or more AR-type rifles affixed
with a bump-stock-type device killed 58 people and wounded several hundred more in Las
Vegas, Nevada. Bump-stock-type devices—including the device used by the Las Vegas
shooter—are designed to channel recoil energy to increase the rate of fire of semiautomatic
firearms from a single trigger pull. Specifically, they are designed to allow the shooter to
maintain a continuous firing cycle after a single pull of the trigger by directing the recoil energy
of the discharged rounds into the space created by the sliding stock in constrained linear
rearward and forward paths.

        As discussed below, ATF has previously classified some bump-stock-type devices as
machineguns. Between 2008 and 2017, however, ATF concluded that bump-stock-type devices
of the type currently on the market, including the devices used in the Las Vegas attack, are
firearm parts not subject to regulation under the Gun Control Act (GCA), as amended, or the

AR001238

-2-

National Firearms Act (NFA), as amended. Following the Las Vegas shooting, ATF received correspondence from the general public and from members of Congress requesting that ATF review whether bump-stock-type devices should be classified as machineguns under the NFA. On December 26, 2017, the Department of Justice (Department) issued an advance notice of proposed rulemaking (ANPRM), informing the public that it is considering issuing a rule to clarify that bump-stock-type devices are machineguns under the GCA and NFA. The ANPRM also sought comments from the public and industry regarding the nature and scope of the market for these devices. Public comment for the ANPRM closed on January 25, 2018, with ATF receiving over 113,000 comments. The President subsequently issued a memorandum on February 20, 2018, directing the Attorney General "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."

This notice of proposed rulemaking (NPRM) proposes to define certain statutory terms, which would make clear that bump-stock-type devices are "machineguns" under the GCA and NFA. It is the next step in the regulatory process, which informs the public of the costs and benefits of the proposed rule and provides them with the opportunity to comment on the Department's proposed regulatory text.

BACKGROUND: The NFA defines "machinegun" as any weapon which: "shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." The term also includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

The GCA defines "machinegun" by reference to the NFA definition. Section 922(o) of the GCA makes it unlawful for any person to possess a machinegun unless it was lawfully possessed prior to the effective date of the section or is under the authority of the Federal government or a State. Because the GCA effectively froze the universe of machineguns that can be lawfully possessed and transferred by non-governmental entities, the value of those machineguns has steadily increased over time. This price premium on automatic weapons has spurred inventors and manufacturers to develop firearms, triggers, and other devices that permit shooters to use semiautomatic rifles to replicate automatic fire without converting these rifles into "machineguns" under the GCA and NFA.

Shooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearm's cyclic firing rate to mimic automatic fire. Such devices are designed principally to increase the rate of fire of semiautomatic firearms. These devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's

-3-

recoil either through a mechanism like an internal spring or in conjunction with the shooter's manual motions. ATF has regulated some of these devices as machineguns. Specifically, ATF concluded in 2006 that devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns.

However, other bump-stock-type devices currently on the market, including those recovered from the Las Vegas shooting, have not been regulated by ATF as machineguns under the GCA or NFA. These devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire. ATF has indicated in a number of letter rulings between 2008 and 2017 that semiautomatic firearms modified with these bump-stock-type devices did not fire "automatically," and were thus not "machineguns," because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy. Those determinations, however, did not include substantive legal analysis relating to the definition of "machinegun."

Consistent with its authority to reconsider and rectify potential classification errors, ATF has now determined, based on its interpretation of the definition of "machinegun," that all bump-stock-type devices that harness recoil energy using an internal spring or similar mechanism, or in conjunction with the shooter's manual motions, convert legal semiautomatic firearms into machineguns. Thus, ATF has determined that the bump-stock-devices currently on the market are "machineguns" because these devices initiate an "automatic[]" firing cycle sequence "with a single function of the trigger": the device is the primary impetus for a firing sequence that fires more than one shot with a single pull of the trigger. Upon a thorough review of the relevant statutory terms "single function of the trigger" and "automatically," the statutory definition of "machinegun" thus includes bump-stock-type devices—irrespective of whether the devices harness recoil energy using a mechanism like an internal spring or in conjunction with the shooter's manual motions—because these devices enable a semiautomatic firearm to fire "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

This proposed rule is the appropriate mechanism for ATF to set forth its analysis for its changed assessment. Accordingly, the NPRM proposes to amend certain terms in 27 CFR Parts 447, 478, and 479 in order to clarify that the term "machine gun" includes bump-stock-type devices. The GCA requires a 90-day public comment period for this NPRM.

-4-

RECOMMENDATION:     That the Attorney General sign the attached Notice of Proposed
Rulemaking.

Concurring Components:

APPROVED: _____          OLP _____

DISAPPROVED: _____          OLC _____

OTHER: _____

_____          _____
        Date                              Jefferson B. Sessions III
                                          Attorney General

AR001241

(Billing Code: 4410-FY-P)

**DEPARTMENT OF JUSTICE**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

**27 CFR Parts 447, 478, and 479**

**Docket No. 2017R-22; AG Order No. 4132-2018**

**RIN 1140-AA52**

**Bump-Stock-Type Devices**

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Department of Justice.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Department of Justice (Department) proposes to amend the Bureau of Alcohol, Tobacco, Firearms, and Explosives regulations to clarify that "bump fire" stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are "machineguns" as defined by the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA), because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. With limited exceptions, primarily as to government agencies, the GCA makes it unlawful for any person to

transfer or possess a machinegun unless it was lawfully possessed prior to the effective date of the statute. The bump-stock-type devices covered by this proposed rule were not in existence prior to the GCA's effective date, and therefore would fall within the prohibition on machineguns if this Notice of Proposed Rulemaking (NPRM) is implemented. Consequently, current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the final rule.

**DATES:** Written comments must be postmarked and electronic comments must be submitted on or before [INSERT DATE 90 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]. Commenters should be aware that the electronic Federal Docket Management System will not accept comments after midnight Eastern Daylight Time on the last day of the comment period.

**ADDRESSES:** You may submit comments, identified by docket number ATF 2017R-22, by any of the following methods:

- Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the directions for submitting comments.
- Fax: (202) 648-9741.
- Mail: Vivian Chu, Mailstop 6N-518, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Ave., NE, Washington D.C. 20226. *ATTN: 2017R-22.*

**Instructions:** All submissions received must include the agency name and docket number for this notice of proposed rulemaking. All properly completed comments received will be posted without change to the Federal eRulemaking portal.

2

AR001243

*http://www.regulations.gov*, including any personal information provided.  For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" section of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:**  Vivian Chu, Office of Regulatory Affairs, Enforcement Programs Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave., NE, Washington D.C. 20226; telephone: (202) 648-7070.

**SUPPLEMENTARY INFORMATION:**

On October 1, 2017, a shooter attacked a large crowd attending an outdoor concert in Las Vegas, Nevada.  By using several AR-type rifles with attached bump-stock-type devices, the shooter was able to fire several hundred rounds of ammunition in a short period of time, killing 58 people and injuring over 800.  The bump-stock-type devices recovered from the hotel room from which the shooter conducted the attack included two distinct, but functionally equivalent, model variations from the same manufacturer.  These devices were readily available in the commercial marketplace through online sales directly from the manufacturer, and through multiple retailers.  The manufacturer of these devices is the primary manufacturer and seller of bump-stock-type devices; it has obtained multiple patents for its designs, and has rigorously enforced the patents to prevent competitors from infringing them.  Consequently, at the time of the attack, very few competing bump-stock-type devices were available in the marketplace.

The devices used in Las Vegas and the other bump-stock-type devices currently available on the market all utilize essentially the same functional design.  They are

3

AR001244

designed to be affixed to a semiautomatic long gun (most commonly an AR-type rifle or an AK-type rifle) in place of a standard, stationary rifle stock, for the express purpose of allowing "rapid fire" operation of the semiautomatic firearm to which they are affixed. They are configured with a sliding shoulder stock molded (or otherwise attached) to a pistol-grip/handle (or "chassis") that includes an extension ledge (or "finger rest") on which the shooter places the trigger finger while shooting the firearm. The devices also generally include a detachable rectangular receiver module (or "bearing interface") that is placed in the receiver well of the device's pistol-grip/handle to assist in guiding and regulating the recoil of the firearm when fired.

These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

In general, bump-stock-type devices—including those currently on the market with the characteristics described above—are designed to channel recoil energy to increase the rate of fire of semiautomatic firearms from a single trigger pull. Specifically, they are designed to allow the shooter to maintain a continuous firing cycle after a single pull of the trigger by directing the recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths. Ordinarily, to operate a semiautomatic firearm, the shooter must

4

repeatedly pull and release the trigger to allow it to reset, so that only one shot is fired with each pull of the trigger. When a bump-stock-type device is affixed to a semiautomatic firearm, however, the device harnesses the recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter. The bump-stock-type device functions as a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed). No further physical manipulation of the trigger by the shooter is required.

In 2006, ATF concluded that certain bump-stock-type devices qualified as machineguns under the GCA and NFA. Specifically, ATF concluded that devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns. Between 2008 and 2017, however, ATF also issued classification decisions concluding that other bump-stock-type devices were not machineguns, including a device submitted by the manufacturer of the bump-stock-type devices used in the Las Vegas shooting. Those decisions did not include extensive legal analysis relating to the definition of "machinegun." Nonetheless, they indicated that semiautomatic firearms modified with these bump-stock-type devices did not fire "automatically," and were thus not "machineguns," because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy. ATF has now determined that that conclusion does not reflect the best interpretation of the term "machinegun" under the

5

GCA and NFA. In this proposed rule, the Department accordingly interprets the definition of "machinegun" to clarify that all bump-stock-type devices are "machineguns" under the GCA and NFA because they convert a semiautomatic firearm into a firearm that shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

## I. Background

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.[1] This includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(ii), 7805(a). The Attorney General has delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 CFR 0.130(a)(1)-(2). The Department and ATF have promulgated regulations implementing both the GCA and the NFA. *See* 27 CFR pts. 478, 479. In particular, while still part of the Department of the Treasury, ATF for decades promulgated rules governing "the procedural and substantive requirements relative to the importation, manufacture, making, exportation, identification and registration of, and the dealing in, machine guns." 27 CFR 479.1; *see, e.g., United States v. Dodson*, 519 F. App'x 344, 348-49 & n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the NFA's definition of "machinegun"); *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449-51 (D.C. Cir. 1994) (upholding an ATF determination regarding

---

[1] NFA provisions still refer to the "Secretary of the Treasury." 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, for ease of reference, this notice refers to the Attorney General.

6

AR001247

machinegun receivers). Courts have recognized ATF's leading regulatory role with respect to firearms, including in the specific context of classifying devices as machineguns under the NFA. *See, e.g., York v. Sec'y of Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985).

The GCA defines "machinegun" by referring to the NFA definition,[2] which includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The term "machinegun" also includes the frame or receiver of any such weapon or any part, or combination of parts, designed and intended for use in converting a weapon into a machinegun, and "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

*Id.* With limited exceptions, the GCA prohibits the transfer or possession of machineguns under 18 U.S.C. 922(o).[3]

In 1986, Congress passed the Firearm Owners' Protection Act (FOPA), Pub. L. 99-308, 100 Stat. 449, which included a provision that effectively froze the number of legally transferrable machineguns to those that were registered before May 19, 1986. 18 U.S.C. 922(o). Due to the fixed universe of "pre-1986" machineguns that may be lawfully transferred by nongovernmental entities, the value of those machineguns has

---

[2] 18 U.S.C. 921(a)(23).

[3] Regulations implementing the GCA and the NFA spell the term "machine gun" rather than "machinegun." *E.g.*, 27 CFR 478.11, 479.11. For convenience, this notice uses "machinegun" except when quoting a source to the contrary.

7

AR001248

steadily increased over time.  For example, the current average price range for pre-1986 fully automatic versions of AR-type rifles is between $20,000 and $30,000, while the price range for semiautomatic versions of these rifles is between $600 and $2,500.[4]

This price premium on automatic weapons has spurred inventors and manufacturers to attempt to develop firearms, triggers, and other devices that permit shooters to use semiautomatic rifles to replicate automatic fire without converting these rifles into "machineguns" under the GCA and NFA.  ATF began receiving classification requests for such firearms, triggers, and other devices in the period from 1988 to 1990. ATF has observed a significant increase in such requests since 2004, often in connection with rifle models that were, until 2004, defined as "semiautomatic assault weapons" and prohibited under the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. 921(a)(30) (commonly known as the Federal Assault Weapons Ban) (repealed effective Sept. 13, 2004).  Consistent with ATF's experience, the inventor and manufacturer of the bump-stock-type devices used in the Las Vegas shooting has attributed his innovation of those products specifically to the high cost of fully automatic firearms.  In a 2011 interview, he stated that he developed the original device because he "couldn't afford what [he] wanted – a fully automatic rifle – so . . . [he made] something that would work and be affordable."[5]

## II. ATF's Determinations Regarding Bump-Stock-Type Devices

Shooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearm's cyclic firing rate to mimic automatic fire.  Such devices are designed

---

[4] These figures are based on a review of prices posted on websites maintained by federal firearms licensees on March 1, 2018.

[5] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), http://www.thealbanynews.net/archives/2443.

8

AR001249

principally to increase the rate of fire of semiautomatic firearms. These devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's recoil either through a mechanism like an internal spring or in conjunction with the shooter's maintenance of pressure (typically constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger).

As noted above, ATF has regulated some of these devices as machineguns. Other bump-stock-type devices currently on the market, however, have not been regulated by ATF as machineguns under the GCA or NFA, and thus have not typically been marked with a serial number and other identification markings. Individuals therefore may purchase these devices without undergoing a background check or complying with any other federal regulations applicable to firearms.

A. *ATF's Interpretation of "Single Function of the Trigger"*

In 2002, an inventor submitted a device known as the "Akins Accelerator" to ATF for classification. To operate the Akins Accelerator, the shooter initiated an automatic firing sequence by pulling the trigger one time, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset. Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger, which caused the weapon to discharge the ammunition. The recoil and the spring-powered device thus caused the firearm to cycle back and forth, impacting the trigger finger, which remained rearward in a constant pull without further input by the

9

shooter while the firearm discharged multiple shots.  The device was advertised as able to

fire approximately 650 rounds per minute.  *See* ATF Ruling 2006-2, at 2.

ATF's classification of the Akins Accelerator focused on application of the

"single function of the trigger" prong of the statutory definition of "machinegun."  In an

initial assessment of the Akins Accelerator, ATF concluded that the device did not

qualify as a machinegun because ATF interpreted "single function of the trigger" to mean

a single *movement* of the trigger itself.  In 2006, however, ATF undertook a further

review of the Akins Accelerator based on how it actually functioned when sold.  ATF

determined that the Akins Accelerator was properly classified as a machinegun because

the best interpretation of the phrase "single function of the trigger" was a "single pull of

the trigger."[6]  The Akins Accelerator thus qualified as a machinegun because ATF

determined through testing that when the device was installed on a semiautomatic rifle

(specifically a Ruger Model 10-22), it resulted in a weapon that "[with] a single pull of

the trigger initiates an automatic firing cycle that continues until the finger is released, the

weapon malfunctions, or the ammunition supply is exhausted."  *Akins v. United States*,

No. 8:08-cv-988. slip op. at 5 (M.D. Fla. Sept. 23, 2008) (internal quotation marks

omitted).

In conjunction with its reclassification of the Akins Accelerator, ATF published

ATF Ruling 2006-2, "Classification of Devices Exclusively Designed to Increase the

---

[6] In classifying the Akins Accelerator, ATF used the term "pull" specifically because that was the manner in which the firearm's trigger was activated with the device.  For purposes of analyzing firearms and devices designed for use on firearms, however, the term "pull" is interchangeable with terminology describing all trigger activations, including a push or a flip of a switch. *See, e.g., United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002) (finding that a "trigger is a mechanism used to initiate a firing sequence," and rejecting the argument that a "switch" could not be a trigger, because such a definition would "lead to the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing" (internal quotation marks omitted)).

10

Rate of Fire of a Semiautomatic Firearm." The Ruling explained that ATF had received requests from "several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm." ATF Ruling 2006-2, at 1. After setting forth a detailed description of the components and functionality of the Akins Accelerator and devices with similar designs, ATF Ruling 2006-2 determined that the phrase "single function of the trigger" in the statutory definition of "machinegun" was best interpreted to mean a "single pull of the trigger." *Id.* at 2 (citing *National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066*, 73rd Cong., at 40 (1934)). ATF further indicated that it would apply this interpretation to its classification of devices designed to increase the rate of fire of semiautomatic firearms. Thus, ATF concluded in Ruling 2006-2 that devices exclusively designed to increase the rate of fire of semiautomatic firearms are machineguns if, "when activated by a single pull of the trigger, [such devices] initiate[] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." *Id.* at 3. Finally, because the "single pull of the trigger" interpretation constituted a change from ATF's prior interpretations of the phrase "single function of the trigger," Ruling 2006-2 concluded that "[t]o the extent previous ATF rulings are inconsistent with this determination, they are hereby overruled." *Id.*

Following its reclassification of the Akins Accelerator as a machinegun, ATF determined that removal and disposal of the internal spring would render the device a non-machinegun under the statutory definition. Hence, ATF advised individuals who had purchased the Akins Accelerator that they had the option of removing and disposing of

11

the internal spring, thereby placing the device outside the classification of machinegun and allowing the purchaser/possessor to retain the device in lieu of destroying or surrendering the device.

The inventor of the Akins Accelerator filed a complaint against the United States in May 2008, challenging the classification of the device as a machinegun as arbitrary and capricious under the Administrative Procedure Act. *Akins v. United States*, No. 8:08-cv-988, slip op. at 7-8 (M.D. Fla. Sept. 23, 2008). The United States District Court for the Middle District of Florida rejected the plaintiff's challenge, holding that ATF was within its authority to reconsider and change its interpretation of the phrase "single function of the trigger" in the NFA's statutory definition of machinegun. *Id.* at 14. The court further held that the language of the statute and the legislative history supported ATF's interpretation of the statutory phrase "single function of the trigger" as synonymous with a "single pull of the trigger." *Id.* at 11-12. The court concluded that in Ruling 2006-2, ATF had set forth a "'reasoned analysis'" for the application of that new interpretation to the Akins Accelerator and similar devices, including the need to "protect the public from dangerous firearms." *Id.* at 12.

The United States Court of Appeals for the Eleventh Circuit affirmed the district court's decision, holding that "[t]he interpretation by the Bureau that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam). The Eleventh Circuit further concluded that "[b]ased on the operation of the Accelerator, the Bureau had the authority to 'reconsider and rectify' what it considered to be a classification error." *Id.*

12

AR001253

In ten letter rulings between 2008 and 2017. ATF assessed other bump-stock-type devices. Like the Akins Accelerator, these other bump-stock-type devices allowed the shooter to fire more than one shot with a single pull of the trigger. As discussed below, however, ATF ultimately concluded that these devices did not qualify as machineguns because, in ATF's view, they did not "automatically" shoot more than one shot with a single pull of the trigger. ATF has also applied the "single pull of the trigger" interpretation to other trigger actuators, two-stage triggers. and other devices submitted to ATF for classification. Depending on the method of operation, some such devices were classified to be machineguns that were required to be registered in the National Firearms Registration and Transfer Record.[7]

B. *ATF's Interpretation of "Automatically"*

---

[7] Examples of recent ATF classification letters relying on the "single pull of the trigger" interpretation to classify submitted devices as machineguns include the following:

On April 13, 2015, ATF issued a classification letter regarding a device characterized as a "positive reset trigger," designed to be used on a semiautomatic AR-style rifle. The device consisted of a support/stock, secondary trigger, secondary trigger link, pivot toggle, shuttle link, and shuttle. ATF determined that, after a single pull of the trigger, the device utilized recoil energy generated from firing a projectile to fire a subsequent projectile. ATF noted that "a 'single function of the trigger' is a single pull," and that the device utilized a "single function of the trigger" because the shooter need not release the trigger to fire a subsequent projectile, and instead "can maintain constant pressure through a single function of the trigger."

On October 7. 2016, ATF issued a classification letter regarding two devices described as "LV-15 Trigger Reset Devices." The devices, which were designed to be used on an AR-type rifle, were essentially identical in design and function and were submitted by the same requestor (per the requestor, the second device included "small improvements that have come as the result of further development since the original submission"). The devices were each powered by a rechargeable battery and included the following components: a self-contained trigger mechanism with an electrical connection, a modified two-position semiautomatic AR-15 type selector lever, a rechargeable battery pack, a grip assembly/trigger guard with electrical connections, and a piston that projects forward through the lower rear portion of the trigger guard and pushes the trigger forward as the firearm cycles. ATF held that "to initiate the firing . . . a shooter must simply pull the trigger." It explained that although the mechanism pushed the trigger forward, "the shooter never releases the trigger. Consistent with [the requestor's] explanation, ATF demonstrated that the device fired multiple projectiles with a "single function of the trigger" because a single pull was all that was required to initiate and maintain a firing sequence.

AR001254

Prior ATF rulings concerning bump-stock-type devices have not provided substantial legal analysis regarding the meaning of the term "automatically" as it is used in the GCA and NFA. Moreover, ATF's prior rulings concerning such devices have applied different understandings of the term "automatically." ATF Ruling 2006-2 concluded that devices like the Akins Accelerator initiated an "automatic" firing cycle because, once initiated by a single pull of the trigger, "the automatic firing cycle continues until the finger is released or the ammunition supply is exhausted." ATF Ruling 2006-2, at 1. ATF letter rulings between 2008 and 2017, however, concluded that bump-stock-type devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter do not fire "automatically." Some of these rulings concluded that such devices were not machineguns because they did not "initiate[] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted," without further defining the term "automatically." *E.g.*, Letter for Michael Smith from ATF's Firearm Technology Branch Chief (April 2, 2012). Other rulings instead concluded that these bump-stock-type devices were not machineguns because they lacked any "automatically functioning mechanical parts or springs and perform[ed] no mechanical function[s] when installed," again without further defining the term "automatically" in this context. *E.g.*, Letter for David Compton from ATF's Firearm Technology Branch Chief (June 7, 2010).

**III. Las Vegas Mass Shooting and Requests to Regulate Bump-Stock-Type Devices**

Following the mass shooting in Las Vegas on October 1, 2017, ATF has received correspondence from members of the United States Senate and the United States House

14

of Representatives, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition.

In response, on December 26, 2017, as an initial step in the process of promulgating a federal regulation interpreting the definition of "machinegun" with respect to bump-stock-type devices, ATF published an Advance Notice of Proposed Rulemaking (ANPRM) in the Federal Register. Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 FR 60929. The ANPRM was limited to soliciting comments concerning the market for bump-stock-type devices and manufacturer and retailer data. *Id.* at 60930-31. Public comment on the ANPRM concluded on January 25, 2018. While ATF received over 115,000 comments, the vast majority of these comments were not responsive to the ANPRM.

On February 20, 2018, President Trump issued a memorandum to Attorney General Sessions concerning "bump fire" stocks and similar devices. 83 FR 7949. The memorandum noted that the Department of Justice had already "started the process of promulgating a Federal regulation interpreting the definition of 'machinegun' under Federal law to clarify whether certain bump stock type devices should be illegal." *Id.* at 7949. The President then directed the Department of Justice, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.* Publication of this NPRM is the next step in the process of promulgating such a rule.

15

Consistent with its authority to "'reconsider and rectify'" potential classification errors, *Akins*, 312 F. App'x at 200, ATF has reviewed its original classification determinations for bump-stock-type devices from 2008 to 2017 in light of its interpretation of the relevant statutory language, namely the definition of "machinegun." These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

ATF has now determined, based on its interpretation of the relevant statutory language, that these bump-stock-type devices, which harness recoil energy in conjunction with the shooter's maintenance of pressure, turn legal semiautomatic firearms into machineguns. Specifically, ATF has determined that these devices initiate an "automatic[]" firing cycle sequence "by a single function of the trigger" because the device is the primary impetus for a firing sequence that fires more than one shot with a single pull of the trigger. 26 U.S.C. 5845(b). ATF's classifications of bump-stock-devices between 2008 and 2017 did not include extensive legal analysis of these terms in concluding that the bump-stock-type devices at issue were not "machineguns." The statutory definition of machinegun includes bump-stock-type devices—irrespective of whether the devices harness recoil energy using a mechanism like an internal spring or in conjunction with the shooter's maintenance of pressure—because these devices enable a

16

AR001257

semiautomatic firearm to fire "automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* This proposed rule is the appropriate mechanism for ATF to set forth its analysis for its changed assessment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983).

## IV. Advance Notice of Proposed Rulemaking

Based on ATF's initial review of the comments it received on the ANPRM, the vast majority of comments concern the legal authority to regulate bump-stock-type devices. Some of those comments opined that the Department has the power to regulate bump-stock-type devices. Most, however, contended that the Department lacks such authority, either because only Congress has the authority to regulate bump-stock-type devices or because the Second Amendment of the U.S. Constitution precludes any federal regulation of such devices.

The Department disagrees. Congress has granted the Attorney General authority to issue rules to administer the GCA and NFA, and the Attorney General has delegated to ATF the authority to administer and enforce those statutes and implementing regulations. *See supra* Part I. Because, with some exceptions, the possession of a machinegun is prohibited by the GCA, the Department is well within its authority to issue a rule that further clarifies and interprets the statutory definition of machinegun. Nor is regulation of bump-stock-type devices as machineguns inconsistent with the Second Amendment. The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), noted that the Second Amendment does not extend to "'dangerous and unusual weapons'" not in "'common use.'" *Id.* at 627. *Heller* further observed that it would be "startling" to conclude "that the National Firearms Act's restrictions on machineguns . . . might be

17

AR001258

unconstitutional." *Id.* at 624. Since *Heller*, federal courts of appeals have repeatedly held that federal statutes prohibiting machineguns comport with the Second Amendment. *See, e.g., Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (upholding federal statute banning possession of machineguns because they are "dangerous and unusual and therefore not in common use"); *accord United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *United States v. Marzzarella*, 614 F.3d 85, 94-95 (3d Cir. 2010); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008). No court has interpreted *Heller* as encompassing a constitutional right to possess machineguns or machinegun conversion devices.

Numerous persons commented that bump-stock-type devices do not fall under the statutory definition of "machinegun because, when attached, they do not change the mechanical functioning of a semiautomatic firearm, and still require a separate trigger pull for each fired round." They noted that bump firing is a technique, and pointed to many other ways in which a shooter can increase a firearm's rate of fire without using a bump-stock-type device.

The Department disagrees. The relevant statutory question is whether a particular device causes a firearm to "shoot . . . automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). Bump firing and other techniques for increasing the rate of fire do not satisfy this definition because they do not produce an automatic firing sequence with a single pull of the trigger. Instead, bump firing without an assistive device requires the shooter to exert pressure with the trigger finger to re-engage the trigger for each round fired. The bump-stock-type devices described above, however, satisfy the definition. ATF's classification decisions between

18

2008 and 2017 did not reflect the best interpretation of the term "automatically" as used in the definition of "machinegun," because those decisions focused on the lack of mechanical parts like internal springs in the bump-stock-type devices at issue. The bump-stock-type devices at issue in those rulings, however, utilized the recoil of the firearm itself to maintain an automatic firing sequence initiated by a single pull of the trigger. As with the Akins Accelerator, the bump-stock-type devices at issue cause the trigger to "bump" into the finger, so that the shooter need not pull the trigger repeatedly to expel ammunition. As stated above, ATF previously focused on the trigger itself to interpret "single function of the trigger," but adopted a better legal and practical interpretation of "function" to encompass the shooter's activation of the trigger by, as in the case of the Akins Accelerator and other bump-stock-type devices, a single pull that causes the weapon to shoot until the ammunition is exhausted or the pressure on the trigger is removed. Because these bump-stock-type devices allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device, ATF has determined that bump-stock-type devices are machinegun conversion devices, and therefore qualify as machineguns under the GCA and the NFA. *See infra* Part V.

Commenters also argued that banning bump-stock-type devices will not significantly impact public safety. Again, the Department disagrees. The shooting in Las Vegas on October 1, 2017, highlighted the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict. The shooting also made many individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious. The proposed regulation aims to ameliorate that threat.

19

Some commenters objected to any regulation of bump-stock-type devices because, they argued, it will decrease innovation in the firearms accessories market and result in the loss of manufacturing and associated jobs. They suggested that the Federal Government should prevent the misuse of firearms through other means, such as by enforcing existing firearms laws, preventing mentally ill persons from acquiring weapons, and enacting more stringent criminal penalties for those who commit crimes with bump-stock-type devices. However, an important step in the enforcement of existing firearms laws is ensuring that ATF's regulations correctly interpret those laws.

This proposed rulemaking will have an economic impact, see *infra* Part VI, but the impact will not be widespread, and the costs associated with this rule are easily exceeded by the benefits it will provide for public safety. The Department also disagrees that the proposed rulemaking will decrease innovation in the firearms accessories market. The fact that more than 65,000 industry professionals from the United States and foreign countries attend the annual Shooting, Hunting and Outdoor Trade (SHOT) Show, where many new and improved firearms accessories are introduced, is a clear market signal that there is strong demand for innovation and development of new shooting accessories irrespective of whether the bump-stock-type devices described in this rulemaking are prohibited.

**V. Proposed Rule**

The regulations in 27 CFR part 479 contain the procedural and substantive requirements relative to the importation, manufacturing, making, exportation, identification and registration of, and dealing in machineguns, destructive devices, and certain other firearms and weapons under the NFA. Currently, the regulatory definition

20

of "machine gun" in 27 CFR 479.11 matches the statutory definition of "machinegun" in the NFA quoted in Part I, above. The definition includes the terms "single function of the trigger" and "automatically," but those terms are not expressly defined in the statutory text. Those terms are best interpreted, however, to encompass firearms equipped with bump-stock-type devices. As discussed above, bump-stock-type devices like the Akins Accelerator and other devices that operate to mimic automatic fire when added to semiautomatic rifles present the same risk to public safety that Congress has already deemed unacceptable by enacting and amending the GCA (18 U.S.C. 922(o)). Therefore, the Department proposes to exercise its delegated authority to clarify its interpretations of the statutory terms "single function of the trigger," "automatically," and "machinegun." Specifically, the Department proposes to amend 27 CFR 479.11 by defining the term "single function of the trigger" to mean "single pull of the trigger." The Department further proposes to amend these regulations by defining the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." Finally, the Department proposes to clarify that the definition of a "machinegun" includes a device that allows semiautomatic firearms to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as bump-stock-type devices).

The interpretation of the phrase "single function of the trigger" to mean "single pull of the trigger" reflects ATF's position since 2006, and it is the best interpretation of the statute. The Supreme Court in *Staples v. United States*, 511 U.S. 600 (1994).

21

indicated that a machinegun under the NFA "fires repeatedly with a single pull of the trigger." *Id.* at 602 n.1. This interpretation is also consistent with how the phrase "single function of the trigger" was understood at the time of the NFA's enactment in 1934. For instance, in a congressional hearing leading up to the NFA's enactment, the National Rifle Association's then-president testified that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066,* 73rd Cong., 2nd Sess., at 40 (1934). Furthermore, and as noted above, the Eleventh Circuit concluded that ATF's interpretation of "single function of the trigger" to mean "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins v. United States,* 312 F. App'x 197, 200 (11th Cir. 2009). No other court has held otherwise.[8]

Interpreting the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger" also reflects the ordinary meaning of that term at the time of the NFA's enactment in 1934. The word "automatically" is the adverbial form of "automatic," meaning "[h]aving a self-acting or self-regulating mechanism that performs a required act

---

[8] As used in this proposed rule, the term "pull" is synonymous with "push" and other terms that describe activation of a trigger. The courts have made clear that whether a trigger is operated through a "pull," "push," or some other action such as a flipping a switch, does not change the analysis of the functionality of a firearm. For example, in *United States v. Fleischli,* 305 F.3d at 655-56, the Seventh Circuit rejected the argument that a switch did not constitute a trigger for purposes of assessing whether a firearm was a machinegun under the NFA, because such an interpretation of the statute would lead to "the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *See also United States v. Camp,* 343 F.3d 743, 745 (5th Cir. 2003) ("'To construe "trigger" to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a very common kind. The language [in 18 U.S.C. 922(o)] implies no intent to so restrict the meaning[.]'" (quoting *United States v. Jokel,* 969 F.2d 132, 135 (5th Cir. 1992) (emphasis removed))). Examples of machineguns that operate through a trigger activated by a push include the Browning design, M2 .50 caliber, the Vickers, the Maxim, and the M134 hand-fired Minigun.

AR001263

at a predetermined point in an operation[.]" *Webster's New International Dictionary* 187 (2d ed. 1934); *see also* 1 *Oxford English Dictionary* 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself").

Relying on these definitions, the United States Court of Appeals for the Seventh Circuit accordingly interpreted the term "automatically" as used in the NFA as "delineat[ing] how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism" "set in motion by a single function of the trigger and . . . accomplished without manual reloading." *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). So long as the firearm is capable of producing multiple rounds with a single pull of the trigger for some period of time, the firearm shoots "automatically" irrespective of why the firing sequence ultimately ends. *Id.* ("[T]he reason a weapon ceased firing is not a matter with which § 5845(b) is concerned."). *Olofson* thus requires only that the weapon shoot multiple rounds with a single function of the trigger "as the result of a self-acting mechanism," not that the self-acting mechanism produce the firing sequence without any additional action by the shooter. This definition accordingly requires that the self-acting or self-regulating mechanism must perform an act that is primarily responsible for causing the weapon to shoot more than one shot.

Finally, it is reasonable to conclude, based on these interpretations, that the term "machinegun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. When a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger,

23

that movement initiates a firing sequence that produces more than one shot.  And that firing sequence is "automatic" because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed).  Accordingly, these devices are included under the definition of machinegun and, therefore, come within the purview of the NFA.

The GCA and its implementing regulations in 27 CFR part 478 incorporate the NFA's definition of machinegun.  Accordingly, this proposed rule makes the same amendments to the definitions of "single function of the trigger," "automatically," and "machine gun" in 27 CFR 478.11.

The Arms Export Control Act (AECA), as amended, does not include the term "machinegun" in its key provision, 22 U.S.C. 2778.  However, regulations in 27 CFR part 447 that implement the AECA include a similar definition of "machinegun," and explain that machineguns, submachineguns, machine pistols, and fully automatic rifles fall within Category I(b) of the U.S. Munitions Import List when those defense articles are permanently imported.  *See* 27 CFR 447.11, 447.21.  Currently, the definition of "machinegun" in § 447.11 provides that "[a] 'machinegun', 'machine pistol', 'submachinegun', or 'automatic rifle' is a firearm originally designed to fire, or capable of being fired fully automatically by a single pull of the trigger."  This proposed rule would harmonize the AECA's regulatory definition of "machinegun" with the definitions in 27 CFR parts 478 and 479, as those definitions would be amended by this rule.

The proposed rule would replace prior classifications of bump-stock-type devices, including devices that ATF previously determined were not machineguns.  The rule thus

24

would supplant any prior letter rulings with which it is inconsistent so that any bump-stock-type device described above qualifies as a machinegun. Accordingly, manufacturers, current owners, and persons wishing to purchase such devices would be subject to the restrictions imposed by the GCA and NFA.

The Department has determined that there would not be a registration period for any device that would be classified as "machinegun" as a result of this rulemaking. The NFA provides that only the manufacturer, importer, or maker of a firearm may register it.[9] Accordingly, there is no means by which the possessor may register a firearm retroactively, including a firearm that has been reclassified. Further, 18 U.S.C. 922(o) prohibits the possession of machineguns that were not lawfully possessed before the effective date of the statute. Accordingly, if the final rule is consistent with this NPRM, current possessors of bump-stock-type devices will be obligated to dispose of those devices. A final rule will provide specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o).

## VI. Statutory and Executive Order Review

### A. Executive Orders 12866, 13563, and 13771

Executive Orders 13563 (Improving Regulation and Regulatory Review) and 12866 (Regulatory Planning and Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563

---

[9] 26 U.S.C. 5841(b); 27 CFR 479.101(b).

25

AR001266

emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs) directs agencies to reduce regulation and control regulatory costs. This proposed rule is expected to be an EO 13771 regulatory action. Details on the estimated costs of this proposed rule can be found in the rule's economic analysis below.

This rule has been designated a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget. This proposed rule is intended to interpret the definition of "machinegun" within the GCA and NFA such that it includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

**Need for Federal Regulatory Action**

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning regulatory action is the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This proposed rule is addressing a negative externality. The negative externality of the

26

commercial sale of bump-stock-type devices is that they could be used for criminal
purposes. This poses a public safety issue that the Department is trying to address.

**Executive Summary**

Table 1 provides a summary of the affected population and anticipated costs and
benefits to promulgating this rule.

Table 1: Summary of Affected Population, Costs, and Benefits

| Category | Affected Populations, Costs, and Benefits |
|---|---|
| Applicability | • Manufacturers of bump-stock-type devices<br>• Retail sellers of bump-stock-type devices<br>• Gun owners who own bump-stock-type devices or would have purchased them in the future |
| Affected Population | • 2 manufacturers of bump-stock-type devices<br>• 2,281 retailers of bump-stock-type devices<br>• Owners and future consumers of bump-stock-type devices |
| Total Quantified Costs to Industry, Public, and Government (7% Discount Rate) | $217.0 million present value over 10 years<br>$36.3 million annualized |
| Unquantified Costs | • Costs of destruction<br>• Costs of advertising to inform owners of the need to dispose of their bump-stock-type devices<br>• Lost consumer surplus to users of bump-stock-type devices |
| Unquantified Benefits | • Prevents criminal usage of bump-stock-type devices<br>• Could reduce casualties in an incident that would have involved a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to incidents |

**Affected Population**

27

AR001268

The populations affected by this rule are manufacturers of bump-stock-type devices, retailers who sell them either in brick-and-mortar stores or online, and individuals who have purchased or would have wanted to purchase bump-stock-type devices. The number of entities and individuals selling or purchasing bump-stock-type devices are as follows:

- 2 manufacturers
- 2,281 retailers
- An uncertain number of individuals who have purchased bump-stock-type devices or would have purchased them in the future

Because many bump-stock-type devices—including those ATF addressed in classification letters between 2008 and 2017—have not been subject to regulation under the GCA, ATF does not keep track of manufacturers or retailers of bump-stock-type devices, nor does ATF keep track or maintain a database of individuals who have purchased bump-stock-type devices. Therefore, the affected population of manufacturers and retailers is an estimate and based on publicly available information and, with respect to retailers who are also Federal firearms licensees (FFLs), is also based on ATF's records in the Federal Firearms Licensing System.

ATF estimates that since 2010, as many as six domestic bump-stock-type device manufacturers have been in the marketplace, but due to patent infringement litigation, only two remain in the market. For the estimate of the number of retailers, ATF filtered all FFLs for a list of potential sellers. While there are approximately 80,000 FFLs currently licensed, only certain types sell firearms to the public. ATF first removed FFLs that do not sell firearms to the public. Next, since not all FFLs sell firearm accessories, ATF needed to estimate the number that do sell accessories. ATF assumed that FFLs that

28

are likely to sell bump-stock-type devices would have online websites. ATF requests public comment on the reasonableness of the assumption that retailers of bump-stock-type devices are likely to be businesses with an online presence. ATF ran a query on the FFL database and found that of those that sell firearms to the public, 2,270 have websites. Because sellers of firearm accessories do not necessarily sell firearms, ATF also performed an online search and found an additional 11 retailers who sell firearm accessories, but not firearms. Adding these two totals together, ATF estimates that there are 2,281 retailers of bump-stock-type devices.

Because there are no records of individuals who have purchased firearm accessories, ATF does not have an estimated number of individuals who would be affected by this proposed rule. Although ATF lacks data on the number of individuals who have purchased bump-stock-type devices, ATF has some information from one manufacturer and four retailers on the volume of sales of such devices. Based on these reported amounts, ATF estimates that the number of bump-stock-type devices that were purchased during the 8-year period beginning in 2010 ranges from 35,000 per year as a low estimate to 75,000 per year as the high and primary estimate. ATF used a public commenter's 400,000 total estimate as a third estimate. For further information on the methodology of these estimates, please review the analysis regarding "Costs" below.

**Costs**

There are three primary sources of costs from this rule. First, for owners of bump-stock-type devices, there will be a lost value from no longer being able to possess or use the devices. Second, there will be a lost value to manufacturers who would have manufactured and sold the devices in the future and to gun owners who would have

29

purchased them. Finally, there is a disposal cost associated with the need to destroy the devices or render them inactive.

### Cost to the public for loss of property

As reported by public comments, individuals purchase bump-stock-type devices so that they can simulate automatic firing on a semiautomatic firearm. Commenters noted a variety of purposes for which bump-stock-type devices have been advertised and used, including for recreation and fun, assisting persons with mobility issues in firing quickly, self-defense, killing invasive pig species, and target practice (although, as some commenters observed, bump-stock-type devices impede firing accuracy). If the proposed rule became effective, bump-stock-type devices would be considered machineguns under the NFA and could not be lawfully possessed because the GCA prohibits persons from possessing a machinegun unless it was lawfully possessed before the effective date of the statute. Bump-stock-type devices currently possessed by individuals would have to be destroyed or turned in upon implementation of the regulation.

The lost value from no longer being able to use or purchase bump-stock-type devices will depend on the volume of sales in the market and the value that consumers place on the devices. ATF has limited information about the market for bump-stock-type devices. One commenter estimated that more than 400,000 bump-stock-type devices may have been sold. Based on publicly available information, ATF estimates that in the first two years that bump-stock-type devices were in the market, approximately 35,000 were sold per year.[10] However, after 2011, other manufacturers entered the market and there is no available information regarding the total number of bump-stock-type devices

---

[10] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), http://www.thealbanynews.net/archives/2443.

30

AR001271

manufactured. ATF is using publicly available information on manufacturing and combining it with the information on retail sales to estimate a range of the number of bump-stock-type devices in the marketplace.

ATF first developed an estimate of the number of bump-stock-type devices in the marketplace, based on information on retail sales provided in response to the ANPRM. One retailer stated that it sold an average of 4,000 to 5,000 bump-stock-type devices per year.[11] Public comments indicated that one retailer sold 3,800 bump-stock-type devices annually, one sold 60 per year, and one sold approximately 5-10 per year.[12]  For the purposes of this regulatory analysis (RA), ATF assumes that a large retailer would have sold 4,400, a midrange retailer would have sold 60, and a small retailer would have sold 8.[13]  For the purposes of this analysis, ATF assumes the number of retailers by size are as follows:

- 4 large * 4,400 annual sales
- 755 midrange * 60 annual sales
- 1,511 small * 8 annual sales

The number of large retailers is a known number.  As stated in the Affected Population section above, based on ATF's internal database and online research, the remaining number of retailers is 2,270.  For the purposes of this RA, ATF assumed that one-third of the remaining retailer population are midrange retailers, and the remaining 1,511 are small retailers.  Using these assumed numbers of retailers and annual sales by

[11] Based on an internal survey of large retailers.
[12] Regulations.gov, *Docket ID: ATF-2018-0001-27509*, https://www.regulations.gov/document?D=ATF-2018-0001-27509 (last visited on Mar. 6, 2018); Regulations.gov, *Docket ID: ATF-2018-0001-0433*, https://www.regulations.gov/document?D=ATF-2018-0001-0433 (last visited on Mar. 6, 2018); Regulations.gov, *Docket ID: ATF-2018-0001-0128*, https://www.regulations.gov/document?D=ATF-2018-0001-0128 (last visited on Mar. 6, 2018).
[13] For a large retailer the average sales were 4,400 = (3,800 + 5,000) / 2. For a small retailer, the average sales were 8 = (5 + 10) / 2.

31

size of retailer. ATF estimated annual sales of about 75,000 [(4 * 4,400) + (755 * 60) + (1,511 * 8)].

ATF next developed an estimate of the number of bump-stock-type devices in the United States based on information about the numbers of bump-stock-type devices manufactured. Based on publicly available information, ATF estimates that approximately 35,000 bump-stock-type devices were sold in 2010.[14]  Only in 2012 did other manufacturers enter the marketplace. For the purposes of this RA, ATF assumes that in the first two years of production, the one manufacturer produced the same 35,000 in years 2010 and 2011. ATF has two sets of production estimates. Because no information is otherwise known about the production of bump-stock-type devices, ATF assumes that the low estimate of annual bump-stock-type device production is a constant 35,000, based on the one data point. As stated earlier, a public commenter provided an estimate of 400,000 bump-stock-type devices currently in circulation. To account for how these were purchased over the last 8 years, ATF also assumed the same 35,000 production in the first 2 years, but spread out the remaining 330,000 over the remaining 6 years, or about 55,000 per year. However, incorporating the provided retail sales information, ATF developed a third, higher estimate reflecting that when the other manufacturers entered the market, the number of bump-stock-type devices sold on the market annually could have been 75,000.

The high estimate is ATF's primary estimate because ATF knows that there was an increase in production starting in 2012. In 2012, there were other manufacturers who entered the market, and the first manufacturer increased production at some point

---

[14] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), http://www.thealbanynews.net/archives/2443.

AR001273

thereafter. Furthermore, the primary estimate includes information provided by retailers as a more comprehensive outlook on the overall production numbers. For the purposes of this analysis, ATF assumes that both the increase in production and the market entry of other manufacturers all occurred in 2012. Table 2 provides the breakdown of production for the low estimate, public comment estimate, and primary estimate.

Table 2. Number of Bump-Stock-Type Devices Produced, Based on Manufacturer and Retail Sales

| Year | Low Estimate | Public Comment Estimate | Primary Estimate |
|------|-------------|------------------------|------------------|
| 2010 | 35,000 | 35,000 | 35,000 |
| 2011 | 35,000 | 35,000 | 35,000 |
| 2012 | 35,000 | 55,000 | 75,000 |
| 2013 | 35,000 | 55,000 | 75,000 |
| 2014 | 35,000 | 55,000 | 75,000 |
| 2015 | 35,000 | 55,000 | 75,000 |
| 2016 | 35,000 | 55,000 | 75,000 |
| 2017 | 35,000 | 55,000 | 75,000 |
| Total | 280,000 | 400,000 | 520,000 |

In other words, the number of bump-stock-type devices held by the public could range from about 280,000 to about 520,000.

ATF does not know the production cost of bump-stock-type devices, but for the purposes of this RA, ATF uses the retail sales amounts as a proxy for the total value of these devices. For devices that have already been sold, there are two countervailing effects that affect the value of the devices. There may have been some depreciation of the devices since they were originally purchased, resulting in a value somewhat reduced from the retail price. On the other hand, some consumers would have been willing to pay more than the retail price for a bump-stock-type device, and for these individuals the devices would have a higher valuation than the retail price. Both of these effects are

33

AR001274

difficult to estimate, and here ATF assumes that the retail sales price is a reasonable proxy for the value of the devices.

The primary manufacturer of bump-stock-type devices sells them at a price of $179.95 to $425.95.[15] For the purposes of this RA, ATF estimates that the average sale price for these bump-stock-type devices was $301.00 during the first two years they were sold. In 2012, at least one other manufacturer entered the market and started selling their devices at the rate of $99.99, making the overall prices for these devices lower.[16] For the purposes of this RA, ATF assumes that the average sale price for bump-stock-type devices from 2012 to 2017 was $200.00. Based on these costs, multiplied by the number of bump-stock-type devices in the market, Table 3 provides the sales value that the public has spent on these devices over the course of the last eight years.

Table 3. Amount Spent on Bump-Stock-Type Devices (Undiscounted)

| Year | Low Estimate | Public Comment Estimate | Primary Estimate |
|------|-------------|-------------------------|------------------|
| 2011 | $10,533,250 | $10,533,250 | $10,533,250 |
| 2012 | $10,533,250 | $10,533,250 | $10,533,250 |
| 2013 | $7,016,450 | $11,025,850 | $15,035,250 |
| 2014 | $7,016,450 | $11,025,850 | $15,035,250 |
| 2015 | $7,016,450 | $11,025,850 | $15,035,250 |
| 2016 | $7,016,450 | $11,025,850 | $15,035,250 |
| 2017 | $7,016,450 | $11,025,850 | $15,035,250 |
| Total | $56,148,750 | $76,195,750 | $96,242,750 |

---

[15] Slide Fire AR-15 Bump Fire Stocks (archived page on Jan. 28, 2017),
https://web.archive.org/web/20170128085532/http://www.slidefire.com/products/ar-platform (last visited Mar. 6, 2018).
[16] Bump Fire Systems (archived page on Feb. 21, 2015),
https://web.archive.org/web/20150221050223/http://bumpfiresystems.com/ (last visited Mar. 6, 2018).

AR001275

ATF estimates that the total, undiscounted amount spent on bump-stock-type devices was $96.2 million. While the retail prices of these bump-stock-type devices remained constant over the eight years of sales, these purchases occurred over time; therefore, ATF presents the discounted value at 3% and 7% in Table 4 to account for the present value of these purchases.

Table 4. The Amount Spent Purchasing Bump-Stock-Type Devices, Discounted at 3% and 7%

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| 2011 | $10,533,250 | $12,210,924 | $14,773,428 |
| 2012 | $10,533,250 | $11,855,266 | $13,806,942 |
| 2013 | $15,035,250 | $16,429,424 | $18,418,828 |
| 2014 | $15,035,250 | $15,950,897 | $17,213,858 |
| 2015 | $15,035,250 | $15,486,308 | $16,087,718 |
| 2016 | $15,035,250 | $15,035,250 | $15,035,250 |
| 2017 | $15,035,250 | $14,597,330 | $14,051,636 |
| Total | $96,242,750 | $101,565,397 | $109,387,659 |
| Annualized Cost | | $14,468,640 | $18,318,906 |

Because these purchases occurred in the past, ATF's discount years start at -5 and increase to 0 to account for the Executive Order 13771 standard that costs be presented in 2016 dollars. With these assumptions, ATF estimates that the annualized, discounted amount spent on bump-stock-type devices was $14.5 million and $18.3 million at 3% and 7%, respectively.

Based on the same discounting formula, ATF estimates that the total undiscounted cost for the low estimate would be $56.1 million, and the total discounted values would be $60.2 million and $66.3 million at 3% and 7%, respectively. The annualized values for the low estimates of total number of bump-stock-type devices sold are $8.6 million and $11.1 million at 3% and 7%, respectively. For the 400,000-unit estimate provided by

35

AR001276

the public commenter, the total undiscounted amount would be $76.2 million, and the total discounted values would be $80.9 million and $87.8 million at 3% and 7%, respectively. The annualized values for the 400,000-unit sales estimate are $11.5 million and $14.7 million at 3% and 7%, respectively.

### Forgone Future Production and Sales

ATF has estimated the lost production and lost sales that would occur in the 10 years after the implementation of this proposed rule, should this proposed rule take effect. In order to do this, ATF needed to predict the number of devices that would be sold in the future in the absence of a rule. Such a prediction should take account of recent expected changes in the demand for and supply of bump-stock-type devices. For example, based on a survey, half of the known, large former retailers of bump-stock-type devices no longer sell bump-stock-type devices as a result of the Las Vegas shooting, nor do they intend to sell them in the future. Moreover, while ATF has estimated the number of bump-stock-type devices manufactured since 2010, ATF is without sufficient information to estimate the number of individuals who were interested in acquiring bump-stock-type devices prior to the Las Vegas shooting but would no longer want them due to the shooting.

Another recent change affecting individuals' future purchases of bump-stock-type devices is that certain States have already banned such devices. These States are California, Florida, Massachusetts, New Jersey, New York, and Washington. The effect of States' bans on individuals' future purchases of bump-stock-type devices should not be attributed to this proposed rule since these reductions in purchases would happen with or without the rule. However, ATF was unable to quantify the impact of States' bans and

36

thus was unable to account for the future effects of these bans in the estimate of the effects of the proposed rule.

Based on previously mentioned comments from large retailers, ATF expects that, in the absence of this rule, some retailers would not sell bump-stock-type devices in the future. In order to estimate the expected future reduction in demand for bump-stock-type devices as a result of the Las Vegas shooting, ATF assumes that the reduction of sales by large retailers that has already occurred would be a reasonable estimate of the future reduction of sales overall that would occur in the absence of the rule. ATF estimates that there are four large retailers of bump-stock-type devices, of which two have stated that they would no longer sell bump-stock-type devices regardless of this proposed rule. For the purposes of this regulatory analysis, it is estimated that each of the two large retailers sell 4,400 bump-stock-type devices annually. Removing the effects of these two large retailers from the future market reduces ATF's primary estimate of 74,988 in past annual production to an estimate of 66,484 (75,284 – 8,800) in annual sales that would occur in the future in the absence of a rule. Table 5 provides the estimated breakdown of lost production and sales forgone should this rule become final.

Table 5. Forgone Production and Sales of Future Bump-Stock-Type Devices

| Year | No. of Bump-Stock-Type Devices | Undiscounted | 3% | 7% |
|------|-------------------------------|--------------|-----|-----|
| 2018 | 66,484 | $20,008,360 | $19,425,592.04 | $18,699,401.68 |
| 2019 | 66,484 | $20,008,360 | $18,859,798.10 | $17,476,076.34 |
| 2020 | 66,484 | $20,008,360 | $18,310,483.59 | $16,332,781.62 |
| 2021 | 66,484 | $20,008,360 | $17,777,168.53 | $15,264,281.89 |
| 2022 | 66,484 | $20,008,360 | $17,259,386.92 | $14,265,684.01 |
| 2023 | 66,484 | $20,008,360 | $16,756,686.33 | $13,332,414.96 |
| 2024 | 66,484 | $20,008,360 | $16,268,627.51 | $12,460,200.90 |
| 2025 | 66,484 | $20,008,360 | $15,794,783.99 | $11,645,047.57 |

37

AR001278

| | | | | |
|---|---|---|---|---|
| 2026 | 66,484 | $20,008,360 | $15,334,741.74 | $10,883,222.03 |
| 2027 | 66,484 | $20,008,360 | $14,888,098.77 | $10,171,235.54 |
| Total | | $200,083,598 | $170,675,367.53 | $140,530,346.56 |
| Annualized Cost | | | $24,313,796.52 | $23,534,302.70 |

Based on these estimates, ATF estimates that the undiscounted value of forgone future sales over 10 years would be $200.1 million, undiscounted, or $24.3 million and $23.5 million, annualized and discounted at 3% and 7%.

Disposal

This proposed rule would require the destruction of existing bump-stock-type devices. The cost of disposal would have several components. For individuals who own bump-stock-type devices, there would be a cost for the time and effort to destroy the devices or ensure that they are destroyed by another party. For retailers, wholesalers, and manufacturers, there would be a cost of the time and effort to destroy or ensure the destruction of any devices held in inventory. Based on the response from public comments, it is not clear if there would also be a cost from the lost value of that inventory.

Individuals who have purchased bump-stock-type devices prior to the implementation of this rule would have the option of destroying the devices themselves, turning the devices in to the nearest ATF office for destruction by ATF or, subject to compliance with U.S. Mail regulations and the policies of commercial shipment services, sending the devices to ATF through the U.S. Mail or other commercial delivery service. Options for destroying the devices may include melting, crushing, or shredding in a manner that renders the device incapable of ready restoration. Since the majority of bump-stock-type devices are made of plastic material, individuals wishing to destroy the

38

devices themselves could simply use a hammer to break apart the devices and throw the pieces away.  Other destruction options that ATF has historically accepted include torch cutting or sawing the device in a manner that removes at least ¼ inch of material for each cut and completely severs design features critical to the functionality of the device as a bump-stock-type device.

If a possessor chooses to turn in the device to the local ATF office, the cost to the public to destroy the device would be the cost to drive to the nearest ATF office, the cost of sending through the U.S. Mail, or the cost of sending via private shipper.  For the purposes of this regulatory analysis, ATF assumes that most individuals disposing of their existing bump-stock-type devices would destroy these devices themselves rather than turn them into the nearest ATF office through personal delivery, mail, or private shipper.

Should this rule take effect, public comments suggest that unsellable inventory could be worth approximately $35,000 per large retailer.  One public commenter, assumed to be a large retailer, stated that its gross sales were $140,000.  Another public commenter assumed to be a midrange retailer had gross sales of $18,000.  No known sales were reported for a small retailer.  Based on the proportion of sales among the large, midrange, and small retailers, ATF estimates that the amount in existing inventory for a midrange retailer would be $4,500 and, for a small retailer, $74.[17]

The retailer, assumed to be large, also commented that the opportunity cost of time needed to destroy existing inventory would be approximately $700.  ATF's subject matter experts estimate that a retailer could use a maintenance crew to destroy existing

---

[17] Midrange: $4,500 = ($18,000 / $140,000) * $35,000.  Small: $74 = (8 / 3,800) * $35,000.

AR001280

inventory. To determine the hourly time needed to destroy existing inventory, ATF used the $700 reported amount, divided by the loaded wage rate of a building cleaning worker. ATF subject matter experts also suggest that existing packers would be used for a midrange retailer and the minimum wage would be used for a small retailer. The loaded rate of 1.43 was used to account for fringe benefits.[18] Table 6 provides the wages used for this analysis.

Table 6. Wage Series to Destroy Existing Inventory

| Wage Series | Series Code | Unloaded Wage Rate | Loaded Wage Rate | Source |
|---|---|---|---|---|
| Individual | | $13.60 | $13.60 | https://www.transportation.gov/sites/dot.gov/files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf |
| Minimum Wage Rate | Min Wage | $7.25 | $10.40 | https://www.bls.gov/opub/reports/minimum-wage/2016/home.htm |
| Packers, Packagers, and Handlers | 53-7064 | $11.74 | $16.84 | https://www.bls.gov/oes/2016/may/oes537064.htm |
| Retail Salespersons | 41-2031 | $13.07 | $18.75 | https://www.bls.gov/oes/2016/may/oes412031.htm |
| Building Cleaning Workers, All Other | 37-2019 | $14.88 | $21.34 | https://www.bls.gov/oes/2016/may/oes372019.htm |

Based on the estimated wages and reported opportunity cost of time, ATF estimates that it would take a large retailer 32.8 hours, a midrange retailer 0.45 hours, and a small retailer 0.25 hours to destroy existing inventory. Table 7 provides the per-retailer estimated opportunity cost of time.

Table 7. Opportunity Cost of Time to Destroy Existing Inventory

---

[18] BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $32.35) / (Private Industry Wages and Salaries = $22.55) = 1.43. BLS average 2016. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

AR001281

| Population | Incremental Cost | Hourly Burden | Opportunity Cost of Time |
|---|---|---|---|
| Individual | $13.60 | 0.25 | $3.40 |
| Retailer (Large) | $21.34 | 32.8 | $699.95 |
| Retailer (Midrange) | $16.84 | 0.45 | $7.58 |
| Retailer (Small) | $19.51 | 0.25 | $4.88 |

As stated earlier, ATF estimates that there are 519,927 bump-stock-type devices already purchased by the public. Based on the opportunity cost of time per bump-stock-type device, and the estimated opportunity cost of time per retailer, ATF provides the cost to destroy all existing bump-stock-type devices in Table 8.

Table 8. Opportunity Cost of Time to Destroy Existing
Devices by Individual and Retailer Size

| Individual | $1,768,000 |
|---|---|
| Retailer (Large) | $2,800 |
| Retailer (Midrange) | $5,752 |
| Retailer (Small) | $3,947 |
| **Total Disposal Cost** | **$1,780,498** |

ATF estimates that it would cost a total of $1.8 million to destroy all existing bump-stock-type devices.

We treat all costs of disposal of existing devices owned by individuals or held in inventory by retailers or manufacturers as if they occur in 2018. Therefore, the costs of the rule in 2018 would include the total undiscounted value of existing stock of bump-stock-type devices in Table 4 ($96.2 million), the year 2018 loss of future production from Table 5 ($20.0 million), and the total cost of disposal from Table 8 ($1.8 million). Overall, ATF estimates that the total cost of this proposed rule would be $297.2 million over a 10-year period of future analysis. This cost includes the first-year cost to destroy

41

AR001282

all existing bump-stock-type devices, including unsellable inventory and opportunity cost
of time.  Table 9 provides the 10-year cost of this proposed rule.

Table 9. 10-Year Cost of Proposed Rule

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| 2018 | $118,031,608 | $111,256,111 | $103,093,378 |
| 2019 | $20,008,360 | $18,310,484 | $16,332,782 |
| 2020 | $20,008,360 | $17,777,169 | $15,264,282 |
| 2021 | $20,008,360 | $17,259,387 | $14,265,684 |
| 2022 | $20,008,360 | $16,756,686 | $13,332,415 |
| 2023 | $20,008,360 | $16,268,628 | $12,460,201 |
| 2024 | $20,008,360 | $15,794,784 | $11,645,048 |
| 2025 | $20,008,360 | $15,334,742 | $10,883,222 |
| 2026 | $20,008,360 | $14,888,099 | $10,171,236 |
| 2027 | $20,008,360 | $14,454,465 | $9,505,828 |
| Total | $298,106,846 | $258,100,553 | $216,954,074 |
| Annualized Cost | | $36,768,073 | $36,332,813 |

As stated in the paragraph above, the total undiscounted cost is $297.2 million,
and the discounted costs would be $36.8 million and $36.3 million annualized at 3% and
7% respectively.

Government costs

Government costs are estimated as *de minimis* because collection of the bump-
stock-type devices by ATF would be an ancillary duty of existing ATF Special Agents.

**Cost Savings**

ATF did not calculate any cost savings for this proposed rule.

**Benefits**

As reported by public comments, this proposed rule would affect the criminal use
of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident.

42

AR001283

The purpose of this rule is to amend ATF regulations to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA. Banning bump-stock-type devices could reduce casualties in an incident involving a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to incidents, because it prevents shooters from using a device that allows them to shoot a semiautomatic firearm automatically.

**Alternatives**

Alternative 1—No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes to regulations, there would be no cost, savings, or benefits to this alternative.

Alternative 2—Patronizing a shooting range. Individuals wishing to experience the shooting of a "full-auto" firearm could go to a shooting range that provides access to lawfully registered "pre-1986" machineguns to customers, where the firearm remains on the premises and under the control of the shooting range. ATF does not have the information to determine which, where, or how many gun ranges provide such a service and is therefore not able to quantify this alternative.

Alternative 3—Opportunity alternatives. Based on public comments, individuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger finger to fire more rapidly. To the extent that individuals are capable of doing so, this would be their alternative to using bump-stock-type devices.

No other feasible alternatives were identified, and thus none were considered.

*B. Executive Order 13132*

43

AR001284

This regulation will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*C. Executive Order 12988*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (Civil Justice Reform).

*D. Regulatory Flexibility Act (RFA)*

**Summary of Findings**

ATF performed an Initial Regulatory Flexibility Analysis of the impacts on small businesses and other entities from the NPRM. Based on the information from this analysis, ATF found:

• It is estimated that of the two remaining manufacturers, at least one manufacturer only produces bump-stock-type devices and therefore could completely go out of business:

• There are 2,281 retailers, of which most are estimated to be small;

• There are no relevant government entities.

**Initial Regulatory Flexibility Analysis**

The Regulatory Flexibility Act (RFA) establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To

44

achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." Pub. L. 96-354, § 2(b), 94 Stat. 1164 (1980).

Under the RFA, the agency is required to consider if this rule will have a significant economic impact on a substantial number of small entities. Agencies must perform a review to determine whether a rule will have such an impact. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

Under the RFA (5 U.S.C. 603(b)-(c)), the regulatory flexibility analysis must provide and/or address:

  • A description of the reasons why action by the agency is being considered;

  • A succinct statement of the objectives of, and legal basis for, the proposed rule;

  • A description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

  • A description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

  • An identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule; and

  • Descriptions of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.

45

AR001286

The RFA covers a wide range of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. 5 U.S.C. 601(3)-(6). ATF determined that the rule affects a variety of large and small businesses (see the "Description of the Potential Number of Small Entities" section below). Based on the requirements above, ATF prepared the following regulatory flexibility analysis assessing the impact on small entities from the rule.

**A description of the reasons why action by the agency is being considered**

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning regulatory action is the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This proposed rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that it could be used for criminal purposes. This poses a public safety issue, which the Department is trying to address.

**A succinct statement of the objectives of, and legal basis for, the proposed rule**

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.

**A description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply**

46

This rule would affect primarily manufacturers of bump-stock-type devices, FFLs that sell bump-stock-type devices, and other small retailers of firearm accessories that have invested in the bump-stock-type device industry. Based on publicly available information, there are two manufacturers affected. Of the known retailers, the large retailers do not intend to continue selling bump-stock-type devices. There may be some small retailers that would intend to continue selling these devices should this proposed rule not go into effect and would thus be affected by this proposed rule. Based on the information from this analysis, ATF found:

- There are 2,270 retailers who are likely to be small entities;
- There are no government jurisdictions affected by this proposed rule; and
- There are no nonprofits found in the data.

**A description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record**

There are no reporting or recordkeeping requirements for this proposed rule. The only relevant compliance requirement consists of disposing of all existing inventory of bump-stock-type devices for small entities that carry them. There would not be any professional skills necessary to record or report in this proposed rulemaking.

**An identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule**

This proposed rule does not duplicate or conflict with other Federal rules.

47

AR001288

**Descriptions of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities**

Alternatives were considered in this proposed rule. Alternatives include making no regulatory changes. ATF rejected this alternative because it does not address the public safety concerns raised by bump-stock-type devices, and would not be consistent with ATF's interpretation of the statutory term "machinegun." There were no other regulatory alternatives to this proposal that ATF has been able to identify that would accomplish the intent of this proposed rule.

*E. Small Business Regulatory Enforcement Fairness Act of 1966*

This rule is a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 804. This rule is likely to be considered major as it is economically significant and is projected to have an effect of over $100 million on the economy in at least the first year of the rule.

*F. Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Pub. L. 104-4, 109 Stat. 48.

*G. Paperwork Reduction Act of 1995*

This final rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act, 44 U.S.C. 3501-3521.

48

## VII. Public Participation

### A. Comments Sought

ATF requests comments on the proposed rule from all interested persons. ATF specifically requests comments on the scope of this proposed rule and the definition of "machinegun." ATF also requests comments on the costs and benefits of the proposed rule and on the appropriate methodology and data for calculating those costs and benefits. Further, ATF requests public comment on the reasonableness of the assumption that retailers of bump-stock-type devices are likely to be businesses with an online presence. In addition, ATF specifically requests comments regarding how ATF should address bump-stock-type devices that private parties currently possess, and the appropriate means of implementing a final rule.

All comments must reference the docket number ATF 2017R-22, be legible, and include the commenter's complete first and last name and full mailing address. ATF will not consider, or respond to, comments that do not meet these requirements or comments containing profanity. In addition, if ATF cannot read your comment due to technical difficulties and cannot contact you for clarification, ATF may not be able to consider your comment.

ATF will carefully consider all comments, as appropriate, received on or before the closing date, and will give comments received after that date the same consideration if it is practical to do so, but assurance of consideration cannot be given except as to comments received on or before the closing date. ATF will not acknowledge receipt of comments.

### B. Confidentiality

49

AR001290

ATF will make all comments, whether submitted electronically or on paper, available for public viewing at ATF and on the Internet as part of the eRulemaking initiative, and subject to the Freedom of Information Act. Commenters who do not want their name or other personal identifying information posted on the Internet should submit comments by mail or facsimile, along with a separate cover sheet containing their personal identifying information. Both the cover sheet and comment must reference this docket number (ATF 2017R-22). Information contained in the cover sheet will not appear on the Internet. ATF will not redact personal identifying information that appears within the comment, and it will appear on the Internet.

The commenter should not include material that he or she considers inappropriate for disclosure to the public. Any person submitting a comment shall specifically designate that portion (if any) of the comment that contains material that is confidential under law (e.g., trade secrets, processes). The commenter shall set forth any portion of a comment that is confidential under law on pages separate from the balance of the comment with each page prominently marked "confidential" at the top of the page.

Confidential information will be included in the rulemaking record but will not be disclosed to the public. Any comments containing material that is not confidential under law may be disclosed to the public. In any event, the name of the person submitting a comment is not exempt from disclosure.

C. *Submitting Comments*

Submit comments in any of three ways (but do not submit the same comments multiple times or by more than one method). Hand-delivered comments will not be accepted.

50

- *Federal eRulemaking Portal:* ATF strongly recommends that you submit your comments to ATF via the Federal eRulemaking portal. Visit http://www.regulations.gov and follow the instructions for submitting comments. Comments will be posted within a few days of being submitted. However, if large volumes of comments are being processed simultaneously, your comment may not be viewable for up to several weeks. Please keep the comment tracking number that regulations.gov provides after you have successfully uploaded your comment.

- *Mail:* Send written comments to the address listed in the **ADDRESSES** section of this document. Written comments must appear in minimum 12-point font size (.17 inches), include the commenter's complete first and last name and full mailing address, be signed, and may be of any length.

- *Facsimile:* Submit comments by facsimile transmission to (202) 648-9741. Faxed comments must:

    (1) Be legible and appear in minimum 12-point font size (.17 inches);

    (2) Be on 8½" x 11" paper;

    (3) Be signed and contain the commenter's complete first and last name and full mailing address; and

    (4) Be no more than five pages long.

*D. Request for Hearing*

Any interested person who desires an opportunity to comment orally at a public hearing should submit his or her request, in writing, to the Director of ATF within the 90-day comment period. The Director, however, reserves the right to determine, in light of all circumstances, whether a public hearing is necessary.

51

**Disclosure**

Copies of this notice and the comments received will be available at

http://www.regulations.gov (search for Docket No. 2017R-22) and for public inspection

by appointment during normal business hours at: ATF Reading Room, Room 1E-063, 99

New York Ave., NE, Washington, DC  20226; telephone: (202) 648-8740.

**List of Subjects**

**27 CFR Part 447**

Administrative practice and procedure, Arms and munitions, Chemicals, Customs

duties and inspection, Imports, Penalties, Reporting and recordkeeping requirements,

Scientific equipment, Seizures and forfeitures.

**27 CFR Part 478**

Administrative practice and procedure, Arms and munitions, Customs duties and

inspection, Exports, Imports, Intergovernmental relations, Law enforcement officers,

Military personnel, Penalties, Reporting and recordkeeping requirements, Research,

Seizures and forfeitures, Transportation.

**27 CFR Part 479**

Administrative practice and procedure, Arms and munitions, Excise taxes, Exports,

Imports, Military personnel, Penalties, Reporting and recordkeeping requirements,

Seizures and forfeitures, Transportation.

**Authority and Issuance**

Accordingly, for the reasons discussed in the preamble, 27 CFR parts 447, 478,

and 479 are proposed to be amended as follows:

52

PART 447--IMPORTATION OF ARMS, AMMUNITION AND IMPLEMENTS OF WAR

1. The authority citation for 27 CFR part 447 continues to read as follows:

**Authority:** 22 U.S.C. 2778, E.O. 13637, 78 FR 16129 (Mar. 8, 2013).

2. In § 447.11, amend the definition of "Machinegun" to read as follows:

**§ 447.11 Meaning of terms.**

\*          \*          \*          \*          \*

*Machinegun.* A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machinegun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

53

AR001294

\*　　　\*　　　\*　　　\*　　　\*

## PART 478--COMMERCE IN FIREARMS AND AMMUNITION

3. The authority citation for 27 CFR part 478 continues to read as follows:

**Authority**: 5 U.S.C. 552(a); 18 U.S.C. 921-931.

4. In § 478.11, amend the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

### § 478.11 Meaning of terms.

\*　　　\*　　　\*　　　\*　　　\*

*Machine gun.*

\* \* \* For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*　　　\*　　　\*　　　\*　　　\*

## PART 479--MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

5. The authority citation for 27 CFR part 479 continues to read as follows:

**Authority:** 26 U.S.C. 7805.

54

6. In § 479.11, amend the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

### § 479.11 Meaning of terms.

\*       \*       \*       \*       \*

*Machine gun.*

\* \* \* For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*       \*       \*       \*       \*

Dated: March 23, 2018.

_____
Jefferson B. Sessions III,
Attorney General.

55

AR001296

presentation also addressed, among other things, followup information related to Workshop I topics, including part 207 (registration and listing) and parts 210 and 211 (current good manufacturing practice), including the possibility of one or more separate CFR sections for designated medical gases, as well as additional topics including the certification process for designated medical gases and issues related to the filling of oxygen containers by emergency medical service (EMS) providers and health care facilities. FDA also heard comments on additional regulations and medical gas issues as time allowed.

The Agency has determined that we will hold a third workshop to have additional comments from stakeholders regarding the issues discussed at Workshops I and II, as well as any additional topics related to medical gas regulation that stakeholders may wish to discuss, as time allows. This workshop is primarily intended to build on the discussion from the previous workshops, as well as written comments submitted to the docket.

During Workshop III (May 11, 2018), FDA intends to provide designated panel time for followup discussion of several topics raised at previous workshops, and for an open panel to discuss any additional issues related to medical gas regulation that are of interest to FDA or other workshop participants. The topics for designated panel time include further consideration of potential changes to: Part 201 (labeling); parts 210 and 211 (current good manufacturing practice); part 207 (registration and listing); and parts 310, 314, and 514 (postmarket reporting of adverse drug experiences, including adverse reactions and medication errors); including the possibility of one or more separate CFR sections for designated medical gases. Potential topics for open panel time include, but are not limited to: The certification process for designated medical gases; issues related to the filling of oxygen containers by EMS providers and health care facilities; or other topics of interest to stakeholders.

### III. Participating in the Public Workshop

*Registration and Requests for Oral Presentations:* If you wish to a make an oral presentation, you must register by submitting your name, title, firm name, address, telephone, email address, and Fax number to *MedgasPublicWorkshops@fda.hhs.gov* (see **FOR FURTHER INFORMATION CONTACT**) by May 4, 2018, for Workshop III. Please also indicate the type of organization

you represent (*e.g.,* industry, consumer organization) and a brief summary of your remarks (including the discussion topic(s) that you would like to address).

FDA will try to accommodate all persons who wish to make a presentation; however, the duration of each speaker's presentation may be limited by time constraints. FDA will notify registered presenters of their scheduled presentation times. Persons registered to speak should check in before the workshop and are encouraged to arrive early to ensure their designated order of presentation. Participants who are not present when called may not be permitted to speak at a later time. An agenda will be made available at least 3 days before the workshop at *https:// www.fda.gov/Drugs/NewsEvents/ ucm582091.htm.* FDA may also post specific questions for consideration at the meeting web page; these will be made available at least 3 days before the workshop at *https://www.fda.gov/ Drugs/NewsEvents/ucm582091.htm.*

*Streaming Webcast of the Public Workshops:* This public workshop will be webcast; the URL will be posted at *https://www.fda.gov/Drugs/NewsEvents/ ucm582091.htm* at least 1 day before the workshop. A video record of the public workshops will be available at the same website address for 1 year. If you need special accommodations because of a disability, please contact *MedgasPublicWorkshops@fda.hhs.gov* (or see **FOR FURTHER INFORMATION CONTACT**) at least 7 days in advance of the workshop.

Dated: March 21, 2018.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2018–06251 Filed 3–28–18; 8:45 am]

**BILLING CODE 4164–01–P**

---

### DEPARTMENT OF JUSTICE

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

**27 CFR Parts 447, 478, and 479**

**[Docket No. 2017R–22; AG Order No. 4132–2018]**

**RIN 1140–AA52**

**Bump-Stock-Type Devices**

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Department of Justice.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Department of Justice (Department) proposes to amend the Bureau of Alcohol, Tobacco, Firearms, and Explosives regulations to clarify

that "bump fire" stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are "machineguns" as defined by the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA), because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. With limited exceptions, primarily as to government agencies, the GCA makes it unlawful for any person to transfer or possess a machinegun unless it was lawfully possessed prior to the effective date of the statute. The bump-stock-type devices covered by this proposed rule were not in existence prior to the GCA's effective date, and therefore would fall within the prohibition on machineguns if this Notice of Proposed Rulemaking (NPRM) is implemented. Consequently, current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the final rule.

**DATES:** Written comments must be postmarked and electronic comments must be submitted on or before June 27, 2018. Commenters should be aware that the electronic Federal Docket Management System will not accept comments after midnight Eastern Daylight Time on the last day of the comment period.

**ADDRESSES:** You may submit comments, identified by docket number ATF 2017R–22, by any of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the directions for submitting comments.

• *Fax:* (202) 648–9741.

• *Mail:* Vivian Chu, Mailstop 6N–518, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Ave. NE, Washington DC 20226. *ATTN: 2017R–22.*

*Instructions:* All submissions received must include the agency name and docket number for this notice of proposed rulemaking. All properly

AR001297

completed comments received will be posted without change to the Federal eRulemaking portal, *http://www.regulations.gov,* including any personal information provided. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" section of this document.

**FOR FURTHER INFORMATION CONTACT:** Vivian Chu, Office of Regulatory Affairs, Enforcement Programs Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE, Washington DC 20226; telephone: (202) 648–7070.

**SUPPLEMENTARY INFORMATION:** On October 1, 2017, a shooter attacked a large crowd attending an outdoor concert in Las Vegas, Nevada. By using several AR-type rifles with attached bump-stock-type devices, the shooter was able to fire several hundred rounds of ammunition in a short period of time, killing 58 people and injuring over 800. The bump-stock-type devices recovered from the hotel room from which the shooter conducted the attack included two distinct, but functionally equivalent, model variations from the same manufacturer. These devices were readily available in the commercial marketplace through online sales directly from the manufacturer, and through multiple retailers. The manufacturer of these devices is the primary manufacturer and seller of bump-stock-type devices; it has obtained multiple patents for its designs, and has rigorously enforced the patents to prevent competitors from infringing them. Consequently, at the time of the attack, very few competing bump-stock-type devices were available in the marketplace.

The devices used in Las Vegas and the other bump-stock-type devices currently available on the market all utilize essentially the same functional design. They are designed to be affixed to a semiautomatic long gun (most commonly an AR-type rifle or an AK-type rifle) in place of a standard, stationary rifle stock, for the express purpose of allowing "rapid fire" operation of the semiautomatic firearm to which they are affixed. They are configured with a sliding shoulder stock molded (or otherwise attached) to a pistol-grip/handle (or "chassis") that includes an extension ledge (or "finger rest") on which the shooter places the trigger finger while shooting the firearm. The devices also generally include a detachable rectangular receiver module (or "bearing interface") that is placed in

the receiver well of the device's pistol-grip/handle to assist in guiding and regulating the recoil of the firearm when fired.

These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

In general, bump-stock-type devices—including those currently on the market with the characteristics described above—are designed to channel recoil energy to increase the rate of fire of semiautomatic firearms from a single trigger pull. Specifically, they are designed to allow the shooter to maintain a continuous firing cycle after a single pull of the trigger by directing the recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths. Ordinarily, to operate a semiautomatic firearm, the shooter must repeatedly pull and release the trigger to allow it to reset, so that only one shot is fired with each pull of the trigger. When a bump-stock-type device is affixed to a semiautomatic firearm, however, the device harnesses the recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter. The bump-stock-type device functions as a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed). No further physical manipulation of the trigger by the shooter is required.

In 2006, ATF concluded that certain bump-stock-type devices qualified as machineguns under the GCA and NFA. Specifically, ATF concluded that devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns. Between 2008 and 2017, however, ATF also issued classification

decisions concluding that other bump-stock-type devices were not machineguns, including a device submitted by the manufacturer of the bump-stock-type devices used in the Las Vegas shooting. Those decisions did not include extensive legal analysis relating to the definition of "machinegun." Nonetheless, they indicated that semiautomatic firearms modified with these bump-stock-type devices did not fire "automatically," and were thus not "machineguns," because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy. ATF has now determined that that conclusion does not reflect the best interpretation of the term "machinegun" under the GCA and NFA. In this proposed rule, the Department accordingly interprets the definition of "machinegun" to clarify that all bump-stock-type devices are "machineguns" under the GCA and NFA because they convert a semiautomatic firearm into a firearm that shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

## I. Background

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.[1] This includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(ii), 7805(a). The Attorney General has delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 CFR 0.130(a)(1)–(2). The Department and ATF have promulgated regulations implementing both the GCA and the NFA. *See* 27 CFR pts. 478, 479. In particular, while still part of the Department of the Treasury, ATF for decades promulgated rules governing "the procedural and substantive requirements relative to the importation, manufacture, making, exportation, identification and registration of, and the dealing in, machine guns." 27 CFR 479.1; *see, e.g., United States* v. *Dodson,* 519 F. App'x 344, 348–49 & n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the NFA's definition of

[1] NFA provisions still refer to the "Secretary of the Treasury." 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, for ease of reference, this notice refers to the Attorney General.

"machinegun"); *F.J. Vollmer Co.* v. *Higgins*, 23 F.3d 448, 449–51 (D.C. Cir. 1994) (upholding an ATF determination regarding machinegun receivers). Courts have recognized ATF's leading regulatory role with respect to firearms, including in the specific context of classifying devices as machineguns under the NFA. *See, e.g., York* v. *Sec'y of Treasury*, 774 F.2d 417, 419–20 (10th Cir. 1985).

The GCA defines "machinegun" by referring to the NFA definition,[2] which includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The term "machinegun" also includes the frame or receiver of any such weapon or any part, or combination of parts, designed and intended for use in converting a weapon into a machinegun, and "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.* With limited exceptions, the GCA prohibits the transfer or possession of machineguns under 18 U.S.C. 922(o).[3]

In 1986, Congress passed the Firearm Owners' Protection Act (FOPA), Pub. L. 99–308, 100 Stat. 449, which included a provision that effectively froze the number of legally transferrable machineguns to those that were registered before May 19, 1986. 18 U.S.C. 922(o). Due to the fixed universe of "pre-1986" machineguns that may be lawfully transferred by nongovernmental entities, the value of those machineguns has steadily increased over time. For example, the current average price range for pre-1986 fully automatic versions of AR-type rifles is between $20,000 and $30,000, while the price range for semiautomatic versions of these rifles is between $600 and $2,500.[4]

This price premium on automatic weapons has spurred inventors and manufacturers to attempt to develop firearms, triggers, and other devices that permit shooters to use semiautomatic rifles to replicate automatic fire without converting these rifles into "machineguns" under the GCA and NFA. ATF began receiving classification requests for such firearms, triggers, and

other devices in the period from 1988 to 1990. ATF has observed a significant increase in such requests since 2004, often in connection with rifle models that were, until 2004, defined as "semiautomatic assault weapons" and prohibited under the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. 921(a)(30) (commonly known as the Federal Assault Weapons Ban) (repealed effective Sept. 13, 2004). Consistent with ATF's experience, the inventor and manufacturer of the bump-stock-type devices used in the Las Vegas shooting has attributed his innovation of those products specifically to the high cost of fully automatic firearms. In a 2011 interview, he stated that he developed the original device because he "couldn't afford what [he] wanted—a fully automatic rifle—so . . . [he made] something that would work and be affordable."[5]

## II. ATF's Determinations Regarding Bump-Stock-Type Devices

Shooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearm's cyclic firing rate to mimic automatic fire. Such devices are designed principally to increase the rate of fire of semiautomatic firearms. These devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's recoil either through a mechanism like an internal spring or in conjunction with the shooter's maintenance of pressure (typically constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger).

As noted above, ATF has regulated some of these devices as machineguns. Other bump-stock-type devices currently on the market, however, have not been regulated by ATF as machineguns under the GCA or NFA, and thus have not typically been marked with a serial number and other identification markings. Individuals therefore may purchase these devices without undergoing a background check or complying with any other federal regulations applicable to firearms.

### A. ATF's Interpretation of "Single Function of the Trigger"

In 2002, an inventor submitted a device known as the "Akins Accelerator" to ATF for classification. To operate the Akins Accelerator, the

shooter initiated an automatic firing sequence by pulling the trigger one time, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset. Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger, which caused the weapon to discharge the ammunition. The recoil and the spring-powered device thus caused the firearm to cycle back and forth, impacting the trigger finger, which remained rearward in a constant pull without further input by the shooter while the firearm discharged multiple shots. The device was advertised as able to fire approximately 650 rounds per minute. *See* ATF Ruling 2006–2, at 2.

ATF's classification of the Akins Accelerator focused on application of the "single function of the trigger" prong of the statutory definition of "machinegun." In an initial assessment of the Akins Accelerator, ATF concluded that the device did not qualify as a machinegun because ATF interpreted "single function of the trigger" to mean a single *movement* of the trigger itself. In 2006, however, ATF undertook a further review of the Akins Accelerator based on how it actually functioned when sold. ATF determined that the Akins Accelerator was properly classified as a machinegun because the best interpretation of the phrase "single function of the trigger" was a "single pull of the trigger."[6] The Akins Accelerator thus qualified as a machinegun because ATF determined through testing that when the device was installed on a semiautomatic rifle (specifically a Ruger Model 10–22), it resulted in a weapon that "[with] a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted." *Akins* v. *United States*, No. 8:08–cv–988, slip op. at 5 (M.D. Fla. Sept. 23, 2008) (internal quotation marks omitted).

---

[2] 18 U.S.C. 921(a)(23).

[3] Regulations implementing the GCA and the NFA spell the term "machine gun" rather than "machinegun." *E.g.,* 27 CFR 478.11, 479.11. For convenience, this notice uses "machinegun" except when quoting a source to the contrary.

[4] These figures are based on a review of prices posted on websites maintained by federal firearms licensees on March 1, 2018.

[5] Donald A. Lucas, *Firing Up Some Simple Solutions,* Albany News (Dec. 22, 2011), *http://www.thealbanynews.net/archives/2443.*

[6] In classifying the Akins Accelerator, ATF used the term "pull" specifically because that was the manner in which the firearm's trigger was activated with the device. For purposes of analyzing firearms and devices designed for use on firearms, however, the term "pull" is interchangeable with terminology describing all trigger activations, including a push or a flip of a switch. *See, e.g., United States* v. *Fleischli,* 305 F.3d 643, 655–56 (7th Cir. 2002) (finding that a "trigger is a mechanism used to initiate a firing sequence," and rejecting the argument that a "switch" could not be a trigger, because such a definition would "lead to the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing" (internal quotation marks omitted))

AR001299

In conjunction with its reclassification of the Akins Accelerator, ATF published ATF Ruling 2006–2, "Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm." The Ruling explained that ATF had received requests from "several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm." ATF Ruling 2006–2, at 1. After setting forth a detailed description of the components and functionality of the Akins Accelerator and devices with similar designs, ATF Ruling 2006–2 determined that the phrase "single function of the trigger" in the statutory definition of "machinegun" was best interpreted to mean a "single pull of the trigger." *Id.* at 2 (citing *National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives*, 73rd Cong., at 40 (1934)). ATF further indicated that it would apply this interpretation to its classification of devices designed to increase the rate of fire of semiautomatic firearms. Thus, ATF concluded in Ruling 2006–2 that devices exclusively designed to increase the rate of fire of semiautomatic firearms are machineguns if, "when activated by a single pull of the trigger, [such devices] initiate[] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." *Id.* at 3. Finally, because the "single pull of the trigger" interpretation constituted a change from ATF's prior interpretations of the phrase "single function of the trigger," Ruling 2006–2 concluded that "[t]o the extent previous ATF rulings are inconsistent with this determination, they are hereby overruled." *Id.*

Following its reclassification of the Akins Accelerator as a machinegun, ATF determined that removal and disposal of the internal spring would render the device a non-machinegun under the statutory definition. Hence, ATF advised individuals who had purchased the Akins Accelerator that they had the option of removing and disposing of the internal spring, thereby placing the device outside the classification of machinegun and allowing the purchaser/possessor to retain the device in lieu of destroying or surrendering the device.

The inventor of the Akins Accelerator filed a complaint against the United States in May 2008, challenging the classification of the device as a machinegun as arbitrary and capricious under the Administrative Procedure Act. *Akins* v. *United States*, No. 8:08–cv–988, slip op. at 7–8 (M.D. Fla. Sept.

23, 2008). The United States District Court for the Middle District of Florida rejected the plaintiff's challenge, holding that ATF was within its authority to reconsider and change its interpretation of the phrase "single function of the trigger" in the NFA's statutory definition of machinegun. *Id.* at 14. The court further held that the language of the statute and the legislative history supported ATF's interpretation of the statutory phrase "single function of the trigger" as synonymous with a "single pull of the trigger." *Id.* at 11–12. The court concluded that in Ruling 2006–2, ATF had set forth a "'reasoned analysis'" for the application of that new interpretation to the Akins Accelerator and similar devices, including the need to "protect the public from dangerous firearms." *Id.* at 12.

The United States Court of Appeals for the Eleventh Circuit affirmed the district court's decision, holding that "[t]he interpretation by the Bureau that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Akins* v. *United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam). The Eleventh Circuit further concluded that "[b]ased on the operation of the Accelerator, the Bureau had the authority to 'reconsider and rectify' what it considered to be a classification error." *Id.*

In ten letter rulings between 2008 and 2017, ATF assessed other bump-stock-type devices. Like the Akins Accelerator, these other bump-stock-type devices allowed the shooter to fire more than one shot with a single pull of the trigger. As discussed below, however, ATF ultimately concluded that these devices did not qualify as machineguns because, in ATF's view, they did not "automatically" shoot more than one shot with a single pull of the trigger. ATF has also applied the "single pull of the trigger" interpretation to other trigger actuators, two-stage triggers, and other devices submitted to ATF for classification. Depending on the method of operation, some such devices were classified to be machineguns that were required to be registered in the National Firearms Registration and Transfer Record.[7]

---

[7] Examples of recent ATF classification letters relying on the "single pull of the trigger" interpretation to classify submitted devices as machineguns include the following:

On April 13, 2015, ATF issued a classification letter regarding a device characterized as a "positive reset trigger," designed to be used on a semiautomatic AR-style rifle. The device consisted of a support/stock, secondary trigger, secondary trigger link, pivot toggle, shuttle link, and shuttle

*B. ATF's Interpretation of "Automatically"*

Prior ATF rulings concerning bump-stock-type devices have not provided substantial legal analysis regarding the meaning of the term "automatically" as it is used in the GCA and NFA. Moreover, ATF's prior rulings concerning such devices have applied different understandings of the term "automatically." ATF Ruling 2006–2 concluded that devices like the Akins Accelerator initiated an "automatic" firing cycle because, once initiated by a single pull of the trigger, "the automatic firing cycle continues until the finger is released or the ammunition supply is exhausted." ATF Ruling 2006–2, at 1. ATF letter rulings between 2008 and 2017, however, concluded that bump-stock-type devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter do not fire "automatically." Some of these rulings concluded that such devices were not machineguns because they did not "initiate[] an automatic firing cycle that continues either the finger is released or the ammunition supply is exhausted," without further defining the term "automatically." *E.g.*, Letter for Michael Smith from ATF's Firearm Technology Branch Chief (April 2, 2012). Other rulings instead concluded

ATF determined that, after a single pull of the trigger, the device utilized recoil energy generated from firing a projectile to fire a subsequent projectile. ATF noted that "a 'single function of the trigger' is a single pull," and that the device utilized a "single function of the trigger" because the shooter need not release the trigger to fire a subsequent projectile, and instead "can maintain constant pressure through a single function of the trigger."

On October 7, 2016, ATF issued a classification letter regarding two devices described as "LV-15 Trigger Reset Devices." The devices, which were designed to be used on an AR-type rifle, were essentially identical in design and function and were submitted by the same requestor (but the requestor, the second device included "small improvements that have come as the result of further development since the original submission"). The devices were each powered by a rechargeable battery and included the following components: a self-contained trigger mechanism with an electrical connection, a modified two-position semiautomatic AR-15 type selector lever, a rechargeable battery pack, a grip assembly/trigger guard with electrical connections, and a piston that projects forward through the lower rear portion of the trigger guard and pushes the trigger forward as the firearm cycles. ATF held that "to initiate the firing . . . a shooter must simply pull the trigger." It explained that although the mechanism pushed the trigger forward, "the shooter never releases the trigger. Consistent with [the requestor's] explanation, ATF demonstrated that the device fired multiple projectiles with a 'single function of the trigger' because a single pull was all that was required to initiate and maintain a firing sequence.

AR001300

Case 2:19-cv-00037-JNP   Document 59-23   Filed 11/30/22   PageID.1769   Page 64 of 75

that these bump-stock-type devices were not machineguns because they lacked any "automatically functioning mechanical parts or springs and perform[ed] no mechanical function[s] when installed," again without further defining the term "automatically" in this context. *E.g.,* Letter for David Compton from ATF's Firearm Technology Branch Chief (June 7, 2010).

**III. Las Vegas Mass Shooting and Requests To Regulate Bump-Stock-Type Devices**

Following the mass shooting in Las Vegas on October 1, 2017, ATF has received correspondence from members of the United States Senate and the United States House of Representatives, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition.

In response, on December 26, 2017, as an initial step in the process of promulgating a federal regulation interpreting the definition of "machinegun" with respect to bump-stock-type devices, ATF published an Advance Notice of Proposed Rulemaking (ANPRM) in the **Federal Register**. Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 FR 60929. The ANPRM was limited to soliciting comments concerning the market for bump-stock-type devices and manufacturer and retailer data. *Id.* at 60930–31. Public comment on the ANPRM concluded on January 25, 2018. While ATF received over 115,000 comments, the vast majority of these comments were not responsive to the ANPRM.

On February 20, 2018, President Trump issued a memorandum to Attorney General Sessions concerning "bump fire" stocks and similar devices. 83 FR 7949. The memorandum noted that the Department of Justice had already "started the process of promulgating a Federal regulation interpreting the definition of 'machinegun' under Federal law to clarify whether certain bump stock type devices should be illegal." *Id.* at 7949. The President then directed the Department of Justice, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM] and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.* Publication of this

NPRM is the next step in the process of promulgating such a rule.

Consistent with its authority to "'reconsider and rectify'" potential classification errors, *Akins,* 312 F. App'x at 200, ATF has reviewed its original classification determinations for bump-stock-type devices from 2008 to 2017 in light of its interpretation of the relevant statutory language, namely the definition of "machinegun." These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

ATF has now determined, based on its interpretation of the relevant statutory language, that these bump-stock-type devices, which harness recoil energy in conjunction with the shooter's maintenance of pressure, turn legal semiautomatic firearms into machineguns. Specifically, ATF has determined that these devices initiate an "automatic[]" firing cycle sequence "by a single function of the trigger" because the device is the primary impetus for a firing sequence that fires more than one shot with a single pull of the trigger. 26 U.S.C. 5845(b). ATF's classifications of bump-stock-devices between 2008 and 2017 did not include extensive legal analysis of these terms in concluding that the bump-stock-type devices at issue were not "machineguns." The statutory definition of machinegun includes bump-stock-type devices—irrespective of whether the devices harness recoil energy using a mechanism like an internal spring or in conjunction with the shooter's maintenance of pressure—because these devices enable a semiautomatic firearm to fire "automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* This proposed rule is the appropriate mechanism for ATF to set forth its analysis for its changed assessment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 57 (1983).

**IV. Advance Notice of Proposed Rulemaking**

Based on ATF's initial review of the comments it received on the ANPRM, the vast majority of comments concern

the legal authority to regulate bump-stock-type devices. Some of those comments opined that the Department has the power to regulate bump-stock-type devices. Most, however, contended that the Department lacks such authority, either because only Congress has the authority to regulate bump-stock-type devices or because the Second Amendment to the U.S. Constitution precludes any federal regulation of such devices.

The Department disagrees. Congress has granted the Attorney General authority to issue rules to administer the GCA and NFA, and the Attorney General has delegated to ATF the authority to administer and enforce those statutes and implementing regulations. *See supra* Part I. Because, with some exceptions, the possession of a machinegun is prohibited by the GCA, the Department is well within its authority to issue a rule that further clarifies and interprets the statutory definition of machinegun. Nor is regulation of bump-stock-type devices as machineguns inconsistent with the Second Amendment. The Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570 (2008), noted that the Second Amendment does not extend to "'dangerous and unusual weapons'" not in "'common use.'" *Id.* at 627. *Heller* further observed that it would be "startling" to conclude "that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id.* at 624. Since *Heller,* federal courts of appeals have repeatedly held that federal statutes prohibiting machineguns comport with the Second Amendment. *See, e.g., Hollis v. Lynch,* 827 F.3d 436, 451 (5th Cir. 2016) (upholding federal statute banning possession of machineguns because they are "dangerous and unusual and therefore not in common use"); *accord United States v. Henry,* 688 F.3d 637, 640 (9th Cir. 2012); *United States v. Marzzarella,* 614 F.3d 85, 94–95 (3d Cir. 2010); *Hamblen v. United States,* 591 F.3d 471, 472, 474 (6th Cir. 2009); *United States v. Fincher,* 538 F.3d 868, 874 (8th Cir. 2008). No court has interpreted *Heller* as encompassing a constitutional right to possess machineguns or machinegun conversion devices.

Numerous persons commented that bump-stock-type devices do not fall under the statutory definition of "machinegun because, when attached, they do not change the mechanical functioning of a semiautomatic firearm, and still require a separate trigger pull for each fired round." They noted that bump firing is a technique, and pointed to many other ways in which a shooter

**13447**

can increase a firearm's rate of fire without using a bump-stock-type device.

The Department disagrees. The relevant statutory question is whether a particular device causes a firearm to "shoot * * * automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). Bump firing and other techniques for increasing the rate of fire do not satisfy this definition because they do not produce an automatic firing sequence with a single pull of the trigger. Instead, bump firing without an assistive device requires the shooter to exert pressure with the trigger finger to re-engage the trigger for each round fired. The bump-stock-type devices described above, however, satisfy the definition. ATF's classification decisions between 2008 and 2017 did not reflect the best interpretation of the term "automatically" as used in the definition of "machinegun," because those decisions focused on the lack of mechanical parts like internal springs in the bump-stock-type devices at issue. The bump-stock-type devices at issue in those rulings, however, utilized the recoil of the firearm itself to maintain an automatic firing sequence initiated by a single pull of the trigger. As with the Akins Accelerator, the bump-stock-type devices at issue cause the trigger to "bump" into the finger, so that the shooter need not pull the trigger repeatedly to expel ammunition. As stated above, ATF previously focused on the trigger itself to interpret "single function of the trigger," but adopted a better legal and practical interpretation of "function" to encompass the shooter's activation of the trigger by, as in the case of the Akins Accelerator and other bump-stock-type devices, a single pull that causes the weapon to shoot until the ammunition is exhausted or the pressure on the trigger is removed. Because these bump-stock-type devices allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device, ATF has determined that bump-stock-type devices are machinegun conversion devices, and therefore qualify as machineguns under the GCA and the NFA. *See infra* Part V.

Commenters also argued that banning bump-stock-type devices will not significantly impact public safety. Again, the Department disagrees. The shooting in Las Vegas on October 1, 2017, highlighted the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict. The shooting also made many individuals aware that these devices exist—potentially

including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious. The proposed regulation aims to ameliorate that threat.

Some commenters objected to any regulation of bump-stock-type devices because, they argued, it will decrease innovation in the firearms accessories market and result in the loss of manufacturing and associated jobs. They suggested that the Federal Government should prevent the misuse of firearms through other means, such as by enforcing existing firearms laws, preventing mentally ill persons from acquiring weapons, and enacting more stringent criminal penalties for those who commit crimes with bump-stock-type devices. However, an important step in the enforcement of existing firearms laws is ensuring that ATF's regulations correctly interpret those laws.

This proposed rulemaking will have an economic impact, *see infra* Part VI, but the impact will not be widespread, and the costs associated with this rule are easily exceeded by the benefits it will provide for public safety. The Department also disagrees that the proposed rulemaking will decrease innovation in the firearms accessories market. The fact that more than 65,000 industry professionals from the United States and foreign countries attend the annual Shooting, Hunting and Outdoor Trade (SHOT) Show, where many new and improved firearms accessories are introduced, is a clear market signal that there is strong demand for innovation and development of new shooting accessories irrespective of whether the bump-stock-type devices described in this rulemaking are prohibited.

## V. Proposed Rule

The regulations in 27 CFR part 479 contain the procedural and substantive requirements relative to the importation, manufacturing, making, exportation, identification and registration of, and dealing in machineguns, destructive devices, and certain other firearms and weapons under the NFA. Currently, the regulatory definition of "machine gun" in 27 CFR 479.11 matches the statutory definition of "machinegun" in the NFA quoted in Part I, above. The definition includes the terms "single function of the trigger" and "automatically," but those terms are not expressly defined in the statutory text. Those terms are best interpreted, however, to encompass firearms equipped with bump-stock-type devices. As discussed above, bump-stock-type devices like the Akins Accelerator and other devices that operate to mimic automatic fire when

added to semiautomatic rifles present the same risk to public safety that Congress has already deemed unacceptable by enacting and amending the GCA (18 U.S.C. 922(o)). Therefore, the Department proposes to exercise its delegated authority to clarify its interpretations of the statutory terms "single function of the trigger," "automatically," and "machinegun." Specifically, the Department proposes to amend 27 CFR 479.11 by defining the term "single function of the trigger" to mean "single pull of the trigger." The Department further proposes to amend these regulations by defining the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." Finally, the Department proposes to clarify that the definition of a "machinegun" includes a device that allows semiautomatic firearms to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as bump-stock-type devices).

The interpretation of the phrase "single function of the trigger" to mean "single pull of the trigger" reflects ATF's position since 2006, and it is the best interpretation of the statute. The Supreme Court in *Staples v. United States,* 511 U.S. 600 (1994), indicated that a machinegun under the NFA "fires repeatedly with a single pull of the trigger." *Id.* at 602 n.1. This interpretation is also consistent with how the phrase "single function of the trigger" was understood at the time of the NFA's enactment in 1934. For instance, in a congressional hearing leading up to the NFA's enactment, the National Rifle Association's then-president testified that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066,* 73rd Cong., 2nd Sess., at 40 (1934). Furthermore, and as noted above, the Eleventh Circuit concluded that ATF's interpretation of "single function of the trigger" to mean "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins v. United States,* 312 F. App'x 197, 200 (11th Cir.

2009). No other court has held otherwise.[B]

Interpreting the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger" also reflects the ordinary meaning of that term at the time of the NFA's enactment in 1934. The word "automatically" is the adverbial form of "automatic," meaning "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Webster's New International Dictionary* 187 (2d ed. 1934); *see also* 1 *Oxford English Dictionary* 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself").

Relying on these definitions, the United States Court of Appeals for the Seventh Circuit accordingly interpreted the term "automatically" as used in the NFA as "delineat[ing] how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism" "set in motion by a single function of the trigger and . . . accomplished without manual reloading." *United States* v. *Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). So long as the firearm is capable of producing multiple rounds with a single pull of the trigger for some period of time, the firearm shoots "automatically" irrespective of why the firing sequence ultimately ends. *Id.* ("[T]he reason a weapon ceased firing is not a matter with which § 5845(b) is concerned."). *Olofson* thus requires only that the weapon shoot multiple rounds with a single function of the trigger "as the result of a self-acting mechanism," not that the self-acting mechanism produce

[B] As used in this proposed rule, the term "pull" is synonymous with "push" and other terms that describe activation of a trigger. The courts have made clear that whether a trigger is operated through a "pull," "push," or some other action such as a flipping a switch, does not change the analysis of the functionality of a firearm. For example, in *United States* v. *Fleischli*, 305 F.3d at 655–56, the Seventh Circuit rejected the argument that a switch did not constitute a trigger for purposes of assessing whether a firearm was a machinegun under the NFA, because such an interpretation of the statute would lead to "the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *See also United States* v. *Camp*, 343 F.3d 743, 745 (5th Cir. 2003) ("'To construe "trigger" to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a very common kind. The language [in 18 U.S.C. 922(o)] implies no intent to so restrict the meaning[.]'" (quoting *United States* v. *Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (emphasis removed))). Examples of machineguns that operate through a trigger activated by a push include the Browning design, M2 .50 caliber, the Vickers, the Maxim, and the M134 hand-fired Minigun.

the firing sequence without any additional action by the shooter. This definition accordingly requires that the self-acting or self-regulating mechanism must perform an act that is primarily responsible for causing the weapon to shoot more than one shot.

Finally, it is reasonable to conclude, based on these interpretations, that the term "machinegun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. When a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And that firing sequence is "automatic" because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed). Accordingly, these devices are included under the definition of machinegun and, therefore, come within the purview of the NFA.

The GCA and its implementing regulations in 27 CFR part 478 incorporate the NFA's definition of machinegun. Accordingly, this proposed rule makes the same amendments to the definitions of "single function of the trigger," "automatically," and "machine gun" in 27 CFR 478.11.

The Arms Export Control Act (AECA), as amended, does not include the term "machinegun" in its key provision, 22 U.S.C. 2778. However, regulations in 27 CFR part 447 that implement the AECA include a similar definition of "machinegun," and explain that machineguns, submachineguns, machine pistols, and fully automatic rifles fall within Category I(b) of the U.S. Munitions Import List when those defense articles are permanently imported. *See* 27 CFR 447.11, 447.21. Currently, the definition of "machinegun" in § 447.11 provides that "[a] 'machinegun', 'machine pistol', 'submachinegun', or 'automatic rifle' is a firearm originally designed to fire, or capable of being fired fully automatically by a single pull of the trigger." This proposed rule would harmonize the AECA's regulatory definition of "machinegun" with the definitions in 27 CFR parts 478 and 479,

as those definitions would be amended by this rule.

The proposed rule would replace prior classifications of bump-stock-type devices, including devices that ATF previously determined were not machineguns. The rule thus would supplant any prior letter rulings with which it is inconsistent so that any bump-stock-type device described above qualifies as a machinegun. Accordingly, manufacturers, current owners, and persons wishing to purchase such devices would be subject to the restrictions imposed by the GCA and NFA.

The Department has determined that there would not be a registration period for any device that would be classified as "machinegun" as a result of this rulemaking. The NFA provides that only the manufacturer, importer, or maker of a firearm may register it.[9] Accordingly, there is no means by which the possessor may register a firearm retroactively, including a firearm that has been reclassified. Further, 18 U.S.C. 922(o) prohibits the possession of machineguns that were not lawfully possessed before the effective date of the statute. Accordingly, if the final rule is consistent with this NPRM, current possessors of bump-stock-type devices will be obligated to dispose of those devices. A final rule will provide specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o).

## VI. Statutory and Executive Order Review

### A. Executive Orders 12866, 13563, and 13771

Executive Orders 13563 (Improving Regulation and Regulatory Review) and 12866 (Regulatory Planning and Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs) directs agencies to reduce regulation and control regulatory costs. This proposed rule is expected to be an E.O. 13771

[9] 26 U.S.C. 5841(b); 27 CFR 479.101(b)

AR001303

regulatory action. Details on the estimated costs of this proposed rule can be found in the rule's economic analysis below.

This rule has been designated a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget. This proposed rule is intended to interpret the definition of "machinegun" within the GCA and NFA such that it includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the

trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

### Need for Federal Regulatory Action

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning regulatory action is the failure of the market to compensate for negative externalities caused by

commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This proposed rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that they could be used for criminal purposes. This poses a public safety issue that the Department is trying to address.

### Executive Summary

Table 1 provides a summary of the affected population and anticipated costs and benefits to promulgating this rule.

TABLE 1—SUMMARY OF AFFECTED POPULATION, COSTS, AND BENEFITS

| Category | Affected populations, costs, and benefits |
|---|---|
| Applicability ................................................ | • Manufacturers of bump-stock-type devices.<br>• Retail sellers of bump-stock-type devices. |
| Affected Population ...................................... | • Gun owners who own bump-stock-type devices or would have purchased them in the future.<br>• 2 manufacturers of bump-stock-type devices.<br>• 2,281 retailers of bump-stock-type devices.<br>• Owners and future consumers of bump-stock-type devices. |
| Total Quantified Costs to Industry, Public, and Government (7% Discount Rate). | $217.0 million present value over 10 years, $36.3 million annualized. |
| Unquantified Costs ...................................... | • Costs of destruction.<br>• Costs of advertising to inform owners of the need to dispose of their bump-stock-type devices. |
| Unquantified Benefits .................................. | • Lost consumer surplus to users of bump-stock-type devices.<br>• Prevents criminal usage of bump-stock-type devices.<br>• Could reduce casualties in an incident that would have involved a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to incidents. |

### Affected Population

The populations affected by this rule are manufacturers of bump-stock-type devices, retailers who sell them either in brick-and-mortar stores or online, and individuals who have purchased or would have wanted to purchase bump-stock-type devices. The number of entities and individuals selling or purchasing bump-stock-type devices are as follows:
• 2 manufacturers
• 2,281 retailers
• An uncertain number of individuals who have purchased bump-stock-type devices or would have purchased them in the future

Because many bump-stock-type devices—including those ATF addressed in classification letters between 2008 and 2017—have not been subject to regulation under the GCA, ATF does not keep track of manufacturers or retailers of bump-stock-type devices, nor does ATF keep track or maintain a database of individuals who have purchased bump-stock-type devices. Therefore, the

affected population of manufacturers and retailers is an estimate and based on publicly available information and, with respect to retailers who are also Federal firearms licensees (FFLs), is also based on ATF's records in the Federal Firearms Licensing System.

ATF estimates that since 2010, as many as six domestic bump-stock-type device manufacturers have been in the marketplace, but due to patent infringement litigation, only two remain in the market. For the estimate of the number of retailers, ATF filtered all FFLs for a list of potential sellers. While there are approximately 80,000 FFLs currently licensed, only certain types sell firearms to the public. ATF first removed FFLs that do not sell firearms to the public. Next, since not all FFLs sell firearm accessories, ATF needed to estimate the number that do sell accessories. ATF assumed that FFLs that are likely to sell bump-stock-type devices would have online websites. ATF requests public comment on the reasonableness of the assumption that retailers of bump-stock-type devices are

likely to be businesses with an online presence. ATF ran a query on the FFL database and found that of those that sell firearms to the public, 2,270 have websites. Because sellers of firearm accessories do not necessarily sell firearms, ATF also performed an online search and found an additional 11 retailers who sell firearm accessories, but not firearms. Adding these two totals together, ATF estimates that there are 2,281 retailers of bump-stock-type devices.

Because there are no records of individuals who have purchased firearm accessories, ATF does not have an estimated number of individuals who would be affected by this proposed rule. Although ATF lacks data on the number of individuals who have purchased bump-stock-type devices, ATF has some information from one manufacturer and four retailers on the volume of sales of such devices. Based on these reported amounts, ATF estimates that the number of bump-stock-type devices that were purchased during the 8-year period beginning in 2010 ranges from

35,000 per year as a low estimate to 75,000 per year as the high and primary estimate. ATF used a public commenter's 400,000 total estimate as a third estimate. For further information on the methodology of these estimates, please review the analysis regarding "Costs" below.

### Costs

There are three primary sources of costs from this rule. First, for owners of bump-stock-type devices, there will be a lost value from no longer being able to possess or use the devices. Second, there will be a lost value to manufacturers who would have manufactured and sold the devices in the future and to gun owners who would have purchased them. Finally, there is a disposal cost associated with the need to destroy the devices or render them inactive.

### Cost to the Public for Loss of Property

As reported by public comments, individuals purchase bump-stock-type devices so that they can simulate automatic firing on a semiautomatic firearm. Commenters noted a variety of purposes for which bump-stock-type devices have been advertised and used, including for recreation and fun, assisting persons with mobility issues in firing quickly, self-defense, killing invasive pig species, and target practice (although, as some commenters observed, bump-stock-type devices impede firing accuracy). If the proposed rule became effective, bump-stock-type devices would be considered machineguns under the NFA and could not be lawfully possessed because the GCA prohibits persons from possessing a machinegun unless it was lawfully possessed before the effective date of the statute. Bump-stock-type devices currently possessed by individuals would have to be destroyed or turned in upon implementation of the regulation.

The lost value from no longer being able to use or purchase bump-stock-type devices will depend on the volume of sales in the market and the value that consumers place on the devices. ATF has limited information about the market for bump-stock-type devices. One commenter estimated that more than 400,000 bump-stock-type devices may have been sold. Based on publicly available information, ATF estimates that in the first two years that bump-stock-type devices were in the market,

approximately 35,000 were sold per year.[10] However, after 2011, other manufacturers entered the market and there is no available information regarding the total number of bump-stock-type devices manufactured. ATF is using publicly available information on manufacturing and combining it with the information on retail sales to estimate a range of the number of bump-stock-type devices in the marketplace.

ATF first developed an estimate of the number of bump-stock-type devices in the marketplace, based on information on retail sales provided in response to the ANPRM. One retailer stated that it sold an average of 4,000 to 5,000 bump-stock-type devices per year.[11] Public comments indicated that one retailer sold 3,800 bump-stock-type devices annually, one sold 60 per year, and one sold approximately 5–10 per year.[12] For the purposes of this regulatory analysis (RA), ATF assumes that a large retailer would have sold 4,400, a midrange retailer would have sold 60, and a small retailer would have sold 8.[13] For the purposes of this analysis, ATF assumes the number of retailers by size are as follows:

- 4 large * 4,400 annual sales
- 755 midrange * 60 annual sales
- 1,511 small * 8 annual sales

The number of large retailers is a known number. As stated in the Affected Population section above, based on ATF's internal database and online research, the remaining number of retailers is 2,270. For the purposes of this RA, ATF assumed that one-third of the remaining retailer population are midrange retailers, and the remaining 1,511 are small retailers. Using these assumed numbers of retailers and annual sales by size of retailer, ATF estimated annual sales of about 75,000 [(4 * 4,400) + (755 * 60) + (1,511 * 8)].

ATF next developed an estimate of the number of bump-stock-type devices in the United States based on information about the numbers of bump-stock-type devices manufactured. Based on publicly available information, ATF estimates that approximately 35,000 bump-stock-type devices were sold in 2010.[14] Only in 2012 did other manufacturers enter the marketplace. For the purposes of this RA, ATF assumes that in the first two years of production, the one manufacturer produced the same 35,000 in years 2010 and 2011. ATF has two sets of production estimates. Because no information is otherwise known about the production of bump-stock-type devices, ATF assumes that the low estimate of annual bump-stock-type device production is a constant 35,000, based on the one data point. As stated earlier, a public commenter provided an estimate of 400,000 bump-stock-type devices currently in circulation. To account for how these were purchased over the last 8 years, ATF also assumed the same 35,000 production in the first 2 years, but spread out the remaining 330,000 over the remaining 6 years, or about 55,000 per year. However, incorporating the provided retail sales information, ATF developed a third, higher estimate reflecting that when the other manufacturers entered the market, the number of bump-stock-type devices sold on the market annually could have been 75,000.

The high estimate is ATF's primary estimate because ATF knows that there was an increase in production starting in 2012. In 2012, there were other manufacturers who entered the market, and the first manufacturer increased production at some point thereafter. Furthermore, the primary estimate includes information provided by retailers as a more comprehensive outlook on the overall production numbers. For the purposes of this analysis, ATF assumes that both the increase in production and the market entry of other manufacturers all occurred in 2012. Table 2 provides the breakdown of production for the low estimate, public comment estimate, and primary estimate.

[10] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), *http:// www.thealbanynews.net/archives/2443*.

[11] Based on an internal survey of large retailers.

[12] *Regulations.gov, Docket ID: ATF–2018–0001–27509, https://www.regulations.gov/ document?D=ATF-2018-0001-27509* (last visited on Mar. 6, 2018); *Regulations.gov, Docket ID: ATF–2018–0001–0433, https://www.regulations.gov/ document?D=ATF-2018-0001-0433* (last visited on Mar. 6, 2018); *Regulations.gov, Docket ID: ATF–2018–0001–0128, https://www.regulations.gov/ document?D=ATF-2018-0001-0128* (last visited on Mar. 6, 2018).

[13] For a large retailer the average sales were 4,400 = (3,800 + 5,000)/2. For a small retailer, the average sales were 8 = (5 + 10)/2.

[14] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), *http:// www.thealbanynews.net/archives/2443*.

AR001305

TABLE 2—NUMBER OF BUMP-STOCK-TYPE DEVICES PRODUCED, BASED ON MANUFACTURER AND RETAIL SALES

| Year | Low estimate | Public comment estimate | Primary estimate |
|---|---|---|---|
| 2010 | 35,000 | 35,000 | 35,000 |
| 2011 | 35,000 | 35,000 | 35,000 |
| 2012 | 35,000 | 55,000 | 75,000 |
| 2013 | 35,000 | 55,000 | 75,000 |
| 2014 | 35,000 | 55,000 | 75,000 |
| 2015 | 35,000 | 55,000 | 75,000 |
| 2016 | 35,000 | 55,000 | 75,000 |
| 2017 | 35,000 | 55,000 | 75,000 |
| Total | 280,000 | 400,000 | 520,000 |

In other words, the number of bump-stock-type devices held by the public could range from about 280,000 to about 520,000.

ATF does not know the production cost of bump-stock-type devices, but for the purposes of this RA, ATF uses the retail sales amounts as a proxy for the total value of these devices. For devices that have already been sold, there are two countervailing effects that affect the value of the devices. There may have been some depreciation the devices since they were originally purchased, resulting in a value somewhat reduced from the retail price. On the other hand, some consumers would have been willing to pay more than the retail price for a bump-stock-type device, and for these individuals the devices would have a higher valuation than the retail price. Both of these effects are difficult to estimate, and here ATF assumes that the retail sales price is a reasonable proxy for the value of the devices.

The primary manufacturer of bump-stock-type devices sells them at a price of $179.95 to $425.95.[15] For the purposes of this RA, ATF estimates that the average sale price for these bump-stock-type devices was $301.00 during the first two years they were sold. In 2012, at least one other manufacturer entered the market and started selling their devices at the rate of $99.99, making the overall prices for these devices lower.[16] For the purposes of this RA, ATF assumes that the average sale price for bump-stock-type devices from 2012 to 2017 was $200.00. Based on these costs, multiplied by the number of bump-stock-type devices in the market, Table 3 provides the sales value that the public has spent on these devices over the course of the last eight years.

TABLE 3—AMOUNT SPENT ON BUMP-STOCK-TYPE DEVICES (UNDISCOUNTED)

| Year | Low estimate | Public comment estimate | Primary estimate |
|---|---|---|---|
| 2011 | $10,533,250 | $10,533,250 | $10,533,250 |
| 2012 | 10,533,250 | 10,533,250 | 10,533,250 |
| 2013 | 7,016,450 | 11,025,850 | 15,035,250 |
| 2014 | 7,016,450 | 11,025,850 | 15,035,250 |
| 2015 | 7,016,450 | 11,025,850 | 15,035,250 |
| 2016 | 7,016,450 | 11,025,850 | 15,035,250 |
| 2017 | 7,016,450 | 11,025,850 | 15,035,250 |
| Total | 56,148,750 | 76,195,750 | 96,242,750 |

ATF estimates that the total, undiscounted amount spent on bump-stock-type devices was $96.2 million. While the retail prices of these bump-stock-type devices remained constant over the eight years of sales, these purchases occurred over time; therefore, ATF presents the discounted value at 3% and 7% in Table 4 to account for the present value of these purchases.

TABLE 4—THE AMOUNT SPENT PURCHASING BUMP-STOCK-TYPE DEVICES, DISCOUNTED AT 3% AND 7%

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| 2011 | $10,533,250 | $12,210,924 | $14,773,428 |
| 2012 | 10,533,250 | 11,855,266 | 13,806,942 |
| 2013 | 15,035,250 | 16,429,424 | 18,418,828 |
| 2014 | 15,035,250 | 15,950,897 | 17,213,858 |
| 2015 | 15,035,250 | 15,486,308 | 16,087,718 |
| 2016 | 15,035,250 | 15,035,250 | 15,035,250 |
| 2017 | 15,035,250 | 14,597,330 | 14,051,636 |

[15] Slide Fire AR–15 Bump Fire Stocks (archived page on Jan. 28, 2017). https://web.archive.org/web/20170128085532/http://www.slidefire.com/products/ar-platform (last visited Mar. 6, 2018).

[16] Bump Fire Systems (archived page on Feb. 21, 2015). https://web.archive.org/web/20150221050223/http://bumpfiresystems.com/ (last visited Mar. 6, 2018).

AR001306

TABLE 4—THE AMOUNT SPENT PURCHASING BUMP-STOCK-TYPE DEVICES, DISCOUNTED AT 3% AND 7%—Continued

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| Total | 96,242,750 | 101,565,397 | 109,387,659 |
| Annualized Cost | | 14,468,640 | 18,318,906 |

Because these purchases occurred in the past, ATF's discount years start at -5 and increase to 0 to account for the Executive Order 13771 standard that costs be presented in 2016 dollars. With these assumptions, ATF estimates that the annualized, discounted amount spent on bump-stock-type devices was $14.5 million and $18.3 million at 3% and 7%, respectively.

Based on the same discounting formula, ATF estimates that the total undiscounted cost for the low estimate would be $56.1 million, and the total discounted values would be $60.2 million and $66.3 million at 3% and 7%, respectively. The annualized values for the low estimates of total number of bump-stock-type devices sold are $8.6 million and $11.1 million at 3% and 7%, respectively. For the 400,000-unit estimate provided by the public commenter, the total undiscounted amount would be $76.2 million, and the total discounted values would be $80.9 million and $87.8 million at 3% and 7%, respectively. The annualized values for the 400,000-unit sales estimate are $11.5 million and $14.7 million at 3% and 7%, respectively.

Forgone Future Production and Sales

ATF has estimated the lost production and lost sales that would occur in the 10 years after the implementation of this proposed rule, should this proposed rule take effect. In order to do this, ATF needed to predict the number of devices that would be sold in the future in the absence of a rule. Such a prediction should take account of recent expected changes in the demand for and supply of bump-stock-type devices. For example, based on one survey, half of the known, large former retailers of bump-stock-type devices no longer sell bump-stock-type devices as a result of the Las Vegas shooting, nor do they intend to sell them in the future. Moreover, while ATF has estimated the number of bump-stock-type devices manufactured since 2010, ATF is without sufficient information to estimate the number of individuals who were interested in acquiring bump-stock-type devices prior to the Las Vegas shooting but would no longer want them due to the shooting.

Another recent change affecting individuals' future purchases of bump-stock-type devices is that certain States have already banned such devices. These States are California, Florida, Massachusetts, New Jersey, New York, and Washington. The effect of States' bans on individuals' future purchases of bump-stock-type devices should not be attributed to this proposed rule since these reductions in purchases would happen with or without the rule. However, ATF was unable to quantify the impact of States' bans and thus was unable to account for the future effects of these bans in the estimate of the effects of the proposed rule.

Based on previously mentioned comments from large retailers, ATF expects that, in the absence of this rule, some retailers would not sell bump-stock-type devices in the future. In order to estimate the expected future reduction in demand for bump-stock-type devices as a result of the Las Vegas shooting, ATF assumes that the reduction of sales by large retailers that has already occurred would be a reasonable estimate of the future reduction of sales overall that would occur in the absence of the rule. ATF estimates that there are four large retailers of bump-stock-type devices, of which two have stated that they would no longer sell bump-stock-type devices regardless of this proposed rule. For the purposes of this regulatory analysis, it is estimated that each of the two large retailers sell 4,400 bump-stock-type devices annually. Removing the effects of these two large retailers from the future market reduces ATF's primary estimate of 74,988 in past annual production to an estimate of 66,484 (75,284 − 8,800) in annual sales that would occur in the future in the absence of a rule. Table 5 provides the estimated breakdown of lost production and sales forgone should this rule become final.

TABLE 5—FORGONE PRODUCTION AND SALES OF FUTURE BUMP-STOCK-TYPE DEVICES

| Year | Number of bump-stock-type devices | Undiscounted | 3% | 7% |
|---|---|---|---|---|
| 2018 | 66,484 | $20,008,360 | $19,425,592.04 | $18,699,401.68 |
| 2019 | 66,484 | 20,008,360 | 18,859,798.10 | 17,476,076.34 |
| 2020 | 66,484 | 20,008,360 | 18,310,483.59 | 16,332,781.62 |
| 2021 | 66,484 | 20,008,360 | 17,777,168.53 | 15,264,281.89 |
| 2022 | 66,484 | 20,008,360 | 17,259,386.92 | 14,265,684.01 |
| 2023 | 66,484 | 20,008,360 | 16,756,686.33 | 13,332,414.96 |
| 2024 | 66,484 | 20,008,360 | 16,268,627.51 | 12,460,200.90 |
| 2025 | 66,484 | 20,008,360 | 15,794,783.99 | 11,645,047.57 |
| 2026 | 66,484 | 20,008,360 | 15,334,741.74 | 10,883,222.03 |
| 2027 | 66,484 | 20,008,360 | 14,888,098.77 | 10,171,235.54 |
| Total | | 200,083,598 | 170,675,367.53 | 140,530,346.56 |
| Annualized Cost | | | 24,313,796.52 | 23,534,302.70 |

Based on these estimates, ATF estimates that the undiscounted value of forgone future sales over 10 years would be $200.1 million, undiscounted, or $24.3 million and $23.5 million, annualized and discounted at 3% and 7%.

AR001307

Disposal

This proposed rule would require the destruction of existing bump-stock-type devices. The cost of disposal would have several components. For individuals who own bump-stock-type devices, there would be a cost for the time and effort to destroy the devices or ensure that they are destroyed by another party. For retailers, wholesalers, and manufacturers, there would be a cost of the time and effort to destroy or ensure the destruction of any devices held in inventory. Based on the response from public comments, it is not clear if there would also be a cost from the lost value of that inventory.

Individuals who have purchased bump-stock-type devices prior to the implementation of this rule would have the option of destroying the devices themselves, turning the devices in to the nearest ATF office for destruction by ATF or, subject to compliance with U.S. Mail regulations and the policies of commercial shipment services, sending the devices to ATF through the U.S. Mail or other commercial delivery service. Options for destroying the devices may include melting, crushing, or shredding in a manner that renders the device incapable of ready restoration. Since the majority of bump-stock-type devices are made of plastic material, individuals wishing to destroy the devices themselves could simply use a hammer to break apart the devices and throw the pieces away. Other destruction options that ATF has historically accepted include torch cutting or sawing the device in a manner that removes at least ¼ inch of material for each cut and completely severs design features critical to the functionality of the device as a bump-stock-type device.

If a possessor chooses to turn in the device to the local ATF office, the cost to the public to destroy the device would be the cost to drive to the nearest ATF office, the cost of sending through the U.S. Mail, or the cost of sending via private shipper. For the purposes of this regulatory analysis, ATF assumes that most individuals disposing of their existing bump-stock-type devices would destroy these devices themselves rather than turn them into the nearest ATF office through personal delivery, mail, or private shipper.

Should this rule take effect, public comments suggest that unsellable inventory could be worth approximately $35,000 per large retailer. One public commenter, assumed to be a large retailer, stated that its gross sales were $140,000. Another public commenter assumed to be a midrange retailer had gross sales of $18,000. No known sales were reported for a small retailer. Based on the proportion of sales among the large, midrange, and small retailers, ATF estimates that the amount in existing inventory for a midrange retailer would be $4,500 and, for a small retailer, $74.[17]

The retailer, assumed to be large, also commented that the opportunity cost of time needed to destroy existing inventory would be approximately $700. ATF's subject matter experts estimate that a retailer could use a maintenance crew to destroy existing inventory. To determine the hourly time needed to destroy existing inventory, ATF used the $700 reported amount, divided by the loaded wage rate of a building cleaning worker. ATF subject matter experts also suggest that existing packers would be used for a midrange retailer and the minimum wage would be used for a small retailer. The loaded rate of 1.43 was used to account for fringe benefits.[18] Table 6 provides the wages used for this analysis.

TABLE 6—WAGE SERIES TO DESTROY EXISTING INVENTORY

| Wage series | Series code | Unloaded wage rate | Loaded wage rate | Source |
|---|---|---|---|---|
| Individual .......................... | ......................................... | $13.60 | $13.60 | https://www.transportation.gov/sites/dot.gov/files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf. |
| Minimum Wage Rate ........ | Min Wage ...................... | 7.25 | 10.40 | https://www.bls.gov/opub/reports/minimum-wage/2016/home.htm. |
| Packers, Packagers, and Handlers. | 53–7064 ......................... | 11.74 | 16.84 | https://www.bls.gov/oes/2016/may/oes537064.htm. |
| Retail Salespersons .......... | 41–2031 ......................... | 13.07 | 18.75 | https://www.bls.gov/oes/2016/may/oes412031.htm. |
| Building Cleaning Workers, All Other. | 37–2019 ......................... | 14.88 | 21.34 | https://www.bls.gov/oes/2016/may/oes372019.htm. |

Based on the estimated wages and reported opportunity cost of time, ATF estimates that it would take a large retailer 32.8 hours, a midrange retailer 0.45 hours, and a small retailer 0.25 hours to destroy existing inventory. Table 7 provides the per-retailer estimated opportunity cost of time.

TABLE 7—OPPORTUNITY COST OF TIME TO DESTROY EXISTING INVENTORY

| Population | Incremental cost | Hourly burden | Opportunity cost of time |
|---|---|---|---|
| Individual ................................................................................................................................................. | $13.60 | 0.25 | $3.40 |
| Retailer (Large) ....................................................................................................................................... | 21.34 | 32.8 | 699.95 |
| Retailer (Midrange) ................................................................................................................................. | 16.84 | 0.45 | 7.58 |
| Retailer (Small) ....................................................................................................................................... | 19.51 | 0.25 | 4.88 |

[17] Midrange: $4,500 = ($18,000/$140,000) * $35,000. Small: $74 = ($8/3,800) * $35,000.

[18] BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $32.35)/(Private Industry Wages and Salaries = $22.55) = 1.43. BLS average 2016. U.S. Bureau of Labor Statistics. https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

AR001308

As stated earlier, ATF estimates that there are 519,927 bump-stock-type devices already purchased by the public. Based on the opportunity cost of time per bump-stock-type device, and the estimated opportunity cost of time per retailer, ATF provides the cost to destroy all existing bump-stock-type devices in Table 8.

TABLE 8—OPPORTUNITY COST OF TIME TO DESTROY EXISTING DEVICES BY INDIVIDUAL AND RETAILER SIZE

| | |
|---|---|
| Individual .................................... | $1,768,000 |
| Retailer (Large) ........................ | 2,800 |

TABLE 8—OPPORTUNITY COST OF TIME TO DESTROY EXISTING DEVICES BY INDIVIDUAL AND RETAILER SIZE—Continued

| | |
|---|---|
| Retailer (Midrange) .................... | 5,752 |
| Retailer (Small) ........................ | 3,947 |
| Total Disposal Cost ................ | 1,780,498 |

ATF estimates that it would cost a total of $1.8 million to destroy all existing bump-stock-type devices.

We treat all costs of disposal of existing devices owned by individuals or held in inventory by retailers or manufacturers as if they occur in 2018.

Therefore, the costs of the rule in 2018 would include the total undiscounted value of existing stock of bump-stock-type devices in Table 4 ($96.2 million), the year 2018 loss of future production from Table 5 ($20.0 million), and the total cost of disposal from Table 8 ($1.8 million). Overall, ATF estimates that the total cost of this proposed rule would be $297.2 million over a 10-year period of future analysis. This cost includes the first-year cost to destroy all existing bump-stock-type devices, including unsellable inventory and opportunity cost of time. Table 9 provides the 10-year cost of this proposed rule.

TABLE 9—10-YEAR COST OF PROPOSED RULE

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| 2018 | $118,031,608 | $111,256,111 | $103,093,378 |
| 2019 | 20,008,360 | 18,310,484 | 16,332,782 |
| 2020 | 20,008,360 | 17,777,169 | 15,264,282 |
| 2021 | 20,008,360 | 17,259,387 | 14,265,684 |
| 2022 | 20,008,360 | 16,756,686 | 13,332,415 |
| 2023 | 20,008,360 | 16,268,628 | 12,460,201 |
| 2024 | 20,008,360 | 15,794,784 | 11,645,048 |
| 2025 | 20,008,360 | 15,334,742 | 10,883,222 |
| 2026 | 20,008,360 | 14,888,099 | 10,171,236 |
| 2027 | 20,008,360 | 14,454,465 | 9,505,828 |
| Total | 298,106,846 | 258,100,553 | 216,954,074 |
| Annualized Cost | | 36,768,073 | 36,332,813 |

As stated in the paragraph above, the total undiscounted cost is $297.2 million, and the discounted costs would be $36.8 million and $36.3 million annualized at 3% and 7% respectively.

Government Costs

Government costs are estimated as *de minimis* because collection of the bump-stock-type devices by ATF would be an ancillary duty of existing ATF Special Agents.

Cost Savings

ATF did not calculate any cost savings for this proposed rule.

Benefits

As reported by public comments, this proposed rule would affect the criminal use of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident.

The purpose of this rule is to amend ATF regulations to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA. Banning bump-stock-type devices could reduce casualties in an incident involving a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to

incidents, because it prevents shooters from using a device that allows them to shoot a semiautomatic firearm automatically.

Alternatives

Alternative 1—No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes to regulations, there would be no cost, savings, or benefits to this alternative.

Alternative 2—Patronizing a shooting range. Individuals wishing to experience the shooting of a "full-auto" firearm could go to a shooting range that provides access to lawfully registered "pre-1986" machineguns to customers, where the firearm remains on the premises and under the control of the shooting range. ATF does not have the information to determine which, where, or how many gun ranges provide such a service and is therefore not able to quantify this alternative.

Alternative 3—Opportunity alternatives. Based on public comments, individuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger finger to fire more rapidly. To the extent that

individuals are capable of doing so, this would be their alternative to using bump-stock-type devices.

No other feasible alternatives were identified, and thus none were considered.

*B. Executive Order 13132*

This regulation will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*C. Executive Order 12988*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (Civil Justice Reform).

AR001309

*D. Regulatory Flexibility Act (RFA)*

Summary of Findings

ATF performed an Initial Regulatory Flexibility Analysis of the impacts on small businesses and other entities from the NPRM. Based on the information from this analysis, ATF found:

• It is estimated that of the two remaining manufacturers, at least one manufacturer only produces bump-stock-type devices and therefore could completely go out of business;

• There are 2,281 retailers, of which most are estimated to be small;

• There are no relevant government entities.

Initial Regulatory Flexibility Analysis

The Regulatory Flexibility Act (RFA) establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." Public Law 96–354, 2(b), 94 Stat. 1164 (1980).

Under the RFA, the agency is required to consider if this rule will have a significant economic impact on a substantial number of small entities. Agencies must perform a review to determine whether a rule will have such an impact. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

Under the RFA (5 U.S.C. 603(b)–(c)), the regulatory flexibility analysis must provide and/or address:

• A description of the reasons why action by the agency is being considered;

• A succinct statement of the objectives of, and legal basis for, the proposed rule;

• A description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

• A description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

• An identification, to the extent practicable, of all relevant Federal rules

which may duplicate, overlap or conflict with the proposed rule; and

• Descriptions of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.

The RFA covers a wide range of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. 5 U.S.C. 601(3)–(6). ATF determined that the rule affects a variety of large and small businesses (see the "Description of the Potential Number of Small Entities" section below). Based on the requirements above, ATF prepared the following regulatory flexibility analysis assessing the impact on small entities from the rule.

A Description of the Reasons Why Action by the Agency Is Being Considered

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning regulatory action is the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This proposed rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that it could be used for criminal purposes. This poses a public safety issue, which the Department is trying to address.

A Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.

A Description of and, Where Feasible, an Estimate of the Number of Small Entities To Which the Proposed Rule Will Apply

This rule would affect primarily manufacturers of bump-stock-type devices, FFLs that sell bump-stock-type devices, and other small retailers of firearm accessories that have invested in the bump-stock-type device industry. Based on publicly available information,

there are two manufacturers affected. Of the known retailers, the large retailers do not intend to continue selling bump-stock-type devices. There may be some small retailers that would intend to continue selling these devices should this proposed rule not go into effect and would thus be affected by this proposed rule. Based on the information from this analysis, ATF found:

• There are 2,270 retailers who are likely to be small entities;

• There are no government jurisdictions affected by this proposed rule; and

• There are no nonprofits found in the data.

A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Proposed Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

There are no reporting or recordkeeping requirements for this proposed rule. The only relevant compliance requirement consists of disposing of all existing inventory of bump-stock-type devices for small entities that carry them. There would not be any professional skills necessary to record or report in this proposed rulemaking.

An Identification, to the Extent Practicable, of All Relevant Rules Which May Duplicate, Overlap or Conflict With the Proposed Rule

This proposed rule does not duplicate or conflict with other Federal rules.

Descriptions of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities

Alternatives were considered in this proposed rule. Alternatives include making no regulatory changes. ATF rejected this alternative because it does not address the public safety concerns raised by bump-stock-type devices, and would not be consistent with ATF's interpretation of the statutory term "machinegun." There were no other regulatory alternatives to this proposal that ATF has been able to identify that would accomplish the intent of this proposed rule.

*E. Small Business Regulatory Enforcement Fairness Act of 1966*

This rule is a major rule as defined by section 251 of the Small Business

Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 804. This rule is likely to be considered major as it is economically significant and is projected to have an effect of over $100 million on the economy in at least the first year of the rule.

### F. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48.

### G. Paperwork Reduction Act of 1995

This final rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act, 44 U.S.C. 3501–3521.

## VII. Public Participation

### A. Comments Sought

ATF requests comments on the proposed rule from all interested persons. ATF specifically requests comments on the scope of this proposed rule and the definition of "machinegun." ATF also requests comments on the costs and benefits of the proposed rule and on the appropriate methodology and data for calculating those costs and benefits. Further, ATF requests public comment on the reasonableness of the assumption that retailers of bump-stock-type devices are likely to be businesses with an online presence. In addition, ATF specifically requests comments regarding how ATF should address bump-stock-type devices that private parties currently possess, and the appropriate means of implementing a final rule.

All comments must reference the docket number ATF 2017R–22, be legible, and include the commenter's complete first and last name and full mailing address. ATF will not consider, or respond to, comments that do not meet these requirements or comments containing profanity. In addition, if ATF cannot read your comment due to technical difficulties and cannot contact you for clarification, ATF may not be able to consider your comment.

ATF will carefully consider all comments, as appropriate, received on or before the closing date, and will give comments received after that date the same consideration if it is practical to do so, but assurance of consideration

cannot be given except as to comments received on or before the closing date. ATF will not acknowledge receipt of comments.

### B. Confidentiality

ATF will make all comments, whether submitted electronically or on paper, available for public viewing at ATF and on the internet as part of the eRulemaking initiative, and subject to the Freedom of Information Act. Commenters who do not want their name or other personal identifying information posted on the internet should submit comments by mail or facsimile, along with a separate cover sheet containing their personal identifying information. Both the cover sheet and comment must reference this docket number (ATF 2017R–22). Information contained in the cover sheet will not appear on the internet. ATF will not redact personal identifying information that appears within the comment, and it will appear on the internet.

The commenter should not include material that he or she considers inappropriate for disclosure to the public. Any person submitting a comment shall specifically designate that portion (if any) of the comment that contains material that is confidential under law (e.g., trade secrets, processes). The commenter shall set forth any portion of a comment that is confidential under law on pages separate from the balance of the comment with each page prominently marked "confidential" at the top of the page.

Confidential information will be included in the rulemaking record but will not be disclosed to the public. Any comments containing material that is not confidential under law may be disclosed to the public. In any event, the name of the person submitting a comment is not exempt from disclosure.

### C. Submitting Comments

Submit comments in any of three ways (but do not submit the same comments multiple times or by more than one method). Hand-delivered comments will not be accepted.
• Federal eRulemaking Portal: ATF strongly recommends that you submit your comments to ATF via the Federal eRulemaking portal. Visit http://www.regulations.gov and follow the instructions for submitting comments. Comments will be posted within a few days of being submitted. However, if large volumes of comments are being processed simultaneously, your comment may not be viewable for up to several weeks. Please keep the comment

tracking number that regulations.gov provides after you have successfully uploaded your comment.
• Mail: Send written comments to the address listed in the **ADDRESSES** section of this document. Written comments must appear in minimum 12-point font size (.17 inches), include the commenter's complete first and last name and full mailing address, be signed, and may be of any length.
• Facsimile: Submit comments by facsimile transmission to (202) 648–9741. Faxed comments must:
(1) Be legible and appear in minimum 12-point font size (.17 inches);
(2) Be on 8½″ x 11″ paper;
(3) Be signed and contain the commenter's complete first and last name and full mailing address; and
(4) Be no more than five pages long.

### D. Request for Hearing

Any interested person who desires an opportunity to comment orally at a public hearing should submit his or her request, in writing, to the Director of ATF within the 90-day comment period. The Director, however, reserves the right to determine, in light of all circumstances, whether a public hearing is necessary.

### Disclosure

Copies of this notice and the comments received will be available at http://www.regulations.gov (search for Docket No. 2017R–22) and for public inspection by appointment during normal business hours at: ATF Reading Room, Room 1E–063, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–8740.

### List of Subjects

#### 27 CFR Part 447

Administrative practice and procedure, Arms and munitions, Chemicals, Customs duties and Imports, Penalties, Reporting and recordkeeping requirements, Scientific equipment, Seizures and forfeitures.

#### 27 CFR Part 478

Administrative practice and procedure, Arms and munitions, Customs duties and inspection, Exports, Imports, Intergovernmental relations, Law enforcement officers, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

#### 27 CFR Part 479

Administrative practice and procedure, Arms and munitions, Excise taxes, Exports, Imports, Military personnel, Penalties, Reporting and

**13457**

recordkeeping requirements, Seizures and forfeitures, Transportation.

**Authority and Issuance**

Accordingly, for the reasons discussed in the preamble, 27 CFR parts 447, 478, and 479 are proposed to be amended as follows:

**PART 447—IMPORTATION OF ARMS, AMMUNITION AND IMPLEMENTS OF WAR**

■ 1. The authority citation for 27 CFR part 447 continues to read as follows:

Authority: 22 U.S.C. 2778, E.O. 13637, 78 FR 16129 (Mar. 8, 2013).

■ 2. In § 447.11, amend the definition of "Machinegun" to read as follows:

**§ 447.11   Meaning of terms.**

\*   \*   \*   \*   \*

*Machinegun.* A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machinegun" includes bump-stock-type devices, *i.e.*, devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*   \*   \*   \*   \*

**PART 478—COMMERCE IN FIREARMS AND AMMUNITION**

■ 3. The authority citation for 27 CFR part 478 continues to read as follows:

Authority: 5 U.S.C. 552(a); 18 U.S.C. 921–931.

■ 4. In § 478.11, amend the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

**§ 478.11   Meaning of terms.**

\*   \*   \*   \*   \*

*Machine gun.*

\*   \*   \* For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, *i.e.*, devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*   \*   \*   \*   \*

**PART 479—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS**

■ 5. The authority citation for 27 CFR part 479 continues to read as follows:

Authority: 26 U.S.C. 7805.

■ 6. In § 479.11, amend the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

**§ 479.11   Meaning of terms.**

\*   \*   \*   \*   \*

*Machine gun.*

\*   \*   \* For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, *i.e.*, devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*   \*   \*   \*   \*

Dated: March 23, 2018.
**Jefferson B. Sessions III,**
*Attorney General.*
[FR Doc. 2018–06292 Filed 3–28–18; 8:45 am]
**BILLING CODE 4410–FY–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R05–OAR–2017–0164; FRL–9976–14—Region 5]**

**Air Plan Approval; Ohio; Ohio NSR PM₂.₅ Precursors**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve, under the Clean Air Act (CAA), revisions to Ohio's state implementation plan (SIP) as requested by the Ohio Environmental Protection Agency (OEPA) on March 10, 2017, and supplemented on July 18, 2017. The revisions to Ohio's SIP implement certain EPA regulations for particulate matter smaller than 2.5 micrometers (PM₂.₅) for nonattainment areas by establishing definitions related to PM₂.₅ and defining PM₂.₅ precursors. The revisions also incorporate the findings of a comprehensive precursor demonstration performed by OEPA, which determined that volatile organic compounds (VOC) and ammonia (NH₃) are an insignificant source of PM₂.₅ for the purpose of new source review in nonattainment areas in Ohio.

**DATES:** Comments must be received on or before April 30, 2018.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2017–0164 at *http://www.regulations.gov*, or via email to *damico.genevieve@epa.gov*. For comments submitted at *Regulations.gov*, follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov*. For either manner of submission, EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider