(Billing Code:   4410-FY-P)

**DEPARTMENT OF JUSTICE**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

**27 CFR Parts 447, 478, and 479**

**[Docket No. 2018R-22F; AG Order No. 4367-2018]**

**RIN 1140-AA52**

**Bump-Stock-Type Devices**

**AGENCY:**  Bureau of Alcohol, Tobacco, Firearms, and Explosives; Department of Justice

**ACTION:**  Final rule.

**SUMMARY:**  The Department of Justice is amending the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to clarify that bump-stock-type devices—meaning "bump fire" stocks, slide-fire devices, and devices with certain similar characteristics—are "machineguns" as defined by the National Firearms Act of 1934 and the Gun Control Act of 1968 because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger.  Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue

AR004032

firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. With limited exceptions, the Gun Control Act, as amended, makes it unlawful for any person to transfer or possess a machinegun unless it was lawfully possessed prior to the effective date of the statute. The bump-stock-type devices covered by this final rule were not in existence prior to the effective date of the statute, and therefore will be prohibited when this rule becomes effective. Consequently, under the final rule, current possessors of these devices will be required to destroy the devices or abandon them at an ATF office prior to the effective date of the rule.

**DATES:**  This rule is effective [INSERT DATE 90 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**FOR FURTHER INFORMATION CONTACT:**  Vivian Chu, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648-7070.

**SUPPLEMENTARY INFORMATION:**

I. Executive Summary
    A. Summary of the Regulatory Action
    B. Summary of Costs and Benefits
II. Background
    A. Regulatory Context
    B. Las Vegas Shooting
    C. Advance Notice of Proposed Rulemaking
III. Notice of Proposed Rulemaking
    A. Prior Interpretations of "Single Function of the Trigger" and "Automatically"
    B. Re-evaluation of Bump-Stock-Type Devices

2

AR004033

    C. Proposed Definition of "Single Function of the Trigger"
    D. Proposed Definition of "Automatically"
    E. Proposed Clarification That the Definition of "Machinegun" Includes Bump-Stock-Type Devices
    F. Amendment of 27 CFR 479.11
    G. Amendment of 27 CFR 478.11
    H. Amendment of 27 CFR 447.11
IV. Analysis of Comments and Department Responses for Proposed Rule
    A. Comments Generally Supporting the Rule
    B. Particular Reasons Raised in Support of the Rule
    C. Comments Generally Opposing the Rule
    D. Specific Issues Raised in Opposition to the Rule
    E. ATF Suggested Alternatives
    F. Other Alternatives
    G. Proposed Rule's Statutory and Executive Order Review
    H. Affected Population
    I. Costs and Benefits
    J. Regulatory Flexibility Act
    K. Miscellaneous Comments
    L. Comments on the Rulemaking Process
V. Final Rule
VI. Statutory and Executive Order Review
    A. Executive Orders 12866, 13563, and 13771
    B. Executive Order 13132
    C. Executive Order 12988
    D. Regulatory Flexibility Act
    E. Small Business Regulatory Enforcement Fairness Act of 1996
    F. Congressional Review Act
    G. Unfunded Mandates Reform Act of 1995
    H. Paperwork Reduction Act of 1995

## I. Executive Summary

### A. Summary of the Regulatory Action

The current regulations at §§ 447.11, 478.11, and 479.11 of title 27, Code of

Federal Regulations (CFR), contain definitions for the term "machinegun."[1]  The

definitions used in 27 CFR 478.11 and 479.11 match the statutory definition of

"machinegun" in the National Firearms Act of 1934 (NFA), as amended, and the Gun

---

[1] Regulations implementing the relevant statutes spell the term "machine gun" rather than "machinegun." *E.*g., 27 CFR 478.11, 479.11.  For convenience, this notice uses "machinegun" except when quoting a source to the contrary.

AR004034

Control Act of 1968 (GCA), as amended.  Under the NFA, the term "machinegun" means

"any weapon which shoots, is designed to shoot, or can be readily restored to shoot,

automatically more than one shot, without manual reloading, by a single function of the

trigger." 26 U.S.C. 5845(b).  The term "machinegun" also includes "the frame or

receiver of any such weapon" or any part or combination of parts designed and intended

"for use in converting a weapon into a machinegun," and "any combination of parts from

which a machinegun can be assembled if such parts are in the possession or under the

control of a person." *Id.*  This definition uses the key terms "single function of the

trigger" and "automatically," but these terms are not defined in the statutory text.

The definition of "machinegun" in 27 CFR 447.11, promulgated pursuant to the

portion of section 38 of the Arms Export Control Act (AECA) (22 U.S.C. 2778)

delegated to the Attorney General by section 1(n)(ii) of Executive Order 13637 (78 FR

16129), is similar.  Currently, the definition of "machinegun" in § 447.11 provides that a

"'machinegun', 'machine pistol', 'submachinegun', or 'automatic rifle' is a firearm

originally designed to fire, or capable of being fired fully automatically by a single pull of

the trigger."

In 2006, ATF concluded that certain bump-stock-type devices qualified as

machineguns under the NFA and GCA.  Specifically, ATF concluded that a device

attached to a semiautomatic firearm that uses an internal spring to harness the force of a

firearm's recoil so that the firearm shoots more than one shot with a single pull of the

trigger is a machinegun.  Between 2008 and 2017, however, ATF also issued

classification decisions concluding that other bump-stock-type devices were not

machineguns, primarily because the devices did not rely on internal springs or similar

AR004035

mechanical parts to channel recoil energy.  Decisions issued during that time did not include extensive legal analysis relating to the definition of "machinegun."  ATF undertook a review of its past classifications and determined that those conclusions did not reflect the best interpretation of "machinegun" under the NFA and GCA.

ATF decided to promulgate a rule that would bring clarity to the definition of "machinegun"—specifically with respect to the terms "automatically" and "single function of the trigger," as those terms are used to define "machinegun."  As an initial step in the process of promulgating a rule, on December 26, 2017, the Department of Justice (Department) published in the *Federal Register* an advance notice of proposed rulemaking titled "Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices."  82 FR 60929.  Subsequently, on March 29, 2018, the Department published in the *Federal Register* a notice of proposed rulemaking (NPRM) titled "Bump-Stock-Type Devices."  83 FR 13442.

The NPRM proposed to amend the regulations at 27 CFR 447.11, 478.11, and 479.11 to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger.  Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter.  Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger.  83 FR at 13447-48.

AR004036

The NPRM proposed regulatory definitions for the statutory terms "single function of the trigger" and "automatically," and amendments of the regulatory definition of "machinegun" for purposes of clarity.  Specifically, the NPRM proposed to amend the definitions of "machinegun" in §§ 478.11 and 479.11, define the term "single function of the trigger" to mean "single pull of the trigger," and define the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 FR at 13447-48.  The NPRM also proposed to clarify that the definition of "machinegun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as bump-stock-type devices). *Id.* at 13447.  Finally, the NPRM proposed to harmonize the definition of "machinegun" in § 447.11 with the definitions in 27 CFR parts 478 and 479, as those definitions would be amended.  *Id.* at 13448.

The goal of this final rule is to amend the relevant regulatory definitions as described above.  The Department, however, has revised the definition of "single function of the trigger" to mean "single pull of the trigger" and analogous motions, taking into account that there are other methods of initiating an automatic firing sequence that do not require a pull.  This final rule also informs current possessors of bump-stock-type devices of the proper methods of disposal, including destruction by the owner or abandonment to ATF.

*B. Summary of Costs and Benefits*

6

ATF estimates the total undiscounted cost of this rule at $312.1 million over 10 years. The total 7% discount cost is estimated at $245.5 million, and the discounted costs would be $32.8 million and $35.0 million, annualized at 3% and 7% respectively. The estimate includes costs to the public for loss of property ($102.5 million); costs of forgone future production and sales ($198.9 million); costs of disposal ($9.4 million); and government costs ($1.3 million). Unquantified costs include potential loss of wages for employees of bump-stock-type device manufacturers, notification to bump-stock-type device owners of the need to destroy the devices, and loss of future usage by the owners of bump-stock-type devices. ATF did not calculate any cost savings for this final rule.

This final rule clarifies that bump-stock-type devices are machineguns that are subject to the NFA and GCA. The provisions of those statutes addressing machineguns are designed to increase public safety by, among other things, limiting legal access to them. Consistent with the NFA and GCA, therefore, a desired outcome of this final rule is increased public safety.

## II. Background

*A. Regulatory Context*

The Attorney General is responsible for enforcing the NFA, as amended, and the GCA, as amended.[2] This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the NFA and GCA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a). The Attorney General has delegated the responsibility for

---

[2] NFA provisions still refer to the "Secretary of the Treasury." 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, for ease of reference, this notice refers to the Attorney General.

7

AR004038

administering and enforcing the NFA and GCA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 CFR 0.130(a)(1)-(2). Accordingly, the Department and ATF have promulgated regulations implementing both the NFA and the GCA. *See* 27 CFR parts 478, 479. In particular, ATF for decades promulgated rules governing "the procedural and substantive requirements relative to the importation, manufacture, making, exportation, identification and registration of, and the dealing in, machine guns." 27 CFR 479.1; *see, e.g.*, *United States v. Dodson*, 519 F. App'x 344, 348-49 & n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the NFA's definition of "machinegun"); *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449-51 (D.C. Cir. 1994) (upholding an ATF determination regarding machinegun receivers). Courts have recognized ATF's leading regulatory role with respect to firearms, including in the specific context of classifying devices as machineguns under the NFA. *See, e.g.*, *York v. Sec'y of Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985).

The GCA defines "machinegun" by referring to the NFA definition,[3] which includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The term "machinegun" also includes "the frame or receiver of any such weapon" or any part, or combination of parts, designed and intended "for use in converting a weapon into a machinegun," and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the

---

[3] 18 U.S.C. 921(a)(23).

8

AR004039

control of a person. *Id.* With limited exceptions, the GCA prohibits the transfer or possession of machineguns under 18 U.S.C. 922(o).

In 1986, Congress passed the Firearms Owners' Protection Act (FOPA), Pub. L. 99-308, 100 Stat. 449, which included a provision that effectively froze the number of legally transferrable machineguns to those that were registered before the effective date of the statute. 18 U.S.C. 922(o). Due to the fixed universe of "pre-1986" machineguns that may be lawfully transferred by nongovernmental entities, the value of those machineguns has steadily increased over time. This price premium on automatic weapons has spurred inventors and manufacturers to develop firearms, triggers, and other devices that permit shooters to use semiautomatic rifles to replicate automatic fire without converting these rifles into "machineguns" under the NFA and GCA. ATF began receiving classification requests for such firearms, triggers, and other devices that replicate automatic fire beginning in 1988. ATF has noted a significant increase in such requests since 2004, often in connection with rifle models that were, until 2004, defined as "semiautomatic assault weapons" and prohibited under the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. 921(a)(30) (sunset effective Sept. 13, 2004).

ATF received classification requests pertaining to bump-stock-type devices. Shooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearms' cyclic firing rate to mimic automatic fire. These devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's recoil either through a mechanism like an internal spring or in conjunction with the shooter's maintenance of pressure (typically constant forward

9

AR004040

pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger).

In 2006, ATF concluded that certain bump-stock-type devices qualified as machineguns under the NFA and GCA.  Specifically, ATF concluded that devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns.  Between 2008 and 2017, however, ATF also issued classification decisions concluding that other bump-stock-type devices were not machineguns, including a device submitted by the manufacturer of the bump-stock-type devices used in the 2017 Las Vegas shooting discussed below.  Those decisions indicated that semiautomatic firearms modified with these bump-stock-type devices did not fire "automatically," and thus were not "machineguns," because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy.  (For further discussion of ATF's prior interpretations, see Part III.A.)  Because ATF has not regulated these certain types of bump-stock-type devices as machineguns under the NFA or GCA, they have not been marked with a serial number or other identification markings.  Individuals, therefore, have been able to legally purchase these devices without undergoing background checks or complying with any other Federal regulations applicable to firearms.

*B.  Las Vegas Shooting*

On October 1, 2017, a shooter attacked a large crowd attending an outdoor concert in Las Vegas, Nevada.  By using several AR-type rifles with attached bump-

10

stock-type devices, the shooter was able to fire several hundred rounds of ammunition in a short period of time, killing 58 people and wounding approximately 500. The bump-stock-type devices recovered from the scene included two distinct, but functionally equivalent, model variations from the same manufacturer. These types of devices were readily available in the commercial marketplace through online sales directly from the manufacturer, and through multiple retailers.

The Las Vegas bump-stock-type devices, as well as other bump-stock-type devices available on the market, all utilize essentially the same functional design. They are designed to be affixed to a semiautomatic long gun (most commonly an AR-type rifle or an AK-type rifle) in place of a standard, stationary rifle stock, for the express purpose of allowing "rapid fire" operation of the semiautomatic firearm to which they are affixed. They are configured with a sliding shoulder stock molded (or otherwise attached) to a pistol-grip/handle (or "chassis") that includes an extension ledge (or "finger rest") on which the shooter places the trigger finger while shooting the firearm. The devices also generally include a detachable rectangular receiver module (or "bearing interface") that is placed in the receiver well of the device's pistol-grip/handle to assist in guiding and regulating the recoil of the firearm when fired. Bump-stock-type devices, including those with the aforementioned characteristics, are generally designed to channel recoil energy to increase the rate of fire of a semiautomatic firearm from a single trigger pull. Accordingly, when a bump-stock-type device is affixed to a semiautomatic firearm, the device harnesses and directs the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary finger without additional physical manipulation of the trigger by the shooter.

11

Following the mass shooting in Las Vegas, ATF received correspondence from members of the United States Congress, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices available on the market constitute machineguns under the statutory definition. Consistent with its authority to "reconsider and rectify" potential classification errors, *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam), ATF reviewed its earlier determinations for bump-stock-type devices issued between 2008 and 2017 and concluded that those determinations did not include extensive legal analysis of the statutory terms "automatically" or "single function of the trigger." The Department decided to move forward with the rulemaking process to clarify the meaning of these terms, which are used in the NFA's statutory definition of "machinegun."

*C. Advance Notice of Proposed Rulemaking*

On December 26, 2017, the Department, as an initial step in the process of promulgating a Federal regulation interpreting the definition of "machinegun" with respect to bump-stock-type devices, published an advance notice of proposed rulemaking (ANPRM) in the *Federal Register*. Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 FR 60929. The ANPRM solicited comments concerning the market for bump-stock-type devices and manufacturer and retailer data. Specifically, the Department asked a series of questions of consumers, retailers, and manufacturers of bump-stock-type devices regarding the cost of bump-stock-type devices, average gross receipts of sales, and the volume and cost of manufacturing, as well as input on the potential effect of a rulemaking affecting bump-

12

AR004043

stock-type devices, including viable markets or the cost of disposing of inventory. Public comment on the ANPRM concluded on January 25, 2018. While ATF received over 115,000 comments, the vast majority of these comments were not responsive to the ANPRM.

On February 20, 2018, the President issued a memorandum to the Attorney General concerning "bump fire" stocks and similar devices. Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 83 FR 7949. The memorandum noted that the Department of Justice had already "started the process of promulgating a Federal regulation interpreting the definition of 'machinegun' under Federal law to clarify whether certain bump stock type devices should be illegal." *Id.* The President then directed the Department of Justice, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.*

### III. Notice of Proposed Rulemaking

On March 29, 2018, the Department published in the *Federal Register* a notice of proposed rulemaking (NPRM) titled "Bump-Stock-Type Devices," 83 FR 13442 (ATF Docket No. 2017R-22), proposing changes to the regulations in 27 CFR 447.11, 478.11, and 479.11. The comment period for the proposed rule concluded on June 27, 2018.

*A. Prior Interpretations of "Single Function of the Trigger" and "Automatically"*

In the NPRM, the Department reviewed ATF's history of classifying bump-stock-type devices through agency rulings and relevant litigation. In particular, it described

AR004044

how ATF published ATF Ruling 2006-2, "Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm." The ruling explained that ATF had received requests from "several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm." ATF Ruling 2006-2, at 1. Prior to issuing ATF Ruling 2006-2, ATF had examined a device called the "Akins Accelerator." To operate the device, the shooter initiated an automatic firing sequence by pulling the trigger one time, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset. Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger, which caused the weapon to discharge the ammunition. The recoil and the spring-powered device thus caused the firearm to cycle back and forth, impacting the trigger finger without further input by the shooter while the firearm discharged multiple shots. The device was advertised as able to fire approximately 650 rounds per minute. *See id.* at 2.

ATF initially reviewed the Akins Accelerator in 2002 and determined it not to be a machinegun because ATF interpreted the statutory term "single function of the trigger" to refer to a single movement of the trigger. But ATF undertook further review of the device based on how it actually functioned when sold and later determined that the Akins Accelerator should be classified as a machinegun. ATF reached that conclusion because the best interpretation of the phrase "single function of the trigger" includes a "single pull of the trigger." The Akins Accelerator qualified as a machinegun because ATF determined through testing that when the device was installed on a semiautomatic rifle (specifically a Ruger Model 10-22), it resulted in a weapon that "[with] a single pull of

14

the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted." *Akins v. United States*, No. 8:08-cv-988, slip op. at 5 (M.D. Fla. Sept. 23, 2008) (internal quotation marks omitted).

When issuing ATF Ruling 2006-2, ATF set forth a detailed description of the components and functionality of the Akins Accelerator and devices with similar designs. The ruling determined that the phrase "single function of the trigger" in the statutory definition of "machinegun" was best interpreted to mean a "single pull of the trigger." ATF Ruling 2006-2, at 2 (citing *National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066*, 73rd Cong., at 40 (1934)). ATF further indicated that this interpretation would apply when the agency classified devices designed to increase the rate of fire of semiautomatic firearms. Thus, ATF concluded in ATF Ruling 2006-2 that devices exclusively designed to increase the rate of fire of semiautomatic firearms were machineguns if, "when activated by a single pull of the trigger, [such devices] initiate[] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." *Id.* at 3. Finally, because the "single pull of the trigger" interpretation constituted a change from ATF's prior interpretations of the phrase "single function of the trigger," ATF Ruling 2006-2 concluded that "[t]o the extent previous ATF rulings are inconsistent with this determination, they are hereby overruled." *Id.*

Following its reclassification of the Akins Accelerator as a machinegun, ATF determined and advised owners of Akins Accelerator devices that removal and disposal of the internal spring—the component that caused the rifle to slide forward in the stock—

15

AR004046

would render the device a non-machinegun under the statutory definition. Thus, a possessor could retain the device by removing and disposing of the spring, in lieu of destroying or surrendering the device.

In May 2008, the inventor of the Akins Accelerator filed a lawsuit challenging ATF's classification of his device as a machinegun, claiming the agency's decision was arbitrary and capricious under the Administrative Procedure Act (APA). *Akins v. United States*, No. 8:08-cv-988, slip op. at 7-8 (M.D. Fla. Sept. 23, 2008). The United States District Court for the Middle District of Florida rejected the plaintiff's challenge, holding that ATF was within its authority to reconsider and change its interpretation of the phrase "single function of the trigger" in the NFA's statutory definition of "machinegun." *Id.* at 14. The court further held that the language of the statute and the legislative history supported ATF's interpretation of the statutory phrase "single function of the trigger" as synonymous with "single pull of the trigger." *Id.* at 11-12. The court concluded that in ATF Ruling 2006-2, ATF had set forth a "reasoned analysis" for the application of that new interpretation to the Akins Accelerator and similar devices, including the need to "protect the public from dangerous firearms." *Id.* at 12.

The United States Court of Appeals for the Eleventh Circuit affirmed the district court's decision, holding that "[t]he interpretation by the Bureau that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Akins*, 312 F. App'x at 200. The Eleventh Circuit further concluded that "[b]ased on the operation of the Accelerator, the Bureau had the authority to 'reconsider and rectify' what it considered to be a classification error." *Id.*

16

AR004047

In ten letter rulings between 2008 and 2017, ATF applied the "single pull of the trigger" interpretation to other bump-stock-type devices. Like the Akins Accelerator, these other bump-stock-type devices allowed the shooter to fire more than one shot with a single pull of the trigger. However, ATF ultimately concluded that these devices did not qualify as machineguns because, in ATF's view, they did not "automatically" shoot more than one shot with a single pull of the trigger. ATF also applied its "single pull of the trigger" interpretation to other trigger actuators, two-stage triggers, and other devices submitted to ATF for classification. Depending on the method of operation, some such devices were classified to be machineguns that were required to be registered in the National Firearms Registration and Transfer Record (NFRTR) and could not be transferred or possessed, except in limited circumstances, under 18 U.S.C. 922(o).[4]

---

[4] Examples of recent ATF classification letters relying on the "single pull of the trigger" interpretation to classify submitted devices as machineguns include the following:

- On April 13, 2015, ATF issued a classification letter regarding a device characterized as a "positive reset trigger," designed to be used on a semiautomatic AR-style rifle. The device consisted of a support/stock, secondary trigger, secondary trigger link, pivot toggle, shuttle link, and shuttle. ATF determined that, after a single pull of the trigger, the device utilized recoil energy generated from firing a projectile to fire a subsequent projectile. ATF noted that "a 'single function of the trigger' is a single pull," and that the device utilized a "single function of the trigger" because the shooter need not release the trigger to fire a subsequent projectile, and instead "can maintain constant pressure through a single function of the trigger."
- On October 7, 2016, ATF issued a classification letter regarding two devices described as "LV-15 Trigger Reset Devices." The devices, which were designed to be used on an AR-type rifle, were essentially identical in design and function and were submitted by the same requester (per the requester, the second device included "small improvements that have come as the result of further development since the original submission"). The devices were each powered by a rechargeable battery and included the following components: a self-contained trigger mechanism with an electrical connection, a modified two-position semiautomatic AR-15 type selector lever, a rechargeable battery pack, a grip assembly/trigger guard with electrical connections, and a piston that projected forward through the lower rear portion of the trigger guard and pushed the trigger forward as the firearm cycled. ATF held that "to initiate the firing . . . a shooter must simply pull the trigger." It explained that although the mechanism pushed the trigger forward, "the shooter never releases the trigger. Consistent with [the requester's] explanation, ATF demonstrated that the device fired multiple projectiles with a "single function of the trigger" because a single pull was all that was required to initiate and maintain a firing sequence.

17

In the NPRM, the Department also noted that prior ATF rulings concerning bump-stock-type devices did not provide substantial or consistent legal analysis regarding the meaning of the term "automatically," as it is used in the NFA and GCA. For example, ATF Ruling 2006-2 concluded that devices like the Akins Accelerator initiated an "automatic" firing cycle because, once initiated by a single pull of the trigger, "the automatic firing cycle continues until the finger is released or the ammunition supply is exhausted." ATF Ruling 2006-2, at 1. In contrast, other ATF letter rulings between 2008 and 2017 concluded that bump-stock-type devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter do not fire "automatically." Of the rulings issued between 2008 and 2017, ATF provided different explanations for why certain bump-stock-type devices were not machineguns, but none of them extensively examined the meaning of "automatically." For instance, some letter rulings concluded that certain devices were not machineguns because they did not "initiate[] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted," without further defining the term "automatically." *E.g.*, Letter for Michael Smith from ATF's Firearm Technology Branch Chief (April 2. 2012). Other letter rulings concluded that certain bump-stock-type devices were not machineguns because they lacked any "automatically functioning mechanical parts or springs and perform[ed] no mechanical function[s] when installed," again without further defining the term "automatically" in this context. *E.g.*, Letter for David Compton from ATF's Firearm Technology Branch Chief (June 7, 2010).

*B. Re-evaluation of Bump-Stock-Type Devices*

18

In the NPRM, the Department reviewed the functioning of semiautomatic firearms, describing that ordinarily, to operate a semiautomatic firearm, the shooter must repeatedly pull and release the trigger to allow it to reset, so that only one shot is fired with each pull of the trigger. 83 FR at 13443. It then explained that bump-stock-type devices, like the ones used in Las Vegas, are designed to channel recoil energy to increase the rate of fire of semiautomatic firearms from a single trigger pull. *Id.* Shooters can maintain a continuous firing cycle after a single pull of the trigger by directing the recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths. *Id.* These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's ledge with constant rearward pressure. *Id.* The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire. *Id.*

In light of its reassessment of the relevant statutory terms "single function of the trigger" and "automatically," the NPRM stated ATF's conclusion that bump-stock-type devices are "machineguns" as defined in the NFA because they convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that, after a single pull of the trigger, harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a

19

semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger.

## C. *Proposed Definition of "Single Function of the Trigger"*

The Department proposed to interpret the phrase "single function of the trigger" to mean "a single pull of the trigger," as it considered it the best interpretation of the statute and because it reflected ATF's position since 2006. The Supreme Court in *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), indicated that a machinegun within the NFA "fires repeatedly with a single pull of the trigger." This interpretation is also consistent with how the phrase "single function of the trigger" was understood at the time of the NFA's enactment in 1934. For instance, in a congressional hearing leading up to the NFA's enactment, the National Rifle Association's then-president testified that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066*, 73rd Cong., 2nd Sess., at 40 (1934). Furthermore, and as noted above, the Eleventh Circuit in *Akins* concluded that ATF's interpretation of "single function of the trigger" to mean a "single pull of the trigger" "is consonant with the statute and its legislative history." 312 F. App'x at 200. No other court has held otherwise.[5]

---

[5] The NPRM also explained that the term "pull" can be analogized to "push" and other terms that describe activation of a trigger. For instance, ATF used the term "pull" in classifying the Akins Accelerator because that was the manner in which the firearm's trigger was activated with the device. But the courts have made clear that whether a trigger is operated through a "pull," "push," or some other action such as a flipping a switch, does not change the analysis of the functionality of a firearm. For example, in *United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit rejected the argument that a switch did not constitute a trigger for purposes of assessing whether a firearm was a machinegun under the NFA, because such an interpretation of the statute would lead to "the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *See also United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) ("'To construe "trigger" to mean only a small

AR004051

*D. Proposed Definition of "Automatically"*

The Department also proposed to interpret the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." That interpretation reflects the ordinary meaning of that term at the time of the NFA's enactment in 1934. The word "automatically" is the adverbial form of "automatic," meaning "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Webster's New International Dictionary* 187 (2d ed. 1934); *see also* 1 *Oxford English Dictionary* 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself.").

Relying on these definitions, the United States Court of Appeals for the Seventh Circuit interpreted the term "automatically" as used in the NFA as "delineat[ing] how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). So long as the firearm is capable of producing multiple rounds with a single pull of the trigger until the trigger finger is removed, the ammunition supply is exhausted, or the firearm malfunctions, the firearm shoots "automatically" irrespective of why the firing sequence ultimately ends. *Id.* ("[T]he reason a weapon ceased firing is not a matter with which § 5845(b) is concerned."). *Olofson* thus requires only that the weapon shoot

---

lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a very common kind. The language [in 18 U.S.C. 922(o)] implies no intent to so restrict the meaning[.]'" (quoting *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (emphasis removed))). Examples of machineguns that operate through a trigger activated by a push include the Browning design, M2 .50 caliber, the Vickers, the Maxim, and the M134 hand-fired Minigun.

21

AR004052

multiple rounds with a single function of the trigger "as the result of a self-acting mechanism," not that the self-acting mechanism produces the firing sequence without any additional action by the shooter. This definition accordingly requires that the self-acting or self-regulating mechanism allows the firing of multiple rounds through a single function of the trigger.

*E. Proposed Clarification That the Definition of "Machinegun" Includes Bump-Stock-Type Devices*

The Department also proposed, based on the interpretations discussed above, to clarify that the term "machinegun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. The Department explained that when a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And that firing sequence is "automatic" because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed). Accordingly, these devices are included under the definition of "machinegun" and, therefore, come within the purview of the NFA.

*F. Amendment of 27 CFR 479.11*

The regulatory definition of "machine gun" in 27 CFR 479.11 matches the statutory definition of "machinegun" in the NFA. The definition includes the terms

22

"single function of the trigger" and "automatically," but those terms are not defined in the statutory text. The NPRM proposed to define these terms in order to clarify the meaning of "machinegun." Specifically, the Department proposed to amend the definition of "machine gun" in 27 CFR 479.11 by:

1. defining the term "single function of the trigger" to mean "single pull of the trigger";

2. defining the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger"; and

3. adding a sentence to clarify that a "machine gun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as a bump-stock-type device).

G. *Amendment of 27 CFR 478.11*

The GCA and its implementing regulations in 27 CFR part 478 reference the NFA's definition of machinegun. Accordingly, the NPRM proposed to make the same amendments in 27 CFR 478.11 that were proposed for § 479.11.

H. *Amendment of 27 CFR 447.11*

The Arms Export Control Act (AECA), as amended, does not define the term "machinegun" in its key provision, 22 U.S.C. 2778.[6]  However, regulations in 27 CFR

---

[6]  Under the AECA, the President has the authority to designate which items are controlled as defense articles for purposes of importation and exportation. 22 U.S.C. 2778(a)(1). The President has, in turn, delegated to the Attorney General the authority to promulgate regulations designating the defense articles controlled for permanent importation, including machineguns.

23

part 447 that implement the AECA include a similar definition of "machinegun," and explain that machineguns, submachineguns, machine pistols, and fully automatic rifles fall within Category I(b) of the U.S. Munitions Import List when those defense articles are permanently imported. *See* 27 CFR 447.11, 447.21. Currently, the definition of "machinegun" in § 447.11 provides that "[a] 'machinegun', 'machine pistol', 'submachinegun', or 'automatic rifle' is a firearm originally designed to fire, or capable of being fired fully automatically by a single pull of the trigger." The NPRM proposed to harmonize the AECA's regulatory definition of machinegun with the definitions in 27 CFR parts 478 and 479, as those definitions would be amended by the proposed rule.

**IV. Analysis of Comments and Department Responses for Proposed Rule**

In response to the NPRM, ATF received over 186,000 comments. Submissions came from individuals, including foreign nationals, lawyers, and government officials, as well as various interest groups. Overall, 119,264 comments expressed support for the proposed rule, 66,182 comments expressed opposition, and for 657 comments, the commenter's position could not be determined. The commenters' grounds for support and opposition, along with specific concerns and suggestions, are discussed below.

*A. Comments Generally Supporting the Rule*

Comments Received

Of the 119,264 comments received in support of the rule, 14,618 used one form letter in support of the proposed rule; 51,454 were petitions or petition signatures compiled by an organization and individuals; and 53,192 were unique comments. Many of the 53,192 unique comments used repetitious declarations of support or a single sentence or phrase, declaring, in essence, (1) ban bump stocks now or I support a ban; (2)

24

common sense gun reform or gun control now; (3) bump stocks should be outlawed; or (4) I fully support this proposed rule. Others supporting the rule expressed disbelief as to how such devices were legal and that it seemed to be a "no brainer," especially after Las Vegas, to prevent anyone from possessing an item that allows the shooter to inflict mass carnage. Several commenters stated that they were present at or knew people who were directly affected by the Las Vegas shooting and urged finalization of the proposed rule on bump-stock-type devices. Some commenters identified as active or former military, while other individuals noted their support for a prohibition on bump-stock-type devices while identifying as gun owners and gun enthusiasts, strong supporters of the Second Amendment, or members of a particular pro-gun interest group. For instance, one commenter wrote, "As an FFL [Federal firearms license] dealer, gun owner and collector, I am writing to support the ban on the sale of bump stocks." Another explained that he has been a member of the National Rifle Association (NRA) for over 30 years and loves hunting and shooting but believes "there is zero justification for bump stocks," because the "only thing bump stocks are good for is creating a kill zone."

Department Response

The Department acknowledges the commenters' support for the proposed rule. The rule clarifies the regulatory definition of "machinegun" to include bump-stock-type devices, and, therefore, subjects them to the restrictions imposed by the NFA and GCA. As 18 U.S.C. 922(o), with limited exceptions, prohibits the possession of machineguns that were not lawfully possessed before the effective date of the statute, current possessors of bump-stock-type devices will be obligated to cease possessing these devices.

25

AR004056

*B. Particular Reasons Raised in Support of the Rule*

1. Threat to Public Safety

Comments Received

Over 36,000 of the supporting comments expressly cited public safety, saving lives (or specifically children's lives), reducing gun deaths and future mass shootings, or protecting law enforcement as the reason for supporting a rule that would restrict possession of bump-stock-type devices. A majority of these comments, including submissions from professional medical associations, declared that allowing persons to modify semiautomatic rifles with bump-stock-type devices so that they operate with a similar rate of fire as fully automatic rifles poses a substantial risk to public safety and that the continued presence of these devices puts all communities at risk. Some commenters said that research shows that nations that have reasonable gun restrictions experience fewer mass shootings. Additionally, many students and numerous individuals identified as former or current teachers expressed support for the rule, with some citing fear that their school could be the next site of a mass shooting or stating that they do not want to continue seeing their students in constant fear of the next active shooter.

Several commenters also noted that bump-stock-type devices are a danger to police forces, with one commenter, a retired law enforcement officer, declaring that regulating bump-stock-type devices is an issue of public safety and will save the lives of those who are in law enforcement. Similarly, other commenters, including a former military physician, stated that the rapid fire enabled by bump-stock-type devices significantly increases the casualties in an attack and puts police officers who respond at greater risk. In light of the Las Vegas shooting, many commenters argued that, given that

26

bump-stock-type devices are easily attainable and inexpensive items, prohibiting these devices is a needed step to reduce gun deaths or prevent future mass shootings. Many individuals, including several State and local government officials and gun safety or public health groups, expressed the urgent need for ATF to finalize the proposed rule in order to protect the public and children, especially given the frequency of mass shootings in recent months and the likelihood that a potential perpetrator will seek out these devices.

Department Response

The Department acknowledges that a bump-stock-type device combined with a semiautomatic firearm can empower a single individual to take many lives in a single incident. The reason for the Department's classification change is that ATF, upon review (discussed in Part III), believes that bump-stock-type devices must be regulated because they satisfy the statutory definition of "machinegun" in the NFA and GCA. By making clear that these devices are subject to the restrictions that the NFA and GCA place on machineguns, this rule reflects the public safety goals of those statutes. Indeed, the NPRM stated that the Las Vegas tragedy made "individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious." 83 FR at 13447. For further discussion of benefits, see Part VI.A.

2. Unnecessary for Civilians to Own

Comments Received

Of the total supporting comments, at least 25,135 of the commenters opined that bump-stock-type devices have no place in civil society and are unnecessary for ordinary

AR004058

persons to own. One of the primary reasons thousands expressed support for the regulation was their view that bump-stock-type devices have no legitimate uses for hunting or sporting purposes, target shooting, or self-protection. Many of these commenters emphasized that the devices cause a decrease in shooter accuracy, and therefore are not useful for hunting and target shooting, and are inappropriate for use in self or home defense. For example, one commenter rhetorically stated, "[W]hat law abiding gun owner who is responsible for every bullet they shoot would want to reduce their accuracy?" Some of these commenters further asserted that because the devices enable rapid but inaccurate fire, they pose a particular risk to large-scale public events, such as the Las Vegas concert. Many commenters, including those identifying as former or active military members, commented that only the military or law enforcement should have access to bump-stock-type devices or that there was no need for civilians to have access to them.

Department Response

The Department acknowledges supporters' comments on limiting the possession of bump-stock-type devices to military or law enforcement. Such a limitation is consistent with the Firearms Owners' Protection Act (FOPA), Pub. L. 99-308, 100 Stat. 449, which makes it unlawful for any person to transfer or possess a machinegun that was not lawfully possessed before the effective date of the statute. FOPA made an exception for governmental entities, allowing for the "transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." 18 U.S.C. 922(o)(2)(A). Congress provided this exemption because it recognized the necessity for the military and law

AR004059

enforcement to continue to use and possess these types of weapons. This final rule is consistent with implementing the requirements of the NFA and GCA provisions that regulate possession of machineguns.

3. Consistent with the Intent of the National Firearms Act

Comments Received

More than 27,000 of the supporting comments urged issuance of the final rule because bump-stock-type devices and other similar conversion devices were meant to circumvent the restrictions of the NFA and GCA, as bump-stock-type devices enable shooters to transform their guns into automatic weapons. Some commenters asserted that it is useless to have a law against automatic weapons yet allow manufacturers to legally produce and sell an item with the sole purpose of turning a firearm into an automatic weapon. Many of these commenters also stated that bump-stock-type devices violate the spirit of the law and that this loophole should be closed by ATF as quickly as possible. Further, at least 1,675 of the supporting comments stated that the proposed rule is consistent with the purposes of the NFA and the intent of Congress. Specifically, these commenters opined that the regulation "enforces machine gun laws that date back many decades" and that "it will have the same dramatic benefit originally intended by those foundational laws."

Department Response

The Department acknowledges supporters' comments that bump-stock-type devices were meant to circumvent the restrictions of the NFA and GCA. Prior to this rule, ATF issued classification letters that determined that some bump-stock-type devices were not "machineguns" as defined by the NFA. Those decisions, however, did not

29

AR004060

include extensive legal analysis, as described in Part III. Upon reexamining these classifications, this final rule promulgates definitions for the terms "single function of the trigger" and "automatically" as those terms are used in the statutory definition of "machinegun." ATF believes these definitions represent the best interpretation of the statute. Therefore, recognizing that a bump-stock-type device used with a semiautomatic firearm enables a shooter to shoot automatically more than one shot by a single function of the trigger, the purpose of this rule is to clarify that such devices are machineguns under the NFA.

4. Constitutional Under the Second Amendment

Comments Received

More than 2,100 commenters in support of the rule argued that a rule prohibiting possession of bump-stock-type devices does not conflict with the Second Amendment. Many opined that the Framers of the Constitution did not intend for these types of devices, which can inflict mass carnage, to be protected by the Second Amendment. Commenters expressed the view that because persons living in the 18th century used muskets capable of firing only one shot before requiring a long reloading process, our forefathers would not have wanted bump-stock-type devices to be readily available. Other commenters, including those who declared themselves to be strong supporters of the Second Amendment, stated that prohibiting bump-stock-type devices was consistent with the Second Amendment.

Several commenters noted language from the majority opinion in *District of Columbia v. Heller*, 554 U.S. 570 (2008). There, the Supreme Court declared that the Second Amendment protects an individual right to bear arms for traditional lawful

30

AR004061

purposes such as self-defense and hunting. However, the Court also stated, "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Commenters further summarized the Court's conclusions that limitations on the right to keep and carry arms are supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." *Id.* at 627. Commenters argued that the Supreme Court's Second Amendment decisions support the proposed rule.

Department Response

The Department acknowledges supporters' concerns and agrees that regulation of bump-stock-type devices is permissible under the Second Amendment. For discussion of the Department's position on the constitutionality of this final rule under the Second Amendment, see Part IV.D.1.a.

5. Absence of Congressional Action

Comments Received

Over 1,500 comments in support urged action on this final rule by invoking popular support for responsible gun limitations. Many of these commenters stated this measure would be a sensible first step for gun safety and that ATF should act where Congress has not acted. One gun safety organization noted that while congressional measures have stalled, ATF is doing what it can to refine rules. At least 1,300 commenters indicated that ATF should choose saving children and the public welfare over the interests of the gun industry and pro-gun organizations, naming in particular the

31

NRA. One commenter wrote, "It's time we quit cow-towing [sic] to the NRA and considered all the rest of us and our children especially. Being afraid to go to school is unAmerican which is what the insistence by the NRA on no gun control is - unAmerican." Many supporting commenters echoed these sentiments.

Department Response

In light of the legal analysis of the term "machinegun" set forth above, the Department agrees with commenters that it is necessary to clarify that the term "machinegun" includes bump-stock-type devices. Congress granted the Attorney General authority to issue rules to administer the NFA and GCA, and the Attorney General has delegated to ATF the authority to administer and enforce these statutes and to implement the related regulations accordingly. The Department and ATF have initiated this rulemaking to clarify the regulatory interpretation of the NFA and GCA.

*C. Comments Generally Opposing the Rule*

Comments Received

A total of 66,182 comments were received that opposed the rule. Approximately 40,806 of those comments were form submissions by the National Association for Gun Rights (NAGR) on behalf of its members, with 25,874 submitted on paper petitions and 14,932 submitted by facsimile. The remaining 25,376 opposing comments were individually submitted. Many of the commenters identified as lawyers, judges, industry groups, or members of law enforcement or the military. There were several commenters who stated they did not own or had no interest in owning a bump-stock-type device but still objected to the rule on various grounds, including that it is unconstitutional and only punishes law-abiding owners of bump-stock-type devices. Of the 25,376 comments

32

individually submitted, 12,636 used one of three form letters; the remaining 12,740 were
unique comments. A majority of these commenters raised specific, detailed objections to
the agency's proposal and the premise upon which the regulation is based, whereas
several hundred of the unique comments were limited to a few sentences opposing the
regulation without further detail. For example, these types of comments simply declared,
in essence, (1) no ban, or a ban is unnecessary; (2) individuals' Second Amendment
rights should not be infringed; or (3) I oppose any additional gun regulations.

Department Response

The Department acknowledges the commenters' objections to the proposed rule
but disagrees with assertions that the rule infringes on the constitutional right to keep and
bear arms and punishes law-abiding gun owners. The Department believes that bump-
stock-type devices satisfy the definition of "machinegun" under the NFA and GCA and
that this final rule reflects the public safety goals of the NFA and GCA. The Department
thoroughly considered the various issues raised in opposition to the rule, which are
discussed below.

*D. Specific Issues Raised in Opposition to the Rule*

1. Constitutional and Statutory Arguments

a. Violates the Second Amendment

Comments Received

A total of 16,051 of the commenters opposed the rule on the ground that it
violates the Second Amendment. Of these, 11,753 used a form letter stating that the
"regulations dismiss Second Amendment protections, by appealing to the *Heller* court
decision. But the Constitution trumps the Supreme Court -- so when the Second

33

Amendment says the right to keep and bear arms shall not be infringed, any limitation of the right for law-abiding citizens should be treated as unconstitutional[.]" Many commenters, including those identifying as former or active law enforcement or military members, echoed these sentiments by declaring that the proposed rule infringes on the rights of law-abiding gun owners, and that the phrasing of the Second Amendment— "shall not be infringed"—strictly limits or negates the ability of Government to impose any regulations on firearms. One commenter, for instance, argued that the Second Amendment's reference to a "well-regulated Militia" includes unorganized militia, which the commenter interpreted to mean any person who owns a gun. Because the military has automatic weapons, the commenter reasoned that the people—as the unorganized militia—are likewise constitutionally entitled to access such weapons.

Numerous commenters cited the Supreme Court's decision in *Heller*, 554 U.S. 570, which declared that the Second Amendment protects an individual right to bear arms. Commenters also referred to the Supreme Court's decision in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam), stating that this decision makes clear that weapons in "common use" cannot be banned. One commenter pointed out that if bump-stock-type devices are now machineguns, then there are an additional 519,927 machineguns that are currently owned typically by law-abiding citizens for lawful purposes. This amount, the commenter argued, surpasses the 200,000 stun guns found to trigger a "common use" analysis in *Caetano*, meaning that such items cannot be banned unless they are both dangerous and unusual. Further, commenters said that *Caetano* stands for the proposition that any advancement in weaponry is still protected under the Second Amendment. They argued that the Court declared "the Second Amendment

34

extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding" and that its protection is not limited to only those weapons useful in warfare. *Id.* at 1027 (internal quotation marks omitted).

Department Response

The Department does not believe that the proposed regulation violates the Second Amendment. The Supreme Court has indicated, and several lower courts have squarely held, that the Second Amendment does not protect a right to possess a machinegun. Because bump-stock-type devices are machinegun conversion devices that qualify as "machineguns" under Federal law, *see supra* Part III.E., prohibiting them does not violate the Second Amendment.

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *accord McDonald v. City of Chi.*, 561 U.S. 742, 786 (2010). In *Heller*, for example, the Supreme Court recognized an "important limitation on the right to keep and carry arms": "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. More specifically, and importantly for purposes of this rulemaking, the Court explicitly described machineguns as the kind of dangerous and unusual weapons not protected by the Second Amendment. In the course of explaining the Court's holding in *United States v. Miller*, 307 U.S. 174 (1939) (upholding Federal prohibition of short-barreled shotguns), the Court noted that a portion of *Miller* could be "[r]ead in isolation" to "mean that only those weapons useful in warfare are protected" by the Second Amendment. *Heller*, 554 U.S. at 624. But "[t]hat would be a startling reading of the opinion," the Court continued, "since it would mean that the National Firearms Act's restrictions on machineguns . . . might be

35

unconstitutional, machineguns being useful in warfare in 1939." *Id. Heller* thus made clear that machineguns, like short-barreled shotguns, are "weapons not typically possessed by law-abiding citizens for lawful purposes," and thus fall outside the scope of the Second Amendment as historically understood. *Id.* at 625; *see also id.* at 627 (accepting that M-16 rifles are dangerous and unusual weapons that may be banned).

In the decade since *Heller* was decided, lower courts have consistently upheld prohibitions of machineguns. *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (upholding Federal statute banning possession of machineguns because they are "dangerous and unusual and therefore not in common use"); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *see also Heller v. Dist. of Columbia* (*Heller II*), 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller*"); *United States v. Marzzarella*, 614 F.3d 85, 94-95 (3d Cir. 2010) ("the Supreme Court has made clear the Second Amendment does not protect" machineguns and short-barreled shotguns).

This body of precedent, in addition to *Heller*, strongly supports the Department's view that a bump-stock-type device, as a machinegun conversion device qualifying as a "machinegun" under Federal law, is not protected by the Second Amendment. What makes a machinegun a "dangerous and unusual weapon" unprotected by the Second Amendment is its capacity to fire automatically, *see, e.g.*, *Henry*, 688 F.3d at 640, which "puts the machine gun on a different plane" than other firearms, *United States v. Kirk*, 105 F.3d 997, 1002 (5th Cir. 1997) (en banc) (opinion of Higginbotham, J.). Bump-

36

AR004067

stock-type devices qualify as machineguns, as discussed above, because they enable an otherwise semiautomatic firearm to fire automatically. Since they bear the same key characteristic that makes traditional machineguns "dangerous and unusual," bump-stock-type devices are unprotected by the Second Amendment for the same reason.

This conclusion is fully consistent with *Caetano v. Massachusetts*, 136 S. Ct. 1027. In *Caetano*, the Supreme Judicial Court of Massachusetts had upheld a State prohibition of stun guns on the grounds that stun guns were not in common use when the Second Amendment was ratified and are not useful in military operations. *See id.* at 1027-28. The Supreme Court summarily vacated this ruling because neither of the State court's premises was valid: *Heller* made a "clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding,'" and "rejected the proposition 'that only those weapons useful in warfare are protected.'" *Id.* at 1028 (quoting *Heller*, 554 U.S. at 582, 624-25). The Department's conclusion in this rulemaking that the Second Amendment does not protect bump-stock-type devices rests on neither of the propositions rejected by *Caetano*. As discussed above, the Department believes that this rule comports with the Second Amendment because bump-stock-type devices qualify as machineguns, which are not constitutionally protected—not because bump-stock-type devices did not exist in 1791 or are not useful in warfare. Moreover, although the Supreme Judicial Court of Massachusetts ultimately held that stun guns are protected under the Second Amendment in *Ramirez v. Commonwealth*, 94 N.E.3d 809 (2018), the court did not suggest that more dangerous weapons, like machineguns and machinegun conversion devices, are also protected. The court acknowledged that a stun

37

gun is even "less lethal than a handgun," *id.* at 817, the weapon that the Supreme Court expressly held to be protected in *Heller*, 554 U.S. at 635.

b. Violates the Fifth Amendment

*i. Violates Due Process Clause – Entrapment*

Comments Received

At least one commenter, a gun-rights nonprofit organization, argued that ATF's change of position constitutes unconstitutional entrapment. It maintained that ATF's past classification letters, which informed the public that certain bump-stock-type devices were not subject to the NFA or GCA, invited the public to rely on its consistent decisions and acquire such items. With the sudden change of position, the organization asserted, ATF seeks to entrap citizens who have simply purchased a federally approved firearm accessory. Citing *Sherman v. United States*, 356 U.S. 367, 376 (1958), the organization argued that it is "unconstitutional for the Government to beguile an individual 'into committing crimes which he otherwise would not have attempted.'" Further, it argued that at least some 520,000 law-abiding citizens could be criminals who could face up to ten years' imprisonment "without even receiving individual notice of ATF's reversal of position."

Department Response

The Department disagrees that the final rule amounts to entrapment. Entrapment is a complete defense to a criminal charge on the theory that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). A valid

38

entrapment defense has two related elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988).

As described above, ATF has now concluded that it misclassified some bump-stock-type devices and therefore initiated this rulemaking pursuant to the requirements of the APA. An agency is entitled to correct its mistakes. *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) ("[I]t is well understood that [a]n agency is free to discard precedents or practices it no longer believes correct. Indeed we expect that an[ ] agency may well change its past practices with advances in knowledge in its given field or as its relevant experience and expertise expands. If an agency decides to change course, however, we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."). This rulemaking procedure is specifically designed to notify the public about changes in ATF's interpretation of the NFA and GCA and to help the public avoid the unlawful possession of a machinegun. It is important to note that at no time did ATF induce any member of the public to commit a crime. The ANPRM, NPRM, and this final rule have followed the statutory process for ensuring that the public is aware of the correct classification of bump-stock-type devices under the law, and that continued possession of such devices is prohibited. Anyone currently in possession of a bump-stock-type device is not acting unlawfully unless they fail to relinquish or destroy their device after the effective date of this regulation.

39

*ii. Violates Takings Clause and Due Process Clause*

Comments Received

Over 1,200 commenters objected that the rule will violate the Takings Clause of the Fifth Amendment, which provides "private property [shall not] be taken for public use, without just compensation." Some commenters said that the Takings Clause requires the Government to compensate manufacturers for their present and future loss of revenues. Many other commenters further indicated that the Government would owe compensation to owners of bump-stock-type devices because the Government would effectively be taking personal property for public safety, which is a form of public use. They cited *Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2428 (2015), for the proposition that mandating relinquishment of property constitutes a physical taking and requires compensation. One commenter contrasted this rule with the regulation at issue in *Andrus v. Allard*, 444 U.S. 51 (1979), which prohibited the commercial sale of eagle body parts gathered before 1940. The commenter observed that the Supreme Court held the eagle-part regulation was not a regulatory taking because it did not compel the surrender of the body parts and imposed no physical invasion or restraint upon them. *Id.* at 65-66. By contrast, the commenter noted, owners of bump-stock-type devices under the regulation would be compelled to surrender their devices or face criminal penalties.

Several commenters also stated that "for this regulation to be Constitutional each and every owner of a bump stock, or other devices captured in this regulation not yet named, must be given their day in court to present evidence and an argument as to why their property shouldn't be taken without compensation at a minimum."

40

AR004071

Many commenters separately opined that the Department did not include the cost of compensation in its cost-benefit analysis and several proposed estimated costs of such compensation. Those comments are addressed in Part IV.I.1.

Department Response

The Department does not agree that classifying bump-stock-type devices as machineguns results in the unlawful taking of property "for public use, without just compensation." U.S. Const. amend. V. It is well established that "the nature of the [government's] action is critical in takings analysis." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 (1987); *accord Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) ("character of the government action" has "particular significance"). The Department's action here, classifying bump-stock-type devices as machineguns subject to the NFA and GCA, does not have the nature of a taking.

A restriction on "contraband or noxious goods" and dangerous articles by the government to protect public safety and welfare "has not been regarded as a taking for public use for which compensation must be paid." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006); *see also United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845 (8th Cir. 1999) ("forfeiture of contraband is an exercise of the government's police power" and does not qualify as a taking).[7] The Takings Clause was "not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power

---

[7] In the takings context, the use of the term "police power" in connection with Federal regulation does not posit the existence of a "plenary police power" at the Federal level. *Cf. United States v. Lopez*, 514 U.S. 549, 566 (1995). Rather, it refers to "the power of the federal government to engage," pursuant to one or more of its enumerated powers, "in activities not unlike those engaged in by the states under their inherent sovereign powers" to protect the public welfare. *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1568 n.17 (Fed. Cir. 1994).

41

AR004072

over private property which is necessary for the orderly existence of all governments. It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given." *Chi., Burlington & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 594 (1906) (internal quotation marks omitted); *see, e.g.*, *Holliday Amusement Co. of Charleston v. South Carolina*, 493 F.3d 404, 409-11 (4th Cir. 2007) (upholding State prohibition of video gaming machines without compensation).

In *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887), for example, the Supreme Court rejected a distiller's argument that a State constitutional amendment prohibiting the manufacture and sale of intoxicating liquors was an unconstitutional taking. The Court explained that the government's power to prohibit the "use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Id.* at 669. Similarly, the Supreme Court held in *Miller v. Schoene*, 276 U.S. 272, 280 (1928), that Virginia was not required to compensate owners of red cedar trees for the value of trees that the State had ordered destroyed to prevent the spread of a disease that threatened local apple orchards. "[W]here the public interest is involved," the Court observed, "preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Id.* at 279-80. Lower courts have likewise deemed the Takings Clause

42

AR004073

inapplicable to governmental regulation of dangerous personal property for public-safety reasons. *See, e.g., Garcia v. Vill. of Tijeras*, 767 P.2d 355 (N.M. Ct. App. 1988) (village ordinance banning possession of pit bulls was "a proper exercise of the Village's police power" and not a taking).

Consistent with these cases, courts have rejected arguments that restrictions on the possession of dangerous firearms, like machineguns, are takings requiring just compensation. In *Akins v. United States*, 82 Fed. Cl. 619 (2008), for example, the Court of Federal Claims held that ATF's ultimate classification of the Akins Accelerator as a machinegun, *see supra* Part III, was not a taking. The court reasoned that ATF had acted "pursuant to the police power conferred on it by Congress" rather than by exercising eminent domain, and that the plaintiff lacked a sufficient property interest because he had "voluntarily entered an area subject to pervasive federal regulation—the manufacture and sale of firearms." *Id.* at 623-24; *see also Bennis v. Michigan*, 516 U.S. 442, 452 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."). Similar reasoning led the District of Columbia Court of Appeals to hold that a D.C. law prohibiting machineguns and requiring their disposal or removal was not a taking. *Fesjian v. Jefferson*, 399 A.2d 861, 865-66 (1979). These precedents support the Department's conclusion that the prohibition of bump-stock-type devices as machineguns does not have the character of a compensable taking within the meaning of the Fifth Amendment.

The Department acknowledges that a panel of the U.S. Court of Appeals for the Ninth Circuit recently upheld a preliminary injunction against the Attorney General of

43

AR004074

California that relied in part on the Takings Clause in prohibiting the State from implementing restrictions on firearm magazines that hold more than 10 rounds. *Duncan v. Becerra*, No. 17-56081, 2018 WL 3433828 (9th Cir. July 17, 2018). The Ninth Circuit's order essentially adopted the district court's analysis of the Takings Clause question. *See id.* at *3. The district court's reasoning on the takings question was closely intertwined with the Second Amendment inquiry, and rested on the conclusion that it was "dubious" for California to deem large-capacity magazines a public nuisance given the Supreme Court's observation that "[g]uns in general are not deleterious devices or products or obnoxious waste materials." *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1137 (S.D. Cal. 2017) (internal quotation marks omitted) (quoting *Staples v. United States*, 511 U.S. 600, 610 (1994)). But regulation of bump-stock-type devices is fundamentally distinguishable from California's prohibition on possessing such magazines. As discussed, and as *Heller* indicates, dangerous and unusual weapons are not entitled to Second Amendment protection, and may indeed qualify as deleterious devices or contraband. Other district courts have followed the reasoning of cases like *Akins* and *Fesjian* and rejected takings challenges to California firearm restrictions. *See Rupp v. Becerra*, 2018 WL 2138452, at *8-9 (C.D. Cal. May 9, 2018) (restrictions on "assault weapons"); *Wiese v. Becerra*, 263 F. Supp. 3d 986, 995 (E.D. Cal. 2017) (prohibition of large-capacity gun magazines).

Finally, the Department does not agree that each owner of a bump-stock-type device has a due-process right to a hearing in connection with the promulgation of this rule. The rule clarifies the scope of the NFA and GCA, general legislative enactments, with respect to bump-stock-type devices. "Official action that is legislative in nature is

44

not subject to the notice and hearing requirements of the due process clause." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994); *see also, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard."). Furthermore, the Department's conclusion that bump-stock-type devices are machineguns under the NFA and GCA means that owners lack a cognizable property interest in these devices for due-process purposes. As the Fifth Circuit held in *Cooper v. City of Greenwood*, firearms covered by the NFA are "contraband *per se*," and "[c]ourts will not entertain a claim contesting the confiscation of contraband *per se* because one cannot have a property right in that which is not subject to legal possession." 904 F.2d 302, 305 (1990).

c. Violates Ex Post Facto Clause and Bill of Attainder Clause

Comments Received

Numerous commenters asserted that the proposed rule would violate article I, section 9, clause 3 of the Constitution, which states, "No Bill of Attainder or ex post facto Law shall be passed." One gun-rights nonprofit organization, quoting *United States v. O'Neal*, 180 F.3d 115, 122 (4th Cir. 1999), stated that even though this is a regulatory action, the "sanction or disability it imposes is 'so punitive in fact' that the law 'may not legitimately be viewed as civil in nature.'"

Another commenter, the Maryland Shall Issue organization, argued that ATF's reliance on 18 U.S.C. 922(o) creates an impermissible ex post facto law because current owners and manufacturers of bump-stock-type devices "became felons as of the date and time they took possession of a bump stock, even though such possession and manufacture

45

AR004076

was then expressly permitted by prior ATF interpretations." The commenter cited *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798), and *Peugh v. United States*, 569 U.S. 530 (2013), to support its arguments. It argued that the ex post facto issue can be avoided by holding that the exemption in 18 U.S.C. 922(o)(2)(A) applies where bump-stock-type devices are possessed under "the authority" of prior ATF rulings. Furthermore, the commenter, citing *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988), stated that the Supreme Court has held that an agency cannot engage in retroactive rulemaking without specific congressional authorization. Relying on *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 36 (2006), the commenter stated there is no question that the proposed rule has a retroactive effect because the rule would "affect" existing rights and impose new liabilities on the past and continued possession of bump-stock-type devices.

At least one commenter argued the rule is an unconstitutional bill of attainder because the rule restricts particular brands of stocks, per the Department's definition, while not at the same time restricting all brands of stocks. Similarly, another commenter stated the regulation appears punitive in nature, and abusively narrow in targeting Slide Fire, a seller of bump-stock-type devices that has already announced the close of its business.

Department Response

The Department disagrees that the proposed rule violates the Ex Post Facto or Bill of Attainder Clauses. The rule would criminalize only future conduct, not past possession of bump-stock-type devices that ceases by the effective date of this rule. In *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798), the Supreme Court set out four types of laws that violate the Ex Post Facto Clause:

46

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390. Citing *Calder*, the Supreme Court has explained that "[t]o fall within the *ex post facto* prohibition, a law must be retrospective—that is, *it must apply to events occurring before its enactment*—and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (emphasis added; citations and internal quotation marks omitted). The Federal courts have thus been careful to distinguish statutes and regulations that violate the Ex Post Facto Clause from those that criminalize only future conduct and are therefore not "retrospective," including in the firearms possession context. For example, following passage of the Lautenberg Amendment (18 U.S.C. 922(g)(9)), which made it unlawful for persons convicted of a misdemeanor crime of domestic violence to possess a firearm, several defendants argued that the law violated the Ex Post Facto Clause. One defendant argued that he had a prior conviction for a misdemeanor crime of domestic violence, but lawfully possessed a firearm before 18 U.S.C. 922(g)(9) became law. *United States v. Mitchell*, 209 F.3d 319 (4th Cir. 2000). The defendant argued that, as applied to him, the statute violated the Ex Post Facto Clause because the new law penalized him for his previous domestic violence conviction. However, the Fourth Circuit disagreed, noting that "[i]t is immaterial that Mitchell's firearm purchase and domestic violence conviction occurred prior to § 922(g)(9)'s enactment because the conduct prohibited by § 922(g)(9) is the *possession* of a firearm."

47

*Id.* at 322; *see also United States v. Pfeifer*, 371 F.3d 430, 436-37 (8th Cir. 2004); *United States v. Meade*, 986 F. Supp. 66, 69 (D. Mass. 1997), *aff'd*, 175 F.2d 215 (1st Cir. 1999); *United States v. Brady*, 26 F.3d 282, 290-91 (2d Cir. 1994); *United States v. Gillies*, 851 F.2d 492, 495-96 (1st Cir. 1988) (Breyer, J.); *United States v. D'Angelo*, 819 F.2d 1062, 1065-66 (11th Cir. 1987).

This rule brings clarity to the meaning of "machinegun," and makes clear that individuals are subject to criminal liability only for possessing bump-stock-type devices *after* the effective date of regulation, not for possession before that date. No action taken before the effective date of the regulation is affected under the rule. Although regulating past possession of a firearm may implicate the Ex Post Facto Clause, regulating the continued or future possession of a firearm that is already possessed does not. *See Benedetto v. Sessions*, No. CCB-17-0058; 2017 WL 4310089, at *5 (D. Md. Sept. 27, 2017) ("Whether a gun was purchased before the challenged law was enacted . . . is immaterial to whether the challenged law regulates conduct that occurred before or after its enactment."); *see also Samuels v. McCurdy*, 267 U.S. 188, 193 (1925) (rejecting Ex Post Facto Clause challenge to statute that prohibited the post-enactment possession of intoxicating liquor, even when the liquor was lawfully acquired before the statute's enactment). For this reason, the Department disagrees with commenters' assertions that the rule violates the Ex Post Facto Clause.

Relatedly, the Department also disagrees with the view that 18 U.S.C. 922(o)(2)(A) provides the authority to permit continued possession of bump-stock-type devices "under the authority" of prior ATF rulings. Section 922(o)(2)(A) is inapplicable because, among other reasons, ATF's letter rulings regarding bump-stock-type devices

48

did not purport to authorize the possession of devices qualifying as machineguns under section 922(o)(1); instead, ATF advised individuals that certain devices did not qualify as machineguns in the first place, a position that ATF has now reconsidered. Furthermore, section 922(o)(2)(A) does not empower ATF to freely grant exemptions from section 922's general prohibition of machineguns.

The Department also disagrees that the proposed rule constitutes a bill of attainder. The Supreme Court has highlighted the fact that the Bill of Attainder Clause applies only to Congress, noting that "[t]he distinguishing feature of a bill of attainder is the substitution of a *legislative* for a judicial determination of guilt." *De Veau v. Braisted*, 363 U.S. 144, 160 (1960) (emphasis added). The Court has also described a bill of attainder as "a law that *legislatively* determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) (emphasis added). Accordingly, the Bill of Attainder Clause does not apply "to regulations promulgated by an executive agency." *Paradissiotis v. Rubin,* 171 F.3d 983, 988-89 (5th Cir. 1999) (citing *Walmer v. U.S. Dep't of Defense*, 52 F.3d 851, 855 (10th Cir. 1995) ("The bulk of authority suggests that the constitutional prohibition against bills of attainder applies to legislative acts, not to regulatory actions of administrative agencies.")); *see also Korte v. Office of Personnel Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986); *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966). Even if the proposed rule were subject to the Bill of Attainder Clause, it would pass constitutional muster. The fact that Slide Fire announced the close of its business does not make this rule a bill of attainder; that company is not being singled out, as the proposed rule applies to all similar devices. Further, the regulation of all

49

machineguns of this type is not a "punishment" as is required for an enactment to be unlawful bill of attainder. *See Nixon*, 433 U.S. at 473.

d.  Violates Fourth Amendment

Comments Received

Many commenters also raised objections on grounds that the proposed rule violates the Fourth Amendment's guarantee against unreasonable searches and seizures. Commenters believed that because bump-stock-type devices essentially would become contraband under the rule, "mandating [their] surrender to authorities would violate the 4th Amendment protection from seizure without due process."

Department Response

Although commenters cite the Fourth Amendment, it is unclear how a "search" or "seizure" would result from this rule.  The Department is unaware of any precedent supporting the view that a general regulatory prohibition of possession of certain contraband can violate the Fourth Amendment.  A seizure in "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989), and the final rule makes clear that current possessors of bump-stock-type devices are not required to surrender the devices to the authorities. Instead, current possessors may lawfully dispose of their devices in other ways, as discussed below in Part IV.D.7.

e.  Violates Ninth and Tenth Amendments

Comments Received

Various commenters opposed to the rule stated that it would violate the Ninth and Tenth Amendments of the Constitution.  The Ninth Amendment provides: "The

50

AR004081

enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." One commenter said, "The BATF is another agency whose existence violates the 10th Amendment." Another commenter argued, "as an accessory, the federal government cannot ban [bump-stock-type devices], because only the states can ban them." A handful of other commenters stated that the rule violates States' rights under the Tenth Amendment because it violates the "right to keep and bear arms" provisions of 44 State constitutions.

Department Response

The Department disagrees that the proposed rule violates the commenters' rights under the Ninth Amendment. The Ninth Amendment "does not confer substantive rights in addition to those conferred by other portions of our governing law. The Ninth Amendment 'was added to the Bill of Rights to ensure that the maxim *expressio unius est exclusio alterius* would not be used at a later time to deny fundamental rights merely because they were not specifically enumerated in the Constitution.'" *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991) (citing *Charles v. Brown*, 495 F. Supp. 862, 863-64 (N.D. Ala. 1980)). Federal "circuit courts across the country have consistently held that the Ninth Amendment does not impinge upon Congress's authority to restrict firearm ownership." *United States v. Finnell*, 256 F. Supp. 2d 493, 498 (E.D. Va. 2003).

The Department also disagrees that the rule violates the Tenth Amendment. Commenters seemingly argued that the powers exercised by the Department in issuing the rule were "powers not delegated to the United States by the Constitution, nor

51

AR004082

prohibited by it to the States." However, Federal courts have long held that the NFA, GCA, and implementing regulations do not violate the Tenth Amendment. The NFA does not "usurp[] police power reserved to the States." *United States v. Miller*, 307 U.S. 174, 176 (1939). Further, "[b]ecause § 922(o) was a proper exercise of Congress's enumerated authority under the Commerce Clause, and because it does not compel, let alone commandeer, the states to do anything, the statute does not violate the Tenth Amendment." *United States v. Kenney*, 91 F.3d 884, 891 (7th Cir. 1996).

f. Lack of Statutory Authority

Comments Received

A total of 47,863 commenters, most of whom sent form submissions opposed to the proposed rule, argued that ATF lacks statutory authority to regulate bump-stock-type devices. Many commenters said that ATF, by its own admission, repeatedly stated it could not regulate such devices. Commenters generally expressed the view that because bump-stock-type devices are not firearms, ATF has no authority under the NFA or GCA to regulate them. Some commenters contended that 6 U.S.C. 531 gives ATF only narrow statutory authority and does not provide ATF general authority to regulate the safety of firearms, accessories, or parts.

In addition, numerous commenters argued that, as the term "machinegun" is already clearly defined in the NFA, only Congress can make changes to the definition and regulate bump-stock-type devices. Furthermore, commenters stated that the agency's interpretation of the term "machinegun" would not be entitled to deference under *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

52

AR004083

Department Response

The Attorney General is responsible for enforcing the NFA, as amended, and the GCA, as amended. This includes the authority to promulgate regulations necessary to enforce the provisions of these statutes. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a). The statutory provision cited by some commenters, 6 U.S.C. 531, is the provision of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, that transferred the powers the Secretary of the Treasury had with respect to ATF to the Attorney General when ATF was transferred to the Department of Justice. Accordingly, the Attorney General is now responsible for enforcing the NFA and GCA, and he has delegated the responsibility for administering and enforcing the NFA and GCA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 CFR 0.130(a)(1)-(2).

"Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). In the original GCA implementing regulations, ATF provided regulatory definitions of the terms that Congress did not define in the statute. 33 FR 18555 (Dec. 14, 1968). Since 1968, ATF has occasionally added definitions to the implementing regulations. *See, e.g.*, 63 FR 35520 (June 30, 1998). Similarly, 26 U.S.C. 7805(a) states that "the [Attorney General] shall prescribe all needful rules and regulations for the enforcement of this title." As is the case with the GCA, ATF has provided regulatory definitions for terms in the NFA that Congress did not define, such as "frame or receiver" and "manual reloading." *See, e.g.*, 81 FR 2658 (Jan. 15, 2016).

53

These definitions were necessary to explain and implement the statute, and do not contradict the statute. Federal courts have recognized ATF's authority to classify devices as "firearms" under Federal law. *See, e.g., Demko v. United States*, 44 Fed. Cl. 83, 93 (1999) (destructive device); *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009) (per curiam) (machinegun).

This rule is based upon this authority. Further, ATF has provided technical and legal reasons why bump-stock-type devices enable automatic fire by a single function of the trigger, and thus qualify as machinegun conversion devices, not mere "accessories." ATF has regularly classified items as machinegun "conversion devices" or "combinations of parts," including auto sears (ATF Ruling 81-4) and the Akins Accelerator (ATF Ruling 2006-2).

The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes. However, the Department disagrees that the rule conflicts with the statutes or is in contravention of administrative-law principles. The rule merely defines terms used in the definition of "machinegun" that Congress did not—the terms "automatically" and "single function of the trigger"—as part of implementing the provisions of the NFA and GCA.

When a court is called upon to review an agency's construction of the statute it administers, the court looks to the framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). The first step of the *Chevron* review is to ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

54

AR004085

Congress. If, however, the court determines Congress has not directly addressed the

precise question at issue . . . . the question for the court is whether the agency's answer is

based on a permissible construction of the statute." *Id.* at 842-43 (footnote omitted).

The Department believes that this rule's interpretations of "automatically" and "single

function of the trigger" in the statutory definition of "machinegun" accord with the plain

meaning of those terms. Moreover, even if those terms are ambiguous, this rule rests on

a reasonable construction of them. Although Congress defined "machinegun" in the

NFA, 26 U.S.C. 5845(b), it did not further define the components of that definition. *See,*

*e.g.*, *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 419 (6th

Cir. 2006) (noting that the NFA does not define the phrases "designed to shoot" or "can

be readily restored" in the definition of "machinegun"). Congress thus implicitly left it to

the Department to define "automatically" and "single function of the trigger" in the event

those terms are ambiguous. *See Chevron*, 467 U.S. at 844. Courts have appropriately

recognized that the Department has the authority to interpret elements of the definition of

"machinegun" like "automatically" and "single function of the trigger." *See York v.*

*Sec'y of Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985); *United States v. Dodson*, 519

F. App'x 344, 348-49 & n.4 (6th Cir. 2013); *cf., e.g.*, *Firearms Import/Export Roundtable*

*Trade Grp. v. Jones*, 854 F. Supp. 2d 1, 18 (D.D.C. 2012) (upholding ATF's

interpretation of 18 U.S.C. 925(d) to ban importation of certain firearm parts under

*Chevron* "step one"); *Modern Muzzleloading. Inc. v. Magaw*, 18 F. Supp. 2d 29, 35-36

(D.D.C. 1998) ("since the ATF's classification of [a firearm as not antique] 'amounts to

or involves its interpretation' of the GCA, a statute administered by the ATF, we review

that interpretation under the deferential standard announced in *Chevron*").

55

AR004086

Second, the Department's construction of those terms is reasonable under *Chevron*. As explained in more detail in Part III, the Department is clarifying its regulatory definition of "automatically" to conform to how that word was understood and used when the NFA was enacted in 1934. *See Olofson*, 563 F.3d at 658. And the Department is reaffirming that a single pull of the trigger is a single function of the trigger, consistent with the NFA's legislative history, ATF's previous determinations, and judicial precedent. *See, e.g.*, *Akins*, 312 F. App'x at 200. This rule is therefore lawful under the NFA and GCA even if the operative statutory terms are ambiguous.

g.  Violation of the Americans with Disabilities Act

Comments Received

A few commenters indicated that bump-stock-type devices are assistive devices for people with nerve damage or a physical disability. A few commenters further stated that the regulation could be a violation of the Americans with Disabilities Act (ADA), 42 U.S.C. ch. 126. In particular, one commenter claimed that under the ADA, an individual can establish coverage under the law by "showing that he or she has been subjected to *an action* prohibited under the Act because of an actual or *perceived physical* [condition] that is not transitory and minor." The commenter asserted that this regulation constitutes such "an action" and would violate the civil rights of a diverse group of persons with disabilities, including homeowners, veterans, target shooters, and hunters.

Department Response

The Department disagrees with commenters that the final rule would violate the ADA. While the ADA applies to State and local governments, it does not apply to the Executive Branch of the Federal Government. *See* 42 U.S.C. 12131(1) (defining "public

56

entity" as any State or local government; any department, agency. special purpose district, or other instrumentality of a State or States or local government: and the National Railroad Passenger Corporation. and any commuter authority). Accordingly, because ATF is a Federal agency that is not subject to the ADA, the commenters' assertion that ATF's regulation would violate the ADA is incorrect.

While not mentioned by commenters, ATF is covered by section 504 of the Rehabilitation Act of 1973, which prohibits discrimination, solely by reason of disability, in Federally conducted programs and activities. 29 U.S.C. 794(a) (stating that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency"). As detailed above, the sole purpose of this rulemaking is to clarify that bump-stock-type devices satisfy the statutory definition of "machinegun." as defined by Congress in the NFA and GCA. While a few commenters made general assertions that bump-stock-type devices can be used as assistive devices for people with disabilities. none submitted any specific information to suggest that this rule would cause qualified individuals with disabilities, solely by reason of their disability, to be excluded from the participation in, subjected to discrimination under, or denied the benefits of any program or activity of ATF. Accordingly, there is nothing in the record to suggest that this rule would raise concerns under the Rehabilitation Act.

AR004088

2. Politically Motivated and Emotional Response

Comments Received

At least 41,954 commenters opposed to the rule, including the 40,806 comments submitted through the NAGR petition, asserted that the proposed rule is a political or knee-jerk response to a tragic incident. Many commenters suggested that the proposed rule reflected political pressure and would be a hasty response that would not achieve real benefits and could lead to confiscating all guns. A handful of commenters even asserted they would support the elimination of ATF. Petitions submitted through NAGR portray the rule as a response to "the anti-gun left . . . so they can turn millions of commonly owned firearms into 'illegal guns' with the stroke of a pen." They cautioned that this rule unfairly capitalizes on the misfortunes of others to push political agendas and that facts should not be thrown aside. Another commenter said that this rule will be tainted because from the beginning the President made clear he had no intention of instructing the Department to abide by the public comments, having declared that bump-stock-type devices "will soon be out" after the "mandated comment period" notwithstanding possible congressional action.

Department Response

While the Las Vegas tragedy brought attention to bump-stock-type devices and requests from Congress and nongovernmental organizations prompted ATF to review its classification of bump-stock-type devices, the Department disagrees that this rulemaking is an unreasoned reaction to recent events. As discussed in the NPRM, see Part III above, ATF recognized that its prior classifications determining only some bump-stock-type devices to be machineguns did not include extensive legal analysis of certain terms that

58

are significant to defining "machinegun" under the NFA and were not always consistent. This final rule defines the terms "automatically" and "single function of the trigger" to clarify the meaning of machinegun and to make clear that bump-stock-type devices are machineguns under the meaning of the statute. The Department further notes that the President specifically directed it to clarify the legal status of bump-stock-type devices through the administrative "procedures the law prescribes," including notice and comment. 83 FR 7949 (Feb. 23, 2018).

3. Not Used in Criminal Activity

Comments Received

Numerous commenters expressed that besides the shooting in Las Vegas, there is no evidence that bump-stock-type devices have been used in the commission of crimes. Several commenters stated that, pursuant to a Freedom of Information Act request, they asked ATF and the Federal Bureau of Investigation (FBI) for any records on whether bump-stock-type devices have been used in crimes and that they received no confirmation affirming the existence of any such records. Moreover, some commenters stated that ATF provided no evidence or justification that bump-stock-type devices will be used more frequently in future crimes. They argued that if the agency cannot show what materials it relied on to regulate bump-stock-type devices for purposes of public safety, then the rulemaking is arbitrary and capricious under the APA. Commenters cited judicial decisions such as *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 52 (1983), in which the Supreme Court held that when an agency rescinds or changes its stance on a regulation, it must explain the

59

evidence underlying its decision and offer a rational connection between the facts found and the choice made.

Many commenters also noted that there is still no confirmation or documentation, despite requests, from Federal agencies confirming that bump-stock-type devices were actually used in the Las Vegas incident, and that ATF has not issued a "Report of Technical Examination" (ATF Form 3311.2) for any of the firearms used in the incident. With questions remaining about the Las Vegas criminal investigation and doubts as to whether bump-stock-type devices were actually used, commenters argued that ATF has no basis to promulgate a regulation that, as ATF declared in the NPRM, "would affect the criminal use of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident." 83 FR at 13454.

These arguments were frequently raised alongside concerns that the cost-benefit analysis did not address the fact that there would be few benefits to the rule given that bump-stock-type devices have supposedly been used in only one crime. These concerns are addressed in Part IV.I.5.

Department Response

The Department disagrees that ATF seeks to regulate bump-stock-type devices merely because they were, or have the potential to be, used in crime. The NPRM stated that the Las Vegas shooting made "individuals aware that these devices exist— potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious." 83 FR at 13447. But the NRPM also provided a detailed analysis explaining that bump-stock-type devices must be regulated

60

because they satisfy the statutory definition of "machinegun" as it is defined in the NFA and GCA. *Id.* at 13447-48.

Commenters conflate the legal basis for ATF's regulation of bump-stock-type devices with the background information that was provided as context for the reason ATF revisited its previous classifications. In the NPRM, ATF explained that the tragedy in Las Vegas gave rise to requests from Congress and nongovernmental organizations that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition. *Id.* at 13446. While part of the Department's mission is to enhance public safety, the impetus for the change in classification was not, as commenters argued, that the device may potentially pose a public safety threat but because, upon review, ATF believes that it satisfies the statutory definition of "machinegun." This rule reflects the public safety objectives of the NFA and GCA, but the materials and evidence of public safety implications that commenters seek have no bearing on whether these devices are appropriately considered machineguns based on the statutory definition.

In *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), the Supreme Court wrote that an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). However, that case involved a Federal agency that rescinded a final rule—based on data and policy choices—shortly after publication, arguing that that rule was no longer necessary for a multitude of reasons, including that the costs outweighed the safety benefits. *See id.* at

AR004092

38-39. The Supreme Court recognized that any change requires a reasoned basis, noting that "[i]f Congress established a presumption from which judicial review should start, that presumption—contrary to petitioners' views—is not *against* safety regulation, but *against* changes in current policy that are not justified by the rulemaking record." *Id.* at 42. However, the revocation in that case involved a discretionary policy decision, and did not depend solely upon statutory construction. The bump-stock-type device rule is not a discretionary policy decision based upon a myriad of factors that the agency must weigh, but is instead based only upon the functioning of the device and the application of the relevant statutory definition. Therefore, the Department does not believe that this rule conflicts with *State Farm*.

4. Will Not Enhance Public Safety

Comments Received

More than 1,100 commenters indicated that a regulation on bump-stock-type devices would have no measurable effect on the current rate of crime or enhance public safety. One commenter argued that the use of bump-stock-type devices by mass shooters might actually save lives based on his experience that using the device can result in a rifle jamming, misfeeding, or misfiring, which would be the best time to disrupt a shooter. Other commenters noted that bump-stock-type devices actually impede a shooter's ability to fire accurately. Commenters stated that there is currently no empirical evidence that further firearms regulations would reduce crime or safeguard people more effectively. One commenter, for example, estimated that out of the tens of thousands of gun deaths per year, most of which he stated are suicides, the proposed rule would only impact a minute percentage, while another commenter opined that crime rate data from the FBI

62

AR004093

show that areas with more firearms restrictions have more crime. A handful of commenters pointed to Chicago as having some of the most stringent gun restrictions yet continuing to have high rates of homicide and gun-related deaths that "surpass[] war zones."

Many commenters opposed to the regulation maintained that neither this rule nor any new gun laws will prevent criminals or people with malicious intent from proceeding to commit crimes. Several voiced the opinion that people determined to kill many people will find other means, such as cars, knives, toxic substances, homemade explosives, or any other object. The problem, they argued, is not the object, but the person who controls it—and that criminals will do whatever they can to accomplish unlawful ends. One commenter, identifying as a law enforcement officer, wrote that he frequently encounters prohibited possessors who still somehow obtain a firearm and do not care about the consequences. Another commenter stated that the fact that the shooter in Las Vegas was well aware that murder is unlawful but chose to ignore the law only serves as proof that laws do not stop evildoers.

Additionally, several hundred commenters stated that ATF should focus its time and energy on enforcing existing gun laws and regulations rather than issuing a new one. One commenter, a former corrections officer from Baltimore, suggested that time would be better spent prosecuting criminals for crimes on the books. Similarly, another commenter noted that "[w]hen the courtrooms are revolving doors that push gang members right back out," the problem is not the lack of laws but rather a lack of tools and resources devoted to enforcing the existing laws. Some commenters remarked that had there been better policing, certain mass shootings could have been avoided.

63

Department Response

The Department agrees with the commenters that the existing laws should be enforced, and the Department is committed to addressing significant violent crime problems facing our communities. No law or regulation entirely prevents particular crimes, but the Las Vegas shooting illustrated the particularly destructive capacity of bump-stock-type devices when used in mass shooting incidents. In any event, the impetus for this rule is the Department's belief, after a detailed review, that bump-stock-type devices satisfy the statutory definition of "machinegun." Through the NFA and GCA, Congress took steps to regulate machineguns because it determined that machineguns were a public safety threat. ATF must therefore classify devices that satisfy the statutory definition of "machinegun" as machineguns. The proposed rule is thus lawful and necessary to provide public guidance on the law.

5. Punishes Law-Abiding Citizens

Comments Received

At least 2,103 commenters opposed the rule on the ground that it would punish law-abiding citizens and would turn them instantly into potential felons. They asserted that hundreds of thousands of law-abiding citizens are being punished for the acts of one evil person and that the overwhelming majority use bump-stock-type devices lawfully and for fun. Many commenters, some of whom do not own a bump-stock-type device, objected that owners of these devices would become felons overnight just for owning a piece of plastic that is not needed to achieve bump firing. They further pointed out that because there is no grandfathering provision, law-abiding gun owners would have to surrender any bump-stock-type devices after having spent money to buy them. Many

AR004095

raised these objections in connection with concerns that the rule is unconstitutional under the Ex Post Facto Clause and the Takings Clause of the Constitution, as already discussed in this preamble. Moreover, some commenters, concerned that the rule's proposed language could later apply to other trigger assemblies, stated that thousands of law-abiding citizens may eventually become criminals overnight for simply owning a non-factory trigger.

Department Response

The Department disagrees that law-abiding citizens would instantly become felons under this rule. This final rule provides specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o). Current possessors of bump-stock-type devices who properly destroy or abandon their devices will avoid criminal liability. As described in Part IV.D.1.b, this is not a compensable "taking" of property under the Constitution.

6. Other Priorities and Efficiencies

Comments Received

Hundreds of commenters who oppose the rule suggested that the focus should not be on any new gun regulation but rather on an array of other issues, including addressing mental health, drug addiction, education, civility, and the decline of parenting and morals. Many argued that more resources should be devoted to treating the mentally ill or to the opioid epidemic, including ensuring that law enforcement and mental health agencies have the power to incarcerate and institutionalize people who are a danger to themselves or others. Several others suggested that resources should be devoted to

65

AR004096

securing public spaces, observing that the U.S. Capitol and all Federal buildings have armed security but many schools and workplaces do not. Numerous commenters noted that other improvements are needed before any new gun restriction is pursued, such as improving records in the National Instant Criminal Background Check System (NICS), properly charging persons with crimes that would bar them from owning firearms, or addressing bullying and teaching morals and the Bible in schools. One commenter suggested the Government investigate the social changes that are turning men into killers, while another said that to make a difference, one needs to go after the videogame industry and Hollywood movies that glorify carnage, body counts, murder, and violence. Commenters argued that only once these issues are tackled can discussion of new gun regulations begin.

Department Response

The Department acknowledges comments regarding treatment of mental health and drug addiction, securing schools and workplaces, improving records in the NICS system, and various social issues. The Department agrees that these are important issues, but they are outside the scope of this rulemaking. Several of these matters were raised as alternatives for the Department to consider. See Part IV.F for further discussion of alternatives.

7. Enforcement and Compliance

Comments Received

Some commenters questioned how ATF will enforce this regulation, and a few stated that they or people they know of will not comply with this rule should it go into effect. Several questioned whether the agency would send armed agents to visit homes

AR004097

and confiscate bump-stock-type devices, while others pointed out that because bump-stock-type devices have not been tracked in any way, confiscation will depend on volunteers. Commenters highlighted the lack of success that certain States, such as Massachusetts, have had in collecting bump-stock-type devices after passing laws restricting their possession. Many commenters suggested it would be a waste of ATF employees' time and public funds for ATF to implement the rule. Several others remarked that confiscation or enforcement would be easily circumvented because new technology like 3D printing and CNC (Computer Numeric Control) equipment (computerized milling machines), or even traditional manufacturing methods, will facilitate a black market in homemade bump-stock-type devices. One commenter submitted to ATF "a fully functional" bump-stock equivalent that was created "using super glue, 2-part epoxy, an AR-15 A2 pistol grip, threaded steel rods, and small ABS plastic bricks [i.e., Legos]."

Department Response

The Department acknowledges comments on enforcement of and compliance with the rule. As stated in the NPRM, current possessors of bump-stock-type devices will be obligated to dispose of these devices. Acceptable methods of destruction include completely melting, shredding, or crushing the device. If the device is made of metal, an alternative acceptable method of destruction is using an oxy/acetylene torch to make three angled cuts that completely severs design features critical to the functionality of the bump-stock-type device. Each cut should remove at least ¼ inch of metal per cut. Any method of destruction must render the device so that it is not readily restorable to a firing condition or is otherwise reduced to scrap. However, as the majority of bump-stock-type

67

AR004098

devices are made of plastic material, individuals may use a hammer to break them apart so that the device is not readily restorable to a firing condition or is otherwise reduced to scrap, and throw the pieces away.

Current possessors are encouraged to undertake destruction of the devices. However, current possessors also have the option to abandon bump-stock-type devices at the nearest ATF office.

Current possessors of bump-stock-type devices will have until the effective date of the rule (90 days from the date of publication in the *Federal Register*) to comply. Additional information on the destruction of bump-stock-type devices will be available at www.atf.gov.

8. Lack of Consistency

Comments Received

Hundreds of commenters indicated that ATF's reversal of position from its earlier determinations and insistence that a bump-stock-type device now qualifies as a machinegun under the NFA "hurts [the agency's] credibility." As one commenter remarked, the perpetual state of inconsistencies, whereby products are approved and then later ruled to be illegal by ATF, "creates an air of fear and distrust in the gunowning public," and moreover, "calls into question the validity and competence of the very agency charged with making these determinations." Several commenters argued that ATF's lack of consistency only serves to increase distrust of the agency, the Government, and the legal process.

68

AR004099

Department Response

The Department acknowledges comments regarding the inconsistency in ATF's previous classifications of some bump-stock-type devices as machineguns and others as non-machineguns. As described in Part III, upon review, ATF recognized that the decisions issued between 2008 and 2017 did not provide consistent or extensive legal analysis regarding the term "automatically" as that term applies to bump-stock-type devices. Consistent with its authority to reconsider and rectify its past classifications, the Department accordingly clarifies that the definition of "machinegun" in the NFA and GCA includes bump-stock-type devices because they convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. The Supreme Court has made clear that this sort of regulatory correction is permissible. An agency may change its course as long as it "suppl[ies] a reasoned analysis for the change," which the Department has done at length in the NPRM and this final rule. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). And the agency bears no heightened burden in prescribing regulations that displace inconsistent previous regulatory actions. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009).

9. Earlier Determinations Correct

Comments Received

Over 1,500 commenters opposed to the rule maintained that ATF's earlier classifications determining certain bump-stock-type devices not to be subject to the NFA

69

AR004100

or GCA were correct and should not be reversed. These commenters stated that reversing

this position is unnecessary and unlawful. To make the point that ATF is bound by its

prior determinations, many commenters submitted ATF's own classification letters and

highlighted the Department's arguments made in litigation as evidence that the rule on

bump-stock-type devices is an arbitrary decision. In particular, commenters cited the

Department's arguments made in litigation with Freedom Ordnance Manufacturing, Inc.

("Freedom Ordnance"), No. 3:16-cv-243 (S.D. Ind. filed Dec. 13, 2016). There, the

Department defended its decision to classify Freedom Ordnance's Electronic Reset

Assistant Device (ERAD) as a machinegun. In responding to Freedom Ordnance's

argument that the ERAD was a bump-stock-type device and not subject to regulation, the

Department stated such stocks were not machineguns because "[b]ump firing requires the

shooter to manually and simultaneously pull and push the firearm in order for it to

continue firing." Brief for ATF in Support of Motion for Summary Judgment and in

Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 28, at 21 (July 27,

2017). These prior decisions and admissions, commenters argued, preclude the

Department from suddenly reversing its decision.

Department Response

The Department acknowledges that ATF previously determined that certain

bump-stock-type devices were not "machineguns" under the law. The Department notes,

however, that a great deal of its analysis in the Freedom Ordnance litigation was fully

consistent with its position in this rule. For example, the Department adhered to its view

that a single pull is a "single function" of the trigger, *see id.* at 13-14, and it argued that a

device that relieves the shooter from having to "pull and release the trigger for *each*

70

AR004101

*individual, subsequent shot*" converts the firearm into a machinegun, *id.* at 22. While the Department accepted the previous classification of some bump-stock-type devices as non-machineguns, it relied on the mistaken premise that the need for "shooter input" (i.e., maintenance of pressure) for firing with bump-stock-type devices means that such devices do not enable "automatic" firing, *see id.* at 21—even though Freedom Ordnance's ERAD also required maintenance of pressure by the shooter, *see id.* at 20.

In any event, as explained in the NPRM, the Department believes that ATF clearly has authority to "reconsider and rectify" its classification errors. *Akins*, 312 F. App'x at 200; *see also Fox*, 556 U.S. at 514-15; *Hollis v. Lynch*, 121 F. Supp. 3d 617, 642 (N.D. Tex. 2015) (no due process violation in ATF's revocation of mistaken approval to manufacture a machinegun). In the NPRM, the Department noted that "ATF has reviewed its original classification determinations for bump-stock-type devices from 2008 to 2017 in light of its interpretation of the relevant statutory language, namely the definition of 'machinegun.'" 83 FR at 13446. The NPRM explained that "ATF's classifications of bump-stock-type devices between 2008 and 2017 did not include extensive legal analysis of these terms in concluding that the bump-stock-type devices at issue were not 'machineguns.'" *Id.* Specifically, some of these rulings concluded that such devices were not machineguns because they did not "'initiate[] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted,'" but did not provide a definition or explanation of the term "automatically." *Id.* at 13445. This is precisely the purpose of this rule. As explained in more detail in Part III, the Department has determined that bump-stock-type devices enable a shooter to initiate an automatic firing sequence with a single pull of the trigger, making the devices

71

AR004102

machineguns under the NFA and GCA.  Consistent with the APA, this rule is the appropriate means for ATF to set forth its analysis for its changed assessment.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983).

10.  Bump Firing and Bump-Stock-Type Device Operation

a.  Bump-Stock-Type Device Operation

Comments Received

More than 17,000 commenters argued that ATF cannot proceed because its description of how bump-stock-type devices operate is inaccurate and that the proposed rule is based on a false premise.  Commenters emphatically argued that bump-stock-type devices do not make a semiautomatic firearm shoot automatically by a single function of the trigger.  They stated: (1) no part of the bump-stock-type device touches the trigger itself, but rather touches only the shooter's trigger finger, and (2) if bump-stock-type devices made semiautomatic rifles fully automatic, then holding the gun with only the trigger finger hand while depressing the trigger should cause the gun to repeatedly fire, which does not happen when a rifle is affixed with a bump-stock-type device.  One commenter said that should ATF be asked to demonstrate the firing of a rifle equipped with a bump-stock-type device with the shooter only using his trigger hand, and no coordinated input from the other hand, it could not be done, as it requires two hands, skill, and coordination.  Similarly, another commenter asserted that while various manual bump-firing techniques "vary in difficulty and are arguably more difficult to master than the use of a bump-stock-type device, the fact is that they use exactly the same principle as a bump-stock-type device *without* the use of such a device, and thus the device itself cannot be the 'primary impetus for a firing sequence' as described."

72

AR004103

Several commenters raised specific objections to ATF's description in the NPRM that a bump-stock-type device "harnesses the recoil energy [of a firearm] to slide the firearm back and forth so that the trigger automatically re-engages by 'bumping' the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter" and that the device is "a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed)." 83 FR at 13443. These commenters disputed these descriptions, stating that a bump-stock-type device does not harness any recoil energy and there is nothing that makes it an energy sink (such as a spring) that stores recoil energy to move the firearm forward. Further, they argued that further physical manipulation is required to operate a firearm equipped with a bump-stock-type device—specifically, the shooter must physically manipulate the trigger after every shot fired by pushing the firearm forward to re-engage the trigger.

The bump-stock firing sequence is not automatic, commenters argued, because trigger reset is not caused by a mechanical device, part, or combination of parts associated with pulling the trigger. Reset occurs, they said, only if continuous forward motion and pressure is applied by the non-trigger hand or arm of the shooter, not the device. As described by some commenters, "[t]he trigger of a semiautomatic firearm in a bump-stock type device is being repeatedly actuated, functioned, pulled (take your pick) by the non trigger hand of the shooter pushing the firearm forward. That actuation, function, [or] pull can and often does occur entirely independent of recoil. Recoil is incidental to the firing sequence of a bump-stock type device equipped semiautomatic

73

firearm, not intrinsic." In challenging ATF's proposed rule and description of how these devices operate, one commenter asked ATF to provide the history of the machinegun and semiautomatic firearms, along with a discussion of the differences between the mechanical and legal definitions.

In sum, commenters argued that because ATF's premise of how bump-stock-type devices operate is inaccurate, there is no basis for ATF to regulate them as machineguns.

Department Response

The Department disagrees that ATF's description of how bump-stock-type devices operate is inaccurate. ATF explained that bump-stock-type devices "are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure." 83 FR at 13443. The Department believes that this accurately describes the operation of these devices. Further, ATF explained that bump-stock-type devices "are designed to allow the shooter to maintain a continuous firing cycle after a single pull of the trigger by directing the recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." *Id.* This is a distinctive feature of bump-stock-type devices and enables the unique functioning and operation of these devices. The bump-stock-type device captures and harnesses the firearm's recoil to maintain a continuous firing sequence, and thus is properly described as "a self-acting or self-regulating mechanism." The very purpose of a bump-stock-type device is to

74

eliminate the need for the shooter to manually capture, harness, or otherwise utilize this energy to fire additional rounds, as one would have to do to "bump fire" without a bump-stock-type device. Further, this mechanism "allows the firing of multiple rounds through a single function of the trigger" because, as explained in the NPRM, ATF's interpretation that the phrase "single function of the trigger" includes a "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam).

The Department agrees with the commenters that "[n]o part of the bump stock touches the trigger, only the shooter[']s trigger finger." However, this is neither legally nor technically determinative. The fact that a bump-stock-type device does not touch the trigger does not mean that the device has not acted automatically (by directing and utilizing recoil energy) or that anything other than a single pull of the trigger occurred. That is, the bump-stock-type device remains "a self-acting or self-regulating mechanism" for the reasons described in this section. The fact that bump-stock-type devices do not touch the trigger does not mean that they do not qualify as machineguns within the meaning of the NFA and GCA. ATF has provided a thorough explanation of their functioning, showing that a semiautomatic firearm utilizing a bump-stock-type device "shoots automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b).

Additionally, the Department disagrees that to be classified as a "machinegun" under the NFA, a firearm must fire "repeatedly" when a shooter holds and fires the gun with only the trigger-finger hand. Any such argument misconstrues the meaning of "automatically." As explained above, bump-stock-type devices operate automatically

75

because their design eliminates the requirement that a shooter manually capture and direct recoil energy to fire additional rounds. In this way, semiautomatic firearms shoot "automatically" when equipped with bump-stock-type devices in that their recoil energy is channeled through these "self-acting or self-regulating mechanisms." The commenters' positions reflect previous analysis that ATF is now correcting. ATF explained above that "[p]rior ATF rulings concerning bump-stock-type devices have not provided substantial legal analysis regarding the meaning of the term 'automatically' as it is used in the GCA and NFA." 83 FR at 13445.

The Department disagrees that a shooter repeatedly actuates, functions, or pulls the trigger of a semiautomatic firearm using a bump-stock-type device with the non-trigger hand by "pushing the firearm forward." In fact, the shooter "pulls" the trigger once and allows the firearm and attached bump-stock-type device to operate until the shooter releases the trigger finger or the constant forward pressure with the non-trigger hand. The non-trigger hand never comes in contact with the trigger and does not actuate, function, or pull it. By maintaining constant forward pressure, a shooter relies on the device to capture and direct recoil energy for each subsequent round and requires no further manipulation of the trigger itself.

In this way, the Department also disagrees that "[r]ecoil is incidental to the firing sequence of a bump-stock type device equipped semiautomatic firearm, not intrinsic." Without recoil and the capture and directing of that recoil energy, a bump-stock-type device would be no different from a traditional shoulder stock. As numerous commenters acknowledged, bump-stock-type devices allow shooters to fire semiautomatic firearms at a faster rate and in a different manner than they could with traditional shoulder stocks.

76

Bump-stock-type devices do this by capturing and directing recoil mechanically, enabling continuous fire without repeated manual manipulation of the trigger by a shooter.

b.  Bump-Stock-Type Device Firing Technique

Comments Received

Thousands of commenters objected to the proposed rule on grounds that bump-stock-type devices are novelty items that assist with bump firing, which is a technique that any shooter can perform with training or with everyday items such as a rubber band or belt loop.  Many commenters stated that all semiautomatic firearms can be bump fired by a shooter simply holding the trigger finger stationary and pushing the weapon forward until the trigger is depressed against it to the point of firing, and that use of bump-stock-type devices makes using the bump-fire shooting technique safer for the shooter and those around the shooter.  Some commenters also gave examples of extremely skilled and fast shooters who do not need any assistive device or item to fire a semiautomatic firearm at a rapid rate.  Commenters therefore argued that if the Department proceeds to prohibit possession of bump-stock-type devices they must also ban rubber bands, belt loops, string, or even people's fingers.

Department Response

The Department disagrees with commenters' assessments and believes that bump-stock-type devices are objectively different from items such as belt loops that are designed for a different primary purpose but can serve an incidental function of assisting with bump firing.  To bump fire a firearm using a belt loop or a similar method without a bump-stock-type device, a shooter must put his thumb against the trigger and loop that thumb through a belt loop.  With the non-trigger hand, the shooter then pushes the

77

firearm forward until the thumb engages the trigger and the firearm fires. The recoil pushes the firearm backwards as the shooter controls the distance of the recoil, and the trigger resets. The constant forward pressure with the non-trigger hand pushes the firearm forward, again pulling the firearm forward, engaging the trigger, and firing a second round.

This rule defines the term "automatically" to mean "functioning as the result of a self-acting or self-regulating mechanism." Bump-stock-type devices enable semiautomatic firearms to operate "automatically" because they serve as a self-acting or self-regulating mechanism. An item like a belt loop is not a "self-acting or self-regulating mechanism." When such items are used for bump firing, no device is present to capture and direct the recoil energy; rather, the shooter must do so. Conversely, bump-stock-type devices are specifically designed to capture the recoil energy, a force that initiates a firing sequence that ultimately produces more than one shot. That firing sequence is "automatic" because the device harnesses the firearm's recoil energy as part of a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger.

Bump firing utilizing a belt loop or similar method of maintaining tension on the firearm is thus more difficult than using a bump-stock-type device. In fact, the belt-loop method provides a stabilizing point for the trigger finger but relies on the shooter—not a device—to harness the recoil energy so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger. Unlike a bump-stock-type device, the belt loop or a similar manual method requires the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils.

78

AR004109

ATF's previous bump-stock-type device classifications determined that these devices enable continuous firing by a single function of the trigger. Other firing techniques may do the same because they rely on a single "pull." However, as ATF has made clear, a determining factor is whether the device operates or functions automatically. The proposed and final rules make clear that if a device incorporates a self-acting or self-regulating component for the firing cycle, the firearm equipped with the device operates automatically. Again, this differs from traditional semiautomatic firearms because the trigger must be repeatedly manipulated by the shooter to fire additional rounds, whereas a bump-stock-type device allows for a single pull, and the self-acting or self-regulating device automatically re-engages the trigger finger.

Further, while skilled shooters may be able to fire more rapidly than a shooter employing a bump-stock-type device on a semiautomatic firearm, they do so by pulling and releasing the trigger for each shot fired. This is a fundamental distinction between skilled shooters and those employing bump-stock-type devices. Bump-stock-type devices require that a shooter pull the trigger to fire the first round and merely maintain the requisite pressure to fire subsequent rounds. This is the purpose of a bump-stock-type device—to make rapid firing easier without the need to pull and release the trigger repeatedly. This shows that skilled shooters would be unaffected by the proposed rule and counters commenters' arguments that the rule is "arbitrary and capricious" on these grounds.

79