11. Proposed Definitions

a. Vagueness – Rate of Fire

Comments Received

Many commenters focused on the increased rate of fire associated with bump-stock-type devices and objected to the proposed regulation being "based, at least in part, on the idea that bump stocks are machineguns because they 'allow[] "rapid fire" of the semiautomatic firearm,' 'increase the rate of fire of semiautomatic firearms,' and 'mimic automatic fire'" (quoting 83 FR at 13443-44). Commenters objected to classifying bump-stock-type devices as machineguns because "a high rate of fire alone does not transform a semi-automatic into an automatic weapon under the NFA."

Additionally, other commenters objected to classifying other "rate-increasing devices" as machineguns because doing so would require a standard rate of fire to be defined, which some said is impossible, or would capture certain semiautomatic firearms and firearms accessories. A few commenters pointed out that "[t]rue machine guns do not require freedom to oscillate fore and aft to increase their rate of fire. The rate of fire of a machine gun is intrinsic to the weapon and completely independent of the shooter's manual dexterity, the firing position, the number of hands holding the firearm, and any degree of freedom of motion. . . . Bump stocks do not increase the rate of fire when the semiautomatic firearm is operated with only one hand – even when shouldered. The human element is indispensable to any firing rate increase achieved with a bump stock."

Department Response

The Department has neither proposed the rate of fire as a factor in classifying machineguns, nor utilized this as the applicable standard in the proposed rule. The

80

AR004111

Department disagrees with any assertion that the rule is based upon the increased rate of fire. While bump-stock-type devices are intended to increase the rate at which a shooter may fire a semiautomatic firearm, this rule classifies these devices based upon the functioning of these devices under the statutory definition. The Department believes that bump-stock-type devices satisfy the statutory definition of "machinegun" because bump-stock-type devices utilize the recoil energy of the firearm to create an automatic firing sequence with a single pull of the trigger. The rate of fire is not relevant to this determination.

The Department also agrees with commenters that the standard rate of fire of a semiautomatic firearm or machinegun is a characteristic that is not dependent upon the individual shooter. Any reference to the "increased" rate of fire attributable to bump-stock-type devices refers only to the increased rate of fire that a particular shooter may achieve. Further, the Department agrees that there is no rate of fire that can identify or differentiate a machinegun from a semiautomatic firearm. This is because the statutory definition alone determines whether a firearm is a machinegun. The Department believes that the final rule makes clear that a bump-stock-device will be classified as a machinegun based only upon whether the device satisfies the statutory definition.

b.  Vagueness – Impact on Semiautomatic Firearms and Other Firearm Accessories

Comments Received

More than 56,000 commenters, including those submitting through the three main form letters opposing the rule and the NAGR submission, indicated that the proposed rule would set a dangerous precedent because a future "anti-gun Administration" will use it to

81

confiscate millions of legally owned semiautomatic firearms as well as firearm components and accessories.

Commenters opposed to the rule broadly argued that by classifying bump-stock-type devices as machineguns, AR-15s and other semiautomatic firearms also may be classified as machineguns. In particular, commenters stated that under the GCA, rifles and shotguns are defined using a "single pull of the trigger" standard, in contrast to machineguns, which are defined by a "single function of the trigger" standard under the NFA. Commenters argued that by defining "single function of the trigger" to mean "single pull of the trigger," the rule will bring all semiautomatic rifles and shotguns currently regulated under the GCA under the purview of the NFA. Commenters also argued that the proposed regulatory text encompasses a number of commercially available items, such as Gatling guns, competition triggers, binary triggers, Hellfire trigger mechanisms, or even drop-in replacement triggers. One commenter pointed out that the language "firing without additional physical manipulation of the trigger by shooter" would apply, for instance, to Model 37 pump shotguns made by Ithaca.

Several commenters said that the proposed rule should be more narrowly tailored so that it applies to bump-stock-type devices only. For instance, one commenter proposed that the following be added to the definition of bump-stock-type device: "A single accessory capable of performing the roles of both a pistol grip and a shoulder stock." Another commenter suggested that, at most, one sentence could be added at the end of the definition of "machinegun":

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means a device that—(1) attaches to a semiautomatic rifle (as defined in section 921(a)(28) of title 18, United States Code); (2) is designed and intended to repeatedly activate the

82

trigger without the deliberate and volitional act of the user pulling the trigger each time the firearm is fired; and (3) functions by continuous forward pressure applied to the rifle's fore end in conjunction with a linear forward and backward sliding motion of the mechanism utilizing the recoil energy when the rifle is discharged.

One commenter suggested that, instead of trying to define a bump-stock-type device, it would be better to issue a rule stating that one cannot modify or replace the current style of stock with one that contains other features, with exceptions for adjusting the length of the stock or having a cheek rest.

Department Response

The Department disagrees that other firearms or devices, such as rifles, shotguns, and binary triggers, will be reclassified as machineguns under this rule. Although rifles and shotguns are defined using the term "single pull of the trigger," 18 U.S.C. 921(a)(5), (7), the statutory definition of "machinegun" also requires that the firearm "shoots automatically more than one shot, without manual reloading," by a single function of the trigger, 26 U.S.C. 5845(b). While semiautomatic firearms may shoot one round when the trigger is pulled, the shooter must release the trigger before another round is fired. Even if this release results in a second shot being fired, it is as the result of a separate function of the trigger. This is also the reason that binary triggers cannot be classified as "machineguns" under the rule—one function of the trigger results in the firing of only one round. By contrast, a bump-stock-type device utilizes the recoil energy of the firearm itself to create an automatic firing sequence with a single pull of the trigger. The Department notes that ATF has already described a "single pull of the trigger" as a "single function of the trigger." *See* ATF Ruling 2006-2.

Further, while the phrase "firing without additional physical manipulation of the trigger by the shooter" would apply to firearms like the Model 37 pump shotguns made

83

by Ithaca, that firearm could not be classified as a machinegun under the rule.  The Model 37 permits a shooter to pull the trigger, hold it back, and pump the fore-end.  The pump-action ejects the spent shell and loads a new shell that fires as soon as it is loaded.  While this operates by a single function of the trigger, it does not shoot "automatically," and certainly does not shoot "without manual reloading." 26 U.S.C. 5845(b).  In fact, the pump-action design requires that the shooter take action to manually load the firearm for each shot fired.

The Department disagrees that "automatically" should be defined using the more extensive definition quoted above.  Whereas analysis as to what constitutes a "single function of the trigger" is separate from whether a firearm shoots automatically, the commenter's proposed definition merges the two issues.  The Department believes that this may lead to confusion, further complicate the issue, and result in further questions that require clarification.

c.  Concerns Raised by Equating "Function" and "Pull"

Comments Received

One commenter said drafters of the NFA chose the term "function" intentionally and that by proposing to equate "function" with "pull," a whole new fully automatic non-machinegun market will be opened because "fire initiated by voice command, electronic switch, swipe on a touchscreen or pad, or any conceivable number of interfaces [does] not requir[e] a pull."  The commenter suggested that "single function of a trigger" be defined to include but not be limited to a pull, as that would include bump-stock-type devices without opening a "can of worms."

84

Department Response

The proposed addition to the regulatory definition of machinegun includes this statement: "For purposes of this definition, the term 'single function of the trigger' means a 'single pull of the trigger.'" The Department believes that the commenter is correct—this proposed definition may lead to confusion. The proposed definition suggests that *only* a single *pull* of the trigger will qualify as a single function. However, it is clear that a push or other method of initiating the firing cycle must also be considered a "single function of the trigger." Machineguns such as the M134 Minigun utilize a button or an electric switch as the trigger. *See* 83 FR at 13447 n.8 (explaining that other methods of trigger activation are analogous to pulling a trigger).

Therefore, the Department concurs with the commenters and has modified the proposed definition so that in this final rule the regulatory text will state that "single function of the trigger" means a "single pull of the trigger" and analogous motions rather than a "single pull of the trigger." Although the case law establishes that a "single pull" is a "single function," those cases were addressing devices that relied on a single pull of the trigger, as opposed to some other single motion to activate the trigger. The term "single function" is reasonably interpreted to also include other analogous methods of trigger activation.

*E. ATF Suggested Alternatives*

1. General Adequacy of ATF Alternatives

Comments Received

One commenter opposed to the rule suggested that the alternatives discussed in the NPRM were not in compliance with Office of Management and Budget (OMB)

85

Circular A-4 guidance, and that ATF failed to consider available alternatives and the impact on innovation. In addition, the commenter stated that ATF failed to show a need for the rule and argued that ATF did not make a good-faith attempt to meet its statutory mandate to identify, analyze, and rule out feasible alternatives. One commenter suggested that the analysis of alternatives should include alternatives provided under OMB Circular A-4, which include tort liability, criminal statutes, and punishments for violating statutes.

Department Response

OMB Circular A-4 requires the consideration of "possible alternatives" to regulation.[8] ATF considered possible alternatives that it could legally employ under the NFA, as many of the suggested alternatives from commenters—e.g., grandfathering and reimbursement policies—are not possible given the legal constraints of existing ATF authority. OMB Circular A-4 stipulates, "The number and choice of alternatives selected for detailed analysis is a matter of judgment. There must be some balance between thoroughness and the practical limits on [the agency's] analytical capacity."[9] Circular A-4 adds that "analyzing all possible combinations is not practical when there are many options (including possible interaction effects)."[10] In these cases, the agency is to use its judgment to choose reasonable alternatives for careful consideration. During formulation of the NPRM, ATF considered various alternatives, including examples provided under OMB Circular A-4, and deemed them inappropriate. ATF believes that bump-stock-type

---

[8] OMB Circular A-4, *Regulatory Analysis*, at 2 (Sept. 17, 2003), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.
[9] *Id*. at 7.
[10] *Id*. at 11.

86

devices satisfy the definition of "machinegun" under the NFA, so regulatory action is necessary to implement the NFA and GCA.

2. First ATF Alternative – No Regulatory Action

Comments Received

Commenters opposed to the regulation implicitly agreed with the first alternative listed by ATF, which is for the Department not to take any action. They argued that attention should be devoted to improving the background check system, that ATF should concentrate on enforcing the existing gun laws, or that if there is to be change, that change should be made by Congress or the States. One commenter argued ATF failed to properly analyze this alternative.

Department Response

As explained above, Part IV.D.4, the Department has concluded that the NFA and GCA require regulation of bump-stock-type devices as machineguns, and that taking no regulatory action is therefore not a viable alternative to this rule.

3. Second ATF Alternative – Shooting Ranges

Comments Received

Commenters who suggested that bump-stock-type devices be used in a controlled setting, or be available only at shooting ranges, were largely in support of the rule rather than viewing it as a complete alternative to taking no regulatory action.

Department Response

The Department acknowledges comments on the potential use of bump-stock-type devices in a controlled setting, such as a shooting range. As stated above, the Department believes that such items satisfy the statutory definition of "machinegun," and therefore it

87

AR004118

is promulgating this rule to clarify the definition. ATF has previously held that the on-premises rental of NFA firearms is permitted. However, whereas machineguns that are currently available for rental at shooting ranges are lawfully registered in the NFRTR if they may be lawfully possessed under 18 U.S.C. 922(o)(2)(B), bump-stock-type devices cannot be registered because none were in existence when section 922(o) was enacted in 1986.

4. Third ATF Alternative – Use Other Means

Comments Received

Many commenters opposed to the rulemaking pointed out that bump firing can be accomplished by using other everyday items such as belt loops or rubber bands. *See* Part IV.10.b. No commenter said that solely using rubber bands or other items would be a satisfactory alternative if the proposed rule went into effect. Rather, these commenters made the point that if bump firing is possible with or without bump-stock-type devices, then the Department would be obliged to also prohibit possession of rubber bands and belt loops under the NFA.

Department Response

The Department has detailed in the NPRM and this rule the distinction between bump firing with a bump-stock-type device and using belt loops or rubber bands. *See* Part IV.10.b. Although a shooter using a belt loop, string, or other manual method utilizes recoil energy to bump fire, the shooter is responsible for constraining the firearm, maintaining the correct finger pressure, and regulating the force necessary to fire continuously. This is clearly distinguishable from a bump-stock-type device, as ATF has explained that such a device functions "as a self-acting and self-regulating force that

88

channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge." 83 FR at 13443. Based on the clear differences between bump-stock-type devices and manual means of bump firing, the Department disagrees with the commenters that manual means of bump firing are factually or technically equivalent to bump-stock-type devices.

*F. Other Alternatives*

1. Allow Registration or Grandfathering of Bump-Stock-Type Devices Under NFA

Comments Received

Several hundred commenters argued that ATF should announce an amnesty period, allowing time for current owners of bump-stock-type devices to register them as NFA firearms in the NFRTR. These commenters argued that pursuant to section 207(d) of the GCA, the Attorney General has power to establish amnesty periods for up to 90 days. Further, they argued there is precedent for an amnesty period, pointing to the seven-year amnesty/registration period that was allowed for the Striker-12/Streetsweeper and USAS-12 shotguns. *See* ATF Rulings 94-1, 94-2. Doing so, they argued, would save the Government from having to compensate current owners of bump-stock-type devices and also even generate money for the Government, as individuals would be required to pay a $200 tax on the devices. *See* 26 U.S.C. 5821.

Department Response

The Department disagrees that an amnesty period is possible in this scenario. While in 1968 Congress left open the possibility of future amnesty registration of firearms subject to the NFA, ATF has long held that it eliminated any possible amnesty

89

for machineguns in 1986. Following passage of 18 U.S.C. 922(o), ATF advised the industry and the public that amnesty registration of machineguns was not legally permissible. For example, in 1996 and 1997, ATF advised an industry member that

> 18 U.S.C. § 922(o) would preclude the registration of machineguns during an amnesty period. Section 922(o) prohibits possession of machineguns which were not lawfully possessed prior to its effective date of May 19, 1986 . . . . Since 922(o) [was enacted after the amnesty provision of the NFA], its provisions would prevail over any earlier enactment in conflict. This means that any future amnesty period could not permit the lawful possession and registration of machineguns prohibited by section 922(o).

Letter for C. Michael Shyne from ATF's National Firearms Act Branch Chief (March 10, 1997). Section 922(o) does not ban the private possession and transfer of all machineguns because it specifically excludes "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date [section 922(o)] takes effect." 18 U.S.C. 922(o)(2)(B). The intent of the statute was to limit transactions in post-1986 machineguns. *See United States v. Ferguson*, 788 F. Supp. 580, 581 (D.D.C. 1992) ("Under section 922(o)(2)(B), certain machineguns, namely, those that were lawfully possessed before enactment of the statute in 1986, may be legally possessed and transferred even today."); *see also United States v. O'Mara*, 827 F. Supp. 1468, 1470 n.4 (C.D. Cal. 1993) (citing *Ferguson*). Congress's goal was to ban the transfer and possession of such weapons outright. *United States v. Hunter*, 843 F. Supp. 235, 247-48 (E.D. Mich. 1994). The legislative history supports this proposition. When asked whether an amnesty period could "be administratively declared by the Secretary of the Treasury by the enactment of this bill," Senator Kennedy responded that "[t]here is nothing in the bill that gives such an authority, and there is clearly no valid law enforcement goal to be achieved by such open-ended amnesty." *See id.* at 248.

90

AR004121

Some commenters pointed to ATF Rulings 94-1 and 94-2 as precedent for an amnesty period; however, section 922(o) applies only to machineguns, and there was no similar restriction on the destructive devices at issue in ATF Rulings 94-1 and 94-2. Therefore, these rulings cannot serve as precedent in the present case.

2. Licensing and Background Checks

Comments Received

Numerous commenters suggested other methods for how bump-stock-type devices should be regulated, including methods involving background checks. Some commenters broadly suggested that these devices should be sold like firearms under the GCA, meaning that the purchaser would undergo a background check when acquiring one from a retailer. One commenter suggested a new "2.5 firearms class" that would cover "grey area" guns and accessories, like bump-stock-type devices. Possessors of items falling under the "2.5 firearms class" would undergo background checks and, as with State-issued concealed-carry permits, local law enforcement would be able to cancel privileges if necessary. Other commenters suggested that bump-stock-type devices should not be available to the public unless the possessor is licensed, passes a background check, or provides a valid reason for needing a bump-stock-type device. Another commenter suggested bump-stock-type devices should be regulated like "any other weapon" under the NFA, 26 U.S.C. 5845(e), so that current owners could register them by paying a $5 fee, allowing a waiting period to elapse, and establishing a paper trail of ownership.

91

AR004122

Department Response

The Department acknowledges these suggested alternatives but does not have the authority to add a new class of firearms to the statutory scheme or impose licensing requirements to acquire a firearm. Such changes would require legislation. Further, the definition of "any other weapon" in the NFA does not apply to bump-stock-type devices. Because bump-stock-type devices are properly classified as "machineguns" under the NFA and GCA, the Department believes that ATF must regulate them as such, and that the recommended alternatives are not possible unless Congress amends the NFA and GCA.

3. Remuneration

Comments Received

Over 1,000 commenters opposed to the rule argued that compensation should be provided to owners of bump-stock-type devices. Several supporters of the rule also suggested there should be a buy-back program in order to reduce the number of bump-stock-type devices. One commenter more specifically stated that manufacturers or retailers should be required to buy back all such devices and make full refunds to all purchasers. Another supporter suggested a one-time tax credit to owners who surrender their bump-stock-type devices or provide proof of destruction.

Department Response

The Department acknowledges comments on compensation for current owners of bump-stock-type devices. While ATF has the authority to implement the NFA and GCA, the Department does not have the necessary Federal appropriations to implement a buy-

92

back program or offer monetary compensation. To implement a buy-back program or provide a tax credit would require congressional action.

4. Medical Exemption

Comments Received

Some commenters suggested that Department amend the proposed rule so it would provide an exemption for "medical necessity," thereby allowing certain individuals, such as those with nerve damage or one functional arm, to possess bump-stock-type devices. Similarly, commenters suggested bump-stock-type devices should only be available for people who are physically unable to pull a trigger for hunting or target practice.

Department Response

The Department does not have authority to create a medical exemption for the possession of machineguns. Pursuant to the NFA and GCA, for private possession of machineguns to be lawful, they must have been lawfully possessed before the effective date of 18 U.S.C. 922(o).

5. Allow Removal of Trigger Ledge

Comments Received

One commenter suggested that "ATF could find that bump-stock-type devices with the ledge/rest removed are *not* affected by any additional regulation." The commenter argued that this would make the proposed rule "logically consistent with the notion that operators may 'bump fire' with or without a bump-stock-type device, as long as they do not utilize a device allowing a fixed trigger finger."

93

AR004124

Department Response

The Department does not believe that removing the trigger ledge is sufficient to affect a bump-stock-type device's classification as a machinegun. While the trigger ledge makes it easier to utilize the device, removing the ledge does nothing to prevent the directing of the "recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." 83 FR at 13443. Therefore, even without the trigger ledge, the bump-stock-type device will operate as designed if the shooter simply holds his or her finger in place. As such the bump-stock-type device remains a "machinegun" under the NFA and GCA.

6. Miscellaneous Alternatives to Regulate Bump-Stock-Type Devices

Comments Received

Other miscellaneous comments included suggesting a ban only on future production and commercial sale of such items; enacting a quota on the number of devices that can be produced or possessed; enacting a Pigouvian tax, which is a tax imposed on a good that is calculated to reduce market quantity (and increase market price) in order to achieve the socially optimal level of the good; deferring action until Congress takes action; leaving the matter for State legislative action; improving security at mass-attended events; and improving law enforcement capabilities.

Department Response

The Department acknowledges comments on alternative suggestions for the regulation of bump-stock-type devices, but it does not have authority to implement many of the suggested alternatives. The Department does not have the authority to restrict only the future manufacture or sale of bump-stock-type devices, nor does it have the authority

94

to remove the general prohibition on the transfer and possession of machineguns that were not lawfully possessed on the effective date of 18 U.S.C. 922(o). In addition, the Department lacks the authority to enact an excise tax on bump-stock-type devices.

As mentioned above, the Department does not agree with commenters that any change needs to be enacted by Congress or should be left to State legislatures. Congress passed both the NFA and GCA, delegating enforcement authority to the Attorney General. Accordingly, the Attorney General has the authority to promulgate regulations necessary to enforce the provisions of the NFA and GCA, and the Department determined that notice-and-comment rulemaking was the appropriate avenue to clarify the definition of "machinegun." In the interest of public safety and in light of the statutory definition of "machinegun," the Department has determined that Federal regulation of bump-stock-type devices is necessary. However, this action does not prevent Congress from taking action on bump-stock-type devices in the future.

The Department acknowledges comments on improving security at mass-attended events and agrees that it is important to improve law enforcement capabilities. The Department actively works with State and local law enforcement agencies to provide security at mass-attended events, as well as training and equipment for their departments.

*G. Proposed Rule's Statutory and Executive Order Review*

Comments Received

A few commenters suggested that ATF failed to comply with Executive Orders 12866, 13563, and 13771, including failing to identify and repeal two regulations for every new regulation issued. Commenters argued that ATF did not quantify the benefits of the rule, and it did not explain why those benefits were unquantifiable as required by

95

OMB Circular A-4. Commenters stated that ATF did not identify the need for the proposed rule, in that ATF cited no evidence to support that the Las Vegas shooter used a bump-stock-type device. One commenter asked that ATF demonstrate how the cost-benefit analysis shows that the proposed rule is in the interests of gun owners, business owners, and the Federal Government. The commenter further suggested that ATF did not provide any citations or peer-reviewed research as evidence of the need for Federal regulatory action. Lastly, some commenters questioned how ATF determined the negative externalities that were presented in the NPRM.

Department Response

Executive Order 12866 and OMB Circular A-4 acknowledge that regulatory agencies should comply with them wherever possible or feasible. The Department interprets and adheres to the existing Executive Orders and OMB Circular A-4 to the extent that it is possible, using the best available information, and to the extent quantified information was available. Alternatively, wherever quantifiable means were not available, the Department considered qualitative costs, benefits, concerns, and justifications.

This rule is a significant regulatory action that clarifies the statutory definition of machinegun. By clarifying that bump-stock-type devices are machineguns subject to the restrictions of the NFA and GCA, the rule in effect removes those devices from the civilian marketplace. This final rule is an Executive Order 13771 regulatory action. *See* OMB, *Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs"* (Apr. 5, 2017).

96

As for the need for Federal regulation, agencies are allowed to consider public safety as a compelling need for a Federal rulemaking. Executive Order 12866 expressly recognizes as appropriate exercises of agency rulemaking authority that "are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American people." 58 FR 51735 (Oct. 4, 1993). As explained in the NPRM, the purpose of this rule is to amend ATF regulations to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA, with a desired outcome of increasing public safety. In accordance with OMB Circular A-4, the Department has provided information wherever possible regarding the costs, benefits, and justification of this rule.

As further requested by one commenter, this rule not only considers the implications of this rule on gun owners in the United States, business owners, and the Federal Government, but also considers the risk of criminal use of bump-stock-type devices and the general safety of the public to justify the issuance of this final rule.

*H. Affected Population*

Comments Received

There were a number of commenters who stated this rule will affect between 200,000 and 500,000 owners. Some commenters suggested that the estimated number of bump-stock-type devices should be higher, potentially over a million, than the estimated amount stated in the NPRM. Some commenters indicated that this would incorporate homemade devices, 3D-printed devices, or other devices made by personal means.

97

Department Response

In the NPRM, ATF did not estimate the number of owners. 83 FR at 13449. The 280,000-520,000 range in the Executive Order 12866 section of the NPRM is the estimated number of bump-stock-type devices in circulation, not the number of owners. While the Department does not know the total number of bump-stock-type devices currently extant, nor the number of owners, the Department's high estimate of 520,000 is still the primary estimate only for devices sold on the market. While it may be possible to make homemade devices, the Department cannot calculate the number of such devices or the likelihood of these devices circulating among the public. The Department is using the best available information, and there is no known information that would allow ATF to estimate such a number, much less achieve the level of accuracy that the public is requesting. Therefore, the estimates provided continue to be based upon the best available information.

*I. Costs and Benefits*

1. Costs to Purchasers

Comments Received

One commenter stated that some models of bump-stock-type devices never sold for less than $425 plus taxes. Another commenter stated that the Department's regulatory analysis did not account for the individual cost in purchasing bump-stock-type devices, only manufacturers' and retailers' expenses. Other commenters suggested that the analysis did not account for taxes. One commenter suggested that the costs should incorporate the cost of purchasing a pre-1986 machinegun. One commenter suggested

98

that many owners have bump-stock-type devices as the only stocks that they own and that purchasing a standard stock will need to be incorporated into the analysis.

Some commenters stated that the cost analysis does not include compensation for bump-stock-type devices and that the cost could be more than $50 trillion. Other commenters indicated that the rule did not account for lost lives, treatment costs, decreased tourism, and costs of criminal investigations. Other commenters argued that ATF failed to consider other costs, such as loss of faith in ATF by the regulated industry and resentment for not being reimbursed for bump-stock-type devices.

Department Response

The Department concurs that certain models sold at the $425.95 rate (a rate also included in ATF's range of costs published in the NPRM), representing the high end of the range of rates. 83 FR at 13451. However, bump-stock-type devices also sold for as low as $100. *Id.* In order to account for the full range of prices, the Department used the average of the full range of prices; therefore, the average price of $301 was used in the NPRM to account for the full range of market prices for these bump-stock-type devices. *Id.* As for the payment of taxes, the Department concurs that an unknown number of bump-stock-type-devices were sold, and individuals paid local taxes on them at time of purchase. For the purposes of this final rule, the Department maintains the average price used in the NPRM but incorporates the average cost of combined State and local taxes. For the purposes of this final rule, the Department estimates that the national average of taxes is 6.47% and attributed this tax rate to the price of all bump-stock-type devices that were sold on the market.[11]

---

[11] *See* Jared Walczak & Scott Drenkard, *State and Local Tax Rates in 2017*, Tax Found. (Jan. 31, 2017), https://taxfoundation.org/state-and-local-sales-tax-rates-in-2017/.

99

AR004130

The Department disagrees that the regulatory analysis did not account for the individual cost in purchasing bump-stock-type devices. The market price of bump-stock-type devices sold to the public represents the public price of these devices, which also accounts for the manufacturer and retail prices and does not double-count costs. While it may be possible for the public to purchase a pre-1986 machinegun, these amounts are not used to purchase bump-stock-type devices, so the market prices for these pre-1986 machineguns are not considered for purposes of this rule.

The Department reached out to the commenter who discussed the population of gun owners who will need to replace their bump-stock-type devices with standard stocks. The commenter was unable to provide a source establishing the existence of such gun owners and only speculated that this was a possibility. Having determined that this was speculation, the Department declined to incorporate this information into the analysis.

The Department does not propose compensation for bump-stock-type devices, so these costs were not included in the rule. See Part IV.D.1.b for a discussion of the Fifth Amendment's Takings Clause. Further, costs associated with victims, criminal investigations, loss of tourism, loss of faith in ATF by the regulated industry, and resentment for not being reimbursed for bump-stock-type devices are all indirect or unquantifiable costs of the rule and are not considered in the cost-benefit analysis.

2. Costs to Manufacturers, Employees, and Communities

Comments Received

Commenters suggested that this rule will cost manufacturers, employees, and families of manufacturers their livelihood. In particular, one commenter suggested that three additional manufacturers would have entered or re-entered the market after the

100

AR004131

lapse of the patent for the main manufacturer of bump-stock-type devices. Additionally, public comments suggested that the Department overlooked the capital expenses required to start a company.

Department Response

The Department has considered the effect that this rule will have on these manufacturers, employees, and families and acknowledges that they will no longer be able to manufacture bump-stock-type devices. The Department acknowledges that there will be a potential loss of wages from employees losing jobs from loss of manufacturing; however, the extent to which they are unable to find replacement jobs is speculative. The Department considered the capital expenses for manufacturers, including patents and equipment to start production. However, in light of the Las Vegas shooting and the estimated time it would have taken for the patents to expire, the Department has determined that there could be potential crowding of additional manufacturers and saturation of the market for bump-stock-type devices. Therefore, the viability of these businesses is speculative and the capital expenses that they incurred are a sunk cost for those who put in the expense. While the Department does not include capital expenses for manufacturing in the economic analysis, the Department had already considered the overall potential for return on investment for any manufacturers who would have remained in the market from the existing estimate of foregone production. Accounting for capital expenses would be double counting of expenditures. Therefore, the economic analysis for this portion remains the same.

101

AR004132

3. Costs of Litigation

Comments Received

Commenters suggested that the Department did not account for the cost of litigation regarding the rule.

Department Response

Litigation costs are not a direct cost of the rule because such costs do not result from compliance with the rule. Additionally, any estimate of litigation expenses would be highly speculative and would not inform the Department's decision regarding the implementation of this final rule. However, the Department acknowledges that to the extent parties choose to enter into litigation regarding this final rule, there are indirect costs associated with that litigation.

4. Government Costs

Comments Received

Commenters suggested that this rule would cost the Government approximately $297 million, including the disposal cost of the bump-stock-type devices. Other commenters indicated that confiscation costs were not included in the cost of the rule. One commenter provided estimates on the cost to house bump-stock-type device owners in prison as felons, particularly if a large number of owners opt not to destroy such devices. Lastly, one commenter suggested that ATF consider foregone sales taxes associated with ammunition used to fire bump-stock-type devices.

Department Response

In the NPRM, the Department estimated that the total cost of the rule for the general public (e.g., owners and manufacturers of bump-stock-type devices) would be

102

about $326.2 million over a 10-year period, not that the rule would cost the Federal Government that amount. 83 FR at 13454. The Department's estimate that Government costs are de minimis still stands for this final rule because the costs identified by these commenters are not Government expenditures. Further, costs associated with administering the option of current possessors of bump-stock-type devices abandoning their devices at their local ATF offices will be de minimis. The Department also disagrees that this rule will turn owners of bump-stock-type devices into felons. This final rule provides an effective date that allows ample time for current owners to destroy or abandon such devices. To the extent that owners timely destroy or abandon these bump-stock-type devices, they will not be in violation of the law or incarcerated as a result. However, if prohibited bump-stock-type devices are possessed after the effective date of the final rule, the person in possession of the bump-stock-type device will be in violation of Federal law.

While the usage of bump-stock-type devices may boost ammunition sales, the Department did not consider the loss of tax revenue collected from additional ammunition sales because they are speculative and are not a direct cost of the rule. Additionally, any estimate of tax revenue generated would not inform the Department's decision regarding the implementation of this final rule.

5. Benefits

Comments Received

Commenters stated that there are no quantifiable benefits to justify the costs of this rule, nor will it prevent criminal use of firearms. One commenter also stated that ATF did not explain why the benefits were unquantifiable as required by OMB Circular

103

A-4. Some commenters suggested that ATF is required "by law" to quantify and monetize benefits. Commenters stated that the benefits do not outweigh the costs and ATF failed to conduct any analysis of the benefits of the rule and did not quantify the benefits. Further, commenters argued that ATF did not substantiate its assertion that bump-stock-type devices will be used more frequently in future crimes if this rule is not promulgated.

One commenter argued that the Department needed to separate the effects of using a bump-stock-type device from other factors that might have incremental effects on criminal activity, such as crowd density and angle of fire. The commenter stated that benefits must be reduced accordingly and must take into account a reduction in violence instead of elimination of the threat of violence from bump-stock-type devices. Many commenters argued that ATF cannot rely on the Las Vegas shooting as the measure of benefits for this rule.

Commenters discussed means of monetizing shooting incidents or comparing the death rates related to other items like motor vehicles, opiates, knives, and rocks. Other commenters in support of the rule suggested that ATF incorporate the financial and societal benefits of this rule.

Department Response

The Department declines to quantify benefits because OMB Circular A-4 requires quantifying and monetizing benefits only "if possible." OMB Circular A-4 at 45. One commenter provided descriptions on how to determine quantitative benefits of this rule and specifics on using a break-even analysis; however, due to limitations on data, the Department has considered the qualitative benefits for this rulemaking.

104

The Department did not account for the cost of deaths and injuries unrelated to bump-stock-type devices, as these are unrelated to this rule. This rule does not prohibit the use of firearms that could be used in shootings, or other items or devices. Furthermore, it is unclear how risk associated with other devices such as motor vehicles should influence ATF's decision-making. ATF has provided a cost-benefit analysis in both the NPRM and this final rule that fulfills the requirements of Executive Order 12866, OMB Circular A-4, the Regulatory Flexibility Act (RFA), and the Unfunded Mandates Reform Act.

*J. Regulatory Flexibility Act*

Comments Received

Some commenters suggested that the RFA requires examination of the future impact of the rule on innovation and of making a lawful product into an unlawful one.

Department Response

The Department disagrees that the RFA requires an examination of those specific factors. The RFA "requires agencies to consider the impact of their regulatory proposals on small entities, analyze effective alternatives that minimize small entity impacts, and make their analyses available for public comment."[12] The RFA "does not seek preferential treatment for small entities, nor does it require agencies to adopt regulations that impose the least burden on them, or mandate exemptions for them. Rather, it requires agencies to examine public policy issues using an analytical process that

---

[12] U.S. Small Business Administration, Office of Advocacy, *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act*, at 1 (Aug. 2017), https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf.

105

AR004136

identifies barriers to small business competitiveness and seeks a level playing field for small entities. not an unfair advantage."[13]

The Department found that this rule significantly impacts small businesses related to bump-stock-type devices. The Department interprets the RFA to mean that small businesses should not be prevented from using innovations to compete with other businesses, and to account for small businesses when determining alternative approaches with respect to small businesses in the field.[14]  At this time, there are only small businesses that manufacture bump-stock-type devices; therefore, no regulatory alternative was considered to alleviate the regulatory burden on small businesses with respect to competition with businesses that are not small.

*K. Miscellaneous Comments*

Commenters both in support of and in opposition to the proposed rule raised additional miscellaneous issues. These are discussed below.

1. Improve Background Checks

Comments Received

Separate from the suggested alternative, discussed above, that bump-stock-type devices be sold like firearms, many commenters voiced their general support for various enhancements to the existing Federal background check requirement.  Commenters said the "gun show loophole" should be closed, and many called for universal background checks.  At least one commenter suggested there should be psychiatric evaluations for firearms purchasers.  Commenters making these points were largely supporters of the proposed rule. but at least a few commenters opposed to the rule also supported

---

[13] *Id.*
[14] *Id.*

106

AR004137

background checks. One opposed commenter said better communication between the relevant government agencies and tighter background checks were needed. A few opposed commenters suggested it would be more effective to have a more in-depth background check along with a minimum age of 21 or 25 and a five-day waiting period because they observed that young, alienated people have frequently been the perpetrators of mass shootings.

Department Response

The Department acknowledges comments on enhanced or expanded background checks, an increase in minimum age requirements, and waiting periods. The Department is aware of the importance of having accurate and complete information available to the NICS, which is managed by the FBI; further, the Department works with Federal and State agencies to ensure that necessary information is submitted to the system. The Department does not, however, have the authority to increase the minimum-age requirement or enact a mandatory waiting period to purchase a firearm.

2. Increase Criminal Penalties

Comments Received

Commenters on both sides of the issue suggested that there be more stringent criminal penalties for firearms offenses. Some commenters in support of the rule said there should be severe penalties for possessing a bump-stock-type device, or for manufacturing one through digital printing, or simply for anyone who manufactures or distributes bump-stock-type devices. Another commenter supporting the rule said that bump-stock-type devices should be prohibited from all public spaces where there is the potential for mass murder, but did not object to persons who wanted to use bump-stock-

107

type devices on their own property or on hunting or shooting grounds. Some commenters opined that generally there should be more severe penalties for anyone using guns illegally or irresponsibly. A few commenters opposed to the rule suggested that in lieu of a rule prohibiting possession, a more effective deterrent would be severe penalties for the manufacture and sale of bump-stock-type devices. and that there should instead be swift and severe punishment, such as the death penalty for persons who commit or attempt to commit a mass shooting, or, more generally, that the law should be written to include mandated, nondiscretionary sentences.

Department Response

The Department does not have the authority to increase criminal penalties. Only Congress can increase, amend, or add new criminal penalties for Federal crimes.

3. Repeal the NFA and Hughes Amendment, and Remove Silencers

Comments Received

Numerous commenters opposed to the regulation viewed the proposed rule as an infringement on their rights. As part of their opposition to the proposed rule, some commented that the NFA itself is inherently unconstitutional and declared that it should be repealed. Commenters similarly questioned the constitutionality of the Hughes Amendment (18 U.S.C. 922(o)), which was enacted as a part of the Firearms Owners' Protection Act in 1986 and prohibits possession by individuals of any post-1986 machinegun. These commenters declared it should be repealed. A majority of these commenters simply objected to any further firearms restrictions and insisted these laws be repealed in order to restore freedoms they believe to have been steadily eroded by the Government. Some commenters noted that bump-stock-type devices evolved as a

108

AR004139

workaround to the NFA and Hughes Amendment restrictions so that shooters could have an affordable alternative to shoot in a manner that is close to a machinegun. Some opined that that a rule prohibiting bump-stock-type devices would be acceptable so long as these other restrictions are lifted to give individuals affordable access to machineguns. A few commenters also added that silencers should be removed from the NFA's coverage or be made available like any other firearm device, with at least one commenter stating that the Hearing Protection Act or Sportsmen's Heritage and Recreational Enhancement (SHARE) Act should be passed.

Department Response

The Department does not have the authority to repeal or amend provisions of the NFA, such as by removing silencers from the NFA. The NFA is a statute, which only Congress may repeal or alter. ATF does not have the authority to remove the general prohibition on the transfer and possession of machineguns that were not lawfully possessed before the date 18 U.S.C. 922(o) became effective, nor does it have the authority to permit nongovernmental entities to possess machineguns or other NFA firearms that are not lawfully registered in the NFRTR. Only Congress can alter these provisions. However, as stated, ATF does have the authority to implement the existing statute and has utilized the rulemaking process to do so.

4. Focus on Mental Health and Other Gun Control Measures

Comments Received

Supporters argued that in addition to finalizing the rule, more attention needs to be paid to improving mental health care. Generally, these commenters suggested there should be more spending on the mental health system so as to increase access.

AR004140

Numerous commenters in support of the rule also listed several other proposals pertaining to gun safety or gun control measures that should be implemented. Almost 5,000 commenters expressed that "other conversion devices" along with bump-stock-type devices should be banned. And more than 1,500 commenters also called for a ban on "assault weapons" or firearms altogether, while several others specifically stated that there should be restrictions on high-capacity magazines. Some commenters provided many other suggestions, including a higher age limit to acquire a firearm, written tests for firearm access, mandatory gun safety classes, proper storage inspections, a nationwide gun registry, licensure and gun ownership insurance requirements, ammunition limits, and protocols for removing firearms from domestic abusers and the mentally ill through protective orders.

Department Response

The Department acknowledges the importance of improving mental health care. However, mental health treatment does not fall under the Department's authority.

Although this rulemaking specifically addresses bump-stock-type devices, any item that meets the definition of a "machinegun" will be regulated as such and cannot be possessed unless legally registered. But only Congress can add additional requirements that must be met in order to purchase a firearm.

The Department does not have the authority to remove firearms from persons who are not prohibited from receiving or possessing them under Federal law. Only Congress can amend or add new categories of prohibited persons.

*L. Comments on the Rulemaking Process*

AR004141

1. Availability of Supporting Documentation

Comments Received

A handful of commenters argued that the procedures of the APA were not properly followed, in part because ATF did not include any supporting documentation on how it formulated its decision to regulate bump-stock-type devices. In particular, commenters stated that although they submitted Freedom of Information Act requests, ATF did not make available its own prior letter determinations that classified various bump-stock-type devices as firearm parts not subject to the NFA or GCA, nor did ATF make available any evidence suggesting that there have been other instances of criminal use of a bump-stock-type device. This kind of documentation, they argued, would provide the basis upon which the agency justified its proposed rule and therefore should be made public in order to allow for meaningful comment under the APA.

Department Response

Contrary to the commenters' arguments, the Department believes that it provided all of the background information necessary to allow meaningful public participation. The APA, 5 U.S.C. 553(b), provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register," and that this notice shall include, *inter alia*, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Federal courts have recognized that they must determine whether regulations are consistent with statutes, and "whether the process used in arriving at those regulations afforded those affected . . . their procedural due. More specifically, in the informal rulemaking context . . . , this inquiry asks whether the agency gave 'interested persons an opportunity to participate in the rule making through submission of written (or other)

111

data' and whether it 'incorporate(d) in the rule adopted a concise general statement of

their basis and purpose.'" *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1024 (D.C. Cir.

1978) (quoting 5 U.S.C. 553). A "notice of proposed rulemaking must provide sufficient

factual detail and rationale for the rule to permit interested parties to comment

meaningfully." *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 445 (D.C. Cir. 2004)

(internal quotation marks omitted).

The Department agrees with commenters that interested parties will not be able to

make meaningful comments upon an agency's proposed regulation if the notice "fails to

provide an accurate picture" of the agency's reasoning. *Conn. Light & Power Co. v.

NRC*, 673 F.2d 525, 528 (D.C. Cir. 1982). Commenters fail, however, to recognize that

the text of the NPRM set out the facts necessary to "provide an accurate picture" of the

Department's reasoning. In the NPRM, the Department articulated the reasons for its

proposed change in the classification of bump-stock-type devices, provided detailed

descriptions and explanations of its prior classifications, and offered thorough

explanations of its past and current analysis. Accordingly, the Department believes that it

provided notice to the public, in sufficient factual detail, to permit interested parties to

comment meaningfully on the proposed rule.

2. Previous "Lack of Candor"

Comments Received

One commenter also included an extensive description of ATF's "prior lack of

candor," including instances where ATF purportedly (1) committed "institutional

perjury" before the courts in the context of criminal prosecutions and supporting

probable-cause showings for search warrants; (2) committed deception and delayed

112

responding with respect to congressional inquiries regarding NFRTR inaccuracies as well

the "Fast and Furious" investigation; and (3) misled the public about the accuracy of the

NFRTR. According to the commenter, these episodes highlight a pattern of procedural

irregularities that should draw further scrutiny of this rulemaking.

Department Response

These comments are beyond the scope of this rulemaking, but the Department

notes that ATF has committed available resources to develop the NPRM and respond to

comments as part of the rulemaking process. In developing this rulemaking and

responding to comments, ATF has followed all established procedures and complied with

all relevant policies and requirements.

3. 90-Day Public Comment Period

Comments Received

One commenter asserted that the agency failed to provide the statutorily mandated

90-day public comment period. The commenter relied on an online article that

"detail[ed] the trials and tribulations of trying to find the appropriate docket," given that

some commenters indicated that they encountered a "Comment Period Closed"

notification on the FederalRegister.gov website when the NPRM was published on March

29, 2018. The author of the online article said that he submitted an inquiry to ATF

asking why the comment period appeared closed when it should have been open through

June 27, 2018, and why the website, at various times, depicted different numbers for the

amount of comments ATF received. The author's description of events concluded by

noting that he received a response from ATF with a specified weblink to Regulations.gov

where he could submit a comment but that none of his comments submitted were visible

113

on the website. Relying primarily on this online account, the commenter asserts that ATF did not disclose this weblink to the public and that numerous people believed that the comment period was closed from the very beginning of the comment period and were therefore precluded from submitting comments. The commenter therefore believes that the comment period should be extended because ATF did not permit the statutorily mandated 90-day comment period.

Department Response

The Department acknowledges that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal (www.Regulations.gov), which is managed and maintained by a third-party host. ATF was in touch with the managers of the Federal eRulemaking portal, and relayed an explanation of these technical issues to the author of the online article in two subsequent emails dated April 2 and April 3, 2018. However, there is no evidence that the proposed rule was not available for public comment for the 90-day comment period. On the contrary, ATF received numerous comments from the very beginning of the comment period.

ATF explained to the author of the article that on March 29, 2018, when the comment period opened for the NPRM, the link for submitting comments to the NPRM had been inadvertently connected to the Regulations.gov Docket ID number 2018-0001-0001, which had been used by the Regulations.gov website for the ANPRM comment period, December 26, 2017, through January 25, 2018. On March 29, 2018, the same day the proposed rule was published in the *Federal Register*, individuals were able to and did submit comments for the NPRM even though it was linked to the Docket ID used for the

114

ANPRM. Realizing that the link for the NPRM should not have been listed under the ANPRM Docket ID, a new Docket ID number (2018-0002-0001) was created for the NPRM. These Docket ID numbers are created by the third-party managers of Regulations.gov for purposes of the website. ATF uses its own docket number, 2017R-22, as seen in the text of the ANPRM and NPRM.

Once the third-party managers of Regulations.gov created a new Docket ID number for the NPRM with a "Comment Now" feature, they eliminated the ability to submit NPRM comments under the old ANPRM Docket ID. The Department acknowledges that there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018-0001-0001) was prominently situated on the homepage of the Regulations.gov website even though that link was no longer able to accept comments for the NPRM. Despite the brief prominence of the old ANPRM Docket ID on the Regulations.gov website, the public had the ability to submit comments through the Federal eRulemaking Portal for the NPRM at all times, as a simple search for "bump stock" in the main search bar on Regulations.gov during this time would have displayed the link for the new NPRM Docket ID, which was active and accepting comments. Moreover, some individuals confused about how to comment on Regulations.gov called ATF's Office of Regulatory Affairs, which was able to assist them.

ATF also responded to the author's inquiry regarding the discrepancy in the numbers showing the amount of comments received. Over the weekend of March 31, 2018, the third-party managers of Regulations.gov transferred all comments submitted for the NPRM through the ANPRM Docket ID to the new NPRM Docket ID. ATF was

115

AR004146

informed that the number of comments displayed on Regulations.gov updated only once a day and therefore would harmonize over the next few days as ongoing system maintenance occurred. Ultimately, the website depicting the amount of comments received reflects all comments received since March 29, 2018, the beginning of the comment period.

To answer the author's inquiry as to why his comments submitted were not visible on Regulations.gov, ATF reminded the online author that Part VII.C of the NPRM, which described the three methods for submitting public comments, informed the public that comments submitted through Regulations.gov "will be posted within a few days of being submitted. However, if large volumes of comments are being processed simultaneously, . . . comment[s] may not be viewable for up to several weeks." Since the beginning of the comment period, ATF received a high volume of comments and, as forewarned, there was a delay between the time comments were submitted and when they became viewable on the website, assuming the comment met the posting guidelines stated in Part VII.A of the NPRM. By April 3, 2018, two of the online author's comments were visible on Regulations.gov, and the agency provided him with direct weblinks to his comments.

Accordingly, the Department disagrees that the agency failed to provide the statutorily mandated 90-day public comment period. Moreover, the Department notes that the Federal eRulemaking Portal is one of the three methods available for the public to submit comments during the 90-day comment period. Therefore, the public also had the ability to submit comments via mail or facsimile during the entire 90-day period.

116

The Department believes the numerous examples provided by the commenter of cases in which Federal agencies extended comment periods are inapplicable to this rulemaking. The specific scenarios the commenter listed were apparently all the result of the lapse in government funding that occurred in October 2013. At that time, agencies were largely unstaffed, and insufficient personnel were available to process the comments. This rulemaking has not involved similar difficulties.

4. Request for Public Hearing

Comments Received

A few commenters requested a hearing pursuant to the NPRM because they want the opportunity to be heard before ATF prescribes any rule. One commenter stated that 18 U.S.C. 926(b) requires ATF to hold a public hearing when such is requested because the statute provides that the Attorney General "shall afford interested parties opportunity for hearing, before prescribing . . . rules and regulations [under 18 U.S.C. ch. 44]."

Department Response

The Department is not persuaded that a public hearing is necessary or appropriate in connection with this rulemaking. The Department believes that a comprehensive public record has already been established through the comment process, which generated over 186,000 comments, some of which included substantial discussions of the rulemaking. The Department does not believe that a public hearing would meaningfully add data or information germane to the examination of the merits of the proposal or would provide substantive factual information that would assist the Department in improving the rule in material ways. Furthermore, the Department believes that it has made changes to this rule and included clarifications in the preamble that address the

117

important issues raised by parties who requested a hearing. In light of all the circumstances, a public hearing is unnecessary.

The Supreme Court has held that it is not necessary for an agency to hold a public hearing on a rulemaking simply because it receives a request for one. In both *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742 (1972), and *United States v. Florida East Coast Railway*, 410 U.S. 224 (1973), the Court established the rule that it is necessary to examine the particular statute involved when determining whether notice-and-comment procedures under 5 U.S.C. 553 are available or, alternatively, whether there is a right to a formal hearing. In general, unless a statute specifically provides for rules to be made on the record after a hearing, the Federal courts have held that the informal rulemaking procedure is applicable. Thus, even statutory language such as "due notice and opportunity for a public hearing," and "opportunity for hearing," have been held to mandate only informal procedures under 5 U.S.C. 553. *See* 3 Administrative Law 16.03 (2018).

One Federal court specifically addressed the language in 18 U.S.C. 926(b), on which one commenter relied, and rejected the commenter's position. In that case, the plaintiff contended "that all of the regulations must be invalidated because the Secretary failed to follow the procedures mandated in FOPA by refusing to afford interested parties an opportunity for an oral hearing." However, the court held that the agency provided an "opportunity" for a hearing even though it decided against an oral hearing. The court wrote:

> FOPA contains no provision guaranteeing interested parties the right to an oral hearing. . . . It is well-settled that the requirement of a hearing does not necessitate that the hearing be oral. Here, the Secretary, pursuant to regulation, reserved for himself the right to determine whether an oral hearing should be held. He

118

> ultimately determined that an oral hearing was unwarranted, but did provide interested parties with the opportunity to submit written comments. This is all the hearing requirement in § 926(b) demands.

*Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 485 (4th Cir. 1990) (citations omitted). Here, the Department has made the same determination that an oral hearing is unnecessary.

## V. Final Rule

This final rule adopts, with minor changes, the proposed amendments to the definition of "machine gun" in 27 CFR 447.11, 478.11, and 479.11, which include clarification of the meaning of "automatically" and "single function of the trigger" and clarification that bump-stock-type devices are machineguns. The Department accordingly determined that persons in possession of bump-stock-type devices must destroy or abandon the devices.

In response to comments received and discussed in Part IV, the Department added employees of manufacturers and one additional manufacturer to the populations potentially affected by this rule, and incorporated sales tax of $19.00 per bump-stock-type device as part of the economic analysis. Also, the Department considered additional alternatives and inserted an OMB Circular A-4 Accounting Statement for clarity.

## VI. Statutory and Executive Order Review

### A. Executive Orders 12866, 13563, and 13771

Executive Orders 13563 (Improving Regulation and Regulatory Review) and 12866 (Regulatory Planning and Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order

119

AR004150

13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs) directs agencies to reduce regulation and control regulatory costs. This final rule is expected to have an impact of over $100 million in the first year of this regulatory action. Details on the estimated costs of this final rule can be found in the rule's economic analysis below.

The Attorney General has determined this rule is a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866 because, as discussed, the rule will have an annual effect on the economy of $100 million or more. Accordingly, the rule has been reviewed by the Office of Management and Budget. This rule is a significant regulatory action that clarifies the meaning of the statutory definition of machinegun and reflects the public safety goals of the NFA and GCA. Further, this rule is a regulatory action subject to Executive Order 13771. *See* OMB, *Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs"* (Apr. 5, 2017).

This final rule is intended to interpret the definition of "machinegun" within the NFA and GCA such that it includes a bump-stock-type device, i.e., a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

120

## Accounting Statement

Table 1 provides the annualized and unquantified costs and benefits to this final rule. These costs are annualized and discounted at 3% and 7%.

Table 1.  OMB Circular A-4 Accounting Statement

| Category | Primary Estimate | | Minimum Estimate | | Midrange Estimate | | Source |
|---|---|---|---|---|---|---|---|
| Benefits | | | | | | | |
| Annualized monetized benefits (discount rate in parentheses) | (7%) | N/A | (7%) | N/A | (7%) | N/A | Final Rule |
| | (3%) | N/A | (3%) | N/A | (3%) | N/A | |
| Unquantified Benefits | • Limit access to bump-stock-type devices<br>• Prevents usage of bump-stock-type devices for criminal purposes<br>• Intended to reduce casualties in mass shootings<br>• Intended to help protect first responders when responding to shooting incidents | | | | | | Final Rule |
| Costs | | | | | | | |
| Annualized monetized costs (discount rate in parentheses) | (7%) | $35.0 mil | (7%) | $28.9 mil | (7%) | $32.0 mil | Final Rule |
| | (3%) | $32.8 mil | (3%) | $27.6 mil | (3%) | $31.2 mil | Final Rule |
| Qualitative costs (unquantified) | • Potential loss of wages for employees of bump-stock-type device manufacturers<br>• Costs of advertising to inform owners of the need to dispose of their bump-stock-type devices<br>• Lost consumer surplus to users of bump-stock-type devices | | | | | | Final Rule |
| Transfers | | | | | | | |
| Annualized monetized transfers: "on budget" | 0 | | 0 | | 0 | | Final Rule |
| From whom to whom? | N/A | | N/A | | N/A | | None |

121

AR004152

| Annualized monetized transfers: "off-budget" | 0 | 0 | 0 | Final Rule |
|---|---|---|---|---|
| From whom to whom? | N/A | N/A | N/A | None |
| Miscellaneous Analysis/ Category | Effects | | | Source Citation |
| Effects on State, local, and/or tribal governments | None | | | None |
| Effects on small businesses | Significant effect on small businesses. Prepared FRFA. | | | RFA |
| Effects on wages | None | | | None |
| Effects on growth | None | | | None |

### Need for Federal Regulatory Action

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning regulatory action is the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This final rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that they could be used for criminal purposes. This poses a public safety issue that the Department is trying to address.

### Summary of Affected Population, Costs, and Benefits

Table 2 provides a summary of the affected population and anticipated costs and benefits to promulgating this rule.

122

AR004153

Table 2.  Summary of Affected Population, Costs, and Benefits

| Category | Affected Populations, Costs, and Benefits |
|---|---|
| Applicability | <ul><li>Manufacturers of bump-stock-type devices</li><li>Employees of bump-stock-type device manufacturers</li><li>Retail sellers of bump-stock-type devices</li><li>Gun owners who own bump-stock-type devices or would have purchased them in the future</li></ul> |
| Affected Population | <ul><li>1 manufacturer of bump-stock-type devices</li><li>2,281 retailers of bump-stock-type devices</li><li>Owners and future consumers of bump-stock-type devices</li></ul> |
| Total Quantified Costs to Industry, Public, and Government (7% Discount Rate) | <ul><li>$245.5 million present value over 10 years</li><li>$35.0 million annualized</li></ul> |
| Unquantified Costs | <ul><li>Potential loss of wages for employees of bump-stock-type device manufacturers</li><li>Costs of advertising to inform owners of the need to dispose of their bump-stock-type devices</li><li>Lost consumer surplus to users of bump-stock-type devices</li></ul> |
| Unquantified Benefits | <ul><li>Limits access to bump-stock-type devices</li><li>Prevents usage of bump-stock-type devices for criminal purposes</li><li>Intended to reduce casualties in mass shootings</li><li>Intended to help protect first responders when responding to shooting incidents</li></ul> |

**Changes from the NPRM to FR**

Table 3 presents a summary of the changes to economic effects from NPRM to final rule.

Table 3.  Changes in Bump-Stock-Type Devices From NPRM to the Final Rule

| Variables | NPRM | Final Rule | Difference | Description of Changes |
|---|---|---|---|---|

123

AR004154

| | N/A | Employees of bump-stock-type device manufacturers | Adding employees of bump-stock-type device manufacturers | Per public comment, ATF included employees of manufacturers qualitatively |
|---|---|---|---|---|
| Applicability | 2 manufacturers | 1 manufacturer | Subtracted 1 | Based on publicly available information |
| Cost of Bump-Stock-Type Devices | $301 | $320 | $19 | Per public comment, ATF included State and local taxes |
| Destruction | $5.4 million | $9.4 million | $3.9 million | Change in policy |
| Future Sales | $213.0 million | $198.9 million | $14.1 million | Change from 2 large retailers selling bump-stock-type devices to 1 |
| Government Cost | $0 | $1.3 million | $1.3 million | Change in policy |
| Alternatives | | | | |
| Amnesty or "grandfathering" | This alternative was rejected because since the passage of 18 U.S.C. 922(o), amnesty registration of machineguns is not legally permissible. | | | Per public comment |
| Licensing and background checks | This alternative was rejected because only Congress can add a new class of firearm and impose licensing or acquisition requirements on them. | | | Per public comment |
| Remuneration | This alternative was rejected because only Congress has the authority to offer monetary compensation. | | | Per public comment |
| Medical exemption | This alternative was rejected because neither the NFA nor the GCA provides for medical exemptions to acquire a firearm. Only Congress can add medical exemptions. | | | Per public comment |
| Future production and sales | This alternative was rejected because ATF does not have the authority to restrict only the future manufacture or sale of bump-stock-type devices. | | | Per public comment |

124

AR004155

| Quota | This alternative was rejected because ATF lacks authority to implement it, as all devices determined to be machineguns are prohibited across the board. | Per public comment |
|---|---|---|
| Instituting a tax | This alternative was rejected because excise tax is regulated by statute and only Congress can determine the amount of excise tax on an item. | Per public comment |
| Improved security at mass events | This alternative was rejected because improved security must be paired with reasonable regulations to increase public safety and reduce violent crime. | Per public comment |
| Congressional legislation | This alternative was rejected because ATF has been delegated authority to issue rules to implement the NFA and GCA. This action will not prevent Congress from taking action on bump-stock-type devices. | Per public comment |
| Leave to States to regulate | This alternative was rejected because ATF prioritizes public safety and preventing crime. This action will not prevent States from taking action on bump-stock-type devices. | Per public comment |
| Improved law enforcement | This alternative was rejected because training and equipment must be paired with reasonable regulatory efforts to increase public safety and reduce violent crime. | Per public comment |

**Affected Population**

The populations affected by this rule are manufacturers of bump-stock-type devices, employees of bump-stock-type device manufacturers, retailers who sell them either in brick-and-mortar stores or online, and individuals who have purchased or would have wanted to purchase bump-stock-type devices. The number of entities and individuals affected are as follows:

- 1 manufacturer

- 2,281 retailers

125

- An uncertain number of individuals who have purchased bump-stock-type devices or would have purchased them in the future[15]

- An estimated 22 employees who were employed by one manufacturer, based on public comments[16]

Because many bump-stock-type devices—including those ATF addressed in classification letters between 2008 and 2017—have not been subject to regulation under the GCA, ATF does not keep track of manufacturers or retailers of bump-stock-type devices, nor does ATF keep track or maintain a database of individuals who have purchased bump-stock-type devices. Therefore, the affected population of manufacturers and retailers is an estimate and based on publicly available information and, with respect to retailers who are also Federal firearms licensees (FFLs), is also based on ATF's records in the Federal Firearms Licensing System.

Based on publicly available information and comments on the NPRM, ATF estimates that since 2010, as many as seven domestic bump-stock-type device manufacturers have been in the marketplace, but due to patent infringement litigation, only three remained in the market. However, it appears two have ceased manufacturing bump-stock-type devices since publication of the NPRM due their inability to obtain liability insurance. For the estimate of the number of retailers, ATF filtered all FFLs for a list of potential sellers. While there are approximately 80,000 FFLs currently licensed, only certain types of FFLs sell firearms to the public. ATF first removed FFLs that do

---

[15] Note that many commenters assumed that each person who owns a bump-stock-type device owns one device. This overestimates the number of owners because owners of such devices may own more than one, as evidenced by the Las Vegas shooter, who allegedly owned at least 12.
[16] Regulations.gov, *Docket ID: ATF-2018-0002-16668*, available at
https://www.regulations.gov/document?D=ATF-2018-0002-16668 (last visited Nov. 16, 2018).

126

AR004157

not sell firearms to the public. Next, since not all FFLs sell firearm accessories, ATF needed to estimate the number that do sell accessories. ATF assumed that FFLs that are likely to sell bump-stock-type devices also have websites. ATF ran a query on the FFL database and found that of those that sell firearms to the public, 2,270 have websites. Because sellers of firearm accessories do not necessarily sell firearms, ATF also performed an online search and found an additional 11 retailers who sell firearm accessories, but not firearms. Adding these two totals together, ATF estimates that there are 2,281 retailers of bump-stock-type devices.

Because there are no records of individuals who have purchased firearm accessories, ATF does not have an estimated number of individuals who will be affected by this final rule. Although ATF lacks data on the number of individuals who have purchased bump-stock-type devices, ATF has some information from one manufacturer and four retailers on the volume of sales of such devices. Based on these reported amounts, ATF estimates that the number of bump-stock-type devices that were purchased during the 8-year period beginning in 2010 ranges from 35,000 per year as a low estimate to 75,000 per year as the high and primary estimate. ATF used a public commenter's estimate of 400,000 total devices in circulation as a third estimate. For further information on the methodology of these estimates, please review the analysis regarding "Costs" below.

**Costs**

There are four primary sources of costs from this rule. First, for owners of bump-stock-type devices, there will be a lost value from no longer being able to possess or use the devices. Second, there will be a lost value from future sales of the devices. Third,

127

there is a disposal cost associated with the need to destroy the devices or abandon them at the nearest ATF office. Finally, there will be a potential loss of wages from employees losing jobs from loss of manufacturing; however, the extent to which they will be unable to find replacement jobs is speculative.

Manufacturing and startup cost

Commenters suggested that ATF overlooked the capital expenses to start up a company to manufacture bump-stock-type devices. The Department considered the capital expenses for manufacturers. However, in light of the Las Vegas shooting and potential crowding of additional manufacturers, the Department determined that the potential for manufacturers to continue business in a potentially saturated market was doubtful. Furthermore, the Department has already calculated the foregone return on investment when the Department considered foregone production, so accounting for capital expenses would be double counting of expenditures. Therefore, the viability that these businesses will be successful is speculative and the capital expenses that they incurred are a sunk cost for those who put in the expense.

Cost to the public for loss of property

One reason individuals purchase bump-stock-type devices is so that they can simulate automatic firing on a semiautomatic firearm. Commenters noted a variety of purposes for which bump-stock-type devices have been advertised and used, including for recreation and fun, assisting persons with mobility issues in firing quickly, self-defense, killing invasive pig species, and target practice (although, as some commenters observed, bump-stock-type devices impede firing accuracy). After implementation of this final rule, bump-stock-type devices that meet the definition of "machinegun" under

128

the NFA and GCA cannot be lawfully possessed because the pertinent provision of the GCA. 18 U.S.C. 922(o), prohibits persons from possessing a machinegun unless it was lawfully possessed before the effective date of section 922(o). Bump-stock-type devices currently possessed by individuals will have to be destroyed or abandoned prior to the effective date of this regulation.

The lost value from no longer being able to use or purchase bump-stock-type devices will depend on the volume of sales in the market and the value that consumers place on the devices. ATF has limited information about the market for bump-stock-type devices. ATF first developed an estimate of the number of bump-stock-type devices in the marketplace based on information on retail sales provided in response to the ANPRM. One ANPRM commenter estimated that more than 400,000 bump-stock-type devices may have been sold. Based on publicly available information, ATF estimates that in the first two years that bump-stock-type devices were in the market, approximately 35,000 were sold per year.[17] However, after 2011, other manufacturers entered the market and there is no available information regarding the total number of bump-stock-type devices manufactured. ATF is using publicly available information on manufacturing and combining it with the information on retail sales to estimate a range of the number of bump-stock-type devices in the marketplace.

One retailer stated that it sold an average of 4,000 to 5,000 bump-stock-type devices per year.[18] One commenter indicated that one retailer sold 3,800 bump-stock-

---

[17] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), http://www.thealbanynews.net/archives/2443.
[18] Based on an internal survey of large retailers.

129

type devices annually, one sold 60 per year, and one sold approximately 5-10 per year.[19]
For the purposes of this regulatory analysis (RA), ATF assumes that a large retailer has
sold 4,400, a midrange retailer has sold 60, and a small retailer has sold 8.[20]  For the
purposes of this analysis, ATF assumes the number of retailers by size are as follows:

- 4 large * 4,400 annual sales
- 755 midrange * 60 annual sales
- 1,511 small * 8 annual sales

The number of large retailers is a known number.  As stated in the Affected
Population section above, based on ATF's internal database and online research, the
remaining number of retailers is 2,270.  For the purposes of this RA, ATF estimated that
one-third of the remaining retailer population are midrange retailers, and the remaining
1,511 are small retailers.  Using these estimated numbers of retailers and annual sales by
size of retailer, ATF estimated annual sales of about 75,000 [(4 * 4,400) + (755 * 60) +
(1,511 * 8)].

ATF next developed an estimate of the number of bump-stock-type devices in the
United States based on information about the number of bump-stock-type devices
manufactured.  Based on publicly available information, ATF estimates that
approximately 35,000 bump-stock-type devices were sold in 2010.[21]  Only in 2012 did
other manufacturers enter the marketplace.  For the purposes of this RA, ATF assumes
that in the first two years of production, the one manufacturer produced the same 35,000

---

[19] Regulations.gov, *Docket ID: ATF-2018-0001-27509*, https://www.regulations.gov/document?D=ATF-2018-0001-27509 (last visited on Nov. 16, 2018); Regulations.gov, *Docket ID: ATF-2018-0001-0433*, https://www.regulations.gov/document?D=ATF-2018-0001-0433 (last visited on Nov. 16, 2018); Regulations.gov, *Docket ID: ATF-2018-0001-0128*, https://www.regulations.gov/document?D=ATF-2018-0001-0128 (last visited on Nov. 16, 2018).
[20] For a large retailer the average sales were 4,400 = (3,800 + 5,000) / 2. For a small retailer, the average sales were 8 = (5 + 10) / 2.
[21] Lucas, *supra* note 17.

130

AR004161

in years 2010 and 2011. ATF has two sets of production estimates. Because no information is otherwise known about the production of bump-stock-type devices, ATF assumes that the low estimate of annual bump-stock-type device production is a constant 35,000, based on the one data point. As stated earlier, a public commenter provided an estimate of 400,000 bump-stock-type devices currently in circulation. To account for how these were purchased over the last 8 years, ATF also assumed the same 35,000 production in the first 2 years, but spread out the remaining 330,000 over the remaining 6 years, or about 55,000 per year. However, there were public comments that stated how many bump-stock-type devices were sold by that retailer. Using the retail sales information, ATF developed a third, higher estimate reflecting that when the other manufacturers entered the market, the number of bump-stock-type devices sold on the market annually could have been 75,000.

The high estimate is ATF's primary estimate because ATF knows that there was an increase in production starting in 2012. In 2012, there were other manufacturers who entered the market, and the first manufacturer increased production at some point thereafter. Furthermore, the primary estimate includes information provided by retailers as a more comprehensive outlook on the overall production numbers. For the purposes of this analysis, ATF assumes that both the increase in production and the market entry of other manufacturers all occurred in 2012. Table 4 provides the breakdown of production for the low estimate, public comment estimate, and primary estimate.

Table 4. Number of Bump-Stock-Type Devices Produced, Based on Manufacturer and Retail Sales

| Year | Low Estimate | Public Comment Estimate | Primary Estimate |
|---|---|---|---|

131

AR004162

| | | | |
|---|---|---|---|
| 2010 | 35,000 | 35,000 | 35,000 |
| 2011 | 35,000 | 35,000 | 35,000 |
| 2012 | 35,000 | 55,000 | 75,000 |
| 2013 | 35,000 | 55,000 | 75,000 |
| 2014 | 35,000 | 55,000 | 75,000 |
| 2015 | 35,000 | 55,000 | 75,000 |
| 2016 | 35,000 | 55,000 | 75,000 |
| 2017 | 35,000 | 55,000 | 75,000 |
| Total | 280,000 | 400,000 | 520,000 |

In other words, the number of bump-stock-type devices held by the public could range from about 280,000 to about 520,000.

ATF does not know the production cost of bump-stock-type devices, but for the purposes of this RA, ATF uses the retail sales amounts as a proxy for the total value of these devices. For devices that have already been sold, there are two countervailing effects that affect the value of the devices. There may have been some depreciation of the devices since they were originally purchased, resulting in a value somewhat reduced from the retail price. On the other hand, some consumers may have been willing to pay more than the retail price for a bump-stock-type device, and for these individuals the devices would have a higher valuation than the retail price. Both of these effects are difficult to estimate, and here ATF assumes that the retail sales price is a reasonable proxy for the value of the devices.

The primary manufacturer of bump-stock-type devices sells them at a price of $179.95 to $425.95.[22] For the purposes of this RA, ATF estimates that the average sale price, including State and local taxes, for these bump-stock-type devices was $320.00

---

[22] Slide Fire AR-15 Bump Fire Stocks (archived page on Jan. 28, 2017), https://web.archive.org/web/20170128085532/http://www.slidefire.com/products/ar-platform (last visited Nov. 28, 2018).

132

AR004163

during the first two years they were sold. In 2012, at least one other manufacturer entered the market and started selling its devices at the rate of $99.99, making the overall prices for these devices lower.[23] For the purposes of this RA, ATF assumes that the average sale price, including State and local taxes, for bump-stock-type devices from 2012 to 2017 was $213.00. Based on these costs, multiplied by the number of bump-stock-type devices in the market, Table 5 provides the sales value that the public has spent on these devices over the course of the last eight years.

Table 5.  Amount Spent on Bump-Stock-Type Devices (Undiscounted)

| Year | Low Estimate | Midrange Estimate | Primary |
|------|-------------|-------------------|---------|
| 2011 | $11,214,896 | $11,214,896 | $11,214,896 |
| 2012 | $11,214,896 | $11,214,896 | $11,214,896 |
| 2013 | $7,470,511 | $11,739,374 | $16,008,237 |
| 2014 | $7,470,511 | $11,739,374 | $16,008,237 |
| 2015 | $7,470,511 | $11,739,374 | $16,008,237 |
| 2016 | $7,470,511 | $11,739,374 | $16,008,237 |
| 2017 | $7,470,511 | $11,739,374 | $16,008,237 |
| Total | $59,782,345 | $81,126,661 | $102,470,977 |

ATF estimates that the total, undiscounted amount spent on bump-stock-type devices was $102.5 million. While the retail prices of these bump-stock-type devices remained constant over the eight years of sales, these purchases occurred over time; therefore, ATF presents the discounted value at 3% and 7% in Table 6 to account for the present value of these purchases.

Table 6.  The Amount Spent Purchasing Bump-Stock-Type Devices,
Discounted at 3% and 7%

| Year | Undiscounted | 3% | 7% |
|------|-------------|-----|-----|

---

[23] Bump Fire Systems (archived page on Feb. 21, 2015),
https://web.archive.org/web/20150221050223/http://bumpfiresystems.com/ (last visited Nov. 28, 2018).

133

AR004164

| | | | |
|---|---|---|---|
| 2011 | $11,214,896 | $13,001,138 | $15,729,472 |
| 2012 | $11,214,896 | $12,622,464 | $14,700,441 |
| 2013 | $16,008,237 | $17,492,633 | $19,610,779 |
| 2014 | $16,008,237 | $16,983,139 | $18,327,831 |
| 2015 | $16,008,237 | $16,488,484 | $17,128,814 |
| 2016 | $16,008,237 | $16,008,237 | $16,008,237 |
| 2017 | $16,008,237 | $15,541,978 | $14,960,969 |
| Total | $102,470,977 | $108,138,073 | $116,466,542 |
| Annualized Cost | | $15,404,959 | $19,504,391 |

Because these purchases occurred in the past, ATF's discount years start at -5 and increase to 0 to account for the Executive Order 13771 standard that costs be presented in 2016 dollars. With these assumptions, ATF estimates that the annualized, discounted amount spent on bump-stock-type devices was $15.4 million and $19.5 million at 3% and 7%, respectively.

Based on the same discounting formula, ATF estimates that the total undiscounted cost for the low estimate is $59.7 million, and the total discounted values are $64.1 million and $70.6 million at 3% and 7%, respectively. The annualized values for the low estimates of the total number of bump-stock-type devices sold are $9.1 million and $11.8 million at 3% and 7%, respectively. For the 400,000-unit estimate provided by the public commenter, the total undiscounted amount is $81.1 million, and the total discounted values would be $86.1 million and $93.5 million at 3% and 7%, respectively. The annualized values for the 400,000-unit sales estimate are $12.3 million and $15.7 million at 3% and 7%, respectively.

Forgone future production and sales

ATF has estimated the lost production and lost sales that will occur in the 10 years after the implementation of this final rule. These estimates take into account lost

134

revenue from manufacturers and retailers. ATF does not parse out manufacturing and retail sales, in order to limit double counting. In order to do this, ATF needed to predict the number of devices that would have been sold in the future in the absence of a rule. Such a prediction should take account of recent expected changes in the demand for and supply of bump-stock-type devices. For example, based on a survey, three of the four known, large former retailers of bump-stock-type devices no longer sell bump-stock-type devices as a result of the Las Vegas shooting, nor do they intend to sell them in the future. Moreover, while ATF has estimated the number of bump-stock-type devices manufactured since 2010, ATF is without sufficient information to estimate the number of individuals who were interested in acquiring bump-stock-type devices prior to the Las Vegas shooting but would no longer want them due to the shooting.

Another recent change affecting individuals' future purchases of bump-stock-type devices is that certain States have already banned such devices. These States are California, Connecticut, Delaware, Florida, Hawaii, Maryland, Massachusetts, New Jersey, Rhode Island, Vermont, and Washington.[24] The effect of States' bans on individuals' future purchases of bump-stock-type devices should not be attributed to this final rule since these reductions in purchases will happen with or without the rule. However, ATF was unable to quantify the impact of States' bans and thus was unable to account for the future effects of these bans in the estimate of the effects of the final rule.

---

[24] Cal. Penal Code sections 16930, 32900 (2018); 2018 Conn. Acts 18-29 (Reg. Sess.); Del. Code Ann. tit. 11, section 1444(a)(6) (2018); Fla. Stat. section 790.222 (2018); Haw. Rev. Stat. section 134-8.5 (2018); Md. Code. Ann., Crim. Law section 4-305.1 (2018); Mass. Gen. Laws ch. 140, section 121, 131 (2018); N.J. Stat. Ann. sections 2C:39-3(*l*), 2C:39-9(j); 11 R.I. Gen. Laws section 11-47-8(d) (2018); Vt. Stat. Ann. tit. 13, section 4022 (2018); 2018 Wash. Sess. Laws ch. 7, pp. 196-220.

135

AR004166

Based on previously mentioned comments from large retailers, ATF expects that, even in the absence of this rule, some retailers would not sell bump-stock-type devices in the future. In order to estimate the expected future reduction in demand for bump-stock-type devices as a result of the Las Vegas shooting, ATF assumes that the reduction of sales by large retailers that has already occurred would be a reasonable estimate of the future reduction of sales overall that would occur in the absence of this rule. In the NPRM, ATF estimated that two of the four large retailers would remain in the market to sell bump-stock-type devices. 83 FR at 13452. Since then, one of these remaining retailers merged with one of the large retailers that opted not to sell bump-stock-type devices, resulting in only one large retailer remaining in the market. For the purposes of this regulatory analysis, it is estimated that the one large retailer that would otherwise intend to keep selling bump-stock-type devices sells 4,400 of such devices annually. Removing the effects of these three large retailers from the future market reduces ATF's primary estimate of 74,988 in past annual production to an estimate of 62,084 (= 75,284 − 13,200) in annual sales that would have occurred in the future in the absence of this rule. Table 7 provides the estimated breakdown of lost production and sales forgone due to this rule.

Table 7. Forgone Production and Sales of Future Bump-Stock-Type Devices

| Year | No. of Bump-Stock-Type Devices | Undiscounted | 3% | 7% |
|---|---|---|---|---|
| 2018 | 62,084 | $19,893,303 | $19,313,886.10 | $18,591,871.67 |
| 2019 | 62,084 | $19,893,303 | $18,751,345.73 | $17,375,581.00 |
| 2020 | 62,084 | $19,893,303 | $18,205,190.03 | $16,238,860.74 |
| 2021 | 62,084 | $19,893,303 | $17,674,941.77 | $15,176,505.37 |
| 2022 | 62,084 | $19,893,303 | $17,160,137.64 | $14,183,649.88 |

136

| | | | | |
|---|---|---|---|---|
| 2023 | 62,084 | $19,893,303 | $16,660,327.81 | $13,255,747.55 |
| 2024 | 62,084 | $19,893,303 | $16,175,075.54 | $12,388,549.11 |
| 2025 | 62,084 | $19,893,303 | $15,703,956.84 | $11,578,083.28 |
| 2026 | 62,084 | $19,893,303 | $15,246,560.04 | $10,820,638.58 |
| 2027 | 62,084 | $19,893,303 | $14,802,485.47 | $10,112,746.34 |
| Total | | $198,933,027 | $169,693,906.98 | $139,722,233.51 |
| Annualized Cost | | | $24,173,981.19 | $23,398,969.82 |

Based on these estimates, ATF estimates that the undiscounted value of forgone future sales over 10 years is $198.9 million, undiscounted, or $24.2 million and $23.4 million, annualized and discounted at 3% and 7%.

Disposal

This final rule requires the destruction of existing bump-stock-type devices. The cost of disposal has several components. For individuals who own bump-stock-type devices, there is a cost for the time and effort to destroy the devices or ensure that they are destroyed by another party. For retailers, wholesalers, and manufacturers, there is a cost of the time and effort to destroy or ensure the destruction of any devices held in inventory. In addition, this final rule incorporates the option of abandoning bump-stock-type devices at an ATF office. Based on the response from commenters, this cost is taken into consideration under the foregone sales section.

Individuals who have purchased bump-stock-type devices prior to the implementation of this rule must destroy the devices themselves prior to the effective date of the rule or abandon them at their local ATF office. Options for destroying the devices include melting, crushing, or shredding in a manner that renders the device incapable of ready restoration. Since the majority of bump-stock-type devices are made of plastic material, individuals can use a hammer to break apart the devices and throw the

137

pieces away. Other destruction options that ATF has historically accepted include torch cutting or sawing the device in a manner that removes at least ¼ inch of material for each cut and completely severs design features critical to the functionality of the device as a bump-stock-type device.

Current possessors are encouraged to undertake destruction of the devices. However, current possessors also have the option to abandon bump-stock-type devices at the nearest ATF office. Current possessors of bump-stock-type devices will have until the effective date of the rule (90 days from date of publication in the *Federal Register*) to comply. Additional information on the destruction of bump-stock-type devices will be available on www.atf.gov.

Based on comments received on the ANPRM, unsellable inventory could be worth approximately $35,000 per large retailer. One commenter, assumed to be a large retailer, stated that its gross sales were $140,000. Another commenter assumed to be a midrange retailer had gross sales of $18,000. No known sales were reported for a small retailer. Based on the proportion of sales among the large, midrange, and small retailers, ATF estimates that the amounts in existing inventory for each type of retailer are as follows:

- large retailer: $35,000;
- midrange retailer: $4,500; and
- small retailer: $74.[25]

---

[25] Midrange: $4,500 = ($18,000 / $140,000) * $35,000.  Small: $74 = (8 / 3,800) * $35,000.

138

AR004169

There were no comments on the NPRM about these assumptions or the methodology used based on the ANPRM comments. Therefore, the analysis used to determine the cost of unsellable inventory remains the same for this final rule.

The commenter assumed to be a large retailer also commented that the opportunity cost of time needed to destroy existing inventory will be approximately $700. ATF's subject matter experts estimate that a retailer could use a maintenance crew to destroy existing inventory. To determine the hourly time needed to destroy existing inventory, ATF used the $700 reported amount, divided by the loaded wage rate of a building cleaning worker. ATF subject matter experts also suggest that existing packers would be used for a midrange retailer and the minimum wage would be used for a small retailer. A multiplier of 1.43 was applied to unloaded wage rates to account for fringe benefits.[26] Table 9 provides the wages used for this analysis.

Table 9. Wage Series to Destroy Existing Inventory

| Wage Series | Series Code | Unloaded Wage Rate | Loaded Wage Rate | Source |
|---|---|---|---|---|
| Individual | | $13.60 | $13.60 | https://www.transportation.gov/sites/dot.gov/files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf |
| Minimum Wage Rate | Min Wage | $7.25 | $10.40 | https://www.bls.gov/opub/reports/minimum-wage/2016/home.htm |
| Packers, Packagers, and Handlers | 53-7064 | $11.74 | $16.84 | https://www.bls.gov/oes/2016/may/oes537064.htm |
| Retail Salespersons | 41-2031 | $13.07 | $18.75 | https://www.bls.gov/oes/2016/may/oes412031.htm |
| Building Cleaning | 37-2019 | $14.88 | $21.34 | https://www.bls.gov/oes/2016/may/oes372019.htm |

---

[26] BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $32.35) / (Private Industry Wages and Salaries = $22.55) = 1.43. BLS average 2016. U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey:[cm]&s=popularity:D.

139

AR004170

| Workers, All Other | | | |
|---|---|---|---|
| | | | |

Based on the estimated wages and reported opportunity cost of time, ATF estimates that it will take a large retailer 32.8 hours, a midrange retailer 0.45 hours, and a small retailer 0.25 hours to destroy existing inventory. Table 10 provides the per-retailer estimated opportunity cost of time.

Table 10.  Opportunity Cost of Time to Destroy Existing Inventory

| Population | Incremental Cost | Hourly Burden | Opportunity Cost of Time |
|---|---|---|---|
| Individual | $13.60 | 0.25 | $3.40 |
| Retailer (Large) | $21.34 | 32.8 | $699.95 |
| Retailer (Midrange) | $16.84 | 0.45 | $7.58 |
| Retailer (Small) | $19.51 | 0.25 | $4.88 |

As stated earlier, ATF estimates that there are 520,000 bump-stock-type devices already purchased by the public. For the purposes of this analysis, we estimate the following calculations to destroy bump-stock-type devices:

- Individual: $1.3 million = (1.8 million * 75%)
- Retailer (Large): 3 retailers * $699.95 opportunity cost of time + ($35,000 inventory * 75%)
- Retailer (Midrange): 569 retailers * $7.58 opportunity cost of time + ($4,500 inventory * 75%)
- Retailer (Small): 1139 retailers * $4.88 opportunity cost of time + ($74 inventory * 75%)

140

AR004171

Based on the opportunity cost of time per bump-stock-type device, and the estimated opportunity cost of time per retailer, ATF provides the cost to destroy all existing bump-stock-type devices in Table 11.

Table 11.  Cost of Existing Inventory and Opportunity Cost of Time to Destroy Existing Devices by Individual and Retailer Size

|  | Original Cost | Reduced Cost | Net Change |
|---|---|---|---|
| Individual | $1,768,000 | $1,326,000 | $442,000 |
| Retailer (Large) | $142,800 | $80,850 | $61,950 |
| Retailer (Midrange) | $3,421,252 | $1,924,687 | $1,496,565 |
| Retailer (Small) | $116,279 | $66,176 | $50,103 |
| **Total Disposal Cost** | **$5,448,330** | **$3,397,713** | **$2,050,618** |

For those abandoning bump-stock-type devices, we estimate that 130,000 individuals, 1 large retailer, 138 midrange retailers, and 139 small retailers will abandon them at their nearest ATF office.  Table 12 provides the cost of gas, travel time, and mileage to abandon them.

Table 12.  Cost of Gas, Travel Time, and Mileage

| Cost Item | Rate | Source |
|---|---|---|
| Gas Consumption | $0.545 | https://www.gsa.gov/travel-resources |
| Hours of Weekend Travel Time | 1.556 | https://nhts.ornl.gov/2009/pub/stt.pdf |
| Miles Traveled | 7 | https://nhts.ornl.gov/2009/pub/stt.pdf |

Assuming these devices will be abandoned during leisure hours, ATF uses the leisure wage rate of $13.60.  ATF estimates that the cost to travel to ATF offices will be $24.98 per trip = (13.60 leisure wage * 1.556 hours of weekend travel time) + ($0.545 gas consumption * 7 miles traveled).  For the purposes of this analysis, we estimate the following calculations to destroy bump-stock-type devices:

- Individual: 520,000 bump-stock-type devices * 25% * $24.98

141

AR004172

- Retailer (Large): (1 retailer * $24.98 travel cost) + ($35,000 inventory * 25%)

- Retailer (Midrange): (190 retailers *$24.98 travel cost) + ($4,500 inventory * 25%)

- Retailer (Small): (379 retailers * $24.98 travel cost) + ($74 inventory * 75%)

Table 13 provides the additional cost of abandoning bump-stock-type devices at ATF offices.

Table 13. Disposal Cost to Abandon Bump-Stock-Type Devices at ATF Offices

| Individual | $3,247,400 |
|---|---|
| Retailer (Large) | $8,775 |
| Retailer (Midrange) | $1,375,025 |
| Retailer (Small) | $1,373,974 |
| Total Cost to Abandon | $6,005,174 |

We treat all costs of disposal of existing devices owned by individuals or held in inventory by retailers or manufacturers as if they occur in 2018. Therefore, the disposal costs of the rule in 2018 would include the total undiscounted value of existing stock of bump-stock-type devices and the total cost of disposal from Tables 11 and 13 for the total disposal cost of $9.4 million.

Government costs

Because ATF allows bump-stock-type device owners to abandon these devices at ATF offices, ATF incorporates the government cost to dispose of these devices. ATF estimates that an agent at a GS-13 level will dispose of the device in 0.25 hours at a

142

AR004173

loaded wage rate of $41.07 per hour.[27]  ATF anticipates that it will cost $1.3 million to destroy these devices in-house.

Overall, ATF estimates that the total cost of this final rule would be $312.1 million over a 10-year period of future analysis.  This cost includes the first-year cost to destroy all existing bump-stock-type devices, including unsellable inventory and opportunity cost of time.  Table 14 provides the 10-year cost of this final rule.

Table 14. 10-Year Cost of Final rule

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| 2018 | 133,101,942 | 129,225,186 | 124,394,338 |
| 2019 | 19,893,303 | 18,751,346 | 17,375,581 |
| 2020 | 19,893,303 | 18,205,190 | 16,238,861 |
| 2021 | 19,893,303 | 17,674,942 | 15,176,505 |
| 2022 | 19,893,303 | 17,160,138 | 14,183,650 |
| 2023 | 19,893,303 | 16,660,328 | 13,255,748 |
| 2024 | 19,893,303 | 16,175,076 | 12,388,549 |
| 2025 | 19,893,303 | 15,703,957 | 11,578,083 |
| 2026 | 19,893,303 | 15,246,560 | 10,820,639 |
| 2027 | 19,893,303 | 14,802,485 | 10,112,746 |
| Total | 312,141,666 | 279,605,207 | 245,524,700 |
| Annualized Cost | | 32,778,260 | 34,957,194 |

The total 7% discounted cost is $249.6 million, and the annualized discounted costs would be $32.8 million and $35.0 million annualized at 3% and 7% respectively.

**Cost Savings**

ATF did not calculate any cost savings for this final rule.

---

[27] Office of Personnel Management, *Salary Table 2018-GS*, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2018/GS_h.pdf.

AR004174

**Benefits**

As reported by commenters, the purpose of this rule is to amend ATF regulations to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA. Additionally, a desired outcome of this rule is increased public safety. While there has been only one known shooting involving bump-stock-type devices, banning such devices could result in reduced casualties as a consequence of reducing incidents of shootings involving a weapon fitted with a bump-stock-type device. A ban also could result in less danger to first responders when responding to incidents, because it prevents shooters from using devices that allow them to shoot semiautomatic firearms automatically.

**Alternatives**

Alternative 1—No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes to regulations, there would be no cost, savings, or benefits to this alternative.

Alternative 2—Patronizing a shooting range. Individuals wishing to experience shooting a "full-auto" firearm could go to a shooting range that provides access to lawfully registered "pre-1986" machineguns to customers, where the firearm remains on the premises and under the control of the shooting range. ATF does not have the information to determine which, where, or how many gun ranges provide such a service and is therefore not able to quantify this alternative.

Alternative 3—Opportunity alternatives. Based on public comments, individuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger finger to fire more rapidly. To the extent that

144

individuals are capable of doing so, this would be their alternative to using bump-stock-type devices.

Public comments from the NPRM suggested other alternatives:

1. Provide amnesty or "grandfathering." This alternative was rejected because since the passage of 18 U.S.C. 922(o), amnesty registration of machineguns is not legally permissible; all devices determined to be machineguns are prohibited except as provided by exceptions established by statute.

2. Provide licensing and background checks. This alternative was rejected because only Congress can add a new class of firearm to the GCA and impose licensing or acquisition requirements on it.

3. Provide compensation for the destruction of the devices. This alternative was rejected because only Congress has the authority to offer monetary compensation.

4. Provide a medical exemption. This alternative was rejected because neither the NFA nor the GCA provides for medical exemptions to acquire an otherwise prohibited firearm. Only Congress can add medical exemptions.

5. Prohibit only future manufacture and sales. This alternative was rejected because ATF does not have the authority to restrict only the future manufacture or sale of bump-stock-type devices.

6. Provide a quota. This alternative was rejected because ATF lacks authority to implement it, as all devices determined to be machineguns are prohibited across the board.

145

AR004176

7. Institute a tax. This alternative was rejected because ATF lacks authority to establish excise taxes.

8. Improve security at mass events. This alternative was rejected because improved security must be paired with reasonable regulations to increase public safety and reduce violent crime.

9. Congressional legislation. This alternative was rejected because issuance of this rule will not prevent Congress from taking action on bump-stock-type devices.

10. Leave the issue to the States. This alternative was rejected because ATF is responsible for implementing the NFA and GCA, Federal laws designed to maintain public safety. Issuance of this rule will not prevent States from taking action on bump-stock-type devices.

11. Improved law enforcement capabilities. This alternative was rejected because while training and equipment may assist law enforcement efforts, they are not a substitute for the Department's exercise of its public safety responsibility of interpreting the NFA and GCA appropriately.

*B. Executive Order 13132*

This regulation will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

146

AR004177

*C.  Executive Order 12988*

This regulation meets the applicable standards set forth in sections 3(a) and

3(b)(2) of Executive Order 12988 (Civil Justice Reform).

*D.  Regulatory Flexibility Act (RFA)*

**Summary of Findings**

ATF performed a Final Regulatory Flexibility Analysis of the impacts on small

businesses and other entities from the final rule.  Based on the information from this

analysis, ATF found:

- It is estimated that the remaining manufacturer will go out of business;

- There are 2,281 retailers, of which most are estimated to be small;

- There are no relevant government entities.

**Final Regulatory Flexibility Analysis**

The Regulatory Flexibility Act (RFA) establishes "as a principle of regulatory

issuance that agencies shall endeavor, consistent with the objectives of the rule and of

applicable statutes, to fit regulatory and informational requirements to the scale of the

businesses, organizations, and governmental jurisdictions subject to regulation.  To

achieve this principle, agencies are required to solicit and consider flexible regulatory

proposals and to explain the rationale for their actions to assure that such proposals are

given serious consideration." Pub. L. 96-354, section 2(b), 94 Stat. 1164 (1980).

Under the RFA, the agency is required to consider if this rule will have a

significant economic impact on a substantial number of small entities.  Agencies must

perform a review to determine whether a rule will have such an impact.  If the agency

147

determines that it will. the agency must prepare a regulatory flexibility analysis as described in the RFA.

Under the RFA (5 U.S.C. 604(a)), the final regulatory flexibility analysis must contain:

- A statement of the need for, and objectives of, the rule;

- A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments:

- The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

- A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

- A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

- A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the

148

other significant alternatives to the rule considered by the agency that affect the impact on small entities was rejected.

The RFA covers a wide range of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. 5 U.S.C. 601(3)-(6). ATF determined that the rule affects a variety of large and small businesses (see the section below titled "A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available"). Based on the requirements above, ATF prepared the following regulatory flexibility analysis assessing the impact on small entities from the rule.

**A statement of the need for, and objectives of, the rule**

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning this regulatory action is the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This final rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that they could be used for criminal purposes. This poses a public safety issue, which the Department is trying to address.

149

**A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments**

Several commenters suggested that this rule will devastate companies that manufacture bump-stock-type devices and the local communities that they employ. The Department concurs that this rule will prevent manufacturers of bump-stock-type devices from producing and selling them. Based on publicly available information, the Department estimates that there is only one manufacturer actively producing and selling such devices. For the purposes of this rule, it is considered a small business. Due to the requirements of the NFA, there are no alternatives that are scalable by business size for this rule.

Some commenters suggested that the RFA requires agencies to consider the innovative impacts that small businesses have on the firearms market. ATF interprets the RFA's usage of "innovation" in terms of regulatory approaches that the agency could use to allow for small businesses to compete against non-small businesses. As there are no non-small businesses that manufacture bump-stock-type devices, ATF was unable to determine any regulatory approaches that would allow small manufacturers to compete with non-small businesses with respect to manufacturing bump-stock-type devices.

150

AR004181

**The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments**

There were no comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule. Therefore, no changes were made to the proposed rule in the final rule as a result of comments.

**A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available**

This rule would affect primarily manufacturers of bump-stock-type devices, FFLs that sell bump-stock-type devices, and other small retailers of firearm accessories that have invested in the bump-stock-type device industry. Based on publicly available information, there is one manufacturer affected. Of the known retailers, the large retailers do not intend to continue selling bump-stock-type devices. There may be some small retailers that would have intended to continue selling these devices had this final rule not been promulgated and would thus be affected by this final rule. Based on the information from this analysis, ATF found:

- There is 1 manufacturer who is likely to be a small entity;
- There are 2,270 retailers who are likely to be small entities;
- There are no government jurisdictions affected by this final rule; and
- There are no nonprofits found in the data.

151

AR004182

**A description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record**

There are no reporting or recordkeeping requirements for this final rule. The only relevant compliance requirement consists of disposing of all existing inventory of bump-stock-type devices for small entities that carry them. There would not be any professional skills necessary to record or report in this final rulemaking.

**A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected**

Alternatives were considered in this final rule. Alternatives include making no regulatory changes. ATF rejected this alternative because it would not be consistent with ATF's interpretation of the statutory term "machinegun." There were no other regulatory alternatives to this proposal that ATF has been able to identify that accomplish the objective of this final rule.

*E. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 804. This rule is likely to be

152

considered major as it is economically significant and is projected to have an effect of over $100 million on the economy in at least the first year of the rule.

*F. Congressional Review Act*

This rule is a major rule as defined by the Congressional Review Act, 5 U.S.C. 804. This rule is likely to be considered major as it is economically significant and is projected to have an effect of over $100 million on the economy in at least the first year of the rule's existence.

*G. Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Pub. L. 104-4, 109 Stat. 48.

*H. Paperwork Reduction Act of 1995*

This final rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act, 44 U.S.C. 3501-3521.

**Disclosure**

Copies of the final rule, proposed rule, and comments received in response to the proposed rule will be available for public inspection through the Federal eRulemaking portal, http://regulations.gov, or by appointment during normal business hours at: ATF Reading Room, Room 1E-062, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648-8740.

**List of Subjects**

153

*27 CFR Part 447*

Administrative practice and procedure, Arms and munitions, Chemicals, Customs duties and inspection, Imports, Penalties, Reporting and recordkeeping requirements, Scientific equipment, Seizures and forfeitures.

*27 CFR Part 478*

Administrative practice and procedure, Arms and munitions, Customs duties and inspection, Exports, Imports, Intergovernmental relations, Law enforcement officers, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

*27 CFR Part 479*

Administrative practice and procedure, Arms and munitions, Excise taxes, Exports, Imports, Military personnel, Penalties, Reporting and recordkeeping requirements, Seizures and forfeitures, Transportation.

**Authority and Issuance**

Accordingly, for the reasons discussed in the preamble, 27 CFR parts 447, 478, and 479 are amended as follows:

## PART 447--IMPORTATION OF ARMS, AMMUNITION AND IMPLEMENTS OF WAR

1. The authority citation for 27 CFR part 447 continues to read as follows:

**Authority:** 22 U.S.C. 2778, E.O. 13637, 78 FR 16129 (Mar. 8, 2013).

2. In § 447.11, revise the definition of "Machinegun" to read as follows:

**§ 447.11 Meaning of terms.**

*       *       *       *       *

154

AR004185

*Machinegun.* A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*          \*          \*          \*          \*

## PART 478--COMMERCE IN FIREARMS AND AMMUNITION

3. The authority citation for 27 CFR part 478 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 921-931; 44 U.S.C. 3504(h).

4. In § 478.11, revise the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

155

§ 478.11 Meaning of terms.

\*          \*          \*          \*          \*

*Machine gun.* \* \* \*  For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions.  The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*          \*          \*          \*          \*

PART 479--MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

    5.  The authority citation for 27 CFR part 479 continues to read as follows:

    **Authority:** 26 U.S.C. 5812; 26 U.S.C. 5822; 26 U.S.C. 7801; 26 U.S.C. 7805.

    6.  In § 479.11, revise the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

§ 479.11 Meaning of terms.

\*          \*          \*          \*          \*

*Machine gun.* \* \* \*  For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means

156

functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

\*          \*          \*          \*          \*

Dated: December 18, 2018.

Approved:

_____

Matthew G. Whitaker,
Acting Attorney General.

157

AR004188