519 Fed.Appx. 344
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
George Arthur DODSON, III, Defendant–Appellant.

No. 12–2205.
|
May 29, 2013.

**Synopsis**
**Background:** Defendant was convicted in the United States District Court for the Eastern District of Michigan of possession of machinegun, and he appealed.

**Holdings:** The Court of Appeals, Boggs, Circuit Judge, held that:

unregistered auto sears possessed by defendant constituted "machineguns" for purposes of determining number of illegal firearms in his possession;

district court did not abuse its discretion in failing to consider defendant's argument that he reasonably believed that auto sears that he possessed were exempt from National Firearms Act's registration requirements;

district court did not abuse its discretion in rejecting defendant's good-faith-reliance defense; and

finding that World War II-era submachine guns in defendant's possession could be readily restored, and thus could be used to support sentencing enhancement, was not clear error.

Affirmed.

**\*345** On Appeal from the United States District Court for the Eastern District of Michigan.

Before: BOGGS and COLE, Circuit Judges; and QUIST, District Judge. \*

\*        The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

OPINION

BOGGS, Circuit Judge.

Gun enthusiast George Dodson was in the business of selling AR–15 drop-in auto sears, which, in combination with M16 parts, can be used to convert AR–15s to fully automatic firearms. Since 1981, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has considered these auto sears "machineguns" subject to the full scope of regulation under the National Firearms Act. Apparently under the belief that his pre–1981 auto sears were exempt, Dodson continued selling them for over thirty years, until he was caught and charged with possession of a machinegun. Dodson pleaded guilty, but now challenges various guidelines enhancements and the reasonableness of his sentence. In particular, he argues the district court erred in finding no exemption for pre–1981 auto sears and, if not, that it erred in failing to consider his mistake-of-law and good-faith-reliance defenses. Although Dodson's misconception was not uncommon, it is not supported by the law. In addition, because mistake of law is no defense and Dodson did not establish good-faith reliance, the district court was not required to consider these at sentencing. In any case, **\*346** the district court implicitly rejected these defenses, finding Dodson likely to violate the gun laws again. Dodson also argues that certain machineguns he owned were not "readily restorable," and thus should not have been considered at sentencing. As the district court's restorability determination rested on credible evidence and the proper legal standard, there was no error. The sentence is affirmed.

I

In 1979, Dodson developed and began selling an AR–15 "safety sear," a readily installable device that when added to an AR–15 replicates the built-in trigger mechanism of

a fully automatic weapon. In 1981, the ATF issued Ruling 81–4, which classified these AR–15 drop-in auto sears as "machineguns" under the National Firearms Act, because they are "a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot." ATF Rul. 81–4, 1981–3 A.T.F.Q.B. 78; 26 U.S.C. § 5845(b). Dodson, and many others, read the ruling as grandfathering in auto sears manufactured before November 1, 1981, exempting them from the tax and registration requirements of the National Firearms Act.[1] As a result, he manufactured and stockpiled thousands of auto sears before the deadline, selling the inventory through his company, Su–Press–On, Inc., for the next thirty years. The ATF began an investigation after discovering one of Dodson's auto sears in the weapons cache of a Michigan-based organization known as the "Hutaree," alleged to be an "anti-government extremist organization which advocates violence against local, state, and Federal law enforcement." *See United States v. Stone,* No. 2:10–cr–20123–VAR–PJK (E.D.Mich. Mar. 29, 2010). In 2001, an ATF agent responded to an advertisement in "The Shotgun News" and purchased an auto sear from Dodson for $105, through mail order. The ATF subsequently executed search warrants on Dodson's residence and storage units, finding 40 auto sears, eight other machineguns, and hundreds of legal firearms.

[1]   The precise contours of this supposed exception are not well defined. *See* Stephen Halbrook, *Firearms Law Deskbook* § 9:5 (discussing ATF Ruling 81–4 and AR–15 rifle prosecutions). The ATF has made clear that possession of even a pre–1981 auto sear, when in combination with certain other parts or an AR–15, is considered possession of a machinegun. Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Handbook,* App'x B, editor's note to Ruling 81–4. In the firearms community, therefore, a common belief is that while pre–1981 auto sears are legal, they are no better than expensive paperweights given that they may be only possessed alone. *See, e.g.,* James Jeffries, *AR–15 Drop–In Autosears,* http://www.ar15.com/content/legal/dias.html (accessed May 2013); *AR15 Drop–In Auto Sears— What's the Difference?,* http://www.quarterbore. com/ nfa/dias.html (last updated Mar. 23, 2004); *Legal Side,* Small Arms Review, May 1998, at 14, *available at* http:// www.titleii.com/bardwell/ar_15_auto_sear_faq.txt.

On October 11, 2011, a grand jury returned a 151–count superseding indictment, charging Dodson with various firearms-related crimes, including unlawful possession of machineguns, possession of unregistered machineguns, and

dealing in firearms without a license. Dodson moved to dismiss the auto-sear counts, arguing that pre–1981 auto sears were legal to possess and transfer, without registration. The district court denied the motion, holding that the date of manufacture of the auto sears was irrelevant. On the eve of trial, Dodson pleaded guilty to unlawful transfer of a machinegun, in violation of 18 U.S.C. § 922(*o*). He reserved the right to appeal three disputed sentencing enhancements: a six-level enhancement for possession of 25–99 firearms; a four-level enhancement for possession of firearms with **\*347** obliterated serial numbers; and a four-level enhancement for trafficking in machineguns.

Dodson's objection to the number-of-firearms and trafficking enhancements was the same as in his original motion to dismiss: pre–1981 auto sears are legal to possess and sell. The district court again rejected this argument. Dodson also objected to the enhancement for possession of firearms with altered or obliterated serial numbers. Although the auto sears never had serial numbers in the first place, three of the other machineguns found by the ATF had their serial numbers removed. These were World War II-era submachine guns (colloquially known as "grease guns"), which had been sawed in half and distributed as demilitarized scrap by the U.S. Government.[2] The ATF welded the two halves of one of the grease guns together, and with the addition of spare machinegun parts and 90 minutes of labor, successfully managed to restore the grease gun to full capability. Finding the guns could be "readily restored," the district court applied the enhancement.

[2]   Before the passage of the Gun Control Act and National Firearms Act in 1968, the U.S. Government facilitated the distribution of surplus and obsolete military weapons through its deactivated war trophy (DEWAT) and demilitarization programs. *See generally* National Commission on the Causes and Prevention of Violence, Firearms & Violence in American Life 167–68 (1969). The DEWAT program, aimed at returning servicemen, permitted owners of prohibited weapons to keep them, if rendered inoperable by welding the barrel shut under the supervision of the ATF. *See* Rev. Rul. 55–590, 1955–2 C.B. 483 (1955); Rev. Proc. 58–8, 1958–1 C.B. 690 (1958). After the DEWAT program was discontinued, the military continued to sell obsolete weapons, demilitarized by torch cuts across the receivers, to junk dealers. Firearms & Violence in American Life at 168. Under the 1968 amendments to the federal gun laws, however, registration was required for "all firearms [as defined by the statute, i.e., short-barreled shotguns and

rifles, machineguns, silencers, and destructive devices], whether or not antiques, unserviceable, Dewats, or in the possession of peace officers." *United States v. Whalen,* 337 F.Supp. 1012, 1016–17 (S.D.N.Y.1972); *see also United States v. Ross,* 9 F.3d 1182, 1184–85 (7th Cir.1993), *reversed on other grounds by* 40 F.3d 144 (7th Cir.1994). From 1968 on, only truly unrestorable firearms within the statutory categories have been exempt from regulation. *See, e.g., United States v. Wada,* 323 F.Supp.2d 1079 (D.Or.2004); *United States v. Seven Miscellaneous Firearms,* 503 F.Supp. 565 (D.D.C.1980).

With these enhancements applied, the court determined the Guidelines range to be 97–121 months. The government recommended a downward variance to 60 months. Taking into account Dodson's poor health and advanced age (70 at the time of sentencing), the district court varied even further downward, imposing a sentence of 36 months. Dodson now appeals his sentence, objecting to the sentencing enhancements imposed and the reasonableness of his sentence. Dodson also makes similar objections to pre-trial rulings of the district court, but since Dodson "waive[d] any right to appeal his conviction," we will not reach these objections.

## II

### A

We review the district court's legal conclusions regarding the Sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. Catchings,* 708 F.3d 710, 720 (6th Cir.2013). Under the Sentencing Guidelines, if a firearm offense involves 25–99 (unlawful) firearms, the offense level is increased by 6 levels. U.S.S.G. § 2K2.1(b)(1)(C) & cmt. n. 5. Dodson challenges the classification of his auto sears as unlawfully possessed machineguns; this is a legal question of statutory interpretation subject to *de novo* review. **\*348** *See United States v. Woodard,* 337 Fed.Appx. 534, 537 (6th Cir.2009).

The relevant statute here is the National Firearms Act, which defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot ... [including] any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun...." 26 U.S.C. § 5845(b).

Initially, the statute only considered a "combination" of parts to constitute a machinegun; the 1986 Firearm Owners' Protection Act, expanded the definition to include "any" individual part. Pub.L. No. 99–308, § 109, 100 Stat. 449, 460 (1986). The National Firearms Act subjects machineguns and other specified firearms to various tax, registration, and other regulatory requirements, criminalizing violation of its provisions. 26 U.S.C. § 5861. The federal machinegun ban—the provision under which Dodson was convicted—incorporates the same definition of machinegun. 18 U.S.C. § 922(*o* ); 18 U.S.C. § 921(a)(23).

Historically, it was not clear whether AR–15 drop-in auto sears were "machineguns" as defined by 26 U.S.C. § 5845(b). ATF Ruling 81–4, however, clarified that these auto sears were considered "machineguns," subject to all the provisions of the National Firearms Act.[3] ATF Rul. 81–4, 1981–3 A.T.F.Q.B. 78. Despite passing references to his auto sears as "safety sears," Dodson does not on appeal contest the propriety of the ATF's determination. Instead, he claims the ATF ruling was meant to apply only on a prospective basis, as shown by its statement that "[w]ith respect to the machine gun classification of the auto sear under the National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be applied to auto sears manufactured before November 1, 1981." No court has definitively ruled on the retroactivity of 81–4, but the Seventh Circuit has taken a dim view of Dodson's position. *United States v. Cash,* 149 F.3d 706, 708 (7th Cir.1998) ("Perhaps their reading has some basis that we do not now perceive. Firearms dealers would do well to assume, however, that all current transfers of auto sears must comply with the statutes, no matter when the devices were manufactured.").

3      The ATF's power to interpret federal firearm laws is discussed in note 4 *infra.*

To interpret this ruling properly, we must look to the statute under which the retroactivity is authorized. As a general matter, no "regulation relating to the internal revenue laws shall apply to any taxable period ending before [the filing of the regulation]." 26 U.S.C. § 7805(b)(1). Unlike regulations, rulings—being interpretations of existing law—will ordinarily be applied retroactively. Rev. Proc. 89–14, 1989–1 C.B. 814, sec. 7.01(3). The agency, however, may indicate the extent to which the ruling is to be retroactively applied, under the authority of § 7805(b)(8). *Ibid.* The ATF invoked such authority here, opting to apply Ruling 81–4 prospectively only. Although § 7805 is restricted to matters

"relating to the internal revenue laws," the entire National Firearms Act, including its registration requirements, is codified within Title 26. *Cf. United States v. Matthews,* 438 F.2d 715, 716–17 (5th Cir.1971) (holding registration requirement as an exercise of the national taxing power). It is plausible, therefore, that § 7805 may limit the retroactive application of all provisions of the National Firearms Act, both taxing and regulatory. As a result, the ATF does have the authority to retroactively excuse a class of weapons for failure to comply with registration requirements.

**\*349**  It is at this point, however, that Dodson's argument breaks down. While the ATF may retroactively exempt certain weapons from tax and regulation requirements, it cannot exempt those same weapons from prospective application of the law. This is clear from the particular wording of § 7805(b), which provides that no regulation shall apply "to any taxable period" ending before the filing date of the regulation. While § 7805 is meant to limit retroactive application of the law to pre-filing *time periods,* it is not meant to exempt pre-filing *items* (whether manufactured or acquired before the regulation). Thus a certain item, to which the new ruling or regulation applies, is exempt in time 1 (pre-regulation) but taxed in time 2 (post-regulation). The same logic applies to registration requirements: the owner of the item is excused from having failed to register in time 1 but must comply with the law in time 2. The effect of the retroactivity of Ruling 81–4, therefore, is that pre–1981 manufacturers are exempt from the $200 making tax, 26 U.S.C. § 5821; pre–1981 sales are exempt from the $200 transfer tax, 26 U.S.C. § 5811; pre–1981 dealers are exempt from the $500 special occupational tax, 26 U.S.C. § 5801; and pre–1981 owners are exempt from criminal prosecution for past possession of an unregistered machinegun, 26 U.S.C. § 5861(d). But post–1981 transfers and possessions—even of previously manufactured auto sears—must be subject to the tax and registration requirements of the National Firearms Act. Dodson mistakes an exemption limited to past time periods for an absolute exemption for a class of items. All taxes and requirements prior to the date of the regulation are excused, but the activity underlying those taxes is subject to the law on a prospective basis.

Dodson's argument is further weakened by his attempt to stretch the ATF exemption beyond taxes and registration to a criminal statute, 18 U.S.C. § 922(*o*). Although there are plausible "taxpayer reliance" arguments for applying tax and economic laws prospectively, *cf. Dickman v. Comm'r of Internal Revenue,* 465 U.S. 330, 343, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), such policies are wholly inapplicable in the public-safety context. Automatic weapons are just as dangerous whether they were manufactured in 1981 or 2011, and Dodson's reading would legalize devices without even the added protective feature of federal registration. Dodson's argument is particularly problematic given the timing of the machinegun ban, which came into effect five years after the 1981 retroactivity ruling. Pub.L. No. 99–308, § 102. Dodson should not be able to bootstrap the 1981 ruling into an exemption from the 1986 ban. This is especially so where the 1986 amendments expanded the definition of machinegun, which by including "any" part—not just a combination of parts—more clearly brought auto sears within the scope of the definition. The ATF does not have the ability to redefine or create exceptions to Congressional statutes, and surely cannot do so before those statutes were passed.[4]

4    Dodson's arguments focus on the ATF's ability to create exceptions to the federal gun laws. This situation, however, also raises the question in reverse: can the ATF *expand* the scope of the federal gun laws? In particular, did Ruling 81–4 create criminal liability where there was none before? As a general matter, regulatory agencies may interpret general provisions in their statutes, even though criminal sanctions may result. *See Babbitt v. Sweet Home Chapter of Cmties. for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (upholding EPA regulation interpreting the statutory term "take" to include "harm"). Ruling 81–4 is such an interpretation of existing law, issued to facilitate compliance by the public, not create new law. Such rulings are typically considered informal rulemakings, not subject to the notice and hearing requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b)(A). *York v. Sec'y of Treasury,* 774 F.2d 417, 419–20 (10th Cir.1985) (ATF ruling merely interpretative rule); *see also United States v. One TRW, Model M14, 7.62 Caliber Rifle,* 441 F.3d 416, 420 (6th Cir.2006) (declining to answer question of what deference is due to ATF rulings). While clearly of a more formal character than "user friendly" guides and handbooks, *e.g., Golden & Zimmerman, LLC v. Domenech,* 599 F.3d 426, 432 (4th Cir.2010) (FAQs in ATF reference guide not agency action), interpretative rulings like Ruling 81–4 are distinguishable from "legislative" agency actions that "put[ ] new criminal liability on the acts or omissions of regulated persons," under authority delegated by statute, *see United States v. Cain,* 583 F.3d 408, 419, 420 (6th Cir.2009) (Attorney General's regulation applying Sex Offender Registration and Notification Act to defendant subject to notice-and-comment procedures); *see also Gonzales v. Oregon,* 546 U.S. 243, 262, 269,

126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (holding that Attorney General does not have statutory authority to criminalize assisted suicides and that his interpretation was inconsistent with the statute).

Statutes that require agency action to clarify their terms may raise fair notice and vagueness concerns. *See United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 518 & n. 9, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (applying rule of lenity where ATF rulings were not on point); *but see United States v. Evans,* 712 F.Supp. 1435, 1444 (D.Mont.1989) (no due process violation where ATF failed to clarify statutory definition of machinegun). But once the ruling has issued, the defendant can no longer make such objections. *See United States v. Norris,* 39 Fed.Appx. 361, 364 (7th Cir.2002) (ATF definition of "place of residence" supported criminal conviction).

## *350  B

Faced with a losing interpretation, Dodson additionally argues that the district court erred in failing to consider his reasonable-mistake-of-law and good-faith-reliance defenses. To the extent that Dodson argues that his trial rights were violated by this error, he waived the right to make such a challenge in his plea agreement. Dodson also argues, however, that these defenses should have been considered as significant factors at sentencing. Although not clearly articulated, this would appear to be a challenge to the substantive reasonableness of the sentence, specifically, "failing to consider pertinent § 3553(a) factors." *United States v. Webb,* 403 F.3d 373, 385 (6th Cir.2005). We review the substantive reasonableness of the district court's sentencing determination under an abuse-of-discretion standard. *Gall v. United States,* 552 U.S. 38, 46, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). A sentence within the Guidelines range is presumptively reasonable, and a sentence below the Guidelines range warrants even greater deference. *United States v. Curry,* 536 F.3d 571, 573 (6th Cir.2008).

Dodson's mistake-of-law argument is not well taken. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States,* 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In certain cases, Congress has "softened the impact of the common-law presumption by making specific intent to violate the law an element" of the crime. *Id.* at 200, 111 S.Ct. 604. As result, many complicated tax offenses require a "willful" mental state. *Ibid.* Here, however, the statute simply requires

knowledge for violation of the crime. *Compare* 18 U.S.C. § 924(a)(2) ( "Whoever knowingly violates subsection ... (*o*) of section 922 shall be fined under this title, imprisoned not more than 10 years, or both.") *with* 18 U.S.C. § 924(a)(1) (D) ("[Whoever] willfully violates any other provision of this chapter shall be fined under this title, imprisoned not more than five years, or both."). Further, a mistake-of-law defense is particularly  **\*351**  inappropriate when applied to the federal machinegun ban, which has the characteristics of a public-welfare offense dealing with "dangerous or deleterious devices." *United States v. Int'l Minerals & Chem. Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). Such offenses require the individual to "ascertain at his peril whether that which he sells comes within the inhibition of the statute." *United States v. Balint,* 258 U.S. 250, 254, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (narcotics); *see also United States v. Freed,* 401 U.S. 601, 609–10, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (hand grenades); *United States v. Drasen,* 845 F.2d 731, 737–38 (7th Cir.1988) (short-barrel rifle kits); *but see Staples v. United States,* 511 U.S. 600, 608–15, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (government required to prove beyond a reasonable doubt that defendant knew semiautomatic weapon had automatic firing capability). The district court expressed its concern that Dodson was selling these "really dangerous weapons" to "anybody at all"—a concern that would not be mitigated by Dodson's subjective belief that his auto sears were exempt on a technicality. Where mistake of law is not relevant to the underlying offense, it cannot be an abuse of discretion for the district court to fail to consider such a defense at sentencing.

Although Dodson's good-faith-reliance argument—or as it is usually called, "entrapment by estoppel" [5]—is conceptually a viable defense, he fails to demonstrate any of its requirements. The "entrapment by estoppel" defense is available where 1) a government official announced that the charged criminal act was legal; 2) the defendant relied on that statement; 3) the defendant's reliance was reasonable; and, 4) given the defendant's reliance, prosecution would be unfair. *United States v. Levin,* 973 F.2d 463, 468 (6th Cir.1992). Here, Dodson relies on an investigative report of ATF agent Michael Powell, along with vague allegations that the ATF and federal prosecutors "misinterpreted" the ruling for years. [6] The Powell report closed an investigation for lack of prosecutorial potential, based on Powell's inability to determine the date of manufacture of certain auto sears. The report explained that "AR15 drop-in auto sears manufactured prior to November 1, 1981 are not subject to regulation under the National Firearms Act." This report is not sufficient to meet any of the

necessary entrapment-by-estoppel elements. First, although the report suggests that auto sears may be exempt from the provisions of the National Firearms Act, it does not affirmatively state that possession of auto sears is legal under 18 U.S.C. § 922(*o* ). Second, there is no evidence that Dodson was aware of this report, which was prepared in 2007 for an investigation in Texas. In addition, Dodson had been selling his auto sears for many years before this investigation—it does not appear that the report changed his behavior in any way. Third, even if he had read the report, it was not reasonable for Dodson to rely on the statements of an ATF field agent in an investigative context for conclusive determinations of law. Agent Powell was not a lawyer, nor was he intending to provide legal guidance to the general public. Fourth, it is not even clear **\*352** that prosecution would have been unfair. Dodson was aware he was selling dangerous, heavily regulated items to unknown individuals, but continued to take advantage of a narrow technicality for over thirty years without obtaining any formal opinion from the ATF. Given the weakness of his entrapment-by-estoppel defense, the district court did not abuse its discretion in failing to consider such a defense at sentencing. *Cf. United States v. Walker,* 450 Fed.Appx. 464, 468 (6th Cir.2011) (rejecting equitable-estoppel challenge to sentencing determination due to lack of affirmative misconduct by the government); *see also Lemons,* 480 Fed.Appx. at 400 (rejecting possibility of "partial" entrapment-by-estoppel defense).

5   While this is the standard term, it refers to situations where the government is estopped from prosecuting someone because it acted in a way that entrapped the defendant. It does not mean the defendant "was entrapped due to some sort of estoppel." *United States v. Lemons,* 480 Fed.Appx. 400, 402 n. 1 (6th Cir.2012).

6   Dodson also suggests that he relied on ATF Ruling 81–4. As discussed before, his reading of the ruling was not reasonable, and thus should not have been relied on.

Although in this case the district court was not required to address such arguments, the district court did implicitly consider whether the offense was committed in good faith. At the sentencing hearing, the district court stated that "I don't think you have learned from this and there's a high possibility that you will continue to engage in illegal conduct involving weapons." In explaining his decision to vary downward, the district judge cited Dodson's age and health, but admitted that "I do view him as still a threat to engage in illegal activities involving guns.... I do agree with [the Assistant U.S. Attorney], [Dodson] knew—does know everything—the defendant does know everything about guns." The district

court did not abuse its discretion in finding Dodson's good-faith-reliance arguments unconvincing, especially where the ultimate sentence was significantly below the recommended guidelines range.

### III

Dodson also objects to the sentencing enhancement for possession of a firearm with an obliterated serial number under U.S.S.G. § 2K2.1(b)(4)(B). [7] In particular, he argues that the halved grease gun should not be considered a machinegun, as it was not "readily restorable" under the terms of 26 U.S.C. § 5845(b). The definition of the term "readily restorable" is a question of statutory interpretation that we review *de novo;* any underlying factual findings we review for clear error. *See United States v. One TRW, Model M14, 7.62 Caliber Rifle,* 441 F.3d 416, 419, 425 (6th Cir.2006).

7   Dodson attempts to characterize the grease guns as de-militarized or scrap metal parts, and thus not firearms at all. Unfortunately, the National Firearms Act does not excuse old or demilitarized machineguns from regulation, as long as they are readily restorable. 26 U.S.C. § 5845(b). Dodson's guns are not old enough to be considered "antique firearms" (Spanish–American War or earlier), 26 U.S.C. § 5845(g), and the exception for guns that "[are] primarily [ ] collector's item[s] and [ ] not likely to be used as [ ] weapon[s]" does not apply to machineguns, 26 U.S.C. § 5845(a); *see also United States v. Ross,* 9 F.3d 1182 (7th Cir.1993), *reversed on other grounds by* 40 F.3d 144 (7th Cir.1994) (conviction for unregistered deactivated World War I machinegun). The Act prohibits possession of any gun with obliterated serial numbers—even if it was manufactured before serial numbers were required, and even if the serial number was removed before such removal was illegal. 26 U.S.C. § 5861(h); 18 U.S.C. § 922(k); Crime Control Act of 1990, Pub.L. No. 101–647, § 2202, 104 Stat. 4789, 4856 (criminalizing possession). This rule is strictly enforced, with no knowledge required for the sentencing enhancement to apply. U.S.S.G. § 2K2.1 cmt. n. 8(B).

Dodson's appellate argument relies on the opinion of his expert that the grease guns were scrap. The condition in which the guns were obtained is not the relevant legal standard. Instead, the question is whether the guns can be restored in "a process that is fairly or reasonably efficient, quick, and easy, but not necessarily **\*353** the most efficient, speedy, or easy." *Id.* at 422. Factors that courts have considered include time, ease, expertise, availability, expense, scope,

and feasability. *Ibid.* Courts have found machineguns to be "readily restorable" although requiring up to a full day's work using standard machine-shop tools to become operational. *Id.* at 423 (four to six hours); *United States v. Smith,* 477 F.2d 399, 400 (8th Cir.1973) (eight hours). Here, the gun was restored with 90 minutes of work, using widely available parts and equipment and common welding techniques. This process fits comfortably within the relevant legal standard, and Dodson makes no challenges to the district court's finding that the ATF witness was credible. This enhancement was properly applied.

## IV

Dodson finally objects to the district court's failure to apply various mitigating factors, in particular the loss of his entire financial savings and purpose in life. The inability to own firearms, however, was a consequence of his conviction, not his sentence, and thus would have been inappropriate for the district court to consider. *United States v. Bistline,* 665 F.3d 758, 766–67 (6th Cir.2012). Dodson also suggests the district court did not fully consider his age, health, and mental illness. The district court, however, clearly addressed these factors and significantly departed downwards on their basis; it is difficult to see any reviewable basis for his objection. ("[Considering] the defendant's age, health, mental health issues, positive employment record, I do feel that the sentence is a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)."). The sentence was reasonable.

## V

The sentence imposed by the district court is **AFFIRMED.**

**All Citations**

519 Fed.Appx. 344

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

23 F.3d 448
United States Court of Appeals,
District of Columbia Circuit.

F.J. VOLLMER COMPANY, INC., Appellant,

v.

Stephen E. HIGGINS, Director, Bureau of
Alcohol, Tobacco and Firearms, Appellee.

No. 92–5365.
|
Argued March 4, 1994.
|
Decided May 17, 1994.

**Synopsis**

Licensed manufacturer of firearms sued for judicial review of decision of Bureau of Alcohol, Tobacco and Firearms denying application for transfer. The United States District Court for the District of Columbia, Norma Holloway Johnson, J., granted summary judgment in favor of Bureau and appeal was taken. The Court of Appeals, Randolf, Circuit Judge, held that: (1) Bureau properly denied transfer as to semiautomatic rifle with modified receiver and installed machine gun conversion kit, and (2) Bureau erred in treating machine gun in which modified receiver had been remodified and returned to its original state as a postcutoff date and thus illegal machine gun.

Affirmed in part and reversed in part.

**\*448  \*\*140**  Appeal from the United States District Court for the District of Columbia (89cv3341).

**Attorneys and Law Firms**

Stephen P. Halbrook, argued the cause and filed the briefs for appellant.

Fred E. Haynes, Asst. U.S. Atty., argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., **\*449  \*\*141** John D. Bates and R. Craig Lawrence, Asst. U.S. Attys.

Before: EDWARDS, HENDERSON, and RANDOLPH, Circuit Judges.

**Opinion**

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

It is a federal criminal offense "to transfer or possess a machinegun," unless the person lawfully possessed the machinegun before May 19, 1986, or the weapon is transferred "to or by, or possess[ed] by or under the authority of, the United States or any department or agency thereof...." 18 U.S.C. § 922(*o* ). The Secretary of the Treasury, through the Bureau of Alcohol, Tobacco and Firearms, is authorized to approve or deny transfers. 26 U.S.C. § 5812(a); 27 C.F.R. pt. 179. The Bureau must deny an application for a transfer if it "would place the transferee in violation of the law." 26 U.S.C. § 5812(a).

F.J. Vollmer Company, Inc., a licensed manufacturer of firearms, filed two transfer applications with the Bureau. The first related to a weapon consisting of a machinegun conversion kit, manufactured and registered before May 19, 1986, and a semiautomatic receiver Vollmer had reconfigured after that date. The second related to a weapon also containing a machinegun conversion kit, but having a receiver Vollmer had restored to its original condition after reconfiguring it. Upon receipt of a letter from the Bureau in effect denying Vollmer's applications, the company sued for judicial review. The district court granted summary judgment in favor of the Bureau and this appeal followed. [1]

[1]    Vollmer also sought a writ of mandamus, which the district court denied. Vollmer has presented no argument against this aspect of the court's judgment, and it is therefore affirmed. *See Rollins Environmental Servs., Inc. v. EPA,* 937 F.2d 649, 652 n. 2 (D.C.Cir.1991); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) (Scalia, J.).

I

 Vollmer's first application related to a machinegun identical to 174 others in its possession—a Heckler and Koch Model 94 (HK 94) semiautomatic rifle with a modified receiver and installed machinegun conversion kit. Machinegun conversion kits are, according to the Bureau, "used to convert semiautomatic weapons into automatic weapons without the use of a machinegun receiver." Brief for Appellee at 2. Such

306 U.S.App.D.C. 140

a conversion kit is itself a "machinegun" under 18 U.S.C. § 921(a)(23), which incorporates the National Firearms Act's definition of the term in 26 U.S.C. § 5845(b):

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

According to previous Bureau rulings, machinegun conversion kits manufactured and registered before May 19, 1986, may be installed on rifles after that date without running afoul of § 922(*o*)'s prohibition. [2] Vollmer could not take advantage of the grandfather clause in § 922(*o*)(2)(B), however, because in the Bureau's view Vollmer manufactured machineguns after the cutoff date by modifying the receivers. A receiver is "that part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward position to receive the barrel." 27 C.F.R. § 179.11. Vollmer removed from each rifle receiver an attachment block and drilled a hole in the magazine housing. As the Bureau saw it, these modifications —although not necessary to install the machinegun **\*450** **\*\*142** conversion kit—removed the only two physical differences between the HK 94 semiautomatic rifle receiver and a machinegun receiver made by the same company (an HK MP5). [3]

[2] This is because a conversion kit is considered a machinegun under the statute. So long as the kit was lawfully possessed prior to the cutoff date, combining the kit with other, non-machinegun parts after that date does not alter its lawful status.

[3] Vollmer said it made the changes for cosmetic reasons.

The Bureau's reasoning is sound. Vollmer legally possessed the machinegun conversion kits and it therefore could legally transfer them even if it attached them to rifles made after May 19, 1986. But modified receivers falling within § 921(a)(23)'s definition of a "machinegun," as these did, may not be transferred. It is difficult to understand how combining a legal conversion kit with a time-barred receiver could transform the illegal receiver into a legal one. Vollmer's argument is that each of its 174 weapons is simply one machinegun. Modifying the receiver, in other words, still left Vollmer with one operational machinegun, whereas the Bureau's position leads to the conclusion that Vollmer possessed two machineguns, one consisting of the conversion kit and the other consisting of the receiver, both of which had to be taxed and registered separately.

But the Bureau did not determine that one machinegun is two for taxing or registration purposes. It merely said that anything meeting the statute's definition of machinegun and made after the cutoff date cannot be transferred or possessed even if combined with an otherwise lawfully possessed machinegun. In defining machineguns to include receivers, Congress did not distinguish between receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation. Vollmer conceded that if the company's modified receivers stood alone, it could not transfer them. *See United States v. Evans,* 712 F.Supp. 1435, 1438–39 (D.Mont.1989), *aff'd,* 928 F.2d 858 (9th Cir.1991); *United States v. Goff,* 677 F.Supp. 1526, 1543–46 (D.Utah 1987). There is nothing in the statute to suggest that installing the illegally possessed receivers into otherwise lawfully possessed machineguns would make a difference.

In an argument based on an estoppel theory, Vollmer claims to have relied upon a letter from the Bureau advising the company that it could legally reconfigure the receivers. The argument goes nowhere. The letter did not directly mention receiver modifications. Even if we interpreted the Bureau's general statements to comprehend that subject, the letter by no means represents the sort of affirmative misconduct required to estop the government from enforcing its laws. *See Heckler v. Community Health Servs. of Crawford County,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984); *INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982) (per curiam); *INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (per curiam).

Vollmer's final point regarding its 174 machineguns is that the Bureau is acting inconsistently since it has allowed others to possess machineguns having receivers modified after the cutoff date. The Bureau's position is rather more refined than Vollmer represents. After Congress passed legislation banning machineguns, but before the legislation became effective, manufacturers seeking to register machineguns prior to the cutoff date flooded the Bureau with applications. The Bureau wound up registering almost 16,000 conversion kits. As the Bureau discovered later, many of these conversion kits would not function unless the receivers were modified by various milling operations, operations which constituted the manufacture of a machinegun. The Bureau therefore did not regard these so-called conversion kits as eligible for registration as machineguns prior to May 19, 1986. Several manufacturers, after installing the non-qualifying conversion kits on rifles with modified receivers, transferred the assembled machineguns to unsuspecting individuals. Between May 19, 1986, and January 1988, the Bureau approved many such transfers. In late 1987, when the Bureau became aware of the problem, it began inspecting firearms manufacturers to determine whether certain conversion kits were registrable items. On January 14, 1988, the Bureau implemented a policy to deal with the situation. It allowed innocent buyers of the problem machineguns to remain eligible for continued conditional registration; and it granted conditional exceptions to individuals **451 **143 or dealers who in good faith had installed conversion kits on receivers modified after the cutoff date. The Bureau made clear, however, that it would not approve transfers requested by manufacturers who had performed the receiver modifications. Vollmer is such a manufacturer, and it does not fall under the good faith or innocent owner exceptions.

For the reasons given, the district court correctly granted the Bureau's motion for summary judgment in regard to the 174 machineguns with receivers Vollmer had modified after May 19, 1986.

## II

Vollmer's second transfer application related to a machinegun in which the modified HK 94 receiver had been remodified and returned to its original state. Presumably, Vollmer accomplished this by filling the hole in the magazine and refitting the attachment block, so that the receiver once again duplicated an HK 94 semiautomatic receiver. The Bureau refused to approve a transfer because "[i]t is not possible for a receiver which was modified to permit automatic fire to be modified back into a semiautomatic firearm and removed from the purview of the National Firearms Act." According to the Bureau, only destroying the receiver can remove it from § 922(*o* )'s proscription.

The administrative record does not contain the reasoning behind the Bureau's interpretation. Counsel for the agency tells us that it rests on the National Firearms Act. The Act regulates "firearms," which are a specific category of weapons defined in 26 U.S.C. § 5845(a). A machinegun is a firearm. *Id.* Under the Act, anything that can be "readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" is a machinegun. 26 U.S.C. § 5845(b). Bureau counsel asserts that the receiver at issue is "potentially restorable," but the Bureau made no findings of fact and offered no reasoned explanation on the subject.[4] This alone would warrant setting aside the agency's action and remanding the case. 5 U.S.C. § 706(2)(A); *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990); *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498–99 (D.C.Cir.1988); *Environmental Defense Fund v. EPA,* 852 F.2d 1316, 1326 (D.C.Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). We believe it appropriate, however, to consider the other questions raised by the Bureau's decision. Vollmer is entitled to a decision on these questions now. Violation of 18 U.S.C. § 922(*o* ) is a criminal offense, punishable by fine and imprisonment. 18 U.S.C. § 924(a)(2). Failing to pay taxes on and failing to register a machinegun are violations of the National Firearms Act, punishable by fine and imprisonment. 26 U.S.C. § 5871.

4    On at least two previous occasions, during a prosecution, the Bureau has presented evidence that the machinegun could be restored in two minutes, *United States v. Woodlan,* 527 F.2d 608, 609 (6th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976), or in an eight-hour working day in a properly equipped machine shop. *United States v. Smith,* 477 F.2d 399, 400–01 (8th Cir.1973).

It is true that the National Firearms Act covers machineguns, as well as short-barreled rifles and shotguns, even if they have been modified, so long as they can be "readily restored." 26 U.S.C. § 5845(b), (c), & (d).[5] Neither the Act nor the Bureau's regulations, however, define "readily restored." *See* 26 U.S.C. § 5845; 27 C.F.R. § 179.11. We do know that, in the Bureau's view, "firearms" subject to the Act may be excluded from coverage if they are "[a]lter[ed] by removing the feature

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

or features that cause[d] the weapon to be classified as an NFA firearm." FIREARMS ENFORCEMENT PROGRAM, ATF Order 3310.4B ¶ 83(e)(2), at 43 (Feb. 8, 1989). Alterations of this sort include welding an extension onto a rifle or shotgun barrel; and welding closed a slot on certain handguns to **\*452 \*\*144** prevent the attachment of a shoulder stock. *Id.* ¶ 83(f) (2) & (4), at 43. The Bureau must believe that if welding removes a critical feature, the firearm cannot be "readily restored" and it therefore can be removed from the firearm classification. In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole. Vollmer's welding the attachment block back onto the magazine and filling the hole it had drilled do not appear to be significantly different from the operations the Bureau describes as sufficient to remove a short-barrelled rifle or shotgun from the category of "firearm." It would seem to follow that Vollmer's operations thus removed the HK receiver from the category of machinegun.

| 5 | As originally enacted in 1934, the National Firearms Act defined machinegun as "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot without manual reloading, by a single function of the trigger." 26 U.S.C. § 2733(b) (1940). The Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213, altered the definition to include the phrase "readily restored to shoot." |
|---|---|

The Bureau's contrary conclusion raises a related problem. From all that appears, it is just as easy to turn a brand new HK 94 semiautomatic rifle receiver into a machinegun receiver as it is to do the same to a formerly-modified-but-later-restored receiver such as the one Vollmer now possesses. Yet it is incredible to suppose that every HK 94 semiautomatic rifle receiver made since May 19, 1986, must therefore be considered readily restorable and illegal under 18 U.S.C. § 922(*o* ). [6]

| 6 | One might contend that a new, unaltered receiver never achieved the status of machinegun and therefore cannot be "restored." The Bureau, however, believes that the phrase "readily restored" applies even to weapons that have never been assembled. *See United States v. Drasen,* 845 F.2d 731, 735–37 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). |
|---|---|

The district court upheld the Bureau's action on a rationale not yet discussed: "Since the statute authorizes ATF to regulate machine guns that are inoperable and unlikely to become operable, the statute clearly authorizes the Agency to regulate machineguns that remain operable." [7] This is unpersuasive. Vollmer's machinegun remains subject to regulation, just as an inoperable firearm remains subject to regulation. Vollmer thus must obtain the Bureau's permission before transferring the weapon. The question is not whether the machinegun assembled from the conversion kit and the receiver will be regulated, but whether the restored HK receiver is itself a machinegun and is thus illegal to possess. Even if we were less certain that the restored receiver is not itself a machinegun, we must resolve the ambiguity in Vollmer's favor, as the Supreme Court instructed in *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, ——— n. 9, 112 S.Ct. 2102, 2110 & n. 9, 119 L.Ed.2d 308 (1992). Accordingly, the Bureau erred in treating Vollmer's restored receiver as a post cutoff date (and thus illegal) machinegun.

| 7 | Machineguns and other firearms that become "unserviceable"—that is, incapable of firing and incapable of being readily restored to a firing condition, 26 U.S.C. § 5845(h)—"may be transferred as a curio or ornament," 26 U.S.C. § 5852(e). |
|---|---|

*Affirmed in part and reversed in part.*

**All Citations**

23 F.3d 448, 306 U.S.App.D.C. 140

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

774 F.2d 417
United States Court of Appeals,
Tenth Circuit.

William M. YORK, dba York
Arms Co., Plaintiff-Appellant,

v.

SECRETARY OF TREASURY; Stephen E.
Higgins, Director Bureau of Alcohol, Tobacco
and Firearms (BATF) and John Does 1 through
20, Agents of BATF, Defendants-Appellees.

No. 84–1370.
|
Oct. 1, 1985.

**Synopsis**
Federally licensed firearms manufacturer sued for injunctive and other relief from ruling of Bureau of Alcohol, Tobacco and Firearms classifying gun he was selling as a "machine gun." The United States District Court for the District of Utah, Aldon J. Anderson, J., granted defendant's motion for summary judgment and dismissed the complaint with prejudice, and manufacturer appealed. The Court of Appeals, Logan, Circuit Judge, held that: (1) Bureau's classification was not arbitrary, capricious, or abuse of discretion; (2) adjudicatory hearings under Administrative Procedure Act were not required; (3) due process did not entitle manufacturer to predeprivation hearing; and (4) manufacturer failed to show he was subject of selective enforcement in violation of his equal protection rights.

Affirmed.

**Attorneys and Law Firms**

**\*418** Loni F. DeLand and Herschel Bullen of McRae & DeLand, Salt Lake City, Utah, for plaintiff-appellant.

Brent D. Ward, U.S. Atty., and Barbara W. Richman, Asst. U.S. Atty., Salt Lake City, Utah, for defendants-appellees.

Before LOGAN, SETH and SEYMOUR, Circuit Judges.

**Opinion**

LOGAN, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R.App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

Plaintiff William M. York appeals from the district court's grant of summary judgment for defendants, the Secretary of the Treasury and the Director and agents of Bureau of Alcohol, Tobacco and Firearms (BATF). York sued for injunctive and other relief from a BATF ruling classifying the YAC STEN MK II weapon as a "machinegun." York claimed that (1) the BATF ruling was arbitrary, capricious, and an abuse of discretion; (2) the BATF ruling violated his rights as seller of the gun to due process and equal protection; and (3) he is entitled to de novo review of the agency's decision.

In 1982 the BATF became aware that York was selling a gun called the YAC STEN MK II, a somewhat modified version of the famous World War II British STEN submachine gun. BATF issued its ruling after examining a sample obtained through normal commercial channels. York, a federally licensed firearms manufacturer, had ignored the BATF's request for a sample to enable classification of the gun under the National Firearms Act, 26 U.S.C. §§ 5801–5872.

Before the ruling, York had written to the BATF to request general information on the standards applicable to his business but had made no mention of the STEN. In response, the BATF sent York several publications **\*419** but recommended that he contact the Bureau with specific questions. York made no further written inquiries, although he was aware that the STEN's status was in question and apparently made some telephone inquiries.

After classifying the STEN as a "machinegun" under 26 U.S.C. § 5845(b), BATF agents told York to recall the weapons already sold and advised purchasers by letter to return the guns. York resisted the recall and filed this action. The district court granted defendants' motion for summary judgment and dismissed York's complaint with prejudice.

I

Congress has delegated the administration of the National Firearms Act to the Department of the Treasury, which acts through the BATF. *See Davis v. Erdmann,* 607 F.2d 917, 918 (10th Cir.1979) (judicial recognition of the administrative

hierarchy). Under 26 U.S.C. § 7805(a), the Secretary of the Treasury or his delegate "shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code title, which includes the National Firearms Act. In the present case, the BATF was using that enforcement power to interpret 26 U.S.C. § 5845(b), which provides that a "machine gun" includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.*

The Bureau designated the STEN a machinegun in ATF Ruling 83–5. The ruling noted that the STEN had identical design characteristics to the original World War II submachinegun, except for a disconnector intended to prevent more than one shot from being fired with a single trigger function. The ruling stated:

> "The trip lever (disconnector) is designed in such a way a simple modification to it, such as bending, breaking or cutting allows the weapon to operate automatically. Thus, this simple modification to the trip lever (disconnector), together with STEN submachinegun design features and components in the YAC STEN MK II carbine, permits the firearms to shoot automatically, more than one shot, without manual reloading by a single function of the trigger. The above combination of machinegun design features as employed in the YAC STEN MK II carbine are not normally found in the typical sporting firearm."

R. I, 137–38. After noting that the National Firearms Act defined a weapon that shoots automatically, or can be readily restored to shoot automatically, more than one shot by a single trigger function, as a machinegun, the Bureau ruling declared:

> "The 'shoots automatically' definition covers weapons that will function automatically. The 'readily restorable' definition defines weapons which previously could shoot automatically

but will not in their present condition. The 'designed' definition includes weapons which have not previously functioned as machineguns but possess specific machinegun design features which facilitate automatic fire by simple alteration or elimination of existing component parts."

R. I, 138.

The BATF ruling on the STEN was thus an administrative interpretation of an existing statute. Under *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964), "when faced with a problem of statutory construction, [a court] shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Id.* at 16, 85 S.Ct. at 801. This court similarly has held that a court "should not overturn an administrative interpretation of a statute which it is charged with administering unless it can be said that the interpretation is plainly erroneous." *Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Administration,* 477 F.2d 777, 784 (10th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973). Although an interpretative rule like the one involved in this case is not granted the "force of law" of legislative rules, it still **\*420** requires deferential treatment by the court. *Compensation Commission of Alaska v. Aragon,* 329 U.S. 143, 153–54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).

 Applying these standards to the facts of this case, we hold that the BATF classification was based on relevant factors, was not a clear error of judgment, and was not arbitrary, capricious, or an abuse of discretion. Although York argues that the BATF has not classified other firearms that are "readily convertible" to automatic weapons as machineguns, there are statements in the record outlining important distinctions between those guns and the STEN. Charles Lanum, a firearms enforcement officer with the BATF, explained to York in a November 1983 meeting that the YAC STEN MK II was merely a manipulation of the parts of the original British STEN, not a redesign. In contrast, several of the weapons that York characterized as comparable were not designed originally to accommodate machinegun parts. The BATF ruling stressed that the disconnector in the YAC STEN MK II, which must prevent automatic fire, could be disabled by mere bending, breaking, or cutting. In response to a letter from York's congressman, the BATF asserted that other weapons were

neither designed originally to fire automatically nor able to be converted without substantial alteration or substitution of parts. York has never offered any evidence contradicting these points beyond his own vehement insistence that the unclassified guns are the same as the STEN. In fact, his counsel admitted when arguing against the summary judgment motion that there was no way to demonstrate that the YAC STEN MK II could not be converted to automatic operation.

York has also detailed the adverse impact the BATF ruling will have on his business. But harsh consequences for York's business alone are not enough to find an agency's action unreasonable. *See Gulf Oil Corp. v. Hickel,* 435 F.2d 440, 447–48 (D.C.Cir.1970).

II

Analysis of whether the BATF followed necessary procedures requires us first to decide whether the Bureau's action qualifies as an adjudication or a rulemaking. We are convinced that it includes elements of both. *See* 2 K. Davis, *Administrative Law Treatise* § 10:5 (2d ed. 1979) (recognizing that most agency actions involve elements of both adjudication and rulemaking).

The portion of the BATF ruling that further defines the language of 26 U.S.C. § 5845(b) was merely an interpretative rule not subject to either notice and comment procedure under 5 U.S.C. § 553 or the formalities of an agency hearing under 5 U.S.C. §§ 556–557.[1] *See, e.g., American Postal Workers Union, AFL–CIO v. U.S. Postal Service,* 707 F.2d 548, 559 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). In contrast, that portion of the Bureau's ruling placing the STEN in the category of machineguns, i.e., applying the law to the facts of a particular case, was not a rulemaking of any stripe.[2] Rather, such agency action fell into the category of adjudication, albeit informal. Such decisions require adjudicatory hearings under the Administrative Procedure Act only when a statute demands that they be made "on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a); *see also* **\*421** *Anaconda Company v. Ruckelshaus,* 482 F.2d 1301, 1306 (10th Cir.1973). There is no such requirement in this case. Further, the classification of the STEN falls under an exception to the hearing requirement for "proceedings in which decisions rest solely on inspections, tests, or elections." 5 U.S.C. § 554(a)(3).

[1]   The Bureau's interpretation of the statute's wording in ATF Ruling 83–5 is consistent with its prior interpretations in two other cases. *See* ATF Rulings 82–2 and 83–5, R. I, 83–84.

[2]   This case can be distinguished from *Hoffmann-La Roche, Inc. v. Kleindienst,* 478 F.2d 1 (3rd Cir.1973), in which the court found agency action classifying certain drugs to be only a rulemaking. In *Hoffman,* the proposed agency order applied "across the board to all producers, wholesalers, and distributors ... as well as to pharmacies and physicians." *Id.* at 13. Hoffman was not in any special or unique circumstances, and the classification had only prospective application. *Id.* None of these factors are present in the STEN classification.

Nevertheless, York argues that the agency failed to observe his *constitutional* right to due process in this case. In this respect York evidently claims that he is constitutionally entitled to a *predeprivation* hearing. He complains that he was allowed "no input regarding the decision to construe the STEN a machinegun." Brief of Appellant at 12. He speaks of the deficiency in the administrative record and the Bureau's "redefinition" of the term "machinegun." *Id.* at 14–15.

York did receive notice of the Bureau's concern with the STEN several months before it classified the STEN as a machinegun. He chose to continue with his marketing plan without providing a sample of the gun to the BATF. He selected this course, despite his admission that the government has a "public interest" in regulating automatic weapons, because he did not want his business delayed by Bureau consideration. Nevertheless, there is no doubt that, as applied to prohibit further sales of the STEN and to require past purchasers to return the guns to York for refunds, the agency action here was summary. It was based chiefly upon the BATF's inspection of the STEN it acquired.

The Supreme Court has issued several recent decisions concerning when the Due Process Clause requires predeprivation hearings. In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court identified three factors that must be weighed in deciding what process is due:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through

the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Id.* at 335, 96 S.Ct. at 903. We can apply this test to the instant case.

York has an important interest affected by the BATF decision, which banned further sales of his gun and required him to recall and give refunds for guns already sold. But the two other considerations weigh heavily in favor of the government. The risk of error is low in this case because the evidence upon which the government relied to classify the STEN as a machinegun is scientific, engineering data —sharply focused, easily documented and not based to a significant extent upon witness credibility or other subjective determinations. *See id.* at 343–44, 96 S.Ct. at 906–07. And the government has a strong interest in regulating automatic weapons capable of criminal use, and in being able to act quickly to stem the flow of such weapons to the public. The Supreme Court has upheld, against similar due process claims, summary seizure of a mislabeled vitamin product. *See Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *see also North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (destruction of food unfit for human consumption without a predeprivation hearing). We therefore hold that York was not deprived of his constitutional due process right by the government's action.

We believe, however, that constitutional due process do require a hearing for York after the issuance of the order classifying the STEN as a machinegun, if he contends the agency made a mistake of fact, i.e., that his gun does not meet the criteria set out in the BATF's expanded definition of "machinegun." *See White v. Acree,* 594 F.2d 1385 (10th Cir.1979). We do not read his briefs on appeal to make such a contention. As noted, York's counsel admitted there was no way to demonstrate that the STEN could not be converted to automatic operation.

**\*422** III

York's equal protection claim appears to be that he has been denied his rights because of selective enforcement. He contends that firearms similar to the STEN have *not* been classified as machineguns.

As the district court pointed out, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1961). We have held in the parole revocation setting that one who succeeds on a selective enforcement claim must show by a preponderance of the evidence that (1) he or she has been singled out while others who are similarly situated have not been subjected to enforcement and (2) the selection has been invidious or in bad faith and based on intentional, purposeful discrimination stemming from impermissible considerations such as race, religion, or the desire to prevent the exercise of other constitutionally secured rights. *Barton v. Malley,* 626 F.2d 151, 155 (10th Cir.1980); *see also United States v. Salazar,* 720 F.2d 1482, 1487 (10th Cir.1983), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985). In addition, "[a]ggressively displaying one's antipathy to the ... system or daring the Government to enforce it does not create immunity from or a defense to, prosecution." *United States v. Stout,* 601 F.2d 325, 328 (7th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979); *see also United States v. Rickman,* 638 F.2d 182, 183 (10th Cir.1980).[3]

3    York advertised kits for his STEN guns in a York Arms Company catalog as good weapons for those purchasers who "just don't care for Big Brother's record keeping program." R. I, 153. The STEN "Sputter Gun" also was advertised as the weapon for those "who want the fun and excitement of owning and firing a fully automatic weapon without the government tax and red tape." R. I, 155. The gun, according to the catalog, could be fired by simply holding it against the operator's bicep, inserting a loaded magazine, and pulling and then releasing the bolt handle. The main beauty of the gun, according to the catalog, was the absence of a trigger. Without a trigger, the advertisement reasoned, the gun could not be a machinegun under the statute.

In this case, York has not met his burden to show selective enforcement. He has produced no evidence that there are other gun manufacturers who truly are "similarly situated." He also offers little beyond mere accusations that there

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

was bad faith in the Bureau's actions. References in a license investigation report to his "reputation" for skirting regulations and to a "reasonable assumption" that the STENs could end up in criminal hands do not necessarily raise an inference of bad faith. Those industry rumors instead provided legitimate reasons for lawful investigation of the situation, i.e., inspection of the STEN. Once that was accomplished, the properties of the gun, and not the alleged proclivities of its maker, were the basis of the BATF ruling. As we have noted, York's "semi-automatic" guns were not the first to be classified as machineguns. Prior rulings took the same action on essentially the same basis for weapons from different sources.

AFFIRMED.

**All Citations**

774 F.2d 417

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

128 S.Ct. 2783
Supreme Court of the United States

DISTRICT OF COLUMBIA et al., Petitioners,

v.

Dick Anthony HELLER.

No. 07–290.
|
Argued March 18, 2008.
|
Decided June 26, 2008.

**Synopsis**

**Background:** Special police officer and others brought action seeking, on Second Amendment grounds, to enjoin District of Columbia from enforcing gun-control statutes. The United States District Court for the District of Columbia, Sullivan, J., 311 F.Supp.2d 103, granted District of Columbia's motion to dismiss, and appeal was taken. The District of Columbia Court of Appeals, Silberman, Senior Circuit Judge, 478 F.3d 370, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:

the Second Amendment conferred an individual right to keep and bear arms;

statutes banning handgun possession in the home violated Second Amendment; and

statute containing prohibition against rendering any lawful firearm in the home operable for purpose of immediate self-defense violated Second Amendment.

Affirmed.

Justice Stevens filed dissenting opinion in which Justices Souter, Ginsburg, and Breyer joined.

Justice Breyer filed dissenting opinion in which Justices Stevens, Souter, and Ginsburg joined.

**West Codenotes**

**Held Unconstitutional**

D.C. Official Code, 2001 Ed. § 7-2507.02.

**Limited on Constitutional Grounds**
D.C. Official Code, 2001 Ed. § 7-2502.02.

**\*\*2785** *Syllabus* [*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

District of Columbia law bans handgun possession by making it a crime to carry an unregistered firearm and prohibiting the registration of handguns; provides separately that no person may carry an unlicensed handgun, but authorizes the police chief to issue 1–year licenses; and requires residents to keep lawfully owned firearms unloaded and dissembled or bound by a trigger lock or similar device. Respondent Heller, a D.C. special policeman, applied to register a handgun he wished to keep at home, but the District refused. He filed this suit seeking, on Second Amendment grounds, to enjoin the city from enforcing the bar on handgun registration, the licensing requirement insofar as it prohibits carrying an unlicensed firearm in the home, and the trigger-lock requirement insofar as it prohibits the use of functional firearms in the home. The **\*\*2786** District Court dismissed the suit, but the D.C. Circuit reversed, holding that the Second Amendment protects an individual's right to possess firearms and that the city's total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right.

*Held:*

1. The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home. Pp. 2788 – 2816.

(a) The Amendment's prefatory clause announces a purpose, but does not limit or expand the scope of the second part, the operative clause. The operative clause's text and history demonstrate that it connotes an individual right to keep and bear arms. Pp. 2788 – 2799.

(b) The prefatory clause comports with the Court's interpretation of the operative clause. The "militia" comprised all males physically capable of acting in concert for the

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4842 Page 18 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

common defense. The Antifederalists feared that the Federal Government would disarm the people in order to disable this citizens' militia, enabling a politicized standing army or a select militia to rule. The response was to deny Congress power to abridge the ancient right of individuals to keep and bear arms, so that the ideal of a citizens' militia would be preserved. Pp. 2799 – 2803.

(c) The Court's interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed the Second Amendment. Pp. 2802 – 2804.

(d) The Second Amendment's drafting history, while of dubious interpretive worth, reveals three state Second Amendment proposals that unequivocally referred to an individual right to bear arms. P. 2804.

(e) Interpretation of the Second Amendment by scholars, courts, and legislators, from immediately after its ratification through the late 19th century, also supports the Court's conclusion. Pp. 2804 – 2812.

(f) None of the Court's precedents forecloses the Court's interpretation. Neither *United States v. Cruikshank,* 92 U.S. 542, 553, 23 L.Ed. 588, nor *Presser v. Illinois,* 116 U.S. 252, 264–265, 6 S.Ct. 580, 29 L.Ed. 615, refutes the individual-rights interpretation. *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206, does not limit the right to keep and bear arms to militia purposes, but rather limits the type of weapon to which the right applies to those used by the militia, *i.e.,* those in common use for lawful purposes. Pp. 2812 – 2816.

2. Like most rights, the Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose: For example, concealed weapons prohibitions have been upheld under the Amendment or state analogues. The Court's opinion should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *Miller's* holding that the sorts of weapons protected are those "in common use at the time" finds support in the historical tradition of prohibiting the carrying of dangerous and unusual weapons. Pp. 2816 – 2817.

3. The handgun ban and the trigger-lock requirement (as applied to self-defense) violate the Second Amendment. **2787 The District's total ban on handgun possession in the home amounts to a prohibition on an entire class of "arms" that Americans overwhelmingly choose for the lawful purpose of self-defense. Under any of the standards of scrutiny the Court has applied to enumerated constitutional rights, this prohibition—in the place where the importance of the lawful defense of self, family, and property is most acute—would fail constitutional muster. Similarly, the requirement that any lawful firearm in the home be disassembled or bound by a trigger lock makes it impossible for citizens to use arms for the core lawful purpose of self-defense and is hence unconstitutional. Because this Court conceded at oral argument that the D.C. licensing law is permissible if it is not enforced arbitrarily and capriciously, the Court assumes that a license will satisfy his prayer for relief and does not address the licensing requirement. Assuming he is not disqualified from exercising Second Amendment rights, the District must permit Heller to register his handgun and must issue him a license to carry it in the home. Pp. 2817 – 2822.

478 F.3d 370, affirmed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post,* pp. 2822 – 2847. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post,* pp. 2847 – 2870.

## Attorneys and Law Firms

Walter Dellinger, for petitioners.

Paul D. Clement, for the United States as amicus curiae, by special leave of the Court.

Alan Gura, for respondent.

Thomas C. Goldstein, Christopher M. Egleson, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Walter Dellinger, Matthew M. Shors, Mark S. Davies, Brianne J. Gorod, Not admitted in D.C.; supervised by principals of the firm, Joseph Blocher, Not admitted in D.C.; supervised by principals of the firm, O'Melveny & Myers LLP, Washington, DC, Peter J. Nickles, Interim Attorney General, Todd S. Kim, Solicitor General, Counsel of Record, Donna M. Murasky, Deputy Solicitor, General, Lutz Alexander Prager,

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4843 Page 19 of 131

*District of Columbia v. Heller, 554 U.S. 570 (2008)*

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Office of the Attorney General for the District of Columbia, Washington, DC, Robert A. Long, Jonathan L. Marcus, Covington & Burling LLP, Washington, DC, for Petitioners.

Alan Gura, Counsel of Record, Robert A. Levy, Clark M. Neily III, Gura & Possessky, PLLC, Alexandria, Virginia, for Respondents.

Frederick L. Whitmer, Thelen Reid Brown, Raysman & Steiner LLP, New York, NY, Charles M. Dyke, Counsel of Record, Thelen Reid Brown, Raysman & Steiner LLP, San Francisco, CA, Charles M. English, Jeffrey R. Gans, Elizabeth M. Walsh, Emily A. Jones, Laura P. Bourgeois, Thelen Reid Brown, Raysman & Steiner LLP, Washington, DC, for Professors of Linguistics and English Dennis E. Baron, Ph.D., Richard W. Bailey, Ph.D. and Jeffrey P. Kaplan, Ph.D. in Support of Petitioners.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

**\*573** We consider whether a District of Columbia prohibition on the possession of **\*\*2788** usable handguns in the home violates the Second Amendment to the Constitution.

**\*574** I

The District of Columbia generally prohibits the possession of handguns. It is a crime to carry an unregistered **\*575** firearm, and the registration of handguns is prohibited. See D.C.Code §§ 7–2501.01(12), 7–2502.01(a), 7–2502.02(a)(4) (2001). Wholly apart from that prohibition, no person may carry a handgun without a license, but the chief of police may issue licenses for 1–year periods. See §§ 22–4504(a), 22–4506. District of Columbia law also requires residents to keep their lawfully owned firearms, such as registered long guns, "unloaded and dissembled or bound by a trigger lock or similar device" unless they are located in a place of business or are being used for lawful recreational activities. See § 7–2507.02. [1]

[1] There are minor exceptions to all of these prohibitions, none of which is relevant here.

Respondent Dick Heller is a D.C. special police officer authorized to carry a handgun while on duty at the Thurgood Marshall Judiciary Building. He applied for a registration certificate for a handgun that he wished to keep at home, but the District refused. He thereafter filed a lawsuit in the Federal District Court for the District of Columbia seeking, **\*576** on Second Amendment grounds, to enjoin the city from enforcing the bar on the registration of handguns, the licensing requirement insofar as it prohibits the carrying of a firearm in the home without a license, and the trigger-lock requirement insofar as it prohibits the use of "functional firearms within the home." App. 59a. The District Court dismissed respondent's complaint, see *Parker v. District of Columbia,* 311 F.Supp.2d 103, 109 (2004). The Court of Appeals for the District of Columbia Circuit, construing his complaint as seeking the right to render a firearm operable and carry it about his home in that condition only when necessary for self-defense, [2] reversed, see *Parker v. District of Columbia,* 478 F.3d 370, 401 (2007). It held that the Second Amendment protects an individual right to possess firearms and that the city's total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right. See *id.,* at 395, 399–401. The Court of Appeals directed the District Court to enter summary judgment for respondent.

[2] That construction has not been challenged here.

We granted certiorari. 552 U.S. 1035, 128 S.Ct. 645, 169 L.Ed.2d 417 (2007).

II

We turn first to the meaning of the Second Amendment.

A

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In interpreting this text, we are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *United States v. Sprague,* 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931); see also *Gibbons v. Ogden,* 9 Wheat. 1, 188, 6 L.Ed. 23 (1824). Normal meaning may of **\*577** course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4844 Page 20 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

**\*\*2789** The two sides in this case have set out very different interpretations of the Amendment. Petitioners and today's dissenting Justices believe that it protects only the right to possess and carry a firearm in connection with militia service. See Brief for Petitioners 11–12; *post,* at 2822 (STEVENS, J., dissenting). Respondent argues that it protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home. See Brief for Respondent 2–4.

The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose. The Amendment could be rephrased, "Because a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." See J. Tiffany, A Treatise on Government and Constitutional Law § 585, p. 394 (1867); Brief for Professors of Linguistics and English as *Amici Curiae* 3 (hereinafter Linguists' Brief). Although this structure of the Second Amendment is unique in our Constitution, other legal documents of the founding era, particularly individual-rights provisions of state constitutions, commonly included a prefatory statement of purpose. See generally Volokh, The Commonplace Second Amendment, 73 N.Y.U.L.Rev. 793, 814–821 (1998).

 Logic demands that there be a link between the stated purpose and the command. The Second Amendment would be nonsensical if it read, "A well regulated Militia, being necessary to the security of a free State, the right of the people to petition for redress of grievances shall not be infringed." That requirement of logical connection may cause a prefatory clause to resolve an ambiguity in the operative clause. ("The **\*578** separation of church and state being an important objective, the teachings of canons shall have no place in our jurisprudence." The preface makes clear that the operative clause refers not to canons of interpretation but to clergymen.) But apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause. See F. Dwarris, A General Treatise on Statutes 268–269 (P. Potter ed. 1871); T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 42–45 (2d ed. 1874). [3] " 'It is nothing unusual in acts ... for the enacting part to go beyond the preamble; the remedy often extends beyond the particular act or mischief which first suggested the necessity of the law.' " J. Bishop, Commentaries on Written Laws and Their Interpretation § 51, p. 49 (1882) (quoting *Rex v.*

*Marks,* 3 East 157, 165, 102 Eng.Rep. 557, 560 (K.B.1802)). Therefore, while we will begin our **\*\*2790** textual analysis with the operative clause, we will return to the prefatory clause to ensure that our reading of the operative clause is consistent with the announced purpose. [4]

[3] As Sutherland explains, the key 18th-century English case on the effect of preambles, *Copeman v. Gallant,* 1 P. Wms. 314, 24 Eng. Rep. 404 (1716), stated that "the preamble could not be used to restrict the effect of the words used in the purview." 2A N. Singer, Sutherland on Statutory Construction § 47.04, pp. 145 – 146 (rev. 5th ed.1992). This rule was modified in England in an 1826 case to give more importance to the preamble, but in America "the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms." *Id.,* at 146.

Justice STEVENS says that we violate the general rule that every clause in a statute must have effect. *Post,* at 2826. But where the text of a clause itself indicates that it does not have operative effect, such as "whereas" clauses in federal legislation or the Constitution's preamble, a court has no license to make it do what it was not designed to do. Or to put the point differently, operative provisions should be given effect as operative provisions, and prologues as prologues.

[4] Justice STEVENS criticizes us for discussing the prologue last. *Ibid.* But if a prologue can be used only to clarify an ambiguous operative provision, surely the first step must be to determine whether the operative provision is ambiguous. It might be argued, we suppose, that the prologue itself should be one of the factors that go into the determination of whether the operative provision is ambiguous—but that would cause the prologue to be used to produce ambiguity rather than just to resolve it. In any event, even if we considered the prologue *along with* the operative provision we would reach the same result we do today, since (as we explain) our interpretation of "the right of the people to keep and bear arms" furthers the purpose of an effective militia no less than (indeed, more than) the dissent's interpretation. See *infra,* at 2801 – 2802.

 **\*579 1. Operative Clause.**

**a. "Right of the People."** The first salient feature of the operative clause is that it codifies a "right of the people." The unamended Constitution and the Bill of Rights use the phrase "right of the people" two other times, in the First Amendment's Assembly–and–Petition Clause and in the Fourth Amendment's Search–and–Seizure Clause. The

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Ninth Amendment uses very similar terminology ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people"). All three of these instances unambiguously refer to individual rights, not "collective" rights, or rights that may be exercised only through participation in some corporate body. [5]

[5]   Justice STEVENS is of course correct, *post,* at 2827, that the right to assemble cannot be exercised alone, but it is still an individual right, and not one conditioned upon membership in some defined "assembly," as he contends the right to bear arms is conditioned upon membership in a defined militia. And Justice STEVENS is dead wrong to think that the right to petition is "primarily collective in nature." *Ibid.* See *McDonald v. Smith,* 472 U.S. 479, 482–484, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (describing historical origins of right to petition).

Three provisions of the Constitution refer to "the people" in a context other than "rights"—the famous preamble ("We the people"), § 2 of Article I (providing that "the people" will choose members of the House), and the Tenth Amendment (providing that those powers not given the Federal Government remain with "the States" or "the people"). Those provisions arguably refer to "the people" acting collectively— *580 but they deal with the exercise or reservation of powers, not rights. Nowhere else in the Constitution does a "right" attributed to "the people" refer to anything other than an individual right. [6]

[6]   If we look to other founding-era documents, we find that some state constitutions used the term "the people" to refer to the people collectively, in contrast to "citizen," which was used to invoke individual rights. See Heyman, Natural Rights and the Second Amendment, in The Second Amendment in Law and History 179, 193–195 (C. Bogus ed.2000) (hereinafter Bogus). But that usage was not remotely uniform. See, *e.g.,* N.C. Declaration of Rights § XIV (1776), in 5 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 2787, 2788 (F. Thorpe ed.1909) (hereinafter Thorpe) (jury trial); Md. Declaration of Rights § XVIII (1776), in 3 *id.,* at 1686, 1688 (vicinage requirement); Vt. Declaration of Rights, ch. 1, § XI (1777), in 6 *id.,* at 3737, 3741 (searches and seizures); Pa. Declaration of Rights § XII (1776), in 5 *id.,* at 3082, 3083 (free speech). And, most importantly, it was clearly not the terminology used in the Federal Constitution, given the First, Fourth, and Ninth Amendments.

What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not **2791 an unspecified subset. As we said in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990):

> " '[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"— those who were male, able bodied, and within a certain age range. Reading the Second Amendment as protecting only the right *581 to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as "the people."

We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.

**b. "Keep and Bear Arms."** We move now from the holder of the right—"the people"—to the substance of the right: "to keep and bear Arms."

Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4846 Page 22 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays, &* c. and not bear other arms." See also, *e.g.,* An Act for the trial of Negroes, 1797 Del. Laws ch. XLIII, § 6, in 1 First Laws of the State of Delaware 102, 104 (J. Cushing ed.1981 (pt. 1)); see generally *State v. Duke,* 42 Tex. 455, 458 (1874) (citing decisions of state courts construing "arms"). Although one founding-era thesaurus limited "arms" (as opposed to "weapons") to "instruments of offence *generally* made use of in war," even that source stated that all firearms constituted "arms." 1 J. Trusler, The Distinction Between Words Esteemed **\*582** Synonymous in the English Language 37 (3d ed. 1794) (emphasis added).

Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g., Reno v. American Civil Liberties Union,* 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the Fourth Amendment applies to modern forms of search, *e.g., Kyllo v. United States,* 533 U.S. 27, 35–36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the Second Amendment extends, **\*\*2792** prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

We turn to the phrases "keep arms" and "bear arms." Johnson defined "keep" as, most relevantly, "[t]o retain; not to lose," and "[t]o have in custody." Johnson 1095. Webster defined it as "[t]o hold; to retain in one's power or possession." No party has apprised us of an idiomatic meaning of "keep Arms." Thus, the most natural reading of "keep Arms" in the Second Amendment is to "have weapons."

The phrase "keep arms" was not prevalent in the written documents of the founding period that we have found, but there are a few examples, all of which favor viewing the right to "keep Arms" as an individual right unconnected with militia service. William Blackstone, for example, wrote that Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to "keep arms in their houses." 4 Commentaries on the Laws of England 55 (1769) (hereinafter Blackstone); see also 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House ... any Arms ..."); 1 W. Hawkins, Treatise on the Pleas of the Crown 26 (1771) (similar). Petitioners point to militia laws of the founding period that required militia members to "keep" arms in connection with **\*583** militia service, and they conclude from this that the phrase "keep Arms" has a militia-related connotation. See Brief for Petitioners 16–17 (citing laws of Delaware, New Jersey, and Virginia). This is rather like saying that, since there are many statutes that authorize aggrieved employees to "file complaints" with federal agencies, the phrase "file complaints" has an employment-related connotation. "Keep arms" was simply a common way of referring to possessing arms, for militiamen *and everyone else.* [7]

[7] See, *e.g.,* 3 A Compleat Collection of State–Tryals 185 (1719) ( "Hath not every Subject power to keep Arms, as well as Servants in his House for defence of his Person?"); T. Wood, A New Institute of the Imperial or Civil Law 282 (1730) ("Those are guilty of *publick* Force, who keep Arms in their Houses, and make use of them otherwise than upon Journeys or Hunting, or for Sale ..."); A Collection of All the Acts of Assembly, Now in Force, in the Colony of Virginia 596 (1733) ("Free Negros, Mulattos, or Indians, and Owners of Slaves, seated at Frontier Plantations, may obtain Licence from a Justice of Peace, for keeping Arms, *&c.*"); J. Ayliffe, A New Pandect of *Roman* Civil Law 195 (1734) ("Yet a Person might keep Arms in his House, or on his Estate, on the Account of Hunting, Navigation, Travelling, and on the Score of Selling them in the way of Trade or Commerce, or such Arms as accrued to him by way of Inheritance"); J. Trusler, A Concise View of the Common Law and Statute Law of England 270 (1781) ("[I]f [papists] keep arms in their houses, such arms may be seized by a justice of the peace"); Some Considerations on the Game Laws 54 (1796) ("Who has been deprived by [the law] of keeping arms for his own defence? What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece ... ?"); 3 B. Wilson, The Works of the Honourable James Wilson 84 (1804) (with reference to state constitutional right: "This is one of our many renewals of the Saxon regulations. 'They were bound,' says Mr. Selden, 'to keep arms for the preservation of the kingdom, and of their own persons' "); W. Duer, Outlines of the Constitutional Jurisprudence of the United States

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4847 Page 23 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

31–32 (1833) (with reference to colonists' English rights: "The right of every individual to keep arms for his defence, suitable to his condition and degree; which was the public allowance, under due restrictions of the natural right of resistance and self-preservation"); 3 R. Burn, Justice of Peace and Parish Officer 88 (29th ed. 1845) ("It is, however, laid down by Serjeant *Hawkins, ...* that if a lessee, after the end of the term, keep arms in his house to oppose the entry of the lessor, ..."); *State v. Dempsey,* 31 N.C. 384, 385 (1849) (citing 1840 state law making it a misdemeanor for a member of certain racial groups "to carry about his person or keep in his house any shot gun or other arms").

**\*\*2793 \*584** At the time of the founding, as now, to "bear" meant to "carry." See Johnson 161; Webster; T. Sheridan, A Complete Dictionary of the English Language (1796); 2 Oxford English Dictionary 20 (2d ed.1989) (hereinafter Oxford). When used with "arms," however, the term has a meaning that refers to carrying for a particular purpose—confrontation. In *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), in the course of analyzing the meaning of "carries a firearm" in a federal criminal statute, Justice GINSBURG wrote that "[s]urely a most familiar meaning is, as the Constitution's Second Amendment ... indicate[s]: 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.,* at 143, 118 S.Ct. 1911 (dissenting opinion) (quoting Black's Law Dictionary 214 (6th ed.1990)). We think that Justice GINSBURG accurately captured the natural meaning of "bear arms." Although the phrase implies that the carrying of the weapon is for the purpose of "offensive or defensive action," it in no way connotes participation in a structured military organization.

From our review of founding-era sources, we conclude that this natural meaning was also the meaning that "bear arms" had in the 18th century. In numerous instances, "bear arms" was unambiguously used to refer to the carrying of weapons outside of an organized militia. The most prominent examples are those most relevant to the Second Amendment: nine state constitutional provisions written in the 18th century or the first two decades of the 19th, which enshrined a right of citizens to "bear arms in defense of themselves and the state" or "bear arms in defense of himself and **\*585** the state." [8] It is clear from those formulations that "bear arms" did not refer only to carrying a weapon in an organized military unit. Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right, for example, as a recognition of the natural right of defense "of one's person

or house"—what he called the law of "self preservation." 2 Collected Works of James Wilson 1142, and n. x (K. Hall & M. Hall eds.2007) (citing Pa. Const., Art. IX, § 21 (1790)); see also T. Walker, Introduction to American Law 198 (1837) **\*\*2794** ("Thus the right of self-defence [is] guaranteed by the [Ohio] constitution"); see also *id.,* at 157 (equating Second Amendment with that provision of the Ohio Constitution). That was also the interpretation of those state constitutional provisions adopted by pre-Civil War state courts.[9] These provisions **\*586** demonstrate—again, in the most analogous linguistic context—that "bear arms" was not limited to the carrying of arms in a militia.

[8]

> See Pa. Declaration of Rights § XIII, in 5 Thorpe 3083 ("That the people have a right to bear arms for the defence of themselves and the state ... "); Vt. Declaration of Rights, ch. 1, § XV, in 6 *id.,* at 3741 ("That the people have a right to bear arms for the defence of themselves and the State ..."); Ky. Const., Art. XII, § 23 (1792), in 3 *id.,* at 1264, 1275 ("That the right of the citizens to bear arms in defence of themselves and the State shall not be questioned"); Ohio Const., Art. VIII, § 20 (1802), in 5 *id.,* at 2901, 2911 ("That the people have a right to bear arms for the defence of themselves and the State ... "); Ind. Const., Art. First, § 20 (1816), in 2 *id.,* at 1057, 1059 ("That the people have a right to bear arms for the defense of themselves and the State ... "); Miss. Const., Art. I, § 23 (1817), in 4 *id.,* at 2032, 2034 ("Every citizen has a right to bear arms, in defense of himself and the State"); Conn. Const., Art. First, § 17 (1818), in *id.,* at 536, 538 ("Every citizen has a right to bear arms in defense of himself and the State"); Ala. Const., Art. I, § 23 (1819), in *id.,* at 96, 98 ("Every citizen has a right to bear arms in defence of himself and the State"); Mo. Const., Art. XIII, § 3 (1820), in 4 *id.,* at 2150, 2163 ("[T]hat their right to bear arms in defence of themselves and of the State cannot be questioned"). See generally Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Politics 191 (2006).

[9]

> See *Bliss v. Commonwealth,* 12 Ky. 90, 2 Litt. 90, 91–92 (1822); *State v. Reid,* 1 Ala. 612, 616–617 (1840); *State v. Schoultz,* 25 Mo. 128, 155 (1857); see also *Simpson v. State,* 13 Tenn. 356, 5 Yer. 356, 360 (1833) (interpreting similar provision with " 'common defence' " purpose); *State v. Huntly,* 25 N.C. 418, 422–423 (1843) (same); cf. *Nunn v. State,* 1 Ga. 243, 250–251 (1846) (construing Second Amendment); *State v. Chandler,* 5 La. Ann. 489, 489–490 (1850) (same).

The phrase "bear Arms" also had at the time of the founding an idiomatic meaning that was significantly different from its

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4848   Page 24 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

natural meaning: "to serve as a soldier, do military service, fight" or "to wage war." See Linguists' Brief 18; *post,* at 2827 – 2828 (STEVENS, J., dissenting). But it *unequivocally* bore that idiomatic meaning only when followed by the preposition "against," which was in turn followed by the target of the hostilities. See 2 Oxford 21. (That is how, for example, our Declaration of Independence ¶ 28 used the phrase: "He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country ....") Every example given by petitioners' *amici* for the idiomatic meaning of "bear arms" from the founding period either includes the preposition "against" or is not clearly idiomatic. See Linguists' Brief 18–23. Without the preposition, "bear arms" normally meant (as it continues to mean today) what Justice GINSBURG's opinion in *Muscarello* said.

In any event, the meaning of "bear arms" that petitioners and Justice STEVENS propose is *not even* the (sometimes) idiomatic meaning. Rather, they manufacture a hybrid definition, whereby "bear arms" connotes the actual carrying of arms (and therefore is not really an idiom) but only in the service of an organized militia. No dictionary has ever adopted that definition, and we have been apprised of no source that indicates that it carried that meaning at the time of the founding. But it is easy to see why petitioners and the dissent are driven to the hybrid definition. Giving "bear Arms" its idiomatic meaning would cause the protected right to consist of the right to be a soldier or to wage war—an absurdity that no commentator has ever endorsed. See L. Levy, Origins of the Bill of Rights 135 (1999). Worse still, **\*587** the phrase "keep and bear Arms" would be incoherent. The word "Arms" would have two different meanings at once: "weapons" (as the object of "keep") and (as the object of "bear") one-half of an idiom. It would be rather like saying "He filled and kicked the bucket" to mean "He filled the bucket and died." Grotesque.

Petitioners justify their limitation of "bear arms" to the military context by pointing out the unremarkable fact that it was often used in that context—the same mistake they made with respect to "keep arms." It is especially unremarkable that the phrase was often used in a military context in the federal legal sources (such as records of congressional debate) that have been the focus of petitioners' inquiry. Those sources would have had little occasion to use it *except* in discussions about the standing army and the militia. And the phrases used primarily in those military discussions include not only "bear arms" but also "carry arms," "possess arms," and "have arms"—though no one **\*\*2795** thinks that those

*other* phrases also had special military meanings. See Barnett, Was the Right to Keep and Bear Arms Conditioned on Service in an Organized Militia? 83 Texas L.Rev. 237, 261 (2004). The common references to those "fit to bear arms" in congressional discussions about the militia are matched by use of the same phrase in the few nonmilitary federal contexts where the concept would be relevant. See, *e.g.,* 30 Journals of Continental Congress 349–351 (J. Fitzpatrick ed.1934). Other legal sources frequently used "bear arms" in nonmilitary contexts. [10] Cunningham's legal dictionary, cited **\*588** above, gave as an example of its usage a sentence unrelated to military affairs ("Servants and labourers shall use bows and arrows on *Sundays,* & c. and not bear other arms"). And if one looks beyond legal sources, "bear arms" was frequently used in nonmilitary contexts. See Cramer & Olson, What Did "Bear Arms" Mean in the Second Amendment? 6 Georgetown J.L. & Pub. Pol'y 511 (2008) (identifying numerous nonmilitary uses of "bear arms" from the founding period).

10     See J. Brydall, Privilegia Magnatud apud Anglos 14 (1704) (Privilege XXXIII) ("In the 21st Year of King Edward the Third, a Proclamation Issued, that no Person should bear any Arms within London, and the Suburbs"); J. Bond, A Compleat Guide to Justices of the Peace 43 (3d ed. 1707) ("Sheriffs, and all other Officers in executing their Offices, and all other persons pursuing Hu[e] and Cry may lawfully bear Arms"); 1 An Abridgment of the Public Statutes in Force and Use Relative to Scotland (1755) (entry for "Arms": "And if any person above described shall have in his custody, use, or bear arms, being thereof convicted before one justice of peace, or other judge competent, summarily, he shall for the first offense forfeit all such arms" (citing 1 Geo., ch. 54, § 1, in 5 Eng. Stat. at Large 90 (1668))); Statute Law of Scotland Abridged 132–133 (2d ed. 1769) ("Acts for disarming the highlands" but "exempting those who have particular licenses to bear arms"); E. de Vattel, The Law of Nations, or, Principles of the Law of Nature 144 (1792) ("Since custom has allowed persons of rank and gentlemen of the army to bear arms in time of peace, strict care should be taken that none but these should be allowed to wear swords"); E. Roche, Proceedings of a Court–Martial, Held at the Council–Chamber, in the City of Cork 3 (1798) (charge VI: "With having held traitorous conferences, and with having conspired, with the like intent, for the purpose of attacking and despoiling of the arms of several of the King's subjects, qualified by law to bear arms"); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822) ("[I]n this country the constitution guarranties to all persons

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4849 Page 25 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify people unnecessarily").

Justice STEVENS points to a study by *amici* supposedly showing that the phrase "bear arms" was most frequently used in the military context. See *post,* at 2828 – 2829, n. 9; Linguists' Brief 24. Of course, as we have said, the fact that the phrase was commonly used in a particular context does not show that it is limited to that context, and, in any event, we have given many sources where the phrase was used in nonmilitary contexts. Moreover, the study's collection appears to include (who knows how many times) the idiomatic phrase "bear arms against," which is irrelevant. The *amici* also dismiss examples such as " 'bear arms ... for the purpose of killing game' " because those uses are "expressly **\*589** qualified." Linguists' Brief 24. (Justice STEVENS uses the same excuse for dismissing the state constitutional provisions analogous to the Second Amendment that identify private-use purposes for which the individual right can be asserted. See *post,* at 2828.) That analysis is faulty. A purposive qualifying phrase that contradicts the word or phrase it modifies is unknown this side of the looking glass **\*\*2796** (except, apparently, in some courses on linguistics). If "bear arms" means, as we think, simply the carrying of arms, a modifier can limit the purpose of the carriage ("for the purpose of self-defense" or "to make war against the King"). But if "bear arms" means, as the petitioners and the dissent think, the carrying of arms only for military purposes, one simply cannot add "for the purpose of killing game." The right "to carry arms in the militia for the purpose of killing game" is worthy of the Mad Hatter. Thus, these purposive qualifying phrases positively establish that "to bear arms" is not limited to military use.[11]

[11]　Justice STEVENS contends, *post,* at 2830, that since we assert that adding "against" to "bear arms" gives it a military meaning we must concede that adding a purposive qualifying phrase to "bear arms" can alter its meaning. But the difference is that we do not maintain that "against" *alters* the meaning of "bear arms" but merely that it *clarifies* which of various meanings (one of which is military) is intended. Justice STEVENS, however, argues that "[t]he term 'bear arms' is a familiar idiom; when used unadorned by any additional words, its meaning is 'to serve as a soldier, do military service, fight.' " *Post,* at 2828. He therefore must establish that adding a contradictory purposive phrase can *alter* a word's meaning.

Justice STEVENS places great weight on James Madison's inclusion of a conscientious-objector clause in his original draft of the Second Amendment: "but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person." Creating the Bill of Rights 12 (H. Veit, K. Bowling & C. Bickford eds.1991) (hereinafter Veit). He argues that this clause establishes that the drafters of the Second Amendment intended "bear Arms" to refer only **\*590** to military service. See *post,* at 2836. It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process.[12] In any case, what Justice STEVENS would conclude from the deleted provision does not follow. It was not meant to exempt from military service those who objected to going to war but had no scruples about personal gunfights. Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever—so much so that Quaker frontiersmen were forbidden to use arms to defend their families, even though "[i]n such circumstances the temptation to seize a hunting rifle or knife in self-defense ... must sometimes have been almost overwhelming." P. Brock, Pacifism in the United States 359 (1968); see M. Hirst, The Quakers in Peace and War 336–339 (1923); 3 T. Clarkson, Portraiture of Quakerism 103–104 (3d ed. 1807). The Pennsylvania Militia Act of 1757 exempted from service those *"scrupling the use of arms"*— a phrase that no one contends had an idiomatic meaning. See 5 Stat. at Large of Pa. 613 (J. Mitchell & H. Flanders comm'rs 1898) (emphasis in original). Thus, the most natural interpretation of Madison's deleted text is that those opposed to carrying weapons for potential violent confrontation would not be "compelled to render military service," in which such carrying would be required.[13]

[12]　Justice STEVENS finds support for his legislative history inference from the recorded views of one Antifederalist member of the House. *Post,* at 2836, n. 25. "The claim that the best or most representative reading of the [language of the] amendments would conform to the understanding and concerns of [the Antifederalists] is ... highly problematic." Rakove, The Second Amendment: The Highest Stage of Originalism, in Bogus 74, 81.

[13]　The same applies to the conscientious-objector amendments proposed by Virginia and North Carolina, which said: "That any person religiously scrupulous of bearing arms ought to be exempted upon payment of an equivalent to employ another to bear arms in his stead." See Veit 19; 4 J. Eliot, The Debates in the Several State Constitutions on the Adoption of the Federal Constitution 243, 244 (2d ed. 1836) (reprinted 1941).

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4850 Page 26 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Certainly their second use of the phrase ("bear arms in his stead") refers, by reason of context, to compulsory bearing of arms for military duty. But their first use of the phrase ("any person religiously scrupulous of bearing arms") assuredly did not refer to people whose God allowed them to bear arms for defense of themselves but not for defense of their country.

**\*\*2797  \*591** Finally, Justice STEVENS suggests that "keep and bear Arms" was some sort of term of art, presumably akin to "hue and cry" or "cease and desist." (This suggestion usefully evades the problem that there is no evidence whatsoever to support a military reading of "keep arms.") Justice STEVENS believes that the unitary meaning of "keep and bear Arms" is established by the Second Amendment's calling it a "right" (singular) rather than "rights" (plural). See *post,* at 2830 – 2831. There is nothing to this. State constitutions of the founding period routinely grouped multiple (related) guarantees under a singular "right," and the First Amendment protects the "right [singular] of the people peaceably to assemble, and to petition the Government for a redress of grievances." See, *e.g.,* Pa. Declaration of Rights §§ IX, XII, XVI, in 5 Thorpe 3083–3084; Ohio Const., Art. VIII, §§ 11, 19 (1802), in *id.,* at 2910–2911. [14] And even if "keep and bear Arms" were a unitary phrase, we find no evidence that it bore a military meaning. Although the phrase was not at all common (which would be unusual for a term of art), we have found instances of its use with a clearly nonmilitary connotation. In a 1780 debate in the House of Lords, for example, Lord Richmond described an order to disarm private **\*592** citizens (not militia members) as "a violation of the constitutional right of Protestant subjects to keep and bear arms for their own defence." 49 The London Magazine or Gentleman's Monthly Intelligencer 467 (1780). In response, another member of Parliament referred to "the right of bearing arms for personal defence," making clear that no special military meaning for "keep and bear arms" was intended in the discussion. *Id.,* at 467–468. [15]

[14]  Faced with this clear historical usage, Justice STEVENS resorts to the bizarre argument that because the word "to" is not included before "bear" (whereas it is included before "petition" in the First Amendment), the unitary meaning of " 'to keep and bear' " is established. *Post,* at 2830, n. 13. We have never heard of the proposition that omitting repetition of the "to" causes two verbs with different meanings to become one. A promise "to support and to defend the Constitution of the United States" is not a whit different from a promise "to support and defend the Constitution of the United States."

[15]  Cf. 21 Geo. II, ch. 34, § 3, in 7 Eng. Stat. at Large 126 (1748) ("That the Prohibition contained ... in this Act, of having, keeping, bearing, or wearing any Arms or Warlike Weapons ... shall not extend ... to any Officers or their Assistants, employed in the Execution of Justice ...").

**c. Meaning of the Operative Clause.** Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." As we said in *United States v. Cruikshank,* 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second **\*\*2798** amendment declares that it shall not be infringed ...." [16]

[16]  Contrary to Justice STEVENS' wholly unsupported assertion, *post,* at 2831, there was no pre-existing right in English law "to use weapons for certain military purposes" or to use arms in an organized militia.

Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents. See J. Malcolm, To Keep and Bear Arms 31–53 (1994) (hereinafter Malcolm); L. Schwoerer, The Declaration of Rights, 1689, p. 76 (1981). **\*593** Under the auspices of the 1671 Game Act, for example, the Catholic Charles II had ordered general disarmaments of regions home to his Protestant enemies. See Malcolm 103–106. These experiences caused Englishmen to be extremely wary of concentrated military forces run by the state and to be jealous of their arms. They accordingly obtained an assurance from William and Mary, in the Declaration of Rights (which was codified as the English Bill of Rights), that Protestants would never be disarmed: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. This right has long been understood to be the predecessor to our Second Amendment. See E. Dumbauld, The Bill of Rights and What It Means Today 51 (1957); W. Rawle, A View of the Constitution of the United States of America 122

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4851 Page 27 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

(1825) (hereinafter Rawle). It was clearly an individual right, having nothing whatever to do with service in a militia. To be sure, it was an individual right not available to the whole population, given that it was restricted to Protestants, and like all written English rights it was held only against the Crown, not Parliament. See Schwoerer, To Hold and Bear Arms: The English Perspective, in Bogus 207, 218; but see 3 J. Story, Commentaries on the Constitution of the United States § 1858 (1833) (hereinafter Story) (contending that the "right to bear arms" is a "limitatio[n] upon the power of parliament" as well). But it was secured to them as individuals, according to "libertarian political principles," not as members of a fighting force. Schwoerer, Declaration of Rights, at 283; see also *id.,* at 78; G. Jellinek, The Declaration of the Rights of Man and of Citizens 49, and n. 7 (1901) (reprinted 1979).

By the time of the founding, the right to have arms had become fundamental for English subjects. See Malcolm 122–134. Blackstone, whose works, we have said, "constituted the preeminent authority on English law for the founding **\*594** generation," *Alden v. Maine,* 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. See 1 Blackstone 136, 139–140 (1765). His description of it cannot possibly be thought to tie it to militia or military service. It was, he said, "the natural right of resistance and self-preservation," *id.,* at 139, and "the right of having and using arms for self-preservation and defence," *id.,* at 140; see also 3 *id.,* at 2–4 (1768). Other contemporary authorities concurred. See G. Sharp, Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia 17–18, 27 (3d ed. 1782); 2 J. de Lolme, The Rise and Progress of the English Constitution 886–887 (1784) (A. Stephens ed. 1838); W. Blizard, Desultory Reflections on Police 59–60 (1785). Thus, the right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual **\*\*2799** right protecting against both public and private violence.

And, of course, what the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists. In the tumultuous decades of the 1760's and 1770's, the Crown began to disarm the inhabitants of the most rebellious areas. That provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms. A New York article of April 1769 said that "[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769, in Boston

Under Military Rule 79 (O. Dickerson ed.1936) (reprinted 1970); see also, *e.g.,* Shippen, Boston Gazette, Jan. 30, 1769, in 1 The Writings of Samuel Adams 299 (H. Cushing ed. 1904) (reprinted 1968). They understood the right to enable individuals to defend themselves. As the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker) made clear in the notes to the **\*595** description of the arms right, Americans understood the "right of self-preservation" as permitting a citizen to "repe[l] force by force" when "the intervention of society in his behalf, may be too late to prevent an injury." 1 Blackstone's Commentaries 145–146, n. 42 (1803) (hereinafter Tucker's Blackstone). See also W. Duer, Outlines of the Constitutional Jurisprudence of the United States 31–32 (1833).

There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the First Amendment's right of free speech was not, see, *e.g., United States v. Williams,* 553 U.S. 285, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.* Before turning to limitations upon the individual right, however, we must determine whether the prefatory clause of the Second Amendment comports with our interpretation of the operative clause.

## 2. Prefatory Clause.

The prefatory clause reads: "A well regulated Militia, being necessary to the security of a free State ...."

**a. "Well–Regulated Militia."** In *United States v. Miller,* 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), we explained that "the Militia comprised all males physically capable of acting in concert for the common defense." That definition comports with founding-era sources. See, *e.g.,* Webster ("The militia of a country are the able bodied men organized into companies, regiments and brigades ... and required by law to attend military exercises on certain days only, but at other times left to pursue their usual occupations"); The Federalist No. 46, pp. 329, 334 (B. Wright ed.1961) (J. Madison) ("near half a million of citizens with arms in their hands"); Letter to Destutt de Tracy (Jan. 26, 1811), in The Portable Thomas **\*596** Jefferson 520, 524 (M. Peterson ed. 1975) ("the militia of the State, that is to say, of every man in it able to bear arms").

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Petitioners take a seemingly narrower view of the militia, stating that "[m]ilitias are the state- and congressionally-regulated military forces described in the Militia Clauses (art. I, § 8, cls. 15–16)." Brief for Petitioners 12. Although we agree with petitioners' interpretive assumption that "militia" means the same thing in Article I **2800 and the Second Amendment, we believe that petitioners identify the wrong thing, namely, the organized militia. Unlike armies and navies, which Congress is given the power to create ("to raise ... Armies"; "to provide ... a Navy," Art. I, § 8, cls. 12–13), the militia is assumed by Article I already to be *in existence*. Congress is given the power to "provide for calling forth the Militia," § 8, cl. 15; and the power not to create, but to "organiz[e]" it—and not to organize "a" militia, which is what one would expect if the militia were to be a federal creation, but to organize "the" militia, connoting a body already in existence, *ibid.,* cl. 16. This is fully consistent with the ordinary definition of the militia as all able-bodied men. From that pool, Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Act of May 8, 1792, 1 Stat. 271. To be sure, Congress need not conscript every able-bodied man into the militia, because nothing in Article I suggests that in exercising its power to organize, discipline, and arm the militia, Congress must focus upon the entire body. Although the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them.

 *597 Finally, the adjective "well-regulated" implies nothing more than the imposition of proper discipline and training. See Johnson 1619 ("Regulate": "To adjust by rule or method"); Rawle 121–122; cf. Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814 (referring to "a well-regulated militia, composed of the body of the people, trained to arms").

 b. **"Security of a Free State."** The phrase "security of a free State" meant "security of a free polity," not security of each of the several States as the dissent below argued, see 478 F.3d, at 405, and n. 10. Joseph Story wrote in his treatise on the Constitution that "the word 'state' is used in various senses [and in] its most enlarged sense it means the people composing a particular nation or community." 1 Story § 208; see also 3 *id.,* § 1890 (in reference to the Second

Amendment's prefatory clause: "The militia is the natural defence of a free country"). It is true that the term "State" elsewhere in the Constitution refers to individual States, but the phrase "security of a free State" and close variations seem to have been terms of art in 18th-century political discourse, meaning a " 'free country' " or free polity. See Volokh, "Necessary to the Security of a Free State," 83 Notre Dame L.Rev. 1, 5 (2007); see, *e.g.,* 4 Blackstone 151 (1769); Brutus Essay III (Nov. 15, 1787), in The Essential Antifederalist 251, 253 (W. Allen & G. Lloyd eds., 2d ed.2002). Moreover, the other instances of "state" in the Constitution are typically accompanied by modifiers making clear that the reference is to the several States—"each state," "several states," "any state," "that state," "particular states," "one state," "no state." And the presence of the term "foreign state" in Article I and Article III shows that the word "state" did not have a single meaning in the Constitution.

There are many reasons why the militia was thought to be "necessary to the security of a free State." See 3 Story § 1890. First, of course, it is useful in repelling invasions and suppressing insurrections. Second, it renders large *598 standing armies unnecessary—an argument that Alexander Hamilton made in favor of federal **2801 control over the militia. The Federalist No. 29, pp. 226, 227 (B. Wright ed.1961). Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny.

### 3. Relationship Between Prefatory Clause and Operative Clause.

We reach the question, then: Does the preface fit with an operative clause that creates an individual right to keep and bear arms? It fits perfectly, once one knows the history that the founding generation knew and that we have described above. That history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights.

The debate with respect to the right to keep and bear arms, as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution. During the 1788 ratification debates, the fear that the Federal Government would disarm the people in order to

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric. See, *e.g.,* Letters from The Federal Farmer III (Oct. 10, 1787), in 2 The Complete Anti–Federalist 234, 242 (H. Storing ed.1981). John Smilie, for example, worried not only that Congress's "command of the militia" could be used to create a "select militia," or to have "no militia at all," but also, as a separate concern, that "[w]hen a select militia is formed; the people in general may be disarmed." 2 Documentary History of the Ratification of the Constitution 508–509 (M. Jensen ed.1976) (hereinafter **\*599** Documentary Hist.). Federalists responded that because Congress was given no power to abridge the ancient right of individuals to keep and bear arms, such a force could never oppress the people. See, *e.g.,* A Pennsylvanian III (Feb. 20, 1788), in The Origin of the Second Amendment 275, 276 (D. Young ed., 2d ed.2001) (hereinafter Young); White, To the Citizens of Virginia (Feb. 22, 1788), in *id.,* at 280, 281; A Citizen of America (Oct. 10, 1787), in *id.,* at 38, 40; Foreign Spectator, Remarks on the Amendments to the Federal Constitution, Nov. 7, 1788, in *id.,* at 556. It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down.

It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. Justice BREYER's assertion that individual self-defense is merely a "subsidiary interest" of the right to keep and bear arms, see *post,* at 2841 (dissenting opinion), is profoundly mistaken. He bases that assertion solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification;* it was the *central component* of the right itself.

Besides ignoring the historical reality that the Second Amendment was not intended to lay down a "novel principl[e]" **\*\*2802** but rather codified a right "inherited from our English ancestors," *Robertson v. Baldwin,* 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897), petitioners' interpretation does not even achieve the narrower **\*600** purpose that prompted codification of the right. If, as they

believe, the Second Amendment right is no more than the right to keep and use weapons as a member of an organized militia, see Brief for Petitioners 8—if, that is, the *organized* militia is the sole institutional beneficiary of the Second Amendment's guarantee—it does not assure the existence of a "citizens' militia" as a safeguard against tyranny. For Congress retains plenary authority to organize the militia, which must include the authority to say who will belong to the organized force. [17] That is why the first Militia Act's requirement that only whites enroll caused States to amend their militia laws to exclude free blacks. See Siegel, The Federal Government's Power to Enact Color–Conscious Laws, 92 Nw. U.L.Rev. 477, 521–525 (1998). Thus, if petitioners are correct, the Second Amendment protects citizens' right to use a gun in an organization from which Congress has plenary authority to exclude them. It guarantees a select militia of the sort the Stuart kings found useful, but not the people's militia that was the concern of the founding generation.

17     Article I, § 8, cl. 16, of the Constitution gives Congress the power

> "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

It could not be clearer that Congress's "organizing" power, unlike its "governing" power, can be invoked even for that part of the militia not "employed in the Service of the United States." Justice STEVENS provides no support whatever for his contrary view, see *post,* at 2832, n. 20. Both the Federalists and Antifederalists read the provision as it was written, to permit the creation of a "select" militia. See The Federalist No. 29, pp. 226, 227 (B. Wright ed.1961); Centinel, Revived, No. XXIX, Philadelphia Independent Gazetteer, Sept. 9, 1789, in Young 711, 712.

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4854 Page 30 of 131
District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

B

Our interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately **\*601** followed adoption of the Second Amendment. Four States adopted analogues to the Federal Second Amendment in the period between independence and the ratification of the Bill of Rights. Two of them—Pennsylvania and Vermont—clearly adopted individual rights unconnected to militia service. Pennsylvania's Declaration of Rights of 1776 said: "That the people have a right to bear arms *for the defence of themselves* and the state ...." § XIII, in 5 Thorpe 3082, 3083 (emphasis added). In 1777, Vermont adopted the identical provision, except for inconsequential differences in punctuation and capitalization. See Vt. Const., ch. 1, § XV, in 6 *id.*, at 3741.

North Carolina also codified a right to bear arms in 1776: "That the people have a right to bear arms, for the defence of the State ...." Declaration of Rights § XVII, in 5 *id.*, at 2787, 2788. This could plausibly be read to support only a right to bear arms in a militia—but that is a peculiar way to make the point in a constitution that elsewhere repeatedly mentions the militia explicitly. See N. C. Const., §§ XIV, XVIII, XXXV, in *id.*, at 2789, 2791, 2793. Many colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that "for the security and *defence of this province* from internal dangers and insurrections" required those men who qualified for militia duty individually "to **\*\*2803** carry fire arms" "to places of public worship." 19 Colonial Records of the State of Georgia 137–139 (A. Candler ed.1911 (pt. 1)) (emphasis added). That broad public-safety understanding was the connotation given to the North Carolina right by that State's Supreme Court in 1843. See *State v. Huntly,* 25 N.C. 418, 25 N. C. 418, 422–423.

The 1780 Massachusetts Constitution presented another variation on the theme: "The people have a right to keep and to bear arms for the common defence ...." Pt. First, Art. XVII, in 3 Thorpe 1888, 1892. Once again, if one gives narrow meaning to the phrase "common defence" this can be thought to limit the right to the bearing of arms in a **\*602** state-organized military force. But once again the State's highest court thought otherwise. Writing for the court in an 1825 libel case, Chief Justice Parker wrote: "The liberty of the press was to be unrestrained, but he who used it was to be responsible in cases of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction."

*Commonwealth v. Blanding,* 20 Mass. 304, 313–314. The analogy makes no sense if firearms could not be used for any individual purpose at all. See also Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L.Rev. 204, 244 (1983) (19th-century courts never read "common defence" to limit the use of weapons to militia service).

We therefore believe that the most likely reading of all four of these pre-Second Amendment state constitutional provisions is that they secured an individual right to bear arms for defensive purposes. Other States did not include rights to bear arms in their pre–1789 constitutions—although in Virginia a Second Amendment analogue was proposed (unsuccessfully) by Thomas Jefferson. (It read: "No freeman shall ever be debarred the use of arms [within his own lands or tenements]." [18] 1 The Papers of Thomas Jefferson 344 (J. Boyd ed.1950).)

18    Justice STEVENS says that the drafters of the Virginia Declaration of Rights rejected this proposal and adopted "instead" a provision written by George Mason stressing the importance of the militia. See *post,* at 2835, and n. 24. There is no evidence that the drafters regarded the Mason proposal as a substitute for the Jefferson proposal.

Between 1789 and 1820, nine States adopted Second Amendment analogues. Four of them—Kentucky, Ohio, Indiana, and Missouri—referred to the right of the people to "bear arms in defence of themselves and the State." See n. 8, *supra.* Another three States—Mississippi, Connecticut, and Alabama—used the even more individualistic phrasing that each citizen has the "right to bear arms in defence of himself and the State." See *ibid.* Finally, two States—Tennessee and Maine—used the "common defence" language **\*603** of Massachusetts. See Tenn. Const., Art. XI, § 26 (1796), in 6 Thorpe 3414, 3424; Me. Const., Art. I, § 16 (1819), in 3 *id.*, at 1646, 1648. That of the nine state constitutional protections for the right to bear arms enacted immediately after 1789 at least seven unequivocally protected an individual citizen's right to self-defense is strong evidence that that is how the founding generation conceived of the right. And with one possible exception that we discuss in Part II–D–2, 19th-century courts and commentators interpreted these state constitutional provisions to protect an individual right to use arms for self-defense. See n. 9, *supra; Simpson v. State,* 13 Tenn. 356, 5 Yer. 356, 360 (1833).

The historical narrative that petitioners must endorse would thus treat the Federal Second Amendment as an odd outlier,

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4855 Page 31 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

protecting a right unknown in state constitutions or at English common law, based on **2804 little more than an overreading of the prefatory clause.

C

Justice STEVENS relies on the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress. It is dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right, rather than to fashion a new one. But even assuming that this legislative history is relevant, Justice STEVENS flatly misreads the historical record.

It is true, as Justice STEVENS says, that there was concern that the Federal Government would abolish the institution of the state militia. See *post,* at 2832 – 2833. That concern found expression, however, *not* in the various Second Amendment precursors proposed in the state conventions, but in separate structural provisions that would have given the States concurrent and seemingly non-pre-emptible authority to organize, discipline, and arm the militia when the Federal Government failed to do so. See Veit 17, 20 (Virginia proposal); 4 J. Eliot, The Debates in the Several State *604 Conventions on the Adoption of the Federal Constitution 244, 245 (2d ed. 1836) (reprinted 1941) (North Carolina proposal); see also 2 Documentary Hist. 624 (Pennsylvania minority's proposal). The Second Amendment precursors, by contrast, referred to the individual English right already codified in two (and probably four) state constitutions. The Federalist-dominated first Congress chose to reject virtually all major structural revisions favored by the Antifederalists, including the proposed militia amendments. Rather, it adopted primarily the popular and uncontroversial (though, in the Federalists' view, unnecessary) individual-rights amendments. The Second Amendment right, protecting only individuals' liberty to keep and carry arms, did nothing to assuage Antifederalists' concerns about federal control of the militia. See, *e.g.,* Centinel, Revived, No. XXIX, Philadelphia Independent Gazetteer, Sept. 9, 1789, in Young 711, 712.

Justice STEVENS thinks it significant that the Virginia, New York, and North Carolina Second Amendment proposals were "embedded ... within a group of principles that are distinctly military in meaning," such as statements about the danger of standing armies. *Post,* at 2833 – 2834. But so was the highly influential minority proposal in Pennsylvania, yet that proposal, with its reference to hunting, plainly referred to

an individual right. See 2 Documentary Hist. 624. Other than that erroneous point, Justice STEVENS has brought forward absolutely no evidence that those proposals conferred only a right to carry arms in a militia. By contrast, New Hampshire's proposal, the Pennsylvania minority's proposal, and Samuel Adams' proposal in Massachusetts unequivocally referred to individual rights, as did two state constitutional provisions at the time. See Veit 16, 17 (New Hampshire proposal); 6 Documentary Hist. 1452, 1453 (J. Kaminski & G. Saladino eds. 2000) (Samuel Adams' proposal). Justice STEVENS' view thus relies on the proposition, unsupported by any evidence, that different people of the founding period *605 had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties.

D

We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century. Before proceeding, **2805 however, we take issue with Justice STEVENS' equating of these sources with postenactment legislative history, a comparison that betrays a fundamental misunderstanding of a court's interpretive task. See *post,* at 2837, n. 28. " '[L]egislative history,' " of course, refers to the pre-enactment statements of those who drafted or voted for a law; it is considered persuasive by some, not because they reflect the general understanding of the disputed terms, but because the legislators who heard or read those statements presumably voted with that understanding. *Ibid.* "[P]ostenactment legislative history," *ibid.,* a deprecatory contradiction in terms, refers to statements of those who drafted or voted for the law that are made after its enactment and hence could have had no effect on the congressional vote. It most certainly does not refer to the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification. That sort of inquiry is a critical tool of constitutional interpretation. As we will show, virtually all interpreters of the Second Amendment in the century after its enactment interpreted the Amendment as we do.

**1. Postratification Commentary.**

Three important founding-era legal scholars interpreted the Second Amendment in published writings. All three

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4856 Page 32 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

understood it to protect an individual right unconnected with militia service.

**\*606** St. George Tucker's version of Blackstone's Commentaries, as we explained above, conceived of the Blackstonian arms right as necessary for self-defense. He equated that right, absent the religious and class-based restrictions, with the Second Amendment. See 2 Tucker's Blackstone 143. In Note D, entitled, "View of the Constitution of the United States," Tucker elaborated on the Second Amendment: "This may be considered as the true palladium of liberty .... The right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." 1 *id.,* at App. 300 (ellipsis in original). He believed that the English game laws had abridged the right by prohibiting "keeping a gun or other engine for the destruction of game." *Ibid.*; see also 2 *id.,* at 143, and nn. 40 and 41. He later grouped the right with some of the individual rights included in the First Amendment and said that if "a law be passed by congress, prohibiting" any of those rights, it would "be the province of the judiciary to pronounce whether any such act were constitutional, or not; and if not, to acquit the accused ...." 1 *id.,* at App. 357. It is unlikely that Tucker was referring to a person's being "accused" of violating a law making it a crime to bear arms in a state militia. [19]

[19]     JUSTICE STEVENS quotes some of Tucker's unpublished notes, which he claims show that Tucker had ambiguous views about the Second Amendment. See *post,* at 31, and n. 32. But it is clear from the notes that Tucker located the power of States to arm their militias in the *Tenth* Amendment, and that he cited the Second Amendment for the proposition that such armament could not run afoul of any power of the Federal Government (since the Amendment prohibits Congress from ordering disarmament). Nothing in the passage implies that the Second Amendment pertains only to the carrying of arms in the organized militia.

**\*607** In 1825, William Rawle, a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the **\*\*2806** Bill of Rights, published an influential treatise, which analyzed the Second Amendment as follows:

"The first [principle] is a declaration that a well regulated militia is necessary to the security of a free state; a proposition from which few will dissent ....

"The corollary, from the first position is, that the right of the people to keep and bear arms shall not be infringed.

"The prohibition is general. No clause in the constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both." Rawle 121–122. [20]

[20]     Rawle, writing before our decision in *Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 8 L.Ed. 672 (1833), believed that the Second Amendment could be applied against the States. Such a belief would of course be nonsensical on petitioners' view that it protected only a right to possess and carry arms when conscripted by the State itself into militia service.

Like Tucker, Rawle regarded the English game laws as violating the right codified in the Second Amendment. See *id.,* at 122–123. Rawle clearly differentiated between the people's right to bear arms and their service in a militia: "In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens, divided into military bands, and instructed at least in part, in the use of arms for the purposes of war." *Id.,* at 140. Rawle further said that the Second Amendment right ought not "be abused to the disturbance of the public peace," such as by assembling with other armed individuals "for an **\*608** unlawful purpose"—statements that make no sense if the right does not extend to *any* individual purpose. *Id.,* at 123.

Joseph Story published his famous Commentaries on the Constitution of the United States in 1833. Justice STEVENS suggests that "[t]here is not so much as a whisper" in Story's explanation of the Second Amendment that favors the individual-rights view. *Post,* at 2840. That is wrong. Story explained that the English Bill of Rights had also included a "right to bear arms," a right that, as we have discussed, had nothing to do with militia service. 3 Story § 1858. He then equated the English right with the Second Amendment:

"§ 1891. A similar provision [to the Second Amendment] in favour of protestants (for to them it is confined) is to be

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4857 Page 33 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

found in the bill of rights of 1688, it being declared, 'that the subjects, which are protestants, may have arms for their defence suitable to their condition, and as allowed by law.' But under various pretences the effect of this provision has been greatly narrowed; and it is at present in England more nominal than real, as a defensive privilege." (Footnotes omitted.)

This comparison to the Declaration of Right would not make sense if the Second Amendment right was the right to use a gun in a militia, which was plainly not what the English right protected. As the Tennessee Supreme Court recognized 38 years after Story wrote his Commentaries, "[t]he passage from Story, shows clearly that this right was intended ... and was guaranteed to, and to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights." *Andrews v. State,* 50 Tenn. 165, 183 – 184 (1871). Story's Commentaries also cite as support Tucker and Rawle, both of whom clearly viewed the right as **\*\*2807** unconnected to militia service. See 3 Story § 1890, n. 2, § 1891, n. 3. In addition, in a shorter 1840 work Story wrote: "One of the ordinary modes, by which **\*609** tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia." A Familiar Exposition of the Constitution of the United States § 450 (reprinted 1986).

Antislavery advocates routinely invoked the right to bear arms for self-defense. Joel Tiffany, for example, citing Blackstone's description of the right, wrote that "the right to keep and bear arms, also implies the right to use them if necessary in self defence; without this right to use the guaranty would have hardly been worth the paper it consumed." A Treatise on the Unconstitutionality of American Slavery 117–118 (1849); see also L. Spooner, The Unconstitutionality of Slavery 116 (1845) (right enables "personal defence"). In his famous Senate speech about the 1856 "Bleeding Kansas" conflict, Charles Sumner proclaimed:

"The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet such is the madness of the hour, that, in defiance of the solemn guarantee, embodied in the Amendments to the Constitution, that 'the right of

the people to keep and bear arms shall not be infringed,' the people of Kansas have been arraigned for keeping and bearing them, and the Senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed—of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment." The Crime Against Kansas, May 19–20, 1856, in American Speeches: Political Oratory From the Revolution to the Civil War 553, 606–607 (T. Widmer ed. 2006).

**\*610** We have found only one early-19th century-commentator who clearly conditioned the right to keep and bear arms upon service in the militia—and he recognized that the prevailing view was to the contrary. "The provision of the constitution, declaring the right of the people to keep and bear arms, & c. was probably intended to apply to the right of the people to bear arms for such [militia-related] purposes only, and not to prevent congress or the legislatures of the different states from enacting laws to prevent the citizens from always going armed. A different construction however has been given to it." B. Oliver, The Rights of an American Citizen 177 (1832).

## 2. Pre–Civil War Case Law.

The 19th-century cases that interpreted the Second Amendment universally support an individual right unconnected to militia service. In *Houston v. Moore,* 5 Wheat. 1, 24, 5 L.Ed. 19 (1820), this Court held that States have concurrent power over the militia, at least where not pre-empted by Congress. Agreeing in dissent that States could "organize, arm, and discipline" the militia in the absence of conflicting federal regulation, Justice Story said that the Second Amendment "may not, perhaps, be thought to have any important bearing on this point. If it have, it confirms and illustrates, rather than impugns the reasoning already suggested." *Id.,* at 51–53. Of course, if the Amendment simply "protect[ed] the right of the people of each of the several States to maintain a well-regulated militia," *post,* at 2822 (STEVENS, J., dissenting), it would have enormous **\*\*2808** and obvious bearing on the point. But the Court and Story derived the States' power over the militia from the nonexclusive nature of federal power, not from the Second Amendment, whose preamble merely "confirms and illustrates" the importance of the militia. Even clearer was Justice Baldwin. In the famous fugitive-slave case of **\*611** *Johnson v. Tompkins,* 13 F. Cas. 840, 850, 852 (CC Pa. 1833), Baldwin, sitting as a Circuit Judge, cited both the Second Amendment and the Pennsylvania analogue for his conclusion that a citizen has "a right to carry arms in defence

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4858 Page 34 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

of his property or person, and to use them, if either were assailed with such force, numbers or violence as made it necessary for the protection or safety of either."

Many early-19th century state cases indicated that the Second Amendment right to bear arms was an individual right unconnected to militia service, though subject to certain restrictions. A Virginia case in 1824 holding that the Constitution did not extend to free blacks explained: "[N]umerous restrictions imposed on [blacks] in our Statute Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States as respects the free whites, demonstrate, that, here, those instruments have not been considered to extend equally to both classes of our population. We will only instance the restriction upon the migration of free blacks into this State, and upon their right to bear arms." *Aldridge v. Commonwealth,* 4 Va. 447, 2 Va. Cas. 447, 449 (Gen.Ct.). The claim was obviously not that blacks were prevented from carrying guns in the militia. [21] See also *Waters v. State,* 1 Gill 302, 309 (Md.1843) *612 (because free blacks were treated as a "dangerous population," "laws have been passed to prevent their migration into this State; to make it unlawful for them to bear arms; to guard even their religious assemblages with peculiar watchfulness"). An 1829 decision by the Supreme Court of Michigan said: "The constitution of the United States also grants to the citizen the right to keep and bear arms. But the grant of this privilege cannot be construed into the right in him who keeps a gun to destroy his neighbor. No rights are intended to be granted by the constitution for an unlawful or unjustifiable purpose." *United States v. Sheldon,* in 5 Transactions of the Supreme Court of the Territory of Michigan 337, 346 (W. Blume ed.1940) (hereinafter Blume). It is not possible to read this as discussing anything other than an individual right unconnected to militia service. If it did have to do with militia service, the limitation upon it would not be any "unlawful or unjustifiable purpose," but any nonmilitary purpose whatsoever.

[21]   Justice STEVENS suggests that this is not obvious because free blacks in Virginia had been required to muster without arms. See *post,* at 2837, n. 29 (citing Siegel, The Federal Government's Power to Enact Color–Conscious Laws, 92 Nw. U.L.Rev. 477, 497 (1998)). But that could not have been the type of law referred to in *Aldridge,* because that practice had stopped 30 years earlier when blacks were excluded entirely from the militia by the first militia Act. See Siegel, *supra,* at 498, n. 120. Justice STEVENS further suggests that

laws barring blacks from militia service could have been said to violate the "right to bear arms." But under Justice STEVENS' reading of the Second Amendment (we think), the protected right is the right to carry arms to the extent one is enrolled in the militia, not the right *to be in the militia.* Perhaps Justice STEVENS really does adopt the full-blown idiomatic meaning of "bear arms," in which case every man and woman in this country has a right "to be a soldier" or even "to wage war." In any case, it is clear to us that *Aldridge*'s allusion to the existing Virginia "restriction" upon the right of free blacks "to bear arms" could only have referred to "laws prohibiting free blacks from keeping weapons," Siegel, *supra,* at 497–498.

**2809   In *Nunn v. State,* 1 Ga. 243, 251 (1846), the Georgia Supreme Court construed the Second Amendment as protecting the "*natural* right of self-defence" and therefore struck down a ban on carrying pistols openly. Its opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right:

"The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia,* shall not be *infringed,* curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary *613 to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right,* originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, re-established by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own *Magna Charta!*" *Ibid.*

Likewise, in *State v. Chandler,* 5 La. Ann. 489, 490 (1850), the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

Those who believe that the Second Amendment preserves only a militia-centered right place great reliance on the Tennessee Supreme Court's 1840 decision in *Aymette v. State,* 21 Tenn. 154. The case does not stand for that

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4859   Page 35 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

broad proposition; in fact, the case does not mention the word "militia" at all, except in its quoting of the Second Amendment. *Aymette* held that the state constitutional guarantee of the right to "bear" arms did not prohibit the banning of concealed weapons. The opinion first recognized that both the state right and the federal right were descendents of the 1689 English right, but (erroneously, and contrary to virtually all other authorities) read that right to refer only to "protect[ion of] the public liberty" and "keep[ing] in awe those who are in power," *id.,* at 158. The court then adopted a sort of middle position, whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny. This odd reading of the right is, to be sure, not the one we adopt —but it is not petitioners' reading either. More importantly, seven years earlier the Tennessee Supreme Court **\*614** had treated the state constitutional provision as conferring a right "to all the free citizens of the State to keep and bear arms for their defence," *Simpson,* 13 Tenn. 356, 5 Yer., at 360; and 21 years later the court held that the "keep" portion of the state constitutional right included the right to personal self-defense: "[T]he right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace." *Andrews,* 50 Tenn., at 178 – 179; see also *ibid.* (equating state provision with Second Amendment).

### 3. Post–Civil War Legislation.

In the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether **\*\*2810** and how to secure constitutional rights for newly free slaves. See generally S. Halbrook, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876 (1998) (hereinafter Halbrook); Brief for Institute for Justice as *Amicus Curiae.* Since those discussions took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources. Yet those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens; their understanding of the origins and continuing significance of the Amendment is instructive.

Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms. Needless to say, the claim was not that blacks

were being prohibited from carrying arms in an organized state militia. A Report of the Commission of the Freedmen's Bureau in 1866 stated plainly: "[T]he civil law [of Kentucky] prohibits the colored man from bearing arms .... Their arms are taken from them by the civil **\*615** authorities .... Thus, the right of the people to keep and bear arms as provided in the Constitution is *infringed.*" H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236. A joint congressional Report decried:

> "[I]n some parts of [South Carolina,] armed parties are, without proper authority, engaged in seizing all fire-arms found in the hands of the freedmen. Such conduct is in plain and direct violation of their personal rights as guaranteed by the Constitution of the United States, which declares that 'the right of the people to keep and bear arms shall not be infringed.' The freedmen of South Carolina have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms, and they need them to kill game for subsistence, and to protect their crops from destruction by birds and animals." Joint Comm. on Reconstruction, H.R.Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (Proposed Circular of Brigadier General R. Saxton).

The view expressed in these statements was widely reported and was apparently widely held. For example, an editorial in The Loyal Georgian (Augusta) on February 3, 1866, assured blacks that "[a]ll men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves." Halbrook 19.

Congress enacted the Freedmen's Bureau Act on July 16, 1866. Section 14 stated:

> "[T]he right ... to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens ... without respect to race or color, or previous condition of slavery ...." 14 Stat. 176–177.

The understanding that the Second Amendment gave freed blacks the right to keep and bear arms was reflected in congressional **\*616** discussion of the bill, with even an opponent of it saying that the founding generation "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense." Cong. Globe, 39th Cong., 1st Sess., 362, 371 (1866) (Sen. Davis).

Case 2:19-cv-00037-JNP  Document 59-31  Filed 11/30/22  PageID.4860  Page 36 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Similar discussion attended the passage of the Civil Rights Act of 1871 and the Fourteenth Amendment. For example, Representative Butler said of the Act: "Section eight is intended to enforce the well-known constitutional provision guaranteeing **\*\*2811** the right of the citizen to 'keep and bear arms,' and provides that whoever shall take away, by force or violence, or by threats and intimidation, the arms and weapons which any person may have for his defense, shall be deemed guilty of larceny of the same." H.R.Rep. No. 37, 41st Cong., 3d Sess., 7–8 (1871). With respect to the proposed Amendment, Senator Pomeroy described as one of the three "indispensable" "safeguards of liberty ... under the Constitution" a man's "right to bear arms for the defense of himself and family and his homestead." Cong. Globe, 39th Cong., 1st Sess., 1182 (1866). Representative Nye thought the Fourteenth Amendment unnecessary because "[a]s citizens of the United States [blacks] have equal right to protection, and to keep and bear arms for self-defense." *Id.,* at 1073.

It was plainly the understanding in the post-Civil War Congress that the Second Amendment protected an individual right to use arms for self-defense.

**4. Post–Civil War Commentators.**

Every late–19th–century legal scholar that we have read interpreted the Second Amendment to secure an individual right unconnected with militia service. The most famous was the judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations. Concerning the Second Amendment it said:

"Among the other defences to personal liberty should be mentioned the right of the people to keep and bear **\*617** arms .... The alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms. How far it is in the power of the legislature to regulate this right, we shall not undertake to say, as happily there has been very little occasion to discuss that subject by the courts." *Id.,* at 350.

That Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms, is made even clearer in his 1880 work, General Principles of Constitutional Law. The Second Amendment, he said, "was adopted with some modification and enlargement from the English Bill of Rights of 1688, where it stood as a protest against arbitrary action of the overturned dynasty in disarming the people." *Id.,* at 270. In a section entitled "The Right in General," he continued:

"It might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. The militia, as has been elsewhere explained, consists of those persons who, under the law, are liable to the performance of military duty, and are officered and enrolled for service when called upon. But the law may make provision for the enrolment of all who are fit to perform military duty, or of a small number only, or it may wholly omit to make any provision at all; and if the right were limited to those enrolled, the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose. But this enables government to have a well-regulated militia; for to bear arms implies something more than the mere keeping; it **\*618** implies the learning to handle and use them in a way that makes those who keep them ready for **\*\*2812** their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Id.,* at 271.

All other post-Civil War 19th-century sources we have found concurred with Cooley. One example from each decade will convey the general flavor:

"[The purpose of the Second Amendment is] to secure a well-armed militia .... But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms .... The clause is analogous to the one securing the freedom of speech and of the press. Freedom, not license, is secured; the fair use, not the libellous abuse, is protected." J. Pomeroy, An Introduction to the Constitutional Law of the United States § 239, pp. 152–153 (1868) (hereinafter Pomeroy).

"As the Constitution of the United States, and the constitutions of several of the states, in terms more or less comprehensive, declare the right of the people to keep and bear arms, it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons,

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4861 Page 37 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

when not on a journey, or as travellers, from *wearing or carrying concealed weapons,* be constitutional. There has been a great difference of opinion on the question." 2 J. Kent, Commentaries on American Law *340, n. 2 (O. Holmes ed., 12th ed. 1873) (hereinafter Kent).

**\*619** "Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war. The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right. No doubt, a person whose residence or duties involve peculiar peril may keep a pistol for prudent self-defence." B. Abbott, Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land 333 (1880) (hereinafter Abbott).

"The right to bear arms has always been the distinctive privilege of freemen. Aside from any necessity of self-protection to the person, it represents among all nations power coupled with the exercise of a certain jurisdiction. ... [I]t was not necessary that the right to bear arms should be granted in the Constitution, for it had always existed." J. Ordronaux, Constitutional Legislation in the United States 241–242 (1891).

E

We now ask whether any of our precedents forecloses the conclusions we have reached about the meaning of the Second Amendment.

*United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588, in the course of vacating the convictions of members of a white mob for depriving blacks of their right to keep and bear arms, held that the Second Amendment does not by its own force apply to anyone other than the Federal Government. The opinion explained that the right "is not a right granted by the Constitution [or] in any manner dependent upon that instrument for its existence. **\*\*2813** The second amendment ... means no more **\*620** than that it shall not be infringed by Congress." *Id.,* at 553. States, we said, were free to restrict or protect the right under their police powers. The limited discussion of the Second Amendment in *Cruikshank* supports, if anything, the individual-rights

interpretation. There was no claim in *Cruikshank* that the victims had been deprived of their right to carry arms in a militia; indeed, the Governor had disbanded the local militia unit the year before the mob's attack, see C. Lane, The Day Freedom Died 62 (2008). We described the right protected by the Second Amendment as " 'bearing arms for a lawful purpose' " [22] and said that "the people [must] look for their protection against any violation by their fellow-citizens of the rights it recognizes" to the States' police power. 92 U.S., at 553. That discussion makes little sense if it is only a right to bear arms in a state militia. [23]

[22]   Justice STEVENS' accusation that this is "not accurate," *post,* at 2843, is wrong. It is true it was the indictment that described the right as "bearing arms for a lawful purpose." But, in explicit reference to the right described in the indictment, the Court stated that "[t]he second amendment declares that it [*i.e.,* the right of bearing arms for a lawful purpose] shall not be infringed." 92 U.S., at 553.

[23]   With respect to *Cruikshank*'s continuing validity on incorporation, a question not presented by this case, we note that *Cruikshank* also said that the First Amendment did not apply against the States and did not engage in the sort of Fourteenth Amendment inquiry required by our later cases. Our later decisions in *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886), and *Miller v. Texas,* 153 U.S. 535, 538, 14 S.Ct. 874, 38 L.Ed. 812 (1894), reaffirmed that the Second Amendment applies only to the Federal Government.

*Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), held that the right to keep and bear arms was not violated by a law that forbade "bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law." *Id.,* at 264–265, 6 S.Ct. 580. This does not refute the individual-rights interpretation of the Amendment; no one supporting that interpretation has contended that States may not ban such groups. Justice STEVENS **\*621** presses *Presser* into service to support his view that the right to bear arms is limited to service in the militia by joining *Presser*'s brief discussion of the Second Amendment with a later portion of the opinion making the seemingly relevant (to the Second Amendment) point that the plaintiff was not a member of the state militia. Unfortunately for Justice STEVENS' argument, that later portion deals with the *Fourteenth Amendment;* it was the *Fourteenth Amendment* to which the plaintiff's nonmembership in the militia was relevant. Thus, Justice STEVENS' statement that *Presser* "suggested that ... nothing

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4862   Page 38 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

in the Constitution protected the use of arms outside the context of a militia," *post,* at 2843, is simply wrong. *Presser* said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations.

Justice STEVENS places overwhelming reliance upon this Court's decision in *Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206. "[H]undreds of judges," we are told, "have relied on the view of the Amendment we endorsed there," *post,* at 2823, and "[e]ven if the textual and historical arguments on both sides of the issue were evenly balanced, respect for the well-settled views of all of our predecessors on this Court, and for the rule of law itself ... **\*\*2814** would prevent most jurists from endorsing such a dramatic upheaval in the law," *post,* at 2824. And what is, according to Justice STEVENS, the holding of *Miller* that demands such obeisance? That the Second Amendment "protects the right to keep and bear arms for certain military purposes, but that it does not curtail the Legislature's power to regulate the nonmilitary use and ownership of weapons." *Post,* at 2823.

Nothing so clearly demonstrates the weakness of Justice STEVENS' case. *Miller* did not hold that and cannot possibly be read to have held that. The judgment in the case upheld against a Second Amendment challenge two men's federal indictment for transporting an unregistered short-barreled **\*622** shotgun in interstate commerce, in violation of the National Firearms Act, 48 Stat. 1236. It is entirely clear that the Court's basis for saying that the Second Amendment did not apply was *not* that the defendants were "bear [ing] arms" not "for ... military purposes" but for "nonmilitary use," *post,* at 2823. Rather, it was that the *type of weapon at issue* was not eligible for Second Amendment protection: "In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument.*" 307 U.S., at 178, 59 S.Ct. 816 (emphasis added). "Certainly," the Court continued, "it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." *Ibid.* Beyond that, the opinion provided no explanation of the content of the right.

This holding is not only consistent with, but positively suggests, that the Second Amendment confers an individual right to keep and bear arms (though only arms that "have

some reasonable relationship to the preservation or efficiency of a well regulated militia"). Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen. Justice STEVENS can say again and again that *Miller* did not "turn on the difference between muskets and sawed-off shotguns; it turned, rather, on the basic difference between the military and nonmilitary use and possession of guns," *post,* at 2845, but the words of the opinion prove otherwise. The most Justice STEVENS can plausibly claim for *Miller* is that it declined to decide the nature of the Second Amendment right, despite the Solicitor General's argument (made in the alternative) that the right was collective, see Brief for United States, O.T.1938, **\*623** No. 696, pp. 4– 5. *Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons.

It is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment. Justice STEVENS claims, *post,* at 2845, that the opinion reached its conclusion "[a]fter reviewing many of the same sources that are discussed at greater length by the Court today." Not many, which was not entirely the Court's fault. The defendants made no appearance in the case, neither filing a brief nor appearing at oral argument; the Court heard from no one but the Government (reason enough, one would think, not to make that case the beginning and the end of this Court's consideration of the Second Amendment). See Frye, The Peculiar Story of *United States v. Miller,* 3 N.Y.U.J.L. & Liberty 48, 65–68 (2008). The Government's brief **\*\*2815** spent two pages discussing English legal sources, concluding "that at least the carrying of weapons without lawful occasion or excuse was always a crime" and that (because of the class-based restrictions and the prohibition on terrorizing people with dangerous or unusual weapons) "the early English law did not guarantee an unrestricted right to bear arms." Brief for United States, O.T.1938, No. 696, at 9–11. It then went on to rely primarily on the discussion of the English right to bear arms in *Aymette v. State,* 21 Tenn. 154, for the proposition that the only uses of arms protected by the Second Amendment are those that relate to the militia, not self-defense. See Brief for United States, O.T.1938, No. 696, at 12–18. The final section of the brief recognized that "some courts have said that the right to bear arms includes the right of the individual to have them for the protection of his person and property," and launched an alternative argument

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4863 Page 39 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

that "weapons which are commonly used by criminals," such as sawed-off shotguns, are not protected. See *id.,* at 18–21. The Government's *Miller* brief thus provided **\*624** scant discussion of the history of the Second Amendment—and the Court was presented with no counterdiscussion. As for the text of the Court's opinion itself, that discusses *none* of the history of the Second Amendment. It assumes from the prologue that the Amendment was designed to preserve the militia, 307 U.S., at 178, 59 S.Ct. 816 (which we do not dispute), and then reviews some historical materials dealing with the nature of the militia, and in particular with the nature of the arms their members were expected to possess, *id.,* at 178–182, 59 S.Ct. 816. Not a word *(not a word)* about the history of the Second Amendment. This is the mighty rock upon which the dissent rests its case. [24]

[24] As for the "hundreds of judges," *post,* at 2823, who have relied on the view of the Second Amendment Justice STEVENS claims we endorsed in *Miller:* If so, they overread *Miller.* And their erroneous reliance upon an uncontested and virtually unreasoned case cannot nullify the reliance of millions of Americans (as our historical analysis has shown) upon the true meaning of the right to keep and bear arms. In any event, it should not be thought that the cases decided by these judges would necessarily have come out differently under a proper interpretation of the right.

We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits. Read in isolation, *Miller's* phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller* 's "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial **\*625** and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler,* 289 Ore. 359, 368, 614 P.2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973)). Indeed, that is precisely the way in which the

Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read *Miller* to say only that the **\*\*2816** Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right, see Part III, *infra.* [25]

[25] *Miller* was briefly mentioned in our decision in *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), an appeal from a conviction for being a felon in possession of a firearm. The challenge was based on the contention that the prior felony conviction had been unconstitutional. No Second Amendment claim was raised or briefed by any party. In the course of rejecting the asserted challenge, the Court commented gratuitously, in a footnote, that "[t]hese legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. See *United States v. Miller* ... (the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia')." *Id.,* at 65–66, n. 8, 100 S.Ct. 915. The footnote then cites several Court of Appeals cases to the same effect. It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued.

We conclude that nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment. It should be unsurprising that such a significant matter has been for so long judicially unresolved. For most of our history, the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens. Other provisions of the Bill of Rights have similarly remained unilluminated for lengthy periods. This Court first **\*626** held a law to violate the First Amendment's guarantee of freedom of speech in 1931, almost 150 years after the Amendment was ratified, see *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and it was not until after World War II that we held a law invalid under the Establishment Clause, see *Illinois ex rel. McCollum v. Board of Ed. of School Dist. No. 71, Champaign Cty.,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Even a question as basic as the scope of proscribable libel was not addressed by this Court until 1964, nearly two centuries after the founding. See *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710,

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4864 Page 40 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

11 L.Ed.2d 686 (1964). It is demonstrably not true that, as Justice STEVENS claims, *post,* at 2844 – 2845, "for most of our history, the invalidity of Second–Amendment–based objections to firearms regulations has been well settled and uncontroversial." For most of our history the question did not present itself.

## III

 Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. See, *e.g., Sheldon,* in 5 Blume 346; Rawle 123; Pomeroy 152–153; Abbott 333. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. See, *e.g., State v. Chandler,* 5 La. Ann., at 489–490; *Nunn v. State,* 1 Ga., at 251; see generally 2 Kent *340, n. 2; The American Students' Blackstone 84, n. 11 (G. Chase ed. 1884). Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession **2817 of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing *627 conditions and qualifications on the commercial sale of arms.[26]

26    We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

 We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148–149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). See also *State v. Langford,* 10 N.C. 381, 383–384 (1824); *O'Neill v. State,* 16 Ala. 65, 67 (1849); *English v. State,* 35 Tex. 473, 476 (1871); *State v. Lanier,* 71 N.C. 288, 289 (1874).

 It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause *628 and the protected right cannot change our interpretation of the right.

## IV

 We turn finally to the law at issue here. As we have said, the law totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable.

 As the quotations earlier in this opinion demonstrate, the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights,[27] banning from the home **2818 "the most preferred firearm in the nation to 'keep' and use for *629 protection of one's home and family," 478 F.3d, at 400, would fail constitutional muster.

27    Justice BREYER correctly notes that this law, like almost all laws, would pass rational-basis scrutiny. *Post,* at 2850 – 2851. But rational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws. See, *e.g., Engquist v.*

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4865 Page 41 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

*Oregon Dept. of Agriculture,* 553 U.S. 591, 602, 128 S.Ct. 2146, 2153 – 2154, 2008 WL 2329768, *6–7, 170 L.Ed.2d 975 (2008). In those cases, "rational basis" is not just the standard of scrutiny, but the very substance of the constitutional guarantee. Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. See *United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("There may be narrower scope for operation of the presumption of constitutionality [*i.e.,* narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments ..."). If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.

Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn v. State,* the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). See 1 Ga., at 251. In *Andrews v. State,* the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," 50 Tenn., at 187, violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns. *Ibid.* See also *State v. Reid,* 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional").

It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

**\*630** We must also address the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times. This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional. The District argues that we should interpret this element of the statute to contain an exception for self-defense. See Brief for Petitioners 56–57. But we think that is precluded by the unequivocal text, and by the presence of certain other enumerated exceptions: "Except for law enforcement personnel ..., each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia." D.C.Code § 7–2507.02. The nonexistence of a self-defense exception is also suggested by the D.C. Court of Appeals' statement that the statute forbids residents to use firearms to **\*\*2819** stop intruders, see *McIntosh v. Washington,* 395 A.2d 744, 755–756 (1978). [28]

28    *McIntosh* upheld the law against a claim that it violated the Equal Protection Clause by arbitrarily distinguishing between residences and businesses. See 395 A.2d, at 755. One of the rational bases listed for that distinction was the legislative finding "that for each intruder stopped by a firearm there are four gun-related accidents within the home." *Ibid.* That tradeoff would not bear mention if the statute did not prevent stopping intruders by firearms.

Apart from his challenge to the handgun ban and the trigger-lock requirement respondent asked the District Court to enjoin petitioners from enforcing the separate licensing requirement "in such a manner as to forbid the carrying of a firearm within one's home or possessed land without a license." App. 59a. The Court of Appeals did not invalidate the licensing requirement, but held only that the District "may not prevent [a handgun] from being moved throughout one's house." 478 F.3d, at 400. It then ordered the District Court to enter summary judgment "consistent **\*631** with [respondent's] prayer for relief." *Id.,* at 401. Before this Court petitioners have stated that "if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified," by which they apparently mean if he is not a felon and is not insane. Brief for Petitioners 58. Respondent conceded at oral argument that

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4866 Page 42 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

he does not "have a problem with ... licensing" and that the District's law is permissible so long as it is "not enforced in an arbitrary and capricious manner." Tr. of Oral Arg. 74–75. We therefore assume that petitioners' issuance of a license will satisfy respondent's prayer for relief and do not address the licensing requirement.

Justice BREYER has devoted most of his separate dissent to the handgun ban. He says that, even assuming the Second Amendment is a personal guarantee of the right to bear arms, the District's prohibition is valid. He first tries to establish this by founding-era historical precedent, pointing to various restrictive laws in the colonial period. These demonstrate, in his view, that the District's law "imposes a burden upon gun owners that seems proportionately no greater than restrictions in existence at the time the Second Amendment was adopted." *Post,* at 2848. Of the laws he cites, only one offers even marginal support for his assertion. A 1783 Massachusetts law forbade the residents of Boston to "take into" or "receive into" "any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop or other Building" loaded firearms, and permitted the seizure of any loaded firearms that "shall be found" there. Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p. 218. That statute's text and its prologue, which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the "depositing of loaded Arms" in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's **\*632** application in that case). In any case, we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home. The other laws Justice BREYER cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. *Post,* at 2849 – 2850. Nothing about those fire-safety laws undermines **\*\*2820** our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns. Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents.

Justice BREYER points to other founding-era laws that he says "restricted the firing of guns within the city limits to at least some degree" in Boston, Philadelphia, and New York. *Post,* at 2848 (citing Churchill, Gun Regulation, the Police

Power, and the Right to Keep Arms in Early America, 25 Law & Hist. Rev. 139, 162 (2007)). Those laws provide no support for the severe restriction in the present case. The New York law levied a fine of 20 shillings on anyone who fired a gun in certain places (including houses) on New Year's Eve and the first two days of January, and was aimed at preventing the "great Damages ... frequently done on [those days] by persons going House to House, with Guns and other Fire Arms and being often intoxicated with Liquor." Ch. 1501, 5 Colonial Laws of New York 244–246 (1894). It is inconceivable that this law would have been enforced against a person exercising his right to self-defense on New Year's Day against such drunken hooligans. The Pennsylvania law to which Justice BREYER refers levied a fine of five shillings on one who fired a gun or set off fireworks in Philadelphia without first obtaining a license from the Governor. See Act of Aug. 26, 1721, ch. CCXLV, § IV, in 3 Stat. at Large of Pa. 253–254 (1896). Given Justice Wilson's explanation **\*633** that the right to self-defense with arms was protected by the Pennsylvania Constitution, it is unlikely that this law (which in any event amounted to at most a licensing regime) would have been enforced against a person who used firearms for self-defense. Justice BREYER cites a Rhode Island law that simply levied a 5–shilling fine on those who fired guns in *streets* and *taverns,* a law obviously inapplicable to this case. See An Act for preventing Mischief being done in the town of *Newport,* or in any other Town in this Government, 1731 Rhode Island Session Laws, pp. 240–241. Finally, Justice BREYER points to a Massachusetts law similar to the Pennsylvania law, prohibiting "discharg[ing] any Gun or Pistol charged with Shot or Ball in the Town of *Boston.*" Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay p. 208. It is again implausible that this would have been enforced against a citizen acting in self-defense, particularly given its preambulatory reference to "the *indiscreet* firing of Guns." *Ibid.* (preamble) (emphasis added).

A broader point about the laws that Justice BREYER cites: All of them punished the discharge (or loading) of guns with a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail), not with significant criminal penalties. [29] They are akin to modern penalties for minor public-safety infractions like speeding or jaywalking. And although such public-safety laws may not contain exceptions for self-defense, it is inconceivable that the threat of a jaywalking ticket would deter someone from disregarding a "Do Not Walk" sign in order to flee an attacker, or that the government would enforce those laws under such circumstances. Likewise, we do not think that a

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4867 Page 43 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

law imposing a **\*634** 5–shilling fine and forfeiture of the gun would have prevented a person in the founding era from using a **\*\*2821** gun to protect himself or his family from violence, or that if he did so the law would be enforced against him. The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even obtaining a gun in the first place. See D.C.Code § 7–2507.06.

29    The Supreme Court of Pennsylvania described the amount of five shillings in a contract matter in 1792 as "nominal consideration." *Morris's Lessee v. Smith,* 4 Dall. 119, 120, 1 L.Ed. 766 (Pa.1792). Many of the laws cited punished violation with fine in a similar amount; the 1783 Massachusetts gunpowder-storage law carried a somewhat larger fine of £ 10 (200 shillings) and forfeiture of the weapon.

Justice BREYER moves on to make a broad jurisprudential point: He criticizes us for declining to establish a level of scrutiny for evaluating Second Amendment restrictions. He proposes, explicitly at least, none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowering "interest-balancing inquiry" that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Post,* at 2852. After an exhaustive discussion of the arguments for and against gun control, Justice BREYER arrives at his interest-balanced answer: Because handgun violence is a problem, because the law is limited to an urban area, and because there were somewhat similar restrictions in the founding period (a false proposition that we have already discussed), the interest-balancing inquiry results in the constitutionality of the handgun ban. QED.

   We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted **\*635** them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful

neo-Nazi march through Skokie. See *National Socialist Party of America v. Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) *(per curiam).* The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest balancing by the people—which Justice BREYER would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

Justice BREYER chides us for leaving so many applications of the right to keep and bear arms in doubt, and for not providing extensive historical justification for those regulations of the right that we describe as permissible. See *post,* at 2869 – 2870. But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field, any more than *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879), our first in-depth Free Exercise Clause case, left that area in a state of utter certainty. And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.

   In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as **\*\*2822** does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense. Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.

\* \* \*

**\*636** We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see *supra,* at 2816 – 2817, and n. 26. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4868 Page 44 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct.

We affirm the judgment of the Court of Appeals.

*It is so ordered.*

Justice STEVENS, with whom Justice SOUTER, Justice GINSBURG, and Justice BREYER join, dissenting.
The question presented by this case is not whether the Second Amendment protects a "collective right" or an "individual right." Surely it protects a right that can be enforced by individuals. But a conclusion that the Second Amendment protects an individual right does not tell us anything about the scope of that right.

Guns are used to hunt, for self-defense, to commit crimes, for sporting activities, and to perform military duties. The Second Amendment plainly does not protect the right to use a gun to rob a bank; it is equally clear that it *does* encompass the right to use weapons for certain military purposes. Whether it also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense **\*637** is the question presented by this case. The text of the Amendment, its history, and our decision in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), provide a clear answer to that question.

The Second Amendment was adopted to protect the right of the people of each of the several States to maintain a well-regulated militia. It was a response to concerns raised during the ratification of the Constitution that the power of Congress to disarm the state militias and create a national standing army posed an intolerable threat to the sovereignty of the several States. Neither the text of the Amendment nor the arguments advanced by its proponents evidenced the slightest interest in limiting any legislature's authority to regulate private civilian uses of firearms. Specifically, there is no indication that the Framers of the Amendment intended to enshrine the common-law right of self-defense in the Constitution.

In 1934, Congress enacted the National Firearms Act, the first major federal firearms law. [1] Sustaining an indictment the

**\*\*2823** Act, this Court held that, "[i]n the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Miller,* 307 U.S., at 178, 59 S.Ct. 816. The view of the Amendment we took in *Miller*—that it protects the right to keep and bear arms for certain military purposes, but that it does not curtail the Legislature's power to regulate the nonmilitary use and ownership of weapons—is both **\*638** the most natural reading of the Amendment's text and the interpretation most faithful to the history of its adoption.

[1]     There was some limited congressional activity earlier: A 10% federal excise tax on firearms was passed as part of the Revenue Act of 1918, 40 Stat. 1057, and in 1927 a statute was enacted prohibiting the shipment of handguns, revolvers, and other concealable weapons through the United States mails. Ch. 75, 44 Stat. 1059–1060 (hereinafter 1927 Act).

Since our decision in *Miller,* hundreds of judges have relied on the view of the Amendment we endorsed there; [2] we ourselves affirmed it in 1980. See *Lewis v. United States,* 445 U.S. 55, 65–66, n. 8, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980). [3] No new evidence has surfaced since 1980 supporting the view that the Amendment was intended to curtail the power of Congress to regulate **\*639** civilian use or misuse of weapons. Indeed, a review of the drafting history of the Amendment demonstrates that its Framers *rejected* proposals that would have broadened its coverage to include such uses.

[2]     Until the Fifth Circuit's decision in *United States v. Emerson,* 270 F.3d 203 (2001), every Court of Appeals to consider the question had understood *Miller* to hold that the Second Amendment does not protect the right to possess and use guns for purely private, civilian purposes. See, *e.g., United States v. Haney,* 264 F.3d 1161, 1164–1166 (C.A.10 2001); *United States v. Napier,* 233 F.3d 394, 402–404 (C.A.6 2000); *Gillespie v. Indianapolis,* 185 F.3d 693, 710–711 (C.A.7 1999); *United States v. Scanio,* No. 97–1584, 1998 WL 802060, \*2 (C.A.2, Nov.12, 1998) (unpublished opinion); *United States v. Wright,* 117 F.3d 1265, 1271–1274 (C.A.11 1997); *United States v. Rybar,* 103 F.3d 273, 285–286 (C.A.3 1996); *Hickman v. Block,* 81 F.3d 98, 100–103 (C.A.9 1996); *United States v. Hale,* 978 F.2d 1016, 1018–1020 (C.A.8 1992); *Thomas v. City Council of Portland,* 730 F.2d 41, 42 (C.A.1 1984) *(per curiam);*

AR004400

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4869 Page 45 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

*United States v. Johnson,* 497 F.2d 548, 550 (C.A.4 1974) *(per curiam); United States v. Johnson,* 441 F.2d 1134, 1136 (C.A.5 1971); *see also Sandidge v. United States,* 520 A.2d 1057, 1058–1059 (D.C.App.1987). And a number of courts have remained firm in their prior positions, even after considering *Emerson.* See, *e.g., United States v. Lippman,* 369 F.3d 1039, 1043–1045 (C.A.8 2004); *United States v. Parker,* 362 F.3d 1279, 1282–1284 (C.A.10 2004); *United States v. Jackubowski,* 63 Fed.Appx. 959, 961 (C.A.7 2003) (unpublished opinion); *Silveira v. Lockyer,* 312 F.3d 1052, 1060–1066 (C.A.9 2002); *United States v. Milheron,* 231 F.Supp.2d 376, 378 (Me.2002); *Bach v. Pataki,* 289 F.Supp.2d 217, 224–226 (N.D.N.Y.2003); *United States v. Smith,* 56 M.J. 711, 716 (Air Force Ct. Crim. App. 2001).

3      Our discussion in *Lewis* was brief but significant. Upholding a conviction for receipt of a firearm by a felon, we wrote: "These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. See *United States v. Miller,* 307 U.S. 174, 178[, 59 S.Ct. 816, 83 L.Ed. 1206] (1939) (the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia')." 445 U.S., at 65 – 66, n. 8, 100 S.Ct. 915.

The opinion the Court announces today fails to identify any new evidence supporting the view that the Amendment was intended to limit the power of Congress to regulate civilian uses of weapons. Unable to point to any such evidence, the Court stakes its holding on a strained and unpersuasive reading of the Amendment's text; significantly different provisions in the **2824 1689 English Bill of Rights, and in various 19th-century State Constitutions; postenactment commentary that was available to the Court when it decided *Miller;* and, ultimately, a feeble attempt to distinguish *Miller* that places more emphasis on the Court's decisional process than on the reasoning in the opinion itself.

Even if the textual and historical arguments on both sides of the issue were evenly balanced, respect for the well-settled views of all of our predecessors on this Court, and for the rule of law itself, see *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 636, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (Stewart, J., dissenting), would prevent most jurists from endorsing such a dramatic upheaval in the law. [4] As Justice Cardozo observed years ago, the "labor of **640** judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks

on the secure foundation of the courses laid by others who had gone before him." The Nature of the Judicial Process 149 (1921).

4      See *Vasquez v. Hillery,* 474 U.S. 254, 265 – 266, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) ("*[Stare decisis]* permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact. While *stare decisis* is not an inexorable command, the careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged 'to bring its opinions into agreement with experience and with facts newly ascertained.' *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 412[, 52 S.Ct. 443, 76 L.Ed. 815] (1932) (Brandeis, J., dissenting)"); *Pollock v. Farmers' Loan & Trust Co.,* 157 U.S. 429, 652, 15 S.Ct. 673, 39 L.Ed. 759 (1895) (White, J., dissenting) ("The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people").

In this dissent I shall first explain why our decision in *Miller* was faithful to the text of the Second Amendment and the purposes revealed in its drafting history. I shall then comment on the postratification history of the Amendment, which makes abundantly clear that the Amendment should not be interpreted as limiting the authority of Congress to regulate the use or possession of firearms for purely civilian purposes.

I

The text of the Second Amendment is brief. It provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

Three portions of that text merit special focus: the introductory language defining the Amendment's purpose, the

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

class of persons encompassed within its reach, and the unitary nature of the right that it protects.

*"A well regulated Militia, being necessary to the security of a free State"*

The preamble to the Second Amendment makes three important points. It identifies the preservation of the militia as the Amendment's purpose; it explains that the militia is necessary to the security of a free State; and it recognizes that the militia must be "well regulated." In all three respects it is comparable to provisions in several State Declarations **\*641** of Rights that were adopted roughly contemporaneously **\*\*2825** with the Declaration of Independence. [5] Those state provisions highlight the importance members of the founding generation attached to the maintenance of state militias; they also underscore the profound fear shared by many in that era of the dangers posed by standing armies. [6] While **\*642** the need for state militias has not been a matter of significant public interest for almost two centuries, that fact should not obscure the contemporary concerns that animated the Framers.

5    The Virginia Declaration of Rights ¶ 13 (1776) provided: "That a well-regulated Militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State; that Standing Armies, in time of peace, should be avoided, as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power." 1 B. Schwartz, The Bill of Rights 235 (1971) (hereinafter Schwartz).

Maryland's Declaration of Rights, Arts. XXV–XXVII (1776), provided: "That a well-regulated militia is the proper and natural defence of a free government"; "That standing armies are dangerous to liberty, and ought not to be raised or kept up, without consent of the Legislature"; "That in all cases, and at all times, the military ought to be under strict subordination to and control of the civil power." 1 Schwartz 282.

Delaware's Declaration of Rights §§ 18–20 (1776) provided: "That a well regulated militia is the proper, natural, and safe defence of a free government"; "That standing armies are dangerous to liberty, and ought not to be raised or kept up without the consent of the Legislature"; "That in all cases and at all times the military ought to be under strict subordination to and governed by the civil power." 1 Schwartz 278.

Finally, New Hampshire's Bill of Rights, Arts. XXIV–XXVI (1783), read: "A well regulated militia is the proper, natural, and sure defence of a state"; "Standing armies are dangerous to liberty, and ought not to be raised or kept up without consent of the legislature"; "In all cases, and at all times, the military ought to be under strict subordination to, and governed by the civil power." 1 Schwartz 378. It elsewhere provided: "No person who is conscientiously scrupulous about the lawfulness of bearing arms, shall be compelled thereto, provided he will pay an equivalent." *Id.,* at 377 (Art. XIII).

6    The language of the Amendment's preamble also closely tracks the language of a number of contemporaneous state militia statutes, many of which began with nearly identical statements. Georgia's 1778 militia statute, for example, began, "[w]hereas a well ordered and disciplined Militia, is essentially necessary, to the Safety, peace and prosperity, of this State." Act of Nov. 15, 1778, 19 Colonial Records of the State of Georgia 103 (Candler ed.1911 (pt. 2)). North Carolina's 1777 militia statute started with this language: "[w]hereas a well regulated Militia is absolutely necessary for the defending and securing the Liberties of a free State." N.C. Sess. Laws ch. 1, § I, p. 1. And Connecticut's 1782 "Acts and Laws Regulating the Militia" began, "[w]hereas the Defence and Security of all free States depends (under God) upon the Exertions of a well regulated Militia, and the Laws heretofore enacted have proved inadequate to the End designed." Conn. Acts and Laws p. 585 (hereinafter 1782 Conn. Acts).

These state militia statutes give content to the notion of a "well-regulated militia." They identify those persons who compose the State's militia; they create regiments, brigades, and divisions; they set forth command structures and provide for the appointment of officers; they describe how the militia will be assembled when necessary and provide for training; and they impose penalties for nonappearance, delinquency, and failure to keep the required weapons, ammunition, and other necessary equipment. The obligation of militia members to "keep" certain specified arms is detailed further, n. 12, *infra,* and accompanying text.

The parallels between the Second Amendment and these state declarations, and the Second Amendment's omission of any statement of purpose related to the right to use firearms for hunting or personal self-defense, is especially striking in light of the fact that the Declarations of Rights of Pennsylvania and Vermont *did* expressly protect such civilian uses at the time. Article XIII of Pennsylvania's 1776 Declaration of Rights announced that "the people have a right to bear arms for the **\*\*2826** defence *of themselves* and the state," 1 Schwartz

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4871 Page 47 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

266 (emphasis added); § 43 of the Declaration ensured that "[t]he inhabitants of this state shall have the liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed," *id.,* at 274. And Article XV of the 1777 Vermont Declaration of Rights guaranteed "[t]hat the people have a right to bear arms for the defence *of themselves* and the State. *Id.,* at 324 (emphasis added).

**\*643** The contrast between those two declarations and the Second Amendment reinforces the clear statement of purpose announced in the Amendment's preamble. It confirms that the Framers' single-minded focus in crafting the constitutional guarantee "to keep and bear Arms" was on military uses of firearms, which they viewed in the context of service in state militias.

The preamble thus both sets forth the object of the Amendment and informs the meaning of the remainder of its text. Such text should not be treated as mere surplusage, for "[i]t cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison,* 1 Cranch 137, 174, 2 L.Ed. 60 (1803).

The Court today tries to denigrate the importance of this clause of the Amendment by beginning its analysis with the Amendment's operative provision and returning to the preamble merely "to ensure that our reading of the operative clause is consistent with the announced purpose." *Ante,* at 2790. That is not how this Court ordinarily reads such texts, and it is not how the preamble would have been viewed at the time the Amendment was adopted. While the Court makes the novel suggestion that it need only find some "logical connection" between the preamble and the operative provision, it does acknowledge that a prefatory clause may resolve an ambiguity in the text. *Ante,* at 2789. [7] Without **\*644** identifying any language in the text that even mentions civilian uses of firearms, the Court proceeds to "find" its preferred reading in what is at best an ambiguous text, and then concludes that its reading is not foreclosed by the preamble. Perhaps the Court's approach to the text is acceptable advocacy, but it is surely an unusual approach for judges to follow.

[7] The sources the Court cites simply do not support the proposition that some "logical connection" between the two clauses is all that is required. The Dwarris treatise, for example, merely explains that "[t]he general purview of a statute is not ... *necessarily* to be restrained by any words introductory to the enacting clauses." F. Dwarris, A General Treatise on Statutes 268 (P. Potter ed. 1871)

(emphasis added). The treatise proceeds to caution that "the preamble cannot control the enacting part of a statute, which is expressed in clear and unambiguous terms, yet, if any doubt arise on the words of the enacting part, the preamble may be resorted to, to explain it." *Id.,* at 269. Sutherland makes the same point. Explaining that "[i]n the United States preambles are not as important as they are in England," the treatise notes that in the United States "the settled principle of law is that the preamble cannot control the enacting part of the statute *in cases where the enacting part is expressed in clear, unambiguous terms.*" 2A N. Singer, Sutherland on Statutory Construction § 47.04, p. 146 (rev. 5th ed.1992) (emphasis added). Surely not even the Court believes that the Amendment's operative provision, which, though only 14 words in length, takes the Court the better part of 18 pages to parse, is perfectly "clear and unambiguous."

### *"[T]he right of the people"*

The centerpiece of the Court's textual argument is its insistence that the words "the people" as used in the Second Amendment must have the same meaning, and protect the same class of individuals, as when they are used in the First and Fourth Amendments. According to the Court, in all three provisions—as well as **\*\*2827** the Constitution's preamble, § 2 of Article I, and the Tenth Amendment —"the term unambiguously refers to all members of the political community, not an unspecified subset." *Ante,* at 2790 – 2791. But the Court *itself* reads the Second Amendment to protect a "subset" significantly narrower than the class of persons protected by the First and Fourth Amendments; when it finally drills down on the substantive meaning of the Second Amendment, the Court limits the protected class to "law-abiding, responsible citizens," *ante,* at 2821. But the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions. The Court offers no way to harmonize its conflicting pronouncements.

**\*645** The Court also overlooks the significance of the way the Framers used the phrase "the people" in these constitutional provisions. In the First Amendment, no words define the class of individuals entitled to speak, to publish, or to worship; in that Amendment it is only the right peaceably to assemble, and to petition the Government for a redress of grievances, that is described as a right of "the people." These rights contemplate collective action. While the right peaceably to assemble protects the individual rights of those

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4872 Page 48 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

persons participating in the assembly, its concern is with action engaged in by members of a group, rather than any single individual. Likewise, although the act of petitioning the Government is a right that can be exercised by individuals, it is primarily collective in nature. For if they are to be effective, petitions must involve groups of individuals acting in concert.

Similarly, the words "the people" in the Second Amendment refer back to the object announced in the Amendment's preamble. They remind us that it is the collective action of individuals having a duty to serve in the militia that the text directly protects and, perhaps more importantly, that the ultimate purpose of the Amendment was to protect the States' share of the divided sovereignty created by the Constitution.

As used in the Fourth Amendment, "the people" describes the class of persons protected from unreasonable searches and seizures by Government officials. It is true that the Fourth Amendment describes a right that need not be exercised in any collective sense. But that observation does not settle the meaning of the phrase "the people" when used in the Second Amendment. For, as we have seen, the phrase means something quite different in the Petition and Assembly Clauses of the First Amendment. Although the abstract definition of the phrase "the people" could carry the same meaning in the Second Amendment as in the Fourth Amendment, the preamble of the Second Amendment suggests that the uses of the phrase in the First and Second Amendments *646 are the same in referring to a collective activity. By way of contrast, the Fourth Amendment describes a right *against* governmental interference rather than an affirmative right *to* engage in protected conduct, and so refers to a right to protect a purely individual interest. As used in the Second Amendment, the words "the people" do not enlarge the right to keep and bear arms to encompass use or ownership of weapons outside the context of service in a well-regulated militia.

*"[T]o keep and bear Arms"*

Although the Court's discussion of these words treats them as two "phrases"—as if they read "to keep" and "to bear"—they describe a unitary right: to possess arms if needed for military purposes and to use them in conjunction with military activities.

**\*\*2828** As a threshold matter, it is worth pausing to note an oddity in the Court's interpretation of "to keep and bear Arms." Unlike the Court of Appeals, the Court does not read that phrase to create a right to possess arms for "lawful, private purposes." *Parker v. District of Columbia,* 478 F.3d 370, 382 (C.A.D.C.2007). Instead, the Court limits the Amendment's protection to the right "to possess and carry weapons in case of confrontation." *Ante,* at 2797. No party or *amicus* urged this interpretation; the Court appears to have fashioned it out of whole cloth. But although this novel limitation lacks support in the text of the Amendment, the Amendment's text *does* justify a different limitation: The "right to keep and bear Arms" protects only a right to possess and use firearms in connection with service in a state-organized militia.

The term "bear arms" is a familiar idiom; when used unadorned by any additional words, its meaning is "to serve as a soldier, do military service, fight." 1 Oxford English Dictionary 634 (2d ed.1989). It is derived from the Latin *arma ferre,* which, translated literally, means "to bear *[ferre]* war equipment *[arma]*." Brief for Professors of **\*647** Linguistics and English as *Amici Curiae* 19. One 18th-century dictionary defined "arms" as "[w]eapons of offence, or armour of defence," 1 S. Johnson, A Dictionary of the English Language (1755), and another contemporaneous source explained that "[b]y *arms,* we understand those instruments of offence generally made use of in war; such as firearms, swords, &c. By *weapons,* we more particularly mean instruments of other kinds (exclusive of fire-arms), made use of as offensive, on special occasions." 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794). [8] Had the Framers wished to expand the meaning of the phrase "bear arms" to encompass civilian possession and use, they could have done so by the addition of phrases such as "for the defense of themselves," as was done in the Pennsylvania and Vermont Declarations of Rights. The *unmodified* use of "bear arms," by contrast, refers most naturally to a military purpose, as evidenced by its use in literally dozens of contemporary texts. [9] The absence **\*648** of **\*\*2829** any reference to civilian uses of weapons tailors the text of the Amendment to the purpose identified in its preamble. [10] But when discussing these words, the Court simply ignores the preamble.

[8]     The Court's repeated citation to the dissenting opinion in *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), *ante,* at 2793, 2794, as illuminating the meaning of "bear arms," borders on the risible. At issue in *Muscarello* was the proper construction of the word "carries" in 18 U.S.C. §

AR004404

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

924(c) (1994 ed.); the dissent in that case made passing reference to the Second Amendment only in the course of observing that both the Constitution and Black's Law Dictionary suggested that something more active than placement of a gun in a glove compartment might be meant by the phrase " 'carries a firearm.' " 524 U.S., at 143, 118 S.Ct. 1911.

9      *Amici* professors of linguistics and English reviewed uses of the term "bear arms" in a compilation of books, pamphlets, and other sources disseminated in the period between the Declaration of Independence and the adoption of the Second Amendment. See Brief for Professors of Linguistics and English as 23–25. *Amici* determined that of 115 texts that employed the term, all but five usages were in a clearly military context, and in four of the remaining five instances, further qualifying language conveyed a different meaning.

The Court allows that the phrase "bear Arms" did have as an idiomatic meaning, " 'to serve as a soldier, do military service, fight,' " *ante*, at 2794, but asserts that it "*unequivocally* bore that idiomatic meaning only when followed by the preposition 'against,' which was in turn followed by the target of the hostilities," *ante*, at 2794. But contemporary sources make clear that the phrase "bear arms" was often used to convey a military meaning without those additional words. See, *e.g.,* To the Printer, Providence Gazette (May 27, 1775) ("By the common estimate of three millions of people in America, allowing one in five to bear arms, there will be found 600,000 fighting men"); Letter of Henry Laurens to the Mass. Council (Jan. 21, 1778), in Letters of Delegates to Congress 1774–1789, p. 622 (P. Smith ed. 1981) ("Congress were yesterday informed ... that those Canadians who returned from Saratoga ... had been compelled by Sir Guy Carleton to bear Arms"); Of the Manner of Making War Among the Indians of North–America, Connecticut Courant (May 23, 1785) ("The Indians begin to bear arms at the age of fifteen, and lay them aside when they arrive at the age of sixty. Some nations to the southward, I have been informed, do not continue their military exercises after they are fifty"); 28 Journals of the Continental Congress 1030 (G. Hunt ed. 1910) ("That hostages be mutually given as a security that the Convention troops and those received in exchange for them do not bear arms prior to the first day of May next"); H.R. J., 9th Cong., 1st Sess., 217 (Feb. 12, 1806) ("Whereas the commanders of British armed vessels have impressed many American seamen, and compelled them to bear arms on board said vessels, and assist in fighting their battles with nations in amity and peace with the United States"); H.R. J., 15th Cong., 2d Sess., 182–183 (Jan. 14, 1819) ("[The petitioners] state

that they were residing in the British province of Canada, at the commencement of the late war, and that owing to their attachment to the United States, they refused to bear arms, when called upon by the British authorities ...").

10     *Aymette v. State,* 21 Tenn. 154, 156 (1840), a case we cited in *Miller,* further confirms this reading of the phrase. In *Aymette,* the Tennessee Supreme Court construed the guarantee in Tennessee's 1834 Constitution that " 'the free white men of this State, have a right to keep and bear arms for their common defence.' " Explaining that the provision was adopted with the same goals as the Federal Constitution's Second Amendment, the court wrote: "The words 'bear arms' ... have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured, is of general and public nature, to be exercised by the people in a body, for their *common defence,* so the *arms,* the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment." 21 Tenn., at 158. The court elaborated: "[W]e may remark, that the phrase, ' *bear arms,'* is used in the Kentucky Constitution as well as our own, and implies, as has already been suggested, their military use .... A man in the pursuit of deer, elk, and buffaloes, might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he had *borne arms,* much less could it be said, that a private citizen *bears arms,* because he has a dirk or pistol concealed under his clothes, or a spear in a cane." *Id.,* at 161.

*649     The Court argues that a "qualifying phrase that contradicts the word or phrase it modifies is unknown this side of the looking glass." *Ante,* at 2795. But this fundamentally fails to grasp the point. The stand-alone phrase "bear arms" most naturally conveys a military meaning *unless* the addition of a qualifying phrase signals that a different meaning is intended. When, as in this case, there is no such qualifier, the most natural meaning is the military one; and, in the absence of any qualifier, it is all the more appropriate to look to the preamble to confirm the natural meaning of the text.[11] The Court's **2830 objection is particularly puzzling in light of its own contention that the addition of the modifier "against" changes the meaning of "bear arms." Compare *ante,* at 2793 (defining "bear arms" to mean "carrying [a weapon] for a particular purpose—confrontation"), with *650 ante,* at 2794 ("The phrase 'bear Arms' also had at the time of the founding an idiomatic meaning that was significantly different from its natural meaning: to serve as a soldier, do military service, fight or to wage war. But it unequivocally bore that idiomatic meaning only when followed by the

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4874   Page 50 of 131
District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

preposition 'against' " (emphasis deleted; citations and some internal quotation marks omitted)).

11    As lucidly explained in the context of a statute mandating a sentencing enhancement for any person who "uses" a firearm during a crime of violence or drug trafficking crime:

"To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, 'Do you use a cane?,' he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of 'using a firearm' is to speak of using it for its distinctive purpose, *i.e.,* as a weapon. To be sure, one can use a firearm in a number of ways, including as an article of exchange, just as one can 'use' a cane as a hall decoration—but that is not the ordinary meaning of 'using' the one or the other. The Court does not appear to grasp the distinction between how a word *can be* used and how it *ordinarily is* used."
*Smith v. United States,* 508 U.S. 223, 242, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (SCALIA, J., dissenting) (some internal quotation marks, footnotes, and citations omitted).

The Amendment's use of the term "keep" in no way contradicts the military meaning conveyed by the phrase "bear arms" and the Amendment's preamble. To the contrary, a number of state militia laws in effect at the time of the Second Amendment's drafting used the term "keep" to describe the requirement that militia members store their arms at their homes, ready to be used for service when necessary. The Virginia military law, for example, ordered that "every one of the said officers, non-commissioned officers, and privates, shall constantly *keep* the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer." Act ... for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § III, p. 2 (emphasis added). [12] "[K]eep and bear arms" thus perfectly **\*651** describes the responsibilities of a framing-era militia member.

12    See also Act for the regulating, training, and arraying of the Militia, ... of the State, 1781 N.J. Laws, ch. XIII, § 12, p. 43 ("And be it Enacted, That each Person enrolled as aforesaid, shall also *keep* at his Place of Abode one Pound of good merchantable Gunpowder and three Pounds of Ball sized to his Musket or Rifle" (emphasis added)); An Act for establishing a Militia, 1785 Del. Laws § 7, p. 59 ("*And be it enacted,* That every person between the ages of eighteen and fifty ... shall at his own

expence, provide himself ... with a musket or firelock, with a bayonet, a cartouch box to contain twenty three cartridges, a priming wire, a brush and six flints, all in good order, on or before the first day of April next, under the penalty of forty shillings, and shall *keep* the same by him at all times, ready and fit for service, under the penalty of two shillings and six pence for each neglect or default thereof on every muster day" (second emphasis added)); 1782 Conn. Acts p. 590 ("And it shall be the duty of the Regional Quarter–Master to provide and *keep* a sufficient quantity of Ammunition and warlike stores for the use of their respective Regiments, to be *kept* in such Place or Places as shall be ordered by the Field Officers" (emphasis added)).

This reading is confirmed by the fact that the clause protects only one right, rather than two. It does not describe a right "to keep ... Arms" and a separate right "to bear ... Arms." Rather, the single right that it does describe is both a duty and a right to have arms available and ready for military service, and to use them for military purposes when necessary. [13] Different language surely would have been used to protect nonmilitary use and possession of weapons from regulation if such an intent had played any role in the drafting of the Amendment.

13    The Court notes that the First Amendment protects two separate rights with the phrase "the 'right [singular] of the people peaceably to assemble, and to petition the Government for a redress of grievances.' " *Ante,* at 2797. But this only proves the point: In contrast to the language quoted by the Court, the Second Amendment does not protect a "right to keep *and to* bear arms," but rather a "right to keep and bear Arms." The State Constitutions cited by the Court are distinguishable on the same ground.

**\*\*2831** \* \* \*

When each word in the text is given full effect, the Amendment is most naturally read to secure to the people a right to use and possess arms in conjunction with service in a well-regulated militia. So far as appears, no more than that was contemplated by its drafters or is encompassed within its terms. Even if the meaning of the text were genuinely susceptible to more than one interpretation, the burden would remain on those advocating a departure from the purpose identified in the preamble and from settled law to come forward with persuasive new arguments or evidence. The textual analysis offered by respondent and embraced by **\*652** the Court falls far short of sustaining that heavy

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4875 Page 51 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

burden. [14] And the Court's emphatic reliance on the claim "that the Second Amendment ... codified a *pre-existing* right," *ante,* at 2804, is of course beside the point because the right to keep and bear arms for service in a state militia was also a pre-existing right.

[14]   The Court's atomistic, word-by-word approach to construing the Amendment calls to mind the parable of the six blind men and the elephant, famously set in verse by John Godfrey Saxe. The Poems of John Godfrey Saxe 135–136 (1873). In the parable, each blind man approaches a single elephant; touching a different part of the elephant's body in isolation, each concludes that he has learned its true nature. One touches the animal's leg, and concludes that the elephant is like a tree; another touches the trunk and decides that the elephant is like a snake; and so on. Each of them, of course, has fundamentally failed to grasp the nature of the creature.

Indeed, not a word in the constitutional text even arguably supports the Court's overwrought and novel description of the Second Amendment as "elevat [ing] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Ante,* at 2821.

## II

The proper allocation of military power in the new Nation was an issue of central concern for the Framers. The compromises they ultimately reached, reflected in Article I's Militia Clauses and the Second Amendment, represent quintessential examples of the Framers' "split[ting] the atom of sovereignty." [15]

[15]   By " 'split[ting] the atom of sovereignty,' " the Framers created " 'two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.' " *Saenz v. Roe,* 526 U.S. 489, 504, n. 17, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (KENNEDY, J., concurring)).

**\*653** Two themes relevant to our current interpretive task ran through the debates on the original Constitution. "On the one hand, there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States." *Perpich v. Department of Defense,* 496 U.S. 334, 340, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990). [16] Governor Edmund Randolph, reporting on the Constitutional Convention to the Virginia Ratification Convention, explained: "With respect to a standing army, I believe there was not a member in the federal Convention, who did not feel indignation at such an institution." 3 J. Elliot, **\*\*2832** Debates in the Several State Conventions on the Adoption of the Federal Constitution 401 (2d ed. 1863) (hereinafter Elliot). On the other hand, the Framers recognized the dangers inherent in relying on inadequately trained militia members "as the primary means of providing for the common defense," *Perpich,* 496 U.S., at 340, 110 S.Ct. 2418; during the Revolutionary War, "[t]his force, though armed, was largely untrained, and its deficiencies were the subject of bitter complaint." Wiener, The Militia Clause of the Constitution, 54 Harv. L.Rev. 181, 182 (1940). [17] **\*654** In order to respond to those twin concerns, a compromise was reached: Congress would be authorized to raise and support a national Army [18] and Navy, and also to organize, arm, discipline, and provide for the calling forth of "the Militia." U.S. Const., Art. I, § 8, cls. 12–16. The President, at the same time, was empowered as the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." Art. II, § 2. But, with respect to the militia, a significant reservation was made to the States: Although Congress would have the power to call forth, [19] organize, arm, and discipline the militia, as well as to govern "such Part of them as may be employed in the Service of the United States," the States respectively would retain the right to appoint the officers and to train the militia in accordance with the discipline prescribed by Congress. Art. I, § 8, cl. 16. [20]

[16]   Indeed, this was one of the grievances voiced by the colonists: Paragraph 13 of the Declaration of Independence charged of King George, "He has kept among us, in times of peace, Standing Armies without the Consent of our legislatures."

[17]   George Washington, writing to Congress on September 24, 1776, warned that for Congress "[t]o place any dependance upon Militia, is, assuredly, resting upon a broken staff." 6 Writings of George Washington 106, 110 (J. Fitzpatrick ed.1932). Several years later he reiterated this view in another letter to Congress: "Regular Troops

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4876 Page 52 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

alone are equal to the exigencies of modern war, as well for defence as offence .... *No Militia* will ever acquire the habits necessary to resist a regular force .... The firmness requisite for the real business of fighting is only to be attained by a constant course of discipline and service." 20 *id.,* at 49, 49–50 (Sept. 15, 1780). And Alexander Hamilton argued this view in many debates. In 1787, he wrote:

"Here I expect we shall be told that the militia of the country is its natural bulwark, and would be at all times equal to the national defense. This doctrine, in substance, had like to have lost us our independence.... War, like most other things, is a science to be acquired and perfected by diligence, by perseverance, by time, and by practice." The Federalist No. 25, p. 166 (C. Rossiter ed.1961).

18    "[B]ut no Appropriation of Money to that Use [raising and supporting Armies] shall be for a longer Term than two Years." U.S. Const., Art. I, § 8, cl. 12

19    This "calling forth" power was only permitted in order for the militia "to execute the Laws of the Union, suppress Insurrections and repel Invasions." Art. I, § 8, cl. 15.

20    The Court assumes—incorrectly, in my view—that even when a state militia was not called into service, Congress would have had the power to exclude individuals from enlistment in that state militia. See *ante,* at 2802. That assumption is not supported by the text of the Militia Clauses of the original Constitution, which confer upon Congress the power to "organiz[e], ar[m], and disciplin[e], the Militia," Art. I, § 8, cl. 16, but not the power to say who will be members of a state militia. It is also flatly inconsistent with the Second Amendment. The States' power to create their own militias provides an easy answer to the Court's complaint that the right as I have described it is empty because it merely guarantees "citizens' right to use a gun in an organization from which Congress has plenary authority to exclude them." *Ante,* at 2802.

*655 But the original Constitution's retention of the militia and its creation of divided authority over that body did not prove sufficient to allay fears about the dangers posed by a standing army. For it was perceived by some that Article I contained a significant gap: While it empowered **2833 Congress to organize, arm, and discipline the militia, it did not prevent Congress from providing for the militia's *dis*armament. As George Mason argued during the debates in Virginia on the ratification of the original Constitution:

"The militia may be here destroyed by that method which has been practised in other parts of the world before; that is, by rendering them useless—by disarming them. Under various pretences, Congress may neglect to provide for arming and disciplining the militia; and the state governments cannot do it, for Congress has the exclusive right to arm them." 3 Elliot 379.

This sentiment was echoed at a number of state ratification conventions; indeed, it was one of the primary objections to the original Constitution voiced by its opponents. The Antifederalists were ultimately unsuccessful in persuading state ratification conventions to condition their approval of the Constitution upon the eventual inclusion of any particular amendment. But a number of States did propose to the first Federal Congress amendments reflecting a desire to ensure that the institution of the militia would remain protected under the new Government. The proposed amendments sent by the States of Virginia, North Carolina, and New York focused on the importance of preserving the state militias and reiterated the dangers posed by standing armies. New Hampshire sent a proposal that differed significantly from the others; while also invoking the dangers of a standing army, it suggested that the Constitution should more broadly protect the use and possession of weapons, without tying such a guarantee expressly to the maintenance of the militia. The States of Maryland, Pennsylvania, and *656 Massachusetts sent no relevant proposed amendments to Congress, but in each of those States a minority of the delegates advocated related amendments. While the Maryland minority proposals were exclusively concerned with standing armies and conscientious objectors, the unsuccessful proposals in both Massachusetts and Pennsylvania would have protected a more broadly worded right, less clearly tied to service in a state militia. Faced with all of these options, it is telling that James Madison chose to craft the Second Amendment as he did.

The relevant proposals sent by the Virginia Ratifying Convention read as follows:

"17th. That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural and safe defence of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that, in all cases, the military

*District of Columbia v. Heller, 554 U.S. 570 (2008)*

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

should be under strict subordination to, and be governed by, the civil power." *Id.,* at 659.

"19th. That any person religiously scrupulous of bearing arms ought to be exempted, upon payment of an equivalent to employ another to bear arms in his stead." *Ibid.*

North Carolina adopted Virginia's proposals and sent them to Congress as its own, although it did not actually ratify the original Constitution until Congress had sent the proposed Bill of Rights to the States for ratification. 2 Schwartz 932–933; see The Complete Bill of Rights 182–183 (N. Cogan ed.1997) (hereinafter Cogan).

New York produced a proposal with nearly identical language. It read:

**\*657** "That the people have a right to keep and bear Arms; that a well regulated Militia, including the body of the People capable of bearing Arms, is the **\*\*2834** proper, natural, and safe defence of a free State .... That standing Armies, in time of Peace, are dangerous to Liberty, and ought not to be kept up, except in Cases of necessity; and that at all times, the Military should be kept under strict Subordination to the civil Power." 2 Schwartz 912.

Notably, each of these proposals used the phrase "keep and bear arms," which was eventually adopted by Madison. And each proposal embedded the phrase within a group of principles that are distinctly military in meaning.[21]

21    In addition to the cautionary references to standing armies and to the importance of civil authority over the military, each of the proposals contained a guarantee that closely resembled the language of what later became the Third Amendment. The 18th proposal from Virginia and North Carolina read: "That no soldier in time of peace ought to be quartered in any house without the consent of the owner, and in time of war in such manner only as the law directs." 3 Elliot 659. And New York's language read: "That in time of Peace no Soldier ought to be quartered in any House without the consent of the Owner, and in time of War only by the Civil Magistrate in such manner as the Laws may direct." 2 Schwartz 912.

By contrast, New Hampshire's proposal, although it followed another proposed amendment that echoed the familiar concern about standing armies,[22] described the protection involved in more clearly personal terms. Its proposal read:

22    *"Tenth,* That no standing Army shall be Kept up in time of Peace unless with the consent of three fourths of the Members of each branch of Congress, nor shall Soldiers in Time of Peace be quartered upon private Houses with out the consent of the Owners." *Id.,* at 761.

*"Twelfth,* Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.,* at 758, 761.

The proposals considered in the other three States, although ultimately rejected by their respective ratification **\*658** conventions, are also relevant to our historical inquiry. First, the Maryland proposal, endorsed by a minority of the delegates and later circulated in pamphlet form, read:

"4. That no standing army shall be kept up in time of peace, unless with the consent of two thirds of the members present of each branch of Congress.

.....

"10. That no person conscientiously scrupulous of bearing, arms, in any case, shall be compelled personally to serve as a soldier." *Id.,* at 729, 735.

The rejected Pennsylvania proposal, which was later incorporated into a critique of the Constitution titled "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787," signed by a minority of the State's delegates (those who had voted against ratification of the Constitution), *id.,* at 628, 662, read:

"7. That the people have a right to bear arms for the defense of themselves and their own State, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to, and be governed by the civil powers." *Id.,* at 665.

Finally, after the delegates at the Massachusetts Ratification Convention had compiled a list of proposed amendments and alterations, a motion was made to add to the list the following language: "that **\*\*2835** the said Constitution be never construed to authorize Congress to ... prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Cogan 181. This motion, however, failed to

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4878 Page 54 of 131
District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

achieve the necessary support, and the proposal was excluded **\*659** from the list of amendments the State sent to Congress. 2 Schwartz 674–675.

Madison, charged with the task of assembling the proposals for amendments sent by the ratifying States, was the principal draftsman of the Second Amendment.[23] He had before him, or at the very least would have been aware of, all of these proposed formulations. In addition, Madison had been a member, some years earlier, of the committee tasked with drafting the Virginia Declaration of Rights. That committee considered a proposal by Thomas Jefferson that would have included within the Virginia Declaration the following language: "No freeman shall ever be debarred the use of arms [within his own lands or tenements]." 1 Papers of Thomas Jefferson 363 (J. Boyd ed.1950). But the committee rejected that language, adopting instead the provision drafted by George Mason.[24]

[23] Madison explained in a letter to Richard Peters, Aug. 19, 1789, the paramount importance of preparing a list of amendments to placate those States that had ratified the Constitution in reliance on a commitment that amendments would follow: "In many States the [Constitution] was adopted under a tacit compact in [favor] of some subsequent provisions on this head. In [Virginia]. It would have been *certainly* rejected, had no assurances been given by its advocates that such provisions would be pursued. As an honest man *I feel* my self bound by this consideration." Creating the Bill of Rights 281, 282 (H. Veit, K. Bowling, & C. Bickford eds.1991) (hereinafter Veit).

[24] The adopted language, Virginia Declaration of Rights ¶ 13 (1776), read as follows: "That a well-regulated Militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State; that Standing Armies, in time of peace, should be avoided as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power." 1 Schwartz 235.

With all of these sources upon which to draw, it is strikingly significant that Madison's first draft omitted any mention of nonmilitary use or possession of weapons. Rather, his original draft repeated the essence of the two proposed amendments sent by Virginia, combining the substance of the two provisions succinctly into one, which read: "The **\*660** right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country; but no person religiously

scrupulous of bearing arms, shall be compelled to render military service in person." Cogan 169.

Madison's decision to model the Second Amendment on the distinctly military Virginia proposal is therefore revealing, since it is clear that he considered and rejected formulations that would have unambiguously protected civilian uses of firearms. When Madison prepared his first draft, and when that draft was debated and modified, it is reasonable to assume that all participants in the drafting process were fully aware of the other formulations that would have protected civilian use and possession of weapons and that their choice to craft the Amendment as they did represented a rejection of those alternative formulations.

Madison's initial inclusion of an exemption for conscientious objectors sheds revelatory light on the purpose of the Amendment. It confirms an intent to describe a duty as well as a right, and it unequivocally identifies the military character of both. The objections voiced to the conscientious-objector clause only confirm the central **\*\*2836** meaning of the text. Although records of the debate in the Senate, which is where the conscientious-objector clause was removed, do not survive, the arguments raised in the House illuminate the perceived problems with the clause: Specifically, there was concern that Congress "can declare who are those religiously scrupulous, and prevent them from bearing arms."[25] The ultimate removal of the clause, therefore, only serves to confirm the purpose of the Amendment—to protect **\*661** against congressional disarmament, by whatever means, of the States' militias.

[25] Veit 182. This was the objection voiced by Elbridge Gerry, who went on to remark, in the next breath: "What, sir, is the use of a militia? It is to prevent the establishment of a standing army, the bane of liberty .... Whenever government mean to invade the rights and liberties of the people, they always attempt to destroy the militia, in order to raise an army upon their ruins." *Ibid.*

The Court also contends that because "Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever," *ante,* at 2796, the inclusion of a conscientious-objector clause in the original draft of the Amendment does not support the conclusion that the phrase "bear Arms" was military in meaning. But that claim cannot be squared with the record. In the proposals cited *supra,* at 2833 – 2834, both Virginia and North Carolina included the following language: "That any person religiously scrupulous of bearing arms ought to be exempted, upon

Case 2:19-cv-00037-JNP  Document 59-31  Filed 11/30/22  PageID.4879  Page 55 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

payment of an equivalent *to employ another to bear arms in his stead* " (emphasis added).[26] There is no plausible argument that the use of "bear arms" in those provisions was not unequivocally and exclusively military: The State simply does not compel its citizens to carry arms for the purpose of private "confrontation," *ante,* at 2793, or for self-defense.

[26] The failed Maryland proposals contained similar language. See *supra,* at 2834.

The history of the adoption of the Amendment thus describes an overriding concern about the potential threat to state sovereignty that a federal standing army would pose, and a desire to protect the States' militias as the means by which to guard against that danger. But state militias could not effectively check the prospect of a federal standing army so long as Congress retained the power to disarm them, and so a guarantee against such disarmament was needed.[27] As we explained in *Miller:* "With obvious purpose to assure the continuation and render possible the effectiveness of such **\*662** forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." 307 U.S., at 178, 59 S.Ct. 816. The evidence plainly refutes the claim that the Amendment was motivated by the Framers' fears that Congress might act to regulate any civilian uses of weapons. And even if the historical record were genuinely ambiguous, the burden would remain on the parties advocating a change in the law to introduce facts or arguments " 'newly ascertained,' " *Vasquez,* 474 U.S., at 266, 106 S.Ct. 617; the Court is unable to identify any such facts or arguments.

[27] The Court suggests that this historical analysis casts the Second Amendment as an "odd outlier," *ante,* at 2803; if by "outlier," the Court means that the Second Amendment was enacted in a unique and novel context, and responded to the particular challenges presented by the Framers' federalism experiment, I have no quarrel with the Court's characterization.

### III

Although it gives short shrift to the drafting history of the Second Amendment, **\*\*2837** the Court dwells at length on four other sources: the 17th-century English Bill of Rights; Blackstone's Commentaries on the Laws of England; postenactment commentary on the Second Amendment; and post-Civil War legislative history.[28] All of these sources shed only indirect light on the question before us, and in any event offer little support for the Court's conclusion.[29]

[28] The Court's fixation on the last two types of sources is particularly puzzling, since both have the same characteristics as postenactment legislative history, which is generally viewed as the least reliable source of authority for ascertaining the intent of any provision's drafters. As has been explained:

"The legislative history of a statute is the history of its consideration and enactment. 'Subsequent legislative history'—which presumably means the *post*-enactment history of a statute's consideration and enactment—is a contradiction in terms. The phrase is used to smuggle into judicial consideration legislators' expression *not* of what a bill currently under consideration means (which, the theory goes, reflects what their colleagues understood they were voting for), but of what a law *previously enacted* means. ... In my opinion, the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed." *Sullivan v. Finkelstein,* 496 U.S. 617, 631–632, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990) (SCALIA, J., concurring in part).

[29] The Court stretches to derive additional support from scattered state-court cases primarily concerned with state constitutional provisions. See *ante,* at 2807 – 2810. To the extent that those state courts assumed that the Second Amendment was coterminous with their differently worded state constitutional arms provisions, their discussions were of course dicta. Moreover, the cases on which the Court relies were decided between 30 and 60 years after the ratification of the Second Amendment, and there is no indication that any of them engaged in a careful textual or historical analysis of the federal constitutional provision. Finally, the interpretation of the Second Amendment advanced in those cases is not as clear as the Court apparently believes. In *Aldridge v. Commonwealth,* 4 Va. 447, 2 Va. Cas. 447 (Gen.Ct.1824), for example, a Virginia court pointed to the restriction on free blacks' "right to bear arms" as evidence that the protections of the State and Federal Constitutions did not extend to free blacks. The Court asserts that "[t]he claim was obviously not that blacks were prevented from carrying guns in the militia." *Ante,* at 2808. But it is not obvious at all. For in many States, including Virginia, free blacks during the colonial period were prohibited from carrying guns in the militia, instead being required to "muste[r] without arms"; they were later barred from serving in the militia altogether. See Siegel, The Federal Government's Power to Enact Color–Conscious Laws: An Originalist Inquiry,

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4880   Page 56 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

92 Nw. U.L.Rev. 477, 497–498, and n. 120 (1998). But my point is not that the *Aldridge* court endorsed my view of the Amendment—plainly it did not, as the premise of the relevant passage was that the Second Amendment applied to the States. Rather, my point is simply that the court could have understood the Second Amendment to protect a militia-focused right, and thus that its passing mention of the right to bear arms provides scant support for the Court's position.

### *663 *The English Bill of Rights*

The Court's reliance on Article VII of the 1689 English Bill of Rights—which, like most of the evidence offered by the Court today, was considered in *Miller* [30]— **2838** is misguided *664 both because Article VII was enacted in response to different concerns from those that motivated the Framers of the Second Amendment, and because the guarantees of the two provisions were by no means coextensive. Moreover, the English text contained no preamble or other provision identifying a narrow, militia-related purpose.

[30]    The Government argued in its brief:
    "[I]t would seem that the early English law did not guarantee an unrestricted right to bear arms. Such recognition as existed of a right in the people to keep and bear arms appears to have resulted from oppression by rulers who disarmed their political opponents and who organized large standing armies which were obnoxious and burdensome to the people. This right, however, it is clear, gave sanction only to the arming of the people as a body to defend their rights against tyrannical and unprincipled rulers. It did not permit the keeping of arms for purposes of private defense." Brief for United States in *United States v. Miller,* O.T.1938, No. 696, pp. 11–12 (citations omitted). The Government then cited at length the Tennessee Supreme Court's opinion in *Aymette,* 21 Tenn. 154, which further situated the English Bill of Rights in its historical context. See n. 10, *supra.*

The English Bill of Rights responded to abuses by the Stuart monarchs; among the grievances set forth in the Bill of Rights was that the King had violated the law "[b]y causing several good Subjects being Protestants to be disarmed at the same time when Papists were both armed and Employed contrary to Law." L. Schwoerer, The Declaration of Rights, 1689, App. 1, p. 295 (1981). Article VII of the Bill of Rights was a response to that selective disarmament; it guaranteed that "the Subjects which are Protestants may have Armes for their defence, Suitable to their condition and as allowed by Law." *Id.,* at 297. This grant did not establish a general right of

all persons, or even of all Protestants, to possess weapons. Rather, the right was qualified in two distinct ways: First, it was restricted to those of adequate social and economic status ("suitable to their Condition"); second, it was only available subject to regulation by Parliament ("as allowed by Law"). [31]

[31]    Moreover, it was the Crown, not Parliament, that was bound by the English provision; indeed, according to some prominent historians, Article VII is best understood not as announcing any individual right to unregulated firearm ownership (after all, such a reading would fly in the face of the text), but as an assertion of the concept of parliamentary supremacy. See Brief for Jack N. Rakove et al. as *Amici Curiae* 6–9.

The Court may well be correct that the English Bill of Rights protected the right of *some* English subjects to use *some* arms for personal self-defense free from restrictions by the Crown (but not Parliament). But that right—adopted *665 in a different historical and political context and framed in markedly different language—tells us little about the meaning of the Second Amendment.

### *Blackstone's Commentaries*

The Court's reliance on Blackstone's Commentaries on the Laws of England is unpersuasive for the same reason as its reliance on the English Bill of Rights. Blackstone's invocation of " 'the natural right of resistance and self-preservation,' " *ante,* at 2798, and " 'the right of having and using arms for self-preservation and defence,' " *ibid.,* referred specifically to Article VII in the English Bill of Rights. The excerpt from Blackstone offered by the Court, therefore, is, like Article VII itself, of limited use in interpreting the very differently worded, and differently historically situated, Second Amendment.

What *is* important about Blackstone is the instruction he provided on reading the sort of text before us today. Blackstone described an interpretive approach that gave far more weight to preambles than the Court allows. Counseling that "[t]he fairest and most rational method to interpret the will of the legislator, is by exploring his intentions at the time when the law was made, by *signs* the most natural and probable," Blackstone explained: "If words happen to be still dubious, we may establish their meaning from the context; with which it may be of singular use to compare a word, or a sentence, whenever they are ambiguous, equivocal, or intricate. Thus, the proeme, or preamble,

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4881 Page 57 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

is often called in to help the construction of an act of parliament.' 1 Commentaries on the Laws of England 59–60 (1765). In light of the Court's invocation of Blackstone as " 'the preeminent authority on English law for **\*\*2839** the founding generation,' " *ante*, at 2798 (quoting *Alden v. Maine*, 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)), its disregard for his guidance on matters of interpretation is striking.

### *\*666 Postenactment Commentary*

The Court also excerpts, without any real analysis, commentary by a number of additional scholars, some near in time to the framing and others postdating it by close to a century. Those scholars are for the most part of limited relevance in construing the guarantee of the Second Amendment: Their views are not altogether clear, [32] they tended to collapse the Second Amendment with Article VII of the English *\*667* Bill of Rights, and they appear to have been unfamiliar with the drafting history of the Second Amendment. [33]

[32]  For example, St. George Tucker, on whom the Court relies heavily, did not consistently adhere to the position that the Amendment was designed to protect the "Blackstonian" self-defense right, *ante*, at 2805. In a series of unpublished lectures, Tucker suggested that the Amendment should be understood in the context of the compromise over military power represented by the original Constitution and the Second and Tenth Amendments:

"If a State chooses to incur the expense of putting arms into the Hands of its own Citizens for their defense, it would require no small ingenuity to prove that they have no right to do it, or that it could by any means contravene the Authority of the federal Govt. It may be alleged indeed that this might be done for the purpose of resisting the laws of the federal Government, or of shaking off the Union: to which the plainest answer seems to be, that whenever the States think proper to adopt either of these measures, they will not be with-held by the fear of infringing any of the powers of the federal Government. But to contend that such a power would be dangerous for the reasons above-mentioned, would be subversive of every principle of Freedom in our Government; of which the first Congress appears to have been sensible by proposing an Amendment to the Constitution, which has since been ratified and has become part of it, viz., 'That a well regulated militia being necessary to the Security of

a free State, the right of the people to keep & bear arms shall not be infringed.' To this we may add that this power of arming the militia, is not one of those prohibited to the States by the Constitution, and, consequently, is reserved to them under the twelfth Article of the ratified aments." 4 S. Tucker, Ten Notebooks of Law Lectures, 1790s, pp. 127–128, in Tucker–Coleman Papers (College of William and Mary).

See also Cornell, St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings, 47 Wm. & Mary L.Rev. 1123 (2006).

[33]  The Court does acknowledge that at least one early commentator described the Second Amendment as creating a right conditioned upon service in a state militia. See *ante*, at 2807–2808 (citing B. Oliver, The Rights of an American Citizen (1832)). Apart from the fact that Oliver is the *only* commentator in the Court's exhaustive survey who appears to have inquired into the intent of the drafters of the Amendment, what is striking about the Court's discussion is its failure to refute Oliver's description of the meaning of the Amendment or the intent of its drafters; rather, the Court adverts to simple nose counting to dismiss his view.

The most significant of these commentators was Joseph Story. Contrary to the Court's assertions, however, Story actually supports the view that the Amendment was designed to protect the right of each of the States to maintain a well-regulated militia. When Story used the term "palladium" in discussions of the Second Amendment, he merely echoed the concerns that animated the Framers of the Amendment and led to its adoption. An excerpt from his 1833 Commentaries on the Constitution of the United States—the same passage cited by the Court in *Miller*[34]—merits reproducing at some length:

[34]  *Miller,* 307 U.S., at 182, n. 3, 59 S.Ct. 816.

"The importance of [the Second Amendment] will scarcely be doubted by any persons who have duly reflected upon the subject. The militia is the natural **\*\*2840** defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses with which they are attended and the facile means which they afford to ambitious and unprincipled rulers to subvert the government, or trample upon the rights of the people. The

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4882 Page 58 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

right of the citizens to keep and bear arms has justly been considered as the **\*668** palladium of the liberties of a republic, since it offers a strong moral check against the usurpation and arbitrary power of rulers, and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them. And yet, though this truth would seem so clear, and the importance of a well-regulated militia would seem so undeniable, it cannot be disguised that, among the American people, there is a growing indifference to any system of militia discipline, and a strong disposition, from a sense of its burdens, to be rid of all regulations. How it is practicable to keep the people duly armed without some organization, it is difficult to see. There is certainly no small danger that indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by the clause of our national bill of rights." 2 J. Story, Commentaries on the Constitution of the United States § 1897, pp. 620–621 (4th ed. 1873) (footnote omitted).

Story thus began by tying the significance of the Amendment directly to the paramount importance of the militia. He then invoked the fear that drove the Framers of the Second Amendment—specifically, the threat to liberty posed by a standing army. An important check on that danger, he suggested, was a "well-regulated militia," *id.,* at 621, for which he assumed that arms would have to be kept and, when necessary, borne. There is not so much as a whisper in the passage above that Story believed that the right secured by the Amendment bore any relation to private use or possession of weapons for activities like hunting or personal self-defense.

After extolling the virtues of the militia as a bulwark against tyranny, Story went on to decry the "growing indifference to any system of militia discipline." *Ibid.* When he wrote, "[h]ow it is practicable to keep the people duly armed without some organization it is difficult to see," *ibid.*, he underscored **\*669** the degree to which he viewed the arming of the people and the militia as indissolubly linked. Story warned that the "growing indifference" he perceived would "gradually undermine all the protection intended by this clause of our national bill of rights," *ibid.* In his view, the importance of the Amendment was directly related to the continuing vitality of an institution in the process of apparently becoming obsolete.

In an attempt to downplay the absence of any reference to nonmilitary uses of weapons in Story's commentary, the Court relies on the fact that Story characterized Article VII of the English Declaration of Rights as a " 'similar provision,' " *ante,* at 2807. The two provisions were indeed similar,

in that both protected some uses of firearms. But Story's characterization in no way suggests that he believed that the provisions had the same scope. To the contrary, Story's exclusive focus on the militia in his discussion of the Second Amendment confirms his understanding of the right protected by the Second Amendment as limited to military uses of arms.

**\*\*2841** Story's writings as a Justice of this Court, to the extent that they shed light on this question, only confirm that Justice Story did not view the Amendment as conferring upon individuals any "self-defense" right disconnected from service in a state militia. Justice Story dissented from the Court's decision in *Houston v. Moore,* 5 Wheat. 1, 24, 5 L.Ed. 19 (1820), which held that a state court "had a concurrent jurisdiction" with the federal courts "to try a militia man who had disobeyed the call of the President, and to enforce the laws of Congress against such delinquent." *Id.,* at 32. Justice Story believed that Congress' power to provide for the organizing, arming, and disciplining of the militia was, when Congress acted, plenary; but he explained that in the absence of congressional action, "I am certainly not prepared to deny the legitimacy of such an exercise of [state] authority." *Id.,* at 52. As to the Second Amendment, he wrote that it "may **\*670** not, perhaps, be thought to have any important bearing on this point. If it have, it confirms and illustrates, rather than impugns the reasoning already suggested." *Id.,* at 52–53. The Court contends that had Justice Story understood the Amendment to have a militia purpose, the Amendment would have had "enormous and obvious bearing on the point." *Ante,* at 2808. But the Court has it quite backwards: If Story had believed that the purpose of the Amendment was to permit civilians to keep firearms for activities like personal self-defense, what "confirm[ation] and illustrat[ion]," *Houston,* 5 Wheat., at 53, 5 L.Ed. 19, could the Amendment possibly have provided for the point that States retained the power to organize, arm, and discipline their own militias?

*Post–Civil War Legislative History*

The Court suggests that by the post-Civil War period, the Second Amendment was understood to secure a right to firearm use and ownership for purely private purposes like personal self-defense. While it is true that some of the legislative history on which the Court relies supports that contention, see *ante,* at 2809 – 2811, such sources are entitled to limited, if any, weight. All of the statements the Court cites were made long after the framing of the Amendment and cannot possibly supply any insight into the intent of the

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4883 Page 59 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Framers; and all were made during pitched political debates, so that they are better characterized as advocacy than good-faith attempts at constitutional interpretation.

What is more, much of the evidence the Court offers is decidedly less clear than its discussion allows. The Court notes: "Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms." *Ante,* at 2810. The Court hastily concludes that "[n]eedless to say, the claim was not that blacks were being prohibited from carrying arms in an organized state militia," *ibid.* But some of the claims of the **\*671** sort the Court cites may have been just that. In some Southern States, Reconstruction-era Republican governments created state militias in which both blacks and whites were permitted to serve. Because "[t]he decision to allow blacks to serve alongside whites meant that most southerners refused to join the new militia," the bodies were dubbed " 'Negro militia[s].' " S. Cornell, A Well–Regulated Militia 177 (2006). The "arming of the Negro militias met with especially fierce resistance in South Carolina .... The sight of organized, armed freedmen incensed opponents of Reconstruction and led to an intensified campaign of Klan terror. Leading members of the Negro militia were beaten or lynched and their weapons stolen." *Id.,* at 176 – 177.

**\*\*2842** One particularly chilling account of Reconstruction-era Klan violence directed at a black militia member is recounted in the memoir of Louis F. Post, A "Carpetbagger" in South Carolina, 10 Journal of Negro History 10 (1925). Post describes the murder by local Klan members of Jim Williams, the captain of a "Negro militia company," *id.,* at 59, this way:

"[A] cavalcade of sixty cowardly white men, completely disguised with face masks and body gowns, rode up one night in March, 1871, to the house of Captain Williams ... in the wood [they] hanged [and shot] him ... [and on his body they] then pinned a slip of paper inscribed, as I remember it, with these grim words: 'Jim Williams gone to his last muster.' " *Id.,* at 61.

In light of this evidence, it is quite possible that at least some of the statements on which the Court relies actually did mean to refer to the disarmament of black militia members.

IV

The brilliance of the debates that resulted in the Second Amendment faded into oblivion during the ensuing years, for the concerns about Article I's Militia Clauses that generated such pitched debate during the ratification process and led to the adoption of the Second Amendment were short lived.

**\*672** In 1792, the year after the Amendment was ratified, Congress passed a statute that purported to establish "an Uniform Militia throughout the United States." 1 Stat. 271. The statute commanded every able-bodied white male citizen between the ages of 18 and 45 to be enrolled therein and to "provide himself with a good musket or firelock" and other specified weaponry. [35] *Ibid.* The statute is significant, for it confirmed the way those in the founding generation viewed firearm ownership: as a duty linked to military service. The statute they enacted, however, "was virtually ignored for more than a century," and was finally repealed in 1901. See *Perpich,* 496 U.S., at 341, 110 S.Ct. 2418.

[35]     The additional specified weaponry included: "a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle and a quarter of a pound of powder." 1 Stat. 271.

The postratification history of the Second Amendment is strikingly similar. The Amendment played little role in any legislative debate about the civilian use of firearms for most of the 19th century, and it made few appearances in the decisions of this Court. Two 19th-century cases, however, bear mentioning.

In *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876), the Court sustained a challenge to respondents' convictions under the Enforcement Act of 1870 for conspiring to deprive any individual of " 'any right or privilege granted or secured to him by the constitution or laws of the United States.' " *Id.,* at 548. The Court wrote, as to counts 2 and 10 of respondents' indictment:

"The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent on **\*673** that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4884 Page 60 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government." *Id.,* at 553.

**\*\*2843** The majority's assertion that the Court in *Cruikshank* "described the right protected by the Second Amendment as ' "bearing arms for a lawful purpose," ' " *ante,* at 2813 (quoting *Cruikshank,* 92 U.S., at 553), is not accurate. The *Cruikshank* Court explained that the defective *indictment* contained such language, but the Court did not itself describe the right, or endorse the indictment's description of the right.

Moreover, it is entirely possible that the basis for the indictment's counts 2 and 10, which charged respondents with depriving the victims of rights secured by the Second Amendment, was the prosecutor's belief that the victims— members of a group of citizens, mostly black but also white, who were rounded up by the sheriff, sworn in as a posse to defend the local courthouse, and attacked by a white mob—bore sufficient resemblance to members of a state militia that they were brought within the reach of the Second Amendment. See generally C. Lane, The Day Freedom Died: The Colfax Massacre, The Supreme Court, and the Betrayal of Reconstruction (2008).

Only one other 19th-century case in this Court, *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), engaged in any significant discussion of the Second Amendment. The petitioner in *Presser* was convicted of violating a state statute that prohibited organizations other than the Illinois National Guard from associating together as military companies or parading with arms. Presser challenged his conviction, asserting, as relevant, that the statute violated both the Second and **\*674** the Fourteenth Amendments. With respect to the Second Amendment, the Court wrote:

> "We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States." *Id.,* at 264–265, 6 S.Ct. 580.

And in discussing the Fourteenth Amendment, the Court explained:

> "The plaintiff in error was not a member of the organized volunteer militia of the State of Illinois, nor did he belong to the troops of the United States or to any organization under the militia law of the State of Illinois. On the contrary, the fact that he did not belong to the organized militia or the troops of the United States was an ingredient in the offence for which he was convicted and sentenced. The question is, therefore, had he a right as a citizen of the United States, in disobedience of the State law, to associate with others as a military company, and to drill and parade with arms in the towns and cities of the State? If the plaintiff in error has any such privilege he must be able to point to the provision of the Constitution or statutes of the United States by which it is conferred." *Id.,* at 266, 6 S.Ct. 580.

*Presser,* therefore, both affirmed *Cruikshank*'s holding that the Second Amendment posed no obstacle to regulation by state governments, and suggested that in any event nothing in the Constitution protected the use of arms outside the **\*675** context of a militia "authorized by law" and organized by the State or Federal Government. [36]

> [36]  In another case the Court endorsed, albeit indirectly, the reading of *Miller* that has been well settled until today. In *Burton v. Sills,* 394 U.S. 812, 89 S.Ct. 1486, 22 L.Ed.2d 748 (1969) *(per curiam),* the Court dismissed for want of a substantial federal question an appeal from a decision of the New Jersey Supreme Court upholding, against a Second Amendment challenge, New Jersey's gun-control law. Although much of the analysis in the New Jersey court's opinion turned on the inapplicability of the Second Amendment as a constraint on the States, the court also quite correctly read *Miller* to hold that "Congress, though admittedly governed by the second amendment, may regulate interstate firearms so long as the regulation does not impair the maintenance of the active, organized militia of the states." *Burton v. Sills,* 53 N.J. 86, 99, 248 A.2d 521, 527 (1968).

**\*\*2844** In 1901, the President revitalized the militia by creating " 'the National Guard of the several States,' " *Perpich,* 496 U.S., at 341, and nn. 9–10, 110 S.Ct. 2418; meanwhile, the dominant understanding of the Second Amendment's inapplicability to private gun ownership continued well into the 20th century. The first two federal laws directly restricting civilian use and possession of firearms—the 1927 Act prohibiting mail delivery of "pistols, revolvers, and other firearms capable of being concealed on the person," ch. 75, 44 Stat. 1059, and the 1934 Act prohibiting the possession of sawed-off shotguns

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

and machine guns—were enacted over minor Second Amendment objections dismissed by the vast majority of the legislators who participated in the debates. [37] Members of Congress clashed over the wisdom and efficacy of such laws as crime-control measures. But since the statutes did not infringe **\*676** upon the military use or possession of weapons, for most legislators they did not even raise the specter of possible conflict with the Second Amendment.

[37]  The 1927 Act was enacted with no mention of the Second Amendment as a potential obstacle, although an earlier version of the bill had generated some limited objections on Second Amendment grounds, see 66 Cong. Rec. 725–735 (1924). And the 1934 Act featured just one colloquy, during the course of lengthy Committee debates, on whether the Second Amendment constrained Congress' ability to legislate in this sphere, see Hearings on H.R. 9066 before the House Committee on Ways and Means, 73d Cong., 2d Sess., 19 (1934).

Thus, for most of our history, the invalidity of Second–Amendment–based objections to firearms regulations has been well settled and uncontroversial. [38] Indeed, the Second Amendment was not even mentioned **\*\*2845** in either full House of Congress during the legislative proceedings that led to the passage of the 1934 Act. Yet enforcement of that law produced the judicial decision that confirmed the status of the Amendment as limited in reach to military usage. After reviewing many of the same sources that are discussed at **\*677** greater length by the Court today, the *Miller* Court unanimously concluded that the Second Amendment did not apply to the possession of a firearm that did not have "some reasonable relationship to the preservation or efficiency of a well regulated militia." 307 U.S., at 178, 59 S.Ct. 816.

[38]  The majority appears to suggest that even if the meaning of the Second Amendment has been considered settled by courts and legislatures for over two centuries, that settled meaning is overcome by the "reliance of millions of Americans" "upon the true meaning of the right to keep and bear arms." *Ante,*at 2835, n. 24. Presumably by this the Court means that many Americans own guns for self-defense, recreation, and other lawful purposes, and object to government interference with their gun ownership. I do not dispute the correctness of this observation. But it is hard to see how Americans have "relied," in the usual sense of the word, on the existence of a constitutional right that, until 2001, had been rejected by every federal court to take up the question. Rather, gun owners have "relied" on the laws passed by

democratically elected legislatures, which have generally adopted only limited gun-control measures.

Indeed, reliance interests surely cut the other way: Even apart from the reliance of judges and legislators who properly believed, until today, that the Second Amendment did not reach possession of firearms for purely private activities, "millions of Americans" have relied on the power of government to protect their safety and well-being, and that of their families. With respect to the case before us, the legislature of the District of Columbia has relied on its ability to act to "reduce the potentiality for gun-related crimes and gun-related deaths from occurring within the District of Columbia," H. Con. Res. 694, Ser. No. 94-24, p. 25 (1976); see *post,* at 2854 – 2856 (BREYER, J., dissenting); so, too, have the residents of the District.

The key to that decision did not, as the Court belatedly suggests, *ante,* at 2813 – 2815, turn on the difference between muskets and sawed-off shotguns; it turned, rather, on the basic difference between the military and nonmilitary use and possession of guns. Indeed, if the Second Amendment were not limited in its coverage to military uses of weapons, why should the Court in *Miller* have suggested that some weapons but not others were eligible for Second Amendment protection? If use for self-defense were the relevant standard, why did the Court not inquire into the suitability of a particular weapon for self-defense purposes?

Perhaps in recognition of the weakness of its attempt to distinguish *Miller,* the Court argues in the alternative that *Miller* should be discounted because of its decisional history. It is true that the appellees in *Miller* did not file a brief or make an appearance, although the court below had held that the relevant provision of the National Firearms Act violated the Second Amendment (albeit without any reasoned opinion). But, as our decision in *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60, in which only one side appeared and presented arguments, demonstrates, the absence of adversarial presentation alone is not a basis for refusing to accord *stare decisis* effect to a decision of this Court. See Bloch, *Marbury* Redux, in Arguing *Marbury v. Madison* 59, 63 (M. Tushnet ed.2005). Of course, if it can be demonstrated that new evidence or arguments were genuinely not available to an earlier Court, that fact should be given special weight as we consider whether to overrule a prior case. But the Court does not make that claim, because it cannot. Although it is true that the drafting history of the Amendment was not **\*678** discussed in the Government's brief, see *ante,* at 2814 – 2815, it is certainly not the drafting history that the Court's decision today turns on. And those sources upon which the Court today

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4886 Page 62 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

relies most heavily *were* available to the *Miller* Court. The Government cited the English Bill of Rights and quoted a lengthy passage from *Aymette v. State,* 21 Tenn. 154 (1840), detailing the history leading to the English guarantee, Brief for United States in *United States v. Miller,* O.T.1938, No. 696, pp 12–13; it also cited Blackstone, *id.,* at 9, n. 2, Cooley, *id.,* at 12, 15, and Story, *id.,* at 15. The Court is reduced to critiquing the number of *pages* the Government devoted to exploring the English legal sources. Only two (in a brief 21 pages in length)! Would the Court be satisfied with four? Ten?

The Court is simply wrong when it intones that *Miller* contained "*not a word*" about the Amendment's history. *Ante,* at 2815. The Court plainly looked to history to construe the term "Militia," and, on the best reading of *Miller,* the entire guarantee of the Second Amendment. After noting the original Constitution's grant of power to Congress and to the States over the militia, the Court explained:

> "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment **\*\*2846** were made. It must be interpreted and applied with that end in view.

> "The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion.

> "The signification attributed to the term Militia appears from the debates in the Convention, the history **\*679** and legislation of Colonies and States, and the writings of approved commentators." *Miller,* 307 U.S., at 178–179, 59 S.Ct. 816.

The majority cannot seriously believe that the *Miller* Court did not consider any relevant evidence; the majority simply does not approve of the conclusion the *Miller* Court reached on that evidence. Standing alone, that is insufficient reason to disregard a unanimous opinion of this Court, upon which substantial reliance has been placed by legislators and citizens for nearly 70 years—

V

The Court concludes its opinion by declaring that it is not the proper role of this Court to change the meaning of rights "enshrine[d]" in the Constitution. *Ante,* at 2822. But the right the Court announces was not "enshrined" in the Second Amendment by the Framers; it is the product of today's law-changing decision. The majority's exegesis has utterly failed to establish that as a matter of text or history, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" is "elevate[d] above all other interests" by the Second Amendment. *Ante,* at 2822.

Until today, it has been understood that legislatures may regulate the civilian use and misuse of firearms so long as they do not interfere with the preservation of a well-regulated militia. The Court's announcement of a new constitutional right to own and use firearms for private purposes upsets that settled understanding, but leaves for future cases the formidable task of defining the scope of permissible regulations. Today judicial craftsmen have confidently asserted that a policy choice that denies a "law-abiding, responsible citize[n]" the right to keep and use weapons in the home for self-defense is "off the table." *Ante,* at 2822. Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, **\*680** I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table. [39]

[39]  It was just a few years after the decision in *Miller* that Justice Frankfurter (by any measure a true judicial conservative) warned of the perils that would attend this Court's entry into the "political thicket" of legislative districting. *Colegrove v. Green,* 328 U.S. 549, 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) (plurality opinion). The equally controversial political thicket that the Court has decided to enter today is qualitatively different from the one that concerned Justice Frankfurter: While our entry into that thicket was justified because the political process was manifestly unable to solve the problem of unequal districts, no one has suggested that the political process is not working exactly as it should in mediating the debate between the advocates and opponents of gun control. What impact the Court's unjustified entry into *this* thicket will have on that ongoing debate—or indeed on the Court itself—is a matter that future historians will no doubt discuss at length. It is, however, clear to me that adherence to a policy of judicial restraint would be far wiser than the bold decision announced today.

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4887 Page 63 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

I do not know whether today's decision will increase the labor of federal judges to **2847 the "breaking point" envisioned by Justice Cardozo, but it will surely give rise to a far more active judicial role in making vitally important national policy decisions than was envisioned at any time in the 18th, 19th, or 20th centuries.

The Court properly disclaims any interest in evaluating the wisdom of the specific policy choice challenged in this case, but it fails to pay heed to a far more important policy choice —the choice made by the Framers themselves. The Court would have us believe that over 200 years ago, the Framers made a choice to limit the tools available to elected officials wishing to regulate civilian uses of weapons, and to authorize this Court to use the common-law process of case-by-case judicial lawmaking to define the contours of acceptable gun-control policy. Absent compelling evidence that is nowhere to be found in the Court's opinion, I could not possibly conclude that the Framers made such a choice.

For these reasons, I respectfully dissent.

 *681 Justice BREYER, with whom Justice STEVENS, Justice SOUTER, and Justice GINSBURG join, dissenting. We must decide whether a District of Columbia law that prohibits the possession of handguns in the home violates the Second Amendment. The Court, relying upon its view that the Second Amendment seeks to protect a right of personal self-defense, holds that this law violates that Amendment. In my view, it does not.

I

The majority's conclusion is wrong for two independent reasons. The first reason is that set forth by Justice STEVENS —namely, that the Second Amendment protects militia-related, not self-defense-related, interests. These two interests are sometimes intertwined. To assure 18th-century citizens that they could keep arms for militia purposes would necessarily have allowed them to keep arms that they could have used for self-defense as well. But self-defense alone, detached from any militia-related objective, is not the Amendment's concern.

The second independent reason is that the protection the Amendment provides is not absolute. The Amendment permits government to regulate the interests that it serves.

Thus, irrespective of what those interests are—whether they do or do not include an independent interest in self-defense —the majority's view cannot be correct unless it can show that the District's regulation is unreasonable or inappropriate in Second Amendment terms. This the majority cannot do.

In respect to the first independent reason, I agree with Justice STEVENS, and I join his opinion. In this opinion I shall focus upon the second reason. I shall show that the District's law is consistent with the Second Amendment even if that Amendment is interpreted as protecting a wholly separate interest in individual self-defense. That is so because the District's regulation, which focuses upon the presence of handguns in high-crime urban areas, represents a *682 permissible legislative response to a serious, indeed life-threatening, problem.

Thus I here assume that one objective (but, as the majority concedes, *ante,* at 2801, not the *primary* objective) of those who wrote the Second Amendment was to help assure citizens that they would have arms available for purposes of self-defense. Even so, a legislature could reasonably conclude that the law will advance goals of great public importance, namely, saving lives, preventing injury, and reducing crime. The law is tailored to the urban crime problem in that it is local in scope **2848 and thus affects only a geographic area both limited in size and entirely urban; the law concerns handguns, which are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals; and at the same time, the law imposes a burden upon gun owners that seems proportionately no greater than restrictions in existence at the time the Second Amendment was adopted. In these circumstances, the District's law falls within the zone that the Second Amendment leaves open to regulation by legislatures.

II

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In interpreting and applying this Amendment, I take as a starting point the following four propositions, based on our precedent and today's opinions, to which I believe the entire Court subscribes:

(1) The Amendment protects an "individual" right—*i.e.,* one that is separately possessed, and may be separately enforced,

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4888 Page 64 of 131

*District of Columbia v. Heller,* 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

by each person on whom it is conferred. See, *e.g., ante,* at 2799 (opinion of the Court); *ante,* at 2822 (STEVENS, J., dissenting).

(2) As evidenced by its preamble, the Amendment was adopted "[w]ith obvious purpose to assure the continuation **\*683** and render possible the effectiveness of [militia] forces." *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); see *ante,* at 2801 (opinion of the Court); *ante,* at 2822 (STEVENS, J., dissenting).

(3) The Amendment "must be interpreted and applied with that end in view." *Miller, supra,* at 178, 59 S.Ct. 816.

(4) The right protected by the Second Amendment is not absolute, but instead is subject to government regulation. See *Robertson v. Baldwin,* 165 U.S. 275, 281–282, 17 S.Ct. 326, 41 L.Ed. 715 (1897); *ante,* at 2799, 2816 (opinion of the Court).

My approach to this case, while involving the first three points, primarily concerns the fourth. I shall, as I said, assume with the majority that the Amendment, in addition to furthering a militia-related purpose, also furthers an interest in possessing guns for purposes of self-defense, at least to some degree. And I shall then ask whether the Amendment nevertheless permits the District handgun restriction at issue here.

Although I adopt for present purposes the majority's position that the Second Amendment embodies a general concern about self-defense, I shall not assume that the Amendment contains a specific untouchable right to keep guns in the house to shoot burglars. The majority, which presents evidence in favor of the former proposition, does not, because it cannot, convincingly show that the Second Amendment seeks to maintain the latter in pristine, unregulated form.

To the contrary, colonial history itself offers important examples of the kinds of gun regulation that citizens would then have thought compatible with the "right to keep and bear arms," whether embodied in Federal or State Constitutions, or the background common law. And those examples include substantial regulation of firearms in urban areas, including regulations that imposed obstacles to the use of firearms for the protection of the home.

Boston, Philadelphia, and New York City, the three largest cities in America during that period, all restricted the firing

of guns within city limits to at least some degree. See **\*684** Churchill, **\*\*2849** Gun Regulation, the Police Power, and the Right To Keep Arms in Early America, 25 Law & Hist. Rev. 139, 162 (2007); Dept. of Commerce, Bureau of Census, C. Gibson, Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990 (1998) (Table 2), online at http://www.census.gov/population/www/ documentation/twps0027/tab02.txt (all Internet materials as visited June 19, 2008, and available in Clerk of Court's case file). Boston in 1746 had a law prohibiting the "discharge" of "any Gun or Pistol charged with Shot or Ball in the Town" on penalty of 40 shillings, a law that was later revived in 1778. See Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay, p. 208; An Act for Reviving and Continuing Sundry Laws that are Expired, and Near Expiring, 1778 Mass. Sess. Laws ch. V, pp. 193, 194. Philadelphia prohibited, on penalty of five shillings (or two days in jail if the fine were not paid), firing a gun or setting off fireworks in Philadelphia without a "governor's special license." See Act of Aug. 26, 1721, § IV, in 3 Stat. at Large of Pa. 253–254 (J. Mitchell & H. Flanders comm'rs 1896). And New York City banned, on penalty of a 20–shilling fine, the firing of guns (even in houses) for the three days surrounding New Year's Day. 5 Colonial Laws of New York, ch. 1501, pp. 244–246 (1894); see also An Act to Suppress the Disorderly Practice of Firing Guns, & c., on the Times Therein Mentioned (1774), in 8 Stat. at Large of Pa. 410–412 (1902) (similar law for all "inhabited parts" of Pennsylvania). See also An Act for preventing Mischief being done in the Town of *Newport,* or in any other Town in this Government, 1731 Rhode Island Session Laws, pp. 240 – 241 (prohibiting, on penalty of five shillings for a first offense and more for subsequent offenses, the firing of "any Gun or Pistol ... in the Streets of any of the Towns of this Government, or in any Tavern of the same, after dark, on any Night whatsoever").

Furthermore, several towns and cities (including Philadelphia, New York, and Boston) regulated, for fire-safety reasons, **\*685** the storage of gunpowder, a necessary component of an operational firearm. See Cornell & DeDino, A Well Regulated Right, 73 Ford. L.Rev. 487, 510–512 (2004). Boston's law in particular impacted the use of firearms in the home very much as the District's law does today. Boston's gunpowder law imposed a £10 fine upon "any Person" who "shall take into any Dwelling–House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building, within the Town of *Boston,* any ... Fire–Arm, loaded with, or having Gun–Powder." An Act in Addition to the several Acts already made for the prudent Storage of Gun–Powder

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

within the Town of *Boston,* ch. XIII, 1783 Mass. Acts pp. 218–219; see also 1 S. Johnson, A Dictionary of the English Language 751 (4th ed. 1773) (defining "firearms" as "[a]rms which owe their efficacy to fire; guns"). Even assuming, as the majority does, see *ante,* at 2819 – 2820, that this law included an implicit self-defense exception, it would nevertheless have prevented a homeowner from keeping in his home a gun that he could immediately pick up and use against an intruder. Rather, the homeowner would have had to get the gunpowder and load it into the gun, an operation that would have taken a fair amount of time to perform. See Hicks, United States Military Shoulder Arms, 1795–1935, 1 Journal of Am. Military Hist. Foundation 23, 30 (1937) (experienced soldier could, with specially prepared cartridges as opposed to plain gunpowder and ball, load and fire musket 3–to–4 times per minute); *id.,* at 26–30 (describing the loading process); see also Grancsay, The Craft of the Early American Gunsmith, 6 Metropolitan Museum of Art Bulletin 54, 60 (1947) (noting that rifles were slower to load and fire than muskets).

**\*\*2850** Moreover, the law would, as a practical matter, have prohibited the carrying of loaded firearms anywhere in the city, unless the carrier had no plans to enter any building or was willing to unload or discard his weapons before going inside. And Massachusetts residents must have believed this kind of law compatible with the provision in the Massachusetts **\*686** Constitution that granted "[t]he people ... a right to keep and to bear arms for the common defence"—a provision that the majority says was interpreted as "secur[ing] an individual right to bear arms for defensive purposes." Art. XVII (1780), in 3 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 1888, 1892 (F. Thorpe ed.1909) (hereinafter Thorpe); *ante,* at 2802 – 2803 (opinion of the Court).

The New York City law, which required that gunpowder in the home be stored in certain sorts of containers, and laws in certain Pennsylvania towns, which required that gunpowder be stored on the highest story of the home, could well have presented similar obstacles to in-home use of firearms. See Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws p. 627; An Act for Erecting the Town of Carlisle, in the County of Cumberland, into a Borough, ch. XIV, § XLII, 1782 Pa. Laws p. 49; An Act for Erecting the Town of Reading, in the County of Berks, into a Borough, ch. LXXVI, § XLII, 1783 Pa. Laws p. 211. Although it is unclear whether these laws, like the Boston law, would have prohibited the storage of gunpowder inside a firearm, they would at the very least have made it difficult to reload the gun to fire a second

shot unless the homeowner happened to be in the portion of the house where the extra gunpowder was required to be kept. See 7 United States Encyclopedia of History 1297 (P. Oehser ed. 1967) ("Until 1835 all small arms [were] single-shot weapons, requiring reloading by hand after every shot"). And Pennsylvania, like Massachusetts, had at the time one of the self-defense-guaranteeing state constitutional provisions on which the majority relies. See *ante,* at 2802 – 2803 (citing Pa. Declaration of Rights, § XIII (1776), in 5 Thorpe 3083).

The majority criticizes my citation of these colonial laws. See *ante,* at 2819 – 2821. But, as much as it tries, it cannot ignore their existence. I suppose it is possible that, as the majority suggests, see *ante,* at 2819 – 2820, they all in practice contained self-defense exceptions. But none of them expressly provided **\*687** one, and the majority's assumption that such exceptions existed relies largely on the preambles to these acts—an interpretive methodology that it elsewhere roundly derides. Compare *ibid.* (interpreting 18th-century statutes in light of their preambles) with *ante,* at 2789 – 2790, and n. 3 (contending that the operative language of an 18th-century enactment may extend beyond its preamble). And in any event, as I have shown, the gunpowder-storage laws would have *burdened* armed self-defense, even if they did not completely *prohibit* it.

This historical evidence demonstrates that a self-defense assumption is the *beginning,* rather than the *end,* of any constitutional inquiry. That the District law impacts self-defense merely raises *questions* about the law's constitutionality. But to answer the questions that are raised (that is, to see whether the statute is unconstitutional) requires us to focus on practicalities, the statute's rationale, the problems that called it into being, its relation to those objectives—in a word, the details. There are no purely logical or conceptual answers to such questions. All of which to say that to raise a self-defense question is not to answer it.

### III

I therefore begin by asking a process-based question: How is a court to determine **\*\*2851** whether a particular firearm regulation (here, the District's restriction on handguns) is consistent with the Second Amendment? What kind of constitutional standard should the court use? How high a protective hurdle does the Amendment erect?

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4890 Page 66 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

The question matters. The majority is wrong when it says that the District's law is unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Ante,* at 2817. How could that be? It certainly would not be unconstitutional under, for example, a "rational-basis" standard, which requires a court to uphold regulation so long as it bears a "rational relationship" **\*688** to a "legitimate governmental purpose." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The law at issue here, which in part seeks to prevent gun-related accidents, at least bears a "rational relationship" to that "legitimate" life-saving objective. And nothing in the three 19th-century state cases to which the majority turns for support mandates the conclusion that the present District law must fall. See *Andrews v. State,* 50 Tenn. 165, 177, 186–187, 192 (1871) (striking down, as violating a *state* constitutional provision adopted in 1870, a *statewide* ban on carrying a broad class of weapons, insofar as it applied to revolvers); *Nunn v. State,* 1 Ga. 243, 246, 250–251 (1846) (striking down similarly broad ban on openly carrying weapons, based on erroneous view that the Federal Second Amendment applied to the States); *State v. Reid,* 1 Ala. 612, 614–615, 622 (1840) (*upholding* a concealed-weapon ban against a *state* constitutional challenge). These cases were decided well (80, 55, and 49 years, respectively) after the framing; they neither claim nor provide any special insight into the intent of the Framers; they involve laws much less narrowly tailored than the one before us; and state cases in any event are not determinative of federal constitutional questions, see, *e.g., Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 549, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (citing *Martin v. Hunter's Lessee,* 1 Wheat. 304, 4 L.Ed. 97 (1816)).

Respondent proposes that the Court adopt a "strict scrutiny" test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson,* 521 U.S. 74, 82, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); see Brief for Respondent 54–62. But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales—whose constitutionality under a strict-scrutiny standard would be far from clear. See *ante,* at 2816.

**\*689** Indeed, adoption of a true strict-scrutiny standard for evaluating gun regulations would be impossible. That is because almost every gun-control regulation will seek to advance (as the one here does) a "primary concern of every government—a concern for the safety and indeed the lives of its citizens." *United States v. Salerno,* 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Court has deemed that interest, as well as "the Government's general interest in preventing crime," to be "compelling," see *id.,* at 750, 754, 107 S.Ct. 2095, and the Court has in a wide variety of constitutional contexts found such public-safety concerns sufficiently forceful to justify restrictions on individual liberties, see, *e.g., Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) *(per curiam)* (First **\*\*2852** Amendment free speech rights); *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (First Amendment religious rights); *Brigham City v. Stuart,* 547 U.S. 398, 403–404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (Fourth Amendment protection of the home); *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (Fifth Amendment rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *Salerno, supra,* at 755 (Eighth Amendment bail rights). Thus, any attempt *in theory* to apply strict scrutiny to gun regulations will *in practice* turn into an interest-balancing inquiry, with the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other, the only question being whether the regulation at issue impermissibly burdens the former in the course of advancing the latter.

I would simply adopt such an interest-balancing inquiry explicitly. The fact that important interests lie on both sides of the constitutional equation suggests that review of gun-control regulation is not a context in which a court should effectively presume either constitutionality (as in rational-basis review) or unconstitutionality (as in strict scrutiny). Rather, "where a law significantly implicates competing constitutionally protected interests in complex ways," the Court generally asks whether the statute burdens a protected interest in a way or to an extent that is out of **\*690** proportion to the statute's salutary effects upon other important governmental interests. See *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 402, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (BREYER, J., concurring). Any answer would take account both of the statute's effects upon the competing interests and the existence of any clearly superior less restrictive alternative. See *ibid.* Contrary to the majority's unsupported suggestion that this sort of "proportionality" approach is unprecedented, see *ante,* at 2820 – 2821, the Court has applied it in various constitutional

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4891 Page 67 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

contexts, including election-law cases, speech cases, and due process cases. See 528 U.S., at 403, 120 S.Ct. 897 (citing examples where the Court has taken such an approach); see also, *e.g., Thompson v. Western States Medical Center,* 535 U.S. 357, 388, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (BREYER, J., dissenting) (commercial speech); *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (election regulation); *Mathews v. Eldridge,* 424 U.S. 319, 339–349, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (procedural due process); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (government employee speech).

In applying this kind of standard the Court normally defers to a legislature's empirical judgment in matters where a legislature is likely to have greater expertise and greater institutional factfinding capacity. See *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 195–196, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); see also *Nixon, supra,* at 403, 120 S.Ct. 897 (BREYER, J., concurring). Nonetheless, a court, not a legislature, must make the ultimate constitutional conclusion, exercising its "independent judicial judgment" in light of the whole record to determine whether a law exceeds constitutional boundaries. *Randall v. Sorrell,* 548 U.S. 230, 249, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (opinion of BREYER, J.) (citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)).

The above-described approach seems preferable to a more rigid approach here for a further reason. Experience as much as logic has led the Court to decide that in one area of constitutional law or another **\*\*2853** the interests are likely to prove **\*691** stronger on one side of a typical constitutional case than on the other. See, *e.g., United States v. Virginia,* 518 U.S. 515, 531–534, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (applying heightened scrutiny to gender-based classifications, based upon experience with prior cases); *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (applying rational-basis scrutiny to economic legislation, based upon experience with prior cases). Here, we have little prior experience. Courts that *do* have experience in these matters have uniformly taken an approach that treats empirically based legislative judgment with a degree of deference. See Winkler, Scrutinizing the Second Amendment, 105 Mich. L.Rev. 683, 687, 716–718 (2007) (describing hundreds of gun-law decisions issued in the last half century by Supreme Courts in 42 States, which courts with "surprisingly little variation" have adopted a

standard more deferential than strict scrutiny). While these state cases obviously are not controlling, they are instructive. Cf., *e.g., Bartkus v. Illinois,* 359 U.S. 121, 134, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (looking to the "experience of state courts" as informative of a constitutional question). And they thus provide some comfort regarding the practical wisdom of following the approach that I believe our constitutional precedent would in any event suggest.

IV

The present suit involves challenges to three separate District firearm restrictions. The first requires a license from the District's chief of police in order to carry a "pistol," *i.e.,* a handgun, anywhere in the District. See D.C.Code § 22–4504(a) (2001); see also §§ 22–4501(a), 22–4506. Because the District assures us that respondent could obtain such a license so long as he meets the statutory eligibility criteria, and because respondent concedes that those criteria are facially constitutional, I, like the majority, see no need to address the constitutionality of the licensing requirement. See *ante,* at 2818 – 2819.

**\*692** The second District restriction requires that the lawful owner of a firearm keep his weapon "unloaded and disassembled or bound by a trigger lock or similar device" unless it is kept at his place of business or being used for lawful recreational purposes. See § 7–2507.02. The only dispute regarding this provision appears to be whether the Constitution requires an exception that would allow someone to render a firearm operational when necessary for self-defense (*i.e.,* that the firearm may be operated under circumstances where the common law would normally permit a self-defense justification in defense against a criminal charge). See *Parker v. District of Columbia,* 478 F.3d 370, 401 (2007) (case below); *ante,* at 2817 – 2818 (opinion of the Court); Brief for Respondent 52–54. The District concedes that such an exception exists. See Brief for Petitioners 56–57. This Court has final authority (albeit not often used) to definitively interpret District law, which is, after all, simply a species of federal law. See, *e.g., Whalen v. United States,* 445 U.S. 684, 687–688, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); see also *Griffin v. United States,* 336 U.S. 704, 716–718, 69 S.Ct. 814, 93 L.Ed. 993 (1949). And because I see nothing in the District law that would *preclude* the existence of a background common-law self-defense exception, I would avoid the constitutional question by interpreting the statute to

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4892 Page 68 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

include it. See *Ashwander v. TVA,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

I am puzzled by the majority's unwillingness to adopt a similar approach. It readily reads unspoken self-defense exceptions into every colonial law, but it refuses **\*\*2854** to accept the District's concession that this law has one. Compare *ante,* at 2819 – 2820, with *ante,* at 2817 – 2818. The one District case it cites to support that refusal, *McIntosh v. Washington,* 395 A.2d 744, 755–756 (1978), merely concludes that the District Legislature had a rational basis for applying the trigger-lock law in homes but not in places of business. Nowhere does that case say that the statute precludes a self-defense exception of the sort that I have just described. And even if it did, **\*693** we are not bound by a lower court's interpretation of federal law.

The third District restriction prohibits (in most cases) the registration of a handgun within the District. See § 7–2502.02(a)(4). Because registration is a prerequisite to firearm possession, see § 7–2502.01(a), the effect of this provision is generally to prevent people in the District from possessing handguns. In determining whether this regulation violates the Second Amendment, I shall ask how the statute seeks to further the governmental interests that it serves, how the statute burdens the interests that the Second Amendment seeks to protect, and whether there are practical less burdensome ways of furthering those interests. The ultimate question is whether the statute imposes burdens that, when viewed in light of the statute's legitimate objectives, are disproportionate. See *Nixon,* 528 U.S., at 402, 120 S.Ct. 897 (BREYER, J., concurring).

### A

No one doubts the constitutional importance of the statute's basic objective, saving lives. See, *e.g., Salerno,* 481 U.S., at 755, 107 S.Ct. 2095. But there is considerable debate about whether the District's statute helps to achieve that objective. I begin by reviewing the statute's tendency to secure that objective from the perspective of (1) the legislature (namely, the Council of the District of Columbia (hereinafter Council)) that enacted the statute in 1976, and (2) a court that seeks to evaluate the Council's decision today.

First, consider the facts as the legislature saw them when it adopted the District statute. As stated by the local council committee that recommended its adoption, the major substantive goal of the District's handgun restriction is "to reduce the potentiality for gun-related crimes and gun-related deaths from occurring within the **\*694** District of Columbia." Firearms Control Regualtions Act of 1975 (Council Act No. 1-142), Hearing and Disposition before the House Committee on the District of Columbia, 94th Cong., 2d Sess., on H. Con. Res. 694, Ser. No. 94–24, p. 25 (1976) (hereinafter DC Rep.) (reproducing, *inter alia,* the Council Committee Report). The Committee concluded, on the basis of "extensive public hearings" and "lengthy research," that "[t]he easy availability of firearms in the United States has been a major factor contributing to the drastic increase in gun-related violence and crime over the past 40 years." *Id.,* at 24, 25. It reported to the Council "startling statistics," *id.,* at 26, regarding gun-related crime, accidents, and deaths, focusing particularly on the relation between handguns and crime and the proliferation of handguns within the District. See *id.,* at 25–26.

The Committee informed the Council that guns were "responsible for 69 deaths in this country each day," for a total of "[a]pproximately 25,000 gun-deaths ... each year," along with an additional 200,000 gun-related injuries. *Id.,* at 25. Three thousand of these deaths, the report stated, were accidental. *Ibid.* A quarter of the victims in those accidental deaths were children under the age of 14. *Ibid.* And according to the Committee, "[f]or **\*\*2855** every intruder stopped by a homeowner with a firearm, there are 4 gun-related accidents within the home." *Ibid.*

In respect to local crime, the Committee observed that there were 285 murders in the District during 1974—a record number. *Id.,* at 26. The Committee also stated that, "[c]ontrary to popular opinion on the subject, firearms are more frequently involved in deaths and violence among relatives and friends than in premeditated criminal activities." *Ibid.* Citing an article from the American Journal of Psychiatry, the Committee reported that "[m]ost murders are committed by previously law-abiding citizens, in situations where spontaneous violence is generated by anger, passion or intoxication, and where the killer and victim are acquainted." *Ibid.* "Twenty-five percent of these murders," **\*695** the Committee informed the Council, "occur within families." *Ibid.*

1

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4893   Page 69 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

The Committee Report furthermore presented statistics strongly correlating handguns with crime. Of the 285 murders in the District in 1974, 155 were committed with handguns. *Ibid.* This did not appear to be an aberration, as the report revealed that "handguns [had been] used in roughly 54% of all murders" (and 87% of murders of law enforcement officers) nationwide over the preceding several years. *Ibid.* Nor were handguns only linked to murders, as statistics showed that they were used in roughly 60% of robberies and 26% of assaults. *Ibid.* "A crime committed with a pistol," the Committee reported, "is 7 times more likely to be lethal than a crime committed with any other weapon." *Id.,* at 25. The Committee furthermore presented statistics regarding the availability of handguns in the United States, *ibid.,* and noted that they had "become easy for juveniles to obtain," even despite then-current District laws prohibiting juveniles from possessing them, *id.,* at 26.

In the Committee's view, the current District firearms laws were unable "to reduce the potentiality for gun-related violence," or to "cope with the problems of gun control in the District" more generally. *Ibid.* In the absence of adequate federal gun legislation, the Committee concluded, it "becomes necessary for local governments to act to protect their citizens, and certainly the District of Columbia as the only totally urban statelike jurisdiction should be strong in its approach." *Id.,* at 27. It recommended that the Council adopt a restriction on handgun registration to reflect "a legislative decision that, at this point in time and due to the gun-control tragedies and horrors enumerated previously" in the Committee Report, "pistols ... are no longer justified in this jurisdiction." *Id.,* at 31; see also *ibid.* (handgun restriction "denotes a policy decision that handguns ... have no legitimate use in the purely urban environment of the District").

**\*696** The District's special focus on handguns thus reflects the fact that the Committee Report found them to have a particularly strong link to undesirable activities in the District's exclusively urban environment. See *id.,* at 25–26. The District did not seek to prohibit possession of other sorts of weapons deemed more suitable for an "urban area." See *id.,* at 25. Indeed, an original draft of the bill, and the original Committee recommendations, had sought to prohibit registration of shotguns as well as handguns, but the Council as a whole decided to narrow the prohibition. Compare *id.,* at 30 (describing early version of the bill), with D.C.Code § 7–2502.02).

2

Next, consider the facts as a court must consider them looking at the matter as of today. See, *e.g., Turner,* 520 U.S., at 195, 117 S.Ct. 1174 (discussing role of court as **\*\*2856** factfinder in a constitutional case). Petitioners, and their *amici,* have presented us with more recent statistics that tell much the same story that the Committee Report told 30 years ago. At the least, they present nothing that would permit us to second-guess the Council in respect to the numbers of gun crimes, injuries, and deaths, or the role of handguns.

From 1993 to 1997, there were 180,533 firearm-related deaths in the United States, an average of over 36,000 per year. Dept. of Justice, Bureau of Justice Statistics, M. Zawitz & K. Strom, Firearm Injury and Death From Crime, 1993–97, p. 2 (Oct.2000), online at http://www.ojp.usdoj.gov/bjs/pub/pdf/fidc9397.pdf (hereinafter Firearm Injury and Death From Crime). Fifty-one percent were suicides, 44% were homicides, 1% were legal interventions, 3% were unintentional accidents, and 1% were of undetermined causes. See *ibid.* Over that same period there were an additional 411,800 nonfatal firearm-related injuries treated in U.S. hospitals, an average of over 82,000 per year. *Ibid.* Of these, 62% resulted from assaults, 17% were unintentional, 6% **\*697** were suicide attempts, 1% were legal interventions, and 13% were of unknown causes. *Ibid.*

The statistics are particularly striking in respect to children and adolescents. In over one in every eight firearm-related deaths in 1997, the victim was someone under the age of 20. American Academy of Pediatrics, Firearm–Related Injuries Affecting the Pediatric Population, 105 Pediatrics 888 (2000) (hereinafter Firearm–Related Injuries). Firearm-related deaths account for 22.5% of all injury deaths between the ages of 1 and 19. *Ibid.* More male teenagers die from firearms than from all natural causes combined. Dresang, Gun Deaths in Rural and Urban Settings, 14 J. Am. Bd. Family Practice 107 (2001). Persons under 25 accounted for 47% of hospital-treated firearm injuries between June 1, 1992, and May 31, 1993. Firearm–Related Injuries 891.

Handguns are involved in a majority of firearm deaths and injuries in the United States. *Id.,* at 888. From 1993 to 1997, 81% of firearm-homicide victims were killed by handgun. Firearm Injury and Death From Crime 4; see also Dept. of Justice, Bureau of Justice Statistics, C. Perkins, Weapon Use and Violent Crime 8

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4894   Page 70 of 131

(Sept.2003) (Table 10), http://www.ojp.usdoj.gov/bjs/pub/pdf/wuvc01.pdf (hereinafter Weapon Use and Violent Crime) (statistics indicating roughly the same rate for 1993–2001). In the same period, for the 41% of firearm injuries for which the weapon type is known, 82% of them were from handguns. Firearm Injury and Death from Crime 4. And among children under the age of 20, handguns account for approximately 70% of all unintentional firearm-related injuries and deaths. Firearm–Related Injuries 890. In particular, 70% of all firearm-related teenage suicides in 1996 involved a handgun. *Id.,* at 889; see also Zwerling, Lynch, Burmeister, & Goertz, The Choice of Weapons in Firearm Suicides in Iowa, 83 Am. J. Pub. Health 1630, 1631 (1993) (Table 1) (handguns used in 36.6% of all firearm suicides in Iowa from 1980–1984 and 43.8% from 1990–1991).

**\*698** Handguns also appear to be a very popular weapon among criminals. In a 1997 survey of inmates who were armed during the crime for which they were incarcerated, 83.2% of state inmates and 86.7% of federal inmates said that they were armed with a handgun. See Dept. of Justice, Bureau of Justice Statistics, C. Harlow, Firearm Use by Offenders 3 (Nov.2001), online at http://www.ojp.usdoj.gov/bjs/pub/pdf/fuo.pdf; see also Weapon Use and Violent Crime 2 (Table 2) (statistics indicating that handguns were used in over **\*\*2857** 84% of nonlethal violent crimes involving firearms from 1993 to 2001). And handguns are not only popular tools for crime, but popular objects of it as well: the Federal Bureau of Investigation received on average over 274,000 reports of stolen guns for each year between 1985 and 1994, and almost 60% of stolen guns are handguns. Dept. of Justice, Bureau of Justice Statistics, M. Zawitz, Guns Used in Crime 3 (July 1995), online at http://www.ojp.usdoj.gov/bjs/pub/pdf/guic.pdf. Department of Justice studies have concluded that stolen handguns in particular are an important source of weapons for both adult and juvenile offenders. *Ibid.*

Statistics further suggest that urban areas, such as the District, have different experiences with gun-related death, injury, and crime than do less densely populated rural areas. A disproportionate amount of violent and property crimes occur in urban areas, and urban criminals are more likely than other offenders to use a firearm during the commission of a violent crime. See Dept. of Justice, Bureau of Justice Statistics, D. Duhart, Urban, Suburban, and Rural Victimization, 1993–98, pp. 1, 9 (Oct.2000), online at http://www.ojp.usdoj.gov/bjs/pub/pdf/usrv98.pdf. Homicide appears to be a much greater issue in urban areas; from 1985 to 1993, for example, "half of all homicides occurred in 63 cities with 16% of the nation's

population." Wintemute, The Future of Firearm Violence Prevention, 282 JAMA 475 (1999). One study concluded that although the overall rate of gun death between 1989 and 1999 was roughly the same in urban and **\*699** rural areas, the urban homicide rate was three times as high; even after adjusting for other variables, it was still twice as high. Branas, Nance, Elliott, Richmond, & Schwab, Urban–Rural Shifts in Intentional Firearm Death, 94 Am. J. Pub. Health 1750, 1752 (2004); see also *ibid.* (noting that rural areas appear to have a higher rate of firearm suicide). And a study of firearm injuries to children and adolescents in Pennsylvania between 1987 and 2000 showed an injury rate in urban counties 10 times higher than in nonurban counties. Nance et al., The Rural–Urban Continuum, 156 Archives of Pediatrics & Adolescent Medicine 781, 782 (2002).

Finally, the linkage of handguns to firearms deaths and injuries appears to be much stronger in urban than in rural areas. "[S]tudies to date generally support the hypothesis that the greater number of rural gun deaths are from rifles or shotguns, whereas the greater number of urban gun deaths are from handguns." Dresang, *supra,* at 108. And the Pennsylvania study reached a similar conclusion with respect to firearm injuries—they are much more likely to be caused by handguns in urban areas than in rural areas. See Nance et al., *supra,* at 784.

### 3

Respondent and his many *amici* for the most part do not disagree about the *figures* set forth in the preceding subsection, but they do disagree strongly with the District's *predictive judgment* that a ban on handguns will help solve the crime and accident problems that those figures disclose. In particular, they disagree with the District Council's assessment that "freezing the pistol ... population within the District," DC Rep., at 26, will reduce crime, accidents, and deaths related to guns. And they provide facts and figures designed to show that it has not done so in the past, and hence will not do so in the future.

First, they point out that, since the ban took effect, violent crime in the District has increased, not decreased. See **\*700** Brief for Criminologists et al. as *Amici Curiae* 4–8, 3a (hereinafter Criminologists' Brief); Brief for Congress of Racial Equality as **\*\*2858** *Amicus Curiae* 35–36; Brief for National Rifle Association et al. as *Amici Curiae* 28–30 (hereinafter NRA Brief). Indeed, a comparison with 49

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4895 Page 71 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

other major cities reveals that the District's homicide rate is actually substantially *higher* relative to these other cities than it was before the handgun restriction went into effect. See Brief for Academics et al. as *Amici Curiae* 7–10 (hereinafter Academics' Brief); see also Criminologists' Brief 6–9, 3a–4a, 7a. Respondent's *amici* report similar results in comparing the District's homicide rates during that period to that of the neighboring States of Maryland and Virginia (neither of which restricts handguns to the same degree), and to the homicide rate of the Nation as a whole. See Academics' Brief 11–17; Criminologists' Brief 6a, 8a.

Second, respondent's *amici* point to a statistical analysis that regresses murder rates against the presence or absence of strict gun laws in 20 European nations. See Criminologists' Brief 23 (citing Kates & Mauser, Would Banning Firearms Reduce Murder and Suicide? 30 Harv. J.L. & Pub. Pol'y 649, 651–694 (2007)). That analysis concludes that strict gun laws are correlated with *more* murders, not fewer. See Criminologists' Brief 23; see also *id.,* at 25–28. They also cite domestic studies, based on data from various cities, States, and the Nation as a whole, suggesting that a reduction in the number of guns does not lead to a reduction in the amount of violent crime. See *id.,* at 17–20. They further argue that handgun bans do not reduce suicide rates, see *id.,* at 28–31, 9a, or rates of accidents, even those involving children, see App. to Brief for International Law Enforcement Educators and Trainers Association et al. as *Amici Curiae* App. 7–15 (hereinafter ILEETA Brief).

Third, they point to evidence indicating that firearm ownership does have a beneficial self-defense effect. Based on a 1993 survey, the authors of one study estimated that there **\*701** were 2.2–to–2.5 million defensive uses of guns (mostly brandishing, about a quarter involving the actual firing of a gun) annually. See Kleck & Gertz, Armed Resistance to Crime, 86 J.Crim. L. & C. 150, 164 (1995); see also ILEETA Brief App. 1–6 (summarizing studies regarding defensive uses of guns). Another study estimated that for a period of 12 months ending in 1994, there were 503,481 incidents in which a burglar found himself confronted by an armed homeowner, and that in 497,646 (98.8%) of them, the intruder was successfully scared away. See Ikeda, Dahlberg, Sacks, Mercy, & Powell, Estimating Intruder–Related Firearms Retrievals in U.S. Households, 12 Violence & Victims 363 (1997). A third study suggests that gun-armed victims are substantially less likely than non-gun-armed victims to be injured in resisting robbery or assault. Barnett & Kates, Under Fire, 45 Emory L.J. 1139, 1243–1244, n.

478 (1996). And additional evidence suggests that criminals are likely to be deterred from burglary and other crimes if they know the victim is likely to have a gun. See Kleck, Crime Control Through the Private Use of Armed Force, 35 Social Problems 1, 15 (1988) (reporting a substantial drop in the burglary rate in an Atlanta suburb that required heads of households to own guns); see also ILEETA Brief 17–18 (describing decrease in sexual assaults in Orlando when women were trained in the use of guns).

Fourth, respondent's *amici* argue that laws criminalizing gun possession are self-defeating, as evidence suggests that they will have the effect only of restricting law-abiding citizens, but not criminals, from acquiring guns. See, *e.g.,* Brief for President *Pro Tempore* of Senate of Pennsylvania as *Amicus Curiae* 35, 36, and n. 15. That effect, they argue, will be especially pronounced in the District, whose proximity **\*\*2859** to Virginia and Maryland will provide criminals with a steady supply of guns. See Brief for Heartland Institute as *Amicus Curiae* 20.

In the view of respondent's *amici,* this evidence shows that other remedies—such as *less* restriction on gun ownership, **\*702** or liberal authorization of law-abiding citizens to carry concealed weapons—better fit the problem. See, *e.g.,* Criminologists' Brief 35–37 (advocating easily obtainable gun licenses); Brief for Southeastern Legal Foundation, Inc., et al. as *Amici Curiae* 15 (hereinafter SLF Brief) (advocating "widespread gun ownership" as a deterrent to crime); see also J. Lott, More Guns, Less Crime (2d ed.2000). They further suggest that at a minimum the District fails to show that its *remedy,* the gun ban, bears a reasonable relation to the crime and accident *problems* that the District seeks to solve. See, *e.g.,* Brief for Respondent 59–61.

These empirically based arguments may have proved strong enough to convince many legislatures, as a matter of legislative policy, not to adopt total handgun bans. But the question here is whether they are strong enough to destroy judicial confidence in the reasonableness of a legislature that rejects them. And that they are not. For one thing, they can lead us more deeply into the uncertainties that surround any effort to reduce crime, but they cannot prove either that handgun possession diminishes crime or that handgun bans are ineffective. The statistics do show a soaring District crime rate. And the District's crime rate went up after the District adopted its handgun ban. But, as students of elementary logic know, *after it* does not mean *because of it.* What would the District's crime rate have looked like without the ban?

*District of Columbia v. Heller, 554 U.S. 570 (2008)*

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Higher? Lower? The same? Experts differ; and we, as judges, cannot say.

What about the fact that foreign nations with strict gun laws have higher crime rates? Which is the cause and which the effect? The proposition that strict gun laws *cause* crime is harder to accept than the proposition that strict gun laws in part grow out of the fact that a nation already has a higher crime rate. And we are then left with the same question as before: What would have happened to crime without the gun laws—a question that respondent and his *amici* do not convincingly answer.

**\*703** Further, suppose that respondent's *amici* are right when they say that householders' possession of loaded handguns help to frighten away intruders. On that assumption, one must still ask whether that benefit is worth the potential death-related cost. And that is a question without a directly provable answer.

Finally, consider the claim of respondent's *amici* that handgun bans *cannot* work; there are simply too many illegal guns already in existence for a ban on legal guns to make a difference. In a word, they claim that, given the urban sea of pre-existing legal guns, criminals can readily find arms regardless. Nonetheless, a legislature might respond, we want to make an effort to try to dry up that urban sea, drop by drop. And none of the studies can show that effort is not worthwhile.

In a word, the studies to which respondent's *amici* point raise policy-related questions. They succeed in proving that the District's predictive judgments are controversial. But they do not by themselves show that those judgments are incorrect; nor do they demonstrate a consensus, academic or otherwise, supporting that conclusion.

Thus, it is not surprising that the District and its *amici* support the District's **\*\*2860** handgun restriction with studies of their own. In one particular suggests that, statistically speaking, the District's law has indeed had positive life-saving effects. See Loftin, McDowall, Wiersema, & Cottey, Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia, 325 New England J. Med. 1615 (1991) (hereinafter Loftin study). Others suggest that firearm restrictions as a general matter reduce homicides, suicides, and accidents in the home. See, *e.g.,* Duggan, More Guns, More Crime, 109 J. Pol. Econ. 1086 (2001); Kellermann, Somes, Rivara, Lee, & Banton, Injuries and Deaths Due to Firearms in the Home, 45 J. Trauma: Injury,

Infection & Critical Care 263 (1998); Miller, Azrael, & Hemenway, Household Firearm Ownership and Suicide Rates in **\*704** the United States, 13 Epidemiology 517 (2002). Still others suggest that the defensive uses of handguns are not as great in number as respondent's *amici* claim. See, *e.g.,* Brief for American Public Health Association et al. as *Amici Curiae* 17–19 (hereinafter APHA Brief) (citing studies).

Respondent and his *amici* reply to these responses; and in doing so, they seek to discredit as methodologically flawed the studies and evidence relied upon by the District. See, *e.g.,* Criminologists' Brief 9–17, 20–24; Brief for Association of American Physicians and Surgeons, Inc., as *Amicus Curiae* 12–18; SLF Brief 17–22; Britt, Kleck, & Bordua, A Reassessment of the D.C. Gun Law, 30 Law & Soc. Rev. 361 (1996) (criticizing the Loftin study). And, of course, the District's *amici* produce counterrejoinders, referring to articles that defend their studies. See, *e.g.,* APHA Brief 23, n. 5 (citing McDowall, Loftin, & Wiersema, Using Quasi–Experiments To Evaluate Firearm Laws, 30 Law & Soc. Rev. 381 (1996)).

The upshot is a set of studies and counterstudies that, at most, could leave a judge uncertain about the proper policy conclusion. But from respondent's perspective any such uncertainty is not good enough. That is because legislators, not judges, have primary responsibility for drawing policy conclusions from empirical fact. And, given that constitutional allocation of decisionmaking responsibility, the empirical evidence presented here is sufficient to allow a judge to reach a firm *legal* conclusion.

In particular this Court, in First Amendment cases applying intermediate scrutiny, has said that our "sole obligation" in reviewing a legislature's "predictive judgments" is "to assure that, in formulating its judgments, the legislature "has drawn reasonable inferences based on substantial evidence." *Turner,* 520 U.S., at 195, 117 S.Ct. 1174 (internal quotation marks omitted). And judges, looking at the evidence before us, should agree that the District Legislature's predictive judgments satisfy that legal standard. That is to say, the **\*705** District's judgment, while open to question, is nevertheless supported by "substantial evidence."

There is no cause here to depart from the standard set forth in *Turner,* for the District's decision represents the kind of empirically based judgment that legislatures, not courts, are best suited to make. See *Nixon,* 528 U.S., at 402, 120 S.Ct. 897 (BREYER, J., concurring). In fact, deference to legislative

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4897 Page 73 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

judgment seems particularly appropriate here, where the judgment has been made by a local legislature, with particular knowledge of local problems and insight into appropriate local solutions. See *Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion) ("[W]e must acknowledge that the Los Angeles City Council is in a better **\*\*2861** position than the Judiciary to gather and evaluate data on local problems"); cf. DC Rep., at 67 (statement of Rep. Gude) (describing District's law as "a decision made on the local level after extensive debate and deliberations"). Different localities may seek to solve similar problems in different ways, and a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (internal quotation marks omitted). "The Framers recognized that the most effective democracy occurs at local levels of government, where people with firsthand knowledge of local problems have more ready access to public officials responsible for dealing with them." *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 575, n. 18, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (Powell, J., dissenting) (citing The Federalist No. 17, p. 107 (J. Cooke ed.1961) (A. Hamilton)). We owe that democratic process some substantial weight in the constitutional calculus.

For these reasons, I conclude that the District's statute properly seeks to further the sort of life-preserving and public-safety interests that the Court has called "compelling." *Salerno,* 481 U.S., at 750, 754, 107 S.Ct. 2095.

## **\*706** B

I next assess the extent to which the District's law burdens the interests that the Second Amendment seeks to protect. Respondent and his *amici,* as well as the majority, suggest that those interests include: (1) the preservation of a "well regulated Militia"; (2) safeguarding the use of firearms for sporting purposes, *e.g.,* hunting and marksmanship; and (3) assuring the use of firearms for self-defense. For argument's sake, I shall consider all three of those interests here.

### 1

The District's statute burdens the Amendment's first and primary objective hardly at all. As previously noted, there is general agreement among the Members of the Court that the

principal (if not the only) purpose of the Second Amendment is found in the Amendment's text: the preservation of a "well regulated Militia." See *supra,* at 2848. What scant Court precedent there is on the Second Amendment teaches that the Amendment was adopted "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces" and "must be interpreted and applied with that end in view." *Miller,* 307 U.S., at 178, 59 S.Ct. 816. Where that end is implicated only minimally (or not at all), there is substantially less reason for constitutional concern. Compare *ibid.* ("In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument").

To begin with, the present case has nothing to do with *actual* military service. The question presented presumes that respondent is "*not* affiliated with any state-regulated militia." 552 U.S. 1035, 128 S.Ct. 645, 169 L.Ed.2d 417 (2007) (emphasis added). I am aware of no indication that the District either now or in the **\*707** recent past has called up its citizenry to serve in a militia, that it has any inkling of doing so anytime in the foreseeable future, or that this law must be construed to prevent the use of handguns during legitimate militia activities. Moreover, even if **\*\*2862** the District were to call up its militia, respondent would not be among the citizens whose service would be requested. The District does not consider him, at 66 years of age, to be a member of its militia. See D.C.Code § 49–401 (2001) (militia includes only male residents ages 18 to 45); App. to Pet. for Cert. 120a (indicating respondent's date of birth).

Nonetheless, as some *amici* claim, the statute might interfere with training in the use of weapons, training useful for military purposes. The 19th-century constitutional scholar, Thomas Cooley, wrote that the Second Amendment protects "learning to handle and use [arms] in a way that makes those who keep them ready for their efficient use" during militia service. General Principles of Constitutional Law 271 (1880); *ante,* at 2811 – 2812 (opinion of the Court); see also *ante,* at 2811 – 2812 (citing other scholars agreeing with Cooley on that point). And former military officers tell us that "private ownership of firearms makes for a more effective fighting force" because "[m]ilitary recruits with previous firearms experience and training are generally better marksmen, and accordingly, better soldiers." Brief for Retired

Case 2:19-cv-00037-JNP  Document 59-31  Filed 11/30/22  PageID.4898  Page 74 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Military Officers as *Amici Curiae* 1–2 (hereinafter Military Officers' Brief). An *amicus* brief filed by retired Army generals adds that a "well-regulated militia—whether *ad hoc* or as part of our organized military—depends on recruits who have familiarity and training with firearms—rifles, pistols, and shotguns." Brief for Major General John D. Altenburg, Jr., et al. as *Amici Curiae* 4 (hereinafter Generals' Brief). Both briefs point out the importance of handgun training. Military Officers' Brief 26–28; Generals' Brief 4. Handguns are used in military service, see Military Officers' Brief 26, and "civilians who are familiar with handgun marksmanship **\*708** and safety are much more likely to be able to safely and accurately fire a rifle or other firearm with minimal training upon entering military service," *id.,* at 28.

Regardless, to consider the military-training objective a modern counterpart to a similar militia-related colonial objective and to treat that objective as falling within the Amendment's primary purposes makes no difference here. That is because the District's law does not seriously affect military-training interests. The law permits residents to engage in activities that will increase their familiarity with firearms. They may register (and thus possess in their homes) weapons other than handguns, such as rifles and shotguns. See D.C.Code §§ 7–2502.01, 7–2502.02(a) (only weapons that cannot be registered are sawed-off shotguns, machineguns, short-barreled rifles, and pistols not registered before 1976); compare Generals' Brief 4 (listing "*rifles,* pistols, and *shotguns*" as useful military weapons (emphasis added). And they may operate those weapons within the District "for lawful recreational purposes." § 7–2507.02; see also § 7–2502.01(b)(3) (nonresidents "participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction," may carry even weapons not registered in the District). These permissible recreations plainly include actually using and firing the weapons, as evidenced by a specific D.C.Code provision contemplating the existence of local firing ranges. See § 7–2507.03.

And while the District law prevents citizens from training with handguns *within the District,* the District consists of only 61.4 square miles of urban area. See Dept. of Commerce, Bureau of Census, United States: 2000 (pt. 1), p. 11 (2002) (Table 8). The adjacent States do permit the use of handguns for target practice, and those States are only a brief subway ride away. See Md.Crim. Law Code Ann. **\*\*2863** § 4–203(b)(4) (Lexis Supp.2007) (general handgun restriction does not apply to "the wearing, carrying, or transporting by **\*709** a person of a handgun used in connection with," *inter alia,* "a target shoot, formal or informal target practice, sport shooting event, hunting, [or] a Department of Natural Resources-sponsored firearms and hunter safety class"); Va.Code Ann. § 18.2–287.4 (Lexis Supp.2007) (general restriction on carrying certain loaded pistols in certain public areas does not apply "to any person actually engaged in lawful hunting or lawful recreational shooting activities at an established shooting range or shooting contest"); Washington Metropolitan Area Transit Authority, Metrorail System Map, online at http://www.wmata.com/ metrorail/systemmap.cfm.

Of course, a subway rider must buy a ticket, and the ride takes time. It also costs money to store a pistol, say, at a target range, outside the District. But given the costs already associated with gun ownership and firearms training, I cannot say that a subway ticket and a short subway ride (and storage costs) create more than a minimal burden. Cf. *Crawford v. Marion County Election Bd.,* 553 U.S. 181, 238 – 239, 128 S.Ct. 1610, 1614–1615, 170 L.Ed.2d 574 (2008) (BREYER, J., dissenting) (acknowledging travel burdens on indigent persons in the context of voting where public transportation options were limited). Indeed, respondent and two of his coplaintiffs below may well use handguns outside the District on a regular basis, as their declarations indicate that they keep such weapons stored there. See App. to Pet. for Cert. 77a (respondent); see also *id.,* at 78a, 84a (coplaintiffs). I conclude that the District's law burdens the Second Amendment's primary objective little, or not at all.

2

The majority briefly suggests that the "right to keep and bear Arms" might encompass an interest in hunting. See, *e.g., ante,* at 2801. But in enacting the present provisions, the District sought to "take nothing away from sportsmen." DC Rep., at 33. And any inability of District residents to hunt near where they live has much to do with the jurisdiction's exclusively urban character and little to do with the District's **\*710** firearm laws. For reasons similar to those I discussed in the preceding subsection—that the District's law does not prohibit possession of rifles or shotguns, and the presence of opportunities for sporting activities in nearby States—I reach a similar conclusion, namely, that the District's law burdens any sports-related or hunting-related objectives that the Amendment may protect little, or not at all.

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4899 Page 75 of 131
District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

### 3

The District's law does prevent a resident from keeping a loaded handgun in his home. And it consequently makes it more difficult for the householder to use the handgun for self-defense in the home against intruders, such as burglars. As the Court of Appeals noted, statistics suggest that handguns are the most popular weapon for self-defense. See 478 F.3d, at 400 (citing Kleck & Gertz, 86 J.Crim. L. & C., at 182–183). And there are some legitimate reasons why that would be the case: *Amici* suggest (with some empirical support) that handguns are easier to hold and control (particularly for persons with physical infirmities), easier to carry, easier to maneuver in enclosed spaces, and that a person using one will still have a hand free to dial 911. See ILEETA Brief 37–39; NRA Brief 32–33; see also *ante,* at 2818. But see Brief for Petitioners 54–55 (citing sources preferring shotguns and rifles to handguns for purposes of self-defense). To that extent the law burdens to some **\*\*2864** degree an interest in self-defense that for present purposes I have assumed the Amendment seeks to further.

### C

In weighing needs and burdens, we must take account of the possibility that there are reasonable, but less restrictive, alternatives. Are there *other* potential measures that might similarly promote the same goals while imposing lesser restrictions? See *Nixon,* 528 U.S., at 402, 120 S.Ct. 897 (BREYER, J., concurring) ("existence of a clearly superior, less restrictive alternative" **\*711** can be a factor in determining whether a law is constitutionally proportionate). Here I see none.

The reason there is no clearly superior, less restrictive alternative to the District's handgun ban is that the ban's very objective is to reduce significantly the number of handguns in the District, say, for example, by allowing a law enforcement officer immediately to assume that *any* handgun he sees is an *illegal* handgun. And there is no plausible way to achieve that objective other than to ban the guns.

It does not help respondent's case to describe the District's objective more generally as an "effort to diminish the dangers associated with guns." That is because the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous. That they are easy to

hold and control means that they are easier for children to use. See Brief for American Academy of Pediatrics et al. as *Amici Curiae* 19 ("[C]hildren as young as three are able to pull the trigger of most handguns"). That they are maneuverable and permit a free hand likely contributes to the fact that they are by far the firearm of choice for crimes such as rape and robbery. See Weapon Use and Violent Crime 2 (Table 2). That they are small and light makes them easy to steal, see *supra,* at 2797 – 2798, and concealable, cf. *ante,* at 2816 (opinion of the Court) (suggesting that concealed-weapon bans are constitutional).

This symmetry suggests that any measure less restrictive in respect to the use of handguns for self-defense will, to that same extent, prove less effective in preventing the use of handguns for illicit purposes. If a resident has a handgun in the home that he can use for self-defense, then he has a handgun in the home that he can use to commit suicide or engage in acts of domestic violence. See *supra,* at 2856 (handguns prevalent in suicides); Brief for National Network to End Domestic Violence et al. as *Amici Curiae* 27 (handguns prevalent in domestic violence). If it is indeed the case, as the District believes, that **\*712** the number of guns contributes to the number of gun-related crimes, accidents, and deaths, then, although there may be less restrictive, *less effective* substitutes for an outright ban, there is no less restrictive *equivalent* of an outright ban.

Licensing restrictions would not similarly reduce the handgun population, and the District may reasonably fear that even if guns are initially restricted to law-abiding citizens, they might be stolen and thereby placed in the hands of criminals. See *supra,* at 2856 – 2857. Permitting certain types of handguns, but not others, would affect the commercial market for handguns, but not their availability. And requiring safety devices such as trigger locks, or imposing safe-storage requirements would interfere with any self-defense interest while simultaneously leaving operable weapons in the hands of owners (or others capable of acquiring the weapon and disabling the safety device) who might use them for domestic violence or other crimes.

The absence of equally effective alternatives to a complete prohibition finds support in the empirical fact that other States **\*\*2865** and urban centers prohibit particular types of weapons. Chicago has a law very similar to the District's, and many of its suburbs also ban handgun possession under most circumstances. See Chicago, Ill., Municipal Code §§ 8–20–030(k), 8–20–40, 8–20–50(c) (2008); Evanston, Ill., City Code § 9–8–2 (2007); Morton Grove, Ill.,

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4900   Page 76 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

Village Code § 6–2–3(C) (2007); Oak Park, Ill., Village Code § 27–2–1 (2007); Winnetka, Ill., Village Ordinance § 9.12.020(B) (2008), online at http://www.amlegal.com/library/il/Winnetka.shtml; Wilmette, Ill., Ordinance § 12–24(b) (2008), online at http://www.amlegal.com/library/il/Wilmette.shtml. Toledo bans certain types of handguns. Toledo, Ohio, Municipal Code, § 549.25 (2008). And San Francisco in 2005 enacted by popular referendum a ban on most handgun possession by city residents; it has been precluded from enforcing that prohibition, however, by state-court decisions deeming it pre-empted by state law. See **\*713** *Fiscal v. City and County of San Francisco,* 158 Cal.App.4th 895, 900–902, 70 Cal.Rptr.3d 324, 326–328 (2008). (Indeed, the fact that as many as 41 States may pre-empt) local gun regulation suggests that the absence of more regulation like the District's may perhaps have more to do with state law than with a lack of locally perceived need for them. See Legal Community Against Violence, Regulating Guns in America 14 (2006), http://www.lcav.org/Library/reports_analyses/National_Audit_Total_8.16.06.pdf.

In addition, at least six States and Puerto Rico impose general bans on certain types of weapons, in particular assault weapons or semiautomatic weapons. See Cal.Penal Code.Ann. § 12280(b) (West Supp.2008); Conn. Gen.Stat. § 53–202c (2007); Haw.Rev.Stat. § 134–8 (1993); Md.Crim. Law Code Ann. § 4–303(a) (Lexis 2002); Mass. Gen. Laws, ch. 140, § 131M (West 2006); N.Y. Penal Law Ann. § 265.02(7) (West Supp.2008); 25 Laws P.R. Ann. § 456m (Supp.2006); see also 18 U.S.C. § 922(*o*) (federal machinegun ban). And at least 14 municipalities do the same. See Albany, N. Y., Municipal Code § 193–16(A) (2005); Aurora, Ill., Ordinance § 29–49(a) (2007); Buffalo, N. Y., City Code § 180–1(F) (2000); Chicago, Ill., Municipal Code § 8–24–025(a), 8–20–030(h); Cincinnati, Ohio, Municipal Code § 708–37(a) (Supp.2008); Cleveland, Ohio, Ordinance § 628.03(a) (2007); Columbus, Ohio, City Code § 2323.31 (2007); Denver, Colo., Revised Municipal Code § 38–130(e) (2008); Morton Grove, Ill., Village Code § 6–2–3(B) (1996 and Supp. 2007); N.Y.C. Admin. Code § 10–303.1 (2007); Oak Park, Ill., Village Code § 27–2–1 (2007); Rochester, N. Y., Code § 47–5(f) (2008), online at http://www.ci.rochester.ny.us/index.cfm?id=112; South Bend, Ind., Ordinance §§ 13–97(b), 13–98 (2008), online at http://library2.municode.com//default/DocView13974/1/2; Toledo, Ohio, Municipal Code § 549.23(a). These bans, too, suggest that there may be no substitute to an outright prohibition in cases where a governmental body has deemed a particular type of weapon especially dangerous.

**\*714** D

The upshot is that the District's objectives are compelling; its predictive judgments as to its law's tendency to achieve those objectives are adequately supported; the law does impose a burden upon any self-defense interest that the Amendment seeks to secure; and there is no clear less restrictive alternative. I turn now to the final portion of the "permissible regulation" question: Does the District's law *disproportionately* burden Amendment-protected interests? Several considerations, taken together, convince me that it does not.

First, the District law is tailored to the life-threatening problems it attempts to address. The law concerns one class of weapons, handguns, leaving residents free to possess shotguns and rifles, along with ammunition. The area that falls within its scope is totally urban. Cf. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 563, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (varied **\*\*2866** effect of statewide speech restriction in "rural, urban, or suburban" locales "demonstrates a lack of narrow tailoring"). That urban area suffers from a serious handgun-fatality problem. The District's law directly aims at that compelling problem. And there is no less restrictive way to achieve the problem-related benefits that it seeks.

Second, the self-defense interest in maintaining loaded handguns in the home to shoot intruders is not the *primary* interest, but at most a subsidiary interest, that the Second Amendment seeks to serve. The Second Amendment's language, while speaking of a "Militia," says nothing of "self-defense." As JUSTICE STEVENS points out, the Second Amendment's drafting history shows that the language reflects the Framers' primary, if not exclusive, objective. See *ante,* at 2831 – 2837 (dissenting opinion). And the majority itself says that "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was *the* reason that right ... was codified in a written Constitution." **\*715** *Ante,* at 2836 (emphasis added). The *way* in which the Amendment's operative clause seeks to promote that interest—by protecting a right "to keep and bear Arms"—may *in fact* help further an interest in self-defense. But a factual connection falls far short of a primary objective. The Amendment itself tells us that militia preservation was first and foremost in the Framers' minds. See *Miller,* 307 U.S., at 178, 59 S.Ct. 816 ("With obvious

Case 2:19-cv-00037-JNP  Document 59-31  Filed 11/30/22  PageID.4901  Page 77 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

purpose to assure the continuation and render possible the effectiveness of [militia] forces the declaration and guarantee of the Second Amendment were made," and the Amendment "must be interpreted and applied with that end in view").

Further, any self-defense interest at the time of the framing could not have focused exclusively upon urban-crime-related dangers. Two hundred years ago, most Americans, many living on the frontier, would likely have thought of self-defense primarily in terms of outbreaks of fighting with Indian tribes, rebellions such as Shays' Rebellion, marauders, and crime-related dangers to travelers on the roads, on footpaths, or along waterways. See Dept. of Commerce, Bureau of Census, Population: 1790 to 1990 (1998) (Table 4), online at http://www.census.gov/population/censusdata/table–4.pdf (of the 3,929,214 Americans in 1790, only 201,655—about 5%—lived in urban areas). Insofar as the Framers focused at all on the tiny fraction of the population living in large cities, they would have been aware that these city dwellers were subject to firearm restrictions that their rural counterparts were not. See *supra,* at 2848 – 2850. They are unlikely then to have thought of a right to keep loaded handguns in homes to confront intruders in urban settings as *central.* And the subsequent development of modern urban police departments, by diminishing the need to keep loaded guns nearby in case of intruders, would have moved any such right even further away from the heart of the Amendment's more basic protective ends. See, *e.g.,* Sklansky, **\*716** The Private Police, 46 UCLA L.Rev. 1165, 1206–1207 (1999) (professional urban police departments did not develop until roughly the mid–19th century).

Nor, for that matter, am I aware of any evidence that *handguns* in particular were central to the Framers' conception of the Second Amendment. The lists of militia-related weapons in the late-18th-century state statutes appear primarily to refer to other sorts of weapons, muskets in particular. See *Miller, supra,* at 180–182, 59 S.Ct. 816 (reproducing colonial militia laws). Respondent points out in his brief that the Federal Government and two States at the time of the founding had **\*\*2867** enacted statutes that listed handguns as "acceptable" militia weapons. Brief for Respondent 47. But these statutes apparently found them "acceptable" only for certain special militiamen (generally, certain soldiers on horseback), while requiring muskets or rifles for the general infantry. See Act of May 8, 1792, ch. XXXIII, 1 Stat. 271; Laws of the State of North Carolina 592 (1791); First Laws of the State of Connecticut 150 (J. Cushing ed. 1982); see also 25 Journals of

the Continental Congress 1774–1789, pp. 741–742 (G. Hunt ed. 1922).

Third, irrespective of what the Framers *could have thought,* we know what they *did think.* Samuel Adams, who lived in Boston, advocated a constitutional amendment that would have precluded the Constitution from ever being " 'construed' " to " 'prevent the people of the United States, who are peaceable citizens, from keeping their own arms.' " 6 Documentary History of the Ratification of the Constitution 1453 (J. Kaminski & G. Saladino eds.2000). Samuel Adams doubtless knew that the Massachusetts Constitution contained somewhat similar protection. And he doubtless knew that Massachusetts law prohibited Bostonians from keeping loaded guns in the house. So how could Samuel Adams have advocated such protection *unless* he thought that the protection was *consistent* with local regulation that seriously impeded urban residents from using their arms **\*717** against intruders? It seems unlikely that he meant to deprive the Federal Government of power (to enact Boston-type weapons regulation) that he knew Boston had and (as far as we know) he would have thought constitutional under the Massachusetts Constitution. Indeed, since the District of Columbia (the subject of the Seat of Government Clause, U.S. Const., Art. I, § 8, cl. 17) was the only *urban* area under direct federal control, it seems unlikely that the Framers thought about *urban* gun control at all. Cf. *Palmore v. United States,* 411 U.S. 389, 398, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (Congress can "legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it").

Of course the District's law and the colonial Boston law are not identical. But the Boston law disabled an even wider class of weapons (indeed, all firearms). And its existence shows at the least that local legislatures could impose (as here) serious restrictions on the right to use firearms. Moreover, as I have said, Boston's law, though highly analogous to the District's, was not the *only* colonial law that could have impeded a homeowner's ability to shoot a burglar. Pennsylvania's and New York's laws could well have had a similar effect. See *supra,* at 2849 – 2850. And the Massachusetts and Pennsylvania laws were not only thought consistent with an *unwritten* common-law gun-possession right, but also consistent with *written* state constitutional provisions providing protections similar to those provided by the Federal Second Amendment. See *ibid.* I cannot agree with the majority that these laws are largely uninformative because

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4902 Page 78 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)
128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

the penalty for violating them was civil, rather than criminal. *Ante,* at 2820 – 2821. The Court has long recognized that the exercise of a constitutional right can be burdened by penalties far short of jail time. See, *e.g., Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (invalidating $7 per week solicitation fee as applied to religious group); **\*718** see also *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 136, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("A tax based on the content of speech does not become **\*\*2868** more constitutional because it is a small tax").

Regardless, why would the majority require a precise colonial regulatory analogue in order to save a modern gun regulation from constitutional challenge? After all, insofar as we look to history to discover how we can constitutionally regulate a right to self-defense, we must look, not to what 18th-century legislatures actually *did* enact, but to what they would have thought they *could* enact. There are innumerable policy-related reasons why a legislature might not act on a particular matter, despite having the power to do so. This Court has "frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *United States v. Wells,* 519 U.S. 482, 496, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (internal quotation marks and brackets omitted). It is similarly "treacherous" to reason from the fact that colonial legislatures *did not* enact certain kinds of legislation to a conclusion that a modern legislature *cannot* do so. The question should not be whether a modern restriction on a right to self-defense *duplicates* a past one, but whether that restriction, when compared with restrictions originally thought possible, enjoys a similarly strong justification. At a minimum that similarly strong justification is what the District's modern law, compared with Boston's colonial law, reveals.

Fourth, a contrary view, as embodied in today's decision, will have unfortunate consequences. The decision will encourage legal challenges to gun regulation throughout the Nation. Because it says little about the standards used to evaluate regulatory decisions, it will leave the Nation without clear standards for resolving those challenges. See *ante,* at 2836, and n. 26. And litigation over the course of many years, or the mere specter of such litigation, threatens to leave cities without effective protection against gun violence and accidents during that time.

**\*719** As important, the majority's decision threatens severely to limit the ability of more knowledgeable, democratically elected officials to deal with gun-related problems. The majority says that it leaves the District "a variety of tools for combating" such problems. *Ante,* at 2822. It fails to list even one seemingly adequate replacement for the law it strikes down. I can understand how reasonable individuals can disagree about the merits of strict gun control as a crime-control measure, even in a totally urbanized area. But I cannot understand how one can take from the elected branches of government the right to decide whether to insist upon a handgun-free urban populace in a city now facing a serious crime problem and which, in the future, could well face environmental or other emergencies that threaten the breakdown of law and order.


V


The majority derides my approach as "judge-empowering." *Ante,* at 2821. I take this criticism seriously, but I do not think it accurate. As I have previously explained, this is an approach that the Court has taken in other areas of constitutional law. See *supra,* at 2852 – 2853. Application of such an approach, of course, requires judgment, but the very nature of the approach—requiring careful identification of the relevant interests and evaluating the law's effect upon them—limits the judge's choices; and the method's necessary transparency lays bare the judge's reasoning for all to see and to criticize.

The majority's methodology is, in my view, substantially less transparent than mine. At a minimum, I find it difficult to understand the reasoning that seems to underlie certain conclusions that it reaches.

**\*\*2869** The majority spends the first 54 pages of its opinion attempting to rebut JUSTICE STEVENS' evidence that the Amendment was enacted with a purely militia-related purpose. In the majority's view, the Amendment also protects **\*720** an interest in armed personal self-defense, at least to some degree. But the majority does not tell us precisely what that interest is. "Putting all of [the Second Amendment's] textual elements together," the majority says, "we find that they guarantee the individual right to possess and carry weapons in case of confrontation." *Ante,* at 2797. Then, three pages later, it says that "we do not read the Second Amendment to permit citizens to carry arms for *any sort* of confrontation." *Ante,* at 2799. Yet, with one critical exception, it does not explain which confrontations count. It simply leaves that question unanswered.

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4903 Page 79 of 131

District of Columbia v. Heller, 554 U.S. 570 (2008)

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

The majority does, however, point to one type of confrontation that counts, for it describes the Amendment as "elevat[ing] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Ante,* at 2846. What is its basis for finding that to be the core of the Second Amendment right? The only historical sources identified by the majority that even appear to touch upon that specific matter consist of an 1866 newspaper editorial discussing the Freedmen's Bureau Act, see *ante,* at 2810, two quotations from that 1866 Act's legislative history, see *ante,* at 2810 – 2811, and a 1980 state-court opinion saying that in colonial times the same were used to defend the home as to maintain the militia, see *ante,* at 2815. How can citations such as these support the far-reaching proposition that the Second Amendment's primary concern is not its stated concern about the militia, but rather a right to keep loaded weapons at one's bedside to shoot intruders?

Nor is it at all clear to me how the majority decides *which* loaded "arms" a homeowner may keep. The majority says that that Amendment protects those weapons "typically possessed by law-abiding citizens for lawful purposes." *Ante,* at 2816. This definition conveniently excludes machineguns, but permits handguns, which the majority describes as "the most popular weapon chosen by Americans for self-defense **\*721** in the home." *Ante,* at 2818; see also *ante,* at 2816 – 2817. But what sense does this approach make? According to the majority's reasoning, if Congress and the States lift restrictions on the possession and use of machineguns, and people buy machineguns to protect their homes, the Court will have to reverse course and find that the Second Amendment *does,* in fact, protect the individual self-defense-related right to possess a machinegun. On the majority's reasoning, if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so. In essence, the majority determines what regulations are permissible by looking to see what existing regulations permit. There is no basis for believing that the Framers intended such circular reasoning.

I am similarly puzzled by the majority's list, in Part III of its opinion, of provisions that in its view would survive Second Amendment scrutiny. These consist of (1) "prohibitions on carrying concealed weapons"; (2) "prohibitions on the possession of firearms by felons"; (3) "prohibitions on the possession of firearms by ... the mentally ill"; (4) "laws forbidding the carrying of firearms in sensitive places such

as schools and government buildings"; and (5) government "conditions and qualifications" attached to "the commercial sale of arms." *Ante,* at 2816. Why these? Is it **\*\*2870** that similar restrictions existed in the late-18th century? The majority fails to cite any colonial analogues. And even were it possible to find analogous colonial laws in respect to all these restrictions, why should these colonial laws count, while the Boston loaded-gun restriction (along with the other laws I have identified) apparently does not count? See *supra,* at 2849 – 2850, 2867 – 2868.

At the same time the majority ignores a more important question: Given the purposes for which the Framers enacted **\*722** the Second Amendment, how should it be applied to modern-day circumstances that they could not have anticipated? Assume, for argument's sake, that the Framers did intend the Amendment to offer a degree of self-defense protection. Does that mean that the Framers also intended to guarantee a right to possess a loaded gun near swimming pools, parks, and playgrounds? That they would not have cared about the children who might pick up a loaded gun on their parents' bedside table? That they (who certainly showed concern for the risk of fire, see *supra,* at 2849 – 2850) would have lacked concern for the risk of accidental deaths or suicides that readily accessible loaded handguns in urban areas might bring? Unless we believe that they intended future generations to ignore such matters, answering questions such as the questions in this case requires judgment—judicial judgment exercised within a framework for constitutional analysis that guides that judgment and which makes its exercise transparent. One cannot answer those questions by combining inconclusive historical research with judicial *ipse dixit.*

The argument about method, however, is by far the less important argument surrounding today's decision. Far more important are the unfortunate consequences that today's decision is likely to spawn. Not least of these, as I have said, is the fact that the decision threatens to throw into doubt the constitutionality of gun laws throughout the United States. I can find no sound legal basis for launching the courts on so formidable and potentially dangerous a mission. In my view, there simply is no untouchable constitutional right guaranteed by the Second Amendment to keep loaded handguns in the house in crime-ridden urban areas.

VI

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4904 Page 80 of 131

**District of Columbia v. Heller, 554 U.S. 570 (2008)**

128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060...

For these reasons, I conclude that the District's measure is a proportionate, not a disproportionate, response to the compelling concerns that led the District to adopt it. And, **\*723** for these reasons as well as the independently sufficient reasons set forth by Justice STEVENS, I would find the District's measure consistent with the Second Amendment's demands.

With respect, I dissent.

### All Citations

554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637, 76 USLW 4631, 08 Cal. Daily Op. Serv. 8060, 2008 Daily Journal D.A.R. 9613, 21 Fla. L. Weekly Fed. S 497

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

114 S.Ct. 1793
Supreme Court of the United States

Harold E. STAPLES, III, Petitioner,

v.

UNITED STATES.

No. 92–1441.
|
Argued Nov. 30, 1993.
|
Decided May 23, 1994.

**Synopsis**

Defendant was convicted in the United States District Court for the Northern District of Oklahoma of possession of unregistered machine gun. Defendant appealed. The Court of Appeals, 971 F.2d 608, affirmed. Defendant petitioned for writ of certiorari. The Supreme Court, Justice Thomas, held that government should have been required to prove beyond reasonable doubt that defendant knew weapon he possessed had characteristics that brought it within statutory definition of machine gun.

Court of Appeals' judgment reversed, case remanded.

Justice Ginsburg filed opinion concurring in judgment, in which Justice O'Connor joined.

Justice Stevens filed dissenting opinion in which Justice Blackmun joined.

**\*\*1794** *Syllabus* [*]

[*]   The syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499 (1906).

**\*600** The National Firearms Act criminalizes possession of an unregistered "firearm," 26 U.S.C. § 5861(d), including a "machinegun," § 5845(a)(6), which is defined as a weapon that automatically fires more than one shot with a single pull of the trigger, § 5845(b). Petitioner Staples was charged with possessing an unregistered machinegun in violation of § 5861(d) after officers searching his home seized a semiautomatic rifle—*i.e.,* a weapon that normally fires only one shot with each trigger pull—that had apparently been modified for fully automatic fire. At trial, Staples testified that the rifle had never fired automatically while he possessed it and that he had been ignorant of any automatic firing capability. He was convicted after the District Court rejected his proposed jury instruction under which, to establish a § 5861(d) violation, the Government would have been required to prove beyond a reasonable doubt that Staples knew that the gun would fire fully automatically. The Court of Appeals affirmed, concluding that the Government need not prove a defendant's knowledge of a weapon's physical properties to obtain a conviction under § 5861(d).

*Held:* To obtain a § 5861(d) conviction, the Government should have been required to prove beyond a reasonable doubt that Staples knew that his rifle had the characteristics that brought it within the statutory definition of a machinegun. Pp. 1796–1804.

(a) The common-law rule requiring *mens rea* as an element of a crime informs interpretation of § 5861(d) in this case. Because some indication of congressional intent, express or implied, is required to dispense with *mens rea,* § 5861(d)'s silence on the element of knowledge required for a conviction does not suggest that Congress intended to dispense with a conventional *mens rea* requirement, which would require that the defendant know the facts making his conduct illegal. Pp. 1796–1797.

(b) The Court rejects the Government's argument that the Act fits within the Court's line of precedent concerning "public welfare" or "regulatory" offenses and thus that the presumption favoring *mens rea* does not apply in this case. In cases concerning public welfare offenses, the Court has inferred from silence a congressional intent to dispense with conventional *mens rea* requirements in statutes that regulate potentially harmful or injurious items. In such cases, the Court has reasoned **\*601** that as long as a defendant knows that he is dealing with a dangerous device of a character that places him in responsible relation to a public danger, he should be alerted to the probability of strict regulation, and is placed on notice that he must determine at his peril whether his conduct comes within the statute's inhibition. See, *e.g., United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604; *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356. Guns, however, do not fall within the category of dangerous devices as it has been developed in public welfare offense **\*\*1795** cases. In contrast to the selling of dangerous drugs at issue in *Balint* or the possession of hand grenades considered

in *Freed,* private ownership of guns in this country has enjoyed a long tradition of being entirely lawful conduct. Thus, the destructive potential of guns in general cannot be said to put gun owners sufficiently on notice of the likelihood of regulation to justify interpreting § 5861(d) as dispensing with proof of knowledge of the characteristics that make a weapon a "firearm" under the statute. The Government's interpretation potentially would impose criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of weapons in their possession—makes their actions entirely innocent. Had Congress intended to make outlaws of such citizens, it would have spoken more clearly to that effect. Pp. 1797–1802.

(c) The potentially harsh penalty attached to violation of § 5861(d)—up to 10 years' imprisonment—confirms the foregoing reading of the Act. Where, as here, dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement. Pp. 1802–1804.

(d) The holding here is a narrow one that depends on a common-sense evaluation of the nature of the particular device Congress has subjected to regulation, the expectations that individuals may legitimately have in dealing with that device, and the penalty attached to a violation. It does not set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. P. 1804.

971 F.2d 608 (CA 10 1992), reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and SCALIA, KENNEDY, and SOUTER, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, in which O'CONNOR, J., joined, *post,* p. 1804. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 1806.

**Attorneys and Law Firms**

Jennifer L. De Angelis, Tulsa, OK, for petitioner.

James A. Feldman, Washington, DC, for respondent.

**Opinion**

 **\*602**  Justice THOMAS delivered the opinion of the Court.

The National Firearms Act makes it unlawful for any person to possess a machinegun that is not properly registered with the Federal Government. Petitioner contends that, to convict him under the Act, the Government should have been required to prove beyond a reasonable doubt that he knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun. We agree and accordingly reverse the judgment of the Court of Appeals.

I

The National Firearms Act (Act), 26 U.S.C. §§ 5801–5872, imposes strict registration requirements on statutorily defined "firearms." The Act includes within the term "firearm" a machinegun, § 5845(a)(6), and further defines a machinegun as "any weapon which shoots, ... or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," § 5845(b). Thus, any fully automatic weapon is a "firearm" within the meaning of the Act. [1] Under the Act, all firearms must be registered in the National Firearms Registration and Transfer Record maintained by the Secretary of the Treasury. § 5841. Section 5861(d) makes it a crime, punishable  **\*603**  by up to 10 years in prison, see § 5871, for any person to possess a firearm that is not properly registered.

[1]    As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

Upon executing a search warrant at petitioner's home, local police and agents of the  **\*\*1796**  Bureau of Alcohol, Tobacco and Firearms (BATF) recovered, among other things, an AR–15 rifle. The AR–15 is the civilian version of the military's M–16 rifle, and is, unless modified, a semiautomatic weapon. The M–16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire. Many M–16 parts are interchangeable with those in the AR–15 and can be used to convert the AR–15 into an automatic weapon. No doubt to inhibit such conversions, the AR–15

is manufactured with a metal stop on its receiver that will prevent an M–16 selector switch, if installed, from rotating to the fully automatic position. The metal stop on petitioner's rifle, however, had been filed away, and the rifle had been assembled with an M–16 selector switch and several other M–16 internal parts, including a hammer, disconnector, and trigger. Suspecting that the AR–15 had been modified to be capable of fully automatic fire, BATF agents seized the weapon. Petitioner subsequently was indicted for unlawful possession of an unregistered machinegun in violation of § 5861(d).

At trial, BATF agents testified that when the AR–15 was tested, it fired more than one shot with a single pull of the trigger. It was undisputed that the weapon was not registered as required by § 5861(d). Petitioner testified that the rifle had never fired automatically when it was in his possession. He insisted that the AR–15 had operated only semiautomatically, and even then imperfectly, often requiring manual ejection of the spent casing and chambering of the next round. According to petitioner, his alleged ignorance of any automatic firing capability should have shielded him from criminal liability for his failure to register the weapon. He requested the District Court to instruct the jury that, to establish a violation of § 5861(d), the Government must prove **604** beyond a reasonable doubt that the defendant "knew that the gun would fire fully automatically." 1 App. to Brief for Appellant in No. 91–5033 (CA10), p. 42.

The District Court rejected petitioner's proposed instruction and instead charged the jury as follows:

> "The Government need not prove the defendant knows he's dealing with a weapon possessing every last characteristic [which subjects it] [2] to the regulation. It would be enough to prove he knows that he is dealing with a dangerous device of a type as would alert one to the likelihood of regulation." Tr. 465.

[2]    In what the parties regard as a mistranscription, the transcript contains the word "suggested" instead of "which subjects it."

Petitioner was convicted and sentenced to five years' probation and a $5,000 fine.

The Court of Appeals affirmed. Relying on its decision in *United States v. Mittleider,* 835 F.2d 769 (CA10 1987), cert. denied, 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988), the court concluded that the Government need not prove a

defendant's knowledge of a weapon's physical properties to obtain a conviction under § 5861(d). 971 F.2d 608, 612–613 (CA10 1992). We granted certiorari, 508 U.S. 939, 113 S.Ct. 2412, 124 L.Ed.2d 635 (1993), to resolve a conflict in the Courts of Appeals concerning the *mens rea* required under § 5861(d).

II

A

Whether or not § 5861(d) requires proof that a defendant knew of the characteristics of his weapon that made it a "firearm" under the Act is a question of statutory construction. As we observed in *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Id.,* at 424, 105 S.Ct. at 2087 (citing **\*605** *United States v. Hudson,* 7 Cranch 32, 3 L.Ed. 259 1812)). Thus, we have long recognized that determining the mental state **\*\*1797** required for commission of a federal crime requires "construction of the statute and ... inference of the intent of Congress." *United States v. Balint,* 258 U.S. 250, 253, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922). See also *Liparota, supra,* at 423, 105 S.Ct., at 2087.

The language of the statute, the starting place in our inquiry, see *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149–1150, 117 L.Ed.2d 391 (1992), provides little explicit guidance in this case. Section 5861(d) is silent concerning the *mens rea* required for a violation. It states simply that "[i]t shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Nevertheless, silence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal. See *Balint, supra,* at 251, 42 S.Ct., at 302 (stating that traditionally, *"scienter"* was a necessary element in every crime). See also n. 3, *infra.* On the contrary, we must construe the statute in light of the background rules of the common law, see *United States v. United States Gypsum Co.,* 438 U.S. 422, 436–437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978), in which the requirement of some *mens rea* for a crime is firmly embedded. As we have observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the

principles of Anglo–American criminal jurisprudence." *Id.,* at 436, 98 S.Ct., at 2873 (internal quotation marks omitted). See also *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil").

There can be no doubt that this established concept has influenced our interpretation of criminal statutes. Indeed, we have noted that the common-law rule requiring *mens rea* **\*606** has been "followed in regard to statutory crimes even where the statutory definition did not in terms include it." *Balint, supra,* at 251–252, 42 S.Ct., at 302. Relying on the strength of the traditional rule, we have stated that offenses that require no *mens rea* generally are disfavored, *Liparota, supra,* at 426, 105 S.Ct., at 2088, and have suggested that some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime. Cf. *United States Gypsum, supra,* at 438, 98 S.Ct., at 2874; *Morissette, supra,* at 263, 72 S.Ct., at 249–250.

According to the Government, however, the nature and purpose of the Act suggest that the presumption favoring *mens rea* does not apply to this case. The Government argues that Congress intended the Act to regulate and restrict the circulation of dangerous weapons. Consequently, in the Government's view, this case fits in a line of precedent concerning what we have termed "public welfare" or "regulatory" offenses, in which we have understood Congress to impose a form of strict criminal liability through statutes that do not require the defendant to know the facts that make his conduct illegal. In construing such statutes, we have inferred from silence that Congress did not intend to require proof of *mens rea* to establish an offense.

For example, in *Balint,* we concluded that the Narcotic Act of 1914, which was intended in part to minimize the spread of addictive drugs by criminalizing undocumented sales of certain narcotics, required proof only that the defendant knew that he was selling drugs, not that he knew the specific items he had sold were "narcotics" within the ambit of the statute. See *Balint, supra,* at 254, 42 S.Ct., at 303. Cf. *United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (stating in dicta that a statute criminalizing the shipment of adulterated or misbranded drugs did not require knowledge that the items

were misbranded or **\*\*1798** adulterated). As we explained in *Dotterweich, Balint* dealt with "a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional **\*607** requirement for criminal conduct—awareness of some wrongdoing." 320 U.S., at 280–281, 42 S.Ct., at 136. See also *Morissette, supra,* at 252–256, 72 S.Ct., at 244–246.

Such public welfare offenses have been created by Congress, and recognized by this Court, in "limited circumstances." *United States Gypsum, supra,* 438 U.S., at 437, 98 S.Ct., at 2873. Typically, our cases recognizing such offenses involve statutes that regulate potentially harmful or injurious items. Cf. *United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 564–565, 91 S.Ct. 1697, 1701–1702, 29 L.Ed.2d 178 (1971) (characterizing *Balint* and similar cases as involving statutes regulating "dangerous or deleterious devices or products or obnoxious waste materials"). In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," *Dotterweich, supra,* at 281, 64 S.Ct., at 136, he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to "ascertain at his peril whether [his conduct] comes within the inhibition of the statute." *Balint, supra,* 258 U.S., at 254, 42 S.Ct., at 303. Thus, we essentially have relied on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional *mens rea* requirements. See generally *Morissette, supra,* at 252–260, 72 S.Ct., at 244–248. [3]

3    By interpreting such public welfare offenses to require at least that the defendant know that he is dealing with some dangerous or deleterious substance, we have avoided construing criminal statutes to impose a rigorous form of strict liability. See, *e.g., United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 563–564, 91 S.Ct. 1697, 1700–1701, 29 L.Ed.2d 178 (1971) (suggesting that if a person shipping acid mistakenly thought that he was shipping distilled water, he would not violate a statute criminalizing undocumented shipping of acids). True strict liability might suggest that the defendant need not know even that he was dealing with a dangerous item. Nevertheless, we have referred to public welfare offenses as "dispensing with" or "eliminating" a *mens rea* requirement or "mental element," see, *e.g.,*

*Morissette,* 342 U.S., at 250, 263, 72 S.Ct. at 249–250; *United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 136–137, 88 L.Ed. 48 (1943), and have described them as strict liability crimes, *United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978). While use of the term "strict liability" is really a misnomer, we have interpreted statutes defining public welfare offenses to eliminate the requirement of *mens rea;* that is, the requirement of a "guilty mind" with respect to an element of a crime. Under such statutes we have not required that the defendant know the facts that make his conduct fit the definition of the offense. Generally speaking, such knowledge is necessary to establish *mens rea,* as is reflected in the maxim *ignorantia facti excusat.* See generally J. Hawley & M. McGregor, Criminal Law 26–30 (1899); R. Perkins, Criminal Law 785–786 (2d ed. 1969); G. Williams, Criminal Law: The General Part 113–174 (1953). Cf. *Queen v. Tolson,* 23 Q.B. 168, 187 (1889) (Stephen, J.) ("[I]t may, I think, be maintained that in every case knowledge of fact [when not appearing in the statute] is to some extent an element of criminality as much as competent age and sanity").

### *608 B

The Government argues that § 5861(d) defines precisely the sort of regulatory offense described in *Balint.* In this view, all guns, whether or not they are statutory "firearms," are dangerous devices that put gun owners on notice that they must determine at their hazard whether their weapons come within the scope of the Act. On this understanding, the District Court's instruction in this case was correct, because a conviction can rest simply on proof that a defendant knew he possessed a "firearm" in the ordinary sense of the term.

The Government seeks support for its position from our decision in *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), which involved a prosecution for possession of unregistered grenades **1799 under § 5861(d). [4] The defendant knew that the items in his possession were grenades, and we concluded that § 5861(d) did not require the Government to prove the defendant also knew that the grenades were unregistered. *Id.,* at 609, 91 S.Ct., at 1118. To be sure, in deciding that *mens rea* was not required with respect to that element of the offense, we suggested *609 that the Act "is a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Ibid.* Grenades,

we explained, "are highly dangerous offensive weapons, no less dangerous than the narcotics involved in *United States v. Balint.*" *Ibid.* But that reasoning provides little support for dispensing with *mens rea* in this case.

4      A grenade is a "firearm" under the Act. 26 U.S.C. §§ 5845(a)(8), 5845(f)(1)(B).

As the Government concedes, *Freed* did not address the issue presented here. In *Freed,* we decided only that § 5861(d) does not require proof of knowledge that a firearm is *unregistered.* The question presented by a defendant who possesses a weapon that is a "firearm" for purposes of the Act, but who knows only that he has a "firearm" in the general sense of the term, was not raised or considered. And our determination that a defendant need not know that his weapon is unregistered suggests no conclusion concerning whether § 5861(d) requires the defendant to know of the features that make his weapon a statutory "firearm"; different elements of the same offense can require different mental states. See *Liparota,* 471 U.S., at 423, n. 5, 105 S.Ct., at 2085, n. 5; *United States v. Bailey,* 444 U.S. 394, 405–406, 100 S.Ct. 624, 632–633, 62 L.Ed.2d 575 (1980). See also W. LaFave & A. Scott, Handbook on Criminal Law 194–195 (1972). Moreover, our analysis in *Freed* likening the Act to the public welfare statute in *Balint* rested entirely on the assumption that the defendant *knew* that he was dealing with hand grenades —that is, that he knew he possessed a particularly dangerous type of weapon (one within the statutory definition of a "firearm"), possession of which was not entirely "innocent" in and of itself. 401 U.S., at 609, 91 S.Ct., at 1118. The predicate for that analysis is eliminated when, as in this case, the very question to be decided is *whether* the defendant must know of the particular characteristics that make his weapon a statutory firearm.

Notwithstanding these distinctions, the Government urges that *Freed's* logic applies because guns, no less than grenades, *610 are highly dangerous devices that should alert their owners to the probability of regulation. But the gap between *Freed* and this case is too wide to bridge. In glossing over the distinction between grenades and guns, the Government ignores the particular care we have taken to avoid construing a statute to dispense with *mens rea* where doing so would "criminalize a broad range of apparently innocent conduct." *Liparota,* 471 U.S., at 426, 105 S.Ct., at 2088. In *Liparota,* we considered a statute that made unlawful the unauthorized acquisition or possession of food stamps. We determined that the statute required proof that the defendant knew his possession of food stamps was unauthorized, largely

because dispensing with such a *mens rea* requirement would have resulted in reading the statute to outlaw a number of apparently innocent acts. *Ibid.* Our conclusion that the statute should not be treated as defining a public welfare offense rested on the commonsense distinction that a "food stamp can hardly be compared to a hand grenade." *Id.,* at 433, 105 S.Ct., at 2092.

Neither, in our view, can all guns be compared to hand grenades. Although the contrast is certainly not as stark as that presented in *Liparota,* the fact remains that there is a long tradition of widespread lawful gun ownership by private individuals in this country. Such a tradition did not apply to the possession of hand grenades in *Freed* or to the selling of dangerous drugs that we considered in *Balint.* See also *International Minerals,* 402 U.S., at 563–565, 91 S.Ct., at 1700–1702; *Balint,* 258 U.S., at 254, 42 S.Ct., at 303. In fact, in *Freed* we construed **1800 § 5861(d) under the assumption that "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Freed, supra,* at 609, 91 S.Ct., at 1118. Here, the Government essentially suggests that we should interpret the section under the altogether different assumption that "one would hardly be surprised to learn that owning a gun is not an innocent act." That proposition is simply not supported by common experience. Guns in general are not "deleterious devices or products or obnoxious waste materials," *International Minerals,* *611 supra,* at 565, 91 S.Ct., at 1701, that put their owners on notice that they stand "in responsible relation to a public danger," *Dotterweich,* 320 U.S., at 281, 64 S.Ct., at 136.

The Government protests that guns, unlike food stamps, but like grenades and narcotics, are potentially harmful devices. [5] Under this view, it seems that *Liparota*'s concern for criminalizing ostensibly innocuous conduct is inapplicable whenever an item is sufficiently dangerous— that is, dangerousness alone should alert an individual to probable regulation and justify treating a statute that regulates the dangerous device as dispensing with *mens rea.* But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. Of course, we might surely classify certain categories of guns—no doubt including the machineguns,

sawed-off shotguns, and artillery pieces that Congress has subjected to *612 regulation—as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in *Freed.* But precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions, their destructive potential, while perhaps even greater than that of some items we would classify along with narcotics and hand grenades, cannot be said to put gun owners sufficiently on notice of the likelihood of regulation to justify interpreting § 5861(d) as not requiring proof of knowledge of a weapon's characteristics. [6]

5    The dissent's assertions to the contrary notwithstanding, the Government's position, "[a]ccurately identified," *post,* at 1810, is precisely that "guns in general" are dangerous items. The Government, like the dissent, cites *Sipes v. United States,* 321 F.2d 174, 179 (CA8), cert. denied, 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d 150 (1963), for the proposition that a defendant's knowledge that the item he possessed "was a gun" is sufficient for a conviction under § 5861(d). Brief for United States 21. Indeed, the Government argues that "guns" should be placed in the same category as the misbranded drugs in *Dotterweich* and the narcotics in *Balint* because " 'one would hardly be surprised to learn' (*Freed,* 401 U.S. at 609, 91 S.Ct., at 1118) that there are laws that affect one's rights of gun ownership." Brief for United States 22. The dissent relies upon the Government's repeated contention that the statute requires knowledge that "the item at issue was highly dangerous and of a type likely to be subject to regulation." *Id.,* at 9. But that assertion merely patterns the general language we have used to describe the *mens rea* requirement in public welfare offenses and amounts to no more than an assertion that the statute should be treated as defining a public welfare offense.

6    The dissent asserts that the question is not whether all guns are deleterious devices, but whether a gun "such as the one possessed by petitioner," *post,* at 1811 (which the dissent characterizes as a "semiautomatic weapon that [is] readily convertible into a machinegun," *post,* at 1806, 1811, 1815), is such a device. If the dissent intends to suggest that the category of readily convertible semiautomatics provides the benchmark for defining the knowledge requirement for § 5861(d), it is difficult to see how it derives that class of weapons as a standard. As explained above, see n. 5, *supra,* the Government's argument has nothing to do with this ad hoc category of weapons. And the statute certainly does not suggest that any significance should attach to readily convertible semiautomatics, for that class bears no relation to the

Staples v. U.S., 511 U.S. 600 (1994)
114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

definitions in the Act. Indeed, in the absence of any definition, it is not at all clear what the contours of this category would be. The parties assume that virtually *all* semiautomatics may be converted into automatics, and limiting the class to those "readily" convertible provides no real guidance concerning the required *mens rea.* In short, every owner of a semiautomatic rifle or handgun would potentially meet such a *mens rea* test.

But the dissent apparently does not conceive of the *mens rea* requirement in terms of specific categories of weapons at all, and rather views it as a more fluid concept that does not require delineation of any concrete elements of knowledge that will apply consistently from case to case. The dissent sees no need to define a class of items the knowing possession of which satisfies the *mens rea* element of the offense, for in the dissent's view the exact content of the knowledge requirement can be left to the jury in each case. As long as the jury concludes that the item in a given case is "sufficiently dangerous to alert [the defendant] to the likelihood of regulation," *post,* at 1813, the knowledge requirement is satisfied. See also *post,* at 1806, 1814, 1815. But the *mens rea* requirement under a criminal statute is a question of law, to be determined by the court. Our decisions suggesting that public welfare offenses require that the defendant know that he stands in "responsible relation to a public danger," *Dotterweich,* 320 U.S., at 281, 64 S.Ct. at 136, in no way suggest that what constitutes a public danger is a jury question. It is for courts, through interpretation of the statute, to define the *mens rea* required for a conviction. That task cannot be reduced to setting a general "standard," *post,* at 1813, that leaves it to the jury to determine, based presumably on the jurors' personal opinions, whether the items involved in a particular prosecution are sufficiently dangerous to place a person on notice of regulation.

Moreover, as our discussion above should make clear, to determine as a threshold matter whether a particular statute defines a public welfare offense, a court must have in view some category of dangerous and deleterious devices that will be assumed to alert an individual that he stands in "responsible relation to a public danger." *Dotterweich, supra,* at 281, 64 S.Ct. at 136. The truncated *mens rea* requirement we have described applies precisely because the *court* has determined that the statute regulates in a field where knowing possession of some general class of items should alert individuals to probable regulation. Under the dissent's approach, however, it seems that every regulatory statute potentially could be treated as a public welfare offense as long as the jury—not the

court—ultimately determines that the specific items involved in a prosecution were sufficiently dangerous.

**\*\*1801  \*613** On a slightly different tack, the Government suggests that guns are subject to an array of regulations at the federal, state, and local levels that put gun owners on notice that they must determine the characteristics of their weapons and comply with all legal requirements.[7] But regulation in itself is not sufficient to place gun ownership in the category of the sale of narcotics in *Balint.* The food stamps at issue in *Liparota* were subject to comprehensive regulations, yet we did not understand the statute there to dispense with a *mens rea* requirement. Moreover, despite the overlay of legal restrictions on gun ownership, we question whether regulations on guns are sufficiently intrusive that they impinge upon the common experience that owning a gun is usually licit and blameless conduct. Roughly 50 percent of **\*614** American homes contain at least one firearm of some sort,[8] and in the vast majority of States, buying a shotgun or rifle is a simple transaction that would not alert a person to regulation any more than would buying a car.[9]

[7]    See, *e.g.,* 18 U.S.C. §§ 921–928 (1988 ed. and Supp. IV) (requiring licensing of manufacturers, importers, and dealers of guns and regulating the sale, possession, and interstate transportation of certain guns).

[8]    See U.S. Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 209 (1992) (Table 2.58).

[9]    For example, as of 1990, 39 States allowed adult residents, who are not felons or mentally infirm, to purchase a rifle or shotgun simply with proof of identification (and in some cases a simultaneous application for a permit). See U.S. Dept. of Justice, Bureau of Justice Statistics, Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms 114, Exh. B.4 (1990); U.S. Congress, Office of Technology Assessment, Automated Record Checks of Firearm Purchasers 27 (July 1991). See also M. Cooper, Reassessing the Nation's Gun Laws, Editorial Research Reports 158, 160 (Jan.—Mar. 1991) (table) (suggesting the total is 41 States); Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms, State Laws and Published Ordinances—Firearms (19th ed. 1989).

If we were to accept as a general rule the Government's suggestion that dangerous and regulated items place their owners under an obligation to inquire at their peril into compliance with regulations, we would undoubtedly reach some untoward results. Automobiles, for example, might also

Staples v. U.S., 511 U.S. 600 (1994)

114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

be termed "dangerous" devices and are highly regulated at both the state and federal levels. Congress might see fit to criminalize the violation of certain regulations concerning automobiles, **1802 and thus might make it a crime to operate a vehicle without a properly functioning emission control system. But we probably would hesitate to conclude on the basis of silence that Congress intended a prison term to apply to a car owner whose vehicle's emissions levels, wholly unbeknownst to him, began to exceed legal limits between regular inspection dates.

Here, there can be little doubt that, as in *Liparota,* the Government's construction of the statute potentially would impose criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of weapons in their *615 possession—makes their actions entirely innocent. [10] The Government does not dispute the contention that virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear, into a machinegun within the meaning of the Act. Cf. *United States v. Anderson,* 885 F.2d 1248, 1251, 1253–1254 (CA5 1989) (en banc). Such a gun may give no externally visible indication that it is fully automatic. See *United States v. Herbert,* 698 F.2d 981, 986 (CA9), cert. denied, 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983). But in the Government's view, any person who has purchased what he believes to be a semiautomatic rifle or handgun, or who simply has inherited a gun from a relative and left it untouched in an attic or basement, can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be an automatic.

[10]    We, of course, express no view concerning the inferences a jury may have drawn regarding petitioner's knowledge from the evidence in this case.

We concur in the Fifth Circuit's conclusion on this point: "It is unthinkable to us that Congress intended to subject such law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment if ... what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to have worn down into or been secretly modified to be a fully automatic weapon." *Anderson, supra,* at 1254. As we noted in *Morissette,* the "purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction." 342 U.S., at 263, 72 S.Ct., at 249. [11] We are reluctant to impute that purpose to *616 Congress where, as here, it would mean easing the path to convicting persons whose conduct would not even alert them

to the probability of strict regulation in the form of a statute such as § 5861(d).

[11]    The Government contends that Congress intended precisely such an aid to obtaining convictions, because requiring proof of knowledge would place too heavy a burden on the Government and obstruct the proper functioning of § 5861(d). Cf. *United States v. Balint,* 258 U.S. 250, 254, 42 S.Ct. 301, 303, 66 L.Ed. 604 (1922) (difficulty of proving knowledge suggests Congress did not intend to require *mens rea*). But knowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon. And firing a fully automatic weapon would make the regulated characteristics of the weapon immediately apparent to its owner. In short, we are confident that when the defendant knows of the characteristics of his weapon that bring it within the scope of the Act, the Government will not face great difficulty in proving that knowledge. Of course, if Congress thinks it necessary to reduce the Government's burden at trial to ensure proper enforcement of the Act, it remains free to amend § 5861(d) by explicitly eliminating a *mens rea* requirement.

C

The potentially harsh penalty attached to violation of § 5861(d)—up to 10 years' imprisonment—confirms our reading of the Act. Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea.* Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary. See, *e.g., Commonwealth v. Raymond,* 97 Mass. 567 (1867) (fine of up to $200 or six months in jail, or both); *Commonwealth v. Farren,* 91 Mass. 489 (1864) (fine); **1803 *People v. Snowburger,* 113 Mich. 86, 71 N.W. 497 (1897) (fine of up to $500 or incarceration in county jail). [12]

[12]    Leading English cases developing a parallel theory of regulatory offenses similarly involved violations punishable only by fine or short-term incarceration. See, *e.g., Queen v. Woodrow,* 15 M. & W. 404, 153 Eng.Rep. 907 (Ex.1846) (fine of £200 for adulterated tobacco); *Hobbs v. Winchester Corp.,* [1910] 2 K. B. 471 (maximum penalty of three months' imprisonment for sale of unwholesome meat).

*Staples v. U.S., 511 U.S. 600 (1994)*
114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

As commentators have pointed out, the small penalties attached to such offenses logically complemented the absence of a *mens rea* requirement: In a system that generally requires **\*617** a "vicious will" to establish a crime, 4 W. Blackstone, Commentaries \*21, imposing severe punishments for offenses that require no *mens rea* would seem incongruous. See Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55, 70 (1933). Indeed, some courts justified the absence of *mens rea* in part on the basis that the offenses did not bear the same punishments as "infamous crimes," *Tenement House Dept. v. McDevitt,* 215 N.Y. 160, 168, 109 N.E. 88, 90 (1915) (Cardozo, J.), and questioned whether imprisonment was compatible with the reduced culpability required for such regulatory offenses. See, *e.g., People ex rel. Price v. Sheffield Farms–Slawson–Decker Co.,* 225 N.Y. 25, 32–33, 121 N.E. 474, 477 (1918) (Cardozo, J.); *id.,* at 35, 121 N.E., at 478 (Crane, J., concurring) (arguing that imprisonment for a crime that requires no *mens rea* would stretch the law regarding acts *mala prohibita* beyond its limitations).[13] Similarly, commentators collecting the early cases have argued that offenses punishable by imprisonment cannot be understood to be public welfare offenses, but must require *mens rea.* See R. Perkins, Criminal Law 793–798 (2d ed. 1969) (suggesting that the penalty should be the starting point in determining whether a statute describes a public welfare offense); Sayre, *supra,* at 72 ("Crimes punishable with prison sentences ... ordinarily require proof of a guilty intent").[14]

[13]    Cf. *Queen v. Tolson,* 23 Q.B., at 177 (Wills, J.) (In determining whether a criminal statute dispenses with *mens rea,* "the nature and extent of the penalty attached to the offence may reasonably be considered. There is nothing that need shock any mind in the payment of a small pecuniary penalty by a person who has unwittingly done something detrimental to the public interest").

[14]    But see, *e.g., State v. Lindberg,* 125 Wash. 51, 215 P. 41 (1923) (applying the public welfare offense rationale to a felony).

In rehearsing the characteristics of the public welfare offense, we, too, have included in our consideration the punishments imposed and have noted that "penalties commonly are relatively small, and conviction does no grave damage to an **\*618** offender's reputation." *Morissette,* 342 U.S., at 256, 72 S.Ct., at 246.[15] We have even recognized that it was "[u]nder such considerations" that courts have construed statutes to dispense with *mens rea. Ibid.*

[15]    See also *United States Gypsum,* 438 U.S., at 442, n. 18, 98 S.Ct., at 2876, n. 18 (noting that an individual violation of the Sherman Antitrust Act is a felony punishable by three years in prison or a fine not exceeding $100,000 and stating that "[t]he severity of these sanctions provides further support for our conclusion that the [Act] should not be construed as creating strict-liability crimes"). Cf. *Holdridge v. United States,* 282 F.2d 302, 310 (CA8 1960) (Blackmun, J.) ("[W]here a federal criminal statute omits mention of intent and ... where the penalty is relatively small, where conviction does not gravely besmirch, [and] where the statutory crime is not one taken over from the common law, ... the statute can be construed as one not requiring criminal intent").

Our characterization of the public welfare offense in *Morissette* hardly seems apt, however, for a crime that is a felony, as is violation of § 5861(d).[16] After all, "felony" is, as we noted in distinguishing certain common-law crimes from public welfare offenses, " 'as bad a word as you can give to man or thing.' " *Id.,* at 260, 72 S.Ct., at 248 (quoting 2 F. Pollock & F. Maitland, History of English Law 465 (2d ed. 1899)). Close adherence **\*\*1804** to the early cases described above might suggest that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense. In this view, absent a clear statement from Congress that *mens rea* is not required, we should not apply the public welfare offense rationale to interpret any statute defining a felony offense as dispensing with *mens rea.* But see *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922).

[16]    Title 18 U.S.C. § 3559 makes any crime punishable by more than one year in prison a felony.

We need not adopt such a definitive rule of construction to decide this case, however. Instead, we note only that where, as here, dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement. **\*619** In such a case, the usual presumption that a defendant must know the facts that make his conduct illegal should apply.

### III

In short, we conclude that the background rule of the common law favoring *mens rea* should govern interpretation of § 5861(d) in this case. Silence does not suggest that Congress

dispensed with *mens rea* for the element of § 5861(d) at issue here. Thus, to obtain a conviction, the Government should have been required to prove that petitioner knew of the features of his AR–15 that brought it within the scope of the Act. [17]

[17] In reaching our conclusion, we find it unnecessary to rely on the rule of lenity, under which an ambiguous criminal statute is to be construed in favor of the accused. That maxim of construction "is reserved for cases where, '[a]fter "seiz[ing] every thing from which aid can be derived," ' the Court is 'left with an ambiguous statute.' " *Smith v. United States,* 508 U.S. 223, 239, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993) (quoting *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), in turn quoting *United States v. Fisher,* 2 Cranch 358, 386, 2 L.Ed. 304 (1805)). See also *United States v. R.L.C.,* 503 U.S. 291, 311, 112 S.Ct. 1329, 1341, 117 L.Ed.2d 559 (1992) (THOMAS, J., concurring in part and concurring in judgment); *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991) (rule of lenity inapplicable unless there is a " 'grievous ambiguity or uncertainty' " in the statute). Here, the background rule of the common law favoring *mens rea* and the substantial body of precedent we have developed construing statutes that do not specify a mental element provide considerable interpretive tools from which we can "seize aid," and they do not leave us with the ultimate impression that § 5861(d) is "grievous [ly]" ambiguous. Certainly, we have not concluded in the past that statutes silent with respect to *mens rea* are ambiguous. See, *e.g., United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922).

We emphasize that our holding is a narrow one. As in our prior cases, our reasoning depends upon a commonsense evaluation of the nature of the particular device or substance Congress has subjected to regulation and the expectations that individuals may legitimately have in dealing with the regulated items. In addition, we think that the penalty attached to § 5861(d) suggests that Congress did not intend to eliminate a *mens rea* requirement for violation of the section. As we noted in *Morissette:* "Neither this Court nor, **\*620** so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." 342 U.S., at 260, 72 S.Ct., at 248. We attempt no definition here, either. We note only that our holding depends critically on our view that if Congress had intended to make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons, and to subject

them to lengthy prison terms, it would have spoken more clearly to that effect. Cf. *United States v. Harris,* 959 F.2d 246, 261 (CADC), cert. denied, 506 U.S. 932, 113 S.Ct. 362, 364, 121 L.Ed.2d 275, 277 (1992).

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

Justice GINSBURG, with whom Justice O'CONNOR joins, concurring in the judgment.

The statute petitioner Harold E. Staples is charged with violating, 26 U.S.C. § 5861(d), **\*\*1805** makes it a crime for any person to "receive or possess a firearm which is not registered to him." Although the word "knowingly" does not appear in the statute's text, courts generally assume that Congress, absent a contrary indication, means to retain a *mens rea* requirement. *Ante,* at 1797; see *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088–2089, 85 L.Ed.2d 434 (1985); *United States v. United States Gypsum Co.,* 438 U.S. 422, 437–438, 98 S.Ct. 2864, 2873–2874, 57 L.Ed.2d 854 (1978).[1] Thus, our holding in *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), that § 5861(d) does not require proof of knowledge that the firearm is unregistered, rested on the premise that the defendant indeed **\*621** knew the items he possessed were hand grenades. *Id.,* at 607, 91 S.Ct., at 1117; *id.,* at 612, 91 S.Ct., at 1119–1120 (Brennan, J., concurring in judgment) ("The Government and the Court agree that the prosecutor must prove knowing possession of the items and also knowledge that the items possessed were hand grenades.").

[1] Contrary to the dissent's suggestion, we have not confined the presumption of *mens rea* to statutes codifying traditional common-law offenses, but have also applied the presumption to offenses that are "entirely a creature of statute," *post,* at 1807, such as those at issue in *Liparota, Gypsum,* and, most recently, *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 522–523, 114 S.Ct. 1747, 1752–1753, 128 L.Ed.2d 539 (1994).

Conviction under § 5861(d), the Government accordingly concedes, requires proof that Staples "knowingly" possessed the machinegun. Brief for United States 23. The question before us is not *whether* knowledge of possession is required, but what level of knowledge suffices: (1) knowledge simply of possession of the object; (2) knowledge, in addition, that

the object is a dangerous weapon; (3) knowledge, beyond dangerousness, of the characteristics that render the object subject to regulation, for example, awareness that the weapon is a machinegun. [2]

[2] Some Courts of Appeals have adopted a variant of the third reading, holding that the Government must show that the defendant knew the gun was a machinegun, but allowing inference of the requisite knowledge where a visual inspection of the gun would reveal that it has been converted into an automatic weapon. See *United States v. O'Mara,* 963 F.2d 1288, 1291 (CA9 1992); *United States v. Anderson,* 885 F.2d 1248, 1251 (CA5 1989) (en banc).

Recognizing that the first reading effectively dispenses with *mens rea,* the Government adopts the second, contending that it avoids criminalizing "apparently innocent conduct," *Liparota, supra,* at 426, 105 S.Ct., at 2088, because under the second reading, "a defendant who possessed what he thought was a toy or a violin case, but which in fact was a machinegun, could not be convicted." Brief for United States 23. The Government, however, does not take adequate account of the "widespread lawful gun ownership" Congress and the States have allowed to persist in this country. See *United States v. Harris,* 959 F.2d 246, 261 (CADC) *(per curiam),* cert. denied, 506 U.S. 932, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992). Given the notable lack of comprehensive regulation, "mere unregistered possession of certain types of [regulated weapons]—often [difficult to distinguish] **\*622** from other, [non-regulated] types," has been held inadequate to establish the requisite knowledge. See 959 F.2d, at 261.

The Nation's legislators chose to place under a registration requirement only a very limited class of firearms, those they considered especially dangerous. The generally "dangerous" character of all guns, the Court therefore observes, *ante,* at 1800, did not suffice to give individuals in Staples' situation cause to inquire about the need for registration. Cf. *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (requiring reporting of sale of strictly regulated narcotics, opium and cocaine). Only the third reading, then, suits the purpose of the *mens rea* requirement—to shield people against punishment for apparently innocent activity. [3]

[3] The *mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, "deeply rooted in the American legal system," that, ordinarily, "ignorance of the law or a mistake of law is no defense to criminal prosecution." *Cheek v. United States,* 498 U.S. 192,

199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991). Cf. *United States v. Freed,* 401 U.S. 601, 612, 91 S.Ct. 1112, 1119, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring in judgment) ("If the ancient maxim that 'ignorance of the law is no excuse' has any residual validity, it indicates that the ordinary intent requirement—*mens rea*—of the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy."). The maxim explains why some "innocent" actors—for example, a defendant who knows he possesses a weapon with all of the characteristics that subject it to registration, but was unaware of the registration requirement, or thought the gun was registered—may be convicted under § 5861(d), see *post,* at 1814. Knowledge of whether the gun was registered is so closely related to knowledge of the registration requirement that requiring the Government to prove the former would in effect require it to prove knowledge of the law. Cf. *Freed, supra,* at 612–614, 91 S.Ct., at 1119–1121 (Brennan, J., concurring in judgment).

**\*\*1806** The indictment in Staples' case charges that he "knowingly received and possessed firearms." 1 App. to Brief for Appellant in No. 91–5033 (CA10), p. 1. [4] "Firearms" has a **\*623** circumscribed statutory definition. See 26 U.S.C. § 5845(a). The "firear[m]" the Government contends Staples possessed in violation of § 5861(d) is a machinegun. See § 5845(a)(6). The indictment thus effectively charged that Staples *knowingly possessed a machinegun.* "Knowingly possessed" logically means "possessed and knew that he possessed." The Government can reconcile the jury instruction [5] with the indictment only on the implausible assumption that the term "firear[m]" has two different meanings when used once in the same charge—simply "gun" when referring to what petitioner knew, and "machinegun" when referring to what he possessed. See Cunningham, Levi, Green, & Kaplan, Plain Meaning and Hard Cases, 103 Yale L.J. 1561, 1576–1577 (1994); cf. *Ratzlaf v. United States,* 510 U.S. 135, 143, 114 S.Ct. 655, 656, 126 L.Ed.2d 615 (1994) (construing statutory term to bear same meaning "each time it is called into play").

[4] The indictment charged Staples with possession of two unregistered machineguns, but the jury found him guilty of knowingly possessing only one of them. Tr. 477.

[5] The trial court instructed the jury:

"[A] person is knowingly in possession of a thing if his possession occurred voluntarily and intentionally and not because of mistake or accident or other innocent reason. The purpose of adding the word 'knowingly' is to insure that no one can

be convicted of possession of a firearm he did not intend to possess. The Government need not prove the defendant knows he's dealing with a weapon possessing every last characteristic [which subjects it] to the regulation. It would be enough to prove he knows that he is dealing with a dangerous device of a type as would alert one to the likelihood of regulation. If he has such knowledge and if the particular item is, in fact, regulated, then that person acts at his peril. Mere possession of an unregistered firearm is a violation of the law of the United States, and it is not necessary for the Government to prove that the defendant knew that the weapon in his possession was a firearm within the meaning of the statute, only that he knowingly possessed the firearm." *Id., at 465.*

For these reasons, I conclude that conviction under § 5861(d) requires proof that the defendant knew he possessed not simply a gun, but a machinegun. The indictment in this case, but not the jury instruction, properly described this knowledge requirement. I therefore concur in the Court's judgment.

**\*624** Justice STEVENS, with whom Justice BLACKMUN joins, dissenting.

To avoid a slight possibility of injustice to unsophisticated owners of machineguns and sawed-off shotguns, the Court has substituted its views of sound policy for the judgment Congress made when it enacted the National Firearms Act (or Act). Because the Court's addition to the text of 26 U.S.C. § 5861(d) is foreclosed by both the statute and our precedent, I respectfully dissent.

The Court is preoccupied with guns that "generally can be owned in perfect innocence." *Ante,* at 1800. This case, however, involves a semiautomatic weapon that was readily convertible into a machinegun—a weapon that the jury found to be " 'a dangerous device of a type as would alert one to the likelihood of regulation.' " *Ante,* at 1796. These are not guns "of some sort" that can be found in almost "50 percent of American **\*\*1807** homes." *Ante,* at 1801. [1] They are particularly dangerous—indeed, a substantial percentage of the unregistered machineguns now in circulation are converted semiautomatic weapons. [2]

1   Indeed, only about 15 percent of all the guns in the United States are semiautomatic. See National Rifle Association, Fact Sheet, Semi–Automatic Firearms 1 (Feb. 1, 1994). Although it is not known how many of

those weapons are readily convertible into machineguns, it is obviously a lesser share of the total.

2   See U.S. Dept. of Justice, Attorney General's Task Force on Violent Crime: Final Report 29, 32 (Aug. 17, 1981) (stating that over an 18–month period over 20 percent of the machineguns seized or purchased by the Bureau of Alcohol, Tobacco and Firearms had been converted from semiautomatic weapons by "simple tool work or the addition of readily available parts") (citing U.S. Dept. of Treasury, Bureau of Alcohol, Tobacco and Firearms, Firearms Case Summary (Washington: U.S. Govt. Printing Office 1981)).

The question presented is whether the National Firearms Act imposed on the Government the burden of proving beyond a reasonable doubt not only that the defendant knew he possessed a dangerous device sufficient to alert him to **\*625** regulation, but also that he knew it had all the characteristics of a "firearm" as defined in the statute. Three unambiguous guideposts direct us to the correct answer to that question: the text and structure of the Act, our cases construing both this Act and similar regulatory legislation, and the Act's history and interpretation.

I

Contrary to the assertion by the Court, the text of the statute does provide "explicit guidance in this case." Cf. *ante,* at 1797. The relevant section of the Act makes it "unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Significantly, the section contains no knowledge requirement, nor does it describe a common-law crime.

The common law generally did not condemn acts as criminal unless the actor had "an evil purpose or mental culpability," *Morissette v. United States,* 342 U.S. 246, 252, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952), and was aware of all the facts that made the conduct unlawful, *United States v. Balint,* 258 U.S. 250, 251–252, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922). In interpreting statutes that codified traditional common-law offenses, courts usually followed this rule, even when the text of the statute contained no such requirement. *Ibid.* Because the offense involved in this case is entirely a creature of statute, however, "the background rules of the common law," cf. *ante,* at 1797, do not require a particular construction, and critically different rules of construction apply. See *Morissette v. United States,* 342 U.S., at 252–260, 72 S.Ct., at 244–248.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Staples v. U.S., 511 U.S. 600 (1994)

114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

In *Morissette,* Justice Jackson outlined one such interpretive rule:

"Congressional silence as to mental elements in an Act merely adopting into federal statutory law a concept of crime already ... well defined in common law and statutory interpretation by the states may warrant quite contrary inferences than the same silence in creating an offense **\*626** new to general law, for whose definition the courts have no guidance except the Act." *Id.,* at 262, 72 S.Ct., at 249.

Although the lack of an express knowledge requirement in § 5861(d) is not dispositive, see *United States v. United States Gypsum Co.,* 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978), its absence suggests that Congress did not intend to require proof that the defendant knew all of the facts that made his conduct illegal.[3]

> [3] The Seventh Circuit's comment in a similar case is equally apt here: "The crime is possessing an unregistered firearm—not 'knowingly' possessing an unregistered firearm, or possessing a weapon knowing it to be a firearm, or possessing a firearm knowing it to be unregistered. ... [Petitioner's] proposal is not that we *interpret* a knowledge or intent requirement in § 5861(d); it is that we *invent* one." *United States v. Ross,* 917 F.2d 997, 1000 (1990) *(per curiam)* (emphasis in original), cert. denied, 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991).

**\*\*1808** The provision's place in the overall statutory scheme, see *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001–1002, 108 L.Ed.2d 132 (1990), confirms this intention. In 1934, when Congress originally enacted the statute, it limited the coverage of the 1934 Act to a relatively narrow category of weapons such as submachineguns and sawed-off shotguns—weapons characteristically used only by professional gangsters like Al Capone, Pretty Boy Floyd, and their henchmen.[4] At the time, the Act would have had little application to guns used by hunters or guns kept at home as protection against unwelcome intruders.[5] **\*627** Congress therefore could reasonably presume that a person found in possession of an unregistered machinegun or sawed-off shotgun intended to use it for criminal purposes. The statute as a whole, and particularly the decision to criminalize mere possession, reflected a legislative judgment that the likelihood of innocent possession of such an unregistered

weapon was remote, and far less significant than the interest in depriving gangsters of their use.

> [4] "The late 1920s and early 1930s brought ... a growing perception of crime both as a major problem and as a national one.... [C]riminal gangs found the submachinegun (a fully automatic, shoulder-fired weapon utilizing automatic pistol cartridges) and sawed-off shotgun deadly for close-range fighting." Hardy, The Firearms Owners' Protection Act: A Historical and Legal Perspective, 17 Cumb.L.Rev. 585, 590 (1987).

> [5] The Senate Report on the bill explained: "The gangster as a law violator must be deprived of his most dangerous weapon, the machinegun. Your committee is of the opinion that limiting the bill to the taxing of sawed-off guns and machineguns is sufficient at this time. It is not thought necessary to go so far as to include pistols and revolvers and sporting arms. But while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a machinegun or sawed-off shotgun." S.Rep. No. 1444, 73d Cong., 2d Sess., 1–2 (1934).

In addition, at the time of enactment, this Court had already construed comparable provisions of the Harrison Anti–Narcotic Act not to require proof of knowledge of all the facts that constitute the proscribed offense. *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922).[6] Indeed, Attorney General Cummings expressly advised Congress that the text of the gun control legislation deliberately followed the language of the Anti–Narcotic Act to reap the benefit of cases construing it.[7] Given the reasoning of *Balint,* we properly may infer that Congress did not intend the Court to read a stricter knowledge requirement into the gun control legislation than we read into the Anti–Narcotic Act. *Cannon v. University of Chicago,* 441 U.S. 677, 698–699, 99 S.Ct. 1946, 1958–1959, 60 L.Ed.2d 560 (1979).

> [6] In the *Balint* case, after acknowledging the general common-law rule that made knowledge of the facts an element of every crime, we held that as to statutory crimes the question is one of legislative intent, and that the Anti–Narcotic Act should be construed to authorize "punishment of a person for an act in violation of law[,] [even] when ignorant of the facts making it so." *Balint,* 258 U.S., at 251–252, 42 S.Ct., at 302. The "policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant

AR004449

13

of the noxious character of what he sells." *Id.,* at 253, 42 S.Ct., at 302.

7    See National Firearms Act: Hearings on H.R. 9066 before the House Committee on Ways and Means, 73d Cong., 2d Sess., 6 (1934).

Like the 1934 Act, the current National Firearms Act is primarily a regulatory measure. The statute establishes **\*628** taxation, registration, reporting, and recordkeeping requirements for businesses and transactions involving statutorily defined firearms, and requires that each firearm be identified by a serial number. 26 U.S.C. §§ 5801–5802, 5811–5812, 5821–5822, 5842–5843. The Secretary of the Treasury must maintain a central registry that includes the names and addresses of persons in possession of all firearms not controlled by the Government. § 5841. Congress also prohibited certain acts and omissions, including the possession of an unregistered firearm.[8] § 5861.

8    "Omission of a mental element is the norm for statutes designed to deal with inaction. *Not* registering your gun, *not* cleaning up your warehouse, *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), and like 'acts' are done without thinking. Often the omission occurs because of lack of attention.... Yet Congress may have sound reasons for requiring people to investigate and act, objectives that cannot be achieved if the courts add mental elements to the statutes." *Ross,* 917 F.2d, at 1000.

**\*\*1809** As the Court acknowledges, *ante,* at 1798, to interpret statutory offenses such as § 5861(d), we look to "the nature of the statute and the particular character of the items regulated" to determine the level of knowledge required for conviction. An examination of § 5861(d) in light of our precedent dictates that the crime of possession of an unregistered machinegun is in a category of offenses described as "public welfare" crimes.[9] Our decisions interpreting such offenses clearly require affirmance of petitioner's conviction.

9    These statutes are sometimes referred to as "strict liability" offenses. As the Court notes, because the defendant must know that he is engaged in the type of dangerous conduct that is likely to be regulated, the use of the term "strict liability" to describe these offenses is inaccurate. *Ante,* at 1798, n. 3. I therefore use the term "public welfare offense" to describe this type of statute.

## II

"Public welfare" offenses share certain characteristics: (1) they regulate "dangerous or deleterious devices or products or **\*629** obnoxious waste materials," see *United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971); (2) they "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare," *Morissette,* 342 U.S., at 254, 72 S.Ct., at 245; and (3) they "depend on no mental element but consist only of forbidden acts or omissions," *id.,* at 252–253, 72 S.Ct., at 244. Examples of such offenses include Congress' exertion of its power to keep dangerous narcotics,[10] hazardous substances,[11] and impure and adulterated foods and drugs[12] out of the channels of commerce.[13]

10    See *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922).

11    See *United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).

12    See *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

13    The Court in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed 288 (1952), expressing approval of our public welfare offense cases, stated:
"Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static." *Id.,* at 260, 72 S.Ct., at 248 (footnotes omitted).

Public welfare statutes render criminal "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." *Liparota v. United States,* 471 U.S. 419, 433, 105 S.Ct. 2084, 2092, 85 L.Ed.2d 434 (1985). Thus, under such statutes, "a defendant can be convicted even though he was unaware of the circumstances of his conduct that made it illegal." *Id.,* at 443, n. 7, 105 S.Ct., at 2097 n. 7 (White, J., dissenting). Referring to the strict criminal sanctions for unintended violations of the food and drug laws, Justice Frankfurter wrote:

AR004450

Staples v. U.S., 511 U.S. 600 (1994)
114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

"The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should in useconstruction **\*630** of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. The prosecution ... is based on a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." **\*\*1810** *United States v. Dotterweich,* 320 U.S. 277, 280–281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (citing *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922); other citations omitted).

The National Firearms Act unquestionably is a public welfare statute. *United States v. Freed,* 401 U.S. 601, 609, 91 S.Ct. 1112, 1118, 28 L.Ed.2d 356 (1971) (holding that this statute "is a regulatory measure in the interest of the public safety"). Congress fashioned a legislative scheme to regulate the commerce and possession of certain types of dangerous devices, including specific kinds of weapons, to protect the health and welfare of the citizenry. To enforce this scheme, Congress created criminal penalties for certain acts and omissions. The text of some of these offenses—including the one at issue here—contains no knowledge requirement.

The Court recognizes:

"[W]e have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him 'in responsible relation to a public danger,' *Dotterweich, supra,* at 281, 64 S.Ct., at 136, he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to 'ascertain at his peril whether [his conduct] comes within the inhibition of the statute.' *Balint,* 258 U.S., at 254, 42 S.Ct., at 303." *Ante,* at 1798.

**\*631** We thus have read a knowledge requirement into public welfare crimes, but not a requirement that the defendant know all the facts that make his conduct illegal. Although the Court acknowledges this standard, it nevertheless concludes that a gun is not the type of dangerous device that would alert one to the possibility of regulation.

Both the Court and Justice GINSBURG erroneously rely upon the "tradition[al]" innocence of gun ownership to find that Congress must have intended the Government to prove knowledge of all the characteristics that make a weapon a statutory "firear[m]." *Ante,* at 1799–1800; *ante,* at 1805 (GINSBURG, J., concurring in judgment). We held in *Freed,* however, that a § 5861(d) offense may be committed by one with no awareness of either wrongdoing or of all the facts that constitute the offense. [14] 401 U.S., at 607–610, 91 S.Ct., at 1117–1119. Nevertheless, the Court, asserting that the Government "gloss[es] over the distinction between grenades and guns," determines that "the gap between *Freed* and this case is too wide to bridge." *Ante,* at 1799. As such, the Court instead reaches the rather surprising conclusion that guns are more analogous to food stamps than to hand grenades. [15] Even if **\*632** one accepts that dubious proposition, the Court founds it upon a faulty premise: its mischaracterization of the Government's submission as one contending that "*all guns* ... are dangerous devices that put gun owners on notice...." *Ante,* at 1798 (emphasis added). [16] Accurately identified, the Government's **\*\*1811** position presents the question whether guns such as the one possessed by petitioner " 'are highly dangerous offensive weapons, no less dangerous than the narcotics' " in *Balint* or the hand grenades in *Freed,* see *ante,* at 1799 (quoting *Freed,* 401 U.S., at 609, 91 S.Ct. at 1118). [17]

14    *Freed,* 401 U.S., at 607, 91 S.Ct., at 1117 (holding that a violation's § 5861(d) may be established without proof that the defendant was aware of the fact that the firearm he possessed was unregistered). Our holding in *Freed* is thus squarely at odds with the Court's conclusion that the "defendant must know the facts that make his conduct illegal," *ante,* at 1804.

15    The Court's and Justice GINSBURG's reliance upon *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), is misplaced. *Ante,* at 1799–1800; *ante,* at 1805. Although the Court is usually concerned with fine nuances of statutory text, its discussion of *Liparota* simply ignores the fact that the food stamp fraud provision, unlike § 5861(d), contained the word "knowingly." The Members of the Court in *Liparota* disagreed on the proper interpretation. The dissenters accepted the Government's view that the term merely required proof that the defendant had knowledge of the facts that constituted the crime. See *Liparota,* 471 U.S., at 442–443, 105 S.Ct., at 2097 (White, J., dissenting) ("I would read ... to require awareness of only the relevant aspects of one's conduct

Staples v. U.S., 511 U.S. 600 (1994)
114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

rendering it illegal, not the fact of illegality"). The majority, however, concluded that "knowingly" also connoted knowledge of illegality. *Id.,* at 424–425, 105 S.Ct. at 2087–2088. Because neither "knowingly" nor any comparable term appears in § 5861(d), the statute before us today requires even less proof of knowledge than the dissenters would have demanded in *Liparota.*

16    Justice GINSBURG similarly assumes that the character of "*all guns* " cannot be said to place upon defendants an obligation "to inquire about the need for registration." *Ante,* at 1805 (emphasis added).

17    The Government does note that some Courts of Appeals have required proof of knowledge only that "the weapon was 'a firearm, within the general meaning of that term,' " Brief for United States 24–25 (citing cases). Contrary to the assertion by the Court, *ante,* at 1800, n. 5, however, the Government does not advance this test as the appropriate knowledge requirement, but instead supports the one used by other Courts of Appeals. Compare the Court's description of the Government's position, *ibid.,* with the following statements in the Government's brief:

> "A defendant may be convicted of such offenses so long as the government proves that he knew the item at issue was highly dangerous and of a type likely to be subject to regulation." Brief for United States 9.

> "[T]he court of appeals correctly required the government to prove only that petitioner knew that he possessed a dangerous weapon likely to be subject to regulation." *Id.,* at 13.

> "B. The intent requirement applicable to section 5861(d) is knowledge that one is dealing with a dangerous item of a type likely to be subject to regulation." *Id.,* at 16.

> "But where a criminal statute involves regulation of a highly hazardous substance—and especially where it penalizes a failure to act or to comply with a registration scheme—the defendant's knowledge that he was dealing with such a substance and that it was likely to be subject to regulation provides sufficient intent to support a conviction." *Id.,* at 17–18.

> "Rather, absent contrary congressional direction, knowledge of the highly dangerous nature of the articles involved and the likelihood that they are subject to regulation takes the place of the more rigorous knowledge requirement applicable where apparently innocent and harmless devices are subject to regulation." *Id.,* at 20.

> "But the instruction did not require the government to prove that petitioner knew his weapon 'possess[ed] every last characteristic [which subjects it] to regulation'; he need only have 'know[n] that he [was]

> dealing with a dangerous device of a type as would alert one to the likelihood of regulation.' Tr. 465.

> "That instruction accurately describes the mental state necessary for a violation of Section 5861(d)." *Id.,* at 23.

> "[P]roof that a defendant was on fair notice that the item he possessed was highly dangerous and likely to be regulated is sufficient to support a conviction." *Id.,* at 24.

**\*633** Thus, even assuming that the Court is correct that the mere possession of an ordinary rifle or pistol does not entail sufficient danger to alert one to the possibility of regulation, that conclusion does not resolve this case. Petitioner knowingly possessed a semiautomatic weapon that was readily convertible into a machinegun. The " 'character and nature' " of such a weapon is sufficiently hazardous to place the possessor on notice of the possibility of regulation. See *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 525, 114 S.Ct. 1747, 1754, 128 L.Ed.2d 539 (1994) (citation omitted). [18] No significant difference exists between **\*634** imposing upon the possessor a duty to determine whether such a weapon is registered, *Freed,* 401 U.S., at 607–610, 91 S.Ct., at 1117–1119, and imposing a duty to determine whether that weapon has been converted into a machinegun.

18    The Court and Justice GINSBURG apparently assume that the outer limits of any such notice can be no broader than the category of dangerous objects that Congress delineated as "firearms." *Ante,* at 1800; *ante,* at 1805. Our holding in *Posters 'N' Things,* illustrates the error in that assumption. A retailer who may not know whether certain merchandise is actually drug paraphernalia, as that term is defined in the relevant federal statute, may nevertheless violate the law if "aware that customers in general are likely to use the merchandise with drugs." 511 U.S., at 524, 114 S.Ct., at 1753. The owner of a semiautomatic weapon that is readily convertible into a machinegun can certainly be aware of its dangerous nature and the consequent probability of regulation even if he does not know whether the weapon is actually a machinegun. If ignorance of the precise characteristics that render an item forbidden should be a defense, items that are likely to be "drug paraphernalia" are no more obviously dangerous, and thus regulated, than items that are likely to be "firearms."

Cases arise, of course, in which a defendant would not know that a device was dangerous unless he knew that it was a "firearm" as defined in the Act. *Freed* was such a case; unless the defendant knew that the device in question was a hand grenade, he **\*\*1812** would not necessarily have known that

114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

it was dangerous. But given the text and nature of the statute, it would be utterly implausible to suggest that Congress intended the owner of a sawed-off shotgun to be criminally liable if he knew its barrel was 17.5 inches long but not if he mistakenly believed the same gun had an 18–inch barrel. Yet the Court's holding today assumes that Congress intended that bizarre result.

The enforcement of public welfare offenses always entails some possibility of injustice. Congress nevertheless has repeatedly decided that an overriding public interest in health or safety may outweigh that risk when a person is dealing with products that are sufficiently dangerous or deleterious to make it reasonable to presume that he either knows, or should know, whether these products conform to special regulatory requirements. The dangerous character of the product is reasonably presumed to provide sufficient notice of the probability of regulation to justify strict enforcement against those who are merely guilty of negligent, rather than willful, misconduct.

The National Firearms Act is within the category of public welfare statutes enacted by Congress to regulate highly dangerous items. The Government submits that a conviction under such a statute may be supported by proof that the **\*635** defendant "knew the item at issue was highly dangerous and of a type likely to be subject to regulation." Brief for United States 9.[19] It is undisputed that the evidence in this case met that standard. Nevertheless, neither Justice THOMAS for the Court nor Justice GINSBURG has explained why such a knowledge requirement is unfaithful to our cases or to the text of the Act.[20] Instead, following the approach of their decision in *United States v. Harris,* 959 F.2d 246, 260–261 (CADC) *(per curiam),* cert. denied *sub nom. Smith v. United States,* 506 U.S. 932, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992), they have simply explained why, in their judgment, it would be unfair to punish the possessor of this machinegun.

[19]   As a matter of law, this is the level of knowledge required by the statute. Therefore, contrary to the Court's suggestion, *ante,* at 1800–1801, n. 6, I have not left the determination of the "exact content of the knowledge requirement" to the jury. I only leave to the jury its usual function: the application of this legal standard to the facts. In performing this function, juries are frequently required to determine if a law has been violated by application of just such a "general 'standard.' " See, *e.g., Posters 'N' Things,* 511 U.S., at 523–525, 114 S.Ct., at

1753–1754; *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–2615, 37 L.Ed.2d 419 (1973).

[20]   The Court also supports its conclusion on the basis of the purported disparity between the penalty provided by this statute and those of other regulatory offenses. Although a modest penalty may indicate that a crime is a public welfare offense, such a penalty is not a requisite characteristic of public welfare offenses. For example, the crime involved in *Balint* involved punishment of up to five years' imprisonment. See *Dotterweich,* 320 U.S., at 285, 64 S.Ct., at 138; see also *Morissette,* 342 U.S., at 251, n. 8, 72 S.Ct., at 244, n. 8 (noting that rape of one too young to consent is an offense "in which the victim's actual age was determinative despite defendant's reasonable belief that the girl had reached age of consent"). Moreover, congressional authorization of a range of penalties in some cases—petitioner, for instance, is on probation—demonstrates a recognition that relatively innocent conduct should be punished less severely.

### III

The history and interpretation of the National Firearms Act supports the conclusion that Congress did not intend to **\*636** require knowledge of all the facts that constitute the offense of possession of an unregistered weapon. During the first 30 years of enforcement of the 1934 Act, consistent with the absence of a knowledge requirement and with the reasoning in *Balint,* courts uniformly construed it not to require knowledge of all the characteristics of the weapon that brought it within the statute. In a case decided in 1963, then-Judge Blackmun reviewed the earlier cases and concluded that the defendant's knowledge that he possessed a gun was "all the scienter which the statute **\*\*1813** requires." *Sipes v. United States,* 321 F.2d 174, 179 (CA8), cert. denied, 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d 150 (1963).

Congress subsequently amended the statute twice, once in 1968 and again in 1986. Both amendments added knowledge requirements to other portions of the Act,[21] but neither the text nor the history of either amendment discloses an intent to add any other knowledge requirement to the possession of an unregistered firearm offense. Given that, with only one partial exception,[22] every federal tribunal to address the question had concluded that proof of knowledge of all the facts constituting a violation was not required for a conviction **\*637** under § 5861(d),[23] we may infer that Congress intended that interpretation to survive. See *Lorillard*

*v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978).

21    Significantly, in 1968, Congress included a knowledge requirement in § 5861(*l*). 26 U.S.C. § 5861(*l*) (making it unlawful "to make, or cause the making of, a false entry on any application, return, or record required by this chapter, *knowing* such entry to be false") (emphasis added). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States,* 480 U.S. 522, 525, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (internal quotation marks and citations omitted); see also *Lawrence County v. Lead–Deadwood School Dist. No. 40–1,* 469 U.S. 256, 267–268, 105 S.Ct. 695, 701–702, 83 L.Ed.2d 635 (1985).

22    *United States v. Herbert,* 698 F.2d 981, 986–987 (CA9), cert. denied, 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983) (requiring the Government to prove knowledge of all the characteristics of a weapon only when no *external* signs indicated that the weapon was a "firearm"). Not until 1989 did a Court of Appeals adopt the view of the majority today. See *United States v. Williams,* 872 F.2d 773 (CA6).

23    See, *e.g., United States v. Gonzalez,* 719 F.2d 1516, 1522 (CA11 1983), cert. denied, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984); *Morgan v. United States,* 564 F.2d 803, 805–806 (CA8 1977); *United States v. Cowper,* 503 F.2d 130, 132–133 (CA6 1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975); *United States v. DeBartolo,* 482 F.2d 312, 316 (CA1 1973); *United States v. Vasquez,* 476 F.2d 730, 732 (CA5), cert. denied, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973), overruled by *United States v. Anderson,* 885 F.2d 1248 (CA5 1989) (en banc).

      And, as I have already noted, *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), was consistent with the Government's position here. Although the Government accepted the burden of proving that Freed knew that the item he possessed was a hand grenade, the possessor of an unfamiliar object such as a hand grenade would not know that it was "a dangerous item of a type likely to be subject to regulation," Brief for United States 16; see also *id.,* at 20, 23, 24, unless he knew what it was.

In short, petitioner's knowledge that he possessed an item that was sufficiently dangerous to alert him to the likelihood of regulation would have supported a conviction during the first half century of enforcement of this statute. Unless application of that standard to a particular case violates the Due Process Clause,[24] it is the responsibility of Congress, not this Court, to amend the statute if Congress deems it unfair or unduly strict.

24    Petitioner makes no such claim in this Court.

IV

On the premise that the purpose of the *mens rea* requirement is to avoid punishing people "for apparently innocent activity," Justice GINSBURG concludes that proof of knowledge that a weapon is " 'a dangerous device of a type as would alert one to the likelihood of regulation' " is not an adequate *mens rea* requirement, but that proof of knowledge that the weapon possesses " 'every last characteristic' " that subjects it to regulation is. *Ante,* at 1805–1806, and n. 5 (GINSBURG, J., concurring in judgment) (quoting the trial court's jury instruction).

 **\*638** Assuming that "innocent activity" describes conduct without any consciousness of wrongdoing, the risk of punishing such activity can be avoided only by reading into the statute the common-law concept of *mens rea:* "an evil purpose or mental culpability." **\*\*1814** *Morissette,* 342 U.S., at 252, 72 S.Ct., at 244.[25] But even petitioner does not contend that the Government must prove guilty intent or intentional wrongdoing. Instead, the "*mens rea* " issue in this case is simply what knowledge requirement, if any, Congress implicitly included in this offense. There are at least five such possible knowledge requirements, four of which entail the risk that a completely innocent mistake will subject a defendant to punishment.

25    Our use of the term *mens rea* has not been consistent. In *Morissette,* we used the term as if it always connoted a form of wrongful intent. In other cases, we employ it simply to mean whatever level of knowledge is required for any particular crime. See, *e.g., United States v. Bailey,* 444 U.S. 394, 403, 100 S.Ct. 624, 631, 62 L.Ed.2d 575 (1980). In this sense, every crime except a true strict-liability offense contains a *mens rea* requirement. For instance, the Court defined *mens rea* in *Liparota v. United States,* 471 U.S., at 426, 105 S.Ct., at 2088–2089, as "knowledge of illegality." In dissent, however, Justice WHITE equated the term with knowledge of the facts that make the conduct illegal. *Id.,* at 442–443, 105 S.Ct., at 2097–2098. Today, the Court assigns

the term the latter definition, *ante,* at 1797, but in fact requires proof of knowledge of only some of the facts that constitute the violation, *ante,* at 1799 (not requiring proof of knowledge of the fact that the gun is unregistered).

First, a defendant may know that he possesses a weapon with all of the characteristics that make it a "firearm" within the meaning of the statute and also know that it has never been registered, but be ignorant of the federal registration requirement. In such a case, we presume knowledge of the law even if we know the defendant is "innocent" in the sense that Justice GINSBURG uses the word. Second, a defendant may know that he possesses a weapon with all of the characteristics of a statutory firearm and also know that the law requires that it be registered, but mistakenly believe that it is in fact registered. *Freed* squarely holds that this defendant's "innocence" is not a defense. Third, a defendant **\*639** may know only that he possesses a weapon with all of the characteristics of a statutory firearm. Neither ignorance of the registration requirement nor ignorance of the fact that the weapon is unregistered protects this "innocent" defendant. Fourth, a defendant may know that he possesses a weapon that is sufficiently dangerous to likely be regulated, but not know that it has all the characteristics of a statutory firearm. Petitioner asserts that he is an example of this "innocent" defendant. Fifth, a defendant may know that he possesses an ordinary gun and, being aware of the widespread lawful gun ownership in the country, reasonably assume that there is no need "to inquire about the need for registration." *Ante,* at 1805 (GINSBURG, J., concurring in judgment). That, of course, is not this case. See *supra,* at 1807, and n. 1. [26]

26    Although I disagree with the assumption that "widespread lawful gun ownership" provides a sufficient reason for believing that there is no need to register guns (there is also widespread lawful automobile ownership), acceptance of that assumption neither justifies the majority's holding nor contradicts my conclusion on the facts of this case.

Justice GINSBURG treats the first, second, and third alternatives differently from the fourth and fifth. Her acceptance of knowledge of the characteristics of a statutory "firearm" as a sufficient predicate for criminal liability— despite ignorance of either the duty to register or the fact of nonregistration, or both—must rest on the premise that such knowledge would alert the owner to the likelihood of regulation, thereby depriving the conduct of its "apparen[t] innocen[ce]." Yet in the fourth alternative, a jury determines just such knowledge: that the characteristics of the weapon

known to the defendant would alert the owner to the likelihood of regulation.

In short, Justice GINSBURG's reliance on "the purpose of the *mens rea* requirement—to shield people against punishment for apparently innocent activity," *ante,* at 1805, neither explains why ignorance of certain facts is a defense although **\*640** ignorance of others is not, nor justifies her disagreement with the jury's finding that this defendant knew **\*\*1815** facts that should have caused him to inquire about the need for registration. [27]

27    In addition, contrary to Justice GINSBURG's assumption, if one reads the term "firearm" from the quoted section of the indictment to mean "gun," the indictment still charges an offense under § 5861(d) and does not differ from the critical jury instruction. See *ante,* at 1805-1806. Even if Justice GINSBURG is correct that there is a technical variance, petitioner makes no claim that any such variance prejudiced him. The wording of the indictment, of course, sheds no light on the proper interpretation of the underlying statutory text. Although the repeated use of a term in a *statute* may shed light on the statute's construction, see *Ratzlaf v. United States,* 510 U.S. 135, 143, 114 S.Ct. 655, 660, 126 L.Ed.2d 615 (1993), such use in an indictment is irrelevant to that question.

## V

This case presents no dispute about the dangerous character of machineguns and sawed-off shotguns. Anyone in possession of such a weapon is "standing in responsible relation to a public danger." See *Dotterweich,* 320 U.S., at 281, 64 S.Ct. at 136-137 (citation omitted). In the National Firearms Act, Congress determined that the serious threat to health and safety posed by the private ownership of such firearms warranted the imposition of a duty on the owners of dangerous weapons to determine whether their possession is lawful. Semiautomatic weapons that are readily convertible into machineguns are sufficiently dangerous to alert persons who knowingly possess them to the probability of stringent public regulation. The jury's finding that petitioner knowingly possessed "a dangerous device of a type as would alert one to the likelihood of regulation" adequately supports the conviction.

Accordingly, I would affirm the judgment of the Court of Appeals.

**Staples v. U.S., 511 U.S. 600 (1994)**
114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

**All Citations**

511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608, 62 USLW 4379

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

305 F.3d 643
United States Court of Appeals,
Seventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Joseph H. FLEISCHLI, Defendant–Appellant.

No. 01–2703.
|
Argued Jan. 7, 2002.
|
Decided Sept. 12, 2002.
|
Rehearing En Banc Denied Oct. 23, 2002.

**Synopsis**

Defendant was convicted in the United States District Court for the Central District of Illinois, Richard Mills, Senior District Judge, of possession of machine guns, transportation of a firearm by a felon, possession of a firearm by a felon, unlawful manufacture of a machine gun, and possession of an unregistered destructive device, and he appealed. The Court of Appeals, Ilana Diamond Rovner, Circuit Judge, held that: (1) law enforcement agent's affidavit in support of search warrants for defendant's home and business for illegal firearms provided sufficiently reliable information on which to base finding of probable cause to issue the warrants; (2) defendant, as felon who could not possess any firearms, could not immunize himself from prosecution for possessing more tightly regulated machine guns by hiding behind corporate charter of licensed firearms manufacturer of which he was allegedly an authorized agent; (3) Congress did not exceed its powers under the Commerce Clause when it enacted statute setting forth offense of possession of machine guns; (4) Commerce clause requirement was met on charge of possession of a firearm by a felon with regard to firearms possessed in defendant's home or business so long as the guns had previously traveled in interstate commerce; (5) in a matter of first impression for the Seventh Circuit, gun had a "trigger" as required to constitute a "machine gun" for purpose of offenses of possessing and manufacturing a machine gun, where it had a mechanism used to initiate a firing sequence; (6) instruction on charge of possession of an unregistered destructive device was adequate; (7) evidence was sufficient to support conviction of possession of an unregistered destructive device; (8) fact that defendant was mere passenger in van in which gun was transported did

not bar finding that he "transported" the gun, for purpose of offense of transportation of a firearm by a felon; (9) admission of evidence of defendant's possession of firearms in Missouri did not violate defendant's Sixth Amendment right to be tried in the district where the crime was committed; and (10) application of two-point upward adjustment for exercise of management responsibility over property, assets, or activities of a criminal organization was within district court's discretion.

Affirmed.

**Attorneys and Law Firms**

**\*647** Patricia A. Tomaw (argued), Office of U.S. Atty., Springfield, IL, for Plaintiff–Appellee.

Richard E. Gardiner (argued), Fairfax, VA, for Defendant–Appellant.

Before MANION, ROVNER and EVANS, Circuit Judges.

**Opinion**

ILANA DIAMOND ROVNER, Circuit Judge.

Joseph Fleischli was convicted by a jury of two counts of possession of machine guns in violation of 18 U.S.C. § 922(*o*)(1), one count of transportation of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), one count of unlawful manufacture of a machine gun in violation of 26 U.S.C. § 5861(f), and one count of possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d). Fleischli was sentenced to 120 months' imprisonment, three years of supervised release and a $600 special assessment. He appeals from both his conviction and his sentence on numerous constitutional, statutory and factual grounds. We affirm.

**I.**

Fleischli concedes that prior to the events that led to his indictment, he had been convicted of four felonies. Two convictions related to the illegal manufacture and possession of firearms and two related to illegal drugs. In March and May of 1998, an informant told the Springfield, Illinois ATF office that Fleischli had an aircraft machine gun (sometimes called a "minigun") and that Fleischli had taken it to

AR004457

Missouri in the Spring of 1998. The informant said that in Missouri, Fleischli and others had fired the minigun. Around this same time, Donald Gibbs, an associate of Fleischli, approached Deputy James Malone in the Macoupin County Sheriff's Department with an unusual request. Gibbs wanted the Sheriff's Department to issue a letter to the Treasury Department requesting a demonstration of a Steyr machine gun in anticipation of a possible purchase. **\*648** Gibbs gave the deputy Fleischli's business card which listed Fleischli as president of Springfield Armaments Services, Inc. ("SAS"), a Class II licensed firearms manufacturer. Gibbs told the deputy that Fleischli was a licensed firearms manufacturer who owned a minigun and wanted to add to his collection. Gibbs provided the deputy with a sample letter to use in drafting the letter to the Treasury Department, requesting permission for Fleischli, as a licensed dealer, to purchase the gun. The deputy recognized Gibbs as a convicted felon and notified his captain who, in turn, notified the Springfield ATF about this strange encounter.

The ATF learned that SAS was incorporated in 1996 by Delmar and Diamonda Tobias, who were Fleischli's father-in-law and mother-in-law, and by Vernon Medlock. These three made up the board of directors as well. Delmar Tobias [1] was listed as president and Medlock was the secretary/treasurer. Apparently, Fleischli had attempted (and failed) to obtain a federal firearms license in 1991 and sought restoration of his federal explosives privileges in 1993. The ATF was therefore already familiar with Fleischli when Captain Jeff Rhodes called from the Sheriff's Department to tell them about Gibbs' conversation with Deputy Malone. The ATF agents decided to investigate, with the aid of Deputy Malone, possible firearms violations by Fleischli.

[1]     Hereafter we will use the name "Tobias" to refer to Delmar Tobias.

The ATF subsequently recorded a number of calls between Malone and Fleischli. The deputy initiated contact by calling the number listed on the business card provided by Gibbs. That number turned out to belong to Otto American Boiler, a business Fleischli owned in Springfield. During these recorded calls, Fleischli told the deputy about his firearms manufacturing business, the minigun he had constructed, and other machine guns he owned. To persuade the Sheriff's Department to issue the Treasury letter, Fleischli agreed to demonstrate the minigun on August 11, 1998 at the Brittany Range in Macoupin County. At the August 11 demonstration, ATF seized the minigun. ATF agents questioned Fleischli,

Delmar Tobias and Medlock about SAS. Fleischli said the minigun belonged to SAS, that SAS was Tobias's company and that he (Fleischli) was just an employee. Fleischli admitted he possessed other machine guns in a safe at Otto American Boiler and other firearms at his home. Fleischli volunteered that an ATF agent previously told him he could not obtain a federal firearms license in his wife's name so he decided to use his father-in-law instead. As the finger-pointing escalated, Tobias told the agents that SAS was Fleischli's idea and that Tobias was simply a partner. Tobias told the agents that Fleischli purchased all the guns that were registered to SAS. Medlock also washed his hands of blame, telling the agents that Fleischli asked him to be secretary/treasurer of SAS but that he received no pay and played no active role in the company.

On that same day, ATF agents armed with warrants obtained before this questioning searched Otto American Boiler, SAS and Fleischli's home. The agents recovered approximately seventy-five firearms from Fleischli's home. They seized machine guns, machine gun parts and explosive devices from his place of business. Machine guns registered to SAS were found at Otto American Boiler. Registration forms and other paperwork related to the guns were found at Otto American Boiler in Fleischli's office in his desk drawer. Following these seizures on August 11, the agents gathered evidence about the **\*649** prior shooting demonstration in Missouri. They obtained witness statements, a videotape of the event, and photographs. A six-count indictment against Fleischli followed.

Fleischli moved to suppress evidence seized from his home and business and moved to dismiss the indictment. He argued that the search warrants were not based on probable cause because one of the informants supplying information used to obtain the warrant was not reliable. That informant, Danny Dapron, told the agents he had last seen the minigun and other guns at Fleischli's home and business on February 1, 1998. Dapron had a checkered past himself and Fleischli argued he could not have seen the guns on February 1, 1998 because he (Dapron) was in jail at that time. The court denied the motion to suppress because Dapron was just one of several sources of information supporting the warrant. Indeed, Fleischli himself had independently corroborated Dapron's statements during his many recorded conversations with Deputy Malone. The district court therefore denied the motion to suppress and also rejected Fleischli's arguments in support of his motion to dismiss the indictment. A jury subsequently found Fleischli guilty on all six counts and the district court sentenced

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

him to 120 months' imprisonment. In determining Fleischli's sentence, the court included a two-level increase for his role in the offense as manager of an illegal business. Fleischli appeals.

## II.

Fleischli raises eleven challenges to his conviction and one to his sentence for an even dozen. He contends that: (1) there was no probable cause to issue the warrants used to search his home and business premises on August 11, 1998; (2) he was exempt from section 922(*o*)(1) by virtue of section 922(*o*)(2) because he was an authorized agent of a licensed firearms manufacturer; (3) section 922(*o*)(1) exceeds Congress's powers under the Commerce Clause; (4) the government failed to prove in the section 922(g)(1) possession count that Fleischli's possession of firearms substantially affected interstate commerce; (5) section 922(g)(1) exceeds Congress's powers under the Commerce Clause to the extent that it applies to Fleischli's mere possession of firearms in his home and business; (6) section 5822 does not encompass Fleischli's manufacture of machine guns because he was acting as an agent of a licensed manufacturer; (7) the minigun was not a machine gun within the meaning of section 5845 because it does not fire automatically and does not have a trigger; (8) the term "similar device" in the definition of the term "destructive device" in section 5845 is unconstitutionally vague; (9) the four alleged destructive devices seized from Fleischli did not come within the purview of section 5845(f) because they were used only as fireworks; (10) Fleischli could not be convicted of transporting firearms under section 922(g)(1) because he was merely a passenger in a vehicle used to transport firearms; (11) evidence of Fleischli's possession of firearms in Missouri was inadmissable under the Sixth Amendment which requires that a person be tried within the state and district in which the crime occurred; and (12) the court erred in applying a two-level enhancement for Fleischli's role in the offense because there were no other participants in the offense. A number of Fleischli's arguments are easily resolved by well-settled law and we will address them in summary fashion.

## A.

On August 11, 1998, ATF agents searched Fleischli's home and business **\*650** pursuant to two warrants. The warrants were issued on the basis of probable cause established by the affidavit of ATF Special Agent Robert Schmidt. Fleischli maintains that the warrants were improperly issued and not based on probable cause because Agent Schmidt credited information from Danny Lee Dapron, an unreliable informant, in drafting his affidavit. In the affidavit, Schmidt reported that he interviewed Dapron, a former employee of Otto American Boiler. Dapron told Schmidt that he saw the minigun at Otto American Boiler on February 1, 1998, and that Fleischli kept another gun in a safe on the premises as well. Dapron also reported seeing a number of firearms in a vault in the basement of Fleischli's home on that same day. Fleischli complains that the affidavit did not contain the basis of Dapron's knowledge and that the agent did not corroborate the information. Moreover, Fleischli contends, Dapron was an unreliable source with a criminal record who was actually in jail on February 1, 1998, the day he claims to have seen guns at Fleischli's home and business. Finally, Fleischli complains that the information provided by Dapron was stale by the time the warrant was executed, approximately six months later. Fleischli thus asks us to conclude that the warrant was not based on probable cause and that the evidence seized from his home and business should be suppressed.

We review *de novo* the district court's determination that probable cause existed to support a search warrant. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Singleton,* 125 F.3d 1097, 1102 (7th Cir.1997), *cert. denied,* 522 U.S. 1098, 118 S.Ct. 898, 139 L.Ed.2d 833 (1998). We review for clear error, however, findings of historical fact and give due weight to inferences drawn from those facts by resident judges and local law enforcement agencies. *Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657; *Singleton,* 125 F.3d at 1102. We begin by reviewing the affidavit on which the court relied in issuing the warrants. Special Agent Schmidt's twelve-page affidavit contains an extensive amount of information from a variety of sources, including Fleischli himself. In recorded conversations with Deputy Malone, Fleischli corroborated much of the information provided by Dapron and others. A few examples will suffice to demonstrate the reliability of the information provided in the affidavit.

Dapron, a family friend of Fleischli's for thirty-seven years, worked at Otto American Boiler for a number of years. He correctly identified Delmar and Diamonda Tobias as Fleischli's in-laws, he knew that Fleischli's wife held an Illinois explosives license, he knew that Fleischli had taken the guns to Knob Creek, Kentucky for shooting demonstrations on a number of occasions, and he knew

where Fleischli stored his guns in safes both at his home and at Otto American Boiler. Dapron identified the types of guns Fleischli owned, naming the models and manufacturers. In short, Dapron demonstrated an intimate knowledge of Fleischli, his guns, and his home and business. Much of the detailed information provided by Dapron was corroborated by Fleischli himself, lending further credibility to Dapron's information. Fleischli told Malone, for example, that he had just returned from a machine gun shoot in Knob Creek, Kentucky, and that he had attended shooting events at Knob Creek twice a year for eighteen years. Fleischli told the deputy he had brought several guns with him down to Knob Creek. When asking for the Treasury letter, Fleischli originally asked that it be sent to 1905 East Washington, which turned out to be the address **\*651** of Otto American Boiler. The phone number on Fleischli's business card for SAS also turned out to be the number of Otto American Boiler. Fleischli also told the deputy about some of the guns he owned, including some that had been identified by Dapron. Special Agent Schmidt confirmed that Fleischli's wife held a valid explosives license from the State of Illinois. Further confirmation of Dapron's information was provided by Delmar Tobias who told a sheriff's deputy that his son-in-law stored the minigun in his (Fleischli's) safe. When an affidavit relies on an informant's tip, the issuing judge must look to the totality of the circumstances in determining whether probable cause exists. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Spry,* 190 F.3d 829, 835 (7th Cir.1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000). Probable cause is a fluid concept, based on a reasonable belief that evidence in the place to be searched will lead to an arrest or conviction for a particular offense. *United States v. McClinton,* 135 F.3d 1178, 1183 (7th Cir.1998), *cert. denied,* 524 U.S. 921, 118 S.Ct. 2308, 141 L.Ed.2d 167 and 525 U.S. 885, 119 S.Ct. 197, 142 L.Ed.2d 161 (1998). "Probable cause denotes more than a mere suspicion, but does not require certainty." *Id.* Special Agent Schmidt's affidavit provides sufficiently reliable information on which to base a finding of probable cause. In addition to information from Dapron and Fleischli himself, Special Agent Schmidt relied on information from another confidential informant, from Fleischli's associate Gibbs, and from sheriff's department and ATF investigators. Although Dapron was the only link to the location where the guns would be found, numerous sources including Fleischli himself verified that he currently possessed a large number of firearms. Although Dapron had a criminal record and may have misidentified the date on which he last saw the guns, he demonstrated an extensive and

intimate knowledge of Fleischli's family, business and home, as well as his gun collection. Much of this information was independently corroborated, lending further credibility to the facts that could not be confirmed until the search was actually conducted (i.e., the presence of guns in particular locations within Fleischli's home and business). The court thus did not err in issuing the warrant based on information provided by Dapron and others.

**B.**

Fleischli was convicted of two counts of possession of machine guns in violation of 18 U.S.C. § 922(*o*)(1). He argues on appeal that he was exempt from the operation of section 922(*o*)(1) by virtue of section 922(*o*)(2) and the accompanying federal regulations. Section 922(*o*)(1) states:

> Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

18 U.S.C. § 922(*o*)(1). Section 922(*o*)(2) states in relevant part:

> This subsection does not apply with respect to ... a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof[.]

18 U.S.C. § 922(*o*)(2)(A). Federal regulations provide that qualified manufacturers may "import and manufacture machine guns ... for use by dealers qualified under this part as samples as provided in paragraph (d) of this section." 27 C.F.R. § 179.105(c). Paragraph (d), in turn, explains that applications to transfer and register certain machine guns will be approved "if it is established by specific information the expected governmental customers **\*652** who would require a demonstration of the weapon ... and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon."

Presumably this is the letter Fleischli and Gibbs sought to have the Sheriff's Department issue. Fleischli now argues that, in the Spring of 1998, when he transported machine guns to Missouri, he was authorized to do so by the president of SAS, a licensed manufacturer, and he was accompanied by the president of SAS on this trip as well. Because he was acting as an agent of the corporation, his possession of the guns was the corporations's possession. He thus maintains that he did not violate section 922(*o*)(1).

We review this question of statutory interpretation *de novo. United States v. Jain,* 174 F.3d 892, 897 (7th Cir.1999), *cert. denied,* 528 U.S. 889, 120 S.Ct. 210, 145 L.Ed.2d 177 (1999). Fleischli, in essence, argues that a felon who may not possess any firearms may immunize himself from prosecution for possessing more tightly regulated machine guns by hiding behind a corporate charter. He maintains that because his status as a felon is not an element of a section 922(*o*) violation, he may not be prosecuted under that provision if a licensed corporation authorized him to possess and transport a machine gun. Fleischli's argument is bold but unavailing. First, SAS would never have obtained a license if it had truthfully disclosed that it was a front for a convicted felon to gain access to firearms. Under 18 U.S.C. § 923(d)(1), an applicant for a license to manufacture or deal in firearms will be approved if "the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate commerce under section 922(g) and (n) of this chapter[.]" In other words, if Fleischli had held himself out to be the president of SAS during the licensing process (as he did when he approached the Sheriff's Department for the Treasury letter), SAS would not have received its license. *See also* 18 U.S.C. § 925(b) (allowing a licensed manufacturer, dealer or collector under indictment for a felony to continue operations until any conviction pursuant to the indictment becomes final). The statutory scheme when viewed as a whole was never intended to allow convicted felons to hide behind a corporate charter to gain access to the most heavily regulated firearms, such as machine guns.

Second, it is well-settled that "an agent cannot be insulated from criminal liability by the fact that his principal authorized his conduct." *McNamara v. Johnston,* 522 F.2d 1157, 1165 (7th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47

L.Ed.2d 761 (1976). *See also Gillespie v. City of Indianapolis,* 185 F.3d 693 (7th Cir.1999), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000) (upholding challenge to section 922(g)(9) by a police officer who lost his job because he could not possess a firearm after being convicted of domestic violence); *United States v. Floyd,* 882 F.2d 235, 240 (7th Cir.1989) (holding union official could not be absolved of wrongdoing by claiming the act was done with union authorization under the principal recognized in *McNamara* ). In short, a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation.

## C.

Fleischli next contends that Congress exceeded its powers under the Commerce **\*653** Clause when it enacted section 922(*o*)(1). Fleischli concedes that we have previously rejected a Commerce Clause challenge to section 922(*o*). *See United States v. Kenney,* 91 F.3d 884 (7th Cir.1996). He maintains, however, that *Kenney* is now in conflict with the Supreme Court's more recent ruling in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), and that we must therefore reverse his convictions on Counts 1 and 3. In *Morrison,* the Supreme Court struck down a section of the Violence Against Women Act that created a federal civil remedy for gender-motivated violence because gender-motivated violence is not an activity that substantially affects interstate commerce. Nothing in *Morrison* casts doubt on the validity of section 922(*o*)(1), and our analysis in *Kenney* remains sound. *See also United States v. Haney,* 264 F.3d 1161, 1166–71 (10th Cir.2001), *cert. denied,* 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002) (upholding section 922(*o*) against a post-*Morrison* Commerce Clause challenge). Seeing no reason to doubt our earlier analysis and no reason to split from the well-reasoned decision of our sister circuit, we affirm Fleischli's convictions on Counts 1 and 3.

## D.

Fleischli challenges his conviction under 18 U.S.C. § 922(g) (1), the "felon in possession" statute, because the government was not required to prove that his possession of firearms substantially affected interstate commerce. Again Fleischli acknowledges that we have rejected an identical argument in the past. *See Gillespie,* 185 F.3d at 705. This time he maintains that *Gillespie* cannot stand in light of *Jones v. United States,*

529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). But we have rejected that argument as well, and Fleischli offers us no reason to reconsider our earlier opinions. *See United States v. Mitchell,* 299 F.3d 632, 634–35 (7th Cir.2002); *United States v. Wesela,* 223 F.3d 656, 660 (7th Cir.2000), *cert. denied,* 531 U.S. 1174, 121 S.Ct. 1145, 148 L.Ed.2d 1008 (2001). *See also United States v. Singletary,* 268 F.3d 196, 205 (3rd Cir.2001), *cert. denied,* 535 U.S. 976, 122 S.Ct. 1450, 152 L.Ed.2d 391 (2002) (collecting cases).

### E.

We next review Fleischli's claim that section 922(g)(1) does not extend to firearms possessed in Fleischli's home or business. He bases this argument on *Jones,* stating that the possession of firearms in a home or non-firearms related business (presumably Otto American Boiler) is not in any sense commercial activity. Thus, he argues, as applied to him, section 922(g)(1) exceeds Congress's powers under the Commerce Clause. This is a curious argument given Fleischli's claim above that he did not personally possess any of the firearms but rather held them as an agent of SAS, a licensed firearms manufacturer. In that capacity, we have no doubt he would concede his possession of firearms affected commerce. Fleischli is entitled to argue in the alternative, however. This claim is really just a slightly different twist on Fleischli's claim above that the government should have been required to prove that his possession of firearms substantially affected interstate commerce. We have held numerous times that the Commerce Clause requirement is met in the case of firearms possession when the guns have previously traveled in interstate commerce. *See Mitchell,* 299 F.3d at 634–35; *Wesela,* 223 F.3d at 660. Nothing in *Jones* requires a different result.

### F.

Fleischli next challenges his conviction under 26 U.S.C. § 5822. Presumably **\*654** he means to challenge his conviction under 26 U.S.C. § 5861(f) which states that "[i]t shall be unlawful for any person to make a firearm in violation of the provisions of this chapter[.]" Section 5822, in turn, provides the scheme by which persons seeking to manufacture firearms may apply for permission to do so. Section 5822 provides that no person shall make a firearm unless he has filed a written application with the Secretary, paid any appropriate taxes, identified the firearm

on the application, identified himself on the application (a photograph and fingerprints must be included if the applicant is an individual), and obtained the approval of the Secretary to make and register the firearm. Section 5822 also provides "Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of the law." Fleischli contends that section 5822 did not apply to him because he manufactured the gun in question under the auspices of SAS, a licensed manufacturer. Section 5822, he maintains, does not apply to licensed manufacturers but rather applies to non-licensed persons who wish to manufacture a machine gun. Because SAS was licensed under section 5802, it was not required to apply for approval under section 5822, and because Fleischli was employed by SAS, his manufacture of a machine gun could not be prosecuted under section 5822.

Fleischli does not cite a single case in support of this novel theory. It is essentially a replay of his argument that he is not subject to section 922(o)(1) because he was acting as the agent of a licensed manufacturer. We reject this claim here as we rejected it in section B above. First, SAS would not have obtained a license to manufacture guns if it had disclosed that Fleischli, a convicted felon, would be central to the operation. Second, Fleischli may not hide behind a corporate charter to engage in conduct he could not legally accomplish as an individual. Such a theory is contrary to the language and structure of the statutory scheme regulating firearms. If Fleischli's theory prevailed, a hypothetical "Felons, Inc." could provide convicted felon-employees with access to firearms they could not legally obtain, completely thwarting Congressional intent to keep firearms out of the hands of convicted felons. We do not believe Congress intended to create such a gaping loophole, and no statutory language supports such an expansive reading. *McNamara,* 522 F.2d at 1165; *Gillespie,* 185 F.3d at 693; *Floyd,* 882 F.2d at 240. Indeed, section 5822 specifies that applications will be denied if the making or possession of a firearm would place the person making the firearm in violation of the law. As a convicted felon, Fleischli's application would be denied because possession of a gun would place him in violation of 18 U.S.C. § 922(g)(1). Fleischli's conviction under section 5861 will stand.

### G.

Fleischli challenges his convictions for possessing and manufacturing a machine gun on the ground that the minigun

does not meet the statutory definition of a machine gun. In particular, he claims the minigun is not a machine gun as that term is defined in 26 U.S.C. § 5845(b) because the minigun does not fire automatically and does not have a trigger. Section 5845(b) defines a machine gun as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, **\*655** for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). The words "automatic" and "trigger" are not defined in the statute or regulations. Fleischli argues that a gun does not fire automatically unless it uses a portion of the energy of a firing cartridge to extract the fired cartridge and chamber the next round without a separate pull of the trigger. He derives this meaning from the United States Code's definition of "semiautomatic." He also claims the minigun is akin to a Gatling gun, which is not considered a machine gun under an IRS ruling. Relying on firearms reference manuals, he also contends that his minigun lacked a trigger as that term is defined in the firearms field because the minigun operates by virtue of an electrical on-off switch.

In interpreting the National Firearms Act ("NFA"), the Supreme Court offered commonsense explanations of the terms "automatic" and "semiautomatic" that give us all the ammunition we need to dispose of Fleischli's disingenuous argument:

> As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is,

once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

*Staples v. United States,* 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Fleischli dismisses this passage as not binding, arguing that the Court did not define "automatically" but rather defined "automatic." We think the Court's meaning is plain enough. If Fleischli's minigun, with one application of the trigger, continued to fire until the trigger was released or the ammunition exhausted, it was a machine gun within the meaning of the Act.

That leads us to consider whether the minigun had a trigger. Fleischli's minigun was activated by means of an electronic on-off switch rather than a more traditional mechanical trigger. He maintains that an electronic switch does not meet the traditional definition of trigger and that the minigun, which fired between 2000 and 6000 rounds per minute once it was switched on, was therefore not a machine gun. This is a puerile argument, based on hyper-technical adherence to literalism. We are not surprised to learn that Fleischli is not the first defendant to make such a brazen argument, although he appears to be the first to do so in this circuit. We join our sister circuits in holding that a trigger is a mechanism used to initiate a firing sequence. *United States v. Jokel,* 969 F.2d 132, 135 (5th Cir.1992) (commonsense understanding of trigger is mechanism used to initiate firing sequence); *United States v. Evans,* 978 F.2d 1112, 1113–14 n. 2 (9th Cir.1992), *cert. denied,* 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (trigger is anything that releases the bolt to cause the weapon to fire). Fleischli's definition "would lead to the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *Evans,* 978 F.2d at 1113–14 n. 2. The dictionary definition of "trigger" includes both the traditional ("a small projecting tongue in a firearm that, when **\*656** pressed by the finger, actuates the mechanism that discharges the weapon") and the more general ("anything, as an act or event,

that serves as a stimulus and initiates or precipitates a reaction or series of reactions."). *See* WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (2001). Fleischli's electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machine gun as defined in the National Firearms Act.

**H.**

We next consider whether the term "similar device" in 26 U.S.C. § 5845(f) is unconstitutionally vague. Fleischli was convicted of violating section 5861(d), which prohibits possession of an unregistered firearm. Section 5845(a)(8) defines "firearm" to include a "destructive device." Section 5845(f), in turn, defines destructive device:

> The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device[.]

26 U.S.C. § 5845(f). The statute further provides that the term "destructive device" does not include devices that are not designed or redesigned for use as weapons. 26 U.S.C. § 5845(f)(3). Fleischli was charged with possessing four "explosive or incendiary bombs or similar devices each consisting of a cardboard container sealed at both ends, containing a mixture of pentaerythritol tetranintrate (PETN) powder, a non-electric blasting cap with a short length of fuse." R. 26 at 7. Fleischli maintains that the use of the word "similar" causes a reasonable person to speculate as to how nearly a device must resemble a bomb, grenade, rocket, missile or mine in determining whether the device is encompassed by the statute. Fleischli thus contends the statute is unconstitutionally vague.

The three circuits to consider this issue have all found that the statute is not unconstitutionally vague. *See United States v. Markley,* 567 F.2d 523, 527–28 (1st Cir.1977), *cert.*

*denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978); *United States v. Ross,* 458 F.2d 1144, 1145 (5th Cir.1972), *cert. denied,* 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972); *United States v. Morningstar,* 456 F.2d 278, 281 (4th Cir.1972), *cert. denied,* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972). All three courts agreed that a person of ordinary intelligence would understand the statute to include any combination of parts intended to be used as a bomb or weapon or from which a bomb or weapon could be readily assembled. Fleischli's device comes well within the purview of the statute. He maintains, however, that the four devices he was charged with possessing were not intended for use as weapons but rather as fireworks. He complains that the jury was not instructed that the government was required to prove the devices were designed or redesigned for use as a weapon.

The jury was instructed as follows:

> You must determine whether any of the devices charged in Count 6 is a destructive device. If the objective design of the device indicates that the object has no legitimate social or commercial purpose, the defendant's intent in possessing that device is not relevant to your determination. However, if the assembled device may form an object with both a legitimate and a nonlegitimate **\*657** use, then you may consider the defendant's subjective intent in deciding whether that device qualifies as a destructive device.

R.81, Tr. at 461. This instruction was a correct statement of the law in this circuit, and allowed Fleischli to proceed with his defense that the objects were actually fireworks, not destructive devices. *See United States v. Saunders,* 166 F.3d 907, 914 (7th Cir.1999); *United States v. Johnson,* 152 F.3d 618, 625 (7th Cir.1998). The jury simply did not believe his version of events. The statute gave adequate notice of what conduct was proscribed, and the jury was properly instructed about the government's burden of proof. We find no error.

**I.**

Fleischli next raises a sufficiency of the evidence challenge, arguing that the government failed to prove that the four devices were designed or redesigned for use as weapons. He claims that the undisputed evidence shows that the devices were intended for use as fireworks at the Tobiases' farm. Fleischli's in-laws apparently held a valid fireworks permit. Fleischli has an uphill battle in making out a sufficiency of the evidence claim. In reviewing this claim we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Copus,* 93 F.3d 269, 271 (7th Cir.1996). We may reverse a conviction only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt. *Id.*

The government presented evidence that Fleischli possessed four fully assembled devices consisting of blasting caps (detonators), varying amounts of PETN (a highly explosive powder), and fuses. Government evidence demonstrated that lighting the fuse would cause the blasting cap to activate, which in turn would detonate the explosive powder. The resulting explosion was of sufficient force to damage property and cause personal injury. In response to Fleischli's claim that the devices were intended for use as fireworks, an ATF explosives expert testified that no commercial firecrackers of which he was aware used a detonator or PETN. The ATF expert testified that he knew of no social or commercial use for the devices as assembled. This evidence was more than adequate to support a conviction under section 5861(d).

### J.

Fleischli was convicted of transporting firearms in interstate commerce in violation of 18 U.S.C. § 922(g)(1). The district court here instructed the jury that a "defendant transports a firearm when he transports or causes to be transported the firearm in a vehicle." R. 81, Tr. at 458. The charge was based on the transport of the minigun from Illinois to Missouri in the Spring of 1998. The gun was transported in a trailer that was towed by a van owned and driven by Kevin Traeger. Fleischli and his family were passengers in Traeger's van. Fleischli cites *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), for the proposition that the driver of the vehicle was the only person legally liable for transporting the firearms. Because Fleischli was merely a passenger in the van in which the minigun was transported, he maintains he did not "transport" the gun. He does not dispute

that, as a factual matter, he agreed to bring his minigun to Missouri to attend a shooting event, that the minigun was loaded into Traeger's trailer at Otto American **\*658** Boiler, that Fleischli demonstrated the gun in Missouri, and that the gun was returned to the safe at Otto American Boiler at the end of the day.

In *Muscarello,* the Court considered the meaning of "carry" as that term is used in 18 U.S.C. § 924(c)(1). The Court concluded that "carry" is not limited to the carrying of weapons directly on the person but can include their carriage in a car. 524 U.S. at 132, 118 S.Ct. 1911. According to the Court, a person may "carry" firearms in a wagon, truck, car or other vehicle that one accompanies. 524 U.S. at 128, 118 S.Ct. 1911. The Court rejected the petitioner's claim that such a broad definition of "carry" would make it equivalent to "transport," which clearly had a separate meaning in the statute. The Court commented that "carry" implies personal agency and some degree of possession, "whereas 'transport' does not have such a limited connotation, and, in addition, implies the movement of goods in bulk over great distances." 524 U.S. at 134, 118 S.Ct. 1911. " 'Transport' is a broader category that includes 'carry' but also encompasses other activity." 524 U.S. at 135, 118 S.Ct. 1911.

There is no support in the language of the statute or the case law for Fleischli's distinction between a passenger and driver of the vehicle in which the firearm is transported. Under *Muscarello,* the key to the meaning of "carry" is personal agency and possession. "Transport" includes "carry" and is a broader category. The evidence demonstrated that the gun belonged to Fleischli, that it was transported to Missouri at his impetus, that he accompanied the gun in a van to Missouri and oversaw the loading and unloading of the gun at both ends of the trip. In short, he transported the gun to Missouri as that word is commonly understood. The government was required to prove no more than that. The district court's instruction accurately conveyed the law by clarifying that the standard could be met by showing that Fleischli caused the firearm to be transported.

### K.

Over Fleischli's objection, the government offered evidence of Fleischli's possession of firearms in Missouri. Fleischli contends that this evidence violated his Sixth Amendment right to be tried in the district where the crime was committed. Possession of a firearm is a continuing offense which ceases

only when the possession stops. *United States v. Ballentine,* 4 F.3d 504, 507 (7th Cir.1993), *cert. denied,* 510 U.S. 1179, 114 S.Ct. 1222, 127 L.Ed.2d 568 (1994). Continuing offenses may be prosecuted in any district in which they occurred. *United States v. Chin,* 981 F.2d 1275, 1278 (C.A.D.C.1992), *cert. denied,* 508 U.S. 923, 113 S.Ct. 2377, 124 L.Ed.2d 281 (1993). Thus, Fleischli was properly prosecuted for possession in either Illinois or Missouri, and the court did not err by admitting evidence of Fleischli's gun-related activities in Missouri. Moreover, Fleischli was also charged with transporting a gun from Illinois to Missouri and evidence of his possession of the gun in Missouri was highly relevant to that charge and appropriately admitted.

## L.

Finally, Fleischli contests his sentence, arguing that the district court incorrectly applied an enhancement for his role in the offense pursuant to U.S.S.G. § 3B1.1(c). That provision allows a court to increase the defendant's offense level by two levels if the defendant was an organizer, leader, manager, or supervisor in any criminal activity. Fleischli contends that this enhancement may be applied only when the offense is committed by more **\*659** than one participant. Because "participant" is defined as a person who is criminally responsible for the commission of the offense (regardless of whether that person is convicted), and there were no other criminally responsible persons, Fleischli argues that the district court erred in applying the enhancement. Fleischli is correct that a section 3B1.1(c) enhancement may be applied only when there is another participant in the offense. *United States v. Mustread,* 42 F.3d 1097, 1103 (7th Cir.1994); U.S.S.G. 3B1.1, Application Note 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). The district court was aware of this limitation, and declined to apply an adjustment under section 3B1.1(c). Instead the court departed upward, relying on additional language from Application Note 2:

> An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility

over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1, Application Note 2.

In particular, the court referenced Application Note 2 and then noted:

> And here the government clearly established at trial that the defendant procured parts for illegal weapons and engaged in illegal weapons manufacture. He arranged for potential sale of the Minigun. He demonstrated its firepower at a gun show. And he had Mr. Tobias register arms and conduct transactions in his stead. Similarly, Mr. Fleischli employed Mr. Medlock as the firearm company's secretary-treasurer because Mr. Medlock had a valid firearm owner identification card, FOID card, and could use it to possess guns which the defendant could not legally possess himself. So these activities, it seems to the Court, clearly warrant a two-point upward departure pursuant to 3B1.1.

R.79, Sentencing Tr. at 8–9. The court had already found that it was Fleischli's idea to set up the corporation after repeated attempts to gain access to firearms legally had failed.

We review the court's decision to depart upward from the applicable Guideline range for abuse of discretion. *United States v. Leahy,* 169 F.3d 433, 439 (7th Cir.1999). We see no abuse of discretion here. Fleischli set up a sham corporation using friends and relatives to help him gain access to firearms he could not obtain legally. He recruited others to act as straw men in his gun purchase activities, and directed the operation himself. He maintained in his own home and business a veritable arsenal of weapons that were registered to this company, exercising management responsibility over the property, assets, or activities of a criminal organization. We therefore affirm the district court's application of an upward departure to Fleischli's sentence.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

## III.

For the reasons stated above, we find no error in Fleischli's conviction or sentence. We therefore affirm the judgment of the district court.

AFFIRMED.

**All Citations**

305 F.3d 643

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

343 F.3d 743
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff–Appellant,

v.

Ernest Carol CAMP, Defendant–Appellee.

No. 02–30925.
|
Aug. 21, 2003.

**Synopsis**

Defendant was indicted for possession of a machine gun. Defendant moved to dismiss. The United States District Court for the Western District of Louisiana, Donald E. Walter, J., granted motion. Government appealed. The Court of Appeals, Rhesa Hawkins Barksdale, Circuit Judge, held that semiautomatic rifle modified to fire multiple shots with one action of pulling added switch was a "machine gun."

Vacated and remanded.

**Attorneys and Law Firms**

**\*744** William Joseph Flanagan, U.S. Atty. (argued), Shreveport, LA, for Plaintiff–Appellant.

Joseph Ransdell Keene (argued), Law Offices of J. Ransdell Keene, Shreveport, LA, for Defendant–Appellee.

Appeal from the United States District Court for the Western District of Louisiana.

Before KING, Chief Judge, and HIGGINBOTHAM and BARKSDALE, Circuit Judges.

**Opinion**

RHESA HAWKINS BARKSDALE, Circuit Judge:

The United States appeals the FED.R.CRIM.P. 12(b) dismissal of Ernest Camp's indictment for possession of a machine gun, in violation of 18 U.S.C. §§ 922(*o*)(1) and 924(a)(2). At issue is whether the term "trigger" as used in 26 U.S.C. § 5845(b) (defining "machine gun") includes a switch that starts a motor, causing a modified semiautomatic rifle to automatically fire more than one shot. VACATED and REMANDED.

I.

Louisiana authorities executing a search warrant at Camp's home seized firearms, illegal drugs, and drug-manufacturing equipment. One firearm was a modified semiautomatic rifle; Camp had added an electrically-operated trigger mechanism (device).

When an added switch behind the original trigger was pulled, it supplied electrical power to a motor connected to the bottom of a fishing reel that had been placed inside the weapon's trigger guard; the motor caused the reel to rotate; and that rotation caused the original trigger to function in rapid succession. The weapon would fire until either the shooter released the switch or the loaded ammunition was expended.

The Bureau of Alcohol, Tobacco, and Firearms (ATF) tested the weapon and found it "capable of firing more than one shot, without manual reloading[,] by a single function of the trigger". (This finding corresponds with the definition of a machine gun found in 26 U.S.C. § 5845(b).) The ATF was able to cause the weapon to fire two three-shot bursts. As a result, the ATF concluded that the modified rifle was a "machine gun" for purposes of § 5845(b).

Camp was indicted for possession of a machine gun. *See* 18 U.S.C. §§ 922(*o*) (1) and 924(a)(2). He stipulated that he possessed the firearm, but contended it was not a "machine gun" as defined by § 5845(b). The district court treated this contention as a Rule 12(b) motion to dismiss; held an evidentiary hearing; and dismissed the indictment. It held: the "switch" was not a "trigger" for purposes of § 5845(b); the weapon required multiple functions of the primary trigger; and, therefore, the weapon, as modified, was not a § 5845(b) machine gun.

II.

The district court's application of the statute is reviewed *de novo. United States v. Jennings*, 195 F.3d 795, 797 (5th Cir.1999), *cert. denied,* 530 U.S. 1245, 120 S.Ct. 2694, 147 L.Ed.2d 965 (2000). Pursuant to § 5845(b), a "machine gun" is

any weapon which shoots ... automatically more than one shot, without manual reloading, *by a single function of the trigger.* The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such **\*745** parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added).


A.

The term "trigger" is not defined by statute. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir.1992), defined a trigger, as used in 26 U.S.C. § 5845(d)(shotguns), as any "mechanism ... used to initiate the firing sequence". *See also United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir.2002) (concerning machine gun, approving of *Jokel*'s definition), *cert. denied,* 538 U.S. 1001, 123 S.Ct. 1923, 155 L.Ed.2d 828 (2003); *United States v. Evans*, 978 F.2d 1112, 1113 (9th Cir.1992), *cert. denied,* 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (concerning machine gun, defining trigger as "anything that releases the bolt to cause ... [the weapon] to fire" (internal quotation omitted; alteration in original)).

In *Jokel,* the defendant contended his firearm lacked a "trigger" because it required the insertion of a nail and spring in order to fire, rather than, as is traditional, pulling a small lever. Our court disagreed: "To construe 'trigger' to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a very common kind. *The language implies no intent to so restrict the meaning....*" 969 F.2d at 135 (emphasis added). It is undisputed that the switch in Camp's device "initiated the firing sequence".

Camp attempts to distinguish his firearm by noting there is another "trigger"—the rifle's original metal lever/trigger.

He contends that, for purposes of § 5845(b), this original trigger is the operative one; and, because it functioned each time the rifle was fired, the rifle, as modified, did not become a machine gun. To accept this contention would allow transforming firearms into machine guns, so long as the original trigger was not destroyed. *See Fleischli,* 305 F.3d at 655 (dismissing as "puerile" defendant's contention that firearm was not machine gun because it used electrical, rather than traditional, trigger); *Evans*, 978 F.2d at 1113 n. 2 (same).

Camp also claims the switch is merely a legal "trigger activator". At the evidentiary hearing, an ATF Agent testified that "trigger activators" involve using springs that "force the trigger back to the forward position, *meaning that you have to separately pull the trigger each time you want to fire the gun,* but it gives the illusion of functioning as a machinegun". (Emphasis added.) According to the Agent, the ATF understands such trigger activators to be legal, insofar as they do not transform legal firearms into machine guns.

We reject Camp's contention that the switch on his firearm was a legal "trigger activator". As discussed, those activators described by the ATF Agent require a user to separately pull the activator each time the weapon is fired. Camp's weapon, however, required only one action—pulling the switch he installed—to fire multiple shots. This distinction is expressly contemplated by § 5845(b), which speaks of "shoot[ing] automatically more than one shot ... by a *single* function of the trigger". (Emphasis added.)


B.

Finally, Camp contends *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), is relevant to whether his modified rifle was a machine gun. Pursuant to *Staples,* the Government must prove a defendant "*knew* the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun". *Id.* at 602, 114 S.Ct. 1793 (emphasis added). As the Government acknowledges, **\*746** this is an issue for the proceedings on remand.


III.

For the foregoing reasons, the dismissal of the indictment is VACATED; this matter is REMANDED for further proceedings consistent with this opinion.

*VACATED; REMANDED.*

**All Citations**

343 F.3d 743

---

969 F.2d 132
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Franklin Monroe JOKEL, Defendant-Appellant.

No. 92-1029
|
Summary Calendar.
|
Aug. 10, 1992.

**Synopsis**

Defendant was convicted before the United States District Court for the Northern District of Texas, David O. Belew, Jr., J., of possession of a shotgun and explosive mines that were unregistered and had no serial numbers, and he appealed. The Court of Appeals held that: (1) evidence was sufficient to prove that gun was a "shotgun" within meaning of statute; (2) hinge on shotgun was a "trigger" within meaning of statute; (3) instruction concerning destructive devices conformed to statute and did not increase government's burden; and (4) evidence was sufficient to prove that devices were readily convertible into mines with the addition of only gunpowder and shot, which were found with the devices.

Affirmed.

**Attorneys and Law Firms**

*133 David H. Stokes, Stokes & Warren, Stephenville, Tex., for defendant-appellant.

Michael Jergins, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before HIGGINBOTHAM, SMITH, and DEMOSS, Circuit Judges.

**Opinion**

PER CURIAM:

Franklin Jokel appeals his conviction of possession of a shotgun and explosive mines that were unregistered and had no serial numbers, in violation of 26 U.S.C. §§ 5845(d) and (f) and 5861(d) and (i). Finding no error, we affirm.

I.

A sheriff's deputy had seized from Jokel's residence a shotgun that the government introduced at trial; also seized were four incomplete directional mines consisting of pipe nipples, end plugs, and fuses, which could be converted into completed mines with the addition of explosive powder and metal shot. In the container in which deputies found the incomplete mines, deputies also found gunpowder and metal shot called Minie balls.

Jokel does not dispute that he manufactured the shotgun and pipe devices; he testified that he made them for his own use. He believed that, without a trigger, no device that he made would be a firearm within the meaning of the law. He used pipe material that he obtained from hardware and plumbing stores and that had been left at his house by a previous owner. He never intended to use any of his homemade devices as a weapon.

He did not think the shotgun had a trigger. He fired it by inserting a nail near the hammer in such a way that, when the hammer was released, it would fall forward and hit the nail.

Jokel testified that he owned black powder firearms, that is, ones that fire Minie balls. He also owned several cans of smokeless ball powder.

He also testified that he intended to use the pipe devices only to create smoke to *134 detect opponents in paint ball war games; he intended to lay a trip cord in the area of the games. When a member of the opposing teams would walk over the cord, it would trip the pipe device, emitting smoke for his team to see. Jokel testified that neither the shotgun nor the four pipe devices had serial number or were registered.

Bureau of Alcohol, Tobacco, and Firearms (ATF) officer Curtiss H.A. Bartlett testified that the shotgun did not have a separate and distinct trigger but had a mechanism that served the function of a trigger. With the insertion of a nail and a spring, which was a ready restoration, the shotgun did and would fire a shell. The shotgun is fired by pulling back a springed hinge as one would do with a trigger on a gun; the hinge would move forward to strike the firing pin (the nail), which would cause the shell to fire.

Bartlett testified, "It does not have a separate trigger. In this particular case, the hammer and the trigger are really the same piece. You just draw the hinge back and let it go. So the hinge serves as both the hammer and the trigger." That is, the hinge is the shotgun's triggering mechanism. The shotgun "can only fire a single shot with each function of the trigger." Thus, Bartlett in fact testified that the shotgun has a trigger.

AFT officer Jerry Taylor described the mines as being composed of pipe material, end plugs, and fuses. He also described the metal shot and the gunpowder that were found with the mines and that could make them operable.

## II.

Jokel argues that the evidence was insufficient to support the convictions. On such a claim, we examine the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in favor of the verdict. The evidence is sufficient if a reasonable trier of fact could have found that it established guilt beyond a reasonable doubt. Every reasonable hypothesis of innocence need not have been excluded, nor need the evidence be entirely inconsistent with innocent conduct. *United States v. Vasquez,* 953 F.2d 176, 181 (5th Cir.), *cert. denied,* 504 U.S. 946, 112 S.Ct. 2288, 119 L.Ed.2d 212 (1992).

## A.

 Jokel first argues that the evidence on counts 1 and 2 was insufficient to prove that the shotgun was a shotgun within the meaning of the statute, on the ground that it did not have a trigger. Section 5845(d) provides,

> The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to the fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon

> which may be readily restored to fire a fixed shotgun shell.

Jokel testified that he thought that the shotgun did not have a trigger. Bartlett testified that the hinge was a trigger. A reasonable jury certainly could have found Bartlett's testimony more persuasive than Jokel's. The evidence undoubtedly was sufficient.

## B.

 By way of the foregoing sufficiency argument, Jokel seems to argue that the hinge was not a trigger within the meaning of section 5845(d). The statute does not define "trigger," and we are aware of no caselaw construing the statute in this regard.

Unless defined otherwise, words in a statute are given their common meanings. *United States v. Chen,* 913 F.2d 183, 189 (5th Cir.1990). The numerous definitions of "trigger" include "a piece (as a lever) connected with a catch or detent as a means of releasing it ... [;] the part of the action of a firearm moved by the finger to release the hammer or firing pin in firing ... [;] a device that fires an explosive ... functioning as or in a manner analogous to **\*135** a trigger." Webster's Third New Int'l Dictionary of the English Language Unabridged 2444 (1971). Jokel cites an older, abridged dictionary in his attempt to show that a trigger must be a small lever pulled by a finger.

The ordinary meaning is not as restricted as Jokel argues. The ordinary meaning is that a trigger is a mechanism that is used to initiate the firing sequence. For example, the verb "to trigger" means "to cause the explosion of." *Id.*

To construe "trigger" to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to only one kind of trigger, albeit a very common kind. The language implies no intent to so restrict the meaning, and we will not read such intent into section 5845(d).

One might argue that, if either a narrow or a broad construction of a term could be applied, the rule of lenity requires that the former be used. The rule of lenity, however, is not to be used to reject a common sense meaning of a term. Otherwise, the intent of Congress would be defeated. *Chen,* 913 F.2d at 189.

C.

Next, Jokel argues that the jury instruction on counts 3 and 4 increased the government's burden and that the evidence was insufficient to meet the increased burden. The court first defined "destructive device" for the jury:

> The term "destructive device" means any explosive mine. A destructive device includes any combination of parts either designed or intended for use in converting any device into a destructive device and from which a destructive device may be readily assembled....

The court then instructed as follows:

> For you to find the defendant guilty of the crime set out in Count 3, you must be convinced that the government has provided each of the following beyond a reasonable doubt:

> First, that the defendant knew that he had a destructive device in his possession;

> Second, that this destructive device was an explosive mine;

> Third, that the defendant knew of the characteristics of the destructive device, that it was an explosive mine;

> Fourth, that this was a destructive device, or a combination of parts from which a destructive device could be readily assembled, and;

> Fifth, that this destructive device was not registered to the defendant in the National Firearms Registration and Transfer Record. It does not matter whether the defendant knew that a destructive device had to be registered.

The instruction on count 4 was identical, except for the fifth item, which stated, "Fifth, that this destructive device was not identified by a serial number. It does not matter whether the defendant knew that the destructive device had to be identified by serial number."

Jokel construes the second and third items of the instruction to require that the government prove that the destructive devices were completed explosive mines. Section 5845(f) provides the following definition:

> The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and **\*136** from which a destructive device may be readily assembled....

The statute criminalizes possession of a completed mine or a thing that is readily convertible into a completed mine. The language of the district court's second and third enumerated instructions requires that the government prove that the devices were completed mines.

An instruction that increases the government's burden and to which the government does not object becomes the law of the case. *United States v. Gordon,* 876 F.2d 1121, 1125 (5th Cir.1989). The government concedes that the instruction is the law of the case. Jokel argues accordingly that the evidence was insufficient to prove that the destructive devices were completed explosive mines.

Any one instruction, however, does not have meaning in isolation from the instructions that went before and came after it. *See United States v. Daniel,* 957 F.2d 162, 169 (5th Cir.1992); *United States v. Cohen,* 631 F.2d 1223, 1227 (5th

Cir.1980). Prior to giving the second and third enumerated instructions, the district court, pursuant to section 5845(f), defined a destructive device to include both completed mines and things readily convertible into mines.

In context, the questioned instruction conformed to the statute and did not increase the government's burden. The evidence was sufficient to prove that the devices were readily convertible into mines with the addition of only gun powder and shot, which were found with the devices.

AFFIRMED.

**All Citations**

969 F.2d 132

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

563 F.3d 652
United States Court of Appeals,
Seventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
David OLOFSON, Defendant–Appellant.

No. 08–2294.
|
Argued Jan. 22, 2009.
|
Decided May 1, 2009.

**Synopsis**

**Background:** Defendant was convicted in a jury trial in that United States District Court for the Eastern District of Wisconsin, Charles N. Clevert, Jr., J., of transferring machinegun. Defendant appealed.

**Holdings:** The Court of Appeals, Manion, Circuit Judge, held that:

defendant's proffered instruction defining "automatically" was not accurate statement of law;

evidence was sufficient to show that defendant transferred machinegun;

defendant had requisite knowledge that weapon had characteristics of machinegun;

statutes prohibiting transfers of machineguns were not unconstitutionally vague;

exclusion of defendant's expert from courtroom during testimony of government's firearms expert was warranted;

denial of defendant's various motions to compel disclosure of evidence did not constitute *Brady* violation.

Affirmed.

**Attorneys and Law Firms**

**\*655** Gregory J. Haanstad, Attorney (argued), Michelle L. Jacobs, Attorney, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Robert Sanders, Winston Salem, NC, William J. Olson, Herbert W. Titus (argued), William J. Olson, P.C., McLean, VA, for Defendant–Appellant.

Before MANION and KANNE, Circuit Judges, and KENDALL, District Judge.[*]

[*]     Hon. Virginia M. Kendall, District Judge for the Northern District of Illinois, is sitting by designation.

**Opinion**

MANION, Circuit Judge.

David Olofson was indicted for knowingly transferring a machinegun in violation of 18 U.S.C. § 922(*o*). A jury convicted Olofson of the charged offense following a two-day trial, and the district court sentenced him to thirty months' imprisonment. Olofson appeals his conviction. For the following reasons, we affirm.

I. Background

Robert Kiernicki saw a "for sale" advertisement for a Colt AR–15 rifle that David Olofson had posted at a gas station in New Berlin, Wisconsin. Kiernicki called Olofson at the phone number listed on the ad to inquire about the weapon. Olofson informed Kiernicki that the advertised gun was no longer available but agreed to order and assemble another Colt AR–15 for Kiernicki. In the meantime, Olofson loaned Kiernicki an AR–15[1] and hundreds of rounds of ammunition on four separate occasions. The selector switch on the borrowed AR–15 had three positions: one marked "fire," one marked "safety," and one that was unmarked. Olofson and Kiernicki discussed the unmarked setting on July 13, 2006, which was the fourth time that Olofson loaned Kiernicki the weapon. Olofson told Kiernicki that putting the selector switch in the unmarked position would enable the AR–15 to fire a three-round burst with a single pull of the trigger, but the gun would then jam.

1    Four of the AR–15's fire control components were parts from M–16 rifles: the trigger, hammer, disconnector, and selector switch.

While at a shooting range that same day, Kiernicki (for the first time since using the gun) switched the AR–15 to the unmarked position and pulled the trigger; three or four rounds were discharged before the gun jammed. Kiernicki fired the weapon in that fashion several times, and each time it jammed after a short burst of three or four rounds. Police received a telephone complaint of automatic gunfire at the shooting range. When officers arrived at the range, they confiscated the AR–15 from Kiernicki. Kiernicki told the police that he had borrowed the gun from Olofson. Several days later, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") interviewed Olofson while executing a search warrant at his home. During that conversation, Olofson acknowledged loaning the AR–15 to Kiernicki.

On December 5, 2006, a grand jury indicted Olofson for knowingly transferring a machinegun in violation of 18 U.S.C. § 922(*o* ). Shortly before trial, Olofson filed a motion to compel the government to disclose evidence of the ATF's firearms testing procedures, correspondence between the ATF and the manufacturer of Olofson's AR–15 about the use of M–16 parts in AR–15 rifles, and the ATF's registration history of AR–15 rifles that contain M–16 parts. The district court denied that motion on the first day of trial after concluding that the information the defendant was seeking was not exculpatory under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**\*656** At trial, the government asked the district court to exclude Olofson's expert witness from the courtroom during the testimony of its firearms expert. Over Olofson's objection, the court granted the government's request. The government's expert testified that he used military-grade ammunition the first time he test-fired the AR–15 with the selector switch in the unmarked position and that the gun fired only one round. Later, using civilian-grade ammunition, he conducted two more test-fires of the weapon in the unmarked mode. In one of those tests, he held the trigger down and the gun fired all of its ammunition (twenty rounds) before stopping. He also emptied two twenty-round magazines in five- or ten-round bursts by depressing, holding, and releasing the trigger several times. The government's expert stated that such firing capabilities did not result from a "hammer-follow" malfunction but rather were intended features of the gun.

After the close of the evidence, the court used the definition of a "machinegun" from 26 U.S.C. § 5845(b) to instruct the jury and chose not to define the word "automatically" from that statute as the defendant had requested. Following deliberation, the jury returned a guilty verdict. Olofson then moved for a judgment of acquittal, arguing that the evidence presented at trial was insufficient to convict him of the charged offense and that the statutes under which he was prosecuted are unconstitutionally vague. The district court denied that motion and sentenced Olofson to thirty months in prison. Olofson appeals, challenging his conviction on five grounds.

## II. Discussion

### A. Olofson's Proposed Jury Instruction

Title 18 U.S.C. § 922(*o* )(1) provides that, subject to exceptions not relevant here, "it shall be unlawful for any person to transfer or possess a machinegun." The applicable definition [2] of a "machinegun" is

2    According to 18 U.S.C. § 921(a)(23), "[a]s used in this chapter[,][t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. [§ ] 5845(b))."

*any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.* The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added). The district court instructed the jury using the first sentence of § 5845(b) but did not give any guidance on the meaning of the word "automatically." Olofson contends that the court inaccurately stated the law when it did not instruct the jury using the definition of "automatically" that derives from *Staples v. United States,* 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), and that we allegedly adopted in *United States v. Fleischli,* 305 F.3d 643, 655 (7th Cir.2002). [3] Whether jury instructions correctly state the law is a matter we review de novo. *United States v.*

*Thornton,* 539 F.3d 741, 745 (7th Cir.2008). We **\*657** will reverse only if the instructions viewed as a whole misled the jury to the defendant's prejudice. *Id.*

3      The defendant contends that if that instruction had been given, the jury could have found him not guilty because a malfunction was the reason the weapon stopped firing or, alternatively, was what caused the gun to fire more than one round with a single trigger pull.

In *Staples,* the defendant was convicted of possession of an unregistered machinegun. 511 U.S. at 603–04, 114 S.Ct. 1793. At trial, the defendant insisted that he did not know that the weapon was capable of firing automatically (which is one of the features of a "machinegun" under § 5845(b)) and requested a jury instruction that the government must prove beyond a reasonable doubt that he knew the gun could fire in such a manner. *Id.* The district court refused to give the defendant's proposed instruction; instead, it gave an instruction that discounted the defendant's need for knowledge of every characteristic of the weapon that made it subject to regulation. *Id.* at 604, 114 S.Ct. 1793. The Tenth Circuit affirmed, holding that "the Government need not prove a defendant's knowledge of a weapon's physical properties to obtain a conviction." *Id.* In reversing, the Supreme Court held that the government was required to prove that the defendant knew of the characteristics of the gun that brought it within the ambit of the statute. *Id.* at 619, 114 S.Ct. 1793.

At the beginning of its opinion, the Court quoted the statutory definition of "machinegun" from § 5845(b) and stated that "any fully automatic weapon is a 'firearm' within the meaning of the Act." *Id.* at 602, 114 S.Ct. 1793. In a footnote, the Court then said the following:

> As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. *That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.* Such weapons are "machineguns" within the meaning of the Act.

*Id.* at n. 1, 114 S.Ct. 1793 (emphasis added).

The narrow holding from *Staples* is that *mens rea* was an element of the crime in question—i.e., that the government had to prove the defendant's knowledge of the features of the weapon (including automatic firing capability) that brought it within the proscriptive purview of the statute. *Id.* at 619, 114 S.Ct. 1793. The precise definition of "automatically" was not at issue; therefore, the Court's discussion of the terms "automatic" and "fully automatic" was immaterial to its holding. Indeed, the Court prefaced its explanation of the terms "automatic" and "fully automatic" with the phrase "[a]s used here." Thus, rather than interpreting a statute, the Court simply was providing a glossary for terms frequently appearing in the opinion. Therefore, *Staples* did not establish a requirement for district courts to instruct juries on the meaning of "automatically" from § 5845(b).

The same is true of our decision in *Fleischli.* In that case, the defendant was convicted of two counts of possession of machineguns in violation of 18 U.S.C. § 922(*o* )(1). *Fleischli,* 305 F.3d at 647. The defendant argued that a certain weapon was not a machinegun under § 5845(b) because it did not fire automatically and did not have a trigger. *Id.* at 654. Fleischli relied upon the definition of a semiautomatic rifle from 18 U.S.C. § 921(a)(28) to assert that a gun does not fire automatically "unless it uses a portion of the energy of a firing cartridge to extract the fired cartridge and chamber the next round without a separate pull of the trigger." *Id.* at 655. This court concluded that the gun's electronic on/off switch that initiated the firing sequence was a trigger and, having quoted from footnote one in *Staples,* stated that if the gun continued to fire until that switch was turned off or until the ammunition was exhausted, it was a machinegun. *Id.* at 655–56.

**\*658** Olofson suggests that *Fleischli* obliged the district court to give his proffered instruction. True, in *Fleischli* we did borrow terminology from *Staples* in order to stamp out the appellant's "disingenuous argument"; *id.* at 655; however, we never purported to be setting forth a comprehensive definition of "automatically" from § 5845(b). Indeed, we described the *Staples* footnote as merely "offer[ing] commonsense explanations" of the words "automatic" and "semiautomatic," which confirms that we did not consider that passage to be precedentially binding. As we explain below, a weapon does not have to continue to fire until its trigger is released or its ammunition is exhausted in order to qualify as a "machinegun" under § 5845(b). Therefore, Olofson's reliance on *Fleischli* for that proposition is misplaced.

We turn now to address what the word "automatically" means as it is used in the definition of "machinegun" in § 5845(b). "Statutory interpretation begins with the plain language of the statute." *United States v. Berkos,* 543 F.3d 392, 396 (7th Cir.2008). We assume that the purpose of the statute is communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive. *Id.*

Again, "[t]he term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). "The most relevant time for determining a statutory term's meaning" is the year of the provision's enactment. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,* 512 U.S. 218, 228, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (citing *Perrin v. United States,* 444 U.S. 37, 42–45, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). Therefore, we examine how "automatically" was commonly used and understood in 1934, the year in which the definition of "machinegun" became law with the passage of the National Firearms Act, Pub.L. 73–474, 48 Stat. 1236. A leading dictionary from 1934 tells us that "automatically" is the adverbial form of "automatic." WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed.1934). The adjectival form of "automatic" is relevantly defined by that dictionary as "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Id.* Another contemporaneous dictionary similarly describes "automatic" as "[s]elf-acting under conditions fixed for it, going of itself." OXFORD ENGLISH DICTIONARY 574 (1933). [4] Thus defined, in § 5845(b) the adverb "automatically," as it modifies the verb "shoots," [5] delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism. That mechanism is one that is set in motion by a single function of the trigger and is accomplished without manual reloading.

[4]   Modern versions of those two dictionaries define "automatic" in the same terms. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 148 (2002); OXFORD ENGLISH DICTIONARY 805 (2d ed.1989).

[5]   For the sake of efficiency and readability, we use the term "shoots" as shorthand for "shoots, is designed to shoot, or can be readily restored to shoot," unless otherwise indicated.

That interpretation clearly forecloses the argument that a weapon is not a machinegun merely because it *stopped firing* due to a malfunction; indeed, the reason a weapon ceased firing is not a matter with which § 5845(b) is concerned. Under that interpretation, however, a defendant can still argue that the *reason a gun fired more than one round* (with a single pull of **\*659** the trigger without manual reloading) was due to a malfunction—i.e., the additional rounds fired resulted from a mishap rather than from a regular self-acting mechanism.

In light of the foregoing interpretation, we conclude that Olofson's proffered instruction was not an accurate statement of the law and that the district court properly rejected it. Moreover, the district court correctly used § 5845(b) to instruct the jury. As used in the statute, "automatically" comports with its ordinary modern meaning, *see* note 4, that is readily accessible to laypersons and is in no sense confusing; therefore, the district court was not required to define that term for the jury. *United States v. Castillo,* 406 F.3d 806, 821 (7th Cir.2005); *Miller v. Neathery,* 52 F.3d 634, 638 (7th Cir.1995).

### B. Sufficiency of the Evidence

Olofson contends that the evidence presented at trial was insufficient to sustain his conviction. When a defendant challenges the sufficiency of the evidence, we view the evidence in the light most favorable to the government and will reverse the conviction only if no rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Castaldi,* 547 F.3d 699, 705 (7th Cir.2008). In order to convict a person of violating 18 U.S.C. § 922(*o* )(1), the government must prove that 1) the defendant possessed or transferred a machinegun 2) with knowledge that the weapon had the characteristics that bring it within the statutory definition of a machinegun. *United States v. McGiffen,* 267 F.3d 581, 590 (7th Cir.2001).

Regarding the first element, Kiernicki testified that Olofson loaned him the AR–15 on four occasions, the last of which was July 13, 2006. An ATF agent also testified that Olofson admitted loaning the gun to Kiernicki. In addition, Kiernicki stated that the gun fired three or four rounds (on several occasions) with one pull of the trigger. The government's expert who test-fired the AR–15 stated that he exhausted a twenty-round magazine with one continuous depression of the trigger and emptied two additional twenty-round magazines in five-or ten-round bursts by intermittently depressing, holding, and releasing the trigger. He also

declared that the weapon was intended to fire in such fashions and that a "hammer-follow" malfunction was not the cause. That evidence was adequate to permit a reasonable jury to find beyond a reasonable doubt that Olofson transferred a "machinegun" as defined by § 5845(b). Regarding the evidence on the knowledge element, Kiernicki said that Olofson told him "the three-round burst wouldn't work and that it would jam up." Kiernicki understood that statement to mean that "[t]hree rounds come out of it when you would pull the trigger" once. That testimony was sufficient for a reasonable jury to find beyond a reasonable doubt that the defendant knew that the AR–15, with a single pull of the trigger and without manual reloading, could shoot more than one round as the result of a self-acting mechanism. For these reasons, the defendant's challenge to the sufficiency of the evidence fails. [6]

6     The jury heard the testimony of the defendant's firearms expert about the AR–15's supposed malfunctioning and obviously rejected it; on a sufficiency-of-the-evidence challenge, we will not second-guess the jury's credibility determinations. *United States v. Brandt,* 546 F.3d 912, 917 (7th Cir.2008).

### C. Unconstitutional Vagueness

Olofson argues that 18 U.S.C. §§ 922(*o* ) and 924(a)(2) are unconstitutionally vague. We review the constitutionality of a statute de novo. *United States v. Warner,* 498 F.3d 666, 697 (7th Cir.2007). A statute is unconstitutionally vague if it **\*660** either "1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or 2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim,* 444 F.3d 910, 915 (7th Cir.2006). A vagueness challenge such as this one that does not implicate First Amendment freedoms is analyzed as applied to the specific facts of the case. *Id.*

To the extent Olofson contends that the statutes are fatally vague due to the way "automatically" is used in the incorporated definition of "machinegun" from § 5845(b), we disagree. We have already noted that the common meaning of "automatically" is readily known by laypersons and thus a specific instruction defining the term for the jury was unnecessary. Similarly, a person of ordinary intelligence would have understood the common meaning of the term —"as the result of a self-acting mechanism"—and thus would have had fair warning of the relevant features of a weapon that § 5845(b) covers and that §§ 922(*o* ) and 924(a)(2) regulate.

Therefore, we reject Olofson's argument that §§ 922(*o* ) and 924(a)(2) are unconstitutionally vague. [7]

7     Olofson does not present any cogent argument that §§ 922(*o*) and 924(a)(2) lack standards to prevent arbitrary or discriminatory enforcement.

### D. Exclusion of Olofson's Firearms Expert from the Courtroom

The defendant also argues that the district court improperly granted the government's request to exclude his firearms expert (Len Savage) from the courtroom during the testimony of the government's firearms expert. Olofson contends that the presence of his expert during the testimony of the government's expert was essential to the presentation of his case.

Under Federal Rule of Evidence 615, "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." That rule does not authorize the exclusion of four categories of persons, including "a person whose presence is shown by a party to be essential to the presentation of the party's cause." FED.R.EVID. 615(3). As the party asserting a Rule 615(3) exception, Olofson bore the burden for showing that the exception applied. *Opus 3, Ltd. v. Heritage Park, Inc.,* 91 F.3d 625, 628 (4th Cir.1996); *United States v. Jackson,* 60 F.3d 128, 135 (2d Cir.1995). We review for an abuse of discretion a district court's decision about the essentiality of a witness's presence under Rule 615(3). *Milcevic v. Fletcher Jones Imports, Ltd.,* 402 F.3d 912, 916 (9th Cir.2005); *Opus 3,* 91 F.3d at 629; *Jackson,* 60 F.3d at 135–36.

At trial, Olofson presented two reasons for opposing the government's request to exclude Savage from the courtroom. First, he argued that because Federal Rule of Evidence 703 permits an expert to base his opinion upon facts or data made known to him at trial, Savage "should be allowed to be present to hear" the government expert's testimony. However, merely because Rule 703 contemplates that an expert may render an opinion based on facts or data made known at trial does not necessarily mean that an expert witness is exempt from a Rule 615 sequestration order. The text of Rule 615 plainly does not provide for such a per se exception; rather, Rule 615(3) confers discretion upon district courts to determine whether a given witness (of whatever stripe) is essential. We agree with the courts of appeals that have addressed the issue that Rule 703 is not an automatic exemption for expert witnesses

from Rule 615 sequestration. **\*661** *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1374 (5th Cir.1981); *Morvant v. Constr. Aggregates Corp.,* 570 F.2d 626, 630 (6th Cir.1978); *see Opus 3,* 91 F.3d at 629. Therefore, the mere mention of Rule 703 by Olofson was insufficient to show that a Rule 615(3) exception was warranted.

Second, Olofson stated that he "would like to have Mr. Savage present to hear" the government expert's testimony on malfunctions so that he could "rebut or add information" if such testimony was incomplete or incorrect. While no precise incantation is required, we doubt whether those statements advanced the argument that Savage's presence was essential under Rule 615(3). Olofson did not tell the district court (as he tells us on appeal) that Savage's presence was of critical import to his highly-technical defense that the AR–15 malfunctioned. Even assuming that he did make the argument, Olofson did not carry his burden of demonstrating essentiality. The defendant stated that Savage should be allowed to hear the government expert's testimony so that Savage could "rebut or add information" to any inaccurate testimony about malfunctions, but Olofson did not tell the district court why Savage's presence was necessary to achieve that end. Indeed, much of the data and malfunction information relied upon by the government's expert was already known to Savage due to the pre-trial disclosure of the government expert's reports, and Savage had the opportunity to respond to such materials during the defendant's case. Regarding any information which was not included in the reports but may have come into evidence during the testimony of the government's expert, Olofson had ample opportunity on direct examination for Savage to rebut, add to, or opine on the implications of such information by asking him to assume its existence.

Although it might have been helpful or desirable for Savage to hear the government expert's testimony, Olofson did not show that Savage's presence was *essential* to the presentation of his case. Therefore, the district court did not abuse its discretion in denying Savage a sequestration exemption under Rule 615(3).

### E. Denial of Olofson's Discovery Requests

Prior to trial and pursuant to *Brady,* Olofson made a motion to compel the discovery of evidence he had requested but that the government had not produced. The defendant sought: 1) documentation of the procedures used by the ATF in testing the AR–15; 2) correspondence between the ATF and the manufacturer of the defendant's AR–15 concerning the use

of M–16 parts in early AR–15 rifles; 3) information about changes in the ATF's registry of AR–15 rifles with M–16 components; and 4) documents pertaining to the ATF's refusal to register AR–15 rifles with M–16 parts. The district court denied the defendant's motion on the first day of trial after concluding that the information sought was not exculpatory. On appeal, Olofson claims that the district court committed prejudicial error in denying his *Brady* motion and that he therefore is entitled to a new trial. We review a district court's decision that evidence need not be produced under *Brady* for an abuse of discretion. *United States v. Dabney,* 498 F.3d 455, 459 (7th Cir.2007).

Under *Brady,* the government is constrained to disclose evidence that is favorable to a defendant and material to either his guilt or punishment. *United States v. Fallon,* 348 F.3d 248, 251 (7th Cir.2003). Favorable evidence includes both impeachment and exculpatory evidence. *United States v. Baker,* 453 F.3d 419, 422 (7th Cir.2006). Even when the government has not disclosed such evidence, "strictly speaking, there is never a **\*662** real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "We have described this inquiry as 'materiality,' and stated that the demonstration of materiality is the key to obtaining a new trial where a defendant alleges a *Brady* violation." *Baker,* 453 F.3d at 422. Thus there are three parts to a *Brady* violation: 1) the disputed evidence must be favorable to the defendant, either because it is exculpatory or impeaching; 2) that evidence must have been suppressed by the government, either willfully or inadvertently; and 3) prejudice must have occurred. *Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936.

Regarding the first non-disclosed item—the ATF's internal procedures for test-firing AR–15 rifles—Olofson says he wanted that information because "[f]ailure to follow those procedures by changing the type of ammunition in the second test could demonstrate that the tests had been manipulated to arrive at a reversal of the results of the first test." We do not see how that information could have exculpated Olofson; section 5845(b) does not require compliance with ATF test-fire procedures in order for a weapon to qualify as a machinegun, nor must the weapon fire any particular grade of ammunition or in the prohibited fashion during the first test-fire. Assuming that such evidence might have had some impeachment value, there was no *Brady* violation because the government's expert was otherwise sufficiently impeached. *United States v. Ervin,*

540 F.3d 623, 632 (7th Cir.2008) ( "*Brady* does not extend to 'evidence that impeaches an already thoroughly impeached witness.' " (quoting *United States v. Kozinski,* 16 F.3d 795, 819 (7th Cir.1994))). Specifically, Olofson questioned the government's expert at length about ATF test-fire procedures and the types of ammunition used in the tests. In addition, the government's expert admitted that the gun fired automatically more than one round with a single function of the trigger without manual reloading in the second test with civilian-grade rounds, but jammed in the first test with military-grade rounds. Even if the second test was inconsistent with ATF procedures, that fact would not undermine confidence in the outcome of the trial. *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Therefore, the district court did not abuse its discretion in denying the defendant's motion to compel the production of that evidence.

With respect to his request for the ATF's correspondence with the manufacturer of his AR–15 concerning the use of M–16 parts in early AR–15 rifles, the defendant contends that evidence was exculpatory because it was relevant to his knowledge of whether or not his AR–15 was a machinegun. The district court denied Olofson's request on the first day of trial. At the sentencing hearing, the court revisited the issue; the court inspected a document *in camera,* stated that it was not exculpatory, and placed it under seal. We subsequently ordered that document to be unsealed. That evidence is a 1983 letter from the ATF to the manufacturer of the AR–15 in which the ATF advised the company that the installation of certain M–16 parts in AR–15 receivers may permit the weapon to fire automatically even though an automatic sear is not present. We agree with the district court that the document is not exculpatory: it has no bearing on Olofson's knowledge of whether his AR–15 was a machinegun.[8] The letter has **\*663** no impeachment value either. Therefore, the district court did not abuse its discretion in refusing to order the production of that evidence.

[8]   The government's theory of the case was that the AR–15 *functioned* as a machinegun, thus implicating the first sentence of § 5845(b)'s definition of the term. As discussed earlier, the district court instructed the jury using only that part of § 5845(b), and sufficient evidence

of Olofson's knowledge of the AR–15's firing capacity was presented to convict him. Had the government attempted to prove that a part or combination of parts in the AR–15 made it a machinegun under the second sentence of § 5845(b), then perhaps evidence about the manufacturer's installation of M–16 parts in AR–15s would have been relevant to the defendant's knowledge of those parts in the weapon.

Lastly, Olofson argues that any documents relating to the ATF's change in registry or refusal to register AR–15 rifles with M–16 components were exculpatory because they could have been used to refute the government expert's testimony that the M–16 parts in Olofson's AR–15 made it a machinegun. But the government's expert did not testify that the AR–15 was a machinegun merely because it had M–16 parts; rather, the expert stated that the AR–15 *fired* the way it did due in part to the M–16 components. Regardless, like the district court, we do not see how the ATF's opinions or positions regarding the presence of M–16 parts in AR–15 rifles are the least bit germane to Olofson's conviction for knowingly transferring a machinegun. The district court did not abuse its discretion in denying Olofson's motion to compel the government to produce that evidence.


### III. Conclusion

In sum, the defendant's proffered jury instruction was not a correct statement of the law, and the district court properly rejected it. Furthermore, the evidence presented at trial was sufficient to sustain Olofson's conviction, and 18 U.S.C. §§ 922(*o* ) and 924(a)(2) are not unconstitutionally vague as applied to the facts of this case. In addition, the district court did not abuse its discretion in either excluding the defendant's firearms expert from the courtroom during the government expert's testimony or in denying Olofson's motion to compel the production of evidence he had requested from the government. Accordingly, we AFFIRM Olofson's conviction.


**All Citations**

563 F.3d 652

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-31   Filed 11/30/22   PageID.4950   Page 126 of 131

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)

194 L.Ed.2d 99, 84 USLW 4133, 16 Cal. Daily Op. Serv. 2934...

136 S.Ct. 1027
Supreme Court of the United States

Jaime CAETANO

v.

MASSACHUSETTS.

No. 14–10078.
|
March 21, 2016.

**Synopsis**

**Background:** Defendant was convicted after a bench trial in the Massachusetts District Court Department, Framingham Division, Middlesex County, Robert V. Greco and Martine G. Carroll, JJ., of possession of a stun gun. Defendant's application for direct appellate review was granted. The Massachusetts Supreme Judicial Court, 470 Mass. 774, 26 N.E.3d 688, affirmed.

Upon granting certiorari, the Supreme Court held that lack of common use of stun guns at time of Second Amendment's enactment, unusual nature of stun guns as a modern invention, and lack of ready adaptability of stun guns for use in the military did not preclude stun guns from being protected by Second Amendment right to bear arms.

Certiorari granted; vacated and remanded.

Justice Alito filed an opinion concurring in the judgment, in which Justice Thomas joined.

**West Codenotes**

**Validity Called into Doubt**
M.G.L.A. c. 140, § 131J

**Opinion**

**\*1027**  PER CURIAM.

 The Court has held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *District of Columbia v. Heller,* 554 U.S. 570, 582, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and that this "Second Amendment right is fully applicable to the States,"

*McDonald v. Chicago,* 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). In this case, the Supreme Judicial Court of Massachusetts upheld a Massachusetts law prohibiting the possession of stun guns after examining "whether a stun gun is the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment." 470 Mass. 774, 777, 26 N.E.3d 688, 691 (2015).

 The court offered three explanations to support its holding that the Second Amendment does not extend to stun guns. First, the court explained that stun guns are not protected because they "were not in common use at the time of the Second Amendment's enactment." **\*1028**  *Id.,* at 781, 26 N.E.3d, at 693. This is inconsistent with *Heller* 's clear statement that the Second Amendment "extends ... to ... arms ... that were not in existence at the time of the founding." 554 U.S., at 582, 128 S.Ct. 2783.

The court next asked whether stun guns are "dangerous per se at common law and unusual," 470 Mass., at 781, 26 N.E.3d, at 694, in an attempt to apply one "important limitation on the right to keep and carry arms," *Heller,* 554 U.S., at 627, 128 S.Ct. 2783; see *ibid.* (referring to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' "). In so doing, the court concluded that stun guns are "unusual" because they are "a thoroughly modern invention." 470 Mass., at 781, 26 N.E.3d, at 693–694. By equating "unusual" with "in common use at the time of the Second Amendment's enactment," the court's second explanation is the same as the first; it is inconsistent with *Heller* for the same reason.

 Finally, the court used "a contemporary lens" and found "nothing in the record to suggest that [stun guns] are readily adaptable to use in the military." 470 Mass., at 781, 26 N.E.3d, at 694. But *Heller* rejected the proposition "that only those weapons useful in warfare are protected." 554 U.S., at 624–625, 128 S.Ct. 2783.

For these three reasons, the explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent. Consequently, the petition for a writ of certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Supreme Judicial Court of Massachusetts is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice ALITO, with whom Justice THOMAS joins, concurring in the judgment.

After a "bad altercation" with an abusive boyfriend put her in the hospital, Jaime Caetano found herself homeless and "in fear for [her] life." Tr. 31, 38 (July 10, 2013). She obtained multiple restraining orders against her abuser, but they proved futile. So when a friend offered her a stun gun "for self-defense against [her] former boy friend," 470 Mass. 774, 776, 26 N.E.3d 688, 690 (2015), Caetano accepted the weapon.

It is a good thing she did. One night after leaving work, Caetano found her ex-boyfriend "waiting for her" outside." Tr. 35. He "started screaming" that she was "not gonna [expletive deleted] work at this place" any more because she "should be home with the kids" they had together. *Ibid.* Caetano's abuser towered over her by nearly a foot and outweighed her by close to 100 pounds. But she didn't need physical strength to protect herself. She stood her ground, displayed the stun gun, and announced: "I'm not gonna take this anymore.... I don't wanna have to [use the stun gun on] you, but if you don't leave me alone, I'm gonna have to." *Id.,* at 35–36. The gambit worked. The ex-boyfriend "got scared and he left [her] alone." *Id.,* at 36.

It is settled that the Second Amendment protects an individual right to keep and bear arms that applies against both the Federal Government and the States. *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); *McDonald v. Chicago,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). That right vindicates the "basic right" of "individual self-defense." *Id.,* at 767, 130 S.Ct. 3020; see *Heller, supra,* at 599, 628, 128 S.Ct. 2783. Caetano's encounter with her violent ex-boyfriend illustrates the connection **\*1029** between those fundamental rights: By arming herself, Caetano was able to protect against a physical threat that restraining orders had proved useless to prevent. And, commendably, she did so by using a weapon that posed little, if any, danger of permanently harming either herself or the father of her children.

Under Massachusetts law, however, Caetano's mere possession of the stun gun that may have saved her life made her a criminal. See Mass. Gen. Laws, ch. 140, § 131J (2014). When police later discovered the weapon, she was arrested, tried, and convicted. The Massachusetts Supreme Judicial Court affirmed the conviction, holding that a stun gun "is not the type of weapon that is eligible for Second Amendment protection" because it was "not in common use at the time of

[the Second Amendment's] enactment." 470 Mass., at 781, 26 N.E.3d, at 693.

This reasoning defies our decision in *Heller,* which rejected as "bordering on the frivolous" the argument "that only those arms in existence in the 18th century are protected by the Second Amendment." 554 U.S., at 582, 128 S.Ct. 2783. The decision below also does a grave disservice to vulnerable individuals like Caetano who must defend themselves because the State will not.

I

The events leading to Caetano's prosecution occurred sometime after the confrontation between her and her ex-boyfriend. In September 2011, police officers responded to a reported shoplifting at an Ashland, Massachusetts, supermarket. The store's manager had detained a suspect, but he identified Caetano and another person in the parking lot as potential accomplices. Police approached the two and obtained Caetano's consent to search her purse. They found no evidence of shoplifting, but saw Caetano's stun gun. Caetano explained to the officers that she had acquired the weapon to defend herself against a violent ex-boyfriend.

The officers believed Caetano, but they arrested her for violating Mass. Gen. Laws, ch. 140, § 131J, "which bans entirely the possession of an electrical weapon," 470 Mass., at 775, 26 N.E.3d, at 689.[1] When Caetano moved to dismiss the charge on Second Amendment grounds, the trial court denied the motion.

[1]  Specifically, the statute prohibits the possession of any "portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill." Mass. Gen. Laws, ch. 140, § 131J (2014). The statute includes exceptions for law-enforcement officers and weapon suppliers, who may possess electrical weapons "designed to incapacitate temporarily." *Ibid.* Violations are punishable by a fine of $500 to $1,000, imprisonment of 6 months to 2 ½ years, or both. *Ibid.*

A subsequent bench trial established the following undisputed facts. The parties stipulated that Caetano possessed the stun gun and that the weapon fell within the statute's prohibition.[2] The Commonwealth also did not challenge Caetano's testimony **\*1030** that she possessed the weapon

Case 2:19-cv-00037-JNP  Document 59-31  Filed 11/30/22  PageID.4952  Page 128 of 131

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
194 L.Ed.2d 99, 84 USLW 4133, 16 Cal. Daily Op. Serv. 2934...

to defend herself against the violent ex-boyfriend. Indeed, the prosecutor urged the court "to believe the defendant." Tr. 40. The trial court nonetheless found Caetano guilty, and she appealed to the Massachusetts Supreme Judicial Court.

2      Stun guns like Caetano's "are designed to stun a person with an electrical current" by running a current between two metal prongs on the device and placing the prongs in direct contact with the person. 470 Mass. 774, 775, n. 2, 26 N.E.3d 688, 689, n. 2 (2015). A similar device, popularly known by the brand name "Taser," shoots out wires tipped with electrodes that can deliver an electrical current from a distance. Tr. 25–26. Tasers can also be used like a stun gun without deploying the electrodes—a so-called "dry stun." *Id.,* at 26. As the Commonwealth's witness testified at trial, these sorts of electrical weapons are "non-lethal force" "designed to incapacitate"—"not kill"—a target. *Id.,* at 27.

The Supreme Judicial Court rejected Caetano's Second Amendment claim, holding that "a stun gun is not the type of weapon that is eligible for Second Amendment protection." 470 Mass., at 775, 26 N.E.3d, at 689. The court reasoned that stun guns are unprotected because they were "not 'in common use at the time' of enactment of the Second Amendment," *id.,* at 781, 26 N.E.3d, at 693 (quoting *Heller, supra,* at 627, 128 S.Ct. 2783), and because they fall within the "traditional prohibition against carrying dangerous and unusual weapons," 470 Mass., at 779, 26 N.E.3d, at 692 (citing *Heller, supra,* at 627, 128 S.Ct. 2783).

II

Although the Supreme Judicial Court professed to apply *Heller,* each step of its analysis defied *Heller*'s reasoning.

A

The state court repeatedly framed the question before it as whether a particular weapon was " 'in common use at the time' of enactment of the Second Amendment." 470 Mass., at 781, 26 N.E.3d, at 693; see also *id.,* at 779, 780, 781, 26 N.E.3d, at 692, 693, 694. In *Heller,* we emphatically rejected such a formulation. We found the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" not merely wrong, but "bordering on the frivolous." 554 U.S., at 582, 128 S.Ct. 2783. Instead, we held that "the Second Amendment extends, prima facie,

to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding.*" *Ibid.* (emphasis added). [3] It is hard to imagine language speaking more directly to the point. Yet the Supreme Judicial Court did not so much as mention it.

3      Stun guns are plainly "bearable arms." As *Heller* explained, the term includes any "[w]eapo[n] of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] ... for the purpose of offensive or defensive action." 554 U.S., at 581, 584, 128 S.Ct. 2783 (internal quotation marks omitted).

Instead, the court seized on language, originating in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), that " 'the sorts of weapons protected were those "in common use at the time." ' " 470 Mass., at 778, 26 N.E.3d, at 692 (quoting *Heller, supra,* at 627, 128 S.Ct. 2783 in turn quoting *Miller, supra,* at 179, 59 S.Ct. 816). That quotation does not mean, as the court below thought, that only weapons popular in 1789 are covered by the Second Amendment. It simply reflects the reality that the founding-era militia consisted of citizens "who would bring the sorts of lawful weapons that they possessed at home to militia duty," *Heller,* 554 U.S., at 627, 128 S.Ct. 2783 and that the Second Amendment accordingly guarantees the right to carry weapons "typically possessed by law-abiding citizens for lawful purposes," *id.,* at 625, 128 S.Ct. 2783. While stun guns were not in existence at the end of the 18th century, the same is true for the weapons most commonly used today for self-defense, namely, revolvers and semiautomatic pistols. Revolvers were virtually unknown until well into the 19th century, [4] and semiautomatic pistols **\*1031** were not invented until near the end of that century. [5] Electronic stun guns are no more exempt from the Second Amendment's protections, simply because they were unknown to the First Congress, than electronic communications are exempt from the First Amendment, or electronic imaging devices are exempt from the Fourth Amendment. *Id.,* at 582 (citing *Reno v. American Civil Liberties Union,* 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and *Kyllo v. United States,* 533 U.S. 27, 35–36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). As *Heller* aptly put it: "We do not interpret constitutional rights that way." 554 U.S., at 582, 128 S.Ct. 2783.

4      See J. Bilby, A Revolution in Arms: A History of the First Repeating Rifles 23 (2006). Samuel Colt did not patent his famous revolver until 1836. *Ibid.*

5    See Firearms: An Illustrated History 166 (2014); see also
     W. Greener, The Gun and Its Development 524–529,
     531–534 (9th ed. 1910) (discussing revolvers and self-
     loading semiautomatic pistols as "modern pistols").

### B

The Supreme Judicial Court's holding that stun guns may be
banned as "dangerous and unusual weapons" fares no better.
As the *per curiam* opinion recognizes, this is a conjunctive
test: A weapon may not be banned unless it is *both* dangerous
*and* unusual. Because the Court rejects the lower court's
conclusion that stun guns are "unusual," it does not need
to consider the lower court's conclusion that they are also
"dangerous." See *ante,* at 1027 – 1028. But make no mistake
—the decision below gravely erred on both grounds.

### 1

As to "dangerous," the court below held that a weapon is
"dangerous per se" if it is " 'designed and constructed to
produce death or great bodily harm' and 'for the purpose of
bodily assault or defense.' " 470 Mass., at 779, 26 N.E.3d, at
692 (quoting *Commonwealth v. Appleby,* 380 Mass. 296, 303,
402 N.E.2d 1051, 1056 (1980)). That test may be appropriate
for applying statutes criminalizing assault with a dangerous
weapon. See *ibid.,* 402 N.E.2d, at 1056. But it cannot be used
to identify arms that fall outside the Second Amendment.
First, the relative dangerousness of a weapon is irrelevant
when the weapon belongs to a class of arms commonly used
for lawful purposes. See *Heller, supra,* at 627, 128 S.Ct. 2783
(contrasting " 'dangerous and unusual weapons' " that may
be banned with protected "weapons ... 'in common use at the
time' "). Second, even in cases where dangerousness might
be relevant, the Supreme Judicial Court's test sweeps far too
broadly. *Heller* defined the "Arms" *covered by* the Second
Amendment to include " 'any thing that a man wears for his
defence, or takes into his hands, or useth in wrath to cast at or
strike another.' " 554 U.S., at 581, 128 S.Ct. 2783. Under the
decision below, however, virtually every covered arm would
qualify as "dangerous."

Were there any doubt on this point, one need only look at
the court's first example of "dangerous per se" weapons:
"firearms." 470 Mass., at 779, 26 N.E.3d, at 692. If *Heller*
tells us anything, it is that firearms cannot be categorically
prohibited just because they are dangerous. 554 U.S., at 636,
128 S.Ct. 2783. *A fortiori,* stun guns that the Commonwealth's

own witness described as "non-lethal force," Tr. 27, cannot
be banned on that basis.

### 2

The Supreme Judicial Court's conclusion that stun guns are
"unusual" rested largely on its premise that one must ask
whether a weapon was commonly used in 1789. See **\*1032**
470 Mass., at 780–781, 26 N.E.3d, at 693–694. As already
discussed, that is simply wrong. See *supra,* at 1030 – 1031.

The court also opined that a weapon's unusualness depends
on whether "it is a weapon of warfare to be used by the
militia." 470 Mass., at 780, 26 N.E.3d, at 693. It asserted that
we followed such an approach in *Miller* and "approved its
use in *Heller.*" 470 Mass., at 780, 26 N.E.3d, at 693. But
*Heller* actually said that it would be a "startling reading"
of *Miller* to conclude that "only those weapons useful in
warfare are protected." 554 U.S., at 624, 128 S.Ct. 2783.
Instead, *Miller* and *Heller* recognized that militia members
traditionally reported for duty carrying "the sorts of lawful
weapons that they possessed at home," and that the Second
Amendment therefore protects such weapons as a class,
regardless of any particular weapon's suitability for military
use. 554 U.S., at 627, 128 S.Ct. 2783; see *id.,* at 624–625, 128
S.Ct. 2783. Indeed, *Heller* acknowledged that advancements
in military technology might render many commonly owned
weapons ineffective in warfare. *Id.,* at 627–628, 128 S.Ct.
2783. But such "modern developments ... cannot change our
interpretation of the right." *Ibid.*

In any event, the Supreme Judicial Court's assumption that
stun guns are unsuited for militia or military use is untenable.
Section 131J allows law enforcement and correctional
officers to carry stun guns and Tasers, presumably for such
purposes as nonlethal crowd control. Subduing members of
a mob is little different from "suppress[ing] Insurrections," a
traditional role of the militia. U.S. Const., Art. I, § 8, cl. 15;
see also *ibid.*(militia may be called forth "to execute the Laws
of the Union"). Additionally, several branches of the U.S.
armed services equip troops with electrical stun weapons to
"incapacitate a target without permanent injury or known side
effects." U.S. Army, Project Manager Close Combat Systems,
PD Combat Munitions: Launched Electrode Stun Device
(LESD), http://www.pica.army.mil/pmccs/combatmunitions/
nonlethalsys/taserx26e.html (all Internet materials as last
visited Mar. 18, 2016); see U.S. Marine Corps Administrative
Message 560/08 (Oct. 2, 2008) (Marine Corps guidance

Case 2:19-cv-00037-JNP Document 59-31 Filed 11/30/22 PageID.4954 Page 130 of 131

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
194 L.Ed.2d 99, 84 USLW 4133, 16 Cal. Daily Op. Serv. 2934...

for use of Tasers), http://www.marines.mil/News/Messages/ MessagesDisplay/tabid/13286/Article/113024/marine-corps-training-and-use-of-human-electro-muscular-incapacitation-hemi-dev.aspx; Joint Non–Lethal Weapons Directorate, Non–Lethal Weapons (NLW) Reference Book 3 (2012) (Department of Defense report stating that "[m]ultiple Services employ" Tasers), http://dtic.mil/dtic/tr/fulltext/u2/ a565971.pdf.

C

As the foregoing makes clear, the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*. The Supreme Judicial Court offered only a cursory discussion of that question, noting that the " 'number of Tasers and stun guns is dwarfed by the number of firearms.' " 470 Mass., at 781, 26 N.E.3d, at 693. This observation may be true, but it is beside the point. Otherwise, a State would be free to ban *all* weapons *except* handguns, because "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller, supra,* at 629, 128 S.Ct. 2783.

The more relevant statistic is that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," who it appears may lawfully possess them in 45 States. *People v. Yanna,* 297 Mich.App. 137, 144, 824 N.W.2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional); see Volokh, **\*1033** Nonlethal Self–Defense, (Almost Entirely) Nonlethal Weapons, and the Rights To Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 244 (2009) (citing stun gun bans in seven States); Wis. Stat. § 941.295 (Supp. 2015) (amended Wisconsin law permitting stun gun possession); see also Brief in Opposition 11 (acknowledging that "approximately 200,000 civilians owned stun guns" as of 2009). While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.

III

The lower court's ill treatment of *Heller* cannot stand. The reasoning of the Massachusetts court poses a grave threat to the fundamental right of self-defense. The Supreme Judicial Court suggested that Caetano could have simply gotten a firearm to defend herself. 470 Mass., at 783, 26 N.E.3d, at

695. But the right to bear other weapons is "no answer" to a ban on the possession of protected arms. *Heller,* 554 U.S., at 629, 128 S.Ct. 2783. Moreover, a weapon is an effective means of self-defense only if one is prepared to use it, and it is presumptuous to tell Caetano she should have been ready to shoot the father of her two young children if she wanted to protect herself. Courts should not be in the business of demanding that citizens use *more* force for self-defense than they are comfortable wielding.[6]

[6]  The court below also noted that Massachusetts no longer requires a license to possess mace or pepper spray. 470 Mass., at 783, 26 N.E.3d, at 695. But the law was changed in 2014, after Caetano was convicted. A spray can also be foiled by a stiff breeze, while a stun gun cannot.

Countless people may have reservations about using deadly force, whether for moral, religious, or emotional reasons —or simply out of fear of killing the wrong person. See Brief for Arming Women Against Rape & Endangerment as *Amicus Curiae* 4–5. "Self-defense," however, "is a basic right." *McDonald,* 561 U.S., at 767, 130 S.Ct. 3020. I am not prepared to say that a State may force an individual to choose between exercising that right and following her conscience, at least where both can be accommodated by a weapon already in widespread use across the Nation.

\* \* \*

A State's most basic responsibility is to keep its people safe. The Commonwealth of Massachusetts was either unable or unwilling to do what was necessary to protect Jaime Caetano, so she was forced to protect herself. To make matters worse, the Commonwealth chose to deploy its prosecutorial resources to prosecute and convict her of a criminal offense for arming herself with a nonlethal weapon that may well have saved her life. The Supreme Judicial Court then affirmed her conviction on the flimsiest of grounds. This Court's grudging *per curiam* now sends the case back to that same court. And the consequences for Caetano may prove more tragic still, as her conviction likely bars her from ever bearing arms for self-defense. See Pet. for Cert. 14.

If the fundamental right of self-defense does not protect Caetano, then the safety of all Americans is left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe.

**Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)**

194 L.Ed.2d 99, 84 USLW 4133, 16 Cal. Daily Op. Serv. 2934...

**All Citations**

136 S.Ct. 1027, 194 L.Ed.2d 99, 84 USLW 4133, 16 Cal.
Daily Op. Serv. 2934, 2016 Daily Journal D.A.R. 2663, 26
Fla. L. Weekly Fed. S 27

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.