312 Fed.Appx. 197
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

William AKINS, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 08–15640
|
Non–Argument Calendar.
|
Feb. 4, 2009.

**Synopsis**

**Background:** Inventor of apparatus for accelerating cyclic
firing rate of semi-automatic firearm brought action against
Bureau of Alcohol, Tobacco, Firearms and Explosives,
challenging classification of apparatus as prohibited firearm.
Bureau moved for summary judgment. The United States
District Court for the Middle District of Florida granted
motion. Inventor appealed.

**Holdings:** The Court of Appeals held that:

it was within Bureau's discretion to reclassify apparatus;

reclassification did not violate inventor's due process rights;
and

statute was not unconstitutionally vague.

Affirmed.

**Attorneys and Law Firms**

**\*197** John R. Monroe, Roswell, GA, for Plaintiff–
Appellant.

Nicholas Bagley, Washington, DC, for Defendant–Appellee.

Appeal from the United States District Court for the Middle
District of Florida. D.C. Docket No. 08–00988–CV–T–26–
TGW.

Before BIRCH, HULL and PRYOR, Circuit Judges.

**Opinion**

**\*198** PER CURIAM:

**\*\*1** William Akins appeals the summary judgment in favor
of the Bureau of Alcohol, Tobacco, Firearms, and Explosives
and against his complaint that the Bureau violated his due
process rights when it classified the Akins Accelerator, an
accessory that increases the rate of fire of a semiautomatic
rifle, as a prohibited firearm. Akins argues that the decision
of the Bureau to classify the Accelerator as a "machinegun"
as defined in the National Firearms Act, 26 U.S.C. §
5845(b), is unreasonable and not entitled to deference; the
classification of the Accelerator without a hearing violated
his right to procedural due process; and section 5845(b) is
unconstitutionally vague. We affirm.

## I. BACKGROUND

The Gun Control Act makes its unlawful for any person, other
than law enforcement personnel, to "transfer or possess a
machinegun" manufactured after May 19, 1986. 18 U.S.C.
§ 922(*o*). The term "machinegun" used in section 922(*o*)
shares the definition of the term in the National Firearms
Act. The Firearms Act defines a machinegun as "any weapon
which shoots, is designed to shoot, or can be readily
restored to shoot, automatically more than one shot, without
manual reloading, by a single function of the trigger." 26
U.S.C. § 5845(b). A machinegun also includes "the frame
or receiver of any such weapon, any part designed and
intended solely and exclusively, or combination of parts
designed and intended, for use in converting a weapon into
a machinegun...." *Id.* Congress delegated authority to the
Bureau to interpret and enforce the Act. 27 C.F.R. § 479.

Akins invented an "apparatus for accelerating the cyclic firing
rate of a semiautomatic firearm" and received a patent for the
accessory. The Accelerator is a molded stock that cradles a
semiautomatic rifle and uses an internal spring and the force
of recoil to reposition and refire the rifle. According to Akins,
a gunman pulls the trigger, then "maintains tension against
the finger stops," and each time the rifle recoils, it is pushed

forward by "tension supplied by the spring," which pushes "the trigger ... into the finger [ ] and the rifle." The process continues until the rifle empties its ammunition chamber or the shooter releases contact with the finger stops. This process is known commonly as "bump firing," but the Accelerator allegedly enables the shooter to achieve better accuracy than with similar devices.

In March 2002, Akins wrote the Firearms Technology Branch of the Bureau to inquire if it would classify the Accelerator as a machinegun. In the letter, Akins explained that the Accelerator "alter[ed] the stock on some semiautomatic rifles in a manner which allows them to be fired so rapidly that the practical effect is equivalent to a fully-automatic machinegun." After the Firearms Branch tested a prototype of the Accelerator with an SKS-type rifle, it determined that "[t]he weapon did not fire more than one shot by a single function of the trigger" and concluded that "the submitted stock assembly does not constitute a machinegun ... [nor] a part or parts designed and intended for use in converting a weapon into a machinegun." The letter mentioned that the prototype broke during testing.

 **2 Concerned that the classification might not include an Accelerator that functioned properly, Akins asked the Bureau in January 2004 to explain its ruling. The Bureau stated that it classified the Accelerator based on its "theory of operation," which "was clear even though the rifle/stock assembly did not perform as intended." Akins began to produce and sell the Accelerator.

 *199 In August 2006, the Bureau noticed a website that Akins used to market the Accelerator. The website advertised the Accelerator as "[e]valuated by" the Bureau and quoted from its letters. An individual who had purchased an Accelerator wrote the Bureau and asked for a "written determination" whether the accessory when "assembled with a standard Ruger 10/22 semiautomatic carbine" would constitute a machinegun. The Bureau also received requests to evaluate other devices designed to increase the rate of fire of a semiautomatic firearm.

The Bureau opened an investigation regarding the Accelerator in September 2006. After the Bureau obtained and tested the accessory, it advised Akins in November 2006 that the Accelerator, when used with a Ruger 10/22 rifle, "demonstrated that a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply

is exhausted." The Bureau classified the Accelerator as a machinegun, notified Akins that its previous letters were "overruled," and instructed him either to register the devices he possessed or to surrender them.

On December 13, 2006, the Bureau issued a new policy statement, ATF Ruling 2006–2. The Bureau stated that "conversion parts that, when installed in a semiautomatic rifle, result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger, are a machinegun as defined in the National Firearms Act and the Gun Control Act." The Bureau described the Accelerator in the statement and stated that the accessory was a machinegun. In January 2007, the Bureau ordered Akins to turn over any recoil springs in his possession.

In early February, Akins asked the Bureau to reconsider its decision. Akins alleged that "[i]f the trigger finger remains in contact with the trigger, only one shot can result until the trigger is released and then pressed again" and he mentioned that several other devices had not been classified as machineguns although they also enabled shooters to fire two or three shots with a single pull of the trigger. Akins argued that the original classification of the Accelerator was "consistent" with "long-standing agency interpretations" and he asked for an opportunity to "present [his] case orally" to the Bureau. The Bureau affirmed its decision summarily in September 2007.

Akins filed a complaint against the United States in May 2008. He alleged that the decision of the Bureau was arbitrary and capricious and violated his right to due process. Akins requested the court: (1) declare that the Accelerator is not a machinegun; (2) issue an injunction to prohibit the government from treating the Accelerator as a machinegun; (3) declare section 5845 unconstitutionally vague; and (4) issue an injunction to prohibit the government from classifying the Accelerator as a machinegun.

 **3 The United States moved for summary judgment, which the district court granted. The district court found that the decision of the Bureau that the Accelerator qualified as machinegun was consistent with the language and legislative history of the National Firearms Act and concluded that the Bureau had the authority to reclassify the Accelerator. The court ruled that the actions of the Bureau did not violate Akins's right to procedural due process and that the definition of machinegun in section 5845 was not unconstitutionally vague.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo.*   **\*200**  *Cooper v. Fulton County, Ga.,* 458 F.3d 1282, 1285 (11th Cir.2006). Under the Administrative Procedures Act, we defer to the decision of the Bureau unless it "(1) exceeds the Bureau's statutory authority, (2) violates a constitutional right, or (3) constitutes an 'arbitrary' or 'capricious action,' or 'an abuse of discretion' or an action 'otherwise not in accordance with law.' " *Gun South, Inc. v. Brady,* 877 F.2d 858, 861 (11th Cir.1989) (quoting the Administrative Procedure Act, 5 U.S.C.A. § 706(2)(A), (B), and (C) (West 1977)). Based on that deferential standard, we "cannot substitute our judgment for the Bureau's judgment, but rather, we must presume" that the actions of the government agency are "valid[.]" *Id.* We review *de novo* the constitutionality of a federal statute. *See United States v. Awan,* 966 F.2d 1415, 1424 (11th Cir.1992).

## III. DISCUSSION

Akins challenges the summary judgment on three grounds. First, Akins argues that the classification by the Bureau of the Accelerator as a machinegun is unreasonable. Second, Akins argues that the summary disposition of the classification violated his right to due process. Third, Akins contends that section 5845(b) of the National Firearms Act is unconstitutionally vague. These arguments fail.

 The Bureau acted within its discretion when it reclassified the Accelerator as a machinegun. A machinegun is a weapon that fires "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The interpretation by the Bureau that the phrase "single function of the trigger" means a "single pull of the trigger" is consonant with the statute and its legislative history. *See Staples v. United States,* 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 1795 n. 1, 128 L.Ed.2d 608 (1994); *National Firearms Act: Hearings Before the Committee on Ways and Means,* 73rd Cong. 40 (1934). After a single application of the trigger by a gunman, the Accelerator uses its internal spring and the force of recoil to fire continuously the rifle cradled inside until the gunman releases the trigger or the ammunition is exhausted. Based on the operation of the Accelerator, the Bureau had authority to "reconsider and rectify" what

it considered to be a classification error. *See Gun South,* 877 F.2d at 862–63. That decision was not arbitrary and capricious. *See id.* at 866.

 **\*\*4**  The Bureau did not violate Akins's right to due process when it reclassified the Accelerator summarily. Due process requires that the " 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). As the *Mathews* Court explained, "[a]ll that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Id.* at 349, 96 S.Ct. at 909 (citation omitted). Akins received notice that the Bureau had reclassified the Accelerator, and Akins submitted a lengthy request for the agency to reconsider its decision based on his interpretation of the statute. No further process was required.

 Section 5845(b) also is not unconstitutionally vague. A statute is constitutionally vague when it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited."   **\*201**  *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). The plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly. *See United States v. Thomas,* 567 F.2d 299, 300 (5th Cir.1978) (applying a commonsense meaning to the word "silencer" under former section 5845 in a vagueness challenge). Use of the word "function" instead of "pull" to reference the action taken by a gunman to commence the firing process is not so confusing that a man of common intelligence would have to guess at its meaning.

## IV. CONCLUSION

The summary judgment in favor of the United States is **AFFIRMED.**

**All Citations**

312 Fed.Appx. 197, 2009 WL 255682

**End of Document**                               © 2019 Thomson Reuters. No claim to original U.S. Government Works.

  © 2019 Thomson Reuters. No claim to original U.S. Government Works.      AR004491

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

130 S.Ct. 3020
Supreme Court of the United States

Otis McDONALD, et al., Petitioners,

v.

CITY OF CHICAGO, ILLINOIS, et al.

No. 08–1521.
|
Argued March 2, 2010.
|
Decided June 28, 2010.

**Synopsis**

**Background:** Petitioners filed federal suit against city, which was consolidated with two related actions, seeking a declaration that two Illinois cities' handgun ban and several related city ordinances violated the Second and Fourteenth Amendments. The United States District Court for the Northern District of Illinois, Milton I. Shadur, J., 617 F.Supp.2d 752, dismissed the suits. Petitioners appealed. The United States Court of Appeals for the Seventh Circuit, Easterbrook, Chief Judge, 567 F.3d 856, affirmed. Certiorari was granted.

**Holding:** The Supreme Court, Justice Alito, held that Second Amendment right to keep and bear arms is fully applicable to the States by virtue of Fourteenth Amendment.

Reversed and remanded.

Justice Scalia, filed concurring opinion.

Justice Thomas, filed opinion concurring in part and concurring in the judgment.

Justice Stevens, filed dissenting opinion.

Justice Breyer, filed dissenting opinion in which Justice Ginsburg and Justice Sotomayor joined.

**\*\*3021** *Syllabus* [*]

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions

for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Two years ago, in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637, this Court held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense and struck down a District of Columbia law that banned the possession of handguns in the home. Chicago (hereinafter City) and the village of Oak Park, a Chicago suburb, have laws effectively banning handgun possession by almost all private citizens. After *Heller,* petitioners filed this federal suit against the City, which was consolidated with two related actions, alleging that the City's handgun ban has left them vulnerable to criminals. They sought a declaration that the ban and several related City ordinances violate the Second and Fourteenth Amendments. Rejecting petitioners' argument that the ordinances are unconstitutional, the court noted that the Seventh Circuit previously had upheld the constitutionality of a handgun ban, that *Heller* had explicitly refrained from opining on whether the Second Amendment applied to the States, and that the court had a duty to follow established Circuit precedent. The Seventh Circuit affirmed, relying on three 19th-century cases—*United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588, *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615, and *Miller v. Texas,* 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812—which were decided in the wake of this Court's interpretation of the Fourteenth Amendment's Privileges or Immunities Clause in the *Slaughter–House Cases,* 16 Wall. 36, 21 L.Ed. 394.

*Held:* The judgment is reversed, and the case is remanded.

567 F.3d 856, reversed and remanded.

Justice ALITO delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, III, concluding that the Fourteenth Amendment incorporates the Second Amendment right, recognized in *Heller,* to keep and bear arms for the purpose of self-defense. Pp. 3028 –3030, 3031 – 3036, 3036 – 3044.

(a) Petitioners base their case on two submissions. Primarily, they argue that the right to keep and bear arms is protected by the Privileges or Immunities Clause of the Fourteenth Amendment and that the *Slaughter–House Cases'* narrow interpretation of the Clause should now be rejected. As a secondary argument, they contend that the Fourteenth Amendment's Due Process Clause incorporates the Second

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4961   Page 6 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Amendment right. Chicago and Oak Park (municipal respondents) maintain that a right set out in the Bill of Rights applies to the States only when it is an indispensable attribute of *any* " 'civilized' " legal system. If it is possible to imagine a civilized country that does not recognize the right, municipal respondents assert, that right is not protected by due process. And since there are civilized countries that ban or strictly regulate the private possession of handguns, they maintain that due process does not preclude such measures. Pp. 3027 – 3028.

(b) The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government, not to the States, see, *e.g., Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 247, 8 L.Ed. 672, but the constitutional Amendments adopted in the Civil War's aftermath fundamentally altered the federal system. Four years after the adoption of the Fourteenth Amendment, this Court **\*\*3022** held in the *Slaughter–House Cases* that the Privileges or Immunities Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws," 16 Wall., at 79, 21 L.Ed. 394, and that the fundamental rights predating the creation of the Federal Government were not protected by the Clause, *id.,* at 76. Under this narrow reading, the Court held that the Privileges or Immunities Clause protects only very limited rights. *Id.,* at 79–80. Subsequently, the Court held that the Second Amendment applies only to the Federal Government in *Cruikshank, supra*, *Presser, supra*, and *Miller, supra*, the decisions on which the Seventh Circuit relied in this case. Pp. 3028 – 3030.

(c) Whether the Second Amendment right to keep and bear arms applies to the States is considered in light of the Court's precedents applying the Bill of Rights' protections to the States. Pp. 3031 – 3036.

(1) In the late 19th century, the Court began to hold that the Due Process Clause prohibits the States from infringing Bill of Rights protections. See, *e.g., Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232. Five features of the approach taken during the ensuing era are noted. First, the Court viewed the due process question as entirely separate from the question whether a right was a privilege or immunity of national citizenship. See *Twining v. New Jersey,* 211 U.S. 78, 99, 29 S.Ct. 14, 53 L.Ed. 97. Second, the Court explained that the only rights due process protected against state infringement were those "of such a nature that they are included in the conception of due process of law." *Ibid.*

Third, some cases during this era "can be seen as having asked ... if a civilized system could be imagined that would not accord the particular protection" asserted therein. *Duncan v. Louisiana,* 391 U.S. 145, 149, n. 14, 88 S.Ct. 1444, 20 L.Ed.2d 491. Fourth, the Court did not hesitate to hold that a Bill of Rights guarantee failed to meet the test for Due Process Clause protection, finding, *e.g.,* that freedom of speech and press qualified, *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138; *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, but the grand jury indictment requirement did not, *Hurtado, supra.* Finally, even when such a right was held to fall within the conception of due process, the protection or remedies afforded against state infringement sometimes differed from those provided against abridgment by the Federal Government. Pp. 3031 – 3032.

(2) Justice Black championed the alternative theory that § 1 of the Fourteenth Amendment totally incorporated all of the Bill of Rights' provisions, see, *e.g., Adamson v. California,* 332 U.S. 46, 71–72, 67 S.Ct. 1672, 91 L.Ed. 1903 (Black, J., dissenting), but the Court never has embraced that theory. Pp. 3032 – 3033.

(3) The Court eventually moved in the direction advocated by Justice Black, by adopting a theory of selective incorporation by which the Due Process Clause incorporates particular rights contained in the first eight Amendments. See, *e.g., Gideon v. Wainwright,* 372 U.S. 335, 341, 83 S.Ct. 792, 9 L.Ed.2d 799. These decisions abandoned three of the characteristics of the earlier period. The Court clarified that the governing standard is whether a particular Bill of Rights protection is fundamental to our Nation's particular scheme of ordered liberty and system of justice. *Duncan, supra,* at 149, n. 14, 88 S.Ct. 1444. The Court eventually held that almost all of the Bill of Rights' guarantees met the requirements for protection under the Due Process Clause. The Court also held that Bill of Rights protections **\*\*3023** must "all ... be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy v. Hogan,* 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653. Under this approach, the Court overruled earlier decisions holding that particular Bill of Rights guarantees or remedies did not apply to the States. See, *e.g., Gideon, supra,* which overruled *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. Pp. 3034 – 3036.

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4962   Page 7 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

(d) The Fourteenth Amendment makes the Second Amendment right to keep and bear arms fully applicable to the States. Pp. 3036 – 3044.

(1) The Court must decide whether that right is fundamental to the Nation's scheme of ordered liberty, *Duncan, supra,* at 149, 88 S.Ct. 1444, 20 L.Ed.2d 491, or, as the Court has said in a related context, whether it is "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2302, 138 L.Ed.2d 772. *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present, and the *Heller* Court held that individual self-defense is "the central component" of the Second Amendment right. 554 U.S., at 599, 128 S.Ct. 2783, 171 L.Ed.2d 637. Explaining that "the need for defense of self, family, and property is most acute" in the home, *id.,* at 628, the Court found that this right applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *id.,* at 628 – 629, 128 S.Ct. 2783. It thus concluded that citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *Id.,* at 630, 128 S.Ct. 2783. *Heller* also clarifies that this right is "deeply rooted in this Nation's history and tradition," *Glucksberg, supra,* at 721, 117 S.Ct. 2302. *Heller* explored the right's origins in English law and noted the esteem with which the right was regarded during the colonial era and at the time of the ratification of the Bill of Rights. This is powerful evidence that the right was regarded as fundamental in the sense relevant here. That understanding persisted in the years immediately following the Bill of Rights' ratification and is confirmed by the state constitutions of that era, which protected the right to keep and bear arms. Pp. 3036 – 3038.

(2) A survey of the contemporaneous history also demonstrates clearly that the Fourteenth Amendment's Framers and ratifiers counted the right to keep and bear arms among those fundamental rights necessary to the Nation's system of ordered liberty. Pp. 3038 – 3044.

(i) By the 1850's, the fear that the National Government would disarm the universal militia had largely faded, but the right to keep and bear arms was highly valued for self-defense. Abolitionist authors wrote in support of the right, and attempts to disarm "Free–Soilers" in "Bloody Kansas" met with outrage that the constitutional right to keep and bear arms had been taken from the people. After the Civil War, the Southern States engaged in systematic efforts to disarm and injure African-Americans, see *Heller,*

*supra,* at 614 – 615, 128 S.Ct. 2783. These injustices prompted the 39th Congress to pass the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1866 to protect the right to keep and bear arms. Congress, however, ultimately deemed these legislative remedies insufficient, and approved the Fourteenth Amendment. Today, it is generally accepted that that Amendment was understood to provide a constitutional basis for protecting the rights set out in the Civil Rights Act. See *General Building Contractors Assn., Inc.* **\*3024** *v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835. In congressional debates on the proposed Amendment, its legislative proponents in the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection. Evidence from the period immediately following the Amendment's ratification confirms that that right was considered fundamental. Pp. 3038 – 3042.

(ii) Despite all this evidence, municipal respondents argue that Members of Congress overwhelmingly viewed § 1 of the Fourteenth Amendment as purely an antidiscrimination rule. But while § 1 does contain an antidiscrimination rule, *i.e.,* the Equal Protection Clause, it can hardly be said that the section does no more than prohibit discrimination. If what municipal respondents mean is that the Second Amendment should be singled out for special—and specially unfavorable—treatment, the Court rejects the suggestion. The right to keep and bear arms must be regarded as a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner. Pp. 3042 – 3044.

Justice ALITO, joined by THE CHIEF JUSTICE, Justice SCALIA, and Justice KENNEDY, concluded, in Parts II–C, IV, and V, that the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right recognized in *Heller.* Pp. 3030 – 3031, 3044 – 3048.

(a) Petitioners argue that the Second Amendment right is one of the "privileges or immunities of citizens of the United States." There is no need to reconsider the Court's interpretation of the Privileges or Immunities Clause in the *Slaughter–House Cases* because, for many decades, the Court has analyzed the question whether particular rights are protected against state infringement under the Fourteenth Amendment's Due Process Clause. Pp. 3030 – 3031.

(b) Municipal respondents' remaining arguments are rejected because they are at war with *Heller* 's central holding. In

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4963   Page 8 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

effect, they ask the Court to hold the right to keep and bear arms as subject to a different body of rules for incorporation than the other Bill of Rights guarantees. Pp. 3044 – 3048.

(c) The dissents' objections are addressed and rejected. Pp. 3048 – 3050.

Justice THOMAS agreed that the Fourteenth Amendment makes the Second Amendment right to keep and bear arms that was recognized in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637, fully applicable to the States. However, he asserted, there is a path to this conclusion that is more straightforward and more faithful to the Second Amendment's text and history. The Court is correct in describing the Second Amendment right as "fundamental" to the American scheme of ordered liberty, *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491, and "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2302, 138 L.Ed.2d 772. But the Fourteenth Amendment's Due Process Clause, which speaks only to "process," cannot impose the type of substantive restraint on state legislation that the Court asserts. Rather, the right to keep and bear arms is enforceable against the States because it is a privilege of American citizenship recognized by § 1 of the Fourteenth Amendment, which provides, *inter alia:* "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." In interpreting this language, it is important to recall that constitutional provisions are " 'written to be understood by the voters.' " **\*3025** *Heller,* 554 U.S., at 576, 128 S.Ct. 2783. The objective of this inquiry is to discern what "ordinary citizens" at the time of the Fourteenth Amendment's ratification would have understood that Amendment's Privileges or Immunities Clause to mean. *Id.*, at 577. A survey of contemporary legal authorities plainly shows that, at that time, the ratifying public understood the Clause to protect constitutionally enumerated rights, including the right to keep and bear arms. Pp. 3026 – 3044.

ALITO, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, and III, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined, and an opinion with respect to Parts II–C, IV, and V, in which ROBERTS, C. J., and SCALIA and KENNEDY, JJ., join. SCALIA, J., filed a concurring opinion, *post,* pp. 3050 – 3058. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, *post,* pp. 3058 – 3088. STEVENS, J., filed

a dissenting opinion, *post,* pp. 3088 – 3120. BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined, *post,* pp. 3120 – 3136.

**Attorneys and Law Firms**

Alan Gura for the petitioners.

Paul D. Clement for the respondents Nat. Rifle Association, Inc., et al. in support of the petitioners.

James A. Feldman for the respondents City of Chicago, Ill.

Stephen P. Halbrook, Fairfax, VA, Counsel for the National Rifle Association of America, Inc., Robert Klein Engler, Dr. Gene Reisinger, Dr. Kathryn Tyler, Van F. Welton, and Brett Benson. Stephen D. Poss, Counsel of Record, Kevin P. Martin, Joshua S. Lipshutz, Goodwin Procter LLP, Boston, MA, Paul D. Clement, King & Spalding, Washington, DC, Counsel for the National Rifle Association of America, Inc.

David G. Sigale, Law Firm of David G. Sigale, P.C., Lisle, Illinois, Alan Gura, Counsel of Record, Alexandria, Virginia for the Seventh Circuit.

Charles M. Dyke, Counsel of Record, Yi-Yi Chang, Nixon Peabody LLP, San Francisco, CA, for the Board of Education of the City of Chicago, Institute of Medicine of Chicago, Wayman African Methodist Episcopal Church of Chicago, Illinois Council Against Handgun Violence, Legal Community Against Violence, Violence Policy Center, States United to Prevent Gun Violence, Freedom States Alliance, Connecticut Against Gun Violence, Maine Citizens Against Gun Violence, Citizens for a Safer Minnesota, Ohio Coalition Against Gun Violence, Wisconsin Anti-Violence Effort Educational Fund, and Gunfreekids.org in Support of Respondents City of Chicago and Village of Oak Park.

James A. Feldman, Special Assistant, Corporation Counsel, Washington, D.C., Mara S. Georges, Corporation Counsel of the City of Chicago, Benna Ruth Solomon, Counsel of Record, Deputy Corporation Counsel, Myriam Zreczny Kasper, Chief Assistant Corporation Counsel, Suzanne M. Loose, Assistant Corporation Counsel, Andrew W. Worseck, Assistant Corporation Counsel, Chicago, Illinois, Counsel for the City of Chicago; Raymond L. Heise, Village Attorney of Oak Park, Oak Park, Illinois, Counsel for the Village of Oak Park, Hans Germann, Ranjit Hakim, Alexandra Shea, Mayer Brown LLP, Chicago, Illinois, for Respondents City of Chicago and Village of Oak Park.

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4964 Page 9 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

## Opinion

Justice ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, and III, in which THE CHIEF JUSTICE, Justice SCALIA, Justice KENNEDY, and Justice THOMAS join, and an opinion with respect to Parts II–C, IV, and V, in which THE CHIEF JUSTICE, Justice SCALIA, and Justice KENNEDY join.

**\*749** Two years ago, in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), we held that the Second Amendment protects the **\*750** right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home. The city of Chicago (City) and the village of Oak Park, a Chicago suburb, have laws that are similar to the District of Columbia's, but Chicago and Oak Park argue that their laws are constitutional because the Second Amendment has no application to the States. We have previously held that most of the provisions of the Bill of Rights apply with full force to both the Federal Government and the States. Applying the standard that is well established in our case law, we hold that the Second Amendment right is fully applicable to the States.

### I

Otis McDonald, Adam Orlov, Colleen Lawson, and David Lawson (Chicago petitioners) are Chicago residents who would like to keep handguns in their homes for self-defense but are prohibited from doing so by Chicago's firearms laws. A City ordinance provides that "[n]o person shall ... possess ... any firearm unless such person is the holder of a valid registration certificate for such firearm." Chicago, Ill., Municipal Code § 8–20–040(a) (2009). The Code then prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City. § 8–20–050(c). Like Chicago, Oak Park makes it "unlawful for any person to possess ... any firearm," a term that includes "pistols, revolvers, guns and small arms ... commonly known as handguns." Oak Park, Ill., Village Code §§ 27–2–1 (2007), 27–1–1 (2009).

Chicago enacted its handgun ban to protect its residents "from the loss of property and injury or death from firearms." **\*751** See Chicago, Ill., Journal of Proceedings of the City Council, p. 10049 (Mar. 19, 1982). The Chicago petitioners

and their *amici,* however, argue that the handgun ban has left them vulnerable to criminals. Chicago Police Department statistics, we are told, reveal that the City's handgun murder rate has actually increased since the ban was enacted [1] and that Chicago residents now face one of the highest murder rates in the country and rates of other violent crimes that exceed the average in comparable cities. [2]

[1]    See Brief for Heartland Institute as *Amicus Curiae* 6–7 (noting that handgun murder rate was 9.65 in 1983 and 13.88 in 2008).

[2]    Brief for Buckeye Firearms Foundation, Inc., et al. as *Amici Curiae* 8–9 ("In 2002 and again in 2008, Chicago had more murders than any other city in the U.S., including the much larger Los Angeles and New York" (internal quotation marks omitted)); see also Brief for International Law Enforcement Educators and Trainers Association et al. as *Amici Curiae* 17–21, and App. A (providing comparisons of Chicago's rates of assault, murder, and robbery to average crime rates in 24 other large cities).

Several of the Chicago petitioners have been the targets of threats and violence. For instance, Otis McDonald, who is in his **\*\*3027** late seventies, lives in a high-crime neighborhood. He is a community activist involved with alternative policing strategies, and his efforts to improve his neighborhood have subjected him to violent threats from drug dealers. App. 16–17; Brief for State Firearm Associations as *Amici Curiae* 20–21; Brief for State of Texas et al. as *Amici Curiae* 7–8. Colleen Lawson is a Chicago resident whose home has been targeted by burglars. "In Mrs. Lawson's judgment, possessing a handgun in Chicago would decrease her chances of suffering serious injury or death should she ever be threatened again in her home." [3] McDonald, Lawson, and the other Chicago petitioners own handguns that they store outside of the city limits, but they would like to keep their handguns in their homes for protection. See App. 16–19, 43–44 (McDonald), 20–24 (C. Lawson), 19, 36 (Orlov), 20–21, 40 (D.Lawson).

[3]    Brief for Women State Legislators et al. as *Amici Curiae* 2.

**\*752** After our decision in *Heller,* the Chicago petitioners and two groups [4] filed suit against the City in the United States District Court for the Northern District of Illinois. They sought a declaration that the handgun ban and several related Chicago ordinances violate the Second and Fourteenth

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4965 Page 10 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Amendments to the United States Constitution. Another action challenging the Oak Park law was filed in the same District Court by the National Rifle Association (NRA) and two Oak Park residents. In addition, the NRA and others filed a third action challenging the Chicago ordinances. All three cases were assigned to the same District Judge.

4    The Illinois State Rifle Association and the Second Amendment Foundation, Inc.

The District Court rejected plaintiffs' argument that the Chicago and Oak Park laws are unconstitutional. See App. 83–84; *NRA, Inc. v. Oak Park,* 617 F.Supp.2d 752, 754 (N.D.Ill.2008). The court noted that the Seventh Circuit had "squarely upheld the constitutionality of a ban on handguns a quarter century ago," *id.*, at 753 (citing *Quilici v. Morton Grove,* 695 F.2d 261 (C.A.7 1982)), and that *Heller* had explicitly refrained from "opin[ing] on the subject of incorporation vel non of the Second Amendment," *NRA,* 617 F.Supp.2d, at 754. The court observed that a district judge has a "duty to follow established precedent in the Court of Appeals to which he or she is beholden, even though the logic of more recent caselaw may point in a different direction." *Id.,* at 753.

The Seventh Circuit affirmed, relying on three 19th-century cases—*United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876), *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), and *Miller v. Texas,* 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812 (1894)—that were decided in the wake of this Court's interpretation of the Privileges or Immunities Clause of the Fourteenth Amendment in the *Slaughter–House Cases,* 16 Wall. 36, 21 L.Ed. 394 (1873). The Seventh Circuit described the rationale of those cases as "defunct" and recognized that they did not consider the question whether the **\*753** Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right to keep and bear arms. *NRA, Inc. v. Chicago,* 567 F.3d 856, 857, 858 (2009). Nevertheless, the Seventh Circuit observed that it was obligated to follow Supreme Court precedents that have "direct application," and it declined to predict how the Second Amendment would fare under this Court's modern "selective incorporation" approach. *Id.,* at 857–858 (internal quotation marks omitted).

**\*\*3028** We granted certiorari. 557 U.S. 965, 130 S.Ct. 48, 174 L.Ed.2d 632 (2009).

II

A

Petitioners argue that the Chicago and Oak Park laws violate the right to keep and bear arms for two reasons. Petitioners' primary submission is that this right is among the "privileges or immunities of citizens of the United States" and that the narrow interpretation of the Privileges or Immunities Clause adopted in the *Slaughter–House Cases, supra,* should now be rejected. As a secondary argument, petitioners contend that the Fourteenth Amendment's Due Process Clause "incorporates" the Second Amendment right.

Chicago and Oak Park (municipal respondents) maintain that a right set out in the Bill of Rights applies to the States only if that right is an indispensable attribute of *any* " 'civilized' " legal system. Brief for Municipal Respondents 9. If it is possible to imagine a civilized country that does not recognize the right, the municipal respondents tell us, then that right is not protected by due process. *Ibid.* And since there are civilized countries that ban or strictly regulate the private possession of handguns, the municipal respondents maintain that due process does not preclude such measures. *Id.,* at 21–23. In light of the parties' far-reaching arguments, we begin by recounting this Court's analysis over the years of the relationship between the provisions of the Bill of Rights and the States.

**\*754** B

The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government. In *Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 8 L.Ed. 672 (1833), the Court, in an opinion by Chief Justice Marshall, explained that this question was "of great importance" but "not of much difficulty." *Id.*, at 247. In less than four pages, the Court firmly rejected the proposition that the first eight Amendments operate as limitations on the States, holding that they apply only to the Federal Government. See also *Lessee of Livingston v. Moore,* 7 Pet. 469, 551–552, 8 L.Ed. 751 (1833) ("[I]t is now settled that those amendments [in the Bill of Rights] do not extend to the states").

The constitutional Amendments adopted in the aftermath of the Civil War fundamentally altered our country's federal

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

system. The provision at issue in this case, § 1 of the Fourteenth Amendment, provides, among other things, that a State may not abridge "the privileges or immunities of citizens of the United States" or deprive "any person of life, liberty, or property, without due process of law."

Four years after the adoption of the Fourteenth Amendment, this Court was asked to interpret the Amendment's reference to "the privileges or immunities of citizens of the United States." The *Slaughter–House Cases, supra,* involved challenges to a Louisiana law permitting the creation of a state-sanctioned monopoly on the butchering of animals within the city of New Orleans. Justice Samuel Miller's opinion for the Court concluded that the Privileges or Immunities Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.,* at 79. The Court held that other fundamental rights—rights that predated the creation of the Federal Government and that "the State governments were created to establish and secure"—were not protected by the Clause. *Id.,* at 76.

**\*755** In drawing a sharp distinction between the rights of federal and state citizenship, **\*\*3029** the Court relied on two principal arguments. First, the Court emphasized that the Fourteenth Amendment's Privileges or Immunities Clause spoke of "the privileges or immunities of *citizens of the United States,*" and the Court contrasted this phrasing with the wording in the first sentence of the Fourteenth Amendment and in the Privileges and Immunities Clause of Article IV, both of which refer to *state* citizenship.[5] (Emphasis added.) Second, the Court stated that a contrary reading would "radically chang[e] the whole theory of the relations of the State and Federal governments to each other and of both these governments to the people," and the Court refused to conclude that such a change had been made "in the absence of language which expresses such a purpose too clearly to admit of doubt." *Id.,* at 78. Finding the phrase "privileges or immunities of citizens of the United States" lacking by this high standard, the Court reasoned that the phrase must mean something more limited.

[5]  The first sentence of the Fourteenth Amendment makes "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof ... citizens of the United States *and of the State wherein they reside.*" (Emphasis added.) The Privileges and Immunities Clause of Article IV provides that "[t]he Citizens of each State shall be

entitled to all Privileges and Immunities of *Citizens in the several States.*" (Emphasis added.)

Under the Court's narrow reading, the Privileges or Immunities Clause protects such things as the right

"to come to the seat of government to assert any claim [a citizen] may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions ... [and to] become a citizen of any State of the Union by a *bonafide* residence therein, with the same rights as other citizens of that State." *Id.,* at 79–80 (internal quotation marks omitted).

**\*756** Finding no constitutional protection against state intrusion of the kind envisioned by the Louisiana statute, the Court upheld the statute. Four Justices dissented. Justice Field, joined by Chief Justice Chase and Justices Swayne and Bradley, criticized the majority for reducing the Fourteenth Amendment's Privileges or Immunities Clause to "a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage." *Id.,* at 96; see also *id.,* at 104. Justice Field opined that the Privileges or Immunities Clause protects rights that are "in their nature ... fundamental," including the right of every man to pursue his profession without the imposition of unequal or discriminatory restrictions. *Id.,* at 96–97 (internal quotation marks omitted). Justice Bradley's dissent observed that "we are not bound to resort to implication ... to find an authoritative declaration of some of the most important privileges and immunities of citizens of the United States. It is in the Constitution itself." *Id.,* at 118. Justice Bradley would have construed the Privileges or Immunities Clause to include those rights enumerated in the Constitution as well as some unenumerated rights. *Id.,* at 119. Justice Swayne described the majority's narrow reading of the Privileges or Immunities Clause as "turn [ing] ... what was meant for bread into a stone." *Id.*, at 129 (dissenting opinion).

Today, many legal scholars dispute the correctness of the narrow *Slaughter–House* interpretation. See, *e.g., Saenz v. Roe,* 526 U.S. 489, 522, n. 1, 527, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (THOMAS, J., dissenting) (scholars of the Fourteenth Amendment agree "that the Clause does not mean what the Court said it meant in 1873"); Amar, **\*\*3030** Substance and Method in the Year 2000, 28 Pepperdine L.Rev. 601, 631, n. 178 (2001) ("Virtually no serious modern scholar—left, right, and center—thinks that this [interpretation] is a plausible reading of the

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Amendment"); Brief for Constitutional Law Professors as *Amici Curiae* 33 (claiming an "overwhelming consensus among leading constitutional **\*757** scholars" that the opinion is "egregiously wrong"); C. Black, A New Birth of Freedom 74–75 (1997).

Three years after the decision in the *Slaughter–House Cases,* the Court decided *Cruikshank,* the first of the three 19th-century cases on which the Seventh Circuit relied. 92 U.S. 542, 23 L.Ed. 588. In that case, the Court reviewed convictions stemming from the infamous Colfax Massacre in Louisiana on Easter Sunday 1873. Dozens of blacks, many unarmed, were slaughtered by a rival band of armed white men.[6] Cruikshank himself allegedly marched unarmed African–American prisoners through the streets and then had them summarily executed.[7] Ninety-seven men were indicted for participating in the massacre, but only nine went to trial. Six of the nine were acquitted of all charges; the remaining three were acquitted of murder but convicted under the Enforcement Act of 1870, 16 Stat. 140, for banding and conspiring together to deprive their victims of various constitutional rights, including the right to bear arms.[8]

[6]     See C. Lane, The Day Freedom Died 265–266 (2008); see also Brief for NAACP Legal Defense & Education Fund, Inc., as *Amicus Curiae* 3, and n. 2.

[7]     See Lane, *supra,* at 106.

[8]     *United States v. Cruikshank,* 92 U.S. 542, 544–545, 23 L.Ed. 588 (statement of the case), 548, 553 (opinion of the Court) (1876); Lawrence, Civil Rights and Criminal Wrongs: The Mens Rea of Federal Civil Rights Crimes, 67 Tulane L.Rev. 2113, 2153 (1993).

The Court reversed all of the convictions, including those relating to the deprivation of the victims' right to bear arms. *Cruikshank,* 92 U.S., at 553, 559. The Court wrote that the right of bearing arms for a lawful purpose "is not a right granted by the Constitution" and is not "in any manner dependent upon that instrument for its existence." *Id.,* at 553. "The second amendment," the Court continued, "declares that it shall not be infringed; but this ... means no more than that it shall not be infringed by Congress." *Ibid.* "Our later decisions in **\*758** *Presser v. Illinois,* 116 U.S. 252, 265[, 6 S.Ct. 580, 29 L.Ed. 615] (1886), and *Miller v. Texas,* 153 U.S. 535, 538[, 14 S.Ct. 874, 38 L.Ed. 812] (1894), reaffirmed that the Second Amendment applies only to the Federal Government." *Heller,* 554 U.S., at 620, n. 23, 128 S.Ct., at 2813 n. 23.

C

As previously noted, the Seventh Circuit concluded that *Cruikshank, Presser,* and *Miller* doomed petitioners' claims at the Court of Appeals level. Petitioners argue, however, that we should overrule those decisions and hold that the right to keep and bear arms is one of the "privileges or immunities of citizens of the United States." In petitioners' view, the Privileges or Immunities Clause protects all of the rights set out in the Bill of Rights, as well as some others, see Brief for Petitioners 10, 14, 15–21, but petitioners are unable to identify the Clause's full scope, Tr. of Oral Arg. 5–6, 8–11. Nor is there any consensus on that question among the scholars who agree that the *Slaughter–House Cases'* interpretation is flawed. See *Saenz, supra,* at 522, n. 1, 119 S.Ct. 1518 (THOMAS, J., dissenting).

We see no need to reconsider that interpretation here. For many decades, the question of the rights protected by the **\*\*3031** Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the *Slaughter–House* holding.

At the same time, however, this Court's decisions in *Cruikshank, Presser,* and *Miller* do not preclude us from considering whether the Due Process Clause of the Fourteenth Amendment makes the Second Amendment right binding on the States. See *Heller,* 554 U.S., at 620, n. 23, 128 S.Ct., at 2813 n. 23. None of those cases "engage[d] in the sort of Fourteenth Amendment inquiry required by our later cases." *Ibid.* As explained more fully below, *Cruikshank, Presser,* and *Miller* all preceded the era in which the Court began the process of "selective incorporation" under the Due Process Clause, and we have never previously addressed the question whether the **\*759** right to keep and bear arms applies to the States under that theory.

Indeed, *Cruikshank* has not prevented us from holding that other rights that were at issue in that case are binding on the States through the Due Process Clause. In *Cruikshank,* the Court held that the general "right of the people peaceably to assemble for lawful purposes," which is protected by the First Amendment, applied only against the Federal Government and not against the States. See 92 U.S., at 551–552. Nonetheless, over 60 years later the Court held that the right of peaceful assembly was a "fundamental righ[t] ...

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4968   Page 13 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

safeguarded by the due process clause of the Fourteenth Amendment." *De Jonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937). We follow the same path here and thus consider whether the right to keep and bear arms applies to the States under the Due Process Clause.

### D

#### 1

In the late 19th century, the Court began to consider whether the Due Process Clause prohibits the States from infringing rights set out in the Bill of Rights. See *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (due process does not require grand jury indictment); *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (due process prohibits States from taking of private property for public use without just compensation). Five features of the approach taken during the ensuing era should be noted.

First, the Court viewed the due process question as entirely separate from the question whether a right was a privilege or immunity of national citizenship. See *Twining v. New Jersey,* 211 U.S. 78, 99, 29 S.Ct. 14, 53 L.Ed. 97 (1908).

Second, the Court explained that the only rights protected against state infringement by the Due Process Clause were those rights "of such a nature that they are included in the conception of due process of law." *Ibid.* See also, **\*760** *e.g., Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942); *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). While it was "possible that some of the personal rights safeguarded by the first eight Amendments against National action [might] also be safeguarded against state action," the Court stated, this was "not because those rights are enumerated in the first eight Amendments." *Twining,* 211 U.S., at 99, 29 S.Ct. 14.

**\*\*3032** The Court used different formulations in describing the boundaries of due process. For example, in *Twining,* the Court referred to "immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." *Id.,* at 102, 29 S.Ct. 14 (internal

quotation marks omitted). In *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), the Court spoke of rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." And in *Palko,* the Court famously said that due process protects those rights that are "the very essence of a scheme of ordered liberty" and essential to "a fair and enlightened system of justice." 302 U.S., at 325, 58 S.Ct. 149.

Third, in some cases decided during this era the Court "can be seen as having asked, when inquiring into whether some particular procedural safeguard was required of a State, if a civilized system could be imagined that would not accord the particular protection." *Duncan v. Louisiana,* 391 U.S. 145, 149, n. 14, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Thus, in holding that due process prohibits a State from taking private property without just compensation, the Court described the right as "a principle of natural equity, recognized by all temperate and civilized governments, from a deep and universal sense of its justice." *Chicago, B. & Q.R. Co., supra,* at 238, 17 S.Ct. 581. Similarly, the Court found that due process did not provide a right against compelled incrimination in part because this right "has no place in the jurisprudence of civilized and free **\*761** countries outside the domain of the common law." *Twining, supra,* at 113, 29 S.Ct. 14.

Fourth, the Court during this era was not hesitant to hold that a right set out in the Bill of Rights failed to meet the test for inclusion within the protection of the Due Process Clause. The Court found that some such rights qualified. See, *e.g., Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (freedom of speech and press); *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (same); *Powell, supra* (assistance of counsel in capital cases); *De Jonge, supra* (freedom of assembly); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (free exercise of religion). But others did not. See, *e.g., Hurtado, supra* (grand jury indictment requirement); *Twining, supra* (privilege against self-incrimination).

Finally, even when a right set out in the Bill of Rights was held to fall within the conception of due process, the protection or remedies afforded against state infringement sometimes differed from the protection or remedies provided against abridgment by the Federal Government. To give one example, in *Betts* the Court held that, although the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney,

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

the Due Process Clause required appointment of counsel in state criminal proceedings only where "want of counsel in [the] particular case ... result[ed] in a conviction lacking in ... fundamental fairness." 316 U.S., at 473, 62 S.Ct. 1252. Similarly, in *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the Court held that the "core of the Fourth Amendment" was implicit in the concept of ordered liberty and thus "enforceable against the States through the Due Process Clause" but that the exclusionary rule, which applied in federal cases, did not apply to the States. *Id.,* at 27–28, 33, 69 S.Ct. 1359.

2

An alternative theory regarding the relationship between the Bill of Rights and **3033 § 1 of the Fourteenth Amendment was *762 championed by Justice Black. This theory held that § 1 of the Fourteenth Amendment totally incorporated all of the provisions of the Bill of Rights. See, *e.g., Adamson, supra,* at 71–72, 67 S.Ct. 1672 (Black, J., dissenting); *Duncan, supra,* at 166, 88 S.Ct. 1444 (Black, J., concurring). As Justice Black noted, the chief congressional proponents of the Fourteenth Amendment espoused the view that the Amendment made the Bill of Rights applicable to the States and, in so doing, overruled this Court's decision in *Barron.*[9] *Adamson, supra*, at 72, 67 S.Ct. 1672 (dissenting opinion).[10] Nonetheless, *763 the Court never has embraced Justice Black's "total incorporation" theory.

[9] Senator Jacob Howard, who spoke on behalf of the Joint Committee on Reconstruction and sponsored the Amendment in the Senate, stated that the Amendment protected all of "the personal rights guarantied and secured by the first eight amendments of the Constitution." Cong. Globe, 39th Cong., 1st Sess., 2765 (1866) (hereinafter 39th Cong. Globe). Representative John Bingham, the principal author of the text of § 1, said that the Amendment would "arm the Congress ... with the power to enforce the bill of rights as it stands in the Constitution today." *Id.*, at 1088; see also *id.,* at 1089–1090; A. Amar, The Bill of Rights: Creation and Reconstruction 183 (1998) (hereinafter Amar, Bill of Rights). After ratification of the Amendment, Bingham maintained the view that the rights guaranteed by § 1 of the Fourteenth Amendment "are chiefly defined in the first eight amendments to the Constitution of the United States." Cong. Globe, 42d Cong., 1st Sess., App. 84 (1871). Finally, Representative Thaddeus Stevens, the political leader of the House and acting

chairman of the Joint Committee on Reconstruction, stated during the debates on the Amendment that "the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States." 39th Cong. Globe 2459; see also M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 112 (1986) (counting at least 30 statements during the debates in Congress interpreting § 1 to incorporate the Bill of Rights); Brief for Constitutional Law Professors as *Amici Curiae* 20 (collecting authorities and stating that "[n]ot a single senator or representative disputed [the incorporationist] understanding" of the Fourteenth Amendment).

[10] The municipal respondents and some of their *amici* dispute the significance of these statements. They contend that the phrase "privileges or immunities" is not naturally read to mean the rights set out in the first eight Amendments, see Brief for Historians et al. as *Amici Curiae* 13–16, and that "there is 'support in the legislative history for no fewer than four interpretations of the ... Privileges or Immunities Clause,' " Brief for Municipal Respondents 69 (quoting Currie, The Reconstruction Congress, 75 U. Chi. L.Rev. 383, 406 (2008); brackets omitted). They question whether there is sound evidence of " 'any strong public awareness of nationalizing the *entire* Bill of Rights.' " Brief for Municipal Respondents 69 (quoting Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L.J. 1509, 1600 (2007)). Scholars have also disputed the total incorporation theory. See, *e.g.,* Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L.Rev. 5 (1949); Berger, Incorporation of the Bill of Rights in the Fourteenth Amendment: A Nine–Lived Cat, 42 Ohio St. L.J. 435 (1981).

Proponents of the view that § 1 of the Fourteenth Amendment makes all of the provisions of the Bill of Rights applicable to the States respond that the terms privileges, immunities, and rights were used interchangeably at the time, see, *e.g.,* Curtis, *supra,* at 64–65, and that the position taken by the leading congressional proponents of the Amendment was widely publicized and understood, see, *e.g.,* Wildenthal, *supra,* at 1564–1565, 1590; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866–1868, 30 Whittier L.Rev. 695 (2009). A number of scholars have found support for the total incorporation of the Bill of Rights. See Curtis, *supra,* at 57–130; Aynes, On Misreading John Bingham and the Fourteenth Amendment, 103 Yale L.J.

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4970 Page 15 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

57, 61 (1993); see also Amar, Bill of Rights 181–230. We take no position with respect to this academic debate.

**\*\*3034** 3

While Justice Black's theory was never adopted, the Court eventually moved in that direction by initiating what has been called a process of "selective incorporation," *i. e.*, the Court began to hold that the Due Process Clause fully incorporates particular rights contained in the first eight Amendments. See, *e.g.*, *Gideon v. Wainwright*, 372 U.S. 335, 341, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Malloy v. Hogan*, 378 U.S. 1, 5–6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Pointer v. Texas*, 380 U.S. 400, 403–404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Washington v. Texas*, 388 U.S. 14, 18, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Duncan*, 391 U.S., at 147–148, 88 S.Ct. 1444; *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

**\*764** The decisions during this time abandoned three of the previously noted characteristics of the earlier period.[11] The Court made it clear that the governing standard is not whether *any* "civilized system [can] be imagined that would not accord the particular protection." *Duncan*, 391 U.S., at 149, n. 14, 88 S.Ct. 1444. Instead, the Court inquired whether a particular Bill of Rights guarantee is fundamental to *our* scheme of ordered liberty and system of justice. *Id.*, at 149, and n. 14, 88 S.Ct. 1444; see also *id.*, at 148, 88 S.Ct. 1444 (referring to those "fundamental principles of liberty and justice which lie at the base of all *our* civil and political institutions" (emphasis added; internal quotation marks omitted)).

11   By contrast, the Court has never retreated from the proposition that the Privileges or Immunities Clause and the Due Process Clause present different questions. And in recent cases addressing unenumerated rights, we have required that a right also be "implicit in the concept of ordered liberty." See, *e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks omitted).

The Court also shed any reluctance to hold that rights guaranteed by the Bill of Rights met the requirements for protection under the Due Process Clause. The Court eventually incorporated almost all of the provisions of the Bill of Rights.[12] **\*\*3035** **\*765** Only a handful of the Bill of Rights protections remain unincorporated.[13]

12

With respect to the First Amendment, see *Everson v. Board of Ed. of Ewing*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (Free Exercise Clause); *De Jonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937) (freedom of assembly); *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (free speech); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (freedom of the press).

With respect to the Fourth Amendment, see *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (warrant requirement); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (exclusionary rule); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (freedom from unreasonable searches and seizures).

With respect to the Fifth Amendment, see *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (Double Jeopardy Clause); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (privilege against self-incrimination); *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (Just Compensation Clause).

With respect to the Sixth Amendment, see *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (trial by jury in criminal cases); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (compulsory process); *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (speedy trial); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (right to confront adverse witness); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (assistance of counsel); *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (right to a public trial).

With respect to the Eighth Amendment, see *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (cruel and unusual punishment); *Schilb v. Kuebel*, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971) (prohibition against excessive bail).

13

In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict, see n. 14, *infra* ), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.

We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause.

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4971   Page 16 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

See *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 276, n. 22, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (declining to decide whether the excessive-fines protection applies to the States); see also *Engblom v. Carey,* 677 F.2d 957, 961 (C.A.2 1982) (holding as a matter of first impression that the "Third Amendment is incorporated into the Fourteenth Amendment for application to the states").

Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation.

Finally, the Court abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court." *Malloy,* 378 U.S., at 10–11, 84 S.Ct. 1489 (internal quotation marks omitted). Instead, the Court decisively held that incorporated Bill of Rights protections "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.,* at 10, 84 S.Ct. 1489; see also *Mapp v. Ohio,* 367 U.S. 643, 655–656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Ker v. California,* 374 U.S. 23, 33–34, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); **\*766** *Aguilar v. Texas,* 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Pointer, supra,* at 406, 85 S.Ct. 1065; *Duncan, supra,* at 149, 157–158, 88 S.Ct. 1444; *Benton, supra,* at 794–795, 89 S.Ct. 2056; *Wallace v. Jaffree,* 472 U.S. 38, 48–49, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). [14]

14    There is one exception to this general rule. The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials. See *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); see also *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (holding that the Due Process Clause does not require unanimous jury verdicts in state criminal trials). But that ruling was the result of an unusual division among the Justices, not an endorsement of the two-track approach to incorporation. In *Apodaca,* eight Justices agreed that the Sixth Amendment applies identically to both the Federal Government and the States. See *Johnson,supra,* at 395, 92 S.Ct. 1620 (Brennan, J., dissenting). Nonetheless, among those eight, four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, *Apodaca,*

406 U.S., at 406, 92 S.Ct. 1628 (plurality opinion), and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials, *id.,* at 414–415, 92 S.Ct. 1628 (Stewart, J., dissenting); *Johnson, supra,* at 381–382, 92 S.Ct. 1620 (Douglas, J., dissenting). Justice Powell's concurrence in the judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, cases. *Apodaca,* therefore, does not undermine the well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government. See *Johnson, supra,* at 395–396, 92 S.Ct. 1620 (Brennan, J., dissenting) ("In any event, the affirmance must not obscure that the majority of the Court remains of the view that, as in the case of every specific of the Bill of Rights that extends to the States, the Sixth Amendment's jury trial guarantee, however it is to be construed, has identical application against both State and Federal Governments" (footnote omitted)).

**\*\*3036** Employing this approach, the Court overruled earlier decisions in which it had held that particular Bill of Rights guarantees or remedies did not apply to the States. See, *e.g., Mapp, supra* (overruling in part *Wolf,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782); *Gideon,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (overruling *Betts,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595); *Malloy, supra* (overruling *Adamson,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, and *Twining,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97); *Benton,* 395 U.S., at 794, 89 S.Ct. 2056 (overruling *Palko,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288).

### \*767  III

With this framework in mind, we now turn directly to the question whether the Second Amendment right to keep and bear arms is incorporated in the concept of due process. In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, *Duncan,* 391 U.S., at 149, 88 S.Ct. 1444, or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997) (internal quotation marks omitted).

### A

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4972 Page 17 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Our decision in *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, [15] and in *Heller,* we held that individual self-defense is "the *central component* " of the Second Amendment right. 554 U.S., at 599, 128 S.Ct., at 2801–2802; see also *id.,* at 628, 128 S.Ct., at 2817 (stating that the "inherent right of self-defense has been central to the Second Amendment right"). Explaining that "the need for defense of self, family, and property is most acute" in the home, *ibid.,* we found that this right applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *id.,* at 628 – 629, 128 S.Ct., at 2818 (some internal quotation marks omitted); see also *id.,* at 628, 128 S.Ct., at 2817 (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense); *id.,* at 629, 128 S.Ct., at 2818 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon"). Thus, we concluded, ***769** citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *Id.,* at 630, 128 S.Ct., at 2818.

[15] Citing Jewish, Greek, and Roman law, Blackstone wrote that if a person killed an attacker, "the slayer is in no kind of fault whatsoever, not even in the minutest degree; and is therefore to be totally acquitted and discharged, with commendation rather than blame." 4 W. Blackstone, Commentaries on the Laws of England 182 (1769).

*Heller* makes it clear that this right is "deeply rooted in this Nation's history and tradition." *Glucksberg, supra,* at 721, 117 S.Ct. 2302 (internal quotation marks omitted). *Heller* explored the right's origins, noting that the 1689 English Bill of Rights explicitly protected a right to keep arms for self-defense, 554 U.S. at 592 – 593, 128 S.Ct., at 2797–2798, and that by 1765, Blackstone was able to assert that the right to keep and bear arms was "one of the fundamental rights of Englishmen," *id.,* at 594, 128 S.Ct., at 2798.

***3037** Blackstone's assessment was shared by the American colonists. As we noted in *Heller,* King George III's attempt to disarm the colonists in the 1760's and 1770's "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." [16] *Ibid.*; see also L. Levy, Origins of the Bill of Rights 137–143 (1999) (hereinafter Levy).

[16] For example, an article in the Boston Evening Post stated: "For it is certainly beyond human art and

sophistry, to prove the British subjects, to whom the priviledge of possessing arms is expressly recognized by the Bill of Rights, and, who live in a province where the law requires them to be equip'd with arms, & c. are guilty of an illegal act, in calling upon one another to be provided with them, as the law directs." Boston Evening Post, Feb. 6, 1769, in Boston Under Military Rule 1768–1769, p. 61 (1936) (emphasis deleted).

The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights. "During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric." *Heller, supra,* at 598, 128 S.Ct., at 2801 (citing Letters from The Federal Farmer III (Oct. 10, 1787), in 2 The Complete Anti–Federalist 234, 242 (H. Storing ed.1981)); see also Federal Farmer: An Additional Number of Letters to the Republican, Letter XVIII (Jan. 25, 1788), in 17 Documentary History of the Ratification of the Constitution 360, 362–363 (J. Kaminski & G. Saladino eds.1995); S. Halbrook, The Founders' Second Amendment 171–278 ***769** 2008). Federalists responded, not by arguing that the right was insufficiently important to warrant protection but by contending that the right was adequately protected by the Constitution's assignment of only limited powers to the Federal Government. *Heller, supra,* at 599, 128 S.Ct., at 2801–2802; cf. The Federalist No. 46, p. 296 (C. Rossiter ed. 1961) (J. Madison). Thus, Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government. See Levy 143–149; J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo–American Right 155–164 (1994). But those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution. See 1 Debates in the Several State Conventions on the Adoption of the Federal Constitution 327–331 (J. Elliot 2d ed. 1854); 3 *id.,* at 657–661; 4 *id.,* at 242–246, 248–249; see also Levy 26–34; 1 A. Kelly, W. Harbison, & H. Belz, The American Constitution: Its Origins and Development 110, 118 (7th ed.1991). This is surely powerful evidence that the right was regarded as fundamental in the sense relevant here.

This understanding persisted in the years immediately following the ratification of the Bill of Rights. In addition to the four States that had adopted Second Amendment analogues before ratification, nine more States adopted state constitutional provisions protecting an individual right to

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4973 Page 18 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

keep and bear arms between 1789 and 1820. *Heller, supra,* at 600 – 603, 128 S.Ct., at 2802–2804. Founding-era legal commentators confirmed the importance of the right to early Americans. St. George Tucker, for example, described the right to keep and bear arms as "the true palladium of liberty" and explained that prohibitions on the right would place liberty "on the brink of destruction." 1 Blackstone's Commentaries, Editor's App. 300 (S. Tucker ed. 1803); see also W. Rawle, A View of the Constitution of the United States of America 125–126 (2d ed. 1829); 3 J. Story, **\*3038** Commentaries on the **\*770** Constitution of the United States § 1890, p. 746 (1833) ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them").

B

1

By the 1850's, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights —the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense. See M. Doubler, Civilian in Peace, Soldier in War 87–90 (2003); Amar, Bill of Rights 258– 259. Abolitionist authors wrote in support of the right. See L. Spooner, The Unconstitutionality of Slavery 66 (1860); J. Tiffany, A Treatise on the Unconstitutionality of American Slavery 117–118 (1849). And when attempts were made to disarm "Free–Soilers" in "Bloody Kansas," Senator Charles Sumner, who later played a leading role in the adoption of the Fourteenth Amendment, proclaimed that "[n]ever was [the rifle] more needed in just self-defense than now in Kansas." The Crime Against Kansas: The Apologies for the Crime: The True Remedy, Speech of Hon. Charles Sumner in the Senate of the United States 64–65 (1856). Indeed, the 1856 Republican Party Platform protested that in Kansas the constitutional rights of the people had been "fraudulently and violently taken from them" and the "right of the people to keep and bear arms" had been "infringed." National Party Platforms 1840–1972, p. 27 (D. Johnson & K. Porter, comp., 5th ed.1973). [17]

17

Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right. The 1864 Democratic Party Platform complained that the confiscation of firearms by Union troops occupying parts of the South constituted "the interference with and denial of the right of the people to bear arms in their defense." National Party Platforms 1840–1972, at 34.

**\*771** After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks. See *Heller,* 554 U.S., at 614, 128 S.Ct., at 2810; E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, p. 8 (1988) (hereinafter Foner). The laws of some States formally prohibited African-Americans from possessing firearms. For example, a Mississippi law provided that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife." Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, in 1 Documentary History of Reconstruction 289 (W. Fleming ed.1950); see also Regulations for Freedmen in Louisiana, in *id.,* at 279–280; H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866) (describing a Kentucky law); E. McPherson, The Political History of the United States of America During the Period of Reconstruction 40 (1871) (describing a Florida law); *id.,* at 33 (describing an Alabama law). [18]

18

In South Carolina, prominent black citizens held a convention to address the State's Black Code. They drafted a memorial to Congress, in which they included a plea for protection of their constitutional right to keep and bear arms: " 'We ask that, inasmuch as the Constitution of the United States explicitly declares that the right to keep and bear arms shall not be infringed ... that the late efforts of the Legislature of this State to pass an act to deprive us [of] arms be forbidden, as a plain violation of the Constitution.' " S. Halbrook, Freedmen, The Fourteenth Amendment, and The Right to Bear Arms, 1866–1876, p. 9 (1998) (hereinafter Halbrook, Freedmen) (quoting 2 Proceedings of the Black State Conventions, 1840–1865, p. 302 (P. Foner & G. Walker eds.1980)). Senator Charles Sumner relayed the memorial to the Senate and described the memorial as a request that black citizens "have the constitutional protection in keeping arms." 39th Cong. Globe 337.

**\*3039** **\*772** Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4974 Page 19 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

militias, forcibly took firearms from newly freed slaves. In the first session of the 39th Congress, Senator Henry Wilson told his colleagues: "In Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country." 39th Cong. Globe 40 (1865). The Report of the Joint Committee on Reconstruction— which was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents shortly after Congress approved the Fourteenth Amendment [19]— contained numerous examples of such abuses. See, *e.g.,* H.R.Rep. No. 30, 39th Cong., 1st Sess., pt. 2, pp. 219, 229, 272, pt. 3, pp. 46, 140, pt. 4, pp. 49–50 (1866); see also S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 23–24, 26, 36 (1865). In one town, the "marshal [took] all arms from returned colored soldiers, and [was] very prompt in shooting the blacks whenever an opportunity occur[red]." H.R. Exec. Doc. No. 70, at 238 (internal quotation marks omitted). As Senator Wilson put it during the debate on a failed proposal to disband Southern militias: "There is one unbroken chain of testimony from all people that are loyal to this country, that the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description." 39th Cong. Globe 915 (1866). [20]

[19]    See B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 265–266 (1914); *Adamson v. California,* 332 U.S. 46, 108–109, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (appendix to dissenting opinion of Black, J.).

[20]    Disarmament by bands of former Confederate soldiers eventually gave way to attacks by the Ku Klux Klan. In debates over the later enacted Enforcement Act of 1870, Senator John Pool observed that the Klan would "order the colored men to give up their arms; saying that everybody would be Kukluxed in whose house fire-arms were found." Cong. Globe, 41st Cong., 2d Sess., 2719 (1870); see also H.R. Exec. Doc. No. 268, 42d Cong., 2d Sess., 2 (1872).

**\*773** Union Army commanders took steps to secure the right of all citizens to keep and bear arms, [21] but the 39th Congress **\*\*3040** concluded that legislative action was necessary. Its efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental.

[21]
For example, the occupying Union commander in South Carolina issued an order stating that "[t]he constitutional rights of all loyal and well disposed inhabitants to bear arms, will not be infringed." General Order No. 1, Department of South Carolina, January 1, 1866, in 1 Documentary History of Reconstruction 208 (W. Fleming ed.1950). Union officials in Georgia issued a similar order, declaring that " '[a]ll men, without the distinction of color, have the right to keep arms to defend their homes, families or themselves.' " Cramer, Johnson, & Morsary, "This Right is Not Allowed by Governments That Are Afraid of The People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified, 17 Geo. Mason L.Rev. 823, 854 (2010) (hereinafter Cramer) (quoting Right to Bear Arms, Phila., Pa., Christian Recorder, Feb. 24, 1866, pp. 1–2). In addition, when made aware of attempts by armed parties to disarm blacks, the head of the Freedmen's Bureau in Alabama "made public [his] determination to maintain the right of the negro to keep and to bear arms, and [his] disposition to send an armed force into any neighborhood in which that right should be systematically interfered with." Joint Committee on Reconstruction, H.R.Rep. No. 30, 39th Cong., 1st Sess., pt. 3, p. 140 (1866).

The most explicit evidence of Congress' aim appears in § 14 of the Freedmen's Bureau Act of 1866, which provided that "the right ... to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms,* shall be secured to and enjoyed by all the citizens ... without respect to race or color, or previous condition of slavery." 14 Stat. 176–177 (emphasis added). [22] Section 14 thus explicitly guaranteed that "all the citizens," black and white, would have "the constitutional right to bear arms."

[22]
The Freedmen's Bureau bill was amended to include an express reference to the right to keep and bear arms, see 39th Cong. Globe 654 (Rep. Thomas Eliot), even though at least some Members believed that the unamended version alone would have protected the right, see *id.,* at 743 (Sen. Lyman Trumbull).

**\*774** The Civil Rights Act of 1866, 14 Stat. 27, which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms. [23] Section 1 of the Civil Rights Act guaranteed the "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." *Ibid.* This language was virtually

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

identical to language in § 14 of the Freedmen's Bureau Act, 14 Stat. 176 ("the right ... to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal"). And as noted, the latter provision went on to explain that one of the "laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal" was "the constitutional right to bear arms." *Ibid.* Representative Bingham believed that the Civil Rights Act protected the same rights as enumerated in the Freedmen's Bureau bill, which of course explicitly mentioned the right to keep **\*775** and bear arms. 39th Cong. Globe 1292. The unavoidable conclusion is that the Civil Rights Act, like the Freedmen's Bureau Act, aimed to protect "the constitutional **\*\*3041** right to bear arms" and not simply to prohibit discrimination. See also Amar, Bill of Rights 264–265 (noting that one of the "core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances" of freedmen who had been stripped of their arms and to "affirm the full and equal right of every citizen to self-defense").

23    There can be no doubt that the principal proponents of the Civil Rights Act of 1866 meant to end the disarmament of African-Americans in the South. In introducing the bill, Senator Trumbull described its purpose as securing to blacks the "privileges which are essential to freemen." *Id.,* at 474. He then pointed to the previously described Mississippi law that "prohibit[ed] any negro or mulatto from having fire-arms" and explained that the bill would "destroy" such laws. *Ibid.* Similarly, Representative Sidney Clarke cited disarmament of freedmen in Alabama and Mississippi as a reason to support the Civil Rights Act and to continue to deny Alabama and Mississippi representation in Congress: "I regret, sir, that justice compels me to say, to the disgrace of the Federal Government, that the 'reconstructed' State authorities of Mississippi were allowed to rob and disarm our veteran soldiers and arm the rebels fresh from the field of treasonable strife. Sir, the disarmed loyalists of Alabama, Mississippi, and Louisiana are powerless to-day, and oppressed by the pardoned and encouraged rebels of those States. They appeal to the American Congress for protection. In response to this appeal I shall vote for every just measure of protection, for I do not intend to be among the treacherous violators of the solemn pledge of the nation." *Id.,* at 1838–1839.

Congress, however, ultimately deemed these legislative remedies insufficient. Southern resistance, Presidential

vetoes, and this Court's pre-Civil-War precedent persuaded Congress that a constitutional amendment was necessary to provide full protection for the rights of blacks.[24] Today, it is generally accepted that the Fourteenth Amendment was understood to provide a constitutional basis for protecting the rights set out in the Civil Rights Act of 1866. See *General Building Contractors Assn., Inc. v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); see also Amar, Bill of Rights 187; Calabresi & Fine, Two Cheers for Professor Balkin's Originalism, 103 Nw. U.L.Rev. 663, 669–670 (2009).

24    For example, at least one Southern court had held the Civil Rights Act to be unconstitutional. That court did so, moreover, in the course of upholding the conviction of an African-American man for violating Mississippi's law against firearm possession by freedmen. See Decision of Chief Justice Handy, Declaring the Civil Rights Bill Unconstitutional, N.Y. Times, Oct. 26, 1866, p. 2, col. 3.

In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection. Senator Samuel Pomeroy described three "indispensable" "safeguards of liberty under our form of Government." 39th Cong. Globe 1182. One of these, he said, was the right to keep and bear arms:

"Every man ... should have the right to bear arms for the defense of himself and family and his homestead. And if the cabin door of the freedman is broken open **\*776** and the intruder enters for purposes as vile as were known to slavery, then should a well-loaded musket be in the hand of the occupant to send the polluted wretch to another world, where his wretchedness will forever remain complete." *Ibid.*

Even those who thought the Fourteenth Amendment unnecessary believed that blacks, as citizens, "have equal right to protection, and to keep and bear arms for self-defense." *Id.,* at 1073 (Sen. James Nye); see also Foner 258–259.[25]

25    Other Members of the 39th Congress stressed the importance of the right to keep and bear arms in discussing other measures. In speaking generally on Reconstruction, Representative Roswell Hart listed the " 'right of the people to keep and bear arms' " as among those rights necessary to a "republican form of government." 39th Cong. Globe 1629. Similarly, in objecting to a bill designed to disarm Southern militias,

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4976   Page 21 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Senator Willard Saulsbury argued that such a measure would violate the Second Amendment. *Id.*, at 914–915. Indeed, the bill "ultimately passed in a form that disbanded militias but maintained the right of individuals to their private firearms." Cramer 858.

Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental. In an 1868 speech addressing the disarmament of freedmen, Representative Stevens emphasized the necessity of the right: "Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty." "The fourteenth amendment, now so happily adopted, settles the whole question." Cong. Globe, 40th Cong., 2d Sess., 1967. And in debating the Civil Rights Act of 1871, Congress routinely **\*\*3042** referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South. See Halbrook, Freedmen 120–131. Finally, legal commentators from the period emphasized the fundamental nature of the right. See, *e.g.,* T. Farrar, Manual of the Constitution of the United States of America § 118, p. 145 (1867); **\*777** J. Pomeroy, An Introduction to the Constitutional Law of the United States § 239, pp. 152–153 (3d ed. 1875).

The right to keep and bear arms was also widely protected by state constitutions at the time when the Fourteenth Amendment was ratified. In 1868, 22 of the 37 States in the Union had state constitutional provisions explicitly protecting the right to keep and bear arms. See Calabresi & Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition? 87 Texas L.Rev. 7, 50 (2008).[26] Quite a few of these state constitutional guarantees, moreover, explicitly protected the right to keep and bear arms as an individual right to self-defense. See Ala. Const., Art. I, § 28 (1868); Conn. Const., Art. I, § 17 (1818); Ky. Const., Art. XIII, § 25 (1850); Mich. Const., Art. XVIII, § 7 (1850); Miss. Const., Art. I, § 15 (1868); Mo. Const., Art. I, § 8 (1865); Tex. Const., Art. I, § 13 (1869); see also Mont. Const., Art. III, § 13 (1889); Wash. Const., Art. I, § 24 (1889); Wyo. Const., Art. I, § 24 (1889); see also *State v. McAdams,* 714 P.2d 1236, 1238 (Wyo.1986). What is more, state constitutions adopted during the Reconstruction era by former Confederate States included a right to keep and bear arms. See, *e.g.,* Ark. Const., Art. I, § 5 (1868); Miss. Const., Art. I, § 15 (1868); Tex. Const., Art. I, § 13 (1869). A clear majority of the States in 1868,

therefore, recognized the right to keep and bear arms as being among the foundational rights necessary to our system of Government.[27]

26    More generally worded provisions in the constitutions of seven other States may also have encompassed a right to bear arms. See Calabresi & Agudo, 87 Texas L.Rev., at 52.

27    These state constitutional protections often reflected a lack of law enforcement in many sections of the country. In the frontier towns that did not have an effective police force, law enforcement often could not pursue criminals beyond the town borders. See Brief for Rocky Mountain Gun Owners et al. as *Amici Curiae* 15. Settlers in the West and elsewhere, therefore, were left to "repe[l] force by force when the intervention of society ... [was] too late to prevent an injury." *District of Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 2799, 171 L.Ed.2d 637 (2008) (internal quotation marks omitted). The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded these state constitutional guarantees. See *id.*, at 599, 609, 615, 128 S.Ct., at 2801–2802, 2807, 2810.

**\*778** In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.

2

Despite all this evidence, municipal respondents contend that Congress, in the years immediately following the Civil War, merely sought to outlaw "discriminatory measures taken against freedmen, which it addressed by adopting a non-discrimination principle" and that even an outright ban on the possession of firearms was regarded as acceptable, "so long as it was not done in a discriminatory manner." Brief for Municipal Respondents 7. They argue that Members of Congress overwhelmingly viewed § 1 of the Fourteenth Amendment "as an antidiscrimination rule," and they cite statements to the effect **\*\*3043** that the section would outlaw discriminatory measures. *Id.*, at 64. This argument is implausible.

First, while § 1 of the Fourteenth Amendment contains "an antidiscrimination rule," namely, the Equal Protection Clause, municipal respondents can hardly mean that § 1 does no more than prohibit discrimination. If that were so, then the

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4977 Page 22 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

First Amendment, as applied to the States, would not prohibit nondiscriminatory abridgments of the rights to freedom of speech or freedom of religion; the Fourth Amendment, as applied to the States, would only prohibit all unreasonable searches and seizures but only discriminatory searches and seizures—and so on. We assume that this is not municipal respondents' view, so what they must mean is that the Second Amendment should be singled out for **\*779** special—and specially unfavorable—treatment. We reject that suggestion.

Second, municipal respondents' argument ignores the clear terms of the Freedmen's Bureau Act of 1866, which acknowledged the existence of the right to bear arms. If that law had used language such as "the equal benefit of laws concerning the bearing of arms," it would be possible to interpret it as simply a prohibition of racial discrimination. But § 14 speaks of and protects "the constitutional right to bear arms," an unmistakable reference to the right protected by the Second Amendment. And it protects the "full and equal benefit" of this right in the States. 14 Stat. 176–177. It would have been nonsensical for Congress to guarantee the full and equal benefit of a constitutional right that does not exist.

Third, if the 39th Congress had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African-Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers. In the years immediately following the Civil War, a law banning the possession of guns by all private citizens would have been nondiscriminatory only in the formal sense. Any such law—like the Chicago and Oak Park ordinances challenged here—presumably would have permitted the possession of guns by those acting under the authority of the State and would thus have left firearms in the hands of the militia and local peace officers. And as the Report of the Joint Committee on Reconstruction revealed, see *supra,* at 3039, those groups were widely involved in harassing blacks in the South.

Fourth, municipal respondents' purely antidiscrimination theory of the Fourteenth Amendment disregards the plight of whites in the South who opposed the Black Codes. If the 39th Congress and the ratifying public had simply prohibited racial discrimination with respect to the bearing of arms, opponents of the Black Codes would have been left without **\*780** the means of self-defense—as had abolitionists in Kansas in the 1850's.

Fifth, the 39th Congress' response to proposals to disband and disarm the Southern militias is instructive. Despite recognizing and deploring the abuses of these militias, the 39th Congress balked at a proposal to disarm them. See 39th Cong. Globe 914; Halbrook, Freedmen, 20–21. Disarmament, it was argued, would violate the members' right to bear arms, and it was ultimately decided to disband the militias but not to disarm their members. See Act of Mar. 2, 1867, § 6, 14 Stat. 487; Halbrook, Freedmen 68–69; Cramer 858–861. It cannot be doubted that the right to bear arms was regarded as a substantive guarantee, not a prohibition **\*\*3044** that could be ignored so long as the States legislated in an evenhanded manner.

IV

Municipal respondents' remaining arguments are at war with our central holding in *Heller* : that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. Municipal respondents, in effect, ask us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause.

Municipal respondents' main argument is nothing less than a plea to disregard 50 years of incorporation precedent and return (presumably for this case only) to a bygone era. Municipal respondents submit that the Due Process Clause protects only those rights " ' recognized by all temperate and civilized governments, from a deep and universal sense of [their] justice.' " Brief for Municipal Respondents 9 (quoting *Chicago, B. & Q.R. Co.,* 166 U.S., at 238, 17 S.Ct. 581). According to municipal respondents, if it is possible to imagine *any* civilized legal system that does not recognize a particular right, then the Due Process Clause does not make that right binding **\*781** on the States. Brief for Municipal Respondents 9. Therefore, the municipal respondents continue, because such countries as England, Canada, Australia, Japan, Denmark, Finland, Luxembourg, and New Zealand either ban or severely limit handgun ownership, it must follow that no right to possess such weapons is protected by the Fourteenth Amendment. *Id.*, at 21–23.

This line of argument is, of course, inconsistent with the long-established standard we apply in incorporation cases. See

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.4978   Page 23 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

*Duncan,* 391 U.S., at 149, and n. 14, 88 S.Ct. 1444. And the present-day implications of municipal respondents' argument are stunning. For example, many of the rights that our Bill of Rights provides for persons accused of criminal offenses are virtually unique to this country. [28] If *our* understanding of the right to a jury trial, the right against self-incrimination, **\*782** and the right to counsel were necessary attributes of *any* civilized country, it would follow that the United States is the only civilized Nation in the world.

[28]    For example, the United States affords criminal jury trials far more broadly than other countries. See, *e.g.,* Van Kessel, Adversary Excesses in the American Criminal Trial, 67 Notre Dame L.Rev. 403 (1992); Leib, A Comparison of Criminal Jury Decision Rules in Democratic Countries, 5 Ohio St. J.Crim. L. 629, 630 (2008); Henderson, The Wrongs of Victim's Rights, 37 Stan. L.Rev. 937, 1003, n. 296 (1985); see also *Roper v. Simmons,* 543 U.S. 551, 624, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (SCALIA, J., dissenting) ("In many significant respects the laws of most other countries differ from our law—including ... such explicit provisions of our Constitution as the right to jury trial"). Similarly, our rules governing pretrial interrogation differ from those in countries sharing a similar legal heritage. See Dept. of Justice, Office of Legal Policy, Report to the Attorney General on the Law of Pretrial Interrogation: Truth in Criminal Justice Report No. 1 (Feb. 12, 1986), reprinted in 22 U. Mich. J.L. Ref. 437, 534–542 (1989) (comparing the system envisioned by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), with rights afforded by England, Scotland, Canada, India, France, and Germany). And the "Court-pronounced exclusionary rule ... is distinctively American." *Roper, supra,* at 624, 125 S.Ct. 1183 (SCALIA, J., dissenting) (citing *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 415, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting) (noting that exclusionary rule was "unique to American jurisprudence" (internal quotation marks omitted))); see also Sklansky, Anti–Inquisitorialism, 122 Harv. L.Rev. 1634, 1648–1656, 1689–1693 (2009) (discussing the differences between American and European confrontation rules).

**\*\*3045** Municipal respondents attempt to salvage their position by suggesting that their argument applies only to substantive as opposed to procedural rights. Brief for Municipal Respondents 10, n. 3. But even in this trimmed form, municipal respondents' argument flies in the face of more than a half century of precedent. For example, in *Everson v. Board of Ed. of Ewing,* 330 U.S. 1, 8, 67 S.Ct.

504, 91 L.Ed. 711 (1947), the Court held that the Fourteenth Amendment incorporates the Establishment Clause of the First Amendment. Yet several of the countries that municipal respondents recognize as civilized have established state churches. [29] If we were to adopt municipal respondents' theory, all of this Court's Establishment Clause precedents involving actions taken by state and local governments would go by the boards.

[29]    England and Denmark have state churches. See Torke, The English Religious Establishment, 12 J. Law & Religion 399, 417–427 (1995–1996) (describing legal status of Church of England); Constitutional Act of Denmark, pt. I, § 4 (1953) ("The Evangelical Lutheran Church shall be the Established Church of Denmark"). The Evangelical Lutheran Church of Finland has attributes of a state church. See Christensen, Is the Lutheran Church Still the State Church? An Analysis of Church–State Relations in Finland, 1995 B.Y.U.L.Rev. 585, 596–600 (describing status of church under Finnish law). The Web site of the Evangelical Lutheran Church of Finland states that the church may be usefully described as both a "state church" and a "folk church." See J. Seppo, The Current Condition of Church–State Relations in Finland (2004), online at http://evl.fi/EVLen.nsf/Documents/838DDBEF4A28712AC225730F001F7C67?OpenDocument&lang=EN (all Internet materials as visited June 23, 2010, and available in Clerk of Court's case file).

Municipal respondents maintain that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety. Brief for Municipal Respondents 11. And they note that there is intense disagreement on the question whether the private **\*783** possession of guns in the home increases or decreases gun deaths and injuries. *Id.,* at 11, 13–17.

The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. See, *e.g., Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States v. Leon,* 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (reflecting on the serious consequences of dismissal

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona,* 384 U.S. 436, 517, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting); *id.,* at 542, 86 S.Ct. 1602 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases ... will return a killer, a rapist or other criminal to the streets ... to repeat his crime"); *Mapp,* 367 U.S., at 659, 81 S.Ct. 1684. Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications.

We likewise reject municipal respondents' argument that we should depart from our established incorporation methodology on the ground that making the **\*\*3046** Second Amendment binding on the States and their subdivisions is inconsistent with principles of federalism and will stifle experimentation. Municipal respondents point out—quite correctly—that conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control. Municipal respondents therefore urge us to allow state and local governments to enact any gun control law that they deem to be reasonable, including a complete ban on the possession of handguns in the home for self-defense. Brief for Municipal Respondents 18–20, 23.

 **\*784** There is nothing new in the argument that, in order to respect federalism and allow useful state experimentation, a federal constitutional right should not be fully binding on the States. This argument was made repeatedly and eloquently by Members of this Court who rejected the concept of incorporation and urged retention of the two-track approach to incorporation. Throughout the era of "selective incorporation," Justice Harlan in particular, invoking the values of federalism and state experimentation, fought a determined rearguard action to preserve the two-track approach. See, *e.g., Roth v. United States,* 354 U.S. 476, 500–503, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., concurring in result in part and dissenting in part); *Mapp, supra,* at 678–680, 81 S.Ct. 1684 (Harlan, J., dissenting); *Gideon,* 372 U.S., at 352, 83 S.Ct. 792 (Harlan, J., concurring); *Malloy,* 378 U.S., at 14–33, 84 S.Ct. 1489 (Harlan, J., dissenting); *Pointer,* 380 U.S., at 408–409, 85 S.Ct. 1065 (Harlan, J., concurring in result); *Washington,* 388 U.S., at 23–24, 87 S.Ct. 1920 (Harlan, J., concurring in result); *Duncan,* 391 U.S., at 171–193, 88 S.Ct. 1444 (Harlan, J., dissenting); *Benton,* 395 U.S., at 808–809, 89 S.Ct. 2056 (Harlan, J., dissenting); *Williams v. Florida,* 399 U.S. 78, 117,

90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (Harlan, J., dissenting in part and concurring in result in part).

Time and again, however, those pleas failed. Unless we turn back the clock or adopt a special incorporation test applicable only to the Second Amendment, municipal respondents' argument must be rejected. Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless *stare decisis* counsels otherwise,[30] **\*785** that guarantee is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values. As noted by the 38 States that have appeared in this case as *amici* supporting petitioners, "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." Brief for State of Texas et al. 23.

[30]   As noted above, see n. 13, *supra,* cases that predate the era of selective incorporation held that the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement do not apply to the States. See *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (indictment); *Minneapolis & St. Louis R. Co. v. Bombolis,* 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916) (civil jury).

As a result of *Hurtado,* most States do not require a grand jury indictment in all felony cases, and many have no grand juries. See Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, D. Rottman & S. Strickland, State Court Organization 2004, pp. 213, 215–217 (2006) (Table 38), online at http://bjs.ojp.usdoj.gov/content/pub/pdf/sco04.pdf.

As a result of *Bombolis,* cases that would otherwise fall within the Seventh Amendment are now tried without a jury in state small claims courts. See, *e.g., Cheung v. Eighth Judicial Dist. Court,* 121 Nev. 867, 124 P.3d 550 (2005) (no right to jury trial in small claims court under Nevada Constitution).

**\*\*3047** Municipal respondents and their *amici* complain that incorporation of the Second Amendment right will lead to extensive and costly litigation, but this argument applies with even greater force to constitutional rights and remedies that have already been held to be binding on the States. Consider the exclusionary rule. Although the exclusionary rule "is not an individual right," *Herring v. United States,* 555 U.S. 135, 141, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009), but a "judicially created rule," *id.,* at 139, 128 S.Ct., at 2789, this Court made the rule applicable to the States. See *Mapp, supra,* at 660, 81 S.Ct. 1684. The exclusionary rule is said to result

in "tens of thousands of contested suppression motions each year." Stuntz, The Virtues and Vices of the Exclusionary Rule, 20 Harv. J. L. & Pub. Pol'y 443, 444 (1997).

Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to "interest-balancing" and have sustained a variety of restrictions. Brief for Municipal Respondents 23–31. In *Heller,* however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, 554 U.S., at 633 – 635, 128 S.Ct., at 2820–2821, and this Court decades ago **\*786** abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," *Malloy, supra,* at 10–11, 84 S.Ct. 1489 (internal quotation marks omitted).

As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting *amici* cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in *Heller*. Municipal respondents cite precisely one case (from the late 20th century) in which such a ban was sustained. See Brief for Municipal Respondents 26–27 (citing *Kalodimos v. Morton Grove,* 103 Ill.2d 483, 83 Ill.Dec. 308, 470 N.E.2d 266 (1984)); see also Reply Brief for Respondent NRA et al. 23, n. 7 (asserting that no other court has ever upheld a complete ban on the possession of handguns). It is important to keep in mind that *Heller,* while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S., at 626, 128 S.Ct., at 2816. We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.,* at 626 – 627, 128 S.Ct., at 2816–2817. We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

Municipal respondents argue, finally, that the right to keep and bear arms is unique among the rights set out in the first eight Amendments "because the reason for codifying the Second Amendment (to protect the militia) differs from the **\*787** purpose (primarily, to use firearms to engage in self-defense) that is claimed to make the right implicit in the concept of ordered liberty." Brief for Municipal Respondents 36–37. Municipal respondents suggest that the Second Amendment right differs **\*\*3048** from the rights heretofore incorporated because the latter were "valued for [their] own sake." *Id.,* at 33. But we have never previously suggested that incorporation of a right turns on whether it has intrinsic as opposed to instrumental value, and quite a few of the rights previously held to be incorporated—for example the right to counsel and the right to confront and subpoena witnesses—are clearly instrumental by any measure. Moreover, this contention repackages one of the chief arguments that we rejected in *Heller, i.e.,* that the scope of the Second Amendment right is defined by the immediate threat that led to the inclusion of that right in the Bill of Rights. In *Heller,* we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. 554 U.S., at 598 – 599, 128 S.Ct., at 2801–2802. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was "the *central component* of the right itself." *Id.,* at 599.

V

A

We turn, finally, to the two dissenting opinions. Justice STEVENS' eloquent opinion covers ground already addressed, and therefore little need be added in response. Justice STEVENS would " 'ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments.' " *Post,* at 3092 (quoting *Malloy,* 378 U.S., at 24, 84 S.Ct. 1489 (Harlan, J., dissenting)). The question presented in this case, in his view, "is whether the particular **\*788** right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom." *Post,* at 3103. He would hold that "[t]he rights protected against state infringement by the Fourteenth Amendment's Due Process Clause need not be identical in shape or scope to the rights protected against

Case 2:19-cv-00037-JNP  Document 59-32  Filed 11/30/22  PageID.4981  Page 26 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Federal Government infringement by the various provisions of the Bill of Rights." *Post,* at 3093.

As we have explained, the Court, for the past half century, has moved away from the two-track approach. If we were now to accept Justice STEVENS' theory across the board, decades of decisions would be undermined. We assume that this is not what is proposed. What is urged instead, it appears, is that this theory be revived solely for the individual right that *Heller* recognized, over vigorous dissents.

The relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle. It is far too late to exhume what Justice Brennan, writing for the Court 46 years ago, derided as "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *Malloy, supra,* at 10–11, 84 S.Ct. 1489 (internal quotation marks omitted).

### B

Justice BREYER's dissent makes several points to which we briefly respond. To begin, while there is certainly room for disagreement about *Heller* 's analysis of the history of the right to keep and bear arms, nothing written since *Heller* persuades us to reopen the question there decided. Few other questions of original meaning have been as thoroughly explored.

Justice BREYER's conclusion that the Fourteenth Amendment does not incorporate **\*\*3049** the right to keep and bear arms appears to rest primarily on four factors: First, "there is no popular consensus" that the right is fundamental, *post,* at **\*789** 3124; second, the right does not protect minorities or persons neglected by those holding political power, *post,* at 3125; third, incorporation of the Second Amendment right would "amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the States and the Federal Government" and preventing local variations, *ibid.*; and fourth, determining the scope of the Second Amendment right in cases involving state and local laws will force judges to answer difficult empirical questions regarding matters that are outside their area of expertise, *post,* at 3126 – 3128. Even if we believed that these factors were relevant to the incorporation inquiry, none of these factors undermines the case for incorporation of the right to keep and bear arms for self-defense.

First, we have never held that a provision of the Bill of Rights applies to the States only if there is a "popular consensus" that the right is fundamental, and we see no basis for such a rule. But in this case, as it turns out, there is evidence of such a consensus. An *amicus* brief submitted by 58 Members of the Senate and 251 Members of the House of Representatives urges us to hold that the right to keep and bear arms is fundamental. See Brief for Senator Kay Bailey Hutchison et al. 4. Another brief submitted by 38 States takes the same position. Brief for State of Texas et al. 6.

Second, petitioners and many others who live in high-crime areas dispute the proposition that the Second Amendment right does not protect minorities and those lacking political clout. The plight of Chicagoans living in high-crime areas was recently highlighted when two Illinois legislators representing Chicago districts called on the Governor to deploy the Illinois National Guard to patrol the City's streets. [31] The legislators noted that the number of Chicago homicide victims during the current year equaled the number of **\*790** American soldiers killed during that same period in Afghanistan and Iraq and that 80% of the Chicago victims were black. [32] *Amici* supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime. [33] If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials.

[31] See Mack & Burnette, 2 Lawmakers to Quinn: Send the Guard to Chicago, Chicago Tribune, Apr. 26, 2010, p. 6.

[32] Janssen & Knowles, Send in Troops? Chicago Sun–Times, Apr. 26, 2010, p. 2; see also Brief for NAACP Legal Defense & Educational Fund, Inc., as *Amicus Curiae* 5, n. 4 (stating that in 2008, almost three out of every four homicide victims in Chicago were African-Americans); *id.,* at 5–6 (noting that "each year [in Chicago], many times more African Americans are murdered by assailants wielding guns than were killed during the Colfax massacre" (footnote omitted)).

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4982 Page 27 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

33    See Brief for Women State Legislators et al. 9–10, 14–15; Brief for Jews for the Preservation of Firearms Ownership 3–4; see also Brief for Pink Pistols et al. in *District of Columbia v. Heller,* O.T.2007, No. 07–290, pp. 5–11.

**\*\*3050** Third, Justice BREYER is correct that incorporation of the Second Amendment right will to some extent limit the legislative freedom of the States, but this is always true when a Bill of Rights provision is incorporated. Incorporation always restricts experimentation and local variations, but that has not stopped the Court from incorporating virtually every other provision of the Bill of Rights. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller,* 554 U.S., at 636, 128 S.Ct., at 2822. This conclusion is no more remarkable with respect to the Second Amendment than it is with respect to all the other limitations on state power found in the Constitution.

Finally, Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms **\*791** restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended that an interest-balancing test, the Court specifically rejected that suggestion. See *supra,* at 3046 – 3047. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller, supra,* at 634, 128 S.Ct., at 2821.

* * *

In *Heller,* we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. See *Duncan,* 391 U.S., at 149, and n. 14, 88 S.Ct. 1444. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller.* The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

Justice SCALIA, concurring.

I join the Court's opinion. Despite my misgivings about Substantive Due Process as an original matter, I have acquiesced in the Court's incorporation of certain guarantees in the Bill of Rights "because it is both long established and narrowly limited." *Albright v. Oliver,* 510 U.S. 266, 275, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (SCALIA, J., concurring). This case does not require me to reconsider that view, since straightforward application of settled doctrine suffices to decide it.

I write separately only to respond to some aspects of Justice STEVENS' dissent. Not that aspect which disagrees with the majority's application of our precedents to this case, **\*792** which is fully covered by the Court's opinion. But much of what Justice STEVENS writes is a broad condemnation of the theory of interpretation which underlies the Court's opinion, a theory that makes the traditions of our people paramount. He proposes a different theory, which he claims is more "cautiou[s]" and respectful of proper limits on the judicial role. *Post,* at 3119 – 3120. It is that claim I wish to address.

I

A

After stressing the substantive dimension of what he has renamed the "liberty **\*\*3051** clause," *post,* at 3090 – 3091, [1] Justice STEVENS proceeds to urge readoption of the theory of incorporation articulated in *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), see *post,* at 3096 – 3099. But in fact he does not favor application of that theory at all. For whether *Palko* requires only that "a fair and enlightened system of justice would be impossible without" the right sought to be incorporated, 302 U.S., at 325, 58 S.Ct. 149, or requires in addition that the right be rooted in the "traditions and conscience of our people," *ibid.* (internal quotation marks omitted), many of the rights Justice STEVENS thinks are incorporated could not past muster under either test: abortion, *post,* at 3091–3092 (citing *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)); homosexual sodomy, *post,* at 3097 (citing *Lawrence v. Texas,* 539 U.S. 558, 572, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)); the right to have excluded from criminal trials evidence obtained in violation of the Fourth Amendment, *post,* at 3098 (citing *Mapp v. Ohio,* 367 U.S. 643, 650, 655–657, 81 S.Ct. 1684,

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4983 Page 28 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

6 L.Ed.2d 1081 (1961)); and the right to teach one's **\*793** children foreign languages; *post,* at 3091 (citing *Meyer v. Nebraska,* 262 U.S. 390, 399–403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)), among others.

1     I do not entirely understand Justice STEVENS' renaming of the Due Process Clause. What we call it, of course, does not change what the Clause says, but shorthand should not obscure what it says. Accepting for argument's sake the shift in emphasis—from avoiding certain deprivations without that "process" which is "due," to avoiding the deprivations themselves—the Clause applies not just to deprivations of "liberty," but also to deprivations of "life" and even "property."

That Justice STEVENS is not applying any version of *Palko* is clear from comparing, on the one hand, the rights he believes *are* covered, with, on the other hand, his conclusion that the right to keep and bear arms is *not* covered. Rights that pass his test include not just those "relating to marriage, procreation, contraception, family relationships, and child rearing and education," but also rights against "[g]overnment action that shocks the conscience, pointlessly infringes settled expectations, trespasses into sensitive private realms or life choices without adequate justification, [or] perpetrates gross injustice." *Post,* at 3101 (internal quotation marks omitted). Not *all* such rights are in, however, since only "*some* fundamental aspects of personhood, dignity, and the like" are protected, *post,* at 3101 (emphasis added). Exactly what is covered is not clear. But whatever else is in, he *knows* that the right to keep and bear arms is out, despite its being as "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks omitted), as a right can be, see *District of Columbia v. Heller,* 554 U.S. 570, 593 – 595, 599, 603, 614 – 616, 128 S.Ct. 2783, 2798–2799, 2801–2804, 2809–2812, 171 L.Ed.2d 637 (2008). I can find no other explanation for such certitude except that Justice STEVENS, despite his forswearing of "personal and private notions," *post,* at 3100 (internal quotation marks omitted), deeply believes it should be out.

The subjective nature of Justice STEVENS' standard is also apparent from his claim that it is the courts' prerogative —indeed their *duty*—to update the Due Process Clause so that it encompasses new freedoms the Framers were too narrow-minded to imagine, *post,* at 3098 – 3099, and n. 21. Courts, he proclaims, must "do justice to [the Clause's] urgent call and its open texture" by exercising the "interpretive discretion the latter embodies." *Post,* **\*\*3052** at 3099 –

3100. (Why the *people* are not up to the task of deciding what new rights to **\*794** protect, even though it is *they* who are authorized to make changes, see U.S. Const., Art. V, is never explained. [2] ) And it would be "judicial abdication" for a judge to "tur[n] his back" on *his* task of determining what the Fourteenth Amendment covers by "outsourc[ing]" the job to "historical sentiment," *post,* at 3099—that is, by being guided by what the American people throughout our history have thought. It is only we judges, exercising our "own reasoned judgment," *post,* at 3096, who can be entrusted with deciding the Due Process Clause's scope—which rights serve the Amendment's "central values," *post,* at 3101— which basically means picking the rights we want to protect and discarding those we do not.

2     Justice STEVENS insists that he would not make courts the *sole* interpreters of the "liberty clause"; he graciously invites "[a]ll Americans" to ponder what the Clause means to them today. *Post,* at 3099, n. 22. The problem is that in his approach the people's ponderings do not matter, since whatever the people decide, courts have the last word.

### B

Justice STEVENS resists this description, insisting that his approach provides plenty of "guideposts" and "constraints" to keep courts from "injecting excessive subjectivity" into the process. [3] *Post,* at 3099 – 3100. Plenty indeed—and **\*795** that alone is a problem. The ability of omnidirectional guideposts to constrain is inversely proportional to their number. But even individually, each lodestar or limitation he lists either is incapable of restraining judicial whimsy or cannot be squared with the precedents he seeks to preserve.

3     Justice BREYER is not worried by that prospect. His interpretive approach applied to incorporation of the Second Amendment includes consideration of such factors as "the extent to which incorporation will further other, perhaps more basic, constitutional aims; and the extent to which incorporation will advance or hinder the Constitution's structural aims"; whether recognizing a particular right will "further the Constitution's effort to ensure that the government treats each individual with equal respect" or will "help maintain the democratic form of government"; whether it is "inconsistent ... with the Constitution's efforts to create governmental institutions well suited to the carrying out of its constitutional promises"; whether it fits with "the Framers' basic

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

reason for believing the Court ought to have the power of judicial review"; courts' comparative advantage in answering empirical questions that may be involved in applying the right; and whether there is a "strong offsetting justification" for removing a decision from the democratic process. *Post,* at 3123 – 3124, 3125 – 3129 (dissenting opinion).

He begins with a brief nod to history, *post,* at 3099 – 3100, but as he has just made clear, he thinks historical inquiry unavailing, *post,* at 3098 – 3099. Moreover, trusting the meaning of the Due Process Clause to what has historically been protected is circular, see *post,* at 3098 – 3099, since that would mean no *new* rights could get in.

Justice STEVENS moves on to the "most basic" constraint on subjectivity his theory offers: that he would "esche[w] attempts to provide any all-purpose, top-down, totalizing theory of 'liberty.' " *Post,* at 3100. The notion that the absence of a coherent theory of the Due Process Clause will somehow *curtail* judicial caprice is at war with reason. Indeterminacy means opportunity for courts to impose whatever rule they like; it is the problem, not the solution. The idea that interpretive pluralism would *reduce* courts' ability to impose their will on the ignorant masses is not merely naive, but absurd. If there are no right answers, there are no wrong answers either.

Justice STEVENS also argues that requiring courts to show "respect for the **3053 democratic process" should serve as a constraint. *Post,* at 3101. That is true, but Justice STEVENS would have them show respect in an extraordinary manner. In his view, if a right "is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate." *Ibid.* In other words, a right, such as the right to keep and bear arms, that has long been recognized but on which the States are considering restrictions, apparently deserves *less* protection, while a privilege the political branches (instruments of the democratic process) have withheld entirely and continue to withhold, deserves *more.* That topsy-turvy approach **796 conveniently accomplishes the objective of ensuring that the rights this Court held protected in *Casey, Lawrence,* and other such cases fit the theory—but at the cost of insulting rather than respecting the democratic process.

The next constraint Justice STEVENS suggests is harder to evaluate. He describes as "an important tool for guiding judicial discretion" "sensitivity to the interaction between the intrinsic aspects of liberty and the practical realities of contemporary society." *Post,* at 3101. I cannot say whether that sensitivity will really guide judges because I have no idea what it is. Is it some sixth sense instilled in judges when they ascend to the bench? Or does it mean judges are more constrained when they agonize about the cosmic conflict between liberty and its potentially harmful consequences? Attempting to give the concept more precision, Justice STEVENS explains that "sensitivity is an aspect of a deeper principle: the need to approach our work with humility and caution." *Ibid.* Both traits are undeniably admirable, though what relation they bear to sensitivity is a mystery. But it makes no difference, for the first case Justice STEVENS cites in support, see *ibid., Casey,* 505 U.S., at 849, 112 S.Ct. 2791, dispels any illusion that he has a meaningful form of judicial modesty in mind.

Justice STEVENS offers no examples to illustrate the next constraint: *stare decisis, post,* at 3102. But his view of it is surely not very confining, since he holds out as a "canonical" exemplar of the proper approach, see *post,* at 3097, 3118, *Lawrence,* which overruled a case decided a mere 17 years earlier, *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), see 539 U.S., at 578, 123 S.Ct. 2472 (it "was not correct when it was decided, and it is not correct today"). Moreover, Justice STEVENS would apply that constraint unevenly: He apparently approves those Warren Court cases that adopted jot-for-jot incorporation of procedural protections for criminal defendants, *post,* at 3094, but would abandon those Warren Court rulings that undercut his *797 approach to substantive rights, on the basis that we have "cut back" on cases from that era before, *post,* at 3094 – 3095.

Justice STEVENS also relies on the requirement of a "careful description of the asserted fundamental liberty interest" to limit judicial discretion. *Post,* at 3102 (internal quotation marks omitted). I certainly agree with that requirement, see *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), though some cases Justice STEVENS approves have not applied it seriously, see, *e.g., Lawrence, supra,* at 562, 123 S.Ct. 2472 ("The instant case involves liberty of the person both in its spatial and in its more transcendent dimensions"). But if the "careful description" requirement is used in the manner we have hitherto employed, then the enterprise of determining the Due Process Clause's "conceptual core," *post,* at 3101, is a waste of time. In the cases he cites we sought a careful, specific description of the right at issue in order to determine *whether that right, thus narrowly defined, was* **3054 *fundamental.*

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

See, *e.g., Glucksberg,* 521 U.S., at 722–728, 117 S.Ct. 2258; *Reno, supra,* at 302–306, 113 S.Ct. 1439; *Collins v. Harker Heights,* 503 U.S. 115, 125–129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 269–279, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); see also *Vacco v. Quill,* 521 U.S. 793, 801–808, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). The threshold step of defining the asserted right with precision is entirely unnecessary, however, if (as Justice STEVENS maintains) the "conceptual core" of the "liberty clause," *post,* at 3101, includes a number of capacious, hazily defined categories. There is no need to define the right with much precision in order to conclude that it pertains to the plaintiff's "ability independently to define [his] identity," his "right to make certain unusually important decisions that will affect his own, or his family's, destiny," or some aspect of his "[s]elf-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity [or] respect." *Ibid.* (internal quotation marks omitted). Justice STEVENS must therefore have in mind some other use for the careful-description **\*798** requirement—perhaps just as a means of ensuring that courts "procee[d] slowly and incrementally," *post,* at 3102. But that could be achieved just as well by having them draft their opinions in longhand. [4]

[4] After defending the careful-description criterion, Justice STEVENS quickly retreats and cautions courts not to apply it too stringently. *Post,* at 3102 – 3103. Describing a right *too* specifically risks robbing it of its "universal valence and a moral force it might otherwise have," *ibid.,* and "loads the dice against its recognition," *post,* at 3102, n. 25 (internal quotation marks omitted). *That* must be avoided, since it endangers rights Justice STEVENS *does* like. See *ibid.* (discussing *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)). To make sure *those* rights get in, we must leave leeway in our description, so that a right that has not itself been recognized as fundamental can ride the coattails of one that has been.

## II

If Justice STEVENS' account of the constraints of his approach did not demonstrate that they do not exist, his application of that approach to the case before us leaves no doubt. He offers several reasons for concluding that the Second Amendment right to keep and bear arms is not fundamental enough to be applied against the States. [5] None is persuasive, but more pertinent to my purpose, each is either

intrinsically indeterminate, would preclude incorporation of rights we have already held incorporated, or both. His approach **\*799** therefore does nothing to stop a judge from arriving at any conclusion he sets out to reach.

[5] Justice STEVENS claims that I mischaracterize his argument by referring to the Second Amendment right to keep and bear arms, instead of "the interest in keeping a firearm of one's choosing in the home," the right he says petitioners assert. *Post,* at 3109, n. 36. But it is precisely the "Second Amendment right to keep and bear arms" that petitioners argue is incorporated by the Due Process Clause. See, *e.g.,* Pet. for Cert. i. Under Justice STEVENS' own approach, that should end the matter. See *post,* at 3102 ("[W]e must pay close attention to the precise liberty interest the litigants have asked us to vindicate"). In any event, the demise of watered-down incorporation, see *ante,* at 3067 – 3068, means that we no longer subdivide Bill of Rights guarantees into their theoretical components, only some of which apply to the States. The First Amendment freedom of speech is incorporated—not the freedom to speak on Fridays, or to speak about philosophy.

Justice STEVENS begins with the odd assertion that "firearms have a fundamentally ambivalent relationship to liberty," since sometimes they are used to cause (or sometimes accidentally produce) injury to others. *Post,* at 3107. The source of the **\*\*3055** rule that only nonambivalent liberties deserve Due Process protection is never explained —proof that judges applying Justice STEVENS' approach can add new elements to the test as they see fit. The criterion, moreover, is inherently manipulable. Surely Justice STEVENS does not mean that the Clause covers only rights that have *zero* harmful effect on *anyone.* Otherwise even the First Amendment is out. Maybe what he means is that the right to keep and bear arms imposes *too great* a risk to others' physical well-being. But as the plurality explains, *ante,* at 3045, other rights we have already held incorporated pose similarly substantial risks to public safety. In all events, Justice STEVENS supplies neither a standard for how severe the impairment on others' liberty must be for a right to be disqualified, nor (of course) any method of measuring the severity.

Justice STEVENS next suggests that the Second Amendment right is not fundamental because it is "different in kind" from other rights we have recognized. *Post,* at 3108 – 3109. In one respect, of course, the right to keep and bear arms *is* different from some other rights we have held the Clause protects and he would recognize: It is deeply grounded in

our Nation's history and tradition. But Justice STEVENS has a different distinction in mind: Even though he does "not doubt for a moment that many Americans ... see [firearms] as critical to their way of life as well as to their security," he pronounces that owning a handgun is not "critical to leading a life of autonomy, dignity, or political equality." [6] *Post,* at 3109. **\*800** Who says? Deciding what is essential to an enlightened, liberty-filled life is an inherently political, moral judgment—the antithesis of an objective approach that reaches conclusions by applying neutral rules to verifiable evidence. [7]

[6]   Justice STEVENS goes a step farther still, suggesting that the right to keep and bear arms is not protected by the "liberty clause" because it is not really a liberty at all, but a "property right." *Post,* at 3109. Never mind that the right to bear arms sounds mighty like a liberty; and never mind that the "liberty clause" is really a Due Process Clause which explicitly protects "property," see *United States v. Carlton,* 512 U.S. 26, 41–42, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (SCALIA, J., concurring in judgment). Justice STEVENS' theory cannot explain why the Takings Clause, which unquestionably protects property, has been incorporated, see *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 41 L.Ed. 979 (1897), in a decision he appears to accept, *post,* at 3096, n. 14.

[7]   As Justice STEVENS notes, see *post,* at 3116 – 3117, I accept as a matter of *stare decisis* the requirement that to be fundamental for purposes of the Due Process Clause, a right must be "implicit in the concept of ordered liberty," *Lawrence, supra,* at 593, n. 3, 123 S.Ct. 2472 (SCALIA, J., dissenting) (internal quotation marks omitted). But that inquiry provides infinitely less scope for judicial invention when conducted under the Court's approach, since the field of candidates is *immensely* narrowed by the prior requirement that a right be rooted in this country's traditions. Justice STEVENS, on the other hand, is free to scan the universe for rights that he thinks "implicit in the concept," etc. The point Justice STEVENS makes here is merely one example of his demand that an historical approach to the Constitution prove itself, not merely much better than his in restraining judicial invention, but utterly perfect in doing so. See Part III, *infra.*

No determination of what rights the Constitution of the United States covers would be complete, of course, without a survey of what *other* countries do. *Post,* at 3110 – 3111. When it comes to guns, Justice STEVENS explains, our Nation is *already* an outlier among "advanced democracies"; not even

our "oldest allies" protect as robust a right as we do, and we should not widen the gap. *Ibid.* Never mind that he explains neither which countries **\*\*3056** qualify as "advanced democracies" nor why others are irrelevant. For there is an even clearer indication that this criterion lets judges pick which rights States must respect and those they can ignore: As the plurality shows, *ante,* at 3044 – 3045, and nn. 28–29, this follow-the-foreign-crowd requirement would foreclose rights **\*801** that we have held (and Justice STEVENS accepts) are incorporated, but that other "advanced" nations do not recognize—from the exclusionary rule to the Establishment Clause. A judge applying Justice STEVENS' approach must either throw all of those rights overboard or, as cases Justice STEVENS approves have done in considering unenumerated rights, simply ignore foreign law when it undermines the desired conclusion, see, *e.g., Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (making no mention of foreign law).

Justice STEVENS also argues that since the right to keep and bear arms was *codified* for the purpose of "prevent[ing] elimination of the militia," it should be viewed as " 'a federalism provision' " logically incapable of incorporation. *Post,* at 3111 (quoting *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 45, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (THOMAS, J., concurring in judgment); some internal quotation marks omitted). This criterion, too, evidently applies only when judges want it to. The opinion Justice STEVENS quotes for the "federalism provision" principle, Justice THOMAS's concurrence in *Newdow,* argued that incorporation of the Establishment Clause "makes little sense" because that Clause was originally understood as a limit on congressional interference with state establishments of religion. *Id.,* at 49–51, 124 S.Ct. 2301. Justice STEVENS, of course, has no problem with applying the Establishment Clause to the States. See, *e.g., id.,* at 8, n. 4, 124 S.Ct. 2301 (opinion for the Court by STEVENS, J.) (acknowledging that the Establishment Clause "appl[ies] to the States by incorporation into the Fourteenth Amendment"). While he insists *that* Clause is not a "federalism provision," *post,* at 3111, n. 40, he does not explain why *it* is not, but the right to keep and bear arms *is* (even though only the latter refers to a "right of the people"). The "federalism" argument prevents the incorporation of only *certain* rights.

Justice STEVENS next argues that even if the right to keep and bear arms is "deeply rooted in some important senses," the roots of States' efforts to regulate guns run just as deep. *Post,* at 3112 – 3113 (internal quotation marks omitted). **\*802** But this too is true of other rights we have

AR004518

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4987 Page 32 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

held incorporated. No fundamental right—not even the First Amendment—is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character. At least that is what they show (Justice STEVENS would agree) for *other* rights. Once again, principles are applied selectively.

Justice STEVENS' final reason for rejecting incorporation of the Second Amendment reveals, more clearly than any of the others, the game that is afoot. Assuming that there is a "plausible constitutional basis" for holding that the right to keep and bear arms is incorporated, he asserts that we ought not to do so *for prudential reasons. Post,* at 3114. Even if we had the authority to withhold rights that are within the Constitution's command (and we assuredly do not), two of the reasons Justice STEVENS gives for abstention show just how much power he would hand to judges. The States' "right to experiment" with solutions to the problem of gun violence, he says, is at its apex here because "the best solution is far from clear." *Post,* at 3114 (internal quotation marks omitted). That is true of most serious **3057** social problems—whether, for example, "the best solution" for rampant crime is to admit confessions unless they are affirmatively shown to have been coerced, but see *Miranda v. Arizona,* 384 U.S. 436, 444– 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or to permit jurors to impose the death penalty without a requirement that they be free to consider "any relevant mitigating factor," see *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), which in turn leads to the conclusion that defense counsel has provided inadequate defense if he has not conducted a "reasonable investigation" into potentially mitigating factors, see, *e.g., Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), inquiry into which question tends to destroy any prospect of prompt justice, see, *e.g., Wong v. Belmontes,* 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) *(per curiam)* (reversing grant of habeas relief for sentencing on a crime committed in 1981). The obviousness of the optimal answer is **803** in the eye of the beholder. The implication of Justice STEVENS' call for abstention is that if We The Court conclude that They The People's answers to a problem are silly, we are free to "interven[e]," *post,* at 3114, but if we too are uncertain of the right answer, or merely think the States may be on to something, we can loosen the leash.

A second reason Justice STEVENS says we should abstain is that the States have shown they are "capable" of protecting the right at issue, and if anything have protected it too much. *Post,* at 3115. That reflects an assumption that judges

can distinguish between a *proper* democratic decision to leave things alone (which we should honor), and a case of democratic market failure (which we should step in to correct). I would not—and no judge should—presume to have that sort of omniscience, which seems to me far more "arrogant," *post,* at 3111, than confining courts' focus to our own national heritage.

### III

Justice STEVENS' response to this concurrence, *post,* at 3116 – 3119, makes the usual rejoinder of "living Constitution" advocates to the criticism that it empowers judges to eliminate or expand what the people have prescribed: The traditional, historically focused method, he says, reposes discretion in judges as well.[8] Historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced **804** judgments about which evidence to consult and how to interpret it.

[8]    Justice STEVENS also asserts that his approach is "more faithful to this Nation's constitutional history" and to "the values and commitments of the American people, as they stand today," *post,* at 3118. But what he asserts to be the proof of this is that his approach aligns (no surprise) with those cases he approves (and dubs "canonical," *ibid.*). Cases he disfavors are discarded as "hardly bind[ing]" "excesses," *post,* at 3094 – 3095, or less "enduring," *post,* at 3096, n. 16. Not proven. Moreover, whatever relevance Justice STEVENS ascribes to current "values and commitments of the American people" (and that is unclear, see *post,* at 3115, n. 47), it is hard to see how it shows fidelity to them that he disapproves a different subset of old cases than the Court does.

I will stipulate to that.[9] But the question to be decided is not whether the historically focused method is a *perfect* **3058** *means* of restraining aristocratic judicial Constitution- writing; but whether it is the *best means available* in an imperfect world. Or indeed, even more narrowly than that: whether it is demonstrably much better than what Justice STEVENS proposes. I think it beyond all serious dispute that it is much less subjective, and intrudes much less upon the democratic process. It is less subjective because it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor. In the most controversial matters brought before this Court—for example, the constitutionality

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4988 Page 33 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

of prohibiting abortion, assisted suicide, or homosexual sodomy, or the constitutionality of the death penalty—*any* historical methodology, under *any* plausible standard of proof, would lead to the same conclusion. [10] Moreover, the methodological differences that divide historians, and the varying interpretive assumptions they bring to their work, *post,* at 3117 – 3118, are nothing compared to the differences among the American people (though perhaps not among graduates of prestigious law schools) with regard to the moral judgments Justice STEVENS would have courts pronounce. And whether or not special expertise is needed **\*805** to answer historical questions, judges most certainly have no "comparative ... advantage," *post,* at 3101 – 3102 (internal quotation marks omitted), in resolving moral disputes. What is more, his approach would not eliminate, but multiply, the hard questions courts must confront, since he would not *replace* history with moral philosophy, but would have courts consider *both*.

9    That is not to say that every historical question on which there is room for debate is indeterminate, or that every question on which historians disagree is equally balanced. Cf. *post,* at 3117 – 3118. For example, the historical analysis of the principal dissent in *Heller* is as valid as the Court's only in a two-dimensional world that conflates length and depth.

10    By the way, Justice STEVENS greatly magnifies the difficulty of an historical approach by suggesting that it was *my* burden in *Lawrence* to show the "ancient roots of proscriptions against sodomy," *post,* at 3117 – 3118 (internal quotation marks omitted). *Au contraire,* it was *his* burden (in the opinion he joined) to show the ancient roots of the right of sodomy.

And the Court's approach intrudes less upon the democratic process because the rights it acknowledges are those established by a constitutional history formed by democratic decisions; and the rights it fails to acknowledge are left to be democratically adopted or rejected by the people, with the assurance that their decision is not subject to judicial revision. Justice STEVENS' approach, on the other hand, deprives the people of that power, since whatever the Constitution and laws may say, the list of protected rights will be whatever courts wish it to be. After all, he notes, the people have been wrong before, *post,* at 3119, and courts may conclude they are wrong in the future. Justice STEVENS abhors a system in which "majorities or powerful interest groups always get their way," *post,* at 3119, but replaces it with a system in which unelected and life-tenured judges always get their way. That such usurpation is effected unabashedly, see *post,* at 3117 –

3118—with "the judge's cards ... laid on the table," *ibid.*—makes it even worse. In a vibrant democracy, usurpation should have to be accomplished in the dark. It is Justice STEVENS' approach, not the Court's, that puts democracy in peril.

Justice THOMAS, concurring in part and concurring in the judgment.

I agree with the Court that the Fourteenth Amendment makes the right to keep and bear arms set forth in the Second Amendment "fully applicable to the States." *Ante,* at 3026. I write separately because I believe there is a more straightforward path to this conclusion, one that is **\*\*3059** more **\*806** faithful to the Fourteenth Amendment's text and history. I therefore do not join Parts II–C, IV, and V of the principal opinion.

Applying what is now a well-settled test, the Court concludes that the right to keep and bear arms applies to the States through the Fourteenth Amendment's Due Process Clause because it is "fundamental" to the American "scheme of ordered liberty," *ante,* at 3036 (citing *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)), and " 'deeply rooted in this Nation's history and tradition,' " *ante,* at 3036 (quoting *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997)). I agree with that description of the right. But I cannot agree that it is enforceable against the States through a Clause that speaks only to "process." Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause.

I

In *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), this Court held that the Second Amendment protects an individual right to keep and bear arms for the purpose of self-defense, striking down a District of Columbia ordinance that banned the possession of handguns in the home. *Id.,* at 635, 128 S.Ct., at 2821–2822. The question in this case is whether the Constitution protects that right against abridgment by the States.

As the Court explains, if this case were litigated before the Fourteenth Amendment's adoption in 1868, the answer to that question would be simple. In *Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 8 L.Ed. 672 (1833), this Court held

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

that the Bill of Rights applied only to the Federal Government. Writing for the Court, Chief Justice Marshall recalled that the founding generation added the first eight Amendments to the Constitution in response to Antifederalist concerns regarding the extent of federal—not state—power, and held that if "the framers of these amendments [had] intended them to be limitations on the powers of the state governments," **\*807** "they would have declared this purpose in plain and intelligible language." *Id.,* at 250. Finding no such language in the Bill of Rights, Chief Justice Marshall held that it did not in any way restrict state authority. *Id.,* at 248–250; see *Lessee of Livingston v. Moore,* 7 Pet. 469, 551–552, 8 L.Ed. 751 (1833) (reaffirming *Barron* 's holding); *Permoli v. Municipality No. 1 of New Orleans,* 3 How. 589, 609–610, 11 L.Ed. 739 (1845) (same).

Nearly three decades after *Barron,* the Nation was splintered by a civil war fought principally over the question of slavery. As was evident to many throughout our Nation's early history, slavery, and the measures designed to protect it, were irreconcilable with the principles of equality, government by consent, and inalienable rights proclaimed by the Declaration of Independence and embedded in our constitutional structure. See, *e.g.,* 3 Records of the Federal Convention of 1787, p. 212 (M. Farrand ed.1911) (remarks of Luther Martin) ("[S]lavery is inconsistent with the genius of republicanism, and has a tendency to destroy those principles on which it is supported, as it lessens the sense of the equal rights of mankind" (emphasis deleted)); A. Lincoln, Speech at Peoria, Ill. (Oct. 16, 1854), reprinted in 2 The Collected Works of Abraham Lincoln 266 (R. Basler ed. 1953) ("[N]o man is good enough to govern another man, *without that other's consent.* I say this is the leading principle —the sheet anchor of American republicanism.... Now the relation **\*\*3060** of masters and slaves is, *pro tanto,* a total violation of this principle").

After the war, a series of constitutional amendments were adopted to repair the Nation from the damage slavery had caused. The provision at issue here, § 1 of the Fourteenth Amendment, significantly altered our system of government. The first sentence of that section provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." This unambiguously overruled this Court's contrary holding in **\*808** *Dred Scott v. Sandford,* 19 How. 393, 15 L.Ed. 691 (1857), that the Constitution did not recognize black Americans as citizens of the United States or their own State. *Id.,* at 405–406.

The meaning of § 1's next sentence has divided this Court for many years. That sentence begins with the command that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." On its face, this appears to grant the persons just made United States citizens a certain collection of rights—*i.e.,* privileges or immunities—attributable to that status.

This Court's precedents accept that point, but define the relevant collection of rights quite narrowly. In the *Slaughter–House Cases,* 16 Wall. 36, 21 L.Ed. 394 (1873), decided just five years after the Fourteenth Amendment's adoption, the Court interpreted this text, now known as the Privileges or Immunities Clause, for the first time. In a closely divided decision, the Court drew a sharp distinction between the privileges and immunities of state citizenship and those of federal citizenship, and held that the Privileges or Immunities Clause protected only the latter category of rights from state abridgment. *Id.,* at 78. The Court defined that category to include only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.,* at 79. This arguably left open the possibility that certain individual rights enumerated in the Constitution could be considered privileges or immunities of federal citizenship. See *ibid.* (listing "[t]he right to peaceably assemble" and "the privilege of the writ of *habeas corpus* " as rights potentially protected by the Privileges or Immunities Clause). But the Court soon rejected that proposition, interpreting the Privileges or Immunities Clause even more narrowly in its later cases.

Chief among those cases is *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876). There, the Court held that members of a white militia who had brutally murdered as many as 165 black Louisianians congregating outside a courthouse had **\*809** not deprived the victims of their privileges as American citizens to peaceably assemble or to keep and bear arms. *Ibid.;* see L. Keith, The Colfax Massacre 109 (2008). According to the Court, the right to peaceably assemble codified in the First Amendment was not a privilege of United States citizenship because "[t]he right ... existed long *before* the adoption of the Constitution." 92 U.S., at 551 (emphasis added). Similarly, the Court held that the right to keep and bear arms was not a privilege of United States citizenship because it was not "in any manner dependent upon that instrument for its existence." *Id.,* at 553. In other words, the reason the Framers codified the right to bear arms in the Second Amendment—its nature as an inalienable right

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

that pre-existed the Constitution's adoption—was the very reason citizens could not enforce it against States through the Fourteenth.

That circular reasoning effectively has been the Court's last word on the Privileges **\*3061** or Immunities Clause.[1] In the intervening years, the Court has held that the Clause prevents state abridgment of only a handful of rights, such as the right to travel, see *Saenz v. Roe,* 526 U.S. 489, 503, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), that are not readily described as essential to liberty.

[1]    In the two decades after *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876), was decided, this Court twice reaffirmed its holding that the Privileges or Immunities Clause does not apply the Second Amendment to the States. *Presser v. Illinois,* 116 U.S. 252, 266–267, 6 S.Ct. 580, 29 L.Ed. 615 (1886); *Miller v. Texas,* 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812 (1894).

As a consequence of this Court's marginalization of the Clause, litigants seeking federal protection of fundamental rights turned to the remainder of § 1 in search of an alternative fount of such rights. They found one in a most curious place—that section's command that every State guarantee "due process" to any person before depriving him of "life, liberty, or property." At first, litigants argued that this Due Process Clause "incorporated" certain procedural rights codified in the Bill of Rights against the States. The Court **\*810** generally rejected those claims, however, on the theory that the rights in question were not sufficiently "fundamental" to warrant such treatment. See, *e.g., Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (grand jury indictment requirement); *Maxwell v. Dow,* 176 U.S. 581, 20 S.Ct. 448, 44 L.Ed. 597 (1900) (12–person jury requirement); *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908) (privilege against self-incrimination).

That changed with time. The Court came to conclude that certain Bill of Rights guarantees *were* sufficiently fundamental to fall within § 1's guarantee of "due process." These included not only procedural protections listed in the first eight Amendments, see, *e.g., Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (protection against double jeopardy), but substantive rights as well, see, *e.g., Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (right to free speech); *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (same). In the process of incorporating these rights against the States, the Court often applied them differently against the States than against the Federal Government on the theory that only those "fundamental" aspects of the right required Due Process Clause protection. See, *e.g., Betts v. Brady,* 316 U.S. 455, 473, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942) (holding that the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, but that the Due Process Clause required appointment of counsel in state criminal cases only where "want of counsel ... result[ed] in a conviction lacking in ... fundamental fairness"). In more recent years, this Court has "abandoned the notion" that the guarantees in the Bill of Rights apply differently when incorporated against the States than they do when applied to the Federal Government. *Ante,* at 3035 (opinion of the Court) (internal quotation marks omitted). But our cases continue to adhere to the view that a right is incorporated through the Due Process Clause only if it is sufficiently "fundamental," *ante,* at 3046, 3048 – 3050 (plurality opinion)—a term the Court has long struggled to define.

**\*811**    While this Court has at times concluded that a right gains "fundamental" status only if it is essential to the American "scheme of ordered liberty" or " 'deeply rooted in this Nation's history and tradition,' **\*\*3062** " *ante,* at 3036 (opinion of Court) (quoting *Glucksberg,* 521 U.S., at 721, 117 S.Ct. 2302), the Court has just as often held that a right warrants Due Process Clause protection if it satisfies a far less measurable range of criteria, see *Lawrence v. Texas,* 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (concluding that the Due Process Clause protects "liberty of the person both in its spatial and in its more transcendent dimensions"). Using the latter approach, the Court has determined that the Due Process Clause applies rights against the States that are not mentioned in the Constitution at all, even without seriously arguing that the Clause was originally understood to protect such rights. See, *e.g., Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Lawrence, supra.*

All of this is a legal fiction. The notion that a constitutional provision that guarantees only "process" before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words. Moreover, this fiction is a particularly dangerous one. The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish "fundamental" rights that warrant protection from nonfundamental rights that do not. Today's decision

Case 2:19-cv-00037-JNP  Document 59-32  Filed 11/30/22  PageID.4991  Page 36 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

illustrates the point. Replaying a debate that has endured from the inception of the Court's substantive due process jurisprudence, the dissents laud the "flexibility" in this Court's substantive due process doctrine, *post,* at 3096 (opinion of STEVENS, J.); see *post,* at 3122 – 3123 (opinion of BREYER, J.), while the plurality makes yet another effort to impose principled restraints on its exercise, see *ante,* at 3044 – 3048. But neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding at the time of its ratification.

 **\*812**  To be sure, the plurality's effort to cabin the exercise of judicial discretion under the Due Process Clause by focusing its inquiry on those rights deeply rooted in American history and tradition invites less opportunity for abuse than the alternatives. See *post,* at 3123 (BREYER, J., dissenting) (arguing that rights should be incorporated against the States through the Due Process Clause if they are "well suited to the carrying out of ... constitutional promises"); *post,* at 3100 (STEVENS, J., dissenting) (warning that there is no "all-purpose, top-down, totalizing theory of 'liberty' " protected by the Due Process Clause). But any serious argument over the scope of the Due Process Clause must acknowledge that neither its text nor its history suggests that it protects the many substantive rights this Court's cases now claim it does.

I cannot accept a theory of constitutional interpretation that rests on such tenuous footing. This Court's substantive due process framework fails to account for both the text of the Fourteenth Amendment and the history that led to its adoption, filling that gap with a jurisprudence devoid of a guiding principle. I believe the original meaning of the Fourteenth Amendment offers a superior alternative, and that a return to that meaning would allow this Court to enforce the rights the Fourteenth Amendment is designed to protect with greater clarity and predictability than the substantive due process framework has so far managed.

I acknowledge the volume of precedents that have been built upon the substantive due process framework, and I further acknowledge the importance of *stare decisis* to the stability of our Nation's legal system.  **\*\*3063**  But *stare decisis* is only an "adjunct" of our duty as judges to decide by our best lights what the Constitution means. *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 963, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Rehnquist, C. J., concurring in judgment in part and dissenting in part). It is not "an inexorable command." *Lawrence, supra,* at 577, 123 S.Ct. 2472. Moreover, as judges, we interpret the Constitution

 **\*813**  one case or controversy at a time. The question presented in this case is not whether our entire Fourteenth Amendment jurisprudence must be preserved or revised, but only whether, and to what extent, a particular Clause in the Constitution protects the particular right at issue here. With the inquiry appropriately narrowed, I believe this case presents an opportunity to reexamine, and begin the process of restoring, the meaning of the Fourteenth Amendment agreed upon by those who ratified it.

II

"It cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison,* 1 Cranch 137, 174, 2 L.Ed. 60 (1803) (opinion for the Court by Marshall, C. J.). Because the Court's Privileges or Immunities Clause precedents have presumed just that, I set them aside for the moment and begin with the text.

The Privileges or Immunities Clause of the Fourteenth Amendment declares that "[n]o State ... shall abridge the privileges or immunities of citizens of the United States." In interpreting this language, it is important to recall that constitutional provisions are " 'written to be understood by the voters.' " *Heller,* 554 U.S., at 576, 128 S.Ct., at 2788 (quoting *United States v. Sprague,* 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931)). Thus, the objective of this inquiry is to discern what "ordinary citizens" at the time of ratification would have understood the Privileges or Immunities Clause to mean. 554 U.S., at 577, 128 S.Ct., at 2788.

A

1

At the time of Reconstruction, the terms "privileges" and "immunities" had an established meaning as synonyms for "rights." The two words, standing alone or paired together, were used interchangeably with the words "rights," "liberties," and "freedoms," and had been since the time of Blackstone. See 1 W. Blackstone, Commentaries \*129 (describing  **\*814**  the "rights and liberties" of Englishmen as "private immunities" and "civil privileges"). A number of antebellum judicial decisions used the terms in this manner. See, *e.g., Magill v. Brown,* 16 F. Cas. 408, 428 (No. 8,952) (CC ED Pa. 1833) (Baldwin, J.) ("The words 'privileges and

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

immunities' relate to the rights of persons, place or property; a privilege is a peculiar right, a private law, conceded to particular persons or places"). In addition, dictionary definitions confirm that the public shared this understanding. See, *e.g.,* 2 N. Webster, An American Dictionary of the English Language 1039 (C. Goodrich & N. Porter rev. 1865) (defining "privilege" as "a right or immunity not enjoyed by others or by all" and listing among its synonyms the words "immunity," "franchise," "right," and "liberty"); 1 *id.,* at 661 (defining "immunity" as "[f]reedom from an obligation" or "particular privilege"); 2 *id.,* at 1140 (defining "right" as "[p]rivilege or immunity granted by authority"). [2]

[2]    See also 2 C. Richardson, A New Dictionary of the English Language 1512 (1839) (defining "privilege" as "an appropriate or peculiar law or rule or right; a peculiar immunity, liberty, or franchise"); 1 *id.,* at 1056 (defining "immunity" as "[f]reedom or exemption, (from duties,) liberty, privilege"); The Philadelphia School Dictionary; or Expositor of the English Language 152 (3d ed. 1812) (defining "privilege" as a "peculiar advantage"); *id.,* at 105 (defining "immunity" as "privilege, exemption"); Royal Standard English Dictionary 411 (1788) (defining "privilege" as "public right, peculiar advantage").

The fact that a particular interest was designated as a "privilege" or "immunity," **3064 rather than a "right," "liberty," or "freedom," revealed little about its substance. Blackstone, for example, used the terms "privileges" and "immunities" to describe both the inalienable rights of individuals and the positive-law rights of corporations. See 1 Commentaries, at *129 (describing "private immunities" as a "*residuum* of natural liberty," and "civil privileges" as those "which society hath engaged to provide, in lieu of the natural liberties so given up by individuals"); *id.,* at *468 (stating that a corporate charter enables a corporation to "establish *815 rules and orders" that serve as "the privileges and immunities ... of the corporation"). Writers in this country at the time of Reconstruction followed a similar practice. See, *e.g., Racine & Mississippi R. Co. v. Farmers' Loan & Trust Co.,* 49 Ill. 331, 334 (1868) (describing agreement between two railroad companies in which they agreed " 'to fully merge and consolidate the[ir] capital stock, powers, privileges, immunities and franchises' "); *Hathorn v. Calef,* 53 Me. 471, 483–484 (1866) (concluding that a statute did not "modify any power, privileges, or immunity, pertaining to the franchise of any corporation"). The nature of a privilege or immunity thus varied depending on the person, group, or entity to whom those rights were assigned. See Lash, The Origins of the Privileges or Immunities Clause, Part I:

"Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L.J. 1241, 1256–1257 (2010) (surveying antebellum usages of these terms).

2

The group of rights-bearers to whom the Privileges or Immunities Clause applies is, of course, "citizens." By the time of Reconstruction, it had long been established that both the States and the Federal Government existed to preserve their citizens' inalienable rights, and that these rights were considered "privileges" or "immunities" of citizenship.

This tradition begins with our country's English roots. Parliament declared the basic liberties of English citizens in a series of documents ranging from the Magna Carta to the Petition of Right and the English Bill of Rights. See 1 B. Schwartz, The Bill of Rights: A Documentary History 8–16, 19–21, 41–46 (1971) (hereinafter Schwartz). These fundamental rights, according to the English tradition, belonged to all people but became legally enforceable only when recognized in legal texts, including acts of Parliament and the decisions of common-law judges. See B. Bailyn, The Ideological Origins of the American Revolution 77–79 (1967). These rights included many that later would be set forth in our *816 Federal Bill of Rights, such as the right to petition for redress of grievances, the right to a jury trial, and the right of "Protestants" to "have arms for their defence." English Bill of Rights (1689), reprinted in 1 Schwartz 41, 43.

As English subjects, the colonists considered themselves to be vested with the same fundamental rights as other Englishmen. They consistently claimed the rights of English citizenship in their founding documents, repeatedly referring to these rights as "privileges" and "immunities." For example, a Maryland law provided:

    **3065 "[A]ll the Inhabitants of this Province being Christians (Slaves excepted) Shall have and enjoy all such *rights liberties immunities priviledges and free customs* within this Province as any natural born subject of England hath or ought to have or enjoy in the Realm of England...." Md. Act for the Liberties of the People (1639), in *id.,* at 68 (emphasis added). [3]

[3]    See also, *e.g.,* First Charter of Va. (1606), reprinted in 7 Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3783, 3788 (F. Thorpe ed.1909)

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4993 Page 38 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

(hereinafter Thorpe) ("DECLAR[ING]" that "all and every the Persons being our Subjects, ... shall HAVE and enjoy all Liberties, Franchises, and Immunities ... as if they had been abiding and born, within this our Realm of *England* " (emphasis in original)); Charter of New England (1620), in 3 *id.,* at 1827, 1839 ("[A]ll and every the Persons, beinge our Subjects, ... shall have and enjoy all Liberties, and ffranchizes, and Immunities of free Denizens and naturall Subjects ... as if they had been abidinge and born within this our Kingdome of England"); Charter of Mass. Bay (1629), in *id.* at 1846, 1856–1857 (guaranteeing that "all and every the Subjects of Us, ... shall have and enjoy all liberties and Immunities of free and naturall Subjects ... as yf they and everie of them were borne within the Realme of England"); Grant of the Province of Me. (1639), in *id.,* at 1625, 1635 (guaranteeing "Liberties Francheses and Immunityes of or belonging to any the naturall borne subjects of this our Kingdom of England"); Charter of Carolina (1663), in 5 *id.,* at 2743, 2747 (guaranteeing to all subjects "all liberties franchises and priviledges of this our kingdom of England"); Charter of R.I. and Providence Plantations (1663), in 6 *id.,* at 3211, 3220 ("[A]ll and every the subjects of us ... shall have and enjoye all libertyes and immunityes of ffree and naturall subjects within any the dominions of us, our heires, or successours, ... as if they, and every of them, were borne within the realme of England"); Charter of Ga. (1732), in 2 *id.,* at 765, 773 ("[A]ll and every the persons which shall happen to be born within the said province ... shall have and enjoy all liberties, franchises and immunities of free denizens and natural born subjects, within any of our dominions, to all intents and purposes, as if abiding and born within this our kingdom of Great–Britain").

**\*817** As tensions between England and the Colonies increased, the colonists adopted protest resolutions reasserting their claim to the inalienable rights of Englishmen. Again, they used the terms "privileges" and "immunities" to describe these rights. As the Massachusetts Resolves declared:

"*Resolved,* That there are certain essential Rights of the *British* Constitution of Government, which are founded in the Law of God and Nature, and are the common Rights of Mankind—Therefore

.....

"*Resolved,* That no Man can justly take the Property of another without his Consent: And that upon

this *original* Principle the Right of Representation ... is evidently founded.

.....

"*Resolved,* That this *inherent* Right, together with all other, essential *Rights, Liberties, Privileges and Immunities* of the People of *Great Britain,* have been fully confirmed to them by *Magna Charta.*" The Massachusetts Resolves (Oct. 29, 1765), reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764–1766, p. 56 (E. Morgan ed.1959) (some emphasis added). [4]

[4]   See also, *e.g.,* A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 174 (1968) (quoting 1774 Georgia resolution declaring that the Colony's inhabitants were entitled to " 'the same rights, privileges, and immunities with their fellow-subjects in *Great Britain* ' " (emphasis in original)); The Virginia Resolves, Resolutions as Printed in the Journal of the House of Burgesses, reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764–1766, at 46, 48 ("[T]he Colonists aforesaid are declared entitled to all Liberties, Privileges, and Immunities of Denizens and natural Subjects, to all Intents and Purposes, as if they had been abiding and born within the Realm of *England* " (emphasis in original)).

**\*\*3066 \*818** In keeping with this practice, the First Continental Congress declared in 1774 that the King had wrongfully denied the colonists "the rights, liberties, and immunities of free and natural-born subjects ... within the realm of England." 1 Journals of the Continental Congress 1774–1789, p. 68 (W. Ford ed. 1904). In an address delivered to the inhabitants of Quebec that same year, the Congress described those rights as including the "great" "right[s]" of "trial by jury," "Habeas Corpus," and "freedom of the press." Address of the Continental Congress to the Inhabitants of Quebec (1774), reprinted in 1 Schwartz 221–223.

After declaring their independence, the newly formed States replaced their colonial charters with constitutions and state bills of rights, almost all of which guaranteed the same fundamental rights that the former colonists previously had claimed by virtue of their English heritage. See, *e. g.,* Pa. Declaration of Rights (1776), reprinted in 5 Thorpe 3081–3084 (declaring that "all men are born equally free and independent, and have certain natural, inherent and

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4994 Page 39 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

inalienable rights," including the "right to worship Almighty God according to the dictates of their own consciences" and the "right to bear arms for the defence of themselves and the state"). [5]

[5]     See also Va. Declaration of Rights (1776), reprinted in 1 Schwartz 234–236; Pa. Declaration of Rights (1776), in *id.*, at 263–275; Del. Declaration of Rights (1776), in *id.*, at 276–278; Md. Declaration of Rights (1776), in *id.*, at 280–285; N.C. Declaration of Rights (1776), in *id.*, at 286–288.

Several years later, the Founders amended the Constitution to expressly protect many of the same fundamental rights against interference by the Federal Government. Consistent with their English heritage, the founding generation generally did not consider many of the rights identified in these amendments as new entitlements, but as inalienable rights of all men, given legal effect by their codification in the Constitution's text. See, *e.g.,* 1 Annals of Cong. 431–432, 436–437, 440–442 (1789) (statement of Rep. Madison) **\*819** proposing Bill of Rights in the First Congress); The Federalist No. 84, pp. 531–533 (B. Wright ed. 1961) (A.Hamilton); see also *Heller,* 554 U.S., at 592, 128 S.Ct., at 2797 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"). The Court's subsequent decision in *Barron,* however, made plain that the codification of these rights in the Bill of Rights made them legally enforceable only against the Federal Government, not the States. See 7 Pet., at 247.

3

Even though the Bill of Rights did not apply to the States, other provisions of the Constitution did limit state interference with individual rights. Article IV, § 2, cl. 1, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The text of this provision resembles the Privileges or Immunities Clause, and it can be assumed that the public's understanding of the latter was informed by its understanding of the former.

Article IV, § 2, was derived from a similar clause in the Articles of Confederation, and reflects the dual citizenship the Constitution provided to all Americans after replacing that "league" of separate sovereign States. *Gibbons v. Ogden,* 9 Wheat. 1, 187, 6 L.Ed. 23 (1824); see 3 J. Story,

Commentaries on the Constitution of the United States § 1800, p. 675 (1833). By virtue of a person's citizenship in a particular State, he was guaranteed whatever rights and liberties that State's constitution **\*\*3067** and laws made available. Article IV, § 2, vested citizens of each State with an additional right: the assurance that they would be afforded the "privileges and immunities" of citizenship in any of the several States in the Union to which they might travel.

What were the "Privileges and Immunities of Citizens in the several States"? That question was answered perhaps most famously by Justice Bushrod Washington sitting as Circuit **\*820** Justice in *Corfield v. Coryell,* 6 F. Cas. 546, 551–552 (No. 3,230) (CC ED Pa. 1825). In that case, a Pennsylvania citizen claimed that a New Jersey law prohibiting nonresidents from harvesting oysters from the State's waters violated Article IV, § 2, because it deprived him, as an out-of-state citizen, of a right New Jersey availed to its own citizens. *Id.,* at 550. Justice Washington rejected that argument, refusing to "accede to the proposition" that Article IV, § 2, entitled "citizens of the several states ... to participate in *all* the rights which belong exclusively to the citizens of any other particular state." *Id.,* at 552 (emphasis added). In his view, Article IV, § 2, did not guarantee equal access to all public benefits a State might choose to make available to its citizens. See *id.,* at 552. Instead, it applied only to those rights "which are, in their nature, *fundamental* ; which belong, of right, to the citizens of all free governments." *Id.,* at 551 (emphasis added). Other courts generally agreed with this principle. See, *e.g., Abbot v. Bayley,* 23 Mass. 89, 92–93 (1827) (noting that the "privileges and immunities" of citizens in the several States protected by Article IV, § 2, are "qualified and not absolute" because they do not grant a traveling citizen the right of "suffrage or of eligibility to office" in the State to which he travels).

When describing those "fundamental" rights, Justice Washington thought it "would perhaps be more tedious than difficult to enumerate" them all, but suggested that they could "be all comprehended under" a broad list of "general heads," such as "[p]rotection by the government," "the enjoyment of life and liberty, with the right to acquire and possess property of every kind," "the benefit of the writ of habeas corpus," and the right of access to "the courts of the state," among others. [6] *Corfield, supra,* at 551–552.

[6]     Justice Washington's complete list was as follows:
        "Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property

of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised." 6 F. Cas., at 551–552.

**\*821** Notably, Justice Washington did not indicate whether Article IV, § 2, *required* States to recognize these fundamental rights in their own citizens and thus in sojourning citizens alike, or whether the Clause simply prohibited the States from discriminating against sojourning citizens with respect to whatever fundamental rights state law happened to recognize. On this question, the weight of legal authorities at the time of Reconstruction indicated **\*\*3068** that Article IV, § 2, prohibited States from discriminating against sojourning citizens when recognizing fundamental rights, but did not require States to recognize those rights and did not prescribe their content. The highest courts of several States adopted this view, see, *e.g., Livingston v. Van Ingen,* 9 Johns. \*507, \*561 (N.Y.Sup.Ct.1812) (Yates, J.); *id.,* at \*577 (Kent, C.J.); *Campbell v. Morris,* 3 H. & McH. 535, 553–554 (Md.Gen.Ct.1797) (Chase, J.), as did several influential treatise writers, see T. Cooley, Constitutional Limitations 15–16, and n. 3 (1868) (describing Article IV, § 2, as designed "to prevent discrimination by the several States against the citizens and public proceedings of other States"); 2 J. Kent, Commentaries on American Law 35 (11th ed. 1867) (stating that Article IV, § 2, entitles sojourning citizens "to the privileges that persons of the same description are entitled to in the state to which the removal is made, and to none other"). This Court adopted the same conclusion in a unanimous opinion **\*822** just one year after the Fourteenth Amendment was ratified. See *Paul v. Virginia,* 8 Wall. 168, 180, 19 L.Ed. 357 (1869).

* * *

The text examined so far demonstrates three points about the meaning of the Privileges or Immunities Clause in § 1. First, "privileges" and "immunities" were synonyms for "rights." Second, both the States and the Federal Government had long recognized the inalienable rights of their citizens. Third, Article IV, § 2, of the Constitution protected traveling citizens against state discrimination with respect to the fundamental rights of state citizenship.

Two questions still remain, both provoked by the textual similarity between § 1's Privileges or Immunities Clause and Article IV, § 2. The first involves the nature of the rights at stake: Are the privileges or immunities of "citizens of the United States" recognized by § 1 the same as the privileges and immunities of "Citizens in the several States" to which Article IV, § 2, refers? The second involves the restriction imposed on the States: Does § 1, like Article IV, § 2, prohibit only discrimination with respect to certain rights *if* the State chooses to recognize them, or does it require States to recognize those rights? I address each question in turn.

B

I start with the nature of the rights that § 1's Privileges or Immunities Clause protects. Section 1 overruled *Dred Scott* 's holding that blacks were not citizens of either the United States or their own State and, thus, did not enjoy "the privileges and immunities of citizens" embodied in the Constitution. 19 How., at 417. The Court in *Dred Scott* did not distinguish between privileges and immunities of citizens of the United States and citizens in the several States, instead referring to the rights of citizens generally. It did, however, give examples of what the rights of citizens were—the **\*823** constitutionally enumerated rights of "the full liberty of speech" and the right "to keep and carry arms." *Ibid.*

Section 1 protects the rights of citizens "of the United States" specifically. The evidence overwhelmingly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution, including the right to keep and bear arms.

1

Nineteenth-century treaties through which the United States acquired territory from other sovereigns routinely promised inhabitants of the newly acquired Territories **\*\*3069** that

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4996 Page 41 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

they would enjoy all of the "rights," "privileges," and "immunities" of United States citizens. See, *e.g.,* Treaty of Amity, Settlement, and Limits, Art. 6, Feb. 22, 1819, 8 Stat. 256–258, T.S. No. 327 (entered into force Feb. 19, 1821) (cession of Florida) ("The inhabitants of the territories which his Catholic Majesty cedes to the United States, by this Treaty, shall be incorporated in the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution, and admitted to the enjoyment of *all the privileges, rights, and immunities, of the citizens of the United States* " (emphasis added)). [7]

[7]    See also Treaty Between the United States of America and the Ottawa Indians of Blanchard's Fork and Roche De Boeuf, June 24, 1862, 12 Stat. 1237 ("The Ottawa Indians of the United Bands of Blanchard's Fork and of Roche de Boeuf, having become sufficiently advanced in civilization, and being desirous of becoming citizens of the United States ... [after five years from the ratification of this treaty] shall be deemed and declared to be citizens of the United States, to all intents and purposes, and shall be entitled to all the *rights, privileges, and immunities of such citizens* " (emphasis added)); Treaty Between the United States of America and Different Tribes of Sioux Indians, Art. VI, April 29, 1868, 15 Stat. 637 ("[A]ny Indian or Indians receiving a patent for land under the foregoing provisions, shall thereby and from thenceforth become and be a citizen of the United States, and be entitled to all the *privileges and immunities of such citizens* " (emphasis added)).

 **\*824** Commentators of the time explained that the rights and immunities of "citizens of the United States" recognized in these treaties "undoubtedly mean [t] those privileges that are common to all the citizens of this republic." Marcus, An Examination of the Expediency and Constitutionality of Prohibiting Slavery in the State of Missouri 17 (1819). It is therefore altogether unsurprising that several of these treaties identify liberties enumerated in the Constitution as privileges and immunities common to all United States citizens.

For example, the Louisiana Cession Act of 1803, which codified a treaty between the United States and France culminating in the Louisiana Purchase, provided:

  "The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal constitution, to the enjoyment of *all the rights, advantages, and immunities of citizens of the United States;* and in the mean time they shall be maintained and protected in *the*

*free enjoyment of their liberty, property, and the religion which they profess*." Treaty Between the United States of America and the French Republic, Art. III, Apr. 30, 1803, 8 Stat. 202, T.S. No. 86 (emphasis added). [8]

[8]    Subsequent treaties contained similar guarantees that the inhabitants of the newly acquired Territories would enjoy the freedom to exercise certain constitutional rights. See Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Art. IX, Feb. 2, 1848, 9 Stat. 930, T.S. No. 207 (cession of Texas) (declaring that inhabitants of the Territory were entitled "to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction"); Treaty concerning the Cession of the Russian Possessions in North America by his Majesty the Emperor of all the Russias to the United States of America, Art. III, Mar. 30, 1867, 15 Stat. 542, T.S. No. 301 (June 20, 1867) (cession of Alaska) ("The inhabitants of the ceded territory, ... if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion").

 **\*\*3070   \*825** The Louisiana Cession Act reveals even more about the privileges and immunities of United States citizenship because it provoked an extensive public debate on the meaning of that term. In 1820, when the Missouri Territory (which the United States acquired through the Cession Act) sought to enter the Union as a new State, a debate ensued over whether to prohibit slavery within Missouri as a condition of its admission. Some Congressmen argued that prohibiting slavery in Missouri would deprive its inhabitants of the "privileges and immunities" they had been promised by the Cession Act. See, *e.g.,* 35 Annals of Cong. 1083 (1820) (remarks of Kentucky Rep. Hardin). But those who opposed slavery in Missouri argued that the right to hold slaves was merely a matter of state property law, not one of the privileges and immunities of United States citizenship guaranteed by the Act. [9]

[9]    See, *e.g.,* Speech of Mr. Joseph Hemphill (Pa.) on the Missouri Question in the House of Representatives 16 (1820), as published in pamphlet form and reprinted in 22 Moore Pamphlets, p. 16 ("If the right to hold slaves

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4997 Page 42 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

is a federal right and attached merely to citizenship of the United States, [then slavery] could maintain itself against state authority, and on this principle the owner might take his slaves into any state he pleased, in defiance of the state laws, but this would be contrary to the constitution"); see also Lash, The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L.J. 1241, 1288–1290 (2010) (collecting other examples).

Daniel Webster was among the leading proponents of the antislavery position. In his "Memorial to Congress," Webster argued that "[t]he rights, advantages and immunities here spoken of [in the Cession Act] must ... be such as are recognized or communicated by the Constitution of the United States," not the "rights, advantages and immunities, derived exclusively from the *State* governments...." D. **\*826** Webster, A Memorial to the Congress of the United States, on the Subject of Restraining the Increase of Slavery in New States to be Admitted into the Union 15 (Dec. 15, 1819) (emphasis added). "The obvious meaning" of the Act, in Webster's view, was that "*the rights derived under the federal Constitution* shall be enjoyed by the inhabitants of [the Territory]." *Id.,* at 15–16 (emphasis added). In other words, Webster articulated a distinction between the rights of United States citizenship and the rights of state citizenship, and argued that the former included those rights "recognized or communicated by the Constitution." Since the right to hold slaves was not mentioned in the Constitution, it was not a right of federal citizenship.

Webster and his allies ultimately lost the debate over slavery in Missouri, and the Territory was admitted as a slave State as part of the now-famous Missouri Compromise. Missouri Enabling Act of Mar. 6, 1820, ch. 22, § 8, 3 Stat. 548. But their arguments continued to inform public understanding of the privileges and immunities of United States citizenship. In 1854, Webster's Memorial was republished in a pamphlet discussing the Nation's next major debate on slavery—the proposed repeal of the Missouri Compromise through the Kansas–Nebraska Act, see The Nebraska Question: Comprising Speeches in the United States Senate: Together with the History of the Missouri Compromise 9–12 (1854). It was published again in 1857 in a collection of famous American speeches. See Political Text–Book, or Encyclopedia: Containing Everything Necessary for the Reference of the Politicians and Statesmen of the United States 601–604 (M. Cluskey ed. 1857); see also Lash, 98 Geo. L. J., at 1294–1296 (describing Webster's arguments and their influence).

**\*\*3071** 2

Evidence from the political branches in the years leading to the Fourteenth Amendment's adoption demonstrates broad public understanding that the privileges and immunities **\*827** of United States citizenship included rights set forth in the Constitution, just as Webster and his allies had argued. In 1868, President Andrew Johnson issued a proclamation granting amnesty to former Confederates, guaranteeing "to all and to every person who directly or indirectly participated in the late insurrection or rebellion, a full pardon and amnesty for the offence of treason ... with restoration of *all rights, privileges, and immunities under the Constitution* and the laws which have been made in pursuance thereof." 15 Stat. 712 (emphasis added).

Records from the 39th Congress further support this understanding.

a

After the Civil War, Congress established the Joint Committee on Reconstruction to investigate circumstances in the Southern States and to determine whether, and on what conditions, those States should be readmitted to the Union. See Cong. Globe, 39th Cong., 1st Sess., 6, 30 (1865) (hereinafter 39th Cong. Globe); M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 57 (1986) (hereinafter Curtis). That Committee would ultimately recommend the adoption of the Fourteenth Amendment, justifying its recommendation by submitting a report to Congress that extensively catalogued the abuses of civil rights in the former slave States and argued that "adequate security for future peace and safety ... can only be found in such changes of the organic law as shall determine the civil rights and privileges of all citizens in all parts of the republic." See Report of the Joint Committee on Reconstruction, S.Rep. No. 112, 39th Cong., 1st Sess., 15 (1866); H. R. Rep. No. 30, 39th Cong., 1st Sess., p. XXI (1866).

As the Court notes, the Committee's Report "was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents." *Ante,* at 3039; B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 264–265 (1914) (noting that 150,000 copies of the **\*828** Report were printed and that it was widely distributed as

a campaign document in the election of 1866). In addition, newspaper coverage suggests that the wider public was aware of the Committee's work even before the Report was issued. For example, the Fort Wayne Daily Democrat (which appears to have been unsupportive of the Committee's work) paraphrased a motion instructing the Committee to

> "enquire into [the] expediency of amending the Constitution of the United States so as to declare with greater certainty the power of Congress to enforce and determine by appropriate legislation all the guarantees contained in *that instrument*." The Nigger Congress! Fort Wayne Daily Democrat, Feb. 1, 1866, p. 4 (emphasis added).

b

Statements made by Members of Congress leading up to, and during, the debates on the Fourteenth Amendment point in the same direction. The record of these debates has been combed before. See *Adamson v. California,* 332 U.S. 46, 92–110, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (appendix to dissenting opinion of Black, J.) (concluding that the debates support the conclusion that § 1 was understood to incorporate the Bill of Rights against the States); *ante,* at 3033, n. 9, 3040, n. 23, (opinion of the Court) (counting the debates among other evidence that § 1 applies the Second Amendment against the States). Before considering that record **3072 here, it is important to clarify its relevance. When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted. Statements by legislators can assist in this process to the extent they demonstrate the manner in which the public used or understood a particular word or phrase. They can further assist to the extent there is evidence that these statements were disseminated to the public. In other words, this evidence is useful not because **829 it demonstrates what the draftsmen of the text may have been thinking, but only insofar as it illuminates what the public understood the words chosen by the draftsmen to mean.

(1)

Three speeches stand out as particularly significant. Representative John Bingham, the principal draftsman of § 1, delivered a speech on the floor of the House in February 1866 introducing his first draft of the provision. Bingham began by

discussing *Barron* and its holding that the Bill of Rights did not apply to the States. He then argued that a constitutional amendment was necessary to provide "an express grant of power in Congress to enforce by penal enactment these great canons of the supreme law, securing to all the citizens in every State all the privileges and immunities of citizens, and to all the people all the sacred rights of person." 39th Cong. Globe 1089–1090 (1866). Bingham emphasized that § 1 was designed "to arm the Congress of the United States, by the consent of the people of the United States, with the power to enforce the bill of rights as it stands in the Constitution today. It 'hath that extent—no more.' " *Id.,* at 1088.

Bingham's speech was printed in pamphlet form and broadly distributed in 1866 under the title, "One Country, One Constitution, and One People," and the subtitle, "In Support of the Proposed Amendment to Enforce the Bill of Rights." [10] Newspapers also reported his proposal, with the New York Times providing particularly extensive coverage, **830 including a full reproduction of Bingham's first draft of § 1 and his remarks that a constitutional amendment to "enforc[e]" the "immortal bill of rights" was "absolutely essential to American nationality." N.Y. Times, Feb. 27, 1866, p. 8.

10    One Country, One Constitution, and One People: Speech of Hon. John A. Bingham, of Ohio, In the House of Representatives, February 28, 1866, In Support of the Proposed Amendment to Enforce the Bill of Rights (Cong.Globe). The pamphlet was published by the official reporter of congressional debates, and was distributed presumably pursuant to the congressional franking privilege. See Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L.J. 1509, 1558, n. 167 (2007) (hereinafter Wildenthal).

Bingham's first draft of § 1 was different from the version ultimately adopted. Of particular importance, the first draft granted Congress the "power to make all laws ... necessary and proper to secure" the "citizens of each State all privileges and immunities of citizens in the several States," rather than restricting state power to "abridge" the privileges or immunities of citizens of the United States. [11] 39th Cong. Globe 1088.

11    The full text of Bingham's first draft of § 1 provided as follows:
      "The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.4999 Page 44 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." 39th Cong. Globe 1088.

That draft was met with objections, which the Times covered extensively. A **\*3073** front-page article hailed the "Clear and Forcible Speech" by Representative Robert Hale against the draft, explaining—and endorsing—Hale's view that Bingham's proposal would "confer upon Congress all the rights and power of legislation now reserved to the States" and would "in effect utterly obliterate State rights and State authority over their own internal affairs." [12] N.Y. Times, Feb. 28, 1866, p. 1.

[12] In a separate front-page article on the same day, the paper expounded upon Hale's arguments in even further detail, while omitting Bingham's chief rebuttals. N.Y. Times, Feb. 28, 1866, p. 1. The unbalanced nature of The New York Times' coverage is unsurprising. As scholars have noted, "[m]ost papers" during the time of Reconstruction "had a frank partisan slant ... and the *Times* was no exception." Wildenthal 1559. In 1866, the paper "was still defending" President Johnson's resistance to Republican reform measures, as exemplified by the fact that it "supported Johnson's veto of the Civil Rights Act of 1866." *Ibid.*

**\*831** Critically, Hale did *not* object to the draft insofar as it purported to protect constitutional liberties against state interference. Indeed, Hale stated that he believed (incorrectly in light of *Barron* ) that individual rights enumerated in the Constitution were already enforceable against the States. See 39th Cong. Globe 1064 ("I have, somehow or other, gone along with the impression that there is that sort of protection thrown over us in some way, whether with or without the sanction of a judicial decision that we are so protected"); see N.Y. Times, Feb. 28, 1866, at 1. Hale's misperception was not uncommon among members of the Reconstruction generation. See *infra,* at 3047 – 3048. But that is secondary to the point that the Times' coverage of this debate over § 1's meaning suggests public awareness of its main contours —*i.e.,* that § 1 would, at a minimum, enforce constitutionally enumerated rights of United States citizens against the States.

Bingham's draft was tabled for several months. In the interim, he delivered a second well-publicized speech, again arguing that a constitutional amendment was required to give Congress the power to enforce the Bill of Rights against the States. That speech was printed in pamphlet form, see Speech of Hon. John A. Bingham, of Ohio, on the Civil

Rights Bill, Mar. 9, 1866 (Cong.Globe); see 39th Cong. Globe 1837 (remarks of Rep. Lawrence) (noting that the speech was "extensively published"), and the New York Times covered the speech on its front page. Thirty–Ninth Congress, N.Y. Times, Mar. 10, 1866, p. 1.

By the time the debates on the Fourteenth Amendment resumed, Bingham had amended his draft of § 1 to include the text of the Privileges or Immunities Clause that was ultimately adopted. Senator Jacob Howard introduced the new draft on the floor of the Senate in the third speech relevant here. Howard explained that the Constitution recognized "a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the **\*832** Constitution, ... some by the first eight amendments of the Constitution," and that "there is no power given in the Constitution to enforce and to carry out any of these guarantees" against the States. 39th Cong. Globe 2765. Howard then stated that "[t]he great object" of § 1 was to "restrain the power of the States and compel them at all times to respect these great fundamental guarantees." *Id.,* at 2766. Section 1, he indicated, imposed "a general prohibition upon all the States, as such, from abridging the privileges and immunities of the citizens of the United States." *Id.,* at 2765.

In describing these rights, Howard explained that they included "the privileges **\*3074** and immunities spoken of" in Article IV, § 2. *Id.,* at 2765. Although he did not catalogue the precise "nature" or "extent" of those rights, he thought "*Corfield vs. Coryell*" provided a useful description. Howard then submitted that

"[t]o these privileges and immunities, whatever they may be—... should be added *the personal rights guarantied and secured by the first eight amendments of the Constitution* ; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, [and] *... the right to keep and to bear arms*." *Ibid.* (emphasis added).

News of Howard's speech was carried in major newspapers across the country, including the New York Herald, see N.Y. Herald, May 24, 1866, p. 1, which was the best-selling paper in the Nation at that time, see A. Amar, The Bill of Rights: Creation and Reconstruction 187 (1998) (hereinafter Amar). [13] The New York Times carried the speech as well, **\*833** reprinting a lengthy excerpt of Howard's remarks, including the statements quoted above. N.Y. Times, May 24, 1866, p. 1. The following day's Times editorialized on

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5000   Page 45 of 208

McDonald v. City of Chicago, III., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Howard's speech, predicting that "[t]o this, the first section of the amendment, the Union party throughout the country will yield a ready acquiescence, and the South could offer no justifiable resistance," suggesting that Bingham's narrower second draft had not been met with the same objections that Hale had raised against the first. N.Y. Times, May 25, 1866, p. 4.

13  Other papers that covered Howard's speech include the following: Baltimore Gazette, May 24, 1866, p. 4; Boston Daily Journal, May 24, 1866, p. 4; Boston Daily Advertiser, May 24, 1866, p. 1; Daily National Intelligencer, May 24, 1866, p. 3. Springfield Daily Republican, May 24, 1866, p. 3; Charleston Daily Courier, May 28, 1866, p. 4; Charleston Daily Courier, May 29, 1866, p. 1; Chicago Tribune, May 29, 1866, p. 2; Philadelphia Inquirer, May 24, 1866, p. 8.

As a whole, these well-circulated speeches indicate that § 1 was understood to enforce constitutionally declared rights against the States, and they provide no suggestion that any language in the section other than the Privileges or Immunities Clause would accomplish that task.

(2)

When read against this backdrop, the civil rights legislation adopted by the 39th Congress in 1866 further supports this view. Between passing the Thirteenth Amendment—which outlawed slavery alone—and the Fourteenth Amendment, Congress passed two significant pieces of legislation. The first was the Civil Rights Act of 1866, which provided that "all persons born in the United States" were "citizens of the United States" and that "such citizens, of every race and color, ... shall have the same right" to, among other things, "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." § 1, 14 Stat. 27.

Both proponents and opponents of this Act described it as providing the "privileges" of citizenship to freedmen, and defined those privileges to include constitutional rights, such as the right to keep and bear arms. See 39th Cong. Globe 474 (remarks of Sen. Trumbull) (stating that "the late slaveholding **834** States" had enacted laws "depriving persons of African descent of privileges which are essential to freemen," including "prohibit[ing] any negro or mulatto from having fire-arms" and stating that "[t]he purpose of the bill under consideration is to destroy all these discriminations");

*id.,* at 1266–1267 (remarks **\*3075** of Rep. Raymond) (opposing the Act, but recognizing that to "[m]ake the colored man a citizen of the United States" would guarantee to him, *inter alia,* "a defined *status* ... a right to defend himself and his wife and children; a right to bear arms").

Three months later, Congress passed the Freedmen's Bureau Act, which also entitled all citizens to the "full and equal benefit of all laws and proceedings concerning personal liberty" and "personal security." Act of July 16, 1866, § 14, 14 Stat. 176. The Act stated expressly that the rights of personal liberty and security protected by the Act "includ[ed] the constitutional right to bear arms." *Ibid.*

(3)

There is much else in the legislative record. Many statements by Members of Congress corroborate the view that the Privileges or Immunities Clause enforced constitutionally enumerated rights against the States. See Curtis 112 (collecting examples). I am not aware of any statement that directly refutes that proposition. That said, the record of the debates—like most legislative history—is less than crystal clear. In particular, much ambiguity derives from the fact that at least several Members described § 1 as protecting the privileges and immunities of citizens "in the several States," harkening back to Article IV, § 2. See *supra,* at 3041 (describing Sen. Howard's speech). These statements can be read to support the view that the Privileges or Immunities Clause protects some or all the fundamental rights of "citizens" described in *Corfield*. They can also be read to support the view that the Privileges or Immunities Clause, like Article IV, § 2, prohibits only state discrimination with **\*835** respect to those rights it covers, but does not deprive States of the power to deny those rights to all citizens equally.

I examine the rest of the historical record with this understanding. But for purposes of discerning what the public most likely thought the Privileges or Immunities Clause to mean, it is significant that the most widely publicized statements by the legislators who voted on § 1 —Bingham, Howard, and even Hale—point unambiguously toward the conclusion that the Privileges or Immunities Clause enforces at least those fundamental rights enumerated in the Constitution against the States, including the Second Amendment right to keep and bear arms.

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5001 Page 46 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

3

Interpretations of the Fourteenth Amendment in the period immediately following its ratification help to establish the public understanding of the text at the time of its adoption.

Some of these interpretations come from Members of Congress. During an 1871 debate on a bill to enforce the Fourteenth Amendment, Representative Henry Dawes listed the Constitution's first eight Amendments, including "the right to keep and bear arms," before explaining that after the Civil War, the country "gave the most grand of all these rights, privileges, and immunities, by one single amendment to the Constitution, to four millions of American citizens" who formerly were slaves. Cong. Globe, 42d Cong., 1st Sess., 475–476 (1871). "It is all these," Dawes explained, "which are comprehended in the words 'American citizen.' " *Id.*, at 476; see also *id.*, at 334 (remarks of Rep. Hoar) (stating that the Privileges or Immunities Clause referred to those rights "declared to belong to the citizen by the Constitution itself"). Even opponents of Fourteenth Amendment enforcement legislation acknowledged that the Privileges or Immunities **3076 Clause protected constitutionally enumerated individual rights. See 2 Cong. Rec. 384–385 (1874) (remarks *836 of Rep. Mills) (opposing enforcement law, but acknowledging, in referring to the Bill of Rights, that "[t]hese first amendments and some provisions of the Constitution of like import embrace the 'privileges and immunities' of citizenship as set forth in article 4, section 2, of the Constitution *and in the fourteenth amendment* " (emphasis added)); see Curtis 166–170 (collecting examples).

Legislation passed in furtherance of the Fourteenth Amendment demonstrates even more clearly this understanding. For example, Congress enacted the Civil Rights Act of 1871, 17 Stat. 13, which was titled in pertinent part "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States," and which is codified in the still-existing 42 U.S.C. § 1983. That statute prohibits state officials from depriving citizens of "any rights, privileges, or immunities *secured by the Constitution.*" Rev. Stat.1979, 42 U.S.C. § 1983 (emphasis added). Although the Judiciary ignored this provision for decades after its enactment, this Court has come to interpret the statute, unremarkably in light of its text, as protecting constitutionally enumerated rights. *Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

A Federal Court of Appeals decision written by a future Justice of this Court adopted the same understanding of the Privileges or Immunities Clause. See, *e.g., United States v. Hall,* 26 F. Cas. 79, 82 (No. 15,282) (CC SD Ala. 1871) (Woods, J.) ("We think, therefore, that the ... rights enumerated in the first eight articles of amendment to the constitution of the United States, are the privileges and immunities of citizens of the United States"). In addition, two of the era's major constitutional treatises reflected the understanding that § 1 would protect constitutionally enumerated rights from state abridgment.[14] A third such treatise unambiguously *837 indicates that the Privileges or Immunities Clause accomplished this task. G. Paschal, The Constitution of the United States 290 (1868) (explaining that the rights listed in § 1 had "already been guarantied" by Article IV and the Bill of Rights, but that "[t]he new feature declared" by § 1 was that these rights, "which had been construed to apply only to the national government, are thus imposed upon the States").

14      See J. Pomeroy, An Introduction to the Constitutional
        Law of the United States 155–156 (E. Bennett ed.
        1886) (describing § 1, which the country was then still
        considering, as a "needed" "remedy" for *Barron ex rel.
        Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 8 L.Ed.
        672 (1833), which held that the Bill of Rights was not
        enforceable against the States); T. Farrar, Manual of
        the Constitution of the United States of America 58–
        59, 145–146, 395–397 (1867); *id.,* at 546 (3d ed. 1872)
        (describing the Fourteenth Amendment as having "swept
        away" the "decisions of many courts" that "the popular
        rights guaranteed by the Constitution are secured only
        against [the federal] government").

Another example of public understanding comes from United States Attorney Daniel Corbin's statement in an 1871 Ku Klux Klan prosecution. Corbin cited *Barron* and declared:

"[T]he fourteenth amendment changes all that theory, and lays the same restriction upon the States that before lay upon the Congress of the United States—that, as Congress heretofore could not interfere with the right of the citizen to keep and bear arms, now, after the adoption of the fourteenth amendment, the State cannot interfere with the right of the citizen to keep and bear arms. The right to keep and bear arms is included in the fourteenth amendment, **3077 under 'privileges and immunities.' " Proceedings in the Ku Klux Trials at Columbia, S. C., in the United States Circuit Court, November Term, 1871, p. 147 (1872).

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5002 Page 47 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

* * *

This evidence plainly shows that the ratifying public understood the Privileges or Immunities Clause to protect constitutionally enumerated rights, including the right to keep **\*838** and bear arms. As the Court demonstrates, there can be no doubt that § 1 was understood to enforce the Second Amendment against the States. See *ante,* at 3038 – 3044. In my view, this is because the right to keep and bear arms was understood to be a privilege of American citizenship guaranteed by the Privileges or Immunities Clause.

C

The next question is whether the Privileges or Immunities Clause merely prohibits States from discriminating among citizens if they recognize the Second Amendment's right to keep and bear arms, or whether the Clause requires States to recognize the right. The municipal respondents, Chicago and Oak Park, argue for the former interpretation. They contend that the Second Amendment, as applied to the States through the Fourteenth, authorizes a State to impose an outright ban on handgun possession such as the ones at issue here so long as a State applies it to all citizens equally. [15] The Court explains why this antidiscrimination-only reading of § 1 as a whole is "implausible." *Ante,* at 3042 – 3043 (citing Brief for Municipal Respondents 64). I agree, but because I think it is the Privileges or Immunities Clause that applies this right to the States, I must explain why this Clause in particular protects against more than just state discrimination, and in fact establishes a minimum baseline of rights for all American citizens.

[15] The municipal respondents and Justice BREYER's dissent raise a most unusual argument that § 1 prohibits discriminatory laws affecting only the right to keep and bear arms, but offers substantive protection to other rights enumerated in the Constitution, such as the freedom of speech. See *post,* at 3032 – 3033. Others, however, have made the more comprehensive —and internally consistent—argument that § 1 bars discrimination alone and does not afford protection to any substantive rights. See, *e.g.,* R. Berger, Government by Judiciary: The Transformation of the Fourteenth Amendment (2d ed. 1997). I address the coverage of the Privileges or Immunities Clause only as it applies to the Second Amendment right presented here, but I do so with the understanding that my conclusion may have implications for the broader argument.

**\*839** 1

I begin, again, with the text. The Privileges or Immunities Clause opens with the command that "*No State shall*" abridge the privileges or immunities of citizens of the United States. Amdt. 14, § 1 (emphasis added). The very same phrase opens Article I, § 10, of the Constitution, which prohibits the States from "pass[ing] any Bill of Attainder" or "ex post facto Law," among other things. Article I, § 10, is one of the few constitutional provisions that limits state authority. In *Barron,* when Chief Justice Marshall interpreted the Bill of Rights as lacking "plain and intelligible language" restricting state power to infringe upon individual liberties, he pointed to Article I, § 10, as an example of text that would have accomplished that task. 7 Pet., at 250. Indeed, Chief Justice Marshall would later describe Article I, § 10, as "a bill of rights for the people of each state." *Fletcher v. Peck,* 6 Cranch 87, 138, 3 L.Ed. 162 (1810). Thus, the fact that the Privileges or Immunities Clause uses the command "[n]o State shall"— which Article **\*\*3078** IV, § 2, does not—strongly suggests that the former imposes a greater restriction on state power than the latter.

This interpretation is strengthened when one considers that the Privileges or Immunities Clause uses the verb "abridge," rather than "discriminate," to describe the limit it imposes on state authority. The Webster's dictionary in use at the time of Reconstruction defines the word "abridge" to mean "[t]o deprive; to cut off; ... as, to *abridge* one of his rights." 1 Webster, An American Dictionary of the English Language, at 6. The Clause is thus best understood to impose a limitation on state power to infringe upon pre-existing substantive rights. It raises no indication that the Framers of the Clause used the word "abridge" to prohibit only discrimination.

This most natural textual reading is underscored by a well-publicized revision to the Fourteenth Amendment that the Reconstruction Congress rejected. After several **\*840** Southern States refused to ratify the Amendment, President Johnson met with their Governors to draft a compromise. N.Y. Times, Feb. 5, 1867, p. 5. Their proposal eliminated Congress' power to enforce the Amendment (granted in § 5), and replaced the Privileges or Immunities Clause in § 1 with the following:

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5003 Page 48 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the States in which they reside, and the Citizens of each State shall be entitled to all *the privileges and immunities of citizens in the several States.*" Draft reprinted in 1 Documentary History of Reconstruction 240 (W. Fleming ed.1950) (hereinafter Fleming).

Significantly, this proposal removed the "[n]o State shall" directive and the verb "abridge" from § 1, and also changed the class of rights to be protected from those belonging to "citizens of the United States" to those of the "citizens in the several States." This phrasing is materially indistinguishable from Article IV, § 2, which generally was understood as an antidiscrimination provision alone. See *supra,* at 3066 – 3068. The proposal thus strongly indicates that at least the President of the United States and several Southern Governors thought that the Privileges or Immunities Clause, which they unsuccessfully tried to revise, prohibited more than just state-sponsored discrimination.

### 2

The argument that the Privileges or Immunities Clause prohibits no more than discrimination often is followed by a claim that public discussion of the Clause, and of § 1 generally, was not extensive. Because of this, the argument goes, § 1 must not have been understood to accomplish such a significant task as subjecting States to federal enforcement of a minimum baseline of rights. That argument overlooks **\*841** critical aspects of the Nation's history that underscored the need for, and wide agreement upon, federal enforcement of constitutionally enumerated rights against the States, including the right to keep and bear arms.

### a

I turn first to public debate at the time of ratification. It is true that the congressional debates over § 1 were relatively brief. It is also true that there is little evidence of extensive debate in the States. Many state legislatures did not keep records of their debates, and the few records that do exist reveal only modest discussion. See Curtis 145. These facts are not surprising.

First, however consequential we consider the question today, the nationalization of constitutional rights was not

the most **\*\*3079** controversial aspect of the Fourteenth Amendment at the time of its ratification. The Nation had just endured a tumultuous civil war, and §§ 2, 3, and 4 —which reduced the representation of States that denied voting rights to blacks, deprived most former Confederate officers of the power to hold elective office, and required States to disavow Confederate war debts—were far more polarizing and consumed far more political attention. See Wildenthal 1600; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866–1868, 30 Whittier L.Rev. 695, 699 (2009).

Second, the congressional debates on the Fourteenth Amendment reveal that many Representatives, and probably many citizens, believed that the Thirteenth Amendment, the 1866 Civil Rights legislation, or some combination of the two, had already enforced constitutional rights against the States. Justice Black's dissent in *Adamson* chronicles this point in detail. 332 U.S., at 107–108, 67 S.Ct. 1672 (appendix to dissenting opinion). Regardless of whether that understanding was accurate as a matter of constitutional law, it helps to explain why **\*842** Congressmen had little to say during the debates about § 1. See *ibid.*

Third, while *Barron* made plain that the Bill of Rights was not legally enforceable against the States, see *supra,* at 3059, the significance of that holding should not be overstated. Like the Framers, see *supra,* at 3066, many 19th-century Americans understood the Bill of Rights to declare inalienable rights that pre-existed all government. Thus, even though the Bill of Rights technically applied only to the Federal Government, many believed that it declared rights that no legitimate government could abridge.

Chief Justice Henry Lumpkin's decision for the Georgia Supreme Court in *Nunn v. State,* 1 Ga. 243 (1846), illustrates this view. In assessing state power to regulate firearm possession, Lumpkin wrote that he was "aware that it has been decided, that [the Second Amendment], like other amendments adopted at the same time, is a restriction upon the government of the United States, and does not extend to the individual States." *Id.,* at 250. But he still considered the right to keep and bear arms as "an unalienable right, which lies at the bottom of every free government," and thus found the States bound to honor it. *Ibid.* Other state courts adopted similar positions with respect to the right to keep and bear arms and other enumerated rights. [16] Some courts even suggested that the protections in the Bill of Rights were legally enforceable against the States, *Barron*

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5004 Page 49 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

notwithstanding.[17] A prominent treatise of the era took the same position. W. Rawle, A View of the **\*843** Constitution of the United States of America 124–125 (2d ed. 1829) (arguing that certain of the first eight Amendments "appl[y] to the state legislatures" because those Amendments "form parts of the declared rights of the people, of which neither the state powers nor those of the Union can ever deprive them"); *id.,* at 125–126 (describing the Second Amendment "right of the people to keep and bear Arms" as "a restraint on both" Congress and the States); see also **\*\*3080** *Heller,* 554 U.S., at 607, 128 S.Ct., at 2805–2806 (describing Rawle's treatise as "influential"). Certain abolitionist leaders adhered to this view as well. Lysander Spooner championed the popular abolitionist argument that slavery was inconsistent with constitutional principles, citing as evidence the fact that it deprived black Americans of the "natural right of all men 'to keep and bear arms' for their personal defence," which he believed the Constitution "prohibit[ed] both Congress and the State governments from infringing." The Unconstitutionality of Slavery 98 (1860).

16   See, *e.g., Raleigh & Gaston R. Co. v. Davis,* 19 N.C. 451, 458–462 (1837) (right to just compensation for government taking of property); *Rohan v. Sawin,* 59 Mass. 281, 285 (1850) (right to be secure from unreasonable government searches and seizures); *State v. Buzzard,* 4 Ark. 18, 28 (1842) (right to keep and bear arms); *State v. Jumel,* 13 La. Ann. 399, 400 (1858) (same); *Cockrum v. State,* 24 Tex. 394, 401–404 (1859) (same).

17   See, *e.g., People v. Goodwin,* 18 Johns. \*187, \*201 (N.Y.Sup.Ct.1820); *Rhinehart v. Schuyler,* 7 Ill. 473, 522 (1845).

In sum, some appear to have believed that the Bill of Rights *did* apply to the States, even though this Court had squarely rejected that theory. See, *e.g., supra,* at 3072 – 3073 (recounting Rep. Hale's argument to this effect). Many others believed that the liberties codified in the Bill of Rights were ones that no State *should* abridge, even though they understood that the Bill technically did not apply to States. These beliefs, combined with the fact that most state constitutions recognized many, if not all, of the individual rights enumerated in the Bill of Rights, made the need for federal enforcement of constitutional liberties against the States an afterthought. See *ante,* at 3042 (opinion of the Court) (noting that, "[i]n 1868, 22 of the 37 States in the Union had state constitutional provisions explicitly protecting the right to keep and bear arms"). That changed with the national conflict over slavery.

b

In the contentious years leading up to the Civil War, those who sought to retain the institution of slavery found that to **\*844** do so, it was necessary to eliminate more and more of the basic liberties of slaves, free blacks, and white abolitionists. Congressman Tobias Plants explained that slaveholders "could not hold [slaves] safely where dissent was permitted," so they decided that "all dissent must be suppressed by the strong hand of power." 39th Cong. Globe 1013. The measures they used were ruthless, repressed virtually every right recognized in the Constitution, and demonstrated that preventing only discriminatory state firearms restrictions would have been a hollow assurance for liberty. Public reaction indicates that the American people understood this point.

The overarching goal of proslavery forces was to repress the spread of abolitionist thought and the concomitant risk of a slave rebellion. Indeed, it is difficult to overstate the extent to which fear of a slave uprising gripped slaveholders and dictated the acts of Southern legislatures. Slaves and free blacks represented a substantial percentage of the population and posed a severe threat to Southern order if they were not kept in their place. According to the 1860 Census, slaves represented one quarter or more of the population in 11 of the 15 slave States, nearly half the population in Alabama, Florida, Georgia, and Louisiana, and *more* than 50% of the population in Mississippi and South Carolina. Statistics of the United States (Including Mortality, Property, &c.,) in 1860, The Eighth Census 336–350 (1866).

The Southern fear of slave rebellion was not unfounded. Although there were others, two particularly notable slave uprisings heavily influenced slaveholders in the South. In 1822, a group of free blacks and slaves led by Denmark Vesey planned a rebellion in which they would slay their masters and flee to Haiti. H. Aptheker, American Negro Slave Revolts 268–270 (1983). The plan was foiled, leading to the swift arrest of 130 blacks, and the execution of 37, including Vesey. *Id.,* at 271. Still, slaveowners took notice—it was reportedly feared that as many as 6,600 to 9,000 slaves and **\*845** free blacks were involved in the plot. *Id.,* at 272. A few **\*\*3081** years later, the fear of rebellion was realized. An uprising led by Nat Turner took the lives of at least 57 whites before it was suppressed. *Id.,* at 298–302.

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5005 Page 50 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

The fear generated by these and other rebellions led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense. Teaching slaves to read (even the Bible) was a criminal offense punished severely in some States. See K. Stampp, The Peculiar Institution: Slavery in the Ante-bellum South 208, 211 (1956). Virginia made it a crime for a member of an "abolition" society to enter the State and argue "that the owners of slaves have no property in the same, or advocate or advise the abolition of slavery." 1835–1836 Va. Acts ch. 66, p. 44. Other States prohibited the circulation of literature denying a master's right to property in his slaves and passed laws requiring postmasters to inspect the mails in search of such material. C. Eaton, The Freedom–of–Thought Struggle in the Old South 118–143, 199–200 (1964).

Many legislatures amended their laws prohibiting slaves from carrying firearms [18] to apply the prohibition to free blacks as well. See, *e.g.,* Act of Dec. 23, 1833, § 7, 1833 Ga. Acts pp. 226, 228 (declaring that "it shall not be lawful for any free person of colour in this state, to own, use, or carry fire arms of any description whatever"); H. Aptheker, Nat Turner's Slave Rebellion 74–76, 83–94 (1966) (discussing similar Maryland and Virginia statutes); see also Act of Mar. 15, **\*846** 1852, ch. 206, 1852 Miss. Laws p. 328 (repealing laws allowing free blacks to obtain firearms licenses); Act of Jan. 31, 1831, 1831 Fla. Acts p. 30 (same). Florida made it the "duty" of white citizen "patrol[s] to search negro houses or other suspected places, for fire arms." Act of Feb. 17, 1833, ch. 671, 1833 Fla. Acts pp. 26, 30. If they found any firearms, the patrols were to take the offending slave or free black "to the nearest justice of the peace," whereupon he would be "sever[ely] punished" by "whipping on the bare back, not exceeding thirty-nine lashes," unless he could give a "plain and satisfactory" explanation of how he came to possess the gun. *Ibid.*

18  See, *e.g.,* Black Code, ch. 33, § 19, 1806 Acts of First Session of Territory of Orleans pp. 160, 162 (prohibiting slaves from using firearms unless they were authorized by their master to hunt within the boundaries of his plantation); An Act to Provide for the More Effectual Performance of Patrol Duty, 1819 S.C. Acts pp. 29, 31 (same); An Act to Amend the Sixth Section of an Act Entitled "An Act Concerning Slaves," approved 5th Feb., 18, 1840, ch. 58, 1850 Tex. Laws, 3d sess., pp. 42–43 (making it unlawful for "any slave to own firearms of any description").

Southern blacks were not alone in facing threats to their personal liberty and security during the antebellum era. Mob violence in many Northern cities presented dangers as well. Cottrol & Diamond, The Second Amendment: Toward an Afro–Americanist Reconsideration, 80 Geo. L.J. 309, 340 (1991) (hereinafter Cottrol) (recounting a July 1834 mob attack against "churches, homes, and businesses of white abolitionists and blacks" in New York that involved "upwards of twenty thousand people and required the intervention of the militia to suppress"); *ibid.* (noting an uprising in Boston nine years later in which a confrontation between a group of white sailors and four blacks led "a mob of several hundred whites*"* to "attac[k] and severely beat every black they could find").

c

After the Civil War, Southern anxiety about an uprising among the newly freed slaves peaked. As Representative Thaddeus Stevens is reported to have said, " '[w]hen it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, **\*\*3082** the snobs, and the male waiting-maids in Congress, were in hysterics.' " K. Stampp, The Era of Reconstruction, 1865–1877, p. 104 (1965) (hereinafter Era of Reconstruction).

 **\*847** As the Court explains, this fear led to "systematic efforts" in the "old Confederacy" to disarm the more than 180,000 freedmen who had served in the Union Army, as well as other free blacks. See *ante,* at 3038. Some States formally prohibited blacks from possessing firearms. *Ibid.* (quoting 1865 Miss. Laws p. 165, § 1, reprinted in 1 Fleming 289). Others enacted legislation prohibiting blacks from carrying firearms without a license, a restriction not imposed on whites. See, *e.g.,* La. Statute of 1865, reprinted in *id.,* at 280. Additionally, "[t]hroughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves." *Ante,* at 3039.

As the Court makes crystal clear, if the Fourteenth Amendment "had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African–Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers." *Ante,* at 3043. In the years following the Civil War, a law banning firearm possession outright "would have been nondiscriminatory only in the

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

formal sense," for it would have "left firearms in the hands of the militia and local peace officers." *Ibid.*

Evidence suggests that the public understood this at the time the Fourteenth Amendment was ratified. The publicly circulated Report of the Joint Committee on Reconstruction extensively detailed these abuses, see *ante,* at 3038 – 3039 (collecting examples), and statements by citizens indicate that they looked to the Committee to provide a federal solution to this problem, see, *e.g.,* 39th Cong. Globe 337 (remarks of Rep. Sumner) (introducing "a memorial from the colored citizens of the State of South Carolina" asking for, *inter alia,* "constitutional protection in keeping arms, in holding public assemblies, and in complete liberty of speech and of the press").

One way in which the Federal Government responded was to issue military orders countermanding Southern arms legislation. **\*848** See, *e.g.,* Jan. 17, 1866, order from Major General D.E. Sickles, reprinted in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 37 (1871) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed"). The significance of these steps was not lost on those they were designed to protect. After one such order was issued, The Christian Recorder, published by the African Methodist Episcopal Church, published the following editorial:

" 'We have several times alluded to the fact that the Constitution of the United States, guaranties to every citizen the right to keep and bear arms.... All men, without the distinction of color, have the right to keep arms to defend their homes, families, or themselves.'

"We are glad to learn that [the] Commissioner for this State ... has given freedmen to understand that they have as good a right to keep fire arms as any other citizens. The Constitution of the United States is the supreme law of the land, and we will be governed by that at present." Right to Bear Arms, Phila., Pa., Christian Recorder, Feb. 24, 1866, pp. 29–30.

The same month, The Loyal Georgian carried a letter to the editor asking, "Have colored persons a right to own and carry **\*\*3083** fire arms?—A Colored Citizen." The editors responded as follows:

"Almost every day, we are asked questions similar to the above. We answer *certainly* you have the *same* right to own

and carry fire arms that *other* citizens have. You are not only free but citizens of the United States and, as such, entitled to the same privileges granted to other citizens by the Constitution of the United States.

. . . . .

"... Article II, of the amendments to the Constitution of the United States, gives the people the right to bear **\*849** arms and states that this right shall not be infringed.... All men, without distinction of color, have the right to keep arms to defend their homes, families or themselves." Letter to the Editor, Augusta, Ga., Loyal Georgian, Feb. 3, 1866, p. 3.

These statements are consistent with the arguments of abolitionists during the antebellum era that slavery, and the slave States' efforts to retain it, violated the constitutional rights of individuals—rights the abolitionists described as among the privileges and immunities of citizenship. See, *e.g.,* J. Tiffany, Treatise on the Unconstitutionality of American Slavery 56 (1849) ( "pledg[ing] ... to see that all the rights, privileges, and immunities, granted by the constitution of the United States, are extended to all"); *id.,* at 99 (describing the "right to keep and bear arms" as one of those rights secured by "the constitution of the United States"). The problem abolitionists sought to remedy was that, under *Dred Scott,* blacks were not entitled to the privileges and immunities of citizens under the Federal Constitution and that, in many States, whatever inalienable rights state law recognized did not apply to blacks. See, *e.g., Cooper v. Savannah,* 4 Ga. 68, 72 (1848) (deciding, just two years after Chief Justice Lumpkin's opinion in *Nunn* recognizing the right to keep and bear arms, see *supra,* at 3079 – 3080, that "[f]ree persons of color have never been recognized here as citizens; they are not entitled to bear arms").

Section 1 guaranteed the rights of citizenship in the United States and in the several States without regard to race. But it was understood that liberty would be assured little protection if § 1 left each State to decide which privileges or immunities of United States citizenship it would protect. As Frederick Douglass explained before § 1's adoption, "the Legislatures of the South can take from him the right to keep and bear arms, as they can—they would not allow a negro to walk with a cane where I came from, they would not allow five of them to assemble together." In **\*850** What New Skin Will the Old Snake Come Forth? An Address Delivered in New York, New York, on May 10, 1865, reprinted in 4 The Frederick Douglass Papers 79, 83–84 (J. Blassingame & J. McKivigan eds. 1991) (footnote omitted). "Notwithstanding

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5007 Page 52 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

the provision in the Constitution of the United States that the right to keep and bear arms shall not be abridged," Douglass explained that "the black man has never had the right to keep or bear arms." *Id.*, at 84. Absent a constitutional amendment to enforce that right against the States, he insisted that "the work of the Abolitionists [wa]s not finished." *Ibid.*

This history confirms what the text of the Privileges or Immunities Clause most naturally suggests: Consistent with its command that "[n]o State shall ... abridge" the rights of United States citizens, the Clause establishes a minimum baseline of federal rights, and the constitutional right to keep and bear arms plainly was among them. [19]

[19]  I conclude that the right to keep and bear arms applies to the States through the Privileges or Immunities Clause, which recognizes the rights of United States "citizens." The plurality concludes that the right applies to the States through the Due Process Clause, which covers all "person[s]." Because this case does not involve a claim brought by a noncitizen, I express no view on the difference, if any, between my conclusion and the plurality's with respect to the extent to which the States may regulate firearm possession by noncitizens.

**3084  III

My conclusion is contrary to this Court's precedents, which hold that the Second Amendment right to keep and bear arms is not a privilege of United States citizenship. See *Cruikshank*, 92 U.S., at 548–549, 551–553. I must, therefore, consider whether *stare decisis* requires retention of those precedents. As mentioned at the outset, my inquiry is limited to the right at issue here. Thus, I do not endeavor to decide in this case whether, or to what extent, the Privileges or Immunities Clause applies any other rights enumerated *851 in the Constitution against the States. [20] Nor do I suggest that the *stare decisis* considerations surrounding the application of the right to keep and bear arms against the States would be the same as those surrounding another right protected by the Privileges or Immunities Clause. I consider *stare decisis* only as it applies to the question presented here.

[20]  I note, however, that I see no reason to assume that the constitutionally enumerated rights protected by the Privileges or Immunities Clause should consist of all the rights recognized in the Bill of Rights and no others. Constitutional provisions outside the Bill of Rights protect individual rights, see, *e.g.*, Art. I, § 9, cl. 2

(granting the "Privilege of the Writ of Habeas Corpus"), and there is no obvious evidence that the Framers of the Privileges or Immunities Clause meant to exclude them. In addition, certain Bill of Rights provisions prevent federal interference in state affairs and are not readily construed as protecting rights that belong to individuals. The Ninth and Tenth Amendments are obvious examples, as is the First Amendment's Establishment Clause, which "does not purport to protect individual rights." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 50, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (THOMAS, J., concurring in judgment); see Amar 179–180.

A

This inquiry begins with the *Slaughter–House Cases*. There, this Court upheld a Louisiana statute granting a monopoly on livestock butchering in and around the city of New Orleans to a newly incorporated company. 16 Wall. 36, 21 L.Ed. 394. Butchers excluded by the monopoly sued, claiming that the statute violated the Privileges or Immunities Clause because it interfered with their right to pursue and "exercise their trade." *Id.*, at 60. This Court rejected the butchers' claim, holding that their asserted right was not a privilege or immunity of American citizenship, but one governed by the States alone. The Court held that the Privileges or Immunities Clause protected only rights of *federal* citizenship—those "which owe their existence to the Federal government, its National character, its Constitution, or its laws," *id.*, at 79—and did not protect *any* of the rights of state citizenship, *852 id.*, at 74. In other words, the Court defined the two sets of rights as mutually exclusive.

After separating these two sets of rights, the Court defined the rights of state citizenship as "embrac[ing] nearly every civil right for the establishment and protection of which organized government is instituted"—that is, all those rights listed in *Corfield*. 16 Wall., at 76 (referring to "those rights" that "Judge Washington" described). That left very few rights of **3085 federal citizenship for the Privileges or Immunities Clause to protect. The Court suggested a handful of possibilities, such as the "right of free access to [federal] seaports," protection of the Federal Government while traveling "on the high seas," and even two rights listed in the Constitution. *Id.*, at 79 (noting "[t]he right to peaceably assemble" and "the privilege of the writ of *habeas corpus* "); see *supra*, at 3060. But its decision to interpret the rights of state and federal citizenship as mutually exclusive led the Court in future cases to conclude that constitutionally

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

enumerated rights were excluded from the Privileges or Immunities Clause's scope. See *Cruikshank, supra.*

I reject that understanding. There was no reason to interpret the Privileges or Immunities Clause as putting the Court to the extreme choice of interpreting the "privileges and immunities" of federal citizenship to mean either all those rights listed in *Corfield,* or almost no rights at all. 16 Wall., at 76. The record is scant that the public understood the Clause to make the Federal Government "a perpetual censor upon all legislation of the States" as the *Slaughter–House* majority feared. *Id.,* at 78. For one thing, *Corfield* listed the "elective franchise" as one of the privileges and immunities of "citizens of the several states," 6 F. Cas., at 552, yet Congress and the States still found it necessary to adopt the Fifteenth Amendment—which protects "[t]he right of citizens of the United States to vote"—two years after the Fourteenth Amendment's passage. If the Privileges or Immunities Clause were understood to protect every **\*853** conceivable civil right from state abridgment, the Fifteenth Amendment would have been redundant.

The better view, in light of the States and Federal Government's shared history of recognizing certain inalienable rights in their citizens, is that the privileges and immunities of state and federal citizenship overlap. This is not to say that the privileges and immunities of state and federal citizenship are the same. At the time of the Fourteenth Amendment's ratification, States performed many more functions than the Federal Government, and it is unlikely that, simply by referring to "privileges or immunities," the Framers of § 1 meant to transfer every right mentioned in *Corfield* to congressional oversight. As discussed, "privileges" and "immunities" were understood only as synonyms for "rights." See *supra,* at 3063 – 3064. It was their attachment to a particular group that gave them content, and the text and history recounted here indicate that the rights of United States citizens were not perfectly identical to the rights of citizens "in the several States." Justice Swayne, one of the dissenters in *Slaughter–House,* made the point clear:

> "The citizen of a State has the *same* fundamental rights as a citizen of the United States, *and also certain others,* local in their character, arising from his relation to the State, and in addition, those which belong to the citizen of the United States, he being in that relation also. There may thus be a double citizenship, each having some rights peculiar to itself. It is only over those which belong to the citizen of the

United States that the category here in question throws the shield of its protection." 16 Wall., at 126 (emphasis added).

Because the privileges and immunities of American citizenship include rights enumerated in the Constitution, they overlap to at least some extent with the privileges and immunities traditionally recognized in citizens in the several States.

**\*854** A separate question is whether the privileges and immunities of American citizenship include any rights besides those enumerated in the Constitution. The four **\*\*3086** dissenting Justices in *Slaughter–House* would have held that the Privileges or Immunities Clause protected the unenumerated right that the butchers in that case asserted. See *id.,* at 83 (opinion of Field, J.); *id.,* at 111 (opinion of Bradley, J.); *id.,* at 124 (opinion of Swayne, J.). Because this case does not involve an unenumerated right, it is not necessary to resolve the question whether the Clause protects such rights, or whether the Court's judgment in *Slaughter–House* was correct.

Still, it is argued that the mere possibility that the Privileges or Immunities Clause may enforce unenumerated rights against the States creates " 'special hazards' " that should prevent this Court from returning to the original meaning of the Clause. [21] *Post,* at 3089 – 3090 (STEVENS, J., dissenting). Ironically, the same objection applies to the Court's substantive due process jurisprudence, which illustrates the risks of granting judges broad discretion to recognize individual constitutional rights in the absence of textual or historical guideposts. But I see no reason to assume that such hazards apply to the Privileges or Immunities Clause. The mere fact that the Clause does not expressly list the rights it protects does not render it incapable of principled judicial application. The Constitution contains many provisions that require an examination of more than just constitutional text to determine whether a particular act is within Congress' power or is otherwise prohibited. See, *e.g.,* Art. I, § 8, cl. 18 (Necessary and Proper Clause); Amdt. 8 (Cruel and **\*855** Unusual Punishments Clause). When the inquiry focuses on what the ratifying era understood the Privileges or Immunities Clause to mean, interpreting it should be no more "hazardous" than interpreting these other constitutional provisions by using the same approach. To be sure, interpreting the Privileges or Immunities Clause may produce hard questions. But they will have the advantage of being questions the Constitution asks us to answer. I believe those questions are more worthy of this Court's attention—and far more likely to yield discernible

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5009 Page 54 of 208

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

answers—than the substantive due process questions the Court has for years created on its own, with neither textual nor historical support.

21     To the extent Justice STEVENS is concerned that reliance on the Privileges or Immunities Clause may invite judges to "write their personal views of appropriate public policy into the Constitution," *post,* at 3089 – 3090 (internal quotation marks omitted), his celebration of the alternative—the "flexibility," "transcend[ence]," and "dynamism" of substantive due process—speaks for itself, *post,* at 3096, 3099.

Finding these impediments to returning to the original meaning overstated, I reject *Slaughter–House* insofar as it precludes any overlap between the privileges and immunities of state and federal citizenship. I next proceed to the *stare decisis* considerations surrounding the precedent that expressly controls the question presented here.

B

Three years after *Slaughter–House,* the Court in *Cruikshank* squarely held that the right to keep and bear arms was not a privilege of American citizenship, thereby overturning the convictions of militia members responsible for the brutal Colfax Massacre. See *supra,* at 3027 – 3028. *Cruikshank* is not a precedent entitled to any respect. The flaws in its interpretation of the Privileges or Immunities Clause are made evident by the preceding evidence of its original meaning, and I would reject the holding on that basis alone. But, the consequences of *Cruikshank* warrant mention as well.

**3087 *Cruikshank* 's holding that blacks could look only to state governments for protection of their right to keep and bear arms enabled private forces, often with the assistance of local governments, to subjugate the newly freed slaves and their descendants through a wave of private violence designed to drive blacks from the voting booth and force them *856 into peonage, an effective return to slavery. Without federal enforcement of the inalienable right to keep and bear arms, these militias and mobs were tragically successful in waging a campaign of terror against the very people the Fourteenth Amendment had just made citizens.

Take, for example, the Hamburg Massacre of 1876. There, a white citizen militia sought out and murdered a troop of black militiamen for no other reason than that they had dared to conduct a celebratory Fourth of July parade through their

mostly black town. The white militia commander, "Pitchfork" Ben Tillman, later described this massacre with pride: "[T]he leading white men of Edgefield" had decided "to seize the first opportunity that the negroes might offer them to provoke a riot and teach the negroes a lesson by having the whites demonstrate their superiority by killing as many of them as was justifiable." S. Kantrowitz, Ben Tillman & the Reconstruction of White Supremacy 67 (2000) (ellipsis, brackets, and internal quotation marks omitted). None of the perpetrators of the Hamburg murders was ever brought to justice. 22

22     Tillman went on to a long career as South Carolina's Governor and, later, United States Senator. Tillman's contributions to campaign finance law have been discussed in our recent cases on that subject. See *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 394 – 395, 433, 446, 476, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (STEVENS, J., concurring in part and dissenting in part) (discussing at length the Tillman Act of 1907, ch. 420, 34 Stat. 864). His contributions to the culture of terrorism that grew in the wake of *Cruikshank* had an even more dramatic and tragic effect.

Organized terrorism like that perpetuated by Tillman and his cohorts proliferated in the absence of federal enforcement of constitutional rights. Militias such as the Ku Klux Klan, the Knights of the White Camellia, the White Brotherhood, the Pale Faces, and the '76 Association spread terror among blacks and white Republicans by breaking up Republican meetings, threatening political leaders, and whipping black militiamen. Era of Reconstruction 199–200; Curtis **857 156. These groups raped, murdered, lynched, and robbed as a means of intimidating, and instilling pervasive fear in, those whom they despised. A. Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction 28–46 (1995).

Although Congress enacted legislation to suppress these activities, 23 Klan tactics remained a constant presence in the lives of Southern blacks for decades. Between 1882 and 1968, there were at least 3,446 reported lynchings of blacks in the South. Cottrol 351–352. They were tortured and killed for a wide array of alleged crimes, without even the slightest hint of due process. Emmit Till, for example, was killed in 1955 for allegedly whistling at a white woman. S. Whitfield, A Death in the Delta: The Story of Emmett Till 15–31 (1988). The fates of other targets of mob violence were equally depraved. See, *e.g.,* Lynched Negro and Wife Were First Mutilated, Vicksburg (Miss.) Evening Post, Feb. 8, 1904, reprinted in R. Ginzburg, 100 Years **3088 of Lynchings 63 (1988);

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5010 Page 55 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Negro Shot Dead for Kissing His White Girlfriend, Chicago Defender, Feb. 31, 1915, in *id.,* at 95 (reporting incident in Florida); La. Negro Is Burned Alive Screaming "I Didn't Do It," Cleveland Gazette, Dec. 13, 1914, in *id.,* at 93 (reporting incident in Louisiana).

23    In an effort to enforce the Fourteenth Amendment and halt this violence, Congress enacted a series of civil rights statutes, including the Force Acts, see Act of May 31, 1870, 16 Stat. 140; Act of Feb. 28, 1871, 16 Stat. 433, and the Ku Klux Klan Act, see Act of Apr. 20, 1871, 17 Stat. 13.

The use of firearms for self-defense was often the only way black citizens could protect themselves from mob violence. As Eli Cooper, one target of such violence, is said to have explained, "[t]he 'Negro has been run over for fifty years, but it must stop now, and pistols and shotguns are the only weapons to stop a mob.' " Church Burnings Follow Negro Agitator's Lynching, Chicago Defender, Sept. 6, 1919, in *id.,* at 124. Sometimes, as in Cooper's case, self-defense did not succeed. He was dragged from his home by a mob and **\*858** killed as his wife looked on. *Ibid.* But at other times, the use of firearms allowed targets of mob violence to survive. One man recalled the night during his childhood when his father stood armed at a jail until morning to ward off lynchers. See Cottrol 354. The experience left him with a sense, "not 'of powerlessness, but of the "possibilities of salvation" ' " that came from standing up to intimidation. *Ibid.*

In my view, the record makes plain that the Framers of the Privileges or Immunities Clause and the ratifying-era public understood—just as the Framers of the Second Amendment did—that the right to keep and bear arms was essential to the preservation of liberty. The record makes equally plain that they deemed this right necessary to include in the minimum baseline of federal rights that the Privileges or Immunities Clause established in the wake of the war over slavery. There is nothing about *Cruikshank* 's contrary holding that warrants its retention.

\* \* \*

I agree with the Court that the Second Amendment is fully applicable to the States. I do so because the right to keep and bear arms is guaranteed by the Fourteenth Amendment as a privilege of American citizenship.

Justice STEVENS, dissenting.

In *District of Columbia v. Heller,* 554 U.S. 570, 573, 128 S.Ct. 2783, 2788, 171 L.Ed.2d 637 (2008), the Court answered the question whether a federal enclave's "prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution." The question we should be answering in this case is whether the Constitution "guarantees individuals a fundamental right," enforceable against the States, "to possess a functional, personal firearm, including a handgun, within the home." Complaint ¶ 34, App. 23. That is a different—and more difficult—inquiry than asking if the Fourteenth Amendment "incorporates" the Second Amendment. The **\*859** so-called incorporation question was squarely and, in my view, correctly resolved in the late 19th century.[1]

1    See *United States v. Cruikshank,* 92 U.S. 542, 553, 23 L.Ed. 588 (1876); *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886); *Miller v. Texas,* 153 U.S. 535, 538, 14 S.Ct. 874, 38 L.Ed. 812 (1894). This is not to say that I agree with all other aspects of these decisions.

Before the District Court, petitioners focused their pleadings on the special considerations raised by domestic possession, which they identified as the core of their asserted right. In support of their claim that the city of Chicago's handgun ban violates the Constitution, they now rely primarily on the Privileges or Immunities Clause of the Fourteenth Amendment. See Brief for Petitioners 9–65. They rely **\*\*3089** secondarily on the Due Process Clause of that Amendment. See *id.,* at 66–72. Neither submission requires the Court to express an opinion on whether the Fourteenth Amendment places any limit on the power of States to regulate possession, use, or carriage of firearms outside the home.

I agree with the plurality's refusal to accept petitioners' primary submission. *Ante,* at 3030 – 3031. Their briefs marshal an impressive amount of historical evidence for their argument that the Court interpreted the Privileges or Immunities Clause too narrowly in the *Slaughter–House Cases,* 16 Wall. 36, 21 L.Ed. 394 (1873). But the original meaning of the Clause is not as clear as they suggest[2]— and not nearly as clear as it would **\*860** need to be to dislodge 137 years of precedent. The burden is severe for those who seek radical change in such an established body of constitutional doctrine.[3] Moreover, the suggestion that

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5011 Page 56 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

invigorating the Privileges or Immunities Clause will reduce judicial discretion, see Reply Brief for Petitioners 22, n. 8, 26; Tr. of Oral Arg. 64–65, strikes me as implausible, if not exactly backwards. "For the very reason that it has so long remained a clean slate, a revitalized Privileges or Immunities Clause holds special hazards for judges who are mindful that their proper task is not to write their personal views of appropriate public policy into the Constitution." [4]

2   Cf., *e.g.,* Currie, The Reconstruction Congress, 75 U. Chi. L.Rev. 383, 406 (2008) (finding "some support in the legislative history for no fewer than four interpretations" of the Privileges or Immunities Clause, two of which contradict petitioners' submission); Green, The Original Sense of the (Equal) Protection Clause: Subsequent Interpretation and Application, 19 Geo. Mason U. Civ. Rights L.J. 219, 255–277 (2009) (providing evidence that the Clause was originally conceived of as an antidiscrimination measure, guaranteeing equal rights for black citizens); Rosenthal, The New Originalism Meets the Fourteenth Amendment: Original Public Meaning and the Problem of Incorporation, 18 J. Contemp. Legal Issues 361 (2009) (detailing reasons to doubt that the Clause was originally understood to apply the Bill of Rights to the States); Hamburger, Privileges or Immunities, 105 Nw. U.L.Rev. 61 (2011) (arguing that the Clause was meant to ensure freed slaves were afforded "the Privileges and Immunities" specified in Article IV, § 2, cl. 1, of the Constitution. Although he urges its elevation in our doctrine, Justice THOMAS has acknowledged that, in seeking to ascertain the original meaning of the Privileges or Immunities Clause, "[l]egal scholars agree on little beyond the conclusion that the Clause does not mean what the Court said it meant in 1873." *Saenz v. Roe,* 526 U.S. 489, 522, n. 1, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (dissenting opinion); accord, *ante,* at 3030 – 3031 (plurality opinion).

3   It is no secret that the desire to "displace" major "portions of our equal protection and substantive due process jurisprudence" animates some of the passion that attends this interpretive issue. *Saenz,* 526 U.S., at 528, 119 S.Ct. 1518 (THOMAS, J., dissenting).

4   Wilkinson, The Fourteenth Amendment Privileges or Immunities Clause, 12 Harv. J.L. & Pub. Pol'y 43, 52 (1989). Judge Wilkinson's point is broader than the privileges or immunities debate. As he observes, "there may be more structure imposed by provisions subject to generations of elaboration and refinement than by a provision in its pristine state. The fortuities of

uneven constitutional development must be respected, not cast aside in the illusion of reordering the landscape anew." *Id.,* at 51–52; see also *Washington v. Glucksberg,* 521 U.S. 702, 759, n. 6, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Souter, J., concurring in judgment) (acknowledging that, "[t]o a degree," the *Slaughter–House* "decision may have led the Court to look to the Due Process Clause as a source of substantive rights").

I further agree with the plurality that there are weighty arguments supporting petitioners' second submission, insofar as **\*\*3090** it concerns the possession of firearms for lawful self-defense in the home. But these arguments are less compelling than the plurality suggests; they are much less **\*861** compelling when applied outside the home; and their validity does not depend on the Court's holding in *Heller.* For that holding sheds no light on the meaning of the Due Process Clause of the Fourteenth Amendment. Our decisions construing that Clause to render various procedural guarantees in the Bill of Rights enforceable against the States likewise tell us little about the meaning of the word "liberty" in the Clause or about the scope of its protection of nonprocedural rights.

This is a substantive due process case.

I

Section 1 of the Fourteenth Amendment decrees that no State shall "deprive any person of life, liberty, or property, without due process of law." The Court has filled thousands of pages expounding that spare text. As I read the vast corpus of substantive due process opinions, they confirm several important principles that ought to guide our resolution of this case. The principal opinion's lengthy summary of our "incorporation" doctrine, see *ante,* at 3028 – 3030, 3031 – 3036 (majority opinion), 3030 – 3031 (plurality opinion), and its implicit (and untenable) effort to wall off that doctrine from the rest of our substantive due process jurisprudence, invite a fresh survey of this old terrain.

*Substantive Content*

The first, and most basic, principle established by our cases is that the rights protected by the Due Process Clause are not merely procedural in nature. At first glance, this proposition might seem surprising, given that the Clause refers to "process." But substance and procedure are often deeply entwined. Upon closer inspection, the text can be read to

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5012 Page 57 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

"impos[e] nothing less than an obligation to give substantive content to the words 'liberty' and 'due process of law,' " *Washington v. Glucksberg,* 521 U.S. 702, 764, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Souter, J., concurring in judgment), lest superficially fair procedures be permitted to "destroy the enjoyment" of life, liberty, and **\*862** property, *Poe v. Ullman,* 367 U.S. 497, 541, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting), and the Clause's prepositional modifier be permitted to swallow its primary command. Procedural guarantees are hollow unless linked to substantive interests; and no amount of process can legitimize some deprivations.

I have yet to see a persuasive argument that the Framers of the Fourteenth Amendment thought otherwise. To the contrary, the historical evidence suggests that, at least by the time of the Civil War if not much earlier, the phrase "due process of law" had acquired substantive content as a term of art within the legal community.[5] This understanding is **\*\*3091 \*863** consonant with the venerable "notion that governmental authority has implied limits which preserve private autonomy,"[6] a notion which predates the founding and which finds reinforcement in the Constitution's Ninth Amendment, see *Griswold v. Connecticut,* 381 U.S. 479, 486–493, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).[7] The Due Process Clause cannot claim to be the source of our basic freedoms—no legal document ever could, see *Meachum v. Fano,* 427 U.S. 215, 230, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (STEVENS, J., dissenting)—but it stands as one of their foundational guarantors in our law.

5    See, *e.g.,* Ely, The Oxymoron Reconsidered: Myth and Reality in the Origins of Substantive Due Process, 16 Const. Commentary 315, 326–327 (1999) (concluding that founding-era "American statesmen accustomed to viewing due process through the lens of [Sir Edward] Coke and [William] Blackstone could [not] have failed to understand due process as encompassing substantive as well as procedural terms"); Gedicks, An Originalist Defense of Substantive Due Process: Magna Carta, Higher–Law Constitutionalism, and the Fifth Amendment, 58 Emory L.J. 585, 594 (2009) (arguing "that one widely shared understanding of the Due Process Clause of the Fifth Amendment in the late eighteenth century encompassed judicial recognition and enforcement of unenumerated substantive rights"); Maltz, Fourteenth Amendment Concepts in the Antebellum Era, 32 Am. J. Legal Hist. 305, 317–318 (1988) (explaining that in the antebellum era a "substantial number of states," as well as antislavery

advocates, "imbued their [constitutions'] respective due process clauses with a substantive content"); Tribe, Taking Text and Structure Seriously: Reflections on Free–Form Method in Constitutional Interpretation, 108 Harv. L.Rev. 1221, 1297, n. 247 (1995) ("[T]he *historical* evidence points strongly toward the conclusion that, at least by 1868 even if not in 1791, any state legislature voting to ratify a constitutional rule banning government deprivations of 'life, liberty, or property, without due process of law' would have understood that ban as having substantive as well as procedural content, given that era's premise that, to qualify as 'law,' an enactment would have to meet substantive requirements of rationality, non-oppressiveness, and evenhandedness"); see also Stevens, The Third Branch of Liberty, 41 U. Miami L.Rev. 277, 290 (1986) ("In view of the number of cases that have given substantive content to the term liberty, the burden of demonstrating that this consistent course of decision was unfaithful to the intent of the Framers is surely a heavy one").

6    1 L. Tribe, American Constitutional Law § 8–1, p. 1335 (3d ed.2000).

7    The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

If text and history are inconclusive on this point, our precedent leaves no doubt: It has been "settled" for well over a century that the Due Process Clause "applies to matters of substantive law as well as to matters of procedure." *Whitney v. California,* 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Time and again, we have recognized that in the Fourteenth Amendment as well as the Fifth, the "Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Glucksberg,* 521 U.S., at 719, 117 S.Ct. 2258. "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion of O'Connor, J., joined by Rehnquist, C.J., and GINSBURG and BREYER, JJ.) (quoting *Glucksberg,* 521 U.S., at 720, 117 S.Ct. 2258). Some of our most enduring precedents, accepted today by virtually everyone, were substantive due process decisions. See, *e.g., Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (recognizing due-process- as well as equal-protection-based right to marry person of another race); *Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (outlawing racial

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5013 Page 58 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

segregation in District of Columbia **864* public schools); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (vindicating right of parents to direct upbringing and education of their children); *Meyer v. Nebraska,* 262 U.S. 390, 399–403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (striking down prohibition on teaching of foreign languages).

*Liberty*

The second principle woven through our cases is that substantive due process is fundamentally a matter of personal liberty. For it is the liberty clause of the Fourteenth **3092* Amendment that grounds our most important holdings in this field. It is the liberty clause that enacts the Constitution's "promise" that a measure of dignity and self-rule will be afforded to all persons. *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). It is the liberty clause that reflects and renews "the origins of the American heritage of freedom [and] the abiding interest in individual liberty that makes certain state intrusions on the citizen's right to decide how he will live his own life intolerable." *Fitzgerald v. Porter Memorial Hospital,* 523 F.2d 716, 720 (C.A.7 1975) (Stevens, J.). Our substantive due process cases have episodically invoked values such as privacy and equality as well, values that in certain contexts may intersect with or complement a subject's liberty interests in profound ways. But as I have observed on numerous occasions, "most of the significant [20th-century] cases raising Bill of Rights issues have, in the final analysis, actually interpreted the word 'liberty' in the Fourteenth Amendment." [8]

[8]     Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L.Rev. 13, 20 (1992); see *Fitzgerald,* 523 F.2d, at 719–720; Stevens, 41 U. Miami L.Rev., at 286–289; see also Greene, The So–Called Right to Privacy, 43 U.C.D.L.Rev. 715, 725–731 (2010).

It follows that the term "incorporation," like the term "unenumerated rights," is something of a misnomer. Whether an asserted substantive due process interest is explicitly **865* named in one of the first eight Amendments to the Constitution or is not mentioned, the underlying inquiry is the same: We must ask whether the interest is "comprised within the term liberty." *Whitney,* 274 U.S., at 373, 47 S.Ct. 641 (Brandeis, J., concurring). As the second Justice Harlan has shown, ever since the Court began considering the applicability of the Bill of Rights to the States, "the Court's

usual approach has been to ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments." *Malloy v. Hogan,* 378 U.S. 1, 24, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (dissenting opinion); see also Frankfurter, Memorandum on "Incorporation" of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, 78 Harv. L.Rev. 746, 747–750 (1965). In the pathmarking case of *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), for example, both the majority and dissent evaluated petitioner's free speech claim not under the First Amendment but as an aspect of "the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." [9]

[9]     See also *Gitlow,* 268 U.S., at 672, 45 S.Ct. 625 (Holmes, J., dissenting) ("The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States"). Subsequent decisions repeatedly reaffirmed that persons hold free speech rights against the States on account of the Fourteenth Amendment's liberty clause, not the First Amendment *per se.* See, *e.g., NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 466, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Thornhill v. Alabama,* 310 U.S. 88, 95, and n. 7, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); see also *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 336, n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("The term 'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States"). Classic opinions written by Justice Cardozo and Justice Frankfurter endorsed the same basic approach to "incorporation," with the Fourteenth Amendment taken as a distinct source of rights independent from the first eight Amendments. *Palko v. Connecticut,* 302 U.S. 319, 322–328, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (opinion for the Court by Cardozo, J.); *Adamson v. California,* 332 U.S. 46, 59–68, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Frankfurter, J., concurring).

**3093* *866* In his own classic opinion in *Griswold,* 381 U.S., at 500, 85 S.Ct. 1678 (opinion concurring in judgment), Justice Harlan memorably distilled these precedents' lesson: "While the relevant inquiry may be aided by resort to one or more of the provisions of the Bill of Rights, it is not

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5014 Page 59 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

dependent on them or any of their radiations. The Due Process Clause of the Fourteenth Amendment stands ... on its own bottom." [10] Inclusion in the Bill of Rights is neither necessary nor sufficient for an interest to be judicially enforceable under the Fourteenth Amendment. This Court's " 'selective incorporation' " doctrine, *ante,* at 3034, is not simply "related" to substantive due process, *ante,* at 3036; it is a subset thereof.

[10]   See also *Wolf v. Colorado,* 338 U.S. 25, 26, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) ("The notion that the 'due process of law' guaranteed by the Fourteenth Amendment is shorthand for the first eight amendments of the Constitution ... has been rejected by this Court again and again, after impressive consideration. ... The issue is closed"). *Wolf* 's holding on the exclusionary rule was overruled by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), but the principle just quoted has never been disturbed. It is notable that *Mapp,* the case that launched the modern "doctrine of *ad hoc,*" " 'jot-for-jot' " incorporation, *Williams v. Florida,* 399 U.S. 78, 100–101, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (Harlan, J., concurring in result), expressly held "that the exclusionary rule is an essential part of both the Fourth *and Fourteenth* Amendments." 367 U.S., at 657, 81 S.Ct. 1684 (emphasis added).

*Federal/State Divergence*

The third precept to emerge from our case law flows from the second: The rights protected against state infringement by the Fourteenth Amendment's Due Process Clause need not be identical in shape or scope to the rights protected against Federal Government infringement by the various provisions of the Bill of Rights. As drafted, the Bill of Rights directly constrained only the Federal Government. See *Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 8 L.Ed. 672 (1833). Although the enactment of the Fourteenth **\*867** Amendment profoundly altered our legal order, it "did not unstitch the basic federalist pattern woven into our constitutional fabric." *Williams v. Florida,* 399 U.S. 78, 133, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (Harlan, J., concurring in result). Nor, for that matter, did it expressly alter the Bill of Rights. The Constitution still envisions a system of divided sovereignty, still "establishes a federal republic where local differences are to be cherished as elements of liberty" in the vast run of cases, *National Rifle Assn. of Am. Inc. v. Chicago,* 567 F.3d 856, 860 (C.A.7 2009) (Easterbrook, C. J.), still allocates a general "police power ... to the States and the States alone," *United States v. Comstock,* 560 U.S. 126, 153, 130 S.Ct. 1949,

1967, 176 L.Ed.2d 878 (2010) (KENNEDY, J., concurring in judgment). Elementary considerations of constitutional text and structure suggest there may be legitimate reasons to hold state governments to different standards than the Federal Government in certain areas. [11]

[11]   I can hardly improve upon the many passionate defenses of this position that Justice Harlan penned during his tenure on the Court. See *Williams,* 399 U.S., at 131, n. 14, 90 S.Ct. 1914 (opinion concurring in result) (cataloguing opinions).

It is true, as the Court emphasizes, *ante,* at 3034 – 3036, that we have made numerous provisions of the Bill of Rights fully applicable to the States. It is settled, for **\*\*3094** instance, that the Governor of Alabama has no more power than the President of the United States to authorize unreasonable searches and seizures. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). But we have never accepted a " 'total incorporation' " theory of the Fourteenth Amendment, whereby the Amendment is deemed to subsume the provisions of the Bill of Rights en masse. See *ante,* at 3034. And we have declined to apply several provisions to the States in any measure. See, *e.g., Minneapolis & St. Louis R. Co. v. Bombolis,* 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916) (Seventh Amendment); *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (Grand Jury Clause). We have, moreover, resisted a uniform approach to the Sixth Amendment's criminal jury guarantee, demanding 12–member panels and unanimous **\*868** verdicts in federal trials, yet not in state trials. See *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); *Williams,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446. In recent years, the Court has repeatedly declined to grant certiorari to review that disparity. [12] While those denials have no precedential significance, they confirm the proposition that the "incorporation" of a provision of the Bill of Rights into the Fourteenth Amendment does not, in itself, mean the provision must have precisely the same meaning in both contexts.

[12]   See, *e.g., Pet. for Cert. in Bowen v. Oregon,* O.T.2009, No. 08–1117, p. i, cert. denied, 558 U.S. 815, 130 S.Ct. 52, 175 L.Ed.2d 21 (2009) (request to overrule *Apodaca* ); Pet. for Cert. in *Lee v. Louisiana,* O.T.2008, No. 07–1523, p. i, cert. denied, 555 U.S. 823, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008) (same); Pet. for Cert. in *Logan v. Florida,* O.T.2007, No. 07–7264, pp. 14–19, cert. denied, 552 U.S. 1189, 128 S.Ct. 1222, 170 L.Ed.2d 76 (2008) (request to overrule *Williams* ).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

It is true, as well, that during the 1960's the Court decided a number of cases involving procedural rights in which it treated the Due Process Clause as if it transplanted language from the Bill of Rights into the Fourteenth Amendment. See, *e.g., Benton v. Maryland,* 395 U.S. 784, 795, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (Double Jeopardy Clause); *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (Confrontation Clause). "Jot-for-jot" incorporation was the norm in this expansionary era. Yet at least one subsequent opinion suggests that these precedents require perfect state/federal congruence only on matters " 'at the core' " of the relevant constitutional guarantee. *Crist v. Bretz,* 437 U.S. 28, 37, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); see also *id.,* at 52–53, 98 S.Ct. 2156 (Powell, J., dissenting). In my judgment, this line of cases is best understood as having concluded that, to ensure a criminal trial satisfies essential standards of fairness, some procedures should be the same in state and federal courts: The need for certainty and uniformity is more pressing, and the margin for error slimmer, when criminal justice is at issue. That principle has little relevance to the question whether a *non*-procedural rule set forth in the Bill of Rights qualifies **\*869** as an aspect of the liberty protected by the Fourteenth Amendment.

Notwithstanding some overheated dicta in *Malloy,* 378 U.S., at 10–11, 84 S.Ct. 1489, it is therefore an overstatement to say that the Court has "abandoned," *ante,* at 3034, 3035 (majority opinion), 3047 (plurality opinion), a "two-track approach to incorporation," *ante,* at 3046 (plurality opinion). The Court moved away from that approach in the area of criminal procedure. But the Second Amendment differs in fundamental respects from its neighboring provisions in the Bill of Rights, as I shall explain in Part V, *infra;* **\*\*3095** and if some 1960's opinions purported to establish a general method of incorporation, that hardly binds us in this case. The Court has not hesitated to cut back on perceived Warren Court excesses in more areas than I can count.

I do not mean to deny that there can be significant practical, as well as esthetic, benefits from treating rights symmetrically with regard to the State and Federal Governments. Jot-for-jot incorporation of a provision may entail greater protection of the right at issue and therefore greater freedom for those who hold it; jot-for-jot incorporation may also yield greater clarity about the contours of the legal rule. See *Johnson v. Louisiana,* 406 U.S. 356, 364–368, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (Douglas, J., dissenting); *Pointer,* 380 U.S., at 413–414, 85 S.Ct. 1065 (Goldberg, J., concurring). In a federalist system such as ours, however, this approach

can carry substantial costs. When a federal court insists that state and local authorities follow its dictates on a matter not critical to personal liberty or procedural justice, the latter may be prevented from engaging in the kind of beneficent "experimentation in things social and economic" that ultimately redounds to the benefit of all Americans. *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). The costs of federal courts' imposing a uniform national standard may be especially high when the relevant regulatory interests vary **\*870** significantly across localities, and when the ruling implicates the States' core police powers.

Furthermore, there is a real risk that, by demanding the provisions of the Bill of Rights apply identically to the States, federal courts will cause those provisions to "be watered down in the needless pursuit of uniformity." *Duncan v. Louisiana,* 391 U.S. 145, 182, n. 21, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Harlan, J., dissenting). When one legal standard must prevail across dozens of jurisdictions with disparate needs and customs, courts will often settle on a relaxed standard. This watering-down risk is particularly acute when we move beyond the narrow realm of criminal procedure and into the relatively vast domain of substantive rights. So long as the requirements of fundamental fairness are always and everywhere respected, it is not clear that greater liberty results from the jot-for-jot application of a provision of the Bill of Rights to the States. Indeed, it is far from clear that proponents of an individual right to keep and bear arms ought to celebrate today's decision. [13]

13 The vast majority of States already recognize a right to keep and bear arms in their own constitutions, see Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Politics 191 (2006) (cataloguing provisions); Brief for Petitioners 69 (observing that "[t]hese Second Amendment analogs are effective and consequential"), but the States vary widely in their regulatory schemes, their traditions and cultures of firearm use, and their problems relating to gun violence. If federal and state courts must harmonize their review of gun-control laws under the Second Amendment, the resulting jurisprudence may prove significantly more deferential to those laws than the *status quo ante.* Once it has been established that a single legal standard must govern nationwide, federal courts will face a profound pressure to reconcile that standard with the diverse interests of the States and their long history of regulating in this sensitive area. Cf. *Williams,* 399 U.S., at 129–130, 90 S.Ct. 1914 (Harlan, J., concurring in result) (noting "

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5016 Page 61 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

"backlash" " potential of jot-for-jot incorporation); Grant, Felix Frankfurter: A Dissenting Opinion, 12 UCLA L.Rev. 1013, 1038 (1965) ("If the Court will not reduce the requirements of the fourteenth amendment below the federal gloss that now overlays the Bill of Rights, then it will have to reduce that gloss to the point where the states can live with it"). *Amici* argue persuasively that, post-"incorporation," federal courts will have little choice but to fix a highly flexible standard of review if they are to avoid leaving federalism and the separation of powers—not to mention gun policy—in shambles. See Brief for Brady Center to Prevent Gun Violence et al. (hereinafter Brady Center Brief).

**3096 *871 II

So far, I have explained that substantive due process analysis generally requires us to consider the term "liberty" in the Fourteenth Amendment, and that this inquiry may be informed by, but does not depend upon, the content of the Bill of Rights. How should a court go about the analysis, then? Our precedents have established, not an exact methodology, but rather a framework for decisionmaking. In this respect, too, the Court's narrative fails to capture the continuity and flexibility in our doctrine.

The basic inquiry was described by Justice Cardozo more than 70 years ago. When confronted with a substantive due process claim, we must ask whether the allegedly unlawful practice violates values "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). [14] If the practice in question lacks any "oppressive and arbitrary" character, if judicial enforcement of the asserted right would not materially contribute to "a fair and enlightened system of justice," then the claim is unsuitable for substantive due process protection. *Id.,* at 327, 325, 58 S.Ct. 149. Implicit in Justice Cardozo's test is a recognition that the postulates of liberty have a universal character. Liberty claims that are inseparable from the customs that prevail in a certain region, the idiosyncratic expectations of a certain group, or the personal preferences of their champions, may be valid claims in some sense; but they are not of constitutional stature. *872 Whether conceptualized as a "rational continuum" of legal precepts, *Poe,* 367 U.S., at 543, 81 S.Ct. 1752 (Harlan, J., dissenting), or a seamless web of moral commitments, the rights embraced by the liberty clause transcend the local and the particular.

[14] Justice Cardozo's test itself built upon an older line of decisions. See, *e.g., Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 237, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (discussing "limitations on [state] power which grow out of the essential nature of all free governments [and] implied reservations of individual rights, ... and which are respected by all governments entitled to the name" (internal quotation marks omitted)).

Justice Cardozo's test undeniably requires judges to apply their own reasoned judgment, but that does not mean it involves an exercise in abstract philosophy. In addition to other constraints I will soon discuss, see Part III, *infra,* historical and empirical data of various kinds ground the analysis. Textual commitments laid down elsewhere in the Constitution, judicial precedents, English common law, legislative and social facts, scientific and professional developments, practices of other civilized societies, [15] and, above all else, the " 'traditions and conscience of our people,' " *Palko,* 302 U.S., at 325, 58 S.Ct. 149 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)), are critical variables. They can provide evidence about which rights really are vital to ordered liberty, as well as a spur to judicial action.

[15] See *Palko,* 302 U.S., at 326, n. 3, 58 S.Ct. 149; see also, *e.g., Lawrence v. Texas,* 539 U.S. 558, 572–573, 576–577, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *Glucksberg,* 521 U.S., at 710–711, and n. 8, 117 S.Ct. 2258.

The Court errs both in its interpretation of *Palko* and in its suggestion that later cases rendered *Palko* 's methodology defunct. Echoing *Duncan,* the Court advises that Justice Cardozo's test will not be satisfied " 'if a civilized system could be imagined that would not accord the particular **3097 protection.' " *Ante,* at 3032 (quoting 391 U.S., at 149, n. 14, 88 S.Ct. 1444). *Palko* does contain some language that could be read to set an inordinate bar to substantive due process recognition, reserving it for practices without which "neither liberty nor justice would exist." 302 U.S., at 326, 58 S.Ct. 149. But in view of Justice Cardozo's broader analysis, as well as the numerous cases that have upheld liberty claims under the *Palko* standard, such readings are plainly overreadings. We have never applied *Palko* in such a draconian manner.

*873 Nor, as the Court intimates, see *ante,* at 3034, did *Duncan* mark an irreparable break from *Palko,* swapping out liberty for history. *Duncan* limited its discussion to "particular procedural safeguard [s]" in the Bill of Rights relating to

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5017   Page 62 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

"criminal processes," 391 U.S., at 149, n. 14, 88 S.Ct. 1444; it did not purport to set a standard for other types of liberty interests. Even with regard to procedural safeguards, *Duncan* did not jettison the *Palko* test so much as refine it: The judge is still tasked with evaluating whether a practice "is fundamental ... [to] ordered liberty," within the context of the "Anglo–American" system. *Duncan,* 391 U.S., at 149–150, n. 14, 88 S.Ct. 1444. Several of our most important recent decisions confirm the proposition that substantive due process analysis—from which, once again, "incorporation" analysis derives—must not be wholly backward looking. See, *e.g., Lawrence v. Texas,* 539 U.S. 558, 572, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ("[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry" (internal quotation marks omitted)); *Michael H. v. Gerald D.,* 491 U.S. 110, 127–128, n. 6, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (opinion of SCALIA, J.) (garnering only two votes for history-driven methodology that "consult[s] the most specific tradition available"); see also *post,* at 3122 – 3123 (BREYER, J., dissenting) (explaining that post-*Duncan* "incorporation" cases continued to rely on more than history). [16]

[16]    I acknowledge that some have read the Court's opinion in *Glucksberg* as an attempt to move substantive due process analysis, for all purposes, toward an exclusively historical methodology—and thereby to debilitate the doctrine. If that were ever *Glucksberg* 's aspiration, *Lawrence* plainly renounced it. As between *Glucksberg* and *Lawrence,* I have little doubt which will prove the more enduring precedent.

The Court's flight from *Palko* leaves its analysis, careful and scholarly though it is, much too narrow to provide a satisfying answer to this case. The Court hinges its entire decision on one mode of intellectual history, culling selected pronouncements and enactments from the 18th and 19th centuries to ascertain what Americans thought about firearms. **\*874** Relying on *Duncan* and *Glucksberg,* the principal opinion suggests that only interests that have proved "fundamental from an American perspective," *ante,* at 3046, 3050 (plurality opinion), or " 'deeply rooted in this Nation's history and tradition,' " *ante,* at 3036 (majority opinion). (quoting *Glucksberg,* 521 U.S., at 721, 117 S.Ct. 2258), to the Court's satisfaction, may qualify for incorporation into the Fourteenth Amendment. To the extent the principal opinion could be read to imply that the historical pedigree of a right is the exclusive or dispositive determinant of its status under the Due Process Clause, the opinion is seriously mistaken.

A rigid historical test is inappropriate in this case, most basically, because our substantive due process doctrine has never evaluated substantive rights in purely, or even predominantly, historical terms. When the Court applied many of the *procedural* guarantees in the Bill of Rights to the States in the 1960's, it often asked whether the guarantee in question was "fundamental in the context of the criminal **\*\*3098** processes maintained by the American States." [17] *Duncan,* 391 U.S., at 150, n. 14, 88 S.Ct. 1444. That inquiry could extend back through time, but it was focused not so much on historical conceptions of the guarantee as on its functional significance within the States' regimes. This contextualized approach made sense, as the choice to employ any given trial-type procedure means little in the abstract. It is only by inquiring into how that procedure intermeshes with other procedures and practices in a criminal justice system that its relationship to "liberty" and "due process" can be determined.

[17]    The Court almost never asked whether the guarantee in question was deeply rooted in founding-era practice. See Brief for Respondent City of Chicago et al. 31, n. 17 (hereinafter Municipal Respondents' Brief) (noting that only two opinions extensively discussed such history).

Yet when the Court has used the Due Process Clause to recognize rights distinct from the trial context—rights relating to the primary conduct of free individuals—Justice Cardozo's test has been our guide. The right to free speech, for **\*875** instance, has been safeguarded from state infringement not because the States have always honored it, but because it is "essential to free government" and "to the maintenance of democratic institutions"—that is, because the right to free speech is implicit in the concept of ordered liberty. *Thornhill v. Alabama,* 310 U.S. 88, 95, 96, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); see also, *e.g., Loving,* 388 U.S., at 12, 87 S.Ct. 1817 (discussing right to marry person of another race); *Mapp v. Ohio,* 367 U.S. 643, 650, 655–657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (discussing right to be free from arbitrary intrusion by police); *Schneider v. State (Town of Irvington),* 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (discussing right to distribute printed matter). [18] While the verbal formula has varied, the Court has largely been consistent in its liberty-based approach to substantive interests outside of the adjudicatory system. As the question before us indisputably concerns such an interest, the answer cannot be found in a granular inspection of state constitutions or congressional debates.

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5018   Page 63 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

18    Cf. *Robinson v. California,* 370 U.S. 660, 666–668, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (invalidating state statute criminalizing narcotics addiction as "cruel and unusual punishment in violation of the Fourteenth Amendment" based on nature of the alleged " 'crime,' " without historical analysis); Brief for Respondent National Rifle Association of America, Inc., et al. 29 (noting that "lynchpin" of incorporation test has always been "the importance of the right in question to ... 'liberty' " and to our "system of government").

More fundamentally, a rigid historical methodology is unfaithful to the Constitution's command. For if it were really the case that the Fourteenth Amendment's guarantee of liberty embraces only those rights "so rooted in history, tradition, and practice as to require special protection," *Glucksberg,* 521 U.S., at 721, n. 17, 117 S.Ct. 2258, then the guarantee would serve little function, save to ratify those rights that state actors have *already* been according the most extensive protection.[19] Cf. *Duncan,* 391 U.S., at 183, 88 S.Ct. 1444 (Harlan, J., dissenting) (critiquing "circular [ity]" of historicized test for incorporation). **\*876**  That approach is unfaithful to the expansive principle Americans laid down when they ratified the Fourteenth Amendment and to the level of generality they chose when they crafted its language; it promises an objectivity it cannot deliver and masks the value judgments that pervade **\*\*3099** any analysis of what customs, defined in what manner, are sufficiently " 'rooted' "; it countenances the most revolting injustices in the name of continuity,[20] for we must never forget that not only slavery but also the subjugation of women and other rank forms of discrimination are part of our history; and it effaces this Court's distinctive role in saying what the law is, leaving the development and safekeeping of liberty to majoritarian political processes. It is judicial abdication in the guise of judicial modesty.

19    I do not mean to denigrate this function, or to imply that only "*new* rights"—whatever one takes that term to mean—ought to "get in" the substantive due process door. *Ante,* at 3052 – 3053 (SCALIA, J., concurring).

20    See *Bowers v. Hardwick,* 478 U.S. 186, 199, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) ("Like Justice Holmes, I believe that '[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past' " (quoting Holmes, The Path of the Law, 10 Harv. L.Rev. 457, 469 (1897))).

No, the liberty safeguarded by the Fourteenth Amendment is not merely preservative in nature but rather is a "dynamic concept." Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L.Rev. 13, 38 (1992). Its dynamism provides a central means through which the Framers enabled the Constitution to "endure for ages to come," *McCulloch v. Maryland,* 4 Wheat. 316, 415, 4 L.Ed. 579 (1819), a central example of how they "wisely spoke in general language and left to succeeding generations the task of applying that language to the unceasingly changing environment in which they would live," Rehnquist, The Notion of a Living Constitution, 54 Texas L. Rev. 693, 694 (1976). "The task of giving concrete meaning to the term 'liberty,' " I have elsewhere explained at some length, "was apart of the work assigned to future generations." Stevens, **\*877**  The Third Branch of Liberty, 41 U. Miami L.Rev. 277, 291 (1986).[21] The judge who would outsource the interpretation of "liberty" to historical sentiment has turned his back on a task the Constitution assigned to him and drained the document of its intended vitality.[22]

21    Justice KENNEDY has made the point movingly:
      "Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Lawrence,* 539 U.S., at 578–579, 123 S.Ct. 2472.

22    Contrary to Justice SCALIA's suggestion, I emphatically do not believe that "only we judges" can interpret the Fourteenth Amendment, *ante,* at 3052, or any other constitutional provision. All Americans can; all Americans should. I emphatically do believe that we judges must exercise—indeed, cannot help but exercise—our own reasoned judgment in so doing. Justice SCALIA and I are on common ground in maintaining that courts should be "guided by what the American people throughout our history have thought." *Ibid.* Where we part ways is in his view that courts should be guided *only* by historical considerations.
      There is, moreover, a tension between Justice SCALIA's concern that "courts have the last word" on constitutional questions, *ante,* at 3052, n. 2, on the one hand, and his touting of the Constitution's Article V amendment process, *ante,* at 3051 – 3052, on the other. The American

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

people can of course reverse this Court's rulings through that same process.

### III

At this point a difficult question arises. In considering such a majestic term as "liberty" and applying it to present circumstances, how are we to do justice to its urgent call and its open texture—and to the grant of interpretive discretion the **3100 latter embodies—without injecting excessive subjectivity or unduly restricting the States' "broad latitude in experimenting with possible solutions to problems of vital local concern," *Whalen v. Roe,* 429 U.S. 589, 597, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)? One part of the answer, already discussed, is that we must ground the analysis in historical experience and reasoned *878 judgment, and never on "merely personal and private notions." *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Our precedents place a number of additional constraints on the decisional process. Although "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), significant guideposts do exist. [23]

[23]      In assessing concerns about the "open-ended[ness]" of this area of law, *Collins,* 503 U.S., at 125, 112 S.Ct. 1061, one does well to keep in view the malleability not only of the Court's "deeply rooted"/ fundamentality standard but also of substantive due process' constitutional cousin, "equal protection" analysis. Substantive due process is sometimes accused of entailing an insufficiently "restrained methodology." *Glucksberg,* 521 U.S., at 721, 117 S.Ct. 2258. Yet "the word 'liberty' in the Due Process Clause seems to provide at least as much meaningful guidance as does the word 'equal' in the Equal Protection Clause." Post, The Supreme Court 2002 Term—Foreword: Fashioning the Legal Constitution: Culture, Courts, and Law, 117 Harv. L.Rev. 4, 94, n. 440 (2003). And "[i]f the objection is instead that the text of the [Due Process] Clause warrants providing only protections of process rather than protections of substance," "it is striking that even those Justices who are most theoretically opposed to substantive due process, like Scalia and Rehnquist, are also nonetheless enthusiastic about applying the equal protection component of the Due Process Clause of the Fifth Amendment to the federal government." *Ibid.* (citing *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 213–231, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)).

The most basic is that we have eschewed attempts to provide any all-purpose, top-down, totalizing theory of "liberty." [24] That project is bound to end in failure or worse. The Framers did not express a clear understanding of the term to guide us, and the now-repudiated *Lochner* line of cases attests to the dangers of judicial overconfidence in using substantive due process to advance a broad theory of the right or the good. See, *e.g., Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). In its most durable precedents, the Court *879 "has not attempted to define with exactness the liberty ... guaranteed" by the Fourteenth Amendment. *Meyer,* 262 U.S., at 399, 43 S.Ct. 625; see also, *e.g., Bolling,* 347 U.S., at 499, 74 S.Ct. 693. By its very nature, the meaning of liberty cannot be "reduced to any formula; its content cannot be determined by reference to any code." *Poe,* 367 U.S., at 542, 81 S.Ct. 1752 (Harlan, J., dissenting).

[24]      That one eschews a comprehensive theory of liberty does not, *pace* Justice SCALIA, mean that one lacks "a coherent theory of the Due Process Clause," *ante,* at 3052. It means that one lacks the hubris to adopt a rigid, context-independent definition of a constitutional guarantee that was deliberately framed in open-ended terms.

Yet while "the 'liberty' specially protected by the Fourteenth Amendment" is "perhaps not capable of being fully clarified," *Glucksberg,* 521 U.S., at 722, 117 S.Ct. 2258, it is capable of being refined and delimited. We have insisted that only certain types of especially significant personal interests may qualify for especially heightened protection. Ever since "the deviant economic due process cases [were] repudiated," *id.,* at 761, 117 S.Ct. 2258 (Souter, J., concurring in judgment), our doctrine has steered away from "laws that touch economic problems, business affairs, **3101 or social conditions," *Griswold,* 381 U.S., at 482, 85 S.Ct. 1678, and has instead centered on "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education," *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). These categories are not exclusive. Government action that shocks the conscience, pointlessly infringes settled expectations, trespasses into sensitive private realms or life choices without adequate justification, perpetrates gross injustice, or simply lacks a rational basis will always be vulnerable to judicial invalidation. Nor does the fact that an asserted right falls within one of these categories end the inquiry. More fundamental rights may receive more robust judicial protection, but the strength of the individual's liberty interests

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5020 Page 65 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

and the State's regulatory interests must always be assessed and compared. No right is absolute.

Rather than seek a categorical understanding of the liberty clause, our precedents have thus elucidated a conceptual core. The clause safeguards, most basically, "the ability independently to define one's identity," *Roberts v. United States Jaycees,* 468 U.S. 609, 619, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), "the individual's right to make certain unusually important decisions that will affect his own, or his family's, destiny," *Fitzgerald,* 523 F.2d, at 719, and the right to be respected as a human being. Self-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity and respect—these are the central values we have found implicit in the concept of ordered liberty.

Another key constraint on substantive due process analysis is respect for the democratic process. If a particular liberty interest is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate. When the Court declined to establish a general right to physician-assisted suicide, for example, it did so in part because "the States [were] currently engaged in serious, thoughtful examinations of physician-assisted suicide and other similar issues," rendering judicial intervention both less necessary and potentially more disruptive. *Glucksberg,* 521 U.S., at 719, 735, 117 S.Ct. 2258. Conversely, we have long appreciated that more "searching" judicial review may be justified when the rights of "discrete and insular minorities"—groups that may face systematic barriers in the political system—are at stake. *United States v. Carolene Products Co.,* 304 U.S. 144, 153, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Courts have a "comparative ... advantage" over the elected branches on a limited, but significant, range of legal matters. *Post,* at 3124.

Recognizing a new liberty right is a momentous step. It takes that right, to a considerable extent, "outside the arena of public debate and legislative action." *Glucksberg,* 521 U.S., at 720, 117 S.Ct. 2258. Sometimes that momentous step must be taken; some fundamental aspects of personhood, dignity, and the like do not vary from State to State, and demand a baseline level of protection. But sensitivity to the interaction between the intrinsic aspects of liberty and the practical realities of contemporary society provides an important tool for guiding judicial discretion.

**\*881** This sensitivity is an aspect of a deeper principle: the need to approach our work with humility and caution. Because the relevant constitutional language is so "spacious," *Duncan,* 391 U.S., at 148, 88 S.Ct. 1444, I have emphasized that "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever **\*\*3102** we are asked to break new ground in this field." *Collins,* 503 U.S., at 125, 112 S.Ct. 1061. Many of my colleagues and predecessors have stressed the same point, some with great eloquence. See, *e.g., Casey,* 505 U.S., at 849, 112 S.Ct. 2791; *Moore v. East Cleveland,* 431 U.S. 494, 502–503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); *Poe,* 367 U.S., at 542–545, 81 S.Ct. 1752 (Harlan, J., dissenting); *Adamson v. California,* 332 U.S. 46, 68, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Frankfurter, J., concurring). Historical study may discipline as well as enrich the analysis. But the inescapable reality is that no serious theory of § 1 of the Fourteenth Amendment yields clear answers in every case, and "[n]o formula could serve as a substitute, in this area, for judgment and restraint." *Poe,* 367 U.S., at 542, 81 S.Ct. 1752 (Harlan, J., dissenting).

Several rules of the judicial process help enforce such restraint. In the substantive due process field as in others, the Court has applied both the doctrine of *stare decisis*—adhering to precedents, respecting reliance interests, prizing stability and order in the law—and the common-law method—taking cases and controversies as they present themselves, proceeding slowly and incrementally, building on what came before. This restrained methodology was evident even in the heyday of "incorporation" during the 1960's. Although it would have been much easier for the Court simply to declare certain Amendments in the Bill of Rights applicable to the States *in toto,* the Court took care to parse each Amendment into its component guarantees, evaluating them one by one. This piecemeal approach allowed the Court to scrutinize more closely the right at issue in any given dispute, reducing both the risk and the cost of error.

**\*882** Relatedly, rather than evaluate liberty claims on an abstract plane, the Court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Glucksberg,* 521 U.S., at 721, 117 S.Ct. 2258 (quoting *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Collins,* 503 U.S., at 125, 112 S.Ct. 1061; *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 277–278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)). And just as we have required such careful description from the litigants, we have required of ourselves that we

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

"focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake." *Collins,* 503 U.S., at 125, 112 S.Ct. 1061; see also Stevens, Judicial Restraint, 22 San Diego L.Rev. 437, 446–448 (1985). This does not mean that we must define the asserted right at the most specific level, thereby sapping it of a universal valence and a moral force it might otherwise have.[25] It means, simply, that we must pay close attention to the precise liberty interest the litigants have asked us to vindicate.

[25]  The notion that we should define liberty claims at the most specific level available is one of Justice SCALIA's signal contributions to the theory of substantive due process. See, *e.g., Michael H. v. Gerald D.,* 491 U.S. 110, 127–128, n. 6, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (opinion of SCALIA, J.); *ante,* at 3053 – 3054 (SCALIA, J., concurring). By so narrowing the asserted right, this approach "loads the dice" against its recognition, Roosevelt, Forget the Fundamentals: Fixing Substantive Due Process, 8 U. Pa. J. Const. L. 983, 1002, n. 73 (2006): When one defines the liberty interest at issue in *Lawrence* as the freedom to perform specific sex acts, *ante,* at 3051, the interest starts to look less compelling. The Court today does not follow Justice SCALIA's "particularizing" method, *Katzenbach v. Morgan,* 384 U.S. 641, 649, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), as it relies on general historical references to keeping and bearing arms, without any close study of the States' practice of regulating especially dangerous weapons.

**3103  Our holdings should be similarly tailored. Even if the most expansive formulation of a claim does not qualify for substantive due process recognition, particular components of the claim might. Just because there may not be a categorical *883 right to physician-assisted suicide, for example, does not " 'foreclose the possibility that an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge.' " *Glucksberg,* 521 U.S., at 735, n. 24, 117 S.Ct. 2258 (quoting *id.,* at 750, 117 S.Ct. 2258 (STEVENS, J., concurring in judgments)); see also *Vacco v. Quill,* 521 U.S. 793, 809, n. 13, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997) (leaving open " 'the possibility that some applications of the New York [prohibition on assisted suicide] may impose an intolerable intrusion on the patient's freedom' "). Even if a State's interest in regulating a certain matter must be permitted, in the general course, to trump the individual's countervailing liberty interest, there may still be situations in which the latter "is entitled to constitutional protection." *Glucksberg,* 521 U.S., at 742, 117 S.Ct. 2302 (STEVENS, J., concurring in judgments).

As this discussion reflects, to acknowledge that the task of construing the liberty clause requires judgment is not to say that it is a license for unbridled judicial lawmaking. To the contrary, only an honest reckoning with our discretion allows for honest argumentation and meaningful accountability.

## IV

The question in this case, then, is not whether the Second Amendment right to keep and bear arms (whatever that right's precise contours) applies to the States because the Amendment has been incorporated into the Fourteenth Amendment. It has not been. The question, rather, is whether the particular right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom. And to answer that question, we need to determine, first, the nature of the right that has been asserted and, second, whether that right is an aspect of Fourteenth Amendment "liberty." Even accepting the Court's holding in *Heller,* it remains entirely possible that the right to keep and bear arms identified in that opinion *884 is not judicially enforceable against the States, or that only part of the right is so enforceable.[26] It is likewise possible for the Court to find in this case that some part of the *Heller* right applies to the States, and then to find in later cases that other parts of the right also apply, or apply on different terms.

[26]  In *District of Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 2799, 171 L.Ed.2d 637 (2008), the Court concluded, over my dissent, that the Second Amendment confers "an individual right to keep and bear arms" disconnected from militia service. If that conclusion were wrong, then petitioners' "incorporation" claim clearly would fail, as they would hold no right against the Federal Government to be free from regulations such as the ones they challenge. Cf. *post,* at 3124 (BREYER, J., dissenting). I do not understand petitioners or any of their *amici* to dispute this point. Yet even if *Heller* had never been decided—indeed, even if the Second Amendment did not exist—we would still have an obligation to address petitioners' Fourteenth Amendment claim.

As noted at the outset, the liberty interest petitioners have asserted is the "right to possess a functional, personal firearm, including a handgun, within the home." Complaint ¶ 34, App. 23. The city of Chicago allows residents to keep functional firearms, so long as they are registered, but it generally prohibits the possession of handguns,

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5022 Page 67 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

sawed-off shotguns, machineguns, and short-barreled rifles. See Chicago, **3104 Ill., Municipal Code § 8–20–050 (2009). [27] Petitioners' complaint centered on their desire to keep a handgun at their domicile—it references the "home" in nearly every paragraph, see Complaint ¶¶ 3–4, 11–30, 32, 34, 37, 42, 44, 46, App. 17, 19–26—as did their supporting declarations, see, *e.g.,* App. 34, 36, 40, 43, 49–52, 54–56. Petitioners now frame the question that confronts us as "[w]hether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges *885 or Immunities or Due Process Clauses." Brief for Petitioners i. But it is our duty "to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake," *Collins,* 503 U.S., at 125, 112 S.Ct. 1061, and the gravamen of this complaint is plainly an appeal to keep a handgun or other firearm of one's choosing in the home.

[27]     The village of Oak Park imposes more stringent restrictions that may raise additional complications. See *ante,* at 3026 (majority opinion) (quoting Oak Park, Ill., Village Code §§ 27–2–1 (2007), 27–1–1 (2009)). The Court, however, declined to grant certiorari on the National Rifle Association's challenge to the Oak Park restrictions. Chicago is the only defendant in this case.

Petitioners' framing of their complaint tracks the Court's ruling in *Heller.* The majority opinion contained some dicta suggesting the possibility of a more expansive arms-bearing right, one that would travel with the individual to an extent into public places, as "in case of confrontation." 554 U.S., at 592, 128 S.Ct., at 2797–2798. But the *Heller* plaintiff sought only dispensation to keep an operable firearm in his home for lawful self-defense, see *id.,* at 576, 128 S.Ct., at 2788, and n. 2, and the Court's opinion was bookended by reminders that its holding was limited to that one issue, *id.,* at 573, 635, 128 S.Ct., at 2788, 2821–2822; accord, *ante,* at 3050 (plurality opinion). The distinction between the liberty right these petitioners have asserted and the Second Amendment right identified in *Heller* is therefore evanescent. Both are rooted to the home. Moreover, even if both rights have the logical potential to extend further, upon "future evaluation," *Heller,* 554 U.S., at 635, 128 S.Ct., at 2821, it is incumbent upon us, as federal judges contemplating a novel rule that would bind all 50 States, to proceed cautiously and to decide only what must be decided.

Understood as a plea to keep their preferred type of firearm in the home, petitioners' argument has real force. [28] The decision to keep a loaded handgun in the house is often

motivated by the desire to protect life, liberty, and property. It is comparable, in some ways, to decisions about the education and upbringing of one's children. For it is the kind of *886 decision that may have profound consequences for every member of the family, and for the world beyond. In considering whether to keep a handgun, heads of households must ask themselves whether the desired safety benefits outweigh the risks of deliberate or accidental misuse that may result in death or serious injury, not only to residents of the home but to others as well. Millions of Americans have answered this question in the affirmative, not infrequently because they believe they have an inalienable right to do so —because they consider it an aspect of "the supreme human dignity of being master of one's fate rather than a ward of the State," **3105 *Indiana v. Edwards,* 554 U.S. 164, 186, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) (SCALIA, J., dissenting). Many such decisions have been based, in part, on family traditions and deeply held beliefs that are an aspect of individual autonomy the government may not control. [29]

[28]     To the extent that petitioners contend the city of Chicago's registration requirements for firearm possessors also, and separately, violate the Constitution, that claim borders on the frivolous. Petitioners make no effort to demonstrate that the requirements are unreasonable or that they impose a severe burden on the underlying right they have asserted.

[29]     Members of my generation, at least, will recall the many passionate statements of this view made by the distinguished actor, Charlton Heston.

Bolstering petitioners' claim, our law has long recognized that the home provides a kind of special sanctuary in modern life. See, *e.g.,* U.S. Const., Amdts. 3, 4; *Lawrence,* 539 U.S., at 562, 567, 123 S.Ct. 2472; *Payton v. New York,* 445 U.S. 573, 585–590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Stanley v. Georgia,* 394 U.S. 557, 565–568, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Griswold,* 381 U.S., at 484–485, 85 S.Ct. 1678. Consequently, we have long accorded special deference to the privacy of the home, whether a humble cottage or a magnificent manse. This veneration of the domestic harkens back to the common law. William Blackstone recognized a "right of habitation," 4 Commentaries *223, and opined that "every man's house is looked upon by the law to be his castle of defence and asylum," 3 *id.,* at *288. *Heller* carried forward this legacy, observing that "the need for defense of self, family, and property is most acute" in one's abode, and celebrating "the right of law-abiding, responsible citizens to

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5023 Page 68 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

use arms in defense of hearth and home." 554 U.S., at 628, 635, 128 S.Ct., at 2817, 2821.

While the individual's interest in firearm possession is thus heightened in the home, the State's corresponding interest **\*887** in regulation is somewhat weaker. The State generally has a lesser basis for regulating private as compared to public acts, and firearms kept inside the home generally pose a lesser threat to public welfare as compared to firearms taken outside. The historical case for regulation is likewise stronger outside the home, as many States have for many years imposed stricter, and less controversial, restrictions on the carriage of arms than on their domestic possession. See, *e.g., id.,* at 626, 128 S.Ct., at 2816–2817 (noting that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"); *English v. State,* 35 Tex. 473, 478–479 (1871) (observing that "almost, if not every one of the States of this Union have [a prohibition on the carrying of deadly weapons] upon their statute books," and lambasting claims of a right to carry such weapons as "little short of ridiculous"); Miller, Guns as Smut: Defending the Home–Bound Second Amendment, 109 Colum. L.Rev. 1278, 1321–1336 (2009).

It is significant, as well, that a rule limiting the federal constitutional right to keep and bear arms to the home would be less intrusive on state prerogatives and easier to administer. Having unleashed in *Heller* a tsunami of legal uncertainty, and thus litigation,[30] and now on the cusp of imposing a national rule on the States in this area for the first time in United States history, the Court could at least moderate the confusion, upheaval, and burden on the States by adopting a rule that is clearly and tightly bounded in scope.

[30]   See Municipal Respondents' Brief 20, n. 11 (stating that at least 156 Second Amendment challenges were brought in time between *Heller* 's issuance and brief's filing); Brady Center Brief 3 (stating that over 190 Second Amendment challenges were brought in first 18 months since *Heller* ); Brief for Villages of Winnetka and Skokie, Illinois, et al. as *Amici Curiae* 15 (stating that, in wake of *Heller,* municipalities have "repealed longstanding handgun laws to avoid costly litigation").

**\*\*3106**  In their briefs to this Court, several *amici* have sought to bolster petitioners' claim still further by invoking a right to **\*888** individual self-defense.[31] As petitioners note, the *Heller* majority discussed this subject extensively and remarked that "the inherent right of self-defense has

been central to the Second Amendment right." 554 U.S., at 628, 128 S.Ct., at 2817. And it is true that if a State were to try to deprive its residents of any reasonable means of defending themselves from imminent physical threats, or to deny persons any ability to assert self-defense in response to criminal prosecution, that might pose a significant constitutional problem. The argument that there is a substantive due process right to be spared such untenable dilemmas is a serious one.[32]

[31]   See, *e.g.,* Brief for Professors of Philosophy etc.; Brief for International Law Enforcement Educators and Trainers Association et al. 29–45; Brief for Thirty-four California District Attorneys et al. 12–31.

[32]   The argument that this Court should establish any such right, however, faces steep hurdles. All 50 States already recognize self-defense as a defense to criminal prosecution, see 2 P. Robinson, Criminal Law Defenses § 132 (1984 and Supp.2009), so this is hardly an interest to which the democratic process has been insensitive. And the States have always diverged on how exactly to implement this interest, so there is wide variety across the Nation in the types and amounts of force that may be used, the necessity of retreat, the rights of aggressors, the availability of the "castle doctrine," and so forth. See Brief for Oak Park Citizens Committee for Handgun Control as *Amicus Curiae* 9–21; Brief for American Cities et al. as *Amici Curiae* 17–19; 2 W. LaFave, Substantive Criminal Law § 10.4, pp. 142–160 (2d ed.2003). Such variation is presumed to be a healthy part of our federalist system, as the States and localities select different rules in light of different priorities, customs, and conditions.

As a historical and theoretical matter, moreover, the legal status of self-defense is far more complicated than it might first appear. We have generally understood Fourteenth Amendment "liberty" as something one holds against direct state interference, whereas a personal right of self-defense runs primarily against other individuals; absent government tyranny, it is only when the State has *failed* to interfere with (violent) private conduct that self-help becomes potentially necessary. Moreover, it was a basic tenet of founding-era political philosophy that, in entering civil society and gaining "the advantages of mutual commerce" and the protections of the rule of law, one had to relinquish, to a significant degree, "that wild and savage liberty" one possessed in the state of nature. 1 W. Blackstone, Commentaries \*125; see also, *e.g.,* J. Locke, Second Treatise of Civil Government § 128, pp. 63–64 (J. Gough ed.1947) (in state of nature man has power "to do whatever he thinks fit for the

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

preservation of himself and others," but this "he gives up when he joins in a ... particular political society"); *Green v. Biddle,* 8 Wheat. 1, 63, 5 L.Ed. 547 (1823) (argument for defendant) ("It is a trite maxim, that man gives up a part of his natural liberty when he enters into civil society, as the price of the blessings of that state: and it may be said, with truth, this liberty is well exchanged for the advantages which flow from law and justice"). Some strains of founding-era thought took a very narrow view of the right to armed self-defense. See, *e.g.,* Brief for Historians on Early American Legal, Constitutional and Pennsylvania History as *Amici Curiae* 6–13 (discussing Whig and Quaker theories). Just because there may be a natural or common-law right to some measure of self-defense, it hardly follows that States may not place substantial restrictions on its exercise or that this Court should recognize a constitutional right to the same.

 **\*889** But that is not the case before us. Petitioners have not asked that we establish a constitutional right to individual self-defense; neither their pleadings in the District Court nor their filings in this Court make any such request. Nor do petitioners contend that the city of Chicago—which, recall, allows its residents to keep most rifles and shotguns, and to keep them loaded—has unduly burdened any such right. What petitioners have asked **\*\*3107** is that we "incorporate" the Second Amendment and thereby establish a constitutional entitlement, enforceable against the States, to keep a handgun in the home.

Of course, owning a handgun may be useful for practicing self-defense. But the right to take a certain type of action is analytically distinct from the right to acquire and utilize specific instrumentalities in furtherance of that action. And while some might favor handguns, it is not clear that they are a superior weapon for lawful self-defense, and nothing in petitioners' argument turns on that being the case. The notion that a right of self-defense *implies* an auxiliary right to own a certain type of firearm presupposes not only controversial judgments about the strength and scope of the (posited) self-defense right, but also controversial assumptions **\*890** about the likely effects of making that type of firearm more broadly available. It is a very long way from the proposition that the Fourteenth Amendment protects a basic individual right of self-defense to the conclusion that a city may not ban handguns.[33]

[33] The Second Amendment right identified in *Heller* is likewise clearly distinct from a right to protect oneself. In my view, the Court badly misconstrued the Second Amendment in linking it to the value

of personal self-defense above and beyond the functioning of the state militias; as enacted, the Second Amendment was concerned with tyrants and invaders, and paradigmatically with the federal military, not with criminals and intruders. But even still, the Court made clear that self-defense plays a limited role in determining the scope and substance of the Amendment's guarantee. The Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose. See 554 U.S., at 629, 128 S.Ct., at 2818–2819. And the Court's common-use gloss on the Second Amendment right, see *id.,* at 627, 128 S.Ct., at 2817, as well as its discussion of permissible limitations on the right, *id.,* at 626 – 628, 128 S.Ct., at 2816–2817, had little to do with self-defense.

In short, while the utility of firearms, and handguns in particular, to the defense of hearth and home is certainly relevant to an assessment of petitioners' asserted right, there is no freestanding self-defense claim in this case. The question we must decide is whether the interest in keeping in the home a firearm of one's choosing—a handgun, for petitioners —is one that is "comprised within the term liberty" in the Fourteenth Amendment. *Whitney,* 274 U.S., at 373, 47 S.Ct. 641 (Brandeis, J., concurring).

V

While I agree with the Court that our substantive due process cases offer a principled basis for holding that petitioners have a constitutional right to possess a usable firearm in the home, I am ultimately persuaded that a better reading of our case law supports the city of Chicago. I would not foreclose the possibility that a particular plaintiff—say, an elderly widow who lives in a dangerous neighborhood and does not have the strength to operate a long gun—may have **\*891** a cognizable liberty interest in possessing a handgun. But I cannot accept petitioners' broader submission. A number of factors, taken together, lead me to this conclusion.

First, firearms have a fundamentally ambivalent relationship to liberty. Just as they can help homeowners defend their families and property from intruders, they can help thugs and insurrectionists murder innocent victims. The threat that firearms will be misused is far from hypothetical, for gun crime has devastated many of our communities. *Amici* calculate that approximately 1 million Americans have been wounded or killed by gunfire in the last decade.[34] Urban areas such as Chicago **\*\*3108** suffer

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

disproportionately from this epidemic of violence. Handguns contribute disproportionately to it. Just as some homeowners may prefer handguns because of their small size, light weight, and ease of operation, some criminals will value them for the same reasons. See *Heller,* 554 U.S., at 710 – 712, 128 S.Ct., at 2864–2865 (BREYER, J., dissenting). In recent years, handguns were reportedly used in more than four-fifths of firearm murders and more than half of all murders nationwide.[35]

[34]     Brady Center Brief 11 (extrapolating from Government statistics); see also Brief for American Public Health Association et al. as *Amici Curiae* 6–7 (reporting estimated social cost of firearm-related violence of $100 billion per year).

[35]     Bogus, Gun Control and America's Cities: Public Policy and Politics, 1 Albany Govt. L.Rev. 440, 447 (2008) (drawing on Federal Bureau of Investigation data); see also *Heller,* 554 U.S., at 697 – 698, 128 S.Ct., at 2797–2798 (BREYER, J., dissenting) (providing additional statistics on handgun violence); Municipal Respondents' Brief 13–14 (same).

Hence, in evaluating an asserted right to be free from particular gun-control regulations, liberty is on both sides of the equation. Guns may be useful for self-defense, as well as for hunting and sport, but they also have a unique potential to facilitate death and destruction and thereby to destabilize ordered liberty. *Your* interest in keeping and bearing a certain firearm may diminish *my* interest in being and feeling safe from armed violence. And while granting you the right **\*892** to own a handgun might make you safer on any given day—assuming the handgun's marginal contribution to self-defense outweighs its marginal contribution to the risk of accident, suicide, and criminal mischief—it may make you and the community you live in less safe overall, owing to the increased number of handguns in circulation. It is at least reasonable for a democratically elected legislature to take such concerns into account in considering what sorts of regulations would best serve the public welfare.

The practical impact of various gun-control measures may be highly controversial, but this basic insight should not be. The idea that deadly weapons pose a distinctive threat to the social order—and that reasonable restrictions on their usage therefore impose an acceptable burden on one's personal liberty—is as old as the Republic. As THE CHIEF JUSTICE observed just the other day, it is a foundational premise of modern government that the State holds a monopoly on legitimate violence: "A basic step in organizing a civilized society is to take [the] sword out of private hands and turn it over to an organized government, acting on behalf of all the people." *Robertson v. United States ex rel. Watson,* 560 U.S. 272, 282 – 283, 130 S.Ct. 2184, 176 L.Ed.2d 1024 (2010) (dissenting opinion). The same holds true for the handgun. The power a man has in the state of nature "of doing whatsoever he thought fit for the preservation of himself and the rest of mankind, he gives up," to a significant extent, "to be regulated by laws made by the society." J. Locke, Second Treatise of Civil Government § 129, p. 64 (J. Gough ed.1947).

Limiting the federal constitutional right to keep and bear arms to the home complicates the analysis but does not dislodge this conclusion. Even though the Court has long afforded special solicitude for the privacy of the home, we have never understood that principle to "infring[e] upon" the authority of the States to proscribe certain inherently dangerous items, for "[i]n such cases, compelling reasons may exist for overriding the right of the individual to possess those **\*893** materials." **\*\*3109** *Stanley,* 394 U.S., at 568, n. 11, 89 S.Ct. 1243. And, of course, guns that start out in the home may not stay in the home. Even if the government has a weaker basis for restricting domestic possession of firearms as compared to public carriage—and even if a blanket, statewide prohibition on domestic possession might therefore be unconstitutional—the line between the two is a porous one. A state or local legislature may determine that a prophylactic ban on an especially portable weapon is necessary to police that line.

Second, the right to possess a firearm of one's choosing is different in kind from the liberty interests we have recognized under the Due Process Clause. Despite the plethora of substantive due process cases that have been decided in the post-*Lochner* century, I have found none that holds, states, or even suggests that the term "liberty" encompasses either the common-law right of self-defense or a right to keep and bear arms. I do not doubt for a moment that many Americans feel deeply passionate about firearms, and see them as critical to their way of life as well as to their security. Nevertheless, it does not appear to be the case that the ability to own a handgun, or any particular type of firearm, is critical to leading a life of autonomy, dignity, or political equality: The marketplace offers many tools for self-defense, even if they are imperfect substitutes, and neither petitioners nor their *amici* make such a contention. Petitioners' claim is not the kind of substantive interest, accordingly, on which a uniform, judicially enforced national standard is presumptively appropriate.[36]

36     Justice SCALIA worries that there is no "objective" way to decide what is essential to a "liberty-filled" existence: Better, then, to ignore such messy considerations as how an interest actually affects people's lives. *Ante,* at 3055. Both the constitutional text and our cases use the term "liberty," however, and liberty is not a purely objective concept. Substantive due process analysis does not require any "political" judgment, *ibid.* It does require some amount of practical and normative judgment. The only way to assess what is essential to fulfilling the Constitution's guarantee of "liberty," in the present day, is to provide reasons that apply to the present day. I have provided many; Justice SCALIA and the Court have provided virtually none.

    Justice SCALIA also misstates my argument when he refers to "the right to keep and bear arms," without qualification. *Ante,* at 3055. That is what the Second Amendment protects against Federal Government infringement. I have taken pains to show why the Fourteenth Amendment liberty interest asserted by petitioners—the interest in keeping a firearm of one's choosing in the home—is not necessarily coextensive with the Second Amendment right.

**\*894** Indeed, in some respects the substantive right at issue may be better viewed as a property right. Petitioners wish to *acquire* certain types of firearms, or to *keep* certain firearms they have previously acquired. Interests in the possession of chattels have traditionally been viewed as property interests subject to definition and regulation by the States. Cf. *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection,* 560 U.S. 702, 707, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010) (opinion for the Court by SCALIA, J.) ("Generally speaking, state law defines property interests"). Under that tradition, Chicago's ordinance is unexceptional.[37]

37     It has not escaped my attention that the Due Process Clause refers to "property" as well as "liberty." Cf. *ante,* at 3051, n. 1, 3055, n. 6 (opinion of SCALIA, J.). Indeed, in *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), I alone viewed "the critical question" as "whether East Cleveland's housing ordinance [was] a permissible restriction on appellant's right to use her own property as she sees fit," *id.,* at 513, 97 S.Ct. 1932 (opinion concurring in judgment). In that case, unlike in this case, the asserted property right was coextensive with a right to organize one's family life, and I could find "no precedent" for the ordinance at issue, which "exclude[d] any of an owner's relatives from the group of persons who may occupy his residence on a permanent basis." *Id.,* at 520, 97 S.Ct. 1932. I am open to property claims under the Fourteenth Amendment. This

case just involves a weak one. And ever since the Court "incorporated" the more specific property protections of the Takings Clause in 1897, see *Chicago, B. & Q.R. Co.,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979, substantive due process doctrine has focused on liberty.

  **\*\*3110** The liberty interest asserted by petitioners is also dissimilar from those we have recognized in its capacity to undermine the security of others. To be sure, some of the Bill of Rights' procedural guarantees may place "restrictions on **\*895** law enforcement" that have "controversial public safety implications." *Ante,* at 3045 (plurality opinion); see also *ante,* at 3055 (opinion of SCALIA, J.). But those implications are generally quite attenuated. A defendant's invocation of his right to remain silent, to confront a witness, or to exclude certain evidence cannot directly cause any threat. The defendant's liberty interest is constrained by (and is itself a constraint on) the adjudicatory process. The link between handgun ownership and public safety is much tighter. The handgun is itself a tool for crime; the handgun's bullets *are* the violence.

Similarly, it is undeniable that some may take profound offense at a remark made by the soapbox speaker, the practices of another religion, or a gay couple's choice to have intimate relations. But that offense is moral, psychological, or theological in nature; the actions taken by the rights bearers do not actually threaten the physical safety of any other person.[38] Firearms may be used to kill another person. If a legislature's response to dangerous weapons ends up impinging upon the liberty of any individuals in pursuit of the greater good, it invariably does so on the basis of more than the majority's " 'own moral code,' " *Lawrence,* 539 U.S., at 571, 123 S.Ct. 2472 (quoting *Casey,* 505 U.S., at 850, 112 S.Ct. 2791). While specific policies may of course be misguided, gun control is an area in which it "is quite wrong ... to assume that regulation and liberty occupy mutually exclusive zones—that as one expands, the other must contract." Stevens, 41 U. Miami L.Rev., at 280.

38     Cf. *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 913–914, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (STEVENS, J., concurring in part and dissenting in part).

Third, the experience of other advanced democracies, including those that share our British heritage, undercuts the notion that an expansive right to keep and bear arms is intrinsic to ordered liberty. Many of these countries place restrictions on the possession, use, and carriage of firearms far more onerous than the restrictions found in this Nation. **\*896**

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5027   Page 72 of 208

See Municipal Respondents' Brief 21–23 (discussing laws of England, Canada, Australia, Japan, Denmark, Finland, Luxembourg, and New Zealand). That the United States is an international outlier in the permissiveness of its approach to guns does not suggest that our laws are bad laws. It does suggest that this Court may not need to assume responsibility for making our laws still more permissive.

Admittedly, these other countries differ from ours in many relevant respects, including their problems with violent crime and the traditional role that firearms have played in their societies. But they are not so different from the United States that we ought to dismiss their experience entirely. Cf. *ante,* at 3044 – 3045 (plurality opinion); *ante,* at 3055 – 3056 (opinion of SCALIA, J.). The fact that our oldest allies have almost uniformly found it appropriate to regulate firearms extensively **\*\*3111** tends to weaken petitioners' submission that the right to possess a gun of one's choosing is fundamental to a life of liberty. While the "American perspective" must always be our focus, *ante,* at 3046, 3050 (plurality opinion), it is silly—indeed, arrogant—to think we have nothing to learn about liberty from the billions of people beyond our borders.

Fourth, the Second Amendment differs in kind from the Amendments that surround it, with the consequence that its inclusion in the Bill of Rights is not merely unhelpful but positively harmful to petitioners' claim. Generally, the inclusion of a liberty interest in the Bill of Rights points toward the conclusion that it is of fundamental significance and ought to be enforceable against the States. But the Second Amendment plays a peculiar role within the Bill, as announced by its peculiar opening clause.[39] Even accepting the *Heller* Court's view that the Amendment protects an individual right to keep and bear arms disconnected from militia service, it remains undeniable that "the purpose for which **\*897** the right was codified" was "to prevent elimination of the militia." *Heller,* 554 U.S., at 599, 128 S.Ct., at 2801; see also *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (Second Amendment was enacted "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces"). It was the States, not private persons, on whose immediate behalf the Second Amendment was adopted. Notwithstanding the *Heller* Court's efforts to write the Second Amendment's preamble out of the Constitution, the Amendment still serves the structural function of protecting the States from encroachment by an overreaching Federal Government.

[39]    The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

The Second Amendment, in other words, "is a federalism provision," *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 45, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (THOMAS, J., concurring in judgment). It is directed at preserving the autonomy of the sovereign States, and its logic therefore "resists" incorporation by a federal court *against* the States. *Ibid.* No one suggests that the Tenth Amendment, which provides that powers not given to the Federal Government remain with "the States," applies to the States; such a reading would border on incoherent, given that the Tenth Amendment exists (in significant part) to safeguard the vitality of state governance. The Second Amendment is no different.[40]

[40]    Contrary to Justice SCALIA's suggestion, this point is perfectly compatible with my opinion for the Court in *Elk Grove Unified School Dist.,* 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98. Cf. *ante,* at 3056. Like the Court itself, I have never agreed with Justice THOMAS' view that the Establishment Clause is a federalism provision. But I agree with his underlying logic: If a clause in the Bill of Rights exists to safeguard federalism interests, then it makes little sense to "incorporate" it. Justice SCALIA's further suggestion that I ought to have revisited the Establishment Clause debate in this opinion, *ibid.,* is simply bizarre.

The Court is surely correct that Americans' conceptions of the Second Amendment right evolved over time in a more individualistic direction; that Members of the Reconstruction Congress were urgently concerned about the safety of the newly freed slaves; and that some Members believed that, **\*898** following ratification of the Fourteenth Amendment, the Second Amendment would apply to the States. But it is a giant leap from these data points to the conclusion that the Fourteenth **\*\*3112** Amendment "incorporated" the Second Amendment as a matter of original meaning or postenactment interpretation. Consider, for example, that the text of the Fourteenth Amendment says nothing about the Second Amendment or firearms; that there is substantial evidence to suggest that, when the Reconstruction Congress enacted measures to ensure newly freed slaves and Union sympathizers in the South enjoyed the right to possess firearms, it was motivated by antidiscrimination and equality concerns rather than arms-bearing concerns *per se;*[41] that many contemporaneous courts and commentators did not

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5028   Page 73 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

understand the Fourteenth Amendment to have had an "incorporating" effect; and that the States heavily regulated the right to keep and bear arms both before and after the Amendment's passage. The Court's narrative largely elides these facts. The complications they raise show why even the most dogged historical inquiry into the "fundamentality" of the Second Amendment right (or any other) necessarily entails judicial judgment—and therefore judicial discretion—every step of the way.

41    See *post,* at 3132 – 3133; Municipal Respondents' Brief 62–69; Brief for Thirty-four Professional Historians and Legal Historians as *Amici Curiae* 22–26; Rosenthal, Second Amendment Plumbing After *Heller:* Of Standards of Scrutiny, Incorporation, Well–Regulated Militias, and Criminal Street Gangs, 41 Urb. Law. 1, 73–75 (2009). The plurality insists that the Reconstruction-era evidence shows the right to bear arms was regarded as "a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner." *Ante,* at 3043 – 3044. That may be so, but it does not resolve the question whether the Fourteenth Amendment's Due Process Clause was originally understood to encompass a right to keep and bear arms, or whether it ought to be so construed now.

I accept that the evolution in Americans' understanding of the Second Amendment may help shed light on the question whether a right to keep and bear arms is included **\*899** within Fourteenth Amendment "liberty." But the reasons that motivated the Framers to protect the ability of militiamen to keep muskets available for military use when our Nation was in its infancy, or that motivated the Reconstruction Congress to extend full citizenship to the freedmen in the wake of the Civil War, have only a limited bearing on the question that confronts the homeowner in a crime-infested metropolis today. The many episodes of brutal violence against African–Americans that blight our Nation's history, see *ante,* at 3038 – 3042 (majority opinion); *ante,* at 3080 – 3082, 3086 – 3088 (THOMAS, J., concurring in part and concurring in judgment), do not suggest that every American must be allowed to own whatever type of firearm he or she desires —just that no group of Americans should be systematically and discriminatorily disarmed and left to the mercy of racial terrorists. And the fact that some Americans may have thought or hoped that the Fourteenth Amendment would nationalize the Second Amendment hardly suffices to justify the conclusion that it did.

Fifth, although it may be true that Americans' interest in firearm possession and state-law recognition of that

interest are "deeply rooted" in some important senses, *ante,* at 3036 (internal quotation marks omitted), it is equally true that the States have a long and unbroken history of regulating firearms. The idea that States may place substantial restrictions on the right to keep and bear arms short of complete disarmament is, in fact, far more entrenched than the notion that the Federal Constitution protects any such right. Federalism is a far "older and more deeply rooted tradition than is a right to carry," **\*\*3113** or to own, "any particular kind of weapon." 567 F.3d, at 860 (Easterbrook, C. J.).

From the early days of the Republic, through the Reconstruction era, to the present day, States and municipalities have placed extensive licensing requirements on firearm acquisition, restricted the public carriage of weapons, and banned altogether the possession of especially dangerous **\*900** weapons, including handguns. See *Heller,* 554 U.S., at 683 – 687, 128 S.Ct., at 2848–2850 (BREYER, J., dissenting) (reviewing colonial laws); Cornell & DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Ford. L.Rev. 487, 502–516 (2004) (reviewing pre-Civil War laws); Brief for Thirty-four Professional Historians and Legal Historians as *Amici Curiae* 4–22 (reviewing Reconstruction-era laws); Winkler, Scrutinizing the Second Amendment, 105 Mich. L.Rev. 683, 711–712, 716–726 (2007) (reviewing 20th-century laws); see generally *post,* at 3131 – 3136.[42] After the 1860's just as before, the state courts almost uniformly upheld these measures: Apart from making clear that all regulations had to be constructed and applied in a nondiscriminatory manner, the Fourteenth Amendment hardly made a dent. And let us not forget that this Court did not recognize *any* non-militia-related interests under the Second Amendment until two Terms ago, in *Heller*. Petitioners do not dispute the city of Chicago's observation that "[n]o other substantive Bill of Rights protection has been regulated nearly as intrusively" as the right to keep and bear arms. Municipal Respondents' Brief 25.[43]

42    I am unclear what the plurality means when it refers to "the paucity of precedent sustaining bans comparable to those at issue here." *Ante,* at 3047. There is only one ban at issue here—the city of Chicago's handgun prohibition —and the municipal respondents cite far more than "one case," *ibid.,* from the post-Reconstruction period. See Municipal Respondents' Brief 24–30. The evidence adduced by respondents and their *amici* easily establishes their contentions that the "consensus in States that recognize a firearms right is that arms possession, even in the home, is ... subject to interest-balancing," *id.,* at

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5029 Page 74 of 208
McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

24; and that the practice of "[b]anning weapons routinely used for self-defense," when deemed "necessary for the public welfare," "has ample historical pedigree," *id.,* at 28. Petitioners do not even try to challenge these contentions.

43    I agree with Justice SCALIA that a history of regulation hardly proves a right is not "of fundamental character." *Ante,* at 3056 – 3057. An unbroken history of extremely intensive, carefully considered regulation does, however, tend to suggest that it is not.

This history of intrusive regulation is not surprising given that the very text of the Second Amendment calls out for **\*901** regulation, [44] and the ability to respond to the social ills associated with dangerous **\*\*3114** weapons goes to the very core of the States' police powers. Our precedent is crystal clear on this latter point. See, *e.g., Gonzales v. Oregon,* 546 U.S. 243, 270, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) ("[T]he structure and limitations of federalism ... allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omitted)); *United States v. Morrison,* 529 U.S. 598, 618, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"); *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) ("The promotion of safety of persons and property is unquestionably at the core of the State's police power"); *Automobile Workers v. Wisconsin Employment Relations Bd.,* 351 U.S. 266, 274, 76 S.Ct. 794, 100 L.Ed. 1162 (1956) ("The dominant interest of the State in preventing violence and property damage cannot be questioned. It is a matter of genuine local concern"). Compared with today's ruling, most if not all of **\*902** this Court's decisions requiring the States to comply with other provisions in the Bill of Rights did not exact nearly so heavy a toll in terms of state sovereignty.

44    The *Heller* majority asserted that "the adjective 'well-regulated' " in the Second Amendment's preamble "implies nothing more than the imposition of proper discipline and training." 554 U.S., at 597, 128 S.Ct., at 2800. It is far from clear that this assertion is correct. See, *e.g.,* U.S. Const., Art. I, § 4, cl. 1; § 8, cls. 3, 5, 14; § 9, cl. 6; Art. III, § 2, cl. 2; Art. IV, § 2, cl. 3; § 3, cl. 2 (using "regulate" or "Regulation" in manner suggestive of broad, discretionary governmental authority); Art. I, § 8, cl. 16 (invoking powers of "disciplining" and "training" militia in manner suggestive of narrower authority);

*Heller,* 554 U.S., at 579 – 581, 128 S.Ct., at 2790–2791 (investigating Constitution's separate references to "people" as clue to term's meaning in Second Amendment); cf. Cornell & DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Ford. L.Rev. 487, 504 (2004) ("The authors of this curious interpretation of the Second Amendment have constructed a fantasy world where words mean their opposite, and regulation is really anti-regulation"). But even if the assertion were correct, the point would remain that the preamble envisions an active state role in overseeing how the right to keep and bear arms is utilized, and in ensuring that it is channeled toward productive ends.

Finally, even apart from the States' long history of firearms regulation and its location at the core of their police powers, this is a quintessential area in which federalism ought to be allowed to flourish without this Court's meddling. Whether or not we *can* assert a plausible constitutional basis for intervening, there are powerful reasons why we *should not* do so.

Across the Nation, States and localities vary significantly in the patterns and problems of gun violence they face, as well as in the traditions and cultures of lawful gun use they claim. Cf. *post,* at 3128 – 3129. The city of Chicago, for example, faces a pressing challenge in combating criminal street gangs. Most rural areas do not. The city of Chicago has a high population density, which increases the potential for a gunman to inflict mass terror and casualties. Most rural areas do not. [45] The city of Chicago offers little in the way of hunting opportunities. Residents of rural communities are, one presumes, much more likely to stock the dinner table with game they have personally felled.

45    Cf. *Heller,* 554 U.S., at 698, 128 S.Ct., at 2856–2857 (BREYER, J., dissenting) (detailing evidence showing that a "disproportionate amount of violent and property crimes occur in urban areas, and urban criminals are more likely than other offenders to use a firearm during the commission of a violent crime").

Given that relevant background conditions diverge so much across jurisdictions, the Court ought to pay particular heed to state and local legislatures' "right to experiment." *New State Ice,* 285 U.S., at 311, 52 S.Ct. 371 (Brandeis, J., dissenting). So long as the regulatory measures they have chosen are not "arbitrary, capricious or unreasonable," we should be allowing them to "try novel social and economic" policies. *Ibid.* It "is more in keeping ... with our status as a court

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5030 Page 75 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

in a federal system," under these circumstances, "to avoid imposing **\*903** a single solution ... from the top down." *Smith v. Robbins,* 528 U.S. 259, 275, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

It is all the more unwise for this Court to limit experimentation in an area "where the best solution is far from clear." *United States v. Lopez,* 514 U.S. 549, 581, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (KENNEDY, J., concurring). Few issues of public policy are subject to such intensive **\*\*3115** and rapidly developing empirical controversy as gun control. See *Heller,* 554 U.S., at 699 – 704, 128 S.Ct., at 2857–2860 (BREYER, J., dissenting). Chicago's handgun ban, in itself, has divided researchers. Compare Brief for Professors of Criminal Justice as *Amici Curiae* (arguing that ordinance has been effective at reducing gun violence) with Brief for International Law Enforcement Educators and Trainers Association et al. as *Amici Curiae* 17–26 (arguing that ordinance has been a failure). [46] Of course, on some matters the Constitution requires that we ignore such pragmatic considerations. But the Constitution's text, history, and structure are not so clear on the matter before us—as evidenced by the groundbreaking nature of today's fractured decision—and this Court lacks both the technical capacity and the localized expertise to assess "the wisdom, need, and propriety" of most gun-control measures. *Griswold,* 381 U.S., at 482, 85 S.Ct. 1678. [47]

[46]  The fact that Chicago's handgun murder rate may have "actually increased since the ban was enacted," *ante,* at 3026 (majority opinion), means virtually nothing in itself. Countless factors unrelated to the policy may have contributed to that trend. Without a sophisticated regression analysis, we cannot even begin to speculate as to the efficacy or effects of the handgun ban. Even with such an analysis, we could never be certain as to the determinants of the city's murder rate.

[47]  In some sense, it is no doubt true that the " 'best' " solution is elusive for many "serious social problems." *Ante,* at 3056 – 3057 (opinion of SCALIA, J.). Yet few social problems have raised such heated empirical controversy as the problem of gun violence. And few, if any, of the liberty interests we have recognized under the Due Process Clause have raised as many complications for judicial oversight as the interest that is recognized today. See *post,* at 3125 – 3128.
I agree with the plurality that for a right to be eligible for substantive due process recognition, there need not be "a 'popular consensus' that the right is fundamental." *Ante,*

at 3048 – 3049. In our remarkably diverse, pluralistic society, there will almost never be such uniformity of opinion. But to the extent that popular consensus is relevant, I do not agree with the plurality that the *amicus* brief filed in this case by numerous state attorneys general constitutes evidence thereof. *Ibid.* It is puzzling that so many state lawmakers have asked us to limit their *option* to regulate a dangerous item. Cf. *post,* at 3124 – 3125.

**\*904** Nor will the Court's intervention bring any clarity to this enormously complex area of law. Quite to the contrary, today's decision invites an avalanche of litigation that could mire the federal courts in fine-grained determinations about which state and local regulations comport with the *Heller* right—the precise contours of which are far from pellucid —under a standard of review we have not even established. See *post,* at 3126 – 3128. The plurality's "assuranc[e]" that "incorporation does not imperil every law regulating firearms," *ante,* at 3047, provides only modest comfort. For it is also an admission of just how many different types of regulations are potentially implicated by today's ruling, and of just how ad hoc the Court's initial attempt to draw distinctions among them was in *Heller.* The practical significance of the proposition that "the Second Amendment right is fully applicable to the States," *ante,* at 3026 (majority opinion), remains to be worked out by this Court over many, many years.

Furthermore, and critically, the Court's imposition of a national standard is still more unwise because the elected branches have shown themselves to be perfectly capable of safeguarding the interest in keeping and bearing arms. The strength of a liberty claim must be assessed in connection with its status in the democratic process. And in this case, no one disputes "that opponents of [gun] control have considerable political power and do not seem **\*\*3116** to be at a systematic disadvantage in the democratic process," or that "the widespread commitment to an individual right to own guns ... operates as a safeguard against excessive or unjustified gun **\*905** control laws." [48] Sunstein, Second Amendment Minimalism: *Heller* as *Griswold,* 122 Harv. L.Rev. 246, 260 (2008). Indeed, there is a good deal of evidence to suggest that, if anything, American lawmakers tend to *under*-regulate guns, relative to the policy views expressed by majorities in opinion polls. See K. Goss, Disarmed: The Missing Movement for Gun Control in America 6 (2006). If a particular State or locality has enacted some "improvident" gun-control measures, as petitioners believe Chicago has done, there is no apparent reason to

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5031 Page 76 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

infer that the mistake will not "eventually be rectified by the democratic process." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

48    Likewise, no one contends that those interested in personal self-defense—every American, presumably—face any particular disadvantage in the political process. All 50 States recognize self-defense as a defense to criminal prosecution. See n. 32, *supra.*

This is not a case, then, that involves a "special condition" that "may call for a correspondingly more searching judicial inquiry." *Carolene Products,* 304 U.S., at 153, n. 4, 58 S.Ct. 778. Neither petitioners nor those most zealously committed to their views represent a group or a claim that is liable to receive unfair treatment at the hands of the majority. On the contrary, petitioners' views are supported by powerful participants in the legislative process. Petitioners have given us no reason to believe that the interest in keeping and bearing arms entails any special need for judicial lawmaking, or that federal judges are more qualified to craft appropriate rules than the people's elected representatives. Having failed to show why their asserted interest is intrinsic to the concept of ordered liberty or vulnerable to maltreatment in the political arena, they have failed to show why "the word liberty in the Fourteenth Amendment" should be "held to prevent the natural outcome of a dominant opinion" about how to deal with the problem of handgun violence in the city of Chicago. *Lochner,* 198 U.S., at 76, 25 S.Ct. 539 (Holmes, J., dissenting).

**\*906** VI

The preceding sections have already addressed many of the points made by Justice SCALIA in his concurrence. But in light of that opinion's fixation on this one, it is appropriate to say a few words about Justice SCALIA's broader claim: that his preferred method of substantive due process analysis, a method "that makes the traditions of our people paramount," *ante,* at 3050, is both more restrained and more facilitative of democracy than the method I have outlined. Colorful as it is, Justice SCALIA's critique does not have nearly as much force as does his rhetoric. His theory of substantive due process, moreover, comes with its own profound difficulties.

Although Justice SCALIA aspires to an "objective," "neutral" method of substantive due process analysis, *ante,* at 3055 – 3056, his actual method is nothing of the sort. Under the "historically focused" approach he advocates, *ante,* at 3057,

numerous threshold questions arise before one ever gets to the history. At what level of generality should one frame the liberty interest in question? See n. 25, *supra.* What does it mean for a right to be " 'deeply rooted in this Nation's history and tradition,' " *ante,* at 3026 – 3027 (quoting *Glucksberg,* 521 U.S., at 721, 117 S.Ct. 2302)? By what standard will that proposition be tested? Which types of sources will count, and how will those sources be **\*\*3117** weighed and aggregated? There are no objective, neutral answers to these questions. There is not even a theory—at least, Justice SCALIA provides none—of how to go about answering them.

Nor is there any escaping *Palko,* it seems. To qualify for substantive due process protection, Justice SCALIA has stated, an asserted liberty right must be not only deeply rooted in American tradition, "but it must *also* be implicit in the concept of ordered liberty." *Lawrence,* 539 U.S., at 593, n. 3, 123 S.Ct. 2472 (dissenting opinion) (internal quotation marks omitted). Applying the latter, *Palko*-derived half of that test requires **\*907** precisely the sort of reasoned judgment—the same multifaceted evaluation of the right's contours and consequences—that Justice SCALIA mocks in his concurrence today.

So does applying the first half. It is hardly a novel insight that history is not an objective science, and that its use can therefore "point in any direction the judges favor," *ante,* at 3058 (opinion of SCALIA, J.). Yet 21 years after the point was brought to his attention by Justice Brennan, Justice SCALIA remains "oblivious to the fact that [the concept of 'tradition'] can be as malleable and as elusive as 'liberty' itself." *Michael H.,* 491 U.S., at 137, 109 S.Ct. 2333 (dissenting opinion). Even when historical analysis is focused on a discrete proposition, such as the original public meaning of the Second Amendment, the evidence often points in different directions. The historian must choose which pieces to credit and which to discount, and then must try to assemble them into a coherent whole. In *Heller,* Justice SCALIA preferred to rely on sources created much earlier and later in time than the Second Amendment itself, see, *e.g.,* 554 U.S., at 577 – 578, 128 S.Ct., at 2789–2790 (consulting late-19th-century treatises to ascertain how Americans would have read the Amendment's preamble in 1791); I focused more closely on sources contemporaneous with the Amendment's drafting and ratification.[49] No mechanical yardstick can measure which of us was correct, either with respect to the materials we chose to privilege or the insights we gleaned from them.

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5032 Page 77 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

49    See *Heller,* 554 U.S., at 662, 128 S.Ct., at 2836–2837 (STEVENS, J., dissenting) ("Although it gives short shrift to the drafting history of the Second Amendment, the Court dwells at length on four other sources: the 17th-century English Bill of Rights; Blackstone's Commentaries on the Laws of England; postenactment commentary on the Second Amendment; and post-Civil War legislative history"); see also *post,* at 3120 – 3122 (discussing professional historians' criticisms of *Heller* ).

The malleability and elusiveness of history increase exponentially when we move from a pure question of original meaning, as in *Heller,* to Justice SCALIA's theory of substantive **\*908** due process. At least with the former sort of question, the judge can focus on a single legal provision; the temporal scope of the inquiry is (or should be) relatively bounded; and there is substantial agreement on what sorts of authorities merit consideration. With Justice SCALIA's approach to substantive due process, these guideposts all fall away. The judge must canvas the entire landscape of American law as it has evolved through time, and perhaps older laws as well, see, *e.g., Lawrence,* 539 U.S., at 596, 123 S.Ct. 2472 (SCALIA, J., dissenting) (discussing " 'ancient roots' " of proscriptions against sodomy (quoting *Bowers v. Hardwick,* 478 U.S. 186, 192, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986))), pursuant to a standard (deeply rootedness) that has never been defined. In conducting this rudderless, panoramic tour of American legal history, the judge has more than ample opportunity to "look over the heads of the crowd and pick out [his] friends," **\*\*3118** *Roper v. Simmons,* 543 U.S. 551, 617, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (SCALIA, J., dissenting).

My point is not to criticize judges' use of history in general or to suggest that it always generates indeterminate answers; I have already emphasized that historical study can discipline as well as enrich substantive due process analysis. My point is simply that Justice SCALIA's defense of his method, which holds out objectivity and restraint as its cardinal—and, it seems, only—virtues, is unsatisfying on its own terms. For a limitless number of subjective judgments may be smuggled into his historical analysis. Worse, they may be *buried* in the analysis. At least with my approach, the judge's cards are laid on the table for all to see, and to critique. The judge must exercise judgment, to be sure. When answering a constitutional question to which the text provides no clear answer, there is always some amount of discretion; our constitutional system has always depended on judges' filling in the document's vast open spaces.50 But there is also transparency.

50    Indeed, this is truly one of our most deeply rooted legal traditions.

**\*909** Justice SCALIA's approach is even less restrained in another sense: It would effect a major break from our case law outside of the "incorporation" area. Justice SCALIA does not seem troubled by the fact that his method is largely inconsistent with the Court's canonical substantive due process decisions, ranging from *Meyer,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, and *Pierce,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, in the 1920's, to *Griswold,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, in the 1960's, to *Lawrence,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508, in the 2000's. To the contrary, he seems to embrace this dissonance. My method seeks to synthesize dozens of cases on which the American people have relied for decades. Justice SCALIA's method seeks to vaporize them. So I am left to wonder, which of us is more faithful to this Nation's constitutional history? And which of us is more faithful to the values and commitments of the American people, as they stand today? In 1967, when the Court held in *Loving,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, that adults have a liberty-based as well as equality-based right to wed persons of another race, interracial marriage was hardly "deeply rooted" in American tradition. Racial segregation and subordination were deeply rooted. The Court's substantive due process holding was nonetheless correct—and we should be wary of any interpretive theory that implies, emphatically, that it was not.

Which leads me to the final set of points I wish to make: Justice SCALIA's method invites not only bad history, but also bad constitutional law. As I have already explained, in evaluating a claimed liberty interest (or any constitutional claim for that matter), it makes perfect sense to give history significant weight: Justice SCALIA's position is closer to my own than he apparently feels comfortable acknowledging. But it makes little sense to give history dispositive weight in every case. And it makes *especially* little sense to answer questions like whether the right to bear arms is "fundamental" by focusing only on the past, given that both the practical significance and the public understandings of such a right often change as society changes. What if the evidence had **\*910** shown that, whereas at one time firearm possession contributed substantially to personal liberty and safety, nowadays it contributes nothing, or even tends to undermine them? Would it still have been reasonable to constitutionalize the right?

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

**\*\*3119** The concern runs still deeper. Not only can historical views be less than completely clear or informative, but they can also be wrong. Some notions that many Americans deeply believed to be true, at one time, turned out not to be true. Some practices that many Americans believed to be consistent with the Constitution's guarantees of liberty and equality, at one time, turned out to be inconsistent with them. The fact that we have a written Constitution does not consign this Nation to a static legal existence. Although we should always "pa[y] a decent regard to the opinions of former times," it is "not the glory of the people of America" to have "suffered a blind veneration for antiquity." The Federalist No. 14, pp. 99, 104 (C. Rossiter ed. 1961) (J. Madison). It is not the role of federal judges to be amateur historians. And it is not fidelity to the Constitution to ignore its use of deliberately capacious language, in an effort to transform foundational legal commitments into narrow rules of decision.

As for "the democratic process," *ante,* at 3057 – 3058, a method that looks exclusively to history can easily do more harm than good. Just consider this case. The net result of Justice SCALIA's supposedly objective analysis is to vest federal judges—ultimately a majority of the judges on this Court—with unprecedented lawmaking powers in an area in which they have no special qualifications, and in which the give-and-take of the political process has functioned effectively for decades. Why this "intrudes much less upon the democratic process," *ante,* at 3058, than an approach that would defer to the democratic process on the regulation of firearms is, to say the least, not self-evident. I cannot even tell what, under Justice SCALIA's view, constitutes an "intrusion."

**\*911** It is worth pondering, furthermore, the vision of democracy that underlies Justice SCALIA's critique. Very few of us would welcome a system in which majorities or powerful interest groups always get their way. Under our constitutional scheme, I would have thought that a judicial approach to liberty claims such as the one I have outlined— an approach that investigates both the intrinsic nature of the claimed interest and the practical significance of its judicial enforcement, that is transparent in its reasoning and sincere in its effort to incorporate constraints, that is guided by history but not beholden to it, and that is willing to protect some rights even if they have not already received uniform protection from the elected branches—has the capacity to improve, rather than "[im]peril," *ante,* at 3058, our democracy. It all depends on judges' exercising careful, reasoned judgment. As it always has, and as it always will.

VII

The fact that the right to keep and bear arms appears in the Constitution should not obscure the novelty of the Court's decision to enforce that right against the States. By its terms, the Second Amendment does not apply to the States; read properly, it does not even apply to individuals outside of the militia context. The Second Amendment was adopted to protect the *States* from federal encroachment. And the Fourteenth Amendment has never been understood by the Court to have "incorporated" the entire Bill of Rights. There was nothing foreordained about today's outcome.

Although the Court's decision in this case might be seen as a mere adjunct to its decision in *Heller,* the consequences could prove far more destructive—quite literally—to our Nation's communities and to our constitutional structure. Thankfully, the Second Amendment right identified in *Heller* and its newly minted Fourteenth **\*\*3120** Amendment analogue are limited, at least for now, to the home. But neither the "assurances" provided by the plurality, *ante,* at 3047 – 3048, nor the **\*912** many historical sources cited in its opinion should obscure the reality that today's ruling marks a dramatic change in our law—or that the Justices who have joined it have brought to bear an awesome amount of discretion in resolving the legal question presented by this case.

I would proceed more cautiously. For the reasons set out at length above, I cannot accept either the methodology the Court employs or the conclusions it draws. Although impressively argued, the majority's decision to overturn more than a century of Supreme Court precedent and to unsettle a much longer tradition of state practice is not, in my judgment, built "upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms." *Griswold,* 381 U.S., at 501, 85 S.Ct. 1678 (Harlan, J., concurring in judgment).

Accordingly, I respectfully dissent.

Justice BREYER, with whom Justice GINSBURG and Justice SOTOMAYOR join, dissenting.

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

In my view, Justice STEVENS has demonstrated that the Fourteenth Amendment's guarantee of "substantive due process" does not include a general right to keep and bear firearms for purposes of private self-defense. As he argues, the Framers did not write the Second Amendment with this objective in view. See *ante,* at 3111 – 3112 (dissenting opinion). Unlike other forms of substantive liberty, the carrying of arms for that purpose often puts others' lives at risk. See *ante,* at 3107 – 3109. And the use of arms for private self-defense does not warrant federal constitutional protection from state regulation. See *ante,* at 3112 – 3116.

The Court, however, does not expressly rest its opinion upon "substantive due process" concerns. Rather, it directs its attention to this Court's "incorporation" precedents and asks whether the Second Amendment right to private self-defense **\*913** is "fundamental" so that it applies to the States through the Fourteenth Amendment. See *ante,* at 3031 – 3036.

I shall therefore separately consider the question of "incorporation." I can find nothing in the Second Amendment's text, history, or underlying rationale that could warrant characterizing it as "fundamental" insofar as it seeks to protect the keeping and bearing of arms for private self-defense purposes. Nor can I find any justification for interpreting the Constitution as transferring ultimate regulatory authority over the private uses of firearms from democratically elected legislatures to courts or from the States to the Federal Government. I therefore conclude that the Fourteenth Amendment does not "incorporate" the Second Amendment's right "to keep and bear Arms." And I consequently dissent.

## I

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Two years ago, in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Court rejected the pre-existing judicial consensus that the Second Amendment was primarily concerned with the need to maintain a "well regulated Militia." See *id.,* at 638, 128 S.Ct., at 2823, and n. 2, 672 – 679, 2842 – 2846 (STEVENS, J., dissenting); **\*\*3121** *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Although the Court acknowledged that "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms *was the reason*

that right ... was codified in a written Constitution," the Court asserted that "individual self-defense ... was the *central component* of the right itself." *Heller,* 554 U.S., at 599, 128 S.Ct., at 2801 (some emphasis added). **\*914** The Court went on to hold that the Second Amendment restricted Congress' power to regulate handguns used for self-defense, and the Court found unconstitutional the District of Columbia's ban on the possession of handguns in the home. *Id.,* at 635, 128 S.Ct., at 2821–2822.

The Court based its conclusions almost exclusively upon its reading of history. But the relevant history in *Heller* was far from clear: Four dissenting Justices disagreed with the majority's historical analysis. And subsequent scholarly writing reveals why disputed history provides treacherous ground on which to build decisions written by judges who are not expert at history.

Since *Heller,* historians, scholars, and judges have continued to express the view that the Court's historical account was flawed. See, *e.g.,* Konig, Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America, 56 UCLA L.Rev. 1295 (2009); Finkelman, It Really Was About a Well Regulated Militia, 59 Syracuse L.Rev. 267 (2008); P. Charles, The Second Amendment: The Intent and Its Interpretation by the States and the Supreme Court (2009); Merkel, *The District of Columbia v. Heller* and Antonin Scalia's Perverse Sense of Originalism, 13 Lewis & Clark L.Rev. 349 (2009); Kozuskanich, Originalism in a Digital Age: An Inquiry Into the Right to Bear Arms, 29 J. Early Republic 585 (2009); Cornell, St. George Tucker's Lecture Notes, the Second Amendment, and Originalist Methodology: A Critical Comment, 103 Nw. U.L.Rev. 1541 (2009); Posner, In Defense of Looseness: The Supreme Court and Gun Control, New Republic, Aug. 27, 2008, pp. 32–35; see also Epstein, A Structural Interpretation of the Second Amendment: Why *Heller* Is (Probably) Wrong on Originalist Grounds, 59 Syracuse L.Rev. 171 (2008).

Consider as an example of these critiques an *amici* brief filed in this case by historians who specialize in the study of the English Civil Wars. They tell us that *Heller* misunderstood a key historical point. See Brief for English/Early American Historians as *Amici Curiae* (hereinafter English Historians' Brief) (filed by 21 professors at leading universities in the United States, United Kingdom, and Australia). *Heller* 's conclusion that "individual self-defense" was "the **\*915** *central component* " of the Second Amendment's right

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5035 Page 80 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

"to keep and bear Arms" rested upon its view that the Amendment "codified a *pre-existing* right" that had "nothing whatever to do with service in a militia." 554 U.S., at 599, 592 – 593, 128 S.Ct., at 2797, 2801–2802. That view in turn rested in significant part upon Blackstone having described the right as " 'the right of having and using arms for self-preservation and defence,' " which reflected the provision in the English Declaration of Right of 1689 that gave the King's Protestant " 'subjects' " the right to " 'have arms for their defence suitable to their Conditions, and as allowed by Law.' " *Id.,* at 593 – 594, 128 S.Ct., at 2798 (quoting 1 W. Blackstone, Commentaries on the Laws of England 140 (1765) (hereinafter Blackstone), and 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)). The Framers, said the majority, understood that right "as permitting **\*3122** a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.' " 554 U.S., at 595, 128 S.Ct., at 2799 (quoting 1 Blackstone's Commentaries 145–146, n. 42 (S. Tucker ed. 1803)).

The historians now tell us, however, that the right to which Blackstone referred had, not *nothing,* but *everything,* to do with the militia. As properly understood at the time of the English Civil Wars, the historians claim, the right to bear arms "ensured that *Parliament* had the power" to arm the citizenry: "to defend the realm" in the case of a foreign enemy, and to "secure the right of 'self-preservation,' " or "self-defense," should "*the sovereign* usurp the English Constitution." English Historians' Brief 3, 8–13, 23–24 (emphasis added). Thus, the Declaration of Right says that private persons can possess guns only " 'as allowed by law.' " *Id.,* at 13. See *id.,* at 20–24. Moreover, when Blackstone referred to " 'the right of having and using arms for self-preservation and defence,' " he was referring to the right of the people "*to take part in the militia* to defend their political liberties," and *to the right of Parliament* (which represented the people) to *raise a militia* even when the King sought to deny it **\*916** that power. *Id.,* at 4, 24–27 (emphasis added). Nor can the historians find any convincing reason to believe that the Framers had something different in mind than what Blackstone himself meant. Compare *Heller, supra,* at 593 – 595, 128 S.Ct., at 2798–2799, with English Historians' Brief 28–40. The historians concede that at least one historian takes a different position, see *id.,* at 7, but the Court, they imply, would lose a poll taken among professional historians of this period, say, by a vote of 8 to 1.

If history, and history alone, is what matters, why would the Court not now reconsider *Heller* in light of these more recently published historical views? See *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 923–924, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (BREYER, J., dissenting) (noting that *stare decisis* interests are at their lowest with respect to recent and erroneous constitutional decisions that create unworkable legal regimes); *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 362 – 363, 130 S.Ct. 876, 955–956, 175 L.Ed.2d 753 (2010) (listing similar factors); see also *Wallace v. Jaffree,* 472 U.S. 38, 99, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (REHNQUIST, J., dissenting) ("*[S]tare decisis* may bind courts as to matters of law, but it cannot bind them as to matters of history"). At the least, where *Heller* 's historical foundations are so uncertain, why extend its applicability?

My aim in referring to this history is to illustrate the reefs and shoals that lie in wait for those nonexpert judges who place virtually determinative weight upon historical considerations. In my own view, the Court should not look to history alone but to other factors as well—above all, in cases where the history is so unclear that the experts themselves strongly disagree. It should, for example, consider the basic values that underlie a constitutional provision and their contemporary significance. And it should examine as well the relevant consequences and practical justifications that might, or might not, warrant removing an important question from the democratic decisionmaking process. See *ante,* at 3097 – 3099 **\*917** STEVENS, J., dissenting) (discussing shortcomings of an exclusively historical approach).

II

A

In my view, taking *Heller* as a given, the Fourteenth Amendment does not incorporate the Second Amendment right to keep **\*\*3123** and bear arms for purposes of private self-defense. Under this Court's precedents, to incorporate the private self-defense right the majority must show that the right is, *e.g.,* "fundamental to the American scheme of justice," *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); see *ibid.,* n. 14; see also *ante,* at 3050 (plurality opinion) (finding that the right is "fundamental" and therefore incorporated). And this it fails to do.

The majority here, like that in *Heller,* relies almost exclusively upon history to make the necessary showing. *Ante,* at 3036 – 3044. But to do so for incorporation purposes is both

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5036 Page 81 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

wrong and dangerous. As Justice STEVENS points out, our society has historically made mistakes—for example, when considering certain 18th- and 19th-century property rights to be fundamental. *Ante,* at 3098 – 3099. And in the incorporation context, as elsewhere, history often is unclear about the answers. See Part I, *supra;* Part III, *infra.*

Accordingly, this Court, in considering an incorporation question, has never stated that the historical status of a right is the only relevant consideration. Rather, the Court has either explicitly or implicitly made clear in its opinions that the right in question has remained fundamental over time. See, *e.g., Apodaca v. Oregon,* 406 U.S. 404, 410, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (plurality opinion) (stating that the incorporation "inquiry must focus upon the function served" by the right in question in "*contemporary society* " (emphasis added)); *Duncan, supra,* at 154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (noting that the right in question "continues to receive strong support"); **\*918** *Klopfer v. North Carolina,* 386 U.S. 213, 226, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (same). And, indeed, neither of the parties before us in this case has asked us to employ the majority's history-constrained approach. See Brief for Petitioners 67–69 (arguing for incorporation based on trends in contemporary support for the right); Brief for Respondent City of Chicago et al. 23–31 (hereinafter Brief for Municipal Respondents) (looking to current state practices with respect to the right).

I thus think it proper, above all where history provides no clear answer, to look to other factors in considering whether a right is sufficiently "fundamental" to remove it from the political process in every State. I would include among those factors the nature of the right; any contemporary disagreement about whether the right is fundamental; the extent to which incorporation will further other, perhaps more basic, constitutional aims; and the extent to which incorporation will advance or hinder the Constitution's structural aims, including its division of powers among different governmental institutions (and the people as well). Is incorporation needed, for example, to further the Constitution's effort to ensure that the government treats each individual with equal respect? Will it help maintain the democratic form of government that the Constitution foresees? In a word, will incorporation prove consistent, or inconsistent, with the Constitution's efforts to create governmental institutions well suited to the carrying out of its constitutional promises?

Finally, I would take account of the Framers' basic reason for believing the Court ought to have the power of judicial review. Alexander Hamilton feared granting that power to Congress alone, for he feared that Congress, acting as judges, would not overturn as unconstitutional a popular statute that it had recently enacted, as legislators. The Federalist No. 78, p. 405 (G. Carey & J. McClellan eds. **\*\*3124** 2001) ("This independence of the judges is equally requisite to guard the constitution and the rights of individuals from the **\*919** effects of those ill humours which" can, at times, lead to "serious oppressions of the minor party in the community"). Judges, he thought, may find it easier to resist popular pressure to suppress the basic rights of an unpopular minority. See *United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). That being so, it makes sense to ask whether that particular comparative judicial advantage is relevant to the case at hand. See, *e.g.,* J. Ely, Democracy and Distrust (1980).

B

How do these considerations apply here? For one thing, I would apply them only to the private self-defense right directly at issue. After all, the Amendment's militia-related purpose is primarily to protect *States* from *federal* regulation, not to protect individuals from militia-related regulation. *Heller,* 554 U.S., at 599, 128 S.Ct., at 2801–2802; see also *Miller,* 307 U.S., at 178, 59 S.Ct. 816. Moreover, the Civil War Amendments, the electoral process, the courts, and numerous other institutions today help to safeguard the States and the people from any serious threat of federal tyranny. How are state militias additionally necessary? It is difficult to see how a right that, as the majority concedes, has "largely faded as a popular concern" could possibly be so fundamental that it would warrant incorporation through the Fourteenth Amendment. *Ante,* at 3037 – 3038. Hence, the incorporation of the Second Amendment cannot be based on the militia-related aspect of what *Heller* found to be more extensive Second Amendment rights.

For another thing, as *Heller* concedes, the private self-defense right that the Court would incorporate has nothing to do with "the *reason* " the Framers "codified" the right to keep and bear arms "in a written Constitution." 554 U.S., at 599, 128 S.Ct., at 2801–2802 (emphasis added). *Heller* immediately adds that the self-defense right was nonetheless "the *central component* of the right." *Ibid.* In my view, this is the historical equivalent of a claim that water runs uphill. See Part I, *supra.* But, taking

AR004568

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5037   Page 82 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

it as valid, the Framers' basic *reasons* for including **920** language in the Constitution would nonetheless seem more pertinent (in deciding about the contemporary *importance* of a right) than the particular *scope* 17th- or 18th-century listeners would have then assigned to the words they used. And examination of the Framers' motivation tells us they did not think the private armed self-defense right was of paramount importance. See Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1164 (1991) ("[T]o see the [Second] Amendment as primarily concerned with an individual right to hunt, or protect one's home," would be "like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge"); see also, *e.g.,* Rakove, The Second Amendment: The Highest Stage of Originalism, 76 Chi.-Kent L.Rev. 103, 127–128 (2000); Brief for Historians on Early American Legal, Constitutional, and Pennsylvania History as *Amici Curiae* 22–33.

Further, there is no popular consensus that the private self-defense right described in *Heller* is fundamental. The plurality suggests that two *amici* briefs filed in the case show such a consensus, see *ante,* at 3048 – 3049, but, of course, numerous *amici* briefs have been filed opposing incorporation as well. Moreover, every State regulates firearms extensively, and public opinion is sharply divided on the appropriate level of regulation. Much of **3125** this disagreement rests upon empirical considerations. One side believes the right essential to protect the lives of those attacked in the home; the other side believes it essential to regulate the right in order to protect the lives of others attacked with guns. It seems unlikely that definitive evidence will develop one way or the other. And the appropriate level of firearm regulation has thus long been, and continues to be, a hotly contested matter of political debate. See, *e.g.,* Siegel, Dead or Alive: Originalism as Popular Constitutionalism in *Heller,* 122 Harv. L. Rev. 191, 201–245 (2008). (Numerous sources supporting arguments and data in Part II–B can be found in the Appendix, *infra.*)

 **921** Moreover, there is no reason here to believe that incorporation of the private self-defense right will further any other or broader constitutional objective. We are aware of no argument that gun-control regulations target or are passed with the purpose of targeting "discrete and insular minorities." *Carolene Products Co.,* 304 U.S., at 153, n. 4, 58 S.Ct. 778; see, *e.g., ante,* at 3115 – 3116 (STEVENS, J., dissenting). Nor will incorporation help to ensure equal respect for individuals. Unlike the First Amendment's rights of free speech, free press, assembly, and petition, the private self-defense right does not constitute a necessary part of the

democratic process that the Constitution seeks to establish. See, *e.g., Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Unlike the First Amendment's religious protections, the Fourth Amendment's protection against unreasonable searches and seizures, the Fifth and Sixth Amendments' insistence upon fair criminal procedure, and the Eighth Amendment's protection against cruel and unusual punishments, the private self-defense right does not significantly seek to protect individuals who might otherwise suffer unfair or inhumane treatment at the hands of a majority. Unlike the protections offered by many of these same Amendments, it does not involve matters as to which judges possess a comparative expertise, by virtue of their close familiarity with the justice system and its operation. And, unlike the Fifth Amendment's insistence on just compensation, it does not involve a matter where a majority might unfairly seize for itself property belonging to a minority.

Finally, incorporation of the right *will* work a significant disruption in the constitutional allocation of decisionmaking authority, thereby interfering with the Constitution's ability to further its objectives.

*First,* on any reasonable accounting, the incorporation of the right recognized in *Heller* would amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the **922** States and the Federal Government. Private gun regulation is the quintessential exercise of a State's "police power"—*i.e.,* the power to "protec[t] ... the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State," by enacting "all kinds of restraints and burdens" on both "persons and property." *Slaughter–House Cases,* 16 Wall. 36, 62, 21 L.Ed. 394 (1873) (internal quotation marks omitted). The Court has long recognized that the Constitution grants the States special authority to enact laws pursuant to this power. See, *e.g., Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (noting that States have "great latitude" to use their police powers (internal quotation marks omitted)); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). A decade ago, we wrote that there is "no better example of the police power" than "the **3126** suppression of violent crime." *United States v. Morrison,* 529 U.S. 598, 618, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). And examples in which the Court has deferred to state legislative judgments in respect to the exercise of the police power are legion. See, *e.g., Gonzales v. Oregon,* 546 U.S. 243, 270,

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (assisted suicide); *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (same); *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954) ("We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless ... ").

*Second,* determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make. See, *e.g., Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion); *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 195–196, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). And it may require this kind of analysis in virtually every case.

Government regulation of the right to bear arms normally embodies a judgment that the regulation will help save lives. The determination whether a gun regulation is constitutional would thus almost always require the weighing of the constitutional  *923  right to bear arms against the "primary concern of every government—a concern for the safety and indeed the lives of its citizens." *United States v. Salerno,* 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). With respect to other incorporated rights, this sort of inquiry is *sometimes* present. See, *e.g., Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) *(per curiam)* (free speech); *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (religion); *Brigham City v. Stuart,* 547 U.S. 398, 403–404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (Fourth Amendment); *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (Fifth Amendment); *Salerno, supra,* at 755, 107 S.Ct. 2095 (bail). But here, this inquiry—calling for the fine tuning of protective rules—is likely to be part of a daily judicial diet.

Given the competing interests, courts will have to try to answer empirical questions of a particularly difficult kind. Suppose, for example, that after a gun regulation's adoption the murder rate went up. Without the gun regulation would the murder rate have risen even faster? How is this conclusion affected by the local recession which has left numerous people unemployed? What about budget cuts that led to a downsizing of the police force? How effective was that police force to begin with? And did the regulation simply take guns from those who use them for lawful purposes without affecting their possession by criminals?

Consider too that countless gun regulations of many shapes and sizes are in place in every State and in many local communities. Does the right to possess weapons for self-defense extend outside the home? To the car? To work? What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons? When is a gun semiautomatic? Where are different kinds of weapons likely needed? Does time of day matter? Does the presence of a child in the house matter? Does the presence of a convicted felon in the house matter? Do police need special rules permitting patdowns designed to find guns? When do registration requirements become severe to the point that they amount to an unconstitutional ban? Who can possess guns and of what kind?  **3127  Aliens? Prior drug offenders?  *924  Prior alcohol abusers? How would the right interact with a state or local government's ability to take special measures during, say, national security emergencies? As the questions suggest, state and local gun regulation can become highly complex, and these "are only a few uncertainties that quickly come to mind." *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 898, 129 S.Ct. 2252, 2261, 173 L.Ed.2d 1208 (2009) (ROBERTS, C. J., dissenting).

The difficulty of finding answers to these questions is exceeded only by the importance of doing so. Firearms cause well over 60,000 deaths and injuries in the United States each year. Those who live in urban areas, police officers, women, and children, all may be particularly at risk. And gun regulation may save their lives. Some experts have calculated, for example, that Chicago's handgun ban has saved several hundred lives, perhaps close to 1,000, since it was enacted in 1983. Other experts argue that stringent gun regulations "can help protect police officers operating on the front lines against gun violence," have reduced homicide rates in Washington, D. C., and Baltimore, and have helped to lower New York's crime and homicide rates. Brief for Association of Prosecuting Attorneys et al. as *Amici Curiae* 13–16, 20.

At the same time, the opponents of regulation cast doubt on these studies. And who is right? Finding out may require interpreting studies that are only indirectly related to a particular regulatory statute, say, one banning handguns in the home. Suppose studies find more accidents and suicides where there is a handgun in the home than where there is a long gun in the home or no gun at all? To what extent do such studies justify a ban? What if opponents of the ban put forth counterstudies?

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-32   Filed 11/30/22   PageID.5039   Page 84 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

In answering such questions judges cannot simply refer to judicial homilies, such as Blackstone's 18th-century perception that a man's home is his castle. See 4 Blackstone 223. Nor can the plurality so simply reject, by mere assertion, the fact that "incorporation will require judges to assess the **\*925** costs and benefits of firearms restrictions." *Ante,* at 3050. How can the Court assess the strength of the government's regulatory interests without addressing issues of empirical fact? How can the Court determine if a regulation is appropriately tailored without considering its impact? And how can the Court determine if there are less restrictive alternatives without considering what will happen if those alternatives are implemented?

Perhaps the Court could lessen the difficulty of the mission it has created for itself by adopting a jurisprudential approach similar to the many state courts that administer a state constitutional right to bear arms. See *infra,* at 3130 – 3131 (describing state approaches). But the Court has not yet done so. Cf. *Heller,* 554 U.S., at 634 – 635, 128 S.Ct., at 2818– 2822 (rejecting an " 'interest-balancing' approach" similar to that employed by the States); *ante,* at 3050 (plurality opinion). Rather, the Court has haphazardly created a few simple rules, such as that it will not touch "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," or "laws imposing conditions and qualifications on the commercial sale of arms." *Heller, supra,* at 626 – 627, 128 S.Ct., at 2817; *ante,* at 3047 (plurality opinion). But why these rules and not others? Does the Court know that these regulations are justified by some special gun-related risk of death? In fact, the Court does not know. It has simply invented rules that sound sensible without being able to explain why or how Chicago's handgun ban is different.

**\*\*3128** The fact is that judges do not know the answers to the kinds of empirically based questions that will often determine the need for particular forms of gun regulation. Nor do they have readily available "tools" for finding and evaluating the technical material submitted by others. *District Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 74, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009); see also *Turner Broadcasting,* 520 U.S., at 195–196, 117 S.Ct. 1174. Judges cannot easily make empirically based predictions; **\*926** they have no way to gather and evaluate the data required to see if such predictions are accurate; and the nature of litigation and concerns about *stare decisis* further make it difficult for judges to change course if predictions prove

inaccurate. Nor can judges rely upon local community views and values when reaching judgments in circumstances where prediction is difficult because the basic facts are unclear or unknown.

At the same time, there is no institutional need to send judges off on this "mission-almost-impossible." Legislators are able to "amass the stuff of actual experience and cull conclusions from it." *United States v. Gainey,* 380 U.S. 63, 67, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). They are far better suited than judges to uncover facts and to understand their relevance. And legislators, unlike Article III judges, can be held democratically responsible for their empirically based and value-laden conclusions. We have thus repeatedly affirmed our preference for "legislative not judicial solutions" to this kind of problem, see, *e.g., Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 513, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), just as we have repeatedly affirmed the Constitution's preference for democratic solutions legislated by those whom the people elect.

In *New State Ice Co. v. Liebmann,* 285 U.S. 262, 310–311, 52 S.Ct. 371, 76 L.Ed. 747 (1932), Justice Brandeis stated in dissent:

> "Some people assert that our present plight is due, in part, to the limitations set by courts upon experimentation in the fields of social and economic science; and to the discouragement to which proposals for betterment there have been subjected otherwise. There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. I cannot believe that the framers of the Fourteenth Amendment, or the States which ratified it, intended to deprive us of the power to correct [the social problems we face]."

**\*927** There are 50 state legislatures. The fact that this Court may already have refused to take this wise advice with respect to Congress in *Heller* is no reason to make matters worse here.

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

*Third,* the ability of States to reflect local preferences and conditions—both key virtues of federalism—here has particular importance. The incidence of gun ownership varies substantially as between crowded cities and uncongested rural communities, as well as among the different geographic regions of the country. Thus, approximately 60% of adults who live in the relatively sparsely populated Western States of Alaska, Montana, and Wyoming report that their household keeps a gun, while fewer than 15% of adults in the densely populated Eastern States of Rhode Island, New Jersey, and Massachusetts say the same.

The nature of gun violence also varies as between rural communities and cities. Urban centers face significantly greater levels of firearm crime and homicide, while rural communities have proportionately **\*\*3129** greater problems with nonhomicide gun deaths, such as suicides and accidents. And idiosyncratic local factors can lead to two cities finding themselves in dramatically different circumstances: For example, in 2008, the murder rate was 40 times higher in New Orleans than it was in Lincoln, Nebraska.

It is thus unsurprising that States and local communities have historically differed about the need for gun regulation as well as about its proper level. Nor is it surprising that "primarily, and historically," the law has treated the exercise of police powers, including gun control, as "matter[s] of local concern." *Medtronic,* 518 U.S., at 475, 116 S.Ct. 2240 (internal quotation marks omitted).

*Fourth,* although incorporation of any right removes decisions from the democratic process, the incorporation of this particular right does so without strong offsetting justification—as the example of Oak Park's handgun ban helps to show. See Oak Park, Ill., Village Code § 27–2–1 (2007). **\*928** Oak Park decided to ban handguns in 1983, after a local attorney was shot to death with a handgun that his assailant had smuggled into a courtroom in a blanket. Brief for Oak Park Citizens Committee for Handgun Control as *Amicus Curiae* 1, 21. A citizens committee spent months gathering information about handguns. *Id.,* at 21. It secured 6,000 signatures from community residents in support of a ban. *Id.,* at 21–22. And the village board enacted a ban into law. *Id.,* at 22.

Subsequently, at the urging of ban opponents the board held a community referendum on the matter. *Ibid.* The citizens committee argued strongly in favor of the ban. *Id.,* at 22–23. It pointed out that most guns owned in Oak Park were handguns

and that handguns were misused more often than citizens used them in self-defense. *Id.,* at 23. The ban opponents argued just as strongly to the contrary. *Ibid.* The public decided to keep the ban by a vote of 8,031 to 6,368. *Ibid.* And since that time, Oak Park now tells us, crime has decreased and the community has seen no accidental handgun deaths. *Id.,* at 2.

Given the empirical and local value-laden nature of the questions that lie at the heart of the issue, why, in a Nation whose Constitution foresees democratic decisionmaking, is it so *fundamental* a matter as to require taking that power from the people? What is it here that the people did not know? What is it that a judge knows better?

\* \* \*

In sum, the police power, the superiority of legislative decisionmaking, the need for local decisionmaking, the comparative desirability of democratic decisionmaking, the lack of a manageable judicial standard, and the life-threatening harm that may flow from striking down regulations all argue against incorporation. Where the incorporation of other rights has been at issue, *some* of these problems have arisen. But in this instance *all* these problems are present, *all* at **\*929** the same time, and *all* are likely to be present in most, perhaps nearly all, of the cases in which the constitutionality of a gun regulation is at issue. At the same time, the important factors that favor incorporation in other instances—*e.g.,* the protection of broader constitutional objectives—are not present here. The upshot is that all factors militate against incorporation—with the possible exception of historical factors.

III

I must, then, return to history. The Court, in seeking to justify incorporation, asks whether the interests the Second **\*\*3130** Amendment protects are " 'deeply rooted in this Nation's history and tradition.' " *Ante,* at 3036 (quoting *Glucksberg,* 521 U.S., at 721, 117 S.Ct. 2258). It looks to selected portions of the Nation's history for the answer. And it finds an affirmative reply.

As I have made clear, I do not believe history is the only pertinent consideration. Nor would I read history as broadly as the majority does. In particular, since we here are evaluating a more particular right—namely, the right

to bear arms for purposes of private self-defense—general historical references to the "right to keep and bear arms" are not always helpful. Depending upon context, early historical sources may mean to refer to a militia-based right—a matter of considerable importance 200 years ago—which has, as the majority points out, "largely faded as a popular concern." *Ante,* at 3038. There is no reason to believe that matters of such little contemporary importance should play a significant role in answering the incorporation question. See *Apodaca,* 406 U.S., at 410, 92 S.Ct. 1628 (plurality opinion) (incorporation "inquiry must focus upon the function served" by the right in question in "contemporary society"); *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (incorporation must take into account "the movements of a free society" and "the gradual and empiric process of inclusion and exclusion" (internal quotation marks omitted)); cf. U.S. Const., Art. I, § 9 (prohibiting **\*930** federal officeholders from accepting a "Title, of any kind whatever, from [a] foreign State"—presumably a matter of considerable importance 200 years ago).

That said, I can find much in the historical record that shows that some Americans in some places at certain times thought it important to keep and bear arms for private self-defense. For instance, the reader will see that many States have constitutional provisions protecting gun possession. But, as far as I can tell, those provisions typically do no more than guarantee that a gun regulation will be a *reasonable* police power regulation. See Winkler, Scrutinizing the Second Amendment, 105 Mich. L.Rev. 683, 686, 716–717 (2007) (hereinafter Winkler, Scrutinizing) (the "courts of every state to consider the question apply a deferential 'reasonable regulation' standard"); see also *id.,* at 716–717 (explaining the difference between that standard and ordinary rational-basis review). It is thus altogether unclear whether such provisions would prohibit cities such as Chicago from enacting laws, such as the law before us, banning handguns. See *id.,* at 723. The majority, however, would incorporate a right that is likely *inconsistent* with Chicago's law; and the majority would almost certainly *strike down* that law. Cf. *Heller,* 554 U.S., at 628 – 635, 128 S.Ct., at 2818–2822 (striking down the District of Columbia's handgun ban).

Thus, the specific question before us is not whether there are references to the right to bear arms for self-defense throughout this Nation's history—of course there are—or even whether the Court should incorporate a simple constitutional requirement that firearms regulations not unreasonably burden the right to keep and bear arms, but

rather whether there is a consensus that *so substantial* a private self-defense right as the one described in *Heller* applies to the States. See, *e.g., Glucksberg,* supra, at 721, 117 S.Ct. 2258 (requiring "a careful description" of the right at issue when deciding whether it is "deeply rooted in this Nation's history and tradition" (internal quotation marks omitted)). On this question, **\*931** the reader will have to make up his or her own mind about the historical record that I describe in part below. In my view, **\*\*3131** that record is insufficient to say that the right to bear arms for private self-defense, as explicated by *Heller,* is fundamental in the sense relevant to the incorporation inquiry. As the evidence below shows, States and localities have consistently enacted firearms regulations, including regulations similar to those at issue here, throughout our Nation's history. Courts have repeatedly upheld such regulations. And it is, at the very least, possible, and perhaps likely, that incorporation will impose on every, or nearly every, State a different right to bear arms than they currently recognize—a right that threatens to destabilize settled state legal principles. Cf. 554 U.S., at 634 – 635, 128 S.Ct., at 2818–2822 (rejecting an " 'interest-balancing' approach" similar to that employed by the States).

I thus cannot find a historical consensus with respect to whether the right described by *Heller* is "fundamental" as our incorporation cases use that term. Nor can I find sufficient historical support for the majority's conclusion that right is "deeply rooted in this Nation's history and tradition." Instead, I find no more than ambiguity and uncertainty that perhaps even expert historians would find difficult to penetrate. And a historical record that is so ambiguous cannot itself provide an adequate basis for incorporating a private right of self-defense and applying it against the States.

*The 18th Century*

The opinions in *Heller* collect much of the relevant 18th-century evidence. See 554 U.S., at 579 – 605, 128 S.Ct., at 2790–2805; *id.,* at 640 – 665, 128 S.Ct., at 2824–2838 (STEVENS, J., dissenting); *id.,* at 683 – 687, 128 S.Ct., at 2848–2850 (BREYER, J., dissenting). In respect to the relevant question—the "deeply rooted nature" of a right to keep and bear arms for purposes of private self-defense—that evidence is inconclusive, particularly when augmented as follows:

**\*932** *First,* as I have noted earlier in this opinion, and Justice STEVENS argued in dissent, the history discussed in *Heller* shows that the Second Amendment was enacted primarily for

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

the purpose of protecting militia-related rights. See *supra,* at 3122; *Heller, supra,* at 579 – 605, 128 S.Ct., at 2790–2805. Many of the scholars and historians who have written on the subject apparently agree. See *supra,* at 3122.

*Second,* historians now tell us that the right to which Blackstone referred, an important link in the *Heller* majority's historical argument, concerned the right of Parliament (representing the people) to form a militia to oppose a tyrant (the King) threatening to deprive the people of their traditional liberties (which did not include an unregulated right to possess guns). Thus, 18th-century language referring to a "right to keep and bear arms" does not *ipso facto* refer to a private right of self-defense—certainly not unambiguously so. See English Historians' Brief 3–27; see also *supra,* at 3120 – 3122.

*Third,* scholarly articles indicate that firearms were heavily regulated at the time of the framing—perhaps more heavily regulated than the Court in *Heller* believed. For example, one scholar writes that "[h]undreds of individual statutes regulated the possession and use of guns in colonial and early national America." Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms, 25 Law & Hist. Rev. 139, 143 (2007). Among these statutes was a ban on the private firing of weapons in Boston, as well as comprehensive restrictions on similar conduct in Philadelphia and New York. See Acts and Laws of Massachusetts Bay, p. 208 (1746); 5 J. Mitchell & H. Flanders, Statutes at Large of Pennsylvania From 1682 to 1801, **\*3132** pp. 108–109 (1898); 4 Colonial Laws of New York ch. 1233, p. 748 (1894); see also Churchill, *supra,* at 162–163 (discussing bans on the shooting of guns in Pennsylvania and New York).

*Fourth,* after the Constitution was adopted, several States continued to regulate firearms possession by, for example, **\*933** adopting rules that would have prevented the carrying of loaded firearms in the city, *Heller,* 554 U.S., at 684 – 686, 128 S.Ct., at 2848–2850 (BREYER, J., dissenting); see also *id.,* at 631 – 633, 128 S.Ct., at 2819–2820. Scholars have thus concluded that the primary Revolutionary-era limitation on a State's police power to regulate guns appears to be only that regulations were "aimed at a legitimate public purpose" and "consistent with reason." Cornell, Early American Gun Regulation and the Second Amendment, 25 Law & Hist. Rev. 197, 198 (2007).

*The Pre–Civil War 19th Century*

I would also augment the majority's account of this period as follows:

*First,* additional States began to regulate the discharge of firearms in public places. See, *e.g.,* Act of Feb. 17, 1831, § 6, reprinted in 3 Statutes of Ohio and the Northwestern Territory 1740 (S. Chase ed. 1835); Act of Dec. 3, 1825, 1825 Tenn. Priv. Acts ch. 292, pp. 306–307.

*Second,* States began to regulate the possession of concealed weapons, which were both popular and dangerous. See, *e.g.,* C. Cramer, Concealed Weapon Laws of the Early Republic 143–152 (1999) (collecting examples); see also 1837–1838 Tenn. Acts ch. 137, pp. 200–201 (banning the wearing, sale, or giving of Bowie knives); 1847 Va. Acts ch. 7, § 8, p. 110 ("Any free person who shall habitually carry about his person, hidden from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, from the use of which the death of any person might probably ensue, shall for every offence be punished by [a] fine not exceeding fifty dollars").

State courts repeatedly upheld the validity of such laws, finding that, even when the state constitution granted a right to bear arms, the legislature was permitted to, *e.g.,* "abolish" these small, inexpensive, "most dangerous weapons entirely from use," even in self-defense. *Day v. State,* 37 Tenn. 496, 500 (1858); see also, *e.g., State v. Jumel,* 13 La. Ann. 399, 400 (1858) (upholding concealed weapon ban because it "prohibit[ed] **\*934** only *a particular mode* of bearing arms which is found dangerous to the peace of society"); *State v. Chandler,* 5 La. Ann. 489, 489–490 (1850) (upholding concealed weapon ban and describing the law as "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons"); *State v. Reid,* 1 Ala. 612, 616–617 (1840).

*The Post–Civil War 19th Century*

It is important to read the majority's account with the following considerations in mind:

*First,* the plurality today properly declines to revisit our interpretation of the Privileges or Immunities Clause. See *ante,* at 3030 – 3031. The Court's case for incorporation must thus rest on the conclusion that the right to bear arms is "fundamental." But the very evidence that it advances in support of the conclusion that Reconstruction-era Americans strongly supported a private self-defense right shows with equal force that Americans wanted African–

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5043 Page 88 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

American citizens to have the *same* rights to possess guns as did white citizens. *Ante,* at 3038 – 3044. Here, for example, is what Congress said when it enacted a Fourteenth Amendment predecessor, the Second Freedmen's Bureau Act. It wrote that the statute, in order to secure "the constitutional right to **3133** bear arms ... for all citizens," would ensure that each citizen:

> "shall have ... *full and equal benefit* of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, [by securing] ... to ... all the citizens of [every] ... State or district without *respect to race or color, or previous condition of slavery."* § 14, 14 Stat. 176–177 (emphasis added).

This sounds like an *antidiscrimination* provision. See Rosenthal, **935** The New Originalism Meets the Fourteenth Amendment: Original Public Meaning and the Problem of Incorporation, 18 J. Contemp. Legal Issues 361, 383–384 (2009) (discussing evidence that the Freedmen's Bureau was focused on discrimination).

Another Fourteenth Amendment predecessor, the Civil Rights Act of 1866, also took aim at *discrimination.*See § 1, 14 Stat. 27 (citizens of "every race and color, without regard to any previous condition of slavery or involuntary servitude ... shall have the same right [to engage in various activities] and to full and equal benefit of all laws ... as is enjoyed by white citizens"). And, of course, the Fourteenth Amendment itself insists that all States guarantee their citizens the "equal protection of the laws."

There is thus every reason to believe that the *fundamental* concern of the Reconstruction Congress was the eradication of discrimination, not the provision of a new substantive right to bear arms free from reasonable state police power regulation. See, *e.g.,* Brief for Municipal Respondents 62–69 (discussing congressional record evidence that Reconstruction Congress was concerned about discrimination). Indeed, why would those who wrote the Fourteenth Amendment have wanted to give such a right to Southerners who had so recently waged war against the North, and who continued to disarm and oppress recently freed African–American citizens? Cf. Act of Mar. 2, 1867, § 6, 14 Stat. 487 (disbanding Southern militias because they were, *inter alia,* disarming the freedmen).

*Second,* firearms regulation in the later part of the 19th century was common. The majority is correct that the Freedmen's Bureau points to a right to bear arms, and it stands to reason, as the majority points out, that "[i]t would have been nonsensical for Congress to guarantee the ... equal benefit of a ... right that does not exist." *Ante,* at 3043. But the majority points to no evidence that there existed during this period a fundamental right to bear arms for private self-defense immune to the reasonable exercise of the **936** state police power. See Emberton, The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South, 17 Stan. L. & Pol'y Rev. 615, 621–622 (2006) (noting that history shows that "nineteenth-century Americans" were "not opposed to the idea that the state should be able to control the use of firearms").

To the contrary, in the latter half of the 19th century, a number of state constitutions adopted or amended after the Civil War explicitly recognized the legislature's general ability to limit the right to bear arms. See Tex. Const., Art. I, § 13 (1869) (protecting "the right to keep and bear arms," "under such regulations as the legislature may prescribe"); Idaho Const., Art. I, § 11 (1889) ("The people shall have the right to bear arms ...; but the Legislature shall regulate the exercise of this right by law"); Utah Const., Art. I, § 6 (1896) (same). And numerous other state constitutional provisions adopted during this period explicitly granted the legislature various types of regulatory power over firearms. See Brief for Thirty–Four Professional Historians and Legal Historians **3134** as *Amici Curiae* 14–15 (hereinafter Legal Historians' Brief).

Moreover, four States largely banned the possession of all nonmilitary handguns during this period. See 1879 Tenn. Acts ch. 186, § 1 (prohibiting citizens from carrying "publicly or privately, any ... belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand"); 1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding "concealed or ope[n]" bearing of "any fire arm or other deadly weapon, within the limits of any city, town or village"); 1881 Ark. Acts no. 96, § 1 (prohibiting the "wear[ing] or carry[ing]" of "any pistol ... except such pistols as are used in the army or navy," except while traveling or at home); 1871 Tex. Gen. Laws ch. 34 (prohibiting the carrying of pistols unless there are "immediate and pressing" reasonable grounds to fear "immediate and pressing" attack or for militia service). Fifteen States **937** banned the concealed carry of pistols and other deadly weapons. See Legal Historians' Brief 16, n. 14. And individual municipalities enacted stringent gun

Case 2:19-cv-00037-JNP  Document 59-32  Filed 11/30/22  PageID.5044  Page 89 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

controls, often in response to local conditions—Dodge City, Kansas, for example, joined many western cattle towns in banning the carrying of pistols and other dangerous weapons in response to violence accompanying western cattle drives. See Brief for Municipal Respondents 30 (citing Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876)); Courtwright, The Cowboy Subculture, in Guns in America: A Reader 86, 96 (J. Dizard, R. Muth, & S. Andrews eds.1999) (discussing how Western cattle towns required cowboys to " 'check' " their guns upon entering town).

Further, much as they had during the period before the Civil War, state courts routinely upheld such restrictions. See, *e.g., English v. State,* 35 Tex. 473 (1871); *Hill v. State,* 53 Ga. 472, 475 (1874); *Fife v. State,* 31 Ark. 455, 461 (1876); *State v. Workman,* 35 W.Va. 367, 373, 14 S.E. 9 (1891). The Tennessee Supreme Court, in upholding a ban on possession of nonmilitary handguns and certain other weapons, summarized the Reconstruction understanding of the States' police power to regulate firearms:

> "Admitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good; *and where certain weapons are forbidden to be kept or used by the law of the land,* in order to the prevention of *[sic]* crime—a great public end —*no man can be permitted to disregard this general end, and demand of the community the right, in order to gratify his whim or willful desire to use a particular weapon in his particular self-defense.* The law allows ample means of self-defense, without the use of the weapons which we have held may be rightfully proscribed by this statute. The object being to banish these weapons from the community by an absolute prohibition **\*938** for the prevention of crime, no man's particular safety, if such case could exist, ought to be allowed to defeat this end." *Andrews v. State,* 50 Tenn. 165, 188–189 (1871) (emphasis added).

*The 20th and 21st Centuries*

Although the majority does not discuss 20th- or 21st-century evidence concerning the Second Amendment at any length, I think that it is essential to consider the recent history of the right to bear arms for private self-defense when considering whether the right is "fundamental." To that end, many States now provide state constitutional protection for an individual's right to keep and bear arms. See Volokh, **\*\*3135** State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev.

L. & Politics 191, 205 (2006) (identifying over 40 States). In determining the importance of this fact, we should keep the following considerations in mind:

*First,* by the end of the 20th century, in every State and many local communities, highly detailed and complicated regulatory schemes governed (and continue to govern) nearly every aspect of firearm ownership: Who may sell guns and how they must be sold; who may purchase guns and what type of guns may be purchased; how firearms must be stored and where they may be used; and so on. See generally Legal Community Against Violence, Regulating Guns in America (2008), online at http://www.lcav.org/publications-briefs/regulating_guns.asp (all Internet materials as visited June 24, 2010, and available in Clerk of Court's case file) (detailing various arms regulations in every State).

Of particular relevance here, some municipalities ban handguns, even in States that constitutionally protect the right to bear arms. See Chicago, Ill., Municipal Code § 8–20–050(c) (2009); Oak Park, Ill., Village Code §§ 27–2–1 (2007), 27–1–1 (2009); Toledo, Ohio, Municipal Code, ch. 549.25 (2010). Moreover, at least seven States and Puerto Rico ban **\*939** assault weapons or semiautomatic weapons. See Cal.Penal Code Ann. § 12280(b) (2009 West Supp.); Conn. Gen. Stat. § 53–202c (2007); Haw.Rev.Stat. § 134–8 (1993); Md.Crim. Law Code Ann. § 4–303(a) (Lexis 2002); Mass. Gen. Laws, ch. 140, § 131M (West 2006); N.J. Stat. Ann. § 2C:39–5 (West Supp.2010); N.Y. Penal Law Ann. § 265.02(7) (West Supp.2008); 25 Laws P.R. Ann. § 456m (Supp.2006); see also 18 U.S.C. § 922(*o*) (federal machinegun ban).

Thirteen municipalities do the same. See Albany, N. Y., City Code § 193–16(A) (2005); Aurora, Ill., Code of Ordinances § 29–49(a) (2010); Buffalo, N. Y., City Code § 180–1(F) (2000); Chicago, Ill., Municipal Code § 8–24–025(a) (2009); Cincinnati, Ohio, Municipal Code § 708–37(a) (2008); Cleveland, Ohio, Codified Ordinances § 628.03(a) (2008); Columbus, Ohio, City Code § 2323.31 (2005); Denver, Colo., Municipal Code § 38–130(e) (2008); Morton Grove, Ill., Village Code § 6–2–3(A) (2009); N.Y.C. Admin. Code § 10–303.1 (2009); Oak Park, Ill., Village Code § 27–2–1 (2007); Rochester, N. Y., City Code § 47–5(F) (2008); Toledo, Ohio, Municipal Code § 549.23(a). And two States, Maryland and Hawaii, ban assault pistols. See Haw.Rev.Stat. § 134–8; Md.Crim. Law Code Ann. § 4–303.

*Second,* as I stated earlier, state courts in States with constitutions that provide gun rights have almost uniformly

AR004576

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

interpreted those rights as providing protection only against *unreasonable* regulation of guns. See, *e.g.,* Winkler, Scrutinizing 686 (the "courts of every state to consider" a gun regulation apply the " 'reasonable regulation' " approach); *State v. McAdams,* 714 P.2d 1236, 1238 (Wyo.1986); *Robertson v. City and County of Denver,* 874 P.2d 325, 328 (Colo.1994).

When determining reasonableness those courts have normally adopted a highly deferential attitude toward legislative determinations. See Winkler, Scrutinizing 723 (identifying only six cases in the 60 years before the article's publication striking down gun-control laws: three that banned "the transportation of any firearms for any purpose **\*940** whatsoever," a single "permitting law," and two as-applied challenges in "unusual circumstances"). Hence, as evidenced by the breadth of existing regulations, States and local governments maintain substantial flexibility to regulate firearms—much as they seemingly have throughout the Nation's history— **\*\*3136** even in those States with an arms right in their constitutions.

Although one scholar implies that state courts are less willing to permit total gun prohibitions, see Volokh, Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1458 (2009), I am aware of no instances in the past 50 years in which a state court has struck down as unconstitutional a law banning a particular class of firearms, see Winkler, Scrutinizing 723.

Indeed, state courts have specifically upheld as constitutional (under their state constitutions) firearms regulations that have included handgun bans. See *Kalodimos v. Morton Grove,* 103 Ill.2d 483, 499–500, 83 Ill.Dec. 308, 470 N.E.2d 266, 273 (1984) (upholding a handgun ban because the arms right is merely a right "to possess some form of weapon suitable for self-defense or recreation"); *Cleveland v. Turner,* No. 36126, 1977 WL 201393, \*5 (Ohio App., Aug. 4, 1977) (handgun ban "does not absolutely interfere with the right of the people to bear arms, but rather proscribes possession of a specifically defined category of handguns"); *State v. Bolin* 378 S.C. 96, 99, 662 S.E.2d 38, 39 (2008) (ban on handgun possession by persons under 21 did not infringe arms right because they can "posses[s] other types of guns"). Thus, the majority's decision to incorporate the private self-defense right recognized in *Heller* threatens to alter state regulatory regimes, at least as they pertain to handguns.

*Third,* the plurality correctly points out that *only a few* state courts, a "paucity" of state courts, have specifically upheld handgun bans. *Ante,* at 3047. But which state courts have struck them down? The absence of supporting information **\*941** does not help the majority find support. Cf. *United States v. Wells,* 519 U.S. 482, 496, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (noting that it is "treacherous to find in congressional silence alone the adoption of a controlling rule of law" (internal quotation marks omitted)). Silence does not show or tend to show a consensus that a private self-defense right (strong enough to strike down a handgun ban) is "deeply rooted in this Nation's history and tradition."

\* \* \*

In sum, the Framers did not write the Second Amendment in order to protect a private right of armed self-defense. There has been, and is, no consensus that the right is, or was, "fundamental." No broader constitutional interest or principle supports legal treatment of that right as fundamental. To the contrary, broader constitutional concerns of an institutional nature argue strongly against that treatment.

Moreover, nothing in 18th-, 19th-, 20th-, or 21st-century history shows a consensus that the right to private armed self-defense, as described in *Heller,* is "deeply rooted in this Nation's history [or] tradition" or is otherwise "fundamental." Indeed, incorporating the right recognized in *Heller* may change the law in many of the 50 States. Read in the majority's favor, the historical evidence is at most ambiguous. And, in the absence of any other support for its conclusion, ambiguous history cannot show that the Fourteenth Amendment incorporates a private right of self-defense against the States.

With respect, I dissent.

APPENDIX

Sources Supporting Data in Part II–B

*Popular Consensus*

Please see the following sources to support the paragraph on popular opinion, *supra,* at 3124 – 3125:

**\*\*3137** **\*942**   • Briefs filed in this case that argue against incorporation include: Brief for United States

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5046 Page 91 of 208

McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)

130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

Conference of Mayors as *Amicus Curiae* 1, 17–33 (organization representing "all United States cities with populations of 30,000 or more"); Brief for American Cities et al. as *Amici Curiae* 1–3 (brief filed on behalf of many cities, *e.g.,* Philadelphia, Seattle, San Francisco, Oakland, Cleveland); Brief for Representative Carolyn McCarthy et al. as *Amici Curiae* 5–10; Brief for State of Illinois et al. as *Amici Curiae* 7–35.

• Wilkinson, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L.Rev. 253, 301 (2009) (discussing divided public opinion over the correct level of gun control).

*Data on Gun Violence*

Please see the following sources to support the sentences concerning gun violence, *supra*, at 3126 – 3127:

• Dept. of Justice, Bureau of Justice Statistics, M. Zawitz & K. Strom, Firearm Injury and Death from Crime, 1993–97, p. 2 (Oct.2000) (over 60,000 deaths and injuries caused by firearms each year).

• Campbell et al., Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1092 (2003) (noting that an abusive partner's access to a firearm increases the risk of homicide eightfold for women in physically abusive relationship).

• American Academy of Pediatrics, Firearm–Related Injuries Affecting the Pediatric Population, 105 Pediatrics 888 (2000) (noting that in 1997 "firearm-related deaths accounted for 22.5% of all injury deaths" for individuals between 1 and 19).

• Dept. of Justice, Federal Bureau of Investigation, Law Enforcement Officers Killed & Assaulted, 2006, (Table 27) (noting that firearms killed 93% of the 562 law enforcement **\*943** officers feloniously killed in the line of duty between 1997 and 2006), online at http://www2.fbi.gov/ucr/killed/2006/table27.html.

• Dept. of Justice, Bureau of Justice Statistics, D. Duhart, Urban, Suburban, and Rural Victimization, 1993–98, pp. 1, 9 (Oct.2000) (those who live in urban areas particularly at risk of firearm violence).

• Wintemute, The Future of Firearm Violence Prevention, 281 JAMA 475 (1999) ("half of all homicides occurred in 63 cities with 16% of the nation's population").

*Data on the Effectiveness of Regulation*

Please see the following sources to support the sentences concerning the effectiveness of regulation, *supra*, at 3126 – 3127:

• See Brief for Professors of Criminal Justice as *Amici Curiae* 13 (noting that Chicago's handgun ban saved several hundred lives, perhaps close to 1,000, since it was enacted in 1983).

• Brief for Association of Prosecuting Attorneys et al. as *Amici Curiae* 13–16, 20 (arguing that stringent gun regulations "can help protect police officers operating on the front lines against gun violence," and have reduced homicide rates in Washington, D. C., and Baltimore).

• Brief for United States Conference of Mayors as *Amicus Curiae* 4–13 (arguing that gun regulations have helped to lower New York's crime and homicide rates).

**\*\*3138** *Data on Handguns in the Home*

Please see the following sources referenced in the sentences discussing studies concerning handguns *in the home*, *supra*, at 3127 – 3127:

• Brief for American Public Health Association et al. as *Amici Curiae* 13–16 (discussing studies that show handgun ownership in the home is associated with increased risk of homicide).

**\*944** • Wiebe, Firearms in U.S. Homes as a Risk Factor for Unintentional Gunshot Fatality, 35 Accident Analysis and Prevention 711, 713–714 (2003) (showing that those who die in firearms accidents are nearly four times more likely than average to have a gun in their home).

• Kellermann et al., Suicide in the Home in Relation to Gun Ownership, 327 New England J. Medicine 467, 470 (1992) (demonstrating that "homes with one or more handguns were associated with a risk of suicide almost twice as high as that in homes containing only long guns").

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5047 Page 92 of 208
**McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)**
130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030...

*Data on Regional Views and Conditions*

Please see the following sources referenced in the section on the diversity of regional views and conditions, *supra*, at 3128 – 3129:

- Okoro et al., Prevalence of Household Firearms and Firearm–Storage Practices in the 50 States and the District of Columbia: Findings From the Behavioral Risk Factor Surveillance System, 2002, 116 Pediatrics e370, e372 (2005) (presenting data on firearm ownership by State).

- *Heller,* 554 U.S., at 698 – 699, 128 S.Ct., at 2856–2857 (BREYER, J., dissenting) (discussing various sources showing that gun violence varies by State, including Wintemute, *supra.*

- *Heller, supra,* at 698 – 699, 128 S.Ct., at 2856–2857 (BREYER, J., dissenting) (discussing the fact that urban centers face significantly greater levels of firearm crime and homicide, while rural communities have proportionately greater problems with nonhomicide gun deaths, such as suicides and accidents (citing Branas, Nance, Elliott, Richmond, & Schwab, Urban–Rural Shifts in Intentional Firearm Death, 94 Am. J. Public Health 1750, 1752 (2004))).

- Dept. of Justice, Federal Bureau of Investigation, 2008 Crime in the United States, (Table 6) (noting that murder rate is 40 times higher in New Orleans than it is in Lincoln, Nebraska).

**All Citations**

561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894, 78 USLW 4844, 10 Cal. Daily Op. Serv. 8030, 2010 Daily Journal D.A.R. 9899, 22 Fla. L. Weekly Fed. S 619

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

827 F.3d 436
United States Court of Appeals, Fifth Circuit.

Jay Aubrey Isaac HOLLIS, Individually and
as Trustee of the Jay Aubrey Isaac Hollis
Revocable Living Trust, Plaintiff–Appellant,
v.
Loretta E. LYNCH, Attorney General of the
United States; Thomas E. Brandon, Acting
Director of the Bureau of Alcohol, Tobacco,
Firearms, and Explosives, Defendants–Appellees.

No. 15–10803
|
FILED June 30, 2016

**Synopsis**
**Background:** Trustee of revocable living trust brought action against federal government challenging constitutionality of statute that made possession of a machine gun unlawful. The United States District Court for the Northern District of Texas, Barbara M.G. Lynn, J., 121 F.Supp.3d 617, dismissed. Trustee appealed.

**Holdings:** The Court of Appeals, Leslie H. Southwick, Circuit Judge, held that:

state statute that barred ownership of a machine gun did not moot trustee's claim;

trustee was subject to Gun Control Act's prohibition on possession of a machine gun;

machine guns are dangerous weapons; and

machine guns were not in common use, and thus were unusual.

Affirmed.

**\*439** Appeal from the United States District Court for the Northern District of Texas

**Attorneys and Law Firms**

Stephen Dean Stamboulieh, Esq., Stamboulieh Law, P.L.L.C., Madison, MS, Alan Alexander Beck, Esq., Law Office of Alan Beck, San Diego, CA, for Plaintiff–Appellant.

Patrick George Nemeroff, Daniel M. Riess, U.S. Department of Justice, Washington, DC, for Defendants–Appellees.

George M. Lee, Seiler Epstein Ziegler & Applegate, L.L.P., San Francisco, CA, for Firearms Policy Coalition, Incorporated, Firearms Policy Foundation, Incorporated, Colorado Second Amendment Association, Lone Star Gun Rights, Madison Society, Incorporated, Mississippi Carry, Incorporated, Amici Curiae.

Herbert W. Titus, Esq., Vienna, VA, for Gun Owners of America, Incorporated, Gun Owners Foundation, Gun Owners of California, Incorporated, Heller Foundation, Conservative Legal Defense and Education Fund, Institute on the Constitution, Bradley D. Rogers, Amici Curiae.

Before KING, SOUTHWICK, and HAYNES, Circuit Judges.

**Opinion**

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal concerns the constitutionality of a 1986 federal statute that makes possession of a "machinegun" unlawful. Jay Aubrey Isaac Hollis, as trustee of his own revocable trust, submitted an application to the Bureau of Alcohol, Tobacco, Firearms and Explosives to manufacture a machinegun. ATF denied his application pursuant to the 1986 statute. Hollis filed suit, challenging the constitutionality of the 1986 statute. The district court dismissed the suit, holding that Hollis lacked standing, and, in the alternative, that machineguns are not protected by the Second Amendment. We disagree about standing, **\*440** but we AFFIRM the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We begin by reviewing the statutory and regulatory background before turning to the facts of this case. Two federal laws are relevant to this appeal, the National Firearms Act of 1934 and the Gun Control Act of 1968. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") administers both laws. 28 C.F.R. § 0.130(a)(1)-(2).

AR004580

The National Firearms Act regulates the manufacturing of machineguns. It defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The National Firearms Act states that "[n]o person shall make a firearm [ 1 ] unless he has (a) filed ... a written application ... to make and register the firearm"; "(b) paid any tax payable"; "(c) identified the firearm to be made"; "(d) identified himself in the application form"; and "(e) obtained ... approval" from the ATF "to make and register the firearm...." *Id.* § 5822. An application will "be denied if the making or possession of the firearm would place the person making the firearm in violation of law." *Id.* Whether a machinegun may be made or registered thus depends on whether its possession is prohibited by some other law.

1      The National Firearms Act's definition of "firearm" includes a "machinegun." 26 U.S.C. § 5845(a).

That prohibition arose in 1986 when Congress amended the Gun Control Act of 1968 to make it "unlawful for any person to transfer or possess a machinegun," subject to certain exceptions for government entities and machineguns lawfully possessed before 1986. 18 U.S.C. § 922(o). The Gun Control Act's definition of "machinegun" is the same as the one adopted in the National Firearms Act. *See id.* § 922(a)(4). Finally, "[t]he term 'person' ... include[s] any individual, corporation, company, association, firm, partnership, society, or joint stock company." *Id.* § 921(a)(1).

Taken together, because the National Firearms Act states that no application to manufacture a firearm may be granted if the possession of the firearm would place the applicant in violation of federal law, and Section 922(o) of the Gun Control Act makes possession of a machinegun illegal, no application to make a machinegun may be approved.

Against this statutory backdrop, we turn to the facts of this case. Jay Aubrey Isaac Hollis established the Jay Aubrey Isaac Hollis Revocable Living Trust ("Hollis Trust"), with himself as trustee. In May 2014, Hollis, in his capacity as trustee, submitted ATF Form 5320.1 to the ATF to manufacture an M–16 machinegun from AR–15 components. [2] On September 8, 2014, the ATF approved Hollis's application. Two days later, though, the ATF informed Hollis his application was granted in error and revoked approval of the application. The ATF then delivered a letter to Hollis acknowledging the mistake. The letter

explained the "ATF may not approve any private person's application to **441** make and register a machinegun after May 19, 1986," and any continued possession of a machinegun would be a violation of the National Firearms Act.

2      The M–16 is a rifle in service with the United States military. It is capable of automatic fire, that is to say, firing more than one round per trigger-action. Because federal law refers to such a weapon as a "machinegun," we refer to the M–16 as a machinegun to avoid confusion. The AR–15 is essentially a semi-automatic version of the M–16, that is to say, it fires only one round per trigger-action.

Hollis filed suit. First, he claimed that Section 922(o), which bans machineguns, violates the Second Amendment. Second, he claimed that Congress exceeded its power under the Commerce Clause in enacting Section 922(o). Third, he alleged the Government took his property, the M–16 machinegun, without due process of law. Fourth, he asserted the ATF has approved other machinegun applications after 1986, and therefore, the ATF's denial of his application was an equal protection violation. Fifth, he claimed Section 922(o) does not prohibit an unincorporated trust from manufacturing or possessing a machinegun.

The Government moved to dismiss the case for lack of subject matter jurisdiction and for failure to state a claim. Opposing the motion, Hollis also requested, pursuant to Federal Rule of Civil Procedure 56(d), discovery in order to ascertain whether the ATF had in fact approved machineguns since 1986. Finally, Hollis requested leave to amend his complaint if the district court determined it lacked subject matter jurisdiction over the case.

On August 7, 2015, the district court granted the motion to dismiss. As to Hollis's Second Amendment claim, the court determined that there was no subject matter jurisdiction because Hollis lacked standing. It also concluded that even if Hollis had standing, Hollis's Second Amendment, Commerce Clause, due process, equal protection, and statutory trust claims should be dismissed for failure to state a claim. Finally, the district court ruled moot Hollis's request for discovery under Rule 56(d). Hollis timely appealed.

DISCUSSION

We address standing and whether Hollis should be allowed to amend in Part I of our opinion. In Part II, we discuss the argument that Section 922(o) does not explicitly bar a trust from possessing a machinegun. In Part III, we analyze whether Section 922(o) infringes Hollis's Second Amendment rights. Finally, we explain in Part IV that Hollis has waived his equal protection argument on appeal. [3]

3     Hollis has not briefed his Commerce Clause and due process claims; they are therefore waived. *See United States v. Cervantes*, 706 F.3d 603, 609 n. 1 (5th Cir. 2013).

*I. Standing and Motion to Amend Complaint*

Federal courts have jurisdiction only over "cases" or "controversies." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting U.S. CONST. art. III, § 2, cl. 1). One element of the case-or-controversy requirement is that Hollis must have standing to sue. *Id.* "We review questions of standing *de novo.*" *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 635 (5th Cir. 2012).

"[S]tanding ... focuses on whether the plaintiff is the proper party to bring this suit...." *Raines*, 521 U.S. at 818, 117 S.Ct. 2312. For standing, Hollis must show: (1) he suffered an injury in fact, which is a concrete and particularized invasion of a legally protected interest; (2) the injury is traceable to the challenged action of the Government; and (3) it is likely, rather than merely speculative, the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). When a suit, like this one, is "challenging the legality of government action[,] ... the nature and extent of **\*442** facts that must be ... proved ... in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action.... If he is, there is ordinarily little question that the action ... has caused him injury, and that a judgment preventing ... the action will redress it." *Id.* at 561–62, 112 S.Ct. 2130.

The district court determined Hollis lacked standing to bring his Second Amendment claim. It accepted that there was an injury, namely, being barred from possessing a machinegun. Where Hollis failed was in satisfying prongs two and three of the standing inquiry—traceability and redressability—because a Texas statute also would bar Hollis's claim even if Section 922(o) were to fall away. Thus, Hollis's injury would not be traceable to federal action and would not be redressed by striking down Section 922(o).

The Texas statute on which the district court relied is a criminal statute that prohibits possession or manufacture of a machinegun:

> (a) A person commits an offense if the person intentionally or knowingly possesses, manufactures, transports, repairs, or sells:
>
> > (1) any of the following items, unless the item is registered in the National Firearms Registration and Transfer Record maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives ...:
> >
> > > (A) an explosive weapon; [or]
> > >
> > > (B) a machine gun.

TEX. PENAL CODE § 46.05(a)(1)(A)-(B).

We disagree with the district court that the Texas statute moots the federal claim. The rights embodied in the Second Amendment apply with equal force to the states. *See McDonald v. City of Chicago*, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Accordingly, if we were to hold Section 922(o), a federal law, unconstitutional on Second Amendment grounds, it is likely that Section 46.05, a state law, would also be unconstitutional. Two of our prior cases are illustrative. In one case, we upheld a federal law, which prohibits federally licensed firearms dealers from selling handguns to persons under the age of 21, against a Second Amendment challenge. *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 188 (5th Cir. 2012) ("*NRA I*"). In the second case, we upheld a Texas law, which prohibits those between the ages of 18 and 20 from carrying handguns in public, against a Second Amendment challenge because we were bound by our decision in *NRA I. National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 342 (5th Cir. 2013) ("*NRA II*"). *NRA I* and *NRA II* demonstrate that in Second Amendment cases, the fates of federal and state laws are intertwined.

Moreover, a judgment in favor of Hollis on his Second Amendment challenge would also likely put him in compliance under Texas law, erasing it as a separate bar. If Hollis were to prevail in this case, the likely effect would be approval of Hollis's application to make a machinegun, which would satisfy the Texas requirement that lawful possession of a machinegun is dependent on being "registered in the National Firearms Registration and Transfer Record...." TEX. PENAL CODE § 46.05(a)(1). Hollis has standing.

Because Hollis has standing, his arguments as to amending his complaint to achieve standing are moot.

*II. Statutory Argument*

Our review of a district court's interpretation of a statute is *de novo*. *Teemac v. Henderson*, 298 F.3d 452, 456 (5th Cir. 2002). The Gun Control Act makes it **\*443** "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). As defined in the Gun Control Act, the "term 'person' ... *include[s]* any individual, corporation, company, association, firm, partnership, society, or joint stock company." *Id.* § 921(a)(1) (emphasis added).

Hollis contends that it is not he, personally, who would make and possess the machinegun but rather the Hollis Trust. Hollis argues that Section 922(o) only bars "persons" from making and possessing such weapons, and the relevant definition of persons does not include a trust. Therefore, because it is the Hollis Trust, with Hollis as trustee acting on its behalf, that desires to manufacture and possess the machinegun, Section 922(o) does not apply.

This argument strains common sense and misunderstands trust law. Historically, "a trust was not considered a distinct legal entity[;]" it was "a 'fiduciary relationship' between multiple people." *Americold Realty Tr. v. ConAgra Foods, Inc.*, —— U.S. ——, 136 S.Ct. 1012, 1016, 194 L.Ed.2d 71 (2016). While in some jurisdictions trusts have a separate legal existence, Texas is not one of those. According to Hollis's complaint, the Hollis Trust "is created and existing under the laws of the State of Texas." Under Texas law, "[t]he term 'trust' refers not to a separate legal entity but rather to the fiduciary relationship governing the trustee with respect to the trust property." *Ray Malooly Tr. v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006). Indeed, the "Texas Trust Code[ ] explicitly defines a trust as a relationship rather than a legal entity." *Id.*

In Texas, a "trustee is vested with *legal title and right of possession* of the trust property but holds it for the benefit of the beneficiaries, who are vested with equitable title to the trust property." *Faulkner v. Bost*, 137 S.W.3d 254, 258–59 (Tex. App.—Tyler 2004, no pet.) (emphasis added). Thus, Hollis, a person, would in fact possess the machinegun even if he is a trustee. A trust cannot possess anything as it is not an entity under Texas law. Hollis is subject to Section 922(o)'s ban on possessing a machinegun.

In addition, the relevant definition of "person" uses the term "include," signifying a non-exhaustive list. 18 U.S.C. § 921(a)

(1). The statutory use of a non-exhaustive list of illustrative examples does not exclude items not expressly specified. *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 264 (5th Cir. 2014). Thus, even when a trust is a separate legal entity that can possess property, it may well be included in the definition of "person."

*III. Second Amendment*

Hollis argues that Section 922(o) is unconstitutional because it infringes his Second Amendment rights. The constitutionality of statutes is reviewed *de novo*. *NRA I*, 700 F.3d at 192. We begin by explaining Second Amendment jurisprudence and laying out our analytic approach to such cases before discussing the present claim.

A. Second Amendment Jurisprudence

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

The Supreme Court has explored the meaning of the Second Amendment in depth. *See District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In *Heller*, the plaintiff challenged a D.C. law that almost totally banned private handgun ownership. *Id.* at 574, 128 S.Ct. 2783. In striking down the **\*444** law, the Court held that the Second Amendment codified a pre-existing individual right to keep and bear arms. *Id.* at 592, 128 S.Ct. 2783. Important to our analysis is the Supreme Court's explanation of why the Second Amendment guarantees such an individual right.

The Court held that the first clause of the Second Amendment, which deals with the militia, is prefatory and not a limitation on the amendment itself. The second clause is the "operative" one. *Id.* at 577, 128 S.Ct. 2783. While the Second Amendment was no doubt concerned with the effectiveness of militias, "[t]he prefatory clause does not suggest that preserving the militia was the only reason" for the Second Amendment. *Id.* at 599, 128 S.Ct. 2783. Instead, its main purpose was to "guarantee the individual right to possess and carry weapons in case of confrontation," which *Heller* later clarified to mean "an individual right to bear arms for defensive purposes." *Id.* at 592, 602, 128 S.Ct. 2783. Indeed, in a subsequent case, the Court confirmed that "self-defense is the *central component*" of the Second Amendment. *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020. *Heller* went on to hold that because the Second Amendment is about the defense of "hearth and home," and

because "the American people have considered the handgun to be the quintessential self-defense weapon[,] ... a complete prohibition of their use" is invalid. 554 U.S. at 635, 629, 128 S.Ct. 2783. *Heller*'s reach goes beyond handguns, though, because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582, 128 S.Ct. 2783.

While *Heller* recognized the right of individual Americans to keep and bear arms, it also recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626, 128 S.Ct. 2783. The Court then gave a non-exhaustive list of "longstanding prohibitions on the possession of firearms" that are "presumptively lawful" and pass muster under *Heller*:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626–27 & n. 26, 128 S.Ct. 2783. While these longstanding and presumptively lawful measures are one set of limitations, *Heller* recognized "another important limitation on the right to keep and carry arms." *Id*. at 627, 128 S.Ct. 2783. That limitation comes from *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), a case that represented the Supreme Court's only analysis of the Second Amendment in the 20th Century. *Heller*, 554 U.S. at 621, 128 S.Ct. 2783; *see generally* Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & LIBERTY 48 (2008).

In *Miller*, the defendants were arrested for, among other things, transporting an unregistered sawed-off shotgun and thereby violating the National Firearms Act. 307 U.S. at 175, 59 S.Ct. 816. *Miller* upheld the National Firearms Act against a Second Amendment challenge, concluding that

> [i]n the absence of any evidence tending to show that possession or use of a [sawed-off shotgun] ... has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment [protects] such an instrument. Certainly it is not within judicial notice **\*445** that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.* at 178, 59 S.Ct. 816 (quotation marks omitted). Relying on this passage, Hollis argues that "if evidence is presented ... [that] an item is part of the ordinary military equipment, then it is protected by the Second Amendment." Because an "M–16 is the quintessential militia-styled arm for the modern day," Hollis argues he has a Second Amendment right to possess one.

*Heller* soundly rejected this interpretation of *Miller*. Particularly relevant for us, *Heller* referred to machineguns as the quintessential example of why that reading is wrong:

> Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns ... might be unconstitutional, machineguns being useful in warfare in 1939.

*Heller*, 554 U.S. at 624, 128 S.Ct. 2783. The Court held that *Miller* "must be read in tandem" with what was a "traditional militia," which was "a pool of men bringing arms in common use at the time for lawful purposes like self-defense." *Id.* (quotation marks omitted). The weapons brought to militia duty were "the sorts of lawful weapons that they possessed at home." *Id.* at 627, 128 S.Ct. 2783. As a result, *Heller* read "*Miller* to say only that the Second Amendment does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 625, 128 S.Ct. 2783.

*Heller*, therefore, distinguished between two classes of weapons: (1) those that are useful in the militia or military, and (2) those that are "possessed at home" and are in "common use at the time for lawful purposes like self-defense." *See id*. at 621–27, 128 S.Ct. 2783 (quotation marks omitted). The individual right protected by the Second Amendment *applies only to the second category of weapons*, though that category at times may overlap with the first. The Second Amendment does not create a right to possess a weapon solely because the weapon may be used in or is useful for militia or military service.

We find further support for this restriction in *Heller*'s discussion about what *Miller* meant by weapons that were in "common use at the time":

> We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." It may be objected that if weapons that are most useful in military service— M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty.

*Id*. at 627, 128 S.Ct. 2783 (citation omitted). The Court acknowledged that an effective militia today, i.e., the National Guard, likely requires "sophisticated arms that are highly unusual in society at large." *Id.* Still, even though "the degree of fit between the prefatory clause and the protected right" has changed, the interpretation of the Second Amendment is still tied to weapons in common use for protection of hearth and home. *Id.* at 627–28, 128 S.Ct. 2783. We glean the following principles from what we just discussed.

**\*446** First, protected weapons are "those in common use at the time." *See id*. at 627, 128 S.Ct. 2783 (quotation marks omitted). If a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment.

Second, *Heller* took it as a given that M–16s are dangerous and unusual weapons and not protected by the Second Amendment. Indeed, Justice Breyer wrote in his dissent: "The majority says that [the] Amendment protects those weapons 'typically possessed by law-abiding citizens for lawful purposes.' ... *This definition conveniently excludes machineguns*, but permits handguns...." *Id*. at 720, 128 S.Ct. 2783 (Breyer, J., dissenting) (emphasis added).

Third, the Court recognized the divergence of these two classes of weapons. "In the colonial and revolutionary war era ... weapons used by militiamen and weapons used in defense of person and home were one and the same." *Id*. at 624–25, 128 S.Ct. 2783. Today, though, ordinary military weaponry is far more advanced than the weapons typically found at home and used for defense. A state's "militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large." *Id*. at 627, 128 S.Ct. 2783. Even so, the fact that a modern day militia, constituted with persons bringing weapons from home in common use, would be ineffective "against modern-day bombers and tanks," "cannot change our interpretation of the right." *Id*. at 627–28, 128 S.Ct. 2783. Thus, to state again, *Heller* rejected a functionalist interpretation of the Second Amendment premised on the effectiveness of militia service.

Another recent decision confirms our analysis. At issue was a Massachusetts law that banned stun guns. *Caetano v. Massachusetts*, ––– U.S. ––––, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016). The Supreme Judicial Court of Massachusetts upheld the law against a Second Amendment challenge, in part because it "found 'nothing in the record to suggest that [stun guns] are readily adaptable to use in the military.' " *Id*. at 1028. The Court vacated the Massachusetts court's opinion, explaining that "*Heller* rejected the proposition that only those weapons useful in warfare are protected." *Id*. (quotation marks omitted). *Caetano* reaffirmed that whether a weapon has a nexus to military utility is not the test as to whether that weapon receives Second Amendment protection.

In summary, the Second Amendment protects an individual right to keep and bear arms in defense of hearth and home. Two restrictions limit that right. The first concerns "longstanding" and "presumptively lawful regulatory

AR004585

measures." *Heller*, 554 U.S. at 626–27 & n. 26, 128 S.Ct. 2783. The second focuses on the types of arms that enjoy protection. The Second Amendment protects the class of weapons that enable "citizens to use them for the core lawful purpose of self-defense...." *Id*. at 630, 128 S.Ct. 2783. Therefore, because "[t]he Second Amendment protects an individual right to possess a firearm unconnected with service in a militia," whether a weapon is effective in a militia is not the relevant inquiry for determining whether that weapon is protected under the Second Amendment. *Id*. at 577, 128 S.Ct. 2783. We now turn to our analytic framework.

B. Framework for Analyzing Second Amendment Claims
After *Heller*, we adopted a two-step inquiry for analyzing laws that might impact the Second Amendment. First, we "determine whether the challenged law impinges upon a right protected by the Second Amendment...." *NRA I*, 700 F.3d at 194. If it does not, the "law passes constitutional **\*447** muster," but if it does, we proceed to "the second step[, which] is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *Id*. at 194–95.

In *NRA I*, we held that the first *Heller* restriction, "longstanding, presumptively lawful regulatory measure[s]," "would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." 700 F.3d at 196. *NRA I*, however, did not have occasion to consider the second *Heller* restriction, that the constitutional right applies only to weapons that are "in common use at the time" and "possessed at home" for "lawful purposes like self-defense." *Heller*, 554 U.S. at 624, 627, 128 S.Ct. 2783. We see no need to distinguish between these two restrictions, however, and therefore hold that a law that regulates a class of weapons that are not in common use will be upheld at step one.

C. Analysis
Taking step one of our inquiry, we examine "whether the conduct at issue falls within the scope of the Second Amendment right." *NRA I*, 700 F.3d at 194. Here, the conduct is the keeping and bearing of an M–16 machinegun. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582, 128 S.Ct. 2783. There is no *prima facie* case, though, when the weapon is not one "in common use at the time," "possessed at home," and for "lawful purposes like self-defense." *Id*.

at 627, 624, 128 S.Ct. 2783. Further, a firearm is not "in common use" if it is "dangerous and unusual." *Id*. at 627, 128 S.Ct. 2783. As explained above, both the *Heller* majority and dissent identified the M–16 to be a dangerous and unusual weapon.

Hollis counters that *Heller* in no way affected *Miller*'s statement "that if evidence is presented [that a weapon] is part of the ordinary military equipment, then it is protected by the Second Amendment." As explained above in our examination of the Second Amendment, this statement is patently incorrect. *Heller* refuted this interpretation of *Miller*, stating that such an interpretation would be "startling." *Id*. at 624, 128 S.Ct. 2783. Indeed, under Hollis's theory of *Miller*, the only limitation on what arms can be owned would be those weapons not "part of the ordinary soldier's equipment." Fortunately, that theory has already been refuted as to grenades, which presumably are standard issue to soldiers but may lawfully be barred from private ownership. *See Staples v. United States*, 511 U.S. 600, 608–12, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

Hollis next argues that the Second Amendment is what protects "the Right of the People to alter or abolish" a government that becomes destructive of the people's rights. Hollis seeks equality between the people and the Government so that those seeking to abolish the government will have a fair chance. But self-defense, not revolution, "is the *central component* of the Second Amendment." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quotation marks omitted).

Hollis then argues that *Heller*'s dangerous and unusual test refers not to the characteristics of a class of weapons but the manner in which weapons are used. *Heller*, though, said that "the sorts of *weapons* protected [are] those in common use at the time ... [and that [this] limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual *weapons*." 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added) (quotation marks and citation omitted). **\*448** Thus, Hollis's argument is tantamount to asking us to overrule the Supreme Court. Indeed, Hollis in a Rule 28(j) letter cites to an online paper that advances his view that dangerous and unusual refers only to the manner in which weapons are used. Daniel R. Page, *Dangerous and Unusual Misdirection: A Look at the Common Law Tradition of Prohibiting Going Armed with Dangerous and Unusual Weapons to the Terror of the People, as Cited in* District of Columbia v. Heller (last rev'd June 28, 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1859395. But

that very paper acknowledged this "inaccurate definition of 'dangerous and unusual weapons' [was] embraced in *Heller*...." *Id*. at 32. We leave changes in Supreme Court caselaw to the Supreme Court.

Finally, amici argue that to the extent we rely on these passages from *Heller*, they are dicta. Amici may well be right as to some of the statements. Still, we are generally bound by Supreme Court dicta, especially when it is "recent and detailed." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013). These relevant passages from *Heller* are recent and detailed.

We conclude that these passages from *Heller* directly apply to the claims Hollis advances. Still, it is appropriate to undertake an independent inquiry as to whether machineguns are protected by the Second Amendment because these passages are dicta. We do so below.

### 1. Machineguns and "Dangerousness"

In cases pre-dating *Heller*, we stated that machineguns are "dangerous" weapons. In one case, we held that the unlawful possession of a machinegun in violation of Section 922(o) was a crime of violence because it "constitutes conduct that presents a serious risk of physical injury to another" due to the "inherently dangerous nature of machine guns." *United States v. Golding*, 332 F.3d 838, 840 (5th Cir. 2003). In another case, we put machineguns and pipebombs in the same category, noting that both were "primarily weapons of war and have no appropriate sporting use or use for personal protection." *United States v. Jennings*, 195 F.3d 795, 799 n. 4 (5th Cir. 1999).

While these precedents addressed whether machineguns were dangerous for the purposes of a sentence enhancement and not for the purposes of the Second Amendment, they are persuasive to our analysis. Moreover, every one of our sister circuits that have addressed this issue have agreed that machineguns are dangerous and unusual weapons for the purposes of the Second Amendment. [4] Finally, the Supreme Court has held that the machinegun is of "quasi-suspect character," in the same category as hand-grenades, and that these weapons generally fall "outside those categories [of weapons that have] traditionally ... been widely accepted as lawful possessions...." *Staples*, 511 U.S. at 612, 114 S.Ct. 1793. We therefore conclude that machineguns are dangerous weapons.

[4]     *See United States v. One (1) Palmetto State Armory PA–15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804,* 822 F.3d 136, 143–44 (3d. Cir. 2016); *Kolbe v. Hogan*, 813 F.3d 160, 177, *reh'g en banc granted*, 636 Fed.Appx. 880 (4th Cir. 2016); *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015); *United States v. Henry*, 688 F.3d 637, 639–40 (9th Cir. 2012); *United States v. Allen*, 630 F.3d 762, 766 (8th Cir. 2011); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009).

### 2. Machineguns and "Unusualness"

*Heller* concluded that handguns are "the most popular weapon chosen by **\*449** Americans for self-defense in the home" and are therefore not unusual. 554 U.S. at 629, 128 S.Ct. 2783. Every post-*Heller* case to grapple with whether a weapon is "popular" enough to be considered "in common use" has relied on statistical data of some form, creating a consensus that "common use is an objective and largely statistical inquiry." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) (quotation marks omitted). Still, "what line separates 'common' from 'uncommon' ownership is something the Court did not say." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). As a result, courts have differed in the statistics used and methodological approaches adopted.

Some courts have taken the view that the total number of a particular weapon is the relevant inquiry. The Second Circuit determined that "large-capacity magazines" are in common use solely because of their high absolute number: 50 million. *Cuomo*, 804 F.3d at 255. Other courts have relied on proportions and percentages. The Fourth Circuit found that AR–15s are in common use because they accounted for "5.5 percent of all firearms, and 14.4 percent of all rifles produced in the [United States]...." *Kolbe v. Hogan*, 813 F.3d 160, 174, *reh'g en banc granted*, 636 Fed.Appx. 880 (4th Cir. 2016). The Seventh Circuit, though, held the opposite when it determined that AR–15s are not in common use because only "9% of the nation's firearms owners have assault weapons." *Friedman*, 784 F.3d at 409. These cases indicate there is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use.

More recently, two Supreme Court justices observed that the "relevant statistic" involves the counting of jurisdictions. In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:

> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

*Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, *plus* that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use. *Id*.

This wide variety in methodological approaches suggest that these statistics—raw number, percentage and proportion, jurisdiction-counting—identify potentially relevant data for the common use inquiry. For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon.

As for raw numbers, an ATF report provided by Hollis indicates that there are 175,977 pre–1986 civilian-owned machineguns in existence. This number is far below the 50 million large-capacity magazines the Second Circuit held was sufficient for a showing of common use. *Cuomo*, 804 F.3d at 255. It is also below the "more than 8 million AR- and AK-platform semi-automatic rifles" "manufactured in or imported into the United States" the Fourth Circuit held was sufficient for a showing of common use. **\*450** *Kolbe*, 813 F.3d at 174. [5] We also note that *Kolbe*, which is the only opinion striking down a law that banned AR–15 style "assault rifle[s]," has been vacated for rehearing en banc. *Kolbe v. Hogan*, 636 Fed.Appx. 880 (4th Cir. 2016). Three other circuits have upheld similar bans. *Cuomo*, 804 F.3d at 269;

*Friedman*, 784 F.3d at 412; *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011).

[5]    While we used *Kolbe* above as an example of an opinion that undertook percentage or proportionality analysis, *Kolbe* also looked at raw numbers.

Hollis, in another Rule 28(j) letter, relies on Justice Alito's *Caetano* concurrence, arguing that because the number of machineguns in existence is similar to the number of stun guns, machineguns are also in common use. But as explained above, Justice Alito did not think the absolute number by itself was sufficient. Rather, he thought the number was sufficient when paired with the statistic that stun guns may be lawfully possessed in 45 states. The same showing cannot be made for machineguns. Twelve states and the District of Columbia entirely ban machineguns even if the weapon is legal under the Gun Control Act. [6] An additional 22 states, like Texas in the present case, ban machineguns unless the weapon is legal under federal law. [7] Thus, 34 states and the District of Columbia prohibit possessing machineguns. Only 16 states have no such prohibition, but even some of these states have some sort of restriction affecting or limiting machinegun possession. [8]

Fn6    *See* CAL. PENAL CODE § 32625; D.C. CODE ANN. § 22–4514; FLA. STAT. § 790.221; 720 ILL. COMP. STAT. 5/24–1; IOWA CODE § 724.1; LA. STAT. § 40:1752; MASS. GEN. LAWS ch. 140, § 131; MINN. STAT. § 609.67; N.J. STAT. § 2C:39; N.Y. PENAL LAW § 265.02; OHIO REV. CODE § 2923; 11 R.I. GEN. LAWS § 47–8; WIS. STAT. § 941.26.

[7]    *See* ALASKA STAT. § 11.61.200; ARIZ. REV. STAT. ANN. §§ 13–3101, 13–3102; COLO. REV. STAT. § 18–12–102; DEL. CODE tit. 11, § 1444; GA. CODE ANN. §§ 16–11–122–16–11–124; IND. CODE §§ 35–47–5–35–47–8; KAN. STAT. ANN. §§ 21–6301–21–6302; ME. STAT. tit. 17–A, §§ 1051–1052; MICH. COMP. LAWS § 750.224; MO. REV. STAT. § 571.020.1; NEB. REV. STAT. § 28–1203; NEV. REV. STAT. § 202.350; N.C. GEN. STAT. § 14–409; N.D. CENT. CODE § 62.1–05–01; OR. REV. STAT. § 166.272; 18 PA. CONS. STAT. § 908; S.C. CODE ANN. §§ 16–23–230–16–23–250; S.D. CODIFIED LAWS §§ 22–1–2(8), 22–14–6(2); TENN. CODE § 39–17–1302; TEX. PENAL CODE § 46.05; WASH. REV. CODE § 9.41.190; W. VA. CODE § 61–7–9.

[8]    For example, it is legal to possess a machinegun in Montana only when use is not for an offensive

or aggressive purpose. *See* MONT. CODE ANN. §§ 45–8–302–45–8–307. Other states having machinegun laws similar to that of Montana are Virginia, *see* VA. CODE ANN. §§ 18.2–288–18.2–296, Arkansas, *see* ARK. CODE ANN. §§ 5–73–202–5–73–205, and Connecticut, *see* CONN. GEN. STAT. § 53–202. The states having no restrictions on the possession of machineguns are Alabama, Hawaii, Idaho, Kentucky, Maryland, Mississippi, New Hampshire, New Mexico, Oklahoma, Utah, Vermont, and Wyoming.

Percentage analysis may also be relevant. There is, though, no evidence in the record regarding the total number of machineguns produced or manufactured, or the total number of private citizens that own guns or rifles. Thus, we do not undertake such an analysis. Suffice it to say that had we run such an analysis, the results would be unfavorable for Hollis. In our discussion of AR–15s, we noted that other circuits determined that over 8 million AR–15s are in existence. If we were to run the same calculations these other circuits did, but with 176,000 instead of 8 million, the percentages would be quite low.

Our summary reveals that irrespective of the metric used, Hollis does not have the numbers to support his claims.

Hollis and amici make one more argument. They claim the reason machineguns **\*451** are not more popular is because they have been banned. This exact point was made by Justice Breyer in his dissent in *Heller*. Justice Breyer said that the majority's common use test would mean that

> [I]f Congress and the States lift restrictions on the possession and use of machineguns, and people buy machineguns ... the Court will have to reverse course and find that the Second Amendment *does,* in fact, protect the individual self-defense-related right to possess a machinegun. On the majority's reasoning, if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so.... There is no basis

for believing that the Framers intended such circular reasoning.

554 U.S. at 720–21, 128 S.Ct. 2783 (Breyer, J., dissenting). This argument was made in dissent, though, illustrating that it was considered by the *Heller* majority and rejected. This argument was insufficient to carry the day in *Heller* and accordingly must fail here too.

Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection, so we uphold Section 922(o) at step one of our framework.

*IV. Equal Protection and Rule 56(d)*

Hollis's equal protection claim is barely presented in his appellate briefing. The term "equal protection" appears only once in the body of Hollis's opening brief. That lone mention is a reference to the procedural history of the case as opposed to an explanation of the claim. Indeed, there is no argument in Hollis's opening brief as to equal protection. A "passing reference to his equal protection claim ... is insufficient to prevent ... waiver." *Jin Choi v. Univ. of Tex. Health Sci. Ctr.*, 633 Fed.Appx. 214, 215 n. 1 (5th Cir. 2015). Hollis, addressing the waiver argument in his reply brief, states that his "Equal Protection argument is subsumed in his Second Amendment argument." Reply briefs cannot be used to raise new arguments. *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008). Perhaps Hollis should consider that any necessary Equal Protection analysis is subsumed in our discussion of the Second Amendment.

Hollis also requested discovery under Rule 56(d) to, presumably, make out his equal protection argument. We review the district court's denial of a motion for discovery pursuant to Rule 56(d) for abuse of discretion. *American Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013). Discovery under Rule 56(d) is permitted to oppose a motion for summary judgment. The district court ruled on the Government's motion to dismiss under Rules 12(b)(1) and 12(b)(6). Therefore, Rule 56(d) is inapplicable.

Finally, Hollis filed a motion for judicial notice of an approved post-May 19, 1986 application, i.e., approval after Congress banned possession of machineguns in 1986, to manufacture a machinegun. The motion is DENIED.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

***

We restate our determinations. Hollis has standing, rendering his arguments regarding amending his complaint moot. Trusts are "persons" within the Gun Control Act, and machineguns are not protected arms under the Second Amendment. We AFFIRM on these grounds. Hollis has not briefed his other arguments, and they are therefore WAIVED. We AFFIRM the district court's denial of discovery under **\*452** Rule 56(d). Finally, Hollis's motion for judicial notice is DENIED as MOOT.

**All Citations**

827 F.3d 436

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

591 F.3d 471
United States Court of Appeals,
Sixth Circuit.

Richard HAMBLEN, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 09-5025.
|
Argued: Dec. 4, 2009.
|
Decided and Filed: Dec. 30, 2009.

**Synopsis**

**Background:** Following affirmance, 239 Fed.Appx. 130, of his convictions for possession of machine guns and possession of unregistered firearms, defendant moved to vacate, set aside, or correct sentence. The United States District Court for the Middle District of Tennessee, Todd J. Campbell, Chief Judge, 2008 WL 5136586, denied the motion, and defendant appealed.

The Court of Appeals, Siler, Circuit Judge, held that Second Amendment did not authorize defendant's unlicensed possession of unregistered machine guns for personal use.

Affirmed.

**Attorneys and Law Firms**

**\*471 ARGUED:** Jeffery S. Frensley, Ray & Frensley, Nashville, Tennessee, for Appellant. Blanche Bong Cook, Assistant United States Attorney, Nashville, Tennessee, for Appellee. **ON BRIEF:** Jeffery S. Frensley, Ray & Frensley, Nashville, Tennessee, for Appellant. Matthew J. Everitt, Assistant United States Attorney, Nashville, Tennessee, for Appellee.

**\*472** Before: SILER, GILMAN, and ROGERS, Circuit Judges.

**OPINION**

SILER, Circuit Judge.

Petitioner Richard Hamblen appeals the district court's denial of his 28 U.S.C. § 2255 motion to vacate, claiming that his convictions for possession of machine guns, in violation of 18 U.S.C. § 922(*o*), and possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d), are unconstitutional. Because the Second Amendment does not confer an unrestricted individual right to keep and bear machine guns, we affirm the district court's judgment and deny Hamblen's petition for relief.

**BACKGROUND**

Hamblen enlisted in the Tennessee State Guard in 1999.[1] The all-volunteer State Guard is one of four organizations within the Tennessee Department of the Military and is authorized by Tennessee statute. The State Guard's mission is to augment the Tennessee National Guard, and it typically performs ceremonial duties.

[1]   This background statement is substantially taken from our unpublished opinion in *United States v. Hamblen*, 239 Fed.Appx.130 (6th Cir.2007).

The State Guard is authorized to become an armed force if it is activated by the governor of Tennessee. Although it has been called into service, the State Guard has not recently been activated. If activated, the governor of Tennessee is authorized to obtain weapons needed to equip the State Guard. Tenn.Code Ann. § 58-1-405.

As volunteers in an honored, traditional form of service in Tennessee, all State Guard members are responsible for purchasing their own uniforms and other equipment, but they are not issued weapons. The State Guard is, however, provided with twenty-one M16 rifles and ammunition for use during a three-day annual training session conducted by a State Guard commander. State Guard policy prohibits members from either keeping State Guard weapons in their possession or carrying their own individual weapons in the course of their duty.

Hamblen believed that the State Guard might be activated and used as an armed force after September 11, 2001. Because the State Guard had only a few weapons and over a thousand members, Hamblen concluded that the State Guard did not have the resources to perform its duties as an armed force and

AR004591

began looking for a means to better equip the State Guard. He was aware that State Guard members were specifically instructed after September 11, 2001 not to carry weapons in connection with their duties. Nevertheless, he purchased parts kits with his own funds and used his metalworking expertise to build nine machine guns. On at least one occasion, Hamblen had members of his unit train with his 1919 A4 machine gun. At the time, he knew that this training exercise violated State Guard policy.

Hamblen never discussed his machine gun possession with his superiors at the State Guard, and no law enforcement officials or State Guard superiors knew of Hamblen's machine guns. Hamblen admitted that no one at the State Guard ever ordered or even authorized him to obtain any weapons for the State Guard. He also admitted that he knew that his possession of the machine guns violated the statutes under which he was convicted. He believed, however, that he was authorized to possess the machine guns because the U.S. Constitution provides an exception to gun control laws and gives people the right to **\*473** possess militarily useful weapons for an armed force like the State Guard.

In 2004, Hamblen took steps to make his possession of the machine guns legal by obtaining a federal firearms license, which permitted him to sell pistols, revolvers, shotguns and rifles. However, he had not paid a special occupation tax that would have enabled him to deal in National Firearms Act weapons, such as machine guns. Moreover, none of the nine machine guns was ever registered to Hamblen in the National Firearms Registration and Transfer Record.

The Bureau of Alcohol, Tobacco, Firearms and Explosives began an investigation of Hamblen in 2004 after receiving information that he illegally possessed machine guns. When federal agents asked Hamblen whether he possessed automatic weapons, he admitted that he possessed some and directed the agents to a safe at the back of his building that contained the machine guns.

In 2005, Hamblen was charged in a two-count indictment for unlawfully possessing machine guns, in violation of 18 U.S.C. § 922(*o*), and possessing unregistered firearms, in violation of 26 U.S.C. § 5861(d). After trial, he was convicted on both counts of the indictment. The district court denied Hamblen's motion for judgment of acquittal, which was based on the allegedly unconstitutional infringement of Hamblen's Second Amendment rights that he claimed would result from his conviction under 18 U.S.C. § 922(*o*). In 2006, Hamblen

was sentenced to a term of imprisonment of fifteen months for each count, to run concurrently, followed by a two-year period of supervised release.

Hamblen appealed his convictions and two concurrent sentences. *United States v. Hamblen,* 239 Fed.Appx. 130 (6th Cir.), *cert. denied,* 552 U.S. 992, 128 S.Ct. 523, 169 L.Ed.2d 343 (2007). Holding that the statutory prohibition against possessing machine guns did not violate the Second Amendment right to bear arms as applied to Hamblen, that the statutory prohibition against possessing machine guns was not unconstitutionally vague as applied, and that the statutory prohibition against possessing unregistered firearms was not unconstitutional as applied, this court affirmed the judgment of the district court. *Id.* at 134-37. In 2008, Hamblen filed a 28 U.S.C. § 2255 motion to vacate his sentence. The district court denied the motion and issued a certificate of appealability on Hamblen's Second Amendment claim.

## STANDARD OF REVIEW

In reviewing the denial of a 28 U.S.C. § 2255 motion, we apply a de novo standard of review to the legal issues and uphold the factual findings of the district court unless they are clearly erroneous. *Benitez v. United States,* 521 F.3d 625, 630 (6th Cir.2008). To warrant relief under 28 U.S.C. § 2255, a petitioner must demonstrate the existence of "an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States,* 330 F.3d 733, 736 (6th Cir.2003).

## DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In interpreting the scope of the Second Amendment, we are guided by *District of Columbia v. Heller,* --- U.S. ----, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). We note, as a preliminary matter, that Hamblen's possession of nine unregistered machine guns was not only **\*474** outside the scope of his duties as a member of the State Guard, but also directly violated State Guard policy. Therefore, this case does not present a novel issue of law regarding the Second Amendment's prefatory clause.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Hamblen's challenge to his conviction for unlawful possession of unregistered machine guns has been directly foreclosed by the Supreme Court, which specifically instructed in *Heller* that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 2815-16. Moreover, the *Heller* Court expressly rejected Hamblen's reading of *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), when it opined that it would be a "startling" interpretation of precedent to suggest that restrictions on machine guns, set forth in the National Firearms Act, might

be unconstitutional. *See Heller,* 128 S.Ct. at 2815. Thus, whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use.

**AFFIRMED.**

**All Citations**

591 F.3d 471

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

538 F.3d 868
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Appellee,

v.

Hollis Wayne FINCHER, Appellant.

Nos. 07-2514, 07-2888.
|
Submitted: March 10, 2008.
|
Filed: Aug. 13, 2008.
|
Rehearing and Rehearing En
Banc Denied Sept. 25, 2008. *

*    Neither Judge Smith nor Judge Shepherd participated in the consideration or decision of this matter.

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the Western District of Arkansas, Jimm Larry Hendren, J., of possession of an unregistered sawed-off shotgun and later ordered to reimburse the United States Treasury for legal services provided to him, 2007 WL 2177062. Defendant appealed.

**Holdings:** The Court of Appeals, Wollman, Circuit Judge, held that:

defendant's possession of firearms was not reasonably related to a well regulated militia, and thus was not protected by the Second Amendment;

district court did not err in accepting as accurate appraiser's opinion that defendant's property had a value of $455,000 in determining defendant's financial eligibility for court appointed counsel;

district court did not err when it found that defendant owned his property free and clear in determining defendant's financial eligibility for court appointed counsel; and

district court did not err in concluding that defendant's attempted transfer of property to his daughters via quit claim deed should be considered when determining defendant's financial eligibility for court appointed counsel.

Affirmed in part, and vacated and remanded in part.

**Attorneys and Law Firms**

**\*870** Quentin M. Rhoades, argued, Missoula, MT, for appellant.

Wendy L. Johnson, AUSA, argued, Fort Smith, AR, for appellee.

Before WOLLMAN, BOWMAN, and MELLOY, Circuit Judges.

**Opinion**

WOLLMAN, Circuit Judge.

Hollis Wayne Fincher was convicted by a jury on one count of possession of a machine gun, in violation of 18 U.S.C. §§ 922(*o*), 924(a)(2), and one count of possession of an unregistered sawed-off shotgun, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Fincher does not dispute that he possessed these guns or that he did so without a license. He appeals his conviction, however, arguing that he has the right to possess these weapons under the Second Amendment of the United States Constitution because his possession has some reasonable relationship to the maintenance of a well regulated militia. Fincher also challenges the district court's determination that he is not eligible for court appointed counsel and challenges the district court's request to resentence him. We affirm the conviction and remand the issue of Fincher's eligibility for court appointed counsel to the district court for further inquiry.

**I. Second Amendment**

**A. Background**

Before Fincher's trial began, the government became aware of Fincher's intention **\*871** to argue to the jury that his possession of guns was protected under the Second Amendment. Because that issue is a matter of law, the government filed a motion in limine asking the district court to prevent Fincher from arguing matters of law to the jury. After hearing oral argument on the motion, the district court granted the motion in part and denied it in part. In doing so, the district court stated that matters of law are "quintessentially

within the province of the judge and not matters to be addressed to the jury." Nevertheless, the district court stated that it would allow Fincher to present evidence outside the presence of the jury that under *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), and *United States v. Hale,* 978 F.2d 1016 (8th Cir.1992), his possession of the guns was reasonably related to a well regulated militia.

At the close of the government's case, Fincher moved for judgment of acquittal. The district court denied the motion, stating that it was based on an attack on the law and not the evidence, and that under Hale, 978 F.2d 1016, the fact that a particular weapon may be susceptible to military use does not by itself establish a Second Amendment right to possess the weapon.

During his case-in-chief, Fincher presented his own testimony, which the district court heard in camera. Fincher testified that he possessed the guns as part of his membership in the Washington County Militia ("WCM"), an organization he helped found in 1994. He testified that the purpose of the WCM is to ensure the militia can operate as effectively militarily as possible in a time of state emergency and that the WCM has regular meetings and training sessions for its members. Fincher testified that between seven and nine individuals attend any given meeting of the WCM, though it is not always the same individuals in attendance. The WCM does not maintain a roster of its members or an inventory of weapons.

The WCM is not a secret organization. In fact, along with the other members of the WCM, Fincher wrote and sent letters to federal agencies via certified mail informing them of the WCM's existence and attempting to put them on notice that the WCM was lawful under state law. Fincher also sent at least one letter to the governor of Arkansas, informing him about the WCM, seeking approval, and stating that the governor's failure to object to the WCM's declaration would provide affirmation that the state of Arkansas did not object to the WCM. Fincher denied receiving a letter from the governor stating that the state records did not contain any reference to the WCM and that no such organization was registered with, or sanctioned by, the office of the governor or the state of Arkansas.

In addition to sending written notice of the WCM to various governmental offices, Fincher invited local sheriffs to view the WCM facilities and weapons. Fincher also told state officials that the WCM possessed machine guns, which the public could observe at any one of the three annual picnics sponsored by the WCM, and he showed the machine guns to at least one sheriff. Fincher also testified about how the weapons used by the WCM were chosen and stored, some at the WCM facility and others at the individual members' residences.

When asked about the procedures for activating the WCM in the case of an emergency, Fincher stated that if an emergency occurred while he was the commander of the WCM, he would contact "the sheriff if-if I was able, you know, depending on the emergency, or the governor, or probably any other-or maybe the mayor of a city or any-anyone or no one. If there was an emergency that had to be **\*872** taken care of, we have the right to preserve life, liberty, and pursuit of happiness. We have the duty to. You don't stand around and wait for someone to tell you you can protect your life or perform emergency medical assistance or put out a fire. These are natural rights of the people." He also testified that the state could call up the militia at any point, and that even though the written notices that WCM sent to various governmental offices did not contain any phone numbers or other direct contact information, the governor would know how to contact them.

The district court ruled that Fincher's proffered testimony would not be admitted because the WCM, despite its attempts to receive state recognition, was an unorganized and unregulated militia and therefore, as a matter of law, did not fall within the auspices of the Second Amendment. The district court also noted that even if the WCM was a state-sponsored or state-connected militia, there was no evidence that the person in charge of that militia would determine that possession of machine guns or sawed-off shotguns was necessary to the preservation of a well regulated militia.

### B. Discussion

Fincher asserts that the district court erred by not allowing the jury to determine whether his possession of firearms was reasonably related to a well regulated militia and therefore protected by the Second Amendment. We review a district court's grant of a motion in limine for abuse of discretion, *Robinson v. Potter,* 453 F.3d 990, 995 (8th Cir.2006), and we accord it great deference on evidentiary rulings such as the admissibility of proffered testimony, *United States v. Wilson,* 103 F.3d 1402, 1406 (8th Cir.1997). We review de novo the district court's legal conclusions, such as whether possession of firearms in relation to membership in a non-state-sponsored militia is protected by the Second

Amendment. *United States v. Lippman,* 369 F.3d 1039, 1043 (8th Cir.2004).

The role of the jury is to decide facts, not legal issues. *United States v. Peck,* 161 F.3d 1171, 1174 (8th Cir.1998). Accordingly, the district court did not err in prohibiting Fincher from arguing or presenting evidence regarding a question of law to the jury.

We turn to the question whether the district court erred by concluding that Fincher's possession of the guns did not fall within the protection of the Second Amendment. We conclude that the district court's determination that the WCM was not affiliated with the state militia and therefore not subject to the protections of the Second Amendment under *Miller* and *Hale* is well supported by the record.

Fincher contends that our decision in *Hale,* 978 F.2d 1016, established an affirmative defense to the charge of unlawful possession of firearms. In *Hale,* we stated that the possession of firearms is not protected unless the possession bears a reasonable relationship to a well regulated militia. 978 F.2d at 1020; *see also United States v. Pfeifer,* 371 F.3d 430, 438 (8th Cir.2004) (citing *Hale* ); *United States v. Farrell,* 69 F.3d 891, 894 (8th Cir.1995) (same). Although the WCM is not a secretive organization and has held relatively regular training sessions and meetings over the years, we stated in *Hale* that " '[t]echnical' membership in a state militia (e.g., membership in an 'unorganized' state militia) or membership in a non-governmental military organization is not sufficient to satisfy the 'reasonable relationship' test." *Hale,* 978 F.2d at 1020 (citing *United States v. Oakes,* 564 F.2d 384, 387 (10th Cir.1977)). In Arkansas, the state militia is defined as:

**\*873** (a) The militia shall be divided into two (2) parts: the organized, consisting of the active and inactive Army National Guard and Air National Guard; and *the unorganized, consisting of all those persons of the militia not in the active or inactive Army National Guard or the Air National Guard.*

(b) The militia shall consist of all able-bodied male residents of the state between the ages of seventeen (17) and forty-five (45) years who are, or intend to become, citizens of the United States, unless exempt by law, together with all other acceptable volunteers, waiving necessary requirements.

Ark.Code. Ann. § 12-61-101 (emphasis added). Thus, despite WCM's attempts to contact the governor's office and

become an organized state militia, the district court correctly concluded that Fincher's testimony, even if believed by the jury, would not support his Second Amendment argument because Fincher is not a member of an organized state militia. Rather, Fincher's testimony established that the WCM was an "unorganized" militia because it is not the Army National Guard or the Air National Guard and is not formally connected with the state of Arkansas. Therefore, under *Hale,* Fincher's possession of firearms is, as a matter of law, not reasonably related to a well regulated militia and is thus not protected by the Second Amendment.

In reaching this conclusion, we have taken into account the Supreme Court's recent decision in *District of Columbia v. Heller,* --- U.S. ----, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008),[1] in which the Court held that the District of Columbia's complete prohibition on the possession of usable handguns in one's home violated the Second Amendment. *Id.* at 2817-18. In holding that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," *Id.* at 2797,[2] the Court also stated that the right to possess firearms is not beyond the reach of all government regulation. *Id.* at 2799, 2816 ("Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

[1]     At trial, Fincher's Second Amendment argument focused on his claim of right to possess the guns because they are military weapons and he is a member of the militia and not a claim of an individual right to possess a machine gun or unregistered sawed-off shotgun. Nevertheless, we think it is clear that even if Fincher had made the latter argument at trial, his possession of the guns is not protected under *Heller.*

[2]     We note that the Supreme Court did not address the question whether the Second Amendment is incorporated through the Fourteenth Amendment and thus applicable to the states.

In discussing the limitations the government can place on an individual's right to possess firearms, the Court noted that *Miller* does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller,* 128 S.Ct. at 2815-16. The Court also articulated a nonexclusive list of what it viewed to be acceptable government regulation of firearms:

[T]he majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons **874** and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Id.* at 2816-17 (internal citations and footnote omitted).

Accordingly, under *Heller,* Fincher's possession of the guns is not protected by the Second Amendment. Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use. Furthermore, Fincher has not directly attacked the federal registration requirements on firearms, and we doubt that any such attack would succeed in light of *Heller.* Accordingly, because Fincher's possession of guns is not protected by the Second Amendment, the district court did not abuse its discretion in preventing him from arguing otherwise to the jury.

## II. Court Appointed Counsel

### A. Background

The circumstances surrounding Fincher's court appointed counsel are fully recited in the district court's order, *United States v. Fincher,* No. 06-50064-001, 2007 WL 2177062 (W.D.Ark. July 27, 2007), and are largely undisputed by Fincher. For the purpose of our analysis, we will highlight the main facts.

Fincher was arrested on November 9, 2006, for violating 18 U.S.C. § 922(*o*). When he made his initial appearance later that day, he requested the appointment of an attorney because of his financial inability to retain counsel. He executed a

"Financial Affidavit In Support of Request For Attorney or Other Court Services Without Payment Of Fee" ("the financial affidavit"), which indicated that he had no personal income, that his wife made $10.50 an hour, that he had $2,000 in savings, that he owned two vehicles of unknown value, one on which he was still making payments, and that he owned his home and 120 acres of real estate in Fayetteville, Arkansas, which had unknown value. Based upon that information, the district court appointed counsel to represent Fincher pursuant to the Criminal Justice Act.

On December 13, 2006, Fincher's appointed counsel withdrew because Fincher had retained other counsel. Thereafter, Fincher was convicted on both counts charged in the indictment. On March 8, 2007, Fincher informed the district court that he no longer had counsel and requested that counsel be appointed for him, which was done.

Before Fincher was sentenced, he executed a quitclaim deed conveying the 120 acres of real estate to his daughters in exchange for consideration of "One dollar ($1.00) and other good and valuable consideration," and reserving a life estate in the property for himself and his wife. Thereafter, the district court imposed concurrent sentences of 78 months' imprisonment on each count. Fincher was also subject to a fine of up to $250,000. Although the guidelines range called for a fine of between $12,500 and $125,000, the district court imposed a fine of only $1,000 under the belief that Fincher had no significant assets.

After sentencing, Fincher requested release on bond pending appeal. The district court conducted a hearing on the **875** matter and agreed that Fincher could be released on $100,000 bond. Fincher indicated that he could not post bond in that amount. The district court noted that Fincher might be able to use his real estate to secure the bond, whereupon Fincher's daughters executed a mortgage for that purpose. As a result, the district court became aware that Fincher's property had significant value, and that Fincher had conveyed it to his daughters.

As a result of these circumstances, on July 3, 2007, the district court held an evidentiary hearing to determine Fincher's financial eligibility for court appointed counsel. The district court received testimony from Fincher, his wife, and his two daughters. The district court also requested that Fincher provide supporting documents, such as his contract with retained counsel and the deed transferring the real estate. In

addition, the district court ordered an independent appraisal of the property, which estimated that it had a value of $455,000.

On July 27, 2007, the district court entered an order stating that Fincher "is not now, nor has he ever been at any time material to this proceeding, financially unable to obtain counsel to represent him in this proceeding and that appointments of counsel for him were improvidently made." *Fincher,* 2007 WL 2177062, at *10. Accordingly, the district court ordered Fincher to reimburse the United States Treasury $8,357.55 for the legal services provided to him by the attorneys appointed under the Criminal Justice Act. *Id.*

### B. Discussion

Fincher asserts that the district court's July 27, 2007, order revoking his eligibility for court appointed counsel should be reversed because he did not misrepresent the value of his real estate when he stated that the value was unknown. He also challenges the appraised value of the property and the district court's conclusion that he owns the property free and clear. Fincher asserts that he was subjectively unaware of the value of the property when he filled out the affidavit, that the property is not worth nearly as much as the appraised value because it is landlocked, and that he owned it as a joint tenant with his wife. Fincher further contends that the transfer of the property to his daughters was legitimate because he informed the Assistant United States Attorney who was working on the case about the transfer.

The Criminal Justice Act provides a framework for ensuring that individuals who are financially unable to afford defense counsel are provided counsel as required by the Sixth Amendment. *United States v. Brockman,* 183 F.3d 891, 897 (8th Cir.1999). The Act requires that each United States district court create "a plan for furnishing representation for any person financially unable to obtain adequate representation...." 18 U.S.C. § 3006A(a). A person is eligible for court appointed counsel if, after the United States magistrate judge or court conducts an "appropriate inquiry," the court is satisfied that "the person is financially unable to obtain counsel." 18 U.S.C. § 3006A(b). Financial inability to obtain counsel is not the same as being indigent or destitute, but the defendant has the burden of establishing that he or she is financially unable to obtain counsel. *Brockman,* 183 F.3d at 897; *Museitef v. United States,* 131 F.3d 714, 716 (8th Cir.1997). "If at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may

terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate." 18 U.S.C. § 3006A(c); *see also* 18 U.S.C. § 3006A(f) ("Whenever the United States **\*876** magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid...."); *Museitef,* 131 F.3d at 715.

Thus, our review of the district court's determination of financial eligibility for court appointed counsel is a three-step process. *See United States v. Parker,* 439 F.3d 81, 92 (2d Cir.2006) (reviewing district court's mid-case appointment of counsel). We must ask, (1) whether the district court conducted an "appropriate inquiry" into the defendant's financial eligibility, (2) whether the district court correctly determined the defendant's financial eligibility, and (3) whether the district court erred when it weighed the "interests of justice." *Id.* at 92-93. Because we ultimately remand this issue to the district court for further review, we reach only the first of these three questions.

To determine a defendant's financial eligibility, the district court should make a "full inquiry" into the defendant's actual ability to retain counsel. *Museitef,* 131 F.3d at 716. A full-scale adversarial hearing is not required, however, before a district court may order repayment of attorney's fees under the Criminal Justice Act. *United States v. Vale,* 140 Fed.Appx. 302, 303 (2d Cir.2005) (unpublished opinion) (citing *United States v. Crosby,* 602 F.2d 24, 28 (2d Cir.1979)); *see also Parker,* 439 F.3d at 93 ("The task necessarily varies with the circumstances presented, and no one method or combination of methods is required." (internal quotation omitted)). We review *de novo* the adequacy of the district court's inquiry. *Parker,* 439 F.3d at 93 n. 12.

In this case, the district court's initial inquiry was based upon the financial affidavit submitted by Fincher. *See id.* at 93 (noting that in some cases the court's inquiry may be limited to the defendant's statements on the financial affidavit). Based upon the limited information available at that time, the district court did not err in appointing counsel for Fincher. *Brockman,* 183 F.3d at 897 (any doubt about the defendant's eligibility for court appointed counsel should be resolved in the defendant's favor); *United States v. Cohen,* 419 F.2d 1124, 1127 (8th Cir.1969) (district court's determination that defendant was ineligible for court appointed counsel based upon the ownership of real estate with an unknown value and without a more searching inquiry was error).

Although a district court should investigate information contained in an affidavit when the information provided renders the defendant's eligibility questionable, the district court's initial determination of eligibility can be amended when new information comes to light. *See In re Boston Herald, Inc.,* 321 F.3d 174, 179 (1st Cir.2003) (erroneous eligibility determinations can be corrected at a later time). In this case, the district court became aware of the fact that Fincher's property had significant value when it was mortgaged to secure Fincher's $100,000 bond and Fincher testified that he knew that property in the same area had recently sold for between $2,000 and $4,000 an acre. This new information was sufficient to warrant a reexamination of Fincher's eligibility. [3]

[3]   In its July 27, 2007, order, the district court noted that it should have conducted a investigation beyond Fincher's financial affidavit before it initially appointed him counsel. *Fincher,* 2007 WL 2177062, at *7. Nevertheless, the district court reasoned that the defendant has the burden of establishing financial eligibility for court appointed counsel and that Fincher did not meet this burden and in fact misrepresented his financial eligibility by listing the 120 acres as having an unknown value when, in fact, he knew that real estate in the same area had recently sold for between $2,000 and $4,000 an acre. *See id.* (citing *United States v. Lefkowitz,* 125 F.3d 608 (8th Cir.1997)).

**\*877**   Fincher argues that the district court erred in determining that he was not eligible for court appointed counsel because the district court did not take into consideration the fact that the property is landlocked and therefore is not as valuable as the appraisal indicates. Fincher testified at the hearing, however, that the property is located one mile off a public road and that there is an unpaved road that goes directly to the property. Fincher also informed the district court that the property has a right-of-way that, although not currently used, is attached to ownership of the property. Furthermore, it is undisputed that Fincher and his wife currently reside on the property, suggesting that the property is not in fact inaccessible. The appraisal acknowledges that any ingress and egress to the property would need to be improved, as the current road is not paved. Accordingly, we conclude that the district court did not err in accepting as accurate the appraiser's opinion that the property had a value of $455,000, which falls within Fincher's estimate that the property is worth between $2,000 and $4,000 an acre.

Fincher argues for the first time on appeal that because he owned the property as a joint tenant with his wife, he did not own it free and clear, and that the district court therefore erred by concluding otherwise. This late-raised assertion is directly contradicted, however, by the testimony of Fincher's daughter, who testified that Fincher's name is the sole one on the title. Furthermore, Fincher's wife testified that she did not know if she had ever been deeded any portion of the property. Although the quit claim deed that transferred the property to Fincher's daughters in early 2007 recites that Fincher and his wife each owned an undivided one-half interest in the property as tenants in common, there is no evidence in the record that Fincher and his wife owned the property as joint tenants. Accordingly, the district court did not err when it found that Fincher owned the property free and clear because Fincher has not established that there are any mortgages or liens on the property.

Regarding Fincher's transfer of the property to his daughters via quit claim deed, we conclude that Fincher's letter to the Assistant United States Attorney regarding the transfer of the property does not insulate the transfer from later question. Testimony at the evidentiary hearing from Fincher, his wife, and his two daughters, as well as the letter sent to the AUSA, all indicate that the property was transferred after Fincher's conviction to avoid the possibility of the property being sold to pay any fine imposed by the district court as part of Fincher's sentence. Accordingly, the district court did not err in concluding that the attempted transfer of the property should be considered when determining Fincher's eligibility for court appointed counsel.

Despite these conclusions and the fact that the district court conducted a more thorough inquiry into Fincher's eligibility in July 2007 than it did initially, the district court's analysis leaves factual questions unanswered. Thus, we remand this issue to the district court for further consideration of whether Fincher's wife has any ownership in the property and, if so, whether that affects Fincher's ownership of the property or the application of the Arkansas Homestead Exemption. Specifically, the district court must consider whether the entire 120 acres of real estate is protected by the Homestead Exemption, making Fincher eligible for court appointed counsel despite his ownership of the property, or whether the exemption protects **\*878** only a portion of the real estate. *See* Ark.Code Ann. § 16-66-210; *see also United States v. Trevino,* 679 F.Supp. 636, 636 (S.D.Tex.1987) (doubting that defendants should have to sell their homestead to appeal criminal conviction); *Perry v. Chief of Police of City of*

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

*Marianna, Ark.,* 660 F.Supp. 1546, 1552 (E.D.Ark.1987) (in determining indigency, defendant should not be required to sell his inexpensive car or his home).[4] Additionally, the district court should consider whether Fincher has the current ability to reimburse the United States Treasury for the legal services he received in light of the transfer of the real estate to Fincher's daughters.

[4]    Generally, cases in which a defendant's ineligibility for court appointed counsel has been affirmed are based upon the defendant's income and cash flow, not a requirement that the defendant sell his homestead to facilitate the payment of defense costs. *See, e.g., Lefkowitz,* 125 F.3d at 621 (defendant had recently spent several hundred thousand dollars on other attorney's fees and personal expenses and district court found defendant's own testimony of indigence to be lacking credibility); *United States v. Harris,* 707 F.2d 653, 661 (2d Cir.1983) (district court found that defendant had "substantial income" in the past two years and might have had other undisclosed income); *United States v. Wetzel,* 488 F.2d 153, 157 (8th Cir.1973) (affirming reimbursement order (for about $350) because defendant received $19,000 for the sale of cattle and owned real estate (the opinion provides no indication that the real estate was defendant's homestead)).

### III. IFP Status on Appeal

We turn next to Fincher's request for *in forma pauperis ("IFP")* status on appeal. Because we remand to the district court for further review the issue of Fincher's eligibility for court appointed counsel, we do not reach this issue. Nevertheless, Fincher's IFP status on appeal is dependent upon his eligibility for court appointed counsel at the trial level. If the district court concludes that Fincher is eligible for court appointed counsel and therefore should not be required to reimburse the cost of the legal services he received, and Fincher's financial circumstances do not change between the time of the district court and the appellate court proceedings, he should be granted IFP status on appeal. *See United States v. Danielson,* 325 F.3d 1054, 1077 (9th

Cir.2003) (court appointed counsel continues on appeal unless defendant's financial situation changes and he or she is no longer financially eligible).

### IV. Sentencing

On the basis of its conclusion that Fincher misrepresented his financial eligibility for court appointed counsel, the district court seeks a remand for resentencing. In light of our conclusion that the district court must conduct a more searching inquiry into Fincher's eligibility for court appointed counsel, we decline the request for remand. Moreover, it is questionable whether we have jurisdiction to remand in the absence of an appeal or cross-appeal from the government, or whether the district court has jurisdiction to resentence a defendant in the absence of statutory authority to do so. *See Greenlaw v. United States,* --- U.S. ----, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) (holding that a circuit court cannot increase a defendant's sentence without a government appeal or cross-appeal); *United States v. Ross,* 245 F.3d 577, 585-86 (6th Cir.2001) (district court may not resentence defendant without statutory authority); *see also United States v. Sadler,* 234 F.3d 368, 373-74 (8th Cir.2000) (a district court's "change of heart as to the appropriateness of the sentence, rather than a correction in the application of the guidelines," is not the type of "clear error" that can be corrected under Rule 35(c) (internal quotation and citation omitted)); *cf.* **\*879** *United States v. Fortino,* No. 07-3476, 2008 WL 2388893, 281 Fed.Appx. 629 (8th Cir. June 13, 2008) (per curiam).

### V. Conclusion

The conviction is affirmed. The order directing Fincher to reimburse the United States Treasury $8,357.55 for the legal services he received pursuant to the Criminal Justice Act is vacated and the case is remanded the district court for further proceedings consistent with the views set forth in this opinion.

### All Citations

538 F.3d 868

---

End of Document          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP  Document 59-32  Filed 11/30/22  PageID.5069  Page 114 of 208
Heller v. District of Columbia, 670 F.3d 1244 (2011)
399 U.S.App.D.C. 314

670 F.3d 1244
United States Court of Appeals,
District of Columbia Circuit.

Dick Anthony HELLER, et al., Appellants

v.

DISTRICT OF COLUMBIA, et al., Appellees.

No. 10–7036.
|
Argued Nov. 15, 2010.
|
Decided Oct. 4, 2011.

**Synopsis**

**Background:** Citizens brought action, challenging Firearms Registration Amendment Act which was promulgated in effort to cure constitutional deficits that Supreme Court had identified in *Heller*. The United States District Court for the District of Columbia, Ricardo M. Urbina, J., 698 F.Supp.2d 179, granted summary judgment for defendants. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Ginsburg, Circuit Judge, held that:

authority given to District of Columbia in 1973 in Home Rule Act (HRA) gave power to District to enact laws regulating firearms;

requirement of mere registration of handguns was presumptively lawful;

intermediate scrutiny applied to determination of whether registration requirements impinged upon Second Amendment right;

meaningful evidence, not mere assertions, was required to justify predictive judgments;

remand was required to give parties opportunity to develop more thorough factual record regarding novel gun registration requirements;

intermediate scrutiny applied to prohibition on semi-automatic rifles and large-capacity magazines; and

substantial relationship existed between prohibition on assault weapons and magazines holding more than ten rounds and important governmental interests.

Affirmed in part, vacated in part, and remanded.

Kavanaugh, Circuit Judge, filed dissenting opinion.

**\*1246** Appeal from the United States District Court for the District of Columbia (No. 1:08–cv–01289).

**Attorneys and Law Firms**

Stephen P. Halbrook argued the cause for appellants. With him on the briefs was Richard E. Gardiner.

William J. Olson, Herbert W. Titus, and John S. Miles were on the brief for amici curiae Conservative Legal Defense and Education Fund, et al. in support of appellants.

Todd S. Kim, Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were Peter J. Nickles, Attorney General, Donna M. Murasky, Deputy Solicitor General, and Holly M. Johnson, Assistant Attorney General.

Matthew M. Shors was on the brief for amici curiae Professional Historians and **\*1247** Law Professors, et al. in support of appellees.

Paul R.Q. Wolfson, A. Stephen Hut, Jr., Joshua M. Salzman, and Jonathan E. Lowy were on the brief for amici curiae The Brady Center to Prevent Gun Violence, et al. in support of appellees.

Before: GINSBURG, HENDERSON and KAVANAUGH, Circuit Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge KAVANAUGH.

GINSBURG, Circuit Judge:

I. Background................................................................................................ ...... 1248

II.  Analysis............................................................................................................ ...... 1250

  A.  Statutory Authority......................................................................................... ..... 1250

  B.  The Second Amendment.................................................................................. ...... 1251

    1.  The *Heller* Decision.................................................................................... 1252

    2.  The Constitutional Framework................................................................... 1252

    3.  Registration Requirements.......................................................................... 1253

      a.  Do the registration requirements impinge upon the Second Amendment right?............................... 1253

        i. Basic registration requirements........................................................ 1253

        ii. Novel registration requirements..................................................... 1255

      b.  Intermediate scrutiny is appropriate........................................................ 1256

      c.  Intermediate scrutiny requires remand.................................................... 1258

    4.  Assault Weapons and Large–Capacity Magazines........................................ 1260

      a.  Do the prohibitions impinge upon the Second Amendment right?.................................. 1260

      b.  Intermediate scrutiny is appropriate........................................................ 1261

      c.  The prohibitions survive intermediate scrutiny.......................................... 1262

III.  Conclusion......................................................................................................... 1264

Appendix: Regarding the Dissent............................................................................ ...... 1264

  A.  Interpreting *Heller* and *McDonald*.................................................................. ...... 1264

  B.  Registration Requirements............................................................................... 1267

  C.  Assault Weapons............................................................................................ 1267

**∗∗317**  In June 2008 the Supreme Court held the District of Columbia laws restricting the possession of firearms in one's home violated the Second Amendment right of individuals to keep and bear arms. *See District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783. In the wake of that decision, the District adopted the Firearms Registration Amendment Act of 2008 (FRA), D.C. Law 17–372, which amended the Firearms Control Regulations Act of 1975, D.C. Law 1–85.

The plaintiffs in the present case challenge, both facially and as applied to them, the provisions of the District's gun laws, new and old, requiring the registration of firearms and prohibiting both the registration of "assault weapons" and the possession of magazines with a capacity of more than ten rounds of ammunition. The plaintiffs argue those provisions (1) are not within the District's congressionally delegated

legislative authority or, if they are, then they (2) violate the Second Amendment.

The district court granted summary judgment for the District and the plaintiffs appealed. We hold the District had the authority under D.C. law to promulgate the challenged gun laws, and we uphold as constitutional the prohibitions of assault **\*\*318  \*1248** weapons and of large-capacity magazines and some of the registration requirements. We remand the other registration requirements to the district court for further proceedings because the record is insufficient to inform our resolution of the important constitutional issues presented.

## I. Background

In *Heller,* the Supreme Court held the Second Amendment protects "an individual right to keep and bear arms," 554 U.S. at 595, 128 S.Ct. 2783, but not a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626, 128 S.Ct. 2783. More specifically, the Court held unconstitutional the District's "ban on handgun possession in the home" as well as its "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense," *id.* at 635, 128 S.Ct. 2783, noting "the inherent right of self-defense [is] central to the Second Amendment right," *id.* at 628, 128 S.Ct. 2783. Therefore, unless the plaintiff was "disqualified from the exercise of Second Amendment rights" for some reason, such as a felony conviction, the District had to permit him to register his handgun. *Id.* at 635, 128 S.Ct. 2783.

Shortly after the Supreme Court issued its decision in *Heller,* the D.C. Council passed emergency legislation in an effort to conform the District's laws to the Supreme Court's holding while it considered permanent legislation. The Council's Committee on Public Safety and the Judiciary then held three public hearings on the subject. In December 2008, upon the Committee's recommendation, the full Council passed the FRA. 56 D.C. Reg. 3438 (May 1, 2009).

The plaintiffs challenge a host of provisions of the new scheme for regulating firearms. * First they object to the general requirement that owners register their firearms, D.C.Code § 7–2502.01(a). In particular, the plaintiffs challenge the following requirements that apply each time a person applies to the Metropolitan Police Department (MPD) for a registration certificate. Each applicant must:

\*  Although the District revised its regulatory scheme, the ban on semi-automatic rifles and the registration scheme themselves are not entirely new. The District has banned all semi-automatic firearms shooting more than twelve shots without reloading and has required basic registration since 1932. *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652. It enacted most of its comprehensive registration scheme in 1975. *See* Firearms Control Regulations Act of 1975, D.C. Law 1–85.

• Disclose certain information about himself—such as his name, address, and occupation—and about his firearm. § 7–2502.03(b).

    • Submit "for a ballistics identification procedure" each pistol to be registered. § 7–2502.03(d). Ballistics testing is not required for long guns. *See id.*

    • Appear in person and, at the MPD's request, bring with him the firearm to be registered. § 7–2502.04(c).

    • Register no more than one pistol in a 30–day period. § 7–2502.03(e).

    • Renew each registration certificate "3 years after the date of issuance." § 7–2502.07a(a). In order to renew the certificate, the applicant must "submit a statement ... attesting to" his current address, possession of the firearm, and compliance with the registration requirements in § 7–2502.03(a). § 7–2502.07a(c).

In addition, the plaintiffs challenge five requirements that are more similar to licensing the owner of the firearm than to **\*\*319  \*1249** registering the weapon itself. * Specifically, the applicant must:

\*  The plaintiffs also challenge several administrative and enforcement provisions incidental to the underlying regime. *See* D.C.Code §§ 7–2502.03(d), 7–2502.05(b), D.C. Mun. Regs. tit. 24, § 2320 (fees for registration, ballistics testing, and fingerprinting); D.C.Code § 7–2507.06 (violation punishable by fine of up to $1,000, one year in prison, or both); § 7–2502.08 (registrant must notify MPD if firearm is transferred, lost, stolen, or destroyed, and exhibit registration certificate upon demand of MPD). These provisions are lawful insofar as the underlying regime is lawful and hence enforceable.

Heller v. District of Columbia, 670 F.3d 1244 (2011)

399 U.S.App.D.C. 314

• Have vision qualifying one for a driver's license. § 7–2502.03(a)(11).

    • Demonstrate knowledge of the District's laws pertaining to firearms "and, in particular, the safe and responsible use, handling, and storage of the same." § 7–2502.03(a)(10).

    • Submit to being fingerprinted and photographed. § 7–2502.04; D.C. Mun. Regs. tit. 24, § 2312.1–2.

    • Undergo a background check every six years to confirm his continuing compliance with the registration requirements in § 7–2502.03(a). § 7–2502.07a(d).

    • Attend a firearms training or safety course providing "a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction." § 7–2502.03(a)(13)(A).

Second, the plaintiffs challenge the District's prohibitions of "assault weapon[s]," D.C.Code § 7–2502.02(a)(6), and of magazines holding more than ten rounds of ammunition, § 7–2506.01(b). The FRA defines "assault weapon" to include certain brands and models of semi-automatic rifles, pistols, and shotguns, such as the Colt AR–15 series of rifles, as well as semi-automatic firearms with certain features, regardless of make and model, such as a semi-automatic rifle with a "pistol grip that protrudes conspicuously beneath the action of the weapon" or a "thumbhole stock." § 7–2501.01(3A)(A). The District also prohibits possession of "any large capacity ammunition feeding device," which includes "a magazine ... or similar device that has a capacity of ... more than 10 rounds of ammunition." § 7–2506.01(b) (hereinafter "large-capacity magazines").

Plaintiffs Mark Snyder and Absalom F. Jordan, Jr. complied with the registration requirements and successfully registered a rifle and a pistol respectively. Plaintiff Jordan, however, was unable to register two additional pistols due to the one–gun–per–30–days limit. Three of the plaintiffs, Dick Anthony Heller, William Carter, and Jordan applied to register semi-automatic rifles, but the MPD denied their applications because it found the firearms were prohibited "assault weapons." Plaintiff Heller was also denied registration of a pistol because the magazine had a capacity of 15 rounds.[*]

[*]     In their complaint, the plaintiffs challenge the constitutionality of the FRA insofar as it bans all "assault weapons," including semi-automatic rifles, pistols, and shotguns. In their briefs, however, they recount no attempt to register a semi-automatic pistol or a semi-automatic shotgun of a kind prohibited by the District's ban on assault weapons, nor do they mention such weapons in arguing the ban is unconstitutional. Accordingly, we take their challenge to the ban on assault weapons as referring only to the ban on semi-automatic rifles, as set out in D.C.Code § 7–2501.01(3A)(A)(i)(I) and (IV). *See Summers v. Earth Island Inst.,* 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009) (standing doctrine "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction," and the plaintiff "bears the burden of showing that he has standing for each type of relief sought" (internal quotation marks omitted)); *Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n,* 485 F.2d 786, 790 n. 16 (D.C.Cir.1973) (declining to consider claims because "[i]n their brief ... petitioners offer no argument whatever in support of these points").

**\*1250 \*\*320** Before the district court, the plaintiffs argued all D.C. gun laws are required by the Act of June 30, 1906, ch. 3932, 34 Stat. 808, to be "usual and reasonable," but contended the aforementioned provisions meet neither criterion or, if they do, then they violate the plaintiffs' Second Amendment rights. The district court held the challenged laws do not exceed the District's authority under local law because they are usual and reasonable police regulations within the meaning of the 1906 Act. 698 F.Supp.2d 179, 196–97 (2010). Then, addressing the constitutional challenge, the court determined "the registration requirements plainly implicate the core Second Amendment right" but, applying intermediate scrutiny, upheld the registration scheme in all respects. *Id.* at 190–93. The court also upheld the ban on assault weapons and large-capacity magazines on the ground that the bans "do not implicate the core Second Amendment right." *Id.* at 195. Holding, in the alternative, the bans would survive intermediate scrutiny, *id.,* the court granted summary judgment for the District, and the plaintiffs appealed.

## II. Analysis

Pursuant to the principle of constitutional avoidance, we "resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue." *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988). Accordingly, we consider first

whether the D.C. Council had the statutory authority to enact the challenged gun laws.

A. Statutory Authority

The Congress in 1878 permanently established a Board of Commissioners, to which it delegated regulatory authority over the District in discrete areas of policy. Organic Act of June 11, 1878, ch. 180, 20 Stat. 102, 103; *see also District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 111, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953) (under Organic Act, "municipal government was confined to mere administration" (internal quotation marks omitted)). The Congress passed the 1906 Act in part to grant the Board the specific authority to regulate firearms:

> the Commissioners of the District of Columbia are hereby authorized and empowered to make and enforce all such *usual and reasonable* police regulations ... as they may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia.

Act of June 30, 1906, ch. 3932, § 4, 34 Stat. 808, 809 (emphasis added), amended and codified at D.C.Code § 1–303.43 (referring to "Council" in lieu of "Commissioners").

In 1973 the Congress passed the District of Columbia Home Rule Act (HRA), *see District of Columbia Self–Government and Governmental Reorganization Act,* Pub. L. No. 93–198, 87 Stat. 774 (codified as amended at D.C.Code § 1–201.01 *et seq.*), which remains in effect today. Section 302 of the HRA, D.C.Code § 1–203.02, "Legislative Power," provides in relevant part:

> Except as provided in [certain sections not relevant here], the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this [Act]....

The plaintiffs argue the District's authority to regulate firearms remains limited by the 1906 Act, and that Act prevents the District from promulgating the gun **\*\*321 \*1251** laws challenged here. Specifically, the plaintiffs argue the D.C. gun laws are not "usual" because they are not commonly found in either state or federal law and they are also unreasonable. (They maintain the Eighth Amendment case law concerning what is "unusual" should inform our analysis of whether these laws are "usual.") The District defends the challenged laws as both "usual and reasonable." It argues a regulation is "usual" if any other jurisdiction has or has had a law addressing similar subject matter.

In any event the District argues, and the United States as amicus curiae agrees, its authority in the HRA over "all rightful subjects of legislation" affirmatively gives it the power to enact the challenged gun laws. The plaintiffs respond to that argument with the observation that the 1906 Act should not be "deemed amended or repealed" because the HRA did not "specifically provide[ ]" for repeal and the 1906 Act is not "inconsistent with" the HRA. *See* D.C.Code § 1–207.17(b) ("No law or regulation which is in force on January 2, 1975 shall be deemed amended or repealed by [the HRA] except to the extent specifically provided herein or to the extent that such law or regulation is inconsistent with this chapter").

We agree with the District that it was authorized to enact the challenged gun laws. The HRA granted the District broad legislative power, subject to a few express exceptions, none of which is relevant here. *See* D.C.Code § 1–203.02; *id.* § 1–204.04(a). The plaintiffs do not contend the District's authority to enact these gun laws is limited by any other provision of the HRA, *see Marijuana Policy Project v. United States,* 304 F.3d 82, 83 (D.C.Cir.2002) (HRA "lists certain matters that are not rightful subjects" of legislation, such as "a commuter tax on non-residents' income"), and the District of Columbia Court of Appeals has authoritatively if more generally said as much, *see Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics,* 441 A.2d 889, 903 (D.C.1981) (en banc) (Council's legislative power "limited only by specified exceptions and by the general requirement that legislation be consistent with the U.S. Constitution and the Home Rule Act"). *See also John R. Thompson Co.,* 346 U.S. at 104–05, 110, 73 S.Ct. 1007 (concluding Organic Act of February 21, 1871, 16 Stat. 419, which gave District power over "all rightful subjects of legislation," conferred authority "as broad as the police power of a state"). Hence we conclude

Case 2:19-cv-00037-JNP  Document 59-32  Filed 11/30/22  PageID.5074  Page 119 of 208
Heller v. District of Columbia, 670 F.3d 1244 (2011)
399 U.S.App.D.C. 314

the grant of authority in the HRA comprises the subject of firearms and supersedes the qualified grant to the District in the 1906 Act.

Insofar as the 1906 Act remains effective, it serves only to clarify that the new D.C. Council is the body responsible for the "function" of regulating firearms, as stated in D.C.Code § 1–303.43. Specifically, § 404(a) of the HRA provides

> all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan No. 3 of 1967, shall be carried out by the Council in accordance with the provisions of this chapter.

D.C.Code § 1–204.04(a). Accordingly, we need not decide whether the laws at issue are "usual and reasonable" because we hold the District has authority under the HRA to enact laws regulating firearms.

B. The Second Amendment

Having determined the District had the statutory authority to promulgate the challenged gun laws, we next consider whether those laws are consistent with the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and **322 *1252 bear Arms, shall not be infringed." To determine how we are to approach this question, we begin with *Heller.*

1. The *Heller* Decision

In *Heller* the Supreme Court explained the Second Amendment "codified a *pre-existing* " individual right to keep and bear arms, 554 U.S. at 592, 128 S.Ct. 2783, which was important to Americans not only to maintain the militia, but also for self-defense and hunting, *id.* at 599, 128 S.Ct. 2783. Although "self-defense had little to do with the right's *codification* [,] it was the *central component* of the right itself." *Id.*

Still, the Court made clear "the right secured by the Second Amendment is not unlimited," *id.* at 626, 128 S.Ct. 2783, and it gave some examples to illustrate the boundaries of that

right. For instance, the Court noted "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625, 128 S.Ct. 2783 (citing *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). This limitation upon the right to keep and bear arms was "supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627, 128 S.Ct. 2783 (internal quotation marks omitted).

The Court identified other historical limitations upon the scope of the right protected by the Second Amendment. For example, it noted "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* at 626, 128 S.Ct. 2783. It also provided a list of some "presumptively lawful regulatory measures":

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 & n. 26, 128 S.Ct. 2783. The Court made clear, however, it was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 626, 128 S.Ct. 2783.

2. The Constitutional Framework

Under *Heller,* therefore, there are certain types of firearms regulations that do not govern conduct within the scope of the Amendment. We accordingly adopt, as have other circuits, a two-step approach to determining the constitutionality of the District's gun laws. *Ezell v. City of Chicago,* 651 F.3d 684, 701–04 (7th Cir.2011); *United States v. Chester,* 628 F.3d 673, 680 (4th Cir.2010); *United States v. Reese,* 627 F.3d 792, 800–01 (10th Cir.2010); *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir.2010). We ask first whether a particular provision impinges upon a right protected by the Second

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

399 U.S.App.D.C. 314

Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny. *See Ezell,* 651 F.3d at 701–04; *Chester,* 628 F.3d at 680; *Reese,* 627 F.3d at 800–01; *Marzzarella,* 614 F.3d at 89; *see also Nordyke v. King,* 644 F.3d 776, 786 (9th Cir.2011) ("only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment"). As explained below, and again in keeping with other circuits, we think that insofar as the laws at issue here do impinge upon a Second **\*\*323 \*1253** Amendment right, they warrant intermediate rather than strict scrutiny.

With respect to the first step, *Heller* tells us "longstanding" regulations are "presumptively lawful," 554 U.S. at 626–27 & n. 26, 128 S.Ct. 2783; that is, they are presumed not to burden conduct within the scope of the Second Amendment. *See McDonald v. City of Chicago,* ––– U.S. ––––, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (*Heller* "did not cast doubt on [certain types of] longstanding regulatory measures"); *Chester,* 628 F.3d at 679 (*Heller* "acknowledged that the scope of the Second Amendment is subject to historical limitations"); *Marzzarella,* 614 F.3d at 91 (*Heller* indicates "longstanding limitations are exceptions to the right to bear arms"); *United States v. Rene E.,* 583 F.3d 8, 12 (1st Cir.2009) (*Heller* "identified limits" of the Second Amendment based upon "various historical restrictions on possessing and carrying weapons"). This is a reasonable presumption because a regulation that is "longstanding," which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment. A plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right. A requirement of newer vintage is not, however, presumed to be valid.

### 3. Registration Requirements

To apply this analytical framework, we first consider whether each of the challenged registration requirements impinges upon the right protected by the Second Amendment. We uphold the requirement of mere registration because it is longstanding, hence "presumptively lawful," and the presumption stands unrebutted. Other registration requirements we remand to the district court, as explained below, for further proceedings.

#### a. Do the registration requirements impinge upon the Second Amendment right?

The plaintiffs argue the registration requirements are not longstanding and therefore not presumptively lawful, and in fact impermissibly burden the right protected by the Second Amendment. The District responds that registration requirements have been accepted throughout our history, are not overly burdensome, and therefore do not affect the right protected by the Second Amendment.

#### i. Basic registration requirements

The record supports the view that basic registration of handguns is deeply enough rooted in our history to support the presumption that a registration requirement is constitutional. The Court in *Heller* considered "prohibitions on the possession of firearms by felons" to be "longstanding" although states did not start to enact them until the early 20th century. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) (noting "ban on convicts possessing firearms were unknown before World War I" and "compilation of laws in mid–1925 indicated that no State banned possession of long guns based on a prior conviction; that only six banned possession of concealable weapons on such basis; that, except for New York, ... even those laws dated from 1923 or later"). At just about the same time, states and localities began to require registration of handguns.

Registration typically required that a person provide to the local Government a modicum of information about the registrant and his firearm. A 1911 New York **\*\*324 \*1254** statute delegated the record keeping function to sellers of concealable firearms, requiring them to "keep a register" recording the "date of sale, name, age, occupation and residence of every purchaser of such a [firearm], together with the calibre, make, model, manufacturer's number or other mark of identification on such [firearm]," which register had to be "open at all reasonable hours for the inspection of any peace officer." Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 444–45. Similar laws had already been enacted by Illinois, Act of Apr. 16, 1881, ¶ 90, and Georgia, Act of Aug. 12, 1910, No. 432, § 2, 1910 Ga. Laws 134, 135 (official who grants license to carry pistol or revolver "shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the

caliber and number of the same"). Other states were soon to do so. *See* Oregon, Act of Feb. 21, 1917, ch. 377, 1917 Or. Laws 804, 805–06; Michigan, Act of June 2, 1927, No. 372, § 9, 1927 Mich. Laws 887, 891 ("any person within this state who owns or has in his possession a pistol" must "present such weapon for safety inspection to the commissioner or chief of police.... A certificate of inspection shall thereupon be issued ... and kept as a permanent official record for a period of six years"). In 1917 California likewise required the purchaser of a concealable firearm to give the seller basic information about himself, including his name, address, occupation, physical description (height and color of skin, eyes, and hair), and about the weapon (caliber, make, model, number). Act of May 4, 1917, ch. 145, § 7, 1917 Cal. Laws 221, 222–23. Hawaii did the same in 1927, while still a territory, Small Arms Act, Act 206, § 9, 1927 Haw. Laws 209, 211, as did the Congress for the District of Columbia in 1932, *see* Act of July 8, 1932, ch. 465, § 8, 47 Stat. 650, 652.

In sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the Nation by population. [*] Therefore, we presume the District's basic registration requirement, D.C.Code § 7–2502.01(a), including the submission of certain information, § 7–2502.03(b), does not impinge upon the right protected by the Second Amendment. Further, we find no basis in either the historical record or the record of this case to rebut that presumption. Indeed, basic registration requirements are self-**\*\*325  \*1255** evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous. *Cf. Rosario v. Rockefeller,* 410 U.S. 752, 754–58, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (law "requir[ing] a voter to enroll in the party of his choice at least 30 days before the general election in November in order to vote in the next subsequent party primary" does not violate First and Fourteenth Amendments because "if [the petitioners'] plight [could] be characterized as disenfranchisement at all, it was not caused by [the law], but by their own failure to take timely steps to effect their enrollment"); *id.* at 760, 93 S.Ct. 1245 ("the State is certainly justified in imposing some reasonable cutoff point for registration or party enrollment, which citizens must meet in order to participate in the next election"); *Justice v. Town of Cicero,* 577 F.3d 768, 773–74 (7th Cir.2009) ("ordinance requiring the registration of all firearms ... appears to be consistent with the ruling in *Heller* "). These early registration requirements, however, applied with only a few exceptions solely to handguns—that is, pistols

and revolvers—and not to long guns. Consequently, we hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic.

[*]  Today seven states require registration of some or all firearms, including Hawaii, Haw.Rev.Stat. § 134–3(a), (b), (e) (registration of all firearms); California, Cal.Penal Code § 11106(c) (registration for sales of handguns); Michigan, Mich. Comp. Laws § 28.422(5) (purchaser must provide information to obtain "license" for each pistol); New Jersey, N.J.Rev.Stat. 2C:58–12 (registration of assault firearms); Louisiana, La.Rev.Stat. Ann. § 40:1783 (registration of firearms); Maryland, Md.Code Ann., Crim. Law § 4–303 (registration of pre-ban assault pistols); and Connecticut, Conn. Gen.Stat. § 53–202d(a) (registration of pre-ban assault weapons); as do some cities and counties, including Chicago, Municipal Code § 8–20–140 *et seq.* (registration of all firearms); New York City, Admin. Code, § 10–304(a), (f) (registration of rifles and shotguns); Las Vegas, Mun. Code § 10.66.140 (registration of handguns); Omaha, Mun. Code § 20–251 (registration of "any concealable firearm"); Cleveland, Offenses & Bus. Activities Code §§ 674.02, 674.05 (registration card required for each handgun) (but preempted by Ohio Rev.Code Ann. § 9.68(A)); and Clark County, Nevada, Code § 12.04.110 (registration of handguns). Moreover, several states require sellers to report to law enforcement information about firearm sales identifying the purchaser and the firearm. *See* Legal Cmty. Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Guns Laws,* 253 (Feb. 2008), http://www.lcav.org/publications-briefs/reports_analyses/RegGuns.entire.report.pdf (identifying ten states).

### ii. Novel registration requirements

Several other of the District's registration requirements are not longstanding, including the ballistics-identification provision, D.C.Code § 7–2502.03(d), the one–pistol–per–30–days rule, § 7–2502.03(e), and the requirements that applicants appear in person, § 7–2502.04(c), and re-register each firearm after three years, § 7–2502.07a(a)–(c). Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant demonstrate knowledge about firearms, § 7–2502.03(a)(10), be fingerprinted and photographed, § 7–2502.04(a)–(b), take a firearms training

or safety course, § 7–2502.03(a)(13)(A), meet a vision requirement, § 7–2502.03(a)(11), and submit to a background check every six years, § 7–2502.07a(d). [*]

[*] Although some types of licensure have been required by some states since the early 20th century, *see, e.g.,* Act of Apr. 6, 1909, ch. 114, § 3, 1909 N.H. Laws 451, 451–52 (license "to carry a loaded pistol or revolver"); Small Arms Act, Act 206, §§ 5, 7, 1927 Haw. Laws 209, 209–11 (license to carry a pistol or revolver outside the home), the District's particular requirements are novel, not longstanding.

The requirements that are not longstanding, which include, in addition to those listed in the prior paragraph, *all* the requirements as applied to long guns, also affect the Second Amendment right because they are not de minimis. [**] All of these requirements, such as the mandatory five hours of firearm training and instruction, § 7–2502.03(a)(13)(A), make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the "core lawful purpose" protected by the Second Amendment, *Heller,* 554 U.S. at 630, 128 S.Ct. 2783. Because they impinge upon that right, we must determine whether these requirements are **326 *1256 constitutional. [*] In order to do that, however, we must first determine the degree of scrutiny to which they are appropriately subject.

[**] The requirement of basic registration as applied to long guns may also be de minimis. For now, however, we assume this requirement, too, impinges upon the Second Amendment right because, as we discuss below, the record is devoid of information concerning the application of registration requirements to long guns. On remand and with the benefit of additional evidence, the district court will be better able to address this question in the first instance.

[*] We note that some of the plaintiffs' arguments— in particular with respect to the provisions requiring registrants to demonstrate knowledge about firearms, meet a vision standard, and take a training course—are so cursory we might, in other circumstances, consider them forfeit. *See United States v. Law,* 528 F.3d 888, 908 n. 11 (D.C.Cir.2008) (appellant's argument forfeited "because he failed to develop it"). As we will in any event be remanding other registration requirements to the district court, however, *see* Part II.B.3.c, we see no reason to foreclose these particular plaintiffs from fleshing out their arguments as well as supplementing the record, if they can.

### b. Intermediate scrutiny is appropriate

The plaintiffs argue strict scrutiny is the appropriate standard of review because, in holding the Fourteenth Amendment made the Second Amendment applicable to the States, the Court in *McDonald* described the right "to keep and bear arms [as] among those fundamental rights necessary to our system of ordered liberty," 130 S.Ct. at 3042. The District responds that strict scrutiny would be inappropriate because, among other reasons, the right to keep and carry arms has always been heavily regulated; it argues we should adopt a "reasonable-regulation test." The plaintiffs, in turn, contend *Heller* forecloses a "reasonableness" test.

*Heller* clearly does reject any kind of "rational basis" or reasonableness test, *see* 554 U.S. at 628 n. 27, 128 S.Ct. 2783, but it leaves open the question what level of scrutiny we are to apply to laws regulating firearms. True, the Supreme Court often applies strict scrutiny to legislation that impinges upon a fundamental right. *See, e.g., Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ( "classifications affecting fundamental rights are given the most exacting scrutiny" (citation omitted)). In applying strict scrutiny, the Court requires the Government to prove its law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC,* 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (internal quotation marks omitted). The Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (applying intermediate scrutiny to restrictions on "time, place, or manner of protected speech"); *Marzzarella,* 614 F.3d at 96 ("Strict scrutiny does not apply automatically any time an enumerated right is involved"); *Chester,* 628 F.3d at 682 ("We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights"); Adam Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683, 697–98, 700 (2007) ("mere fact of 'fundamentality' does not answer the question of what would be the appropriate standard of review for the right to bear arms" as "many of the individual rights in the Bill of Rights do not trigger strict scrutiny, including many that are incorporated," and "[e]ven among those incorporated rights that do prompt strict scrutiny, such as the freedom of speech and of religion, strict scrutiny is only occasionally applied").

*Cf. Mills v. Habluetzel,* 456 U.S. 91, 98–99, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) (disabilities attendant to illegitimacy are constitutional "to the extent they are substantially related to a legitimate state interest"); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) ( "classifications by gender must serve important governmental **\*\*327  \*1257** objectives and must be substantially related to achievement of those objectives").

As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Chester,* 628 F.3d at 682; *see also Turner Broad. Sys., Inc. v. FCC (Turner I),* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ( "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue" (citation omitted)); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) ("We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."); Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence,* 56 UCLA L. REV. 1343, 1376 (2009) ("The case law dealing with free speech and the free exercise of religion provides a particularly good analogue" for Second Amendment). That is, a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify. *See Turner I,* 512 U.S. at 661, 114 S.Ct. 2445 ("must-carry provisions do not pose such inherent dangers to free expression ... as to justify application of the most exacting level of First Amendment scrutiny"; rather, "the appropriate standard ... is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech"); *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ("commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values" (internal quotation marks omitted)); *Buckley v. Valeo,* 424 U.S. 1, 44–45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ( "expenditure limitations" are subject to "exacting scrutiny

applicable to limitations on core First Amendment rights of political expression" because they impose a "great[ ] burden on basic freedoms"); *Ezell,* 651 F.3d at 703 (level of scrutiny "will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right"); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L. Rev. 1443, 1471 (2009) ("Ballot access regulations are ... subject to strict scrutiny if they 'impose a severe burden on associational rights,' but to a much weaker level of scrutiny if they 'impose[ ] only modest burdens' " (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 128 S.Ct. 1184, 1191–92, 170 L.Ed.2d 151 (2008))); Winkler, *supra,* at 698 ("Strict scrutiny ... does not apply to fundamental, preferred rights when the courts determine that the underlying burden is only incidental").

As between strict and intermediate scrutiny, we conclude the latter is the more appropriate standard for review of gun registration laws. As the Third Circuit reasoned in *Marzzarella* with regard to a prohibition on possession of a firearm with the serial numbers obliterated, registration requirements "do[ ] not severely limit the possession of firearms." 614 F.3d at 97. **\*\*328  \*1258** Indeed, none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose.

### c. Intermediate scrutiny requires remand

As for the novel registration requirements, to pass muster under intermediate scrutiny the District must show they are "substantially related to an important governmental objective." *Clark,* 486 U.S. at 461, 108 S.Ct. 1910; *see also United States v. Williams,* 616 F.3d 685, 692–94 (7th Cir.2010) (prohibition of firearm possession by felons survives intermediate scrutiny). That is, the District must establish a tight "fit" between the registration requirements and an important or substantial governmental interest, a fit "that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." *Fox,* 492 U.S. at 480, 109 S.Ct. 3028; *see also Ward,* 491 U.S. at 782–83, 109 S.Ct. 2746 ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve

Heller v. District of Columbia, 670 F.3d 1244 (2011)

399 U.S.App.D.C. 314

that interest"). We think the District has advanced, albeit incompletely—almost cursorily—articulated, two important governmental interests it may have in the registration requirements, *viz.,* to protect police officers and to aid in crime control. *Cf. United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("the Government's general interest in preventing crime is compelling"). The Council Committee on Public Safety explained: "Registration is critical because it ... allows officers to determine in advance whether individuals involved in a call may have firearms ... [and] assists law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class." [*] Report on Bill 17–843, at 3–4 (Nov. 25, 2008).

[*] On remand, the District will have an opportunity to explain in greater detail how these governmental interests are served by the novel registration requirements. The Committee also thought registration useful because it "gives law enforcement essential information about firearm ownership, ... permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons." Report on Bill 17–843, at 3–4 (Nov. 25, 2008). These rationales are circular, however, and do not on their own establish either an important interest of the Government or a substantial relationship between the registration of firearms and an important interest.

We cannot conclude, however, that the novel registration requirements—or any registration requirement as applied to long guns—survive intermediate scrutiny based upon the record as it stands because the District has not demonstrated a close fit between those requirements and its governmental interests. In support of the registration requirements, the District relies upon the Committee Report on the FRA, along with testimony and written statements submitted to the Committee at public hearings. Even so, the record is inadequate for us confidently to hold the registration requirements are narrowly tailored.

For example, the Committee Report asserts "studies show" that "laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states," and that "handguns sold in multiple sales to the **329 *1259 same individual purchaser are frequently used in crime." *Id.* at 10. The Report neither identifies the studies relied upon nor claims those studies showed the laws achieved their

purpose, nor in any other way attempts to justify requiring a person who registered a pistol to wait 30 days to register another one. The record does include testimony that offers cursory rationales for some other requirements, such as safety training and demonstrating knowledge of gun laws, *see, e.g.,* Testimony of Cathy L. Lanier, Chief of Police, at 2 (Oct. 1, 2008), but the District fails to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked (perhaps because it was relying upon the asserted interests we have discounted as circular).

Although we do "accord substantial deference to the predictive judgments" of the legislature, *Turner Broad. Sys., Inc. v. FCC (Turner II),* 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (quoting *Turner I,* 512 U.S. at 665, 114 S.Ct. 2445) (internal quotation marks omitted), the District is not thereby "insulated from meaningful judicial review," *Turner I,* 512 U.S. at 666, 114 S.Ct. 2445 (controlling opinion of Kennedy, J.); *see also City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion) (citing *Turner I* and "acknowledg[ing] that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems"). Rather, we must "assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner II,* 520 U.S. at 195, 117 S.Ct. 1174 (quoting *Turner I,* 512 U.S. at 666, 114 S.Ct. 2445) (internal quotation marks omitted). Therefore, the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments. On the present record, we conclude the District has not supplied evidence adequate to show a substantial relationship between any of the novel registration requirements and an important governmental interest.

Nor, however, do the plaintiffs present more meaningful contrary evidence concerning handguns, and neither the District nor the plaintiffs present any evidence at all concerning application of the registration requirements to long guns. The parties' mutual failure in their briefs to distinguish between handguns and long guns points up a significant deficiency in the present record. [*] The Committee Report implicitly acknowledged the distinction between handguns and long guns only back-handedly, quoting *Heller* to emphasize specifically "the problem of handgun violence in this country" before discussing the proposed FRA. Report on Bill 17–843, at 3 (Nov. 25, 2008). Handguns indeed

appear to have been the exclusive subject of the Committee's concern. Nowhere in the Report is there even a single reference to the need for registration of rifles or shotguns. For all the legislative record and the record in this case reveal, the provisions of the FRA that deal specifically with registration of long guns might have been written in invisible ink.

> \* While the Court in *Heller* observed that the handgun is "the quintessential self-defense weapon," 554 U.S. at 629, 128 S.Ct. 2783, a rifle or shotgun is the firearm of choice for hunting, which activity *Heller* recognized as providing one basis for the right to keep and bear arms, albeit not the central one, *id.* at 599, 128 S.Ct. 2783.

In the light of these evidentiary deficiencies and "the importance of the issues" at stake in this case, taking our cue from the Supreme Court in *Turner I,* we **\*\*330 \*1260** believe the parties should have an opportunity "to develop a more thorough factual record." 512 U.S. at 664–68, 114 S.Ct. 2445 (controlling opinion of Kennedy, J.). In *Turner I,* the Court had determined intermediate scrutiny was appropriate for the First Amendment challenge at issue. "On the state of the record developed [that] far," however, the Government was unable to show the law was narrowly tailored. *Id.* at 665, 114 S.Ct. 2445. Rather than invalidate a legislative judgment based upon that shortcoming, the Court remanded the case for development of "a more thorough factual record." *Id.* at 668, 114 S.Ct. 2445. We follow suit by remanding the novel registration requirements, and all registration requirements as applied to long guns, to the district court for further evidentiary proceedings.

### 4. Assault Weapons and Large–Capacity Magazines

Because the plaintiffs fail to present an argument in their briefs questioning the constitutionality of the ban on semi-automatic pistols and shotguns, *see* page 1249 footnote \* above, we construe the plaintiffs' challenge to the ban on assault weapons as going only to the prohibition of certain semi-automatic rifles. We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity. \* For the court to determine whether these prohibitions are constitutional, therefore, we first must ask whether they impinge upon the right protected by the Second Amendment. That is, prohibiting certain arms might not meaningfully affect "individual self-defense, [which] is 'the *central component* ' of the Second Amendment right." *McDonald,* 130 S.Ct. at 3036, 130 S.Ct. 3020 (quoting *Heller,* 554 U.S. at 599, 128 S.Ct. 2783). Of course, the Court also

said the Second Amendment protects the right to keep and bear arms for other "lawful purposes," such as hunting, but self-defense is the "core lawful purpose" protected, *Heller,* 554 U.S. at 630, 128 S.Ct. 2783.

> \* We know of only two exceptions: the Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652, in which the Congress banned in D.C. "any firearm which shoots ... semi-automatically more than twelve shots without reloading," and the Act of June 2, 1927, No. 372, § 3, 1927 Mich. Laws 887, 888, which prohibited the possession of any "firearm which can be fired more than sixteen times without reloading."

The Court in *Heller,* as mentioned above at page 1252, recognized yet another "limitation on the right to keep and carry arms," namely that the "sorts of weapons protected" are those " 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624, 627, 128 S.Ct. 2783. The Court found this limitation "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 627, 128 S.Ct. 2783. Because the prohibitions at issue, unlike the registration requirements, apply only to particular classes of weapons, we must also ask whether the prohibited weapons are "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, 128 S.Ct. 2783; if not, then they are not the sorts of "Arms" protected by the Second Amendment.

### a. Do the prohibitions impinge upon the Second Amendment right?

The plaintiffs contend semi-automatic rifles, in particular the AR variants, are commonly possessed for self-protection in the home as well as for sport. They also argue magazines holding more than ten rounds are commonly possessed for self-defense and for other lawful purposes and that the prohibition of such magazines **\*\*331 \*1261** would impose a burden upon them. Specifically, they point out that without a large-capacity magazine it would be necessary, in a stressful situation, to pause in order to reload the firearm.

The District, by contrast, argues neither assault weapons nor weapons with large-capacity magazines are among the "Arms" protected by the Second Amendment because they are both "dangerous and unusual," *Heller,* 554 U.S. at 627, 128 S.Ct. 2783 (internal quotation marks omitted), and because prohibiting them minimally burdens the plaintiffs; hence the District maintains the bans are constitutional. The

399 U.S.App.D.C. 314

Committee on Public Safety received evidence that assault weapons are not useful for the purposes of sporting or self-defense, but rather are "military-style" weapons designed for offensive use. *See generally* Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence (Oct. 1, 2008). The Committee concluded assault weapons "have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations." Report on Bill 17–843, at 7 (Nov. 25, 2008).

The District likewise contends magazines holding more than ten rounds are disproportionately involved in the murder of law enforcement officers and in mass shootings, and have little value for self-defense or sport. It cites the Siebel testimony, which relies upon a report of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) stating that semi-automatic rifles with large-capacity magazines are not suitable for sporting purposes. The District also reasons that the usefulness of large-capacity magazines for self-defense in rare circumstances does not mean the burden imposed upon the plaintiffs is more than minimal.

We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in "common use," as the plaintiffs contend. Approximately 1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market. As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten.

Nevertheless, based upon the record as it stands, we cannot be certain whether these weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions of certain semi-automatic rifles and magazines holding more than ten rounds meaningfully affect the right to keep and bear arms. We need not resolve that question, however, because even assuming they do impinge upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.

b. Intermediate scrutiny is appropriate

As we did in evaluating the constitutionality of certain of the registration requirements, we determine the appropriate standard of review by assessing how severely the prohibitions burden the Second Amendment right. Unlike the law held unconstitutional in *Heller,* the laws at issue here do not prohibit the possession of "the **\*\*332 \*1262** quintessential self-defense weapon," to wit, the handgun. 554 U.S. at 629, 128 S.Ct. 2783. Nor does the ban on certain semi-automatic rifles prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun. *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self–Defense with a Gun,* 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun); Dep't of Treasury, *Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles* 38 (1998) (semi-automatic assault rifles studied are "not generally recognized as particularly suitable for or readily adaptable to sporting purposes"). Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right. As the District points out, the plaintiffs present hardly any evidence that semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport. *Cf.* Kleck & Gertz, *supra,* at 177 (finding that of 340,000 to 400,000 instances of defensive gun use in which the defenders believed the use of a gun had saved a life, 240,000 to 300,000 involved handguns). Accordingly, we believe intermediate rather than strict scrutiny is the appropriate standard of review.

In this we agree with the reasoning of the Third Circuit in *Marzzarella.* The court there applied intermediate scrutiny to the prohibition of unmarked firearms in part because it thought the ban was similar to a regulation "of the manner in which ... speech takes place," a type of regulation subject to intermediate scrutiny "under the time, place, and manner doctrine" of the First Amendment. 614 F.3d at 97. Notably, because the prohibition left a person "free to possess any otherwise lawful firearm," the court reasoned it was "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights." *Id.* Here, too, the prohibition

*Heller v. District of Columbia*, 670 F.3d 1244 (2011)

399 U.S.App.D.C. 314

of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves. *See* Volokh, *supra*, at 1471 ("where content-neutral speech restrictions are involved, restrictions that impose severe burdens (because they don't leave open ample alternative channels) must be judged under strict scrutiny, but restrictions that impose only modest burdens (because they do leave open ample alternative channels) are judged under a mild form of intermediate scrutiny").

c. The prohibitions survive intermediate scrutiny

Recall that when subject to intermediate scrutiny the Government has the burden of showing there is a substantial relationship or reasonable "fit" between, on the one hand, the prohibition on assault weapons and magazines holding more than ten rounds and, on the other, its important interests in protecting police officers and controlling crime. The record evidence substantiates that the District's prohibition is substantially related to those ends.

The Committee on Public Safety relied upon a report by the ATF, which described assault weapons as creating "mass produced mayhem." *Assault Weapons Profile* 19 (1994). This description is elaborated in the Siebel testimony for the Brady Center: "the military features of semi-automatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly" and "[p]istol **\*333** **\*1263** grips on assault rifles ... help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position." The same source also suggests assault weapons are preferred by criminals and place law enforcement officers "at particular risk ... because of their high firepower," as does the ATF, *see* Dep't of Treasury, *Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles* 34–35, 38 (1998). *See also* Christopher S. Koper et al., U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003,* at 51, 87 (2004) (assault weapons "account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful," and "criminal use of [assault weapons] ... declined after" the federal assault weapons ban enacted in 1994 "independently of trends in gun crime"); *id.* at 11 ("AR–15 type rifles are civilian weapons patterned after the U.S. military's M–16 rifle and were the

assault rifles most commonly used in crime before the ban" in federal law from 1994 to 2004).

*Heller* suggests "M–16 rifles and the like" may be banned because they are "dangerous and unusual," *see* 554 U.S. at 627, 128 S.Ct. 2783. The Court had previously described the "AR–15" as "the civilian version of the military's M–16 rifle." *Staples v. United States,* 511 U.S. 600, 603, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Although semi-automatic firearms, unlike automatic M–16s, fire "only one shot with each pull of the trigger," *id.* at 602 n. 1, 114 S.Ct. 1793, semi-automatics still fire almost as rapidly as automatics. *See* Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, at 1 (Oct. 1, 2008) ("30–round magazine" of UZI "was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semi-automatic"). Indeed, it is difficult to draw meaningful distinctions between the AR–15 and the M–16. *See Staples,* 511 U.S. at 603, 114 S.Ct. 1793 ("Many M–16 parts are interchangeable with those in the AR–15 and can be used to convert the AR–15 into an automatic weapon"); Koper, *supra,* at 4 (AR–15 and other federally banned assault weapons "are civilian copies of military weapons and accept ammunition magazines made for those military weapons"). In short, the evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia. *See* Comm. on Pub. Safety, Report on Bill 17–593, at 4 (Nov. 25, 2008) ("The District shares the problem of gun violence with other dense, urban jurisdictions").

The record also supports the limitation on magazine capacity to ten rounds. The Committee relied upon Siebel's testimony that "[t]he threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines" because, "[b]y permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters." *See also* Koper, *supra,* at 87 ("guns used in shootings are 17% to 26% more likely to have [magazines holding more than ten rounds] than guns used in gunfire cases resulting in no wounded victims"); *id.* at 97 ("studies ... suggest that attacks with semi-automatics—including [assault weapons] and other semi-automatics with [magazines holding more than ten rounds] —result in more shots fired, persons wounded, and wounds per victim than do other gun attacks"). The Siebel testimony moreover supports the District's claim that high-capacity magazines are dangerous in self-defense situations because " the tendency **\*334** **\*1264** is for defenders to keep

Case 2:19-cv-00037-JNP Document 59-32 Filed 11/30/22 PageID.5083 Page 128 of 208
*Heller v. District of Columbia, 670 F.3d 1244 (2011)*
399 U.S.App.D.C. 314

firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." Moreover, the Chief of Police testified the "2 or 3 second pause" during which a criminal reloads his firearm "can be of critical benefit to law enforcement." Overall the evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers, which supports the District's claim that a ban on such magazines is likely to promote its important governmental interests.

We conclude the District has carried its burden of showing a substantial relationship between the prohibition of both semi-automatic rifles and magazines holding more than ten rounds and the objectives of protecting police officers and controlling crime. Accordingly, the bans do not violate the plaintiffs' constitutional right to keep and bear arms.

### III. Conclusion

For the reasons stated above, we affirm the judgment of the district court with respect, first, to the requirement of mere registration as applied to handguns and expressed in D.C.Code §§ 7–2502.01(a) and 7–2502.03(b), and second, to the ban on "assault weapons" and large-capacity magazines, as they are defined in §§ 7–2502.02(a)(6), 7–2501.01(3A)(A)(i)(I), (IV), and 7–2506.01(b). With respect to the registration requirements in §§ 7–2502.03(a)(10), 7–2502.03(a)(11), 7–2502.03(a)(13)(A), 7–2502.03(d), 7–2502.03(e), 7–2502.04, and 7–2502.07a, and all the registration requirements (including §§ 7–2502.01(a) and 7–2502.03(b)) as applied to long guns, *see* Part II.B.3.c, the judgment is vacated and this matter is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*

### Appendix: Regarding the Dissent

Our colleague has issued a lengthy dissenting opinion explaining why he would strike down both the District's registration requirements and its ban on semi-automatic rifles. We respond to his main arguments below.

### A. Interpreting *Heller* and *McDonald*

A substantial portion of the dissent is devoted to arguing *Heller* and *McDonald* preclude the application of heightened (intermediate, or for that matter, strict) scrutiny in all Second

Amendment cases. The dissent reasons that *Heller* rejected balancing tests and that heightened scrutiny is a type of balancing test. As we read *Heller,* the Court rejected only Justice Breyer's proposed "interest-balancing" inquiry, which would have had the Court ask whether the challenged statute "burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." 554 U.S. at 689–90, 128 S.Ct. 2783 (Breyer J., dissenting). That is, Justice Breyer, rather than ask merely whether the Government is promoting an important interest by way of a narrowly tailored means, as we do here, would have had courts in Second Amendment cases decide whether the challenged statute "imposes burdens that, when viewed in light of the statute's legitimate objectives, are disproportionate." *Id.* at 693, 128 S.Ct. 2783. Thus, although Justice Breyer would have had us assess whether the District's handgun ban "further[s] the sort of life-preserving and public-safety interests that the Court has called 'compelling,' " *id.* at 705, 128 S.Ct. 2783 (citation omitted), the key to his "interest-balancing" approach was "proportionality"; that is, he would have had us weigh this governmental interest against "the extent to which the District's law **335 *1265 burdens the interests that the Second Amendment seeks to protect," *id.* at 706, 128 S.Ct. 2783.

Our dissenting colleague asserts (at 1282) heightened scrutiny is also "a form of interest balancing" and maintains that strict and intermediate scrutiny "always involve at least some assessment of whether the law in question is sufficiently important to justify infringement on an individual constitutional right." Although, as he points out, the Supreme Court has in a few opinions applying heightened scrutiny —out of scores if not hundreds of such opinions—used the word "balance," heightened scrutiny is clearly not the "interest-balancing inquiry" proposed by Justice Breyer and rejected by the Court in *Heller.* The Court there said, Justice Breyer's proposal did not correspond to any of "the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis)," 554 U.S. at 634, 128 S.Ct. 2783, but was rather "a judge-empowering 'interest-balancing inquiry' " that would have a court weigh the asserted governmental interests against the burden the Government would place upon exercise of the Second Amendment right, a balancing that is not part of either strict or intermediate scrutiny.

The dissent further contends *McDonald* confirms the Supreme Court's rejection of heightened scrutiny in Second Amendment cases because a plurality of the Court there

said "Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." 130 S.Ct. at 3050. That observation was clearly and specifically directed to Justice Breyer's interest-balancing inquiry, as the very next sentence shows: "As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *Id.* Moreover, strict and intermediate scrutiny do not, as the dissent asserts (at 1278), "obviously require assessment of the 'costs and benefits' of government regulations." Rather, they require an assessment of whether a particular law will serve an important or compelling governmental interest; that is not a comparative judgment.

If the Supreme Court truly intended to rule out any form of heightened scrutiny for all Second Amendment cases, then it surely would have said at least something to that effect. *Cf. Heller,* 554 U.S. at 628 n. 27, 128 S.Ct. 2783 (expressly rejecting rational basis review). The Court did not say anything of the sort; the plaintiffs in this case do not suggest it did; and the idea that *Heller* precludes heightened scrutiny has eluded every circuit to have addressed that question since *Heller* was issued. *See* First Circuit: *United States v. Booker,* 644 F.3d 12, 25 (2011) (requiring "a substantial relationship between the restriction and an important governmental objective"); Third Circuit: *Marzzarella,* 614 F.3d at 97 (applying intermediate scrutiny); Fourth Circuit: *United States v. Masciandaro,* 638 F.3d 458, 471 (2011) (same); *Chester,* 628 F.3d at 683 (same); *id.* at 690 (Davis, J., concurring) (same); Seventh Circuit: *Ezell,* 651 F.3d at 709 (applying "more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny' "); *id.* at 712–14 (Rovner J., concurring) (endorsing intermediate scrutiny); *Williams,* 616 F.3d at 692–93 (applying intermediate scrutiny); *United States v. Skoien,* 614 F.3d 638, 641–42 (2010) (en banc) (upholding law upon assumption intermediate scrutiny applies); Ninth Circuit: *Nordyke,* 644 F.3d at 786 n. 9 (reserving "precisely what type of heightened scrutiny applies to laws that substantially **336 *1266 burden Second Amendment rights"); *id.* at 795 (Gould J., concurring in part, "would subject to heightened scrutiny only arms regulations falling within the core purposes of the Second Amendment" and " would subject incidental burdens on the Second Amendment right ... to reasonableness review"); Tenth Circuit: *Reese,* 627 F.3d at 802 (applying intermediate scrutiny).

The dissent (at 1284–85) takes us to task for suggesting a restriction on a core enumerated constitutional right can be subjected to intermediate scrutiny. This assertion, true or false, is simply misplaced; we apply intermediate scrutiny precisely because the District's laws do not affect the core right protected by the Second Amendment. *See supra* at 1256–57, 1261–62.

Unlike our dissenting colleague, we read *Heller* straightforwardly: The Supreme Court there left open and untouched even by implication the issue presented in this case. The Court held the ban on handguns unconstitutional without at the same time adopting any particular level of scrutiny for Second Amendment cases because it concluded that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* at 628–29, 128 S.Ct. 2783 (internal quotation marks and citation omitted); *McDonald,* 130 S.Ct. at 3036 (quoting *Heller,* 554 U.S. at 628–30, 128 S.Ct. 2783). Nothing in *Heller* suggests a case involving a restriction significantly less severe than the total prohibition of handguns at issue there could or should be resolved without reference to one or another of the familiar constitutional "standards of scrutiny." On the contrary, the Supreme Court was explicit in cautioning that because *Heller* was its "first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field." *Heller,* 554 U.S. at 635, 128 S.Ct. 2783; *see also, e.g., Ezell,* 651 F.3d at 703 (with the exception of "broadly prohibitory laws restricting the core Second Amendment right," courts are "left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights"); *Chester,* 628 F.3d at 682 ("*Heller* left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to note that rational-basis review would not apply in this context"); Volokh, *supra,* at 1456 ("The Court [in *Heller* ] did not discuss what analysis would be proper for less 'severe' restrictions, likely because it had no occasion to").

Having rejected the possibility of heightened scrutiny, the dissent (at 1285) goes on to find in *Heller* this proposition: "Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right." We do not see this purportedly "up-front" test "announced"

anywhere in the Court's opinion. The Court in *Heller* said certain "longstanding" regulations are "presumptively lawful," 554 U.S. at 626–27 & n. 26, 128 S.Ct. 2783, but it nowhere suggested, nor does it follow logically, that a regulation must be longstanding or "rooted in text, history, and tradition" in order to be constitutional. As we have said, the Court struck down the handgun ban because it so severely restricted the core Second Amendment right of self-defense in the home that it "would fail constitutional **\*\*337 \*1267** muster" under any standard of scrutiny. Likewise, the Court invalidated the District's requirement that handguns "in the home be rendered and kept inoperable" because that requirement "makes it impossible for citizens to use them for the core lawful purpose of self-defense." *Id.* at 630, 128 S.Ct. 2783. The Court in *Heller* did consider whether there were historical analogues to the handgun ban, but only to note, primarily in response to Justice Breyer's dissent, that because earlier laws were far less restrictive, they did not support the constitutionality of a ban on handguns. *See id.* at 632, 128 S.Ct. 2783 ("Nothing about [the] fire-safety laws" cited by Justice Breyer "undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns"); *id.* ("other founding-era laws" cited by Justice Breyer "provide no support for the severe restriction in the present case"). In any event, we think it clear *Heller* did not announce the "up-front" test applicable to all Second Amendment cases that our dissenting colleague goes to great lengths to "divine" from that opinion.

In sum, *Heller* explicitly leaves many questions unresolved and says nothing to cast doubt upon the propriety of the lower courts applying some level of heightened scrutiny in a Second Amendment challenge to a law significantly less restrictive than the outright ban on all handguns invalidated in that case. Although *Heller* renders longstanding regulations presumptively constitutional, it nowhere suggests a law must be longstanding or rooted in text, history, and tradition to be constitutional.

B. Registration Requirements

Our dissenting colleague contends (at 1294) the historical registration laws we cite do not support the District's basic registration requirement because to rely upon those laws as historical precedents "is to conduct the *Heller* analysis at an inappropriately high level of generality." In fact, however, the historical regulations and the District's basic registration requirement are not just generally alike, they are practically identical: They all require gun owners to give an agent of the Government basic information about themselves and their firearm.

In any event, we do not decide, but rather remand to the district court, the question whether the District's novel registration requirements and all its registration requirements as applied to long guns withstand intermediate scrutiny. *See supra* at 1260. Accordingly, those registration requirements will be deemed constitutional only if the District shows they serve its undoubtedly important governmental interests in preventing crimes and protecting police officers.

C. Assault Weapons

In arguing *Heller* requires holding unconstitutional the District's ban on certain semi-automatic rifles, the dissent relies heavily upon the idea that *Heller* held possession of semi-automatic handguns is "constitutionally protected." The Court's holding in *Heller* was in fact narrower, condemning as unconstitutional a prohibition of all handguns, that is, a ban on the "entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. 554 U.S. at 628, 128 S.Ct. 2783. A narrower prohibition, such as a ban on certain semi-automatic pistols, may also "fail constitutional muster," *id.,* but that question has not yet been decided by the Supreme Court. [*] Therefore, the dissent (at 1286) **\*\*338 \*1268** mischaracterizes the question before us as whether "the Second Amendment protects semi-automatic *handguns* but not semi-automatic *rifles*." The dissent at (1289 n. 16) insists it is "implausible" to read *Heller* as foreclosing every ban on every possible sub-class of handguns or, for that matter, a ban on a sub-class of rifles. *See Marzzarella,* 614 F.3d at 101 (upholding prohibition on possession of handguns with serial numbers obliterated); *cf.* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L. Rev. 375, 422 (2009) (*Heller* "avoided—perhaps in part because it had little cause to consider—categorization at the level of classification: that is, the creation of subcategories that may warrant only intermediate protection"). [**]

---

[*]     Indeed, as we noted in Part I, the present plaintiffs, whilst in the district court, separately and specifically challenged the ban on certain semi-automatic pistols.

*Heller v. District of Columbia*, 670 F.3d 1244 (2011)

399 U.S.App.D.C. 314

**

Moreover, despite the dissent's contrary assertion (at 1288), a number of states and municipalities, representing over one fourth of the Nation's population, ban semi-automatic rifles or assault weapons, and these bans are by no means "significantly narrower" than the District's ban. *See* N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10 (prohibiting possession, manufacture, disposal, and transport of assault weapons, including AR–15); Conn. Gen.Stat. §§ 53–202a, 53–202c (prohibiting possession of semi-automatic firearms, including AR–15); Cal.Penal Code §§ 12276–12282 (same); Haw.Rev.Stat. §§ 134–1, 134–4, 134–8 (banning assault pistols); Mass. Gen. Laws ch. 140, §§ 121–123 (banning assault weapons as defined in expired federal law); Md.Code, Criminal Law, §§ 4–301–4–306 (prohibiting assault pistols); N.J. Stat. Ann. §§ 2C:39–1(w), 2C:39–5 (prohibiting assault firearms, including AR–15); Legal Cmty. Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Guns Laws,* 25–26 (Feb. 2008), http:// www.lcav.org/publications-briefs/ reports_analyses/RegGuns.entire.report. pdf (Boston, Cleveland, Columbus, and New York City prohibit assault weapons, including semi-automatic rifles); Aurora, Ill., Code of Ordinances § 29–49 (prohibiting assault weapons, including AR–15); City Code of Buffalo N.Y. § 180–1 (prohibiting assault weapons, including assault rifles); Denver Colo. Mun. Code § 38–130 (same); City of Rochester Code § 47–5 (same). In fact, the District's prohibition is very similar to the nationwide ban on assault weapons that was in effect from 1994 to 2004. *See* 18 U.S.C. §§ 921(a)(30), 922(v)(1) (prohibiting possession of semi-automatic rifles and pistols, including AR–15).

The dissent, indulging us by assuming some level of heightened scrutiny applies, maintains (at 1288) "D.C. cannot show a compelling interest in banning semi-automatic rifles." Why not? "[B]ecause the necessary implication of the decision in *Heller* is that D.C. could not show a sufficiently compelling interest to justify its banning semi-automatic handguns." That conclusion, however, is neither to be found in nor inferred from *Heller.* As we explain above, the Court in *Heller* held the District's ban on all handguns would fail constitutional muster under any standard of scrutiny because the handgun is the "quintessential" self-defense weapon. *See* 554 U.S. at 629, 128 S.Ct. 2783 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to

lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the **339 *1269 police"). The same cannot be said of semi-automatic rifles.

Finally, in criticizing our application of intermediate scrutiny to the ban on assault weapons, our dissenting colleague says (at 1286, 1290) "it is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns" "because handguns can be concealed." It is not our place, however, to determine in the first instance whether banning semi-automatic rifles in particular would promote important law-enforcement objectives. Our role is narrower, *viz.,* to determine whether the District has presented evidence sufficient to "establish the reasonable fit we require" between the law at issue and an important or substantial governmental interest. *Fox,* 492 U.S. at 480, 109 S.Ct. 3028.

KAVANAUGH, Circuit Judge, dissenting:

The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller,* the Supreme Court held that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In *McDonald v. City of Chicago,* the Court added that the right to keep and bear arms is a "fundamental" constitutional right implicit in our scheme of ordered liberty and "deeply rooted in this Nation's history and tradition." —— U.S. ——, 130 S.Ct. 3020, 3036, 3042, 177 L.Ed.2d 894 (2010).

In *Heller,* the Court ruled that the District of Columbia's ban on the possession of handguns violated the Second Amendment. 554 U.S. at 635, 128 S.Ct. 2783. In the wake of *Heller,* the District of Columbia enacted a new gun law. As relevant here, D.C. bans possession of most semi-automatic rifles and requires registration of all guns possessed in the District of Columbia. *See* D.C.Code §§ 7–2501.01(3A)(A)(i), 7–2502.01–.10.

In this case, we are called upon to assess those provisions of D.C.'s law under *Heller.* In so doing, we are of course aware of the longstanding problem of gun violence in the District of Columbia. In part for that reason, *Heller* has engendered substantial controversy. *See, e.g.,* J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law,* 95 VA. L. REV. 253 (2009); Richard A. Posner, *In Defense of Looseness,* THE NEW REPUBLIC, Aug. 27, 2008, at 32.

As a lower court, however, it is not our role to re-litigate *Heller* or to bend it in any particular direction. Our sole job is to faithfully apply *Heller* and the approach it set forth for analyzing gun bans and regulations.

In my judgment, both D.C.'s ban on semi-automatic rifles and its gun registration requirement are unconstitutional under *Heller.*

In *Heller,* the Supreme Court held that handguns—the vast majority of which today are semi-automatic—are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles. Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use by law-abiding citizens for self-defense in the home, hunting, and other lawful uses. Moreover, semi-automatic *handguns* are used in connection with violent crimes far more than **340 *1270** semi-automatic *rifles* are. It follows from *Heller*'s protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected and that D.C.'s ban on them is unconstitutional. (By contrast, fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller.*) [1]

[1]    A semi-automatic gun "fires only one shot with each pull of the trigger" and "requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples v. United States,* 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). A fully automatic gun—also known as a machine gun—"fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.*

D.C.'s registration requirement, which is significantly more stringent than any other federal or state gun law in the United States, is likewise unconstitutional. *Heller* and later *McDonald* said that regulations on the sale, possession, or use of guns are permissible if they are within the class of traditional, "longstanding" gun regulations in the United States. Registration of all lawfully possessed guns— as distinct from licensing of gun owners or mandatory record-keeping by gun sellers—has not traditionally been required in the United States and even today remains highly unusual.

Under *Heller*'s history- and tradition-based test, D.C.'s registration requirement is therefore unconstitutional. [2]

[2]    Plaintiffs also challenge D.C.'s ban on magazines of more than 10 rounds. I would remand that issue for further factual development in the District Court. *See infra* note 20.

It bears emphasis that *Heller,* while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation. Indeed, *Heller* largely preserved the status quo of gun regulation in the United States. *Heller* established that traditional and common gun laws in the United States remain constitutionally permissible. The Supreme Court simply pushed back against an outlier local law—D.C.'s handgun ban —that went far beyond the traditional line of gun regulation. As *Heller* emphasized: "Few laws in the history of our Nation have come close to the severe restriction of the District's" law. 554 U.S. at 629, 128 S.Ct. 2783. [3]

[3]    In that sense, *Heller* was similar in its overarching practical and real-world ramifications to recent Supreme Court decisions such as *Brown v. Entertainment Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011); *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010); *Kennedy v. Louisiana,* 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); and *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Those decisions disapproved novel or uncommon state legislative efforts to regulate beyond traditional boundaries in areas that affected enumerated individual constitutional rights—California's law banning sale of violent video games, Florida's law permitting life without parole for certain juvenile crimes, Louisiana's law permitting the death penalty for certain rapes, and Colorado's law prohibiting gay people from receiving protection from discrimination. Because those laws were outliers, the decisions invalidating them did not cause major repercussions throughout the Nation. *Heller* was a decision in that same vein, in terms of its immediate practical effects in the United States. By contrast, of course, some Supreme Court decisions interpreting the Constitution's individual rights provisions not only are significant jurisprudentially but also have substantial practical impacts on common federal or state practices. *See, e.g., Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009); *United States v. Booker,* 543 U.S. 220, 125 S.Ct.

738, 160 L.Ed.2d 621 (2005). *Heller* was not a decision of that kind.

**\*1271 \*\*341** After *Heller,* however, D.C. seemed not to heed the Supreme Court's message. Instead, D.C. appeared to push the envelope again, with its new ban on semi-automatic rifles and its broad gun registration requirement. D.C.'s public safety motivation in enacting these laws is worthy of great respect. But the means D.C. has chosen are again constitutionally problematic. The D.C. gun provisions at issue here, like the ban at issue in *Heller,* are outliers that are not traditional or common in the United States. As with D.C.'s handgun ban, therefore, holding these D.C. laws unconstitutional would not lead to nationwide tumult. Rather, such a holding would maintain the balance historically and traditionally struck in the United States between public safety and the individual right to keep arms—a history and tradition that *Heller* affirmed and adopted as determining the scope of the Second Amendment right.

I

A key threshold question in this case concerns the constitutional test we should employ to assess the challenged provisions of the D.C. gun law. The *Heller* Court held that the Second Amendment guarantees an individual right to possess guns. But the Court emphasized that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller,* 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.*

In light of that limiting language in *Heller,* constitutional analysis of D.C.'s new law raises two main questions. Under *Heller,* what kinds of firearms may the government ban? And what kinds of regulations may the government impose on the sale, possession, or use of firearms?

Put in simple terms, the issue with respect to what test to apply to gun bans and regulations is this: Are gun bans and regulations to be analyzed based on the Second Amendment's text, history, and tradition (as well as by appropriate analogues thereto when dealing with modern weapons and new circumstances, *see infra* Part I.B)? Or may judges re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to

override the individual right? And if the latter, is the proper test strict scrutiny or intermediate scrutiny?

As I read *Heller,* the Supreme Court was not silent about the answers to those questions. Rather, the Court set forth fairly precise guidance to govern those issues going forward.

A

In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny. To be sure, the Court never said something as succinct as "Courts should not apply strict or intermediate scrutiny but should instead look to text, history, and tradition to define the scope of the right and assess gun bans and regulations." But that is the clear message I take away from the Court's holdings and reasoning in the two cases.

As to bans on categories of guns, the *Heller* Court stated that the government may ban classes of guns that have been banned in our "historical tradition"—namely, guns that are "dangerous and unusual" and thus are not "the sorts of lawful **\*\*342 \*1272** weapons that" citizens typically "possess [ ] at home." 554 U.S. at 627, 128 S.Ct. 2783. The Court said that "dangerous and unusual weapons" are equivalent to those weapons not "in common use," as the latter phrase was used in *United States v. Miller,* 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). *Heller,* 554 U.S. at 627, 128 S.Ct. 2783. Thus, the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" or automatic "M-16 rifles and the like." *Id.* at 625, 627, 128 S.Ct. 2783. That interpretation, the Court explained, "accords with the historical understanding of the scope of the right." *Id.* at 625, 128 S.Ct. 2783. "Constitutional rights," the Court said, "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35, 128 S.Ct. 2783. The scope of the right is thus determined by "historical justifications." *Id.* at 635, 128 S.Ct. 2783. And tradition (that is, post-ratification history) also matters because "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation." *Id.* at 605, 128 S.Ct. 2783 (emphasis omitted).

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Heller v. District of Columbia, 670 F.3d 1244 (2011)

399 U.S.App.D.C. 314

Because the D.C. law at issue in *Heller* banned handguns (including semi-automatic handguns), which have not traditionally been banned and are in common use by law-abiding citizens, the Court found that the D.C. ban on handgun possession violated the Second Amendment. Stressing the D.C. law's inconsistency with our "historical tradition," *id.* at 627, 128 S.Ct. 2783, the Court stated that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's" law, *id.* at 629, 128 S.Ct. 2783.

As to regulations on the sale, possession, or use of guns, *Heller* similarly said the government may continue to impose regulations that are traditional, "longstanding" regulations in the United States. *Id.* at 626–27, 128 S.Ct. 2783. In *McDonald,* the Court reiterated that "longstanding regulatory measures" are permissible. *McDonald v. City of Chicago,* ⎯⎯ U.S. ⎯⎯, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (controlling opinion of Alito, J.). Importantly, the *Heller* Court listed several examples of such longstanding (and therefore constitutionally permissible) regulations, such as laws against concealed carry and laws prohibiting possession of guns by felons. 554 U.S. at 626, 128 S.Ct. 2783. The Court stated that analysis of whether other gun regulations are permissible must be based on their "historical justifications." *Id.* at 635, 128 S.Ct. 2783. [4]

[4]     The Court in *Heller* stated as follows:

     Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

     We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were

those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 626–27, 128 S.Ct. 2783 (citations and footnote omitted). The Court in *McDonald* reiterated:

     As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting *amici* cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in *Heller....* We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

130 S.Ct. at 3047 (controlling opinion of Alito, J.) (quoting *Heller,* 554 U.S. at 626–27, 128 S.Ct. 2783).

In disapproving D.C.'s ban on handguns, in approving a ban on machine guns, and in approving longstanding regulations such as concealed-carry and felon-in-possession **343 *1273** laws, *Heller* established that the scope of the Second Amendment right—and thus the constitutionality of gun bans and regulations—is determined by reference to text, history, and tradition. As to the ban on handguns, for example, the Supreme Court in *Heller* never asked whether the law was narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in *Heller* and measured D.C.'s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use—and thus that D.C.'s handgun ban was unconstitutional.

Moreover, in order for the Court to prospectively approve the constitutionality of several kinds of gun laws—such as machine gun bans, concealed-carry laws, and felon-in-possession laws—the Court obviously had to employ *some* test. Yet the Court made no mention of strict or intermediate scrutiny when approving such laws. Rather, the test the Court relied on—as it indicated by using terms such as "historical tradition" and "longstanding" and "historical justifications"—was one of text, history, and tradition. *Id.* at 626–27, 635, 128 S.Ct. 2783; *see* Eugene

Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L. REV. 1443, 1463 (2009) ("Absent [from *Heller* ] is any inquiry into whether the law is necessary to serve a compelling government interest in preventing death and crime, though handgun ban proponents did indeed argue that such bans are necessary to serve those interests and that no less restrictive alternative would do the job."); Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L. REV. 375, 380 (2009) ("Rather than adopting one of the First Amendment's many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage."); *id.* at 405 (*Heller* "neither requires nor permits any balancing beyond that accomplished by the Framers themselves."). [5]

[5]    The Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered. *Cf.* Tr. of Oral Arg. at 44, *Heller,* 554 U.S. 570, 128 S.Ct. 2783 (No. 07–290) (Chief Justice Roberts: "Well, these various phrases under the different standards that are proposed, 'compelling interest,' 'significant interest,' 'narrowly tailored,' none of them appear in the Constitution .... I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up.").

**344    *1274   B

Before addressing the majority opinion's contrary analysis of *Heller* and *McDonald,* it is important to underscore two points regarding *Heller*'s focus on text, history, and tradition.

*First*, just because gun regulations are assessed by reference to history and tradition does not mean that governments lack flexibility or power to enact gun regulations. Indeed, governments appear to have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny. After all, history and tradition show that a variety of gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court said in *Heller.* [6] By contrast, if courts applied strict scrutiny, then presumably very few gun regulations would be upheld. Indeed, Justice Breyer made this point in his dissent in *Heller* when he noted that the majority opinion had listed certain permissible gun

regulations "whose constitutionality under a strict-scrutiny standard would be far from clear." 554 U.S. at 688, 128 S.Ct. 2783 (Breyer, J., dissenting). [7]

[6]    It is not uncommon for courts to look to post-ratification history and tradition to inform the interpretation of a constitutional provision. For example, when interpreting the scope of the President's Article II power, the Court has relied on such history and tradition. *See Dames & Moore v. Regan,* 453 U.S. 654, 679 n. 8, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). So, too, the Court looked to traditional practice when analyzing an Establishment Clause issue related to legislative prayer. *See Marsh v. Chambers,* 463 U.S. 783, 786–92, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). That said, post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text. The Court in *Marbury* found unconstitutional a law passed by the First Congress. *See Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803). The practice of separate but equal was inconsistent with and repugnant to the text and original meaning of the Equal Protection Clause. *See Brown v. Bd. of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880). The existence of post-ratification examples of congressional exclusion of elected members did not persuade the Court in *Powell v. McCormack*: "That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date." 395 U.S. 486, 546–47, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

[7]    The fact that fewer gun laws might pass muster under strict scrutiny than under a history- and tradition-based approach is no doubt why the plaintiffs in *Heller* and here have advocated strict scrutiny.

So the major difference between applying the *Heller* history- and tradition-based approach and applying one of the forms of scrutiny is not necessarily the number of gun regulations that will pass muster. Instead, it is that the *Heller* test will be more determinate and "much less subjective" because "it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald,* 130 S.Ct. at 3058 (Scalia, J., concurring).

*1275   **345   To be sure, analyzing the history and tradition of gun laws in the United States does not always yield easy answers. Justice Scalia, the author of the *Heller*

399 U.S.App.D.C. 314

majority opinion, thus acknowledged in his concurrence in *McDonald*: "No fundamental right—not even the First Amendment—is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character.... Historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it. I will stipulate to that." *Id.* at 3056–57. That said, the range of potential answers will be far more focused under an approach based on text, history, and tradition than under an interest-balancing test such as intermediate scrutiny. *See id.* at 3057 n. 9.

*Second*, when legislatures seek to address new weapons that have not traditionally existed or to impose new gun regulations because of conditions that have not traditionally existed, there obviously will not be a history or tradition of banning such weapons or imposing such regulations. That does not mean the Second Amendment does not apply to those weapons or in those circumstances. Nor does it mean that the government is powerless to address those new weapons or modern circumstances. Rather, in such cases, the proper interpretive approach is to reason by analogy from history and tradition. *See Parker v. District of Columbia,* 478 F.3d 370, 398 (D.C.Cir.2007) ("[J]ust as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a 'search,' the Second Amendment protects the possession of the *modern-day equivalents* of the colonial pistol.") (emphasis added). *aff'd sub nom. Heller,* 554 U.S. 570, 128 S.Ct. 2783; Tr. of Oral Arg. at 77, *Heller,* 554 U.S. 570, 128 S.Ct. 2783 (No. 07–290) (Chief Justice Roberts: "[Y]ou would define 'reasonable' in light of the restrictions that existed at the time the amendment was adopted.... [Y]ou can't take it into the marketplace was one restriction. So that would be—we are talking about lineal descendents of the arms but presumably there are lineal descendents of the restrictions as well."); *cf. Kyllo v. United States,* 533 U.S. 27, 31–35, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (applying traditional Fourth Amendment standards to novel thermal imaging technology); *California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (allowing government to view property from airplanes based on common-law principle that police could look at property when passing by homes on public thoroughfares).

The Constitution is an enduring document, and its principles were designed to, and do, apply to modern conditions and developments. The constitutional principles do not change (absent amendment), but the relevant principles must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers. To be sure, applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins. But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution.

C

The majority opinion here applies intermediate scrutiny and contends that intermediate **\*\*346 \*1276** scrutiny is consistent with *Heller* and *McDonald.* The majority opinion employs history and tradition only as a threshold screen to determine whether the law in question implicates the individual right; if so, the majority opinion then subjects the individual right to balancing under the intermediate scrutiny test. As explained above, I disagree with that approach. I read *Heller* and *McDonald* as setting forth a test based wholly on text, history, and tradition. Deeper examination of the two Supreme Court opinions—and, in particular, how the Court's opinions responded to the dissents in the two cases—buttresses my conclusion.

Turning first to *Heller*: The back and forth between the *Heller* majority opinion and Justice Breyer's dissent underscores that the proper Second Amendment test focuses on text, history, and tradition. In his dissent, Justice Breyer suggested that the Court should follow the lead of certain First Amendment cases, among others, that had applied a form of intermediate-scrutiny interest balancing:

The fact that important interests lie on both sides of the constitutional equation suggests that review of gun-control regulation is not a context in which a court should effectively presume either constitutionality (as in rational-basis review) or unconstitutionality (as in strict scrutiny). Rather, "where a law significantly implicates competing constitutionally protected interests in complex ways," the Court generally asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests. See *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 402 [120 S.Ct. 897, 145 L.Ed.2d 886] (2000) (Breyer, J., concurring)....

In particular this Court, in First Amendment cases applying intermediate scrutiny, has said that our "sole obligation" in reviewing a legislature's "predictive judgments" is "to assure that, in formulating its judgments," the legislature "has drawn reasonable inferences based on substantial evidence." *Turner,* 520 U.S., at 195 [117 S.Ct. 1174] (internal quotation marks omitted). And judges, looking at the evidence before us, should agree that the District legislature's predictive judgments satisfy that legal standard....

There is no cause here to depart from the standard set forth in *Turner,* for the District's decision represents the kind of empirically based judgment that legislatures, not courts, are best suited to make. See *Nixon,* 528 U.S., at 402 [120 S.Ct. 897] (Breyer, J., concurring)....

The upshot is that the District's objectives are compelling; its predictive judgments as to its law's tendency to achieve those objectives are adequately supported; the law does impose a burden upon any self-defense interest that the Amendment seeks to secure; and there is no clear less restrictive alternative.

*Heller,* 554 U.S. at 689–90, 704–05, 714, 128 S.Ct. 2783 (Breyer, J., dissenting).

Justice Breyer expressly rejected strict scrutiny and rational basis review. Instead, he explicitly referred to intermediate scrutiny and relied on cases such as *Turner Broadcasting* that had applied intermediate scrutiny. *See Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 189–225, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). And he discussed the strength of the government's interest and the fit between the law and those interests, as the Court does when applying heightened **347 *1277 scrutiny. It is thus evident that Justice Breyer's *Heller* dissent advocated a form of intermediate scrutiny.[8]

[8] The *Heller* majority stated that Justice Breyer was not proposing any of the traditional forms of scrutiny "*explicitly at least.*" 554 U.S. at 634, 128 S.Ct. 2783 (emphasis added). Justice Breyer ruled out strict scrutiny and rational basis review and relied heavily on *Turner Broadcasting,* which had applied a form of intermediate scrutiny. But he was not explicit about the label for his test, as the *Heller* majority opinion noted. In that regard, it bears mention that strict scrutiny and intermediate scrutiny can take on different forms in different contexts that are sometimes colloquially referred to as, for example, strict-scrutiny-light or intermediate-scrutiny-

plus or the like. How strong the government interest must be, how directly the law must advance that interest, how reasonable the alternatives must be—those questions are not always framed with precision in two clearly delineated categories, as opposed to points on a sliding scale of heightened scrutiny approaches. *See, e.g., Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) ("a contribution limit involving significant interference with associational rights could survive if the Government demonstrated that contribution regulation was closely drawn to match a sufficiently important interest") (citations and internal quotation marks omitted); *United States v. Virginia,* 518 U.S. 515, 531, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (referring to "skeptical scrutiny" and "heightened review" of gender-based law).

The Court responded to Justice Breyer by rejecting his "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller,* 554 U.S. at 634, 128 S.Ct. 2783 (quoting *id.* at 689–90, 128 S.Ct. 2783 (Breyer, J., dissenting)). The Court stated rather emphatically: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government —the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.*

In rejecting a judicial interest-balancing approach, the Court explained that the Second Amendment "is the very *product* of an interest balancing by the people" that judges should not "now conduct for them anew." *Id.* at 635, 128 S.Ct. 2783. The Court added that judges may not alter the scope of the Amendment because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35, 128 S.Ct. 2783. The Court emphasized that the scope of the right was determined by "historical justifications." *Id.* at 635, 128 S.Ct. 2783. And the Court stated that tradition (that is, post-ratification history) matters because "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation." *Id.* at 605, 128 S.Ct. 2783 (emphasis omitted).

*Heller v. District of Columbia,* 670 F.3d 1244 (2011)

399 U.S.App.D.C. 314

To be sure, the Court noted in passing that D.C.'s handgun ban would fail under any level of heightened scrutiny or review the Court applied. *Id.* at 628–29, 128 S.Ct. 2783. But that was more of a gilding-the-lily observation about the extreme nature of D.C.'s law—and appears to have been a pointed comment that the dissenters **\*348 \*1278** should have found D.C.'s law unconstitutional even under their own suggested balancing approach—than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment cases. We know as much because the Court expressly dismissed Justice Breyer's *Turner Broadcasting* intermediate scrutiny approach and went on to demonstrate how courts should consider Second Amendment bans and regulations—by analysis of text, history, and tradition. *Id.* at 626–27, 634–35, 114 S.Ct. 2445.

Is it possible, however, that the *Heller* Court was ruling out intermediate scrutiny but leaving open the possibility that strict scrutiny might apply? That seems highly unlikely, for reasons Justice Breyer himself pointed out in dissent:

> Respondent proposes that the Court adopt a "strict scrutiny" test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson,* 521 U.S. 74, 82 [117 S.Ct. 1925, 138 L.Ed.2d 285] (1997); see Brief for Respondent 54–62. But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales—whose constitutionality under a strict-scrutiny standard would be far from clear.

*Id.* at 688, 114 S.Ct. 2445 (Breyer, J., dissenting).

Justice Breyer thus perceived that the Court's history- and tradition-based approach would likely permit governments to enact *more* gun laws and regulations than a strict scrutiny approach would allow. History and tradition establish that several gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court determined in *Heller.* If courts applied strict scrutiny, however, very few gun regulations would presumably be constitutional.

Even more to the point, as Justice Breyer also noted, the Court in *Heller* affirmatively *approved* a slew of gun laws—

machine gun bans, concealed-carry laws, felon-in-possession laws, and the like—without analyzing them under strict scrutiny. The Court approved them based on a history- and tradition-based test, not strict scrutiny. Indeed, these laws might not have passed muster under a strict scrutiny analysis.

The Court's later decision in *McDonald* underscores that text, history, and tradition guide analysis of gun laws and regulations. There, the Court again precluded the use of balancing tests; furthermore, it expressly rejected judicial assessment of "the costs and benefits of firearms restrictions" and stated that courts applying the Second Amendment thus would not have to make "difficult empirical judgments" about the efficacy of particular gun regulations. 130 S.Ct. at 3050 (controlling opinion of Alito, J.).

That language from *McDonald* is critically important because strict and intermediate scrutiny obviously require assessment of the "costs and benefits" of government regulations and entail "difficult empirical judgments" about their efficacy—precisely what *McDonald* barred. *McDonald*'s rejection of such inquiries, which was even more direct than *Heller*'s, is flatly incompatible with a strict or intermediate scrutiny approach to gun regulations.

**\*1279 \*\*349** That conclusion is fortified by a careful examination of the back and forth in *McDonald* between Justice Alito's controlling opinion and Justice Breyer's dissent.

In his *McDonald* dissent, Justice Breyer explained at some length that he was concerned about the practical ramifications of *Heller* and *McDonald* because judges would have great difficulty assessing gun regulations under heightened scrutiny (whether it might be called strict or intermediate or something else on that heightened scrutiny spectrum). He stated that determining the constitutionality of a gun regulation would "almost always require the weighing of the constitutional right to bear arms against the primary concern of every government—a concern for the safety and indeed the lives of its citizens." 130 S.Ct. at 3126 (Breyer, J., dissenting) (internal quotation marks omitted). "Given the competing interests, courts will have to try to answer empirical questions of a particularly difficult kind." *Id.* He listed a variety of possible gun laws that would raise such difficult empirical questions, including laws regulating semi-automatic rifles and laws imposing registration requirements. *Id.* Justice Breyer asserted that assessing the constitutionality of those laws under heightened scrutiny would require difficult

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

judicial evaluations of the effectiveness of particular gun laws. Justice Breyer asked: "How can the Court assess the strength of the government's regulatory interests without addressing issues of empirical fact? How can the Court determine if a regulation is appropriately tailored without considering its impact? And how can the Court determine if there are less restrictive alternatives without considering what will happen if those alternatives are implemented?" *Id.* at 3127.

The questions identified by Justice Breyer are of course the kinds of questions that courts ask when applying heightened scrutiny. So how did the Court respond to Justice Breyer? The Court simply rejected the premise of Justice Breyer's criticism. Those kinds of difficult assessments would not need to be made, the Court said, because courts would not be applying that kind of test or scrutiny: "Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. 'The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.' " *Id.* at 3050 (controlling opinion of Alito, J.) (citation omitted) (quoting *Heller,* 554 U.S. at 684, 128 S.Ct. 2783). The Court also reiterated that "longstanding" gun regulations were constitutionally permissible. *Id.* at 3047.

The *McDonald* Court's response to Justice Breyer is quite telling for our purposes: The Court dismissed the suggestion that courts in Second Amendment cases would need to assess the strength of the government's regulatory interests, or determine whether the regulation was appropriately tailored, or consider the alternatives. In other words, the Court declined to conduct the kinds of inquiries that would need to be conducted under a form of strict or intermediate scrutiny.

But Justice Breyer then asked: From where did the Court derive the exceptions the Court listed in *Heller* and *McDonald* allowing laws that ban concealed carry, **\*\*350 \*1280** possession by a felon, and the like? Justice Breyer suggested that the Court "simply invented rules that sound sensible." *Id.* at 3127 (Breyer, J., dissenting). But the Court responded that, no, it was not inventing rules but rather was holding that the scope of the right was determined by text, history, and tradition—and that "longstanding regulatory measures"

were therefore permissible. *Id.* at 3047 (controlling opinion of Alito, J.). As the Court had explained in *Heller,* the scope of the right was determined by text, history, and tradition, and such longstanding laws were within the historical understanding of the scope of the right. *See also McDonald,* 130 S.Ct. at 3050, 3056 (Scalia, J., concurring) (Court's approach "makes the traditions of our people paramount"; "traditional restrictions" on the right are permissible).

D

Although *Heller* and *McDonald* rejected judicial interest balancing, the majority opinion here applies intermediate scrutiny. The majority opinion does so because it says that heightened scrutiny tests are not actually balancing tests and thus were not precluded by the Supreme Court's rejection of balancing tests. I disagree with the majority opinion's attempt to distinguish *Heller* and *McDonald* in this way.

To begin with, as explained above, the Court in my view went further in *Heller* and *McDonald* than just rejecting the concept of balancing tests. The Court emphasized the role of history and tradition; it rejected not only balancing but also examination of costs and benefits; it disclaimed the need for difficult empirical judgments; it specifically rejected Justice Breyer's approach, which was a form of intermediate scrutiny as applied in *Turner Broadcasting*; and it prospectively blessed certain laws for reasons that could be (and were) explained only by history and tradition, not by analysis under a heightened scrutiny test.

It is ironic, moreover, that Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*; that the *Heller* majority flatly rejected that *Turner Broadcasting*-based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on *Turner Broadcasting. See Heller,* 554 U.S. at 690, 704–05, 128 S.Ct. 2783 (Breyer, J., dissenting) (citing *Turner Broadcasting,* 520 U.S. 180, 117 S.Ct. 1174); *Heller,* 554 U.S. at 634–35, 128 S.Ct. 2783; Maj. Op. at 1257, 1259–60 (citing *Turner Broadcasting,* 520 U.S. 180, 117 S.Ct. 1174; *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

In addition, the premise of the majority opinion's more general point—that *Heller*'s rejection of balancing tests does not mean it rejected strict and intermediate scrutiny—is incorrect. Strict and intermediate scrutiny are balancing tests and thus are

necessarily encompassed by *Heller*'s more general rejection of balancing.

The heightened scrutiny approach largely took hold as a First Amendment principle—articulated most prominently by Justices Frankfurter and Harlan—to uphold laws that infringed free speech rights but were deemed to be justified by an overriding public purpose, often in cases involving speech by Communists. *See Konigsberg v. State Bar of California,* 366 U.S. 36, 49–52, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); *Barenblatt v. United States,* 360 U.S. 109, 126–27, 134, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); **\*351 \*1281** *Sweezy v. New Hampshire,* 354 U.S. 234, 265–67, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in judgment). From the beginning, it was recognized that these tests were balancing tests. In *Barenblatt,* for example, one of the early cases applying a form of what we now call strict scrutiny, the Court stated that First Amendment rights may be overcome based on "a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown," and that the "subordinating interest of the State must be compelling in order to overcome the individual constitutional rights at stake." 360 U.S. at 126–27, 79 S.Ct. 1081 (internal quotation marks omitted). In *Konigsberg,* the Court similarly explained that laws limiting speech could be justified by "valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." 366 U.S. at 50–51, 81 S.Ct. 997. Writing for the Court, Justice Harlan noted that the test required an "appropriate weighing of the respective interests involved." *Id.* at 51, 81 S.Ct. 997. In dissent, Justice Black objected to a "doctrine that permits constitutionally protected rights to be 'balanced' away whenever a majority of this Court thinks that a State might have interest sufficient to justify abridgment of those freedoms." *Id.* at 61, 81 S.Ct. 997 (Black, J., dissenting).

As in their original formulations, the successor strict and intermediate scrutiny tests applied today remain quintessential balancing inquiries that focus ultimately on whether a particular government interest is sufficiently compelling or important to justify an infringement on the individual right in question. *Cf. Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,* 518 U.S. 727, 740–41, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (the Court's application of varying levels of scrutiny is a process of "restat[ing] and refin[ing] ... basic First Amendment principles, adopting them more particularly to the balance of competing interests and the special circumstances of each

field of application"); *Employment Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 889 n. 5, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (applying strict scrutiny to general laws that burden religious practice would require judges to "regularly balance against the importance of general laws the significance of religious practice"); Mario L. Barnes & Erwin Chemerinsky, *The Once and Future Equal Protection Doctrine?,* 43 CONN. L. REV. 1059, 1080 (2011) ("The levels of scrutiny are essentially balancing tests—each test determines how the weights on the scale are to be arranged. Strict scrutiny puts the weights strongly against the government and rational basis places the weights in its favor."); Alan Brownstein, *The Religion Clauses as Mutually Reinforcing Mandates,* 32 CARDOZO L. REV. 1701, 1721–22 (2011) (though strict scrutiny is not as "ad hoc, subjective and indeterminate" as a "multi-factor balancing test" or "intermediate level scrutiny," even under strict scrutiny "there will be some cases, where the state's interest is authentic and substantial, which will require balancing"); Stephen A. Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny,* 48 AM. J. LEGAL HIST. 355, 375 (2006) ("compelling state interest doctrine" is a "balancing test") (internal quotation marks omitted); Darrell A.H. Miller, *Retail Rebellion and the Second Amendment,* 86 IND. L.J. 939, 967 (2011) ( "both *Heller* and *McDonald* indicate strongly that standards of scrutiny are just shorthand for unguided interest balancing").

**\*1282 \*\*352** To be sure, application of the strict and intermediate scrutiny tests yields categorical results and rules over time. And strict scrutiny in particular places a heavy thumb on the scale in favor of the individual right in question, meaning the balance is often struck against the government. But the tests are undoubtedly balancing tests that require a contemporary judicial assessment of the strength of the asserted government interests in imposing a particular regulation. If that interest is deemed sufficiently strong, and the law is deemed to be appropriately tailored to serving that interest given the potential alternatives, then the law generally overcomes the individual right. That is a form of interest balancing. It is true that strict and intermediate scrutiny come in a variety of flavors and are not always applied in the exact same way in all settings (as illustrated by Justice Breyer's extensive explanation in his *Heller* dissent). But they always involve at least some assessment of whether the law in question is sufficiently important to justify infringement on an individual constitutional right. That's balancing. And *Heller* and *McDonald* rejected the use of balancing tests—including,

therefore, strict or intermediate scrutiny—in fleshing out the scope of the Second Amendment right.

Of course, as noted above, *Heller* and *McDonald* didn't just reject interest balancing. The Court went much further by expressly rejecting Justice Breyer's intermediate scrutiny approach, disclaiming cost-benefit analysis, and denying the need for empirical inquiry. By doing so, the Court made clear, in my view, that strict and intermediate scrutiny are inappropriate.

In short, I do not see how *Heller* and *McDonald* can be squared with application of strict or intermediate scrutiny to D.C.'s gun laws. The majority opinion here refers to the levels of scrutiny as "familiar." Maj. Op. at 1266. As one commentator has stated, however, "the search for the familiar may be leading courts and commentators astray: The central disagreement in *Heller* was a debate not about strict scrutiny and rational basis review but rather about categoricalism and balancing." Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L. REV. at 379. [9] That disagreement in *Heller* was resolved in favor of categoricalism—with the categories defined by text, history, and tradition—and against balancing tests such as strict or intermediate scrutiny or reasonableness.

[9]  I recognize that some other courts of appeals have adopted approaches similar to the majority opinion's approach here. Based on my reading of *Heller* and *McDonald,* I respectfully have come to a different conclusion.

E

It might be objected that the Supreme Court could not have intended a test cabined by text, history, and tradition (and analogues thereto) when addressing modern weapons or conditions) given the prevalence of strict and intermediate scrutiny tests in the Court's jurisprudence regarding some other constitutional rights. I disagree with that suggestion and think it is based on too narrow a view of the Court's overall constitutional jurisprudence.

Taking a step back, we know the Supreme Court has developed an array of rules, tests, and standards specific to each right. Particularly for a lower court, it is difficult therefore to apply an overarching **\*\*353 \*1283** interpretive approach to questions of constitutional law that are necessarily guided by decades of precedent interpreting

different provisions of the Constitution under different methodologies. Some individual constitutional rights are analyzed under heightened (strict or intermediate) scrutiny, some under categorical tests divined from text, history, and tradition, some by reasonableness tests, some in other ways.

Strict and intermediate scrutiny today are primarily used in substantive due process and equal protection cases, and for certain aspects of First Amendment free speech doctrine. Strict and intermediate scrutiny tests are not employed in the Court's interpretation and application of many other individual rights provisions of the Constitution.

For example, the Court has not typically invoked strict or intermediate scrutiny to analyze the Jury Trial Clause, the Establishment Clause, the Self–Incrimination Clause, the Confrontation Clause, the Cruel and Unusual Punishments Clause, or the Habeas Corpus Clause, to name a few. *See, e.g., Kennedy v. Louisiana,* 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); *Boumediene v. Bush,* 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). In a recent landmark case concerning the Confrontation Clause, the Court stated in language quite similar to *Heller*'s that by "replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable." *Crawford v. Washington,* 541 U.S. 36, 67–68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Even in the First Amendment case law, which the majority opinion here looks to for guidance, the Court has not used strict or intermediate scrutiny when considering bans on categories of speech. In *United States v. Stevens,* the Court echoed *Heller*: "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document 'prescribing limits, and declaring that those limits may be passed at pleasure.' " 559 U.S. 460, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) (quoting *Marbury v. Madison,* 5 U.S. 137, 178, 1 Cranch 137, 2 L.Ed. 60 (1803)); *see also Simon & Schuster, Inc. v. Members of the N.Y. State Crime*

*Victims Bd.,* 502 U.S. 105, 125, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (Kennedy, J., concurring) (When the "regulated content has the full protection of the First Amendment," that "is itself a full and sufficient reason for holding the statute unconstitutional. In my view it is both unnecessary and incorrect to ask whether the State can show that the statute is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.") (internal quotation marks omitted).

In short, it would hardly have been unusual or unthinkable for the Supreme Court to set forth a Second Amendment test based on text, history, and tradition—rather than a heightened scrutiny approach. (Indeed, in *Heller,* the Supreme **\*354 \*1284** Court affirmed this Court's decision, which similarly declined to adopt a strict or intermediate scrutiny test.) Therefore, I would take the Supreme Court's words in *Heller* and *McDonald* at face value and not superimpose on those opinions a strict or intermediate scrutiny test that the Court declined to apply.

F

To sum up so far: Because the Supreme Court in *Heller* did not adopt a strict or intermediate scrutiny test and rejected judicial interest balancing, I must disagree with the majority opinion's decision in this case to adopt the intermediate scrutiny balancing test. In my view, it is a severe stretch to read *Heller,* as the majority opinion does, as consistent with an intermediate scrutiny balancing test. The Supreme Court struck down D.C.'s handgun ban because handguns have not traditionally been banned and are in common use by law-abiding citizens, not because the ban failed to serve an important government interest and thus failed the intermediate scrutiny test. And the Court endorsed certain gun laws because they were rooted in history and tradition, not because they passed the intermediate scrutiny test.

One final aside about the appropriate test to apply: Even if it were appropriate to apply one of the levels of scrutiny after *Heller,* surely it would be strict scrutiny rather than the intermediate scrutiny test adopted by the majority opinion here. *Heller* ruled that the right to possess guns is a core enumerated constitutional right and rejected Justice Breyer's suggested *Turner Broadcasting* intermediate scrutiny approach. And *McDonald* later held that "the right to keep and bear arms" is "among those fundamental rights necessary to our system of ordered liberty." 130 S.Ct. at 3042.

For those fundamental substantive constitutional rights that the Court has subjected to a balancing test and analyzed under one of the levels of scrutiny—for example, the First Amendment freedom of speech and the rights protected by substantive due process—the Court has generally employed strict scrutiny to assess direct infringements on the right. *See, e.g., Citizens United v. FEC,* 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (First Amendment strict scrutiny in context of infringement on "political speech"); *Boy Scouts of America v. Dale,* 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (First Amendment strict scrutiny in context of infringement on freedom of association); *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (First Amendment strict scrutiny in context of content-based speech regulation); *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (substantive due process doctrine "forbids the government to infringe fundamental liberty interests ... unless the infringement is narrowly tailored to serve a compelling state interest") (internal quotation marks and alteration omitted); *see generally* Richard H. Fallon, Jr., *Strict Judicial Scrutiny,* 54 UCLA L. REV. 1267, 1271 (2007) ("the Supreme Court adopted the strict scrutiny formula as its generic test for the protection of fundamental rights").

Strict scrutiny requires the government to show that a law is narrowly tailored to serve a compelling state interest. *See Citizens United,* 130 S.Ct. at 898 (strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve **\*355 \*1285** that interest") (internal quotation marks omitted). This test strongly favors the individual right in question. *See Brown v. Entertainment Merchants Ass'n,* ––– U.S. ––––, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (strict scrutiny "is a demanding standard"); *Vieth v. Jubelirer,* 541 U.S. 267, 294, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion) (strict scrutiny imposes "a strong presumption of invalidity" with a "thumb on the scales" in favor of the individual right); *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (under strict scrutiny, "a heavy burden of justification is on the State").

It is especially inappropriate for the majority opinion here to apply intermediate scrutiny rather than strict scrutiny to D.C.'s ban on semi-automatic rifles. No court of appeals decision since *Heller* has applied intermediate scrutiny to a ban on a class of arms that have not traditionally been banned and

are in common use. A ban on a class of arms is not an "incidental" regulation. It is equivalent to a ban on a category of speech. Such restrictions on core enumerated constitutional protections are *not* subjected to mere intermediate scrutiny review. The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not traditionally been banned.

## G

In sum, our task as a lower court here is narrow and constrained by precedent. We need not squint to divine some hidden meaning from *Heller* about what tests to apply. *Heller* was up-front about the role of text, history, and tradition in Second Amendment analysis—and about the absence of a role for judicial interest balancing or assessment of costs and benefits of gun regulations. Gun bans and gun regulations that are longstanding—or, put another way, sufficiently rooted in text, history, and tradition—are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right. Our role as a lower court is simply to apply the test announced by *Heller* to the challenged provisions of D.C.'s new gun laws.

## II

Whether we apply the *Heller* history- and tradition-based approach or strict scrutiny or even intermediate scrutiny, D.C.'s ban on semi-automatic rifles fails to pass constitutional muster. D.C.'s registration requirement is likewise unconstitutional.

## A

The first issue concerns D.C.'s ban on most semi-automatic rifles. [10] A semi-automatic gun "fires only one shot with each pull of the trigger" and "requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples v. United States,* 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). That is in contrast to **356 *1286 an automatic gun—also known as a machine gun—which "fires repeatedly with a single pull of

the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.* [11]

[10]  D.C.'s law bans semi-automatic rifles by listing specific guns that, as relevant here, share the characteristics of being a long gun and firing in a semi-automatic manner, and typically have features such as protruding pistol grips. D.C.Code § 7–2501.01(3A)(A)(i)(I). The statute also includes a catchall provision covering semi-automatic rifles that have certain additional features such as protruding pistol grips. *Id.* § 7–2501.01(3A)(A)(i) (IV).

[11]  Under federal law, the "term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

The vast majority of handguns today are semi-automatic. [12] In *Heller,* the Supreme Court ruled that D.C.'s law banning handguns, including semi-automatic handguns, was unconstitutional. *District of Columbia v. Heller,* 554 U.S. 570, 628–29, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). This case concerns semi-automatic rifles. [13] As with handguns, a significant percentage of rifles are semi-automatic. D.C. asks this Court to find that the Second Amendment protects semi-automatic *handguns* but not semi-automatic *rifles*.

[12]  *See* CHRISTOPHER S. KOPER, REPORT TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE 81 (2004) (80% of handguns produced in 1993 were semi-automatic); DEP'T OF JUSTICE, GUNS USED IN CRIME 3 (1995) ("Most new handguns are pistols rather than revolvers.").

[13]  Rifles are within a broader category referred to as "long guns." Long guns, such as rifles and shotguns, are intended to be fired from the shoulder instead of with a single hand and are generally defined as being at least 16 to 18 inches long.

There is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles.

As an initial matter, considering just the public safety rationale invoked by D.C., semi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed. As was noted by the dissent in *Heller,* handguns "are the overwhelmingly favorite weapon

of armed criminals." 554 U.S. at 682, 128 S.Ct. 2783 (Breyer, J., dissenting); *see also* FBI, CRIME IN THE UNITED STATES, 2009 tbl.20 (2010). So it would seem a bit backwards—at least from a public safety perspective —to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. Indeed, at oral argument, the excellent Solicitor General for D.C. acknowledged that "an argument could be made that the government interest in banning handguns is just as compelling, if not more compelling" than the government interest in banning semi-automatic rifles. Tr. of Oral Arg. at 35. He added that "the government's interest may be more compelling with regard to handgun[s]." *Id.* at 36. Counsel's frank acknowledgment highlights the serious hurdle that *Heller* erects in the way of D.C.'s attempt to ban semi-automatic rifles. Put simply, it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles. [14]

[14] Some would respond that the Second Amendment should not protect semi-automatic handguns either. But that option is not open to us after *Heller*. The question therefore is whether a sensible and principled constitutional line can be drawn between semi-automatic handguns and semi-automatic rifles. I think not. Such a line might be drawn out of a bare desire to restrict *Heller* as much as possible or to limit it to its facts, but that is not a sensible or principled constitutional line for a lower court to draw or a fair reading of the *Heller* opinion, in my view.

More to the point for purposes of the *Heller* analysis, the Second Amendment as **\*\*357 \*1287** construed in *Heller* protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller.*

The first commercially available semi-automatic rifles, the Winchester Models 1903 and 1905 and the Remington Model 8, entered the market between 1903 and 1906. *See* JOHN HENWOOD, THE 8 AND THE 81: A HISTORY OF REMINGTON'S PIONEER AUTOLOADING RIFLES 5 (1993); JOHN HENWOOD, THE FORGOTTEN WINCHESTERS: A HISTORY OF THE MODELS 1905, 1907, AND 1910 SELF–LOADING RIFLES 2–6 (1995). (The first semi-automatic shotgun, designed by John Browning and manufactured by Remington, hit the market in 1905 and was a runaway commercial success. *See*

HENWOOD, 8 AND THE 81, at 4.) Other arms manufacturers, including Standard Arms and Browning Arms, quickly brought their own semi-automatic rifles to market. *See id.* at 64–69. Five-shot magazines were standard, but as early as 1907, Winchester was offering the general public ten-shot magazines for use with its .351 caliber semi-automatic rifles. *See* HENWOOD, THE FORGOTTEN WINCHESTERS 22–23. Many of the early semi-automatic rifles were available with pistol grips. *See id.* at 117–24. These semi-automatic rifles were designed and marketed primarily for use as hunting rifles, with a small ancillary market among law enforcement officers. *See* HENWOOD, 8 AND THE 81, at 115–21.

By contrast, full automatics were developed for the battlefield and were never in widespread civilian use in the United States. Rifle-caliber machine guns (excluding the Gatling gun, which required hand cranking) first saw widespread use in the European colonial powers' African conquests of the 1890s. *See* JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN 79–107 (1986). Automatic, pistol-caliber machine guns were fielded by European militaries toward the end of World War I. The Thompson machine gun (commonly known as the "Tommy gun") entered commercial sale in the United States in the mid-1920s but saw very limited civilian use outside of organized crime and law enforcement. *See* LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA 203–04 (1975). Within less than a decade, the Tommy gun and other automatic weapons had been subjected to comprehensive federal regulation. National Firearms Act, ch. 757, 48 Stat. 1236 (1934); *see also* 18 U.S.C. § 922(*o* ).

Semi-automatic rifles remain in common use today, as even the majority opinion here acknowledges. *See* Maj. Op. at 1261 ("We think it clear enough in the record that semi-automatic rifles ... are indeed in 'common use,' as the plaintiffs contend."). According to one source, about 40 percent of rifles sold in 2010 were semi-automatic. *See* NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY ch. 1 (forthcoming 2012). The AR-15 is the most popular semi-automatic rifle; since 1986, about two million semi-automatic AR-15 rifles have been manufactured. J.A. 84 (Declaration of Firearms Researcher Mark Overstreet). In 2007, the AR-15 *alone* accounted for 5.5 percent of firearms and 14.4 percent of rifles produced in the United States for the domestic market. *Id.* A brief perusal of the website of a popular American gun seller underscores the point that semi-automatic rifles are quite common in the United States. *See,*

Case 2:19-cv-00037-JNP  Document 59-32  Filed 11/30/22  PageID.5100  Page 145 of 208
Heller v. District of Columbia, 670 F.3d 1244 (2011)
399 U.S.App.D.C. 314

*e.g.,* CABELA'S, http://www. cabelas.com. Semi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting **\*\*358 \*1288** and competitions. J.A. 137 (Declaration of Firearms Expert Harold E. Johnson). And many hunting guns are semi-automatic. *Id.*

Although a few states and municipalities ban some categories of semi-automatic rifles, most of the country does not, and even the bans that exist are significantly narrower than D.C.'s. What the Supreme Court said in *Heller* as to D.C.'s handgun ban thus applies just as well to D.C.'s new semi-automatic rifle ban: "Few laws in the history of our Nation have come close to the severe restriction of the District's" law. 554 U.S. at 629, 128 S.Ct. 2783.

What is more, in its 1994 decision in *Staples,* the Supreme Court already stated that semi-automatic weapons "traditionally have been widely accepted as lawful possessions." 511 U.S. at 612, 114 S.Ct. 1793. Indeed, the precise weapon at issue in *Staples* was the AR-15. The AR-15 is the quintessential semi-automatic rifle that D.C. seeks to ban here. Yet as the Supreme Court noted in *Staples,* the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. By contrast, as the Court stated in *Staples* and again in *Heller,* short-barreled shotguns and automatic "M-16 rifles and the like" are not in common use and have been permissibly banned by Congress. *Heller,* 554 U.S. at 625, 627, 128 S.Ct. 2783; *see also Staples,* 511 U.S. at 611–12, 114 S.Ct. 1793 ("certain categories of guns —no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation —... have the same quasi-suspect character we attributed to owning hand grenades," but "guns falling outside those categories traditionally have been widely accepted as lawful possessions"); 18 U.S.C. § 922(*o* )(1) ("it shall be unlawful for any person to transfer or possess a machinegun"). [15]

[15] In our decision in *Parker,* we similarly stated that handguns, shotguns, and rifles have traditionally been possessed by law-abiding citizens and are within the protection of the Second Amendment. *Parker v. District of Columbia,* 478 F.3d 370, 398 (D.C.Cir.2007), *aff'd sub nom. Heller,* 554 U.S. 570, 128 S.Ct. 2783.

The Supreme Court's statement in *Staples* that semi-automatic rifles are traditionally and widely accepted as lawful possessions further demonstrates that such guns are protected under the *Heller* history- and tradition-based test. The government may still ban automatic firearms (that is, machine guns), which traditionally have been banned. But the government may not generally ban semi-automatic guns, whether semi-automatic rifles, shotguns, or handguns.

Even if it were appropriate to apply some kind of balancing test or level of scrutiny to D.C.'s ban on semi-automatic rifles, the proper test would be strict scrutiny, as explained above. *See supra* Part I.F. That is particularly true where, as here, a court is analyzing a ban on a *class* of arms within the scope of Second Amendment protection. If we are to apply strict scrutiny, we must do so in a manner consistent with *Heller's* holding that D.C.'s handgun ban was unconstitutional. But D.C. cannot show a compelling interest in banning semi-automatic rifles because the necessary implication of the decision in *Heller* is that D.C. could not show a sufficiently compelling interest to justify its banning semi-automatic handguns.

For its part, the majority opinion analyzes D.C.'s ban on semi-automatic rifles under an intermediate scrutiny balancing test. Even if the majority opinion were **\*\*359 \*1289** right that intermediate scrutiny is the proper test, the majority opinion's application of intermediate scrutiny here is unconvincing: The fundamental flaw in the majority opinion is that it cannot persuasively explain why semi-automatic handguns are constitutionally protected (as *Heller* held) but semi-automatic rifles are not.

In attempting to distinguish away *Heller's* protection of semi-automatic handguns, the majority opinion suggests that semi-automatic rifles are almost as dangerous as automatic rifles (that is, machine guns) because semi-automatic rifles fire "almost as rapidly." Maj. Op. at 1263. Putting aside that the majority opinion's data indicate that semi-automatics actually fire two-and-a-half times slower than automatics, *id.,* the problem with the comparison is that semi-automatic *rifles* fire at the same general rate as semi-automatic *handguns.* And semi-automatic handguns are constitutionally protected under the Supreme Court's decision in *Heller.* So the majority opinion cannot legitimately distinguish *Heller* on that basis. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L. REV. 1443, 1484 (2009) ( "The laws generally define assault weapons to be a set of semiautomatic weapons (fully automatic weapons have long been heavily regulated, and lawfully owned fully automatics are very rare and very expensive) that are little different from semiautomatic pistols and rifles that are commonly owned by tens of millions of law-abiding citizens. 'Assault weapons' are

no more 'high power' than many other pistols and rifles that are not covered by the bans.") (footnote omitted). [16]

[16]  In passing, the majority opinion here tosses out the possibility that *Heller* might protect handguns that are revolvers but not handguns that are semiautomatic pistols. *See* Maj. Op. at 1267–68. I find that an utterly implausible reading of *Heller* given the Court's many blanket references to handguns and given that most handguns are semi-automatic.

The majority opinion next contends that semi-automatic handguns are good enough to meet people's needs for self-defense and that they shouldn't need semi-automatic rifles. But that's a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right. Indeed, *Heller* itself specifically rejected this mode of reasoning: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed." 554 U.S. at 629, 128 S.Ct. 2783; *see also Parker v. District of Columbia,* 478 F.3d 370, 400 (D.C.Cir.2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637. Furthermore, the majority opinion's assertion does not sufficiently account for the fact that rifles, but typically not handguns, are used for hunting. *Cf. Heller,* 554 U.S. at 599, 128 S.Ct. 2783 (most founding-era Americans "undoubtedly" thought right to own firearms "even more important for self-defense and hunting" than for militia service).

**\*1290  \*\*360**  In support of its law, D.C. suggests that semi-automatic rifles are "offensive" and not just "defensive." But that is plainly true of semi-automatic handguns as well (after all, handguns are far and away the guns most often used in violent crimes), and yet the Supreme Court held semi-automatic handguns to be constitutionally protected. Moreover, it's hard to see why, if a gun is effective for "offense," it might not also be effective for "defense." If a gun is employed by criminals on the offense who are willing to violate laws and invade homes, for example, their potential victims will presumably want to be armed with similarly effective weapons for their defense. *Cf. Heller,* 554 U.S.

at 711, 128 S.Ct. 2783 (Breyer, J., dissenting) ("the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous"). There is no reason to think that semi-automatic rifles are not effective for self-defense in the home, which *Heller* explained is a core purpose of the Second Amendment right. The offense/defense distinction thus doesn't advance the analysis here, at least in part because it is the person, not the gun, who determines whether use of the gun is offensive or defensive. Perhaps D.C.—by referring to the offense/defense distinction —is simply intending to say that semi-automatic rifles are especially dangerous. But it is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns, and the Supreme Court has already held semi-automatic handguns to be constitutionally protected.

D.C. repeatedly refers to the guns at issue in this case as "assault weapons." But if we are constrained to use D.C.'s rhetoric, we would have to say that *handguns* are the quintessential "assault weapons" in today's society; they are used far more often than any other kind of gun in violent crimes. *See* BUREAU OF JUSTICE STATISTICS, PUB. NO. 194820, WEAPON USE AND VIOLENT CRIME 3 (2003) (87% of violent crimes committed with firearms between 1993 and 2001 were committed with handguns). So using the rhetorical term "assault weapon" to refer to semi-automatic rifles does not meaningfully distinguish semi-automatic rifles from semi-automatic handguns. Nor does the rhetorical term "assault weapon" help make the case that semi-automatic rifles may be banned even though semi-automatic handguns are constitutionally protected.

Under intermediate scrutiny, yet another problem with D.C.'s law is its tailoring. The law is not sufficiently tailored even with respect to the category of semi-automatic rifles. It bans certain semi-automatic rifles but not others—with no particular explanation or rationale for why some made the list and some did not. The list appears to be haphazard. It does not reflect the kind of tailoring that is necessary to justify infringement of a fundamental right, even under the more relaxed intermediate scrutiny test.

In short, the majority opinion cannot persuasively explain why semi-automatic handguns are constitutionally protected but semi-automatic rifles are not. In *Heller,* D.C. argued that it could ban handguns because individuals could still own rifles. That argument failed. Here, D.C. contends that it can ban rifles because individuals can still own handguns. D.C.'s at-

least-you-can-still-possess-other-kinds-of-guns argument is no more persuasive this time around. Under the *Heller* history- and tradition-based test, or the strict scrutiny test, or even the majority opinion's own intermediate scrutiny test, the **\*\*361 \*1291** D.C. ban on semi-automatic rifles is unconstitutional.

B

The second main issue on appeal concerns D.C.'s gun registration regime. D.C. requires registration of all guns lawfully possessed in D.C. The Supreme Court in *Heller* expressly allowed "*longstanding* prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27, 128 S.Ct. 2783 (emphasis added). The Court added that regulations and exceptions should be judged based on their "historical justifications." *Id.* at 635, 128 S.Ct. 2783. In *McDonald,* the Court summarized the point this way: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' " *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (controlling opinion of Alito, J.) (quoting *Heller,* 554 U.S. at 626–27, 128 S.Ct. 2783). [17]

[17] With respect to guns that the government has the constitutional authority to ban—namely, those classes of weapons that have traditionally been banned and are not in common use by law-abiding citizens— the government may of course impose registration as a lesser step. *See United States v. Miller,* 307 U.S. 174, 175 n. 1, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (describing federal statute requiring registration of short-barreled rifles and shotguns, machine guns, and silencers transported in interstate commerce). But D.C.'s registration requirement applies to all guns, not just those it has the authority to ban.

The fundamental problem with D.C.'s gun registration law is that registration of lawfully possessed guns is not "longstanding." Registration of all guns lawfully possessed by citizens in the relevant jurisdiction has not been traditionally required in the United States and, indeed, remains highly unusual today.

In considering D.C.'s registration requirement, it's initially important to distinguish registration laws from licensing laws. Licensing requirements mandate that gun owners meet certain standards or pass certain tests before owning guns or using them in particular ways. Those laws can advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public. For example, many jurisdictions that permit the carrying of concealed weapons have traditionally imposed licensing requirements on persons who wish to carry such weapons. Registration requirements, by contrast, require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can. For that reason, registration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership. It is true that registration requirements also provide a hook to convict (and potentially flip) criminals who are suspected of having committed other illegal acts, but as the majority opinion recognizes, that is a "circular" and constitutionally unacceptable rationale for requiring registration with respect to a core enumerated constitutional right. Maj. Op. at 1258 n.\*.

**\*1292 \*\*362** Likewise, it's also important at the outset to distinguish registration requirements imposed on gun *owners* from record-keeping requirements imposed on gun *sellers.* Some record-keeping requirements on gun sellers are traditional and common. Thus, the government may constitutionally impose certain record-keeping requirements on the sellers of guns. *See Heller,* 554 U.S. at 627, 128 S.Ct. 2783 (listing "conditions and qualifications on the commercial sale of arms" as being within category of traditional gun regulations).

The issue here, however, is registration of all guns owned by people in the District of Columbia. As D.C. acknowledges, there is not, and never has been, a "comprehensive federal system of firearm registration." COUNCIL COMM. ON PUB. SAFETY & THE JUDICIARY, COMM. REP. ON B. 17-843, at 3 (D.C. 2008). Similarly, the vast majority of states have not traditionally required registration of lawfully possessed guns. The majority opinion cites several state laws that have existed since the beginning of the 20th Century. Maj. Op. at 1253–54. But those state laws generally required record-keeping by gun *sellers*, not registration of all lawfully

possessed guns by gun *owners.* There certainly is no tradition in the United States of gun registration imposed on all guns. And laws regulating gun sellers provide no support for D.C.'s registration requirement, which compels every gun owner to register every gun he or she lawfully possesses.

Even if modern laws alone could satisfy *Heller*'s history- and tradition-based test, there presumably would have to be a strong showing that such laws are common in the states. *Cf. Kennedy v. Louisiana,* 554 U.S. 407, 423–26, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (only six states permitting death penalty for child rapists shows national consensus *against* it). Such a showing cannot be made with respect to registration requirements. Today, most states require no registration for *any* firearms; only seven states require registration for *some* firearms; and only Hawaii requires registration for *all* firearms. And even Hawaii does not impose all of the onerous requirements associated with registration that D.C. does.[18] Put simply, D.C.'s registration law is the strictest in the Nation, by D.C.'s own admission. *See* Firearms Control: Hearing of the H.C. Comm. on Home Aff. (U.K. 2010) (statement of Peter Nickles, D.C. Att'y Gen.) (acknowledging common view that D.C. has "the strictest gun laws in the United States"); *see also* Haw.Rev.Stat. § 134–3(a)–(b); Cal.Penal Code §§ 11106, 12276, 12276.1, 12276.5, 12280, 12285(a) (registration of handguns and certain rifles that are otherwise banned); Conn. Gen.Stat. § 53–202d(a) (registration of grandfathered rifles that are otherwise banned); Md.Code Ann., Crim. Law § 4–303(b) (registration of grandfathered pistols that are otherwise banned); N.J. Stat. Ann. §§ 2C:39–5(f), **\*1293** **\*\*363** 2C:58–12 (registration of grandfathered weapons that are otherwise banned); La.Rev.Stat. Ann. §§ 40:1781, 40:1783 (registration of limited types of firearms); Mich. Comp. Laws § 28.422 (de facto registration of pistols).

[18]  The D.C. law at issue here requires far more than basic registration of guns. It mandates, among other things, that a gun owner submit every pistol for a "ballistics identification procedure," D.C.Code § 7–2502.03(d); appear in person to register a gun, § 7–2502.04; register only one pistol every 30 days, § 7–2502.03(e); and renew each registration certificate every three years, § 7–2502.07a(a). It is undisputed in this case that D.C.'s myriad registration-related requirements are unique—and uniquely burdensome—among laws in the United States. These additional registration-related requirements find even less support in history and tradition than the basic registration requirement.

Because the vast majority of states have not traditionally required and even now do not require registration of lawfully possessed guns, D.C.'s registration law—which is the strictest in the Nation and mandates registration of all guns—does not satisfy the history- and tradition-based test set forth in *Heller* and later *McDonald.*

D.C. contends that registration is a longstanding requirement in American law because early militia laws required militiamen to submit arms for inspection. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America,* 25 LAW & HIST. REV. 139, 161 (2007). But D.C.'s attempt to analogize its registration law to early militia laws is seriously flawed for two reasons. First, these early militia laws applied only to militiamen, not to all citizens. In general, men over age 45 and women did not have to comply with such laws. *See Heller,* 554 U.S. at 580, 128 S.Ct. 2783 ("the militia in colonial America consisted of a subset of the people—those who were male, able bodied, and within a certain age range") (internal quotation marks omitted). Second, militia members were required to submit for inspection only one or a few firearms, not all of their firearms. That's because the purpose of those early militia requirements was *not* registration of firearms, but rather simply to ensure that the militia was well-equipped. *See, e.g.,* An Act for Amending the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections (1784), *in* 11 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 476, 476–79 (William Waller Hening ed., Richmond, George Cochran 1823) (The "defence and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty.... [E]very of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements and ammunition ready to be produced whenever called for by his commanding officer.").

Those militia requirements were a far cry from a registration requirement for all firearms. Those laws therefore provide no meaningful support for D.C.'s broad and unprecedented registration law. Nor has D.C. been able to find any other historical antecedents for its registration requirement. Yet again, what the Supreme Court said in *Heller* with respect to D.C.'s handgun ban applies as well to D.C.'s registration requirement: "Few laws in the history of our Nation have come close to the severe restriction of the District's" law. 554 U.S. at 629, 128 S.Ct. 2783.

The Supreme Court's 1939 decision in *Miller* further suggests that registration of all lawfully possessed guns is not permissible under the Second Amendment. *See United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). *Miller* involved a defendant's conviction for possessing an unregistered firearm. If registration were constitutionally permissible for all lawfully possessed guns, the Court could simply have affirmed the conviction on that ground. Instead, the *Miller* Court analyzed whether the kind of gun Miller possessed—a sawed-off shotgun—was within the class of weapons protected by the Second Amendment. The Court's approach suggested that the government could require registration only of guns that **\*\*364 \*1294** were outside the protection of the Second Amendment—namely, those classes of guns that the government had traditionally banned and that were not in common use, such as machine guns and sawed-off shotguns. *Id.* at 178, 59 S.Ct. 816; *see also Heller,* 554 U.S. at 622, 128 S.Ct. 2783 (emphasizing that *Miller* turned on the "type of weapon at issue") (emphasis omitted). After all, if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment.

Perhaps recognizing the dearth of historical or precedential support for its registration law, D.C. says that licensing laws are "conceptually similar" to registration requirements. D.C. Br. at 19. D.C. also advances a similar argument when citing the record-keeping laws for sellers as support for its registration requirement. But to rely on those laws to support registration requirements on gun owners for all of their guns is to conduct the *Heller* analysis at an inappropriately high level of generality—akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing government officials.

D.C.'s law requiring registration of all lawfully possessed guns in D.C. is not part of the tradition of gun regulation in the United States; it is the most stringent such law in the Nation; and it is significantly more onerous than traditional licensing requirements or record-keeping requirements imposed only on gun sellers. Registration requirements of the kind enacted by D.C. thus do not satisfy the Supreme Court's history- and tradition-based test.

Even if it were proper to apply strict or intermediate scrutiny to D.C.'s registration law (as the majority opinion does), the registration requirement still would run into serious constitutional problems. If we were applying one of those balancing tests, however, I would remand: The current record is insufficient to render a final evaluation of the registration law under those balancing tests.

To begin with, it would be hard to persuasively say that the government has an interest sufficiently weighty to justify a regulation that infringes constitutionally guaranteed Second Amendment rights if the Federal Government and the states have not traditionally imposed—and even now do not commonly impose—such a regulation. *Cf. Brown v. Entertainment Merchants Ass'n,* ——U.S. ——, 131 S.Ct. 2729, 2736, 180 L.Ed.2d 708 (2011) (considering First Amendment challenge to ban on sale of violent video games: "California's argument would fare better if there were a *longstanding tradition* in this country of specially restricting children's access to depictions of violence, but there is none.") (emphasis added); *United States v. Stevens,* 559U.S. 460, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) (considering First Amendment challenge to ban on depictions of animal cruelty: "we are unaware of any ... tradition excluding depictions of animal cruelty from 'the freedom of speech' codified in the First Amendment") (emphasis omitted); *Romer v. Evans,* 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("It is not within our constitutional tradition to enact laws of this sort.").

Moreover, D.C.'s articulated basis for the registration requirement is that police officers, when approaching a house to execute a search or arrest warrant or take other investigative steps, will know whether **\*\*365 \*1295** the residents have guns. But that is at best a Swiss-cheese rationale because police officers obviously will assume the occupants might be armed regardless of what some central registration list might say. So this asserted rationale leaves far too many false negatives to satisfy strict or intermediate scrutiny with respect to burdens on a fundamental individual constitutional right.[19] D.C.'S REGISTRATION LAW thus does not appear to be sufficiently tailored to advance a compelling or important government interest for purposes of the heightened scrutiny tests. That said, D.C. alludes to the possibility that other rationales might be asserted to support a registration requirement. Therefore, if I were applying a form of heightened scrutiny to the registration requirement, I would remand for further analysis of the interests that might be asserted. (It is possible, moreover, that the registration law might pass intermediate but not strict scrutiny.)

19    Moreover, citizens may not be forced to register in order to exercise certain other constitutionally recognized fundamental rights, such as to publish a blog or have an abortion. *See* Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense,* 56 UCLA L. REV. at 1546 (discussing impermissibility of registration requirements applied to free speech and abortion rights). In concluding that D.C.'s handgun registration requirement might satisfy intermediate scrutiny, the majority opinion notes that the government may require registration for voting. *See* Maj. Op. at 1254–55. But those laws serve the significant government interest of preventing voter fraud. The majority opinion also cites car registration laws. *Id.* Of course, there is no enumerated constitutional right to own a car. Perhaps more to the point, those laws help prevent theft and assist recovery of stolen cars. No similar interest justifies gun registration laws.

Oddly, the majority opinion says that a registration requirement is permissible for handguns but might be impermissible for rifles or other long guns. *See id.* That approach gives potentially greater constitutional protection to long guns than to handguns even though *Heller* held that handguns warrant the highest constitutional protection.

In any event, the proper test to apply is *Heller*'s history- and tradition-based test. Because most of the Nation has never required—and even now does not require—registration of all lawfully possessed firearms, D.C.'s strict registration law is not "longstanding" in the United States. After *Heller,* some licensing requirements remain permissible, and some record-keeping requirements on gun sellers remain permissible. But D.C.'s registration law violates the Second Amendment as construed by the Supreme Court.

* * *

This is a case where emotions run high on both sides of the policy issue because of the vital public safety interests at stake. As one who was born here, grew up in this community in the late 1960s, 1970s, and 1980s, and has lived and worked in this area almost all of his life, I am acutely aware of the gun, drug, and gang violence that has plagued all of us. As a citizen, I certainly share the goal of Police Chief Cathy Lanier to reduce and hopefully eliminate the senseless violence that has persisted for too long and harmed so many. And I greatly respect the motivation behind the D.C. gun laws at issue in this case. So my view on how to analyze the constitutional question here under the relevant Supreme Court precedents is not to say that I think certain gun registration laws or

laws regulating semi-automatic guns are necessarily a bad idea as a matter of policy. If our job were to decree what we think is the best policy, I would carefully consider the issues through that different lens and might well look favorably **\*\*366 \*1296** upon certain regulations of this kind. But our task is to apply the Constitution and the precedents of the Supreme Court, regardless of whether the result is one we agree with as a matter of first principles or policy. *See Texas v. Johnson,* 491 U.S. 397, 420–21, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (Kennedy, J., concurring) ("The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result."). A lower-court judge has a special obligation, moreover, to strictly and faithfully follow the lead of the "one supreme Court" established by our Constitution, regardless of whether the judge agrees or disagrees with the precedent.

D.C. believes that its law will help it fight violent crime. Few government responsibilities are more significant. That said, the Supreme Court has long made clear that the Constitution disables the government from employing certain means to prevent, deter, or detect violent crime. *See, e.g., Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Kennedy v. Louisiana,* 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In the words of the Supreme Court, the courts must enforce those constitutional rights even when they have "controversial public safety implications." *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 3045, 177 L.Ed.2d 894 (2010) (controlling opinion of Alito, J.).

As I read the relevant Supreme Court precedents, the D.C. ban on semi-automatic rifles and the D.C. gun registration requirement are unconstitutional and may not be enforced. We should reverse the judgment of the District Court and remand for proceedings consistent with this opinion.[20] I respectfully dissent.

20    The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court. In order to apply *Heller*'s test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in

399 U.S.App.D.C. 314

common use. The parties here did not brief that question in much detail. Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the *Heller* test. Therefore, I would remand to the District Court for analysis of that issue.

**All Citations**

670 F.3d 1244, 399 U.S.App.D.C. 314

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

614 F.3d 85
United States Court of Appeals,
Third Circuit.

UNITED STATES of America
v.
Michael MARZZARELLA, Appellant.

No. 09–3185.
|
Argued Feb. 22, 2010.
|
Filed July 29, 2010.

**Synopsis**

**Background:** Defendant indicted for possession of a handgun with an obliterated serial number moved to dismiss. The United States District Court for the Western District of Pennsylvania, Sean J. McLaughlin, J., 595 F.Supp.2d 596, denied the motion. Defendant entered conditional guilty plea reserving the right to appeal the constitutionality of the charging statute. Defendant appealed.

**Holdings:** The Court of Appeals, Scirica, Circuit Judge, held that:

statute merited intermediate, rather than strict, scrutiny;

statute served a substantial, or important government interest;

statute fit reasonably with substantial, or important interest;

even under strict scrutiny, statute served a compelling interest; and

statute was narrowly tailored to serve compelling interest.

Affirmed.

**Attorneys and Law Firms**

**\*87** Thomas W. Patton, Esquire (Argued), Office of Federal Public Defender, Erie, PA, for Appellant.

Laura S. Irwin, Esquire (Argued), Robert L. Eberhardt, Esquire, Office of the United States Attorney, Pittsburgh, PA, for Appellee.

Before SCIRICA and CHAGARES, Circuit Judges, and RODRIGUEZ [*] District Judge.

[*]   The Honorable Joseph H. Rodriguez, United States District Judge for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal presents a single issue, whether Defendant Michael Marzzarella's conviction under 18 U.S.C. § 922(k) for possession of a handgun with an obliterated serial number violates his Second Amendment right to keep and bear arms. We hold it does not and accordingly will affirm the conviction.

I.

In April 2006, the Pennsylvania State Police were notified by a confidential informant that Marzzarella was involved in the sale of stolen handguns. On April 25, the confidential informant arranged a purchase of handguns from Marzzarella. The next day, State Trooper Robert Toski, operating in an undercover capacity, accompanied the informant to Marzzarella's **\*88** home in Meadville, Pennsylvania, where Toski purchased a .25 caliber Titan pistol with a partially obliterated serial number for $200. On May 16, Marzzarella sold Toski a second firearm and informed him that its serial number could be similarly obliterated.

On June 12, 2007, Marzzarella was indicted for possession of a firearm with an obliterated serial number, in violation of § 922(k). [1] No charges were brought for the sale of the Titan pistol or the sale or possession of the second firearm. Marzzarella moved to dismiss the indictment, arguing § 922(k), as applied, violated his Second Amendment right to keep and bear arms, as recognized by the Supreme Court in *District of Columbia v. Heller*, ——U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The District Court denied the motion, holding the Second Amendment does not protect a right to own handguns with obliterated

serial numbers and that § 922(k) does not meaningfully burden the "core" right recognized in *Heller*—the right to possess firearms for defense of hearth and home. Moreover, it held that because § 922(k) is designed to regulate the commercial sale of firearms and to prevent possession by a class of presumptively dangerous individuals, it is analogous to several longstanding limitations on the right to bear arms identified as presumptively valid in *Heller.* Finally, the District Court held that even if Marzzarella's possession of the Titan pistol was protected by the Second Amendment, § 922(k) would pass muster under intermediate scrutiny as a constitutionally permissible regulation of Second Amendment rights.

1    Section 922(k) provides:

It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

We recognize the words "removed," "obliterated," and "altered" may denote distinct actions. *See United States v. Carter,* 421 F.3d 909, 912–13 (9th Cir.2005) (detailing the difference in the ordinary meanings of "obliterated" and "altered" in U.S.S.G. § 2K2.1(b)(4)). Because the disposition of this case does not turn on their distinctions, we use these terms, as well as the term "unmarked," interchangeably.

After the denial of the motion to dismiss the indictment, Marzzarella entered a conditional guilty plea, reserving the right to appeal the constitutionality of § 922(k). The District Court sentenced him to nine months imprisonment. Marzzarella now appeals. [2]

2    The District Court had jurisdiction over Marzzarella's indictment under 18 U.S.C. § 3231. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review of a constitutional challenge to the application of a statute. *United States v. Fullmer,* 584 F.3d 132, 151 (3d Cir.2009).

## II.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. To determine whether § 922(k) impermissibly burdens Marzzarella's Second Amendment rights, we begin with *Heller.* [3]

3    The Supreme Court recently issued its decision in *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). *McDonald* dealt primarily with the incorporation of the Second Amendment against the states, *id.* at 3050 (plurality opinion of Alito, J.), and does not alter our analysis of the scope of the right to bear arms.

**\*89** In *Heller,* the Supreme Court struck down several District of Columbia statutes prohibiting the possession of handguns and requiring lawfully owned firearms to be kept inoperable. 128 S.Ct. at 2817–18. The Court concluded the Second Amendment "confer[s] an individual right to keep and bear arms," *id.* at 2799, at least for the core purpose of allowing law-abiding citizens to "use arms in defense of hearth and home," *id.* at 2821. Although the Court declined to fully define the scope of the right to possess firearms, it did caution that the right is not absolute. *Id.* at 2816–17 ("Like most rights, the right secured by the Second Amendment is not unlimited.... [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms...."). But because the District of Columbia's laws prevented persons from possessing firearms even for self-defense in the home, they were unconstitutional under any form of means-end scrutiny applicable to assess the validity of limitations on constitutional rights. *Id.* at 2817–18 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights ... [the statutes] would fail constitutional muster." (citation and footnote omitted)).

As we read *Heller,* it suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. *Cf. United States v. Stevens,* 533 F.3d 218, 233 (3d Cir.2008), *aff'd* —— U.S. ——, 130 S.Ct. 1577, 176 L.Ed.2d 435 (recognizing the preliminary issue in a First Amendment challenge is whether the speech at issue is protected or unprotected). [4] If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

4

Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. *See, e.g.,* 128 S.Ct. at 2791–92 ("Just as the First Amendment protects modern forms of communications ... the Second Amendment extends ... to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citation omitted)); *id.* at 2799 ("Of course the right [to bear arms] was not unlimited, just as the First Amendment's right of free speech was not." (citation omitted)); *id.* at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions ... but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest-balancing by the people...."). We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.

### A.

Our threshold inquiry, then, is whether § 922(k) regulates conduct that falls within the scope of the Second Amendment. In other words, we must determine whether the possession of an unmarked firearm in the home is protected by the right to bear arms. In defining the Second Amendment, the Supreme Court began by analyzing the text of the "operative clause," which provides that "the right of the people to keep and bear Arms, shall not be infringed." *Heller,* 128 S.Ct. at 2789–90. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 2821, the Court interpreted **\*90** the text in light of its meaning at the time of ratification, *id.* at 2797–99. It concluded that the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." *Id.* at 2797. The "prefatory clause"—providing "[a] well regulated Militia being necessary to the security of a Free State"—explains only the purpose for codification, *viz.,* preventing the disbandment of the militia by the federal government. *Id.* at 2801. It says nothing about the content of the right to bear arms and does not mean the right was protected solely to preserve the militia. *Id.* "[M]ost [Americans] undoubtedly thought it even more important for self-defense and hunting," and the interest in self-defense "was the *central component* of the right itself." *Id.*

But the right protected by the Second Amendment is not unlimited. [5] *Id.* at 2816; *see also McDonald v. City of Chicago,* ——U.S. ——, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (plurality opinion of Alito, J.) (reiterating the limited nature of the right to bear arms). First, it does not extend to all types of weapons, only to those typically possessed by law-abiding citizens for lawful purposes. *Id.* at 2815–16 (interpreting *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). In *Miller,* the Supreme Court reversed the dismissal of an indictment of two men for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of then 26 U.S.C. § 1332(c) and (d). 307 U.S. at 175, 59 S.Ct. 816. The Court held the shotgun was unprotected by the Second Amendment. *Id.* at 178, 59 S.Ct. 816. In *Heller,* the Court explained that "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons," 128 S.Ct. at 2814—those commonly owned by law-abiding citizens, *id.* at 2815–16. This proposition reflected a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 2817. Accordingly, the right to bear arms, as **\*91** codified in the Second Amendment, affords no protection to "weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 2815–16.

5

There is some dispute over whether the language from *Heller* limiting the scope of the Second Amendment is dicta. *Compare United States v. Scroggins,* 599 F.3d 433, 451 (5th Cir.2010) (characterizing this language as dicta), *petition for cert. filed, (U.S.* June 1, 2010) (09–11204), *and United States v. McCane,* 573 F.3d 1037, 1047 (10th Cir.2009) (Tymkovich, J., dissenting) (same), *cert. denied,* —— U.S. ——, 130 S.Ct. 1686, 176 L.Ed.2d 179 (2010) *with United States v. Rozier,* 598 F.3d 768, 771 n. 6 (11th Cir.2010) (stating this language is not dicta), *cert. denied,* —— U.S. ——, 130 S.Ct. 3399, 177 L.Ed.2d 313 (2010), *and United States v. Vongxay,* 594 F.3d 1111, 1115 (9th Cir.2010) (same). But even if dicta, it is Supreme Court dicta, and, as such, requires serious consideration. *See Heleva v. Brooks,* 581 F.3d 187, 188 n. 1 (3d Cir.2009) ("[W]e do not view [Supreme Court] dicta lightly." (alterations in original) (internal quotation marks omitted)); *see also Schwab v. Crosby,* 451 F.3d 1308, 1325 (11th Cir.2006) ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta."). Several other courts of appeals have followed this dicta. *See, e.g., United States v. Skoien,* 614 F.3d 638, 640–41, 2010 WL 2735747, at \*3 (7th Cir.2010) (en banc);

*United States v. White,* 593 F.3d 1199, 1205–06 (11th Cir.2010) (extending it to cover a ban on possession by domestic violence offenders); *United States v. Rene E.,* 583 F.3d 8, 12 (1st Cir.2009) (finding the prohibition of juvenile possession of firearms was consistent with the approach of *Heller*'s dicta), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 1109, ––– L.Ed.2d –––– (2010); *McCane,* 573 F.3d at 1047 (relying solely on this dicta to conclude a ban on possession of firearms by felons did not offend the Second Amendment); *United States v. Anderson,* 559 F.3d 348, 352 (5th Cir.2009), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 2814, 174 L.Ed.2d 308 (2009); *United States v. Fincher,* 538 F.3d 868, 873–74 (8th Cir.2008) (upholding a ban on machine guns), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 1369, 173 L.Ed.2d 591 (2009). Moreover, the Court itself reaffirmed the presence of these limitations in *McDonald,* 130 S.Ct. at 3047 (plurality opinion of Alito, J.).

Moreover, the Court identified several other valid limitations on the right similarly derived from historical prohibitions. *Id.* at 2816–17.

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* The Court explained that this list of "presumptively lawful regulatory measures" was merely exemplary and not exhaustive. *Id.* at 2817 n. 26.

We recognize the phrase "presumptively lawful" could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny. Both

readings are reasonable interpretations, but we think the better reading, based on the text and the structure of *Heller,* is the former—in other words, that these longstanding limitations are exceptions to the right to bear arms.[6] Immediately following the above-quoted passage, the Court discussed "another important limitation" on the Second Amendment —restrictions on the types of weapons individuals may possess. *Heller,* 128 S.Ct. at 2817. The Court made clear that restrictions on the possession of dangerous and unusual weapons are not constitutionally suspect because these weapons are outside the ambit of the amendment. *Id.* at 2815–16 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes...."). By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently—as exceptions to the Second Amendment guarantee.

6    *See* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L.Rev. 375, 413 (2009) ("*Heller* categorically excludes certain types of 'people' and 'Arms' from Second Amendment coverage, denying them any constitutional protection whatsoever.").

This reading is also consistent with the historical approach *Heller* used to define the scope of the right. If the Second Amendment codified a pre-existing right to bear arms, *id.* at 2797, it codified the pre-ratification understanding of that right, *id.* at 2821 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them...."). Therefore, if the right to bear arms as commonly understood at the time of ratification did not bar restrictions on possession by felons or the mentally ill, it follows that by constitutionalizing this understanding, the Second Amendment carved out these limitations from the right. Moreover, the specific language chosen by the Court refers to "prohibitions" on the possession of firearms by felons and the mentally ill. *Id.* at 2816–17. The endorsement of prohibitions as opposed to regulations, whose validity would turn on the presence or absence of certain circumstances, suggests felons and the mentally **\*92** ill are disqualified from exercising their Second Amendment rights.[7] The same is true for "laws forbidding the carrying of firearms in sensitive places."[8] *Heller,* 128 S.Ct. at 2817.

7    *See* Blocher, *supra* note 5, at 414 (reading this language to stand for the proposition that "felons and the mentally

ill, however defined, are excluded entirely from Second Amendment coverage").

8      Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment under this reading. *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of firearms." 128 S.Ct. at 2817. In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

Accordingly, *Heller* delineates some of the boundaries of the Second Amendment right to bear arms.[9] At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous[10] weapons for self-defense in the home. *Id.* at 2821 ("[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes. *See, e.g., id.* at 2801 (discussing hunting's importance to the pre-ratification conception of the right); *id.* (discussing the right to bear arms as a bulwark against potential governmental oppression). The right is not unlimited, however, as the Second Amendment affords no protection for the possession of dangerous and unusual weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places. *Id.* at 2816–17.

9      *McDonald* concerns primarily the incorporation of the Second Amendment; its discussion of the scope of the right to bear arms is coextensive with *Heller's*.

10      By "non-dangerous weapons," we refer to weapons that do not trigger *Miller's* exception for dangerous and unusual weapons.

But *Heller* did not purport to fully define all the contours of the Second Amendment, *id.* at 2816 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment ...."), and accordingly, much of the scope of the right remains unsettled. While the Second Amendment clearly protects possession for certain lawful purposes, it is not the case that all possession for these purposes is protected conduct. For example, although the Second Amendment protects the individual right to possess

firearms for defense of hearth and home, *Heller* suggests, and many of our sister circuits have held, a felony conviction disqualifies an individual from asserting that interest. *See* 128 S.Ct. at 2816–17; *United States v. Rozier,* 598 F.3d 768, 770 (11th Cir.2010) ("We find 18 U.S.C. § 922(g)(1) to be constitutional, even if a felon possesses a firearm purely for self-defense."), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 3399, 177 L.Ed.2d 313 (2010); *see also United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir.2010); *United States v. Anderson,* 559 F.3d 348, 352 (5th Cir.2009), *cert. denied,* 129 S.Ct. 2814 (2009). This is so, even if a felon arguably possesses just as strong an interest in defending himself and his home as any law-abiding individual.

Moreover, *Heller's* list of presumptively lawful regulations is not exhaustive, 128 S.Ct. at 2817 n. 26, and accordingly, the **\*93** Second Amendment appears to leave intact additional classes of restrictions. But the approach for identifying these additional restrictions is also unsettled. *Heller's* identified exceptions all derived from historical regulations, but it is not clear that pre-ratification presence is the only avenue to a categorical exception. For example, does 18 U.S.C. § 922(g)(3)'s prohibition of possession by substance abusers violate the Second Amendment because no restrictions on possession by substance abusers existed at the time of ratification? Or is it valid because it presumably serves the same purpose as restrictions on possession by felons—preventing possession by presumptively dangerous individuals? *See Scarborough v. United States,* 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) ("[By prohibiting possession by felons,] Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (internal quotation marks omitted)); *United States v. Cheeseman,* 600 F.3d 270, 280 (3d Cir.2010) (noting, in a criminal forfeiture action, that congressional intent in passing § 922(g)(3) was "to keep firearms out of the possession of drug abusers, a dangerous class of individuals"), *petition for cert. filed,* 78 U.S.L.W. 3731 (U.S. June 1, 2010) (No. 09–1470). Therefore, prudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by *Heller. Cf. Stevens,* 533 F.3d at 225 (counseling restraint when extending the logic of categorical exceptions for unprotected speech to new types of speech).

Section 922(k)'s prohibition of the possession of firearms with "removed, obliterated, or altered" serial numbers is one of those regulations unmentioned by *Heller*. Marzzarella argues

§ 922(k) is unconstitutional because the Second Amendment categorically protects the right to possess unmarked firearms. *Heller* defined the Second Amendment by looking to what the right meant at the time of ratification. 128 S.Ct. at 2798–99. Because the Second Amendment protects weapons "of the kind in common use at the time," *id.* at 2815 (quoting *Miller,* 307 U.S. at 179, 59 S.Ct. 816), it must, says Marzzarella, protect firearms in common use at the time of ratification. He alleges that firearms in common use in 1791 did not possess serial numbers. Accordingly, he contends the Second Amendment must protect firearms without serial numbers.

We are not persuaded by Marzzarella's historical syllogism. His argument rests on the conception of unmarked firearms as a constitutionally recognized class of firearms, in much the same way handguns constitute a class of firearms. That premise is unavailing. *Heller* cautions against using such a historically fact-bound approach when defining the types of weapons within the scope of the right. 128 S.Ct. at 2791 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way."). Moreover, Marzzarella himself asserts that serial numbers on firearms did not exist at the time of ratification.[11] Accordingly, **\*94** they would not be within the contemplation of the pre-existing right codified by the Second Amendment. It would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms.

[11]  Marzzarella does not cite to any source for this assertion, but it appears that serial numbers arose only with the advent of mass production of firearms. *See* Thomas Henshaw, The History of Winchester Firearms 1866–1992, at ix (6th ed.1993) (listing the first recorded serial number on a Winchester firearm as appearing in 1866); National Park Service, U.S. Department of the Interior, Springfield Armory National Historic Site—M1865—88 rifles, http://www.nps.gov/spar/historyculture/m 1865–88–rifles.htm (last visited July 8, 2010) (stating that no serial numbers appeared on Springfield Armory weapons until 1868).

Furthermore, it also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility. *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality. *Id.* at 2818 (citing handguns'

ease in storage, access, and use in case of confrontation). But unmarked firearms are functionally no different from marked firearms. The mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic.

Although there is no categorical protection for unmarked firearms, Marzzarella's conduct may still fall within the Second Amendment because his possession of the Titan pistol in his home implicates his interest in the defense of hearth and home—the core protection of the Second Amendment. While the burden on his ability to defend himself is not as heavy as the one involved in *Heller,* infringements on protected rights can be, depending on the facts, as constitutionally suspect as outright bans. *See United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ( "It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree."). Marzzarella contends that by preventing him from possessing this particular handgun in his home, § 922(k) unconstitutionally limited his ability to defend himself.[12]

[12]  The Government argues Marzzarella did not possess the firearm for self-defense purposes because he intended to sell it to Toski. But the Government elected to indict Marzzarella only for possession of the handgun, not the sale. If he possessed the pistol for self-defense purposes, its subsequent sale would not somehow retroactively eliminate that interest.

We are skeptical of Marzzarella's argument that possession in the home is conclusive proof that § 922(k) regulates protected conduct. Because the presence of a serial number does not impair the use or functioning of a weapon in any way, the burden on Marzzarella's ability to defend himself is arguably *de minimis.* Section 922(k) did not bar Marzzarella from possessing any otherwise lawful marked firearm for the purpose of self-defense, and a person is just as capable of defending himself with a marked firearm as with an unmarked firearm. With or without a serial number, a pistol is still a pistol. Furthermore, it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances. By this rationale, any type of firearm possessed in the home would be protected merely because it could be used for self-defense. Possession of machine guns or short-barreled shotguns—or any other dangerous and unusual weapon—so long as they were kept in the home, would then fall within the Second Amendment. But the Supreme Court has made clear the Second Amendment

does not protect those types of weapons. *See Miller,* 307 U.S. at 178, 59 S.Ct. 816 (holding that short-barreled shotguns are unprotected); *see also United States v.* **\*95** *Fincher,* 538 F.3d 868, 874 (8th Cir.2008) ( "Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied,* 129 S.Ct. 1369 (2009).

It is arguably possible to extend the exception for dangerous and unusual weapons to cover unmarked firearms. "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes...." *Heller,* 128 S.Ct. at 2815–16. The District Court could not identify, and Marzzarella does not assert, any lawful purpose served by obliterating a serial number on a firearm. Because a firearm with a serial number is equally effective as a firearm without one, there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm. These weapons would then have value primarily for persons seeking to use them for illicit purposes. *See United States v. Carter,* 421 F.3d 909, 910 (9th Cir.2005) (noting that unmarked firearms have a "greater flexibility to be utilized in illicit activities" (alteration and internal quotation marks omitted)); *cf. United States v. Tagg,* 572 F.3d 1320, 1326 (11th Cir.2009) (finding no Second Amendment protection for pipe bombs because they could not be used for legitimate lawful purposes); *State v. Chandler,* 5 La. Ann. 489, 489–90 (1850) (holding concealed weapons could be prohibited because of their tendency to be used in violent crimes on unsuspecting victims). Nevertheless, a handgun with an obliterated serial number seems distinct from a weapon like a short-barreled shotgun. While a short-barreled shotgun is dangerous and unusual in that its concealability fosters its use in illicit activity, it is also dangerous and unusual because of its heightened capability to cause damage. *See United States v. Amos,* 501 F.3d 524, 532 (6th Cir.2007) (McKeague, J., dissenting) ("With its shorter barrel, a sawed-off shotgun can be concealed under a large shirt or coat. It is the combination of low, somewhat indiscriminate accuracy, large destructive power, and the ability to conceal that makes a sawed-off shotgun useful for only violence against another person ...."); *see also United States v. Upton,* 512 F.3d 394, 404 (7th Cir.2008) (likening sawed-off shotguns to "other dangerous weapons like bazookas, mortars, pipe bombs, and machine guns"). An unmarked firearm, on the other hand, is no more damaging than a marked firearm.

Accordingly, while the Government argues that § 922(k) does not impair any Second Amendment rights, we cannot be certain that the possession of unmarked firearms in the home is excluded from the right to bear arms. Because we conclude § 922(k) would pass constitutional muster even if it burdens protected conduct, we need not decide whether Marzzarella's right to bear arms was infringed.

## B.

Assuming § 922(k) burdens Marzzarella's Second Amendment rights, we evaluate the law under the appropriate standard of constitutional scrutiny. *Heller* did not prescribe the standard applicable to the District of Columbia's handgun ban. 128 S.Ct. at 2817–18. Instead, it held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights [the ban] ... would fail constitutional muster." *Id.* (footnote omitted).

The Government argues a rational basis test [13] should apply to § 922(k), but *Heller* **\*96** rejects that standard for laws burdening Second Amendment rights. *Id.* at 2816 n. 27. The Court noted that even a law as burdensome as the District of Columbia's handgun ban would be constitutional under a rational basis test. *Id.* The fact that the ban was struck down, therefore, indicates some form of heightened scrutiny must have applied. Moreover, "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.*

13    A rational basis test presumes the law is valid and asks only whether the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Marzzarella, on the other hand, contends we must apply strict scrutiny [14] because the right to bear arms is an enumerated fundamental constitutional right. *See McDonald,* 130 S.Ct. at 3050 (plurality opinion of Alito, J.). Whether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges. Strict scrutiny does not apply automatically any time an enumerated right is involved. We do not treat First Amendment challenges that way. [15] Strict scrutiny is triggered by content-based restrictions

on speech in a public forum, *see Pleasant Grove City v. Summum,* ——U.S. ——, ——, 129 S.Ct. 1125, 1132, 172 L.Ed.2d 853 (2009), but content-neutral time, place, and manner restrictions in a public forum trigger a form of intermediate scrutiny, *see Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (upholding such restrictions if they "are justified without reference to the content of the regulated speech, ... they are narrowly tailored to serve a significant governmental interest, and ... they leave open ample alternative channels for communication of the information." (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984))). Regulations on nonmisleading commercial speech trigger another form of intermediate scrutiny, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (requiring the regulation to directly advance a substantial governmental interest and not be more burdensome than necessary to serve that interest), whereas disclosure requirements for commercial speech trigger a rational basis test, *see Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) ("We do not suggest that disclosure requirements do not implicate the advertiser's First Amendment rights at all.... But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."). In sum, the right to free speech, an undeniably enumerated fundamental right, *see W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see **\*97** no reason why the Second Amendment would be any different.

14    Strict scrutiny asks whether the law is narrowly tailored to serve a compelling government interest. *Playboy Entm't Group,* 529 U.S. at 813, 120 S.Ct. 1878.

15    While we recognize the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment.

If the Second Amendment can trigger more than one particular standard of scrutiny, § 922(k) should merit a less stringent standard than the one that would have applied to the District of Columbia's handgun ban. While it is not free from doubt, we think this means that § 922(k) should be evaluated under intermediate scrutiny. The burden imposed by the law does not severely limit the possession of firearms. The District of Columbia's handgun ban is an example of a law at the far end of the spectrum of infringement on protected Second Amendment rights. *Heller,* 128 S.Ct. at 2818 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."). It did not just regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home. *Id.* But § 922(k) does not come close to this level of infringement. It leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number.

Furthermore, the legislative intent behind § 922(k) was not to limit the ability of persons to possess any class of firearms. While the intent of the District of Columbia's ban was to prevent the possession of handguns, § 922(k) permits possession of all otherwise lawful firearms. As Congress indicated with respect to the Omnibus Crime Control and Safe Streets Act of 1968—which included § 922(k)'s predecessor:

> It is not the purpose of the title to place any undue or unnecessary restrictions or burdens on responsible, law-abiding citizens with respect to the acquisition, possession, transporting, or use of firearms appropriate to ... personal protection, or any other lawful activity. The title is not intended to discourage or eliminate the private ownership of such firearms by law-abiding citizens for lawful purposes....

S. Rep. 90–1097, at 28 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2114. Section 922(k) is designed to prohibit possession of only unmarked firearms, while leaving the possession of marked firearms untouched.

Because § 922(k) was neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights. The distinction between limitations on the exercise of protected conduct and regulation of the form in which that conduct occurs also appears in the First Amendment context. Discrimination against particular messages in a public forum is subject to the most exacting

scrutiny. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Regulations of the manner in which that speech takes place, however, receive intermediate scrutiny, under the time, place, and manner doctrine. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746. Accordingly, we think § 922(k) also should merit intermediate, rather than strict, scrutiny.

In the First Amendment speech context, intermediate scrutiny is articulated in several different forms. *See Turner Broad. Sys.,* 512 U.S. at 662, 114 S.Ct. 2445 (requiring the regulation serve "an important or substantial" interest and not "burden substantially more speech than is necessary" to further that interest (internal quotation marks omitted)); *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (requiring a "substantial" governmental goal and a "reasonable fit" between the **\*98** regulation and that objective); *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (applying the time, place, and manner standard which asks whether the regulation is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication); *Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343 (requiring the regulation directly advance a substantial interest and be no more extensive than necessary to serve the interest). Although these standards differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either "significant," "substantial," or "important." *See, e.g., Turner Broad. Sys.,* 512 U.S. at 662, 114 S.Ct. 2445; *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. They generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect. *See, e.g., Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 556, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *Fox,* 492 U.S. at 480, 109 S.Ct. 3028. The regulation need not be the least restrictive means of serving the interest, *see, e.g., Turner Broad. Sys.,* 512 U.S. at 662, 114 S.Ct. 2445; *Ward,* 491 U.S. at 798, 109 S.Ct. 2746, but may not burden more speech than is reasonably necessary, *see, e.g., Turner Broad. Sys.,* 512 U.S. at 662, 114 S.Ct. 2445; *Ward,* 491 U.S. at 800, 109 S.Ct. 2746.

Those requirements are met here. First, we think it plain that § 922(k) serves a law enforcement interest in enabling the tracing of weapons via their serial numbers. Section 922(k) was enacted by the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213, 1221.[16] The objective of this Act was "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett*

*v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). The goal of § 922(k), in particular, is to assist law enforcement by making it possible to use the serial number of a firearm recovered in a crime to trace and identify its owner and source. *See United States v. Adams,* 305 F.3d 30, 34 (1st Cir.2002) ( "[A]nyone can see what Congress was getting at in the statute.... [T]he statute aims to punish one who possesses a firearm whose principal means of tracing origin and transfers in ownership —its serial number—has been deleted or made appreciably more difficult to make out."); *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir.1992) ("It is no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes. When a firearm is stolen, determining this chain is difficult and when serial numbers are obliterated, it is virtually impossible."). Firearms without serial numbers are of particular value to those engaged in illicit activity because the absence of serial numbers helps shield recovered firearms and their possessors from identification. *See Carter,* 421 F.3d at 910. Their prevalence, therefore, makes it more difficult for law enforcement to gather information on firearms recovered in crimes. Accordingly, preserving the ability of law enforcement to conduct serial number tracing— effectuated by limiting the availability of untraceable firearms —constitutes a substantial or important interest.

16     This restriction was originally enacted by the Federal Firearms Act of 1938, Pub.L. No. 75–785, 52 Stat. 1250, 1251.

Section 922(k) also fits reasonably with that interest in that it reaches only conduct creating a substantial risk of rendering a firearm untraceable. Because unmarked weapons are functionally no different **\*99** from marked weapons, § 922(k) does not limit the possession of any class of firearms. Moreover, because we, like the District Court, cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm, the burden will almost always fall only on those intending to engage in illicit behavior. Regulating the possession of unmarked firearms—and no other firearms—therefore fits closely with the interest in ensuring the traceability of weapons. Accordingly, § 922(k) passes muster under intermediate scrutiny.

Although we apply intermediate scrutiny, we conclude that even if strict scrutiny were to apply to § 922(k), the statute still would pass muster. For a law to pass muster under strict scrutiny, it must be "narrowly tailored to serve a compelling state interest." *FEC v. Wis. Right to Life, Inc.,* 551 U.S. 449, 465, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). We presume

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

the law is invalid, and the government bears the burden of rebutting that presumption. *Playboy Entm't Group,* 529 U.S. at 817, 120 S.Ct. 1878.

While First Amendment jurisprudence has articulated a comprehensive doctrine around what can and cannot be a compelling interest for restrictions on speech, *see, e.g.,* Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny,* 144 U. Pa. L.Rev. 2417, 2419–21 (1996), Second Amendment jurisprudence is not yet so developed. As we discussed above, serial number tracing serves a governmental interest in enabling law enforcement to gather vital information from recovered firearms. Because it assists law enforcement in this manner, we find its preservation is not only a substantial but a compelling interest. *See United States v. Salerno,* 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding that the government interest in preventing crime is compelling).

Marzzarella would have us conclude that serial number tracing is not a genuine compelling interest because current federal law does not mandate an intensive enough registration and tracing system to always provide a picture of the entire chain of custody of a recovered firearm. If a regulation fails to cover a substantial amount of conduct implicating the asserted compelling interest, its underinclusiveness can be evidence that the interest is not significant enough to justify the regulation. *See Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *see also Fla. Star v. B.J.F.,* 491 U.S. 524, 541–42, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the highest order ... when it leaves appreciable damage to that supposedly vital interest unprohibited." (citation and internal quotations marks omitted)). As Marzzarella points out, firearms are normally traceable only to the first retail purchaser. [17] Because private sellers are not required to record their sales, firearms sold secondhand generally cannot be tracked by serial number. [18] Moreover, even federally licensed dealers, who must record their sales, are only required to keep these records for twenty years, not in perpetuity. 27 C.F.R. § 478.129(e). The **\*100** absence of a more comprehensive recordation scheme means the serial number tracing of a recovered firearm generally does not permit law enforcement agencies to follow the firearm through every transfer from the initial retail sale to the end user. Marzzarella argues this renders § 922(k) fatally underinclusive.

17    *See* Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* x (2000), *available at* http://www.mayorsagainstillegalguns. org/downloads/pdf/Following_the_Gun% 202000.pdf. Although the ATF report *Following the Gun* does not appear in the record, Marzzarella cites to it in his opening brief. We consider its use unobjectionable.

18    *See id.* at 17 (referring to firearms sold secondhand as "untraceable").

We see no reason to view serial number tracing so narrowly. The direct tracing of the chain of custody of firearms involved in crimes is one useful means by which serial numbers assist law enforcement. [19] But serial number tracing also provides agencies with vital criminology statistics—including a detailed picture of the geographical source areas for firearms trafficking and "time-to-crime" statistics which measure the time between a firearm's initial retail sale and its recovery in a crime [20]—as well as allowing for the identification of individual dealers involved in the trafficking of firearms and the matching of ballistics data with recovered firearms. [21] Section 922(k), therefore, "demonstrate[s] [Congress's] commitment to advancing" the compelling interest of preserving serial number tracing. *Fla. Star,* 491 U.S. at 540, 109 S.Ct. 2603.

19    *See Following the Gun, supra* note 17, at 44 ("[T]racing was used as an investigative tool to gain information on recovered crime guns in 60 percent of the investigations....").

20    The reporting of trace data by the ATF has been partially restricted by the Tiahrt Amendments to federal appropriations bills, Pub.L. No. 111–8, 123 Stat. 524, 575 (2009) (codified as Note to 18 U.S.C. § 923). Currently, the restriction prevents the ATF from publicly disclosing trace data, and precludes the data from being disclosed or used in any civil action. *Id.* It does not restrict the reporting of this data to law enforcement agencies. *Id.*

21    *See Following the Gun, supra* note 17, at 41–44.

Section 922(k) must also be narrowly tailored to serve that interest. Narrow tailoring requires that the regulation actually advance the compelling interest it is designed to serve. *See Eu v. S.F. County Democratic Cent. Comm.,* 489 U.S. 214, 226, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). The law must be the least-restrictive method of serving that interest, and the burdening of a significant amount of protected conduct not implicating the interest is evidence the regulation is

insufficiently tailored. *See Ashcroft v. ACLU,* 542 U.S. 656, 666, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). Section 922(k) restricts possession only of weapons which have been made less susceptible to tracing. Because it does not limit the possession of any otherwise lawful firearm, it does not burden more possession than necessary to protect the interest in serial number tracing.

 Marzzarella argues § 922(k) is overinclusive and, therefore, fails narrow tailoring. Because in certain cases—such as Marzzarella's—it is possible through laboratory procedures to discern the original serial number of a firearm despite efforts to remove, obliterate, or alter it, he contends § 922(k) goes further than is required. Presumably, Marzzarella believes the overinclusiveness could be cured by applying § 922(k) only where, upon recovery of the firearm and subsequent laboratory testing, the serial number still cannot be read.[22] But we do not think the fact that, in some cases, ex post circumstances **\*101** can allow for the deciphering of a serial number renders § 922(k) insufficiently tailored. The statute protects the compelling interest of tracing firearms by discouraging the possession and use of firearms that are harder or impossible to trace. It does this by criminalizing the possession of firearms which have been altered to make them harder or impossible to trace. That these actions sometimes fail does not make the statute any less properly designed to remedy the problem of untraceable firearms. Accordingly, we find § 922(k) is narrowly tailored.

[22] We have our doubts about the administrability of such a standard. For starters, how much effort by law enforcement agencies would be required before courts could determine the serial number was unreadable? Moreover, the standard would provide uneven deterrence because persons would be unaware at the time of commission whether their conduct would lead to criminal liability or not. Section 922(k), read in this manner, would likely be difficult to apply.

### III.

Second Amendment doctrine remains in its nascency, and lower courts must proceed deliberately when addressing regulations unmentioned by *Heller.* Accordingly, we hesitate to say Marzzarella's possession of an unmarked firearm in his home is unprotected conduct. But because § 922(k) would pass muster under either intermediate scrutiny or strict scrutiny, Marzzarella's conviction must stand.

For the foregoing reasons, we will affirm the District Court's denial of Marzzarella's motion to dismiss the indictment and affirm his judgment of conviction and sentence.

**All Citations**

614 F.3d 85

---

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

105 F.3d 997
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
William Joseph KIRK, Defendant-Appellant.

No. 94-50472.
|
Feb. 3, 1997.

**Attorneys and Law Firms**

**\*997** Richard L. Durbin, Jr., Asst. U.S. Attorney, Mark Randolph Stelmach, Assistant **\*998** U.S. Attorney, Office of the United States Attorney, San Antonio, TX, for plaintiff-appellee.

Edwin Gerald Morris, Morris & Florey, Austin, TX, for defendant-appellant.

Keith S. Hampton, Cynthia Lanning Hampton, Austin, TX, for Texas Criminal Defense Lawyers Association, amicus curiae.

Appeal from the United States District Court for the Western District of Texas; Sam Sparks, Judge.

Before POLITZ, Chief Judge, and KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES,\* STEWART, PARKER and DENNIS, Circuit Judges.

\*    Judge Benavides was recused from consideration of this case.

Prior report: 70 F.3d 791

**Opinion**

PER CURIAM:

By virtue of an equally divided en banc court, the judgment of the district court is AFFIRMED.

ROBERT M. PARKER, Circuit Judge, joined by POLITZ, Chief Judge, and KING, HIGGINBOTHAM, DAVIS, WIENER, STEWART and DENNIS, Circuit Judges, would affirm for the following reasons:

In my view, there was a rational basis for Congress to conclude that post-1986 incidents of manufacture, transfer, and possession of machineguns fall within its power to regulate interstate commerce. Every circuit that has examined 18 U.S.C. § 922(*o*)-both before and after *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)-has determined that § 922(*o*) does not exceed the authority granted to Congress by the Commerce Clause. [1]

1    *See United States v. Rybar,* 103 F.3d 273 (3d Cir.1996); *United States v. Beuckelaere,* 91 F.3d 781 (6th Cir.1996); *United States v. Kenney,* 91 F.3d 884 (7th Cir.1996); *United States v. Rambo,* 74 F.3d 948 (9th Cir.), *cert. denied,* 519 U.S. 819, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995); *United States v. Hale,* 978 F.2d 1016 (8th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993).

A careful reading of *Lopez* compels this conclusion. In *Lopez,* the Supreme Court held that Congress exceeded its Commerce Clause power by enacting § 922(q) which criminalizes possession of a firearm within 1000 feet of the grounds of a school, *see* § 921(a)(25), a small geographic area finitely circumscribed and related to education, a uniquely local concern. In contrast, the extensive history of federal firearm regulation and the national scope of § 922(q) distinguishes it from § 922(q). It is important to the understanding of *Lopez* that the Supreme Court intended to establish an outer limit to congressional authority, not to retreat from well-established Commerce Clause precedent. *United States v. Kenney,* 91 F.3d 884, 887 (7th Cir.1996). As Chief Justice Rehnquist noted, "[S]ome of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1634.

Simply stated, I believe that we should join the other circuits in holding that Congress had a rational basis for concluding that the manufacture, transfer and possession of machineguns substantially affect commerce and § 922(*o*) therefore is constitutional.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

PATRICK E. HIGGINBOTHAM, Circuit Judge, joined by POLITZ, Chief Judge, and DAVIS and WIENER, Circuit Judges, would affirm for the following reasons:

We are persuaded that a legislative judgment that possession of machine guns acquired after 1986 has a substantial effect on interstate commerce, particularly by facilitating the trade in illegal drugs, is supported by our judicial experience and facts about machine guns and interstate criminal activity common to public discourse. Congress did not exceed its power under the Commerce Clause, and we today correctly affirm this conviction.

I.

This case ultimately turns on the role of congressional findings in judicial review of **\*999** congressional exercises of its commerce power. Our opinion in *United States v. Lopez,* 2 F.3d 1342 (5th Cir.1993), *aff'd,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), stressed the absence of congressional findings of the relationship between Congress's regulation of guns near schools and its commerce power. We required that Congress justify its authority by findings. The Supreme Court affirmed our holding that Congress lacked authority to regulate possession of a gun in proximity to a school, but it did not adopt our rationale. Rather, the Court shied away from so direct an imposition of procedure upon the Congress. Nonetheless, the court did give weight to the absence of congressionally identified ties between the regulation and the commerce power. 514 U.S. at ---- - ----, 115 S.Ct. at 1631-32.

*Lopez,* then, adhered to a rational basis standard of review. This deferential standard does not insist that Congress actually make factual findings. To the contrary, its tolerance of hypothetical, judicially supposed purposes and means gives the rational basis standard its deferential character. Courts can assume a more activist role in judicial review by refusing to look to a basis for legislation not identified by Congress. This elevates the standard of review, according significantly less deference to Congress. Giving weight to the absence of congressional findings lies in the middle ground between an intrusive absolute insistence upon legislative findings and traditional rational basis inquiry. Congressional findings are not merely playthings of formalism. They help define the respective roles of the courts and the Congress and the federal and the state governments. So the role of findings demands our attention. But their absence does not end our inquiry. Here

Congress made no findings. We give weight to the absence of findings, but we do not find their absence controlling. Under *Lopez,* we must continue to apply the rational basis test, which asks courts not to set aside congressional acts as exceeding the Commerce Clause power if the Congress could have found that the relevant intrastate activity has a substantial effect on interstate commerce. This deference respects differences between the fact-finding of courts and legislative findings, differences of a constitutional order. Legislative "findings," relative to judicial findings, are untidy in their blending of empirical assessment and policy judgments. The difference reflects the fundamentally different roles of the judiciary and the Congress. Congress must respond actively to problems faced by political communities; its judgment is accented by its look to the future and its effort to offer solutions to social ills. The judicial decision looks backward, responding to the limits of a case or controversy. We must not forget these differences in inquiring what the legislature rationally could have found. Losing sight of these differences risks a blurring of the respective roles of Congress and the courts, a difference the rational basis test is intended to respect. On the one hand, courts have a constitutional duty to scrutinize congressional actions to ensure that Congress stays within its constitutionally enumerated powers; "if *Lopez* means anything, it is that Congress's power under the Commerce Clause must have some limits." *United States v. Rybar,* 103 F.3d 273, 291 (3d Cir.1996) (Alito, J., dissenting). On the other hand, we must discipline our scrutiny to ensure that we are about the business of judicial review and not the business of social policy. Stated another way, respecting the policy-making role of majoritarian legislative bodies is not an empty recitation.

This familiar problem for rational basis review is especially awkward when the issue is whether an intrastate activity has a substantial effect on interstate commerce. Unless the Court follows Justice Thomas away from an effects test, *see Lopez,* 514 U.S. at ---- - ----, 115 S.Ct. at 1642-51 (Thomas, J., concurring), we cannot escape this difficulty. Justice Breyer's elaborate study of education, guns, and commerce will continue to be commonplace, despite the reality that judicial searches for data that might have supported a legislative finding raise the troubling prospect of the courts doing work the Congress ought to have done. *See id.* at ---- - ----, 115 S.Ct. at 1659-62 (Breyer, J., dissenting). And as Justice Souter has pointed out, the doctrine of clear statement offers no escape. *See id.* at ----, 115 S.Ct. at 1655 (Souter, J., dissenting). What the **\*1000** Supreme Court will do with the meaning of "substantial effect" remains to be seen. These plastic words

AR004651

may lessen deference to Congress by judicial demands for empirical evidence as well as normative valuations of state and federal "interests." Regardless of that future, according weight to the absence of legislative findings in close cases fairly accommodates these competing interests. Cases are at least close when courts feel the need to conduct elaborate empirical studies to determine whether the facts support exercise of the federal commerce power. If the facts were not within our easy reach, this would be a close case indeed, and the absence of findings would then tilt the outcome. This simply states a limit upon the role of the courts in their inquiries into whether there is a rational basis for a legislative judgment.

## II.

In executing the rational basis test, we turn to facts bearing on the relationship between possession of machine guns and interstate commerce. The prosecution has not aided our factual inquiry on this score. But the concern over machine guns was hardly exotic. To the contrary, concern over both the unique firepower of automatic weapons and the recent increase in their number was the subject of public discussion, as a simple repair to the popular press makes plain. That exercise also sheds light on the type of data and expert opinion available to the Congress. A 1985 article in a national weekly magazine alerted Americans to the dangerous proliferation of machine guns and reported that "[t]he MAC-10 has become the side arm of choice for 'cocaine cowboys' and other drug smugglers." *Machine Gun U.S.A.,* NEWSWEEK, October 14, 1985, at 46. According to the article, American gun dealers imported an average of 55,000 machine guns during the early 1980s. In 1988, two years after the passage of § 922(*o*), the International Association of Chiefs of Police estimated that criminals possessed between 650,000 and two million automatic and semi-automatic weapons. *The Arms Race in Your Own Back Yard,* U.S. NEWS & WORLD REPORT, April 4, 1988, at 24. Presumably, the great percentage of these weapons were semi-automatic weapons and not machine guns. In 1987, the DEA "seized an average of one machine gun a day," which led the press to report that "most of this ferocious firepower is deployed in connection with narcotics trafficking." *Id.* This sort of information, easily accessible to Congress, would support a legislative judgment that the possession of machine guns interferes with federal drug enforcement; that regulating the simple possession of machine guns acquired after 1986 is necessary to stop the rapid growth of the pool of supply. Indeed, there is reason to

think that Congress had these sorts of figures in mind when it enacted § 922(*o*). *See* 1986 U.S.S.C.A.N. 1330 (noting that an alternative bill "prohibited the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime").

The efficacy of § 922(*o*) also suggests that a legislative judgment of a strong tie between machine guns and federal crimes would have been valid. In 1983, ATF seized 871 machine guns and conversion kits; by 1985, that number had ballooned to 3,263. NEWSWEEK, October 14, 1985, at 46. After passage of § 922(*o*), however, this figure dropped dramatically. There were only 834 ATF machine gun seizures in fiscal year 1987, as opposed to 2,854 seizures in fiscal year 1986, a decrease of 71 percent. *Semiautomatic Assault Weapons Act of 1989: Hearings before the Subcommittee on Crime of the Committee on the Judiciary,* 101st Cong., 1st Sess. 354 (1989) (Appendix 9: "The 1986 Machine Gun Law Works"); Tony Freemantle, *Police Groups Warm to Bill on Gun Control,* HOUSTON CHRONICLE, March 19, 1989, at A1. These figures at least suggest that § 922(*o*) succeeded in substantially reducing the number of machine guns in the hands of criminals encountered by federal law enforcement. And the striking effectiveness of federal enforcement of the congressional freeze of the machine gun market gives us reason to think that in 1986 Congress could have mustered facts to support its legislative judgment that the ban would be effective in reducing the availability of machine guns to those confronting federal law enforcement, particularly in the drug **\*1001** trade. That other inferences might be drawn from the data or that there is conflicting data is no answer because our question is not what judges think or prefer, but what rational judgment Congress could have made.

The bill that enacted § 922(*o*) also imposed on drug traffickers who use a machine gun a special ten-year sentence rather than the standard five-year sentence for other firearms. Pub.L. No. 99-308 § 104, 100 Stat. 456, 457 (May 19, 1986) (amending 18 U.S.C. § 924(c)(1)). Two years later, Congress thought it prudent to add another twenty years to this penalty. Pub.L. No. 100-690 § 6460, 102 Stat. 4373, 4373 (Nov. 18, 1988). This concerted attention to the dangers of automatic weapons is at odds with the suggestion that Congress's freeze on the market in machine guns rests on an irrational judgment about the ties between machine guns and drug dealers and about the effects of tolerating their possession after 1986. Federal law enforcement recognizes the importance of having such powerful weapons in confrontations with drug traffickers. In

1988, DEA, the primary enforcement agency in the regulation of drugs, moved away from shotguns and made 9-mm, 32-round weapons that can be fired automatically its "primary" weapons. U.S. NEWS & WORLD REPORT, April 4, 1988, at 24. These developments make it clear that it is at least rational to conclude that federal regulation of a distinct market in machine guns is part and parcel of federal drug regulation.

Judge Parker in his opinion for the panel found it important that Congress has done more here than outlaw simple possession of a machine gun. We agree. Not every possession is prohibited. Rather, the Congress has left lawful the possession of machine guns manufactured before 1986 and lawfully possessed before that date. It is a crime to transfer any machine gun after 1986 or to possess a machine gun manufactured after that date. That is, Congress froze in place the market in machine guns. Judge Garwood made this point in his opinion for the panel in *Lopez:*

> Section 922(*o*) is restricted to a narrow class of highly destructive, sophisticated weapons that have been either manufactured or imported *after* enactment of the Firearms Owners' Protection Act, which is more suggestive of a nexus to or [e]ffect on interstate or foreign commerce than possession of any firearms whatever, no matter when or where originated, within one thousand feet of the grounds of any school.

2 F.3d at 1356 (emphasis in original) (footnote omitted). It is true that simple possession is the stated offense under the statute, but by excepting activity occurring before 1986, a proscribed possession, by definition, must have been the product of a post-1986 transfer, interstate or intrastate (putting to one side the remote cases of worn guns and, for the moment, cases involving conversion into fully automatic guns). Such careful regulation reflects legislative deliberation we are bound to respect.

Machine guns possess a firepower that outstrips any other kind of gun. Persons knowledgeable about firearms, such as those who campaign for repeal of gun regulations, usually emphasize that machine guns stand in a class of their own. *See Assault Weapons: A View from the Front*

*Lines: Hearing before the Committee on the Judiciary,* 103d Cong., 1st Sess. 183, 185-86 (1994) (emphasizing that the cosmetic similarities between machine guns and semi-automatic assault weapons belie functional differences that make assault weapons more like hunting and target rifles than like machine guns). The destructive capacity of machine guns puts them in the same category as explosives, which the federal government has heavily regulated for over twenty-five years, except machine guns have little lawful use. *See* Organized Crime Control Act of 1970, Title XI, § 1102(a), Pub.L. No. 91-452, 84 Stat. 953-55 (codified as amended at 18 U.S.C. §§ 842-843) (prohibiting, among other things, the storage of explosives without a federal permit); *United States v. Lopez,* 467 F.2d 668, 673 (8th Cir.1972) ("There being a rational basis upon which Congress properly could have determined that the misuse of explosive materials is one activity which, as a class, affects commerce, the Government need not specifically allege and prove a connection between interstate commerce **\*1002** and the conduct made criminal by § 842(h)."), *cert. denied,* 410 U.S. 956, 93 S.Ct. 1427, 35 L.Ed.2d 689 (1973).

This fundamental difference between machine guns and other guns is reflected in the long history of machine-gun regulation by Congress. Initially, Congress used the taxing power to insist upon machine gun registration. *See* National Firearms Act of 1934, Pub.L. No. 474 §§ 2-6, 48 Stat. 1236, 1237-38. It soon turned to the Commerce Clause as a basis for restricting the market in machine guns. *See* Federal Firearms Act of 1938, Pub.L. No. 785, 52 Stat. 1250. That law remained in effect for thirty years, when Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 197 (current version at 18 U.S.C. §§ 921-928), of which § 922(*o*) is now a part. Machine guns, then, have not been the exclusive regulatory domain of the states. Their lethal force has produced a national response.

### III.

Those who urge that this legislation is unconstitutional are at pains not to undercut the constitutionality of laws prohibiting the simple possession of drugs. Yet it is difficult to conclude that Congress could not have rationally found that machine guns play a large role in major drug transactions and thus that the availability of these weapons of war has a substantial effect on the interstate traffic in drugs. Congress has acted on that effect in providing that the use of a gun, otherwise lawful, in a drug transaction brings substantially increased penalties.

18 U.S.C. § 924(c)(1). We have repeatedly recognized firearms as one of the drug dealer's "tools of the trade." *See United States v. Martinez,* 808 F.2d 1050, 1057 (5th Cir.), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). The firepower of a machine gun puts it in a quite different category from the handguns, shotguns, and rifles so popular with sportsmen. Its continuous fire puts the machine gun on a different plane from the semi-automatic. The routine cases on the criminal docket in federal courts make the connection between machine guns and major drug transactions undeniable. Whether the effect is "substantial" is less certain, as we have explained. *See supra* at 1000-01. But we need conduct no elaborate study. As shown above, the writing of the popular press and the scale of congressionally-set penalties demonstrate that the baseline of public debate assumes a heavy use of machine guns in drug-related crimes. Significantly, our cases provide anecdotal information that meshes with this data and together would make § 922(*o*) a rational way to cabin both violence attending the drug trade and the trade itself.[1] The quantity of machine **\*1003** guns that federal courts encounter in drug cases is high enough to conclude that Congress would have had a rational basis for a legislative judgment that prohibiting their intrastate possession would have a substantial effect on the interstate commerce in illegal drugs.

[1]    A brief survey of recent federal cases reveals many examples. *See, e.g., Smith v. United States,* 508 U.S. 223, 224, 113 S.Ct. 2050, 2052, 124 L.Ed.2d 138 (1993) (defendant in possession of a fully automatic MAC-10 and MAC-11 machine gun attempts to buy cocaine by selling the MAC-10, a gun that "apparently is a favorite among criminals" because it "can fire more than 1,000 rounds per minute"); *United States v. Powell,* 469 U.S. 57, 59, 105 S.Ct. 471, 473, 83 L.Ed.2d 461 (1984) (search of defendant's car yields, among other things, two kilograms of cocaine and a machine gun); *County Court v. Allen,* 442 U.S. 140, 143, 99 S.Ct. 2213, 2217, 60 L.Ed.2d 777 (1979) (loaded machine gun and more than a pound of heroin found in the trunk of defendants' car); *United States v. Jones,* 102 F.3d 804, 806 (6th Cir.1996) (cocaine dealers attempt to sell federal agents a MAC-10, a MAC-11, and an AK-47, two of which have obliterated serial numbers); *United States v. Agis-Meza,* 99 F.3d 1052, 1054 (11th Cir.1996) (two defendants charged with violation of § 922(*o*) plead guilty to possession of marijuana); *United States v. Alerta,* 96 F.3d 1230, 1233 (9th Cir.1996) (two brothers arrested for methamphetamine distribution are found in possession of two fully automatic weapons:

a MAC-10 and a converted TEC-9); *United States v. Hawthorne,* 94 F.3d 118, 120 (4th Cir.1996) (automatic pistols used during drug transactions); *U.S. v. Ulloa,* 94 F.3d 949, 950-51 (5th Cir.1996) (defendant trading cocaine for five MAC-10's, 48 M-16's, one UZI, and other weapons), *petition for cert. filed,* No. 96-6914 (U.S. Nov. 25, 1996); *United States v. Cannon,* 88 F.3d 1495, 1505 (8th Cir.1996) ("The record in this case contains evidence that a machine gun is a drug dealer's most prized possession."); *United States v. Moskovits,* 86 F.3d 1303, 1311 (3d Cir.1996) (affirming a finding that a defendant convicted of distributing cocaine committed perjury when he denied owning a machine gun), *cert. denied,* 519 U.S. 1120, 117 S.Ct. 968, 136 L.Ed.2d 853 (1997); *United States v. Blue,* 78 F.3d 56, 58 (2d Cir.1996) (DEA agents discover a machine gun under a mattress while searching an apartment during a cocaine investigation); *United States v. Garcia,* 77 F.3d 274, 275 (9th Cir.1996) (sheriff's deputies discover a machine gun in "a typical stash house where drugs are stored and weapons are kept to protect the merchandise"); *United States v. Buchanan,* 70 F.3d 818, 824-25 (5th Cir.1995) (9mm fully automatic pistol found in car with 280 grams of crack cocaine), *cert. denied,* 517 U.S. 1126, 116 S.Ct. 1366, 134 L.Ed.2d 532 (1996); *United States v. Murphy,* 69 F.3d 237, 239 (8th Cir.1995) (defendant convicted of attempt to manufacture methamphetamine, use of a firearm in relation to a drug offense, and possession of a machine gun), *cert. denied,* 516 U.S. 1153, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996); *United States v. Brantley,* 68 F.3d 1283, 1286 (11th Cir.1995) (defendant convicted of both possession of cocaine with intent to distribute and use of a fully automatic firearm in the commission of a drug offense), *cert. denied,* 516 U.S. 1136, 116 S.Ct. 964, 133 L.Ed.2d 885, --- U.S. ----, 116 S.Ct. 1334, 134 L.Ed.2d 484 (1996); *United States v. Zermeno,* 66 F.3d 1058, 1060 (9th Cir.1995) (marijuana, packaging materials, money counters, camouflage gear, two assault rifles, a machine gun, and 1,550 rounds of ammunition found in "stash house"); *United States v. Luciano-Mosquera,* 63 F.3d 1142, 1149 (1st Cir.1995) (M-16 carried onto beach during off-loading of cocaine base from boat), *cert. denied,* 517 U.S. 1234, 116 S.Ct. 1879, 135 L.Ed.2d 174 (1996); *United States v. Melendez,* 60 F.3d 41, 44 (2d Cir.1995) (heroin trafficking operation accumulates a number of machine guns and other firearms that were used to protect its operations), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1020, 134 L.Ed.2d 99 (1996), 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996), 516 U.S. 969, 116 S.Ct. 429, 133 L.Ed.2d 345 (1995), 516 U.S. 900, 116 S.Ct. 258, 133 L.Ed.2d 182 (1995); *United States v. Messino,* 55 F.3d 1241, 1245 (7th Cir.1995) (cocaine dealer sells a fully automatic machine gun with

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

a silencer to a confidential informant); *United States v. Davis,* 53 F.3d 638, 639 (4th Cir.1995) (probation of defendant who pled guilty to distributing cocaine revoked after he is seen carrying a machine gun on a college campus); *United States v. Taffe,* 36 F.3d 1047, 1048-49 (11th Cir.1994) (UZI machine pistol equipped with a silencer used in heist of three bales of cocaine and fired at police officers); *United States v. Thomas,* 12 F.3d 1350, 1361-62 (5th Cir.1994) (AR-15 rifle modified to fire as a machine gun used by defendant for protection because of "his line of business" in conspiracy to distribute cocaine, amphetamine, methamphetamine and marijuana), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1861, 128 L.Ed.2d 483 (1994), 511 U.S. 1114, 114 S.Ct. 2119, 128 L.Ed.2d 676 (1994); *United States v. Garcia,* 997 F.2d 1273, 1277 (9th Cir.1993) (machine gun used to protect and embolden drug dealer found in house with a kilo of heroin, 4.5 kilos of cocaine, and 1.24 grams of cocaine base); *United States v. Sims,* 975 F.2d 1225, 1230 (6th Cir.1992) (ATF agents discover two AR-15 rifles, converted to fire fully automatically, and 257 rounds of ammunition in the back seat of a car in connection with the arrest of defendants attempting to buy $337,500 worth of cocaine); *United States v. Capote-Capote,* 946 F.2d 1100, 1102-04 (5th Cir.1991) (machine gun used to protect kilogram of cocaine), *cert. denied,* 504 U.S. 942, 112 S.Ct. 2278, 119 L.Ed.2d 204 (1992); *United States v. Moore,* 919 F.2d 1471 (10th Cir.1990) (loaded British Sten machine gun found in open closet of room containing cocaine, ziplock bags, weighing scale, dealing records, $3,400, and a calculator); *United States v. Rogers,* 921 F.2d 1089 (10th Cir.1990) (same facts as recited in *Moore* ), *modified,* 925 F.2d 1285 (10th Cir.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 985 (1991); *United States v. Lucas,* 932 F.2d 1210, 1223-24 (8th Cir.) (along with thirteen other guns, machine gun "kept at the ready" to safeguard crack house and facilitate illegal manufacture and trade in crack cocaine), *cert. denied,* 502 U.S. 869, 112 S.Ct. 199, 116 L.Ed.2d 159 (1991), 502 U.S. 949, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991), 502 U.S. 991, 112 S.Ct. 609, 116 L.Ed.2d 632 (1991), 502 U.S. 1100, 112 S.Ct. 1186, 117 L.Ed.2d 429 (1992); *United States v. Matra,* 841 F.2d 837, 839 (8th Cir.1988) (machine gun, along with eight other weapons, made the crack house a "veritable fortress").

This rationale would not "convert the commerce power into a reserved 'general federal police power' " (quoting *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1632). As observed, machine guns are very different weapons from guns without the capability of automatic fire and have been the subject of federal commerce regulation for nearly sixty years. We would expect a national rather than a state-by-state regulatory pattern of, say, anti-tank bazookas, plastic explosives, plutonium, or other tools of terrorists. Federal regulation of machine guns, as distinguished from other guns, does not bring similar invasions of traditional state interests. Although § 922(*o*) and § 922(q) both criminalize the possession of certain guns, § 922(*o*) ought not be brushed off as a mere "clone" of § 922(q).

Of course, the *Lopez* Court insisted that we distinguish between the regulation of crime and the regulation of commercial activity. 514 U.S. at ---- - ----, 115 S.Ct. at 1630-31. This case differs from *Lopez* in the critical respect that criminals use machine guns to evade regulation of the national drug trade while guns near schools have a negligible **\*1004** effect on the traditionally local activity of public education, which is not itself commercial. Crime can be interstate business. And local intrastate criminal activity can have a substantial effect on that interstate activity. Indeed, Congress might rationally conclude that the relationship between "local possession" of machine guns and the drug trade is even more compelling than the ties between local loan sharking and organized crime. *See Perez v. United States,* 402 U.S. 146, 157, 91 S.Ct. 1357, 1362-63, 28 L.Ed.2d 686 (1971) ( "[L]oan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and rich alike and siphons funds from numerous localities to finance its national operations.").

The judiciary's role in policing the process of federalism brings hard calls, including the task of distinguishing national economic activity from local crime. *Lopez* is not merely symbolic jurisprudence. Rather, it announces that there are yet limits upon Congress's use of the commerce power to make a federal case out of traditionally local concerns, particularly in criminal law enforcement. That said, we part company with the declaration that § 922(*o*) is an invasion of the state's traditional police power. That the Congress has attached a criminal penalty to the possession of a machine gun or storage of explosives does not alone mean that it has invaded the traditional police power of the states. With respect, that announces an outcome, not a rationale.

There is no social utility in the distribution of cocaine and marijuana, and their interstate character is undeniable. It is no surprise, then, that Congress "regulates" the national market in these drugs by banning them, a ban that rationally extends to simple possession. There is little social utility in acquiring since 1986 operable machine guns or in making them. They are not sporting weapons; they are weapons of war. They

are guns in the same sense that pussycats and tigers are both members of the cat family. The courts have learned that a machine gun's destructive capacity makes it highly useful for protecting commerce in contraband such as narcotics.

Given the rapid influx of machine guns, it is hardly irrational to conclude that meaningful regulation of their use in lines of interstate commerce requires regulation of this intrastate possession. The attempt to distinguish drugs and machine guns on the basis of fungibility fails to appreciate the fact that many guns can easily be converted from semi-automatic to fully automatic. *See, e.g., United States v. Branch,* 91 F.3d 699, 736-37 (5th Cir.1996) (affirming a § 922(*o*) conviction where the defendant used conversion kits and instructional books and videotapes to manufacture fully automatic weapons out of semi-automatic weapons). News reports describe the process as "so low tech on some brands that [ATF] agents ... have seen it done with a paperclip." U.S. NEWS & WORLD REPORT, April 4, 1988, at 24. As with drugs, identifying and tracing the fully automatic nature of machine guns is often impossible.

Efforts to minimize the consequences of striking down this statute by reassuring that Congress can cure the defects it finds by inserting a jurisdictional element are empty of content: for example, it can provide penalties for possession of weapons that are "in or affecting commerce." With deference, this velvet over the sword in fact erodes the logic of an otherwise not insubstantial argument. If the present statute cannot be sustained because Congress could not rationally have made a legislative judgment of the need to freeze the post-1986 market, there is little federal regulatory scope left; that reality should be forthrightly acknowledged. If a legislative decision to freeze the class is irrational, proof that an individual member of the class had a substantial effect on commerce in a given case is problematic if "substantial effect" is accorded a constant meaning. So those who would strike this statute cast themselves as protecting state interests by insisting that the Commerce Clause empowers Congress to outlaw only those machine guns where in a specific case the government proves that the use of the machine gun was in commerce or affecting commerce. The irony is that this requirement is more intrusive of state interests than the test we apply and they reject. It is more tolerant of federal intrusion because it may be met by showing **\*1005** merely that a gun "has previously traveled in interstate commerce." *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 524, 30 L.Ed.2d 488 (1971). That is, this minimal nexus to commerce could give Congress more latitude in exercising its federal commerce power than the substantial-effects test we have employed here. A case-by-case inquiry into whether the defendant possessed a gun that was once in interstate commerce, even "after any number of intermediate sales within the State and after any lapse of time," *United States v. Sullivan,* 332 U.S. 689, 693, 68 S.Ct. 331, 333, 92 L.Ed. 297 (1948), would allow federal regulation of items that, taken as a class, have virtually no effect on interstate commerce. It would concede congressional power to outlaw possession of guns in general, an upset of a traditional state-federal balance and a concession we are not persuaded to make. *Lopez* would indeed look more like symbolic jurisprudence with little real implementation of the federalist arrangement of our Constitution. After all, few guns have never crossed a state line. It is not for us to say that *Bass* cannot survive *Lopez.* We would not embrace it, however, to support a rejection of a less intrusive inquiry.

In general, judges are not equipped by training to engage in elaborate empirical studies; more importantly, the courts are institutionally ill-equipped. Deference to Congress does not require courts to leave their traditional roles by pursuing empirical research. But it does require courts not to ignore the obvious, at least when the obvious is born of judicial experience. We need look no further than our considerable experience with the drug market and the role of automatic weapons in that activity. Based on that experience, we are comfortable in concluding that Congress could have rationally found the required nexus between its careful regulation of the possession of machine guns and the interstate commerce in, for example, illegal drugs, as well as the attendant commerce in machine guns alone. The federal government has the power under the Commerce Clause to wage the war on drugs. It equally has the power to freeze the escalating destructive power of the weapons of that war, the automatic firepower drawn by the drug trade.

Automatic and non-automatic weapons fire on different planes, functionally and legally. Guns without the capability of automatic fire are lawfully found in the hands of thousands of persons across the country. The states have traditionally regulated these weapons, indeed virtually all guns, except the machine gun. We weigh the absence of congressional findings against the constitutionality of § 922(*o*), but given the facts we have outlined conclude that the absence of an invasion of a traditional state interest tilts this case in favor of the constitutionality of the statute. Saying so pulls no teeth from *Lopez* and sounds no retreat from the judicial scrutiny of efforts to make federal cases of state crimes.

EDITH H. JONES, Circuit Judge, joined by GARWOOD, JOLLY, SMITH, DUHÉ, BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges, would reverse for the following reasons:

This appeal has provided an occasion for our *en banc* court to consider the breadth of Congress's power to enact criminal laws under the Commerce Clause in light of *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The specific issue is whether Congress breached its Commerce Clause authority in enacting 18 U.S.C. § 922(*o*), which was the basis for appellant Kirk's conviction for the wholly intrastate possession of a machinegun. Half of the judges participating in this en banc [1] rehearing conclude that *Lopez* has more than mere symbolic significance. Carefully applied, it compels the conclusion that the § 922(*o*) ban on mere intrastate possession of a machinegun exceeds Congress' authority "[t]o regulate Commerce ... among the several States." U.S. Const., Art. 1, § 8, cl.3. The other half of the participating judges disagree with this conclusion, although their reasoning differs. Kirk's conviction must be affirmed by an equally divided court, but the importance and recurring nature of these issues lead us to publish this opinion.

[1]   Judge Benavides was recused from consideration of this case.

**\*1006** I. BACKGROUND

William J. Kirk was charged in a four-count indictment with violations of 18 U.S.C. § 922(*o*)(1988). The indictment charged Kirk with two counts of unlawful possession of a machinegun (Counts One and Three); and two counts of unlawful transfer of a machinegun (Counts Two and Four). [2] The possession counts make no mention of interstate commerce or of any connection between Kirk's machinegun or his possession of it with commerce, interstate or otherwise. Kirk moved to dismiss the indictment, contending in part that § 922(*o*) exceeds Congress' delegated powers under the Commerce Clause in that it punishes the transfer or possession of a machinegun with no showing that the intrastate transfer or possession affects interstate commerce. The district court denied the motion to dismiss. Kirk then pled guilty to Count One for unlawful possession of a machinegun, reserving his right to appeal the denial of his pre-trial constitutional challenge to § 922(*o*).

[2]   For purposes of 18 U.S.C. § 922(*o*), a "machinegun" is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b)(1988); *see* 18 U.S.C. § 921(a)(23).

A divided panel of this court rejected Kirk's constitutional challenge and affirmed his conviction. *United States v. Kirk,* 70 F.3d 791 (5th Cir.1995), *reh'g en banc granted,* 78 F.3d 160 (5th Cir.1996). Because this case poses similar constitutional questions to those presented in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), we granted rehearing *en banc,* vacating the panel opinion to determine the constitutionality of the § 922(*o*) ban on the possession of machineguns. [3]

[3]   With certain exceptions, § 922(*o*) bans both the transfer and possession of machineguns. *See infra* part II. We need not consider here the constitutionality of § 922(*o*)'s restriction on the transfer of machineguns. The prohibition on the transfer of machineguns raises different constitutional questions than those raised by § 922(*o*)'s ban on their mere possession.

II. PREFACE

The language and legislative history of § 922(*o*) and a brief discussion of *Lopez* form a backdrop for further analysis.

A. Section 922(*o*)

In 1986 Congress amended the Gun Control Act of 1968, 18 U.S.C. §§ 921-28, with the passage of the Firearms Owners' Protection Act (FOPA), Pub.L. No. 99-308, 100 Stat. 449 (1986). Section 102(9) of FOPA added § 922(*o*) to the existing statute. 100 Stat. at 453. Section 922(*o*) provides:

(*o*)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to-

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

(A) a transfer to or by, or possession by or under the authority of the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o*). Section 922(*o*) became effective May 19, 1986. *See* FOPA § 110(c), 100 Stat. at 461 (effective date).

The legislative history of § 922(*o*) is sparse. *See* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective,* 17 Cumb. L.Rev. 585, 669-71 (1987). Section 922(*o*) was added to FOPA as a last minute amendment on the House floor and its provisions were not debated. *See United States v. Wilks,* 58 F.3d 1518, 1519 (10th Cir.1995); *United States v. Lopez,* 2 F.3d 1342, 1356 (5th Cir.1993), *aff'd,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); 132 Cong. Rec. H1750-52 (daily ed. April 10, 1986); Hardy, *supra,* at 670. The only apparent explanation for § 922(*o*) is a statement from its sponsor, **\*1007** Representative Hughes, who, rushing to explain his position before the time for debate expired, stated, "I do not know why anyone would object to the banning of machineguns." 132 Cong. Rec. H1750 (daily ed. April 10, 1986). No other reference to § 922(*o*) appears in committee reports or elsewhere, with the exception of a brief Senate colloquy primarily concerned with the scope of the provision's exemptions as they relate to machinegun manufacturers and government-authorized machineguns. 132 Cong. Rec. S5358-62 (daily ed. May 6, 1986); Hardy, *supra,* at 670-71 & nn. 462-463.[4] Thus, the legislative history of § 922(*o*) itself provides no insight into the relationship between § 922(*o*) and interstate commerce.

[4]    Following a colloquy between Senators Hatch and Dole concerning the exemptions contained in § 922(*o*), Senator Metzenbaum expressed concern that the colloquy did not express the correct interpretation of the amendment. In partial response, Senator McClure stated: "I know that the Senator [Metzenbaum] from Ohio has interposed a reservation with respect to my request. I take this time only to say to the Senator from Ohio that this discussion [concerning § 922(*o*) ] is up at all because the other body injected some language at the very last minute, literally, of their debate, and there is no legislative history as to what that language means. There

are a substantial number of House Members as well as other interested parties who have asked questions about what it means; and what we are trying to do is provide some legislative history as to our understanding of what the House provision means, since the House itself had no legislative history on this subject." 132 Cong. Rec. S5361-62 (daily ed. May 6, 1986).

B. United States v. Lopez

In *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court considered the constitutionality of 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V), which banned the possession of firearms near a school and which had been overturned in this court. *United States v. Lopez,* 2 F.3d 1342 (5th Cir.1993). [5] The Court recognized that Congressional power over interstate commerce under the Commerce Clause extends to (1) legislation regulating "the use of the channels of interstate commerce;" (2) laws regulating and protecting "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) regulations of intrastate activities that have a substantial effect on interstate commerce. *Id.* at ---- - ----, 115 S.Ct. at 1629-30.

[5]    Section 922(q)(1)(A) was enacted as part of the Gun-Free School Zone Act of 1990 and provides: "It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."

Each of these categories of cases represents a distinct way, exemplified by the Court's chosen citations, to describe the impact of federal legislation upon interstate commerce. *See United States v. Robertson,* 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995). Before going further, we note that although *Lopez* does not explicitly abandon the deferential rational basis standard of review, *see, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276-80, 101 S.Ct. 2352, 2360-61, 69 L.Ed.2d 1 (1981), neither does the Court defer unblinkingly to Congress's judgment. Indeed, the Court's citations emphasize that it is the judicial duty ultimately to review conformity of legislation to the Commerce Clause. *Lopez,* 514 U.S. at ---- n. 2, 115 S.Ct. at 1629 n. 2; *see also Hodel,* 452 U.S. at 311, 101 S.Ct. at 2391-92 ("simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.") (Rehnquist, J. concurring in judgment). As *Lopez* demonstrates, exercise of this

duty requires independent judicial scrutiny of the reasons advanced to explain why the regulation is necessary to protect interstate commerce. Even a statutorily imposed requirement of a jurisdictional nexus to interstate commerce will not insulate a provision from judicial review. *See, e.g., United States v. Pappadopoulos,* 64 F.3d 522, 527 (9th Cir.1995). [6]

6    "... where Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings, the government must satisfy the jurisdictional requirement by pointing to a 'substantial' effect on or connection to interstate commerce." *Pappadopoulos,* 64 F.3d at 527 (holding arson directed against a private home not sufficiently related to interstate commerce).

**\*1008**  Moving to a more detailed consideration of the *Lopez* categories, regulation of the "channels of interstate commerce," the first category, is limited to direct regulation of the interstate channels themselves. The cases cited in *Lopez,* or by its reference to *Perez v. United States,* 402 U.S. 146, 148, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971), to describe the first category involve statutes that contain an express jurisdictional nexus element. *See, e.g.,* 18 U.S.C. §§ 2312-2315 (interstate shipment of stolen goods); 18 U.S.C. § 1201 (interstate transport of kidnaping victims); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (regulation of working conditions in the production of goods "for interstate commerce"). This category must be limited to legislation that specifically reaches interstate transfers, possessions, and transactions and business "engaged in commerce." *United States v. Robertson, supra* at ----, 115 S.Ct. at 1733 (goldmine "engaged in commerce").

The second category of Commerce Clause power permits laws regulating or protecting instruments of interstate commerce, or persons or things in interstate commerce, even though the threat may derive from intrastate activity. The Court cites in this connection the *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), which upheld rate regulation of a railroad engaged in interstate commerce, and *Southern Railway Company v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911), permitting regulation of interstate railway safety. The Court also cites a statute criminalizing the destruction of aircraft used in interstate commerce, 18 U.S.C. § 32, and vehicle thefts from interstate shipments, 18 U.S.C. § 659. This category includes regulation or protection pertaining to instrumentalities or things as they move in interstate commerce.

With regard to the third category of cases, as the Court put it, "the pattern is clear." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1630. Federal regulation of even intrastate economic activity will be sustained if the activity substantially affects interstate commerce. The Court's citations again bear out its purpose. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276-280, 101 S.Ct. 2352, 2360-61, 69 L.Ed.2d 1 (1981) (upholding regulation of intrastate coal mining); *Perez v. United States, supra* (intrastate extortionate credit transactions); *Katzenbach v. McClung,* 379 U.S. 294, 299-301, 85 S.Ct. 377, 381-382, 13 L.Ed.2d 290 (1964) (restaurants utilizing substantial interstate supplies); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 252-253, 85 S.Ct. 348, 354-355, 13 L.Ed.2d 258 (1964) (inns and hotels catering to interstate guests). All of the cases involved economic regulations or legislation bearing on commercial activity, and in those cases, the intrastate activity either substantially affected interstate commerce, or it had to be regulated in order not to undercut a federal commercial regulatory scheme. *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1631. [7]

7    *See also United States v. Robertson, supra,* ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely intrastate commercial activities that nonetheless have substantial interstate effects."); *United States v. DiSanto,* 86 F.3d 1238, 1245 (1st Cir.1996).

The Court majority agreed that § 922(q) neither regulates "the channels of interstate commerce" nor protects "an instrumentality of interstate commerce or a thing in interstate commerce," *id.* at ----, 115 S.Ct. at 1630. The problem in *Lopez* centered on the third category of Commerce Clause power. There are three steps to the Court's analysis of the substantial effects test. The threshold question is whether the local activity sought to be regulated is commercial in nature, or whether its regulation is necessary to effectuate federal regulation of a larger commercial activity. The majority agreed that the ban on possession of a gun in a school zone fails to "substantially affect any sort of interstate commerce." *Id.* at ----, 115 S.Ct. at 1634. Further, § 922(q) "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." **\*1009** *Id.* at ---- - ----, 115 S.Ct. at 1630-31. The majority easily rejected the notion that the

act of possessing a gun in a school zone is subject to federal regulation because, viewed in the aggregate, such acts substantially affect interstate commerce. *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1631. What this means is that non-commercial intrastate acts may not be deemed commercial, for purposes of extending federal regulation, simply by considering them *en masse;* [8] such activities are only subject to federal regulation if their regulation is essential to a larger economic regulatory scheme. *Lopez* thus holds that "commercial activity" is not a definitional vacuum waiting to be filled by a creative Congress and judges. While the Court acknowledges that characterizing an intrastate activity as commercial or non-commercial may create some legal uncertainty, 514 U.S. at ----, 115 S.Ct. at 1633, the Court's conclusion regarding the purely criminal provision, § 922(q), caused no interpretive difficulty to the majority. *Lopez* sends a clear cautionary signal that federal criminalization of intrastate noneconomic activity, when such regulation is not essential to a broader regulation of commercial activity, will have difficulty satisfying the substantial effects basis for Commerce Clause regulation.

[8]     This reasoning does not undermine *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), because the farmer's activity there, albeit local, directly distorted the federally controlled market for wheat. *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1630. Nevertheless, the Court's analysis does not hold that any intrastate commercial activity is regulable by Congress simply because it is commercial-the substantial effects test must be met to ensure a sufficient connection with interstate commerce.

The second element of the substantial effects test is whether the statute contains a jurisdictional nexus to interstate commerce. *Lopez* commented on the absence of any jurisdictional nexus requirement in § 922(q) that would insure, through case-by-case inquiry, that a particular firearm possession substantially affects interstate commerce. *Lopez* illustrated how a jurisdictional nexus requirement could save a statute from Constitutional infirmity by describing *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). The provision at issue in *Bass* criminalized, *inter alia,* a felon's possession of a firearm "in commerce or affecting commerce." Former 18 U.S.C. § 1202(a). The government convicted Bass without offering proof of a nexus to interstate commerce. The Court reversed the conviction for this omission and "thus interpreted the statute to reserve the Constitutional question whether Congress could regulate, without more, the 'mere possession' of firearms." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1624 (citing *Bass,* 404 U.S.

at 339, n. 4, 92 S.Ct. at 518, n. 4). As previously noted, a jurisdictional nexus requirement does not *ipso facto* validate a statute against an as-applied Commerce Clause challenge, [9] but its existence is reassuring against a facial challenge.

[9]     *See United States v. Collins,* 40 F.3d 95, 99-101 (5th Cir.1994) (robbery of an individual victim lacks sufficient nexus to interstate commerce to prosecute under Hobbs Act).

The final element of the substantial effects inquiry is whether there are limits in the statute that mark a boundary of some sort between matters of truly national concern and those traditionally subject to state regulation. In this connection, the Court acknowledged that legislative findings, while not legally necessary, would facilitate judicial review of the substantial effects question. *Lopez,* 514 U.S. at ---- - ----, 115 S.Ct. at 1631-32; *Perez, supra,* 402 U.S. at 156, 91 S.Ct. at 1362. No such findings accompanied § 922(q), however. The Court also agreed with the Fifth Circuit [10] that legislative findings pertaining to previous firearms statutes could not be imported into the analysis of § 922(q). 514 U.S. at ----, 115 S.Ct. at 1632. The Court finally rejected both the "costs of crime" and "national productivity" theories proffered by the federal government to demonstrate substantial interstate commerce effects, and it rejected Justice Breyer's equation of education with commercial activity. 514 U.S. at ---- - ----, 115 S.Ct. at 1632-34. Neither of these attenuated strings of logic, according to *Lopez,* furnishes any principled limit on federal power in areas such as criminal law enforcement or education, **\*1010** where states have traditionally been sovereign.

[10]     *United States v. Lopez,* 2 F.3d at 1366.

### III. DISCUSSION

On its face, § 922(*o*) seems a clone of § 922(q), the provisions struck down in *Lopez.* The statute bans for present purposes "mere possession" of machineguns manufactured or imported after 1986; it is supported neither by a jurisdictional nexus requirement nor by salvaging legislative findings; it is a criminal, not an economic regulatory provision; and it clearly overlaps state and local law enforcement authority. Other circuit courts and other judges in this court, however, have not seen it that way, [11] although their reasons for upholding the statute differ significantly. Most of these cases err by assuming that every intrastate possession of machineguns involves interstate commerce. That error leads

to misapplication of the first and second categories of Commerce Clause cases described by *Lopez,* and to an untenable distinction between § 922(*o*) and § 922(q) when the third *Lopez* category is considered. The errors in other cases are best exposed by our analysis, [12] which will discuss § 922(*o*) under each category of *Lopez,* and which takes *Lopez* seriously as establishing at least an outer boundary on Congress's criminal jurisdiction under the Commerce Clause. [13]

[11]    *United States v. Kenney,* 91 F.3d 884 (7th Cir.1996); *United States v. Beuckelaere,* 91 F.3d 781 (6th Cir.1996); *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996); *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995); *United States v. Rybar,* 103 F.3d 273 (3d Cir.1996).

[12]    Judge Parker and Judge Higginbotham imply that this analysis strays from the rational basis test for evaluating the constitutionality of legislation. Not so. First, as a general principle, following *Lopez,* the rational basis test will apply the data created, referenced or expressed by Congress in conjunction with an enactment to the three aspects of federal commerce clause power described in *Lopez.* That is what we have done here, hampered by the absence of data from Congress concerning how banning the possession of machineguns nationwide involves or substantially affects interstate commerce. Second, the rational basis test assumes the existence of data created or referenced in the legislative process whose rationality can be analyzed. Here, there are no relevant data relating the ban on mere intrastate possession of machineguns by § 922(*o*) to Congress's interstate commerce jurisdiction. There are no legislative findings, no committee reports, and no pertinent Congressional debate that "would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye...." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1632. Most important, there is neither an explicit jurisdictional nexus requirement nor any other tie to interstate commerce apparent from the statutory architecture. It is not this court's responsibility or place to invent a rational basis for Congress. Third, the absence of such data mirrors the situation before the Court in *Lopez* and reinforces the consistency between these two cases. In *Lopez,* Congress had not endeavored in § 922(q) to express any connection between interstate commerce and possession of a gun in a school zone. Unlike the majority, the dissent there was willing to create a factual backdrop for the statute, just as Judges Parker and Higginbotham seek to do here.

[13]    It would be a mistake to argue that because Justices Kennedy and O'Connor concurred in *Lopez* and joined a separate writing, the *Lopez* analysis is not definitive. The two justices joined and endorsed Justice Rehnquist's majority opinion. ("As the Chief Justice explains, unlike the earlier cases to come before the Court, here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus.") *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1640 (Kennedy, J., citing Rehnquist opinion).

A. Does § 922(*o*) Regulate "Channels of" or "Things in" Interstate Commerce?

The Government contends that § 922(*o*) may be justified under either of the first two *Lopez* categories, as a regulation of the channels of interstate commerce or of a thing in interstate commerce. There is circuit court support for each position. *See United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995) (upholding § 922(*o*) as regulation of a thing in interstate commerce); *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996) (§ 922(*o*) valid as regulation of channels of interstate commerce); *United States v. Beuckelaere,* 91 F.3d 781 (6th Cir.1996) (§ 922(*o*) valid under all three *Lopez* categories); *but see United States v. Kenney,* 91 F.3d 884 (7th Cir.1996) (§ 922(*o*) upheld only under substantial effects prong of *Lopez* ).

1. The Channels of Interstate Commerce

Recourse to the first two *Lopez* categories suffers initially, however, from a serious factual **\*1011** error. Proponents of the constitutionality of § 922(*o*) assume that every possession of a machinegun manufactured after May 19, 1986, excepting only the narrow class of possessions permitted in the statute, connotes that the gun traveled or was transferred in interstate commerce. These decisions overlook that an automatic weapon may be created by modifying a semiautomatic weapon, *see United States v. Jones,* 976 F.2d 176, 178 (4th Cir.1992), *cert. denied* 508 U.S. 914, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993) (describing home conversion of shotguns), or that it may evolve from ordinary wear and tear on a semiautomatic firearm. In *United States v. Anderson,* 885 F.2d 1248, 1250-51 (5th Cir.1989) (*en banc* ), this court recognized that "[s]everal of the most popular shotgun models, many handguns, and not a few rifles" can by "either wear and tear or a simple operation" become "machineguns" within the statutory definition. Section 922(*o*)

would therefore prohibit the simple possession of an ordinary semi-automatic pistol whose sear wore off in 1987. Shorn of the misunderstanding that illegal possession cannot occur without illegal transfer [14], § 922(o) plainly reaches mere intrastate possession of machineguns as well as possession of machineguns which have illegally moved or been transferred in interstate commerce. Any decision upholding § 922(o) under Lopez must come to grips with this reality.

[14]    *United States v. Kirk,* 70 F.3d 791, 796 (5th Cir.1995); *Rambo, supra,* 74 F.3d at 952 (same); *Beuckelaere, supra,* 91 F.3d at 783 (same).

*Rambo,* for instance, seeks to justify § 922(o) as regulating the channels of interstate commerce because it is "an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." *Rambo,* 74 F.3d at 951, citing *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1630. But because § 922(o) also prohibits purely intrastate possession of machineguns, *Rambo* 's logic proves too much. The first *Lopez* category, as earlier described, included cases that were distinguished by express jurisdictional nexus requirements to movements or transactions in interstate commerce. In *Kenney,* the court rejected the channels of commerce rationale for § 922(o) on this basis:

> ... although it may be true that Congress must regulate intrastate transfers and even mere possessions of machineguns in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce.

91 F.3d at 889.

*Lopez* summarily rejected the argument that banning firearm possession in school zones regulates the channels of commerce. Section 922(o) does not more clearly express a nexus to channels of commerce than did its virtual clone, § 922(q), the *Lopez* provision. To disregard the similarity of the provisions trifles with *Lopez.* Section 922(o) is limited neither to transfers nor to possession in or even affecting interstate commerce. It criminalizes, as in this case, the mere possession of a machinegun independent of any type of transfer. This provision does not regulate the channels of

interstate commerce. Decisions like *Rambo* and the panel opinion, in holding otherwise, have distorted the channels of commerce rationale and are attempting to read a statute which does not exist.

Cases relying on the channels of commerce rationale also misplace emphasis on the temporal limit on the possession ban and the dangerousness of the product. Neither of these characteristics more closely aligns § 922(o) with a regulation of the channels of interstate commerce. The grandfather clause of the ban applies it only to machineguns manufactured or imported after May of 1986, but that feature fails to enhance its relation to interstate commerce. [15] After 1986, both interstate and wholly intrastate private possessions are prohibited, yet there are no Congressional findings that this drastic impact upon intrastate activity was connected to or mandated by a relation to the channels of interstate commerce. Similarly, the fact that machineguns are a dangerous **\*1012** commodity does not place them more or less within the channels of commerce for purposes of federal regulation. *United States v. Bishop,* 66 F.3d 569, 587 n. 28 (3d Cir.1995) ("The dangerousness of the object is not the source of Congressional power; the connection to interstate commerce is.") Baseball cards as well as toxic chemicals can be regulated by Congress only if there is a necessary relationship to interstate commerce. The argument based on dangerousness is more closely attuned to justifying a national police power than a national commerce power. *Lopez* reminded us that the Constitution does not confer a general police power upon the federal government. *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1634.

[15]    The effect of the grandfather clause does, paradoxically, assure a nexus between interstate commerce and criminal possession of pre-1986 *unlawfully* possessed machineguns, because, as this court's *Lopez* opinion noted, pre-1986 regulatory laws expressly embodied a jurisdictional nexus to commerce. *See Lopez,* 2 F.3d at 1356, n. 29.

2. Things in Interstate Commerce

The flawed premise underlying regulating machineguns as "things in interstate commerce" is that they are by their nature a commodity "transferred across state lines for profit by business entities." *Wilks,* 58 F.3d at 1521 (citation omitted). We agree again with the Seventh Circuit's criticism of this reasoning, because "the regulation is much broader than the category." *Kenney,* 91 F.3d at 889. The second

*Lopez/Perez* category, as previously explained, includes regulations of instrumentalities or things-such as interstate transportation rates and safety regulations-whose nexus to interstate commerce is obvious. Thus, again to quote *Kenney:*

> The *Wilks* court's observation that "[t]he interstate flow of machineguns 'not only has a substantial effect on interstate commerce; it *is* interstate commerce,' " 58 F.3d at 1521 [ (quoting *United States v. Hunter,* 843 F.Supp. 235, 249 (E.D.Mich.1994)) (emphasis in original) ], is correct as far as it goes, but it does not address the different question of the propriety of § 922(*o*)'s regulation of intrastate possession and transfer.

91 F.3d at 889.

Criminal possession of a machinegun after May 19, 1986 under § 922(*o*) is not dependent on or related to the movement of the machinegun in interstate commerce, and it is *not* "bound up with interstate attributes." *Wilks,* 58 F.3d at 1521. Further, not all commerce is interstate commerce, as commerce "which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other States" is not commerce within the meaning of the Commerce Clause. *Gibbons v. Ogden,* 9 Wheat. 1, 22 U.S. 1, 194, 6 L.Ed. 23 (1824). The *Wilks* reasoning makes the things in commerce basis of Commerce Clause regulation limitless, contrary to its purpose.

Nor are we persuaded that § 922(*o*) can be upheld on the basis of legislative findings-eighteen years old when § 922(*o*) was enacted-contained in the Omnibus Act [16] and the Gun Control Act of 1968. [17] Cases such as *Wilks* have sought to enhance the things in commerce rationale by describing § 922(*o*) as an incremental development in a seamless web of federal firearm regulation. *Wilks,* 58 F.3d at 1521-22. But as explained in detail by Judge Garwood's opinion in *Lopez,* all previous federal gun control laws have been expressly tied to the conduct of the firearms business, a business whose inter- and intra-state activities are clearly commercial. *See Lopez,* 2 F.3d at 1348-57. The Supreme Court in *Lopez* approved this court's reading of the general legislative history and pattern of previous federal firearms legislation, *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1632, and refused to rest on Congressional findings from other statutes to justify § 922(q). *Id.* at ----, 115 S.Ct. at 1632. Like the Supreme Court in *Lopez,* and unlike *Wilks,* we find reliance on Congressional findings from

previous federal firearms legislation inappropriate to support the § 922(*o*) possession ban. *See Lopez,* 2 F.3d at 1357 n. 31.

16    Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 197 (1968).

17    Gun Control Act of 1968, Pub.L. No. 90-618, 82 Stat. 1213 (1968).

Reliance on findings from other legislation not only contradicts the Supreme Court, it is a misleading indicator of the relevant gun control law. The Congressional findings relating to FOPA indicate that the Act's purpose was to *secure* the rights of citizens to possess firearms and to ensure that no "*undue* **\*1013** *or unnecessary Federal restrictions* " are placed on citizens "with respect to the acquisition, possession or use of firearms." FOPA § 1(b)(2), 100 Stat. at 449 (emphasis added) (*quoting* Gun Control Act of 1968 § 101, 82 Stat. at 1213-14 (1968)). [18] Neither the language of § 922(*o*) nor its legislative history provides any indication that Congress viewed the prohibition on possession of machineguns as an essential part of a broader regulatory scheme or that Congress considered the relationship between the ban on possession of machineguns and interstate commerce.

18    Additionally, § 1 of FOPA contains Congressional findings that the rights of citizens "to keep and bear arms under the second amendment of the United States Constitution ... require[s] additional legislation to correct existing firearms statutes and enforcement policies." FOPA § 1(b)(1)(A), 100 Stat. at 449.

In comparison to § 922(*o*), which lacks any reference to interstate commerce, Congress specifically tied other regulations enacted concurrently with § 922(*o*) to interstate commerce. FOPA § 102, 100 Stat. at 451-52. [19] Two other provisions contained in § 922 were amended and one new subsection was added to § 922(*o*). FOPA § 102, 100 Stat. at 451-53. Congress thus maintained the "basic jurisdictional structure" found in previous firearms legislation, which required the "licensing of all firearms dealers and manufacturers, ... and in all other instances [provided] an express nexus either to interstate commerce or to the activity of, or dealing with, federally licensed dealers or manufacturers...." *Lopez,* 2 F.3d at 1354. Unlike § 922(*o*) and (q), these other regulations, however, are grounded in either Congress' taxing powers, or are expressly tied to interstate or foreign commerce. *Id.* at 1354-57. Neither the language of § 922(*o*) nor its legislative history supports a finding that the ban on possession of machineguns regulates

only machineguns connected with interstate commerce. *See supra* part II.A. Section 922(*o*) stands isolated from the rest of the FOPA because it conspicuously lacks either a nexus to commerce or the support of findings that banning mere intrastate possession of machineguns is essential to effectuate federal regulation. Section 922(*o*) cannot be upheld as a permissible regulation of a "thing" in interstate commerce. [20]

[19] Section 922(g) was amended to provide that it would be unlawful for certain persons (as defined by § 922(g))-"to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." FOPA § 102, 100 Stat. at 452.

Section 922(h) was replaced in its entirety and states: "It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment-(1) to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or (2) to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." *Id.*

Section 922(n) was added to § 922 and provides: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." *Id.*

[20] Section 922(*o*) also does not regulate an "instrumentality" of interstate commerce. Like § 922(q) in *Lopez*, § 922(*o*) regulates mere possession of a machinegun, regardless of its movement in interstate commerce. *See Lopez,* 514 U.S. at ----, 115 S.Ct. at 1630; *see also Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971)(aircraft are instrumentalities); *Houston & Shreveport R. Co. v. United States,* 234 U.S. 342, 351, 34 S.Ct. 833, 836, 58 L.Ed. 1341 (1914)(interstate carriers are instruments of interstate commerce). Section 922(*o*) therefore fails to regulate an instrumentality of interstate commerce.

## B. Does § 922(*o*) "Substantially Affect" Interstate Commerce?

The essential question in this case as in *Lopez* becomes whether § 922(*o*) represents a valid exercise of Congressional authority to regulate an activity "substantially affecting" interstate commerce. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1630.

The Government contends that § 922(*o*) has the requisite effect, as it is part of a comprehensive approach to the regulation of **\*1014** machineguns and that a single intrastate possession or transfer of a machinegun is nationally significant because of the cumulative effect such a transaction has on the supply-and-demand for machineguns. In a similar vein, *Kenney* argues that both the nature of § 922(*o*) and the history of federal firearms legislation support the provision's consistency with the post-*Lopez* scope of the Commerce Clause. *Kenney* first analogizes the banning of private post-1986 machinegun possession to the farmer's harvest of excessive wheat in *Wickard v. Filburn,* 317 U.S. at 125, 63 S.Ct. at 89, and concludes, "... there is a rational basis to regulate the local conduct of machinegun possession, including possession resulting from home manufacture, to effectuate § 922(*o*)'s purpose of freezing the number of legally possessed machineguns at 1986 levels, an effect that is closely entwined with regulating interstate commerce." 91 F.3d at 890. *Kenney* also describes the possession ban as rooted in a sixty-year history of federal machinegun regulation and thus as an incremental step in federal firearms regulation; it is a measure commanding "deference to Congress's accumulated institutional expertise." *Id.*

Among the three elements of *Lopez* 's substantial effects test, the first and most critical is that of characterization: whether § 922(*o*) fulfills the mission of regulating interstate commerce as (1) a regulation of economic activity which, although itself local, has substantial effect on interstate commerce, or (2) a regulation of activity which is essential to maintaining a larger, interstate regime of economic regulation. Neither *Kenney* nor the government in supporting § 922(*o*) has characterized it as a regulation of economic activity. It is not. It is "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* 514 U.S. at ---- - ----, 115 S.Ct. at 1630-31.

Defenders of § 922(*o*) argue instead that the possession ban is an essential part of the regulation of "commercial activity," either to insure federal control of the market for machineguns or to enforce a freeze on the number of available machineguns. *See, e.g. Beucklelaere,* 91 F.3d at 785; *Kenney,*

91 F.3d at 890. No doubt Congress has undertaken fully to regulate the business of firearms dealing, insofar as sales and transfers in or affecting commerce are concerned.[21] But as we have repeatedly noted, mere intrastate possession of a machinegun does not necessarily involve a transfer or an economic transaction of any kind.[22]

[21]    *See generally Lopez*, 2 F.3d 1342, 1348-1360 (Garwood, J.), reciting the history of federal firearms legislation.

[22]    Taking a different slant at the substantial effects test, Judge Higginbotham's novel approach to the test pays verbal obeisance to *Lopez* while seriously undermining it. Judge Higginbotham posits that rational basis review should lead federal courts to uphold the possession ban based on "facts ... within our [judges'] easy reach." Lacking any data from the legislative process, his opinion stitches together bits of news articles, statistics, and Congressional testimony from unrelated hearings to conclude that Congress might have banned machinegun possession to stem the illegal drug trade. His is an interesting empirical creation, but methodologically it follows Justice Breyer's *dissent* in *Lopez*. More troubling, Judge Higginbotham's opinion begs the question: it never explains why banning the wholly intrastate, non-crime-related, noncommercial personal possession of a machinegun is reasonably or substantially necessary to control use of these firearms in the illegal drug trade or other interstate commerce. Unlike the *Lopez* majority, his opinion ultimately substitutes wholesale deference to Congress for any attempt to define the boundaries of the commerce clause, even in noncommercial criminal statutes like § 922(*o*).

Moreover, the analogy to *Wickard* is flawed. In *Wickard*, the government's agricultural program aimed to control and support prices in the wheat market. Filburn's consumption of home-grown wheat substituted for the controlled wheat, impairing to that extent the price support effort. Section 922(*o*), by contrast, intends to extirpate any domestic commercial market for machineguns manufactured or imported after 1986. Even if this goal constitutes a legitimate regulation of interstate commerce, it does not follow that criminalizing purely private, intrastate possession is necessary to eliminate the market. Section 922(*o*) also prohibits transfers of machineguns and, to the extent it represents a permissible exercise of Commerce

**\*1015**  Clause power,[23] that prohibition aims directly and completely at commercial activity in machineguns. Private possession of a machinegun does not involve a market

activity, and there is no legitimate market in which a substitution effect would occur.

[23]    Not all transfers are commercial in nature. Transfers by gift or by succession would not be.

Another way of explaining the superfluousness of the § 922(*o*) possession is to compare firearms regulation to the narcotics trafficking laws. Not only are most of those criminal provisions also expressly tied to the commerce in illegal controlled substances, but Congress also made extensive findings to establish the necessary relationship of possession and intrastate trade to the overall scheme. *See, e.g., United States v. Leshuk*, 65 F.3d 1105, 1112 (4th Cir.1995); *Lopez*, 2 F.3d at 1367, n. 51; *United States v. Lopez*, 459 F.2d 949, 951-53 (5th Cir.), *cert. denied sub nom. Llerena v. United States*, 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).[24] The nature of controlled substances supports Congress's findings: they are fungible, and their intrastate, interstate or imported origin is often impossible to discern. Firearms, including machineguns, are identifiable and traceable. Banning private, intrastate machinegun possession is not an essential link in the chain of federal regulation of firearms dealing.

[24]    *See United States v. Genao*, 79 F.3d 1333 (2d Cir.1996) (upholding 21 U.S.C. §§ 841, 846); *United States v. Leshuk*, 65 F.3d 1105 (4th Cir.1995) (21 U.S.C. § 841(a)(1)); *United States v. Clark*, 67 F.3d 1154 (5th Cir.1995) (upholding 21 U.S.C. § 860), *cert. denied*, 517 U.S. 1141, 116 S.Ct. 1432, 134 L.Ed.2d 554 (1996); *United States v. Tucker*, 90 F.3d 1135 (6th Cir.1996) (same); *United States v. Bell*, 90 F.3d 318 (8th Cir.1996) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Brown*, 72 F.3d 96 (8th Cir.1995) (same); *United States v. Yoon*, No. 95-16698, 1996 WL 367621 (9th Cir. June 28, 1996) (unpublished per curiam) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Wacker*, 72 F.3d 1453 (10th Cir.1995) (upholding 21 U.S.C. §§ 841(a)(1), 846); *United States v. Kremetis*, 903 F.Supp. 250 (D.N.H.1995) (same); *United States v. Smith*, 920 F.Supp. 245 (D.Me.1996) (upholding 21 U.S.C. §§ 841(a)(1)-(2), 846); *United States v. Salmiento*, 898 F.Supp. 45 (D.P.R.1995) (upholding 21 U.S.C. § 860); *United States v. Gonzalez*, 893 F.Supp. 935 (S.D.Cal.1995) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Garcia-Salazar*, 891 F.Supp. 568 (D.Kan.1995) (upholding 21 U.S.C. § 860); *United States v. Murillo*, No. CR 93-20131 JW, 1995 WL 621797 (N.D.Cal.1995) (upholding 21 U.S.C. §§ 841(a), 843(b), 846); *United States v. Grafton*, 1995 WL 506001

(N.D.Ga.1995) (upholding 21 U.S.C. §§ 841, 846); *United States v. Walker,* 910 F.Supp. 837 (N.D.N.Y.1995) (upholding 21 U.S.C. §§ 841, 846, 848); *United States v. Bramble,* 894 F.Supp. 1384 (D.Haw.1995) (upholding 21 U.S.C. §§ 841(a)(1), 844(a)).

*Kenney* also asserts that because Congress has historically regulated firearms and has evinced particular interest in regulating machineguns, its "accumulated institutional expertise" justifies § 922(*o*). This argument might be called "the nose under the camel's tent" theory of Commerce Clause power: once Congress has begun to regulate a particular activity, courts should defer to any extensions of regulation that Congress legislates. Surely this position renders any theoretical limit on the enumerated Commerce Clause power nugatory.

Because we have concluded that mere intrastate possession is neither an economic activity nor an intrastate activity whose regulation is essential to a larger commercial regulatory regime, § 922(*o*) cannot pass muster under the *Lopez* substantial effects test. Reinforcing this conclusion, although not necessary to it, are the results of the other two parts of the test, which deal with Congressional findings and the limits on federal authority.

If Congress had made findings explaining the connection of mere intrastate possession of machineguns to interstate commerce, or if there were an expressly required nexus between such possession and commerce,[25] § 922(*o*) might be vindicated under the second **\*1016** *Lopez* prong. These features are lacking. Whatever the effect a single intrastate possession of a machinegun has on economic activity in firearms, the text and legislative history of § 922(*o*) do not support any conclusion that Congress considered such effects or viewed § 922(*o*) as part of a comprehensive approach to federal regulation of commerce in machineguns. As discussed previously, § 922(*o*) was inserted into FOPA with virtually no discussion of its content and with absolutely no discussion of its place in the broad scheme of federal firearms regulations. *See supra* part II.A. Like § 922(q) found unconstitutional in *Lopez,* no Congressional findings attest that § 922(*o*) is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1631. No studies, testimony or evidence of any other sort-Congressional or otherwise-is adduced in favor of § 922(*o*). Nor does § 922(*o*) contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."

*Id.* at ----, 115 S.Ct. at 1631. To infer in the face of this void that regulation of intrastate possession is essential to effectively regulate interstate traffic in machineguns states a naked conclusion, a fiat without supporting facts. Congress has not helped us to discern a connection between the possession ban and interstate commerce which is otherwise invisible to the naked eye. *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1632.

25        We are not at liberty to question the Supreme Court's approval of the predecessor statute to 18 U.S.C. § 922(g)(1), which criminalizes possession of a firearm by a felon "in or affecting commerce." Only a minimal jurisdictional nexus is required, i.e. that at some time the firearm had travelled in interstate commerce. *Scarborough v. United States,* 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977). As this broad reading of the Commerce Clause has Supreme Court inprimatur, albeit pre-*Lopez,* we can only note the tension between the two decisions and will continue to enforce § 922(g)(1). *See United States v. Rawls,* 85 F.3d 240, 243 (5th Cir.1996) (Garwood, J., specially concurring).

Finally, like § 922(q), § 922(*o*) intrudes upon the traditional police powers of the states and violates *Lopez* 's third mandate for a substantial-effects regulation of intrastate activity because it affords no logical demarcation between the national and local interests. *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993)(states have primary authority for defining and enforcing criminal law); *see Lopez,* 514 U.S. at ---- n. 3, 115 S.Ct. at 1631 n. 3; *Bass,* 404 U.S. at 349-50, 92 S.Ct. at 523-24. Section 922(*o*) would punish a local resident for the mere possession of a machinegun acquired after 1986 with "no requirement that his possession of the [machinegun] have any concrete tie to interstate commerce." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1634. The Supreme Court avoided such a result in *Bass. Bass,* 404 U.S. at 349-50, 92 S.Ct. at 523-24. To uphold § 922(*o*), a purely criminal law, with no nexus to interstate commerce, whose enforcement intrudes upon traditional police powers of the states, would convert the commerce power into a reserved "general federal police power." *Id.* at ---- - ----, 115 S.Ct. at 1632-33; *see also id.* at ----, 115 S.Ct. at 1638 (Kennedy, J., concurring)("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."). The rationale that Congress can, on a blank slate, criminalize possession under the interstate Commerce Clause in order to regulate "the demand side of

the market" can be applied to the possession of anything. Following *Lopez,* § 922(*o*) cannot be upheld as a regulation which substantially affects interstate commerce.

## CONCLUSION

Regardless of one's view of the wisdom of banning the private possession of machineguns, the question before this court is whether the Commerce Clause grants Congress the authority to ban private, intrastate possession of a machinegun with no showing that the prohibition is connected in any way to interstate commerce or is part of a broader federal regulatory scheme. Congress's commerce powers are broad,

reaching even Roscoe Filburn's wheat field in Ohio. *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *Lopez,* however, closely controls this case. *Lopez* does not permit Congress, acting pursuant to the Commerce Clause, to criminalize the mere intrastate possession of machineguns without some indication that the possession ban is necessary to the regulation of, or has some other substantial tie to, interstate commerce. Section 922(*o*)'s ban on the mere possession of a **\*1017** machinegun exceeds Congress's authority under the Commerce Clause.

**All Citations**

105 F.3d 997 (Mem)

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

479 Mass. 331
Supreme Judicial Court of Massachusetts,
Suffolk..

Jorge RAMIREZ

v.

COMMONWEALTH.

SJC–12340
|
Argued December 5, 2017
|
Decided April 17, 2018

**Synopsis**

**Background:** Defendant was charged with possession of a stun gun and other offenses. The trial court denied defendant's motion to dismiss the stun gun charge, and defendant petitioned a single justice for relief. A single justice of the Supreme Judicial Court, Suffolk County, Hines, J., reserved and reported the petition to the full court.

**Holdings:** The Supreme Judicial Court, Gants, J., held that:

the absolute prohibition in statute governing the sale or possession of electrical weapons that bars all civilians from possessing or carrying stun guns, even in their home, was inconsistent with the Second Amendment and therefore unconstitutional, and

the statute was facially invalid, and therefore, had to be struck down in its entirety.

Vacated and remanded.

**West Codenotes**

**Held Unconstitutional**
Mass. Gen. Laws Ann. ch. 140, § 131J

**\*\*810** Firearms. Constitutional Law, Right to bear arms, Severability. Statute, Validity, Severability.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 21, 2017.

The case was reported by Hines, J.

**Attorneys and Law Firms**

Benjamin H. Keehn, Committee for Public Counsel Services, for Jorge Ramirez.

Kathryn Leary, Assistant District Attorney, for the Commonwealth.

Present: Gants, C.J., Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.

**Opinion**

GANTS, C.J.

**\*331** We once again confront the question whether the absolute criminal prohibition of civilian possession of a stun gun, in violation of G. L. c. 140, § 131J, violates the Second Amendment to the United States Constitution, which is applied to the States by its incorporation into the Fourteenth Amendment. In Commonwealth v. Caetano, 470 Mass. 774, 26 N.E.3d 688 (2015) (Caetano I), we held that § 131J did not violate the Second Amendment right to bear arms, as interpreted by District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). However, the United States Supreme Court, in a brief per curiam opinion, concluded that each of the three explanations we offered to support this holding were inconsistent with propositions stated in Heller, and **\*\*811** therefore vacated the judgment and remanded the case for further proceedings. See Caetano v. Massachusetts, —— U.S. ——, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (Caetano II). **\*332** That case was later dismissed as moot after it was "resolved ... to [the parties'] mutual satisfaction," so we did not there revisit the question of § 131J's constitutionality. But we must revisit it in this case, where the defendant was charged in a criminal complaint with possession of a stun gun, in violation of § 131J, among other crimes, and moved unsuccessfully to dismiss that count of the complaint, arguing that § 131J unconstitutionally infringes on his Second Amendment rights.

We conclude that the absolute prohibition against civilian possession of stun guns under § 131J is in violation of the Second Amendment, and we order that the count of the complaint charging the defendant with such possession be dismissed with prejudice.

Background. We summarize the agreed-upon facts relevant to this appeal. On November 5, 2015, at approximately 2:15 A.M., Officer Sean Matthews of the Revere police department

was on patrol when he observed a vehicle with a broken taillight that was being operated in what he believed to be a suspicious manner in an area where the police had recently received reports of a number of motor vehicle break-ins. The vehicle was occupied by three men; the defendant was seated in the rear passenger seat. After Officer Matthews activated his cruiser's blue lights, and before the vehicle came to a stop, he observed the three men moving in a manner that heightened his suspicion. After a backup unit arrived, the three men were ordered out of the vehicle and a patfrisk was conducted of the defendant, which revealed a stun gun in his pants pocket. Officer Matthews seized the weapon and placed the defendant under arrest for possession of a stun gun. During a subsequent search of the vehicle, the police recovered a firearm and a loaded extended grip magazine in the back seat, near where the defendant had been seated. The defendant was charged in a criminal complaint with possession of a stun gun, as well as with carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a); carrying a loaded firearm without a license, in violation of G. L. c. 269, § 10 (n); and possession of a firearm without a firearm identification card, in violation of G. L. c. 269, § 10 (h).

The defendant moved to dismiss the stun gun charge, arguing that § 131J's criminal prohibition of the possession of stun guns by civilians violates the Second Amendment, citing the Supreme Court's opinion in Caetano II. The judge denied the motion without explanation, and also denied the defendant's request for **\*333** written findings of fact and rulings of law. After the defendant petitioned for relief from the single justice pursuant to G. L. c. 211, § 3, and the Commonwealth joined the petition, the single justice reserved and reported the petition to the full court.

Discussion. A stun gun, as defined in § 131J, is "a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill."[1] A **\*\*812** stun **\*334** gun is not a "firearm," which, as defined in G. L. c. 140, § 121, is a weapon "from which a shot or bullet can be discharged," among other requirements.

[1]   General Laws c. 140, § 131J, provides:
  "No person shall possess a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill, except: (1) a [F]ederal, [S]tate or municipal law enforcement officer, or member of a special

reaction team in a [S]tate prison or designated special operations or tactical team in a county correctional facility, acting in the discharge of his official duties who has completed a training course approved by the secretary of public safety in the use of such a devise or weapon designed to incapacitate temporarily; or (2) a supplier of such devices or weapons designed to incapacitate temporarily, if possession of the device or weapon is necessary to the supply or sale of the device or weapon within the scope of such sale or supply enterprise. No person shall sell or offer for sale such device or weapon, except to [F]ederal, [S]tate or municipal law enforcement agencies. A device or weapon sold under this section shall include a mechanism for tracking the number of times the device or weapon has been fired. The secretary of public safety shall adopt regulations governing who may sell or offer to sell such devices or weapons in the [C]ommonwealth and governing law enforcement training on the appropriate use of portable electrical weapons.

  "Whoever violates this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment in the house of correction for not less than [six] months nor more than [two and one-half] years, or by both such fine and imprisonment. A law enforcement officer may arrest without a warrant any person whom he has probable cause to believe has violated this section."

As is apparent, § 131J does not use the term "stun gun." But G. L. c. 269, § 12F, a statute pertaining to airport secure areas, defines a "[p]rohibited weapon" as, among other things, "any stun gun as defined in [G. L. c. 140, § 131J]." The two most well-known electrical weapons that fall within the rubric of § 131J are stun guns and "dart-firing electrical shock device[s]," better known as Tasers. See American Civil Liberties Union of Massachusetts, Less Lethal Force: Proposed Standards for Massachusetts Law Enforcement Agencies, at 5, https://aclum.org/wp-content/uploads/2015/06/reports-less-lethalforce.pdf [https://perma.cc/F29X-XHWH]. Tasers use "compressed nitrogen gas to fire two wires tipped with electrical barbs at [a person]," and, "[w]hen the barbs penetrate

[a person's] skin or clothing, an electrical signal is transmitted through the wires, resulting in a paralyzing and incapacitating electrical shock." Id. at 6. In contrast to Tasers, stun guns have the electrodes attached to the device, and, when this "charged portion of the stun gun" comes into direct contact with a person's skin or clothing, it "completes an electrical circuit and delivers an incapacitating shock to [the person]." Id. at 5–6. For the sake of simplicity, we refer to all electrical weapons under § 131J as "stun guns."

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In Heller, 554 U.S. at 635, 128 S.Ct. 2783, the Supreme Court held that "the District [of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Noting that "the inherent right of self-defense has been central to the Second Amendment right," the Court declared:

> "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' ... would fail constitutional muster" (footnote and citation omitted).

Id. at 628–629, 128 S.Ct. 2783.

Although there was no dispute that the firearm at issue in Heller was an "arm" under the Second Amendment, the Court addressed the meaning of the term "arm." **813 The Court noted that "[t]he 18th–century meaning is no different from the meaning today," and offered two definitions of the word from legal dictionaries written shortly before the enactment of the Second Amendment. Id. at 581, 128 S.Ct. 2783. The first, in the 1773 edition of Samuel Johnson's dictionary, defined "arms" as "[w]eapons of offence, or armour of defence." Id., quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978). The second, in Timothy Cunningham's 1771 legal dictionary, defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or *335 useth in wrath to cast at or strike another." Heller, supra at 581, 128 S.Ct. 2783, quoting 1 A New and Complete Law

Dictionary. The Court characterized the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" as "bordering on the frivolous," declaring that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Heller, supra at 582, 128 S.Ct. 2783. It also noted that "[t]he term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity." Id. at 581, 128 S.Ct. 2783.

The Court, however, made clear that "the right secured by the Second Amendment is not unlimited," and "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626, 128 S.Ct. 2783. The Court recognized two important limitations on the right to keep and carry arms. First, the Court declared, "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626–627, 128 S.Ct. 2783. Second, the Court recognized that there was a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' " (citations omitted). Id. at 627, 128 S.Ct. 2783. The Court declared that this historical tradition was supported by the limitation explained in United States v. Miller, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), "that the sorts of weapons protected [under the Second Amendment] were those 'in common use at the time.' " Heller, supra, quoting Miller, supra at 179, 59 S.Ct. 816. However, a few pages earlier in the Heller opinion, the Court had stated that it "read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Heller, supra at 625, 128 S.Ct. 2783.

In Caetano I, we considered whether a ban on civilian stun gun possession under § 131J violated the Second Amendment, where the possession was outside the home. [2] The defendant had been arrested after a police officer found a stun gun in her purse while *336 she was seated in her vehicle in the parking lot of a supermarket. See Caetano I, 470 Mass. at 775, 26 N.E.3d 688. The defendant told police that she carried the stun gun for self-defense against a former boy friend. See id. She

moved to dismiss the complaint, arguing that her possession of the stun gun was protected by the Second Amendment because **\*\*814** a stun gun is an "arm" for purposes of the Second Amendment, is a weapon used primarily for self-defense, and is in common use in the United States for that purpose. Id. at 775–776, 26 N.E.3d 688. We affirmed the denial of the motion to dismiss as well as her subsequent conviction, concluding, "Without further guidance from the Supreme Court on the scope of the Second Amendment, we do not extend the Second Amendment right articulated by Heller to cover stun guns." Id. at 779, 783, 26 N.E.3d 688.

<div style="margin-left:2em">

2        The defendant in that case testified that she was homeless but temporarily residing in a hotel. See Commonwealth v. Caetano, 470 Mass. 774, 776, 26 N.E.3d 688 (2015).

</div>

We noted that "[t]he conduct at issue in [that] case falls outside the 'core' of the Second Amendment, insofar as the defendant was not using the stun gun to defend herself in her home, ... and involves a 'dangerous and unusual weapon' that was not 'in common use at the time' of enactment." Id. at 779, 26 N.E.3d 688. We determined that a stun gun was a "per se dangerous weapon at common law," id. at 780, 26 N.E.3d 688, because its purpose was solely for "bodily assault or defense." Id., quoting Commonwealth v. Appleby, 380 Mass. 296, 303, 402 N.E.2d 1051 (1980). We also determined that a stun gun was "unusual" because it was not "in common use at the time" the Second Amendment was enacted, Caetano I, supra at 780–781, 26 N.E.3d 688, and was also an "unusual weapon" in terms of the number of persons who own them (as compared to firearms) and in terms of its use (in that it is not readily adaptable to use in the military and is ineffective for hunting and target shooting). Id. at 781, 26 N.E.3d 688.

The Supreme Court granted certiorari, vacated the judgment, and remanded the case for further proceedings. In a per curiam decision, the Supreme Court declared:

> "The [Supreme Judicial] [C]ourt offered three explanations to support its holding that the Second Amendment does not extend to stun guns. First, the court explained that stun guns are not protected because they 'were not in common use at the time of the Second Amendment's enactment.' [Caetano I, 470 Mass. at 781, 26 N.E.3d 688]. This is inconsistent with Heller's clear statement that the Second Amendment 'extends ... to ... arms ... that were not in existence at the time of the founding.' [554 U.S. at 582, 128 S.Ct. 2783].
>
> **\*337** "The court next asked whether stun guns are 'dangerous per se at common law and unusual,' [Caetano

I, 470 Mass. at 781, 26 N.E.3d 688], in an attempt to apply one 'important limitation on the right to keep and carry arms,' [Heller, 554 U.S. at 627, 128 S.Ct. 2783. See id.] (referring to 'the historical tradition of prohibiting the carrying of "dangerous and unusual weapons" '). In so doing, the court concluded that stun guns are 'unusual' because they are 'a thoroughly modern invention.' [Caetano I, supra]. By equating 'unusual' with 'in common use at the time of the Second Amendment's enactment,' the court's second explanation is the same as the first; it is inconsistent with Heller for the same reason.

> "Finally, the court used 'a contemporary lens' and found 'nothing in the record to suggest that [stun guns] are readily adaptable to use in the military.' [Caetano I, 470 Mass. at 781, 26 N.E.3d 688]. But Heller rejected the proposition 'that only those weapons useful in warfare are protected.' [554 U.S. at 624–625, 128 S.Ct. 2783].

> > "For these three reasons, the explanation the ... court offered for upholding the law contradicts this Court's precedent."

Caetano II, 136 S.Ct. at 1027–1028. The Supreme Court did not opine as to whether electrical weapons are protected under **\*\*815** the Second Amendment or, if they are protected, whether § 131J is nonetheless constitutional. [3]

<div style="margin-left:2em">

3        In a concurrence joined by Justice Thomas, Justice Alito expressed his view that electrical weapons are protected by the Second Amendment and that Massachusetts's "categorical ban of such weapons therefore violates the Second Amendment." Caetano v. Massachusetts, ––– U.S. ––––, 136 S.Ct. 1027, 1028–1033, 194 L.Ed.2d 99 (2016) (Alito, J., concurring in the judgment). Justice Alito also stressed that this court's decision did "a grave disservice to vulnerable individuals like [the defendant] who must defend themselves because the State will not." Id. at 1029.

</div>

Having received guidance from the Supreme Court in Caetano II, we now conclude that stun guns are "arms" within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned. Restrictions may be placed on the categories of persons who may possess them, licenses may be required for their possession, and those

licensed to possess them may be barred from carrying them in sensitive places, such as schools and government buildings. But the absolute prohibition in § 131J that bars all civilians from possessing or carrying stun guns, even in *338 their home, is inconsistent with the Second Amendment and is therefore unconstitutional.

Having so found, we must now decide whether § 131J is facially invalid and therefore must be struck down in its entirety, or whether it is only partially invalid and can be narrowed in its application to preserve its constitutionality. When confronting a constitutional flaw in a statute, a court strives "to limit the solution to the problem." Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). As part of limiting the solution to the problem, a court may choose to "enjoin only the unconstitutional applications of a statute while leaving other applications in force, see United States v. Raines, 362 U.S. 17, 20–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), or to sever its problematic portions while leaving the remainder intact, United States v. Booker, 543 U.S. 220, 227–229, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)." Ayotte, supra at 328–329, 126 S.Ct. 961. See generally Free Enter. Fund v. Public Co. Accounting Oversight Bd., 561 U.S. 477, 508–509, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

In Ayotte, supra at 329–330, 126 S.Ct. 961, the Supreme Court identified three "interrelated principles" that should inform a court's approach when it confronts a constitutional flaw in a statute. First, a court should "try not to nullify more of a legislature's work than is necessary, for ... '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " Id. at 329, 126 S.Ct. 961, quoting Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion). See Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ("facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the [United States] Constitution"). "Accordingly, the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact.' " Ayotte, supra, quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

Second, "mindful that our constitutional mandate and institutional competence are **816 limited," a court should restrain itself from " 'rewrit[ing] [S]tate law to conform it to constitutional requirements[,]' even as [a court] strive[s] to salvage it." Ayotte, supra at 329, 126 S.Ct. 961, quoting Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). A court's "ability to devise a judicial remedy that does not entail quintessentially legislative work often depends on how clearly [the court has] already articulated the *339 background constitutional rules at issue and how easily [it] can articulate the remedy." Ayotte, supra.

Third, "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.' " Id. at 330, 126 S.Ct. 961, quoting Califano v. Westcott, 443 U.S. 76, 94, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (Powell, J., concurring in part and dissenting in part). "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" Ayotte, supra.

Applying these three "interrelated principles," we are confident that the Legislature would prefer partial invalidation to facial invalidation if the scope of the stun gun statute could be narrowed without the "quintessentially legislative work" of rewriting State law. See Ayotte, 546 U.S. at 329, 126 S.Ct. 961. Although stun guns, like handguns, are weapons "typically possessed by law-abiding citizens for lawful purposes," see Heller, 554 U.S. at 625, 128 S.Ct. 2783, stun guns, like handguns, are weapons that can injure or kill and, in the wrong hands, can be used for many unlawful or reckless purposes. An electrical device or weapon falls within the prohibition of § 131J only if the electrical current, impulse, wave, or beam it emits "is designed to incapacitate temporarily, injure or kill."[4] G. L. c. 140, § 131J. As we noted in Caetano I, "stun guns deliver a charge of up to 50,000 volts," and "are designed to incapacitate a target by causing disabling pain, uncontrolled muscular contractions, and general disruption of the central nervous system." Caetano I, 470 Mass. at 782, 26 N.E.3d 688, citing Amnesty International, Less than Lethal? Use of Stun Weapons in U.S. Law Enforcement, 1–2, 6–7 & nn.17, 18 (2008), https://www.amnesty.org/download/Documents/52000/amr510102008en.pdf [https://perma.cc/JK53–XMR3].

4          Axon Enterprise, Inc. (formerly known as TASER
           International, Inc., until April, 2017), the leading
           manufacturer of stun guns, notes that its conducted
           electrical weapon products, including stun guns,
           "are often used in aggressive confrontations that
           may result in serious, permanent bodily injury or
           death to those involved" and that its "products
           may be associated with these injuries." See
           Axon Enterprise, Inc., United States Securities and
           Exchange Commission Form 10–K, 2017 Annual
           Report, at 15, https://www.sec.gov/Archives/edgar/
           data/1069183/000106918318000020/
           a10kaaxn123117.htm [https://perma.cc/Y3WY–SPKR].

Our appellate case law reveals that stun guns have been used to incapacitate a victim before killing him by strangulation, see Commonwealth v. Williams, 475 Mass. 705, 713, 60 N.E.3d 335 (2016) (victim "was assaulted repeatedly with a stun gun and eventually strangled **\*340** to death"); to assault victims to force them to submit to unwanted sexual intercourse, see Commonwealth v. Gomes, 54 Mass. App. Ct. 1, 2, 763 N.E.2d 83 (2002) ("The assailant drove the complainants to a remote area ..., displayed a stun gun, and forced them to have sex with him"); and to punish and control victims of domestic violence, see Commonwealth v. Melton, 77 Mass. App. Ct. 552, 553, 933 N.E.2d 125 (2010) (victim, who "suffered frequent beatings, threats of violence **\*\*817** and sexual abuse, and continuous emotional intimidation," "testified that the defendant had used various weapons against her, such as a knife, stun gun, and belt, and detailed certain incidents of abuse"). Although less lethal than a handgun, stun guns can be used to conceal the torture and abuse of another person because they "can deliver repeated or prolonged shocks without leaving marks." Caetano I, 470 Mass. at 782, 26 N.E.3d 688, citing Amnesty International, supra at 1–2. See Turner & Jumbelic, Stun Gun Injuries in the Abuse and Death of a Seven–Month–Old Infant, 48 J. Forensic Sci. 1 (2003).

The Legislature was so concerned with the risk of their misuse that, in 1986, it initially barred all individuals, including law enforcement officers, from possessing electrical weapons. See G. L. c. 140, § 131J, inserted by St. 1986, c. 212. In 2004, the Legislature amended the law to its current form, which continues to bar civilian possession of stun guns, but exempts law enforcement officers from the ban when using electrical weapons in the discharge of their official duties as well as those who supply these weapons to law enforcement officers. See G. L. c. 140, § 131J, as amended by St. 2004, c. 170, § 1.

We recognize that declaring § 131J to be facially invalid would leave in place no restriction on stun gun possession by anyone in Massachusetts. Unless and until the Legislature were to act to replace § 131J with a revised version that would pass muster under the Second Amendment, facial invalidation of § 131J would mean that there would be no law in place preventing stun guns from being sold to or possessed by violent felons, persons convicted of domestic violence, convicted drug dealers, children, or the mentally ill. But, having carefully considered whether the scope of the stun gun statute could be narrowed to render it constitutional without the "quintessentially legislative work" of rewriting State law, see Ayotte, 546 U.S. at 329, 126 S.Ct. 961, we have reluctantly come to the conclusion that it cannot be saved.

We are mindful that the Legislature has expressly adopted the principle of severability of statutory provisions. See **\*341** G. L. c. 4, § 6, Eleventh, inserted by St. 1983, c. 210 ("The provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof"). Where a provision of a statute is held unconstitutional, "the valid portions of the statute should be preserved if the invalid provision is separable from the remainder of the statute." Commonwealth v. Brown, 466 Mass. 676, 681, 1 N.E.3d 259 (2013). But, where § 131J provides that, apart from law enforcement officers and suppliers, "[n]o person shall possess a [stun gun]," there is no provision that can be severed to save its constitutionality. The invalid provision here is "[n]o person," and the statute does not make sense if that provision were severed.

We also recognize that the Supreme Court in Heller made clear that the Second Amendment does not prevent a legislature from enacting statutes that prohibit the possession of arms by certain classes of persons who pose a special danger to society, such as felons and the mentally ill. See Heller, 554 U.S. at 626–627, 128 S.Ct. 2783. In contrast with the ban on stun guns, the State has not barred all civilian possession of firearms; instead, it has prohibited certain classes of persons from possessing firearms by promulgating licensing requirements. General Laws c. 140, § 129C, mandates that no person "shall own or possess any firearm, rifle, shotgun or ammunition unless he has been **\*\*818** issued a firearm identification card" (FID card) under G. L. c. 140, § 129B. And § 129B (1) provides that a person shall be issued an FID card "if it appears that the applicant is not a prohibited person," which includes persons convicted of felonies or adjudicated a youthful offender or

delinquent child; persons convicted of violent crimes (as defined in G. L. c. 140, § 121) or misdemeanors punishable by imprisonment for more than two years; persons who have been committed to a hospital or an institution for mental illness, alcohol, or substance abuse; and persons under the age of fifteen. Because presumptively lawful prohibitions do not burden conduct protected by the Second Amendment, they fall outside the scope of the Second Amendment and are not subject to heightened scrutiny. See Chief of Police of Worcester v. Holden, 470 Mass. 845, 853, 26 N.E.3d 715 (2015). See also Commonwealth v. McGowan, 464 Mass. 232, 240–241, 982 N.E.2d 495 (2013) (we have "consistently held, without applying any level of heightened scrutiny, that the decisions in Heller and McDonald [v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010),] did not invalidate laws that require a person to have a[n] [FID] card to possess a firearm in one's home or place of business").

 **\*342**  If the Legislature had made it a crime only for this class of "prohibited persons" to possess a stun gun (or a comparable class), there could be no doubt that such a statute would be constitutional and that it would preserve much of what the Legislature intended through its broader ban. But we cannot ourselves limit the application of § 131J to "prohibited persons" without engaging in the "quintessentially legislative work" of rewriting State law. See Ayotte, 546 U.S. at 329, 126 S.Ct. 961. We would first need to decide whether the class of "prohibited persons" should be the same for the possession of stun guns as for the possession of firearms, which are more lethal than stun guns. We would then need to decide whether a person must be licensed to possess a stun gun, as is required to possess a firearm. [5] And if we decided that a license should be required, we would need to consider if we should adopt the same licensing scheme for stun guns as exists for firearms, or some variant of that licensing scheme.

---

[5]    We note that prohibited persons may be barred from possessing a weapon without there being a licensing system. General Laws c. 140, § 122D, prohibits various categories of persons from purchasing or possessing "self-defense spray," which is defined in G. L. c. 140, § 122C (a), to mean "chemical mace, pepper spray or any device or instrument which contains, propels or emits a liquid, gas, powder or other substance designed to incapacitate." But, unlike with firearms, individuals over the age of eighteen need not be licensed to purchase or possess self-defense spray. See G. L. c. 140, § 122C (d). The Legislature simply made it a criminal violation for a person to purchase or possess self-defense spray if he

or she is within a category of persons enumerated in § 122D.

We therefore come to the conclusion that we cannot save § 131J through partial invalidation and must declare it to be facially invalid. Because this will invalidate the Legislature's absolute ban and leave no lesser restriction on the possession of stun guns in its place, and because we recognize that the Legislature may wish to do what we cannot (revise the statute in a manner that will preserve its constitutionality), we will direct that the entry of the judgment after the date of our issuance of the rescript in this case be delayed in order to allow the Legislature adequate time to amend the statute in light of this opinion, if it so chooses. See, e.g., Moot v. Department of Envtl. Protection, 456 Mass. 309, 310, 923 N.E.2d 81 (2010) (in earlier case, Department of Environmental Protection regulation had been declared to **\*\*819** be invalid, but court "issued a stay of the entry of judgment after rescript in the Superior Court to permit the Legislature to take any action it might deem appropriate in light of our opinion"); **\*343** Goodridge v. Department of Pub. Health, 440 Mass. 309, 344, 798 N.E.2d 941 (2003) (marriage licensing statute declared unconstitutional because it could not be construed to permit same-sex couples to marry, but court ordered that "[e]ntry of judgment shall be stayed for 180 days to permit the Legislature to take such action as it may deem appropriate in light of this opinion").

Conclusion.  The case is remanded to the county court for entry of a judgment (a) declaring that the absolute prohibition in G. L. c. 140, § 131J, against the civilian possession of stun guns is in violation of the Second Amendment to the United States Constitution, and therefore that § 131J in its current form, as amended by St. 2004, c. 170, § 1, is facially invalid; and (b) vacating the District Court's order denying the defendant's motion to dismiss the charge of unlawfully possessing a stun gun in violation of § 131J, and directing the judge to allow the motion and to dismiss that charge. The entry of that judgment shall be stayed for sixty days after the date of the issuance of the rescript in this case. In the meantime, to avoid needless delay in the adjudication of the defendant's remaining criminal charges, the Commonwealth may treat the charge under § 131J as having been dismissed, and may proceed with its prosecution of the remaining charges, without awaiting the entry of the judgment in the county court to that effect.

So ordered.

AR004674

**Ramirez v. Commonwealth, 479 Mass. 331 (2018)**

94 N.E.3d 809

**All Citations**

479 Mass. 331, 94 N.E.3d 809

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

112 S.Ct. 1535, 118 L.Ed.2d 174, 60 USLW 4307

112 S.Ct. 1535
Supreme Court of the United States

Keith JACOBSON, Petitioner

v.

UNITED STATES.

No. 90-1124.
|
Argued Nov. 6, 1991.
|
Decided April 6, 1992.

**Synopsis**

Defendant was convicted in the United States District Court for the District of Nebraska of receiving child pornography through the mail and he appealed. The Court of Appeals for the Eighth Circuit, 893 F.2d 999,reversed but, on rehearing en banc, affirmed916 F.2d 467, and certiorari was granted. The Supreme Court, Justice White, held that Government did not establish that defendant, who had received mailings from the Government purporting to be from organizations asserting individual rights, was predisposed to commit the offense prior to first contact by Government.

Reversed.

Justice O'Connor dissented and filed opinion in which Chief Justice Rehnquist and Justice Kennedy joined, and in which Justice Scalia joined in part.

**1536  Syllabus [*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

At a time when federal law permitted such conduct, petitioner Jacobson ordered and received from a bookstore two Bare Boys magazines containing photographs of nude preteen and teenage boys. Subsequently, the Child Protection Act of 1984 made illegal the receipt through the mails of sexually explicit depictions of children. After finding Jacobson's name on the bookstore mailing list, two Government agencies sent mail to him through five fictitious organizations and a bogus pen pal, to explore his willingness to break the law. Many of those organizations represented that they were founded to protect and promote sexual freedom and freedom of choice and that they promoted lobbying efforts through catalog sales. Some mailings raised the spectre of censorship. Jacobson responded to some of the correspondence. After 2 ½ years on the Government mailing list, Jacobson was solicited to order child pornography. He answered a letter that described concern about child pornography as hysterical nonsense and decried international censorship, and then received a catalog and ordered a magazine depicting young boys engaged in sexual activities. He was arrested after a controlled delivery of a photocopy of the magazine, but a search of his house revealed no materials other than those sent by the Government and the Bare Boys magazines. At his jury trial, he pleaded entrapment and testified that he had been curious to know the type of sexual actions to which the last letter referred and that he had been shocked by the Bare Boys magazines because he had not expected to receive photographs of minors. He was convicted, and the Court of Appeals affirmed.

*Held:* The prosecution failed, as a matter of law, to adduce evidence to support the jury verdict that Jacobson was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law by receiving child pornography through the mails. In their zeal to enforce the law, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 212, 77 L.Ed. 413. Jacobson was not simply offered the opportunity to order pornography, after which he promptly availed himself of that opportunity. He was the target of 26 months of repeated Government mailings and communications, **541 and the Government has failed to carry its burden of proving predisposition independent of its attention. The preinvestigation evidence-the Bare Boys magazines-merely indicates a generic inclination to act within a broad **1537 range, not all of which is criminal. Furthermore, Jacobson was acting within the law when he received the magazines, and he testified that he did not know that they would depict minors. As for the evidence gathered during the investigation, Jacobson's responses to the many communications prior to the criminal act were at most indicative of certain personal inclinations and would not support the inference that Jacobson was predisposed to violate the Child Protection Act. On the other hand, the strong arguable inference is that, by waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the

availability of sexually explicit materials, the Government not only excited Jacobson's interest in material banned by law but also exerted substantial pressure on him to obtain and read such material as part of the fight against censorship and the infringement of individual rights. Thus, rational jurors could not find beyond a reasonable doubt that Jacobson possessed the requisite predisposition before the Government's investigation and that it existed independent of the Government's many and varied approaches to him. Pp. 1540-1543.

916 F.2d 467 (CA 8 1990), reversed.

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, SOUTER, and THOMAS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C.J., and KENNEDY, J., joined, and in which SCALIA, J., joined except as to Part II, *post,* p. 1543.

**Attorneys and Law Firms**

George H. Moyer, Jr., Madison, Neb., for petitioner.

Paul J. Larkin, Jr., Washington, D.C., for respondent.

**Opinion**

 **\*542**  Justice WHITE delivered the opinion of the Court.

On September 24, 1987, petitioner Keith Jacobson was indicted for violating a provision of the Child Protection Act of 1984 (Act), Pub.L. 98-292, 98 Stat. 204, which criminalizes the knowing receipt through the mails of a "visual depiction [that] involves the use of a minor engaging in sexually explicit conduct...." 18 U.S.C. § 2252(a)(2)(A). Petitioner defended on the ground that the Government entrapped him into committing the crime through a series of communications from undercover agents that spanned the 26 months preceding his arrest. Petitioner was found guilty after a jury trial. The Court of Appeals affirmed his conviction, holding that the Government had carried its burden of proving beyond reasonable doubt that petitioner was predisposed to break the law and hence was not entrapped.

Because the Government overstepped the line between setting a trap for the "unwary innocent" and the "unwary criminal," *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958), and as a matter of law failed to establish that petitioner was independently predisposed to

commit the crime for which he was arrested, we reverse the Court of Appeals' judgment affirming his conviction.

I

In February 1984, petitioner, a 56-year-old veteran-turned-farmer who supported his elderly father in Nebraska, ordered two magazines and a brochure from a California adult bookstore. The magazines, entitled Bare Boys I and Bare Boys II, contained photographs of nude preteen and  **\*543**  teenage boys. The contents of the magazines startled petitioner, who testified that he had expected to receive photographs of "young men 18 years or older." Tr. 425. On cross-examination, he explained his response to the magazines:

> "[PROSECUTOR]: [Y]ou were shocked and surprised that there were pictures of very young boys without clothes on, is that correct?

> "[JACOBSON]: Yes, I was.

> "[PROSECUTOR]: Were you offended?

. . . . .

 **\*\*1538**  "[JACOBSON]: I was not offended because I thought these were a nudist type publication. Many of the pictures were out in a rural or outdoor setting. There was-I didn't draw any sexual connotation or connection with that." *Id.,* at 463.

The young men depicted in the magazines were not engaged in sexual activity, and petitioner's receipt of the magazines was legal under both federal and Nebraska law. Within three months, the law with respect to child pornography changed; Congress passed the Act illegalizing the receipt through the mails of sexually explicit depictions of children. In the very month that the new provision became law, postal inspectors found petitioner's name on the mailing list of the California bookstore that had mailed him Bare Boys I and II. There followed over the next 2 ½ years repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore petitioner's willingness to break the new law by ordering sexually explicit photographs of children through the mail.

The Government began its efforts in January 1985 when a postal inspector sent petitioner a letter supposedly from the

American Hedonist Society, which in fact was a fictitious organization. The letter included a membership application and stated the Society's doctrine: that members had the **\*544** "right to read what we desire, the right to discuss similar interests with those who share our philosophy, and finally that we have the right to seek pleasure without restrictions being placed on us by outdated puritan morality." Record, Government Exhibit 7. Petitioner enrolled in the organization and returned a sexual attitude questionnaire that asked him to rank on a scale of one to four his enjoyment of various sexual materials, with one being "really enjoy," two being "enjoy," three being "somewhat enjoy," and four being "do not enjoy." Petitioner ranked the entry "[p]re-teen sex" as a two, but indicated that he was opposed to pedophilia. *Ibid.*

For a time, the Government left petitioner alone. But then a new "prohibited mailing specialist" in the Postal Service found petitioner's name in a file, Tr. 328-331, and in May 1986, petitioner received a solicitation from a second fictitious consumer research company, "Midlands Data Research," seeking a response from those who "believe in the joys of sex and the complete awareness of those lusty and youthful lads and lasses of the neophite [*sic*] age." Record, Government Exhibit 8. The letter never explained whether "neophite" referred to minors or young adults. Petitioner responded: "Please feel free to send me more information, I am interested in teenage sexuality. Please keep my name confidential." *Ibid.*

Petitioner then heard from yet another Government creation, "Heartland Institute for a New Tomorrow" (HINT), which proclaimed that it was "an organization founded to protect and promote sexual freedom and freedom of choice. We believe that arbitrarily imposed legislative sanctions restricting *your* sexual freedom should be rescinded through the legislative process." *Id.,* Defendant's Exhibit 102. The letter also enclosed a second survey. Petitioner indicated that his interest in "[p]reteen sex-homosexual" material was above average, but not high. In response to another question, petitioner wrote: "Not only sexual expression but freedom of the press is under attack. We must be ever vigilant **\*545** to counter attack right wing fundamentalists who are determined to curtail our freedoms." *Id.,* Government Exhibit 9.

HINT replied, portraying itself as a lobbying organization seeking to repeal "all statutes which regulate sexual activities, except those laws which deal with violent behavior, such as rape. HINT is also lobbying to eliminate any legal definition of 'the age of consent.' " *Id.,* at Defendant's Exhibit 113.

These lobbying efforts were to be funded by sales from a catalog to be published in the future "offering the sale of various items which we believe you will find to be both interesting and stimulating." *Ibid.* HINT **\*\*1539** also provided computer matching of group members with similar survey responses; and, although petitioner was supplied with a list of potential "pen pals," he did not initiate any correspondence.

Nevertheless, the Government's "prohibited mailing specialist" began writing to petitioner, using the pseudonym "Carl Long." The letters employed a tactic known as "mirroring," which the inspector described as "reflect[ing] whatever the interests are of the person we are writing to." Tr. 342. Petitioner responded at first, indicating that his interest was primarily in "male-male items." Record, Government Exhibit 9A. Inspector "Long" wrote back:

> "My interests too are primarily male-male items. Are you satisfied with the type of VCR tapes available? Personally, I like the amateur stuff better if its [*sic*] well produced as it can get more kinky and also seems more real. I think the actors enjoy it more." *Id.,* Government Exhibit 13.

Petitioner responded:

> "As far as my likes are concerned, I like good looking young guys (in their late teens and early 20's) doing their thing together." *Id.,* Government Exhibit 14.

Petitioner's letters to "Long" made no reference to child pornography. After writing two letters, petitioner discontinued the correspondence.

**\*546** By March 1987, 34 months had passed since the Government obtained petitioner's name from the mailing list of the California bookstore, and 26 months had passed since the Postal Service had commenced its mailings to petitioner. Although petitioner had responded to surveys and letters, the Government had no evidence that petitioner had ever intentionally possessed or been exposed to child pornography. The Postal Service had not checked petitioner's mail to determine whether he was receiving questionable mailings from persons-other than the Government-involved in the child pornography industry. Tr. 348.

At this point, a second Government agency, the Customs Service, included petitioner in its own child pornography sting, "Operation Borderline," after receiving his name on lists submitted by the Postal Service. *Id.,* at 71-72. Using

AR004678

Jacobson v. U.S., 503 U.S. 540 (1992)
112 S.Ct. 1535, 118 L.Ed.2d 174, 60 USLW 4307

the name of a fictitious Canadian company called "Produit Outaouais," the Customs Service mailed petitioner a brochure advertising photographs of young boys engaging in sex. Record, Government Exhibit 22. Petitioner placed an order that was never filled. *Id.,* Government Exhibit 24.

The Postal Service also continued its efforts in the Jacobson case, writing to petitioner as the "Far Eastern Trading Company Ltd." The letter began:

"As many of you know, much hysterical nonsense has appeared in the American media concerning 'pornography' and what must be done to stop it from coming across your borders. This brief letter does not allow us to give much comments; however, why is your government spending millions of dollars to exercise international censorship while tons of drugs, which makes yours the world's most crime ridden country are passed through easily." *Id.,* Government Exhibit 1.

The letter went on to say:

"[W]e have devised a method of getting these to you without prying eyes of U.S. Customs seizing your **\*547** mail.... After consultations with American solicitors, we have been advised that once we have posted our material through your system, it cannot be opened for any inspection without authorization of a judge." *Ibid.*

The letter invited petitioner to send for more information. It also asked petitioner to sign an affirmation that he was "not a law enforcement officer or agent of the U.S. Government acting in an undercover capacity for the purpose of entrapping Far Eastern Trading Company, its agents or customers." Petitioner responded. *Ibid.* A catalog was sent, *id.,* Government Exhibit 2, and petitioner ordered Boys Who Love Boys, *id.,* Government **\*\*1540** Exhibit 3, a pornographic magazine depicting young boys engaged in various sexual activities. Petitioner was arrested after a controlled delivery of a photocopy of the magazine.

When petitioner was asked at trial why he placed such an order, he explained that the Government had succeeded in piquing his curiosity:

"Well, the statement was made of all the trouble and the hysteria over pornography and I wanted to see what the material was. It didn't describe the-I didn't know for sure what kind of sexual action they were referring to in the Canadian letter." Tr. 427-428.

In petitioner's home, the Government found the Bare Boys magazines and materials that the Government had sent to him in the course of its protracted investigation, but no other materials that would indicate that petitioner collected, or was actively interested in, child pornography.

Petitioner was indicted for violating 18 U.S.C. § 2252(a)(2) (A). The trial court instructed the jury on the petitioner's entrapment defense, [1] petitioner was convicted, and a divided **\*548** Court of Appeals for the Eighth Circuit, sitting en banc, affirmed, concluding that "Jacobson was not entrapped as a matter of law." 916 F.2d 467, 470 (1990). We granted certiorari. 499 U.S. 974, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991).

1    The jury was instructed:
    "As mentioned, one of the issues in this case is whether the defendant was entrapped. If the defendant was entrapped he must be found not guilty. The government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. "If the defendant before contact with law-enforcement officers or their agents did not have any intent or disposition to commit the crime charged and was induced or persuaded by law-enforcement officers o[r] their agents to commit that crime, then he was entrapped. On the other hand, if the defendant before contact with law-enforcement officers or their agents did have an intent or disposition to commit the crime charged, then he was not entrapped even though law-enforcement officers or their agents provided a favorable opportunity to commit the crime or made committing the crime easier or even participated in acts essential to the crime." App. 11-12.

## II

There can be no dispute about the evils of child pornography or the difficulties that laws and law enforcement have encountered in eliminating it. See generally *Osborne v. Ohio,* 495 U.S. 103, 110, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98 (1990); *New York v. Ferber,* 458 U.S. 747, 759-760, 102 S.Ct. 3348, 3355-3356, 73 L.Ed.2d 1113 (1982). Likewise, there can be no dispute that the Government may use undercover agents to enforce the law. "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212,

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

77 L.Ed. 413 (1932); *Sherman,* 356 U.S., at 372, 78 S.Ct., at 820; *United States v. Russell,* 411 U.S. 423, 435-436, 93 S.Ct. 1637, 1644-1645, 36 L.Ed.2d 366 (1973).

In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. *Sorrells, supra,* 287 U.S., at 442, 53 S.Ct., at 212; *Sherman, supra,* 356 U.S., at 372, 78 S.Ct., at 820. Where the Government has induced an **\*549** individual to break the law and the defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents. *United States v. Whoie,* 288 U.S.App.D.C. 261, 263-264, 925 F.2d 1481, 1483-1484 (1991). [2]

[2] Inducement is not at issue in this case. The Government does not dispute that it induced petitioner to commit the crime. The sole issue is whether the Government carried its burden of proving that petitioner was predisposed to violate the law *before* the Government intervened. The dissent is mistaken in claiming that this is an innovation in entrapment law and in suggesting that the Government's conduct prior to the moment of solicitation is irrelevant. See *post,* at 1544-1545. The Court rejected these arguments six decades ago in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), when the Court wrote that the Government may not punish an individual "for an alleged offense which is the product of the creative activity of its own officials" and that in such a case the Government "is in no position to object to evidence of the activities of its representatives in relation to the accused" *Id.,* at 451, 53 S.Ct., at 216. Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument, submitting that the evidence it developed during the course of its investigation was probative because it indicated petitioner's state of mind *prior* to the commencement of the Government's investigation. See Tr. of Oral Arg. 41, 49.

This long-established standard in no way encroaches upon Government investigatory activities. Indeed, the Government's internal guidelines for undercover operations provide that an inducement to commit a crime should not be offered unless:

"(a) [T]here is a reasonable indication, based on information developed through informants or other means, that the subject is engaging, has engaged, or is likely to engage in illegal activity of a similar type; *or* "(b) The opportunity for illegal activity has been structured so that there is reason for believing that persons drawn to the opportunity, or brought to it, are predisposed to engage in the contemplated illegal activity." Attorney General's Guidelines on FBI Undercover Operations (Dec. 31, 1980), reprinted in S.Rep. No. 97-682, p. 551 (1982).

**\*\*1541** Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later. In **\*550** such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition. See *United States v. Sherman,* 200 F.2d 880, 882 (CA2 1952). Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner-who must be presumed to know the law-had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction. *Mathews v. United States,* 485 U.S. 58, 66, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988).

But that is not what happened here. By the time petitioner finally placed his order, he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985. *Sorrells, supra,* 287 U.S., at 442, 53 S.Ct., at 213; *Sherman,* 356 U.S., at 372, 78 S.Ct., at 820.

The prosecution's evidence of predisposition falls into two categories: evidence developed prior to the Postal Service's mail campaign, and that developed during the course of the investigation. The sole piece of preinvestigation evidence is petitioner's 1984 order and receipt of the Bare Boys magazines. But this is scant if any proof of petitioner's predisposition to commit an illegal act, the criminal character of which a defendant is presumed to know. It may indicate a predisposition to view sexually oriented photographs that are responsive to his sexual tastes; but evidence that merely indicates a generic inclination to act within a broad range,

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

not all of which is criminal, is of little probative value in establishing predisposition.

 **\*551** Furthermore, petitioner was acting within the law at the time he received these magazines. Receipt through the mails of sexually explicit depictions of children for noncommercial use did not become illegal **\*\*1542** under federal law until May 1984, and Nebraska had no law that forbade petitioner's possession of such material until 1988. Neb.Rev.Stat. § 28-813.01 (1989). Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it. This obedience may reflect a generalized respect for legality or the fear of prosecution, but for whatever reason, the law's prohibitions are matters of consequence. Hence, the fact that petitioner legally ordered and received the Bare Boys magazines does little to further the Government's burden of proving that petitioner was predisposed to commit a criminal act. This is particularly true given petitioner's unchallenged testimony that he did not know until they arrived that the magazines would depict minors.

 The prosecution's evidence gathered during the investigation also fails to carry the Government's burden. Petitioner's responses to the many communications prior to the ultimate criminal act were at most indicative of certain personal inclinations, including a predisposition to view photographs of preteen sex and a willingness to promote a given agenda by supporting lobbying organizations. Even so, petitioner's responses hardly support an inference that he would commit the crime of receiving child pornography through the mails.[3] Furthermore, a person's inclinations and "fantasies ... are **\*552** his own and beyond the reach of government...." *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973); *Stanley v. Georgia,* 394 U.S. 557, 565-566, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969).

[3]    We do not hold, as the dissent suggests, see *post,* at 1546; that the Government was required to prove that petitioner knowingly violated the law. We simply conclude that proof that petitioner engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing.

On the other hand, the strong arguable inference is that, by waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials, the Government not only excited petitioner's interest in sexually explicit materials banned by law but also exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights. For instance, HINT described itself as "an organization founded to protect and promote sexual freedom and freedom of choice" and stated that "the most appropriate means to accomplish [its] objectives is to promote honest dialogue among concerned individuals and to continue its lobbying efforts with State Legislators." Record, Defendant's Exhibit 113. These lobbying efforts were to be financed through catalog sales. *Ibid.* Mailings from the equally fictitious American Hedonist Society, *id.,* Government Exhibit 7, and the correspondence from the nonexistent Carl Long, *id.,* Defendant's Exhibit 5, endorsed these themes.

Similarly, the two solicitations in the spring of 1987 raised the spectre of censorship while suggesting that petitioner ought to be allowed to do what he had been solicited to do. The mailing from the Customs Service referred to "the worldwide ban and intense enforcement on this type of material," observed that "what was legal and commonplace is now an 'underground' and secretive service," and emphasized that "[t]his environment forces us to take extreme measures" to ensure delivery. *Id.,* Government Exhibit 22. The Postal Service solicitation described the concern about child pornography as "hysterical nonsense," decried "international censorship," and assured petitioner, based on consultation with "American solicitors," that an order that had been posted could not be opened for inspection without authorization **\*553** of a judge. *Id.,* Government Exhibit 1. It further asked petitioner to affirm that he was not a Government agent **\*\*1543** attempting to entrap the mail order company or its customers. *Ibid.* In these particulars, both Government solicitations suggested that receiving this material was something that petitioner ought to be allowed to do.

Petitioner's ready response to these solicitations cannot be enough to establish beyond reasonable doubt that he was predisposed, prior to the Government acts intended to create predisposition, to commit the crime of receiving child pornography through the mails. See *Sherman,* 356 U.S., at 374, 78 S.Ct., at 822. The evidence that petitioner was ready and willing to commit the offense came only after the Government had devoted 2 ½ years to convincing him that he had or should have the right to engage in the very behavior proscribed by law. Rational jurors could not say beyond

a reasonable doubt that petitioner possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches to petitioner. As was explained in *Sherman,* where entrapment was found as a matter of law, "the Government [may not] pla[y] on the weaknesses of an innocent party and beguil[e] him into committing crimes which he otherwise would not have attempted." *Id.,* at 376, 78 S.Ct., at 822.

Law enforcement officials go too far when they "implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. U.S.,* 287 U.S. 435, at 442, 53 S.Ct. 210, at 212-213, 77 L.Ed. 413 (emphasis added). Like the *Sorrells* Court, we are "unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them." *Id.,* at 448, 53 S.Ct., at 215. When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if **\*554** left to his own devices, likely would have never run afoul of the law, the courts should intervene.

Because we conclude that this is such a case and that the prosecution failed, as a matter of law, to adduce evidence to support the jury verdict that petitioner was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law by receiving child pornography through the mails, we reverse the Court of Appeals' judgment affirming the conviction of Keith Jacobson.

*It is so ordered.*

Justice O'CONNOR, with whom THE CHIEF JUSTICE and Justice KENNEDY join, and with whom Justice SCALIA joins except as to Part II, dissenting.
Keith Jacobson was offered only two opportunities to buy child pornography through the mail. Both times, he ordered. Both times, he asked for opportunities to buy more. He needed no Government agent to coax, threaten, or persuade him; no one played on his sympathies, friendship, or suggested that his committing the crime would further a greater good. In fact, no Government agent even contacted him face to face. The Government contends that from the enthusiasm with which

Mr. Jacobson responded to the chance to commit a crime, a reasonable jury could permissibly infer beyond a reasonable doubt that he was predisposed to commit the crime. I agree. Cf. *United States v. Hunt,* 749 F.2d 1078, 1085 (CA4 1984) (ready response to solicitation shows predisposition), cert. denied, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985); *United States v. Kaminski,* 703 F.2d 1004, 1008 (CA7 1983) (" 'the most important factor ... is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement' ") (quoting *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1336 (CA9 1977), cert. denied, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978)); *United States v. Sherman,* 200 F.2d 880, 882 (CA2 1952) (indication **\*\*1544** of predisposition **\*555** is a defendant's willingness to commit the offense " 'as evinced by ready complaisance' " (citation omitted)).

The first time the Government sent Mr. Jacobson a catalog of illegal materials, he ordered a set of photographs advertised as picturing "young boys in sex action fun." He enclosed the following note with his order: "I received your brochure and decided to place an order. If I like your product, I will order more later." Record, Government Exhibit 24. For reasons undisclosed in the record, Mr. Jacobson's order was never delivered.

The second time the Government sent a catalog of illegal materials, Mr. Jacobson ordered a magazine called "Boys Who Love Boys," described as: "11 year old and 14 year old boys get it on in every way possible. Oral, anal sex and heavy masturbation. If you love boys, you will be delighted with this." *Id.,* Government Exhibit 2. Along with his order, Mr. Jacobson sent the following note: "Will order other items later. I want to be discreet in order to protect you and me." *Id.,* Government Exhibit 3.

Government agents admittedly did not offer Mr. Jacobson the chance to buy child pornography right away. Instead, they first sent questionnaires in order to make sure that he was generally interested in the subject matter. Indeed, a "cold call" in such a business would not only risk rebuff and suspicion, but might also shock and offend the uninitiated, or expose minors to suggestive materials. Cf. *FCC v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) (right to be free from offensive material in one's home); 39 U.S.C. § 3010 (regulating the mailing of sexually explicit advertising materials). Mr. Jacobson's responses to the questionnaires gave the investigators reason

to think he would be interested in photographs depicting preteen sex.

The Court, however, concludes that a reasonable jury could not have found Mr. Jacobson to be predisposed beyond a reasonable doubt on the basis of his responses to the Government's catalogs, even though it admits that, by that time, **\*556** he was predisposed to commit the crime. The Government, the Court holds, failed to provide evidence that Mr. Jacobson's obvious predisposition at the time of the crime "was independent and not the product of the attention that the Government had directed at petitioner." *Ante,* at 1541. In so holding, I believe the Court fails to acknowledge the reasonableness of the jury's inference from the evidence, redefines "predisposition," and introduces a new requirement that Government sting operations have a reasonable suspicion of illegal activity before contacting a suspect.

I

This Court has held previously that a defendant's predisposition is to be assessed as of the time the Government agent first suggested the crime, not when the Government agent first became involved. *Sherman v. United States,* 356 U.S. 369, 372-376, 78 S.Ct. 819, 820-823, 2 L.Ed.2d 848 (1958). See also *United States v. Williams,* 705 F.2d 603, 618, n. 9 (CA2), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). Until the Government actually makes a suggestion of criminal conduct, it could not be said to have "implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce its commission...." *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 212-213, 77 L.Ed. 413 (1932). Even in *Sherman v. United States, supra,* in which the Court held that the defendant had been entrapped as a matter of law, the Government agent had repeatedly and unsuccessfully coaxed the defendant to buy drugs, ultimately succeeding only by playing on the defendant's sympathy. The Court found lack of predisposition based on the Government's numerous unsuccessful attempts to induce the crime, not on the basis of preliminary contacts with the defendant.

**\*\*1545** Today, the Court holds that Government conduct may be considered to create a predisposition to commit a crime, even before any Government action to induce the commission of the crime. In my view, this holding changes entrapment doctrine. Generally, the inquiry is whether a suspect is predisposed **\*557** before the Government induces

the commission of the crime, not before the Government makes initial contact with him. There is no dispute here that the Government's questionnaires and letters were not sufficient to establish inducement; they did not even suggest that Mr. Jacobson should engage in any illegal activity. If all the Government had done was to send these materials, Mr. Jacobson's entrapment defense would fail. Yet the Court holds that the Government must prove not only that a suspect was predisposed to commit the crime before the opportunity to commit it arose, but also before the Government came on the scene. *Ante,* at 1540.

The rule that preliminary Government contact can create a predisposition has the potential to be misread by lower courts as well as criminal investigators as requiring that the Government must have sufficient evidence of a defendant's predisposition *before it ever seeks to contact him.* Surely the Court cannot intend to impose such a requirement, for it would mean that the Government must have a reasonable suspicion of criminal activity before it begins an investigation, a condition that we have never before imposed. The Court denies that its new rule will affect run-of-the-mill sting operations, *ante,* at 1541, and one hopes that it means what it says. Nonetheless, after this case, every defendant will claim that something the Government agent did before soliciting the crime "created" a predisposition that was not there before. For example, a bribetaker will claim that the description of the amount of money available was so enticing that it implanted a disposition to accept the bribe later offered. A drug buyer will claim that the description of the drug's purity and effects was so tempting that it created the urge to try it for the first time. In short, the Court's opinion could be read to prohibit the Government from advertising the seductions of criminal activity as part of its sting operation, for fear of creating a predisposition in its suspects. That limitation would be especially likely to **\*558** hamper sting operations such as this one, which mimic the advertising done by genuine purveyors of pornography. No doubt the Court would protest that its opinion does not stand for so broad a proposition, but the apparent lack of a principled basis for distinguishing these scenarios exposes a flaw in the more limited rule the Court today adopts.

The Court's rule is all the more troubling because it does not distinguish between Government conduct that merely highlights the temptation of the crime itself, and Government conduct that threatens, coerces, or leads a suspect to commit a crime in order to fulfill some other obligation. For example, in *Sorrells,* the Government agent repeatedly asked for illegal

liquor, coaxing the defendant to accede on the ground that " 'one former war buddy would get liquor for another.' " 287 U.S., at 440, 53 S.Ct., at 212. In *Sherman,* the Government agent played on the defendant's sympathies, pretending to be going through drug withdrawal and begging the defendant to relieve his distress by helping him buy drugs. 356 U.S., at 371, 78 S.Ct., at 820.

The Government conduct in this case is not comparable. While the Court states that the Government "exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights," *ante,* at 1542, one looks at the record in vain for evidence of such "substantial pressure." The most one finds is letters advocating legislative action to liberalize obscenity laws, letters which could easily be ignored or thrown away. Much later, the Government sent separate mailings of catalogs of illegal materials. Nowhere did the Government suggest that **\*\*1546** the proceeds of the sale of the illegal materials would be used to support legislative reforms. While one of the HINT letters suggested that lobbying efforts would be funded by sales from a catalog, Record, Defendant's Exhibit 113, the catalogs actually sent, nearly a year later, were from different fictitious entities (Produit Outaouais and Far Eastern Trading Company), and gave no **\*559** suggestion that money would be used for any political purposes. *Id.,* Government Exhibit 22, Government Exhibit 2. Nor did the Government claim to be organizing a civil disobedience movement, which would protest the pornography laws by breaking them. Contrary to the gloss given the evidence by the Court, the Government's suggestions of illegality may also have made buyers beware, and increased the mystique of the materials offered: "For those of you who have enjoyed youthful material ... we have devised a method of getting these to you without prying eyes of U.S. Customs seizing your mail." *Id.,* Government Exhibit 1. Mr. Jacobson's curiosity to see what " 'all the trouble and the hysteria' " was about, *ante,* at 1540, is certainly susceptible of more than one interpretation. And it is the jury that is charged with the obligation of interpreting it. In sum, the Court fails to construe the evidence in the light most favorable to the Government, and fails to draw all reasonable inferences in the Government's favor. It was surely reasonable for the jury to infer that Mr. Jacobson was predisposed beyond a reasonable doubt, even if other inferences from the evidence were also possible.

II

The second puzzling thing about the Court's opinion is its redefinition of predisposition. The Court acknowledges that "[p]etitioner's responses to the many communications prior to the ultimate criminal act were ... indicative of certain personal inclinations, including a predisposition to view photographs of preteen sex...." *Ante,* at 1542. If true, this should have settled the matter; Mr. Jacobson was predisposed to engage in the illegal conduct. Yet, the Court concludes, "petitioner's responses hardly support an inference that he would commit the crime of receiving child pornography through the mails." *Ibid.*

The Court seems to add something new to the burden of proving predisposition. Not only must the Government **\*560** show that a defendant was predisposed to engage in the illegal conduct, here, receiving photographs of minors engaged in sex, but also that the defendant was predisposed to break the law knowingly in order to do so. The statute violated here, however, does not require proof of specific intent to break the law; it requires only knowing receipt of visual depictions produced by using minors engaged in sexually explicit conduct. See 18 U.S.C. § 2252(a)(2); *United States v. Moncini,* 882 F.2d 401, 404-406 (CA9 1989). Under the Court's analysis, however, the Government must prove *more* to show predisposition than it need prove in order to convict.

The Court ignores the judgment of Congress that specific intent is not an element of the crime of receiving sexually explicit photographs of minors. The elements of predisposition should track the elements of the crime. The predisposition requirement is meant to eliminate the entrapment defense for those defendants who would have committed the crime anyway, even absent Government inducement. Because a defendant might very well be convicted of the crime here absent Government inducement even though he did not know his conduct was illegal, a specific intent requirement does little to distinguish between those who would commit the crime without the inducement and those who would not. In sum, although the fact that Mr. Jacobson's purchases of Bare Boys I and Bare Boys II were legal at the time may have some relevance to the question of predisposition, it is not, as the Court suggests, dispositive.

**\*\*1547** The crux of the Court's concern in this case is that the Government went too far and "abused" the " 'processes of detection and enforcement' " by luring an innocent person

Jacobson v. U.S., 503 U.S. 540 (1992)

112 S.Ct. 1535, 118 L.Ed.2d 174, 60 USLW 4307

to violate the law. *Ante,* at 1543, quoting *Sorrells,* 287 U.S., at 448, 53 S.Ct., at 215. Consequently, the Court holds that the Government failed to prove beyond a reasonable doubt that Mr. Jacobson was predisposed to commit the crime. It was, however, the jury's task, as the conscience of the community, to decide whether Mr. Jacobson was a willing participant in the criminal **\*561** activity here or an innocent dupe. The jury is the traditional "defense against arbitrary law enforcement." *Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968). Indeed, in *Sorrells,* in which the Court was also concerned about overzealous law enforcement, the Court did not decide itself that the Government conduct constituted entrapment, but left the issue to the jury. 287 U.S., at 452, 53 S.Ct., at 216. There is no dispute that the jury in this case was fully and accurately instructed on the law of entrapment, and nonetheless found Mr. Jacobson guilty. Because I believe there was sufficient evidence to uphold the jury's verdict, I respectfully dissent.

**All Citations**

503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174, 60 USLW 4307

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

688 F.3d 637
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Matthew Wayne HENRY, Defendant–Appellant.

No. 11–30181.
|
Argued and Submitted June 26, 2012.
|
Filed Aug. 9, 2012.

**Synopsis**
**Background:** Defendant was convicted in the United
States District Court for the District of Alaska, H. Russel
Holland, Senior District Judge, of illegal possession of a
homemade machine gun. Defendant appealed.

**Holdings:** The Court of Appeals, Milan D. Smith, Jr.,
Circuit Judge, held that:

Second Amendment right to bear arms did not extend to
the defendant's possession of a homemade machine gun,
and

the Commerce Clause authorized the criminal ban on the
possession of homemade machine guns.

Affirmed.

**Attorneys and Law Firms**

**\*638** Fred Richard Curtner, III (argued), Anchorage, AK,
for the defendant-appellant.

Jo Ann Farrington (argued), Assistant United States
Attorney, Karen L. Loeffler, United States Attorney,
Anchorage, AK, for the plaintiff-appellee.

Appeal from the United States District Court for the
District of Alaska, H. Russel Holland, Senior District
Judge, Presiding. D.C. No. 3:10–cr–00115–HRH–1.

Before: ALFRED T. GOODWIN, WILLIAM A.
FLETCHER, and MILAN D. SMITH, JR., Circuit
Judges.

**OPINION**

M. SMITH, Circuit Judge:

Defendant–Appellant Matthew Wayne Henry appeals his
conviction for illegal possession of a homemade machine
gun, under 18 U.S.C. § 922(*o* ). He contends that he has a
Second Amendment right to possess a homemade
machine gun in his home. We reject this argument
because machine guns are "dangerous and unusual
weapons" that are unprotected by the Second
Amendment. *Dist. of Columbia v. Heller,* 554 U.S. 570,
627, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Henry also
argues that Congress did not have the power to enact §
922(*o* )'s prohibition against possessing machine guns
pursuant to the powers delegated to Congress in the
Commerce Clause. That argument fails because we
already have held that the Commerce Clause authorizes §
922(*o* )'s machine gun possession ban. *United States v.
Stewart,* 451 F.3d 1071, 1078 (9th Cir.2006).
Accordingly, we affirm Henry's conviction.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 30, 2009, the Anchorage Police Department
dispatched officers to a home after receiving reports of
gunfire. Officers found numerous shell casings in the
area. The Anchorage police executed a search warrant of
the residence, seeking evidence of firearms and
ammunition. Officers seized a loaded .308–caliber assault
rifle and an empty magazine found under Henry's bed. On
October 31, 2009, Henry was arraigned in state court for
discharging firearms while intoxicated. On December 7,
2009, the case was dismissed because the state declined to
prosecute.

**\*639** After Henry's release, the Anchorage police
received an anonymous tip that Henry had converted the
.308–caliber rifle into a machine gun prior to its seizure.
The Bureau of Alcohol, Tobacco, and Firearms (ATF)
examined the rifle and determined that it had indeed been
converted into a machine gun. The ATF obtained a

federal search warrant, and, on June 14, 2010, discovered at Henry's residence twenty guns, gun parts, firearms conversion instructions, and a machine gun auto-sear, which converts rifles to automatic weapons.

On November 17, 2010, the grand jury indicted Henry on two counts: (1) knowingly and unlawfully possessing a machine gun, in violation of 18 U.S.C. §§ 922(*o* )(1)[1] and 924(a)(2), and (2) knowingly and unlawfully possessing an auto-sear, a part used to convert a weapon into a machine gun, in violation of 18 U.S.C. §§ 922(*o* )(1) and 924(a)(2). Henry moved to dismiss the two counts, arguing that, as applied to him, § 922(*o* ) violates his Second Amendment right to keep and bear arms, and is not authorized under the Commerce Clause. The district court denied Henry's motion to dismiss, concluding that there is no Second Amendment right to possess a homemade machine gun in one's home, and that Congress had the power to enact § 922(*o* ) using the powers delegated to it under the Commerce Clause.

1    18 U.S.C. § 922(*o* ) states:
       (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
       (2) This subsection does not apply with respect to—
          (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
          (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

After the district court denied Henry's motion, the case proceeded to trial. Henry testified that a firearm the government offered into evidence belonged to him. Henry further testified that he acquired all of the necessary parts to build a rifle from a variety of sources, and eventually built such a firearm. Although he denied at trial that he was trying to make a machine gun, he concedes on appeal that the rifle as converted by him was a homemade machine gun.

The jury found Henry guilty on count 1, and not guilty on count 2. The district court sentenced Henry to twenty-four months' imprisonment, and ordered his machine gun to be forfeited pursuant to 18 U.S.C. § 924(d)(1). Henry timely appealed his conviction.

## STANDARD OF REVIEW AND JURISDICTION

We review a statute's constitutionality de novo. *United States v. Vongxay,* 594 F.3d 1111, 1114 (9th Cir.2010). We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### I. Second Amendment

 Henry claims that the Second Amendment protects his right to possess a homemade machine gun in his home.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller,* the Supreme Court struck down the District of Columbia's ban on handgun possession, concluding that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case **\*640** of confrontation." 554 U.S. at 592, 635, 128 S.Ct. 2783.[2] However, the Court stated that the Second Amendment only protects the right to own certain weapons, and that it "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625, 128 S.Ct. 2783. The Court also concluded that the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' " limits the right to keep and carry arms. *Id.* at 627, 128 S.Ct. 2783.

2    Subsequently, the Supreme Court held in *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), that the Second Amendment applies to the states. *Id.* at 3026.

*Heller* did not specify the types of weapons that qualify as "dangerous and unusual," but the Court stated that it would be "startling" for the Second Amendment to protect machine guns. *Id.* at 624, 128 S.Ct. 2783. Since *Heller* was decided, every circuit court to address the issue has held that there is no Second Amendment right to possess a machine gun.[3]

3    *See United States v. Allen,* 630 F.3d 762, 766 (8th Cir.2011); *United States v. Marzzarella,* 614 F.3d 85, 94–95 (3d Cir.2010). *cert. denied,* —— U.S. ——, 131 S.Ct. 958, 178 L.Ed.2d 790 (2011); *Hamblen v. United States,* 591 F.3d 471, 472, 474 (6th Cir.2009); *United*

AR004687

*States v. Fincher,* 538 F.3d 868, 874 (8th Cir.2008), *cert. denied,* 555 U.S. 1174, 129 S.Ct. 1369, 173 L.Ed.2d 591 (2009).

We agree with the reasoning of our sister circuits that machine guns are "dangerous and unusual weapons" that are not protected by the Second Amendment. An object is "dangerous" when it is "likely to cause serious bodily harm." *Black's Law Dictionary* 451 (9th ed.2009). Congress defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The machine gun was first widely used during World War I, where it "demonstrated its murderously effective firepower over and over again." William Rosenau, Book Note, *The Origins of the First Modern Weapon,* TECH. REV., Jan. 1987, at 74, (reviewing John Ellis, *The Social History of the Machine Gun* (1986)). A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. *See George C. Wilson, Visible Violence,* 12 NAT'L J. 886, 887 (2003). Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns.

A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(*o*), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market.

In short, machine guns are highly "dangerous and unusual weapons" that are not "typically possessed by law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 625, 627, 128 S.Ct. 2783. Thus, we hold that the Second Amendment does not apply to machine guns. Moreover, because we conclude that machine gun possession is not entitled to Second Amendment protection, it is unnecessary to consider Henry's argument that the district court applied the incorrect level of constitutional scrutiny in evaluating his claims.

## II. Commerce Clause

Henry next asserts that the Commerce Clause does not give Congress the **\*641** power to prohibit possession of homemade machine guns. We disagree.

The Commerce Clause allows Congress to "regulate Commerce ... among the several States[.]" U.S. Const. art. I, § 8, cl. 3. The Supreme Court has interpreted this to mean that Congress may regulate: 1) "the channels of interstate commerce[,]" 2) "the instrumentalities of interstate commerce, and persons or things in interstate commerce[,]" and 3) "activities that substantially affect interstate commerce." *Gonzales v. Raich,* 545 U.S. 1, 16–17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Supreme Court precedent "firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17, 125 S.Ct. 2195. In *Raich,* for example, the Supreme Court concluded that the Commerce Clause allows Congress to regulate locally cultivated medical marijuana because "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would[ ] affect price and market conditions." *Id.* at 19, 125 S.Ct. 2195.

In *Stewart,* we rejected the defendant's claim that § 922(*o*)'s ban on machine gun possession was not within Congress's Commerce Clause authority, even though the statute applies to homemade machine guns that do not travel in interstate commerce. 451 F.3d at 1078. Applying *Raich,* we concluded that "Congress had a rational basis for concluding that in the aggregate, possession of homemade machineguns could substantially affect interstate commerce in machineguns" because "[h]omemade guns, even those with a unique design, can enter the interstate market and affect supply and demand." *Id.* Every other circuit that has reached the issue has similarly held that § 922(*o*) is constitutional under the Commerce Clause.[4]

[4]   *See, e.g., United States v. Haney,* 264 F.3d 1161, 1170–71 (10th Cir.2001), *cert. denied,* 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002); *United States v. Franklyn,* 157 F.3d 90, 93, 96–97 (2d Cir.1998), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 887, 142 L.Ed.2d 786 (1999); *United States v. Wright,* 117 F.3d 1265, 1267, 1270–71 (11th Cir.1997), *vacated in part on rehearing on other grounds by United States v. Wright,* 133 F.3d 1412 (11th Cir.1998); *United States v. Knutson,* 113 F.3d 27, 31 (5th Cir.1997) (per curiam); *United States v. Rybar,* 103 F.3d 273, 284–85 (3d Cir.1996), *cert. denied,* 522 U.S. 807, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997); *United States v. Kenney,* 91 F.3d 884, 889 (7th Cir.1996); *United States v. Beuckelaere,* 91 F.3d 781, 784–85 (6th Cir.1996); *United States v. Hale,* 978 F.2d 1016, 1018 (8th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993).

Henry points to no relevant change in the caselaw of our circuit or the Supreme Court that overrules *Stewart's*

AR004688

conclusion that § 922(*o* ) is a valid exercise of Congress' Commerce Clause powers.[5] We reject Henry's argument that *Heller* overrules **\*642** *Stewart's* Commerce Clause precedent because of what we said in footnote 6 of that opinion. In *Stewart,* we noted "in passing that since the Second Amendment does not grant individual rights, we cannot rely on it as a basis for requiring Congress to make specific findings in legislation touching on firearms." *Stewart,* 451 F.3d at 1075 n. 6 (citation omitted). In *Heller,* in contrast, the Supreme Court concluded that "the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. at 595, 128 S.Ct. 2783. Our circuit precedent remains binding until the Supreme Court "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir.2003) (en banc). Thus, while *Heller* clearly overrules *Stewart's* statement in footnote 6 that the Second Amendment does not confer individual rights, it has absolutely no impact on *Stewart's* Commerce Clause holding. Indeed, *Heller* does not even mention the Commerce Clause. Accordingly, *Stewart's* Commerce Clause holding remains binding precedent in our circuit.

[5]   Two days after oral argument in this appeal, the Supreme Court decided *National Federation of Independent Business v. Sebelius,* ——U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), which held that the federal statute requiring individuals to purchase health insurance is a valid exercise of Congress's tax power. Five justices also agreed that the Commerce Clause did not authorize this statute. There has been considerable debate about whether the statements about the Commerce Clause are dicta or binding precedent. *See, e.g.,* David Post, *Commerce Clause "Holding v. Dictum Mess" Not So Simple,* THE VOLOKH CONSPIRACY, (July 3, 2012, 8:17 AM), http://www.volokh.com/2012/07/03/commerce-clause-holding-v-dictum-mess-not-so-simple/. We need not resolve that issue here because *National Federation of Independent Business* involved a requirement that individuals take action. *See Nat'l Fed'n of Indep. Bus.,* 132 S.Ct. at 2587 (Roberts, C.J.) ("Construing the Commerce Clause to permit Congress to regulate individuals precisely *because* they are doing nothing would open a new and potentially vast domain to congressional authority.") (emphasis in original). In contrast, Section 922(*o* ) involves a *prohibition* of conduct. Therefore, even if *National Federation of Independent Business* changed Supreme Court precedent regarding the Commerce Clause, we conclude it would not overrule *Stewart.*

In light of the above, *Stewart* requires us to reject Henry's claim that Congress did not have the authority to enact § 922(*o* )'s ban on machine guns pursuant to the Commerce Clause.

## CONCLUSION

For the foregoing reasons, Henry's conviction is affirmed.

**AFFIRMED.**

**All Citations**

688 F.3d 637, 12 Cal. Daily Op. Serv. 9049, 2012 Daily Journal D.A.R. 11,057

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Sherman v. United States, 356 U.S. 369 (1958)

78 S.Ct. 819, 2 L.Ed.2d 848

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by U.S. v. Gendron, 1st Cir.(Mass.), February 28, 1994

78 S.Ct. 819
Supreme Court of the United States

Joseph George SHERMAN, Petitioner,
v.
UNITED STATES of America.

No. 87.
|
Argued Jan. 16, 1958.
|
Decided May 19, 1958.

**Synopsis**

Defendant was convicted in the United States District Court for the Southern District of New York, of illegal sale of narcotics, and his conviction was affirmed by the Court of Appeals, 240 F.2d 949, and he brought certiorari. The Supreme Court, Mr. Chief Justice Warren, held that undisputed testimony of prosecution's witnesses established entrapment as a defense, as matter of law, in that defendant obtained narcotics for informer only after repeated persuasion, including appeal to sympathy and inducement of defendant himself to return to narcotics habit.

Reversed and remanded.

**Attorneys and Law Firms**

**\*\*820 \*370** Mr. Henry A. Lowenberg, New York City, for the petitioner.

Mr. James W. Knapp, Washington, D.C., for the respondent.

**Opinion**

Mr. Chief Justice WARREN delivered the opinion of the Court.

The issue before us is whether petitioner's conviction should be set aside on the ground that as a matter of law the defense of entrapment was established. Petitioner was convicted under an indictment charging three sales of narcotics in violation of 21 U.S.C. s 174, 21 U.S.C.A. s 174. A previous conviction had been reversed on account of improper instructions as to the issue of entrapment. 2 Cir., 200 F.2d 880. In the second trial, as in the first, petitioner's defense was **\*371** a claim of entrapment: an agent of the Federal Government induced him to take part in illegal transactions when otherwise he would not have done so.

In late August 1951, Kalchinian, a government informer, first met petitioner at a doctor's office where apparently both were being treated to be cured of narcotics addition. Several accidental meetings followed, either at the doctor's office or at the pharmacy where both filled their prescriptions from the doctor. From mere greetings, conversation progressed to a discussion of mutual experiences and problems, including their attempts to overcome addiction to narcotics. Finally Kalchinian asked petitioner if he knew of a good source of narcotics. He asked petitioner to supply him with a source because he was not responding to treatment. From the first, petitioner tried to avoid the issue. Not until after a number of repetitions of the request, predicated on Kalchinian's presumed suffering, did petitioner finally acquiesce. Several times thereafter he obtained a quantity of narcotics which he shared with Kalchinian. Each time petitioner told Kalchinian that the total cost of narcotics he obtained was twenty-five dollars and that Kalchinian owed him fifteen dollars. The informer thus bore the cost of his share of the narcotics plus the taxi and other expenses necessary to obtain the drug. After several such sales Kalchinian informed agents of the Bureau of Narcotics that he had another seller for them. On three occasions during November 1951. Government agents observed petitioner give narcotics to Kalchinian in return for money supplied by the Government.

At the trial the factual issue was whether the informer had convinced an otherwise unwilling person to commit a criminal act or whether petitioner was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade. **\*372** The issue of entrapment went to the jury,[1] and a conviction resulted. Petitioner was sentenced to imprisonment for ten years. The Court of Appeals for the Second Circuit affirmed. 240 F.2d 949. We granted certiorari. 353 U.S. 935, 77 S.Ct. 812, 1 L.Ed.2d 758.

[1]    The charge to the jury was not in issue here.

In Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, this Court firmly recognized the defense of

AR004690

entrapment in the federal courts. The intervening years have in no way detracted from the principles underlying that decision. The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy **821 are necessary weapons in the arsenal of the police officer. However, 'A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.' 287 U.S. at page 442, 53 S.Ct. at page 212. The stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.

However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the creative activity' of law-enforcement officials. (Emphasis supplied.) See 287 U.S. at pages 441, 451, 53 S.Ct. at pages 212, 216. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles *373 by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence. See 287 U.S. at page 451, 53 S.Ct. at page 216.

We conclude from the evidence that entrapment was established as a matter of law. In so holding, we are not choosing between conflicting witnesses, nor judging credibility. Aside from recalling Kalchinian, who was the Government's witness, the defense called no witnesses. We reach our conclusion from the undisputed testimony of the prosecution's witnesses.

It is patently clear that petitioner was induced by Kalchinian. The informer himself testified that, believing petitioner to be undergoing a cure for narcotics addiction, he nonetheless sought to persuade petitioner to obtain for him a source of narcotics. In Kalchinian's own words we are told of the accidental, yet recurring, meetings, the ensuing conversations concerning mutual experiences in regard to narcotics addiction, and then of Kalchinian's resort to sympathy. On request was not enough, for

Kalchinian tells us that additional ones were necessary to overcome, first, petitioner's refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation. Kalchinian not only procured a source of narcotics but apparently also induced petitioner to return to the habit. Finally, assured of a catch, Kalchinian informed the authorities so that they could close the net. The Government cannot disown Kalchinian and insist it is not responsible for his actions. Although he was not being paid, Kalchinian was an active government informer who had but recently been the instigatory of at least *374 two other prosecutions.[2] Undoubtedly the impetus for **822 such achievements was the fact that in 1951 Kalchinian was himself under criminal charges for illegally selling narcotics and had not yet been sentenced.[3] It makes to difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement. In his testimony the federal agent in charge of the case admitted that he never bothered to question Kalchinian about the way he had made contact with *375 petitioner. The Government cannot make such use of an informer and then claim dissassociation through ignorance.

[2]   'Q. And it was your (Kalchinian's) job, was it not, while you were working with these agents to go out and try and induce somebody to sell you narcotics, isn't that true?
'A. No, it wasn't my job at all to do anything of the kind.
'Q. Do you remember this question (asked at the first trial)—. . . 'Q. And it was your job while working with these agents to go out and try and induce a person to sell narcotics to you, isn't that correct? A. I would say yes to that.' Do you remember that?
'A. If that is what I said, let it stand just that way.
'Q. So when you testify now that it was not your job you are not telling the truth?
'A. I mean by job that nobody hired me for that. That is what I inferred, otherwise I meant the same thing in my answer to your question.' R. 100.

[3]   'Q. But you had made a promise, an agreement, though, to cooperate with the Federal Bureau of Narcotics before you received a suspended sentence from the court?
'A. (Kalchinian). I had promised to cooperate in 1951.
'Q. And that was before your sentence?
'A. Yes, that was before my sentence.' R. 99.
Kalchinian received a suspended sentence in 1952 after a statement by the United States Attorney to the Judge that he had been cooperative with the Goivernment. R. 89, 98.

The Government sought to overcome the defense of entrapment by claiming that petitioner evinced a 'ready complaisance' to accede to Kalchinian's request. Aside from a record of past convictions, which we discuss in the following paragraph, the Government's case is unsupported. There is no evidence that petitioner himself was in the trade. When his apartment was searched after arrest, no narcotics were found. There is no significant evidence that petitioner even made a profit on any sale to Kalchinian.[4] The Government's characterization of petitioner's hesitancy to Kalchinian's request as the natural wariness of the criminal cannot fill the evidentiary void.[5]

[4]    At one point Kalchinian did testify that he had previously received the same amount of narcotics at some unspecified lower price. He characterized this other price as 'not quite' the price he paid petitioner. R. 80.

[5]    It is of interest to note that on the first appeal in this case the Court of Appeals came to the same conclusion as we do as to the evidence discussed so far. See United States v. Sherman, 2 Cir., 200 F.2d 880, 883.

The Government's additional evidence in the second trial to show that petitioner was ready and willing to sell narcotics should the opportunity present itself was petitioner's record of two past narcotics convictions. In 1942 petitioner was convicted of illegally selling narcotics; in 1946 he was convicted of illegally possessing them. However, a nine-year-old sales conviction and a five-year-old possession conviction are insufficient to prove petitioner had a readiness to sell narcotics at the time Kalchinian approached him, particularly when we must *376 assume from the record he was trying to overcome the narcotics habit at the time.

The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. Selecting the proper time, the informer then tells the government agent. The set-up is accepted by the agent without even a question as to the manner in which the informer encountered the seller. Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted.[6] Law enforcement does not require methods such as this.

[6]    Cf. e.g., Lutfy v. United States, 9 Cir., 198 F.2d 760, 34 A.L.R.2d 879; Wall v. United States, 5 Cir., 65 F.2d 993; Butts v. United States, 8 Cir., 273 F. 35, 18 A.L.R. 143.

It has been suggested that in overturning this conviction we should reassess the doctrine of entrapment according to principles announced in the separate opinion of Mr. Justice Roberts **823 in Sorrells v. United States, 287 U.S. 435, 453, 53 S.Ct. 210, 217, 77 L.Ed. 413. To do so would be to decide the case on grounds rejected by the majority in Sorrells and, so far as the record shows, not raised here or below by the parties before us. We do not ordinarily decide issues not presented by the parties and there is good reason not to vary that practice in this case.

At least two important issues of law enforcement and trial procedure would have to be decided without the benefit of argument by the parties, one party being the Government. Mr. Justice Roberts asserted that although the defendant could claim that the Government had induced him to commit the crime, the Government could not reply by showing that the defendant's criminal conduct was due to his own readiness and not to the persuasion of government *377 agents. The handicap thus placed on the prosecution is obvious.[7] Furthermore, it was the position of Mr. Justice Roberts that the factual issue of entrapment—now limited to the question of what the government agents did—should be decided by the judge, not the jury. Not only was this rejected by the Court in Sorrells, but where the issue has been presented to them, the Courts of Appeals have since Sorrells unanimously concluded that unless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused.[8]

[7]    In the first appeal of this case Judge Learned Hand stated: 'Indeed, it would seem probable that, if there were no reply (to the claim of inducement), it would be impossible ever to secure convictions of any offences which consist of transactions that are carried on in secret.' United States v. Sherman, 2 Cir., 200 F.2d 880, 882.

[8]    For example, in the following cases the courts have, in affirming convictions, held that the issue of entrapment had been properly submitted to the jury. United States v. Lindenfeld, 2 Cir., 142 F.2d 829; United States v. Brandenburg, 3 Cir., 162 F.2d 980; Demos v. United States, 5 Cir., 205 F.2d 596; Nero v. United States, 6 Cir., 189 F.2d 515; United States v. Cerone, 7 Cir., 150 F.2d 382; Louie Hung v. United States, 9 Cir., 111 F.2d

AR004692

Sherman v. United States, 356 U.S. 369 (1958)

78 S.Ct. 819, 2 L.Ed.2d 848

325; Ryles v. United States, 10 Cir., 183 F.2d 944; Cratty v. United States, 82 U.S.App.D.C. 236, 163 F.2d 844. And in the following cases the courts have reversed convictions where the issue of entrapment was either not submitted to the jury or was submitted on improper instructions. United States v. Sherman, 2 Cir., 200 F.2d 880; United States v. Sawyer, 3 Cir., 210 F.2d 169; Wall v. United States, 5 Cir., 65 F.2d 993; Lutfy v. United States, 9 Cir., 198 F.2d 760, 33 A.L.R.2d 879; Yep v. United States, 10 Cir., 83 F.2d 41.

To dispose of this case on the ground suggested would entail both overruling a leading decision of this Court and brushing aside the possibility that we would be **\*378** creating more problems than we would supposedly be solving.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court with instructions to dismiss the indictment.

Reversed and remanded.

Mr. Justice FRANKFURTER, whom Mr. Justice DOUGLAS, Mr. Justice HARLAN, and Mr. Justice BRENNAN join, concurring in the result.

Although agreeing with the Court that the undisputed facts show entrapment as a matter of law, I reach this result by a route different from the Court's.

The first case in which a federal court clearly recognized and sustained a claim of entrapment by government officers as a defense to an indictment was, apparently, Woo Wai v. United States, 9 Cir., 223 F. 412. Yet the basis of this defense, affording guidance for its application in particular circumstances, is as much in doubt today as it was when the defense was first recognized over forty years ago, although entrapment has been the decisive issue in many prosecutions. The lower courts have continued gropingly **\*\*824** to express the feeling of outrage at conduct of law enforcers that brought recognition of the defense in the first instance, but without the formulated basis in reason that it is the first duty of courts to construct for justifying and guiding emotion and instinct.

Today's opinion does not promote this judicial desideratum, and fails to give the doctrine of entrapment the solid foundation that the decisions of the lower courts and criticism of learned writers have clearly shown is needed.[1] Instead it accepts without re-examination the

**\*379** theory espoused in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, over strong protest by Mr. Justice Roberts, speaking for Brandeis and Stone, JJ., as well as himself. The fact that since the Sorrells case the lower courts have either ignored its theory and continued to rest decision on the narrow facts of each case, or have failed after penetrating effort to define a satisfactory generalization, see, e.g., United States v. Becker, 2 Cir., 62 F.2d 1007 (L. Hand, J.), is proof that the prevailing theory of the Sorrells case ought not to be deemed the last word. In a matter of this kind the Court should not rest on the first attempt at an explanation for what sound instinct counsels. It should not forego re-examination to achieve clarity of thought, because confused and inadequate analysis is too apt gradually to lead to a course of decisions that diverges from the true ends to be pursued.[2]

[1]   Excellent discussions of the problem can be found in Mikell, The Doctrine of Entrapment in the Federal Courts, 90 U.Pa.L.Rev. 245; Donnelly, Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs, 60 Yale L.J. 1091, 1098—1115; Note, Entrapment by Government Officials, 28 Col.L.Rev. 1067.

[2]   It is of course not a rigid rule of this Court to restrict consideration of a case merely to arguments advanced by counsel. Presumably certiorari was not granted in this case simply to review the evidence under an accepted rule of law. The solution, when an issue of real importance to the administration of criminal justice has not been argued by counsel, is not to perpetuate a bad rule but to set the case down for reargument with a view to re-examining that rule.

It is surely sheer fiction to suggest that a conviction cannot be had when a defendant has been entrapped by government officers or informers because 'Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.' In these cases raising claims of entrapment, the only legislative intention that can with any show of reason be extracted from the statute is the intention to make criminal precisely the conduct in which the defendant has engaged. That conduct includes all the elements necessary to constitute criminality. Without compulsion and 'knowingly,' **\*380** where that is requisite, the defendant has violated the statutory command. If he is to be relieved from the usual punitive consequences, it is on no account because he is innocent of the offense described. In these circumstances, conduct is not less criminal because the result of temptation, whether the tempter is a private

AR004693

person or government agent or informer.

The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced. As Mr. Justice Holmes said in Olmstead v. United States, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (dissenting), in another connection, 'It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. * * * (F)or my part I think it a less evil that some criminals should escape than that the government **825 should play an ignoble part.' Insofar as they are used as instrumentalities in the administration of criminal justice, the federal courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them. They do this in the exercise of a recognized jurisdiction to formulate and apply 'proper standards for the enforcement of the federal criminal law in the federal courts,' McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819, an obligation that goes beyond the conviction of the particular defendant before the court. Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake.

*381 The formulation of these standards does not in any way conflict with the statute the defendant has violated, or involve the initiation of a judicial policy disregarding or qualifying that framed by Congress. A false choice is put when it is said that either the defendant's conduct does not fall within the statute or he must be convicted. The statute is wholly directed to defining and prohibiting the substantive offense concerned and expresses no purpose, either permissive or prohibitory, regarding the police conduct that will be tolerated in the detection of crime. A statute prohibiting the sale of narcotics is as silent on the question of entrapment as it is on the admissibility of illegally obtained evidence. It is enacted, however, on the basis of certain presuppositions concerning the established legal order and the role of the courts within that system in formulating standards for the administration of criminal justice when Congress itself has not specifically legislated to that end. Specific statutes are to be fitted into an antecedent legal system.

It might be thought that it is largely an academic question whether the court's finding a bar to conviction derives from the statute or from a supervisory jurisdiction over the administration of criminal justice; under either theory substantially the same considerations will determine whether the defense of entrapment is sustained. But to look to a statute for guidance in the application of a policy not remotely within the contemplation of Congress at the time of its enactment is to distort analysis. It is to run the risk, furthermore, that the court will shirk the responsibility that is necessarily in its keeping, if Congress is truly silent, to accommodate the dangers of overzealous law enforcement and civilized methods adequate to counter the ingenuity of modern criminals. The reasons that actually underlie the defense of entrapment can too easily be lost sight of in the pursuit of a wholly fictitious congressional intent.

*382 The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power. For answer it is wholly irrelevant to ask if the 'intention' to commit the crime originated with the defendant or government officers, or if the criminal conduct was the product of 'the creative activity' of law—enforcement officials. Yet in the present case the Court repeats and purports to apply these unrevealing tests. Of course in every case of this kind the intention that the particular crime be committed originates with the police, and without their inducement the crime would not have occurred. But it is perfectly clear from such decisions as the decoy letter cases in this Court, e.g., Grimm v. United States, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550, where the police in effect simply furnished the opportunity for the commission of the crime, that this is not enough to enable the defendant to escape conviction.

The intention referred to, therefore, must be a general intention or predisposition **826 to commit, whenever the opportunity should arise, crimes of the kind solicited, and in proof of such a predisposition evidence has often been admitted to show the defendant's reputation, criminal activities, and prior disposition. The danger of prejudice in such a situation, particularly if the issue of entrapment must be submitted to the jury and disposed of by a general verdict of guilty or innocent, is evident. The defendant must either forego the claim of entrapment or run the substantial risk that, in spite of instructions, the jury will allow a criminal record or bad reputation to weigh in its determination of guilt of the specific offense of which he stands charged. Furthermore, a test that looks to the character and predisposition of the defendant rather than the conduct of the police loses sight of the underlying reason for the defense of entrapment. No *383 matter what the defendant's past record and present inclinations to criminality, or the depths to which he has

Sherman v. United States, 356 U.S. 369 (1958)

78 S.Ct. 819, 2 L.Ed.2d 848

sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society. And in the present case it is clear that the Court in fact reverses the conviction because of the conduct of the informer Kalchinian, and not because the Government has failed to draw a convincing picture of petitioner's past criminal conduct. Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. No more does it vary according to the suspicions, reasonable or unreasonable, of the police concerning the defendant's activities. Appeals to sympathy, friendship, the possibility of exorbitant gain, and so forth, can no more be tolerated when directed against a past offender than against an ordinary law-abiding citizen. A contrary view runs afoul of fundamental principles of equality under law, and would espouse the notion that when dealing with the criminal classes anything goes. The possibility that no matter what his past crimes and general disposition the defendant might not have committed the particular crime unless confronted with inordinate inducements, must not be ignored. Past crimes do not forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected. The whole ameliorative hopes of modern penology and prison administration strongly counsel against such a view.

This does not mean that the police may not act so as to detect those engaged in criminal conduct and ready and willing to commit further crimes should the occasion arise. Such indeed is their obligation. It does mean *384 that in holding out inducements they should act in such a manner as is likely to induce to the commission of crime only these persons and not others who would normally avoid crime and through self-struggle resist ordinary temptations. This test shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime. It is as objective a test as the subject matter permits, and will give guidance in regulating police conduct that is lacking when the reasonableness of police suspicions must be judged or the criminal disposition of the defendant retrospectively appraised. It draws directly on the fundamental intuition that led in the first instance to the outlawing of 'entrapment' as a prosecutorial instrument. The power of government is abused and

directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations **827 without government adding to them and generating crime.

What police conduct is to be condemned, because likely to induce those not otherwise ready and willing to commit crime, must be picked out from case to case as new situations arise involving different crimes and new methods of detection. The Sorrells case involved persistent solicitation in the face of obvious reluctance, and appeals to sentiments aroused by reminiscences of experiences as companions in arms in the World War. Particularly reprehensible in the present case was the use of repeated requests to overcome petitioner's hesitancy, coupled with appeals to sympathy based on mutual experiences with narcotics addiction. Evidence of the setting in which the inducement took place is of course highly relevant in *385 judging its likely effect, and the court should also consider the nature of the crime involved, its secrecy and difficulty of detection, and the manner in which the particular criminal business is usually carried on.

As Mr. Justice Roberts convincingly urged in the Sorrells case, such a judgment, aimed at blocking off areas of impermissible police conduct, is appropriate for the court and not the jury. 'The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention.' 287 U.S. at page 457, 53 S.Ct. at page 218 (separate opinion). Equally important is the consideration that a jury verdict, although it may settle the issue of entrapment in the particular case, cannot give significant guidance for official conduct for the future. Only the court, through the gradual evolution of explicit standards in accumulated precedents, can do this with the degree of certainty that the wise administration of criminal justice demands.

**All Citations**

356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR004695