108 S.Ct. 883
Supreme Court of the United States

Frederick MATHEWS, Petitioner,

v.

UNITED STATES.

No. 86–6109.
|
Argued Dec. 2, 1987.
|
Decided Feb. 24, 1988.

**Synopsis**

Defendant, an employee of the Small Business Administration, was convicted before the United States District Court for the Eastern District of Wisconsin, Thomas J. Curran, J., of accepting a bribe, and he appealed. The Court of Appeals, 803 F.2d 325, affirmed. On grant of certiorari, the Supreme Court, Chief Justice Rehnquist, held that even if a defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment.

Reversed.

Justice Brennan filed a concurring opinion.

Justice Scalia filed an opinion, concurring in the judgment.

Justice White filed a dissenting opinion in which Justice Blackmun joined.

Justice Kennedy took no part in the consideration or decision of this case.

**\*\*884 Syllabus** [*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*58** Petitioner, an employee of the Small Business Administration (SBA), was the principal SBA contact for James DeShazer, the president of a company that participated in an SBA program. DeShazer believed that his company was not being provided with certain program benefits because he had rejected petitioner's repeated requests for loans. Assisting the Federal Bureau of Investigation (FBI) in an investigation of the matter, DeShazer, under FBI surveillance, offered petitioner a previously requested loan, which petitioner agreed to accept. Later, DeShazer met petitioner and gave him the money. Petitioner was immediately arrested and charged with the federal offense of accepting a bribe in exchange for an official act. The District Court denied petitioner's pretrial motion seeking to raise an entrapment defense, ruling that entrapment was not available because petitioner would not admit all of the elements (including the requisite mental state) of the offense. Petitioner testified in his own defense that although he had accepted the loan, he believed it was a personal loan unrelated to his SBA duties. The court refused to instruct the jury as to entrapment, the jury found petitioner guilty, and the Court of Appeals affirmed.

*Held:* Even if the defendant in a federal criminal case denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment—a defense that has the two related elements of Government inducement of the crime, and a lack of predisposition on the defendant's part to engage in the criminal conduct. There is no merit to the Government's contention that, because entrapment presupposes the commission of a crime, a defendant should not be allowed both to deny the offense or an element thereof, and to rely on the inconsistent, affirmative defense of entrapment. Although the Federal Rules of Civil Procedure specifically authorize inconsistent pleading, the absence of a cognate provision in the Federal Rules of Criminal Procedure is not because of the Rules' intent to more severely restrict criminal defendants than civil parties, but because of the much less elaborate system of pleadings—particularly with respect to the defendant—in a criminal case. A simple not guilty plea puts the prosecution to its proof as to all elements of the crime charged, and raises the defense of entrapment. Moreover, the Government's arguments that allowing a defendant to rely on inconsistent defenses **\*59** will encourage perjury, lead to jury confusion, and subvert the trial's truth-finding function are not persuasive. The question whether the evidence at trial was insufficient to support an entrapment instruction was pretermitted by the Court of Appeals, and is open for consideration by that court on remand. Pp. 886–888.

803 F.2d 325 (CA 7 1986), reversed and remanded.

Mathews v. U.S., 485 U.S. 58 (1988)
108 S.Ct. 883, 99 L.Ed.2d 54, 56 USLW 4183

REHNQUIST, C.J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a concurring opinion, *post,* p. ——. SCALIA, J., filed an opinion concurring in the judgment, *post,* p. ——. WHITE, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. ——. KENNEDY, J., took no part in the consideration or decision of the case.

**Attorneys and Law Firms**

*Franklyn M. Gimbel,* by appointment of the Court, 481 U.S. 1046, argued the cause for petitioner. With him on the briefs were *Jeffrey A. Kaufman* and *Marna M. Tess-Mattner.*

*Charles A. Rothfeld* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Weld,* and *Deputy Solicitor General Bryson.*

**Opinion**

Chief Justice REHNQUIST delivered the opinion of the Court.

This case requires the Court to decide whether a defendant in a federal criminal **\*\*885** prosecution who denies commission of the crime may nonetheless have the jury instructed, where the evidence warrants, on the affirmative defense of entrapment. The United States Court of Appeals for the Seventh Circuit upheld the ruling of the District Court, which had refused to instruct the jury as to entrapment because petitioner would not admit committing all of the elements of the crime of accepting a bribe. 803 F.2d 325 (1986). This holding conflicts with decisions of other Courts of Appeals, which have taken a variety of approaches to the question.[1] We **\*60** granted certiorari to resolve this conflict, and we now reverse.

[1]    Two other Circuits have adopted the approach taken by the Seventh Circuit. See *United States v. Hill,* 655 F.2d 512, 514 (CA3 1981); *United States v. Whitley,* 734 F.2d 1129, 1139 (CA6 1984). Four Circuits have ruled that a defendant may not affirmatively deny committing the elements of the crime if he desires an entrapment instruction. *United States v. Annese,* 631 F.2d 1041, 1046–1047 (CA1 1980); *United States v. Mayo,* 705 F.2d 62, 72–73 (CA2 1983); *United States v. Dorta,* 783 F.2d 1179, 1181 (CA4), cert. denied, 477 U.S. 905 (1986); *United States v. Mora,* 768 F.2d 1197, 1198–1199 (CA10 1985), cert. denied, 474 U.S. 1083, 106 S.Ct. 856, 88 L.Ed.2d 895 (1986). One Circuit has declared that a defendant denying the elements of the crime may rely on entrapment if the issue is raised by the Government's evidence. *United States v. Smith,* 757 F.2d 1161, 1169 (CA11 1985). Another Circuit has developed a hybrid rule allowing a testifying defendant to contest the intent element of the offense charged, but not the acts, while arguing entrapment. *United States v. Henry,* 749 F.2d 203 (CA5 1984) (en banc); two Circuits have ruled that a defendant is entitled to an entrapment instruction even if he testifies and denies all elements of the offense. *United States v. Demma,* 523 F.2d 981 (CA9 1975) (en banc); *Hansford v. United States,* 112 U.S.App.D.C. 359, 303 F.2d 219 (1962). We note also that even within the Circuits, the decisions have been contradictory and inconsistent.

Petitioner was employed by the Small Business Administration (SBA) in Milwaukee, Wisconsin, and was responsible for the SBA's "8A Program," which provided aid to certain small businesses. Under the program, the SBA obtained Government contracts and subcontracted them to program participants. The SBA would then assist the participants in performing the contracts. Midwest Knitting Mills, whose president was James DeShazer, was one of the participants in the 8A Program. DeShazer's principal contact at the SBA was petitioner.

In October 1984, DeShazer complained to a Government customer that petitioner had repeatedly asked for loans. DeShazer believed that petitioner was not providing Midwest with 8A Program benefits because DeShazer had not made the requested loans. In early 1985, the Federal Bureau of Investigation (FBI) arranged for DeShazer to assist in the investigation resulting from his complaint. Under FBI surveillance, DeShazer offered petitioner a loan that, according to DeShazer, petitioner had previously requested. **\*61** Petitioner agreed to accept the loan, and two months later, DeShazer met petitioner at a restaurant and gave him the money. Petitioner was immediately arrested and charged with accepting a gratuity in exchange for an official act. 18 U.S.C. § 201(g).

Before trial petitioner filed a motion *in limine* seeking to raise an entrapment defense. The District Court denied the motion, ruling that entrapment was not available to petitioner because he would not admit all of the elements (including the requisite mental state) of the offense charged. The District Court did, however, allow petitioner to argue as his first line of defense that his acts "were procurred [*sic*] by the overt acts of the

principle *[sic]* witness of the Government, Mr. DeShazer." [2]
App. 131.

[2]     In pursuing this line of defense, petitioner apparently introduced the same evidence that he planned to adduce in support of his entrapment claim.

At trial, the Government argued that petitioner had accepted the loan in return for cooperation in SBA matters. The Government called DeShazer, who testified both that petitioner had repeatedly asked for loans and that he and petitioner had agreed that the loan at issue would result in SBA **\*\*886** - provided benefits for Midwest. The Government also played tape recordings of conversations between DeShazer and petitioner in which they discussed the loan. Petitioner testified in his own defense that although he had accepted the loan, he believed it was a personal loan unrelated to his duties at the SBA. Petitioner stated that he and DeShazer were friends and that he had accepted a personal loan from DeShazer previously. According to petitioner, he was in dire financial straits when DeShazer broached the possibility of providing a loan. Petitioner also testified that DeShazer had stated that he needed quickly to get rid of the money that he was offering to petitioner because he had been hiding the money from his wife and was concerned that she would be upset if she discovered this secret; DeShazer had also stated **\*62** at one point that if petitioner did not take the money soon, DeShazer would be tempted to spend it.

At the close of the trial, petitioner moved for a "mistrial" because of the District Court's refusal to instruct the jury as to entrapment. The District Court noted that the evidence of entrapment was "shaky at best," *ibid.,* but rather than premise its denial of petitioner's motion on that ground, the court reaffirmed its earlier ruling that, as a matter of law, petitioner was not entitled to an entrapment instruction because he would not admit committing all elements of the crime charged. The jury subsequently found petitioner guilty.

The United States Court of Appeals for the Seventh Circuit affirmed the District Court's refusal to allow petitioner to argue entrapment:

> "When a defendant pleads entrapment, he is asserting that, although he had criminal intent, it was 'the Government's deception [that implanted] the criminal design in the mind of the defendant.' *United States v. Russell,* 411 U.S. 423, 436 [93 S.Ct. 1637, 1645, 36 L.Ed.2d 366] ... (1973); *United States v. Rodgers,* 755 F.2d 533, 550 (7th Cir.1985). We find this to be inconsistent *per se* with the defense that

the defendant never had the requisite criminal intent. We see no reason to allow [petitioner] or any other defendant to plead these defenses simultaneously." 803 F.2d, at 327.

We granted certiorari, 480 U.S. 945, 107 S.Ct. 1601, 94 L.Ed.2d 788 (1987), to consider under what circumstances a defendant is entitled to an entrapment instruction. We hold that even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment.

Because the parties agree as to the basics of the affirmative defense of entrapment as developed by this Court, there is little reason to chronicle its history in detail. Suffice it to say that the Court has consistently adhered to the view, first enunciated in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), **\*63** that a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct. See *Sherman v. United States,* 356 U.S. 369, 376–378, 78 S.Ct. 819, 822–823, 2 L.Ed.2d 848 (1958); *United States v. Russell,* 411 U.S. 423, 435–436, 93 S.Ct. 1637, 1644–1645, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Predisposition, "the principal element in the defense of entrapment," *Russell, supra,* 411 U.S., at 433, 93 S.Ct., at 1643, focuses upon whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime. *Sherman, supra,* 356 U.S., at 372, 78 S.Ct., at 820; *Russell, supra,* 411 U.S., at 436, 93 S.Ct., at 1645. The question of entrapment is generally one for the jury, rather than for the court. *Sherman, supra,* 356 U.S., at 377, 78 S.Ct. at 823.

**\*\*887** The Government insists that a defendant should not be allowed both to deny the offense and to rely on the affirmative defense of entrapment. Because entrapment presupposes the commission of a crime, *Russell, supra,* 411 U.S., at 435, 93 S.Ct., at 1644, a jury could not logically conclude that the defendant had both failed to commit the elements of the offense *and* been entrapped. According to the Government, petitioner is asking to "clai[m] the right to swear that he had no criminal intent and in the same breath to argue that he had one that did not originate with him." *United States v. Henry,* 749 F.2d 203, 214 (CA5 1984) (en banc) (Gee, J., dissenting).

As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); 4 C. Torcia, Wharton's Criminal Procedure § 538, p. 11 (12th ed. 1976) (hereinafter Wharton). A parallel rule has been applied in the context of a lesser included offense instruction, see Fed. Rule Crim.Proc. 31(c); *Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973); *Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965). In *Stevenson,* this Court reversed a murder conviction arising out of a gunfight in the Indian Territory. The **\*64** principal holding of the Court was that the evidence was sufficient to entitle the defendant to a manslaughter instruction, but the Court also decided that the defendant was entitled as well to have the jury instructed on self-defense. The affirmative defense of self-defense is, of course, inconsistent with the claim that the defendant killed in the heat of passion.

Federal appellate cases also permit the raising of inconsistent defenses. See *Johnson v. United States,* 138 U.S.App.D.C. 174, 179, 426 F.2d 651, 656 (1970) (the defense in a rape case was permitted to argue that the act did not take place and that the victim consented), cert. dism'd, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971); see also *Womack v. United States,* 119 U.S.App.D.C. 40, 336 F.2d 959 (1964). And state cases support the proposition that a homicide defendant may be entitled to an instruction on both accident and self-defense, two inconsistent affirmative defenses. 4 Wharton § 545, p. 32.

The Government points out that inconsistent pleading is specifically authorized under the Federal Rules of Civil Procedure, but that there is no parallel authorization under the Federal Rules of Criminal Procedure. Rule 8(e)(2) of the Federal Rules of Civil Procedure provides in relevant part:

"A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses.... *A party may also state as many separate claims or defenses as he has regardless of consistency* and whether based on legal, equitable or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11." (Emphasis added).

The absence of a cognate provision affecting criminal trials, we think, is not because the Rules intended to more severely restrict criminal defendants than civil parties, but because of the much less elaborate system of pleadings—particularly with respect to the defendant—in a criminal case. The issues of fact in a criminal trial are usually developed by the evidence adduced and the court's instructions to the jury. A **\*65** simple plea of not guilty, Fed.Rule Crim.Proc. 11, puts the prosecution to its proof as to all elements of the crime charged, and raises the defense of entrapment. *Sorrells,* 287 U.S., at 452, 53 S.Ct., at 216. The only matters required to be specially pleaded by a defendant are notice of alibi, Fed.Rule Crim.Proc. 12.1, or of intent to rely on insanity as a defense, Fed.Rule Crim.Proc. 12.2.

The Government argues that allowing a defendant to rely on inconsistent defenses will encourage perjury, lead to jury confusion, and subvert the truth-finding function **\*\*888** of the trial. These same concerns are, however, present in the civil context, yet inconsistency is expressly allowed under the Federal Rules of Civil Procedure. We do not think that allowing inconsistency necessarily sanctions perjury. Here petitioner wished to testify that he had no intent to commit the crime, and have his attorney argue to the jury that if it concluded otherwise, then it should consider whether that intent was the result of Government inducement. The jury would have considered inconsistent defenses, but petitioner would not have necessarily testified untruthfully.

We would not go so far as to say that charges on inconsistent defenses may not on occasion increase the risk of perjury, but particularly in the case of entrapment we think the practical consequences will be less burdensome than the Government fears. The Court of Appeals in *United States v. Demma,* 523 F.2d 981, 985 (CA9 1975) (en banc), observed:

"Of course, it is very unlikely that the defendant will be able to prove entrapment without testifying and, in the course of testifying, without admitting that he did the acts charged.... When he takes the stand, the defendant forfeits his right to remain silent, subjects himself to all the rigors of cross-examination, including impeachment, and exposes himself to prosecution for perjury. Inconsistent testimony by the defendant seriously impairs and potentially destroys his credibility. While we hold that a defendant may both deny the acts **\*66** and other

*Mathews v. U.S.*, 485 U.S. 58 (1988)
108 S.Ct. 883, 99 L.Ed.2d 54, 56 USLW 4183

> elements to constitute the
> crime charged and at the same time
> claim entrapment, the high risks to him
> make it unlikely as a strategic matter
> that he will choose to do so."

The Government finally contends that since the entrapment defense is not of "constitutional dimension," *Russell,* 411 U.S., at 433, 93 S.Ct., at 1643, and that since it is "relatively limited," *id.,* at 435, 93 S.Ct., at 1644, Congress would be free to make the entrapment defense available on whatever conditions and to whatever category of defendants it believed appropriate. Congress, of course, has never spoken on the subject, and so the decision is left to the courts. We are simply not persuaded by the Government's arguments that we should make the availability of an instruction on entrapment where the evidence justifies it subject to a requirement of consistency to which no other such defense is subject.

The Government contends as an alternative basis for affirming the judgment below that the evidence at trial was insufficient to support an instruction on the defense of entrapment. Of course evidence that Government agents merely afforded an opportunity or facilities for the commission of the crime would be insufficient to warrant such an instruction. But this question was pretermitted by the Court of Appeals, and it will be open for consideration by that court on remand.

*Reversed and remanded.*

Justice KENNEDY took no part in the consideration or decision of this case.

Justice BRENNAN, concurring.
I join the Court's opinion. I write separately only because I have previously joined or written four opinions dissenting from this Court's holdings that the defendant's predisposition is relevant to the entrapment defense. *Hampton v. United States,* 425 U.S. 484, 495, 96 S.Ct. 1646, 1652, 48 L.Ed.2d 113 (1976) (BRENNAN, J., dissenting); **\*67** *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (Douglas, J., dissenting); *id.,* at 439, 93 S.Ct., at 1646 (Stewart, J., dissenting); *Sherman v. United States,* 356 U.S. 369, 378, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring in judgment). See also *Sorrells v. United States,* 287 U.S. 435, 453, 53 S.Ct.

210, 217, 77 L.Ed. 413 (1932) (Roberts, J., concurring in judgment). Although some governmental misconduct might be sufficiently egregious to violate due process, **\*\*889** Russell, supra, 411 U.S., at 431–432, 93 S.Ct., at 1642–1643, my differences with the Court have been based on statutory interpretation and federal common law, not on the Constitution. Were I judging on a clean slate, I would still be inclined to adopt the view that the entrapment defense should focus exclusively on the Government's conduct. But I am not writing on a clean slate; the Court has spoken definitively on this point. Therefore I bow to *stare decisis,* and today join the judgment and reasoning of the Court.

Justice SCALIA, concurring in the judgment.

I concur in the judgment of the Court because in my view the defense of entrapment will rarely be genuinely inconsistent with the defense on the merits, and when genuine inconsistency exists its effect in destroying the defendant's credibility will suffice to protect the interests of justice.

The typical case presenting the issue before us here is one in which the defendant introduces evidence to the effect that he did not commit the unlawful acts, or did not commit them with the requisite unlawful intent, and also introduces evidence to show his lack of predisposition and inordinate government inducement. There is nothing inconsistent in these showings. The inconsistency alleged by the government is a purely formal one, which arises only if entrapment is defined to require not only (1) inordinate government inducement to commit a crime, (2) directed at a person not predisposed to commit the crime, but also (3) causing that person to commit the crime. If the third element is added to the definition, counsel's argument to the jury cannot claim entrapment without admitting the crime. But I see no reason why the third **\*68** element is essential, unless it is for the very purpose of rendering the defense unavailable without admission of the crime. Surely it does not add anything of substance to the findings the jury must make, since findings of (1) inordinate inducement plus (2) lack of predisposition will almost inevitably produce a conclusion of (3) causality. To be sure, entrapment cannot be available as a defense unless a crime by the object of the entrapment is established, since if there is no crime there is nothing to defend against; but in that sense all affirmative defenses assume commission of the crime.

My point is not that entrapment must be defined to exclude element (3). Whether it is or not, since that element seems

to me unnecessary to achieve the social policy fostered by the defense I am not willing to declare the defense unavailable when it produces the formal inconsistency of the defendant's simultaneously denying the crime and asserting entrapment which assumes commission of the crime. I would not necessarily accept such formal inconsistency for other defenses, where the element contradicted is a functionally essential element of the defense.

Of course in the entrapment context, as elsewhere, the defendant's case may involve genuine, *non* formal inconsistency. The defendant might testify, for example, that he was not in the motel room where the illegal drugs changed hands, and that the drugs were pressed upon him in the motel room by agents of the government. But that kind of genuine inconsistency here, as elsewhere, is self-penalizing. There is nothing distinctive about entrapment that justifies a special prophylactic rule.

Justice WHITE, with whom Justice BLACKMUN joins, dissenting.

At his criminal trial, petitioner took the stand and flatly denied accepting a loan "for or because of any official act." App. 128–130; 18 U.S.C. § 201(g). Petitioner later moved for a mistrial because the District Court would not permit **\*69** him to rely on that testimony while he simultaneously argued that, in fact, he *had* accepted a loan for an official act, but only at the Government's instigation. Today, the Court holds that this rather sensible ruling on the part of the District Court constitutes reversible **\*\*890** error. The reasons the Court offers for reaching this conclusion are not at all persuasive, and I respectfully dissent.

## I

The Court properly recognizes that its result is not compelled by the Constitution. As the Court acknowledges, petitioner has no Fifth or Sixth Amendment right to conduct the inconsistent entrapment defense that he wished to mount at trial. *Ante,* at 888. And yet, if the Constitution does not compel reversal of the decision below, then what does?

Certainly not any Act of Congress, or the Federal Rules of Criminal Procedure. As the majority candidly admits, "Congress ... has never spoken on the subject [at issue here], and so the decision is left to the courts." *Ibid.* Moreover, the Court also frankly notes that while the Federal Rules

of Civil Procedure contain a provision expressly authorizing inconsistent defenses, Fed.Rule Civ.Proc. 8(e)(2), the Federal Criminal Rules are without any such authorization. *Ante,* at 887. Indeed, the rather scant authority the majority cites in support of its view that inconsistent defenses are generally permitted in criminal trials, *ante,* at *ibid.*, is strongly suggestive of just how extraordinary such pleadings are in the criminal context. [1]

| [1] | While some cases have explicitly permitted inconsistent criminal defenses outside of the entrapment area, *e.g.*, *Whittaker v. United States,* 108 U.S.App.D.C. 268, 269, 281 F.2d 631, 632 (1960), others have been less receptive to this defense strategy, see, *e.g.*, *United States v. Ervin,* 436 F.2d 1331, 1334 (CA5 1971); *Blunt v. United States,* 131 U.S.App.D.C. 306, 312, n. 12, 404 F.2d 1283, 1289, n. 12 (1968). Given the rarity of reported federal cases on this question, drawing any conclusion about the prevailing practice in the federal courts is difficult. See Note, Entrapment and Denial of the Crime: A Defense of the Inconsistency Rule, 1986 Duke L.J. 866, 878–879, and n. 127. |

**\*70** Nor is the result the Court reaches urged by a predominance of authority in the lower courts. As the Court recognizes, only two Circuits have held, as the Court does today, that a criminal defendant may deny committing the elements of a crime, and then contend that the Government entrapped him into the offense. The remaining Circuits are far more restrained in their allowance of such inconsistent defenses, divided along the lines the majority discusses in its opinion. *Ante,* at 885, n. 1.

Thus, neither the Constitution, nor a statute, nor the Criminal Rules, nor the bulk of authority compels us to reverse petitioner's conviction. Nor does the Court claim support from any of these sources for its decision. Instead, the majority rests almost exclusively on an application of the "general proposition [that] a defendant is entitled to an instruction as to any legally sufficient defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Ante,* at 887. There are several reasons, however, why this "general proposition" is inapposite here.

## II

First, there is the unique nature of the entrapment defense. There is a valuable purpose served by having civil litigants plead alternative defenses which may be legally inconsistent.

Allowing a tort defendant to claim both that he owed no duty of care to the plaintiff, but that if he did, he met that duty, preserves possible alternative defenses under which the defendant is entitled to relief. It prevents formalities of pleadings, or rigid application of legal doctrines, from standing in the way of the equitable resolution of a civil dispute. See generally 2A J. Moore, J. Lucas, & G. Grotheer, Moore's Federal Practice ¶ 8.32, pp. 8–224—8–229 (2d ed. 1987). The same may be true for *some* criminal defenses *71 such as "self-defense" or "provocation") where a defendant may truthfully testify as to the facts of the crime, leaving it to his counsel to argue that these facts make out, as a matter of law, several possible defenses.

But the entrapment defense, by contrast, "is a relatively limited defense"; it is only available to "a defendant who has committed **891 all the elements of a proscribed offense." *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). Thus, when a defendant (as petitioner did here) testifies that he did not commit the elements of the offense he is charged with, the defense of entrapment is *not* a plausible alternative legal theory of the case; rather, it is a proper defense *only* if the accused is lying. We have rejected before the notion that a defendant has a right to lie at trial, or a right to solicit his attorney's aid in executing such a defense strategy. See *Nix v. Whiteside,* 475 U.S. 157, 173, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986). And there is respectable authority for concluding that no legitimate end of the criminal justice system is served by requiring a trial court to entertain such tactics, in the form of an entrapment defense which is at odds with the defendant's own testimony.[2]

[2]  See, *e.g., United States v. Dorta,* 783 F.2d 1179, 1181–1182 (CA4 1986); *United States v. Smith,* 757 F.2d 1161, 1167–1168 (CA11 1985); *United States v. Henry,* 749 F.2d 203, 214–216 (CA5 1984) (en banc) (Gee, J., dissenting).

Allowing such inconsistency in defense tactics invites the scourge of an effective criminal justice system: perjury. In the past, we have taken extraordinary steps to combat perjury in criminal trials; these steps have even included permitting the admission of otherwise inadmissible evidence to prevent a defendant from procuring an acquittal via false testimony. See, *e.g., Oregon v. Hass,* 420 U.S. 714, 720–723, 95 S.Ct. 1215, 1220–1221, 43 L.Ed. 570 (1975); *Harris v. New York,* 401 U.S. 222, 225–226, 91 S.Ct. 643, 645–646, 28 L.Ed.2d 1 (1971). Yet today, the Court reaches a result which it concedes "may ... on occasion" increase the risk of perjury. *Ante,* at 887–888. This is reason enough to reject the Court's

result. Worse still, the majority's prognostication may well *72 be an understatement. Even if—as the Court suggests, *ibid.*—inconsistent defenses do not measurably increase the frequency of perjury in civil trials, the risk of perjury in a criminal trial is always greater than in a civil setting because the stakes are so much higher. See *Britt v. North Carolina,* 404 U.S. 226, 238, 92 S.Ct. 431, 439, 30 L.Ed.2d 400 (1971) (Douglas, J., dissenting). Absent some constitutional or statutory mandate to conduct criminal trials in a particular way, we should be taking steps to minimize, not increase, the danger of perjured testimony.

After all, a criminal trial is not a game or a sport. "[T]he very nature of a trial [i]s a search for truth." *Nix v. Whiteside, supra,* 475 U.S., at 166, 106 S.Ct., at 994. This observation is particularly applicable to criminal trials, which are the means by which we affix our most serious judgments of individual guilt or innocence. It is fundamentally inconsistent with this understanding of criminal justice to permit a defendant to win acquittal on a rationale which he states, under oath, to be false. "Permitting a defendant to argue two defenses that cannot both be true is equivalent to sanctioning perjury by the defendant." See Note, Entrapment and Denial of the Crime: A Defense of the Inconsistency Rule, 1986 Duke L.J. 866, 883–884.

Finally, even if the Court's decision does not result in increased perjury at criminal trials, it will—at the very least —result in increased confusion among criminal juries.[3] The lower courts have rightly warned that jury confusion is likely to result from allowing a defendant to say "I did not do it" *73 **892 while his lawyer argues "he did it, but the government tricked him into it." See, *e.g., United States v. Dorta,* 783 F.2d 1179, 1182 (CA4 1986). Creating such confusion may enable some defendants to win acquittal on the entrapment defense, but only under the peculiar circumstances where a jury rejects the defendant's own stated view of the facts. We have not previously endorsed defense efforts to prevail at trial by playing such "shell games" with the jury; rather, we have written that "[a] defendant has no entitlement to the luck of a lawless decisionmaker." *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Nor, it should be added, is there any entitlement to a baffled decisionmaker.

[3]  Again, the fact that the system endures the jury confusion caused by inconsistent civil defenses is no support for the Court's conclusion here. For one thing, reliability is

**Mathews v. U.S., 485 U.S. 58 (1988)**
108 S.Ct. 883, 99 L.Ed.2d 54, 56 USLW 4183

obviously a more important concern in criminal cases than in civil.

Moreover, in civil cases, the trial court has the option of ordering the jury to complete a special verdict form, thus minimizing any errors in judgment which may result from inconsistent defenses. See Fed.Rule Civ.Proc. 49(a). The Criminal Rules contain no similar provision, cf. Fed.Rule Crim.Proc. 31, and "as a general rule special verdicts are disfavored in criminal cases," see *United States v. Buishas,* 791 F.2d 1310, 1317 (CA7 1986).

III

Ultimately, only petitioner knows whether he accepted a loan in exchange for an official act, or whether he obtained it as a personal favor. Today, the Court holds that petitioner has a right to take the stand and claim the latter, while having his attorney argue that he was entrapped into doing the former. Nothing counsels such a result—let alone compels it. Hence this dissent.

**All Citations**

485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54, 56 USLW 4183

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5172   Page 9 of 114

Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C., 475 F.3d 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

475 F.3d 319
United States Court of Appeals,
District of Columbia Circuit.

WILLIAMS GAS PROCESSING—GULF
COAST COMPANY, L.P., et al., Petitioners
v.
FEDERAL ENERGY REGULATORY
COMMISSION, Respondent
Producer Coalition, et al., Intervenors.

No. 05–1342.
|
Argued Nov. 20, 2006.
|
Decided Dec. 19, 2006.

**Synopsis**
**Background:** Natural gas company and pipeline owner petitioned for judicial review of orders in which Federal Energy Regulatory Commission (FERC) asserted jurisdiction over natural gas pipeline segment pursuant to Natural Gas Act (NGA).

**Holdings:** The Court of Appeals, Edwards, Senior Circuit Judge, held that:

"incomplete information" rationale offered by FERC in support of challenged orders lacked reasoned analysis in orders themselves, and thus could not support orders on review, and

orders, which rested at least in part on unsupported "incomplete information" rationale, were devoid of reasoned decisionmaking and had to be set aside as arbitrary and capricious.

Vacated and remanded.

**\*320** On Petition for Review of Orders of the Federal Energy Regulatory Commission.

**Attorneys and Law Firms**

James T. McManus argued the cause for petitioners. With him on the briefs were Joseph S. Koury, Mari M. Ramsey, and David A. Glenn.

Carol J. Banta, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were John S. Moot, General Counsel, and Robert H. Solomon, Solicitor.

Thomas J. Eastment argued the cause for intervenors Dominion Exploration & Production, Inc., et al. With him on the brief were Adam J. White, James M. Costan, Charles J. McClees, Douglas W. Rasch, Bruce A. Connell, and Frederick T. Kolb.

Before: SENTELLE and TATEL, Circuit Judges, and EDWARDS, Senior Circuit Judge.

**Opinion**

Opinion for the Court filed by Senior Circuit Judge EDWARDS.

EDWARDS, Senior Circuit Judge.

**\*\*311** Williams Gas Processing–Gulf Coast Co. ("WGP") and Transcontinental Gas Pipe Line Corp. ("Transco") petition for review **\*\*312 \*321** of two Federal Energy Regulatory Commission ("FERC" or "the Commission") orders asserting jurisdiction over a natural gas pipeline off the coast of Louisiana. *See Transcontinental Gas Pipe Line Corp.,* 111 F.E.R.C. ¶ 61,498 (2005) ("*2005 Transco Rehearing Order* "); *Transcontinental Gas Pipe Line Corp.,* 111 F.E.R.C. ¶ 61,090 (2005) ("*2005 Transco Jurisdictional Order* "). Under the Natural Gas Act ("NGA" or "the Act"), 15 U.S.C. §§ 717–717z, FERC has jurisdiction over pipelines that "transport" natural gas, but not over those that "gather" it. But the Act does not define these terms, leaving FERC to create a test that will rationally and reliably distinguish between the two types of pipeline. FERC's efforts to properly classify Transco's pipeline are emblematic of its struggle to complete this task.

In 2001, FERC disclaimed jurisdiction over a 12.43 mile, 24–inch diameter pipeline in Transco's Central Louisiana system lying downstream of the pipeline facilities of Jupiter Energy Corp. ("Jupiter"). *Transcontinental Gas Pipe Line Corp.,* 96 F.E.R.C. ¶ 61,246 (2001) ("*2001 Transco Jurisdictional*

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5173   Page 10 of 114

Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C., 475 F.3d 319 (2006)
374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

*Order* "), *reh'g denied in relevant part, Transcontinental Gas Pipe Line Corp.,* 97 F.E.R.C. ¶ 61,298 (2001) ("*2001 Transco Rehearing Order* "). This court upheld FERC's 2001 orders as supported by substantial evidence and not arbitrary and capricious. *Williams Gas Processing–Gulf Coast Co. v. FERC,* 331 F.3d 1011 (D.C.Cir.2003) ("*WGP–Transco I* ").

In 2003, in a separate proceeding initiated by Jupiter, FERC determined that an 8–inch Jupiter pipeline feeding into the 24–inch Transco lateral serves a transportation function. *Jupiter Energy Corp.,* 103 F.E.R.C. ¶ 61,184 (2003), *reh'g denied, Jupiter Energy Corp.,* 105 F.E.R.C. ¶ 61,243 (2003) ( "*2003 Jupiter Rehearing Order* "). The consequence of this ruling was that a jurisdictional pipeline (Jupiter) flowed into a non-jurisdictional pipeline (Transco). On review, the Fifth Circuit vacated and remanded, holding that the Commission's decision was arbitrary and capricious because Jupiter's transportation pipeline sat upstream of a Transco gathering pipeline. *Jupiter Energy Corp. v. FERC,* 407 F.3d 346, 350–51 (5th Cir.2005) ( "*Jupiter Appeal* "). The Fifth Circuit noted that FERC's Jupiter orders produced an "anomalous scenario," to wit: "A series of *gathering* pipelines (upstream ...) feed[ing] into a *transportation* pipeline (Jupiter's 8–inch line), ... in turn feed[ing] into a *gathering* pipeline (the Transco line)." *Id.* at 350. The court concluded that "this cannot be considered consistent." *Id.*

In 2004, before the Fifth Circuit's *Jupiter Appeal* decision had been handed down, FERC issued an order requiring WGP and Transco to show cause why the agency's *2001 Transco Jurisdictional Order* should not be reversed as "anomalous" in light of the Jupiter orders. *Transcontinental Gas Pipe Line Corp.,* 107 F.E.R.C. ¶ 61,122 (2004) ("*Show Cause Order* "). Shortly after the Fifth Circuit vacated the Jupiter orders, FERC reversed its prior determination and held that the Transco lateral directly downstream of the Jupiter facility serves a transportation function. *2005 Transco Jurisdictional Order,* 111 F.E.R.C. ¶ 61,090.

On June 28, 2005, FERC issued two decisions. First, in the case on remand from the Fifth Circuit, the Commission affirmed its jurisdictional determination in the Jupiter orders. *Jupiter Energy Corp.,* 111 F.E.R.C. ¶ 61,497 (2005). Second, FERC denied the request for rehearing of its *2005 Transco Jurisdictional Order,* on the grounds that the disputed 2001 orders were issued "on the basis of incomplete information," and "no gas is collected along the length of Transco's downstream line." **\*322   \*\*313** *2005 Transco Rehearing Order,* 111 F.E.R.C. ¶ 61,498. The Jupiter orders are now

pending review before the Fifth Circuit and the challenges to the Commission's *2005 Transco Jurisdictional Order* and *2005 Transco Rehearing Order* are at the heart of the petition for review in this case.

WGP and Transco's principal argument is that it was unlawful for FERC to reconsider its prior conclusion regarding Transco's pipeline segment lying downstream of the pipeline facilities of Jupiter. Petitioners argue, in particular, that "[t]he Commission's lone finding and premise ... that the subject pipeline facility is not a 'gathering' facility solely because, purportedly, no gas was collected along that pipeline ... is contrary to the facts of record." Petitioners' Reply Br. at 2. Petitioners also contend that, because "the Commission ... previously decided these same facilities to be gathering in final, court-affirmed orders, the Commission is barred from re-deciding these same issues." *Id.*

WGP and Transco are right in their observation that "[t]his is a classic case of an agency, both in its orders under review and its brief to this Court, failing to demonstrate that it has engaged in reasoned decisionmaking." *Id.* They are wrong, however, in suggesting that FERC was without authority to reconsider its *2001 Transco Jurisdictional Order.* Indeed, petitioners' counsel conceded at oral argument that it is within FERC's authority to make jurisdictional determinations that rest on the premises that (1) there is one point on any given route where gathering stops and transportation begins, and (2) a transportation pipeline cannot feed into a gathering pipeline. *See* Recording of Oral Argument at 12:06. These two points were highlighted by the Fifth Circuit in the *Jupiter Appeal* decision. 407 F.3d at 350–51. If these two principles apply, then FERC might be justified in finding that both the Jupiter and Transco lines are jurisdictional facilities. The problem here is that the agency's rationale underlying the disputed *2005 Transco Jurisdictional Order* and *2005 Transco Rehearing Order* only hints at these principles.

In its briefs to this court, FERC argues that it revisited its *2001 Transco Jurisdictional Order* to eliminate a "fundamental inconsistency" in its case law. Respondent's Br. at 3, 13. The Commission could have stated as much in its 2005 orders and justified the policy shift, for an agency is free to change course in a regulatory regime provided that it offers a reasoned explanation for so doing and is not otherwise constrained by statutory limitations. We are forced to vacate the 2005 orders, however, because *in those decisions,* FERC neither explained its action as consistent with precedent nor justified it as a reasoned and permissible shift in policy. Although these

Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C., 475 F.3d 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

orders ultimately may prove to be justified on the merits, they are presently wanting for lack of reasoned decisionmaking.

## I. BACKGROUND

The Natural Gas Act grants FERC the power to regulate "the transportation [or 'transmission'] of natural gas in interstate commerce" but not "the production or gathering of natural gas." 15 U.S.C. § 717(b). Until fairly recently, companies sold gas under rates that encompassed both gathering and transportation services. *Lomak Petroleum, Inc. v. FERC,* 206 F.3d 1193, 1195 n. 2 (D.C.Cir.2000). However, "in the wake of major regulatory changes in the natural gas industry," including the unbundling of gathering and transportation services, *Conoco Inc. v. FERC,* 90 F.3d 536, 539–41 (D.C.Cir.1996), companies primarily engaged in transporting gas "no longer need [ ] to operate" **\*\*314 \*323** gathering facilities, *Lomak,* 206 F.3d at 1195. As a result, many natural gas transporters have sought to separate their transportation and gathering facilities, through transfer (otherwise known as "spindown") of the latter to gathering affiliates. *See WGP–Transco I,* 331 F.3d at 1015.

Because the NGA does not define gathering and transportation, FERC is responsible for drawing the "not always clear" line between the two. *See ExxonMobil Gas Mktg. Co. v. FERC,* 297 F.3d 1071, 1076–77 (D.C.Cir.2002) (quoting *Conoco,* 90 F.3d at 542). Gathering facilities are generally understood to be pipelines that collect gas from wells (where gas originates) and deliver it into pipelines which will transport it in interstate commerce. *Id.* at 1076; *Conoco,* 90 F.3d at 539 n. 2. However, since on any given route between the wells (upstream) and the final destination (downstream), various pipeline segments may be owned by different companies, it is no mean feat for the agency to determine which segments serve a gathering function and which do not. Faced with this reality and inundated with requests for jurisdictional clarification, *see Gas Pipeline Facilities & Servs. on the Outer Cont'l Shelf,* 74 F.E.R.C. ¶ 61,222, at 61,751–52 (1996), FERC has had trouble finding its footing. *See ExxonMobil,* 297 F.3d at 1087 ("FERC has been struggling with the reclassification of facilities ...."); *Shell Gas Pipeline Co.,* 74 F.E.R.C. ¶ 61,277, at 61,895 (1996) ("[T]he development of an appropriate methodology has been an ongoing task ....").

In *Farmland Industries, Inc.,* 23 F.E.R.C. ¶ 61,063 (1983), FERC announced the "primary function test," under which it considers six factors to determine the jurisdictional status of a pipeline: "(1) the pipelines' length and diameter; (2) the central point in the field; (3) the facility's geographic configuration or pattern; (4) the location of compressors and processing plants, particularly where the pipelines are located behind[, *i.e.* upstream of,] the [processing] plant; (5) the location of wells along all or part of the facilities; and (6) the line[s'] operating pressure." *WGP–Transco I,* 331 F.3d at 1014. Only six years later, however, the Fifth Circuit found fault with the test, because it ignored the geographical realities of offshore gas collection (where pipelines serving a gathering function often need to be larger and longer) and focused instead on purely physical criteria. *EP Operating Co. v. FERC,* 876 F.2d 46, 48–49 (5th Cir.1989). The primary function test was seen by the court as failing to classify facilities with "marked similarities in operational characteristics" the same way. *Id.* at 50.

In response, FERC modified its primary function test to include "a sliding scale which will allow the use of gathering pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the offshore production area." *Amerada Hess Corp.,* 52 F.E.R.C. ¶ 61,268, at 61,988 (1990). It also announced that it would consider "nonphysical criteria such as the purpose, location and operation of the facility, the general business activity of the owner of the facility, and whether the jurisdictional determination is consistent with the objectives of the NGA ...." *Id.* at 61,987; *see Sea Robin Pipeline Co. v. FERC,* 127 F.3d 365, 369 (5th Cir.1997) ("*Sea Robin I* "). After several years, however, the Fifth Circuit concluded that FERC had once again failed to create a viable test. According to the court, FERC had "reverted," committing exactly the same error criticized in *EP Operating:* it treated the physical size of the pipeline as presumptive. *Id.* at 370. The court also found that the Commission was relying too much on nonphysical factors, which, while "relevant, ... are only **\*\*315 \*324** part of the mix" and should be treated as "secondary to the physical factors." *Id.* at 371. Because, in the court's view, FERC seemed unable to consistently resolve when gathering ceases and transportation commences, the Fifth Circuit invited FERC to " reformulate" its primary function test another time. *Id.*

On remand, FERC revised the test. First, FERC concluded that the "behind-the-plant" factor should be given less weight in the offshore context, because almost all offshore facilities are situated upstream of processing plants. *Sea Robin Pipeline Co.,* 87 F.E.R.C. ¶ 61,384, at 62,425 (1999) ("*Sea Robin*

*Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C.,* 475 F.3d 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

II "), *reh'g denied, Sea Robin Pipeline Co.,* 92 F.E.R.C. ¶ 61,072 (2000) ("*Sea Robin II Rehearing Order* "). FERC then replaced the "central point in the field" factor used in the onshore context with a "centralized aggregation" inquiry into whether "there exists a central location where gas is aggregated for further transportation to shore. *Id.* FERC stated that its revised test would enable it to consistently discern the "point at which the collection or gathering of gas ends, and interstate transmission begins." *Id.* at 62,427.

In its order denying rehearing of *Sea Robin II,* FERC stated, "[T]he Commission does not agree that the fact of Sea Robin's upstream interconnection with [a jurisdictional facility], by itself, compels a finding that the east leg of Sea Robin's system is jurisdictional." *Sea Robin II Rehearing Order,* 92 F.E.R.C. ¶ 61,072, at 61,295. ExxonMobil sought review before this court arguing, *inter alia,* that "FERC's jurisdictional ruling has created an utterly illogical situation, wherein gas is transported on a jurisdictional pipeline ... into a non-jurisdictional gathering leg of Sea Robin's pipeline." *ExxonMobil,* 297 F.3d at 1087 (internal quotation marks omitted). After canvassing FERC's case law, we held that "the presence of an interconnection with an upstream jurisdictional facility [does not compel] a finding that the downstream facility is likewise jurisdictional." *Id.* Based on the historical treatment of the lines in question, we explained that, "[i]f anything," the jurisdictional line upstream of the Sea Robin facility "ha[d] been erroneously classified." *Id.* We accepted FERC's argument that the "inconsistent treatment of the [upstream] pipeline and the Sea Robin pipeline" did not necessarily render the decision arbitrary and capricious and upheld the classification. *Id.* at 1087, 1089.

Such was the state of FERC's primary function test when Transco asked FERC to authorize the spindown of its Central Louisiana system to WGP, and WGP in turn petitioned FERC for a declaratory order disclaiming jurisdiction over the facilities. After considering each factor of the revised primary function test, FERC found that a large central pipeline, "the spine," serves a transportation function, while "6 to 24–inch offshore lateral lines connect at various locations into the spine and serve to collect gas from the surrounding production areas." *2001 Transco Jurisdictional Order,* 96 F.E.R.C. ¶ 61,246, at 61,976. FERC concluded that these lateral lines "serve to gather gas from production located in their vicinity." *Id.* FERC denied rehearing with respect to the laterals' classification, *see 2001 Transco Rehearing Order,* 97 F.E.R.C. ¶ 61,298, and we upheld the 2001 orders

as supported by substantial evidence and not arbitrary and capricious, *see WGP–Transco I,* 331 F.3d 1011.

Before this court's decision had issued in *WGP–Transco I,* FERC conducted a separate jurisdictional status proceeding covering Jupiter's 8–inch line upstream of and feeding into one of the 24–inch Transco laterals. **\*\*316 \*325** *Jupiter Energy Corp.,* 103 F.E.R.C. ¶ 61,184. Focusing heavily on the centralized aggregation point factor, FERC concluded that the Jupiter pipeline performs a transportation function. *Id.* at 61,713. Jupiter sought rehearing, arguing that the presence of Transco's gathering lateral downstream of the Jupiter pipeline foreclosed a finding that the facility engages in transportation. *2003 Jupiter Rehearing Order,* 105 F.E.R.C. ¶ 61,243. FERC concluded that its 2001 orders "cannot now be the basis for claiming that Jupiter's facilities should also be declared to be gathering." *Id.* at 62,286. In a footnote, FERC reversed the position it had taken in its *Sea Robin II Rehearing Order* and declared that "[t]he presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *Id.* at n. 8.

Seemingly uncomfortable with the muddle it had created —"[a] series of *gathering* pipelines" feeding into "a *transportation* pipeline (Jupiter's 8–inch line), ... in turn feed[ing] into a *gathering* pipeline (the Transco line)," *Jupiter Appeal,* 407 F.3d at 350—FERC issued an order requiring WGP and Transco to show cause why the *2001 Transco Jurisdictional Order* should not be reversed as "anomalous" in light of the Jupiter orders. *Show Cause Order,* 107 F.E.R.C. ¶ 61,122, at 61,411. FERC also repeated the declaration contained in its Jupiter footnote that upstream transportation facilities determine the classification of downstream facilities. *Id.*

Before FERC could address the *Show Cause Order,* the Fifth Circuit vacated FERC's Jupiter orders. *Jupiter Appeal,* 407 F.3d 346. The Fifth Circuit highlighted that FERC's *Sea Robin II* decision endorsed the principle that "there is *one* point on any given route where gathering stops and transportation begins." *Id.* at 350. The Fifth Circuit therefore reasoned that, because FERC had "already set the jurisdictional boundary downstream from one of Jupiter's pipelines," it was "arbitrary for the Commission now to set a jurisdictional dividing point [further upstream]." *Id.* at 351. The court vacated the Jupiter orders as anomalous and inconsistent. *Id.* at 350–51.

Just a week after the Fifth Circuit vacated the Jupiter orders, FERC decided that WGP and Transco had failed to show

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5176 Page 13 of 114

*Williams Gas Processing–Gulf Coast Co., L.P. v. F.E.R.C.,* 475 F.3d 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

cause sufficient to prevent reclassification of the 24–inch lateral. *2005 Transco Jurisdictional Order,* 111 F.E.R.C. ¶ 61,090. In the "Background" section of its decision, FERC stated: (1) since it had not been aware that a transportation facility stood upstream of the lateral when it disclaimed jurisdiction over it in 2001, its determination "was made on the basis of incomplete information"; and (2) "[t]he presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *Id.* at 61,411. In the "Discussion" section of its decision, FERC based its conclusion that Transco's 24–inch lateral actually serves a transportation function on one fact: unlike the gathering arms of the Sea Robin pipeline, "[n]o gas is collected along the Jupiter pipeline." *Id.* at 61,413.

On June 28, 2005, FERC issued two decisions. First, FERC affirmed its jurisdictional determination in the Jupiter orders. In so doing, FERC noted that, because Transco's pipeline was being reclassified from gathering to transportation, "the inconsistency identified by the [Fifth Circuit] no longer exists." *Jupiter Energy Corp.,* 111 F.E.R.C. ¶ 61,497. Second, FERC denied Transco's request for rehearing, offering two rationales in a five-paragraph decision: (1) the 2001 orders were issued "on the basis of incomplete information"; and (2) "no gas is collected along the length of Transco's downstream line." *2005 Transco Rehearing **317 *326 Order,* 111 F.E.R.C. ¶ 61,498. FERC provided no other reasoning or factual support for its conclusion. WGP and Transco now seek review in this court.

## II. ANALYSIS

### A. *Standard of Review*

We must vacate FERC's 2005 orders if they are arbitrary and capricious. 5 U.S.C. § 706(2)(A); *see ExxonMobil,* 297 F.3d at 1083. We therefore look to whether FERC "articulated a rational explanation for its action." *AT & T Inc. v. FCC,* 452 F.3d 830, 837 (D.C.Cir.2006) (quoting *Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 921 (D.C.Cir.1985)). Reasoned decisionmaking necessarily requires consideration of relevant precedent. *See Brusco Tug & Barge Co. v. NLRB,* 247 F.3d 273, 278 (D.C.Cir.2001) ("[I]t is 'axiomatic that [agency action] must either be consistent with prior [action] or offer a reasoned basis for its departure from precedent ....' " (quoting *ConAgra, Inc. v. NLRB,* 117 F.3d 1435, 1443 (D.C.Cir.1997))). However, it is well understood that

[a]n agency is free to discard precedents or practices it no longer believes correct. Indeed we expect that an[ ] agency may well change its past practices with advances in knowledge in its given field or as its relevant experience and expertise expands. If an agency decides to change course, however, we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.

*Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1296 (D.C.Cir.2004) (per curiam) (internal citations and quotation marks omitted); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis ....") (internal quotation marks omitted); *see, e.g., Office of Commc'n, Inc. of the United Church of Christ v. FCC,* 327 F.3d 1222, 1228–29 (D.C.Cir.2003) (upholding policy-shift where agency adequately explained its departure); *ANR Pipeline Co. v. FERC,* 205 F.3d 403, 407 (D.C.Cir.2000) ("An agency may not of course depart from prior policy without explanation. But FERC explained how changed circumstances justified a new policy."); *Busse Broad. Corp. v. FCC,* 87 F.3d 1456, 1458 (D.C.Cir.1996) (upholding agency action where "to the extent the agency departed from precedent, it offered a reasonable explanation for doing so").

Arbitrary and capricious review "demands evidence of reasoned decisionmaking *at the agency level;* agency rationales developed for the first time during litigation do not serve as adequate substitutes." *Kansas City v. HUD,* 923 F.2d 188, 192 (D.C.Cir.1991); *see Point Park Univ. v. NLRB,* 457 F.3d 42, 50 (D.C.Cir.2006) ("Nor can our Court fill in critical gaps in [an agency's] reasoning. We can only look to the [agency's] stated rationale. We cannot sustain its action on some other basis the [agency] did not mention."); *Williams Gas Processing–Gulf Coast Co. v. FERC,* 373 F.3d 1335, 1345 (D.C.Cir.2004) ("It is axiomatic that we may uphold

Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C., 475 F.3d 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

agency orders based only on reasoning that is fairly stated by the agency in the order under review ....").

WGP and Transco point out that in 2001 FERC applied each factor of its primary function test and concluded that Transco's 24–inch lateral performs a gathering function; yet, in 2005, FERC reached the opposite conclusion, Petitioners' Br. at 19–20, but without the requisite support for such a drastic change in course, *id.* at 18, 25. **\*\*318 \*327** The simple question here is whether FERC's reclassification of the Transco lateral is justified either as consistent with precedent or as a considered departure therefrom. In other words, are the contested 2005 orders supported by reasoned decisionmaking?

**B. *FERC's "Incomplete Information" Rationale Is Inadequate***

FERC justified its 2005 orders in part by stating that its original decision was based on incomplete information. On this point, the Commission claims that it did not become aware that the Transco lateral sat downstream of a line properly classified as jurisdictional until after the 2001 proceedings. *See 2005 Transco Rehearing Order,* 111 F.E.R.C. ¶ 61,498, at 63,113; *2005 Transco Jurisdictional Order,* 111 F.E.R.C. ¶ 61,090, at 61,411. But FERC never explained why the classification of the Jupiter facility is relevant to the jurisdictional status of the Transco lateral under existing precedent. The only statement approximating a clarification of the "incomplete information" rationale can be found in a blanket assertion contained in the "Background" section of the earlier of the two 2005 orders: FERC declared, "The presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *2005 Transco Jurisdictional Order,* 111 F.E.R.C. ¶ 61,090, at 61,411.

But FERC simply cited the Jupiter footnote (where it had first stated the proposition without explanation). FERC made no attempt to square this new policy statement with its directly contradictory stance in *Sea Robin II Rehearing Order* and this court's decision in *ExxonMobil.* In *Sea Robin II Rehearing Order,* FERC stated, "[T]he Commission does not agree that the fact of Sea Robin's upstream interconnection with [a jurisdictional facility], by itself, compels a finding that the east leg of Sea Robin's system is jurisdictional." 92 F.E.R.C. ¶ 61,072, at 61,295. And in *ExxonMobil,* FERC convinced this court to conclude that "the presence of an interconnection with an upstream jurisdictional facility [does not compel] a finding that the downstream facility is likewise

jurisdictional." 297 F.3d at 1087. Now FERC asserts that it must reclassify a downstream line because "[t]he presence of upstream transmission facilities determines the classification of downstream facilities." *2005 Transco Jurisdictional Order,* 111 F.E.R.C. ¶ 61,090, at 61,411. FERC's rationale could hardly be more inconsistent with precedent. And "FERC's attempts to distinguish its precedents ... [are] nonexistent." *PG & E Gas Transmission, Nw. Corp. v. FERC,* 315 F.3d 383, 389 (D.C.Cir.2003).

**C. *FERC's Inconsistent Precedents and Changing Policy***

FERC's new assertion that a facility downstream of a jurisdictional pipeline must also be jurisdictional finds support in two interrelated principles which FERC once embraced but recently rejected: (1) there is one point along every route at which gathering ceases and transportation begins, and (2) a transportation facility cannot feed into a gathering facility.

In a 1996 Policy Statement, FERC announced, "[W]here gas is destined for interstate commerce, there is necessarily a point at which the gathering or collection of the gas ends, and interstate transportation begins." *Gas Pipeline Facilities,* 74 F.E.R.C. ¶ 61,222, at 61,757. In *Sea Robin I,* the Fifth Circuit treated this principle as a settled component of FERC policy: "The determinative question is when did gathering cease and transportation commence." 127 F.3d at 371. And indeed, on remand FERC apparently endorsed **\*\*319 \*328** that notion. *Sea Robin II,* 87 F.E.R.C. ¶ 61,384, at 62,427 ("[T]here is necessarily a point at which the collection or gathering of gas ends, and interstate transmission begins."); *see also Dauphin Island Gathering Sys.,* 93 F.E.R.C. ¶ 61,198, at 61,653 (2000) (same). Yet, in *Sea Robin II, Sea Robin II Rehearing Order,* and *ExxonMobil,* FERC issued and defended an order which resulted in a route changing from jurisdictional to non-jurisdictional and back to jurisdictional. FERC thus recently eschewed the first principle and persuaded this court to do so as well.

FERC's treatment of the second principle follows a similar course. In 1983, FERC stated, "[B]ecause the movement of gas through the Coronado system can be classified as intrastate pipeline 'transportation,' we cannot find the subsequent downstream movement of gas from that system to be exempt 'gathering.' " *Galaxy Energies, Inc.,* 24 F.E.R.C. ¶ 61,121, at 61,304 (1983). More recently, FERC declared, "[A] facility functionalized as gathering may not be located downstream of facilities functionalized as transmission." *Trunkline Gas Co.,* 70 F.E.R.C. ¶ 61,163,

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5178 Page 15 of 114

Williams Gas Processing-Gulf Coast Co., L.P. v. FERC, 475 U.S.App.D.C. 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

at 61,503 (1995); *see also Dauphin Island,* 93 F.E.R.C. ¶ 61,198, at 61,652 ("[I]t would be incongruous for gas flowing on an upstream transportation line to be delivered into a downstream gathering line."). But in 2002, FERC convinced this court to distinguish *Trunkline* as a case in which "the classification of the upstream system was in dispute," and reject the "proposition that the presence of an interconnection with an upstream jurisdictional facility compels a finding that the downstream facility is likewise jurisdictional." *ExxonMobil,* 297 F.3d at 1087.

In *Jupiter Appeal,* the Fifth Circuit assumed that the first principle constituted FERC's own tenet, and that the second principle necessarily flows from the first. 407 F.3d at 350–51. Indeed, the pull of the principles provides a logical explanation for FERC's 2005 orders. If there can only be one point along any given route at which the function of facilities changes, then the situation FERC created—where a transportation pipeline fed into a gathering pipeline which, in turn, fed into a transportation pipeline—was in fact anomalous and required reconsideration. Likewise, if a gathering facility cannot sit downstream of a transportation facility, FERC was required—as a matter of reason—to change either the classification of the Jupiter pipeline or the Transco lateral. Moreover, if the two principles demand corrective action where a transportation facility sits upstream of a gathering facility, FERC's apparent new statement of policy can be seen to proffer a third principle guiding resolution: "[t]he presence of upstream transmission facilities determines the classification of downstream facilities, not the opposite." *2005 Transco Jurisdictional Order,* 111 F.E.R.C. ¶ 61,090, at 61,411.

It would thus appear that FERC's "incomplete information" rationale rests on its tacit adoption of these two principles and application of a new policy derived from them. Only if FERC views the principles as inviolate, does FERC's "incomplete information" rationale begin to make sense.

**D. *The 2005 Orders Lack Reasoned Decisionmaking***

The problem with FERC's "incomplete information" rationale is that it is not supported by any reasoned analysis *in the orders themselves.* Although we suspect that the orders may reflect an unstated endorsement of the two principles discussed above, we have no good basis upon which to rest this supposition. Arbitrary **\*\*320 \*329** and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it. *Columbia Gas Transmission Corp. v. FERC,*

448 F.3d 382, 387 (D.C.Cir.2006) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947))); *PDK Labs. Inc. v. DEA,* 362 F.3d 786, 798 (D.C.Cir.2004) ("[I]t is important to remember that if we find that an agency's stated rationale for its decision is erroneous, we cannot sustain its action on some other basis the agency did not mention."); *AT & T Corp. v. FCC,* 236 F.3d 729, 734–35 (D.C.Cir.2001) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given." (quoting *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856)).

In order to rely on the two principles, FERC had to acknowledge the need to reconsider its precedent, announce its definitive adoption of the principles, and explain their impact on the existing primary function test. If FERC intended to adopt a new policy specifying that the classification of the downstream facility must yield where the principles demand corrective action, FERC was obliged to explain that extension of its case law as well. *See PG & E Gas,* 315 F.3d at 390 ("FERC has given no explanation whatsoever for this apparent shift in Commission policy. FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process."); *Mo. Pub. Serv. Comm'n v. FERC,* 234 F.3d 36, 41 (D.C.Cir.2000) ( "A passing reference ... is not sufficient to satisfy the Commission's obligation to carry out reasoned and principled decisionmaking. We have repeatedly required the Commission to fully articulate the basis for its decision.") (internal quotation marks omitted). But instead of openly acknowledging its intention to reverse course to bring order to its case law, FERC attempted to "gloss[ ] over" its prior holding in *Sea Robin II Rehearing Order* and its position in *ExxonMobil,* and, in so doing, "cross[ed] the line from the tolerably terse to the intolerably mute." *PG & E Gas,* 315 F.3d at 390 (internal quotation marks omitted).

In its briefs, FERC attempts to make the required showing, explaining that the Commission reversed the Transco lateral's classification in order to eliminate a "fundamental inconsistency" in its case law. Respondent's Br. at 3, 13. But counsel's explanation to this court cannot substitute for "reasoned decisionmaking *at the agency level.*" *Kansas City,* 923 F.2d at 192; *see Chamber of Commerce of U.S. v. SEC,* 412 F.3d 133, 145 (D.C.Cir.2005) ("[The agency] —not its counsel and not this court—is charged by the

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5179   Page 16 of 114

Williams Gas Processing-Gulf Coast Co., L.P. v. F.E.R.C., 475 F.3d 319 (2006)

374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

Congress with bringing its expertise and its best judgment to bear upon [an issue of policy].''); *Village of Bensenville v. FAA,* 376 F.3d 1114, 1121 (D.C.Cir.2004) ("We do not ordinarily consider agency reasoning that 'appears nowhere in the [agency's] order.' ' (quoting *PanAmSat Corp. v. FCC,* 198 F.3d 890, 897 (D.C.Cir.1999))). Since we conclude that FERC neither explained how the "incomplete information" finding fit within its muddled case law nor rehabilitated that morass by clearly charting a new course, we find that the rationale cannot support the 2005 orders.

This conclusion is dispositive. Although FERC rested its decision on both the "incomplete information" rationale and its finding that no gas is collected along either the Jupiter pipeline or the Transco lateral, it did so without according **\*\*321 \*330** the two conclusions individual weight. "[W]hen an agency relies on multiple grounds for its decision, some of which are invalid," we may only "sustain the decision [where] one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.,* 439 F.3d 715, 717–18 (D.C.Cir.2006) (internal quotation marks omitted); *see Int'l Union, United Mine Workers v. Dep't of Labor,* 358 F.3d 40, 44–45 (D.C.Cir.2004) (finding that an agency "failed to provide an adequate explanation for its decision" where "[t]wo of the three reasons it gave ... would not support its decision," and the court did "not know —nor [was it] free to guess—what the agency would have done had it realized that it could not justify its decision [based on the two invalid grounds]"). Here, the 2005 orders do not reveal whether FERC would have reclassified the Transco lateral on the basis of its lack of gas collection finding alone. *See* Recording of Oral Argument at 24:33 (admitting that the 2005 orders do not indicate the relative weight accorded to the two bases). The assurance of FERC's counsel, *see id.* at 25:03 (urging the court to uphold the decision based on the lack of gas collection rationale alone), does not provide an acceptable substitute. *Allegheny Power v. FERC,* 437 F.3d 1215, 1226 (D.C.Cir.2006) (refusing to consider counsel's clarification of a standard where "counsel ha[d] pointed to nothing said by FERC itself establishing such a concept"); *KeySpan–Ravenswood, LLC v. FERC,* 348 F.3d 1053, 1059 (D.C.Cir.2003) ("[P]ost hoc salvage operations of counsel cannot overcome the inadequacy of the Commission's explanation.") (internal quotation marks omitted). We thus need not inquire into the validity of FERC's lack of gas collection rationale. *See* Petitioners' Br. at 19– 25 (arguing that FERC's lack of gas collection justification is inconsistent with FERC precedent); Respondent's Br. at 15–19 (contending that the lack of gas collection rationale is consistent with precedent); Intervenors' Br. at 11–13 (same). Because FERC rested its determination, at least in part, on its infirm "incomplete information" ground, we must find the 2005 orders devoid of reasoned decisionmaking and set them aside as arbitrary and capricious.

### III. CONCLUSION

For the reasons stated above, we vacate FERC's 2005 orders and remand to the agency for further proceedings consistent with this opinion. We offer no judgment on the merits of FERC's choice to reverse the Transco lateral's jurisdictional determination. The decision on the merits must await reasoned decisionmaking from the Commission.

**All Citations**

475 F.3d 319, 374 U.S.App.D.C. 310, 168 Collier Bankr.Cas.2d 698, Util. L. Rep. P 14,627

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

135 S.Ct. 2419
Supreme Court of the United States

Marvin D. HORNE, et al., Petitioners

v.

DEPARTMENT OF AGRICULTURE.

No. 14–275.
|
Argued April 22, 2015.
|
Decided June 22, 2015.

**Synopsis**

**Background:** Farmers brought action for judicial review of imposition of civil penalties for failure to comply with United States Department of Agriculture (USDA) raisin marketing order. The United States District Court for the Eastern District of California, Lawrence J. O'Neill, J., 2009 WL 4895362, granted summary judgment for the USDA. Farmers appealed. The United States Court of Appeals for the Ninth Circuit, Hawkins, Senior Circuit Judge, 673 F.3d 1071, affirmed. Certiorari was granted. The Supreme Court, Justice Thomas, —— U.S. ——, 133 S.Ct. 2053, 186 L.Ed.2d 69, reversed and remanded. On remand, the United States Court of Appeals for the Ninth Circuit, Hawkins, Senior Circuit Judge, 750 F.3d 1128, again affirmed, finding reserve requirement was not a Fifth Amendment taking. Certiorari was granted.

**Holdings:** The Supreme Court, Chief Justice Roberts, held that:

regulatory reserve requirement was a physical taking;

failure to pay growers and handlers violated Fifth Amendment Takings Clause;

retention of contingent interest in portion of raisins' value did not negate government's duty to pay just compensation;

mandate to reserve raisin as condition to engage in the market was a per se taking; and

growers and handlers were not required to pay fine prior to bringing challenge.

Reversed.

Justice Thomas filed a concurring opinion.

Justice Breyer filed an opinion concurring in part and dissenting in part in which Justices Ginsburg and Kagan joined.

Justice Sotomayor filed a dissenting opinion.

**West Codenotes**

**Held Unconstitutional**
7 C.F.R. §§ 989.66, 989.67

**\*2421** *Syllabus* [*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The Agricultural Marketing Agreement Act of 1937 authorizes the Secretary of Agriculture to promulgate "marketing orders" to help maintain stable markets for particular agricultural products. The marketing order for raisins established a Raisin Administrative Committee that imposes a reserve requirement—a requirement that growers set aside a certain percentage of their crop for the account of the Government, free of charge. The Government makes use of those raisins by selling them in noncompetitive markets, donating them, or disposing of them by any means consistent with the purposes of the program. If any profits are left over after subtracting the Government's expenses from administering the program, the net proceeds are distributed back to the raisin growers. In 2002–2003, raisin growers were required to set aside 47 percent of their raisin crop under the reserve requirement. In 2003–2004, 30 percent. Marvin Horne, Laura Horne, and their family are raisin growers who refused to set aside any raisins for the Government on the ground that the reserve requirement was an unconstitutional taking of **\*2422** their property for public use without just compensation. The Government fined the Hornes the fair market value of the raisins as well as additional civil penalties for their failure to obey the raisin marketing order.

The Hornes sought relief in federal court, arguing that the reserve requirement was an unconstitutional taking of their

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

property under the Fifth Amendment. On remand from this Court over the issue of jurisdiction, *Horne v. Department of Agriculture,* 569 U.S. ——, 133 S.Ct. 2053, 186 L.Ed.2d 69 the Ninth Circuit held that the reserve requirement was not a Fifth Amendment taking. The court determined that the requirement was not a *per se* taking because personal property is afforded less protection under the Takings Clause than real property and because the Hornes, who retained an interest in any net proceeds, were not completely divested of their property. The Ninth Circuit held that, as in cases allowing the government to set conditions on land use and development, the Government imposed a condition (the reserve requirement) in exchange for a Government benefit (an orderly raisin market). It held that the Hornes could avoid relinquishing large percentages of their crop by "planting different crops." 750 F.3d 1128, 1143.

*Held* : The Fifth Amendment requires that the Government pay just compensation when it takes personal property, just as when it takes real property. Any net proceeds the raisin growers receive from the sale of the reserve raisins goes to the amount of compensation they have received for that taking —it does not mean the raisins have not been appropriated for Government use. Nor can the Government make raisin growers relinquish their property without just compensation as a condition of selling their raisins in interstate commerce. Pp. 2425 – 2433.

(a) The Fifth Amendment applies to personal property as well as real property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home. Pp. 2425 – 2433.

(1) This principle, dating back as far as Magna Carta, was codified in the Takings Clause in part because of property appropriations by both sides during the Revolutionary War. This Court has noted that an owner of personal property may expect that new regulation of the use of property could "render his property economically worthless." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027– 1028, 112 S.Ct. 2886, 120 L.Ed.2d 798. But there is still a "longstanding distinction" between regulations concerning the use of property and government acquisition of property. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 323, 122 S.Ct. 1465, 152 L.Ed.2d 517. When it comes to physical appropriations, people do not expect their property, real or personal, to be actually occupied or taken away. Pp. 2425 – 2427.

(2) The reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee. The Committee disposes of those raisins as it wishes, to promote the purposes of the raisin marketing order. The Government's formal demand that the Hornes turn over a percentage of their raisin crop without charge, for the Government's control and use, is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 432, 102 S.Ct. 3164, 73 L.Ed.2d 868. Pp. 2427 – 2428.

**\*2423** (b) The fact that the growers are entitled to the net proceeds of the raisin sales does not mean that there has been no taking at all. When there has been a physical appropriation, "we do not ask ... whether it deprives the owner of all economically valuable use" of the item taken. *Tahoe– Sierra Preservation Council,* 535 U.S., at 323, 122 S.Ct. 1465. The fact that the growers retain a contingent interest of indeterminate value does not mean there has been no taking, particularly when that interest depends on the discretion of the taker, and may be worthless, as it was for one of the two years at issue here. *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210, distinguished. Once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation. Pp. 2428 – 2430.

(c) The taking in this case also cannot be characterized as part of a voluntary exchange for a valuable government benefit. In one of the years at issue, the Government insisted that the Hornes part with 47 percent of their crop for the privilege of selling the rest. But the ability to sell produce in interstate commerce, although certainly subject to reasonable government regulation, is not a "benefit" that the Government may withhold unless growers waive constitutional protections. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815, distinguished. *Leonard & Leonard v. Earle,* 279 U.S. 392, 49 S.Ct. 372, 73 L.Ed. 754, distinguished. Pp. 2430 – 2431.

(d) The Hornes are not required to first pay the fine and then seek compensation under the Tucker Act. See *Horne,* 569 U.S., at ——, 133 S.Ct. 2053. Because they have the full economic interest in the raisins the Government alleges should have been set aside for its account—*i.e.,* they own the raisins they grew as well as the raisins they handled, having paid the growers for all of their raisins, not just their free-

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5182 Page 19 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

tonnage raisins—they may raise a takings-based defense to the fine levied against them. There is no need for the Ninth Circuit to calculate the just compensation due on remand. The clear and administrable rule is that "just compensation normally is to be measured by 'the market value of the property at the time of the taking.' " *United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376. Here, the Government already calculated that amount when it fined the Hornes the fair market value of the raisins. Pp. 2431 – 2433.

750 F.3d 1128, reversed.

ROBERTS, C.J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined, and in which GINSBURG, BREYER, and KAGAN, JJ., joined as to Parts I and II. THOMAS, J., filed a concurring opinion. BREYER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG and KAGAN, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion.

**Attorneys and Law Firms**

Michael W. McConnell, Washington, DC, for Petitioners.

Edwin S. Kneedler, Washington, DC, for Respondent.

Jeffrey M. Prieto, Acting General Counsel, Carrie F. Ricci, Associate General Counsel, Leslie K. Lagomarcino, Senior Counsel, Department of Agriculture, Washington, DC, Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Benjamin C. Mizer, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Elizabeth B. Prelogar, Assistant to the Solicitor General, Michael S. Raab, Joshua Waldman, Attorneys, Department **\*2424** of Justice, Washington, DC, for Respondent.

Brian C. Leighton, Clovis, CA, Michael W. McConnell, Counsel of Record, John C. O'Quinn, Stephen S. Schwartz, Jason M. Wilcox, Devin A. DeBacker, Kirkland & Ellis LLP, Washington, DC, for Petitioners.

**Opinion**

Chief Justice ROBERTS delivered the opinion of the Court.

Under the United States Department of Agriculture's California Raisin Marketing Order, a percentage of a grower's crop must be physically set aside in certain years for the account of the Government, free of charge. The Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market. The question is whether the Takings Clause of the Fifth Amendment bars the Government from imposing such a demand on the growers without just compensation.

I

The Agricultural Marketing Agreement Act of 1937 authorizes the Secretary of Agriculture to promulgate "marketing orders" to help maintain stable markets for particular agricultural products. The marketing order for raisins requires growers in certain years to give a percentage of their crop to the Government, free of charge. The required allocation is determined by the Raisin Administrative Committee, a Government entity composed largely of growers and others in the raisin business appointed by the Secretary of Agriculture. In 2002–2003, this Committee ordered raisin growers to turn over 47 percent of their crop. In 2003–2004, 30 percent.

Growers generally ship their raisins to a raisin "handler," who physically separates the raisins due the Government (called "reserve raisins"), pays the growers only for the remainder ("free-tonnage raisins"), and packs and sells the free-tonnage raisins. The Raisin Committee acquires title to the reserve raisins that have been set aside, and decides how to dispose of them in its discretion. It sells them in noncompetitive markets, for example to exporters, federal agencies, or foreign governments; donates them to charitable causes; releases them to growers who agree to reduce their raisin production; or disposes of them by "any other means" consistent with the purposes of the raisin program. 7 CFR § 989.67(b)(5) (2015). Proceeds from Committee sales are principally used to subsidize handlers who sell raisins for export (not including the Hornes, who are not raisin exporters). Raisin growers retain an interest in any net proceeds from sales the Raisin Committee makes, after deductions for the export subsidies and the Committee's administrative expenses. In the years at issue in this case, those proceeds were less than the cost of producing the crop one year, and nothing at all the next.

The Hornes—Marvin Horne, Laura Horne, and their family— are both raisin growers and handlers. They "handled" not only their own raisins but also those produced by other growers, paying those growers in full for all of their raisins, not just the free-tonnage portion. In 2002, the Hornes refused to set aside any raisins for the Government, believing they were not

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5183 Page 20 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

legally bound to do so. The Government sent trucks to the Hornes' facility at eight o'clock one morning to pick up the raisins, but the Hornes refused entry. App. 31; cf. *post*, at 2442 (SOTOMAYOR, J., dissenting). **\*2425** The Government then assessed against the Hornes a fine equal to the market value of the missing raisins—some $480,000—as well as an additional civil penalty of just over $200,000 for disobeying the order to turn them over.

When the Government sought to collect the fine, the Hornes turned to the courts, arguing that the reserve requirement was an unconstitutional taking of their property under the Fifth Amendment. Their case eventually made it to this Court when the Government argued that the lower courts had no jurisdiction to consider the Hornes' constitutional defense to the fine. *Horne v. Department of Agriculture,* 569 U.S. ——, 133 S.Ct. 2053, 186 L.Ed.2d 69 (2013) (*Horne I*). We rejected the Government's argument and sent the case back to the Court of Appeals so it could address the Hornes' contention on the merits. *Id.,* at ——, 133 S.Ct., at 2063–2064.

On remand, the Ninth Circuit agreed with the Hornes that the validity of the fine rose or fell with the constitutionality of the reserve requirement. 750 F.3d 1128, 1137 (2014). The court then considered whether that requirement was a physical appropriation of property, giving rise to a *per se* taking, or a restriction on a raisin grower's use of his property, properly analyzed under the more flexible and forgiving standard for a regulatory taking. The court rejected the Hornes' argument that the reserve requirement was a *per se* taking, reasoning that "the Takings Clause affords less protection to personal than to real property," and concluding that the Hornes "are not completely divested of their property rights," because growers retain an interest in the proceeds from any sale of reserve raisins by the Raisin Committee. *Id.,* at 1139.

The court instead viewed the reserve requirement as a use restriction, similar to a government condition on the grant of a land use permit. See *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). As in such permit cases, the Court of Appeals explained, the Government here imposed a condition (the reserve requirement) in exchange for a Government benefit (an orderly raisin market). And just as a landowner was free to avoid the government condition by forgoing a permit, so too the Hornes could avoid the reserve requirement by "planting different crops." 750 F.3d, at 1143. Under that analysis, the court found that the reserve requirement was a proportional response to the Government's interest in ensuring an orderly raisin market, and not a taking under the Fifth Amendment.

We granted certiorari. 574 U.S. ——, 135 S.Ct. 1039, 190 L.Ed.2d 907 (2015).

II

The petition for certiorari poses three questions, which we answer in turn.

A

The first question presented asks "Whether the government's 'categorical duty' under the Fifth Amendment to pay just compensation when it 'physically takes possession of an interest in property,' *Arkansas Game & Fish Comm'n v. United States,* —— U.S. ——, 133 S.Ct. 511, 518, 184 L.Ed.2d 417 (2012), applies only to real property and not to personal property." The answer is no.

1

There is no dispute that the "classic taking [is one] in which the government directly appropriates private property for its own use." *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning* **\*2426** *Agency,* 535 U.S. 302, 324, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (brackets and internal quotation marks omitted). Nor is there any dispute that, in the case of real property, such an appropriation is a *per se* taking that requires just compensation. See *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426–435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amdt. 5. It protects "private property" without any distinction between different types. The principle reflected in the Clause goes back at least 800 years to Magna Carta, which specifically protected agricultural crops from uncompensated

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5184 Page 21 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)
192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

takings. Clause 28 of that charter forbade any "constable or other bailiff" from taking "corn or other provisions from any one without immediately tendering money therefor, unless he can have postponement thereof by permission of the seller." Cl. 28 (1215), in W. McKechnie, Magna Carta, A Commentary on the Great Charter of King John 329 (2d ed. 1914).

The colonists brought the principles of Magna Carta with them to the New World, including that charter's protection against uncompensated takings of personal property. In 1641, for example, Massachusetts adopted its Body of Liberties, prohibiting "mans Cattel or goods of what kinde soever" from being "pressed or taken for any publique use or service, unlesse it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford." Massachusetts Body of Liberties ¶ 8, in R. Perry, Sources of Our Liberties 149 (1978). Virginia allowed the seizure of surplus "live stock, or beef, pork, or bacon" for the military, but only upon "paying or tendering to the owner the price so estimated by the appraisers." 1777 Va. Acts ch. XII. And South Carolina authorized the seizure of "necessaries" for public use, but provided that "said articles so seized shall be paid for agreeable to the prices such and the like articles sold for on the ninth day of October last." 1779 S.C. Acts § 4.

Given that background, it is not surprising that early Americans bridled at appropriations of their personal property during the Revolutionary War, at the hands of both sides. John Jay, for example, complained to the New York Legislature about military impressment by the Continental Army of "Horses, Teems, and Carriages," and voiced his fear that such action by the "little Officers" of the Quartermasters Department might extend to "Blankets, Shoes, and many other articles." A Hint to the Legislature of the State of New York (1778), in John Jay, The Making of a Revolutionary 461–463 (R. Morris ed. 1975) (emphasis deleted). The legislature took the "hint," passing a law that, among other things, provided for compensation for the impressment of horses and carriages. 1778 N.Y. Laws ch. 29. According to the author of the first treatise on the Constitution, St. George Tucker, the Takings Clause was "probably" adopted in response to "the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war, without any compensation whatever." 1 Blackstone's Commentaries, Editor's App. 305–306 (1803).

**\*2427** Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in *James v. Campbell,* 104 U.S. 356, 358, 26 L.Ed. 786 (1882), a case concerning the alleged appropriation of a patent by the Government:

> "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."

Prior to this Court's decision in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real. *Pennsylvania Coal* expanded the protection of the Takings Clause, holding that compensation was also required for a "regulatory taking"—a restriction on the use of property that went "too far." *Id.,* at 415, 43 S.Ct. 158. And in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court clarified that the test for how far was "too far" required an "ad hoc" factual inquiry. That inquiry required considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action.

Four years after *Penn Central,* however, the Court reaffirmed the rule that a physical *appropriation* of property gave rise to a *per se* taking, without regard to other factors. In *Loretto,* the Court held that requiring an owner of an apartment building to allow installation of a cable box on her rooftop was a physical taking of real property, for which compensation was required. That was true without regard to the claimed public benefit or the economic impact on the owner. The Court explained that such protection was justified not only by history, but also because "[s]uch an appropriation is perhaps the most serious form of invasion of an owner's property interests," depriving the owner of the "the rights to possess, use and dispose of" the property. 458 U.S., at 435, 102 S.Ct. 3164 (internal quotation marks omitted). That reasoning—both with respect to history

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5185 Page 22 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

and logic—is equally applicable to a physical appropriation of personal property.

The Ninth Circuit based its distinction between real and personal property on this Court's discussion in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), a case involving extensive limitations on the use of shorefront property. 750 F.3d, at 1139–1141. *Lucas* recognized that while an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless," such an "implied limitation" was not reasonable in the case of land. 505 U.S., at 1027–1028, 112 S.Ct. 2886.

*Lucas,* however, was about regulatory takings, not direct appropriations. Whatever *Lucas* had to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be actually occupied or taken away. Our cases have stressed the "longstanding distinction" between government acquisitions of property and regulations. *Tahoe–Sierra Preservation Council,* 535 U.S., at 323, 122 S.Ct. 1465. The different treatment of real and personal property in a regulatory case suggested by *Lucas* did not alter the established rule of treating direct appropriations of real and **\*2428** personal property alike. See 535 U.S., at 323, 122 S.Ct. 1465. (It is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa" (footnote omitted)).

2

The reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee. App. to Pet. for Cert. 179a; Tr. of Oral Arg. 31. The Committee's raisins must be physically segregated from free-tonnage raisins. 7 CFR § 989.66(b)(2). Reserve raisins are sometimes left on the premises of handlers, but they are held "for the account" of the Government. § 989.66(a). The Committee disposes of what become its raisins as it wishes, to promote the purposes of the raisin marketing order.

Raisin growers subject to the reserve requirement thus lose the entire "bundle" of property rights in the appropriated raisins—"the rights to possess, use and dispose of" them, *Loretto,* 458 U.S., at 435, 102 S.Ct. 3164 (internal quotation marks omitted)—with the exception of the speculative hope that some residual proceeds may be left when the Government is done with the raisins and has deducted the expenses of implementing all aspects of the marketing order. The Government's "actual taking of possession and control" of the reserve raisins gives rise to a taking as clearly "as if the Government held full title and ownership," *id.,* at 431, 102 S.Ct. 3164 (internal quotation marks omitted), as it essentially does. The Government's formal demand that the Hornes turn over a percentage of their raisin crop without charge, for the Government's control and use, is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Id.,* at 432, 102 S.Ct. 3164.

The Government thinks it "strange" and the dissent "baffling" that the Hornes object to the reserve requirement, when they nonetheless concede that "the government may prohibit the sale of raisins without effecting a per se taking." Brief for Respondent 35; *post,* at 2443 (SOTOMAYOR, J., dissenting). But that distinction flows naturally from the settled difference in our takings jurisprudence between appropriation and regulation. A physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower. The Constitution, however, is concerned with means as well as ends. The Government has broad powers, but the means it uses to achieve its ends must be "consist[ent] with the letter and spirit of the constitution." *McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). As Justice Holmes noted, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way." *Pennsylvania Coal,* 260 U.S., at 416, 43 S.Ct. 158.

B

The second question presented asks "Whether the government may avoid the categorical duty to pay just compensation for a physical taking of property by reserving to the property owner a contingent interest in a portion of the value of the property, set at the government's discretion." The answer is no.

The Government and dissent argue that raisins are fungible goods whose only value is in the revenue from their sale. According to the Government, the raisin marketing order leaves that interest with the raisin growers: After selling reserve raisins and deducting expenses and subsidies **\*2429** for exporters, the Raisin Committee returns any net proceeds

Case 2:19-cv-00037-JNP  Document 59-33  Filed 11/30/22  PageID.5186  Page 23 of 114
Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)
192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

to the growers. 7 CFR §§ 989.67(d), 989.82, 989.53(a), 989.66(h). The Government contends that because growers are entitled to these net proceeds, they retain the most important property interest in the reserve raisins, so there is no taking in the first place. The dissent agrees, arguing that this possible future revenue means there has been no taking under *Loretto.* See *post,* at 2437 – 2440.

But when there has been a physical appropriation, "we do not ask ... whether it deprives the owner of all economically valuable use" of the item taken. *Tahoe–Sierra Preservation Council,* 535 U.S., at 323, 122 S.Ct. 1465; see *id.,* at 322, 122 S.Ct. 1465 ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." (citation omitted)). For example, in *Loretto,* we held that the installation of a cable box on a small corner of Loretto's rooftop was a *per se* taking, even though she could of course still sell and economically benefit from the property. 458 U.S., at 430, 436, 102 S.Ct. 3164. The fact that the growers retain a contingent interest of indeterminate value does not mean there has been no physical taking, particularly since the value of the interest depends on the discretion of the taker, and may be worthless, as it was for one of the two years at issue here.

The dissent points to *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), noting that the Court found no taking in that case, even though the owners' artifacts could not be sold at all. *Post,* at 2440. The dissent suggests that the Hornes should be happy, because they might at least get *something* from what had been their raisins. But *Allard* is a very different case. As the dissent recognizes, the owners in that case retained the rights to possess, donate, and devise their property. In finding no taking, the Court emphasized that the Government did not "compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them." 444 U.S., at 65–66, 100 S.Ct. 318. Here of course the raisin program requires physical surrender of the raisins and transfer of title, and the growers lose any right to control their disposition.

The Government and dissent again confuse our inquiry concerning *per se* takings with our analysis for regulatory takings. A regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under *Penn Central.* That is why, in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980),

we held that a law limiting a property owner's right to exclude certain speakers from an already publicly accessible shopping center did not take the owner's property. The owner retained the value of the use of the property as a shopping center largely unimpaired, so the regulation did not go "too far." *Id.,* at 83, 100 S.Ct. 2035 (quoting *Pennsylvania Coal Co.,* 260 U.S., at 415, 43 S.Ct. 158). But once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation. See *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 747–748, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (SCALIA, J., concurring in part and concurring in judgment). That is not an issue here: The Hornes did not receive any net proceeds from Raisin Committee sales for the years at issue, because they had not set aside any reserve raisins in those years (and, in *2430 any event, there were no net proceeds in one of them).

C

The third question presented asks "Whether a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." The answer, at least in this case, is yes.

The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According to the Government, if raisin growers don't like it, they can "plant different crops," or "sell their raisin-variety grapes as table grapes or for use in juice or wine." Brief for Respondent 32 (brackets and internal quotation marks omitted).

"Let them sell wine" is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history. In any event, the Government is wrong as a matter of law. In *Loretto,* we rejected the argument that the New York law was not a taking because a landlord could avoid the requirement by ceasing to be a landlord. We held instead that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." 458 U.S., at 439, n. 17, 102 S.Ct. 3164. As the Court explained, the contrary argument "proves too much":

"For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5187 Page 24 of 114
Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)
192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices." *Ibid.*

As the Court concluded, property rights "cannot be so easily manipulated." *Ibid.*

The Government and dissent rely heavily on *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). There we held that the Environmental Protection Agency could require companies manufacturing pesticides, fungicides, and rodenticides to disclose health, safety, and environmental information about their products as a condition to receiving a permit to sell those products. While such information included trade secrets in which pesticide manufacturers had a property interest, those manufacturers were not subjected to a taking because they received a "valuable Government benefit" in exchange—a license to sell dangerous chemicals. *Id.,* at 1007, 104 S.Ct. 2862; see *Nollan,* 483 U.S., at 834, n. 2, 107 S.Ct. 3141 (discussing *Monsanto* ).

The taking here cannot reasonably be characterized as part of a similar voluntary exchange. In one of the years at issue here, the Government insisted that the Hornes turn over 47 percent of their raisin crop, in exchange for the "benefit" of being allowed to sell the remaining 53 percent. The next year, the toll was 30 percent. We have already rejected the idea that *Monsanto* may be extended by regarding basic and familiar uses of property as a "Government benefit" on the same order as a permit to sell hazardous chemicals. See *Nollan,* 483 U.S., at 834, n. 2, 107 S.Ct. 3141 (distinguishing *Monsanto* on the ground that "the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit' "). Selling produce in interstate commerce, although certainly subject to reasonable government regulation, is similarly not a special governmental benefit that the Government may hold **\*2431** hostage, to be ransomed by the waiver of constitutional protection. Raisins are not dangerous pesticides; they are a healthy snack. A case about conditioning the sale of hazardous substances on disclosure of health, safety, and environmental information related to those hazards is hardly on point.

*Leonard & Leonard v. Earle,* 279 U.S. 392, 49 S.Ct. 372, 73 L.Ed. 754 (1929), is also readily distinguishable. In that case, the Court upheld a Maryland requirement that oyster packers remit ten percent of the marketable detached oyster shells

or their monetary equivalent to the State for the privilege of harvesting the oysters. But the packers did "not deny the power of the State to declare their business a privilege," and the power of the State to impose a "privilege tax" was "not questioned by counsel." *Id.,* at 396, 49 S.Ct. 372. The oysters, unlike raisins, were "feræ naturæ" that belonged to the State under state law, and "[n]o individual ha[d] any property rights in them other than such as the state may permit him to acquire." *Leonard v. Earle,* 155 Md. 252, 258, 141 A. 714, 716 (1928). The oyster packers did not simply seek to sell their property; they sought to appropriate the State's. Indeed, the Maryland Court of Appeals saw the issue as a question of "a reasonable and fair compensation" *from* the packers *to* "the state, as owner of the oysters." *Id.,* at 259, 141 A., at 717 (internal quotation marks omitted).

Raisins are not like oysters: they are private property—the fruit of the growers' labor—not "public things subject to the absolute control of the state," *id.,* at 258, 141 A., at 716. Any physical taking of them for public use must be accompanied by just compensation.

### III

The Government correctly points out that a taking does not violate the Fifth Amendment unless there is no just compensation, and argues that the Hornes are free to seek compensation for any taking by bringing a damages action under the Tucker Act in the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1); *Monsanto,* 467 U.S., at 1020, 104 S.Ct. 2862. But we held in *Horne I* that the Hornes may, in their capacity as handlers, raise a takings-based defense to the fine levied against them. We specifically rejected the contention that the Hornes were required to pay the fine and then seek compensation under the Tucker Act. See 569 U.S., at ——, 133 S.Ct., at 2063 ("We ... conclude that the [Agricultural Marketing Agreement Act] withdraws Tucker Act jurisdiction over [the Hornes'] takings claim. [The Hornes] (as handlers) have no alternative remedy, and their takings claim was not 'premature' when presented to the Ninth Circuit.").

As noted, the Hornes are both growers and handlers. Their situation is unusual in that, as handlers, they have the full economic interest in the raisins the Government alleges should have been set aside for its account. They own the raisins they grew and are handling for themselves, and they own the raisins they handle for other growers, having paid

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5188 Page 25 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

those growers for all their raisins (not just the free-tonnage amount, as is true with respect to most handlers). See *supra,* at 2424 – 2425; Tr. of Oral Arg. 3–4. The penalty assessed against them as handlers included the dollar equivalent of the raisins they refused to set aside—their raisins. 750 F.3d, at 1135, n. 6; Brief for Petitioners 15. They may challenge the imposition of that fine, and do not have to pay it first and then resort to the Court of Federal Claims.

Finally, the Government briefly argues that if we conclude that the reserve requirement effects a taking, we should remand **\*2432** for the Court of Appeals to calculate "what compensation would have been due if petitioners had complied with the reserve requirement." Brief for Respondent 55. The Government contends that calculation must consider what the value of the reserve raisins would have been without the price support program, as well as "other benefits ... from the regulatory program, such as higher consumer demand for raisins spurred by enforcement of quality standards and promotional activities." *Id.,* at 55–56. Indeed, according to the Government, the Hornes would "likely" have a net gain under this theory. *Id.,* at 56.

The best defense may be a good offense, but the Government cites no support for its hypothetical-based approach, or its notion that general regulatory activity such as enforcement of quality standards can constitute just compensation for a specific physical taking. Instead, our cases have set forth a clear and administrable rule for just compensation: "The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.' " *United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).

Justice BREYER is concerned that applying this rule in this case will affect provisions concerning whether a condemning authority may deduct special benefits—such as new access to a waterway or highway, or filling in of swampland—from the amount of compensation it seeks to pay a landowner suffering a partial taking. *Post,* at 2435 – 2436 (opinion concurring in part and dissenting in part); see *Bauman v. Ross,* 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897) (laying out of streets and subdivisions in the District of Columbia). He need not be. Cases of that sort can raise complicated questions involving the exercise of the eminent domain power, but they do not create a generally applicable exception to the usual compensation rule, based on asserted regulatory benefits of

the sort at issue here. Nothing in the cases Justice BREYER labels "*Bauman* and its progeny," *post,* at 2435, suggests otherwise, which may be why the Solicitor General does not cite them. \*

---

\* For example, in *United States v. Miller,* 317 U.S. 369, 377, 63 S.Ct. 276, 87 L.Ed. 336 (1943), the Court—in calculating the fair market value of land—discounted an increase in value resulting from speculation "as to what the Government would be compelled to pay as compensation" after the land was earmarked for acquisition. In *United States v. Sponenbarger,* 308 U.S. 256, 265, 60 S.Ct. 225, 84 L.Ed. 230 (1939), the Court determined there was no taking in the first place, when the complaint was merely that a Government flood control plan provided insufficient protection for the claimant's land. *McCoy v. Union Elevated R. Co.,* 247 U.S. 354, 363, 38 S.Ct. 504, 62 L.Ed. 1156 (1918), similarly involved a claim "for damages to property not actually taken." So too *Reichelderfer v. Quinn,* 287 U.S. 315, 53 S.Ct. 177, 77 L.Ed. 331 (1932). There the Court held that claimants who had paid a special assessment when Rock Creek Park in Washington, D.C., was created —because the Park increased the value of their property —did not thereby have the right to prevent Congress from altering use of part of the Park for a fire station 38 years later. In *Dohany v. Rogers,* 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930), the law authorizing the taking did "not permit the offset of benefits for a railroad," and therefore was "not subject to the objection that it fails to provide adequate compensation ... and is therefore unconstitutional." *Id.,* at 367, and n. 1, 50 S.Ct. 299 (quoting *Fitzsimmons & Galvin, Inc. v. Rogers,* 243 Mich. 649, 665, 220 N.W. 881, 886 (1928)). And in *Norwood v. Baker,* 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898), the issue was whether an assessment to pay for improvements exceeded a village's taxing power. Perhaps farthest afield are the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 153, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), which involved valuation questions arising from the Government reorganization of northeast and midwest railroads. The Court in that case held that the legislation at issue was not "merely an eminent domain statute" but instead was enacted "pursuant to the bankruptcy power." *Id.,* at 151, 153, 95 S.Ct. 335.

**\*2433** In any event, this litigation presents no occasion to consider the broader issues discussed by Justice BREYER. The Government has already calculated the amount of just compensation in this case, when it fined the Hornes the fair market value of the raisins: $483,843.53. 750 F.3d, at 1135,

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5189   Page 26 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

n. 6. The Government cannot now disavow that valuation, see Reply Brief 21–23, and does not suggest that the marketing order affords the Hornes compensation in that amount. There is accordingly no need for a remand; the Hornes should simply be relieved of the obligation to pay the fine and associated civil penalty they were assessed when they resisted the Government's effort to take their raisins. This case, in litigation for more than a decade, has gone on long enough.

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed.

*It is so ordered.*

Justice THOMAS, concurring.

I join the Court's opinion in full. I write separately to offer an additional observation concerning Justice BREYER's argument that we should remand the case. The Takings Clause prohibits the government from taking private property except "for public use," even when it offers "just compensation." U.S. Const., Amdt. 5. That requirement, as originally understood, imposes a meaningful constraint on the power of the state—"the government may take property only if it actually uses or gives the public a legal right to use the property." *Kelo v. New London,* 545 U.S. 469, 521, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (THOMAS, J., dissenting). It is far from clear that the Raisin Administrative Committee's conduct meets that standard. It takes the raisins of citizens and, among other things, gives them away or sells them to exporters, foreign importers, and foreign governments. 7 CFR § 989.67(b) (2015). To the extent that the Committee is not taking the raisins "for public use," having the Court of Appeals calculate "just compensation" in this case would be a fruitless exercise.

Justice BREYER, with whom Justice GINSBURG and Justice KAGAN join, concurring in part and dissenting in part.

I agree with Parts I and II of the Court's opinion. However, I cannot agree with the Court's rejection, in Part III, of the Government's final argument. The Government contends that we should remand the case for a determination of whether any compensation would have been due if the Hornes had complied with the California Raisin Marketing Order's reserve requirement. In my view, a remand for such a determination is necessary.

The question of just compensation was not presented in the Hornes' petition for certiorari. It was barely touched on in the briefs. And the courts below did not decide it. At the same time, the case law that I have found indicates that the Government may well be right: The marketing order may afford just compensation for the takings of raisins that it imposes. If that is correct, then the reserve requirement does not violate the Takings Clause.

I

The Takings Clause of the Fifth Amendment provides that "private property [shall **\*2434** not] be taken for public use, without just compensation." The Clause means what it says: It "does not proscribe the taking of property; it proscribes taking *without just compensation.*" *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (emphasis added). Under the Clause, a property owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken," which is to say that "[h]e must be made whole but is not entitled to more." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934).

On the record before us, the Hornes have not established that the Government, through the raisin reserve program, takes raisins *without just compensation.* When the Government takes as reserve raisins a percentage of the annual crop, the raisin owners retain the remaining, free-tonnage, raisins. The reserve requirement is intended, at least in part, to enhance the price that free-tonnage raisins will fetch on the open market. See 7 CFR § 989.55 (2015); 7 U.S.C. § 602(1). And any such enhancement matters. This Court's precedents indicate that, when calculating the just compensation that the Fifth Amendment requires, a court should deduct from the value of the taken (reserve) raisins any enhancement caused by the taking to the value of the remaining (free-tonnage) raisins.

More than a century ago, in *Bauman v. Ross,* 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897), this Court established an exception to the rule that "just compensation normally is to be measured by 'the market value of the property at the time of the taking.' " *United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984) (quoting *Olson, supra,* at 255, 54 S.Ct. 704). We considered in *Bauman* how to calculate just compensation when the Government takes only a portion of a parcel of property:

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5190 Page 27 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)
192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

"[W]hen part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition, as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened." 167 U.S., at 574, 17 S.Ct. 966.

"The Constitution of the United States," the Court stated, "contains no express prohibition against considering benefits in estimating the just compensation to be paid for private property taken for the public use." *Id.,* at 584, 17 S.Ct. 966.

The Court has consistently applied this method for calculating just compensation: It sets off from the value of the portion that was taken the value of any benefits conferred upon the remaining portion of the property. See *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 151, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("[C]onsideration other than cash —for example, any special benefits to a property owner's remaining properties—may be counted in the determination of just compensation" (footnote omitted)); *United States v. Miller,* 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1943) ("[I]f the taking has in fact benefitted the remainder, the benefit may be set off against the value of the land taken"); *United States v. Sponenbarger,* 308 U.S. 256, 266–267, 60 S.Ct. 225, 84 L.Ed. 230 (1939) ("[I]f governmental activities **\*2435** inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty. Such activities in substance take nothing from the landowner"); *Reichelderfer v. Quinn,* 287 U.S. 315, 323, 53 S.Ct. 177, 77 L.Ed. 331 (1932) ("Just compensation ... was awarded if the benefits resulting from the proximity of the improvement [were] set off against the value of the property taken from the same owners"); *Dohany v. Rogers,* 281 U.S. 362, 367–368, 50 S.Ct. 299, 74 L.Ed. 904 (1930) (a statute that "permits deduction of benefits derived from the construction of a highway" from the compensation paid to landowners "afford[s] no basis for anticipating that ... just compensation will be denied"); *Norwood v. Baker,* 172 U.S. 269, 277, 19 S.Ct. 187, 43 L.Ed. 443 (1898) ("Except for [state law], the State could have authorized benefits to be deducted from the actual value of the land taken, without

violating the constitutional injunction that compensation be made for private property taken for public use; for the benefits received could be properly regarded as compensation *pro tanto* for the property appropriated to public use").

The rule applies regardless of whether a taking enhances the value of one property or the value of many properties. That is to say, the Government may "permi[t] consideration of actual benefits—enhancement in market value—flowing directly from a public work, although all in the neighborhood receive like advantages." *McCoy v. Union Elevated R. Co.,* 247 U.S. 354, 366, 38 S.Ct. 504, 62 L.Ed. 1156 (1918). The Federal Constitution does not distinguish between "special" benefits, which specifically affect the property taken, and "general" benefits, which have a broader impact.

Of course, a State may prefer to guarantee a greater payment to property owners, for instance by establishing a standard for compensation that does not account for general benefits (or for any benefits) afforded to a property owner by a taking. See *id.,* at 365, 38 S.Ct. 504 (describing categories of rules applied in different jurisdictions); Schopflocher, Deduction of Benefits in Determining Compensation or Damages in Eminent Domain, 145 A.L.R. 7, 158–294 (1943) (describing particular rules applied in different jurisdictions). Similarly, "Congress ... has the power to authorize compensation greater than the constitutional minimum." *50 Acres of Land, supra,* at 30, n. 14, 105 S.Ct. 451 (1984). Thus, Congress, too, may limit the types of benefits to be considered. See, *e.g.,* 33 U.S.C. § 595. But I am unaware of any congressional authorization that would increase beyond the constitutional floor the compensation owed for a taking of the Hornes' raisins.

If we apply *Bauman* and its progeny to the marketing order's reserve requirement, "the benefit [to the free-tonnage raisins] may be set off against the value of the [reserve raisins] taken." *Miller, supra,* at 376, 63 S.Ct. 276. The value of the raisins taken might exceed the value of the benefit conferred. In that case, the reserve requirement effects a taking without just compensation, and the Hornes' decision not to comply with the requirement was justified. On the other hand, the benefit might equal or exceed the value of the raisins taken. In that case, the California Raisin Marketing Order does not effect a taking without just compensation. See *McCoy, supra,* at 366, 38 S.Ct. 504 ("In such [a] case the owner really loses nothing which he had before; and it may be said with reason, there has been no real injury"); *Brown v. Legal Foundation of Wash.,* 538 U.S. 216, 237, 123 S.Ct. 1406,

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5191 Page 28 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

155 L.Ed.2d 376 (2003) ("[I]f petitioners' **\*2436** net loss was zero, the compensation that is due is also zero"). And even the Hornes agree that if the reserve requirement does not effect a taking without just compensation, then they cannot use the Takings Clause to excuse their failure to comply with the marketing order—or to justify their refusal to pay the fine and penalty imposed based on that failure. See Brief for Petitioners 31 ("The constitutionality of the fine rises or falls on the constitutionality of the Marketing Order's reserve requirement and attendant transfer of reserve raisins" (internal quotation marks omitted)).

II

The majority believes the *Bauman* line of cases most likely does not apply here. It says that those cases do "not create a generally applicable exception to the usual compensation rule, based on asserted regulatory benefits of the sort at issue here." *Ante,* at 2432. But it is unclear to me what distinguishes this case from those.

It seems unlikely that the majority finds a distinction in the fact that this taking is based on regulatory authority. Cf. *Chrysler Corp. v. Brown,* 441 U.S. 281, 295, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) ("It has been established in a variety of contexts that properly promulgated, substantive agency regulations have the force and effect of law" (internal quotation marks omitted)). It similarly seems unlikely that the majority intends to distinguish between takings of real property and takings of personal property, given its recognition that the Takings Clause "protects 'private property' without any distinction between different types." *Ante,* at 2426. It is possible that the majority questions the Government's argument because of its breadth—the Government argues that "it would be appropriate to consider what value all of the raisins would have had *in the absence of the marketing order,*" and I am unaware of any precedent that allows a court to account for portions of the marketing order that are entirely separate from the reserve requirement. But neither am I aware of any precedent that would distinguish between how the *Bauman* doctrine applies to the reserve requirement itself and how it applies to other types of partial takings.

Ultimately, the majority rejects the Government's request for a remand because it believes that the Government "does not suggest that the marketing order affords the Hornes compensation" in the amount of the fine that the

Government assessed. *Ante,* at 2433. In my view, however, the relevant precedent indicates that the Takings Clause requires compensation in an amount equal to the value of the reserve raisins adjusted to account for the benefits received. And the Government does, indeed, suggest that the marketing order affords just compensation. See Brief for Respondent 56 ("It is likely that when all benefits and alleged losses from the marketing order are calculated, [the Hornes] would have a net *gain* rather than a net loss, given that a central point of the order is to benefit producers"). Further, the Hornes have not demonstrated the contrary. Before granting judgment in favor of the Hornes, a court should address the issue in light of all of the relevant facts and law.

\* \* \*

Given the precedents, the parties should provide full briefing on this question. I would remand the case, permitting the lower courts to consider argument on the question of just compensation.

For these reasons, while joining Parts I and II of the Court's opinion, I respectfully dissent from Part III.

**\*2437** Justice SOTOMAYOR, dissenting.

The Hornes claim, and the Court agrees, that the Raisin Marketing Order, 7 CFR pt. 989 (2015) (hereinafter Order), effects a *per se* taking under our decision in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). But *Loretto* sets a high bar for such claims: It requires that each and every property right be destroyed by governmental action before that action can be said to have effected a *per se* taking. Because the Order does not deprive the Hornes of all of their property rights, it does not effect a *per se* taking. I respectfully dissent from the Court's contrary holding.

I

Our Takings Clause jurisprudence has generally eschewed "magic formula[s]" and has "recognized few invariable rules." *Arkansas Game and Fish Comm'n v. United States,* 568 U.S. ——, —— – ——, 133 S.Ct. 511, 518, 184 L.Ed.2d 417 (2012). Most takings cases therefore proceed under the fact-specific balancing test set out in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). See *Arkansas Game and Fish Comm'n,* 568 U.S.,

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5192   Page 29 of 114

at ——, 133 S.Ct., at 518–519; *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538–539, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). The Hornes have not made any argument under *Penn Central*. In order to prevail, they therefore must fit their claim into one of the three narrow categories in which we have assessed takings claims more categorically.

In the "special context of land-use exactions," we have held that "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit" constitute takings unless the government demonstrates a nexus and rough proportionality between its demand and the impact of the proposed development. *Lingle,* 544 U.S., at 538, 546, 125 S.Ct. 2074; see *Dolan v. City of Tigard,* 512 U.S. 374, 386, 391, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). We have also held that a regulation that deprives a property owner of "*all* economically beneficial us[e]" of his or her land is a *per se* taking. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (emphasis in original). The Hornes have not relied on either of these rules in this Court. See Brief for Petitioners 42, 55.

Finally—and this is the argument the Hornes do rely on— we have held that the government effects a *per se* taking when it requires a property owner to suffer a "permanent physical occupation" of his or her property. *Loretto,* 458 U.S., at 426, 102 S.Ct. 3164. In my view, however, *Loretto*—when properly understood—does not encompass the circumstances of this case because it only applies where all property rights have been destroyed by governmental action. Where some property right is retained by the owner, no *per se* taking under *Loretto* has occurred.

This strict rule is apparent from the reasoning in *Loretto* itself. We explained that "[p]roperty rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" *Id.,* at 435, 102 S.Ct. 3164 (quoting *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). A "permanent physical occupation" of property occurs, we said, when governmental action "destroys *each* of these rights." 458 U.S., at 435, 102 S.Ct. 3164 (emphasis in original); see *ibid.,* n. 12 (requiring that an **\*2438** owner be "absolutely dispossess[ed]" of rights). When, as we held in *Loretto, each* of these rights is destroyed, the government has not simply "take[n] a single 'strand' from the 'bundle' of property rights"; it has "chop[ped] through

the bundle" entirely. *Id.,* at 435, 102 S.Ct. 3164. In the narrow circumstance in which a property owner has suffered this "most serious form of invasion of [his or her] property interests," a taking can be said to have occurred without any further showing on the property owner's part. *Ibid.*

By contrast, in the mine run of cases where governmental action impacts property rights in ways that do not chop through the bundle entirely, we have declined to apply *per se* rules and have instead opted for the more nuanced *Penn Central* test. See, *e.g., Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (applying *Penn Central* to assess a requirement that title to land within Indian reservations escheat to the tribe upon the landowner's death); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82–83, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (engaging in similar analysis where there was "literally ... a 'taking' of th[e] right" to exclude); *Kaiser Aetna v. United States,* 444 U.S. 164, 174–180, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (applying *Penn Central* to find that the Government's imposition of a servitude requiring public access to a pond was a taking); see also *Loretto,* 458 U.S., at 433–434, 102 S.Ct. 3164 (distinguishing *PruneYard* and *Kaiser Aetna* ). Even governmental action that reduces the value of property or that imposes "a significant restriction ... on one means of disposing" of property is not a *per se* taking; in fact, it may not even be a taking at all. *Andrus v. Allard,* 444 U.S. 51, 65– 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

What our jurisprudence thus makes plain is that a claim of a *Loretto* taking is a bold accusation that carries with it a heavy burden. To qualify as a *per se* taking under *Loretto,* the governmental action must be so completely destructive to the property owner's rights—all of them—as to render the ordinary, generally applicable protections of the *Penn Central* framework either a foregone conclusion or unequal to the task. Simply put, the retention of even one property right that is not destroyed is sufficient to defeat a claim of a *per se* taking under *Loretto.*

II

A

When evaluating the Order under this rubric, it is important to bear two things in mind. The first is that *Loretto* is not concerned with whether the Order is a good idea now, whether it was ever a good idea, or whether it intrudes upon some

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5193 Page 30 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)
192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

property rights. The Order may well be an outdated, and by some lights downright silly, regulation. It is also no doubt intrusive. But whatever else one can say about the Order, it is not a *per se* taking if it does not result in the destruction of every property right. The second thing to keep in mind is the need for precision about whose property rights are at issue and about what property is at issue. Here, what is at issue are the Hornes' property rights in the raisins they own and that are subject to the reserve requirement. The Order therefore effects a *per se* taking under *Loretto* if and only if each of the Hornes' property rights in the portion of raisins that the Order designated as reserve has been destroyed. If not, then whatever fate the Order may reach under some other takings test, it is not a *per se* taking.

The Hornes, however, retain at least one meaningful property interest in the reserve **\*2439** raisins: the right to receive some money for their disposition. The Order explicitly provides that raisin producers retain the right to "[t]he net proceeds from the disposition of reserve tonnage raisins," 7 CFR § 989.66(h), and ensures that reserve raisins will be sold "at prices and in a manner intended to maxim[ize] producer returns," § 989.67(d)(1). According to the Government, of the 49 crop years for which a reserve pool was operative, producers received equitable distributions of net proceeds from the disposition of reserve raisins in 42. See Letter from Donald B. Verrilli, Jr., Solicitor General, to Scott S. Harris, Clerk of Court (Apr. 29, 2015).

Granted, this equitable distribution may represent less income than what some or all of the reserve raisins could fetch if sold in an unregulated market. In some years, it may even turn out (and has turned out) to represent no net income. But whether and when that occurs turns on market forces for which the Government cannot be blamed and to which all commodities —indeed, all property—are subject. In any event, we have emphasized that "a reduction in the value of property is not necessarily equated with a taking," *Andrus,* 444 U.S., at 66, 100 S.Ct. 318 that even "a significant restriction ... imposed on one means of disposing" of property is not necessarily a taking, *id.,* at 65, 100 S.Ct. 318 and that not every " 'injury to property by governmental action' " amounts to a taking, *PruneYard,* 447 U.S., at 82, 100 S.Ct. 2035. Indeed, we would not have used the word "destroy" in *Loretto* if we meant "damaged" or even "substantially damaged." I take us at our word: *Loretto* 's strict requirement that all property interests be "destroy[ed]" by governmental action before that action can be called a *per se* taking cannot be satisfied if there remains a

property interest that is at most merely damaged. That is the case here; accordingly, no *per se* taking has occurred.

Moreover, when, as here, the property at issue is a fungible commodity for sale, the income that the property may yield is the property owner's most central interest. Cf. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (noting that the "nature" of particular property defines "the extent of the property right therein"). "[A]rticles of commerce," in other words, are "desirable because [they are] convertible into money." *Leonard & Leonard v. Earle,* 279 U.S. 392, 396, 49 S.Ct. 372, 73 L.Ed. 754 (1929). The Hornes do not use the raisins that are subject to the reserve requirement—which are, again, the only raisins that have allegedly been unlawfully taken—by eating them, feeding them to farm animals, or the like. They wish to use those reserve raisins by selling them, and they value those raisins only because they are a means of acquiring money. While the Order infringes upon the amount of that potential income, it does not inexorably eliminate it. Unlike the law in *Loretto,* see 458 U.S., at 436, 102 S.Ct. 3164 the Order therefore cannot be said to have prevented the Hornes from making *any* use of the relevant property.

The conclusion that the Order does not effect a *per se* taking fits comfortably within our precedents. After all, we have observed that even "[r]egulations that bar trade in certain goods" altogether—for example, a ban on the sale of eagle feathers—may survive takings challenges. *Andrus,* 444 U.S., at 67, 100 S.Ct. 318. To be sure, it was important to our decision in *Andrus* that the regulation at issue did not prohibit the possession, donation, or devise of the property. See *id.,* at 66, 100 S.Ct. 318. But as to those feathers the plaintiffs would have liked to sell, the law said they could not be sold at any price—and therefore **\*2440** categorically could not be converted into money. Here, too, the Hornes may do as they wish with the raisins they are not selling. But as to those raisins that they would like to sell, the Order subjects a subset of them to the reserve requirement, which allows for the conversion of reserve raisins into at least *some* money and which is thus *more* generous than the law in *Andrus.* We held that no taking occurred in *Andrus,* so rejecting the Hornes' claim follows *a fortiori.*

We made this principle even clearer in *Lucas,* when we relied on *Andrus* and said that where, as here, "property's only economically productive use is sale or manufacture for sale," a regulation could even "render [that] property economically *worthless* " without effecting a *per se* taking. *Lucas,* 505 U.S.,

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5194 Page 31 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

at 1027–1028, 112 S.Ct. 2886 (citing *Andrus,* 444 U.S., at 66–67, 100 S.Ct. 318; emphasis added). The Order does not go nearly that far. It should easily escape our opprobrium, at least where a *per se* takings claim is concerned.

## B

The fact that at least one property right is not destroyed by the Order is alone sufficient to hold that this case does not fall within the narrow confines of *Loretto.* But such a holding is also consistent with another line of cases that, when viewed together, teach that the government may require certain property rights to be given up as a condition of entry into a regulated market without effecting a *per se* taking.

First, in *Leonard & Leonard v. Earle,* 279 U.S. 392, 49 S.Ct. 372, 73 L.Ed. 754, we considered a state law that required those who wished to engage in the business of oyster packing to deliver to the State 10 percent of the empty oyster shells. We rejected the argument that this law effected a taking and held that it was "not materially different" from a tax upon the privilege of doing business in the State. *Id.,* at 396, 49 S.Ct. 372. "[A]s the packer lawfully could be required to pay that sum in money," we said, "nothing in the Federal Constitution prevents the State from demanding that he give up the same per cent of such shells." *Ibid.* [1]

[1] The Court attempts to distinguish *Leonard & Leonard* because it involved wild oysters, not raisins. *Ante,* at 2430. That is not an inaccurate factual statement, but I do not find in *Leonard & Leonard* any suggestion that its holding turned on this or any other of the facts to which the Court now points. Indeed, the only citation the Court offers for these allegedly crucial facts is the Maryland Court of Appeals' opinion, not ours. See *ante,* at 2430.

Next, in *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815, we held that no taking occurred when a provision of the Federal Insecticide, Fungicide, and Rodenticide Act required companies that wished to sell certain pesticides to first submit sensitive data and trade secrets to the Environmental Protection Agency as part of a registration process. Even though the EPA was permitted to publicly disclose some of that submitted data—which would have had the effect of revealing trade secrets, thus substantially diminishing or perhaps even eliminating their value—we reasoned that, like the privilege tax in *Leonard & Leonard,* the disclosure requirement was the price Monsanto had to pay for " 'the advantage of living and doing business in

a civilized community.' " 467 U.S., at 1007, 104 S.Ct. 2862 (quoting *Andrus,* 444 U.S., at 67, 100 S.Ct. 318; some internal quotation marks omitted). We offered nary a suggestion that the law at issue could be considered a *per se* taking, and instead recognized that "a voluntary submission of data by an applicant" in exchange for the **\*2441** ability to participate in a regulated market "can hardly be called a taking." 467 U.S., at 1007, 104 S.Ct. 2862. [2]

[2] The Court claims that *Monsanto* is distinguishable for three reasons, none of which hold up. First, it seems, the Court believes the degree of the intrusion on property rights is greater here than in *Monsanto.* See *ante,* at 2430. Maybe, maybe not. But nothing in *Monsanto* suggests this is a relevant question, and the Court points to nothing saying that it is. Second, the Court believes that "[s]elling produce in interstate commerce" is not a government benefit. *Ante,* at 2430. Again, that may be true, but the Hornes are not simply selling raisins in interstate commerce. They are selling raisins in a regulated market at a price artificially inflated by Government action in that market. That is the benefit the Hornes receive, and it does not matter that they "would rather not have" received it. *United States v. Sperry Corp.,* 493 U.S. 52, 62–63, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). Third, the Court points out that raisins "are not dangerous pesticides; they are a healthy snack." *Ante,* at 2431. I could not agree more, but nothing in *Monsanto,* or in *Andrus* for that matter, turned on the dangerousness of the commodity at issue.

Finally, in *Yee v. Escondido,* 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), we addressed a mobile-home park rent-control ordinance that set rents at below-market rates. We held the ordinance did not effect a taking under *Loretto,* even when it was considered in conjunction with other state laws regarding eviction that effectively permitted tenants to remain at will, because it only regulated the terms of market participation. See 503 U.S., at 527–529, 112 S.Ct. 1522.

Understood together, these cases demonstrate that the Government may condition the ability to offer goods in the market on the giving-up of certain property interests without effecting a *per se* taking. [3] The Order is a similar regulation. It has no effect whatsoever on raisins that the Hornes grow for their own use. But insofar as the Hornes wish to sell some raisins in a market regulated by the Government and at a price supported by governmental intervention, the Order requires that they give up the right to sell a portion of those raisins at that price and instead accept disposal of them at a lower price. Given that we have held that the Government may impose

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5195   Page 32 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

a price on the privilege of engaging in a particular business without effecting a taking—which is all that the Order does—it follows that the Order at the very least does not run afoul of our *per se* takings jurisprudence. Under a different takings test, one might reach a different conclusion. But the Hornes have advanced only this narrow *per se* takings claim, and that claim fails.

3    The Court points out that, in a footnote in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), we suggested that it did not matter for takings purposes whether a property owner could avoid an intrusion on her property rights by using her property differently. See *ante,* at 2430 (quoting 458 U.S., at 439, n. 17, 102 S.Ct. 3164). But in *Yee v. Escondido,* 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), we clarified that, where a law does not on its face effect a *per se* taking, the voluntariness of a particular use of property or of entry into a particular market is quite relevant. See *id.,* at 531–532, 112 S.Ct. 1522. In other words, only when a law requires the forfeiture of *all* rights in property does it effect a *per se* taking regardless of whether the law could be avoided by a different use of the property. As discussed above, the Order is not such a law.

## III

The Court's contrary conclusion rests upon two fundamental errors. The first is the Court's breezy assertion that a *per se* taking has occurred because the Hornes "lose the entire 'bundle' of property rights in the appropriated raisins ... with the exception of" the retained interest in the equitable distribution of the proceeds from **\*2442** the disposition of the reserve raisins. *Ante,* at 2427 – 2428. But if there is a property right that has not been lost, as the Court concedes there is, then the Order has *not* destroyed each of the Hornes' rights in the reserve raisins and does *not* effect a *per se* taking. The Court protests that the retained interest is not substantial or certain enough. But while I see more value in that interest than the Court does, the bottom line is that *Loretto* does not distinguish among retained property interests that are substantial or certain enough to count and others that are not.⁴ Nor is it at all clear how the Court's approach will be administrable. How, after all, are courts, governments, or individuals supposed to know how much a property owner must be left with before this Court will bless the retained interest as sufficiently meaningful and certain?

4    The Court relies on *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), for the proposition that " '[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.' " *Ante,* at 2429. But all that means is that a *per se* taking may be said to have occurred with respect to the portion of property that has been taken even if other portions of the property have not been taken. This is of no help to the Hornes, or to the Court, because it in no way diminishes a plaintiff's burden to demonstrate a *per se* taking as to the portion of his or her property that he or she claims has been taken—here, the reserve raisins. As to that specific property, a *per se* taking occurs if and only if the *Loretto* conditions are satisfied.

One virtue of the *Loretto* test was, at least until today, its clarity. Under *Loretto,* a total destruction of all property rights constitutes a *per se* taking; anything less does not. See 458 U.S., at 441, 102 S.Ct. 3164 (noting the "very narrow" nature of the *Loretto* framework). Among the most significant doctrinal damage that the Court causes is the blurring of this otherwise bright line and the expansion of this otherwise narrow category. By the Court's lights, perhaps a 95 percent destruction of property rights can be a *per se* taking. Perhaps 90? Perhaps 60, so long as the remaining 40 is viewed by a reviewing court as less than meaningful? And what makes a retained right meaningful enough? One wonders. Indeed, it is not at all clear what test the Court has actually applied. Such confusion would be bad enough in any context, but it is especially pernicious in the area of property rights. Property owners should be assured of where they stand, and the government needs to know how far it can permissibly go without tripping over a categorical rule.

The second overarching error in the Court's opinion arises from its reliance on what it views as the uniquely physical nature of the taking effected by the Order. This, it says, is why many of the cases having to do with so-called regulatory takings are inapposite. See *ante,* at 2428 – 2430. It is not the case, however, that Government agents acting pursuant to the Order are storming raisin farms in the dark of night to load raisins onto trucks. But see Tr. of Oral Arg. 30 (remarks of ROBERTS, C.J.). The Order simply requires the Hornes to set aside a portion of their raisins—a requirement with which the Hornes refused to comply. See 7 CFR § 989.66(b)(2); Tr. of Oral Arg. 31. And it does so to facilitate two classic regulatory goals. One is the regulatory purpose of limiting the

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5196   Page 33 of 114

Horne v. Department of Agriculture, 135 S.Ct. 2419 (2015)

192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493...

quantity of raisins that can be sold on the market. The other is the regulatory purpose of arranging the orderly disposition of those raisins whose sale would otherwise exceed the cap.

 **\*2443**  The Hornes and the Court both concede that a cap on the quantity of raisins that the Hornes can sell would not be a *per se* taking. See *ante,* at 2428; Brief for Petitioners 23, 52. The Court's focus on the physical nature of the intrusion also suggests that merely arranging for the sale of the reserve raisins would not be a *per se* taking. The rub for the Court must therefore be not that the Government is doing these things, but that it is accomplishing them by the altogether understandable requirement that the reserve raisins be physically set aside. I know of no principle, however, providing that if the Government achieves a permissible regulatory end by asking regulated individuals or entities to physically move the property subject to the regulation, it has committed a *per se* taking rather than a potential regulatory taking. After all, in *Monsanto,* the data that the pesticide companies had to turn over to the Government was presumably turned over in some physical form, yet even the Court does not call *Monsanto* a physical takings case. It therefore cannot be that any regulation that involves the slightest physical movement of property is necessarily evaluated as a *per se* taking rather than as a regulatory taking.

The combined effect of these errors is to unsettle an important area of our jurisprudence. Unable to justify its holding under our precedents, the Court resorts to superimposing new limitations on those precedents, stretching the otherwise strict *Loretto* test into an unadministrable one, and deeming

regulatory takings jurisprudence irrelevant in some undefined set of cases involving government regulation of property rights. And it does all of this in service of eliminating a type of reserve requirement that is applicable to just a few commodities in the entire country—and that, in any event, commodity producers could vote to terminate if they wished. See Letter from Solicitor General to Clerk of Court (Apr. 29, 2015); 7 U.S.C. § 608c(16)(B); 7 CFR § 989.91(c). This intervention hardly strikes me as worth the cost, but what makes the Court's twisting of the doctrine even more baffling is that it ultimately instructs the Government that it can permissibly achieve its market control goals by imposing a quota without offering raisin producers a way of reaping any return whatsoever on the raisins they cannot sell. I have trouble understanding why anyone would prefer that.

\* \* \*

Because a straightforward application of our precedents reveals that the Hornes have not suffered a *per se* taking, I would affirm the judgment of the Ninth Circuit. The Court reaches a contrary conclusion only by expanding our *per se* takings doctrine in a manner that is as unwarranted as it is vague. I respectfully dissent.

**All Citations**

135 S.Ct. 2419, 192 L.Ed.2d 388, 83 USLW 4503, 15 Cal. Daily Op. Serv. 6493, 2015 Daily Journal D.A.R. 7020, 25 Fla. L. Weekly Fed. S 421

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

100 S.Ct. 318
Supreme Court of the United States

Cecil D. ANDRUS, Secretary of
the Interior, et al., Appellants,

v.

L. Douglas ALLARD et al.

No. 78-740.
|
Argued Oct. 1, 1979.
|
Decided Nov. 27, 1979.

**Synopsis**

Complaint was filed challenging validity of regulations promulgated by the Secretary of Interior that prohibit commercial transaction in parts of birds legally killed before birds came under protection of Eagle Protection Act and Migratory Bird Treaty Act. A Three-Judge Court of the United States District Court for the District of Colorado ruled the regulations invalid as an unauthorized extension of the Acts and violative of Fifth Amendment property rights. On appeal, the Supreme Court, Mr. Justice Brennan, J., held that: (1) both the Eagle Protection Act and the Migratory Bird Treaty Act contemplate regulatory prohibition of commerce in parts of protected birds, without regard to when those birds are originally taken, and (2) prohibition of commercial transactions in preexisting avian artifacts under the Eagle Protection Act and the Migratory Bird Treaty Act do not violate Fifth Amendment property rights.

Reversed.

Mr. Chief Justice Burger concurred in judgment.

**\*\*319   \*51**   *Syllabus* [*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

The Eagle Protection Act makes it unlawful to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" bald or golden eagles or any part thereof, with the proviso that the prohibition does not apply to "possession or transportation" of such eagles or parts thereof taken prior to the effective date of the Act. Similarly, the Migratory Bird Treaty Act makes it unlawful to engage in such activities with respect to migratory birds and their parts, unless they are permitted by regulations promulgated under the Act. Appellant Secretary of the Interior promulgated regulations prohibiting commercial transactions in parts of birds legally killed before they came under the protection of these Acts. After two of the appellees who had sold "pre-existing" Indian artifacts partly composed of feathers of currently protected birds were prosecuted for violations of both Acts, appellees, who are engaged in the trade of such artifacts, brought suit in District Court for declaratory and injunctive relief, alleging that the Acts do not forbid the sale of appellees' artifacts insofar as the constituent bird parts were obtained prior to the effective dates of the Acts, and that if the Acts and regulations do apply to such property, they violate the Fifth Amendment. The District Court granted the relief sought, holding that the Acts were to be interpreted as not applicable to pre-existing, legally obtained bird parts, and that therefore the regulations were void as unauthorized extensions of the Acts and were violative of appellees' Fifth Amendment property rights.

Held:

1. Both Acts contemplate regulatory prohibition of commerce in the parts of protected birds, without regard to when those birds were originally taken. Pp. 322-326.

(a) In view of the exhaustive and careful enumeration of forbidden acts in the Eagle Protection Act, the narrow limitation of the proviso to "possession or transportation" **\*\*320**  compels the conclusion that, with respect to pre-existing artifacts, Congress specifically, declined to except any activities other than *possession* and *transportation* from the general ban. The legislative history shows that this precise use of terminology **\*52**  was intentional. Moreover, the prohibition against the sale of bird parts lawfully taken before the effective date of federal protection is fully consonant with the Act's purpose of preventing evasion of the statutory prohibitions for commercial gain. Pp. 322-323.

(b) While the Migratory Bird Treaty Act contains no explicit exception for the possession or transportation of bird parts obtained before the federal protection became effective, nevertheless the text, context, and purpose of that Act support the Secretary's interpretative regulations. There is nothing in the Act that *requires* an exception for the sale of pre-existing

100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

artifacts, and no such statutory exception can be implied. The Act's structure and context also suggest congressional understanding that regulatory authorities could ban the sale of lawfully taken birds, except where otherwise expressly instructed by the Act. Pp. 323-326.

2. The simple prohibition of the sale of lawfully acquired property does not effect a taking in violation of the Fifth Amendment. The challenged regulations do not compel the surrender of the artifacts in question, and there is no physical invasion or restraint upon them. The denial of one traditional property right does not always amount to a taking. Nor is the fact that the regulations prevent the most profitable use of appellees' property dispositive, since a reduction in the value of property is not necessarily equated with a taking. Pp. 326-328.

**Attorneys and Law Firms**

Harriet S. Shapiro, Washington, D. C., for appellants.

John P. Akolt, III, Denver, Colo., for appellees.

**Opinion**

Mr. Justice BRENNAN delivered the opinion of the Court.

The Eagle Protection Act and the Migratory Bird Treaty Act are conservation statutes designed to prevent the destruction **\*53** of certain species of birds.[1] Challenged in this **\*\*321** case is the validity of regulations promulgated by appellant Secretary of the Interior that prohibit commercial transactions in parts of birds legally killed before the birds came under the **\*54** protection of the statutes. The regulations provide in pertinent part:

1    The Eagle Protection Act, § 1, 54 Stat. 250, as amended, as set forth in 16 U.S.C. § 668(a), provides in pertinent part:

"Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter,

transport, export or import, at any time or in any manner any bald eagle commonly known as the American eagle or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both: . . . *Provided further,* That nothing herein shall be construed to prohibit possession or transportation of any bald eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to June 8, 1940, and that nothing herein shall be construed to prohibit possession or transportation of any golden eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to the addition to this subchapter of the provisions relating to preservation of the golden eagle."

The Migratory Bird Treaty Act, § 2, 40 Stat. 755, as amended, as set forth in 16 U.S.C. § 703, similarly provides:

"Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation,

100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

carriage, or export, any migratory bird, any part, nest, or eggs of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, and the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972."

50 CFR § 21.2(a) (1978):

"Migratory birds, their parts, nests, or eggs, lawfully acquired prior to the effective date of Federal protection under the Migratory Bird Treaty Act . . . may be possessed or transported without a Federal permit, but may not be imported, exported, purchased, sold, bartered, or offered for purchase, sale, trade, or barter. . . ."

50 CFR § 22.2(a) (1978):

"Bald eagles, alive or dead, or their parts, nests, or eggs lawfully acquired prior to June 8, 1940, and golden eagles, alive or dead, or their parts, nests, or eggs lawfully acquired prior to October 24, 1962,

may be possessed, or transported without a Federal permit, but may not be imported, exported, purchased, sold, traded, bartered, or offered for purchase, sale, trade or barter. . . ."

Appellees are engaged in the trade of Indian artifacts: several own commercial enterprises, one is employed by such an enterprise, and one is a professional appraiser. A number of the artifacts are partly composed of the feathers of currently protected birds, but these artifacts existed before the statutory protections came into force. After two of the appellees who had sold "pre-existing" artifacts were prosecuted for violations of the Eagle Protection Act and the Migratory Bird Treaty Act,[2] appellees brought this suit for declaratory and injunctive relief in the District Court for the District of Colorado. The complaint alleged that the statutes do not **\*55** forbid the sale of appellees' artifacts insofar as the constituent birds' parts were obtained prior to the effective dates of the statutes. It further alleged that if the statutes and regulations do apply to such property, they violate the Fifth Amendment.[3]

[2] Appellee L. Douglas Allard was convicted and fined for violating the Eagle Protection Act, 16 U.S.C. § 668(a), which establishes criminal penalties for unpermitted eagle sales. *United States v. Allard,* 397 F.Supp. 429 (D.C.Mont.1975). Appellee Pierre Bovis was prosecuted under the Eagle Protection Act and under the Migratory Bird Treaty Act, 16 U.S.C. § 707, which provides criminal penalties for the unlawful sale of migratory birds. *United States v. Bovis,* Nos. 75-CR-63 and 75-CR-66 (Colo.1975).

[3] Appellees also alleged that the Migratory Bird Treaty Act and regulations thereunder were unconstitutionally vague and involved an improper delegation of legislative power to the Executive Branch. These allegations were not passed on by the District Court and are not pressed here. We therefore do not address them.

A three-judge court, convened pursuant to 28 U.S.C. § 2282 (1970 ed.),[4] held that because of "grave doubts whether these two acts would be constitutional if they were construed to apply to pre-act bird products," the Acts were to be interpreted as "not applicable to preexisting, legally-obtained bird parts or products therefrom. . . ." App. to Juris. Statement 13a-14a. Accordingly, the court ruled that "the interpretive regulations, 50 C.F.R. §§ 21.2(a) and 22.2(a) [are] void as

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5200 Page 37 of 114

Andrus v. Allard, 444 U.S. 51 (1979)
100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

unauthorized extensions of the Migratory Bird Treaty Act and the Eagle Protection Act and [are] violative of the [appellees'] Fifth Amendment property rights." *Id.*, at 14a. Judgment was entered declaring "the subject regulations to be invalid and unenforceable as against the [appellees'] property rights in feathers and artifacts owned before the effective date of the subject statute," and enjoining appellants "from any interference with the exercise of such rights, including the rights of sale, barter or exchange." **322 *Id.*, at 16a-17a. We noted probable jurisdiction. 440 U.S. 905, 99 S.Ct. 1210, 59 L.Ed.2d 452 (1979). We reverse.

4    The Secretary contends that appellees' constitutional claims are insubstantial and did not justify convention of a three-judge court. We disagree. See *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); *Hagans v. Lavine,* 415 U.S. 528, 536-538, 94 S.Ct. 1372, 1378-1380, 39 L.Ed.2d 577 (1974).

                            I

Appellant Secretary of the Interior contends that both the Eagle Protection and Migratory Bird Treaty Acts contemplate *56 regulatory prohibition of commerce in the parts of protected birds, without regard to when those birds were originally taken. Appellees respond that such a prohibition serves no purpose, arguing that statutory protection of wildlife is not furthered by am embargo upon traffic in avian artifacts that existed before the statutory safeguards came into effect.

                            A

Our point of departure in statutory analysis is the language of the enactment. See *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). "Though we may not end with the words in construing a disputed statute, one certainly begins there." F. Frankfurter, Some Reflections on the Reading of Statutes 16 (1947).

The terms of the Eagle Protection Act plainly must be read as appellant Secretary argues. The sweepingly framed prohibition in § 668(a) makes it unlawful to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" protected birds. Congress expressly dealt with the problem of pre-existing bird products by qualifying that general prohibition with the proviso that "nothing herein shall be construed to prohibit *possession or*

*transportation* " of bald or golden eagle parts taken prior to the effective date of coverage under the Act. (Emphasis supplied.)

In view of the exhaustive and careful enumeration of forbidden acts in § 668(a), the narrow limitation of the proviso to "possession or transportation" compels the conclusion that, with respect to pre-existing artifacts, Congress specifically declined to except any activities other than *possession* and *transportation* from the general activity ban. To read a further exemption for pre-existing artifacts into the Eagle Protection Act, "we would be forced to ignore the ordinary meaning of plain language." *TVA v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978). Nor can there be any question of oversight or drafting error. Throughout the statute the distinct concepts of *57 possession, transportation, taking, and sale or purchase are treated with precision. The broad proscriptive provisions of the Eagle Protection Act were consistently framed to encompass a full catalog of prohibited acts, always including sale or purchase. See §§ 668(a), 668(b), 668b(b). In contrast, the exemptions created were specifically limited to possession or transportation, § 668(a),[5] taking, § 668a,[6] or taking, possession, or transportation, *ibid.*[7]

5    Exemption for pre-existing artifacts.

6    Exemption for takings necessary to protect wildlife, livestock, or agriculture from predation.

7    Exemption for scientific, zoological, or religious needs and, in certain circumstances, for falconry.

That this precise use of terminology was intentional is clear from the legislative history. An explanatory letter from the Department of Agriculture that was adopted in the Senate Report on the bill defines the reach of the Eagle Protection Act to make it unlawful to

"take, possess, sell, purchase, transport, or otherwise deal with the bald eagle . . . with the proviso to the effect that it will not apply to the *possession* or *transportation* of any such eagle . . . taken prior to the effective date of the bill." S.Rep. No. 1589, 76th Cong., 3d Sess., 1 (1940). (Emphasis added.)

Further when Congress amended the Eagle Protection Act in 1962 to cover golden eagles, it once again excepted only possession and transportation of pre-existing artifacts from the general ban. 76 Stat. 1246. And **323 it is particularly relevant that Congress has twice reviewed and amended the

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5201   Page 38 of 114

Andrus v. Allard, 444 U.S. 51 (1979)

100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

statute without rejecting the Department's view that it is authorized to bar the sale of pre-existing artifacts.[8] Cf. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

[8]    In 1962, Congress extended the Eagle Protection Act to cover golden, as well as bald, eagles, 76 Stat. 1246, and in 1972 penalties under the statute were reinforced, 86 Stat. 1064. On each occasion-especially the latter-the purposes and scheme of the bill were considered. S.Rep. No. 1986, 87th Cong., 2d Sess. (1962); H.R.Rep. No. 1450, 87th Cong., 2d Sess. (1962); S.Rep. No. 92-1159 (1972), U.S.Code Cong. & Admin.News, p. 4285; H.R.Rep. No. 92-817 (1972). Regulations preventing the sale of pre-existing artifacts had been in force for some time preceding these amendments, see 50 CFR § 6.1 (Cum.Supp.1944); 50 CFR §§ 11.1 and 11.8(b) (1964); 50 CFR § 22.2 (1978), although the wording of the 1960 regulation may suggest otherwise, 50 CFR §§ 11.1 and 11.6(b) (1961).

**\*58**  The prohibition against the sale of bird parts lawfully taken before the effective date of federal protection is fully consonant with the purposes of the Eagle Protection Act. It was reasonable for Congress to conclude that the possibility of commercial gain presents a special threat to the preservation of the eagles because that prospect creates a powerful incentive both to evade statutory prohibitions against taking birds and to take a large volume of birds. The legislative draftsmen might well view evasion as a serious danger because there is no sure means by which to determine the age of bird feathers; feathers recently taken can easily be passed off as having been obtained long ago.[9]

[9]    See Affidavit of Dr. Alan H. Brush, App. 44-46.

Appellees argue that even if the age of feathers cannot be ascertained, it is still possible to date the Indian artifacts of which the feathers are a constituent. Thus, they contend that the goal of preventing evasion of the statute could have been achieved by means less onerous than a general sales ban: for example, by requiring documentation and appraisal of feathered artifacts. The short answer is that this legislation is not limited to the sale of feathers as part of artifacts; it broadly addresses sale or purchase of feathers and other bird parts in any shape or form. The prohibitions of the statute were devised to resist any evasion, whether in the sale of feathers as part of datable artifacts or in the sale of separate undatable bird products. Moreover, even if there were alternative ways to insure statutory evasion, Congress was free to choose the method it found most efficacious and convenient. **\*59**

"[T]he legislature . . . is authorized to pass measures for the protection of the people . . . in the exercise of the police power, and is itself the judge of the necessity or expediency of the means adopted."[10] *New York ex rel. Silz v. Hesterberg,* 211 U.S. 31, 40, 29 S.Ct. 10, 12, 53 L.Ed. 75 (1908).

[10]    Our reading of the Eagle Protection Act is not shaken by the fact that, until 1959, Alaska was exempted from the strictures of § 668. See 54 Stat. 250, amended by § 14, 73 Stat. 143. The fact that eagles could be taken, possessed, sold, and purchased in the Territory of Alaska in no way undercut the general ban on sales in the 48 States; we do not read the pre-1959 Alaska exemption as a license to sell Alaska eagles in the rest of the country, or vice versa. We are also unpersuaded by appellees' argument that the Eagle Protection Act does not apply to feathers that have lost their "identities" as elements in artifacts. This contention is bottomed on the statutory use of the word bird "part" instead of bird "product." The distinction between the terms is immaterial: for example, when Congress amended the Migratory Bird Treaty Act to specify that it applied to bird products as well as bird parts, Pub.L. 93-300, 88 Stat. 190, the Senate Report indicated that the change was a clarification rather than a substantive change in the reach of the law. S.Rep. No. 93-851, p. 3 (1974).

## B

The fundamental prohibition in the Migratory Bird Treaty Act is couched in language as expansive as that employed in the Eagle Protection Act. Title 16 U.S.C. § 703 provides that

  **\*\*324**  "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful . . . to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export"

protected birds. But the Migratory Bird Treaty Act contains no explicit exception for the possession or transportation of **\*60** bird parts obtained before the federal protection became effective: that exception is created by the Secretary's regulation. 50 CFR § 21.2 (1978). Unlike our analysis under the Eagle Protection Act, therefore, reliance upon the negative inference from a narrow statutory exemption for

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5202 Page 39 of 114

*Andrus v. Allard,* 444 U.S. 51 (1979)
100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

the transportation or possession of pre-existing artifacts is precluded. [11] Nevertheless, the text, context, and purpose of the Migratory Bird Treaty Act support the Secretary's interpretative regulations of that enactment.

[11]  The Migratory Bird Treaty Act, passed in 1918, 40 Stat. 755, predates the Eagle Protection Act by 22 years. Originally the legislation implementing a Migratory Bird Convention between Great Britain (on behalf of Canada) and the United States, the Act now implements similar treaties between this country and other nations. See generally Coggins & Patti, The Resurrection and Expansion of the Migratory Bird Treaty Act, 50 Colo.L.Rev. 165, 169-174 (1979); M. Bean, The Evolution of National Wildlife Law 68-74 (1977).

On its face, the comprehensive statutory prohibition is naturally read as forbidding transactions in all bird parts, including those that compose pre-existing artifacts. While there is no doubt that regulations may exempt transactions from the general ban, [12] nothing in the statute *requires* an exception for the sale of pre-existing artifacts. And no such statutory exception can be implied. When Congress wanted an exemption from the statutory prohibition, it provided so in unmistakable terms. Cf. 16 U.S.C. § 711. [13]

[12]  The § 703 prohibition is, by its own terms, subject to regulatory exception. See also 16 U.S.C. § 704.

[13]  "Nothing in this subchapter shall be construed to prevent the breeding of migratory game birds on farms and preserves and the sale of birds so bred under proper regulation for the purpose of increasing the food supply."

The structure and context of this enactment-to the extent that they enlighten-also suggest congressional understanding that regulatory authorities could ban the sale of lawfully **\*61** taken birds, except where otherwise expressly instructed by the statute. If Congress had assumed that lawfully taken birds could automatically be sold under the Act, it would have been unnecessary to specify in § 711 that it is permissible under certain circumstances to sell game birds lawfully bred on farms and preserves. [14] Furthermore, Congress could not have been unaware that a traditional legislative tool for enforcing conservation policy was a flat proscription on the sale of wildlife, without regard to the legality of the taking. At the time, a number of States, for example, simply prohibited or restricted possession or sale of wildlife during seasons closed to hunting. See *New York ex rel. Silz v. Hesterberg, supra,* at 40, 29 S.Ct., at 12. Also before Congress was the

Canadian law implementing the Migratory Bird Treaty, [15] and that law itself contained a provision barring the purchase, sale, or possession of protected bird parts "*during the time* when the capturing, killing, or taking of such bird, nest, or egg is prohibited by **\*\*325** law," 55 Cong.Rec. 5412 (1917). [16] (Emphasis added.) The Canadian sale ban-of which Congress was aware-thus applied not to illegally taken birds, but rather to all protected birds during the season in which hunting was prohibited. Against this background, the absence of a statutory exemption for pre-existing avian artifacts implies that the Migratory Bird Treaty Act was intended to embrace the traditional conservation technique of banning transactions in protected birds, whenever taken.

[14]  In fact, the Conference Report accepting the floor amendment that became § 711 was actually withdrawn in order to add language indicating that lawfully bred birds could be sold. See 56 Cong.Rec. 8015 (1918); *id.,* at 8130, 8430.

[15]  55 Cong.Rec. 5412-5413 (1917) (Senate); 56 Cong.Rec. 7372 (1918) (House).
Britain entered into the treaty on behalf of Canada.

[16]  The Canadian statute indicates that there might be a lawful excuse for possessing or selling birds out of season, but not what such an excuse would be.

**\*62** Related statutes may sometimes shed light upon a previous enactment. Cf. *United States v. Aluminum Co. of America,* 148 F.2d 416, 429 (CA2 1945) (L. Hand, J.). Other conservation legislation enacted by Congress has employed the enforcement technique of forbidding the sale of protected wildlife without respect to the lawfulness of the taking. The Eagle Protection Act is a notable example. The more recent Endangered Species Act of 1973, as originally framed, prohibited the sale of products or parts of endangered species, without an exception for those products legally held for commercial purposes at the time of the Act's passage. [17] See 16 U.S.C. § 1538; *United States v. Kepler,* 531 F.2d 796 (CA6 1976); *Delbay Pharmaceuticals, Inc. v. Department of Commerce,* 409 F.Supp. 637, 641-642, 644 (D.C.D.C.1976); see also H.R.Rep. No. 94-823, pp. 3-4 (1976) (discussing an amendment to the Endangered Species Act). And when Congress has meant to exempt lawfully taken items from the retroactive application of statutory prohibitions, it has taken care to do so explicitly, see 16 U.S.C. § 1372 (Marine Mammal Protection Act of 1972); 16 U.S.C. § 1538(b) (Endangered Species Act of 1973), or it has specifically amended the statute for that purpose, see 90 Stat. 911,

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5203 Page 40 of 114

*Andrus v. Allard, 444 U.S. 51 (1979)*

100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

amending 16 U.S.C. § 1539 (Endangered Species Act); 92 Stat. 3760, amending 16 U.S.C. §§ 1538 and 1539 (Endangered Species Act). In contrast, Congress has never established a pre-existing-artifacts exception to the Migratory Bird Treaty Act, even though it has amended the statute on several occasions. [18]

17    In 1976, Congress specifically amended the Act to establish a very limited sales exemption for products of animals lawfully owned for commercial purposes before the Act came into effect. Pub.L. 94-359, 90 Stat. 911, amending 16 U.S.C. § 1539. The amendment was circumscribed in scope and merely *authorized* but did not *order* the Secretary of Commerce to grant exemptions for pre-Act animal products.

18    In arguing the position that the statute prevents only the sale of illegally taken birds, appellees rely upon the language of the 1972 Migratory Bird Convention with Japan, incorporated into the Migratory Bird Treaty Act in 1974. Pub.L. 93-300, 88 Stat. 190. The Convention provides that "[a]ny sale, purchase or exchange of these [migratory] birds or their eggs, *taken illegally,* alive or dead, and any sale, purchase or exchange of the products thereof or their parts shall . . . be prohibited." (Emphasis added.) But the language of the Convention, like the terms of the other Conventions, does not carry great weight in the interpretation of the statute. There are material variations in the particulars of each of the Conventions, see Coggins & Patti, *supra* n. 11, at 173-174; Bean, *supra* n. 11, at 70-73; it is therefore hazardous to look to any single Convention for definitive resolution of a statutory construction problem. Furthermore, inasmuch as the Conventions represent binding international commitments, they establish *minimum* protections for wildlife; Congress could and did go further in developing domestic conservation measures. See *id.,* at 74-76.

**\*63** We are therefore persuaded that the Migratory Bird Treaty Act empowers the Secretary of the Interior to bar commercial transactions in covered bird parts in spite of the fact that the parts were lawfully taken before the onset of federal protection. We see no indication to the contrary. [19] It follows **\*\*326 \*64** that the Secretary could properly permit the possession or transportation, and not the sale or purchase, of pre-existing bird artifacts. [20] Accordingly, we disagree with the District Court's interpretation of the Act as inapplicable to pre-existing legally obtained bird parts.

19    Our interpretation of the statute does not depart from any course of construction adopted by other courts. Although appellees argue that several courts have

determined that lawfully taken birds may be sold under the Migratory Bird Treaty Act, we do not read the cases as supporting appellees' position. Two of the cited cases, *United States v. Hamel,* 534 F.2d 1354 (CA9 1976) (*per curiam* ), and *United States v. Blanket,* 391 F.Supp. 15 (W.D.Okl.1975), neither decide nor imply a decision as to the statutory question posed here. Language favorable to appellees in *United States v. Aitson,* No. 74-1588 (CA10, July 21, 1975), is merely dictum in an unpublished opinion. Contrast also *United States v. Richards,* 583 F.2d 491 (CA10 1978). *United States v. Marks,* 4 F.2d 420 (S.D.Tex.1925), did hold it impermissible to punish the sale of birds taken before the Migratory Bird Treaty Act was passed. But that ruling rested upon the court's view that Congress' authority to regulate the birds must rest wholly upon the treaty rather than the commerce power. Whatever the logic of that ruling, the underlying assumption that the national commerce power does not reach migratory wildlife is clearly flawed. See, *e. g., Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). Thus, only two early district court cases, both authored by the same judge, sustain the statutory proposition advanced by appellees. *United States v. Fuld Store Co.,* 262 F. 836 (D.C.Mont.1920); *In re Informations Under Migratory Bird Treaty Act,* 281 F. 546 (D.C.Mont.1922). The cases involved no more than a cursory inquiry into the statute, and we find them unconvincing.

20    Indeed, heightened restrictions on the sale or purchase of migratory bird parts were appropriate in light of congressional recognition of the danger to wildlife posed by commercial exploitation. The 1960 amendments to the Migratory Bird Treaty Act specifically addressed that problem by stiffening penalties for the taking of protected birds with intent to sell and for the sale of protected birds. 74 Stat. 866; see H.R.Rep. No. 1787, 86th Cong., 2d Sess. (1960); S.Rep. No. 1779, 86th Cong., 2d Sess. (1960), U.S.Code Cong. & Admin.News, p. 3459.

II

We also disagree with the District Court's holding that, as construed to authorize the prohibition of commercial transactions in pre-existing avian artifacts, the Eagle Protection and Migratory Bird Treaty Acts violate appellees' Fifth Amendment property rights because the prohibition wholly deprives them of the opportunity to earn a profit from those relics. [21]

21    Although this argument appears to have been cast in the District Court in terms of economic substantive due process, before this Court appellees have used the terminology of the Takings Clause.

The Secretary has raised the question of appellees' standing to assert a takings claim with respect to their artifacts. He asserts that appellees have not clearly stated that they acquired their property interest in the bird artifacts before the sales ban came into force. If they have not, the Secretary argues, then the "value of any artifacts purchased by appellees *after* the effective date of the Act had already been diminished by the applicability of the Act." Brief for Appellants 30. This contention is misplaced. Even assuming that appellees have not sufficiently alleged pre-effectiveness possession, they have standing to urge their constitutional claim. Because the regulation they challenge restricts their ability to dispose of their property, appellees have a personal, concrete, live interest in the controversy. See *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The timing of acquisition of the artifacts is relevant to a takings analysis of appellees' investment-backed expectations, but it does not erect a jurisdictional obstacle at the threshold. Of course, there is no standing to assert a takings claim by those who are merely employed in selling artifacts owned by others. All appellees, however, may face future criminal prosecutions for violations of the statutes, and that, of itself, suffices to give them standing to litigate their interest in the construction of the statutes.

**\*65** *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123-128, 98 S.Ct. 2646, 2659-2662, 57 L.Ed.2d 631 (1978), is our most recent exposition on the Takings Clause. That exposition need not be repeated at length here. Suffice it to say that government regulation-by definition-involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922); see *Penn Central, supra,* 438 U.S., at 124, 98 S.Ct., at 2659.

**\*\*327** The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " *Ibid.*; 98 S.Ct., at 2659; see *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990,

8 L.Ed.2d 130 (1962). There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. See *Penn Central, supra,* 438 U.S., at 123-128, 98 S.Ct., at 2659-2662. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic.

The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses **\*66** a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. Compare *Penn Central, supra,* at 130-131, 98 S.Ct., at 2662-2663 and *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), with *Pennsylvania Coal Co. v. Mahon, supra,* and *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961). See also Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165, 1230-1233 (1967). In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.

It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking. Compare *Goldblatt v. Hempstead, supra,* 369 U.S., at 594, 82 S.Ct., at 990, and *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), with *Pennsylvania Coal Co. v. Mahon, supra.* [22] In the instant case, it is not clear that appellees will be unable to derive economic benefit from the artifacts; for example, they might exhibit the artifacts for an admissions charge. At any rate, loss of future profits-unaccompanied by any physical property restriction-provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests. Cf., *e. g.,* Fuller & Perdue, The Reliance Interest in Contract Damages (pt. 1), 46 Yale L.J. 52 (1936).

100 S.Ct. 318, 13 ERC 2057, 62 L.Ed.2d 210, 9 Envtl. L. Rep. 20,791

22    It should be emphasized that in *Pennsylvania Coal* the loss of profit opportunity was accompanied by a physical restriction against the removal of the coal.

**\*67**  Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking. For example, the Court has sustained regulations prohibiting the sale of alcoholic beverages despite the fact that individuals were left with previously acquired stocks. *Everard's Breweries v. Day,* 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174 (1924), involved a federal statute that forbade the sale of liquors manufactured before passage of the statute. The claim of a taking in violation of the Fifth Amendment was tersely rejected. *Id.,* at 563, 44 S.Ct., at 633. [23] Similarly, in *Jacob Ruppert, Inc. v. Caffey,* 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260 (1920), a federal law that extended a domestic sales ban from intoxicating to nonintoxicating alcoholic beverages "on hand at the time of the passage of the act," *id.,* at 302, 40 S.Ct., at 150, was upheld. Mr. **\*\*328** Justice Brandeis dismissed the takings challenge, stating that "there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use." [24] *Id.,* at 303, 40 S.Ct., at 151. See *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).

23    It is not significant that the statute considered in *Everard's Breweries* had been passed under the Eighteenth (Prohibition) Amendment. The Court did not suggest that the Amendment gave Congress a special prerogative to override ordinary Fifth Amendment limitations.

24    Although the beverage owner in *Jacob Ruppert* retained the ability to export his product or to sell it domestically for purposes other than consumption, see 251 U.S., at 303, 40 S.Ct., at 151; *Hamilton v. Kentucky Distilleries Co.,* 251 U.S. 146, 157, 40 S.Ct. 106, 108, 64 L.Ed. 194 (1919), the domestic sales ban was undoubtedly commercially crippling.

    No importance should be attached to the fact that the enactment in *Jacob Ruppert* was promulgated pursuant to the war power. But cf. *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958).

It is true that appellees must bear the costs of these regulations. But, within limits, that is a burden borne to secure "the advantage of living and doing business in a civilized community." *Pennsylvania Coal Co. v. Mahon, supra,* 260 U.S., at 422, 43 S.Ct., at 163 (Brandeis, J., dissenting). We hold that the simple prohibition of the sale of lawfully acquired property in this **\*68** case does not effect a taking in violation of the Fifth Amendment. [25]

25    Appellees also briefly argue that the regulations in this case interfere with their right to engage in a lawful occupation. Even if we were inclined to exhume this variant of the theory of substantive due process, it would not be applicable here. Appellees may still sell artifacts that do not consist in part of protected bird products.

*Reversed.*

THE CHIEF JUSTICE concurs in the judgment of the Court.

## All Citations

444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210, 13 ERC 2057, 9 Envtl. L. Rep. 20,791

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5206 Page 43 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

107 S.Ct. 1232
Supreme Court of the United States

KEYSTONE BITUMINOUS COAL
ASSOCIATION, et al., Petitioners
v.
Nicholas DeBENEDICTIS, Secretary, Pennsylvania
Department of Environmental Resources, et al.

No. 85–1092.
|
Argued Nov. 10, 1986.
|
Decided March 9, 1987.

**Synopsis**

Coal companies brought action challenging Pennsylvania Subsidence Act which requires that 50 percent of the coal beneath certain structures be kept in place to provide surface support. The United States District Court for the Western District of Pennsylvania, 581 F.Supp. 511, upheld the act, and coal companies appealed. The Court of Appeals for the Third Circuit, 771 F.2d 707, affirmed, and certiorari was granted. The Supreme Court, Justice Stevens, held that: (1) there was public purpose for the Act; (2) there was no showing of the diminution of value in land resulting from the Act; (3) Act did not work unconstitutional taking on its face; (4) there was no showing of unconstitutional taking of the separate support estate recognized by Pennsylvania law; and (5) public interests in the legislation were adequate to justify impact of the Act on coal companies' contractual agreements with surface owners.

Affirmed.

Chief Justice Rehnquist dissented and filed an opinion in which Justice Powell, Justice O'Connor, and Justice Scalia joined.

**1234  *470  *Syllabus* [*]

[*]  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Section 4 of Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act (Act) prohibits coal mining that causes subsidence damage to pre-existing public buildings, dwellings, and cemeteries. Implementing regulations issued by Pennsylvania's Department of Environmental Resources (DER) require 50% of the coal beneath § 4–protected structures to be kept in place to provide surface support, and extend § 4's protection to water courses. Section 6 of the Act authorizes the DER to revoke a mining permit if the removal of coal causes damage to a § 4–protected structure or area and the operator has not within six months repaired the damage, satisfied any claim arising therefrom, or deposited the sum that repairs will reasonably cost as security. Petitioners, who own or control substantial coal reserves under Act-protected property, filed suit in Federal District Court seeking to enjoin the DER from enforcing the Act and regulations. The complaint alleged, *inter alia,* that Pennsylvania recognizes a separate "support estate" in addition to the surface and mineral estates in land; that approximately 90% of the coal petitioners will mine was severed from surface estates between 1890 and 1920; that petitioners typically acquired waivers of any damages claims that might result from coal removal; that § 4, as implemented by the 50% rule, and § 6 violate the Fifth Amendment's Takings Clause; and that § 6 violates Article I's Contracts Clause. Because petitioners had not yet alleged or proved any specific injury caused by the enforcement of §§ 4 and 6 or the regulations, the only question before the District Court was whether the mere enactment of §§ 4 and 6 and the regulations constituted a taking. The District Court granted DER's motion for summary judgment on this facial challenge. The Court of Appeals affirmed, holding that *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, does not control; that the Act does not effect a taking; and that the impairment of private contracts effectuated by the Act was justified by the public interests protected by the Act.

*471  *Held:*

1. Petitioners have not satisfied their burden of showing that §§ 4 and 6 and the regulations' 50% rule constitute a taking of **1235  private property without compensation in violation of the Fifth and Fourteenth Amendments. *Pennsylvania Coal* does not control this case because the two factors there considered relevant—the Commonwealth's interest in enacting the law and the extent of the alleged taking—here support the Act's constitutionality. Pp. 1240–1250.

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5207 Page 44 of 114
Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

(a) Unlike the statute considered in *Pennsylvania Coal,* the Act is intended to serve genuine, substantial, and legitimate public interests in health, the environment, and the fiscal integrity of the area by minimizing damage to surface areas. None of the indicia of a statute enacted solely for the benefit of private parties identified in *Pennsylvania Coal* are present here. Petitioners' argument that § 6's remedies are unnecessary to satisfy the Act's public purposes because of the Commonwealth's insurance program that reimburses repair costs is not persuasive, since the public purpose is served by deterring mine operators from causing damage in the first place by making them assume financial responsibility. Thus, the Commonwealth has merely exercised its police power to prevent activities that are tantamount to public nuisances. The character of this governmental action leans heavily against finding a taking. Pp. 1242–1246.

(b) The record in this case does not support a finding similar to the one in *Pennsylvania Coal* that the Act makes it impossible for petitioners to profitably engage in their business, or that there has been undue interference with their investment-backed expectations. Because this case involves only a facial constitutional challenge, such a finding is necessary to establish a taking. However, petitioners have never claimed that their mining operations, or even specific mines, have been unprofitable since the Act was passed; nor is there evidence that mining in any specific location affected by the 50% rule has been unprofitable. In fact, the only relevant evidence is testimony indicating that § 4 requires petitioners to leave 27 million tons (less than 2%) of their coal in place. Petitioners' argument that the Commonwealth has effectively appropriated this coal since it has no other useful purpose if not mined fails because the 27 million tons do not constitute a separate segment of property for taking law purposes. The record indicates that only 75% of petitioners' underground coal can be profitably mined in any event, and there is no showing that their reasonable "investment-backed expectations" have been materially affected by the § 4–imposed duty. Petitioners' argument that the Act constitutes a taking because it entirely destroys the value of their unique support estate also fails. As a practical matter, the support estate has value only insofar as it is used to exploit another **\*472** estate. Thus, the support estate is not a separate segment of property for takings law purposes since it constitutes just one part of the mine operators' bundle of property rights. Because petitioners retain the right to mine virtually all the coal in their mineral estates, the burden the Act places on the support estate does not constitute a taking. Moreover, since there is no evidence as to what percentage

of petitioners' support estates, either in the aggregate or with respect to any individual estate, has been affected by the Act, their Takings Clause facial challenge fails. Pp. 1246–1250.

2. Section 6 does not impair petitioners' contractual agreements in violation of Article I, § 10, of the Constitution by denying petitioners their right to hold surface owners to their contractual waivers of liability for surface damage. The Contracts Clause has not been read literally to obliterate valid exercises of the States' police power to protect the public health and welfare. Here, the Commonwealth has a significant and legitimate public interest in preventing subsidence damage to the § 4–protected buildings, cemeteries, and water courses, and has determined that the imposition of liability on coal companies is necessary to protect that interest. This determination, is entitled to deference because the Commonwealth is not a party to the **\*\*1236** contracts in question. Thus, the impairment of petitioners' right to enforce the generations-old damages waivers is amply justified by the public purposes served by the Act. Pp. 1250–1253.

771 F.2d 707 (CA 3 1985), affirmed.

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. REHNQUIST, C.J., filed a dissenting opinion, in which POWELL, O'CONNOR, and SCALIA, JJ., joined, *post,* p. ——.

**Attorneys and Law Firms**

*Rex E. Lee* argued the cause for petitioners. With him on the briefs were *Benjamin W. Heineman, Jr., Michael A. Nemeroff, Carter G. Phillips, Henry McC. Ingram,* and *Thomas C. Reed.*

*Andrew S. Gordon,* Chief Deputy Attorney General of Pennsylvania, argued the cause for respondent. With him on the brief was *LeRoy S. Zimmerman,* Attorney General.\*

\* Briefs of *amici curiae* urging reversal were filed for the Mid-Atlantic Legal Foundation et al. by *Richard B. McGlynn;* for the National Coal Association et al. by *Harold P. Quinn, Jr.;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun, Robert K. Best,* and *Lucinda Low Swartz.*

Briefs of *amici curiae* urging affirmance were filed for the State of California *ex rel.* John K. Van de Kamp et al. by *Mr. Van de Kamp,* attorney General of California, *pro se, Richard C. Jacobs, N. Gregory Taylor,* and *Theodora Berger,* Assistant Attorneys General, *Richard M. Frank,* and *Craig C.*

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5208 Page 45 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

*Thompson,* and by the Attorneys General for their respective States as follows: *John Steven Clark* of Arkansas, *Jim Smith* of Florida, *Corinne K.A. Watanabe* of Hawaii, *Linley E. Pearson,* of Indiana, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.,* of Louisiana, *Stephen H. Sachs* of Maryland, *Francis X. Bellotti* of Massachusetts, *James E. Tierney* of Maine, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Edwin L. Pittman* of Mississippi, *William L. Webster* of Missouri, *Robert M. Spire* of Nebraska, *Stephen E. Merrill* of New Hampshire, *W. Cary Edwards* of New Jersey, *Robert Abrams* of New York, *Lacy H. Thornburg* of North Carolina, *Michael Turpin* of Oklahoma, *Dave Frohnmayer* of Oregon, *Mark V. Meierhenry* of South Dakota, *W.J. Michael Cody* of Tennessee, *Jeffrey l. Amestoy* of Vermont, *Kenneth O. Eikenberry* of Washington, and *Bronson C. La Follette* of Wisconsin; for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch,* and *Robert H. Freilich;* and for the Pennsylvania State Grange et al. by *K.W. James Rochow.*

## Opinion

**\*473** Justice STEVENS, delivered the opinion of the Court.

In *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Court reviewed the constitutionality of a Pennsylvania statute that admittedly destroyed "previously existing rights of property and contract." *Id.,* at 413, 43 S.Ct., at 159. Writing for the Court, Justice Holmes explained:

> "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. **\*474** So the question depends upon the particular facts." *Ibid.*

In that case the "particular facts" led the Court to hold that the Pennsylvania Legislature had gone beyond its constitutional powers when it enacted a statute prohibiting the mining of anthracite coal in a manner that would cause the subsidence of land on which certain structures were located.

Now, 65 years later, we address a different set of "particular facts," involving the Pennsylvania Legislature's 1966 conclusion that the Commonwealth's existing mine subsidence legislation had failed to protect the public interest in safety, land conservation, preservation of affected municipalities' tax bases, and land development in the Commonwealth. Based on detailed findings, the legislature enacted the Bituminous Mine Subsidence and Land Conservation Act (Subsidence Act or the Act), Pa.Stat.Ann., Tit. 52, § 1406.1 *et seq.* (Purdon Supp.1986). Petitioners contend, relying heavily on our decision in *Pennsylvania Coal,* that §§ 4 and 6 of the Subsidence Act and certain implementing regulations violate the Takings Clause, and that § 6 of the Act violates the Contracts Clause of the Federal Constitution. The District Court and the Court of Appeals concluded that *Pennsylvania Coal* does not control for several reasons and that our subsequent cases make it clear that neither § 4 nor § 6 is unconstitutional on its face. We agree.

I

Coal mine subsidence is the lowering of strata overlying a coal mine, including the land surface, caused by the extraction of underground coal. This lowering of the strata can have devastating effects.[1] It often causes substantial damage **\*475** to foundations, walls, other structural members, **\*\*1237** and the integrity of houses and buildings. Subsidence frequently causes sinkholes or troughs in land which make the land difficult or impossible to develop. Its effect on farming has been well documented—many subsided areas cannot be plowed or properly prepared. Subsidence can also cause the loss of groundwater and surface ponds.[2] In short, it presents the type of environmental concern that has been the focus of so much federal, state, and local regulation in recent decades.[3]

---

1    See generally Department of the Interior, Lee & Abel, Subsidence from Underground Mining: Environmental Analysis and Planning Considerations, Geological Survey Circular 2–12, p. 876 (1983); P. Mavrolas & M. Schechtman, Coal Mine Subsidence 6–8 (1981); Blazey & Strain, Deep Mine Subsidence—State Law and the Federal Response, 1 Eastern Mineral Law Foundation § 1.01, pp. 1–5 (1980); Department of the Interior, Bureau of Mines, Moebs, Subsidence Over Four Room-and-Pillar Sections in Southwestern Pennsylvania, R18645 (1982); H.R.Rep. No. 95–218, p. 126 (1977).

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5209 Page 46 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

2    "Wherever [subsidence effects] extend, damage can
     occur to buildings, roads, pipelines, cables, streams,
     water impoundments, wells, and aquifers. Buildings can
     be cracked or tilted; roads can be lowered or cracked;
     streams, water impoundments, and aquifers can all be
     drained into the underground excavations. Oil and gas
     wells can be severed, causing their contents to migrate
     into underground mines, into aquifers, and even into
     residential basements. Sewage lines, gas lines, and water
     lines can all be severed, as can telephone and electric
     cables." Blazey & Strain, *supra*, § 1.01[2].

3    Indeed, in 1977, Congress passed the Federal Surface
     Mining Control and Reclamation Act, 91 Stat. 445, 30
     U.S.C. § 1201 *et seq.*, which includes regulation of
     subsidence caused by underground coal mining. See 30
     U.S.C. § 1266.

Despite what their name may suggest, neither of the
"full extraction" mining methods currently used in western
Pennsylvania [4] enables miners to extract all subsurface coal;
considerable amounts need to be left in the ground to provide
access, support, and ventilation to the mines. Additionally,
mining companies have long been required by various
Pennsylvania laws and regulations, the legitimacy of which is
not challenged here, to leave coal in certain areas for public
safety reasons. [5] Since 1966, Pennsylvania has placed an
additional set of restrictions on the amount of coal that may be
**\*476** extracted; these restrictions are designed to diminish
subsidence and subsidence damage in the vicinity of certain
structures and areas.

4    The two "full extraction" coal mining methods in use in
     western Pennsylvania are the room and pillar method,
     and the longwall method. App. 90–91.

5    For example, Pennsylvania law requires that coal beneath
     and adjacent to certain large surface bodies of water be
     left in place. Pa.Stat.Ann., Tit. 52, § 3101 *et seq.* (Purdon
     1966).

Pennsylvania's Subsidence Act authorizes the Pennsylvania
Department of Environmental Resources (DER) to
implement and enforce a comprehensive program to prevent
or minimize subsidence and to regulate its consequences.
Section 4 of the Subsidence Act, Pa.Stat.Ann., Tit. 52, §
1406.4 (Purdon Supp.1986), prohibits mining that causes
subsidence damage to three categories of structures that
were in place on April 17, 1966: public buildings and
noncommercial buildings generally used by the public;
dwellings used for human habitation; and cemeteries. [6]
Since 1966 the **\*\*1238** DER has applied **\*477** a formula

that generally requires 50% of the coal beneath structures
protected by § 4 to be kept in place as a means of
providing surface support. [7] Section 6 of the Subsidence
Act, Pa.Stat.Ann., Tit. 52, § 1406.6 (Purdon Supp.1986),
authorizes the DER to revoke a mining permit if the removal
of coal causes damage to a structure or area protected by § 4
and the operator has not within six months either repaired the
damage, satisfied any claim arising therefrom, or deposited a
sum equal to the reasonable cost of repair with the DER as
security. [8]

6    Section 4 provides:
     "Protection of surface structures against damage from
     cave-in, collapse, or subsidence
     "In order to guard the health, safety and general welfare
     of the public, no owner, operator, lessor, lessee, or
     general manager, superintendent or other person in
     charge of or having supervision over any bituminous coal
     mine shall mine bituminous coal so as to cause damage
     as a result of the caving-in, collapse or subsidence of the
     following surface structures in place on April 27, 1966,
     overlying or in the proximity of the mine:
     "(1) Any public building or any noncommercial structure
     customarily used by the public, including but not being
     limited to churches, schools, hospitals, and municipal
     utilities or municipal public service operations.
     "(2) Any dwelling used for human habitation; and
     "(3) Any cemetery or public burial ground; unless the
     current owner of the structure consents and the resulting
     damage is fully repaired or compensated."
     In response to the enactment in 1977 of the Federal
     Surface Mining Control and Reclamation Act, 91
     Stat. 445, 30 U.S.C. § 1201 *et seq.*, and regulations
     promulgated by the Secretary of the Interior in 1979,
     44 Fed.Reg. 14902, the Pennsylvania DER adopted
     new regulations extending the statutory protection to
     additional classes of buildings and surface features.
     Particularly:
     (a)(1) public buildings and non-commercial buildings
     customarily used by the public [after April 27, 1966],
     including churches, schools, hospitals, courthouses, and
     government offices;
     ———————
     "(4) perennial streams and impoundments of water with
     the storage volume of 20 acre feet;
     "(5) aquifers which serve as a significant source of water
     supply to any public water system; and
     "(6) coal refuse disposa[l]" areas. 25 Pa.Code §§
     89.145(a) and 89.146(b) (1983).

7    The regulations define the zone for which the 50% rule
     applies:

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

"(2) The support area shall be rectangular in shape and determined by projecting a 15 degree angle of draw from the surface to the coal seam, beginning 15 feet from each side of the structure. For a structure on a surface slope of 5.0% or greater, the support area on the downslope side of the structure shall be extended an additional distance, determined by multiplying the depth of the overburden by the percentage of the surface slope." § 89.146(b)(2).

However, this 50% requirement is neither an absolute floor nor ceiling. It may be waived by the Department upon a showing that alternative measures will prevent subsidence damage. § 89.146(b)(5). Alternatively, more stringent measures may be imposed, or mining may be prohibited, if it appears that leaving 50% of the coal in place will not provide adequate support. § 89.146(b)(4).

8   Although some subsidence eventually occurs over every underground mine, the extent and timing of the subsidence depends upon a number of factors, including the depth of the mining, the geology of the overlying strata, the topography of the surface, and the method of coal removal. The DER believes that the support provided by its 50% rule will last in almost all cases for the life of the structure being protected. Since 1966, petitioners have mined under approximately 14,000 structures or areas protected by § 4; there have been subsidence damage claims with respect to only 300. Stipulations of Counsel 41 and 42, App. 90.

## *478  II

In 1982, petitioners filed a civil rights action in the United States District Court for the Western District of Pennsylvania seeking to enjoin officials of the DER from enforcing the Subsidence Act and its implementing regulations. Petitioners are an association of coal mine operators, and four corporations that are engaged, either directly or through affiliates, in underground mining of bituminous coal in western Pennsylvania. The members of the association and the corporate petitioners own, lease, or otherwise control substantial coal reserves beneath the surface of property affected by the Subsidence Act. The defendants in the action, respondents here, are the Secretary of the DER, the Chief of the DER's Division of Mine Subsidence, and the Chief of the DER's Section on Mine Subsidence Regulation.

The complaint alleges that Pennsylvania recognizes three separate estates in land: The mineral estate; the surface estate; and the "support estate." Beginning well over 100 years ago, landowners began severing title to underground coal and the right of surface support while retaining or conveying away ownership of the surface estate. It is stipulated that approximately 90% of the coal that is or will be mined by petitioners in western Pennsylvania was severed from the surface in the period between 1890 and 1920. When acquiring or retaining the mineral estate, petitioners or their predecessors typically acquired or retained certain additional rights that would enable them to extract and remove the coal. Thus, they acquired the right to deposit wastes, to provide for drainage and ventilation, and to erect facilities such as tipples, roads, or railroads, on the surface. Additionally, they typically acquired a waiver of any claims for damages that might result from the removal of the coal.

In the portions of the complaint that are relevant to us, petitioners alleged that both § 4 of the Subsidence Act, as implemented  *479  by the 50% rule, and § 6 of the Subsidence Act, constitute a taking of their private property without compensation in violation of the Fifth and Fourteenth Amendments. They also alleged that § 6 impairs their contractual agreements in violation of  **1239  Article I, § 10, of the Constitution.[9] The parties entered into a stipulation of facts pertaining to petitioners' facial challenge, and filed cross-motions for summary judgment on the facial challenge. The District Court granted respondents' motion.

9   Petitioners also challenged various other portions of the Subsidence Act below, see 771 F.2d 707, 718–719 (1985); 581 F.Supp. 511, 513, 519–520 (1984), but have not pursued these claims in this Court.

In rejecting petitioners' Takings Clause claim, the District Court first distinguished *Pennsylvania Coal,* primarily on the ground that the Subsidence Act served valid public purposes that the Court had found lacking in the earlier case. 581 F.Supp. 511, 516 (W.D.Pa.1984). The District Court found that the restriction on the use of petitioners' property was an exercise of the Commonwealth's police power, justified by Pennsylvania's interest in the health, safety, and general welfare of the public. In answer to petitioners' argument that the Subsidence Act effectuated a taking because a separate, recognized interest in realty—the support estate—had been entirely destroyed, the District Court concluded that under Pennsylvania law the support estate consists of a bundle of rights, including some that were not affected by the Act. That the right to cause damage to the surface may constitute the most valuable "strand" in the bundle of rights possessed by the owner of a support estate was not considered controlling under our decision in *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5211 Page 48 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

In rejecting petitioners' Contracts Clause claim, the District Court noted that there was no contention that the Subsidence **\*480** Act or the DER regulations had impaired any contract to which the Commonwealth was a party. Since only private contractual obligations had been impaired, the court considered it appropriate to defer to the legislature's determinations concerning the public purposes served by the legislation. The court found that the adjustment of the rights of the contracting parties was tailored to those "significant and legitimate" public purposes. 581 F.Supp., at 514. At the parties' request, the District Court certified the facial challenge for appeal.

The Court of Appeals affirmed, agreeing that *Pennsylvania Coal* does not control because the Subsidence Act is a legitimate means of "protect[ing] the environment of the Commonwealth, its economic future, and its well-being." 771 F.2d 707, 715 (1985). The Court of Appeals' analysis of the Subsidence Act's effect on petitioners' property differed somewhat from the District Court's, however. In rejecting the argument that the support estate had been entirely destroyed, the Court of Appeals did not rely on the fact that the support estate itself constitutes a bundle of many rights, but rather considered the support estate as just one segment of a larger bundle of rights that invariably includes either the surface estate or the mineral estate. As Judge Adams explained:

"To focus upon the support estate separately when assessing the diminution of the value of plaintiffs' property caused by the Subsidence Act therefore would serve little purpose. The support estate is more properly viewed as only one 'strand' in the plaintiff's 'bundle' of property rights, which also includes the mineral estate. As the Court stated in *Andrus*, '[t]he destruction of one "strand" of the bundle is not a taking because the aggregate must be viewed in its entirety.' 444 U.S. at 65 [100 S.Ct. at 326].... The use to which the mine operators wish to put the support estate is forbidden. However, because the plaintiffs still possess valuable mineral rights that enable **\*481** them profitably to mine coal, subject only to the Subsidence Act's requirement that they prevent subsidence, their entire 'bundle' of property rights has not been destroyed." *Id.*, at 716.

With respect to the Contracts Clause claim, the Court of Appeals agreed with the District Court that a higher degree of deference should be afforded to legislative determinations respecting economic and social **\*\*1240** legislation affecting wholly private contracts than when the State impairs its own agreements. The court held that the impairment of private agreements effectuated by the Subsidence Act was justified by the legislative finding "that subsidence damage devastated many surface structures and thus endangered the health, safety, and economic welfare of the Commonwealth and its people." *Id.*, at 718. We granted certiorari, 475 U.S. 1080, 106 S.Ct. 1456, 89 L.Ed.2d 714 (1986), and now affirm.

III

Petitioners assert that disposition of their takings claim [10] calls for no more than a straightforward application of the Court's decision in *Pennsylvania Coal Co. v. Mahon.* Although there are some obvious similarities between the cases, we agree with the Court of Appeals and the District Court that the similarities are far less significant than the differences, and that *Pennsylvania Coal* does not control this case.

[10] "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amdt. 5. This restriction is applied to the States through the Fourteenth Amendment. See *Chicago B. & Q. R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

In *Pennsylvania Coal,* the Pennsylvania Coal Company had served notice on Mr. and Mrs. Mahon that the company's mining operations beneath their premises would soon reach a point that would cause subsidence to the surface. The Mahons filed a bill in equity seeking to enjoin the coal company from removing any coal that would cause "the caving in, collapse **\*482** or subsidence" of their dwelling. The bill acknowledged that the Mahons owned only "the surface or right of soil" in the lot, and that the coal company had reserved the right to remove the coal without any liability to the owner of the surface estate. Nonetheless, the Mahons asserted that Pennsylvania's then recently enacted Kohler Act of 1921, P.L. 1198, Pa.Stat.Ann., Tit. 52, § 661 *et seq.* (Purdon 1966), which prohibited mining that caused subsidence under certain structures, entitled them to an injunction.

After initially having entered a preliminary injunction pending a hearing on the merits, the Chancellor soon dissolved it, observing:

"[T]he plaintiffs' bill contains no averment on which to base by implication or otherwise any finding of fact that any interest public or private is involved in the defendant's proposal to mine the coal except the private interest of the

Case 2:19-cv-00037-JNP  Document 59-33  Filed 11/30/22  PageID.5212  Page 49 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

plaintiffs in the prevention of private injury." Tr. of Record in *Pennsylvania Coal v. Mahon,* O.T. 1922, No. 549, p. 23.

The Pennsylvania Supreme Court reversed, concluding that the Kohler Act was a proper exercise of the police power. 274 Pa. 489, 118 A. 491 (1922). One Justice dissented. He concluded that the Kohler Act was not actually intended to protect lives and safety, but rather was special legislation enacted for the sole benefit of the surface owners who had released their right to support. *Id.,* at 512–518, 118 A., at 499–501.

The company promptly appealed to this Court, asserting that the impact of the statute was so severe that "a serious shortage of domestic fuel is threatened." Motion to Advance for Argument in *Pennsylvania Coal v. Mahon,* O.T. 1922, No. 549, p. 3. The company explained that until the Court ruled, "no anthracite coal which is likely to cause surface subsidence can be mined," and that strikes were threatened **\*483** throughout the anthracite coal fields.[11] In its argument in this Court, the company contended that the Kohler Act was not a bona fide exercise of the police power, but in reality was nothing more than " 'robbery under the forms of law' " because its purpose was "not to protect the lives or safety **\*\*1241** of the public generally but merely to augment the property rights of a favored few." See 260 U.S., at 396–398, 43 S.Ct., at 159, quoting *Loan Assn. v. Topeka,* 20 Wall. 655, 664, 22 L.Ed. 455 (1874).

11    The urgency with which the case was treated is evidenced by the fact that the Court issued its decision less than a month after oral argument; a little over a year after the test case had been commenced.

Over Justice Brandeis' dissent, this Court accepted the company's argument. In his opinion for the Court, Justice Holmes first characteristically decided the specific case at hand in a single, terse paragraph:

"This is the case of a single private house. No doubt there is a public interest even in this, as there is in every purchase and sale and in all that happens within the commonwealth. Some existing rights may be modified even in such a case. *Rideout v. Knox,* 148 Mass. 368 [19 N.E. 390]. But usually in ordinary private affairs the public interest does not warrant much of this kind of interference. A source of damage to such a house is not a public nuisance even if similar damage is inflicted on others in different places. The damage is not common or public. *Wesson v. Washburn Iron Co.,* 13 Allen, 95, 103. The extent of the public interest

is shown by the statute to be limited, since the statute ordinarily does not apply to land when the surface is owned by the owner of the coal. Furthermore, it is not justified as a protection of personal safety. That could be provided for by notice. Indeed the very foundation of this bill is that the defendant gave timely notice of its intent to mine under the house. On the other hand the extent of the taking is great. It purports to abolish what is recognized in Pennsylvania as an estate in **\*484** land—a very valuable estate—and what is declared by the Court below to be a contract hitherto binding the plaintiffs. If we were called upon to deal with the plaintiffs' position alone, we should think it clear that the statute does not disclose a public interest sufficient to warrant so extensive a destruction of the defendant's constitutionally protected rights." 260 U.S., at 413–414, 43 S.Ct., at 159.

Then—uncharacteristically—Justice Holmes provided the parties with an advisory opinion discussing "the general validity of the Act."[12] In the advisory portion of the Court's opinion, Justice Holmes rested on two propositions, both critical to the Court's decision. First, because it served only private interests, not health or safety, the Kohler Act could not be "sustained as an exercise of the police power." *Id.,* at 414, 43 S.Ct., at 159. Second, the statute made it "commercially impracticable" to mine "certain coal" in the areas affected by the Kohler Act.[13]

12    "But the case has been treated as one in which the general validity of the act should be discussed. The Attorney General of the State, the City of Scranton, and the representatives of other extensive interests were allowed to take part in the argument below and have submitted their contentions here. It seems, therefore, to be our duty to go farther in the statement of our opinion, in order that it may be known at once, and that further suits should not be brought in vain." 260 U.S., at 414, 43 S.Ct., at 159.

13    "What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it. This we think that we are warranted in assuming that the statute does." *Id.,* at 414–415, 43 S.Ct. at 159–160.
      This assumption was not unreasonable in view of the fact that the Kohler Act may be read to prohibit mining that causes any subsidence—not just subsidence that results in damage to surface structures. The record in this

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5213 Page 50 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

case indicates that subsidence will almost always occur eventually. See n. 8, *supra.*

The holdings and assumptions of the Court in *Pennsylvania Coal* provide obvious and necessary reasons for distinguishing *Pennsylvania Coal* from the case before us today. ***485** The two factors that the Court considered relevant, have become integral parts of our takings analysis. We have held that land use regulation can effect a taking if it "does not substantially advance legitimate state interests, ... or denies an owner economically viable use of his land." ****1242** *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (citations omitted); see also *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Application of these tests to petitioners' challenge demonstrates that they have not satisfied their burden of showing that the Subsidence Act constitutes a taking. First, unlike the Kohler Act, the character of the governmental action involved here leans heavily against finding a taking; the Commonwealth of Pennsylvania has acted to arrest what it perceives to be a significant threat to the common welfare. Second, there is no record in this case to support a finding, similar to the one the Court made in *Pennsylvania Coal,* that the Subsidence Act makes it impossible for petitioners to profitably engage in their business, or that there has been undue interference with their investment-backed expectations.

*The Public Purpose*

Unlike the Kohler Act, which was passed upon in *Pennsylvania Coal,* the Subsidence Act does not merely involve a balancing of the private economic interests of coal companies against the private interests of the surface owners. The Pennsylvania Legislature specifically found that important public interests are served by enforcing a policy that is designed to minimize subsidence in certain areas. Section 2 of the Subsidence Act provides:

"This act shall be deemed to be an exercise of the police powers of the Commonwealth for the protection of the health, safety and general welfare of the people of the Commonwealth, by providing for the conservation of surface land areas which may be affected in the mining of bituminous coal by methods other than 'open pit' or ***486** 'strip' mining, to aid in the protection of the safety of the public, to enhance the value of such lands for taxation, to aid in the preservation of surface water drainage and public water supplies and generally to improve the use and enjoyment of such lands and to maintain primary

jurisdiction over surface coal mining in Pennsylvania." Pa.Stat.Ann., Tit. 52, § 1406.2 (Purdon Supp.1986).

The District Court and the Court of Appeals were both convinced that the legislative purposes [14] set forth in the statute were genuine, substantial, and legitimate, and we have no reason to conclude otherwise. [15]

14    The legislature also set forth rather detailed findings about the dangers of subsidence and the need for legislation. See Pa.Stat.Ann., Tit. 52, § 1406.3 (Purdon Supp.1986).

15    "We are not disposed to displace the considered judgment of the Court of Appeals on an issue whose resolution is so contingent upon an analysis of state law." *Runyon v. McCrary,* 427 U.S. 160, 181, 96 S.Ct. 2586, 2599, 49 L.Ed.2d 415 (1976).

None of the indicia of a statute enacted solely for the benefit of private parties identified in Justice Holmes' opinion are present here. First, Justice Holmes explained that the Kohler Act was a "private benefit" statute since it "ordinarily does not apply to land when the surface is owned by the owner of the coal." 260 U.S., at 414, 43 S.Ct. at 159. The Subsidence Act, by contrast, has no such exception. The current surface owner may only waive the protection of the Act if the DER consents. See 25 Pa. Code § 89.145(b) (1983). Moreover, the Court was forced to reject the Commonwealth's safety justification for the Kohler Act because it found that the Commonwealth's interest in safety could as easily have been accomplished through a notice requirement to landowners. The Subsidence Act, by contrast, is designed to accomplish a number of widely varying interests, with reference to which petitioners have not suggested alternative methods through which the Commonwealth could proceed.

Petitioners argue that at least § 6, which requires coal companies to repair subsidence damage or pay damages to those ***487** who suffer subsidence damage, is unnecessary because the Commonwealth administers an insurance program that adequately reimburses surface owners for the cost ****1243** of repairing their property. But this argument rests on the mistaken premise that the statute was motivated by a desire to protect private parties. In fact, however, the public purpose that motivated the enactment of the legislation is served by preventing the damage from occurring in the first place—in the words of the statute—"by providing for the conservation of surface land areas." Pa.Stat.Ann., Tit. 52, § 1406.2 (Purdon Supp.1986). The requirement that the mine

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5214 Page 51 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

operator assume the financial responsibility for the repair of damaged structures deters the operator from causing the damage at all—the Commonwealth's main goal—whereas an insurance program would merely reimburse the surface owner after the damage occurs. [16]

[16]  We do not suggest that courts have "a license to judge the effectiveness of legislation," *post*, at 1255, n. 3, or that courts are to undertake "least restrictive alternative" analysis in deciding whether a state regulatory scheme is designed to remedy a public harm or is instead intended to provide private benefits. That a land use regulation may be somewhat overinclusive or underinclusive is, of course, no justification for rejecting it. See *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388–389, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). But, on the other hand, *Pennsylvania Coal* instructs courts to examine the operative provisions of a statute, not just its stated purpose, in assessing its true nature. In *Pennsylvania Coal,* that inquiry led the Court to reject the Pennsylvania Legislature's stated purpose for the statute, because the "extent of the public interest is shown by the statute to be limited." 260 U.S., at 413–414, 43 S.Ct., at 159. In this case, we, the Court of Appeals, and the District Court, have conducted the same type of inquiry the Court in *Pennsylvania Coal* conducted, and have determined that the details of the statute do not call the stated public purposes into question.

Thus, the Subsidence Act differs from the Kohler Act in critical and dispositive respects. With regard to the Kohler Act, the Court believed that the Commonwealth had acted only to ensure against damage to some private landowners' homes. Justice Holmes stated that if the private individuals needed support for their structures, they should not have **\*488** "take[n] the risk of acquiring only surface rights." 260 U.S., at 416, 43 S.Ct., at 160. Here, by contrast, the Commonwealth is acting to protect the public interest in health, the environment, and the fiscal integrity of the area. That private individuals erred in taking a risk cannot estop the Commonwealth from exercising its police power to abate activity akin to a public nuisance. The Subsidence Act is a prime example that "circumstances may so change in time ... as to clothe with such a [public] interest what at other times ... would be a matter of purely private concern." *Block v. Hirsh,* 256 U.S. 135, 155, 41 S.Ct. 458, 459, 65 L.Ed. 865 (1921).

In *Pennsylvania Coal* the Court recognized that the nature of the State's interest in the regulation is a critical factor in determining whether a taking has occurred, and thus whether compensation is required. [17]  The Court distinguished the case before it from a case it had decided eight years earlier, *Plymouth Coal Co. v. Pennsylvania,* 232 U.S. 531, 34 S.Ct. 359, 58 L.Ed. 713 (1914). There, "it was held competent for the legislature to require a pillar of coal to be left along the line of adjoining property." *Pennsylvania Coal,* 260 U.S., at 415, 43 S.Ct., at 160. Justice Holmes explained that unlike the Kohler Act, the statute challenged in *Plymouth Coal* dealt with "a requirement for the safety of employees invited into the mine, and secured an average reciprocity of advantage that has been recognized as a justification of various laws." 260 U.S., at 415, 43 S.Ct., at 160.

[17]  In his dissent, Justice Brandeis argued that the State has an absolute right to prohibit land use that amounts to a public nuisance. *Id.,* 260 U.S., at 417, 43 S.Ct., at 160. Justice Holmes' opinion for the Court did not contest that proposition, but instead took issue with Justice Brandeis' conclusion that the Kohler Act represented such a prohibition. *Id.,* at 413–414, 43 S.Ct., at 159.

Many cases before and since *Pennsylvania Coal* have recognized that the nature of the State's action is critical in takings analysis. [18]  In **\*\*1244  \*489** *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), for example, a Kansas distiller who had built a brewery while it was legal to do so challenged a Kansas constitutional amendment which prohibited the manufacture and sale of intoxicating liquors. Although the Court recognized that the "buildings and machinery constituting these breweries are of little value" because of the Amendment, *id.,* at 657, 8 S.Ct., at 294, Justice Harlan explained that a

[18]  Of course, the type of taking alleged is also an often critical factor. It is well settled that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, see, *e.g., United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). While the Court has almost invariably found that the permanent physical occupation of property constitutes a taking, see *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–438, 102 S.Ct. 3164, 3175–3177, 73 L.Ed.2d 868 (1982), the Court has repeatedly upheld regulations that destroy or adversely affect real property interests. See, *e.g., Connolly v. Pension Benefit Guaranty Corporation,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986);

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5215 Page 52 of 114
Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

*Penn Central Transportation Co. v. New York City,* 438 U.S., at 125, 98 S.Ct., at 2659; *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 674, n. 8, 96 S.Ct. 2358, 2362, n. 8, 49 L.Ed.2d 132 (1976); *Goldblatt v. Hempstead,* 369 U.S. 590, 592–593, 82 S.Ct. 987, 988–989, 8 L.Ed.2d 130 (1962); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Gorieb v. Fox,* 274 U.S. 603, 608, 47 S.Ct. 675, 677, 71 L.Ed. 1228 (1927); *Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909). This case, of course, involves land use regulation, not a physical appropriation of petitioners' property.

"prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property.... The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Id.,* at 668–669, 8 S.Ct., at 300–301.

**\*490** See also *Plymouth Coal Co., supra; Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); *Reinman v. Little Rock,* 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900 (1915); *Powell v. Pennsylvania,* 127 U.S. 678, 8 S.Ct. 992, 32 L.Ed. 253 (1888).

We reject petitioners' implicit assertion that *Pennsylvania Coal* overruled these cases which focused so heavily on the nature of the State's interest in the regulation. Just five years after the *Pennsylvania Coal* decision, Justice Holmes joined the Court's unanimous decision in *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), holding that the Takings Clause did not require the State of Virginia to compensate the owners of cedar trees for the value of the trees that the State had ordered destroyed. The trees needed to be destroyed to prevent a disease from spreading to nearby apple orchards, which represented a far more valuable resource. In upholding the state action, the Court did not consider it necessary to "weigh with nicety the question whether the infected cedars constitute a nuisance according to common law; or whether they may be so declared by statute." *Id.,* at 280, 48 S.Ct., at 247. Rather, it was clear that the State's exercise of its police power to prevent the impending danger was justified, and did not require compensation. See also

*Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Omnia Commercial Co. v. United States,* 261 U.S. 502, 509, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923). Other subsequent cases reaffirm the important role that the nature of the state action plays in our takings analysis. See *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Consolidated Rock Products Co. v. Los Angeles,* 57 Cal.2d 515, 20 Cal.Rptr. 638, 370 P.2d 342, appeal dism'd, **\*1245** 371 U.S. 36, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). As the Court explained in *Goldblatt* : "Although a comparison of values before and after" a regulatory action "is relevant, ... it is by no means conclusive...." 369 U.S., at 594, 82 S.Ct., at 990. [19]

[19] See also *Agins v. Tiburon,* 447 U.S. 255, 261, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (the question whether a taking has occurred "necessarily requires a weighing of private and public interests"); *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 163, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980) ("No police power justification is offered for the deprivation").

**\*491** The Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances is consistent with the notion of "reciprocity of advantage" that Justice Holmes referred to in *Pennsylvania Coal.* [20] Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. [21] See *Penn Central Transportation Co. v. New York City,* 438 U.S., at 144–150, 98 S.Ct., at 2669–2672 (REHNQUIST, J., dissenting); cf. *California Reduction Co. v. Sanitary Reduction Works,* 199 U.S. 306, 322, 26 S.Ct. 100, 104, 50 L.Ed. 204 (1905). These restrictions are "properly treated as part of the burden of common citizenship." *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949). Long ago it was recognized that "all property in **\*492** this country is held under the implied obligation that the owner's use of it shall not be injurious to the community," *Mugler v. Kansas,* 123 U.S., at 665, 8 S.Ct., at 299; see also *Beer Co. v. Massachusetts,* 97 U.S. (7 Otto) 25, 32, 24 L.Ed. 989 (1877), and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it. [22] See *Mugler,* 123 U.S., at 664, 8 S.Ct., at 298.

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5216 Page 53 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

20    The special status of this type of state action can also be understood on the simple theory that since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not "taken" anything when it asserts its power to enjoin the nuisance-like activity. Cf. Sax, Takings, Private Property and Public Rights, 81 Yale L.J. 149, 155–161 (1971); Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165, 1235–1237 (1967). However, as the current CHIEF JUSTICE has explained: "The nuisance exception to the taking guarantee is not coterminous with the police power itself." *Penn Central Transportation Co.,* 438 U.S., at 145, 98 S.Ct., at 2669 (REHNQUIST, J., dissenting). This is certainly the case in light of our recent decisions holding that the "scope of the 'public use' requirement of the Takings Clause is 'coterminous with the scope of a sovereign's police powers.' " See *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1014, 104 S.Ct. 2862, 2879, 81 L.Ed.2d 815 (1984) (quoting *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 240, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984)). See generally R. Epstein, Takings 108–112 (1985).

21    The Takings Clause has never been read to require the States or the courts to calculate whether a specific individual has suffered burdens under this generic rule in excess of the benefits received. Not every individual gets a full dollar return in benefits for the taxes he or she pays; yet, no one suggests that an individual has a right to compensation for the difference between taxes paid and the dollar value of benefits received.

22    Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance. See *Nassr v. Commonwealth,* 394 Mass. 767, 477 N.E.2d 987 (1985) (hazardous waste operation); *Kuban v. McGimsey,* 96 Nev. 105, 605 P.2d 623 (1980) (brothel); *MacLeod v. Takoma Park,* 257 Md. 477, 263 A.2d 581 (1970) (unsafe building); *Eno v. Burlington,* 125 Vt. 8, 209 A.2d 499 (1965) (fire and health hazard); *Pompano Horse Club, Inc. v. State ex rel. Bryan,* 93 Fla. 415, 111 So. 801 (1927) (gambling facility); *People ex rel. Thrasher v. Smith,* 275 Ill. 256, 114 N.E. 31 (1916) ( "bawdyhouse"). It is hard to imagine a different rule that would be consistent with the maxim "*sic utere tuo ut alienum non laedas*" (use your own property in such manner as not to injure that of another.) See generally *Empire State Insurance Co. v. Chafetz,* 278 F.2d 41 (CA5 1960). As Professor Epstein has recently commented: "The issue of compensation cannot arise until the question of justification has been disposed of. In the typical nuisance prevention case, this question is resolved against the claimant." Epstein, *supra,* at 199.

**\*\*1246** In *Agins v. Tiburon,* we explained that the "determination that governmental action constitutes a taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest," and we recognized that this question "necessarily requires a weighing of private and public interests." 447 U.S., at 260–261, 100 S.Ct., at 2141. As the cases discussed above demonstrate, the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation. The Subsidence Act, unlike the Kohler Act, plainly seeks to further such an interest. Nonetheless, we need not rest our decision on this factor alone, because petitioners have also failed to make a **\*493** showing of diminution of value sufficient to satisfy the test set forth in *Pennsylvania Coal* and our other regulatory takings cases.

*Diminution of Value and Investment-Backed Expectations*

The second factor that distinguishes this case from *Pennsylvania Coal* is the finding in that case that the Kohler Act made mining of "certain coal" commercially impracticable. In this case, by contrast, petitioners have not shown any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking. For this reason, their takings claim must fail.

In addressing petitioners' claim we must not disregard the posture in which this case comes before us. The District Court granted summary judgment to respondents only on the facial challenge to the Subsidence Act. The court explained that "[b]ecause plaintiffs have not alleged any injury due to the enforcement of the statute, there is as yet no concrete controversy regarding the application of the specific provisions and regulations. Thus, *the only question before this court is whether the mere enactment of the statutes and regulations constitutes a taking.*" 581 F.Supp., at 513 (emphasis added). The next phase of the case was to be petitioners' presentation of evidence about the actual effects the Subsidence Act had and would have on them. Instead of proceeding in this manner, however, the parties filed a joint motion asking the court to certify the facial challenge for appeal. The parties explained that an assessment of the actual impact that the Act has on petitioners' operations "will involve complex and voluminous proofs," which neither party was currently in a position to present, App. 15–17, and stressed

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5217 Page 54 of 114

**Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)**
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

that if an appellate court were to reverse the District Court on the facial challenge, then all of their expenditures in adjudicating the as-applied challenge would be wasted. Based **\*494** on these considerations, the District Court certified three questions relating to the facial challenge. [23]

23     The certified questions asked whether §§ 4, 5, or 6 of the Subsidence Act, and various regulations:
"1. Violate the Rule of the *Mahon* Decision[,]
"2. Constitute *Per Se* Takings,
"3. Violate Article I, § 10 of the Constitution of the United States." App. 12.
The Court of Appeals recognized the limited nature of its inquiry, pointing out that it was passing only on the facial challenge, and that the "as-applied challenge remains for disposition in the district court." 771 F.2d, at 710, n. 3.

The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation. This point is illustrated by our decision in *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), in which we rejected a preenforcement challenge to the constitutionality of the Surface Mining Control and Reclamation Act of 1977. We concluded that the District Court had been mistaken in its reliance on *Pennsylvania Coal* as support for a holding that two statutory provisions were unconstitutional **\*\*1247** because they deprived coal mine operators of the use of their land. The Court explained:

"[T]he court below ignored this Court's oft-repeated admonition that the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary. See *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588 [92 S.Ct. 1716, 1719, 32 L.Ed.2d 317] (1972); *Rescue Army v. Municipal Court,* 331 U.S. 549, 568–575, 584 [67 S.Ct. 1409, 1419–1423, 1427, 91 L.Ed. 1666] (1947); *Alabama State Federation of Labor v. McAdory,* 325 U.S. 450, 461 [65 S.Ct. 1384, 1389, 89 L.Ed. 1725] (1945). Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property. Just last Term, we reaffirmed:

"\*495 " '[T]his Court has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few

persons." Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance.' *Kaiser Aetna v. United States,* 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332] (1979) (citations omitted).

"These 'ad hoc, factual inquiries' must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.

"Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the 'mere enactment' of the Surface Mining Act constitutes a taking. See *Agins v. Tiburon,* 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (1980). The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land....' *Agins v. Tiburon, supra,* at 260 [100 S.Ct., at 2141]; see also *Penn Central Transp. Co. v. New York City,* 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631] (1978)." 452 U.S., at 295–296, 101 S.Ct., at 2370.

Petitioners thus face an uphill battle in making a facial attack on the Act as a taking.

The hill is made especially steep because petitioners have not claimed, at this stage, that the Act makes it commercially **\*496** impracticable for them to continue mining their bituminous coal interests in western Pennsylvania. Indeed, petitioners have not even pointed to a single mine that can no longer be mined for profit. The only evidence available on the effect that the Subsidence Act has had on petitioners' mining operations comes from petitioners' answers to respondents' interrogatories. Petitioners described the effect that the Subsidence Act had from 1966–1982 on 13 mines that the various companies operate, and claimed that they have been required to leave a bit less than 27 million tons of coal in place to support § 4 areas. The total coal in those 13 mines amounts to over 1.46 billion tons. See App. 284. Thus § 4 requires them to leave less than 2% of their coal in place. [24] But, as we have indicated, **\*\*1248** nowhere

near all of the underground coal is extractable even aside from the Subsidence Act. The categories of coal that must be left for § 4 purposes and other purposes are not necessarily distinct sets, and there is no information in the record as to how much coal is actually left in the ground *solely* because of § 4. We do know, however, that petitioners have never claimed that their mining operations, or even any specific mines, have been unprofitable since the Subsidence Act was passed. Nor is there evidence that mining in any specific location affected by the 50% rule has been unprofitable.

24    The percentage of the total that must be left in place under § 4 is not the same for every mine because of the wide variation in the extent of surface development in different areas. For 7 of the 13 mines identified in the record, 1% or less of the coal must remain in place; for 3 others, less than 3% must be left in place; for the other 3, the percentages are 4%, 7.8%, and 9.4%. See App. 284.

Instead, petitioners have sought to narrowly define certain segments of their property and assert that, when so defined, the Subsidence Act denies them economically viable use. They advance two alternative ways of carving their property in order to reach this conclusion. First, they focus on the specific tons of coal that they must leave in the ground under **\*497** the Subsidence Act, and argue that the Commonwealth has effectively appropriated this coal since it has no other useful purpose if not mined. Second, they contend that the Commonwealth has taken their separate legal interest in property—the "support estate."

Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property "whose value is to furnish the denominator of the fraction." Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165, 1192 (1967). 25 In *Penn Central* the Court explained:

25    See also Sax, Takings and the Police Power, 74 Yale L.J. 36, 60 (1964); Rose, *Mahon* Reconstructed: Why the Takings Issue is Still a Muddle, 57 S.Cal.L.Rev. 561, 566–567 (1984).

   " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the

character of the action and on the nature of the interference with rights *in the parcel as a whole* —here the city tax block designated as the 'landmark site.' " 438 U.S., at 130–131, 98 S.Ct., at 2662.

Similarly, in *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), we held that "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking because the aggregate must be viewed in its entirety." *Id.,* at 65–66, 100 S.Ct., at 326–327. Although these verbal formulizations do not solve all of the definitional issues that may arise in defining the relevant mass of property, they do provide sufficient guidance to compel us to reject petitioners' arguments.

**\*498** *The Coal in Place*

The parties have stipulated that enforcement of the DER's 50% rule will require petitioners to leave approximately 27 million tons of coal in place. Because they own that coal but cannot mine it, they contend that Pennsylvania has appropriated it for the public purposes described in the Subsidence Act.

This argument fails for the reason explained in *Penn Central* and *Andrus.* The 27 million tons of coal do not constitute a separate segment of property for takings law purposes. Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area as readily as the requirement that coal pillars be left in place. Similarly, under petitioners' theory **\*\*1249** one could always argue that a setback ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes. Cf. *Gorieb v. Fox,* 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927) (upholding validity of setback ordinance) (Sutherland, J.). There is no basis for treating the less than 2% of petitioners' coal as a separate parcel of property.

We do not consider Justice Holmes' statement that the Kohler Act made mining of "certain coal" commercially impracticable as requiring us to focus on the individual pillars of coal that must be left in place. That statement is best understood as referring to the Pennsylvania Coal Company's assertion that it could not undertake profitable anthracite coal mining in light of the Kohler Act. There were strong assertions in the record to support that conclusion. For

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5219 Page 56 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

example, the coal company claimed that one company was "unable to operate six large collieries in the city of Scranton, employing more than five thousand men." Motion to Advance for Argument **\*499** in *Pennsylvania Coal Co. v. Mahon,* O.T. 1922, No. 549, p. 2. [26] As Judge Adams explained:

[26]   Of course, the company also argued that the Subsidence Act made it commercially impracticable to mine the very coal that had to be left in place. Although they could have constructed pillars for support in place of the coal, the cost of the artificial pillars would have far exceeded the value of the coal. See Brief for Plaintiff in Error in *Pennsylvania Coal v. Mahon,* O.T. 1922, No. 549, pp. 7–9.

"At first blush, this language seems to suggest that the Court would have found a taking no matter how little of the defendants' coal was rendered unmineable—that because 'certain' coal was no longer accessible, there had been a taking of that coal. However, when one reads the sentence in context, it becomes clear that the Court's concern was with whether the defendants' 'right to mine coal ... [could] be exercised *with profit.*' 260 U.S. at 414 [43 S.Ct., at 159] (emphasis added).... Thus, the Court's holding in *Mahon* must be assumed to have been based on its understanding that the Kohler Act rendered the business of mining coal unprofitable." 771 F.2d, at 716, n. 6.

When the coal that must remain beneath the ground is viewed in the context of any reasonable unit of petitioners' coal mining operations and financial-backed expectations, it is plain that petitioners have not come close to satisfying their burden of proving that they have been denied the economically viable use of that property. The record indicates that only about 75% of petitioners' underground coal can be profitably mined in any event, and there is no showing that petitioners' reasonable "investment-backed expectations" have been materially affected by the additional duty to retain the small percentage that must be used to support the structures protected by § 4. [27]

[27]   We do not suggest that the State may physically appropriate relatively small amounts of private property for its own use without paying just compensation. The question here is whether there has been any taking at all when no coal has been physically appropriated, and the regulatory program places a burden on the use of only a small fraction of the property that is subjected to regulation. See generally n. 18, *supra.*

**\*500** *The Support Estate*

Pennsylvania property law is apparently unique in regarding the support estate as a separate interest in land that can be conveyed apart from either the mineral estate or the surface estate. [28] Petitioners therefore argue that even if comparable legislation in another State would not constitute a taking, the Subsidence Act has that consequence **\*\*1250** because it entirely destroys the value of their unique support estate. It is clear, however, that our takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights. For example, in *Penn Central,* the Court rejected the argument that the "air rights" above the terminal constituted a separate segment of property for Takings Clause purposes. 438 U.S., at 130, 98 S.Ct., at 2662. Likewise, in *Andrus v. Allard,* we viewed the right to sell property as just one element of the owner's property interest. 444 U.S., at 65–66, 100 S.Ct., at 326–327. In neither case did the result turn on whether state law allowed the separate sale of the segment of property.

[28]   See *Charnetski v. Miners Mills Coal Mining Co.,* 270 Pa. 459, 113 A. 683 (1921); *Penman v. Jones,* 256 Pa. 416, 100 A. 1043 (1917); *Captline v. County of Allegheny,* 74 Pa.Commw. 85, 459 A.2d 1298 (1983), cert. denied, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984); see generally Montgomery, The Development of the Right of Subjacent Support and the "Third Estate" in Pennsylvania, 25 Temple L.Q. 1 (1951).

The Court of Appeals, which is more familiar with Pennsylvania law than we are, concluded that as a practical matter the support estate is always owned by either the owner of the surface or the owner of the minerals. It stated:

"The support estate consists of the right to remove the strata of coal and earth that undergird the surface or to leave those layers intact to support the surface and prevent subsidence. These two uses cannot co-exist and, depending upon the purposes of the owner of the support **\*501** estate, one use or the other must be chosen. If the owner is a mine operator, the support estate is used to exploit the mineral estate. When the right of support is held by the surface owner, its use is to support that surface and prevent subsidence. Thus, although Pennsylvania law does recognize the support estate as a 'separate' property interest, *id.,* it cannot be used profitably by one who does not also possess either the mineral estate or the surface estate. *See* Montgomery, *The Development of the Right of Subjacent Support and*

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5220 Page 57 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

the 'Third Estate in Pennsylvania,' 25 Temple L.Q. 1, 21 (1951)." 771 F.2d, at 715–716.

Thus, in practical terms, the support estate has value only insofar as it protects or enhances the value of the estate with which it is associated. Its value is merely a part of the entire bundle of rights possessed by the owner of either the coal or the surface. Because petitioners retain the right to mine virtually all of the coal in their mineral estates, the burden the Act places on the support estate does not constitute a taking. Petitioners may continue to mine coal profitably even if they may not destroy or damage surface structures at will in the process.

But even if we were to accept petitioners' invitation to view the support estate as a distinct segment of property for "takings" purposes, they have not satisfied their heavy burden of sustaining a facial challenge to the Act. Petitioners have acquired or retained the support estate for a great deal of land, only part of which is protected under the Subsidence Act, which, of course, deals with subsidence in the immediate vicinity of certain structures, bodies of water, and cemeteries. See n. 6, *supra.* The record is devoid of any evidence on what percentage of the purchased support estates, either in the aggregate or with respect to any individual estate, has been affected by the Act. Under these circumstances, petitioners' **\*502** facial attack under the Takings Clause must surely fail.[29]

[29] Another unanswered question about the level of diminution involves the District Court's observation that the support estate carries with it far more than the right to cause subsidence damage without liability. See 581 F.Supp., at 519. There is no record as to what value these other rights have and it is thus impossible to say whether the regulation of subsidence damage under certain structures, and the imposition of liability for damage to certain structures, denies petitioners the economically viable use of the support estate, even if viewed as a distinct segment of property.

## IV

In addition to their challenge under the Takings Clause, petitioners assert that § 6 of the Subsidence Act violates the Contracts Clause by not allowing them to hold the surface owners to their contractual waiver of liability for surface damage. **\*\*1251** Here too, we agree with the Court of Appeals and the District Court that the Commonwealth's

strong public interests in the legislation are more than adequate to justify the impact of the statute on petitioners' contractual agreements.

Prior to the ratification of the Fourteenth Amendment, it was Article I, § 10, that provided the primary constitutional check on state legislative power. The first sentence of that section provides:

"No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold or silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." U.S. Const., Art. I, § 10.

Unlike other provisions in the section, it is well settled that the prohibition against impairing the obligation of contracts is not to be read literally. *W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 433, 54 S.Ct. 816, 818, 78 L.Ed. 1344 (1934). The context in which the Contracts Clause is found, the historical setting in which it was **\*503** adopted,[30] and our cases construing the Clause, indicate that its primary focus was upon legislation that was designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy. See *e.g., ibid.; Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Even in such cases, the Court has refused to give the Clause a literal reading. Thus, in the landmark case of *Home Building & Loan Assn. v. Blaisdell,* the Court upheld Minnesota's statutory moratorium against home foreclosures, in part, because the legislation was addressed to the "legitimate end" of protecting "a basic interest of society," and not just for the advantage of some favored group. *Id.,* at 445, 54 S.Ct., at 242.

[30] "It was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting 'as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them,' *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 439 [54 S.Ct. 231, 240, 78 L.Ed. 413] (1934)." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 256, 98 S.Ct. 2716, 2728, 57 L.Ed.2d 727 (1978) (BRENNAN, J., dissenting).

As Justice Stewart explained:

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5221 Page 58 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

"[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.' *Manigault v. Springs,* 199 U.S. 473, 480 [26 S.Ct. 127, 130, 50 L.Ed. 274 (1905) ]. As Mr. Justice **\*504** Holmes succinctly put the matter in his opinion for the Court in *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357 [28 S.Ct. 529, 531, 52 L.Ed. 828 (1908) ]: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.' " *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241–242, 98 S.Ct. 2716, 2720–2721, 57 L.Ed.2d 727 (1978).

In assessing the validity of petitioners' Contracts Clause claim in this case, we begin by identifying the precise contractual right that has been impaired and the **\*\*1252** nature of the statutory impairment. Petitioners claim that they obtained damages waivers for a large percentage of the land surface protected by the Subsidence Act, but that the Act removes the surface owners' contractual obligations to waive damages. We agree that the statute operates as "a substantial impairment of a contractual relationship," *id.,* at 244, 98 S.Ct., at 2722, and therefore proceed to the asserted justifications for the impairment. [31]

[31]  As we have mentioned above, we do not know what percentage of petitioners' acquired support estate is in fact restricted under the Subsidence Act. See *supra,* at 1250. Moreover, we have no basis on which to conclude just how substantial a part of the support estate was the waiver of liability is. See *id.,* at n. 29. These inquiries are both essential to determine the "severity of the impairment," which in turn affects "the level of scrutiny to which the legislation will be affected." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). While these dearths in the record might be critical in some cases, they are not essential to our discussion here because the Subsidence Act withstands scrutiny even if it is assumed that it constitutes a total impairment.

The record indicates that since 1966 petitioners have conducted mining operations under approximately 14,000 structures protected by the Subsidence Act. It is not clear whether that number includes the cemeteries and water courses under which mining has been conducted. In any event, it is petitioners' position that, because they contracted **\*505** with some previous owners of property generations ago, [32] they have a constitutionally protected legal right to conduct their mining operations in a way that would make a shambles of all those buildings and cemeteries. As we have discussed, the Commonwealth has a strong public interest in preventing this type of harm, the environmental effect of which transcends any private agreement between contracting parties.

[32]  Most of these waivers were obtained over 70 years ago as part of the support estate which was itself obtained or retained as an incident to the acquisition or retention of the right to mine large quantities of underground coal. No question of enforcement of such a waiver against the original covenantor is presented; rather, petitioners claim a right to enforce the waivers against subsequent owners of the surface. This claim is apparently supported by Pennsylvania precedent holding that these waivers run with the land. See *Kormuth v. United States Steel Co.,* 379 Pa. 365, 108 A.2d 907 (1954); *Scranton v. Phillips,* 94 Pa. 15, 22 (1880). That the Pennsylvania courts might have had, or may in the future have, a valid basis for refusing to enforce these perpetual covenants against subsequent owners of the surface rights is not necessarily a sufficient reason for concluding that the legislative impairment of the contracts is permissible. See *Tidal Oil Co. v. Flanagan,* 263 U.S. 444, 44 S.Ct. 197, 68 L.Ed. 382 (1924); *Central Land Co. v. Laidley,* 159 U.S. 103, 16 S.Ct. 80, 40 L.Ed. 91 (1895) (distinguishing legislative and judicial action).

Of course, the finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations. A court must also satisfy itself that the legislature's "adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977)). But, we have repeatedly held that unless the State

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

is itself a contracting party, courts should " 'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " *Energy Reserves Group, Inc.,* 459 U.S., at 413, 103 S.Ct., at 705 (quoting *United States Trust Co.,* 431 U.S., at 23, 97 S.Ct., at 1518).

**\*506** As we explained more fully above, the Subsidence Act plainly survives scrutiny under our standards for evaluating impairments of private contracts.[33] The Commonwealth has determined that in order to **\*\*1253** deter mining practices that could have severe effects on the surface, it is not enough to set out guidelines and impose restrictions, but that imposition of liability is necessary. By requiring the coal companies either to repair the damage or to give the surface owner funds to repair the damage, the Commonwealth accomplishes both deterrence and restoration of the environment to its previous condition. We refuse to second-guess the Commonwealth's determinations that these are the most appropriate ways of dealing with the problem. We conclude, therefore, that the impairment of petitioners' right to enforce the damages waivers is amply justified by the public purposes served by the Subsidence Act.

[33]    Because petitioners did not raise the issue before the District Court, the Court of Appeals rejected their attempt to argue on appeal that the Subsidence Act also affects contracts to which the Commonwealth is a party. See 771 F.2d, at 718, n. 8.

The judgment of the Court of Appeals is

*Affirmed.*

Chief Justice REHNQUIST, with whom Justice POWELL, Justice O'CONNOR, and Justice SCALIA join, dissenting. More than 50 years ago, this Court determined the constitutionality of Pennsylvania's Kohler Act as it affected the property interests of coal mine operators. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The Bituminous Mine Subsidence and Land Conservation Act approved today effects an interference with such interests in a strikingly similar manner. The Court finds at least two reasons why this case is different. First, we are told, "the character of the governmental action involved here leans heavily against finding a taking." *Ante,* at 1242. Second, the Court concludes that the Subsidence Act neither "makes it impossible for petitioners **\*507** to profitably engage in their business," nor involves "undue interference with

[petitioners'] investment-backed expectations." *Ibid.* Neither of these conclusions persuades me that this case is different, and I believe that the Subsidence Act works a taking of petitioners' property interests. I therefore dissent.

I

In apparent recognition of the obstacles presented by *Pennsylvania Coal* to the decision it reaches, the Court attempts to undermine the authority of Justice Holmes' opinion as to the validity of the Kohler Act, labeling it "uncharacteristically ... advisory." *Ante,* at 1241. I would not so readily dismiss the precedential value of this opinion. There is, to be sure, some language in the case suggesting that it could have been decided simply by addressing the particular application of the Kohler Act at issue in the case. See, *e.g., Pennsylvania Coal, supra,* at 414, 43 S.Ct., at 159 ("If we were called upon to deal with the plaintiffs' position alone, we should think it clear that the statute does not disclose a public interest sufficient to warrant so extensive a destruction of the defendant's constitutionally protected rights"). The Court, however, found that the validity of the Act itself was properly drawn into question: "[T]he case has been treated as one in which the general validity of the [Kohler] act should be discussed." *Ibid.* [1] The coal company clearly had an interest in obtaining a determination that the Kohler Act was unenforceable if it worked a taking without providing for compensation. For **\*508** these reasons, I would not find the opinion of the Court in *Pennsylvania Coal* advisory in any respect.

[1]    The Pennsylvania Supreme Court, in the decision under review, had also determined that the case called for "consideration ... of the constitutionality of the act itself." *Mahon v. Pennsylvania Coal Co.,* 274 Pa. 489, 494, 118 A. 491, 492 (1922). Before this Court, the coal company persisted in its claim that the Pennsylvania statute took its property without just compensation. See Brief for Plaintiff in Error in *Pennsylvania Coal Co. v. Mahon,* O.T. 1922, No. 549, pp. 7–8, 16, 19–21, 28–33; Brief for Defendants in Error in *Pennsylvania Coal Co. v. Mahon,* O.T. 1922, No. 549, p. 73.

The Court's implication to the contrary is particularly disturbing in this context, because the holding in *Pennsylvania Coal* today discounted by the Court has for 65 years been the foundation of our "regulatory takings" jurisprudence. See *Penn Central Transportation Co. v. New York* **\*\*1254** *City,* 438 U.S. 104, 127, 98 S.Ct. 2646, 2660,

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5223 Page 60 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

57 L.Ed.2d 631 (1978); D. Hagman & J. Juergensmeyer, Urban Planning and Land Development Control Law 319 (2d ed. 1986) ("Pennsylvania Coal was a monumental decision which remains a vital element in contemporary taking law"). We have, for example, frequently relied on the admonition that "if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal, supra,* 260 U.S., at 415, 43 S.Ct., at 160. See, *e.g., MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958). Thus, even were I willing to assume that the opinion in *Pennsylvania Coal* standing alone is reasonably subject to an interpretation that renders more than half the discussion "advisory," I would have no doubt that our repeated reliance on that opinion establishes it as a cornerstone of the jurisprudence of the Fifth Amendment's Just Compensation Clause.

I accordingly approach this case with greater deference to the language as well as the holding of *Pennsylvania Coal* than does the Court. Admittedly, questions arising under the Just Compensation Clause rest on ad hoc factual inquiries, and must be decided on the facts and circumstances in each case. See *Penn Central Transportation Co. v. New York City, supra,* 438 U.S., at 124, 98 S.Ct., at 2659; *United States v. Central Eureka Mining Co., supra,* 357 U.S., at 168, 78 S.Ct., at 1104. Examination of the relevant factors presented here convinces me that the differences between **\*509** them and those in *Pennsylvania Coal* verge on the trivial.

## II

The Court first determines that this case is different from *Pennsylvania Coal* because "the Commonwealth of Pennsylvania has acted to arrest what it perceives to be a significant threat to the common welfare." Ante, at 1242. In my view, reliance on this factor represents both a misreading of *Pennsylvania Coal* and a misunderstanding of our precedents.

### A

The Court opines that the decision in *Pennsylvania Coal* rested on the fact that the Kohler Act was "enacted solely for the benefit of private parties," ante, at 1242, and "served only private interests." *Ante,* at 1242. A review of the Kohler Act shows that these statements are incorrect. The Pennsylvania Legislature passed the statute "as remedial legislation, designed to cure existing evils and abuses." *Mahon v. Pennsylvania Coal Co.,* 274 Pa. 489, 495, 118 A. 491, 492 (1922) (quoting the Act). These were *public* "evils and abuses," identified in the preamble as "wrecked and dangerous streets and highways, collapsed public buildings, churches, schools, factories, streets, and private dwellings, broken gas, water and sewer systems, the loss of human life...." *Id.,* at 496, 118 A., at 493.[2] The Pennsylvania Supreme Court recognized that these concerns were "such as to create an emergency, properly warranting the exercise of the police power...." *Id.,* at 497, 118 A., at 493. There can be **\*510** no doubt that the Kohler Act was intended to serve public interests.

2      That these were public "evils and abuses" is further illustrated by the coverage of the Kohler Act, which regulated mining under "any public building or any structure customarily used by the public," including churches, schools, hospitals, theaters, hotels, and railroad stations. *Mahon v. Pennsylvania Coal, supra,* 274 Pa., at 495, 118 A., at 492. Protected areas also included streets, roads, bridges, or "any other public passageway, dedicated to public use or habitually used by the public," as well as public utility structures, private homes, workplaces, and cemeteries. *Ibid.*

Though several aspects of the Kohler Act limited its protection of these interests, **\*\*1255** see *Pennsylvania Coal,* 260 U.S., at 414, 43 S.Ct., at 159, this Court did not ignore the public interests served by the Act. When considering the protection of the "single private house" owned by the Mahons, the Court noted that "[n]o doubt there is a *public* interest even in this." *Id.,* at 413, 43 S.Ct., at 159 (emphasis added). It recognized that the Act "affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved." *Id.,* at 414, 43 S.Ct., at 159. See also *id.,* at 416, 43 S.Ct., at 160 ("We assume ... that the statute was passed upon the conviction that an exigency existed that would warrant it, and we assume that an exigency exists that would warrant the exercise of eminent domain"). The strong public interest in the stability of streets and cities, however, was insufficient "to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Ibid.* Thus, the Court made clear that the mere existence of a public

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5224 Page 61 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

purpose was insufficient to release the government from the compensation requirement: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation." *Id.,* at 415, 43 S.Ct., at 160.

The Subsidence Act rests on similar public purposes. These purposes were clearly stated by the legislature: "[T]o aid in the protection of the safety of the public, to enhance the value of [surface area] lands for taxation, to aid in the preservation of surface water drainage and public water supplies and generally to improve the use and enjoyment of such lands...." Pa.Stat.Ann., Title 52, § 1406.2 (Purdon Supp.1986). The Act's declaration of policy states that mine subsidence "has seriously impeded land development ... has caused a very clear and present danger to the health, safety and welfare of the people of Pennsylvania [and] erodes the **\*511** tax base of the affected municipalities." §§ 1406.3(2), (3), (4). The legislature determined that the prevention of subsidence would protect surface structures, advance the economic future and well-being of Pennsylvania, and ensure the safety and welfare of the Commonwealth's residents. *Ibid.* Thus, it is clear that the Court has severely understated the similarity of purpose between the Subsidence Act and the Kohler Act. The public purposes in this case are not sufficient to distinguish it from *Pennsylvania Coal.* [3]

[3]    The Court notes that the particulars of the Subsidence Act better serve these public purposes than did the Kohler Act. *Ante,* at 1242. This may well be true, but our inquiry into legislative purpose is not intended as a license to judge the effectiveness of legislation. When considering the Fifth Amendment issues presented by Hawaii's Land Reform Act, we noted that the Act, "like any other, may not be successful in achieving its intended goals. But 'whether *in fact* the provisions will accomplish the objectives is not the question: the [constitutional requirement] is satisfied if ... the ... [State] Legislature *rationally could have believed* that the [Act] would promote its objective.' " *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 242, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984), quoting *Western & Southern Life Insurance Co. v. State Bd. of Equalization,* 451 U.S. 648, 671–672, 101 S.Ct. 2070, 2084–2085, 68 L.Ed.2d 514 (1981). Conversely, our cases have never found it sufficient that legislation efficiently achieves its desired objectives to hold that the compensation required by the Fifth Amendment is unavailable.

B

The similarity of the public purpose of the present Act to that in *Pennsylvania Coal* does not resolve the question whether a taking has occurred; the existence of such a public purpose is merely a necessary prerequisite to the government's exercise of its taking power. See *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 239–243, 245, 104 S.Ct. 2321, 2328–2331, 2331–2332, 81 L.Ed.2d 186 (1984); *Berman v. Parker,* 348 U.S. 26, 32–33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). The *nature* of these purposes may be relevant, for we have recognized that a taking does not occur where the government exercises its unquestioned authority to prevent a property owner from using his property to injure **\*\*1256** others without having to compensate the value of the forbidden use. See **\*512** *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). See generally *Penn Central Transportation Co. v. New York City,* 438 U.S., at 144–146, 98 S.Ct., at 2669–2670 (REHNQUIST, J., dissenting). The Court today indicates that this "nuisance exception" alone might support its conclusion that no taking has occurred. Despite the Court's implication to the contrary, see *ante,* at 1242, and n. 15, the legitimacy of this purpose is a question of federal, rather than state, law, subject to independent scrutiny by this Court. This statute is not the type of regulation that our precedents have held to be within the "nuisance exception" to takings analysis.

The ease with which the Court moves from the recognition of public interests to the assertion that the activity here regulated is "akin to a public nuisance" suggests an exception far wider than recognized in our previous cases. "The nuisance exception to the taking guarantee," however, "is not coterminous with the police power itself," *Penn Central Transportation, supra,* at 145, 98 S.Ct., at 2669 (REHNQUIST, J., dissenting), but is a narrow exception allowing the government to prevent "a misuse or illegal use." *Curtin v. Benson,* 222 U.S. 78, 86, 32 S.Ct. 31, 32, 56 L.Ed. 102 (1911). It is not intended to allow "the prevention of a legal and essential use, an attribute of its ownership." *Ibid.*

The narrow nature of this exception is compelled by the concerns underlying the Fifth Amendment. Though, as the Court recognizes, *ante,* at 1245, the Fifth Amendment does not prevent actions that secure a "reciprocity of advantage," *Pennsylvania Coal, supra,* 260 U.S., at 415, 43 S.Ct., at

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5225 Page 62 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

160, it is designed to prevent "the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him." *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 325, 13 S.Ct. 622, 625, 37 L.Ed. 463 (1893). See also *Penn Central Transportation Co. v. New York City, supra,* 438 U.S., at 123–125, 98 S.Ct., at 2658–2659; *Armstrong v.United* **\*513** *States,*364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). A broad exception to the operation of the Just Compensation Clause based on the exercise of multifaceted health, welfare, and safety regulations would surely allow government much greater authority than we have recognized to impose societal burdens on individual landowners, for nearly every action the government takes is intended to secure for the public an extra measure of "health, safety, and welfare."

Thus, our cases applying the "nuisance" rationale have involved at least two narrowing principles. First, nuisance regulations exempted from the Fifth Amendment have rested on discrete and narrow purposes. See *Goldblatt v. Hempstead, supra; Hadacheck v. Sebastian, supra; Mugler v. Kansas, supra.* The Subsidence Act, however, is much more than a nuisance statute. The central purposes of the Act, though including public safety, reflect a concern for preservation of buildings, economic development, and maintenance of property values to sustain the Commonwealth's tax base. We should hesitate to allow a regulation based on essentially economic concerns to be insulated from the dictates of the Fifth Amendment by labeling it nuisance regulation.

Second, and more significantly, our cases have never applied the nuisance exception to allow complete extinction of the value of a parcel of property. Though nuisance regulations have been sustained despite a substantial reduction in value, we have not accepted the proposition that the State may completely extinguish a property interest or prohibit all use without providing compensation. **\*\*1257** Thus, in *Mugler v. Kansas, supra,* the prohibition on manufacture and sale of intoxicating liquors made the distiller's brewery "of little value" but did not completely extinguish the value of the building. Similarly, in *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), the individual forced to cut down his cedar trees nevertheless was able "to use the felled trees." *Penn Central Transportation Co. v. New York City, supra,* 438 U.S., at 126, 98 S.Ct., at 2660. The **\*514** restriction on surface mining upheld in *Goldblatt v.*

*Hempstead, supra,* may have prohibited "a beneficial use" of the property, but did not reduce the value of the lot in question. 369 U.S., at 593, 594, 82 S.Ct., at 990. In none of these cases did the regulation "destroy essential uses of private property." *Curtin v. Benson, supra,* 222 U.S., at 86, 32 S.Ct., at 32.

Here, petitioners' interests in particular coal deposits have been completely destroyed. By requiring that defined seams of coal remain in the ground, see *ante,* at 1237–1238, and n. 7, § 4 of the Subsidence Act has extinguished any interest one might want to acquire in this property, for " 'the right to coal consists in the right to mine it.' " *Pennsylvania Coal,* 260 U.S., at 414, 43 S.Ct., at 159, quoting *Commonwealth ex rel. Keator v. Clearview Coal Co.,* 256 Pa. 328, 331, 100 A. 820 (1917). Application of the nuisance exception in these circumstances would allow the State not merely to forbid one "particular use" of property with many uses but to extinguish *all* beneficial use of petitioners' property.[4]

4   *Plymouth Coal Co. v. Pennsylvania,* 232 U.S. 531, 34 S.Ct. 359, 58 L.Ed. 713 (1914), did not go this far. Though the Court in that case upheld a statute requiring mine operators to leave certain amounts of coal in their mines, examination of the opinion in *Plymouth Coal* reveals that the statute was not challenged as a taking for which compensation was due. Instead, the coal company complained that the statutory provisions for defining the width of required pillars of coal were constitutionally deficient as a matter of procedural due process.

Though suggesting that the purposes alone are sufficient to uphold the Act, the Court avoids reliance on the nuisance exception by finding that the Subsidence Act does not impair petitioners' investment-backed expectations or ability to profitably operate their businesses. This conclusion follows mainly from the Court's broad definition of the "relevant mass of property," *ante,* at 1248, which allows it to ascribe to the Subsidence Act a less pernicious effect on the interests of the property owner. The need to consider the effect of regulation on some identifiable segment of property makes all important the admittedly difficult task of defining the relevant **\*515** parcel. See *Penn Central Transportation Co. v. New York City,* 438 U.S., at 149, n. 13, 98 S.Ct., at 2672, n. 13 (REHNQUIST, J., dissenting). For the reasons explained below, I do not believe that the Court's opinion adequately performs this task.

III

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5226 Page 63 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

The *Pennsylvania Coal* Court found it sufficient that the Kohler Act rendered it "commercially impracticable to mine certain coal." 260 U.S., at 414, 43 S.Ct., at 159. The Court, *ante,* at 1249, observes that this language is best understood as a conclusion that certain coal mines could not be operated at a profit. Petitioners have not at this stage of the litigation rested their claim on similar proof; they have not "claimed that their mining operations, or even any specific mines, have been unprofitable since the Subsidence Act was passed." *Ante,* at 1248. The parties have, however, stipulated for purposes of this facial challenge that the Subsidence Act requires petitioners to leave in the ground 27 million tons of coal, without compensation therefor. Petitioners also claim that the Act extinguishes their purchased interests in support estates which allow them to **\*\*1258** mine the coal without liability for subsidence. We are thus asked to consider whether these restrictions are such as to constitute a taking.

## A

The Court's conclusion that the restriction on particular coal does not work a taking is primarily the result of its view that the 27 million tons of coal in the ground "do not constitute a separate segment of property for takings law purposes." *Ante,* at 1248. This conclusion cannot be based on the view that the interests are too insignificant to warrant protection by the Fifth Amendment, for it is beyond cavil that government appropriation of "relatively small amounts of private property for its own use" requires just compensation. *Ante,* at 1249, n. 27. Instead, the Court's refusal to recognize the coal in the ground as a separate segment of property for takings purposes is based on the fact that the **\*516** alleged taking is "regulatory," rather than a physical intrusion. See *ante,* at 1244, n. 18. On the facts of this case, I cannot see how the label placed on the government's action is relevant to consideration of its impact on property rights.

Our decisions establish that governmental action short of physical invasion may constitute a taking because such regulatory action might result in "as complete [a loss] as if the [government] had entered upon the surface of the land and taken exclusive possession of it." *United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 1065, 90 L.Ed. 1206 (1946). Though the government's direct benefit may vary depending upon the nature of its action, the question is evaluated from the perspective of the property holder's loss rather than the government's gain. See *ibid.; United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357,

359, 89 L.Ed. 311 (1945); *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910). Our observation that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government," *Penn Central Transportation Co. v. New York City, supra,* 438 U.S., at 124, 98 S.Ct., at 2659, was not intended to alter this perspective merely because the claimed taking is by regulation. Instead, we have recognized that regulations—unlike physical invasions—do not typically extinguish the "full bundle" of rights in a particular piece of property. In *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), for example, we found it crucial that a prohibition on the sale of avian artifacts destroyed only "one 'strand' of the bundle" of property rights, "because the aggregate must be viewed in its entirety." This characteristic of regulations frequently makes unclear the breadth of their impact on identifiable segments of property, and has required that we evaluate the effects in light of the "several factors" enumerated in *Penn Central Transportation Co.:* "The economic impact of the regulation on the claimant, ... the extent to which the regulation has interfered with investment-backed expectations, [and] the character of the governmental action." 438 U.S., at 124, 98 S.Ct., at 2659.

**\*517** No one, however, would find any need to employ these analytical tools where the government has physically taken an identifiable segment of property. Physical appropriation by the government leaves no doubt that it has in fact deprived the owner of all uses of the land. Similarly, there is no need for further analysis where the government by regulation extinguishes the whole bundle of rights in an identifiable segment of property, for the effect of this action on the holder of the property is indistinguishable from the effect of a physical taking. [5] Thus, it is clear our decision **\*\*1259** in *Andrus v. Allard, supra,* would have been different if the Government had confiscated the avian artifacts. In my view, a different result would also follow if the Government simply prohibited every use of that property, for the owner would still have been "deprive[d] of all or most of his interest in the subject matter." *United States v. General Motors Corp. supra,* 323 U.S., at 378, 65 S.Ct., at 359.

5      There is admittedly some language in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 130–131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978), that suggests a contrary analysis: " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5227 Page 64 of 114

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)
107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." The Court gave no guidance on how one is to distinguish a "discrete segment" from a "single parcel." It was not clear, moreover, that the air rights at issue in *Penn Central* were entirely eliminated by the operation of New York City's Landmark Preservation Law, for, as the Court noted, "it simply cannot be maintained, on this record, that appellants have been prohibited from occupying *any* portion of the airspace above the Terminal." *Id.,* at 136, 98 S.Ct., at 2665.

In this case, enforcement of the Subsidence Act and its regulations will require petitioners to leave approximately 27 million tons of coal in place. There is no question that this coal is an identifiable and separable property interest. Unlike many property interests, the "bundle" of rights in this coal is sparse. " 'For practical purposes, the right to coal consists in the right to mine it.' " **\*518** *Pennsylvania Coal,* 260 U.S., at 414, 43 S.Ct., at 159, quoting *Commonwealth ex rel. Keater v. Clearview Coal Co.,* 256 Pa., at 331, 100 A., at 820. From the relevant perspective—that of the property owners—this interest has been destroyed every bit as much as if the government had proceeded to mine the coal for its own use. The regulation, then, does not merely inhibit one strand in the bundle, cf. *Andrus v. Allard, supra,* but instead destroys completely any interest in a segment of property. In these circumstances, I think it unnecessary to consider whether petitioners may operate individual mines or their overall mining operations profitably, for they have been denied all use of 27 million tons of coal. I would hold that § 4 of the Subsidence Act works a taking of these property interests.

B

Petitioners also claim that the Subsidence Act effects a taking of their support estate. Under Pennsylvania law, the support estate, the surface estate, and the mineral estate are "three distinct estates in land which can be held in fee simple separate and distinct from each other...." *Captline v. County of Allegheny,* 74 Pa.Commw. 85, 91, 459 A.2d 1298, 1301 (1983), cert. denied, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984). In refusing to consider the effect of the Subsidence Act on this property interest alone, the Court dismisses this feature of Pennsylvania property law as simply a "legalistic distinctio[n] within a bundle of property rights."

*Ante,* at 1250. "Its value," the Court informs us, "is merely a part of the entire bundle of rights possessed by the owner of either the coal or the surface." *Ante,* at 1250. See also 771 F.2d 707, 716 (1985) ("To focus upon the support estate separately ... would serve little purpose"). This view of the support estate allows the Court to conclude that its destruction is merely the destruction of one "strand" in petitioners' bundle of property rights, not significant enough in the overall bundle to work a taking.

Contrary to the Court's approach today, we have evaluated takings claims by reference to the units of property defined **\*519** by state law. In *Ruckleshaus v. Monsanto, Co.,* for example, we determined that certain "health, safety, and environmental data" was "cognizable as a trade-secret **\*\*1260** property right under Missouri law," 467 U.S., at 1003, 104 S.Ct., at 2873, and proceeded to evaluate the effects of governmental action on this state-defined property right.[6] Reliance on state law is necessitated by the fact that " '[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980), quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In reality, the Court's decision today cannot reject this necessary reliance on state law. Rather, it simply rejects the support estate as the relevant segment of property and evaluates the impact of the Subsidence Act by reference to some broader, yet undefined, segment of property presumably recognized by state law.

6    Indeed, we rejected the claim that the Supremacy Clause allowed Congress to dictate that the effect of its regulation "not vary depending on the property law of the State in which the submitter [of trade-secret information] is located.... If Congress can 'pre-empt' state property law in the manner advocated ..., then the Taking Clause has lost all vitality." *Ruckleshaus v. Monsanto, Co.,* 467 U.S., at 1012, 104 S.Ct., at 2878.

I see no reason for refusing to evaluate the impact of the Subsidence Act on the support estate alone, for Pennsylvania has clearly defined it as a separate estate in property. The Court suggests that the practical significance of this estate is limited, because its value "is merely part of the bundle of rights possessed by the owner of either the coal or the surface." *Ante,* at 1250. Though this may accurately describe the usual state of affairs, I do not understand the Court to

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5228 Page 65 of 114

**Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)**

107 S.Ct. 1232, 25 ERC 1649, 94 L.Ed.2d 472, 55 USLW 4326...

mean that one holding the support estate alone would find it worthless, for surely the owners of the mineral or surface estates **\*520** would be willing buyers of this interest. [7] Nor does the Court suggest that the owner of both the mineral and support estates finds his separate interest in support to be without value. In these circumstances, where the estate defined by state law is both severable and of value in its own right, it is appropriate to consider the effect of regulation on that particular property interest.

[7] It is clear that under Pennsylvania law, "one person may own the coal, another the surface, and the third the right of support." *Smith v. Glen Alden Coal Co.,* 347 Pa. 290, 304, 32 A.2d 227, 234–235 (1943).

When held by owners of the mineral estate, the support estate "consists of the right to remove the strata of coal and earth that undergird the surface ...." 771 F.2d, at 715. Purchase of this right, therefore, shifts the risk of subsidence to the surface owner. Section 6 of the Subsidence Act, by making the coal mine operator strictly liable for any damage to surface structures caused by subsidence, purports to place this risk on the holder of the mineral estate regardless of whether the holder also owns the support estate. Operation of this provision extinguishes petitioners' interests in their support estates, making worthless what they purchased as a separate right under Pennsylvania law. Like the restriction on mining particular coal, this complete interference with a property right extinguishes its value, and must be accompanied by just compensation. [8]

[8] It is therefore irrelevant that petitioners have not presented evidence of "what percentage of the purchased support estates, either in the aggregate or with respect to any individual estate, has been affected by the Act." *Ante,* at 1250. There is no doubt that the Act extinguishes support estates. Because it fails to provide compensation for this taking, the Act violates the dictates of the Fifth Amendment.

## IV

In sum, I would hold that Pennsylvania's Bituminous Mine Subsidence and Land **\*\*1261** Conservation Act effects a taking of petitioners' property without providing just compensation. Specifically, the Act works to extinguish petitioners' interest **\*521** in at least 27 million tons of coal by requiring that coal to be left in the ground, and destroys their purchased support estates by returning to them financial liability for subsidence. I respectfully dissent from the Court's decision to the contrary. [9]

[9] Because I would find § 6 of the Subsidence Act unconstitutional under the Fifth Amendment, I would not reach the Contracts Clause issue addressed by the Court, *ante,* at 1250–1253.

## All Citations

480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472, 25 ERC 1649, 55 USLW 4326, 17 Envtl. L. Rep. 20,440

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)
98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

98 S.Ct. 2646
Supreme Court of the United States

PENN CENTRAL TRANSPORTATION
COMPANY et al., Appellants,
v.
CITY OF NEW YORK et al.

No. 77–444.
|
Argued April 17, 1978.
|
Decided June 26, 1978.
|
Rehearing Denied Oct. 2, 1978.
|
See 439 U.S. 883, 99 S.Ct. 226.

**Synopsis**

Following refusal of New York City Landmarks Preservation Commission to approve plans for construction of 50-story office building over Grand Central Terminal, which had been designated a "landmark," the terminal owner filed suit charging, inter alia, that application of landmarks preservation law constituted a "taking" of the property without just compensation and arbitrarily deprived owners of their property without due process. The Supreme Court, Trial Term, New York County, granted injunctive relief. The Supreme Court, Appellate Division, 50 A.D.2d 265, 377 N.Y.S.2d 20, reversed. The Court of Appeals, 42 N.Y.2d 324, 397 N.Y.S.2d 914, 366 N.E.2d 1271, affirmed, and owners appealed. The Supreme Court, Mr. Justice Brennan, held that: (1) owners could not establish a "taking" merely by showing that they had been denied the right to exploit the superadjacent airspace, irrespective of remainder of the parcel; (2) landmark laws which embody a comprehensive plan to preserve structures of historic or aesthetic interest are not discriminatory, like "reverse spot" zoning; (3) that the law affected some owners more severely than others did not itself result in a "taking," and (4) the law did not interfere with owners' present use or prevent it from realizing a reasonable rate of return on its investment, especially since preexisting air rights were transferable to other parcels in the vicinity.

Judgment of Court of Appeals affirmed.

Mr. Justice Rehnquist filed a dissenting opinion in which Mr. Chief Justice Burger and Mr. Justice Stevens joined.

**\*\*2649** *Syllabus*[*]

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*104** Under New York City's Landmarks Preservation Law (Landmarks Law), which was enacted to protect historic landmarks and neighborhoods from precipitate decisions to destroy or fundamentally alter their character, the Landmarks Preservation Commission (Commission) may designate a building to be a "landmark" on a particular "landmark site" or may designate an area to be a "historic district." The Board of Estimate may thereafter modify or disapprove the designation, and the owner may seek judicial review of the final designation decision. The owner of the designated landmark must keep the building's exterior "in good repair" and before exterior alterations are made must secure Commission approval. Under two ordinances owners of landmark sites may transfer development rights from a landmark parcel to proximate lots. Under the Landmarks Law, the Grand Central Terminal (Terminal), which is owned by the Penn Central Transportation Co. and its affiliates (Penn Central) was designated a "landmark" and the block it occupies a "landmark site." Appellant Penn Central, though opposing the designation before the Commission, did not seek judicial review of the final designation decision. Thereafter appellant Penn Central entered into a lease with appellant UGP Properties, whereby UGP was to construct a multistory office building over the Terminal. After the Commission had rejected appellants' plans for the building as destructive of the Terminal's historic and aesthetic features, with no judicial review thereafter being sought, appellants brought suit in state court claiming that the application of the Landmarks Law had "taken" their property without just compensation in violation of the Fifth and Fourteenth Amendments and arbitrarily deprived them of their property without due process of law in violation of the Fourteenth Amendment. The trial court's grant of relief was reversed on appeal, the New York Court of Appeals ultimately concluding that there was no "taking" since the Landmarks Law had not transferred control of the property to the city, but only restricted appellants' exploitation of it; and that there was no denial of due process because (1) the same use of the Terminal was permitted as before; (2) the appellants had not shown that they could not earn a reasonable return on their investment **\*105** in the Terminal

AR004761

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

itself; (3) even if the Terminal proper could never operate at a reasonable profit, some of the income from Penn Central's extensive real estate holdings in the area must realistically be imputed to the Terminal; and (4) the development rights above the Terminal, which were made transferable to numerous sites in the vicinity, provided significant compensation for loss of rights above the Terminal itself. *Held:* The application of the Landmarks Law to the Terminal property does not constitute a "taking" of appellants' property within the meaning of the Fifth Amendment as made applicable to the States by the Fourteenth Amendment. Pp. 2559–2666.

(a) In a wide variety of contexts the government may execute laws or programs that adversely affect recognized economic values without its action constituting a "taking," and in instances such as zoning laws where a state tribunal has reasonably concluded that "the health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected real property interests. In many instances use restrictions that served a substantial public purpose have been upheld against "taking" challenges, *e. g., Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130; *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348, though a state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as **2650 to constitute a "taking," *e. g., Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, and government acquisitions of resources to permit uniquely public functions constitute "takings," *e. g., United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206. Pp. 2659–2662.

(b) In deciding whether particular governmental action has effected a "taking," the character of the action and nature and extent of the interference with property rights (here the city tax block designated as the "landmark site") are focused upon, rather than discrete segments thereof. Consequently, appellants cannot establish a "taking" simply by showing that they have been denied the ability to exploit the super-jacent airspace, irrespective of the remainder of appellants' parcel. Pp. 2662–2663.

(c) Though diminution in property value alone, as may result from a zoning law, cannot establish a "taking," as appellants concede, they urge that the regulation of individual landmarks is different because it applies only to selected properties. But it does not follow that landmark laws, which embody

a comprehensive plan to preserve structures of historic or aesthetic interest, are discriminatory, like "reverse spot" zoning. Nor can it be successfully contended that designation of a landmark involves only a matter of taste and therefore will inevitably **106** lead to arbitrary results, for judicial review is available and there is no reason to believe it will be less effective than would be so in the case of zoning or any other context. Pp. 2663–2664.

(d) That the Landmarks Law affects some landowners more severely than others does not itself result in "taking," for that is often the case with general welfare and zoning legislation. Nor, contrary to appellants' contention, are they solely burdened and unbenefited by the Landmarks Law, which has been extensively applied and was enacted on the basis of the legislative judgment that the preservation of landmarks benefits the citizenry both economically and by improving the overall quality of city life. Pp. 2664–2665.

(e) The Landmarks Law no more effects an appropriation of the airspace above the Terminal for governmental uses than would a zoning law appropriate property; it simply prohibits appellants or others from occupying certain features of that space while allowing appellants gainfully to use the remainder of the parcel. *United States v. Causby, supra*, distinguished. P. 2665.

(f) The Landmarks Law, which does not interfere with the Terminal's present uses or prevent Penn Central from realizing a "reasonable return" on its investment, does not impose the drastic limitation on appellants' ability to use the air rights above the Terminal that appellants claim, for on this record there is no showing that a smaller, harmonizing structure would not be authorized. Moreover, the pre-existing air rights are made transferable to other parcels in the vicinity of the Terminal, thus mitigating whatever financial burdens appellants have incurred. Pp. 2665–2666.

42 N.Y.2d 324, 397 N.Y.S.2d 914, 366 N.E.2d 1271, affirmed.

**Attorneys and Law Firms**

Daniel M. Gribbon, Washington, D. C., for appellants.

Leonard J. Koerner, New York City, for appellees.

Patricia M. Wald, Washington, D. C., for the U. S., as amicus curiae, by special leave of Court.

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)
98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

## Opinion

**\*107**  Mr. Justice BRENNAN delivered the opinion of the Court.

The question presented is whether a city may, as part of a comprehensive program to preserve historic landmarks and historic districts, place restrictions on the development of individual historic landmarks—in addition to those imposed by applicable zoning ordinances—without effecting a "taking" requiring the payment of "just compensation." Specifically, we must decide whether the application of New York City's Landmarks Preservation Law to the parcel of land occupied by Grand Central Terminal has "taken" its owners' property in violation **\*\*2651** of the Fifth and Fourteenth Amendments.

### I

### A

Over the past 50 years, all 50 States and over 500 municipalities have enacted laws to encourage or require the preservation of buildings and areas with historic or aesthetic importance.[1] These nationwide legislative efforts have been **\*108** precipitated by two concerns. The first is recognition that, in recent years, large numbers of historic structures, landmarks, and areas have been destroyed[2] without adequate consideration of either the values represented therein or the possibility of preserving the destroyed properties for use in economically productive ways.[3] The second is a widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all. Not only do these buildings and their workmanship represent the lessons of the past and embody precious features of our heritage, they serve as examples of quality for today. "[H]istoric conservation is but one aspect of the much larger problem, basically an environmental one, of enhancing—or perhaps developing for the first time—the quality of life for people."[4]

[1]   See National Trust for Historic Preservation, A Guide to State Historic Preservation Programs (1976); National Trust for Historic Preservation, Directory of Landmark and Historic District Commissions (1976). In addition to these state and municipal legislative efforts, Congress has determined that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order

to give a sense of orientation to the American people," National Historic Preservation Act of 1966, 80 Stat. 915, 16 U.S.C. § 470(b) (1976 ed.), and has enacted a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance. See generally Gray, The Response of Federal Legislation to Historic Preservation, 36 Law & Contemp. Prob. 314 (1971).

[2]   Over one-half of the buildings listed in the Historic American Buildings Survey, begun by the Federal Government in 1933, have been destroyed. See Costonis, The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks, 85 Harv.L.Rev. 574, 574 n. 1 (1972), citing Huxtable, Bank's Building Plan Sets Off Debate on "Progress," N.Y. Times, Jan. 17, 1971, section 8, p. 1, col. 2.

[3]   See, e. g., N.Y.C. Admin. Code, § 205–1.0(a) (1976).

[4]   Gilbert, Introduction, Precedents for the Future, 36 Law & Contemp. Prob. 311, 312 (1971), quoting address by Robert Stipe, 1971 Conference on Preservation Law, Washington, D. C., May 1, 1971 (unpublished text, pp. 6–7).

New York City, responding to similar concerns and acting **\*109** pursuant to a New York State enabling Act,[5] adopted its Landmarks Preservation Law in 1965. See N.Y.C. Admin. Code, ch. 8–A, § 205–1.0 et seq. (1976). The city acted from the conviction that "the standing of [New York City] as a world-wide tourist center and world capital of business, culture and government" would be threatened if legislation were not enacted to protect historic landmarks and neighborhoods from precipitate decisions to destroy or fundamentally alter their character. § 205–1.0(a). The city believed that comprehensive measures to safeguard desirable features of the existing urban fabric would benefit its citizens in a variety of ways: e. g., fostering "civic pride in the beauty and noble accomplishments of the past"; protecting and enhancing "the city's attractions to tourists and visitors"; "support[ing] and stimul[ating] business and industry"; "strengthen[ing] the economy of the city"; and promoting "the use of historic districts, landmarks, interior landmarks and scenic landmarks for the education, pleasure and welfare of the people of the city." § 205–1.0(b).

[5]   See N.Y.Gen.Mun.Law § 96–a (McKinney 1977). It declares that it is the public policy of the State of New York to preserve structures and areas with special historical or aesthetic interest or value and authorizes

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

local governments to impose reasonable restrictions to perpetuate such structures and areas.

The New York City law is typical of many urban landmark laws in that its primary method of achieving its goals is not by **2652 acquisitions of historic properties,[6] but rather by involving public entities in land-use decisions affecting these properties *110 and providing services, standards, controls, and incentives that will encourage preservation by private owners and users.[7] While the law does place special restrictions on landmark properties as a necessary feature to the attainment of its larger objectives, the major theme of the law is to ensure the owners of any such properties both a "reasonable return" on their investments and maximum latitude to use their parcels for purposes not inconsistent with the preservation goals.

[6]  The consensus is that widespread public ownership of historic properties in urban settings is neither feasible nor wise. Public ownership reduces the tax base, burdens the public budget with costs of acquisitions and maintenance, and results in the preservation of public buildings as museums and similar facilities, rather than as economically productive features of the urban scene. See Wilson & Winkler, The Response of State Legislation to Historic Preservation, 36 Law & Contemp. Prob. 329, 330–331, 339–340 (1971).

[7]  See Costonis, *supra* n.2, at 580–581; Wilson & Winkler, *supra* n.6; Rankin, Operation and Interpretation of the New York City Landmark Preservation Law, 36 Law & Contemp. Prob. 366 (1971).

The operation of the law can be briefly summarized. The primary responsibility for administering the law is vested in the Landmarks Preservation Commission (Commission), a broad based, 11-member agency[8] assisted by a technical staff. The Commission first performs the function, critical to any landmark preservation effort, of identifying properties and areas that have "a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation." § 207–1.0(n); see § 207–1.0(h). If the Commission determines, after giving all interested parties an opportunity to be heard, that a building or area satisfies the ordinance's criteria, it will designate a building to be a "landmark," § 207–1.0(n),[9] situated *111 on a particular "landmark site," § 207–1.0(o),[10] or will designate an area to be a "historic district," § 207–1.0(h).[11] After the Commission makes a designation, New York City's Board of Estimate, after considering the

relationship of the designated property "to the master plan, the zoning resolution, projected public improvements and any plans for the renewal of the area involved," § 207–2.0(g)(1), may modify or disapprove the designation, and the owner may seek **2653 judicial review of the final designation decision. Thus far, 31 historic districts and over 400 individual landmarks have been finally designated,[12] and the process is a continuing one.

[8]  The ordinance creating the Commission requires that it include at least three architects, one historian qualified in the field, one city planner or landscape architect, one realtor, and at least one resident of each of the city's five boroughs. N.Y.C. Charter § 534 (1976). In addition to the ordinance's requirements concerning the composition of the Commission, there is, according to a former chairman, a "prudent tradition" that the Commission include one or two lawyers, preferably with experience in municipal government, and several laymen with no specialized qualifications other than concern for the good of the city. Goldstone, Aesthetics in Historic Districts, 36 Law & Contemp. Prob. 379, 384–385 (1971).

[9]  " 'Landmark.' Any improvement, any part of which is thirty years old or older, which has a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation and which has been designated as a landmark pursuant to the provisions of this chapter." § 207–1.0(n).

[10]  " 'Landmark site.' An improvement parcel or part thereof on which is situated a landmark and any abutting improvement parcel or part thereof used as and constituting part of the premises on which the landmark is situated, and which has been designated as a landmark site pursuant to the provisions of this chapter." § 207–1.0(o ).

[11]  " 'Historic district.' Any area which: (1) contains improvements which: (a) have a special character or special historical or aesthetic interest or value; and (b) represent one or more periods or styles of architecture typical of one or more eras in the history of the city; and (c) cause such area, by reason of such factors, to constitute a distinct section of the city; and (2) has been designated as a historic district pursuant to the provisions of this chapter." § 207–1.0(h). The Act also provides for the designation of a "scenic landmark," see § 207–1.0(w), and an "interior landmark." See § 207–1.0(m).

[12]  See Landmarks Preservation Commission of the City of New York, Landmarks and Historic Districts (1977). Although appellants are correct in noting that some

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

of the designated landmarks are publicly owned, the vast majority are, like Grand Central Terminal, privately owned structures.

Final designation as a landmark results in restrictions upon the property owner's options concerning use of the landmark site. First, the law imposes a duty upon the owner to keep the exterior features of the building "in good repair" to assure that the law's objectives not be defeated by the landmark's **\*112** falling into a state of irremediable disrepair. See § 207–10.0(a). Second, the Commission must approve in advance any proposal to alter the exterior architectural features of the landmark or to construct any exterior improvement on the landmark site, thus ensuring that decisions concerning construction on the landmark site are made with due consideration of both the public interest in the maintenance of the structure and the landowner's interest in use of the property. See §§ 207–4.0 to 207–9.0.

In the event an owner wishes to alter a landmark site, three separate procedures are available through which administrative approval may be obtained. First, the owner may apply to the Commission for a "certificate of no effect on protected architectural features": that is, for an order approving the improvement or alteration on the ground that it will not change or affect any architectural feature of the landmark and will be in harmony therewith. See § 207–5.0. Denial of the certificate is subject to judicial review.

Second, the owner may apply to the Commission for a certificate of "appropriateness." See § 207–6.0. Such certificates will be granted if the Commission concludes—focusing upon aesthetic, historical, and architectural values—that the proposed construction on the landmark site would not unduly hinder the protection, enhancement, perpetuation, and use of the landmark. Again, denial of the certificate is subject to judicial review. Moreover, the owner who is denied either a certificate of no exterior effect or a certificate of appropriateness may submit an alternative or modified plan for approval. The final procedure—seeking a certificate of appropriateness on the ground of "insufficient return," see § 207–8.0—provides special mechanisms, which vary depending on whether or not the landmark enjoys a tax exemption,[13] to ensure **\*\*2654** that designation does not cause economic hardship.

[13]   If the owner of a non-tax-exempt parcel has been denied certificates of appropriateness for a proposed alteration and shows that he is not earning a reasonable return on the property in its present state, the Commission and other city agencies must assume the burden

of developing a plan that will enable the landmark owner to earn a reasonable return on the landmark site. The plan may include, but need not be limited to, partial or complete tax exemption, remission of taxes, and authorizations for alterations, construction, or reconstruction appropriate for and not inconsistent with the purposes of the law. § 207–8.0(c). The owner is free to accept or reject a plan devised by the Commission and approved by the other city agencies. If he accepts the plan, he proceeds to operate the property pursuant to the plan. If he rejects the plan, the Commission may recommend that the city proceed by eminent domain to acquire a protective interest in the landmark, but if the city does not do so within a specified time period, the Commission must issue a notice allowing the property owner to proceed with the alteration or improvement as originally proposed in his application for a certificate of appropriateness.

Tax-exempt structures are treated somewhat differently. They become eligible for special treatment only if four preconditions are satisfied: (1) the owner previously entered into an agreement to sell the parcel that was contingent upon the issuance of a certificate of approval; (2) the property, as it exists at the time of the request, is not capable of earning a reasonable return; (3) the structure is no longer suitable to its past or present purposes; and (4) the prospective buyer intends to alter the landmark structure. In the event the owner demonstrates that the property in its present state is not earning a reasonable return, the Commission must either find another buyer for it or allow the sale and construction to proceed.

But this is not the only remedy available for owners of tax-exempt landmarks. As the case at bar illustrates, see *infra*, at 2658, if an owner files suit and establishes that he is incapable of earning a "reasonable return" on the site in its present state, he can be afforded judicial relief. Similarly, where a landmark owner who enjoys a tax exemption has demonstrated that the landmark structure, as restricted, is totally inadequate for the owner's "legitimate needs," the law has been held invalid as applied to that parcel. See *Lutheran Church v. City of New York*, 35 N.Y.2d 121, 359 N.Y.S.2d 7, 316 N.E.2d 305 (1974).

**\*113**  Although the designation of a landmark and landmark site restricts the owner's control over the parcel, designation also enhances the economic position of the landmark owner in one significant respect. Under New York City's zoning laws, owners of real property who have not developed their property **\*114** to the full extent permitted by the applicable zoning laws are allowed to transfer development

rights to contiguous parcels on the same city block. See New York City, Zoning Resolution Art. I, ch. 2, § 12–10 (1978) (definition of "zoning lot"). A 1968 ordinance gave the owners of landmark sites additional opportunities to transfer development rights to other parcels. Subject to a restriction that the floor area of the transferee lot may not be increased by more than 20% above its authorized level, the ordinance permitted transfers from a landmark parcel to property across the street or across a street intersection. In 1969, the law governing the conditions under which transfers from landmark parcels could occur was liberalized, see New York City Zoning Resolutions 74–79 to 74–793, apparently to ensure that the Landmarks Law would not unduly restrict the development options of the owners of Grand Central Terminal. See Marcus, Air Rights Transfers in New York City, 36 Law & Contemp. Prob. 372, 375 (1971). The class of recipient lots was expanded to include lots "across a street and opposite to another lot or lots which except for the intervention of streets or street intersections f [or]m a series extending to the lot occupied by the landmark building [, provided that] all lots [are] in the same ownership." New York City Zoning Resolution 74–79 (emphasis deleted). [14] In addition, the 1969 amendment permits, in highly commercialized **115** areas like midtown Manhattan, the transfer of all unused development rights to a single parcel. *Ibid.*

[14]  To obtain approval for a proposed transfer, the landmark owner must follow the following procedure. First, he must obtain the permission of the Commission which will examine the plans for the development of the transferee lot to determine whether the planned construction will be compatible with the landmark. Second, he must obtain the approbation of New York City's Planning Commission which will focus on the effects of the transfer on occupants of the buildings in the vicinity of the transferee lot and whether the landmark owner will preserve the landmark. Finally, the matter goes to the Board of Estimate, which has final authority to grant or deny the application. See also Costonis, *supra* n.2, at 585–586 (1972).

B

This case involves the application of New York City's Landmarks Preservation Law to Grand Central Terminal (Terminal). The Terminal, which is owned by the Penn Central Transportation Co. and its affiliates (Penn Central), is one of New York City's most famous buildings. Opened in 1913, it is regarded not only as providing an ingenious

engineering solution to the problems presented by urban railroad stations, but also as a magnificent example of the French beaux-arts style.

The Terminal is located in midtown Manhattan. Its south facade faces 42d Street and that street's intersection with Park Avenue. At street level, the Terminal is bounded on the west by Vanderbilt Avenue, on the east by the Commodore Hotel, and on the north by the Pan-American Building. Although a 20-story office tower, to have been located above the Terminal, was part of the original design, the planned tower was never constructed. [15] The Terminal itself is an eight-story structure which Penn **2655** Central uses as a railroad station and in which it rents space not needed for railroad purposes to a variety of commercial interests. The Terminal is one of a number of properties owned by appellant Penn Central in this area of midtown Manhattan. The others include the Barclay, Biltmore, Commodore, Roosevelt, and Waldorf-Astoria Hotels, the Pan-American Building and other office buildings along Park Avenue, and the Yale Club. At least eight of these are eligible to be recipients of development rights afforded the Terminal by virtue of landmark designation.

[15]  The Terminal's present foundation includes columns, which were built into it for the express purpose of supporting the proposed 20-story tower.

On August 2, 1967, following a public hearing, the Commission designated the Terminal a "landmark" and designated the **116** "city tax block" it occupies a "landmark site." [16] The Board of Estimate confirmed this action on September 21, 1967. Although appellant Penn Central had opposed the designation before the Commission, it did not seek judicial review of the final designation decision.

[16]  The Commission's report stated:
"Grand Central Station, one of the great buildings of America, evokes a spirit that is unique in this City. It combines distinguished architecture with a brilliant engineering solution, wedded to one of the most fabulous railroad terminals of our time. Monumental in scale, this great building functions as well today as it did when built. In style, it represents the best of the French Beaux Arts." Record 2240.

On January 22, 1968, appellant Penn Central, to increase its income, entered into a renewable 50-year lease and sublease agreement with appellant UGP Properties, Inc. (UGP), a wholly owned subsidiary of Union General Properties, Ltd., a United Kingdom corporation. Under the terms of the agreement, UGP was to construct a multistory office building

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

above the Terminal. UGP promised to pay Penn Central $1 million annually during construction and at least $3 million annually thereafter. The rentals would be offset in part by a loss of some $700,000 to $1 million in net rentals presently received from concessionaires displaced by the new building.

Appellants UGP and Penn Central then applied to the Commission for permission to construct an office building atop the Terminal. Two separate plans, both designed by architect Marcel Breuer and both apparently satisfying the terms of the applicable zoning ordinance, were submitted to the Commission for approval. The first, Breuer I, provided for the construction of a 55-story office building, to be cantilevered above the existing facade and to rest on the roof of the Terminal. The second, Breuer II Revised, [17] called for tearing *117 down a portion of the Terminal that included the 42d Street facade, stripping off some of the remaining features of the Terminal's facade, and constructing a 53-story office building. The Commission denied a certificate of no exterior effect on September 20, 1968. Appellants then applied for a certificate of "appropriateness" as to both proposals. After four days of hearings at which over 80 witnesses testified, the Commission denied this application as to both proposals.

[17]     Appellants also submitted a plan, denominated Breuer II, to the Commission. However, because appellants learned that Breuer II would have violated existing easements, they substituted Breuer II Revised for Breuer II, and the Commission evaluated the appropriateness only of Breuer II Revised.

The Commission's reasons for rejecting certificates respecting Breuer II Revised are summarized in the following statement: "To protect a Landmark, one does not tear it down. To perpetuate its architectural features, one does not strip them off." Record 2255. Breuer I, which would have preserved the existing vertical facades of the present structure, received more sympathetic consideration. The Commission first focused on the effect that the proposed tower would have on one desirable feature created by the present structure and its surroundings: the dramatic view of the Terminal from Park Avenue South. Although appellants had contended that the Pan-American Building had already destroyed the silhouette of the south facade and that one additional tower could do no **2656 further damage and might even provide a better background for the facade, the Commission disagreed, stating that it found the majestic approach from the south to be still unique in the city and that a 55-story tower atop the Terminal would be far more detrimental to its south facade

than the Pan-American Building 375 feet away. Moreover, the Commission found that from closer vantage points the Pan Am Building and the other towers were largely cut off from view, which would not be the case of the mass on top of the Terminal planned under Breuer I. In conclusion, the Commission stated:

"[We have] no fixed rule against making additions to designated buildings—it all depends on how they are done . . . . But to balance a 55-story office tower above *118 a flamboyant Beaux-Arts facade seems nothing more than an aesthetic joke. Quite simply, the tower would overwhelm the Terminal by its sheer mass. The 'addition' would be four times as high as the existing structure and would reduce the Landmark itself to the status of a curiosity.

"Landmarks cannot be divorced from their settings—particularly when the setting is a dramatic and integral part of the original concept. The Terminal, in its setting, is a great example of urban design. Such examples are not so plentiful in New York City that we can afford to lose any of the few we have. And we must preserve them in a meaningful way—with alterations and additions of such character, scale, materials and mass as will protect, enhance and perpetuate the original design rather than overwhelm it." *Id.*, at 2251. [18]

[18]     In discussing Breuer I, the Commission also referred to a number of instances in which it had approved additions to landmarks: "The office and reception wing added to Gracie Mansion and the school and church house added to the 12th Street side of the First Presbyterian Church are examples that harmonize in scale, material and character with the structures they adjoin. The new Watch Tower Bible and Tract Society building on Brooklyn Heights, though completely modern in idiom, respects the qualities of its surroundings and will enhance the Brooklyn Heights Historic District, as Butterfield House enhances West 12th Street, and Breuer's own Whitney Museum its Madison Avenue locale." Record 2251.

Appellants did not seek judicial review of the denial of either certificate. Because the Terminal site enjoyed a tax exemption, [19] remained suitable for its present and future uses, and was not the subject of a contract of sale, there were no further administrative remedies available to appellants as to the Breuer I and Breuer II Revised plans. See n. 13, *supra*. Further, appellants did not avail themselves of the opportunity to develop *119 and submit other plans for the Commission's consideration and approval. Instead, appellants filed suit in New York Supreme Court, Trial Term, claiming,

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

*inter alia*, that the application of the Landmarks Preservation Law had "taken" their property without just compensation in violation of the Fifth and Fourteenth Amendments and arbitrarily deprived them of their property without due process of law in violation of the Fourteenth Amendment. Appellants sought a declaratory judgment, injunctive relief barring the city from using the Landmarks Law to impede the construction of any structure that might otherwise lawfully be constructed on the Terminal site, and damages for the "temporary taking" that occurred between August 2, 1967, the designation date, and the date when the restrictions arising from the Landmarks Law would be lifted. The trial court granted the injunctive and declaratory relief, but severed the question of damages for a "temporary taking." [20]

19    See N.Y. Real Prop. Tax Law § 489–aa *et seq.* (McKinney Supp. 1977).

20    Although that court suggested that any regulation of private property to protect landmark values was unconstitutional if "just compensation" were not afforded, it also appeared to rely upon its findings: first, that the cost to Penn Central of operating the Terminal building itself, exclusive of purely railroad operations, exceeded the revenues received from concessionaires and tenants in the Terminal; and second, that the special transferable development rights afforded Penn Central as an owner of a landmark site did not "provide compensation to plaintiffs or minimize the harm suffered by plaintiffs due to the designation of the Terminal as a landmark."

**2657   Appellees appealed, and the New York Supreme Court, Appellate Division, reversed. 50 A.D.2d 265, 377 N.Y.S.2d 20 (1975). The Appellate Division held that the restrictions on the development of the Terminal site were necessary to promote the legitimate public purpose of protecting landmarks and therefore that appellants could sustain their constitutional claims only by proof that the regulation deprived them of all reasonable beneficial use of the property. The Appellate Division held that the evidence appellants *120 introduced at trial—"Statements of Revenues and Costs," purporting to show a net operating loss for the years 1969 and 1971, which were prepared for the instant litigation—had not satisfied their burden. [21] First, the court rejected the claim that these statements showed that the Terminal was operating at a loss, for in the court's view, appellants had improperly attributed some railroad operating expenses and taxes to their real estate operations and compounded that error by failing to impute any rental value to the vast space in the Terminal devoted to railroad purposes. Further, the Appellate Division concluded that appellants had

failed to establish either that they were unable to increase the Terminal's commercial income by transforming vacant or underutilized space to revenue-producing use, or that the unused development rights over the Terminal could not have been profitably transferred to one or more nearby sites. [22] The Appellate Division concluded that all appellants had succeeded in showing was that they had been deprived of the property's most profitable use, and that this showing did not establish that appellants had been unconstitutionally deprived of their property.

21    These statements appear to have reflected the costs of maintaining the exterior architectural features of the Terminal in "good repair" as required by the law. As would have been apparent in any case therefore, the existence of the duty to keep up the property was here —and will presumably always be—factored into the inquiry concerning the constitutionality of the landmark restrictions.
      The Appellate Division also rejected the claim that an agreement of Penn Central with the Metropolitan Transit Authority and the Connecticut Transit Authority provided a basis for invalidating the application of the Landmarks Law.

22    The record reflected that Penn Central had given serious consideration to transferring some of those rights to either the Biltmore Hotel or the Roosevelt Hotel.

The New York Court of Appeals affirmed. 42 N.Y.2d 324, 397 N.Y.S.2d 914, 366 N.E.2d 1271 (1977). That court summarily rejected any claim that the Landmarks Law had "taken" *121 property without "just compensation," *id.*, at 329, 397 N.Y.S.2d, at 917, 366 N.E.2d, at 1274, indicating that there could be no "taking" since the law had not transferred control of the property to the city, but only restricted appellants' exploitation of it. In that circumstance, the Court of Appeals held that appellants' attack on the law could prevail only if the law deprived appellants of their property in violation of the Due Process Clause of the Fourteenth Amendment. Whether or not there was a denial of substantive due process turned on whether the restrictions deprived Penn Central of a "reasonable return" on the "privately created and privately managed ingredient" of the Terminal. *Id.*, at 328, 397 N.Y.S.2d, at 916, 366 N.E.2d, at 1273. [23] The Court of **2658   Appeals concluded that the Landmarks Law had not effected a denial of due process because: (1) the landmark regulation permitted the same use as had been made of the Terminal for more than half a century; (2) the appellants had failed to show that they could not earn a reasonable return on

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

their investment in the Terminal itself; (3) even if the Terminal proper could never operate at a reasonable profit some of the income from Penn Central's extensive real estate holdings in the area, which include hotels and office buildings, must realistically be imputed to the Terminal; and **\*122** (4) the development rights above the Terminal, which had been made transferable to numerous sites in the vicinity of the Terminal, one or two of which were suitable for the construction of office buildings, were valuable to appellants and provided "significant, perhaps 'fair,' compensation for the loss of rights above the terminal itself." *Id.*, at 333–336, 397 N.Y.S.2d, at 922, 366 N.E.2d, at 1276–1278.

23    The Court of Appeals suggested that in calculating the value of the property upon which appellants were entitled to earn a reasonable return, the "publicly created" components of the value of the property—*i. e.*, those elements of its value attributable to the "efforts of organized society" or to the "social complex" in which the Terminal is located—had to be excluded. However, since the record upon which the Court of Appeals decided the case did not, as that court recognized, contain a basis for segregating the privately created from the publicly created elements of the value of the Terminal site and since the judgment of the Court of Appeals in any event rests upon bases that support our affirmance see *infra*, this page, we have no occasion to address the question whether it is permissible or feasible to separate out the "social increments" of the value of property. See Costonis, The Disparity Issue: A Context for the *Grand Central Terminal* Decision, 91 Harv.L.Rev. 402, 416–417 (1977).

Observing that its affirmance was "[o]n the present record," and that its analysis had not been fully developed by counsel at any level of the New York judicial system, the Court of Appeals directed that counsel "should be entitled to present . . . any additional submissions which, in the light of [the court's] opinion, may usefully develop further the factors discussed." *Id.*, at 337, 397 N.Y.S.2d, at 922, 366 N.E.2d, at 1279. Appellants chose not to avail themselves of this opportunity and filed a notice of appeal in this Court. We noted probable jurisdiction. 434 U.S. 983 (1977). We affirm.

II

The issues presented by appellants are (1) whether the restrictions imposed by New York City's law upon appellants' exploitation of the Terminal site effect a "taking" of appellants' property for a public use within the meaning of the Fifth Amendment, which of course is made applicable to

the States through the Fourteenth Amendment, see *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897), and, (2), if so, whether the transferable development rights afforded appellants constitute "just compensation" within the meaning of the Fifth Amendment. [24] We need only address the question whether a "taking" has occurred. [25]

24    Our statement of the issues is a distillation of four questions presented in the jurisdictional statement:

"Does the social and cultural desirability of preserving historical landmarks through government regulation derogate from the constitutional requirement that just compensation be paid for private property taken for public use?

"Is Penn Central entitled to no compensation for that large but unmeasurable portion of the value of its rights to construct an office building over the Grand Central Terminal that is said to have been created by the efforts of 'society as an organized entity'?

"Does a finding that Penn Central has failed to establish that there is no possibility, without exercising its development rights, of earning a reasonable return on all of its remaining properties that benefit in any way from the operations of the Grand Central Terminal warrant the conclusion that no compensation need be paid for the taking of those rights?

"Does the possibility accorded to Penn Central, under the landmark-preservation regulation, of realizing some value at some time by transferring the Terminal development rights to other buildings, under a procedure that is conceded to be defective, severely limited, procedurally complex and speculative, and that requires ultimate discretionary approval by governmental authorities, meet the constitutional requirements of just compensation as applied to landmarks?" Jurisdictional Statement 3–4.

The first and fourth questions assume that there has been a taking and raise the problem whether, under the circumstances of this case, the transferable development rights constitute "just compensation." The second and third questions, on the other hand, are directed to the issue whether a taking has occurred.

25    As is implicit in our opinion, we do not embrace the proposition that a "taking" can never occur unless government has transferred physical control over a portion of a parcel.

**\*123** A

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5238 Page 75 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

Before considering appellants' specific contentions, it will be useful to review **\*\*2659** the factors that have shaped the jurisprudence of the Fifth Amendment injunction "nor shall private property be taken for public use, without just compensation." The question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States*, 364 **\*124** U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. See *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); see *United States v. Caltex, Inc.*, 344 U.S. 149, 156, 73 S.Ct. 200, 203, 97 L.Ed. 157 (1952).

In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See *Goldblatt v. Hempstead, supra,* 369 U.S., at 594, 82 S.Ct., at 990. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, *e. g., United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic

values. Exercises of the taxing power are one obvious example. A second are the decisions in which this Court has dismissed "taking" challenges on the ground that, while the challenged government action caused **\*125** economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes. See, *e. g., United States v. Willow River Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945) (interest in high-water level of river for runoff for tailwaters to maintain power head is not property); *United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (no property interest can exist in navigable waters); see also *Demorest v. City Bank Co.,* 321 U.S. 36, 64 S.Ct. 384, 88 L.Ed. 526 (1944); *Muhlker v. Harlem R. Co.,* 197 U.S. 544, 25 S.Ct. 522, 49 L.Ed. 872 (1905); Sax, Takings and the Police Power, 74 Yale L.J. 36, 61–62 (1964).

More importantly for the present case, in instances in which a state tribunal reasonably concluded that "the health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. See *Nectow v. Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928). Zoning laws are, of course, the classic example, see **\*\*2660** *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (prohibition of industrial use); *Gorieb v. Fox,* 274 U.S. 603, 608, 47 S.Ct. 675, 677, 71 L.Ed. 1228 (1927) (requirement that portions of parcels be left unbuilt); *Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909) (height restriction), which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property. See *Goldblatt v. Hempstead, supra,* 369 U.S., at 592–593, 82 S.Ct., at 988–989, and cases cited; see also *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 674, n. 8, 96 S.Ct. 2358, 2362 n. 8, 49 L.Ed.2d 132 (1976).

Zoning laws generally do not affect existing uses of real property, but "taking" challenges have also been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm. *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), is illustrative. In that case, a state entomologist, acting pursuant to a state statute, ordered **\*126** the claimants to cut down a large number of ornamental red cedar trees because they produced cedar rust fatal to apple trees cultivated nearby.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-33   Filed 11/30/22   PageID.5239   Page 76 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

Although the statute provided for recovery of any expense incurred in removing the cedars, and permitted claimants to use the felled trees, it did not provide compensation for the value of the standing trees or for the resulting decrease in market value of the properties as a whole. A unanimous Court held that this latter omission did not render the statute invalid. The Court held that the State might properly make "a choice between the preservation of one class of property and that of the other" and since the apple industry was important in the State involved, concluded that the State had not exceeded "its constitutional powers by deciding upon the destruction of one class of property [without compensation] in order to save another which, in the judgment of the legislature, is of greater value to the public." *Id.,* at 279, 48 S.Ct., at 247.

Again, *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), upheld a law prohibiting the claimant from continuing his otherwise lawful business of operating a brickyard in a particular physical community on the ground that the legislature had reasonably concluded that the presence of the brickyard was inconsistent with neighboring uses. See also *United States v. Central Eureka Mining Co., supra* (Government order closing gold mines so that skilled miners would be available for other mining work held not a taking); *Atchison, T. & S. F. R. Co. v. Public Utilities Comm'n,* 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953) (railroad may be required to share cost of constructing railroad grade improvement); *Walls v. Midland Carbon Co.,* 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276 (1920) (law prohibiting manufacture of carbon black upheld); *Reinman v. Little Rock,* 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900 (1915) (law prohibiting livery stable upheld); *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (law prohibiting liquor business upheld).

*Goldblatt v. Hempstead, supra,* is a recent example. There, a 1958 city safety ordinance banned any excavations below **\*127** the water table and effectively prohibited the claimant from continuing a sand and gravel mining business that had been operated on the particular parcel since 1927. The Court upheld the ordinance against a "taking" challenge, although the ordinance prohibited the present and presumably most beneficial use of the property and had, like the regulations in *Miller* and *Hadacheck,* severely affected a particular owner. The Court assumed that the ordinance did not prevent the owner's reasonable use of the property since the owner made no showing of an adverse effect on the value of the land. Because the restriction served a substantial public purpose, the Court thus held no taking had occurred. It is, of course, implicit in *Goldblatt* that a use restriction on real property may constitute a "taking" if not reasonably necessary to the

effectuation of a substantial public purpose, see **\*\*2661** *Nectow v. Cambridge, supra;* cf. *Moore v. East Cleveland,* 431 U.S. 494, 513–514, 97 S.Ct. 1932, 1943, 52 L.Ed.2d 531 (1977) (STEVENS, J., concurring), or perhaps if it has an unduly harsh impact upon the owner's use of the property.

*Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), is the leading case for the proposition that a state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a "taking." There the claimant had sold the surface rights to particular parcels of property, but expressly reserved the right to remove the coal thereunder. A Pennsylvania statute, enacted after the transactions, forbade any mining of coal that caused the subsidence of any house, unless the house was the property of the owner of the underlying coal and was more than 150 feet from the improved property of another. Because the statute made it commercially impracticable to mine the coal, *id.,* at 414, 43 S.Ct., at 159, and thus had nearly the same effect as the complete destruction of rights claimant had reserved from the owners of the surface land, see *id.,* at 414–415, 43 S.Ct., at 159–160, the Court held that the statute was invalid as effecting a "taking" **\*128** without just compensation. See also *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (Government's complete destruction of a materialman's lien in certain property held a "taking"); *Hudson Water Co. v. McCarter,* 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908) (if height restriction makes property wholly useless "the rights of property . . . prevail over the other public interest" and compensation is required). See generally Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165, 1229–1234 (1967).

Finally, government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute "takings." *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), is illustrative. In holding that direct overflights above the claimant's land, that destroyed the present use of the land as a chicken farm, constituted a "taking," *Causby* emphasized that Government had not "merely destroyed property [but was] using a part of it for the flight of its planes." *Id.,* 328 U.S., at 262–263, n. 7, 66 S.Ct., at 1066. See also *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962) (overflights held a taking); *Portsmouth Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287

Case 2:19-cv-00037-JNP  Document 59-33  Filed 11/30/22  PageID.5240  Page 77 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

(1922) (United States military installations' repeated firing of guns over claimant's land is a taking); *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (repeated floodings of land caused by water project is taking); but see *YMCA v. United States,* 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969) (damage caused to building when federal officers who were seeking to protect building were attacked by rioters held not a taking). See generally Michelman, *supra,* at 1226–1229; Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964).

## B

In contending that the New York City law has "taken" their property in violation of the Fifth and Fourteenth Amendments, appellants make a series of arguments, which, while tailored to the facts of this case, essentially urge that **\*129** any substantial restriction imposed pursuant to a landmark law must be accompanied by just compensation if it is to be constitutional. Before considering these, we emphasize what is not in dispute. Because this Court has recognized, in a number of settings, that States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city, see *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9–10, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); **\*\*2662** *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); *Welch v. Swasey,* 214 U.S., at 108, 29 S.Ct., at 571, appellants do not contest that New York City's objective of preserving structures and areas with special historic, architectural, or cultural significance is an entirely permissible governmental goal. They also do not dispute that the restrictions imposed on its parcel are appropriate means of securing the purposes of the New York City law. Finally, appellants do not challenge any of the specific factual premises of the decision below. They accept for present purposes both that the parcel of land occupied by Grand Central Terminal must, in its present state, be regarded as capable of earning a reasonable return,[26] and that the transferable development rights afforded appellants by virtue of the Terminal's designation as a landmark are valuable, even if not as valuable as the rights to construct above the Terminal. In appellants' view none of these factors derogate from their claim that New York City's law has effected a "taking."

26    Both the Jurisdictional Statement 7–8, n. 7, and Brief for Appellants 8 n. 7 state that appellants are not seeking review of the New York courts' determination that Penn Central could earn a "reasonable return" on its investment in the Terminal. Although appellants suggest in their reply brief that the factual conclusions of the New York courts cannot be sustained unless we accept the rationale of the New York Court of Appeals, see Reply Brief for Appellants 12 n. 15, it is apparent that the findings concerning Penn Central's ability to profit from the Terminal depend in no way on the Court of Appeals' rationale.

**\*130**  They first observe that the airspace above the Terminal is a valuable property interest, citing *United States v. Causby, supra.* They urge that the Landmarks Law has deprived them of any gainful use of their "air rights" above the Terminal and that, irrespective of the value of the remainder of their parcel, the city has "taken" their right to this superadjacent airspace, thus entitling them to "just compensation" measured by the fair market value of these air rights.

Apart from our own disagreement with appellants' characterization of the effect of the New York City law, see *infra,* at 2665, the submission that appellants may establish a "taking" simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable. Were this the rule, this Court would have erred not only in upholding laws restricting the development of air rights, see *Welch v. Swasey, supra,* but also in approving those prohibiting both the subjacent, see *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), and the lateral, see *Gorieb v. Fox,* 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927), development of particular parcels.[27] "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the **\*131** parcel as a whole—here, the city tax block designated as the "landmark site."

27    These cases dispose of any contention that might be based on *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), that full use of air rights is so bound up with the investment-backed expectations of appellants that governmental deprivation of these rights invariably—*i. e.,* irrespective of the impact of the restriction on the value of the parcel as a whole

—constitutes a "taking." Similarly, *Welch, Goldblatt,* and *Gorieb* illustrate the fallacy of appellants' related contention that a "taking" must be found to have occurred whenever the land-use restriction may be characterized as imposing a "servitude" on the claimant's parcel.

Secondly, appellants, focusing on the character and impact of the New York City law, argue that it effects a "taking" because its operation has significantly diminished the value of the Terminal site. Appellants concede that the decisions sustaining other land-use regulations, which, **2663 like the New York City law, are reasonably related to the promotion of the general welfare, uniformly reject the proposition that diminution in property value, standing alone, can establish a "taking," see *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value caused by zoning law); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87 1/2 % diminution in value); cf. *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S., at 674 n. 8, 96 S.Ct., at 2362 n. 8, and that the "taking" issue in these contexts is resolved by focusing on the uses the regulations permit. See also *Goldblatt v. Hempstead, supra.* Appellants, moreover, also do not dispute that a showing of diminution in property value would not establish a taking if the restriction had been imposed as a result of historic-district legislation, see generally *Maher v. New Orleans*, 516 F.2d 1051 (CA5 1975), but appellants argue that New York City's regulation of individual landmarks is fundamentally different from zoning or from historic-district legislation because the controls imposed by New York City's law apply only to individuals who own selected properties.

Stated baldly, appellants' position appears to be that the only means of ensuring that selected owners are not singled out to endure financial hardship for no reason is to hold that any restriction imposed on individual landmarks pursuant to the New York City scheme is a "taking" requiring the payment of "just compensation." Agreement with this argument would, of course, invalidate not just New York City's law, but all comparable landmark legislation in the Nation. We find no merit in it.

*132 It is true, as appellants emphasize, that both historic-district legislation and zoning laws regulate all properties within given physical communities whereas landmark laws apply only to selected parcels. But, contrary to appellants' suggestions, landmark laws are not like discriminatory, or "reverse spot," zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones. See 2 A.

Rathkopf, The Law of Zoning and Planning 26–4, and n. 6 (4th ed. 1978). In contrast to discriminatory zoning, which is the antithesis of land-use control as part of some comprehensive plan, the New York City law embodies a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found in the city, [28] and as noted, over 400 landmarks and 31 historic districts have been designated pursuant to this plan.

[28]  Although the New York Court of Appeals contrasted the New York City Landmarks Law with both zoning and historic-district legislation and stated at one point that landmark laws do not "further a general community plan," 42 N.Y.2d 324, 330, 397 N.Y.S.2d 914, 918, 366 N.E.2d 1271, 1274 (1977), it also emphasized that the implementation of the objectives of the Landmarks Law constitutes an "acceptable reason for singling out one particular parcel for different and less favorable treatment." *Ibid.*, 397 N.Y.S.2d, at 918, 366 N.E.2d, at 1275. Therefore, we do not understand the New York Court of Appeals to disagree with our characterization of the law.

Equally without merit is the related argument that the decision to designate a structure as a landmark "is inevitably arbitrary or at least subjective, because it is basically a matter of taste," Reply Brief for Appellants 22, thus unavoidably singling out individual landowners for disparate and unfair treatment. The argument has a particularly hollow ring in this case. For appellants not only did not seek judicial review of either the designation or of the denials of the certificates of appropriateness and of no exterior effect, but do not even now suggest that the Commission's decisions concerning the Terminal were in any sense arbitrary or unprincipled. But, in *133 any event, a landmark owner has a right to judicial review of any Commission decision, and, quite simply, there is no basis whatsoever for a conclusion that courts will have any greater difficulty identifying arbitrary or discriminatory action in the context of landmark regulation than in the **2664 context of classic zoning or indeed in any other context. [29]

[29]  When a property owner challenges the application of a zoning ordinance to his property, the judicial inquiry focuses upon whether the challenged restriction can reasonably be deemed to promote the objectives of the community land-use plan, and will include consideration of the treatment of similar parcels. See generally *Nectow v. Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928). When a property owner challenges a landmark

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

designation or restriction as arbitrary or discriminatory, a similar inquiry presumably will occur.

Next, appellants observe that New York City's law differs from zoning laws and historic-district ordinances in that the Landmarks Law does not impose identical or similar restrictions on all structures located in particular physical communities. It follows, they argue, that New York City's law is inherently incapable of producing the fair and equitable distribution of benefits and burdens of governmental action which is characteristic of zoning laws and historic-district legislation and which they maintain is a constitutional requirement if "just compensation" is not to be afforded. It is, of course, true that the Landmarks Law has a more severe impact on some landowners than on others, but that in itself does not mean that the law effects a "taking." Legislation designed to promote the general welfare commonly burdens some more than others. The owners of the brickyard in *Hadacheck*, of the cedar trees in *Miller v. Schoene*, and of the gravel and sand mine in *Goldblatt v. Hempstead*, were uniquely burdened by the legislation sustained in those cases.[30] Similarly, zoning **\*134** laws often affect some property owners more severely than others but have not been held to be invalid on that account. For example, the property owner in *Euclid* who wished to use its property for industrial purposes was affected far more severely by the ordinance than its neighbors who wished to use their land for residences.

[30] Appellants attempt to distinguish these cases on the ground that, in each, government was prohibiting a "noxious" use of land and that in the present case, in contrast, appellants' proposed construction above the Terminal would be beneficial. We observe that the uses in issue in *Hadacheck, Miller*, and *Goldblatt* were perfectly lawful in themselves. They involved no "blameworthiness, . . . moral wrongdoing or conscious act of dangerous risk-taking which induce[d society] to shift the cost to a pa[rt]icular individual." Sax, Takings and the Police Power, 74 Yale L.J. 36, 50 (1964). These cases are better understood as resting not on any supposed "noxious" quality of the prohibited uses but rather on the ground that the restrictions were reasonably related to the implementation of a policy—not unlike historic preservation—expected to produce a widespread public benefit and applicable to all similarly situated property.

Nor, correlatively, can it be asserted that the destruction or fundamental alteration of a historic landmark is not harmful. The suggestion that the beneficial quality of appellants' proposed construction is established by the fact that the construction would have been consistent with applicable zoning laws ignores the development in sensibilities and ideals reflected in landmark legislation like New York City's. Cf. *West Bros. Brick Co. v. Alexandria*, 169 Va. 271, 282–283, 192 S.E. 881, 885–886, *appeal dismissed for want of a substantial federal question*, 302 U.S. 658, 58 S.Ct. 369, 82 L.Ed. 508 (1937).

In any event, appellants' repeated suggestions that they are solely burdened and unbenefited is factually inaccurate. This contention overlooks the fact that the New York City law applies to vast numbers of structures in the city in addition to the Terminal—all the structures contained in the 31 historic districts and over 400 individual landmarks, many of which are close to the Terminal.[31] Unless we are to reject the judgment of the New York City Council that the preservation of landmarks benefits all New York citizens and all structures, both economically and by improving the quality of life in the city as a whole—which we are unwilling to do—we cannot **\*135** conclude that the owners of the Terminal have in no sense been benefited by the Landmarks Law. Doubtless appellants believe they are more burdened than **\*\*2665** benefited by the law, but that must have been true, too, of the property owners in *Miller, Hadacheck, Euclid*, and *Goldblatt*.[32]

[31] There are some 53 designated landmarks and 5 historic districts or scenic landmarks in Manhattan between 14th and 59th Streets. See Landmarks Preservation Commission, Landmarks and Historic Districts (1977).

[32] It is, of course, true that the fact the duties imposed by zoning and historic-district legislation apply throughout particular physical communities provides assurances against arbitrariness, but the applicability of the Landmarks Law to a large number of parcels in the city, in our view, provides comparable, if not identical, assurances.

Appellants' final broad-based attack would have us treat the law as an instance, like that in *United States v. Causby*, in which government, acting in an enterprise capacity, has appropriated part of their property for some strictly governmental purpose. Apart from the fact that *Causby* was a case of invasion of airspace that destroyed the use of the farm beneath and this New York City law has in nowise impaired the present use of the Terminal, the Landmarks Law neither exploits appellants' parcel for city purposes nor facilitates nor arises from any entrepreneurial operations of the city. The situation is not remotely like that in *Causby* where the airspace above the property was in the flight pattern

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5243 Page 80 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

for military aircraft. The Landmarks Law's effect is simply to prohibit appellants or anyone else from occupying portions of the airspace above the Terminal, while permitting appellants to use the remainder of the parcel in a gainful fashion. This is no more an appropriation of property by government for its own uses than is a zoning law prohibiting, for "aesthetic" reasons, two or more adult theaters within a specified area, see *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), or a safety regulation prohibiting excavations below a certain level. See *Goldblatt v. Hempstead*.

### C

Rejection of appellants' broad arguments is not, however, the end of our inquiry, for all we thus far have established is **\*136** that the New York City law is not rendered invalid by its failure to provide "just compensation" whenever a landmark owner is restricted in the exploitation of property interests, such as air rights, to a greater extent than provided for under applicable zoning laws. We now must consider whether the interference with appellants' property is of such a magnitude that "there must be an exercise of eminent domain and compensation to sustain [it]." *Pennsylvania Coal Co. v. Mahon*, 260 U.S., at 413, 43 S.Ct., at 159. That inquiry may be narrowed to the question of the severity of the impact of the law on appellants' parcel, and its resolution in turn requires a careful assessment of the impact of the regulation on the Terminal site.

Unlike the governmental acts in *Goldblatt, Miller, Causby, Griggs*, and *Hadacheck*, the New York City law does not interfere in any way with the present uses of the Terminal. Its designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years: as a railroad terminal containing office space and concessions. So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel. More importantly, on this record, we must regard the New York City law as permitting Penn Central not only to profit from the Terminal but also to obtain a "reasonable return" on its investment.

Appellants, moreover, exaggerate the effect of the law on their ability to make use of the air rights above the Terminal in two respects.[33] First, it simply cannot be maintained,

on this record, that appellants have been prohibited from occupying *any* portion of the airspace above the Terminal. While the Commission's actions in denying applications to construct an **\*137** office building in excess of 50 stories above the Terminal may indicate that it will refuse to issue a certificate **\*\*2666** of appropriateness for any comparably sized structure, nothing the Commission has said or done suggests an intention to prohibit *any* construction above the Terminal. The Commission's report emphasized that whether any construction would be allowed depended upon whether the proposed addition "would harmonize in scale, material and character with [the Terminal]." Record 2251. Since appellants have not sought approval for the construction of a smaller structure, we do not know that appellants will be denied any use of any portion of the airspace above the Terminal.[34]

33    Appellants, of course, argue at length that the transferable development rights, while valuable, do not constitute "just compensation." Brief for Appellants 36–43.

34    Counsel for appellants admitted at oral argument that the Commission has not suggested that it would not, for example, approve a 20-story office tower along the lines of that which was part of the original plan for the Terminal. See Tr. of Oral Arg. 19.

Second, to the extent appellants have been denied the right to build above the Terminal, it is not literally accurate to say that they have been denied *all* use of even those pre-existing air rights. Their ability to use these rights has not been abrogated; they are made transferable to at least eight parcels in the vicinity of the Terminal, one or two of which have been found suitable for the construction of new office buildings. Although appellants and others have argued that New York City's transferable development-rights program is far from ideal,[35] the New York courts here supportably found that, at least in the case of the Terminal, the rights afforded are valuable. While these rights may well not have constituted "just compensation" if a "taking" had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on appellants and, for that reason, are to be taken into account in considering the impact of regulation. Cf. *Goldblatt v. Hempstead*, 369 U.S., at 594 n. 3, 82 S.Ct., at 990 n. 3.

35    See Costonis, *supra* n. 2, at 585–589.

**\*138** On this record, we conclude that the application of New York City's Landmarks Law has not effected a

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5244 Page 81 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)
98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

"taking" of appellants' property. The restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties. [36]

[36] We emphasize that our holding today is on the present record, which in turn is based on Penn Central's present ability to use the Terminal for its intended purposes and in a gainful fashion. The city conceded at oral argument that if appellants can demonstrate at some point in the future that circumstances have so changed that the Terminal ceases to be "economically viable," appellants may obtain relief. See Tr. of Oral Arg. 42–43.

*Affirmed.*

Mr. Justice REHNQUIST, with whom THE CHIEF JUSTICE and Mr. Justice STEVENS join, dissenting.

Of the over one million buildings and structures in the city of New York, appellees have singled out 400 for designation as official landmarks. [1] The owner of a building might initially be pleased that his property has been chosen by a distinguished committee of architects, historians, and city **\*139** planners for such a singular distinction. But he may well discover, as appellant Penn Central Transportation Co. did here, that the landmark designation imposes upon him **\*\*2667** a substantial cost, with little or no offsetting benefit except for the honor of the designation. The question in this case is whether the cost associated with the city of New York's desire to preserve a limited number of "landmarks" within its borders must be borne by all of its taxpayers or whether it can instead be imposed entirely on the owners of the individual properties.

[1] A large percentage of the designated landmarks are public structures (such as the Brooklyn Bridge, City Hall, the Statute of Liberty and the Municipal Asphalt Plant) and thus do not raise Fifth Amendment taking questions. See Landmarks Preservation Commission of the City of New York, Landmarks and Historic Districts (1977 and Jan. 10, 1978, Supplement). Although the Court refers to the New York ordinance as a *comprehensive* program to preserve *historic* landmarks, *ante,* at 2651, the ordinance is not limited to historic buildings and gives little guidance to the Landmarks Preservation Commission in its selection of landmark sites. Section 207–1.0(n) of the Landmarks Preservation Law, as set forth in N.Y.C. Admin. Code, ch. 8–A (1976), requires only that the selected landmark be at least 30 years old and possess "a special character or special historical or

aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation."

Only in the most superficial sense of the word can this case be said to involve "zoning." [2] Typical zoning restrictions may, it is true, so limit the prospective uses of a piece of property as to diminish the value of that property in the abstract because it may not be used for the forbidden purposes. But any such abstract decrease in value will more than likely be at least partially offset by an increase in value which flows from similar restrictions as to use on neighboring **\*140** properties. All property owners in a designated area are placed under the same restrictions, not only for the benefit of the municipality as a whole but also for the common benefit of one another. In the words of Mr. Justice Holmes, speaking for the Court in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), there is "an average reciprocity of advantage."

[2] Even the New York Court of Appeals conceded that "[t]his is not a zoning case. . . . Zoning restrictions operate to advance a comprehensive community plan for the common good. Each property owner in the zone is both benefited and restricted from exploitation, presumably without discrimination, except for permitted continuing nonconforming uses. The restrictions may be designed to maintain the general character of the area, or to assure orderly development, objectives inuring to the benefit of all, which property owners acting individually would find difficult or impossible to achieve . . . .

"Nor does this case involve landmark regulation of a historic district. . . . [In historic districting, as in traditional zoning,] owners although burdened by the restrictions also benefit, to some extent, from the furtherance of a general community plan.

———————

"Restrictions on alteration of individual landmarks are not designed to further a general community plan. Landmark restrictions are designed to prevent alteration or demolition of a single piece of property. To this extent, such restrictions resemble 'discriminatory' zoning restrictions, properly condemned . . . ." 42 N.Y.2d 324, 329–330, 397 N.Y.S.2d 914, 917–918, 366 N.E.2d 1271, 1274 (1977).

Where a relatively few individual buildings, all separated from one another, are singled out and treated differently from surrounding buildings, no such reciprocity exists. The cost to the property owner which results from the imposition of restrictions applicable only to his property and not that of his neighbors may be substantial—in this case, several million

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

dollars—with no comparable reciprocal benefits. And the cost associated with landmark legislation is likely to be of a completely different order of magnitude than that which results from the imposition of normal zoning restrictions. Unlike the regime affected by the latter, the landowner is not simply prohibited from using his property for certain purposes, while allowed to use it for all other purposes. Under the historic-landmark preservation scheme adopted by New York, the property owner is under an affirmative duty to *preserve* his property *as a landmark* at his own expense. To suggest that because traditional zoning results in some limitation of use of the property zoned, the New York City landmark preservation scheme should likewise be upheld, represents the ultimate in treating as alike things which are different. The rubric of "zoning" has not yet sufficed to avoid the well-established proposition that the Fifth Amendment bars the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). See discussion *infra*, at pp. 2671–2672.

In August 1967, Grand Central Terminal was designated a landmark over the objections of its owner Penn Central. Immediately upon this designation, Penn Central, like all **\*141** owners of a landmark site, was placed under an affirmative duty, backed **\*\*2668** by criminal fines and penalties, to keep "exterior portions" of the landmark "in good repair." Even more burdensome, however, were the strict limitations that were thereupon imposed on Penn Central's use of its property. At the time Grand Central was designated a landmark, Penn Central was in a precarious financial condition. In an effort to increase its sources of revenue, Penn Central had entered into a lease agreement with appellant UGP Properties, Inc., under which UGP would construct and operate a multistory office building cantilevered above the Terminal building. During the period of construction, UGP would pay Penn Central $1 million per year. Upon completion, UGP would rent the building for 50 years, with an option for another 25 years, at a guaranteed *minimum* rental of $3 million per year. The record is clear that the proposed office building was in full compliance with all New York zoning laws and height limitations. Under the Landmarks Preservation Law, however, appellants could not construct the proposed office building unless appellee Landmarks Preservation Commission issued either a "Certificate of No Exterior Effect" or a "Certificate of Appropriateness." Although appellants' architectural plan would have preserved the facade of the Terminal, the Landmarks Preservation Commission has refused to approve the construction.

## I

The Fifth Amendment provides in part: "nor shall private property be taken for public use, without just compensation." [3] **\*142** In a very literal sense, the actions of appellees violated this constitutional prohibition. Before the city of New York declared Grand Central Terminal to be a landmark, Penn Central could have used its "air rights" over the Terminal to build a multistory office building, at an apparent value of several million dollars per year. Today, the Terminal cannot be modified in *any* form, including the erection of additional stories, without the permission of the Landmark Preservation Commission, a permission which appellants, despite good-faith attempts, have so far been unable to obtain. Because the Taking Clause of the Fifth Amendment has not always been read literally, however, the constitutionality of appellees' actions requires a closer scrutiny of this Court's interpretation of the three key words in the Taking Clause—"property," "taken," and "just compensation." [4]

3    The guarantee that private property shall not be taken for public use without just compensation is applicable to the States through the Fourteenth Amendment. Although the state "legislature may prescribe a form of procedure to be observed in the taking of private property for public use, . . . it is not due process of law if provision be not made for compensation." *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 236, 17 S.Ct. 581, 584, 41 L.Ed. 979 (1897).

4    The Court's opinion touches base with, or at least attempts to touch base with, most of the major eminent domain cases decided by this Court. Its use of them, however, is anything but meticulous. In citing to *United States v. Caltex, Inc.*, 344 U.S. 149, 156, 73 S.Ct. 200, 97 L.Ed. 157 (1952), for example, *ante*, at 2659, the only language remotely applicable to eminent domain is stated in terms of "the destruction of respondents' terminals by a trained team of engineers in the face of their impending seizure by the enemy." 344 U.S., at 156, 73 S.Ct., at 203.

## A

Appellees do not dispute that valuable property rights have been destroyed. And the Court has frequently emphasized that the term "property" as used in the Taking Clause includes the entire "group of rights inhering in the citizen's [ownership]."

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5246 Page 83 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

*United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). The term is not used in the "vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. [Instead, it] . . . denote [s] the *group of rights* inhering in the citizen's relation to the physical THING, *AS* **\*143** *THE RIGHT TO POSSESS, USE AND DISPOSE OF IT.* . . . the constitutional provision is addressed to *every sort of interest* the **\*\*2669** citizen may possess." *Id.*, at 377–378, 65 S.Ct., at 359 (emphasis added).

While neighboring landowners are free to use their land and "air rights" in any way consistent with the broad boundaries of New York zoning, Penn Central, absent the permission of appellees, must forever maintain its property in its present state.[5] The property has been thus subjected to a nonconsensual servitude not borne by any neighboring or similar properties.[6]

[5]    In particular, Penn Central cannot increase the height of the Terminal. This Court has previously held that the "air rights" over an area of land are "property" for purposes of the Fifth Amendment. See *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) ("air rights" taken by low-flying airplanes); *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962) (same); *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922) (firing of projectiles over summer resort can constitute taking). See also *Butler v. Frontier Telephone Co.*, 186 N.Y. 486, 79 N.E. 716 (1906) (stringing of telephone wire across property constitutes a taking).

[6]    It is, of course, irrelevant that appellees interfered with or destroyed property rights that Penn Central had not yet physically used. The Fifth Amendment must be applied with "reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, *or such as may be reasonably expected in the immediate future.*" *Boom Co. v. Patterson*, 98 U.S. 403, 408, 25 L.Ed. 206 (1879) (emphasis added).

## B

Appellees have thus destroyed—in a literal sense, "taken"—substantial property rights of Penn Central. While the term "taken" might have been narrowly interpreted to include only physical seizures of property rights, "the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of

a right or interest to the sovereign constitutes the taking." *Id.*, at 378, 65 S.Ct., at 359. See also **\*144** *United States v. Lynah*, 188 U.S. 445, 469, 23 S.Ct. 349, 47 L.Ed. 539 1903);[7] *Dugan v. Rank*, 372 U.S. 609, 625, 83 S.Ct. 999, 1009, 10 L.Ed.2d 15 (1963). Because "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense," *Armstrong v. United States*, 364 U.S., at 48, 80 S.Ct., at 1568, however, this does not end our inquiry. But an examination of the two exceptions where the destruction of property does *not* constitute a taking demonstrates that a compensable taking has occurred here.

[7]    "Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors." 188 U.S., at 470, 23 S.Ct., at 357.

## 1

As early as 1887, the Court recognized that the government can prevent a property owner from using his property to injure others without having to compensate the owner for the value of the forbidden use.

"A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be *injurious to the health, morals, or safety of the community*, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. . . . The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, *by reason of their not being permitted, by a noxious use of* **\*145** *their property, to inflict* **\*\*2670** *injury upon the community.*" *Mugler v. Kansas*, 123 U.S. 623, 668–669, 8 S.Ct. 273, 301, 31 L.Ed. 205.

Thus, there is no "taking" where a city prohibits the operation of a brickyard within a residential area, see *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915),

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5247 Page 84 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

or forbids excavation for sand and gravel below the water line, see *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Nor is it relevant, where the government is merely prohibiting a noxious use of property, that the government would seem to be singling out a particular property owner. *Hadacheck, supra*, at 413, 36 S.Ct., at 146.[8]

[8] Each of the cases cited by the Court for the proposition that legislation which severely affects some landowners but not others does not effect a "taking" involved noxious uses of property. See *Hadacheck; Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *Goldblatt*. See *ante*, at 2660–2661, 2664.

The nuisance exception to the taking guarantee is not coterminous with the police power itself. The question is whether the forbidden use is dangerous to the safety, health, or welfare of others. Thus, in *Curtin v. Benson*, 222 U.S. 78, 32 S.Ct. 31, 56 L.Ed. 102 (1911), the Court held that the Government, in prohibiting the owner of property within the boundaries of Yosemite National Park from grazing cattle on his property, had taken the owner's property. The Court assumed that the Government could constitutionally require the owner to fence his land or take other action to prevent his cattle from straying onto others' land without compensating him.

"Such laws might be considered as strictly regulations of the use of property, of so using it that no injury could result to others. They would have the effect of making the owner of land herd his cattle on his own land and of making him responsible for a neglect of it." *Id.*, at 86, 32 S.Ct., at 33.

The prohibition in question, however, was "not a prevention of a misuse or illegal use but the prevention of a legal and essential use, an attribute of its ownership." *Ibid.*

Appellees are not prohibiting a nuisance. The record is **\*146** clear that the proposed addition to the Grand Central Terminal would be in full compliance with zoning, height limitations, and other health and safety requirements. Instead, appellees are seeking to preserve what they believe to be an outstanding example of beaux-arts architecture. Penn Central is prevented from further developing its property basically because *too good* a job was done in designing and building it. The city of New York, because of its unadorned admiration for the design, has decided that the owners of the building must preserve it unchanged for the benefit of sightseeing New Yorkers and tourists.

Unlike land-use regulations, appellees' actions do not merely *prohibit* Penn Central from using its property in a narrow set of noxious ways. Instead, appellees have placed an *affirmative* duty on Penn Central to maintain the Terminal in its present state and in "good repair." Appellants are not free to use their property as they see fit within broad outer boundaries but must strictly adhere to their past use except where appellees conclude that alternative uses would not detract from the landmark. While Penn Central may continue to use the Terminal as it is presently designed, appellees otherwise "exercise complete dominion and control over the surface of the land," *United States v. Causby*, 328 U.S. 256, 262, 66 S.Ct. 1062, 1066, 90 L.Ed. 1206 (1946), and must compensate the owner for his loss. *Ibid.* "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired." *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947). See also *Dugan v. Rank, supra*, 372 U.S., at 625, 83 S.Ct., at 1009.[9]

[9] In *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893), the Monongahela company had expended large sums of money in improving the Monongahela River by means of locks and dams. When the United States condemned this property for its own use, the Court held that full compensation had to be awarded. "Suppose, in the improvement of a navigable stream, it was deemed essential to construct a canal with locks, in order to pass around rapids or falls. Of the power of Congress to condemn whatever land may be necessary for such canal, there can be no question; and of the equal necessity of paying full compensation for all private property taken there can be as little doubt." *Id.*, at 337, 13 S.Ct., at 630. Under the Court's rationale, however, where the Government wishes to preserve a pre-existing canal system for public use, it need not condemn the property but need merely order that it be preserved in its present form and be kept "in good repair."

**\*147  \*\*2671** 2

Even where the government prohibits a noninjurious use, the Court has ruled that a taking does not take place if the prohibition applies over a broad cross section of land and thereby "secure[s] an average reciprocity of advantage." *Pennsylvania Coal Co. v. Mahon*, 260 U.S., at 415, 43 S.Ct., at 160.[10] It is for this reason that zoning does not constitute a "taking." While zoning at times reduces *individual* property

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

values, the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the zoning will be benefited by another.

10    Appellants concede that the preservation of buildings of historical or aesthetic importance is a permissible objective of state action. Brief for Appellants 12. *Cf. Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *United States v. Gettysburg Electric R. Co.*, 160 U.S. 668, 16 S.Ct. 427, 40 L.Ed. 576 (1896).
For the reasons noted in the text, historic *zoning*, as has been undertaken by cities, such as New Orleans, may well not require compensation under the Fifth Amendment.

Here, however, a multimillion dollar loss has been imposed on appellants; it is uniquely felt and is not offset by any benefits flowing from the preservation of some 400 other "landmarks" in New York City. Appellees have imposed a substantial cost on less than one one-tenth of one percent of the buildings in New York City for the general benefit of all its people. It is exactly this imposition of general costs on a few individuals at which the "taking" protection is directed. The Fifth Amendment
"prevents the public from loading upon one individual more than his just share of the burdens of government, **\*148** and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 325, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893).

Less than 20 years ago, this Court reiterated that the
"Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S., at 49, 80 S.Ct., at 1569.

Cf. *Nashville, C. & St. L. R. Co. v. Walters*, 294 U.S. 405, 428–430, 55 S.Ct. 486, 494–495, 79 L.Ed. 949 (1935). [11]

11    "It is true that the police power embraces regulations designed to promote public convenience or the general welfare, and not merely those in the interest of public health, safety and morals. . . . But when particular individuals are singled out to bear the cost of advancing the public convenience, that imposition must bear some

reasonable relation to the evils to be eradicated or the advantages to be secured. . . . While moneys raised by general taxation may constitutionally be applied to purposes from which the individual taxed may receive no benefit, and indeed, suffer serious detriment, . . . so-called assessments for public improvements laid upon particular property owners are ordinarily constitutional only if based on benefits received by them." 294 U.S., at 429–430, 55 S.Ct., at 494–495.

As Mr. Justice Holmes pointed out in *Pennsylvania Coal Co. v. Mahon*, "the question at bottom" in an eminent domain case "is upon whom the loss of the changes desired should fall." 260 U.S., at 416, 43 S.Ct., at 160. The benefits that appellees believe will flow from preservation of the Grand Central Terminal will accrue to all the citizens of New York City. There is no **\*\*2672** reason to believe that appellants will enjoy a substantially greater share of these benefits. If the cost of preserving Grand Central Terminal were spread evenly across the entire population of the city of New York, the burden per person would be in cents per year—a minor cost appellees would **\*149** surely concede for the benefit accrued. Instead, however, appellees would impose the entire cost of several million dollars per year on Penn Central. But it is precisely this sort of discrimination that the Fifth Amendment prohibits. [12]

12    The fact that the Landmarks Preservation Commission may have allowed additions to a relatively few landmarks is of no comfort to appellants. *Ante*, at 2656 n. 18. Nor is it of any comfort that the Commission refuses to allow appellants to construct any additional stories because of their belief that such construction would not be aesthetic. *Ante*, at 2656.

Appellees in response would argue that a taking only occurs where a property owner is denied *all* reasonable value of his property. [13] The Court has frequently held that, even where a destruction of property rights would not *otherwise* constitute a taking, the inability of the owner to make a reasonable return on his property requires compensation under the Fifth Amendment. See, *e. g., United States v. Lynah*, 188 U.S., at 470, 23 S.Ct., at 357. But the converse is not true. A taking does not become a noncompensable exercise of police power simply because the government in its grace allows the owner to make some "reasonable" use of his property. "[I]t is the character of the invasion, not the amount of damage resulting from it, **\*150** so long as the damage is substantial, that determines the question whether it is a taking." *United States v. Cress*, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5249 Page 86 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)
98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

(1917); *United States v. Causby*, 328 U.S., at 266, 66 S.Ct., at 1068. See also *Goldblatt v. Hempstead*, 369 U.S., at 594, 82 S.Ct., at 990.

13    Difficult conceptual and legal problems are posed by a rule that a taking only occurs where the property owner is denied all reasonable return on his property. Not only must the Court define "reasonable return" for a variety of types of property (farmlands, residential properties, commercial and industrial areas), but the Court must define the particular property unit that should be examined. For example, in this case, if appellees are viewed as having restricted Penn Central's use of its "air rights," *all* return has been denied. See *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The Court does little to resolve these questions in its opinion. Thus, at one point, the Court implies that the question is whether the restrictions have "an unduly harsh impact upon the owner's use of the property," *ante*, at 2661; at another point, the question is phrased as whether Penn Central can obtain "a 'reasonable return' on its investment," *ante*, at 2666; and, at yet another point, the question becomes whether the landmark is "economically viable," *ante*, at 2666 n. 36.

C

Appellees, apparently recognizing that the constraints imposed on a landmark site constitute a taking for Fifth Amendment purposes, do not leave the property owner empty-handed. As the Court notes, *ante*, at 2654–2655, the property owner may theoretically "transfer" his previous right to develop the landmark property to adjacent properties if they are under his control. Appellees have coined this system "Transfer Development Rights," or TDR's.

Of all the terms used in the Taking Clause, "just compensation" has the strictest meaning. The Fifth Amendment does not allow simply an approximate compensation but requires "a full and perfect equivalent for the property taken." *Monongahela Navigation Co. v. United States*, 148 U.S., at 326, 13 S.Ct., at 626.

"[I]f the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken." *Ibid*

**\*\*2673** See also *United States v. Lynah, supra*, 188 U.S., at 465, 23 S.Ct., at 355; *United States v. Pewee Coal Co.*, 341 U.S. 114, 117, 71 S.Ct. 670, 671, 95 L.Ed. 809 (1951). And the determination of whether a "full and perfect equivalent" has been awarded is a "judicial function." *United States v. New River Collieries Co.*, 262 U.S. 341, 343–344, 43 S.Ct. 565, 566–567, 67 L.Ed. 1014 (1923). The fact **\*151** that *appellees* may believe that TDR's provide full compensation is irrelevant.

"The legislature may determine what private property is needed for public purposes—that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry." *Monongahela Navigation Co. v. United States, supra*, 148 U.S., at 327, 13 S.Ct., at 626.

Appellees contend that, even if they have "taken" appellants' property, TDR's constitute "just compensation." Appellants, of course, argue that TDR's are highly imperfect compensation. Because the lower courts held that there was no "taking," they did not have to reach the question of whether or not just compensation has already been awarded. The New York Court of Appeals' discussion of TDR's gives some support to appellants:

"The many defects in New York City's program for development rights transfers have been detailed elsewhere . . . . The area to which transfer is permitted is severely limited [and] complex procedures are required to obtain a transfer permit." 42 N.Y.2d 324, 334–335, 397 N.Y.S.2d 914, 920, 366 N.E.2d 1271, 1277 (1977).

And in other cases the Court of Appeals has noted that TDR's have an "uncertain and contingent market value" and do "not adequately preserve" the value lost when a building is declared to be a landmark. *French Investing Co. v. City of New York*, 39 N.Y.2d 587, 591, 385 N.Y.S.2d 5, 7, 350 N.E.2d 381, 383, appeal dismissed 429 U.S. 990, 97 S.Ct. 515, 50 L.Ed.2d 602 (1976). On the other hand, there is evidence in the record that Penn Central has been **\*152** offered substantial amounts for its TDR's. Because the record on appeal is relatively slim, I would remand to the Court of Appeals for a determination

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5250 Page 87 of 114

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978)

98 S.Ct. 2646, 11 ERC 1801, 57 L.Ed.2d 631, 8 Envtl. L. Rep. 20,528

of whether TDR's constitute a "full and perfect equivalent for the property taken." [14]

[14] The Court suggests, *ante*, at 2663, that if appellees are held to have "taken" property sights of landmark owners, not only the New York City Landmarks Preservation Law, but "all comparable landmark legislation in the Nation" must fall. This assumes, of course, that TDR's are not "just compensation" for the property rights destroyed. It also ignores the fact that many States and cities in the Nation have chosen to preserve landmarks by purchasing or condemning restrictive easements over the facades of the landmarks and are apparently quite satisfied with the results. See, *e. g.*, Ore.Rev.Stat. §§ 271.710, 271.720 (1977); Md.Ann.Code, Art. 41, § 181A (1978); Va.Code §§ 10–145.1 and 10–138(e) (1978); Richmond, Va., City Code §§ 21–23 *et seq.* (1975). The British National Trust has effectively used restrictive easements to preserve landmarks since 1937. See National Trust Act, 1937, 1 Edw. 8 and 1 Geo. 6 ch. lvii, §§ 4 and 8. Other States and cities have found that tax incentives are also an effective means of encouraging the private preservation of landmark sites. See, *e. g.*, Conn.Gen.Stat. § 12–127a (1977); Ill.Rev.Stat., ch. 24, § 11–48.2–6 (1976); Va.Code § 10–139 (1978). The New York City Landmarks Preservation Law departs drastically from these traditional, and constitutional, means of preserving landmarks.

## II

Over 50 years ago, Mr. Justice Holmes, speaking for the Court, warned that the courts were "in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S., at 416, 43 S.Ct., at 160. The Court's opinion in this case demonstrates **2674 that the danger thus foreseen has not abated. The city of New York is in a precarious financial state, and some may believe that the costs of landmark preservation will be more easily borne by corporations such as Penn Central than the overburdened individual taxpayers *153 of New York. But these concerns do not allow us to ignore past precedents construing the Eminent Domain Clause to the end that the desire to improve the public condition is, indeed, achieved by a shorter cut than the constitutional way of paying for the change.

## All Citations

438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, 11 ERC 1801, 8 Envtl. L. Rep. 20,528

---

End of Document        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

458 F.3d 1327
United States Court of Appeals,
Federal Circuit.

ACADIA TECHNOLOGY, INC., and GLOBAL
WIN TECHNOLOGY, LTD., Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 05–5178.
|
Aug. 8, 2006.

**Synopsis**

**Background:** Owners of imported computer cooling fans brought suit against the United States to recover for taking based on depreciation in value while computer cooling fans were in government custody for more than four years after seizure by United States Customs Service based on complaints of counterfeit certification marks. The United States Court of Federal Claims, Robert H. Hodges, Jr., Senior Judge, 65 Fed.Cl. 425,granted government's motion to dismiss for failure to state claim. Owners appealed.

**Holdings:** The Court of Appeals, Bryson, Circuit Judge, held that:

seizure of property to enforce intellectual property provision of Tariff Act is not taking, and

allegedly unreasonable delay in returning the property did not result in compensable taking.

Affirmed.

**Attorneys and Law Firms**

**\*1328** Mattaniah Eytan, of Corte Madera, California, argued for plaintiffs-appellants.

Marla T. Conneely, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel was Marta Whearley, Office

of Assistant Chief, U.S. Bureau of Customs and Border Protection, of San Francisco, California.

Brian F. Burke, Baker & McKenzie LLP, of Washington, DC, for amicus curiae. With him on the brief was Kristine E. Pirnia. Of counsel on the brief were Nancie G. Marzulla and Roger J. Marzulla, Defenders of Property Rights, of Washington, DC.

Before BRYSON, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

**Opinion**

BRYSON, Circuit Judge.

The appellants, importers of computer parts, contend that their imported goods were taken without just compensation, in violation of the Fifth Amendment, when the government seized their goods upon importation and did not return them for a period of more than four years. The Court of Federal Claims held that the appellants failed to state a claim on which relief could be granted. *Acadia Tech., Inc. v. United States,* 65 Fed.Cl. 425 (2005). We affirm.

I

Appellants Acadia Technology, Inc., and Global Win Technology, Ltd., (collectively, "Acadia") own the property at issue in this appeal, 20,923 cooling fans for computer central processing units. Acadia sought to import those goods into the United States in three shipments in October 1997 and February 1998.

Underwriters Laboratories ("UL") is a testing laboratory that examines and tests **\*1329** various products for compliance with safety standards. If UL finds that a manufacturer's goods comply with applicable standards, UL authorizes the manufacturer to affix UL's certification marks to its goods. The "reverse UR" is a certification mark that UL issues for electrical components of multi-component devices (such as computer cooling fans).

Section 42 of the Lanham Act, 15 U.S.C. § 1124, forbids importation of merchandise "which shall copy or simulate a [registered] trademark." Section 526(e) of the Tariff Act of 1930, 19 U.S.C. § 1526(e), provides that any merchandise bearing a counterfeit mark (within the meaning of 15 U.S.C. § 1127) that is imported into the United States in violation

Acadia Technology, Inc. v. U.S., 458 F.3d 1327 (2006)
29 ITRD 1121, 79 U.S.P.Q.2d 1609

of 15 U.S.C. § 1124 "shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws."

In October 1997, U.S. Customs and Border Protection ("Customs"), acting pursuant to section 526(e) of the Tariff Act, detained a shipment of Acadia's cooling fans that bore the "reverse UR" mark. After receiving a letter from UL on October 16, 1997, stating that UL believed the use of the marks to be unauthorized and counterfeit, Customs seized the fans. On February 2 and 3, 1998, Customs seized two more shipments of Acadia's cooling fans, again after receiving letters from UL stating that UL believed that the use of the "reverse UR" mark on the fans was unauthorized and counterfeit. According to the complaint, the three shipments of cooling fans had a total value of approximately $125,130 when they were seized.

After Customs seized the fans, it notified Acadia of the seizure and advised Acadia that it would initiate summary forfeiture proceedings unless Acadia filed a claim of ownership. In letters dated April 16, 1998, and July 29, 1998, Acadia requested that Customs terminate the summary forfeiture proceedings. Acadia submitted forms in which it requested that the matter be transferred to the Department of Justice for the institution of a judicial civil forfeiture action.

The matter was transferred to the Department of Justice in accordance with Acadia's request, but a forfeiture complaint was not promptly filed. On October 8, 2002, after a period of more than four years, the Department of Justice filed a civil forfeiture action in the United States District Court for the Northern District of California, seeking forfeiture of all three of Acadia's shipments. A year later, on October 15, 2003, the district court entered a stipulation and order of dismissal. Under the terms of the order, the forfeiture action was dismissed. The stipulated dismissal provided that each party was to bear its own costs. The fans were thereafter returned to Acadia. At that point, according to Acadia's complaint, the fans had become obsolete and their only value was as scrap, for which purpose they were worth only about $41,000.

After the dismissal of the forfeiture action, Acadia filed this action in the Court of Federal Claims, claiming the right to recover the difference between the value of the fans at the time they were seized and their value when they were returned. The government moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a

claim upon which relief could be granted. In its opposition to the government's motion to dismiss, Acadia conceded that the Court of Federal Claims lacked jurisdiction over two of its claims, but it argued that the court had jurisdiction over its claim that **\*1330** the government's actions violated the Takings Clause of the Fifth Amendment and that Acadia was entitled to recover the loss in the value of the fans as just compensation for the taking. The Court of Federal Claims granted the government's motion to dismiss the takings claim for failure to state a claim, and Acadia now appeals.

II

Acadia argues that the government's actions constituted a taking for two independent reasons. First, Acadia argues that the seizure of its goods was a taking because it was not authorized by the statute under which Customs seized Acadia's goods. Second, Acadia argues that the government's delay of several years in initiating forfeiture proceedings was unreasonable and therefore constituted a taking regardless of whether the initial seizure was lawful.

A

With respect to the lawfulness of the original seizure, Acadia contends that 19 U.S.C. § 1526(e), the statute on which Customs relied to seize the cooling fans, applies only to counterfeit trademarks, and not to false certification marks such as the "reverse UR" mark at issue in this case. Section 1526(e) provides that any merchandise "bearing a counterfeit mark (within the meaning of section 1127 of title 15) imported into the United States in violation of the provisions of section 1124 of title 15, shall be seized and ... forfeited for violations of the customs laws." 19 U.S.C. § 1526(e). Section 1127 of title 15 defines a "mark" to include "any trademark, service mark, collective mark, or certification mark," and it defines "counterfeit" as "a spurious mark, which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Section 1124 of title 15 provides, in pertinent part, that "no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of [the Lanham] Act ... shall be admitted to entry." 15 U.S.C. § 1124. Acadia points to the use of the term "trademark" in section 1124 and argues that section 1124 (and thus the seizure and forfeiture provisions of section 1526(e)) apply to trademarks, but not to certification marks. For that

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

reason, Acadia argues, the seizure of Acadia's cooling fans was unlawful and therefore compensable as a taking.

Both the trial court in this case and the United States District Court for the Northern District of California in *United States v. 10,510 Packaged Computer Towers,* 152 F.Supp.2d 1189, 1194–97 (N.D.Cal.2001), have disagreed with Acadia's construction of section 1526(e) and have held that the statute applies to counterfeit certification marks as well as counterfeit trademarks. This court has never addressed that question, and it is unnecessary for us to do so here. For purposes of determining whether there has been a taking of Acadia's property without just compensation, it is unnecessary to determine whether section 1526(e) applies to the particular goods at issue in this case. That is because a takings claim is separate from a challenge to the lawfulness of the government's conduct: a taking does not result simply because the government acted unlawfully, nor does a takings claim fail simply because the government's conduct is subject to challenge as unlawful.

As we explained in **\*1331** *Rith Energy, Inc. v. United States,* 247 F.3d 1355 (Fed.Cir.2001), "an uncompensated taking and an unlawful government action constitute 'two separate wrongs that give rise to two separate causes of action.' " *Id.* at 1365 (quoting *Del–Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1364 (Fed.Cir.1998)). "[A] property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims." *Id.* As such:

> [I]n a takings case we assume that the underlying action was lawful and we decide only whether the governmental action in question constituted a taking for which compensation must be paid. [The appellant's] complaints about the wrongfulness of the [government action] are therefore not properly presented in the context of its takings claim. The only question before us is whether [the appellant] was entitled to be compensated for the effects of that action.

*Rith Energy, Inc. v. United States,* 270 F.3d 1347, 1352–53 (Fed.Cir.2001) (on petition for rehearing); *see also Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 543, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *Lion Raisins, Inc. v. United States,* 416 F.3d 1356, 1369 (Fed.Cir.2005) ("We have made clear that a claim premised on a regulatory violation does not state a claim for a taking."); *John Corp. v. City of Houston,* 214 F.3d 573, 579 n. 9 (5th Cir.2000) (citing cases for the proposition that "the Takings Clause presupposes legitimate government action"); *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997) (Tucker Act does not create jurisdiction in the Court of Federal Claims for a party contesting the propriety of a seizure); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993) ("[The] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act."); *Fla. Rock Indus., Inc. v. United States,* 791 F.2d 893, 905 (Fed.Cir.1986). Acadia's assertion that Customs' actions ran afoul of the Customs statutes therefore does not form the basis for a legal claim under the Takings Clause of the Fifth Amendment. *See Lion Raisins,* 416 F.3d at 1369 ("Because Lion's takings claim was premised on the allegations that the [government agency] violated the statute and regulations, the Court of Federal Claims properly dismissed the complaint."). For takings purposes, we therefore must assume the government conduct at issue in this case was not unlawful.

Assuming that Customs' seizure of Acadia's goods was lawful, the question presented by Acadia's first argument becomes whether the seizure of property to enforce an intellectual property provision of the Tariff Act is the sort of "public use" of private property for which the Takings Clause of the Fifth Amendment requires compensation. The case law makes clear that it is not.

When property has been seized pursuant to the criminal laws or subjected to *in rem* forfeiture proceedings, such deprivations are not "takings" for which the owner is entitled to compensation. *Bennis v. Michigan,* 516 U.S. 442, 452–53, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Van Oster v. Kansas,* 272 U.S. 465, 468, 47 S.Ct. 133, 71 L.Ed. 354 (1926). The same rule applies even if the property is seized as evidence in a criminal investigation or as the suspected instrumentality of a crime, but is ultimately returned to the owner either because the government **\*1332** does not pursue forfeiture proceedings or because the owner prevails in a forfeiture action. *See, e.g., United States v. $7,990.00 in U.S. Currency,*

170 F.3d 843, 845–46 (8th Cir.1999) ("[T]he government's temporary possession of seized property that it ultimately returned to a forfeiture claimant ... is not a 'taking' for Fifth Amendment purposes."); *United States v. One 1979 Cadillac Coupe De Ville,* 833 F.2d 994, 1000 (Fed.Cir.1987); *United States v. Various Gambling Devices,* 478 F.2d 1194, 1198 (5th Cir.1973); *Seay v. United States,* 61 Fed.Cl. 32, 35 (2004); *Crocker v. United States,* 37 Fed.Cl. 191, 195–96, *aff'd,* 125 F.3d 1475 (Fed.Cir.1997).

In *One 1979 Cadillac,* the government seized the claimant's car and brought a forfeiture action in district court, alleging that the car had been used in a narcotics transaction. The jury ruled in favor of the owner of the car, and the district court ordered the government to pay $4,050 in damages, which represented the decrease in value over the 30 months between the initial seizure and the court's ruling. 833 F.2d at 996. We reversed, holding that the government's seizure and retention of the property did not constitute a taking. *Id.* at 1000–01. Similarly, in *Seay,* the Court of Federal Claims held that the government did not have a duty to compensate the claimant where the government seized property and returned it to the claimants in a damaged condition nearly six years after the seizure. 61 Fed.Cl. at 35. The government's seizure, retention, and damaging of the property did not give rise to an actionable claim for a taking, the court reasoned, because "items properly seized by the government under its police power are not seized for 'public use' within the meaning of the Fifth Amendment." *Id.*

Although there is no underlying allegation of criminal conduct in the present case as there was in *One 1979 Cadillac* and *Seay,* there is no reason to treat civil forfeitures differently for purposes of takings analysis simply because Congress has directed that the forfeitures be enforced through civil rather than criminal proceedings. A Customs seizure of goods suspected of bearing counterfeit marks is a classic example of the government's exercise of the police power to condemn contraband or noxious goods, an exercise that has not been regarded as a taking for public use for which compensation must be paid. *See Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1027–28, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless."); *Andrus v. Allard,* 444 U.S. 51, 66–67, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) ("Regulations that bar trade in certain goods have been upheld against claims of

unconstitutional taking."); *$7,990.00 in U.S. Currency,* 170 F.3d at 845 ("[T]he forfeiture of contraband is an exercise of the government's police power, not its eminent domain power."); *see also Lee v. City of Chicago,* 330 F.3d 456, 476 (7th Cir.2003) (D.Wood, J., concurring) ("*[I]n rem* forfeitures of property used for illicit purposes are non-compensable exercises of the government's police power."). While it is insufficient to avoid the burdens imposed by the Takings Clause simply to invoke the "police powers" of the state, regardless of the respective benefits to the public and burdens on the property owner, the prohibition on importing goods bearing counterfeit marks that misrepresent their quality and safety is the kind of exercise of the police power that has repeatedly been treated as legitimate even in the absence **\*1333** of compensation to the owners of the imported property. *See generally Calero–Toledo,* 416 U.S. at 680, 94 S.Ct. 2080 (statutory forfeiture scheme authorizing forfeiture of a vessel used to transport marijuana does not violate the Takings Clause); *Miller v. Schoene,* 276 U.S. 272, 279–80, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (state-ordered destruction of red cedar trees, hosts to cedar rust, which attacks apple trees held not to be a taking for which compensation is required: "[W]here the public interest is involved, preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property."); *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (state law outlawing manufacture and sale of alcoholic beverages did not constitute a taking of private property for public use: "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit.").[1]

---

[1]   In *Shelden v. United States,* 7 F.3d 1022 (Fed.Cir.1993), this court held that an innocent owner of a mortgage interest in property that was subject to a criminal forfeiture could pursue a takings claim. As we subsequently made clear in *Vereda, Ltda. v. United States,* 271 F.3d 1367 (Fed.Cir.2001), the decision in *Shelden* was limited to an *in personam* criminal forfeiture following the criminal conviction of a third party, in which an innocent owner-claimant sought to recover his interest in the forfeited property. It did not involve an *in rem* forfeiture directed against the property itself. *Shelden* and other cases involving claims of innocent third parties with respect to property that is subject to criminal *in personam* forfeitures, *see, e.g., Froudi v. United States,* 22 Cl.Ct. 290 (1991), are not applicable

to *in rem* seizures and forfeiture proceedings of the sort at issue in this case, involving alleged contraband or counterfeit goods. We need not address in this case whether the decision in *Shelden* is still valid in light of the subsequent decision of the Supreme Court in *Bennis v. Michigan, supra.*

B

Acadia's second argument is that, regardless of the legitimacy of the initial seizures of the cooling fans, the delay in returning the fans was unreasonable and the unreasonable delay resulted in a compensable taking. We reject that argument as well. As in the case of the challenge to the initial seizures, the flaw in Acadia's argument regarding unreasonable governmental delay is that it is predicated on the unlawfulness of the delay. Acadia acknowledged at oral argument that if the delay in this case were considered reasonable under the circumstances, there would be no taking requiring compensation under the Takings Clause. Under the authorities cited above, such as the *Rith Energy* case, that concession makes clear that the true nature of Acadia's action is one for damages based on unlawful conduct by the government, not on a taking of private property for public use.

Acadia contends that if it cannot obtain compensation through a takings action for unreasonable delay in instituting forfeiture proceedings, it will have no remedy against governmental abuse in holding seized property indefinitely without either filing a judicial forfeiture action against the property or returning it to its owner. In fact, the courts have recognized a right not to have property held in such settings for an unreasonable time and have crafted a remedy to vindicate that right. Following the seizure of property, the owner of **\*1334** the property has a due process right to have the government either return the property or initiate forfeiture proceedings without unreasonable delay. *See, e.g., United States v. Eight Thousand Eight Hundred & Fifty Dollars,* 461 U.S. 555, 564–67, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) ("*$8850* "); *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *United States v. $7,990.00 in U.S. Currency,* 170 F.3d 843, 846 (8th Cir.1999); *United States v. Premises Known as 608 Taylor Ave.,* 584 F.2d 1297, 1302–05 (3d Cir.1978) ("[D]ue process ... requires forfeiture proceedings against seized property be brought without unreasonable delay." (citing cases)); *Ivers v. United States,* 581 F.2d 1362, 1368 (9th Cir.1978) ("Due Process requires that these proceedings be commenced with some promptitude."). In the case of such delay, the Supreme Court

has held that a property owner has a remedy in a United States district court that has been recognized since the early nineteenth century:

> A claimant is able to trigger rapid filing of a forfeiture action if he desires it. First, the claimant can file an equitable action seeking an order compelling the filing of the forfeiture action or return of the seized property. *See Slocum v. Mayberry,* [15 U.S. (2 Wheat.) 1, 10 (1817) ] (Marshall, C.J.). Less formally, the claimant could simply request that the Customs Service refer the matter to the United States Attorney. If the claimant believes that the initial seizure was improper, he could file a motion ... for a return of the seized property.

*$8,850,* 461 U.S. at 569, 103 S.Ct. 2005; *see also United States v. Von Neumann,* 474 U.S. 242, 244 n. 3, 106 S.Ct. 610, 88 L.Ed.2d 587 (1986). By invoking that remedy, a property owner may force the government either to return the property or to initiate forfeiture proceedings. If the government commences forfeiture proceedings after an inordinate delay, the owner may file a motion with the court requesting dismissal of the proceeding and return of his property on the ground that the delay has violated his due process rights, even if the property would otherwise be forfeitable. *See $7,990.00 in U.S. Currency,* 170 F.3d at 846; *United States v. One 1973 Buick Riviera Auto.,* 560 F.2d 897, 901 (8th Cir.1977) (citing cases); *United States v. One Motor Yacht Named Mercury,* 527 F.2d 1112, 1114 (1st Cir.1975). Such a due process violation may also give rise to a right to money damages against individual defendants in a court with jurisdiction to grant such a remedy. *See Seguin v. Eide,* 720 F.2d 1046, 1047–48 & n. 2 (9th Cir.1983); *States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146, 1155–57 (4th Cir.1974). A violation of due process rights, however, does not give rise to a claim for money damages against the United States in the Court of Federal Claims. *See James v. Caldera,* 159 F.3d 573, 581 (Fed.Cir.1998); *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997); *LeBlanc v. United States,* 50 F.3d 1025, 1028 (Fed.Cir.1995).[2]

**Acadia Technology, Inc. v. U.S., 458 F.3d 1327 (2006)**
29 ITRD 1121, 79 U.S.P.Q.2d 1609

2      The Supreme Court has suggested that an owner in Acadia's position might be able to bring a suit under the Tucker Act for money damages under a theory of breach of an implied-in-fact contract of bailment between the owner and Customs. *See Kosak v. United States,* 465 U.S. 848, 860 n. 22, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984). That theory, however, was not asserted in this case, and we express no opinion as to whether the facts in Acadia's complaint might support such a claim.

In sum, we hold that the trial court correctly dismissed Acadia's complaint for failure to state a claim on which relief **\*1335** could be granted. While the Court of Federal Claims has jurisdiction to enter an award of damages for a violation of the Takings Clause of the Fifth Amendment, the court correctly held that Acadia's allegations did not give rise to a takings claim under the governing authorities.[3]

3      The government argues in the alternative that the trial court lacked jurisdiction over Acadia's takings claim, principally on the ground that Acadia's remedy was in the district court under the comprehensive statutory scheme for administrative and judicial review

of forfeitures. *See Vereda,* 271 F.3d at 1374–75. A principal thrust of Acadia's takings claim, however, was that the government engaged in unreasonable delay before initiating forfeiture proceedings in this case and that the delay caused Acadia's loss. Because the statutory scheme for *in rem* forfeitures does not provide a means to address pre-forfeiture delay, the forfeiture statutes do not preempt the jurisdiction of the Court of Federal Claims over Acadia's takings claim. In this regard, we follow the court's analysis in *Vereda,* 271 F.3d at 1376, where the court explained that the takings claim in *Shelden* was not preempted because, under circumstances such as those in *Shelden* and in this case, the civil forfeiture statutes did not provide the plaintiff with "specific and comprehensive scheme for administrative and judicial review" of its claim of a violation of its rights in the subject property.

AFFIRMED.

**All Citations**

458 F.3d 1327, 29 ITRD 1121, 79 U.S.P.Q.2d 1609

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.   AR004788   6

170 F.3d 843
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Appellee,

v.

$7,990.00 IN U.S. CURRENCY, Defendant,
George James Fiorentino, Claimant/Appellant.

No. 98–1793.
|
Submitted Dec. 7, 1998.
|
Decided March 15, 1999.

**Synopsis**

Civil forfeiture proceeding was dismissed by the United States District Court for the District of Minnesota, Donald D. Alsop, J., based on finding of unreasonable delay in instituting proceedings, but claimant's motions for prejudgment interest were denied, and claimant appealed. The Court of Appeals, Loken, Circuit Judge, held that: (1) when the government has unsuccessfully sought to forfeit previously seized property, no statute expressly authorizes the payment of prejudgment interest to the successful claimant; (2) the no-interest rule could not be avoided, so as to pay prejudgment interest to claimant, by labeling the award constructive interest, or compensation for claimant's loss of use of the property; (3) government's temporary possession of seized property that was ultimately returned to claimant was not a "taking" for Fifth Amendment purposes, so as to require payment of prejudgment interest; and (4) due process did not require payment of prejudgment interest.

Affirmed.

**Attorneys and Law Firms**

**\*844**  George James Fiorentino, pro se.

Francis X. Herman, Minneapolis, MN, argued, for Appellee.

Before FAGG, BEAM, and LOKEN, Circuit Judges.

**Opinion**

LOKEN, Circuit Judge.

In October 1995, Minnesota police seized $7,990 in cash and four baggies of suspected contraband drugs from George James Fiorentino. In January 1996, Fiorentino pleaded guilty to illegal drug trafficking and was sentenced to 130 months in prison. In November 1996, the government filed a civil action to forfeit the cash pursuant to 21 U.S.C. § 881(a)(6). The district court [1] granted summary judgment for Fiorentino, concluding the government's unreasonable delay in instituting the forfeiture proceeding violated Fiorentino's due process rights. Rather than appeal, the United States paid $7,990 to Fiorentino. He now appeals the district court's denial of his post-judgment motions for an award of prejudgment interest. We affirm.

[1]    The HONORABLE DONALD D. ALSOP, United States District Judge for the District of Minnesota.

 Prejudgment interest may not be awarded against the United States absent an express waiver of its sovereign immunity, a time-honored principle known as the "no-interest rule." Waivers of this immunity may not be implied. "For well over a century, this Court, executive agencies, and Congress itself consistently have recognized that federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates that result." *Library of Congress v. Shaw,* 478 U.S. 310, 316, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *see Arneson v. Callahan,* 128 F.3d 1243, 1245 (8th Cir.1997), *cert. denied,* 524 U.S. 926, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998).

 When the government has unsuccessfully sought to forfeit previously seized property under 21 U.S.C. § 881(a)(6), no statute **\*845** expressly authorizes the payment of prejudgment interest to the successful claimant. The statute governing the return of the seized property makes no mention of prejudgment interest:

> Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution.

28 U.S.C. § 2465. [2] The reference to "costs" in § 2465 does not authorize the payment of interest on the value of the property being returned. "A statute allowing costs ... does not provide the clear affirmative intent of Congress to waive the sovereign's immunity" from an award of interest. *Shaw,* 478 U.S. at 321, 106 S.Ct. 2957; *see Jarboe–Lackey Feedlots, Inc. v. United States,* 7 Cl.Ct. 329, 337 (1985).

[2]     By contrast, Congress has explicitly waived its sovereign immunity from awards of prejudgment interest in other statutes, such as 26 U.S.C. § 7426(g) (claims for wrongfully levied property), 28 U.S.C. § 2411 (overpayments of federal tax), and 28 U.S.C. § 2644 (refunds of excess customs duties).

The drug forfeiture statutes generally incorporate the customs laws relating to seizure and forfeiture of property. *See* 21 U.S.C. § 881(d); 19 U.S.C. §§ 1602–18. The customs statutes do not authorize payment of prejudgment interest on property wrongfully seized by the United States Customs Service. To our knowledge, Congress has never provided for payment of interest on property wrongfully seized by customs officials, nor have we found any case in which the United States was ordered to pay interest on property seized by customs officials and returned to a claimant after the government failed to prove a right to forfeiture. Thus, it seems clear there is no statutory basis for awarding interest on the $7,990 returned to Fiorentino, as the Second Circuit concluded in *Ikelionwu v. United States,* 150 F.3d 233, 238–39 (2d Cir.1998).

Fiorentino relies on forfeiture cases in which two other circuits declined to apply the no-interest rule and instead ordered the government to "disgorge benefits that it has actually and calculably received from an asset that it has been holding improperly" by paying constructive interest to the successful claimant. *United States v. $277,000 U.S. Currency,* 69 F.3d 1491, 1498 (9th Cir.1995); *accord United States v. $515,060.42 in U.S. Currency,* 152 F.3d 491, 504–06 (6th Cir.1998). We decline to follow those decisions. Sovereign immunity does not depend upon whether the government benefitted from its conduct in question. Nor can the no-interest rule be dismissed by labeling the award Fiorentino seeks constructive interest, or compensation for his loss of use of the property—"the force of the no-interest rule cannot

be avoided simply by devising a new name for an old institution." *Shaw,* 478 U.S. at 321, 106 S.Ct. 2957.

There is a constitutional exception to the "no-interest" rule. When the government effects a "taking" of private property, the "just compensation" required by the Fifth Amendment includes a payment for interest. *See Shaw,* 478 U.S. at 317 n. 5, 106 S.Ct. 2957; *Albrecht v. United States,* 329 U.S. 599, 602, 67 S.Ct. 606, 91 L.Ed. 532 (1947). But the forfeiture of contraband is an exercise of the government's police power, not its eminent domain power. A forfeiture is not subject to the Fifth Amendment's Takings Clause when it deprives an innocent owner of his property. *See Bennis v. Michigan,* 516 U.S. 442, 116 S.Ct. 994, 1001, 134 L.Ed.2d 68 (1996); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680–90, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). [3] Likewise, the government's temporary possession of seized property that is ultimately returned to a forfeiture claimant such as Fiorentino is **\*846** not a "taking" for Fifth Amendment purposes. *See United States v. One 1979 Cadillac Coupe De Ville,* 833 F.2d 994, 1000–01 (Fed.Cir.1987). Thus, the "no-interest" rule applies to forfeitures.

[3]     The present drug forfeiture statutes protect innocent owners with an innocent owner exception to the forfeiture of property connected with drug offenses. *See* 21 U.S.C. §§ 881(a)(6) and (7).

In conclusion, claimants' property rights are protected in forfeiture proceedings by the Due Process Clause. *See generally United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). In this case, that protection was meaningful indeed. Fiorentino, who had no defense to the government's probable cause to forfeit the seized cash, was awarded title to that property under a due process analysis that is based upon his loss of use because the government unreasonably delayed seeking forfeiture. *See United States v. Eight Thousand Eight Hundred and Fifty Dollars,* 461 U.S. 555, 564, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). Fiorentino has no statutory or contractual claim to an award of interest, as the claimants had in *Henkels v. Sutherland,* 271 U.S. 298, 302, 46 S.Ct. 524, 70 L.Ed. 953 (1926), and *United States v. Kingsley,* 851 F.2d 16, 21 (1st Cir.1988). He simply seeks to enlarge his due process recovery with an award of prejudgment interest that in these circumstances would clearly be a windfall. The no-interest rule bars this claim.

The judgment of the district court is affirmed.

**All Citations**

170 F.3d 843

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

26 S.Ct. 341

Supreme Court of the United States.

CHICAGO, BURLINGTON, & QUINCY RAILWAY COMPANY, *Plff. in Err.*,

v.

PEOPLE OF THE STATE OF ILLINOIS *ex rel.* I. O. GRIMWOOD, F. L. O'Brien, and Joseph Eccles, as Commissioners of Drainage District No. One of the Town of Bristol, Kendall County, Illinois.

No. 157.

|

Argued December 14, 1905.

|

Decided March 5, 1906.

## Synopsis

IN ERROR to the Supreme Court of the State of Illinois to review a judgment affirming a judgment of the Circuit Court of Kendall County, in that state, awarding mandamus in proceedings presenting the question as to the right to impose upon a railway company the expense attendant upon the removal and rebuilding of a bridge and culvert, made necessary by the widening and deepening of the channel of a creek to subserve the drainage of low lands. *Affirmed*, subject to the qualification that the expense attendant merely upon the removal of the soil cannot be cast upon the company.

See same case below, 212 Ill. 103, 72 N. E. 219.

The facts are stated in the opinion.

## Attorneys and Law Firms

**\*\*342 \*568** *Messrs.* **Albert J. Hopkins,** *Robert Bruce Scott*, and *Chester M. Dawes* for plaintiff in error.

**\*573** *Messrs.* **John K. Newhall** and *John M. Raymond* for defendants in error.

## Opinion

**\*579** Mr. Justice **Harlan** delivered the opinion of the court:

**\*562** This is a contest between certain drainage commissioners in Illinois and the Chicago, Burlington, & Quincy Railway Company, as to the validity of a demand made by the former that the latter should remove the bridge and culvert now maintained by it over Rob Roy creek, in Kendall county, Illinois, and, if it continues to maintain a bridge and culvert at the same point, that one be substituted that will meet the requirements of a certain plan of drainage adopted by **\*563** those commissioners. Let us see in what way the dispute arises.

This suit or proceeding is based in part on what is known as the farm drainage act of Illinois, in force July 1st, 1885, entitled, 'An Act Provided for Drainage for Agricultural and Sanitary Purposes, etc.' Hurd's Rev. Stat. (Ill.) 1901, p. 712. By that act the commissioners of highways in each town, in the several counties under township organization, are constituted drainage commissioners for all drainage districts in their respective towns, with power as a body politic to sue and be sued, contract and be contracted with. § 1. Owners of lands are authorized to 'drain the same in the general course of natural drainage, by constructing open or covered drains, discharging the same into any natural water course, or into any natural depression, whereby the water will be carried into some natural water course, or into some drain on the public highway, with the consent of the commissioners thereto; and when such drainage is wholly upon the owner's land, he shall not be liable in damages therefor to any person or persons or corporation.' § 4.

The act also provided: 'When the case involves a system of combined drainage in one town, and it is proposed that the cost shall be borne proportionately by the several parties benefited, a petition addressed to the drainage commissioners shall be presented to the town clerk, signed by a majority in number of the adult owners of land lying in a proposed district, and they shall be the owners in the aggregate of more than one third of the lands lying in the proposed district, or by the owners of the major part of the land and who constitute one third or more of the owners of the land in the proposed district, setting forth the boundaries, or a description of the several tracts of land thereof or fractions as usually designated: . . . Said petition shall state that the lands lying within the boundaries of said proposed district require a combined system of drainage or protection from wash or overflow; that the petitioners desire that a drainage district may be **\*564** organized, embracing the lands therein mentioned, for the purpose of constructing, repairing, or maintaining a drain or drains, ditch or ditches, embankment or embankments, grade or grades, or all or either, within said district, for agricultural and sanitary purposes, by special assessments **\*\*343** upon the property benefited thereby.' § 11. Again: 'Upon the organization of a drainage district, the

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

commissioners shall go upon the land and determine upon a system of drainage, which shall provide main outlets of ample capacity for the waters of the district, having in view the future contingencies, as well as the present. . . . The maps and papers showing the final determination as to the system of drainage shall be filed in the clerk's office and be recorded in the drainage record.' § 17. Hurd's Rev. Stat. (Ill.) 1901, pp. 713, 714, 717.

Section 40 1/2 has, however, a more special application to the present case. It is in these words: 'The commissioners shall have the power and are required to make all necessary bridges and culverts along or across any public highway or railroad which may be deemed necessary for the use or protection of the work, and the cost of the same shall be paid out of the road and bridge tax, *or by the railroad company*, as the case may be: *Provided, however*, notice shall first be given to the road or railroad authorities to build or construct such bridge or culvert, and they shall have thirty days in which to build or construct the same, such bridges or culverts shall, in all cases, be constructed so as not to interfere with the free flow of water through the drains of the district. Should any railroad company refuse or neglect to build or construct any bridge or culvert as herein required, the commissioners constructing the same may recover the cost and expenses therefor in a suit against said company before any justice of the peace or any court having jurisdiction, and reasonable attorney's fees may be recovered as part of the cost. The proper authorities of any public road or railroad shall have the right of appeal the same as provided for individual landowners.' § 40 1/2. Ibid., 723.

 **\*565**  It is contended by the defendants in error that § 56 of what is known as the levee act has a bearing on the case. That section need not, however, be set out, as the supreme court of the state adjudged in this case that a district organized under the farm drainage act was subject only to the provisions of that act, and that the drainage commissioners could not claim any authority under the other act. 212 Ill. 103, 72 N. E. 219. See also *Gauen* v. *Moredock & I. L. Drainage Dist. No. 1*, 131 Ill. 446, 23 N. E. 633; *Drainage Comrs.* v. *Volke*, 163 Ill. 243, 45 N. E. 415; *McCaleb* v. *Coon Run Drainage & Levee District*, 190 Ill. 549, 60 N. E. 898.

The present proceeding was instituted in the circuit court of Kendall county, Illinois, by the defendants in error as drainage commissioners for the Bristol drainage district in that county, against the Chicago, Burlington, & Quincy Railway Company. It is a petition for mandamus.

Besides a general demurrer, the railway company demurred specially upon the ground that a judgment in favor of the commissioners would take its property for public use without compensation, and therefore without due process of law, as well as deny to it the equal protection of the laws, in violation of the Constitution of the United States. The demurrer was overruled. The defendant having elected to stand by its demurrer, judgment was rendered ordering a writ of mandamus as prayed for in the petition. That judgment was affirmed by the supreme court of Illinois, 212 Ill. 103, 72 N. E. 219, and hence the present writ of error.

As the case was determined upon the demurrer, the facts are to be taken as alleged in the petition. The case, thus presented, is as follows:

The drainage district in question was organized under the farm drainage act above referred to and contains about 2,000 acres of land on both sides of Rob Roy creek, across which are the road and right of way of the railway company. For more than fifty years before the district was established, that creek had been, as it now is, a natural water course. Prior  **\*566**  to June 24th, 1903, the commissioners located a ditch or drain on the line of the creek for the purpose of enlarging its channel or water course, and thereby enabling the lands in the drainage district to be better drained and made more tillable.

The railway company operated and maintained its road across Rob Roy creek, not under any specific grant of authority, but under its general corporate power to construct, operate, and maintain a railroad. It placed a bridge or culvert 12 by 30 feet at the point where the road crosses the creek. In constructing a foundation for the bridge or culvert the company sank or placed in the creek at the point of crossing huge wooden timbers and stones, thereby preventing the deepening and enlarging of the creek by the commissioners, unless they removed such timber and stones; and if that be done the result will be the destruction of the bridge or culvert. The present channel or water way of the creek, under the bridge or culvert is 3 feet in depth and 12 feet in width. It is insufficient to allow the natural flow of water in the ditch or drain proposed to be constructed by the commissioners. The estimated cost of this ditch or open drain is $20,000. The present bridge across the creek does not exceed $8,000 in value, and a new bridge, conforming  **\*\*344**  to the plan of the Commissioners, will cost not exceeding $13,000.

On the 24th of June, 1903, the drainage commissioners notified the railway company in writing that a bridge was necessary at the point where the company's right of way

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

would be crossed or intersected by the proposed ditch; that it was necessary to enlarge the opening under the present bridge; that the proposed improvement was to be the water way of a combined system of drainage established in the vicinity under the charge and direction of the drainage commissioners of the district; that the mainditch of the drainage, where it will intersect the company's right of way, must be of the width of 23 feet and of the depth of 9 1/2 feet, the bridge constructed to be of the width of 23 feet **\*567** in the clear at the surface or level of land, and to permit at least sixteen feet in the clear at the bottom of the ditch. The notice stated that the company was required, in pursuance of the statute in such case made and provided, to build and construct such bridge within thirty days from the date of the notice, in default whereof the commissioners would construct the same at the cost and expense of the company.

The company disregarded the notice and failed to build and construct the required bridge or culvert at the point of intersection with the creek, in accordance with the dimensions specified in the notice, and so as to permit such enlargement of the channel under the bridge as would be sufficient for the natural flow of water in the proposed ditch or drain.

The petition averred that a majority of the lands of the drainage district were swamp or slough lands, and in their present condition were not subject to cultivation, but by means of the proposed deepening and enlarging of Rob Roy creek, and as a result of the removal of the timbers and stones in the creek and the enlargement and deepening of the creek, all the lands in the drainage district would be 'greatly improved, and made good, tillable land, subject to cultivation;' that the proposed location of the ditch or drain along the creek was the best route or means for drainage of the district, constituting the only natural water course of the drainage district, and affording the only natural outlet or way of drainage of the lands to make them tillable; that if said improvement and enlargement of the ditch was made and the timbers and stones removed from the creek at the point of crossing, all of the lands of the district would be made good, tillabel lands for general farming purposes; and that the proposed construction of a ditch or drain along Rob Roy creek, when completed in accordance with said plans, would 'not divert or carry waters which by nature of force of gravity would flow or drain into any other natural water course in said drainage district or the vicinity thereof.'

The commissioners allege in their petition that the neglect, failure, and refusal of the railway company to remove the timbers and stones it had placed in the creek, and to construct

and enlarge the opening under its bridge or culvert, had prevented them from completing the construction of the ditch or drain in accordance with the plans adopted by them; that it was necessary for the use and protection of the proposed drainage work that the opening underneath the bridge or culvert be constructed and enlarged in the manner indicated in order that the lands in the district might be drained in accordance with said plans; which plans 'are reasonable for the suitable and proper drainage of said district.'

The relief asked was a writ of mandamus commanding the railway company to forthwith enlarge, deepen, and widen the water way over and across the company's right of way across Rob Roy creek.

1. The first question is one of the authority of this court to review the judgment below. As we have seen, the railway company insisted in the court of original jurisdiction that the statute under which the drainage commissioners proceeded **\*580** could not be applied in this case without taking its property for public use without compensation, and therefore depriving to it of property without due process of law, or without denying to it the equal protection of the laws, guaranteed by the Constitution of the United States. The judgment of the trial court was adverse to that view. In the supreme court of the state the railway company, by its assignments of error, preserved its objection based on constitutional grounds. That court did not, in words, refer to the Constitution of the United States, and its opinion concluded: 'Entertaining the views above expressed, and founding our conclusion upon the rights and duties of the parties as found in the common law, we deem it unnecessary to pass upon the constitutionality of § 40 1/2 of the farm drainage act.' [212 Ill. 120, 72 N. E. 225.]

The contention is that as the state court based its judgment on the common-law duty of the railway company, and not expressly on any Federal ground, it cannot be said that there was any *denial* of the Federal right claimed by the company; consequently, it is argued, this court is without jurisdiction to re-examine the final judgment. Rev. Stat. § 709, U. S. Comp. Stat. 1901, p. 575.

Undoubtedly, the general rule is that **\*\*345** where the judgment of the state court rests upon an independent, separate ground of local or general law, broad enough or sufficient in itself to cover the essential issues and control the rights of the parties, however the Federal question raised on the record might be determined, this court will affirm or dismiss, as the one course or the other may be appropriate, without considering that question. But it is equally well

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

settled that the failure of the state court to pass on the Federal right or immunity specially set up, of record, is not conclusive, but this court will decide the Federal question if the necessary effect of the judgment is to deny a Federal right or immunity specially set up or claimed, and which, if recognized and enforced, would require a judgment different from one resting upon some ground of local or general law. And such plainly was the effect of the judgment in this case. If, as the railway company contended, the proposed **\*581** action of the drainage commissioners would deprive it of property without due process of law and also deny to it the equal protection of the laws, then a judgment should have been rendered for the company. And that result could not be avoided merely by silence on the Federal question, and by placing the judgment on some principle of the common law. The constitutional grounds relied on must, if sustained, displace or supersede any principle of general or local law which, but for such grounds, might be sufficient for the complete determination of the rights of the parties. The claim of a Federal right or immunity specially set up from the outset went to the very root of the case and dominated every part of it. If that claim be valid, then the law is for the railway company; for the supreme law of the land must always control. Therefore a failure to recognize such Federal right or immunity, and the decision of the case on some ground of general or local law, necessarily has the same effect as if the claim of Federal right or immunity had been expressly denied. That claim having, then, been distinctly set up by the company, and being broad enough to cover the entire case, it may not be ignored, and this court cannot refuse to determine whether the alleged Federal right exists and is protected by the Constitution of the United States. If the case had been decided in favor of the railway company on some ground of local or general law, then the claim of a Federal right would have become immaterial, and we could not have re-examined the judgment. But the decision was otherwise, and was, in law, a denial of the claim of a Federal right.

For these reasons we are of opinion that this court has jurisdiction to re-examine the final judgment of the state court so far as it involved the Federal right or immunity specially set up by the railway company.

2. The concrete case arising upon the petition and the demurrer is this: A public corporation, charged by law with the duty of causing a large body of lands, principally swamp and slough lands, to be drained and made capable of cultivation, **\*582** has, under direct legislative authority, adopted a reasonable and suitable plan to accomplish that object. That plan requires the enlarging and deepening of the channel of a natural water course running through the district, which is the only natural outlet or way of drainage of the lands of the district,—the best and only practicable mode by which the lands can be made tillable. But that plan cannot be carried out unless the timbers and stones in the creek— placed there by the railway company when it constructed the foundation for its present bridge—are removed. The timber and stones referred to cannot, however, be removed without destroying the foundations of the present bridge and rendering it necessary (if the railway company continues to operate its road, which we assume it intends to do) to construct another bridge with an opening underneath wide enough to permit a channel sufficient to carry off the waters of the creek as increased in volume under the drainage system adopted by the commissioners.

The contention of the railway company is that, as its present bridge was lawfully constructed, under its general corporate power to build, construct, operate, and maintain a railroad in the county and township aforesaid, and as the depth and width of the channel under it were sufficient, at the time, to carry off the water of the creek as it then flowed, and now flows,—the foundation of the bridge cannot be removed and its use of the bridge disturbed unless compensation be first made or secured to it in such amount as will be sufficient to meet the expense of removing the timbers and stones from the creek and of constructing a new bridge of such length and with such opening under it as the plan of the commissioners requires. The company insists that to require it to meet these expenses out of its own funds will be, within the meaning of the Constitution, a *taking* of its property for public use without compensation, and, therefore, without due process of law, as well as a denial to it of the equal protection of the laws.

The importance of these questions will justify a reference to some of the adjudged cases; referring first to those recognizing **\*583** the distinction between an incidental injury to rights of private property resulting from the exercise of governmental powers, lawfully **\*\*346** and reasonably exerted for the public good, and the *taking*, within the meaning of the Constitution, of private property for public use.

In *Northern Transp. Co.* v. *Chicago*, 99 U. S. 635, 642, 25 L. ed. 336, 338, which involved a claim for damages directly resulting from the construction by the city of Chicago of a tunnel under Chicago river, whereby for a very long time the plaintiff was prevented from using its dock and other property for purposes of its business; in *Mugler* v. *Kansas*, 123 U. S. 623, 669, 31 L. ed. 205, 213, 8 Sup. Ct. Rep. 273, which

related in part, to the lawful prohibition by the state of the use of private property in a particular way, whereby its value was materially diminished, if not practically destroyed; in *New York & N. E. R. Co.* v. *Bristol*, 151 U. S. 556, 557, 571, 38 L. ed. 269, 272, 274, 14 Sup. Ct. Rep. 437, which involved the question whether a railroad company could be required, at its sole expense, to remove a grade crossing which it had lawfully established and used, and to establish another crossing at a different place; in *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 252, 41 L. ed. 976, 990, 17 Sup. Ct. Rep. 581, in which one of the questions was whether it was a condition of the exercise by the state of its authority to regulate the use of property owned by individuals or corporations, that the owner should be indemnified for the damage or injury resulting from the exercise of such authority for legitimate public purposes; *Gibson* v. *United States*, 166 U. S. 269, 271, 276, 41 L. ed. 996, 998, 1002, 17 Sup. Ct. Rep. 578, in which the owner of a farm on an island in the Ohio river, at which there was a landing, sought to recover compensation for the injury done to the farm by reason of the construction by the United States of a dike for the purpose of concentrating the waterflow in the main channel of the river; and in *Scranton* v. *Wheeler*, 179 U. S. 141, 164, 45 L. ed. 126, 137, 21 Sup. Ct. Rep. 48, which involved the question whether the United States was required to compensate an owner of land fronting on a public navigable river, when his access from the shore to the navigable part of such river was permanently obstructed by a pier erected in the river under **\*584** the authority of Congress for the purpose of improving navigation;—in each of those cases this court recognized the principle that injury may often come to private property as the result of legitimate governmental action, reasonably taken for the public good and for no other purpose, and yet there will be no *taking* of such property within the meaning of the constitutional guaranty against the deprivation of property without due process of law, or against the taking of private property for public use without compensation. To this class belongs the recent, and, as we think, decisive case of *New Orleans Gaslight Co.* v. *Drainage Commission*, 197 U. S. 453, 49 L. ed. 831, 25 Sup. Ct. Rep. 471, to be hereafter adverted to in another connection. In this class may also be placed *Mills* v. *United States*, 12 L. R. A. 673, 46 Fed. 738. That was the case of an improvement by the United States of the navigation of Savannah river, which resulted in so raising the water in that river as to make it impossible to prevent the flooding of adjacent rice fields that were ordinarily and naturally drained into the river, and rendering it necessary that expense be incurred in order to provide new drainage from those fields into a back river, where the water levels were suitable. In commenting upon

that case, this court said, in *United States* v. *Lynah*, 188 U. S. 445, 47 L. ed. 539, 23 Sup. Ct. Rep. 349: 'Obviously there was no taking of the plaintiff's lands, but simply an injury which could be remedied at an expense, as alleged, of $10,000, and the action was one to recover the amount of this consequential injury. The court rightfully held that it could not be sustained.' See also *Bedford* v. *United States*, 192 U. S. 217, 48 L. ed. 414, 24 Sup. Ct. Rep. 238, and *Manigault* v. *Springs*, 199 U. S. 473, 50 L. ed. 274, 26 Sup. Ct. Rep. 127.

We refer also, as having direct application here, to some of the cases, familiar to the profession, that recognize the possession by each state of the power, never surrendered to the government of the Union, of guarding and promoting the public interests by reasonable police regulations that do not violate the Constitution of the state or the Constitution of the United States. *Gibbons* v. *Ogden*, 9 Wheat. 1, 6 L. ed. 23; *Hannibal & St. J. R. Co.* v. *Husen*, 95 U. S. 465, 472, 24 L. ed. 527, 530; **\*585** *Patterson* v. *Kentucky*, 97 U. S. 501, 503, 24 L. ed. 1115, 1116; *Morgan's L. & T. R. & S. S. Co.* v. *Board of Health*, 118 U. S. 455, 464, 30 L. ed. 237, 241, 6 Sup. Ct. Rep. 1114; *Hennington* v. *Georgia*, 163 U. S. 299, 308, 309, 41 L. ed. 166, 170, 171, 16 Sup. Ct. Rep. 1086; *New York, N. H. & H. R. Co.* v. *New York*, 165 U. S. 628–631, 41 L. ed. 853, 854, 17 Sup. Ct. Rep. 418.

We assume that the drainage statute in question is entirely consistent with the Constitution of Illinois. It is so regarded by the supreme court of the state, and that is all-sufficient in this case. We assume, also, without discussion—as from the decisions of the state court, we may properly assume—that the draining of this large body of lands so as to make them fit for human habitation and cultivation is a public purpose, to accomplish which the state may, by appropriate agencies, exert the general **\*\*347** powers it possesses for the common good. By the removal of water from large bodies of land, the state court has said, and by 'the subjection of such lands to cultivation, they are made to bear their proper proportionate burden to the support of the inhabitants and the commerce of the state. Their value is increased, and thereby their contribution in taxes to the state and local governments is increased.' 212 Ill. 103, 119, 72 N. E. 219. It is conceded that this public purpose cannot be certainly and effectively attained except through the plan adopted by the drainage commissioners. Further, the regulations against which the railway company invokes the Constitution have a real, direct, and obvious relation to the public objects sought to be accomplished by them; in no sense are they arbitrary or unreasonable. Indeed it is admitted that the plan of the commissioners, is appropriate and the best that can be devised

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

for draining the lands in question. But the railway company, in effect, if not in words, insists that the rights which it asserts in this case are superior and paramount to any that the public has to use the water course in question for the purpose of draining the lands in its vicinity, although such water course was in existence, for the benefit of the public, long before the railway company constructed its bridge. This contention cannot, however, be sustained, except upon the theory that the acquisition by the railway company of a right of way through the lands in **\*586** question, and the construction on that right of way of a bridge across Rob Roy creek at the point in question, carried with it a surrender by the state of its power, by appropriate agencies, to provide for such use of that natural water course as might subsequently become necessary or proper for the public interests. If the state could part with such power, held in trust for the public,—which is by no means admitted,—it has not done so in any statute, either by express words or by necessary implication. When the railway company laid the foundations of its bridge in Rob Roy creek, it did so subject to the rights of the public in the use of that water course, and also subject to the possibility that new circumstances and future public necessities might, in the judgment of the state, reasonably require a material change in the methods used in crossing the creek with cars. It may be—and we take it to be true—that the opening under the bridge as originally constructed was sufficient to pass all the water then or now flowing through the creek. But the duty of the company, implied in law, was to maintain an opening under the bridge that would be adequate and effectual for such an increase in the volume of water as might result from lawful, reasonable regulations established by appropriate public authority from time to time for the drainage of lands on either side of the creek. Angell, Water Courses, 6th'ed. § 465*b*, p. 640.

The supreme court of Illinois said in this case: 'The right of drainage through a natural water course or a natural water way is a natural easement, appurtenant to the land of every individual through whose land such natural water course runs, and every owner of land along such water course is obliged to take notice of the natural easement possessed by other owners along the same water course.' Again, in the same case: 'Where lands are valuable for cultivation, and the country, as this, depends so much upon agriculture, the public welfare demands that the lands shall be drained; and, in the absence of any constitutional provision in relation to such laws they have been sustained. upon high authority, as the exercise of the **\*587** police power.' Further: 'A natural water course, being a natural easement, is placed upon the same ground, in many respects as to the public right, as is a

public highway. At the common law, if a railroad or another highway crosses a natural water course or a public highway, such highway or railroad must be so constructed across the existing highway or waterway, and so maintained, that said highway or waterway, as the case may be, shall not only subserve the demands of the public as they exist at the time of crossing the same, but for all future time. . . . The great weight of authority is, that where there is a natural water way, or where a highway already exists and is crossed by a railroad company under its general license to build a railroad, and without any specific grant by the legislative authority to obstruct the highway or water way, the railroad company is bound to make and keep its crossing, at its own expense, in such condition as shall meet all the reasonable requirements of the public as the changed conditions and increased use may demand.' The court said that the implied authority of the company to build its present bridge was coupled with its common law duty 'to build its bridge over the natural water course with a view of the future as well as the present contingencies and requirements of such water course, and with the further implied provision that there remained in the state, whenever the public welfare required it, the right to regulate its use.' Still further: 'The subject [the draining of lands] was deemed of such importance that the people, by § 31 of article 4 of the Constitution of 1870, conferred upon the general assembly plenary powers in making provision for **\*\*348** drainage for agricultural and sanitary purposes, and pursuant to that power the general assembly passed the act under which the appellees are proceeding, declaring that the organization should be for agricultural and sanitary purposes. The drainage districts organized as are the appellees, under that law are invested with the right of eminent domain and the power of taxation, upon the theory that they are public utilities and are held to be quasi public corporations. In their organic character **\*588** they do not represent merely the individual property owners or themselves, but they represent the state in carrying out its policy, as found in the common law and declared by its Constitution and statutes. It has been so often said that it need only be adverted to here, that corporations such as appellant do not hold their property and exercise their franchises strictly in a private right, but that from the nature of their business and their relation to society they are public corporations in a sense, and are subject to public control and regulation, though with their grant of power to traverse the state with their lines of railroad it cannot be said that their right of private property attaches to every highway and water course over which their roads may be constructed. To so hold would render such enterprises, which are designed for the benefit of the state, obstacles to its progress and a

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

menace to its general welfare. . . . Of course, in the exercise of the right of the public interest, as against such corporations, the demand must be reasonable, and must clearly appear to be for the public welfare. In this case it is not questioned that the improvement of Rob Roy creek, as proposed, is necessary for the proper drainage of the lands comprising the drainage district. The petition alleges that such enlargement is necessary and that the same cannot be carried on with the obstructions placed in the bed of said creek by appellant. This the appellant does not deny.' 212 Ill. 109–111, 114, 118, 72 N. E. 219.

In *Ohio & M. R. Co.* v. *McClelland*, 25 Ill. 140, 144, it was said—indeed, all the cases hold—that 'the power to enact police regulations operates upon all alike;' that that power 'is incident to and a part of government itself, and need not be expressly reserved, when it grants rights or property to individuals or corporate bodies, as they take subservient to this right.'

A case quite in point is that of *Kankakee & S. R. Co.* v. *Horan*, 131 Ill. 288, 23 N. E. 621. That was an action against a railroad company to recover for damage from the backing of water upon plaintiff's land by reason of an insufficient culvert constructed **\*589** by it for the passage of water from a certain natural water course. The contention of the company was that the culvert when constructed was sufficient for the flow of water at the time, and that it was not bound to make such provision as was necessary for an increase of water in the slough subsequently arising from the drainage into it of the lands along its course. Upon this point the supreme court of Illinois said: 'We do not subscribe to this doctrine. The Parker slough was a water course, and it was the legal right of anyone along its line for miles above the railroad, where the water naturally shed toward the slough, to drain into it, and no one below, owning land along the slough, would have any legal remedy against such person so draining water into the slough above him, for any damage done to his inheritance by means of an increased flow of water caused thereby. In other words, the slough was a legal water course for the drainage of all the land the natural tendency of which was to cast its surplus water, caused by the falling of rain and snow into it; and this whether the flow was increased by artificial means or not. It would seem legitimately to follow that the railroad company, in providing a passageway for the slough, was bound to anticipate and provide for any such legal increase of the water flow. If it did not, it was doing a wrong and legal injury to any one situated like the appellee, who received injury in consequence of a failure on its part to do its duty.' See also the following Illinois cases: *People ex rel.*

*Bloomington* v. *Chicago & A. R. Co.* 67 Ill. 118; *Chicago, R. I. & P. R. Co.* v. *Moffitt*, 75 Ill. 524; *Chicago & N. W. R. Co.* v. *Chicago*, 140 Ill. 309, 29 N. E. 1109; *Ohio & M. R. Co.* v. *Thillman*, 143 Ill. 127, 36 Am. St. Rep. 359, 32 N. E. 529; *Frazer* v. *Chicago*, 186 Ill. 480, 486, 51 L. R. A. 306, 78 Am. St. Rep. 296, 57 N. E. 1055.

Many cases in other courts are to the same general effect. They negative the suggestion of the railway company that the adequacy of its bridge and the opening under it for passing the water of the creek at the time the bridge was constructed determines its obligations to the public at all subsequent periods. In *Cooke* v. *Boston & L. R. Corp.* 133 Mass. 185, 188, **\*590** it appeared that a railroad company had statutory authority to cross a certain highway with its road. The statute provided that if the railroad crossed any highway it should be so constructed as not to impede or obstruct the safe and convenient use of the highway. And one of the contentions of the company was that the statute limited its duty and obligation to provide for the wants of travelers at the time it exercised the privilege granted to it. The court said: 'The legislature intended to provide against any obstruction of the safe and convenient use of the highway, for all time; and if, by the increase **\*\*349** of population in the neighborhood, or by an increasing use of the highway, the crossing which at the outset was adequate is no longer so, it is the duty of the railroad corporation to make such alteration as will meet the present needs of the public who have occasion to use the highway.' In *Lake Erie & W. R. Co.* v. *Cluggish*, 143 Ind. 347, 42 N. E. 743, the court said (quoting from *Lake Erie & W. R. Co.* v. *Smith*, 61 Fed. 885): 'The duty of a railroad to restore a stream or highway which is crossed by the line of its road is a continuing duty; and if, by the increase of population or other causes, the crossing becomes inadequate to meet the new and altered conditions of the country, it is the duty of the railroad to make such alterations as will meet the present needs of the public.' So, in *Indiana ex rel. Muncie* v. *Lake Erie & W. R. Co.* 83 Fed. 287, which was the case of an overhead crossing lawfully constructed on one of the streets of a city, the court said: 'If, by the growth of population or otherwise, the crossing has become inadequate to meet the present needs of the public, it is the duty of the railroad company to remedy the defect by restoring the crossing so that it will not unnecessarily impair the usefulness of the highway.'

The cases to which we have referred are in accord with the declarations of this court in the recent case of *New Orleans Gaslight Co.* v. *Drainage Commission*, 197 U. S. 453, 49 L. ed. 831, 25 Sup. Ct. Rep. 471. That case would seem

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

to be decisive of the question before us. It there appeared that a gas company had acquired an exclusive right **\*591** to supply gas to the city of New Orleans and its inhabitants through pipes and mains laid in the streets. In the exercise of that right it had laid its pipes in the streets. Subsequently a drainage commission, proceeding under statutory authority, devised a system of drainage for the city, and in the execution of its plans it became necessary to change the location in some places of the mains and pipes laid by the gas company. The contention of that company was that it could not be required, at its own cost, to shift its pipes and mains so as to accommodate the drainage system; that to require it to do so would be a taking of its property for public use without compensation, in violation of the Constitution of the United States. This court said: 'The gas company did not acquire any specific location in the streets; it was content with the general right to use them; and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the state might require, for a necessary public use, that changes in location be made. . . . There is nothing in the grant to the gas company, even if it could legally be done, undertaking to limit the right of the state to establish a system of drainage in the streets. We think whatever right the gas company acquired was subject, in so far as the location of its pipes was concerned, to such further regulations as might be required in the interest of the public health and welfare. These views are amply sustained by the authorities. *National Waterworks Co.* v. *Kansas City*, 28 Fed. 921, in which the opinion was delivered by Mr. Justice Brewer, then circuit judge; *Columbus Gaslight & Coke Co.* v. *Columbus*, 50 Ohio St. 65, 19 L. R. A. 510, 40 Am. St. Rep. 648, 33 N. E. 292; *Jamaica Pond Aqueduct Corp.* v. *Brookline*, 121 Mass. 5; *Re Deering*, 93 N. Y. 361; *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 254, 41 L. ed. 979, 990, 17 Sup. Ct. Rep. 581. In the latter case it was held that uncompensated obedience to a regulation enacted for the public safety under the police power of the state was not taking property without due compensation. In our view, that is all there is to this case. The gas company, by its grant from the city, acquired no exclusive right to the location of its pipes in the streets, as chosen **\*592** by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the state, for the purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense none of the property of the gas company

has been taken, and the injury sustained is *damnum absque injuria*.'

The learned counsel for the railway company seem to think that the adjudications relating to the police power of the state to protect the public health, the public morals, and the public safety are not applicable, in principle, to cases where the police power is exerted for the general well-being of the community apart from any question of the public health, the public morals, or the public safety. Hence, he presses the thought that the petition in this case does not, in words, suggest that the drainage in question has anything to do with the health of the drainage district, but only avers that the system of drainage adopted by the commissioners will reclaim the lands of the district, and make them tillable or fit for cultivation. We cannot assent to the view expressed by counsel. We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety. **\*\*350** *Lake Shore & M. S. R. Co.* v. *Ohio*, 173 U. S. 285, 292, 43 L. ed. 702, 704, 19 Sup. Ct. Rep. 465; *Gilman* v. *Philadelphia*, 3 Wall. 713, 729, 18 L. ed. 96, 100; *Pound* v. *Turck*, 95 U. S. 459, 464, 24 L. ed. 525, 527; *Hannibal & St. J. R. Co.* v. *Husen*, 95 U. S. 470, 24 L. ed. 529. And the validity of a police regulation, whether established directly by the state or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable, and whether really designed to accomplish a legitimate public purpose. Private property cannot be taken without compensation for public use under a police regulation relating **\*593** strictly to the public health, the public morals, or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare. The foundations upon which the power rests are in every case the same. This power, as said in *Carthage* v. *Frederick*, 122 N. Y. 268, 10 L. R. A. 178, 19 Am. St. Rep. 490, 25 N. E. 480, has always been exercised by municipal corporations, 'by making regulations to preserve order, to promote freedom of communication, and to facilitate the transaction of business in crowded communities. Compensation has never been a condition of its exercise, even when attended with inconvenience or pecuniary loss, as each member of a community is presumed to be benefited by that which promotes the general welfare.' The constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of governmental power. If, in the execution of any power, no matter what it is, the government, Federal or state, finds it necessary to take

Case 2:19-cv-00037-JNP Document 59-33 Filed 11/30/22 PageID.5268 Page 105 of 114

*Chicago, B. & Q. Ry. Co. v. People of State of Illinois,* 200 U.S. 561 (1906)
26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner. *Cherokee Nation* v. *Southern Kansas R. Co.* 135 U. S. 641, 659, 34 L. ed. 295, 303, 10 Sup. Ct. Rep. 965; *Sweet* v. *Rechel,* 159 U. S. 380, 399, 402, 40 L. ed. 188, 196, 197, 16 Sup. Ct. Rep. 43; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 336, 37 L. ed. 463, 471, 13 Sup. Ct. Rep. 622; *United States* v. *Lynah,* 188 U. S. 445, 47 L. ed. 539, 23 Sup. Ct. Rep. 349. If the means employed have no real, substantial relation to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, beyond the necessities of the case,—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt. *Minnesota* v. *Barber,* 136 U. S. 313, 320, 34 L. ed. 455, 458, 3 Inters. Com. Rep. 185, 10 Sup. Ct. Rep. 862. Upon the general subject there is no real conflict among the adjudged cases. Whatever conflict there is arises upon the question whether there has been or will be in the particular case, within the true meaning of the Constitution, a 'taking' of private property for public use. If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is **\*594** no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution. Such is the present case. There are, unquestionably, limitations upon the exercise of the police power which cannot, under any circumstances, be ignored. But the clause prohibiting the taking of private property without compensation 'is not intended as a limitation of the exercise of those police powers which are necessary to the tranquillity of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments. It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given.' Sedgw. Stat. & Const. Law, 434.

It remains to deal with a particular aspect of the case. The opening under the present bridge, we assume from the record, was sufficient, when the bridge was constructed, to pass all the water naturally flowing in the creek from lands in that locality. It is sufficient if the channel of the river be left as it is now. The commissioners demand, however, as they may rightfully do in the public interest, a larger, deeper, and wider channel in order to accommodate the increased volume of water in the creek that will come from the proposed plan of the commissioners. But that is a matter which concerns the public, not the railway company. The duty of the company will end when it removes

the obstructions which it has placed in the way of enlarging, deepening, and widening of the channel. It follows, upon principles of justice, that while the expense attendant upon the removal of the present bridge and culvert and the timbers and stones placed by the company in the creek, as well as the expense of the erection of any new bridge which the company may elect to construct in order to conform to the plan of the commissioners, should be borne by the railway company, the expense attendant merely upon the removal of soil in order to enlarge, deepen, and widen the channel must be borne by the district. The expense to be borne by the **\*\*351** district and the railway **\*595** company, respectively, can be ascertained by the state court in some appropriate way, and such orders made as will be necessary to facilitate the execution of the plan of the commissioners.

Without further discussion, we hold it to be the duty of the railway company, at its own expense, to remove from the creek the present bridge, culvert, timbers, and stones placed there by it, and also (unless it abandons or surrenders its right to cross the creek at or in the vicinity of the present crossing) to erect at its own expense and maintain a new bridge for crossing that will conform to the regulations established by the drainage commissioners, under the authority of the state; and such a requirement if enforced will not amount to a taking of private property for public use within the meaning of the Constitution, nor to a denial of the equal protection of the laws.

Leaving it to the state court to give effect to these views by appropriate orders, and subject to the above qualifications, *the decree of the state court is affirmed.*

Mr. Justice **Holmes,** concurring:

I concur in the main with the judgment of the court. I agree that the public authority has a right to widen or deepen a channel if it sees fit, and that any cost that the railroad is put to in rebuilding a bridge the railroad must bear. But the public must pay for the widening or deepening, and I think that it does not matter whether what it has to remove is the original earth or same other substance lawfully put in the place of the original earth. Very likely in this case the distinction is of little importance; but it may be hereafter. I suppose it to be plain, as my brother Brewer says, that, if an expense is thrown upon the railroad unlawfully, its property is taken for public use without due compensation. *Woodward* v. *Central Vermont R. Co.* 180 Mass. 599, 62 N. E. 1051.

AR004800 9

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

**\*596** I am authorized to say that my brothers **White** and **McKenna** agree with my view.

Mr. Justice **Brewer,** dissenting:

The question in this case is a narrow one, yet of profound importance, and, involving, as in my judgment it does, a grievous wrong to owners of private property, I am constrained to dissent. Conceding the regularity of the proceedings and the power of the state to drain the lands in the drainage district, and, if necessary therefor, to compel the building of a new and enlarged bridge over Rob Roy creek, I dissent from the conclusion that the state may cast the entire cost of such rebuilding upon the railroad company.

It appears from the petition, which was demurred to, and whose allegations of fact must therefore be taken as true, that the drainage district consists of about 2,000 acres on both sides of Rob Roy creek; that a majority of the lands of said drainage district are swamp or slough lands, and, under natural conditions, not subject to cultivation, but by drainage will all be greatly improved and made good tillable lands. The railroad company has for forty years maintained a bridge or culvert over Rob Roy creek which has answered and does answer all its purposes and necessities. The cost of the ditches and drains in the drainage district in accordance with the plans adopted by the commissioners is estimated at $20,000. The railroad bridge or culvert across the creek does not exceed in value $8,000, and a new bridge or culvert can be constructed at a cost of not exceeding $13,000. The drainage act provides for an appraisement of the damage done to any tract by the construction of the proposed work, and a judgment in favor of the owner against the commissioners of the district for that amount. It also provides for an assessment of the benefits to the different tracts, upon the basis of which assessments taxes are to be levied to pay for the construction and maintenance of the drainage system. In other words, any damage done to **\*597** any particular tract by the construction of the drainage system is to be paid to the owner of that tract, if a private individual, and the tracts which are benefited are to be charged with the cost in proportion to the amount of benefit received. Section 40 1/2 of the drainage act then provides:

'The commissioners shall have the power and are required to make all necessary bridges and culverts along or across any public highway or railroad which may be deemed necessary for the use or protection of the work, and the cost of the same shall be paid out of the road and bridge tax, *or by the*

*railroad company*, as the case may be: *Provided, however*, notice shall first be given to the road or railroad authorities to build or construct such a bridge or culvert, and they shall have thirty days in which to build or construct the same, such bridges or culverts shall, in all cases, be constructed so as not to interfere with the free flow of water through the drains of the district. Should any railroad company refuse or neglect to build or construct any bridge or culvert as herein required, the commissioners constructing the same may recover the cost and expenses therefor in a suit against said company before any justice of the peace or any court having jurisdiction, and reasonable attorney's fees may be recovered as part of the cost. The proper authorities of any public road or railroad shall have the right **\*\*352** of appeal the same as provided for individual landowners.'

According to this, if any bridge or culvert on any public highway is needed in order to perfect the drainage system, the cost of it is to be paid out of the public funds; but if a bridge or culvert is required on a railroad, the cost of it must be paid by the railroad company. And this is arbitrary, without any appraisement of benefits or damages.

Now, the property of a railroad company is private property. It cannot be taken for public uses without just compensation. True, it is used by the owners in performing the quasi public work of transportation, but it is not given up to public uses generally. It is not devoted to education or the improvement of farm lands, or, indeed, any other use than that of transportation. **\*598** If taken therefrom and devoted to other public uses it is the taking of private property for public uses. That this can be done may be conceded, but only upon just compensation.

When private property is taken for public uses compensation must be paid. That is the mandate of the Federal Constitution and of that of nearly every state in the Union. Independently of such mandate, compensation would be required. In 2 Kent, Com. 12th ed. p. 339, it is said:

'A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent; and this principle in American constitutional jurisprudence is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law.' See also cases cited in the note; especially *Gardner* v. *Newburgh*, 2 Johns. Ch. 162, 166, 7 Am. Dec. 526.

In *Sinnickson* v. *Johnson*, 17 N. J. L. 129, 145, 34 Am. Dec. 184, referred to approvingly by this court in *Pumpelly* v.

*Green Bay & M. Canal Co.* 13 Wall. 166, 178, 20 L. ed. 557, 560; and *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 324, 37 L. ed. 463, 467, 13 Sup. Ct. Rep. 622, 625, it was said:

'This power to take private property reaches back of all constituted provisions; and it seems to have been considered a settled principle of universal law that the right to compensation is an incident to the exercise of that power; that the one is so inseparably connected with the other that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle.'

If this be true when the taking is for that which is solely a public use, how much more true is it when the taking is largely for the benefit of private individuals, and at best only incidentally for the benefit of the public? Now the sole purpose of this proceeding, as admitted by the demurrer, was the transformation of these swamp and untillable lands into good tillable lands; in other words, to that extent, increasing the value of the farms in the hands of their private owners. While the statute **\*599** under which these proceedings were had contemplates drainage for agricultural and sanitary purposes, there is nothing in this record to show that any sanitary result was contemplated, and the only object disclosed is the direct beneficial result to the owners of these swamp lands. There is not the slightest intimation that the health, morals, or safety of the community will be promoted, or is intended to be promoted, by the drainage. I quote the exact language of the petition:

'And the petitioners aver that the aforesaid location of the ditch or drain along the said Rob Roy creek was for the purpose of enlarging the channel or water course of the aforesaid Rob Roy creek, and thereby enabling the land in said drainage district to be better drained and render the soil in said district more tillable.'

'And your petitioners aver that a majority of the lands of said drainage district are what is known as swamp or slough land, and under the present condition are not subject to cultivation, but by means of the proposed deepening and enlarging of said Rob Roy creek, as herein described, and as a result of the removal of said timbers and stones in said Rob Roy creek, at the place aforesaid, and of the enlargement of and deepening of said Rob Roy creek, all of the lands in said drainage district will be greatly improved, and made good, tillable land, subject to cultivation.'

If it be a principle of natural justice that private property shall not be taken for public purposes without just compensation,

is it not equally a principle of antural justice that no man shall be compelled to pay out money for the benefit of the public without any reciprocal compensation? What difference in equity does it make whether a piece of land is taken for public uses or so many dollars for like purposes? *Cary Library* v. *Bliss*, 151 Mass. 364, 378, 379, 7 L. R. A. 765, 25 N. E. 902; *Woodward* v. *Central Vermont R. Co.* 180 Mass. 599, 603, 62 N. E. 1051.

But it is said that this is done under the police power of the state, and that that can be exercised without any provision for **\*600** compensation. It seems to me the police power **\*\*353** has become the refuge of every grievous wrong upon private property. Whenever any unjust burden is cast upon the owner of private property which cannot be supported under the power of eminent domain or that of taxation, it is referred to the police power. But no exercise of the police power can disregard the constitutional guaranties in respect to the taking of private property, due process, and equal protection, nor should it override the demands of natural justice. The question in the case is not how far the state may go in compelling a railroad company to expend money in increasing its facilities for transportation, but how far it can go in charging upon the company the cost of improving farms along the line of its road.

Again, it will be perceived that by the section quoted, if, in consequence of the drainage, a bridge or culvert is required on any public highway, its cost is paid out of the public funds; but whenever a bridge or culvert is required along or across a railroad the company is charged with the cost. In the one case the public pays, and in the other a private owner. It is not pretended that the railway is in any way benefited by the drainage. Its property is not improved, its revenues are not increased. The reconstruction of the bridge or culvert is not needed by it in its work of transportation. It has used this present bridge for over forty years, meeting in that time all the demands of the public for transportation. So that, receiving no benefit, it is charged with the cost of reconstruction,— about $13,000,—in order to improve the value of the lands belonging to private owners in this drainage district, when if a highway crossed at the same place and a new bridge or culvert was required, the cost of it would be paid out of the public funds. I cannot conceive how this can be looked upon as 'the equal protection of the laws.'

Further, even under the conclusion reached by the court, the plaintiff in error should recover its cost, and in accord with the common practice in this court, the order should be that the judgment be reversed and the case remanded for further

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

proceedings **\*601** not inconsistent with our opinion. *Stanley v. Schwalby*, 162 U. S. 255, 282, 40 L. ed. 960, 969, 16 Sup. Ct. Rep. 754. Why should it be compelled to pay two or three hundred dollars in costs when it has shown that the decision below placed an improper charge upon it, the amount of which is not disclosed, and which may be a very substantial sum?

I am, therefore, constrained to dissent from both the opinion and judgment.

**All Citations**

200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596, 4 Am.Ann.Cas. 1175

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

493 F.3d 404
United States Court of Appeals,
Fourth Circuit.

HOLLIDAY AMUSEMENT COMPANY
OF CHARLESTON, INCORPORATED;
Warren P. Holliday, Plaintiffs–Appellants,

v.

SOUTH CAROLINA, State of; Grady L.
Patterson, Jr., in his official capacity as
Treasurer of the State of South Carolina; Jim
Hodges, Governor of South Carolina; Charles
M. Condon, Attorney General; Robert M.
Stewart, individually, Defendants–Appellees.

No. 06–1668.
|
Argued: May 22, 2007.
|
Decided: July 3, 2007.

**Synopsis**
**Background:** Distributor of video poker machines brought action against State of South Carolina and state officials, alleging that law which outlawed video gaming machines in the state effected an unconstitutional taking of his property without just compensation. The United States District Court for the District of South Carolina, at Charleston, C. Weston Houck, Senior District Judge, 2006 WL 1285105, granted summary judgment to the state and its officials. Plaintiff appealed.

**Holdings:** The Court of Appeals, Wilkinson, Circuit Judge, held that:

action was not ripe, and

law did not effect a regulatory takings.

Affirmed.

See also 401 F.3d 534.

**Attorneys and Law Firms**

**\*405 ARGUED:** Roger J. Marzulla, Marzulla & Marzulla, Washington, DC, for Appellants. Robert Holmes Hood, Hood Law Firm, Charleston, South Carolina, for Appellees. **ON BRIEF:** Nancie G. Marzulla, Marzulla & Marzulla, Washington, DC, for Appellants. James B. Hood, Deborah H. Sheffield, Hood Law Firm, Charleston, South Carolina; Henry D. McMaster, South Carolina Attorney General, C. Havird Jones, Jr., Senior Assistant Attorney General, Attorney General's Office, Columbia, South Carolina, for Appellees.

Before WIDENER, WILKINSON, and KING, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge WIDENER and Judge KING joined.

**OPINION**

WILKINSON, Circuit Judge:

Plaintiffs Warren P. Holliday and Holliday Amusement Company of Charleston, Inc. ("Holliday"), seek just compensation for an alleged regulatory taking. Holliday claims that 1999 S.C. Act No. 125, which outlawed video gaming machines in the state of South Carolina, destroyed Holliday's **\*406** business and thus effected an unconstitutional taking of his property without just compensation. Holliday brought suit in federal district court, and the court granted summary judgment to the state and its officials. We now affirm.

**I.**

From 1976 to 2000, Holliday Amusement Co. of Charleston, Inc., a business owned and operated by Warren Holliday, distributed video poker machines in the state of South Carolina. On July 1, 1999, South Carolina enacted 1999 S.C. Act No. 125 (codified at S.C.Code Ann. § 12–21–2710 (2000)), which outlawed the possession of video gaming machines in the state and subjected such machines to forfeiture, effective July 1, 2000.

After the Act was passed and before it went into effect, certain owners and lessees of video gaming machines filed suit in South Carolina court challenging the constitutionality of the Act. *See Westside Quik Shop, Inc. v. Stewart,* 341 S.C. 297, 534 S.E.2d 270 (2000). They sought an injunction against the Act's enforcement, on the ground that it represented an unconstitutional taking of their property without just compensation. *Id.* at 271. Holliday was not a party to this litigation, although he was a member of the South Carolina Coin Operators Association, which filed an amicus brief. The South Carolina Supreme Court held that Act 125 did not constitute a taking of plaintiffs' video gaming machines, business, or real property and that compensation was thus not required under either the South Carolina or the U.S. Constitution. *Id.* The Act went into effect on July 1, 2000. At that time, Holliday owned 532 operational video poker machines, costing approximately $7000 each.

On January 19, 2001, Holliday brought this action in federal district court, claiming that Act 125 worked a taking of his property, for which he was entitled to just compensation under the Fifth and Fourteenth Amendments. Holliday claimed that, as a result of the Act, his video poker machines (which had been modified to South Carolina specifications such that they could not be used elsewhere) lost all market value, and his business became worthless. Holliday sought compensation for these losses under the Constitution and 42 U.S.C. § 1983.

The district court first granted the state's motion to dismiss for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine. On appeal, this court vacated the district court judgment, because *Rooker–Feldman* only applies to parties to the previous state-court litigation. *See Holliday Amusement Co. of Charleston, Inc. v. South Carolina,* 401 F.3d 534, 537 (4th Cir.2005) (citing *Johnson v. De Grandy,* 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994)).

Upon remand, the district court granted summary judgment to the defendants. The district court held that, under Supreme Court precedent, no taking had occurred; in addition, it held that plaintiff's claim was collaterally estopped by the *Westside* decision, and that sovereign immunity barred some claims. Holliday appeals.

## II.

As an initial matter, we doubt this federal action to be ripe under the requirements of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). *Williamson* set forth "two independent prudential hurdles" to a claim for just compensation for a regulatory taking brought against a state entity in federal court. *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 733–34, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). First, the property **\*407** owner must have a final administrative decision regarding the application of the challenged regulations to the property. *Williamson,* 473 U.S. at 186, 105 S.Ct. 3108. Second, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. 3108.

It is the second *Williamson* requirement, the "state procedures requirement," which poses an obstacle here. Plaintiff has not satisfied this requirement because, as he admits, he has not sought just compensation through a state court procedure. In our view, given that South Carolina opens its courts to inverse condemnation claims arising from regulatory takings, *see, e.g., Hardin v. South Carolina Dept. of Transp.,* 371 S.C. 598, 641 S.E.2d 437, 441 (2007); *Byrd v. City of Hartsville,* 365 S.C. 650, 620 S.E.2d 76, 81 (2005), the plaintiff was obligated under *Williamson* to avail himself of those procedures.

We recognize, of course, that the state procedures requirement does not apply to facial challenges to the validity of a state regulation. *See San Remo Hotel, L.P. v. City and County of San Francisco,* 545 U.S. 323, 345, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005); *see also Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). This case is not a facial challenge, nor is it a challenge to a statute requiring direct transfer of funds to the government. *See Eastern Enters. v. Apfel,* 524 U.S. 498, 521, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality); *see also Washlefske v. Winston,* 234 F.3d 179, 183 (4th Cir.2000) (suit was ripe where only question to be determined was legality of state program). Rather, it is a regulatory takings case, in which the plaintiff has made clear throughout that he "does not seek to prohibit the taking of his property under Act 125 but, to the contrary, accepts the validity of the governmental action as a prerequisite of maintaining this suit for just compensation." Brief of Appellant at 26, *Holliday,* 401 F.3d 534 (4th Cir.2005); *see also* Brief of Appellant at 12. Being such a suit, state procedures for the award of just compensation must be utilized.

Plaintiff argues, however, that he is exempt from the state procedures requirement by virtue of the fact that another group of videogaming operators unsuccessfully asserted a takings claim in *Westside Quik Shop, Inc. v. Stewart,* 341 S.C. 297, 534 S.E.2d 270 (2000). He further argues that his position is supported by the Supreme Court's decision in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), in which, he claims, the Court recognized a "futility" exception to the state procedures requirement.

We conclude, however, that the relevant Supreme Court precedent does not establish an exception to the state procedures requirement in a case such as this. Although the Court has not categorically defined what constitutes an "adequate" state procedure, its cases discussing when a plaintiff might eschew state procedures involve instances where state procedures were not available for plaintiff's claim. In *Williamson* itself, for instance, the Court found plaintiff's claim unripe because the state of Tennessee had available a statutory inverse condemnation scheme which state courts had interpreted "to allow recovery through inverse condemnation where the 'taking' is effected by restrictive zoning laws or development regulations." *Id.* at 196, 105 S.Ct. 3108. In contrast, in *Suitum v. Tahoe Regional Planning Agency,* while refraining from deciding the state procedures issue because it was not addressed below, the Court noted that the **\*408** parties appeared to agree that the defendant local planning agency "d[id] not ... have provisions for paying just compensation," thus making a federal suit the "sole remedy" for the alleged taking. 520 U.S. at 734 n. 8, 117 S.Ct. 1659.

Although plaintiff argues that the present case merits an exception under *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), we do not take that case to say anything different from *Williamson* and *Suitum,* much less to create a new exception broad enough to accommodate the present circumstances. Rather, the situation in *Del Monte Dunes* was of the kind anticipated in *Williamson* itself: in contrast to *Williamson,* where the Court explicitly noted that Tennessee allowed claims for regulatory takings, at the time of the alleged taking in *Del Monte Dunes,* California provided no state-law inverse condemnation procedure for regulatory takings. *Id.* at 710, 119 S.Ct. 1624. This deficiency meant that "Del Monte Dunes was not required to pursue relief in state court as a precondition to federal relief." *Id.* at 699, 119 S.Ct. 1624. *Del Monte Dunes* and the present case, by contrast, are

in no way identical. In this case, the plaintiff asserts that his state-court claim will be unsuccessful; in *Del Monte Dunes,* a state court claim did not exist at all.

Finally, *San Remo Hotel, L.P. v. City and County of San Francisco,* 545 U.S. 323, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005), confirms the prior cases on the state procedures requirement. *San Remo* suggested that the plaintiff must obtain "the entry of a final state *judgment* denying just compensation," *id.* at 337, 125 S.Ct. 2491, and stated that "no claim that a state agency has violated the federal Takings Clause can be heard in federal court until the property owner has been denied just compensation through an *available* state compensation *procedure,*" *id.* at 338, 125 S.Ct. 2491 (emphasis added) (internal quotation marks omitted).

We recognize that various circuits have characterized the state procedures requirement differently. Some have spoken in terms of a "futility" exception, but even those have applied it sparingly, if at all, and no court appears to have established a futility exception in a case like the present one. *See Wash. Legal Found. v. Legal Found. of Wash.,* 271 F.3d 835, 851 (9th Cir.2001) (en banc) (finding futility exception where state supreme court was defendant in federal suit and denied possibility of state relief in its brief). In fact, the circuits that theoretically admit the possibility of a "futility" exception reject the argument that "adequate" state procedure must mean state procedure with a possibility of success. At least three circuits have dismissed the federal claims of a plaintiff who failed to use state procedures before they were time-barred, even though the inability to file in state court meant plaintiff "ha[d] permanently prevented the claim from ever ripening." *Liberty Mut. Ins. Co. v. Brown,* 380 F.3d 793, 799 (5th Cir.2004); *see Pascoag Reservoir & Dam, LLC v. Rhode Island,* 337 F.3d 87, 93 n. 5 (1st Cir.2003) (same); *Harbours Pointe of Nashotah, LLC v. Vill. of Nashotah,* 278 F.3d 701, 706 (7th Cir.2002) (same).

Other circuits, meanwhile, have characterized the state procedures requirement more stringently. *See, e.g., Cormack v. Settle–Beshears,* 474 F.3d 528, 531 (8th Cir.2007) ("We have been unable to find a case in which this court has declared a state's inverse condemnation procedures to be inadequate."); *Agripost, Inc. v. Miami–Dade County ex rel. Manager,* 195 F.3d 1225, 1231 & n. 13 (11th Cir.1999) (exceptions to state procedures requirement exist only where "state law provides [owner] no process" or "due to state court interpretation, **\*409** the process is inadequate," e.g., "the state court interpreted the law as capping the property owner's

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

damages"). In short, neither the Supreme Court cases nor the decisions of other circuits provide any basis for allowing plaintiff to bring suit in federal court without utilizing state mechanisms of relief.

Plaintiff argues that our approach cannot be right, because it would work to keep him out of federal court altogether. In state court, the stare decisis effect of *Westside* would prevent the plaintiff from prevailing on his takings claim, after which a return to federal court would be barred by full faith and credit through the operation of South Carolina preclusion rules. *See* 28 U.S.C. § 1738 (2000); *Byrd v. City of Hartsville,* 365 S.C. 650, 620 S.E.2d 76, 79 n. 6 (2005) ("Takings analysis under South Carolina law is the same as the analysis under federal law.").

*San Remo* makes clear, however, that such an outcome poses no constitutional problem. In *San Remo,* the Supreme Court declined to create an exception to the full faith and credit statute "solely to preserve the availability of a federal forum" for litigants' federal takings claims. *See* 545 U.S. at 347, 125 S.Ct. 2491. "It is hardly a radical notion," the Court noted, "to recognize that, as a practical matter, a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts." *Id.* at 346, 125 S.Ct. 2491. Indeed, "there is scant precedent for the litigation in federal district court of claims that a state agency has taken property in violation of the Fifth Amendment's takings clause. To the contrary, most of the cases in our takings jurisprudence ... came to us on writs of certiorari from state courts of last resort." *Id.* at 347, 125 S.Ct. 2491.

The Court in *San Remo* underscored the principle of federalism at the core of *Williamson*'s prudential ripeness requirements. It noted that "state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions" surrounding property regulation and are "fully competent to adjudicate constitutional challenges" in that arena. *Id.* The *Williamson* state procedures requirement puts such issues in the most competent hands; it minimizes conflicting holdings in state and federal courts (a conflict that plaintiff in fact is seeking to create); and it reduces the risk that legitimate exercises of state police power in furtherance of important goals—such as public health, public welfare, and environmental protection —will be impeded by vexatious and repetitive litigation. We see no reason and we have no authority to second-guess the Supreme Court's conviction that claims for just compensation for regulatory takings by state agencies generally belong in state court.

## III.

In the unlikely event that we misapprehend the import of *Williamson* and *San Remo,* plaintiff in any case lacks a valid constitutional claim. Plaintiff claims that Act 125 effected an uncompensated regulatory taking of his video poker machines, as well as his business's stock, location contracts, and goodwill. [1] Such claims are tenuous at best. As the Supreme Court has stated, "[G]overnment regulation —by definition—involves the adjustment **\*410** of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase,*" *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (ban on sale of protected bird artifacts not a taking). While *Andrus* involved conservation measures "designed to prevent the destruction of certain species of birds," *id.* at 52–53, 100 S.Ct. 318, the principle in that case was plain: it is possible to push the notion of regulatory takings to the point that the most basic exercises of the police power become the subject of ever more expense and litigation.

[1] Without analyzing whether each alleged loss implicates a property interest recognized under South Carolina law, we note that at the least plaintiff makes a claim arising from his ownership of tangible assets, e.g., his video gaming machines, for which he may state a claim for just compensation, albeit an unsuccessful one. *See Rick's Amusement, Inc. v. South Carolina,* 351 S.C. 352, 570 S.E.2d 155, 158–59 (2001).

Even the owner of real property "necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). But "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Id.* at 1027–28, 112 S.Ct. 2886. Such is the "burden borne to secure the advantage of living and doing business in a civilized community." *Andrus,* 444 U.S. at 67, 100 S.Ct. 318 (internal quotation marks omitted).

This point has particular force in this case. Plaintiff is not challenging an ordinary regulation of an ordinary business, but a law relating to gambling—an area in which the state traditionally enjoys wide latitude to regulate activity minutely or to outlaw it completely. *See, e.g., Lawton v. Steele,* 152 U.S. 133, 136, 14 S.Ct. 499, 38 L.Ed. 385 (1894) (recognizing regulation of gambling as traditional exercise of police power). The *Lawton* Court in fact spoke pointedly about gambling devices and declined to make the seizure of "the cards, chips, and dice of a gambling room" the subject of a takings challenge. *Id.* at 141, 14 S.Ct. 499.

Plaintiff attempts to distinguish cases which, like *Lawton,* involve forfeiture on the ground that, although Act 125 compels the forfeiture of video gaming machines, plaintiff's particular machines have not been subjected to a forfeiture proceeding. *See, e.g., Bennis v. Michigan,* 516 U.S. 442, 452, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) (forfeiture comporting with due process does not constitute taking). As *Lawton* suggests, however, this distinction is meaningless for plaintiff's takings claim: whether the plaintiff complains of the physical taking of his property or the regulatory taking of its value, his claim depends upon the false premise that the state's legitimate regulation of gambling constitutes a taking.

Plaintiff's claim resembles previous, unsuccessful takings claims arising from another classic exercise of state police power: regulation of the sale of alcoholic beverages. The Supreme Court consistently rejected takings challenges to Prohibition–era regulations of previously acquired stock. *See Everard's Breweries v. Day,* 265 U.S. 545, 563, 44 S.Ct. 628, 68 L.Ed. 1174 (1924) ("That [the challenged statute] did not take [claimants'] property in violation of the Fifth Amendment, is clear."); *Jacob Ruppert, Inc. v. Caffey,* 251 U.S. 264, 303, 40 S.Ct. 141, 64 L.Ed. 260 (1920) (same). Nor is the current situation different simply because it involves state rather than federal action, or because South Carolina has not banned all gambling but rather has instituted a state lottery. *See* 2001 S.C. Act No. 59 § 2. In fact, the Supreme Court has rejected takings claims arising from state regulations **\*411** imposing partial rather than complete bans on alcoholic beverage sales. *See, e.g., Mugler v. Kansas,* 123 U.S. 623, 668–69, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (rejecting takings challenge to Kansas law prohibiting manufacture or sale of beer without a permit and regulating the purposes for which beer could be manufactured).

Plaintiff contends that the fact that video gaming was legal in South Carolina for years gave him a legitimate expectation

of its continued legality and hence the continued well-being of his business enterprise. But, as the Supreme Court pointed out in *Lucas,* the owner of any form of personal property must anticipate the possibility that new regulation might significantly affect the value of his business. *See* 505 U.S. at 1027–28, 112 S.Ct. 2886. [2] This is all the more true in the case of a heavily regulated and highly contentious activity such as video poker. The pendulum of politics swings periodically between restriction and permission in such matters, and prudent investors understand the risk. As *Mugler* Court stated long ago of alcohol:

2

> We believe that Supreme Court case law makes clear that gambling regulations like Act 125 per se do not constitute takings, and thus analysis under existing takings frameworks is unnecessary. Even if such analysis were appropriate, however, plaintiff's claim would fail. The *Lucas* test for regulations inflicting a complete loss of value does not apply, because *Lucas* by its own terms distinguishes personal property. *See* 505 U.S. at 1019, 1027–28, 112 S.Ct. 2886. Meanwhile, under the *Penn Central* test for partial diminutions in value, partial takings claims entail "ad hoc, factual inquiries," focusing on, inter alia, the regulation's economic impact, particularly its interference with "distinct investment-backed expectations;" and "the character of the governmental action." *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Plaintiff's participation in a traditionally regulated industry greatly diminishes the weight of his alleged investment-backed expectations, while the challenged government action is a classic "instance[ ] in which a state tribunal reasonably concluded that the health, safety, morals, or general welfare would be promoted" by the prohibition embodied in Act 125. *Id.* at 125, 98 S.Ct. 2646 (internal quotation marks omitted). Thus, under any analysis, plaintiff's claim must fail.

It is true, when the defendants in these cases purchased or erected their breweries, the laws of the State did not forbid the manufacture of intoxicating liquors. But the State did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. Indeed, the supervision of the public health and the public morals is a governmental power, continuing in its nature, and to be dealt with as the special exigencies of the moment may require; ... for this purpose, the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.

AR004808

**Holiday Amusement Co. of Charleston, Inc. v. South Carolina, 493 F.3d 404 (2007)**

123 U.S. at 669, 8 S.Ct. 273 (internal citation and quotation marks omitted).

Given the nature of plaintiff's business, he was well aware that the South Carolina legislature might not continue to look favorably upon it. The fact that this possibility came to pass does not yield him a constitutional claim.

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*

**All Citations**

493 F.3d 404

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.