8 S.Ct. 273, 31 L.Ed. 205

8 S.Ct. 273

Supreme Court of the United States

1    Affirming State v. Mugler, 29 Kan. 252.

MUGLER

v.

STATE OF KANSAS,[1] (two cases.)

STATE OF KANSAS ex rel.

TUFTS, Asst. Atty. Gen., Gen.,

v.

ZIEBOLD et al.

December 5, 1887.

**Synopsis**

In Error to the Supreme Court of the State of Kansas. Appeal from the Circuit Court of the United States for the District of Kansas.

**\*\*273** The defendant, Peter Mugler, was prosecuted criminally in two different cases for the violation of the prohibitory liquor law of the state of Kansas. In the first case, the indictment contained one count, charging that the defendant 'did unlawfully manufacture, and did assist and abet in the manufacture, of certain intoxicating liquors on, to-wit, the first day of November, A. D. 1881, in violation of the provisions of an act entitled 'An act to prohibit the manufacture and sale of intoxicating liquors, except for medical, mechanical, and scientific purposes, and to regulate the manufacture and sale thereof for such excepted purposes.'' The trial was had in this case before the court, without a jury, upon an agreed statement of facts, which statement of facts is as follows: 'It is hereby stipulated and agreed that the facts in the above-entitled case are, and that the evidence would prove them to be, as follows: That the defendant, Peter Mugler, has been a resident of the state of Kansas continually since the year 1872; that, being foreign born, he in that year declared his intention to become a citizen of the United States, and always since that time, intending to become such citizen, he did, in the month of June, 1881, by the judgment of the district court of Wyandotte county, Kansas, become a full citizen of the United States and of the state of Kansas; that in the year 1877, said defendant erected and furnished a brewery on lots Nos. 152 and 154, on Third street, in the city of Salina, Saline county, Kansas, for use in the manufacture of an intoxicating malt liquor, commonly known as **\*\*274** beer; that such building

was specially constructed and adapted for the manufacture of such malt liquor, at an actual cost and expense to said defendant of ten thousand dollars, and was used by him for the purpose for which it was designed and intended after its completion in 1877, and up to May 1, 1881; that said brewery was at all times after its completion, and on May 1, 1881, worth the sum of ten thousand dollars for use in the manufacture of said beer, and is not worth to exceed the sum of twenty-five hundred dollars for any other purpose; that said defendant, since October 1, 1881, has used said brewery in the manner and for the purpose for which it was constructed and adapted, by the manufacture therein of such intoxicating malt liquors, and at the time of the manufacture of said malt liquor said defendant had no permit to manufacture the same for medical, scientific, or mechanical purposes, as provided by chapter 128 of the Laws of 1881. And the foregoing was all the evidence introduced in this case, and upon which a finding of guilty was made.' The defendant was found guilty, and fined $100, and appealed to the supreme court of the state of Kansas, where the court below was affirmed. A writ of error was sued out, upon the grounds that the proceedings in said suit involved the validity of a constitutional enactment of the state of Kansas, and of a statute of said state; the defendant claiming that said constitutional enactment and statute are in violation of the constitution of the United States, and the judgment of said supreme court of the state of Kansas being in favor of the validity of said enactment and statute.

Plaintiff in error invoked in the argument before the supreme court of the state of Kansas a portion of the first section of the fourteenth amendment to the constitution of the United States, which provides: 'Nor shall any state deprive any person of life, liberty, or property without due process of law.' The amendment to the constitution of the state of Kansas which is complained of is as follows: 'The manufacture and sale of intoxicating liquors shall be forever prohibited in this state, except for medical, scientific, and mechanical purposes.' Const. Kan. art. 15, § 10. This amendment was adopted by the people November 2, 1880. The statute complained of is chapter 128 of the Laws of Kansas, passed in 1881. That statute became operative May 1, 1881. Section 8 of that statute is as follows: 'Any person, without taking out and having a permit to manufacture intoxicating liquors as provided in this act, who shall manufacture, or aid, assist, or abet in the manufacture, of any of the liquors mentioned in section 1 of this act, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall suffer the same punishment as provided in the last preceding section of this act for unlawfully selling such liquors.' Section 5 of that statute is as follows: 'No person shall manufacture or

assist in the manufacture of intoxicating liquors in this state, except for medical, scientific, and mechanical purposes. Any person or persons desiring to manufacture any of the liquors mentioned in section one of this act, for medical, scientific, and mechanical purposes, shall present to the probate judge of the county wherein such business is proposed to be carried on a petition asking a permit for such purpose, setting forth the name of the applicant, the place where it is desired to carry on such business, and the kind of liquor to be manufactured. Such petition shall have appended thereto a certificate, signed by at least twelve citizens of the township or city where such business is sought to be established, certifying that such applicant is a person of good moral character, temperate in his habits, and a proper person to manufacture and sell intoxicating liquors. Such applicant shall file with said petition a bond to the state of Kansas, in the sum of ten thousand dollars, conditioned that, for any violation of the provisions of this act, said bond shall be forfeited. Such bond shall be signed by said applicant or applicants, as principal or principals, and by at least three sureties, who shall justify, under oath, in the sum of seven thousand dollars each, and who shall be of the number signing said petition. The probate judge shall consider such petition and **275 bond, and, if satisfied that such petition is true, and that the bond is sufficient, may, in his discretion, grant a permit to manufacture intoxicating liquors for medical, scientific, and mechanical purposes. The said permit, the order granting the same, and the bond and justification thereon, shall be forth with recorded by said probate judge in the same manner and with like offect as in a case of a permit to sell such liquors as provided in section two of this act; and the probate judge shall be entitled to the same fee for his services, to be paid by the applicant. Such manufacturer shall keep a book, wherein shall be entered a complete record of the liquors manufactured by him, the sales made, with the dates thereof, the name and residence of the purchaser, the kind and quantity of liquors sold, and the price received or charged therefor. An abstract of such record, verified by the affidavit of the manufacturer, shall be filed quarterly in said probate court, at the end of each quarter during the period covered by such permit. Such manufacturer shall sell the liquor so manufactured only for medical, mechanical, and scientific purposes, and only in original packages. He shall not sell such liquors for medical purposes except to druggists, who, at the time of such sale, shall be duly authorized to sell intoxicating liquors as provided in this act; and he shall sell such liquors to no other person or persons, associations or corporations, except for scientific or mechanical purposes, and then only in quantities not less than five gallons.'

The case of *State ex rel. Tufts* v. *Ziebold et al.* is a civil case, commenced in the district court of Atchison county, Kansas, in the name of the state, by the assistant attorney general for that county, to abate an alleged nuisance, to-wit, a place where intoxicating liquors are bartered, sold, and given away, and are kept for barter, sale, and gift, in violation of law, and a place where intoxicating liquors are manufactured for barter, sale, and gift, in the state of Kansas, and to perpetually enjoin the defendants from using or permitting to be used the premises described in the petition for the purposes mentioned, in violation of the prohibitory law of the state of Kansas. The defendants filed with the clerk of the district court a bond and petition for removal to the circuit court of the United States; and, on the hearing of said petition, the same was overruled by the judge of the district court, who rendered the following opinion, retaining the cases for trial:

'*The State of Kansas ex rel. J. F. Tufts, Assistant Attorney General, Plaintiff*, vs. *Ziebold & Hagelin, Defendants*.

'On application to remove to United States circuit court.

'MARTIN, J. This is an action under the clause of section 13 of the prohibitory liquor law, which was added by the legislature of 1885; the relator, averring that the defendants have no permit from the probate judge of this county, either to manufacture or sell intoxicating liquors, and that they are doing both at their brewery, near the city of Atchison, asks that they be enjoined from selling, and from manufacturing for sale, in the state of Kansas, any malt, vinous, spirituous, fermented, or other intoxicating liquors. The defendants have filed an answer, containing a general denial, and also an averment to the effect that the defendant's brewery, which is alleged to be of the value of $60,000, was erected prior to the adoption of the prohibitory amendment to the constitution of this state, and the passage of the prohibitory law, for the purpose of manufacturing beer, and that it is adapted to no other purpose, and that if the defendants are prevented from the operation thereof for the purpose for which it was erected, the same will be wholly lost to the defendants, and that said prohibitory act is unconstitutional and void. The defendants have also presented a petition and bond for the removal of the case to the circuit court of the United States for the District of Kansas for trial. In the petition for removal it is alleged that said prohibitory act is in contravention of article 4, and section 1 of article 14, of the amendments to the constitution of the United States.

**276 'The record presents for adjudication certain federal questions which will require the removal of the cause, unless

the propositions involved have been settled by decisions of the supreme court of the United States. But, as stated by the present learned judge for the Eighth circuit, 'when a proposition has once been decided by the supreme court, it can no longer be said that in it there still remains a federal question.' *State* v. *Bradley*, 26 Fed. Rep. 289. It is a part of the constitutional history of this country that the 10 amendments to the federal constitution, numbered 1 to 10, inclusive, which were submitted to the state for ratification by the first congress at its first session, were intended as limitations upon the powers of the federal government, and not as restrictions upon the authority of the states; and as a result no state statute can be held null and void by any court, state or federal, on account of a supposed conflict with these amendments, or any of them. Article 4, which is quoted in the petition for removal, and which relates to unreasonable searches and seizures, may therefore be dismissed from our consideration. *Barron* v. *Mayor, etc.*, 7 Pet. 243; *Livingston's Lessee* v. *Moore*, Id. 469, 551, 552; *Fox* v. *State of Ohio*, 5 How. 410, 434, 435; *Smith* v. *State of Maryland*, 18 How. 71, 76; *Twitchell* v. *Com.*, 7 Wall. 321, 325, 326; *U. S.* v. *Cruikshank*, 92 U. S. 542, 552.

'The real point suggested by the petition for removal is whether, in view of the decisions of the supreme court of the United States, it is yet an open question that the prohibitory liquor law of this state, in so far as it restricts the right to sell and manufacture beer, is or is not in contravention of section 1 of article 14 of said amendment, which reads as follows:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privilege or immunity of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of its laws.'

'Our own supreme court, in a case nearly like this one, has held that the act is not in conflict with this section, Justice BREWER, (now of the federal circuit bench,) dissenting. *State* v. *Mugler*, 29 Kan. 252. The United States circuit court for the Northern district of Georgia also takes the same view as our supreme court in the case of a brewery similarly affected by the recent local option law of Georgia. *Weil* v. *Calhoun*, 25 Fed. Rep. 865. In the case of *State* v. *Walruff*, 26 Fed. Rep. 178, Judge BREWER adheres, however, to his dissenting opinion in the *Mugler Case*, and holds the statute in question to be in conflict with the fourteenth amendment, because no provision is made in the act for the payment

of damages to property and business injuriously affected by its operation; and this decision has been followed by Judge LOVE, of the federal district court for Iowa, in two cases. [*Kessinger* v. *Hinkhouse, Mahin* v. *Pfeiffer*,] 27 Fed. Rep. 883, 892. The decisions of the state courts of last resort, and of the inferior federal courts, are not conclusive upon the interpretation of the federal constitution. The supreme court of the United States is, however, the final expositor and arbiter of all disputed questions touching the scope and meaning of that sacred instrument, and its decisions thereon are binding upon all courts, both state and federal.

'Is the doctrine of the *Walruff Case* supported by these decisions? With the utmost deference to the opinion of Judge BREWER, we are constrained to think not. The authorities cited by him certainly do not justify his proposition, and other cases not referred to are inconsistent with his views. He treats the Walruff brewery as if taken by the state for public use without just compensation. Yet this alone, if true, would not be a matter of federal cognizance. By the fifth amendment the federal government was inhibited from depriving any person of life, liberty, or property without due process of **277** law, and also from taking private property for public use without just compensation? But, as remarked by Justice MILLER in *Davidson* v. *New Orleans*, 96 U. S. 97, 105, in commenting on the clause of the fourteenth amendment forbidding the state from depriving any person of his property without due process of law, 'if private property is taken for public uses without just compensation, it must be remembered that when the fourteenth amendment was adopted, the provision on that subject in immediate juxtaposition in the fifth amendment with the one we are construing was left out and this was taken.' Prior to the adoption of the fourteenth amendment, a man whose property was taken by any state process for public use, without just compensation, could not on that ground resort to the federal courts for redress. His remedy was in the state courts, and it remains so to this day, that amendment being entirely silent upon the subject. But the doctrine in the *Walruff Case* seems to assume that the deprivation of property without due process of law is the same thing as the taking of private property for public use without just compensation, or that the former includes the latter. But the statesmen who framed the early amendments were at least as wise and had as accurate an understanding of the import of the words in a fundamental law as any who have succeeded them. They were not given to a waste of words, nor the useless and perplexing repetition of the same proposition in different forms. They recognized the fact that private property might be taken for public use under regular process without just compensation, and also that a man might be deprived

8 S.Ct. 273, 31 L.Ed. 205

of his property without due process of law, and yet obtain compensation therefor to the full measure of its value; and the federal government was inhibited from both of these forms of injustice, while the states were left free to establish such rules on the subject as they deemed proper. Since the adoption of the fourteenth amendment, however, the fact that a person is deprived of his property by a state, without due process of law, constitutes a ground for the exercise of jurisdiction by the federal courts. Referring to this subject in the case of *Davidson* v. *New Orleans, supra*, Justice MILLER says: 'It is not a little remarkable that, while this provision has been in the constitution of the United States as a restraint upon the authority of the federal government for nearly a century, and while during all that time the manner in which the powers of that government have been exercised has been watched with jealousy, and subjected to the most rigid criticism in all its branches, this special limitation upon its powers has rarely been invoked in the judicial forum or the more enlarged theater of public discussion. But while it has been a part of the constitution as a restraint upon the powers of the states only a very few years, the docket of this court is crowded with cases in which we are asked to hold that state courts and state legislatures have deprived their own citizens of life, liberty, and property without due process of law. There is here abundant evidence that there exists some strange misconception of the scope of the provision as found in the fourteenth amendment. In fact, it would seem from the character of many of the cases before us, and the arguments made in them, that the clause under consideration is looked upon as a means of bringing to the test of the decision of this court the abstract opinions of every unsuccessful litigant in a state court of justice of the decision against him, and of the merits of the legislation on which such a decision may be founded.'

'Neither the state nor the federal courts ever had any rightful power to avoid an act of a state legislature, because by such court deemed impolitic or unreasonable. It could only be so avoided when in contravention of the constitution of the state, or of the federal constitution, or some act of congress passed or treaty made in pursuance of its authority. The views of a court upon the merits or demerits of a statute have nothing to do with its validity. In the *Walruff Case* an effort appears to be made to blend and combine two principles,—one embraced in the fourteenth amendment; and the other entirely **\*\*278** outside of the constitution,—and then to show that the Kansas liquor law is in conflict with the combined principle. The syllabus of the case shows this. It reads as follows: 'The prohibitory amendment to the constitution of Kansas, and the laws passed in pursuance

thereof, condemn and confiscate to public use all property then in use for the manufacture of the prohibited articles, and, having failed to provide compensation therefor, are in violation of the fourteenth amendment to the constitution of the United States, as taking property without due process of law.' Waiving, however, for the present, this unwarranted blending of constitutional and extra-constitutional principles, it is safe to assert that no decision of the supreme court of the United States either establishes or tends to establish the doctrine that a liquor law such as ours operates upon the owners of distilleries or breweries as a taking of private property for public use, or as a deprivation of property without a due process of law.

'The scope of the first section of the fourteenth amendment was first fully discussed by that tribunal in the *Slaughter-House Cases*, 16 Wall. 36:'The legislature of Louisiana, on March 8, 1869, passed an act conferring upon the defendant company, a corporation created by the act, the exclusive right, for twenty-five years, to have and maintain slaughter-houses, landings for cattle, and yards for confining cattle intended for slaughter, within the parishes of Orleans, Jefferson, and St. Bernard, a territory comprising an area of 1,154 square miles, including the city of New Orleans, and prohibiting all other persons from keeping or having slaughter-houses, landings for cattle, and yards for confining cattle intended for slaughter, within said limits, and requiring that all cattle and other animals to be slaughtered for food in that district should be brought to the slaughter-houses and works of said company, to be slaughtered upon the payment of a fee and certain perquisites to the company for such service. The plaintiffs, an association of butchers, averred that, prior to the passage of the act in question, they were engaged in the business of procuring and bringing to said parishes, animals suitable for human food, and in preparing the same for market; that in the prosecution of this business they had provided in these parishes suitable establishments for landing, sheltering, keeping, and slaughtering cattle, and the sale of meat; that with their association about 400 persons were connected, and that in said parishes almost 1,000 persons were thus engaged in procuring, preparing, and selling animal food. It is evident that the establishment of the plaintiffs would be rendered almost valueless, and their business substantially broken up, by the operation of the monopoly created by the legislature. And yet the supreme court held that this legislation was not in contravention of any of the provisions of the fourteenth amendment, but that it was a valid exercise of the police power of the state of Louisiana, with which the federal courts could not rightfully interfere.' In the entire official report of the case, embracing nearly one hundred cases, and including

the brief of the unsuccessful counsel, the opinion of the court, and the views of three dissenting justices, there is not a word of reference to the taking of private property for public use without first compensation. The learned justice did not seem to regard this as one of the evils that the fourteenth amendment was designed to remedy. To the argument that the butchers were deprived of their property without due process of law, Justice MILLER, delivering the opinion of the court, answered as follows: 'It is sufficient to say that, under no construction of that provision that we have ever seen, or that we deemed admissible, can the restraint imposed by the state of Louisiana upon the exercise of their trade by the butchers of New Orleans be held to be a deprivation of property within the meaning of that provision.'

'In the case of *Bartemeyer* v. *Iowa*, 18 Wall. 129–133, Justice MILLER, again delivering the opinion of the court, says: 'The weight of authority is overwhelming that no such immunity has heretofore existed as would prevent **\*\*279** state legislatures from regulating, and even prohibiting, the traffic in intoxicating drinks, with a solitary exception. That exception is the case of a law operating so rigidly on property in existence at the time of its passage, absolutely prohibiting its sale, as to amount to depriving the owner of his property. A single case (*Wynehamer* v. *People*, 13 N. Y. 485) has held that as to such property the statute would be void for that reason. But no case has held that such a law was void as violating the privileges or immunities of citizens of a state or of the United States. If, however, such a proposition is seriously urged, we think that the right to sell intoxicating liquors, so far as such right exists, is not one of the rights growing out of citizenship of the United States, and in this regard the case falls within the principles laid down by the court in the *Slaughter-House Cases*.' The 'solitary exception' from the principle is then referred to as follows: 'But if it were true, and if it were fairly presented to us, that the defendant was the owner of the glass of intoxicating liquor which he sold to Hickey at the time that the state of Iowa first imposed an absolute prohibition on the sale of such liquor, then we can see that two very grave questions would arise, namely: *First*, whether this would be a statute depriving him of his property without due process of law; and, *secondly*, whether it would be so far a violation of the fourteenth amendment in that regard as would call for judicial action by this court.' And Justice FIELD, concurring specially, says: 'I have no doubt of the power of the state to regulate the sale of intoxicating liquors, when such regulation does not amount to the destruction of the right of property in them. The right of property in an article involves the power to sell and dispose of such article, as well as to use and enjoy it. Any act which declares that the owner shall neither sell nor dispose of it, nor use and enjoy it, confiscates it, depriving him of his property without due process of law.'

'In the *Walruff Case*, Judge BREWER lays great stress upon those passages relating to the doctrine in the New York case. But what relevancy they had to the *Walruff Case* in difficult to imagine. It was not claimed that Walruff had any beer that was manufactured prior to the adoption of the prohibitory amendment and the passage of the prohibitory law of 1881; and if such a fact had been made to appear, still neither said amendment nor the act of 1881 imposed an absolute prohibition upon the sale of such beer, and not even the slightest restriction upon its use, except that the owner shall not become drunk by imbibing it. Although the tenth amendment to our state constitution, and the legislation in pursuance thereof, are commonly called 'prohibitory,' yet they are not so in strictness of speech, as fully stated by our supreme court in the *Mugler case*. The evident purpose of both is to diminish the evils of intemperance by placing the manufacture and sale of intoxicating liquors under regulations more strict than those formerly existing.

'It is said, however, that Walruff owned a brewery,— a building and its appurtenances especially adapted to the manufacture of beer,—prior to the adoption of said amendment. This is a great remove from the 'solitary exception' mentioned by Justice MILLER in the Iowa case, —a remove from the product in the manufactory. But the title to such brewery is in no manner affected or incumbered by the amendment and the statutes. Neither the real estate nor the personal property is '*taken*' by the state for public use. The state obtains no title, no easement, no license,— nothing. And the owner is in nowise *deprived* of his property; he parts with nothing. It is true that the state restricts and regulates to some extent the use of such property, so that, in the opinion of the legislature, it shall not be an instrument of hurt and injury to the public. And this brings us to the quotation by Judge BREWER from the opinion of Justice FIELD in the *Chicago Elevator Case*, entitled '*Munn* v. *Illinois*,' 94 U. S. 113, 141, as follows: 'All that is beneficial in property arises from its use and the fruits of that use; and whatever deprives a person of them deprives him of all that is desirable or valuable in **\*\*280** the title and possession. If the constitutional guaranty extends no further than to prevent a deprivation of title and possession, and allows a deprivation of use, and the fruits of that use, it does not merit the encomiums it has received.' It must be remembered, however, that this is not the opinion of the court, but only the view of one of the two dissenting justices. The court, by Chief Justice WAITE, states as its opinion that, by the powers inherent in

every sovereignty, a government may regulate the conduct of its citizens towards each other, and, when necessary for the public good, the manner in which each shall use his own property. Accordingly, it was held that, notwithstanding the provisions of the fourteenth amendment to the constitution of the United States, the grain elevators built in Chicago by private enterprise, with private capital, and owned by individuals prior to the adoption of the constitution of 1870 by the people of Illinois, were so far subject to the power of the state under that constitution that a subsequent legislature might make rules and regulations for the government of elevators in their dealings with their patrons, and might fix the value of the use of such elevator property by establishing maximum rates for the storage, handling, and transfer of grain. The case of *Beer Co.* v. *Massachusetts*, 97 U. S. 25, reaffirms *Bartemeyer* v. *Iowa*, and upholds to the fullest extent the authority of the states over the manufacture and sale of intoxicating liquors, subject to the one exception specified in the Iowa case, which has been already fully discussed. In this case, however, the beer company relied upon certain chartered privileges in the nature of a contract, rather than upon the fourteenth amendment; but the court held that the legislature could not by any contract divest itself of its police power, which was held to extend to the protection of the lives, health, and property of her citizens, the maintenance of good order, and the preservation of the public good. See, further, as to the police powers of the state, *Patterson* v. *Kentucky*, 97 U. S. 501, and authorities cited. In *Stone* v. *Mississippi*, 101 U. S. 814, it appeared that in 1867 the legislature of Mississippi granted a charter to a lottery company for twenty-five years, in consideration of a stipulated sum in cash, and the annual payment of a further sum, and a percentage of receipts for the sale of tickets. A provision of the constitution adopted in convention May 15, 1868, and ratified by the people December 1, 1869, declares that 'the legislature shall never authorize any lottery, nor shall the sale of lottery tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold.' And he also held that the prohibition of such lotteries was not an infringement of vested rights within the meaning of the constitution of the United States, and that the legislature could not, by chartering a lottery company, defeat the will of the people of a state authoritatively expressed in relation to the continuance of such business in their midst. The lottery company did not invoke any immunity by reason of the fourteenth amendment, although it was officially promulgated long before the ratification of the state constitution by the people of Mississippi. It relied, as did the beer company in the preceding case, upon the clause

of the constitution of the United States declaring that no state shall pass any law impairing the obligation of contracts. And neither the aggrieved parties nor the court seem to have discovered that the proceedings constituted a taking of private property for public use without just compensation, nor a privation of property without due process of law. In *Foster* v. *Kansas*, 112 U. S. 201, 5 Sup. Sup. Ct. Rep. 8, (32 Kan. 765,) the supreme court of the United States, in an opinion covering only a few lines, holds our Kansas liquor law of 1881 to be valid, and not repugnant to the constitution of the United States, on the authority of the Iowa and Massachusetts cases before referred to. And the amendment of 1885 to the act of 1881 did not render the liquor law any more objectionable on any ground raised in this case or the *Walruff Case*.

'Some quotations have already been made from the opinion of the court **281 in *Davidson* v. *New Orleans*, 96 U. S. 97, where an assessment of certain real estate in New Orleans, for draining swamps of that city, was resisted in the state courts on the ground that the proceeding deprived the owner of his property without due process of law, in violation of the fourteenth amendment. But it was held that neither the corporate agency by which the work was done, the excessive price which the statute allowed therefor, nor the relative importance of the work to the value of the land assessed, nor the fact that the assessment was made before the work was done, nor that it was unequal as regards the benefits conferred, nor that the personal judgments were rendered for the amounts assessed, were matters in which the state authorities were controlled by the federal constitution, and the assessment was therefore held valid as against any objections which could be raised in the supreme court of the United States on a proceeding in error from the supreme court of Louisiana.

'In *Barbier* v. *Connolly*, 113 U. S. 27, 5 Sup. Ct. Rep. 357, the court held that the fourteenth amendment of the constitution does not impair the police power of a state, and that an ordinance of the city of San Francisco, prohibiting washing and ironing in public laundries and wash-houses, within defined territorial limits, from 10 o'clock at night to 6 in the morning, was purely a police regulation within the competency of a municipality possessed of the ordinary powers. And in another case, under the same ordinance, (*Soon Hing* v. *Crowley*, 113 U. S. 703, 5 Sup. Ct. Rep. 730,) it was held to be no valid ground of constitutional objection that the ordinance permitted other and different kinds of business to be done within the hours prohibited to laundries and wash-houses. This ordinance was intended to and did bear heavily upon the Chinese, who owned and kept laundries

and wash-houses in that city, and such establishments must have been greatly depreciated in value by the enforcement of this restrictive regulation; yet the supreme court decided that the fourteenth amendment did not invest the federal courts with any power to grant relief, Justice FIELD delivering the unanimous opinion of the court in both cases.

'In the case of *Railway Co.* v. *Humes,* 115 U. S. 514, 6 Sup. Ct. Rep. 110, it was held that a statute of Missouri requiring every railway corporation in the state to erect and maintain fences and cattle-guards on the side of its road, and, if it does not, making it liable to double the amount of damages occasioned thereby and done by its agents, cars, or engines to cattle or other animals on its road, does not deprive a railroad corporation, against which such double damages are recovered, of its property without due process of law, or deny it the equal protection of the law in violation of the fourteenth amendment. Justice FIELD, in delivering the opinion of the court, refers with approval to the remarks of Justice MILLER, in *Davidson* v. *New Orleans,* respecting the general misconception of the scope of these provisions, and says: 'If the laws enacted by a state be within the legitimate sphere of legislative power, and their enforcement be attended with the observance of those general rules which our system of jurisprudence prescribes for the security of private rights, the harshness, injustice, and oppressive character of such laws will not invalidate them as affecting life, liberty, or property without due process of law.' And again: 'It is hardly necessary to say that the hardship, impolicy, or injustice of state laws is not necessarily an objection to their constitutional validity; and that the remedy for evils of that character is to be sought from state legislatures. Our jurisdiction cannot be invoked unless some right claimed under the constitution, laws, or treaty of the United States is invaded. This court is not a harbor where refuge can be found from every act of ill-advised and oppressive state legislation.'

'This review of the leading decisions of the supreme court of the United States, giving a construction to section 1 of the fourteenth amendment, taken with the admitted doctrine of that court prior to said amendment, that the **\*\*282** manufacture and sale of intoxicating liquors within a state were purely and exclusively matters of state regulation and control, is sufficient to establish the following propositions, namely: (1) The first clause of that section relates to the privileges and immunities of citizens of the United States, as distinguished from the privileges and immunities of citizens of the state, and the right to manufacture and sell intoxicating liquors is not one of those privileges and immunities which by that clause the states are forbidden to abridge. (2) The

states have as complete power now, as ever, to so regulate the use of property within their limits that it shall not be made an instrument of injury to the public, but rather to promote the general welfare. (3) The regulation of the manufacture and sale of intoxicating liquors within a state, being matters of public and internal government, are not impaired by said section 1 of the fourteenth amendment; but the powers of the state to deal with the subject are as full, complete, and exclusive since as before the adoption of said amendment, provided that the owner of property be not deprived of it without due process of law. (4) The present law of this state, prohibiting the defendants from manufacturing and selling beer without a permit, and restricting the purposes for which it may be manufactured and sold, is not a taking of the defendants' brewery by the state for public use, nor a deprivation of the defendants of their brewery, within any admissible construction of those respective clauses of said section. (5) And these propositions, having been settled by repeated decisions of the supreme court of the United States, there is no longer a federal question which should be certified by a state court to an inferior federal court for decision.

'The cases cited in the opinion in the *Walruff Case,* other than those already referred to, appear to be entirely irrelevant, unless it be in the case in 18 How. 272, which discusses the meaning of the phrase 'due process of law,' but it is not inconsistent with any position taken in this opinion. *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, is cited as a 'leading case.' The action was commenced before the adoption of the fourteenth amendment, and it involved the construction of that provision of the constitution of the state of Wisconsin which declares that 'the property of no person shall be taken for public use without just compensation therefor.' The plaintiff's land to the extent of 640 acres was overflowed by reason of a dam erected by the defendant company, and had been substantially submerged before the action was commenced, and it was held that this was such a taking of the plaintiff's land as required compensation to be made, —a principle which would certainly be law in Kansas, the very principle of our mill-dam act. But here the defendant corporation obtained a valuable easement upon the land of the plaintiff, who was almost wholly deprived of its actual possession and use. The Illinois, New Jersey, and New York cases referred to in the opinion also treat of the right of eminent domain and the qualifications of that right, but they are no nearer in point than the case in 13 Wall. The doctrine of the *Walruff Case* is that, by force of the fourteenth amendment, a state cannot alter its laws and institute what it deems necessary reforms without first making compensation to those who would suffer a consequential loss by the change.

'At the beginning of the civil war, the business of the distiller was as free from interference and taxation by the general government as any other industry or manufacture. In order to raise revenue for the prosecution of the war, however, distilled spirits were taxed to several times their first cost, and distilleries were placed under the strictest government surveillance; and although during late years the tax has in part abated, yet the absolute government control still continues. Under the operation of the internal revenue laws, hundreds of the owners of the smaller distilleries were compelled to close them, or flee with them to the mountains and become 'moonshiners,' and their investments in them became almost a total loss. But, although by the fifth amendment the federal government has always been forbidden from taking **283 private property for public use without just compensation, and also from depriving any person of life, liberty, or property without due process of law, yet we have never heard of the presentation of a claim by a ruined distiller against the government, for the reparation of his loss, and such a claim would certainly not be seriously entertained. But why is not such a claim against the United States as good as a like claim by the defendants upon this state? May not the state safely go as far in the exercise of her police power for the protection of the property, health, and morals of her inhabitants as the United States may proceed, under her power of taxation, to raise revenue to defray her extraordinary expenses? We will suppose the case of a new state where, either because no apparent necessity existed, or from inadvertence or neglect, no statute was enacted against the keeping of gambling-houses, and while this state of affairs existed many such places were established, at a large outlay of money, and the proprietors were carrying on a lucrative business. Must the state, as a condition precedent to the enforcement of legislation against the evil, purchase and pay for the houses, or their furniture and gambling devices, together with the good-will of their business? And the same inquiry might be made as to houses of ill fame and lotteries, under similar circumstances. Think of the states being compelled to buy up gambling-houses, brothels, and lotteries, and the good-will of such establishments, before any statute for their suppression could be enforced! Judge LOVE, following the authority and logic of the *Walruff Case,* holds that the protection of the fourteenth amendment extends to dram-shops or saloons which were in existence prior to the enactment of the Iowa prohibitory liquor law, and that the state must buy them out in order to their suppression. And the principle carried to its legitimate conclusion will also embrace all the supposed cases hereinbefore named, and cover them with like immunity.

'Such a construction of the beneficent and liberal provisions of the first section of the fourteenth amendment is utterly untenable and inadmissible. The fourteenth is one of the three amendments growing out of the civil war, having in the main a unity of purpose in three successive steps: *First,* the emancipation of an enslaved race; *secondly,* the clothing of that race with national and state citizenship and full civil rights; and, *thirdly,* their political enfranchisement as a guaranty against the invasion of their newly-acquired rights. And, as Justice MILLER says in the *Slaughter-House Cases,* in giving the construction to any of these amendments, it is necessary to keep this main purpose steadily in view, although their letter and spirit must apply to all cases coming within their purview, whether the party concerned be of African descent or not. Neither the advocates nor the opponents of the fourteenth amendment, while it was the subject of discussion in congress, before the state legislatures, and by the people, ever placed any such construction upon such section 1, as that set forth in the *Walruff Case.* If its advocates had avowed a construction so degrading to the states, and so subversive of their authority, it is doubtful if it would have been ratified by a single member of the Union. Happily, the supreme court of the United States has repeatedly spoken in such terms as to give assurance against any fear that such an interpretation of that section shall ever become the law of the land.

'The applications to remove the case to the United States circuit court for trial will be denied.'

The defendants, however, filed in said court a transcript of the record in the case, and the same was docketed in said court as pending therein. The state filed a verified plea in abatement, and to the jurisdiction of the court, controverting the facts alleged in the petition for the removal as the grounds of such removal. To this plea the defendants filed an answer, (replication?) and, upon the issue joined on the plea by such answer, the cause was submitted to the court. By agreement, the proofs of the parties, plaintiff and defendants, were **284 made by affidavits, all objections being waived, and no question being raised on either side as to the proper practice of taking proof on such an issue. Upon the hearing of the plea in abatement, it appearing that the answers to said pleas were not verified, it was agreed that each of said pleas should be considered as denied, only in so far as the same were denied in the affidavits filed for the defense in said case. It was also admitted that no application for a permit to sell or manufacture liquor on the premises described in the petition, the selling or manufacturing of which was sought to be enjoined, had ever been made by either of the

defendants under the law. It was also agreed that, upon the evidence offered upon said hearing, the said judge should consider, adjudge, and issue such order of injunction, if any, as ought to be issued in said case, provided the said case was retained in that court. The court overruled the plea in abatement, holding the case for hearing in the circuit court. After wards the complainant and appellant filed an amended and recast bill, alleging and praying as in the original petition in the state court, but framed according to the equity pleadings. This amended and recast bill contains, in addition to the allegations in the original bill, substantially these three following propositions: *First*, that all rights, interests, estate, and title in and to said premises, vested in said defendants, were acquired with a full knowledge that all places where intoxicating liquors are sold in violation of law, were by the statutes of said state of Kansas declared to be a common nuisance, and directed to be shut up and abated as public nuisances; *second*, that none of the malt, vinous, spirituous, fermented, or other intoxicating liquors now in possession of said defendants on said premises, the barter, sale, or gift of which in violation of the laws of the state of Kansas is sought to be enjoined in this action, were in existence prior to the adoption of said constitutional amendment, and the enactment of said acts by the legislature of the state of Kansas; *third*, that at the time said defendants erected the buildings and the appurtenances on the premises described in plaintiff's petition, and at the time said defendants acquired their present rights, interests, estate, and title to said premises, the sale, barter, and giving away of spirituous, vinous, fermented, or other intoxicating liquors, without first taking out and having a license or permit, was prohibited by the laws of said state, punished by fine and imprisonment, and all places where such liquors were sold or given away in violation of the law were declared to be common nuisances, and directed to be shut up and abated as such. These propositions were also contained in the plea in abatement. In addition to these allegations, and as part of the bill, there were annexed full copies of the laws of the state of Kansas, which authorize these proceedings, and also the law upon which the first and third of the foregoing propositions are based.

The defendants filed their answer to said amended and recast bill, alleging that, at the time they purchased and erected the buildings and premises described in the bill, the laws of the state of Kansas permitted the manufacture of beer and intoxicating liquors without any restrictions. That said buildings and premises were erected for that especial purpose; and that said property was useless for any other purpose than for that for which they were constructed, to-wit, the manufacture of beer and other intoxicating liquors,

and if enjoined from prosecuting that particular business, they would suffer a total loss of the value of the buildings; that the law under which this prosecution was instituted was void and unconstitutional, and the provisions thereof were in violation of and in contravention to the provisions of article 4, and section 1 of article 14, of the amendments to the constitution of the United States.

On Thursday, February 10, 1887, at the November term, 1886, this cause being submitted on bill and answer, a final decree was made and pronounced in the cause, wherein it was, in substance, adjudged and decreed that the complainant and appellant, the state of Kansas, on the relation of J. F. Tufts, assistant attorney general of the state of Kansas for Atchison county, Kansas, **285 was not entitled to the relief prayed for, and dismissing said bill at the cost of said complainant and appellant. The complainant then brought this appeal to this court.

ASSIGNMENT OF ERRORS.

The complainant and appellant assigns as error, and asks for a reversal upon, the following rulings of the court below: *First*, that the court below erred in overruling the plea in abatement to the jurisdiction of the court, and in holding the case for hearing; *second*, that the court below erred in rendering a final decree on the bill and answer for the defendants, and dismissing complainant's bill.

This statute and constitutional amendment have received a construction at the hands of the supreme court of Kansas, *Prohibitory Amendment Cases*, 24 Kan. 700, and the case at bar, *State* v. *Mugler*, 29 Kan. 252, defining the privileges and liabilities under the old law and under the new. In 1877, when plaintiff in error, Mugler, erected his brewery, he had a right to manufacture beer or any other intoxicating liquors which he chose. He can do so still, provided he obtains a permit, which can be obtained by complying with the law. In 1877 he could manufacture intoxicating liquors for any purpose. Under the amendment, he can only manufacture for medical, scientific, and mechanical purposes. In 1877 he had no right to sell intoxicating liquors in any quantity, in any place, or to any person in Kansas, without a license. *State* v. *Volmer*, 6 Kan. 371; *Dolson* v. *Hope*, 7 Kan. 161; *Alexander* v. *O'Donnell*, 12 Kan. 608. Such is still the law. The license is now called a permit.

The word 'property,' as used in Const. U. S. 14th Amend., means the right of use and the right of disposal, without any control save only by *the law of the land*. Bl. Comm. 138. The police power of the state is a part of *the law of the land*. It

does not affirmatively appear that plaintiff in error, Mugler, was the owner of the property at the time of the passage of the amendment, or at the time of the commission of the offense. If he was at the time he made his investment, he had—*First*, the right to sell it; *second*, the right to use it, limited by the police power of the state; and, by reason of statutes then in force, this right was a defeasible one,—a mere privilege or license. The right to manufacture and sell intoxicating liquors has always been held, by the common law of England, by the courts and legislatures of the states, by this court, and by the congress of the United States, as a peculiarly temporary, defeasible, and transient right, as particularly subject to the police power. The right of plaintiff in error to use his property at the time he acquired it for the purpose for which it was erected was, *under the statutes of Kansas*, but a mere license. The right to sell was a license. *Mugler* v. *State*, 29 Kan. 252. Sale is the object of manufacture. *Brown* v. *Maryland*, 12 Wheat. 419. The right to manufacture includes the right to sell. *Beer Co.* v. *Massachusetts*, 97 U. S. 32. To take away the right to sell is to take away, *de facto*, the right to manufacture. As to the right to manufacture for sale outside the state, see *State* v. *Walruff*, 26 Fed. Rep. 178. A state, in the enactment of a law, contemplates the existence of no other sovereignty than itself. *Bartemeyer* v. *Iowa*, 18 Wall. 129; *Wynehamer* v. *People*, 13 N. Y. 378. It does not appear that plaintiff in error was situated so as to sell outside of the state with profit. It follows, then, that plaintiff's privileges at the time he made his investment were expressly defeasible under the laws then in force.

It is not claimed that plaintiff has been deprived of his property objectively considered. He still has possession of it. He still has the right to sell it. Nor is it claimed that he is deprived of its use generally. The only claim is that **\*\*286** he is deprived of *the privilege to use it for the manufacture of liquors for sale as a beverage.* The absolute prohibition of the sale of intoxicating liquors is not contravened by anything in the constitution of the United States. *Foster* v. *Kansas*, 112 U. S. 205, 5 Sup. Ct. Rep. 97; *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Bartemeyer* v. *Iowa*, 18 Wall. 129. Sale is the object of manufacture. Everything in this case indicates that the sole and only purpose plaintiff had in erecting his brewery was to use it in the manufacture of intoxicants for sale within the state. Plaintiff in error has only been deprived of a privilege which both by the statutes of Kansas and the common law, was always defeasible.

The law was within the police power of the state. Prior to the adoption of the fourteenth amendment, it was conceded that the regulation of the liquor traffic was purely and exclusively a matter of state control. *License Cases*, 5 How. 504, 631;

*Com.* v. *Kendall*, 12 Cush. 414;*Com.* v. *Clapp*, 5 Gray, 97;*Com.* v. *Howe*, 13 Gray, 26; *Santo* v. *State*, 2 Iowa, 165; *Our House* v. *State*, 4 G. Greene, 172;*Zumhoff* v. *State*, Id. 526; *State* v. *Donehey*, 8 Iowa, 396; *State* v. *Wheeler*, 25 Conn. 290; *Reynolds* v. *Geary*, 26 Conn. 179; *Oviatt* v. *Pond*, 29 Conn. 479; *People* v. *Hawley*, 3 Mich. 330; *People* v. *Gallagher*, 4 Mich. 244; *Jones* v. *People*, 14 Ill. 196; *State* v. *Prescott*, 27 Vt. 194; *Lincoln* v. *Smith*, Id. 328; *Gill* v. *Parker*, 31 Vt. 610. But see *Beebe* v. *State*, 6 Ind. 501;*Meshmeyer* v. *State*, 11 Ind. 484; *Wynehamer* v. *People*, 13 N. Y. 378. It is also competent to declare the traffic a nuisance, and to provide legal process for its condemnation and destruction, and to seize and condemn the building occupied. *Our House* v. *State*, 4 G. Greene, 172; *Lincoln* v. *Smith*, 27 Vt. 328; *Oviatt* v. *Pond*, 29 Conn. 479; *State* v. *Robinson*, 33 Me. 568; *License Cases*, 5 How. 589. But see *Wynehamer* v. *People*, 13 N. Y. 378; *Welch* v. *Stowell*, 2 Doug. (Mich.) 332. See, also, Cooley, Const. Lim. (Ed. 1868) 581, 583, 584.

Since the adoption of the fourteenth amendment, all rights are held subject to the police power, and this power cannot by any contract be divested. *Beer Co.* v. *Massachusetts*, 97 U. S. 25. The amendment was not designed to interfere with the police power. *Barbier* v. *Connelly*, 113 U. S. 27, 5 Sup. Ct. Rep. 357. A proceeding similar to the one at bar was held not to raise a federal question. *Schmidt* v. *Cobb*, 119 U. S. 286, 7 Sup. Ct. Rep. 1373. Inferior federal courts have held the same doctrine. *Weil* v. *Calhoun*, 25 Fed. Rep. 872; *U. S.* v. *Nelson*, 29 Fed. Rep. 202. The *Oleomargarine Cases* are recent illustrations. *Powell* v. *Com.*, 7 Atl. Rep. 913; *State* v. *Addington*, 12 Mo. App. 214, 77 Mo. 115; *State* v. *Smyth*, 14 R. I. 100. See, also, the regulation of the sale of milk. *Com.* v. *Evans*, 132 Mass. 11;*State* v. *Newton*, 45 N. J. Law, 469; *People* v. *Clipperly*, 101 N. Y. 634, 4 N. E. Rep. 107, reversing 44 Hun, 319. The regulations of the opium traffic. *Ex parte Yung Jon*, 28 Fed. Rep. 308. The enactment in this case falls far short of those which have heen upheld by this court in *Beer Co.* v. *Massachusetts*, 97 U. S. 25, and in the *Slaughter-House Cases*. Only a single case has decided that a statute of this kind is unconstitutional, (*Wynehamer* v. *People*, 13 N. Y. 378,) and in that case it was not held void as violating a privilege or immunity, but the statute operated so rigidly on property in existence at the time, *absolutely prohibiting its sale*, as to amount to depriving the owner of his property. It is not shown in this case that the beer was on hand at the time of the adoption of the amendment.

In the case of *State of Kansas* v. *Ziebold et al.*, the allegations of the plea that the defendants are not deprived of the right to use their premises for the purpose of manufacturing beer

for sale in other states, and that their property **287** is as valuable for that purpose as if used for the purpose of manufacturing for sale in this state are not denied, and must be taken as true. The fourteenth amendment only extends to the rights that individuals have as citizens of the United States, and not to such as they have as citizens of the state. *Presser* v. *Illinois*, 116 U. S. 252, 6 Sup. Ct. Rep. 580.

This law is not in violation of article 4, Const. U. S., relating to unreasonable searches and seizures, since that article is a limitation on the power of the federal government, and not a restriction on the authority of the state. *Barron* v. *Baltimore*, 7 Pet. 243; *Livingston's Lessee* v. *Moore*, 7 Pet. 469, 551, 552; *Fox* v. *State of Ohio*, 5 How. 410, 434, 435; *Smith* v. *State of Maryland*, 18 How. 71, 76; *Twitchell* v. *Com.*, 7 Wall. 321, 325, 326; *U. S.* v. *Cruikshank*, 92 U. S. 542, 552.

The vested rights here claimed to be invaded rest not upon express legislative authority. At the time of the purchase of the premises and the making of the improvements, the munufacture of intoxicating liquors was free from tax, license, or restraint. The sale of such liquors has always been under restraint, and places where such liquor was kept for sale in violation of law have always been declared to be nuisances. To hold that these appellees had a right to continue the use of these premises for a purpose which the legislature of the state has declared to be detrimental to the state, until compensation is made, would be to hold that there is, because of the absence of restrictive legislation at the time the improvements were made, an *implied* contract right vested in them that the state would never interfere with them if they made improvements adapted to this particular business. The supreme court has said that no *express* contract of this kind can be made. *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659; *Stone* v. *Mississippi*, 101 U. S. 814; *Union Co.* v. *Landing Co.*, 113 U. S. 746, 4 Sup. Ct. Rep. 652; *Gas Co.* v. *Light Co.* 115 U. S. 650, 6 Sup. Ct. Rep. 252. In the case of *Union Co.* v. *Landing Co.*, the defendants, relying on a grant from the legislature of an exclusive right for 20 years, made extensive improvements adapted to their particular kind of business, and yet the supreme court held that the grant was no protection against subsequent legislation; that the right of the state to protect public health and public morals could not be contracted away by one legislature so as to bind its successor. In the case at bar the property, except for a particular use, is not interfered with, and their vested rights, if any, exist because they made improvements, not under express legislative authority granted them to engage in this business, but in the absence of any legislation. Can there

be a vested right in the use of property to manufacture beer more sacred than the contract rights above cited?

All rights are held subject to the police power. It is not a taking of private property for public use, but a salutary restraint on a noxious use by the owner. That this power extends to the right to regulate, prohibit, and suppress the liquor traffic has not been doubted since the *License Cases*, 5 How. 504. Dill. Mun. Corp. 136; Tied. Lim. Police Power, §§ 122, 122*a;* 2 Kent, Comm. 340; *People* v. *Hawley*, 3 Mich. 330; *Com.* v. *Tewksbury*, 11 Metc. 55. To hold otherwise would be destructive of all social organization. *Coates* v. *Mayor of New York*, 7 Cow. 585. These laws are presumed to be passed for the public good, and cannot be said to impair any right or the obligation of any contract, or to do any injury in the proper and legal sense of these terms. *Com.* v. *Intoxicating Liquors, (Beer Co.* v. *Massachusetts*, 97 U. S. 25,) 115 Mass. 153, citing *Com.* v. *Alger*, 7 Cush. 85, 86; *Thorpe* v. *Railroad Co.*, 27 Vt. 140;*People* v. *Hawley*, Mich. 330; *Presbyterian Church* v. *New York*, 5 Cow. 538; *Vanderbilt* v. *Adams*, 7 Cow. 349; *Coates* v. *New York*, Id. 585, 604, 606. The right to compensation for private property taken for public use is foreign to the subject of preventing or abating public nuisances. *City of St. Louis* v. *Stern*, 3 Mo. App. 48.

This act has been held to be constitutional. *State* v. *Mugler*, 29 Kan. 252.

 **288** Vested rights which do not rest on contract may be divested without, on the provision of the constitution, that no state shall pass any law impairing the obligation of contracts. *Satterlee* v. *Matthewson*, 2 Pet. 380; *Watson* v. *Mercer*, 8 Pet. 88, and cases cited; *Louisiana* v. *Mayor of New Orleans*, 109 U. S. 285, 3 Sup. Ct. Rep. 211.

No better presentation of this case can be made than is contained in the opinion of Judge MARTIN on the petition for removal to the circuit court, (see statement of facts.)

The law of Kansas, prohibiting the manufacture of 'any spirituous, malt, vinous, fermented, or other intoxicating liquors' except for 'medical, scientific, and mechanical purposes is in conflict with article 14 of the constitution.

In the indictment there was no allegation and no attempt to prove that the beer was manufactured for sale or barter. The proposition in the Kansas constitution is that no citizen shall manufacture, even for his own use, or for exportation, any intoxicating liquors. The state has the power to prohibit the manufacture of intoxicating liquors for sale or barter within its own limits; but it has no power to prohibit any citizen to

manufacture for his own use, or for export, or storage, any article of food or drink not endangering or affecting the rights of others. In the implied compact between the state and the citizen, certain rights are reserved by the latter, with which the state cannot interfere. These are guarantied by the federal and state constitutions in the provisions which protect 'life, liberty, and property.' Under the doctrines of the Commune, the state has the right to control the tastes, appetites, and habits of the citizen. But under our form of government, the state does not attempt to control the citizen except as to his conduct to others. John Stuart Mill on 'Liberty,' 145, 146; 2 Kent, Comm. 1; 1 Cooley, Bl. 122, 123; *Munn* v. *People of Illinois*, 94 U. S. 113, citing *Thorpe* v. *Railroad Co.*, 27 Vt. 143. The right to manufacture beer for his own use, either food or drink, is certainly an absolute or natural right reserved to every citizen. It is a right guarantied by the fourteenth amendment; and when the legislature of Kansas punishes the plaintiff in error for simply manufacturing beer, it deprives him of that right 'without due process of law,' and denies to him 'the equal protection of the laws.'

If the legislature can prescribe what a man shall or shall not manufacture, ignoring the question of whether he intends to dispose of it to others, or whether its manufacture is dangerous in the process of manufacturing to the lives or property of others, then the same power can prescribe the tastes, habits, and expenditure of every citizen. The right of the state to prohibit unwholesome trades, etc., is based on the general principle that every person ought to so use his own as not to injure his neighbors. This is the police power; and it is much easier to perceive and realize the existence and sources of it than to mark its boundaries. *Slaughter-House Cases*, 16 Wall. 36; *Union Co.* v. *Landing Co.*, 111 U. S. 588, 4 Sup. Ct. Rep. 652, (opinions of Justices BRADLEY and FIELD;) *Com.* v. *Alger*, 7 Cush. 84. But broad and comprehensive as is this power, it cannot extend to the individual tastes and habits of the citizen. *License Cases*, 5 How. 583. Whatever may be the injurious results from the use of beer, it will not be contended that there is anything in the process of manufacturing it which endangers the lives or property of others. *Corfield* v. *Coryell*, 4 Wash. C. C. 371. There can be no doubt but that 'citizens of the United States' and 'citizens of the states' have the natural right to manufacture beer for individual use. To this right is added the right, secured by the other clause of the fourteenth amendment, 'nor shall any state deprive any person of life, liberty, or property without due process of law.'

**289** 'Due process of law' means such an exertion of the power of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs. Cooley, Const. Lim. 356; *Wynehamer* v. *People*, 13 N. Y. 432; *State* v. *Allen*, 2 McCord, 56; *Sears* v. *Cottrell*, 5 Mich. 251; *Taylor* v. *Porter*, 4 Hill, 140; *Hoke* v. *Henderson*, 4 Dev. 15; *James* v. *Reynolds' Adm'rs*, 2 Tex. 251; *Kennard* v. *Louisiana*, 92 U. S. 480. The article is a restraint on the judicial and executive powers of government, and cannot be so construed as to leave to congress to make any process, due process of law. *Murray's Lessee* v. *Land & Imp. Co.*, 18 How. 276. In *Dartmouth College Case*, 4 Wheat. 518, Mr. Webster defined 'due process of law' to be the general law which hears before it condemns. See, also, *Brown* v. *Hummel*, 6 Pa. St. 86; *Norman* v. *Heist*, 5 Watts & S. 171. 'The general laws governing society' guaranty the right to manufacture beer; and until the citizen attempts to sell or barter, he cannot be punished. If all that is charged in this indictment be proved, no offense is shown to have been committed under the laws of any free people. Under the power to regulate, the state cannot deprive the citizen of the lawful use of his property, if it does not injuriously affect or endanger others. *Lake View* v. *Cemetery Co.*, 70 Ill. 191. Nor can it, in the exercise of the police power, enact laws that are unnecessary, and that will be oppressive to the citizen. *Railway Co.* v. *City of Jacksonville*, 67 Ill. 37–40; *Tenement-House Cigar Cases*, 98 N. Y. 98; *People* v. *Marx*, 99 N. Y. 377; *Intoxicating Liquor Cases*, 25 Kan. 765, (opinion of Judge BREWER;) *Calder* v. *Bull*, 3 Dall. 386; *Fletcher* v. *Peck*, 6 Cranch, 135; *Dash* v. *Van Kleeck*, 7 Johns. 477; *Taylor* v. *Porter*, 4 Hill, 146, (per BRONSON, J.;) *Goshen* v. *Stonington*, 4 Conn. 225, (per HOSMER, J.)

But this statute deprives the plaintiff in error directly and absolutely of his property, without 'due process of law.' By the enactment of this statute the property is reduced in value, not indirectly or consequentially, but by direct prohibition of its real and primary use. This question was not passed on in *Bartemeyer* v. *Iowa*, 18 Wall. 129. To destroy the right to manufacture beer for a beverage is to deprive the owner of his property, although he is left the right to manufacture for other purposes, since that is the ordinary, usual, and principal use of beer. *Wynehamer* v. *People*, 13 N. Y. 387. This is an attempt not merely to legislate for the future but an attempt to destroy vested rights by legislative enactment without compensation, and without 'due process of law.' *Wilkinson* v. *Leland*, 2 Pet. 657. See, also, *Munn* v. *People of Illinois*, 94 U. S. 113, (per FIELD, J.;) *Bartemeyer* v. *Iowa*, (BRADLEY, J.,) 18 Wall. 129; *Beer Co.* v. *Massachusetts*, 97 U. S. 25. That private property cannot be taken for public purposes, without just compensation, is a fundamental maxim of all governments. *Munn* v. *People of Illinois*, (FIELD, J.,) 94 U. S. 113. As to

the distinction between taking for public use and destruction, and also direct or consequential damages or loss, see Sedg. St. & Const. Law, 519–524, and notes. *Taking* need not be confined to actual physical appropriation. Id. If the owner is deprived of the use for which it was designed, to retain title and possession is of little consequence. *Munn* v. *People of Illinois, supra*, citing *Bronson* v. *Kinzie*, (TANEY, C. J.,) 1 How. 311. This question was effectually disposed of by this court. *Pumpelly* v. *Green Bay Co.*, 13 Wall. 177. The court below adopted the rule of consequential and remote damages as laid down in *Transportation Co.* v. *City of Chicago*, 99 U. S. 838, citing Cooley, Const. Lim. 542, and notes. That rule has no application to this case. Since this case was heard it has been decided that depriving a citizen by express prohibition from the use of his property for the sake of the public is a taking of private property for public use. *State* v. *Walruff*, 26 Fed. Rep. 178. See, also, for an exhaustive discussion of the right to compensation, *Wynehamer* v. *People*, 13 N. Y. 378; *Beebe* v. *State*, 6 Ind. 501; *Tenement-House Cigar Cases*, 98 N. Y. 98.

  **\*\*290**  The entire scheme of the thirteenth section, which sttempts by mere legislative enactment to convert the building and machinery of appellees into a common nuisance, and to compass their destruction, and also which attempts to execute the criminal law against the persons of appellees, by equitable proceedings instead of a common-law trial, is an attempt to deprive these persons of their property and liberty without 'due process of law.' The proceedings provided for in the thirteenth section are additional to the ordinary methods of trial, conviction, and punishment provided by the other sections of the act. By this section the legislature finding a brewery in operation within the state, which up to the time of the passage of the act was a lawful business, *eo instante*, without notice, trial, or hearing, by the mere exercise of its arbitrary caprice, declares it to be a common nuisance, and prescribes to consequences which are to follow inevitably by judicial mandate commanded by statute, and involving and permitting the exercise of no judicial discretion. The court is not to *determine* the brewery to be a nuisance, but is to *find it* to be one. And the court is commanded by its officers, to take possession of and shut up the place, and abate the nuisance by destroying all the property, not as a forfeiture consequent on conviction, but merely because the legislature so commands, and without the intervention of a real judicial action. And, again, an injunction shall issue, which is an injunction against a *crime*, and the violation of the injunction is punished as for *contempt*, by the process of a court of *equity*, which *may be more severe than the penalty upon trial and conviction* for keeping and maintaining the nuisance. And by section 14

the state shall not be required to prove the one fact which constitutes the offense, viz., that the party did not have a permit, thus taking away the presumption of innocence from the party charged.

This whole proceeding is but an attempt to administer criminal law in equity. That this is a criminal proceeding see *Fisher* v. *McGirr*, 1 Gray, 26; *Greene* v. *Briggs*, 1 Curt. 328; *Hibbard* v. *People*, 4 Mich. 129; *Neitzel* v. *City of Concordia*, 14 Kan. 446; *Boyd* v. *U. S.*, 116 U. S. 616, 6 Sup. Ct. Rep. 524. *A legislative enactment cannot make that a nuisance which is not such in fact*. To make such a determination is a *judicial* function. Rights of property cannot be so arbitrarily destroyed or injured. *Yates* v. *Milwaukee*, 10 Wall. 497, 504, 505; *Hutton* v. *City of Comden*, 39 N. J. Law, 122, 129, 130; Cooley, Const. Lim. (5th Ed.) 110, and notes, 446; *Lowry* v. *Rainwater*, 70 Mo. 152; *Jeck* v. *Anderson*, 57 Cal. 251. Such a legislative determination would also be void, because, where the *fact* of injury to public health or morals did not exist, as here, it would be a violation of the absolute right of the citizen to follow such pursuit as he sees fit, provided it be *not in fact 'injurious to the community.'* *People* v. *Marx*, 99 N. Y. 386, 2 N. E. Rep. 29, and cases cited. Such legislation is unconstitutional. *Quintini* v. *City of Bay St. Louis*, 1 South. Rep. 625, 628.

Criminal law cannot be administered in a court of equity. Even in cases of public nuisances, where equity has jurisdiction, exceptional and extremely limited as it is, the question of *nuisance or not* must in cases of doubt be *tried by a jury*, and the injunction will be granted or not as *that fact is decided*. 2 Story, Eq. Jur. § 923. In practice the jurisdiction is applied almost exclusively to nuisances in the nature of purprestures upon public rights and property. Id. §§ 921–924. But the jurisdiction is never exercised on any idea that the nuisance is a *crime*, or with a view of preventing or punishing a criminal act. 1 Bish. Crim. Proc. § 1417. Equity has no jurisdiction in matters of crime. *Lawrence* v. *Smith*, (Lord ELDON,) Jac. 471, 473. Equity does not interfere to enforce penal laws unless the act is in *itself a nuisance. Mayor, etc., of Hudson* v. *Thorne*, 7 Paige, 261; **\*\*291**  *Davis* v. *American Soc., etc.*, 75 N. Y. 362, 368; *Kramer* v. *Police Dept. N. Y.*, 21 Jones & S. 492; 1 Bish. Crim. Proc. §§ 1412–1417; 1 Spence, Eq. Jur. *\*689–\** 690. With the principle that 'the *settled course of judicial proceedings*' is 'due process of law,' in view, (*Murray's Lessee* v. *Improvement Co.*, 18 How. 280; *Walker* v. *Sauvinet*, 92 U. S. 90, 93,) the fourteenth amendment was adopted. On principle *this secures jury trial* in the states in all cases in which, at the time of its adoption, such trial was deemed a fundamental right. The Kansas constitution

(section 5, Bill of Rights) provides that *the right of trial by jury shall be inviolate.* Section 10. In all prosecutions the accused shall have *a speedy public trial by jury.* No act is valid which conflicts with these provisions. *Railway* v. *Railway,* 31 Kan. 661, 3 Pac. Rep. 284. A jury trial is preserved in that state *in all cases in which it existed prior to the adoption of the constitution. In re Rolf,* 30 Kan. 762, 763, 1 Pac. Rep. 523; *Kimball* v. *Connor,* 3 Kan. 415, 432; *Ross* v. *Commissioners,* 16 Kan. 418. A prosecution for a matter made penal by the laws of the state, as for selling liquor *without a license,* is 'unquestionably a criminal action.' *Neitzel* v. *City of Concordia,* 14 Kan. 446, 448. *In re Rolf,* 30 Kan. 760, 761, 1 Pac. Rep. 523. And upon the point that section 14 dispenses with proof of the single fact which constitutes the crime, thereby taking a way the presumption of innocence, not only is the section unconstitutional, but all the other parts of the act equally so.

This act deprives the appellees of their liberty and property without due process of law, and abridges the privileges and immunities of the appellees as citizens of the United States within the meaning of the fourteenth amendment. At the time of the passage of this act it was one of the fundamental rights of appellees, as citizens, to manufacture beer, and to use their brewery for that purpose. The state could only restrain this right by virtue of the police power, which could only be exercised to the extent reasonable and necessary for the preservation and promotion of the morals and health of the people of Kansas. This act goes further than this. It destroys their property for the public use other than for police purposes, and without compensation. This is depriving them of their property without due process of law. This provision of the constitution is to be liberally construed, (*Boyd* v. *U. S.* 116 U. S. 635, 6 Sup. Ct. Rep. 524,) that there may be no *arbitrary deprivation* of life or liberty, or *arbitrary spoliation* of property. *Barbier* v. *Connolly,* 113 U. S. 31, 5 Sup. Ct. Rep. 357; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 6 Sup. Ct. Rep. 1064. This question has never been decided by this court. *Beer Co.* v. *Massachusetts,* 97 U. S. 25, arose under the right of the state to impair the *obligation of the contract* entered into between the state and the company by its charter. In *Bartemeyer* v. *Iowa,* 18 Wall. 129, the court refused to decide the question on a moot case. In the *License Cases,* 5 How. 589, the sole question under consideration was the violation of the *commerce* clause. The *Slaughter-House Cases,* 16 Wall. 36, did not touch upon this question, as they decided that the police power could regulate slaughter-houses, even to the extent of granting a monopoly, and demonstrated that all persons *could still pursue their business* of slaughtering subject to these regulations. The cases of *Union Co.* v.

*Landing Co.,* 111 U. S. 746, 4 Sup. Ct. Rep. 652; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659; and *Stone* v. *Mississippi,* 101 U. S. 814,—all arose and were decided under the *contract* clause of the constitution.

The police power cannot go beyond the limit of what is necessary and reasonable for guarding against the evil which injures or threatens the public welfare in the given case, and the legislature, under the guise of that power, cannot strike down innocent occupations and destroy private property, the destruction of which is not reasonably necessary to accomplish the needed reform; and this, too, although the legislature is the judge in each case of the extent to which the evil is to be regulated or prohibited. Where the occupation is *in itself* immoral, there can be no question as to the right of the legislature. **\*\*292** 2 Kent, Comm. 340. Nor is it denied that every one holds his property subject to the proper exercise of the police power. Dill. Mun. Corp. 136; Tied. Lim. Police Power, §§ 122, 122*a; Com.* v. *Tewksbury,* 11 Metc. 55. Nor that the legislature can destroy vested rights in the proper excercise of this power. *Coates* v. *Mayor of New York,* 7 Cow. 585. But the unqualified statement that when the legislature has exercised its right of judging, by the enactment of a prohibition, all other departments of the government are bound by the decision, which no court has a right to review, (Bish. St. Cr. § 995,) cannot be true. The legislative power cannot authorize manifest injustice by positive enactment, or take away security for personal liberty or private property, for the protection whereof government was established. *Calder* v. *Bull,* 3 Dall. 386. The state cannot deprive the citizen of the lawful use of his property if it does not injuriously effect others. *Lake View* v. *Cemetery Co.,* 70 Ill. 191. The state cannot enact laws, not necessary to the preservation of the health and safety of the community, that will be oppressive and burdensome to the citizen. *Railway Co.* v. *City of Jacksonville,* 67 Ill. 37. The constitutional guaranty of life, liberty, and pursuit of happiness is not limited by the temporary caprice of a present majority, and can be limited only by the absolute necessities of the public. *Intoxicating Liquor Cases,* (BREWER, J.,) 25 Kan. 765; *Tenement-House Cigar Case,* 98 N. Y. 98; Cooley, Const. Lim. (5th Ed.) 110, 445, 446. No proposition is more firmly established than that the citizen has the right to adopt and follow such lawful and industrial pursuit, *not injurious to the community,* as he may see fit. *People* v. *Marx,* 99 N. Y. 377, 386, 2 N. E. Rep. 29. The mere existence of a brewery in operation, or of beer therein in vats, or packages not intended for consumption *in the state* is not in any way detrimental to the safety, health, or morals of the people of Kansas; nor can it be said that there is anything

immoral in the business of brewing, or in beer itself, as in gambling or lotteries. *Stone* v. *Mississippi*, 101 U. S. 814.

There is no question that this enactment does in the sense of the law deprive appellees of their property. *Pumpelly* v. *Green Bay Co.*, 13 Wall. 177; *Munn* v. *Illinois*, 94 U. S. 141.

It is a fundamental principle that where a nuisance is to be abated, the abatement must be limited by its necessities, and no wanton injury must be committed. The remedy is to stop the use to which the building is put, not to tear down or destroy the structure itself. *Babcock* v. *City of Buffalo*, 56 N. Y. 268, affirming 1 Sheld. 317; *Bridge Co.* v. *Paige*, 83 N. Y. 188–190; Wood, Nuis. § 738. The nuisance here is *sale within the state*. To that extent alone can the legislature authorize the nuisance to be abated or the property destroyed.

The act itself does not contain the limitation put upon it in argument, that the manufacture is only prohibited for sale, barter, or gift *within the state*, and as a vital part of the prohibition is unconstitutional, the whole is unconstitutional. *Wynehamer* v. *People*, 13 N. Y. 378.

But if the legislature has the power claimed for it, then the application of the act to the brewery owned, possessed, and used by appellees at the time of the passage of the act violates the fourteenth amendment, because it deprives them of their property without 'due process of law.' *Wynehamer* v. *People*, 13 N. Y. 378. The legislature can only take private property by awarding compensation. 1 Bl. Comm. 139. For a definition of 'due process of law,' see *Wynehamer* v. *People*, 13 N. Y. 378, 392, citing *Norman* v. *Heist*, 5 Watts & S. 193; *Taylor* v. *Porter*, 4 Hill, 145; *Hoke* v. *Henderson*, 4 Dev. 15; 2 Kent, Comm. 13. All that is beneficial in property is the use. *Pumpelly* v. *Green Bay Co.*, 13 Wall. 177; *Munn* v. *Illinois*, 94 U. S. 141, citing 1 Bl. Comm. 138; 2 Kent, Comm. 320. When a law annihilates the value of property, and strips it of the attributes by which it is alone distinguished as property, the owner is deprived of it. *Wynehamer* v. *People*, 13 N. Y. 398. In **293** order to make a taking of property 'due process of law' there must be adequate compensation. *Sinnickson* v. *Johnson*, 17 N. J. Law, 129; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166. See on the whole subject the opinion of Judge BREWER, *State* v. *Walruff*, 26 Fed. Rep. 178. The criticisms of this opinion by Judge MARTIN in the present case are more specious than sound.

STATEMENT OF FACTS BY THE COURT.

These cases involve an inquiry into the validity of certain statutes of Kansas relating to the manufacture and sale of intoxicating liquors. The first two are indictments, charging Mugler, the plaintiff in error, in one case, with having sold, and in the other with, having manufactured, spirituous, vinous, malt, fermented, and other intoxicating liquors, in Saline county, Kansas, without having the license or permit required by the statute. The defendant, having been found guilty, was fined, in each case, $100, and ordered to be committed to the county jail until the fine was paid. Each judgment was affirmed by the supreme court of Kansas, and thereby, it is contended, the defendant was denied rights, privileges, and immunities guarantied by the constitution of the United States. The third case (*Kansas* v. *Ziebold & Hagelin*) was commenced by petition filed in one of the courts of the state. The relief sought is (1) that the group of buildings in Atchison county, Kansas, constituting the brewery of the defendants, partners as Ziebold & Hagelin, be adjudged a common nuisance, and the sheriff or other proper officer directed to shut up and abate the same; (2) that the defendants be enjoined from using, or permitting to be used, the said premises as a place where intoxicating liquors may be sold, bartered, or given away, or kept for barter, sale, or gift, otherwise than by authority of law. The defendants answered, denying the allegations of the petition, and averring—*First*, that said buildings were erected by them prior to the adoption, by the people of Kansas, of the constitutional amendment prohibiting the manufacture and sale of intoxicating liquors for other than medicinal, scientific, and mechanical purposes, and before the passage of the prohibitory liquor statute of that state; *second*, that they were erected for the purpose of manufacturing beer, and cannot be put to any other use, and, if not so used, they will be of little value; *third*, that the statute under which said suit is brought is void under the fourteenth amendment of the constitution of the United States. Upon the petition and bond of the defendants, the cause was removed into the circuit court of the United States for the district of Kansas, upon the ground that the suit was one arising under the constitution of the United States. A motion to remand it to the state court was denied. The pleadings were recast so as to conform to the equity practice in the courts of the United States; and, the cause having been heard upon bill and answer, the suit was dismissed. From that decree the state prosecutes an appeal.

By a statute of Kansas, approved March 3, 1868, it was made a misdemeanor, punishable by fine and imprisonment, for any one, directly or indirectly, to sell spirituous, vinous, fermented, or other intoxicating liquors, without having a

8 S.Ct. 273, 31 L.Ed. 205

dram-shop, tavern, or grocery license. It was also enacted, among other things, that every place where intoxicating liquors were sold in violation of the statute should be taken, held, and deemed to be a common nuisance; and it was required that all rooms, taverns, eating-houses, bazaars, restaurants, groceries, coffee-houses, cellars, or other places of public resort where intoxicating liquors were sold, in violation of law, should be abated as public nuisances. Gen. St. Kan. 1868, *c.* 35. But in 1880 the people of Kansas adopted a more stringent policy. On the second of November of that year they ratified an amendment to the state constitution, which declared that the manufacture and sale of intoxicating liquors should be forever prohibited in that state, except for medical, scientific, and mechanical **\*\*294** purposes. In order to give effect to that amendment, the legislature repealed the act of 1868, and passed an act, approved February 19, 1881, to take effect May 1, 1881, entitled 'An act to prohibit the manufacture and sale of intoxicating liquors, except for medical, scientific, and mechanical purposes, and to regulate the manufacture and sale thereof for such excepted purposes.' Its first section provides 'that any person or persons who shall manufacture, sell, or barter any spirituous, malt, vinous, fermented, or other intoxicating liquors shall be guilty of a misdemeanor: provided, however, that such liquors may be sold for medical, scientific, and mechanical purposes, as provided in this act.' The second section makes it unlawful for any person to sell or barter for either of such excepted purposes any malt, vinous, spirituous, fermented, or other intoxicating liquors without having procured a druggist's permit therefor, and prescribes the conditions upon which such permit may be granted. The third section relates to the giving by physicians of prescriptions for intoxicating liquors to be used by their patients, and the fourth, to the sale of such liquors by druggists. The fifth section forbids any person from manufacturing or assisting in the manufacture of intoxicating liquors in the state, except for medical, scientific, and mechanical purposes, and makes provision for the granting of licenses to engage in the business of manufacturing liquors for such excepted purposes. The seventh section declares it to be a misdemeanor for any person, not having the required permit, to sell or barter, directly or indirectly, spirituous, malt, vinous, fermented, or other intoxicating liquors; the punishment prescribed being, for the first offense, a fine of not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than twenty nor more than ninety days; for the second offense, a fine of not less than two hundred nor more than five hundred dollars, or imprisonment in the county jail not less than sixty days nor more than six months; and for

every subsequent offense, a fine not less than five hundred nor more than one thousand dollars, or imprisonment in the county jail not less than three months nor more than one year, or both such fine and imprisonment, in the discretion of the court. The eighth section provides for similar fines and punishments against persons who manufacture, or aid, assist, or abet the manufacture of, any intoxicating liquors without having the required permit. The thirteenth section declares, among other things, all places where intoxicating liquors are manufactured, sold, bartered, or given away, or are kept for sale, barter, or use, in violation of the act, to be common nuisances, and provides that upon the judgment of any court having jurisdiction finding such place to be a nuisance, the proper officer shall be directed to shut up and abate the same.

Under that statute, the prosecutions against Mugler were instituted. It contains other sections in addition to those above referred to; but as they embody merely the details of the general scheme adopted by the state for the prohibition of the manufacture and sale of intoxicating liquors, except for the purposes specified, it is unnecessary to set them out. On the seventh of March, 1885, the legislature passed an act amendatory and supplementary to that of 1881. The thirteenth section of the former act, being the one upon which the suit against Ziebold & Hagelin is founded, will be given in full in a subsequent part of this opinion.

The facts necessary to a clear understanding of the questions, common to these cases, are the following: Mugler and Ziebold & Hagelin were engaged in manufacturing beer at their respective establishments, (constructed specially for that purpose,) for several years prior to the adoption of the constitutional amendment of 1880. They continued in such business in defiance of the statute of 1881, and without having the required permit. Nor did Mugler have a license or permit to sell beer. The single sale of which he was found guilty occurred in the state, and after May 1, 1881, that is, after the act of February 19, 1881, took effect, and was of beer manufactured before its passage. **\*\*295** The buildings and machinery constituting these breweries are of little value if not used for the purpose of manufacturing beer; that is to say, if the statutes are enforced against the defendants the value of their property will be very materially diminished.

### Attorneys and Law Firms

**\*637** *George R. Peck, J. B. Johnson, George J. Barker, Gleed & Gleed,* and *S. B. Bradford,* Atty. Gen., for the State.

*638  Also *S. B. Bradford*, Atty. Gen., (*Edwin A. Austin*, Asst. Atty. Gen., and *J. F. Tufts*, Asst. Atty. Gen., Atchison County, of counsel,) for the State.

*628  *G. G. Vest*, for plaintiff in error, Mugler, and for appellees, Ziebold & Hagelin.

*Robert M. Eaton, John C. Tomlinson*, and *Joseph H. Choate*, for appellees, Ziebold & Hagelin.

**Opinion**

*653  Mr. Justice HARLAN, after stating the facts in the foregoing language, delivered the opinion of the court.

*657  The general question in each case is whether the foregoing statutes of Kansas are in conflict with that clause of the fourteenth amendment, which provides that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law.' That legislation by a state prohibiting the manufacture within her limits of intoxicating liquors, to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege, or immunity secured by the constitution of the United States, is made clear by the decisions of this court, rendered before and since the adoption of the fourteenth amendment; to some of which, in view of questions to be presently considered, it will be well to refer.

In the *License Cases*, 5 How. 504, the question was whether certain statutes of Massachusetts, Rhode Island, and New Hampshire, relating to the sale of spirituous liquors, were repugnant to the constitution of the United States. In determining that question, it became necessary to inquire whether there was any conflict between the exercise by congress of its power to regulate commerce with foreign countries, or among the several states, and the exercise by a state of what are called police powers. Although the members of the court did  *658  not fully agree as to the grounds upon which the decision should be placed, they were unanimous in holding that the statutes then under examination were not inconsistent with the constitution of the United States, or with any act of congress. Chief Justice TANEY said: 'If any state deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing in the constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks

proper.' Mr. Justice MCLEAN, among other things, said: 'A state regulates its domestic commerce, contracts, the transmission of estates, real and personal, and acts upon internal matters which relate to its moral and political welfare. Over these subjects the federal government has no power. * * * The acknowledged police power of a state extends often to the destruction of property. A nuisance may be abated. Everything prejudicial to the health or morals of a city may be removed.' Mr. Justice WOODBURY observed: 'How can they [the states] be sovereign within their respective spheres, without power to regulate all their internal commerce, as well as police, and direct how, when, and where it shall be conducted in articles intimately connected either with public morals or public safety or public prosperity?' Mr. Justice GRIER, in still more emphatic language, said: 'The true question presented by these cases, and one which I am not disposed to evade, is whether the states have a right to prohibit the sale and consumption of an article of commerce which they believe to be pernicious in its effects, and the cause of disease, pauperism, and crime. * * * Without attempting to define what are the peculiar subjects or limits of this power, it may safely be affirmed that every law for the restraint or punishment of crime, for the preservation of the public peace, health, and morals must come within this category. * * * It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime which have their origin in the use or abuse of ardent spirits. The  *659  police power, which is exclusively in the states, is alone competent to the correction of these  **296  great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority.'

In *Bartemeyer* v. *Iowa*, 18 Wall. 129, it was said that, prior to the adoption of the fourteenth amendment, state enactments, regulating or prohibiting the traffic in intoxicating liquors, raised no question under the constitution of the United States; and that such legislation was left to the discretion of the respective states, subject to no other limitations than those imposed by their own constitutions, or by the general principles supposed to limit all legislative power. Referring to the contention that the right to sell intoxicating liquors was secured by the fourteenth amendment, the court said that, 'so far as such a right exists, it is not one of the rights growing out of citizenship of the United States.' In *Beer Co.* v. *Massachusetts*, 97 U. S. 33, it was said that, 'as a measure of police regulation, looking to the preservation of public morals, a state law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the constitution of the United States.' Finally, in *Foster* v.

*Kansas,* 112 U. S. 206, 5 Sup. Ct. Rep. 97, the court said that the question as to the constitutional power of a state to prohibit the manufacture and sale of intoxicating liquors was no longer an open one in this court. These cases rest upon the acknowledged right of the states of the Union to control their purely internal affairs, and, in so doing, to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the constitution of the United States. The power to establish such regulations, as was said in *Gibbons* v. *Ogden,* 9 Wheat. 203, reaches everything within the territory of a state not surrendered to the national government.

It is, however, contended that, although the state may prohibit the manufacture of intoxicating liquors for sale or barter within her limits, for general use as a beverage, 'no convention or legislature has the right, under our form of government, **\*660** to prohibit any citizen from manufacturing for his own use, or for export or storage, any article of food or drink not endangering or affecting the rights of others.' The argument made in support of the first branch of this proposition, briefly stated, is that, in the implied compact between the state and the citizen, certain rights are reserved by the latter, which are guarantied by the constitutional provision protecting persons against being deprived of life, liberty, or property, without due process of law, and with which the state cannot interfere; that among those rights is that of manufacturing for one's use either food or drink; and that while, according to the doctrines of the commune, the state may control the tastes, appetites, habits, dress, food, and drink of the people, our system of government, based upon the individuality and intelligence of the citizen, does not claim to control him, except as to his conduct to others, leaving him the sole judge as to all that only affects himself. It will be observed that the proposition, and the argument made in support of it, equally concede that the right to manufacture drink for one's personal use is subject to the condition that such manufacture does not endanger or affect the rights of others. If such manufacture does prejudicially affect the rights and interests of the community, it follows, from the very premises stated, that society has the power to protect itself, by legislation, against the injurious consequences of that business. As was said in *Munn* v. *Illinois,* 94 U. S. 124, while power does not exist with the whole people to control rights that are purely and exclusively private, government may require 'each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another.' But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general

use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding **\*\*297** only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they **\*661** please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.

It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, (*Sinking Fund Cases,* 99 U. S. 718,) the courts must obey the constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in *Marbury* v. *Madison,* 1 Cranch, 137, 167, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty, indeed, are under a solemn duty, to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.

Keeping in view these principles, as governing the relations of the judicial and legislative departments of government with each other, it is difficult to perceive any ground for the judiciary to declare that the prohibition by Kansas of the **\*662** manufacture or sale, within her limits, of intoxicating liquors for general use there as a beverage, is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. There is no justification for holding that the

state, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights; for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country, are, in some degree at least, traceable to this evil. If, therefore, a state deems the absolute prohibition of the manufacture and sale within her limits, of intoxicating liquors, for other than medical, scientific, and mechanical purposes, to be necessary to the peace and security of society, the courts cannot, without usurping legislative functions, override the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the constitution to another department. And so, if, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the efforts to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation **298 having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the constitution and laws of Kansas, might fail, if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized. Such a right does not inhere in citizenship. Nor can it be said that government interferes with or impairs *663 any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks, for general or individual use, as a beverage, are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage. Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the law-making power, upon reasonable grounds, declares to be prejudicial to the general welfare.

This conclusion is unavoidable, unless the fourteenth amendment of the constitution takes from the states of the Union those powers of police that were reserved at the time the original constitution was adopted. But this court has declared, upon full consideration, *Barbier* v. *Connolly* 113

U. S. 31, that the fourteenth amendment had no such effect. After observing, among other things, that that amendment forbade the arbitrary deprivation of life or liberty, and the arbitrary spoliation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the court said: 'But neither the amendment, broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the state, sometimes termed 'its police power,' to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity.' Undoubtedly the state, when providing, by legislation, for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the constitution of the United States, and may not violate rights secured or guarantied by that instrument, or interfere with the execution of the powers confided to the general government. *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Railroad* v. *Husen*, 95 U. S. 465; *Gas-Light Co.* v. *Light Co.*, 115 U. S. 650, 6 Sup. Ct. Rep. 252; *664 Walling* v. *Michigan*, 116 U. S. 446, 6 Sup. Ct. Rep. 454; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 6 Sup. Ct. Rep. 1064; *Steam-Ship Co.* v. *Board of Health*, 118 U. S. 455, 6 Sup. Ct. Rep. 1114.

Upon this ground, if we do not misapprehend the position of defendants, it is contended that, as the primary and principal use of beer is as a beverage; as their respective breweries were erected when it was lawful to engage in the manufacture of beer for every purpose; as such establishments will become of no value as property, or, at least, will be materially diminished in value, if not employed in the manufacture of beer for every purpose,—the prohibition upon their being so employed is, in effect, a taking of property for public use without compensation, and depriving the citizen of his property without due process of law. In other words, although the state, in the exercise of her police powers, may lawfully prohibit the manufacture and sale, within her limits, of intoxicating liquors to be used as a beverage, legislation having that object in view cannot be enforced against those who, at the time, happen to own property, the chief value of which consists in its fitness for such manufacturing purposes, unless compensation is first made for the diminution in the value of their property, resulting from such prohibitory enactments.

This interpretation of the fourteenth amendment is inadmissible. It cannot be supposed that the states intended, by adopting that amendment, to impose restraints upon the exercise of their powers for the protection of the safety,

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

health, or morals of the community. In respect to contracts, the obligations **299 of which are protected against hostile state legislation, this court in *Union Co.* v. *Landing Co.*, 111 U. S. 751, 4 Sup. Ct. Rep. 652, said that the state could not, by any contract, limit the exercise of her power to the prejudice of the public health and the public morals. So, in *Stone* v. *Mississippi*, 101 U. S. 816, where the constitution was invoked against the repeal by the state of a charter, granted to a private corporation, to conduct a lottery, and for which that corporation paid to the state a valuable consideration in money, the court said: 'No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. * * * Government is organized *665 with a view to their preservation, and cannot divest itself of the power to provide for them.' Again, in *Gas-Light Co.* v. *Light Co.*, 115 U. S. 650, 672, 6 Sup. Ct. Rep. 252: 'The constitutional prohibition upon state laws impairing the obligation of contracts does not restrict the power of the state to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a state are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations.'

The principal that no person shall be deprived of life, liberty, or property without due process of law, was embodied, in substance, in the constitutions of nearly all, if not all, of the states at the time of the adoption of the fourteenth amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. *Beer Co.* v. *Massachusetts*, 97 U. S. 32; *Com.* v. *Alger*, 7 Cush. 53. An illustration of this doctrine is afforded by *Patterson* v. *Kentucky*, 97 U. S. 501. The question there was as to the validity of a statute of Kentucky, enacted in 1874, imposing a penalty upon any one selling or offering for sale oils and fluids, the product of coal, petroleum, or other bituminous substances, which would burn or ignite at a temperature below 1300 Fahrenheit. Patterson having sold within that commonwealth, a certain oil, for which letters patent were issued in 1867, but which did not come up to the standard required by said statute, and having been indicted therefor, disputed the state's authority to prevent or obstruct the exercise of that right. This court upheld the legislation of Kentucky, upon the ground that, while the state could not impair the exclusive right of the patentee, or of his assignee, in the discovery described in the letters patent, the tangible property, the fruit of the discovery, was not beyond control in the exercise of her *666 police powers. It was said: 'By the settled doctrines of this court, the police power extends, at least, to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen of his own rights. State legislation, strictly and legitimately for police purposes, does not, in the sense of the constitution, necessarily intrench upon any authority which has been confided, expressly or by implication, to the national government. The Kentucky statute under examination manifestly belongs to that class of legislation. It is, in the best sense, a mere policy regulation, deemed essential to the protection of the lives and property of citizens.' Referring to the numerous decisions of this court guarding the power of congress to regulate commerce against encroachment, under the guise of state regulations, established for the purpose and with the effect of destroying or impairing rights secured by the constitution, it was further said: 'It has, nevertheless, with marked distinctness and uniformity, recognized the necessity, growing out of the fundamental conditions of civil society, of upholding state police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each state owes to her citizens.' **300 See, also, *U. S.* v. *Dewitt*, 9 Wall. 41; *License Tax Cases*, 5 Wall. 462; *Pervear* v. *Com.*, Id. 475.

Another decision very much in point upon this branch of the case, is *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 667, also decided after the adoption of the fourteenth amendment. The court there sustained the validity of an ordinance of the village of Hyde Park, in Cook county, Illinois, passed under legislative authority, forbidding any person from transporting through that village offal or other offensive or unwholesome matter, or from maintaining or carrying on an offensive or unwholesome business or establishment within its limits. The fertilizing company, had, at large expense, and under authority expressly conferred by its charter, located its works at a particular point in the county. Besides, the charter of the village, at that time, provided that it should not interfere with parties engaged in transporting animal matter from Chicago, *667 or from manufacturing it into a fertilizer or other chemical product. The enforcement of the ordinance in question operated to destroy the business of the company, and seriously to impair the value of its property. As, however, its business had become a nuisance to the community in which it was conducted, producing discomfort, and often sickness, among large masses of people, the court maintained the authority of the village, acting under legislative sanction, to protect the public health against such nuisance. It said:

'We cannot doubt that the police power of the state was applicable and adequate to give an effectual remedy. That power belonged to the states when the federal constitution was adopted. They did not surrender it, and they all have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases. It rests upon the fundamental principle that every one shall so use his own as not to wrong and injure another. To regulate and abate nuisances is one of its ordinary functions.'

It is supposed by the defendants that the doctrine for which they contend is sustained by *Pumpelly* v. *Green Bay Co.*, 13 Wall. 168. But in that view we do not concur. This was an action for the recovery of damages for the overflowing of the plaintiff's land by water, resulting from the construction of a dam across a river. The defense was that the dam constituted a part of the system adopted by the state for improving the navigation of Fox and Wisconsin rivers; and it was contended that, as the damages of which the plaintiff complained were only the result of the improvement, under legislative sanction, of a navigable stream, he was not entitled to compensation from the state or its agents. The case, therefore, involved the question whether the overflowing of the plaintiff's land, to such an extent that it became practically unfit to be used, was a taking of property, within the meaning of the constitution of Wisconsin, providing that 'the property of no person shall be taken for public use without just compensation therefor.' This court said it would be a very curious and unsatisfactory result, were it held that, 'if the government refrains from the absolute conversion of real **\*668** property to the uses of the public, it can destroy its value entirely, can in flict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction, without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for the invasion of private rights under the pretext of the public good, which had no warrant in the laws or practices of our ancestors.'

These principles have no application to the case under consideration. The question in *Pumpelly* v. *Green Bay Co.*, arose under the state's power of eminent domain; while the question now before us arises under what are, strictly, the police powers of the state, exerted for the protection of the health, morals, and safety of the people. That case, as this court said in **\*\*301** *Transportation Co.* v. *Chicago*, 99 U. S. 642, was an extreme qualification of the doctrine, universally held, that 'acts done in the proper exercise of

governmental powers, and not directly encroaching upon private property, though these consequences may impair its use,' do not constitute a taking within the meaning of the constitutional provision, or entitle the owner of such property to compensation from the state or its agents, or give him any right of action. It was a case in which there was a 'permanent flooding of private property,' a 'physical invasion of the real estate of the private owner, and a practical ouster of his possession.' His property was, in effect, required to be devoted to the use of the public, and, consequently, he was entitled to compensation.

As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or **\*669** an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. Nor can legislation of that character come within the fourteenth amendment, in any case, unless it is apparent that its real object is not to protect the community, or to promote the general well-being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. The power which the states have of prohibiting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner. It is true, when the defendants in these cases purchased or erected their breweries, the laws of the state did not forbid the manufacture of intoxicating liquors. But the state did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. Indeed, as was

8 S.Ct. 273, 31 L.Ed. 205

said in *Stone* v. *Mississippi*, 101 U. S. 814, the supervision of the public health and the public morals is a governmental power, 'continuing in its nature,' and 'to be dealt with as the special exigencies of the moment may require;' and that, 'for this purpose, the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.' So in *Beer Co.* v. *Massachusetts* **\*670**, 97 U. S. 32: 'If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer.'

It now remains to consider certain questions relating particularly to the thirteenth section of the act of 1885. That section, which takes the place of section 13 of the act of 1881, is as follows:

'Sec. 13. All places where intoxicating liquors are manufactured, sold, bartered, or given away in violation of any of the provisions of this act, or where intoxicating liquors are kept for sale, barter, or delivery in violation of this act, are hereby declared to be common nuisances, and upon the judgment of any court having jurisdiction finding such place to be a nuisance under this **\*\*302** section, the sheriff, his deputy, or under-sheriff, or any constable of the proper county, or marshal of any city where the same is located, shall be directed to shut up and abate such place by taking possession thereof and destroying all intoxicating liquors found therein, together with all signs, screens, bars, bottles, glasses, and other property used in keeping and maintaining said nuisance, and the owner or keeper thereof shall, upon conviction, be adjudged guilty of maintaining a common nuisance, and shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, and by imprisonment in the county jail not less than thirty days nor more than ninety days. The attorney general, county attorney, or any citizen of the county where such nuisance exists, or is kept, or is maintained, may maintain an action in the name of the state to abate and perpetually enjoin the same. The injunction shall be granted at the commencement of the action, and no bond shall be required. Any person violating the terms of any injunction granted in such proceeding, shall be punished as for contempt, by a fine of not less than one hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment, in the discretion of the court.'

**\*671**  \*It is contended by counsel in the case of *Kansas* v. *Ziebold & Hagelin* that the entire scheme of this section is an attempt to deprive persons who come within its provisions of their property and of their liberty without due process of law; especially when taken in connection with that clause of section 14, (amendatory of section 21 of the act of 1881,) which provides that, 'in prosecutions under this act, by indictment or otherwise, \* \* \* it shall not be necessary in the first instance for the state to prove that the party charged did not have a permit to sell intoxicating liquors for the excepted purposes.' We are unable to perceive anything in these regulations inconsistent with the constitutional guaranties of liberty and property. The state having authority to prohibit the manufacture and sale of intoxicating liquors for other than medical, scientific, and mechanical purposes, we do not doubt her power to declare that any place, kept and maintained for the illegal manufacture and sale of such liquors, shall be deemed a common nuisance, and be abated, and, at the same time, to provide for the indictment and trial of the offender. One is a proceeding against the property used for forbidden purposes, while the other is for the punishment of the offender.

It is said that by the thirteenth section of the act of 1885, the legislature, finding a brewery within the state in actual operation, without notice, trial, or hearing, by the mere exercise of its arbitrary caprice, declares it to be a common nuisance, and then prescribes the consequences which are to follow inevitably by judicial mandate required by the statute, and involving and permitting the exercise of no judicial discretion or judgment; that the brewery being found in operation, the court is not to *determine* whether it is a common nuisance, but, under the command of the statute, is to *find it* to be one; that it is not the liquor made, or the making of it, which is thus enacted to be a common nuisance, but the place itself, including all the property used in keeping and maintaining the common nuisance; that the judge having thus signed without inquiry, and, it may be, contrary to the fact and against his own judgment, the edict of the legislature, the court is commanded to take possession by its officers of the **\*672** peace and shut it up; nor is all this destruction of property, by legislative edict, to be made as a forfeiture consequent upon conviction of any offense, but merely because the legislature so commands; and it is done by a *court of equity*, without any previous conviction first had, or any trial known to the law. This, certainly, is a formidable arraignment of the legislation of Kansas, and if it were founded upon a just interpretation of her statutes, the court would have no difficulty in declaring that they could not be enforced without infringing the constitutional rights of the citizen. But those statutes have no such scope, and

are attended with no **303 such results as the defendants suppose. The court is not required to give effect to a legislative 'decree' or 'edict,' unless every enactment by the lawmaking power of a state is to be so characterized. It is not declared that every establishment is to be deemed a common nuisance because it may have been maintained prior to the passage of the statute as a place for manufacturing intoxicating liquors. The statute is prospective in its operation; that is, it does not put the brand of a common nuisance upon any place, unless, after its passage, that place is kept and maintained for purposes declared by the legislature to be injurious to the community. Nor is the court required to adjudge any place to be a common nuisance simply because it is charged by the state to be such. It must first find it to be of that character; that is, must ascertain, in some legal mode, whether, since the statute was passed, the place in question has been, or is being, so used as to make it a common nuisance.

Equally untenable is the proposition that proceedings in equity for the purposes indicated in the thirteenth section of the statute are inconsistent with due process of law. 'In regard to public nuisances,' Mr. Justice Story says, 'the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable, not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. * * * In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the *673 offenders. But an information also lies in equity to redress the grievance by way of injunction.' 2 Stroy, Eq. Jur. §§ 921, 922. The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy than can be had at law. They cannot only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury. *District Atty.* v. *Railroad Co.*, 16 Gray, 245; *Attorney Gen.* v. *Railroad*, 3 N. J. Eq. 139; *Attorney Gen.* v. *Ice Co.*, 104 Mass. 244; *State* v. *Mayor*, 5 Port. (Ala.) 279, 294; *Hoole* v. *Attorney Gen.*, 22 Ala. 194; *Attorney Gen.* v. *Hunter*, 1 Dev. Eq. 13; *Attorney Gen.* v. *Forbes*, 2 Mylne & C. 123, 129, 133; *Attorney Gen.* v. *Railway Co.*, 1 Drew. & S. 161; Eden, Inj. 259; Kerr, Inj. (2d Ed.) 168.

As to the objection that the statute makes no provision for a jury trial in cases like this one, it is sufficient to say that such a mode of trial is not required in suits in equity brought to abate a public nuisance. The statutory direction that an injunction issue at the commencement of the action is not to be construed as dispensing with such preliminary proof as is necessary to authorize an injunction pending the suit.

The court is not to issue an injunction simply because one is asked, or because the charge is made that a common nuisance is maintained in violation of law. The statute leaves the court at liberty to give effect to the principle that an injunction will not be granted to restrain a nuisance, except upon clear and satisfactory evidence that one exists. Here the fact to be ascertained was not whether a place, kept and maintained for *674 purposes forbidden by the statute, was *per se* a nuisance, that fact being conclusively determind by the statute itself, but whether the place in question was so kept and maintained. If the proof upon that point is not full or sufficient, the court can refuse an injunction, or postpone action until the state first obtains the verdict of a jury in her favor. In this case, it cannot be denied that the defendants kept and maintained a place that is within the statutory definition of a common nuisance. Their petition **304 for the removal of the cause from the state court, and their answer to the bill, admitted every fact necessary to maintain this suit, if the statute, under which it was brought, was constitutional.

Touching the provision that in prosecutions, by indictment or otherwise, the state need not, in the first instance, prove that the defendant has not the permit required by the statute, we may remark that, if it has any application to a proceeding like this, it does not deprive him of the presumption that he is innocent of any violation of law. It is only a declaration that when the state has proven that the place described is kept and maintained for the manufacture or sale of intoxicating liquors, such manufacture or sale being unlawful except for specified purposes, and then only under a permit, the prosecution need not prove a negative, namely, that the defendant has not the required license or permit. If the defendant has such license or permit, he can easily produce it, and thus overthrow the *prima facie* case established by the state.

A portion of the argument in behalf of the defendants is to the effect that the statutes of Kansas forbid the manufacture of intoxicating liquors to be exported, or to be carried to other states, and, upon that ground, are repugnant to the clause of the constitution of the United States, giving congress power to regulate commerce with foreign nations and among the

several states. We need only say, upon this point, that there is no intimation in the record that the beer which the respective defendants manufactured was intended to be carried out of the state or to foreign countries. And, without expressing an opinion as to whether such facts will have constituted a good defense, we observe that it will be time enough to decide a case of that character when it shall come before us.

 *675  For the reasons stated, we are of opinion that the judgments of the supreme court of Kansas have not denied to Mugler, the plaintiff in error, any right, privilege, or immunity secured to him by the constitution of the United States, and its judgment, in each case, is accordingly affirmed. We are also of opinion that the circuit court of the United States erred in dismissing the bill of the state against Ziebold & Hagelin. The decree in that case is reversed, and the cause remanded, with directions to enter a decree granting to the state such relief as the act of March 7, 1885, authorizes. It is so ordered.

FIELD, J., (*dissenting*.)

I concur in the judgment rendered by this court in the first two cases,—those coming from the supreme court of Kansas. I dissent from the judgment in the last case, the one coming from the circuit court of the United States. I agree to so much of the opinion as asserts that there is nothing in the constitution or laws of the United States affecting the validity of the act of Kansas prohibiting the sale of intoxicating liquors manufactured in the state, except for the purposes mentioned. But I am not prepared to say that the state can prohibit the manufacture of such liquors within its limits if they are intended for exportation, or forbid their sale within its limits, under proper regulations for the protection of the health and morals of the people, if congress has authorized their importation, though the act of Kansas is broad enough to include both such manufacture and sale. The right to import an article of merchandise, recognized as such by the commercial world, whether the right be given by act of congress or by treaty with a foreign country, would seem necessarily to carry the right to sell the article when imported. In *Brown* v. *Maryland*, 12 Wheat. 447, Chief Justice MARSHALL, in delivering the opinion of this court, said as follows: 'Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing,  *676  then, as importation itself. It must be considered as a component part of the power to regulate commerce.  **305  Congress has a right, not only to authorize importation, but to authorize the importer to sell.'

If one state can forbid the sale within its limits of an imported article, so may all the states, each selecting a different article. There would then be little uniformity of regulations with respect to articles of foreign commerce imported into different states, and the same may be also said of regulations with respect to articles of interstate commerce. And we know it was one of the objects of the formation of the federal constitution to secure uniformity of commercial regulations against discriminating state legislation. The construction of the commercial clause of the constitution, upon which the *License Cases*, 7 How., were decided, appears to me to have been substantially abandoned in later decisions. *Hall* v. *De Cuir*, 95 U. S. 485; *Welton* v. *State of Missouri*, 91 U. S. 275; *County of Mobile* v. *Kimball*, 102 U. S. 691; *Transportation Co.* v. *Parkersburgh*, 107 U. S. 691, 2 Sup. Ct. Rep. 732; *Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 5 Sup. Ct. Rep. 826; *Railway Co.* v. *Illinois*, 18 U. S. 557, 7 Sup. Ct. Rep. 4. I make this reservation that I may not hereafter be deemed concluded by a general concurrence in the opinion of the majority.

I do not agree to what is said with reference to the case from the United States circuit court. That was a suit in equity brought for the abatement of the brewery owned by the defendants. It is based upon clauses in the thirteenth section of the act of Kansas, which are as follows: 'All places where intoxicating liquors are manufactured, sold, bartered, or given away in violation of any of the provisions of this act, or where intoxicating liquors are kept for sale, barter, or delivery in violation of this act, *are hereby declared to be common nuisances;* and upon the judgment of any court having jurisdiction finding such place to be a nuisance under this section, the sheriff, his deputy, or under-sheriff, or any constable of the proper county, or marshal of any city where the same is located, shall be directed to shut  *677  up and abate such place by taking possession thereof and destroying all intoxicating liquors found therein, together with all signs, screens, bars, bottles, glasses, and other property used in keeping and maintaining said nuisance; and the owner or keeper thereof shall, upon conviction, be adjudged guilty of maintaining a common nuisance, and shall be punished by a fine of not less than one hundred dollars, nor more than five hundred dollars, and by imprisonment in the county jail not less than thirty days, nor more than ninety days. The attorney general, county attorney, or any citizen of the county where such nuisance exists, or is kept, or is maintained, may maintain an action in the name of the state to abate and perpetually enjoin the same. The injunction shall be granted at the commencement of the action, and no bond shall be required.'

**Mugler v. Kansas, 123 U.S. 623 (1887)**

8 S.Ct. 273, 31 L.Ed. 205

By a previous section all malt, vinous, and fermented liquors are classed as intoxicating liquors, and their manufacture, barter, and sale are equally prohibited. By the thirteenth section, as is well said by counsel, the legislature, without notice to the owner or hearing of any kind, declares every place where such liquors are sold, bartered, or given away, or kept for sale, barter, or delivery, (in this case a brewery, where beer was manufactured and sold, which, up to the passage of the act, was a lawful industry,) to be a common nuisance; and then prescribes what shall follow, upon a court having jurisdiction finding one of such places to be what the legislature has already pronounced it. The court is not to determine whether the place is a common nuisance in fact, but is to find it to be so if it comes within the definition of the statute, and, having thus found it, the executive officers of the court are to be directed to shut up and abate the place by taking possession of it; and, as though this were not sufficient security against the continuance of the business, they are to be required to destroy all the liquor found therein, and all other property used in keeping and maintaining the nuisance. It matters **\*\*306** not whether they are of such a character as could be used in any other business, or be of value for any other purposes. No discretion is left in the judge or in the officer. **\*678** These clauses appear to me to deprive one who owns a brewery and manufactures beer for sale, like the defendants, of property without due process of law. The destruction to be ordered is not as a forfeiture upon conviction of any offense, but merely because the legislature has so commanded. Assuming, which is not conceded, that the legislature, in the exercise of that undefined power of the state, called its 'police power,' may, without compensation to the owner, deprive him of the use of his brewery for the purposes for which it was constructed under the sanction of the law, and for which alone it is valuable, I cannot see upon what principle, after closing the brewery, and thus putting an end to its use in the future for manufacturing spirits, it can order the destruction of the liquor already manufactured, which it admits by its legislation may be valuable for some purposes, and allows it to be sold for those purposes. Nor can I see how the protection of the health and morals of the people of the state can require the destruction of property like bottles, glasses, and other utensils, which may be used for many lawful purposes. It has heretofore been supposed to be an established principle that where there is a power to abate a nuisance, the abatement must be limited by its necessity, and no wanton or unnecessary injury can be committed to the property or rights of individuals. Thus, if the nuisance consists in the use to which a building is put, the remedy is to stop such use, not to tear down or to demolish the building itself, or to destroy property found within it. *Babcock* v. *City of Buffalo*, 56 N. Y. 268; *Bridge Co.* v. *Paige*, 83 N. Y. 189. The decision of the court, as it seems to me, reverses this principle.

It is plain that great wrong will often be done to manufacturers of liquors if legislation like that embodied in this thirteenth section can be upheld. The supreme court of Kansas admits that the legislature of the state, in destroying the values of such kinds of property, may have gone to the utmost verge of constitutional authority. In my opinion it has passed beyond that verge, and crossed the line which separates regulation from confiscation.

**All Citations**

123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

115 S.Ct. 1624
Supreme Court of the United States

UNITED STATES, Petitioner

v.

Alfonso LOPEZ, Jr.

No. 93–1260.
|
Argued Nov. 8, 1994.
|
Decided April 26, 1995.

**Synopsis**

Defendant was convicted in the United States District Court for the Western District of Texas, H.F. Garcia, J., of possessing firearm in school zone in violation of Gun-Free School Zones Act, and he appealed. The Court of Appeals for the Fifth Circuit, Garwood, Circuit Judge, 2 F.3d 1342, reversed and remanded with directions, and government petitioned for certiorari review. After granting certiorari, 114 S.Ct. 1536, the United States Supreme Court, Chief Justice Rehnquist, held that Gun-Free School Zones Act, making it federal offense for any individual knowingly to possess firearm at place that individual knows or has reasonable cause to believe is school zone, exceeded Congress' commerce clause authority, since possession of gun in local school zone was not economic activity that substantially affected interstate commerce.

Affirmed.

Justice Kennedy filed concurring opinion in which Justice O'Connor joined.

Justice Thomas filed concurring opinion.

Justices Stevens and Souter filed dissenting opinions.

Justice Breyer filed dissenting opinion, in which Justices Stevens, Souter and Ginsburg joined.

**West Codenotes**

**Prior Version Held Unconstitutional**
18 U.S.C.A. § 922(q)(1)(A).

**1625 *549 *Syllabus[*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

After respondent, then a 12th–grade student, carried a concealed handgun into his high school, he was charged with violating the Gun–Free School Zones Act of 1990, which forbids "any individual knowingly to possess a firearm at a place that [he] knows ... is a school zone," 18 U.S.C. § 922(q)(1)(A). The District Court denied his motion to dismiss the indictment, concluding that § 922(q) is a constitutional exercise of Congress' power to regulate activities in and affecting commerce. In reversing, the Court of Appeals held that, in light of what it characterized as insufficient congressional findings and legislative history, § 922(q) is invalid as beyond Congress' power under the Commerce Clause.

*Held:* The Act exceeds Congress' Commerce Clause authority. First, although this Court has upheld a wide variety of congressional Acts regulating intrastate economic activity that substantially affected interstate commerce, the possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, have such a substantial effect on interstate commerce. Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly those terms are defined. Nor is it an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under the Court's cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which, viewed in the aggregate, substantially affects interstate commerce. Second, § 922(q) contains no jurisdictional element that would ensure, through case-by-case inquiry, that the firearms possession in question has the requisite nexus with interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce. To uphold the Government's contention that § 922(q) is justified because firearms possession in a local school zone does indeed substantially affect interstate commerce would require this Court to pile inference upon inference in a manner that

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

would bid fair to convert congressional Commerce Clause **\*550** authority to a general police power of the sort held only by the States. Pp. 1626–1634.

2 F.3d 1342, (CA5 1993), affirmed.

REHNQUIST, C.J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed a concurring opinion, in which O'CONNOR, J., joined, *post,* p. 1634. THOMAS, J., filed a concurring opinion, *post,* p. 1642. STEVENS, J., *post,* p. 1651, and SOUTER, J., *post,* p. 1651, filed dissenting opinions. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post,* p. 1657.

**Attorneys and Law Firms**

Drew S. Days, III, New Haven, CT, for petitioner.

John R. Carter, Georgetown, TX, for respondent.

**Opinion**

**\*\*1626 \*551** Chief Justice REHNQUIST delivered the opinion of the Court.

In the Gun–Free School Zones Act of 1990, Congress made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress "[t]o regulate Commerce ... among the several States...." U.S. Const., Art. I, § 8, cl. 3.

On March 10, 1992, respondent, who was then a 12th–grade student, arrived at Edison High School in San Antonio, Texas, carrying a concealed .38–caliber handgun and five bullets. Acting upon an anonymous tip, school authorities confronted respondent, who admitted that he was carrying the weapon. He was arrested and charged under Texas law with firearm possession on school premises. See Tex.Penal Code Ann. § 46.03(a)(1) (Supp.1994). The next day, the state charges were dismissed after federal agents charged respondent by complaint with violating the Gun–Free School Zones Act of 1990. 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). [1]

1     The term "school zone" is defined as "in, or on the grounds of, a public, parochial or private school" or "within a distance of 1,000 feet from the grounds of a public, parochial or private school." § 921(a)(25).

A federal grand jury indicted respondent on one count of knowing possession of a firearm at a school zone, in violation of § 922(q). Respondent moved to dismiss his federal indictment on the ground that § 922(q) "is unconstitutional as it is beyond the power of Congress to legislate control over our public schools." The District Court denied the motion, concluding that § 922(q) "is a constitutional exercise of Congress' well-defined power to regulate activities in and affecting **\*552** commerce, and the 'business' of elementary, middle and high schools ... affects interstate commerce." App. to Pet. for Cert. 55a. Respondent waived his right to a jury trial. The District Court conducted a bench trial, found him guilty of violating § 922(q), and sentenced him to six months' imprisonment and two years' supervised release.

On appeal, respondent challenged his conviction based on his claim that § 922(q) exceeded Congress' power to legislate under the Commerce Clause. The Court of Appeals for the Fifth Circuit agreed and reversed respondent's conviction. It held that, in light of what it characterized as insufficient congressional findings and legislative history, "section 922(q), in the full reach of its terms, is invalid as beyond the power of Congress under the Commerce Clause." 2 F.3d 1342, 1367–1368 (1993). Because of the importance of the issue, we granted certiorari, 511 U.S. 1029, 114 S.Ct. 1536, 128 L.Ed.2d 189 (1994), and we now affirm.

We start with first principles. The Constitution creates a Federal Government of enumerated powers. See Art. I, § 8. As James Madison wrote: "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

AR004836

U.S. v. Lopez, 514 U.S. 549 (1995)

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." **553** Art. I, § 8, cl. 3. The Court, through Chief Justice Marshall, first defined the nature of Congress' **\*\*1627** commerce power in *Gibbons v. Ogden,* 9 Wheat. 1, 189–190, 6 L.Ed. 23 (1824):

> "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

The commerce power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Id.,* at 196. The *Gibbons* Court, however, acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause.

> "It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.

> "Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one.... The enumeration presupposes something not enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State." *Id.,* at 194–195.

For nearly a century thereafter, the Court's Commerce Clause decisions dealt but rarely with the extent of Congress' power, and almost entirely with the Commerce Clause as a limit on state legislation that discriminated against interstate commerce. See, *e.g., Veazie v. Moor,* 14 How. 568, 573–575, 14 L.Ed. 545 (1853) (upholding a state-created steamboat monopoly **\*554** because it involved regulation of wholly

internal commerce); *Kidd v. Pearson,* 128 U.S. 1, 17, 20–22, 9 S.Ct. 6, 9–10, 32 L.Ed. 346 (1888) (upholding a state prohibition on the manufacture of intoxicating liquor because the commerce power "does not comprehend the purely internal domestic commerce of a State which is carried on between man and man within a State or between different parts of the same State"); see also L. Tribe, American Constitutional Law 306 (2d ed. 1988). Under this line of precedent, the Court held that certain categories of activity such as "production," "manufacturing," and "mining" were within the province of state governments, and thus were beyond the power of Congress under the Commerce Clause. See *Wickard v. Filburn,* 317 U.S. 111, 121, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942) (describing development of Commerce Clause jurisprudence).

In 1887, Congress enacted the Interstate Commerce Act, 24 Stat. 379, and in 1890, Congress enacted the Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U.S.C. § 1 *et seq.* These laws ushered in a new era of federal regulation under the commerce power. When cases involving these laws first reached this Court, we imported from our negative Commerce Clause cases the approach that Congress could not regulate activities such as "production," "manufacturing," and "mining." See, *e.g., United States v. E.C. Knight Co.,* 156 U.S. 1, 12, 15 S.Ct. 249, 253–254, 39 L.Ed. 325 (1895) ("Commerce succeeds to manufacture, and is not part of it"); *Carter v. Carter Coal Co.,* 298 U.S. 238, 304, 56 S.Ct. 855, 869, 80 L.Ed. 1160 (1936) ("Mining brings the subject matter of commerce into existence. Commerce disposes of it"). Simultaneously, however, the Court held that, where the interstate and intrastate aspects of commerce were so mingled together that full regulation of interstate commerce required incidental regulation of intrastate commerce, the Commerce Clause authorized such regulation. See, *e.g., Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914).

In *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 550, 55 S.Ct. 837, 851–52, 79 L.Ed. 1570 (1935), the Court struck down regulations that **\*555** fixed the hours and wages of individuals employed by an intrastate business because the activity being regulated related to interstate commerce only indirectly. In doing so, the Court characterized the distinction between **\*\*1628** direct and indirect effects of intrastate transactions upon interstate commerce as "a fundamental one, essential to the maintenance of our constitutional system." *Id.,* at 548, 55 S.Ct., at 851. Activities that affected interstate commerce directly were within Congress' power; activities that affected

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

interstate commerce indirectly were beyond Congress' reach. *Id.,* at 546, 55 S.Ct., at 850. The justification for this formal distinction was rooted in the fear that otherwise "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government." *Id.,* at 548, 55 S.Ct., at 851.

Two years later, in the watershed case of *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the Court upheld the National Labor Relations Act against a Commerce Clause challenge, and in the process, departed from the distinction between "direct" and "indirect" effects on interstate commerce. *Id.,* at 36–38, 57 S.Ct., at 623–624 ("The question [of the scope of Congress' power] is necessarily one of degree"). The Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. *Id.,* at 37, 57 S.Ct., at 624.

In *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Court upheld the Fair Labor Standards Act, stating:

> "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.,* at 118, 61 S.Ct., at 459.

**\*556** See also *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942) (the commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power").

In *Wickard v. Filburn,* the Court upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of homegrown wheat. 317 U.S., at 128–129, 63 S.Ct., at 90–91. The *Wickard* Court explicitly rejected earlier distinctions between direct and indirect effects on interstate commerce, stating:

> "[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic

effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.' " *Id.,* at 125, 63 S.Ct., at 89.

The *Wickard* Court emphasized that although Filburn's own contribution to the demand for wheat may have been trivial by itself, that was not "enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.,* at 127–128, 63 S.Ct., at 90–91.

*Jones & Laughlin Steel, Darby,* and *Wickard* ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause. In part, this was a recognition of the great changes that had occurred in the way business was carried on in this country. Enterprises that had once been local or at most regional in nature had become national in scope. But the doctrinal change also reflected a view that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate commerce.

But even these modern-era precedents which have expanded congressional power under the Commerce Clause **\*557** confirm that this power is subject to outer limits. In *Jones & Laughlin Steel,* the Court warned that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that **\*\*1629** to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." 301 U.S., at 37, 57 S.Ct., at 624; see also *Darby, supra,* 312 U.S., at 119–120, 61 S.Ct., at 459–460 (Congress may regulate intrastate activity that has a "substantial effect" on interstate commerce); *Wickard, supra,* at 125, 63 S.Ct., at 89 (Congress may regulate activity that "exerts a substantial economic effect on interstate commerce"). Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce. See, *e.g., Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 276–280, 101 S.Ct. 2352, 2360–2361, 69 L.Ed.2d 1 (1981); *Perez v. United States,* 402 U.S. 146, 155–156, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971); *Katzenbach v. McClung,* 379 U.S. 294, 299–301, 85 S.Ct. 377, 381–382, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United*

*States,* 379 U.S. 241, 252–253, 85 S.Ct. 348, 354–355, 13 L.Ed.2d 258 (1964). [2]

[2]  See also *Hodel,* 452 U.S., at 311, 101 S.Ct., at 2391 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so") (REHNQUIST, J., concurring in judgment); *Heart of Atlanta Motel,* 379 U.S., at 273, 85 S.Ct., at 366 ("[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court") (Black, J., concurring).

Similarly, in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the Court reaffirmed that "the power to regulate commerce, though broad indeed, has limits" that "[t]he Court has ample power" to enforce. *Id.,* at 196, 88 S.Ct., at 2023–2024, overruled on other grounds, *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), overruled by *Garcia v. San Antonio Metropolitan Transit *558 Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). In response to the dissent's warnings that the Court was powerless to enforce the limitations on Congress' commerce powers because "[a]ll activities affecting commerce, even in the minutest degree, *[Wickard],* may be regulated and controlled by Congress," 392 U.S., at 204, 88 S.Ct., at 2028 (Douglas, J., dissenting), the *Wirtz* Court replied that the dissent had misread precedent as "[n]either here nor in *Wickard* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities," *id.,* at 197, n. 27, 63 S.Ct., at 89–90, n. 27. Rather, "[t]he Court has said only that where *a general regulatory statute bears a substantial relation to commerce,* the *de minimis* character of individual instances arising under that statute is of no consequence." *Ibid.* (first emphasis added).

Consistent with this structure, we have identified three broad categories of activity that Congress may regulate under its commerce power. *Perez, supra,* at 150, 91 S.Ct., at 1359; see also *Hodel, supra,* at 276–277, 101 S.Ct., at 2360–2361. First, Congress may regulate the use of the channels of interstate commerce. See, *e.g., Darby,* 312 U.S., at 114, 61 S.Ct., at 457; *Heart of Atlanta Motel, supra,* at 256, 85 S.Ct., at 357 (" '[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.' "

(quoting *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 197, 61 L.Ed. 442 (1917))). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. See, *e.g., Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Southern R. Co. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); *Perez, supra,* at 150, 91 S.Ct., at 1359 ("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or ... thefts from interstate shipments (18 U.S.C. § 659)"). Finally, Congress' commerce authority includes the power to regulate those activities *559 having a substantial **1630 relation to interstate commerce, *Jones & Laughlin Steel,* 301 U.S., at 37, 57 S.Ct., at 624, *i.e.,* those activities that substantially affect interstate commerce, *Wirtz, supra,* at 196, n. 27, 88 S.Ct., at 2024, n. 27.

 Within this final category, admittedly, our case law has not been clear whether an activity must "affect" or "substantially affect" interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. Compare *Preseault v. ICC,* 494 U.S. 1, 17, 110 S.Ct. 914, 924–925, 108 L.Ed.2d 1 (1990), with *Wirtz, supra,* at 196, n. 27, 88 S.Ct., at 2024, n. 27 (the Court has never declared that "Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities"). We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce.

We now turn to consider the power of Congress, in the light of this framework, to enact § 922(q). The first two categories of authority may be quickly disposed of: § 922(q) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can § 922(q) be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce. Thus, if § 922(q) is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce.

 First, we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce. Examples include the regulation of intrastate coal mining; *Hodel, supra,* intrastate extortionate credit

transactions, *Perez, supra,* restaurants utilizing substantial interstate supplies, *McClung, supra,* inns and hotels catering to interstate guests, *Heart of Atlanta Motel, supra,* and production **\*560** and consumption of homegrown wheat, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). These examples are by no means exhaustive, but the pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.

Even *Wickard,* which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not. Roscoe Filburn operated a small farm in Ohio, on which, in the year involved, he raised 23 acres of wheat. It was his practice to sow winter wheat in the fall, and after harvesting it in July to sell a portion of the crop, to feed part of it to poultry and livestock on the farm, to use some in making flour for home consumption, and to keep the remainder for seeding future crops. The Secretary of Agriculture assessed a penalty against him under the Agricultural Adjustment Act of 1938 because he harvested about 12 acres more wheat than his allotment under the Act permitted. The Act was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained. The Court said, in an opinion sustaining the application of the Act to Filburn's activity:

> "One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. **\*561** Home-grown wheat in this sense competes with wheat in commerce." 317 U.S., at 128, 63 S.Ct., at 90–91.

Section 922(q) is a criminal statute that by its terms has nothing to do with **\*\*1631** "commerce" or any sort of economic enterprise, however broadly one might define those terms.[3] Section 922(q) is not an essential part of a larger

regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

[3]    Under our federal system, the " 'States possess primary authority for defining and enforcing the criminal law.' " *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993) (quoting *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982)); see also *Screws v. United States,* 325 U.S. 91, 109, 65 S.Ct. 1031, 1039, 89 L.Ed. 1495 (1945) (plurality opinion) ("Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States"). When Congress criminalizes conduct already denounced as criminal by the States, it effects a " 'change in the sensitive relation between federal and state criminal jurisdiction.' " *United States v. Enmons,* 410 U.S. 396, 411–412, 93 S.Ct. 1007, 1015–1016, 35 L.Ed.2d 379 (1973) (quoting *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)). The Government acknowledges that § 922(q) "displace[s] state policy choices in ... that its prohibitions apply even in States that have chosen not to outlaw the conduct in question." Brief for United States 29, n. 18; see also Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp. of Pres. Doc. 1944, 1945 (Nov. 29, 1990) ("Most egregiously, section [922(q)] inappropriately overrides legitimate State firearms laws with a new and unnecessary Federal law. The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed upon the States by the Congress").

Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. For example, in *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Court interpreted former 18 U.S.C. § 1202(a), which made it **\*562** a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce ... any firearm." 404 U.S., at 337, 92 S.Ct., at 517. The Court interpreted the possession component of § 1202(a) to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to

have significantly changed the federal-state balance." *Id.,* at 349, 92 S.Ct., at 523. The *Bass* Court set aside the conviction because, although the Government had demonstrated that Bass had possessed a firearm, it had failed "to show the requisite nexus with interstate commerce." *Id.,* at 347, 92 S.Ct., at 522. The Court thus interpreted the statute to reserve the constitutional question whether Congress could regulate, without more, the "mere possession" of firearms. See *id.,* at 339, n. 4, 92 S.Ct., at 518, n. 4; see also *United States v. Five Gambling Devices,* 346 U.S. 441, 448, 74 S.Ct. 190, 194, 98 L.Ed. 179 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative." Unlike the statute in *Bass,* § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate comerce.

Although as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce, see, *e.g., Preseault v. ICC,* 494 U.S., at 17, 110 S.Ct., at 924–925, (1990), the Government concedes that "[n]either the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." Brief for United States 5–6. We agree with the Government that Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce. See *McClung,* 379 U.S., at 304, 85 S.Ct., at 383–384; **\*563** see also *Perez,* 402 U.S., at 156, 91 S.Ct., at 1362 ("Congress need [not] make particularized findings in order to legislate"). But to the **\*\*1632** extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.[4]

[4]   We note that on September 13, 1994, President Clinton signed into law the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103–322, 108 Stat. 1796. Section 320904 of that Act, *id.,* at 2125, amends § 922(q) to include congressional findings regarding the effects of firearm possession in and around schools upon interstate and foreign commerce. The Government does not rely upon these subsequent findings as a substitute for

the absence of findings in the first instance. Tr. of Oral Arg. 25 ("[W]e're not relying on them in the strict sense of the word, but we think that at a very minimum they indicate that reasons can be identified for why Congress wanted to regulate this particular activity").

The Government argues that Congress has accumulated institutional expertise regarding the regulation of firearms through previous enactments. Cf. *Fullilove v. Klutznick,* 448 U.S. 448, 503, 100 S.Ct. 2758, 2787, 65 L.Ed.2d 902 (1980) (Powell, J., concurring). We agree, however, with the Fifth Circuit that importation of previous findings to justify § 922(q) is especially inappropriate here because the "prior federal enactments or Congressional findings [do not] speak to the subject matter of section 922(q) or its relationship to interstate commerce. Indeed, section 922(q) plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation." 2 F.3d, at 1366.

The Government's essential contention, *in fine,* is that we may determine here that § 922(q) is valid because possession of a firearm in a local school zone does indeed substantially affect interstate commerce. Brief for United States 17. The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent **\*564** crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. See *United States v. Evans,* 928 F.2d 858, 862 (CA9 1991). Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. Cf. *Heart of Atlanta Motel,* 379 U.S., at 253, 85 S.Ct., at 355. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have concluded that § 922(q) substantially affects interstate commerce.

We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See Tr. of Oral Arg. 8–9. Similarly, under the Government's "national productivity" reasoning, Congress

could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

Although Justice BREYER argues that acceptance of the Government's rationales would not authorize a general federal police power, he is unable to identify any activity that the States may regulate but Congress may not. Justice BREYER posits that there might be some limitations on Congress' **\*565** commerce power, such as family law or certain aspects of education. *Post,* at 1661–1662. These suggested limitations, when viewed in light of the dissent's expansive analysis, are devoid of substance.

Justice BREYER focuses, for the most part, on the threat that firearm possession in **\*\*1633** and near schools poses to the educational process and the potential economic consequences flowing from that threat. *Post,* at 1659–1662. Specifically, the dissent reasons that (1) gun-related violence is a serious problem; (2) that problem, in turn, has an adverse effect on classroom learning; and (3) that adverse effect on classroom learning, in turn, represents a substantial threat to trade and commerce. *Post,* at 1661. This analysis would be equally applicable, if not more so, to subjects such as family law and direct regulation of education.

For instance, if Congress can, pursuant to its Commerce Clause power, regulate activities that adversely affect the learning environment, then, *a fortiori,* it also can regulate the educational process directly. Congress could determine that a school's curriculum has a "significant" effect on the extent of classroom learning. As a result, Congress could mandate a federal curriculum for local elementary and secondary schools because what is taught in local schools has a significant "effect on classroom learning," cf. *post,* at 1661, and that, in turn, has a substantial effect on interstate commerce.

Justice BREYER rejects our reading of precedent and argues that "Congress ... could rationally conclude that schools fall on the commercial side of the line." *Post,* at 1664. Again, Justice BREYER's rationale lacks any real limits

because, depending on the level of generality, any activity can be looked upon as commercial. Under the dissent's rationale, Congress could just as easily look at child rearing as "fall[ing] on the commercial side of the line" because it provides a "valuable service—namely, to equip [children] with the skills they need to survive in life and, more specifically, in the workplace." *Ibid.* We do not doubt that Congress **\*566** has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process. That authority, though broad, does not include the authority to regulate each and every aspect of local schools.

Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender "legal uncertainty." *Post,* at 1664. As Chief Justice Marshall stated in *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819):

"Th[e] [federal] government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it ... is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist." *Id.,* at 405.

See also *Gibbons v. Ogden,* 9 Wheat., at 195 ("The enumeration presupposes something not enumerated"). The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation. See Art. I, § 8. Congress has operated within this framework of legal uncertainty ever since this Court determined that it was the Judiciary's duty "to say what the law is." *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803) (Marshall, C.J.). Any possible benefit from eliminating this "legal uncertainty" would be at the expense of the Constitution's system of enumerated powers.

In *Jones & Laughlin Steel,* 301 U.S., at 37, 57 S.Ct., at 624, we held that the question of congressional power under the Commerce Clause "is necessarily one of degree." To the same effect **\*567** is the concurring opinion of Justice Cardozo in *Schechter Poultry:*

"There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.' " 295 U.S., at 554, 55 S.Ct., at 853 **1634 (quoting *United States v. A.L.A. Schechter Poultry Corp.,* 76 F.2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).

These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision of this case. The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. See *supra,* at 1629. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, cf. *Gibbons v. Ogden, supra,* at 195, and that there never will be a distinction between what is **568 truly national and what is truly local, cf. *Jones & Laughlin Steel, supra,* at 30, 57 S.Ct., at 621. This we are unwilling to do.

For the foregoing reasons the judgment of the Court of Appeals is

*Affirmed.*

Justice KENNEDY, with whom Justice O'CONNOR joins, concurring.
The history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent

in our own era counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power. That history gives me some pause about today's decision, but I join the Court's opinion with these observations on what I conceive to be its necessary though limited holding.

Chief Justice Marshall announced that the national authority reaches "that commerce which concerns more States than one" and that the commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons v. Ogden,* 9 Wheat. 1, 194, 196, 6 L.Ed. 23 (1824). His statements can be understood now as an early and authoritative recognition that the Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise. The progression of our Commerce Clause cases from *Gibbons* to the present was not marked, however, by a coherent or consistent course of interpretation; for neither the course of technological advance nor the foundational principles for the jurisprudence itself were self-evident to the courts that sought to resolve contemporary disputes by enduring principles.

Furthermore, for almost a century after the adoption of the Constitution, the Court's Commerce Clause decisions did not concern the authority of Congress to legislate. Rather, **569 the Court faced the related but quite distinct question of the authority of the States to regulate matters that would be within the commerce power had Congress chosen to act. The simple fact was that in the early years of the Republic, Congress seldom perceived the necessity to exercise its power in circumstances where its authority would be called into question. The Court's initial task, therefore, was to elaborate the theories that would permit the States to act where Congress had not done so. Not the least part of the problem was the unresolved question whether the congressional power was exclusive, a question reserved by Chief Justice Marshall in *Gibbons v. Ogden, supra,* at 209–210.

At the midpoint of the 19th century, the Court embraced the principle that the States and the National Government both have authority to regulate certain matters absent the **1635 congressional determination to displace local law or the necessity for the Court to invalidate local law because of the dormant national power. *Cooley v. Board of Wardens of Port of Philadelphia, ex rel. Soc. for Relief of Distressed Pilots,* 12 How. 299, 318–321, 13 L.Ed. 996 (1852). But the utility of that solution was not at once apparent, see generally

F. Frankfurter, The Commerce Clause under Marshall, Taney and Waite (1937) (hereinafter Frankfurter), and difficulties of application persisted, see *Leisy v. Hardin,* 135 U.S. 100, 122–125, 10 S.Ct. 681, 688–690, 34 L.Ed. 128 (1890).

One approach the Court used to inquire into the lawfulness of state authority was to draw content-based or subject-matter distinctions, thus defining by semantic or formalistic categories those activities that were commerce and those that were not. For instance, in deciding that a State could prohibit the in-state manufacture of liquor intended for out-of-state shipment, it distinguished between manufacture and commerce. "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactur[e] and commerce. Manufacture is transformation—the fashioning of raw materials **\*570** into a change of form for use. The functions of commerce are different." *Kidd v. Pearson,* 128 U.S. 1, 20, 9 S.Ct. 6, 10, 32 L.Ed. 346 (1888). Though that approach likely would not have survived even if confined to the question of a State's authority to enact legislation, it was not at all propitious when applied to the quite different question of what subjects were within the reach of the national power when Congress chose to exercise it.

This became evident when the Court began to confront federal economic regulation enacted in response to the rapid industrial development in the late 19th century. Thus, it relied upon the manufacture-commerce dichotomy in *United States v. E.C. Knight Co.,* 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895), where a manufacturers' combination controlling some 98% of the Nation's domestic sugar refining capacity was held to be outside the reach of the Sherman Act. Conspiracies to control manufacture, agriculture, mining, production, wages, or prices, the Court explained, had too "indirect" an effect on interstate commerce. *Id.,* at 16, 15 S.Ct., at 255. And in *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908), the Court rejected the view that the commerce power might extend to activities that, although local in the sense of having originated within a single State, nevertheless had a practical effect on interstate commercial activity. The Court concluded that there was not a "legal or logical connection ... between an employé's membership in a labor organization and the carrying on of interstate commerce," *id.,* at 178, 28 S.Ct., at 282, and struck down a federal statute forbidding the discharge of an employee because of his membership in a labor organization. See also *The Employers' Liability Cases,* 207 U.S. 463, 497, 28 S.Ct. 141, 145, 52 L.Ed. 297 (1908) (invalidating statute creating negligence action against

common carriers for personal injuries of employees sustained in the course of employment, because the statute "regulates the persons because they engage in interstate commerce and does not alone regulate the business of interstate commerce").

**\*571** Even before the Court committed itself to sustaining federal legislation on broad principles of economic practicality, it found it necessary to depart from these decisions. The Court disavowed *E.C. Knight*'s reliance on the manufacturing-commerce distinction in *Standard Oil Co. of N.J. v. United States,* 221 U.S. 1, 68–69, 31 S.Ct. 502, 518–519, 55 L.Ed. 619 (1911), declaring that approach "unsound." The Court likewise rejected the rationale of *Adair* when it decided, in *Texas & New Orleans R. Co. v. Railway Clerks,* 281 U.S. 548, 570–571, 50 S.Ct. 427, 433–434, 74 L.Ed. 1034 (1930), that Congress had the power to regulate matters pertaining to the organization of railroad workers.

In another line of cases, the Court addressed Congress' efforts to impede local activities it considered undesirable by prohibiting the interstate movement of some essential element. In the *Lottery Case,* 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903), the Court rejected the argument that Congress lacked power to prohibit the interstate movement of lottery tickets because it had power only to regulate, not to prohibit. See also **\*\*1636** *Hipolite Egg Co. v. United States,* 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364 (1911); *Hoke v. United States,* 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913). In *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), however, the Court insisted that the power to regulate commerce "is directly the contrary of the assumed right to forbid commerce from moving," *id.,* at 269–270, 38 S.Ct., at 530, and struck down a prohibition on the interstate transportation of goods manufactured in violation of child labor laws.

Even while it was experiencing difficulties in finding satisfactory principles in these cases, the Court was pursuing a more sustainable and practical approach in other lines of decisions, particularly those involving the regulation of railroad rates. In the *Minnesota Rate Cases,* 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913), the Court upheld a state rate order, but observed that Congress might be empowered to regulate in this area if "by reason of the interblending of the interstate and intrastate operations of interstate carriers" the regulation of interstate rates could not be maintained without restrictions on "intrastate **\*572** rates which substantially affect the former." *Id.,* at 432–433, 33 S.Ct., at 753–754. And in the *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58

L.Ed. 1341 (1914), the Court upheld an Interstate Commerce Commission order fixing railroad rates with the explanation that congressional authority, "extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance." *Id.,* at 351, 34 S.Ct., at 836.

Even the most confined interpretation of "commerce" would embrace transportation between the States, so the rate cases posed much less difficulty for the Court than cases involving manufacture or production. Nevertheless, the Court's recognition of the importance of a practical conception of the commerce power was not altogether confined to the rate cases. In *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), the Court upheld the application of federal antitrust law to a combination of meat dealers that occurred in one State but that restrained trade in cattle "sent for sale from a place in one State, with the expectation that they will end their transit ... in another." *Id.,* at 398, 25 S.Ct., at 280. The Court explained that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Ibid.* Chief Justice Taft followed the same approach in upholding federal regulation of stockyards in *Stafford v. Wallace,* 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922). Speaking for the Court, he rejected a "nice and technical inquiry," *id.,* at 519, 42 S.Ct., at 403, when the local transactions at issue could not "be separated from the movement to which they contribute," *id.,* at 516, 42 S.Ct., at 402.

Reluctance of the Court to adopt that approach in all of its cases caused inconsistencies in doctrine to persist, however. In addressing New Deal legislation the Court resuscitated **\*573** the abandoned abstract distinction between direct and indirect effects on interstate commerce. See *Carter v. Carter Coal Co.,* 298 U.S. 238, 309, 56 S.Ct. 855, 872, 80 L.Ed. 1160 (1936) (Act regulating price of coal and wages and hours for miners held to have only "secondary and indirect" effect on interstate commerce); *Railroad Retirement Bd. v. Alton R. Co.,* 295 U.S. 330, 368, 55 S.Ct. 758, 771, 79 L.Ed. 1468 (1935) (compulsory retirement and pension plan for railroad carrier employees too "remote from any regulation of commerce as such"); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 548, 55 S.Ct. 837, 851, 79 L.Ed. 1570 (1935) (wage

and hour law provision of National Industrial Recovery Act had "no direct relation to interstate commerce").

The case that seems to mark the Court's definitive commitment to the practical conception of the commerce power is *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), where the Court sustained labor laws that applied to **\*\*1637** manufacturing facilities, making no real attempt to distinguish *Carter, supra,* and *Schechter, supra.* 301 U.S., at 40–41, 57 S.Ct., at 625–626. The deference given to Congress has since been confirmed. *United States v. Darby,* 312 U.S. 100, 116–117, 61 S.Ct. 451, 458–459, 85 L.Ed. 609 (1941), overruled *Hammer v. Dagenhart, supra.* And in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Court disapproved *E.C. Knight* and the entire line of direct-indirect and manufacture-production cases, explaining that "broader interpretations of the Commerce Clause [were] destined to supersede the earlier ones," at 122, 63 S.Ct., at 88, and "[w]hatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution," *id.,* at 123, n. 24, 63 S.Ct., at 88, n. 24. Later examples of the exercise of federal power where commercial transactions were the subject of regulation include *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), and *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). These and like authorities are within the fair ambit **\*574** of the Court's practical conception of commercial regulation and are not called in question by our decision today.

The history of our Commerce Clause decisions contains at least two lessons of relevance to this case. The first, as stated at the outset, is the imprecision of content-based boundaries used without more to define the limits of the Commerce Clause. The second, related to the first but of even greater consequence, is that the Court as an institution and the legal system as a whole have an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point. *Stare decisis* operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature. That fundamental restraint on our power forecloses us from reverting to an understanding of commerce that would serve only an 18th–century economy, dependent then upon production and trading practices that

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

had changed but little over the preceding centuries; it also mandates against returning to the time when congressional authority to regulate undoubted commercial activities was limited by a judicial determination that those matters had an insufficient connection to an interstate system. Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.

In referring to the whole subject of the federal and state balance, we said this just three Terms ago:

"This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses: first, because the Framers would not have conceived that any government would conduct such activities; and second, because the Framers would not have believed that the Federal Government, rather than the States, would assume such **\*575** responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role." *New York v. United States,* 505 U.S. 144, 157, 112 S.Ct. 2408, 2418, 120 L.Ed.2d 120 (1992) (emphasis deleted).

It does not follow, however, that in every instance the Court lacks the authority and responsibility to review congressional attempts to alter the federal balance. This case requires us to consider our place in the design of the Government and to appreciate the significance of federalism in the whole structure of the Constitution.

Of the various structural elements in the Constitution, separation of powers, checks and balances, judicial review, and federalism, only concerning the last does there seem to be much uncertainty respecting the existence, and the content, of standards that allow the Judiciary to play a significant role **\*\*1638** in maintaining the design contemplated by the Framers. Although the resolution of specific cases has proved difficult, we have derived from the Constitution workable standards to assist in preserving separation of powers and checks and balances. See, *e.g., Prize Cases,* 2 Black 635, 17 L.Ed. 459 (1863); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Bowsher v. Synar,* 478 U.S. 714, 106

S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). These standards are by now well accepted. Judicial review is also established beyond question, *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), and though we may differ when applying its principles, see, *e.g., Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), its legitimacy is undoubted. Our role in preserving the federal balance seems more tenuous.

There is irony in this, because of the four structural elements in the Constitution just mentioned, federalism was the unique contribution of the Framers to political science and political theory. See **\*576** Friendly, Federalism: A Forward, 86 Yale L.J. 1019 (1977); G. Wood, The Creation of the American Republic, 1776–1787, pp. 524–532, 564 (1969). Though on the surface the idea may seem counterintuitive, it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one. "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51, p. 323 (C. Rossiter ed. 1961) (J. Madison). See also *Gregory v. Ashcroft,* 501 U.S. 452, 458–459, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.... In the tension between federal and state power lies the promise of liberty"); *New York v. United States, supra,* at 181, 112 S.Ct., at 2431 ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power' ") (quoting *Coleman v. Thompson,* 501 U.S. 722, 759, 111 S.Ct. 2546, 2570, 115 L.Ed.2d 640 (1991) (Blackmun, J., dissenting)).

The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If, as Madison expected, the Federal and State Governments are to control each other, see The Federalist

No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of **\*577** the two governments to hold accountable for the failure to perform a given function. "Federalism serves to assign political responsibility, not to obscure it." *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992). Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. Cf. *New York v. United States, supra,* at 155–169, 112 S.Ct., at 2417–2425; *FERC v. Mississippi,* 456 U.S. 742, 787, 102 S.Ct. 2126, 2152, 72 L.Ed.2d 532 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part). The resultant inability to hold either branch of the government answerable **\*\*1639** to the citizens is more dangerous even than devolving too much authority to the remote central power.

To be sure, one conclusion that could be drawn from The Federalist Papers is that the balance between national and state power is entrusted in its entirety to the political process. Madison's observation that "the people ought not surely to be precluded from giving most of their confidence where they may discover it to be most due," The Federalist No. 46, p. 295 (C. Rossiter ed. 1961), can be interpreted to say that the essence of responsibility for a shift in power from the State to the Federal Government rests upon a political judgment, though he added assurance that "the State governments could have little to apprehend, because it is only within a certain sphere that the federal power can, in the nature of things, be advantageously administered," *ibid.* Whatever the judicial role, it is axiomatic that Congress does have substantial discretion and control over the federal balance.

For these reasons, it would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance are their own in the first and primary instance. In the Webster–Hayne Debates, see The Great Speeches and **\*578** Orations of Daniel Webster 227–272 (E. Whipple ed. 1879), and the debates over the Civil Rights Acts, see Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., pts. 1– 3 (1963), some Congresses have accepted responsibility to confront the great questions of the proper federal balance in terms of lasting consequences for the constitutional design.

The political branches of the Government must fulfill this grave constitutional obligation if democratic liberty and the federalism that secures it are to endure.

At the same time, the absence of structural mechanisms to require those officials to undertake this principled task, and the momentary political convenience often attendant upon their failure to do so, argue against a complete renunciation of the judicial role. Although it is the obligation of all officers of the Government to respect the constitutional design, see *Public Citizen v. Department of Justice,* 491 U.S. 440, 466, 109 S.Ct. 2558, 2572–2573, 105 L.Ed.2d 377 (1989); *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981), the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far.

In the past this Court has participated in maintaining the federal balance through judicial exposition of doctrines such as abstention, see, *e.g., Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the rules for determining the primacy of state law, see, *e.g., Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the doctrine of adequate and independent state grounds, see, *e.g., Murdock v. Memphis,* 20 Wall. 590, 22 L.Ed. 429 (1875); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the whole jurisprudence of preemption, see, *e.g., Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), and many of the rules governing our habeas jurisprudence, see, *e.g., Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *McCleskey* **\*579** *v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Our ability to preserve this principle under the Commerce Clause has presented a much greater challenge. See *supra,* at 1634–1637. "This clause has throughout the Court's history been the chief source of its adjudications regarding federalism," and "no other body of opinions affords a fairer or more revealing test of judicial qualities." Frankfurter 66–67.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

But as the branch whose distinctive duty it is to declare "what the law is," *Marbury v.* **1640 *Madison,* 1 Cranch, at 177, we are often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines. The substantial element of political judgment in Commerce Clause matters leaves our institutional capacity to intervene more in doubt than when we decide cases, for instance, under the Bill of Rights even though clear and bright lines are often absent in the latter class of disputes. See *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 630, 109 S.Ct. 3086, 3120, 106 L.Ed.2d 472 (1989) (O'CONNOR, J., concurring in part and concurring in judgment) ("We cannot avoid the obligation to draw lines, often close and difficult lines" in adjudicating constitutional rights). But our cases do not teach that we have no role at all in determining the meaning of the Commerce Clause.

Our position in enforcing the dormant Commerce Clause is instructive. The Court's doctrinal approach in that area has likewise "taken some turns." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 180, 115 S.Ct. 1331, 1336, 131 L.Ed.2d 261 (1995). Yet in contrast to the prevailing skepticism that surrounds our ability to give meaning to the explicit text of the Commerce Clause, there is widespread acceptance of our authority to enforce the dormant Commerce Clause, which we have but inferred from the constitutional structure as a limitation on the power of the States. One element of our dormant Commerce Clause jurisprudence has been the principle that the States may not **580** impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state businesses. See *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). Distinguishing between regulations that do place an undue burden on interstate commerce and regulations that do not depends upon delicate judgments. True, if we invalidate a state law, Congress can in effect overturn our judgment, whereas in a case announcing that Congress has transgressed its authority, the decision is more consequential, for it stands unless Congress can revise its law to demonstrate its commercial character. This difference no doubt informs the circumspection with which we invalidate an Act of Congress, but it does not mitigate our duty to recognize meaningful limits on the commerce power of Congress.

The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required. As THE CHIEF JUSTICE explains, unlike the earlier cases to come before the Court here neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus. See *ante,* at 1630–1631. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern.

An interference of these dimensions occurs here, for it is well established that education is a traditional concern of the States. *Milliken v. Bradley,* 418 U.S. 717, 741–742, 94 S.Ct. 3112, 3125–3126, 41 L.Ed.2d 1069 (1974); **581** *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). The proximity to schools, including of course schools owned and operated by the States or their subdivisions, is the very premise for making the conduct criminal. In these circumstances, we have a particular duty to ensure that the federal-state balance is not destroyed. Cf. *Rice, supra,* at 230, 67 S.Ct., at 1152 ("[W]e start with the assumption that the historic police powers of the States" are not displaced by a federal statute "unless that was the clear and manifest purpose of Congress"); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146, 83 S.Ct. 1210, 1219, 10 L.Ed.2d 248 (1963).

**1641** While it is doubtful that any State, or indeed any reasonable person, would argue that it is wise policy to allow students to carry guns on school premises, considerable disagreement exists about how best to accomplish that goal. In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear. See *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 49–50, 93 S.Ct. 1278, 1304–05, 36 L.Ed.2d 16 (1973); *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

If a State or municipality determines that harsh criminal sanctions are necessary and wise to deter students from carrying guns on school premises, the reserved powers of

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

the States are sufficient to enact those measures. Indeed, over 40 States already have criminal laws outlawing the possession of firearms on or near school grounds. See, *e.g.,* Alaska Stat.Ann. §§ 11.61.195(a)(2)(A), 11.61.220(a)(4)(A) (Supp.1994); Cal.Penal Code Ann. § 626.9 (West Supp.1994); Mass.Gen.Laws c. 269, § 10(j) (1992); N.J.Stat.Ann. § 2C:39–5(e) (West Supp.1994); Va.Code Ann. § 18.2–308.1 (1988); Wis.Stat. § 948.605 (1991–1992).

Other, more practicable means to rid the schools of guns may be thought by the citizens of some States to be preferable for the safety and welfare of the schools those States are **\*582** charged with maintaining. See Brief for National Conference of State Legislatures et al. as *Amici Curiae* 26–30 (injection of federal officials into local problems causes friction and diminishes political accountability of state and local governments). These might include inducements to inform on violators where the information leads to arrests or confiscation of the guns, see Lima, Schools May Launch Weapons Hot Line, Los Angeles Times, Ventura County East ed., Jan. 13, 1995, p. B1, col. 5; Reward for Tips on Guns in Tucson Schools, The Arizona Republic, Jan. 7, 1995, p. B2; programs to encourage the voluntary surrender of guns with some provision for amnesty, see Zaidan, Akron Rallies to Save Youths, The Plain Dealer, Mar. 2, 1995, p. 1B; Swift, Legislators Consider Plan to Get Guns Off Streets, Hartford Courant, Apr. 29, 1992, p. A4; penalties imposed on parents or guardians for failure to supervise the child, see, *e.g.,* Okla.Stat., Tit. 21, § 858 (Supp.1995) (fining parents who allow students to possess firearm at school); Tenn.Code Ann. § 39–17–1312 (Supp.1992) (misdemeanor for parents to allow student to possess firearm at school); Straight Shooter: Gov. Casey's Reasonable Plan to Control Assault Weapons, Pittsburgh Post–Gazette, Mar. 14, 1994, p. B2 (proposed bill); Bailey, Anti–Crime Measures Top Legislators' Agenda, Los Angeles Times, Orange Cty. ed., Mar. 7, 1994, p. B1, col. 2 (same); Krupa, New Gun–Control Plans Could Tighten Local Law, The Boston Globe, June 20, 1993, p. 29; laws providing for suspension or expulsion of gun-toting students, see, *e.g.,* Ala.Code § 16–1–24.1 (Supp.1994); Ind.Code § 20–8.1–5–4(b)(1)(D) (1993); Ky.Rev.Stat.Ann. § 158.150(1)(a) (Michie 1992); Wash.Rev.Code § 9.41.280 (1994), or programs for expulsion with assignment to special facilities, see Martin, Legislators Poised to Take Harsher Stand on Guns in Schools, The Seattle Times, Feb. 1, 1995, p. B1 (automatic year-long expulsion for students with guns and intense semester-long reentry program).

**\*583** The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term. The tendency of this statute to displace state regulation in areas of traditional state concern is evident from its territorial operation. There are over 100,000 elementary and secondary schools in the United States. See U.S. Dept. of Education, National Center for Education Statistics, Digest of Education Statistics 73, 104 (NCES 94–115, 1994) (Tables 63, 94). Each of these now has an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property. In some communities no doubt it would be difficult to navigate without infringing on those zones. Yet throughout these areas, school officials would find their own programs for the prohibition **\*\*1642** of guns in danger of displacement by the federal authority unless the State chooses to enact a parallel rule.

This is not a case where the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain policy, cf. *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), or to organize its governmental functions in a certain way, cf. *FERC v. Mississippi,* 456 U.S., at 781, 102 S.Ct., at 2149 (O'CONNOR, J., concurring in judgment in part and dissenting in part). While the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant. Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce.

For these reasons, I join in the opinion and judgment of the Court.

**\*584** Justice THOMAS, concurring.

The Court today properly concludes that the Commerce Clause does not grant Congress the authority to prohibit gun possession within 1,000 feet of a school, as it attempted to do in the Gun–Free School Zones Act of 1990, Pub.L. 101–647, 104 Stat. 4844. Although I join the majority, I write separately to observe that our case law has drifted far from the original understanding of the Commerce Clause. In a future case, we ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our more recent case

law and is more faithful to the original understanding of that Clause.

We have said that Congress may regulate not only "Commerce ... among the several States," U.S. Const., Art. I, § 8, cl. 3, but also anything that has a "substantial effect" on such commerce. This test, if taken to its logical extreme, would give Congress a "police power" over all aspects of American life. Unfortunately, we have never come to grips with this implication of our substantial effects formula. Although we have supposedly applied the substantial effects test for the past 60 years, we *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power. See *New York v. United States,* 505 U.S. 144, 155, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992) ("[N]o one disputes the proposition that '[t]he Constitution created a Federal Government of limited powers' ") (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 2399, 115 L.Ed.2d 410 (1991); *Maryland v. Wirtz,* 392 U.S. 183, 196, 88 S.Ct. 2017, 2023–24, 20 L.Ed.2d 1020 (1968); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937). Cf. *Chisholm v. Georgia,* 2 Dall. 419, 435, 1 L.Ed. 440 (1793) (Iredell, J.) ("Each State in the Union is sovereign as to all the powers reserved. It must necessarily be so, because the United States have no claim to any authority but such as the States have surrendered to them") (emphasis deleted). Indeed, on this crucial point, the majority and Justice BREYER agree in principle: The Federal **\*585** Government has nothing approaching a police power. Compare *ante,* at 1628–1629, with *post,* at 1661–1662.

While the principal dissent concedes that there are limits to federal power, the sweeping nature of our current test enables the dissent to argue that Congress can regulate gun possession. But it seems to me that the power to regulate "commerce" can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States. Our Constitution quite properly leaves such matters to the individual States, notwithstanding these activities' effects on interstate commerce. Any interpretation of the Commerce Clause that even suggests that Congress could regulate such matters is in need of reexamination.

In an appropriate case, I believe that we must further reconsider our "substantial effects" test with an eye toward constructing a standard that reflects the text and history of the Commerce Clause without totally rejecting **\*\*1643** our more recent Commerce Clause jurisprudence.

Today, however, I merely support the Court's conclusion with a discussion of the text, structure, and history of the Commerce Clause and an analysis of our early case law. My goal is simply to show how far we have departed from the original understanding and to demonstrate that the result we reach today is by no means "radical," see *post,* at 1651 (STEVENS, J., dissenting). I also want to point out the necessity of refashioning a coherent test that does not tend to "obliterate the distinction between what is national and what is local and create a completely centralized government." *Jones & Laughlin Steel Corp., supra,* at 37, 57 S.Ct., at 624.

I

At the time the original Constitution was ratified, "commerce" consisted of selling, buying, and bartering, as well as transporting for these purposes. See 1 S. Johnson, A Dictionary **\*586** of the English Language 361 (4th ed. 1773) (defining commerce as "Intercour[s]e; exchange of one thing for another; interchange of any thing; trade; traffick"); N. Bailey, An Universal Etymological English Dictionary (26th ed. 1789) ("trade or traffic"); T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("Exchange of one thing for another; trade, traffick"). This understanding finds support in the etymology of the word, which literally means "with merchandise." See 3 Oxford English Dictionary 552 (2d ed. 1989) (com—"with"; merci—"merchandise"). In fact, when Federalists and Anti–Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably. See The Federalist No. 4, p. 22 (J. Jay) (asserting that countries will cultivate our friendship when our "trade" is prudently regulated by Federal Government); [1] *id.,* No. 7, at 39–40 (A. Hamilton) (discussing "competitions of commerce" between States resulting from state "regulations of trade"); *id.,* No. 40, at 262 (J. Madison) (asserting that it was an "acknowledged object of the Convention ... that the regulation of trade should be submitted to the general government"); Lee, Letters of a Federal Farmer No. 5, in Pamphlets on the Constitution of the United States 319 (P. Ford ed. 1888); Smith, An Address to the People of the State of New York, in *id.,* at 107.

AR004850

1    All references to The Federalist are to the Jacob E. Cooke 1961 edition.

As one would expect, the term "commerce" was used in contradistinction to productive activities such as manufacturing and agriculture. Alexander Hamilton, for example, repeatedly treated commerce, agriculture, and manufacturing as three separate endeavors. See, *e.g.,* The Federalist No. 36, at 224 (referring to "agriculture, commerce, manufactures"); *id.,* No. 21, at 133 (distinguishing commerce, arts, and industry); *id.,* No. 12, at 74 (asserting that commerce and agriculture have shared interests). The same distinctions **\*587** were made in the state ratification conventions. See, *e.g.,* 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 57 (J. Elliot ed. 1836) (hereinafter Debates) (T. Dawes at Massachusetts convention); *id.,* at 336 (M. Smith at New York convention).

Moreover, interjecting a modern sense of commerce into the Constitution generates significant textual and structural problems. For example, one cannot replace "commerce" with a different type of enterprise, such as manufacturing. When a manufacturer produces a car, assembly cannot take place "with a foreign nation" or "with the Indian Tribes." Parts may come from different States or other nations and hence may have been in the flow of commerce at one time, but manufacturing takes place at a discrete site. Agriculture and manufacturing involve the production of goods; commerce encompasses traffic in such articles.

The Port Preference Clause also suggests that the term "commerce" denoted sale and/or transport rather than business generally. According to that Clause, "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." U.S. Const., Art. I, § 9, cl. 6. Although it is possible to **\*\*1644** conceive of regulations of manufacturing or farming that prefer one port over another, the more natural reading is that the Clause prohibits Congress from using its commerce power to channel commerce through certain favored ports.

The Constitution not only uses the word "commerce" in a narrower sense than our case law might suggest, it also does not support the proposition that Congress has authority over all activities that "substantially affect" interstate commerce. The Commerce Clause [2] does not state that Congress may **\*588** "regulate matters that substantially affect commerce with foreign Nations, and among the several States, and with the Indian Tribes." In contrast, the Constitution itself temporarily prohibited amendments that would "affect" Congress' lack of authority to prohibit or restrict the slave trade or to enact unproportioned direct taxation. Art. V. Clearly, the Framers could have drafted a Constitution that contained a "substantially affects interstate commerce" Clause had that been their objective.

2    Even to speak of "the Commerce Clause" perhaps obscures the actual scope of that Clause. As an original matter, Congress did not have authority to regulate all commerce; Congress could only "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. Although the precise line between interstate/foreign commerce and purely intrastate commerce was hard to draw, the Court attempted to adhere to such a line for the first 150 years of our Nation. See *infra,* at 1646–1649.

In addition to its powers under the Commerce Clause, Congress has the authority to enact such laws as are "necessary and proper" to carry into execution its power to regulate commerce among the several States. U.S. Const., Art. I, § 8, cl. 18. But on this Court's understanding of congressional power under these two Clauses, many of Congress' other enumerated powers under Art. I, § 8, are wholly superfluous. After all, if Congress may regulate all matters that substantially affect commerce, there is no need for the Constitution to specify that Congress may enact bankruptcy laws, cl. 4, or coin money and fix the standard of weights and measures, cl. 5, or punish counterfeiters of United States coin and securities, cl. 6. Likewise, Congress would not need the separate authority to establish post offices and post roads, cl. 7, or to grant patents and copyrights, cl. 8, or to "punish Piracies and Felonies committed on the high Seas," cl. 10. It might not even need the power to raise and support an Army and Navy, cls. 12 and 13, for fewer people would engage in commercial shipping if they thought that a foreign power could expropriate their property with ease. Indeed, if Congress could regulate matters that substantially affect interstate commerce, there would have been no need to specify **\*589** that Congress can regulate international trade and commerce with the Indians. As the Framers surely understood, these other branches of trade substantially affect interstate commerce.

Put simply, much if not all of Art. I, § 8 (including portions of the Commerce Clause itself), would be surplusage if Congress had been given authority over matters that substantially affect interstate commerce. An interpretation of cl. 3 that makes the rest of § 8 superfluous simply cannot be correct. Yet this

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

Court's Commerce Clause jurisprudence has endorsed just such an interpretation: The power we have accorded Congress has swallowed Art. I, § 8. [3]

[3] There are other powers granted to Congress outside of Art. I, § 8, that may become wholly superfluous as well due to our distortion of the Commerce Clause. For instance, Congress has plenary power over the District of Columbia and the territories. See U.S. Const., Art. I, § 8, cl. 17, and Art. IV, § 3, cl. 2. The grant of comprehensive legislative power over certain areas of the Nation, when read in conjunction with the rest of the Constitution, further confirms that Congress was not ceded plenary authority over the *whole* Nation.

Indeed, if a "substantial effects" test can be appended to the Commerce Clause, why not to every other power of the Federal Government? There is no reason for singling out the Commerce Clause for special treatment. Accordingly, Congress could regulate all matters that "substantially affect" the Army and Navy, bankruptcies, tax collection, expenditures, and so on. In that case, the Clauses of § 8 all mutually overlap, something we can assume the Founding Fathers never intended.

**1645 Our construction of the scope of congressional authority has the additional problem of coming close to turning the Tenth Amendment on its head. Our case law could be read to reserve to the United States all powers not expressly *prohibited* by the Constitution. Taken together, these fundamental textual problems should, at the very least, convince us that the "substantial effects" test should be reexamined.

*590 II

The exchanges during the ratification campaign reveal the relatively limited reach of the Commerce Clause and of federal power generally. The Founding Fathers confirmed that most areas of life (even many matters that would have substantial effects on commerce) would remain outside the reach of the Federal Government. Such affairs would continue to be under the exclusive control of the States.

Early Americans understood that commerce, manufacturing, and agriculture, while distinct activities, were intimately related and dependent on each other—that each "substantially affected" the others. After all, items produced by farmers and manufacturers were the primary articles of commerce at the time. If commerce was more robust as a result of federal superintendence, farmers and manufacturers could benefit. Thus, Oliver Ellsworth of Connecticut attempted to convince farmers of the benefits of regulating commerce. "Your property and riches depend on a ready demand and generous price for the produce you can annually spare," he wrote, and these conditions exist "where trade flourishes and when the merchant can freely export the produce of the country" to nations that will pay the highest price. A Landholder No. 1, Connecticut Courant, Nov. 5, 1787, in 3 Documentary History of the Ratification of the Constitution 399 (M. Jensen ed. 1978) (hereinafter Documentary History). See also The Federalist No. 35, at 219 (A. Hamilton) ("[D]iscerning citizens are well aware that the mechanic and manufacturing arts furnish the materials of mercantile enterprise and industry. Many of them indeed are immediately connected with the operations of commerce. They know that the merchant is their natural patron and friend"); *id.,* at 221 ("Will not the merchant ... be disposed to cultivate ... the interests of the mechanic and manufacturing arts to which his commerce is so nearly allied?"); A Jerseyman: To the Citizens of New Jersey, Trenton Mercury, Nov. 6, 1787, in 3 Documentary History 147 (noting that agriculture will serve as *591 a "source of commerce"); Marcus, The New Jersey Journal, Nov. 14, 1787, *id.,* at 152 (both the mechanic and the farmer benefit from the prosperity of commerce). William Davie, a delegate to the North Carolina Convention, illustrated the close link best: "Commerce, sir, is the nurse of [agriculture and manufacturing]. The merchant furnishes the planter with such articles as he cannot manufacture himself, and finds him a market for his produce. Agriculture cannot flourish if commerce languishes; they are mutually dependent on each other." 4 Debates 20.

Yet, despite being well aware that agriculture, manufacturing, and other matters substantially affected commerce, the founding generation did not cede authority over all these activities to Congress. Hamilton, for instance, acknowledged that the Federal Government could not regulate agriculture and like concerns:

"The administration of private justice between the citizens of the same State, the supervision of agriculture and of other concerns of a similar nature, all those things in short which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction." The Federalist No. 17, at 106.

In the unlikely event that the Federal Government would attempt to exercise authority over such matters, its effort "would be as troublesome as it would be nugatory." *Ibid.* [4]

[4]   Cf. 3 Debates 40 (E. Pendleton at the Virginia convention) (The proposed Federal Government "does not intermeddle with the local, particular affairs of the states. Can Congress legislate for the state of Virginia? Can [it] make a law altering the form of transferring property, or the rule of descents, in Virginia?"); *id.,* at 553 (J. Marshall at the Virginia convention) (denying that Congress could make "laws affecting the mode of transferring property, or contracts, or claims, between citizens of the same state"); The Federalist No. 33, at 206 (A. Hamilton) (denying that Congress could change laws of descent or could pre-empt a land tax); A Native of Virginia: Observations upon the Proposed Plan of Federal Government, Apr. 2, 1788, in 9 Documentary History 692 (States have sole authority over "rules of property").

**1646   *592  The comments of Hamilton and others about federal power reflected the well-known truth that the new Government would have only the limited and enumerated powers found in the Constitution. See, *e.g.,* 2 Debates 267–268 (A. Hamilton at New York Convention) (noting that there would be just cause for rejecting the Constitution if it would enable the Federal Government to "alter, or abrogate ... [a State's] civil and criminal institutions [or] penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals"); The Federalist No. 45, at 313 (J. Madison); 3 Debates 259 (J. Madison) (Virginia Convention); R. Sherman & O. Ellsworth, Letter to Governor Huntington, Sept. 26, 1787, in 3 Documentary History 352; J. Wilson, Speech in the State House Yard, Oct. 6, 1787, in 2 *id.,* at 167–168. Agriculture and manufacture, since they were not surrendered to the Federal Government, were state concerns. See The Federalist No. 34, at 212–213 (A. Hamilton) (observing that the "internal encouragement of agriculture and manufactures" was an object of *state* expenditure). Even before the passage of the Tenth Amendment, it was apparent that Congress would possess only those powers "herein granted" by the rest of the Constitution. Art. I, § 1.

Where the Constitution was meant to grant federal authority over an activity substantially affecting interstate commerce, the Constitution contains an enumerated power over that particular activity. Indeed, the Framers knew that many of the other enumerated powers in § 8 dealt with matters that substantially affected interstate commerce. Madison, for

instance, spoke of the bankruptcy power as being "intimately connected with the regulation of commerce." The Federalist No. 42, at 287. Likewise, Hamilton urged that "[i]f we mean to be a commercial people or even to be secure on our Atlantic side, we must endeavour as soon as possible to have a navy." *Id.,* No. 24, at 157.

In short, the Founding Fathers were well aware of what the principal dissent calls " 'economic ... realities.' " See  *593 *post,* at 1662 (BREYER, J.) (quoting *North American Co. v. SEC,* 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946)). Even though the boundary between commerce and other matters may ignore "economic reality" and thus seem arbitrary or artificial to some, we must nevertheless respect a constitutional line that does not grant Congress power over all that substantially affects interstate commerce.

### III

If the principal dissent's understanding of our early case law were correct, there might be some reason to doubt this view of the original understanding of the Constitution. According to that dissent, Chief Justice Marshall's opinion in *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 (1824), established that Congress may control all local activities that "significantly affect interstate commerce," *post,* at 1657. And, "with the exception of one wrong turn subsequently corrected," this has been the "traditiona[l] method of interpreting the Commerce Clause. *Post,* at 1665 (citing *Gibbons* and *United States v. Darby,* 312 U.S. 100, 116–117, 61 S.Ct. 451, 458–459, 85 L.Ed. 609 (1941)).

In my view, the dissent is wrong about the holding and reasoning of *Gibbons.* Because this error leads the dissent to characterize the first 150 years of this Court's case law as a "wrong turn," I feel compelled to put the last 50 years in proper perspective.

### A

In *Gibbons,* the Court examined whether a federal law that licensed ships to engage in the "coasting trade" preempted a New York law granting a 30–year monopoly to Robert Livingston and Robert Fulton to navigate the State's waterways by steamship. In concluding that it did, the Court noted that Congress could regulate "navigation" because "[a]ll America ... has uniformly understood, the

**\*\*1647** word 'commerce,' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed." 9 Wheat., at 190. The Court also observed **\*594** that federal power over commerce "among the several States" meant that Congress could regulate commerce conducted partly within a State. Because a portion of interstate commerce and foreign commerce would almost always take place within one or more States, federal power over interstate and foreign commerce necessarily would extend into the States. *Id.,* at 194–196.

At the same time, the Court took great pains to make clear that Congress could *not* regulate commerce "which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." *Id.,* at 194. Moreover, while suggesting that the Constitution might not permit States to regulate interstate or foreign commerce, the Court observed that "[i]nspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State" were but a small part "of that immense mass of legislation ... not surrendered to a general government." *Id.,* at 203. From an early moment, the Court rejected the notion that Congress can regulate everything that affects interstate commerce. That the internal commerce of the States and the numerous state inspection, quarantine, and health laws had substantial effects on interstate commerce cannot be doubted. Nevertheless, they were not "surrendered to the general government."

Of course, the principal dissent is not the first to misconstrue *Gibbons.* For instance, the Court has stated that *Gibbons* "described the federal commerce power with a breadth never yet exceeded." *Wickard v. Filburn,* 317 U.S. 111, 120, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942). See also *Perez v. United States,* 402 U.S. 146, 151, 91 S.Ct. 1357, 1360, 28 L.Ed.2d 686 (1971) (claiming that with *Darby* and *Wickard,* "the broader view of the Commerce Clause announced by Chief Justice Marshall had been restored"). I believe that this misreading stems from two statements in *Gibbons.*

First, the Court made the uncontroversial claim that federal power does not encompass "*commerce* " that "does **\*595** not extend to or affect other States." 9 Wheat., at 194 (emphasis added). From this statement, the principal dissent infers that whenever an activity affects interstate commerce, it necessarily follows that Congress can regulate such activities. Of course, Chief Justice Marshall said no such thing and the inference the dissent makes cannot be drawn.

There is a much better interpretation of the "affect[s]" language: Because the Court had earlier noted that the commerce power did not extend to wholly intrastate commerce, the Court was acknowledging that although the line between intrastate and interstate/foreign commerce would be difficult to draw, federal authority could not be construed to cover purely intrastate commerce. Commerce that did not affect another State could *never* be said to be commerce "among the several States."

But even if one were to adopt the dissent's reading, the "affect[s]" language, at most, permits Congress to regulate only intrastate *commerce* that substantially affects interstate and foreign commerce. There is no reason to believe that Chief Justice Marshall was asserting that Congress could regulate *all* activities that affect interstate commerce. See *ibid.*

The second source of confusion stems from the Court's praise for the Constitution's division of power between the States and the Federal Government:

> "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." *Id.,* at 195.

**\*596** In this passage, the Court merely was making the well understood point that the Constitution commits matters of "national" concern to Congress and leaves "local" matters **\*\*1648** to the States. The Court was *not* saying that whatever Congress believes is a national matter becomes an object of federal control. The matters of national concern are enumerated in the Constitution: war, taxes, patents, and copyrights, uniform rules of naturalization and bankruptcy, types of commerce, and so on. See generally Art. I, § 8. *Gibbons'* emphatic statements that Congress could not regulate many matters that affect commerce confirm that the Court did not read the Commerce Clause as granting Congress control over matters that "affect the States generally."[5] *Gibbons* simply cannot be construed as the principal dissent would have it.

5      None of the other Commerce Clause opinions during
       Chief Justice Marshall's tenure, which concerned the

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

"dormant" Commerce Clause, even suggested that Congress had authority over all matters substantially affecting commerce. See *Brown v. Maryland,* 12 Wheat. 419, 6 L.Ed. 678 (1827); *Willson v. Black Bird Creek Marsh Co.,* 2 Pet. 245, 7 L.Ed. 412 (1829).

### B

I am aware of no cases prior to the New Deal that characterized the power flowing from the Commerce Clause as sweepingly as does our substantial effects test. My review of the case law indicates that the substantial effects test is but an innovation of the 20th century.

Even before *Gibbons,* Chief Justice Marshall, writing for the Court in *Cohens v. Virginia,* 6 Wheat. 264, 5 L.Ed. 257 (1821), noted that Congress had "no general right to punish murder committed within any of the States," *id.,* at 426, and that it was "clear that congress cannot punish felonies generally," *id.,* at 428. The Court's only qualification was that Congress could enact such laws for places where it enjoyed plenary powers—for instance, over the District of Columbia. *Id.,* at 426. Thus, whatever ordinary murders, or robbery, or gun possession might have on interstate commerce (or on any *597 other subject of federal concern) was irrelevant to the question of congressional power. [6]

[6] It is worth noting that Congress, in the first federal criminal Act, did not establish nationwide prohibitions against murder and the like. See Act of Apr. 30, 1790, ch. 9, 1 Stat. 112. To be sure, Congress outlawed murder, manslaughter, maiming, and larceny, but only when those acts were either committed on United States territory not part of a State or on the high seas. *Ibid.* See U.S. Const., Art. I, § 8, cl. 10 (authorizing Congress to outlaw piracy and felonies on high seas); Art. IV, § 3, cl. 2 (plenary authority over United States territory and property). When Congress did enact nationwide criminal laws, it acted pursuant to direct grants of authority found in the Constitution. Compare Act of Apr. 30, 1790, *supra,* §§ 1 and 14 (prohibitions against treason and the counterfeiting of U.S. securities), with U.S. Const., Art. I, § 8, cl. 6 (counterfeiting); Art. III, § 3, cl. 2 (treason). Notwithstanding any substantial effects that murder, kidnaping, or gun possession might have had on interstate commerce, Congress understood that it could not establish nationwide prohibitions.

Likewise, there were no laws in the early Congresses that regulated manufacturing and agriculture. Nor was

there *any* statute that purported to regulate activities with "substantial effects" on interstate commerce.

*United States v. Dewitt,* 9 Wall. 41, 19 L.Ed. 593 (1870), marked the first time the Court struck down a federal law as exceeding the power conveyed by the Commerce Clause. In a two-page opinion, the Court invalidated a nationwide law prohibiting all sales of naphtha and illuminating oils. In so doing, the Court remarked that the Commerce Clause "has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States." *Id.,* at 44. The law in question was "plainly a regulation of police," which could have constitutional application only where Congress had exclusive authority, such as the territories. *Id.,* at 44–45. See also *License Tax Cases,* 5 Wall. 462, 470–471, 18 L.Ed. 497 (1867) (Congress cannot interfere with the internal commerce and business of a State); *Trade–Mark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879) (Congress *598 cannot regulate internal commerce and thus may not establish national trademark registration).

In *United States v. E.C. Knight Co.,* 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895), this Court held that mere attempts to monopolize the manufacture of sugar could not be regulated pursuant to the Commerce Clause. **1649 Raising echoes of the discussions of the Framers regarding the intimate relationship between commerce and manufacturing, the Court declared that "[c]ommerce succeeds to manufacture, and is not a part of it." *Id.,* at 12, 15 S.Ct., at 253. The Court also approvingly quoted from *Kidd v. Pearson,* 128 U.S. 1, 20, 9 S.Ct. 6, 9–10, 32 L.Ed. 346 (1888):

" 'No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce.... If it be held that the term [commerce] includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested ... with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry.' " *E.C. Knight, supra,* 156 U.S., at 14, 15 S.Ct., at 254.

If federal power extended to these types of production "comparatively little of business operations and affairs would be left for state control." *Id.,* at 16, 15 S.Ct., at 255. See also *Newberry v. United States,* 256 U.S. 232, 257, 41

S.Ct. 469, 474, 65 L.Ed. 913 (1921) ("It is settled ... that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacturing, mining, etc., commerce could not exist, but this fact does not suffice to subject them to the control of Congress"). Whether or not manufacturing, agriculture, or other matters substantially affected interstate commerce was irrelevant.

**\*599** As recently as 1936, the Court continued to insist that the Commerce Clause did not reach the wholly internal business of the States. See *Carter v. Carter Coal Co.,* 298 U.S. 238, 308, 56 S.Ct. 855, 871–872, 80 L.Ed. 1160 (1936) (Congress may not regulate mine labor because "[t]he relation of employer and employee is a local relation"); see also *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 543–550, 55 S.Ct. 837, 848–852, 79 L.Ed. 1570 (1935) (holding that Congress may not regulate intrastate sales of sick chickens or the labor of employees involved in intrastate poultry sales). The Federal Government simply could not reach such subjects regardless of their effects on interstate commerce.

These cases all establish a simple point: From the time of the ratification of the Constitution to the mid–1930's, it was widely understood that the Constitution granted Congress only limited powers, notwithstanding the Commerce Clause.[7] Moreover, there was no question that activities wholly separated from business, such as gun possession, were beyond the reach of the commerce power. If anything, the "wrong turn" was the Court's dramatic departure in the 1930's from a century and a half of precedent.

[7] To be sure, congressional power pursuant to the Commerce Clause was alternatively described less narrowly or more narrowly during this 150–year period. Compare *United States v. Coombs,* 12 Pet. 72, 78, 9 L.Ed. 1004 (1838) (commerce power "extends to such acts, done on land, which interfere with, obstruct, or prevent the due exercise of the power to regulate [interstate and international] commerce" such as stealing goods from a beached ship), with *United States v. E.C. Knight Co.,* 156 U.S. 1, 13, 15 S.Ct. 249, 254, 39 L.Ed. 325 (1895) ("Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities ... may be regulated, but this is because they form part of interstate trade or commerce"). During this period, however, this Court never held that Congress could regulate everything that substantially affects commerce.

IV

Apart from its recent vintage and its corresponding lack of any grounding in the original understanding of the Constitution, the substantial effects test suffers from the further **\*600** flaw that it appears to grant Congress a police power over the Nation. When asked at oral argument if there were *any* limits to the Commerce Clause, the Government was at a loss for words. Tr. of Oral Arg. 5. Likewise, the principal dissent insists that there are limits, but it cannot muster even one example. *Post,* at 1661–1662. Indeed, the dissent implicitly concedes that its reading has no limits when it criticizes the Court for "threaten[ing] legal uncertainty in **\*\*1650** an area of law that ... seemed reasonably well settled." *Post,* at 1664–1665. The one advantage of the dissent's standard is certainty: It is certain that under its analysis everything may be regulated under the guise of the Commerce Clause.

The substantial effects test suffers from this flaw, in part, because of its "aggregation principle." Under so-called "class of activities" statutes, Congress can regulate whole categories of activities that are not themselves either "interstate" or "commerce." In applying the effects test, we ask whether the class of activities *as a whole* substantially affects interstate commerce, not whether any specific activity within the class has such effects when considered in isolation. See *Maryland v. Wirtz,* 392 U.S., at 192–193, 88 S.Ct., at 2021–2022 (if class of activities is " 'within the reach of federal power,' " courts may not excise individual applications as trivial) (quoting *Darby,* 312 U.S., at 120–121, 61 S.Ct., at 460–461).

The aggregation principle is clever, but has no stopping point. Suppose all would agree that gun possession within 1,000 feet of a school does not substantially affect commerce, but that possession of weapons generally (knives, brass knuckles, nunchakus, etc.) does. Under our substantial effects doctrine, even though Congress cannot single out gun possession, it can prohibit weapon possession generally. But one *always* can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce. Under our jurisprudence, if Congress passed an omnibus "substantially affects interstate commerce" statute, purporting to regulate every aspect of human existence, the Act apparently would be constitutional. **\*601** Even though particular sections may govern only trivial activities, the statute in the aggregate regulates matters that substantially affect commerce.

V

This extended discussion of the original understanding and our first century and a half of case law does not necessarily require a wholesale abandonment of our more recent opinions. [8] It simply reveals that our substantial effects test is far removed from both the Constitution and from our early case law and that the Court's opinion should not be viewed as "radical" or another "wrong turn" that must be corrected in the future. [9] The analysis also suggests that we ought to temper our Commerce Clause jurisprudence.

[8]   Although I might be willing to return to the original understanding, I recognize that many believe that it is too late in the day to undertake a fundamental reexamination of the past 60 years. Consideration of *stare decisis* and reliance interests may convince us that we cannot wipe the slate clean.

[9]   Nor can the majority's opinion fairly be compared to *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). See *post,* at 1651–1654 (SOUTER, J., dissenting). Unlike *Lochner* and our more recent "substantive due process" cases, today's decision enforces only the Constitution and not "judicial policy judgments." See *post,* at 1653. Notwithstanding Justice SOUTER's discussion, " 'commercial' character" is not only a natural but an inevitable "ground of *Commerce* Clause distinction." See *post,* at 1654 (emphasis added). Our invalidation of the Gun–Free School Zones Act therefore falls comfortably within our proper role in reviewing federal legislation to determine if it exceeds congressional authority as defined by the Constitution itself. As John Marshall put it: "If [Congress] were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the Constitution which they are to guard.... They would declare it void." 3 Debates 553 (before the Virginia ratifying convention); see also The Federalist No. 44, at 305 (J. Madison) (asserting that if Congress exercises powers "not warranted by [the Constitution's] true meaning" the judiciary will defend the Constitution); *id.,* No. 78, at 526 (A. Hamilton) (asserting that the "courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments"). Where, as here, there is a case or controversy, there can be no "misstep," *post,* at 1657, in enforcing the Constitution.

*602   Unless the dissenting Justices are willing to repudiate our long-held understanding of the limited nature of federal power, I would think that they, too, must be willing to reconsider the substantial effects test in a future case. If we wish to be true to a Constitution that does not cede a police power to the Federal Government, our Commerce Clause's boundaries simply cannot be "defined" as being " 'commensurate with the national needs' " or self-consciously intended **1651 to let the Federal Government " 'defend itself against economic forces that Congress decrees inimical or destructive of the national economy.' " See *post,* at 1662 (BREYER, J., dissenting) (quoting *North American Co. v. SEC,* 327 U.S., at 705, 66 S.Ct., at 796). Such a formulation of federal power is no test at all: It is a blank check.

At an appropriate juncture, I think we must modify our Commerce Clause jurisprudence. Today, it is easy enough to say that the Clause certainly does not empower Congress to ban gun possession within 1,000 feet of a school.

Justice STEVENS, dissenting.

The welfare of our future "Commerce with foreign Nations, and among the several States," U.S. Const., Art. I, § 8, cl. 3, is vitally dependent on the character of the education of our children. I therefore agree entirely with Justice BREYER's explanation of why Congress has ample power to prohibit the possession of firearms in or near schools—just as it may protect the school environment from harms posed by controlled substances such as asbestos or alcohol. I also agree with Justice SOUTER's exposition of the radical character of the Court's holding and its kinship with the discredited, pre-Depression version of substantive due process. Cf. *Dolan v. City of Tigard,* 512 U.S. 374, 405–411, 114 S.Ct. 2309, 2326–2330, 129 L.Ed.2d 304 (1994) (STEVENS, J., dissenting). I believe, however, that the Court's extraordinary decision merits this additional comment.

Guns are both articles of commerce and articles that can be used to restrain commerce. Their possession is the consequence, *603 either directly or indirectly, of commercial activity. In my judgment, Congress' power to regulate commerce in firearms includes the power to prohibit possession of guns at any location because of their potentially harmful use; it necessarily follows that Congress may also prohibit their possession in particular markets. The market for the possession of handguns by school-age children is, distressingly, substantial. [*] Whether or not the national interest in eliminating that market would have justified federal legislation in 1789, it surely does today.

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

\*

Indeed, there is evidence that firearm manufacturers—aided by a federal grant—are specifically targeting schoolchildren as consumers by distributing, at schools, hunting-related videos styled "educational materials for grades four through 12," Herbert, Reading, Writing, Reloading, N.Y. Times, Dec. 14, 1994, p. A23, col. 1.

Justice SOUTER, dissenting.

In reviewing congressional legislation under the Commerce Clause, we defer to what is often a merely implicit congressional judgment that its regulation addresses a subject substantially affecting interstate commerce "if there is any rational basis for such a finding." *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); *Preseault v. ICC,* 494 U.S. 1, 17, 110 S.Ct. 914, 924–925, 108 L.Ed.2d 1 (1990); see *Maryland v. Wirtz,* 392 U.S. 183, 190, 88 S.Ct. 2017, 2020–2021, 20 L.Ed.2d 1020 (1968), quoting *Katzenbach v. McClung,* 379 U.S. 294, 303–304, 85 S.Ct. 377, 383–384, 13 L.Ed.2d 290 (1964). If that congressional determination is within the realm of reason, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.' " *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 276, 101 S.Ct., at 2360, quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964); see also *Preseault v. ICC, supra,* 494 U.S., at 17, 110 S.Ct., at 924–925. [1]

1    In this case, no question has been raised about means and ends; the only issue is about the effect of school zone guns on commerce.

**\*604** The practice of deferring to rationally based legislative judgments "is a paradigm of judicial restraint." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). In judicial review under the Commerce Clause, it reflects our respect for the institutional competence of the Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes **\*\*1652** from Congress's political accountability in dealing with matters open to a wide range of possible choices. See *id.,* at 313–316, 113 S.Ct., at 2101–2102; *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., supra,* 452 U.S., at 276, 101 S.Ct., at 2360; *United States v. Carolene Products Co.,* 304 U.S. 144, 147, 151–154, 58 S.Ct. 778, 783–784, 82 L.Ed. 1234 (1938); cf. *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

It was not ever thus, however, as even a brief overview of Commerce Clause history during the past century reminds us. The modern respect for the competence and primacy of Congress in matters affecting commerce developed only after one of this Court's most chastening experiences, when it perforce repudiated an earlier and untenably expansive conception of judicial review in derogation of congressional commerce power. A look at history's sequence will serve to show how today's decision tugs the Court off course, leading it to suggest opportunities for further developments that would be at odds with the rule of restraint to which the Court still wisely states adherence.

I

Notwithstanding the Court's recognition of a broad commerce power in *Gibbons v. Ogden,* 9 Wheat. 1, 196–197, 6 L.Ed. 23 (1824) (Marshall, C.J.), Congress saw few occasions to exercise that power prior to Reconstruction, see generally 2 C. Warren, The Supreme Court in United States History 729–739 (rev. ed. 1935), and it was really the passage of the Interstate Commerce Act of 1887 that opened a new age of congressional reliance on the Commerce Clause for authority to exercise general police powers at the national level, see **\*605** *id.,* at 729–730. Although the Court upheld a fair amount of the ensuing legislation as being within the commerce power, see, *e.g., Stafford v. Wallace,* 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922) (upholding an Act regulating trade practices in the meat packing industry); *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (upholding Interstate Commerce Commission order to equalize interstate and intrastate rail rates); see generally Warren, *supra,* at 729–739, the period from the turn of the century to 1937 is better noted for a series of cases applying highly formalistic notions of "commerce" to invalidate federal social and economic legislation, see, *e.g., Carter v. Carter Coal Co.,* 298 U.S. 238, 303–304, 56 S.Ct. 855, 869–870, 80 L.Ed. 1160 (1936) (striking Act prohibiting unfair labor practices in coal industry as regulation of "mining" and "production," not "commerce"); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 545–548, 55 S.Ct. 837, 849–851, 79 L.Ed. 1570 (1935) (striking congressional regulation of activities affecting interstate commerce only "indirectly"); *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) (striking Act prohibiting shipment in interstate commerce of goods manufactured at factories using

child labor because the Act regulated "manufacturing," not "commerce"); *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) (striking protection of labor union membership as outside "commerce").

These restrictive views of commerce subject to congressional power complemented the Court's activism in limiting the enforceable scope of state economic regulation. It is most familiar history that during this same period the Court routinely invalidated state social and economic legislation under an expansive conception of Fourteenth Amendment substantive due process. See, *e.g., Louis K. Liggett Co. v. Baldridge,* 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928) (striking state law requiring pharmacy owners to be licensed as pharmacists); *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915) (striking state law prohibiting employers from requiring their employees to agree not to join labor organizations); *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (striking state law establishing maximum working hours for bakers). See generally L. Tribe, American Constitutional *\*606* Law 568–574 (2d ed. 1988). The fulcrums of judicial review in these cases were the notions of liberty and property characteristic of laissez-faire economics, whereas the Commerce Clause cases turned on what was ostensibly a structural limit of federal power, but under each conception of judicial review the Court's character for the **\*\*1653** first third of the century showed itself in exacting judicial scrutiny of a legislature's choice of economic ends and of the legislative means selected to reach them.

It was not merely coincidental, then, that sea changes in the Court's conceptions of its authority under the Due Process and Commerce Clauses occurred virtually together, in 1937, with *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, and *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893. See Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv.L.Rev. 645, 674–682 (1946). In *West Coast Hotel,* the Court's rejection of a due process challenge to a state law fixing minimum wages for women and children marked the abandonment of its expansive protection of contractual freedom. Two weeks later, *Jones & Laughlin* affirmed congressional commerce power to authorize NLRB injunctions against unfair labor practices. The Court's finding that the regulated activity had a direct enough effect on commerce has since been seen as beginning the abandonment, for practical purposes, of the formalistic distinction between direct and indirect effects.

In the years following these decisions, deference to legislative policy judgments on commercial regulation became the powerful theme under both the Due Process and Commerce Clauses, see *United States v. Carolene Products Co.,* 304 U.S., at 147–148, 152, 58 S.Ct., at 780–781, 783; *United States v. Darby,* 312 U.S. 100, 119–121, 61 S.Ct. 451, 459–460, 85 L.Ed. 609 (1941); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 118–119, 62 S.Ct. 523, 525–526, 86 L.Ed. 726 (1942), and in due course that deference became articulate in the standard of rationality review. In due process litigation, the Court's statement of a rational *\*607* basis test came quickly. See *United States v. Carolene Products Co., supra,* 304 U.S., at 152, 58 S.Ct., at 783; see also *Williamson v. Lee Optical Co., supra,* 348 U.S., at 489–490, 75 S.Ct., at 465–466. The parallel formulation of the Commerce Clause test came later, only because complete elimination of the direct/indirect effects dichotomy and acceptance of the cumulative effects doctrine, *Wickard v. Filburn,* 317 U.S. 111, 125, 127–129, 63 S.Ct. 82, 89, 90–91, 87 L.Ed. 122 (1942); *United States v. Wrightwood Dairy Co., supra,* 315 U.S., at 124–126, 62 S.Ct., at 528–529, so far settled the pressing issues of congressional power over commerce as to leave the Court for years without any need to phrase a test explicitly deferring to rational legislative judgments. The moment came, however, with the challenge to congressional Commerce Clause authority to prohibit racial discrimination in places of public accommodation, when the Court simply made explicit what the earlier cases had implied: "where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." *Katzenbach v. McClung,* 379 U.S., at 303–304, 85 S.Ct., at 383–384, discussing *United States v. Darby, supra;* see *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S., at 258–259, 85 S.Ct., at 358–359. Thus, under commerce, as under due process, adoption of rational basis review expressed the recognition that the Court had no sustainable basis for subjecting economic regulation as such to judicial policy judgments, and for the past half century the Court has no more turned back in the direction of formalistic Commerce Clause review (as in deciding whether regulation of commerce was sufficiently direct) than it has inclined toward reasserting the substantive protection of *Lochner* due process (as in the inflated protection of contractual autonomy). See, *e.g., Maryland v. Wirtz,* 392 U.S., at 190, 198, 88 S.Ct., at 2020–2021, 2024–2025; *Perez v. United States,* 402 U.S. 146, 151–157, 91 S.Ct. 1357, 1360–1363, 28 L.Ed.2d 686 (1971); *Hodel v. Virginia Surface*

*Mining & Reclamation Assn., Inc.,* 452 U.S., at 276, 277, 101 S.Ct., at 2360, 2360–2361.

**\*608** II

There is today, however, a backward glance at both the old pitfalls, as the Court treats deference under the rationality rule as subject to gradation according to the commercial or noncommercial nature of the immediate subject of the challenged regulation. **\*\*1654** See *ante,* at 1630–1631. The distinction between what is patently commercial and what is not looks much like the old distinction between what directly affects commerce and what touches it only indirectly. And the act of calibrating the level of deference by drawing a line between what is patently commercial and what is less purely so will probably resemble the process of deciding how much interference with contractual freedom was fatal. Thus, it seems fair to ask whether the step taken by the Court today does anything but portend a return to the untenable jurisprudence from which the Court extricated itself almost 60 years ago. The answer is not reassuring. To be sure, the occasion for today's decision reflects the century's end, not its beginning. But if it seems anomalous that the Congress of the United States has taken to regulating school yards, the Act in question is still probably no more remarkable than state regulation of bake shops 90 years ago. In any event, there is no reason to hope that the Court's qualification of rational basis review will be any more successful than the efforts at substantive economic review made by our predecessors as the century began. Taking the Court's opinion on its own terms, Justice BREYER has explained both the hopeless porosity of "commercial" character as a ground of Commerce Clause distinction in America's highly connected economy, and the inconsistency of this categorization with our rational basis precedents from the last 50 years.

Further glosses on rationality review, moreover, may be in the offing. Although this case turns on commercial character, the Court gestures toward two other considerations that it might sometime entertain in applying rational basis **\*609** scrutiny (apart from a statutory obligation to supply independent proof of a jurisdictional element): does the congressional statute deal with subjects of traditional state regulation, and does the statute contain explicit factual findings supporting the otherwise implicit determination that the regulated activity substantially affects interstate commerce? Once again, any appeal these considerations may have depends on ignoring the painful lesson learned in 1937, for neither of the Court's suggestions would square with rational basis scrutiny.

A

The Court observes that the Gun–Free School Zones Act operates in two areas traditionally subject to legislation by the States, education and enforcement of criminal law. The suggestion is either that a connection between commerce and these subjects is remote, or that the commerce power is simply weaker when it touches subjects on which the States have historically been the primary legislators. Neither suggestion is tenable. As for remoteness, it may or may not be wise for the National Government to deal with education, but Justice BREYER has surely demonstrated that the commercial prospects of an illiterate State or Nation are not rosy, and no argument should be needed to show that hijacking interstate shipments of cigarettes can affect commerce substantially, even though the States have traditionally prosecuted robbery. And as for the notion that the commerce power diminishes the closer it gets to customary state concerns, that idea has been flatly rejected, and not long ago. The commerce power, we have often observed, is plenary. *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 276, 101 S.Ct., at 2360; *United States v. Darby,* 312 U.S. at 114, 61 S.Ct., at 457; see *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 549–550, 105 S.Ct. 1005, 1016–1017, 83 L.Ed.2d 1016 (1985); *Gibbons v. Ogden,* 9 Wheat., at 196–197. Justice Harlan put it this way in speaking for the Court in *Maryland v. Wirtz:*

**\*610** "There is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other.... [I]t is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests.... As long ago as [1925], the Court put to rest the contention that state concerns might constitutionally 'outweigh' the importance of an otherwise valid federal statute regulating commerce." **\*\*1655** 392 U.S., at 195–196, 88 S.Ct., at 2023–2024 (citations and internal quotation marks omitted).

See also *United States v. Darby, supra,* 312 U.S., at 114, 61 S.Ct., at 457; *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–2401, 115 L.Ed.2d 410 (1991); *United States v. Carolene Products Co.,* 304 U.S., at 147, 58 S.Ct., at 781.

Nor is there any contrary authority in the reasoning of our cases imposing clear statement rules in some instances of legislation that would significantly alter the state-national balance. In the absence of a clear statement of congressional design, for example, we have refused to interpret ambiguous federal statutes to limit fundamental state legislative prerogatives, *Gregory v. Ashcroft, supra,* 501 U.S., at 460–464, 111 S.Ct., at 2400–2403, our understanding being that such prerogatives, through which "a State defines itself as a sovereign," are "powers with which Congress does not readily interfere," 501 U.S., at 460, 461, 111 S.Ct., at 2400–2401, 2401. Likewise, when faced with two plausible interpretations of a federal criminal statute, we generally will take the alternative that does not force us to impute an intention to Congress to use its full commerce power to regulate conduct traditionally and ably regulated by the States. See *United States v. Enmons,* 410 U.S. 396, 411–412, 93 S.Ct. 1007, 1015–1016, 35 L.Ed.2d 379 (1973); *United States v. Bass,* 404 U.S. 336, 349–350, 92 S.Ct. 515, 523–524, 30 L.Ed.2d 488 (1971); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059–1060, 28 L.Ed.2d 493 (1971).

These clear statement rules, however, are merely rules of statutory interpretation, to be relied upon only when the **\*611** terms of a statute allow, *United States v. Culbert,* 435 U.S. 371, 379–380, 98 S.Ct. 1112, 1116–1117, 55 L.Ed.2d 349 (1978); see *Gregory v. Ashcroft, supra,* 501 U.S., at 470, 111 S.Ct., at 2406; *United States v. Bass, supra,* 404 U.S., at 346–347, 92 S.Ct., at 521–522, and in cases implicating Congress's historical reluctance to trench on state legislative prerogatives or to enter into spheres already occupied by the States, *Gregory v. Ashcroft, supra,* 501 U.S., at 461, 111 S.Ct., at 2401; *United States v. Bass, supra,* 404 U.S., at 349, 92 S.Ct., at 523; see *Rewis v. United States, supra,* 401 U.S., at 811–812, 91 S.Ct., at 1059–1060. They are rules for determining intent when legislation leaves intent subject to question. But our hesitance to presume that Congress has acted to alter the state-federal status quo (when presented with a plausible alternative) has no relevance whatever to the enquiry whether it has the commerce power to do so or to the standard of judicial review when Congress has definitely meant to exercise that power. Indeed, to allow our hesitance to affect the standard of review would inevitably degenerate into the sort of substantive policy review that the Court found indefensible 60 years ago. The Court does not assert (and could not plausibly maintain) that the commerce power is wholly devoid of congressional authority to speak on any subject of traditional state concern; but if congressional action

is not forbidden absolutely when it touches such a subject, it will stand or fall depending on the Court's view of the strength of the legislation's commercial justification. And here once again history raises its objections that the Court's previous essays in overriding congressional policy choices under the Commerce Clause were ultimately seen to suffer two fatal weaknesses: when dealing with Acts of Congress (as distinct from state legislation subject to review under the theory of dormant commerce power) nothing in the Clause compelled the judicial activism, and nothing about the judiciary as an institution made it a superior source of policy on the subject Congress dealt with. There is no reason to expect the lesson would be different another time.

**\*612** B

There remain questions about legislative findings. The Court of Appeals expressed the view, 2 F.3d 1342, 1363–1368 (CA 5 1993), that the result in this case might well have been different if Congress had made explicit findings that guns in schools have a substantial effect on interstate commerce, and the Court today does not repudiate that position, see *ante,* at 1631–1632. Might a court aided by such findings have subjected this legislation to less exacting scrutiny (or, put another **\*\*1656** way, should a court have deferred to such findings if Congress had made them)?[2] The answer to either question must be no, although as a general matter findings are important and to be hoped for in the difficult cases.

2    Unlike the Court, (perhaps), I would see no reason not to consider Congress's findings, insofar as they might be helpful in reviewing the challenge to this statute, even though adopted in later legislation. See the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103–322, § 320904, 108 Stat. 2125 ("[T]he occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country; ... this decline ... has an adverse impact on interstate commerce and the foreign commerce of the United States; ... Congress has power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection"). The findings, however, go no further than expressing what is obviously implicit in the substantive legislation, at such a conclusory level of generality as to add virtually nothing to the record. The Solicitor General certainly exercised sound judgment in placing no significant reliance on these particular afterthoughts. Tr. of Oral Arg. 24–25.

It is only natural to look for help with a hard job, and reviewing a claim that Congress has exceeded the commerce power is much harder in some cases than in others. A challenge to congressional regulation of interstate garbage hauling would be easy to resolve; review of congressional regulation of gun possession in school yards is more difficult, both because the link to interstate commerce is less obvious and because of our initial ignorance of the relevant facts. In a **\*613** case comparable to this one, we may have to dig hard to make a responsible judgment about what Congress could reasonably find, because the case may be close, and because judges tend not to be familiar with the facts that may or may not make it close. But while the ease of review may vary from case to case, it does not follow that the standard of review should vary, much less that explicit findings of fact would even directly address the standard.

The question for the courts, as all agree, is not whether as a predicate to legislation Congress in fact found that a particular activity substantially affects interstate commerce. The legislation implies such a finding, and there is no reason to entertain claims that Congress acted ultra vires intentionally. Nor is the question whether Congress was correct in so finding. The only question is whether the legislative judgment is within the realm of reason. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S., at 276–277, 101 S.Ct., at 2360–2361; *Katzenbach v. McClung,* 379 U.S., at 303–304, 85 S.Ct., at 383–384; *Railroad Retirement Bd. v. Alton R. Co.,* 295 U.S. 330, 391–392, 55 S.Ct. 758, 780, 79 L.Ed. 1468 (1935) (Hughes, C.J., dissenting); cf. *FCC v. Beach Communications, Inc.,* 508 U.S., at 315, 113 S.Ct., at 2102 (in the equal protection context, "those attacking the rationality of the legislative classification have the burden to negate every conceivable basis which might support it[;] ... it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature") (citations and internal quotation marks omitted); *Ferguson v. Skrupa,* 372 U.S. 726, 731–733, 83 S.Ct. 1028, 1031–1032, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S., at 487, 75 S.Ct., at 464. Congressional findings do not, however, directly address the question of reasonableness; they tell us what Congress actually has found, not what it could rationally find. If, indeed, the Court were to make the existence of explicit congressional findings dispositive in some close or difficult cases something other than rationality review would be afoot. The resulting congressional obligation to justify its policy choices on the merits would imply **\*614** either a judicial authority to review the justification (and,

hence, the wisdom) of those choices, or authority to require Congress to act with some high degree of deliberateness, of which express findings would be evidence. But review for congressional wisdom would just be the old judicial pretension discredited and abandoned in 1937, and review for deliberateness would be as patently unconstitutional as an Act of Congress mandating long opinions from this Court. Such a legislative process requirement would function merely as an excuse for covert review of the merits of legislation under standards never expressed **\*\*1657** and more or less arbitrarily applied. Under such a regime, in any case, the rationality standard of review would be a thing of the past.

On the other hand, to say that courts applying the rationality standard may not defer to findings is not, of course, to say that findings are pointless. They may, in fact, have great value in telling courts what to look for, in establishing at least one frame of reference for review, and in citing to factual authority. The research underlying Justice BREYER's dissent was necessarily a major undertaking; help is welcome, and it not incidentally shrinks the risk that judicial research will miss material scattered across the public domain or buried under pounds of legislative record. Congressional findings on a more particular plane than this record illustrates would accordingly have earned judicial thanks. But thanks do not carry the day as long as rational possibility is the touchstone, and I would not allow for the possibility, as the Court's opinion may, *ante,* at 1632, that the addition of congressional findings could in principle have affected the fate of the statute here.

### III

Because Justice BREYER's opinion demonstrates beyond any doubt that the Act in question passes the rationality review that the Court continues to espouse, today's decision may be seen as only a misstep, its reasoning and its suggestions **\*615** not quite in gear with the prevailing standard, but hardly an epochal case. I would not argue otherwise, but I would raise a caveat. Not every epochal case has come in epochal trappings. *Jones & Laughlin* did not reject the direct-indirect standard in so many words; it just said the relation of the regulated subject matter to commerce was direct enough. 301 U.S., at 41–43, 57 S.Ct., at 626–627. But we know what happened.

I respectfully dissent.

Justice BREYER, with whom Justice STEVENS, Justice SOUTER, and Justice GINSBURG join, dissenting.

The issue in this case is whether the Commerce Clause authorizes Congress to enact a statute that makes it a crime to possess a gun in, or near, a school. 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). In my view, the statute falls well within the scope of the commerce power as this Court has understood that power over the last half century.

I

In reaching this conclusion, I apply three basic principles of Commerce Clause interpretation. First, the power to "regulate Commerce ... among the several States," U.S. Const., Art. I, § 8, cl. 3, encompasses the power to regulate local activities insofar as they significantly affect interstate commerce. See, *e.g., Gibbons v. Ogden,* 9 Wheat. 1, 194–195, 6 L.Ed. 23 (1824) (Marshall, C.J.); *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942). As the majority points out, *ante,* at 1630, the Court, in describing how much of an effect the Clause requires, sometimes has used the word "substantial" and sometimes has not. Compare, *e.g., Wickard, supra,* at 125, 63 S.Ct., at 89 ("substantial economic effect"), with *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) ("affects interstate commerce"); see also *Maryland v. Wirtz,* 392 U.S. 183, 196, n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968) (cumulative effect must not be "trivial"); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937) **\*616** (speaking of "close and substantial *relation* " between activity and commerce, not of "substantial effect") (emphasis added); *Gibbons, supra,* at 194 (words of Commerce Clause do not "comprehend ... commerce, which is completely internal ... and which does not ... affect other States"). And, as the majority also recognizes in quoting Justice Cardozo, the question of degree (how *much* effect) requires an estimate of the "size" of the effect that no verbal formulation can capture with precision. See *ante,* at 1633. I use the word "significant" because the word "substantial" implies a somewhat narrower power than recent precedent suggests. See, *e.g.,* **\*\*1658** *Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1361–1362, 28 L.Ed.2d 686 (1971); *Daniel v. Paul,* 395 U.S. 298, 308, 89 S.Ct. 1697, 1702–1703, 23 L.Ed.2d 318 (1969). But to speak of "substantial effect" rather than "significant effect" would make no difference in this case.

Second, in determining whether a local activity will likely have a significant effect upon interstate commerce, a court must consider, not the effect of an individual act (a single instance of gun possession), but rather the cumulative effect of all similar instances (*i.e.,* the effect of all guns possessed in or near schools). See, *e.g., Wickard, supra,* 317 U.S., at 127–128, 63 S.Ct., at 89–90. As this Court put the matter almost 50 years ago:

"[I]t is enough that the individual activity when multiplied into a general practice ... contains a threat to the interstate economy that requires preventative regulation." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948) (citations omitted).

Third, the Constitution requires us to judge the connection between a regulated activity and interstate commerce, not directly, but at one remove. Courts must give Congress a degree of leeway in determining the existence of a significant factual connection between the regulated activity and interstate commerce—both because the Constitution delegates the commerce power directly to Congress and because the **\*617** determination requires an empirical judgment of a kind that a legislature is more likely than a court to make with accuracy. The traditional words "rational basis" capture this leeway. See *Hodel, supra,* at 276–277, 101 S.Ct., at 2360–2361. Thus, the specific question before us, as the Court recognizes, is not whether the "regulated activity sufficiently affected interstate commerce," but, rather, whether Congress could have had "*a rational basis*" for so concluding. *Ante,* at 1629 (emphasis added).

I recognize that we must judge this matter independently. "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Hodel, supra,* at 311, 101 S.Ct., at 2391 (REHNQUIST, J., concurring in judgment). And, I also recognize that Congress did not write specific "interstate commerce" findings into the law under which Lopez was convicted. Nonetheless, as I have already noted, the matter that we review independently (*i.e.,* whether there is a "rational basis") already has considerable leeway built into it. And, the absence of findings, at most, deprives a statute of the benefit of some *extra* leeway. This extra deference, in principle, might change the result in a close case, though, in practice, it has not made a critical legal difference. See, *e.g., Katzenbach v. McClung,* 379 U.S. 294, 299, 85 S.Ct. 377, 299–300, 13 L.Ed.2d 290 (1964) (noting that "no formal findings were made, which of course are not necessary"); *Perez,*

*supra,* 402 U.S., at 156–157, 91 S.Ct., at 1362–1363; cf. *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 666, 114 S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994) (opinion of KENNEDY, J.) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review"); *Fullilove v. Klutznick,* 448 U.S. 448, 503, 100 S.Ct. 2758, 2787, 65 L.Ed.2d 902 (1980) (Powell, J., concurring) ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate ..."). It would seem particularly unfortunate to make the validity of **\*618** the statute at hand turn on the presence or absence of findings. Because Congress did make findings (though not until after Lopez was prosecuted), doing so would appear to elevate form over substance. See Pub.L. 103–322, §§ 320904(2)(F), (G), 108 Stat. 2125, 18 U.S.C. §§ 922(q)(1)(F), (G).

In addition, despite the Court of Appeals' suggestion to the contrary, see 2 F.3d 1342, 1365 (CA5 1993), there is no special need here for a clear indication of Congress' rationale. The statute does not interfere with the exercise of state or local authority. Cf., *e.g., Dellmuth v. Muth,* 491 U.S. 223, 227–228, 109 S.Ct. 2397, 2399–2400, 105 L.Ed.2d 181 (1989) (requiring clear statement for abrogation of Eleventh Amendment immunity). Moreover, any clear statement rule would **\*\*1659** apply only to determine Congress' intended result, *not* to clarify the source of its authority or measure the level of consideration that went into its decision, and here there is no doubt as to which activities Congress intended to regulate. See *ibid.; id.,* at 233, 109 S.Ct., at 2403 (SCALIA, J., concurring) (to subject States to suits for money damages, Congress need only make that intent clear, and need not refer explicitly to the Eleventh Amendment); *EEOC v. Wyoming,* 460 U.S. 226, 243, n. 18, 103 S.Ct. 1054, n. 18, 75 L.Ed.2d 18 (1983) (Congress need not recite the constitutional provision that authorizes its action).

## II

Applying these principles to the case at hand, we must ask whether Congress could have had a *rational basis* for finding a significant (or substantial) connection between gun-related school violence and interstate commerce. Or, to put the question in the language of the *explicit* finding that Congress made when it amended this law in 1994: Could Congress rationally have found that "violent crime in school zones," through its effect on the "quality of education,"

significantly (or substantially) affects "interstate" or "foreign commerce"? 18 U.S.C. §§ 922(q)(1)(F), (G). As long as one views the commerce connection, not as a "technical legal conception," but as "a practical one," **\*619** *Swift & Co. v. United States,* 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518 (1905) (Holmes, J.), the answer to this question must be yes. Numerous reports and studies—generated both inside and outside government—make clear that Congress could reasonably have found the empirical connection that its law, implicitly or explicitly, asserts. (See Appendix, *infra,* at 1665, for a sample of the documentation, as well as for complete citations to the sources referenced below.)

For one thing, reports, hearings, and other readily available literature make clear that the problem of guns in and around schools is widespread and extremely serious. These materials report, for example, that four percent of American high school students (and six percent of inner-city high school students) carry a gun to school at least occasionally, Centers for Disease Control 2342; Sheley, McGee, & Wright 679; that 12 percent of urban high school students have had guns fired at them, *ibid.;* that 20 percent of those students have been threatened with guns, *ibid.;* and that, in any 6–month period, several hundred thousand schoolchildren are victims of violent crimes in or near their schools, U.S. Dept. of Justice 1 (1989); House Select Committee Hearing 15 (1989). And, they report that this widespread violence in schools throughout the Nation significantly interferes with the quality of education in those schools. See, *e.g.,* House Judiciary Committee Hearing 44 (1990) (linking school violence to dropout rate); U.S. Dept. of Health 118–119 (1978) (school-violence victims suffer academically); compare U.S. Dept. of Justice 1 (1991) (gun violence worst in inner-city schools), with National Center 47 (dropout rates highest in inner cities). Based on reports such as these, Congress obviously could have thought that guns and learning are mutually exclusive. Senate Labor and Human Resources Committee Hearing 39 (1993); U.S. Dept. of Health 118, 123–124 (1978). Congress could therefore have found a substantial educational problem —teachers unable to teach, students unable to learn—and concluded that guns near schools contribute substantially to the size and scope of that problem.

**\*620** Having found that guns in schools significantly undermine the quality of education in our Nation's classrooms, Congress could also have found, given the effect of education upon interstate and foreign commerce, that gun-related violence in and around schools is a commercial, as well as a human, problem. Education, although far more than

AR004864

a matter of economics, has long been inextricably intertwined with the Nation's economy. When this Nation began, most workers received their education in the workplace, typically (like Benjamin Franklin) as apprentices. See generally Seybolt; Rorabaugh; U.S. Dept. of Labor (1950). As late as the 1920's, many workers still received general education directly from their employers—from large corporations, such as General Electric, Ford, and Goodyear, which created schools **1660 within their firms to help both the worker and the firm. See Bolino 15–25. (Throughout most of the 19th century fewer than one percent of all Americans received secondary education through attending a high school. See *id.,* at 11.) As public school enrollment grew in the early 20th century, see Becker 218 (1993), the need for industry to teach basic educational skills diminished. But, the direct economic link between basic education and industrial productivity remained. Scholars estimate that nearly a quarter of America's economic growth in the early years of this century is traceable directly to increased schooling, see Denison 243; that investment in "human capital" (through spending on education) exceeded investment in "physical capital" by a ratio of almost two to one, see Schultz 26 (1961); and that the economic returns to this investment in education exceeded the returns to conventional capital investment, see, *e.g.,* Davis & Morrall 48–49.

In recent years the link between secondary education and business has strengthened, becoming both more direct and more important. Scholars on the subject report that technological changes and innovations in management techniques have altered the nature of the workplace so that more jobs now demand greater educational skills. See, *e.g.,* MIT 32 *621 (only about one-third of hand tool company's 1,000 workers were qualified to work with a new process that requires high-school-level reading and mathematical skills); Cyert & Mowery 68 (gap between wages of high school dropouts and better trained workers increasing); U.S. Dept. of Labor 41 (1981) (job openings for dropouts declining over time). There is evidence that "service, manufacturing or construction jobs are being displaced by technology that requires a better-educated worker or, more likely, are being exported overseas," Gordon, Ponticell, & Morgan 26; that "workers with truly few skills by the year 2000 will find that only one job out of ten will remain," *ibid.;* and that

> "[o]ver the long haul the best way to encourage the growth of high-wage jobs is to upgrade the skills of the work force.... [B]etter-trained workers become more productive workers, enabling a company to become more competitive and expand." Henkoff 60.

Increasing global competition also has made primary and secondary education economically more important. The portion of the American economy attributable to international trade nearly tripled between 1950 and 1980, and more than 70 percent of American-made goods now compete with imports. Marshall 205; Marshall & Tucker 33. Yet, lagging worker productivity has contributed to negative trade balances and to real hourly compensation that has fallen below wages in 10 other industrialized nations. See National Center 57; Handbook of Labor Statistics 561, 576 (1989); Neef & Kask 28, 31. At least some significant part of this serious productivity problem is attributable to students who emerge from classrooms without the reading or mathematical skills necessary to compete with their European or Asian counterparts, see, *e.g.,* MIT 28, and, presumably, to high school dropout rates of 20 to 25 percent (up to 50 percent in inner cities), see, *e.g.,* National Center 47; Chubb & Hanushek 215. Indeed, Congress has said, when writing other statutes, that *622 "functionally or technologically illiterate" Americans in the work force "erod [e]" our economic "standing in the international marketplace," Pub.L. 100–418, § 6002(a)(3), 102 Stat. 1469, and that "[o]ur Nation is ... paying the price of scientific and technological illiteracy, with our productivity declining, our industrial base ailing, and our global competitiveness dwindling," H.R.Rep. No. 98–6, pt. 1, p. 19 (1983).

Finally, there is evidence that, today more than ever, many firms base their location decisions upon the presence, or absence, of a work force with a basic education. See MacCormack, Newman, & Rosenfeld 73; Coffee 296. Scholars on the subject report, for example, that today, "[h]igh speed communication and transportation make it possible to produce most products and services anywhere in the world," National Center 38; that "[m]odern machinery and production methods can therefore be combined with low wage workers to drive costs down," *ibid.;* that managers can perform " 'back office functions anywhere in the world now,' " and say that if they " 'can't get enough skilled **1661 workers here' " they will " 'move the skilled jobs out of the country,' " *id.,* at 41; with the consequence that "rich countries need better education and retraining, to reduce the supply of unskilled workers and to equip them with the skills they require for tomorrow's jobs," Survey of Global Economy 37. In light of this increased importance of education to individual firms, it is no surprise that half of the Nation's manufacturers have become involved with setting standards and shaping curricula for local schools, Maturi 65–68, that 88 percent think this

kind of involvement is important, *id.,* at 68, that more than 20 States have recently passed educational reforms to attract new business, Overman 61–62, and that business magazines have begun to rank cities according to the quality of their schools, see Boyle 24.

The economic links I have just sketched seem fairly obvious. Why then is it not equally obvious, in light of those links, that a widespread, serious, and substantial physical **\*623** threat to teaching and learning *also* substantially threatens the commerce to which that teaching and learning is inextricably tied? That is to say, guns in the hands of six percent of inner-city high school students and gun-related violence throughout a city's schools must threaten the trade and commerce that those schools support. The only question, then, is whether the latter threat is (to use the majority's terminology) "substantial." The evidence of (1) the *extent* of the gun-related violence problem, see *supra,* at 1659, (2) the *extent* of the resulting negative effect on classroom learning, see *ibid.* and (3) the *extent* of the consequent negative commercial effects, see *supra,* at 1659–1661, when taken together, indicate a threat to trade and commerce that is "substantial." At the very least, Congress could rationally have concluded that the links are "substantial."

Specifically, Congress could have found that gun-related violence near the classroom poses a serious economic threat (1) to consequently inadequately educated workers who must endure low paying jobs, see, *e.g.,* National Center 29, and (2) to communities and businesses that might (in today's "information society") otherwise gain, from a well-educated work force, an important commercial advantage, see, *e.g.,* Becker 10 (1992), of a kind that location near a railroad or harbor provided in the past. Congress might also have found these threats to be no different in kind from other threats that this Court has found within the commerce power, such as the threat that loan sharking poses to the "funds" of "numerous localities," *Perez v. United States,* 402 U.S., at 157, 91 S.Ct., at 1362–1363, and that unfair labor practices pose to instrumentalities of commerce, see *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 221–222, 59 S.Ct. 206, 213–214, 83 L.Ed. 126 (1938). As I have pointed out, *supra,* at 1659, Congress has written that "the occurrence of violent crime in school zones" has brought about a "decline in the quality of education" that "has an adverse impact on interstate commerce and the foreign commerce of the United States." 18 U.S.C. §§ 922(q)(1)(F), (G). The violence-related facts, the educational **\*624** facts, and the economic facts, taken together, make this conclusion rational. And,

because under our case law, see *supra,* at 1657–1658; *infra,* at 1663, the sufficiency of the constitutionally necessary Commerce Clause link between a crime of violence and interstate commerce turns simply upon size or degree, those same facts make the statute constitutional.

To hold this statute constitutional is not to "obliterate" the "distinction between what is national and what is local," *ante,* at 1633 (citation omitted; internal quotation marks omitted); nor is it to hold that the Commerce Clause permits the Federal Government to "regulate any activity that it found was related to the economic productivity of individual citizens," to regulate "marriage, divorce, and child custody," or to regulate any and all aspects of education. *Ante,* at 1632. First, this statute is aimed at curbing a particularly acute threat to the educational process—the possession (and use) of life-threatening firearms in, or near, the classroom. The empirical evidence that I have discussed above unmistakably documents the special way in which guns and education are incompatible. See *supra,* at 1659. This Court has previously recognized the singularly disruptive potential **\*\*1662** on interstate commerce that acts of violence may have. See *Perez, supra,* 402 U.S., at 156–157, 91 S.Ct., at 1362–1363. Second, the immediacy of the connection between education and the national economic well-being is documented by scholars and accepted by society at large in a way and to a degree that may not hold true for other social institutions. It must surely be the rare case, then, that a statute strikes at conduct that (when considered in the abstract) seems so removed from commerce, but which (practically speaking) has so significant an impact upon commerce.

In sum, a holding that the particular statute before us falls within the commerce power would not expand the scope of that Clause. Rather, it simply would apply preexisting law to changing economic circumstances. See *Heart of Atlanta* **\*625** *Motel, Inc. v. United States,* 379 U.S. 241, 251, 85 S.Ct. 348, 354, 13 L.Ed.2d 258 (1964). It would recognize that, in today's economic world, gun-related violence near the classroom makes a significant difference to our economic, as well as our social, well-being. In accordance with well-accepted precedent, such a holding would permit Congress "to act in terms of economic ... realities," would interpret the commerce power as "an affirmative power commensurate with the national needs," and would acknowledge that the "commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy." *North American Co. v. SEC,* 327 U.S. 686, 705,

66 S.Ct. 785, 796, 90 L.Ed. 945 (1946) (citing *Swift & Co. v. United States,* 196 U.S., at 398, 25 S.Ct., at 280 (Holmes, J.)).


## III

The majority's holding—that § 922 falls outside the scope of the Commerce Clause—creates three serious legal problems. First, the majority's holding runs contrary to modern Supreme Court cases that have upheld congressional actions despite connections to interstate or foreign commerce that are less significant than the effect of school violence. In *Perez v. United States, supra,* the Court held that the Commerce Clause authorized a federal statute that makes it a crime to engage in loan sharking ("[e]xtortionate credit transactions") at a local level. The Court said that Congress may judge that such transactions, "though purely *intra*state, ... affect *inter*state commerce." 402 U.S., at 154, 91 S.Ct., at 1361 (emphasis added). Presumably, Congress reasoned that threatening or using force, say with a gun on a street corner, to collect a debt occurs sufficiently often so that the activity (by helping organized crime) affects commerce among the States. But, why then cannot Congress also reason that the threat or use of force—the frequent consequence of possessing a gun—in or near a school occurs sufficiently often so that such activity (by inhibiting basic education) affects **\*626** commerce among the States? The negative impact upon the national economy of an inability to teach basic skills seems no smaller (nor less significant) than that of organized crime.

In *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), this Court upheld, as within the commerce power, a statute prohibiting racial discrimination at local restaurants, in part because that discrimination discouraged travel by African Americans and in part because that discrimination affected purchases of food and restaurant supplies from other States. See *id.,* at 300, 85 S.Ct., at 381–382; *Heart of Atlanta Motel, supra,* 379 U.S., at 274, 85 S.Ct., at 366 (Black, J., concurring in *McClung* and in *Heart of Atlanta* ). In *Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), this Court found an effect on commerce caused by an amusement park located several miles down a country road in the middle of Alabama—because some customers (the Court assumed), some food, 15 paddleboats, and a juke box had come from out of state. See *id.,* at 304–305, 308, 89 S.Ct., at 1700–1701, 1702. In both of these cases, the Court understood that the specific instance of discrimination (at a local place of accommodation) was part of a general practice that, considered as a whole, caused not only the most

serious human and social harm, but had nationally significant economic dimensions as well. See **\*\*1663** *McClung, supra,* 379 U.S., at 301, 85 S.Ct., at 382; *Daniel, supra,* 395 U.S., at 307, n. 10, 89 S.Ct., at 1702, n. 10. It is difficult to distinguish the case before us, for the same critical elements are present. Businesses are less likely to locate in communities where violence plagues the classroom. Families will hesitate to move to neighborhoods where students carry guns instead of books. (Congress expressly found in 1994 that "parents may decline to send their children to school" in certain areas "due to concern about violent crime and gun violence." 18 U.S.C. § 922(q)(1)(E).) And (to look at the matter in the most narrowly commercial manner), interstate publishers therefore will sell fewer books and other firms will sell fewer school supplies where the threat of violence disrupts learning. Most importantly, like the local racial discrimination at issue in *McClung* and *Daniel,* the local instances here, taken **\*627** together and considered as a whole, create a problem that causes serious human and social harm, but also has nationally significant economic dimensions.

In *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), this Court sustained the application of the Agricultural Adjustment Act of 1938 to wheat that Filburn grew and consumed on his own local farm because, considered in its totality, (1) homegrown wheat may be "induced by rising prices" to "flow into the market and check price increases," and (2) even if it never actually enters the market, home-grown wheat nonetheless "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market" and, in that sense, "competes with wheat in commerce." *Id.,* at 128, 63 S.Ct., at 91. To find both of these effects on commerce significant in amount, the Court had to give Congress the benefit of the doubt. Why would the Court, to find a significant (or "substantial") effect here, have to give Congress any greater leeway? See also *United States v. Women's Sportswear Mfrs. Assn.,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949) ("If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze"); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S., at 236, 68 S.Ct., at 1006 ("[I]t is enough that the individual activity when multiplied into a general practice ... contains a threat to the interstate economy that requires preventive regulation").

The second legal problem the Court creates comes from its apparent belief that it can reconcile its holding with earlier cases by making a critical distinction between "commercial" and noncommercial "transaction[s]." *Ante,* at 1630–1631.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

U.S. v. Lopez, 514 U.S. 549 (1995)
115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

That is to say, the Court believes the Constitution would distinguish between two local activities, each of which has an identical effect upon interstate commerce, if one, but not the other, is "commercial" in nature. As a general matter, this approach fails to heed this Court's earlier warning not to turn "questions of the power of Congress" upon "formula[s]" that would give

**\*628** "controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce." *Wickard, supra,* 317 U.S., at 120, 63 S.Ct., at 87.

See also *United States v. Darby,* 312 U.S. 100, 116–117, 61 S.Ct. 451, 458–459, 85 L.Ed. 609 (1941) (overturning the Court's distinction between "production" and "commerce" in the child labor case, *Hammer v. Dagenhart,* 247 U.S. 251, 271–272, 38 S.Ct. 529, 531, 62 L.Ed. 1101 (1918)); *Swift & Co. v. United States,* 196 U.S., at 398, 25 S.Ct., at 280 (Holmes, J.) ("[C]ommerce among the States is not a technical legal conception, but a practical one, drawn from the course of business"). Moreover, the majority's test is not consistent with what the Court saw as the point of the cases that the majority now characterizes. Although the majority today attempts to categorize *Perez, McClung,* and *Wickard* as involving intrastate "economic activity," *ante,* at 1630, the Courts that decided each of those cases did *not* focus upon the economic nature of the activity regulated. Rather, they focused upon whether that activity *affected* interstate or foreign commerce. In fact, the *Wickard* Court expressly held that Filburn's consumption of home-grown wheat, "*though it may not be regarded* **\*\*1664** *as commerce,*" could nevertheless be regulated—"*whatever its nature* "—so long as "it exerts a substantial economic effect on interstate commerce." *Wickard, supra,* 317 U.S. at 125, 63 S.Ct., at 89 (emphasis added).

More importantly, if a distinction between commercial and noncommercial activities is to be made, this is not the case in which to make it. The majority clearly cannot intend such a distinction to focus narrowly on an act of gun possession standing by itself, for such a reading could not be reconciled with either the civil rights cases (*McClung* and *Daniel* ) or *Perez*—in each of those cases the specific transaction (the race-based exclusion, the use of force) was not itself "commercial." And, if the majority instead means to distinguish generally among broad categories of activities, differentiating what is educational from what is commercial, then, as a **\*629** practical matter, the line becomes almost

impossible to draw. Schools that teach reading, writing, mathematics, and related basic skills serve *both* social and commercial purposes, and one cannot easily separate the one from the other. American industry itself has been, and is again, involved in teaching. See *supra,* at 1659, 1661. When, and to what extent, does its involvement make education commercial? Does the number of vocational classes that train students directly for jobs make a difference? Does it matter if the school is public or private, nonprofit or profit seeking? Does it matter if a city or State adopts a voucher plan that pays private firms to run a school? Even if one were to ignore these practical questions, why should there be a theoretical distinction between education, when it significantly benefits commerce, and environmental pollution, when it causes economic harm? See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

Regardless, if there is a principled distinction that could work both here and in future cases, Congress (even in the absence of vocational classes, industry involvement, and private management) could rationally conclude that schools fall on the commercial side of the line. In 1990, the year Congress enacted the statute before us, primary and secondary schools spent $230 billion—that is, nearly a quarter of a trillion dollars—which accounts for a significant portion of our $5.5 trillion gross domestic product for that year. See Statistical Abstract 147, 442 (1993). The business of schooling requires expenditure of these funds on student transportation, food and custodial services, books, and teachers' salaries. See U.S. Dept. of Education 4, 7 (1993). These expenditures enable schools to provide a valuable service—namely, to equip students with the skills they need to survive in life and, more specifically, in the workplace. Certainly, Congress has often analyzed school expenditure as if it were a commercial investment, closely analyzing whether schools are efficient, whether they justify the significant resources **\*630** they spend, and whether they can be restructured to achieve greater returns. See, *e.g.,* S.Rep. No. 100–222, p. 2 (1987) (federal school assistance is "a prudent investment"); Senate Appropriations Committee Hearing (1994) (private sector management of public schools); cf. Chubb & Moe 185–229 (school choice); Hanushek 85–122 (performance based incentives for educators); Gibbs (decision in Hartford, Conn., to contract out public school system). Why could Congress, for Commerce Clause purposes, not consider schools as roughly analogous to commercial investments from which the Nation derives the benefit of an educated work force?

The third legal problem created by the Court's holding is that it threatens legal uncertainty in an area of law that, until this case, seemed reasonably well settled. Congress has enacted many statutes (more than 100 sections of the United States Code), including criminal statutes (at least 25 sections), that use the words "affecting commerce" to define their scope, see, *e.g.,* 18 U.S.C. § 844(i) (destruction of buildings used in activity affecting interstate commerce), and other statutes that contain no jurisdictional language at all, see, *e.g.,* 18 U.S.C. § 922(*o*)(1) (possession of machineguns). Do these, or similar, statutes regulate noncommercial activities? If so, would that alter the meaning of "affecting commerce" in a jurisdictional element? Cf. *United States v. Staszcuk,* 517 F.2d 53, 57–58 (CA7 1975) (en **\*\*1665** banc) (Stevens, J.) (evaluation of Congress' intent "requires more than a consideration of the consequences of the particular transaction"). More importantly, in the absence of a jurisdictional element, are the courts nevertheless to take *Wickard,* 317 U.S., at 127–128, 63 S.Ct., at 90–91 (and later similar cases) as inapplicable, and to judge the effect of a single noncommercial activity on interstate commerce without considering similar instances of the forbidden conduct? However these questions are eventually resolved, the legal uncertainty now created will restrict Congress' ability to enact criminal laws aimed at criminal behavior that, considered problem by problem rather **\*631** than instance by instance, seriously threatens the economic, as well as social, well-being of Americans.

## IV

In sum, to find this legislation within the scope of the Commerce Clause would permit "Congress ... to act in terms of economic ... realities." *North American Co. v. SEC,* 327 U.S., at 705, 66 S.Ct., at 796 (citing *Swift & Co. v. United States,* 196 U.S., at 398, 25 S.Ct., at 280 (Holmes, J.)). It would interpret the Clause as this Court has traditionally interpreted it, with the exception of one wrong turn subsequently corrected. See *Gibbons v. Ogden,* 9 Wheat., at 195 (holding that the commerce power extends "to all the external concerns of the nation, and to those internal concerns which affect the States generally"); *United States v. Darby,* 312 U.S., at 116–117, 61 S.Ct., at 458 ("The conclusion is inescapable that *Hammer v. Dagenhart* [the child labor case] was a departure from the principles which have prevailed in the interpretation of the Commerce Clause both before and since the decision.... It should be and now is overruled"). Upholding this legislation would do no more than simply recognize that Congress had a "rational basis" for finding a

significant connection between guns in or near schools and (through their effect on education) the interstate and foreign commerce they threaten. For these reasons, I would reverse the judgment of the Court of Appeals. Respectfully, I dissent.

## APPENDIX TO OPINION OF BREYER, J.

### *Congressional Materials*

#### (in reverse chronological order)

Private Sector Management of Public Schools, Hearing before the Subcommittee on Labor, Health and Human Services, and Education and Related Agencies of the Senate Committee on Appropriations, 103d Cong., 2d Sess. (1994) (Senate Appropriations Committee Hearing (1994)).

**\*632** Children and Gun Violence, Hearings before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (Senate Judiciary Committee Hearing (1993)).

Keeping Every Child Safe: Curbing the Epidemic of Violence, Joint Hearing before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources and the House Select Committee on Children, Youth, and Families, 103d Cong., 1st Sess. (1993).

Recess from Violence: Making our Schools Safe, Hearing before the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 103d Cong., 1st Sess. (1993) (Senate Labor and Human Resources Committee Hearing (1993)).

Preparing for the Economy of the 21st Century, Hearings before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 102d Cong., 2d Sess. (1992).

Children Carrying Weapons: Why the Recent Increase, Hearing before the Senate Committee on the Judiciary, 102d Cong., 2d Sess. (1992).

Youth Violence Prevention, Hearing before the Senate Committee on Governmental Affairs, 102d Cong., 2d Sess. (1992).

**U.S. v. Lopez, 514 U.S. 549 (1995)**

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

School Dropout Prevention and Basic Skills Improvement Act of 1990, Pub.L. 101–600, § 2(a)(2), 104 Stat. 3042.

Excellence in Mathematics, Science and Engineering Education Act of 1990, 104 **\*\*1666** Stat. 2883, 20 U.S.C. § 5301(a)(5) (1988 ed., Supp. V).

Oversight Hearing on Education Reform and American Business and the Implementation of the Hawkins–Stafford Amendments of 1988, Hearing before the Subcommittee on Elementary, Secondary, and Vocational Training of the **\*633** House Committee on Education and Labor, 101st Cong., 2d Sess. (1990).

U.S. Power in a Changing World, Report Prepared for the Subcommittee on International Economic Policy and Trade of the House Committee on Foreign Affairs, 101st Cong., 2d Sess., 43–66 (1990).

Gun Free School Zones Act of 1990, Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 101st Cong., 2d Sess. (1990) (House Judiciary Committee Hearing (1990)).

Restoring American Productivity: The Role of Education and Human Resources, Hearing before the Senate Committee on Labor and Human Resources, 101st Cong., 1st Sess. (1989).

Children and Guns, Hearing before the House Select Committee on Children, Youth, and Families, 101st Cong., 1st Sess. (1989) (House Select Committee Hearing (1989)).

Education and Training for a Competitive America Act of 1988, Pub.L. 100–418, Title VI, 102 Stat. 1469.

S.Rep. No. 100–222 (1987).

Education and Training for American Competitiveness, Hearings before the House Committee on Education and Labor, 100th Cong., 1st Sess. (1987).

Competitiveness and the Quality of the American Work Force, Hearings before the Subcommittee on Education and Health of the Joint Economic Committee, 100th Cong., 1st Sess., pts. 1 and 2 (1987).

Oversight Hearing on Illiteracy, Joint Hearing before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on

Education and Labor and the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 99th Cong., 2d Sess. (1986).

**\*634** Oversight onIlliteracy in the United States, Hearings before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on Education and Labor, 99th Cong., 2d Sess. (1986).

Crime and Violence in the Schools, Hearing before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 98th Cong., 2d Sess. (1984).

H.R.Rep. No. 98–6, pts. 1 and 2 (1983).

S.Rep. No. 98–151 (1983).

Education for Economic Security Act, Hearings before the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 98th Cong., 1st Sess. (1983).

Pub.L. 93–380, § 825, 88 Stat. 602 (1974).

I. Clarke, Art and Industry: Instruction in Drawing Applied to the Industrial and Fine Arts, S.Exec.Doc. No. 209, 46th Cong., 2d Sess., pt. 2 (1891).

*Other Federal Government Materials*

(in reverse chronological order)

U.S. Dept. of Education, Office of Educational Research and Improvement, First Findings: The Educational Quality of the Workforce Employer Survey (Feb.1995).

Economic Report of the President 108 (Feb.1994).

U.S. Dept. of Commerce, Statistical Abstract of the United States (1993) (Statistical Abstract (1993)).

U.S. Dept. of Education, Office of Educational Research and Improvement, Public School Education Financing for School Year 1989–90 (June 1993) (U.S. Dept. of Education (1993)).

Economic Report of the President 101 (Feb.1992).

AR004870

115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

U.S. Dept. of Labor, Secretary's Commission on Achieving Necessary Skills, Skills and Tasks For Jobs: A SCANS Report for America 2000 (1992).

**\*635** U.S. Dept. of Labor, Employment and Training Administration, Beyond the School Doors: The Literacy Needs of Job **\*\*1667** Seekers Served by the U.S. Department of Labor (Sept.1992).

U.S. Dept. of Justice, Bureau of Justice Statistics, School Crime: A National Crime Victimization Survey Report (Sept.1991) (U.S. Dept. of Justice (1991)).

U.S. Dept. of Commerce, Bureau of Census, 1990 Census of Population: Education in the United States 474 (Jan.1994).

U.S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Weapons in Schools, OJJDP Bulletin 1 (Oct.1989) (U.S. Dept. of Justice (1989)).

U.S. Dept. of Labor, Bureau of Labor Statistics, Handbook of Labor Statistics 281, 561, 576 (Aug.1989) (Handbook of Labor Statistics (1989)).

Bishop, Incentives for Learning: Why American High School Students Compare So Poorly to their Counterparts Overseas, in 1 U.S. Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 1 (Sept. 1989).

Rumberger & Levin, Schooling for the Modern Workplace, in 1 U.S. Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 85 (Sept.1989).

U.S. Dept. of Education and U.S. Department of Labor, The Bottom Line: Basic Skills in the Workplace 12 (1988).

U.S. Dept. of Labor, Employment and Training Administration, Estimating Educational Attainment of Future Employment Demand for States (Oct.1981) (U.S. Dept. of Labor (1981)).

U.S. Dept. of Health, Education, and Welfare, National Institute of Education, Violent Schools—Safe Schools: The Safe School Study Report to Congress (1978) (U.S. Dept. of Health (1978)).

**\*636** U.S. Dept. of Labor, Bureau of Apprenticeship, Apprenticeship Past and Present (1950) (U.S. Dept. of Labor (1950)).

*Other Readily Available Materials*

(in alphabetical order)

Akin & Garfinkel, School Expenditures and the Economic Returns to Schooling, 12 J.Human Resources 462 (1977).

American Council on Education, Business–Higher Education Forum, America's Competitive Challenge: A Report to the President of the United States (Apr.1983).

Applebome, Employers Wary of School System, N.Y. Times, Feb. 20, 1995, p. A1, col. 1.

Are Real Estate Firms Ready to Ride on the Infobahn?: Information Highway of Technology, 36 National Real Estate Investor, Oct. 1994, p. 6.

Aring, What the 'V' Word is Costing America's Economy: Vocational Education, 74 Phi Delta Kappan 396 (1993).

G. Atkinson, The Economics of Education (1983).

Becker, The Adam Smith Address: Education, Labor Force Quality, and the Economy, Business Economics, Jan. 1992, p. 7 (Becker (1992)).

G. Becker, Human Capital (3d ed. 1993) (Becker (1993)).

I. Berg, Education and Jobs: The Great Training Robbery (1970).

Berryman, The Economy, Literacy Requirements, and At–Risk Adults, in Literacy and the Marketplace: Improving the Literacy of Low–Income Single Mothers 22 (June 1989).

Bishop, Is the Test Score Decline Responsible for the Productivity Growth Decline?, 79 Am.Econ.Rev. 178 (Mar.1989).

Bishop, High School Performance and Employee Recruitment, 13 J.Labor Research 41 (1992).

Blackburn, What Can Explain the Increase in Earnings Inequality Among Males?, 29 Industrial Relations 441 (1990).

**\*637** Boissiere, Knight, & Sabot, Earnings, Schooling, Ability and Cognitive Skills, 75 Am.Econ.Rev. 1016 (1985).

A. Bolino, A Century of Human Capital by Education and Training (1989) (Bolino).

Boyle, Expansion Management's Education Quotient, Economic Development Rev., Winter 1992, pp. 23–25 (Boyle).

Brandel, Wake Up Get Smart, New England Business, May 1991, p. 46.

**\*\*1668** Callahan & Rivara, Urban High School Youth and Handguns: A School–Based Survey, 267 JAMA 3038 (1992).

Card & Krueger, Does School Quality Matter? Returns to Education and the Characteristics of Public Schools in the United States, 100 J.Pol.Econ. 1 (1992).

A. Carnevale, America and the New Economy: How New Competitive Standards are Radically Changing American Workplaces (1991).

A. Carnevale and J. Porro, Quality Education: School Reform for the New American Economy 31–32 (1994).

Center to Prevent Handgun Violence, Caught in the Crossfire: A Report on Gun Violence in our Nation's Schools (Sept.1990).

Centers For Disease Control, Leads from the Morbidity and Mortality Weekly Report, 266 JAMA 2342 (1991) (Centers for Disease Control).

Chubb & Hanushek, Reforming Educational Reform, in Setting National Priorities 213 (H. Aaron ed. 1990) (Chubb & Hanushek).

J. Chubb & T. Moe, Politics, Markets, and America's Schools (1990) (Chubb & Moe).

Coffee, Survey: Worker Skills, Training More Important in Site Selection, Site Selection, Apr. 1993, p. 296 (Coffee).

E. Cohn, The Economics of Education (rev. ed. 1979).

**\*638** Council on Competitiveness, Competitiveness Index 5 (July 1994).

Council on Competitiveness, Elevating the Skills of the American Workforce (May 1993).

Council on Competitiveness, Governing America: A Competitiveness Policy Agenda for The New Administration 33–39 (1989).

R. Cyert & D. Mowery, Technology and Employment: Innovation and Growth in the U.S. Economy (1987) (Cyert & Mowery).

J. Cynoweth, Enhancing Literacy for Jobs and Productivity: Council of State Policy and Planning Agencies Report (1994).

J. Davis & J. Morrall, Evaluating Educational Investment (1974) (Davis & Morrall).

Denison, Education and Growth, in Economics and Education 237 (D. Rogers & H. Ruchlin eds. 1971) (Denison).

M. Dertouzos, R. Lester, & R. Solow, MIT Commission on Industrial Productivity, Made In America: Regaining the Productive Edge (1989).

A. DeYoung, Economics and American Education: A Historical and Critical Overview of the Impact of Economic Theories on Schooling in the United States (1989).

Downs, America's Educational Failures Will Hurt Real Estate, National Real Estate Investor, Aug. 1988, p. 34.

Doyle, The Role of Private Sector Management in Public Education, 76 Phi Delta Kappan 128 (1994).

Education and Economic Development (C. Anderson & M. Bowman eds. 1965).

Education Commission of the States, Task Force on Education for Economic Growth, Action for Excellence (June 1983).

Educational Testing Service, Developing the Skills and Knowledge of the Workforce (1993).

**\*639** SFinding What Really Works in Education, Chief Executive, May 1994, p. 48.

Ganderton & Griffin, Impact of Child Quality on Earnings: The Productivity-of-Schooling Hypothesis, 11 Contemporary Policy Issues 39 (July 1993).

Garver, "Success Story! ": The Evolution of Economic Development in Broward County, Florida, 11 Economic Development Review 85 (Summer 1993).

Gibbs, Schools for Profit, Time, Oct. 17, 1994, p. 48 (Gibbs).

Gintis, Education, Technology, and the Characteristics of Worker Productivity, 61 Am.Econ.Rev. 266 (1971).

Glazer, A Human Capital Policy for the Cities, Public Interest, Summer 1993, p. 27.

Glazer, Violence in Schools: Can Anything be Done to Curb the Growing Violence?, The CQ Researcher, Sept. 11, 1992, pp. 785–808.

**\*\*1669** E. Gordon, J. Ponticell, & R. Morgan, Closing the Literacy Gap in American Business 23 (1991) (Gordon, Ponticell, & Morgan).

E. Hanushek, Making Schools Work: Improving Performance and Controlling Costs (1994) (Hanushek).

Henkoff, Where Will the Jobs Come From?, Fortune, Oct. 19, 1992, p. 58 (Henkoff).

Herbert, Reading, Writing, Reloading, N.Y. Times, Dec. 14, 1994, p. A23, col. 1.

Industry's New Schoolhouse, N.Y. Times, Jan. 9, 1994, section 4A, p. 22, col. 3, Education Life Supp.

Introducing the EQ (Education Quotient), Expansion Management, Sept./Oct. 1991, pp. 18–24.

Investment in Education: The Equity–Efficiency Quandary (T. Schultz ed. 1972).

**\*640** Itzkoff, America's Unspoken Economic Dilemma: Falling Intelligence Levels, 18 J.Social, Pol. & Econ. Studies 311 (1993).

Johnson, The Private Sector Should Help U.S. Schools, Financier, Sept. 1991, p. 34.

Johnson & Stafford, Social Returns to Quantity and Quality of Schooling, 8 J.Human Resources 139 (1973).

W. Johnston & A. Packer, Workforce 2000: Work and Workers for the Twenty-first Century (1987).

Jorgenson, The Contribution of Education to U.S. Economic Growth, 1948–73, in Education and Economic Productivity 95 (E. Dean ed. 1984).

Kirkland, Are Service Jobs Good Jobs?, Fortune, June 10, 1985, p. 38.

J. Kozol, Illiterate America 13 (1985).

J. Kozol, Where Stands the Republic? Illiteracy: A Warning and a Challenge to the Nation's Press 9 (1986).

M. Levin & A. Shank, Educational Investment in an Urban Society: Costs, Benefits, and Public Policy (1970).

Link & Ratledge, Social Returns to Quantity and Quality of Education: A Further Statement, 10 J.Human Resources 78 (1975).

Lyne, The Skills Gap: U.S. Work–Force Woes Complicate Business–Location Equation, Site Selection, Aug. 1992, p. 642.

MacCormack, Newman, & Rosenfield, The New Dynamics of Global Manufacturing Site Location, 35 Sloan Management Review, No. 4, p. 69 (1994) (MacCormack, Newman, & Rosenfield).

F. Machlup, Education and Economic Growth (1970).

Markey, The Labor Market Problems of Today's High School Dropouts, Monthly Labor Review, June 1988, p. 36.

**\*641** Marshall, The Implications of Internationalization for Labor Market Institutions and Industrial Relations Systems, in Rethinking Employment Policy 205 (D. Bawden & F. Skidmore eds. 1989) (Marshall).

R. Marshall & M. Tucker, Thinking for a Living: Work, Skills, and the Future of the American Economy 33 (1992) (Marshall & Tucker).

Maturi, The Workforce Lure: Education/Training Carries More Weight in Siting Decisions, Industry Week, May 16, 1994, pp. 65–68 (Maturi).

M. Maurice, F. Sellier, & J. Silvestre, The Social Foundations of Industrial Power: A Comparison of France and Germany (1986).

Mikulecky, Job Literacy: The Relationship Between School Preparation and Workplace Actuality, 17 Reading Research Quarterly 400 (1982).

Mikulecky & Ehlinger, The Influence of Metacognitive Aspects of Literacy on Job Performance of Electronics Technicians, 18 J.Reading Behavior 41 (1986).

MIT Commission on Industrial Productivity, Education and Training in the United States: Developing the Human Resources We Need for Technological Advance and Competitiveness, in 2 Working Papers of the MIT Commission on Industrial Productivity (1989) (MIT).

Mitchell, The Impact of International Trade on U.S. Employment, in American Labor in a Changing World Economy 5 (W. Morehouse ed. 1978).

**\*\*1670** Morgan & Sirageldin, A Note on the Quality Dimension in Education, 76 J.Pol.Econ. 1069 (1968).

National Academy of Education, Economic Dimensions of Education (1979).

National Center on Education and the Economy, America's Choice: High Skills or Low Wages! (1990) (National Center).

**\*642** National Commission on Excellence in Education, A Nation at Risk 8–9 (Apr.1983).

National Commission on Jobs and Small Business, Making America Work Again: Jobs, Small Business, and the International Challenge (1987).

National Governor's Association, Making America Work 35–36, 77–96 (1987).

National Institute of Justice, Research in Brief, J. Toby, Violence in Schools 3 (Dec.1983).

National School Safety Center, Weapons in Schools (May 1989).

Neef & Kask, Manufacturing Productivity and Labor Costs in 14 Economies, Monthly Labor Review, Dec. 1991, p. 24 (Neef & Kask).

Neff, Recharging U.S. Competitiveness: Perhaps We Should Use Germany's Education System as a Benchmark, Industry Week, Jan. 20, 1992, p. 21.

O'Connor, Education's Significance as Quality–of–Life Location Factor Parallels Nationwide Reformist Movement, Site Selection Handbook, Aug. 1988, p. 846.

M. O'Donoghue, Economic Dimensions in Education (1971).

Organisation for Economic Co-operation and Development, Education and the Economy in a Changing Society (1989).

Overman, Skilled States Lure New Business, HRMagazine, Jan. 1994, pp. 61–62 (Overman).

Packer, Taking Action on the SCANS Report, Educational Leadership, Mar. 1992, p. 27.

R. Perlman, The Economics of Education: Conceptual Problems and Policy Issues (1973).

R. Price, Fighting Violence with 'All the Mushy Stuff,' USA Today, May 9, 1994, p. 9A.

D. Prothrow–Stith & M. Weissman, Deadly Consequences (1991).

**\*643** G. Psacharopoulos, Returns to Education: An International Comparison (1973).

M. Rasell & E. Appelbaum, Investment in Learning: An Assessment of the Economic Return (1992).

Ray & Mickelson, Corporate Leaders, Resistant Youth, and School Reform in Sunbelt City: The Political Economy of Education, 37 Social Problems 178 (1990).

R. Reich, The Work of Nations (1991).

D. Riddle, Service–Led Growth: The Role of the Service Sector in World Development (1986).

W. Rorabaugh, The Craft Apprentice: From Franklin to the Machine Age in America (1986) (Rorabaugh).

Rumberger & Daymont, The Economic Value of Academic and Vocational Training Acquired in High School, in Youth and the Labor Market 157 (M. Borus ed. 1984).

Ruttenberg, The Limited Promise of Public Health Methodologies to Prevent Youth Violence, 103 Yale L.J. 1885 (1994).

Ryscavage & Henle, Earnings Inequality Accelerates in the 1980's, Monthly Labor Review, Dec. 1990, p. 3.

T. Schultz, Education and Productivity (report prepared for the National Commission on Productivity, 1971).

Schultz, Investment in Human Capital, American Economic Review, Mar. 1961, p. 3, reprinted in 1 Economics of Education 13 (M. Blaug ed. 1968) (Schultz 1961)).

S. Seninger, Labor Force Policies for Regional Economic Development: The Role of Employment and Training Programs (1989).

R. Seybolt, Apprenticeship & Apprenticeship Education in Colonial New England & New York (1917) (Seybolt).

Sheley, McGee, & Wright, Gun–Related Violence in and Around Inner–City Schools, 146 Am.J.Diseases in Children 677 (1992) (Sheley, McGee, & Wright).

**1671  *644 Stone & Boundy, School Violence: The Need for a Meaningful Response, 28 Clearinghouse Review 453 (1994).

Strane, Locating in Rural America Could be a Competitive Advantage, 12 Telemarketing, Oct. 1993, p. 92.

R. Sturm, How Do Education and Training Affect a Country's Economic Performance? A Literature Survey (1993).

A Survey of The Global Economy, The Economist, Oct. 1, 1994, p. 37 (Survey of Global Economy).

Swaim & Podgursky, Do More–Educated Workers Fare Better Following Job Displacement?, Monthly Labor Review, Aug. 1989, p. 43.

Tremblay, The Impact of School and College Expenditures on the Wages of Southern and Non–Southern Workers, 7 J.Labor Research 201 (1986).

J. Vaizey, The Economics of Education (1973).

J. Vaizey, The Political Economy of Human Capital (1973).

Vallens, Global Economy May Dictate More Spending for Training, Modern Plastics, Nov. 1993, p. 19.

Wachtel, The Effect on Earnings of School and College Investment Expenditures, 58 Review of Economics & Statistics 326, 330 (1976).

Weiner & Siler, Trained to Order, Forbes, June 26, 1989, pp. 73–78.

L. Wheat, Urban Growth in the Nonmetropolitan South 65 (1976).

Wirth, Education and Work: The Choices We Face, Phi Delta Kappan, Jan. 1993, p. 361.

A. Wirth, Education and Work for the Year 2000 (1992).

L. Wise, Labor Market Policies and Employment Patterns in the United States 50 (1989).

**All Citations**

514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626, 63 USLW 4343, 99 Ed. Law Rep. 24

End of Document                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

18 F.3d 1560
United States Court of Appeals,
Federal Circuit.

FLORIDA ROCK INDUSTRIES,

INC., Plaintiff–Appellee,

v.

The UNITED STATES, Defendant–Appellant.

No. 91–5156.
|
March 10, 1994.
|
Rehearing Denied; Suggestion for
Rehearing In Banc Declined June 21, 1994.[*]

[*]    Nies, Circuit Judge, would rehear the appeal in banc.

## Synopsis

Property owner brought action under Tucker Act, claiming that Army Corps of Engineers' denial of Clean Water Act permit for limestone mining under wetlands amounted to compensable taking. The Claims Court, 8 Cl.Ct. 160, entered judgment in favor of owner, and government appealed. The Court of Appeals, 791 F.2d 893, affirmed in part, vacated in part, and remanded. On remand, the Claims Court, 21 Cl.Ct. 161, again entered judgment in favor of owner, and further awarded owner litigation costs and attorney fees, 23 Cl.Ct. 653. Government appealed. The Court of Appeals, Plager, Circuit Judge, held that: (1) for purposes of determining fair market value, prior decision did not require detailed inquiry into motivation and sophistication of buyers of comparables; (2) evidence did not support finding that all economic use or value of property was taken by regulatory decision; and (3) to determine whether compensable regulatory taking had occurred, Court of Federal Claims would have to undertake balancing of competing interests.

Vacated and remanded.

Nies, Chief Judge, dissented and filed opinion.

## Attorneys and Law Firms

**\*1561** John A. DeVault, III, Bedell, Dittmar, DeVault & Pillans, P.A., Jacksonville, FL, argued for plaintiff-appellee. With him on the brief was C. Warren Tripp, Jr., of counsel.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Barry M. Hartman, Acting Asst. Atty. Gen., Environment & Natural Resources Div., John A. Bryson and Fred R. Disheroon, Attys., Washington, DC. Also on the brief were Roger B. Clegg, Acting Asst. Atty. Gen., Environment & Natural Resources Div., Washington, DC.

Timothy C. Searchinger, Environmental Defense Fund, of New York City, was on the brief for amicus curiae, The Environmental Defense Fund, Inc., The Nat. Wildlife Federation, Inc.

James S. Burling, Ronald A. Zumbrun and Robin L. Rivett, Pacific Legal Foundation, Sacramento, CA, were on the brief for amicus curiae, Pacific Legal Foundation.

Mary V. Dicrescenzo, Nat. Ass'n of Home Builders, Washington, DC, was on the brief for amicus curiae, The Nat. Ass'n of Home Builders, Nat. Ass'n of Realtors, Intern. Council of Shopping Centers, Nat. Ass'n of Indust. and Office Parks, Nat. Realty Committee, Nat. Multi Housing Council and Florida Home Builders Ass'n. With her on the brief was William H. Ethier, Cohn & Birnbaum, Hartford, CT.

George W. Miller, Walter A. Smith, Jr. and Jonathan L. Abram, Washington, DC, were on the brief for amicus curiae, Whitney Benefits, Inc., Peter Kiewit Sons Co.

Before NIES, Chief Judge, NEWMAN and PLAGER, Circuit Judges.

## Opinion

**\*1562** PLAGER, Circuit Judge.

This is a regulatory taking case. It arose when the plaintiff Florida Rock Industries Inc. (Florida Rock) sought a permit under § 404 of the Clean Water Act[1] from the Army Corps of Engineers (Corps) to mine the limestone which lay beneath a tract of wetlands. The Corps denied the permit on October 5, 1980. On May 25, 1982, Florida Rock filed suit in the United States Court of Federal Claims,[2] seeking monetary compensation from the defendant United States (Government); Florida Rock alleged that the Corps'

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-34   Filed 11/30/22   PageID.5345   Page 68 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

permit denial constituted an uncompensated taking of private property for public use in violation of the Fifth Amendment.[3] The Court of Federal Claims agreed, *Florida Rock Indus., Inc. v. United States,* 8 Cl.Ct. 160 (1985) (*Florida Rock I* ), and awarded Florida Rock $1,029,000 plus attorney fees and simple interest. On appeal, this court vacated the judgment that a taking had occurred and remanded for further consideration. *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (*Florida Rock II* ). On remand, the Court of Federal Claims found that the permit denial deprived Florida Rock of all value in its land, and so again concluded that there had been a taking and reinstated the $1,029,000 damages award, this time with compound interest. *Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161 (1990) (*Florida Rock III* ). The Government appeals both the damages award and the choice of compound rather than simple interest. We again find it necessary to vacate the judgment that there has been a taking, and remand for further consideration consistent with this opinion.

[1]     Pub.L. No. 92–500 § 2, 86 Stat. 884 (Oct. 18, 1972), amending the Federal Water Pollution Control Act (codified as amended at 33 U.S.C. § 1344 (1988)).

[2]     The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902, 106 Stat. 4506 (1992), changed the name of the United States Claims Court to the United States Court of Federal Claims.

[3]     U.S. CONST. amend. V, cl. 4.

## BACKGROUND

The detailed background of the case is described in the several opinions referred to above as *Florida Rock I–III.* We provide here only a brief overview before proceeding to the heart of the matter: whether the Corps' denial of the § 404 permit effected a regulatory taking, thus requiring the Government to pay just compensation. The answer to that question depends on the impact the regulatory imposition had on the economic use, and hence value, of the property.

In 1972, shortly before the enactment of the Clean Water Act, Florida Rock purchased a 1,560 acre wetlands parcel in Dade County, Florida, to the west of suburban Miami. The purchase price was $2,964,000 (an average of $1,900 per acre).[4]  Florida Rock obtained the parcel in order to

extract the underlying limestone—a process which destroys the surface wetlands.

[4]     The average per acre prices, calculated on the overall value of the 1,560 acre parcel, are provided here only to permit rough comparison with other figures in the record for the 98 acre parcel at issue. The per acre value of the 98 acre parcel may differ significantly from the per acre value of the 1,560 acre tract; testimony in the record indicates that the market value of the land is highly dependent on the size of the parcel offered (the larger the parcel, the lower the per acre price), and on the location of the parcel relative to the existing roads.

During the 1970s, however, the ecological importance of wetlands was increasingly appreciated. The Corps in 1977 enacted regulations requiring owners of wetlands parcels to obtain permits under § 404 of the Clean Water Act before engaging in dredging or filling activities. *See generally United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 123–24, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985). Not long after, Florida Rock began mining operations on the parcel, without having applied for a § 404 permit. The Corps issued a cease and desist order on September 7, 1978. Florida Rock stopped mining, restored the area as best it could, and began negotiating with the Corps for the permit.

Initially, Florida Rock sought a permit for the entire 1,560 acres. The Corps responded **\*1563** that permits would be issued only for parcels of a size to suffice for three years of mining; in Florida Rock's case, 98 acres would serve its anticipated needs for three years. Florida Rock acquiesced in the Corps' demand and applied for a permit covering only the 98 acre parcel at issue here. After considering the revised application, the Corps concluded that the proposed mining would cause irremediable loss of an ecologically valuable wetland parcel and would create undesirable water turbidity. The permit application was denied on October 2, 1980.

Florida Rock, conceding the validity of the Corps' actions,[5] filed suit in the United States Court of Federal Claims, alleging that the permit denial was an uncompensated regulatory taking of its land. In *Florida Rock I,* the Court of Federal Claims found that the value of the parcel before the taking was $10,500 per acre and that the value after the taking was negligible because rock mining—in the view of the court, the *only* viable economic use—had been foreclosed. *Florida Rock I,* 8 Cl.Ct. at 164 (citing *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981)). The Court of Federal

Claims concluded that the permit denial was a regulatory taking, for which the landowner must be compensated. *Florida Rock I,* 8 Cl.Ct. at 165.

5    Florida Rock chose not to avail itself of the mechanism provided by the Administrative Procedure Act, 5 U.S.C. § 706 (1988), for challenging in District Court the validity of the Corps' refusal to entertain an application for the entire 1,560 acre parcel and subsequent denial of the permit application for the 98 acre parcel.

On appeal to this court, that judgment was vacated in *Florida Rock II.* The Federal Circuit held that the Court of Federal Claims in determining the after-taking value of the affected property had erred in focusing on *immediate* use—the proper focus should instead have been on a determination of "fair market value." *Id.,* 791 F.2d at 903. The case was remanded to the Court of Federal Claims for further proceedings.

On remand, the Court of Federal Claims entertained evidence seeking to establish the fair market value of the property subsequent to the permit denial. The Government presented two assessors, Mr. Slack and Mr. Cantwell, who had investigated contemporaneous land sales in the area. Using the standard comparable sales valuation method, one assessor concluded that the property had a fair market value of $4,000 per acre, while the other found a value of $4,615 per acre. In addition, Florida Rock had received actual purchase offers in the range of $4,000 per acre. The President of Florida Rock Industries, Mr. Edward Baker, testified that he believed the property to be worth $10,000 per acre, even *after* the Corps' permit denial (thus presumably explaining why all such purchase offers were declined).

Finally, the Government presented a state court opinion which had affirmed the state's tax assessment of $4,089,950 for the 1,560 acre parcel, based on comparable sales of nearby parcels during the 1979–1982 time period. (This assessment figure for the larger parcel reflects an average value of $2,621.76 per acre; *see supra* note 3.) *Florida Rock Indus., Inc., v. Bystrom,* 485 So.2d 442, 444–45 (Fla.App.1986), *review denied,* 492 So.2d 1332 (1986) (*Bystrom* ). That assessment was based on comparable sales which presumably reflected the market's evaluation of present and future land use restrictions. *Id.* at 444 and 447.[6]

6    The admissibility and significance of this state court decision was a matter of heated dispute between the parties, both at trial and on appeal. The Government argued that, under the doctrine of nonmutual defensive

collateral estoppel (citing *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984)), *Bystrom* was conclusive on the question of the fair market value of the property, and, given the value of the property thus established, there could be no taking. Florida Rock argued that the Court of Federal Claims was not bound by holdings in a state tax assessment case, and that the general rule that property tax assessments are not admissible as evidence of fair market value in a condemnation proceeding (citing *Miller v. United States,* 223 Ct.Cl. 352, 620 F.2d 812 (Ct.Cl.1980)) was fully applicable. The trial judge agreed with Florida Rock, and concluded that, since valuation for purposes of state taxation and valuation for purposes of determining a taking under the Fifth Amendment are not identical issues, the court was not bound by the *Bystrom* court's findings on that issue.

We find no error in the trial judge's conclusion that the value placed on the property in the tax case should not be determinative of the fair market value for takings purposes. As we explain below, it is not the tax assessor's valuation which is at issue here, but whether there was a market from which a fair value could be established. At the very least, however, this judicial proceeding provides a thorough review of several real estate assessors' analyses of the fair market value at the relevant time, and provides the Court of Federal Claims with a judicial determination based on a high degree of familiarity with the Florida real estate market. As such, it is admissible and persuasive in support of the Government's argument that the 98 acre parcel retained more than nominal fair market value after denial of the permit.

Florida Rock, on the other hand, read *Florida Rock II* to require a detailed inquiry **\*1564** into the motivations and sophistication of buyers of the comparable properties upon which assessment was based. It crafted a survey—viewed by the Court of Federal Claims to be "admittedly novel," *Florida Rock III,* 21 Cl.Ct. at 173—and concluded that virtually all the buyers of the comparable properties were lacking in sufficient knowledge in order for their purchases to qualify as truly comparable sales. Florida Rock's assessor, Mr. Failla, used the results of this survey to justify discarding evidence that the average retail price of parcels in the vicinity of Florida Rock's land was $6,100 per acre, and concluded that the actual fair market value of the tract following the permit denial was negligible. Implicit in this result is the assumption that no one with full knowledge of the regulatory regime would be willing to gamble that concern for the ecological importance of the wetlands would give way in the future to the economics of development pressure from nearby Miami. The Court of

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5347 Page 70 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)
38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

Federal Claims in *Florida Rock III* agreed with Florida Rock's view of the matter, and decided accordingly.

## DISCUSSION

### A.

How to determine whether a regulatory taking under the Fifth Amendment has occurred is a subject of on-going debate.[7] The Supreme Court has provided various articulations, influenced, as could be expected, by the particular circumstances of the cases before it. One formula that has emerged and has been repeated in several cases requires that the court balance several pragmatic considerations in making its regulatory takings determination. These considerations include: the economic impact of the regulation on the claimant, the extent to which the regulation interferes with investment-backed expectations, and the character of the Government action. (The leading case is *Penn. Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (*Penn Central* )). In this appeal, it is the economic impact of the regulation that is at issue.[8]

[7]  The literature is extensive; readers conversant with the field will be familiar with much of it. Among symposia and significant individual contributions in the last year are: Richard Ausness, *Wild Dunes and Serbonian Bogs: The Impact of the Lucas Decision on Shoreline Protection Programs* 70 Denv.U.L.Rev. 437 (1993); *Catholic University Law Review: United States Court of Federal Claims Symposium,* Cath.U.L.Rev. 717 (contributions by James E. Brookshire, Dennis J. Coyle, John A. Humbach, Glynn S. Lunney, Jr., George W. Miller & Jonathan Abram, and Loren A. Smith) (1993); David Mandelker, *Of Mice and Missiles: A True Account of Lucas v. South Carolina Coastal Council,* 8 J. Land Use & Envtl. L. 285 (1993). *Northwestern School of Law of Lewis and Clark College: A Colloquium on Lucas,* 23 Envtl. L. 869 (contributions by Michael C. Blumm, William Funk, James L. Huffman, Donald Large, Edward Sullivan, and Lawrence Watters) (1993); Jed Rubenfeld, *Usings,* 102 Yale L.J. 1077 (1993); *Stanford Law Review: Symposium on Lucas v. South Carolina Coastal Council,* 45 Stan.L.Rev. 1369 (contributions by Richard Epstein, William W. Fisher, Richard Lazarus, and Joseph L. Sax) (1993); *Windfalls and Wipeouts: Environmental Regulation, Property, and the 'Takings' Clause after Lucas v. South Carolina Coastal Council,*

17 Vt.L.Rev. 645 (1993); Walker, *Common Law Rules and Land Use Regulations: Lucas and Future Takings Jurisprudence,* 3 Seton Hall Const.L.J. 3 (1993).

[8]  For a discussion of the various formulas, and a consideration of the mix of 'categorical' or 'per se' rules and 'balancing' rules, *see* Mandelker, *supra* n. 7.

The recent Supreme Court decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (*Lucas* ), teaches that the economic impact factor alone may be determinative; in some circumstances, no balancing of factors is required. If a regulation categorically prohibits *all* economically beneficial use of land—destroying its economic value for private ownership—the regulation has an effect **\*1565** equivalent to a permanent physical occupation.[9] There is, without more, a compensable taking.[10]

[9]  *See Hendler v. United States,* 952 F.2d 1364 (1991), for a discussion of the legal and historical interplay between physical and regulatory takings.

[10]  *Lucas,* however, gives the government a defense based on nuisance limitations that inhere in the owner's title. 505 U.S. 1003, at ——, 112 S.Ct. 2886, at 2900. A nuisance defense, by definition, incorporates a degree of balancing.

If, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's 'categorical' taking rule. As we explain below, we reject the trial court's analysis that led to its conclusion that all economically beneficial use of the land was taken by the Government. We remand for determination of what economic use as measured by market value, if any, remained after the permit denial, and for consideration of whether, in light of the properly assessed value of the land, Florida Rock has a valid takings claim.

### B.

In *Florida Rock II* this court stated that, with regard to the property at issue, although "there may be a question what knowledgeable buyers would have paid, but that they would have paid some substantial figure seems certain." *Id.,* 791 F.2d 893 at 903. The trial court on remand was instructed: "if there is found to exist a solid and adequate fair market value (for the 98 acres) which Florida Rock could have obtained from others

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5348 Page 71 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government." *Id.* We did not discuss what residual fair market value would be "adequate" to forestall a taking determination.

We did explicitly indicate that the Court of Federal Claims should give consideration to "a relevant market made up of investors who are real but are *speculating* in whole or major part." *Florida Rock II,* 791 F.2d at 903 (citing *Bystrom,* 485 So.2d at 447; emphasis added). The court noted the testimony of the Government's assessor, Mr. Cantwell, and said:

> We are of the opinion that Mr. Cantwell's testimony, if considered and believed, established the existence of a market in which Florida Rock could have disposed of the property and mitigated the severity of the regulatory action here involved.

*Id.* And while the court stated that "we take it for granted, as Mr. Cantwell did, that the 'willing buyer' of the market value formula has got to be one who is correctly informed about the physical character of the land, as well as legal restrictions on its use ..." *id.* at 902, we also indicated that the market as a whole was not dominated by persons engaged in fraudulent or illegal behavior:

> Since the tract was not listed for sale, the $4,000 per acre offer, the frequent inquiries, and the assessed value, must have reflected interest of knowledgeable people, not foreigners or gulls.[11]

---

[11] Since state law generally does not preclude foreigners from owning land, and since there is no established meaning to the term 'gulls' (other than among ornithologists), we understand this reference to be to the law governing fraudulent and illegal land sales and to persons generally protected by that law.

*Id.* In short, we understand *Florida Rock II* to hold that purchases which are made by market speculators as well as home builders and other developers are comparable sales, with the caveat that particular sales might be discarded by the assessor if those sales appear questionable in light of the market as a whole.

Florida Rock, and the Court of Federal Claims on remand in *Florida Rock III,* read *Florida Rock II* differently. Our passing reference to buyers being "correctly informed" was read to require a detailed inquiry into the motivation and sophistication of the buyers whose purchases comprised the comparable sales used in the fair market value assessment. The Court of Federal Claims rejected the testimony of Mr. Cantwell—the same testimony which we had noted **\*1566** with approval in *Florida Rock II*—solely because Mr. Cantwell, with little exception, assumed sufficient knowledge on the part of the purchasers. *Florida Rock II,* 21 Cl.Ct. at 172. Instead, the court accepted the testimony of Florida Rock's assessor, who rejected *all* of the comparable sales values on the principle that none of the purchasers were sufficiently sophisticated and knowledgeable. That was error—contrary to our instruction in *Florida Rock II,* contrary to generally accepted understandings of market valuation, and finally, contrary to the working assumptions of a free market.[12]

---

[12] The Court of Federal Claims acknowledged that "[u]sually, it may be adequate to presume all knowledge of legal restrictions on the part of purchasers in arms-length transactions." *Florida Rock III,* 21 Cl.Ct. at 173. We agree; *Florida Rock II* did not require more. It is true that there is a statement in *Florida Rock II*—that a willing buyer is one who is 'correctly informed' about the legal restrictions on the use of the land—that, taken in isolation and as a blanket requirement, is not a correct statement of law. The market from which a fair market value may be ascertained need not contain only legally trained (or advised) persons who fully investigate current land use regulations; ignorance of the law is every buyer's right. It is also true that it was this statement that gave Florida Rock's lawyers a crack through which they attempted to drive their novel approach to what constitutes a fair market. And it was the trial judge's acceptance of this approach that requires today's reversal. When read as a whole, however, the opinion in *Florida Rock II* does not support such a novel approach to the well-established concept of a willing buyer. The opinion clearly focussed the issue on the central question: the fair market value

**Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)**

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

before and after the imposition of the regulatory restraint, and the extent of change, if any.

There is no disagreement as to the facts regarding the existence and nature of the market. Florida Rock's study identified in the immediate vicinity of the 98 acre tract 240 land sales during the period 1971 through 1987. A significant number of those sales occurred in the early 1980s, despite the intervening change in the regulatory environment. The average sales price per acre in 1980 was $6,100. The price per acre varied predominantly as a function of the overall lot size; smaller lots commanded higher per acre prices. Florida Rock's survey indicated that roughly 80% of the buyers had purchased the land for 'investment' purposes and that, overall, the purchasers intended to hold the land for an average of 9 to 10 years.

Thus, there was an active though speculative investment market for Florida Rock's land at the time of and following the permit denial. *Accord, Bystrom,* 485 So.2d at 447–48. The fair market price which Florida Rock could have commanded at that time remains, still, to be determined, but it was certainly much higher than the nominal $500 per acre value accepted by the Court of Federal Claims.

Florida Rock's survey does indicate that most of the buyers in this market did not have extensive knowledge of the provisions of the Clean Water Act and its impact on the development potential of those properties involving wetlands. It is doubtful that any legal conclusions should be drawn from this. Such broad-based disregard for current land use regulations suggests that, while parties contract in the shadow of the law, long term market trends in real estate values are not necessarily correlated to Government controls. The Government's appraisers testified that detailed knowledge of regulatory constraints was relevant only when the goal of the purchasers was *immediate* development. And as Mr. Slack testified, "there was not really a demand for property this far out [from Miami] at this time. People were not buying it to do anything with it right then anyway."

A speculative market may exist in land that is regulated as well as in land that is not, and the precise content of regulations at any given time may not be particularly important to those active in the market. As this court observed in *Florida Rock II,* 791 F.2d 893 at 902–03, yesterday's Everglades swamp to be drained as a mosquito haven is today's wetland to be preserved for wildlife and aquifer recharge;[13] who knows what tomorrow's view of public policy will bring, or how the market will respond to it.

13    *See* F.E. Maloney, S.J. Plager, and F.N. Baldwin, *Water Law and Administration—The Florida Experience* 141–45 (1968) for a discussion of the hydrologic cycle and the inter-relationship between wetlands and the recharge of ground water acquifers, the major source of public water supplies in Florida.

**\*1567** We need not decide such speculative questions here. The uncontroverted evidence of an active real estate market compels the conclusion that the typical 'willing buyer-willing seller' requirement of fair market value had been met; it would be inappropriate for a court to substitute its own judgment of value for that of the market. While an assessor might be justified in adjusting the fair market value figure by discarding aberrational values based upon sales between related entities or fraudulent sales to widows and orphans, an assessor may not discard an *entire* market as aberrational.[14] 'Aberrational' means outside the norm established by general activity. The fact that many players in the market chose to disregard the immediate potential for development in favor of a long-term perspective—hardly unusual behavior in Florida's history of real estate investment—does not make the market as a whole 'aberrational.' When the market provides a well-substantiated value for a property, a court may not substitute its own judgment as to what is a wise investment.

14    Florida Rock did not introduce evidence that the market was comprised of illegal or fraudulent sales. However, Florida Rock cites *Johnson v. Davis,* 480 So.2d 625 (Fla.1985), to support their argument that the parcel could not have been sold without committing fraud. *Johnson,* which issued several years after the permit denial, involved defects in the roof of a home which were known to the seller but not disclosed to the buyer; the holding of that case appears to be limited to material facts "which are not readily observable and not known to the buyer." *Id.* at 629. That is quite a different matter from legal restrictions on the subsequent use of the property which are necessarily part of the public record and ascertainable from it.

It was error to read *Florida Rock II* as requiring a detailed inquiry into the motivation and sophistication of the buyers of comparable parcels. Dollars are fungible; a speculative market provides a landowner with monetary compensation which is just as satisfactory as that provided by any other market. Should a landowner wish to pick and choose her buyers, that luxury is not chargeable to the federal fisc. To conclude otherwise would be tantamount to concluding that there could never be a market fueled by speculation—

a conclusion at odds both with common sense and with our directions in *Florida Rock II*.

## C.

Ultimately, the question that must be answered is whether, as a result of the denial of certain economic uses, there was a taking of Florida Rock's property by the Government. This question turns on "the economic impact of the regulation on the claimant," *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, measured by the change, if any, in the fair market value caused by the regulatory imposition. On the state of the record before us we are unable to answer the question. The Court of Federal Claims answered it with a straightforward 'yes' when the per acre value of the 98 acre parcel after the permit denial was found to be only a nominal $500 per acre, as compared to the $10,500 found by the trial court to be the per acre value prior to the permit denial. This represented a loss in value of roughly 95%. *Florida Rock III,* 21 Cl.Ct. at 175. The court in effect treated the permit denial as essentially a 'categorical' taking of all economic use. *See Lucas,* 505 U.S. at ——, 112 S.Ct. at 2893. "The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land." *Id.*

The Court of Federal Claims' analysis was correct in theory, but started from an incorrect premise—that the value of the parcel after denial of the permit was a nominal $500 per acre. When a figure closer to $4,000 per acre is substituted, the correct outcome is no longer clear. On remand, with a fair market value calculated in accordance with this opinion, the Court of Federal Claims must again return to the approach dictated by *Florida Rock II:*

> [T]he court should consider, along with other relevant matters, the relationship of the owner's basis or investment, and the fair market value before the alleged taking to the fair market value after the alleged taking. In determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.

*Id.,* 791 F.2d at 905.

The Court of Federal Claims must reconsider the assessments proffered by the parties **\*1568** and other evidence in the record, and determine a fair market value accordingly. [15] Should that determination establish, as the evidence in the record suggests, that there was *some* (but not a total) reduction in the overall market value of plaintiff's property as a result of the regulatory imposition, the question will then be posed: does that reduction constitute a taking of property compensable under the Fifth Amendment? [16]

[15] We do not by this intend to preclude the taking of additional evidence; that is a matter within the discretion of the Court of Federal Claims.

[16] Because the issue on appeal is the determination of the value of the property as a whole before and after the regulatory imposition, this case does not present the additional difficulties created by parcelling the property interests affected. *Compare Lucas,* 505 U.S. at ——, 112 S.Ct. 2886 at n. 7 with *Penn Central,* 438 U.S. 104 at 130, 98 S.Ct. 2646, at 2662.

To answer this question requires the court to resolve two preliminary issues. The first is whether a regulation must destroy a certain proportion of a property's economic use or value in order for a compensable taking of property to occur. The second is how to determine, in any given case, what that proportion is.

Since the Supreme Court's decision in *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (*Pennsylvania Coal* ), the problem for courts has been to determine the extent to which the Fifth Amendment burdens the exercise of the police power through regulation, [17] that is, to determine when a particular regulation somehow—in the words of Justice Holmes—goes "too far," *id.* at 415, 43 S.Ct. at 160, and therefore effects a taking. [18] It is now clear that a regulation that constitutes a total deprivation of economically beneficial use goes "too far;" such a regulatory imposition results in a 'categorical' taking similar to a physical taking of property. [19] *Lucas,* 505 U.S. 1003, 112 S.Ct. 2886.

[17] The term "police power" is used herein to refer to the power of the federal government to engage in activities not unlike those engaged in by the states under their

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5351 Page 74 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)
38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

inherent sovereign powers, recognizing that the power in the federal system is of Constitutional origin.

[18] It should be clear that the question in cases such as this is not whether the Government has power to regulate the development of wetlands. While challenges to the Government's power to act through its various agencies are judicially reviewable, *see* 5 U.S.C. § 701 *et seq.,* the Administrative Procedure Act, the question of power to act is not before us. The only question here is, when the Government chooses to act in the manner it did, must it pay the just compensation mandated by the Fifth Amendment.

[19] There is a limited governmental defense to a 'categorical' taking; see note 10, *supra,* and accompanying discussion.

The question remains, does a partial deprivation resulting from a regulatory imposition, that is, a situation in which a regulation deprives the owner of a substantial part but not essentially all of the economic use or value of the property, constitute a partial taking, and is it compensable as such? This question has been much debated in the literature since the Supreme Court's decision announcing that as a general proposition regulatory takings are compensable; the Court's decisions to date have not provided an answer. [20]

[20] *Lucas,* 505 U.S. 1003, n. 7, 112 S.Ct. 2886, n. 7 and accompanying text. For recent academic discussion of the problems of partial regulatory takings, *see* Richard A. Epstein, *Lucas v. South Carolina Coastal Council: A Tangled Web of Expectations, supra* n. 7 (45 Stan.L.Rev. 1369, 1375, 1387–1392, (1993)); Rubenfeld, *supra* n. 7, Part V, Subpart E, "Parceling and Partial Usings."

Nothing in the language of the Fifth Amendment compels a court to find a taking *only* when the Government divests the total ownership of the property; the Fifth Amendment prohibits the uncompensated taking of private property without reference to the owner's remaining property interests. In *Lucas,* the Supreme Court touched upon the question of a partial regulatory taking, *see* 112 S.Ct. 2893–95, but, concluding on the facts before it that the case was one in which the owner was called upon "to sacrifice all economically beneficial uses in the name of the common good," *id.* at ——, 112 S.Ct. at 2895, the Court found a categorical taking and thus did not have to decide the partial **\*1569** taking question. [21] *Id.* at —— n. 9, 112 S.Ct. at 2896 n. 9.

[21] Similarly, in *Whitney Benefits, Inc. v. U.S.,* 926 F.2d 1169 (Fed.Cir.1991), this court held that the impact

of the Surface Mining Control and Reclamation Act of 1977 on plaintiff was a total destruction of all economically viable use; the Government's arguments regarding possible alternative uses, such as farming, were considered "completely off the mark." *Id.,* at 1174.

Justice Stevens, writing separately, criticized as arbitrary the notion that "[a] landowner whose property is diminished in value 95% recovers nothing, while an owner whose property is diminished 100% recovers the land's full value." *Id.* at ——, 112 S.Ct. at 2919, Stevens, *dissenting.* In response, Justice Scalia, writing for the Court, noted that Justice Stevens's analysis "errs in its assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation." *Id.* at ——, 112 S.Ct. at 2894 n. 8. [22]

[22] In addition to the analytical discontinuities that are created by such an all-or-nothing rule, there are practical difficulties as well. *See* Epstein, *supra* n. 14.

No such conceptual problem seems to exist when the taking is by physical occupation. If a property owner owns a 100 acre tract, and the Government takes 95 acres for a public park, no one would argue that the five acres remaining somehow precludes the property owner from claiming entitlement to just compensation for the loss of the 95. Indeed, if the Government took just 5 acres and left the property owner with 95, there would be no question that the owner was entitled to compensation for the parcel taken (plus severance damages attributable to the remaining tract). [23]

[23] See, e.g., A.V. Kendall & S.J. Plager, *Severance Damage in Eminent Domain Proceedings,* 10 U.Fla.L.Rev. 1 (1957).

Courts have held that even relatively minor physical occupations are compensable. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991). Logically, the amount of just compensation should be proportional to the value of the interest taken as compared to the total value of the property, up to and including total deprivation, whether the taking is by physical occupation for the public to use as a park, or by regulatory imposition to preserve the property as a wetland so that it may be used by the public for ground water recharge and other ecological purposes. [24]

[24] Dissenting in *San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1980), Justice Brennan wrote:

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5352 Page 75 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

Police power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property. From the property owner's point of view, it may matter little whether his land is condemned or flooded, or whether it is restricted by regulation to use in its natural state, if the effect in both cases is to deprive him of all beneficial use of it. From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property.

The felt need for some kind of a special rule in regulatory takings cases may stem from the difficult line that has to be drawn between a partial regulatory taking and the mere 'diminution in value' that often accompanies otherwise valid regulatory impositions. As expressed by Justice Holmes in *Pennsylvania Coal,* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone." *Id.,* 260 U.S. at 413, 43 S.Ct. at 159. Gone as well, it is almost superfluous to add, would be the constraints imposed on the Government by the takings clause.

One way to avoid this linedrawing problem would be to declare that no regulatory taking is compensable under the Fifth Amendment; the only available remedy for a regulation that goes 'too far' is invalidation of the imposition. **\*1570** That was the historic practice in the courts for much of the twentieth century, but the Supreme Court definitively rejected that practice in *First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The Fifth Amendment "is designed 'not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' " *Preseault v. ICC,* 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (quoting *First English,* 482 U.S. at 315, 107 S.Ct. at 2385; emphasis in both cases).[25] Nothing in the Fifth Amendment limits its protection to only 'categorical' regulatory takings, nor has the Supreme Court or this court so held.[26] Thus there remains in cases such as this the difficult task of resolving

when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'

[25]　We note in passing that in both *First English* and *Preseault* the Supreme Court applied the takings clause to property interests less compendious than a fee simple. *First English* concerned a temporary prohibition on the use of land in a floodplain. The Supreme Court did not hold, as the dissent would have us today, that the Government's temporary taking required that the Government purchase the fee. Instead, the Supreme Court held that the Fifth Amendment required compensation for what was taken, *viz.* the use of the petitioner's land for a limited period of time. *Preseault* involved a reverter on an easement. The Supreme Court held that the takings challenge was premature because the petitioner had not brought a claim under the Tucker Act in the Court of Federal Claims. The Supreme Court was not concerned that the interest with which the Government had allegedly interfered was a contingent future interest.

[26]　In *Yancey v. United States,* 915 F.2d 1534 (Fed.Cir.1990), a federal government quarantine to control avian influenza had caused the owner of a flock of healthy breeder turkeys to market them for slaughter. The resulting loss to the owner was approximately 75% of the breeder flock's value. This court found a compensable taking.

The trial court will find itself with little direct case law guidance. As *Pennsylvania Coal* and subsequent appellate court decisions have recognized, the question of when a regulatory taking occurs cannot be answered as a matter of absolute doctrine, but instead requires case by case adjudication: "the question depends upon the particular facts." *Id.,* 260 U.S. 393 at 413, 43 S.Ct. at 158 at 159. *See also, inter alia, United States v. Caltex,* 344 U.S. 149, 156, 73 S.Ct. 200, 203, 97 L.Ed. 157 (1952); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Penn Central* 438 U.S. 104 at 124, 98 S.Ct. 2646 at 2659, noting the "essentially ad hoc, factual inquiries" in takings jurisprudence. But recourse to the facts hardly solves the basic problem at hand—there simply is no bright line dividing compensable from noncompensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner. What is necessary is a classic exercise of judicial balancing of competing values.[27]

*Florida Rock Industries, Inc. v. U.S.*, 18 F.3d 1560 (1994)
38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

27     *See Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) ("The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest."); *First Lutheran Church v. Los Angeles County,* 482 U.S. 304, 318–319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) ("It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' ") (*citing Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)); *Penn Central,* 438 U.S. 104 at 125, 98 S.Ct. 2646 at 2659 ("the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations" in takings analysis).

When there is reciprocity of advantage, paradigmatically in a zoning case, *see, e.g., Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), then the claim that the Government has taken private property has little force: the claimant has in a sense been compensated by the public program "adjusting the benefits and burdens of economic life to promote the common good." *Penn Central,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659. Thus shared economic impacts resulting from certain types of land use controls have been held to be non-compensable. **\*1571** *Agins v. Tiburon,* 447 U.S. 255, 262–63, 100 S.Ct. 2138, 2143, 65 L.Ed.2d 106 (1980) (shared 'benefits and burdens' of a zoning ordinance); *Penn Central,* 438 U.S. 104 at 131, 98 S.Ct. 2646 at 2662 (same).

That the purpose and function of the regulatory imposition is relevant to drawing the line between mere diminution and partial taking should not be read to suggest that when Government acts in pursuit of an important public purpose, its actions are excused from liability. To so hold would eviscerate the plain language of the Takings Clause, and would be inconsistent with Supreme Court guidance.[28] It is necessary that the Government act in a good cause, but it is not sufficient. The takings clause already assumes the Government is acting in the public interest: "nor shall private property be taken *for public use* without just compensation" (emphasis added).

28     In *Lucas,* the South Carolina Supreme Court had held that the State's purpose in protecting oceanfront

ecology excused the State from liability for its regulatory imposition. The Supreme Court held that was not the correct criterion for takings jurisprudence. *Lucas,* 505 U.S. 1003, 112 S.Ct. 2886.

It is for the trial court as an initial matter to determine whether the Government acted within its proper role in the circumstances presented by the case of *Florida Rock.* Marketplace decisions should be made under the working assumption that the Government will neither prejudice private citizens, unfairly shifting the burden of a public good onto a few people, nor act arbitrarily or capriciously, that is, will not act to disappoint reasonable investment-backed expectations. The Government, in a word, must act fairly and reasonably, so that private parties can pursue their interests. At the same time, when Government acts as the intermediary between private interests to provide a mutually beneficial environment from which all benefit and in which all can thrive, the shared diminution of free choice that results may not rise to the level of constitutionally required compensation.

In addition, then, to a demonstration of loss of economic use to the property owner as a result of the regulatory imposition—a fact yet to be properly determined in this case —the trial court must consider: are there direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory environment? Or are benefits, if any, general and widely shared through the community and the society, while the costs are focused on a few? Are alternative permitted activities economically realistic in light of the setting and circumstances, and are they realistically available? In short, has the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?

Admittedly this is not a bright line, simply drawn. Property owners and regulators, attempting to predict whether a governmental regulation has gone too far, will still need to use judgment and exercise care in making decisions. In this sense our decision today continues the tradition of *ad hoc* judicial decisionmaking in this area. Over time, however, enough cases will be decided with sufficient care and clarity that the line will more clearly emerge.

The dissent rejects drawing the line between non-compensable 'mere diminution' land use regulatory restraints and compensable takings of property interests that involve less than all of the fee estate. The dissent favors an all or

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5354 Page 77 of 175

*Florida Rock Industries, Inc. v. U.S.*, 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

nothing approach—if some critical threshold of value loss is reached as a result of the regulatory imposition, then the property owner is entitled to compensation for the taking of the entire fee. This is, of course, another way to handle the problem of partial takings, but there are serious problems with the dissent's approach.

If the dissent's approach provided a bright line and avoided the *ad hocery* problem, that might argue in its favor. But it does not. Determining the threshold in any given case which, under the dissent's view would trigger full compensation, requires the same sort of weighing and balancing of indeterminate factors. Furthermore, the dissent endorses the questionable policy of forcing the Government to pay for something it does not want and has not taken. The dissent's approach requires the Government to pay for the 'fee' in the land—i.e., the entire bundle of **\*1572** rights—even though the Government may be seeking only to restrict certain kinds of development or certain uses. This has the potential of unfairness to both the Government and the property owner. The latter may wish to be paid for what she has lost but keep the rest; and the Government should not be put to the obligation of paying for more than it wants when it does not set out to take it.[29] The property owner is entitled to just compensation for what is taken, no less, but no more.[30]

[29] This of course does not free the Government from paying for a 'categorical' taking even though it may have thought it was only restricting certain uses, if in fact the consequence of the regulatory imposition is to take essentially all economic value. *See, e.g., Lucas.*

[30] "Of course, payment need only be made for what is taken, but for all that the Government takes it must pay." *United States v. Dickinson,* 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1946).

The dissent is concerned that what is being taken is 'value,' not property.[31] In fact, in a regulatory context such as this it is both. By taking some portion of Florida Rock's economic use of the property—its power to disturb the overlying wetlands, and with it the common law property right to mine its subsurface minerals—the Government appears to have destroyed part of the value of Florida Rock's holdings. If that proves to be the case, and if the application of the *ad hoc* tests previously described so warrant, the property interest taken belongs to the Government, and the right to just compensation for the interest taken belongs to Florida Rock.[32]

[31] In *Yancey v. United States, see supra* n. 26, just compensation was required to be paid for a loss in value sustained by the property owner. The Government did not take title to any of the 3,295 turkeys.

[32] Identification of a specific property interest to be transferred to the Government should pose little problem for property lawyers. Property interests are about as diverse as the human mind can conceive. Property interests may be real and personal, tangible and intangible, possessory and nonpossessory. They can be defined in terms of sequential rights to possession (present interests—life estates and various types of fees —and future interests), and in terms of shared interests (such as the various kinds of co-ownership). There are specially structured property interests (such as those of a mortgagee, lessee, bailee, adverse possessor), and there are interests in special kinds of things (such as water, and commercial contracts). And property interests play across the entire range of legal ideas: see, e.g., *Tompkins v. Superior Court of San Francisco,* 59 Cal.2d 65, 27 Cal.Rptr. 889, 378 P.2d 113 (1963) (did joint occupancy of an apartment give one occupant the kind of possessory property interest that carried with it the power to grant to police legal entry to search without a warrant for the other occupant's marijuana stash).

The Supreme Court did not have any difficulty in finding that a property interest was taken when the Government authorized the installation of a small cable box on an apartment building; the Government was not required to buy the building. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Nor was there any difficulty in finding a property interest taken— if it needs a label, call it a limited co-tenancy with an easement for access—when the Government sank wells on an owner's property and periodically entered to service the wells and to make tests of the water. *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991). The fact that the source of any particular taking is a regulation rather than a physical entry should make no difference—the nature of legal interests defining the property affected remains unchanged.

Finally, the dissent believes that Supreme Court precedent establishes that a Fifth Amendment claim that specific property has been taken is an all or nothing proposition. If taken to mean that a regulatory taking cannot result in less than a taking of the property owner's entire fee estate, we cannot agree. There has never been any question but that the Government can take any kind of recognized estate or interest in property it chooses in an eminent domain proceeding; it is not limited to fee interests. We see no reason or support

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5355 Page 78 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

for a different rule in inverse condemnation cases, and that is true whether the taking results from a physical or regulatory action.

In this case we have concluded that the record does not support a finding that the fee in the land, i.e., all economic use or value, was taken by this regulation, although that **\*1573** question is still an open one to be decided by the facts of valuation properly found. Since loss of economic use and value is the issue in this regulatory taking case, it is not possible, absent a valid determination in the record of the 'after imposition' value of the land, to know if a taking occurred, much less what the Government must pay for it. We are compelled, therefore, to remand the matter to the trial court for a determination of that essential piece of information, and for an initial determination as to its significance in order to decide whether there is a compensable taking of property.

CONCLUSION

The judgment of the Court of Federal Claims is vacated and the matter is remanded for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

NIES, Chief Judge, dissenting.
On procedural and substantive grounds, I respectfully dissent from the majority's remand for a determination of whether the United States must pay compensation under the Fifth Amendment to the extent that the 98 acres in issue lost a substantial part, but not essentially all, of its economic use or value. The majority's theory is contrary to Fifth Amendment "takings" jurisprudence as delineated by the Supreme Court and this court. Labelling its lost use/value theory a "partial taking" (ipse dixit) does not give it any legitimacy.

Inverse condemnation of land, like the affirmative exercise of the power of eminent domain, requires the transfer of the property found to be taken to the United States. Value is not a transferable interest. Thus, a claim for loss of value does not constitute a takings claim within the meaning of the Fifth Amendment.

In response to the dissent, the majority opines that any loss in value due to a regulatory restriction on land use can be easily

transmuted into a taking of a property right in the land (Op. p. 1570, n. 26) and that such right will belong to the government (p. 1570). The majority's recognition that a successful claim of inverse condemnation of land transfers property rights is salutary. However, the majority's throw-in line on the transfer of a property right to the United States does not change the thrust of its opinion that damages must be paid to the extent of loss of value in the fee to the 98 acres.

The majority's partial taking theory, now vaguely tied to property rights, appears to borrow from the views of then Justice Rehnquist in his dissent in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 138–153, 98 S.Ct. 2646, 2666–2674, 57 L.Ed.2d 631 (1978), and restated in *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 506–521, 107 S.Ct. 1232, 1252–1261, 94 L.Ed.2d 472 (1986) that the taking of an identifiable property right should be compensable. However, the Supreme Court, in *Penn Central* (and in *Keystone* ) rejected the division of the fee owner's bundle of property rights into separate takable rights. *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. at 2662; *Keystone,* 480 U.S. at 470–501, 107 S.Ct. at 1232–1250. These decisions and all others require one to focus on the effect of a regulatory restriction on the totality of an owner's rights in the property. See also *Concrete Pipe & Prod. v. Const. Laborers Pen. Tr.,* 508 U.S. 602, ——, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993) (citing *Keystone* ). A diminution in value from denial of an economic use (even if the loss can be expressed in property right terms) is insufficient to effect a taking under *all* Supreme Court precedent so long as substantial other uses are left to the owner. While the Supreme Court may rethink and change its rulings, this court is not free to adopt positions in conflict with decisions of the Court, anticipating that the Court will be persuaded to adopt a dissenting Justice's view. In any event, the majority espouses compensation for a partial taking of the fee, which is not the same as the total taking of a severable interest. No support for the partial taking theory can be found even in dissents.

With respect to procedural error after the first remand, the issue in this case was limited to whether the entire fee had been taken, which turned on whether the property had a **\*1574** substantial value after the denial of the permit. As this court specifically instructed in *Florida Rock II,*

> [I]f there is found to exist a solid and adequate fair market value (for the 98 acres) which Florida Rock

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5356 Page 79 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government.

791 F.2d 893, 903 (Fed.Cir.1986). This court in *Florida Rock II* remanded for a determination of whether substantial value remained. If it did, no taking occurred. The majority sides with the government on that issue and holds that the entire fee was not taken, which should have ended this litigation under principles of law of the case. Instead, the majority remands to allow Florida Rock to prove a different claim, indeed, a claim once raised and now subsumed in the judgment.[1] Therefore, the issue of a "partial taking," had it been argued on appeal by Florida Rock, would be outside the scope of appellate review because that party filed no cross appeal,[2] and it is not an argument in support of the judgment. *United States v. American Ry. Exp. Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1923).

1    Florida Rock's complaint in the Court of Federal Claims originally sought, *inter alia,* damages for the diminution in value of its land but, during the course of litigation, that issue dropped out in the first trial, and no appeal of the viability of that type of claim was taken. Rather, the issue litigated was whether the United States had taken the entirety of the fee to the 98 acres. The majority brings a closed issue back into the entirety of the case by its partial taking theory.

2    An appellee must file a cross appeal when issues it seeks to raise constitute an attack on the judgment below but not when the issues are merely alternative arguments in support on the judgment. Moore, *Moore's Federal Practice* ¶ 254.11[3] at 4–46 (1993).

This court has no license to shape a case more to its liking by not only ignoring the law of the case but also effectively taking an appeal for Florida Rock. The trial court ordered the government to pay $1+ million for the 98 acres and ordered Florida Rock to tender a deed to the property. Florida Rock tied its fate to upholding that judgment. Under the majority's ruling that the entirety of the fee was not taken, Florida Rock loses.

While the procedural issue is dispositive, I will also address the merits of the majority theory of a "partial" taking which conflicts with current Supreme Court precedent and the precedent of this court.

I

No legal subject has received the attention of scholars more than "takings" jurisprudence in recent years. A flood of literature has been produced advocating various theories of property and social responsibilities.[3]  **\*1575** Some espouse the view that property is held subject to complete control as to its use by the state and federal governments.[4] Others, at the opposite extreme, start from a premise that owners have a right to use their property in any manner, virtually without restriction, and, damages must be paid for any governmental interference with their use.[5] The more often the government must pay for exercising control over private property, the less control there will be. That is the reality.

3    Jed Rubenfeld, "Usings," 102 Yale L.J. 1077 (1993); Glenn Sugameli, "Takings Issues in Light of *Lucas v. South Carolina Coastal Council:* A Decision Full of Sound and Fury Signifying Nothing," 12 Virginia Env.L.J. 439 (1993); Erika Jones et al., "The Fifth Amendment's Just Compensation Clause: Implications for Regulatory Policy," 6 Adm.L.J. of American U. 674 (1993); Hon. John M. Walker, "Common Law Rules and Land Use Regulations: *Lucas* and Future Takings Jurisprudence," 3 Const.L.J. 3 (1993); Richard Epstein, "*Lucas v. South Carolina Coastal Council:* A Tangled Web of Expectations," 45 Stan.L.Rev. 1369 (1992); William W. Fisher III, "The Trouble with *Lucas,*" 45 Stan.L.Rev. 1393 (1992); Joseph L. Sax, "Property Rights and the Economy of Nature: Understanding *Lucas v. South Carolina Coastal Council,*" 45 Stan.L.Rev. 1433 (1992); Richard J. Lazarus, "Putting the Correct Spin in *Lucas,*" 45 Stan.L.Rev. 1411 (1992); Andrea L. Peterson, "The Takings Clause: In Search of Underlying Principles Part I—A Critique of Current Takings Clause Doctrine," 77 Cal.L.Rev. 1299 (1989); Douglas W. Kmiec, "The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse," 88 Colum.L.Rev. 1630 (1988); William A. Fischel, "Introductions: Utilitarian Balancing and Formalism in Takings," 88 Colum.L.Rev. 1581 (1988); Frank Michelman, "Takings, 1987", 88 Colum.L.Rev. 1600 (1988); Margaret Jane Radin, "The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings," 88 Colum.L.Rev. 1667

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5357 Page 80 of 175

*Florida Rock Industries, Inc. v. U.S.*, 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

(1988); Susan Rose Ackerman, "Against Ad Hocery: A Comment on Michelman," 88 Colum.L.Rev. 1697 (1988); Richard A. Epstein, " *Takings: Private Property and the Power of Eminent Domain*" (1985); Margaret Jane Radin, "Property and Personhood," 34 Stan.L.Rev. 957 (1982); Frank Michelman, "Property, Utility, and Fairness: Comment on the Ethical Foundations of Just Compensation Law," 80 Harv.L.Rev. 1165 (1967).

4 Sax, *supra,* "Property Rights and the Economy of Nature: Understanding *Lucas v. South Carolina Coastal Council,*" 45 Stan.L.Rev. 1433 (1992). Although not so stated, such theorists would, in effect, superimpose the constitutional powers of Congress on land rights much as the constitutional powers may negate state immunity under the Eleventh Amendment.

5 Epstein, *Takings: Private Property and the Power of Eminent Domain,* (1985).

The majority decision discusses "takings" law in a conventional manner through sections A and B of its analysis. But then it leads us into the camp of those who advocate damage awards for regulatory restriction (Op. p. 1568). Its economic justification that the government will now pay less for regulatory interference with private property is specious. In the absence of governmental restrictions rising to the very high level of a total "taking" of the property in issue required by Supreme Court precedent, *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225–228, 106 S.Ct. 1018, 1026–1027, 89 L.Ed.2d 166 (1985); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 130–31, 136–38, 98 S.Ct. 2646, 2662, 2665–2666, 57 L.Ed.2d 631 (1978), the government does not now pay. It may pay more in the few cases where a claimant can satisfy those high standards, but it requires little imagination to envision the vast sums required for lost value/use claims if the government must pay for mere impairment of rights. Indeed, the objective of the theory is to preclude government regulation [6] precisely because regulation will entail too great a cost. Only in this respect will the theory save the public fisc.

6 *Id.*

The majority does not analyze loss of value and transfer of a property right separately under its partial taking theory. Essentially it sees no distinction in a property right, an economic use and a loss of value. However, I will address lost value separately from property rights because the concepts, which may be the same under "law-and-economics" theories, are not interchangeable in established takings jurisprudence.

## A.

### Loss of Value

The majority view that lost value of land in itself is compensable is not the course set by the Supreme Court. *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1945), provides perhaps the clearest statement that an inverse condemnation claim respecting land rights requires an identification of the specific property interest to be transferred to the government. *Causby* involved a takings claim by reason of low military aircraft flights over the plaintiff's chicken farm which destroyed its use for that purpose. As held therein:

> [T]he Court of Claims held, as we have noted, that an easement was taken. But the findings of fact contain no precise description as to its nature. It is not described in terms of frequency of flight, permissible altitude, or type of airplane. Nor is there a finding as to whether the easement taken was temporary or permanent. *Yet an accurate description of the property taken is essential, since that interest vests in the United States. United States v. Cress, supra* [243 U.S. 316], 328–329 [37 S.Ct. 380, 385, 61 L.Ed. 746 (1917) ], and cases cited.

*Id.* at 267, 66 S.Ct. at 1069 (emphasis added).

"Value" is not a property right under Florida law or any state law that I can uncover. While much of takings law is unclear, one principle is not. Rights in land depend on the law of the particular state. *Preseault v. ICC,* 494 U.S. 1, 16 n. 9, 20–25, 110 S.Ct. 914, 924 n. 9, 108 L.Ed.2d 1 (1990) (majority and concurring opinions); *Ruckelshaus v. Monsanto* **\*1576** *Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2871, 81 L.Ed.2d 815 (1984) ("Property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."). Use of generalities respecting "property" law disserves the development of coherent takings jurisprudence. The right

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5358 Page 81 of 175

*Florida Rock Industries, Inc. v. U.S.,* 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

taken must be identified not only because, when transferred, it becomes the property of the United States. *Id.; Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1190 (1981), but also because compensation is fixed at the fair market value of the transferred property right. *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1580 (Fed.Cir.1990). [7] This bedrock requirement means that, the United States having purchased the fee or a property right, no second claim that the government took that specific property is possible.

[7]   In a temporary taking, the proper measure of compensation is the value of the use of the property interest during the taking, since the government returns the property interest to the owner when the taking ends. *Yuba,* 904 F.2d at 1580–81.

In contrast, a lost value damage claim would impose not even an easement on the land. Successive claims are not only possible but likely. If loss of value alone created a claim, Florida Rock not only would receive the damage award, but also would keep its land. In effect, takings jurisprudence would become a novel type of Fifth Amendment tort claim for regulatory injury to the landowner under which the United States must pay damages while receiving no quid pro quo. This is not the law.

Inverse condemnation jurisprudence, like the direct exercise of eminent domain power, is based to a large extent on *in rem* concepts. [8] Thus, the theory of compensation simply for a loss in the land's value, not for the taking of a property right founded on Florida law, is untenable.

[8]   "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceeding." *First English Lutheran Church v. Los Angeles County,* 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1986).

The Supreme Court has long *rejected* the position that a diminution in economic value of private lands caused by government regulation of its use requires compensation. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); *Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909). As stated in *Penn Central,* "[Supreme Court precedent] uniformly reject[s] the proposition that diminution in property value, standing alone, can establish a taking." *Penn Central Transp.*

*Co.,* 438 U.S. at 131, 98 S.Ct. at 2663 (citing *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75 percent diminution in value caused by zoning law); *Hadachek v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87 ½ percent diminution in value)). The taking issue "is resolved by focusing on the uses the regulations permit." *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2663.

Appellants in *Penn Central* argued that the NYC landmark law effected a taking because its operation had significantly diminished the value of the Penn Central Terminal site. Appellants further argued that any restriction imposed on individual landmarks pursuant to the Landmark Law constituted a taking requiring just compensation. The Court found "no merit" in the argument. *Id.*

Thus, it is clear that no claim under the Fifth Amendment for a taking is stated by allegations that the property in issue simply lost value.

B.

*The Property Rights in Issue*

In the instant case, while there is no allegation that the government took a property right from the fee owned by Florida Rock, the majority suggests throughout its opinion that mining rights are the property rights in issue whose loss require prorata compensation. Florida Rock's position in contrast is **\*1577** that the denial of the permit for mining effectively took the entire fee by reason of the denial of all economically viable use. This latter position tracks precedent that government actions, which leave one property rights in the owner may, nevertheless, so severely interfere with private land use that they are deemed equivalent to outright condemnation of the land for public use. *Pumpelly v. Green Bay Co.,* 80 U.S. 166, 177–180, 20 L.Ed. 557 (1871) ("taking" by flooding land by dam construction).

*Lucas v. South Carolina,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), is the latest in a series of "takings" cases issued since this case was previously on appeal. The plaintiff pleaded the taking of the "fee simple interest" to certain lands. *Id.* at —— n. 7, 112 S.Ct. at 2894 n. 7. *Lucas* is instructive that a taking of the fee may be found even though the owner was left with some property rights after the governmental action. The state regulations at issue in *Lucas* prohibited any building on Lucas' two oceanfront privately-owned lots. The

Case 2:19-cv-00037-JNP   Document 59-34   Filed 11/30/22   PageID.5359   Page 82 of 175

**Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)**

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

regulations did not strip the owner of all property rights, e.g., the right to sell or devise the land. Nevertheless, the court held that the denial of all economically viable use by state regulation effected a categorical and total taking of the land unless, under state law, the action amounted to abatement of a "nuisance."[9]

[9]    This exception appears inapt as applied to federal regulation. The source of federal action is constitutional, as is the requirement for compensation. Precedent respecting takings by state action must be carefully parsed to determine whether the principles are equally applicable to federal regulation. The authority of Congress to impose use restrictions in this case rests on the commerce clause which, it is true, may be exercised to achieve purposes akin to a state's police power. *Brooks v. United States,* 267 U.S. 432, 436–37, 45 S.Ct. 345, 346, 69 L.Ed. 699 (1925). But it is not at all clear or logical that a state's nuisance law, which the *Lucas* court recognized as the basis for no compensation respecting a state's exercise of police powers, is also the limit of the federal power to take property without compensation. The noncompensable seizure of houses, cars, boats, airplanes, or other private property in connection with drug crimes seems to belie the majority's assumption (Op. p. 1577 n. 10) that state nuisance law alone defines the interrelation of commerce and the Fifth Amendment.

The *Lucas* opinion begins with the recognition that a claim that a governmental regulation took private property for public use has generally required *ad hoc* factual inquiries into the circumstances of each case, there being no set formula for deciding that the action effected an inverse condemnation. *Id.* at ——, 112 S.Ct. at 2893. In *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citing *Penn Central Transportation Co.,* 438 U.S. at 124, 98 S.Ct. at 2659), the Court had provided the following guidance:

> To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

In *Lucas,* two discrete categories of regulatory action were delineated as compensable without case-specific inquiry namely, (1) regulation allowing physical "invasion" of private property and (2) regulation denying *all* economically beneficial or productive use of land. 505 U.S. at ——,

112 S.Ct. at 2893. Thus, where *less* than *all* economically beneficial or productive use of land is lost by reason of governmental regulation, one reverts to an *ad hoc* inquiry to determine whether the property in issue, here the fee, was taken.

In contrast, the majority divides the "ad hoc" inquiry into two types of takings, total and partial. After finding there is no categorical taking by physical invasion or prevention of *all* economic use of land, the two situations recognized in *Lucas,* the majority concludes that, under the *ad hoc* inquiry, the claimant may recover proportional compensation for the impairment of economic use if it passes a threshold beyond "diminution in value."[10]  Contrary to the majority, in an *ad ***1578** hoc* inquiry, the reduction in value resulting from use restriction pertains to whether a "taking" occurred. In making the "taking" determination, such loss is a factor. *Id.,* at ——n. 8, 112 S.Ct. at 2895 n. 8 (95 percent loss may not get "benefit of categorical formulation" but "keenly relevant to takings analysis"). The loss in value, however, is not the property taken (as discussed *supra* ) nor the measure of compensation. *Yuba,* 904 F.2d at 1580.

[10]    The majority supports its theory with citation to *Loretto* and *Hendler. Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991). Both are physical occupation cases decided under a categorical analysis, whereas the majority's taking theory is analyzed under an *ad hoc* analysis. In a permanent physical occupation case, the size of the property interest taken is irrelevant. *Loretto,* 458 U.S. at 434–35, 102 S.Ct. at 3175. Had *Loretto* been analyzed under an *ad hoc* inquiry, the result may well have been different. *See id.* at 452–53, 102 S.Ct. at 3185 (Blackmun, J. dissenting) ("[A]ny intelligible takings inquiry must also ask whether the extent of the state's interference is so severe as to constitute a compensable taking in light of the owner's alternative uses for the property.").

Under Supreme Court precedent, a Fifth Amendment claim that specific property has been taken is an all or nothing proposition. Either the property in issue has been taken and the fair market value at the time of the taking must be paid, or the property is not taken and no compensation is due. *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 800–803 (Fed.Cir.1993). The answer is "yes" or "no," not "partially." See *Lucas,* 505 U.S. at —— n. 8, 112 S.Ct. at 2895 n. 8 ("Takings law is full of those 'all-or-nothing' situations."). Thus, under an *ad hoc* analysis, a 95 percent loss of value

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5360 Page 83 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

in the land, for example, may be sufficient, when considered with other factors, to require the government to purchase 100 percent of the interest in the land, i.e. the fee. Conversely, the landowner asserting the taking of the fee receives nothing, despite the loss in value caused by the regulatory action, if the factors weighed together do not mandate that the government must become an "involuntary purchaser" of the fee. *Florida Rock II,* 791 F.2d at 905.

The majority states that in *Lucas,* the Supreme Court touched upon but did not have to decide "the partial taking question." (op. p. 1568) The Supreme Court did note that precedent did not make it clear, even in a categorical taking, how to determine "the property interest against which the loss of value is to be measured." The court noted that "this uncertainty regarding the denominator in our 'deprivation' fraction has produced inconsistent pronouncements by the Court [citations omitted]." *Lucas,* 505 U.S. at ——n. 7, 112 S.Ct. at 2894 n. 7. The majority seeks to shoehorn its "partial taking" theory into this open question. It does not fit. The *Lucas* court left open the question of how to determine the property interest in issue, the denominator. One would still determine whether there is a total taking of that property interest. The "partial taking" theory does not change the denominator or even the numerator. The majority's denominator remains the fee and if an *ad hoc* inquiry negates that the fee is taken, one simply would go on, (under the majority's view) to consider proportional compensation if a threshold of injury, more than "mere diminution", is passed.[11]

[11]    Anomalously the majority remands for advice on the legal standard of what percentage must be taken to rise to the level of a partial taking.

There can be no question that the "partial" taking theory of the majority does not change the property in issue (the denominator) from the fee to mining rights. If the taking of mining rights were the issue, one would simply evaluate the mining rights at the time the permit was denied. And there would be no need to remand to determine if a taking of such rights occurred. One would merely remand for their evaluation. Cf. *Penn Central,* 438 U.S. at 152, 98 S.Ct. at 2673 (Rehnquist, J. dissenting). Mining is clearly precluded and such right has zero value to Florida Rock after the action on the permit. The majority, instead, engages in a complicated before and after taking evaluation of the fee. But the loss in value *of the fee* does not reflect the value of mining rights on the date of permit denial. One must also take into account that the land is zoned for five-acre residential development

as well. It is pure speculation whether the substantial residual value found by the majority reflects investment value for future mining use or for future residential use.[12] What the majority's **\*1579** evaluation analysis makes clear is that its discussion of mining rights merely serves to obfuscate its theory that a substantially less than total loss of value in the fee must be compensated.

[12]    Once mining rights are transferred to the government, the majority's theory of post-takings value based on offers to buy the land because of possible change in regulations is thrown entirely askew. There could be no change in regulations which would give a subsequent owner the right to mine the mineral estate which the majority agrees becomes government property.

The majority's partial taking theory finds no home in an *ad hoc* analysis. As reaffirmed most recently in *Concrete Pipe & Proc.,* 508 U.S. at ——, 113 S.Ct. at 2290:

[A] claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question. Accord, *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) ( "[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, [and] one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction' ") (citation omitted).

The *ad hoc* analysis answers the question whether the entirety of the property in issue should be deemed confiscated even where the owner retains some rights. It gives no guidance on how to determine what is the property in issue, i.e., the denominator. It is simply the formula to apply after the denominator is properly defined. That "complex question" is not facilely answered by giving the restricted interest a name.

The law has been and continues to mandate that a court may not look only to the part of the entirety of property rights of a fee owner which a regulation restricts, whether called a property right, an economic use, or simply value. As *Concrete Pipe* informs us, there is always a total taking of that interest and conversely, a partial taking of the fee. This is, indeed, the

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5361 Page 84 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

precise rationale for requiring an *ad hoc* analysis. One must weigh the rights (and value) of the property in issue before regulatory action against the rights (and value) therein after regulatory restriction and find confiscatory disparity between the two values for a taking to be found. Thus, where only a portion of the acreage of a tract is affected by denial of a wetlands permit, we have held under an *ad hoc* analysis that no taking of the tract occurred and no compensation was due. *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1192 (1981). [13]

[13]      Indeed, in this case, it is far from clear in my mind that the 98 acres should be treated as a severed tract rather than part of the 1500+ total acreage.

The difficult issue of what is the property in issue (the denominator) was avoidable in *Lucas* because the plaintiff claimed the fee was taken. Here as well. Respecting the denominator, as indicated, we do not have a question of the taking of a *severable* interest, i.e., mineral rights from the bundle of rights in the land. [14] Indeed, Florida Rock abandoned any issue other than the taking of the fee in its entirety prior to the first appeal. *Florida Rock III,* 21 Cl.Ct. 161, 169 n. 5 (1990). At this stage of proceedings, nothing less is at stake than the entire fee interest in the 98 acres. The majority's ruling that the fee was not taken under an *ad hoc* analysis mandates reversal.

[14]      It may also be noted that there is no issue involving frustration of Florida Rock's mining business. This court in *Florida Rock II* concluded that the trial court's finding of a taking based on the fact that Florida Rock was prevented from conducting a profitable mining business made the case "improperly one to recover for frustration of business purposes." *Id.*

## II

Inasmuch as the majority remands for determination of the difference in value of the fee, before and after permit denial, it is appropriate to point out the legal error in the $10,500 valuation figure as the value of the **\*1580** fee *prior* to denial of the permit. One must focus on the fair market value on the date of the denial, namely on October 2, 1982, because that is the date of the alleged taking. *First Lutheran,* 482 U.S. at 321 n. 10, 107 S.Ct. at 2389 n. 10 (the valuation of property taken must be calculated at time of taking); *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1983) (just compensation determined on the date

property is taken); *Tabb Lakes v. United States,* 10 F.3d 796, 803 (Fed.Cir.1993) (compensation is measured from the time the taking occurs).

The pre-denial value ascribed to the fee by the trial court of $10,500 is the value of the wetlands acreage with *no* regulations. The trial court based the $10,500 figure on the acquisition cost with upward adjustments. *Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161, 169 n. 5 (1990) (*Florida Rock III* ).

On the evidence of record, the $10,500 per acre figure does not reflect the fair market value of the fee immediately prior to the denial of the permit on Florida Rock's property. The value of these lands prior to permit denial had previously been diminished by the state and federal *regulations* applicable to all wetlands. However, the regulations in themselves constitute no taking. As specifically held in *United States v. Riverside Bayview Homes, Inc.:*

> A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985).

Thus, any loss attributable to the regulations is noncompensable. As evidenced by enactment of the FWPCA, the nation has come to recognize that wetlands are necessary resources which require special protection from unbridled development. Contrary to the majority, the limitations of development only under permit may be imposed on this type of property without compensation. *Id.*

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5362 Page 85 of 175

Florida Rock Industries, Inc. v. U.S., 18 F.3d 1560 (1994)

38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

Owners of such property have no right from ownership to use lands with this natural resource unfettered. Ownership of property carries responsibilities to the community as a whole as well as privileges. Like height limitations or five-acre zoning laws or other similar restrictions on use, the government's assertion of control generally over use of wetlands, which devalues all such property to some extent, is not itself compensable. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). Thus, the fair market value of the fee must be determined with these general restrictions on land use in place, not as if no regulations of wetlands existed at all. Only with this adjustment is the *pre-taking* value of the property properly determined. Indeed, the evidence of sales of "comparable" lands in the 1980's, discussed by the majority in connection with *post-taking* valuation, appears in fact to reflect the *pre-taking* impact of general wetlands regulations on neighboring property values.

The majority treats sales of wetland property on which no permit was denied as evidence of the value of wetland property on which a permit was denied. Under the majority's rationale, the denial of the permit has *no effect* on valuation. Actually, the majority is suggesting a partial taking occurred based on a comparison between the original value of the subject land and the later lower value of other property, lower because depressed by general regulations, but for which no permit was denied. That would mean the existence of general regulations respecting wetlands effected the taking, which is contrary to the Supreme Court's decision in *Riverside Bayview, supra.* Moreover, the actual alleged act of taking under the majority's view **\*1581** can be simply ignored. Muddled though land takings law may be, it is not so muddled that these concepts can pass muster.

### All Citations

18 F.3d 1560, 38 ERC 1297, 62 USLW 2588, 24 Envtl. L. Rep. 21,036

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

48 S.Ct. 246
Supreme Court of the United States

MILLER et al.

v.

SCHOENE, State Entomologist.

No. 199.
|
Argued January 20, 1928.
|
Decided February 20, 1928.

**Synopsis**

In Error to the Supreme Court of Appeals of the State of Virginia.

Proceeding under the Cedar Rust Act to cause the destruction by W. J. Schoene, State Entomologist, of certain red cedar trees on the lands of Julia V. Miller and others. Judgment adverse to defendants was affirmed (146 Va. 175, 135 S. E. 813), and they bring error. Affirmed.

**Attorneys and Law Firms**

**\*\*246  \*273** Messrs. Randolph Harrison, of Lynchburg, Va., and D. O. Dechert, of Harrisonburg, Va., for plaintiffs in error.

**\*276** Mr. F. S. Tavenner, of Woodstock, Va., for defendant in error.

**Opinion**

**\*277** Mr. Justice STONE delivered the opinion of the Court.

 Acting under the Cedar Rust Act of Virginia, Acts Va. 1914, c. 36, as amended by Acts Va. 1920, c. 260, now embodied in Va. Code (1924) as sections 885 to 893, defendant in error, the state entomologist, ordered the plaintiffs in error to cut down a large number of ornamental red cedar trees growing on their property, as a means of preventing the communication of a rust or plant disease with which they were infected to the apple orchards in the vicinity. The plaintiffs in error appealed from the order to the circuit court of Shenandoah county which, after a hearing and a consideration of evidence, affirmed the order and allowed plaintiffs in error $100 to cover the expense of removal of the cedars. Neither the judgment of the court nor the statute as interpreted allows compensation for the value of the standing cedars or the decrease in the market value of the realty caused by their destruction whether considered as ornamental trees or otherwise. But they save to plaintiffs in error the privilege of using the trees when felled. On appeal the Supreme Court of Appeals of Virginia affirmed the judgment. Miller v. State Entomologist, 146 Va. 175, 135 S. E. 813. Both in the circuit court and the Supreme Court of Appeals plaintiffs in error challenged the constitutionality of the statute under the due process clause of the Fourteenth Amendment and the case is properly **\*\*247** here on writ of error. Judicial Code, s 237a (28 USCA s 344).

The Virginia statute presents a comprehensive scheme for the condemnation and destruction of red cedar trees infected by cedar rust. By section 1 it is declared to be unlawful for any person to 'own, plant or keep alive and standing' on his premises any red cedar tree which is or may be the source or 'host plant' of the communicable plant disease known as cedar rust, and any such tree growing within a certain radius of any apple orchard is declared to be a public nuisance, subject to destruction. Section 2 makes it the duty of the state entomologist, 'upon the **\*278** request in writing of ten or more reputable freeholders of any county or magisterial district, to make a preliminary investigation of the locality * * * to ascertain if any cedar tree or trees * * * are the source of, harbor or constitute the host plant for the said disease * * * and constitute a menace to the health of any apple orchard in said locality, and that said cedar tree or trees exist within a radius of two miles of any apple orchard in said locality.' If affirmative findings are so made, he is required to direct the owner in writing to destroy the trees and, in his notice, to furnish a statement of the 'fact found to exist whereby it is deemed necessary or proper to destroy' the trees and to call attention to the law under which it is proposed to destroy them. Section 5 authorizes the state entomologist to destroy the trees if the owner, after being notified, fails to do so. Section 7 furnishes a mode of appealing from the order of the entomologist to the circuit court of the county, which is authorized to 'hear the objections' and 'pass upon all questions involved,' the procedure followed in the present case.

As shown by the evidence and as recognized in other cases involving the validity of this statute, Bowman v. Virginia State Entomologist, 128 Va. 351, 105 S. E. 141, 12 A. L. R. 1121; Kelleher v. Schoene (D. C.) 14 F. (2d) 341, cedar rust is an infectious plant disease in the form of a fungoid organism which is destructive of the fruit and foliage of the apple, but without effect on the value of the cedar. Its life cycle has two

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

48 S.Ct. 246, 72 L.Ed. 568

phases which are passed alternately as a growth on red cedar and on apple trees. It is communicated by spores from one to the other over a radius of at least two miles. It appears not to be communicable between trees of the same species, but only from one species to the other, and other plants seem not to be appreciably affected by it. The only practicable method of controlling the disease and protecting apple trees from its ravages is the destruction **\*279** of all red cedar trees, subject to the infection, located within two miles of apple orchards.

The red cedar, aside from its ornamental use, has occasional use and value as lumber. It is indigenous to Virginia, is not cultivated or dealt in commercially on any substantial scale, and its value throughout the state is shown to be small as compared with that of the apple orchards of the state. Apple growing is one of the principal agricultural pursuits in Virginia. The apple is used there and exported in large quantities. Many millions of dollars are invested in the orchards, which furnish employment for a large portion of the population, and have induced the development of attendant railroad and cold storage facilities.

On the evidence we may accept the conclusion of the Supreme Court of Appeals that the state was under the necessity of making a choice between the preservation of one class of property and that of the other wherever both existed in dangerous proximity. It would have been none the less a choice if, instead of enacting the present statute, the state, by doing nothing, had permitted serious injury to the apple orchards within its borders to go on unchecked. When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public. It will not do to say that the case is merely one of a conflict of two private interests and that the misfortune of apple growers may not be shifted to cedar owners by ordering the destruction of their property; for it is obvious that there may be, and that here there is, a preponderant public concern in the preservation of the one interest over the other. Compare Bacon v. Walker, 204 U. S. 311, 27 S. Ct. 289, 51 L. Ed. 499; Missouri, Kansas & Texas R. Co. v. May, 194 U. S. 267, 24 S. Ct. 638, 48 L. Ed. 971; Chicago, Terre Haute & Southeastern R. Co. v. Anderson, 242 U. S. 283, 37 S. Ct. 124, 61 L. Ed. 302; Perley v. North Carolina, 249 U. S. 510, 39 S. Ct. 357, 63 L. Ed. 735. And where the public interest is involved **\*280** preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property. Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Hadacheck v. Los Angeles, 239 U. S. 394,

36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927; Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303; Northwestern Fertilizer Co. v. Hyde Park, 97 U. S. 659, 24 L. Ed. 1036; Northwestern Laundry v. Des Moines, 239 U. S. 486, 36 S. Ct. 206, 60 L. Ed. 396; Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385; Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 59 L. Ed. 835, Reinman v. Little Rock, 237 U. S. 171, 35 S. Ct. 511, 59 L. Ed. 900.

**\*\*248**  We need not weigh with nicety the question whether the infected cedars constitute a nuisance according to the common law; or whether they may be so declared by statute. See Hadacheck v. Los Angeles, supra, 411 (36 S. Ct. 143). For where, as here, the choice is unavoidable, we cannot say that its exercise, controlled by considerations of social policy which are not unreasonable, involves any denial of due process. The injury to property here is no more serious, nor the public interest less, than in Hadacheck v. Los Angeles, supra, Northwestern Laundry v. Des Moines, supra, Reinman v. Little Rock, supra, or Sligh v. Kirkwood, supra.

The statute is not, as plaintiffs in error argue, subject to the vice which invalidated the ordinance considered by this court in Eubank v. Richmond, 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cas. 1914B, 192. That ordinance directed the committee on streets of the city of Richmond to establish a building line, not less than five nor more than thirty feet from the street line whenever requested to do so by the owners of two-thirds of the property abutting on the street in question. No property owner might build beyond the line so established. Of this the court said (page 143 (33 S. Ct. 77)):

> 'It (the ordinance) leaves no discretion in the committee on streets as to whether the street (building, semble) line shall or shall not be established in a given case. The action of the committee is determined by two-thirds of the property owners. In **\*281** other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their lots, and against the restriction they are impotent.'

**Miller v. Schoene, 276 U.S. 272 (1928)**
48 S.Ct. 246, 72 L.Ed. 568

The function of the property owners there is in no way comparable to that of the 'ten or more reputable freeholders' in the Cedar Rust Act. They do not determine the action of the state entomologist. They merely request him to conduct an investigation. In him is vested the discretion to decide, after investigation, whether or not conditions are such that the other provisions of the statute shall be brought into action; and his determination is subject to judicial review. The property of plaintiffs in error is not subjected to the possibly arbitrary and irresponsible action of a group of private citizens.

The objection of plaintiffs in error to the vagueness of the statute is without weight. The state court has held it to be applicable and that is enough when, by the statute, no penalty can be incurred or disadvantage suffered in advance of the judicial ascertainment of its applicability. Compare Connally v. General Construction Co., 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322.

Affirmed.

**All Citations**

276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5366 Page 89 of 175
Garcia v. Village of Tijeras, 108 N.M. 116 (1988)
767 P.2d 355, 57 USLW 2507, 1988 -NMCA- 090

108 N.M. 116
Court of Appeals of New Mexico.

Melvin L. GARCIA, Raymond A. Sanchez, David
J. Wilson, Margaret H. Amacker and Duke City
Pit Bull Terrier Club, Inc., a non-profit New
Mexico corporation, Plaintiffs–Appellants,

v.

The VILLAGE OF TIJERAS, a municipality of
the State of New Mexico, Defendant–Appellee.

No. 9424.
|
Oct. 11, 1988.
|
Certiorari Denied Dec. 6, 1988.

**Synopsis**
Dog owners brought action challenging constitutionality of village ordinance banning ownership or possession of pit bull dogs. The District Court of Bernalillo County, Richard B. Traub, D.J., upheld ordinance, and plaintiffs appealed. The Court of Appeals, Bivins, J., held that: (1) ordinance clearly and admittedly applied to plaintiffs' conduct and was not vague for purposes of appeal; (2) ordinance was rationally related to legitimate village purpose; (3) ordinance did not violate dog owners rights to procedural due process; and (4) ordinance did not unconstitutionally allow taking of private property without just compensation.

Affirmed.

**Attorneys and Law Firms**

**356 *117 Billy R. Blackburn, Michael Ushijima, Albuquerque, for plaintiffs-appellants.

Charles J. Crider, Matthews, Crider, Calvert & Bingham, P.C., Albuquerque, for defendant-appellee.

Dale C. Christensen, Jr., Mark J. Hyland, Heidi B. Goldstein, Seward & Kissel, New York City, Louis P. McDonald, Albuquerque, for the American Kennel Club, Inc., as Amicus Curiae.

OPINION

BIVINS, Judge.

{1} Plaintiffs appeal from a judgment upholding the constitutionality of an ordinance of the Village of Tijeras, New Mexico, banning the ownership or possession of a breed of dog "known as American Pit Bull Terrier." They challenge the ordinance on the grounds that it: (1) is void for vagueness; (2) violates substantive and procedural due process; and (3) provides for the taking of private property without just compensation. [1] Plaintiffs do not question the authority of the Village to enact the ordinance. We affirm.

1   Defendant argues that plaintiffs have not complied with the Rules of Civil Appellate Procedure, NMSA 1978, Civ.App.R. 9(a)(3)(ii) & (iii) (Supp.1985) (now codified as SCRA 1986, 12–213(A)(2) & (3)), by failing to recite all the evidence in favor of the trial court's findings and to specifically challenge certain findings and conclusions. The transcripts and briefs in this case sufficiently present the issues to allow review on the merits, notwithstanding a technical violation of the rules. *Huckins v. Ritter*, 99 N.M. 560, 661 P.2d 52 (1983).

FACTS

{2} The Village of Tijeras (Village) is a small, semi-rural community located within Bernalillo County with a population of approximately 312 residents. Eighteen of the eighty households within the Village possessed one or more pit bull dogs at the time the ordinance was enacted. For some time prior to enactment of the ordinance, Village residents had been repeatedly subjected to attacks on their persons and animals by pit bull dogs. Many of their animals were killed and several residents were injured in the attacks. Two months prior to enactment of the ordinance, a nine-year-old girl was severely mauled by pit bull dogs on her way home from school.

{3} Following a series of town meetings for the purpose of discussing the problem presented by these dogs, the Village passed Ordinance No. 32 on May 14, 1984. Section VI, Paragraph I of Ordinance No. 32 makes it unlawful:

> to own or possess in the Village any dog of the breed known as American Pit Bull Terrier. Any such dog may be impounded by the Mayor or Animal Control Officer to be destroyed as provided herein. It shall be held until

a determination is made by a court of competent jurisdiction that the animal is an American Pit Bull Terrier and shall accordingly order that the dog be destroyed.

{4} A month later, plaintiffs filed suit seeking declaratory judgment holding the Village ordinance unconstitutional. Plaintiffs Melvin L. Garcia, Raymond A. Sanchez, and David J. Wilson are residents of the Village and each is the owner of one or more American Pit Bull Terriers. Plaintiff Margaret H. Amacker is a resident of Bernalillo County and is the owner of four "domestic animals which may be classified as American Pit Bull Terriers." Amacker is also the president and registered agent for the Duke City Pit Bull Terrier Club, **357 *118 and travels frequently to the Village with her four animals.

{5} After denying defendant's motion for summary judgment, the matter proceeded to trial. The trial court entered its findings of fact and conclusions of law upholding the ordinance. Judgment was entered in favor of the Village. This appeal follows.

DISCUSSION

{6} As a preliminary matter we note that in scrutinizing the constitutionality of a legislative enactment certain rules of statutory construction favoring constitutionality of the measure are applicable. Foremost among these is the rule that all legislative acts are presumed to be constitutional. *State v. Segotta,* 100 N.M. 498, 672 P.2d 1129 (1983). This presumption extends to municipal ordinances. *City of Albuquerque v. Jones,* 87 N.M. 486, 535 P.2d 1337 (1975). In reviewing the constitutionality of a statute or ordinance, we indulge in every presumption favoring validity of the enactment. *Vandolsen v. Constructors, Inc.,* 101 N.M. 109, 678 P.2d 1184 (Ct.App.1984). This court is obliged to uphold the enactment unless it is satisfied beyond all reasonable doubt that it exceeds constitutional limitations. *Id.; State v. Ball,* 104 N.M. 176, 718 P.2d 686 (1986). The party attacking a statute or ordinance has the burden of establishing its invalidity. *City of Albuquerque v. Jones.*

{7} All of plaintiffs' arguments are based on asserted violations of their right to due process. [2]

2

Although plaintiffs raise the vagueness argument in a section of their brief separate from their other due process arguments, we note that the vagueness doctrine is an aspect of due process. *See State v. Gattis,* 105 N.M. 194, 730 P.2d 497 (Ct.App.1986).

1. *Vagueness*

{8} Plaintiffs first argue that the challenged ordinance fails to define the term "known as American Pit Bull Terrier" with sufficient specificity and is, therefore, void for vagueness. They contend the term is incapable of precise interpretation. Plaintiffs note that the term "American Pit Bull Terrier" is used only by the United Kennel Club, that the American Kennel Club uses the term "American Staffordshire Terrier" to register the same breed, that the American Kennel Club also registers the "Staffordshire Bull Terrier" and the "Bull Terrier," and that all of these breeds might be described as "pit bulls."

{9} The trial court found that the American Pit Bull Terrier is a recognized breed of dog readily identifiable by laymen. We understand the trial court's finding to have been that the breed can be identified by persons who are not qualified to be dog show judges. Plaintiffs have challenged this finding as not supported by substantial evidence. They further argue that the breed varies so much in physical characteristics that it is difficult for the average person to ascertain, with certainty, whether a dog is in fact an American Pit Bull Terrier.

{10} Plaintiffs also contend that owners of mixed-breed dogs, which might be to some percent pit bull, will have no idea whether the ordinance applies to them at all, because the ordinance lacks meaningful standards that could be used to identify those dogs subject to its prohibition. Plaintiffs note that a person might drive through the Village of Tijeras with a pit bull in his or her vehicle without any prior notice of the ordinance.

{11} Under these circumstances, plaintiffs argue that the phrase "known as" is open to a number of interpretations. They contend that this phrase is independently vague. Plaintiffs have standing to challenge the ordinance, on vagueness grounds, only as it applies to them. *See diLeo v. Greenfield,* 541 F.2d 949 (2d Cir.1976); *State v. Hines,* 78 N.M. 471, 432 P.2d 827 (1967). One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

{12} There was testimony at trial that the term "pit bull" is the generic term for "American Staffordshire Terrier." There was also testimony at trial that there is no difference between the American Staffordshire **358 *119 Terrier and the American Pit Bull Terrier.

{13} In addition, there was testimony that each breed of dog has a typical physical appearance termed as "phenotype," and that an unregistered dog can be identified as being of the breed "American Pit Bull Terrier" by its physical characteristics, or phenotype. Several witnesses testified that they could recognize an American Pit Bull Terrier by its physical characteristics.

{14} We believe this evidence supports a determination that the breed American Pit Bull Terrier is a breed of dog recognized by its physical appearance. Given our obligation to indulge every presumption in favor of constitutionality, we interpret the term "known as" in light of the testimony at trial. Thus, we interpret the ordinance to include not only dogs that are registered, but also dogs that are recognizable, as American Pit Bull Terriers or American Staffordshire Terriers.

{15} The trial court found that plaintiffs owned or were involved with American Pit Bull Terriers. These findings were not challenged on appeal. We conclude that the ordinance clearly applies to plaintiffs' conduct.

{16} It is clear, then, that plaintiffs had notice that the ordinance proscribes the conduct in which they were engaged. The essence of the vagueness doctrine is notice. *State ex rel. Health & Social Servs. Dep't v. Natural Father,* 93 N.M. 222, 598 P.2d 1182 (Ct.App.1979). Since plaintiffs had the requisite notice that the ordinance prohibited their activities, the ordinance is not vague as applied to them. Therefore, we are precluded from striking the ordinance on that ground.

{17} As we noted above, plaintiffs attempt to attack the ordinance by pointing out that it is vague as it might be applied to owners of mixed breeds of dog or to other dog owners who have no knowledge that their dog may be "known as [an] American Pit Bull Terrier." This attack is not germane to the inquiry here. A statute is not void for vagueness when a purely facial attack is made alleging uncertainty in its application to hypothetical parties. *Gallaher v. City of Huntington,* 759 F.2d 1155 (4th Cir.1985). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."

*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnote omitted).

{18} The ordinance clearly and admittedly applies to plaintiffs' conduct and, therefore, is not vague for purposes of this appeal.

### 2. Rational Relation

{19} Plaintiffs argue that the Village ordinance at issue violates substantive due process. In order to withstand scrutiny under the fifth and fourteenth amendments to the United States Constitution and similar provisions in our state Constitution, N.M. Const. art. II, §§ 4 & 18, a statute or ordinance must bear a rational relationship to a legitimate legislative goal or purpose. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *Casillas v. S.W.I.G.,* 96 N.M. 84, 628 P.2d 329 (Ct.App.1981).

{20} That the Village had a legitimate purpose in enacting the ordinance—the protection of the health and safety of Village residents—is undisputed. However, plaintiffs contend that the ordinance is not rationally related to that purpose. We disagree. The trial court's findings were to the effect that American Pit Bull Terriers presented a special danger to the health and safety of Village residents. The evidence supports this determination.

{21} As we have already stated, eighteen of the eighty households in the Village possessed pit bull dogs, a proportion approaching 25%. Village witnesses testified concerning a number of specific incidents involving pit bull attacks in the Village. The trial court found that there had been several serious attacks involving American Pit Bull Terriers.

**359 *120 {22} The attack on the nine-year-old girl, Angela Hands, was the most tragic incident. On March 19, 1984, Angela was severely mauled by American Pit Bull Terriers belonging to her grandparents while on her way home from school. Angela was initially attacked by two of her grandparents' younger pit bulls, which were running loose outside their fenced enclosure. One of the young dogs bit her on the hip and knocked her to the ground. The second young dog joined in the attack; the two parent dogs climbed a six-foot-high fenced enclosure and also attacked Angela. She sustained extensive injuries requiring major reconstructive

and rehabilitative surgery. Doctors estimate that Angela will continue to undergo these surgeries until age thirty-five.

{23} In addition to the attack on Angela, there were other reported mishaps in which American Pit Bull Terriers were involved. In December 1983, Melinda Ryan's dog was attacked in the Village by a pit bull belonging to David Wilson. The attack was prolonged, as the pit bull would not release its victim despite shouting, throwing water, and stamping on the attacking dog's neck. Eventually, the Wilson dog released the Ryan dog, but only after repeated blows to the offending animal's head and neck. The Ryan dog was severely injured, sustaining extensive ligamentous and muscular damage that required veterinary surgery.

{24} In July 1983, twenty-seven ducks, chickens, geese, and turkeys belonging to Joann Garcia were killed by American Pit Bull Terriers within the Village when the dogs worked their way into Garcia's fenced enclosure. Modesto Garcia, another resident of the Village, was bitten when American Pit Bull Terriers attacked his son's dog in July 1984. There were other incidents in addition to those described above.

{25} As a complement to the testimony regarding specific incidents, the Village also presented evidence establishing that the American Pit Bull Terrier breed possesses inherent characteristics of aggression, strength, viciousness and unpredictability not found in any other breeds of dog. The testimony indicates that American Pit Bull Terriers are frequently selected by dogfighters specifically because of their extraordinary fighting temperament. In a fight or attack, they are very aggressive and the most tenacious dog of any breed. They continue their attack until they are separated or their victim is destroyed. Unlike other breeds of dog that "bite and slash" in an attack, pit bulls will "bite and hold," thereby inflicting significantly more damage upon their victim.

{26} Testimony was also presented that pit bulls are especially dangerous due to their unpredictability. It is impossible to tell from looking at a pit bull whether it is aggressive or not. American Pit Bull Terriers have been known to be friendly and docile at one moment, willing to sit on your lap and lick your face, and at the next moment to attack in a frenzied rage. A pit bull in the grip of such a fighting frenzy will not respond to attempts to deter its attack. Such frenzies can occur at any time and for no apparent reason. There was testimony to the effect that such berserk frenzies do not occur in other breeds of dog. This behavior has been substantiated by a number of reports from owners

of American Pit Bull Terriers. There was further evidence to show that, in proportion to their population, more dog-bite incidents are caused by American Pit Bull Terriers than by other breeds.

{27} Other evidence tended to establish that the American Pit Bull Terrier is an exceptionally strong and athletic dog. Extraordinary measures are required for confining American Pit Bull Terriers, such as a six-foot chainlink fence with an overhanging ledge to keep the dogs from jumping out, and six-inch wide, one-foot deep concrete footings around the base to keep the dogs from digging under. They have exceptionally strong bites, possibly twice the strength of bites of other dogs. They can grip cyclone fencing and tear it from its mounting, and have been known to destroy sheet metal panels by ripping them apart with their teeth.

{28} Testimony by a representative of the Animal Humane Association in Albuquerque established that the society takes in many **360 *121 stray dogs of every breed and mix-breed. Some have exhibited aggressive behavior towards other dogs, but none have ever caused the kinds of injuries or exhibited the aggressive behavior shown by American Pit Bull Terriers. The Albuquerque Animal Humane Association and other humane societies do not adopt out pit bull dogs because of their potential for attacks on other animals and people.

{29} Plaintiffs produced contrary evidence to the effect that environment and training are more important than genetics in determining the behavior of a dog. Many breeders, including plaintiff Amacker, breed American Pit Bull Terriers for the show ring, where aggressiveness towards humans would disqualify them. Evidence was presented concerning the history of this breed of dog that indicated it was not bred for aggressiveness towards humans. Many owners of American Pit Bull Terriers report that they are loyal and gentle family pets. Evidence was presented to establish that other breeds of dog are responsible for more of the total number of bite incidents every year than are American Pit Bull Terriers.

{30} Notwithstanding this evidence presented by plaintiffs, the evidence presented by the Village was extensive and was derived from credible sources. What is true of some American Pit Bull Terriers may well not be true of others. However, where evidence is conflicting, we defer to the fact finder and uphold the findings if supported by substantial evidence. *See Getz v. Equitable Life Assurance Soc'y of U.S.,* 90 N.M. 195, 561 P.2d 468, *cert. denied,* 434 U.S. 834, 98 S.Ct. 121, 54

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR004901

L.Ed.2d 95 (1977). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Anaconda Co. v. Property Tax Dep't,* 94 N.M. 202, 608 P.2d 514 (Ct.App.1979). We believe the evidence amply supports the trial court's findings concerning the threat to the safety of the residents of the Village presented by American Pit Bull Terriers.

{31} In light of the instances of personal injury and property damage in the Village attributable to American Pit Bull Terriers, of the unusual prevalence of dogs of this breed in the Village, and of the evidence presented concerning the inherent characteristics of aggression, strength, and unpredictability of this breed, we find the ordinance banning possession of American Pit Bull Terriers is reasonably related to protecting the health and safety of the residents of the Village. Thus, we hold that the Village ordinance does not violate substantive due process. In so holding, we do not intend to condemn the American Pit Bull Terrier breed as a whole; we recognize that there are "good" pit bulls and "bad" pit bulls, as plaintiffs argue. We also recognize, however, that pit bulls presented a special threat to the residents of the Village, due to the dogs' prevalence in the Village and to those dogs' history of aggressive behavior. Our ruling would be the same if eighteen out of the eighty households owned German Shepherd dogs, and German Shepherd dogs had been involved in a number of attacks on people and animals before being banned from the Village. The Village has no animal control officer and must rely on a contractual arrangement with county authorities.

{32} The Village was entitled to combat the special threat it faced from pit bulls, and the Village's action was clearly rationally related to efforts to combat that threat. The trial court's carefully drafted decision was narrowly tailored to the unique situation presented; so is our holding affirming that decision.

{33} Plaintiffs also contend that an ordinance banning only one breed of dog rather than all breeds, pure and mixed, bears no rational relationship to a legitimate governmental purpose. Although this argument was raised in the context of their due process claim, we view it as alleging a violation of equal protection. Even so, we find that the Village's classification, whereby owners of American Pit Bull Terriers are treated differently than owners of other breeds of dog, is not violative of either due process or equal protection. Where the challenged ordinance does not trammel fundamental rights or involve a suspect classification, the court presumes the constitutionality **361 *122 of the discriminatory

classification. *Garcia v. Albuquerque Pub. Schools Bd. of Educ.,* 95 N.M. 391, 622 P.2d 699 (Ct.App.1980). In order to meet the requirements of the equal protection clauses of the United States and New Mexico Constitutions, the challenged classification must be rationally related to a legitimate state interest. *Id.* "If any state of facts can reasonably be conceived which will sustain the classification, the statute is valid." *Id.* at 393, 622 P.2d at 701.

{34} As mentioned above, there is substantial evidence of record that American Pit Bull Terriers presented a special threat to the safety of the residents of the Village over and above that presented by other breeds of dog. A legislature or municipal governing body is entitled to address threats in a piecemeal fashion, countering each threat as it arises. *See Vandolsen v. Constructors, Inc.* To satisfy equal protection tenets, it is not necessary that the Village address all potential threats from all breeds of dog; instead, the Village was entitled to address a phase of the problem that was of acute concern. *See id.* Attacks by American Pit Bull Terriers, as opposed to dog attacks in general, were of acute concern to the Village. We therefore hold that the ordinance does not violate plaintiffs' rights to equal protection.

### 3. *Procedural Due Process*

{35} Plaintiffs argue that the ordinance violates due process in that it fails to provide owners of American Pit Bull Terriers notice and an opportunity to be heard prior to the destruction of their dogs. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *McCoy v. New Mexico Real Estate Comm'n,* 94 N.M. 602, 614 P.2d 14 (1980); *James v. Brumlop,* 94 N.M. 291, 609 P.2d 1247 (Ct.App.1980); *see also Lacey v. Lemmons,* 22 N.M. 54, 159 P. 949 (1916). We disagree.

{36} The ordinance on its face provides that a dog identified as an American Pit Bull Terrier "may be impounded * * * [and] held until a determination is made by a court of competent jurisdiction that the animal is an American Pit Bull Terrier * * * *" The plain language of the ordinance contemplates that a hearing will be held to determine whether a dog is an American Pit Bull Terrier prior to the destruction of the dog. *See State v. David,* 102 N.M. 138, 692 P.2d 524 (Ct.App.1984) (constitutional amendment providing that bail may be denied in certain instances by order of district court contemplates a due process hearing). That the ordinance does not expressly set out the procedures to be followed with respect to notice of the hearing and an owner's right to appear and be heard is not fatal.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

{37} It is well settled that if an act can be applied or interpreted so as to avoid constitutional conflict, such construction should be adopted by the court. *Id.* Moreover, we indulge in every presumption favoring validity of the enactment. *Vandolsen v. Constructors, Inc.* We therefore conclude that the express requirement of a judicial determination provided by the ordinance contemplates that such determination will comport with due process requirements, namely, that a hearing will be held before a court of competent jurisdiction and that the owner of the impounded animal will be provided notice of the hearing and an opportunity to appear before the court to present evidence and defenses to the action. *See Montoya v. Blackhurst,* 84 N.M. 91, 500 P.2d 176 (1972). Accordingly, the opportunity to be heard and present evidence would occur at a meaningful time, that is, prior to the destruction of the dog. *See Mathews v. Eldridge.* [3]

---

[3]      Section III, paragraph B of the ordinance also provides that notice of impoundment and procedures for redemption will be given to the owners in accordance with applicable Bernalillo County Ordinances, which the ordinance purports to incorporate by reference.

{38} We therefore reject plaintiffs' challenges under this point.

### 4. *Taking of Property Without Just Compensation*

{39} Plaintiffs argue that the ordinance violates due process in that it allows the taking of private property without just compensation. This argument is likewise without merit. Plaintiffs correctly note **\*362 \*123** that, in New Mexico, dogs are deemed personal property. *See* NMSA 1978, § 77–1–1. However, it is well established that property and property rights are held subject to the proper exercise of the police power. *Mitchell v. City of Roswell,* 45 N.M. 92, 111 P.2d 41 (1941). "[A] reasonable regulation enacted for the benefit of the public health, convenience, safety or general welfare is not an unconstitutional taking of property in violation of * * * due process * * * *" Id.* at 98, 111 P.2d at 44. The ordinance, being a proper exercise of the Village's police power, is not a deprivation of property without due process even though it allows for the destruction of private property. *See Alber v. Nolle,* 98 N.M. 100, 645 P.2d 456 (Ct.App.1982).

{40} Cases cited by plaintiffs for the proposition that the state may not order the destruction of private property absent extreme, imperative or overruling necessity do not support their claim. The United States Supreme Court in *Webb's*

*Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), and *Sentell v. New Orleans & Carrollton R.R.,* 166 U.S. 698, 17 S.Ct. 693, 41 L.Ed. 1169 (1897), recognized that there can be a deprivation of private property where justified as a legitimate exercise of the police power.

> Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the State, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.

*Sentell v. New Orleans & Carrollton R.R.,* 166 U.S. at 704, 17 S.Ct. at 695. A legislative enactment is justified as a legitimate exercise of the police power if it is reasonably necessary to preserve and protect the public health, safety, morals or welfare. *State v. Dennis,* 80 N.M. 262, 454 P.2d 276 (Ct.App.1969). We deem that test to be satisfied here. The extent of damages previously inflicted by American Pit Bull Terriers in the Village, coupled with the evidence of the animal's potential threat and unpredictability, furnish such necessity.

{41} In the matter before us, the Village has legitimately exercised the police power to curtail a menace to the public health and safety. Plaintiffs cite to *Dennis* for the proposition that a legislative body may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable on the use or enjoyment of private property. In *Dennis,* an arson statute (NMSA 1953, § 40A–17–5 (Repl.Vol. 6, 1964)), which was drafted so broadly that it imposed criminal sanctions even on those who might burn structures for entirely legitimate and beneficial purposes, was determined to be an unreasonable exercise of the police power.

{42} Although plaintiffs argue that there are many legitimate and beneficial uses for the American Pit Bull Terrier, the evidence adduced at trial supports the inference that a significant number of such dogs are dangerous due to training and upbringing, as well as their inherent characteristics of aggression, strength, viciousness and unpredictability. Defendant draws a proper analogy to *Green v. Town of*

*Gallup,* 46 N.M. 71, 120 P.2d 619 (1941). In that case, a town ordinance imposing criminal penalties for door-to-door solicitation was upheld, despite allegations that not all door-to-door solicitors represented a nuisance or threat to the public. *Id.* The supreme court recognized that activity which might be innocent or beneficial elsewhere, could rise to the level of a general problem requiring legislative regulation in some municipalities, due to local conditions. *Id.*

{43} In the present case, evidence demonstrates that American Pit Bull Terriers present a special threat to Village residents, over and above any threat they might offer to the public in general. This evidence consisted of testimony establishing that there is a high percentage of pit bull dogs in relation to the population of the Village, and that Village residents had been repeatedly subjected to attacks on their persons and animals by American Pit Bull Terriers for some time prior to enactment of the ordinance. In light of this evidence, the Village could properly determine that an ordinance banning American Pit Bull Terriers was necessary for the **363 *124 protection of its citizens. *See Sentell v. New Orleans & Carrollton R.R.; State v. Dennis.* That a harmless or inoffensive American Pit Bull Terrier may be banned in order to abate the threat to safety of the Village presented by other American Pit Bull Terriers does not render the ordinance invalid. *Cf. Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

{44} We also point out that the geographic scope of this ordinance is limited. Plaintiffs and other pit bull dog owners in the Village may remove their dogs from the Village. We also note that the Village notified everyone prior to enforcing the ordinance. Under these circumstances, a finding that a taking requiring compensation has occurred is much less compelling. *See Quilici v. Village of Morton Grove,* 532 F.Supp. 1169 (N.D.Ill.1981), *aff'd,* 695 F.2d 261 (7th Cir.1982), *cert. denied,* 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983).

{45} It is not entirely clear from the ordinance itself under what circumstances an impounded American Pit Bull Terrier would be destroyed. If the provisions for impounding vicious animals were to be incorporated by the reference to impounding as a procedure, the dog owner apparently would be permitted to redeem the animal. In this record, there is no claim that any dog has been destroyed or is threatened with destruction. We believe the question of whether the provision for destruction is a compensable taking is not ripe for judicial determination; therefore, we do not reach it. *Cf. Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2389, 69 L.Ed.2d 1 (1981) (where there was no allegation of evidence that penalties had been imposed, a due process challenge to civil penalties provided for violation of certain administrative orders was held premature); *see Sanchez v. City of Santa Fe,* 82 N.M. 322, 481 P.2d 401 (1971) (a prerequisite of an "actual controversy" is an issue that is "ripe" for judicial determination).

{46} Plaintiffs' last claim of error therefore is also rejected.

CONCLUSION

{47} Under the facts of this case, we hold that Village of Tijeras Ordinance No. 32 is not violative of the United States or New Mexico Constitutions insofar as it prohibits the ownership or possession of American Pit Bull Terriers within the Village limits. The judgment of the district court is affirmed.

{47} IT IS SO ORDERED.

MINZNER and FRUMAN, JJ., concur.

**All Citations**

108 N.M. 116, 767 P.2d 355, 57 USLW 2507, 1988 -NMCA-090

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

82 Fed.Cl. 619
United States Court of Federal Claims.

William AKINS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 08–136C.
|
July 24, 2008.

**Synopsis**

**Background:** Holder of patent on device which increased the rate of fire of a semi-automatic weapon brought suit against the United States alleging that ruling of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) classifying device as a "machine gun" and prohibiting the sale of device to anyone other than law enforcement agencies effected a physical and regulatory taking. Defendant moved to dismiss.

The United States Court of Federal Claims, Wheeler, J., held that ATF was acting pursuant to the police power conferred on it by Congress when it classified device as a "machine gun," ordered inventor to register or surrender the devices, and prohibited him from selling them to anyone other than law enforcement agencies, and thus its actions did not constitute a physical or regulatory "taking."

Motion granted.

**Attorneys and Law Firms**

*620  John R. Monroe, Roswell, Georgia, for Plaintiff.

Michael N. O'Connell, with whom were Gregory G. Katsas, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., and Melissa Anderson, ATF Office of Chief Counsel, Of Counsel, for Defendant.

***OPINION AND ORDER***

WHEELER, Judge.

In this Fifth Amendment takings case, Plaintiff William Akins seeks just compensation for damages resulting from a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") ruling that classifies Plaintiff's invention, the "Akins Accelerator," as a machine gun, and prohibits Plaintiff from selling this device to anyone other than law enforcement agencies. The case is before the Court on Defendant's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Court of Federal Claims ("RCFC"). For the reasons stated below, the Court grants Defendant's motion to dismiss.

*Background* [1]

[1]   The facts set forth in this opinion do not constitute findings of fact by the Court. The facts cited are either undisputed, or are taken from Plaintiff's complaint and accompanying exhibits, and are presumed to be true for the purpose of deciding Defendant's motion to dismiss. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

On August 15, 2000, the United States Patent and Trademark Office issued *621 Patent No. 6,101,918 ("the '918 patent") to Plaintiff for a device that became known as the "Akins Accelerator." Comp. ¶ 6. According to the patent, the purpose of the Akins Accelerator was "to increase the cyclic rate at which the trigger of a semi-automatic firearm can be actuated to discharge the weapon." Comp. Ex. A.

On March 31, 2002, Plaintiff submitted patent drawings of the Akins Accelerator to ATF for classification under the National Firearms Act, 26 U.S.C. § 5801 *et. seq.* Comp. ¶ 7, Ex. B. In particular, Plaintiff inquired whether ATF would consider the Akins Accelerator to be a machine gun as defined by 26 U.S.C. § 5845(b). *Id.* At the time, Plaintiff did not have any prototypes available for ATF to test. Comp. Ex. B. ATF requested a sample of the device, and on November 17, 2003, sent a letter to Plaintiff's business associate, Thomas Bowers, stating that "the submitted stock assembly does not constitute a machinegun as defined in the NFA." Comp. ¶¶ 10–15, Ex. E. ATF confirmed its November 17, 2003 ruling in a January 29, 2004 letter to Mr. Bowers. Comp. Ex. G. Relying on ATF's classification, Plaintiff and Mr. Bowers began producing and distributing the Akins Accelerators through Plaintiff's predecessor in interest, the Akins Group, Incorporated. Comp. ¶ 23.

On November 22, 2006, more than three years after ATF's initial classification, Richard Vasquez, Assistant Chief of ATF's Firearms Technology Branch, sent a letter to Mr. Bowers stating that ATF had "recently received a request from an individual to examine a device referred to as an 'Akins Accelerator.' " Comp. Ex. H at 1. As a result of this request, ATF tested the Akins Accelerator and determined that it was a machine gun under the National Firearms Act, as well as the Gun Control Act of 1968. Comp. ¶ 24, Ex. H at 1–2 (citing 18 U.S.C. §§ 921(a)(23), 922(o); 26 U.S.C. § 5845(b)). Mr. Vasquez noted ATF's earlier classification and stated that "[t]o the extent that the determination in this letter is inconsistent with the letters dated November 17, 2003, and January 29, 2004, they are hereby overruled." Comp. Ex. H at 3. Three weeks later, on December 13, 2006, ATF issued a generic ruling describing the Akins Accelerator and declaring it to be a machine gun. Comp. ¶ 26. On September 24, 2007, ATF denied Plaintiff's motion for reconsideration stating "the device should remain classified as a machine gun...." Comp. ¶ 30.

On January 19, 2007, ATF required the Akins Group and Plaintiff to remove recoil springs from all Akins Accelerators and surrender them to ATF, thereby rendering the devices non-functional and without value. Comp. ¶¶ 33–34. The Akins Group assigned all rights and interests in claims it may have against the Government to Plaintiff on February 18, 2008. Comp. ¶ 36.

Plaintiff filed a three-count complaint in this Court on March 6, 2008, alleging both regulatory and physical takings as well as due process violations. Plaintiff requested just compensation for property taken, and a declaratory judgment that ATF's ruling was arbitrary and capricious, or, in the alternative, that 18 U.S.C. § 922(o) is unconstitutional. On May 2, 2008, Defendant filed a motion to dismiss Plaintiff's claims pursuant to RCFC 12(b)(1) and 12(b)(6). Specifically, Defendant argued that this Court lacks jurisdiction to (1) hear Plaintiff's due process claim, (2) conduct Administrative Procedures Act ("APA") review of ATF's ruling, (3) declare 18 U.S.C. § 922(o) unconstitutional, or (4) issue the requested declaratory and injunctive relief. In response, Plaintiff withdrew his due process claim and request for declaratory and injunctive relief. Pl.'s Resp. at 2.[2] Thus, only Plaintiff's physical and regulatory takings claims remain before the Court. This Court has jurisdiction to hear a claim for just compensation pursuant to the Takings Clause of the Fifth Amendment. *See e.g., Overview Books, LLC v. United States,* 72 Fed.Cl. 37, 41 (2006) ("A claim for

***622** compensation pursuant to the Takings Clause of the Fifth Amendment constitutes a money-mandating provision sufficient to invoke the jurisdiction of this court.").

2   Plaintiff apparently has filed a separate action in Federal district court challenging the ATF's designation of the Akins Accelerator as a machine gun. *Akins v. United States,* No. 08–CV–00988T–26TGW (M.D.Fla.). For the purposes of a takings claim, this Court must assume that the underlying agency action was lawful. *Acadia Tech., Inc. v. United States,* 458 F.3d 1327, 1331 (Fed.Cir.2006); *Rith Energy, Inc. v. United States,* 270 F.3d 1347, 1352–53 (Fed.Cir.2001) (on petition for rehearing).

## Discussion

### A. *Standards for Decision*

"[A] complaint should be dismissed under RCFC 12(b)(6) 'when the facts asserted by the claimant do not entitle him to a legal remedy.' " *Steward v. United States,* 80 Fed.Cl. 540, 542–43 (2008) (quoting *Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002)). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, and [the Court] must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001) (citations omitted); *see also Huntleigh USA Corp. v. United States,* 63 Fed.Cl. 440, 443 (2005). The Court, however, is not required to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). While the complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (citations omitted).

Under RCFC 12(b), when matters outside the pleadings are presented and not excluded by the Court, the motion to dismiss shall be treated as a motion for summary judgment under RCFC 56, and the parties shall be given reasonable opportunity to present materials pertinent to the

motion. Where, however, the Court relies only on undisputed documents attached as exhibits to the Complaint, the Court may proceed without converting the motion to dismiss to one for summary judgment. *See American Contractors Indem. Co. v. United States,* 81 Fed.Cl. 682, 688 (2008). In this case, Plaintiff attached eleven exhibits to the Complaint containing the abstract to the ′918 patent, and correspondence between the Akins Group and ATF. Defendant does not dispute the validity of any of Plaintiff's attached exhibits, and the Court will consider them for the purposes of Defendant's motion without converting it to a motion for summary judgment.

### B. *Takings Analysis*

The Takings Clause of the Fifth Amendment provides that "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. "[T]he government may 'take' private property either by physical invasion or by regulation." *American Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1371 (Fed.Cir.2004) (citing *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). In this case, Plaintiff alleged both a physical and regulatory taking. First, Plaintiff asserted that ATF "required Akins Group, Inc. to remove recoil springs from all Akins Accelerators in inventory and surrender them to [ATF]." Comp. ¶¶ 33, 41. Second, Plaintiff contended that ATF's December 13, 2006 ruling resulted in a regulatory taking. Comp. ¶¶ 26, 40.

The Takings Clause "does not entitle all aggrieved owners to recompense, only those whose property has been 'taken for a public use.' " *AmeriSource Corp. v. United States,* 525 F.3d 1149, 1152 (Fed.Cir.2008). "Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *Id.* at 1153 (applying the police power doctrine in the context of an alleged physical taking); *see also Rith Energy, Inc. v. United States,* 270 F.3d 1347 (Fed.Cir.2001) (on petition for rehearing) (applying the police power doctrine in the context of an alleged regulatory taking); *Seay v. United States,* 61 Fed.Cl. 32, 35 (2004).

The police power doctrine may apply where the government acts in order "to protect the general health, safety and welfare of its citizens." *AmeriSource Corp. v. United States,* 75 Fed.Cl. 743, 747 (2007), *aff'd,* **\*623** 525 F.3d 1149 (Fed.Cir.2008); *see also Acadia Tech., Inc. v. United States,* 65 Fed.Cl. 425, 429 (2005) (holding that if property "is taken to prevent public harm, the government action may be an exercise of police power."), aff'd, 458 F.3d

1327 (Fed.Cir.2006). As the United States Supreme Court explained long ago:

> A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests.

*Mugler v. Kansas,* 123 U.S. 623, 668–69, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (holding that a State law prohibiting the manufacture and sale of intoxicating liquors except for limited purposes did not constitute a compensable taking). Other examples of the exercise of police power resulting in a noncompensable government taking include: seizing pharmaceuticals to enforce criminal laws against a third party, *AmeriSource Corp.,* 525 F.3d at 1150–51; seizing goods suspected of bearing counterfeit marks, *Acadia Tech.,* 458 F.3d at 1332 (describing the Customs seizure as "a classic example of the government's exercise of the police power to condemn contraband or noxious goods ...."); and revoking a mining permit to prevent harmful runoff to surrounding communities, *Rith Energy,* 270 F.3d at 1352.

Congress has granted ATF the authority to investigate criminal and regulatory violations of Federal firearms laws. 28 U.S.C. § 599A(b)(1). One of the Federal firearms laws that ATF is authorized to enforce is 18 U.S.C. § 922(*o*), which states that "it shall be unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(*o*) (establishing limited exceptions that do not apply in this case). A person who knowingly violates § 922(*o*) shall be fined, imprisoned not more than ten years, or both. 18 U.S.C. § 924(a)(2). The record shows that ATF was acting under this authority when it classified the Akins Accelerator as a machine gun, ordered Plaintiff to register or surrender the devices, and prohibited Plaintiff from selling them to anyone other than

law enforcement agencies. *See* Comp. Ex. H (citing 18 U.S.C. §§ 921(a)(23), 922(*o*); 26 U.S.C. § 5845(b)). As ATF was acting pursuant to the police power conferred on it by Congress, Plaintiff's complaint fails to state a compensable takings claim under the Fifth Amendment. *See AmeriSource Corp.,* 525 F.3d at 1154 ("so long as the government's exercise of authority was pursuant to some power other than eminent domain, then the plaintiff has failed to state a claim for compensation under the Fifth Amendment.") (citing *Bennis v. Michigan,* 516 U.S. 442, 453, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996)).

In addition to being barred under the police power doctrine, the Court agrees with Defendant that Plaintiff's regulatory takings claim fails because his expectancy interest in manufacturing and selling Akins Accelerators to the general public is not protected property under the Fifth Amendment. Under *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Mitchell Arms, Inc. v. United States,* 26 Cl.Ct. 1, 5 (1992), aff'd, 7 F.3d 212 (Fed.Cir.1993); *cf. Lucas,* 505 U.S. at 1027–28, 112 S.Ct. 2886 ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless...."). "[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase."* **\*624** *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (emphasis in original) (holding that Congress's prohibition on the sale of preexisting eagle feathers did not constitute a taking).

In *Mitchell Arms,* the plaintiff, a federally-licensed firearms importer, alleged that ATF's suspension and revocation of import permits constituted a compensable taking under the Fifth Amendment. *Mitchell Arms,* 7 F.3d at 215. The Federal Circuit held that the plaintiff's expectation interest in selling firearms in the United States was not property protected by the Fifth Amendment because the plaintiff "voluntarily entered the firearms import business, thereby knowingly placing itself in the governmentally controlled arena of firearms importation of the Gun Control Act...." *Id.* at 216.

Like the plaintiff in *Mitchell Arms,* Plaintiff here voluntarily entered an area subject to pervasive federal regulation—the manufacture and sale of firearms. According to the abstract of the '918 patent, Plaintiff designed and manufactured an assembly that increased the rate at which semi-automatic weapons are discharged. *See* Comp. Ex. A (describing the Akins Accelerator as "[a]n accelerating assembly effectively to increase the cyclic rate at which the trigger of a semi-automatic firearm can be actuated to discharge the weapon."). Plaintiff's knowledge of the potential for federal regulation of his invention is evidenced by his initial March 31, 2002 letter to ATF in which he describes the Akins Accelerator and asks "would B.A.T.F. consider the installed combination to be a machine gun according to N.F.A federal law?" Comp. Ex. B. Consequently, Plaintiff's expectation interest in manufacturing and distributing Akins Accelerators to the public free from Federal regulation is not a property interest protected by the Fifth Amendment.

*Conclusion*

Based upon the foregoing, Defendant's motion to dismiss under RCFC 12(b)(6) is GRANTED. The Clerk is directed to dismiss Plaintiff's complaint with prejudice.

IT IS SO ORDERED.

**All Citations**

82 Fed.Cl. 619

---

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

116 S.Ct. 994
Supreme Court of the United States

Tina B. BENNIS, Petitioner,

v.

MICHIGAN.

No. 94–8729.
|
Argued Nov. 29, 1995.
|
Decided March 4, 1996.
|
Rehearing Denied April 22, 1996.
|
See 517 U.S. 1163, 116 S.Ct. 1560.

**Synopsis**

After husband was convicted of gross indecency in connection with his sexual activity with prostitute in car, which he and his wife owned jointly, county prosecutor filed complaint alleging that car was public nuisance subject to abatement. The Circuit Court, Wayne County, Michael J. Talbot, J., entered order of abatement, and car owners appealed. The Court of Appeals, 200 Mich.App. 670, 504 N.W.2d 731, reversed. Leave to appeal was granted. The Supreme Court of Michigan, Riley, J., 447 Mich. 719, 527 N.W.2d 483, reversed Court of Appeals. The Supreme Court, Justice Rehnquist, granted certiorari and held that: (1) wife was not entitled to innocent owner defense to contest abatement of car by showing that she did not know husband would use car to violate Michigan's indecency law, and (2) forfeiture of wife's interest in car was not taking of private property for public use in violation of the takings clause.

Judgment of Supreme Court of Michigan affirmed.

Justice Thomas filed concurring opinion.

Justice Ginsburg filed concurring opinion.

Justice Stevens filed dissenting opinion in which Justices Souter and Breyer joined.

Justice Kennedy, filed dissenting opinion.

**\*\*995  \*442**  *Syllabus* [*]

[*]  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner was a joint owner, with her husband, of an automobile in which her husband engaged in sexual activity with a prostitute. In declaring the automobile forfeit as a public nuisance under Michigan's statutory abatement scheme, the trial court permitted no offset for petitioner's interest, notwithstanding her lack of knowledge of her husband's activity. The Michigan Court of Appeals reversed, but was in turn reversed by the State Supreme Court, which concluded, *inter alia,* that Michigan's failure to provide an innocent-owner defense was without federal constitutional consequence under this Court's decisions.

*Held:* The forfeiture order did not offend the Due Process Clause of the Fourteenth **\*\*996** Amendment or the Takings Clause of the Fifth Amendment. Pp. 997–1001.

(a) Michigan's abatement scheme has not deprived petitioner of her interest in the forfeited car without due process. Her claim that she was entitled to contest the abatement by showing that she did not know that her husband would use the car to violate state law is defeated by a long and unbroken line of cases in which this Court has held that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use. See, *e.g., Van Oster v. Kansas,* 272 U.S. 465, 467–468, 47 S.Ct. 133, 134, 71 L.Ed. 354, and *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 668, 683, 94 S.Ct. 2080, 2084, 2091–2092, 40 L.Ed.2d 452; *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 1785–1786, 118 L.Ed.2d 437, and *Austin v. United States,* 509 U.S. 602, 617–618, 113 S.Ct. 2801, 2809–2810, 125 L.Ed.2d 488, distinguished. These cases are too firmly fixed in the country's punitive and remedial jurisprudence to be now displaced. Cf. *J.W. Goldsmith, Jr.–Grant Co. v. United States,* 254 U.S. 505, 511, 41 S.Ct. 189, 191, 65 L.Ed. 376. Pp. 997–1001.

(b) Michigan's abatement scheme has not taken petitioner's property for public use without compensation. Because the forfeiture proceeding did not violate the Fourteenth Amendment, her property in the automobile was transferred by virtue of that proceeding to the State. The government

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain. See, *e.g., United States v. Fuller,* 409 U.S. 488, 492, 93 S.Ct. 801, 804, 35 L.Ed.2d 16. P. 1001.

447 Mich. 719, 527 N.W.2d 483, affirmed.

**\*443** REHNQUIST, C.J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, THOMAS, SCALIA. THOMAS, AND GINSBURG, JJ., JOINED. THOMAS, J., *POST,* P. 1001, AND GINSBURG, JJ., *POST,* P. 1003, FILED CONCURRING OPINIONS. STEVENS, J., FILED A DISSENTING OPINION, IN WHICH SOUTER AND BREYER, JJ., JOINED, *POST,* P. 1003. KENNEDY, J., FILED A DISSENTING OPINION, *POST,* P. 1010.

———————

**Attorneys and Law Firms**

Stefan B. Herpel for petitioner.

Larry L. Roberts for respondent.

Richard H. Seamon for the United States as amicus curiae, by special leave of court.

**Opinion**

Chief Justice REHNQUIST delivered the opinion of the Court.

Petitioner was a joint owner, with her husband, of an automobile in which her husband engaged in sexual activity with a prostitute. A Michigan court ordered the automobile forfeited as a public nuisance, with no offset for her interest, notwithstanding her lack of knowledge of her husband's activity. We hold that the Michigan court order did not offend the Due Process Clause of the Fourteenth Amendment or the Takings Clause of the Fifth Amendment.

Detroit police arrested John Bennis after observing him engaged in a sexual act with a prostitute in the automobile while it was parked on a Detroit city street. Bennis was convicted of gross indecency. [1] The State then sued both **\*444** Bennis and his wife, petitioner Tina B. Bennis, to have the car declared a public nuisance and abated as such under §§ 600.3801 [2] and 600.3825 [3] of Michigan's Compiled Laws.

[1] Mich. Comp. Laws § 750.338b (1979).

[2] Section 600.3801 states in pertinent part:
"Any building, vehicle, boat, aircraft, or place used for the purpose of lewdness, assignation or prostitution or gambling, or used by, or kept for the use of prostitutes or other disorderly persons, ... is declared a nuisance, ... and all ... nuisances shall be enjoined and abated as provided in this act and as provided in the court rules.
Any person or his or her servant, agent, or employee who owns, leases, conducts, or maintains any building, vehicle, or place used for any of the purposes or acts set forth in this section is guilty of a nuisance." Mich. Comp. Laws Ann. § 600.3801 (West Supp.1995).

[3] Section 600.3825 states in pertinent part:
"(1) Order of abatement. If the existence of the nuisance is established in an action as provided in this chapter, an order of abatement shall be entered as a part of the judgment in the case, which order shall direct the removal from the building or place of all furniture, fixtures and contents therein and shall direct the sale thereof in the manner provided for the sale of chattels under execution....
"(2) Vehicles, sale. Any vehicle, boat, or aircraft found by the court to be a nuisance within the meaning of this chapter, is subject to the same order and judgment as any furniture, fixtures and contents as herein provided.
"(3) Sale of personalty, costs, liens, balance to state treasurer. Upon the sale of any furniture, fixtures, contents, vehicle, boat or aircraft as provided in this section, the officer executing the order of the court shall, after deducting the expenses of keeping such property and costs of such sale, pay all liens according to their priorities ..., and shall pay the balance to the state treasurer to be credited to the general fund of the state...." Mich. Comp. Laws § 600.3825 (1979).

**\*\*997** Petitioner defended against the abatement of her interest in the car on the ground that, when she entrusted her husband to use the car, she did not know that he would use it to violate Michigan's indecency law. The Wayne County Circuit Court rejected this argument, declared the car a public nuisance, and ordered the car's abatement. In reaching this disposition, the trial court judge recognized the remedial discretion he had under Michigan's case law. App. 21. He **\*445** took into account the couple's ownership of "another automobile," so they would not be left "without transportation." *Id.,* at 25. He also mentioned his authority to order the payment of one-half of the sale proceeds, after the deduction of costs, to "the innocent co-title holder." *Id.,* at 21. He declined to order such a division of sale proceeds in this

*Bennis v. Michigan,* 516 U.S. 442 (1996)
116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

case because of the age and value of the car (an 11–year–old Pontiac sedan recently purchased by John and Tina Bennis for $600); he commented in this regard: "[T]here's practically nothing left minus costs in a situation such as this." *Id.,* at 25.

The Michigan Court of Appeals reversed, holding that regardless of the language of Michigan Compiled Law § 600.3815(2),[4] Michigan Supreme Court precedent interpreting this section prevented the State from abating petitioner's interest absent proof that she knew to what end the car would be used. Alternatively, the intermediate appellate court ruled that the conduct in question did not qualify as a public nuisance because only one occurrence was shown and there was no evidence of payment for the sexual act. 200 Mich.App. 670, 504 N.W.2d 731 (1993).

4     "Proof of knowledge of the existence of the nuisance on the part of the defendants or any of them, is not required." Mich. Comp. Laws § 600.3815(2) (1979).

The Michigan Supreme Court reversed the Court of Appeals and reinstated the abatement in its entirety. 447 Mich. 719, 527 N.W.2d 483 (1994). It concluded as a matter of state law that the episode in the Bennis vehicle was an abatable nuisance. Rejecting the Court of Appeals' interpretation of § 600.3815(2), the court then announced that, in order to abate an owner's interest in a vehicle, Michigan does not need to prove that the owner knew or agreed that her vehicle would be used in a manner proscribed by § 600.3801 when she entrusted it to another user. *Id.,* at 737, 527 N.W.2d, at 492. The court next addressed petitioner's **\*446** federal constitutional challenges to the State's abatement scheme: The court assumed that petitioner did not know of or consent to the misuse of the Bennis car, and concluded in light of our decisions in *Van Oster v. Kansas,* 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354 (1926), and *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), that Michigan's failure to provide an innocent-owner defense was "without constitutional consequence." 447 Mich., at 740–741, 527 N.W.2d, at 493–494. The Michigan Supreme Court specifically noted that, in its view, an owner's interest may not be abated when "a vehicle is used without the owner's consent." *Id.,* at 742, n. 36, 527 N.W.2d, at 495, n. 36. Furthermore, the court confirmed the trial court's description of the nuisance abatement proceeding as an "equitable action," and considered it "critical" that the trial judge so comprehended the statute. *Id.,* at 742, 527 N.W.2d, at 495.

We granted certiorari in order to determine whether Michigan's abatement scheme has deprived petitioner of her interest in the forfeited car without due process, in violation of the Fourteenth Amendment, or **\*\*998** has taken her interest for public use without compensation, in violation of the Fifth Amendment as incorporated by the Fourteenth Amendment. 515 U.S. 1121, 115 S.Ct. 2275, 132 L.Ed.2d 279 (1995). We affirm.

The gravamen of petitioner's due process claim is not that she was denied notice or an opportunity to contest the abatement of her car; she was accorded both. Cf. *United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). Rather, she claims she was entitled to contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency law. But a long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use.

Our earliest opinion to this effect is Justice Story's opinion for the Court in *The Palmyra,* 12 Wheat. 1, 6 L.Ed. 531 (1827). The Palmyra,which **\*447** had been commissioned as a privateer by the King of Spain and had attacked a United States vessel, was captured by a United States warship and brought into Charleston, South Carolina, for adjudication. *Id.,* at 8. On the Government's appeal from the Circuit Court's acquittal of the vessel, it was contended by the owner that the vessel could not be forfeited until he was convicted for the privateering. The Court rejected this contention, explaining: "The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing." *Id.,* at 14. In another admiralty forfeiture decision 17 years later, Justice Story wrote for the Court that in *in rem* admiralty proceedings "the acts of the master and crew ... bind the interest of the owner of the ship, *whether he be innocent or guilty;* and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." *Harmony v. United States,* 2 How. 210, 234, 11 L.Ed. 239 (1844) (emphasis added).

In *Dobbins's Distillery v. United States,* 96 U.S. 395, 401, 24 L.Ed. 637 (1878), this Court upheld the forfeiture of property used by a lessee in fraudulently avoiding federal alcohol taxes, observing: "Cases often arise where the property of the owner is forfeited on account of the fraud, neglect, or misconduct of those intrusted with its possession, care, and custody, even when the owner is otherwise without fault ...

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

and it has always been held ... that the acts of [the possessors] bind the interest of the owner ... whether he be innocent or guilty."

In *Van Oster v. Kansas,* 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354 (1926), this Court upheld the forfeiture of a purchaser's interest in a car misused by the seller. Van Oster purchased an automobile from a dealer but agreed that the dealer might retain possession for use in its business. The dealer allowed an associate to use the automobile, and the associate used it for the illegal transportation of intoxicating liquor. *Id.,* at 465–466, 47 S.Ct., at 133–134. The State brought a forfeiture action pursuant to a Kansas statute, **\*448** and Van Oster defended on the ground that the transportation of the liquor in the car was without her knowledge or authority. This Court rejected Van Oster's claim:

> "It is not unknown or indeed uncommon for the law to visit upon the owner of property the unpleasant consequences of the unauthorized action of one to whom he has entrusted it. Much of the jurisdiction in admiralty, so much of the statute and common law of liens as enables a mere bailee to subject the bailed property to a lien, the power of a vendor of chattels in possession to sell and convey good title to a stranger, are familiar examples.... They suggest that certain uses of property may be regarded as so undesirable that the owner surrenders his control at his peril....

> "It has long been settled that statutory forfeitures of property entrusted by the innocent owner or lienor to another who uses it in violation of the revenue laws of the United States is not a violation of the due process clause of the Fifth Amendment." *Id.,* at 467–468, 47 S.Ct., at 134.

The *Van Oster* Court relied on *J.W. Goldsmith, Jr.–Grant Co. v. United States,* 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921), in which the Court upheld the forfeiture of a **\*\*999** seller's interest in a car misused by the purchaser. The automobile was forfeited after the purchaser transported bootleg distilled spirits in it, and the selling dealership lost the title retained as security for unpaid purchase money. *Id.,* at 508–509, 41 S.Ct., at 190. The Court discussed the arguments for and against allowing the forfeiture of the interest of an owner who was "without guilt," *id.,* at 510, 41 S.Ct., at 190–191, and concluded that "whether the reason for [the challenged forfeiture scheme] be artificial or real, it is too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced," *id.,* at 511, 41 S.Ct., at 191. [5]

5

In *Austin v. United States,* 509 U.S. 602, 617, 113 S.Ct. 2801, 2809, 125 L.Ed.2d 488 (1993), the Court observed that *J.W. Goldsmith, Jr.–Grant Co. v. United States,* 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921), "expressly reserved the question whether the [guilty-property] fiction could be employed to forfeit the property of a truly innocent owner." This observation is quite mistaken. The *Goldsmith–Grant* Court expressly reserved opinion "as to whether the section can be extended to property *stolen* from the owner or otherwise taken from him *without his privity or consent.*" *Id.,* at 512, 41 S.Ct., at 191 (emphases added). In other words, the *Goldsmith–Grant* Court drew the very same distinction made by the Michigan Supreme Court in this case: "the distinction between the situation in which a vehicle is used without the owner's consent," and one in which, "although the owner consented to [another person's] use, [the vehicle] is used in a *manner* to which the owner did not consent." 447 Mich., at 742, n. 36, 527 N.W.2d, at 495, n. 36. Because John Bennis co-owned the car at issue, petitioner cannot claim she was in the former situation.

The dissent, *post,* at 1007–1008, and n. 12, quoting *Peisch v. Ware,* 4 Cranch 347, 364, 2 L.Ed. 643 (1808), seeks to enlarge the reservation in *Goldsmith–Grant* into a general principle that " 'a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed.' " But *Peisch* was dealing with the same question reserved in *Goldsmith–Grant,* not any broader proposition: "If, by private theft, or open robbery, without any fault on his part, [an owner's] property should be invaded, ... the law cannot be understood to punish him with the forfeiture of that property." 4 Cranch, at 364.

**\*449** In *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the most recent decision on point, the Court reviewed the same cases discussed above, and concluded that "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." *Id.,* at 683, 94 S.Ct., at 2091–2092. Petitioner is in the same position as the various owners involved in the forfeiture cases beginning with *The Palmyra* in 1827. She did not know that her car would be used in an illegal activity that would subject it to forfeiture. But under these cases the Due Process Clause of the Fourteenth Amendment does not protect her interest against forfeiture by the government.

Petitioner relies on a passage from *Calero–Toledo,* that "it would be difficult to reject the constitutional claim of ... an owner who proved not only that he was uninvolved in and

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5381 Page 104 of 175

*Bennis v. Michigan,* 516 U.S. 442 (1996)
116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

unaware of the wrongful activity, but also that he had done **\*450** all that reasonably could be expected to prevent the proscribed use of his property." 416 U.S., at 689, 94 S.Ct., at 2094–2095. But she concedes that this comment was *obiter dictum,* and "[i]t is to the holdings of our cases, rather than their dicta, that we must attend." *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 379, 114 S.Ct. 1673, 1676, 128 L.Ed.2d 391 (1994). And the *holding* of *Calero–Toledo* on this point was that the interest of a yacht rental company in one of its leased yachts could be forfeited because of its use for transportation of controlled substances, even though the company was " 'in no way ... involved in the criminal enterprise carried on by [the] lessee' and 'had no knowledge that its property was being used in connection with or in violation of [Puerto Rican Law].' " 416 U.S., at 668, 94 S.Ct., at 2084. Petitioner has made no showing beyond that here.

Justice STEVENS' dissent argues that our cases treat contraband differently from instrumentalities used to convey contraband, like cars: Objects in the former class are forfeitable "however blameless or unknowing their owners may be," *post,* at 1004, but with respect to an instrumentality in the latter class, an owner's innocence is no defense only to the "principal use being made of that property," *post,* at 1005. However, this Court's precedent has never made the due process inquiry depend on whether the use **\*\*1000** for which the instrumentality was forfeited was the principal use. If it had, perhaps cases like *Calero–Toledo,* in which Justice Douglas noted in dissent that there was no showing that the "yacht had been notoriously used in smuggling drugs ... and so far as we know only one marihuana cigarette was found on the yacht," 416 U.S., at 693, 94 S.Ct., at 2096–2097 (opinion dissenting in part), might have been decided differently.

The dissent also suggests that *The Palmyra* line of cases "would justify the confiscation of an ocean liner just because one of its passengers sinned while on board." *Post,* at 1005. None of our cases have held that an ocean liner may be confiscated because of the activities of one passenger. We said in *Goldsmith–Grant,* and we repeat here, that "[w]hen such **\*451** application shall be made it will be time enough to pronounce upon it." 254 U.S., at 512, 41 S.Ct., at 191.

Notwithstanding this well-established authority rejecting the innocent-owner defense, petitioner argues that we should in effect overrule it by importing a culpability requirement from cases having at best a tangential relation to the "innocent owner" doctrine in forfeiture cases. She cites *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), for the proposition that a criminal defendant may not be punished for a crime if he is found to be not guilty. She also argues that our holding in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), that the Excessive Fines Clause [6] limits the scope of civil forfeiture judgments, "would be difficult to reconcile with any rule allowing truly innocent persons to be punished by civil forfeiture." Brief for Petitioner 18–19, n. 12.

6       U.S. Const., Amdt. 8.

In *Foucha* the Court held that a defendant found not guilty by reason of insanity in a criminal trial could not be thereafter confined indefinitely by the State without a showing that he was either dangerous or mentally ill. Petitioner argues that our statement that in those circumstances a State has no "punitive interest" which would justify continued detention, 504 U.S., at 80, 112 S.Ct., at 1785–1786, requires that Michigan demonstrate a punitive interest in depriving her of her interest in the forfeited car. But, putting aside the extent to which a forfeiture proceeding is "punishment" in the first place, *Foucha* did not purport to discuss, let alone overrule, *The Palmyra* line of cases.

In *Austin,* the Court held that because "forfeiture serves, at least in part, to punish the owner," forfeiture proceedings are subject to the limitations of the Eighth Amendment's prohibition against excessive fines. 509 U.S., at 618, 113 S.Ct., at 2810. There was no occasion in that case to deal with the validity of the "innocent-owner defense," other than to point out that if a forfeiture statute allows such a defense, the defense is **\*452** additional evidence that the statute itself is "punitive" in motive. *Id.,* at 617–618, 113 S.Ct., at 2809–2810. In this case, however, Michigan's Supreme Court emphasized with respect to the forfeiture proceeding at issue: "It is not contested that this is an equitable action," in which the trial judge has discretion to consider "alternatives [to] abating the entire interest in the vehicle." 447 Mich., at 742, 527 N.W.2d, at 495.

In any event, for the reasons pointed out in *Calero–Toledo* and *Van Oster,* forfeiture also serves a deterrent purpose distinct from any punitive purpose. Forfeiture of property prevents illegal uses "both by preventing further illicit use of the [property] and by imposing an economic penalty, thereby rendering illegal behavior unprofitable." *Calero–Toledo, supra,* at 687, 94 S.Ct., at 2094. This deterrent mechanism is hardly unique to forfeiture. For instance, because Michigan also deters dangerous driving by making

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

a motor vehicle owner liable for the negligent operation of the vehicle by a driver who had the owner's consent to use it, petitioner was also potentially liable for her husband's use of the car in violation of Michigan negligence law. Mich. Comp. Laws. § 257.401 (1979). "The law thus builds a secondary defense against a forbidden use and precludes evasions by dispensing with the necessity of judicial inquiry as to collusion between the wrongdoer and the alleged **1001 innocent owner." *Van Oster,* 272 U.S., at 467–468, 47 S.Ct., at 134.

Petitioner also claims that the forfeiture in this case was a taking of private property for public use in violation of the Takings Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment. But if the forfeiture proceeding here in question did not violate the Fourteenth Amendment, the property in the automobile was transferred by virtue of that proceeding from petitioner to the State. The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain. *453 *United States v. Fuller,* 409 U.S. 488, 492, 93 S.Ct. 801, 804, 35 L.Ed.2d 16 (1973); see *United States v. Rands,* 389 U.S. 121, 125, 88 S.Ct. 265, 268, 19 L.Ed.2d 329 (1967).

At bottom, petitioner's claims depend on an argument that the Michigan forfeiture statute is unfair because it relieves prosecutors from the burden of separating co-owners who are complicit in the wrongful use of property from innocent co-owners. This argument, in the abstract, has considerable appeal, as we acknowledged in *Goldsmith–Grant,* 254 U.S., at 510, 41 S.Ct., at 190–191. Its force is reduced in the instant case, however, by the Michigan Supreme Court's confirmation of the trial court's remedial discretion, see *supra,* at 997, and petitioner's recognition that Michigan may forfeit her and her husband's car whether or not she is entitled to an offset for her interest in it, Tr. of Oral Arg. 7, 9.

We conclude today, as we concluded 75 years ago, that the cases authorizing actions of the kind at issue are "too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." *Goldsmith–Grant, supra,* at 511, 41 S.Ct., at 191. The State here sought to deter illegal activity that contributes to neighborhood deterioration and unsafe streets. The Bennis automobile, it is conceded, facilitated and was used in criminal activity. Both the trial court and the Michigan Supreme Court followed our

longstanding practice, and the judgment of the Supreme Court of Michigan is therefore

*Affirmed.*

Justice THOMAS, concurring.
I join the opinion of the Court.

Mrs. Bennis points out that her property was forfeited even though the State did not prove her guilty of any wrongdoing. The State responds that forfeiture of property simply because it was used in crime has been permitted time out of mind. It also says that it wants to punish, for deterrence and perhaps also for retributive purposes, persons who *may* have colluded or acquiesced in criminal use of their *454 property, or who *may* at least have negligently entrusted their property to someone likely to use it for misfeasance. But, the State continues, it does not want to have to *prove* (or to refute proof regarding) collusion, acquiescence, or negligence.

As the Court notes, evasion of the normal requirement of proof before punishment might well seem "unfair." *Ante,* at 1001. One unaware of the history of forfeiture laws and 200 years of this Court's precedent regarding such laws might well assume that such a scheme is lawless—a violation of due process. As the Court remarked 75 years ago in ruling upon a constitutional challenge to forfeiture of the property of an innocent owner:

"If the case were the first of its kind, and its apparent paradoxes might compel a lengthy discussion to harmonize the [statute at issue] with the accepted tests of human conduct.... There is strength ... in the contention that ... [the statute at issue] seems to violate that justice which should be the foundation of the due process of law required by the Constitution." *J.W. Goldsmith, Jr.–Grant Co. v. United States,* 254 U.S. 505, 510, 41 S.Ct. 189, 190, 65 L.Ed. 376 (1921).

But the Court went on to uphold the statute, based upon the historical prevalence and acceptance of similar laws. *Id.,* at 510–511, 41 S.Ct., at 190–191.

This case is ultimately a reminder that the Federal Constitution does not prohibit everything **1002 that is intensely undesirable. See, *e.g., Herrera v. Collins,* 506 U.S. 390, 428, 113 S.Ct. 853, 874–875, 122 L.Ed.2d 203, and n. (1993) (SCALIA, J., concurring). As detailed in the Court's opinion and the cases cited therein, forfeiture of property

**Bennis v. Michigan, 516 U.S. 442 (1996)**
116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

without proof of the owner's wrongdoing, merely because it was "used" in or was an "instrumentality" of crime has been permitted in England and this country, both before and after the adoption of the Fifth and Fourteenth Amendments. Cf. *Burnham v. Superior Court of Cal., County of Marin,* 495 U.S. 604, 619, 110 S.Ct. 2105, 2115, 109 L.Ed.2d 631 (1990) (plurality opinion) (a process of law that **\*455** can show the sanction of settled usage both in England and in this country must be taken to be due process of law) (citing *Hurtado v. California,* 110 U.S. 516, 528–529, 4 S.Ct. 111, 117–118, 28 L.Ed. 232 (1884)). Indeed, 70 years ago this Court held in *Van Oster v. Kansas,* 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354 (1926), that an automobile used in crime could be forfeited notwithstanding the absence of any proof that the criminal use occurred with "knowledge or authority" of the owner. *Id.,* at 466, 47 S.Ct., at 133. A law of forfeiture without an exception for innocent owners, the Court said, "builds a secondary defense" for the State "against a forbidden use and precludes evasions by dispensing with the necessity of judicial inquiry as to collusion between the wrongdoer and the alleged innocent owner." *Id.,* at 467–468, 47 S.Ct., at 134.

The limits on *what* property can be forfeited as a result of what wrongdoing—for example, what it means to "use" property in crime for purposes of forfeiture law—are not clear to me. See *United States v. James Daniel Good Real Property,* 510 U.S. 43, 81, 83, 114 S.Ct. 492, 515, 516, 126 L.Ed.2d 490 (1993) (THOMAS, J., concurring in part and dissenting in part). Those limits, whatever they may be, become especially significant when they are the sole restrictions on the state's ability to take property from those it merely suspects, or does not even suspect, of colluding in crime. It thus seems appropriate, where a constitutional challenge by an innocent owner is concerned, to apply those limits rather strictly, adhering to historical standards for determining whether specific property is an "instrumentality" of crime. Cf. *J.W. Goldsmith, Jr.–Grant Co., supra,* at 512, 41 S.Ct., at 191 (describing more extreme hypothetical applications of a forfeiture law and reserving decision on the permissibility of such applications). The facts here, however, do not seem to me to be obviously distinguishable from those involved in *Van Oster;* and in any event, Mrs. Bennis has not asserted that the car was not an instrumentality of her husband's crime.

If anything, the forfeiture in *Van Oster* was harder to justify than is the forfeiture here, albeit in a different respect. **\*456** In this case, the trial judge apparently found that the sales price of the car would not exceed by much the "costs" to be deducted from the sale; and he took that fact into account

in determining how to dispose of the proceeds of the sale of the car. The state statute has labeled the car a "nuisance" and authorized a procedure for preventing the risk of continued criminal use of it by Mr. Bennis (forfeiture and sale); under a different statutory regime, the State might have authorized the destruction of the car instead, and the State would have had a plausible argument that the order for destruction was "remedial" and thus noncompensable. That it chose to order the car sold, with virtually nothing left over for the State after "costs," may not change the "remedial" character of the State's action substantially. And if the forfeiture of the car here (and the State's refusal to remit any share of the proceeds from its sale to Mrs. Bennis) can appropriately be characterized as "remedial" action, then the more severe problems involved in punishing someone not found to have engaged in wrongdoing of any kind do not arise. *

---

\* This is most obviously true if, in stating that there would be little left over after "costs," the trial judge was referring to the costs of sale. The court's order indicates that he may have had other "costs" in mind as well when he made that statement, *e.g.,* law enforcement costs. See also Mich. Comp. Laws § 600.3825(3) (1979) (costs of keeping the car to be deducted). Even if the "costs" that the trial judge believed would consume most of the sales proceeds included not simply the expected costs of sale, but also the State's costs of keeping the car and law enforcement costs related to this particular proceeding, the State would still have a plausible argument that using the sales proceeds to pay such costs was "remedial" action, rather than punishment.

**\*\*1003** Improperly used, forfeiture could become more like a roulette wheel employed to raise revenue from innocent but hapless owners whose property is unforeseeably misused, or a tool wielded to punish those who associate with criminals, than a component of a system of justice. When the property sought to be forfeited has been entrusted by its owner to one who uses it for crime, however, the Constitution apparently **\*457** assigns to the States and to the political branches of the Federal Government the primary responsibility for avoiding that result.

Justice GINSBURG, concurring.
I join the opinion of the Court and highlight features of the case key to my judgment.

The dissenting opinions target a law scarcely resembling Michigan's "red light abatement" prescription, as interpreted by the State's courts. First, it bears emphasis that the car

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5384 Page 107 of 175

Bennis v. Michigan, 516 U.S. 442 (1996)

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

in question belonged to John Bennis as much as it did to Tina Bennis. At all times he had her consent to use the car, just as she had his. See *ante,* at 999, n. 5 (majority opinion) (noting Michigan Supreme Court's distinction between use of a vehicle without the owner's consent, and use with consent but in a manner to which the owner did not consent). And it is uncontested that Michigan may forfeit the vehicle itself. See *ante,* at 1001 (majority opinion) (citing Tr. of Oral Arg. 7, 9). The sole question, then, is whether Tina Bennis is entitled not to the car, but to a portion of the proceeds (if any there be after deduction of police, prosecutorial, and court costs) as a matter of constitutional right.

Second, it was "critical" to the judgment of the Michigan Supreme Court that the nuisance abatement proceeding is an "equitable action." See *ante,* at 997 (majority opinion) (citing 447 Mich. 719, 742, 527 N.W.2d 483, 495 (1994)). That means the State's Supreme Court stands ready to police exorbitant applications of the statute. It shows no respect for Michigan's high court to attribute to its members tolerance of, or insensitivity to, inequitable administration of an "equitable action."

Nor is it fair to charge the trial court with "blatant unfairness" in the case at hand. See *post,* at 1009, n. 14, and 1010 (STEVENS, J., dissenting). That court declined to order a division of sale proceeds, as the trial judge took pains to explain, for two practical reasons: the Bennises have "another **458** automobile," App. 25; and the age and value of the forfeited car (an 11–year–old Pontiac purchased by John and Tina Bennis for $600) left "practically nothing" to divide after subtraction of costs. See *ante,* at 997 (majority opinion) (citing App. 25).

Michigan, in short, has not embarked on an experiment to punish innocent third parties. See *post,* at 1003 (STEVENS, J., dissenting). Nor do we condone any such experiment. Michigan has decided to deter johns from using cars they own (or co-own) to contribute to neighborhood blight, and that abatement endeavor hardly warrants this Court's disapprobation.

Justice STEVENS, with whom Justice SOUTER and Justice BREYER join, dissenting.

For centuries prostitutes have been plying their trade on other people's property. Assignations have occurred in palaces, luxury hotels, cruise ships, college dormitories, truck stops, back alleys and back seats. A profession of this vintage has

provided governments with countless opportunities to use novel weapons to curtail its abuses. As far as I am aware, however, it was not until 1988 that any State decided to experiment with the punishment of innocent third parties by confiscating property in which, or on which, a single transaction with a prostitute has been consummated.

The logic of the Court's analysis would permit the States to exercise virtually unbridled power to confiscate vast amounts of property where professional criminals have engaged in illegal acts. Some airline passengers have marijuana cigarettes in their luggage; some hotel guests are thieves; some **1004** spectators at professional sports events carry concealed weapons; and some hitchhikers are prostitutes. The State surely may impose strict obligations on the owners of airlines, hotels, stadiums, and vehicles to exercise a high degree of care to prevent others from making illegal use of their property, but neither logic nor history supports the **459** Court's apparent assumption that their complete innocence imposes no constitutional impediment to the seizure of their property simply because it provided the locus for a criminal transaction.

In order to emphasize the novelty of the Court's holding, I shall first comment on the tenuous connection between the property forfeited here and the illegal act that was intended to be punished, which differentiates this case from the precedent on which the Court relies. I shall then comment on the significance of the complete lack of culpability ascribable to petitioner in this case. Finally, I shall explain why I believe our recent decision in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), compels reversal.

I

For purposes of analysis it is useful to identify three different categories of property that are subject to seizure: pure contraband; proceeds of criminal activity; and tools of the criminal's trade.

The first category—pure contraband—encompasses items such as adulterated food, sawed-off shotguns, narcotics, and smuggled goods. With respect to such "objects the possession of which, without more, constitutes a crime," *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965), the government has an obvious remedial interest in removing the items from private circulation, however blameless or unknowing their

**Bennis v. Michigan, 516 U.S. 442 (1996)**

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

owners may be. The States' broad and well-established power to seize pure contraband is not implicated by this case, for automobiles are not contraband. See *ibid.*

The second category—proceeds—traditionally covered only stolen property, whose return to its original owner has a powerful restitutionary justification. Recent federal statutory enactments have dramatically enlarged this category to include the earnings from various illegal transactions. See **\*460** *United States v. 92 Buena Vista Ave., Rumson, N. J.,* 507 U.S. 111, 121, n. 16, 113 S.Ct. 1126, 1133, n. 16, 122 L.Ed.2d 469 (1993). Because those federal statutes include protections for innocent owners, see 21 U.S.C. § 881(a)(6), cases arising out of the seizure of proceeds do not address the question whether the Constitution would provide a defense to an innocent owner in certain circumstances if the statute had not done so. The prevalence of protection for innocent owners in such legislation does, however, lend support to the conclusion that elementary notions of fairness require some attention to the impact of a seizure on the rights of innocent parties.[1]

[1]   Without some form of an exception for innocent owners, the potential breadth of forfeiture actions for illegal proceeds would be breathtaking indeed. It has been estimated that nearly every United States bill in circulation—some $230 billion worth—carries trace amounts of cocaine, so great is the drug trade's appetite for cash. See Range & Witkin, The Drug–Money Hunt, U.S. News & World Report, Aug. 21, 1989, p. 22; Heilbroner, The Law Goes on a Treasure Hunt, N.Y. Times, Dec. 11, 1994, p. 70, col. 1. Needless to say, a rule of strict liability would have catastrophic effects for the Nation's economy.

The third category includes tools or instrumentalities that a wrongdoer has used in the commission of a crime, also known as "derivative contraband," see *One 1958 Plymouth Sedan,* 380 U.S., at 699, 85 S.Ct., at 1250. Forfeiture is more problematic for this category of property than for the first two, both because of its potentially far broader sweep, and because the government's remedial interest in confiscation is less apparent. Many of our earliest cases arising out of these kinds of seizures involved ships that engaged in piracy on the high seas,[2] in the slave **\*\*1005** trade,[3] or in the smuggling of cargoes of goods into the United States.[4] These seizures by the sovereign **\*461** were approved despite the faultlessness of the ship's owner. Because the entire mission of the ship was unlawful, admiralty law treated the vessel itself as if it

were the offender.[5] Moreover, under "the maritime law of the Middle Ages the ship was not only the source, but the limit, of liability."[6]

[2]   See, *e.g., The Palmyra,* 12 Wheat. 1, 6 L.Ed. 531 (1827); *Harmony v. United States,* 2 How. 210, 11 L.Ed. 239 (1844). The latter case has occasionally been cited by other names, including "*Malek Adhel,*" see O. Holmes, The Common Law 27, n. 82 (M. Howe ed.1963).

[3]   See, *e.g., Tryphenia v. Harrison,* 24 F. Cas. 252 (CC Pa. 1806) (Washington, J.).

[4]   See *C.J. Hendry Co. v. Moore,* 318 U.S. 133, 145–148, 63 S.Ct. 499, 505–507, 87 L.Ed. 663 (1943) (collecting cases); *Harmony,* 2 How., at 233–234.

[5]   "The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. The vessel or boat (says the act of Congress) from which such piratical aggression, etc., shall have been first attempted or made shall be condemned. Nor is there any thing new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offence has been done as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party. The doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws; and has been applied to other kindred cases, such as cases arising on embargo and non-intercourse acts. In short, the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." *Ibid.*

[6]   Holmes, The Common Law, at 27.

The early admiralty cases demonstrate that the law may reasonably presume that the owner of valuable property is aware of the principal use being made of that property. That presumption provides an adequate justification for the deprivation of one's title to real estate because of another's adverse possession for a period of years or for a seizure of such property because its principal use is unlawful. Thus, in *Dobbins's Distillery v. United States,* 96 U.S. 395, 399, 24

Case 2:19-cv-00037-JNP   Document 59-34   Filed 11/30/22   PageID.5386   Page 109 of 175

Bennis v. Michigan, 516 U.S. 442 (1996)

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

L.Ed. 637 (1877), we upheld the seizure of premises on which the lessee operated an unlawful distillery when the owner "knowingly suffer[ed] and permitt[ed] his land to be used as a site" for that distillery. And despite the faultlessness of their owners, we have upheld seizures of vehicles being used to transport **462** bootleg liquor, or to smuggle goods into the United States in violation of our customs laws. [7]

[7] See, *e.g., Van Oster v. Kansas,* 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354 (1926) (transportation); *J.W. Goldsmith, Jr.–Grant Co. v. United States,* 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921) (same); *General Motors Acceptance Corp. v. United States,* 286 U.S. 49, 52 S.Ct. 468, 76 L.Ed. 971 (1932) (importation); *United States v. Commercial Credit Co.,* 286 U.S. 63, 52 S.Ct. 467, 76 L.Ed. 978 (1932) (same).

While our historical cases establish the propriety of seizing a freighter when its entire cargo consists of smuggled goods, none of them would justify the confiscation of an ocean liner just because one of its passengers sinned while on board. See, *e.g., Phile v. Ship Anna,* 1 U.S. (1 Dall.) 197, 206, 1 L.Ed. 98 (C.P. Phila.Cty.1787) (holding that forfeiture of a ship was inappropriate if an item of contraband hidden on board was "a trifling thing, easily concealed, and which might fairly escape the notice of the captain"); *J.W. Goldsmith, Jr.– Grant Co. v. United States,* 254 U.S. 505, 512, 41 S.Ct. 189, 191, 65 L.Ed. 376 (1921) (expressing doubt about expansive forfeiture applications). The principal use of the car in this case was not to provide a site for petitioner's husband to carry out forbidden trysts. Indeed, there is no evidence in the record that the car had ever previously been used for a similar purpose. An isolated misuse of a stationary vehicle should not justify the forfeiture of an innocent owner's property on the theory that it constituted an instrumentality of the crime.

This case differs from our historical precedents in a second, crucial way. In those cases, the vehicles or the property actually facilitated the offenses themselves. See *id.,* at 513, 41 S.Ct., at 191 (referring to "the adaptability of a particular form of property" to an illegal purpose"); *Harmony v. United States,* 2 How. 210, 235, 11 L.Ed. 239 (1844). Our leading decisions on forfeited conveyances, for example, involved offenses of which transportation was an element. In *Van Oster v. Kansas,* 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354 (1926), for example, the applicable statute prohibited transportation of intoxicating liquor. See *id.,* at 466, 47 S.Ct., at 133–134. See also *Carroll v. United States,* 267 U.S. 132, 136, 45 S.Ct. 280, 281, 69 L.Ed. 543 (1925) (car **463** had concealed compartments for carrying liquor). In *Calero–*

*Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), similarly, a yacht was seized because it had been used "to transport, or to facilitate the transportation of," a controlled substance. See *id.,* at 665– 666, 94 S.Ct., at 2082–2084. [8] Here, on the other hand, the forfeited property bore no necessary connection to the offense committed by petitioner's husband. It is true that the act occurred in the car, but it might just as well have occurred in a multitude of other locations. The mobile character of the car played a part only in the negotiation, but not in the consummation, of the offense.

[8] The majority questions whether the yacht was actually used to transport drugs, quoting Justice Douglas' dissenting statement that " 'so far as we know' " only one marijuana cigarette was found on board. See *ante,* at 999. Justice Douglas cited no source for that assertion, however, and it does not appear in the majority or concurring opinions. According to the stipulated facts of the case, the Commonwealth of Puerto Rico accused the lessee of using the yacht to "convey, transport, carry and transfer" a narcotic drug. See App. in *Calero–Toledo v. Pearson Yacht Leasing Co.,* O.T.1973, No. 73–157, p. 25.

In recent years, a majority of the Members of this Court has agreed that the concept of an instrumentality subject to forfeiture—also expressed as the idea of "tainted" items —must have an outer limit. In *Austin,* the Court rejected the argument that a mobile home and auto body shop where an illegal drug transaction occurred were forfeitable as "instruments" of the drug trade. 509 U.S., at 621, 113 S.Ct., at 2811. Justice SCALIA agreed that a building in which an isolated drug sale happens to take place also cannot be regarded as an instrumentality of that offense. *Id.,* at 627– 628, 113 S.Ct., at 2814–2815 (opinion concurring in part and concurring in judgment). Justice THOMAS, too, has stated that it is difficult to see how real property bearing no connection to crime other than serving as the location for a drug transaction is in any way "guilty" of an offense. See *United States v. James Daniel Good Real Property,* 510 U.S. 43, 81–82, 114 S.Ct. 492, 515, 126 L.Ed.2d 490 (1993) (opinion concurring in part and dissenting in part). The car in this case, however, **464** was used as little more than an enclosure for a one-time event, effectively no different from a piece of real property. [9] By the rule laid down in our recent cases, that nexus is insufficient to support the forfeiture here.

[9] In fact, the rather tenuous theory advanced by the Michigan Supreme Court to uphold this forfeiture was that the neighborhood where the offense occurred

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

exhibited an ongoing "nuisance condition" because it had a reputation for illicit activity, and the car contributed to that "condition." 447 Mich. 719, 734, 527 N.W.2d 483, 491 (1994). On that view, the car did not constitute the nuisance of itself; only when considered as a part of the particular neighborhood did it assume that character. See *id.,* at 745, 527 N.W.2d, at 496 (Cavanagh, C.J., dissenting). One bizarre consequence of this theory, expressly endorsed by the Michigan high court, is that the very same offense, committed in the very same car, would not render the car forfeitable if it were parked in a different part of Detroit, such as the affluent Palmer Woods area. See *id.,* at 734, n. 22, 527 N.W.2d, at 491, n. 22. This construction confirms the irrelevance of the car's mobility to the forfeiture; any other stationary part of the neighborhood where such an offense could take place— a shed, for example, or an apartment—could be forfeited on the same rationale. Indeed, if petitioner's husband had taken advantage of the car's power of movement, by picking up the prostitute and continuing to drive, presumably the car would not have been forfeitable at all.

The State attempts to characterize this forfeiture as serving exclusively remedial, as opposed to punitive, ends, because its goal was to abate what the State termed a "nuisance." Even if the State were correct, that argument would not rebut the excessiveness of the forfeiture, which I have discussed above. But in any event, there is no serious claim that the confiscation in this case was not punitive. The majority itself concedes that " 'forfeiture serves, at least in part, to **\*1007** punish the owner.' " *Ante,* at 1000 (quoting *Austin,* 509 U.S., at 618, 113 S.Ct., at 2810).[10] At an earlier stage of this litigation, **\*465** the State unequivocally argued that confiscation of automobiles in the circumstances of this case "is swift and certain 'punishment' of the voluntary vice consumer." Brief for Plaintiff–Appellant in No. 97339 (Mich.), p. 22. Therefore, the idea that this forfeiture did not punish petitioner's husband—and, *a fortiori,* petitioner herself —is simply not sustainable.

[10] We have held, furthermore, that "a civil sanction that cannot be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1989) (emphasis added).

Even judged in isolation, the remedial interest in this forfeiture falls far short of that which we have found present in other cases. Forfeiture may serve remedial ends when removal of certain items (such as a burglar's tools) will prevent repeated violations of the law (such as housebreaking). See, *e.g., United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 364, 104 S.Ct. 1099, 1105– 1106, 79 L.Ed.2d 361 (1984) (confiscation of unregistered shotguns); see also *C.J. Hendry Co. v. Moore,* 318 U.S. 133, 63 S.Ct. 499, 87 L.Ed. 663 (1943) (seizure of fishing nets used in violation of state fishing laws). But confiscating petitioner's car does not disable her husband from using other venues for similar illegal rendezvous, since all that is needed to commit this offense is a place. In fact, according to testimony at trial, petitioner's husband had been sighted twice during the previous summer, without the car, soliciting prostitutes in the same neighborhood.[11] The remedial rationale is even less convincing according to the State's "nuisance" theory, for that theory treats the car as a nuisance only so long as the illegal event is occurring and only so long as the car is located in the relevant neighborhood. See n. 9, *supra.* The need to "abate" the car thus disappears the moment it leaves the area. In short, therefore, a remedial justification simply does not apply to a confiscation of this type. See generally Clark, Civil and Criminal Penalties and Forfeitures: A Framework for Constitutional Analysis, 60 Minn. L.Rev. 379, 479–480 (1976).

[11] The forfeited car was purchased in September of the same year, and thus could not have been involved in any such episodes during the preceding summer. See App. 8; 447 Mich., at 728, 527 N.W.2d, at 488.

**\*466** II

Apart from the lack of a sufficient nexus between petitioner's car and the offense her husband committed, I would reverse because petitioner is entirely without responsibility for that act. Fundamental fairness prohibits the punishment of innocent people.

The majority insists that it is a settled rule that the owner of property is strictly liable for wrongful uses to which that property is put. See *ante,* at 997–999. Only three Terms ago, however, the Court surveyed the same historical antecedents and held that all of its forfeiture decisions rested, "at bottom, on the notion that the owner has been negligent in allowing his property to be misused and that he is properly punished for that negligence." *Austin v. United States,* 509 U.S., at 615, 113 S.Ct., at 2808 (citing *Calero–Toledo, Goldsmith– Grant Co., Dobbins's Distillery, Harmony,* and *The Palmyra* ). According to *Austin,* even the hoary fiction that property

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

was forfeitable because of its own guilt was based on the idea that " ' "such misfortunes are in part owing to the negligence of the owner, and therefore he is properly punished by the forfeiture." ' " 509 U.S., at 616, 113 S.Ct., at 2809, quoting *Goldsmith–Grant Co.,* 254 U.S., at 510–511, 41 S.Ct., at 191, in turn quoting 1 W. Blackstone, Commentaries *301. It is conceded that petitioner was in no way negligent in her use or entrustment of the family car. Thus, no forfeiture should have been permitted. The majority, however, simply ignores *Austin*'s detailed analysis of our case law without explanation or comment.

Even assuming that strict liability applies to "innocent" owners, we have consistently recognized an exception for truly blameless individuals. The Court's opinion in *Calero– **1008 Toledo v. Pearson Yacht Leasing Co.,* 416 U.S., at 688–690, 94 S.Ct., at 2094–2095, established the proposition that the Constitution bars the punitive forfeiture of property when its owner alleges and proves that he took all reasonable steps to prevent its illegal use. Accord, *Austin,* 509 U.S., at 616–617, 113 S.Ct., at 2809–2810. The majority *467 dismisses this statement as "*obiter dictum*," *ante,* at 999, but we have assumed that such a principle existed, in a line of cases dating back nearly 200 years. In one of its earliest decisions, the Court, speaking through Chief Justice Marshall, recognized as "unquestionably a correct legal principle" that "a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed." *Peisch v. Ware,* 4 Cranch 347, 363, 2 L.Ed. 643 (1808). [12] In other contexts, we have regarded as axiomatic that persons cannot be punished when they have done no wrong. See *Southwestern Telegraph & Telephone Co. v. Danaher,* 238 U.S. 482, 490–491, 35 S.Ct. 886, 888, 59 L.Ed. 1419 (1915) (invalidating penalty under Due Process *468 Clause for conduct that involved "no intentional wrongdoing; no departure from any prescribed or known standard of action, and no reckless conduct"); *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 454, and n. 17, 113 S.Ct. 2711, 2718, and n. 17, 125 L.Ed.2d 366 (1993) (following *Danaher* ); *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 667–668, 54 L.Ed.2d 604 (1978); see also *Bell v. Wolfish,* 441 U.S. 520, 580, 99 S.Ct. 1861, 1895–1896, 60 L.Ed.2d 447 (1979) (STEVENS, J., dissenting). I would hold now what we have always assumed: that the principle is required by due process.

12    In *Peisch,* a ship was wrecked in Delaware Bay and its cargo unladen and carried off by salvors. The United

States sought forfeiture of the cargo on several grounds, including failure to pay duties on certain distilled spirits in the cargo at the time of importation, and removal of the same from the tax collector before assessment. This Court held that forfeiture was impermissible because the ship's owners were unable to comply with the customs law regarding importation, since the crew had deserted the ship before landing, and the vessel could not be brought into port. 4 Cranch, at 363. As quoted above, the Court held that forfeiture is inappropriate when the means to prevent the violation cannot be carried out. As a separate reason for rejecting the forfeiture, the Court explained that the owners could not be made to suffer for actions taken by the salvors, persons over whom the owners had no control. As the Court put it, an owner should not be "punished" by the forfeiture of property taken "by private theft, or open robbery, without any fault on his part...." *Id.,* at 364. That rule has itself become an established part of our jurisprudence. See *Austin,* 509 U.S., at 614–615, 113 S.Ct., at 2808; *Calero– Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 688– 690, 94 S.Ct. 2080, 2094–2095, 40 L.Ed.2d 452 (1974); *Goldsmith–Grant Co.,* 254 U.S., at 512, 41 S.Ct., at 191; *United States v. One Ford Coupe Automobile,* 272 U.S. 321, 333, 47 S.Ct. 154, 158, 71 L.Ed. 279 (1926); *Van Oster v. Kansas,* 272 U.S., at 467, 47 S.Ct., at 134. While both of the principles announced in *Peisch* arose out of the same set of facts, the majority errs when it treats them as identical. See *ante,* at 999, n. 5. Chief Justice Marshall's opinion discussed and justified each principle independently, and either could apply in the absence of the other.

The unique facts of this case demonstrate that petitioner is entitled to the protection of that rule. The subject of this forfeiture was certainly not contraband. It was not acquired with the proceeds of criminal activity and its principal use was entirely legitimate. It was an ordinary car that petitioner's husband used to commute to the steel mill where he worked. Petitioner testified that they had been married for nine years; that she had acquired her ownership interest in the vehicle by the expenditure of money that she had earned herself; that she had no knowledge of her husband's plans to do anything with the car except "come directly home from work," as he had always done before; and that she even called "Missing Persons" when he failed to return on the night in question. App. 8–10. Her testimony is not contradicted and certainly is credible. Without knowledge that he would commit such an act in the family car, or that he had ever done so previously, surely petitioner cannot be accused of failing to take "reasonable steps" to prevent the illicit behavior. She

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5389 Page 112 of 175

**Bennis v. Michigan, 516 U.S. 442 (1996)**

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

is just as blameless as if a thief, rather than her husband, had used the car in a criminal episode.

While the majority admits that this forfeiture is at least partly punitive in nature, it asserts that Michigan's law also serves a **\*\*1009** "deterrent purpose distinct from any punitive purpose." *Ante,* at 1000. But that is no distinction at all; deterrence is itself one of the aims of punishment. *United States* **\*469** *v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1901–1902, 104 L.Ed.2d 487 (1989). [13] Even on a deterrence rationale, moreover, that goal is not fairly served in the case of a person who has taken all reasonable steps to prevent an illegal act.

[13]  For that reason, the majority's attempt to analogize this forfeiture to the system of tort liability for automobile accidents is unpersuasive. See *ante,* at 1000. Tort law is tied to the goal of compensation (punitive damages being the notable exception), while forfeitures are concededly punitive. The fundamental difference between these two regimes has long been established. "The law never punishes any man criminally but for his own act, yet it frequently punishes him in his pocket, for the act of another. Thus, if a wife commits an offence, the husband is not liable to the penalties; but if she obtains the property of another by any means not felonious, he must make the payment and amends." *Phile v. Ship Anna,* 1 U.S. (1 Dall.) 197, 207 (C.P. Phila.Cty.1787). The converse, of course, is true as well.

Forfeiture of an innocent owner's property that plays a central role in a criminal enterprise may be justified on reasoning comparable to the basis for imposing liability on a principal for an agent's torts. Just as the risk of *respondeat superior* liability encourages employers to supervise more closely their employees' conduct, see *Arizona v. Evans,* 514 U.S. 1, 29, n. 5, 115 S.Ct. 1185, 1200, n. 5, 131 L.Ed.2d 34 (1995) (GINSBURG, J., dissenting), so the risk of forfeiture encourages owners to exercise care in entrusting their property to others, see *Calero–Toledo,* 416 U.S., at 687, 94 S.Ct., at 2094; *ante,* at 1000. But the law of agency recognizes limits on the imposition of vicarious liability in situations where no deterrent function is likely to be served; for example, it exonerates the employer when the agent strays from his intended mission and embarks on a "frolic of his own." See also *United States v. Park,* 421 U.S. 658, 673, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975) (vicarious criminal liability for corporate officer based on company's conduct impermissible if officer was " 'powerless' to prevent or correct the violation") (citation omitted). In this case, petitioner did

not "entrust" the car to her husband on the night in question; he was entitled to use it by virtue of their joint ownership. There is no reason to think that the threat **\*470** of forfeiture will deter an individual from buying a car with her husband— or from marrying him in the first place—if she neither knows nor has reason to know that he plans to use it wrongfully.

The same is true of the second asserted justification for strict liability, that it relieves the State of the difficulty of proving collusion, or disproving the lack thereof, by the alleged innocent owner and the wrongdoer. See *ante,* at 1000 (citing *Van Oster v. Kansas,* 272 U.S., at 467–468, 47 S.Ct., at 134). Whatever validity that interest might have in another kind of case, it has none here. It is patently clear that petitioner did not collude with her husband to carry out *this* offense.

The absence of any deterrent value reinforces the punitive nature of this forfeiture law. But petitioner has done nothing that warrants punishment. She cannot be accused of negligence or of any other dereliction in allowing her husband to use the car for the wholly legitimate purpose of transporting himself to and from his job. She affirmatively alleged and proved that she is not in any way responsible for the conduct that gave rise to the seizure. If anything, she was a *victim* of that conduct. In my opinion, these facts establish that the seizure constituted an arbitrary deprivation of property without due process of law. [14]

[14]  Justice GINSBURG argues that Michigan should not be rebuked for its efforts to deter prostitution, see *ante,* at 1003, but none of her arguments refutes the fact that the State has accomplished its ends by sacrificing the rights of an innocent person. First, the concession that the car itself may be confiscated provides no justification for the forfeiture of the co-owner's separate interest. Second, the assertion that the Michigan Supreme Court "stands ready to police exorbitant applications of the statute," *ibid.,* has a hollow ring because it failed to do so in this case. That court did not even mention the relevance of innocence to the trial court's exercise of its "equitable discretion." Rather, it stated flatly that "Mrs. Bennis' claim is without constitutional consequence." 447 Mich., at 741, 527 N.W.2d, at 494. Third, the blatant unfairness of using petitioner's property to compensate for her husband's offense is not diminished by its modest value. It is difficult, moreover, to credit the trial court's statement that it would have awarded the proceeds of the sale to petitioner if they had been larger, for it expressly ordered that any remaining balance go to the State's coffers. See App. 28. Finally, the State's decision to deter "johns

from using cars *they* own (or co-own) to contribute to neighborhood blight," *ante,* at 1003 (emphasis added), surely does not justify the forfeiture of that share of the car owned by an innocent spouse.

**\*\*1010  \*471**  III

The Court's holding today is dramatically at odds with our holding in *Austin v. United States.* We there established that when a forfeiture constitutes "payment to a sovereign as punishment for some offense"—as it undeniably does in this case—it is subject to the limitations of the Eighth Amendment's Excessive Fines Clause. For both of the reasons I have already discussed, the forfeiture of petitioner's half interest in her car is surely a form of "excessive" punishment. For an individual who merely let her husband use her car to commute to work, even a modest penalty is out of all proportion to her blameworthiness; and when the assessment is confiscation of the entire car, simply because an illicit act took place once in the driver's seat, the punishment is plainly excessive. This penalty violates the Eighth Amendment for yet another reason. Under the Court's reasoning, the value of the car is irrelevant. A brand-new luxury sedan or a 10-year-old used car would be equally forfeitable. We have held that "dramatic variations" in the value of conveyances subject to forfeiture actions undercut any argument that the latter are reasonably tied to remedial ends. See *Austin,* 509 U.S., at 621, 113 S.Ct., at 2811–2812; *United States v. Ward,* 448 U.S. 242, 254, 100 S.Ct. 2636, 2644, 65 L.Ed.2d 742 (1980).

I believe the Court errs today by assuming that the power to seize property is virtually unlimited and by implying that our opinions in *Calero–Toledo* and *Austin* were misguided. Some 75 years ago, when presented with the argument that the forfeiture scheme we approved had no limit, we insisted that expansive application of the law had not yet come to pass. "When such application shall be made," we said, "it will be time enough to pronounce upon it." *Goldsmith–Grant* **\*472** *Co.,* 254 U.S., at 512, 41 S.Ct., at 191. That time has arrived when the State forfeits a woman's car because her husband has secretly committed a misdemeanor inside it. While I am not prepared to draw a bright line that will separate the permissible and impermissible forfeitures of the property of innocent owners, I am convinced that the blatant unfairness of this seizure places it on the unconstitutional side of that line.

I therefore respectfully dissent.

Justice KENNEDY, dissenting.

The forfeiture of vessels pursuant to the admiralty and maritime law has a long, well-recognized tradition, evolving as it did from the necessity of finding some source of compensation for injuries done by a vessel whose responsible owners were often half a world away and beyond the practical reach of the law and its processes. See *Harmony v. United States,* 2 How. 210, 233, 11 L.Ed. 239 (1844); *Republic Nat. Bank of Miami v. United States,* 506 U.S. 80, 87–88, 113 S.Ct. 554, 558–559, 121 L.Ed.2d 474 (1992). The prospect of deriving prompt compensation from *in rem* forfeiture, and the impracticality of adjudicating the innocence of the owners or their good-faith efforts in finding a diligent and trustworthy master, combined to eliminate the owner's lack of culpability as a defense. See *Harmony v. United States, supra,* at 233. Those realities provided a better justification for forfeiture than earlier, more mechanistic rationales. Cf. *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680–681, 94 S.Ct. 2080, 2090–2091, 40 L.Ed.2d 452 (1974) (discussing deodands). The tradeoff, of course, was that the owner's absolute liability was limited to the amount of the vessel and (or) its cargo. For that reason, it seems to me inaccurate, or at least not well supported, to say that the owner's personal culpability was part of the forfeiture rationale. *Austin v. United States,* 509 U.S. 602, 625, 113 S.Ct. 2801, 2813–2814, 125 L.Ed.2d 488 (1993) (SCALIA, J., concurring in part and concurring in judgment); *id.,* at 628–629, 113 S.Ct., at 2815–2816 (KENNEDY, J., concurring in part and concurring in **\*\*1011** judgment). As Justice STEVENS observes, however, *ante,* at 1007–1008, even the well-recognized **\*473** tradition of forfeiture in admiralty has not been sufficient for an unequivocal confirmation from this Court that a vessel in all instances is seizable when it is used for criminal activity without the knowledge or consent of the owner, see *Calero–Toledo v. Pearson Yacht Leasing Co., supra,* at 688–690, 94 S.Ct., at 2094–2095. Cf. *The William Bagaley,* 5 Wall. 377, 410–411, 18 L.Ed. 583 (1867) (discussing English cases holding knowledge or culpability relevant to the forfeiture of a cargo owner's interest).

We can assume the continued validity of our admiralty forfeiture cases without in every analogous instance extending them to the automobile, which is a practical necessity in modern life for so many people. At least to this point, it has not been shown that a strong presumption of negligent entrustment or criminal complicity would be insufficient to protect the government's interest where the automobile is involved in a criminal act in the tangential way that it was here. Furthermore, as Justice STEVENS points

**Bennis v. Michigan, 516 U.S. 442 (1996)**

116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397...

out, *ante,* at 1006, the automobile in this case was not used to transport contraband, and so the seizure here goes beyond the line of cases which sustain the government's use of forfeiture to suppress traffic of that sort.

This forfeiture cannot meet the requirements of due process. Nothing in the rationale of the Michigan Supreme Court indicates that the forfeiture turned on the negligence or complicity of petitioner, or a presumption thereof, and nothing supports the suggestion that the value of her co-

ownership is so insignificant as to be beneath the law's protection.

For these reasons, and with all respect, I dissent.

**All Citations**

516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68, 64 USLW 4124, 96 Cal. Daily Op. Serv. 1397, 96 Daily Journal D.A.R. 2403

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

399 A.2d 861
District of Columbia Court of Appeals.

Robert A. FESJIAN, Petitioner,

v.

Burtell M. JEFFERSON, Chief of Police,
Metropolitan Police Department, Respondent.
Robert J. BUENZLE, Petitioner,

v.

Burtell M. JEFFERSON, Chief of Police,
Metropolitan Police Department, Respondent.
Arthur P. DAVIS, Jr., Petitioner,

v.

Burtell M. JEFFERSON, Chief of Police,
Metropolitan Police Department, Respondent.

Nos. 13183, 13184 and 13186.
|
Submitted Nov. 16, 1978.
|
Decided March 19, 1979.
|
Rehearing Denied April 14, 1979.

**Synopsis**

Gun owners filed petitions for review of metropolitan police department decisions refusing to register certain firearms. Petitions were consolidated. The District of Columbia Court of Appeals, Nebeker, J., held that: (1) statute, which renders new handguns and new machine guns unregisterable, yet contains a grandfather clause permitting owners of previously registered handguns to retain and reregister their firearms while denying owners of machine guns same right, does not violate equal protection clause; (2) having determined that the "readily converted" test applied here and clearly prohibited registration of gun owners' firearms, gun owners lacked standing to challenge applicable statute's "designed to shoot" test as being either vague, or overbroad in some hypothetical cases; (3) even if statute, which provides three alternatives for disposition within seven days of a firearm denied registration, authorized a "taking," such statute was an exercise of legislative police power, and not of eminent domain, and thus such statute did not provide for a taking of gun owners' property without just compensation in violation of Fifth Amendment, and (4) absent an indication in applicable statute that failure of police chief to act within 365 days upon gun owners' applications for registration resulted in a divestment of chief's authority to deny applications, time period set out

in applicable statute was advisory rather than mandatory, and thus chief's failure to act was not construed to constitute an automatic grant of applications by operation of law.

Affirmed.

**Attorneys and Law Firms**

**\*863** Robert A. Fesjian, pro se.

Robert J. Buenzle, pro se.

Arthur P. Davis, Jr., pro se, adopted brief of petitioner Buenzle.

Louis P. Robbins, Acting Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel and Dennis McDaniel, Asst. Corp. Counsel, Washington, D.C., were on brief, for respondent.

Before KELLY, NEBEKER and MACK, Associate Judges.

**Opinion**

NEBEKER, Associate Judge:

These consolidated petitions from a refusal by respondent to register certain firearms present a number of arguments. The arguments challenge the legality of a discrimination between owners of different weapons, the validity of a legislative definition of a machine gun, and the constitutionality of the registration statute which petitioners assert constitutes a prohibited Fifth Amendment "taking." Petitioners also claim that their firearms were automatically registered upon expiration of the statutory time period given the police chief to respond to applications for registration of firearms. We conclude that the automatic registration argument is unpersuasive and determine the statutes in question not to be constitutionally infirm. We, therefore, affirm.

By separate applications, petitioners Robert A. Fesjian, [1] Robert J. Buenzle, [2] and Arthur P. Davis, Jr., [3] sought to re-register their firearms pursuant to the Firearms Control Act of 1975, D.C. Code 1978 Supp., ss 6-1801 to -1880. Each of the firearms had been duly registered in previous years. The new applications were submitted in October and November of 1976. Notice of denial of the applications was given petitioners in December of 1977 or January of 1978. Each petitioner requested and was granted a hearing to challenge the denials. Following the hearings, the applications were again denied on the ground that all of the firearms were

unregisterable since they were machine guns within the provisions of D.C. Code 1978 Supp., s 6-1812. Section 6-1812 states that "(n)o registration certificate shall be issued for . . . the following types of firearms: . . . . (b) Machine gun." A machine gun is defined as "any firearm which shoots, is designed to shoot, or can be readily converted or restored **864 to shoot: (A) automatically . . .; (or) (B) semiautomatically, more than twelve shots without manual reloading." D.C. Code 1978 Supp., s 6-1802(10). The basis for this decision was that each of the weapons was capable of being fed with clips containing more than the permissible number of rounds.

| 1 | Petitioner Fesjian attempted to register a Browning Hi Power 9mm, semiautomatic pistol. |
|---|---|
| 2 | Petitioner Buenzle presented a U.S. M-1 Carbine, .30 caliber rifle for re-registration. |
| 3 | Petitioner Davis attempted to register a U.S. M-1 Carbine, .30 caliber; a Colt AR-15 Sportster; and a .22 caliber rifle, all semiautomatic firearms. |

Petitioners challenge the constitutionality of these statutes on several grounds. First, on equal protection grounds, petitioners challenge D.C. Code 1978 Supp., s 6-1816 as being unconstitutionally discriminatory. The terms of s 6-1812 [4] render new handguns and new machine guns unregisterable, yet contain a grandfather clause permitting owners of previously registered handguns to retain and re-register their firearms while denying owners of machine guns the same right. Petitioner claim that such a distinction is patently discriminatory, I. e., lacking rational support, especially in light of the asserted fact that handguns are more dangerous and are used in crimes more frequently than semiautomatic firearms like the guns in question. Petitioners contend that the latter-mentioned weapons have legitimate sporting and home protection uses, and they are no doubt correct in that observation.

| 4 | The full text of D.C. Code 1978 Supp., s 6-1812 reads: No registration certificate shall be issued for any of the following types of firearms: (a) Sawed-off shotgun; (b) Machine gun; (c) Short-barreled rifle; (d) Pistol not validly registered to the current registrant in the District prior to September 24, 1976; and (e) Pistol not possessed by the current registrant in conformity with the regulations in effect immediately prior to September 24, 1976. |
|---|---|

The Firearms Control Act constitutes an exercise of the police power of the Council of the District of Columbia. Such legislative action need have only a rational basis to overcome an equal protection attack. [5] The statutory grandfather provision distinguishing between owners of previously registered firearms is arguably based on a legislative determination that guns with greater fire power are more dangerous and less tolerable in the District of Columbia than guns with a lesser fire power. A gun, whether clip-fed or otherwise, capable of firing 13 rounds or more without reloading, may reasonably be considered a greater public threat than firearms of more limited capacity. It may be that the Council was prompted to this conclusion by a recognition of the fact that the fire power of a 13-shot semiautomatic firearm threatened the security of the police officers who carry six-shot revolvers. Any number of other lines of thought might have persuaded the Council to classify guns according to their fire power. We hold the determination not to grandfather weapons with greater fire power to have a sufficient rational basis to withstand an attack founded on disparate treatment.

| 5 | McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) states: (T)he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The Constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. |
|---|---|

A corollary argument is also made by petitioners that their firearms should not be considered machine guns since they were presented for registration with clips holding less than 13 rounds. It is contended that any use of the firearms with a clip having a capacity of more than 12 rounds would constitute an illegal modification of the gun like sawing off the barrel of a shotgun or attaching a silencer to a gun's muzzle. To deny registration of a gun submitted with a clip holding less than 13 rounds, the argument runs, is to make the assumption that the gun will be illegally modified after registration an assumption not indulged for any other firearm notwithstanding the fact that any gun could be unlawfully altered by reducing the length of its barrel or adding a silencer.

**\*865** The flaw in this argument is that the Council, in adopting s 6-1802(10), was concerned primarily with the inherent fire power of certain weapons, not with the question of firearm modification after registration. The rationale supporting this provision to prohibit residents of the District from possessing guns whose fire power has legislatively been deemed to be dangerous, differs from the rationale undergirding the statute which forbids certain modifications of firearms to be made after registration. The nature of the weapons, plus the administration of the program, not the character of the weapon's owner, prompted the Council to adopt this statute. Since the guns in question, by virtue of their structure, had the capability to shoot the prohibited number of rounds without reloading, they may properly be found to be unregisterable.

Second, petitioners claim that the "designed to shoot . . . more than twelve shots without manual reloading" definition of a prohibited firearm in s 6-1802(10) constitutes a test so unworkable and inequitable as to be impermissibly overbroad and vague. They contend that the number of rounds a firearm is designed to shoot is irrelevant to a determination of which firearms are dangerous weapons, since many guns which were not designed to shoot 13 or more rounds semiautomatically can be structurally modified to perform like a s 6-1802(10) machine gun. Petitioners' argument is that the "designed to shoot" test could conceivably be used to prohibit nearly all clip and breech-loading guns since these guns can be modified to shoot the prohibited number of rounds. We are asked to find that such a statutory prohibition is overbroad, and that the "designed to shoot" test is vague, failing to clearly identify the class of prohibited firearms and thus failing to give gun owners the constitutionally required fair notice.

Without reaching the merits of either claim, we conclude that both constitutional challenges to the statute are unavailing. The language of the statute unequivocally states that firearms are unregisterable not only if "designed to shoot" more than twelve rounds without reloading, but also if they "can be readily converted or restored to shoot" the prohibited number of rounds semiautomatically. At the hearing, petitioners admitted that their semiautomatic guns could hold clips of more than 12 rounds. It is evident, therefore, that the denial of petitioners' applications was based on the "readily converted to shoot" phrase of the statute. Having determined that the "readily converted" test applies here and clearly prohibits registration of petitioners' firearms, we hold that petitioners lack standing to challenge the statute's "designed to shoot" test as being either vague, United States v. National

Dairy Corp., 372 U.S. 29, 31-33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), or overbroad in some hypothetical cases, Cf. Broadrick v. Oklahoma, 413 U.S. 601, 607-08, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973) (holding that an individual has no standing to challenge on first amendment grounds the "outermost boundaries" of an act as being vague or overbroad when that individual's "conduct falls squarely within the 'hard core' of the statute's proscriptions"). We need not decide the question of the applicability of the overbreadth argument (most usually advanced in First Amendment context) to issues outside the scope of the first amendment rights of expression or association. Note, "The First Amendment Overbreadth Doctrine," 83 Harv.L.Rev. 844 (1970).

Petitioners' third constitutional challenge alleges that D.C. Code 1978 Supp., s 6-1820(c) provides for a taking of their property without just compensation in violation of the Fifth Amendment. That section of the Code provides three alternatives for disposition within seven days of a firearm denied registration. The unsuccessful applicant may (1) "peaceably surrender" the firearm to the chief of police, (2) "lawfully remove" the firearm from the District for as long as he retains an interest in the firearm, or (3) "lawfully dispose" of his interest in the firearm. Petitioners' argument is that the second and third alternatives require, under the terms imposed by **\*866** the Federal Gun Control Act of 1968, 18 U.S.C. s 922 (1970), a quick "forced sale" of the firearms at less than fair market value to a dealer in firearms, while the first alternative would provide not even a salvage value return.

Assuming, Arguendo, that the statute authorized a "taking," we note that the Fifth Amendment prohibits taking of "private property . . . for public use, without just compensation." Such a taking for the public benefit under a power of eminent domain is, however, to be distinguished from a proper exercise of police power to prevent a perceived public harm, which does not require compensation. Lamm v. Volpe, 449 F.2d 1202, 1203 (10th Cir. 1971). That the statute in question is an exercise of legislative police power and not of eminent domain is beyond dispute. The argument of petitioner, therefore, lacks merit.

A final argument presented is that the failure of the police chief to act within 365 days upon petitioners' applications for registration should be construed to constitute an automatic grant of the applications by operation of law. The provision of the Firearms Act setting forth the time frame for administrative review of firearms applications is D.C. Code 1978 Supp., s 6-1817(b). The pertinent part of this statute reads: "That in the case of an application to register a firearm validly registered under prior regulations,

the (police) Chief shall have 365 days after receipt of such application to approve or deny such application." No penalty or consequence of any nature is specified for failing to act within the time period designated. Absent an indication in the statute that such a failure to act results in a divestment of the Chief's authority to deny applications, we hold that the time period set out in the statute is advisory rather than, as petitioners suggest, mandatory. See Ralpho v. Bell, 186 U.S.App.D.C. 368, 388, 569 F.2d 607, 627 (1977); Diamond Match Co. v. United States, 181 F.Supp. 952, 959 (Cust.Ct.1960). Further, under the provisions of the District of Columbia Administrative Procedure Act, D.C. Code 1973, s 1-1510(2), when an administrator fails to act punctually on a matter before him for consideration, this court is empowered solely "to compel agency action unlawfully withheld or unreasonably delayed." Id. See Harper v. Levi, 171 U.S.App.D.C. 321, 328, 520 F.2d 53, 60

(1975) (commenting on identical provision of the Federal Administrative Procedure Act, 5 U.S.C. s 706 (1970)). Hence, even if petitioners had exhausted their administrative remedies and had not received any response from the police department after one year, the most advantageous result petitioners could exact from this court would be an order compelling the MPD to act on the applications.

Finding no constitutional infirmity in the Firearms Control Statutes nor any justification to reverse respondent's decisions, the administrative orders are

Affirmed.

**All Citations**

399 A.2d 861

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

742 Fed.Appx. 218
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals, Ninth Circuit.

Virginia DUNCAN; et al., Plaintiffs-Appellees,
v.
Xavier BECERRA, in his official capacity
as Attorney General of the State of
California, Defendant-Appellant.

No. 17-56081
|
Argued and Submitted May 14,
2018 San Francisco, California
|
Filed July 17, 2018

**Synopsis**
**Background:** Gun owners brought action against Attorney
General of California, alleging prohibition on possession
of large capacity gun magazines violated their Second
Amendment right to bear arms and Takings Clause,
seeking preliminary injunction enjoining state from enforcing
California statute prohibiting possession of large capacity gun
magazines. The United States District Court for the Southern
District of California, Roger T. Benitez, J., 265 F.Supp.3d
1106, granted preliminary injunction. State appealed.

**Holdings:** The Court of Appeals held that:

gun owners were likely to prevail on merits of their claim that
statute violated Second Amendment, and

gun owners were likely to succeed on merits of their claim
that statute violated Takings Clause.

Affirmed.

Wallace, Circuit Judge, filed separate dissenting opinion.

**West Codenotes**

**Validity Called into Doubt**
Cal. Penal Code § 32310(c), (d).

**Attorneys and Law Firms**

**\*219** Anna Barvir, Attorney, Sean Anthony Brady,
Attorney, Carl D. Michel, Esquire, Senior Attorney, Michel
& Associates, P.C., Long Beach, CA, Paul D. Clement,
Attorney, Kasdin Miller Mitchell, Erin E. Murphy, Kirkland
& Ellis LLP, Washington, DC, for Plaintiffs-Appellees

Alexandra Robert Gordon, Deputy Attorney General,
AGCA—Office of the California Attorney General, San
Francisco, CA, Anthony Paul O'Brien, Esquire, Deputy
Attorney General, AGCA-Office of the California Attorney
General, Sacramento, CA, John Darrow Echeverria, Attorney,
California Department of Justice, Los Angeles, CA, for
Defendant-Appellant

Sonya L. Lebsack, Assistant Attorney General, Office of
the Attorney General, Office of the Solicitor General,
Washington, DC, for Amicus Curiae District of Columbia,
Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland,
Massachusetts, New York, Oregon, Rhode Island, Virginia,
and Washington

Paul Wolfson, Esquire, Attorney, WilmerHale, Appellate and
Supreme Court Practice, Washington, DC, for Amicus Curiae
Brady Center To Prevent Gun Violence

Jonathan K. Baum, Katten Muchin Rosenman, LLP, Chicago,
IL, for Amici Curiae California Chapter of the American
College of Emergency Physicians, American Academy
of Pediatrics, California, California Academy of Family
Physicians

Anthony P. Schoenberg, Esquire, Farella Braun & Martel
LLP, San Francisco, CA, for Amici Curiae Giffords Law
Center To Prevent Gun Violence, Gavin Newsom

Victoria L. Weatherford, Esquire, Attorney, San Francisco
City Attorney's Office, San Francisco, CA, for Amici Curiae
City and County of San Francisco, City of Los Angeles, City
of Sunnyvale

Jamie A. Levitt, Morrison & Foerster LLP, New York, NY,
for Amici Curiae Pride Fund To End Gun Violence, Equality
California, Gays Against Guns

Antonio Perez-Marques, Davis Polk & Wardwell, LLP, New York, NY, for Amicus Curiae Everytown for Gun Safety

Joseph Greenlee, Jolein A. Harro, P.C., Steamboat Springs, CO, for Amicus Curiae Doctors for Responsible Gun Ownership, Independence Institute, and Millennial Policy Center

Maximillian G. Tresmond, Esquire, Tresmond & Tresmond, Buffalo, NY, for Amicus Curiae Shooters Committee on Political Education (Scope, Inc.)

David H. Thompson, Cooper & Kirk, PLLC, Washington, DC, for Amicus Curiae National Rifle Association Freedom Action Foundation

Dan M. Peterson, Attorney, Dan M Peterson PLLC, Fairfax, VA, for Amicus Curiae California State Sheriffs' Association, Western States Sheriffs' Association, California Reserve Peace Officers Association, San Francisco Veteran Police Officers Association, California Gang Investigators Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Netword, Law Enforcement Alliance of America, International Association of Law Enforcement Firearms Instructors, Association of New Jersey Rifle & Pistol Clubs, Bridgeville Rifle & Pistol Club, Connecticut Citizens Defense League, Delaware State Sportsmen's Association, Gun Owners'action League Massachusetts, Gun Owners of California, Hawaii Rifle Association, Illinois State Rifle Association, Missourians for Personal Safety, New York State Rifle & Pistol Association, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, Virginia Shooting Sports Association, and Western Missouri Shooters

Oramel H. Skinner, III, Esquire, Arizona Attorney General's Office, Phoenix, AZ, for Amicus Curiae States of Arizona, Alabama, Arkansas, Georgia, Idaho, Kansas, Louisiana, Michigan, Missouri, Montana, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Utah, West Virginia, and Wyoming

Appeal from the United States District Court for the Southern District of California, Roger T. Benitez, District Judge, Presiding, D.C. No. 3:17-cv-01017-BEN-JLB

Before: WALLACE and N.R. SMITH, Circuit Judges, and BATTS,[*] District Judge.

---

[*] The Honorable Deborah A. Batts, United States District Judge for the Southern District of New York, sitting by designation.

**\*220 MEMORANDUM**[**]

[**] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

The State of California ("California"), through its Attorney General, Xavier Becerra, appeals the district court's grant of a preliminary injunction enjoining California from enforcing California Penal Code §§ 32310(c) & (d). "We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011). We do not "determine the ultimate merits," but rather "determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand." *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015). We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we affirm.[1]

[1] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). California makes only a cursory argument that the latter three elements are unmet if we find the district court did not abuse its discretion. Because we find the district court did not abuse its discretion, we only address the first element of the preliminary injunction standard for each constitutional question. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief.... [A] bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." (citation omitted) ).

**\*221 I.**

The district court did not abuse its discretion by granting a preliminary injunction on Second Amendment grounds. *Thalheimer*, 645 F.3d 1109 at 1115.

1. The district court did not abuse its discretion by concluding that magazines for a weapon likely fall within the scope of the Second Amendment. First, the district court identified the applicable law, citing *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), *Caetano v. Massachusetts*, ––– U.S. ––––, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (per curiam), and *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014). Second, it did not exceed its permissible discretion by concluding, based on those cases, that (1) some part of the Second Amendment right likely includes the right to bear a weapon "that has some reasonable relationship to the preservation or efficiency of a well regulated militia," *Miller*, 307 U.S. at 178, 59 S.Ct. 816; *see also Heller*, 554 U.S. at 583, 627-28, 128 S.Ct. 2783; *Caetano*, 136 S.Ct. at 1028; and (2) the ammunition for a weapon is similar to the magazine for a weapon, *Jackson*, 746 F.3d at 967 (" '[T]he right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ) ).

2. The district court did not abuse its discretion by applying the incorrect level of scrutiny. The district court applied both intermediate scrutiny and what it coined the "simple test" of *Heller*. The district court found Plaintiffs were likely to succeed under either analysis. Although the district court applied two different tests, there is no reversible error if one of those tests follows the applicable legal principles and the district court ultimately reaches the same conclusion in both analyses.

Here, in its intermediate scrutiny analysis, the district court correctly applied the two-part test outlined in *Jackson*. The district court concluded that a ban on ammunition magazines is not a presumptively lawful regulation and that the prohibition did not have a "historical pedigree." Next, the district court concluded, citing *Fyock*, that section 32310 infringed on the core of the Second Amendment right, but, citing *Silvester v. Harris*, 843 F.3d 816, 823 (9th Cir. 2016), *Fyock*, 779 F.3d at 999, *Jackson*, 746 F.3d at 965, 968, and *Chovan*, 735 F.3d at 1138, that intermediate scrutiny was the appropriate scrutiny level. The district court concluded that California had identified four "important" interests and reasoned that the proper question was "whether the

dispossession and criminalization components of [section] 32310's ban on firearm magazines holding any more than 10 rounds is a reasonable fit for achieving these important goals."

3. The district court did not abuse its discretion by concluding that sections 32310(c) and (d) did not survive intermediate scrutiny. The district court's review of the evidence included numerous judgment calls regarding the quality, type, and reliability of the evidence, as well as repeated credibility determinations. Ultimately, the district court concluded that section 32310 is "not likely to be a reasonable fit." California articulates no actual error made by the district court, but, rather, multiple instances where it disagrees with the district court's conclusion or analysis regarding certain pieces of evidence. This is insufficient to establish that the district court's findings of fact and its application of the legal standard to those facts were "illogical, **\*222** implausible, or without support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). In reviewing the district court's grant of a preliminary injunction, we cannot "re-weigh the evidence and overturn the district court's evidentiary determinations—in effect, to substitute our discretion for that of the district court." *Fyock*, 779 F.3d at 1000. [2]

[2]    The dissent *does* re-weigh the evidence. It concludes that "California's evidence ... was more than sufficient to satisfy intermediate scrutiny" and that the "2013 Mayors Against Illegal Guns (MAIG) Survey ... easily satisfies the requirement that the evidence upon which the state relies be 'reasonably believed to be relevant' and 'fairly support' the rationale for the challenged law." These conclusions mean the dissent *is* "substitut[ing] [its] discretion for that of the district court," which is impermissible under the applicable standard of review. *Fyock*, 779 F.3d at 1000-01.

Further, disagreeing with another district court regarding a similar record is not necessarily an abuse of discretion. Here, the district court made evidentiary conclusions regarding the record provided by California, specifically noting that it had provided "incomplete studies from unreliable sources upon which experts base speculative explanation and predictions." These conclusions are not "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Hinkson*, 585 F.3d at 1251. As noted above, it is not our role to "re-weigh the evidence and overturn the district court's evidentiary determinations—in effect, to substitute our discretion for that of the district court." *Fyock*, 779 F.3d at 1000.

## II.

The district court did not abuse its discretion by granting a preliminary injunction on Takings Clause grounds. *Thalheimer*, 645 F.3d at 1115. First, the district court, citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), *Horne v. Department of Agriculture*, ––– U.S. ––––, 135 S.Ct. 2419, 192 L.Ed.2d 388 (2015), *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), *Murr v. Wisconsin*, ––– U.S. ––––, 137 S.Ct. 1933, 198 L.Ed.2d 497 (2017), and *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), outlined the correct legal principles. Second, the district court did not exceed its discretion by concluding (1) that the three options provided in section 32310(d) (surrender, removal, or sale) fundamentally "deprive Plaintiffs not just of the *use* of their property, but of *possession*, one of the most essential sticks in the bundle of property rights"; and (2) that California could not use the police power to avoid compensation, *Lucas*, 505 U.S. at 1020-29, 112 S.Ct. 2886; *Loretto*, 458 U.S. at 426, 102 S.Ct. 3164 (holding "a permanent physical occupation authorized by the government is a taking without regard to the public interest it may serve"). [3]

[3]  The dissent also "re-weigh[s] the evidence" and the district court's conclusions on the Takings Clause question. *Fyock*, 779 F.3d at 1000. The district court concluded that the three options available under section 32310(d) constituted either a physical taking (surrender to the government for destruction) or a regulatory taking (forced sale to a firearms dealer or removal out of state). The dissent first takes issue with the district court's conclusion that storage out of state could be financially prohibitive. It is not "illogical" or "implausible" to conclude that forcing citizens to remove property out of state effectively dispossess the property due to the financial burden of using it again. *Hinkson*, 585 F.3d at 1263. Such removal, as the district court notes, also eliminates use of the Banned Magazines in "self defense." *See Heller*, 554 U.S. at 592, 128 S.Ct. 2783 ("[W]e find that [the text of the Second Amendment] guarantee[s] the individual [a] right to possess and carry weapons in case of confrontation."). Second, the dissent argues the district court incorrectly weighed the regulatory takings factors in *Murr*. While the cost ($20 to $50) of the magazine may seem minimal, the district court also noted that the "character of the governmental action," *Murr*, 137 S.Ct. at 1943, was such

that "California will deprive Plaintiffs not just of the *use* of their property, but of *possession*," Similarly, this conclusion is not "illogical," "implausible," or "without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1263.

**AFFIRMED.**

WALLACE, Circuit Judge, dissenting:

 **\*223** I respectfully dissent. For the reasons stated below, I conclude that the district court abused its discretion in preliminarily enjoining California Penal Code §§ 32310(c) & (d).

### I.

In this case, we apply intermediate scrutiny because the challenged law "does not implicate a core Second Amendment right, or ... place a substantial burden on the Second Amendment right." *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014). Under this standard, a challenged law will survive constitutional scrutiny so long as the state establishes a "reasonable fit" between the law and an important government interest. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). "When reviewing the reasonable fit between the government's stated objective and the regulation at issue, the court may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.' " *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting *Jackson*, 746 F.3d at 966). California may establish a reasonable fit with "any evidence 'reasonably believed to be relevant' to substantiate its important interests." *Id.*

The majority concludes the district court did not abuse its discretion in concluding California's large-capacity magazine (LCM) possession ban did not survive intermediate scrutiny on the ground that the district court's conclusion was based on "numerous judgment calls regarding the quality, type, and reliability of the evidence." The problem, however, is that the district court's "judgment calls" presupposed a much too high evidentiary burden for the state. Under intermediate scrutiny, the question is not whether the state's evidence satisfies the district court's subjective standard of empiricism, but rather whether the state relies on evidence "reasonably believed to be relevant" to substantiate its important interests. *Fyock*, 779 F.3d at 1000. So long as the state's evidence "fairly supports" its conclusion that a ban on possession of LCMs would reduce

the lethality of gun violence and promote public safety, the ban survives intermediate scrutiny. *Jackson*, 746 F.3d at 969.

California's evidence—which included statistical studies, expert testimony, and surveys of mass shootings showing that the use of LCMs increases the lethality of gun violence —was more than sufficient to satisfy intermediate scrutiny. For example, the September 2013 Mayors Against Illegal Guns (MAIG) Survey, which the district court writes off as inconclusive and irrelevant, easily satisfies the requirement that the evidence upon which the state relies be "reasonably believed to be relevant" and "fairly support" the rationale for the challenged law. The MAIG survey shows that assault weapons or LCMs were used in at least 15 percent of the mass shootings reported, and that in those incidents 151 percent more people were shot, and 63 percent more people died, as compared to other mass shootings surveyed. Even if the MAIG survey also shows that most mass shooting incidents did not involve LCMs, California could draw a "reasonable **\*224** inference" based on the data that prohibiting possession of LCMs would reduce the lethality of gun violence. *Jackson*, 746 F.3d at 966. Other evidence cited by the state similarly supports the conclusion that mass shootings involving LCMs result in a higher number of shots fired, a higher number of injuries, and a higher number of fatalities than other mass shootings. The district court's characterization of this evidence as insufficient was based either on clearly erroneous findings of fact or an application of intermediate scrutiny that lacked support in inferences that could be drawn from facts in the record. In either case, it was an abuse of discretion.

It is significant that California, in seeking to establish a reasonable fit between §§ 32310(c) & (d) and its interest in reducing the lethality of mass shootings, relied on much of the same evidence presented by the City of Sunnyvale in *Fyock*, a case in which we affirmed the district court's conclusion that Sunnyvale's LCM possession ban was likely to survive intermediate scrutiny. The district court attempts to distinguish the two cases, stressing that an "important difference" between this case and *Fyock* is that the court in *Fyock* "had a sufficiently convincing evidentiary record of a reasonable fit," which "is not the case here." But the evidentiary record in *Fyock* included much of the same evidence the district court here found insufficient—including the aforementioned September 2013 MAIG survey, and expert declarations by Lucy Allen and John Donohue, which the district court dismissed as "defective" and "biased." The district court did not explain why the evidentiary record in

*Fyock* was "sufficiently convincing," while a substantially similar evidentiary record here was insufficient. Given the overlap between the records, and the district court's failure to identify any material differences, the district court's contention that the record here is less credible, less reliable, and less relevant than the record in *Fyock* is difficult to accept.

The majority argues in a footnote that in concluding the district court abused its discretion I have impermissibly re-weighed the evidence. That is not so. Our obligation to refrain from re-weighing evidence is meant to ensure we do not overturn a district court's ruling simply because we would have placed more weight on certain pieces of evidence than others. This obligation to refrain presumes the district court has applied the correct legal standard. Here, by contrast, my argument is that the district court did not evaluate the evidence consistent with the applicable legal standard. This is conceptually distinct from the question whether one piece of evidence should have been given more weight vis-à-vis another piece of evidence. Here, the district court was required under intermediate scrutiny to credit evidence "reasonably believed to be relevant" to advancing the state's important interests. *Fyock*, 779 F.3d at 1000. Instead, the district court rejected this standard for a subjective standard of undefined empirical robustness, which it found the state did not satisfy. This it cannot do.

In sum, I conclude the district court abused its discretion in concluding that California had not established a "reasonable fit" between §§ 32310(c) & (d) and the state's important interests. On the record before the district court, California's LCM possession ban likely survives intermediate scrutiny. Therefore, Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenge and were not entitled to a preliminary injunction.

## II.

The district court also concluded that Plaintiffs were likely to succeed on the merits of their claim under the Takings **\*225** Clause on the ground that §§ 32310(c) & (d) was both a physical appropriation of property and a regulatory taking. In my view, the district court's application of relevant takings doctrine was without support in inferences that could be drawn from facts in the record, and therefore constituted an abuse of discretion.

The district court is correct that a physical appropriation of personal property gives rise to a *per se* taking. *Horne v. Department of Agriculture*, ––– U.S. ––––, 135 S.Ct. 2419, 2427, 192 L.Ed.2d 388 (2015). But here, LCM owners can comply with § 32310 without the state physically appropriating their magazines. Under § 32310(d)(1), an LCM owner may "[r]emove the large-capacity magazine from the state," retaining ownership of the LCM, as well as rights to possess and use the magazines out of state. The district court hypothesized that LCM owners may find removal to be more costly than it is worth, but such speculation, while theoretically relevant to the regulatory takings inquiry, does not turn the compulsory removal of LCMs from the state into a "physical appropriation" by the state. *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (explaining that it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa") (footnote omitted). Given that Plaintiffs do not specify whether they intend to surrender or sell their LCMs, as opposed to remove them from the state and retain ownership, the availability of the removal option means Plaintiffs are unlikely to succeed on their claim that the LCM possession ban is unconstitutional as a physical taking. *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018) (explaining that to succeed on a facial challenge, plaintiffs must show either that "no set of circumstances exists under which the challenged law would be valid," or that the law lacks any "plainly legitimate sweep"); *cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

Nor was the district court within its discretion to conclude that § 32310 likely constituted a regulatory taking. Under the relevant *Penn Central* balancing test, a regulatory taking may be found based on "a complex of factors," including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action." *Murr v. Wisconsin*, ––– U.S. ––––, 137 S.Ct. 1933, 1943, 198 L.Ed.2d 497 (2017); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Here, the district court speculated that because the typical retail cost of an LCM is "between $20 and $50," LCM owners may find

"the associated costs of removal and storage and retrieval" to be too high to justify retaining their magazines. In my view, this speculation is insufficient to conclude that plaintiffs are likely to succeed on the merits of their regulatory takings claim. Even accepting the district court's finding on the "typical retail cost" of an LCM, there are no facts in the record from which to draw an inference regarding the overall economic impact of §§ 32310(c) & (d) on Plaintiffs, particularly as it relates to Plaintiffs' "distinct investment-backed expectations" for their LCMs. Without this foundation, the district court could not plausibly draw the inference that requiring the removal of **\*226** LCMs from California was "functionally equivalent" to a direct appropriation and thus constituted a regulatory taking. *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 539, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).

III.

"Abuse-of-discretion review is highly deferential to the district court." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012). In this case, however, I do not consider it a close call to conclude the district court abused its discretion in finding Plaintiffs were likely to succeed on the merits of their constitutional challenges to California's LCM ban. As to Plaintiffs' Second Amendment challenge, the district court clearly misapplied intermediate scrutiny by refusing to credit relevant evidence that fairly supports the state's rationale for its LCM ban. As to Plaintiffs' Takings Clause challenge, the district court offered only speculation on the economic impact of the challenged law and did not assess Plaintiffs' distinct investment-backed expectations for their LCMs. Therefore, I would conclude the district court exceeded the broad range of permissible conclusions it could have drawn from the record. The proper course is to reverse the district court's order granting the preliminary injunction and remand for further proceedings. Accordingly, I dissent.

As a final note, I realize the end result of the district court's rulings are temporary. The district court is to be commended for following our constant admonition not to delay trial preparation awaiting an interim ruling on the preliminary injunction. *See Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 673 (9th Cir. 1988). The district court has properly proceeded with deliberate speed towards a trial, which will allow it to decide this case with a full and complete record and a new review. Thus, although I would reverse the district court's order and remand for further proceedings, I

credit the district court for ensuring the case did not stall awaiting disposition of this appeal.

**All Citations**

742 Fed.Appx. 218

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

265 F.Supp.3d 1003
United States District Court, D. Arizona.

Mark BILIACK, M.D., Plaintiff,
v.
PAUL REVERE LIFE INSURANCE
COMPANY, et al., Defendants.

No. CV–16–03631–PHX–DJH
|
Signed 08/24/2017
|
Filed 08/25/2017

**Synopsis**

**Background:** Insured brought action against disability insurers and physicians they employed, alleging claims under Arizona law of breach of contract and breach of the obligation of good faith and fair dealing against insurers, and aiding and abetting insurance bad faith against physicians individually. Physicians moved to dismiss for lack of personal jurisdiction and for failure to state a claim.

**Holdings:** The District Court, Diane J. Humetewa, J., held that:

exercise of specific personal jurisdiction in Arizona over physicians was warranted, and

insured stated a claim that physicians aided and abetted insurance bad faith under Arizona law.

Motion denied.

**Attorneys and Law Firms**

**\*1005** Anita Rosenthal, Sander Ruggill Dawson, Steven C. Dawson, Dawson & Rosenthal PC, Sedona, AZ, Scott Edward Davis, Scott E. Davis PC, Scott M. Harris, Scott M. Harris PC, Scottsdale, AZ, Jeffrey K. Rubin, Seattle, WA, Richard H. Friedman, Bremerton, WA, for Plaintiff.

Alicyn Marie Freeman, James R. Broening, Broening Oberg Woods & Wilson PC, Phoenix, AZ, Charles A. Danaher, Peter H. Klee, Sheppard Mullin Richter & Hampton LLC, San Diego, CA, Theona Zhordania, Sheppard Mullin Richter & Hampton LLP, Los Angeles, CA, for Defendants.

**ORDER**

Honorable Diane J. Humetewa, United States District Judge

This matter is before the Court on Defendant Philbin's and Defendant Benson's Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to Dismiss for Failure to State a Claim (Doc. 23). Plaintiff has filed an Opposition to Motion to Dismiss (Doc. 33) and Defendants Philbin and Benson have filed a Reply (Doc. 47). [1]

[1]  Defendants have requested oral argument. The Court denies the request because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed.R.Civ.P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

Also pending is Plaintiff's Motion for Order to File Documents under Seal (Doc. 36), to which no response was filed. In addition, Plaintiff has filed a Motion to Strike Defendants' Objections (Doc. 52). Defendants Philbin and Benson have filed a Response (Doc. 53) and Plaintiff has filed a Reply (Doc. 54).

**I. Background**

Plaintiff initiated this action by filing a Complaint (Doc. 1) on October 20, 2016. Plaintiff filed a First Amended Complaint (Doc. 14) on November 23, 2016 and a Second Amended Complaint (Doc. 18) on December 27, 2016. Plaintiff, an anesthesiologist, alleges that he obtained a disability insurance policy from Defendant Paul Revere Insurance Company ("Paul Revere") in January 1993. (Doc. 18 at 5). [2] Plaintiff **\*1006** obtained a second disability insurance policy from Paul Revere in April 1994. (*Id.* at 6). According to Plaintiff, Defendant Unum Group ("Unum") is an insurance holding company that now controls Paul Revere, though it did not at the time Plaintiff's policies were issued. (Doc. 18 at 2).

[2]  The Court's citations to attachments and/or page numbers of filed documents correspond to the attachment numbers and/or page numbers generated by the district court's electronic filing system, not pre-printed attachment numbers and page numbers on the original documents.

Due to medical conditions involving his back, legs and hips, Plaintiff submitted claims under his disability policies in

Billack v. Paul Revere Life Insurance Company, 265 F.Supp.3d 1003 (2017)

July 2015. (Doc. 18 at 7–8). In September 2015, Defendants sought additional time to make a decision on Plaintiff's claims. (Doc. 18 at 8–9). In December 2015, after paying benefits to Plaintiff for a few months under a reservation of rights, Defendants informed Plaintiff that his benefits were not approved beyond December 3, 2015, that there was no support for his claimed restrictions, and that his claims were closed. (Doc. 18 at 9).

Plaintiff alleges that from September to December, 2015, Defendant Dr. Philbin, who is employed by Unum, reviewed Plaintiff's medical records, a field visit report, and surveillance information. (Doc. 18 at 12). Plaintiff alleges that Dr. Philbin's reports to the Unum file handlers minimized the severity of Plaintiff's conditions and focused on findings supporting a denial while ignoring findings that supported Plaintiff's claims. (*Id.*). Plaintiff further alleges Dr. Philbin initiated communications with two of Plaintiff's treating physicians in Arizona. (*Id.* at 13).

Plaintiff also alleges that another physician employed by Unum, Dr. Benson, reviewed Plaintiff's medical records and Dr. Philbin's opinions. (Doc. 18 at 13). Plaintiff alleges Dr. Benson "reviewed the records in a slanted fashion to support her predetermined outcome" in favor of Dr. Philbin's opinion over Plaintiff's treating physicians' opinions. (Doc. 18 at 14).

Plaintiff alleges three causes of action in the Second Amended Complaint. First, he alleges breach of contract against Paul Revere and Unum. Second, he alleges breach of the obligation of good faith and fair dealing against Paul Revere and Unum. Third, he alleges aiding and abetting the tort of insurance bad faith against Drs. Philbin and Benson individually.

## II. Motion to Dismiss

Defendants Drs. Philbin and Benson (hereinafter, the "Physician Defendants") first seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2), lack of personal jurisdiction. They argue that their contacts with Arizona are insufficient for the Court to exercise personal jurisdiction over them. Alternatively, the Physician Defendants argue that the Court should dismiss the aiding and abetting claim against them because it fails to state a claim upon which relief can be granted.

Plaintiff argues in response that the standards for personal jurisdiction over the Physician Defendants are satisfied here. Plaintiff further argues that his claim for aiding and abetting against the Physician Defendants states a plausible claim

for relief under Arizona law and contains sufficient factual allegations to support the claim.

### A. Personal Jurisdiction

#### 1. Legal Standards

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). The plaintiff, however, need only make " 'a prima facie showing of jurisdictional facts to **\*1007** withstand the motion to dismiss.' " *Id.* (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001)). Although the plaintiff cannot simply rest on the allegations in the complaint, uncontroverted allegations are taken as true and conflicts between parties over statements contained in affidavits are to be resolved in favor of the plaintiff. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citations omitted).

"Where ... there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Id.* Arizona's long-arm jurisdictional statute is co-extensive with federal due process requirements; therefore, the analysis of personal jurisdiction under Arizona law and federal due process is the same. *Atkins v. Calypso Systems, Inc.*, No. CV-14-02706-PHX-NVW, 2015 WL 5856881, at *2 (D. Ariz. October 8, 2015). Under the Due Process Clause, "[a]lthough a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden v. Fiore*, ––– U.S. ––––, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (citations and internal quotations omitted).

"Personal jurisdiction can be either specific or general." *Atkins*, 2015 WL 5856881, at *2. The standard for a court to exercise general personal jurisdiction over a nonresident defendant is exacting and requires that the defendant engage in "continuous and systematic general business contacts" that "approximate physical presence" in the forum state. *Schwarzenegger*, 374 F.3d at 801 (citations and internal quotations omitted). Specific jurisdiction, on the other hand, requires sufficient minimum contacts with the forum state. *See Walden*, 134 S.Ct. at 1121; *Schwarzenegger*, 374 F.3d

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

at 801–802. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 134 S.Ct. at 1121 (citations and internal quotations omitted). The Ninth Circuit "employ[s] a three-part test to assess whether a defendant has sufficient contacts with the forum state to be subject to specific personal jurisdiction:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Schwarzenegger*, 374 F.3d at 802).

"The first required element of specific jurisdiction, 'purposeful direction,' is satisfied when a defendant (1) commits an intentional act, (2) expressly aimed at the forum, (3) which causes foreseeable harm in the forum." *AMA Multimedia LLC v. Sagan Limited*, No. CV-16-01269-PHX-DGC, 2016 WL 5946051, at *3 (D. Ariz. October 13, 2016) (citing *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011)). This standard, sometimes referred to as the "effects test" does not mean that every foreign act with foreseeable effects in the forum state gives rise to specific jurisdiction. *Id.* "The proper question is not where the plaintiff **\*1008** experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134 S.Ct. at 1125.

The second required element, whether the claim arises out of or relates to the defendant's forum-related activities, is established "if the plaintiff 'would not have been injured but for' the defendant's conduct directed at the forum." *AMA Multimedia*, 2016 WL 5946051, at *6 (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998)). As to the third element, reasonableness, "[t]he Court must ensure that the exercise of jurisdiction is reasonable—that it comports with 'fair play and substantial justice.' " *Id.* (citing *Panavision*, 141 F.3d at 1322, and *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

### 2. Application

Plaintiff alleges in the Second Amended Complaint that the Physician Defendants knew Plaintiff resided in Arizona, knew he had worked as an anesthesiologist in Arizona, and knew Plaintiff was being treated for his medical conditions in Arizona by Arizona physicians. (Doc. 18 at 4). Plaintiff further alleges the Physician Defendants intentionally and purposefully directed their activities at Plaintiff knowing that he resided in Arizona. (*Id.*). Plaintiff further alleges they caused harm to him knowing he would likely suffer such harm in Arizona. (*Id.*). Plaintiff also alleges that all Defendants "have caused acts to occur in the State of Arizona which have given rise to Plaintiff's claims herein." (*Id.*). Plaintiff argues the Physician Defendants' conduct satisfies the elements of specific personal jurisdiction.

The Physician Defendants argue that their contacts with Arizona are insufficient to confer personal jurisdiction over them. They claim they had no contact with Arizona, and that their only involvement in Plaintiff's claim was reviewing and analyzing Plaintiff's medical records and rendering medical opinions—Dr. Benson in Tennessee and Dr. Philbin in Massachusetts. (Doc. 23 at 12). In addition, with respect to Dr. Philbin, they explain his involvement included speaking to Plaintiff's Arizona treating physicians over the phone. (*Id.*).

Applying the above legal standards, the Court first considers whether the Physician Defendants purposely directed their activities in Arizona. In doing so, the Court applies the "effects test" by determining whether the Physician Defendants committed intentional acts expressly aimed at the forum which caused foreseeable harm in the forum.

Plaintiff sufficiently presents a prima facie showing the Physician Defendants committed intentional acts. Plaintiff contends they "aided and abetted the tort of bad faith by intentionally conducting a biased review of the records created by Plaintiff's Arizona physicians" and then provided "biased and unsubstantiated medical opinions." (Doc. 18 at 19). Plaintiff further contends Defendant Philbin attempted to improperly influence Plaintiff's Arizona treating doctors "by misconstruing and misrepresenting the statements made by" those doctors. (*Id.*). Plaintiff claims that Defendant Benson "falsely claimed that she had applied the fair claim handling

standard" which requires providing significant weight to the opinions of Plaintiff's Arizona treating doctors. (*Id.*). Finally, Plaintiff contends the Physician Defendants "further aided and abetted the tort of bad faith by misrepresenting the covert surveillance video taken of Plaintiff in the State of Arizona." (*Id.*). These constitute intentional acts and satisfy the first prong of the effects test.

The Court next considers whether the Physician Defendants' conduct was expressly **\*1009** aimed at Arizona. The Ninth Circuit has "repeatedly stated that the 'express aiming' requirement is satisfied, and specific jurisdiction exists, when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Washington Shoe Co. v. A–Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012). Here, as set forth above, Plaintiff alleges the Physician Defendants intentionally and purposefully directed their activities at Plaintiff knowing that he resided in Arizona, that they caused harm to him knowing he would likely suffer such harm in Arizona, and that they caused acts to occur in the State of Arizona that gave rise to Plaintiff's claims. Those acts included contacting Plaintiff's treating doctors in Arizona to improperly influence them to support Defendants' denial of Plaintiff's disability claims. In addition, Defendant Philbin concedes he urged Defendant Unum to conduct a field visit in Arizona to determine Plaintiff's activity level. The Court finds Defendants' alleged actions to aid and abet the tort of bad faith were expressly aimed at Arizona. The Physician Defendants' initiation of communications with Plaintiff's doctors in Arizona and arrangement of a field visit in Arizona, among their other alleged improper conduct pertaining to their reviews of Plaintiff's medical information, were directed toward someone they knew to be residing in Arizona. *See Atkins*, 2015 WL 5856881, at *6 (holding that the defendants' alleged fraud and other torts "were expressly aimed at Arizona because they arose from communications and other conduct directed toward someone whom [they] knew to be residing in Arizona"). The Court therefore finds this condition is satisfied.

The third prong of the effects test is whether the Physician Defendants' actions caused foreseeable harm in the forum. Plaintiff contends they knew he resided in Arizona and therefore knew that the harm he suffered as a result of their aiding and abetting the bad faith denial of his disability benefits would occur in Arizona. Thus, it was certainly foreseeable that the Physician Defendants' actions would cause harm in Arizona.

Having determined the three prongs of the effects test are satisfied, the Court finds that the first required element of specific jurisdiction, purposeful direction, is therefore satisfied. As set forth above, the second required element of specific jurisdiction, whether the claim arises out of or relates to the defendant's forum-related activities, is established "if the plaintiff 'would not have been injured but for' the defendant's conduct directed at the forum." *AMA Multimedia*, 2016 WL 5946051, at *6 (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998)). The Court finds that Plaintiff's allegations sufficiently establish that but for the Physician Defendants' conduct directed at the forum in the form of contacting Plaintiff's treating doctors to improperly influence them, urging a field visit, and conducting biased medical reviews that they knew would form the basis for denying Plaintiff's claim in Arizona, Plaintiff would not have been injured. The second required element of specific jurisdiction is therefore satisfied.

With respect to the third required element of specific jurisdiction, whether the exercise of personal jurisdiction over the Physician Defendants comports with fair play and substantial justice (i.e., is reasonable), the Court finds that it does. "Where a defendant has purposefully directed his activities at forum residents, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *AMA Multimedia*, 2016 WL 5946051, at *6 (citing **\*1010** *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). Although there is no evidence in this case about whether the Physician Defendants' work for Defendant Unum has resulted in other contacts with the State of Arizona, it is difficult to see how that would not be true. It is likely, in the Court's view, that in their roles as reviewing physicians, the Physician Defendants have established other contacts with the State of Arizona similar to those established in this case. The Court finds that the extent of the Physician Defendants' other contacts with Arizona is an important factor in deciding whether it is reasonable to exercise personal jurisdiction over them in this matter. *See AMA Multimedia*, 2016 WL 5946051, at *6 (holding that the extent of a defendant's purposeful interjection is a consideration for determining reasonableness). The Court further finds it would not be an unreasonable burden on the Physician Defendants in defending in this forum. Technological advances have made it such that they may never need to travel to Arizona for this case. Their depositions can be taken where they reside and other accommodations can be made as needed. The Court also finds that Arizona has a significant interest

in adjudicating this dispute given the significant harm that Plaintiff, an Arizona resident, contends he has suffered as a result of Defendants' actions. The Court finds that this forum would provide the most efficient judicial resolution of the controversy. For these reasons, the Court finds that the exercise of personal jurisdiction over the Physician Defendants comports with fair play and substantial justice, and is reasonable.

The Court therefore finds that the three required elements of specific jurisdiction are satisfied here. As a result, the Court has specific personal jurisdiction over the Physician Defendants. Their request to be dismissed from this action for lack of personal jurisdiction will be denied.

### B. Claim for Aiding and Abetting

Next, the Physician Defendants argue that the claim against them for aiding and abetting the tort of insurance bad faith should be dismissed for failure to state a claim. They first argue that a claim for aiding and abetting bad faith is not a viable claim because no conclusive Arizona case law exists to support such a claim. Alternatively, they argue that the claim fails on the merits. Specifically, the Physician Defendants contend that Plaintiff has failed to allege they committed tortious acts separate from the underlying acts of bad faith by the primary tortfeasor. They argue that where the acts alleged are the same as those that form the basis for the underling bad faith claim, the aiding and abetting claim fails.

Plaintiff responds that Arizona clearly recognizes claims for aiding and abetting bad faith. Regarding the merits, Plaintiff argues his allegations are sufficient to state a claim. He contends that the allegations sufficiently describe separate tortious conduct in support of the claim for aiding and abetting.

### 1. Legal Standards

Rule 8(a) of the Federal Rules of Civil Procedure requires that:

> A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds

upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

**\*1011** "The theory of Rule 8(a), and of the federal rules in general, is notice pleading." *Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011). The Rule 8(a) notice pleading standard requires Plaintiff to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). A complaint that provides "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Nor will a complaint suffice if it presents nothing more than "naked assertions" without "further factual enhancement." *Id*. at 557, 127 S.Ct. 1955.

In addition, the Court must interpret the facts alleged in the complaint in the light most favorable to the plaintiff, while also accepting all well-pleaded factual allegations as true. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). That rule does not apply, however, to legal conclusions. *Iqbal*, 129 S.Ct. at 1949.

### 2. Application

The Court finds no merit to the Physician Defendants' argument that Arizona does not recognize a claim for aiding and abetting the tort of bad faith. Indeed, Judge Campbell of this District addressed this very issue in a recent case. *See Haney v. ACE American Insurance Company*, CV–13–12429–PHX–DGC, 2014 WL 1230503, at *4 (D. Ariz. March 25, 2014). Judge Campbell ruled that the defendant's argument that the insurance adjustor could not "be liable for aiding and abetting bad faith[ ] has been rejected repeatedly by courts in this district." *Id.* (collecting cases). He explained that "[i]t is possible for [an adjustor] to aid and abet [an insurance company] through the actions of a common employee," and that "in Arizona, it is well-established that an agent will not be excused from responsibility for tortious conduct [merely] because he is acting for his principal." *Id.* (brackets in original) (citations and internal quotations omitted). Based on this and other decisions in this District (as cited in *Haney*) recognizing a cause of action for aiding and abetting the tort of bad faith, the Court is not persuaded by the Physician Defendants' argument that it is not a recognized cause of action. Moreover, it is of no consequence that the agents at issue in this case are employee physicians as opposed to employee adjustors.

Next, the Court addresses the sufficiency of Plaintiff's allegations in this cause of action. Under Arizona law, "[c]laims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Temple v. Hartford Ins. Co. of Midwest*, 40 F.Supp.3d 1156, 1170 (D. Ariz. 2014) (citing **\*1012** *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 483, 38 P.3d 12, 23 (Ariz. 2002)). The third element "requires the secondary tortfeasor to have committed a separate tortious act in concert with the primary tortfeasor." *Timmons v. ELCO Administrative Services*, CV–13–00846–PHX–PGR, 2013 WL 5242995, at *2 (D. Ariz. September 17, 2013).

Here, Plaintiff's allegations sufficiently state a claim for aiding and abetting the tort of bad faith. Plaintiff alleges in his first cause of action that the primary tortfeasors, Paul Revere and Unum, breached the obligation of good faith and fair dealing. (Doc. 18 at 16–18). He further alleges the Physician Defendants "knew that Paul Revere and Unum's conduct was a breach of those Defendants' duty of good faith and fair dealing owed to Plaintiff." (Doc. 18 at 19). Plaintiff also alleges that the Physician Defendants took separate action from Paul Revere and Unum to substantially assist Paul Revere and Unum in the achievement of the breach of the duty of good faith and fair dealing. (*Id.*). Specifically, he alleges the Physician Defendants aided and abetted by providing biased and unsubstantiated medial opinions and by misrepresenting Plaintiff's Arizona medical records, among other conduct. This alleged conduct constitutes separate tortious acts from those of the primary tortfeasors. The Court therefore finds that Plaintiff has sufficiently alleged a claim for aiding and abetting the tort of bad faith.

### C. Conclusion Regarding Motion to Dismiss

For the foregoing reasons, the Court has determined it has personal jurisdiction over the Physician Defendants. The Court has also determined that Plaintiff has stated a claim for aiding and abetting the tort of bad faith. The Physician Defendants' motion to dismiss will therefore be denied.

## II. Other Pending Motions

Also pending is Plaintiff's Motion for Order to File Documents under Seal (Doc. 36). The Court construes the Physician Defendants' failure to respond as consent to the granting of the motion. *See* LRCiv 7.2(i) (failure to file a response to a motion may be deemed a consent to the granting of the motion and the Court may dispose of it summarily). The motion will therefore be granted.

Lastly, Plaintiff has filed a Motion to Strike Defendants' Objections (Doc. 52). In light of the Court's ruling on the motion to dismiss, Plaintiff's motion to strike will be denied as moot. Likewise, the Physician Defendants Request for Alternative Relief (Doc. 53) is also moot.

Accordingly,

**IT IS ORDERED** that the Physician Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to Dismiss for Failure to State a Claim (Doc. 23) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Order to File Documents under Seal (Doc. 36) is **GRANTED.**

**IT IS FINALLY ORDERED** that Plaintiff's Motion to Strike Defendants' Objections (Doc. 52) and the Physician Defendants Request for Alternative Relief (Doc. 53) are **DENIED** as moot.

**All Citations**

265 F.Supp.3d 1003

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2138452
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Steven RUPP, et al., Plaintiffs,

v.

Xavier BECERRA, in his official capacity
as Attorney General of the State of
California, and Does 1–10, Defendants.

Case No. 8:17–cv–00746–JLS–JDE
|
Signed 05/09/2018

**Attorneys and Law Firms**

Sean Anthony Brady, Carl Dawson Michel, Michel and Associates PC, Matthew Dunbar Cubeiro, Long Beach, CA, for Plaintiffs.

John D. Echeverria, Office of the Attorney General, Los Angeles, CA, Peter H. Chang, CAAG—Office of the Attorney General California Department of Justice, San Francisco, CA, for Defendants.

**ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS (Doc. 17); (2) DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Doc. 24); AND (3) DENYING PLAINTIFFS' MOTION FOR LEAVE AS MOOT (Doc. 41)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

*1 Plaintiffs' lawsuit challenges certain provisions in California's Assault Weapons Control Act, alleging they violate the Due Process Clause, the Takings Clause, and the Second Amendment of the Constitution. There are presently three motions before the Court. First, Defendant Xavier Becerra, in his capacity as Attorney General of the State of California, moves to dismiss Plaintiffs' Due Process Clause and Takings Clause Claims. Second, Plaintiffs move for a preliminary injunction. Third, after full briefing and oral argument on these motions, Plaintiffs filed a Motion for Leave to file a supplemental declaration of Dennis Martin in support of their Motion for Preliminary Injunction. Having fully considered the papers and arguments of the parties, the Court GRANTS Defendant's Motion to Dismiss, DENIES Plaintiffs' Motion for Preliminary Injunction, and DENIES AS MOOT Plaintiffs' Motion for Leave.

**II. BACKGROUND**

**A. The Assault Weapons Control Act**

In 2016, the California State Legislature amended California Penal Code section 30515, the section of the Assault Weapons Control Act (AWCA) that defines prohibited assault weapons by their features. (FAC ¶ 37, Doc. 16.) The AWCA, originally passed in 1989, made it a felony offense to manufacture assault weapons within the State of California, or to possess, sell, transfer, or import such weapons into the state without a permit. (Mem re: MTD at 3; Cal. Penal Code §§ 30600, 30605.) At the time of its passage, the AWCA included a list of specific assault weapons identified by their make and model.[1] Cal. Penal Code § 30510. The legislature found that each of these firearms "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." Cal. Penal Code § 30505(a). Since the AWCA's passage, state legislators have amended the definition of "assault weapon" on a number of occasions, to prohibit the proliferation of "copycat" weapons that were functionally similar to the banned weapons. (FAC ¶ 30; Mem. re: MTD at 4.)

[1]   There are two lists of assault weapons, one created when the law was passed in 1989 and another added when the law was amended in 2000. Plaintiffs refer to the first list as "Category 1" weapons and the second as "Category 2." (FAC ¶¶ 23–29). Category 1 weapons are listed in California Penal Code section 30510, and Category 2 are listed in the California Code of Regulations, title 11, section 5499.

In particular, the AWCA was amended in 1999 to allow legislators to define a new class of restricted weapons according to their features rather than by model. Cal. Penal Code § 30515. (FAC ¶ 30.) This new category ("Category 3") was intended to allow "more flexib[ility] in response to technological developments in the manufacture of semiautomatic weapons." California Bill Analysis, S.B. 880 Assem., 6/14/2016 at 4.[2] Section 30515 describes combinations of features that bring a weapon within the definition of an "assault weapon." The features at issue in this

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Rupp v. Becerra, Not Reported in Fed. Supp. (2018)

case are the pistol grip, thumbhole stock, flash suppressor, and telescoping stock. (FAC ¶ 8.)

2    The California Supreme Court upheld these amendments
     in the face of Equal Protection, separation of powers, and
     Due Process (vagueness) challenges. *Kasler v. Lockyer*,
     23 Cal. 4th 472 (2000). The Ninth Circuit also upheld the
     law, finding that the Second Amendment did not provide
     an individual right to possess a weapon; it dismissed
     constitutional claims based on the Equal Protection and
     Takings Clauses and the First Amendment. *Silveira v.
     Lockyer*, 312 F.3d 1052 (9th Cir. 2002). In *District of
     Columbia v. Heller*, the Supreme Court largely overruled
     *Silveira's* Second Amendment analysis, but did not
     address *Silveira's* Takings analysis. 554 U.S. 570.

**\*2** Under the 1999 amendments, one feature that, when combined with one or more of the above-listed features, rendered the weapon an "assault weapon" was "the capacity to accept a detachable magazine." (FAC ¶ 34; S.B. 880 Hearing at 4.) Under the amendments, if a magazine required a "tool" for detachment, it was not considered detachable. In response to this definition, firearms manufacturers developed a product called a "magazine lock" that required the use of a bullet to depress a button to release the magazine. (FAC ¶ 35; MTD at 4–5.) The button, which Defendant refers to as a "bullet button," enabled the magazine to be "removed and replaced in seconds" while not being technically "detachable." (MTD at 5.) The legislature described the difference between a standard detachable ammunition magazine and a magazine lock with a bullet button feature as a "loophole." S.B. 880 Hearing at 3, 4.

S.B. 880 was proposed in response to a December 2015 mass shooting in San Bernardino, where two assailants used weapons equipped with the bullet button magazine locks to shoot 36 people in less than four minutes. S.B. 880 Hearing at 8. The bill amends the definition of assault weapons pursuant to section 30515 so that, rather than referring to weapons "with the capacity to accept a detachable magazine," it refers to a weapon "that does not have a fixed magazine" in combination with other features.[3] Cal. Penal Code § 30515; S.B. 880 Hearing at 1. A fixed magazine is defined as "an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action." Cal. Penal Code § 30515(b). In particular, a weapon is an assault weapon if it does not have a fixed magazine and has one of the following features: a pistol grip that protrudes conspicuously beneath the action of the weapon; a thumbhole stock; a

folding or telescoping stock; a grenade or flare launcher; a flash suppressor; or a forward pistol grip. Cal. Penal Code § 30515(a)(2)(A)–(F). By its plain language, the statute does not include weapons with (a) a fixed magazine that have the enumerated features, or (b) weapons with the capacity to accept a detachable magazine that lack any of the enumerated features.

3    Plaintiffs refer to these newly-designated assault
     weapons as "Category 4" weapons. (FAC ¶ 38.)

The law provides that a person who, between January 1, 2001 and December 31, 2016, lawfully acquired and possessed a weapon now described by the statute must either: (1) register the weapon prior to July 1, 2018 (Cal. Penal Code §§ 30680, 30900(b)(1)) (the "registration option"); (2) sell the weapon either out of state or to a licensed gun dealer within the state (Cal. Penal Code § 31055); (3) modify the weapon to fix the magazine or remove the enumerated features; or (4) store the weapon outside of the state. According to the statute, in order to exercise the registration option, an owner must provide "the date the firearm was acquired" and "the name and address of the individual from whom, or business from which, the firearm was acquired." (The "date-and-source requirement[4]") Cal. Penal Code §§ 30680, 30900(b). If the owner of such a weapon bequeaths it, the devisee has ninety days to render the weapon permanently inoperable, sell it to a licensed gun dealer, obtain a permit for the weapon, or remove it from the state. Cal. Penal Code § 30915.

4    Throughout this Order, the Court will refer to the option
     for a weapon owner to register and keep the weapon as
     the "registration option." The requirement that the date
     and source of acquisition be provided to the government
     if an owner chooses to exercise the registration option
     will be referred to as the "date-and-source requirement."

## B. The Litigation

Plaintiffs brought suit challenging the AWCA, claiming that the law violates the Second Amendment, the Due Process Clause, and the Takings Clause. (FAC ¶¶ 68–116.) Plaintiffs are eight individuals[5] and one association, the California Rifle & Pistol Association. (*Id.* ¶¶ 48–59.) Of the Individual Plaintiffs, some already own weapons that fall within the definition of assault weapons, and others seek to acquire such weapons. One of the Individual Plaintiffs, Dennis Martin, owns an assault weapon. (*Id.* ¶ 56.) He states that he "will not be able to meet the AWCA's registration requirements

Case 2:19-cv-00037-JNP   Document 59-34   Filed 11/30/22   PageID.5412   Page 135 of 175

Rupp v. Becerra, Not Reported in Fed. Supp. (2018)

because he does not know and has no readily available source to discover: (1) the exact date he acquired the rifle; or (2) the name or address of the individual or business from whom he acquired the rifle." (*Id.* ¶ 56.) Martin is the only Individual Plaintiff who asserts such a barrier to meeting the date-and-source requirement. The California Rifle & Pistol Association has "some ... members who already legally possess rifles" and who also "do not know and do not have any readily available source to discover" the information necessary to meet the date-and-source requirement. (*Id.* ¶ 60.)

5    The FAC names a ninth individual, Douglas Grassey, whom the parties have since stipulated to dismiss. (*See* Stipulation, Doc. 23; Order Dismissing Grassey, Doc. 26.)

**\*3** Plaintiffs object to both the 2016 amendments and the AWCA as a whole. They seek declaratory relief that the code sections prohibiting possession of semiautomatic firearms are unconstitutional, and injunctive relief enjoining enforcement of the date-and-source requirement. The code sections at issue are section 30510(a) (defining what Plaintiffs refer to as "Category 1" and "Category 2" rifles, those defined by model); section 30515(a)(1)(A–C) and (E–F) (defining the additional features which, in combination with a non-fixed magazine, render a weapon an "assault weapon"); section 30515(a)(3) (defining weapon by length); section 30520 ("duties of Attorney General," allowing the California Attorney General to designate and/or describe weapons); section 30600 (prohibiting the manufacture, distribution, transportation, importation, sale, gift, or loan of assault weapons); section 30605 (penalties for possession); section 30900(b)(3) (registration option including required provision of date and source of acquisition); section 30925 (required actions for those bringing an assault weapon into the state); and section 30945 (conditions for possessing a registered assault weapon). The suit also challenges California Code of Regulations, title 11, section 5499, which lists the assault weapons defined by Penal Code section 30510(f). The prayer for relief asks the Court to declare the code sections "unconstitutional facially and to the extent they apply to 'assault weapons' or, alternatively, to the extent they prohibit any semi-automatic, centerfire rifle with a detachable magazine having a 'pistol grip,' 'flash suppressor,' 'thumbhole stock,' or 'telescoping' stock, or any semi-automatic, centerfire rifle that is over 26 inches in overall length." These features are defined in the statute and in regulations as follows:

- A "pistol grip that protrudes conspicuously beneath the action of the weapon," Cal. Penal Code section 30515(a)(1)(A), "allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing." Cal. Code Regs. tit. 11, § 5471(z). Plaintiffs describe this feature as one that "allows for a more comfortable and stable grip, which in turn promotes accuracy when shooting." (FAC ¶ 9.) Moreover, it "lessens recoil" and "minimizes the chance that a rifle will slip out of the user's hand while firing, further increasing safety, improving accuracy, and preventing stray shots." (*Id.*)

- A thumbhole stock is "a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing." Cal. Code Regs. tit. 11, § 5471 (qq). Plaintiffs state that a thumbhole stock "makes it easier for a user to have a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the weapon or firing stray shots." (FAC ¶ 10.)

- A flash suppressor is "any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." Cal. Code Regs. tit. 11, § 5471(r). Plaintiffs write that a function of this device "is to reduce recoil and muzzle (tip of the barrel) movement, making the rifle less painful for the user to operate and increasing accuracy." (FAC ¶ 11.)

- A telescoping stock is one that "is shortened or lengthened by allowing one section to telescope into another portion." Cal. Code Regs. tit. 11, § 5471(oo). Plaintiffs describe its purpose as "fit[ting] the particular user's arm length, making it easier, thus safer, to shoot." (FAC ¶ 12.)

Plaintiffs make no allegations about the definition, safety, accuracy, or functional differences between a detachable, fixed, or bullet button magazine.

Defendant moves to dismiss Plaintiffs' Due Process and Takings claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (MTD at 2.) Plaintiffs seek a preliminary injunction of enforcement of the date-and-source requirement. (PI Mem. at 1, Doc. 24–1.) The Court held oral argument on both motions.

Rupp v. Becerra, Not Reported in Fed. Supp. (2018)

### III. MOTION TO DISMISS

In their Motion for Preliminary Injunction, Plaintiffs argue that an injunction is proper because they have demonstrated a likelihood of success on the merits for all three causes of action. (PI Mem. at 14–27.) Defendant moves to dismiss two of these causes of action. (Mem. re MTD at 32.) Because resolution of the Motion to Dismiss disposes of some of the proffered grounds for issuing an injunction, the Court addresses the Motion to Dismiss first.

### A. Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level ...." *Twombly*, 550 U.S. at 555. Thus, a complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[,]" and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### B. Discussion

**\*4** At the outset, the parties disagree as to the nature of Plaintiffs' challenge. Defendant asserts that Plaintiffs bring a facial challenge. (Mem. re MTD at 8.) Plaintiffs allege that the AWCA's "definition of 'assault weapon' ... violates the Due Process Clause" because it is not rationally related to

a legitimate government purpose. (FAC ¶ 108.) They claim that the date-and-source requirement in particular violates the due process rights of plaintiffs who "cannot provide historical details of acquisition that they were under no obligation to keep or record at the time." (*Id.* ¶ 112.) Plaintiffs challenge the law's conditions for devisees of assault weapons as violative of the Takings Clause. Moreover, they assert that the date-and-source requirement implicates the Takings Clause for weapons owners who have no way of obtaining the required information. (*Id.* ¶¶ 114–116.) At oral argument, counsel for Plaintiffs argued that the Takings Clause and Due Process challenges were as-applied challenges to the date-and-source requirement and conditions for devisees, and that Plaintiffs also asserted a facial challenge because the statute limits the possessory options of the owner. The Court concludes that Plaintiffs have indeed brought both facial and as-applied challenges: the FAC contains assertions both that the law on its face violates the Constitution, and that the application of the 2016 amendments to a subset of Plaintiffs is unconstitutional. Accordingly, the Court will address standing and ripeness for the as-applied challenges before turning to the merits of the facial challenges.

### 1. Standing and Ripeness of As–Applied Challenges

The Court concludes that Plaintiffs' as-applied challenges to the date-and-source requirement and conditions on possession for devisees are not ripe. An as-applied Takings Clause claim is not ripe where a plaintiff "has not yet obtained a final decision regarding the application of the ... ordinance and ... regulations to [his] property." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). The same applies to a Due Process claim. *Id.* at 199 (explaining that "even if viewed as a question of due process, respondent's claim is premature"). The FAC does not include allegations of a single person who tried to register his or her weapon and thereafter was denied a permit. Nor does the FAC include facts that would support Plaintiffs' assertion that any such attempt "to register [the] weapons would be futile." (MTD Opp. at 16, Doc. 21.) Plaintiffs make a number of conclusory assertions in their FAC, including that Martin "has no readily available source to discover" the required information and that many members of the California Rifle & Pistol Association are in the same position. (FAC ¶¶ 56, 60.) These assertions are insufficient to show that an attempt to register is an unnecessary "exercise[ ] in futility" for purposes of standing. *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002). [6]

Case 2:19-cv-00037-JNP Document 59-34 Filed 11/30/22 PageID.5414 Page 137 of 175

Rupp v. Becerra, Not Reported in Fed. Supp. (2018)

6      After oral argument and the submission of the matter for decision, Plaintiffs requested leave to file a Supplemental Martin Declaration to support their Motion for Preliminary Injunction. It is both too little and too late. First, there is no valid reason for Plaintiffs' failure to include such facts in connection with their motion. Second, although some of the facts alleged therein relate to Martin's attempts to find the required information for registration, those facts are still insufficient to show ripeness. Finally, as to the Motion to Dismiss, it would be improper for the Court to consider facts extraneous to the FAC.

Accordingly, the Court concludes that the as-applied challenges brought pursuant to the Due Process and Takings Clauses are not ripe for review. The Court considers these claims only to the extent they amount to facial attacks.

### 2. Due Process Claim

Plaintiffs argue that the AWCA and the 2016 amendments cannot survive rationality review required by the Due Process Clause because they are arbitrary and do not further any permissible governmental objective. (FAC ¶ 86.) Moreover, they argue that the date-and-source requirement retroactively criminalizes conduct that was legal when it was undertaken and should be analyzed with heightened scrutiny. (*Id.* ¶ 87; Opp. at 28–29.) Defendants move to dismiss the Due Process claim, contending that the amendments survive rationality review and accordingly are not arbitrary. (Mem. re: MTD at 18.) Further, they argue that the legislation does not create retroactive liability. (Reply at 13, Doc. 33.)

### a. Rationality Review Standard

**\*5** "[A] regulation that fails to serve any legitimate government objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005). A statute may be unconstitutional on substantive due process grounds if its "provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926); *see also Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997). "Legislative acts that do not impinge on fundamental rights or employ suspect classifications are presumed valid, and this presumption is overcome only by a 'clear showing of arbitrariness and irrationality.' " *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994) (quoting *Hodel v. Indiana*, 452 U.S. 314, 331–32 (1981)) (applying rationality review to claimed property right). There is no requirement that the statute "actually advance its stated purposes." *Id.* A legislative act "does not violate substantive due process as long as it advances any legitimate public purpose ... and if it is 'at least fairly debatable' that the [legislative choice] was rationally related to legitimate governmental interests," it must be upheld. *Id.* (quoting *Christensen v. Yolo County Bd. of Supervisors*, 995 F.2d 161, 165 (9th Cir. 1993)).

If the law survives rationality review, then Plaintiffs cannot, as a matter of law, state a Due Process claim. Accordingly, the Court will determine whether the AWCA survives rationality review by determining whether the legislature had a legitimate government objective in enacting the AWCA, and whether the legislature could have believed at the time of enactment that the statute would promote that objective. [7]

7      The Ninth Circuit has upheld district court 12(b)(6) dismissals based on findings that the law at issue survives rationality review. *See, e.g., Taylor v. Rancho Santa Barbara*, 206 F.3d 932, 937–38 (9th Cir. 2000); *Kahawaiolaa v. Norton*, 386 F.3d 1271 (9th Cir. 2004); *Nat'l Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology*, 228 F.3d 1043 (9th Cir. 2000).

### b. Legitimate Government Objective

The Court concludes that the legislature has articulated a legitimate government objective for the AWCA. It is beyond question that promoting public safety and reducing incidents of gun violence are legitimate government objectives, as the Ninth Circuit, like many other circuits, has found these interests not merely legitimate but substantial or compelling. *See, e.g., Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015); *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016), *cert. denied sub nom. Silvester v. Becerra*, 138 S.Ct. 945 (2018); *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017); *N.Y.S. Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) (holding it "beyond cavil" that such interests are compelling).

In enacting the AWCA, the legislature found that the firearms categorized as assault weapons have "such a high rate of fire and capacity for firepower that [their] function as ...

*Rupp v. Becerra, Not Reported in Fed. Supp. (2018)*

legitimate sports or recreational firearm[s] is substantially outweighed by the danger that [they] can be used to kill and injure human beings." Cal. Penal Code section 30505(a). The AWCA's legislative history shows that the 2016 amendments were directly motivated by the 2015 mass shooting in San Bernardino, where the shooters used weapons with "bullet buttons" intended to circumvent prior iterations of the AWCA. California Bill Analysis, S.B. 880 Assem. at 8. [8] These legislative findings support that the legislature had a legitimate government objective to promote public safety when enacting and amending the AWCA.

[8]   The Court takes judicial notice of the legislative history pursuant to Federal Rule of Evidence 201. *See Zephyr v. Saxon Mortg. Servs., Inc.*, 873 F. Supp. 2d 1223, 1226 (E.D. Cal. 2012). In ruling on a 12(b)(6) motion, a court "'may take judicial notice of matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Id.* (quoting *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) ).

**\*6**   Accordingly, as a matter of law, the requirement that the legislature have a legitimate government objective is met.

### c. Rational Relationship

Having found that a legitimate government objective exists, the Court then determines whether it is at least "fairly debatable" that the legislation promotes that objective. *Kawaoka*, 17 F.3d at 1234.

Plaintiffs assert that there are two arbitrary and therefore irrational features of the law: the definition of assault weapons, and the date-and-source requirement. They contend that the multi-part definition that defines weapons by model *or* by feature "prohibit[s] rifles with a fixed magazine due to their maker's marks, regardless of their features, while permitting effectively identical rifles with non-fixed magazines, as long as they do not have the prohibited features." (FAC ¶ 86.) As outlined above in the descriptions of the weapons, Plaintiffs allege that the features "improve accuracy," reduce recoil, or make the weapons more comfortable to use. They contend that the features do not increase the rate of fire or capacity for firepower. (*Id.* ¶¶ 13–14.) From these allegations of fact, they make the following conclusions: the features "facilitat[e] the rifle's safe and effective operation when used for a lawful purpose such as self-defense," rifles with these features "are no more dangerous or susceptible to use for criminal purposes than those without

them," (*Id.* ¶¶ 13–14, 17), none of the features make the rifles more dangerous or "raise[ ] their likelihood of use in crimes," and the features "enhance public safety by making rifles safer, more accurate, and more effective for use in self-defense," (*Id.* ¶ 81). Plaintiffs conclude, therefore, that the features in question make the weapons safe for the lawful purpose of self-defense.

However, the legislature concluded that the accuracy and ease of use afforded by these features, far from making the weapons safer, made them *more* dangerous. For example, in passing Senate Bill 880, the bill's supporters described the detachable magazine as "what made [the] weapon such an effective tool of mass murder." California Bill Analysis, S.B. 880 Assem. at 6. The AWCA describes the firearms categorized as assault weapons as having "such a high rate of fire and capacity for firepower that [their] function as ... legitimate sports or recreational firearm[s] is substantially outweighed by the danger that [they] can be used to kill and injure human beings." Cal. Penal Code section 30505(a). The Court concludes that it is at least "fairly debatable" that restricting features that make such weapons more accurate and easier to use would promote the legitimate government purpose of public safety. Plaintiffs may disagree with the legislature's conclusions, but that disagreement does not make the law irrational.

Further, that the features-based definition does not include all of the combinations of features present in every weapon on the Category 1 and 2 lists says nothing about the relative safety of the weapons. Plaintiffs argue that the inconsistency between categories renders the law fatally arbitrary, but offer no facts as to why one configuration or combination of features is necessarily safer than another. Therein lies the problem; Plaintiffs address the features in isolation, yet the features are prohibited only *in combination* with a non-fixed magazine. Without facts about safety concerns as to combined features or why one combination is safer than another, Plaintiffs' conclusion is without support. Moreover, the legislature is permitted to reform its gun control regime incrementally; the lists need not have identical coverage to be rational. "[A] legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' " *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809 (1969) (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955)). *see also F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (holding that "a legislative choice is not subject to courtroom fact-

Case 2:19-cv-00037-JNP  Document 59-34  Filed 11/30/22  PageID.5416  Page 139 of 175

Rupp v. Becerra, Not Reported in Fed. Supp. (2018)

finding and may be based on rational speculation unsupported by evidence or empirical data").

**\*7** The Court's conclusion that the AWCA survives rationality review comports with widespread judicial consensus that restrictions on semi-automatic weapons bear a rational relationship to the objective of public safety. *See, e.g., Kasler v. Lockyer*, 23 Cal. 4th 472, 491 (2000); *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 688 (2d Cir. 1996); *Olympic Arms v. Magaw*, 91 F. Supp. 2d 1061, 1075 (E.D. Mich. 2000); *Coalition of New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 686 (D.N.J. 1999) (explaining that the "rational link between public safety and a law proscribing possession of assault weapons is so obvious that it would seem to merit little discussion"); *Benjamin v. Bailey*, 234 Conn. 455, 479–80 (1995); *Robertson v. City and County of Denver*, 874 P.2d 325, 333 (Colo. 1994) (severing provision found unconstitutionally vague and upholding remainder of ordinance on rationality review).

Accordingly, as a matter of law, the Court concludes that the AWCA survives rationality review. Therefore, Plaintiffs' claim that the statute violates the Due Process clause as irrational or arbitrary fails.

#### d. **Retroactive Liability**

Finally, the Court concludes that Plaintiffs mischaracterize the date-and-source requirement as retroactive. It does not criminalize *past* conduct, but creates future liability should an individual not comply with the regulation beginning in July 2018. In the Ninth Circuit, courts apply a two-step framework to determine if a law has a retroactive effect: "[f]irst, we determine whether the statute or regulation clearly expresses that the law is to be applied retroactively ... [i]f not, we consider whether application of the regulation would have a retroactive effect by 'attach[ing] new legal consequences to events completed before its enactment.' " *Sacks v. S.E.C.*, 648 F.3d 945, 951 (9th Cir. 2011) (citations omitted). The date-and-source requirement does not apply retroactively, as it gives owners until July 1, 2018 to comply with the law. Moreover, the date-and-source requirement is triggered only if a weapons owner chooses to exercise the registration option. Weapons owners are afforded a variety of ways to comply with the law: they may also store the weapon out of state, sell it, or modify it. As to the second prong, the date-and-source requirement does not create a legal consequence for past ownership of a weapon, nor does it make it unlawful to

have misplaced or failed to keep records of one's transactions. Rather, it places a condition on *continued* possession of the weapon, and offers multiple avenues to avoid *prospective* criminal liability. It cannot be said that the law creates retroactive liability. Accordingly, no scrutiny more stringent than rationality review is due.

#### e. **Conclusion as To Due Process Claim**

Plaintiffs have failed to show that the law is impermissibly irrational, and the Court concludes that, as a matter of law, the AWCA survives rationality review. Plaintiffs have also not shown that it retroactively criminalizes past conduct. Accordingly, the Court DISMISSES Plaintiffs' Due Process Clause claim.

### 3. **Takings Clause Claim**

Plaintiffs argue that the AWCA enacts both a physical and regulatory taking. (FAC ¶ 115.) They assert that the law prevents them from bequeathing their weapons to family members and severely constrains their property rights in the weapons by forbidding their sale or transfer. (*Id.* ¶¶ 114-15.) Defendants argue that Plaintiffs' Taking Clause claim fails as a matter of law, because the law is a valid exercise of the state's police power. (Mem re: MTD at 13.)

**\*8** The Takings Clause of the Fifth Amendment provides that "private property shall not 'be taken for public use, without just compensation.' " *Lingle*, 544 U.S. at 536. A physical taking occurs "[w]hen the government physically takes possession of an interest in property for some public purpose." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). If there is no physical dispossession of property for a public purpose, a regulation may still function as a "regulatory" taking. A regulatory takings challenge is governed by the *Penn Central* factors, "including the regulation's economic impact on the claimant, the extent to which it interferes with distinct investment-backed expectations, and the character of the government action." *Lingle*, 544 U.S. at 528–29 (citing *Penn. Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). "If [an] ordinance is otherwise a valid exercise of the [government's] police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 592 (1962) (citations omitted). However,

"governmental action in the form of regulation [can] be so onerous as to constitute a taking which constitutionally requires compensation." *Id.* at 594 (citation omitted).

In *Mugler v. Kansas*, the Supreme Court articulated a police power exception to the Takings Clause, holding that "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking." 123 U.S. 623, 668 (1887). Courts have applied this principle to find that there is no taking where the government regulates the sale and manufacture of firearms, *Akins v. United States*, 82 Fed. Cl. 619, 623–24 (2008), and no taking where machine guns denied registration had to be sold, surrendered, or disposed of, *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979). *see also AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed. Cir. 2008) (no taking where government seized and retained prescription drugs pursuant to criminal investigation and they expired before being returned to owners).

The standard the Supreme Court created in *Lucas v. South Carolina Coastal Council* clarifies the line between compensable takings and restrictions on property that were exercises of police power:

> It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power[ ]" ... In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.

505 U.S. 1003, 1027–28 (1992) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). Thus, legislation pursuant to the police power is generally not a taking, but there are exceptions under certain limited circumstances, such as where *land* will no longer have any economically valuable use.

In *Silveira v. Lockyer*, the Ninth Circuit found that the "grandfather clause that permits [plaintiffs] to use the weapons in a number of reasonable ways so long as they register them with the state" was sufficient to show that the legislation was not "a compensable taking." 312 F.3d 1052, 1092 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008). The Ninth Circuit found as much even though plaintiffs alleged that the value of their weapons was reduced, which Plaintiffs do not allege here. *Id.* Plaintiffs do not dispute that this holding is binding authority on this Court.

The Court is persuaded that the AWCA represents an exercise of police power and is not a taking. The AWCA does not compel conveyance of the guns for public use, but regulates possession of an object the legislature has found to be dangerous. The law offers a number of options to lawful gun owners that do not result in the weapon being surrendered to the government. (FAC ¶¶ 43, noting that Category 3 and 4 weapons may be modified or registered.) Plaintiffs are not, in every case, physically dispossessed of their weapons, and they have not put forth sufficient facts to show that the options that permit retention of the weapons, such as modification, operate as takings. Accordingly, Plaintiffs have not, as a matter of law, pleaded a facial takings claim.

**\*9** Nor is the Court persuaded that the conditions placed upon devisees of weapons act as a taking. As a preliminary matter, the statute does not *prohibit* bequeathment; rather, it places conditions upon what a devisee may do if she is bequeathed an assault weapon. Moreover, a facial challenge to the statute based on bequeathment fails. There are any number of weapons owners whose ability to bequeath their weapons would not be implicated: some devisees may live in states where they are able to possess the weapons, while other devisees may have been convicted of a felony and therefore could not inherit such a weapon irrespective of this legislation. As a matter of law, then, Plaintiffs have not established that the law's enactment facially violates the Takings Clause.

The Court further concludes that Plaintiffs' reliance on *Andrus v. Allard*, 444 U.S. 51 (1979), is misplaced. In *Andrus*, the Supreme Court concluded that a prohibition on the sale of endangered bird parts did not violate the Takings Clause, noting that "[i]n this case, it is crucial that appellees retain the rights to ... devise the protected birds." *Id.* at 66. But while an owner of protected bird parts can do nothing to render those bird parts something other than what they are, the AWCA offers weapons owners an opportunity to modify their weapons so that they are no longer subject to the bequeathment regulations. What is more, *Andrus* does not create a generally applicable rule about the centrality

*Rupp v. Becerra, Not Reported in Fed. Supp. (2018)*

of bequeathment rights to a Takings Clause analysis: the Supreme Court clearly stated that the ability to devise the bird parts was crucial "[i]n this case." *Id.* It is far from clear that it is appropriate to analyze assault weapons in the same way as endangered bird parts.

Accordingly, the Court DISMISSES the Takings Clause claim.

### 4. Leave to Amend

Plaintiffs request leave to amend in the event of dismissal. Facial claims of violation of the Due Process and Takings Clause are dismissed as a matter of law, and amendment would therefore be futile. The Court grants leave to amend only to the extent Plaintiffs can allege additional facts to show standing and ripeness of their as-applied challenges to the date-and-source requirement and conditions on devisees. The Court advises Plaintiffs that such amendment would be futile if the new facts alleged in the proposed Supplemental Martin Declaration represent the universe of additional facts they intend to include. Martin's bare assertion that he is unable to find the information through a review of his files and electronic correspondence does not plausibly support his conclusion that there is "no readily available source to discover" the information. (Mot. for Leave Ex. A, Suppl. Decl. ¶¶ 6–7, 9, Doc. 41.)

### IV. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs move to enjoin the date-and-source requirement for registration "until such time as [the] Court can fully adjudicate the many grave constitutional problems that this requirement creates." (PI Mem. at 2.) As the Court has already granted Defendant's motion to dismiss the Due Process and Takings Clause claims, the Court determines only whether Plaintiffs are entitled to a preliminary injunction based on their Second Amendment claims.

### A. Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 676 (2008) (internal quotations marks omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex v. Camenisch*, 451 U.S. 390, 395 (1981). A district court should

issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). This requires the district court to make findings of fact and conclusions of law. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007); *see also Hicks v. Neal*, No. C 12–2207 SI (PR), 2012 WL 3791399, at *3 (N.D. Cal. Aug. 31, 2012) ("In other words, the movant has to demonstrate, not merely allege, his entitlement to a preliminary injunction. ... [A]llegations that may be sufficient for pleading purposes simply are not enough to prove his entitlement to a preliminary injunction.").

**\*10** "[T]he party seeking the injunction ... bear[s] the burden of demonstrating the various factors justifying preliminary injunctive relief ...." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 441 (1974). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. This "requires the plaintiff to make a showing on all four prongs." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### B. Discussion

Plaintiffs contend that they have shown a likelihood of success on the merits on their Second Amendment claim because the date-and-source requirement burdens the core Second Amendment right and survives neither strict nor intermediate scrutiny. (PI Mem. at 22–26.) They assert that Plaintiffs would suffer irreparable harm to their constitutional rights if they are unable to retain their weapons. (*Id.* at 27–28.) Because constitutional rights are implicated, they contend, an injunction is in the public interest. (*Id.* at 29.) Finally, they argue that the balance of the hardships tips in their favor because the injunction would simply maintain the status quo. (*Id.* at 30.)

Defendant disputes that Plaintiffs have standing to challenge the date-and-source requirement, both because Plaintiffs have not presented sufficient evidence as to an actual or imminent injury, and because the alleged injury is not "fairly traceable" to the date-and-source requirement. (PI Opp. at 13–15, Doc. 27.) As to the likelihood of success on the merits, Defendants counter that the date-and-source requirement for assault weapons does not implicate the core Second Amendment right, and in any case survives intermediate scrutiny. (*Id.* at

*Rupp v. Becerra, Not Reported in Fed. Supp. (2018)*

23–29.) They argue that because Plaintiffs lack standing, there is an insufficient showing of irreparable harm. (*Id.* at 30.) Finally, Defendants assert that neither the public interest nor the balance of equities support the requested injunction. (*Id.* at 30–31.)

### 1. Likelihood of Success on the Merits

Plaintiffs argue that the regulation plainly burdens the Second Amendment right, and that the regulation will discourage lawful owners from registering their weapons because they lack some of the required information. (PI Mem. at 26.) Moreover, it might mean that some lawful gun owners choose to dispossess themselves of their weapons rather than attempt to register them, store them out of state, or modify them. (*See* Martin Decl., Doc. 24–5) Defendants assert that the purpose of the date-and-source requirement is to help the California Department of Justice ascertain that existing weapons of the type banned by the AWCA are eligible to be registered and lawfully possessed. (Graham Decl. ¶¶ 26-28, Doc. 28.)

### a. Level of Scrutiny

In *Heller*, the Supreme Court held that the Second Amendment conferred an individual right to keep and bear arms. 554 U.S. at 595. The Ninth Circuit applies the following two-step inquiry to Second Amendment challenges: "(1) the court 'asks whether the challenged law burdens conduct protected by the Second Amendment,'; and (2) if so, what level of scrutiny should be applied." *Fyock*, 779 F.3d at 996 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)). Intermediate scrutiny is appropriate "if the regulation at issue does not implicate the core Second Amendment right *or* does not place a substantial burden on that right." *Id.* at 998–99 (quoting *Jackson v. City and County of S.F.*, 746 F.3d 953, 964 (9th Cir. 2013) ).

**\*11** Assuming without deciding that individual ownership of semi-automatic weapons implicates a core Second Amendment right,[9] the Court must determine the appropriate level of scrutiny. Every circuit to have encountered statewide bans on semi-automatic weapons designated as assault weapons has applied intermediate scrutiny. *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 1262 (D.C. Cir. 2011) (prohibition on possession of certain semiautomatic weapons merited intermediate scrutiny as it "left a person 'free to possess any otherwise lawful firearm'

" (quoting *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010))); *Kolbe*, 849 F.3d at 138 (4th Cir. 2017) (ban on certain military-style weapons and detachable magazines left "citizens free to protect themselves with a plethora of other firearms and ammunition"); *N.Y.S. Rifle and Pistol Ass'n, Inc.*, 804 F.3d at 260 (holding that a prohibition on some semiautomatic weapons identified by feature was not a ban on an entire class of arms therefore "[t]he burden imposed by the challenged legislation [was] real, but ... not 'severe' "); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 411 (7th Cir. 2015) (applying intermediate scrutiny as the ban on assault weapons "leaves residents with many self-defense options").

9    The Ninth Circuit has not specifically addressed this issue post-*Heller*, but other circuits have questioned whether bans on certain assault weapons implicate the Second Amendment. *See, e.g.*, *Heller II* 670 F.3d at 1262; *Kolbe*, 849 F.3d at 137. However, those decisions came at summary judgment when the deciding district courts had a full factual record available for review. At this stage and for the purposes of this Order, the Court will assume, without deciding, that the first step of the Ninth Circuit test is met.

The Court likewise concludes that intermediate scrutiny is appropriate in this instance because, regardless of whether the regulation implicates the core Second Amendment right, the date-and-source requirement does not place a substantial burden on that right. The date-and-source requirement simply regulates the manner in which persons may exercise their Second Amendment rights; it does not eliminate them. Should weapons owners be unable to exercise the registration option and choose to dispossess themselves of their assault weapons, they would remain free to choose any weapon that is *not* restricted by the AWCA or another state law. In other words, even if the date-and-source requirement operated as an outright ban, Plaintiffs would be left with myriad options for self-defense—including the handgun, the "quintessential" self-defense weapon per *Heller*. Because even an outright ban on certain types of semiautomatic weapons does not substantially burden the Second Amendment right, enacting a date-and-source requirement as a condition of the grandfathering registration option falls far short of the substantial burden necessary to trigger strict scrutiny. Accordingly, the Court applies intermediate scrutiny.

### b. Application of Intermediate Scrutiny

The Ninth Circuit's test for intermediate scrutiny instructs that "(1) the government's stated objective must be significant, substantial, or important; and (2) there must be a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139). The state need not "show that [the regulation] is the least restrictive means of achieving its interest." *Fyock*, 779 F.3d at 1000 (citation omitted). Rather, the state is "required to show only that [the regulation] promotes a 'substantial government interest that would be achieved less effectively absent the regulation.' " *Id.* (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)). The stated objective of the AWCA is to promote public safety and prevent gun violence, and the date-and-source requirement in particular is aimed at assisting the California Department of Justice to ascertain that existing weapons of the type banned by the AWCA are eligible to be registered and lawfully possessed. (Graham Decl. ¶¶ 26–28.) As discussed above, it is beyond question that the government's interest in promoting public safety and reducing gun violence is important or substantial. *See, e.g., Fyock*, 779 F.3d at 1000; *Silvester*, 843 F.3d at 827; *Kolbe*, 849 F.3d at 139; *N.Y.S. Rifle and Pistol Ass'n, Inc.*, 804 F.3d at 261.

**\*12**  Plaintiffs argue that the regulation "not only is not reasonably tailored to further [these objectives], but actually impedes them" because it will discourage lawful gun owners who lack the date and source of their acquisition from registering their weapons. (PI Mem. at 26.) This argument fails in its premise, namely, that the registration of weapons by owners who have no date or source information promotes safety more than it would be promoted by requiring the weapons owner to use one of the law's other available options (sale, out-of-state storage, or modification). Plaintiffs describe a false choice between registration and being deprived of their weapons, when the legislature has made other options available.

Moreover, the government need only establish a *reasonable* fit, not narrow or close tailoring. *Fyock*, 779 F.3d at 1000. A reasonable fit is established if the government's objective will be achieved "less effectively absent the regulation." *Id.* (quoting *Colacurcio*, 163 F.3d at 553. Requiring the date and source information helps California Department of Justice to more effectively determine whether a firearm is lawfully possessed, and the law's objective would be less effectively achieved without this requirement. (Graham Decl. ¶¶ 26–28.) Thus, Defendant has established a reasonable fit.

Accordingly, the Court concludes that Plaintiffs have not established a likelihood of success on the merits of this claim.

## 2. Irreparable Injury

The Court also concludes that Plaintiffs have not demonstrated a likelihood of irreparable injury. A plaintiff must support his request for a preliminary injunction with evidence that will "demonstrate, not merely allege, his entitlement to a preliminary injunction ... allegations that may be sufficient for pleading purposes simply are not enough to prove ... entitlement to a preliminary injunction." *Hicks*, 2012 WL 3791399, at \*3. The Court must tailor an injunction "to remedy the specific harm alleged ... an overbroad preliminary injunction is an abuse of discretion." *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) (citing *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

The conclusions offered in the declarations of Martin and the California Rifle & Pistol Association do not "demonstrate" that Plaintiffs will experience irreparable harm stemming from the date-and-source requirement. Nor would they allow the Court to tailor an injunction to the specific injury alleged. Martin alleges that he has "no readily available source" to discover the date he acquired his weapon nor the name or address of the individual or business from whom he acquired it, but alleges no steps that he has taken to show that he engaged in due diligence to find the information. Similarly, Richard Travis's declaration on behalf of the California Rifle & Pistol Association alleges that his association has members who will not be able to meet the registration requirements because they "do not have any readily available source to discover" the required information. (Travis Decl. ¶ 5, Doc. 24–2.) But the Court has no additional facts about any diligence on the part of these members in attempting to get this information, nor why such information is deemed not "readily available." Some members may have misplaced the information; others may have simply not looked through their records which may be in storage; perhaps some engaged in private party transfers. Clearly, the Court has to engage in speculation to determine the scope and source of the alleged harm. This is sufficient neither to justify the extraordinary remedy of injunctive relief nor to allow the Court to properly tailor an injunction. Further, the absence of any facts related to the other options weapons owners have to comply with the law prior to July 1, 2018, such as modifying the weapon, undermines Plaintiffs' position that the date-and-

source requirement is the cause of any alleged irreparable harm.

**\*13** As noted above, Plaintiffs sought to file a supplemental declaration of Dennis Martin ("Supplemental Martin Declaration"). (Motion, Doc. 41.) After reviewing the proposed supplement, the Court concludes that even if it were to consider the additional facts alleged, its determinations about likelihood of success on the merits and adequacy of showing of irreparable harm would not change. Martin alleges that after "reviewing [his] files and electronic correspondence" for one of his weapons, he was unable to locate any records related to his purchase. (Martin Supp'l Decl. ¶ 7.) As to another weapon acquired via a third party transaction, he states that he does "not know when that transaction occurred, the name of the seller, or the California licensed firearms dealer who processed the transaction," nor can he find the information "after reviewing [his] records and electronic correspondence." (*Id.* ¶ 9.) Martin concludes that he will "dispossess" himself of any weapons prior to the registration deadline. (*Id.* ¶ 11.) Martin includes no information about what, if any, burden would result from instead modifying the weapon. Accordingly, the alleged harm is not set forth with sufficient clarity to allow the Court to conclude that such harm stems from the date-and-source requirement. In fact, *no* facts have been alleged as to what it would mean to modify a weapon to either fix the magazine or remove a statutory feature, either as to any economic burden or fundamental change to the weapon. Moreover, as Defendant notes in its Opposition, Martin has not alleged facts to show that he engaged in due diligence such as contacting the California Department of Justice's Bureau of Firearms or the firearm's manufacturer. (Opp. at 4; *see also* Graham Decl. ¶¶ 20–23.) Even if it considered the additional facts presented in the proposed Supplemental Martin Declaration, the Court would conclude that Plaintiffs have not made an adequate showing on likelihood of success on the merits or irreparable injury. The Court therefore denies the Motion for Leave as moot.

### 3. Balance of the Hardships

Plaintiffs assert that the government will suffer no harm if it is enjoined from enforcing the date-and-source requirement until the issue has been heard on the merits. Defendant, however, asserts the principle that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (internal quotation marks omitted). In particular, they contend that an injunction would "cause a concrete harm against the state's law enforcement public-safety interests," including the possibility that "an illegally possessed weapon might be given legal status" thereby "compromis[ing] public safety." (PI Opp. at 31.) Defendant also justifiably questions how many people will actually be negatively affected by the date-and-source requirement; while Plaintiffs argue that there are "potentially thousands" of affected individuals, after months of litigation, they have specifically identified only one. (*Id.*)

The Ninth Circuit instructs that when balancing the hardships "of the public interest against a private interest, the public interest should receive greater weight." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (internal quotation marks omitted). The Court weighs the burden on Plaintiffs who may choose to dispossess themselves of their weapons rather than selling them, storing them out of state, or modifying them, against that on Defendant, who will be enjoined from enforcing a law intended to increase public safety. Taking into account the weighing suggested by *F.T.C.*, the Court concludes that the balance tips in favor of Defendant.

### 4. Public Interest

Finally, because the objective of the AWCA is public safety, Plaintiffs fail to show that an injunction would be in the public interest. *See, e.g., Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 Fed.Appx. 401 (9th Cir. 2016) (holding that "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave.") Plaintiffs assert that the public interest lies in upholding the Constitution, and contend that there is no possible risk to public safety because anyone who cannot fulfill the date-and-source requirement already has the weapon at issue in their possession. (PI Mem. at 29.) However, the point of requiring weapons owners to register or take other action with regards to the assault weapons the state has classified as dangerous is to *immediately* begin to enhance the regulatory regime, not to maintain the status quo.

Accordingly, Plaintiffs have not demonstrated the propriety of injunctive relief, and the Motion for Preliminary Injunction is DENIED.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

## V. **CONCLUSION**

Accordingly, the Court GRANTS Defendant's Motion to Dismiss, DENIES Plaintiffs' Motion for Preliminary Injunction, and DENIES AS MOOT Plaintiffs' Motion for Leave. Plaintiffs may amend their complaint as to the Takings and Due Process Clause claims only to the extent that they can allege facts related to the ripeness and standing of an as-applied challenge and to the extent they can do so consistent with their obligations under Federal Rule of Civil Procedure 11. Any amendments must be made with **twenty-one (21)** days of this order.

## **All Citations**

Not Reported in Fed. Supp., 2018 WL 2138452

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

265 F.Supp.3d 1106
United States District Court, S.D. California.

Virginia DUNCAN, Richard Lewis, Patrick
Lovette, David Marguglio, Christopher Waddell,
California Rifle & Pistol Association, Inc.,
Plaintiffs,
v.
Xavier BECERRA, in his official capacity as
Attorney General of the State of California,
Defendant.

Case No.: 3:17–cv–1017–BEN
|
Signed June 29, 2017

**Synopsis**
**Background:** Citizens brought action against Attorney
General of California, alleging prohibition on possession
of large capacity gun magazines was unconstitutional.
Citizens filed motion for preliminary injunction.

**Holdings:** The District Court, Roger T. Benitez, J., held
that:

[1] citizens established likelihood of success on merits;

[2] citizens established irreparable harm;

[3] balance of hardships weighed in favor of preliminary
injunction; and

[4] public interest favored preliminary injunction.

Motion granted.

West Headnotes (36)

[1]     **Weapons**
        🔑Violation of right to bear arms

        Citizens had standing to challenge
        constitutionality of California's prohibition on
        possession of large capacity gun magazines;
        injury would be immediate and concrete, as

merely continuing to possess magazine able to
hold more than 10 rounds could be charged
as criminal misdemeanor. Cal. Penal Code
§ 32310.

1 Cases that cite this headnote

[2]     **Federal Civil Procedure**
        🔑In general;  injury or interest
        **Federal Courts**
        🔑Necessity of Objection;  Power and Duty of
        Court

        Federal courts are obligated to satisfy
        themselves that a plaintiff has standing and that
        the case is ripe.

        Cases that cite this headnote

[3]     **Federal Civil Procedure**
        🔑In general;  injury or interest
        **Federal Civil Procedure**
        🔑Causation;  redressability

        To establish Article III standing, a plaintiff must
        have: (1) suffered an injury in fact, (2) that is
        fairly traceable to the challenged conduct of the
        defendant, and (3) that is likely to be redressed
        by a favorable judicial decision; the same
        principle applies when there are multiple
        plaintiffs. U.S. Const. art. 3, § 2, cl. 1.

        Cases that cite this headnote

[4]     **Federal Civil Procedure**
        🔑In general;  injury or interest

        When there are multiple plaintiffs, at least one
        plaintiff must have standing to seek each form
        of relief requested in the complaint.

        Cases that cite this headnote

AR004955

[5]    **Federal Civil Procedure**
🔑In general;  injury or interest

Article III standing analysis recognizes that, where threatened action by government is concerned, courts do not require a plaintiff to expose himself to criminal liability before bringing suit. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

[6]    **Injunction**
🔑Grounds in general;  multiple factors

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.

Cases that cite this headnote

[7]    **Weapons**
🔑Right to bear arms in general

The right to keep and bear arms is fundamental and is incorporated against states under the Fourteenth Amendment. U.S. Const. Amends. 2, 14.

Cases that cite this headnote

[8]    **Weapons**
🔑Right to bear arms in general

The Second Amendment extends to common modern firearms useful for self-defense in the home. U.S. Const. Amend. 2.

Cases that cite this headnote

[9]    **Weapons**
🔑Right to bear arms in general

The Second Amendment protects firearms and the ammunition and magazines that enable arms to fire. U.S. Const. Amend. 2.

1 Cases that cite this headnote

[10]    **Weapons**
🔑Right to bear arms in general

The Second Amendment does not explicitly protect ammunition; nevertheless, without bullets, the right to bear arms would be meaningless. U.S. Const. Amend. 2.

Cases that cite this headnote

[11]    **Weapons**
🔑Right to bear arms in general

A regulation eliminating a person's ability to obtain or use ammunition could make it impossible to use firearms for their core purpose; thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them. U.S. Const. Amend. 2.

Cases that cite this headnote

[12]    **Constitutional Law**
🔑Constitutional Rights in General

Constitutional rights implicitly protect those

AR004956

closely related acts necessary to their exercise.

Cases that cite this headnote

**[13]**    **Weapons**
   Violation of right to bear arms

Courts analyzing a Second Amendment challenge must evaluate the burden and then apply the correct scrutiny; this two-step inquiry: (1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny. U.S. Const. Amend. 2.

1 Cases that cite this headnote

**[14]**    **Weapons**
   Violation of right to bear arms

In determining whether a given regulation falls within the scope of the Second Amendment, courts ask whether the regulation is presumptively lawful regulatory measure, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment; if the regulation is presumptively lawful, the inquiry ends, and likewise, if the regulation is a historically approved prohibition not offensive to the Second Amendment, the inquiry ends. U.S. Const. Amend. 2.

Cases that cite this headnote

**[15]**    **Weapons**
   Violation of right to bear arms

Courts determine the appropriate level of scrutiny for Second Amendment challenge by considering (1) how close the challenged law comes to the core of the Second Amendment

right, and (2) the severity of the law's burden on that right. U.S. Const. Amend. 2.

1 Cases that cite this headnote

**[16]**    **Weapons**
   Violation of right to bear arms

A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. U.S. Const. Amend. 2.

Cases that cite this headnote

**[17]**    **Weapons**
   Violation of right to bear arms

A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. U.S. Const. Amend. 2.

Cases that cite this headnote

**[18]**    **Weapons**
   Violation of right to bear arms

Where a restriction does not severely burden or even meaningfully impact the core of the Second Amendment right, intermediate scrutiny is appropriate. U.S. Const. Amend. 2.

Cases that cite this headnote

**[19]**    **Constitutional Law**
   Intermediate scrutiny

AR004957

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

Intermediate scrutiny test requires that (1) the government's stated objective be significant, substantial, or important; and (2) there be a reasonable fit between the challenged regulation and the asserted objective; under the second prong, intermediate scrutiny does not require the least restrictive means of furthering a given end.

1 Cases that cite this headnote

[20]     **Injunction**
         🔑Weapons and explosives

Citizens established likelihood of success on merits of Second Amendment challenge to California's prohibition on possession of large capacity gun magazines and, thus, were entitled to preliminary injunction temporarily restraining state from enforcing dispossession requirement and criminal penalties; dispossession and criminalization components of ban on firearm magazines holding any more than 10 rounds was not reasonable fit for achieving important goals of protecting citizens from gun violence, protecting law enforcement from gun violence, protecting public safety, and preventing crime. U.S. Const. Amend. 2; Cal. Penal Code § 32310(c, d).

1 Cases that cite this headnote

[21]     **Constitutional Law**
         🔑Burden of Proof

For intermediate scrutiny, the burden of justification is demanding and it rests entirely on the state.

2 Cases that cite this headnote

[22]     **Constitutional Law**
         🔑Intermediate scrutiny

On intermediate scrutiny review, the state

cannot get away with shoddy data or reasoning; to survive intermediate scrutiny, the state must show reasonable inferences based on substantial evidence that the statutes are substantially related to the governmental interest.

Cases that cite this headnote

[23]     **Injunction**
         🔑Admissibility
         **Injunction**
         🔑Hearsay

For a preliminary injunction, a court may rely on otherwise inadmissible evidence, including hearsay evidence.

Cases that cite this headnote

[24]     **Constitutional Law**
         🔑Intermediate scrutiny

To satisfy reasonable fit required by intermediate scrutiny, evidence must fairly support the rationale for the state's statute; and courts should not credit facially implausible legislative findings.

Cases that cite this headnote

[25]     **Injunction**
         🔑Weapons and explosives

Citizens established irreparable harm in absence of injunctive relief from California's prohibition on possession of large capacity gun magazines, supporting preliminary injunction temporarily restraining state from enforcing dispossession requirement and criminal penalties; citizens and those like them would irrevocably lose possession and use of magazines upon delivery to police to be destroyed, upon sale to firearms dealer who would have little market for re-sale, or upon shipment somewhere out of state. U.S.

AR004958

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

Const. Amend. 2; Cal. Penal Code § 32310(c, d).

Cases that cite this headnote

[26]     **Federal Courts**
🔑             Particular cases **Federal Courts**
        All or part of issues or parties, new trial on
🔑

If an underlying constitutional question is close, court should uphold the injunction and remand for trial on the merits.

Cases that cite this headnote

[27]     **Injunction**
🔑 Weapons and explosives

Loss of Second Amendment rights constitutes irreparable injury for purposes of preliminary injunction. U.S. Const. Amend. 2.

Cases that cite this headnote

[28]     **Injunction**
🔑 Weapons and explosives

Balance of hardships weighed in favor of preliminary injunction temporarily restraining California from enforcing dispossession requirement and criminal penalties of statute prohibiting possession of large capacity gun magazines; statute imposed criminal sanctions for failure to act and posed potential for extraordinary harm on citizens while discounting their Second Amendment rights. U.S. Const. Amend. 2; Cal. Penal Code § 32310(c, d).

1 Cases that cite this headnote

[29]     **Injunction**
🔑 Grounds in general;  multiple factors
**Injunction**
🔑 Injunctions against government entities in general

Once an applicant satisfies the first two factors for preliminary injunction, likelihood of success on the merits and irreparable harm, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest; these factors merge when the government is the opposing party.

Cases that cite this headnote

[30]     **Injunction**
🔑 Weapons and explosives

Public interest favored preliminary injunction temporarily restraining California from enforcing dispossession requirement and criminal penalties of statute prohibiting possession of large capacity gun magazines; public interest favored exercise of Second Amendment rights by law-abiding responsible citizens, and it was in public interest to prevent violation of constitutional rights. U.S. Const. Amend. 2; Cal. Penal Code § 32310(c, d).

Cases that cite this headnote

[31]     **Civil Rights**
🔑 Preliminary Injunction

It is always in the public interest, for purposes of preliminary injunction, to prevent the violation of a person's constitutional rights.

Cases that cite this headnote

[32]     **Eminent Domain**

AR004959

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

Weapons
**Eminent Domain**
Preliminary or interlocutory injunction

Citizens established likelihood of success on merits of challenge to California's prohibition on possession of large capacity gun magazines as unconstitutional under Takings Clause and, thus, were entitled to preliminary injunction temporarily restraining state from enforcing dispossession requirement and criminal penalties, although statute allowed citizens to sell magazines to firearm dealer or remove magazines from state; fair market value of large capacity magazine in California after enactment of statute would likely be near zero, statute did not specify method or supply place outside state for removal, option for owners to surrender large capacity magazines to law enforcement agency for destruction was per se taking, and statute would deprive citizens not just of use of property but of possession. U.S. Const. Amend. 5; Cal. Penal Code § 32310(c, d).

3 Cases that cite this headnote

[33]    **Eminent Domain**
Nuisance and demolition

A law enacted pursuant to the state's police powers to enjoin a property owner from activities akin to public nuisances is not immune from scrutiny under the regulatory takings doctrine. U.S. Const. Amend. 5.

Cases that cite this headnote

[34]    **Eminent Domain**
Zoning, Planning, or Land Use;  Building Codes

With certain qualifications a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause. U.S. Const. Amend. 5.

Cases that cite this headnote

[35]    **Eminent Domain**
What Constitutes a Taking;  Police and Other Powers Distinguished

When a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. U.S. Const. Amend. 5.

Cases that cite this headnote

[36]    **Eminent Domain**
What Constitutes a Taking;  Police and Other Powers Distinguished

A physical appropriation of property gives rise to a per se taking, without regard to other factors. U.S. Const. Amend. 5.

1 Cases that cite this headnote

**West Codenotes**

**Validity Called into Doubt**
Cal. Penal Code § 32310(c), (d).

**Attorneys and Law Firms**

**\*1109** Carl D. Michel, Anna M. Barvir, Sean Brady, Michel & Associates, P.C., Long Beach, CA, for Plaintiffs.

Attorney General, State of California Office of the Attorney General, San Diego, CA, Alexandra Robert Gordon, Dept. of Justice, Attorney General's Office, San Francisco, CA, Anthony P. O'Brien, California Office of Attorney General, Sacramento, CA, for Defendant.

AR004960

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

## ORDER GRANTING PRELIMINARY INJUNCTION

Hon. Roger T. Benitez, United States District Judge

## I. INTRODUCTION

On July 1, 2017, any previously law-abiding person in California who still possesses **\*1110** a firearm magazine capable of holding more than 10 rounds will begin their new life of crime. That is because California Penal Code § 32310 was amended last fall by the passage of a California ballot initiative, Proposition 63. With this change, § 32310(c) requires persons who lawfully possess these magazines today to *dispossess* them or face criminal penalties of up to one year in a county jail and a fine of $100 per magazine, or both.[1] Section 32310(d) provides three options for dispossession. First, a person may "remove the large-capacity magazine from the State." § 32310(d)(1). Second, a person may "sell the large-capacity magazine to a licensed firearm dealer." § 32310(d)(2). Third, a person may "surrender the large-capacity magazine to a law enforcement agency for destruction." § 32310(d)(3). Naturally, there are statutory exceptions for some individuals such as active and retired law enforcement officers (§§ 32400, 32405, and § 32406). There are also exceptions for employees of armored vehicle businesses (§ 32435) and for movie and television actors when magazines are used as a prop (§ 32445). While there are other exceptions for licensed firearm dealers, manufacturers, and gunsmiths, there are no exceptions made for members of the Armed Forces, or those honorably discharged or retired. Likewise, there are no exceptions for civilian firearms instructors, concealed weapon permit holders, or families who live far from timely help by local law enforcement agencies and who must be self-reliant for their own defense, defense of their families, or of home and property. Finally, there are no exceptions made for citizens who, should the need ever arise, may be called upon to form a militia for the protection of the state from either foreign or domestic enemies.

## A. Complexity

California's gun laws are complicated. *See Peruta v. County of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (*en banc*), *cert. denied*, 2017 WL 176580, —— U.S. ——, 137 S.Ct. 1995, 198 L.Ed.2d 746 (June 26, 2017) ("California has a multifaceted statutory scheme regulating firearms."). **\*1111** Proposition 63 adds one more layer of complexity. Perhaps too much complexity. *See id.* at 953 (Callahan, J., dissenting) ("The counties and California have chipped away at the Plaintiffs' right to bear arms by enacting first a concealed weapons licensing scheme that is tantamount to a complete ban on concealed weapons, and then by enacting an open carry ban. Constitutional rights would become meaningless if states could obliterate them by enacting incrementally more burdensome restrictions while arguing that a reviewing court must evaluate each restriction by itself when determining constitutionality."). In California, the State has enacted, over the span of two decades, an incrementally more burdensome web of restrictions on the rights of law-abiding responsible gun owners to buy, borrow, acquire, modify, use, or possess ammunition magazines able to hold more than 10 rounds. The language used, the internally-referenced provisions, the interplay among them, and the plethora of other gun regulations, have made the State's magazine laws difficult to understand for all but the most learned experts. *See e.g.*, Cal. Pen. Code § 32310(a) (criminalizing manufacturing, importing, keeping for sale, offering for sale, giving, lending, buying or receiving a large capacity magazine while excepting "as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2"); § 32310(b) (defining "manufacturing" as fabricating or assembling a magazine from a combination of parts); § 32415(b) (§ 32310 prohibition on lending does not apply to the loan when it "occurs at a place or location where the possession of the large capacity magazine remains in the accessible vicinity of the person to whom the large capacity magazine is loaned"); § 32406(b) (excepting museums and institutional collections open to the public if securely housed and protected from unauthorized handling); § 32406(f) (excepting a "person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds 10 fewer rounds of ammunition is compatible with that firearm and the person possesses the large-capacity magazine solely for use with the firearm"); § 16470 (defining "large capacity magazine" to include an ammunition feeding device with the capacity to accept more than 10 rounds but not including a feeding device

"that has been permanently altered so that it cannot accommodate more than 10 rounds," and a .22 caliber tube feeding device and a tubular magazine that is contained in a lever-action firearm); § 32311 (criminalizing manufacturing, importing, keeping for sale, offering for sale, giving, lending, buying, or receiving "any large capacity magazine conversion kit"); § 32390 (declaring any large capacity magazine to be a nuisance); § 18010 (destroying nuisance large capacity magazines). Too much complexity fails to give fair notice and violates due process. "[A] penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties ... consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *see also United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Connally* ).

At the preliminary injunction hearing, the attorney for the Attorney General, although well prepared, was not able to describe **\*1112** all of the various exceptions to the dispossession and criminalization components of § 32310. Who could blame her? The California matrix of gun control laws is among the harshest in the nation and are filled with criminal law traps for people of common intelligence who desire to obey the law. Statutes must be sufficiently well-defined so that reasonably intelligent citizens can know what conduct is against the law. The plaintiffs, who are law-abiding responsible residents of California, want to keep pistols and rifles and the magazines that are commonly used with their firearms without running afoul of California's gun control statutes. But these statutes are too complicated to give fair notice.

## B. Magazines Able to Hold More than 10 Rounds Are Popular

Ammunition magazines that hold more than 10 rounds are popular. Some estimate that as many as 100,000,000 such magazines are currently owned by citizens of the United States. Under federal law, they may be bought, sold, lent, used, and possessed. However, unlike citizens and residents of 43 other states, and hundreds if not thousands of local jurisdictions, after June 30, 2017, all law-abiding citizens of California will be deemed criminals *if they simply possess* a lawfully acquired magazine capable of

holding more than 10 rounds of ammunition.

## C. Plaintiffs

Plaintiffs are a group of California residents who either already own magazines holding more than 10 rounds or who want to own magazines holding more than 10 rounds for their defense of self and state. Plaintiff Richard Lewis is a law-abiding citizen and an honorably discharged 22–year United States Marine Corps veteran. For more than 20 years, Lewis has lawfully possessed and continues to possess large capacity magazines. Plaintiff Patrick Lovette is a law-abiding citizen and an honorably retired 22–year United States Navy veteran. For more than 20 years, Lewis has lawfully possessed and continues to possess large capacity magazines. Plaintiffs allege they lawfully possess large capacity magazines for self-defense and other lawful purposes. Plaintiff California Rifle and Pistol Association, Inc., is a membership organization almost as old as the State of California. The organization represents tens of thousands of its California members.

## D. Constitutional Challenge and Motion for Preliminary Injunction

Plaintiffs bring facial and as-applied challenges through 42 U.S.C. § 1983 seeking a declaratory judgment that California Penal Code § 32310 (the ban on magazines holding more than 10 rounds) impermissibly infringes on California citizens' federal constitutional right to keep and bear arms, a right protected by the Second Amendment to the United States Constitution. By this motion for preliminary injunction, Plaintiffs seek only to maintain the *status quo* until a final determination is made on the merits of their constitutional claims, by temporarily restraining the State from enforcing the dispossession requirement and criminal penalties associated with § 32310 (c) & (d).

## E. Two Questions

Ultimately, this case asks two questions. "Does a law-abiding responsible citizen have a right to defend his home from criminals using whatever common magazine size he or she judges best suits the situation? Does that

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

same citizen have a right to keep and bear a common magazine that is useful for service in a militia? Because a final decision on the merits is likely to answer both questions "yes," but a final decision will take too long to offer relief, and because the statute will soon visit irrevocable harm on Plaintiffs and all those similarly situated, a state-wide preliminary **\*1113** injunction is necessary and justified to maintain the *status quo*. Because Plaintiffs have demonstrated on this preliminary record a likelihood of success on the merits, a likelihood of irreparable harm, a balance of equities that tips in their favor, and that an injunction would be in the public interest, a preliminary injunction will issue.

## II. ARTICLE III STANDING & RIPENESS

[1] [2] [3] [4]Defendant does not challenge Plaintiffs' Article III standing at this time. Nevertheless, federal courts are obligated to satisfy themselves that a plaintiff has standing and that the case is ripe. *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (reversing because plaintiff lacked standing). To establish Article III standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, —— U.S. ——, 137 S.Ct. 1645, 198 L.Ed.2d 64, 2017 WL 2407473, at *4 (June 5, 2017) (citations and quotation marks omitted). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Id.* at *5, 124 S.Ct. 2301. At a minimum, Plaintiffs Lewis and Lovette have standing to challenge the dispossession requirement and criminalization component of California's large capacity magazine ban and their case is ripe.

[5]Article III standing analysis recognizes that, where threatened action by government is concerned, courts do not require a plaintiff to expose himself to criminal liability before bringing suit. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007); *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Under the statute at issue here, merely continuing to possess a magazine able to hold more than 10 rounds may be charged as a criminal misdemeanor. The injury will be immediate and concrete. *See Jackson v. City & County of San Francisco,* 829 F.Supp.2d 867, 871–872 (N.D. Cal.

2011). Ripeness, however, does require a credible threat of prosecution. That requirement is satisfied here as the Attorney General has not indicated that § 32310 (c) & (d) will not be enforced on July 1, 2017. Moreover, the State has vigorously enforced § 32310 in the past.[2] Therefore, the Article III **\*1114** requirements of standing and ripeness are satisfied.

## III. STANDARD FOR A PRELIMINARY INJUNCTION

[6]The standard for issuing a preliminary injunction is well established and not in dispute. A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

Plaintiffs claim that § 32310 (c) & (d) trenches on their federal Constitutional rights under the Second Amendment and the Takings Clause. Consequently, a judicial evaluation must be made, beginning with a judgment as to whether there is a likelihood that Plaintiffs will ultimately prevail on the merits of their claims. It is a preliminary judgment. It is made on an incomplete evidentiary record. But the evidence presented is important.[3]

## A. The Second Amendment—Certain Policy Choices Are off the Table

In *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court made absolutely clear that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. The State of California's desire to criminalize simple possession of a firearm magazine able to hold more than 10 rounds is precisely the type of policy choice that the Constitution takes off the table. Because the right to bear arms includes the right to keep and carry ammunition and magazines holding more than 10 rounds for those arms, for both **\*1115** self-defense and to be ready to serve in a militia,

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

the State's criminalization of possession of "large capacity magazines" likely places an unconstitutional burden on the citizen plaintiffs.

**1. Likelihood of Success on the Merits**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Second Amendment rights are not watered-down,[4] second-class rights.[5] "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). The right to bear arms for a legal purpose is an inherent right pre-dating and transcending the Second Amendment. "The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1875), *overruled on other grounds*, *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).

Some may fear that the right to keep and bear arms means citizens hold a right to "possess a deadly implement and thus has implications for public safety," and that "there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries." *McDonald*, 561 U.S. at 782–83, 130 S.Ct. 3020 (argument of the City of Chicago). True enough. But, public safety interests may not eviscerate the Second Amendment.[6] "The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783, 130 S.Ct. 3020 (collecting cases where those likely guilty of a crime are set free because of constitutional rights).

[7]The Supreme Court recognizes an individual's right to keep and bear arms under the Second Amendment for self-defense in the home. *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. This right to keep and bear arms is fundamental and is incorporated against states under the Fourteenth **\*1116** Amendment. *McDonald*, 561 U.S. at 791, 130 S.Ct. 3020.

The Supreme Court also recognizes that the Second Amendment guarantee includes firearms that have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Miller*, 307 U.S. at 178, 59 S.Ct. 816. *Miller* implies that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment.[7] Concluding that magazines holding more than 10 rounds might be found among today's ordinary military equipment or that such magazines would contribute to the common defense, requires only a modest finding.

*a. Self-defense and militia use*

*Heller* and *Miller* are not inconsistent. *Heller* acknowledges that protection for weapons useful to a militia are also useful for defending the home. "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self defense weapon.... Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629, 128 S.Ct. 2783. As *McDonald* puts it, "[i]n *Heller,* we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was 'the *central component* of the right itself.' " *McDonald*, 561 U.S. at 742, 130 S.Ct. 3020 (emphasis in original).

[8]In *Caetano v. Massachusetts*, the Court underscored these two related points from *Heller* and *McDonald.* First, the Second Amendment extends to common modern firearms useful for self-defense in the home. Second, there is no merit to "the proposition 'that *only* those weapons useful in warfare are protected.' " *See Caetano*, ––– U.S. ––––, 136 S.Ct. 1027, 1028, 194 L.Ed.2d 99 (2016) (per curiam) (quoting *Heller*, 554 U.S. at 582, 624–25, 128 S.Ct. 2783) (remanding for further consideration of whether Second Amendment protects stun guns) (emphasis added); *contra Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) (weapons useful in warfare are not protected by the Second Amendment).

AR004964

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

#### b. Ammunition magazines are arms

[9] [10] [11] [12] The Second Amendment protects firearms and the ammunition and magazines that enable arms to fire. The Second Amendment does not explicitly protect ammunition. "Nevertheless, without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson,* 746 F.3d at 967. "Thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* (citing *Ezell v. City of Chicago,* 651 F.3d 684, 704 (7th Cir. 2011)) (holding that the right to possess firearms implied a corresponding right to **\*1117** have access to firing ranges in order to train to be proficient with such firearms). Indeed, *Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves. *Id.* The same is true for magazines. "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.' " *Luis v. United States,* ––– U.S. ––––, 136 S.Ct. 1083, 1097, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring) (quoting *Jackson,* 746 F.3d at 967). Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, "the Second Amendment would be toothless." *Id.*

Most, if not all, pistols and many rifles are designed to function with detachable magazines. They are necessary and integral to the designed operation of these arms. Of course, when a magazine is detached the magazine is not a firearm. It is not dangerous. It may be made of stainless steel or it may be made of polymers, but it cannot fire a single round of ammunition. Its only function is to hold ammunition. Other parts of a firearm are also necessary and integral to the designed operation, but may be separated (*e.g.*, removable gun barrels, gun sights, trigger assemblies, hand grips, etc.). For firearms designed to have magazines, without the magazine attached, the weapon may be limited to firing a single round in the chamber, or not at all (as is the case with some popular pistols designed for safety reasons to fire only when a magazine is in place). Although the State does not concede the issue, neither does it press its case on the argument that magazines are not "arms" for purposes of Second Amendment analysis. Opposition at 9. Nor has

any other court considering the question held that a magazine of any capacity is not subject to Second Amendment review. *See e.g., Fyock v. City of Sunnyvale,* 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014), *aff'd,* 779 F.3d 991 (9th Cir. 2015) ("Rather, the court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as they are integral components to vast categories of guns."). Thus, that which the State defines as a "large capacity magazine" will be analyzed according to Second Amendment principles. This is the theater of operations in which the constitutional battle will be fought.

#### 2. Second Amendment Tests

#### a. The tripartite binary test with a sliding scale and a reasonable fit

For a Second Amendment challenge, the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit. In other words, there are three different two-part tests, after which the sliding scale of scrutiny is selected. Most courts select intermediate scrutiny in the end. Intermediate scrutiny, in turn, looks for a "reasonable fit." Courts in other circuits tend to also use some variation of a multi-part test with the result that intermediate scrutiny is applied to gun restrictions. It is, unfortunately, an overly complex analysis that people of ordinary intelligence cannot be expected to understand. These complicated legal tests, which usually result in Second Amendment restrictions passing an intermediate scrutiny test (a test that is little different from a rational basis test), appear to be at odds with the simple test used by the Supreme Court in *Heller*. The *Heller* test is a test that anyone can figure out.

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose—regardless of whether alternatives exist. And *Heller* draws a distinction between such firearms and weapons **\*1118** specially adapted to unlawful uses and not in common use, such as sawed-off shotguns.
>
> ...
>
> Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting.

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park*, —— U.S. ——, 136 S.Ct. 447, 449, 193 L.Ed.2d 483 (2015) (Justices Thomas and Scalia dissenting from denial of certiorari) (emphasis added) (citations omitted). A complicated Second Amendment test obfuscates as it extirpates, but it is the test that this Court is bound to follow.

### b. Constitutionally suspect under the simple test

Under the simple *Heller* test, § 32310 (c) & (d) are highly suspect. They are suspect because they broadly prohibit common pistol and rifle magazines used for lawful purposes. "[T]hat is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman*, 136 S.Ct. at 449.

Magazines holding more than 10 rounds are useful for self-defense by law-abiding citizens. And they are common. Lawful in at least 43 states and under federal law, these magazines number in the millions. *Cf. Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (defining the term "common" by applying the Supreme Court test in *Caetano* of 200,000 stun guns owned and legal in 45 states being "common"); *see also NYSR & PA v. Cuomo*, 804 F.3d 242, 255–57 (2nd Cir. 2015) (noting large-capacity magazines are "in common use" as the term is used in *Heller* based on even the most conservative estimates). To the extent they may be now uncommon within California, it would only be the result of the State long criminalizing the buying, selling, importing, and manufacturing of these magazines. To say the magazines are uncommon because they have been banned for so long is something of a tautology. It cannot be used as constitutional support for further banning. *See Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so the it isn't commonly used. A law's existence can't be the source of its own constitutional validity.").

Nevertheless, § 32310 (c) & (d) are suspect even under the more complicated analysis employed by the Ninth Circuit Court of Appeals, because the statute is not a reasonable fit as a means to achieve the State's important objectives. To pass muster under the intermediate scrutiny test a statute must have "a reasonable fit" with the State's important interest. The analysis works like this.

### c. Constitutionally suspect under the "reasonable fit" test

#### i. burden & scrutiny

[13]First, a court must evaluate the burden and then apply the correct scrutiny. *Jackson*, 746 F.3d at 960 (citing *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013)). "This two-step inquiry: '(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny.' " *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting*Jackson*, 746 F.3d at 960). As discussed below, § 32310 (c) & (d) burden conduct protected by the Second Amendment.

#### ii. presumptively lawful or historical regulation

[14]In determining whether a given regulation falls within the scope of the **\*1119** Second Amendment under the first step of this inquiry, another two-step test is used. "[W]e ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id.* (citations omitted). If the regulation is presumptively lawful, the inquiry ends. Likewise, if the regulation is a historically approved prohibition not offensive to the Second Amendment, the inquiry ends. Section 32310 (c) & (d) fail both parts of the test. A complete ban on ammunition magazines of any size is not one of the presumptively lawful regulatory measures identified in *Heller*. Neither is there any evidence that magazine capacity restrictions have a historical pedigree.

AR004966

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

### iii. closeness to the core and severity of the burden

[115]If the constitutional inquiry may continue, then the correct level of scrutiny must be selected. For that selection a third two-step evaluation is required. The first step measures how close the statute hits at the core of the Second Amendment right. The second step measures how severe the statute burdens the Second Amendment right. "Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.' " *Bauer*, 858 F.3d at 1222 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).*Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015), has already recognized that a regulation restricting law-abiding citizens from possessing large-capacity magazines within their homes hits at the core of the Second Amendment. *Fyock* said, "[b]ecause Measure C restricts the ability of law-abiding citizens to possess large capacity magazines within their homes for the purpose of self-defense, we agree with the district court that Measure C may implicate the core of the Second Amendment." *Id.*

### iv. the sliding scale of scrutiny

[16] [17] [18]*Heller* says the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of their home. 554 U.S. at 635, 128 S.Ct. 2783.

Guided by this understanding, our test for the appropriate level of scrutiny amounts to 'a sliding scale.' A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. Further down the scale, a law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is

appropriate.

*Bauer*, 858 F.3d at 1222 (citations and quotations marks omitted). Where a restriction "... does not 'severely burden' or even meaningfully impact the core of the Second Amendment right, ... intermediate scrutiny is ... appropriate." *See id.* (citing *Silvester*, 843 F.3d at 821 and *Chovan*, 735 F.3d at 1138). *Fyock* held that the district court did not abuse its discretion in finding Sunnyvale's magazine capacity restriction did not have a severe impact. "[T]here was no abuse of discretion in finding that the impact Measure C may have on the core Second Amendment right is not severe and that intermediate scrutiny is warranted." 779 F.3d at 999.

The State argues as a foregone conclusion that intermediate scrutiny is the correct point on the sliding scale for a regulation on magazines. According to the State, **1120** *Fyock*'s approval of "intermediate scrutiny" is controlling, and other courts have applied intermediate scrutiny to regulations on large capacity magazines. The approach is consistent with past cases analyzing the appropriate level of scrutiny under the second step of *Heller*, as the Ninth Circuit has repeatedly applied intermediate scrutiny. *See e.g.*, *Silvester*, 843 F.3d at 823 (applying intermediate scrutiny to a law mandating ten-day waiting periods for the purchase of firearms); *Fyock*, 779 F.3d at 999 (applying intermediate scrutiny to a law prohibiting the possession of large capacity magazines); *Jackson*, 746 F.3d at 965, 968 (applying intermediate scrutiny to laws mandating certain handgun storage procedures in homes and banning the sale of hollow-point ammunition in San Francisco); *Chovan*, 735 F.3d at 1138 (applying intermediate scrutiny to a law prohibiting domestic violence misdemeanants from possessing firearms). Applying intermediate scrutiny, *Fyock* did find that the plaintiffs were unlikely to succeed on the merits.

The difference here, and it is a important difference, is that the district court in *Fyock* had before it an evidentiary record that was credible, reliable, and on point. *Fyock*, 779 F.3d at 1000 ("Ultimately, the district court found that Sunnyvale submitted pages of credible evidence, from study data to expert testimony to the opinions of Sunnyvale public officials, indicating that the Sunnyvale ordinance is substantially related to the compelling government interest in public safety."). That is not the case here. Here, the Attorney General has submitted at this preliminary stage incomplete studies from unreliable sources upon which experts base speculative explanations and predictions. The evidentiary record is a potpourri of news pieces, State-generated documents, conflicting

definitions of "mass shooting," amorphous harms to be avoided, and a homogenous mass of horrible crimes in jurisdictions near and far for which large capacity magazines were not the cause.

#### v. tailoring required: "a reasonable fit"

[19]Assuming intermediate scrutiny applies, "a reasonable fit" test is conducted. "Our intermediate scrutiny test under the Second Amendment requires that (1) the government's stated objective ... be significant, substantial, or important; and (2) there ... be a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139). Under the second prong "intermediate scrutiny does not require the least restrictive means of furthering a given end." *Id.* at 827 (quoting *Jackson*, 746 F.3d at 969).

#### vi. four important California interests

[20] [21]In this case, the Attorney General identifies four State interests. Each is important. The four articulated State interests are: (1) protecting citizens from gun violence; (2) protecting law enforcement from gun violence; (3) protecting the public safety (which is similar to protecting citizens and law enforcement from gun violence); and (4) preventing crime. *See* Oppo. at 9; 17–18. The question then becomes, whether the dispossession and criminalization components of § 32310's ban on firearm magazines holding any more than 10 rounds is a reasonable fit for achieving these important goals. For intermediate scrutiny "the burden of justification is demanding and it rests entirely on the State." *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F.3d 678, 694 (6th Cir. 2016) (quoting *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (considering the constitutionality of 18 U.S.C. § 922(g)(4)'s permanent gun ban for person previously treated for mental illness).

**\*1121** This Court finds on the preliminary evidentiary record before it that the dispossession and criminalization component of § 32310 (c) & (d) *is not a reasonable fit.* It may well be that on a more robust evidentiary showing, made after greater time and testimony is taken, that the

State will be able to establish a reasonable fit. But not yet. The Attorney General asserts that empirical evidence is not required. Oppo. at 19. He asserts that the substantial evidence demonstrating a reasonable fit can take other softer forms such as "history, consensus, and simple common sense," as well as "correlation evidence" and even simply "intuition." Oppo. at 19–20. But if this "evidence" were sufficient, all firearm restrictions except an outright ban on all firearms would survive review.

[22]Yet, as the Second Circuit cautioned, "on intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show '*reasonable* inferences based on *substantial* evidence' that the statutes are substantially related to the governmental interest." *NYSR & PA*, 804 F.3d at 264 (citations omitted) (emphasis in original) (striking down New York State's 7–round magazine limit). This Court declines to rely on anything beyond hard facts and reasonable inferences drawn from convincing analysis, which amounts to substantial evidence based on relevant and accurate data sets, when considering whether to maintain the *status quo* or permit a state experiment that will irrevocably harm law-abiding responsible magazine-owning citizens.

#### d. The State's evidence

The State's preliminary theoretical and empirical evidence is inconclusive. In fact, it would be reasonable to infer, based on the State's evidence, that a right to possess magazines that hold more than 10 rounds may *promote* self-defense—especially in the home—and would be ordinarily useful for a citizen's militia use. California must provide more than a rational basis to justify its sweeping ban on mere possession. *See e.g., Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban [on carrying guns in public] is justified by an increase in public safety. It has failed to meet this burden.").

[23]So what is the evidence? The Attorney General has provided expert declarations and 3,100 pages of exhibits.[8] Much of the evidence submitted is dated. Approximately 75% of the exhibits the Attorney General has submitted are older than 2013. The documents that are more recent include various surveys of shooting incidents, news articles, position pieces, and firearm descriptions. The amalgamation of exhibits often seems irrelevant. For

example, Exhibit 37 is a smorgasbord of news articles about guns. Among the offerings is a piece about thirteen separate incidents in Australia going back to 1867 in which there are no mentions of large capacity magazines. Oppo. Gordon Declaration Exh. 37, at 101–04. At Exhibit 37, page 151–52, one finds a news piece about a 17–year–old incident in Brazil involving a submachine gun. News about events in Paris, France and Shfaram, Israel fill pages 162–165 and 175–177, while page 195 tells of a shooter in 2010 using a revolver, and page 132 recounts a shooter using two revolvers.

Another exhibit, the Attorney General's Exhibit 50, appears to be a 100–page, 8–point type, 35–year survey of shooting incidents **\*1122** published by Mother Jones magazine. Oppo. Gordon Declaration at Exh. 50. Mother Jones magazine has rarely been mentioned by any court as reliable evidence. It is fair to say that the magazine survey lacks some of the earmarks of a scientifically designed and unbiased collection of data. In another example, Attorney General's Exhibit 30 includes an article from Mother Jones Magazine with a headline, " 'A Killing Machine': Half of All Mass Shooters Used High–Capacity Magazines." Oppo. Gordon Declaration at Exh. 30. Yet, as will be discussed below, the survey found at Attorney General's Exhibit 59 describes in detail only six incidents out of 92 where a mass shooter used a high capacity magazine. Attorney General's Exhibit 14 contains an expert declaration from Christopher Koper that relies, *inter alia*, on Exhibit 30. The expert concedes that "[A]ssessing trends in LCM [large capacity magazine] use is much more difficult because *there was, and is, no national data source on crimes with LCMs*, and few local jurisdictions maintain this sort of information." Oppo. Gordon Declaration at Exh. 14, n.7 & ¶ 47. Further illustrating the lack of hard data underlying the muddled evidence, Koper then attaches his own published report in support of his Exhibit 14 declaration. Titled "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003," Koper summarizes his findings. He states, "it is not clear how often the ability to fire more than 10 shots without reloading (the current magazine capacity limit) affects the outcomes of gun attacks. All of this suggests that the ban's impact on gun violence is likely to be small." *Id.* at Exhibit "C," ¶ 3.3.

### i. The Mayors Against Illegal Guns survey

Another example of California's evidence is a survey of

mass shooting incidents found in the Attorney General's Exhibit 59. Oppo. Gordon Declaration at Exh. 59. The Attorney General relies specifically on Exhibit 59 in its brief. Oppo. at 11–12. Yet, Exhibit 59 tends to prove the opposite of a justification for § 32310 (c) & (d), *i.e.*, it tends to prove there is no need to dispossess and criminalize law-abiding responsible citizens currently possessing magazines holding more than 10 rounds.

Exhibit 59 is a shorter survey of mass shooting incidents that occurred between January 2009 and September 2013. The survey was produced by Mayors Against Illegal Guns.[9] Although the survey describes little about the protocols used to select its data, it does describe in helpful detail 92 mass shooting incidents (where a mass shooting is defined using the FBI's definition of an incident where four or more people were killed with a gun). The survey describes itself as relying on FBI reports and media reports. Though the study is not ideal, because gun violence is a deadly serious issue, some empirical data needs to be carefully reviewed for purposes of the motion for preliminary injunction.

Thus, to test the claims made by the Attorney General against a set of data he himself offers in support of his justification of § 32310 (c) & (d), the Court has reviewed closely the 92 incidents described in Ex 59.[10] Exhibit 59, like the rest of the **\*1123** Attorney General's anthology of evidence, does not demonstrate that the ban on possession of magazines holding any more than 10 rounds is a reasonable fit, at least at this preliminary stage of the proceedings.

Intermediate scrutiny requires the State to demonstrate a reasonable fit. A reasonable fit cannot be just any fit. This is not simply a policy decision by the State. This affects a Constitutionally protected right. The State may experiment. The State need not create a tight fit. The State need not choose the least restrictive means to achieve its important goals. But the means must provide a reasonable fit. The Attorney General claims that magazines holding any more than 10 rounds may be useful and appropriate in the military context, but they pose a distinct threat to safety in private settings as well as places of assembly. The Attorney General asserts that the "military-style features of LCMs make them particularly attractive to mass shooters and other criminals and pose heightened risks to innocent civilians and law enforcement." Oppo. at 11. He asserts that "LCMs are used disproportionately in mass killings and in murders of police." Oppo. at 11. The Mayors Against Illegal Guns survey (hereinafter "Mayors' survey") belies these assertions. Oppo. Gordon Declaration, Exh. 59.

AR004969

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

### (a) of 92 cases, only 10 are from California

What does the Mayors' survey teach about the fit of California's statute? First, it is noted that 82 of the 92 cases are from jurisdictions beyond California. Only ten of the 92 mass shootings in the survey took place in California. These ten incidents prove very little about whether § 32310 (c) & (d) provide a reasonable fit— or means—of achieving the State's four public safety goals.

### (b) the 10 California cases examined

In three of the ten California incidents, the firearm is unknown and the magazine type, if any, is unknown. (# 52 Willowbrook (2/11/11), # 65 Los Angeles (4/3/10), # 92 Wilmington (1/27/09)).[11] In a fourth incident, a revolver was used. (# 18 Tule River Reservation (12/8/12)). Revolvers, of course, do not use magazines at all. In a fifth incident, a pistol was used but no mention is made of a magazine holding any more than 10 rounds. (# 20 Northridge (12/2/12)). In a sixth incident, a pistol was used with four (legal) 10–round magazines. (# 31 Oakland (4/2/12)). This, of course, tends to prove the statute would not have the desired effect. In two more incidents, the pistols used were purchased legally in California. (# 40 Seal Beach (10/12/11); # 84 Santa Clara (3/29/09)).   These would have been sold with California-legal 10–round magazines. No mention is made of larger magazines being used. If that was the case, then again the data tends to prove that the statute would have no good effect.

### (c) no effect in eight cases

In other words, only ten of 92 mass shootings occurred in California and § 32310 (c) & (d) would have had no effect on eight of those ten. The criminalization of possession of magazines holding more than 10 rounds would have had no effect on mass killings by revolver. It would have had no effect on pistols bought legally in California because they are sold with 10–round

magazines. It would have had no effect on shootings where magazines holding *1124 any more than 10 rounds were not used.

### (d) a closer look at the two magazine cases

Of the 92 mass shootings recorded in the Mayors' survey, only two occurred in California *and* involved the use of illegal magazines. (# 7 Santa Monica (6/7/13) and # 85 Oakland (3/21/09)). In the Santa Monica incident, the shooter brought multiple firearms, as happens to be the case in almost all "mass shootings." He brought an AR–15, a revolver, and 3 zip guns. He reportedly possessed forty 30–round magazines. He killed five victims. The survey notes that the AR–15 and the illegal magazines may have been illegally imported from *outside* of California. Receiving and importing magazines holding any more than 10 rounds was already unlawful under California law at the time of the Santa Monica tragedy. In that instance, criminalizing possession of magazines holding any more than 10 rounds likely would not have provided additional protection from gun violence for citizens or police officers or prevented the crime.

In the remaining incident, a shooter in Oakland, California also brought multiple guns. He used an SKS assault-type rifle with a magazine holding more than 10 rounds and a pistol. He killed four policemen. He killed the first two policemen with the pistol when officers stopped his car in a traffic stop. He then fled on foot to an apartment. Two more officers were killed with the assault rifle and an illegal large capacity magazine and a third was wounded. The murderer had a lengthy criminal history, according to the Mayors' survey. At the time of the mass shooting, the killer *was on parole for assault with a deadly weapon.* As such, he was *already prohibited from possessing* any kind of gun. As in the Santa Monica example, criminalizing possession of magazines holding any more than 10 rounds likely would not have provided additional protection from gun violence for citizens and police officers or prevented crime in the Oakland example.

### (e) conclusions from California cases

To sum up, of the 92 mass killings occurring across the 50

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR004970

states between 2013 and 2009, only ten occurred in California. Of those ten, the criminalization and dispossession requirements of § 32310 would have had no effect on eight of the shootings, and only marginal good effects had it been in effect at the time of the remaining two shootings. On this evidence, § 32310 is not a reasonable fit. It hardly fits at all. It appears on this record to be a haphazard solution likely to have no effect on an exceedingly rare problem, while at the same time burdening the constitutional rights of other California law-abiding responsible citizen-owners of gun magazines holding more than 10 rounds.

### (f) no effect on revolvers

The evidence surveying the other 82 mass shooting incidents (which occurred outside of California) also suggests § 32310 makes for an uncomfortably poor fit. For example, as noted earlier, some mass shootings involve only *revolvers*—a style for which there are no magazines. (# 18 Tule River Reservation, Cal. (12/8/12) 5 dead, # 29 Port St. John, Fla. (5/15/12) 4 dead; # 37 Bay City, Tex. (11/30/11) 4 dead). California's statute will have no effect on these types of mass shootings.

### (g) no effect on shotguns

A number of mass shootings involve a *shotgun* as the weapon of choice. The vast majority of shotguns likewise cannot be equipped with a magazine holding more than 10 rounds. (# 1 Washington, D.C., Navy Yard (9/16/13) 12 dead; # 11 Manchester, Ill. (4/24/13) 5 dead; # 12 Federal Way, Wash. (4/21/13) 4 dead; # 14 Herkimer, N.Y. (4/13/13) 4 dead; # 30 Gilbert, *1125 Ariz. (5/2/12) shotgun & 2 pistols & 6 hand-grenades, 4 dead; # 46 Wagener, S.C. (7/3/11) 4 dead; # 51 Oak Harbor, Ohio (4/16/11) shotgun & .22 rifle, 4 dead; # 57 Jackson, Ky. (9/10/10) 5 dead; # 64 Chicago, Ill. (4/14/10) 5 dead; # 69 Bellville, Tex. (1/16/10) shotgun & handgun 5 dead; # 83 Carthage, N.C. (3/29/09) shotgun & handgun, 8 dead). California's statute will have little or no effect on these types of mass shootings.

### (h) no effect on handguns without large capacity magazines

A large number of mass shooting incidents (40 of 92) were the result of shooters using only *pistols or handguns* for which there is no indication in the Mayors' survey that a magazine holding any more than 10 rounds was employed. (# 2 Crab Orchard, Tenn. (9/11/13); # 3 Oklahoma City, Okla. (8/14/13); # 4 Dallas, Tex. (8/7/13); # 5 Clarksburg, W.V. (7/26/13) (original assailants pointed gun at victim who wrested away the handgun he used to kill the assailants and 2 others); # 6 Hialeah, Fla. (7/16/13); # 8 Fernley, Nev. (5/13/13); # 16 Tulsa, Okla. (1/7/13); # 20 Northridge, Cal. (12/2/12); # 22 Minneapolis, Minn. (9/27/12); # 27 Seattle, Wash. (5/20/12); # 31 Oakland, Cal. (4/2/12); # 32 Norcross, Ga. (2/20/12); # 33 Villa Park, Ill. (1/17/12); # 34 Grapevine, Tex. (12/25/11); # 35 Emington, Ill. (12/16/11); # 38 Greensboro, N.C. (11/20/11); # 39 Liberty, S.C. (10/14/11); # 40 Seal Beach, Cal. (10/12/11); # 41 Laurel, Ind. (9/26/11); # 45 Wheatland, Wyo. (7/30/11); # 47 Grand Prairie, Tex. (6/23/11); # 48 Medford, N.Y. (6/9/11); # 50 Ammon, Id. (5/11/11); # 53 Minot, N.D. (1/28/11); # 55 Boston, Mass. (9/28/10); # 56 Riviera Beach, Fla. (9/27/10); # 62 Manchester, Conn. (8/3/10); # 63 Hialeah, Fla. (6/6/10); # 65 Los Angeles, Cal. (4/3/10); # 67 New Orleans, La. (3/26/10); # 70 Madison, Wis. (12/3/09); # 71 Lakewood, Wash. (11/29/09) (hand gun of slain police officer used to kill other officers); # 73 Jupiter, Fla. (11/26/09); # 74 Pearcy, Ark. (11/12/09); # 75 Oklahoma City, Okla. (11/9/09); # 79 Kansas City, Kan. (6/22/09) (2 guns stolen from a police sgt.); # 80 Middletown, Md. (4/19/09); # 84 Santa Clara, Cal. (3/29/09); # 87 Miami, Fla. (3/15/09); # 90 Cleveland, Ohio (3/5/09); # 91 Brockport, N.Y. (2/14/09)). California's statute will have no effect on these types of mass shootings.

### (i) no effects on unknowns and oddities

For 20 of the remaining 92 recorded incidents, the weapon and ammunition used was simply "*unknown*." A few incidents were oddities not easily categorized and not involving a magazine holding any more than 10 rounds. In # 4 Dallas, Tex. (8/7/13), the shooter used a handgun and detonated a bomb. New Town, N.D. (# 21) (11/18/12) involved a hunting rifle. Oakland, Cal. (# 31) (4/2/12) involved a pistol and four 10–round magazines which are lawful in every state. Monongalia, W.V. (# 42) (9/6/11) involved a .30–.30 rifle. Carson City, Nev. (# 43) (9/6/11)

involved an already-illegal machine gun. Appomattox, Va. (# 68) (1/19/10) involved a rifle used to shoot at responding police officers. California's statute will have no effect on these types of mass shootings.

### (j) conclusions from 80 of 92 cases

Having examined the facts as reported by the Mayor's survey for all of the mass shooting incidents from around the United States over the fairly recent five-year period, it appears that the vast majority of events are identified as not involving either assault-type rifles or large capacity magazines. To reduce or eliminate such incidents requires some means other than § 32310's dispossession and criminalization approach. The § 32310 approach would have had little or no discernable good effect towards reaching California's four important safety objectives.

### *1126 (k) six assault rifle cases with no large capacity magazines

The twelve remaining incidents involved either assault-type rifles or magazines holding more than 10 rounds. These deserve a closer look. In six cases an *assault-type rifle* was used but there is no data identifying large capacity magazine use. In Albuquerque, N.M. (# 15) (1/19/13) the shooter used four guns: two shotguns, a .22 rifle, and an AR–15. In Wagener, S.C. (# 46) (7/3/11), although the shooter owned an AK–47, revolvers and pistols, he chose to use only a shotgun. Put another way, given the choice between using an assault rifle or pistols with large capacity magazines, this mass shooter selected a shotgun as his weapon of choice. In Washington, D.C. (# 66) (3/30/10) there were three gunmen who among them used two pistols and one AK–47. In Osage, Kan. (# 72) (11/28/09) an "assault rifle" was the weapon. Likewise, in Mount Airy, N.C. (# 77) (11/1/09) an "assault rifle" was used. While in Geneva County, Ala. (# 89) (3/10/09) the shooter used three weapons: an AR–15, an SKS, and a .38 pistol. The survey does not mention large capacity magazines being used in any of these six incidents.

### (l) remaining 6 cases involve large capacity magazines

The final group of incidents do involve use of magazines holding more than 10 rounds. Of the 92 mass shooting incidents over the five years from 2009 to 2013, although millions of magazines holding more than 10 rounds are owned by citizens nationwide, according to the Mayors' survey, *only six incidents* involved a magazine holding more than 10 rounds. Two incidents involved a pistol and a magazine holding more than 10 rounds. Four incidents involved an assault rifle or other weapon and a magazine holding more than 10 rounds.

As noted earlier, the Santa Monica, California incident (# 7) on June 7, 2013 involved a shooter with an AR–15, a revolver, and three "zip guns." The shooter carried forty 30–round magazines (probably for use with the AR–15). The AR–15 had no serial number. The shooter was 23–years–old, suggesting that the large capacity magazines he possessed he obtained in violation of California law since he was not old enough to have owned such magazines before California criminalized their purchase or importation. As mentioned earlier, the Mayors' survey notes that the "assault rifle, high-capacity magazines, and several components to modify the firearms *may have been shipped from outside California.*" (Emphasis added). It is hard to imagine that the shooter, having already evaded California law to acquire large capacity magazines, would have dispossessed himself of the illegally acquired large capacity magazines if the existing law had included the new Proposition 63 amendments to § 32310.

The next and probably most heinous shooting was the well-publicized Sandy Hook Elementary School shooting in Newtown, Connecticut. (# 17) (12/14/12). The shooter carried a variety of weapons and large capacity magazines. Shortly afterwards, the State of Connecticut made acquisition of large capacity magazines unlawful. However, unlike in California, continued possession of pre-ban magazines remained lawful if declared and the magazines were permitted to be filled to capacity for home protection and shooting range practice. *See* State of Connecticut Department of Emergency Services and Public Protection, Division of State Police, Special Licensing & Firearms Unit: *FAQS REGARDING P.A. 13–3 As Amended by P.A. 13–220* (dated 3/5/14).

The Aurora, Colorado (# 24) (7/20/12) movie theater shooting involved the use of a highly unusual 100–round drum magazine *1127 on an AR–15, along with a shotgun and two pistols. The criminalization of possession of 100–round drum magazines would seem to be a reasonable fit as a means to achieve California's important safety objectives. On the other hand, it may be

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

the type of weapon that would be protected by the Second Amendment for militia use under *Miller*. In any event, California's § 32310 (c) & (d) would not have prevented the shooter from acquiring and using the shotgun and pistols loaded with smaller 10–round magazines.[12]

The next incident is the Tuscon, Arizona shooting (# 54) (1/8/11) in which Chief Judge John Roll, a friend of this Court, was killed. It involved a 33–round magazine for a Glock 19 pistol. Again, a 33–round magazine would seem unusual. But a Glock 19 with its standard magazine would seem to be the quintessential self-defense weapon.

The fifth mass shooting took place in Binghamton, New York (# 82) (4/3/09) where two handguns and a 30–round magazine were used in the killing of 14 victims. The survey reports that 98 rounds were fired in the attack. Since 1994, it has been illegal in New York to purchase a magazine holding more than 10 rounds.

The sixth mass shooting occurred in East Oakland, California (# 85) (3/21/09) and involved a pistol and a SKS assault-style rifle with a high-capacity magazine. As mentioned earlier, the shooting took place during a time when the shooter, who had a criminal history, was *on parole for assault with a deadly weapon.*

### (m) conclusions from the Mayor's survey

Some conclusions can be drawn from the Mayor's survey submitted by the Attorney General. Of the ten mass shooting events that occurred in California, only two involved the use of a magazine holding more than 10 rounds. In view of the large population of California and the five-year time period studied, it appears that the Prop 63 amendments to § 32310 aim to eliminate that which is an incredibly rare danger to public safety. Moreover, based on this preliminary evidentiary record submitted by the Attorney General, § 32310 is a poor fit as a means to eliminate the types of mass shooting events experienced in California. In other words, § 32310 appears to be a poor fit as a means for the State to achieve its four important objectives.

In East Oakland, the shooter had already demonstrated that he was not a law-abiding responsible gun owner. On the contrary, the Mayors' survey notes that "[t]he shooter had a lengthy criminal history, including a conviction for armed battery, which would have [already] prohibited him from possessing a gun." It notes that "he was on parole

for assault with a deadly weapon at the time of the shooting." It also notes that one month before the mass shooting incident in which police officers were targeted, "[t]he shooter took part in a home invasion robbery ... in which a rifle was reported stolen." Criminalizing possession of a magazine holding any more than 10 rounds, as the amendments to § 32310 do, likely would have had no effect on this perpetrator.

The shooter was already prohibited from possessing a gun, by virtue of his criminal history. He was already at risk of arrest simply by possessing a gun. Moreover, he was probably subject to a Fourth Amendment waiver and search at any time by state parole officers, as a result of being on parole for assault with a deadly weapon. It does not take much imagination to guess **\*1128** that, notwithstanding the amendments to § 32310 (c) & (d), the shooter in that case would have continued to illegally possess his illegally acquired large capacity magazines for use with his illegally possessed firearms.

### (n) a slippery slope

What is clear from the preliminary evidence presented is that individuals who intend to engage in mass gun violence typically make plans. They use multiple weapons and come loaded with extra ammunition. They pick the place and the time and do much harm before police can intervene. Persons with violent intentions have used large capacity magazines, machine guns, hand grenades and pipe bombs, notwithstanding laws criminalizing their possession or use. Trying to legislatively outlaw the commonly possessed weapon *de jour* is like wearing flip flops on a slippery slope. A downhill slide is not hard to foresee.

Tragically, when 30–round magazines are banned, attackers will use 15 or 17–round magazines. If magazines holding more than 10 rounds are banned they will use multiple 10–round magazines. If all semi-automatic weapons are banned they will use shotguns and revolvers. All of these scenarios already occur. Because revolvers and handguns are the quintessential home defense weapon protected by the Second Amendment and specifically approved in *Heller*, and because the average defensive gun use involves firing 2.2 rounds (according to the State's experts), states could rationalize a ban on possession of rounds in excess of three per weapon.[13] Criminals intent on violence would then equip themselves with multiple weapons. The State

AR004973

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

could then rationalize a one-weapon-per-individual law. Since "merely" brandishing a firearm is usually effective as a defense to criminal attack (according to the State's experts), it could be argued that a one-revolver-with-one-round-per-individual ban is a reasonable experiment in state police power as a means to protect citizens and law enforcement officers from gun violence.

Statutes disarming law-abiding responsible citizen gun owners reflect an opinion on gun policy. Courts are not free to impose their own policy choices on sovereign states. But as *Heller* explains, the Second Amendment takes certain policy choices and removes them beyond the realm of debate. Disarming California's law-abiding citizenry is not a constitutionally-permissible policy choice.

To the specific point, a mass shooting accomplished with the use of a gun magazine holding more than 10 rounds of ammunition, or any number of rounds, is an exceedingly tragic event. Fortunately, it is also a rare event. Section 32310's ban and criminalization of possession of magazines holding more than 10 rounds is not likely to prevent future mass shootings. And § 32310 (c) & (d) do not provide a reasonable fit to accomplish California's important goal of protecting the public from violent gun crime, as the preliminary data set from the Mayors' survey bears out.

### ii. The State's Expert Declarations

The preliminary expert witness declarations submitted by the Attorney General **\*1129** are likewise unpersuasive. They do not constitute evidence reasonably believed to be relevant to substantiate the State's important interests. *Fyock*, 779 F.3d at 1000 (city may rely on evidence reasonably believed to be relevant). On the contrary, the data offered by the Attorney General is made up of anecdotal accounts, collected by biased entities, upon which educated surmises and tautological observations are framed. A statute criminalizing the mere possession of an integral piece of a constitutionally protected firearm, cannot be justified on the basis of defective data or emotion-driven claims.*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438–39, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) ("This is not to say that a municipality can get away with shoddy data or reasoning.").

### (a) Webster

For example, the Attorney General submits the expert declaration of a professor of health policy and management. *See* Declaration of Daniel W. Webster (filed 6/5/17). Although the expert offers many opinions about the public safety threat posed by magazines holding any more than 10 rounds, he concedes that robust supporting data is missing. "*To date, there are no studies that have examined separately the effects of an assault weapons ban, on the one hand, and a LCM ban, on the other hand....*" *Id.* at ¶ 25 (emphasis added). He then opines that the largest protective effect of these bans comes from restricting magazines holding any more than 10 rounds because "LCMs are used much more frequently than assault weapons." As discussed earlier, however, the Mayor's survey paints a different picture. Without the benefit of unbiased, scientifically collected empirical data, it is unclear upon what evidence Professor Webster is basing his opinions.

The professor also acknowledges, that "*no formal, sophisticated analyses of data on mass shootings in public places by lone shooters for the period 1982–2012 collected by Mother Jones magazine has been performed to my knowledge ....*" *Id.* at ¶ 22 (emphasis added). He grudgingly admits in his declaration that "it is possible that the federal ban on assault weapons and magazines holding more than 10 rounds did contribute to a proportionately small yet meaningful reduction in gun violence, *but available data and statistical models are unable to discern the effect.*" *Id.* at ¶ 21 (emphasis added). Nevertheless, the professor opines that California's 10–round magazine limit "seems prudent." *Id.* at ¶ 26. In fact, he opines that "[i]ndeed, a lower limit could be justified," based on a complete absence of reliable studies done on formal data sets. *Id.*

### (b) Allen

In another example, the Attorney General submits the declaration of an economist who, like the professor of public health, also acknowledges the shoddy state of empirical research on large capacity magazine use. *See* Declaration of Lucy P. Allen (filed 6/5/17). She found two comprehensive sources detailing mass shootings: (1)

AR004974

data from Mother Jones' investigation published by Mother Jones magazine covering mass shootings from 1982–2017; and (2) a study by the Citizens Crime Commission of New York City covering 1984–2012. *Id.* at ¶ 11. She admits that between the two sources, "[f]or many of the mass shootings, the data does not indicate whether a large-capacity magazine is used." *Id.* at ¶ 13 and n.9. In opining about the use of firearms in self-defense, the economist relies on a data set from the NRA Institute for Legislative Action, but admits that "it is not compiled scientifically." *Id.* at ¶ 6.

### (c) Donahue

In yet another example, the Attorney General submits the declaration of a professor with graduate degrees in economics **\*1130** (from Yale) and law (from Harvard University). *See* Declaration of John J. Donahue (filed 6/5/17). Professor Donahue also notes the dearth of solid data, conceding, "*I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs ... or for the number of LCMs in private hands in America.*" *Id.* at ¶ 19 (emphasis added). Citing a few news articles and little more, he opines that, "a review of the resolution of mass shootings in the U.S. suggests that bans on large capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition." *Id.* at ¶ 21.

Ironically, Professor Donahue's declaration was signed, and the preliminary injunction hearing in this case was held, one day before the shooting incident at the baseball field in Alexandria, Virginia. There, a shooter targeted members of a Congressional baseball team firing up to 100 rounds. No one tried to tackle or disarm the shooter while he paused to reload. Instead, it ultimately took two Capitol Police members who were already at the scene to stop the shooter. As Michigan Representative Mike Bishop told CBS News Detroit at the scene,

> "The only reason why any of us walked out of this thing, by the grace of God, one of the folks here had a weapon to fire back and give us a moment to find cover. We were inside the backstop and if we didn't have that cover by a brave person who stood up and took a shot themselves, we would not have gotten out of there and every one of us would have been hit—every single one of us."

*See* http://detroit.cbslocal.com/2017/06/14/michigan-represent ative-ok; http://dailymail.co.uk/news/article-4603404. Likewise, the shooting at Fort Hood, Texas, involved a shooter using a FN "Five-seveN" pistol which comes standard with a 10 or 20 round magazine. The shooter fired some 220 rounds, meaning he would have had to stop and re-load a 20–round high capacity magazine ten times. Yet no one, even on a military base, tried to tackle or disarm the shooter while he paused to reload.

The expert witness also belittles the possibility of an elderly or disabled homeowner needing a firearm for self-defense from a violent home invasion that would hold enough rounds such that reloading was not necessary. The elderly or disabled homeowner suffering a violent home invasion attack may need (more than anyone else) a larger capacity magazine for home protection. That person, the expert decries as "mythical," and "conjured" up by NRA experts, and dismisses as irrelevant. *Id.* at ¶ 28.

Professor Donahue then speculates about how *if* there were a "future case" of a law-abiding citizen who needs a gun for self-defense and needs more than 10 rounds, that citizen "can either re-load the defensive weapon by inserting a new clip or by using a second weapon." *Id.* at ¶ 36. Based upon his own speculation, he then opines that this implies the large capacity magazine ban is "well-tailored" and likely to have little or no impact on self-defense capability. *Id.*

The professor did not need to speculate about some unlikely, hypothetical, future case. The scenario has actually played out in the past. And it turns out that his speculation was a bit off. Among the Attorney General's evidentiary presentation is a news account of a law-abiding woman and her husband who late one night needed to fire a gun in self-defense against armed robbers. Oppo. Gordon Declaration, Exh. 41.

As two armed men broke in, Susan Gonzalez was shot in the chest. She made it back to their bedroom and found her husband's **\*1131** .22 pistol. Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker. Unfortunately, out of ammunition, she was shot again by the other armed attacker. She was not able to re-load or use a second gun. Both her and her husband were shot twice. Forty-two bullets were fired. *Id.,* Exh. 41 (Jacksonville Times–Union, July 18, 2000) ("Suddenly the door flew open and two masked men burst into the doublewide wearing gloves and camouflage jackets and waving guns.... She was shot in the chest ... dialed 911 ... then grabbed her husband's Ruger .22 from a drawer ... fired several shots over the robbers' heads to scare them

AR004975

off ... saw one of the gunmen ... crouched near her refrigerator ... sneaked up behind him and emptied the Ruger, hitting him twice with her seven or eight remaining bullets. The other gunman ... then shot Susan Gonzalez, now out of ammunition. [The gunman] fled from the house but returned ... [.] He put a gun to Susan Gonzalez's head and demanded the keys to the couple's truck."); *cf.* Oppo. Gordon Declaration, Exh. 102 at 388 (Washington Post, Jan. 30, 2013, Transcript of Senate Judiciary Committee Hearing on Gun Violence), Senator L. Graham remarks: "I do not know if 10 versus 19 is common or uncommon. I do know that 10 versus 19 in the hands of the wrong person is a complete disaster. I do know that six bullets in that hands [sic] of a woman trying to defend her children may not be enough ... [.] One bullet in the hands of the wrong person we should all try to prevent. But when you start telling me that I am unreasonable for wanting that woman to have more than six bullets, or to have an AR–15 if people [are] roaming around my neighborhood, I reject the concept."). The Attorney General's own evidence casts doubt on the reliability of his experts' opinions.

### (d) James

The Attorney General submits the declaration of a retired police chief of Emeryville, California. *See* Declaration of Ken James (filed 6/5/17). James relies on his police experience and debriefings of several high profile mass shootings. He says that the existence of high capacity magazines only serves to enhance the killing and injuring potential of a firearm. *Id.* at ¶ 6. No quarrel there. Firearms have the potential to injure and kill.[14] He then opines that "possession and use of high capacity magazines by individuals committing criminal acts pose a significant threat to law enforcement personnel and the general public." No doubt about that. He does not, however, try to explain why forcing law-abiding individuals to disarm and dispossess themselves of magazines holding more than 10–rounds is the solution. He simply suggests that victims have not used them in the past and so they do not need them now. *Id.* at ¶ 8. It is hardly surprising, however, that law-abiding citizens in California, who have been prohibited for years from buying guns with magazines holding more than 10 rounds, would fire no more than 10 rounds in a self-defense situation.

James also describes one professional investigation experience in which he took part. Whatever else James

draws from the experience, his experience suggests that a criminal firing 40 rounds does not always result in a mass shooting disaster or wounded bystanders. He describes an Emeryville drive-by shooting where more than 40 shell casings were found at the scene; only one person was killed and no other person was injured. *Id.* at ¶ 7. Having read and viewed news accounts of self-defense gun use, James then says, "I have performed these reviews to discover evidence that the ability of a victim to fire a large number was necessary." *Id.* at ¶ 8. Perhaps **\*1132** he meant to say the opposite. Lastly, James' declaration relies on a position paper that appears to have been inadvertently omitted.

### (e) City of Sunnyvale

In the *Fyock* case, the court had a sufficiently convincing evidentiary record of a reasonable fit. But there are important differences between the City of Sunnyvale and the entire State of California. Sunnyvale is the crown jewel of California's Silicon Valley. It has a population density of approximately 6,173 persons per square mile, according to the 2010 census. Sunnyvale has consistently ranked among the ten safest cities (of similar size) according to the FBI's crime reports. According to a Wikipedia article, "Sunnyvale is one of the few U.S. cities to have a single unified Department of Public Safety, where all personnel are trained as firefighters, police officers, and EMTs, so they can respond to an emergency in any of the three roles." In a dense population municipality where the local government has uniquely cross-trained emergency personnel that can quickly respond to crime, perhaps a law-abiding citizen can make do with a maximum of ten rounds for self-defense. And perhaps there is a higher risk of stray bullets penetrating walls and wounding bystanders. And perhaps there are few elderly or disabled single adults living alone and far from help in Sunnydale. Perhaps residents are wealthy enough to purchase multiple firearms or live in gated, security-guarded enclaves.

Compare this with Imperial County, California, with a population approximately the same as the City of Sunnyvale. There the population density is only 34 persons per square mile. In Alpine County, California, the entire county population is 1,175 people, according to the 2010 census. Population density is two persons per square mile. Law enforcement response times are no doubt longer there. The risk of stray bullets wounding bystanders is probably low. It is likely that many rely on

AR004976

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

themselves and their lawfully-owned firearms for self-defense. Certainly in suburban and rural settings, there will be occasions when more than 10–rounds are needed for self-defense. Even in San Francisco, with the densest population area in the State (17,858 people per square mile[15]), one court conceded that more than 10 rounds may be needed for defense from criminals. *See San Francisco Police Officers Ass'n v. City and County of S.F.*, 18 F.Supp.3d 997, 1005 (N.D. Cal. 2014) ("Although there will be some occasions when a law-abiding citizen needs more than ten rounds to defend himself or his family, the record shows that such occasions are rare. This will be even rarer in a dense urban area like San Francisco where police will likely be alerted at the onset of gunfire and come to the aid of the victim. Nonetheless, in those rare cases, to deprive the citizen of more than ten shots may lead to his of her own death. Let this point be conceded.").

### iii. False Dichotomy

In the end, it is a false dichotomy upon which the Attorney General rests his evidentiary case. The Attorney General argues that any magazine in criminal hands with more than 10 rounds is "unusually dangerous" to law-abiding citizens. ("Unusually dangerous" is not the same as the Second Amendment reference point of "unusual and dangerous.") At the same time he (and his experts) declare that no good law-abiding citizen really *needs* a gun magazine holding more than 10 rounds for self-defense.

As a purely public policy choice, a government may declare that firearms of any **\*1133** capacity are dangerous in the hands of criminals, a proposition with which this Court would certainly agree. At the same time, it can also be the case that firearms with larger than 10–rounds magazines in the hands of law-abiding citizens makes every individual safer and the public as a whole safer. Guns in the hands of criminals are dangerous; guns in the hands of law-abiding responsible citizens ameliorate that danger. The Second Amendment takes the policy choice away from state government. To give full life to the core right of self-defense of the home, every law-abiding responsible United States citizen has a constitutionally-protected right to keep and bear a handgun (a handgun being the quintessential weapon of choice). Pistols are handguns. Pistols are designed to use magazines of various capacities and some of the most popular come standard with 15 or 17 round magazines.

[24]Using the resources of the criminal justice system against the law-abiding responsible citizen to wrest a heretofore lawfully-possessed magazine holding any more than 10 rounds out of his or her hands, is hardly the reasonable fit required by intermediate scrutiny. The "evidence must fairly support" the "rationale" for the state's statute. *Jackson*, 746 F.3d at 969–70. "[A]nd courts should not credit facially implausible legislative findings." *Id.*

### iv. Ballot Initiative Finding

Here, there are no legislative findings as the statutory provisions in effect are the product of a voter initiative. The initiative contains findings. But to the extent the findings are relevant, they expresses a purpose that affronts the over-arching ideal of the Second Amendment. Sections 2.11 and 2.12 of Proposition 63, in the section titled "Findings and Declarations" addresses "military-style large-capacity ammunition magazines." It declares, "*No one except trained law enforcement should be able to possess these dangerous magazines*." (Emphasis added.)

The rationale is anathema to the United States Constitution's Bill of Rights guarantee of a right to keep and bear arms. It is a right naturally possessed by regular, law-abiding responsible citizens, whom are neither reliant upon, nor subservient to, a privileged, powerful, professional police state.[16]

**\*1134** A reasonable fit as a means to protect citizens and law enforcement from gun violence and crime, in a state with numerous military bases and service men and service women, would surely permit the honorably discharged member of the Armed Forces who has lawfully maintained a magazine holding more than 10 rounds for more than twenty years to continue to keep and use his magazine. These citizens are perhaps the best among us. They have volunteered to serve and have served and sacrificed to protect our country. They have been specially trained to expertly use firearms in a conflict. Oppo. Gordon Declaration, Exh. 102 at 389 (Washington Post, Jan. 30, 2013, Transcript of Senate Judiciary Committee Hearing on Gun Violence), Senator J. Johnson remarks: "It is my understanding talking with my associates in the military, that public policing mirrors much of what the military does." They have proven their good citizenship by years of lawfully keeping firearms as

AR004977

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

civilians. What possibly better citizen candidates to protect the public against violent gun-toting criminals?

Similarly, a reasonable fit as a means to protect citizens and law enforcement from gun violence and crime, would surely make an exception for a Department of Justice-vetted, privately trained citizen to whom the sheriff has granted a permit to carry a concealed weapon, and whom owns a magazine holding more than 10 rounds. California's statute does not except such proven, law-abiding, trustworthy, gun-owning individuals. Quite the opposite. Under the statute, if not enjoined, all of these worthy individuals will become outlaws on July 1, 2017, should they not dispossess themselves of magazines holding 10+ rounds they currently own.[17]

The Attorney General articulates four important objectives to justify this new statutory bludgeon. They all swing at reducing "gun violence." The bludgeon swings to knock large capacity magazines out of the hands of criminals. If the bludgeon does not work, then the criminals still clinging to their large capacity magazines will be thrown in jail while the magazines are destroyed as a public nuisance. The problem is the bludgeon indiscriminately **\*1135** hammers all that is in its path. Here, it also hammers magazines out of the hands of long time law-abiding citizens. It hammers the 15–round magazine as well as the 100–round drum. And it throws the law-abiding, self-defending citizen who continues to possess a magazine able to hold more than 10 rounds into the same jail cell as the criminal. Gun violence to carry out crime is horrendous and should be condemned by all. Defensive gun violence may be the only way a law-abiding citizen can avoid becoming a victim.

Put differently, violent gun use is a constitutionally-protected means for law-abiding citizens to protect themselves from criminals. The phrase "gun violence" may not be invoked as a talismanic incantation to justify any exercise of state power. Implicit in the concept of public safety is the right of law-abiding people to use firearms and the magazines that make them work to protect themselves, their families, their homes, and their state against all armed enemies, foreign and domestic. To borrow a phrase, it would indeed be ironic if, in the name of public safety and reducing gun violence, statutes were permitted to subvert the public's Second Amendment rights—which may repel criminal gun violence and which ultimately ensure the safety of the Republic. *Cf. United States v. Robel*, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ("Implicit in the term 'national defense' is the notion of defending the values and ideals which set this Nation apart.... It would indeed be ironic if, in the name of national defense, we would sanction the

subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile.").

## 2. Irreparable Harm

[25]  [26]  [27]There are elements of Second Amendment jurisprudence that have First Amendment analogies. *See Jackson*, 746 F.3d at 960. The Ninth Circuit has held that the " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). A "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal quotation marks omitted). "If the underlying constitutional question is close ... we should uphold the injunction and remand for trial on the merits." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664–65, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). The same is true for Second Amendment rights. Their loss constitutes irreparable injury. Perhaps even more so in this context, where additional rounds may save lives, and where Plaintiffs and those like them will irrevocably lose possession and use of their magazines upon delivery to the police to be destroyed, or upon sale to a firearms dealer who will have little market for re-sale, or upon shipment somewhere out of state. The right to keep and bear arms protects tangible and intangible interests which cannot be compensated by damages. *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)). "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace*, 187 F.Supp.3d at 150. Loss of that peace of mind, the physical magazines, and the enjoyment of Second Amendment rights constitutes irreparable injury.

## 3. Balance of Hardships

[28]Balancing in the First Amendment context weighs more heavily the **\*1136** chilled rights of individuals, especially when criminal sanctions loom. "As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some

AR004978

hardship on the State. Nevertheless, the balance of equities favors Appellees, whose First Amendment rights are being chilled. This is especially so because the Act under scrutiny imposes criminal sanctions for failure to comply." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 670–71, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). The same is true here. While a preliminary injunction is pending, there will be some hardship on the State. Nevertheless, because § 32310 (c) & (d) impose criminal sanctions for a failure to act it poses the potential for extraordinary harm on Plaintiffs, while discounting their Second Amendment rights. The balance of hardships favors Plaintiffs.

### 4. Public Interest

[29]"Once an applicant satisfies the first two factors [likelihood of success on the merits and irreparable harm], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009); *U.S. S.E.C. v. Wilde*, 2013 WL 2303761, at *8 (C.D. Cal. May 20, 2013); *Native Songbird Care and Conservation v. LaHood*, 2013 WL 3355657, at *12 (N.D. Cal. July 2, 2013); *Tracy Rifle & Pistol LLC v. Harris*, 118 F.Supp.3d 1182, 1193 (E.D. Cal. 2015).

[30] [31]The public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens. And it is always in the public interest to prevent the violation of a person's constitutional rights. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. ——, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014); *Doe*, 772 F.3d at 583 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)) ("Finally, the public interest favors the exercise of First Amendment rights. Although we appreciate the State's significant interest in protecting its citizens from crime, nothing in the record suggests that enjoining the CASE Act would seriously hamper the State's efforts to investigate online sex offenses, as it can still employ other methods to do so. On the other hand, we 'have consistently recognized the significant public interest in upholding First Amendment principles.' "). The balance

of equities and the public interest merge when a likely constitutionally infringing statute is preliminarily enjoined to maintain the *status quo*. That is the case here.

### B. The Government Takings Claim

[32]The Attorney General asserts that, when the government acts pursuant to its police power to protect the safety, health, and general welfare of the public, a prohibition on possession of property declared to be a public nuisance is not a physical taking. *See* Oppo. at 22, (citing *Chicago, B. & Q. Railway Co. v. Illinois*, 200 U.S. 561, 593–594, 26 S.Ct. 341, 50 L.Ed. 596 (1906) and *Akins v. United States*, 82 Fed.Cl. 619, 622 (2008)). The Attorney General then cites a number of courts that have rejected Takings Clause challenges to laws banning the possession of dangerous weapons. *See* Oppo. at 23 (citing *Akins*, 82 Fed.Cl. at 623–24 (restrictions on manufacture and sale of machine **\*1137** guns not a taking) and *Gun South, Inc. v. Brady*, 877 F.2d 858, 869 (11th Cir. 1989) (temporary suspension on importation of assault weapons not a taking)). California has deemed large capacity magazines to be a nuisance. *See* Cal. Pen. Code § 32390. That designation is dubious. As the Supreme Court recognized a decade before *Heller*, "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.' " *Staples v. United States*, 511 U.S. 600, 610, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (citation omitted).

Plaintiffs remonstrate that defending the law's forced, uncompensated, physical dispossession of magazines holding more than 10 rounds as an exercise of its "police power" is not persuasive. Supreme Court precedent casts doubt on the State's theory that an exercise of the police power cannot constitute physical takings. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Loretto*—a case the Attorney General does not cite—the Supreme Court held that a law requiring physical occupation of private property was both "within the State's police power" *and* an unconstitutional physical taking. The Court explained that whether a law effects a physical taking is "a separate question" from whether the state has the police power to enact the law. *Id.* at 425–26, 102 S.Ct. 3164 ("It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid. We conclude that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve.").

[33]In a similar vein, the Supreme Court holds that a law

enacted pursuant to the state's "police powers to enjoin a property owner from activities akin to public nuisances" is not immune from scrutiny under the regulatory takings doctrine. *Lucas v. South Carolina Coastal Council* 505 U.S. 1003, 1020–27, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The Court reasoned that it was true "*[a] fortiori*" that the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated." *Id.* at 1026, 112 S.Ct. 2886.

Recently, the Supreme Court summarized some of the fundamental principles of takings law. *Murr v. Wisconsin*, —— U.S. ——, 137 S.Ct. 1933, 198 L.Ed.2d 497 (2017). "The Takings Clause of the Fifth Amendment provides that private property shall not be taken for public use, without just compensation. The Clause is made applicable to the States through the Fourteenth Amendment. As this Court has recognized, the plain language of the Takings Clause requires the payment of compensation whenever the government acquires private property for a public purpose, but it does not address in specific terms the imposition of regulatory burdens on private property." *Id.* at 1942 (quotations and citations omitted). *Murr* notes that almost a century ago, the Court held that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* (quoting*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

[34] [35] [36]Takings jurisprudence is flexible. There are however, two guides set out by *Murr* for detecting when government regulation is so burdensome that it constitutes a taking. "First, with certain qualifications a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause. Second, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the **\*1138** claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S.Ct. at 1938 (citations and quotation marks omitted). "[A] physical *appropriation* of property g[ives] rise to a *per se* taking, without regard to other factors." *Horne v. Dep't of Agric.*, —— U.S. ——, 135 S.Ct. 2419, 2427, 192 L.Ed.2d 388 (2015).

The dispossession requirement of § 32310(c) & (d) imposes a rare hybrid taking. Subsection (d)(3) forces owners of large capacity magazines to "surrender" them to a law enforcement agency "for destruction." Thus, (d)(3) forces a *per se* taking requiring just compensation. But there are two other choices. Subsection (d)(2) forces the owner to sell his magazines to a firearms dealer. It is a fair guess that the fair market value of a large capacity magazine on or after July 1, 2017, in the State of California, will be near zero. Of course, the parties spend little time debating the future fair market value for the to-be-relinquished magazines. Subsection (d)(1) forces the owner to "remove" their large capacity magazines "from the state," without specifying a method or supplying a place. This choice obviously requires a place to which the magazines may be lawfully removed. In other words, (d)(1) relies on other states, in contrast to California, which permit importation and ownership of large capacity magazines. With the typical retail cost of a magazine running between $20 and $50, the associated costs of removal and storage and retrieval may render the process more costly than the fair market value (if there is any) of the magazine itself. Whatever stick of ownership is left in the magazine-owner's "bundle of sticks," it is the short stick.

Here, California will deprive Plaintiffs not just of the *use* of their property, but of *possession*, one of the most essential sticks in the bundle of property rights. Of course, a taking of one stick is not necessarily a taking of the whole bundle. *Murr*, 137 S.Ct. at 1952 (Roberts, C.J., dissenting) ("Where an owner possesses a full 'bundle' of property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety."). Nevertheless, whatever expectations people may have regarding property regulations, they "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 135 S.Ct. at 2427. Thus, whatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical *dispossession* of such lawfully-acquired private property without just compensation.

Plaintiffs have demonstrated a likelihood of success on the merits of their governmental takings claim. Without compensation, Plaintiffs will be irreparably harmed as they will no longer be able to retrieve or replace their "large" capacity magazines as long as they reside in California. As the law-abiding owner relinquishes his magazine, he or she may also forfeit the self-defense peace of mind that a large capacity magazine had instilled. As in other cases where constitutional rights are likely chilled, the balance of hardships weighs in the citizen's favor. *Doe*, 772 F.3d at 583 ("As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some hardship on the

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

State.").

The public interest also favors the protection of an individual's core Second Amendment rights and his or her protection from an uncompensated governmental taking that goes too far. Notably, a preliminary **\*1139** injunction will not increase the number of large capacity magazines lawfully present in California. The State may continue to investigate and prosecute the unlawful importation, purchase, sale, manufacturing, etc., of large capacity magazines during the pendency of a preliminary injunction. Regardless of the likelihood of success on Plaintiffs' Second Amendment claims, Plaintiffs are also entitled to a preliminary injunction to maintain the *status quo* and prevent irreparable injury under the Takings Clause of the Constitution.

## IV. CONCLUSION

Every injury or death caused by the misuse of a firearm is a tragedy. That the mentally ill and violent criminals choose to misuse firearms is well known. This latest incremental incursion into solving the "gun violence" problem is a reflexively simple solution. But as H.L. Mencken wrote, "There is always a well-known solution to every human problem—neat, plausible, and wrong."[18]

Magazines holding more than 10 rounds are "arms." California Penal Code Section 32310, as amended by Proposition 63, burdens the core of the Second Amendment by criminalizing the mere possession of these magazines that are commonly held by law-abiding citizens for defense of self, home, and state. The regulation is neither presumptively legal nor longstanding. The statute hits close to the core of the Second Amendment and is more than a slight burden. When the simple test of *Heller* is applied, a test that persons of common intelligence can understand, the statute is adjudged an unconstitutional abridgment. Even under the more forgiving test of intermediate scrutiny, the statute is not likely to be a reasonable fit. It is not a reasonable fit because, among other things, it requires law-abiding concealed carry weapon permit holders and Armed Forces veterans to dispossess themselves of lawfully-owned gun magazines that hold more than 10 rounds—or suffer criminal penalties.

The Court does not lightly enjoin a state statute, even on a preliminary basis. However, just as the Court is mindful that a majority of California voters approved Proposition 63 and that the government has a legitimate interest in protecting the public from gun violence, it is equally mindful that the Constitution is a shield from the tyranny of the majority. Plaintiffs' entitlements to enjoy Second Amendment rights and just compensation are not eliminated simply because they possess "unpopular" magazines holding more than 10 rounds.

If this injunction does not issue, hundreds of thousands, if not millions, of otherwise law-abiding citizens will have an untenable choice: become an outlaw or dispossess one's self of lawfully acquired property. That is a choice they should not have to make. Not on this record.

Accordingly, with good cause appearing for the reasons stated in this opinion, Plaintiffs' motion for a preliminary injunction is GRANTED.

**IT IS HEREBY ORDERED** that:

1. Defendant Attorney General Xavier Becerra, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing California Penal Code sections 32310 (c) & (d), as enacted by Proposition 63, or from otherwise requiring persons to dispossess themselves **\*1140** of magazines able to hold more than 10 rounds lawfully acquired and possessed.

2. Defendant Becerra shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute. The government shall file a declaration establishing proof of such notice.

**IT IS SO ORDERED.**

**All Citations**

265 F.Supp.3d 1106

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

1    The full text of § 32310 as amended by Proposition 63 is as follows:

§ 32310. Prohibition on manufacture, import, sale, gift, loan, purchase, receipt, or possession of large-capacity magazines; punishment

(a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:

(1) Remove the large-capacity magazine from the state;

(2) Sell the large-capacity magazine to a licensed firearms dealer; or

(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

2    *See e.g., People v. Verches*, H041967, slip. op., 2017 WL 1880968, at *1–3 (Cal. Ct. App. May 9, 2017). *Verches* describes the California investigation leading up to a prosecution under the predecessor to § 32310 for *importing a large capacity magazine*:

"On May 21, 2011, a task force of California law enforcement agents, including special agent Bradley Bautista of the California Department of Justice, Bureau of Firearms, surveilled a gun show in Reno, Nevada. Their objective was to identify suspected California residents who entered Nevada to purchase weapons or accessories that would be illegal in California. Agents observed an individual, later identified as Verches, purchase an upper receiver for an assault rifle and three large-capacity automatic rifle magazines capable of holding 30 rounds of ammunition. They also heard Verches ask the vendor if he had a "lower" receiver so he could build an assault rifle. Agent Bautista observed Verches leave the gun show carrying a white plastic bag, which he placed in the rear compartment of a black Mercedes Benz bearing a California license plate. Agent Bautista did not know if the plastic bag contained the items that Verches had purchased. Verches was accompanied by an unidentified man.

Agent Bautista confirmed that the Mercedes was registered to Verches at a residential address in Morgan Hill, California. He observed Verches and the unidentified man drive away in the Mercedes, with Verches in the passenger seat. Agents followed Verches in the Mercedes to various stops around Reno, where Verches exited the vehicle for short periods of time, before eventually arriving at a casino-hotel valet parking lot around 6:33 p.m. Agents twice lost sight of the vehicle during the time they were following it. Agents terminated the surveillance after confirming that Verches was a registered guest at the hotel until May 22, 2011, the next day. However, agents placed an electronic tracking device on the Mercedes. Records from the tracking device show that the Mercedes made 15 stops between leaving the gun show and arriving the next day at Verches's house in Morgan Hill.

Agent Bautista conducted a California Automated Firearms System records check that showed Verches did not have any assault rifles registered in his name. He and another agent also made a positive identification of Verches by comparing his DMV photograph with video taken of Verches's purchase at the gun show. Agent Bautista conducted an automated criminal history check and public database search, and later verified Verches's address with the Morgan Hill Police Department. The address matched the registration address for the Mercedes that agents followed from the gun show. On May 24, 2011, Agent Bautista went to the residence and did not see the Mercedes, but observed Verches exiting the house and leaving in another vehicle that was parked in front and registered in his name. Two days after observing Verches at his house, Agent Bautista obtained a search warrant for unregistered AR–15 type or assault rifles and large-capacity magazines, to be found on Verches's person, in his vehicles, or in his home."

3    "In *Fyock*, we affirmed the district court's denial of a preliminary injunction to enjoin a city ordinance restricting possession of large-capacity magazines.... We concluded that the ordinance would likely survive intermediate scrutiny *because the city presented sufficient evidence* to show that the ordinance was substantially related to the compelling government interest of public safety." *Silvester v. Harris*, 843 F.3d 816, 822 (9th Cir. 2016) (citations omitted) (emphasis added).

AR004982

Duncan v. Becerra, 265 F.Supp.3d 1106 (2017)

4    "In *Heller,* however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, and this Court decades ago abandoned 'the notion that the Fourteenth Amendment applies to the States only a *watered-down,* subjective version of the individual guarantees of the Bill of Rights.' " *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785–86, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (citations omitted) (emphasis added).

5    "Municipal respondents' remaining arguments are at war with our central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. Municipal respondents, in effect, ask us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." *McDonald*, 561 U.S. at 780, 130 S.Ct. 3020.

6    For example, the Supreme Court reminds us that, "[o]ur precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role ... the Government's authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

7    In *Miller*, the weapon was a sawed-off shotgun. Because there was little evidence before the district court that a sawed-off shotgun could be "any part of the ordinary military equipment or that its use could contribute to the common defense," possession of the weapon was not protected by the Second Amendment. *Miller*, 307 U.S. at 178, 59 S.Ct. 816 (citation omitted).

8    Both sides interpose evidentiary objections to various documents. The objections are overruled. For a preliminary injunction, a court may "rely on otherwise inadmissible evidence, including hearsay evidence." *San Francisco Veteran Police Officers Ass'n, v. City and County of S.F.*, 18 F.Supp.3d 997, 1006 (N.D. Cal. 2014) (citations omitted).

9

Mayors Against Illegal Guns is apparently not a pro-gun rights organization. According to Wikipedia, it was formed by Mayor Michael Bloomberg. Mayor John Tkazik of Poughkeepsie, New York, resigned along with fifty others in 2014, explaining that the organization: "under the guise of helping mayors facing a crime and drug epidemic, MAIG intended to promote confiscation of guns from law-abiding citizens." Later in 2014, it merged with another group and became "Everytown For Gun Safety."

10

Due to limited time and judicial resources, Ex 59 will be the empirical data set relied on by the Court to determine reasonable fit. Other surveys may cover larger time periods and different parameters. Experts relied on by both parties criticize the reliability and inclusivity of all the available data sets.

11

The Court has assigned numbers to the list of incidents in the Mayors' survey for ease of reference.

12

The Colorado incident is the only case where a truly high capacity 100–round magazine was used.

13

In drawing lines and defining how a regulation "fits," this is not so far-fetched. Indeed, in the past New York State drew the line at seven live rounds arguing that since the average citizen expends only two rounds in self-defense, citizens should make do with seven rounds." *See New York State Rifle and Pistol Ass'n v. Cuomo*, 990 F.Supp.2d 349, 372 (W.D.N.Y. 2013), *aff'd in part and rev'd in part*, 804 F.3d 242 (2nd Cir. 2015) ("Defendants contend, pointing to a study conducted by the NRA, that the average citizen using his or her weapon in self-defense expends only two bullets. Thus, New York argues, citizens do not truly need more than seven rounds.").

14

At the same time, they have the potential to deter and protect.

15

*See* www.sacbee.com/news/politics-government/capitol-alert/article 12486362.html (Mar. 4, 2015).

16

*See e.g., Silveira v. Lockyer*, 328 F.3d 567, 569–70 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing *en banc*) ("[J]udges know the technical fallacies against guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll. But the simple truth—born of experience—is that tyranny thrives best where government need not fear the wrath of an armed people. Our own sorry history bears this out: Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. In Florida, patrols searched blacks' homes for weapons, confiscated those found

AR004983

and punished their owners without judicial process. *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro–Americanist Reconsideration,* 80 Geo. L.J. 309, 338 (1991). In the North, by contrast, blacks exercised their right to bear arms to defend against racial mob violence. *Id.* at 341–42. As Chief Justice Taney well appreciated, the institution of slavery required a class of people who lacked the means to resist. *See Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857) (finding black citizenship unthinkable because it would give blacks the right to "keep and carry arms wherever they went"). A revolt by Nat Turner and a few dozen other armed blacks could be put down without much difficulty; one by four million armed blacks would have meant big trouble.

All too many of the other great tragedies of history—Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few—were perpetrated by armed troops against unarmed populations. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece, as the Militia Act required here. If a few hundred Jewish fighters in the Warsaw Ghetto could hold off the Wehrmacht for almost a month with only a handful of weapons, six million Jews armed with rifles could not so easily have been herded into cattle cars.

My excellent colleagues have forgotten these bitter lessons of history. The prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.

Fortunately, the Framers were wise enough to entrench the right of the people to keep and bear arms within our constitutional structure. The purpose and importance of that right was still fresh in their minds, and they spelled it out clearly so it would not be forgotten.

17      There is some irony in the fact that these CCW holders have abided by the law. In applying for a concealed weapon permit, they disclose, *inter alia*, their name, physical address, date and place of birth, criminal history, traffic violation history, and the particular type and caliber of firearm (including serial number) they intend to carry. *See* Cal. Pen. Code § 26175. In so doing, they provided a ready-made list of gun-owning citizens and a list of the types of guns they carry, which guns are likely to use magazines holding more than 10 rounds.

18      H.L. Mencken, *Prejudices: Second Series*, Alfred A. Knopf, Inc. (1920), p. 158.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

AR004984