263 F.Supp.3d 986
United States District Court, E.D. California.

William WIESE, an individual; Jeermiah Morris,
an individual; Lance Cowley, an individual;
Sherman Macaston, an individual; Adam Richards,
in his capacity as Trustee of the Magazine Ban
Lawsuit Trust; Clifford Flores, individually and
as trustee of the Flores Family Trust; L.Q. Dang,
an individual; Frank Federeau, an individual;
Alan Normandy, an individual; Todd Nielsen, an
individual; The Calguns Foundation; Firearms
Policy Coalition; Firearms Policy Foundation;
and Second Amendment Foundation, Plaintiffs,
v.
Xavier BECERRA, in his official capacity as Attorney
General of California; and Martha Supernor, in her
official capacity as Acting Chief of the Department
of Justice Bureau of Firearms, Defendants.

Civ. No. 2:17–903 WBS KJN
|
Signed 06/29/2017

**Synopsis**
**Background:** Citizens and gun rights organizations brought
action against Attorney General of California and Acting
Chief of Department of Justice Bureau of Firearms, alleging
California's prohibition on possession of large capacity gun
magazines was unconstitutional. Citizens and organizations
filed motion for preliminary injunction.

**Holdings:** The District Court, William B. Shubb, J., held that:

citizens and organizations failed to show likelihood of success
on merits of Second Amendment challenge;

citizens and organizations failed to establish likelihood of
success on merits of Takings Clause challenge;

citizens and organizations failed to establish likelihood of
success on merits of vagueness challenge; and

citizens and organizations failed to establish likelihood of
success on merits of overbreadth challenge.

Motion denied.

**Attorneys and Law Firms**

**\*989** George M. Lee, Douglas Allen Applegate, Seiler
Epstein Ziegler & Applegate LLP, San Francisco, CA,
Raymond Mark Diguiseppe, Law Offices of Raymond Mark
Diguiseppe, Southport, NC, for Plaintiffs.

Alexandra Robert Gordon, CA. Dept. of Justice Office of
the Attorney General, San Francisco, CA, John Darrow
Echeverria, Office of the California Attorney General, Los
Angeles, CA, for Defendants.

MEMORANDUM AND ORDER RE:
MOTION FOR PRELIMINARY INJUNCTION

WILLIAM B. SHUBB, UNITED STATES DISTRICT
JUDGE

Before the court is plaintiffs' Motion for Issuance of
Preliminary Injunction. (Docket No. 28.) The court held a
hearing on the request for a preliminary injunction on June
29, 2017.

I. Factual and Procedural History

This case concerns a challenge to California's prohibition
on the possession of gun magazines that can hold more
than ten bullets, or "large capacity" magazines ("LCM").[1]
Although California had banned the purchase, sale, transfer,
receipt, or manufacture of such magazines since 2000, **\*990**
it did not ban the possession of these magazines. Fyock
v. City of Sunnyvale, 779 F.3d 991, 994 (9th Cir. 2015).
In effect, Californians were allowed to keep large capacity
magazines they had obtained prior to 2000, but no one, with
a few exceptions such as law enforcement officers, has been
allowed to obtain new large capacity magazines since 2000.

[1]    Large capacity magazines are defined under California
       Penal Code § 16740 as any ammunition-feeding device
       with the capacity to accept more than ten rounds.

On July 1, 2016, however, California enacted Senate Bill 1446
("SB 1446"), which amended California Penal Code § 32310,
criminalizing the possession of large capacity magazines
as of July 1, 2017, regardless of when the magazines

were obtained. Then, on November 8, 2016, the California electorate approved Proposition 63, which largely mirrors SB 1446. The amended version of Section 32310 enacted by Proposition 63 requires that anyone possessing a large capacity magazine either remove the magazine from the state, sell the magazine to a licensed firearms dealer, or surrender the magazine to a law enforcement agency for its destruction prior to July 1, 2017. Cal. Penal Code § 32310(d). The amended version of Section 32310 also provides that possession of a large capacity magazine as of July 1, 2017 constitutes an infraction or a misdemeanor punishable by a fine not exceed $100 per large capacity magazine and/or imprisonment in a county jail not to exceed one year. Id. § 32310(c).

On April 28, 2017, plaintiffs filed the instant action alleging that Section 32310 is unconstitutional. After amending their complaint, plaintiffs filed a motion for a temporary restraining order and preliminary injunction on June 12, 2017 and a renewed motion on June 14, 2017. The court denied the request for a temporary restraining order after a hearing on June 16, 2017 based on an insufficient showing of irreparable harm, given plaintiffs' delay in filing suit and the fact that the court would hold a hearing on plaintiffs' request for a preliminary injunction before the large capacity magazine ban took effect on July 1, 2017. (Docket No. 45.) The parties then filed supplemental briefs regarding plaintiffs' request for a preliminary injunction on June 23, 2017.

## II. Discussion

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (citation omitted). In order to obtain a preliminary injunction, the moving party must establish (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); Fyock, 779 F.3d at 995–96.

Plaintiffs contend that California's large capacity magazine ban violates the Second Amendment, is an unconstitutional taking under the Fifth and Fourteenth Amendments, is void for vagueness, and is overbroad. The court proceeds to examine plaintiffs' showing with respect to each claim below.

### A. Second Amendment Challenge

#### 1. Likelihood of Success on the Merits

To evaluate a Second Amendment claim, the court asks whether the challenged law burdens conduct protected by the Second Amendment, and if so, what level of scrutiny should be applied. Fyock, 779 F.3d at 996 (citing United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013)).

**\*991** a. Burden on Conduct
Protected by the Second Amendment

There appears to be no dispute in this case that many people inside and outside of California up to this point have lawfully possessed large capacity magazines for lawful purposes. See Heller v. District of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("Heller II") (finding that magazines holding more than ten rounds were in "common use"). Indeed, there is evidence that large capacity magazines are commonly possessed by law-abiding citizens for lawful purposes and have been legally possessed by many Californians for many years, notwithstanding California's ban on the transfer of such magazines since 2000. (See Curcuruto Decl. ¶¶ 6–8 (citing estimate that 114 million magazines with eleven or more rounds were in consumer possession between 1990 and 2015, just under half of the overall 230 million pistol and rifle magazines owned during that time); Pls.' Request for Judicial Notice, Ex. A (Cal. Dep't of Justice Finding of Emergency at 1) ("There are likely hundreds of thousands of large-capacity magazines in California at this time.... The Department therefore expects many gun owners to be affected by the new ban."); Youngman Decl. ¶ 9 (large capacity magazines are commonly owned by millions of persons in the United States for lawful purposes including target shooting, competition, home defense, collecting, and hunting).)

Thus, notwithstanding California's existing ban on the transfer of large capacity magazines, it appears that California's ban on large capacity magazines burdens conduct protected by the Second Amendment. See Fyock, 779 F.3d at 998 (district court did not clearly err in finding that a regulation on large capacity magazines burdens conduct falling with the scope of the Second Amendment). But see Kolbe v. Hogan, 849 F.3d 114, 135–37 (4th Cir. 2017) (en banc) (large capacity magazines are not protected by the Second Amendment because they are weapons most useful in military service). [2]

2    Because the court holds that California's large capacity magazine ban burdens conduct protected by the Second Amendment because these magazines are commonly possessed by law-abiding citizens for lawful purposes, the court does not examine whether the ban resembles longstanding provisions historically exempted from the Second Amendment. See Fyock, 779 F.3d at 997.

### b. Appropriate Level of Scrutiny

In determining what level of scrutiny applies to the ban on large capacity magazines, the court considers (1) how closely the law comes to the core of the Second Amendment right, which is self-defense, and (2) how severely, if at all, the law burdens that right. Fyock, 779 F.3d at 998–99 (citing Chovan, 735 F.3d at 1138). Intermediate scrutiny is appropriate if the regulation does not implicate the core Second Amendment right or if the regulation does not place a substantial burden on that right. Id. at 998–99 (citing Jackson v. City & County of San Francisco, 746 F.3d 953, 964 (9th Cir. 2014)).

Here, the court finds that intermediate scrutiny is appropriate because "the prohibition of ... large capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." Heller v. District of Columbia, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("Heller II"); Fyock, 779 F.3d at 999 (quoting Heller II). The ban may implicate the core of the Second Amendment because it restricts the ability of law-abiding citizens to possess large capacity magazines within their homes for self-defense. See Fyock, 779 F.3d at 999. However, the ban "does not affect the ability of law-abiding citizens to possess the 'quintessential **992 self-defense weapon'—the handgun. Rather, [it] restricts possession of only a subset of magazines that are over a certain capacity." Id. (quoting District of Columbia v. Heller, 554 U.S. 570, 629, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ("Heller I")).

Indeed, it appears that virtually every other court to examine large capacity magazine bans has found that intermediate scrutiny is appropriate, assuming these magazines are protected by the Second Amendment. See Fyock, 779 F.3d at 999; Kolbe, 849 F.3d at 138–139; N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 258–60 (2d Cir. 2015); Heller II, 670 F.3d at 1261–62; S.F. Veteran Police Officers Ass'n v. City & County of San Francisco, 18 F.Supp.3d 997, 1002–04 (N.D. Cal. 2014). But see Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir. 2015)

(upholding municipal ban on assault weapons and large capacity magazines but declining to determine what level of scrutiny applied).

Accordingly, because California's ban does not substantially burden individuals' ability to defend themselves, intermediate scrutiny is appropriate.

### c. Application of Intermediate Scrutiny

Intermediate scrutiny requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." Fyock, 779 F.3d at 1000 (quoting Chovan, 735 F.3d at 1139). This test does not require that the government's regulation is the least restrictive means of achieving its interests. Rather, the government need only show that the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. (citation omitted). In reviewing the fit between the government's stated objective and the regulation, the court may consider legislative history as well as studies in the record or applicable case law. Id. The evidence need only "fairly support" the state's rationale, and in making this determination, courts "afford substantial deference to the predictive judgments of the legislature." N.Y. State Rifle, 804 F.3d at 261 (citations omitted); see also Kolbe, 849 F.3d at 140 (court must give substantial deference to the legislature, because "it is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments") (citations omitted).

One stated objective of California's large capacity magazine ban is to reduce the incidence and harm of mass shootings. (Gordon Decl., Ex. 50 § 2, ¶ 11; § 3, ¶ 8.) There can be no serious argument that this is not a substantial government interest, especially in light of several recent high profile mass shootings involving large capacity magazines, including the 2016 Orlando Pulse nightclub shooting, the 2015 San Bernardino shooting, the 2012 Aurora movie theater shooting, the 2012 Sandy Hook school shooting, the 2011 Arizona shooting involving then-U.S. Representative Gabrielle Giffords, and the 2007 Virginia Tech shooting, all of which resulted in multiple deaths and injuries. (See Webster Decl. ¶ 10; Graham Decl. ¶ 19; Donohue Decl. ¶ 29.)

Further, defendants have provided studies and expert analyses supporting their conclusion that California's ban would

further these objectives. (See Gordon Decl., Ex. 34 at 87, 89, 97; Webster Decl. ¶¶ 12, 21, 25–26; Donohue Decl. ¶¶ 21, 29; Gordon Decl., Ex. 54 at 2; Gordon Decl., Ex. 62 at 10.) Multiple courts have found a reasonable fit between similar bans with similar stated objectives. See Kolbe, 849 F.3d at 139–41 (reasonable fit between assault weapon and LCM ban and interest in reducing harm caused by criminals and preventing unintentional misuse by otherwise law-abiding citizens); **993** Fyock, 779 F.3d at 1000–01 (reasonable fit between LCM ban and interests in reducing the harm of intentional and accidental gun use and reducing violent crime); N.Y. State Rifle, 804 F.3d at 263–64 (reasonable fit between assault weapon and LCM ban and interest in controlling crime); Heller II, 670 F.3d at 1262–64 (reasonable fit between assault weapon and large capacity magazine ban and interest in protecting police officers and controlling crime); S.F. Veteran Police Officers, 18 F.Supp.3d at 1003–04 (reasonable fit between LCM ban and goals of protecting public safety and reducing injuries from criminal use of LCMs).

Reasonable minds will always differ on such questions as the best way to reduce the incidence and harm of mass shootings, or whether that can even be accomplished at all. In order for there to be a reasonable fit between the objective sought to be achieved and the proposed solution, however, the solution need not be the best possible means of achieving the objective. Defendants are not required to show a perfect fit, only a reasonable fit, between the ban and the important objective of easing enforcement of California's existing ban on the purchase, sale, transfer, or importation of large capacity magazines.

The prior ban did not prohibit possession, and there was no way for law enforcement to determine which magazines were "grandfathered" and which were illegally transferred or modified to accept more than ten rounds after January 1, 2000. (Gordon Decl., Ex. 46 at 3; Graham Decl. ¶ 30; Gordon Decl., Ex. 62 at 10.) The evidence indicates that a ban on the possession of large capacity magazines will help address this enforcement issue. (See Gordon Decl., Ex. 62 at 10.) Further, after the 2004 federal ban on large capacity magazines was lifted, the illegal importation of LCMs into California increased, giving further impetus to California's efforts to ease enforcement of its existing ban. (See Graham Decl. ¶ 23; Gordon Decl., Ex. 63.) The proposed ban will facilitate that effort.

The court recognizes plaintiffs' evidence that few California shootings have involved large capacity magazines, that there is no evidence that any of these shootings involved grandfathered large capacity magazines, and that violent criminals might still be capable of inflicting great harm after the enactment of a ban. (See, e.g., Moody Decl. ¶¶ 9–17; Ayoob Decl. ¶¶ 8–12.) However, it is not necessary for defendants to show, or for the court to find, that the proposed ban will eliminate all gun violence in California, or that it would have prevented any of the past incidents of gun violence. Nor is it the role of this court to judge the wisdom of the California legislature in enacting the statutes at issue here. It is only for this court to determine whether those duly enacted statutes pass constitutional muster under the test which the decisions of higher courts require this court to apply. See N.Y. State Rifle, 804 F.3d at 261 (citations omitted); Kolbe, 849 F.3d at 140.

Overall, it appears that California's stated interests of reducing the incidence and harm of mass shootings and easing enforcement of the state's existing ban "would be achieved less effectively absent the regulation," Fyock, 779 F.3d at 1000, and thus there is a reasonable fit between the ban and California's important objectives. Because of this reasonable fit, plaintiffs have not shown that the large capacity magazine ban fails intermediate scrutiny and have not shown a likelihood of success on the merits on their Second Amendment claim.

### 2. Irreparable Injury, Balance of Hardships, and the Public Interest

Because plaintiffs have not met their burden of showing the likelihood of **994** success on the merits of their Second Amendment claim, preliminary injunctive relief must be denied, notwithstanding the court's findings with respect to irreparable injury, balance of hardships or the public interest. See Winter, 555 U.S. at 20, 129 S.Ct. 365 ("A plaintiff seeking a preliminary injunction just establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (emphasis added).

That said, if plaintiffs are correct that the large capacity magazine ban violates the Second Amendment, it appears that plaintiffs will likely suffer irreparable injury by having to surrender their large capacity magazines, which are irreplaceable due to California's ban on the transfer of large capacity magazines, in violation of their Second Amendment

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

rights. "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted); see also Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' ") (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

While defendants claim there is no irreparable harm because plaintiffs may store their magazines out of state, sell them to licensed dealers, or permanently modify their magazines, there is little evidence as to whether these are in fact viable options for plaintiffs or Californians generally. Accordingly, if plaintiffs were able to show a likelihood of success on the merits of their Second Amendment claim, this factor would weigh in favor of granting a preliminary injunction.

The other Winter factors, however, do not weigh in favor of granting preliminary injunctive relief. Withholding an injunction may result in the violation of plaintiffs' Second Amendment rights and the unlawful forced loss of their personal property, but granting an injunction would also result in a substantial hardship to defendants. The State has a substantial interest in preventing and limiting gun violence, as well as in enforcing validly enacted statutes. See Maryland v. King, 567 U.S. 1301, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Such interest is especially strong here, where the ban was enacted first by the state legislature and then through a state-wide proposition approved by a majority of voters.

Further, while the public's interest is furthered by the protection of individuals' Second Amendment rights, assuming the ban infringes those rights, the public interest is also furthered by preventing and minimizing the harm of gun violence, and in making it easier to enforce California's existing ban on the sale, purchase, transfer, or importation of large capacity magazines, pursuant to a bill enacted by the California Legislature and a proposition approved by the California electorate.

Given the substantial hardships that may result to both sides in this litigation based on the granting or withholding of a preliminary injunction, and the dueling substantial public interests, plaintiffs have not shown that the balance of hardships or the public interest favor granting a preliminary injunction. Further, as discussed above, plaintiffs have not shown a likelihood of success on the merits of their Second Amendment claim. Accordingly, the court will deny plaintiffs' request for a **\*995** preliminary injunction based on their Second Amendment claim.

B. Takings Clause/Due Process Challenge

The Fifth Amendment prohibits the taking of private property for public use without just compensation. U.S. Const. amend. V. Plaintiffs argue that the magazine ban operates as an unconstitutional taking under the Fifth and Fourteenth Amendments because they will have to physically turn over their magazines for destruction or, in the alternative, they will be completely deprived of all beneficial use of their magazines, without just compensation.

Preliminarily, the court is not persuaded that plaintiffs will likely succeed on the merits of their takings claim. Plaintiffs have not cited, and the court is unaware of, any case holding that a complete ban on personal property deemed harmful to the public by the state is a taking for public use which requires compensation. Further, the Supreme Court's decision in Heller I said nothing which could be interpreted as suggesting that a city or state's ban of a previously lawful firearm or firearm component would require compensation to existing owners of those firearms or components. See Heller I, 554 U.S. at 626–27, 128 S.Ct. 2783 (stating that reasonable gun regulations were permissible and implying that a complete ban on machine guns, for example, was permissible).

A long line of federal cases has authorized the taking or destruction of private property in the exercise of the state's police power without compensation. See Mugler v. Kansas, 123 U.S. 623, 669, 8 S.Ct. 273, 31 L.Ed. 205 (1887) ("The exercise of the police power by the destruction of property which is itself a public nuisance ... is very different from taking property for public use.... In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner."); Akins v. United States, 82 Fed.Cl. 619, 622–23 (2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause" and thus no compensation was due where a federal agency ordered, pursuant to federal law, an inventor to surrender a device later classified by the agency as a machine gun) (quoting AmeriSource Corp. v. United States, 525 F.3d 1149, 1153 (Fed. Cir. 2008)); Fesjian v. Jefferson, 399 A.2d 861 (D.C.

Ct. App. 1979) (no compensation is due where a municipality bans machine guns or semi-automatic weapons capable of firing more than twelve rounds without manual reloading); accord Wilkins v. Daniels, 744 F.3d 409, 419 (6th Cir. 2014) (law banning wild animals unless they were implanted with microchips did not operate as a physical taking because owners retained the ability to use and possess their animals and the implanted microchips, and the act was "close kin to the general welfare regulations that the Supreme Court ensured were not constitutionally suspect").

More importantly, even assuming, without deciding, that the large capacity magazine ban operates as a taking requiring just compensation, injunctive relief is generally not available for takings claims. The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of [an] otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); see also Lingle v. Chevron, 544 U.S. 528, 543, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (Due Process clause "does not bar government from interfering with property rights" but only requires compensation in event of interference amounting to a taking) (citing **\*996** First English Lutheran Church, 482 U.S. at 315, 107 S.Ct. 2378).

As explained by one legal scholar, "if a local government is regulating land use to protect the community and the owner has the opportunity to sue for compensation based on any taking that might result, the owner cannot sue to block enforcement of the regulation under the Takings Clause." John D. Echeverria, Eschewing Anticipatory Remedies for Takings: A Response to Professor Merrill, 128 Harv. L. Rev. Forum 202, 204 (2015).[3] Moreover, "[t]he Fifth Amendment does not require that compensation precede the taking." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (citation omitted).

[3]     John D. Echeverria, the author of the quoted article, is a professor at Vermont Law School, not to be confused with counsel for defendants with the same name.

Thus, an allegation that a law operates as an illegal taking because there was no just compensation is not ground to void the law, as "the government is not prohibited from taking private property; indeed, the eminent domain clause contemplates that the government will take private property as needed for public purposes, so long as it pays compensation." Bay View, Inc. v. Ahtna, Inc., 105 F.3d 1281, 1284–85 (9th

Cir. 1997) (citing Evangelical Lutheran Church, 482 U.S. at 314, 107 S.Ct. 2378).

Plaintiffs' cited cases do not establish that a preliminary injunction is available for a takings claim. Most of the cases involve California courts applying California law. Plaintiffs cite Lingle, 544 U.S. at 528, 125 S.Ct. 2074, though as discussed above, that case actually stands for the proposition that injunctive relief is generally not available for an alleged taking. Plaintiffs also cite Golden Gate Hotel Association v. City & County of San Francisco, 836 F.Supp. 707, 709 (N.D. Cal. 1993), where an injunction was granted based on a takings claim, but that decision was reversed by the Ninth Circuit based on a statute of limitations issue, 18 F.3d 1482 (9th Cir. 1994).

Plaintiffs' supplemental brief cites Babbitt v. Youpee, 519 U.S. 234, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997), where Native Americans challenged a law providing that certain small interests in Indian lands would transfer (or "escheat") to the tribe upon the death of the owner of the interest if they did not generate at least $100 in income to the owner in any one of the five years before it was due to escheat. While that decision provides some support for plaintiffs' position, it did not involve review a preliminary injunction, but rather a summary judgment.

Moreover, the Court in Babbitt did not address the rule repeated in numerous cases that injunctive relief is generally not available for a takings claim, or why that rule did not apply. The Court may have found that an injunction was appropriate there because of the speculative nature of the property that was taken—a future interest in land that may or may not be lost depending on future circumstances—meaning that the normal remedy of filing suit to recover the value of the lost property was not a realistic remedy. The Court also noted the "extraordinary character" of the regulation, which "amounted to the virtual abrogation of the right to pass on a certain type of property." Id. at 239–40, 117 S.Ct. 727.

Should plaintiffs succeed on their takings claim, their only remedy is money damages, or compensation for the value of the magazines which they are forced to surrender to the state.[4] Accord **\*997** United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 129 n.6, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (stating that if a federal government action operated as a taking of plaintiff's property, the proper course was to initiate a suit for compensation in the Court of Federal Claims). Accordingly, plaintiffs have not met

their burden of showing their entitlement to a preliminary injunction based on their takings claim.

4    The court expresses no opinion at this time whether this suit would be a proper vehicle for obtaining compensation from the State, though the court notes that the First Amended Complaint only seeks declaratory and injunctive relief with respect to the Fifth Amendment takings claim. (See, e.g., First Am. Compl. ¶¶ 79–80.)

#### C. Vagueness Claim

The Fifth Amendment also provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The government violates due process when it deprives an individual of life, liberty, or property pursuant to an "unconstitutionally vague" criminal statute. *Johnson v. United States*, —— U.S. ——, 135 S.Ct. 2551, 2557, 192 L.Ed.2d 569 (2015). A statute is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

First, plaintiffs claim that the ban is vague because SB 1446 and Proposition 63 created two different versions of California Penal Code § 32406, and it is not clear which version applies. SB 1446 exempts six classes of individuals/entities—(1) honorably retired law enforcement officers, (2) historical societies and museums, (3) persons who find and deliver large capacity magazines to law enforcement agencies, (4) forensic laboratories, (5) trustees and executors, and (6) persons in lawful possession of a firearm acquired prior to 2000 that is only compatible with a large capacity magazines—from the prohibition on possession of these magazines. In contrast, the Proposition 63 version only exempts honorably retired law enforcement officers. (See Pls.' Req. for Judicial Notice, Exs. C (SB 1446 Version of Cal. Penal Code § 32406), and D (Proposition 63 Version of Cal. Penal Code § 32406).) In their view, it is not clear what conduct the ban prohibits, given these dual versions of section 32406.

However, plaintiffs do not cite, and the court is unaware of, any case that has held an enactment to be void for vagueness because it conflicts with another enactment and it is not clear which enactment controls. The only case of which the court is aware where that argument was made held that such enactments were not void for vagueness. See *Karlin*

*v. Foust*, 188 F.3d 446, 469 (7th Cir. 1999) (holding that the question before the court was whether one enactment impliedly repealed the other, not whether the enactments are void for vagueness).

Even if the court were to depart from *Karlin* and consider plaintiffs' vagueness challenge on grounds of conflicting enactments, that challenge would fail. Under California law, where two conflicting versions of the same statute are enacted at different times, the later-enacted version controls. *People v. Bustamante*, 57 Cal.App.4th 693, 701, 67 Cal.Rptr.2d 295 (2d Dist. 1997) (citing *County of Ventura v. Barry*, 202 Cal. 550, 556, 262 P. 1081 (1927) and *People v. Dobbins*, 73 Cal. 257, 259, 14 P. 860 (1887)). It is not beyond the capacity of individuals with ordinary intelligence to look up the enactment dates of Proposition 63 and SB 1446 and see that Proposition 63 was enacted after SB 1446. As Proposition 63 was passed after SB 1446, its version of California Penal Code § 32406 is controlling. Accordingly, the **\*998** court rejects plaintiffs' claim that the large capacity magazine ban is unconstitutionally vague on account of the passage of both SB 1446 and Proposition 63.

Second, plaintiffs contend that the ban is vague because while it exempts possession for retired law enforcement officers, and in the case of SB 1446, trustees or administrators of estates, it does not exempt these individuals from prosecution for manufacturing, importing, keeping for sale, offering for sell, giving, lending, buying, or receiving large capacity magazines.[5] See Cal. Penal Code § 32310(a). According to plaintiffs, this "results in a paradoxical situation that retired law enforcement officers [and trustees and executors] are supposedly entrusted with the right to possess large-capacity magazines," but "cannot bring into the state, nor even receive these magazines." (Docket No. 28–1 at 42–43.)

5    In addition to this concern, plaintiffs contend that absence of clarification from the California Department of Justice as to a number of questions having to do with application of the magazine ban—those having to do with disposal of magazines, modification of magazines, and magazines which may accommodate different size shells—raise additional "vagueness concerns." (See Docket No. 47 at 23–24.) The court declines to consider such concerns in deciding plaintiffs' request for a preliminary injunction because the concerns were not raised in plaintiffs' moving papers. See *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.") (citation omitted). Even if the court were

inclined to consider such concerns, it is not persuaded that the concerns amount to anything more than marginal questions existing alongside a statute whose application is clear in the vast majority of intended applications. See Cal. Teachers Ass'n v. State Bd. of Educ., 271 F.3d 1141, 1151 (9th Cir. 2001) ("[U]ncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.' ") (quoting Hill v. Colorado, 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)).

Given the court's determination that the Proposition 63 version of the statute is controlling, SB 1446's exemption for possession of large capacity magazines by trustees or administrators of estates is no longer in effect. Looking to the ban's exemption for possession by retired law enforcement officers, the court rejects plaintiffs' contention that it is "paradoxical" to allow these individuals to possess these magazines but prohibit them from manufacturing, importing into the state, keeping for sale, offering for sale, giving, lending, buying, or receiving them. It is entirely possible to possess a large capacity magazine without engaging in those other activities. Because there is no "paradox" in the application of the 'retired officer' exemption to California Penal Code section 32310(a), this exemption does not support plaintiffs' vagueness claim.

In sum, plaintiffs have not shown a likelihood of success on the merits as to their vagueness claim. Moreover, for the same reasons discussed above in connection with the Second Amendment claim, plaintiffs have not shown that the balance of hardships or public interest weigh in favor of granting a preliminary injunction. Accordingly, the court will deny plaintiffs' request for a preliminary injunction as to their vagueness claim.

D. Overbreadth Claim

Plaintiffs argue that the large capacity magazine ban is unconstitutionally overbroad because there is no evidence that application of the ban to current owners of large capacity magazines would further the objectives of reducing mass shootings and the harm inflicted during those shootings.

First, the court is unaware of any cases applying the overbreadth doctrine in the Second Amendment context. See United States v. Chester, 628 F.3d 673, 688 (4th Cir. 2010) (Davis, J., concurring) ("[I]mporting **999** the overbreadth doctrine ... into the Second Amendment context would be inappropriate."); cf. United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (citation omitted)). Plaintiffs provide no reason for the court to expand the overbreadth doctrine to the Second Amendment.

Second, challenging a law on overbreadth grounds requires a showing that the law prohibits "a substantial amount" of constitutionally protected conduct. Powell's Books, Inc. v. Kroger, 622 F.3d 1202, 1208 (9th Cir. 2010). Plaintiffs fail to show what constitutionally protected conduct the law substantially prohibits. Plaintiffs argue that the law is overbroad because there is no evidence that current owners of large capacity magazines "have ever been involved in mass shootings, gun crimes, or in anything other than purely lawful activities," (Pls.' Mot. 44). However, because plaintiffs have not shown a likelihood of success on their Second Amendment claim they are similarly unlikely to succeed on their claim that the law prohibits a substantial amount of constitutionally protected conduct.

Further, for the reasons discussed above in connection with the Second Amendment claim, plaintiffs have not shown that the balance of hardships or public interest weigh in favor of granting a preliminary injunction. Accordingly, the court will deny plaintiffs' request for a preliminary injunction as to their overbreadth claim.

IT IS THEREFORE ORDERED that plaintiffs' Renewed Motion for Issuance of Preliminary Injunction (Docket No. 28) be, and the same hereby is, DENIED.

**All Citations**

263 F.Supp.3d 986

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

14 F.3d 133
United States Court of Appeals,
Second Circuit.

INTERPORT PILOTS AGENCY, INC.,
Charles Jonas, Captain, Francis Burn,
Jr., Captain, Philip Gaughran, Captain,
Plaintiffs–Appellants–Cross–Appellees,

v.

S. Fraser SAMMIS, Robert
Pouch, Defendants–Appellees,
Board of Commissioners of Pilots of
The State of New York, Defendants–
Appellees–Cross–Appellants.

Nos. 454, 643, Dockets 93–7499L, 93–7573XAP.

|

Argued Oct. 21, 1993.

|

Decided Jan. 10, 1994.

**Synopsis**

Pilots licensed in Connecticut brought action challenging determination of the Board of Commissioners of Pilots of the State of New York that only New York pilots could take vessels into and out of New York waters on the New York side of Long Island Sound. The United States District Court for the Eastern District of New York, Arthur D. Spatt, J., 774 F.Supp. 734, found in favor of the Connecticut pilots on their claim for declaratory relief but found in favor of the Board on due process and common-law claims, and appeal and cross appeal were taken. The Court of Appeals, Jacobs, Circuit Judge, held that: (1) Long Island Sound between New York and Connecticut constituted "boundary waters" within meaning of the Federal Boundary Waters Act, so that Connecticut-licensed pilots could pilot vessels to and from New York ports on the New York side of the Sound without being required to first obtain New York licenses or special endorsements for those ports on their licenses; (2) Board's challenged policy statement was essentially legislative rather than adjudicative, and thus Connecticut pilots did not have procedural due process right to notice and opportunity for hearing; and (3) issuance of policy did not violate Connecticut pilots' substantive due process rights.

Affirmed.

**Attorneys and Law Firms**

**\*135** Joel N. Kreizman, Little Silver, NJ (Evans, Osborne & Kreizman, of counsel), for plaintiffs-appellants-cross-appellees.

Barrie L. Goldstein, New York City (Robert Abrams, Atty. Gen. of the State of New York, Andrea Green, Deputy Sol. Gen., of counsel), for defendants-appellees-cross-appellants.

Before: McLAUGHLIN, JACOBS and REAVLEY,[*] Circuit Judges.

[*]    Honorable Thomas M. Reavley, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

**Opinion**

JACOBS, Circuit Judge:

On this appeal this Court has occasion for the first time to construe the Federal Boundary Waters Act, enacted in 1837 and codified in its current version at 46 U.S.C. § 8501(b) (1989) (the "boundary statute"). The boundary statute allows vessels entering or leaving a port on waters that are a boundary between two states to use a pilot licensed by either state. Connecticut-licensed pilots assert a right under the boundary statute to pilot ships to New York ports on Long Island Sound, and are protesting their treatment at the hands of New York authorities, who claim that the boundary statute does not apply to Long Island Sound and therefore confers no entitlement on the Connecticut pilots. The Connecticut pilots also allege violations of their substantive and procedural due process rights, actionable under **\*136** 42 U.S.C. § 1983, and a common law claim for tortious interference with prospective economic advantage.

In the district court, the Connecticut pilots secured a declaration of their right under the boundary statute to pilot ships to New York ports on Long Island Sound, but lost on all other claims. These appeals ensued, and for the reasons stated below, we affirm the judgment.

BACKGROUND

Plaintiffs are Interport Pilots Agency, Inc. ("Interport"), an organization of ship pilots, and three Interport members who are licensed as pilots by the State of Connecticut

and the federal government (the "Connecticut pilots"). None of Interport's members is licensed by the State of New York. Defendants are the Board of Commissioners of Pilots of the State of New York, its President and its Secretary (collectively, the "Board"). In 1988, Interport and the Connecticut pilots began to challenge the Board's policies concerning pilotage in Long Island Sound, which policies allegedly excluded the Connecticut pilots from assignments aboard ships seeking to navigate to and from New York ports on the Sound. After the Connecticut pilots began offering ships pilotage services to New York ports through a shorter route than that traditionally used by New York pilots, the New York Board issued notices which had the effect of discouraging shippers from using the services of the Connecticut pilots. Plaintiffs brought this suit, claiming that the Board's actions violated the federal boundary statute and plaintiffs' due process and economic rights.

The district court granted partial summary judgment in favor of plaintiffs, declaring that the boundary statute authorizes the Connecticut pilots to navigate Long Island Sound to and from New York ports. 774 F.Supp. 734 (E.D.N.Y.1991). On the ground of qualified immunity, the district court subsequently dismissed the claims asserted against the individual defendants in their personal capacity. The case proceeded to a jury trial. At the close of the evidence, the district court directed a verdict for the Board on the substantive due process claim and the common law claim. The only issue submitted to the jury was plaintiffs' claim that they were deprived of procedural due process. The jury returned a verdict for the Board, but plaintiffs contend that the jury instructions were erroneous. Plaintiffs' motion for a new trial was denied. A final judgment issued and plaintiffs noticed this appeal as to the dismissal of both due process claims. The Board has cross-appealed the award of declaratory relief.

 Pilotage is the art of navigating ships into and out of ports or along rivers, bays, harbors and other special waters. By legislation initially enacted in 1789, Congress determined to leave regulation of pilotage for the most part to the states. *See* Act of August 7, 1789, ch. 9, § 4, 1 Stat. 54. That provision now reads:

> Except as otherwise provided in this subtitle, pilots in the bays, rivers, harbors, and ports of the United States

shall be regulated only in conformity with the laws of the States.

46 U.S.C. § 8501(a) (1989). Congress has preempted state regulation of pilotage only with respect to vessels on the Great Lakes, 46 U.S.C. § 9302 (1989), and American flag vessels sailing between American ports ("coastwise vessels"). 46 U.S.C. § 8502 (1989). Thus, the states have authority over the pilotage of all American vessels sailing under register, that is, engaged in foreign trade, and all foreign flag vessels (jointly, "registered vessels").

The one limitation on each state's unilateral control over pilotage of registered vessels in its waters is the Federal Boundary Waters Act:

> The master of a vessel entering or leaving a port on waters that are a boundary between 2 States, and that is required to have a pilot under this section, may employ a pilot licensed or authorized by the laws of either of the 2 States.

46 U.S.C. § 8501(b). Neighboring states therefore share the power to regulate pilotage as to ports situated on waters that are a boundary between them. One assumed objective of the statute is to avoid "pilotage wars" between adjacent states, with each **\*137** state attempting to appropriate for its pilots some exclusive privilege or advantage in a bay or harbor. [1] *See Reardon v. Arkell,* 59 F. 624, 625 (S.D.N.Y.1894); *The Abercorn,* 26 F. 877, 879 (D.Or.), *aff'd,* 28 F. 384 (C.C.Or.1886); *The Clymene,* 9 F. 164, 166–67 (E.D.Pa.1881), *aff'd,* 12 F. 346 (C.C.Pa.1882); 1986 N.Y.Op. Att'y Gen. (86–F5) 22, 23.

[1]   The Board rejects this historical explanation and argues that the boundary statute was intended solely to remedy a temporary pilotage shortage. The boundary statute is succinct, intelligible and specific, however, and we have no call to consult legislative history.

Under the authority given it by Congress, New York enacted the Navigation Law in 1853, creating the Board of Commissioners of Pilots to regulate pilotage practices, fees and licensing. *See* 1853 N.Y.Laws, ch. 467, § 1. Its dominion

was initially limited to navigation of New York Harbor by way of Sandy Hook. The Board instituted a pilotage system which requires the exclusive use of a New York-licensed pilot while in those New York waters. *See id.,* § 10. Vessels that fail to use a New York pilot when required to do so are nonetheless liable for pilotage fees and may be fined. In 1959, the Legislature authorized the Board to regulate pilotage on the Hudson River, and the Board accordingly extended the exclusionary licensing scheme. *See* 1959 N.Y.Laws, ch. 676, § 7. Finally, in 1971, the Legislature extended the Board's jurisdiction to pilotage on Long Island Sound, the last unregulated inland body of water along New York's coastline. *See* 1971 N.Y.Laws, ch. 942, § 1, codified at N.Y.Nav.Law § 89–b (McKinney's 1989 & Supp.1993). This legislation also allowed for the grandfathering of all pilots, including Connecticut-licensed pilots, who were actively engaged in the occupation and who were found qualified under the Board's then existing regulations. *See* N.Y.Nav.Law § 91–b(2) (McKinney's 1989).

Navigation Law § 89–b specifically addresses the pilotage of registered vessels transiting Long Island Sound as they make their way to and from the three New York ports situated on the Sound (Port Jefferson and the oil platforms of Northville and Northport). At all times relevant to this appeal, section 89–b(1) provided in pertinent part:

> Every foreign vessel and every American vessel under register transiting the New York state waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point, and any such vessels entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point, shall take a Long Island–Block Island Sound pilot licensed under the authority of this article or of the laws of any other state having concurrent jurisdiction over these waters.

The New York pilotage system is based on the assumption that only New York-licensed pilots have the expertise and familiarity with local waters and conditions to navigate safely. The Board claims that New York employs licensing standards stricter than those for a federal license, and points out that a Connecticut license is issued to any pilot with a federal license. The Board also justifies its licensing policies as a means of affording New York pilots a living wage and avoiding "destructive competition" among pilots to get business by promoting shorter, more hazardous routes. Accordingly, pursuant to the Navigation Law, the Board strictly limits the number of New York-licensed pilots. As traffic to New York ports has declined over the years, so has the number of pilots authorized by the Board to take pilotage assignments in the geographical areas within its jurisdiction.

As to Long Island Sound, 17 pilots are currently authorized to navigate ships to and from New York ports, and the Board maintains a long, stagnant waiting list. These 17 pilots are all members of a single association of New York-licensed pilots, now called Sound Pilots, Inc. ("Sound Pilots"), appointed by the Board to act as the dispatching agent for Long Island Sound. Sound Pilots has established a rotation system for pilotage assignments, and controls the selection of new pilots to enter the rotation.

Sound Pilots' rotation initially included Interport members who, although not licensed in New York, were allowed to pilot ships to **\*138** New York ports on the Sound under the grandfathering provisions of Navigation Law § 91–b(2). For a number of years, these Interport members received approximately 25 percent of the pilotage assignments to registered vessels entering and leaving New York ports on the Sound. As these individual members retired or left, the Interport slots in the rotation system were eliminated. By 1987, no Interport member was included in Sound Pilots' rotation. None of the remaining Interport pilots was licensed in New York. The Connecticut pilots claim they were impeded in their efforts to obtain New York licenses. They point to their years of experience using their federal licenses to pilot coastwise vessels in New York and Connecticut waters of Long Island Sound—pilotage not subject to state regulation, *see* 46 U.S.C. § 8502—and argue that they are as qualified and experienced as the New York pilots to participate in Sound Pilots' rotation.

In 1988, plaintiffs founded Connecticut State Pilots as a division of Interport. Acting on their contention that the federal boundary statute divested New York of any authority to prohibit or regulate such activity by Connecticut pilots, they began offering pilotage services to registered vessels heading to New York ports on Long Island Sound. At the time, the established route for registered vessels entering

Long Island Sound was to steer a course northeast of Block Island and meet a pilot at Point Judith, Rhode Island, where Sound Pilots' station is located. A New York-licensed pilot assigned by Sound Pilots would then board the vessel and navigate a westerly course through the Sound, which often entailed some backtracking of the ship's progress. In order to compete with Sound Pilots, plaintiffs invested in a pilot boat larger than any other pilot boat operating out of the eastern end of Long Island or neighboring Rhode Island. The larger boat enabled the Connecticut pilots to wait for ships at the Montauk pilot station and then use the Montauk–Block Island Channel en route to ports on Long Island Sound. This route allowed ships approaching from the south to save one to two hours of steaming time because they no longer would have to travel the extra northeastern leg to meet the Sound Pilots' boat at Point Judith.

The Board reacted with alarm, claiming that the Montauk–Block Island Channel is known for heavy seas, adverse currents and numerous shoals, and that the Connecticut pilots' use of the Channel is hazardous to navigation and the environment. Apparently, the Channel had been used infrequently ever since an oil tanker attempting to traverse it ran aground in 1970. The record also indicates that the Channel had not been charted in approximately 60 years. In March 1988, the Board communicated with Connecticut's Deputy Commissioner of the Bureau of Water Transportation, the state official responsible for Connecticut's pilotage policies, and attempted to persuade him to instruct Connecticut pilots not to use the Montauk–Block Island Channel. The Connecticut Deputy Commissioner responded that he had no authority to act because the Channel itself is in international waters. In November 1988, the Board issued a directive to all New York-licensed pilots not to use the Montauk–Block Island Channel. In December 1988, the Board issued a policy statement to shipping agents serving vessels in the Long Island–Block Island Sound area discouraging use of the Montauk–Block Island Channel. The Board had never before issued a statement about a navigational hazard to shipping agents.

Over the next year, Interport and the Connecticut Deputy Commissioner criticized the Board's actions and attempted to change the Board's opinion as to the dangers of the Montauk–Block Island Channel, arguing that it was no less safe than other shipping lanes and that Interport had never had an accident in the Channel. The Board corresponded with both critics and met with representatives of Interport, without resolving this disagreement. If anything, the Board's safety

and environmental concerns were heightened at this time by the *Exxon Valdez* disaster in March 1989. Although the Coast Guard had opined in 1989 that the Montauk–Block Island Channel is navigable, the Coast Guard in January 1990 asked officials of Connecticut, New York and Rhode Island to draft uniform policies on the use of the Channel.   **139** The states met on several occasions for that purpose, and a public hearing, attended by Interport, was held on the subject on May 1, 1990. The record does not show what came of this effort.

The Board's other response to the Connecticut State Pilots venture was to levy New York pilotage fees, pursuant to Navigation Law § 89–b(1), against vessels that used Connecticut pilots to navigate to New York ports. In May 1989, a Connecticut-licensed pilot met the tanker *Dan Frigg* at Point Judith and escorted the ship to and from the Northport oil platform. In accordance with instructions from the Board, Sound Pilots took the position that the voyage required a New York-licensed pilot and wrote to the vessel's operator demanding payment of pilotage fees. The vessel refused to pay, citing the federal boundary statute as authority for using a Connecticut pilot. Sound Pilots later advised the Board as to seven additional instances involving Connecticut-licensed pilots who navigated vessels to and from New York ports on Long Island Sound. Because of the pendency of this lawsuit, the Board refrained from taking any further action on these alleged violations.

In support of its position on pilotage fees, the Board developed and refined the view that the federal and state statutory schemes conferred on New York exclusive jurisdiction over pilotage to New York ports on Long Island Sound. No court or other governmental authority had ever issued any binding interpretation of the law to the contrary. The New York Attorney General in 1986 had rendered a formal opinion interpreting the federal boundary statute, and concluded that a Connecticut pilot may navigate a vessel through the New York waters of Long Island Sound, and between a Connecticut port and Execution Rocks in Western Long Island Sound. 1986 N.Y.Op.Att'y Gen. (86–F5) at 22–23. However, the Attorney General did not discuss whether Connecticut pilots may proceed to enter and leave New York ports. The Board unsuccessfully invited the Attorney General to reconsider his position, based in part on the perceived environmental hazard arising out of supposedly less-experienced pilots navigating New York waters in the Sound.

Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133 (1994)

1994 A.M.C. 2704

The Board also conferred repeatedly with counsel as to the import of the boundary statute, and embraced the advice that a Connecticut pilot would not be entitled to navigate to and from a particular New York port unless an endorsement for that port was placed on his Connecticut pilot's license. Since Connecticut has no authority to issue endorsements for New York ports, and since the Board had not endorsed any Connecticut licenses, the Board concluded that no basis existed for any Connecticut pilot to navigate vessels to and from New York ports. The Board analogized the dispute over pilotage in the Sound to the historical conflict between New York and New Jersey pilots in Sandy Hook, which had been resolved by a "concurrency agreement" between the two states providing for uniform pilotage regulations in that body of water. The Board considered its position validated by the fact that no concurrency agreement exists between New York and Connecticut for Long Island Sound.

On November 5, 1990, reacting to a report that a Connecticut pilot navigated the vessel *Hoegh Forum* through Long Island Sound to the Northville platform, the Board issued a policy statement to its pilots, with copies to various New York and Connecticut state officials, which formally articulated its view of its statutory authority. The statement reads in pertinent part:

[I]t is the position of the Board that state pilotage is mandatory on all foreign flag vessels and American flag vessels under Register. Owners would do well to bear in mind and should be reminded that a violation of the pilotage law, particularly in the event of an accident, could have extreme consequences if it were determined that an Owner knowingly violated the state's pilotage or other laws with respect to operations or navigation....

....

... [I]t is illegal for a non-New York state pilot to take a vessel from the Eastern end of the Sound, through New York State waters, into a New York state port, **\*140** under the scope of the laws of the State of New York and our existing regulations.

The statement concludes with a request that New York pilots alert the Board to any violations of this policy. Plaintiffs claim that the Board should have notified them and given them an opportunity to be heard before issuing the November 5 policy statement. Plaintiffs suffered a loss of pilotage business as a result of the policy statement, and filed this lawsuit.

These appeals present three broad issues: (1) whether Connecticut-licensed pilots have a right under the federal boundary statute to provide their services to registered vessels bound to or from the three New York ports on Long Island Sound; (2) whether plaintiffs are entitled to a new trial on their procedural due process claim; and (3) whether plaintiffs' substantive due process claim was properly dismissed as a matter of the law.

DISCUSSION

I. Federal Boundary Waters Act

This case raises for the first time the application of the Federal Boundary Waters Act, 46 U.S.C. § 8501(b), to Long Island Sound. We affirm the district court's declaration that:

> pursuant to 46 U.S.C. § 8501(b), and New York Navigation Law § 89–b, Connecticut-licensed pilots may be employed by foreign-flag vessels and American vessels under register transiting New York waters of the Long Island Sound which form a boundary between New York and Connecticut, and may specifically enter and leave ports located at Northville, Northport and Port Jefferson. Further, such persons may pilot those vessels to and from those New York ports without being required to first obtain a New York license.

774 F.Supp. at 742.

It is undisputed that a Connecticut pilot's license permits the pilot to navigate Long Island Sound to and from Connecticut ports, and a New York pilot's license permits the pilot to navigate Long Island Sound to and from New York ports. It is also undisputed that neither state purports to license its pilots to navigate to and from its sister state's ports. Port Jefferson, Northville and Northport are New York ports on Long Island Sound. If Long Island Sound is a boundary waterway, it follows that, under 46 U.S.C. § 8501(b), the master of a vessel entering or leaving these New York ports "may employ a pilot

licensed or authorized by the laws of either of the 2 States"—New York or Connecticut.

The Board attempts to counter the plain language of the federal boundary statute with two arguments. First, the Board argues that the quoted statutory language means that one state's license confers a right of pilotage to a port in another state only if the pilot has secured a special endorsement on his license for that port. In other words, the Board contends that the boundary statute gives a Connecticut pilot the right to navigate to the New York port of Northport, for example, only if the Connecticut license bears a special "Northport" endorsement. This interpretation of the statute engrafts on it a requirement, not imposed by Congress, that is not consonant either with state sovereignty or with concurrent jurisdiction over boundary waters. It would be anomalous for Connecticut to assert authority over New York ports, and Connecticut has not done so. Accordingly, a Connecticut pilot would have to look to New York to obtain the special endorsement that the Board claims is necessary. If a Connecticut pilot could not dock at a New York port on the Sound without New York's permission, then the boundary statute is essentially a nullity, imposing no meaningful limitation on the system of state control of pilotage. We see no reason to look beyond the wording of the statute, which requires nothing more than a license from one of the two states in order for a pilot to navigate either states' ports situated on boundary waters.

In the alternative, the Board argues that Long Island Sound is not "boundary waters." The Board's argument is as follows. The term "boundary waters" as used in the federal statute refers only to a body of water which serves as a "natural" boundary between two states in accordance with the hornbook principle that the dominion of each state "extends to the middle of the stream." **141** When neighboring states express a contrary intention as to their respective dominions, by drawing an "actual" boundary line through a body of water, the whole body of water no longer serves as a boundary. When an actual boundary line exists, as measured in metes and bounds, that line "controls" the respective rights of neighboring states. New York and Connecticut have agreed upon an actual boundary line which divides Long Island Sound. Thus, according to the Board's argument, the only "boundary waters" in Long Island Sound are the molecules comprising the metaphysical plane of the actual boundary line—and therefore waters on the New York side of that line are New York waters to which the federal boundary statute does not apply.

This argument fails for at least two reasons. First, if a bilateral compact divides the waters in the way the Board contends, there would be no such thing as "boundary waters," because hornbook law draws a similar line at midpoint (in the absence of a compact), so that every drop of water theoretically can be determined to belong to one state or another. Second, the boundary statute makes no distinction between "natural" and "actual" boundary waters. If a body of water is "a boundary between 2 States," the statute applies, even if maps and state compacts draw a line through that body of water.

None of the few cases construing the federal boundary statute supports the Board's strained reading. In *Leech v. Louisiana,* 214 U.S. 175, 29 S.Ct. 552, 53 L.Ed. 956 (1909), the Supreme Court upheld the conviction of a Mississippi-licensed pilot for piloting a foreign vessel up the Mississippi River to New Orleans through waters that lay entirely within Louisiana. The Court noted, however, that a Mississippi license might have been sufficient if the vessel's destination were a port situated further north, within the state of Mississippi, where the river forms a boundary between Louisiana and Mississippi. *Id.* at 178, 29 S.Ct. at 553. *See also Sweatt v. Florida Board of Pilot Commissioners,* 776 F.Supp. 1538 (M.D.Fla.1991) (boundary statute inapplicable to port located on a river wholly within Florida, even though access to port was by way of waters that form a boundary between Florida and Georgia), *aff'd,* 985 F.2d 578 (11th Cir.1993); *The Gleneare,* 7 F. 604 (D.Or.1881) (ship could use either Oregon or Washington pilot while on the Columbia River, a waterway forming the boundary between the two states, but only an Oregon pilot could navigate while on the Wallamet River, which lies solely within Oregon).

Nor does *Warner v. Dunlap,* 532 F.2d 767 (1st Cir.1976), *cert. dismissed,* 470 U.S. 1024, 105 S.Ct. 1387, 84 L.Ed.2d 405 (1985), a decision of more recent vintage, support the Board's argument. In *Warner,* Connecticut-licensed pilots argued that Rhode Island lacked authority to regulate pilotage through its waters in Block Island Sound as to ships using Connecticut ports. The Connecticut pilots did not invoke the boundary statute, because Block Island Sound was admittedly not boundary water. However, they cited *Leech* for the proposition that a state's authority to regulate pilotage is limited to ships entering and departing its ports. The court rejected this argument, observing that "*Leech* dealt with pilotage in waters forming the boundaries between two states and with 46 U.S.C. § [8501(b) ] which permits a vessel to use a pilot licensed in either state regardless of which state's port the vessel travels to.... Block Island Sound, however,

does not serve as a boundary between states." 532 F.2d at 771 (footnote and citations omitted). *See also Reardon v. Arkell,* 59 F. 624, 625 (S.D.N.Y.1894) (boundary statute entitles New Jersey pilot to navigate a ship into and out of the Port of New York); *The Clymene,* 9 F. 164, 167–68 (E.D.Pa.1881), *aff'd,* 12 F. 346 (C.C.Pa.1882) (law requiring Pennsylvania license for pilotage to port of Philadelphia was "inoperative and void" under boundary statute because port is reached through boundary waters of Delaware Bay and River).

The Board's position that Long Island Sound is not "boundary waters" finds no support in either the opinion of the New York Attorney General, or the Navigation Law. In his 1986 formal interpretation of the boundary statute, the New York Attorney General opined that a Connecticut pilot may navigate a vessel through the New York **\*142** waters of Long Island Sound because "[t]here is no question that the Long Island Sound acts as the boundary between New York and Connecticut, and that pilots from either state may navigate those portions of the Sound which act[ ] as the boundary between the states." 1986 N.Y.Op. Att'y Gen. (86–F5) at 22. Similarly, New York Navigation Law § 89–b(1) implicitly assumes that Long Island Sound is a boundary between New York and Connecticut, given its provision that registered vessels "entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point" must take a New York-licensed pilot *or* a pilot licensed by "*any other state having concurrent jurisdiction over these waters.*" (Emphasis added.) The emphasized language must mean Connecticut, the only state besides New York for which Long Island Sound is an interstate border, and can reasonably be read as an acknowledgement of the scope of the boundary statute.

In summary, because Long Island Sound is a boundary between New York and Connecticut, the federal boundary statute permits registered vessels entering or leaving the New York ports on the north shore of Long Island to employ a pilot licensed by either New York or Connecticut. Furthermore, nothing in the statute requires a Connecticut-licensed pilot to obtain any special endorsement with respect to those ports to perform pilotage services.

## II. Procedural Due Process Claim

Plaintiffs also brought a section 1983 claim that the Board, acting under color of state law, violated their procedural due process rights. Plaintiffs allege that (a) as holders of Connecticut pilot licenses, plaintiffs had a property right, established by the federal boundary statute, to pilot vessels to New York ports on Long Island Sound; (b) the Board's November 5, 1990 policy statement deprived plaintiffs of that property right; and (c) the Board failed to provide notice and an opportunity to be heard prior to the deprivation. This claim was tried to a jury which rendered a verdict in favor of the Board.

On appeal, plaintiffs seek a new trial, contending that the district court improperly charged the jury that the necessary intent for establishing a procedural due process violation is specific intent to deprive plaintiffs of a property right, rather than the general intent to do that which was done. The Board concedes that it was error for the district court to give such an instruction. We need not reach that issue, however, because we agree with the Board that the procedural due process claim fails as a matter of law in any event, and should have been disposed of by directed verdict.

Plaintiffs' procedural due process claim should have been dismissed because the challenged official action—the Board's November 5 policy statement—was essentially legislative rather than adjudicative. Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause. *RR Village Ass'n v. Denver Sewer Corp.,* 826 F.2d 1197, 1204–05 (2d Cir.1987). These constitutional due process requirements apply only where the official action is "designed to adjudicate disputed facts in particular cases." *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). "When not bounded by statutory procedural requirements, the Supreme Court has consistently been willing to assume that due process does not require any hearing or participation in 'legislative' decisionmaking other than that afforded by judicial review after rule promulgation." [2] *Pickus v. U.S. Board of Parole,* 543 F.2d 240, 244 (D.C.Cir.1976) (citing *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); **\*143** *Bi–Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)).

2      The Board was not "bounded by statutory procedural requirements" when it issued the November 5 policy statement. An "interpretive statement" or "statement of general policy" is exempt from the notice and hearing requirements of the New York State Administrative Procedure Act. *See* N.Y.A.P.A. § 102(2)(b)(iv), § 202 (McKinney's 1984 & Supp.1994). *See also White v. Shalala,* 7 F.3d 296, 303 (2d Cir.1993) (an agency rule is "interpretative" and exempt from statutory due process

requirements if it is intended "to clarify an existing statute or regulation" rather than "to create new law, rights, or duties in what amounts to a legislative act").

*RR Village* supplies the test for determining whether official action is adjudicative or legislative. In that case, homeowners argued that they had a property right under New York law in promulgated sewage disposal rates and were denied due process when they were not afforded notice or a hearing as to retroactive increases. 826 F.2d at 1203–04. Town officials argued that the grant of a retroactive increase to one sewage disposal company should be considered legislative action, exempt from the constitutional requirements of procedural due process. This Court held in favor of the homeowners, stating:

> The test for determining whether official action is adjudicative or legislative focuses on the function performed by the decisionmaker, not on the method of selecting the decisionmaker, *cf. Minnesota State Board for Community Colleges v. Knight,* 465 U.S. 271, 284, 104 S.Ct. 1058, 1065–66, 79 L.Ed.2d 299 (1984) (policy decision by executive agency would be legislative action), or on the form in which the decision is announced, *see Philadelphia Co. v. SEC,* 175 F.2d 808, 812–13, 816–17 (D.C.Cir.1948) (SEC's revocation of exemption to Rule was adjudicative action where the only intended and actual effect was to determine disputed issue in particular case), *vacated as moot,* 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715 (1949). Action is adjudicative when a decision is based on a determination of "facts about the parties and their activities, businesses, and properties." *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 300 (2d Cir.1971).... Proceedings that "adjudicate disputed facts in particular cases" are subject to the requirements of procedural due process. *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

826 F.2d at 1204–05 (quotation and citations omitted). Because the retroactive rate determination in *RR Village* was based solely on facts about one supplier, and not on "facts relating to the sewage disposal industry in general, much less of questions of social or economic policy or of broad economic factors," the homeowners were entitled to procedural due process. *Id.* at 1205.

Under this standard, the Board's issuance of the November 5 policy statement was legislative rather than adjudicative in character. The policy statement was a general explanation of the Board's authority, to be applied prospectively, and did not seek to impose any retroactive penalty. The Board did not attempt to adjudicate particular facts as to any one pilot or group of pilots. Indeed, the Board was *disavowing* any regulatory authority as to non-New York pilots. In arriving at its policy statement, the Board considered facts relating to pilotage in general, including environmental and safety concerns, economic factors, the legislative intent of the New York Navigation Law, the views of Connecticut authorities, and the lack of a dispositive interpretation of the boundary statute at the time.

Similarly, in *Air Line Pilots Association v. Quesada,* 276 F.2d 892 (2d Cir.1960), we held that the due process clause did not require the Federal Aviation Agency to provide a prior hearing to pilots affected by a regulation forbidding commercial air carriers from using pilots over age 60. *Id.* at 896. The Court determined that the FAA regulation was legislative rather than adjudicative because it had general application and looked to the future:

> The [FAA's] action does not lose the character of rule-making because it modifies the plaintiff pilots' claimed property rights in their licenses and their contractual rights under collective bargaining agreements to pilot planes beyond age sixty. Nor does the regulation violate due process because it modifies pilots' rights without affording each certificate holder a hearing. Administrative regulations often limit in the public interest the use that persons may make of their property without affording each one affected an opportunity to present evidence upon the fairness of the regulation.

*Id.*

  Plaintiffs argue that the November 5 policy statement cannot be deemed a general, explanatory rulemaking because it affected **\*144** only a small number of persons—the Connecticut pilots who were attempting to compete for pilotage business to New York ports on Long Island Sound. It may be that, "when a rule adopted for general application applies only to a small number of persons, its characterization as legislation becomes suspect." *Richardson v. Town of*

*Eastover,* 922 F.2d 1152, 1158 (4th Cir.1991). That concern cannot predominate, however, where the agency rule under attack announces the scope of what it considers to be its jurisdiction. That the Board's position turned out to be wrong, and had a predictable impact on identifiable individuals, did not convert its legislative action into an adjudication. *See Pickus v. U.S. Board of Parole,* 543 F.2d at 245 ("policy rules often have the effect of making individual outcomes more predictable"); *cf. United States v. Florida East Coast Ry. Co.,* 410 U.S. at 246, 93 S.Ct. at 821 (that an official action "may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature"); *AT & T v. FCC,* 572 F.2d 17, 22–23 (2d Cir.) (agency action intended to increase competition in telecommunications industry was legislative and not adjudicative, although adversely affecting AT & T), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).

III. Substantive Due Process Claim

Plaintiffs also allege that the Board violated their substantive due process rights by taking actions under color of state law that were designed to and did injure their business and their use of Connecticut pilot licenses. Essentially, plaintiffs contend that the Board committed an intentional tort which rises to the level of a constitutional violation because the Board is a state actor and because the conduct allegedly was motivated by a desire to harm plaintiffs.

The district court directed a verdict in the Board's favor on this claim, holding that the evidence was insufficient because it did not "shock the conscience" or establish "systematic and intentional harassment." Plaintiffs concede that the Board's actions do not "shock the conscience," but argue that the Board's actions should have been weighed on the less stringent basis of whether the actions were "arbitrary and discriminatory." However the standard is articulated, plaintiffs' substantive due process claim fails.

The due process clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.' " *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986)). The clause has been held to have a substantive component that protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327,

331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). The Supreme Court has warned, however, that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The due process clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976).

A substantive due process claim based on allegedly tortious conduct by a state actor therefore ordinarily requires evidence of conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Collins,* 503 U.S. at ——, 112 S.Ct. at 1070; *see Rosa R. v. Connelly,* 889 F.2d 435, 439 (2d Cir.1989) (requiring evidence that official action was "arbitrary or irrational or motivated by bad faith"), *cert. denied,* 496 U.S. 941, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990); *Chalfy v. Turoff,* 804 F.2d 20, 23 (2d Cir.1986) (per curiam) (requiring proof of "systematic and intentional harassment" to transform official action causing economic injury into a constitutional violation).

Application of this standard to the record in this case required the district court to dismiss the substantive due process claim, as was done. The Board's attempt to discourage **\*145** use of the Montauk–Block Island Channel was supported by defensible safety and environmental concerns, and applied equally to all pilots. Similarly, the November 5, 1990 policy statement, though erroneous, was adopted with advice of counsel concerning an unsettled issue of law, and was not arbitrary or irrational. Overzealous or erroneous government action alone does not give rise to a constitutional violation. *See Rosa R. v. Connelly,* 889 F.2d at 439; *see also McClary v. O'Hare,* 786 F.2d 83, 89 (2d Cir.1986) (no substantive due process violation where "the only fact distinguishing this case from an ordinary tort action ... is the identity of the [tortfeasor]").

To the extent the Board's actions were legislative and in the nature of rulemaking, plaintiffs' substantive due process claim is subject to a yet more stringent test: legislative acts are presumed valid and must be upheld if rationally related to a legitimate governmental objective. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974). Under this test, the Board's actions are not constitutionally

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

infirm if the Board can articulate a rational basis for them. Because the Board's notices and policy statement served the concerns of New York's pilotage regulatory scheme, including safety, environmental protection and state prerogative, its actions survive substantive due process challenge. *See Kaufman v. City of New York,* 717 F.Supp. 84, 88 (S.D.N.Y.) (no substantive due process violation in requiring building owners to pay for asbestos removal even though municipality had approved asbestos installation in the first instance), *aff'd on opinion below,* 891 F.2d 446, 447 (2d Cir.1989) (per curiam), *cert. denied,* 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990).

CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

**All Citations**

14 F.3d 133, 1994 A.M.C. 2704

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   AR005002   10

36 S.Ct. 141
Supreme Court of the United States.

BI-METALLIC INVESTMENT
COMPANY, Plff, in Err.,

v.

STATE BOARD OF EQUALIZATION, and Elias
M. Ammons, James B. Pearee, M. A. Leddy, Roady
Kenehan, and Fred Farrar, as Members, etc., et al.

No. 116.
|
Argued December 7 and 8, 1915.
|
Decided December 20, 1915.

### Synopsis

IN ERROR to the Supreme Court of the State of Colorado to review a decree which, reversing a decree of the District Court of the City and County of Denver, in that state, directed the dismissal of a suit to enjoin the enforcement of an order of the State Tax Commission and State Board of Equalization, increasing the valuation of taxable property in Denver. Affirmed.

See same case below, 56 Colo. 512, 138 Pac. 1010.

The facts are stated in the opinion.

### Attorneys and Law Firms

**\*\*142  \*442** Mr. **Horace Phelps** for plaintiff in error.

**\*443** Mr. **Fred Farrar,** Attorney General of Colorado, and Messrs. **Norton Montgomery, James A. Marsh,** and George Q. Richmond for defendants in error.

### Opinion

Mr. Justice **Holmes** delivered the opinion of the court:

This is a suit to enjoin the State Board of Equalization and the Colorado Tax Commission from putting in force and the defendant Pitcher, as assessor of Denver, from obeying, an order of the boards, increasing the valuation of all taxable property in Denver 40 per cent. The order **\*444** was sustained and the suit directed to be dismissed by the supreme court of the state. 56 Colo. 512, 138 Pac. 1010. See 56 Colo. 343, 138 Pac. 509. The plaintiff is the owner of real estate

in Denver, and brings the case here on the ground that it was given no opportunity to be heard, and that therefore its property will be taken without due process of law, contrary to the 14th Amendment of the Constitution of the United States. That is the only question with which we have to deal. There are suggestions on the one side that the construction of the state Constitution and laws was an unwarranted surprise, and on the other, that the decision might have been placed, although it was not, on the ground that there was an adequate remedy at law. With these suggestions we have nothing to do. They are matters purely of state law. The answer to the former needs no amplification; that to the latter is that the allowance of equitable relief is a question of state policy, and that as the supreme court of the state treated the merits as legitimately before it, we are not to speculate whether it might or might not have thrown out the suit upon the preliminary ground.

For the purposes of decision we assume that the constitutional question is presented in the baldest way,—that neither the plaintiff nor the assessor of Denver, who presents a brief on the plaintiff's side, nor any representative of the city and county, was given an opportunity to be heard, other than such as they may have had by reason of the fact that the time of meeting of the boards is fixed by law. On this assumption it is obvious that injustice may be suffered if some property in the county already has been valued at its full worth. But if certain property has been valued at a rate different from that generally prevailing in the county, the owner has had his opportunity to protest and appeal as usual in our system of taxation (Hagar v. Reclamation Dist. 111 U. S. 701, 709, 710, 28 L. ed. 569, 572, 573, 4 Sup. Ct. Rep. 663), so that it must be assumed that the property **\*445** owners in the county all stand alike. The question, then, is whether all individuals have a constitutional right to be heard before a matter can be decided in which all are equally concerned,—here, for instance, before a superior board decides that the local taxing officers have adopted a system of undervaluation throughout a county, as notoriously often has been the case. The answer of this court in the State R. Tax Cases, 92 U. S. 575, 23 L. ed. 663, at least, as to any further notice, was that it was hard to believe that the proposition was seriously made.

Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex

36 S.Ct. 141, 60 L.Ed. 372

society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached, as it might have been by the state's doubling the rate of taxation, no one would suggest that the 14th Amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body intrusted by the state Constitution with the power. In considering this case in this court we must assume that the proper state machinery has been used, and the question is whether, if the state Constitution had declared that Denver had been undervalued as compared with the rest of the state, and had decreed that for the current year the valuation should be 40 per cent higher, the objection now urged could prevail. It appears to us that to put the question is to answer it. There must be a limit to individual argument in such matters if government is to go on. In **\*446** Londoner v. Denver, 210 U. S. 373, 385, 52 L.

ed. 1103, 1112, 28 Sup. Ct. Rep. 708, a local board had to determine 'whether, in what amount, and upon whom' a tax for paving a street should be levied for special benefits. A relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual grounds, and **\*\*143** it was held that they had a right to a hearing. But that decision is far from reaching a general determination dealing only with the principle upon which all the assessments in a county had been laid.

Judgment affirmed

**All Citations**

239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

904 F.2d 302
United States Court of Appeals,
Fifth Circuit.

Earl Roy COOPER, Plaintiff–Appellant,

v.

CITY OF GREENWOOD, MISSISSIPPI and Leflore
County, Mississippi, Defendants–Appellees.
Earl Roy COOPER, Plaintiff–Appellant,

v.

CITY OF GREENWOOD,
MISSISSIPPI, Defendant–Appellee.

Nos. 89–4396, 89–4642.
|
June 29, 1990.
|
Rehearing and Rehearing En
Banc Denied Aug. 13, 1990.

## Synopsis

Defendant, who was convicted of illegal possession of firearms by convicted felon, brought § 1983 action against city and county after city and county sold the firearms which formed basis for the weapons conviction. The United States District Court for the Northern District of Mississippi, Neal B. Biggers, Jr., J., granted summary judgment against defendant and imposed Rule 11 sanctions against defendant's attorney. Appeal was taken. The Court of Appeals, Politz, Circuit Judge, held that: (1) defendant had constitutionally protected property interest in the firearms which could not be extinguished without according defendant due process, and (2) imposition of sanctions was inappropriate.

Summary judgment reversed; matter remanded and sanctions vacated.

## Attorneys and Law Firms

**\*303** Estes & Waide, Jim Waide, Tupelo, Miss., for plaintiff-appellant.

Robert Lawson Holladay, Drew, Miss., for City of Greenwood.

Frederick B. Clark, Greenwood, Miss., for Leflore County.

Appeal from the United States District Court for the Northern District of Mississippi.

**\*304** Before WISDOM, POLITZ, and JOHNSON, Circuit Judges.

## Opinion

POLITZ, Circuit Judge:

Earl Roy Cooper appeals an adverse summary judgment rejecting his 42 U.S.C. § 1983 suit against the City of Greenwood, Mississippi and Leflore County, Mississippi for the seizure and sale of a number of firearms Cooper assertedly owned but which, as a convicted felon, he could not legally possess. Cooper's attorney appeals the imposition of Fed.R.Civ.P. 11 sanctions. For the reasons assigned we reverse the summary judgment and vacate the imposition of sanctions.

### Background

The Greenwood city police, assisted by Leflore County deputy sheriffs, executed a search warrant of an animal hospital and clinic owned by Cooper's son-in-law, seizing from the attic thereof 201 firearms. Cooper, a convicted felon, was indicted for receipt and possession of the firearms in violation of 18 U.S.C. § 1202(a), now § 922(g). Cooper was convicted on a guilty plea and was sentenced to a jail term. Thereafter the City of Greenwood, which had retained custody of the firearms, sold them at public auction,[1] and split the $30,000 proceeds received with Leflore County. It is undisputed that neither the city, the county nor the federal government sought or obtained court authorization to dispose of the firearms. The city and county authorities acted on their own.

[1]  Apparently exempted from the sale were a number of guns which the Greenwood police determined to have been stolen and returned to their owners.

Claiming ownership of the firearms, Cooper brought this action against the city and county, alleging violations of his fourth and fourteenth amendment rights, and seeking money damages of $30,000, a sum represented to be one-half the value of the firearms. The district court granted summary judgment to both defendants, dismissing Cooper's claims with prejudice. On motion it awarded $2500 in Rule 11 sanctions against Jim Waide, Cooper's attorney, for failing to make a

reasonable investigation before filing suit on Cooper's behalf. Cooper and Waide timely appealed.

## Analysis

### 1. *Summary Judgment.*

 The issues presented on appeal are legal and are subject to plenary review. *Netto v. Amtrak,* 863 F.2d 1210 (5th Cir.1989). Cooper contends that he has a property interest in the firearms and thus was entitled to some measure of process prior to their disposition. Appellees maintain that Cooper lost whatever property interest he might have had when he was convicted of illegally possessing the firearms. Concluding that the firearms are not contraband *per se,* we hold that Cooper's claimed ownership interest in the firearms survived his criminal conviction and could not be extinguished without according him due process.[2]

[2]     The propriety of forfeiture as a criminal penalty for Cooper's § 1202(a) conviction is not at issue in this appeal. Concededly 18 U.S.C. § 3665 (formerly § 3611) provides for forfeiture of firearms used in perpetrating a felony as punishment for the offense. However, this provision can be invoked only if the indictment alleges the property subject to forfeiture and a judgment of criminal forfeiture is entered. Fed.R.Crim.P. 7(c)(2), 32(b)(2); *United States v. Seifuddin,* 820 F.2d 1074 (9th Cir.1987). The government did not invoke section 3665 with respect to the 201 firearms involved herein.

 "The general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated." *United States v. Farrell,* 606 F.2d 1341, 1343 (D.C.Cir.1979) (quoting *United States v. La Fatch,* 565 F.2d 81, 83 (6th Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978)). Contraband is of two types: contraband *per se* and derivative contraband. Contraband *per se* consists of objects which are "intrinsically illegal in character," "the possession of which, without more, constitutes a crime." *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699–700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). A typical example is cocaine, a controlled substance, the possession **\*305** of which is unlawful under the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* Courts will not entertain a claim contesting the confiscation of contraband *per se* because one cannot have a property right in that which is not subject to legal possession. *Id.; United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed.

59 (1951), *overruled on other grounds, Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

 By contrast, derivative contraband includes items which are not inherently unlawful but which may become unlawful because of the use to which they are put—for example, an automobile used in a bank robbery. *One 1958 Plymouth Sedan.* Because a property interest in derivative contraband is not extinguished automatically if the item is put to unlawful use, the forfeiture of such an item is permitted only as authorized by statute, *Farrell,* and such forfeitures are subject to scrutiny for compliance with the safeguards of procedural due process. *See, e.g., United States v. $8,850 in U.S. Currency,* 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983); *United States v. $23,407.69 in U.S. Currency,* 715 F.2d 162 (5th Cir.1983); *Vance v. United States,* 676 F.2d 183 (5th Cir.1982).

 The essential inquiry posed by the instant case may be stated thusly: Is a firearm in the possession of a felon more akin to cocaine or to an automobile used in a bank robbery? We are persuaded that it is more akin to the latter. A firearm, unless of the type proscribed by the National Firearms Act, 26 U.S.C. § 5801 *et seq.,* is not inherently illegal; its possession, "without more," does not constitute a crime. In Cooper's case, the "something more" is Cooper's membership in a category of persons prohibited from possessing firearms. The same firearms could be possessed legally by persons not subject to the felon categorization. *See United States v. Seifuddin,* 820 F.2d 1074 (9th Cir.1987). As aptly observed by a trial court colleague in language apropos of the situation now before us:

> It must be noted that the guns here are not stolen guns or sawed-off shotguns or other weapons defined in 26 U.S.C. § 5845 ... which must be registered pursuant to 26 U.S.C. § 5841.... Consequently, the guns cannot be termed "contraband" subject to forfeiture as are illegal narcotics ... or untaxed whiskey.... In short, the guns, *in rem,* are not illegal. They become illegal only because [the owner] was technically a convicted felon in possession of them.

*United States v. One Lot of Eighteen Firearms,* 325 F.Supp. 1326, 1329 (D.N.H.1971) (citations omitted). Accordingly, we hold that firearms other than those proscribed by the National Firearms Act are not contraband *per se. Cf. Lowther v. United States,* 480 F.2d 1031 (10th Cir.1973);[3] *McKeehan v. United States,* 438 F.2d 739 (6th Cir.1971); *Covington v. Winger,* 562 F.Supp. 115 (S.D.Mich.1983) (on motion for reconsideration), *aff'd,* 746 F.2d 1475 (6th Cir.1984), *cert. denied,* 470 U.S. 1056, 105 S.Ct. 1764, 84 L.Ed.2d 826 (1985); *United States v. One Assortment of 25 Firearms,* 483 F.Supp. 16 (E.D.Tenn.1979); *United States v. Davis,* 346 F.Supp. 435 (S.D.Ill.1972); *but cf. United States v. Ten Miscellaneous Firearms,* 622 F.Supp. 759 (D.Neb.1985). Cooper therefore has a constitutionally protected property interest in those of the 201 firearms which were not within the ambit of 26 U.S.C. § 5845(a).

3    The *Lowther* court also held that acquittal of the underlying criminal charge barred forfeiture. This holding was overruled in *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), which in turn was superseded by the 1986 amendments to 18 U.S.C. § 924(d), P.L. No. 99–308, § 104, 100 Stat. 449, 457 (1986).

Cooper's property interest, however, is limited to an ownership interest; as a convicted felon he cannot legally possess the guns. Appellees argue that Cooper's legal incapacity to possess the firearms renders a forfeiture proceeding an empty and needless formality, thus legitimating their extra-judicial action. We reject that proposition.

Under 18 U.S.C. § 924(d)(1), firearms involved in a violation of § 922(g) (§ 1202(a) at the time of Cooper's offense) "shall be **\*306** subject to ... forfeiture" if the federal government commences forfeiture proceedings within 120 days of seizure. *See* 26 U.S.C. §§ 7321–28. Appellees may be correct in their argument that Cooper's challenge to the constituent elements of a § 924(d) forfeiture action would have received a summary rejection because of his criminal conviction. *See United States v. Thomas,* 709 F.2d 968 (5th Cir.1983), *later proceeding,* 768 F.2d 686 (1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986) (a criminal conviction is conclusive as to an issue arising against the criminal defendant in a subsequent civil action). Nonetheless, consistent with constitutional requisites, Congress has provided that every claimant is entitled to his/her day in court. Cooper was denied that right by appellees' actions. 26 U.S.C. §§ 7323(a), 7325(3); 27 C.F.R.

§ 72.22(b). Further, had statutory proceedings been instituted Cooper would have had an opportunity to seek remission or mitigation at the discretion of the Director of the Bureau of Alcohol, Tobacco and Firearms (BATF). 26 U.S.C. § 7327; 19 U.S.C. § 1618; 27 C.F.R. Part 72, Subpart D (1989). Although his chances of success might have been minimal, he nonetheless had the right to apply. Appellees' actions vitiated that entitlement. In addition, notice of the proceedings would have been published, thereby providing other persons who might have had an interest in the firearms an opportunity to assert their claims. 26 U.S.C. § 7325(2); 28 U.S.C. § 2461(b); Fed.R.Civ.P., Supp. Rule C(4); *United States v. United States Currency Etc.,* 754 F.2d 208 (7th Cir.1985).

Further, although appellees correctly maintain that the firearms may not legally be returned to Cooper's possession, BATF regulations provide an alternate remedy. The Director of the BATF may order property sold for the account of a claimant or may accept an offer of compromise, for example, the partial remission of sale proceeds. 27 C.F.R. § 72.39. We see no reason that a court likewise could not order a sale for the account of a claimant who, like Cooper, legally could not possess firearms, were forfeiture to be denied for any reason.

In any event, the federal government did not institute a § 924(d) forfeiture action and appellees did not institute forfeiture proceedings under state law. In fact, appellees have not represented to us that they have statutory authority under Mississippi law to institute forfeiture proceedings on the facts of this case. Cooper was afforded no process whatever with respect to the sale of the firearms. The summary judgment must be reversed.

**2.** *Rule 11 Sanctions*

The district court sanctioned Waide for failing to make a reasonable investigation of the facts and law, as required by Rule 11 of the Federal Rules of Civil Procedure, prior to filing Cooper's complaint. In the district court's view, a reasonable investigation would have revealed that Cooper had pled guilty to possession of the 201 firearms and thus would have disclosed that Cooper had no protectable property interest to assert. We obviously have concluded otherwise. The sanction was improvidently imposed and it is vacated.

The summary judgment in favor of the City of Greenwood and Leflore County is REVERSED and the matter is REMANDED for proceedings consistent with this opinion; the imposition of sanctions against Jim Waide, Esq., is VACATED.

**All Citations**

904 F.2d 302

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

180 F.3d 115
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Curtis Lee O'NEAL, Defendant–Appellant.

No. 96–4188.
|
Argued April 9, 1999.
|
Decided June 2, 1999.

**Synopsis**

Defendant was convicted in the United States District Court for the Western District of North Carolina, Richard L. Voorhees, J., for unlawful possession of a firearm ,and was sentenced as an armed career criminal, and he appealed. The Court of Appeals, Luttig, Circuit Judge, held that: (1) there was no abuse of discretion in denying defendant's motion for a new trial on grounds of jury misconduct because some jurors had been concerned that defendant might retaliate against them; (2) North Carolina, in determining the right to possess firearms upon discharge from a conviction, does not apply the law in effect on the date of the offense or conviction, but rather the law in effect on the date of discharge; (3) this does not violate the ex post facto clause; (4) thus, three North Carolina convictions were valid predicate convictions for sentencing as an armed career criminal; and (4) defendant had adequate notice that a 1977 conviction was a possible predicate conviction.

Affirmed.

**Attorneys and Law Firms**

**\*117 ARGUED:** Harold Johnson Bender, LAW OFFICE OF HAROLD J. BENDER, Charlotte, North Carolina, for Appellant. Brian Lee Whisler, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Before LUTTIG and WILLIAMS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

**Opinion**

**\*118** Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILLIAMS and Senior Judge BUTZNER joined.

LUTTIG, Circuit Judge:

Curtis Lee O'Neal appeals from his federal conviction for unlawful possession of a firearm and his enhanced sentence as an armed career criminal. He contends that the district court should have granted him a new trial because of jury misconduct and that there were not three predicate convictions to support his enhanced sentence. For the reasons that follow, we affirm.

I.

In April 1995, a jury in the Western District of North Carolina convicted O'Neal of one count of possessing a firearm in violation of 18 U.S.C. § 922(g)(1), which outlaws possession of a firearm, in or affecting interstate commerce, by any person "who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year." The district court denied O'Neal's motion for a new trial on this charge in June 1995. The predicate conviction on which the government relied to trigger section 922(g)(1)'s prohibition was O'Neal's conviction in April 1988 in North Carolina state court for assault with a deadly weapon with intent to kill and inflicting serious injury. At sentencing on O'Neal's firearm possession conviction, the district court, adopting the presentence report ("PSR") "for all purposes of this sentencing," agreed with the PSR's conclusion that O'Neal had at least three previous convictions (including the 1988 conviction) for violent felonies or serious drug offenses, *see* 18 U.S.C. § 924(e), and was therefore an armed career criminal subject to an enhanced sentence under section 4B1.4 of the sentencing guidelines. The court ultimately sentenced him to 262 months, the bottom of his guideline range.

O'Neal appeals, raising two arguments. He first argues that the district court abused its discretion by denying his motion for a new trial based upon jury misconduct. Second, he challenges the propriety of using two of the predicate convictions on which the government relies for his status as an armed career criminal—his North Carolina state convictions in 1975 and 1977.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

## II.

We need not dwell on O'Neal's claim that the district court abused its discretion in denying his motion for a new trial on grounds of jury misconduct, because this claim is meritless. Immediately after the jury rendered its verdict, the foreman and another juror informed the court and counsel that some jurors had been concerned to see O'Neal taking notes during jury selection, and that those jurors had feared that he would use the recorded information to retaliate against them. Because of this concern expressed by members of the jury, O'Neal moved for a mistrial.

The district court denied the motion for three reasons. First, the motion was untimely, having been filed over two months after the date of the verdict. *See* Fed.R.Crim.P. 33 (generally imposing seven-day time limit on motion for new trial). Second, given the overwhelming evidence of O'Neal's guilt, the court did not believe that the jurors' fears affected their verdict. Third, the court held that it could not apply Rule 33's longer period for bringing motions based on newly discovered evidence, because there was no such evidence. Rather, the district court reasoned, O'Neal possessed all of the evidence to support his motion "within ten minutes of the jury's verdict being returned." We see no abuse of discretion in denying O'Neal's motion on such reasoning, and certainly no "clear abuse." *United States v. Dorsey,* 45 F.3d 809, 817 (4th Cir.1995).

## III.

O'Neal raises two challenges to his enhanced sentence as an armed career criminal **\*119** under 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. He first argues that when, in 1983, North Carolina discharged his 1975 and 1977 convictions (by ending his parole), it applied the law in effect when he committed those offenses, pursuant to which it immediately restored his right to possess firearms. If the state did proceed as O'Neal suggests, the 1975 and 1977 convictions cannot, for the reasons discussed below, be used as predicate convictions for treating him as an armed career criminal under section 924(e), and, as a consequence, there are not three predicate convictions to support O'Neal's enhanced sentence. On the other hand, if, in 1983, North Carolina instead applied the law in effect in 1983, O'Neal could not then possess firearms, and these two convictions are therefore valid predicates. O'Neal

argues, however, that if we conclude that North Carolina did in fact apply the law in effect in 1983, application of that law violated the *Ex Post Facto* Clause. U.S. Const., Art. 1, § 10. Finally, as his second challenge to his status as an armed career criminal, O'Neal argues that the 1977 conviction cannot be a predicate conviction because he lacked notice that it might be so used. We reject each of these arguments.

## A.

Section 4B1.4 of the sentencing guidelines imposes an enhanced sentence on anyone who is an armed career criminal under 18 U.S.C. § 924(e)(1). Section 924(e)(1) applies to anyone "who violates section 922(g) of [Title 18] and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or serious drug offense, or both...." As we explained in *United States v. Clark,* 993 F.2d 402, 403 (4th Cir.1993), this language requires, among other things, that the three predicate convictions be "of the type referred to in § 922(g)(1)." Section 922(g)(1) applies to convictions for crimes "punishable by imprisonment for a term exceeding one year." There is, however, an important exception:

> Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20). In determining whether a "restoration of civil rights expressly provides that the person may not ... possess ... firearms," we look to the law of the jurisdiction of conviction, *see id.* (here, the State of North Carolina), and consider the jurisdiction's entire body of law, not merely, for example, the jurisdiction's certificate of restoration of rights, received upon discharge of a conviction. *United States v. McLean,* 904 F.2d 216, 218 (4th Cir.1990). Thus, by the interrelation of these three statutory provisions, sections 921(a)(20), 922(g)(1), and 924(e), a previous conviction may not serve as a predicate for application of section 924(e) if

the jurisdiction of conviction has restored to the defendant the civil rights, including the right to possess firearms, that it stripped from him upon his conviction.

O'Neal has four previous convictions that might serve as predicate convictions under section 924(e). The first is the 1988 conviction. O'Neal does not challenge its use as a predicate conviction. The second is a conviction in August 1983 in South Carolina for trafficking in marijuana. The government, however, no longer seriously contends that this conviction is a valid predicate, but rather admits that South Carolina fully restored O'Neal's civil rights when it discharged this conviction in 1987. Third, in June 1977, O'Neal was convicted in North Carolina for a felony larceny that occurred in March 1975.[1] North Carolina **120** discharged this conviction in May 1983. Finally, in August 1975, O'Neal was convicted in North Carolina for breaking and entering, felony larceny, and safecracking. North Carolina discharged this conviction in May 1983, the same day as the 1977 conviction.

[1]    In his *pro se* supplemental brief, O'Neal, disagreeing with the PSR, the government, and his own counsel's reply brief, claims that this conviction actually occurred in August 1975, with June 1977 merely being the date of sentencing. We need not resolve this question, however, because, for reasons discussed below, whether the conviction occurred in 1975 or 1977 is irrelevant to its validity as a predicate under section 924(e). The key date is, instead, when the conviction was discharged.

In evaluating the validity of the 1975 and 1977 convictions as predicate convictions under section 924(e), it is necessary to understand how North Carolina's Felony Firearms Act changed from its inception through 1983. The original version, enacted in 1971, outlawed possession of a firearm by any person convicted of a crime punishable by imprisonment for two or more years, N.C. Gen. Stat. § 14–415.1(a); section 14–415.2, however, exempted those whose civil rights had been restored.[2] Other laws then in effect generally restored a felon's civil rights two years after discharge of his conviction. *See State v. Currie,* 284 N.C. 562, 202 S.E.2d 153, 154–55 (1974). In 1973, North Carolina amended its laws to restore civil rights immediately upon discharge of a conviction,[3] but it did not then amend section 14–415.2. The effect was to restore a felon's right to possess firearms immediately upon discharge of his conviction. *See* 202 S.E.2d at 155–56. As we have explained, "[w]hen it became apparent that this would make virtually all felons exempt from the Firearms Act, the General Assembly repealed" section 14–415.2. *McLean,* 904

F.2d at 218–19 (citation omitted). At the same time, in 1975, the state legislature amended section 14–415.1 to limit the ban on possession of a firearm to five years from the date of a conviction's discharge.[4] *See* 904 F.2d at 218. These revisions took effect in October 1975, after O'Neal had committed the offenses that led to his 1975 and 1977 convictions, and, except for some minor changes not relevant here, they remained in effect in 1983, when North Carolina discharged those convictions.[5]

[2]    1971 N.C. Sess. Laws, ch. 954, § 1.

[3]    1973 N.C. Sess. Laws, ch. 251, codified at N.C. Gen.Stat. § 13–1 *et seq.*

[4]    1975 N.C. Sess. Laws, ch. 870.

[5]    In December 1995, North Carolina again amended section 14–415.1. *See* N.C. Gen.Stat. § 14–415.1(a) (Michie 1994 & Supp.1995) and accompanying historical notes. These changes are not relevant to this case.

The propriety of treating O'Neal as an armed career criminal under section 924(e) thus turns entirely on whether, in 1983, he was able to take advantage of the (inadvertently) lenient North Carolina law in effect from 1973 to 1975 or rather was subject to the five-year waiting period enacted in 1975 and in effect in 1983. If the former, here gained his right to possess firearms in May 1983, and neither the 1975 nor 1977 conviction may count as a predicate conviction. There would then be only one valid predicate conviction under section 924(e)—the 1988 conviction—and the district court would therefore have erred by enhancing O'Neal's sentence. If the latter, however, O'Neal's right to possess firearms in North Carolina was not restored until May 1988, five years after discharge. But this was at least a month *after* his 1988 conviction, which once again deprived him of the right to possess firearms, and that disability continued until at least June 1997, well after O'Neal's conviction in this case. Thus, if the five-year waiting period applied to O'Neal's 1975 and 1977 convictions, North Carolina *never* effectively restored his right to possess firearms following those convictions, and they both are valid predicate convictions under section 924(e). *See United States v. Clark,* 993 F.2d 402, 405 (4th Cir.1993) (looking to whether, following a conviction, **121** the defendant ever *actually* had the right to possess firearms in the state of conviction, rather than analyzing each conviction in isolation). In conjunction with the 1988 conviction, O'Neal then would have three predicate convictions under section

924(e), and the district court would have been correct to sentence him as an armed career criminal.

Turning first to the question of which version of the Felony Firearms Act North Carolina actually applied to O'Neal in 1983, we conclude that it applied the Act in effect in 1983. North Carolina, in determining the right to possess firearms upon discharge from a conviction, does not, as O'Neal urges, apply the law in effect on the date of the offense or conviction, but rather the law in effect on the date of discharge. *See State v. Tanner,* 39 N.C.App. 668, 251 S.E.2d 705 (1979) (applying post–1975 version of Felony Firearms Act to determine right of defendant to possess firearms following discharge in 1977 of predicate conviction from 1968); *State v. Cobb,* 18 N.C.App. 221, 196 S.E.2d 521 (1973) (applying original Felony Firearms Act to determine right to possess firearms in 1972, even though predicate conviction predated its enactment; rejecting *ex post facto* challenge), *rev'd on other grounds,* 284 N.C. 573, 201 S.E.2d 878 (1974).[6]

[6] We have no occasion to pass on any issues regarding whether North Carolina would allow a change in its laws to strip a felon of his previously restored right to possess firearms, and if so what effect that would have under sections 922(g)(1) and 924(e), or whether that would violate the *Ex Post Facto* Clause. We need only determine what law North Carolina applied in May 1983, since the Felony Firearms Act did not change between 1983 and 1988. *See generally United States v. Haynes,* 961 F.2d 50, 51–52 (4th Cir.1992) (in reversing conviction under § 922(g)(1), invoking West Virginia's presumption against retroactivity to justify applying state law in effect on date that defendant's civil rights (including right to possess firearms) were restored, rather than law in effect on date of possession, which made it a misdemeanor for a convicted felon to carry a firearm).

Having concluded that North Carolina applied the Felony Firearms Act as it stood in 1983, not 1975, to O'Neal's right to possess firearms in 1983, we next consider his argument that in doing so North Carolina violated the *Ex Post Facto* Clause. We reject this argument because the Act does not impose "punishment."

Other circuit courts, considering similar changes to the laws of other states in cases under sections 922(g)(1) or 924(e), appear to have split over the *ex post facto* issue. *See United States v. Huss,* 7 F.3d 1444 (9th Cir.1993) (rejecting *ex post facto* challenge), *overruled on other grounds, United States v. Sanchez–Rodriguez,* 161 F.3d 556 (9th Cir.1998) (*en banc* ). *Cf. Roehl v. United States,* 977 F.2d 375 (7th Cir.1992)

(similar). *But see United States v. Davis,* 936 F.2d 352 (8th Cir.1991) (finding *ex post facto* violation, but upholding 924(e) sentence on other ground). We have never addressed this precise question. *Cf. United States v. Herron,* 38 F.3d 115 (4th Cir.1994) (applying West Virginia law enacted in 1989 to determine right of felon to possess firearms in 1992, where predicate conviction occurred before 1989 but was discharged after 1989; not discussing *ex post facto* issue).

The *Ex Post Facto* Clause bars laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts," *Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), only the latter of which is relevant in this case. The Supreme Court has phrased the second part of this rule as prohibiting laws that retroactively "increase [ ] the penalty by which a crime is punishable." *California Dep't of Corrections v. Morales,* 514 U.S. 499, 507 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). "Punishment" and "penalty" are constitutional terms of art, defined in contra distinction to laws that are "civil," *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), or involve "regulation of a present situation," *Flemming* **\*122** *v. Nestor,* 363 U.S. 603, 614, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (quoting *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (plurality opinion of Frankfurter, J., joined by Clark, Whittaker, and Stewart, JJ.)). While laws that retroactively increase "punishment" or impose a "penalty" violate the *Ex Post Facto* Clause, retroactive civil or regulatory ones do not. *See Hendricks,* 521 U.S. at 361, 370, 117 S.Ct. 2072; *Flemming,* 363 U.S. at 613– 14, 80 S.Ct. 1367. *See also Collins,* 497 U.S. at 41, 110 S.Ct. 2715 ("[I]t has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes....").

In determining whether a law imposes "punishment," the Supreme Court has, particularly in recent cases, applied a two-part test. The Court first asks whether the legislature's intent, as discerned from the structure and design of the statute along with any declared legislative intent, was to impose a punishment or merely to enact a civil or regulatory law. *See Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072; *United States v. Ursery,* 518 U.S. 267, 288–89, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *Russell v. Gregoire,* 124 F.3d 1079, 1084, 1086– 87 (9th Cir.1997), *cert. denied sub nom., Stearns v. Gregoire,* 523 U.S. 1007, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998). *See also United States v. Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("To determine whether a

AR005012

4

restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent."). [7]

[7]     We realize that *Salerno* and *Ursery* were not *ex post facto* cases, and that the test for "punishment" is not necessarily the same in all constitutional contexts, *see Ursery,* 518 U.S. at 285, 116 S.Ct. 2135 (holding that civil forfeiture was not "punishment" under Double Jeopardy Clause and distinguishing cases that involved the Eighth Amendment's Excessive Fines Clause). *Salerno* involved a substantive due process challenge to a law, and *Ursery* involved the Double Jeopardy Clause. But from *Hendricks* (which involved both the Double Jeopardy and *Ex Post Facto* Clauses) and from other cases, it is apparent that the Court applies the same test for "punishment" for at least the *Ex Post Facto,* Double Jeopardy, and Bill of Attainder Clauses, and for substantive due process. *See Hendricks,* 521 U.S. at 363, 366, 117 S.Ct. 2072 (relying on *Salerno* ); *id.* at 361–69, 117 S.Ct. 2072 (treating *Ex Post Facto* and Double Jeopardy Clauses together for purposes of determining whether law at issue imposed "punishment"). *See also Flemming,* 363 U.S. at 613, 80 S.Ct. 1367 (applying same test for "punishment" to challenges under *Ex Post Facto* Clause, Bill of Attainder Clause, and Sixth Amendment right to trial by jury); *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (in case involving various rights under Fifth and Sixth Amendments, referring to "the tests traditionally applied to determine whether an Act of Congress is penal or regulatory," and citing to *ex post facto* cases, among others); *Russell,* 124 F.3d at 1086–87 (in *ex post facto* case, relying on *Ursery, Hendricks, Mendoza–Martinez,* and *Flemming* ). We therefore freely draw on *Ursery, Salerno,* and *Mendoza–Martinez,* along with *ex post facto* cases such as *Hendricks* and *Flemming.*

Second, even if the legislature did not intend to impose a punishment, a law still may be said to do so if the sanction or disability that it imposes is "so punitive in fact" that the law "may not legitimately be viewed as civil in nature." *Ursery,* 518 U.S. at 288, 116 S.Ct. 2135 (internal quotation marks omitted). *See id.* at 290, 116 S.Ct. 2135; *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072. *See also Flemming,* 363 U.S. at 616–17, 80 S.Ct. 1367 (looking first to "the language and structure" of the law, then to "the nature of the deprivation"). A defendant faces a "heavy burden" in making a showing of such a punitive effect, *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072, and can succeed only on the "clearest proof," *id.* (quoting *United States v. Ward,* 448 U.S. 242, 248–49 (1980)); *Ursery,* 518 U.S. at 289 n. 3, 290, 116 S.Ct. 2135.

The analysis under this latter part of the test focuses upon whether the sanction or disability that the law imposes "may rationally be connected" to the legislature's non-punitive intent, or rather "appears excessive" in light of that intent. *Salerno,* 481 U.S. at 747, 107 S.Ct. 2095 (internal **\*123** quotation marks omitted). *See Flemming,* 363 U.S. at 614, 80 S.Ct. 1367 (stating test as whether a "restriction of the individual comes about as a relevant incident to a regulation of a present situation") (quoting *De Veau,* 363 U.S. at 160, 80 S.Ct. 1146); *Flemming,* 363 U.S. at 617, 80 S.Ct. 1367 (finding "rational connection" between law's disability and legislature's intent). *See also Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (similar). If there is a rational connection, the legislature's non-punitive intent will control. If instead the law's sanction or disability appears excessive, then the law is "so punitive in fact" as to amount to "punishment." As the First Circuit explained in a thorough opinion rejecting an *ex post facto* challenge to the predecessor of 18 U.S.C. § 922(g)(1):

> [I]f the past conduct which is made the test of the right to engage in some activity in the future is not the kind of conduct which indicates unfitness to participate in the activity, it will be assumed, as it must, that the purpose of the statute is to impose an additional penalty for the past conduct. If, however, the past conduct can reasonably be said to indicate unfitness to engage in the future activity the assumption will be otherwise.

*Cases v. United States,* 131 F.2d 916, 921 (1st Cir.1942).

Applying this two-part test, we conclude that North Carolina, in amending the Felony Firearms Act to deprive felons of the right to possess firearms for five years following the discharge of their convictions, had a non-punitive intent, and that the deprivation the Act imposes is consistent with that intent. The Act is merely a measured public safety provision whose applicability to those previously convicted of felonies is eminently reasonable. Therefore, the Act does not impose "punishment," and its application to those who committed felonies before its enactment does not violate the *Ex Post Facto* Clause. [8]

8   *United States* v. *Lominac,* 144 F.3d 308 (4th Cir.1998), on which O'Neal relies, did not present the question of whether a law imposed "punishment" and so is not relevant to our analysis. In *Lominac,* we held that a state's change in its rules governing supervised release violated the *Ex Post Facto* Clause because it increased Lominac's sentence. *See id.* at 313–16. There was, understandably, no argument that increasing a prison sentence does not constitute "punishment."

With regard to the first part of the test, North Carolina has made clear that its intent was to enact a civil disability to protect the public from those, felons, whose possession of guns there was the most reason to fear, not to impose any punishment or penalty on felons. In *Cobb,* 196 S.E.2d at 524, the North Carolina Court of Appeals rejected an *Ex Post Facto* Clause challenge to the initial version of the Felony Firearms Act. In so doing, it relied entirely on *Williams v. United States,* 426 F.2d 253 (9th Cir.1970), in which the court had upheld a "similar" law, *Cobb,* 196 S.E.2d at 524, against such a challenge by explaining that it was "civil rather than penal." *Williams,* 426 F.2d at 255. Thus, the *Cobb* court viewed the Felony Firearms Act as civil. More recently, in *Tanner,* the North Carolina Court of Appeals similarly explained that the purpose of the Felony Firearms Act was "protection of the people from violence," 251 S.E.2d at 706, a purpose that the Supreme Court has recognized as "a legitimate regulatory goal." *Salerno,* 481 U.S. at 747, 107 S.Ct. 2095. *See Hendricks,* 521 U.S. at 363, 117 S.Ct. 2072; *Salerno,* 481 U.S. at 748–49, 107 S.Ct. 2095. The Act itself, as it stood in 1983 (the current version is the same in this regard), is consistent with the interpretation of North Carolina's courts, since it bars only the sorts of firearm possession by felons that, because of the conceal ability, power, or location of the firearm, are most likely to endanger the general public. *See* N.C. Gen.Stat. § 14–415.1(a) (banning possession only of handguns, short firearms, and weapons "of mass death and destruction," and exempting from the ban **\*124** possession of "a firearm within [a felon's] own home or on his lawful place of business").

In the face of this "manifest intent," *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072, we see no clear proof that the Act imposes a disability "so punitive,"*see id.,* as to negate such intent. Rather, the rational connection between the law and its intent is undeniable. A legislature's "judgment that a convicted felon ... is among the class of persons who should be disabled from dealing in or possessing firearms because of potential dangerousness is rational." *Lewis v. United States,* 445 U.S. 55, 67, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980)

(holding that federal ban on possession of firearms by felons applies even where predicate conviction may be subject to collateral attack, and that ban has rational basis and therefore does not deprive felons of equal protection of the laws). Such a law imposes an "essentially civil disability." *Id.* As the court in *Cases* explained, "[s]urely it is reasonable to conclude that one who has been convicted of a crime of violence is the kind of a person who cannot safely be trusted to possess and transport arms and ammunition." 131 F.2d at 921. Such persons have "demonstrated their unfitness to be entrusted with such dangerous instrumentalities." *Id. See Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072 ("As we have recognized, previous instances of violent behavior are an important indicator of future violent tendencies." (internal quotation marks omitted)).

Other considerations that the Supreme Court has found relevant in determining whether a law's sanction or disability is so punitive as to override a legislature's non-punitive intent support our conclusion that the Felony Firearms Act does not impose punishment. *See Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. 554 (listing factors); *Ursery,* 518 U.S. at 291–92, 116 S.Ct. 2135 (considering these factors); *Hendricks,* 521 U.S. at 361–63, 117 S.Ct. 2072 (same). First, although the law does impose an "affirmative disability," *Mendoza–Martinez,* 372 U.S. at 168, 83 S.Ct. 554, on felons, it is a mild one, far less onerous than many others that the Court has upheld as not constituting "punishment." *See Lewis,* 445 U.S. at 66, 100 S.Ct. 915 ("This Court has recognized repeatedly that a legislature constitutionally may prohibit a convicted felon from engaging in activities far more fundamental than the possession of a firearm.") (citing *ex post facto* cases); *Hawker v. New York,* 170 U.S. 189, 195–97, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (holding that ban on practice of medicine by felons did not impose punishment and therefore did not violate *Ex Post Facto* Clause). Second, *Lewis* suggests (as does *Cases* ) that such a disability as the Act imposes has not historically been regarded as punishment. Third, the Act includes no *scienter* requirement, and does not apply to conduct that is already criminal, *see* U.S. Const. Amend. II. Finally, although the Act may further the criminal-law aim of deterrence, deterrence can serve civil purposes, *Ursery,* 518 U.S. at 292, 116 S.Ct. 2135, and a law that deprives persons of the ability to commit certain crimes—here, those involving firearms—presupposes that for those persons the deterrence of the criminal law may not be sufficient, and that an additional civil disability may be necessary to protect the public. *See Hendricks,* 521 U.S. at 362–63, 117 S.Ct. 2072.

In upholding North Carolina's Felony Firearms Act against O'Neal's *Ex Post Facto* Clause challenge, we agree with the Ninth Circuit's decision in *Huss,* which, prior to *Ursery* and *Hendricks,* upheld a similar Oregon law against such a challenge in the context of a conviction under section 922(g)(1), and did so chiefly on the authority of *Cases. See Huss,* 7 F.3d at 1446–48.[9] We necessarily disagree with **\*125** the Eighth Circuit's decision in *Davis.* In *Davis,* which, like this case, presented a challenge to the applicability of section 924(e), the court held that the *Ex Post Facto* Clause required Minnesota to apply the law in effect at the time of conviction (which restored the right to possess firearms upon discharge) rather than the law in effect at the time of discharge (which imposed a ten-year waiting period) to determine whether Davis could possess firearms upon his discharge. *See* 936 F.2d at 356–57. We find *Davis* unpersuasive chiefly for two reasons. First, the court assumed an answer to the very question at issue—whether the change in Davis' right to possess firearms imposed "punishment." The court simply asserted that it did, *see id.* at 356, 357 n. 5, and the court's conclusion that the change violated the *Ex Post Facto* Clause necessarily followed, *see id.* at 356 ("Thus, at the time of Davis's 1971 conviction, part of his punishment was that his civil rights would be impaired only until he was discharged from his conviction."). The very presence, without comment, of "punishment" and "civil" in this sentence points to the critical issue that the court overlooked. Second, and related, the court did not consider, or even cite, any of the extensive Supreme Court caselaw on the meaning of "punishment."[10]

[9]   The Seventh Circuit has indirectly taken the same view. In *Roehl,* the court held that a Wisconsin statute that appeared to restore all of a convict's civil rights upon discharge did not actually do so. As "evidence" for this interpretation, the court pointed both to state caselaw holding that this statute did not restore the right to hold public office and to another state law, enacted after the defendant's predicate convictions had been discharged, that barred all felons from possessing a gun, regardless of when they were convicted. 977 F.2d at 377–78. The court briefly noted that its reliance on this latter statute as evidence did not create an "*expost facto* effect," and added, "[w]e have no doubt that if Roehl had been prosecuted for violation of [the latter statute], his earlier convictions could have been predicates without violation of the *ex post facto* provision." *Id.* at 378.

[10]   The Eighth Circuit's conclusion regarding the *ex post facto* effect of the change in Minnesota law also appears to have been unnecessary to the result in *Davis,* as the court went on to conclude that Minnesota did not restore Davis' right to possess firearms, because *federal* law at the time of both his conviction and discharge barred him from possession, and Minnesota had, upon restoring his civil rights, informed him of this disability. *Id.* at 357. The court therefore affirmed Davis' sentence.

In light of all of the foregoing, we hold that in 1983, when North Carolina discharged O'Neal's 1975 and 1977 convictions, the Felony Firearms Act in effect in 1983 barred him from possessing firearms for five years. Because, before the expiration of that five-year period, he was convicted of the 1988 offense, North Carolina never fully restored his civil rights after his 1975 and 1977 convictions, *see Clark,* 993 F.2d at 405, and they are therefore, along with the 1988 conviction, valid predicate convictions for purposes of 18 U.S.C. § 924(e).

### B.

O'Neal raises an additional challenge to the use of his 1977 conviction as a predicate under 18 U.S.C. § 924(e). He argues that this conviction should not count because the government did not include it in the notice that it filed with the district court of its intent to seek an enhanced sentence. We reject this argument because O'Neal had adequate notice that the 1977 conviction was a possible predicate conviction.

There is no requirement that the government list, either in the indictment or "in some formal notice," the predicate convictions on which it will rely for a section 924(e) enhancement. *United States v. Alvarez,* 972 F.2d 1000, 1006 (9th Cir.1992). *See United States v. Tracy,* 36 F.3d 187, 198 (1st Cir.1994). Although a defendant does have a right to adequate notice of the government's plan to seek such an enhancement, *see United States v. Sullivan,* 98 F.3d 686, 688 (1st Cir.1996); *cf. United States v. Mobley,* 40 F.3d 688, 691 (4th Cir.1994) (referring to government "[h]aving provided proper notice" of intent **\*126** to invoke section 924(e)), and of the convictions that may support that enhancement, *see United States v. Hudspeth,* 42 F.3d 1015, 1024 n. 17 (7th Cir.1994) (*en banc* ); *Tracy,* 36 F.3d at 198, the listing of these convictions in the PSR is more than adequate to provide such notice, *see id.; Sullivan,* 98 F.3d at 688; *cf. Hudspeth,* 42 F.3d at 1019 n.6 (explaining that a "certified record of conviction or a [PSR], if not challenged, will normally satisfy" the government's burden of establishing "that a defendant has three prior felony convictions"); *United States v. Morrell,* 61

F.3d 279, 279–80 (4th Cir.1995) (affirming sentence under section 924(e) where possibility of its application, and the possible predicate offenses, were not raised until the PSR, and government initially objected to use of one of the three predicate convictions listed in the PSR; not discussing notice).

In light of the prominence of the 1977 conviction in the PSR in this case, and the opportunity O'Neal had (and took) to object to its use, we conclude that he had adequate notice. The PSR explicitly relied on the 1977 conviction as a possible predicate for subjecting O'Neal to an enhanced sentence as an armed career criminal, and also gave a full description of the offense. Thus, O'Neal had every reason to object to its use, and in fact did so, both in his written objections to the PSR, J.A. at 302 (arguing that the 1977 conviction "is not a crime of violence" and that O'Neal had had his civil rights restored), and at his sentencing hearing, J.A. at 261 (repeating argument that 1977 conviction was not a crime of violence, and adding that government had not "filed a notice on" it). [11] We therefore conclude that the 1977 conviction, along with those in 1975 and 1988, formed the three predicates necessary to support applying 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4 to O'Neal, and we affirm his sentence.

[11]    O'Neal's opening brief on appeal, written before the government allegedly surprised him with the 1977 conviction, further proves his awareness of this conviction. He wrote as follows: "[O]ne of the predicate offenses for the enhanced sentence ... was the August 28, 1975 *conviction* for breaking and entering, larceny and safecracking. The criminal conduct underlying *these convictions* occurred on June 2, 1975 and June 18, 1975, respectively." Appellant's Br. at 10 (emphases added). As the PSR demonstrates, June 2 was the date of arrest for the offenses that led to the 1975 conviction (the conduct having occurred in February), whereas June 18 was the date of arrest for the offense that led to the 1977 conviction (the conduct having occurred in March 1975). J.A. at 291. Thus, O'Neal is referring, albeit unclearly, to both the 1975 and 1977 convictions, which, as already noted, the PSR did clearly distinguish.

IV.

The judgment of the district court is affirmed.

*AFFIRMED*

**All Citations**

180 F.3d 115

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

3 U.S. 386
Supreme Court of the United States.

Calder et Wife,
v.
Bull et Wife.

August Term, 1798.

**\*\*1** In error from the State of Connecticut. The cause was argued at the last term, (in the absence of THE CHIEF JUSTICE) and now the court delivered their opinions seriatim.

**Opinion**

**\*386** Chase, Justice.

**\*\*2** The decision of one question determines (in my opinion), the present dispute. I shall, therefore, state from the record no more of the case, than I think necessary for the consideration of that question only.

The Legislature of Connecticut, on the 2nd Thursday of May 1795, passed a resolution or law, which, for the reasons assigned, set aside a decree of the court of Probate for Harford, on the 21st of March 1793, which decree disapproved of the will of Normand Morrison (the grandson) made the 21st of August 1779, and refused to record the said will; and granted a new hearing by the said Court of Probate, with liberty of appeal therefrom, in six months. A new hearing was had, in virtue of this resolution, or law, before the said Court of Probate, who, on the 27th of July 1795, approved the said will, and ordered it to be recorded. At August 1795, appeal was then had to the superior court at Harford, who at February term 1796, affirmed the decree of the Court of Probate. Appeal was had to the Supreme Court of errors of Connecticut, who, in June 1796, adjudged, that there were no errors. More than 18 months elapsed from the decree of the Court of Probate (on the 1st of March 1793) and thereby Caleb Bull and wife were barred of all right **\*387** of appeal, by a statute of Connecticut. There was no law of that State whereby a new hearing, or trial, before the said Court of Probate might be obtained. Calder and wife claim the premises in question, in right of his wife, as heiress of N. Morrison, physician; Bull and wife claim under the will of N. Morrison, the grandson.

The Council for the Plaintiffs in error, contend, that the said resolution or law of the Legislature of Connecticut, granting a new hearing, in the above case, is an ex post facto law, prohibited by the Constitution of the United States; that any law of the Federal government, or of any of the State governments, contrary to the Constitution of the United States, is void; and that this court possesses the power to declare such law void.

It appears to me a self-evident proposition, that the several State Legislatures retain all the powers of legislation, delegated to them by the State Constitutions; which are not EXPRESSLY taken away by the Constitution of the United States. The establishing courts of justice, the appointment of Judges, and the making regulations for the administration of justice, within each State, according to its laws, on all subjects not entrusted to the Federal Government, appears to me to be the peculiar and exclusive province, and duty of the State Legislatures: All the powers delegated by the people of the United States to the Federal Government are defined, and NO CONSTRUCTIVE powers can be exercised by it, and all the powers that remain in the State Governments are indefinite; except only in the Constitution of Massachusetts.

The effect of the resolution or law of Connecticut, above stated, is to revise a decision of one of its Inferior Courts, called the Court of Probate for Harford, and to direct a new hearing of the case by the same Court of Probate, that passed the decree against the will of Normand Morrison. By the existing law of Connecticut a right to recover certain property had vested in Calder and wife (the appellants) in consequence of a decision of a court of justice, but, in virtue of a subsequent resolution or law, and the new hearing thereof, and the decision in consequence, this right to recover certain property was divested, and the right to the property declared to be in Bull and wife, the appellees. The sole enquiry is, whether this resolution or law of Connecticut, having such operation, is an ex post facto law, within the prohibition of the Federal Constitution?

**\*\*3** Whether the Legislature of any of the States can revise and correct by law, a decision of any of its Courts of Justice, although not prohibited by the Constitution of the State, is a question of very great importance, and not necessary NOW to be determined; because the resolution or law in question does not go so far. I cannot subscribe to the omnipotence of a State **\*388** Legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the Constitution, or fundamental law, of the State. The people of the United States erected their Constitutions, or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty; and to protect their persons and property from violence. The purposes for which

men enter into society will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it: The nature, and ends of legislative power will limit the exercise of it. This fundamental principle flows from the very nature of our free Republican governments, that no man should be compelled to do what the laws do not require; nor to refrain from acts which the laws permit. There are acts which the Federal, or State, Legislature cannot do, without exceeding their authority. There are certain vital principles in our free Republican governments, which will determine and over-rule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law; or to take away that security for personal liberty, or private property, for the protection whereof of the government was established. An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law in governments established on express compact, and on republican principles, must be determined by the nature of the power, on which it is founded. A few instances will suffice to explain what I mean. A law that punished a citizen for an innocent action, or, in other words, for an act, which, when done, was in violation of no existing law; a law that destroys, or impairs, the lawful private contracts of citizens; a law that makes a man a Judge in his own cause; or a law that takes property from A. and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit, of our State Governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them. The Legislature may enjoin, permit, forbid, and punish; they may declare new crimes; and establish rules of conduct for all its citizens in future cases; they may command what is right, and prohibit what is wrong; but they cannot change innocence into guilt; or punish innocence as a crime; or violate the right of an antecedent lawful private contract; or the right of private property. To maintain that our Federal, or State, Legislature possesses such powers, if they had not been expressly restrained; would, **389** in my opinion, be a political heresy, altogether inadmissible in our free republican governments.

**4** All the restrictions contained in the Constitution of the United States on the power of the State Legislatures, were provided in favour of the authority of the Federal Government. The prohibition against their making any ex post facto laws was introduced for greater caution, and very probably arose from the knowledge, that the Parliament of Great Britain claimed and exercised a power to pass such laws, under the denomination of bills of attainder, or bills of pains and penalties; the first inflicting capital, and the other less, punishment. These acts were legislative judgments; and an exercise of judicial power. Sometimes they respected the crime, by declaring acts to be treason, which were not treason, when committed, [a] at other times, they violated the rules of evidence (to supply a deficiency of legal proof) by admitting one witness, when the existing law required two; by receiving evidence without oath; or the oath of the wife against the husband; or other testimony, which the courts of justice would not admit; [a] at other times they inflicted punishments, where the party was not, by law, liable to any punishment; [b] and in other cases, they inflicted greater punishment, than the law annexed to the offence. [c] The ground for the exercise of such legislative power was this, that the safety of the kingdom depended on the death, or other punishment, of the offender: as if traitors, when discovered, could be so formidable, or the government so insecure! With very few exceptions, the advocates of such laws were stimulated by ambition, or personal resentment, and vindictive malice. To prevent such, and similar, acts of violence and injustice, I believe, the Federal and State Legislatures, were prohibited from passing any bill of attainder; or any ex post facto law.

[a]   The case of the Earl of Strafford, in 1641.

[a]   The case of Sir John Fenwick, in 1696.

[b]   The banishment of Lord Clarendon, 1669 (19 Car. II., c. 10), and of the Bishop of Atterbury, in 1723 (9 Geo. I., c. 17).

[c]   The Coventry act, in 1670 (22 & 23 Car. II., c. 1).

The case of the Earl of Strafford, in 1641.

The case of Sir John Fenwick, in 1696.

The banishment of Lord Clarendon, 1669 (19 Ca. 2. c. 10.) and of the Bishop of Atterbury, in 1723, (9 Geo. 1. c. 17.)

The Coventry act, in 1670, (22 & 23 Car. 2 c. 1.)

The Constitution of the United States, article 1, section 9, prohibits the Legislature of the United States from passing any ex post facto law; and, in section 10, lays several restrictions on the authority of the Legislatures of the several states; and, among them, 'that no state shall pass any ex post facto law.'

**\*\*5**  It may be remembered, that the legislatures of several of the states, to wit, Massachusetts, Pennsylvania, Delaware, Maryland, and North and South Carolina, are expressly prohibited, by their state Constitutions, from passing any ex post facto law.

**\*390**  I shall endeavour to show what law is to be considered an ex post facto law, within the words and meaning of the prohibition in the Federal Constitution. The prohibition, 'that no state shall pass any ex post facto law, ' necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing. Literally, it is only, that a law shall not be passed concerning, and after the fact, or thing done, or action committed. I would ask, what fact; of what nature, or kind; and by whom done? That Charles 1st. king of England, was beheaded; that Oliver Cromwell was Protector of England; that Louis 16th, late King of France, was guillotined; are all facts, that have happened; but it would be nonsense to suppose, that the States were prohibited from making any law after either of these events, and with reference thereto. The prohibition, in the letter, is not to pass any law concerning, and after the fact; but the plain and obvious meaning and intention of the prohibition is this; that the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it. The prohibition considered in this light, is an additional bulwark in favour of the personal security of the subject, to protect his person from punishment by legislative acts, having a retrospective operation. I do not think it was inserted to secure the citizen in his private rights, of either property, or contracts. The prohibitions not to make any thing but gold and silver coin a tender in payment of debts, and not to pass any law impairing the obligation of contracts, were inserted to secure private rights; but the restriction not to pass any ex post facto law, was to secure the person of the subject from injury, or punishment, in consequence of such law. If the prohibition against making ex post facto laws was intended to secure personal rights from being affected, or injured, by such laws, and the prohibition is sufficiently extensive for that object, the other restraints, I have enumerated, were unnecessary, and therefore improper; for both of them are retrospective.

I will state what laws I consider ex post facto laws, within the words and the intent of the prohibition. 1st. Every law that makes an action , done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that

changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.  **\*391**  All these, and similar laws, are manifestly unjust and oppressive. In my opinion, the true distinction is between ex post facto laws, and retrospective laws. Every ex post facto law must necessarily be retrospective; but every retrospective law is not an ex post facto law: The former, only, are prohibited. Every law that takes away, or impairs, rights vested, agreeably to existing laws, is retrospective, and is generally unjust; and may be oppressive; and it is a good general rule, that a law should have no retrospect: but there are cases in which laws may justly, and for the benefit of the community, and also of individuals, relate to a time antecedent to their commencement; as statutes of oblivion, or of pardon. They are certainly retrospective, and literally both concerning, and after, the facts committed. But I do not consider any law ex post facto, within the prohibition, that mollifies the rigor of the criminal law; but only those that create, or aggravate, the crime; or encrease the punishment, or change the rules of evidence, for the purpose of conviction. Every law that is to have an operation before the making thereof, as to commence at an antecedent time; or to save time from the statute of limitations; or to excuse acts which were unlawful, and before committed, and the like; is retrospective. But such laws may be proper or necessary, as the case may be. There is a great and apparent difference between making an UNLAWFUL act LAWFUL; and the making an innocent action criminal, and punishing it as a CRIME. The expressions 'ex post facto laws,' are technical, they had been in use long before the Revolution, and had acquired an appropriate meaning, by Legislators, Lawyers, and Authors. The celebrated and judicious Sir William Blackstone, in his commentaries, considers an ex post facto law precisely in the same light I have done. His opinion is confirmed by his successor, Mr. Wooddeson; and by the author of the Federalist, who I esteem superior to both, for his extensive and accurate knowledge of the true principles of Government.

 **\*\*6**  I also rely greatly on the definition, or explanation of EX POST FACTO LAWS, as given by the Conventions of Massachusetts, Maryland, and North Carolina; in their several Constitutions, or forms of Government.

In the declaration of rights, by the convention of Massachusetts, part 1st. sect. 24, 'Laws made to punish actions done before the existence of such laws, and which

have not been declared CRIMES by preceeding laws, are unjust, etc.'

In the declaration of rights, by the convention of Maryland, art. 15th, 'Retrospective laws punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, etc.'

**\*392** In the declaration of rights by the convention of North Carolina, art. 24th, I find the same definition, precisely in the same words, as in the Maryland constitution.

In the declaration of Rights by the convention of Delaware, art. 11th, the same definition was clearly intended, but inaccurately expressed; by saying 'laws punishing offences (instead of actions, or facts) committed before the existence of such laws, are oppressive, etc.'

I am of opinion, that the fact, contemplated by the prohibition, and not to be affected by a subsequent law, was some fact to be done by a Citizen, or Subject.

In 2nd Lord Raymond 1352, Raymond, Justice, called the stat. 7 Geo. 1st. stat. 2 par 8, about registering Contracts for South Sea Stock, an ex post facto law; because it affected Contracts made before the statute.

In the present case, there is no fact done by Bull and wife Plaintiffs in Error, that is in any manner affected by the law or resolution of Connecticut: It does not concern, or relate to, any act done by them. The decree of the Court of Probate of Harford (on the 21st, March) in consequence of which Calder and wife claim a right to the property in question, was given before the said law or resolution, and in that sense, was affected and set aside by it; and in consequence of the law allowing a hearing and the decision in favor of the will, they have lost, what they would have been entitled to, if the Law or resolution, and the decision in consequence thereof, had not been made. The decree of the Court of probate is the only fact, on which the law or resolution operates. In my judgment the case of the Plaintiffs in Error, is not within the letter of the prohibition; and, for the reasons assigned, I am clearly of opinion, that it is not within the intention of the prohibition; and if within the intention, but out of the letter, I should not, therefore, consider myself justified to continue it within the prohibition, and therefore that the whole was void.

It was argued by the Counsel for the plaintiffs in error, that the Legislature of Connecticut had no constitutional power to make the resolution (or law) in question, granting a new hearing, etc.

**\*\*7** Without giving an opinion, at this time, whether this Court has jurisdiction to decide that any law made by Congress, contrary to the Constitution of the United States, is void; I am fully satisfied that this court has no jurisdiction to determine that any law of any state Legislature, contrary to the Constitution of such state, is void. Further, if this court had such jurisdiction, yet it does not appear to me, that the resolution (or law) in question, is contrary to the charter of Connecticut, or its constitution, which is said by counsel to be composed of its charter, **\*393** acts of assembly, and usages, and customs. I should think, that the courts of Connecticut are the proper tribunals to decide, whether laws, contrary to the constitution thereof, are void. In the present case they have, both in the inferior and superior courts, determined that the Resolution (or law) in question was not contrary to either their state, or the federal, constitution.

To show that the resolution was contrary to the constitution of the United States, it was contended that the words, ex post facto law, have a precise and accurate meaning, and convey but one idea to professional men, which is, 'by matter of after fact; by something after the fact.' And Co. Litt. 241. Fearnes Con. Rem. (Old Ed.) 175 and 203. Powell on Devises 113, 133. 134. were cited; and the table to Coke's Reports (by Wilson) title ex post facto, was referred to. There is no doubt that a man may be a trespasser from the beginning, by matter of after fact; as where an entry is given by law, and the party abuses it; or where the law gives a distress, and the party kills, or works, the distress.

I admit, an act unlawful in the beginning may, in some cases, become lawful by matter of after fact.

I also agree, that the words 'ex post facto' have the meaning contended for, and no other, in the cases cited, and in all similar cases; where they are used unconnected with, and without relation to, Legislative acts, or laws.

There appears to me a manifest distinction between the case where one fact relates to, and affects, another fact, as where an after fact, by operation of law, makes a former fact, either lawful or unlawful; and the case where a law made after a fact done, is to operate on, and to affect, such fact. In the first case both the acts are done by private persons. In the second case the first act is done by a private person, and the second act is done by the legislature to affect the first act.

I believe that but one instance can be found in which a British judge called a statute, that affected contracts made before the statute, an ex post facto law; but the judges of Great

Britain always considered penal statutes, that created crimes, or encreased the punishment of them, as ex post facto laws.

If the term ex post facto law is to be construed to include and to prohibit the enacting any law after a fact, it will greatly restrict the power of the federal and state legislatures; and the consequences of such a construction may not be foreseen.

**8** If the prohibition to make no ex post facto law extends to all laws made after the fact, the two prohibitions, not to make any thing but gold and silver coin a tender in payment of debts; and not to pass any law impairing the obligation of contracts, were improper and unnecessary.

*394** It was further urged, that if the provision does not extend to prohibit the making any law after a fact, then all choses in action; all lands by Devise; all personal property by bequest, or distribution; by Elegit; by execution; by judgments, particularly on torts; will be unprotected from the legislative power of the states; rights vested may be divested at the will and pleasure of the state legislatures; and, therefore, that the true construction and meaning of the prohibition is, that the states pass no law to deprive a citizen of any right vested in him by existing laws.

It is not to be presumed, that the federal or state legislatures will pass laws to deprive citizens of rights vested in them by existing laws; unless for the benefit of the whole community; and on making full satisfaction. The restraint against making any ex post facto laws was not considered, by the framers of the constitution, as extending to prohibit the depriving a citizen even of a vested right to property; or the provision, 'that private property should not be taken for PUBLIC use, without just compensation,' was unnecessary.

It seems to me, that the right of property, in its origin, could only arise from compact express, or implied, and I think it the better opinion, that the right, as well as the mode, or manner, of acquiring property, and of alienating or transferring, inheriting, or transmitting it, is conferred by society; is regulated by civil institution, and is always subject to the rules prescribed by positive law. When I say that a right is vested in a citizen, I mean, that he has the power to do certain actions; or to possess certain things, according to the law of the land.

If any one has a right to property such right is a perfect and exclusive right; but no one can have such right before he has acquired a better right to the property, than any other person in the world: a right, therefore, only to recover property cannot be called a perfect and exclusive right. I cannot agree, that a

right to property vested in Calder and wife, in consequence of the decree (of the 21st. of March 1783) disapproving of the will of Morrison, the Grandson. If the will was valid, Mrs. Calder could have no right, as heiress of Morrison, the physician; but if the will was set aside, she had an undoubted title.

The resolution (or law) alone had no manner of effect on any right whatever vested in Calder and wife. The Resolution (or law) combined with the new hearing, and the decision, in virtue of it, took away their right to recover the property in question. But when combined they took away no right of property vested in Calder and wife; because the decree against the will (21st. March 1783) did not vest in or transfer any property to them.

**9** *395** I am under a necessity to give a construction, or explanation of the words, 'ex post facto law,' because they have not any certain meaning attached to them. But I will not go farther than I feel myself bound to do; and if I ever exercise the jurisdiction I will not decide any law to be void, but in a very clear case.

I am of opinion, that the decree of the Supreme Court of Errors of Connecticut be affirmed, with costs.

Paterson, Justice.

The Constitution of Connecticut is made up of usages, and it appears that its Legislature have, from the beginning, exercised the power of granting new trials. This has been uniformly the case till the year 1762, when this power was, by a legislative act, imparted to the superior and county courts. But the act does not remove or annihilate the pre-existing power of the Legislature, in this particular; it only communicates to other authorities a concurrence of jurisdiction, as to the awarding of new trials. And the fact is, that the Legislature have, in two instances, exercised this power since the passing of the law in 1762. They acted in a double capacity, as a house of legislation, with undefined authority, and also as a court of judicature in certain exigencies. Whether the latter arose from the indefinite nature of their legislative powers, or in some other way, it is not necessary to discuss. From the best information, however, which I have been able to collect on this subject, it appears, that the Legislature, or general court of Connecticut, originally possessed, and exercised all legislative, executive, and judicial authority; and that, from time to time, they distributed the two latter in such manner as they thought proper; but without parting with the general superintending power, or the right of exercising the same, whenever they

should judge it expedient. But be this as it may, it is sufficient for the present to observe, that they have on certain occasions, excercised judicial authority from the commencement of their civil polity. This usage makes up part of the Constitution of Connecticut, and we are bound to consider it as such, unless it be inconsistent with the Constitution of the United States. True it is, that the awarding of new trials falls properly within the province of the judiciary; but if the Legislature of Connecticut have been in the uninterrupted exercise of this authority, in certain cases, we must, in such cases, respect their decisions as flowing from a competent jurisdiction, or constitutional organ. And therefore we may, in the present instance, consider the Legislature of the state, as having acted in their customary judicial capacity. If so, there is an end of the question. For if the power, thus exercised, comes more properly within the description of a judicial than of a legislative power; and if by usage or the **\*396** Constitution, which, in Connecticut, are synonimous terms, the Legislature of that state acted in both capacities; then in the case now before us, it would be fair to consider the awarding of a new trial, as an act emanating from the judiciary side of the department. But as this view of the subject militates against the Plaintiffs in error, their counsel has contended for a reversal of the judgment, on the ground, that the awarding of a new trial, was the effect of a legislative act, and that it is unconstitutional, because an ex post facto law. For the sake of ascertaining the meaning of these terms, I will consider the resolution of the General court of Connecticut, as the exercise of a legislative and not a judicial authority. The question, then, which arises on the pleadings in this cause, is, whether the resolution of the Legislature of Connecticut, be an ex post facto law, within the meaning of the Constitution of the United States? I am of opinion, that it is not. The words, ex post facto, when applied to a law, have a technical meaning, and, in legal phraseology, refer to crimes, pains, and penalties. Judge Blackstone's description of the terms is clear and accurate. 'There is, says he, a still more unreasonable method than this, which is called making of laws, ex post facto, when after an action, indifferent in itself, is committed, the Legislator, then, for the first time, declares it to have been a crime, and inflicts a punishment upon the person who has committed it. Here it is impossible, that the party could foresee that an action, innocent when it was done, should be afterwards converted to guilt by a subsequent law; he had, therefore, no cause to abstain from it; and all punishment for not abstaining, must, of consequence, be cruel and unjust.' 1 Bl. Com. 46. Here the meaning, annexed to the terms ex post facto laws, unquestionably refers to crimes, and nothing else. The historic page abundantly evinces, that the power of

passing such laws should be withheld from legislators; as it is a dangerous instrument in the hands of bold, unprincipled, aspiring, and party men, and has been two often used to effect the most detestable purposes.

 **\*\*10** On inspecting such of our state Constitutions, as take notice of laws made ex post facto, we shall find, that they are understood in the same sense.

The Constitution of Massachusetts, article 24th of the Declaration of rights.

'Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government.'

The Constitution of Delaware, article 11th of the Declaration of Rights:

 **\*397** 'That retrospective laws punishing offences committed before the existence of such laws, are oppressive and unjust, and ought not to be made.'

The Constitution of Maryland, article 15th of the Declaration of Rights:

'That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no ex post facto law ought to be made.'

The Constitution of North Carolina, article 24th of the Declaration of Rights:

'That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no ex post facto law ought to be made.'

From the above passages it appears, that ex post facto laws have an appropriate signification; they extend to penal statutes, and no further; they are restricted in legal estimation to the creation, and, perhaps, enhancement of crimes, pains and penalties. The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty; and therefore they may be classed together.

Again, the words of the Constitution of the United States are, 'That no State shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts.' Article 1st. section 10.

Where is the necessity or use of the latter words, if a law impairing the obligation of contracts, be comprehended within the terms ex post facto law? It is obvious from the specification of contracts in the last member of the clause, that the framers of the Constitution, did not understand or use the words in the sense contended for on the part of the Plaintiffs in Error. They understood and used the words in their known and appropriate signification, as referring to crimes, pains, and penalties, and no further. The arrangement of the distinct members of this section, necessarily points to this meaning.

I had an ardent desire to have extended the provision in the Constitution to retrospective laws in general. There is neither policy nor safety in such laws; and, therefore, I have always had a strong aversion against them. It may, in general, be truly observed of retrospective laws of every description, that they neither accord with sound legislation, nor the fundamental principles of the social compact. But on full consideration, I am convinced, that ex post facto laws must be limited in the manner already expressed; they must be taken in their technical, which is also their common and general, acceptation, and are not to be understood in their literal sense.

**11** *398 Iredell, Justice.

Though I concur in the general result of the opinions, which have been delivered, I cannot entirely adopt the reasons that are assigned upon the occasion.

From the best information to be collected, relative to the Constitution of Connecticut, it appears, that the Legislature of that State has been in the uniform, uninterrupted, habit of exercising a general superintending power over its courts of law, by granting new trials. It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, with respect to suits depending or adjudged, new rights of trial, new privileges of proceeding, not previously recognized and regulated by positive institutions; but such is the established usage of Connecticut, and it is obviously consistent with the general superintending authority of her Legislature Nor is it altogether without some sanction for a Legislature to act as a court of justice. In England, we know, that one branch of the Parliament, the house of Lords, not only exercises a judicial power in cases of impeachment, and for the trial of its own members, but as the court of dernier resort, takes cognizance of many suits at law, and in equity: And that in construction of law, the jurisdiction there exercised is by the King in full Parliament; which shows that, in its origin, the causes were probably heard before the whole Parliament. When Connecticut was settled, the right

of empowering her Legislature to superintend the Courts of Justice, was, I presume, early assumed; and its expediency, as applied to the local circumstances and municipal policy of the State, is sanctioned by a long and uniform practice. The power, however, is judicial in its nature; and whenever it is exercised, as in the present instance, it is an exercise of judicial, not of legislative, authority.

But, let us, for a moment, suppose, that the resolution, granting a new trial, was a legislative act, it will by no means follow, that it is an act affected by the constitutional prohibition, that 'no State shall pass any ex post facto law.' I will endeavour to state the general principles, which influence me, on this point, succinctly and clearly, though I have not had an opportunity to reduce my opinion to writing.

If, then, a government, composed of Legislative, Executive and Judicial departments, were established, by a Constitution, which imposed no limits on the legislative power, the consequence would inevitably be, that whatever the legislative power chose to enact, would be lawfully enacted, and the judicial power could never interpose to pronounce it void. It is true, that some speculative jurists have held, that a legislative act against natural justice must, in itself, be void; but I cannot think that, under such a government, any Court of Justice would possess a power to declare it so. Sir William Blackstone, having put the strong case of an act of Parliament, which should *399 authorise a man to try his own cause, explicitly adds, that even in that case, 'there is no court that has power to defeat the intent of the Legislature, when couched in such evident and express words, as leave no doubt whether it was the intent of the Legislature, or no.' 1 Bl. Com. 91.

**12** In order, therefore, to guard against so great an evil, it has been the policy of all the American states, which have, individually, framed their state constitutions since the revolution, and of the people of the United States, when they framed the Federal Constitution, to define with precision the objects of the legislative power, and to restrain its exercise within marked and settled boundaries. If any act of Congress, or of the Legislature of a state, violates those constitutional provisions, it is unquestionably void; though, I admit, that as the authority to declare it void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case. If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the

principles of natural justice. The ideas of natural justice are regulated by no fixed standard: the ablest and the purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice. There are then but two lights, in which the subject can be viewed: 1st. If the Legislature pursue the authority delegated to them, their acts are valid. 2nd. If they transgress the boundaries of that authority, their acts are invalid. In the former case, they exercise the discretion vested in them by the people, to whom alone they are responsible for the faithful discharge of their trust: but in the latter case, they violate a fundamental law, which must be our guide, whenever we are called upon as judges to determine the validity of a legislative act.

Still, however, in the present instance, the act or resolution of the Legislature of Connecticut, cannot be regarded as an ex post facto law; for, the true construction of the prohibition extends to criminal, not to civil, cases. It is only in criminal cases, indeed, in which the danger to be guarded against, is greatly to be apprehended. The history of every country in Europe will furnish flagrant instances of tyranny exercised under the pretext of penal dispensations. Rival factions, in their efforts to crush each other, have superseded all the forms, and suppressed all the sentiments, of justice; while attainders, on the principle of retaliation and proscription, have marked all the **\*400** vicissitudes of party triumph. The temptation to such abuses of power is unfortunately too alluring for human virtue; and, therefore, the framers of the American Constitutions have wisely denied to the respective Legislatures, Federal as well as State, the possession of the power itself: They shall not pass any ex post facto law; or, in other words, they shall not inflict a punishment for any act, which was innocent at the time it was committed; nor increase the degree of punishment previously denounced for any specific offence.

**\*\*13** The policy, the reason and humanity, of the prohibition, do not, I repeat, extend to civil cases, to cases that merely affect the private property of citizens. Some of the most necessary and important acts of Legislation are, on the contrary, founded upon the principle, that private rights must yield to public exigences. Highways are run

through private grounds. Fortifications, Light-houses, and other public edifices, are necessarilly sometimes built upon the soil owned by individuals. In such, and similar cases, if the owners should refuse voluntarily to accommodate the public, they must be constrained, as far as the public necessities require; and justice is done, by allowing them a reasonable equivalent. Without the possession of this power the operations of Government would often be obstructed, and society itself would be endangered. It is not sufficient to urge, that the power may be abused, for, such is the nature of all power, such is the tendency of every human institution: and, it might as fairly be said, that the power of taxation, which is only circumscribed by the discretion of the Body, in which it is vested, ought not to be granted, because the Legislature, disregarding its true objects, might, for visionary and useless projects, impose a tax to the amount of nineteen shillings in the pound. We must be content to limit power where we can, and where we cannot, consistently with its use, we must be content to repose a salutary confidence. It is our consolation that there never existed a Government, in ancient or modern times, more free from danger in this respect, than the Governments of America.

Upon the whole, though there cannot be a case, in which an ex post facto law in criminal matters is requisite, or justifiable (for Providence never can intend to promote the prosperity of any country by bad means) yet, in the present instance the objection does not arise: Because, 1st. if the act of the Legislature of Connecticut was a judicial act, it is not within the words of the Constitution; and 2nd. even if it was a legislative act, it is not within the meaning of the prohibition.

Cushing, Justice.

The case appears to me to be clear of all difficulty, taken either way. If the act is a judicial act, it is not touched by the Federal Constitution: and, if it is a legislative **\*401** act, it is maintained and justified by the ancient and uniform practice of the state of Connecticut.

Judgment affirmed.

**All Citations**

3 U.S. 386, 3 Dall. 386, 1798 WL 587, 1 L.Ed. 648

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Peugh v. U.S., 569 U.S. 530 (2013)

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

133 S.Ct. 2072
Supreme Court of the United States

Marvin PEUGH, Petitioner

v.

UNITED STATES.

No. 12–62.
|
Argued Feb. 26, 2013.
|
Decided June 10, 2013.

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the Northern District of Illinois, Frederick J. Kapala, J., of bank fraud, and he appealed. The United States Court of Appeals for the Seventh Circuit, Rovner, Circuit Judge, 675 F.3d 736, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Sotomayor, held that:

Ex Post Facto Clause is violated when defendant is sentenced under current Guidelines providing higher sentencing range than Guidelines in effect at the time of offense, abrogating *U.S. v. Demaree*, 459 F.3d 791, and

determination that Ex Post Facto Clause is violated in such circumstances does not undo *Booker* remedy creating advisory sentencing regime.

Reversed and remanded.

Justice Kennedy joined the majority opinion in part.

Justice Thomas filed a dissenting opinion, in which Chief Justice Roberts, Justice Scalia, and Justice Alito joined in part.

Justice Alito filed a dissenting opinion, in which Justice Scalia joined.

**West Codenotes**

**Limited on Constitutional Grounds**
18 U.S.C.A. § 3553(a)(4)(A)(ii)

**\*\*2075** *Syllabus* \*

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*530** Petitioner Peugh was convicted of five counts of bank fraud for conduct that occurred in 1999 and 2000. At sentencing, he argued that the *Ex Post Facto* Clause required that he be sentenced under the 1998 version of the Federal Sentencing Guidelines in effect at the time of his offenses rather than under the 2009 version in effect at the time of sentencing. Under the 1998 Guidelines, Peugh's sentencing range was 30 to 37 months, but the 2009 Guidelines assigned more severe consequences to his acts, yielding a range of 70 to 87 months. The District Court rejected Peugh's *ex post facto* claim and sentenced him to 70 months' imprisonment. The Seventh Circuit affirmed.

*Held* : The judgment is reversed, and the case is remanded.

675 F.3d 736, reversed and remanded.

Justice SOTOMAYOR delivered the opinion of the Court, except as to Part III–C, concluding that the *Ex Post Facto* Clause is violated when a defendant is sentenced under Guidelines promulgated **\*\*2076** after he committed his criminal acts and the new version provides a higher sentencing range than the version in place at the time of the offense. Pp. 2079 – 2085, 2085 – 2088.

(a) Though no longer mandatory, see *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, the Guidelines still play an important role in sentencing procedures. A district court must begin "by correctly calculating the applicable Guidelines," *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445, and then consider the parties' arguments and factors specified in 18 U.S.C. § 3553(a). 552 U.S., at 49–50, 128 S.Ct. 586. The court "may not presume that the Guidelines range is reasonable," *id.,* at 50, 128 S.Ct. 586, and must explain the basis for its sentence on the record, *ibid.* On appeal, a sentence is reviewed for reasonableness under an abuse-of-discretion standard. *Id.,* at 51, 128 S.Ct. 586. A district court is to apply the Guidelines "in effect on the date the defendant is sentenced," § 3553(a)(4)(A)(ii), but, per the Guidelines, is to use the Guidelines in effect on the date the offense was committed should the Guidelines in effect on the

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

sentencing date be found to violate the *Ex Post Facto* Clause. Pp. 2079 – 2081.

(b) The Constitution forbids the passage of *ex post facto* laws, a category including, as relevant here, "[e]very law that *changes the punishment,* and inflicts *a greater punishment,* than the law annexed to the **\*531** crime, when committed." *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648. The " scope of this Latin phrase" is given "substance by an accretion of case law." *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344. The touchstone of the inquiry is whether a given change in law presents a " 'sufficient risk of increasing the measure of punishment attached to the covered crimes.' " *Garner v. Jones,* 529 U.S. 244, 250, 120 S.Ct. 1362, 146 L.Ed.2d 236. Pp. 2081 – 2082.

(c) The most relevant prior decision is *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351. There, the Court found an *ex post facto* violation when the petitioner was sentenced under Florida's new sentencing guidelines, which yielded a higher sentencing range than the guidelines in place at the time of his crime. The pre-existing guidelines would have required the sentencing judge to provide clear and convincing reasons in writing for any departure, and the sentence would have been reviewable on appeal. But under the new guidelines, a sentence within the guidelines range required no explanation and was unreviewable. Variation in the sentence, though possible, was burdensome; so in the ordinary case, a defendant would receive a within-guidelines sentence. Thus, increasing the applicable guidelines range created a significant risk of a higher sentence.

The same principles apply to the post-*Booker* federal sentencing scheme, which aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines. Normally, a "judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Freeman v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2685, 2692, 180 L.Ed.2d 519. That the court may impose a sentence outside that range does not deprive the Guidelines of force as the framework for sentencing. Uniformity is also promoted by appellate review for reasonableness with the Guidelines as a benchmark. Appellate courts may presume a within-Guidelines sentence is reasonable, see *Rita v. United States,* 551 U.S. 338, 347, 127 S.Ct. 2456, 168 L.Ed.2d 203, and may "consider the extent of the deviation" from the Guidelines as part of their reasonableness review, **\*\*2077** *Gall,* 552 U.S., at 51, 128 S.Ct. 586. The sentencing regime also puts in place

procedural hurdles that, in practice, make imposition of a non-Guidelines sentence less likely. Florida's scheme and the federal regime differ, but those differences are not dispositive. Common sense indicates that the federal system generally will steer district courts to more within-Guidelines sentences, and considerable empirical evidence suggests that the Guidelines have that effect. A retrospective increase in an applicable Guidelines range thus creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation. Pp. 2082 – 2085.

(d) The Government's contrary arguments are unpersuasive. Its principal claim is that the Sentencing Guidelines lack sufficient legal effect to attain the status of a "law" within the meaning of the *Ex Post Facto* Clause. Changes in law need not bind a sentencing authority for **\*532** there to be an *ex post facto* violation, and "[t]he presence of discretion does not displace the protections of [that] Clause." *Garner,* 529 U.S., at 253, 120 S.Ct. 1362. As for contrasts between the Federal Guidelines and the Florida system in *Miller,* the difference between the two systems is one in degree, not in kind. The attributes of post-*Booker* sentencing fail to show that the Guidelines are but one among many persuasive sources a sentencing court may consult in making a decision. Recognizing an *ex post facto* violation here is consistent with post-*Booker* Sixth Amendment cases. The Court's Sixth Amendment cases, which focus on when a given finding of fact is required to make a defendant legally eligible for a more severe penalty, are distinct from its *ex post facto* cases, which focus on whether a change in law creates a " significant risk" of a higher sentence. The *Booker* remedy was designed, and has been subsequently calibrated, to exploit precisely this distinction: promoting sentencing uniformity while avoiding a Sixth Amendment violation. Nothing in this case undoes the holdings of such cases as *Booker, Rita,* and *Gall.* Pp. 2085 – 2088.

SOTOMAYOR, J., delivered the opinion of the Court, except as to Part III–C. GINSBURG, BREYER, and KAGAN, JJ., joined that opinion in full, and KENNEDY, J., joined except as to Part III–C. THOMAS, J., filed a dissenting opinion, in which ROBERTS, C.J., and SCALIA and ALITO, JJ., joined as to Parts I and II–C. ALITO, J., filed a dissenting opinion, in which SCALIA, J., joined.

### Attorneys and Law Firms

Stephen B. Kinnaird, Washington, DC, for Petitioner.

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

Eric J. Feigin, Washington, DC, for Respondent.

Stephen B. Kinnaird, Counsel of Record, Candice Castenada, Paul Hastings LLP, Washington, DC, Katherine F. Murray, Paul Hastings LLP, Los Angeles, CA, Stephanos Bibas, Philadelphia, PA, Allan A. Ackerman, Chicago, IL, Amy E. Jensen, Paul Hastings LLP, Atlanta, GA, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Lanny A. Breuer, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Eric J. Feigin, Assistant to the Solicitor General, Nina Goodman, Attorney, Department of Justice, Washington, DC, for United States.

**Opinion**

Justice SOTOMAYOR delivered the opinion of the Court, except as to Part III–C. [**]

[**]    Justice KENNEDY joins this opinion except as to Part III–C.

The Constitution forbids the passage of *ex post facto* laws, a category that **2078 includes "[e]very law that changes the punishment *533 , and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (emphasis deleted). The U.S. Sentencing Guidelines set forth an advisory sentencing range for each defendant convicted in federal court. We consider here whether there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense. We hold that there is.

**I**

Petitioner Marvin Peugh and his cousin, Steven Hollewell, ran two farming-related businesses in Illinois. Grainery, Inc., bought, stored, and sold grain; Agri–Tech, Inc., provided farming services to landowners and tenants. When the Grainery began experiencing cash-flow problems, Peugh and Hollewell engaged in two fraudulent schemes. First, they obtained a series of bank loans by representing falsely the existence of contracts for future grain deliveries from Agri–Tech to the Grainery. When they failed to pay back the principal on these loans, the bank suffered losses of over $2 million. Second, they artificially inflated the balances of

accounts under their control by "check kiting," or writing bad checks between their accounts. This scheme allowed them to overdraw an account by $471,000. They engaged in their illicit conduct in 1999 and 2000.

When their acts were uncovered, Peugh and Hollewell were charged with nine counts of bank fraud, in violation of 18 U.S.C. § 1344. While Hollewell pleaded guilty to one count of check kiting, Peugh pleaded not guilty and went to trial, where he testified that he had not intended to defraud the banks. The jury found him guilty of five counts of bank fraud and acquitted him of the remaining counts.

At sentencing, Peugh argued that the *Ex Post Facto* Clause required that he be sentenced under the 1998 version *534 of the Federal Sentencing Guidelines in effect at the time of his offenses, rather than under the 2009 version in effect at the time of sentencing. The two versions yielded significantly different results for Peugh's applicable Guidelines sentencing range. Under the 1998 Guidelines, Peugh's base offense level was 6. United States Sentencing Commission, Guidelines Manual § 2F1.1 (Nov. 1998) (USSG). Thirteen levels were added for a loss amount of over $2.5 million, *ibid.,* and 2 levels for obstruction of justice because of Peugh's perjury at trial, see USSG § 3C1.1 (Nov. 1998). The total offense level under the 1998 Guidelines was therefore 19. As a first-time offender, Peugh was in Criminal History Category I, and so his sentencing range under the 1998 Guidelines was 30 to 37 months. USSG, ch. 5, pt. A (Nov. 1998).

The 2009 Guidelines in effect when Peugh was sentenced in May 2010 assigned more severe consequences to his acts. First, the base offense level was raised from 6 to 7 for crimes, like Peugh's, that have a statutory maximum term of imprisonment of 20 years or more. See USSG § 2B1.1 (Nov. 2009); 18 U.S.C. § 1344. Second, the enhancement for a loss exceeding $2.5 million was 18, a 5–level increase from the 1998 Guidelines. **2079 USSG 2B1.1 (Nov. 2009). After adding the 2–level enhancement for obstruction of justice, Peugh's total offense level under the 2009 Guidelines was 27. With a Criminal History Category of I, Peugh's sentencing range rose under the 2009 Guidelines to 70 to 87 months. USSG, ch. 5, pt. A (Nov. 2009). The low end of the 2009 Guidelines range was 33 months higher than the high end of the 1998 Guidelines range.

At the sentencing hearing, the District Court rejected Peugh's argument that applying the 2009 Guidelines violated the *Ex Post Facto* Clause, noting that it was foreclosed by

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

Seventh Circuit precedent. App. 30 (discussing *United States v. Demaree,* 459 F.3d 791 (2006)). The District Court declined to give Peugh a downward variance, concluding that "a sentence within the [G]uideline [s] range is the most appropriate **\*535** sentence in this case," App. 100. It sentenced Peugh to 70 months' imprisonment, *ibid.,* the bottom of the 2009 Guidelines range.

The Seventh Circuit, in keeping with its decision in *Demaree,* rejected Peugh's *ex post facto* claim and affirmed his conviction and sentence. 675 F.3d 736 (2012). We granted certiorari to resolve a conflict among the Courts of Appeals over whether the *Ex Post Facto* Clause may be violated when a defendant is sentenced under the version of the Sentencing Guidelines in effect at the time of sentencing rather than the version in effect at the time the crime was committed, and the newer Guidelines yield a higher applicable sentencing range.[1] 568 U.S. ——, 133 S.Ct. 594, 184 L.Ed.2d 389 (2012). We now reverse.

[1]       Compare *United States v. Demaree,* 459 F.3d 791, 795 (C.A.7 2006), with *United States v. Wetherald,* 636 F.3d 1315, 1321–1322 (C.A.11 2011); *United States v. Ortiz,* 621 F.3d 82, 87 (C.A.2 2010); *United States v. Lewis,* 606 F.3d 193, 199–203 (C.A.4 2010); *United States v. Lanham,* 617 F.3d 873, 889–890 (C.A.6 2010); *United States v. Turner,* 548 F.3d 1094, 1099–1100 (C.A.D.C.2008).

## II

Prior to 1984, the broad discretion of sentencing courts and parole officers had led to significant sentencing disparities among similarly situated offenders. To address this problem, Congress created the United States Sentencing Commission. *Mistretta v. United States,* 488 U.S. 361, 362, 366–367, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Sentencing Reform Act of 1984, 98 Stat. 1987, eliminated parole in the federal system and directed the Sentencing Commission to promulgate uniform guidelines that would be binding on federal courts at sentencing. *Mistretta,* 488 U.S., at 367, 109 S.Ct. 647. The Commission produced the now familiar Sentencing Guidelines: a system under which a set of inputs specific to a given case (the particular characteristics of the offense and offender) yielded a predetermined output (a range of months within which the defendant could be sentenced).

  **\*536** In *United States v. Booker,* 543 U.S. 220, 244, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), however, this Court held

that mandatory Guidelines ran afoul of the Sixth Amendment by allowing judges to find facts that increased the penalty for a crime beyond "the maximum authorized by the facts established by a plea of guilty or a jury verdict." See also *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The appropriate remedy for this violation, the Court determined, was to strike those portions of the Sentencing Reform Act that rendered the Guidelines mandatory. *Booker,* 543 U.S., at 245–258, 125 S.Ct. 738. Under the resulting scheme, a district court is still required to consult the Guidelines. See **\*\*2080** *id.,* at 259–260, 264, 125 S.Ct. 738; 18 U.S.C. § 3553(a)(4)(A). But the Guidelines are no longer binding, and the district court must consider all of the factors set forth in § 3553(a) to guide its discretion at sentencing, see *Booker,* 543 U.S., at 259–260, 264, 125 S.Ct. 738. The *Booker* remedy, "while not the system Congress enacted," was designed to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Id.,* at 264–265, 125 S.Ct. 738.

  Our subsequent decisions have clarified the role that the Guidelines play in sentencing procedures, both at the district court level and when sentences are reviewed on appeal. First, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (citation omitted). The district court must then consider the arguments of the parties and the factors set forth in § 3553(a). *Id.,* at 49–50, 128 S.Ct. 586. The district court "may not presume that the Guidelines range is reasonable," *id.,* at 50, 128 S.Ct. 586; and it "may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views," **\*537** *Pepper v. United States,* 562 U.S. ——, ——, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196 (2011) (citing *Kimbrough v. United States,* 552 U.S. 85, 109–110, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)). The district court must explain the basis for its chosen sentence on the record. *Gall,* 552 U.S., at 50, 128 S.Ct. 586. "[A] major departure [from the Guidelines] should be supported by a more significant justification than a minor one." *Ibid.*

  On appeal, the district court's sentence is reviewed for reasonableness under an abuse-of-discretion standard. See *id.,* at 51, 128 S.Ct. 586; *Booker,* 543 U.S., at 261–264, 125

S.Ct. 738. Failure to calculate the correct Guidelines range constitutes procedural error, as does treating the Guidelines as mandatory. *Gall,* 552 U.S., at 51, 128 S.Ct. 586. The court of appeals may, but is not required to, presume that a within-Guidelines sentence is reasonable. *Rita v. United States,* 551 U.S. 338, 347, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). The reviewing court may not apply a heightened standard of review or a presumption of unreasonableness to sentences outside the Guidelines range, although it "will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall,* 552 U.S., at 49–51, 128 S.Ct. 586. We have indicated that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when" it is based on the particular facts of a case. *Kimbrough,* 552 U.S., at 109, 128 S.Ct. 558.[2] Overall, this system "requires a court to give respectful consideration to the Guidelines," but it "permits the court to tailor the sentence in light of other statutory concerns as well." *Id.,* at 101, 128 S.Ct. 558 (internal quotation marks omitted).

[2]   We have left open the question whether "closer [appellate] review [of a non-Guidelines sentence] may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect § 3553(a) considerations' even in a mine-run case." *Kimbrough,* 552 U.S., at 109, 128 S.Ct. 558 (quoting *Rita,* 551 U.S., at 351, 127 S.Ct. 2456). Resolution of this case does not require us to assess the merits of this issue.

**2081** Under 18 U.S.C. § 3553(a)(4)(A)(ii), district courts are instructed to apply the Sentencing Guidelines issued by the United States Sentencing Commission that are "in effect **538** on the date the defendant is sentenced." The Sentencing Guidelines reiterate that statutory directive, with the proviso that "[i]f the Court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *[E]x [P]ost [F]acto* [C]lause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." USSG §§ 1B1.11(a), (b)(1) (Nov. 2012). Whether the *Ex Post Facto* Clause was violated by the use of the more onerous Guidelines in effect on the date of Peugh's sentencing is the question presented here.

### III

### A

The Constitution prohibits both federal and state governments from enacting any "*ex post facto* Law." Art. I, § 9, cl. 3; Art. I, § 10. The phrase " '*ex post facto* law' was a term of art with an established meaning at the time of the framing." *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). In *Calder v. Bull,* Justice Chase reviewed the definition that the term had acquired in English common law:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." 3 Dall., at 390 (emphasis deleted).

See also *Carmell v. Texas,* 529 U.S. 513, 521–525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (discussing *Calder v. Bull* and the common-law understanding of the term). Building on Justice Chase's formulation of what constitutes an "*ex post facto* Law," our cases "have not attempted **539** to precisely delimit the scope of this Latin phrase, but have instead given it substance by an accretion of case law." *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

At issue here is *Calder* 's third category of *ex post facto* laws, those that "chang[e] the punishment, and inflic[t] a greater punishment, than the law annexed to the crime, when committed." 3 Dall., at 390. Peugh's claim is that the Clause was violated because the 2009 Guidelines call for a greater punishment than attached to bank fraud in 2000, when his crimes were completed. The Government counters that because the more punitive Guidelines applied at Peugh's sentencing were only advisory, there was no *ex post facto* problem.

Each of the parties can point to prior decisions of this Court that lend support to its view. On the one hand, we have never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the *Ex Post Facto* Clause. See, *e.g., Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

1182 (1937). Moreover, the fact that the sentencing authority exercises some measure of discretion will also not defeat an *ex post facto* claim. See *Garner v. Jones,* 529 U.S. 244, 253, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). On the other hand, we have made it clear that **2082 mere speculation or conjecture that a change in law will retrospectively increase the punishment for a crime will not suffice to establish a violation of the *Ex Post Facto* Clause. See *California Dept. of Corrections v. Morales,* 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). The touchstone of this Court's inquiry is whether a given change in law presents a " 'sufficient risk of increasing the measure of punishment attached to the covered crimes.' " *Garner,* 529 U.S., at 250, 120 S.Ct. 1362 (quoting *Morales,* 514 U.S., at 509, 115 S.Ct. 1597). The question when a change in law creates such a risk is "a matter of degree"; the test cannot be reduced to a "single formula." *Id.,* at 509, 115 S.Ct. 1597 (internal quotation marks omitted). [3]

[3]   Justice THOMAS, raising the issue on his own initiative, would reject our established *Ex Post Facto* Clause framework. *Post,* at 2082 – 2085. We decline to revisit settled precedent, and we reject Justice THOMAS' assertion that our case law has become "unworkab[le]," *post,* at 2082, simply because it requires case-by-case judgments.

## *540 B

The most relevant of our prior decisions for assessing whether the requisite degree of risk is present here is *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), in which this Court considered an *ex post facto* challenge to a sentencing guidelines scheme implemented by the State of Florida. Under Florida's system, a calculation under the guidelines yielded a presumptive sentencing range. *Id.,* at 426, 107 S.Ct. 2446. This range was assumed to be appropriate, and the sentencing judge had discretion to fix a sentence within that range " 'without the requirement of a written explanation.' " *Ibid.* (quoting Fla. Rule Crim. Proc. 3.701(d)(8) (1983)). If the court wished to depart from the guidelines range, however, it was required to give "clear and convincing reasons in writing for doing so." 482 U.S., at 426, 107 S.Ct. 2446. A within-guidelines sentence was unreviewable; a non-guidelines sentence was subject to appellate review. *Ibid.*

The petitioner in *Miller* had been sentenced under new guidelines that yielded a higher sentencing range than the

guidelines that had been in place at the time of his crime, and he had received a sentence at the top of the new range. *Ibid.* This Court found an *ex post facto* violation. We emphasized that in order to impose the petitioner's sentence under the pre-existing guidelines, the sentencing judge would have been required to provide clear and convincing reasons in writing for the departure, and the sentence would then have been reviewable on appeal. *Id.,* at 432, 107 S.Ct. 2446. In contrast, because the sentence imposed was within the new guidelines range, it required no explanation and was unreviewable. *Id.,* at 432–433, 107 S.Ct. 2446. The fact that Florida's guidelines "create[d] a high hurdle that must be cleared before discretion can be exercised" was sufficient to render the changed guidelines an *ex post facto* law. *Id.,* at 435, 107 S.Ct. 2446.

*541 *Miller* thus establishes that applying amended sentencing guidelines that increase a defendant's recommended sentence can violate the *Ex Post Facto* Clause, notwithstanding the fact that sentencing courts possess discretion to deviate from the recommended sentencing range. The sentencing scheme in *Miller* was designed to channel sentences for similarly situated offenders into a specified range. Its reason-giving requirements and standards of appellate review meant that while variation was possible, it was burdensome; and so in the ordinary case, a defendant would receive a within-guidelines sentence. **2083 Under the Florida system, therefore, an increase in the guidelines range applicable to an offender created a significant risk that he would receive a higher sentence. [4] The same principles apply here.

[4]   *Miller* employed a "substantial disadvantage" test that this Court has since abandoned. See *California Dept. of Corrections v. Morales,* 514 U.S. 499, 506–507, n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). The relevant question is whether the change in law creates a " 'sufficient' " or "significant" risk of increasing the punishment for a given crime. *Garner v. Jones,* 529 U.S. 244, 250, 251, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). As we have made clear, however, the result in *Miller* remains sound. See *Morales,* 514 U.S., at 506–507, n. 3, 115 S.Ct. 1597.

The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review. See *Kimbrough,* 552 U.S., at 107, 128 S.Ct. 558. As we have described, "district courts *must* begin their analysis with the

Guidelines and remain cognizant of them throughout the sentencing process." *Gall,* 552 U.S., at 50, n. 6, 128 S.Ct. 586 (emphasis added). Failing to calculate the correct Guidelines range constitutes procedural error. *Id.,* at 51, 128 S.Ct. 586. A district court contemplating a non-Guidelines sentence "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.,* at 50, 128 S.Ct. 586. See also *Pepper,* 562 U.S., at ——, 131 S.Ct., at 1252 (BREYER, J., concurring in part and concurring in judgment) ("[T]he law permits the **\*542** court to disregard the Guidelines only where it is 'reasonable' for a court to do so" (citing *Booker,* 543 U.S., at 261–262, 125 S.Ct. 738)).

These requirements mean that "[i]n the usual sentencing, ... the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Freeman v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2685, 2692, 180 L.Ed.2d 519 (2011) (plurality opinion). Even if the sentencing judge sees a reason to vary from the Guidelines, "if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, *then the Guidelines are in a real sense the basis for the sentence." Ibid.* (emphasis added). See also *id.,* at ——, 131 S.Ct., at 2695 (SOTOMAYOR, J., concurring in judgment) (stating that outside the context of a Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement, "in the normal course the district judge's calculation of the Guidelines range applicable to the charged offenses will serve as the basis for the term of imprisonment imposed"). That a district court may ultimately sentence a given defendant outside the Guidelines range does not deprive the Guidelines of force as the framework for sentencing. Indeed, the rule that an incorrect Guidelines calculation is procedural error ensures that they remain the starting point for every sentencing calculation in the federal system.

Similarly, appellate review for reasonableness using the Guidelines as a benchmark helps promote uniformity by "tend[ing] to iron out sentencing differences." *Booker,* 543 U.S., at 263, 125 S.Ct. 738. Courts of appeals may presume a within-Guidelines sentence is reasonable, see *Rita,* 551 U.S., at 347, 127 S.Ct. 2456, and they may further "consider the extent of the deviation" from the Guidelines as part of their reasonableness review, *Gall,* 552 U.S., at 51, 128 S.Ct. 586. As in *Miller,* then, the post-*Booker* sentencing regime puts in place procedural "hurdle[s]" that, in practice, make the imposition **\*\*2084** of a non-Guidelines sentence less likely. See 482 U.S., at 435, 107 S.Ct. 2446.

**\*543** This is a more difficult case than *Miller,* because there are relevant differences between Florida's sentencing scheme and the current federal sentencing regime. The Florida Legislature had made a within-guidelines sentence unreviewable; whereas in the federal system, the courts of appeals may—but are not required to—presume that a within-Guidelines sentence is reasonable. And under Florida's scheme, a sentencing court departing from the guideline range was required to provide "clear and convincing" reasons for the departure; whereas this Court has not, post-*Booker,* applied such an exacting across-the-board standard of review to variances. Rather, we have held that a district court varying from the Federal Guidelines should provide an explanation adequate to the extent of the departure. See *Gall,* 552 U.S., at 51, 128 S.Ct. 586.

But contrary to the arguments advanced by the Government and Justice THOMAS' dissent (hereinafter dissent), see Brief for United States 23–24; *post,* at 2090 – 2091, these differences are not dispositive. Although the federal system's procedural rules establish gentler checks on the sentencing court's discretion than Florida's did, they nevertheless impose a series of requirements on sentencing courts that cabin the exercise of that discretion. Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences.

Peugh points to considerable empirical evidence indicating that the Sentencing Guidelines have the intended effect of influencing the sentences imposed by judges. Even after *Booker* rendered the Sentencing Guidelines advisory, district courts have in the vast majority of cases imposed either within-Guidelines sentences or sentences that depart downward from the Guidelines on the Government's motion. See United States Sentencing Commission, 2011 Sourcebook of Federal Sentencing Statistics, p. 63 (Figure G) (16th ed.) (USSC). In less than one-fifth of cases since 2007 have district **\*544** courts imposed above- or below-Guidelines sentences absent a Government motion. See *ibid.* See also Baron–Evans & Stith, Booker *Rules,* 160 U. Pa. L. Rev. 1631, 1677 (2012). Moreover, the Sentencing Commission's data indicate that when a Guidelines range moves up or down, offenders' sentences move with it. See USSC, Final Quarterly Data Report, FY 2012, p. 32 (Figure C); USSC, Report on the Continuing Impact of *United States v. Booker* on Federal Sentencing, Pt. A, pp. 60–68 (2012). [5]

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

5     The Government does not dispute these statistics. It argues instead that by relying on aggregated data, Peugh glosses over the fact that non-Guidelines sentences are more common for certain crimes and that some individual judges are less likely to follow the Guidelines than others. Brief for United States 49–50. But these arguments do not refute the basic point that the applicable Guidelines channel sentences toward the specified range, even if they do not fix them within it.

The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing. A retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation.

### C

Our holding today is consistent with basic principles of fairness that animate the *Ex Post Facto* Clause. The Framers considered *ex post facto* laws to be "contrary to the first principles of the social compact and to every principle of sound legislation." The Federalist No. 44, p. 282 (C. **2085** Rossiter ed. 1961) (J. Madison). The Clause ensures that individuals have fair warning of applicable laws and guards against vindictive legislative action. See *Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981); see also *post,* at 2094 – 2095. Even where these concerns are not directly implicated, however, the Clause also safeguards "a fundamental fairness interest ... in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." *Carmell,* 529 U.S., at 533, 120 S.Ct. 1620.

**\*545** The Sentencing Guidelines represent the Federal Government's authoritative view of the appropriate sentences for specific crimes. When Peugh committed his crime, the recommended sentence was 30 to 37 months. When he was sentenced, it was 70 to 87 months. "[T]he purpose and effect of the change in [the Guidelines calculation] was to increase the rates and length of incarceration for [fraud]." *Miller,* 482 U.S., at 431, 107 S.Ct. 2446 (citing *Florida Bar: Amendment to Rules of Criminal Procedure (3.701, 3.988—Sentencing Guidelines),* 451 So.2d 824, 824, n. (1984) (*per curiam* ) (internal quotation marks and alterations omitted)). Such a retrospective increase in the measure of punishment raises clear *ex post facto* concerns. We have previously recognized, for instance, that a defendant charged with an increased

punishment for his crime is likely to feel enhanced pressure to plead guilty. See *Carmell,* 529 U.S., at 534, n. 24, 120 S.Ct. 1620; *Weaver,* 450 U.S., at 32, 101 S.Ct. 960. This pressure does not disappear simply because the Guidelines range is advisory; the defendant will be aware that the range is intended to, and usually does, exert controlling influence on the sentence that the court will impose.

We are therefore not persuaded by the argument advanced by the Government and also suggested by the dissent that the animating principles of the *Ex Post Facto* Clause are not implicated by this case. While the Government argues that the Sentencing Commission is insulated from legislative interference, see Brief for United States 42–44, our precedents make clear that the coverage of the *Ex Post Facto* Clause is not limited to legislative acts, see *Garner,* 529 U.S., at 247, 257, 120 S.Ct. 1362 (recognizing that a change in a parole board's rules could, given an adequate showing, run afoul of the *Ex Post Facto* Clause). It is true that we held, in *Irizarry v. United States,* 553 U.S. 708, 713–714, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008), that a defendant does not have an "expectation subject to due process protection" that he will be sentenced within the Guidelines range. But, contrary to the dissent's view, see *post,* at 2083 – 2085, the *Ex Post Facto* Clause does not merely protect reliance interests. **\*546** It also reflects principles of "fundamental justice." *Carmell,* 529 U.S., at 531, 120 S.Ct. 1620. [6]

6     Of course, "while the principle of unfairness helps explain and shape the Clause's scope, it is not a doctrine unto itself, invalidating laws under the *Ex Post Facto* Clause by its own force." *Carmell,* 529 U.S., at 533, n. 23, 120 S.Ct. 1620.

### IV

The Government's principal argument that there is no constitutional violation in this case is that the Sentencing Guidelines lack sufficient legal effect to attain the status of a "law" within the meaning of the *Ex Post Facto* Clause. Whereas the pre-*Booker* Guidelines "ha[d] the force and effect of laws," *Booker,* 543 U.S., at 234, 125 S.Ct. 738, the post-*Booker* Guidelines, the Government contends, have lost that status due to their advisory nature. **\*\*2086** The dissent echoes this argument. *Post,* at 2088 – 2090, 2091 – 2092.

The distinction that the Government draws is necessarily a fine one, because our precedents firmly establish that changes in law need not bind a sentencing authority in order to violate

*Peugh v. U.S.*, 569 U.S. 530 (2013)
133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

the *Ex Post Facto* Clause. So, for example, a law can run afoul of the Clause even if it does not alter the statutory maximum punishment attached to a crime. In *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182, this Court considered an *ex post facto* challenge to a Washington law altering the statutory penalty for grand larceny from a range of 0 to 15 years' imprisonment to a mandatory term of 15 years' imprisonment. Although the upper boundary of the sentencing court's power to punish remained unchanged, it was enough that the petitioners were "deprived of all *opportunity* to receive a sentence which would give them freedom from custody and control prior to the expiration of the 15–year term." *Id.,* at 402, 57 S.Ct. 797 (emphasis added).

In addition, our cases make clear that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause." *Garner,* 529 U.S., at 253, 120 S.Ct. 1362. In a series of cases, for example, this Court has considered the validity **\*547** under the *Ex Post Facto* Clause of state laws altering the terms on which discretionary parole or early release was available to prisoners. See *Garner,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236; *Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588; *Weaver,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17. Although these cases reached differing conclusions with respect to whether there was an *ex post facto* violation, in none of them did we indicate that the mere fact that the prisoner was not guaranteed parole but rather received it at the will of the parole board was fatal to his claim. See *Garner,* 529 U.S., at 253, 120 S.Ct. 1362; *Morales,* 514 U.S., at 508–510, and n. 6, 115 S.Ct. 1597; *Weaver,* 450 U.S., at 30–31, 101 S.Ct. 960.

The Government does not challenge these holdings but rather argues, in essence, that the Guidelines are too much like guideposts and not enough like fences to give rise to an *ex post facto* violation. It contrasts the Sentencing Guidelines with the Florida system at issue in *Miller,* which, the Government indicates, really did place "a substantial legislative constraint on the judge's exercise of sentencing discretion." Brief for United States 21. But as we have explained at length, the difference between the federal system and the scheme the Court considered in *Miller* is one in degree, not in kind. The Florida system did not achieve its "binding legal effect," Brief for United States 22, by mandating a within-guidelines sentence in every case. Rather, it achieved its "binding legal effect" through a set of procedural rules and standards for appellate review that, in combination, encouraged district courts to sentence within the guidelines. See *Miller,* 482 U.S., at 432–433, 107 S.Ct. 2446. We have detailed all of the ways

in which the federal sentencing regime after *Booker* does the same. [7]

[7] The Government likens the Sentencing Guidelines system to the Parole Commission's Parole Release Guidelines, which established an advisory framework for parole decisions, see *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 391, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), and argues that *Miller* indicated that retrospectively applying more stringent parole guidelines would not have constituted an *ex post facto* violation. The issue of the constitutional validity of the retrospective application of the parole guidelines, however, was not before the Court in *Miller.* While the *Miller* Court did state that lower court cases discussing the federal parole guidelines were "inapposite" to its discussion of the Florida guidelines, 482 U.S., at 434–435, 107 S.Ct. 2446, it had no occasion to address whether changes to the parole guidelines generated an *ex post facto* problem.

**\*\*2087 \*548** The Government elaborates its argument that the Sentencing Guidelines do not have adequate legal force to constitute an *ex post facto* violation by reviewing the various features of the post-*Booker* sentencing regime that, in its view, tend to render the Guidelines purely advisory. As we have noted, district courts may not presume that a within-Guidelines sentence is reasonable; they may "in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views," *Pepper,* 562 U.S., at ——, 131 S.Ct., at 1247; and all sentences are reviewed under a deferential abuse-of-discretion standard. See *supra,* at 2079 – 2081.

While the Government accurately describes several attributes of federal sentencing after *Booker,* the conclusion it draws by isolating these features of the system is ultimately not supportable. On the Government's account, the Guidelines are just one among many persuasive sources a sentencing court can consult, no different from a "policy paper." Brief for United States 28. The Government's argument fails to acknowledge, however, that district courts are not required to consult any policy paper in order to avoid reversible procedural error; nor must they "consider the extent of [their] deviation" from a given policy paper and "ensure that the justification is sufficiently compelling to support the degree of the variance," *Gall,* 552 U.S., at 50, 128 S.Ct. 586. Courts of appeals, in turn, are not permitted to presume that a sentence that comports with a particular policy paper is reasonable; nor do courts of appeals, in considering whether the district court's sentence was reasonable, weigh the extent of any departure from a given policy paper in determining whether the district

*Peugh v. U.S.*, 569 U.S. 530 (2013)

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

court abused its discretion, see *id.,* at 51, 128 S.Ct. 586. It is **\*549** simply not the case that the Sentencing Guidelines are merely a volume that the district court reads with academic interest in the course of sentencing.

 Of course, as the Government and the dissent point out, notwithstanding a rule that retrospective application of a higher Guidelines range violates the *Ex Post Facto* Clause, sentencing courts will be free to give careful consideration to the current version of the Guidelines as representing the most recent views of the agency charged by Congress with developing sentencing policy. See *post,* at 2081 – 2082 (citing *Demaree,* 459 F.3d, at 795). But this does not render our holding "purely semantic." *Id.,* at 795. District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

 Finally, the Government contends that a rule that the *Ex Post Facto* Clause is violated by the application of an increased Guidelines range would be in tension with this Court's post-*Booker* cases and, indeed, would "largely undo ... the *Booker* remedy" for the Sixth Amendment violation found there. Brief for United States 35. If the Guidelines are binding enough to trigger an *ex post facto* violation, the argument goes, then they must be binding enough to trigger a Sixth Amendment violation as well. The Government's **\*\*2088** argument assumes that the Sixth Amendment and the *Ex Post Facto* Clause share a common boundary; that only where judge-found facts are the basis of a higher sentence in a manner that raises Sixth Amendment concerns can a set of sentencing rules be sufficiently determinate to run afoul of the *Ex Post Facto* Clause. But the Sixth Amendment **\*550** and *Ex Post Facto* Clause inquiries are analytically distinct. Our Sixth Amendment cases have focused on when a given finding of fact is required to make a defendant legally eligible for a more severe penalty. Our *ex post facto* cases, in contrast, have focused on whether a change in law creates a "significant risk" of a higher sentence; here, whether a sentence in conformity with the new Guidelines is substantially likely. The *Booker* remedy was designed, and has been subsequently calibrated, to exploit precisely this distinction: it is intended to promote sentencing uniformity while avoiding a Sixth

Amendment violation. In light of the statistics invoked by petitioner, see *supra,* at 2084 – 2085, it appears so far to be achieving this balance. Nothing that we say today "undo[es]" the holdings of *Booker, Rita, Gall, Kimbrough,* or our other recent sentencing cases.

\* \* \*

 The arguments put forward by the Government and the dissent cannot unseat the conclusion that Peugh's case falls within *Calder* 's third category of *ex post facto* violations. "[T]he *Ex Post Facto* Clause forbids the [government] to enhance the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." *Morales,* 514 U.S., at 505, 115 S.Ct. 1597. That is precisely what the amended Guidelines did here. Doing so created a "significant risk" of a higher sentence for Peugh, *Garner,* 529 U.S., at 251, 120 S.Ct. 1362, and offended "one of the principal interests that the *Ex Post Facto* Clause was designed to serve, fundamental justice," *Carmell,* 529 U.S., at 531, 120 S.Ct. 1620. [8] For these reasons, we **\*551** reverse the judgment of the Seventh Circuit and remand the case for further proceedings consistent with this opinion.

8    There may be cases in which the record makes clear that the District Court would have imposed the same sentence under the older, more lenient Guidelines that it imposed under the newer, more punitive ones. In such a case, the *ex post facto* error may be harmless. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Here, however, the Government does not argue that any *ex post facto* violation was harmless. And indeed, any such argument would fail in light of the fact that the District Court rejected Peugh's *ex post facto* claim in keeping with Circuit precedent, applied the new Guidelines, and indicated at sentencing that "a sentence within the [G]uideline range is the most appropriate sentence in this case." App. 30, 100.

*It is so ordered.*

Justice THOMAS, with whom the CHIEF JUSTICE, Justice SCALIA, and Justice ALITO join as to Parts I and II–C, dissenting.

The Constitution prohibits Congress from passing *ex post facto* laws. Art. I, § 9, cl. 3. The retroactive application of the 2009 Guidelines did not alter the punishment affixed to petitioner's crime and does not violate this proscription. I would affirm the Seventh Circuit's decision denying

petitioner's *ex post facto* claim. Therefore, I respectfully dissent.


# I

It is well established that an *ex post facto* law includes "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648 (1798) **\*\*2089** (opinion of Chase, J.). Under our precedents, the relevant inquiry for determining whether a law "inflicts a greater punishment," is whether the "retroactive application of the change in [the] law created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.' " *Garner v. Jones,* 529 U.S. 244, 250, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000) (quoting *California Dept. of Corrections v. Morales,* 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). The retroactive application of subsequently amended Guidelines does not create a "sufficient risk" of increasing a defendant's punishment for two reasons. First, the Guidelines do not constrain the discretion of district courts and, thus, have no legal effect on a defendant's sentence. Second, to the extent that the amended Guidelines **\*552** create a *risk* that a defendant might receive a harsher punishment, that risk results from the Guidelines' persuasive force, not any legal effect. The Guidelines help district judges to impose sentences that comply with § 3553(a). The risk of an increased sentence is, in essence, the risk of a more *accurate* sentence—*i.e.,* a sentence more in line with the statutory scheme's penological goals. Guideline changes that help district courts achieve such pre-existing statutory sentencing goals do not create a risk of an increased sentence cognizable under the *Ex Post Facto* Clause. We have never held that government action violates the *Ex Post Facto* Clause when it merely influences the exercise of the sentencing judge's discretion.


# A

The Federal Sentencing Guidelines do not constrain the discretion of district courts. As we have said repeatedly, the Guidelines are "advisory." *United States v. Booker,* 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (remedial opinion for the Court by BREYER, J.). For this reason, district courts may not "presume" that a within-Guidelines sentence is appropriate. *Gall v. United States,* 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007);

see also *Nelson v. United States,* 555 U.S. 350, 352, 129 S.Ct. 890, 172 L.Ed.2d 719 (2009) (*per curiam* ) (the Guidelines range is "not to be *presumed* reasonable"); *Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"). Rather, district courts must "make an individualized assessment" of the appropriate sentence "based on the facts presented." *Gall, supra,* at 50, 128 S.Ct. 586. Moreover, a district court may freely depart from the range recommended by the Guidelines based not only on "an individualized determination that [the Guidelines] yield an excessive sentence in a particular case," but also based on "*policy* disagreement" with the Guidelines themselves. *Spears v. United States,* 555 U.S. 261, 264, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (*per curiam* ); see **\*553** *Pepper v. United States,* 562 U.S. ——, ——, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196 (2011) ("[O]ur post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views").

It is true that a district judge who "decides that an outside-Guidelines sentence is warranted" must "ensure that the justification is sufficiently compelling to support the degree of the variance" and that "a major departure should be supported by a more significant justification than a minor one." *Gall,* 552 U.S., at 50, 128 S.Ct. 586. This does not demonstrate that the Guidelines constrain the judge's discretion, but rather comports with the notion that an explanation is essential for "meaningful **\*\*2090** appellate review." *Ibid.* And, when a district court departs from the recommended range, the court of appeals may not presume that such a sentence is unreasonable. *Id.,* at 47, 128 S.Ct. 586; *id.,* at 41, 128 S.Ct. 586 ("[C]ourts of appeals must review all sentences —whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard"). While "[t]he applicable guideline [may] nudg[e] [the sentencing judge] toward the sentencing range," "his freedom to impose a reasonable sentence outside the range is unfettered." *United States v. Demaree,* 459 F.3d 791, 795 (C.A.7 2006).

None of petitioner's arguments to the contrary is persuasive. Petitioner first contends that the Guidelines constrain district courts' discretion because improperly calculating the applicable guidelines is reversible error. Brief for Petitioner 20–21, and n. 7; 18 U.S.C. § 3742(f); Cf. *Gall,* 552 U.S., at 51, 128 S.Ct. 586. This argument is a non sequitur. The

Guidelines can only serve their advisory purpose if district courts consider the "range established" by the Guidelines, § 3553(a)(4). For this reason, district courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.,* at 49, 128 S.Ct. 586. But the fact that courts must give due consideration to the recommendation expressed in the *correct* Guidelines does not mean that the Guidelines constrain **\*554** the district court's discretion to impose an appropriate sentence; it simply means that district courts must consider the correct variables before exercising their discretion.

Petitioner next argues that the Guidelines limit district court discretion because sentences falling outside the Guidelines are more likely to be reversed for substantive unreasonableness. Brief for Petitioner 25. I doubt, however, that reversal is a likely outcome when a district judge can justify his sentence based on agreement with either of two Guidelines—the old or the new. If a district court calculated the sentencing range under the new Guidelines but sentenced the defendant to a below-Guidelines sentence that fell within the range provided by the old Guidelines, it would be difficult to label such a sentence "substantively unreasonable." To do so would cast doubt on every within-Guidelines sentence issued under the old Guidelines. Similarly, it is hard to imagine that a court of appeals would reverse a sentence for substantive unreasonableness if it was above the range of the Guidelines in effect at the time of the offense but fell within the range of the most up-to-date Guidelines. This case provides an apt example. After considering all of the § 3553(a)(2) factors, the District Court concluded that a sentence within the amended Guidelines range was "the most appropriate sentence in this case." App. 100. The same sentence would undoubtedly be upheld on appeal if the District Court, on remand, once again determined that a sentence within the amended Guidelines was appropriate in light of all the facts. The essential point is that once new Guidelines have been promulgated, reasonableness review does not meaningfully constrain the discretion of district courts to sentence offenders within either of the two ranges.

The majority argues that our opinion in *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), supports its conclusion that retroactive application of advisory Guidelines violates the *Ex Post Facto* Clause. See *ante,* at 2082 – 2083. But *Miller* leads to the opposite **\*555** conclusion. There, Florida superimposed narrowed presumptive sentencing ranges on the statutory sentencing ranges for particular crimes. 482 U.S., at 425–426, 107 S.Ct.

2446. If a judge imposed a sentence **\*\*2091** within that narrower presumptive range, he did not need to give a written explanation of his reasons for selecting that sentence, and the sentence was not subject to appellate review. *Ibid.* If the judge imposed a sentence outside the presumptive range, however, he was required to provide " 'clear and convincing reasons,' " *id.,* at 426, 107 S.Ct. 2446 (quoting Fla. Rule Crim. Proc. 3.701(d)(11) (1983)), based "on facts proved beyond a reasonable doubt," that justified the departure, 482 U.S., at 432, 107 S.Ct. 2446. In concluding that retroactive application of this scheme violated the *Ex Post Facto* Clause, we reasoned that the Florida guidelines did not "simply provide flexible 'guideposts' for use in the exercise of discretion: instead, they create[d] a high hurdle that must be cleared before discretion c[ould] be exercised." *Id.,* at 435, 107 S.Ct. 2446.

The Court cites *Miller* for the proposition "that applying amended sentencing guidelines that increase a defendant's recommended sentence can violate the *Ex Post Facto* Clause, notwithstanding the fact that sentencing courts possess discretion to deviate from the recommended sentencing range." *Ante,* at 2082. But that claim is not supported by *Miller.* The guidelines in *Miller* violated the *Ex Post Facto* Clause precisely *because* they constrained the sentencing judge's discretion.

The Federal Guidelines, by contrast, do no such thing. Indeed, our post-*Booker* opinions have made abundantly clear that the Guidelines do not create a "high hurdle"—or any hurdle at all—"that must be cleared before discretion can be exercised." *Miller,* 482 U.S., at 435, 107 S.Ct. 2446. Rather, the Guidelines are "flexible 'guideposts' " which inform the district courts' discretion. *Ibid.* Accordingly, their retroactive application cannot constitute a violation of the *Ex Post Facto* Clause.

### \*556 B

Notwithstanding the discretion district courts have to impose appropriate sentences anywhere within the statutory range, Guidelines do "influenc[e] the sentences imposed by judges." *Ante,* at 2084. But, the Guidelines do this by helping district courts impose sentences that are consistent with § 3553(a). It is difficult to see how an advisory Guideline, designed to lead courts to impose sentences more in line with fixed statutory objectives, could ever constitute an *ex post facto* violation. But that is exactly what the Court concludes.

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

District courts are charged with imposing sentences that are " 'sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in" § 3553(a). *Pepper,* 562 U.S., at ——, 131 S.Ct., at 1242 (quoting § 3553(a)). The district court's task is to impose sentences that reflect the punitive goals of justice, deterrence, protection of the public, and rehabilitation. 18 U.S.C. § 3553(a)(2). While easily stated, this goal is difficult to achieve. Enter the Sentencing Guidelines.

The Sentencing Reform Act of 1984 instructs the Sentencing Commission to promulgate Guidelines that reflect the "same basic § 3553(a) objectives" that district courts must consider. *Rita,* 551 U.S., at 348, 127 S.Ct. 2456; see also 28 U.S.C. § 991(b)(1)(A). In crafting the Guidelines, the Commission began with "an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." *Rita, supra,* at 349, 127 S.Ct. 2456 (citing United States Sentencing Commission, Guidelines Manual § 1A1.1, comment., n. 3 (Nov. 2006) (USSG)). The Commission then "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." **2092** *Rita, supra,* at 349, 127 S.Ct. 2456. While an individual judge has limited experience upon which to draw, the Commission "has the capacity ... to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v.* **557** *United States,* 552 U.S. 85, 109, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (internal quotation marks omitted). And the Commission updates the Guidelines regularly as new information becomes available. It consults with " prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others," to ensure that the Guidelines continue to further § 3553(a)'s goals. *Rita, supra,* at 350, 127 S.Ct. 2456; see also *Booker,* 543 U.S., at 263, 125 S.Ct. 738 (noting that the Commission would "modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices").

In light of this extensive study, amendments to the Guidelines should produce sentencing ranges that better comport with the § 3553(a) factors. If the Commission has fulfilled its mission of recommending sentences that are generally consistent with § 3553(a)(2), then sentences *should* fall within the Guidelines range most of the time. This, in part, explains why within-Guidelines sentences are presumed, on appeal, to reflect a "discretionary decision" by the district court that "accords

with the Commission's view." *Rita, supra,* at 351, 127 S.Ct. 2456.

Again, this case furnishes a ready example. Prior to petitioner's sentencing, Congress directed the Commission "to consider" whether fraud guidelines were " 'sufficient to deter and punish' " particular offenses, in light of increases to statutory maximum penalties for certain fraud crimes other than bank fraud. USSG App. C, Amdt. 653 (Reason for Amendment) (effective Nov. 1, 2003) (quoting White–Collar Crime Penalty Enhancement Act of 2002, § 905(b)(2), 116 Stat. 805). This produced amended Guidelines, which were based on the Commission's further assessment of "economic crime issues over a number of years." USSG App. C, Amdt. 617 (Reason for Amendment) (effective Nov. 1, 2001). With an amended Guidelines sentencing range, the District Court concluded that a within-Guidelines sentence was "the most appropriate sentence." App. 100. Neither the statutory sentencing range nor § 3553(a) changed between the time of petitioner's **558** offense and sentencing. Thus, it is quite incorrect to say that reliance on information reflected in the amended Guidelines violated the *Ex Post Facto* Clause.

This is underscored by the fact that even the Court's holding —which requires district courts to calculate the Guidelines range in effect at the time of the offense—will not eliminate the "risk" of a higher sentence. The district judge remains free to consider the range produced by the amended Guidelines. See *Demaree,* 459 F.3d, at 795 ("A judge is certainly entitled to take advice from the Sentencing Commission"). Thus, the mere fact that new Guidelines have been promulgated creates *some* risk of an increased sentence, even if district courts are required to calculate the Guidelines in effect at the time of the offense. Petitioner has presented no evidence indicating what portion of the risk of an increased sentence flows from the retroactive *application* of the amended Guidelines and what portion flows from their very *existence.* In the absence of such evidence, even if I agreed that advisory Guidelines could be *ex post facto* laws, which I do not, I would not find the "risk" of an increased sentence created by the retroactive application of the Guidelines to be "sufficient" for *ex post facto* purposes.

**2093** II

Today's opinion also demonstrates the unworkability of our *ex post facto* jurisprudence. Under our current precedent, whenever a change in the law creates a "risk" of an increased sentence, we must determine whether the risk is "sufficient,"

see *Morales,* 514 U.S., at 509, 115 S.Ct. 1597, or sufficiently " 'significant,' " see *ante,* at 2087 – 2088, to violate the *Ex Post Facto* Clause. Our analysis under that test has devolved into little more than an exercise in judicial intuition. I would return to the original meaning of the Clause as stated in Justice Chase's classic *Calder* formulation, under which laws of this sort are *ex post facto* only when they retroactively increase the punishment "annexed to the crime." 3 Dall., at 390.

**\*559** A

This Court addressed the *Ex Post Facto* Clause a mere decade after the Constitution was ratified. In *Calder,* Justice Chase described four types of *ex post facto* laws. 3 Dall., at 390. As relevant, Justice Chase's third category indicated that "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" violates the *Ex Post Facto* Clause. *Ibid.* Justice Chase's emphasis on increases in the punishment "annexed to the crime" was grounded in the English common law and accurately reflected the original understanding of the *Ex Post Facto* Clause. See Part II–B, *infra.* Unfortunately, the Court rapidly deviated from this formulation. In *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), the Court declared that "any law passed after the commission of an offence which ... 'in relation to that offence, or its consequences, *alters the situation of a party to his disadvantage,*' is an *ex post facto* law." *Id.,* at 235, 2 S.Ct. 443 (quoting Justice Washington's jury charge in *United States v. Hall,* 26 F.Cas. 84, 86 (No. 15,285) (C.C.D.Pa.1809)) (emphasis added). It took nearly a century for the Court to decide that *Kring* 's "departure from *Calder* 's explanation of the original understanding of the *Ex Post Facto* Clause was ... unjustified." *Collins v. Youngblood,* 497 U.S. 37, 49, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (overruling *Kring* ).

Following *Collins* ' disavowal of *Kring,* the Court held that a law is *ex post facto* if it "produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Morales, supra,* at 509, 115 S.Ct. 1597. While *Morales* avoided the over-breadth of *Kring* 's "disadvantage the defendant" test, it failed to reconnect our *ex post facto* jurisprudence to the original understanding of the term.[*] The "sufficient risk" test also depends upon empirical analysis that cannot **\*560** yield determinative answers and which courts are ill equipped to handle. See, *e.g., Garner,* 529 U.S., at 255, 120 S.Ct. 1362 ("When the rule does not by its own terms show a significant risk,

the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule"). More fundamentally, the "sufficient risk" test, like the "disadvantage the defendant" test, wrongly focuses on the particular sentence that the defendant *might* receive, rather than on the punishment "annexed to the crime."

\*     As the author of *Morales,* failure to apply the original meaning was an error to which I succumbed.

The practical difficulties with the test are apparent even from our application in **\*\*2094** *Morales,* where we considered an amendment to California's parole procedures that allowed, under certain circumstances, the Board of Prison Terms to decrease the frequency of parole suitability hearings. Under the sufficient risk test, we were compelled to speculate about the possible effects of the new law on various individuals' prison terms. Ultimately, we held that the amendment did not violate the *Ex Post Facto* Clause because the "narrow class of prisoners covered by the amendment [could not] reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings." *Morales, supra,* at 512, 115 S.Ct. 1597. But nothing in the text or history of the *Ex Post Facto* Clause suggests that it should hinge on the expectations that prisoners and defendants have about how many days they will spend in prison.

B

"Although the Latin phrase '*ex post facto* ' literally encompasses any law passed 'after the fact,' " *Collins,* 497 U.S., at 41, 110 S.Ct. 2715, the Court has long recognized that the phrase "was a term of art with an established meaning" at the time of the founding. *Ibid.* Blackstone offers the first key to understanding this "established meaning." He explicitly opposed **\*561** laws that rendered innocent conduct criminal after the fact. See 1 W. Blackstone, Commentaries \*44 (hereinafter Blackstone). Such laws deprive citizens of notice and fair warning and are, therefore, an affront to man's "reason and freewill." *Id.,* at \*39; see *id.,* at \*46. Blackstone, thus, considered them illegitimate. *Id.,* at \*44; see also The Federalist No. 44, p. 301 (J. Cooke ed. 1961) (J. Madison) ("[E]x post facto laws ... are contrary to the first principles of the social compact, and to every principle of sound legislation"). For this reason, *ex post facto* laws have rightly been described as "formidable instruments of tyranny," *id.,* No. 84, at 577 (A. Hamilton), and their prohibition a "bulwark

AR005038

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5507 Page 55 of 90

Peugh v. U.S., 569 U.S. 530 (2013)
133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

in favour of the personal security of the subject," *Calder, supra,* at 390 (opinion of Chase, J.).

Although Blackstone confined his discussion of *ex post facto* laws to those laws retroactively declaring innocent acts to be criminal, other authorities confirm that laws retroactively increasing the punishment were also understood to be *ex post facto* at the time of the founding. See, *e.g.,* 2 R. Wooddeson, A Systematical View of the Laws of England, as treated in a Course of Vinerian Lectures 638 (1792) (discussing "acts of parliament, which principally affect *the punishment,* making therein some innovation, or creating some forfeiture or disability, not incurred in the ordinary course of law"); 3 J. Story, Commentaries on the Constitution of the United States § 679, p. 486 (Abr. 1833) (The "prohibition" against *ex post facto* laws "reaches every law ... whereby the act, if a crime, is aggravated in enormity, or punishment"). Justice Chase's formulation reflects this understanding. *Calder,* 3 Dall., at 390 ("Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" is *ex post facto* ). Under this view, courts must compare the punishment affixed to the crime at the time of the offense with the punishment affixed at the time of sentencing. If the latter is harsher than the former, the court must apply the punishment in effect at the time of the offense.

**\*562** At common law, it was quite easy to identify when a law retroactively increased the punishment, because the criminal law generally " prescribed a particular sentence for each offense." Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in **\*\*2095** England, France, Germany 1700–1900, p. 36 (A. Schioppa ed. 1987). In a world of determinate sentencing, a retroactive increase in the punishment affixed to a crime renders an act "punishable in a manner in which it was not punishable when it was committed," *Fletcher v. Peck,* 6 Cranch 87, 138, 3 L.Ed. 162 (1810), which is sufficient for an *ex post facto* violation. The key point is that "the *ex post facto* [C]lause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed." *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937).

Focusing on the punishment affixed by law, rather than on the specific sentence imposed, furthers the goals of notice and fair warning recognized by Blackstone as the rationales for the prohibition against *ex post facto* laws. See *Ross' Case,* 19 Mass. 165, 170 (1824) ("A party ought to know, at the time of committing the offence, the whole extent of the punishment;

for it may sometimes be a matter of calculation, whether he will commit the offence, considering the severity of the punishment"). Because increasing the punishment affixed to the crime deprives people of the opportunity to plan their conduct in light of the law, "[t]he enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty; and therefore they may be classed together." *Calder, supra,* at 397 (opinion of Paterson, J.).

Retroactive laws that merely create a *risk* that a defendant will receive a higher sentence, however, do not implicate traditional *ex post facto* concerns. An individual contemplating the commission of a given offense knows he may be sentenced anywhere within the legally prescribed range. He may *hope* to receive a lenient sentence, and he may even **\*563** have good reasons for expecting leniency. But he does not have any guarantees. See *Garner,* 529 U.S., at 258, 120 S.Ct. 1362 (SCALIA, J., concurring in part in judgment) ("Discretion to be compassionate or harsh is inherent in the sentencing scheme, and being denied compassion is one of the risks that the offender knowingly assumes"). The law provides the defendant with only one assurance: He will be sentenced within the range affixed to his offense by statute. Legal changes that alter the *likelihood* of a particular sentence within the legally prescribed range do not deprive people of notice and fair warning, or implicate the concerns about tyranny that animated the adoption of the *Ex Post Facto* Clause.

C

The statutory range in effect at the time of petitioner's offense remained in effect at his sentencing. The Guidelines sentencing range is not the punishment affixed to the offense. See in Part I–A, *supra.* Accordingly, sentencing petitioner under the amended Guidelines did not violate the *Ex Post Facto* Clause. Because the Court concludes otherwise, I respectfully dissent.

Justice ALITO, with whom Justice SCALIA joins, dissenting. I agree with Justice THOMAS that retroactive application of amended advisory Guidelines does not violate the *Ex Post Facto* Clause under our "sufficient risk" test. See *California Dept. of Corrections v. Morales,* 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). I do not have occasion in

**Peugh v. U.S., 569 U.S. 530 (2013)**

133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811...

this case to reconsider that test's merits or its relation to the original understanding of the Clause.

**All Citations**

569 U.S. 530, 133 S.Ct. 2072, 186 L.Ed.2d 84, 81 USLW 4372, 13 Cal. Daily Op. Serv. 5811, 2013 Daily Journal D.A.R. 7323, 24 Fla. L. Weekly Fed. S 253

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

109 S.Ct. 468
Supreme Court of the United States

Otis R. BOWEN, Secretary of Health
and Human Services, Petitioner

v.

GEORGETOWN UNIVERSITY HOSPITAL et al.

No. 87–1097.
|
Argued Oct. 11, 1988.
|
Decided Dec. 12, 1988.

**Synopsis**

Nonprofit hospitals providing routine in-patient Medicare services brought action challenging Secretary of Health and Human Service's "reissuance" of 1981 wage-index rule used to calculate cap on reimburseable wage costs and substantive validity of rule. The United States District Court for the District of Columbia, Louis F. Oberdorfer, J., held that rule was invalid insofar as it was applied to recoup money from Medicare service providers and ordered Secretary to reimburse providers with interest. Secretary appealed. The Court of Appeals, for the District of Columbia, Edwards, Circuit Judge, 821 F.2d 750,affirmed. Certiorari was granted. The Supreme Court, Justice Kennedy, held that: (1) retroactive rule could not be upheld as exercise of Secretary's authority to make retroactive corrective adjustments, and (2) retroactive rule was also invalid under Medicare Act's general grant of authority to promulgate cost-limit rules.

Affirmed.

Justice Scalia filed a concurring opinion.

**469** *Syllabus**

*
The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**204** Under the Medicare program, the Government reimburses health care providers for expenses incurred in providing medical services to Medicare beneficiaries. The Medicare Act in 42 U.S.C. § 1395x(v)(1)(A) authorizes the Secretary of Health and Human Services (Secretary) to promulgate cost-reimbursement regulations and also provides that "[s]uch regulations shall ... (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." In 1981, the Secretary issued a cost-limit schedule that changed the method for calculating the "wage index," a factor used to reflect the salary levels for hospital employees in different parts of the country. Under the prior rule, the wage index for a given geographic area was calculated by using the average salary levels for all hospitals in the area, but the 1981 rule excluded from that computation wages paid by Federal Government hospitals. After the Federal District Court invalidated the 1981 rule in a suit brought by various hospitals in the District of Columbia, and the Secretary settled the hospitals' cost reimbursement reports by applying the pre–1981 wage-index method, the Secretary in 1984 reissued the 1981 rule and proceeded to recoup the sums previously paid to the hospitals, including respondents, as a result of the District Court's ruling. After exhausting administrative remedies, respondents **470 brought suit in Federal District Court, claiming that the retroactive schedule was invalid under, *inter alia,* the Medicare Act. The court granted summary judgment for respondents, and the Court of Appeals affirmed.

*Held:*

1. An administrative agency's power to promulgate regulations is limited to the authority delegated by Congress. As a general matter, statutory grants of rulemaking authority will not be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by express terms. Pp. 471–472.

2. The 1984 reinstatement of the 1981 cost-limit rule is invalid. Pg. 472–475.

**205** a) Section 1395x(v)(1)(A) does not authorize retroactive promulgation of cost-limit rules. The structure and language of the statute require the conclusion that clause (ii) applies not to rulemaking but only to case-by-case adjustments to reimbursement payments where the regulations prescribing computation methods do not reach the correct result in individual cases. This interpretation of clause (ii) is consistent with the Secretary's past implementation of that provision. Pp. 472–474.

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5510 Page 58 of 90

Bowen v. Georgetown University Hosp., 488 U.S. 204 (1988)

109 S.Ct. 468, 102 L.Ed.2d 493, 57 USLW 4057, 23 Soc.Sec.Rep.Serv. 511...

(b) The Medicare Act's general grant of authority to the Secretary to promulgate cost-limit rules contains no express authorization for retroactive rulemaking. This absence of express authorization weighs heavily against the Secretary's position. Moreover, the legislative history of the cost-limit provision indicates that Congress intended to forbid retroactive cost-limit rules, and the Secretary's past administrative practice is consistent with this interpretation of the statute. Pp. 474–475.

261 U.S.App.D.C. 262, 821 F.2d 750, affirmed.

KENNEDY, J., delivered the opinion for a unanimous Court. SCALIA, J., filed a concurring opinion, *post,* p. 475.

**Attorneys and Law Firms**

*Richard J. Lazarus* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Ayer, Assistant Attorney General Bolton, Deputy Solicitor General Merrill, Deputy Assistant Attorney General Spears, John F. Cordes, Mark W. Pennak, Ronald E. Robertson, Terry Coleman,* and *Henry R. Goldberg.*

*Ronald N. Sutter* argued the cause for respondents. With him on the brief were *Mary Susan Philp* and *Thomas K. Hyatt.**

\* Briefs of *amici curiae* urging affirmance were filed for Sisters of Mercy Health Corp. et al. by *James K. Robinson* and *Anthony A. Derezinski;* and for the American Hospital Association by *Linda A. Tomaselli* and *Robert A. Klein.*

**Opinion**

Justice KENNEDY delivered the opinion of the Court.

Under the Medicare program, health care providers are reimbursed by the Government for expenses incurred in providing medical services to Medicare beneficiaries. See Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 *et seq.* (the Medicare Act). Congress has **\*206** authorized the Secretary of Health and Human Services to promulgate regulations setting limits on the levels of Medicare costs that will be reimbursed. The question presented here is whether the Secretary may exercise this rulemaking authority to promulgate cost limits that are retroactive.

I

The Secretary's authority to adopt cost-limit rules is established by § 223(b) of the Social Security Amendments of 1972, 86 Stat. 1393, amending 42 U.S.C. § 1395x(v)(1)(A). This authority was first implemented in 1974 by promulgation of a cost-limit schedule for hospital services; new cost-limit schedules were issued on an annual basis thereafter.

On June 30, 1981, the Secretary issued a cost-limit schedule that included technical changes in the methods for calculating cost limits. One of these changes affected the method for calculating the "wage index," a factor used to reflect the salary levels for hospital employees in different parts of the country. Under the prior rule, the wage index for a given geographic area was calculated by using the average salary levels for all hospitals in the area; the 1981 rule provided that wages paid by Federal Government hospitals would be excluded from that computation. 46 Fed.Reg. 33637, 33638–33639 (1981).

Various hospitals in the District of Columbia area brought suit in United States District Court seeking to have the 1981 **\*\*471** schedule invalidated. On April 29, 1983, the District Court struck down the 1981 wage-index rule, concluding that the Secretary had violated the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.,* by failing to provide notice and an opportunity for public comment before issuing the rule. See *District of Columbia Hospital Assn. v. Heckler,* No. 82–2520, App. to Pet. for Cert. 49a (hereinafter *DCHA* ). The court did not enjoin enforcement of the rule, however, finding it lacked jurisdiction to do so because the hospitals **\*207** had not yet exhausted their administrative reimbursement remedies. The court's order stated:

> "If the Secretary wishes to put in place a valid prospective wage index, she should begin proper notice and comment proceedings; any wage index currently in place that has been promulgated without notice and comment is invalid as was the 1981 schedule." *DCHA,* App. to Pet. for Cert. 64a.

The Secretary did not pursue an appeal. Instead, after recognizing the invalidity of the rule, see 48 Fed.Reg. 39998 (1983), the Secretary settled the hospitals' cost reimbursement reports by applying the pre–1981 wage-index method.

In February 1984, the Secretary published a notice seeking public comment on a proposal to reissue the 1981 wage-index rule, retroactive to July 1, 1981. 49 Fed.Reg. 6175 (1984).

Because Congress had subsequently amended the Medicare Act to require significantly different cost reimbursement procedures, the readoption of the modified wage-index method was to apply exclusively to a 15–month period commencing July 1, 1981. After considering the comments received, the Secretary reissued the 1981 schedule in final form on November 26, 1984, and proceeded to recoup sums previously paid as a result of the District Court's ruling in *DCHA.* 49 Fed.Reg. 46495 (1984). In effect, the Secretary had promulgated a rule retroactively, and the net result was as if the original rule had never been set aside.

Respondents, a group of seven hospitals who had benefited from the invalidation of the 1981 schedule, were required to return over $2 million in reimbursement payments. After exhausting administrative remedies, they sought judicial review under the applicable provisions of the APA, claiming that the retroactive schedule was invalid under both the APA and the Medicare Act.

The United States District Court for the District of Columbia granted summary judgment for respondents. Applying the balancing test enunciated in *Retail, Wholesale and Department ***208** *Store Union, AFL–CIO v. NLRB,* 151 U.S.App.D.C. 209, 466 F.2d 380 (1972), the court held that retroactive application was not justified under the circumstances of the case.

The Secretary appealed to the United States Court of Appeals for the District of Columbia Circuit, which affirmed. 261 U.S.App.D.C. 262, 821 F.2d 750 (1987). The court based its holding on the alternative grounds that the APA, as a general matter, forbids retroactive rulemaking, and that the Medicare Act, by specific terms, bars retroactive cost-limit rules. We granted certiorari, 485 U.S. 903, 108 S.Ct. 1073, 99 L.Ed.2d 232 (1988), and we now affirm.

## II

It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress. In determining the validity of the Secretary's retroactive cost-limit rule, the threshold question is whether the Medicare Act authorizes retroactive rulemaking.

Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. *E.g., Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621–622, 11 L.Ed.2d 576 (1964); **\*\*472** *Claridge Apartments Co. v. Commissioner,* 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); *Miller v. United States,* 294 U.S. 435, 439, 55 S.Ct. 440, 441–442, 79 L.Ed. 977 (1935); *United States v. Magnolia Petroleum Co.,* 276 U.S. 160, 162–163, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928). By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. See *Brimstone R. Co. v. United States,* 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928) ("The power to require readjustments for the past is drastic. It ... ought not to be extended so as to permit unreasonably harsh action without very plain words"). Even where some substantial justification for retroactive rulemaking is presented, courts **\*209** should be reluctant to find such authority absent an express statutory grant.

The Secretary contends that the Medicare Act provides the necessary authority to promulgate retroactive cost-limit rules in the unusual circumstances of this case. He rests on alternative grounds: first, the specific grant of authority to promulgate regulations to "provide for the making of suitable retroactive corrective adjustments," 42 U.S.C. § 1395x(v)(1)(A)(ii); and second, the general grant of authority to promulgate cost limit rules, §§ 1395x(v)(1)(A), 1395hh, 1395ii. We consider these alternatives in turn.

## A

The authority to promulgate cost-reimbursement regulations is set forth in § 1395x(v)(1)(A). That subparagraph also provides that:

> "Such regulations shall ... (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." *Ibid.*

This provision on its face permits some form of retroactive action. We cannot accept the Secretary's argument, however, that it provides authority for the retroactive promulgation of cost-limit rules. To the contrary, we agree with the Court of Appeals that clause (ii) directs the Secretary to

establish a procedure for making case-by-case adjustments to reimbursement payments where the regulations prescribing computation methods do not reach the correct result in individual cases. The structure and language of the statute require the conclusion that the retroactivity provision applies only to case-by-case adjudication, not to rulemaking. [1]

[1]   The Courts of Appeals have not spoken in one voice in construing this provision. Some courts have held that clause (ii) permits the Secretary to promulgate retroactive regulations. *E.g., Tallahassee Memorial Regional Medical Center v. Bowen,* 815 F.2d 1435, 1453–1454 (CA11 1987), cert. denied, 485 U.S. 1020, 108 S.Ct. 1573, 99 L.Ed.2d 888 (1988); *Fairfax Nursing Center, Inc. v. Califano,* 590 F.2d 1297, 1300 (CA4 1979); *Springdale Convalescent Center v. Mathews,* 545 F.2d 943, 954–955 (CA5 1977). The Court of Appeals for the Third Circuit has reached the opposite conclusion, construing clause (ii) to provide for nothing more than a year-end balancing of individual providers' cost-reimbursement accounts. *Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250, 1258, n. 23 (1978). Other courts, without deciding whether clause (ii) permits rulemaking, have held that it requires the Secretary to make case-by-case adjustments to reimbursement determinations. *E.g., St. Paul–Ramsey Medical Center v. Bowen,* 816 F.2d 417, 419–420 (CA8 1987); *Regents of the University of California v. Heckler,* 771 F.2d 1182, 1188–1189 (CA9 1985).

 **\*210**   Section 1395x(v)(1)(A), of which clause (ii) is a part, directs the Secretary to promulgate regulations (including cost-limit rules) establishing the methods to be used in determining reasonable costs for "institutions" and "providers" that participate in the Medicare program. Clause (i) of § 1395x(v)(1)(A) requires these cost-method regulations to take into account both direct and indirect costs incurred by "providers." Clause (ii) mandates that the cost-method regulations include a mechanism for making retroactive corrective adjustments. These adjustments are required when, for "*a provider,*" the "aggregate reimbursement produced by the methods of determining costs" is too low or too high. By its **\*\*473** terms, then, clause (ii) contemplates a mechanism for adjusting the reimbursement received by *a* provider, while the remainder of § 1395x(v)(1)(A) speaks exclusively in the plural. The distinction suggests that clause (ii), rather than permitting modifications to the cost-method rules in their general formulation, is intended to authorize case-by-case inquiry into the accuracy of reimbursement determinations for individual providers. Indeed, it is difficult to see how

a corrective adjustment could be made to the aggregate reimbursement paid "a provider" without performing an individual examination of the provider's expenditures in retrospect.

Our conclusion is buttressed by the statute's use of the term "adjustments." Clause (ii) states that the cost-method **\*211** regulations shall "provide for the making of ... adjustments." In order to derive from this language the authority to promulgate cost-limit rules, the "adjustments" that the cost-method regulations must "provide for the making of" would themselves be additional cost-method regulations. Had Congress intended the Secretary to promulgate regulations providing for the issuance of further amendatory regulations, we think this intent would have been made explicit.

It is also significant that clause (ii) speaks in terms of adjusting the aggregate reimbursement amount computed by one of the methods of determining costs. As the Secretary concedes, the cost-limit rules are one of the methods of determining costs, and the retroactive 1984 rule was therefore an attempt to change one of those methods. Yet nothing in clause (ii) suggests that it permits changes in the *methods* used to compute costs; rather, it expressly contemplates corrective adjustments to the *aggregate amounts* of reimbursement produced pursuant to those methods. We cannot find in the language of clause (ii) an independent grant of authority to promulgate regulations establishing the methods of determining costs.

Our interpretation of clause (ii) is consistent with the Secretary's past implementation of that provision. The regulations promulgated immediately after enactment of the Medicare Act established a mechanism for making retroactive corrective adjustments that remained essentially unchanged throughout the periods relevant to this case. Compare 20 CFR §§ 405.451(b)(1), 405.454(a), (f) (1967), with 42 CFR §§ 405.451(b)(1), 405.454(a), (f) (1983). [2] These regulations **\*212** provide for adjusting the amount of interim payments received by a provider, to bring the aggregate reimbursement into line with the provider's actual reasonable costs.

[2]   It is clear from the language of these provisions that they are intended to implement the Secretary's authority under clause (ii):
    "These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

amount received by the provider during the year for covered services from both [the Medicare program] and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services rendered to beneficiaries during the year." 20 CFR § 405.451(b)(1) (1967); 42 CFR § 405.451(b)(1) (1983).

These are the only regulations that expressly contemplate the making of retroactive corrective adjustments. The 1984 reissuance of the 1981 wage-index rule did not purport to be such a provision; indeed, it is only in the context of this litigation that the Secretary has expressed any intent to characterize the rule as a retroactive corrective adjustment under clause (ii).

Despite the novelty of this interpretation, the Secretary contends that it is entitled to deference under *Young v. Community Nutrition Institute,* 476 U.S. 974, 980–981, 106 S.Ct. 2360, 2364–2365, 90 L.Ed.2d 959 (1986), *Chemical Mfrs. Assn. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–1108, 84 L.Ed.2d 90 (1985), and *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–844, 104 S.Ct. 2778, 2781–2783, 81 L.Ed.2d 694 (1984). We have never applied the principle of those cases to agency litigating positions that are wholly unsupported by regulations, **\*\*474** rulings, or administrative practice. To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Investment Company Institute v. Camp,* 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); cf. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency [orders]"). Even if we were to sanction departure from this principle in some cases, we would not do so here. Far from being a reasoned and consistent view of the scope of clause (ii), the Secretary's current interpretation of clause (ii) is contrary to the narrow **\*213** view of that provision advocated in past cases, where the Secretary has argued that clause (ii) "merely contemplates a year-end balancing of the monthly installments received by a provider with the aggregate due it for the year." *Regents of the University of California v. Heckler,* 771 F.2d 1182, 1189 (CA9 1985); see also *Whitecliff, Inc. v. United States,* 210 Ct.Cl. 53, 60, n. 11, 536 F.2d 347, 352, n. 11 (1976),

cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate. Accordingly, the retroactive rule cannot be upheld as an exercise of the Secretary's authority to make retroactive corrective adjustments.

**B**

The statutory provisions establishing the Secretary's general rulemaking power contain no express authorization of retroactive rulemaking.[3] Any light that might be shed on this matter by suggestions of legislative intent also indicates that no such authority was contemplated. In the first place, where Congress intended to grant the Secretary the authority to act retroactively, it made that intent explicit. As discussed above, § 1395x(v)(1)(A)(ii) directs the Secretary to establish procedures for making retroactive corrective adjustments **\*214** in view of this indication that Congress considered the need for retroactive agency action, the absence of any express authorization for retroactive cost-limit rules weighs heavily against the Secretary's position.

[3] Section 223(b) of the 1972 amendments amended the Medicare Act to state that the Secretary's regulations for computing reasonable costs may
   "provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter...." 42 U.S.C. § 1395x(v)(1)(A).
   Section 1395hh provides that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." Finally, § 1395ii incorporates 42 U.S.C. § 405(a), which provides that "[t]he Secretary shall have full power and authority to make rules and regulations ..., not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions...."

The legislative history of the cost-limit provision directly addresses the issue of retroactivity. In discussing the authority granted by § 223(b) of the 1972 amendments, the House and Senate Committee Reports expressed a desire to forbid retroactive cost-limit rules: "The proposed new authority to set limits on costs ... would be exercised on a prospective,

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5514 Page 62 of 90

Bowen v. Georgetown University Hosp., 488 U.S. 204 (1988)

109 S.Ct. 468, 102 L.Ed.2d 493, 57 USLW 4057, 23 Soc.Sec.Rep.Serv. 511...

rather than retrospective, basis so that the provider would know in advance the limits to Government recognition of incurred costs and have the opportunity to act to avoid having costs that are not reimbursable." H.R.Rep. No. 92–231, p. 83 (1971); see S.Rep. No. 92–1230, p. 188 (1972), U.S.Code Cong. & Admin.News 1972, pp. 4989, 5070.

The Secretary's past administrative practice is consistent with this interpretation of the statute. The first regulations promulgated **475 under § 223(b) provided that "[t]hese limits will be imposed prospectively...." 20 CFR § 405.460(a) (1975). Although the language was dropped from subsection (a) of the regulation when it was revised in 1979, the revised regulation continued to refer to "the prospective periods to which limits are being applied," and it required that notice of future cost limits be published in the Federal Register "[p]rior to the beginning of a cost period to which limits will be applied...." 42 CFR §§ 405.460(b)(2), (3) (1980). Finally, when the regulations were amended again in 1982, the Secretary reinserted the requirement that the limits be applied with prospective effect, noting that the language had been "inadvertently omitted" in the previous amendment but that the reinsertion would "have no effect on the way we develop or apply the limits." 47 Fed.Reg. 43282, 43286 (1982); see 42 CFR § 405.460(a)(2) (1983).

Other examples of similar statements by the agency abound. Every cost-limit schedule promulgated by the Secretary between *215 1974 and 1981, for example, included a statement that § 223 permits the Secretary to establish "prospective" limits on the costs that are reimbursed under Medicare. [4] The Secretary's administrative rulings have also expressed this understanding of § 223(b). See *Beth Israel Hospital v. Blue Cross Assn./Blue Cross/Blue Shield of Massachusetts,* CCH Medicare and Medicaid Guide ¶ 31,645 (Nov. 7, 1981).

[4]     See 46 Fed.Reg. 48010 (1981); *id.,* at 33637; 45 Fed.Reg. 41868 (1980); 44 Fed.Reg. 31806 (1979); 43 Fed.Reg. 43558 (1978); 42 Fed.Reg. 53675 (1977); 41 Fed.Reg. 26992 (1976); 40 Fed.Reg. 23622 (1975); 39 Fed.Reg. 20168 (1974); see also 48 Fed.Reg. 39998 (1983) (notice of invalidation of 1981 cost-limit schedule). Even the notice of proposed rulemaking concerning reissuance of the 1981 schedule contained the statement that § 223 "authorizes the Secretary to set prospective limits on the costs that are reimbursed under Medicare." 49 Fed.Reg. 6175, 6176 (1984). Interestingly, this statement does not

appear in the final notice announcing the reissuance of the 1981 schedule. *Id.,* at 46495.

The Secretary nonetheless suggests that, whatever the limits on his power to promulgate retroactive regulations in the normal course of events, judicial invalidation of a prospective rule is a unique occurrence that creates a heightened need, and thus a justification, for retroactive curative rulemaking. The Secretary warns that congressional intent and important administrative goals may be frustrated unless an invalidated rule can be cured of its defect and made applicable to past time periods. The argument is further advanced that the countervailing reliance interests are less compelling than in the usual case of retroactive rulemaking, because the original, invalidated rule provided at least some notice to the individuals and entities subject to its provisions.

Whatever weight the Secretary's contentions might have in other contexts, they need not be addressed here. The case before us is resolved by the particular statutory scheme in question. Our interpretation of the Medicare Act compels the conclusion that the Secretary has no authority to promulgate retroactive cost-limit rules.

*216 The 1984 reinstatement of the 1981 cost-limit rule is invalid. The judgment of the Court of Appeals is

*Affirmed.*

Justice SCALIA, concurring.

I agree with the Court that general principles of administrative law suggest that § 223(b) of the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A), does not permit retroactive application of the Secretary of Health and Human Service's 1984 cost-limit rule. I write separately because I find it incomplete to discuss general principles of administrative law without reference to the basic structural legislation which is the embodiment of those principles, the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–552, 553–559, 701–706, 1305, 3105, 3344, 5372, 7521. I agree with the District of Columbia Circuit that the APA independently confirms the judgment we have reached.

**476 The first part of the APA's definition of "rule" states that a rule

"means the whole or a part of an agency statement of general or particular applicability *and future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5515 Page 63 of 90

Bowen v. Georgetown University Hosp., 488 U.S. 204 (1988)
109 S.Ct. 468, 102 L.Ed.2d 493, 57 USLW 4057, 23 Soc.Sec.Rep.Serv. 511...

requirements of an agency...." 5 U.S.C. § 551(4) (emphasis added).

The only plausible reading of the italicized phrase is that rules have legal consequences only for the future. It could not possibly mean that merely *some* of their legal consequences must be for the future, though they may also have legal consequences for the past, since that description would not enable rules to be distinguished from "orders," see 5 U.S.C. § 551(6), and would thus destroy the entire dichotomy upon which the most significant portions of the APA are based. (Adjudication—the process for formulating orders, see § 551(7)—has future as well as past legal consequences, since the principles announced in an adjudication cannot be **\*217** departed from in future adjudications without reason. See, *e.g., Local 32, American Federation of Government Employees v. FLRA,* 249 U.S.App.D.C. 198, 202, 774 F.2d 498, 502 (1985) (McGowan, J.); *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 852 (1970) (Leventhal, J.), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)).

Nor could "future effect" in this definition mean merely "*taking effect* in the future," that is, having a future effective date even though, once effective, altering the law applied in the past. That reading, urged by the Secretary of Health and Human Services (Secretary), produces a definition of "rule" that is meaningless, since obviously *all* agency statements have "future effect" in the sense that they do not take effect until after they are made. (One might argue, I suppose, that "future effect" excludes agency statements that take effect immediately, as opposed to one second after promulgation. Apart from the facial silliness of making the central distinction between rulemaking and adjudication hang upon such a thread, it is incompatible with § 553(d), which makes clear that, if certain requirements are complied with, a rule can be effective immediately.) Thus this reading, like the other one, causes § 551(4) to fail in its central objective, which is to distinguish rules from orders. All orders have "future effect" in the sense that they are not effective until promulgated.

In short, there is really no alternative except the obvious meaning, that a rule is a statement that has legal consequences only for the future. If the first part of the definition left any doubt of this, however, it is surely eliminated by the second part (which the Secretary's brief regrettably submerges in ellipsis). After the portion set forth above, the definition continues that a rule

"includes the approval or prescription *for the future* of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, **\*218** or practices bearing on any of the foregoing." 5 U.S.C. § 551(4) (emphasis added).

It seems to me clear that the phrase "for the future"—which even more obviously refers to future operation rather than a future effective date—is not meant to add a requirement to those contained in the earlier part of the definition, but rather to repeat, in a more particularized context, the prior requirement "of future effect." And even if one thought otherwise it would not matter for purposes of the present case, since the HHS "cost-limit" rules governing reimbursement are a "prescription" of "practices bearing on" "allowances" for "services."

The position the Secretary takes in this litigation is out of accord with the Government's own most authoritative interpretation of the APA, the 1947 Attorney General's Manual on the Administrative Procedure Act (AG's Manual), which we have repeatedly given great weight. See, *e.g.,* **\*\*477** *Steadman v. SEC,* 450 U.S. 91, 103, n. 22, 101 S.Ct. 999, 1008, n. 22, 67 L.Ed.2d 69 (1981); *Chrysler Corp. v. Brown,* 441 U.S. 281, 302, n. 31, 99 S.Ct. 1705, 1717–1718, n. 31, 60 L.Ed.2d 208 (1979); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978). That document was prepared by the same Office of the Assistant Solicitor General that had advised Congress in the latter stages of enacting the APA, and was originally issued "as a guide to the agencies in adjusting their procedures to the requirements of the Act." AG's Manual 6. Its analysis is plainly out of accord with the Secretary's position here:

"Of particular importance is the fact that 'rule' includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person. In either case, they must be of *future effect,* implementing or prescribing future law.

---

"[T]he entire Act is based upon a dichotomy between rule making and adjudication.... Rule making is agency action which regulates the future conduct of either **\*219** groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5516 Page 64 of 90

Bowen v. Georgetown University Hosp., 488 U.S. 204 (1988)
109 S.Ct. 468, 102 L.Ed.2d 493, 57 USLW 4057, 23 Soc.Sec.Rep.Serv. 511...

future but also because it is primarily concerned with policy considerations.... Conversely, adjudication is concerned with the determination of past and present rights and liabilities." *Id.,* at 13–14.

These statements cannot conceivably be reconciled with the Secretary's position here that a rule has future effect merely because it is made effective in the future. Moreover, the clarity of these statements cannot be disregarded on the basis of the single sentence, elsewhere in the Manual, that "[n]othing in the Act precludes the issuance of retroactive rules when otherwise legal and accompanied by the finding required by section 4(c)." *Id.,* at 37. What that statement means (apart from the inexplicable reference to § 4(c), 5 U.S.C. § 553(d), which would appear to have no application, no matter which interpretation is adopted), is clarified by the immediately following citation to the portion of the legislative history supporting it, namely, H.R.Rep. No. 1980, 79th Cong., 2d Sess., 49, n. 1 (1946), U.S.Code Cong.Serv.1946, p. 1195. That Report states that "[t]he phrase 'future effect' does not preclude agencies from considering and, so far as legally authorized, dealing with past transactions in prescribing rules for the future." *Ibid.* The Treasury Department might prescribe, for example, that for purposes of assessing future income tax liability, income from certain trusts that has previously been considered nontaxable will be taxable—whether those trusts were established before or after the effective date of the regulation. That is not retroactivity in the sense at issue here, *i.e.,* in the sense of altering the *past* legal consequences of past actions. Rather, it is what has been characterized as "secondary" retroactivity, see McNulty, Corporations and the Intertemporal Conflict of Laws, 55 Cal.L.Rev. 12, 58–60 (1967). A rule with exclusively future effect (taxation of future trust income) can unquestionably *affect* past transactions (rendering the previously established trusts less desirable **\*220** in the future), but it does not for that reason cease to be a rule under the APA. Thus, with respect to the present matter, there is no question that the Secretary could have applied her new wage-index formulas to respondents in the future, even though respondents may have been operating under long-term labor and supply contracts negotiated in reliance upon the pre-existing rule. But when the Secretary prescribed such a formula for costs reimbursable while the prior rule was in effect, she changed the *law* retroactively, a function not performable by rule under the APA.

A rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule—may for that reason be "arbitrary" or "capricious," see 5 U.S.C. § 706, and thus invalid. In reference **\*\*478** to such situations, there are to be found in many cases statements to the effect that "[w]here a rule has retroactive effects, it may nonetheless be sustained in spite of such retroactivity if it is reasonable." *General Telephone Co. of Southwest v. United States,* 449 F.2d 846, 863 (CA5 1971). See also *National Assn. of Independent Television Producers and Distributors v. FCC,* 502 F.2d 249, 255 (CA2 1974) ("Any implication by the FCC that this court may not consider the reasonableness of the retroactive effect of a rule is clearly wrong"). It is erroneous, however, to extend this "reasonableness" inquiry to purported rules that not merely affect past transactions but change what was the law in the past. Quite simply, a rule is an agency statement "of future effect," not "of future effect and/or reasonable past effect."

The profound confusion characterizing the Secretary's approach to this case is exemplified by its reliance upon our opinion in *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Even apart from the fact that that case was not decided under the APA, it has nothing to do with the issue before us here, since it involved adjudication rather than rulemaking. Thus, though it is true that our opinion permitted the Secretary, **\*221** after his correction of the procedural error that caused an initial reversal, see *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), to reach the same substantive result with retroactive effect, the utterly crucial distinction is that *Chenery* involved that form of administrative action where retroactivity is not only permissible but standard. Adjudication *deals* with what the law was; rulemaking deals with what the law will be. That is why we said in *Chenery:*

> "Since the Commission, unlike a court, *does have the ability to make new law prospectively through the exercise of its rule-making powers,* it has less reason to rely upon *ad hoc* adjudication to formulate new standards of conduct.... The function of filling in the interstices of the Act should be performed, as much as possible, *through this quasi-legislative promulgation of rules to be applied in*

Case 2:19-cv-00037-JNP   Document 59-35   Filed 11/30/22   PageID.5517   Page 65 of 90

Bowen v. Georgetown University Hosp., 488 U.S. 204 (1988)

109 S.Ct. 468, 102 L.Ed.2d 493, 57 USLW 4057, 23 Soc.Sec.Rep.Serv. 511...

*the future.*" 332 U.S., at 202, 67 S.Ct., at 1580 (emphasis added).

And just as *Chenery* suggested that rulemaking was prospective, the opinions in *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), suggested the obverse: that adjudication could *not* be purely prospective, since otherwise it would constitute rulemaking. Both the plurality opinion, joined by four of the Justices, and the dissenting opinions of Justices Douglas and Harlan expressed the view that a rule of law announced in an adjudication, but with exclusively prospective effect, could not be accepted as binding (without new analysis) in subsequent adjudications, since it would constitute rulemaking and as such could only be achieved by following the prescribed rulemaking procedures. See *id.,* at 764–766, 89 S.Ct., at 1428–1430 (plurality opinion); *id.,* at 777, 89 S.Ct., at 1435–1436 (Douglas, J., dissenting); *id.,* at 780–781, 89 S.Ct., at 1437–1438 (Harlan, J., dissenting). Side by side these two cases, *Chenery* and *Wyman–Gordon,* set forth quite nicely the "dichotomy between rulemaking and adjudication" upon which "the entire [APA] is based." AG's Manual 14.

Although the APA was enacted over 40 years ago, this Court has never directly confronted whether the statute authorizes **\*222** retroactive rules. This in itself casts doubt on the Secretary's position. If so obviously useful an instrument was available to the agencies, one would expect that we would previously have had occasion to review its exercise. The only Supreme Court case the Government cites, however, is the *pre*-APA case of *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). That case does not stand for a general authority to issue retroactive rules before the APA was enacted, much less for authority to do so in the face of § 551(4). *Addison* involved the promulgation of a definition of "area of production" by the Administrator of the Wage and Hour Division, **\*\*479** for purposes of an exemption to the Fair Labor Standards Act of 1938, 52 Stat. 1060, as amended, 29 U.S.C. § 201 *et seq.* We found his definition unlawful—but instead of directing the entry of judgment for the employees who were claiming higher wages, we remanded the case to the District Court "with instructions to hold it until the Administrator, by making a valid determination of the area with all deliberate speed, acts within the authority given him by Congress." 322 U.S., at 619, 64 S.Ct., at 1222. It is not entirely clear that we required this determination to be made by

regulation rather than by a declaratory order applicable to the case at hand. Where an interpretive rule is held invalid, and there is no pre-existing rule which it superseded, it is obviously available to the agency to "make" law retroactively through adjudication, just as courts routinely do (and just as we indicated the Secretary of Agriculture could have done in *United States v. Morgan,* 307 U.S. 183, 193, 59 S.Ct. 795, 800–801, 83 L.Ed. 1211 (1939)). Perhaps that is all *Addison* stands for. Arguably, however, the Administrator was *obliged* to act by regulation rather than by adjudication, since the statutory exemption in question referred to "area of production (as defined by the Administrator)." See 322 U.S., at 608, 64 S.Ct., at 1217. If the parenthetical had the effect of requiring specification by rule (rather than through adjudication), then the Court *would* have been authorizing a retroactive regulation. But it would have been doing so in a situation **\*223** where one of two legal commands had to be superseded. In these circumstances, either the Administrator had to contravene normal law by promulgating a retroactive regulation, or else the Administrator would, by his inaction, have totally eliminated the congressionally prescribed "area of production" exemption. Something had to yield. If this case involves retroactive rulemaking at all, it does not stand for the Government's asserted principle of the general permissibility of retroactive rules so long as they are reasonable, but rather for the much narrower (and unexceptional) proposition that a particular statute may in some circumstances implicitly authorize retroactive rulemaking.

This case cannot be disposed of, as the Secretary suggests, by simply noting that retroactive rulemaking is similar to retroactive legislation, and that the latter has long been upheld against constitutional attack where reasonable. See, *e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Baltimore & Susquehanna R. Co. v. Nesbit,* 10 How. 395, 13 L.Ed. 469 (1851). See generally Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692 (1960). The issue here is not constitutionality, but rather whether there is any good reason to doubt that the APA means what it says. For purposes of resolving that question, it does not at all follow that, since Congress itself possesses the power retroactively to change its laws, it must have meant agencies to possess the power retroactively to change their regulations. Retroactive legislation has always been looked upon with disfavor, see Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775 (1936); 2 J. Story, Commentaries on the Constitution of the United States § 1398, p. 272 (5th ed.

1891), and even its constitutionality has been conditioned upon a rationality requirement beyond that applied to other legislation, see *Pension Benefit Guaranty Corp., supra,* 467 U.S., at 730, 104 S.Ct., at 2718; *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2892–2893, 49 L.Ed.2d 752 (1976). It is entirely **\*224** unsurprising, therefore, that even though Congress wields such a power itself, it has been unwilling to confer it upon the agencies. Given the traditional attitude towards retroactive legislation, the regime established by the APA is an entirely reasonable one: Where quasi-legislative action is required, an agency cannot act with retroactive effect without some special congressional authorization. That is what the APA says, and there is no reason to think Congress did not mean it.

**\*\*480** The dire consequences that the Secretary predicts will ensue from reading the APA as it is written (and as the Justice Department originally interpreted it) are not credible. From the more than 40 years of jurisprudence since the APA has been in effect, the Secretary cites only one holding and one alternative holding (set forth in a footnote) sustaining retroactive regulations. See *Citizens to Save Spencer County v. EPA,* 195 U.S.App.D.C. 30, 600 F.2d 844 (1979); *National Helium Corp. v. FEA,* 569 F.2d 1137, 1145, n. 18 (Temp.Emerg.Ct.App.1977). They are evidently not a device indispensable to efficient government. It is important to note that the retroactivity limitation applies *only* to rulemaking. Thus, where legal consequences hinge upon the interpretation of statutory requirements, and where no pre-existing interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication. See *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 293–294, 94 S.Ct. 1757, 1771–1772, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.,* 332 U.S., at 202–203, 67 S.Ct., at 1580–1581. Moreover, if and when an agency believes that the extraordinary step of retroactive rulemaking is crucial, all it need do is persuade Congress of that fact to obtain the necessary ad hoc authorization. It may even be that implicit authorization of particular retroactive rulemaking can be found in existing legislation. If, for example, a statute prescribes a deadline by which particular rules must be in effect, and if the agency misses that deadline, the statute may be interpreted to authorize a reasonable retroactive rule despite **\*225** the limitation of the APA. (Such a situation would bear some similarity to that in *Addison.*)

I need not discuss what other exceptions, with basis in the law, may permit an agency to issue a retroactive rule. The only exception suggested by the Secretary to cover the present case has no basis in the law. The Secretary contends that the evils generally associated with retroactivity do not apply to reasonable "curative" rulemaking—that is, the correction of a mistake in an earlier rulemaking proceeding. Because the invalidated 1981 wage-index rule furnished respondents with "ample notice" of the standard that would be applied, the Secretary asserts that it is not unfair to apply the identical 1984 rule retroactively. I shall assume that the invalidated rule provided ample notice, though that is not at all clear. It makes no difference. The issue is not whether retroactive rulemaking is fair; it undoubtedly may be, just as may prospective adjudication. The issue is whether it is a permissible form of agency action under the particular structure established by the APA. The Secretary provides nothing that can bring it within that structure. I might add that even if I felt free to construct my own model of desirable administrative procedure, I would assuredly not sanction "curative" retroactivity. I fully agree with the District of Columbia Circuit that acceptance of the Secretary's position would "make a mockery ... of the APA," since "agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to 'reissue' that rule on a retroactive basis." 261 U.S.App.D.C. 262, 270, 821 F.2d 750, 758 (1987).

For these reasons in addition to those stated by the Court, I agree that the judgment of the District of Columbia Circuit must be affirmed.

## All Citations

488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493, 57 USLW 4057, 23 Soc.Sec.Rep.Serv. 511, Med & Med GD (CCH) P 37,541

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

126 S.Ct. 2422
Supreme Court of the United States

Humberto FERNANDEZ–VARGAS, Petitioner,

v.

Alberto R. GONZALES, Attorney General.

No. 04–1376.
|
Argued March 22, 2006.
|
Decided June 22, 2006.

**Synopsis**

**Background:** Alien who illegally reentered United States after being previously removed petitioned for review of reinstatement of previous order of removal by government. The United States Court of Appeals for the Tenth Circuit, Michael W. McConnell, Circuit Judge, 394 F.3d 881, denied petition. Certiorari was granted.

The Supreme Court, Justice Souter, held that Immigration and Nationality Act (INA) provision for reinstatement of removal orders against aliens illegally reentering applied to aliens who reentered the United States before Illegal Immigration Reform and Immigrant Responsibility Act's (IIRIRA's) effective date and did not retroactively affect any right of, or impose any burden on, continuing violator who had chosen to remain illegally after that date; abrogating *Bejjani v. INS,* 271 F.3d 670, *Castro-Cortez v. INS,* 239 F.3d 1037.

Affirmed.

Justice Stevens filed dissenting opinion.

**\*\*2423  \*30** *Syllabus* \*

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Immigration law has for some time provided that an order for removing an alien present unlawfully may be reinstated if he leaves and unlawfully reenters. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) amended the Immigration and Nationality Act (INA) to enlarge the class of illegal reentrants whose orders may be reinstated and limit the possible relief from a removal order available to them. See § 241(a)(5), 8 U.S.C. § 1231(a)(5). Petitioner Fernandez–Vargas, a Mexican citizen, illegally reentered the United States in 1982, after having been deported. He remained undetected for over 20 years, fathering a son in 1989 and marrying the boy's mother, a United States citizen, in 2001. After he filed an application to adjust his status to that of a lawful permanent resident, the Government began proceedings to reinstate his 1981 deportation order under § 241(a)(5), and deported him. He petitioned the Tenth Circuit to review the reinstatement order, claiming that, because he illegally reentered the country before IIRIRA's effective date, § 241(a)(5) did not bar his application for adjustment of status, and that § 241(a)(5) would be impermissibly retroactive if it did bar his adjustment application. The court held that § 241(a)(5) barred his application and followed *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229, in determining that the new law had no impermissibly retroactive effect in his case.

*Held:* Section 241(a)(5) applies to those who reentered the United States before IIRIRA's effective date and does not retroactively affect any right of, or impose any burden on, the continuing violator of the INA now before this Court. Pp. 2427–2434.

(a)  Statutes are disfavored as retroactive when their application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf, supra,* at 280, 114 S.Ct. 1483. A statute is not given retroactive effect "unless such construction is required by explicit language or by necessary implication." *United States v. St. Louis, S.F. & T.R. Co.,* 270 U.S. 1, 3, 46 S.Ct. 182, 70 L.Ed. 435. In determining whether a statute has an impermissibly retroactive effect, **\*\*2424** the Court first looks to "whether Congress has expressly prescribed the statute's proper reach," *Landgraf, supra,* at 280, 114 S.Ct. 1483, **\*31** and in the absence of express language tries to draw a comparably firm conclusion about the temporal reach specifically intended by applying its "normal rules of construction," *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481. If that effort fails, the Court asks whether applying the statute to the person objecting

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

would have a retroactive effect in the disfavored sense of "affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment," *Landgraf, supra,* at 278, 114 S.Ct. 1483. If the answer is yes, the Court then applies the presumption against retroactivity by construing the statute as inapplicable to the event or act in question. *INS v. St. Cyr,* 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347. Pp. 2427–2428.

(b) Common principles of statutory interpretation fail to unsettle § 241(a)(5)'s apparent application to any reentrant present in the country, whatever the date of return. The statute does not expressly include in or exclude from § 241(a)(5)'s ambit individuals who illegally entered the country before IIRIRA's effective date. Fernandez–Vargas argues that the fact that the old reinstatement provision applied to aliens who had "unlawfully reentered ... after having previously departed or been deported ..., whether before or after June 27, 1952 [the INA's effective date], on any ground described in ... subsection (e)," § 242(f), while § 241(a)(5) lacks language of temporal reach, shows that Congress no longer meant to cover preenactment reentrants. But the old before-or-after clause, which was sandwiched between references to departure or deportation and grounds for deportation, most naturally referred not to an alien's illegal reentry but to the previous deportation or departure. The better inference is that the clause was removed because, in 1996, application keyed to departures in 1952 or earlier was academic. Applying § 241(a)(5) only to deportations or departures after IIRIRA's effective date would exempt anyone who departed before that date but reentered after it. That would be a strange result, since the statute was revised to expand the scope of the reinstatement authority and invest it with something closer to finality. Fernandez–Vargas errs in suggesting that the new law is bereft of clarity and the Court should apply the presumption against retroactivity as a tool for interpreting the statute at the first *Landgraf* step. It is not until a statute is shown to have no firm provision about temporal reach but to produce a retroactive effect when straightforwardly applied that the presumption has its work to do. And IIRIRA has other provisions on temporal reach, which blunt Fernandez–Vargas's argument that a negative inference in his favor may be drawn from removal of the before-or-after clause. Pp. 2428–2430.

(c) This facial reading is confirmed by two features of IIRIRA. First, the provision's text shows that it applies here not because **\*32** Fernandez–Vargas reentered at any particular time, but because he chose to remain after the new

statute became effective. While the law looks back to "an alien [who] has reentered ... illegally," 8 U.S.C. § 1231(a) (5), the provision does not penalize an alien for the reentry; it establishes a process to remove him under a "prior order any time after the reentry," *ibid.* Thus, it is the conduct of remaining in the country after entry that is the predicate action; the law applies to stop an indefinitely continuing violation that the alien could end at any time by voluntarily leaving. It is therefore the alien's choice to continue his illegal presence, after illegal **\*\*2425** reentry and after the new law's effective date, that subjects him to the new and less generous regime, not a past act that he is helpless to undo. *INS v. St. Cyr, supra,* distinguished. Second, IIRIRA's effective date provision shows that Fernandez–Vargas had ample warning of the coming change in the law, but chose to remain until the old regime expired and § 241(a)(5) took its place. He had an opportunity to avoid the new law's application by leaving the country and ending his violation during the six months between IIRIRA's enactment and effective date. For that matter, he could have married his son's mother and applied for adjustment of status during the period, in which case he would at least have had a claim that proven reliance on the law should be honored by applying the presumption against retroactivity. Instead, he augmented his 15 years of unlawful presence by remaining in the country into the future subject to the new law. And the presumption against retroactivity does not amount to a presumption of legal stasis for the benefit of continuous lawbreakers. Pp. 2431–2433.

394 F.3d 881, affirmed.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, *post,* p. 2434.

**Attorneys and Law Firms**

Todd Lundell Mayer, Brown, Rowe & Maw LLP, New York, NY, J. Christopher Keen, Keen Law Offices, LLC, Provo, UT, David M. Gossett, Counsel of Record, Andrew Tauber, Mayer, Brown, Rowe & Maw LLP, Washington, DC, for petitioner.

Paul D. Clement, Solicitor General, Counsel of Record, Peter D. Keisler, Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Sri Srinivasan, Assistant to the Solicitor General, Donald E. Keener, Alison Marie Igoe,

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5521 Page 69 of 90

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)
126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

Attorneys Department of Justice, Washington, D.C., for respondent.

## Opinion

Justice SOUTER delivered the opinion of the Court.

**\*33** For some time, the law has provided that an order for removing an alien present unlawfully may be reinstated if he leaves and unlawfully enters again. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. 104–208, div. C, 110 Stat. 3009–546, enlarged the class of illegal reentrants whose orders may be reinstated and limited the possible relief from a removal order available to them. See Immigration and Nationality Act (INA), § 241(a) (5), 66 Stat. 204, as added by IIRIRA § 305(a)(3), 110 Stat. 3009–599, 8 U.S.C. § 1231(a)(5). The questions here are whether the new version of the reinstatement provision is correctly read to apply to individuals who reentered the United States before IIRIRA's effective date, and whether such a reading may be rejected as impermissibly retroactive. We hold the statute applies to those who entered before IIRIRA and does not retroactively affect any right of, or impose any burden on, the continuing violator of the INA now before us.

I

In 1950, Congress provided that deportation orders issued against some aliens **\*\*2426** who later reentered the United States illegally could be reinstated.[1] Internal Security Act of 1950, § 23(d), 64 Stat. 1012, 8 U.S.C. § 156(d) (1946 ed., Supp. V).[2] Only specific illegal reentrants were subject to the provision, **\*34** those deported as "anarchists" or "subversives," for example, see § 23(c), 64 Stat. 1012, while the rest got the benefit of the ordinary deportation rules. Congress retained a reinstatement provision two years later when it revised the immigration laws through the INA, § 242(f), 66 Stat. 212, as codified in this subsection:

[1] What was formerly known as "deportation" is now called "removal" in IIRIRA. See Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L.Rev. 961, 966 (1998) (IIRIRA "realigned the vocabulary of immigration law, creating a new category of 'removal' proceedings that largely replaces what were formerly exclusion proceedings and deportation

proceedings"). Our use of each term here will vary according to the scheme under discussion.

[2] This is the full text of the provision: "Should any alien subject to the provisions of subsection (c) unlawfully return to the United States after having been released for departure or deported pursuant to this section, the previous warrant of deportation against him shall be considered as reinstated from its original date of issuance."

"Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether before or after June 27, 1952,[3] on any ground described ... in subsection (e) ..., the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry." 8 U.S.C. § 1252(f) (1994 ed.).

[3] A date was inserted when the provision was codified; as originally enacted, the text read, "whether before or after the date of enactment of this Act." 66 Stat. 212.

Again, only a limited class of illegal reentrants was susceptible, see § 242(e), 66 Stat. 211; cf. § 241(a), *id.,* at 204, and even those affected could seek some varieties of discretionary relief, see, *e.g.,* 8 U.S.C. § 1254(a)(1) (1994 ed.) (suspension of deportation available to aliens who maintained a continuous presence in the United States for seven years and could demonstrate extreme hardship and a good moral character).

In IIRIRA, Congress replaced this reinstatement provision with one that toed a harder line, as the old § 242(f) was displaced by the new § 241(a)(5):

"If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply **\*35** for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5) (1994 ed., Supp. III).

The new law became effective on April 1, 1997, "the first day of the first month beginning more than 180 days after" IIRIRA's enactment. § 309(a), 110 Stat. 3009–625. Unlike its predecessor, § 241(a)(5) applies to all illegal reentrants,

explicitly insulates the removal orders from review, and generally forecloses discretionary relief from the terms of the reinstated order. [4]

[4]   Notwithstanding the absolute terms in which the bar on relief is stated, even an alien subject to § 241(a)(5) may seek withholding of removal under 8 U.S.C. § 1231(b)(3)(A) (2000 ed.) (alien may not be removed to country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion"), or under 8 CFR §§ 241.8(e) and 208.31 (2006) (raising the possibility of asylum to aliens whose removal order has been reinstated under INA § 241(a)(5)).

## **2427 II

Humberto Fernandez–Vargas is a citizen of Mexico, who first came to the United States in the 1970s, only to be deported for immigration violations, and to reenter, several times, his last illegal return having been in 1982. Then his luck changed, and for over 20 years he remained undetected in Utah, where he started a trucking business and, in 1989, fathered a son, who is a United States citizen. In 2001, Fernandez–Vargas married the boy's mother, who is also a United States citizen. She soon filed a relative-visa petition on behalf of her husband, see 8 U.S.C. §§ 1154(a), 1151(b) (2000 ed.); see *Fernandez–Vargas v. Ashcroft,* 394 F.3d 881, 883, n. 4 (C.A.10 2005), on the basis of which he filed an application to adjust his status to that of lawful permanent resident, see § 1255(i). The filings apparently tipped off the authorities to his illegal presence here, and in November 2003, the Government began proceedings under § 241(a)(5) that eventuated in reinstating Fernandez–Vargas's 1981 deportation **36** order, but without the possibility of adjusting his status to lawful residence. He was detained for 10 months before being removed to Juarez, Mexico, in September 2004.

Fernandez–Vargas petitioned the United States Court of Appeals for the Tenth Circuit to review the reinstatement order. He took the position that because he illegally reentered the country before IIRIRA's effective date, the controlling reinstatement provision was the old § 242(f), which meant he was eligible to apply for adjustment of status as spouse of a citizen, and he said that the new § 241(a)(5) would be impermissibly retroactive if it barred his application for adjustment. The Court of Appeals held that § 241(a)(5) did bar Fernandez–Vargas's application and followed *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229

(1994), in determining that the new law had no impermissibly retroactive effect in Fernandez–Vargas's case. 394 F.3d, at 886, 890–891. We granted certiorari to resolve a split among the Courts of Appeals over the application of § 241(a)(5) to an alien who reentered illegally before IIRIRA's effective date, [5] 546 U.S. 975, 126 S.Ct. 544, 163 L.Ed.2d 458 (2005), and we now affirm.

[5]   Two Courts of Appeals have held that § 241(a)(5) does not apply at all to aliens who reentered before the provision's effective date, see *Bejjani v. INS,* 271 F.3d 670 (C.A.6 2001); *Castro–Cortez v. INS,* 239 F.3d 1037 (C.A.9 2001), while eight have held that it does, at least in some circumstances, see *Arevalo v. Ashcroft,* 344 F.3d 1 (C.A.1 2003); *Avila–Macias v. Ashcroft,* 328 F.3d 108 (C.A.3 2003); *Velasquez–Gabriel v. Crocetti,* 263 F.3d 102 (C.A.4 2001); *Ojeda–Terrazas v. Ashcroft,* 290 F.3d 292 (C.A.5 2002); *Faiz–Mohammad v. Ashcroft,* 395 F.3d 799 (C.A.7 2005); *Alvarez–Portillo v. Ashcroft,* 280 F.3d 858 (C.A.8 2002); 394 F.3d 881 (C.A.10 2005) (case below); *Sarmiento Cisneros v. United States Attorney General,* 381 F.3d 1277 (C.A.11 2004). The Courts of Appeals in the majority are themselves divided on the question whether an alien's marriage or application for adjustment of status before the statute's effective date (facts not in play here) renders the statute impermissibly retroactive when it is applied to the alien. See, *e.g., Faiz–Mohammad, supra,* at 809–810 (application for adjustment of status); *Alvarez–Portillo, supra,* at 862, 867 (marriage).

## *37 III

Statutes are disfavored as retroactive when their application "would impair rights a party possessed when he **2428** acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf, supra,* at 280, 114 S.Ct. 1483. The modern law thus follows Justice Story's definition of a retroactive statute, as "tak[ing] away or impair[ing] vested rights acquired under existing laws, or creat[ing] a new obligation, impos[ing] a new duty, or attach[ing] a new disability, in respect to transactions or considerations already past," *Society for the Propagation of the Gospel v. Wheeler,* 22 F.Cas. 756, 767 (No. 13,156) (CCNH 1814). Accordingly, it has become "a rule of general application" that "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication." *United States v. St. Louis, S.F. & T.R. Co.,* 270 U.S. 1, 3, 46 S.Ct. 182, 70 L.Ed. 435 (1926) (opinion for the Court by Brandeis, J.).

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5523 Page 71 of 90

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

This Court has worked out a sequence of analysis when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute's enactment. We first look to "whether Congress has expressly prescribed the statute's proper reach," *Landgraf, supra,* at 280, 114 S.Ct. 1483, and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying "our normal rules of construction," *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). If that effort fails, we ask whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of "affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment," *Landgraf, supra,* at 278, 114 S.Ct. 1483; see also *Lindh, supra,* at 326, 117 S.Ct. 2059. If the answer is yes, we then apply the presumption against retroactivity by construing the statute as inapplicable to the **\*38** event or act in question owing to the "absen[ce of] a clear indication from Congress that it intended such a result." *INS v. St. Cyr,* 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); see *Martin v. Hadix,* 527 U.S. 343, 352, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (quoting *Landgraf, supra,* at 280, 114 S.Ct. 1483).

Fernandez–Vargas fights at each step of the way, arguing that Congress intended that INA § 241(a)(5) would not apply to illegal reentrants like him who returned to this country before the provision's effective date; and in any event, that application of the provision to such illegal reentrants would have an impermissibly retroactive effect, to be avoided by applying the presumption against it. We are not persuaded by either contention.[6]

[6] The Government urges us to forgo *Landgraf* analysis altogether because § 241(a)(5) regulates only a present removal process, not past primary conduct, citing our recent decision in *Republic of Austria v. Altmann,* 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Although we ultimately agree with the Government, in the abstract at least, that the reinstatement provision concerns itself with postenactment affairs, see *infra,* at 2432–2433, we find the Government's allusion to *Altmann* inapt. The Court's conclusion in that case, that *Landgraf* was to be avoided, turned on the peculiarities of the Foreign Sovereign Immunities Act. See *Altmann, supra,* at 694–696, 124 S.Ct. 2240. Those peculiarities

are absent here, and we thus advert to *Landgraf,* as we ordinarily do.

A

Needless to say, Congress did not complement the new version of § 241(a)(5) with any clause expressly dealing with individuals who illegally reentered the country before IIRIRA's April 1, 1997, effective date, either including them within **\*\*2429** § 241(a)(5)'s ambit or excluding them from it. Fernandez–Vargas argues instead on the basis of the generally available interpretive rule of negative implication, when he draws attention to language governing temporal reach contained in the old reinstatement provision, but missing from the current one. Section 242(f) applied to "any alien [who] has unlawfully reentered the United States after having previously departed or been deported pursuant to an **\*39** order of deportation, whether before or after June 27, 1952, on any ground described in ... subsection (e)." 8 U.S.C. § 1252(f) (1994 ed.). According to Fernandez–Vargas, since that before-or-after clause made it clear that the statute applied to aliens who reentered before the enactment date of the earlier version, its elimination in the current iteration shows that Congress no longer meant to cover preenactment reentrants. See *Brewster v. Gage,* 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930) ("deliberate selection of language ... differing from that used in the earlier Acts" can indicate "that a change of law was intended"); cf. 2B N. Singer, Statutes and Statutory Construction § 51.04, p. 244 (6th rev. ed.2000). But the clues are not that simple.

To begin with, the old before-or-after clause was sandwiched between references to departure or deportation under a deportation order and to grounds for deportation set out in a different subsection of the INA. It thus most naturally referred not to the illegal reentry but to the alien's previous deportation or departure. If its omission from the new subsection (a)(5) is significant, its immediate significance goes to the date of leaving this country, not the date of illegal return. Since the old clause referred to the date of enactment of the INA in 1952, the negative implication argument from dropping the language is that the reinstatement section no longer applies to those who left the country before that date. But, in 1996, application keyed to departures in 1952 or earlier was academic, and the better inference is that the clause was removed for that reason.[7]

7    We therefore need not entertain Fernandez–Vargas's argument that the provision's drafting history indicates that the language was eliminated deliberately.

If, moreover, we indulged any suggestion that omitting the clause showed an intent to apply § 241(a)(5) only to deportations or departures after IIRIRA's effective date, the result would be a very strange one: it would exempt from the new **\*40** reinstatement provision's coverage anyone who departed before IIRIRA's effective date but reentered after it. The point of the statute's revision, however, was obviously to expand the scope of the reinstatement authority and invest it with something closer to finality, and it would make no sense to infer that Congress meant to except the broad class of persons who had departed before the time of enactment but who might return illegally at some point in the future.

Fernandez–Vargas sidesteps this problem (on a very generous reading of his argument) by making a more general suggestion of congressional intent: whatever the event to which the old law was tied, activity before as well as activity after it implicated the reinstatement power. Since the new law is bereft of such clarity, we should apply the " 'longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien,' " *St. Cyr, supra,* at 320, 121 S.Ct. 2271 (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)), which would effectively impose "[t]he presumption against retroactive application of ambiguous statutory provisions," *St. Cyr,* 533 U.S., at 320, 121 S.Ct. 2271. If we did so, we would find that **\*\*2430** § 241(a)(5) operates only to reentries after its effective date.

Even at this amorphously general level, however, the argument suffers from two flaws, the first being that it puts the cart before the horse. As Fernandez–Vargas realizes, he urges application of the presumption against retroactivity as a tool for interpreting the statute at the first *Landgraf* step. But if that were legitimate, a statute lacking an express provision about temporal reach would never be construed as having a retroactive potential and the final two steps in the *Landgraf* enquiry would never occur (that is, asking whether the statute would produce a retroactive effect, and barring any such application by applying the presumption against retroactivity). It is not until a statute is shown to have no firm provision about temporal reach but to produce a retroactive effect when straightforwardly applied that the presumption has its work to do. See 511 U.S., at 280, 114 S.Ct. 1483.

**\*41** The second flaw is the argument's failure to account for the new statute's other provisions on temporal reach, from which one might draw a negative inference that subsection (a)(5) was (or at least may well have been) meant to apply to reentries before its effective date. In contrast to their silence about the temporal sweep of § 241(a)(5), the 1996 amendments speak directly to the scope of changes in provisions making reentry criminal and setting civil penalties. IIRIRA § 324(c), 110 Stat. 3009–629, note following 8 U.S.C. § 1326 (2000 ed.), provides that the expanded criminal prohibitions, see § 1326(a), apply only to reentries or attempts after the effective date, and § 105(b), 110 Stat. 3009–556, note following 8 U.S.C. § 1325, provides the same as to civil penalties for illegal reentry, see § 1325(b). The point here is not that these provisions alone would support an inference of intent to apply the reinstatement provision retroactively, see *Lindh,* 521 U.S., at 328, n. 4, 117 S.Ct. 2059, for we require a clear statement for that, see *Martin,* 527 U.S., at 354, 119 S.Ct. 1998. But these provisions do blunt any argument that removal of the before-or-after clause suffices to establish the applicability of § 241(a)(5) only to posteffective date reentries. The fact is that IIRIRA sometimes expressly made changes prospective as from its effective date and sometimes expressly provided they were applicable to earlier acts; compare §§ 324(c) and 105(b) with § 347(c), 110 Stat. 3009–639 (provision governing removal of aliens who have unlawfully voted is applicable "to voting occurring before, on, or after the date of the enactment of this Act"), and § 351(c), *id.,* at 3009–640 (provision applicable to "waivers filed before, on, or after the date of the enactment of this Act"). With such a variety of treatment, it is just too hard to infer any clear intention at any level of generality from the fact of retiring the old before-or-after language from what is now § 241(a)(5).

One conclusion can be stated, however. Common principles of statutory interpretation fail to unsettle the apparent **\*42** application of § 241(a)(5) to any reentrant present in the country, whatever the date of return.[8]

8    Justice STEVENS states that when, in 1952, Congress inserted the before-or-after clause with the old § 242(f), it was responding to the Immigration and Naturalization Service (INS) practice of applying the reinstatement provision only to deportation orders issued after the provision's enactment, a practice that necessarily meant the INS applied the provision only to postenactment reentries. By correcting the INS's interpretation only as to deportation orders, Justice STEVENS suggests,

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

Congress did nothing to disturb the practice as to reentries. And when it removed the obsolete before-or-after clause in 1996 without adding alternative language of temporal reach, the argument goes, Congress held fast to its intent in 1950 and 1952 to apply the reinstatement provision only to postenactment reentries. But the INS's practice circa 1951 of applying the reinstatement provision only to postenactment reentries followed from its policy regarding deportation orders, and in 1952 Congress might just as easily have assumed that the branch would go the way of the root. In any event, it is difficult to accept Justice STEVENS's view that congressional understanding from 40 years back was intended to govern the IIRIRA reinstatement provision, given Congress's care to make the revised criminal and civil penalties applicable only to postenactment reentries.

## **2431  B

This facial reading is confirmed by two features of IIRIRA, not previously discussed, that describe the conduct to which § 241(a)(5) applies, and show that the application suffers from no retroactivity in denying Fernandez–Vargas the opportunity for adjustment of status as the spouse of a citizen of the United States. [9] One is in the text of that provision itself, showing that it applies to Fernandez–Vargas today not because he reentered in 1982 or at any other particular *43 time, but because he chose to remain after the new statute became effective. The second is the provision setting IIRIRA's effective date, § 309(a), 110 Stat. 3009–625, which shows that Fernandez–Vargas had an ample warning of the coming change in the law, but chose to remain until the old regime expired and § 241(a)(5) took its place.

[9]  We would reach the same conclusion about denial of opportunities to apply for permission for voluntary departure as an alternative to removal, see 8 U.S.C. § 1229c, and about cancellation of removal, see § 1229b(b), if there were a need to deal with these matters separately. Although Fernandez–Vargas argues that he is being denied the chance to seek these forms of relief, he never applied for either of them and has not formally attempted to claim them in response to the reinstatement and removal proceedings.

As a preface to identifying the conduct by Fernandez–Vargas to which the reinstatement provision applies (the conduct that results in reinstating the old deportation order without the former opportunities to seek adjustment of status), a look at our holding in St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, is helpful. The alien, St. Cyr, was a lawful, permanent resident who made a plea agreement and pleaded guilty to an aggravated felony charge. Although the resulting conviction justified his deportation, when he entered his plea the law allowed him to seek a waiver of deportation at the discretion of the Attorney General. Between the plea and deportation proceedings, however, IIRIRA and another statute repealed the provision for that discretionary relief, converting deportation from a possibility to a certainty. Id., at 325, 121 S.Ct. 2271. The question was whether Landgraf barred application of the new law eliminating discretionary relief, on the ground that applying it to a defendant who pleaded guilty before the enactment of the new law would attach a further burdensome consequence to his plea, amounting to "a new disability, in respect to transactions or considerations already past," 533 U.S., at 321, 121 S.Ct. 2271 (internal quotation marks omitted). The answer was that converting deportation from a likely possibility to a dead certainty would add such a burden, and application of the new law was accordingly barred. Id., at 325, 121 S.Ct. 2271. In making this "commonsense, functional judgment," Martin, supra, at 357, 119 S.Ct. 1998, we emphasized that plea agreements "involve a quid pro quo between a criminal defendant and the government," St. Cyr, 533 U.S., at 321, 121 S.Ct. 2271, in which a waiver of "constitutional rights (including the right to a trial)," had been exchanged for a "perceived benefit," *44 id., at 322, 121 S.Ct. 2271, which in practical **2432 terms was valued in light of the possible discretionary relief, a focus of expectation and reliance, id., at 323, 121 S.Ct. 2271.

St. Cyr's agreement for a quid pro quo and his plea were entirely past, and there was no question of undoing them, but the "transactio[n] or consideratio [n]" on which § 241(a)(5) turns is different. [10] While the law looks back to a past act in its application to "an alien [who] has reentered ... illegally," 8 U.S.C. § 1231(a)(5), the provision does not penalize an alien for the reentry (criminal and civil penalties do that); it establishes a process to remove him "under the prior order at any time after the reentry," ibid. Thus, it is the conduct of remaining in the country after entry that is the predicate action; the statute applies to stop an indefinitely continuing violation that the alien himself could end at any time by voluntarily leaving the country. It is therefore the alien's choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subjects him to the new and less generous legal regime, not a past act that he is helpless to undo up to the moment the Government finds him out.

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5526 Page 74 of 90

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

10  We understand Fernandez–Vargas's claim as falling within the second of Justice Story's categories of retroactivity (new consequences of past acts), not the first category of canceling vested rights. The forms of relief identified by Fernandez–Vargas as rendered unavailable to him by § 241(a)(5) include cancellation of removal, see 8 U.S.C. § 1229b(b), adjustment of status, see § 1255, and voluntary departure, see § 1229c. These putative claims to relief are not "vested rights," a term that describes something more substantial than inchoate expectations and unrealized opportunities. In contrast to "an immediate fixed right of present or future enjoyment," *Pearsall v. Great Northern R. Co.,* 161 U.S. 646, 673, 16 S.Ct. 705, 40 L.Ed. 838 (1896) (internal quotation marks omitted), Fernandez–Vargas's claim to such relief was contingent, and it was up to him to take some action that would elevate it above the level of hope. It is not that these forms of relief are discretionary, cf. *St. Cyr,* 533 U.S., at 325, 121 S.Ct. 2271; it is rather that before IIRIRA's effective date Fernandez–Vargas never availed himself of them or took action that enhanced their significance to him in particular, as St. Cyr did in making his *quid pro quo* agreement, see *supra,* at 2431–2432.

**\*45** That in itself is enough to explain that Fernandez–Vargas has no retroactivity claim based on a new disability consequent to a completed act, but in fact his position is weaker still. For Fernandez–Vargas could not only have chosen to end his continuing violation and his exposure to the less favorable law, he even had an ample warning that the new law could be applied to him and ample opportunity to avoid that very possibility by leaving the country and ending his violation in the period between enactment of § 241(a)(5) and its effective date. IIRIRA became law on September 30, 1996, but it became effective and enforceable only on "the first day of the first month beginning more than 180 days after" IIRIRA's enactment, that is, April 1, 1997. § 309(a), 110 Stat. 3009–625. Unlawful alien reentrants like Fernandez–Vargas thus had the advantage of a grace period between the unequivocal warning that a tougher removal regime lay ahead and actual imposition of the less opportune terms of the new law. In that stretch of six months, Fernandez–Vargas could have ended his illegal presence and potential exposure to the coming law by crossing back into Mexico.[11]  **\*46** For that  **\*\*2433** matter, he could have married the mother of his son and applied for adjustment of status during that period, in which case he would at least have had a claim (about which we express no opinion) that proven reliance on the old law should be honored by applying the presumption against retroactivity.[12]

11  In a series of letters submitted to the Court after oral argument, the parties dispute the consequences if Fernandez–Vargas had left voluntarily after IIRIRA's enactment and, specifically, the period of inadmissibility to which Fernandez–Vargas would thereupon have been subject. Because we conclude that § 241(a)(5) does not operate on a completed pre-enactment act, we need not consider the retroactive implications either of the fact of his inadmissibility or of any variance between the period of inadmissibility upon a postenactment voluntary return and that prescribed under the old regime. The period of inadmissibility stems from an alien's illegal reentry within a specified time after a prior removal and is applicable to Fernandez–Vargas because he reentered shortly after his 1981 deportation, but Fernandez–Vargas does not challenge as impermissibly retroactive IIRIRA's lengthening of that period from 5 to 10 or 20 years, see 8 U.S.C. § 1182(a)(6)(B) (1994 ed.); § 1182(a)(9)(A)(ii) (2000 ed.).

In any event, any period of inadmissibility is subject to waiver by the Attorney General, see § 1182(a)(6)(B) (1994 ed.); § 1182(a)(9)(A)(iii) (2000 ed.), and presumably Fernandez–Vargas could plead his serious case for such a waiver (his marriage, his child) in seeking legal reentry to the United States.

12  See 394 F.3d, at 890, and n. 11 (distinguishing Fernandez–Vargas's circumstance from that of aliens who had married, or both married and applied for adjustment of status, before IIRIRA's effective date).

Fernandez–Vargas did not, however, take advantage of the statutory warning, but augmented his past 15 years of unlawful presence by remaining in the country into the future subject to the new law, whose applicability thus turned not on the completed act of reentry, but on a failure to take timely action that would have avoided application of the new law altogether. To be sure, a choice to avoid the new law before its effective date or to end the continuing violation thereafter would have come at a high personal price, for Fernandez–Vargas would have had to leave a business and a family he had established during his illegal residence. But the branch of retroactivity law that concerns us here is meant to avoid new burdens imposed on completed acts, not all difficult choices occasioned by new law. What Fernandez–Vargas complains of is the application of new law to continuously illegal action within his control both before and after the new law took effect. He claims a right to continue illegal conduct indefinitely under the terms on which it began, an entitlement of legal stasis for those whose lawbreaking is continuous. But "[i]f every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

rules, the whole body of our law would be ossified forever.'' L. Fuller, The Morality of Law 60 (1964) (quoted in *Landgraf,* 511 U.S., at 270, n. 24, 114 S.Ct. 1483). [13]

[13]  This is the nub of our disagreement with Justice STEVENS. He says it misses the point to say that Fernandez–Vargas could avoid the new law by returning to Mexico, which he thinks is like saying that a defendant could avoid a retroactive criminal penalty by locking himself up for 10 years, *post,* at 2434, n. 2. Justice STEVENS thus argues that reimposing an order of removal to end illegal residence is like imposing a penalty for a completed act (the defendant's unspecified act in his analogy). But even on his own analysis, Fernandez–Vargas continued to violate the law by remaining in this country day after day, and Justice STEVENS does not deny that the United States was entitled to bring that continuing violation to an end. He says, however, that Congress should not be understood to provide that if the violation continues into the future it may be ended on terms less favorable than those at the beginning. But this is not the position that retroactivity doctrine imputes to an inexplicit Congress. Fernandez–Vargas may have an equitable argument that the Government should not, for the future, eliminate an opportunity for continuing illegality accompanied by the hopes that long illegal residence and a prospect of marriage gave him in the past. But Congress apparently did not accept such an argument, which could prevail here only if the presumption against retroactivity amounted to a presumption of legal stasis for the benefit of continuous lawbreakers.

**\*\*2434  \*47** Because we conclude that § 241(a)(5) has no retroactive effect when applied to aliens like Fernandez–Vargas, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

Justice STEVENS, dissenting.

In 1982, petitioner Humberto Fernandez–Vargas, an alien who had previously been deported, reentered the United States illegally. Over the next 20 years, petitioner remained here. He worked as a truckdriver, owned a trucking business, fathered a child, and eventually married the child's mother, a United States citizen. The laws in place at the time of petitioner's entry and for the first 15 years of his residence in this country would have rewarded this behavior, allowing him to seek discretionary relief from deportation on the basis of his continued presence in and strong ties to the United States. See 8 U.S.C. § 1254(a)(1) (1994 ed.).

In 1996, however, Congress passed a new version of the applicable provision eliminating almost entirely the possibility of relief from deportation for aliens who reenter the country **\*48** illegally having previously been deported. See Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA or Act), § 305(a)(3), 110 Stat. 3009–599, 8 U.S.C. § 1231(a)(5) (2000 ed.); see also *ante,* at 2426–2427, n. 4. The 1996 provision is silent as to whether it was intended to apply retroactively to conduct that predated its enactment. [1] Despite a historical practice supporting petitioner's reading, and despite the harsh consequences that attend its application to thousands of individuals who, like petitioner, entered the country illegally before 1997, the Court not only holds that the statute applies to preenactment reentries but also that it has no retroactive effect. I disagree with both of these conclusions.

[1]  The statutory provisions expanding the class of people to whom criminal penalties for illegal reentry might apply, however, explicitly apply only to postenactment reentries. See IIRIRA, § 324(c), 110 Stat. 3009–629, note following 8 U.S.C. § 1326.

I

In 1950, when Congress first gave the Attorney General the authority to reinstate an order of deportation, it enacted a reinstatement provision containing no explicit temporal reach. [2] See Internal Security Act, § 23(d), 64 Stat. 1012, 8 U.S.C. § 156(d) (1946 ed., Supp. V). The natural reading of this provision, the one most consistent with the "deeply rooted" traditional presumption against retroactivity, *Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), is that it would apply to deportations that occurred before the provision's enactment but not to preenactment reentries. While both deportation and reentry can constitute "events completed before [the provision's] enactment," *id.,* at 270, 114 S.Ct. 1483, an **\*49** alien's reentry is the act that triggers the provision's operation and is therefore the act to which the provision attaches legal consequences.

[2]  The provision stated:
    "Should any alien subject to the provisions of subsection (c) unlawfully return to the United States

Case 2:19-cv-00037-JNP   Document 59-35   Filed 11/30/22   PageID.5528   Page 76 of 90

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

after having been released for departure or deported pursuant to this section, the previous war-rant of deportation against him shall be considered as reinstated from its original date of issuance." 64 Stat. 1012, codified at 8 U.S.C. § 156(d) (1946 ed., Supp. V).

When the Immigration and Naturalization Service (INS) promulgated regulations implementing the 1950 statute, however, it did not read the statute so naturally. Instead, the INS' regulations, **2435 embodying an overly strong version of the presumption against retroactivity, provided that an order of deportation could only be reinstated if that deportation occurred after the statute's enactment date. See 8 CFR § 152.5 (1950 Cum.Supp.). Thus, the INS read the reinstatement provision as inapplicable even to reentries that occurred *after* the statute's enactment date if the underlying deportation had been entered before that date; it follows *a fortiori* that the provision was considered inapplicable to reentries that occurred before the statute's enactment.

Congress corrected the INS' error two years later by adding the clause "whether before or after the date of enactment of this Act." Immigration and Nationality Act, § 242(f), 66 Stat. 212, 8 U.S.C. § 1252(f) (1994 ed.); see also *ante,* at 2425–2426, and nn. 2–3. As the Court correctly notes, that amendment "most naturally referred not to the illegal reentry but to the alien's previous deportation or departure." *Ante,* at 2429. The best interpretation of Congress' intent with regard to the 1952 statute, then, was that it meant to apply the reinstatement provision to preenactment deportations but to preserve the status quo with regard to preenactment reentries: In accordance with the traditional presumption against retroactivity, preenactment reentries would remain uncovered by the reinstatement provision.

In 1996, when Congress enacted the current reinstatement provision, it drafted a version of the statute that, like its 1950 predecessor, was silent as to its temporal reach. See 8 U.S.C. § 1231(a)(5) (2000 ed.). If we assume (as the Court does) that the addition of the "before-or-after" clause in the 1952 statute merely clarified Congress' original intent in *50 1950 to make the provision applicable to preenactment departures without authorizing any application to preenactment reentries, it is reasonable to attribute precisely the same intent to the Congress that enacted the 1996 statute: As in the 1950 and 1952 versions of the provision, Congress intended the 1996 reinstatement provision to apply to preenactment deportations but not to preenactment reentries.

In sum, our normal rules of construction support the reasonable presumption that Congress intended the provision to cover only postenactment reentries. Accordingly, the 1996 reinstatement provision should not be construed to apply to petitioner's earlier entry into the United States.

II

The Court not only fails to give the 1996 Act its most normal interpretation, but also erroneously concludes that the provision does not have any retroactive effect. The Court reaches this conclusion based on its judgment that the provision applies not to conduct that occurred before the statute's enactment date, but rather to "an indefinitely continuing violation that the alien himself could end at any time by voluntarily leaving the country." *Ante,* at 2432. This reasoning is unpersuasive.

It is true, of course, that the order of deportation entered against petitioner in 1981 could not be reinstated unless he was present in the United States, and that, until he was arrested in 2003, petitioner could have chosen to leave the United States. But it is precisely petitioner's "continuing violation" that allowed him to be eligible for relief from deportation in the first place: He was required to have been physically present in the United States for a period of not less than seven years, to have been a person of good moral character during that time, and to have developed ties to the United States such that his deportation would result in extreme hardship to himself or to his United **2436 States citizen *51 wife or child. [3] See 8 U.S.C. § 1254(a)(1) (1994 ed.); see also *INS v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984) (strictly construing physical presence requirement). Moreover, under the pre–1996 version of the reinstatement provision, the longer petitioner remained in the United States the more likely he was to be granted relief from deportation. See *Matter of Ige,* 20 I. & N. Dec. 880, 882, 1994 WL 520996 (1994) (listing factors considered in evaluating extreme hardship requirement, including alien's length of residence in United States, family in United States, business or occupation, and position in community).

[3]     Although petitioner became eligible for relief from deportation after being physically present in the United States for seven years, he could not apply for that relief until the Government placed him in deportation proceedings, at which point he could raise his eligibility

Case 2:19-cv-00037-JNP   Document 59-35   Filed 11/30/22   PageID.5529   Page 77 of 90

Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006)

126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324...

as an affirmative defense. Cf. *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 951–952, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (applying presumption against retroactivity to statute eliminating affirmative defense).

Given these incentives, petitioner legitimately complains that the Government has changed the rules midgame. At the time of his entry, and for the next 15 years, it inured to petitioner's benefit for him to remain in the United States continuously, to build a business, and to start a family. After April 1, 1997, the date on which the applicable reinstatement provision became effective, all of these activities were rendered irrelevant in the eyes of the law. Only the Court's unfortunately formalistic search for a single "past act that [petitioner] is helpless to undo," *ante,* at 2432, allows it to conclude that the provision at issue has no retroactive effect.[4] For regardless of whether his 1982 reentry was or **\*52** was not an act that he could now "undo," it is certainly an act to which the 1996 reinstatement provision has attached serious adverse consequences. Because the provision has an undeniably harsh retroactive effect, "absent a clear indication from Congress that it intended such a result," *INS v. St. Cyr,* 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), we should apply the presumption against retroactivity and hold that the 1996 reinstatement provision does not apply to petitioner.

4    Even on its own terms the Court's logic is troubling. The Court believes that petitioner could have avoided being affected by the 1996 reinstatement provision, not just retroactively but in any way whatsoever, by leaving the country prior to its effective date—a date that occurred six months after the statute's enactment date not to give aliens "ample warning," *ante,* at 2431, 2432, but instead to allow the Attorney General to prepare for the substantial changes caused by the IIRIRA and to promulgate regulations to effectuate that Act. See § 309, 110 Stat. 3009–625. But had petitioner "take[n] advantage of the statutory warning," *ante,* at 2433, he would have imposed upon himself the very same punishment—the guarantee of removal to Mexico—that he hopes to avoid. Just as we would not say that a defendant may avoid the retroactive application of a criminal statute by locking himself up for 10 years, it cannot be that petitioner's ability to leave the country of his own accord somehow helps to prove that the provision at issue has no retroactive effect.

Accordingly, I respectfully dissent.

## All Citations

548 U.S. 30, 126 S.Ct. 2422, 165 L.Ed.2d 323, 74 USLW 4416, 06 Cal. Daily Op. Serv. 5324, 06 Daily Journal D.A.R. 7858, 19 Fla. L. Weekly Fed. S 314

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

117 S.Ct. 891
Supreme Court of the United States

Kenneth LYNCE, Petitioner,

v.

Hamilton MATHIS, Superintendent,
Tomoka Correctional Institution, et al.

No. 95-7452.
|
Argued Nov. 4, 1996.
|
Decided Feb. 19, 1997.

**Synopsis**

State prisoner filed petition for writ of habeas corpus, alleging that state statute which had retroactively cancelled his provisional early release credits awarded to alleviate prison overcrowding violated ex post facto clause. The District Court dismissed petition and denied certificate of probable cause. The Court of Appeals for the Eleventh Circuit also denied certificate of probable cause. After granting certiorari, the Supreme Court, Justice Stevens, held that challenged statute violated ex post facto clause by increasing prisoner's punishment.

Reversed and remanded.

Justice Thomas concurred in part and concurred in judgment with opinion in which Justice Scalia joined.

**\*\*891** *Syllabus* \*

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Beginning in 1983 the Florida Legislature enacted a series of statutes authorizing the award of early release credits to prison inmates when the state prison population exceeded predetermined levels. In 1986 petitioner received a 22-year prison sentence on a charge of attempted murder. In 1992 **\*\*892** he was released based on the determination that he had accumulated five different types of early release credits totaling 5,668 days, including 1,860 days of "provisional credits" awarded as a result of prison overcrowding. Shortly thereafter, the state attorney general issued an opinion interpreting a 1992 statute as having retroactively canceled all provisional credits awarded to inmates convicted of murder and attempted murder. Petitioner was therefore rearrested and returned to custody. He filed a habeas corpus petition alleging that the retroactive cancellation of provisional credits violated the *Ex Post Facto* Clause. Relying on precedent rejecting this argument on the ground that the sole purpose of these credits was to alleviate prison overcrowding, the District Court dismissed the petition. The Court of Appeals denied a certificate of probable cause.

*Held:* The 1992 statute canceling provisional release credits violates the *Ex Post Facto* Clause. Pp. 895–900.

(a) This Court rejects respondents' contention that the cancellation of petitioner's provisional credits did not violate the Clause because the credits had been issued as part of administrative procedures designed to alleviate prison overcrowding and were therefore not an integral part of petitioner's punishment. To fall within the *ex post facto* prohibition, a law must be retrospective and "disadvantage the offender affected by it," *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, by, *inter alia,* increasing the punishment for the crime, see *Collins v. Youngblood,* 497 U.S. 37, 50, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30. The operation of the 1992 statute was clearly retrospective, and a determination that it disadvantaged petitioner by increasing his punishment is supported by *Weaver v. Graham,* 450 U.S., at 36, 101 S.Ct., at 968, in which the Court held that retroactively decreasing the amount of gain-time awarded for an inmate's good behavior violated the *Ex Post Facto* Clause. Because *Weaver* and subsequent cases focused on whether the legislature's action **\*434** lengthened the prisoner's sentence without examining the subjective purposes behind the sentencing scheme, see, *e.g., id.,* at 33, 101 S.Ct., at 966, the fact that the generous gain-time provisions in Florida's 1983 statute were motivated more by the interest in avoiding overcrowding than by a desire to reward good behavior is not relevant to the essential *ex post facto* inquiry. *California Dept. of Corrections v. Morales,* 514 U.S. 499, 507, 115 S.Ct. 1597, 1602, 131 L.Ed.2d 588, distinguished. Respondents are foreclosed by *Weaver,* 450 U.S., at 32, 101 S.Ct., at 966, to the extent they argue that overcrowding gain-time is not in some technical sense part of the sentence. Their further argument that petitioner could not reasonably have expected to receive any overcrowding credits when he entered his plea of *nolo contendere* is singularly unpersuasive, given the facts that he was actually awarded 1,860 days and that those credits

were retroactively canceled as a result of the 1992 statute. Pp. 895-898.

(b) The Court disagrees with respondents' argument that petitioner is not entitled to relief because his provisional overcrowding credits were awarded pursuant to statutes enacted after the date of his offense rather than pursuant to the 1983 statute. Although the overcrowding statute in effect at the time of his crime was slightly modified in subsequent years, its basic elements remained the same, and the changes do not affect his core *ex post facto* claim. However, the differences in the statutes may have affected the precise amount of release time he received. Because this point was not adequately developed earlier in the proceeding, and because it may not in any event affect petitioner's entitlement to release, the Court leaves it open for further consideration on remand. Pp. 899-900.

Reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., join. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA, J., joined, *post,* p. 900.

**Attorneys and Law Firms**

Joel T. Remland, Orlando, FL, for petitioner.

**\*\*893** Parker D. Thomson, Miami, FL, for respondents.

**Opinion**

**\*435** Justice STEVENS delivered the opinion of the Court.

In 1983 and thereafter the Florida Legislature enacted a series of statutes authorizing the department of corrections to award early release credits to prison inmates when the population of the state prison system exceeded predetermined levels. The question presented by this case is whether a 1992 statute canceling such credits for certain classes of offenders after they had been awarded-indeed, after they had resulted in the prisoners' release from custody-violates the *Ex Post Facto* Clause of the Federal Constitution.

I

In 1986 petitioner pleaded *nolo contendere* to a charge of attempted murder and received a sentence of 22 years (8,030 days) in prison. In 1992 the Florida Department of Corrections released him from prison based on its determination that he had accumulated five different types of early release credits totaling 5,668 days. [1] Of that total, 1,860 days were **\*436** "provisional credits" awarded as a result of prison overcrowding. Shortly after petitioner's release, the state attorney general issued an opinion interpreting a 1992 statute as having retroactively canceled all provisional credits awarded to inmates convicted of murder or attempted murder. Petitioner was therefore rearrested and returned to custody. His new release date was set for May 19, 1998.

[1]     The total included: (1) a 170-day credit for time spent in jail prior to his conviction; (2) "basic gain-time" of 2,640 days; (3) "additional [incentive] gain-time" of 958 days; (4) "administrative gain-time" of 335 days; and (5) "provisional credits" of 1,860 days. Disciplinary action resulted in a forfeiture of 295 days.

In 1994 petitioner filed a petition for a writ of habeas corpus alleging that the retroactive cancellation of provisional credits violated the *Ex Post Facto* Clause. Relying on Eleventh Circuit [2] and Florida [3] precedent holding that the revocation of provisional credits did not violate the *Ex Post Facto* Clause because their sole purpose was to alleviate prison overcrowding, the Magistrate Judge recommended dismissal of the petition. The District Court adopted that recommendation, dismissed the petition, and denied a certificate of probable cause. The Court of Appeals for the Eleventh Circuit also denied a certificate of probable cause in an unpublished order. Because the Court of Appeals for the Tenth Circuit reached a different conclusion on similar facts, *Arnold v. Cody,* 951 F.2d 280 (1991), we granted certiorari to resolve the conflict. 517 U.S. 1186, 116 S.Ct. 1671, 134 L.Ed.2d 775 (1996). [4]

[2]     *Hock v. Singletary,* 41 F.3d 1470 (1995).

[3]     *Dugger v. Rodrick,* 584 So.2d 2 (Fla.1991), cert. denied sub nom. *Rodrick v. Singletary,* 502 U.S. 1037, 112 S.Ct. 886, 116 L.Ed.2d 790 (1992).

[4]     Petitioner did not advance his *ex post facto* claim in state court. In the District Court respondents challenged his failure to exhaust his state remedies, but do not appear to have raised the exhaustion issue in the Court of Appeals; nor have they raised it in this Court. Presumably they are satisfied, as we are, that exhaustion would have been

Case 2:19-cv-00037-JNP Document 59-35 Filed 11/30/22 PageID.5532 Page 80 of 90

Lynce v. Mathis, 519 U.S. 433 (1997)
117 S.Ct. 891, 137 L.Ed.2d 63, 65 USLW 4131, 97 FCDR 765...

futile. The Florida Supreme Court, in *Dugger v. Rodrick,* 584 So.2d 2 (1991), held that retrospective application of the provisional credits statute's offense-based exclusion did not violate the *Ex Post Facto* Clause. The court reasoned that overcrowding credits, unlike basic gain-time or incentive gain-time, were merely "procedural" and did not create any substantive rights. Relying on *Dugger,* the Florida Supreme Court held in *Griffin v. Singletary,* 638 So.2d 500 (1994), that cancellation of provisional credits actually awarded to a prisoner did not violate the *Ex Post Facto* Clause. Respondents have not suggested any reason why the Florida courts would have decided petitioner's case differently.

### *437 II

Motivated largely by the overcrowded condition of the entire Florida prison system,[5] in **894 1983 the state legislature enacted the Correctional Reform Act of 1983, a comprehensive revision of the State's sentencing laws.[6] The Act authorized generous awards of early release credits including "basic gain-time" at the rate of 10 days for each month, "up to 20 days of incentive gain time, which shall be credited and applied monthly," and additional deductions of "meritorious gain-time of from 1 to 60 days." See 1983 Fla. Laws, ch. 83-131, § 8.[7] The Act also created an emergency procedure to be followed "whenever the population of the state correctional system exceeds 98 percent of the lawful capacity of the system for males or females, or both." § 5(1).[8] When *438 such an emergency was declared, "the sentences of all inmates in the system who are eligible to earn gain-time shall be reduced by the credit of up to 30 days gain-time in 5-day increments as may be necessary to reduce the inmate population to 97 percent of lawful capacity." § 5(2).

---

5    In 1980 the Florida Department of Corrections consented to the entry of a decree establishing a limit on the prison population that could not be exceeded without court approval. See *Costello v. Wainwright,* 489 F.Supp. 1100 (M.D.Fla.1980). In 1982 a special session of the legislature created a Corrections Overcrowding Task Force, which drafted the 1983 legislation.

6    1983 Fla. Laws, ch. 83-131.

7    Section 8 amended § 944.275 of the Florida Statutes.

8    Section 5, in pertinent part, provides:
    "(1) The Department of Corrections shall advise the Governor of the existence of a state of emergency in

the state correctional system whenever the population of the state correctional system exceeds 98 percent of the lawful capacity of the system for males or females, or both. In conveying this information, the secretary of the department shall certify the rated design capacity, maximum capacity, lawful capacity, system maximum capacity, and current population of the state correctional system. When the Governor verifies such certification by letter, the secretary shall declare a state of emergency.
    "(2) Following the declaration of a state of emergency, the sentences of all inmates in the system who are eligible to earn gain-time shall be reduced by the credit of up to 30 days gain-time in 5-day increments as may be necessary to reduce the inmate population to 97 percent of lawful capacity." 1983 Fla. Laws, ch. 83-131, § 5.

In the ensuing years, the Florida Legislature modified the overcrowding gain-time system. In 1987 the legislature raised the threshold for awarding emergency release credits from 98% to 99% of capacity. At the same time, the legislature authorized a new form of overcrowding credit, administrative gain-time, with a 98% threshold, which authorized up to a maximum of 60 days additional gain-time to inmates already earning incentive gain-time. Inmates serving sentences for certain offenses were ineligible for the awards. In 1988 the legislature repealed the administrative gain-time provision, and replaced it with a provisional credits system.[9] The language of the provisional credits statute was virtually identical to that of the administrative gain-time statute-it also authorized up to 60 days of gain-time but was triggered when the inmate population reached 97.5% of capacity. In addition, the legislature expanded the list of offenders who were ineligible for the awards.

---

9    1988 Fla. Laws, ch. 88-122, § 5. The provisional credits statute was repealed in 1993. 1993 Fla. Laws, ch. 93-406, §§ 32, 35. The only overcrowding credit system in place today in Florida is the "control release" provision, first enacted in 1989, which authorizes release from incarceration rather than gain-time to control prison population. See Fla. Stat. § 947.146 (Supp.1992).

Having received overcrowding gain-time under the administrative gain-time and provisional credits statutes, as well as basic and incentive gain-time, petitioner was released from prison in 1992. That same year, the legislature canceled provisional overcrowding credits for certain classes of *439 inmates, including those convicted of attempted murder.[10] As a result of that action, credits for 2,789 inmates who were still in custody were canceled, and rearrest warrants were

Case 2:19-cv-00037-JNP   Document 59-35   Filed 11/30/22   PageID.5533   Page 81 of 90

Lynce v. Mathis, 519 U.S. 433 (1997)
117 S.Ct. 891, 137 L.Ed.2d 63, 65 USLW 4131, 97 FCDR 765...

issued **895 for 164 offenders who had been released.[11] Petitioner was in the latter class.

[10]  See Fla. Op. Atty. Gen. 92-96 (1992), reprinted in Lodging, p. 53; *Griffin v. Singletary,* 638 So.2d, at 501. In 1989 the Florida Legislature amended the provisional credits statute to render those convicted of certain murder offenses, including attempted murder, ineligible for provisional credits. Fla. Stat. § 944.277 (1989). The Florida Department of Corrections interpreted the 1989 amendments, and subsequent amendments enacted in 1990 and 1991 which contained the same exclusion, to apply prospectively. The 1992 amendment at issue in this case was originally interpreted by the department of corrections to apply only prospectively, but the subsequent 1992 opinion by the attorney general concluded that the statute applied retroactively.

[11]  Department of Corrections Letter of July 9, 1996, App. to Brief for Florida Public Defender Association, Inc., as *Amicus Curiae.* The petitioner's administrative gain-time credits were also canceled, but he does not challenge that action.

Respondents contend that the cancellation of petitioner's provisional credits did not violate the *Ex Post Facto* Clause for two reasons: (1) Because the credits had been issued as part of administrative procedures designed to alleviate overcrowding, they were not an integral part of petitioner's punishment; and (2) in petitioner's case, the specific overcrowding credits had been awarded pursuant to statutes enacted after the date of his offense rather than pursuant to the 1983 statute. We consider the arguments separately.

## III

The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen. That presumption "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994). This doctrine finds expression in several provisions of our Constitution. *440 [12] The specific prohibition on *ex post facto* laws is only one aspect of the broader constitutional protection against arbitrary changes in the law. In both the civil and the criminal context, the Constitution places limits on the sovereign's ability to use its lawmaking power to modify bargains it has made with its

subjects. The basic principle is one that protects not only the rich and the powerful, *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and a suitable punishment.

[12]  "The *Ex Post Facto* Clause flatly prohibits retroactive application of penal legislation. Article I, § 10, cl. 1, prohibits States from passing another type of retroactive legislation, laws 'impairing the Obligation of Contracts.' The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.' The prohibitions on 'Bills of Attainder' in Art. I, §§ 9-10, prohibit legislatures from singling out disfavored persons and meting out summary punishment for past conduct. See, *e.g., United States v. Brown,* 381 U.S. 437, 456-462 [85 S.Ct. 1707, 1718-1722, 14 L.Ed.2d 484] (1965). The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation...." *Landgraf v. USI Film Products,* 511 U.S., at 266, 114 S.Ct., at 1497 (footnote omitted).

Article I, § 10, of the Federal Constitution provides that "[n]o State shall ... pass any ... ex post facto Law." In his opinion for the Court in *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), Justice Stone explained:

"The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused." *Id.,* at 170, 46 S.Ct., at 68-69.

*441 The bulk of our *ex post facto* jurisprudence has involved claims that a law has inflicted "a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (emphasis deleted).[13] We have explained **896 that such laws implicate the central concerns of the *Ex Post Facto* Clause: "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981).

13    This case falls in the third of the four categories of *ex post facto* laws described by Justice Chase: "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Calder v. Bull,* 3 Dall., at 390, 1 L.Ed. 648 (emphasis deleted).

To fall within the *ex post facto* prohibition, a law must be retrospective-that is, "it must apply to events occurring before its enactment"-and it "must disadvantage the offender affected by it," *id.,* at 29, 101 S.Ct., at 964, by altering the definition of criminal conduct or increasing the punishment for the crime, see *Collins v. Youngblood,* 497 U.S. 37, 50, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30 (1990). In this case the operation of the 1992 statute to effect the cancellation of overcrowding credits and the consequent reincarceration of petitioner was clearly retrospective. The narrow issue that we must decide is thus whether those consequences disadvantaged petitioner by increasing his punishment.

In arguing that the cancellation of overcrowding credits inflicts greater punishment, petitioner relies primarily on our decision in *Weaver v. Graham,* in which we considered whether retroactively decreasing the amount of gain-time awarded for an inmate's good behavior violated the *Ex Post Facto* Clause. In that case the petitioner had pleaded guilty **\*442** to second-degree murder and had been sentenced to prison for 15 years. At the time of Weaver's plea, Florida law provided credits contingent on the good conduct of the prisoner of 5 days per month for the first two years of his sentence, 10 days per month for the third and fourth years, and 15 days per month thereafter. The law therefore provided him with an opportunity to be released after serving less than nine years of his sentence. In 1978 the Florida Legislature enacted a new formula for computing gain-time; instead of 5, 10, and 15 days per month, it authorized only 3, 6, and 9 days. The new statute did not withdraw any credits already awarded to Weaver, but by curtailing the availability of future credits it effectively postponed the date when he would become eligible for early release. Because the statute made the punishment for crimes committed before its enactment "more onerous," we unanimously concluded that it ran "afoul of the prohibition against *ex post facto* laws." 450 U.S., at 36, 101 S.Ct., at 968.

According to petitioner, although this case involves overcrowding credits, it is essentially like *Weaver* because the issuance of these credits was dependent on an inmate's good conduct. Respondents, on the other hand, submit that *Weaver* is not controlling because it was the overcrowded condition of the prison system, rather than the character of the prisoner's conduct, that gave rise to the award. In our view, both of these submissions place undue emphasis on the legislature's subjective intent in granting the credits rather than on the consequences of their revocation.

In arriving at our holding in *Weaver,* we relied not on the subjective motivation of the legislature in enacting the gain-time credits, but rather on whether objectively the new statute "lengthen[ed] the period that someone in petitioner's position must spend in prison." *Id.,* at 33, 101 S.Ct., at 967. Similarly, in this case, the fact that the generous gain-time provisions in Florida's 1983 statute were motivated more by the interest in avoiding overcrowding than by a desire to reward good behavior is not relevant to the essential inquiry demanded by **\*443** the *Ex Post Facto* Clause: whether the cancellation of 1,860 days of accumulated provisional credits had the effect of lengthening petitioner's period of incarceration.

In our post-*Weaver* cases, we have also considered whether the legislature's action lengthened the sentence without examining the purposes behind the original sentencing scheme. In *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), we unanimously concluded that a revision in Florida's sentencing guidelines that went into effect between the date of petitioner's offense and the date of his conviction violated the *Ex Post Facto* Clause. Our determination that the new guideline was " 'more onerous than the prior law,' " *id.,* at 431, 107 S.Ct., at 2452 (quoting **\*\*897** *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298-2299, 53 L.Ed.2d 344 (1977)), rested entirely on an objective appraisal of the impact of the change on the length of the offender's presumptive sentence. 482 U.S., at 431, 107 S.Ct., at 2452 ("Looking only at the change in primary offense points, the revised guidelines law clearly disadvantages petitioner and similarly situated defendants").

In *California Dept. of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), we also relied entirely on objective considerations to support our conclusion that an amendment to California's parole procedures that decreased the frequency of parole hearings for certain offenders had not made any "change in the 'quantum of

*Lynce v. Mathis*, 519 U.S. 433 (1997)
117 S.Ct. 891, 137 L.Ed.2d 63, 65 USLW 4131, 97 FCDR 765...

Case 2:19-cv-00037-JNP   Document 59-35   Filed 11/30/22   PageID.5535   Page 83 of 90

punishment,' " *id.,* at 508, 115 S.Ct., at 1602. The amendment at issue in *Morales* allowed the parole board, after holding an initial parole hearing, to defer for up to three years subsequent parole suitability hearings for prisoners convicted of multiple murders if the board found that it was unreasonable to expect that parole would be granted at a hearing during the subsequent years. We stated that the relevant inquiry is whether the "change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Id.,* at 507, n. 3, 115 S.Ct., at 1602, n. 3. [14] After making that inquiry, we **\*444** found that "there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement." *Id.,* at 512, 115 S.Ct., at 1604. Our holding rested squarely on the conclusion that "a prisoner's ultimate date of release would be entirely unaffected by the change in the timing of suitability hearings." *Id.,* at 513, 115 S.Ct., at 1605. Although we held that "speculative and attenuated possibilit[ies]" of increasing the measure of punishment do not implicate the *Ex Post Facto* Clause, *id.,* at 509, 115 S.Ct., at 1603, the bulk of our analysis focused on the effect of the law on the inmate's sentence.

[14]    Later in the opinion we restated the test in similar language: "In evaluating the constitutionality of the 1981 amendment, we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." *California Dept. of Corrections v. Morales,* 514 U.S., at 509, 115 S.Ct., at 1603.

We did not imply in *Morales,* as respondents contend, that the constitutionality of retroactive changes in the quantum of punishment depended on the purpose behind the parole sentencing system. The only mention of legislative purpose in *Morales* was in the following passage:

"In contrast to the laws at issue in *Lindsey [v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937)], *Weaver*, and *Miller* (which had the purpose and effect of enhancing the range of available prison terms, see *Miller, supra,* at 433-434 [107 S.Ct., at 2452-2453]), the evident focus of the California amendment was merely ' " ' to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings' " ' for prisoners who have no reasonable chance of being released. *In re Jackson,* 39 Cal.3d 464, 473 [216 Cal.Rptr. 760, 765-766] 703 P.2d 100, 106 (1985) (quoting legislative history)." *Id.,* at 507, 115 S.Ct., at 1602.

Thus, we concluded, the change at issue had neither the purpose nor the effect of increasing the quantum of punishment. Whether such a purpose alone would be a sufficient basis for concluding that a law violated the *Ex Post Facto* Clause when it actually had no such effect is a question the Court has never addressed. Moreover, in *Morales* our statements regarding purpose did not refer to the purpose behind the **\*445** creation of the original sentencing scheme; they referred instead to the question whether, in changing that sentencing scheme, the legislature intended to lengthen the inmate's sentence. To the extent that any purpose might be relevant in this case, it would only be the purpose behind the legislature's 1992 enactment of the offense-based exclusion. Here, unlike in *Morales,* there is no evidence that the legislature's change in the sentencing scheme was merely to save time or money. Rather, it is quite obvious that the retrospective change was intended to prevent the early release of prisoners convicted of murder-related offenses **\*\*898** who had accumulated overcrowding credits. [15]

[15]    Indeed, the attorney general issued the 1992 opinion interpreting the statute to apply retroactively in response to concerns about the release of a notorious sex offender and murderer. See Fla. Op. Atty. Gen. 92-96, at 283, reprinted in Lodging, at 53.

Respondents also argue that the retroactive cancellation of overcrowding credits is permissible because overcrowding gain-time-unlike the incentive gain-time at issue in *Weaver* which is used to encourage good prison behavior and prisoner rehabilitation-"b[ears] no relationship to the original penalty assigned the crime or the actual penalty calculated under the sentencing guidelines." Brief for Respondent Mathis 20. To the extent that respondents' argument rests on the notion that overcrowding gain-time is not "in some technical sense part of the sentence," *Weaver,* 450 U.S., at 32, 101 S.Ct., at 966, this argument is foreclosed by our precedents. As we recognized in *Weaver,* retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the *Ex Post Facto* Clause because such credits are "one determinant of petitioner's prison term ... and ... [the petitioner's] effective sentence is altered once this determinant is changed." *Ibid.* We explained in *Weaver* that the removal of such provisions can constitute an increase in punishment, because a "prisoner's eligibility for reduced imprisonment is a significant **\*446** factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Ibid.*

Respondents argue that this reasoning does not apply to overcrowding credits because, when petitioner pleaded *nolo contendere,* he could not reasonably have expected to receive any such credits. The State, after all, could have alleviated the overcrowding problem in various ways: It could have built more prisons; it could have paroled a large category of nonviolent offenders; or it might have discontinued prosecution of some classes of victimless crimes. Respondents thus argue that the 1992 statute does not violate the *Ex Post Facto* Clause because, like the California amendment at issue in *Morales,* it "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." 514 U.S., at 509, 115 S.Ct., at 1603. [16] Given the fact that this petitioner was actually awarded 1,860 days of provisional credits and the fact that those credits were retroactively canceled as a result of the 1992 amendment, we find this argument singularly unpersuasive. In this case, unlike in *Morales,* the actual course of events makes it unnecessary to speculate about what might have happened. The 1992 statute has unquestionably **\*447** disadvantaged petitioner because it resulted in his rearrest and prolonged his imprisonment. Unlike the California amendment at issue in *Morales,* the 1992 Florida statute did more than simply remove a mechanism that created an *opportunity* for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible-including some, like petitioner, who had actually been released. [17]

[16] The support for our conclusion in *Morales* that the Act was merely speculative has no counterpart in this case. In *Morales,* we first relied on the fact that the amendment affected a class of prisoners-multiple murderers-who had little chance of being released on parole. Second, we found that the amendment did not alter the date of the prisoner's initial parole suitability hearing, and therefore only affected those initially deemed unsuitable for parole. Lastly, we recognized that the parole board "retain[ed] the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner." 514 U.S., at 511, 115 S.Ct., at 1604. Simply put, we rejected the inmate's claim in *Morales,* because it could not be said with any certainty that the amended statutory scheme was more "onerous" than at the time of the crime. See *id.,* at 509-510, 115 S.Ct., 1603 (quoting *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298-2299, 53 L.Ed.2d 344 (1977), for "refusing to accept 'speculation' that the effective punishment under a new statutory scheme would be 'more onerous' than under the old one").

[17] We note that respondents do not argue, as the Magistrate Judge found, that the revocation of overcrowding credits is constitutional because such an act is merely "procedural." There is no merit to this argument in any case. We explained in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), that a procedural statute is one that "simply alter[s] the methods employed in determining" whether the punishment is "to be imposed" rather than "chang[ing] ... the quantum of punishment attached to the crime." *Id.,* at 293-294, 97 S.Ct., at 2298. Because the 1992 law did not change the method of determining the sentence, but rather lengthened the sentences of certain prisoners by making them ineligible for early release, it was not merely procedural.

**\*\*899** IV

Although it does not appear that respondents advanced this argument in the papers filed in the District Court, the Court of Appeals, or in their brief in opposition to the petition for certiorari in this Court, they now argue that petitioner is not entitled to relief because his overcrowding credits were awarded pursuant to statutes enacted after the date of his offense rather than pursuant to the 1983 statute. We disagree.

The overcrowding statute in effect at the time of petitioner's crime was modified in subsequent years, but its basic elements remained the same: The statute provided for reductions in a prisoner's sentence when the population of the prison system exceeded a certain percentage of lawful capacity. At the time of petitioner's sentence in 1986, the emergency gain-time statute was in effect. Under that statute, when the prison population reached 98% of lawful capacity, **\*448** the secretary of the department of corrections was required to advise the Governor and, after receiving the Governor's verification of the capacity certification, to declare a state of emergency whereupon the sentences of all eligible inmates "shall be reduced by the credit of up to 30 days gain-time, in 5-day increments, as may be necessary to reduce the inmate population to 97 percent of lawful capacity." Fla. Stat. § 944.598(2) (1983). [18]

[18] Respondent Attorney General Butterworth suggests that under the emergency gain-time statute, the maximum award petitioner could have realized was 30 days

Case 2:19-cv-00037-JNP  Document 59-35  Filed 11/30/22  PageID.5537  Page 85 of 90

Lynce v. Mathis, 519 U.S. 433 (1997)
117 S.Ct. 891, 137 L.Ed.2d 63, 65 USLW 4131, 97 FCDR 765...

of emergency gain-time. Therefore, according to the attorney general, it is unlikely that the gain-time statute would have had any effect on petitioner's sentence. We do not agree that the statute lends itself to such a reading. The statute required the department of corrections to advise the Governor "*whenever* the population of the state correctional system exceeds 98 percent of lawful capacity." Fla. Stat. § 944.598(1) (1983) (emphasis added). The duty to grant up to 30 days gain-time in 5-day increments was continuing until the inmate population reached 97% of lawful capacity. If the inmate population were to rise again to 98%, the Secretary was required to issue additional gain-time.

> Moreover, the attorney general's reading of the emergency gain-time statute would also limit the award of gain-time under the administrative gain-time and provisional credits statute. These statutes contain wording similar to the emergency gain-time statute, see Fla. Stat. § 944.276(1) (1987); Fla. Stat. § 944.277(1) (1989), yet the State has not interpreted the statutes to limit the award of gain-time to a total of 60 days.

The later statutes slightly modified the procedures outlined in the 1983 statute. The administrative gain-time statute enacted in 1987 (after petitioner's plea of *nolo contendere* ) provided that the secretary, after certification to the Governor, "may grant up to a maximum of 60 days administrative gain-time." Fla. Stat. § 944.276(1). Unlike the emergency gain-time statute, the administrative gain-time statute made the issuance of gain-time discretionary, and it contained certain offense-based exclusions. The provisional credits provision was enacted to replace administrative gain time and is essentially the same, except that it provides for the issuance of gain-time when the prison reaches **\*449** 97.5% of lawful capacity, rather than 98%. Fla. Stat. § 944.277 (1988). See *Griffin v. Singletary,* 638 So.2d 500 (Fla.1994).

The changes in the series of statutes authorizing the award of overcrowding gain-time do not affect petitioner's core *ex post facto* claim. Petitioner could have accumulated gain-time under the emergency gain-time provision in much the same manner as he did under the provisional credits statute. We recognize, however, that although the differences in the statutes did not affect petitioner's central entitlement to gain-time, they may have affected the precise amount of gain-time he received. Between 1988 and 1992, the provisional credits were authorized when the prison reached 97.5% capacity rather than 98% capacity as under the emergency gain-time statute. If the prison population did not exceed 98% of capacity between 1988 and 1992, and if petitioner received provisional credits during those years, there is force to the

argument that the cancellation of that portion of the 1,860-day total did not **\*\*900** violate the *Ex Post Facto* Clause. Because this point was not adequately developed earlier in the proceeding, and because it may not in any event affect petitioner's entitlement to release, we leave it open for further consideration on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom Justice SCALIA joins, concurring in part and concurring in the judgment.
I understand the Court's opinion to hold that retroactively canceling petitioner's so-called "provisional credits" after he has used them to gain his freedom violates the *Ex Post Facto* Clause. This result naturally follows from our consistent view that the Clause is intended to prohibit laws that "retroactively alter the definition of crimes or increase the punishment **\*450** for criminal acts." *Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990).

Whether a particular law retroactively increases a criminal punishment is often a close question. In *California Dept. of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), for example, respondent challenged a retroactive change to the frequency of parole hearings. Given that the retroactive change "create[d] only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes," we found no *ex post facto* violation. *Id.,* at 514, 115 S.Ct., at 1605.

Unlike in *Morales,* the increase in petitioner's punishment here was neither "speculative" nor "attenuated." Petitioner pleaded *nolo contendere* to a charge of attempted murder and was duly sentenced. During the period of his confinement, petitioner accumulated release credits under a state statute adopted in response to prison overcrowding. Those credits enabled petitioner to be freed from prison before his sentence (as originally imposed) had run. Shortly before petitioner secured his release, however, the Florida Legislature enacted a statute preventing certain categories of offenders from taking advantage of the provisional credits. Although petitioner's offense placed him among the offenders denied the opportunity to acquire those particular credits, the statute was not applied retroactively. Petitioner was thus released. The state attorney general subsequently issued an opinion

**Lynce v. Mathis, 519 U.S. 433 (1997)**
117 S.Ct. 891, 137 L.Ed.2d 63, 65 USLW 4131, 97 FCDR 765...

giving the statute retroactive effect. The State thereafter rearrested petitioner and returned him to custody.

Under these narrow circumstances, I agree with the Court that the State's retroactive nullification of petitioner's previously accrued, and then used, release credits violates the Constitution's ban on *ex post facto* lawmaking. I do not, however, join the majority's discussion of *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), which I find unnecessary to the resolution of this case. In *Weaver,* we considered whether a statute **\*451** that merely altered the availability of "good conduct" credits ran afoul of the

*Ex Post Facto* Clause. *Id.,* at 25, 101 S.Ct., at 962. The present case involves not merely an effect on the availability of *future* release credits, but the retroactive elimination of credits already earned and used. Accordingly, I concur in part and concur in the judgment.

**All Citations**

519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63, 65 USLW 4131, 97 FCDR 765, 97 Cal. Daily Op. Serv. 1159, 97 Daily Journal D.A.R. 1677, 97 CJ C.A.R. 258, 10 Fla. L. Weekly Fed. S 287

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

209 F.3d 319
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Winston Eugene MITCHELL,
Sr., Defendant-Appellant.

No. 99-4008.
|
Argued: Jan. 25, 2000
|
Decided: March 27, 2000

## Synopsis

Defendant was convicted in the United States District Court for the Eastern District of Virginia, Albert V. Bryan, Jr., Senior District Judge, of possession of a firearm after conviction of a misdemeanor crime of domestic violence, and of unlawfully possessing a silencer, and he appealed. The Court of Appeals, Wilkinson, Chief Judge, held that: (1) conviction for possessing a firearm following conviction of a misdemeanor crime of domestic violence did not require proof that defendant knew that possessing a firearm was illegal; (2) such conviction did not violate the Ex Post Facto Clause; (3) conviction did not violate due process on ground that defendant did not have notice that his continued possession of the firearm was illegal; (4) consents to search of home by defendant and his wife and daughter were valid; and (5) evidence supported the finding that defendant knew that device he possessed had the characteristics of a silencer.

Affirmed.

## Attorneys and Law Firms

**\*320** Argued: Dale Warren Dover, Alexandria, Virginia, for Appellant. Kathleen Marie Kahoe, Assistant United States Attorney, Alexandria, Virginia, for Appellee. On Brief: Helen F. Fahey, United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINSON, Chief Judge, and WILLIAMS and TRAXLER, Circuit Judges.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WILLIAMS and Judge TRAXLER joined.

## OPINION

WILKINSON, Chief Judge.

Winston Mitchell was convicted under 18 U.S.C. § 922(g)(9), which makes it unlawful for a person convicted of a misdemeanor crime of domestic violence to possess a firearm. He also was convicted of possessing **\*321** a silencer in violation of 26 U.S.C. § 5861(d). On appeal, Mitchell challenges his convictions on a number of grounds. Finding no merit in any of his claims, we affirm.

### I.

In February 1996 appellant Winston Eugene Mitchell purchased a .38 caliber handgun in Alexandria, Virginia. A month later, Mitchell was arrested for assaulting his wife, Verlette Mitchell. On June 5, 1996, Mitchell was convicted of misdemeanor assault and battery. Mitchell and his wife continued to live together after this incident.

On September 30, 1996, Congress amended the Gun Control Act of 1968 to make it illegal for a person convicted of a misdemeanor crime of domestic violence to possess a firearm or ammunition. The amended provision states: "It shall be unlawful for any person who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(9) (1994 & Supp. IV 1998). Congress determined that the possession of a gun by one convicted of domestic violence put the possessor's partner at undue risk. *See, e.g., United States v. Lewitzke,* 176 F.3d 1022, 1026-27 (7th Cir.1999). The applicable penalty provision reads, "Whoever knowingly violates subsection [ (g) ] of section 922 shall be fined as provided in this title, imprisoned not more than 10 years or both." 18 U.S.C. § 924(a)(2) (1994).

On July 20, 1998, nearly two years after the enactment of § 922(g)(9), Verlette Mitchell notified the Alexandria City

Police Department that her husband had threatened her. She also told the police that Mitchell possessed a handgun and a homemade silencer. She then gave the police permission to search her home in order to secure these items. That same day a warrant was issued for Mitchell's arrest on stalking charges.

At approximately 10:30 that evening, Officers Henry and Fard arrested Mitchell outside his home. Thinking Mitchell might be armed, the officers approached him with their weapons drawn, ordered him to the ground, and handcuffed him. They searched Mitchell for weapons and found none. Mitchell's adult daughter, Tecinda Mitchell, emerged from the Mitchell home to see what was going on. While Officer Henry stayed with Mitchell, Fard walked onto the Mitchell porch to talk with Tecinda. Shortly thereafter, Mr. Mitchell consented to a search of his home and told Henry exactly where to find the gun. Henry relayed this information to Fard. Fard testified that Tecinda also consented to the search. Tecinda allowed Fard into the home and took him up to her parents' bedroom. Here Fard found Mitchell's .38 caliber handgun as well as 23 rounds of ammunition. Fard also recovered a plastic bottle stuffed with carpet padding, a device the government argues is a homemade silencer.

On August 5, 1998, a grand jury returned a three-count indictment against Mitchell for (1) illegally possessing a firearm in violation of § 922(g)(9), (2) illegally possessing ammunition in violation of § 922(g)(9), and (3) illegally possessing a silencer in violation of 26 U.S.C. § 5861(d) (1994). Mitchell filed a number of pre-trial motions. The district court denied both his motion to dismiss the indictment as unconstitutional under the Ex Post Facto Clause and his motion to suppress the items seized from the Mitchell home.

On September 29, 1998, a jury convicted Mitchell on all three counts. He was sentenced to 48 months imprisonment. Mitchell now appeals his convictions, and we address his claims in turn.

**\*322** II.

A.

Mitchell first argues that § 924(a)(2) required the government to prove that Mitchell knew that possessing a firearm was illegal. We disagree. Section 924(a)(2) provides: "Whoever knowingly violates subsection [ (g) ] of section 922 shall be fined as provided in this title, imprisoned not more than

10 years, or both." The Supreme Court has noted that "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Bryan v. United States,* 524 U.S. 184, 192, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (internal quotation marks omitted). The *Bryan* Court concluded, "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Id.* at 193, 118 S.Ct. 1939. *Bryan* found that the text of 18 U.S.C. § 924(a)(1)(B), a sister provision of § 924(a) (2), did not dictate a different result. *Id.* Section 924(a)(1)(B) provides criminal penalties for "whoever knowingly violates subsection (a)(4), (f), (k), (r), (v), or (w) of section 922." As this *mens rea* language is identical to that in § 924(a)(2), the *Bryan* rule is applicable in the present context. Mitchell's reliance on *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), is thus misplaced because the statutory language in *Liparota* differs from that in *Bryan* and the instant case.

The rule in *Bryan* has been applied without exception by this and other circuits when interpreting § 924(a)(2)'s application to subsection (g) firearm possession crimes. *See, e.g., United States v. Bostic,* 168 F.3d 718, 722-23 (4th Cir.), *cert. denied,* 527 U.S. 1029, 119 S.Ct. 2383, 144 L.Ed.2d 785 (1999); *United States v. Beavers,* 206 F.3d 706, 708-09 (6th Cir.2000); *United States v. Meade,* 175 F.3d 215, 226 n. 5 (1st Cir.1999); *United States v. Wilson,* 159 F.3d 280, 289 (7th Cir.1998). Even before *Bryan,* circuit courts, including this one, understood this to be the rule. *See, e.g., United States v. Langley,* 62 F.3d 602, 605-06 (4th Cir.1995) (en banc) ("[T]he only knowledge the government was required to prove in a prosecution under [§ 924(a)(2) and § 922(g)(1) ] was knowledge of the possession...."); *United States v. Capps,* 77 F.3d 350, 352 (10th Cir.1996) ("[N]o circuit has extended the knowledge component of [§ 924(a)(2) and § 922(g)(1) ] beyond the act of possession itself.").

B.

Mitchell next argues that as applied to him, § 922(g)(9) violates the Ex Post Facto Clause because both his firearm purchase and misdemeanor domestic violence conviction occurred prior to § 922(g)(9)'s enactment. *See* U.S. Const. art. I, § 9, cl. 3.

Again we disagree. "To fall within the ex post facto prohibition, a law must be retrospective-that is, it must

AR005072

apply to events occurring before its enactment-and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (citations and internal quotation marks omitted). It is immaterial that Mitchell's firearm purchase and domestic violence conviction occurred prior to § 922(g)(9)'s enactment because the conduct prohibited by § 922(g)(9) is the *possession* of a firearm. *See, e.g., United States v. Boyd,* 52 F.Supp.2d 1233, 1236-37 (D.Kan.1999) ("This court, as have all others deciding such a challenge, have concluded that ... the illegal act in § 922(g)(9) is the possession of the firearm, not the misdemeanor domestic violence conviction...."); *National Ass'n of Gov't Employees v. Barrett,* 968 F.Supp. 1564, 1575-76 (N.D.Ga.1997), *aff'd sub nom. Hiley v. Barrett,* 155 F.3d 1276 (11th Cir.1998). As it is undisputed that Mitchell possessed the firearm after the **\*323** enactment of § 922(g)(9), the law's application to Mitchell does not run afoul of the ex post facto prohibition.

Courts addressing similar ex post facto challenges to § 922(g) (9) have all agreed with this conclusion. *See, e.g., Boyd,* 52 F.Supp.2d at 1236-37; *McHugh v. Rubin,* 49 F.Supp.2d 105, 108 (E.D.N.Y.1999); *United States v. Hicks,* 992 F.Supp. 1244, 1245-46 (D.Kan.1997); *United States v. Meade,* 986 F.Supp. 66, 69 (D.Mass.1997), *aff'd,* 175 F.3d 215 (1st Cir.1999); *Barrett,* 968 F.Supp. at 1575-76. Analogous ex post facto challenges to other similarly worded firearm possession crimes have also failed. *See, e.g., United States v. D'Angelo,* 819 F.2d 1062, 1065-66 (11th Cir.1987) (Defendant "was in possession of the pistol after the enactment of the statute. Proof of [defendant's] possession obviated the need for proof of the date [defendant] received the pistol."); *United States v. Brady,* 26 F.3d 282, 290-91 (2d Cir.1994); *United States v. Gillies,* 851 F.2d 492, 495 (1st Cir.1988).

## C.

Mitchell next contends that his conviction under § 922(g) (9) violates the Due Process Clause of the Fifth Amendment. He specifically argues that he did not have notice that his continued possession of the firearm was illegal. The statute made perfectly clear, however, that Mitchell's possession of the firearm was unlawful. Mitchell's pleas for particularized notice thus run headlong into the fundamental principle that "ignorance of the law is no excuse." *See, e.g., Barlow v. United States,* 32 U.S. (7 Pet.) 404, 411, 8 L.Ed. 728 (1833) ("It is a common maxim, familiar to all minds, that ignorance

of the law will not excuse any person, either civilly or criminally...."); *Bryan,* 524 U.S. at 195 & n. 21, 118 S.Ct. 1939; *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 563-65, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); *Shevlin-Carpenter Co. v. Minnesota,* 218 U.S. 57, 68, 30 S.Ct. 663, 54 L.Ed. 930 (1910).

Mitchell counters by arguing that his prosecution under § 922(g)(9) falls within an exception to this maxim. *See Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). The *Lambert* Court addressed a city ordinance that criminally penalized felons who remained in Los Angeles more than five days without registering with the police. *Id.* at 226-27, 78 S.Ct. 240. The Court held that a conviction under the registration provision violated due process when the defendant had no notice whatsoever that remaining in the city might lead to criminal prosecution. *See id.* at 228-30, 78 S.Ct. 240. While the *Lambert* Court did hold that the Due Process Clause requires some minimum threshold notice to defendants, *Lambert* 's reach has been exceedingly limited. In fact, the Supreme Court stated that its application has been so circumscribed that it gives "some credence to Justice Frankfurter's colorful prediction in dissent [in *Lambert* ] that the case would stand as 'an isolated deviation from the strong current of precedents-a derelict on the waters of the law.' " *Texaco, Inc. v. Short,* 454 U.S. 516, 537-38 n. 33, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982) (quoting *Lambert,* 355 U.S. at 232, 78 S.Ct. 240 (Frankfurter, J., dissenting)).

In the instant case, Mitchell's conduct in assaulting his wife-the act that led to his misdemeanor domestic violence conviction-put Mitchell on sufficient notice. This court in *United States v. Bostic* rejected an analogous due process challenge to 18 U.S.C. § 922(g)(8), which makes it unlawful for a person subject to a domestic violence protective order to possess a firearm. 168 F.3d 718, 722-23 (4th Cir.1999). The court concluded, "By engaging in abusive conduct toward [his wife and child, the defendant] removed himself from the class of ordinary citizens" to the point where he could not "reasonably expect to be free from regulation when possessing a firearm." *Id.* at 722; *see also United States v. Reddick,* 203 F.3d 767, 769-71 (10th Cir.2000); **\*324** *United States v. Baker,* 197 F.3d 211, 220 (6th Cir.1999); *Meade,* 175 F.3d at 226; *Wilson,* 159 F.3d at 288-89. We find this reasoning persuasive in the present context. *Accord United States v. Beavers,* 206 F.3d 706, 710 (6th Cir.2000).

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

### III.

Mitchell further argues that the district court erred in denying his pre-trial motion to suppress items seized from his home. We hold, however, that the district court did not err by finding that Mitchell, his wife Verlette, and his adult daughter Tecinda all independently consented to the search.

It is undisputed that Mitchell consented to the search shortly after his arrest. Mitchell, however, argues his consent was invalid because it was the product of police duress and coercion. Whether Mitchell voluntarily consented is a question of fact which will be reversed only if after examining the totality of the circumstances, we conclude that the district court's finding was clearly erroneous. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Even accepting Mitchell's allegations as true that the officers failed to notify him of his *Miranda* rights and his right to refuse consent for the search, we cannot conclude that the district court clearly erred by finding his consent to be voluntary. Mitchell was fifty years old and because of past arrests was not "a newcomer to the law." *United States v. Watson,* 423 U.S. 411, 424-25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). In addition, Mitchell consented only a few minutes after being arrested, and he told the police exactly where they could find the gun. Although Mitchell was arrested at gunpoint, the officers holstered their weapons as soon as Mitchell was handcuffed. And after Mitchell was secured there is no evidence that the police threatened Mitchell or used any violence against him. *See id.* at 424, 96 S.Ct. 820.

Verlette Mitchell also consented to the search earlier that day. And as she had "common authority" over the Mitchell home, her consent was valid. *See, e.g., United States v. Matlock,* 415 U.S. 164, 171 & n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Verlette Mitchell's name was on the lease, she had keys to the house, and her clothing and belongings were in the house. Tecinda Mitchell also validly consented because it was reasonable under the circumstances for the police to conclude that she had "common authority" over the house. *See, e.g., Illinois v. Rodriguez,* 497 U.S. 177, 188-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). She was at the Mitchell home the night of the search, and she allowed the officer to enter the home and took him upstairs to her parents' room.

Throughout, she never gave any indication that she did not live at the Mitchell home.

### IV.

Mitchell finally contends that there was insufficient evidence produced at trial for the jury to conclude that he violated 26 U.S.C. § 5861(d). Section 5861(d) makes it unlawful to possess an unregistered firearm-in this case a silencer as defined in 18 U.S.C. § 921(a)(24) (1994). When assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Reviewing the evidence in this manner, we must decide whether it supports the finding that Mitchell knew that the device entered into evidence by the government-the plastic bottle stuffed with carpet padding-had the characteristics of a silencer.

The government's evidence passes this threshold. Mitchell's wife testified that Mitchell kept the device in the same bin where he kept his gun and ammunition. She also recounted seeing Mitchell put the **\*325** device in his fanny pack along with his gun. The government's firearms expert testified that the device reduced gunshot noise by half. The expert also pointed out the "irregular cut in the bottom of the bottle, ... an A-type cut ... with a circular portion on the bottom." The expert explained that the barrel and sight of Mitchell's gun could be inserted into this cut. He concluded that in his expert opinion the device was a rudimentary, improvised firearm silencer. The testimony of these witnesses provides substantial evidence that Mitchell knew that the device had the characteristics of a silencer.

### V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

### All Citations

209 F.3d 319

---