Case 2:19-cv-00037-JNP    Document 59-36    Filed 11/30/22    PageID.5543    Page 1 of 52

371 F.3d 430
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Plaintiff—Appellee,

v.

Robert Lee PFEIFER, also known as
Barney Pfeifer, Defendant—Appellant.

No. 02–3606.
|
Submitted: March 13, 2003.
|
Filed: June 10, 2004.
|
Rehearing and Rehearing En
Banc Denied Aug. 6, 2004.

## Synopsis

**Background:** Defendant was convicted, pursuant to his conditional guilty plea before the United States District Court for the District of South Dakota, Charles B. Kornmann, J., of possessing firearm after being convicted of misdemeanor crime of domestic violence. Defendant appealed.

**Holdings:** The Court of Appeals, John R. Gibson, Circuit Judge, held that:

waiver of counsel in prior assault proceeding was knowing and intelligent, and thus conviction could serve as predicate offense;

application of statute to defendant who was convicted of predicate crime before its enactment did not violate Ex Post Facto Clause;

statute was not unconstitutionally vague; and

application of statute did not violate Second Amendment.

Affirmed.

## Attorneys and Law Firms

**\*432** Patricia A. Carlson, argued, Pierre, SD, for appellant.

Judith K. Grunewaldt, argued, Asst. U.S. Attorney, Sioux Falls, SD, for appellee.

Before HANSEN,[1] Chief Judge, JOHN R. GIBSON and LOKEN, Circuit Judges.

[1]    The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

## Opinion

JOHN R. GIBSON, Circuit Judge.

Robert Lee Pfeifer conditionally pleaded guilty to possessing a firearm after being convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Pfeifer appeals his conviction on the following statutory and constitutional grounds: 1) he did not knowingly and intelligently waive the right to counsel in the predicate domestic violence conviction, as required by 18 U.S.C. § 921(a)(33)(B) in order to obtain a conviction under § 922(g)(9); 2) as applied to him, § 922(g)(9) violates the Ex Post Facto Clause of the United States Constitution because it effectively increases the punishment for an earlier conviction; 3) § 922(g)(9) is unconstitutionally vague because it does not provide fair warning that his possession of a firearm is prohibited conduct; 4) § 922(g)(9) is unconstitutionally overreaching in that it interferes with his Second Amendment right to bear arms. We affirm.

FACTS

On May 5, 1985, Robert Lee Pfeifer was involved in a disagreement with his wife, which ended with Pfeifer striking her in the face with his hand. He was subsequently charged by information with simple assault under S.D.C.L. section 22–18–1 in that he did "willfully and unlawfully, attempt to cause bodily injury to another, namely: Diane Pfeifer, and had the actual ability to cause the injury."

Pfeifer was arraigned on this charge on May 9, 1985, before Judge Donald Heck, a Circuit Judge of the Sixth Judicial Circuit, Pierre, South Dakota. The court informed Pfeifer that he was charged with simple assault and was entitled to have a lawyer at all stages of the proceedings and that, if necessary,

one would be appointed for him at county expense. Pfeifer stated that he wanted to proceed without a lawyer. The court filed the information and read the charge to him in essentially the same language which we have set forth above. The court again told Pfeifer that he was charged with simple assault and informed him that it was a Class 1 misdemeanor. **\*433** Pfeifer stated that he understood the charge.

Pfeifer was asked if he had been in the courtroom when another defendant, Mr. Odom, was advised of his constitutional and statutory rights. The court had informed Odom that he had the right to represent himself in person and to be represented by a lawyer. He had the right to a speedy public trial, to have compulsory process served to obtain witnesses, and to confront and question the witnesses. If he entered a plea of not guilty, he would be presumed innocent, the burden would be on the State to prove the charge beyond a reasonable doubt, and he could be convicted only by a unanimous jury verdict. The entry of a guilty plea waived all of these constitutional and statutory rights. The court also informed Odom of certain driving-related consequences that would stem from a conviction for driving under the influence of alcohol, although this particular instruction had no direct bearing on Pfeifer's case. Pfeifer stated that he heard the rights explained to Odom and had no questions about them.

At the court's request, Pfeifer described the disagreement with his wife that gave rise to the assault charge. Pfeifer said he locked the door to their house because their older children were staying out too late. His wife disagreed and unlocked the door, and he relocked it. According to Pfeifer, "She went to unlock it again and I hit her." Based on Pfeifer's description of the events, the court found that the plea had been voluntarily given and that there was a factual basis for the charge contained in the information. The court accepted the guilty plea and found Pfeifer guilty as charged.

Both before and after his 1985 conviction, Pfeifer used firearms regularly for hunting, guide work, and as part of his work as a butcher. The simple assault conviction had no impact on his ability to possess firearms until eleven years later when Congress enacted 18 U.S.C. § 922(g)(9), which states: "It shall be unlawful for any person ... who has been convicted in any court of a misdemeanor crime of domestic violence ... to possess in or affecting commerce, any firearm."

Although the record indicates that Pfeifer knew through various sources of the new law's applicability to him, he nonetheless went hunting with a rifle on November 10, 2001.

He was subsequently charged with violating § 922(g)(9) and another subsection of § 922. The government later dismissed the second charge as part of a plea agreement under which Pfeifer conditionally pleaded guilty to violating § 922(g)(9). The conditional nature of the guilty plea meant that Pfeifer could raise the appeals now before this court.

I.

Pfeifer argues that his conviction under 18 U.S.C. § 922(g)(9) should be reversed because he did not knowingly and intelligently waive the right to counsel in the predicate misdemeanor proceeding, as required by 18 U.S.C. § 921(a)(33). We review de novo the district court's refusal to dismiss an indictment based on its interpretation of a federal statute. *United States v. Smith,* 171 F.3d 617, 619 (8th Cir.1999).

In 1996, Congress enacted § 922(g)(9), which states: "It shall be unlawful for any person ... who has been convicted in any court of a misdemeanor crime of domestic violence ... to possess in or affecting commerce, any firearm." In defining the term "misdemeanor crime of domestic violence," § 921(a)(33)(B)(i) provides that an earlier misdemeanor conviction shall not count as a predicate offense for purposes of § 922(g)(9) unless the defendant "was represented **\*434** by counsel in the case, or knowingly and intelligently waived the right to counsel in the case."

The courts that have addressed the issue directly have interpreted § 921(a)(33)(B)(i) as creating a legal definition to be decided by the court as a matter of law rather than by a jury as an element of the crime. *See United States v. Hartsock,* 347 F.3d 1, 7 (1st Cir.2003) (holding that absence of waiver is an affirmative defense); *United States v. Akins,* 276 F.3d 1141, 1145 (9th Cir.2002) (same). The First Circuit is the only appellate court to have considered the allocation of the burden of proof on this issue. *See Hartsock,* 347 F.3d at 8–9 (concluding that the defendant bears both the burden of production and burden of persuasion). The proper allocation of the burden of proof was not discussed by the parties in the instant case and does not affect the outcome.

In considering whether a defendant knowingly and intelligently waived counsel for purposes of § 922(g)(9) and § 921(a)(33)(B)(i), courts generally have applied the same principles that are used when analyzing waiver of counsel under the Sixth Amendment. *See, e.g.,* 171 F.3d 617 at 621–22 (8th Cir.1999); *United States v. Jennings,* 323 F.3d 263, 275–

76 (4th Cir.) *cert. denied,* 540 U.S. 1005, 124 S.Ct. 531, 157 L.Ed.2d 412 (2003). In particular, "any waiver of the right to counsel must be knowing, voluntary, and intelligent." *Iowa v. Tovar,* 541 U.S. 77, ——, 124 S.Ct. 1379, 1387, 158 L.Ed.2d 209 (2004). A waiver is intelligent only if the defendant is "made aware of the dangers and disadvantages of self-representation" at the time of the waiver, "so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (internal citation omitted). During the pretrial stages of the criminal process, less vigorous warnings are typically adequate because "the full dangers and disadvantages of self-representation ... are less substantial and more obvious to an accused than they are at trial." *Tovar,* 541 U.S. at ——, 124 S.Ct. at 1382. Throughout the waiver inquiry, "[c]ourts must consider the particular facts and circumstances surrounding each case, including the background, experience, and conduct of the accused." *Moore v. United States,* 178 F.3d 994, 998 (8th Cir.1999).

This court has considered the waiver issue in the context of a § 922(g)(9) offense on one other occasion. In *Smith,* 171 F.3d at 619, the defendant was charged with simple misdemeanor assault following a 1994 incident involving the mother of his child. The Iowa state court appointed counsel to represent the defendant, but counsel did not appear at the defendant's plea hearing. The state court asked the defendant if he wanted to go forward at the plea hearing despite counsel's absence. The defendant agreed, signed a written waiver form, and proceeded with a proposed plea agreement. Two years later, the defendant conditionally pleaded guilty to violating § 922(g)(9), with the 1994 conviction acting as the predicate domestic violence offense. The defendant argued on appeal that he had not knowingly and intelligently waived his right to counsel in the predicate offense. We rejected his argument, holding:

> The evidence of Smith's written waiver, coupled with his prior invocation of his right to appointed counsel, and the acceptance of his waiver by the Iowa magistrate who took his plea, sufficiently show, and allow us to conclude as a matter of law, that Smith voluntarily and knowingly waived his right to counsel **\*435** at

the plea hearing for purposes of § 921(a)(33)(B).

*Id.* at 622.

The government argues, and the district court agreed, that *Smith* forecloses Pfeifer's argument regarding waiver of counsel. *United States v. Pfeifer,* 206 F.Supp.2d 1002, 1004 (D.S.D.2002). However, like the analysis of waiver under the Sixth and Fourteenth Amendments, our determination of whether a defendant knowingly and intelligently waived counsel for purposes of § 921(a)(33)(B) depends on the facts and circumstances of each particular case. *Cf. Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Moore,* 178 F.3d at 998.

Unlike the defendant in *Smith,* Pfeifer never invoked his right to counsel or otherwise had counsel appointed to him during his 1985 assault case. Thus, one of the most important factors in *Smith* for finding a valid waiver—the prior invocation of his right to counsel—is missing here.

Nonetheless, other evidence in the record demonstrates that Pfeifer made a knowing and intelligent waiver. In particular, Pfeifer engaged in the following colloquy with the trial judge:

> COURT: You're charged with simple assault. Do you have a lawyer?
>
> DEFENDANT: No, I don't.
>
> COURT: Do you want a lawyer to represent you?
>
> DEFENDANT: No, I don't.
>
> COURT: You understand that you're entitled to have a lawyer during all stages of these proceedings. If you don't have money or property to hire a lawyer, the Court will appoint one for you at county expense. You understand that?
>
> DEFENDANT: I understand that.
>
> COURT: You want to proceed without a lawyer?
>
> DEFENDANT: I want to proceed without a lawyer.

The trial judge also advised Pfeifer, by reference to a discussion with a previous defendant, of the rights Pfeifer would be giving up by pleading guilty, including the right to

a jury trial, the right to confront witnesses against him, and the right not to testify against himself. Taken together with the colloquy specifically dealing with waiver of counsel, this illustrates that Pfeifer made the decision to waive counsel "with eyes open." *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 (1975); *Tovar,* 541 U.S. at ——, 124 S.Ct. at 1389 (holding that the Sixth Amendment does not require a trial court to give a rigid and detailed admonishment of the usefulness of an attorney to a *pro se* defendant pleading guilty).

Despite the extensive discussion of his rights, Pfeifer asserts that his waiver of counsel was not knowing and intelligent because the trial court did not specifically inform him that he would (eventually) lose his right to possess firearms. In fact, the judge in the 1985 proceeding specifically informed the defendant in the case immediately preceding Pfeifer's that certain driving-related consequences would follow from his guilty plea to a charge of driving under the influence of alcohol, but provided no such warnings to Pfeifer regarding his future ability to possess firearms.

This argument fails because the validity of Pfeifer's waiver of counsel simply does not hinge on the adequacy of the trial court's explanation of the consequences of a guilty plea. *See, e.g., Tovar,* 541 U.S. at ——, 124 S.Ct. at 1389 (waiver may be knowing and intelligent even if the defendant "lacked a full and complete appreciation of all of the consequences flowing from his waiver"); *cf.* **\*436** *United States v. Lippman,* 2004 WL 1172826 at \*3 (8th Cir.2004) (defendant may be convicted under § 922(g) even without knowledge of the law or an intent to violate it). We recognize the considerable unfairness of a situation where a defendant essentially acquiesces to a misdemeanor-and its correspondingly minor punishment-only to learn over a decade later that a newly-enacted law prevents him from lawfully possessing firearms. Nonetheless, the trial judge asked Pfeifer repeatedly if he wanted to proceed without an attorney, and Pfeifer stated each time that he did. Pfeifer indicated that he understood the rights he was waiving. He admitted his guilt on several occasions. Regardless of what Pfeifer knew about the future consequences of his conviction, it simply does not appear that his waiver of counsel was anything other than knowing and intelligent. *See Smith,* 171 F.3d at 621–22; *United States v. Bethurum,* 343 F.3d 712, 718 (5th Cir.2003) (holding that a defendant's waivers of counsel and jury trial were valid for purposes of § 922(g)(9) even though he was not informed of the effect of his guilty plea on his ability to possess a firearm), *cert. denied,* 540 U.S. 1162, 124 S.Ct. 1177, 157 L.Ed.2d 1208 (2004); *cf. United States v. Fountain,* 83 F.3d 946, 950

(8th Cir.1996) (holding that a defendant's guilty plea was valid despite the district court's failure to inform him that it could later be used to enhance a sentence for a different crime).

Because we conclude that Pfeifer's waiver of counsel was knowing and intelligent for purposes of § 921(a)(33)(B)(i), we reject this statutory challenge to his conviction.

II.

Pfeifer next argues that as applied to him § 922(g)(9) violates the Ex Post Facto Clause, U.S. Const. Art. I § 9, cl. 3, because it effectively increases the punishment for his misdemeanor conviction from 17 years earlier. A statute violates the Ex Post Facto Clause if it applies to events occurring before its enactment and alters the definition of criminal conduct or increases the punishment for a crime. *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997). We review *de novo* questions arising under the federal constitution. *United States v. Gary,* 341 F.3d 829, 835 (8th Cir.2003), *cert. denied,* 540 U.S. 1139, 124 S.Ct. 1128, 157 L.Ed.2d 949 (2004).

Although the Eighth Circuit has not considered whether § 922(g)(9) violates the Ex Post Facto Clause when applied to a defendant who committed the predicate offense prior to the enactment of § 922(g)(9), other courts have concluded that it does not. *See United States v. Hemmings,* 258 F.3d 587, 594 (7th Cir.2001); *United States v. Mitchell,* 209 F.3d 319, 322–23 (4th Cir.2000); *cf. United States v. Brady,* 26 F.3d 282, 290–91 (2d Cir.1994) (upholding conviction under felon in possession statute even where predicate felony conviction occurred decades before enactment of the statute). The critical factor in these decisions is that the prohibited conduct-possession of a firearm-occurred after enactment of the statute. *See Mitchell,* 209 F.3d at 322–23 ("As it is undisputed that [the defendant] possessed the firearm after the enactment of § 922(g)(9), the law's application does not run afoul of the ex post facto prohibition"). It is immaterial that the predicate offense occurred before § 922(g)(9) was enacted. "A law is not retroactive simply because it 'draws upon antecedent facts for its operation.' " *Hemmings,* 258 F.3d at 594 (quoting *Cox v. Hart,* 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922)).

Because Pfeifer possessed a firearm after the enactment of § 922(g)(9), we adopt the reasoning of our sister circuits and

**\*437** conclude that his conviction does not violate the Ex Post Facto Clause.

### III.

Pfeifer next argues that § 922(g)(9) is unconstitutionally vague, in violation of his Fifth Amendment right to due process of law. In particular, Pfeifer asserts that § 922(g)(9) does not provide fair warning that his possession of a firearm is prohibited conduct.

This court considered vagueness challenges to § 922(g)(9) in *United States v. Hutzell,* 217 F.3d 966 (8th Cir.2000), and *Smith,* 171 F.3d at 622–23. In *Hutzell,* the defendant pleaded guilty to "domestic abuse assault," a misdemeanor, six months before Congress enacted § 922(g)(9). *Id.* at 967. More than two years later, the defendant fired a gun during an argument and was charged with violating § 922(g)(9). *Id.* He moved to dismiss the indictment on the ground that no one "could be presumed to have had notice that the conduct described in [§ 922(g)(9) ] was in fact unlawful." *Id.* at 968. We rejected his challenge, explaining that "everyone knows" the possession of firearms is a highly regulated activity, and that "an individual's domestic violence conviction should itself put that person on notice that subsequent possession of a gun might well be subject to regulation." *Id.* at 968–69. Other courts have reached the same conclusion. *See United States v. Hancock,* 231 F.3d 557, 564 (9th Cir.2000); *United States v. Beavers,* 206 F.3d 706, 710 (6th Cir.2000).

In *Smith,* we addressed a slightly different issue, which is perhaps more relevant here: the propriety of a conviction under § 922(g)(9) where the predicate offense occurred under a general assault statute, rather than a statute that specifically mentioned "domestic abuse." 171 F.3d at 622–23. The defendant in *Smith* argued that the general nature of the assault statute prevented him from having a constitutionally sufficient level of notice that his possession of firearms was unlawful. *Id.* We held: "The fact that Smith could have been convicted under two misdemeanor statutes, one of which was arguably more applicable to the proscribed conduct, does not negate notice that conviction under the other similarly relevant misdemeanor statute could also serve as a predicate offense for § 922(g)(9)." *Id.* at 623; *accord United States v. Denis,* 297 F.3d 25, 30–31 (1st Cir.2002) (rejecting nearly identical challenge to conviction under § 922(g)(9)); *United States v. Mitchell,* 209 F.3d at 323–24.

In addition to the binding effect of *Smith,* Pfeifer's due process claim is precluded by the overwhelming evidence in the record showing that he had actual notice of the law prohibiting his possession of firearms. In 1996, Pfeifer forfeited custody of his firearms after having a protective order obtained against him in the course of his divorce. At the expiration of the protective order three years later, Pfeifer attempted to regain possession of his firearms from the Sheriff. The Sheriff informed Pfeifer that the new federal law prevented him from legally possessing firearms, and therefore refused to return them.

Pfeifer's awareness of § 922(g)(9) is further illustrated by a motion he filed in a South Dakota court in February 2000 to have his 1985 conviction expunged. A hearing on that motion included the following exchange between the court and John Arrabito, Pfeifer's attorney, regarding the effect of Pfeifer's 1985 conviction:

> MR. ARRABITO: ... I'm assuming that the State is arguing that this crime of simple assault because it was an assault of a family member would reach a broad definition of a crime of domestic violence. I don't think it was specifically **\*438** defined as a misdemeanor crime of domestic violence in 1985 at that time. However-

> THE COURT: It doesn't appear that makes any difference under the federal cases though, does it?

> MR. ARRABITO: I don't think so. I think they're broadly defining it as any assaultive conduct between family members would fall under the broad definition of the crime of domestic violence, yes, sir.

> THE COURT: No matter how old it is even if it precedes the federal law which causes all these problems. At least the federal cases I've read indicate that previous convictions occurring prior to the enactment of the—of Clinton's '96 Act still are disqualifying.

> MR. ARRABITO: I would agree with that scenario.

In light of Pfeifer's actual knowledge of § 922(g)(9), it seems incongruous for him to argue that he was unfairly surprised by this application of the law. *Cf. Hulstine v. Morris,* 819 F.2d 861, 864 (8th Cir.1987) ("Due process requirements may be satisfied if a defendant receives *actual notice* of the charges against him, even if the indictment or information is deficient.") (emphasis in original).

AR005079

For these reasons, we conclude that § 922(g)(9) is not unconstitutionally vague as applied to Pfeifer.


## IV.

 Pfeifer's final argument is somewhat imprecise and makes passing reference to overreaching, the Second Amendment, the Ex Post Facto clause, principles of equal protection, and the fact that Pfeifer could not have his earlier conviction expunged under South Dakota law. We have already addressed the Ex Post Facto issue and need not revisit it here. To the extent Pfeifer is arguing that § 922(g)(9) impermissibly interferes with his Second Amendment right to bear arms, we are unpersuaded. We have held that the Second Amendment does not guarantee the right to possess a firearm unless the firearm has some reasonable relationship to the maintenance of a militia. *See United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *United States v. Lippman,* 2004 WL 1172826 at *4 (8th Cir.2004); *United States v. Hale,* 978 F.2d 1016, 1020 (8th Cir.1993). Pfeifer has made no such assertion in this case, nor would the record support one.

The remainder of this argument may constitute an equal protection challenge to Pfeifer's conviction or to the statute as a whole, but we decline to consider either issue because Pfeifer has cited no relevant authority, nor even any relevant legal principles that may support his position. *See, e.g., United States v. Richards,* 118 F.3d 622, 624 (8th Cir.1997).


## V.

In sum, we reject Pfeifer's statutory and constitutional challenges and affirm his conviction under 18 U.S.C. § 922(g)(9).


**All Citations**

371 F.3d 430

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by U.S. v. Hayes, 4th Cir.(W.Va.), April 16, 2007

175 F.3d 215
United States Court of Appeals,
First Circuit.

UNITED STATES of America, Appellee,
v.
Christopher MEADE, Defendant, Appellant.

No. 98–1905.
|
Heard April 6, 1999.
|
Decided May 11, 1999.

**Synopsis**

After his motion to dismiss one charge was denied, 986 F.Supp. 66, defendant was convicted by jury in the United States District Court for the District of Massachusetts, Edward F. Harrington, J., of possession of a firearm which was unlawful because defendant was subject to judicial antiharassment order and because defendant had previously committed misdemeanor crime of domestic violence. Defendant appealed. The Court of Appeals, Selya, Circuit Judge, held that: (1) defendant's state misdemeanor conviction for assaulting his spouse, under general assault and battery statute, was misdemeanor crime of domestic violence; (2) defendant's stipulation to prior misdemeanor conviction waived his right to assert unreserved legal defenses to that element; and (3) statute prohibiting firearm possession by person subject to antiharassment order did not violate Tenth Amendment or due process clause.

Affirmed.

West Headnotes (15)

[1]     **Weapons**
        Domestic violence

        Statute prohibiting possession of a firearm by one who has prior misdemeanor conviction for domestic violence did not require underlying statute to require, as an element, domestic relationship between misdemeanant and victim; thus, defendant's state misdemeanor conviction for assaulting his spouse, under general assault and battery statute, was "misdemeanor crime of domestic violence," within meaning of firearm statute. 18 U.S.C.A. §§ 921(a)(33)(A), 922(g)(9); M.G.L.A. c. 265, § 13A.

        51 Cases that cite this headnote

[2]     **Statutes**
        Technical terms, terms of art, and legal terms

        In construing statutes, courts should presume, absent contrary evidence, that Congress knew, and meant to adopt, the background legal concepts associated with the words that it chose to incorporate into a law.

        2 Cases that cite this headnote

[3]     **Statutes**
        Plain language; plain, ordinary, common, or literal meaning

        When the plain language of a statute unambiguously reveals its meaning, and the revealed meaning is not eccentric, courts need not consult other aids to statutory construction.

        12 Cases that cite this headnote

[4]     **Statutes**
        Motives, Opinions, and Statements of Legislators
        **Statutes**
        Sponsors or authors

        While there are limitations on the extent to which courts appropriately may rely on the statements of individual legislators to color the meaning of statutory language,

AR005081

contemporaneous statements by a sponsor, although far from conclusive, are generally entitled to respect.

Cases that cite this headnote

[5] **Statutes**
Particular Kinds of Legislative History

In analyzing legislative history, to aid in interpreting statute, specificity breeds credibility; thus, particularized explanations of how specific provisions of an act are meant to work have been deemed more instructive than generalized pronouncements anent statutory purpose.

8 Cases that cite this headnote

[6] **Statutes**
Other Statutes

The case for construing one statute in a manner similar to another is weakest when the two have significant differences.

3 Cases that cite this headnote

[7] **Constitutional Law**
Weapons and explosives
**Weapons**
Validity

Statute prohibiting possession of a firearm by one who has prior misdemeanor conviction for domestic violence was not unconstitutionally vague, as statute contained no ambiguity either as to persons to whom prohibitions applied or as to what conduct was proscribed, and misdemeanant would have adequate notice of statute's applicability. 18 U.S.C.A. § 922(g)(9).

11 Cases that cite this headnote

[8] **Constitutional Law**
Statutes

Criminal statutes are unconstitutionally vague if they do not adequately specify the conduct that they prohibit or the class of persons to whom they apply.

1 Cases that cite this headnote

[9] **Statutes**
Liberal or strict construction; rule of lenity

The rule of lenity has bearing only if, after a full examination of a particular statute, an inquiring court must guess at what Congress intended.

Cases that cite this headnote

[10] **Stipulations**
Agreed statement of facts

Defendant's stipulation to element that he had been convicted of misdemeanor crime of domestic violence, in prosecution for unlawful possession of firearm, reserving only legal claim that firearm statute required underlying misdemeanor statute to have domestic relationship as an element, amounted to waiver of other legal defenses to establishment of that element, including defendant's claims that his civil rights were restored and that restoration of rights provision violated equal protection clause. U.S.C.A. Const.Amend. 14; 18 U.S.C.A. §§ 921(a)(33)(B)(ii), 922(g)(9).

33 Cases that cite this headnote

[11] **Stipulations**
Agreed statement of facts

AR005082

Criminal defendant who stipulates to an element of an offense generally relinquishes his right to test the government's case with respect to the existence of the facts underlying that particular.

9 Cases that cite this headnote

[12] **Criminal Law**
Necessity of Objections in General

Waived defenses, unlike forfeited defenses, are not amenable to plain-error review.

Cases that cite this headnote

[13] **States**
Federal laws invading state powers **Weapons**
Violation of other rights or provisions

Statute prohibiting person who is subject to a judicial anti-harassment or antistalking order from possessing firearms that have been shipped or transported in interstate commerce did not violate the Tenth Amendment, reserving to states those powers not vested in the federal sovereign, because statute did not in any way intrude upon state court proceedings, or upon authority of state or its agents to administer their domestic relations laws in manner they saw fit. U.S.C.A. Const.Amend. 10; 18 U.S.C.A. § 922(g)(8).

10 Cases that cite this headnote

[14] **States**
Powers of United States and Infringement on State Powers

If Congress properly acts pursuant to one of its enumerated powers, its work product does not offend the Tenth Amendment, which reserves to the states all powers not vested by the Constitution in the federal sovereign. U.S.C.A. Const.Amend. 10.

6 Cases that cite this headnote

[15] **Constitutional Law**
Weapons and explosives
**Weapons**
Violation of other rights or provisions

Statute prohibiting person who is subject to a judicial antiharassment or antistalking order from possessing firearms that have been shipped or transported in interstate commerce did not violate due process clause, although it did not mandate that state court restraining orders inform those whom they enjoin of federal law consequences, as statute explicitly set forth both proscribed conduct and affected class of persons, and proscribed conduct was not so innocent as to require actual notice of statutory proscription. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. § 922(g)(8).

21 Cases that cite this headnote

**Attorneys and Law Firms**

**\*217** *Leo T. Sorokin,* Federal Defender Office, for appellant.

*Jennifer Zacks,* Assistant United States Attorney, with whom *Donald K. Stern,* United States Attorney, was on brief, for appellee.

Before: Selya, Boudin and Stahl, Circuit Judges.

**Opinion**

SELYA, Circuit Judge.

This appeal requires us to address questions of first impression concerning the construction and constitutionality of two recently-enacted federal firearms laws, 18 U.S.C. § 922(g)(8) and

AR005083

both of which were intended to help curb the escalating societal problems associated with domestic violence. We conclude that these statutory provisions withstand the appellant's vigorous challenge.

# I

In the early morning hours of May 16, 1997, defendant-appellant Christopher Meade began pounding on the door of his estranged wife's apartment in Lynn, Massachusetts, threatening to shoot her. When police arrived, they discovered a number of persons, including Meade himself, gathered outside the dwelling. The officers instructed all those at the scene to lie face down and display their hands. Instead of obeying, Meade crouched by the side of a parked car and thrust his hand into it. The police later retrieved a loaded handgun from the automobile. Neither the handgun nor the ammunition had been manufactured in Massachusetts.

A recently-enacted federal law makes it a crime for a person who is subject to a judicial anti-harassment or anti-stalking order to possess firearms that have been shipped or transported in interstate commerce. *See* 18 U.S.C. § 922(g)(8) (quoted *infra* note 3). Another recently-enacted federal law makes it a crime for a person who has committed a "misdemeanor crime of domestic violence" to possess such a **\*218** weapon. *See* 18 U.S.C. § 922(g)(9). Meade ran afoul of both proscriptions: on May 16, 1997, he had a prior misdemeanor conviction for assaulting his spouse, and he was subject to a state court restraining order, issued pursuant to Mass. Gen. Laws ch. 209A, prohibiting contact with her. Consequently, the United States charged Meade with having violated sections 922(g)(8) and (9). A jury found him guilty on both counts and the district court imposed a 78–month incarcerative sentence. Meade now appeals.

# II

[1] Defying numerical order, we start with 18 U.S.C. § 922(g)(9). In relevant part, this statute renders it "unlawful for any person ... who has been convicted in any court of a misdemeanor crime of domestic violence" to possess "any firearm or ammunition ... which has been shipped or transported in interstate or foreign commerce."

The appellant, whose only potential predicate offense is a misdemeanor conviction under a general assault and battery statute, Mass. Gen. Laws ch. 265, § 13A, claims that the district court erred in treating that conviction as a "misdemeanor crime of domestic violence" within the purview of 18 U.S.C. § 922(g)(9).

The linguistic hook upon which Meade fastens this claim appears in an ancillary definitional statute, 18 U.S.C. § 921(a)(33)(A), which characterizes a "misdemeanor crime of domestic violence" as an offense that is a misdemeanor under state law, *see id.* § 921(a)(33)(A)(i), and which "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim," *id.* § 921(a)(33)(A)(ii). Meade acknowledges that his prior conviction satisfies the first criterion (i.e., it was for a misdemeanor), but insists that it fails to satisfy the second criterion because the underlying statute does not have *as an element* the relationship status between misdemeanant and victim. As the appellant sees it, the only crimes that fit within the quoted language (and, thus, the only crimes that may serve as predicate offenses for purposes of section 922(g)(9)) are those which, as part of their formal definition, require a showing of both the mode of aggression (e.g., the use of a weapon) and the assailant's relationship status (e.g., spouse). The district court rejected this exercise in statutory interpretation, *see United States v. Meade,* 986 F.Supp. 66, 68 (D.Mass.1997), and so do we.

Meade's argument depends on the answer to the following question: Did Congress intend that only misdemeanors which include the relationship status as an element within their formal definition would count as predicate offenses under section 922(g)(9)? Our search for this answer must begin with the language that Congress used in crafting the statutory scheme. *See United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.1987). That perspective focuses our attention on the word "element" in the text of section 921(a)(33)(A)(ii). This singular noun is followed not by one, but by two conceptually distinct attributes: the mode of aggression and the perpetrator's relationship to the victim. Meade's gloss on the reach of the word "element" indiscriminately conflates the two.

[2] We reject this gloss. In construing statutes, courts should presume, absent contrary evidence, that Congress

knew, and meant to adopt, the background legal concepts associated with the words that it chose to incorporate into a law. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818, 827 (1st Cir.1992). The word "element" fits into this category. It is singular, **\*219** and, absent evidence that Congress wished to deviate from customary usage, it should be read to refer only to the immediately following attribute. Since no such evidence exists, we conclude, without serious question, that only the mode of aggression, not the relationship status between perpetrator and victim, must appear within the formal definition of an antecedent misdemeanor to constitute it as a predicate offense.

[3] We could well end our interpretive inquiry at this juncture. When, as now, the plain language of a statute unambiguously reveals its meaning, and the revealed meaning is not eccentric, courts need not consult other aids to statutory construction. *See Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 474, 139 L.Ed.2d 352 (1997); *Charles George Trucking,* 823 F.2d at 688. From time to time, however, courts (perhaps manifesting a certain institutional insecurity) employ such secondary sources as a means of confirmation. *See, e.g., Negonsott v. Samuels,* 507 U.S. 99, 106–09, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993); *Mullin v. Raytheon Co.,* 164 F.3d 696, 702–03 (1st Cir.1999); *Barker v. United States Dep't of Labor,* 138 F.3d 431, 436 (1st Cir.1998). In this instance, such an exercise removes any lingering doubt.

The statute's legislative history is particularly helpful in this regard. In describing the interrelationship between section 922(g)(9) and other gun-control laws on the Senate floor, the legislation's chief sponsor noted presciently that "convictions for domestic violence-related crimes often are for crimes, such as assault, that are not explicitly identified as related to domestic violence." 142 Cong. Rec. S11878 (1996) (statement of Sen. Lautenberg). For this reason, he urged local law enforcement authorities administering gun registration provisions "to thoroughly investigate misdemeanor convictions on an applicant's criminal record to ensure that none involves domestic violence, before allowing the sale of a handgun." *Id.* These statements, made by the principal architect of the bill before final passage, clearly demonstrate Congress's threshold understanding that "misdemeanor crime[s] of domestic violence" would not be limited to those in which the relationship status was included as a formal element of the statute of conviction.

[4] [5] There are, of course, limitations on the extent to which courts appropriately may rely on the statements of

individual legislators to color the meaning of statutory language. *See, e.g., Regan v. Wald,* 468 U.S. 222, 237, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984). Withal, contemporaneous statements by a sponsor, although far from conclusive, are generally entitled to respect. *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976). Moreover, in analyzing legislative history, specificity breeds credibility; thus, particularized explanations of how specific provisions of an act are meant to work have been deemed more instructive than generalized pronouncements anent statutory purpose. *See Regan,* 468 U.S. at 237, 104 S.Ct. 3026 (recognizing that statements made in floor debates may be persuasive as to Congress's intent when they are "very precisely directed to the intended meaning of particular words in a statute"). The statements we have quoted are of this genre. Perhaps most important, Senator Lautenberg's comments are perfectly consistent with the statutory language and the general purpose of the legislation, and promote a logically and linguistically coherent exegesis of the provision here at issue. They therefore reinforce the construction to which we are led by the plain meaning of the statutory text. *See Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (noting that statements in floor debates evidence legislative intent when they are consistent with statutory language and other legislative history).

**\*220** We note, too, that plain language can be made more (or less) compelling by a frank consideration of possible alternatives. Reading section 922(g)(9) in the manner that the appellant advocates would lead to a significant practical anomaly and would frustrate the clear purpose behind the law, which contemplated that the ban on firearms possession would apply broadly to all those falling into the relevant categories. *See* 18 U.S.C. § 922(g)(9) (making it "unlawful for *any* person ... who has been convicted in *any* court of a misdemeanor crime of domestic violence" to possess "*any* firearm or ammunition") (emphasis supplied); *see also Barrett v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976) (remarking, in the course of interpreting 18 U.S.C. § 922, that its "very structure ... demonstrates that Congress ... sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous"). Fewer than half the states have misdemeanor statutes that formally include relationship status as an element of a misdemeanor domestic assault offense. Others, like Massachusetts, rely on general misdemeanor statutes to accomplish the same ends. Thus, the appellant's interpretation of section 922(g)(9) would render the statute a dead letter in most

jurisdictions—an outcome that Congress hardly could have intended. This lack of congruence strengthens the pull of plain language; courts, after all, should not strain to reach results that inhibit the uniform and consistent application of a federal criminal statute.

The appellant counters this statutory analysis with an array of asseverations, none of which we find persuasive. First, he maintains that had Congress intended not to require relationship status to be a formal element of a misdemeanor crime of domestic violence, it could have written the law differently (to say, for instance, that such a crime is an offense that "has, as an element" the use of force or a weapon, "and was committed by" someone within a relevant relationship). But Congress is not required to draft statutes in ways that are precise to the point of pedantry. As long as a statute, as written, is reasonably clear and does not lead to absurd outcomes, courts should construe it according to its tenor. *See Salinas,* 118 S.Ct. at 474; *Negonsott,* 507 U.S. at 104, 113 S.Ct. 1119; *Charles George Trucking,* 823 F.2d at 688. In all events, Meade's counterfactual does nothing to bolster his problematic interpretation of the statute.

Next, the appellant directs our attention to several statutes—including solicitation and sentence-enhancement laws—in which Congress has employed a more or less comparable linguistic structure that defines a "crime of violence" as an offense that "has as an element" the use or threatened use of force or of a deadly weapon against the person or property of another. *See, e.g.,* 18 U.S.C. §§ 16(a), 373(a), 521(c)(2), 924(c)(3)(A), 924(e)(2)(B)(i), 3156(a)(4)(A), 3559(c)(2)(F)(ii). In the appellant's view, such statutes routinely collapse the mode and object of aggression into a single element, and, thus, suggest that section 921(a)(33)(A)(ii) should be construed to encompass both mode of aggression and relationship status under the "element" rubric. It is true, of course, that Congress's use of parallel language and construction in different statutes may at times inform judicial interpretation. *See Irving v. United States,* 162 F.3d 154, 163 (1st Cir.1998) (en banc); *Greenwood Trust,* 971 F.2d at 827. Here, however, three flaws mar the fabric of the appellant's construct.

[6] First, Congress has made manifest its intent, and there is no need to resort to other aids (including other statutes) for assistance in the interpretive process. *See Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (declining to resort to a canon of construction that supported a particular interpretation of a statute when the "whole context," including the statute's plain language, "dictate[d] **\*221** a different conclusion"). Second,

precedent teaches that the case for construing one statute in a manner similar to another is weakest when the two have significant differences, *see, e.g., United States v. Granderson,* 511 U.S. 39, 50–51, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994), and, here, the appellant seeks to compare plums with pomegranates. Section 922(g)(9) has a distinct, focused, and singular purpose that is not covered by any of the other statutes that Meade identifies. This, combined with the fact that Meade's proposed interpretation completely frustrates congressional intent, is more than sufficient to defeat his tendered comparison and consign his argument to the scrap heap. *See Granderson,* 511 U.S. at 50–51, 114 S.Ct. 1259. Last, but not least, the appellant's interpretation is open to serious question; the statutes that he advertises as fair congeners seem somewhat less than that. *Cf. Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (discussing 18 U.S.C. § 924(e)(2)(B)(i) and identifying only "the use or threat of force" as textually linked to "has as an element"). In sum, because the misdemeanant-in-possession statute is unambiguous and does not parallel the proffered provisions in substance, or in purpose, or, ultimately, in language, we refuse to follow Meade's excursion into comparative analysis.

The appellant has a fallback position. He notes that courts by and large have taken a so-called categorical approach in construing statutes and sentencing guidelines that incorporate "predicate offense" concepts. *See, e.g., Taylor,* 495 U.S. at 600–01, 110 S.Ct. 2143 (construing 18 U.S.C. § 924(e)); *United States v. Winter,* 22 F.3d 15, 18 (1st Cir.1994) (construing USSG § 4B1.1). From this, Meade concludes that only state statutes that include relationship status as an element of the formal definition of a domestic violence misdemeanor may be considered predicate offenses for purposes of 18 U.S.C. § 922(g)(9). This argument fundamentally misapprehends the problem that the categorical approach addresses.

The task before the *Taylor* Court was to determine the precise meaning of the term "burglary" as used in a sentence-enhancement statute, 18 U.S.C. § 924(e). After reviewing the relevant legislative history, the Court determined that Congress meant the term to carry a generic definition. *See Taylor,* 495 U.S. at 589–90, 110 S.Ct. 2143. Having established Congress's intent with respect to the meaning of the word "burglary"—the crime that Congress had specified as a predicate offense—the *Taylor* Court then proceeded to consider a logically posterior question: Could prosecutors seek enhancements for convictions that had been obtained under statutes that encompassed both burglary and other crimes (not themselves eligible to serve as sentence enhancers)? *See id.* at 599–600, 110 S.Ct. 2143. This question raised a

AR005086

broader issue as to whether courts should look to statutory definitions of prior offenses or to the defendant's underlying acts in order to determine whether a prior conviction might be considered a predicate offense for sentence-enhancement purposes. *See id.* The Court responded with a preference for a categorical approach that would focus primarily on formal definitions. *See id.* at 600–01, 110 S.Ct. 2143.

The *Taylor* Court's sequencing of the two inquiries that we have described explodes Meade's argument. Before engaging in a categorical approach, one first must have established the formal definition of the particular predicate offense, a process that necessarily requires determining the requisite elements of the statute of conviction. The appellant's attempt to establish the formal definition of a "misdemeanor crime of domestic violence" by direct resort to a categorical approach thus puts the cart before the horse.[1]

**\*222** [7] [8] The appellant next contends that section 922(g)(9) is unconstitutionally vague because it does not define the offense with sufficient clarity that an ordinary person can ascertain whether his actions would fall within its proscriptions. We reject this contention out of hand. Criminal statutes are unconstitutionally vague if they do not adequately specify the conduct that they prohibit or the class of persons to whom they apply. *See, e.g., United States v. Lanier,* 520 U.S. 259, 265–66, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Here, the statute *sub judice* contains no ambiguity either as to the persons to whom the prohibitions apply or as to what conduct is proscribed. Nor does the appellant's contention that a misdemeanant convicted under a general statute will not know whether his conviction will count as a predicate offense alter the calculus. It is, after all, fair to presume that a misdemeanant will know his relationship with his victim.

[9] As a final matter, the appellant argues that the rule of lenity should weigh in his favor. The rule of lenity has bearing only if, after a full examination of a particular statute, an inquiring court must guess at what Congress intended. *See Holloway v. United States,* 526 U.S. 1, ——n. 14, 119 S.Ct. 966, 972 n. 14, 143 L.Ed.2d 1, —— n. 14 (1999); *United States v. O'Neil,* 11 F.3d 292, 301 n. 10 (1st Cir.1993). In this instance, Congress's intent is clear. Consequently, the rule of lenity is inapposite.

## III

[10] Those convicted of misdemeanors in Massachusetts do not automatically lose their civil rights upon conviction. *See United States v. Indelicato,* 97 F.3d 627, 629 (1st Cir.1996). So it was with Meade who, upon being convicted of misdemeanor assault and battery against his spouse, was sentenced to probation. However, Meade subsequently lost one of his civil rights—the right to sit on a jury—when he was incarcerated after having violated his probation. *See* Mass. Gen. Laws ch. 234A, § 4(7) (prohibiting jury service while incarcerated). Because that disability ended when Meade's immurement ended, he asseverates that his civil rights were "restored," and that, therefore, his misdemeanor conviction should not qualify as a predicate offense for purposes of 18 U.S.C. § 922(g)(9). *See id.* § 921(a)(33)(B)(ii) (stating, *inter alia,* that a conviction does not count as a misdemeanor crime of domestic violence if the offender, after losing his civil rights on that account, has had them restored).

A major, and dispositive, problem with this asseveration is that the appellant has waived it and, accordingly, there is no error to review. *See United States v. Olano,* 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Mitchell,* 85 F.3d 800, 807–08 (1st Cir.1996). The record shows that, toward the close of the government's case in chief, Meade's counsel noted his client's willingness to stipulate that "prior to May 15th [Meade] was convicted of a misdemeanor assault and battery, which is a misdemeanor crime of domestic violence, and ... to agree ... that the jury will be instructed they will accept that element as found." Counsel placed only a single qualification on this stipulation, reserving for appeal the legal question discussed in Part II of this opinion, namely, whether section 922(g)(9) required that misdemeanor crimes of domestic violence must include the necessary relationship status as an element before those crimes can qualify as predicate offenses. The government acquiesced in the stipulation and the condition, as did the **\*223** district court. The trial proceeded on that basis.

[11] As a general matter, a criminal defendant who stipulates to an element of an offense relinquishes his right to test the government's case with respect to the existence of the facts underlying that particular. *See United States v. Hardin,* 139 F.3d 813, 816 (11th Cir.), *cert. denied,* 525 U.S. 898, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998); *United States v. Melina,* 101 F.3d 567, 572 (8th Cir.1996); *United States v. Muse,* 83 F.3d 672, 678 (4th Cir.1996). Thus, Meade cannot now challenge the fact of his misdemeanor conviction. The slightly more difficult question is whether a stipulation as to facts also functions as a waiver of legal defenses to the

establishment of the particular element to which the parties have stipulated. We believe that it does.

To assert that a stipulation to an element of a crime does not affect legal defenses is to build an artificial wall between factual and legal arguments. The prosecution's successful establishment of an element of a crime does not invariably depend on showing merely that a certain set of facts exist; there are often legal barriers to scale as well. This case illustrates the point: establishing the predicate misdemeanor crime of domestic violence hinged not only on producing an official record attesting to an underlying conviction, but also on overcoming whatever legal defenses Meade mounted in regard to the materiality of that conviction. Given that reality, and given the corollary fact that criminal defendants frequently gain strategic benefits from entering into stipulations, *see, e.g., Old Chief v. United States,* 519 U.S. 172, 174, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Tavares,* 21 F.3d 1, 4–5 (1st Cir.1994) (en banc), common sense suggests that the decision to forgo a defense with respect to a particular element involves more than an assessment of whether the relevant facts can successfully be disputed. It follows that when a defendant affirmatively agrees not to put the government to its proof of an element of a crime, a court may presume, in the absence of an express reservation, that the defendant has considered all of his available options, factual and legal, and determined that the better course is to allocate his energies elsewhere. *See Melina,* 101 F.3d at 572 (holding that defendant's stipulation to the interstate commerce element of 18 U.S.C. § 844(i) constituted a "complete waiver of the issue"); *United States v. Clark,* 993 F.2d 402, 405–06 (4th Cir.1993) (holding that defendant's stipulation that the predicate offense element under 18 U.S.C. § 922(g) had been satisfied "relieved [the government] of any obligation of proving any aspect of that element, including the aspect that the defendant's civil rights had not been restored"); *cf. United States v. Broce,* 488 U.S. 563, 569–74, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (holding that a defendant who pleads guilty unconditionally thereby relinquishes his entitlement to challenge either the facts or the legal theories supporting the charge).

[12] This rule governs here. There was not the slightest indication at any point in the proceedings below that Meade intended to raise or preserve any legal defenses apart from his "relationship status" defense. To the precise contrary, the totality of the circumstances (especially Meade's stipulation to the predicate offense, his acquiescence in the jury instructions that followed, and his affirmative preservation of a different legal defense) compels a determination that Meade relinquished

all other defenses, factual and legal, pertaining to the stipulated element.[2] **\*224** We therefore rebuff Meade's suggestion that his newly-minted restoration of rights defense was left open by the parties, *sub silentio,* to be addressed at a later date. That defense was waived. *See United States v. Valenzuela,* 150 F.3d 664, 667–68 (7th Cir.1998) (finding waiver when defendant could have preserved his rights to a legal defense in connection with his factual admission anent drug sales, but failed to do so). And since waived defenses, unlike forfeited defenses, are not amenable to plain-error review, the only other thing that need be said is that, taken to its logical conclusion, the same waiver analysis dooms Meade's argument, advanced for the first time in this venue, that the restoration of rights provision violates the Equal Protection Clause. *See United States v. Bongiorno,* 106 F.3d 1027, 1034 (1st Cir.1997) (holding that a party may waive questions of constitutional dimension).

## IV

Having repulsed the appellant's attacks on 18 U.S.C. § 922(g)(9), we turn now to 18 U.S.C. § 922(g)(8). Meade raises two constitutional challenges to this provision.

[13] First, Meade asserts that section 922(g)(8) affronts the Tenth Amendment, U.S. Const. amend. X, because it promotes interference by the federal government in state civil proceedings. The United States responds that the statute requires proof, in each and every case, that the firearm in question was transported or sold in interstate commerce. *See infra* note 3. Thus, the government reasons, enactment of the statute falls within Congress's regulatory power under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.

[14] The Tenth Amendment reserves to the states all powers not vested by the Constitution in the federal sovereign. *See Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 2376–77, 138 L.Ed.2d 914 (1997). It is settled beyond peradventure that if Congress properly acts pursuant to one of its enumerated powers, its work product does not offend the Tenth Amendment. *See Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The question, then, is whether the enactment of section 922(g)(8) represents a valid exercise of congressional authority under the Commerce Clause.

It is true, as the government observes, that courts

AR005088

U.S. v. Meade, 175 F.3d 215 (1999)

regularly have upheld the use of a case-by-case jurisdictional element, such as imbues this statutory scheme, as a means of satisfying the required nexus with interstate commerce, and, thus, bringing federal legislation within the shelter of the Commerce Clause. *See, e.g., United States v. Cunningham,* 161 F.3d 1343, 1345–47 (11th Cir.1998); *United States v. Pierson,* 139 F.3d 501, 502–03 (5th Cir.), *cert. denied,* 525 U.S. 896, 119 S.Ct. 220, 142 L.Ed.2d 181 (1998); *United States v. Joost,* 133 F.3d 125, 131 (1st Cir.), *cert. denied,* 523 U.S. 1087, 118 S.Ct. 1545, 140 L.Ed.2d 693 (1998). But Meade casts his argument at a slightly different angle. He notes that section 922(g)(8) is separate and apart from the jurisdictional element that underlies the whole of section 922(g), and ruminates that section 922(g)(8) *in and of itself* represents an undue imposition on state sovereignty.[3]

**\*225** This proposition is simply incorrect. Section 922(g)(8) does not in any way intrude upon state court proceedings, or upon the authority of a state or its agents to administer their domestic relations laws in the manner they see fit. Stripped to bare essence, section 922(g)(8) makes the existence of a state court order an element of a federal misdemeanant-in-possession offense—no more and no less. Nothing in the state court proceeding changes on account of, or is in any way affected by, the operation of the federal law. Thus, section 922(g)(8) is totally devoid of Tenth Amendment implications. *See Bongiorno,* 106 F.3d at 1033–34 (holding that the federal Child Support Recovery Act did not violate the Tenth Amendment because it came "into play only after a state court issue[d] a child support order," and it did "not authorize a federal court to revise the underlying decree").

[15] Next, Meade maintains that section 922(g)(8) violates the Due Process Clause because it does not mandate that state court restraining orders inform those whom they enjoin of the federal law consequences that may attach.[4] The issue of notice, in the constitutional sense, customarily centers around whether a law explains with sufficient clarity the conduct that it purports to criminalize. *See, e.g., Bouie,* 378 U.S. at 350–51, 84 S.Ct. 1697. In the case of section 922(g)(8), the statute satisfies the standards embedded in precedent; both the proscribed conduct and the affected class of persons are explicitly set forth. *Accord United States v. Wilson,* 159 F.3d 280, 288 (7th Cir.1998), *petition for cert. filed* (Mar. 29, 1999) (No. 98–8724).

The appellant attempts to put a spin on the notice argument by touting *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). *Lambert* represents one of the relatively rare instances in which the Supreme

Court has concluded that, contrary to the well-established tenet, actual knowledge of the law's requirements is a precondition to criminal liability (and, therefore, ignorance of the law will excuse the defendant). *See id.* at 228–29, 78 S.Ct. 240. Specifically, the *Lambert* Court held that a law which imposed strict liability upon convicted felons for mere presence in a municipality was constitutionally infirm because, without forewarning, it punished conduct that a reasonable person ordinarily would not consider to be criminal. *See id.; see also United States v. Freed,* 401 U.S. 601, 608, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (explaining *Lambert* and noting that "[b]eing in Los Angeles is not per se blameworthy").

A significant problem with this aspect of the appellant's argument is that the Court has steadfastly resisted efforts to extend *Lambert* 's reach, *see, e.g., id.* at 609, 91 S.Ct. 1112 (declining to extend *Lambert* to possession of hand grenades), and has gone so far as to suggest that the *Lambert* dissent correctly characterized the majority opinion as "an isolated deviation from the strong current of precedents—a derelict on the waters of the law." *Texaco, Inc. v. Short,* 454 U.S. 516, 537 n. 33, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). Thus, any attempt to introduce *Lambert* into **\*226** new environs must be viewed with great circumspection.[5]

Meade nevertheless tries to bring his case within the *Lambert* exception by arguing that firearms possession is an act sufficiently innocent that no one could be expected to know that he would violate the law merely by possessing a gun. As *Staples v. United States,* 511 U.S. 600, 610–12, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), makes clear, firearms possession, without more, is not a kind of activity comparable to possession of hand grenades, *see Freed,* 401 U.S. at 609, 91 S.Ct. 1112, narcotics, *see United States v. Balint,* 258 U.S. 250, 253–54, 42 S.Ct. 301, 66 L.Ed. 604 (1922), or child pornography, *see United States v. Robinson,* 137 F.3d 652, 654 (1st Cir.1998). But possession of firearms by persons laboring under the yoke of anti-harassment or anti-stalking restraining orders is a horse of a different hue. The dangerous propensities of persons with a history of domestic abuse are no secret, and the possibility of tragic encounters has been too often realized. We think it follows that a person who is subject to such an order would not be sanguine about the legal consequences of possessing a firearm, let alone of being apprehended with a handgun in the immediate vicinity of his spouse. *Accord United States v. Bostic,* 168 F.3d 718, 722–23 (4th Cir.1999); *Wilson,* 159 F.3d at 288–89; *cf. Tart v. Massachusetts,* 949 F.2d 490, 503 (1st Cir.1991) (rejecting a *Lambert* challenge to a state commercial fishing permit requirement).

AR005089

U.S. v. Meade, 175 F.3d 215 (1999)

In short, we do not believe that the prohibition of section 922(g)(8) involves conduct and circumstances so presumptively innocent as to fall within the narrow confines of the *Lambert* exception. We therefore reject the appellant's contention that the statute, on its face, violates due process rights of notice.

issue here—18 U.S.C. § 922(g)(9)—is by no means a model of draftsmanship, but the appellant's gloss upon it cannot be sustained by any reasonable method of statutory interpretation. The second statute, 18 U.S.C. § 922(g)(8), easily withstands the appellant's multifarious constitutional attacks.

*Affirmed.*

**All Citations**

175 F.3d 215

### V

We need go no further. The first of the firearms statutes at

### Footnotes

1   In his effort to convince us to sanction a categorical approach, Meade uses scare tactics. He proclaims, with appropriate rhetorical flourishes, that, unless relationship status is deemed a part of the formal definition of the predicate offense, factfinding will be a "nightmare." This shark has no teeth. Federal criminal trials typically involve proof and differential factfinding, and the issue of relationship status is by no means outside a jury's competence.

2   In concluding here that stipulation to an element functions as a waiver of legal defenses, we express no opinion on whether the government's duty to prove each element of a crime beyond a reasonable doubt is diluted impermissibly if the jury instructions do not submit the stipulation for the jury's consideration. This thorny question has divided the courts of appeals, *compare Muse,* 83 F.3d at 679–80 (holding that the district court may not remove a stipulated element from the jury's consideration), and *United States v. James,* 987 F.2d 648, 650–51 (9th Cir.1993) (similar) *with United States v. Mason,* 85 F.3d 471, 472–73 (10th Cir.1996) (holding that the right to have the jury decide each element is waived when the defendant enters into a stipulation), but it is not raised in the instant case.

3   The statute provides, in pertinent part, that—
    The statute provides that it shall be unlawful for any person—
    * * *
    (8) who is subject to a court order that—
    (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
    (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person ..., or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury ...; and
    (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner ...; or
    (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner ... that would reasonably be expected to cause bodily injury;
    * * *
    to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

4   We note in passing that irony is no stranger to the law: Meade, after arguing that section 922(g)(8) infracts the Tenth Amendment, now posits that it is unconstitutional because it does not require state judges fully to include federal law ramifications in their restraining orders in domestic proceedings.

5   For the sake of completeness, we note that although *Lambert* has, in effect, been limited to its rather distinctive facts, the Court at times has reached a similar result by means of statutory interpretation (as opposed to due process). *See, e.g., Ratzlaf v. United States,* 510 U.S. 135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Cheek v. United States,* 498 U.S. 192, 200–01, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In this case, however, such a route is unavailable to the appellant; it simply does not appear plausible that Congress intended section 922(g)(8) to carry a mens rea requirement of actual knowledge of the law. Indeed, the Court recently reaffirmed its hoary understanding that where,

AR005090

as here, Congress employs a "knowing" standard of culpability, *see* 18 U.S.C. § 924(a)(2), such a word choice normally signifies that the government needs to prove only that the defendant knew of the facts comprising the offense, and nothing more. *See Bryan v. United States,* 524 U.S. 184, 118 S.Ct. 1939, 1945–46, 141 L.Ed.2d 197 (1998).

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

986 F.Supp. 66
United States District Court, D. Massachusetts.

UNITED STATES of America
v.
Christopher MEADE.

No. CRIM. 97–10185–EFH.
|
Dec. 17, 1997.

## Synopsis

Defendant moved to dismiss charge of possession of a firearm by one who has prior misdemeanor conviction for domestic violence, on ground that his past conviction for assault and battery under Massachusetts law did not qualify as misdemeanor crime of domestic violence and that statute prohibiting such possession violated ex post facto clause of the Federal Constitution. The District Court, Harrington, J., held that: (1) federal statute defining "misdemeanor crime of domestic violence," for purposes of statute prohibiting person convicted of such crime from possessing firearms, does not require predicate offense to have domestic relationship element, and (2) statute prohibiting possession of firearm by one who has prior misdemeanor conviction for domestic violence does not violate ex post facto clause of Federal Constitution.

Motion denied.

## Attorneys and Law Firms

**\*66** Marriane C. Hinkle, U.S. Attorney's Office, Boston, MA, for Plaintiff.

Leo Sorokin, Public Defender Office, Boston, MA, for Defendant.

## **\*67** *MEMORANDUM AND ORDER*

HARRINGTON, District Judge.

This matter is before the Court on Defendant's Motion to Dismiss. Defendant has been indicted in Count I with possession of a firearm by one who has a prior misdemeanor conviction for domestic violence under 18 U.S.C. § 922(g)(9). The defendant filed a motion to dismiss Count I on the ground that his past conviction for assault and battery under Massachusetts General Laws ch. 265, § 13 does not qualify as a misdemeanor crime of domestic violence because the state statute does not require a familial relationship between the parties as an element of the state crime. Defendant also argues that Section 922(g)(9) increased punishment for the defendant's prior misdemeanor conviction in violation of the *Ex Post Facto* Clause of the U.S. Constitution. Upon consideration of the motion, the opposition, and the statutory language, the Court concludes that for the reasons stated herein the motion is denied.

The indictment stems from an incident on May 15, 1997, when the Lynn police, responding to a 911 call, arrested the defendant in possession of a handgun in front of his wife's home. At the time of his arrest the defendant was subject to a Mass.Gen.L. ch. 209A restraining order with a "no contact" provision with his wife. He was charged with various state offenses arising out of this arrest. Two months later, the state charges against the defendant were dismissed and he was indicted in federal court under Section 922(g)(9). At the time of the defendant's May 15, 1997 arrest, he had a prior misdemeanor conviction for assault and battery upon his wife in 1994 in the Dorchester District Court. The certified copy of the defendant's conviction lists the crime as "family abuse-assault and battery."

*Discussion*

Congress enacted the Omnibus Consolidated Appropriations Act of 1997, which amended the Gun Control Act of 1967, to add "misdemeanor crime of domestic violence" to the list of prohibited categories of persons possessing firearms. The amendment is codified at 18 U.S.C. § 922(g)(9). Count I charges the defendant with violating 18 U.S.C. § 922(g)(9) which states in part:

> It shall be unlawful for any person ... who has been convicted in any court of a misdemeanor crime of domestic violence, ... to ship or transport in interstate or foreign commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Section 921(a)(33) defines "misdemeanor crime of domestic violence" as an offense that is a misdemeanor under federal or state law that has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

I. *Statutory Interpretation of Section 921(a)(33)*
The defendant argues that the predicate offense for Section 921(a)(33) must have both an element of use of force and an element of a domestic relationship. Therefore, defendant contends that Mass.Gen.L. ch. 265, § 13 cannot constitute a predicate offense of a "misdemeanor crime of domestic violence" because it does not require proof of a domestic relationship between the defendant and the victim. The government contends that Congress set out two separate requirements for the predicate misdemeanor and introduced only the "use of force" requirement with the words "has, as an element."

 The proper construction of Section 921(a)(33) is a question of first impression in this Circuit. We start—as all statutory construction must start—by looking at the language of the law, in this case 18 U.S.C. § 921(a)(33). *United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.1987). As a general rule, the plain meaning of a statute controls. *Robinson v. Shell Oil Co.,* 519 U.S. 337, ——, 117 S.Ct. 843, 847, 136 L.Ed.2d 808 (1997). When a statute is ambiguous, however, the court may look to **\*68** legislative history to resolve the ambiguity. *United States v. Gonzales,* 520 U.S. 1, ——, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997). Thus, the first step for this Court is to determine whether Section 921(a)(33) is ambiguous. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Robinson,* 519 U.S. at ——, 117 S.Ct. at 847. In this case consideration of these factors leads the Court to conclude that the phrase "has, as an element" is not ambiguous as to whether it applies to one or both requirements.

 Both parties agree that Section 921(a)(33) requires the government to show that a predicate offense was committed with the use or attempted use of force, and that the offense

involved a familial relationship between the defendant and the victim. The crux of the matter is whether the phrase "as an element" modifies both requirements or just the use of force requirement. The inclusion of both the use of force and domestic relationship requirements in one sentence does not mandate that they be treated as one element. In drafting the statute Congress placed the singular word "element" immediately before the use of force requirement. In choosing the singular word "element," Congress intended to modify only the language immediately following the phrase. If Congress had intended that both requirements be mandatory elements of the underlying state statute the word "element" would have been in the plural to encompass both requirements. Reading the phrase "has, as an element" in its ordinary plain meaning, it is clear the singular "element" modifies only the use of force requirement.

To date there is only one published decision, *United States v. Smith,* 964 F.Supp. 286 (N.D.Iowa 1997), construing this provision in a criminal case. Similar to this Court's reasoning, the court in *Smith* found the use of the singular "has, as an element" modified only the use of force requirement. *Id.* at 290–92. The *Smith* court also found it persuasive that the identical "has, as an element" language appears in other statutes defining "crime of violence" and "violent felony" and, in both, modifies only the use of force requirement. *Id.* at 292. Thus, Congress' use of language nearly identical to other statutes where the "as an element" language modifies only the use of force requirement supports this Court's conclusion that the plain language of Section 921(a)(33) does not require the predicate offense to have a domestic relationship element. *Id.*

Given the straightforward statutory command, there is no reason to resort to legislative history. *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Even if the statute were ambiguous, the legislative history of Section 921(a)(33) would lead the Court to the same conclusion. The statements in the legislative record demonstrate that the intent of the amendment was to expand the categories of individuals barred from possessing firearms to include anyone convicted of abusing a family member. In contrast, the defendant's interpretation would limit application of the amendment only to those states which have specific state statutes criminalizing domestic violence.

The amendment was proposed to remedy the disparate treatment between those convicted of a felony involving domestic assault and those convicted of a misdemeanor involving domestic assault. The sponsor of the legislation,

Senator Lautenberg, stated that "This amendment would close this dangerous loophole and keep guns away from violent individuals who threaten their own families." 142 Cong. Rec. S10377–01. Similarly, Senator Feinstein of California stated: "This amendment looks to the type of crime, rather than the classification of the conviction. Anyone convicted of a domestic violence offense would be prohibited from possessing a firearm." 142 Cong. Rec. S10379–01. In addition, Senator Dodd of Connecticut stated that the amendment would "prevent anyone convicted of any kind of domestic violence from owning a gun." 142 Cong. Rec. S12341–01.

Moreover, Senator Lautenberg's statements make clear that the phrase "has, as an element" relates to state crimes that involve an element of force. The legislative history **\*69** reveals that "has, as an element, the use or attempted use of physical force, or threatened use of a deadly weapon" was added to the statute shortly before passage. In explaining the addition, Senator Lautenberg, stated:

> the ban applies to crimes that have, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon. This is an improvement over the earlier version, which did not explicitly include within the ban crimes involving an attempt to use force, or the threatened use of a weapon, if such an attempt or threat did not also involve actual physical violence.

142 Cong. Rec. S11872–01. Therefore, Senator Lautenberg did not intend that the language "as an element" would apply to the domestic relationship requirement.

## II. *Violation of Ex Post Facto Clause of the Constitution*

The defendant argues that 18 U.S.C. § 922(g)(9) increases his punishment for his predicate state conviction and is, therefore, an *ex post facto* law. A criminal or penal law is *ex post facto* if it is retrospective and it disadvantages the offender affected by it. *See* U.S. Const., art. I, § 9, cl. 3. The U.S. Supreme Court recently stated that to fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment and it must disadvantage the

offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime. *Lynce v. Mathis,* 519 U.S. 433, ——, 117 S.Ct. 891, 896, 137 L.Ed.2d 63 (1997). Defendant's claim that Section 922(g)(9) violates the *Ex Post Facto* Clause fails because the statute does not add punishment for the predicate offense, but rather penalizes the defendant's possession of a firearm after the effective date of the statute.

Courts have determined that Congress intended statutes prohibiting persons from possessing firearms to reach persons convicted of offenses committed prior to the effective date of the statute. *See United States v. Brady,* 26 F.3d 282 (2nd Cir.), *cert. denied,* 513 U.S. 894, 115 S.Ct. 246, 130 L.Ed.2d 168 (1994); *United States v. Jordan,* 870 F.2d 1310, 1315 (7th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); *United States v. Matassini,* 565 F.2d 1297, 1307 (5th Cir.1978). The Court of Appeals for the Second Circuit's decision in *Brady* is instructive for its *ex post facto* analysis. In *Brady* the Second Circuit addressed an *ex post facto* challenge to Section 922(g)(1) whereby a defendant argued that his 1951 felony conviction could not serve as an element of the offense prohibited by that section of the gun control laws. In rejecting defendant's challenge, the Court of Appeals for the Second Circuit held that, regardless of the date of the defendant's prior conviction, the crime of being a felon in possession of a firearm was not committed until after the effective date of the statute. *Brady,* 26 F.3d at 285. In *National Ass'n of Government Employees v. Barrett,* 968 F.Supp. 1564, 1575–76 (N.D.Ga.1997), the district court applied the reasoning of *Brady* to hold that Section 922(g)(9) does not criminalize conduct that occurred prior to its effective date and, thus, did not violate the *Ex Post Facto* Clause.

The Court follows this reasoning, and holds that Section 922(g)(9) penalizes the possession of the firearm after the date of enactment of the statute and does not therefore constitute a violation of the *Ex Post Facto* Clause. Defendant violated Section 922(g)(9) on May 15, 1997, after the law became effective. Regardless of the date of defendant's prior conviction, the crime of being in possession of a firearm, after a prior conviction of a misdemeanor crime of domestic violence, was not committed until after the effective date of the statute for which he was charged in Count I. Therefore, the *Ex Post Facto* Clause was not violated by the use of the 1994 conviction as a predicate for violation of Section 922(g)(9).

The defendant also argues that this construction of the statute raises substantial due process and notice concerns. There is

no dispute that the defendant was in a domestic relationship with the victim in the 1994 misdemeanor for assault and battery. The victim of the crime was the defendant's wife at **\*70** the time of the crime, and they are still presently married. The application for the complaint filed in the 1994 case named the defendant's wife as victim and the defendant's 1994 conviction lists the crime charged as "family abuse-assault and battery." Therefore, the Court does not need to address whether a due process concern may be presented when a genuine issue of dispute exists regarding a domestic relationship.

*Conclusion*

In sum, Mass.Gen.L. ch. 265, § 13 can constitute a "misdemeanor crime of domestic violence" as defined in Section 921(a)(33) because the plain language of Section 921(a)(33) does not require the predicate offense to have a domestic relationship element. Additionally, Section 922(g)(9) does not constitute a violation of the *Ex Post Facto* Clause. Thus, defendant's motion for dismissal on these grounds is denied.

SO ORDERED.

**All Citations**

986 F.Supp. 66

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

175 F.2d 215
United States Court of Appeals Third Circuit.

MARSHALL

v.

COLGATE-PALMOLIVE-PEET CO.

No. 9700.
|
Argued Jan. 6, 1949.
|
Decided June 2, 1949.
|
Rehearing Denied June 21, 1949.

### Synopsis

Appeal from the United States District Court for the District of Delaware; Paul Leahy, Judge.

Action by Donald E. Marshall against the Colgate-Palmolive-Peet Company for the declaratory judgment as to rights in inventions and for damages, wherein defendant filed a counterclaim. Judgment for defendant, 76 F.Supp. 378, and plaintiff appeals.

Affirmed.

### Attorneys and Law Firms

**\*216** Newton A. Burgess, New York City (Howard Duane, Wilmington, Del., on the brief), for appellant.

Benjamin B. Schneider, Chicago, Ill. (Hugh M. Morris and Alexander L. Nichols, Wilmington, Del., and Max Dressler, Chicago, Ill., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.

### Opinion

KALODNER, Circuit Judge.

The ultimate question in this litigation is, who is the owner of the three inventions involved,[1] the employee-inventor or the employer? Since his former employer asserted claims of ownership against these inventions, and since these claims interfered with his business interests, the plaintiff brought this suit pursuant to 28 U.S.C.A. § 400,[2] to disperse the cloud

upon his title; he also joined a claim for damages for alleged harmful conduct on the part of the defendant. The defendant filed a counterclaim praying that plaintiff be required to assign the inventions to it. The case was heard in the court below without a jury and, upon findings of fact and conclusions of law, the learned District Judge determined that title belonged to the defendant; in view of that result, the allegations of harmful conduct were dismissed. D.C., 76 F.Supp. 378.

The issues on this appeal are whether the facts were properly found, and whether the law was properly interpreted and applied in the court below.

A patent is property, title to which passes from the inventor only by assignment, and an agreement to assign will be **\*217** specifically enforced. As between employer and employee, rights are determined upon the contract of employment. United States v. Dubilier Condenser Corp., 1933,289 U.S. 178, 187, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488. In this case, the operative facts occurred in the State of New Jersey. Apparently that is where the plaintiff was hired; that is where he worked and where the three inventions in controversy were made. To clear away any conflict of laws question, we note that New Jersey would apply the law as set out in the federal cases. Eustis Manuf'g Co., Inc., v. Eustis, 1893, 51 N.J.Eq. 565, 27 A. 439; see F. F. Drew & Co., Inc., v. Reinhard, 2d Cir., 1948, 170 F.2d 679.

The law is fairly clear. It is recapitulated in Section 397 of the A.L.I. Restatement of the Law of Agency, and the Comments thereto. Absent a contrary understanding, the mere existence of an employer-employee relationship does not entitle the employer to ownership of an invention of the employee. This is true even though the employee uses the time and facilities of the employer, although the latter in that event may have 'shop rights' therein, that is, the right to a free, non-exclusive, personal license to use the invention in his business. Solomons v. United States, 1890, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Gill v. United States, 1896, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480; United States v. Dubilier Condenser Corp., supra. On the other hand, if the employee is hired to invent,[3] or is assigned the duty of devoting his efforts to a particular problem, the resulting invention belongs to the employer. Standard Parts Co. v. Peck, 1924, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033; Houghton v. United States, 4th Cir., 1928, 23 F.2d 386, certiorari denied 277 U.S. 592, 48 S.Ct. 528, 72 L.Ed. 1004; E. F. Drew & Co., Inc., v. Reinhard, supra.

81 U.S.P.Q. 517

The District Court, in this case, applied the principles which we have reiterated. We think the decision reached followed upon the findings that (1) that was a custom or practice for employees of the defendant to assign inventions to it; (2) plaintiff not only knew of this practice, but acquiesced in it, complied with it in every instance except with respect to the three inventions here involved, enforced it generally in his position as head of a department of the defendant, and even enforced it with respect to subordinates working on one of the inventions in dispute; (3) the problems covered by the inventions were assigned to the plaintiff; (4) the inventions were made during the plaintiff's period of employment, and the plaintiff used defendant's facilities; and (5) the plaintiff, throughout, indicated that the work he was doing was for the benefit of the defendant, and that inventions would be assigned.

The plaintiff does not agree with the findings, but we do not think it would prove gainful to repeat at length the evidence in the case. It is sufficient to say that on important issues, testimony of the plaintiff was contradicted by testimony of officers and employees of defendant. There was also a good deal of documentary evidence, some of it subject to interpretation by the parties and some of it too clear to admit of dispute. The underlying issue, to a large extent, was that of credibility, of which the trier of fact is the best judge. The evidence which the learned District Judge believed supports his conclusion that the problems which involved the inventions in controversy were assigned to the plaintiff, and that the plaintiff considered them to have been assigned to him. The evidence further supports the conclusion that during his employment the plaintiff was primarily concerned with the matter of co-inventors, rather than with title to inventions, and that he assumed inventions, as a matter of course, would

be assigned. Thus, in his letter of February 1, 1944, he wrote, 'Personally, I am convinced that the only recourse I can follow under the policies of the Patent Division is to arrange to file an application on the idea before I disclose it to my subordinates. I mean, of course, file it through our patent division and assign it to the company.' [4]

We conclude that the court below **\*218** did not commit such clear error as would entitle us to upset the decisive factual findings. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394-395, 68 S.Ct. 525, 92 L.Ed. 746. Nor was error committed in the application of the law to those findings. Houghton v. United States, supra.

For the reasons stated, the judgment of the District Court will be affirmed.

1    A 'combination bar' of soap and detergent, set forth in application Serial No. 534,182, filed May 5, 1944, as a continuation-in-part of application Serial No. 462,513, filed October 19, 1942; a 'milled floating soap,' set forth in application Serial No. 591,553, filed May 2, 1945; and 'spraying on fluidized particles,' set forth in application Serial No. 587,404, filed April 9, 1945.

2    Sections 2201 and 2202, revised Title 28 U.S.C.A.

3    Cf. Hapgood v. Hewitt, 1886, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369; Dalzell v. Dueber Watch Case Mfg. Co., 1893, 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749.

4    Plaintiff's Exhibit No. 6; Finding of Fact No. 40.

**All Citations**

175 F.2d 215, 81 U.S.P.Q. 517

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

26 F.3d 282
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,

v.

Richard Alan BRADY, Frank Pontillo, also
known as Franky Steel, Robert Montano, Michael
DeMatteo and John Pate, Defendants–Appellants.

Nos. 590, 613, 760, 762, 842, Dockets 93–
1215, 93–1220, 93–1251, 93–1252, 93–1618.

|

Argued March 7, 1994.

|

Decided May 13, 1994.

## Synopsis

Following jury trial before the United States District Court for the Eastern District of New York, Israel Leo Glasser, J., defendants were convicted of various offenses, including conspiracy to murder to enhance their positions within criminal enterprise under Racketeer Influenced and Corrupt Organizations (RICO) Act. Defendants appealed. The Court of Appeals, Parker, District Judge, sitting by designation, held that: (1) evidence concerning murders that occurred during war between rival factions of organized crime family, but did not involve any of defendants, was properly admitted; (2) associate of crime family who was not "made member" of family could be convicted of conspiring to murder to maintain or increase his position within family; and (3) ex post facto clause was not violated by use of 1951 felony conviction as predicate for conviction of felon in possession of firearm.

Affirmed.

## Attorneys and Law Firms

**\*284** Michael G. Considine, Asst. U.S. Atty., E.D. of N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., E.D. of N.Y., David C. James and Valerie Caproni, Asst. U.S. Attys., E.D. of N.Y., of counsel), for appellee.

William M. Kunstler, Kunstler & Kuby, New York City, for defendant-appellant Richard Alan Brady.

Barbara L. Hartung, New York City, for defendant-appellant Frank Pontillo.

Christine E. Yaris, New York City (Joel Cohen, of counsel), for defendant-appellant Robert Montano.

Paul Greenfield, Crupain & Greenfield, New York City, for defendant-appellant Michael DeMatteo.

Before: CARDAMONE, MINER, Circuit Judges, and PARKER, Chief District Judge. [*]

[*]      The Honorable Fred I. Parker, Chief District Judge, United States District Court for the District of Vermont, sitting by designation.

## Opinion

PARKER, Chief District Judge:

The defendants-appellants appeal from judgments of conviction entered on March 23, 1993 in the United States District Court for the Eastern District of New York, following a three-week jury trial before the Honorable I. Leo Glasser. All defendants-appellants were convicted on a six-count superseding indictment charging them with participating in a conspiracy to commit murder for the purpose of increasing their positions within a criminal enterprise in violation of 18 U.S.C. § 1959(a)(5) and with using and carrying firearms during the course of a crime of violence in violation of 18 U.S.C. § 924(c). Defendants-appellants Brady and Pontillo were also charged with and convicted of participating in a conspiracy to collect unlawful debts in violation of 18 U.S.C. § 1962, and defendant-appellant DeMatteo was convicted of unlawfully possessing a firearm as a felon in violation of 18 U.S.C. § 922(g). On appeal, the defendants-appellants [1] challenge their convictions claiming that the evidence was insufficient to support their convictions under the statutes charged, that certain evidentiary rulings were improper and unduly prejudicial, and that the trial court committed other miscellaneous errors. For the reasons stated below, we affirm the convictions.

[1]      Although John Pate originally filed notice of appeal, he subsequently withdrew his appeal and is no longer a party to this action.

## I. BACKGROUND

The charges in this case arise from an internal war between opposing factions of the Colombo Crime Family of La Cosa Nostra. The Boss of the Colombo Crime Family, Carmine Persico, was imprisoned in 1986. Some time after his

imprisonment, Persico appointed Victor Orena to administer the affairs of the Family and to assume the position of "acting boss" of the Family. By June of 1991, it became clear that Orena desired to change his status to "actual" rather than "acting" boss. A violent war erupted between those loyal to Orena, and those loyal to the imprisoned Persico. *See United States v. Scopo,* 19 F.3d 777, 779 (2d Cir.1994); *United States v. Amato,* 15 F.3d 230, 233 (2d Cir.1994); *United States v. Orena,* 986 F.2d 628, 629 (2d Cir.1993). Three weeks after the war began, a truce was declared as a result of a meeting with other families of La Cosa Nostra. The war began again, however, on November 18, 1991, when someone from the Orena faction shot at Greg Scarpa, an acting captain in the Persico faction.

The superseding indictment in this case alleged that this war was waged to establish control of the Family. Each faction formed armed "hit teams" to monitor the movements of the other faction and to attempt to kill its members. The appellants are members of **\*285** the Persico faction whom (along with other Persico faction members)[2] the government charged with conspiracy to murder Orena faction members for the purpose of maintaining or increasing their positions in the Colombo Family of La Cosa Nostra, in violation of 18 U.S.C. § 1959(a)(5). The government also charged appellants under 18 U.S.C. § 924(c)(1) with using and carrying firearms during and relation to a crime of violence—the murder conspiracy in this case. Appellant DeMatteo was also charged with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Appellants Brady and Pontillo were also charged with conspiracy to collect unlawful debts in violation of 18 U.S.C. § 1962(d). At trial, the government's evidence included testimony by F.B.I. Special Agent George Gabriel, court-authorized tape recordings, and the testimony of three cooperating co-conspirators—Joseph Ambrosino, Carmine Imbriale, and Alan Quattrache.

[2]     Appellants Robert Montano, Richard Alan Brady, Michael DeMatteo, John Pate and Frank Pontillo were co-defendants in the trial before Judge Glasser. Prior to the trial, five other co-defendants—Robert Donofrio, Joseph Legrano, Lawrence Micciolo, Joseph Sangiorgio, and Anthony Sayeh—pled guilty.

Gabriel testified as an expert about the structure of organized crime, and specifically the structure of La Cosa Nostra in New York. La Cosa Nostra is made up of five families, each headed by a boss. The family administration includes the boss, an underboss who advises the boss and acts as interim boss if the boss is incapacitated temporarily, and a consiglieri, who advises lower ranking family members and mediates disputes between them. Under the administration are captains or capos who head crews of soldiers or made men. Associates are often affiliated with made members. They include, either individuals aspiring to become members of the family or individuals committing crimes under the auspices of the family who are ineligible for membership because they lack Italian lineage. Noncriminal association with family members is insufficient to make one an "associate."

The cooperating witnesses' testimony detailed various conspiracies and unsuccessful attempts by Persico loyalists to murder Orena faction supporters. Ambrosino, Imbriale and Quattrache testified from personal experience about the internal war waged within the Colombo Family and other illegal activities that occurred during the war.[3] Their testimony revealed the appellants' involvement in various murder plots, particularly the April 1992 attempt to murder Louis "Bo–Bo" Malpeso, a "made member" of the Orena faction. Although he missed, Pontillo actually shot at Malpeso. The cooperating witnesses also linked these appellants to a murder plot against William "Wild Bill" Cutolo. In all, the cooperating witnesses detailed attempts to locate and murder at least seventeen different individuals.[4] The named defendants in this case were involved in some, but not all, of the murder plots.

[3]     Ambrosino and Imbriale were both "associates" aligned with the Persico faction of the Colombo Family. Quattrache was a "made member" of the Family.

[4]     Joseph Amato, Pasquale "Patty" Amato, Joseph Campanella, William "Wild Bill" Cutolo, Alfonse "Funzi D" D'Ambrosio, Vincent "Chickie" DiMartino, Dominick Dionisio, Nicholas "Nicky Black" Grancio, Frank "Frankie Notch" Iannaci, Carmine Imbriale, Louis "Bo–Bo" Malpeso, Victor Orena, Joseph Russo, Gabriel Siana, Joseph Scopo, Frank Sparaco, and Michael Spatero.

The trial also included testimony concerning actual murders that occurred during the course of the war, but were not committed by the named defendants. The cooperating witnesses testified about the murders of four Orena faction members—Nicholas Grancio, Larry Lampese, Vinny Fusaro and John Minerva,[5] as well as the murders of Persico faction members Hank Smurra, "Black Sam" Nastasi, and Steven Mancusi. Ambrosino, Quattrache and F.B.I. Special Agent Christopher Favo all testified that Greg Scarpa, a crew leader associated with the Persico faction, shot Joseph "Joe

Case 2:19-cv-00037-JNP    Document 59-36    Filed 11/30/22    PageID.5568    Page 26 of 52

U.S. v. Brady, 26 F.3d 282 (1994)
40 Fed. R. Evid. Serv. 1102

Waverly" Caccace, an Orena faction member, in the stomach in February of 1992. Ambrosino also testified about the 1989 murder of Anthony Coluccio to which he pled guilty.

<sup>5</sup>  Members of Jo–Jo Russo's crew and Greg Scarpa's crew, both aligned with the Persico faction, committed these murders.

To corroborate the testimony of the three co-conspirator witnesses, the government introduced **\*286** other evidence including address books, hotel records, cellular phones with programmed memories, and bulletproof vests. The government also introduced surveillance testimony of law enforcement officers and evidence seized during searches, including guns and ammunition, as well as a frequency chart and a scanner programmed with police frequencies. The tape-recorded evidence included conversations that occurred in Ambrosino's car. The participants in these conversations, including appellants DeMatteo, Brady, and Pontillo, discussed the war, its casualties and various murder plots against Orena faction members.

After a three-week trial before Judge Glasser in the United States District Court for the Eastern District of New York, a jury convicted the defendants on all counts. Pontillo, Brady, and Montano received sentences of 156 months imprisonment, three years of supervised release, and a $50 assessment for each count of conviction. DeMatteo received a sentence of 157 months of imprisonment, three years of supervised release, and a $50 assessment for each count.

## II. DISCUSSION

Appellants' challenges to their convictions include: (1) Montano and Brady's claim that evidence concerning murders not committed by any defendant was erroneously admitted and violated their due process rights; (2) Pontillo's claim that he was erroneously charged and convicted under 18 U.S.C. § 1959(a)(5) (conspiracy to commit murder in order to maintain or increase his position within the Colombo Family); and (3) DeMatteo's claim that his conviction for being a felon in possession of a firearm violates the Ex Post Facto clause of the United States Constitution. Their contentions are without merit.

### A. Admission of Evidence Concerning Murders

Montano and Brady both claim that the trial judge erred in admitting evidence concerning murders that occurred during the war, but that did not involve any of the defendants in

the present case. <sup>6</sup> A trial court's decision regarding the admissibility of evidence will be overturned only upon a showing of abuse of discretion. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Therefore, Judge Glasser's decision to allow testimony concerning uncharged murders may not be set aside unless there is a showing that he acted irrationally or arbitrarily, or otherwise abused his discretion. *See United States v. Coiro,* 922 F.2d 1008, 1015 (2d Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (citing *United States v. DiTommaso,* 817 F.2d 201, 217 (2d Cir.1987); *United States v. Robinson,* 560 F.2d 507, 514 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978)). The record reveals that Judge Glasser did not abuse his discretion in allowing the government to elicit evidence concerning murders committed by other members and associates of the Colombo Family.

<sup>6</sup>  Stated simply, the appellants complain that evidence of murders was admitted in a case in which there were "no murders." As counsel maintained throughout the trial, the defendants were the gang who couldn't shoot straight. Indeed, the evidence at trial showed that the defendants were not very adept at their attempts to murder Orena faction members. The murder plots consisted of a lot of talk and planning that did not materialize into action other than foiled attempts to locate potential victims and one shot that missed its mark. Nevertheless, substantial evidence demonstrated that the murder plots did exist and the defendants took steps, although ultimately unsuccessful, to accomplish their goals. *See United States v. Rosa,* 17 F.3d 1531, 1543 (2d Cir.1994) (conviction for conspiracy does not depend on the actual achievement of the conspirators' goal).

Appellants first argue that Judge Glasser erroneously admitted the evidence of actual murders as "other crimes" evidence pursuant to Fed.R.Evid. 404(b). Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." In the context of Rule 404(b), "similar act evidence is relevant only if the jury can reasonably conclude ... that *the defendant was the actor.*" *Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988) (emphasis **\*287** added); *see also United States v. Cardall,* 885 F.2d 656, 671 (10th Cir.1989); *United States v. Diaz,* 878 F.2d 608, 616 (2d Cir.) (proof of acts by co-conspirators in conspiracy case is admissible and does not raise 404(b) question), *cert. denied,* 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989).

40 Fed. R. Evid. Serv. 1102

Neither Montano, Brady nor their co-defendants committed any of the murders testified about at their trial. The record contains no indication that the government ever attempted to make such an implication, nor that the court permitted it to be made. Further, the evidence was never offered pursuant to Rule 404(b). Therefore, Rule 404(b) is inapplicable to the evidence presented in this case. The appellants' Rule 404(b) argument fails.

Appellants further argue that the evidence of murders was irrelevant and not probative of the crimes charged in the indictment. Evidence is probative if it tends to prove or actually does prove a proposition. *United States v. Jamil,* 707 F.2d 638, 642 (2d Cir.1983). The defendants were charged under 18 U.S.C. § 1959(a)(5), with having knowingly and intentionally conspired together with others to commit murders, for the purpose of maintaining and increasing their positions in the Colombo Family, an enterprise engaged in racketeering activity as defined in Title 18, United States Code, Section 1959(b)(1). The evidence of murders was direct proof of a disputed fact regarding the conspiracy charged, namely, the existence of a "violent internal war in the Colombo Family." [7] As Judge Glasser explained at least twice during discussions with counsel concerning objections to the challenged testimony, proof of the murders was admissible to prove the government's allegation that there was an internal war that was part and parcel of the charged conspiracy. Such evidence was also relevant to demonstrate the existence of the RICO enterprise and the charged conspiracy by members of the Persico faction to kill members of the Orena faction. This court has held that proof of crimes committed by other individuals in a RICO conspiracy is relevant to show the existence and nature of the enterprise. *United States v. DiNome,* 954 F.2d 839, 843–44 (2d Cir.), *cert. denied,* 506 U.S. 830, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992); *see also Coiro,* 922 F.2d at 1015–16 (evidence of narcotics dealing by someone other than defendant was admissible to prove enterprise and to inform the jury of the background of the charged conspiracy). Such a determination of relevance cannot be said to be arbitrary or irrational.

[7]    Montano's counsel maintained at oral argument that she had no recollection that the defense ever said that there was no intrafamily war. On the contrary, the record reveals that a consistent defense theory pursued by all defendants at trial was to argue that the war did not exist. At trial, Pate's attorney stated that the war was a "figment of someone's imagination" and that the conspiracies were all "hype" and "nonsense." Pontillo's

counsel referred to the "so-called war" and "so-called hit attempts." Montano's counsel at trial asserted that two of the cooperating witnesses "set the whole thing up." Accordingly, the existence of the war was a disputed fact.

Appellants contend that the evidence of murders was so prejudicial as to deny them a fair trial. Pursuant to Fed.R.Evid. 403, they argue that the prejudicial effect of the challenged evidence substantially outweighed its "non-existent" probative value. [8] Rule 403 allows the exclusion of evidence where its "probative value is substantially outweighed by the danger of unfair prejudice." In the context of Rule 403, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee Notes, Fed.R.Evid. 403. A trial judge is not required to mechanically recite his analysis of the admissibility of the evidence under Rule 403. *United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir.1992) (citing *United States v. Sliker,* 751 F.2d 477, 487 (2d Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985)).

[8]    As stated above, we find that the challenged evidence was indeed highly probative of the crimes charged.

The record indicates that the trial court carefully considered the potential prejudice that could be caused by the introduction of evidence concerning murders. Although Judge Glasser only explicitly addressed **\*288** the potential prejudice of the challenged evidence once during the trial, [9] in deciding to admit evidence of actual murders at other points in the trial, he was aware of the defendants' claims of prejudice. Because the existence of the war was crucial to the government's proof and there was no suggestion that the defendants committed any of the murders at issue, we find that the evidence was not unduly prejudicial and was properly admitted. *See United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir.1991) (despite prejudicial impact, evidence of gruesome murders committed by non-defendants prior to defendant's association with group was admissible as probative of existence of charged enterprise and to show background of charges).

[9]    The government indicated that it wanted to elicit a full list of the war casualties from Agent Favo. Judge Glasser denied the request, stating, "I don't see any purpose for that, except the obvious purpose, and I think it would be prejudicial and really have no probative value." Accordingly, Judge Glasser limited the government to

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

asking specific questions concerning four incidents about which previous witnesses had testified.

Finally, the trial court did not apply incorrect reasoning in admitting testimony concerning actual murders. Judge Glasser twice expressed the view that "for the purpose of attempting to prove a conspiracy to commit a crime you can prove the crime, to establish that in fact there was an agreement." Appellants argue that the murders introduced were not the subject of the conspiracy charged and thus were improperly admitted pursuant to this rule. Appellants contend that the conspiracy charged was a conspiracy to murder twenty specific individuals. On the contrary, the superseding indictment clearly states that the conspiracy was one to murder "members of the Orena faction of the Colombo Family." Thus, any murder of an Orena faction member that was committed by a Persico faction member fits the rule articulated by Judge Glasser. [10] This is true regardless of whether the appellants were actually involved in the specific murders. *See generally Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946) (the scope of a conspiracy includes the acts of all of its members and is not limited to those acts in which any one member personally participated). Members of Scarpa's crew, aligned with the Persico faction, murdered Grancio, Lampese, and Fusaro, all Orena faction members. Members of Russo's crew, also aligned with the Persico faction, murdered Orena faction member Vinny Fusaro. Although none of the named defendants belonged to Scarpa's or Russo's crews, all were supporters of Persico, and thus part of the same conspiracy to murder Orena faction members.

[10]    All of the charged defendants were members of the Persico faction. The government proved at trial that these defendants were members of a conspiracy to kill Orena faction members.

The rule regarding evidence of crimes to prove the existence of an agreement does not apply, however, to the murders of Smurra, Nastasi and Mancusi who were Persico, not Orena, faction members. Even so, in allowing the evidence of actual murders, Judge Glasser did not act irrationally nor arbitrarily. The evidence was relevant to prove the existence of a war, [11] that in turn was essential to prove the existence of the conspiracy. It must be remembered that the appellants were not convicted of having committed these murders, but of having agreed to participate in a conspiracy to commit murders that were a part of the same internal struggle for control of the Family. Therefore, although the murders of Persico members could not be used to show the agreement,

they were relevant to demonstrate the existence of the war, as well as to establish motivation to continue the killings. [12]

[11]    Even though the charged defendants had not successfully killed anyone, people were being killed.

[12]    Contrary to appellants' claims, there was sufficient evidence to support a rational juror's inference that appellants had knowledge of the murders at issue.

Appellants also contend that evidence of Carmine Sessa's murder of Anthony Coluccio should have been excluded because it occurred two years before the war began. They fail to state, however, that the government **\*289** properly elicited the evidence of this murder through Ambrosino's direct testimony regarding the crimes to which he had pled guilty as a part of his cooperation agreement. *See Coonan,* 938 F.2d at 1561 (prosecution can avoid appearance that it was concealing impeachment evidence); *United States v. Cosentino,* 844 F.2d 30, 33 (2d Cir.) (government can develop impeaching material during direct examination to anticipate questions on cross that would give the impression it was concealing a relevant fact), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). Ambrosino had in fact pled guilty to the 1989 murder of Coluccio. Further, defense counsel did not object to the introduction of evidence concerning this murder at trial. In fact, defense counsel extensively explored Ambrosino's role in this murder on Ambrosino's cross-examination and that of Imbriale, and defense counsel emphasized Ambrosino's role in it during closing arguments.

Accordingly, we find that the District Court judge did not err in allowing evidence of actual murders to be elicited during the appellants' trial for conspiracy to commit murder.

*B. Failure to Establish an Essential Element of 18 U.S.C. § 1959*

Pontillo, along with his co-defendants, was charged with conspiring to commit murder in order to maintain and increase his position in the Colombo Family. 18 U.S.C. § 1959(a)(5). On appeal, Pontillo contends that because he was not a "made member" of the Colombo Family, his conviction under that statute should be reversed. [13] His argument is merely semantic and is entirely without merit.

[13]    At the trial, the court denied Pontillo's request that the jury be instructed that membership in a criminal

> enterprise is an essential element of 18 U.S.C. § 1959(a).
> He was convicted by the jury on all counts.

The "position-related motivation requirement" is an important element that must be satisfied to uphold a conviction under § 1959. *See United States v. Locascio,* 6 F.3d 924, 940–42 (2d Cir.1993) (convictions of Gotti and Locascio, Boss and Underboss of the Gambino Family, upheld despite Judge Glasser's occasional omission of language pointing out the motivation requirement of § 1959 during his charge to the jury). This essential element of the statute must be given its plain meaning. *See United States v. Concepcion,* 983 F.2d 369, 380 (2d Cir.1992) (defendant must hold a position in a RICO enterprise and commit an underlying crime of violence with a motive of retaining or enhancing that position). On this appeal, Pontillo challenges the district court's reading of the statute, claiming that only a "made member" of a crime family can hold a "position" in an enterprise under the plain meaning of the statute.

Pontillo points to the language of 18 U.S.C. § 1959(a) that provides in relevant part: "Whoever, ... for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... or conspires so to do, shall be punished...." Although the statute makes it illegal for individuals to commit violent crimes in order to gain entrance into a criminal enterprise, Pontillo was not indicted under that provision of the statute, nor did the jury charge include that portion of the statutory language. [14]

14   The superseding indictment charges him with conspiracy to murder for the purpose of increasing or maintaining his position within the family. Similarly, the court instructed the jury that they must find that

>    the defendant you are considering joined the conspiracy for the purpose of maintaining or increasing his position in the Colombo Organized Crime Family; that is, the enterprise which is charged.
>    In deciding whether it was the purpose of the defendant you are considering to maintain or increase his position in the enterprise—the Colombo Family—give the words "maintain" and "increase" their ordinary everyday meaning. For example, you may consider what position, if any, the defendant held in the enterprise and to what extent, if any, the commission of the crime charged served to maintain or uphold or increase his position in the enterprise.

Pontillo notes that the government's cooperating witnesses testified that he was an "associate" of the Colombo Family and not a "made member." Therefore, he claims, that **\*290** he "was not a member of the Colombo Family nor did he hold any position in the Family." Agent Gabriel testified that an associate is an individual aspiring to become a member or who commits crimes under the protection of the family, but cannot become a member because of lack of Italian lineage. He also testified that individuals who have no interest in conducting criminal activity with the Family are also sometimes observed with organized crime members, but that noncriminal association with Family members is insufficient to make one an "associate."

Pontillo contends that because he was merely an associate, he had no position in the Family and thus was not properly charged or convicted under 18 U.S.C. § 1959. [15] As a "non-member" he claims he had no position within the enterprise to increase or maintain. [16] On the contrary, the testimony of Agent Gabriel and the superseding indictment itself make it clear that associates are considered to be members of the enterprise, even though they are not "made members" of the Family. Agent Gabriel's testimony reveals that associates play a significant role in organized crime operations. His testimony was confirmed by other evidence including the testimony of the cooperating witnesses who recounted significant criminal activity engaged in on behalf of the Family by associates, including Pontillo. Two of the cooperating witnesses, Ambrosino and Imbriale, were themselves associates, rather than made members. The first paragraph of the superseding indictment charges that "The members and associates of the Colombo Organized Family of La Cosa Nostra ("the Colombo Family") constituted an enterprise." Therefore, as an associate of the Colombo Family, Pontillo was a member of the enterprise charged by the government in its indictment. *See Concepcion,* 983 F.2d at 380.

15   Because, according to his theory, he is not a member of the enterprise, he claims he can only be convicted under § 1959 if the government had charged him with and established that he joined the conspiracy in order to gain entrance to the enterprise. He claims that to hold otherwise would contradict the plain language of the statute which clearly reflects an intention to reach both those who act for the purpose of becoming a member of an enterprise, and those who want to improve their positions. His argument essentially is that he was a member of the first category that the statute tried to reach, but he was erroneously charged and tried under

the second category, and thus his conviction should be reversed.

16    He correctly states that he cannot be convicted of acting in order to improve someone else's position in the organization.

The government presented evidence that Pontillo sought to improve his position within the enterprise: to move from associate to made member. Imbriale testified about conversations with Montano and Pontillo concerning the need to stay loyal to Carmine Sessa (*i.e.*, the Persico faction) in order to advance in the Colombo Family. Imbriale told Montano and Pontillo that if they stuck by Carmine, they would be taken care of when the war ended. Similar discussions occurred regarding DeMatteo's motivation for participating in the war, and Brady's eagerness to be "welcomed" into Michael Sessa's crew. Additionally, the reason for engaging in the internal war was to elevate the respective factions to supremacy within the Colombo Family. There was substantial evidence before the jury to support its conclusion that Pontillo, even as an associate, was a member of the enterprise who was participating in the murder conspiracy to improve his position in that organization.

### C. 1951 Felony As Predicate Offense Under 18 U.S.C. § 922(g)

DeMatteo contends that his 1951 felony conviction cannot serve as a predicate for the offense of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). [17] Because amendments to § 922 generally do not have retroactive application, *United States v. Brebner,* 951 F.2d 1017, 1020–22 (9th Cir.1991), he claims that his prior conviction cannot be a predicate offense under the statute. Therefore, he contends that application of the statute to the predicate violation  **\*291**  violates the Ex Post Facto clause of the United States Constitution. *See* U.S. Const., art. I, § 9, cl. 3.

17    Title 18 § 922(g) provides in relevant part:
      (g) It shall be unlawful for any person—
      (1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; ... [to] possess in or affecting commerce, any firearm or ammunition....

 DeMatteo's claim is meritless. A criminal or penal law is ex post facto if it is retrospective and it disadvantages the offender affected by it. *United States v. Alkins,* 925 F.2d 541, 549 (2d Cir.1991). The critical question in evaluating

an ex post facto claim "is whether the law changes the legal consequences of acts completed before its effective date." *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981). A statute does not violate ex post facto principles where it applies to a crime that "began prior to, but continued after" the statute's effective date. *United States v. Alkins,* 925 F.2d 541, 549 (2d Cir.1991) (quoting *United States v. Torres,* 901 F.2d 205, 226 (2d Cir.1990)).

One of the principal aims of the Ex Post Facto clause is to ensure that individuals have fair notice of what conduct is criminally proscribed. *Id.* Courts have determined that Congress intended statutes prohibiting felons from possessing firearms to reach "persons convicted of felonies prior to [the effective date of the statute]." *United States v. Matassini,* 565 F.2d 1297, 1307 (5th Cir.1978) (interpreting 18 U.S.C. § 1202(a)(1), the predecessor to § 922(g)); *see also United States v. Jordan,* 870 F.2d 1310, 1315 (7th Cir.) (although enhancement provisions of § 1202 became effective in 1984, fact that defendants' underlying convictions occurred in 1970 and 1972 does not violate the Ex Post Facto clause), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); *United States v. Sutton,* 521 F.2d 1385, 1390 (7th Cir.1975) (no ex post facto violation where Congress proscribes future activities of persons who have in the past engaged in conduct Congress has the power to proscribe).

 DeMatteo violated section 922(g) long after it became the law. Section 922(g) became effective in 1986. DeMatteo's possession of a gun from which the current conviction arises occurred on June 10, 1992. Regardless of the date of DeMatteo's prior conviction, the crime of being a felon in possession of a firearm was not committed until after the effective date of the statute under which he was convicted. By 1992 DeMatteo had more than adequate notice that it was illegal for him to possess a firearm because of his status as a convicted felon, and he could have conformed his conduct to the requirements of the law. Therefore, the Ex Post Facto clause was not violated by the use of a 1951 felony conviction as a predicate for a violation of § 922(g). [18]

18    Appellant does not contend that his prior felony conviction had been expunged or his civil rights otherwise restored prior to the date he possessed a firearm in 1992. *See generally United States v. Huss,* 7 F.3d 1444 (9th Cir.1993); *United States v. Gillies,* 851 F.2d 492 (1st Cir.), *cert. denied,* 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988).

**U.S. v. Brady, 26 F.3d 282 (1994)**
40 Fed. R. Evid. Serv. 1102

After examining the appellants' other points, we have determined that they are without merit.

III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

**All Citations**

26 F.3d 282, 40 Fed. R. Evid. Serv. 1102

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

851 F.2d 492
United States Court of Appeals,
First Circuit.

UNITED STATES of America, Appellee,

v.

John J. GILLIES, Jr., Defendant, Appellant.

No. 87–1704.
|
July 7, 1988.

## Synopsis

Defendant was convicted after bench trial in the United States District Court for the District of Massachusetts, John J. McNaught, J., of violating federal laws that provide strict punishments for previously convicted felons who possess firearms. Defendant appealed. The Court of Appeals, Breyer, J., held that: (1) phrase "possessed in or affecting commerce, any firearm" in statute providing strict punishments for previously convicted felons who possess firearms covers simple in-state possession of gun that, sometime in past, arrived from out of state; (2) application of statute prohibiting convicted felon from possessing firearm, did not violate Fifth Amendment's ex post facto clause, even if firearm traveled in interstate commerce before effective date of law; and (3) indictment was not fatally vague.

Affirmed.

## Attorneys and Law Firms

**\*493** Barbara A.H. Smith with whom Davis, Robinson & Smith, Boston, Mass., was on brief, for defendant, appellant.

S. Theodore Merritt, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

## Opinion

BREYER, Circuit Judge.

After a "jury-waived" trial, a federal district court judge convicted the appellant, James J. Gillies, Jr., of violating federal laws that provide strict punishments for previously convicted felons who possess firearms. 18 U.S.C. §§ 922(g)(1) (1982 & Supp. IV 1986) (*see* Appendix A); 924(e) (1982 & Supp. IV 1986) (*see* Appendix B). Gillies, in this appeal, makes several, rather technical, arguments: that his conduct falls outside the letter of the statute; that the indictment was defective; that the government failed to prove three prior convictions. We have found these arguments unconvincing.

1. Gillies claims that the relevant substantive statutory language does not cover his conduct. The statute, in relevant part, makes it:

*unlawful for any person—*

(1) *who has been convicted* ... of a crime punishable by imprisonment for a term exceeding one year;

————————

to ship or transport in interstate or foreign commerce, any firearm or ammunition; or *to possess in or affecting commerce, any firearm* or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

§ 922(g) (emphasis added). The evidence showed that Gillies, on December 23, 1986, possessed, in Massachusetts, a gun that, in 1977, had traveled from Brazil to Florida. Gillies says that this evidence does not show that he "possess[ed] in or *affecting commerce,* any firearm." In his view, the underlined words "affecting commerce" have a limited meaning; they do not cover simple in-state possession of a gun that, sometime in the past, arrived from out of state. We do not agree.

For one thing, the words "affecting commerce" are jurisdictional words of art, typically signalling a congressional intent to exercise its Commerce Clause power broadly, perhaps as far as the Constitution permits. *See, e.g., Heart of Atlanta Motel v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964) (interpreting statute regulating all activity that "affects [interstate] commerce" as showing congressional intent to reach as far as the Commerce Clause permits, and holding the Commerce Clause does permit Congress to forbid a policy of segregation even at a local hotel); *National Labor Relations Board v. Fainblatt,* 306 U.S. 601, 606–07, 59 S.Ct. 668, 671–72, 83 L.Ed. 1014 (1939) (interpreting term "affecting commerce" found in 29 U.S.C. § 152(7) broadly to include Congress's full powers under Commerce Clause); H.R.Rep. No. 1107, 93d Cong., 2d Sess. 29–31 (1974) (explaining that purpose of

amendment to 15 U.S.C. § 45 changing jurisdiction of Federal Trade Commission ("FTC") from activities "in commerce" to activities "in or affecting interstate commerce" is to expand FTC jurisdiction to maximum extent permitted by Commerce Clause), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7702, 7712–13; H.R.Rep. No. 871, 96th Cong., 2d Sess. 4–7 (1980) (explaining amendment to § 7 of the Clayton Act, 15 U.S.C. § 18, changing its coverage from business activities "engaged in" interstate commerce to those "affecting commerce," thereby expanding Clayton Act's coverage to maximum permitted under the Commerce Clause and overruling *United States v. American Building Maintenance Industries,* 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975)), *reprinted in* 1980 U.S.Code Cong. & Ad.News 2732, 2735–37. *See also* 15 U.S.C. § 78*l* (g)(1) (1982) (securities regulation); 15 U.S.C. § 2006(c)(1) (1982) (automobile labelling); 17 U.S.C. § 910(a) (Supp. II 1984) (copyright enforcement); 42 U.S.C. §§ 6303(c), 6325(d) (1982) (energy conservation); **\*494** 49 U.S.C.App. § 2503(3) (Supp. II 1984) (motor carrier safety).

Moreover, in the modern cases that rest upon an expansive view of Congress's constitutional Commerce Clause powers, the Supreme Court has made clear that the constitutionally necessary effect upon interstate commerce includes the *cumulative* impact of many instances of single events of the type that Congress sought to regulate. *See Heart of Atlanta Motel,* 379 U.S. at 254–59, 85 S.Ct. at 355–59, and cases cited therein. Against this background, one can read the language "possess in or affecting commerce, any firearm" as serving a jurisdictional purpose, making clear that Congress wished to exercise its Commerce Clause power broadly in order to achieve a crime-control objective, namely, stopping convicted felons from possessing guns. If so, the effect on commerce to which Congress refers could include the effect that permitting (or forbidding) a person or persons of this sort to possess interstate guns will have on interstate commerce, Congress's object being to show not necessarily an *injury* to commerce, but rather simply to show *some effect* for jurisdictional reasons. As so read, the word "affecting" would include past or present effects; it would include possession of a gun that *did* travel interstate before the felon possessed it. *Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977).

For another thing, the legislative history of the statute suggests that Congress intended this very result. The relevant House Judiciary Committee Report, for example, said that the effect of the new law is to prohibit persons:

from receiving, *possessing,* or transporting firearms in interstate or foreign commerce *or firearms which have been shipped or transported in interstate or foreign commerce* if they are or have been:

(1) under indictment for or convicted of a felony....

H.R.Rep. No. 495, 99th Cong., 2d Sess. 23 (1980) (emphasis added; footnote deleted), *reprinted in* 1986 U.S.Code Cong. & Ad.News 1327, 1349. Moreover, Congress enacted this statute after the Supreme Court had held that these very words, "possess ... in commerce or affecting commerce ... any firearm" carry this interpretation. In *Scarborough,* 431 U.S. at 563, 97 S.Ct. at 1963, when interpreting a statutory predecessor of § 922(g), § 1202(a) of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title VII"), Pub.L. No. 90–351, Title VII, §§ 1201–03, 82 Stat. 197, 236, *repealed by* Firearm Owner's Protection Act, Pub.L. No. 99–308, § 104(b), 100 Stat. 449, 459 (1986), the Court reconsidered dicta that it had written in *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1972), that appeared to give the words a limited meaning. In *Bass,* 404 U.S. at 350, 92 S.Ct. at 524, the Court wrote:

[f]or example, a person "possesses ... in commerce or affecting commerce" if at the time of the offense the gun was moving interstate or on an interstate facility, or if the possession affects commerce.

In *Scarborough,* the Court looked more closely at Title VII's legislative history, quoting, among other things, sponsoring Senator Long's remarks:

I have prepared an amendment ... simply setting forth the fact that anybody who has been convicted of a felony ... is not permitted to possess a firearm.

It places the burden and the punishment on the kind of people who have no business possessing firearms in the event they come into possession of them....

114 Cong.Rec. 13868–69 (1968), *quoted in Scarborough,* 431 U.S. at 572–73, 97 S.Ct. at 1967–68. The *Scarborough* court then rejected the defendant's contentions that Congress did not intend to punish possession of a firearm unless the gun had moved in interstate commerce at or near the time of possession. It held instead that a felon who possessed a gun violated the statute as long as the gun *previously* had travelled in interstate commerce. Such an interpretation "captures the essence of Congress' intent, striking at the possession of

weapons by people 'who have no business possessing **\*495** [them].' " *Scarborough,* 431 U.S. at 577, 97 S.Ct. at 1970 (citation omitted).

Of course, *Scarborough* considered Title VII, while the statute before us is a later statute. But it is a successor statute to Title VII. The House Judiciary Committee explicitly said that § 922(g), the section here at issue:

> combines in one section ... all of the offenses related to sale of firearms *to* unqualified persons and offenses of receipt, possession and transport of firearms *by* unqualified persons (or their employees) now divided between Title I of the Gun Control Act (18 U.S.C. 922(d), (g), and (h)) and Title VII of the Omnibus Crime Control and Safe Streets Act (19 U.S.C. 1202(a) and (b))....

H.R.Rep. No. 495 at 23 (emphasis in original), *reprinted in* 1986 U.S.Code Cong. & Ad.News at 1349. An examination of the predecessor statute shows that the "transport" and "receipt" language (not here at issue) likely came from Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title IV"), Pub.L. No. 90–351, Title IV, § 902, 82 Stat. 197, 228, *amended by* Gun Control Act of 1968, Pub.L. No. 90–618, Title I, § 102, 82 Stat. 1216, *amended by* Pub.L. No. 97–377, Title I, § 165(a), 96 Stat. 1923 (1982), *amended by* Firearm Owner's Protection Act, Pub.L. No. 99–408, § 2, 100 Stat. 920 (1986), while the "possession" language came from Title VII. We have no good reason to think that Congress, when picking up the language of Title VII, intended to reject *Scarborough* 's authoritative interpretation, particularly in light of the House Judiciary Report just quoted and the statute's use of the same language.

Appellant raises two countervailing considerations. He says that to interpret the word "affecting" as including a *past* affecting or a *cumulative* affecting is an awkward interpretation of the statute's language. We agree, but Congress's choice of language is understandable. A Congress that wanted to extend § 922(g)'s jurisdictional reach to include past, present, and (possibly future) connections with interstate commerce, expanding the crime to include more than just receipt or transport, might have preferred to use a single,

highly general word with a history, such as "affecting," rather than to write a far longer statute using several separate clauses in different tenses, a drafting approach that would have risked generating numerous new judicial interpretations of each additional word.

Appellant also points to the language in *Scarborough* characterizing Title VII as "not the product of model legislative deliberation or draftsmanship." 431 U.S. at 570, 97 S.Ct. at 1966 (citation omitted). He adds that the present act was carefully drafted, and that we therefore should not consider Congress to have adopted Title VII's earlier, "loose" interpretation. This argument, in our view, cannot overcome the other considerations we have discussed. We therefore hold that this statutory language applies to a possession of a gun that previously moved in interstate commerce.

2. Appellant points out that his gun may have arrived in Massachusetts before May, 1986, when Congress enacted the present gun-control law. He argues that application of the law to him thereby violates the Fifth Amendment's *ex post facto* clause, a clause that forbids Congress to enact any law " 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then proscribed.' *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325–26 [18 L.Ed. 356] (1867)." *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 963, 67 L.Ed.2d 17 (1981), *quoted in United States v. Robinson,* 843 F.2d 1, 4 (1st Cir.1988).

The provision of the 1986 law here at issue, however, does not punish the act of transporting a gun in interstate commerce; the "in or affecting commerce" language, as we have just discussed, describes what *kind* of a gun felons may not possess, and it provides the jurisdictional basis for a federal law. The act that the law forbids is possession; and the defendant engaged in that act seven months after the law's enactment. *United States v. Hopkins,* 529 F.2d 775, 777 (8th Cir.1976) (act made criminal **\*496** by Title VII is the possession of the firearm, "not interstate transportation of the weapon by someone else"), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), *cited in Robinson,* 843 F.2d at 6; *see also United States v. D'Angelo,* 819 F.2d 1062, 1065–66 (11th Cir.1987) (also interpreting Title VII); *United States v. Woods,* 696 F.2d 566, 572 (8th Cir.1982) (same); *cf. United States v. Matassini,* 565 F.2d 1297, 1306–07 (5th Cir.1978) (prior felon provision of Title VII does not violate *ex post facto* clause); *United States v. Sutton,* 521 F.2d 1385, 1390–91 (7th Cir.1975) (same).

Appellant does not claim here that he was not given sufficient time to rid himself of a gun that the May 1986 laws made it unlawful for him to possess. Nor do we see here how he could make such an argument given the seven-month period between the statute's effective date and the date of his arrest, and the fact that his conduct—possessing the gun—was, in any event, unlawful long before 1986 (though under different federal statutes with somewhat different punishments).

3. Appellant argues that the indictment is too vague, that it does not " 'sufficiently apprise [him] of what he must be prepared to meet.' *Russell v. United States,* 369 U.S. 749, 763 [82 S.Ct. 1038, 1047, 8 L.Ed.2d 240] (1962) (citations omitted)." *United States v. Santa–Manzano,* 842 F.2d 1, 2 (1st Cir.1988) (Constitution requires that "the indictment ... contain the elements of the offense charged" and "fairly inform a defendant of the charge against which he must defend."); *see also Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Serino,* 835 F.2d 924, 929 (1st Cir.1987). The indictment here reads as follows:

> On or about December 23, 1986, at or around Saugus, in the District of Massachusetts,
>
> JOHN J. GILLIES, JR.
>
> defendant herein, having previously been convicted of three or more violent felonies, as that term is defined in 18 United States Code Section 924(e)(2), did knowingly possess a firearm, that is: a Rossi .38 caliber revolver, with serial number D355921 which had previously travelled in interstate commerce. All in violation of Title 18, United States Code, Sections 922(g) and 924(e).

The indictment informs the defendant which statute he violated, § 922(g); it refers to the specific unlawful act (possession); it refers to the specific gun; it states explicitly the connection with interstate commerce that the government intends to prove; and it tells him which of several different categories of unlawful possessors he falls within, namely, the category of those previously convicted of a crime "punishable by imprisonment for a term exceeding one year." (The indictment refers to "violent felonies ... as defined in ... Section 924(e)(2)," which section defines "violent felonies" in terms of crimes "punishable by imprisonment for a term exceeding one year." *See* Appendix B.) The indictment also refers to *three* prior violent felony convictions, the predicate for applying the extra sentence mandated by § 924(e). We

find the indictment clear enough, and we do not believe the Constitution requires more. *Cf. Hamling, supra; Santa–Manzano, supra; Serino, supra.*

4. Appellant points out that the 1986 recodification of the federal gun control law separates an elaborate set of substantive crimes, placed in § 922, entitled "Unlawful acts," (Appendix A) from an elaborate set of penalties for committing those acts, placed in § 924, entitled "Penalties." (*See* Appendix B.) Section 924, in subsection (a)(1), provides a *maximum* penalty of five years imprisonment and a $5,000 fine for violating § 922(g)(1), but it goes on, in subsection (e)(1), to provide a fifteen-year *minimum* term of imprisonment if the defendant has committed *three* prior violent or drug-related felonies. Appellant argues that § 924(e) (*see* Appendix B) is a "sentencing enhancement" provision—that it does not create a substantive crime. He next says that, if he had insisted on his right to a jury trial, the government would have told the jury about his three prior felony convictions *unnecessarily* **\*497** (for they had to do only with the *sentence,* not with the *crime* ). *Cf. Government of Virgin Islands v. Castillo,* 550 F.2d 850 (3d Cir.1977) (handgun possession conviction reversed because indictment improperly mentions prior felony conviction relevant only for purposes of separate sentencing enhancement statute). And, he concludes, it was this fear of the government's unnecessarily prejudicing the jury that may have led him to waive his right to a jury trial.

We need not decide whether or not § 924(e) is a "sentencing enhancement" statute, for even if we assume appellant is right that references in the indictment to prior felonies should not have been placed before the jury, *see Castillo,* 550 F.2d at 850, *United States v. Foskey,* 636 F.2d 517 (D.C.Cir.1980), appellant waived a jury trial, and the fear of prejudice that he mentions could not have affected his waiver decision. The district court told the appellant that it would remove the references from the jury's copy of the indictment if the appellant wished. The appellant, aware of the choice, nonetheless decided to waive a jury trial, and to be tried by a judge, who, irrespective of the type of statute, would be aware of the convictions. Given the court's offer to protect the defendant from jury awareness of his prior record (except insofar as necessary to prove the elements of § 922(g)), we can find no error.

5. Appellant's last contention is that, at the sentencing hearing, the government failed to offer sufficient proof of three prior "violent felony" convictions. § 924(e)(2)(B).

The government offered proof of several prior convictions, including two for burglary of the same home on successive nights (appellant received concurrent sentences), and two for armed robberies of two different drug stores committed on consecutive days (appellant also received concurrent sentences). He argues, however, that each *pair* of convictions should count as only *one* for the purposes of § 924(e), because "the statute was intended to reach multiple criminal episodes that were distinct in time, not multiple felony convictions arising out of a single criminal episode." *United States v. Petty,* 828 F.2d 2, 3 (8th Cir.1987), *petition for cert. filed,* Apr. 5, 1988. The drug store robberies, however, occurred on different days and at different drug stores. Both robberies are distinct from the burglaries, which occurred three years previously. As a result, even if, as appellant suggests, the two burglary convictions stemmed from one "episode" which stretched over New Year's Eve, 1972, the government still proved three "violent felony" convictions as required by § 924(e). *Accord United States v. Wicks,* 833 F.2d 192 (9th Cir.1987) (two burglary convictions based on burglaries committed in different times in different places qualify as separate "violent felonies" even though both occurred on same night and defendant received a concurrent sentence), *petition for cert. filed,* Apr. 16, 1988; *United States v. Greene,* 810 F.2d 999, 1000 (11th Cir.1986) (single indictment alleging burglaries of four separate buildings at four separate locations on four different days provides evidence of four separate "violent felonies" for purposes of sentencing enhancement).

For these reasons, the judgment of the district court is

*Affirmed.*


APPENDIX A

§ 922. Unlawful acts

(g) It shall be unlawful for any person—

(1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

(2) who is a fugitive from justice;

(3) [1] is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

(5) who, being an alien, is illegally or unlawfully in the United States;

(6) who has been discharged from the Armed Forces under dishonorable conditions; or

**\*498** (7) who, having been a citizen of the United States, has renounced his citizenship;

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.


APPENDIX B

§ 924. Penalties

(a)(1) Except as otherwise provided in paragraph (2) of this subsection, subsection (b) or (c) of this section, or in section 929, whoever—

(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

(B) knowingly violates subsection (a)(4), (a)(6), (f), (g), (i), (j), or (k) of section 922;

(C) knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(*l* ); or

(D) willfully violates any other provision of this chapter,

shall be fined not more than $5,000, imprisoned not more than five years, or both, and shall become eligible for parole as the Parole Commission shall determine.

(2) Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly—

(A) makes any false statement or representation with respect to the information required by the provisions

of this chapter to be kept in the records of a person licensed under this chapter, or

(B) violates subsection (m) of section 922,

shall be fined not more than $1,000, imprisoned not more than one year, or both, and shall become eligible for parole as the Parole Commission shall determine.

(e)(1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g), and such person shall not be eligible for parole with respect to the sentence imposed under this subsection.

(2) As used in this subsection—

(A) the term "serious drug offense" means—

(i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the first section or section 3 of Public Law 96–350 (21 U.S.C. 955a et seq.), for which a maximum term of imprisonment of ten years or more is prescribed by law; or

(ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law; and

(B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

**All Citations**

851 F.2d 492

---

**End of Document**                                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   AR005111   6

819 F.2d 1062
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Campanella D'ANGELO, Defendant-Appellant.

No. 86-8852.
|
June 22, 1987.

**Synopsis**

Defendant was convicted in the United States District Court for the Southern District of Georgia, No. CR486-62, B. Avant Edenfield, J., of possession of firearm which traveled in interstate commerce following felony conviction, and defendant appealed. The Court of Appeals, Hatchett, Circuit Judge, held that: (1) existence of South Carolina arrest warrant constituted sufficient probable cause to justify warrantless arrest under Georgia law, and thus seizure of pistol constituted valid search incident to lawful arrest; (2) evidence was sufficient to establish that pistol had been transported in interstate commerce; and (3) conviction did not violate constitutional prohibition against ex post facto laws.

Affirmed.

**Attorneys and Law Firms**

 **\*1062**  Judy Lancaster, Savannah, Ga., for defendant-appellant.

 **\*1063**  Hinton R. Pierce, U.S. Atty., Kathryn M. Aldridge, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Georgia.

Before HATCHETT and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

**Opinion**

HATCHETT, Circuit Judge:

The primary issue in this appeal is whether the arrest of the appellant and the seizure of the crucial evidence was lawful. Because we find the arrest supported by probable cause and the seizure incident to the lawful arrest, we affirm the district court judgment.

FACTS

On May 29, 1986, deputies from the Screven County, Georgia, Sheriff's Department executed an arrest warrant issued by Jasper County, South Carolina, and mailed to the Screven County Sheriff's Department. After receipt of the arrest warrant, Deputy Sheriff Charles W. Freeman and other deputies arrested the appellant, Campanella D'Angelo. The warrant was based on a charge of assault and battery of an aggravated nature.

When D'Angelo came to the door in response to the deputies' knock, Freeman noticed a bulge in D'Angelo's clothing which appeared to conceal a weapon. Freeman grabbed D'Angelo, pulled him out of the house, and searched him. The bulge concealed a six-inch barrelled Ruger .357 caliber pistol loaded with teflon-coated bullets.

As D'Angelo was led to a sheriff's car, Freeman went into D'Angelo's house pursuant to the Screven County Sheriff's Department's policy of securing an arrestee's home when no other persons were on the premises. As Freeman walked through the house, he noticed a Colt AR-15 .233 caliber rifle leaning against a door jam. Because he knew D'Angelo was a convicted felon, Freeman seized the rifle.

A grand jury indicted D'Angelo in the Southern District of Georgia on three counts: (1) possession of a firearm, in commerce and affecting commerce, after having been convicted of felony offenses, in violation of Title 18 U.S.C.App. § 1202(a)(1); (2) making a false statement in the acquisition of the Colt AR-15 .233 caliber rifle, in violation of Title 18 U.S.C. §§ 922(a)(6) and 924(a); and (3) unlawful receipt of the Colt rifle, in violation of Title 18 U.S.C. § 922(h) (1) and § 924(a).

After indictment, D'Angelo dismissed his lawyer and personally filed a motion to suppress the Ruger pistol and the Colt AR-15 rifle. The district court granted D'Angelo's motion to suppress with regard to the rifle and all evidence and documents concerning the rifle, but denied the motion to suppress with regard to the Ruger pistol.

A jury found D'Angelo guilty of violating 18 U.S.C.App. § 1202(a)(1), possession of a firearm (pistol) which traveled

in interstate commerce following a felony conviction. The district court sentenced D'Angelo to two years imprisonment and a fine of $50.

## ISSUES

D'Angelo raises four issues on appeal: (1) whether the district court erred in denying his motion to suppress the Ruger pistol; (2) whether the district court erred in admitting the South Carolina warrant into evidence; (3) whether the government's evidence was sufficient to satisfy the interstate commerce requirement of 18 U.S.C.App. § 1202(a)(1); and (4) whether the conviction violates the Constitution's prohibition against ex post facto laws.

## DISCUSSION

A. The Motion to Suppress the Pistol
D'Angelo contends that the pistol should have been suppressed as the "fruit" of an unlawful search. He argues that the pistol was not seized incident to a lawful arrest because the arrest warrant, issued in South Carolina, could not be lawfully executed in Georgia. D'Angelo also contends that because **\*1064** his arrest was unlawful, seizure of the pistol was not justified by any exception to the warrant requirement.

The government contends that D'Angelo's motion to suppress was properly denied, and the pistol was properly admitted into evidence at D'Angelo's trial. It argues that the seizure of the pistol was lawful because the seizure was incident to D'Angelo's lawful arrest. The government further argues that the arrest was lawful because the existence of the South Carolina warrant constituted sufficient probable cause to justify a warrantless arrest under Georgia law.

We agree with the parties that the seizure and admissibility of the pistol depends on the lawfulness of D'Angelo's arrest. Under Georgia law, if probable cause to arrest exists, a warrantless arrest is lawful. *Ledesma v. State,* 251 Ga. 487, 306 S.E.2d 629 (1983); *Durden v. State,* 250 Ga. 325, 297 S.E.2d 237 (1982). In *Ledesma,* Fulton County, Georgia authorities received a teletype message from Missouri authorities stating that Miriam Ledesma was wanted for violation of the Missouri Controlled Substances Act. The message said, "Pick up Miriam Ledesma." The Georgia officers interpreted this message to mean that an arrest warrant had been issued in Missouri. At the time of

the message and at the time of Ledesma's arrest, no warrant had been issued in Missouri. The Georgia Supreme Court found that the arresting officers believed a warrant had been issued and that the officers' beliefs were based upon reliable information from Missouri officials. The court held that such information from a reliable source constituted sufficient probable cause to support the arrest. *Ledesma,* 306 S.E.2d at 632.

In this case, it is undisputed that the Screven County sheriff's deputies had a South Carolina warrant with them when they arrested D'Angelo. If the warrant was valid and validly executed, then the arrest based on the warrant is lawful. Even if the warrant is invalid or not properly executed, D'Angelo's arrest may still be upheld as a warrantless arrest under Georgia law.

  Official Code of Georgia, Sections 17-5-1(a)(1) and (4) provide Georgia's exception to the warrant requirement for searches made incident to a lawful arrest.[1] D'Angelo's arrest was lawful under Georgia law because under *Ledesma,* the South Carolina warrant furnished probable cause for the arrest. If a teletype message is sufficient to supply probable cause, as the Georgia Supreme Court held in *Ledesma,* then a warrant in the possession of Georgia officers from another state is sufficient to supply probable cause. Therefore, the seizure of the Ruger pistol constituted a valid search incident to a lawful arrest. D'Angelo's motion to suppress the Ruger pistol was properly denied, and the pistol was properly admitted into evidence.

1    Official Code of Georgia, Sections 17-5-1(a)(1) and (4) state:
         (a) When a lawful arrest is effected, a peace officer may reasonably search the person arrested and the area within the person's immediate presence for the purpose of:
         (1) Protecting the officer from attack;
         ....
         (4) Discovering or seizing any instruments, articles or things which are being used or which have been used in the commission of the crime for which the person has been arrested.

B. Whether the South Carolina Warrant was Properly Admitted at Trial
  D'Angelo contends that, although the document marked at trial as the government's Exhibit 1 was a certified copy of a South Carolina warrant, the government presented no

evidence that it was a copy of the warrant which the deputies had at the time of his arrest.

A review of the transcripts from the suppression hearing and the trial reveals that Freeman had a South Carolina warrant at the time of D'Angelo's arrest, and that Freeman was not certain at the time of trial whether the warrant executed was the original, a certified copy, or an uncertified copy. D'Angelo's argument regarding the warrant's certification is without merit for the same reason earlier stated. It does **\*1065** not matter whether the warrant was a certified copy. Whatever its status, under *Ledesma,* it is sufficient to supply probable cause. [2]

[2]    We need not address whether the warrant was sufficient for extradition purposes from Georgia to South Carolina. This is a federal prosecution for a violation occurring in Georgia.

### C. Sufficiency of the Evidence

D'Angelo contends that the government's evidence was insufficient to support a conviction under 18 U.S.C.App. § 1202(a)(1). [3] He argues that the evidence failed to establish that the pistol had been transported in interstate commerce prior to his acquiring possession of it. He cites *Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), arguing that, in order to satisfy the interstate commerce requirement, the government must produce evidence of specific dates on which the pistol was transported.

[3]    Title 18, United States Code, Appendix § 1202(a)(1) provides:

  Any person who-

    (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, ...

  and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both. In the case of a person who receives, possesses or transports in commerce or affecting commerce any firearm and who has three previous convictions by any court referred to in paragraph (1) of this subsection for robbery or burglary, or both, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the

sentence of, or grant a probationary sentence to, such person with respect to the conviction under this subsection, and such person shall not be eligible for parole with respect to the sentence imposed under this subsection.

Reliance on *Scarborough* is misguided. In *Scarborough,* the government produced evidence of specific dates; however, the Supreme Court did not hold that evidence regarding dates of transportation is necessary for a conviction under 18 U.S.C.App. § 1202(a)(1).

The law in this circuit is clear. A convicted felon may be prosecuted under 18 U.S.C.App. § 1202(a)(1) if the firearm found in the felon's possession has previously been transported in interstate commerce. *United States v. Griffin,* 705 F.2d 434 (11th Cir.1983).

We consider the evidence in the light most favorable to the government. *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.1984). The government offered testimony of Kimberley Pritula, a representative of Sturm Ruger and Company. She testified that she had worked for the company six years and could identify the various gun models on sight. Pritula identified D'Angelo's pistol as a Black Hawk Model .357 caliber, one of Sturm Ruger's revolvers. She further testified that the Black Hawk is manufactured in Southport, Connecticut, and that no Black Hawk pistols have ever been manufactured in Georgia.

The pistol was in D'Angelo's possession when the deputies arrested him in Screven County, Georgia, on May 29, 1986. This evidence is sufficient to establish that the pistol was transported across state lines before D'Angelo possessed it. *United States v. Garrett,* 583 F.2d 1381 (5th Cir.1978).

### D. Ex Post Facto Laws

D'Angelo contends that his conviction is void as a violation of the constitutional prohibition against ex post facto laws. He argues that because 18 U.S.C.App. § 1202(a)(1) was enacted on June 19, 1968, the government must prove that the pistol was transported in interstate commerce and that it came into his possession subsequent to that date.

In *United States v. Garrett,* 583 F.2d 1381 (5th Cir.1978), we decided this issue on facts identical to the facts of D'Angelo's case. We stated that "[a]ppellant's assertion that the government must prove that he came into possession of the firearm after the enactment of 1202(a) must ... fail." *Garrett,* 583 F.2d at 1389. "Proof of either receipt or

possession would have **\*1066** been sufficient to sustain a § 1202(a) offense." *Garrett,* 583 F.2d at 1390. Possession is a continuing offense, and the evidence shows that D'Angelo was in possession of the pistol after the enactment of the statute. Proof of D'Angelo's possession obviated the need for proof of the date D'Angelo received the pistol. Thus, the government did not have to show that he acquired the pistol after 18 U.S.C.App. § 1202(a)(1) became effective. The government proved that D'Angelo had previously been convicted of a felony and that he possessed a firearm which had been transported in interstate commerce.

For the foregoing reasons, we affirm D'Angelo's conviction.

AFFIRMED.

**All Citations**

819 F.2d 1062

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-36   Filed 11/30/22   PageID.5584   Page 42 of 52

Benedetto v. Sessions, Not Reported in Fed. Supp. (2017)

2017 WL 4310089

2017 WL 4310089
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Jeffrey BENEDETTO

v.

Jefferson B. SESSIONS, III, et al.

Civil Action No. CCB−17−0058
|
Signed 09/27/2017

**Attorneys and Law Firms**

Marc D. Schifanelli, Schifanelli Law, LLP, Annapolis, MD, for Jeffrey Benedetto.

Nathan M. Swinton, U.S. Department Of Justice Civil Division, Washington, DC, Mark Holdsworth Bowen, Office of the Attorney General Maryland State Police, Pikesville, MD, for Jefferson B. Sessions, III, et al.

**Memorandum**

Catherine C. Blake, United States District Judge

 **\*1** The plaintiff, Jeffrey Benedetto, has sued two federal defendants, Attorney General Jefferson B. Sessions, III and Thomas E. Brandon, the Acting Director for the Bureau of Alcohol, Tobacco, Firearms, and Explosives. He also has sued two state defendants, William L. Pallozzi, Secretary of the Maryland Department of State Police, and Brian E. Frosh, Attorney General of Maryland. Benedetto asserts an as-applied challenge to a federal firearms statute, 18 U.S.C. § 922(g)(1), and Maryland's equivalent firearms statutes, MD. CODE ANN., PUB. SAFETY § 5−133(b)(1), § 5−144, and § 5−205(b)(1), claiming that they are unconstitutional burdens on his second amendment rights and ex post facto punishments in violation of the United States Constitution, U.S. Const. art. 1, § 9, cl. 3 (applies to the federal government); U.S. Const. art. 1, § 10, cl. 1 (applies to the states).

The plaintiff has filed a motion for summary judgment, and both federal and state defendants have moved to dismiss the claim. For the reasons stated below, this court will deny the plaintiff's motion and will grant the defendants' motions to dismiss. [1]

1      Because this case will be dismissed under Fed. R. Civ. P. 12(b)(6), the court does not need to reach Benedetto's motion for summary judgment. For the same reason, the federal defendants' motion to stay consideration of Benedetto's motion for summary judgment pending discovery will be denied.

**Background**

In 1992, Jeffrey Benedetto pled guilty to a misdemeanor battery charge under what is now § 3−203 of the Maryland Code of Criminal Law. (Compl., ECF No. 1 ¶ 7). He received a one-year suspended sentence and 18 months of probation. (Id.). Since his guilty plea, Benedetto has not been arrested or convicted of another crime. He completed his sentence and probation without incident. (Id.).

Some 24 years later, in 2016, Benedetto tried and failed to obtain a handgun license to defend "himself and his family within his home." (Id. at ¶ 1). He was informed by Maryland State Police that he was disqualified from gun ownership under the Maryland Gun Violence Act of 1996 because his 1992 misdemeanor conviction carries a statutory penalty of greater than two years. (See id. at ¶ 8). Benedetto appealed the decision but was rebuffed by both the Maryland Office of Administrative Appeals and the Circuit Court of Maryland for Anne Arundel County. (Id. at ¶ 9).

Benedetto now sues the state and federal defendants in federal court for declaratory and injunctive relief. He asserts as-applied second amendment challenges against the federal and Maryland firearms regulations: 18 U.S.C. § 922(g)(1) and MD. CODE ANN., PUB. SAFETY §§ 5−133(b)(1), 5−144, and 5−205(b)(1). [2] He also claims that the laws constitute ex post facto punishment in violation of the Constitution. Because Benedetto is not a "law-abiding and responsible citizen" and because the Fourth Circuit already has upheld § 922(g)(1), a law substantially similar to the Maryland firearms statutes, against an ex post facto claim, Benedetto's claims must be dismissed.

2      The federal firearms statute, 18 U.S.C. § 922(g)(1), makes it unlawful "for any person...who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year...to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition

Case 2:19-cv-00037-JNP   Document 59-36   Filed 11/30/22   PageID.5585   Page 43 of 52

Benedetto v. Sessions, Not Reported in Fed. Supp. (2017)

2017 WL 4310089

which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 921(a)(20)(B) expressly excludes from this prohibition "laws of the State [classified] as a misdemeanor and punishable by a term of imprisonment of two years or less." Maryland has substantially similar firearms statutes: MD. CODE ANN., PUB. SAFETY § 5–133(b)(1) prohibits persons from possessing regulated firearms if they have "been convicted of a disqualifying crime;" § 5–144 makes it illegal to knowingly participate in the sale and possession, among other things, of regulated firearms; and § 5–205(b)(1) prohibits persons who have been convicted of a disqualifying crime from possessing a rifle or shotgun. Among the list of disqualifying crimes are "misdemeanor[s]...that carries a statutory penalty of more than 2 years." § 5–101(g)(3).

### Standard of Review

**\*2** When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.' " *Id.* (quoting *Twombly*, 550 U.S. at 570).

### Analysis

Benedetto's complaint contains two challenges. The first alleges that the federal and Maryland firearms laws are unconstitutional as applied because Benedetto pled guilty to a misdemeanor, not a felony. The second asserts that the challenged laws violate the ex post facto clauses of the Constitution.

1. Second Amendment Challenge

Since *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Fourth Circuit has used a two-step framework to address second amendment challenges. The first step requires a court to determine whether the challenged law burdens or regulates the second amendment as it was understood in 1791. *Hamilton v. Pallozzi*, 848 F.3d 614, 623 (4th Cir. 2017). If the court finds that the second amendment is burdened, the second step requires a court to apply intermediate scrutiny to the law. *Kolbe v. Hogan*, 813 F.3d 160, 179 (4th Cir. 2016).

When dealing with a presumptively valid regulatory law, however, the court should streamline the first step of the test. *Hamilton*, 848 F.3d at 623. A presumptively valid law is any law that does not infringe upon the "law-abiding and responsible citizen['s] [freedom] to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). In such cases, the court can bypass the historical analysis otherwise required by *Heller* and instead presume that the challenged law is valid unless the plaintiff rebuts that presumption. *Hamilton*, 848 F.3d at 624. A plaintiff can do so by showing "that his factual circumstances remove his challenge from the realm of ordinary challenges." *U.S. v. Moore*, 666 F.3d 313, 320 (4th Cir. 2012).

In *Hamilton*, the Fourth Circuit limited the type of factual circumstances that may be used to rebut the presumption of lawfulness. The court held that a person convicted of a felony "cannot be returned to the category of law-abiding, responsible citizens," and therefore cannot overcome the presumption of lawfulness in step one, "unless the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful." *Hamilton*, 848 F.3d at 626 (internal quotation omitted). Factors external to the conviction like "rehabilitation, likelihood of recidivism, and passage of time," are not adequate bases for reinstatement to the class of law-abiding, responsible citizens. *Id.* In short, a person with a felony

2017 WL 4310089

conviction may not overcome the presumption of lawfulness unless he can show that his conviction was pardoned or the conviction was unlawful.

The Fourth Circuit recognized that some misdemeanor convictions may overcome the presumption of lawfulness at step one, *id.* at 626 n.11, however, and Benedetto attempts to distinguish his case on this last point. He argues that because he was only convicted of a misdemeanor he is still a law-abiding citizen and therefore the challenged laws as applied to him are not presumptively lawful. He also asserts that even if the laws are presumptively lawful, his post-conviction history removes him from the mass of ordinary challenges and thus rebuts that presumption. Although Benedetto is correct that *Hamilton* leaves open the possibility that a misdemeanor may be treated differently from a felony, he still fails to show that the presumption of lawfulness does not apply to his case. His conviction demonstrates disrespect for law, as in *Hamilton*, and he cannot rebut the presumption of lawfulness because he fails to differentiate his claim from the mass of ordinary challenges.

### A. Misdemeanor Conviction

**\*3** The defendants' motions to dismiss will be granted because Benedetto fails to show that he is a "law-abiding, responsible citizen"[3] or rebut the challenged laws' presumption of lawfulness.[4]

3     Because the federal and Maryland firearms statutes are substantially similar this opinion will analyze both under the same standard. *See Hamilton*, 848 F.3d at 623 (the Fourth Circuit doing the same).

4     The federal defendants argue that even if Benedetto could overcome the presumption of lawfulness they would prevail under intermediate scrutiny. Because the parties' motions will be disposed of at step one of the analysis, step two of the analysis will not be addressed.

The Fourth Circuit recognized that some plaintiffs with convictions labeled as misdemeanors, but punishable by a prison term sufficient to fall within felon disarmament laws, might prevail at step one of the second amendment analysis. *Hamilton*, 848 F.3d at 626 n.11. There is no suggestion, however, that Benedetto would fall into that exception. Important to the *Hamilton* court's holding that even non-violent felons are carved out from second amendment protections was that a felony is not "merely [an] error[ ] in filling out a form or some regulatory misdemeanor offense;

these are significant offenses reflecting disrespect for the law." *Id.* at 627. Benedetto's battery conviction involves harm to another, it carries a maximum sentence of 10 years, and it is not a mere regulatory misdemeanor.

In Maryland, battery has three elements: "the State must prove that: (1) the defendant caused offensive physical contact with, or harm to, the victim; (2) the contact was the result of an intentional or reckless act of the defendant and was not accidental; and (3) the contact was not consented to by the victim or was not legally justified." *U.S. v. Royal*, 731 F.3d 333, 341 (4th Cir. 2013) (quoting *Nicolas v. State*, 44 A.3d 396, 403–04 (Md. 2012)).[5] While it may not require intent to harm, battery cannot be committed accidentally; instead it involves disregard of another's well-being and disrespect for law.[6]

5     Although *Royal* ultimately decided that battery is not a "crime of violence" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), that conclusion was dictated by an analysis different from what is required in this case.

6     Benedetto asserts that at the time of his conviction battery required proof of an "intentional, unpermitted touching of the body of another that is harmful or offensive to the person who was touched. Accidental or inadvertent contact does not amount to a battery." *Doe v. Archdiocese of Washington*, 689 A.2d 634, 640 (Md. 1997). This is a statement of the civil standard for battery. *Id.* In any event, the standard is essentially the same as that set forth in *Royal*.

Contrasting this case with *Corcoran v. Sessions*, ─── F. Supp. 3d ─── (D. Md. 2017), helps emphasize this point. In that case, the court held that the plaintiff was not removed from the class of law-abiding citizens because the conduct underlying his misdemeanor conviction was "*de minimis*," *id.* at \*11, involving only the use of his girlfriend's car without permission, carrying a maximum prison term of only one year, and not involving violence. *Id.* The court was emphatic: Corcoran's criminal activity is "relatively innocuous;" "Corcoran's Unauthorized Use of a Vehicle conviction seems trivial" when compared to more serious convictions like fleeing from the police; Corcoran's conviction does not require "an intent to steal or permanently deprive the owner of property" and nor does it include "as an element the use of force and there is no indication that Corcoran's offense was violent." *Id.* at \*9–\*11.[7]

Case 2:19-cv-00037-JNP   Document 59-36   Filed 11/30/22   PageID.5587   Page 45 of 52

Benedetto v. Sessions, Not Reported in Fed. Supp. (2017)

2017 WL 4310089

7      *Corcoran* did not reach the plaintiff's challenge to 18 U.S.C. § 922(g)(1). *Corcoran*, —— F. Supp. 3d at *1 n.4.

 **\*4** Benedetto's conviction, by contrast, could include the use of force. In Maryland, it carries a term of imprisonment of 10 years, and its focus is not on the "relatively innocuous" temporary taking of a car without permission but the injury to another's person. For this reason, Benedetto's conviction, like the conviction in *Hamilton*, removes him from the category of law-abiding citizens, and therefore the challenged laws are presumptively lawful as applied to him.

## B. The Realm of Ordinary Challenges

Even if Benedetto's conviction removes him from the category of law-abiding citizens, he argues he can overcome the presumption of lawfulness based on his personal background. Benedetto attempts to distinguish his misdemeanor conviction from the mass of other misdemeanor convictions by describing his 25–year post-conviction history, which reflects rehabilitation and good citizenship. As far as the court is aware, Benedetto has been a model citizen since 1992. All of that is of questionable relevance, however. As already noted, the Fourth Circuit was clear in *Hamilton*: "[W]e...hold that evidence of rehabilitation, likelihood of recidivism, and passage of time are not bases for which a challenger might remain in the protected class of law-abiding, responsible citizen[s]." *Hamilton*, 848 F.3d at 626 (internal quotations omitted); *see also Corcoran*, —— F. Supp. 3d at *8. Benedetto argues that the Fourth Circuit only meant to apply this holding to felonies. *Corcoran* disagreed, however, noting that the Fourth Circuit meant to apply "this limitation to step one of the...analysis generally." *Corcoran*, —— F. Supp. 3d at *8 n.22. Indeed, permitting Benedetto to make this claim could lead to the same type of jury argument, if he were charged under 18 U.S.C. § 922(g)(1), that the *Hamilton* court sought to prevent. *Hamilton*, 848 F.3d at 627 ("The criminal defendant would be able to freely admit violation of the law in the past, but request that the jury not convict on the grounds of rehabilitation, unlikeliness of re-offending, or the length of time that had passed since conviction.").

Even if such evidence is admissible at step one as to a state misdemeanor, Benedetto fails to show how the evidence he proffers would remove his case from the realm of ordinary challenges. Though laudable, his rehabilitation is not extraordinary; following the law is merely the baseline. Benedetto has not alleged facts sufficient to explain why the challenged laws as applied to his case differ in any meaningful way from their application to the usual run of cases. As a

result, and for the reasons above, the defendants' motions to dismiss will be granted.

## 2. Ex Post Facto Claim

Benedetto also challenges the federal and Maryland firearm statutes as violations of the ex post facto clauses of the Constitution. U.S. Const. art. 1, § 9, cl. 3 (applies to the federal government); U.S. Const. art. 1, § 10, cl. 1 (applies to the states). Under controlling Fourth Circuit precedent this challenge cannot succeed. In *U.S. v. Mitchell*, 209 F.3d 319 (4th Cir. 2000), the plaintiff challenged the application of the Federal Firearms Act to his case, arguing that because he was convicted, sentenced, and purchased a firearm before the Act was passed, the Act constituted an ex post facto punishment. *Mitchell*, 209 F.3d at 322. The Fourth Circuit rejected these arguments finding that "[i]t is immaterial that [the plaintiff's] firearm purchase and ...conviction occurred" prior to the enactment of the Firearms Act "because the conduct prohibited by [the Act] is the possession of a firearm," an entirely separate act that occurred *after* his conviction and purchase of the firearm. *Id.* The court also found it important that all courts addressing similar challenges had come to the same conclusion. *Id.* at 323.

 **\*5** Benedetto attempts to distinguish himself from the plaintiff in *Mitchell* by noting that the plaintiff in *Mitchell* was contesting a criminal conviction for possession of a firearm in violation of the Federal Firearm Act while Benedetto is challenging the law at a prior, pre-gun-purchase, stage. Whether a gun was purchased before the challenged law was enacted, however, is immaterial to whether the challenged law regulates conduct that occurred before or after its enactment. Indeed, if there is a material difference between this case and *Mitchell* it cuts against Benedetto—the plaintiff in *Mitchell* purchased his gun before the law was enacted and therefore had a stronger argument that the newly enacted law was regulating prior conduct. In any case, the *Mitchell* court was focused on whether the newly unlawful conduct occurred after the relevant conviction. Because the answer in this case is yes, *Mitchell* controls. *See Corcoran*, —— F. Supp. 3d at *18.

The plaintiff also tries to rebut the consensus recognized by *Mitchell* by arguing that *INS v. St. Cyr*, 533 U.S. 289 (2011), *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), and *Jaghoori v. Holder*, 772 F.3d 764 (4th Cir. 2014) are better authority on the application of "new collateral or civil consequences [to] criminal convictions." (ECF No. 7, p.3). But these cases do not consider ex post facto clause

2017 WL 4310089

challenges. They focus instead on whether Congress intended a particular law to have retroactive effect, a related but different question. *See St. Cyr*, 533 U.S. at 314–16; *Landgraf*, 511 U.S. at 285–86; *Jaghoori*, 772 F.3d at 766. *Mitchell* controls; the federal and Maryland firearm statutes do not violate the ex post facto clauses of the Constitution.

## Conclusion

For these reasons, the plaintiff's motion will be denied and the defendants' motions will be granted. A separate order follows.

_____9/27/2017_____  _____/s/_____
Date Catherine C. Blake

United States District Judge

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4310089

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   AR005120   5

45 S.Ct. 264, 37 A.L.R. 1378, 69 L.Ed. 568

45 S.Ct. 264
Supreme Court of the United States.

SAMUELS

v.

McCURDY, Sheriff.

No. 225.
|
Argued and Submitted Jan. 22, 1925.
|
Decided March 2, 1925.

**Synopsis**

Error to the Supreme Court of Georgia.

Suit by Sig Samuels against J. A. McCurdy, Sheriff of De Kalb County, Ga. Judgment of dismissal was affirmed by the Supreme Court of the State of Georgia (156 Ga. 488, 119 S. E. 302), and plaintiff brings error. Affirmed.

**Attorneys and Law Firms**

**\*\*264   \*188** Mr. Hooper Alexander, of Atlanta, Ga., for plaintiff in error.

**Opinion**

**\*190** Mr. Chief Justice TAFT delivered the opinion of the Court.

Sig Samuels, a resident of De Kalb county, Ga., filed his petition in the superior court of that county against its sheriff, J. A. McCurdy, in which he prayed for the specific recovery of certain intoxicating liquors belonging to him which he averred had been seized on search warrant by the defendant. He asked an injunction to prevent their destruction. A rule to show cause issued and a restraining order. A general demurrer to the petition was sustained and the case dismissed. On error to the Supreme Court of the state, the judgment was affirmed. This is a writ of error to that judgment.

**\*191** The petition averred that Phillips, a deputy sheriff of the defendant, went to Samuels' residence and acting under a search warrant seized and carried away a large quantity of whiskys, wines, beer, cordials and liquors, that he stored this in the jail of the county, that it was the purpose of the defendant to destroy them, without any hearing of the petitioner; that the value of the liquors at the scale of prices

current before the prohibition laws was approximately $400, but at the prices paid thereafter if illegally sold, would be very much more; that the greater part of the liquors was bought by the petitioner and kept at his home prior to the year 1907; that the balance thereof was legally purchased by him in the state of Florida and legally shipped to him in interstate commerce prior to the year 1915; that although a citizen of the United States and the state of Georgia, the petitioner was born in Europe where the use of such liquors had been common, that he had been accustomed to their use all his life, that he purchased them lawfully for the use of his family and friends at his own home, and not for any unlawful purpose.

The Session Laws of Georgia for 1907, p. 81, now embodied in section 426 of the Georgia Penal Code, declares that:

> 'It shall not be lawful for any person within the limits of this state to sell or barter for valuable consideration, either directly or indirectly, or give away to induce trade at any place of business, or keep or furnish at any other **\*\*265** * * * places, or manufacture, or keep on hand at their place of business any alcoholic, spirituous, malt, or intoxicating liquors, or intoxicating bitters, or other drinks which, if drunk to excess, will produce intoxication; and any person so offending shall be guilty of a misdemeanor.'

By Act of November 17, 1915 (Laws Ga. Ex. Sess. 1915, p. 77) § 2, it is provided:

> 'It shall be unlawful for any person * * * to manufacture, sell, offer for sale, * * * keep on hand at a place **\*192** of business or at or in any social, fraternal or locker club, or otherwise dispose of any of the prohibited liquors and beverages described in section 1 of this act, or any of them, in any quantity; but this inhibition does not include, and nothing in this act shall affect, the social serving of such liquors and beverages

in private residences in ordinary social intercourse.'

Section 20 of same act reads as follows:

> 'Sec. 20. Be it further enacted by the authority aforesaid, that no property rights of any kind shall exist in said prohibited liquors and beverages, or in the vessels kept or used for the purpose of violating any provision of this act or any law for the promotion of temperance or for the suppression of the evils of intemperance; nor in any such liquors when received, possessed or stored at any forbidden place or anywhere in a quantity forbidden by law, or when kept, stored or deposited in any place in this state for the purpose of sale or unlawful disposition or unlawful furnishing or distribution; and in all such cases the liquors and beverages, and the vessels and receptacles in which such liquors are contained, and the property herein named, kept or used for the purpose of violating the law as aforesaid, are hereby declared to be contraband and are to be forfeited to the state when seized, and may be ordered and condemned to be destroyed after seizure by order of the court that has acquired jurisdiction over the same, or by order of the judge or court after conviction when such liquors and such property named have been seized for use as evidence.'

By Act of March 28, 1917 (Laws Ga. Ex. Sess. 1917, p. 7), it is declared that:

> 'It shall be unlawful for any corporation, firm, person or individual to receive from any common carrier, corporation, firm, person or individual, or to have, control or possess, in this state, any of said

enumerated liquors or beverages whether intended for personal use or otherwise, save as is hereinafter excepted.'

**\*193** The provision of 1915 which permitted the social serving of liquors and beverages in private residences and in ordinary social intercourse was expressly repealed by the act of 1917. Under other provisions liquor and wine may be held for medicinal, mechanical and sacramental purposes on special permits. There are not claimed to be any circumstances in this case excepting the liquors here seized from the condemnation of the act of 1917.

Three grounds are urged for reversal: First, the 1917 law under which liquor lawfully acquired can be seized and destroyed is an ex post facto law. Second, the law in punishing the owner for possessing liquor he had lawfully acquired before its enactment, deprives him of his property without due process. Third, it violates the due process requirement by the seizure and destruction of the liquor without giving the possessor his day in court.

First. This law is not an ex post facto law. It does not provide a punishment for a past offense. It does not fix a penalty for the owner for having become possessed of the liquor. The penalty it imposes is for continuing to possess the liquor after the enactment of the law. It is quite the same question as that presented in Chicago & Alton R. Co. v. Tranbarger, 238 U. S. 67, 35 S. Ct. 678, 59 L. Ed. 1204. There a Missouri statute required railroads to construct water outlets across their rights of way. The railroad company had constructed a solid embankment twelve years before the passage of the act. The railroad was penalized for noncompliance with the statute. This court said:

> 'The argument that in respect to its penalty feature the statute is invalid as an ex post facto law is sufficiently answered by pointing out that plaintiff in error is subjected to a penalty not because of the manner in which it originally constructed its railroad embankment, nor for anything else done or omitted before the passage of the act of 1917, but because after that time it maintained the embankment in a manner prohibited by that act.'

45 S.Ct. 264, 37 A.L.R. 1378, 69 L.Ed. 568

**\*194** Second. Does the seizure of this liquor and its destruction deprive the plaintiff in error of his property without due process of law, in violation of the Fourteenth Amendment?

In Crane v. Campbell, 245 U. S. 304, 38 S. Ct. 98, 62 L. Ed. 304, Crane was arrested for having in his possession a bottle of whisky for his own use, and not for the purpose of giving away or selling the same to any person. This was under a provision of the statute of Idaho that it should be unlawful for any person to import, ship, sell, transport, deliver, receive or have in his possession any intoxicating liquors. It was held that the law was within the police power of the state. The court said:

> 'It must now be regarded as settled that, on account of their well-known noxious qualities and the extraordinary evils shown by experience commonly to be consequent upon their use, a state has power absolutely to prohibit manufacture, gift, purchase, sale, or transportation of intoxicating liquors within its borders without violating the guarantees of the Fourteenth Amendment'—citing Bartemeyer v. Iowa, 18 Wall. 129, 21 L. Ed. 929; Beer Co. v. Massachusetts, 97 U. S. 25, 33, 24 L. Ed. 989; **\*\*266** Mugler v. Kansas, 123 U. S. 623, 662, 8 S. Ct. 273, 31 L. Ed. 205; Crowley v. Christensen, 137 U. S. 86, 91, 11 S. Ct. 13, 34 L. Ed. 620; Purity Extract Co. v. Lynch, 226 U. S. 192, 201, 33 S. Ct. 44, 57 L. Ed. 184; Clark Distilling Co. v. Western Maryland Ry. Co., 242 U. S. 311, 330, 331, 37 S. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845.

The court pointed out that as the state had the power to prohibit, it might adopt such measures as were reasonably appropriate or needful to render exercise of that power effective; and that considering the notorious difficulties always attendant upon efforts to suppress traffic in liquors, the court was unable to say that the challenged inhibition of their possession was arbitrary and unreasonable or without proper relation to the legitimate legislative purpose, that the right to hold intoxicating liquor for personal use was not one of those fundamental privileges **\*195** of a citizen of the United States which no state could abridge, and that a contrary view would be incompatible with the undoubted power to prevent manufacture, gift, sale, purchase or transportation of such articles—the only feasible way of getting them. It did not appear in that case when the liquor seized had been acquired but presumably after the prohibitory act.

In Barbour v. Georgia, 249 U. S. 454, 39 S. Ct. 316, 63 L. Ed. 704, it was held that the Georgia prohibitory law, approved November 18, 1915, but which did not become effective until May 1, 1916, was not invalid under the Fourteenth Amendment when applied to the possession of liquor by one who had acquired it after the approval of the law and before it became effective.

These cases it is said do not apply because the liquor here was lawfully acquired by Samuels before the act of 1917 making it unlawful for one to be possessed of liquor in his residence for use of his family and his guests.

In Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205, it appeared that the breweries, the use of which as such was enjoined as a nuisance, and the beer the sale of which was also enjoined, were owned by Mugler before the Prohibition Act, making both unlawful. In answering the argument that even if the state might prohibit the use and sale, compensation should be made for them before putting it into effect to accord with the Fourteenth Amendment, Mr. Justice Harlan, speaking for the court, said:

'As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not **\*196** disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. Nor can legislation of that character come within the Fourteenth Amendment, in any case, unless it is apparent that its real object is not to protect the community, or to promote the general well-being, but, under the guise

of police regulation, to deprive the owner of his liberty and property, without due process of law. The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner.

'It is true, that, when the defendants in these cases purchased or erected their breweries, the laws of the state did not forbid the manufacture of intoxicating liquors. But the state did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. Indeed, as was said in Stone v. Mississippi, above cited, the supervision of the public health and the public morals is a governmental power, 'continuing in its nature,' and 'to be dealt with as the **\*197** special exigencies of the moment may require'; and that, 'for this purpose, the larges legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.''

In view of this language and the agreed statement of facts the decision necessarily was that the sale of beer made and owned before the Prohibition Law could be punished by that law as a nuisance and that no compensation was necessary, if the Legislature deemed this course necessary for the health and morals of the community.

It is true that a remark in the opinion in Eberle v. Michigan, 232 U. S. 700, 706, 34 S. Ct. 464, 58 L. Ed. 803, refers to the question as still an open one, and the same reference is made in Barbour v. Georgia, 249 U. S. 454, 459, 39 S. Ct. 316, 63 L. Ed. 704. In Hamilton v. Kentucky Distilleries Co., 251 U. S. 146, 157, 40 S. Ct. 106, 64 L. Ed. 194, there is a similar reference, though with a suggestive citation to Mugler v. Kansas. And in Jacob Ruppert v. Caffey, 251 U. S. 264, 40 S. Ct. 141, 64 L. Ed. 260, after calling attention to this reservation, this court said:

> **\*\*267** 'It should, however, be noted that, among the judgments affirmed in the Mugler Case, was one for violation of the act by selling beer acquired before its enactment (see pages 625, 627); and that it was assumed without discussion that the same rule applied to the brewery and its product (page 669).'

But it was not found necessary to consider the question in the Jacob Ruppert Case, because there was no appropriation of property but merely a lessening of value due to permissible restriction imposed upon its use.

The ultimate legislative object of prohibition is to prevent the drinking of intoxicating liquor by any one because of the demoralizing effect of drunkenness upon society. The state has the power to subject those members of society who might indulge in the use of such liquor without injury to themselves to a deprivation of access to liquor in order to remove temptation from those whom **\*198** its use would demoralize and to avoid the abuses which follow in its train. Accordingly laws have been enacted by the states, and sustained by this court by which it has been made illegal to manufacture liquor for one's own use or for another's, to transport it or to sell it or to give it away to others. The Legislature has this power whether it affects liquor lawfully acquired before the prohibition or not. Without compensation it may thus seek to reduce the drinking of liquor. It is obvious that if men are permitted to maintain liquor in their possession, though only for their own consumption, there is danger of its becoming accessible to others. Legislation making possession unlawful is therefore within the police power of the states as reasonable mode of reducing the evils of drunkenness, as we have seen in the Crane and Barbour Cases. The only question which arises is whether for the shrunken opportunity of the possessor of liquor who acquired it before the law, to use it only for his own consumption, the state must make compensation. By valid laws, his property rights have been so far reduced that it would be difficult to measure their value. That which had the qualities of property has, by successive provisions of law in the interest of all, been losing its qualities as property. For many years, every one who has made or stored liquor has known that it was a kind of property which because of its possible vicious uses might be denied by the state the character and attributes as such, that legislation calculated to

45 S.Ct. 264, 37 A.L.R. 1378, 69 L.Ed. 568

suppress its use in the interest of public health and morality was lawful and possible, and this without compensation. Why should compensation be made now for the mere remant of the original right if nothing was paid for the loss of the right to sell it, give it away or transport it? The necessity for its destruction is claimed under the same police power to be for the public betterment as that which authorized its previous restrictions. It seems to us that this conclusion finds support **\*199** in the passage quoted above from the opinion in the Mugler Case and its application to the agreed facts, and in Gardner v. Michigan, 199 U. S. 325, 26 S. Ct. 106, 50 L. Ed. 212, and Reduction Co. v. Sanitary Works, 199 U. S. 306, 26 S. Ct. 100, 50 L. Ed. 204. See, also, North American Storage Co. v. Chicago, 211 U. S. 306, 29 S. Ct. 101, 53 L. Ed. 195, 15 Ann. Cas. 276, and Adams v. Milwaukee, 228 U. S. 572, 584, 33 S. Ct. 610, 57 L. Ed. 971; Lawton v. Steele, 152 U. S. 133, 136, 14 S. Ct. 499, 388 L. Ed. 385; United States v. Pacific Railroad, 120 U. S. 227, 239, 7 S. Ct. 490, 30 L. Ed. 634. In Gardner v. Michigan, a municipal ordinance was held valid which required the owner to deliver to the agent of the city all garbage with vegetable and animal refuse although it was shown that it was property of value because it could be advantageously used for the manufacture of commercial fat. It was decided that the police power justified the Legislature or its subordinate, the city council, in the interest of the public in removing and destroying the garbage as a health measure without compensation.

Finally it is said that the petitioner here has no day in court provided by the law, and therefore that in this respect the liquors have been taken from him without due process. The Supreme Court of Georgia has held in Delaney v. Plunkett, 146 Ga. 547, 565, 91 S. E. 561, L. R. A. 1917D, 926, Ann. Cas. 1917E, 685, that under the twentieth section of the Act of November 17, 1915 (Georgia Laws, Extra Session 1915, p. 77), quoted above, which declares that no property of any kind shall exist in prohibited liquors and beverages, no hearing need be given the possessor of unlawfully held liquors but that they may be destroyed by order of the court. In the Plunkett Case the seizure was of liquor held in excess of an amount permitted by the law of 1915. By the amendment of 1917, as already pointed out, possession even for home use is now forbidden. As in the Plunkett Case, the petitioner does not deny that the liquor seized was within the condemnation of the law and that he has no defense to his possession of it except as he asserts a property right protected by the Fourteenth Amendment which we have **\*200** found he does not have. As a search warrant issued the seizure was presumably valid. The law provides for an order of destruction by a court, but it does not provide for notice to

the previous possessor of the liquor and a hearing before the order is made. Under the circumstances prima facie the liquor existed contrary to law and it was for the possessor to prove the very narrow exceptions under which he could retain it as lawful. It he desired to try the validity of the seizure or the existence of the **\*\*268** exception by which his possession could be made to appear legal, he could resort to suit to obtain possession and to enjoin the destruction under the Georgia law, as he has done in this case. This under the circumstances, it seems to us, constitutes sufficient process of law under the federal Constitution as respects one in his situation. Lawton v. Steele, 152 U. S. 133, 142, 14 S. Ct. 499, 38 L. Ed. 385. What might be necessary, if he were claiming to hold the liquor lawfully for medicinal or some other specially excepted purpose we need not consider.

The averment in the petition was that the sheriff intended to destroy the liquor. There is no averment in the petition that he did not intend to do this by order of court upon his application. We must take it for granted on the demurrer, therefore, as against the pleader that the sheriff did not intend to depart from section 20 of the act of 1915, and that the question made here is on the validity of that section.

Judgment affirmed.

Mr. Justice BUTLER dissenting.

I cannot agree with the opinion of the court in this case. Plaintiff in error is a man of temperate habits, long accustomed to use alcoholic liquor as a beverage. He never sold or in any way illegally dealt with intoxicating liquors and has never been accused of so doing. His supply was lawfully acquired years before the passage of the **\*201** enactment in question (the act of March 28, 1917) for the use of himself, his family and friends in his own home, and not for any unlawful purpose. It consisted of spirituous, vinous and malt liquors and, before the passage of the act, was worth about $400. September 21, 1922, a deputy sheriff or constable, in company with a number of other persons, went to the house of plaintiff in error and searched it and seized and carried away his stock of liquor and delivered it to the sheriff. It was his purpose summarily to destroy it. This suit was brought to restrain him.

Plaintiff in error insists that the seizure deprived him of his property in violation of the due process clause of the Fourteenth Amendment. The decisions of this court in Crane v. Campbell, 245 U. S. 304, 38 S. Ct. 98, 62 L. Ed. 304, and

**Samuels v. McCurdy, 267 U.S. 188 (1925)**

45 S.Ct. 264, 37 A.L.R. 1378, 69 L.Ed. 568

Barbour v. Georgia, 249 U. S. 454, 39 S. Ct. 316, 63 L. Ed. 704, are not controlling. In the Crane Case, the Idaho statute under consideration (chapter 11, Session Laws 1915) made it unlawful to have in possession or to transport any intoxicating liquor within a prohibition district in that state. Crane was accused of having in his possession a bottle of whisky for his own use and benefit, and not for the purpose of giving away or selling the same. The state Supreme Court said:

'The only means provided by the act for procuring intoxicating liquors in a prohibition district for any purpose relates to wine to be used for sacramental purposes and pure alcohol to be used for scientific or mechanical purposes, or for compounding or preparing medicine, so that the possession of whisky, or of any intoxicating liquor, other than wine and pure alcohol for the uses above-mentioned is prohibited.' In re Crane, 27 Idaho 671, 679, 151 P. 1006, 1008 (L. R. A. 1918A, 942).

The point was not made that the liquor was lawfully acquired or that it had never been unlawfully sold, transported or held. Presumably, the whisky was acquired after the act took effect, and it could not be claimed that it had not been sold or transported in violation of law. In the Barbour Case, the prosecution was **\*202** under Georgia legislation approved November 18, 1915, which did not take effect until May 1, 1916. Barbour was convicted of having more than a gallon of vinous liquor in his possession on June 10, 1916. This court, following the Supreme Court of Georgia, assumed that the liquor was acquired after the act was passed and before it took effect, and held that Barbour took the the liquor with notice that after a day certain its possession, by mere lapse of time, would become a crime. The act of 1907, now section 426 of the Georgia Penal Code, was in force and made it unlawful for any person to sell or barter intoxicating liquors. It did not appear and was not claimed that the liquor had been lawfully acquired by the accused or that it had not been sold, transported or held in violation of law. The precise question here raised was not decided in either of these cases. Each presented facts materially different from those in the present case.

The seizure and destruction cannot be sustained on the ground that the act in question destroyed the value of the liquor. The question of compensation is not involved. That alcoholic liquors are capable of valuable uses is recognized by the whole mass of state and national regulatory and prohibitory laws, as well as by the state legislation in question. The liquors seized were valuable for such private use as was intended by plaintiff in error. The insistence is that the state is without power to seize and destroy a private supply of intoxicating liquor lawfully acquired before the prohibitory legislation and kept in one's house for his own use. Such seizure and destruction can be supported only on the ground that the private possession and use would injure the public. See Mugler v. Kansas, 123 U. S. 623, 663, 8 S. Ct. 273, 31 L. Ed. 205; Gardner v. Michigan, 199 U. S. 325, 333, 26 S. Ct. 106, 50 L. Ed. 212.

The enactment does not directly forbid the drinking of intoxicating liquors. The state Supreme Court has not construed it to prevent such private use of intoxicants. **\*203** It is aimed at the liquor traffic. See **\*\*269** Delaney v. Plunkett, 146 Ga. 547, 91 S. E. 561, L. R. A. 1917D, 926, Ann. Cas. 1917E, 685, Barbour v. State, 146 Ga. 667, 92 S. E. 70, 2 A. L. R. 1095, Bunger v. State, 146 Ga. 672, 92 S. E. 72, cited by that court as authority for its decision in this case. Attention has not been called to any legislation which attempts directly to forbid the mere drinking or other private use of such liquors. As against the objection that it would infringe constitutional provisions safeguarding liberty and property, the power of the state to enact and enforce such legislation has not been established. That question is not involved in this case.

Any suggestion that the destruction of such private supply lawfully acquired and held for the use of the owner in his own home is necessary for or has any relation to the suppression of sales or to the regulation of the liquor traffic or to the protection of the public from injury would be fanciful and without foundation. The facts in the case do not permit the application of the doctrine applied in Purity Extract Co. v. Lynch, 226 U. S. 192, 204, 33 S. Ct. 44, 57 L. Ed. 184.

To me it seems very plain that, as applied, the law is oppressive and arbitrary, and that the seizure deprived plaintiff in error of his property in violation of the due process clause of the Fourteenth Amendment. I would reverse the judgment of the state court.

**All Citations**

267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568, 37 A.L.R. 1378

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.