797 F.2d 967
United States Court of Appeals,
Federal Circuit.

Christopher K. KORTE, Petitioner,
v.
OFFICE OF PERSONNEL MANAGEMENT,
Respondent.

Appeal No. 85–2544.
|
July 31, 1986.

## Synopsis

Former air traffic controller was determined to be unsuitable for employment by Office of Personnel Management. The Merit Systems Protection Board affirmed and air traffic controller appealed. The Court of Appeals, Bissell, Circuit Judge, held that: (1) Office of Personnel Management's decision that air traffic controller was disqualified from employment was in accord with statute and President's directive, and (2) air traffic controller's procedural due process rights were not violated by determination that he was unsuitable for employment.

Affirmed.

## Attorneys and Law Firms

**\*969** Joseph P. Cyr, Shearman & Sterling, New York City, argued for petitioner. With him on brief was Clarence W. Olmstead, Jr.

Hillary A. Stern, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for respondent. With him on brief were Richard K. Willard, Asst. Atty. Gen. Civ. Div., David M. Cohen, Director and Robert A. Reutershan. W. Scott Burke, General Counsel and Carrol H. Kinsey, Jr., Atty., Office of the General Counsel, Office of Personnel Management, of counsel.

Before MARKEY, Chief Judge, and FRIEDMAN and BISSELL, Circuit Judges.

## Opinion

BISSELL, Circuit Judge.

Petitioner Korte appeals from the final decision of the Merit Systems Protection Board (Board), Docket No. NY07318510161, which affirmed a decision of the Office of Personnel Management (OPM) determining that he was not suitable for a position as an air traffic controller in connection with his application for employment with the Federal Aviation Administration (FAA). We affirm.

## BACKGROUND

Petitioner is a former air traffic controller who was removed from employment with the FAA based on charges of participating in the 1981 strike against the United States, in violation of 5 U.S.C. § 7311, and absence without leave. In 1984, he applied for employment with the FAA. The parties have stipulated that OPM determined that he was not suitable for employment solely because (1) he belongs to a class of individuals discharged for their participation in the strike; and (2) OPM interpreted a Presidential directive as indefinitely barring from reemployment with the FAA all controllers discharged as a result of the strike.

This court addressed an essentially identical factual situation in a recent class action case, *Wagner v. Office of Personnel Management,* 783 F.2d 1042 (Fed.Cir.), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986).

After the strike, the President issued a directive to the Director of OPM stating that those former federal employees who had been discharged for participating in the strike "should not be deemed suitable for employment with the Federal Aviation Administration." 17 Weekly Comp. of Pres. Doc. 1364 (Dec. 9, 1981). The petitioners in *Wagner* argued

> (A) that OPM incorrectly interpreted the presidential directive as imposing an indefinite ban upon the employment by the [Federal Aviation] Administration of the former controllers, and (B) that if the presidential directive did impose such a ban, it was illegal because it was inconsistent with 5 U.S.C. § 7311, which the

petitioners interpret as barring strikers from federal employment for only three years.

*Wagner,* 783 F.2d at 1044. With regard to the first issue, the court upheld OPM's interpretation as imposing an indefinite ban. *Id.* at 1045. With regard to the second issue, the court examined the language of the statute and the legislative history, and concluded that "Congress meant exactly what it said—that persons who participated in a strike against the government are barred indefinitely from employment in the government." *Id.* at 1046.

Korte opted out of the Wagner class and now attempts to distinguish the *Wagner* holding on constitutional grounds. He argues on appeal that the determination of his unsuitability is unconstitutional because it (1) deprives him of liberty and property rights without the procedural protection required by the Due Process Clause; (2) adopts an irrebuttable presumption violative of the Due Process Clause in that it has no rational relation to any legitimate government interest; and (3) violates the Bill of Attainder Clause.

## OPINION

What Korte does not challenge is the constitutionality of 5 U.S.C. § 7311 (1982) (the statute), which reads in pertinent part:

>      ***970** An individual may not accept or hold a position in the Government of the United States ... if he—... (3) participates in a strike ... against the Government of the United States....

Neither at the Board nor in his briefs to this court does he attack the statute itself, and in response to a question from the panel during oral argument his counsel confirmed that even if the statute imposed a permanent bar to future employment it would not be unconstitutional.

In a memorandum opinion, the Supreme Court has affirmed a judgment that the statute is constitutionally sound. *United Federation of Postal Clerks v. Blount,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), *aff'g* 325 F.Supp. 879 (D.D.C.1971). The district court held that the statute did not violate any constitutional rights of those employees who were members of the plaintiff's union. 325 F.Supp. at 885. The district court also stated that "it is not irrational or arbitrary for the Government to condition employment on a promise not to withhold labor collectively, and to prohibit strikes by those in public employment." 325 F.Supp. at 883.

Similarly, we believe it is not irrational or arbitrary for the government to prohibit reemployment of discharged employees who participated in a strike against the government, and that is just what the statute does. "[P]ersons who participated in a strike against the government are barred indefinitely from employment in the government." *Wagner,* 783 F.2d at 1046. "[A] worker may not hold a government position if the individual has participated in a strike against the government." *American Postal Workers v. United States Postal Service,* 682 F.2d 1280, 1283 (9th Cir.1982).

Conceding, as he must, that the statute does not limit the period of debarment, Korte relies on 5 C.F.R. § 731.303 for his assertion of a period of debarment limited to three years. In its entirety, that regulation reads:

>      When a person is disqualified for any reason named in § 731.202, OPM, in its discretion, may deny that person examination for and appointment to a competitive position for a period of not more than 3 years from the date of determination of disqualification. On expiration of the period of debarment, the person who has been debarred may not be appointed to any position in the competitive service until his fitness for appointment has been redetermined by OPM.

Among the many reasons for disqualification listed in 5 C.F.R. § 731.202(b) is "[a]ny statutory disqualification which makes the individual unfit for the service." Section 7311 is such a statutory disqualification. As the parties stipulated, OPM determined he was not suitable for employment on the basis of that statutory disqualification and the President's directive—he belongs to a class of

Korte v. Office of Personnel Management, 797 F.2d 967 (1986)

individuals discharged for their participation in the strike.

Korte's implicit argument that OPM's action was contrary to its own regulation is beside the point because OPM was not acting on its own authority and exercising its own discretion; rather it was acting under the express direction of the President. Even assuming, arguendo, that the indefinite statutory bar was limited to three years by the regulation, the President's directive overrode or superseded that regulation and imposed an indefinite ban on the class of which Korte was a member. As the government properly argues, OPM's role in the suitability determination was limited to executing the President's instructions.

On the factual record in this case, it is our view that OPM properly determined that he was disqualified. The statute is constitutionally sound and OPM's action was in accord with the statute and the President's directive.

## I DUE PROCESS

### A

Korte asserts that he had constitutionally protected liberty and property interests **\*971** of which he was deprived in violation of the Due Process Clause. Citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), Korte urges this court to adopt a balancing test and to declare OPM's action constitutionally defective.

We note that the Supreme Court recently stated that it has "never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause." *Lyng v. Payne,* 476 U.S. 926, ——, 106 S.Ct. 2333, at 2343, 90 L.Ed.2d 921 (1986). Nevertheless assuming, without deciding, that he had constitutionally protected property and liberty interests, and even assuming those interests were "terminated," we are not persuaded that the Due Process Clause was violated. Korte was afforded what the Supreme Court has declared are the "essential requirements of due process, ... notice and an opportunity to respond." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, ——, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). Because Korte was entitled to a full

administrative hearing, 5 C.F.R. §§ 731.401(a), 1201.24(c), and judicial review, 5 U.S.C. § 7703(a)(1), it was constitutionally permissible for a pretermination hearing to be "an initial check against mistaken decisions." *Loudermill,* 105 S.Ct. at 1495.

Here, the facts are not disputed. Korte admitted participating in the strike. Yet he asserts that OPM should have evaluated his application more fully by considering the factors enumerated in 5 C.F.R. § 731.202(c), *e. g.,* nature and seriousness of the conduct, contributing social or environmental conditions, and rehabilitation. It may thus appear that he is only asserting a "meaningful opportunity to invoke the discretion of the decisionmaker," *Loudermill,* 105 S.Ct. at 1494, but actually he is arguing that "the decisionmaker should be lenient and depart from legal requirements." *Id.* n. 8. The government properly argues that once it was determined that Korte was removed from his air traffic controller position for strike participation, "there was no need for further investigation as the President's directive was then controlling." This court has held that the Presidential directive "explicitly imposed an indefinite ban upon the employment of striking controllers by the [FAA]." *Wagner,* 783 F.2d at 1044. Because this ban, this rule, was expressly mandated by the President, "we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption." *Hampton v. Mow Sun Wong,* 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976).

When Korte appealed to the Board, he wrote that "[o]n December 8, 1984, I received final notice that I had been determined unsuitable." He had earlier been put on notice of the basis for OPM's ultimate decision and he had the opportunity to respond. Korte relates that during the summer of 1984 he "prepared the necessary application form to take the [controller] examination," albeit less some supplementary materials. By letter dated August 30, 1984, the FAA notified him that OPM had decided he was unsuitable, citing the President's 1981 directive. Korte then sent letters, dated September 5, 1984, to both the FAA and OPM "which, among other things, (1) enclosed my complete application for consideration in reaching a final suitability determination." Korte states that in response to that letter, "OPM acknowledged receipt of my complete application but nevertheless confirmed its earlier action."

It is thus evident that Korte was afforded notice and an opportunity to respond. His assertion of a procedural Due Process Clause violation is not well founded.

AR005205

Korte v. Office of Personnel Management, 797 F.2d 967 (1986)

B

Korte also argues that the indefinite debarment announced in the Presidential directive has no rational relation to any legitimate government interest. We do not agree. At the very least, the statute *authorizes* the indefinite debarment of the discharged controllers. Under the statute, just as the government may "condition *972 employment on a promise not to withhold labor collectively, and [may] prohibit strikes by those in public employment," *United Federation of Postal Clerks v. Blount,* 325 F.Supp. 879, 883 (D.D.C.), *aff'd,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), so it may condition reemployment and may prohibit the reemployment of those who participated in a strike against the government. As stated in his directive, the President determined that permitting discharged controllers to return to the FAA would be detrimental both to the efficiency of the FAA's operations and to the safe and effective performance of the nation's air traffic control system. The President's directive does bear a rational relationship to the statutory bar.

II BILL OF ATTAINDER

A bill of attainder has been described by the Supreme Court as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Service v. Minnesota Public Interest Research Group,* 468 U.S. 841, 846–47, 104 S.Ct. 3348, 3350, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Services,* 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977)).

Korte argues that "[a]ccording to the Board's interpretation of the President's Memorandum, on December 9, 1981, President Reagan imposed retroactively a new, additional sanction on the discharged controllers never before imposed upon them or any other Federal employees discharged for striking."

At the outset, we note that even if the President's directive imposed a new or additional sanction, the directive would not violate the constitutional proscription against *ex post facto* laws. The sanction imposed is civil, not criminal, and from "earliest times," the Supreme

Court has construed the *ex post facto* provision to apply only to criminal laws. *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952).

Regarding his bill of attainder contention, neither the Presidential directive nor the statute established Korte's "guilt." As OPM argues, his "guilt" was established when he was found to be a strike participant as a result of an adjudicative determination which included a proceeding at the agency level, a proceeding before the Board's regional office, and an appeal to the full Board, each of which was subject to judicial review. In reply, Korte asserts that

> OPM ignores one of the crucial issues on this appeal. The determination of Mr. Korte's participation in the strike did not constitute a finding that Mr. Korte could never be suitable for FAA service again and did not effect an indefinite debarment.

That assertion is meritless because the determination that he participated in the strike necessarily resulted in an indefinite debarment—the statute is an "absolute prohibition against employment by strikers." *Wagner,* 783 F.2d at 1045. Furthermore, in the course of that determination, "the safeguards of a judicial trial," *United States v. Lovett,* 328 U.S. 303, 316, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946), were provided: for example, he had the right to be represented by counsel, he was clearly informed of the charge against him, the law he was charged with violating had been passed before he committed the act charged, and he was confronted by the witnesses against him. *Id.* at 317–18, 66 S.Ct. at 1079–80.

Moreover, the Bill of Attainder Clause was intended "as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown,* 381 U.S. 437, 442, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965). The clause is a limitation on the authority of the legislative branch. *Id.* at 443–46, 85 S.Ct. at 1712–13. Korte has cited no authority, and we are aware of none, holding that the clause applies to the executive branch.

AR005206

**\*973** III

Korte's other arguments are controlled by *Wagner,* which was issued after he filed his initial brief. As to the former controllers who applied for non-FAA positions, whether the President's directive constitutes an action in the nature of an amnesty, reprieve, or pardon within the meaning of Article 2, Section 2, Clause 1 of the Constitution is an issue we need not and do not address.

AFFIRMED.

**All Citations**

797 F.2d 967

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005207

365 F.2d 105
United States Court of Appeals Ninth Circuit.

John MARSHALL, Appellant,
v.
Grant SAWYER, as Governor of the State of
Nevada, et al., Appellees.

No. 20145.
|
Aug. 10, 1966.

## Synopsis

Civil rights action brought by plaintiff who was excluded from and refused service in premises of establishments that maintained gambling casinos after gaming commission had listed him in black book containing names of persons allegedly within purview of regulation governing manner of casino operation and had addressed letter to casino operators requesting their cooperation in excluding plaintiff from gambling establishments. The United States District Court for the District of Nevada, M.D. Crocker, J., rendered judgments for defendants, and plaintiff appealed. The Court of Appeals, Hamley, Circuit Judge, held that exclusion of plaintiff from 15 or 20 gambling establishments pursuant to unchallenged gaming commission regulation which provided that associating with designated classes of persons might be deemed an unsuitable manner of operation did not restrict his movements in state so as to deny him due process.

Affirmed.

## Attorneys and Law Firms

**\*107** William B. Beirne, A. L. Wirin, Fred Okrand, Los Angeles, Cal., for appellant.

Harvey Dickerson, Carson City, Nev., John C. Bartlett, Reno, Nev., Madison B. Graves, Las Vegas, Nev., J. A. Donnelley, San Diego, Cal., for appellees.

Before POPE, HAMLEY and KOELSCH, Circuit Judges.

## Opinion

HAMLEY, Circuit Judge:

John Marshall brought this civil rights action to recover damages and obtain injunctive relief.[1] He claimed that he was the victim of an unconstitutional agreement and policy to discriminate against him and to bar him from the State of Nevada, as an 'undesirable' person. Marshall named, as the so-called state defendants, the Governor of Nevada, State Gaming Control Board of Nevada, Nevada Gaming Commission, and the members of the board and commission. As the so-called non-state defendants, he named D.I. Operating Company, a Nevada corporation which operates the Desert Inn Hotel, and five employees of that company.

[1]   The provisions of the Civil Rights Act particularly relied upon are 28 U.S.C. § 1343(1), (3) and (4) (1964), and Rev.Stat. § 1979 (1875), 42 U.S.C. § 1983 (1964).

The district court dismissed the action on the ground that the federal court should abstain and remit Marshall to his state court remedies. We reversed and remanded the cause to the district court for further proceedings. Marshall v. Sawyer, 9 Cir., 301 F.2d 639. After a non-jury trial, judgment was entered for defendants. Marshall appeals.

The board and commission named above regulate and control legalized gambling in Nevada pursuant to the Nevada Gaming Control Act (Act), Chapter 463 of the Nevada Revised Statutes. On February 20, 1960, the commission adopted Regulation 5.010. Paragraph 1 of this regulation provides that all 'establishments wherein gaming is conducted' shall be operated in a manner 'suitable to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada.' Paragraph 3 of the regulation provides, in part, that 'catering to, assisting, employing or associating with, either socially or in business affairs, persons of notorious or unsavory reputation or who have extensive police records * * *' may be deemed '* * * unsuitable manners of operation. * * *'

To implement this part of Regulation 5.010, the board and commission, in February and early March, 1960, caused to be compiled a brochure commonly referred to as the black book. This document contains the name, photograph, description and other identifying data of eleven men considered by these agencies to be persons within the classes referred to in Regulation 5.010(3). Marshall is one of the persons so identified in the black book.

This brochure, together with a letter dated March 29, 1960, signed by the chairman of the board, was handed to

AR005208

representatives of the thirteen major casino operators in the Las Vegas area, and to representatives of other large casinos in other parts of the state. Board officials requested these representatives to cooperate with the board in **108** the program manifested by Regulation 5.010, the black book, and the letter of March 29, 1960.[2]

2    Board officials suggested various courses of action the licensees could take in providing such cooperation. Among these were the following: '* * * if detected while attempting to register at one of the major hotels included in this program, they might be told no rooms were available or should they succeed in registering under an assumed name or before their true identity were known to the management, they might be requested to leave and should they refuse, they might thereafter receive such poor service with respect to making up their rooms, the use of the telephone and in the coffee shop, showroom or bar, that they would shortly check out, it being recognized that as a matter of general practice, the gaming casinos themselves reserve the right to decline to permit certain individuals to gamble.'

Marshall had lived in Las Vegas for about four years during the 1950's. He engaged in business there and bought Nevada land, some of which he still owns. He has had occasion to return to Las Vegas on business several times; some of these trips were concerned with litigation over his property. In October, 1960, Marshall came to Las Vegas on business and registered at the Tropicana Hotel. He was immediately placed under surveillance by agents of the board. While he was there, representatives of that hotel told him he was in the black book and asked him to leave, stating that if he did not the hotel would lose its gambling license. Marshall left. That week whenever Marshall went to a Las Vegas establishment that operated a casino, he was asked to leave because of pressure from the state defendants.[3]

3    One method pursued by the state defendants in exerting pressure on licensing establishments was to send in teams of state agents to examine the dice and cards at the casinos which had catered to Marshall. This was done twice during the third week of October, 1960. Allard Roen, one of the managing officers of the Desert Inn testified that Chairman Abbaticchio told him the board was going to continue this type of procedure '* * * as long as people in the black book were being admitted to the hotels.'

At approximately 10:00 p.m. on the night of October 28, 1960, Marshall entered the premises of the Desert Inn Hotel. He occupied a seat in a booth in the bar some ten to twelve feet from the gaming area. From this seat he could observe gaming activity by looking over the back of the booth in which he was seated. Shortly thereafter, Don Borax and J. G. Murray, security officers of Desert Inn Hotel, requested Marshall to leave. He refused to do so and ordered another drink. A waitress from whom the drink was ordered refused to serve him. At this time Borax, Murray and the waitress were acting in accordance with instructions given to them by officers and agents of D.I. Operating Company.

Upon the refusal of Marshall to leave, Roen and Ruby Colod, managing officers of the company, again requested him to leave. Marshall once more refused to leave but moved directly to the bar, where he ordered another drink. The bartender moved away from Marshall and did not serve him. Marshall then asked for and received the names of the persons who has asked him to leave and who had refused him service, stating that it was for the purpose of this lawsuit.

Marshall was assured at the time that no physical force would be used to remove him from the premises, and that he would not be physically ejected. He thereupon left the Desert Inn Hotel. No physical force nor violence was visited upon him on the occasion just described. The non-state defendants asked Marshall to leave the premises of the Desert Inn Hotel solely because they had been requested by the board, its agents, representatives and employees, not to cater to Marshall.

Marshall was not excluded from any establishment serving food or drinks, or from any place offering rooms, or from any place of amusement in the State of Nevada except ones in which there were major casinos licensed by the commission. **109** None of the actions of the defendants, as described above, was based upon considerations of color, race, creed, religion or national origin.

The district court found that Marshall's name was included in the black book because he had an extensive police record. This record, the court found, spanned the period from April, 1929, through August, 1952, and involved six convictions, including one for a felony. The court found that these convictions were obtained under various names by which Marshall had been known, including the names Joe Russo, Frank Roberto, Marshall Cafano, Joseph Rinaldi and George Marshall.

The court further found that Marshall had been questioned at least a dozen times in connection with the investigation of crimes, including murder. Additionally, the court found that Marshall had a reputation in Chicago, Illinois, of using 'muscle techniques such as threats, extortions, bombings and murder.' On or about January 26, 1953, the

court found, Marshall was reported by the Chicago Crime Commission to have been arrested eighteen times between the years 1929 and 1951, and as having a reputation of being a bank robber, expeddler of alcohol and a current bookmaker.

The court found that at the time the black book was compiled the board was in possession of the information concerning Marshall, referred to above, and in possession of a report on organized crime in the State of California, a portion of which is quoted in the margin.[4] Marshall admitted that between the years 1937 and 1951 he was engaged in booking illegal bets on horse races in Chicago. At the trial he offered no evidence bearing upon his reputation, and admitted his police record, which record is also set out in his own complaint instituting this action.

[4]    Concerning Marshall, the report states:
'Reported to be top Lieutenant in Tony Accardo's Syndicate, the successor of the old Capone gang. In December 1957, when Cohen and Fred Sica attempted to muscle a gambler into paying a bookmaking debt, the victim phoned Caifano * in Chicago. The matter was quickly settled. Caifano is a suspected underworld muscle and triggerman. He is high up in the numbers racket. He has a record of arrests, including the serving of terms for both burglary and bank robbery. (* Plaintiff was born Marchello Caifano in New York City, and legally changed his name to John Michael Marshall in 1955 at Clark County, Nevada.)'

The district court found that the specific purpose of the state defendants in compiling the black book was to exclude the persons therein named, or any other person of similar character and qualifications, from the entire premises licensed for gaming. This would include not only the gaming area, but also the hotel, bars, restaurants, amusement areas, golf course, swimming pool and all other parts of the operation.

The district court further found that the state defendants acted reasonably in classifying Marshall as a person who should be excluded from gaming establishments in the State of Nevada. The court also found that the action of the state defendants in causing Marshall to be excluded from the entire premises where gaming was permitted and licensed, and not merely from the gaming area of such premises, was necessary in order to achieve effective enforcement of the Act and of the regulations of the commission and board. Additionally, the court found, Marshall suffered no pecuniary damage whatsoever by reason of his inability to remain in any hotel, bar or restaurant in Nevada where there was licensed gaming.

On the basis of these and other findings, the district court

concluded that none of the defendants violated any of Marshall's constitutional rights, and that he was entitled to no relief in this action. Judgment for defendants was thereupon entered and this appeal followed.

Marshall argues that the finding of fact that defendants acted reasonably in excluding him from the entire premises of establishments where gambling casinos **110 were in operation, and that such was necessary in order to achieve effective enforcement of the Act and Regulation 5.010, is clearly erroneous. He asserts that defendants made no showing of what the evil is that would result from his law-abiding presence in the nongaming portion of the premises.

Regulation 5.010 in effect warns each gaming licensee not to cater, in any part of the licensee's establishment, to 'persons of notorious or unsavory reputation or who have extensive police records.' This regulation therefore represents an administrative determination, made in the course of rule-making, that effective enforcement of the Act requires that such persons be excluded not only from the gaming area, but also any other part of the establishment.

 Marshall has not attacked the validity of this regulation.[5] It follows that there was no proper question of fact before the trial court as to whether exclusion of Marshall (assuming him to be a person of the kind described) from the entire establishment of the Desert Inn Hotel or any other major casino establishment, was necessary to achieve effective enforcement. The unchallenged regulation, manifesting an administrative determination to that effect, settled that question for the purposes of this case. No such question of fact being properly before the court, we need not decide whether the challenged finding of fact concerning that question is clearly erroneous.[6]

[5]    Had he done so, it would have been necessary to convene a three-judge court pursuant to 28 U.S.C. §§ 2281, 2284 (1964), since Regulation 5.010 constitutes an administrative order of general application representing considered state policy. See Marshall v. Sawyer, 9 Cir., 301 F.2d 639, 644-645.

[6]    For the same reason, Marshall's insistence, at the trial and here, that this is not a 'gambling case' because he was not endeavoring to enter the gaming area of the Desert Inn Hotel or any like establishment, is without relevance.

Marshall contends that, under the Supreme Court 'sit-in' decisions,[7] he could not have been forcibly removed from the Desert Inn Hotel as a trespasser while peacefully

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005210

requesting service therein and that, therefore, coercing him to leave in the manner described above violated his rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

7    The decisions cited are: Bell v. State of Maryland, 378 U.S. 226, 286, 293-294, 304, 346, 84 S.Ct. 1814, 12 L.Ed.2d 822, concurring opinion of Justice Goldberg, dissenting opinion of Justice Black; Avent v. State of North Carolina, 373 U.S. 375, 83 S.Ct. 1311, 10 L.Ed.2d 420; Gober v. City of Birmingham, 373 U.S. 374, 83 S.Ct. 1311, 10 L.Ed.2d 419; Lombard v. State of Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338; Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323; Garner v. State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207; and Boynton v. Commonwealth of Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206.

This argument is based on the proposition that all citizens whose conduct is peaceful and orderly have a constitutional right to enjoy private businesses offering public accommodations, free from state interference. But the cases cited do not establish such a broad and unrestricted right. The pronouncements of the Supreme Court in the 'sitin' decisions were directed at discrimination based solely on race; these cases are hardly analogous to the present situation which involves refusal of service on the basis of a criminal record in an establishment which also offers gambling activity.

Marshall has not attacked the validity of Regulation 5.010 which supported the defendants' action. For the purposes of this case, that regulation must therefore be considered a valid restriction on the use of gaming facilities by certain classes of individuals. Similarly, the determination inherent in unchallenged Regulation 5.010, that effective regulation requires the exclusion of these individuals from the entire premises of the establishments offering gaming must also **111** be considered valid. The presence of this regulation and Marshall's failure to contest it forecloses his argument based on a claimed right to unrestricted use of private businesses offering public accommodations.

Viewed in this light, the Supreme Court decisions relied upon by Marshall are inapposite, and his argument based on those decisions is without merit.

Marshall asserts that the effect of defendants' conduct was, arbitrarily and without warrant, to restrict, impede and impair his right to move in and about the State of Nevada, thereby depriving him of due process, in violation of the Fourteenth Amendment.

The basic premise of this argument is that Marshall has

been restricted and impeded in moving in and about the state 'arbitrarily and without warrant.' Unchallenged Regulation 5.010 establishes that such restriction as has been placed upon Marshall is not arbitrary and without warrant. This being so, his exclusion from fifteen or twenty Nevada gambling establishments has not restricted and impeded his movements in that state in any sense cognizable under the Fourteenth Amendment.

Marshall contends that is listing his name in the black book and accompanying letter, without first affording him an administrative hearing, the state defendants violated Article I, § 10, cl. 1 of the Constitution, which forbids the states from passing any bill of attainder, and also violated the Due Process Clause of the Fourteenth Amendment.

As generally understood, a bill of attainder is an act of a legislative body that applies either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial. Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 722, 71 S.Ct. 909, 95 L.Ed. 1317.

Marshall points to a passing comment by Justice Black in his concurring opinion in Joint Anti-Fascist Refugee Committee v. Mc.Grath, 341 U.S. 123, 143, 71 S.Ct. 624, 95 L.Ed. 817, as implying that an act by an administrative or executive branch of government may constitute a bill of attainder. We do not regard the language relied upon as authority for thus expanding what appellant himself concedes to be the traditional role of a bill of attainder.

Assuming, without deciding, that the black book and accompanying letter are, in other respects, in the nature of bills of attainder, the fact that they were not legislative acts deprives them of status as bills of attainder in the constitutional sense.

Procedural due process requires that when, as a premise for administrative action, an agency of government makes a determination of adjudicative facts, one who has a sufficient interest or right at stake shall be afforded an evidentiary hearing before the agency, except in the rare circumstance when some other interest, such as national security, justifies an overriding of such interest. See Davis, The Requirement of a Trial-Type Hearing, 70 Harv.L.Rev. 193, 199 (1956). We accept Professor Davis' definition of 'adjudicative facts':

'Adjudicative facts are facts about the parties and their activities, businesses, and properties, usually answering the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case.

AR005211

Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion.' (Ibid.)

Measured by the foregoing definition, the facts determined by the board and commission as a premise for inclusion of Marshall's name in the black book and accompanying letter— that he is a person of notorious or unsavory reputation, and is a person who has an extensive police record— are adjudicative facts. It may be seriously questioned, however, whether his wish to enter and obtain service in a licensed gambling establishment **\*112** constitutes an interest or right sufficient to entitle him to assert this due process claim.[8]

[8]    As required by the fact that Regulation 5.010 is not challenged by Marshall, we do not distinguish between the gaming and non-gaming areas of establishments which operate licensed casinos.

But, passing this, we believe there is another circumstance present here which precludes Marshall from asserting this due process claim. Under Regulation 5.010(3), persons who have an extensive police record are to be excluded from establishments which operate gambling casinos. The letter of March 29, 1960, which accompanied the black book, recites that the individuals named in that brochure are 'persons who come within the provisions of subsection 3(e) * * *' of that regulation.

Marshall in effect concedes the correctness of the agency determination, implicit in its compilation of the black book, that he has an extensive police record.[9] In his complaint he alleged, in detail, his own police record extending from 1929 to 1955. In the pretrial order proposed by Marshall's counsel, but which was not signed by the judge, the same police record was set forth. At the trial, Marshall admitted that he had a police record, and no evidence to the contrary was submitted on his behalf. The trial court expressly found that Marshall has an 'extensive' police record, and on this appeal he has not challenged that finding.

[9]    In the pretrial order proposed by Marshall, he indicated his willingness to agree that the basis for his designation as an 'undesirable' in his claimed criminal record, which is then set out in the proposed order. The trial court also so found, and Marshall has not questioned that finding.

In our opinion, one who concedes the correctness of an administrative determination of an adjudicative fact is not entitled to damages or injunctive relief in a civil rights action based on a claim that he was denied an evidentiary hearing in connection with the determination of that fact. Under the indicated circumstances, the due process claim is without substance and involves, at most, a technical violation which warrants neither an award of damages nor vindication in a court of equity.

This is not to say that administrative agencies may safely proceed to the determination of adjudicative facts without affording a hearing, on the assumption that the correctness of the factual determination can be sustained in court in the event a civil rights action is instituted. It is not the fact that the correctness of this factual determination has been upheld by the trial court in the present suit which renders Marshall's due process claim a mere technicality. The circumstance which does have that effect is the fact that Marshall himself concedes the correctness of that determination. It must be apparent that administrative agencies may not safely assume that, in other proceedings, they will be likewise relieved from liability which might otherwise attach if no evidentiary hearing is provided.

For the reasons indicated, and subject to the limitations stated, we hold that Marshall's claim based upon the failure to accord him an evidentiary hearing provides no basis for relief under the Due Process Clause.

Marshall argues that the action of the defendants in causing him to be ejected from the Desert Inn Hotel interfered with his right of privacy and repose guaranteed by the Fourth Amendment, made applicable to the states by the Fourteenth Amendment. He also contends that the described action of the defendants demonstrates such arbitrariness and unreasonableness in the classification of Marshall as a person unfit to be on the premises of a gaming establishment as to constitute a violation of the Equal Protection Clause of the Fourteenth Amendment.

These claims may or may not have merit as related to the provisions of Regulation 5.010 excluding described classes of persons from the entire premises **\*113** of the establishments which operate licensed gambling casinos. But Marshall has not challenged the validity of that regulation and may not do so in this suit.[10] Proceeding, as we must, on the assumption that the regulation is valid, and in the light of Marshall's concession and the trial court finding that he is a member of one of the classes named therein, the ejectment of Marshall from the Desert Inn Hotel did not deprive him of any constitutionally-guaranteed right of privacy and repose, or right to be protected from an arbitrary or unreasonable classification.

[10]    See note 5, above.

AR005212

**Marshall v. Sawyer, 365 F.2d 105 (1966)**

|  | **All Citations** |
|---|---|
| Affirmed. | 365 F.2d 105 |

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005213

Brower v. County of Inyo, 489 U.S. 593 (1989)

109 S.Ct. 1378, 103 L.Ed.2d 628

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Morrow v. Meachum, 5th Cir.(Tex.), March 8, 2019

109 S.Ct. 1378
Supreme Court of the United States

Georgia BROWER, Individually and as Administrator of the Estate of William James Caldwell (Brower), Deceased, et al., Petitioners
v.
COUNTY OF INYO et al.

No. 87–248.
|
Argued Jan. 11, 1989.
|
Decided March 21, 1989.

**Synopsis**
Section 1983 action was brought alleging that police officers, acting under color of state law, violated rights of decedent who was killed when stolen car he was driving at high speeds to elude pursuing police crashed into police roadblock, on basis that roadblock constituted unreasonable seizure due to excessive force. The United States District Court for the Eastern District of California, Robert E. Coyle, J., dismissed action and appeal was taken. The Court of Appeals, Ninth Circuit, Goodwin, Circuit Judge, 817 F.2d 540, reversed in part, affirmed in part and remanded. The Supreme Court, Justice Scalia, held that: (1) decedent was subject to Fourth Amendment seizure by placement of roadblock, and (2) complaint adequately alleged unreasonable seizure for purposes of § 1983 liability.

Reversed and remanded.

Justice Stevens filed opinion concurring in judgment in which Justices Brennan, Marshall and Blackmun joined.

Opinion on remand, 884 F.2d 1316.

**1379 *593 *Syllabus*

Petitioners' decedent (Brower) was killed when the stolen car he had been driving at high speeds to elude pursuing police crashed into a police roadblock. Petitioners brought suit under 42 U.S.C. § 1983 in Federal District Court, claiming, *inter alia,* that respondents, acting under color of law, violated Brower's Fourth Amendment rights by effecting an unreasonable seizure using excessive force. Specifically, the complaint alleges that respondents placed an 18–wheel truck completely across the highway in the path of Brower's flight, behind a curve, with a police cruiser's headlights aimed in such fashion as to blind Brower on his approach. It also alleges that the fatal collision was a "proximate result" of this police conduct. The District Court dismissed for failure to state a claim, concluding that the roadblock was not unreasonable under the circumstances, and the Court of Appeals affirmed on the ground that no "seizure" had occurred.

*Held:*

1. Consistent with the language, history, and judicial construction of the Fourth Amendment, a seizure occurs when governmental termination of a person's movement is effected through means intentionally applied. Because the complaint alleges that Brower was stopped by the instrumentality set in motion or put in place to stop him, it states a claim of Fourth Amendment "seizure." Pp. 1380–1382.

2. Petitioners can claim the right to recover for Brower's death because the **1380 unreasonableness alleged consists precisely of setting up the roadblock in such a manner as to be likely to kill him. On remand, the Court of Appeals must determine whether the District Court erred in concluding that the roadblock was not "unreasonable." Pp. 1382–1383.

817 F.2d 540 (CA9 1987), reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and WHITE, O'CONNOR, and KENNEDY, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post,* p. ——.

**Attorneys and Law Firms**

***U.S.594** *Robert G. Gilmore* argued the cause for petitioners. With him on the briefs was *Craig A. Diamond.*

*Philip W. McDowell* argued the cause for respondents. With him on the brief was *Gregory L. James.*

**Opinion**

AR005214

Justice SCALIA delivered the opinion of the Court.

On the night of October 23, 1984, William James Caldwell (Brower) was killed when the stolen car that he had been driving at high speeds for approximately 20 miles in an effort to elude pursuing police crashed into a police roadblock. His heirs, petitioners here, brought this action in Federal District Court under 42 U.S.C. § 1983, claiming, *inter alia,* that respondents used "brutal, excessive, unreasonable and unnecessary physical force" in establishing the roadblock, and thus effected an unreasonable seizure of Brower, in violation of the Fourth Amendment. Petitioners alleged that "under color of statutes, regulations, customs and usages," respondents (1) caused an 18–wheel tractor-trailer to be placed across both lanes of a two-lane highway in the path of Brower's flight, (2) "effectively concealed" this roadblock by placing it behind a curve and leaving it unilluminated, and (3) positioned a police car, with its headlights on, between Brower's oncoming vehicle and the truck, so that Brower would be "blinded" on his approach. App. 8–9. Petitioners further alleged that Brower's fatal collision with the truck was "a proximate result" of this official conduct. *Id.,* at 9. The District Court granted respondents' motion to dismiss the complaint for failure to state a claim on the ground (insofar as the Fourth Amendment claim was concerned) that "establishing a roadblock [was] not unreasonable under the circumstances." App. to Pet. for Cert. A–21. A divided panel of the Court of Appeals for the Ninth Circuit affirmed the dismissal of the Fourth Amendment claim on the basis that no "seizure" had occurred. 817 F.2d 540, 545–546 (1987). We granted certiorari, 487 U.S. 1217, 108 S.Ct. 2869, 101 L.Ed.2d 904 (1988), to resolve a conflict between that decision and the contrary holding **595 of the Court of Appeals for the Fifth Circuit in *Jamieson v. Shaw,* 772 F.2d 1205 (1985).

The Fourth Amendment to the Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), all Members of the Court agreed that a police officer's fatal shooting of a fleeing suspect constituted a Fourth Amendment "seizure." See *id.,* at 7, 105 S.Ct., at 1699; *id.,* at 25, 105 S.Ct., at 1708 (O'CONNOR, J., dissenting). We reasoned that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Id.,* at 7, 105 S.Ct., at 1699. While acknowledging *Garner,* the Court of Appeals here concluded that no "seizure" occurred when Brower collided with the police roadblock because "[p]rior to his failure to stop voluntarily, his freedom of movement was never arrested or restrained" and because "[h]e had a number **1381 of opportunities to stop his automobile prior to the impact." 817 F.2d, at 546. Essentially the same thing, however, could have been said in *Garner.* Brower's independent decision to continue the chase can no more eliminate respondents' responsibility for the termination of his movement effected by the roadblock than Garner's independent decision to flee eliminated the Memphis police officer's responsibility for the termination of his movement effected by the bullet.

The Court of Appeals was impelled to its result by consideration of what it described as the "analogous situation" of a police chase in which the suspect unexpectedly loses control of his car and crashes. See *Galas v. McKee,* 801 F.2d 200, 202–203 (CA6 1986) (no seizure in such circumstances). We agree that no unconstitutional seizure occurs there, but not for a reason that has any application to the present case. *596 Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, see *Hill v. California,* 401 U.S. 797, 802–805, 91 S.Ct. 1106, 1110–1111, 28 L.Ed.2d 484 (1971); cf. *Maryland v. Garrison,* 480 U.S. 79, 85–89, 107 S.Ct. 1013, 1017–1020, 94 L.Ed.2d 72 (1987), but the detention or taking itself must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act. The writs of assistance that were the principal grievance against which the Fourth Amendment was directed, see *Boyd v. United States,* 116 U.S. 616, 624–625, 6 S.Ct. 524, 528–529, 29 L.Ed. 746 (1886); T. Cooley, Constitutional Limitations *301–*302, did not involve unintended consequences of government action. Nor did the general warrants issued by Lord Halifax in the 1760's, which produced "the first and only major litigation in the English courts in the field of search and seizure," T. Taylor, Two Studies in Constitutional Interpretation 26 (1969), including the case we have

Brower v. County of Inyo, 489 U.S. 593 (1989)
109 S.Ct. 1378, 103 L.Ed.2d 628

described as a "monument of English freedom" "undoubtedly familiar" to "every American statesman" at the time the Constitution was adopted, and considered to be "the true and ultimate expression of constitutional law," *Boyd, supra,* at 626, 6 S.Ct., at 530 (discussing *Entick v. Carrington,* 19 How.St.Tr. 1029, 95 Eng.Rep. 807 (K.B. 1765)). In sum, the Fourth Amendment addresses "misuse of power," *Byars v. United States,* 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927), not the accidental effects of otherwise lawful government conduct.

 Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant—even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an **\*597** individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.* That is the reason there was no seizure in the hypothetical situation that concerned the Court of Appeals. The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means—his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

This analysis is reflected by our decision in **\*\*1382** *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), where an armed revenue agent had pursued the defendant and his accomplice after seeing them obtain containers thought to be filled with "moonshine whisky." During their flight they dropped the containers, which the agent recovered. The defendant sought to suppress testimony concerning the containers' contents as the product of an unlawful seizure. Justice Holmes, speaking for a unanimous Court, concluded: "The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined

the contents of each after they had been abandoned." *Id.,* at 58, 44 S.Ct., at 446. Thus, even though the incriminating containers were unquestionably taken into possession as a result (in the broad sense) of action by the police, the Court held that no seizure had taken place. It would have been quite different, of course, if the revenue agent had shouted, "Stop and give us those bottles, in the name of the law!" and the defendant and his accomplice had complied. Then the taking of possession would have been **\*598** not merely the result of government action but the result of the very means (the show of authority) that the government selected, and a Fourth Amendment seizure would have occurred.

 In applying these principles to the dismissal of petitioners' Fourth Amendment complaint for failure to state a claim, we can sustain the District Court's action only if, taking the allegations of the complaint in the light most favorable to petitioners, see *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), we nonetheless conclude that they could prove no set of facts entitling them to relief for a "seizure." See *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Petitioners have alleged the establishment of a roadblock crossing both lanes of the highway. In marked contrast to a police car pursuing with flashing lights, or to a policeman in the road signaling an oncoming car to halt, see *Kibbe v. Springfield,* 777 F.2d 801, 802–803 (CA1 1985), cert. dism'd, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987), a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur. It may well be that respondents here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the barrier, but we do not think it practicable to conduct such an inquiry into subjective intent. See *United States v. Leon,* 468 U.S. 897, 922, n. 23, 104 S.Ct. 3405, 3420, n. 23, 82 L.Ed.2d 677 (1984); see also *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2736–2739, 73 L.Ed.2d 396 (1982). Nor do we think it possible, in determining whether there has been a seizure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (*e.g.,* one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (*e.g.,* one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been **\*599** stopped by the accidental

AR005216

Brower v. County of Inyo, 489 U.S. 593 (1989)

109 S.Ct. 1378, 103 L.Ed.2d 628

discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.

This is not to say that the precise character of the roadblock is irrelevant to further issues in this case. "Seizure" **1383 alone is not enough for § 1983 liability; the seizure must be "unreasonable." Petitioners can claim the right to recover for Brower's death only because the unreasonableness they allege consists precisely of setting up the roadblock in such manner as to be likely to kill him. This should be contrasted with the situation that would obtain if the sole claim of unreasonableness were that there was no probable cause for the stop. In that case, if Brower had had the opportunity to stop voluntarily at the roadblock, but had negligently or intentionally driven into it, then, because of lack of proximate causality, respondents, though responsible for depriving him of his freedom of movement, would not be liable for his death. See *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); *Cameron v. Pontiac,* 813 F.2d 782, 786 (CA6 1987). Thus, the circumstances of this roadblock, including the allegation that headlights were used to blind the oncoming driver, may yet determine the outcome of this case.

The complaint here sufficiently alleges that respondents, under color of law, sought to stop Brower by means of a roadblock and succeeded in doing so. That is enough to constitute a "seizure" within the meaning of the Fourth Amendment. Accordingly, we reverse the judgment of the Court of Appeals and remand for consideration of whether the District Court properly dismissed the Fourth Amendment claim *600 on the basis that the alleged roadblock did not effect a seizure that was "unreasonable."

*It is so ordered.*


Justice STEVENS, with whom Justice BRENNAN, Justice MARSHALL, and Justice BLACKMUN join, concurring in the judgment.

The Court is unquestionably correct in concluding that respondents' use of a roadblock to stop Brower's car constituted a seizure within the meaning of the Fourth Amendment. I therefore concur in its judgment. I do not, however, join its opinion because its dicta seem designed to decide a number of cases not before the Court and to establish the proposition that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control."  *Ante,* at 1380.

The intentional acquisition of physical control of something is no doubt a characteristic of the typical seizure, but I am not entirely sure that it is an essential element of every seizure or that this formulation is particularly helpful in deciding close cases. The Court suggests that the test it articulates does not turn on the subjective intent of the officer. *Ante,* at 1382. This, of course, see, not only comports with the recent trend in our cases, see, *e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2736–2739, 73 L.Ed.2d 396 (1982); *United States v. Mendenhall,* 446 U.S. 544, 554, n. 6, 100 S.Ct. 1870, 1877, n. 6, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), but also makes perfect sense. No one would suggest that the Fourth Amendment provides no protection against a police officer who is too drunk to act intentionally, yet who appears in uniform brandishing a weapon in a threatening manner. Alternatively, however, the concept of objective intent, at least in the vast majority of cases, adds little to the well-established rule that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.,* at 554, 100 S.Ct., at 1877 *601 opinion of Stewart, J.); see also *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

There may be a case that someday comes before this Court in which the concept of intent is useful in applying the Fourth Amendment. What is extraordinary about the Court's discussion of the intent requirement in this case is that there is no dispute that the roadblock was intended to stop the decedent. Decision in the case before us is thus not advanced by pursuing a hypothetical **1384 inquiry concerning whether an unintentional act might also violate the Fourth Amendment. Rather, as explained in Judge Pregerson's dissent in the Court of Appeals, this case is plainly controlled by our decision in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). 817 F.2d 540, 548 (CA9 1987) (opinion concurring in part and dissenting in part). In that case, we held that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S., at 7, 105 S.Ct., at 1699. Because it was undisputed that the police officer acted intentionally, we did not discuss the hypothetical case of an unintentional seizure. I would

AR005217

**Brower v. County of Inyo, 489 U.S. 593 (1989)**

109 S.Ct. 1378, 103 L.Ed.2d 628

exercise the same restraint here.

I am in full accord with Judge Pregerson's dissenting opinion, and, for the reasons stated in his opinion, I join the Court's judgment.

**All Citations**

489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628

---

**End of Document**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   19

AR005218

926 F.2d 532
United States Court of Appeals,
Sixth Circuit.

Leisa GIBSON, Plaintiff–Appellant,

v.

Robert MATTHEWS, Warden, Federal
Correctional Institution, Individually and in his
Official Capacity; William Ellis, M.D., Individually
and in his Official Capacity; Edgar Sim,
Individually and in his Official Capacity; Tim
Picard, Individually and in his Official Capacity;
Stanley E. Morris, Director, U.S. Marshals Service,
in his Official Capacity; Ten Unknown Named
Agents, U.S. Marshals Service, Individually and in
their Official Capacities, Defendants–Appellees.

No. 89–5284.
|
Argued Dec. 8, 1989.
|
Decided Feb. 22, 1991.

**Synopsis**

Prisoner brought civil right suit alleging that prison
officials violated her constitutional rights in not enabling
her to have an abortion. The United States District Court
for the Eastern District of Kentucky, Scott Reed, J., 715
F.Supp. 181, granted summary judgment for prison
officials, and prisoner appealed. The Court of Appeals,
Boggs, Circuit Judge, held that: (1) officials were entitled
to qualified immunity, and (2) officials' actions did not
rise to level of constitutional violation.

Affirmed.

**Attorneys and Law Firms**

**\*533** David A. Friedman, Sara L. Pratt (argued),
American Civil Liberties Union of Kentucky, Louisville,
Ky., for Leisa Gibson.

Louis DeFalaise, U.S. Atty., Marianna J. Read, Asst. U.S.
Atty., Lexington, Ky., John Cordes, Lowell V. Sturgill, Jr.
(argued), Dept. of Justice, Appellate Staff, Civil Div.,
Marianne Finnerty, Trial Atty., U.S. Dept. of Justice, Jay
S. Bybee, U.S. Dept. of Justice, Civil Div., Barbara L.
Herwig, U.S. Dept. of Justice, Appellate Staff, Civil Div.,
Washington, D.C., for defendants-appellees.

Before MILBURN and BOGGS, Circuit Judges, and

ENGEL, Senior Circuit Judge.

**Opinion**

BOGGS, Circuit Judge.

Leisa Gibson, a formerly pregnant bank robber serving
time in federal prison, has sued numerous federal
officials, stating that she wanted to have an abortion and
was not enabled to do so as a result of the actions of
different federal officials. She contends that these actions
violated her rights under the fifth, eighth and ninth
amendments to the Constitution, and thus constituted a
violation of 42 U.S.C. § 1983. The district court construed
her allegations in the manner most favorable to her, but
nevertheless granted defendants summary judgment. 715
F.Supp. 181 (1989). We AFFIRM the district court's
grant of summary judgment for the defendants because
we agree with the district court that Gibson's complaint
does not state a constitutional violation, and we also hold
that the defendants are entitled to qualified immunity.

I

Gibson was convicted of robbery in federal district court
on January 28, 1986. The undisputed facts of Gibson's
story begins while she was in the Harris County, Texas,
Jail, awaiting sentencing. She wrote letters on April 16,
1986 to the federal public defender and on April 24, 1986
to the district judge who would sentence her. In each
letter she specifically indicated a desire to terminate her
then existing pregnancy. In the letter to the public
defender, she indicated that she was then "13–14 weeks"
pregnant, which would indicate a conception date in
mid-January and a probable delivery date in mid-October
of that year.

Thereafter, according to Gibson, she made repeated
requests of virtually everyone that she came in contact
with for assistance in carrying out the abortion, but was
thwarted at every turn. For the purposes **\*534** of this
appeal from a grant of summary judgment, we will
consider the issues strictly assuming that her version of
these events is correct.[1]

[1]   We note for the record, however, that virtually every
     official with whom she dealt disputes her version of
     these events: the Alderson medical records show no

request for an abortion; Sim and Picard deny that she ever spoke to them about an abortion; Ellis's contemporaneous medical notes specifically state that she does not want an abortion; and counselor Martin specifically denies that she ever asked about an abortion.

According to Gibson, she had various dealings with United States Marshals while still in custody in Texas before and after sentencing. She asked them on each occasion to help her procure an abortion. She also asked various jail nurses and a female jail officer for help, all of whom referred her to the Marshals.

She was sentenced on May 16, and the federal judge requested information on when she would be moved to a federal prison and asked that the abortion be carried out as soon as possible.

On June 10, after a several day trip through various federal prison facilities in Oklahoma and Georgia, Gibson arrived at Alderson Prison in West Virginia, and dealt with several medical personnel there. She was told that no abortions were performed there, and that she would have to go to the prison in Lexington, Kentucky for an abortion.

On June 17, she arrived at the Federal Correctional Institution in Lexington, and was examined the same day by two physician's assistants, who told her that her pregnancy was too far along for an abortion. An appointment with a doctor was apparently scheduled for June 20, but she did not keep the appointment because she was not informed of it.

On June 28, according to Gibson (the medical records indicate June 26), she met with Dr. Ellis, who informed her that it was too late to have an abortion at that time. Gibson's affidavit also alleges that she told a prison chaplain, counselors and a psychiatrist of her desire for an abortion. She can provide a specific name for only one of these persons, Beatrice Martin, who is not named as a defendant.

Gibson has now sued the following individuals based on the following theories:

1. Dr. Ellis, for not having helped her have the abortion;

2. Edgar Sim and Tim Picard, two physician's assistants, who met with the plaintiff on June 17 and did not assist her in having the abortion;

3. Robert Matthews, the warden of the Lexington Federal Correctional Institution, for failure to train and supervise those at FCI Lexington;

4. Stanley Morris, the Director of the United States Marshals Service, only in his official capacity;

5. Ten unnamed and otherwise unspecified marshals, presumably those who had some contact with her during her transportation through the federal prison system.

The district court dismissed the case as to all defendants. It appears that an appeal was not prosecuted with regard to Morris, and the "unnamed marshals" have never been specified or even described, nor has any evidence been shown that they are amenable to service in the district in which Gibson filed her suit.[2]

[2]   Gibson brought an independent suit against the marshals that she had contact with in Texas, and that suit has been dismissed. *Gibson v. Baker, et al.,* No. H–88–1669 (S.D.Tex. May 10, 1989).

The suit against Morris was dismissed because he was sued only in his official capacity, and such a suit was equivalent to a suit against the United States and thus barred by sovereign immunity. The other officials were sued both in their individual and official capacity, and the official capacity suits were similarly dismissed. Thus, the only defendants before us are the warden (Matthews), the doctor (Ellis) and the assistants (Sim and Picard), in their individual capacities.

Although it may appear from the facts that Gibson was a victim of the bureaucracy as **\*535** a whole and that no person took care to see that her situation was dealt with, rather than "passing the buck," this theory cannot suffice to affix personal liability on any of the defendants. If any one of them is to be held liable, it must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants.

Thus, we must focus on the action of each defendant in turn. Continuing to take the facts as stated by Gibson and in the light most favorable to her, the following are the actions taken by each defendant.

Sim and Picard met with her the same day she arrived at Lexington, having had no responsibility for her failure to arrive any sooner, and told her that they believed that it was too late for an abortion. Based on the time table established by Gibson herself in the letter to the public

AR005220

Gibson v. Matthews, 926 F.2d 532 (1991)

defender, she was now 22 to 23 weeks pregnant. They did schedule an appointment with Dr. Ellis within three days, and she actually met with Ellis nine days later, on June 26. Dr. Ellis saw her, and informed her that he could not arrange an abortion, because it was "too late."

Warden Matthews had no involvement in the above events, and met with Gibson only one time, after she had given birth. There is no indication that Matthews was in fact aware of Gibson's condition or even her presence during the events in June, nor that he had any communication of any type with Ellis, Sim, or Picard concerning pregnancy or abortions.

II

We uphold the district court's judgment in part because we believe that the defendants are entitled to qualified immunity under the doctrine established in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court in *Harlow* held that an official action does not give rise to a cause of action unless any reasonable government official would know or reasonably should have known that the action would violate a clearly established constitutional right. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). We do not believe that it was a clearly established constitutional right at the time of the alleged actions regarding Gibson that federal prison employees were required to facilitate prisoners in their requests for an abortion.

At the time these events took place, there were no reported cases regarding the abortion rights of prisoners. The Third Circuit, in *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir.1987), subsequently struck down a county policy requiring a court order before prisoners could have an abortion, and implicitly extended to prisoners a right not to be prevented from having an abortion because of their incarcerated status. Since that time, only one other case has dealt with the issue. That case, *Bryant v. Maffucci,* 729 F.Supp. 319 (S.D.N.Y.1990), upheld a grant of summary judgment for defendants when a prisoner's scheduled abortion was not performed because the pregnancy was of 24 weeks duration and abortions could not legally be performed in the third trimester.

In 1986, at the time of the events in this case, federal prison policy stated that prisoners should be required to

execute a form taking responsibility for a decision either to have an abortion or carry a pregnancy to term. 28 C.F.R. § 551.23. A bar on federal payment for inmate abortions was mandated by statute in 1986. Pub.L. No. 99–500, Title II, § 209, 100 Stat. 1783–56.

Under these circumstances, the defendants are entitled to summary judgment on the issue of qualified immunity. *See Russ' Kwik Car Wash v. Marathon Petroleum Co.,* 772 F.2d 214 (6th Cir.1985). In 1986, there simply was no ruling or consensus on the issue of whether a prison was required to furnish or arrange abortion for inmates. The *Monmouth* decision itself refers to the question as "a novel constitutional decision." *Monmouth,* 834 F.2d at 355 (Mansmann, J., concurring). While a prisoner does not lose all constitutional rights within prison, *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), a **\*536** large number of rights are significantly curtailed because of the fact that the prisoner is not at physical liberty to make arrangements that would be possible were the prisoner able to travel in the community.

It was also not clearly established that the fifth amendment required prison officials to accommodate prisoners desiring to have abortions. The Supreme Court had ruled in both *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), that the government was not under an obligation to facilitate abortions, either by explicitly funding them for poor women or by providing abortion funding in state welfare programs. Other cases have held that the government cannot restrict access to abortions, but in those cases the government acted wholly in a prohibitory manner, rather than simply failing to act. The actions that Gibson thinks the prison officials should have performed fall, in our opinion, closer to a failure to act than a prohibition. Accordingly, in light of *Maher* and *Harris,* we believe that there was no clearly established constitutional right of a prisoner under the fifth amendment to require the aid of prison officials in procuring an abortion.

Even if we were to conclude that the holding of *Monmouth* and the import of the prison regulations were clearly established constitutional law prior to 1986, there is no indication that Ellis, Sim, or Picard did anything other than exercise their honest medical judgment. We do not believe that the defendants should have known that their belief that it was too late to procure an abortion violated Gibson's constitutional rights. By Gibson's own letter, she was 22 to 24 weeks pregnant by the time these events took place, a time at which virtually no abortions are performed in the United States. *See* National Center

AR005221

for Health Statistics, *Monthly Vital Statistics Report,* Jan. 5, 1990 (only 1.2% of abortions are performed after the 21st week of pregnancy); Amicus Brief of American Medical Association, et al., for Appellees, *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (No. 88–605) (only 1% of all abortions are performed after the 20th week of pregnancy). She herself had, more than ten weeks earlier, indicated that an abortion, if it were to be performed, should be performed in the next three to five weeks. Under these circumstances, we do not believe that every reasonable official should have known that he or she was violating the constitution by acting toward Gibson as each defendant did act. *Dominque,* 831 F.2d at 676.

III

We would uphold the district court even if qualified immunity was not available. Plaintiff presents three separate constitutional sources as indicating that the right to have an abortion would have been considered clearly established. Even taking her allegations as true, none of them supports her contention that the defendants' actions toward her rose to the level of a constitutional violation.

A. The Eighth Amendment

There is no indication in the holding or even language of any case prior to *Monmouth* that failure to arrange an abortion would be considered "deliberate indifference to serious medical needs," the standard established in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) as the standard for eighth amendment violations. Even if we presume that the defendants should have known before *Monmouth* that an abortion was a "serious medical need" within the meaning of *Estelle,* we do not see how the defendants' actions could be viewed as "deliberate indifference" to that need. Defendants paid prompt and serious attention to her needs as soon as each of them became aware of her desire for an abortion. The delay in attending Gibson which resulted in her inability to have the abortion was in large part due to the delay in transporting her to the Lexington facility, actions beyond the control of the defendants. Their considered opinion that it was too late to arrange an abortion is reasonable in light *537 of the very small number of abortions actually performed after the 24th week of pregnancy. We agree with the district court that, at most, the actions here amounted to negligence, although it is not even alleged that the medical personnel were exercising anything other than their best medical judgment or that such judgment was incorrect. Accordingly, Gibson's eighth amendment claim is denied.

B. Fifth Amendment Substantive Due Process

Defendants' actions also do not violate the fifth amendment's substantive due process clause. The Supreme Court has held, in *Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1985), that mere negligent conduct by a government official could not serve as a deprivation of an individual's liberty interest under the due process clause. As we have noted earlier, the defendants' actions can at best be described as negligent. While reckless or arbitrary deprivation of a liberty interest can also give rise to a fifth amendment violation, *Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277 (6th Cir.1987) (en banc), we do not believe that the defendants' actions rise to that level either.

*Nishiyama* involved the death of a young woman, Kathy Nishiyama, through the grossly negligent acts of the Dickson County Sheriff's Department. The Department permitted a convicted felon, Charles Hartman, to drive a marked and fully equipped patrol car without a police officer present. On the night in question, deputies of the Department told Hartman that he should drive a patrol car back to the jail, unattended, for the personal convenience of the deputies. During this "return trip," Hartman used the flashing blue lights to stop the victim, whom he then beat to death.

We held in *Nishiyama* that an official triggered a § 1983 claim if he or she "intentionally does something unreasonable with disregard to a known risk ... and of a magnitude such that it is highly probable that harm will follow." *Nishiyama,* 814 F.2d at 282. This obviously means that the official must be able to have undertaken another action to prevent the harm without that other action producing an offsetting danger or complication. Here, the lateness in term provided a complication that Gibson's suggested course of action could not have avoided. By analogy to *Nishiyama,* giving Hartman the patrol car when the alternative was simply to procure another ride or call another car to bring deputies out to

Gibson v. Matthews, 926 F.2d 532 (1991)

supervise Hartman was an easy case. The alternative raised no risk of an alternative harm or complication. Giving Hartman the same car in a different situation, such as if it had been necessary to have Hartman drive a critically injured accident victim to a hospital, would pose an entirely different question.

### C. Ninth Amendment

We agree with the district court that the ninth amendment does not confer substantive rights in addition to those conferred by other portions of our governing law. The ninth amendment "was added to the Bill of Rights to ensure that the maxim *expressio unius est exclusio alterius* would not be used at a later time to deny fundamental rights merely because they were not specifically enumerated in the Constitution." *Charles v. Brown,* 495 F.Supp. 862, 863–64 (N.D.Ala.1980). Accordingly, Gibson's ninth amendment claim holds no merit.

### D. Violation of Federal Regulation

At this time a federal regulation stated that prison officials should assist in procuring an abortion for prisoners who desired one. 28 C.F.R. § 551.23. However, in the language of *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and *Washington v. Starke,* 855 F.2d 346 (6th Cir.1988), this regulation did not use "language of an unmistakably mandatory character" with "specified substantive predicates." Thus, official discretion may be employed. *See Hewitt,* 459 U.S.

at 471–72, 103 S.Ct. at 871–72. The regulations merely indicated that certain assistance should be given to prisoners, analogous to **\*538** the regulations requiring prison officials to provide reading materials to prisoners at the prisoners' request. 28 C.F.R. § 541.21(8). The regulations clearly place the responsibility for having an abortion on the prisoner. 28 C.F.R. § 581.23(a) (1986). The regulations are clear that "[a]n inmate shall sign a statement of responsibility for the decision to have an abortion or to bear the child." 28 C.F.R. § 551.23(c) (1986). The inmate is required to give the staff direction "to arrange for the abortion to take place at a hospital or clinic outside the institution." 28 C.F.R. § 551.23(d) (1986). A regulation creates a protected liberty interest only if it is couched in such mandatory terms that "a plaintiff 'must have a legitimate claim of entitlement to that interest, not simply a unilateral expectation of it.' " *Starke,* 855 F.2d at 349, *quoting Bills v. Henderson,* 631 F.2d 1287, 1292 (6th Cir.1980). We do not believe that these regulations at issue are so mandatory that Gibson could believe that the defendants were required, absent clear direction from her, to facilitate her abortion.

### IV

We therefore find no error in the actions of the trial court, and AFFIRM the summary judgment for all defendants based on the failure of Gibson's complaint to state a constitutional violation and on the defense of qualified immunity.

### All Citations

926 F.2d 532

End of Document                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005223

495 F.Supp. 862
United States District Court, N.D. Alabama, Western
Division.

Spencer CHARLES et al., Plaintiffs,
v.
Robert BROWN et al., Defendants.

No. CV 80-540-W.
|
Sept. 4, 1980.

**Synopsis**
On motion to dismiss civil rights action predicated on rights allegedly secured by the Ninth Amendment, the District Court, Hancock, J., held that there is nothing in the Ninth Amendment, which is merely a rule of construction, to be incorporated by the Fourteenth Amendment, and thus a civil rights claim based solely on alleged Ninth Amendment rights had to fail.

Motion granted.

**Attorneys and Law Firms**

**\*863** Joel R. Chandler, Sogol & Chandler, Tuscaloosa, Ala., for plaintiffs.

Ray Ward, Ray, Oliver & Ward, Tuscaloosa, Ala., for defendants.

MEMORANDUM OF DECISION

HANCOCK, District Judge.

This cause came to be heard on defendants' motion to dismiss at the scheduled motion docket on June 20, 1980, in Tuscaloosa, Alabama. Two grounds that defendants state in support of their motion merit consideration. These are: (1) that the complaint fails to state a claim upon which relief can be granted and (2) that subject matter jurisdiction is lacking.

The complaint endeavors to state a cause of action under 42 U.S.C. s 1983 predicated on rights which plaintiffs argue are secured to them by the Ninth Amendment to the United States Constitution. This claim is said to arise from the following facts. Early in May, 1979, defendants authored, published and/or circulated a publication wherein appeared an article pertaining to a speech and language program operated in Greene County. Plaintiff Margaret Charles, a minor, was pictured in this article and her emotional behavior was discussed, allegedly without the consent or authorization of her parents. Plaintiffs contend that the publication of this article subjected them to public contempt and ridicule and constituted an invasion of their right to privacy.

Plaintiffs do not assert that their rights are derived from any constitutional source other than the Ninth Amendment, except that plaintiffs' attorney stated at oral argument that the Fourteenth Amendment should have been included in the complaint for the purpose of incorporating the Ninth Amendment for application to the states. There is ample authority for the principle that provisions expressing fundamental personal rights and found within the first eight amendments to the Constitution have in effect been incorporated into the Fourteenth Amendment and thereby been made applicable to the states. There is no authority, however, stating that the Ninth Amendment has been absorbed by this process.

The rationale behind this becomes apparent after one engages in an analysis of the Ninth Amendment. In contrast to the first eight amendments, the Ninth Amendment does not specify any rights of the people, rather it serves as a savings clause to keep from lowering, degrading or rejecting any rights which are not specifically mentioned in the document itself. The Ninth Amendment does not raise those unmentioned rights to constitutional stature; it simply takes cognizance of their general existence. This is not to say that no unenumerated rights are constitutional in nature, for some of them may be found in the penumbras of the first eight amendments or in the liberty concept of the Fourteenth Amendment and, thus, rise to constitutional magnitude. It is only to say, however, that unenumerated rights do not rise to constitutional magnitude by reason of the Ninth Amendment.

The foregoing interpretation of the Ninth Amendment is supported by the history of that provision, which reflects that the Ninth Amendment was added to the Bill of Rights to ensure that the maxim expressio unius est exclusio alterius would not be used at a later time to deny fundamental rights merely because they were not **\*864**

AR005224

specifically enumerated in the Constitution. 1 Annals of Congress 438-40 (1789); II Story, Commentaries on the Constitution of the United States 626-27 & 651 (5th ed. 1891). Therefore, this court is of the opinion that there is nothing in the Ninth Amendment to be incorporated by the Fourteenth Amendment as the Ninth Amendment is merely a rule of construction. The alternative interpretation, which is unacceptable to this court, would be to construe the Ninth Amendment as incorporating all fundamental rights into the Constitution, although they were never intended to be rights of constitutional magnitude.

A fortiori a s 1983 claim based solely on alleged Ninth Amendment rights must fail because there are no constitutional rights secured by that amendment. Accordingly, defendants' motion to dismiss will be granted and an order to this effect will be entered. The dismissal of the action will be without prejudice, and plaintiffs may amend their complaint in this court within 20 days or file a new action in another court if they desire to seek redress for the alleged wrongful conduct of defendants.

**All Citations**

495 F.Supp. 862

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005225

256 F.Supp.2d 493
United States District Court,
E.D. Virginia,
Alexandria Division.

UNITED STATES of America
v.
Alfred Wayne FINNELL

No. CR. 00–280–A.
|
April 10, 2003.

**Synopsis**

After defendant's conviction for possession of firearm by person previously convicted of misdemeanor crime of domestic violence was affirmed on direct appeal, 27 Fed.Appx. 166, 2001 WL 1464305, defendant moved to vacate. The District Court, Ellis, J., held that: (1) defendant's claims were procedurally defaulted; (2) sentence did not violate Eighth Amendment; and (3) statute under which defendant was convicted did not violate either the Ninth Amendment or the Fourteenth Amendment.

Motion denied.

**Attorneys and Law Firms**

**\*494** Kathleen M. Kahoe, United States Attorney's Office, Alexandria, VA, for U.S.

**\*495** Richard E. Gardiner, Fairfax, VA, for Alfred Wayne Finnell.

***ORDER***

ELLIS, District Judge.

The matter is before the Court on defendant's *pro se* motion to vacate, set aside or correct sentence, pursuant to 28 U.S.C. § 2255. Oral argument is dispensed with because the facts and legal contentions are adequately set forth in the existing record and oral argument would not

aid the decisional process.[1]

[1]   *See United States v. Yearwood,* 863 F.2d 6, 7 (4th Cir.1988) (recognizing that "[a] hearing is not required...on a § 2255 motion if the record of the case conclusively shows that petitioner is entitled to no relief").

**I.**

This case arises out of two assaults that defendant committed against members of his family. The first incident occurred on June 10, 1993, when defendant assaulted his minor step-daughter. Following the commission of this offense, on August 11, 1993, defendant pled guilty in the Juvenile and Domestic Relations District Court of Fairfax County, Virginia, to one count of Assault and Battery Against a Family or Household Member, in violation of Va.Code § 18.2–57.2.

Seven years later, on April 29, 2000, defendant assaulted his wife, Alla Brodovska. On this occasion, defendant, in the course of an argument, pushed Brodovska to the kitchen floor, knelt on her chest with both of his knees, then placed the barrel of a silver-handled pistol against her face. Defendant also threatened to kill Brodovska and struck her head against the floor, nearly causing her to lose consciousness.

Brodovska reported the assault to the Alexandria Police Department on May 2, 2000, and, later that day, defendant was interviewed at his residence by Alexandria Police Officer Ritchie. In the course of the interview, defendant admitted to having had an argument with his wife, but stated that he had not harmed her. Officer Ritchie then requested that defendant turn over any and all firearms in his possession. At that time, defendant produced from his bedroom closet an unloaded Beretta 12–gauge shotgun. Then, when Officer Ritchie questioned defendant about the silver-handled pistol described by Brodovska, defendant stated that the pistol was located in New Jersey. Shortly thereafter, however, defendant admitted that the pistol was actually hidden at a friend's home in Fairfax, Virginia. Officer Ritchie later traveled with defendant to the home of defendant's friend, Sam Miller, who, when questioned, denied knowing anything about the presence of defendant's firearm in his residence. At that point, defendant advised Miller that he had hidden several firearms in Miller's house a few days earlier.

Defendant then led Officer Ritchie to a cabinet in Miller's basement containing two guns wrapped in a brown jacket. The first gun, a Ruger .22 caliber pistol, contained a loaded magazine, and the second gun, a Smith & Wesson .357 caliber revolver, was also loaded with five cartridges.

On August 10, 2000, a federal grand jury returned a two-count Indictment against defendant, charging him with two counts of possession of a firearm following a domestic violence conviction,[2] namely the 1993 conviction for assaulting his minor step-daughter, in violation of **496 18 U.S.C. § 922(g)(9).[3] Defendant, by counsel, moved to dismiss the Indictment, arguing, *inter alia,* that § 922(g)(9) is unconstitutionally vague, violates the Equal Protection and Due Process Clauses of the Fifth Amendment, and exceeds Congress' power under the Commerce Clause. By Order dated September 22, 2000, defendant's motion to dismiss the Indictment was denied. *See United States v. Finnell,* Criminal No. 00–280–A (E.D.Va. Sept. 22, 2000) (Lee, J.).

[2]     Specifically, Count 1 charged defendant with possession of the 12–gauge shotgun found in his bedroom, while Count 2 charged him with possession of the .357 caliber revolver and the .22 caliber pistol found in his friend's basement.

[3]     Section 922(g)(9) provides, in pertinent part, that "[i]t shall be unlawful for any person...who has been convicted in any court of a misdemeanor crime of domestic violence, to...possess in or affecting commerce, any firearm or ammunition...." 18 U.S.C. § 922(g)(9).

On October 4, 2000, following a two-day jury trial, defendant was found guilty of both counts charged in the Indictment. Thereafter, on December 15, 2000, defendant was sentenced to concurrent terms of imprisonment of 24 months on each count, to be followed by three years of supervised release. Defendant, proceeding initially by counsel but later *pro se,*[4] appealed his conviction and sentence to the Court of Appeals for the Fourth Circuit, which affirmed on November 19, 2001. *See United States v. Finnell,* 27 Fed.Appx. 166, 2001 WL 1464305 (4th Cir.2001). The Supreme Court subsequently denied defendant's petition for a writ of certiorari on April 22, 2002. *See Finnell v. United States,* 535 U.S. 1027, 122 S.Ct. 1627, 152 L.Ed.2d 638 (2002).

[4]     Defendant's notice of appeal, filed by his trial counsel, identified four issues for review, namely (i) whether 18 U.S.C. §§ 922(g)(9) and 921(a)(33)(A) are unconstitutionally vague, (ii) whether § 922(g) violates

the Fifth Amendment's Equal Protection and Due Process Clauses, (iii) whether § 922(g)(9) violates the Commerce Clause, and (iv) whether this Court properly instructed the jury. On April 4, 2001, however, the Fourth Circuit granted defendant's motion to dismiss his counsel and proceed on appeal *pro se.* Defendant's subsequently-filed appellate brief did not address any of the issues identified in the original notice of appeal filed by his trial counsel. Instead, defendant argued (i) that his 1993 conviction for assaulting his minor step-daughter was not a qualifying predicate misdemeanor crime of domestic violence, (ii) that § 922(g)(9) violates the Second Amendment and the Full Faith and Credit Clause, and (iii) that this Court erred in failing to reduce defendant's offense level for acceptance of responsibility and for possessing firearms solely for sporting purposes. It is these three arguments, raised in defendant's *pro se* appellate brief, that the Fourth Circuit considered and rejected on direct appeal. *See Finnell,* at 167.

On October 28, 2002, defendant filed a timely motion to vacate, set aside or correct sentence, pursuant to 28 U.S.C. § 2255, arguing therein that 18 U.S.C. § 922(g)(9) violates the Eighth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution. By Order dated October 28, 2002, the government was directed to file a response to defendant's § 2255 motion by November 18, 2002, and defendant, if he wished to do so, was given until December 9, 2002 to file a reply. *See United States v. Finnell,* Criminal No. 00–280–A (E.D.Va. Oct. 28, 2002) (Order). The government thereafter filed its response to defendant's § 2255 motion on November 15, 2002, but defendant declined to file a reply. As both parties have fully briefed the issues raised in defendant's motion, the matter is now ripe for disposition.

## II.

As an initial matter, it is important to note that defendant did not raise the various constitutional claims raised in the instant § 2255 motion either in the course of the trial proceedings or on direct appeal. Thus, as defendant correctly acknowledges, his claims are subject to review **497 on collateral attack pursuant to § 2255 only if he establishes (i) both cause for, and actual prejudice from, his failure to raise the claims earlier, or (ii) that he is actually innocent of the crimes of conviction. *See United States v. Harris,* 183 F.3d 313, 317 (4th Cir.1999)

AR005227

(citations omitted). In this regard, "cause" for failing to raise a claim earlier "must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Mikalajunas,* 186 F.3d 490, 493 (4th Cir.1999) (citations omitted). Alternatively, to establish "actual innocence," a defendant must demonstrate by clear and convincing evidence his "actual factual innocence of the offense of conviction," *i.e.,* that he did not commit the crime, and not simply that he is legally innocent. *Id.* at 493–94. These principles, applied here, compel the conclusion that defendant's constitutional claims are procedurally defaulted and thus not subject to review on collateral attack.

Specifically, as to the issue of "cause," defendant does not even attempt to argue (i) that his counsel was ineffective, (ii) that his claims are novel, or (iii) that some other external obstacle prevented him or his counsel from raising the claims earlier. See *Mikalajunas,* 186 F.3d at 493. Moreover, because each of defendant's constitutional claims fails on substantive grounds, *see infra* Part III, he is unable to establish the requisite prejudice arising out of the procedural default. *See id.* Nor can defendant establish that he is "actually innocent" of the crimes of conviction, as all of his arguments in this regard arise out of his alleged legal, rather than factual, innocence.[5] *See id.* at 494. Indeed, defendant freely admits in his supporting memorandum that he possessed each of the three firearms charged in the Indictment and that he has a previous conviction for a misdemeanor crime of violence. Given this, defendant's claim of "actual innocence" is without merit.

[5]   Specifically, defendant argues that the statute under which he was convicted, 18 U.S.C. § 922(g)(9), is unconstitutional in several respects. Yet, this argument, even if successful, is still insufficient to meet the "actual innocence" standard applicable here. *See id.* at 494.

## III.

Even assuming, *arguendo,* that defendant's claims are not procedurally barred, they nonetheless fail on substantive grounds. Specifically, defendant first claims that 18 U.S.C. § 922(g)(9) violates the Eighth Amendment's prohibition against "cruel and unusual punishments" and sentences that are "grossly disproportionate" to the offenses committed. *See Solem v.*

*Helm,* 463 U.S. 277, 288, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). It is well-settled, however, that an Eighth Amendment proportionality review is not available in the Fourth Circuit "for any sentence less than life imprisonment without the possibility of parole." *United States v. Ming Hong,* 242 F.3d 528, 532 (4th Cir.) (citing *United States v. Polk,* 905 F.2d 54, 55 (4th Cir.1990)), *cert. denied,* 534 U.S. 823, 122 S.Ct. 60, 151 L.Ed.2d 28 (2001). Even were this not the case, defendant's 24–month sentence is clearly proportionate to the crimes committed, particularly given "the very serious nature of defendant's unlawful use of the .357 revolver, his untruthful testimony about the event and his reprehensible behavior in striking his wife." *See United States v. Finnell,* Criminal No. 00–280–A (E.D.Va. Dec. 15, 2000) (Sentencing Memorandum). Moreover, defendant's sentence is substantially below the 10–year statutory maximum set forth in 18 U.S.C. § 924(a)(2), **\*498** further evidencing its reasonableness and proportionality to the crimes of conviction.[6]

[6]   Also without merit is defendant's claim that § 922(g)(9) violates the Eighth Amendment by depriving him of his right as an American citizen to own firearms. *See, e.g., United States v. Lewis,* 236 F.3d 948, 950 (8th Cir.2001) (rejecting Eighth Amendment challenge to § 922(g)(9)); *United States v. Jester,* 139 F.3d 1168, 1170–71 (7th Cir.1998) (rejecting Eighth Amendment challenge to § 922(g)(1)).

Defendant next claims that § 922(g)(9) violates the Ninth Amendment, which provides, in pertinent part, that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. Specifically, defendant claims that § 922(g)(9) is unconstitutional under the Ninth Amendment because it denies him the right to bear arms. Yet, circuit courts across the country have consistently held that the Ninth Amendment does not impinge upon Congress' authority to restrict firearm ownership, as it has done through the enactment of § 922(g)(9).[7] Given this, defendant's Ninth Amendment claim fails.

[7]   *See, e.g., United States v. Baer,* 235 F.3d 561, 564 (10th Cir.2000) (recognizing that "[t]he circuits have uniformly rejected the argument that the Ninth Amendment encompasses 'an unenumerated, fundamental, individual right to bear firearms' ") (citations omitted); *United States v. Wright,* 117 F.3d 1265, 1275 (11th Cir.1997) (rejecting defendant's argument that the criminalization of his possession of firearms and pipe bombs "violates his right to privacy and an unenumerated 'natural' right to self-defense inherent in the Ninth Amendment"); *San Diego County Gun Rights Committee v. Reno,* 98 F.3d 1121, 1125

AR005228

U.S. v. Finnell, 256 F.Supp.2d 493 (2003)

(9th Cir.1996) (stating that "[w]e join our sister circuits in holding that the Ninth Amendment does not encompass an unenumerated, fundamental, individual right to bear firearms"); *United States v. Broussard,* 80 F.3d 1025, 1041 (5th Cir.1996) (stating that "[w]e are not persuaded to discover or declare a new constitutional right to possess weapons under the Ninth Amendment").

Defendant also claims that § 922(g)(9) violates Clause 1 of the Thirteenth Amendment, which reads as follows:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

U.S. Const. amend. XIII, cl. 1. Thus, the Thirteenth Amendment prohibits slavery and involuntary servitude, as well as related "incidents or badges of slavery." *See Washington v. Finlay,* 664 F.2d 913, 927 (4th Cir.1981). Not surprisingly, defendant has failed to identify any relevant precedent to support his Thirteenth Amendment claim, and an independent search conducted by the Court has revealed none. Thus, because the Thirteenth Amendment's prohibition against slavery and involuntary servitude is wholly unrelated to § 922(g)(9), defendant's claim in this regard is properly denied.

Finally, defendant claims that § 922(g)(9) violates the Fourteenth Amendment. This argument, like defendant's other constitutional arguments, is clearly without merit, as the Fourteenth Amendment applies only to the states, and not the federal government. *See, e.g., United States v. Edwards,* 98 F.3d 1364, 1368 (D.C.Cir.1996) (recognizing that the "fourteenth amendment does not apply to the federal government"), *cert. denied,* 520 U.S. 1170, 117 S.Ct. 1437, 137 L.Ed.2d 544 (1997); *National Association of Government Employees, Inc. v. Barrett,* 968 F.Supp. 1564, 1572 n. 10 (N.D.Ga.1997) (rejecting Fourteenth Amendment challenge to § 922(g)(9) on the ground that the Amendment does not apply to the federal government), *aff'd,* 155 F.3d 1276 (11th Cir.1998). Moreover, the basis of defendant's **\*499** Fourteenth Amendment claim—that the Amendment confers an absolute right on all American citizens to own firearms—is contradicted by the numerous cases, including the Fourth Circuit's decision on direct appeal in this case, upholding the constitutionality of the federal firearms laws on Second Amendment grounds.[8]

[8]   *See, e.g., United States v. Finnell,* 27 Fed.Appx. 166, 2001 WL 1464305 (4th Cir.2001); *United States v. Hemmings,* 258 F.3d 587, 594 (7th Cir.2001); *United States v. Lewis,* 236 F.3d 948, 950 (8th Cir.2001); *United States v. Smith,* 171 F.3d 617, 624 (8th Cir.1999); *United States v. Johnson,* 497 F.2d 548, 550 (4th Cir.1974).

## IV.

In sum, it is clear from the record that defendant's constitutional challenges under the Eighth, Ninth, Thirteenth and Fourteenth Amendments fail on both procedural and substantive grounds.

Accordingly, it is hereby **ORDERED** that defendant's motion to vacate, set aside or correct sentence, pursuant to 28 U.S.C. § 2255, is **DENIED**.

Should defendant wish to appeal this Order he must do so within sixty (60) days, pursuant to Rules 3 and 4, Fed. R.App. P.

The Clerk is directed to send a copy of this Order to defendant and to all counsel of record.

### All Citations

256 F.Supp.2d 493

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005229

KeyCite Yellow Flag - Negative Treatment

Abrogation Recognized by Colorado Outfitters Association v. Hickenlooper, D.Colo., June 26, 2014

59 S.Ct. 816
Supreme Court of the United States

UNITED STATES
v.
MILLER et al.

No. 696.
|
Argued March 30, 1939.
|
Decided May 15, 1939.

**Synopsis**

Jack Miller and Frank Layton were charged with unlawfully transporting a firearm in interstate commerce without having registered the firearm, and without having in their possession a stamp-affixed written order for the firearm. From a judgment sustaining a demurrer to the indictment, 26 F.Supp. 1002, the United States of America appeals.

Judgment reversed and cause remanded.

**\*\*816\*174** Appeal from the District Court of the United States for the Western District of Arkansas.

**Attorneys and Law Firms**

**\*175** Mr. Gordon Dean, of Washington, D.C., for the United States.

No appearance for appellees.

**Opinion**

Mr. Justice McREYNOLDS delivered the opinion of the Court.

An indictment in the District Court Western District Arkansas, charged that Jack Miller and Frank Layton 'did unlawfully, knowingly, wilfully, and feloniously transport in interstate commerce from the town of Claremore in the State of Oklahoma to the town of Siloam Springs in the State of Arkansas a certain firearm, to-wit, a double barrel 12-gauge Stevens shotgun having a barrel less than 18 inches in length, bearing identification number 76230, said defendants, at the time of so transporting said firearm in interstate commerce as aforesaid, not having registered said firearm as required by Section 1132d of Title 26, United States Code, 26 U.S.C.A. s 1132d (Act of June 26, 1934, c. 757, Sec. 5, 48 Stat. 1237), and not having in their possession a stamp-affixed written order for said firearm as provided by Section 1132c, Title 26, United States Code, 26 U.S.C.A. s 1132c (June 26, 1934, c. 757, Sec. 4, 48 Stat. 1237) and the regulations issued under authority of the said Act of Congress known as the 'National Firearms Act' approved June 26, 1934, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.'[1]

---

[1]   Act of June 26, 1934, c. 757, 48 Stat. 1236-1240, 26 U.S.C.A. s 1132 et seq.:

'That for the purposes of (sections 1132 to 1132q) this Act-

'Sec. 1 (Section 1132). (a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition, (The Act of April 10, 1936, c. 169, 49 Stat. 1192, 26 U.S.C.A. s 1132, added the words) but does not include any rifle which is within the foregoing provisions solely by reason of the length of its barrel if the caliber of such rifle is .22 or smaller and if its barrel is sixteen inches or more in length.

'Sec. 3 (s 1132b). (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

'Sec. 4 (s 1132c). (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Commissioner. Such order shall identify the applicant by such means of identification as may be prescribed by regulations under (sections 1132 to 1132q) this Act: Provided, That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

'(c) Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the

AR005230

Commissioner. The original thereof with stamps affixed, shall be returned to the applicant.

'(d) No person shall transfer a firearm which has previously been transferred on or after the (thirtieth day after June 26, 1934), effective date of this Act, unless such person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under (sections 1132 to 1132q) this Act for proof of payment of all taxes on such firearms.

'Sec. 5 (s 1132d). (a) Within sixty days after the (thirtieth day after June 26, 1934) effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: Provided, That no person shall be required to register under this section with respect to any firearm acquired after the (thirtieth day after June 26, 1934) effective date of, and in conformity with the provisions of, (sections 1132 to 1132q) this Act.

'Sec. 6 (s 1132e). It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section (1132b or 1132c) 3 or 4 of this Act.

'Sec. 11 (s 1132j). It shall be unlawful for any person who is required to register as provided in section (s 1132d) 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section (1132c of this title) 4 hereof, to ship, carry, or deliver any firearm in interstate commerce.

'Sec. 12 (s 1132k). The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of (sections 1132 to 1132q) this Act into effect.

'Sec. 14 (s 1132m). Any person who violates or fails to comply with any of the requirements of (sections 1132 to 1132q) this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

'Sec. 16 (s 1132o). If any provision of (sections 1132 to 1132q) this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of (sections 1132 to 1132q) the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

'Sec. 18 (s 1132q). This (chapter (1132 to 1132q)) Act may be cited as the 'National Firearms Act.'

**817*176 A duly interposed demurrer alleged: The National Firearms Act is not a revenue measure but an attempt to usurp police power reserved to the States, and is therefore unconstitutional. Also, it offends the inhibition of the Second Amendment to the Constitution, U.S.C.A.-'A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.'

*177 The District Court held that section 11 of the Act violates the Second Amendment. **818 It accordingly sustained the demurrer and quashed the indictment.

The cause is here by direct appeal.

Considering Sonzinsky v. United States, 1937, 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772, and what was ruled in sundry causes arising *178 under the Harrison Narcotic Act[2]-United States v. Jin Fuey Moy, 1916, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061, Ann.Cas.1917D, 854;United States v. Doremus, 1919, 249 U.S. 86, 94, 39 S.Ct. 214, 63 L.Ed. 493;Linder v. United States, 1925, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819, 39 A.L.R. 229;Alston v. United States, 1927, 274 U.S. 289, 47 S.Ct. 634, 71 L.Ed. 1052;Nigro v. United States, 1928, 276 U.S. 332, 48 S.Ct. 388, 72 L.Ed. 600-the objection that the Act usurps police power reserved to the States is plainly untenable.

[2]    Act December 17, 1914, c. 1, 38 Stat. 785, February 24, 1919, c. 18, 40 Stat. 1057, 1130, 26 U.S.C.A. ss 1040-1054, 1383-1391.

In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. Aymette v. State of Tennessee, 2 Humph., Tenn., 154, 158.

The Constitution as originally adopted granted to the Congress power-'To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.' U.S.C.A.Const. art. 1, s 8. With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be

AR005231

U.S. v. Miller, 307 U.S. 174 (1939)

59 S.Ct. 816, 83 L.Ed. 1206, 39-1 USTC P 9513, 22 A.F.T.R. 331, 1939-1 C.B. 373

interpreted and applied with that end in view.

The Militia which the States were expected to maintain and train is set in contrast with Troops which they **\*179** were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia-civilians primarily, soldiers on occasion.

The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.' And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out 'that king Alfred first settled a national militia in this kingdom' and traces the subsequent development and use of such forces.

Adam Smith's Wealth of Nations, Book V. Ch. 1, contains an extended account of the Militia. It is there said: 'Men of republican principles have been jealous of a standing army as dangerous to liberty.' 'In a militia, the character of the labourer, artificer, or tradesman, predominates over that of the soldier: in a standing army, that of the soldier predominates over every other character; and in this distinction seems to consist the essential difference between those two different species of military force.'

'The American Colonies In The 17th Century', Osgood, Vol. 1, ch. XIII, affirms in reference to the early system of defense in New England-

'In all the colonies, as in England, the militia system was based on the principle of the assize of arms. This implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to **\*180** cooperate in the work of defence.' 'The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention **\*\*819** to the latter as to the former.' 'A year later (1632) it was ordered that any single man who had not furnished himself with arms might be put out to service, and this became a permanent part of the legislation of the colony (Massachusetts).'

Also 'Clauses intended to insure the possession of arms

and ammunition by all who were subject to military service appear in all the important enactments concerning military affairs. Fines were the penalty for delinquency, whether of towns or individuals. According to the usage of the times, the infantry of Massachusetts consisted of pikemen and musketeers. The law, as enacted in 1649 and thereafter, provided that each of the former should be armed with a pike, corselet, head-piece, sword, and knapsack. The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length, a priming wire, scourer, and mould, a sword, rest, bandoleers, one pound of powder, twenty bullets, and two fathoms of match. The law also required that two-thirds of each company should be musketeers.'

The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142), provided for the organization and government of the Militia. It directed that the Train Band should 'contain all able bodied men, from sixteen to forty years of age, and the Alarm List, all other men under sixty years of age, \* \* \*.' Also, 'That every non-commissioned officer and private soldier of the said militia not under the control of parents, masters or guardians, and being of sufficient ability therefor in the judgment of the Selectmen of the town in which he shall dwell, shall equip himself, and be constantly provided with a good fire arm, &c.'

By an Act passed April 4, 1786 (Laws 1786, c. 25), the New York Legislature directed: 'That every able-bodied Male Person, being **\*181** a Citizen of this State, or of any of the United States, and residing in this State, (except such Persons as are herein after excepted) and who are of the Age of Sixteen, and under the Age of Forty-five Years, shall, by the Captain or commanding Officer of the Beat in which such Citizens shall reside, within four Months after the passing of this Act, be enrolled in the Company of such Beat. \* \* \* That every Citizen so enrolled and notified, shall, within three Months thereafter, provide himself, at his own Expense, with a good Musket or Firelock, a sufficient Bayonet and Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack; \* \* \*.'

The General Assembly of Virginia, October, 1785 (12 Hening's Statutes c. 1, p. 9 et seq.), declared: 'The defense and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty.'

It further provided for organization and control of the

AR005232

Militia and directed that 'All free male persons between the ages of eighteen and fifty years,' with certain exceptions, 'shall be inrolled or formed into companies.' 'There shall be a private muster of every company once in two months.'

Also that 'Every officer and soldier shall appear at his respective muster-field on the day appointed, by eleven o'clock in the forenoon, armed, equipped, and accoutred, as follows: * * * every non-commissioned officer and private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good **\*182** powder, and four pounds of lead, including twenty blind cartridges; and each serjeant shall have a pair of moulds fit to cast balls for their respective companies, to be purchased by the commanding officer out of the monies arising on delinquencies. Provided, That the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto, shall not be obliged to be armed with muskets, but may have good rifles with proper accoutrements, in lieu thereof. And every of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer. If any private shall make it appear to the satisfaction of **\*\*820** the court hereafter to be appointed for trying delinquencies under this act that he is so poor that he cannot purchase the arms herein required, such court shall cause them to be purchased out of the money arising from delinquents.'

Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed. But none of them seem to afford any material support for the challenged ruling of the court below.

In the margin some of the more important opinions and comments by writers are cited.[3]

3   Concerning The Militia-Presser v. Illinois, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615;Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715;Fife v. State, 31 Ark. 455, 25 Am.Rep. 556;Jeffers v. Fair, 33 Ga. 347;Salina v. Blaksley, 72 Kan. 230, 83 P. 619, 3 L.R.A., N.S., 168, 115 Am.St.Rep. 196,7 Ann.Cas. 925;People v. Brown, 253 Mich. 537, 235 N.W. 245, 82 A.L.R. 341; Aymette v. State, 2 Humph., Tenn., 154; State v. Duke, 42 Tex. 455;State v. Workman, 35 W.Va. 367, 14 S.E. 9,14 L.R.A. 600; Cooley's Constitutional Limitations, Vol. 1, p. 729; Story on The Constitution, 5th Ed., Vol. 2, p. 646; Encyclopaedia of the Social Sciences, Vol. X, p. 471, 474.

**\*183** We are unable to accept the conclusion of the court below and the challenged judgment must be reversed. The cause will be remanded for further proceedings.

Reversed and remanded.

Mr. Justice DOUGLAS took no part in the consideration or decision of this cause.

**All Citations**

307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206, 39-1 USTC P 9513, 22 A.F.T.R. 331, 1939-1 C.B. 373

---

End of Document                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005233

KeyCite Yellow Flag - Negative Treatment
Disagreed With by U.S. v. Stewart, 9th Cir.(Ariz.), November 13, 2003

91 F.3d 884
United States Court of Appeals,
Seventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
John W. KENNEY, Defendant-Appellant.

No. 95-3937.
|
Argued June 12, 1996.
|
Decided July 30, 1996.

## Synopsis

Defendant was convicted in the United States District Court for the Western District of Wisconsin, Barbara B. Crabb, J., of possession of machine gun. Defendant appealed. The Court of Appeals, Flaum, Circuit Judge, held that: (1) statute prohibiting possession of machine guns did not violate commerce clause, and (2) statute did not violate Tenth Amendment.

Affirmed.

## Attorneys and Law Firms

**\*884** John W. Vaudreuil (argued), Office of the United States Attorney, Madison, WI, for Plaintiff-Appellee.

**\*885** Thomas J. Coaty (argued), Madison, WI, for Defendant-Appellant.

Before FLAUM, RIPPLE, and ROVNER, Circuit Judges.

## Opinion

FLAUM, Circuit Judge.

The sole question in this direct appeal is whether John Kenney's conviction for possession of a machine gun is invalid because the criminal statute, 18 U.S.C. § 922(*o*), is unconstitutional. He argues that the Supreme Court's reasoning in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), demonstrates that § 922(*o*) exceeds the scope of Congress's legislative power

under the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3. The magistrate judge agreed and recommended granting Kenney's motion to dismiss the indictment, but the district court took the contrary view and denied the motion. We affirm the district court.

### I.

The relevant facts are undisputed. In 1991, after receiving a tip from Kenney's wife and her consent to search their Wisconsin residence, an FBI agent recovered an Intratec TEC-9 semiautomatic pistol that had been converted to fire as a machine gun. The weapon was testified and operated only in the fully automatic mode. Kenney admitted possessing the weapon and stated that he needed it because of "past dealings in Central America." He later fled the jurisdiction. In 1995 he was arrested in Florida and returned to Wisconsin, where he pleaded guilty to one count of unlawful possession of a machine gun.[1]

[1]   Kenney entered his guilty plea without preserving his constitutional challenge for appeal. However, the government has expressly declined to raise a waiver argument, citing *United States v. Bell,* 70 F.3d 495, 496-97 (7th Cir.1995) (challenge to constitutionality of statute of conviction is, in certain circumstances, jurisdictional claim not waived by guilty plea).

### II.

Section 922(*o*) was enacted in 1986 as § 102(9) of the Firearm Owners' Protection Act, Pub.L. No. 99-308, 100 Stat. 449, 452-53, amending the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* The subsection provides:

(*o*)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

AR005234

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o*). Section 922(*o*), which took effect on May 19, 1986, regulates more than assembled machine guns: the term "machine gun" is defined as either a weapon that fires repeatedly on a single trigger pull or as a part or parts designed to convert a manually firing weapon into a machine gun. 26 U.S.C. § 5845(b). The Bureau of Alcohol, Tobacco, and Firearms has interpreted § 922(*o*) to ban private possession or transfer of new machine guns not lawfully possessed before the statute's effective date, and therefore the Bureau will not approve applications to register new weapons because to do so would place the applicant in violation of the law. 27 C.F.R. § 179.105; *see also Farmer v. Higgins,* 907 F.2d 1041 (11th Cir.1990) (agreeing with this interpretation of § 922(*o*)), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). Section 922(*o*), then, effectively freezes the number of legal machine guns in private hands at its 1986 level.

As the Tenth Circuit noted in *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995), Congress enacted § 922(*o*) with little discussion: "The scant legislative history merely contains a discussion of an earlier bill proposed in the House of Representatives which 'prohibited the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime.' " **\*886** *Id.* at 1519 (quoting H.R.Rep. No. 495, 99th Cong., 2d Sess. 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1330). The only explanation supplied for the last-minute amendment that was later enacted was "the statement of its sponsor, Representative Hughes, that 'I do not know why anyone would object to the banning of machine guns.' " *Id.* (quoting 132 Cong. Rec. H1750 (1986) (statement of Rep. Hughes)); *see also Farmer,* 907 F.2d at 1044-45; David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective,* 17 Cumb. L.Rev. 585, 670-71 (1987).

The standard of Commerce Clause review is narrow and deferential. "Judicial review in this area is influenced above all by the fact that the Commerce Clause is a grant of plenary authority to Congress. This power is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution.' " *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (citations omitted) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824)). "The motive and purpose of a regulation of interstate commerce are matters for the

legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control." *United States v. Darby,* 312 U.S. 100, 115, 61 S.Ct. 451, 457-58, 85 L.Ed. 609 (1941). Our task is merely to determine whether Congress could have had a rational basis to support the exercise of its commerce power; and, further, that the regulatory means chosen were "reasonably adapted to the end permitted by the Constitution." *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *see also United States v. Wilson,* 73 F.3d 675, 679-83 & n. 6 (7th Cir.1995) (citing *Hodel*), *petition for cert. filed,* 64 U.S.L.W. 3669 (U.S. Mar. 20, 1996) (No. 95-1523). But deference is not acquiescence: consistent with the principle of judicial review set forth in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), it is for the courts to judge whether Congress has exceeded its constitutionally enumerated powers. *Wilson,* 73 F.3d at 680.

In *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court divided 5-4 to strike down 18 U.S.C. § 922(q), which forbade "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." As this court recently explained:

   In *Lopez,* the Court determined that in enacting 18 U.S.C. § 922(q), the Gun-Free School Zones Act, Congress had exceeded the "outer limits" of its power under the Commerce Clause. Under the clause, Congress can regulate, the court recounted, three broad categories of activity: the use of the channels of interstate commerce; the instrumentalities of interstate commerce and persons and things in interstate commerce; and activities having a substantial relation to interstate commerce. The latter was the only possible justification for § 922(q).

   The Gun-Free School Zone[s] Act failed to survive the constitutional challenge because it was not an essential part of a larger regulation of economic activity and it did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1631. The statute also did not contain congressional findings which would, the Court said, enable them "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce...." 514 U.S. at ----, 115 S.Ct. at 1632.

*United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995). The three categories of commerce regulation outlined by the Court were not new to *Lopez,* but were originally established in *Perez v. United States,* 402 U.S. 146, 150,

91 S.Ct. 1357, 1359-60, 28 L.Ed.2d 686 (1971). *Lopez* addressed only the third category.

The *Lopez* majority acknowledged that "a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty," and that "the question of congressional power under the Commerce Clause 'is necessarily one of **\*887** degree.' " *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1633 (citation omitted). The majority heeded Justice Cardozo's concern that an overly expansive view of causation "would obliterate the distinction of what is national and what is local in the activities of commerce," *id.* (quoting *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring)), and concluded that to uphold § 922(q) would require the Court "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* 514 U.S. at ----, 115 S.Ct. at 1634. But *Lopez* must also be noted for what it did not do. The majority indicated that it intended to establish an outer limit to congressional authority, not to retrench well-established Commerce Clause precedent: "Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further." *Id.; see also id.* 514 U.S. at ----, 115 S.Ct. at 1637 (Kennedy, J., concurring). The essential defect of § 922(q), in short, was that the narrow scope of its regulation, limited to prohibiting simple possession of a firearm within a school zone, was a noncommercial local activity that neither was interstate commerce nor, whether taken as a single act or as the aggregate effect of all such acts, had a substantial effect on interstate commerce.

In *Bell*, the appellant argued that the *Lopez* analysis rendered unconstitutional 18 U.S.C. § 922(g)(1), a provision that prohibits the possession of firearms by convicted felons. We readily distinguished § 922(g)(1) because it includes a jurisdictional element requiring the government to prove that the felon "ship[ped] or transport[ed] in interstate or foreign commerce, or possess[ed] in or affecting commerce, any firearm," thus establishing a case-by-case effect on interstate commerce even in prosecutions of intrastate possession. *Bell,* 70 F.3d at 498. Section 922(*o*), like § 922(q), lacks an interstate commerce nexus element and thus can not be upheld under *Bell*'s analysis. Section 922(*o*) generally proscribes transfer and possession of machine guns without any reference to interstate commerce. Section 922(*o*) also, like § 922(q), lacks legislative findings or

congressional committee reports regarding its nexus with interstate commerce.

The government argues that § 922(*o*) is constitutional as part of either the second or third *Lopez/Perez* categories, as a regulation of things in interstate commerce or as a regulation of activities substantially affecting interstate commerce. For support, the government points out that every circuit court to consider the question of § 922(*o*)'s constitutionality in light of *Lopez* has upheld it: *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995); *United States v. Kirk,* 70 F.3d 791 (5th Cir.1995), *rehearing en banc granted,* 78 F.3d 160 (5th Cir.1996);[2] and *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996). Kenney counters by citing the contrary pre-*Lopez* view of *United States v. Bownds,* 860 F.Supp. 336 (S.D.Miss.1994).

> [2]    The grant of rehearing en banc impliedly vacated the *Kirk* panel decision. 5th Cir. R. 41.3.

In *Bownds*, the district court held that § 922(*o*) exceeded Congress's commerce power and violated the Tenth Amendment. The court faulted Congress for failing either to include a jurisdictional element in the offense or to make findings "to support its authority to ban the mere possession of machine guns." 860 F.Supp. at 340. The magistrate judge in this case found the *Bownds* reasoning persuasive. We have, however, rejected the argument that *Lopez* requires federal criminal statutes to contain a jurisdictional element, *Wilson,* 73 F.3d at 685, and *Lopez* explicitly reaffirmed the rule that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1631. Even in *Perez,* where the Court discussed legislative history at length in the course of upholding a statute that criminalized loansharking, the Court was careful to note that such history's merely helpful, not essential, in determining a statute's constitutionality. *Perez,* 402 U.S. at 156, 91 S.Ct. at 1362 ("We have mentioned in detail the economic, financial, **\*888** and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particularized findings in order to legislate."); *see also Katzenbach v. McClung,* 379 U.S. 294, 299, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964) ("As we noted in *Heart of Atlanta Motel* both Houses of Congress conducted prolonged hearings on the Act. And, as we said there, while no formal findings were made, which of course are not necessary, it is well that we make mention of the testimony at these hearings the better to understand the problem before Congress and determine whether the Act is a reasonable and appropriate means toward its solution."). Congress does not confer power on itself by making legislative findings; conversely, it need not make

U.S. v. Kenney, 91 F.3d 884 (1996)
65 USLW 2159

findings to exercise its full enumerated powers.

*Lopez* did establish that, where the legislative history is silent, a substantial interstate commerce nexus must be "visible to the naked eye" without resorting to "pil[ing] inference upon inference" until nothing is left of state autonomy. *Lopez,* 514 U.S. at ----, ----, 115 S. Ct at 1632, 1634. The Court was critical of and rejected the illimitable breadth of the loss pooling rationale used to uphold § 922(*o*) in *United States v. Evans,* 928 F.2d 858, 862 (9th Cir.1991), where the Ninth Circuit found a concededly "tenuous" interstate commerce nexus with the machine gun statute by reasoning that firearms are involved in violent crime, the costs of violent crime are substantial, and such costs are spread throughout the population through the mechanism of insurance. *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1632 (citing *Evans*). The *Lopez* Court also rejected the government's arguments that guns in schools cause violent crime that reduces the willingness of people to travel interstate, and that guns in schools handicap the education of the citizenry, in turn undermining productivity and interstate commerce. *Id.* Thus if § 922(*o*) is constitutional, it must bear more than a generic relationship several steps removed from interstate commerce, and it must be a relationship that is apparent, not creatively inferred.

The circuit courts have provided several post-*Lopez* rationales for § 922(*o*)'s constitutionality. In *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995), the Tenth Circuit held § 922(*o*) constitutional under the second category of commerce regulation, that of " 'things in commerce'-i.e., machineguns," reasoning that "[t]he interstate flow of machineguns 'not only has a substantial effect on interstate commerce; it *is* interstate commerce.' " *Id.* at 1521 (quoting *United States v. Hunter,* 843 F.Supp. 235, 249 (E.D.Mich.1994)). The court found that the legislative history of federal firearms regulation as a whole supported its view that § 922(*o*) regulates "an item bound up with interstate attributes and thus differs in substantial respect from legislation concerning possession of a firearm within a purely local school zone." *Id.*

In *United States v. Kirk,* 70 F.3d 791 (5th Cir.1995), *rehearing en banc granted,* 78 F.3d 160 (5th Cir.1996), a two-judge majority of a Fifth Circuit panel concluded that § 922(*o*) falls into either the first or second category. *Id.* at 795-96. To rebut the appellant's claim that the statute regulates not commerce but "mere possession," the court placed particular importance on § 922(*o*)'s grandfather clause, § 922(*o*)(2)(B), reasoning that in light of the provision "there could be no unlawful possession under section 922(*o*) without an unlawful transfer." *Id.* Therefore:

In this context, the limited ban on possession of machineguns must be seen as a necessary and proper measure meant to allow law enforcement to detect illegal transfers where the banned commodity has come to rest: in the receiver's possession. In effect, the ban on such possession is an attempt to control the interstate market for machineguns by creating criminal liability for those who would constitute the demand-side of the market, i.e., those who would facilitate illegal transfer out of the desire to acquire *mere possession.*

*Id.* The *Kirk* majority acknowledged that "some of the activity made unlawful is purely intrastate," but found that, as with the federal regulation of controlled substances, there was "a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession is essential to effective control **\*889** of the interstate incidents of such traffic." *Id.* at 797.

Finally, in *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996), the Ninth Circuit also upheld the constitutionality of § 922(*o*), finding that it fits into the first category of regulation, that of Congress's power to regulate the use or misuse of the channels of commerce. The court was particularly persuaded by the *Kirk* majority's "market theory" analysis that the structure of § 922(*o*) meant that every unlawful possession would necessarily be preceded by an unlawful transfer. *Id.* at 951-52.

These three decisions agree that Congress had the power to enact § 922(*o*), but their analyses vary as to how the statute comports with *Lopez.* None of the circuits found that *Lopez* applied directly, because none believed that § 922(*o*), unlike the ill-fated § 922(q), was properly viewed in the third category of commerce regulation; and yet the courts differed as to which of the two remaining categories they believed § 922(*o*) belonged.

Although we too hold § 922(*o*) constitutional, we find that the statute is best analyzed in the third category. As an initial matter, § 922(*o*) does not appear to be properly categorized as a regulation of the channels of interstate commerce in the narrow sense of the first category set forth in *Lopez* and *Perez.* The examples used in these decisions indicate that this category is limited to direct

regulation of the channels of commerce, for each of the statutes and cases cited, like § 922(g)(1), contains a jurisdictional nexus element. *See, e.g.*, 18 U.S.C. §§ 2312-2315 (interstate shipment of stolen goods); 18 U.S.C. § 1201 (interstate transport of kidnapping victims); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (regulation of working conditions in the production of goods "for interstate commerce"). The first category thus does little more than justify § 922(*o*) insofar as it regulates interstate transfers and possessions. As the *Kirk* dissent noted, the *Kirk* majority's analysis that every illegal possession would necessarily be preceded by an illegal transfer is not entirely true: an automatic weapon may be created by modifying a semiautomatic weapon with raw materials, *see United States v. Jones,* 976 F.2d 176, 178 (4th Cir.1992) (describing home conversion of shotguns), *cert. denied,* 508 U.S. 914, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993); it may also perhaps result from the effects of ordinary wear and tear on a semiautomatic mechanism, *see United States v. Anderson,* 885 F.2d 1248, 1251 (5th Cir.1989) (en banc); and either an automatic weapon or a conversion kit could be manufactured, transferred, and possessed intrastate. Finally, although it may be true that Congress must regulate intrastate transfers and even mere possessions of machine guns in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce. This rationale is therefore an aspect of Congress's broader power to regulate things "affecting" interstate commerce; we must look further, in light of *Lopez,* to confirm the existence of a rational and substantial basis underlying its power to do so.

For similar reasons, § 922(*o*) appears to be an ill fit in the second *Lopez/Perez* category, that of things in or instrumentalities of interstate commerce, because the regulation is much broader than the category. Again, judging from the examples provided by the Court, the second category provides only a partial justification for § 922(*o*). In the *Shreveport Rate Cases* [*Houston, East & West Texas Railway Co. v. U.S.*], 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (rate regulation of railroad engaged in interstate commerce), or *Southern Ry. Co. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (regulation of railway safety on interstate lines), cited in *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1629, and in 18 U.S.C. § 32 (destruction of aircraft used in interstate commerce), or 18 U.S.C. § 659 (theft from vehicles of interstate shipment), cited in *Perez,* 402 U.S. at 150, 91 S.Ct. at 1359-60, the nexus with interstate commerce is explicit and obvious in each case. The *Wilks* court's observation that "[t]he interstate flow of machineguns 'not only has a substantial effect on interstate commerce;

it *is* interstate commerce,' " 58 F.3d at 1521, is correct as far as it goes, but it does not address the different question of the propriety of § 922(*o*)'s regulation of intrastate possession and transfer.

**\*890** It is true that, unlike § 922(q), which was a limited regulation of firearm possession within discrete and local areas of the states, § 922(*o*) represents a congressional effort to regulate the whole of an economic activity, the trade in machine guns. Thus it demonstrates a federal purpose of regulating things in interstate commerce, and Congress may regulate to protect or ban things in interstate commerce "even though the threat may come only from intrastate activities." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1629. This is not, however, a case of intrastate activity "threatening" interstate commerce, in the way that a railroad maintaining disproportionately low intrastate shipping rates places at a competitive disadvantage and thus directly discriminates against the free flow of traffic over its interstate lines, see the *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Permitting unregulated intrastate possessions and transfers of machine guns instead indirectly undermines, via a market theory, the effectiveness of the federal attempt to regulate interstate commerce in machine guns. In other words, the intrastate activity "affects" the interstate commerce, in an attenuated way that raises the *Lopez* concern of whether such effect is "substantial."

And so we arrive at the third category, which, as the district court concluded, provides ample authority for § 922(*o*). It is evident that the regulation of machine guns is well within the scope of congressional authority over activities affecting commerce, and that § 922(*o*) is readily distinguishable from § 922(q). First, unlike § 922(q), § 922(*o*) is recognizable as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1631. Kenney's possession of a machine gun is much like the possession of wheat in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), cited with approval in *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1630, where the Supreme Court upheld the assessment of a penalty by the Secretary of Agriculture against a farmer, Roscoe Filburn, who harvested twelve acres more wheat than he was permitted to under the Agriculture Adjustment Act of 1938. Although Filburn used the wheat on his farm and did not sell it, the *Wickard* Court reasoned that "even if [Filburn's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Wickard,* 317 U.S. at 125,

63 S.Ct. at 89; *see also Perez* (regulation of local loansharking appropriate where loansharking as a whole supports interstate organized crime). Similarly, there is a rational basis to regulate the local conduct of machine gun possession, including possession resulting from home manufacture, to effectuate § 922(*o*)'s purpose of freezing the number of legally possessed machine guns at 1986 levels, an effect that is closely entwined with regulating interstate commerce.

Second, again unlike § 922(q), § 922(*o*) is not a statute that "plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation," and thus the lengthy legislative history of federal firearms regulation does "speak to the subject matter of" § 922(*o*). *Lopez,* 514 U.S. at ----, 115 S.Ct. at 1632 (quoting lower court opinion in *United States v. Lopez,* 2 F.3d 1342, 1366 (5th Cir.1993)). Congress has closely regulated machine guns pursuant to its taxation power since the National Firearms Act of 1934, which subjected machine guns, unlike ordinary firearms, to federal registration and a transfer tax. *Hardy,* 17 Cumb. L.Rev. at 593. The Act was the first major federal attempt at firearms regulation, and it expressly targeted machine guns, a modern weapon whose unusual destructive power was of great appeal to interstate organized crime. *Id.* In considering the bills that became the Gun Control Act of 1968, Congress found that federal control over firearms licensing for dealers, even for intrastate activity, was necessary to address the serious problems associated with interstate trafficking in firearms generally. S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2114, 2168. In light of these findings and enactments, the 1986 addition of § 922(*o*) was not novel but incremental, merely preventing further growth in the number of machine guns in private hands as an exercise of the historic federal interest in the regulation of **\*891** machine guns.[3] As such, and unlike § 922(q), deference to Congress's accumulated institutional expertise is appropriate, *see Fullilove v. Klutznick,* 448 U.S. 448, 503, 100 S.Ct. 2758, 2787, 65 L.Ed.2d 902 (1980) (Powell, J., concurring).

[3] To the extent, if any, that Congress in enacting § 922(*o*) "pre-empt[ed] the historic powers of the States," the intended scope of the statute is clear and unambiguous and thus satisfies the "plain statement" requirement. *Gregory v. Ashcroft,* 501 U.S. 452, 460-61, 111 S.Ct. 2395, 2400-01, 115 L.Ed.2d 410 (1991). The present case is thus quite unlike *United States v. Bass,* 404 U.S. 336, 349-50, 92 S.Ct. 515, 523-24, 30 L.Ed.2d 488 (1971), where the Supreme Court applied a narrowing construction to an ambiguous gun control statute, former 18 U.S.C.App. I § 1202(a), to require the government to prove an interstate commerce nexus in prosecutions for possession of a firearm by a convicted

felon. As the *Bass* Court explained: "In light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms; thus, we need not consider the relevance, in that connection, of our recent decision in *Perez v. United States." Id.* at 339 n. 4, 92 S.Ct. at 518 n. 4 (citation omitted).

In sum, both the nature of the statute and the history of federal firearms legislation support the conclusion that § 922(*o*) is a constitutional exercise of Congress's Commerce Clause power. As the Supreme Court noted in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992): "As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power." *Id.* at 158, 112 S.Ct. at 2418-19 (citing *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). The possession of a machine gun, because of its relation to the closely regulated interstate market in machine guns, can not be considered purely local or noncommercial. Moreover, the modest regulatory means chosen by Congress were "reasonably adapted to the end permitted by the Constitution." *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360.

### III.

Finally, Kenney briefly argues that § 922(*o*) violates the Tenth Amendment by usurping the states' traditional police powers. But "*Lopez* ... did not call into question the well-established principle that Congress may regulate conduct even though that conduct already violates state law." *Wilson,* 73 F.3d at 684. Moreover, the Supreme Court has explained that the Tenth Amendment "is essentially a tautology": the Amendment reiterates the federalist notion that the federal government is limited to its enumerated substantive powers and may not invade the exclusive domain of state authority. *New York v. United States,* 505 U.S. at 156-57, 112 S.Ct. at 2417-18. The manner in which Congress acts is similarly restrained: "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.' " *Id.* at 161, 112 S.Ct. at 2420-21 (quoting *Hodel*). Because § 922(*o*) was a proper exercise of Congress's enumerated

**U.S. v. Kenney, 91 F.3d 884 (1996)**

65 USLW 2159

authority under the Commerce Clause, and because it does not compel, let alone commandeer, the states to do anything, the statute does not violate the Tenth Amendment.

AFFIRMED.

**All Citations**

91 F.3d 884, 65 USLW 2159

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005240

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds In re H.C., Cal.App. 4 Dist., December 4, 2017

104 S.Ct. 2778
Supreme Court of the United States
CHEVRON, U.S.A., INC., Petitioner,
v.
NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.
AMERICAN IRON AND STEEL INSTITUTE, et al., Petitioners,
v.
NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.
William D. RUCKELSHAUS, Administrator, Environmental Protection Agency, Petitioner,
v.
NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.[*]

[*]     US Reports Title: Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.

Nos. 82–1005, 82–1247 and 82–1591.
|
Argued Feb. 29, 1984.
|
Decided June 25, 1984.

**Synopsis**

Rehearing Denied Aug. 16, 1984.

See 468 U.S. 1227, 105 S.Ct. 28, 29.

Petition was filed for review of order of the Environmental Protection Agency. The Court of Appeals, 685 F.2d 718,vacated regulations, and certiorari was granted. The Supreme Court, Justice Stevens, held that Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments.

Reversed.

*Syllabus*[a1]

[a1]     The syllabus constitutes no part of the opinion of the

Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

The Clean Air Act Amendments of 1977 impose certain requirements on States **2779 that have not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation, including the requirement that such "nonattainment" States establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for such sources unless stringent conditions are met. EPA regulations promulgated in 1981 to implement the permit requirement allow a State to adopt a plantwide definition of the term "stationary source," under which an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant, thus allowing a State to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble." Respondents filed a petition for review in the Court of Appeals, which set aside the regulations embodying the "bubble concept" as contrary to law. Although recognizing that the amended Clean Air Act does not explicitly define what Congress envisioned as a "stationary source" to which the permit program should apply, and that the issue was not squarely addressed in the legislative history, the court concluded that, in view of the purpose of the nonattainment program to improve rather than merely maintain air quality, a plantwide definition was "inappropriate," while stating it was mandatory in programs designed to maintain existing air quality.

Held: The EPA's plantwide definition is a permissible construction of the statutory term "stationary source." Pp. 2781–2793.

(a) With regard to judicial review of an agency's construction of the statute which it administers, if Congress has not directly spoken to the precise question at issue, the question for the court is whether the *838 agency's answer is based on a permissible construction of the statute. Pp. 2781–2783.

(b) Examination of the legislation and its history supports the Court of Appeals' conclusion that Congress did not have a specific intention as to the applicability of the "bubble concept" in these cases. Pp. 2783–2786.

AR005241

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

(c) The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas plainly discloses that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Pp. 2786–2787.

(d) Prior to the 1977 Amendments, the EPA had used a plantwide definition of the term "source," but in 1980 the EPA ultimately adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals here, precluding use of the "bubble concept" in nonattainment States' programs designed to enhance air quality. However, when a new administration took office 1981, the EPA, in promulgating the regulations involved here, reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the plantwide definition in nonattainment areas. Pp. 2787–2790.

(e) Parsing the general terms in the text of the amended Clean Air Act—particularly the provisions of §§ 302(j) and 111(a)(3) pertaining to the definition of "source"—does not reveal any actual intent of Congress as to the issue in these cases. To the extent any congressional "intent" can be discerned from the statutory language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the EPA's power to regulate particular sources in order to effectuate the policies of the Clean Air Act. Similarly, the legislative history is consistent with the **2780 view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments. The plantwide definition is fully consistent with the policy of allowing reasonable economic growth, and the EPA has advanced a reasonable explanation for its conclusion that the regulations serve environmental objectives as well. The fact that the EPA has from time to time changed its interpretation of the term "source" does not lead to the conclusion that no deference should be accorded the EPA's interpretation of the statute. An agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis. Policy arguments concerning the "bubble concept" should be addressed to legislators or administrators, not to judges. The EPA's interpretation of the statute here represents a reasonable accommodation of manifestly competing interests and is entitled to deference. Pp. 2790–2793.

222 U.S.App.D.C. 268, 685 F.2d 718 (1982), reversed.

**Attorneys and Law Firms**

*Deputy Solicitor General Bator* argued the cause for petitioners in all cases. With him on the briefs for petitioner in No. 82-1591 were *Solicitor General Lee, Acting Assistant Attorney General Habicht, Deputy Assistant Attorney General Walker, Mark I. Levy, Anne S. Almy, William F. Pedersen,* and *Charles S. Carter. Michael H. Salinsky* and *Kevin M. Fong* filed briefs for petitioner in No. 82-1005. *Robert A. Emmett, David Ferber, Stark Ritchie, Theodore L. Garrett, Patricia A. Barald, Louis E. Tosi, William L. Patberg, Charles F. Lettow,* and *Barton C. Green* filed briefs for petitioners in No. 82-1247.

**\*839** *David D. Doniger* argued the cause and filed a brief for respondents.†>>>

† Briefs of *amici curiae* urging reversal were filed for the American Gas Association by *John A. Myler;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat,* and *Ann P. Sheldon;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

A brief of *amici curiae* urging affirmance was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Thomas Y. Au, Duane Woodard,* Attorney General of Colorado, *Richard L. Griffith,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Robert A. Whitehead, Jr.,* Assistant Attorney General, *James S. Tierney,* Attorney General of Maine, *Robert Abrams,* Attorney General of New York, *Marcia J. Cleveland* and *Mary L. Lyndon,* Assistant Attorneys General, *Irwin I. Kimmelman,* Attorney General of New Jersey, *John J. Easton, Jr.,* Attorney General of Vermont, *Merideth Wright,* Assistant Attorney General, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Maryann Sumi,* Assistant Attorney General.

*James D. English, Mary-Win O'Brien,* and *Bernard Kleiman* filed a brief for the United Steelworkers of America, AFL-CIO-CLC, as *amicus curiae.*

**Opinion**

Justice STEVENS delivered the opinion of the Court.

In the Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685, Congress enacted certain requirements applicable **\*840** to States that had not achieved the national air quality standards established by the

AR005242

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

Environmental Protection Agency (EPA) pursuant to earlier legislation. The amended Clean Air Act required these "nonattainment" States to establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for a new or modified major stationary source unless several stringent conditions are met.[1] The EPA regulation promulgated to implement this permit requirement allows a State to adopt a plantwide definition of the term "stationary source."[2] Under this definition, an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant. The question presented by these cases is whether EPA's decision to allow States to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble" is based on a reasonable construction of the statutory term "stationary source."

[1]   Section 172(b)(6), 42 U.S.C. § 7502(b)(6), provides: "The plan provisions required by subsection (a) shall— ..... "(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173 (relating to permit requirements)." 91 Stat. 747.

[2]   "(i) 'Stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act. "(ii) 'Building, structure, facility, or installation' means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel." 40 CFR §§ 51.18(j)(1)(i) and (ii) (1983).

I

The EPA regulations containing the plantwide definition of the term stationary source were promulgated on October *841 14, 1981. 46 Fed.Reg. 50766. Respondents[3] filed a timely petition for review in the United States Court of Appeals for the District of Columbia Circuit pursuant to 42 U.S.C. § 7607(b)(1).[4] The Court of

Appeals **2781 set aside the regulations. Natural Resources Defense Council, Inc. v. Gorsuch, 222 U.S.App.D.C. 268, 685 F.2d 718 (1982).

[3]   National Resources Defense Council, Inc., Citizens for a Better Environment, Inc., and North Western Ohio Lung Association, Inc.

[4]   Petitioners, Chevron U.S.A. Inc., American Iron and Steel Institute, American Petroleum Institute, Chemical Manufacturers Association, Inc., General Motors Corp., and Rubber Manufacturers Association were granted leave to intervene and argue in support of the regulation.

The court observed that the relevant part of the amended Clean Air Act "does not explicitly define what Congress envisioned as a 'stationary source, to which the permit program ... should apply," and further stated that the precise issue was not "squarely addressed in the legislative history." Id., at 273, 685 F.2d, at 723. In light of its conclusion that the legislative history bearing on the question was "at best contradictory," it reasoned that "the purposes of the nonattainment program should guide our decision here." Id., at 276, n. 39, 685 F.2d, at 726, n. 39.[5] Based on two of its precedents concerning the applicability of the bubble concept to certain Clean Air Act programs,[6] the court stated that the bubble concept was "mandatory" in programs designed merely to maintain existing air quality, but held that it was "inappropriate" in programs enacted to improve air quality. Id., at 276, 685 F.2d, at 726. Since the purpose of the permit *842 program—its "raison d'être," in the court's view—was to improve air quality, the court held that the bubble concept was inapplicable in these cases under its prior precedents. Ibid. It therefore set aside the regulations embodying the bubble concept as contrary to law. We granted certiorari to review that judgment, 461 U.S. 956, 103 S.Ct. 2427, 77 L.Ed.2d 1314 (1983), and we now reverse.

[5]   The court remarked in this regard: "We regret, of course, that Congress did not advert specifically to the bubble concept's application to various Clean Air Act programs, and note that a further clarifying statutory directive would facilitate the work of the agency and of the court in their endeavors to serve the legislators' will." 222 U.S.App.D.C., at 276, n. 39, 685 F.2d, at 726, n. 39.

[6]   Alabama Power Co. v. Costle, 204 U.S.App.D.C. 51, 636 F.2d 323 (1979); ASARCO Inc. v. EPA, 188

AR005243

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

U.S.App.D.C. 77, 578 F.2d 319 (1978).

The basic legal error of the Court of Appeals was to adopt a static judicial definition of the term "stationary source" when it had decided that Congress itself had not commanded that definition. Respondents do not defend the legal reasoning of the Court of Appeals.[7] Nevertheless, since this Court reviews judgments, not opinions,[8] we must determine whether the Court of Appeals' legal error resulted in an erroneous judgment on the validity of the regulations.

[7]    Respondents argued below that EPA's plantwide definition of "stationary source" is contrary to the terms, legislative history, and purposes of the amended Clean Air Act. The court below rejected respondents' arguments based on the language and legislative history of the Act. It did agree with respondents contention that the regulations were inconsistent with the purposes of the Act, but did not adopt the construction of the statute advanced by respondents here. Respondents rely on the arguments rejected by the Court of Appeals in support of the judgment, and may rely on any ground that finds support in the record. See Ryerson v. United States, 312 U.S. 405, 408, 61 S.Ct. 656, 658, 85 L.Ed. 917 (1941); LeTulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 316, 84 L.Ed. 355 (1940); Langnes v. Green, 282 U.S. 531, 533–539, 51 S.Ct. 243, 244–246, 75 L.Ed. 520 (1931).

[8]    E.g., Black v. Cutter Laboratories, 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956); J.E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940); Williams v. Norris, 12 Wheat. 117, 120, 6 L.Ed. 571 (1827); McClung v. Silliman, 6 Wheat. 598, 603, 5 L.Ed. 340 (1821).

II

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, **\*843** as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, **\*\*2782** the court determines Congress has not directly addressed the precise question at issue, the court

does not simply impose its own construction on the statute,[10] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[11]

[9]    The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. See, e.g., FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); SEC v. Sloan, 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745–746, 93 S.Ct. 1773, 1784–1785, 36 L.Ed.2d 620 (1973); Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); FTC v. Colgate–Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1932); Webster v. Luther, 163 U.S. 331, 342, 16 S.Ct. 963, 967, 41 L.Ed. 179 (1896). If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

[10]    See generally, R. Pound, The Spirit of the Common Law 174–175 (1921).

[11]    The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. FEC v. Democratic Senatorial Campaign Committee, 454 U.S., at 39, 102 S.Ct., at 46; Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946); McLaren v. Fleischer, 256 U.S. 477, 480–481, 41 S.Ct. 577, 577–578, 65 L.Ed. 1052 (1921).

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."

AR005244

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation **\*844** of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.[12] Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.[13]

[12]   See, e.g., United States v. Morton, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) Schweiker v. Gray Panthers, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); Batterton v. Francis, 432 U.S. 416, 424–426, 97 S.Ct. 2399, 2404–2406, 53 L.Ed.2d 448 (1977); American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 235–237, 57 S.Ct. 170, 172–173, 81 L.Ed. 142 (1936).

[13]   E.g., INS v. Jong Ha Wang, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); Train v. Natural Resources Defense Council, Inc., 421 U.S., at 87, 95 S.Ct., at 1485.

 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer,[14] and the principle of deference to administrative interpretations

[14]   Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 2479–2480, 81 L.Ed.2d 301 (1984); Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); Investment Company Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); Unemployment Compensation Comm'n v. Aragon, 329 U.S., at 153–154, 67 S.Ct., at 250–251; NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); McLaren v. Fleischer, 256 U.S., at 480–481, 41 S.Ct., at 577–578; Webster v. Luther, 163 U.S., at 342, 16 S.Ct., at 967; Brown v. United States, 113 U.S. 568, 570–571, 5 S.Ct. 648, 649–650, 28 L.Ed. 1079 (1885); United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588 (1878); Edwards' Lessee v. Darby, 12 Wheat. 206, 210, 6 L.Ed. 603 (1827).

"has been consistently followed by this Court whenever

decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full **\*\*2783** understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, e.g., National Broadcasting Co. v. United States, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; Labor Board v. Hearst Publications, Inc., 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170]; **\*845** Republic Aviation Corp. v. Labor Board, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; Securities & Exchange Comm'n v. Chenery Corp., [332] 322 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995]; Labor Board v. Seven–Up Bottling Co., 344 U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377].

"... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." United States v. Shimer, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961).

Accord Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984).

In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is "inappropriate" in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make.

III

In the 1950's and the 1960's Congress enacted a series of

AR005245

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

statutes designed to encourage and to assist the States in curtailing air pollution. See generally Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 63–64, 95 S.Ct. 1470, 1474–1475, 43 L.Ed.2d 731 (1975). The Clean Air Amendments of 1970, Pub.L. 91–604, 84 Stat. 1676, "sharply increased federal authority and responsibility **\*846** in the continuing effort to combat air pollution," 421 U.S., at 64, 95 S.Ct., at 1474, but continued to assign "primary responsibility for assuring air quality" to the several States, 84 Stat. 1678. Section 109 of the 1970 Amendments directed the EPA to promulgate National Ambient Air Quality Standards (NAAQS's)[15] and § 110 directed the States to develop plans (SIP's) to implement the standards within specified deadlines. In addition, § 111 provided that major new sources of pollution would be required to conform to technology-based performance standards; the EPA was directed to publish a list of categories of sources of pollution and to establish new source performance standards (NSPS) for each. Section 111(e) prohibited the operation of any new source in violation of a performance standard.

[15]   Primary standards were defined as those whose attainment and maintenance were necessary to protect the public health, and secondary standards were intended to specify a level of air quality that would protect the public welfare.

Section 111(a) defined the terms that are to be used in setting and enforcing standards of performance for new stationary sources. It provided:

"For purposes of this section:

.....

"(3) The term 'stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant." 84 Stat. 1683.

**\*\*2784** In the 1970 Amendments that definition was not only applicable to the NSPS program required by § 111, but also was made applicable to a requirement of § 110 that each state implementation plan contain a procedure for reviewing the location of any proposed new source and preventing its construction if it would preclude the attainment or maintenance of national air quality standards.[16]

[16]   See §§ 110(a)(2)(D) and 110(a)(4).

In due course, the EPA promulgated NAAQS's, approved SIP's, and adopted detailed regulations governing NSPS's **\*847** for various categories of equipment. In one of its programs, the EPA used a plantwide definition of the term "stationary source." In 1974, it issued NSPS's for the nonferrous smelting industry that provided that the standards would not apply to the modification of major smelting units if their increased emissions were offset by reductions in other portions of the same plant.[17]

[17]   The Court of Appeals ultimately held that this plantwide approach was prohibited by the 1970 Act, see ASARCO Inc., 188 U.S.App.D.C., at 83–84, 578 F.2d, at 325–327. This decision was rendered after enactment of the 1977 Amendments, and hence the standard was in effect when Congress enacted the 1977 Amendments.

*Nonattainment*

The 1970 legislation provided for the attainment of primary NAAQS's by 1975. In many areas of the country, particularly the most industrialized States, the statutory goals were not attained.[18] In 1976, the 94th Congress was confronted with this fundamental problem, as well as many others respecting pollution control. As always in this area, the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs. The 94th Congress, confronting these competing interests, was unable to agree on what response was in the public interest: legislative proposals to deal with nonattainment failed to command the necessary consensus.[19]

[18]   See Report of the National Commission on Air Quality, To Breathe Clean Air, 3.3–20 through 3.3–33 (1981).

[19]   Comprehensive bills did pass both Chambers of Congress; the Conference Report was rejected in the Senate. 122 Cong.Rec. 34375–34403, 34405–34418 (1976).

In light of this situation, the EPA published an Emissions Offset Interpretative Ruling in December 1976, see 41 Fed.Reg. 55524, to "fill the gap," as respondents put it, until Congress acted. The Ruling stated that it was

AR005246

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

intended to **\*848** address "the issue of whether and to what extent national air quality standards established under the Clean Air Act may restrict or prohibit growth of major new or expanded stationary air pollution sources." Id., at 55524–55525. In general, the Ruling provided that "a major new source may locate in an area with air quality worse than a national standard only if stringent conditions can be met." Id., at 55525. The Ruling gave primary emphasis to the rapid attainment of the statute's environmental goals.[20] Consistent with that emphasis, the construction of every new source in nonattainment areas had to meet the "lowest achievable emission rate" under the current state of the art for that type of facility. See Ibid. The 1976 Ruling did not, however, explicitly adopt or reject the "bubble concept."[21]

[20]   For example, it stated:
"Particularly with regard to the primary NAAQS's, Congress and the Courts have made clear that economic considerations must be subordinated to NAAQS achievement and maintenance. While the ruling allows for some growth in areas violating a NAAQS if the net effect is to insure further progress toward NAAQS achievement, the Act does not allow economic growth to be accommodated at the expense of the public health." 41 Fed.Reg. 55527 (1976).

[21]   In January 1979, the EPA noted that the 1976 Ruling was ambiguous concerning this issue:
"A number of commenters indicated the need for a more explicit definition of 'source.' Some readers found that it was unclear under the 1976 Ruling whether a plant with a number of different processes and emission points would be considered a single source. The changes set forth below define a source as 'any structure, building, facility, equipment, installation, or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control.' This definition precludes a large plant from being separated into individual production lines for purposes of determining applicability of the offset requirements." 44 Fed.Reg. 3276.

**\*\*2785** IV

The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue. A small portion of the statute—91

Stat. **\*849** 745–751 (Part D of Title I of the amended Act, 42 U.S.C. §§ 7501–7508)—expressly deals with nonattainment areas. The focal point of this controversy is one phrase in that portion of the Amendments.[22]

[22]   Specifically, the controversy in these cases involves the meaning of the term "major stationary sources" in § 172(b)(6) of the Act, 42 U.S.C. § 7502(b)(6). The meaning of the term "proposed source" in § 173(2) of the Act, 42 U.S.C. § 7503(2), is not at issue.

Basically, the statute required each State in a nonattainment area to prepare and obtain approval of a new SIP by July 1, 1979. In the interim those States were required to comply with the EPA's interpretative Ruling of December 21, 1976. 91 Stat. 745. The deadline for attainment of the primary NAAQS's was extended until December 31, 1982, and in some cases until December 31, 1987, but the SIP's were required to contain a number of provisions designed to achieve the goals as expeditiously as possible.[23]

[23]   Thus, among other requirements, § 172(b) provided that the SIP's shall—
"(3) require, in the interim, reasonable further progress (as defined in section 171(1)) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology;
"(4) include a comprehensive, accurate, current inventory of actual emissions from all sources (as provided by rule of the Administrator) of each such pollutant for each such area which is revised and resubmitted as frequently as may be necessary to assure that the requirements of paragraph (3) are met and to assess the need for additional reductions to assure attainment of each standard by the date required under paragraph (1);
"(5) expressly identify and quantify the emissions, if any, of any such pollutant which will be allowed to result from the construction and operation of major new or modified stationary sources for each such area; ...
.....
"(8) contain emission limitations, schedules of compliance and such other measures as may be necessary to meet the requirements of this section." 91 Stat. 747.
Section 171(1) provided:
"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 110(a)(2)(I) and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 172(a)." Id., at 746.

AR005247

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

**\*850** Most significantly for our purposes, the statute provided that each plan shall

"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173...." Id., 747.

Before issuing a permit, § 173 requires (1) the state agency to determine that there will be sufficient emissions reductions in the region to offset the emissions from the new source and also to allow for reasonable further progress toward attainment, or that the increased emissions will not exceed an allowance for growth established pursuant to § 172(b)(5); (2) the applicant to certify that his other sources in the State are in compliance with the SIP, (3) the agency to determine that the applicable SIP is otherwise being implemented, and (4) the proposed source to comply with the lowest achievable emission rate (LAER).[24]

[24]    Section 171(3) provides:
    "(3) The term 'lowest achievable emission rate' means for any source, that rate of emissions which reflects—
    "(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or
    "(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent. "In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance."
    The LAER requirement is defined in terms that make it even more stringent than the applicable new source performance standard developed under § 111 of the Act, as amended by the 1970 statute.

**\*\*2786 \*851** The 1977 Amendments contain no specific reference to the "bubble concept." Nor do they contain a specific definition of the term "stationary source," though they did not disturb the definition of "stationary source" contained in § 111(a)(3), applicable by the terms of the Act to the NSPS program. Section 302(j), however, defines the term "major stationary source" as follows:

"(j) Except as otherwise expressly provided, the terms 'major stationary source' and 'major emitting facility' mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one

hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)." 91 Stat. 770.

V

The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas does not contain any specific comment on the "bubble concept" or the question whether a plantwide definition of a stationary source is permissible under the permit program. It does, however, plainly disclose that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Indeed, the House Committee Report identified the economic interest as one of the "two main purposes" of this section of the bill. It stated:

"Section 117 of the bill, adopted during full committee markup establishes a new section 127 of the Clean Air Act. The section has two main purposes: (1) to allow reasonable economic growth to continue in an area while making reasonable further progress to assure attainment of the standards by a fixed date; and (2) to allow **\*852** States greater flexibility for the former purpose than EPA's present interpretative regulations afford.

"The new provision allows States with nonattainment areas to pursue one of two options. First, the State may proceed under EPA's present 'tradeoff' or 'offset' ruling. The Administrator is authorized, moreover, to modify or amend that ruling in accordance with the intent and purposes of this section.

"The State's second option would be to revise its implementation plan in accordance with this new provision." H.R.Rep. No. 95–294, p. 211 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1290.[25]

[25]    During the floor debates Congressman Waxman remarked that the legislation struck
    "a proper balance between environmental controls and economic growth in the dirty air areas of America.... There is no other single issue which more clearly poses the conflict between pollution control and new jobs. We have determined that neither need be compromised....
    "This is a fair and balanced approach, which will not

AR005248

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

undermine our economic vitality, or impede achievement of our ultimate environmental objectives." 123 Cong.Rec. 27076 (1977).

The second "main purpose" of the provision—allowing the States "greater flexibility" than the EPA's interpretative Ruling—as well as the reference to the EPA's authority to amend its Ruling in accordance with the intent of the section, is entirely consistent with the view that Congress did not intend to freeze the definition of "source" contained in the existing regulation into a rigid statutory requirement.

The portion of the Senate Committee Report dealing with nonattainment areas states generally that it was intended to "supersede the EPA administrative approach," and that expansion should be permitted if a State could "demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards." **2787 S.Rep. No. 95–127, p. 55 (1977). The Senate Report notes the value of "case-by-case review of each new or modified major source of pollution that seeks to locate in a region exceeding an ambient standard," explaining that such a review "requires matching reductions from existing sources against *853 emissions expected from the new source in order to assure that introduction of the new source will not prevent attainment of the applicable standard by the statutory deadline." Ibid. This description of a case-by-case approach to plant additions, which emphasizes the net consequences of the construction or modification of a new source, as well as its impact on the overall achievement of the national standards, was not, however, addressed to the precise issue raised by these cases.

Senator Muskie made the following remarks:
"I should note that the test for determining whether a new or modified source is subject to the EPA interpretative regulation [the Offset Ruling]—and to the permit requirements of the revised implementation plans under the conference bill—is whether the source will emit a pollutant into an area which is exceeding a national ambient air quality standard for that pollutant—or precursor. Thus, a new source is still subject to such requirements as 'lowest achievable emission rate' even if it is constructed as a replacement for an older facility resulting in a net reduction from previous emission levels.

"A source—including an existing facility ordered to convert to coal—is subject to all the nonattainment requirements as a modified source if it makes any physical change which increases the amount of any air pollutant for which the standards in the area are

exceeded." 123 Cong.Rec. 26847 (1977).

VI

As previously noted, prior to the 1977 Amendments, the EPA had adhered to a plantwide definition of the term "source" under a NSPS program. After adoption of the 1977 Amendments, proposals for a plantwide definition were considered in at least three formal proceedings.

In January 1979, the EPA considered the question whether the same restriction on new construction in nonattainment areas that had been included in its December 1976 Ruling *854 should be required in the revised SIP's that were scheduled to go into effect in July 1979. After noting that the 1976 Ruling was ambiguous on the question "whether a plant with a number of different processes and emission points would be considered a single source," 44 Fed.Reg. 3276 (1979), the EPA, in effect, provided a bifurcated answer to that question. In those areas that did not have a revised SIP in effect by July 1979, the EPA rejected the plantwide definition; on the other hand, it expressly concluded that the plantwide approach would be permissible in certain circumstances if authorized by an approved SIP. It stated: "Where a state implementation plan is revised and implemented to satisfy the requirements of Part D, including the reasonable further progress requirement, the plan requirements for major modifications may exempt modifications of existing facilities that are accompanied by intrasource offsets so that there is no net increase in emissions. The agency endorses such exemptions, which would provide greater flexibility to sources to effectively manage their air emissions at least cost." Ibid.[26]

[26]    In the same Ruling, the EPA added:
"The above exemption is permitted under the SIP because, to be approved under Part D, plan revisions due by January 1979 must contain adopted measures assuring that reasonable further progress will be made. Furthermore, in most circumstances, the measures adopted by January 1979 must be sufficient to actually provide for attainment of the standards by the dates required under the Act, and in all circumstances measures adopted by 1982 must provide for attainment. See Section 172 of the Act and 43 FR 21673–21677 (May 19, 1978). Also, Congress intended under Section 173 of the Act that States would have some latitude to depart from the strict requirements of this Ruling when the State plan is revised and is being carried out in

AR005249

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

accordance with Part D. Under a Part D plan, therefore, there is less need to subject a modification of an existing facility to LAER and other stringent requirements if the modification is accompanied by sufficient intrasource offsets so that there is no net increase in emissions." 44 Fed.Reg. 3277 (1979).

**2788 *855 In April, and again in September 1979, the EPA published additional comments in which it indicated that revised SIP's could adopt the plantwide definition of source in nonattainment areas in certain circumstances. See id., at 20372, 20379, 51924, 51951, 51958. On the latter occasion, the EPA made a formal rulemaking proposal that would have permitted the use of the "bubble concept" for new installations within a plant as well as for modifications of existing units. It explained:

" 'Bubble' Exemption: The use of offsets inside the same source is called the 'bubble.' EPA proposes use of the definition of 'source' (see above) to limit the use of the bubble under nonattainment requirements in the following respects:

"i. Part D SIPs that include all requirements needed to assure reasonable further progress and attainment by the deadline under section 172 and that are being carried out need not restrict the use of a plantwide bubble, the same as under the PSD proposal.

"ii. Part D SIPs that do not meet the requirements specified must limit use of the bubble by including a definition of 'installation' as an identifiable piece of process equipment."[27]

27    Id., at 51926. Later in that Ruling, the EPA added: "However, EPA believes that complete Part D SIPs, which contain adopted and enforceable requirements sufficient to assure attainment, may apply the approach proposed above for PSD, with plant-wide review but no review of individual pieces of equipment. Use of only a plant-wide definition of source will permit plant-wide offsets for avoiding NSR of new or modified pieces of equipment. However, this is only appropriate once a SIP is adopted that will assure the reductions in existing emissions necessary for attainment. See 44 FR 3276 col. 3 (January 16, 1979). If the level of emissions allowed in the SIP is low enough to assure reasonable further progress and attainment, new construction or modifications with enough offset credit to prevent an emission increase should not jeopardize attainment." Id., at 51933.

*856 Significantly, the EPA expressly noted that the word "source" might be given a plantwide definition for some

purposes and a narrower definition for other purposes. It wrote:

"Source means any building structure, facility, or installation which emits or may emit any regulated pollutant. 'Building, structure, facility or installation' means plant in PSD areas and in nonattainment areas except where the growth prohibitions would apply or where no adequate SIP exists or is being carried out." Id., at 51925.[28]

28    In its explanation of why the use of the "bubble concept" was especially appropriate in preventing significant deterioration (PSD) in clean air areas, the EPA stated: "In addition, application of the bubble on a plant-wide basis encourages voluntary upgrading of equipment, and growth in productive capacity." Id., at 51932.

The EPA's summary of its proposed Ruling discloses a flexible rather than rigid definition of the term "source" to implement various policies and programs:

"In summary, EPA is proposing two different ways to define source for different kinds of NSR programs:

"(1) For PSD and complete Part D SIPs, review would apply only to plants, with an unrestricted plant-wide bubble.

"(2) For the offset ruling, restrictions on construction, and incomplete Part D SIPs, review would apply to both plants and individual pieces of process equipment, causing the plant-wide bubble not to apply for new and modified major pieces of equipment.

"In addition, for the restrictions on construction, EPA is proposing to define 'major modification' so as to prohibit the bubble entirely. Finally, an alternative discussed but not favored is to have only pieces of process equipment reviewed, resulting in no plant-wide bubble and allowing minor pieces of equipment to escape **2789 NSR *857 regardless of whether they are within a major plant." Id., at 51934.

In August 1980, however, the EPA adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals in these cases. The EPA took particular note of the two then-recent Court of Appeals decisions, which had created the bright-line rule that the "bubble concept" should be employed in a program designed to maintain air quality but not in one designed to enhance air quality. Relying heavily on those cases,[29] EPA adopted a dual definition of "source" for nonattainment areas that

AR005250

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

required a permit whenever a change in either the entire plant, or one of its components, would result in a significant increase in emissions even if the increase was completely offset by reductions elsewhere in the plant. The EPA expressed the opinion that this interpretation was "more consistent with congressional intent" than the plantwide definition because it "would bring in more sources or modifications for review," 45 Fed.Reg. 52697 (1980), but its primary legal analysis was predicated on the two Court of Appeals decisions.

29    "The dual definition also is consistent with Alabama Power and ASARCO. Alabama Power held that EPA had broad discretion to define the constituent terms of 'source' so as best to effectuate the purposes of the statute. Different definitions of 'source' can therefore be used for different sections of the statute....
"Moreover, Alabama Power and ASARCO taken together suggest that there is a distinction between Clean Air Act programs designed to enhance air quality and those designed only to maintain air quality....
.....
"Promulgation of the dual definition follows the mandate of Alabama Power, which held that, while EPA could not define 'source' as a combination of sources, EPA had broad discretion to define 'building,' 'structure,' 'facility,' and 'installation' so as to best accomplish the purposes of the Act." 45 Fed.Reg. 52697 (1980).

In 1981 a new administration took office and initiated a "Government-wide reexamination of regulatory burdens and complexities." 46 Fed.Reg. 16281. In the context of that *858 review, the EPA reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the same definition in both nonattainment areas and PSD areas.

In explaining its conclusion, the EPA first noted that the definitional issue was not squarely addressed in either the statute or its legislative history and therefore that the issue involved an agency "judgment as how to best carry out the Act." Ibid. It then set forth several reasons for concluding that the plantwide definition was more appropriate. It pointed out that the dual definition "can act as a disincentive to new investment and modernization by discouraging modifications to existing facilities" and "can actually retard progress in air pollution control by discouraging replacement of older, dirtier processes or pieces of equipment with new, cleaner ones." Ibid. Moreover, the new definition "would simplify EPA's rules by using the same definition of 'source' for PSD, nonattainment new source review and the construction moratorium. This reduces confusion and inconsistency."

Ibid. Finally, the agency explained that additional requirements that remained in place would accomplish the fundamental purposes of achieving attainment with NAAQS's as expeditiously as possible.[30] These conclusions were **2790 expressed *859 in a proposed rulemaking in August 1981 that was formally promulgated in October. See id., at 50766.

30    It stated:
"5. States will remain subject to the requirement that for all nonattainment areas they demonstrate attainment of NAAQS as expeditiously as practicable and show reasonable further progress toward such attainment. Thus, the proposed change in the mandatory scope of nonattainment new source review should not interfere with the fundamental purpose of Part D of the Act.
"6. New Source Performance Standards (NSPS) will continue to apply to many new or modified facilities and will assure use of the most up-to-date pollution control techniques regardless of the applicability of nonattainment area new source review.
"7. In order to avoid nonattainment area new source review, a major plant undergoing modification must show that it will not experience a significant net increase in emissions. Where overall emissions increase significantly, review will continue to be required." 46 Fed.Reg. 16281 (1981).

## VII

In this Court respondents expressly reject the basic rationale of the Court of Appeals' decision. That court viewed the statutory definition of the term "source" as sufficiently flexible to cover either a plantwide definition, a narrower definition covering each unit within a plant, or a dual definition that could apply to both the entire "bubble" and its components. It interpreted the policies of the statute, however, to mandate the plantwide definition in programs designed to maintain clean air and to forbid it in programs designed to improve air quality. Respondents place a fundamentally different construction on the statute. They contend that the text of the Act requires the EPA to use a dual definition—if either a component of a plant, or the plant as a whole, emits over 100 tons of pollutant, it is a major stationary source. They thus contend that the EPA rules adopted in 1980, insofar as they apply to the maintenance of the quality of clean air, as well as the 1981 rules which apply to nonattainment areas, violate the statute.[31]

31    "What EPA may not do, however, is define all four terms to mean only plants. In the 1980 PSD rules, EPA

AR005251

did just that. EPA compounded the mistake in the 1981 rules here under review, in which it abandoned the dual definition." Brief for Respondents 29, n. 56.

*Statutory Language*

The definition of the term "stationary source" in § 111(a)(3) refers to "any building, structure, facility, or installation" which emits air pollution. See supra, at 2784. This definition is applicable only to the NSPS program by the express terms of the statute; the text of the statute does not make this definition **\*860** applicable to the permit program. Petitioners therefore maintain that there is no statutory language even relevant to ascertaining the meaning of stationary source in the permit program aside from § 302(j), which defines the term "major stationary source." See supra, at 2786. We disagree with petitioners on this point.

The definition in § 302(j) tells us what the word "major" means—a source must emit at least 100 tons of pollution to qualify—but it sheds virtually no light on the meaning of the term "stationary source." It does equate a source with a facility—a "major emitting facility" and a "major stationary source" are synonymous under § 302(j). The ordinary meaning of the term "facility" is some collection of integrated elements which has been designed and constructed to achieve some purpose. Moreover, it is certainly no affront to common English usage to take a reference to a major facility or a major source to connote an entire plant as opposed to its constituent parts. Basically, however, the language of § 302(j) simply does not compel any given interpretation of the term "source."

Respondents recognize that, and hence point to § 111(a)(3). Although the definition in that section is not literally applicable to the permit program, it sheds as much light on the meaning of the word "source" as anything in the statute.[32] As respondents point out, use of the words "building, structure, facility, or installation," as the definition of source, could be read to impose the permit conditions on an individual building that is a part of a plant.[33] A "word may have a character of its own not to be submerged by its association." **\*861** Russell Motor Car Co. v. United States, 261 U.S. 514, 519, 43 S.Ct. 428, 429, 67 L.Ed. 778 (1923). On the other hand, the meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it

may **\*\*2791** indicate that the true meaning of the series is to convey a common idea. The language may reasonably be interpreted to impose the requirement on any discrete, but integrated, operation which pollutes. This gives meaning to all of the terms—a single building, not part of a larger operation, would be covered if it emits more than 100 tons of pollution, as would any facility, structure, or installation. Indeed, the language itself implies a "bubble concept" of sorts: each enumerated item would seem to be treated as if it were encased in a bubble. While respondents insist that each of these terms must be given a discrete meaning, they also argue that § 111(a)(3) defines "source" as that term is used in § 302(j). The latter section, however, equates a source with a facility, whereas the former defines "source" as a facility, among other items.

[32] We note that the EPA in fact adopted the language of that definition in its regulations under the permit program. 40 CFR §§ 51.18(j)(1)(i), (ii) (1983).

[33] Since the regulations give the States the option to define an individual unit as a source, see 40 CFR § 51.18(j)(1) (1983), petitioners do not dispute that the terms can be read as respondents suggest.

We are not persuaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress.[34] **\*862** We know full well that this language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation. To the extent any congressional "intent" can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate particular sources in order to effectuate the policies of the Act.

[34] The argument based on the text of § 173, which defines the permit requirements for nonattainment areas, is a classic example of circular reasoning. One of the permit requirements is that "the proposed source is required to comply with the lowest achievable emission rate" (LAER). Although a State may submit a revised SIP that provides for the waiver of another requirement—the "offset condition"—the SIP may not provide for a waiver of the LAER condition for any proposed source. Respondents argue that the plantwide definition of the term "source" makes it unnecessary for newly constructed units within the plant to satisfy the LAER requirement if their emissions are offset by the reductions achieved by the retirement of older equipment. Thus, according to respondents, the

AR005252

plantwide definition allows what the statute explicitly prohibits—the waiver of the LAER requirement for the newly constructed units. But this argument proves nothing because the statute does not prohibit the waiver unless the proposed new unit is indeed subject to the permit program. If it is not, the statute does not impose the LAER requirement at all and there is no need to reach any waiver question. In other words, § 173 of the statute merely deals with the consequences of the definition of the term "source" and does not define the term.

*Legislative History*

In addition, respondents argue that the legislative history and policies of the Act foreclose the plantwide definition, and that the EPA's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the Act.

Based on our examination of the legislative history, we agree with the Court of Appeals that it is unilluminating. The general remarks pointed to by respondents "were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire...." Jewell Ridge Coal Corp. v. Mine Workers, 325 U.S. 161, 168–169, 65 S.Ct. 1063, 1067–1068, 89 L.Ed. 1534 (1945). Respondents' argument based on the legislative history relies heavily on Senator Muskie's observation that a new source is subject to the LAER requirement.[35] But the full statement is ambiguous and like the text of § 173 itself, this comment does not tell us what a new source is, much less that it is to have an inflexible definition. We find that the legislative history as a whole is silent on the precise issue before us. It is, however, consistent with the view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments.

[35]   See supra, at 2787. We note that Senator Muskie was not critical of the EPA's use of the "bubble concept" in one NSPS program prior to the 1977 amendments. See ibid.

**\*863** More importantly, that history plainly identifies the policy concerns that motivated the enactment; the plantwide definition is fully consistent with one of those concerns **\*\*2792**—the allowance of reasonable economic

growth—and, whether or not we believe it most effectively implements the other, we must recognize that the EPA has advanced a reasonable explanation for its conclusion that the regulations serve the environmental objectives as well. See supra, at 2789–2790, and n. 29; see also supra, at 2788, n. 27. Indeed, its reasoning is supported by the public record developed in the rulemaking process,[36] as well as by certain private studies.[37]

[36]   See, for example, the statement of the New York State Department of Environmental Conservation, pointing out that denying a source owner flexibility in selecting options made it "simpler and cheaper to operate old, more polluting sources than to trade up...." App. 128–129.

[37]   "Economists have proposed that economic incentives be substituted for the cumbersome administrative-legal framework. The objective is to make the profit and cost incentives that work so well in the marketplace work for pollution control.... [The 'bubble' or 'netting' concept] is a first attempt in this direction. By giving a plant manager flexibility to find the places and processes within a plant that control emissions most cheaply, pollution control can be achieved more quickly and cheaply." L. Lave & G. Omenn, Cleaning Air: Reforming the Clean Air Act 28 (1981) (footnote omitted).

Our review of the EPA's varying interpretations of the word "source"—both before and after the 1977 Amendments—convinces us that the agency primarily responsible for administering this important legislation has consistently interpreted it flexibly—not in a sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex arena. The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations **\*864** and the wisdom of its policy on a continuing basis. Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.

Significantly, it was not the agency in 1980, but rather the Court of Appeals that read the statute inflexibly to

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

command a plantwide definition for programs designed to maintain clean air and to forbid such a definition for programs designed to improve air quality. The distinction the court drew may well be a sensible one, but our labored review of the problem has surely disclosed that it is not a distinction that Congress ever articulated itself, or one that the EPA found in the statute before the courts began to review the legislative work product. We conclude that it was the Court of Appeals, rather than Congress or any of the decisionmakers who are authorized by Congress to administer this legislation, that was primarily responsible for the 1980 position taken by the agency.

### Policy

The arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the "bubble concept," but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges.[38]

[38]   Respondents point out if a brand new factory that will emit over 100 tons of pollutants is constructed in a nonattainment area, that plant must obtain a permit pursuant to § 172(b)(6) and in order to do so, it must satisfy the § 173 conditions, including the LAER requirement. Respondents argue if an old plant containing several large emitting units is to be modernized by the replacement of one or more units emitting over 100 tons of pollutant with a new unit emitting less—but still more than 100 tons—the result should be no different simply because "it happens to be built not at a new site, but within a pre-existing plant." Brief for Respondents 4.

**\*865** In these cases, the Administrator's interpretation represents a reasonable accommodation of manifestly competing in **\*\*2793** terests and is entitled to deference: the regulatory scheme is technical and complex,[39] the agency considered the matter in a detailed and reasoned fashion,[40] and the decision involves reconciling conflicting policies.[41] Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases. Perhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position

to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency. For judicial purposes, it matters not which of these things occurred.

[39]   See e.g., *Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.*, 467 U.S., at 390, 104 S.Ct., at 2480 (1984).

[40]   See *SEC v. Sloan*, 436 U.S., at 117, 98 S.Ct., at 1711; *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287, n. 5, 98 S.Ct. 566, 574, n. 5, 54 L.Ed.2d 538 (1978); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

[41]   See *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. at 699–700, 104 S.Ct. at 2700–2701; *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the **\*866** agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57

AR005254

**Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)**

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

L.Ed.2d 117 (1978).

We hold that the EPA's definition of the term "source" is a permissible construction of the statute which seeks to accommodate progress in reducing air pollution with economic growth. "The Regulations which the Administrator has adopted provide what the agency could allowably view as ... [an] effective reconciliation of these twofold ends...." United States v. Shimer, 367 U.S., at 383, 81 S.Ct., at 1560.

The judgment of the Court of Appeals is reversed.

It is so ordered.

Justice MARSHALL and Justice REHNQUIST took no part in the consideration or decision of these cases.

Justice O'CONNOR took no part in the decision of these cases.

**All Citations**

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, 21 ERC 1049, 14 Envtl. L. Rep. 20,507

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005255

914 F.2d 475
United States Court of Appeals,
Fourth Circuit.

NATIONAL RIFLE ASSOCIATION, a not for profit
corporation; South Carolina Shooting Association,
a not for profit corporation; Greenville Gun Club,
a corporation; Palmetto Gun Club, a not for profit
association; Robley Moore; William P. Goodman;
California Rifle and Pistol Association, a not for
profit corporation; Texas State Rifle Association, a
not for profit association; Unified Sportsmen of
Florida, a not for profit association,
Plaintiffs–Appellants,
v.
Nicholas F. BRADY, Secretary, Department of the
Treasury; Stephen E. Higgins, Director of Bureau
of Alcohol, Tobacco and Firearms, U.S.
Department of Treasury, in his official capacity,
Defendants–Appellees.

No. 89–3345.
|
Argued April 2, 1990.
|
Decided Sept. 13, 1990.
|
Rehearing and Rehearing In Banc
Denied Oct. 11, 1990.

**Synopsis**
Suit was brought challenging the validity of certain
firearms regulations promulgated by the Secretary of the
Treasury pursuant to the Gun Control Act as amended by
the Firearm Owners Protection Act. The United States
District Court for the District of South Carolina, Solomon
Blatt, Jr., Senior District Judge, upheld all four
regulations at issue, and appeal was taken. The Court of
Appeals, Wilkinson, Circuit Judge, held that: (1)
regulations defining "business premises" and "gun show"
were rational and consistent with Gun Control Act as
amended and therefore were valid exercises of Secretary's
rule-making authority; (2) regulation requiring that
licensees maintain records concerning receipt and
disposition of their personal firearms, not merely those
personal firearms transferred from their business
inventories, was reasonable and proper; however, to
extent that regulation required licensees to record
information not specified in the statute, the regulation was
invalid; and (3) regulation directing licensed collectors
not only to record the receipt, sale, or other disposition of

curio and relic firearms, but also to inventory and record
all curio and relic firearms already in their possession
when they obtained their licenses was inconsistent with
the plain language of the statute and was to that extent
invalid.

Affirmed in part and reversed in part.

**Attorneys and Law Firms**

**\*477** Stephen Porter Halbrook (argued), Fairfax, Va., for
plaintiffs-appellants.

Ira C. Lupu, Civ. Div., U.S. Dept. of Justice, Washington,
D.C. (Stuart M. Gerson, Asst. Atty. Gen., Michael Jay
Singer, Mark B. Stern, Civ. Div., U.S. Dept. of Justice,
Washington, D.C., Jack B. Patterson, Imelda Koett,
Bureau of Alcohol, Tobacco and Firearms, Washington,
D.C., on the brief), for defendants-appellees.

Before SPROUSE and WILKINSON, Circuit Judges, and
GARBIS, United States District Judge for the District of
Maryland, sitting by designation.

**Opinion**

WILKINSON, Circuit Judge:

In this case, we must determine the validity of certain
firearms regulations promulgated by the Secretary of the
Treasury pursuant to the Gun Control Act of 1968, Pub.L.
No. 90–618, as amended by the Firearm Owners
Protection Act of 1986, Pub.L. No. 99–308, presently
codified at 18 U.S.C. §§ 921 *et seq.* The National Rifle
Association, along with several other groups and
individuals involved with the use and promotion of
firearms, challenges the regulations as inconsistent with
the Firearm Owners Protection Act. The district court
upheld all four regulations at issue here as compatible
with the statutory mandate. We hold that two of the four
regulations are consistent with the terms of the statute,
that the third regulation is in part consistent but in part
inconsistent with the statute, and that the fourth regulation
is inconsistent with the plain language of the statute.
Accordingly, we affirm in part and reverse in part the
judgment of the district court.

AR005256

National Rifle Ass'n v. Brady, 914 F.2d 475 (1990)

## I.

Congress passed the Gun Control Act of 1968 in order to regulate interstate firearms transactions, primarily through licensing requirements on firearms businesses. Licensees may include importers, manufacturers, dealers, and collectors of firearms. The Secretary of the Treasury was authorized to promulgate regulations to facilitate the enforcement of the Gun Control Act. This responsibility was delegated within the Department of the Treasury to the Bureau of Alcohol, Tobacco and Firearms (BATF).

In 1986, Congress passed the Firearm Owners Protection Act, Pub.L. No. 99–308 (FOPA), which amended several provisions of the Gun Control Act. FOPA was designed to protect the legitimate interests of firearms owners "while preserving the necessary statutory foundation for legitimate law enforcement efforts." S.Rep. No. 98–583, 98th Cong., 2d Sess. 1 (1984).[1] It was intended to reduce the regulatory burden on law-abiding owners of firearms without eviscerating BATF's effectiveness in combatting violations of the firearms laws.

[1]    There was no Senate Report on Pub.L. No. 99–308. S.Rep. No. 98–583 accompanied S. 914, the substantially similar predecessor to S. 49, the Senate bill which was the basis for Pub.L. No. 99–308.

After passage of FOPA, the Secretary of the Treasury initiated a comprehensive review of all regulations implementing the Gun Control Act and issued temporary regulations, effective November 15, 1986, for the enforcement of the amended Act. Some of the temporary regulations were merely repromulgations of regulations which the Secretary had issued prior to the passage of FOPA, while others were new in content. In addition, the Secretary issued a Notice of Proposed Rulemaking requesting comments on the temporary regulations. BATF received over 1500 written **478** comments, including those of the National Rifle Association (NRA) and other interested parties. BATF refused the request of certain of these parties for an oral hearing. On March 31, 1988, the Secretary published the regulations in their final form.

On September 29, 1988, the NRA, six other gun associations, a gun show promoter, and a gunsmith (hereinafter collectively referred to as the NRA) filed suit challenging several of the newly published regulations as contrary to FOPA. They also contended that the Gun Control Act ensured an opportunity for an oral hearing, which had not been afforded them by BATF. On cross-motions for summary judgment, the district court upheld all but one of the challenged regulations and ruled that the NRA was not entitled to an oral hearing.

The NRA appeals.[2]

[2]    The government does not appeal the district court's invalidation of that portion of 27 C.F.R. § 178.11 defining the term "manufacture."

## II.

We must first address the appropriate standard of review to govern our examination of the regulations at issue. In the usual challenge to an agency's construction of a statute it administers, our review is conducted according to the standards set forth in *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny. The Supreme Court has made plain that "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782; *see also Motley v. Heckler,* 800 F.2d 1253, 1254–55 (4th Cir.1986) ("[W]here Congress has entrusted an agency with implementation of a statutory scheme, that agency's interpretation of the statutory terms is entitled to substantial deference."). Thus, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency," *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782, but instead must uphold the agency's interpretation as long as it is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *see also Sullivan v. Everhart,* 494 U.S. 83, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990).

Here, however, the NRA contends that through an amendment to the Gun Control Act contained in FOPA Congress intended to restrict severely BATF's ability to promulgate regulations and to dispense with the deference that courts would customarily accord those regulations. Prior to passage of FOPA, the Gun Control Act's enabling provision stated that "[t]he Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter." FOPA amended this provision to read: "The Secretary may prescribe only such rules and regulations as are necessary to carry out

National Rifle Ass'n v. Brady, 914 F.2d 475 (1990)

the provisions of this chapter...." 18 U.S.C. § 926. The NRA argues that the change of language in the enabling provision evinces a congressional intent to eliminate most of the regulations adopted by BATF, preserving only those that are truly necessary to further the purposes of the Gun Control Act. The NRA also points to a number of statements in the legislative history of FOPA by individual members of Congress in support of its interpretation of the significance of the change of language in § 926. Thus, the NRA maintains that we should not defer to BATF's interpretation of the Gun Control Act as manifested in its regulations, but rather should strike down the regulations if we do not find them strictly necessary **479 and the least restrictive means of accomplishing the purposes of the Act.

The change in language in § 926 surely counsels BATF not to stray from the directives of the statute, but it is not of the decisive import that the NRA contends. Under the NRA's reading of the amended § 926, it would be the courts, and not BATF, that would have responsibility to determine when a regulation is "necessary" to carry out the purposes of the Gun Control Act. The amended language, however, retains the regulatory function in the Secretary. It does not divest him of his primary role in the implementation of this legislation. BATF, moreover, is better equipped than the courts for such an endeavor, having the technical expertise essential to determinations of statutory enforcement. *See Wilson v. Lyng,* 856 F.2d 630, 636 (4th Cir.1988). Also, BATF, as opposed to the courts, is "in a position to provide nationally uniform interpretations of statutory terms." *Id.* Because § 926 authorizes the Secretary to promulgate those regulations which are "necessary," it almost inevitably confers some measure of discretion to determine what regulations are in fact "necessary." Absent a clearer message from Congress that it wishes courts to replace BATF in this role, we are hesitant to work a fundamental alteration in the relationship between the agency and the courts.

The argument that BATF retains statutory discretion to promulgate regulations is bolstered by the specific grants of rulemaking authority in a number of the areas implicated by this litigation. FOPA specifically provides that a licensee "shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe." 18 U.S.C. § 923(g)(1)(A). Similarly, 18 U.S.C. § 923(g)(2) provides that "[e]ach licensed collector shall maintain in a bound volume the nature of which the Secretary may by regulations prescribe, records of the receipt, sale, or other disposition of firearms." Finally, 18 U.S.C. § 923(j) directs that

licensees may temporarily conduct business at gun shows and other events "under rules or regulations prescribed by the Secretary." Such grants of authority make it unlikely that Congress intended in its amendment of § 926 to displace the deference generally due an agency charged by Congress with implementing its directives.

Finally, the Report of the Senate Judiciary Committee, which introduced the change in § 926, explained that deletion of "reasonably" from the enabling provision was merely intended to remove redundant language:

> Section 106 of S. 914, as reported, amends 18 U.S.C. 926, which deals with rules and regulations.... Sections 106(2) and (3) provide that the Secretary shall promulgate only such regulations as are necessary (as opposed to the redundant "reasonably necessary") to carry out the provisions of the Gun Control Act.

S.Rep. 98–583, 98th Cong., 2d Sess. 27 (1984). Although such legislative history is rarely conclusive, a Committee Report, which "represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation," *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969), is not to be subordinated to the statements of individual members of Congress. For all of the above reasons, it remains difficult to conclude that the alteration in § 926 was intended to install the courts as primary arbiters of regulatory necessity or that the principles of *Chevron* do not apply to this litigation.[3]

[3]    The NRA also suggests that BATF's power to promulgate regulations is limited by the fact that the Gun Control Act is a criminal statute. The NRA contends that the rule which directs that ambiguity in criminal statutes be resolved in favor of lenity requires the invalidation of all regulations that do not adopt the narrowest possible construction of the Act. Many of the cases, however, on which the NRA relies in making this argument involve the application of the rule of lenity in criminal prosecutions and are simply inapposite to questions of deference to agency regulations. *See United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Headspeth,* 852 F.2d 753 (4th Cir.1988); *United States v. Schultheis,* 486 F.2d 1331 (4th Cir.1973). In addition, while it is possible that willful violation of the regulations at issue here might lead to criminal

AR005258

prosecutions, the regulations are in the main licensing requirements, and the government properly notes that any disputes over their scope or meaning are far more likely to arise in contests over license application, renewal, or revocation than in a criminal courtroom. The usual level of deference is therefore appropriate.

With these principles in mind, we shall proceed to address in turn each of the challenged regulations.

**\*480** III.

A.

Since its original passage in 1968, the Gun Control Act has required that in order to obtain a license to conduct business, a firearms importer, manufacturer, or dealer must have "premises from which he conducts business." 18 U.S.C. § 923(d)(1)(E)(i). FOPA did not eliminate this requirement, which exists so that regulatory authorities will know where the inventory and records of a licensee can be found. In 1968, the Secretary promulgated a regulation defining the term "business premises" as used in the statute. *See* 33 Fed.Reg. 18,557 (December 14, 1968). The relevant portion of that regulation remains unchanged after FOPA. It specifies that "[a] private dwelling, no part of which is open to the public, shall not be recognized as coming within the meaning of the term." 27 C.F.R. § 178.11.

The NRA argues that this regulation is contrary to 18 U.S.C. § 923(d)(1)(E)(i). It contends that "business premises" is a self-defining term, the definition of which simply is any place where a licensee does business, whether that place be open to the public or not. Thus, the NRA maintains, the regulation is an impermissible expansion on the requirement in the statute. The NRA also complains that the regulation will interfere with activities such as gunsmithing or brokering between licensees which might occur at a private dwelling not open to the public.

We cannot agree that "business premises" is a self-defining term. While the definition argued for by the NRA is probably the broadest possible meaning of the

term, the definition provided in the BATF regulation is quite reasonable. To define "business premises" so as to except private dwellings not open to any member of the public comports with a common understanding of the term. Additionally, the requirement of some minimal public access has the benefit of creating a locus which defines the business to customers and facilitates regulators' inspection of the licensee's inventory and records. Thus, we think the Secretary has defined an undefined and ambiguous term in the statute in a reasonable manner. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

In addition, the regulation need not impinge on activities such as gunsmithing or brokering between licensees in a private dwelling. Contrary to the NRA's contention, the regulation does not require licensees who work out of private dwellings simply to throw open their homes to the general public or even to observe regular business hours. BATF rulings make clear that licensees need only open that portion of their homes in which they do business and only "to the clientele that the business is set up to serve." ATF Rul. 73–13, 1973 ATF C.B. 92. Thus, licensees need not fear that their homes will be transformed into public thoroughfares. The promulgation of 27 C.F.R. § 178.11 is a valid exercise of the Secretary's power, and is reasonable and consistent with 18 U.S.C. § 923(d)(1)(E)(i).

B.

FOPA provides that a licensee may conduct business temporarily at "a gun show or event sponsored by any national, State, or local organization ... devoted to **\*481** the collection, competitive use, or other sporting use of firearms in the community." 18 U.S.C. § 923(j). This provision is an exception to the general rule that licensees may only conduct business from their "business premises." After passage of FOPA, the Secretary promulgated a regulation defining "gun show or event" as follows:

> A gun show or an event is a function sponsored by any national, State, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization

AR005259

or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.

27 C.F.R. § 178.100.

The NRA again contends that the Secretary has impermissibly defined a self-defining term in the statute. It argues that the term "gun show" is self-defining, and means simply a display of firearms in a civic building or similar location, whereas the term "event" needs qualification. From this argument, it follows that the "sponsored by" clause in the statute refers only to the term "event," and not to the term "gun show." Thus, according to the NRA, the Secretary has misinterpreted 18 U.S.C. § 923(j) by requiring that "gun shows" and "events," rather than only "events," be sponsored by one of the types of sponsoring organizations listed in the statute.

We think it uncertain as a matter of syntax whether the "sponsored by" clause refers only to "events" or to both "gun shows" and "events." In such a situation, a court must defer to the agency's regulation so long as it is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. The regulation at issue here is a permissible construction of 18 U.S.C. § 923(j). Since a modifying phrase may apply to one or both of the two preceding nouns separated by an "or," it is reasonable to conclude from the structure of the statutory language that "gun show" as well as "event" is modified by the term "sponsored by." Moreover, it is questionable whether "gun show" could fairly be described as a self-defining term. To consider it such, the Secretary argues, would create significant problems of statutory interpretation and enforcement. For example, any licensee seeking to evade the general rule that firearms business must be conducted from "business premises" could simply designate his temporary display of firearms a "gun show" rather than an "event" and thereby remove himself from the statute. We think it reasonable that the Secretary would interpret the "sponsorship" requirement to apply to both "gun shows" and "events," and to prevent vitiation of the "business premises" requirement.

C.

Prior to the passage of FOPA, licensed firearms dealers were required to record the sale or other disposition of firearms held in both their business inventories and their personal collections. *See United States v. Endicott,* 803 F.2d 506, 510–11 (9th Cir.1986); *United States v. Currier,* 621 F.2d 7, 9 (1st Cir.1980). Initially, FOPA altered this scheme by providing that, with respect to their personal collections, licensees need only comply with those restrictions applicable to any other person who disposes of a firearm. The statute read as follows:

> Nothing in this chapter shall be construed to prohibit a licensed manufacturer, importer, or dealer from maintaining and disposing of a personal collection of firearms, subject only to such restrictions as apply in this chapter to dispositions by a person other than a licensed manufacturer, importer, or dealer. If any firearm is so disposed of by a licensee within one year after its transfer from his business inventory into such licensee's personal collection or if such disposition or any other acquisition is made for the purpose of willfully evading the restrictions placed upon licensees by this chapter, then such firearm shall be deemed part of such licensee's business inventory.

*482 Pub.L. No. 99–308, section 103(4). Concerned that the statute as written might contain a loophole through which licensees could dispose of firearms from their personal collections without leaving any records, Congress amended the statute on July 8, 1986, by appending the following language to the end of the prior formulation of the statute:

> except that any licensed manufacturer, importer, or dealer who has maintained a firearm as part of a personal collection for one year and who sells or otherwise disposes of such firearm shall record the description of the firearm in a bound volume, containing the name and place of residence and date of birth of the

transferee if the transferee is an individual, or the identity and principal and local places of business of the transferee if the transferee is a corporation or other business entity: *Provided,* That no other recordkeeping shall be required.

Pub.L. No. 99–360, section 1(c), presently codified together with Pub.L. No. 99–308, section 103(4), at 18 U.S.C. § 923(c).

Thus, 18 U.S.C. § 923 requires that licensees keep two sets of record books: § 923(g)(1)(A) requires that they maintain a business bound book in which to record receipt and disposition of firearms in the business inventory, and § 923(c) requires that they maintain a personal bound book in which to record disposition of personal firearms. The Secretary has implemented these statutory requirements in a number of regulations. The § 923(g)(1)(A) requirement that licensees keep a business bound book is implemented through 27 C.F.R. § 178.125(e), which provides:

> [E]ach licensed dealer shall enter into a record each receipt and disposition of firearms. In addition, before commencing or continuing a firearms business, each licensed dealer shall inventory the firearms possessed for such business and shall record same in the record required by this paragraph.

The § 923(c) requirement that licensees keep a personal bound book is implemented through 27 C.F.R. § 178.125a, as follows:

> [A] licensed manufacturer, licensed importer, or licensed dealer is not required to record on a firearms transaction record, Form 4473, the sale or other disposition of a firearm maintained as part of the licensee's personal firearms collection: *Provided,* That (1) the licensee has maintained the firearm

as part of such collection for 1 year from the date the firearm was transferred from the business inventory into the personal collection or otherwise acquired as a personal firearm, (2) the licensee recorded in the bound record prescribed by § 178.125(e) the receipt of the firearm into the business inventory or other acquisition, (3) the licensee recorded the firearm as a disposition in the bound record prescribed by § 178.125(e) when the firearm was transferred from the business inventory into the personal firearms collection or otherwise acquired as a personal firearm, and (4) the licensee enters the sale or other disposition of the firearm from the personal firearms collection into a bound record, under the format prescribed below....

The NRA asserts that taken together, 27 C.F.R. § 178.125(e) and 27 C.F.R. § 178.125a improperly expand upon 18 U.S.C. § 923. It contends that the regulations create recordkeeping requirements where none were contemplated by the statute with respect to transactions in which a licensee sells a firearm from his personal collection which he obtained either before he was a licensee or as a nonlicensee. The NRA maintains that no recordkeeping whatsoever is required for transactions involving such firearms, but only for those transactions involving personal firearms transferred from the business collection.

We disagree. We think the Secretary's interpretation of the statute as reflected in the regulations is a permissible one. While the language of the statute may be ambiguous as to whether the requirement that licensees record transactions involving personal firearms held for one year refers to all personal firearms of a licensee or only to those personal firearms transferred from a dealer's business collection, it is not unreasonable for the Secretary to conclude **\*483** that the requirement applies to the former. The regulations are consistent with the purpose of the statutory provision. The regulations require that licensees record the purchase of all firearms in their business bound books, and that they then record in their business bound books the transfer of any firearms to their personal collections. They also require that licensees

AR005261

National Rifle Ass'n v. Brady, 914 F.2d 475 (1990)

demonstrate that personal firearms obtained before licensing have been held at least one year prior to their disposition as personal firearms. The regulations ensure that firearms kept in the personal collection are bona fide personal firearms, and they minimize the opportunity for licensees to evade the statute's recordkeeping requirements for business firearms by simply designating those firearms "personal firearms" immediately prior to their disposition. In addition, the recordkeeping requirements contained in the regulations provide a means for the Secretary to verify that personal firearms were actually held for a year by a licensee prior to sale. Thus, we think the regulations at issue here are both "rational and consistent with the statute." *United Food & Commercial Workers,* 484 U.S. at 123, 108 S.Ct. at 421.

The NRA also complains that the Secretary has by regulation required that licensees record in their personal bound books information not called for by 18 U.S.C. § 923(c). The statute specifies that a licensee

> shall record the description of the firearm in a bound volume, containing the name and place of residence and date of birth of the transferee if the transferee is an individual, or the identity and principal and local places of business of the transferee if the transferee is a corporation or other business entity: *Provided,* That no other recordkeeping shall be required.

18 U.S.C. § 923(c). The information that the Secretary requires be recorded is specified in 27 C.F.R. § 178.125a(4):

> [T]he licensee enters the sale or other disposition of the firearm from the personal firearms collection into a bound record, ... showing the date of the sale or other disposition, the name and address of the transferee, or the name and license number of the transferee if such person is a licensee, and the date of birth of the transferee if other than a licensee. In addition, the licensee shall cause

the transferee, if other than a licensee, to be identified in any manner customarily used in commercial transactions (e.g., a drivers license), and shall note on the record the method used.

We agree with the NRA that the regulation is invalid to the extent it requires licensees to record information not called for by the statute. The regulation requires licensees to record in their personal bound book the license number of the transferee if the transferee is a licensee, and the method of identification used if the transferee is a nonlicensee. This information is not required to be recorded by the statute. To the contrary, the statute explicitly provides that "no other recordkeeping shall be required" other than that specified in the statute. As a matter of policy, one might conclude that the identity of an individual can best be ascertained through a driver's license or, in the case of a licensee, a license number. However, Congress explicitly indicated that the place of residence and date of birth of an individual transferee and the business addresses of a corporate transferee were to constitute the appropriate means of identification for purposes of a licensee's personal collection. Clearly, in other sections of the statute Congress knew how to grant the Secretary authority to promulgate reasonable regulations with respect to numerous transactions in firearms. *See, e.g.,* 18 U.S.C. §§ 923(g)(1)(A), (g)(2), (j). These sections, however, deal with transactions involving firearms contained in business collections. In the specific section dealing with firearms contained in personal collections, Congress forbade the imposition of additional recordkeeping by the Secretary. Congress could hardly have been more clear in its direction that "no other recordkeeping shall be required." While the information requested in the regulation may well be beneficial to BATF in its efforts to track firearm dispositions, the plain language of the **\*484** statute makes clear that this is information that Congress did not wish licensees to be required to record. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781. The regulation is therefore invalid to the extent it requires that licensees record these additional items not specified in 18 U.S.C. § 923(c).[4]

<hr/>

4       The regulation also contains a requirement that licensees record the date of sale of firearms from their personal collections. While recordation of the date of sale is not explicitly listed as a recordkeeping requirement in the statute, it is inherent in the statute's requirement that sales be recorded that the date of sale

AR005262

National Rifle Ass'n v. Brady, 914 F.2d 475 (1990)

also be specified. The requirement of 27 C.F.R. § 178.125a(4) that licensees record the date of sale of personal firearms in their personal bound books is therefore consistent with the language of 18 U.S.C. § 923(c).

Thus, we uphold the requirement in 27 C.F.R. § 178.125a that licensees record the receipt and disposition of all firearms in their personal collections, but invalidate that portion of the regulation requiring licensees to record additional information not called for by the statute.

### D.

FOPA directs that licensed collectors maintain "records of the receipt, sale, or other disposition" of curio and relic firearms. 18 U.S.C. § 923(g)(2). To implement this statutory provision, the Secretary promulgated a regulation requiring that licensed collectors record the receipt and disposition of curio and relic firearms, and that

> [i]n addition, before commencing or continuing a firearms curio or relic collection, each licensed collector shall inventory the curios or relics possessed in such collection and shall record same in the record required by this paragraph.

27 C.F.R. § 178.125(f).

The NRA complains that this regulation imposes additional recordkeeping requirements on licensed collectors that were not contemplated by the statute. It argues that the statute only requires that licensed collectors record the receipt or disposition of curios and relics, but that the regulation impermissibly expands on this requirement by insisting that licensed collectors record all curios and relics already in their possession when they acquire their licenses.

We agree that 27 C.F.R. § 178.125(f) impermissibly expands on the requirements of the statute. The statute makes no mention of any requirement that licensed

collectors inventory their preexisting collections and record their contents. Rather, it makes clear that records need only be kept concerning the receipt and disposition of curios and relics. The Secretary's regulation creates a whole new recordkeeping requirement above and beyond the requirements provided for by the plain language of the statute.

The Secretary protests that when a collector is issued a collector's license, he may be deemed to have "received" those curios and relics already in his possession. This argument for a sort of "constructive receipt" stretches the language of the statute "to the breaking point." *FCC v. American Broadcasting Co.,* 347 U.S. 284, 294, 74 S.Ct. 593, 600, 98 L.Ed. 699 (1954). "Receipt" and "possession" simply do not have the same meaning. This court and others have recognized in similar contexts that the two terms are not synonymous. *See United States v. Goerlich,* 729 F.2d 1168, 1170 (8th Cir.1984); *United States v. Burton,* 629 F.2d 975, 977 (4th Cir.1980). The Secretary's interpretation would change the statute from one that focuses upon transactions in firearms to one that focuses on simple possession. To insist that a collector maintain records of the curios and relics already in his possession before he obtains a license, as does 27 C.F.R. § 178.125(f), is thus to place a gloss on the statute which is not supported by the statute's plain language. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 430–32, 107 S.Ct. 1207, 1217, 94 L.Ed.2d 434 (1987).

The Secretary also contends that to strike down this regulation would interfere with his ability to assure accurate accounting of a collector's curios and relics. He points out that if licensees are not required **\*485** to record firearms already in their possession when they acquire their licenses, it will be difficult for BATF inspectors to determine whether the collector properly recorded each firearm disposed of and whether such firearms were disposed of lawfully. While the Secretary may accurately depict the enforcement problems that invalidation of this requirement may create, courts are simply not at liberty to ignore the plain language of the statute. The policy arguments forwarded by the Secretary with respect to enforcement "should be directed to the Congress rather than to [the courts]." *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 22, 83 S.Ct. 671, 678, 9 L.Ed.2d 547 (1963). Because the statute requires only that licensed collectors record the *receipt, sale,* or *other disposition* of curios and relics, and not that they inventory and record curios and relics already in their possession, 27 C.F.R. § 178.125(f) is invalid.

AR005263

National Rifle Ass'n v. Brady, 914 F.2d 475 (1990)

IV.

The NRA finally contends that all of the regulations must be invalidated because the Secretary failed to follow the procedures mandated in FOPA by refusing to afford interested parties an opportunity for an oral hearing.

 FOPA contains no provision guaranteeing interested parties the right to an oral hearing. Instead, it provides:

> The Secretary shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations.

18 U.S.C. § 926(b). It is well-settled that the requirement of a hearing does not necessitate that the hearing be oral. *See United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 238–42, 93 S.Ct. 810, 817–19, 35 L.Ed.2d 223 (1973); *A.T. & T. v. FCC,* 572 F.2d 17, 22 (2d Cir.1978). Here, the Secretary, pursuant to regulation, reserved for himself the right to determine whether an oral hearing should be held. *See* 51 Fed.Reg. 39,635. He ultimately determined that an oral hearing was unwarranted, but did provide interested parties with the opportunity to submit written comments. This is all the hearing requirement in § 926(b) demands.

The NRA points to the fact that the Secretary conducted a public oral hearing in 1968 soon after enactment of the Gun Control Act, and argues that this demonstrates that the Secretary believed that an oral hearing was mandated by the Act. We are not persuaded. That the Secretary may once have chosen to accord parties additional procedural rights by holding an oral hearing "does not carry the necessary implication that [he] felt [he] was required to do so." *Florida East Coast Ry.,* 410 U.S. at 236 n. 6, 93

S.Ct. at 816–17 n. 6. The choice to provide an oral hearing on one occasion does not bind the Secretary to continue to do so in the future. Thus, we hold that the Secretary complied with the hearing requirement of § 926(b) by permitting interested parties to submit written comments on the proposed regulations.

V.

For the foregoing reasons, we hold that the regulations defining "business premises" and "gun show" are rational and consistent with the Gun Control Act as amended, and are therefore valid exercises of the Secretary's rulemaking authority. Likewise, the regulation requiring that licensees maintain records concerning the receipt and disposition of their personal firearms, and not merely those personal firearms transferred from their business inventories, is also reasonable and proper; however, to the extent that regulation requires licensees to record information not specified in the statute, the regulation is invalid. The regulation directing licensed collectors not only to record the receipt, sale, or other disposition of curio and relic firearms, but also to inventory and record all curio and relic firearms already in their possession when they obtained their licenses, is inconsistent with the plain language of the statute and is to that extent invalid. Thus, the judgment of the district court is affirmed in part and reversed in part.

AFFIRMED IN PART AND REVERSED IN PART.

**All Citations**

914 F.2d 475

End of Document            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005264