44 Fed.Cl. 83
United States Court of Federal Claims.

Thomas A. DEMKO and Penn Arms, Inc.,
Plaintiffs,
v.
The UNITED STATES, Defendant.

No. 98–661T.
|
June 18, 1999.

### Synopsis

Transferor and transferee of shotgun classified as a "destructive device" filed suit challenging the classification, and seeking refund of $200 transfer tax. On cross-motions for summary judgment, the Court of Federal Claims, Miller, J., held that: (1) pursuant to plain language of the statute defining the term "destructive device," the Bureau of Alcohol, Tobacco and Firearms (ATF), as the delegatee of the Secretary of the Treasury, has the authority to classify a shotgun and/or shotgun shell which is not generally recognized as suitable for sporting purposes as a destructive device, and (2) delegation of legislative authority to the ATF to classify as a "destructive device" a shotgun or shotgun shell "not generally recognized as suitable for sporting purposes" is not unconstitutionally vague.

Plaintiff's motion denied; defendant's cross-motion granted.

### Attorneys and Law Firms

**\*84** Richard E. Gardiner, Fairfax, VA, for plaintiffs.

David R. House, Washington, D.C., with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

### OPINION

MILLER, Judge.

This case, before the court after argument on the parties' cross-motions for summary judgment, presents the issues (1) whether the Striker–12 shotgun was properly classified as a destructive device and thus subject to a $200.00 transfer tax pursuant to 26 U.S.C. § 5811 (1994), and (2) if so, whether the delegation of legislative authority to so classify is unconstitutionally vague.

### FACTS

The following facts are undisputed, unless otherwise noted. The Striker–12 is a 12–gauge shotgun with a 12–round spring motor driven revolving magazine. 26 U.S.C. § 5845(f)(2) of 26 U.S.C. describes a destructive device as

> any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes ....

Statutorily defined firearms, particularly those classified as destructive devices, must be registered and are subject to taxes at the time of transfer. *See* 26 U.S.C. §§ 5812, 5822, 5841, 5845(a)(8), (f)(2) (1994). The Secretary of the Treasury, who has enforcement authority pursuant to 26 U.S.C. § 7801(a), delegated authority to the Bureau of Alcohol, Tobacco and Firearms (the "ATF") to make such classifications by means of Treasury Department Order No. 221, 1972–1 C.B. 777. The ATF issued Ruling 94–2 effective March 1, 1994, classifying the Striker–12 as a "destructive device" within the meaning of 26 U.S.C. § 5845(f).[1] The ATF Ruling recited the following description:

[1]   The ATF is an agency of the Department of Treasury and is authorized to collect taxes levied by 26 U.S.C. § 5811.

The Striker–12 and Streetsweeper shotguns are virtually identical 12–gauge shotguns with a spring-driven revolving magazine. The magazine has a 12–round capacity. The shotgun has a fixed stock or folding shoulder stock and may be fired with the folding stock collapsed. The shotgun with an 18–inch barrel is 37 inches in length with the stock extended, and 26.5 inches in length with the stock folded. The shotgun is 5.7 inches in width and weighs 9.24 pounds unloaded. The Striker/Streetsweeper has two pistol grips, one in the center of the firearm below the buttstock, and one on the forearm. The Striker/Streetsweeper was designed and developed in South Africa as a military, security, and anti-terrorist weapon. Various types of 12–gauge cartridge can be fired from the shotgun, and a rapid indexing procedure allows various types of ammunition to be loaded into the cylinder and selected for firing. All 12 rounds can be fired from the shotgun in 3 seconds or less.

After considering the composition, utility, and purpose of the weapon, the ATF concluded:

> The Striker–12/Streetsweeper is a shotgun with a bore of more than one-half **\*85** inch in diameter which is not particularly suitable for sporting purposes. The weight, size, bulk, designed magazine capacity, configuration, and other factors indicate that the Striker–12/Streetsweeper is a military-type shotgun, as opposed to a shotgun particularly suitable for sporting purposes. Accordingly, the Striker–12/Streetsweeper is a destructive device as that term is used in 26 U.S.C. § 5845(f)(2). Pursuant to section 7805(b), this ruling is applied prospectively effective March 1, 1994, with respect to the making, transfer, and special (occupational) taxes imposed by the [National Firearms Act (the "NFA"), 26 U.S.C. Chapter 53]. All other provisions of the NFA apply retroactively effective March 1, 1994.

Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796, 1996–2010 (1994), which amended the Gun Control Act of 1968, 18 U.S.C. §§ 921–928 (1994 & Supp. II 1996), the manufacture, transfer, and possession of certain weapons was restricted. The Striker–12/Streetsweeper was included in the list of banned semiautomatic assault weapons because of its revolving cylinder. *See* 18 U.S.C. §§ 921(a)(30)(A)(ix), 922(v) (1994). Pursuant to the grandfather clause, however, those weapons otherwise lawfully possessed prior to the date of enactment were excluded from this ban. *See* 18 U.S.C. § 922(v)(2). The weapon transfer at issue here was subject to the grandfather provision. *See generally, Navegar, Inc. v. United States,* 103 F.3d 994 (D.C.Cir.1997) (discussing 1994 Crime Control Act amendments with regard to, *inter alia,* Striker–12).

In April 1997 plaintiff Penn Arms, Inc., applied to the ATF for permission to transfer a Striker–12 to plaintiff Sheriff Thomas A. Demko in his individual capacity.[2] The $200.00 transfer tax imposed by 26 U.S.C. § 5811 was paid at the time of transfer. The ATF approved the transfer on or about January 4, 1995. Plaintiffs filed a request for a refund of the $200.00 transfer tax by letter dated February 26, 1997. The ATF has not rendered a decision on this request.

[2]    Penn Arms and plaintiff will be referred to collectively as "plaintiffs."

Plaintiffs challenge the ATF's findings and conclusions on a number of grounds. Plaintiffs dispute whether all 12 rounds may actually be fired within the 3–second interval stated in the ATF's ruling. In support of this position, plaintiffs submit the Affidavit of J.F. Kornberger, who was in charge of the original development of the Striker–12 in South Africa, and is the Director of Engineering for Penn Arms and held the same position with the predecessor manufacturer of the Striker–12 in the United States. Mr. Kornberger avers: "While the mechanical design of the Striker 12 allows all 12 rounds to be fired in three seconds, I know of no person who can actually do so. After firing thousands of rounds with the Striker 12 (probably more than any other person), I can only fire all 12 rounds in six or seven seconds." Affidavit of J.F. Kornberger, Oct. 19, 1995, ¶ 4. Plaintiffs also challenge the assertion that the weapon was developed in South Africa as a military, security, and anti-terrorist weapon. Indeed, plaintiffs put forth:

> The basic design of the Striker 12

AR005266

was originally conceived by a Rhodesian cattle farmer named Hilton Walker who wished to have a multi-round shotgun for killing small animals, such as snakes and scorpions, which were threatening his cattle and for home defense. He designed the Striker 12 for sale to farmers. It was not designed for the military or for anti-terrorist use by law enforcement. In fact, as manufactured in South Africa, not a single Striker 12 was sold to the military or law enforcement.

Kornberger Affidavit ¶ 2. Plaintiffs also dispute that the Striker–12 is not generally recognized as particularly suitable for sporting purposes and that the Striker–12 is a military-type shotgun. According to plaintiffs, ATF Ruling 94–2 is the only authority that has concluded "that the Striker 12 'is not particularly suitable for sporting purposes.' ATF Ruling 94–2 does not even discuss, let alone conclude, that the Striker 12 is not 'generally recognized as' particularly suitable for sporting purposes." Plf's Statement of Genuine Issues No. 3, filed Mar. 24, 1993.[3] **86 Nevertheless, plaintiffs agreed during argument that disputes regarding the factual basis of the ATF Ruling were not material to the resolution of this matter. *See* Transcript of Proceedings, *Demko v. United States,* No. 98–661T, at 3 (Fed.Cl. June 18, 1999) (hereinafter "Tr.").

[3]     Because plaintiffs did not challenge the determination that the Striker–12 is generally recognized as being particularly suitable for sporting purposes in their claim for a refund, plaintiffs may not now raise this objection. *See Ottawa Silica Co. v. United States,* 699 F.2d 1124, 1138 (Fed.Cir.1983) (discussing doctrine of variance); *see also* 26 U.S.C. § 7422(a) (1994); 27 C.F.R. § 70.123(b)(1) (1996); 26 C.F.R. § 301.6402–2(b)(1) (1997).

Plaintiffs seek review of this classification and the authority of the ATF to make such determinations with regard to shotguns, as well as a refund of the $200.00 tax paid upon transfer of this weapon pursuant to 26 U.S.C. § 7422 (1994 & Supp. II 1996).

## DISCUSSION

### 1. *Classification of the Striker–12*

Plaintiffs maintain that the primary issue before the court is whether the ATF had the authority to classify the Striker–12 as a destructive device pursuant to 26 U.S.C. § 5845(f). The resolution of this issue requires an interpretation of the last clause of 26 U.S.C. § 5845(f)(2), which excepts from the definition of a destructive device "a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes." According to plaintiffs, the ATF lacked the authority to classify the Striker–12 as a destructive device because the clause "which the Secretary finds is generally recognized as particularly suitable for sporting purposes" applies only to "shotgun shell" and does not modify "shotgun." Plaintiffs rely on the doctrine of the last antecedent as compelling their reading because the drafters of this provision did not include a comma before the disjunctive. As a result, the clause would only apply to the term immediately preceding it, "shotgun shell." Plaintiffs direct the court's attention to the legislative history surrounding the evolution of the definition of destructive device, which, according to plaintiffs, should be persuasive that all shotguns were excluded from the definition of destructive device.

Defendant rests on a natural reading of the statute—giving the words their ordinary meanings—to reveal that the clause modifies both shotgun and shotgun shell. Defendant points out that a comma sets off the entire exclusionary clause from the definition of destructive device, and suggests that the clause should be read as a whole. Defendant dismisses plaintiffs' attempts "to cast doubt as to the meaning of this phrase by injecting ambiguity where none exists. The normal reader would not doubt that the 'sporting purposes' [test] modifies both 'shotgun shell' and 'shotgun,' " Def's Br. filed Jan. 22, 1999, at 10, terming plaintiffs' suggested reading "nonsensical." *Id.* at 18. Defendant touts the same legislative history surrounding the actual bill passed in furtherance of its position, and posits that "legislative history not only supports the position that the natural reading of the statute provides for application of the sporting purposes test to both 'shotgun' and 'shotgun shell [,]' but in fact requires that reading of the statute." *Id.* at 14.

Statutory interpretation begins with an examination of the text of the statute. *See Fanning, Phillips & Molnar v. West,* 160 F.3d 717, 721 (Fed.Cir.1998); *Hoechst–Roussel Pharm. v. Lehman,* 109 F.3d 756, 758 (Fed.Cir.1997). "In

Demko v. U.S., 44 Fed.Cl. 83 (1999)

so doing, we must interpret statutory words as taking their ordinary, common meaning unless otherwise defined by Congress." *Hoechst–Roussel,* 109 F.3d at 758; *see NSK Ltd. v. United States,* 115 F.3d 965, 974 (Fed.Cir.1997) ("[W]here Congress uses terms that have accumulated settled meaning under either equity or common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.") (quotation omitted); *Best Power Tech. Sales Corp. v. Austin,* 984 F.2d 1172, 1177 (Fed.Cir.1993) ( "It is a basic principle of statutory interpretation ... that undefined terms in a statute are deemed to have their ordinarily understood meaning."); *see also Wilshire Westwood Assocs. v. Atlantic Richfield Corp.,* 881 F.2d 801, 803–04 (9th Cir.1989) (" 'A fundamental canon of statutory construction is **\*87** that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' ") (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

When Congress' intent is clear from the language of the statute, the matter is at an end because the court is required to "give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see Nike, Inc. v. Wal–Mart Stores, Inc.,* 138 F.3d 1437, 1440 (Fed.Cir.1998) ("Although a statute clear on its face does not warrant resort to history, inquiry is proper to determine whether ambiguity has invaded an apparently clear text."), *petition for cert. filed,* June 4, 1999, No. 98–1942; *see also Perez v. United States,* 156 F.3d 1366, 1370–72 (Fed.Cir.1998) (noting plain language of statute is controlling, but resorting to legislative history to resolve issue before court); *Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs,* 17 F.3d 616, 631–32 (3d Cir.1994) (reviewing legislative history which conformed with court's reading of statutory language); *District 6, UMWA v. Dep't of the Interior Board of Mine Operations Appeals,* 562 F.2d 1260, 1264–65 (D.C.Cir.1977) (finding two interpretations of statute permissible and referring to legislative history to determine congressional intent).

However, where a literal interpretation contravenes the purpose of the statutory scheme, leads to an absurd result, or is ambiguous, the court will look beyond the express language of the statute. *See Brooks v. Donovan,* 699 F.2d 1010, 1011 (9th Cir.1983); *see also Resolution Trust Corp. v. Nernberg,* 3 F.3d 62, 64 (3d Cir.1993). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 844–45, 104 S.Ct. 2778 (noting that considerable deference is due construction of a statutory scheme agency is entrusted to administer unless contrary to congressional intent); *see Elliot Coal,* 17 F.3d at 629 (stating deference is not required when agency's construction of statutory provisions is in conflict with plain meaning). Statutes should not be construed in a manner that obviates the need for any provision. *See Wilshire Westwood,* 881 F.2d at 804; *Loe v. Secretary of DHHS,* 22 Cl.Ct. 430, 432 (1991) ("[T]he rule of the last antecedent does not override the even more fundamental princip[le] of statutory construction that the statute must be read in its entirety. The court cannot construe a phrase in question without reference to the statute as a whole.") (citation omitted). Taken into consideration is " 'not only the bare meaning of the word but also its placement and purpose in the statutory scheme.' " *Fanning, Phillips,* 160 F.3d at 721 (quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)).

### 2. *The doctrine of the last antecedent*

"The doctrine of the last antecedent states that qualifying words, phrases and clauses must be applied to the words or phrases immediately preceding them and are not to be construed as extending to and including others more remote." *Wilshire Westwood,* 881 F.2d at 804; *see Vogel Fertilizer Co. v. United States,* 225 Ct.Cl. 15, 25–26, 634 F.2d 497, 502–03 (1980), *aff'd,* 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982); *Elliot Coal,* 17 F.3d at 629 (quoting *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975)). Standard rules of grammar remain applicable. *See Anhydrides & Chems., Inc. v. United States,* 130 F.3d 1481, 1483 (Fed.Cir.1997) (stating "rules of grammar apply in statutory construction"); *Vogel Fertilizer,* 225 Ct.Cl. at 25–26, 634 F.2d at 502–03 (basing decision, in part, on common English usage).

> Under the normal rules of English punctuation for words in a series, it is the absence of a comma or other punctuation before the coordinate conjunction "or" that would indicate it and its modifier, the limiting adjective clause, are to be treated separately rather than as part of the whole series. Conversely, the presence of a comma before the last clause in the

AR005268

Demko v. U.S., 44 Fed.Cl. 83 (1999)

statute suggests that the limiting clause applies to the entire series.

**\*88** *Elliot Coal,* 17 F.3d at 630 (citations omitted) (finding use of comma indicates application of modifying phrase to all preceding phrases); *see Resolution Trust,* 3 F.3d at 65 ("The use of a comma to set off a modifying phrase from other clauses may indicate that the qualifying language ... applie[s] to all of the previous phrases.... Consequently, the lack of a comma before the last clause ... suggests that the limiting phrase applies only to the third clause.") (citation omitted); *cf. National Sur. Corp. v. Midland Bank,* 551 F.2d 21, 34 (3d Cir.1977) (holding limiting language applied only to word immediately preceding it in absence of comma). The syntax of the language at issue is also significant, and should be read in a manner that gives meaning to all parts. *See Elliot Coal,* 17 F.3d at 630–31. Nonetheless, the rules of grammar and syntax are not necessarily dispositive. *See id.* at 631; *Resolution Trust,* 3 F.3d at 65 ("We do not believe, however, that we should allow syntax to completely control the resolution of this issue and, thus, must find something a bit more substantial to support construction."). The court may also look to the intent and purpose of the statute in ascertaining its meaning. *See Elliot Coal,* 17 F.3d at 630–32; *Resolution Trust,* 3 F.3d at 65 (looking to purpose of statute and " 'mischief and defect' ... statute was intended to cure") (citation omitted).[4]

[4]    If, after applying the rules of statutory construction, the court is left with an ambiguous statute, the rule of lenity may be invoked. The rule of lenity resolves ambiguities in favor of the private citizen. Thus, if a statute is susceptible to more than one interpretation, the less harsh penalty will apply. Because, in this instance, criminal penalties may attach to the failure to pay taxes on firearms, invocation of the rule of lenity in plaintiffs' favor would be proper in the case of an ambiguous statute. *See United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–18, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (applying rule of lenity in civil context upon finding that statute was ambiguous because NFA has criminal applications); *Crandon v. United States,* 494 U.S. 152, 168, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); *cf. Zwak v. United States,* 848 F.2d 1179 (11th Cir.1988) (finding taxes at issue civil in nature). "To the extent that the language or history of [a statute] is uncertain, this 'time-honored interpretive guideline' serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon,* 494 U.S. at 158, 110 S.Ct. 997 (quoting *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985)). A mere grammatical possibility, however, is insufficient to

invoke the rule of lenity, particularly as a degree of ambiguity is present in most statutes. *See Caron v. United States,* 524 U.S. 308, ——, 118 S.Ct. 2007, 2012, 141 L.Ed.2d 303 (1998); *Muscarello v. United States,* 524 U.S. 125, ——, 118 S.Ct. 1911, 1919, 141 L.Ed.2d 111 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, ... we can make no more than a guess as to what Congress intended.") (quotations omitted); *see Thiess v. Witt,* 100 F.3d 915, 918 (Fed.Cir.1996) (noting "a term of a statute does not become ambiguous because it is possible to articulate a different construction"). Instead, the statute must contain a "grievous ambiguity or uncertainty." *Staples v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (quotations omitted). Here, the plain language of the statute is not ambiguous. Thus, the rule of lenity is inapplicable. Plaintiffs' interpretation of the statute contravenes its plain meaning and "takes us over the line between lenity and credulity." *Thompson/Center Arms,* 504 U.S. at 513 n. 6, 112 S.Ct. 2102.

The key clause, 26 U.S.C. § 5845(f)(2), in context, reads:

> The term "destructive device" means ... any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, *except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes....*

(Emphasis added.) Two exceptions are listed in the modifying clause at issue here—shotgun and shotgun shell. The entire clause is set off from the rest of the provision by a comma. Within the clause, however, the terms shotgun and shotgun shell are connected by the disjunctive "or."

"Generally the term 'or' functions grammatically as a coordinating conjunction and joins two separate parts of a sentence." *Ruben v. Secretary of DHHS,* 22 Cl.Ct. 264, 266 (1991) (noting that "or" is generally ascribed disjunctive intent unless contrary to legislative intent). As a disjunctive, the word "or" connects two parts of a sentence, "but disconnect[s] **\*89** their meaning, the

AR005269

meaning in the second member excluding that in the first." *Id.* (quoting G. Curme, *A Grammar of the English Language, Syntax* 166 (1986)); *see Quindlen v. Prudential Ins. Co.,* 482 F.2d 876, 878 (5th Cir.1973) (noting disjunctive results in alternatives, which must be treated separately). Nonetheless, courts have not adhered strictly to such rules of statutory construction. *See Ruben,* 22 Cl.Ct. at 266. For instance, "[i]t is settled that 'or' may be read to mean 'and' when the context so indicates." *Willis v. United States,* 719 F.2d 608, 612 (2d Cir.1983); *see Ruben,* 22 Cl.Ct. at 266 (quoting same); *see also De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."); *Union Ins. Co. v. United States,* 6 Wall. 759, 73 U.S. 759, 764, 18 L.Ed. 879 (1867) ("But when we look beyond the mere words to the obvious intent we cannot help seeing the word 'or' must be taken conjunctively.... This construction impairs no rights of the parties ... and carries into effect the true intention of Congress....").

Plaintiffs interpret the clause to apply the limiting language—"which the Secretary finds is generally recognized as particularly suitable for sporting purposes"—only to the term "shotgun shell," which immediately precedes it. Relying on the doctrine of the last antecedent, plaintiffs maintain that the absence of a comma following the word "shotgun" limits the application of the subsequent qualifying language to shotgun shell. In other words, plaintiffs read the statute to exempt all shotguns, but only those shotgun shells that the Secretary or his delegate finds are generally recognized as particularly suitable for sporting purposes.

Defendant responds that the addition of a comma after shotgun would require exactly the opposite interpretation that plaintiffs proffer, to wit, "that Congress intended to treat the terms separately, with the modifying language applying only to the term 'shotgun shell.' " Def's Br. filed Jan. 22, 1999, at 18. According to defendant, if plaintiffs' suggestion with regard to the addition of a comma after shotgun were employed, the language would read: "except a shotgun[,] or shotgun shell which the Secretary o[r] his delegate finds is generally recognized as particularly suitable for sporting purposes...." Def's Br. filed Jan. 22, 1999, at 18. Plaintiffs respond that, if Congress intended the sporting purposes test to apply to both shotgun and shotgun shells, the sentence would read: "except a shotgun[,] or shotgun shell [,] which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes...." Plfs' Br. filed Mar. 24, 1999, at 4. Plaintiffs' reading would place

shotgun shell in apposition to the word shotgun. A shotgun shell and a shotgun are not the same, nor does "shotgun shell" provide additional information regarding the word "shotgun." Thus, plaintiffs' proffered construction defies all rules of syntax. Reasoning that a comma normally is employed in a series of three or more words or phrases, defendant concludes that a comma has no bearing on this matter. Defendant further contends that, "[d]espite plaintiffs' tortured attempts to inject ambiguity into the statute, ... the legislative history of § 5854(f)(2) in fact confirms that the plain meaning applies the sporting purposes test to 'shotgun' as well as 'shotgun shell.' " *Id.* at 19.

A plain reading of the statutory language reveals that the entire dependent clause is a limitation on those weapons that fall within the definition of a destructive device and is itself the last antecedent. The qualifying language is separated from the rest of the provision with a comma and, as a whole, applies to that which precedes it. An ordinary reading of this limiting language suggests that both shotguns and shotgun shells found to be generally recognized as suitable for sporting purposes are excluded from classification as destructive devices. Although the language used employs the disjunctive "or," the disjunctive is located within the limiting language and susceptible to the interpretation that "or" in this instance was not utilized as an exclusive disjunct, but rather as an inclusive disjunct, to wit, "and."[5] **\*90** Moreover, as only two items appear in this series, a comma normally would not be used to separate shotgun and shotgun shell.

5    "Or" is "(1) used as a function word to indicate an alternative ..., the equivalent or substitutive character of two words or phrases ...; (2) either; ... (4) used in logic as a sentential connective that forms a complex sentence which is true *when at least one* of its constituent sentences is true." *Merriam–Webster's Collegiate Dictionary* 817 (10th ed.1998) (emphasis added).

The doctrine of the last antecedent does not assist plaintiffs. This doctrine includes the notion that qualifying language applies to the words or phrases immediately preceding inasmuch as it does not impair the meaning of the sentence. As such, it is consistent to apply the qualifying language within the dependent clause to both shotgun and shotgun shell. The court, in this instance, is not confronted by a series of three words or phrases all separated by commas. *See Elliot Coal,* 17 F.3d at 629–30 (holding last antecedent inapplicable because "owner, lessee, or other person" were separated by commas requiring application of subsequent limiting language to entire series, and finding this interpretation consistent with plain language and grammatical constructs). The

Demko v. U.S., 44 Fed.Cl. 83 (1999)

plain meaning of the statute, read in its entirety, also supports interpretation that the entire clause is the last antecedent and that the qualifying language within the limiting clause is applicable to both a shotgun and a shotgun shell. *Cf. National Surety,* 551 F.2d at 34 (finding that absence of comma limited application of qualifying language to word preceding it, rather than more remote phrase, which was consistent with plain meaning of statute). Moreover, defendant correctly points out that a singular verb in this context is appropriate because the plain meaning of the statute indicates that the sporting purposes test will at times apply to a shotgun, while at others a shotgun shell. *Cf. Wilshire Westwood,* 881 F.2d at 804–05 (concluding that plaintiffs' proposed application to series of two was contrary to doctrine of last antecedent, which would require plural verb when "actual grammar sets forth a singular verb").

Although the parties agree that resort to legislative history is unnecessary because the statutory language is clear, the legislative history bolsters defendant's reading of the statute. Defendant presents both the Senate and House Committee Reports concerning amendments by the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213 (1968), codified at 18 U.S.C. §§ 921–928, which, *inter alia,* amended 26 U.S.C. § 5845(f)(2). The House Conference Report notes: "The Senate amendment is essentially the same as the House bill, *except* that ... excluded from the definition are *shotguns and shotgun shells* found by the Secretary to be suitable for sporting purposes...." Gun Control Act of 1968, Conference Report, H.R. REP. No. 90–1956 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4426, 4427 (emphasis added) (hereinafter "Conference Report"). The House Committee on the Judiciary Report recited:

> The urgent necessity for adding restrictions on transactions in long guns equivalent to those Congress has already applied to handguns is sadly evident from recent history and mounting statistics. Of the 6,500 firearms murders in the United States each year, 30 percent, or over 2,000, are committed with rifles or shotguns. Ninety-five percent of all law enforcement officers killed in the line of duty are victims of firearms—and one out of every four of these is killed by a rifle or shotgun.... President Kennedy, Martin Luther King, Jr., Medgar Evers, and the 16 dead and

> 31 wounded victims of a deranged man firing from the tower of the University of Texas were all shot by rifles or shotguns. H.R. 17735, as amended, is designed effectively to control the indiscriminate flow of such weapons across State borders and to assist and encourage States and local communities to adopt and enforce stricter gun control laws.

H.R. REP. No. 90–1577 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413 (hereinafter "House Committee Report"). The House Committee Report indicated that the amendments added restrictions covering transactions in ammunition and transactions in rifles and shotguns approximating those restrictions applying to handguns, as well as "tighter restrictions of shipments and sales of destructive devices." *Id.* Although the Senate Committee on the Judiciary Report dealing with the amendments to the Gun Control Act **\*91** of 1968, referred to the amendments to the term destructive device as "a technical revision of existing law," the Report went further to note that the term destructive device was being enlarged to encompass large caliber weapons except, *inter alia,* "any *shotgun shell or shotgun* generally recognized as particularly suitable for shooting sport purposes." S. REP. No. 90–1501, at 30, 47 (1968) (emphasis added).[6]

[6]    Plaintiffs had no contest with materials that defendant submitted with its final brief. An authoritative handbook on weapons described the Striker–12 "as a potential military, security and anti-terrorist weapon." *Jane's Infantry Weapons* 244 (13th ed.1987). *See generally Persyn v. United States,* 34 Fed.Cl. 187, 190 n. 3 (1995) (referencing one of Jane's yearbooks), *aff'd,* 106 F.3d 424, 1996 WL 740996 (1996) (Table), *cert. denied,* 520 U.S. 1213, 117 S.Ct. 1697, 137 L.Ed.2d 824 (1997). Similarly, the manufacturer's advertisement refers to the Striker–12 as "the ultimate weapon in law enforcement of the future. *Its awesome fire power, compact styling, lack of recoil, and complete reliability makes the use of any other shotgun by law enforcement personnel a serious compromise in personal safety.*" The description continues to portray the Striker–12 as providing "a powerful psychological edge when confronting volatile situations .... *Multiple assailants can now be addressed with confidence .... This is a proven firearm currently in use in police and combat situations throughout the world.*"

Plaintiffs contend that the foregoing references to "shotgun shell or shotgun," as well as "shotguns and

AR005271

Demko v. U.S., 44 Fed.Cl. 83 (1999)

shotgun shells," were erroneous variances. Urging the court to disregard these reports and focus on the language of the statute itself, plaintiffs also point out that the Conference Report excluded any shotgun other than a short-barreled shotgun. *See* Conference Report at 4427. Plaintiffs also rely on the statement that "[t]he Senate amendment is essentially the same as the House bill." *Id.* Plaintiffs, however, fail to place these statements in context. The Conference Report recited the definitions included in the House amendments and noted the similarities between the House and Senate bills. Significantly, the Conference Report then recited the differences between the two bills. Specifically, it noted that the Senate bill "excluded from the definition [of destructive device] ... shotguns and shotgun shells found by the Secretary to be suitable for sporting purposes." *Id.* The Conference Report then "adopt[ed] the Senate amendment" with regard to the definition of destructive device. *Id.* Thus, the Conference Report does not support plaintiffs' contentions.

Contesting the validity of committee reports, plaintiffs also seek support for their interpretation of the statute in comments from individual legislators. Plaintiffs emphasize that Congress does not vote on committee reports, but, rather, on the text of the statute itself, and that the comments from individual legislators more accurately reflect the intent of Congress. *See Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt."). Although plaintiffs are correct that the committee reports may not be altered and thus may not accurately reflect the intent of Congress in every instance, individual references that the bill revisions, in its various forms, merely were technical, noncontroversial, or meant to exclude every weapon beyond a shotgun, rifle, pistol or revolver do not undermine the court's interpretation. *See* 114 Cong. Rec. 26,900, 26,903 (1968); *see also In re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988) ("To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent, ... stray comments by individual legislators, not otherwise supported ..., cannot be attributed to the full body that voted on the bill. The opposite inference is more likely."); *Abourezk v. Reagan,* 785 F.2d 1043, 1054–55 n. 11 (D.C.Cir.1986) (noting statutory text is more reliable than committee reports), *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).[7] Plaintiffs assume, without **\*92** record support, that bringing all shotguns within the control of the NFA, as destructive weapons, would have been contrary to the intent of the proponents of the amendments.[8] The statute plainly indicates that only those shotguns that fall within the definition of a destructive device and that are not considered generally recognized for sporting purposes are so classified.

[7]   The text of the floor debates reveals that a technical revision to the definition of destructive device was contemplated. A close reading of the statements both preceding and following the indication that the amendment was a technical revision suggests that the legislators contemplated the exclusion of certain shotguns and/or shotgun shells.

> Mr. Pastore. Directing attention to line 6, it says here: "except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes;".
>
> Once we include this in the law, it is open for exclusion? I understand some attempt is to be made here to include shotguns, and also to include shells. If at this point, by vote, we exclude them, can we include them later on?
>
> Mr. Dodd. This is just excluding them from the definition of destructive devices.
>
> Mr. Pastore. I see. But is has nothing at all to do with the general attempt to include under controls shotguns and shotgun shells?
>
> Mr. Dodd. It does not. It is just to exclude them from the definition of destructive device.

114 Cong. Rec. 26,900. The court also notes that the reference to the amended term "destructive device" as "a noncontroversial measure" was a statement by Senator Hruska indicating that similarity between the measure at issue and "similar ... measures [he] introduced in the Senate as long as 3 years ago in a vain effort to try to dispose of a noncontroversial measure at that time." *Id.* Senator Hruska noted: "There was little or no difference of opinion as to the necessity of an updating and a radical revision of the Machine Gun Act."*Id.* With regard to the statement by Senator Cooper, who considered destructive devices to include "every kind of weapon which goes beyond the case of a shotgun, a sporting rifle, or a pistol or revolver," the court notes that this statement was made in the context of debate surrounding licensed dealers and licensed collectors. *Id.* at 26,903.

[8]   House Report No. 1577 accompanied the House bill, H.R. 17735—State Firearms Control Assistance Act of 1968. Senate Report No. 1501 accompanied the Senate bill, S. 3633—Gun Control Act of 1968. Conference Report No. 1956, entitled Statement of the Managers on the Part of the House, accompanied H.R. 17735, which was subsequently passed as amended. The Conference Report was intended to reconcile the differences between the House and Senate with regard to the amending language. The Conference Report, *inter alia,* accepted the definition of a destructive device excluding shotguns and shotgun shells that the

AR005272

Secretary found to be generally used for sporting purposes. Although the inclusion of shotguns and the sporting purposes test appear to have generated some controversy, *see* 114 Cong. Rec. 27,461–65, the Conference Report seemingly represents Congress' resolution of these issues, particularly given that almost the identical language was adopted when the statute was passed.

Since 1968 the language of 18 U.S.C. § 921(a)(4) has defined destructive device as

> (B) any type of weapon (other than a shotgun or a shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter.[9]

[9]   Plaintiffs note accurately that the original definition of a destructive device, which was included in Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, 227–28 (1968) ("Title IV"), and stated in 18 U.S.C. § 921(a)(4), excluded all shotguns except short-barreled shotguns. *See* 18 U.S.C. § 921(b)(2)(C). This definition was amended shortly after passage of the bill to narrow the exclusion as represented above. *See* 18 U.S.C. § 921(a)(4). Plaintiffs' emphasis on Title IV, which was amended within months of enactment by the Gun Control Act of 1968, is misplaced.

This language directly parallels that incorporated into the definition of destructive device in 26 U.S.C. § 5845(f)(2). Although the statute provides for the classification of some shotguns or shotgun shells as destructive devices, shotguns or shotgun shells are not *per se* classified as such and subject to being banned. Moreover, the interchangeable references—"shotgun or shotgun shell," "shotgun shell or shotgun," "shotguns and shotgun shells"—in the legislative reports and statutory definitions support the conclusion that the entire clause is the last antecedent and the "or" separating shotgun and shotgun shell serves as an inclusive disjunct applying to both, as well as each individually depending upon the circumstances of the particular case before the ATF. Such a "reading of the statutory language is consistent with

Congress's goal in enacting the legislation containing the section, which was to achieve greater control and regulation of weapons that can be used in violent crimes." *United States v. Tribunella,* 749 F.2d 104, 109, 110 (2d Cir.1984) (noting that behind Gun Control Act was "Congress's overriding concern ... for decreasing the violent use of guns"). Plaintiffs' arguments that the exclusion applies only to ammunition, *i.e.,* shotgun shells, **\*93** flies in the face of legislative history, case law, and common sense.[10]

[10]   That certain shotguns and shotgun shells could be subject to classification as destructive devices is also suggested by case law. *See United States v. Greer,* 588 F.2d 1151, 1154, 1154–57 (6th Cir.1978) (stating 26 U.S.C. § 5845(f)(2) "deals with large-bore weapons other than sporting guns"); *see also Cox v. ATF,* 571 F.2d 267, 268 n. 2 (5th Cir.1978) (noting weapons within classification of 26 U.S.C. § 5845 are associated typically with criminal activity, having "little or no sporting use"). Moreover, plaintiffs have cited no evidence demonstrating that only shotgun shells were directly at issue. Plaintiffs conceded at oral argument that "[t]here is no discussion ... of shotgun shells" in either the committee reports or floor debates. Tr. at 38. Notably, the Conference Report recited:

> Under the House bill the term "ammunition" was defined to include only ammunition for destructive devices, pistols, and revolvers and was defined to exclude shotgun shells .... Under the Senate amendment such term was defined to mean all ammunition and components of ammunition for all firearms. The conference substitute adopts the Senate amendment.

> Conference Report at 4428. Thus, the record belies plaintiffs' assertions.

Pursuant to the plain language of the statute, the ATF, as the delegatee, has the authority to classify a shotgun and/or shotgun shell which was not generally recognized as suitable for sporting purposes as a destructive weapon. The question thus devolves to whether this was a proper delegation of authority by Congress.

### 3. *Delegation of legislative authority*

Plaintiffs assert that the phrase "generally recognized as particularly suitable for sporting purposes" fails to provide an intelligible standard from which the ATF may make determinations that a shotgun or shotgun shell is a destructive device. Specifically, although conceding that "particularly suitable for sporting purposes ... seems to lay down an intelligible principle," Plfs' Br. filed Dec. 11, 1998, at 13, plaintiffs contend that the combination of the

AR005273

Demko v. U.S., 44 Fed.Cl. 83 (1999)

phrase "generally recognized as" with the sporting purposes test renders "the entire phrase boundless ... [and] dependent not upon an analysis of the characteristics of the shotgun itself, but rather upon whether some unspecified class of persons recognizes the shotgun" as falling within the sporting purposes test. Plfs' Br. filed Mar. 24, 1999, at 11; *see* Tr. at 16. In the absence of an intelligible standard, plaintiffs maintain that this is an instance in which the delegation of authority is unconstitutional.

Defendant rejoins that the sporting purposes test is the same test enunciated under 18 U.S.C.A. § 925(d)(3) (Supp.1999), which provides:

> The Secretary shall authorize a firearm or ammunition to be imported or brought into the United States ... if ... the firearm or ammunition—
>
> ....
>
> is of the type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is *generally recognized as particularly suitable for or readily adaptable to sporting purposes....*

(Emphasis added.) Not only have the courts consistently upheld this test, but defendant argues that the sporting purposes test is narrower than other tests previously found constitutional.

 "All legislative Powers ... shall be vested in a Congress of the United States...." U.S. Const., Art. 1, § 1. Although Congress may not delegate this authority, it may seek assistance from the other branches of Government. *See Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991); *Mistretta v. United States,* 488 U.S. 361, 371–72, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). "Thus, Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby,* 500 U.S. at 165, 111 S.Ct. 1752. Such delegation is not forbidden if given within the context of an intelligible standard to which the delegatee must adhere. *See id.* (citing cases and finding that " 'imminent hazard to the public safety' " was intelligible principle) (citation omitted); *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647; *Grymes Hill Manor Estates v. United States,* 179 Ct.Cl. 466, 470–71, 373 F.2d 920, 922 (1967) (finding liberal delegation constitutional because "policy of the statutory provision is clearly apparent, the Congress **\*94** has delineated the public agency to apply it, and has fixed the boundaries of the delegated authority") (footnote omitted). Broad delegations facilitate both legislative and

administrative processes by granting authority to those agencies possessing specialized knowledge and thus best suited to realizing Congress' intent. *See Grymes Hill,* 179 Ct.Cl. at 470–71, 373 F.2d at 922.

In *Mistretta* the Supreme Court discussed judicial review of Congress' attempts to delegate authority:

> Until 1935, this Court never struck down a challenged statute on delegation grounds. *See Synar v. United States,* 626 F.Supp. 1374, 1383(DC) (three-judge court), *aff'd sub nom., Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). After invalidating in 1935 two statutes as excessive delegations, *see A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 [ (1935) ], and *Panama Refining Co. v. Ryan,* [293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446 (1935) ], we have upheld, again without deviation, Congress' ability to delegate power under broad standards. *See, e.g., Lichter v. United States,* 334 U.S. 742, 785–786, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (upholding delegation of authority to determine excessive profits); *American Power & Light Co. v. SEC,* 329 U.S. [90], 105, 67 S.Ct. 133, 91 L.Ed. 103 (upholding delegation of authority to Securities and Exchange Commission to prevent unfair or inequitable distribution of voting power among security holders); *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (upholding delegation to Price Administrator to fix commodity prices that would be fair and equitable, and would effectuate purposes of Emergency Price Control Act of 1942); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 600, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (upholding delegation to Federal Power Commission to determine just and reasonable rates); *National Broadcasting Co. v. United States,* 319 U.S. 190, 225–26, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (upholding delegation to Federal Communications Commission to regulate broadcast licensing "as public interest, convenience, or necessity" require).

488 U.S. at 373–74, 109 S.Ct. 647 (footnote omitted).

 Contrary to plaintiffs' contentions, the sporting purposes test enunciated in 18 U.S.C. § 925, is essentially the same test as that in 26 U.S.C. § 5845(f)(2).[11] Courts have previously upheld classifications made by the ATF pursuant to 18 U.S.C. § 925. *See Gilbert Equip. Co. v. Higgins,* 709 F.Supp. 1071 (S.D.Ala.1989), *aff'd,* 894 F.2d 412 (11th Cir.1990) (Table); *see also Gun South, Inc. v. Brady,* 877 F.2d 858, 866 (11th Cir.1989). By extension, it is logical that classifications under 26 U.S.C. § 5845(f)(2) similarly are proper exercises of the agency's discretion, which may be reviewed in a proceeding to

AR005274

determine if a rational basis for the decision exists. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.") (footnote omitted). The mere fact that the ATF may exercise some discretion in determining whether shotguns or shotgun shells are generally recognized as **\*95** particularly suitable for sporting purposes does not render the delegation of authority impermissible. *See Grymes Hill,* 179 Ct.Cl. at 471, 373 F.2d at 923 (finding discretion is not fatal " 'where Congress has prescribed the general standard and has left to an administrative agency the determination of the precise situations to which the provisions ... will be applied' ") (citations omitted). The statutory language of 26 U.S.C. § 5845 makes clear that the ATF's authority applies only to the classification of shotguns and/or shotgun shells that are found not generally recognized as suitable for sporting purposes. *See also Gun South,* 877 F.2d at 863 (stating 18 U.S.C. § 925(d)(3) "requires the Secretary to authorize the importation of sporting firearms" and noting Senate Report recognized "unusually broad discretion" in application of this statute by Secretary).

11    The ATF noted that the definitions under 18 U.S.C. § 925(d)(3) and 26 U.S.C. § 5845(f)(2) were the same, with the exception of the phrase "readily adaptable." *See* ATF Ruling 94–2 at 24. Plaintiffs argue that the "readily adaptable" language included in 18 U.S.C. § 925(d)(3) transforms the sporting purposes test into something other than the sporting purposes test enunciated in 26 U.S.C. § 5845(f)(2). For purposes of the instant matter, this is a distinction without difference.

Furthermore, the ATF Ruling revisited prior rulings regarding the Striker–12:

In 1984, ATF ruled that the Striker–12 was not eligible for importation under section 925(d)(3) since it is not particularly suitable for sporting purposes. In making this determination, the 1984 letter-ruling notes that the Striker was being used in a number of "combat" shooting events. In a letter dated June 30, 1986, ATF again denied importation to the Striker–12, on the basis that it did not meet the "sporting purposes" test of section 925(d)(3). This letter states that, "We believe the weapon to have been specifically designed for military and law enforcement uses."

ATF Ruling 94–2 at 24–25.

Congress has provided a sufficiently intelligible guide for the ATF to follow in determining whether a shotgun or shotgun shell falls within the definition of a destructive device. This statute does not permit the classification of all shotguns or shotgun shells as destructive devices and excludes those that are commonly used for sporting purposes. This standard is sufficiently definite to provide boundaries to the ATF's authority. This test is further delimited by the intent and purpose behind the amendments to the Gun Control Act of 1968, which included "[t]he urgent need for adding restrictions on transactions in long guns equivalent to those Congress has already applied to handguns." House Committee Report at 4413. The Gun Control Act, in amending 18 U.S.C. Chap. 44, also recited:

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity ....

Pub.L. No. 90–618, 82 Stat. 1213–14, § 101. Congress' purpose and intent is thus revealed plainly.

With regard to plaintiffs' objection that the phrase "generally recognized as" makes boundless the ATF's authority, it is significant that the ATF did not focus on this as a part of its classification process.[12] Although noting the phrase "generally recognized as" at least three times in Ruling 94–2, the ATF utilized the test enunciated in 18 U.S.C. § 925(d)(3) and analyzed the physical characteristics of the weapon, the general use of the weapon, as well as the weapon's similarity to shotguns used for sporting purposes and combat.

12    Although contesting whether the phrase "generally recognized as" sets forth an intelligible principle, plaintiffs concede that the ATF did not base its determination regarding the Striker–12 on this phrase. *See* Plfs' Br. filed Mar. 24, 1999, at 12.

In evaluating the physical characteristics of the Striker–12/Streetsweeper, ATF concludes that the

AR005275

weight, bulk, designed magazine capacity, configuration, and other features indicate that it was designed primarily for military and law enforcement use and is not particularly suitable for sporting purposes.

The weight of the Striker—12/Streetsweeper, 9.24 pounds unloaded, is on the high end for traditional 12–gauge sporting shotguns, which generally weigh between 7 and 10 pounds. Thus, the weight of the Striker–12/Streetsweeper makes it awkward to carry for extended periods, as in hunting, and cumbersome to fire at multiple small moving targets, as in skeet and trap shooting. The width of the Striker–12/Streetsweeper, 5.7 inches, far exceeds that of traditional sporting shotguns, which do not exceed three inches in width or four inches in depth. The large size and bulk of the Striker–12/Streetsweeper make it extremely difficult to maneuver quickly enough to engage moving targets as is necessary in hunting, skeet, and trap shooting. The spring driven revolving magazine with 12–cartridge capacity is a much larger capacity than traditional repeating sporting shotguns, which generally **\*96** contain tubular magazines with a capacity of 3–5 cartridges. The folding shoulder stock and the two pistol grips are not typical of sporting-type shotguns. Finally, the overall appearance and general shape of the weapon are radically different from traditional sporting shotguns and strikingly similar to shotguns designed specifically for or modified for combat and law enforcement use.

ATF Ruling 94–2 at 25.

Reference to private individuals when making a determination strains the limits of constitutionality. *See Yakus v. U.S.,* 321 U.S. at 424, 64 S.Ct. 660 (discussing impermissible delegation in *A.L.A. Schechter,* 295 U.S. at 541–42, 55 S.Ct. 837, which provided no standard thus granting virtually unfettered discretion). However, in making its determination, the ATF did not rely on an unidentified group from which to determine whether the shotgun was "generally recognized as" permissible under the sporting purposes test, but, rather, relied on quantifiable characteristics of the Striker–12.[13] Furthermore, the phrase "generally recognized as" neither requires that the ATF resort to private individuals or groups, nor grants to the ATF unlimited authority. *See Gilbert Equip.,* 709 F.Supp. at 1082–83 (discussing Senate recommendations surrounding enforcement of "sporting purposes" test, which included advisory panel). Case law reveals that the

---

[13]    Plaintiffs do not contend that the Striker–12 is suitable

for sporting purposes. *See supra* note 3; *see also supra* note 6.

ATF views the "generally recognized" qualification to require both that the firearm itself or the "type" of firearm to which the subject firearm is being compared have attained general recognition as being particularly suitable for ... sporting purposes, and that a particular use of a firearm have attained general recognition as being a "sporting purpose," or that an event have attained general recognition as being a "sport," before those uses and/or events can be "sporting purposes" or "sports" ....

*Gilbert Equip.,* 709 F.Supp. at 1085, 1085–86 (discussing 18 U.S.C. § 925(d)(3)) (footnotes omitted); *see also Gun South,* 877 F.2d at 866 (" '[G]enerally recognized' in 925(d)(3) suggests a community standard which may change over time even though the firearm remains the same. Thus, a changing pattern of use may significantly affect whether a firearm is *generally recognized as particularly suitable for ... a sporting purpose.*"). The mere fact that Congress may have drafted the language of 26 U.S.C. § 5845(f)(2) more precisely does not render the statute unconstitutionally vague. *United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) (analyzing 18 U.S.C. § 1715).

Where, as here, the agency can follow the statutory guide and achieve the end intended by Congress, the delegation is constitutional. "Such straining to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine, and we will not indulge in it." *Id.* at 93, 96 S.Ct. 316. "Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. 'They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.' " *Lichter v. United States,* 334 U.S. 742, 785, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (quoting *American Power,* 329 U.S. at 104, 67 S.Ct. 133). Analyzing the statutory language and its purpose, the court concludes that Congress has provided an intelligible principle, which applies to limited circumstances and is capable of review in a proper proceeding. *See Mistretta,* 488 U.S. at 379, 109 S.Ct. 647 (citing *Yakus,* 321 U.S. at 425–26, 64 S.Ct. 660).

**CONCLUSION**

Demko v. U.S., 44 Fed.Cl. 83 (1999)

The plain meaning of the statute indicates that the qualifying language within the exclusionary clause is applicable to both shotgun and shotgun shell. The ATF therefore has the authority to classify the Striker–12 as a destructive device. The statutory standard—"generally recognized as particularly suitable for sporting purposes"—provides an **\*97** intelligible standard for the ATF to follow in making such rulings and is thus constitutionally sufficient. Accordingly, based on the foregoing,

1. Plaintiffs' motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted.

2. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED**.

**All Citations**

44 Fed.Cl. 83

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005277

U.S. v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416 (2006)

2006 Fed.App. 0103P

441 F.3d 416
United States Court of Appeals,
Sixth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
ONE TRW, MODEL M14, 7.62 CALIBER RIFLE,
Serial Number 1488973 from William K. Alverson,
Defendant,
William K. Alverson, Claimant–Appellant.

No. 04–5082.
|
Argued: Oct. 5, 2005.
|
Decided and Filed: March 20, 2006.
|
Rehearing and Rehearing En Banc Denied Aug.
24, 2006.*

*     Judge Griffin would grant rehearing for the reasons stated in his dissent.

**Synopsis**
**Background:** Government brought action seeking forfeiture of M-14 rifle, as unregistered machine gun. The United States District Court for the Eastern District of Kentucky, Karl S. Forester, J., 294 F.Supp.2d 896,granted summary judgment for government, and claimant appealed.

The Court of Appeals, Karen Nelson Moore, Circuit Judge, held that firearm was forfeitable "machinegun."

Affirmed.

Griffin, Circuit Judge, dissented and filed opinion.

**Attorneys and Law Firms**

**\*417 ARGUED:** Richard E. Gardiner, Fairfax, Virginia, for Appellant. David Y. Olinger, Jr., Assistant United States Attorney, Lexington, Kentucky, for Appellee. **ON BRIEF:** Richard E. Gardiner, Fairfax, Virginia, for Appellant. David Y. Olinger, Jr., Assistant United States Attorney, Lexington, Kentucky, for Appellee.

Before: MOORE, GIBBONS, and GRIFFIN, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which GIBBONS, J., joined.

GRIFFIN, J. (pp. 425–29), delivered a separate dissenting opinion.

## OPINION

KAREN NELSON MOORE, Circuit Judge.

This case involves a forfeiture of the Defendant weapon pursuant to 26 U.S.C. § 5872(a) because the weapon was found to be a machinegun within the terms of the National Firearms Act ("NFA"), 26 U.S.C. § 5845(b), and was not registered to the Claimant–Appellant, William K. Alverson ("Alverson"), in violation of 26 U.S.C. § 5861(d). Alverson claims that the Government failed to satisfy the burden required to justify the forfeiture because it did not show that the Defendant firearm was "designed to shoot" automatically or could "be readily restored to shoot" automatically under the NFA's definition of a machinegun. 26 U.S.C. § 5845(b). For the reasons set forth below, we **AFFIRM** the district court's judgment granting the United States's motion for summary judgment.

### I. BACKGROUND

In the fall of 2001, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") Field Office in Lexington, Kentucky was informed that MK Specialties ("MKS") was selling firearms made from cut-up M–14 receivers marketed as the MKS M–14. The Lexington ATF Office determined that Alverson had purchased one of these weapons. In early January 2002, ATF Special Agents verified that

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.     16

Alverson was in possession *418 of such a weapon, and on January 11, 2002, ATF Special Agents seized it from him. Subsequent to its seizure, ATF Firearms Enforcement Officer Richard Vasquez examined the weapon and issued a report, concluding that the Defendant weapon was a machinegun within the meaning of the NFA. ATF also conducted a search of the National Firearms Registration and Transfer Record and found that the Defendant weapon was not registered to Alverson or any other person.

Following the seizure, Alverson filed a claim of ownership of the Defendant weapon, contesting the forfeiture on the ground that it was not a machinegun under the NFA. On October 3, 2002, the United States filed a complaint for forfeiture in rem, claiming that the Defendant weapon was a "machinegun" under 26 U.S.C. § 5845(b) and was not registered to Alverson, in violation of 26 U.S.C. § 5861(d). The United States moved for summary judgment, and Alverson filed a motion to stay. The district court dismissed Alverson's motion to stay and granted the Government's motion for summary judgment. Alverson then timely filed an appeal of the district court's grant of summary judgment.

## II. ANALYSIS

### A. Standard of Review
We review a grant of summary judgment de novo. *United States v. Any & All Radio Station Transmission Equip.,* 218 F.3d 543, 547 (6th Cir.2000) (citing *EEOC v. Nw. Airlines, Inc.,* 188 F.3d 695, 701 (6th Cir.1999)). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. Burden of Proof
In 2001, Congress enacted the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983, which, among other reforms, placed on the Government the burden of proving by a preponderance of the evidence that the property is subject to forfeiture in most civil forfeiture proceedings. *Id.* § 983(c)(1). CAFRA states that "a suit or

action brought under any civil forfeiture statute for the civil forfeiture of any property" shall be governed by CAFRA's burden of proof requirements. 18 U.S.C. § 983(c)(1). However, CAFRA later limits the application of this provision by stating that " 'civil forfeiture statute' ... (2) does not include—... (B) the Internal Revenue Code of 1986." *Id.* § 983(i); *see also Deep Sea Fisheries, Inc. v. 144,774 Pounds of Blue King Crab,* 410 F.3d 1131, 1134 (9th Cir.2005) (explaining that CAFRA applies to "all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2)"). The NFA provision under which this forfeiture was initiated, 26 U.S.C. § 5872(a), is contained in Title 26, which is the Internal Revenue Code of 1986.[1] Therefore, CAFRA does not govern the burden of proof here. *See United States v. One Harrington & Richardson Rifle, Model M–14, 7.62 Caliber Serial No. 85279,* 378 F.3d 533 (6th Cir.2004) (order) (applying the pre-CAFRA burden-of-proof standard to a forfeiture pursuant to the NFA).

[1]   The United States Code explains that the Internal Revenue Code of 1954 as amended may be cited as the Internal Revenue Code of 1986, and that "[t]he sections of Title 26, United States Code, are identical to the sections of the Internal Revenue Code." 1 U.S.C. § 204; Tax Reform Act of 1986, Pub.L. 99–514, § 2(a), 100 Stat.2095 (noting that "[t]he Internal Revenue Title enacted August 16, 1954, as heretofore, hereby, or hereafter amended, may be cited as the 'Internal Revenue Code of 1986' ").

*419  We now turn to the law governing the burden of proof necessary to sustain this forfeiture pursuant to the NFA. The Treasury Fund Forfeiture Act of 1992 provided that

[e]xcept as provided in paragraph (2) and section 5872(b) of the Internal Revenue Code of 1986, the provisions of law relating to—(A) the seizure, summary and judicial forfeiture, and condemnation of property for violation of Customs laws, (B) the remission or mitigation of such forfeiture, and (C) the compromise of claims, shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under any applicable law enforced or administered by the Bureau of Alcohol, Tobacco and Firearms.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005279

U.S. v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416 (2006)

2006 Fed.App. 0103P

Pub.L. 102–393, Tit. VI, § 638(b)(1), 106 Stat. 1779 (formerly codified at 31 U.S.C. § 9703(*o*)(1)), *repealed by* Homeland Security Act of 2002, Pub.L. 107–296, Tit. XI, Subtit. B, § 1113, 116 Stat. 2279 (codified at 18 U.S.C. § 3051).[2] The Customs laws governing forfeitures are found at 19 U.S.C. §§ 1602–1631. Under these provisions, where a person whose property has been seized for forfeiture wants to contest the seizure, that person must first file a claim of ownership of property. 19 U.S.C. § 1608. The Government must then initiate a civil judicial forfeiture action. *Id.* § 1604. Under the burden-shifting scheme set forth by 19 U.S.C. § 1615, the Government bears the burden of establishing probable cause to believe that the property was used in violation of the law, and the burden then shifts to the claimant to prove by a preponderance of the evidence that the item was improperly seized. *Id.* § 1615; *Any & All Radio Station Transmission Equip.,* 218 F.3d at 548.

2    The district court erroneously applied 18 U.S.C. § 3051(c)(1), which repealed 31 U.S.C. 9703(*o*) but was not enacted until November 25, 2002, over ten months after the property at issue was seized. This error, however, is immaterial, because the Customs laws, 19 U.S.C. §§ 1602–1631, apply under either statute, and thus the burden of proof is the same.

Alverson's argument that former 31 U.S.C. § 9703(*o*)(1) does not apply to forfeitures pursuant to 26 U.S.C. § 5872(a) because § 5872(a) is not an "applicable law enforced or administered by the Bureau of Alcohol, Tobacco and Firearms" is without merit. Because Congress specifically exempted § 5872(b) but not § 5872(a) from § 9703(*o*)(1)'s reach, the intent was clearly for § 5872(a) to be considered an "applicable law" under § 9703(*o*)(1). Moreover, Alverson points to no alternative statute that would have governed in place of 31 U.S.C. § 9703(*o*)(1).

## C. Statutory Interpretation

The NFA defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The statute does not define "designed to shoot" or "can be readily restored," and neither the Supreme Court nor the Sixth Circuit has defined these terms.

### 1. The ATF Rulings

The Government argues that we should rely on several ATF Rulings ("the Rulings") that define "designed to shoot" and "can be readily restored" and that classify various modified weapons as machineguns because they were "designed to shoot" automatically. Typically, where a statute is ambiguous and the implementing agency has interpreted the statute, a court will determine what, if any, level of deference the interpretation should be afforded and then defer accordingly. The Supreme Court has distinguished between the more deferential standard of *Chevron,* under which agency interpretations will control as long as they are "based on a permissible construction of the statute," *Chevron U.S.A. Inc. v. Natural Res. Def. Council,* **\*420** *Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the less deferential standard of *Skidmore,* under which the weight of an agency's interpretation "depend[s] upon ... all those factors which give it power to persuade, if lacking power to control," *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See United States v. Mead Corp.,* 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). *Chevron* deference will be afforded to agency interpretations, like the ATF Rulings, that were not made pursuant to notice-and-comment rulemaking or formal adjudication, only where the reviewing court determines that Congress intended such agency action to have the "force of law." *Mead Corp.,* 533 U.S. at 231–32, 121 S.Ct. 2164; *see also Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

The amount of deference that the Rulings merit is unsettled,[3] and we need not decide this question in this case. The ATF Rulings, even if entitled to full *Chevron* deference, would provide little guidance, as their explanation of "can be readily restored to shoot" hardly helps to clarify the statutory definition of this provision.[4] Moreover, the Rulings have little bearing on whether the Defendant weapon "can be readily restored to shoot[ ] automatically" because the weapons at issue in the Rulings were classified as machineguns based on the ATF's determination that they were "designed to shoot" automatically.[5]

3    This matter is further complicated by the fact that the we are interpreting a criminal statute, and under the rule of lenity, ambiguities are generally resolved in favor of the party accused of violating the law, even in a civil proceeding. *See Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 384 n. 8, 160 L.Ed.2d 271 (2004); *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–18, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (plurality); *Crandon v. United States,* 494 U.S. 152, 168, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); *id.* at 177, 110 S.Ct. 997 (Scalia, J., joined by O'Connor & Kennedy, JJ., concurring). *But see*

AR005280

*Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 703, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). However, even ambiguous criminal statutes may not trigger the rule of lenity unless the ambiguity is " 'grievous.' " *See Muscarello v. United States,* 524 U.S. 125, 139, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (quoting *Staples v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)).

4    The Rulings define the "can be readily restored" prong to mean "weapons which previously could shoot automatically but will not in their present condition," and the "designed" prong to include "weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts." ATF Rul. 82–2, 1982–1 A.T.F. Q.B. 18; *accord* ATF Rul. 82–8, 1982–2 A.T.F. Q.B. 49; ATF Rul. 83–5, 1983–3 A.T.F. Q.B. 35.

5    The Rulings found the particular weapons there at issue to be "designed to shoot" automatically where a "simple modification" such as "cutting, filing, or grinding," ATF Rul. 82–2, 1982–1 A.T.F. Q.B. 18, or "bending, breaking or cutting," ATF Rul. 83–5, 1983–3 A.T.F. Q.B. 35, allowed the weapon to shoot automatically.

### 2. Available Evidence

In support of its motion, the Government submitted a Firearms Technology Branch Report of Technical Examination ("FTB Report") written by ATF Officer Richard Vasquez after his investigation of the Defendant weapon that detailed its characteristics and the methods used to restore it to automatic shooting capacity.[6] ***421** The Claimant objects to the admissibility of the FTB Report, as it was unsworn and not accompanied by an affidavit. *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)) (holding that unsworn statements may not be considered on a motion for summary judgment). We need not resolve this dispute, however, as Claimant's expert witness, Robert Kraft, testified at his deposition that the Defendant weapon could be converted to fire automatically in four to six hours to manufacturer's specifications and in two to three hours with hand-manufactured parts. Because we view the evidence

in the light most favorable to the nonmoving party in reviewing a grant of summary judgment, *see Adickes,* 398 U.S. at 157, 90 S.Ct. 1598, given the conflict between the FTB Report and the Claimant's expert-witness testimony, we are obliged to credit the Claimant's expert in any event, regardless of the admissibility of the FTB Report. As we must draw all reasonable inferences in favor of the party opposing the motion for summary judgment, *Johnson v. Karnes,* 398 F.3d 868, 873 (6th Cir.2005), we will assume that it would require six hours to restore the Defendant weapon to automatic shooting capacity.

6    The FTB Report stated that the Defendant weapon had been manufactured from an M–14 machinegun receiver, which has been classified as a machinegun by the ATF since 1968, Rev. Rul. 58–417, 1958–2 C.B. 875, that had been cut in half. The Report notes that the Defendant weapon had been modified—severed in one location, and then welded back together with some of the metal being removed—and was in this semiautomatic condition when it was seized, but retained several design features that are specific to an M–14 machinegun. The Report further estimates that the Defendant weapon could be altered to shoot automatically in approximately forty-five minutes using a hand grinder, a slitting disk, a drill press, and hand files.

### 3. "Can Be Readily Restored to Shoot[ ] Automatically"

We have not interpreted the phrase "readily restored" in a published opinion[7] or in the context of a weapon like the Defendant.[8] Webster's Third New International Dictionary defines "readily" to mean "with fairly quick efficiency," "without needless loss of time," "reasonably fast," "speedily," "with a fair degree of ease," "without much difficulty," "with facility," and "easily." Webster's Third New International Dictionary 1889 (1981). This definition identifies several components of "readily," most notably, speed, ease, and efficiency. The inclusion of limiting modifiers, i.e., "with *fairly* quick efficiency," ***422** "without *much* difficulty," and "*reasonably* fast," *id.* (emphasis added), makes clear that "readily" is a relative term, one that describes a process that is *fairly* or *reasonably* efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process.

7    In an unpublished opinion, we held that a disassembled weapon that could be converted to fire automatically could be "readily restored" despite evidence that it was missing a necessary part because the part was available on the open market. *United States v. Cook,* No.

AR005281

92–1467, 1993 WL 243823, at *3–4 (6th Cir. July 6, 1993).

[8]  We recently concluded that a modified semiautomatic rifle could be "readily restored" under the NFA; however, this decision was reached on the basis of ATF conclusions without the court's analysis of the meaning of "readily restored" and how this requirement applied to the specific characteristics of the weapon it was considering. *See One Harrington & Richardson Rifle, Model M–14, 7.62 Caliber Serial No. 85279,* 378 F.3d at 534–35. There, however, we were able to consider the FTB Report's conclusions regarding the firearm because it was accompanied by an affidavit. *United States v. One Harrington & Richardson Rifle, Model M–14, 7.62 Caliber Serial Number 85279,* 278 F.Supp.2d 888, 891–92 (W.D.Mich.2003). Moreover, in that case, the claimant failed to put forth any expert evidence to contest the Report's findings, *id.* at 892, and thus we could properly rely on the moving party's unrebutted evidence in reviewing the grant of summary judgment. We have also held that a firearm that can be converted to shoot automatically within two minutes "can be readily restored." *United States v. Woodlan,* 527 F.2d 608, 609 (6th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

In the context of the NFA and its use as a modifier describing the manner of firearm restoration, "readily" has been read to encompass several elements of restoration: (1) time, i.e., how long it takes to restore the weapon; (2) ease, i.e., how difficult it is to restore the weapon; (3) expertise, i.e., what knowledge and skills are required to restore the weapon; (4) necessary equipment, i.e., what tools are required to restore the weapon; (5) availability, i.e., where additional parts are required, how easily they can be obtained; (6) expense, i.e., how much it costs to restore the weapon; (7) scope, i.e., the extent to which the weapon has to be changed to allow it to shoot automatically; (8) feasability, i.e., whether the restoration would damage or destroy the weapon or cause it to malfunction. *See S.W. Daniel, Inc. v. United States,* 831 F.2d 253, 254–55 (11th Cir.1987) (ease and scope); *United States v. Alverson,* 666 F.2d 341, 345 (9th Cir.1982) (expertise,[9] ease, and scope); *United States v. Smith,* 477 F.2d 399, 400 (8th Cir.1973) (time and equipment); *United States v. Aguilar–Espinosa,* 57 F.Supp.2d 1359, 1362 (M.D.Fla.1999) (time, ease, expertise, and equipment); *United States v. Seven Misc. Firearms,* 503 F.Supp. 565, 573–75 (D.D.C.1980) (time, ease, expertise, equipment, availability, expense, and feasibility); *United States v. Cook,* No. 92–1467, 1993 WL 243823, at *3–4 (6th Cir. July 6, 1993) (availability).

[9]  In *Alverson,* the Ninth Circuit considered the defendant's personal knowledge and experience in converting semiautomatic weapons to fully automatic in determining that the weapon in question could be "readily restored." 666 F.2d at 345. Were we to consider expertise this way—i.e., taking into account the knowledge and skills of the particular defendant/claimant—this would only further bolster our conclusion that the Defendant weapon "can be readily restored," as Claimant Alverson in the case at bar is an expert gunsmith. (The Ninth Circuit case involved a different claimant).

The statutory canon of construction *noscitur a sociis,* or "it is known by its associates," instructs "that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law Dictionary 1087 (8th ed.2004); *see also Parker v. Metro. Life Ins. Co.,* 121 F.3d 1006, 1014 (6th Cir.1997). "[R]eadily restored," therefore, must not be construed as an abstract phrase, but rather its contours should be determined in the context of what it means to be able to "readily restore[ ]" a machinegun as opposed to some other object. The sort of object being restored, primarily its complexity, helps to determine whether a given amount of time, money, expertise, and skill required to restore it is considered a "ready" restoration. For example, a car that could be restored in ten hours for $500 would likely be considered "readily restored," whereas a skateboard that required the same inputs likely would not be considered "readily restored." Although the dissent asserts, based on "common sense," that "a process [of restoration] that takes in excess of four to six hours" could not be "ready," Dissenting Opinion ("Dissent.Op.") at 427–28, this contention lacks meaning because it is too abstract and fails to consider what "readily restored" means in the context of a highly complex firearm.

The decisions of several other courts make clear that the Defendant weapon, which would require, according to Alverson's own expert, a maximum of six **\*423** hours to convert to fire automatically, "can be readily restored" under the NFA. The Eighth Circuit held that a semiautomatic rifle that would take an eight-hour working day in a properly equipped machine shop to convert to shoot automatically qualified as a "machinegun" under the NFA.[10] *Smith,* 477 F.2d at 400; *cf. United States v. Shilling,* 826 F.2d 1365, 1367 (4th Cir.1987) (holding that disassembled guns that could be made to shoot automatically were "readily restor[able]"); *S.W. Daniel, Inc.,* 831 F.2d at 254–55 (upholding the use of a jury instruction defining a machinegun as "those weapons which have not previously functioned as machine guns but possess design features which facilitate full automatic

U.S. v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416 (2006)

2006 Fed.App. 0103P

fire by simple modification or elimination of existing component parts"); *Alverson,* 666 F.2d at 345 (concluding that an automatic weapon that was converted to fire semiautomatically prior to its sale to defendant could be "readily restored" where it could be modified to shoot automatically by filing down one of its parts); *United States v. Lauchli,* 371 F.2d 303, 312–13 (7th Cir.1966) (in a case prior to the addition of the "can be readily restored" language to the NFA, deciding that weapons requiring assembly to shoot automatically were machineguns under the NFA).

[10]   One district court opinion, on which the dissent relies heavily, Dissent. Op. at 429, criticized *Smith* for "press[ing] the notion of 'ready restoration' near or beyond its distal boundary." *Aguilar–Espinosa,* 57 F.Supp.2d at 1362 (defining "ready restoration" as "a less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers, including, for example, Allen wrenches, files, jeweler's screw drivers, and the like but excluding, for example, the resources available to a master machinist with a modern and well-equipped lathe"). However, that court's understanding of "readily restored" is based on its impressionistic concept of this term formulated almost entirely from whole cloth and is only marginally supported by the authorities it cites. *See id.* Moreover, the court there did not have occasion to apply its stated definition nor did it decide whether the weapon in question could be "readily restored to shoot[ ] automatically," and thus this definition is dicta, and it remains uncertain how it would have been applied. Therefore, the dissent's reliance on *Aguilar–Espinosa* is curious, and is made even more curious because it is a district court opinion that is not binding precedent on any court. In any event, based on the record evidence, the Defendant weapon potentially satisfies even *Aguilar–Espinosa* 's definition of "readily restored." Although the dissent claims that we "rel[y] on *Aguilar–Espinosa* to support [our] definition of 'readily restored,' " Dissent. Op. at 429 n. 6, we cite the case as one of many to illustrate the variety of factors that courts have considered in giving meaning to "readily restored."

The Defendant weapon in the case at bar can be converted to fire automatically in even less time than the weapon that could be "readily restored" in *Smith.* Alverson's expert testified that the Defendant rifle could be restored to fully-automatic-shooting capacity to manufacturer's specifications in four to six hours with particular machinery or in two to three hours by hand manufacturing the parts.[11]

[11]   Because this expert testified that the weapon could

potentially malfunction if restored with hand-manufactured parts, and given that we must view the evidence in the light most favorable to the nonmoving party, we will assume that the restoration would require six hours.

The two relevant cases finding that the weapons there considered were not readily restorable can be distinguished from the Defendant weapon. In *Seven Miscellaneous Firearms,* the district court found that weapons forfeited from a museum collection were not readily restorable where conversion would require expert gunsmith **\*424** services, tools costing up to $65,000, essential parts that could not be found in this country, and between four and perhaps in excess of thirty hours, and could damage or destroy the weapons and cause them to injure the shooter upon firing. 503 F.Supp. at 573–75. By contrast, the Defendant weapon here had all of the necessary parts for restoration and would take no more than six hours to restore. In *F.J. Vollmer Company v. Higgins,* the District of Columbia Circuit rejected the ATF's once-a-machinegun-always-a-machinegun rule and held that where a manufacturer had altered an automatic weapon by removing certain features that caused the weapon to be classified as a machinegun, the ability to convert the weapon back to automatic firing capacity did not make the weapon capable of being "readily restored." 23 F.3d 448, 451–52 (D.C.Cir.1994). However, that court's decision was based on the unreasonableness of prohibiting the company from adding a legal part to a semiautomatic receiver simply because the receiver had once been automatic and because there were no findings to support the contention that the reconfigured semiautomatic receiver was "potentially restorable" to a machinegun receiver. *F.J. Vollmer Co. v. Magaw,* 102 F.3d 591, 594 (D.C.Cir.1996).[12]

[12]   The dissent, in citing several precedents finding the weapons they consider capable of being "readily restored to shoot [ ] automatically," erroneously treats these holdings as representing the outer limits of what constitutes "readily restorable." Dissent. Op. at 429 (citing *Woodlan,* 527 F.2d at 608; *F.J. Vollmer Co., Inc.,* 23 F.3d at 452; *Alverson,* 666 F.2d at 345; *United States v. Woods,* 560 F.2d 660, 664–65 (5th Cir.1978); *United States v. Catanzaro,* 368 F.Supp. 450, 453 n. 3 (D.Conn.1973)). However, these courts certainly did not "adopt ... tests for defining what constitutes 'readily restorable,' " Dissent. Op. at 429, nor even define the boundaries of "readily restorable," but merely found that the weapons they considered fell within a spectrum of weapons that are "readily restorable." Therefore, these precedents do not support the dissent's conclusion that the Defendant weapon cannot be "readily restorable."

AR005283

U.S. v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416 (2006)

2006 Fed.App. 0103P

Alverson additionally argues that the Defendant weapon cannot be "readily restored" because "restore" means to bring back to an original condition, and the Defendant weapon was not brought back to an original condition as it was made from cut-up M–14s. This argument lacks force because the definition of "restore" does not preclude an object from being considered "restored" without returning it to a condition in which it previously existed. Webster's Third New International Dictionary provides several definitions of "restore," one of which—"to bring back to or put back into a former or original state"—matches the definition Alverson cites, and others—"to put or bring back (as into existence or use)" and "to bring back from ... a changed condition"—that are broader and make clear that to be "restored" does not require return to a preexisting state. Webster's Third New International Dictionary 1936. Several courts have so interpreted "readily restored" to encompass weapons that were "originally legal semi-automatic rifles" and only later converted to shoot automatically. *Shilling*, 826 F.2d at 1367; *accord Alverson*, 666 F.2d at 345; *see also S.W. Daniel, Inc.*, 831 F.2d at 254 (approving jury instruction explaining "readily restored" to include "weapons which *have not previously functioned as machine guns* but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts" (emphasis added)).[13]

[13]   Despite the dissent's contention that "restore" means only to return to a preexisting condition, it nonetheless cites *S.W. Daniel* 's approval of this jury instruction to support its conception of "readily." Dissent. Op. at 429 n. 6 (citing *S.W. Daniel*, 831 F.2d at 254).

**\*425** In any event, the M–14 parts from which the Defendant weapon was manufactured had once been part of an M–14 weapon that fired automatically. Therefore, modifying the Defendant weapon to fire automatically would constitute "restoration" even under the narrower definition Alverson offers.

Finally, we reiterate that the Government must only show probable cause to justify the forfeiture, and the Claimant then bears the burden of proving his case by a preponderance of the evidence. *See Any & All Radio Station Transmission Equip.*, 218 F.3d at 548. Therefore, despite the minimal record available to us on review, the testimony by Alverson's own witness that the Defendant weapon could be converted into an automatic weapon in a matter of hours, which the United States submitted in support of its motion, suffices to meet the Government's burden. Alverson's proffered evidence, which consists

solely of this same expert testimony and a letter from MKS describing some of the features of the MKS-modified M–14 receiver, fails to create a genuine issue of material fact, even without consideration of the FTB Report or the ATF Rulings. Based on the evidence presented and the legal definition of "readily restored," no reasonable juror could conclude that the Defendant weapon was not a machinegun under 26 U.S.C. § 5845(b).

**4. Designed to Shoot Automatically**

As our conclusion that the Defendant firearm "can be readily restored to shoot [ ] automatically" is sufficient to classify it as a machinegun and to justify the forfeiture in this case, we decline to consider whether the firearm is also "designed to shoot" automatically.

**III. CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's judgment granting the Government's motion for summary judgment.

GRIFFIN, Circuit Judge, dissenting.

I respectfully dissent. I would hold that the MKS–M14A is not a "machinegun," as defined by 26 U.S.C. § 5845(b), because it cannot "be readily restored to shoot, automatically." Accordingly, I would reverse and remand for further proceedings.

I.

We review de novo the district court's grant of summary judgment. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir.2000).[1] Summary judgment is warranted when there is no genuine issue of material fact **\*426** and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Of course, it is well-established that a

motion for summary judgment must be supported by affidavits, depositions, answers to interrogatories, admissions on file, or other documentary evidence. FED. R. CIV. P. 56(c). In reviewing those materials, "[t]he Court should believe the evidence presented by the nonmovant, and draw all justifiable inferences in his favor." *Cotter v. Ajilon Servs., Inc.,* 287 F.3d 593, 597 (6th Cir.2002) (citing *Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 933–34 (6th Cir.2000)).[2]

---

[1]    I note preliminarily that Congress recently enacted the Civil Asset Forfeiture Act of 2000 (CAFRA). In doing so, Congress intended to "rectify an unfairness to the individual vis-a-vis the government ... by leveling the playing field between the government and persons whose property has been seized." *United States v. Real Property in Section 9, Otsego County,* 241 F.3d 796, 799 (6th Cir.2001). Among other changes, the law corrected a widely criticized "aberration" in the prior forfeiture law that placed the burden of production and persuasion on the *claimant* to prove that the property was *not* subject to forfeiture after the government established mere probable cause. *Id.* In its place, CAFRA implemented the customary burden of production and persuasion in civil actions, which requires the government to prove its case by a preponderance of the evidence. 18 U.S.C. § 983(c)(1). Although CAFRA's language indicating its applicability to any civil forfeiture action brought under any "civil forfeiture statute," 18 U.S.C. § 983(c)(1), suggests its corresponding applicability to this case, CAFRA specifically exempts "the Internal Revenue Code of 1986" from its definition of a "civil forfeiture statute," *id.* § 983(i)(2)(B). Accordingly, because the National Firearms Act is part of Title 26 (the Internal Revenue Code), § 983(i)(2)(B) prevents CAFRA from applying to this case.

[2]    Significantly, the majority ignores this aspect of our summary judgment standard of review.

---

Pursuant to Rule 56(e), an unauthenticated document like the Vasquez report may not be considered.[3] *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir.1993). Without the Vasquez report, we are left to rely on the deposition testimony of claimant's expert, who testified, in pertinent part, as follows:

---

[3]    Notably, the Ninth Circuit is also working to resolve the instant issue. The case of *United States v. One TRW U.S. Rifle, Model 14, 7.62 x 51 mm caliber,* involves the same rifle manufactured by the same company, a similar fact pattern, and the same counsel for appellant. The district court of Arizona issued an order granting summary judgment to the United States declaring that the defendant weapon was forfeitable as a "machinegun." *United States v. One TRW U.S. Rifle, Model 14, 7.62 x 51 mm caliber,* No. CIV 02–264–TUC–RCC (D.Ariz. Apr. 16, 2004). In that case, Officer Vasquez also helped the United States conclude that the defendant weapon was a "machinegun" within the meaning of § 5845(b). Brief of Appellee (No. 04–16049), 2004 WL 3155791, *5–6 (9th Cir. Dec. 16, 2004). The Ninth Circuit recently heard oral argument in this case on February 15, 2006.

---

Q   In making that change [to convert the MKS–M14A to shoot automatically] do you have an estimate of how long it would take you to make that change if you could make that change?

A   I've thought about, you know, the equipment and stuff I would have, if I had the machines available to make the parts to what I would call OM, original manufacturer's specs. You're probably looking at a ballpark of about four to six hours.

This unrebutted evidence establishes that the MKS–M14A *could* be converted by an *expert gunsmith with readily available equipment* to shoot automatically in four to six hours. The issue therefore becomes whether the MKS–M14A, which could be converted by an expert gunsmith with readily available equipment to shoot automatically in four to six hours, is a weapon that, as a matter of law, can "be readily restored to shoot, automatically." 26 U.S.C. § 5845(b).[4] In light of that testimony, alongside the reasons that follow, I conclude that the rifle cannot be "readily restored" to shoot automatically.[5]

---

[4]    Title 26 U.S.C. § 5845(b) provides:

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Pursuant to the National Firearms Act, it is illegal for an individual to possess a "machinegun" that is not registered to him in the National Firearms Registration and Transfer Record. *Id.,* § 5861(d).

[5]    Moreover, when purchasing the MKS–M14A, the

AR005285

manufacturer, MKS Specialties, represented to claimant that the weapon could not be restored to shoot automatically:

> To render the function of this receiver [of the rifle] safe during firing, a piece cut from an auto sear is welded directly to the rear of the receiver to allow for the use of the connecting rod. *By welding this piece to the receiver it makes any modification or conversion to a select fire or full auto weapon impossible without damaging or rendering the receiver useless.* The button which is attached to this section is strictly cosmetic and in no way is it, or can it be converted for full auto use.

(Emphasis added.) Because the government did not object to claimant's submission of the MKS letter, this evidence is unrebutted and, as a result, the government has failed to demonstrate that the MKS–M14A was designed to shoot automatically. *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived ....").

**\*427** II.

The inquiry begins with the fundamental purpose of judicial construction of statutes, which is to ascertain and give effect to the original meaning of the words used by Congress:

> [W]e begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts' "—at least where the disposition required by the text is not absurd—" 'is to enforce it according to its terms.' " *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000).

Where, as here, no statutory definitions exist, courts may refer to dictionary definitions for guidance in discerning the plain meaning of a statute's language. *United States v. Edward Rose & Sons,* 384 F.3d 258, 263 (6th Cir.2004); *Cler v. Ill. Educ. Ass'n,* 423 F.3d 726 (7th Cir.2005); *Cleveland v. City of L.A.,* 420 F.3d 981, 989 (9th Cir.2005). The ordinary, common meaning of the word "readily" is "[i]n a prompt, timely manner; promptly." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 222 (4th ed.2000). Other dictionaries are to the same effect:

> "in a ready manner: as a: without hesitating: WILLINGLY <readily accepted advice> b: without much difficulty: EASILY <for reasons that anyone could readily understand>[,]" MERRIAM–WEBSTER ONLINE DICTIONARY, http://www.m-w.com (enter term "readily");

> "quickly, immediately, willingly or without any problem," CAMBRIDGE ADVANCED LEARNER'S DICTIONARY, http://dictionary.cambridge.org/ (enter term "readily");

> "[i]n a prompt, timely manner; promptly," DICTIONARY.COM, http:// dictionary.reference.com/ (enter term "readily").

Correspondingly, "restorable" means "[a]dmitting of being restored; capable of being reclaimed; as, restorable land." DICTIONARY.COM, http:// dictionary.reference.com/ (enter term "restorable").

Although the majority recites a variety of similar definitions for the term "readily," it thereafter relies on the "modifiers" contained in those definitions to conclude that the term "encompass[es] several elements of restoration[.]" This approach clouds the issue and opens the door to future extensions of the word "readily" in **\*428** contravention of the objective understanding of the word. In my view, it defies common sense to conclude that a process that takes in excess of four to six hours is "a process that is *fairly* or *reasonably* efficient, quick, and easy ...." *Id.*

Moreover, the majority's analysis of whether the MKS–M14A could be restored to shoot automatically fails to adequately explain how the defendant weapon, which is a new and entirely separate weapon from the M14, could be "restored" in any fashion. "Restoration" acts to "return[ ] something to its earlier good condition or position." CAMBRIDGE ADVANCED LEARNER'S DICTIONARY, http:// dictionary.cambridge.org/ (enter term "restoration"). Although no "earlier" version of the MKS–M14A exists, the majority relies on "broader"

definitions for the term "restored" in an effort to explain that an item need not "return to a preexisting state[ ]" to render it "restored." Like its efforts to define "readily," the majority's approach to the term "restore" further clouds the issue and again assigns to the term a definition without boundaries. For example, pursuant to the majority's limitless definition of "restore," even a single shot weapon is now conceivably subject to forfeiture. Indeed, the skilled technician who is somehow capable of converting a single shot weapon to fire automatically has "restored" the weapon to shoot automatically because, according to the majority, restoration "does not require return to a preexisting state." *Id.*

Considering the dictionary definitions for the words "readily" and "restored," I reject the conclusion reached in *United States v. Smith,* 477 F.2d 399, 400 (8th Cir.1973), that a firearm is readily restorable to shoot automatically when it takes eight hours to rebuild and reconstruct the rifle by an expert gunsmith in a machine shop. Similarly, I reject the majority's reliance on *Smith* to reach its conclusion that a somewhat lesser time frame satisfies the "readily restorable" language in § 5845(b).

### III.

The conclusion reached in *United States v. Smith* that a rifle can be readily restored is contrary to the weight of recent authority. For example, the district court in *United States v. Aguilar–Espinosa,* 57 F.Supp.2d 1359 (M.D.Fla.1999), defined "readily restorable" as a "less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers ... but excluding, for example, the resources available to a master machinist ..." *id.* at 1362. *Accord United States v. Seven Misc. Firearms,* 503 F.Supp. 565, 573–74 (D.D.C.1980) (finding weapon was not "readily restorable" because to accomplish such a procedure would require more than four hours in a shop with appropriate tools, expert gunsmith services, and the sum of roughly $65,000).

Other courts have likewise adopted similar tests for defining what constitutes "readily restorable." *See, e.g., United States v. Woodlan,* 527 F.2d 608, 609 (6th Cir.1976) (finding weapon "readily restorable" because it was "capable of being modified in two minutes to fire

automatically"); *United States v. Woods,* 560 F.2d 660, 664–65 (5th Cir.1977) (finding weapon was "readily restorable" because merely connecting two pieces with a "minimum of effort" rendered it operable); *United States v. Catanzaro,* 368 F.Supp. 450, 453 n. 3 (D.Conn.1973) (finding weapon "readily restorable" because it required only $15 worth of easily obtainable replacement parts and one hour of assembly); *United States v. Alverson,* 666 F.2d 341, 345 (9th Cir.1982) (finding sufficient evidence that **\*429** defendant possessed a "readily restorable" machinegun because it would convert to fully automatic if the "disconnect" were filed down or shaved off); *F.J. Vollmer Co., Inc. v. Higgins,* 23 F.3d 448, 452 (D.C.Cir.1994) (analyzing whether "critical features" of the weapon would be required to render the weapon "readily restorable").

Applying the dictionary definitions of "readily restorable" in conjunction with the foregoing caselaw survey highlights the anomalous nature of the Eighth Circuit's decision in *United States v. Smith,* 477 F.2d at 400. *Accord Aguilar–Espinosa,* 57 F.Supp.2d at 1362 (noting *Smith* "presses the notion of 'ready restoration' near or beyond its distal boundary").[6] The majority's reliance on that decision is therefore misplaced.

[6]    The majority seeks to distinguish the *Aguilar–Espinosa* court's criticism of the *Smith* decision by noting the *Aguilar–Espinosa* court's "understanding of 'readily restored' is based on its impressionistic concept of this term formulated almost entirely from whole cloth" and, as a result, the majority designates the *Aguilar–Espinosa* court's definition as dicta. Although the majority criticizes the *Aguilar–Espinosa* decision, it nevertheless relies on *Aguilar–Espinosa* to support its definition of "readily restored."
On the merits, the authorities cited by the *Aguilar–Espinosa* court support that court's definition of "readily restorable." Indeed, the court in *S.W. Daniel, Inc. v. United States,* 831 F.2d 253 (11th Cir.1987), affirmed the district court's use of a jury instruction, which cited § 5845(b) almost verbatim, and then emphasized that only a "simple modification" was required to qualify the weapon as a machinegun, *id.* at 254. Similarly, in *United States v. Woods,* 560 F.2d 660 (5th Cir.1977), the court concluded that a weapon was "readily restorable" because merely connecting two pieces with a "minimum of effort" rendered it operable, *id.* at 664–65. Finally, we recognized in *United States v. Woodlan,* 527 F.2d 608 (6th Cir.1976), that a weapon was "readily restorable" because it was "capable of being modified in two minutes to fire automatically [,]" *id.* at 609. The three cases relied upon by the *Aguilar–Espinosa* decision therefore squarely support the court's definition of "readily restorable."
The majority asserts, in conclusory fashion, that "the Defendant weapon potentially satisfies even this definition [provided by the *Aguilar–Espinosa* court] of

AR005287

U.S. v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416 (2006)

2006 Fed.App. 0103P

'readily restored.' " Because the majority declines to accompany that statement with any governing legal authority, it is difficult to discern how a six-hour timetable for reconstructing the defendant rifle would satisfy the *Aguilar–Espinosa* court's definition of "readily restorable" which focuses on simplicity and expediency.

#### IV.

Finally, I note that the available legislative history supports my position. Although I am mindful of the limited utility and reliability of legislative history, *see Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545U.S. 546, ——, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005), it nonetheless reveals that " 'readily restored to shoot' is intended to mean that *only a simple mechanical operation* is required to restore a weapon to a capacity of fully automatic fire." Omnibus Crime Control and Safe Streets Act of 1967, H.R. 1097, 90th Cong. § 911(b)(1968)

(emphasis added). Consistent with the dictionary definition of "readily," this brief legislative history reflects the need for courts to focus on the expediency of the process involved to restore the weapon.

#### V.

For these reasons, I respectfully dissent. Viewing the evidence in the light most favorable to Alverson and drawing all reasonable inferences in his favor, *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), I would reverse and remand for further proceedings.

**All Citations**

441 F.3d 416, 2006 Fed.App. 0103P

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005288

854 F.Supp.2d 1
United States District Court,
District of Columbia.

FIREARMS IMPORT/EXPORT ROUNDTABLE
TRADE GROUP,
and
Timothy Bero, Plaintiffs,

v.

B. Todd JONES, Director of the Bureau of
Alcohol,
Tobacco, Firearms and Explosives, et al.,
Defendants.
Civil Action 11–547(BJR).
|
March 12, 2012.

## Synopsis

**Background:** Business organization providing support to importers and exporters of firearms and related items and president of importer and exporter of firearms and firearms accessories brought action for declaratory and injunctive relief against Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), ATF's director, Attorney General, and Department of Justice (DOJ) based on alleged violations of Administrative Procedure Act (APA) and Fifth Amendment, claiming that AFT improperly denied president's applications to import firearms barrels, that ATF's interpretation of Gun Control Act (GCA) was unlawfully promulgated and was arbitrary, capricious, and erroneous interpretation of statute, and that applicable GCA provision was unconstitutional. Defendants moved to dismiss, or, alternatively, for summary judgment.

**Holdings:** The District Court, Barbara J. Rothstein, J., held that:

supplementation of the administrative record was not warranted;

ATF's open letter announcing its changed interpretation of GCA provision was interpretive rule exempt from notice and comment requirement under APA;

ATF's denial of president's import applications was reasonable;

GCA did not allow for exception, for repair or replacement components, to prohibition on importation of any frame, receiver, or barrel of firearms that would be barred if assembled;

ATF provided requisite reasoned explanation for its changed interpretation of statute restricting importation of component parts of non-importable firearms;

plaintiffs lacked standing to challenge GCA as unconstitutionally vague; and

takings claim was premature.

Motion to dismiss granted.

## Attorneys and Law Firms

**\*6** Mark Lee Shaw, Jeremy N. Spitzer, Michael A. Danforth, Shaw Law Ltd., Waukegan, IL, Robert Ernest Sanders, Law Office of Robert Ernest Sanders, Winston Salem, NC, for Plaintiffs.

Michael Andrew Zee, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

BARBARA J. ROTHSTEIN, District Judge.

Plaintiffs Firearms Import/Export Roundtable Trade Group ("FAIR") and Timothy Bero, the president of North West Imports (collectively, "plaintiffs")[1], bring this action against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("the ATF") and its director B. Todd Jones[2] as well as Attorney General Eric Holder and the Department of Justice (collectively, "defendants") alleging violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 *et seq.,* and the Fifth Amendment of the United States Constitution.[3] Plaintiffs claim that the ATF improperly denied Bero's applications to import firearms barrels and that ATF's **\*7** interpretation of the governing provisions of the Gun Control Act ("GCA" or "the Act") was unlawfully promulgated and is an arbitrary, capricious and erroneous interpretation of the statute. They also allege that the

applicable GCA provision is unconstitutional. Defendants move to dismiss plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, in the alternative, for summary judgment. Upon a review of defendants' motion, the opposition thereto, and the record of this case, the Court concludes defendants' motion should be granted.

1    FAIR is a business organization that "provide[s] importers and exporters of firearms, firearm parts, firearm accessories, and ammunition with relevant and timely information regarding changes to federal, state and business dynamics" and that "work[s] to minimize risks for entities engaged in the trade." Compl. ¶ 1. North West Imports is "an importer and exporter of firearms and firearms accessories. *Id.* at ¶ 2. Bero is a member of FAIR. *Id.*

2    On August 30, 2011, B. Todd Jones was appointed as the Acting Director of ATF, succeeding the previous Acting Director, Kenneth Melson, whom plaintiffs named as a defendant in their complaint. Pursuant to Federal Rule of Civil Procedure 25(d), Jones has been substituted as a defendant in his official capacity.

3    Plaintiffs purport to sue Jones and Holder in their individual capacities. *See* Compl. ¶¶ 3, 6. Defendants counter that government officials cannot be sued in their individual capacity where a complainant seeks only declaratory or injunctive relief. Plaintiffs do not respond to this argument in their opposition. In failing to defend this aspect of their complaint, plaintiffs have conceded defendants' point. *See Cnty. Bd. of Arlington v. U.S. Dep't of Transp.,* 705 F.Supp.2d 25, 29 (D.D.C.2010) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (quoting *Hopkins v. Women's Div., Gen. Bd. of Global Ministries,* 238 F.Supp.2d 174, 178 (D.D.C.2002)). Accordingly, the Court dismisses plaintiffs' individual-capacity claims against Jones and Holder.

## I. BACKGROUND

**A. Statutory Context**

The GCA governs the importation of firearms. Section 922(1) of the GCA makes it unlawful for any individual to "knowingly import or bring into the United States ... any firearm or ammunition," except as provided for in 18 U.S.C. § 925(d). 18 U.S.C. § 922(1). Section 925(d) provides that the Attorney General "shall authorize" the importation of a firearm if it falls within one of four exceptions to the general prohibition on firearm imports.[4] The exception at issue in this case is for "sporting purpose" firearms.[5] If a firearm is "generally recognized as particularly suitable for or readily adaptable to sporting purposes," and if it is neither a firearm as defined in section 5845(a) of the Internal Revenue Code,[6] nor a surplus military firearm, the Attorney General must authorize it for importation. 18 U.S.C. § 925(d)(3).

4    The Attorney General, who has sole discretion to determine whether a firearm meets this sporting purpose test, has delegated this authority to the Director of the ATF. *See* 28 C.F.R. § 0.130(a) (delegating to the Director of ATF the authority to "[i]nvestigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform other duties as assigned by the Attorney General, including exercising the functions and powers of the Attorney General" under the GCA including 18 U.S.C. § 922(1) (relating to the illegal importation of firearms)); *see also Gun South, Inc. v. Brady,* 877 F.2d 858, 863 (11th Cir.1989) (noting that ATF "must decide whether a firearm is generally suitable for a sporting purpose"); *see also Springfield, Inc. v. Buckles,* 292 F.3d 813, 815 (D.C.Cir.2002); *Demko v. United States,* 216 F.3d 1049, 1054 (Fed.Cir.2000).

5    The other exceptions, which are not at issue in this case, include firearms that will be used for scientific or research purposes, that are unserviceable, or that are a curio or museum piece. 18 U.S.C. § 925(d)(1)-(3).

6    Section 5845(a) is a provision of the National Firearms Act ("NFA") that defines a firearm to include sawed-off shotguns, short-barreled rifles, machineguns, silencers, destructive devices, and certain concealable weapons. *See* 26 U.S.C. § 5845(a). Such an NFA "firearm" is different from a GCA "firearm" which is defined in 18 U.S.C. § 921(a)(3) as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device," 18 U.S.C. § 921(a)(3), and does not include antique firearms. *Id.*

In addition to creating four categories of importable

Firearms Import/Export Roundtable Trade Group v. Jones, 854 F.Supp.2d 1 (2012)

firearms, section 925(d)(3) restricts the importation of the component parts of non-importable firearms, including firearm barrels. In relevant part, it provides that "in any case where the Attorney General has not authorized the importation of the firearms pursuant to this paragraph, **8** it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled." 18 U.S.C. § 925(d)(3). Congress added this provision to section 925(d)(3) in 1986 when it passed the Firearms Owners' Protection Act ("FOPA"). In effect, the FOPA amendment prevents an importer from circumventing the import restrictions on assembled firearms by disassembling a firearm into its component pieces for import and subsequent reassembly.

**B. Regulatory Context**

ATF has rulemaking authority with respect to federal firearms law. *See* 18 U.S.C. § 926; 28 C.F.R. § 0.130(a)(1). Pursuant to this power, the agency has altered its interpretation of the FOPA amendment in at least three instances. Plaintiffs question the permissibility of these changes and the process that ATF followed to implement them.

In 1988, two years after the passage of the GCA, ATF published a final rule implementing section 925(d)(3)'s treatment of the import of non-sporting firearm barrels. The agency drew a distinction between two classes of firearms that was not explicitly established in the statute: it interpreted section 925(d)(3)'s restriction on the import of non-sporting firearms parts to apply to parts for non-importable handguns but not to the parts of long guns.[7] According to the defendants, this interpretation was "generally consistent with the fact that, as of 1988, ATF had applied the sporting purpose test to prohibit the importation of a long gun on only two occasions."[8] Defs.' Mot. to Dismiss or, in the alt., for Summ. Judgment ("Defs.' Mot.") at 5–6.

[7]     Long guns are not defined in the GCA. They are understood to include firearms such as muskets and rifles, *see Parker v. District of Columbia,* 478 F.3d 370, 398 (D.C.Cir.2007), and they are distinct from handguns which the GCA defines as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(29).

[8]     *See* Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles 4 (1989), available at http://www.atf.gov/firearms/industry/july–1989–%20i mportability-of-certain-semiautomatic-rifles.pdf The 1989 Study noted that two "combat-type" shotguns had been found to be non-sporting in 1984 and 1986. *Id.* at 4–5. Other than these two isolated instances, all long guns had been approved for importation so long as they were neither NFA firearms nor surplus military firearms. *Id.* at 4.

In 2001, ATF narrowed the scope of permissible firearm part imports to include only those that were for "repair or replacement" of a long gun lawfully owned in the United States. *See* Administrative Record ("AR") at 5. The agency provided notice of this new interpretation in its Federal Firearms Licensee Newsletter. *Id.* The prohibition on all handgun part imports remained in place. The newsletter directed prospective importers to include in ATF Form 6 (the standard form though which importers apply for importation permits)[9] a representation that "the importation is for repair or replacement only." *Id.*

[9]     Title 27, Section 478.112(b)(1) of the Code of Federal Regulations provides that "[a]n application for a permit, ATF Form 6–Part I, to import or bring a firearm, firearm barrel, or ammunition into the United States ... must be filed ... with the [ATF] Director."

In 2005, ATF eliminated the purpose-dependent, "repair or replacement" exception. After receiving input from the Office of Legal Counsel in the Department of Justice ("OLC")[10] on section 925(d)(3)'s **9** meaning, ATF concluded that the repair or replacement exception did not conform to the governing statute. Accordingly, on July 13, 2005, ATF issued an "Open Letter to Federally Licensed Firearms Importers and Registered Importers of U.S. Munitions Import List Articles" ("July Open Letter") announcing and explaining the change. *See id.* at 24–26. The letter stated that "ATF will longer approve ATF Form 6 application of any frames, receivers, or barrels for firearms that would be prohibited from importation if assembled." It specified that "[n]o exceptions to the statutory language, for example for 'repair or replacement' of existing firearms, will be allowed." *Id.*[11] Since issuance of the letter, ATF has denied applications to import certain parts if they are for a firearm which, when assembled, is not authorized for import.

[10]     While considering proposal of additional regulations on imports ATF solicited the legal opinion of the OLC on the appropriate interpretation of section 925(d)(3). AR at 16–17. In a memorandum to the then-director of the

AR005291

Firearms Import/Export Roundtable Trade Group v. Jones, 854 F.Supp.2d 1 (2012)

ATF, OLC concluded that the statute did not provide a basis for the "repair or replacement" exception to the importation prohibition that ATF had read into section 925(d)(3) in 2001. According to OLC, the exception was not supported by the text of the provision and was based on ATF's past "misapprehension of its authority." *Id.* at 18–23. According to OLC's construal of section 925(d)(3), the provision erected a comprehensive ban on importing any frame, receiver, or barrel of any firearm that was itself non-importable. *Id.* at 18–21.

[11]   The ATF went on to acknowledge in the letter that the agency "recognizes that importers have, in the past, obtained import permit authorizing the important of barrels and receivers for non-importable firearms for "repair and replacement" and may have entered into contracts in reliance upon such authorization." AR at 24–26. Thus, as a mitigation measure ATF declared that it would forgo enforcement of the "import restriction" for 60 days and "allow importers holding existing permits to continue to import barrels and receivers" for 60 days. *Id.* ATF further explained that it believed this amount of time would allow importers to complete the process of importing. *Id.*

## C. Bero's Import Permit Applications
In November 2010, Bero applied to ATF for two permits to import two different types of barrels: 900 "MG–34 Machine Gun Barrels" and 1000 "Scorpion Machine Pistol Barrels." *Id.* at 27–28; 30–31. The parties do not dispute that both were barrels of firearms that GCA prohibited from import in assembled form. Bero indicated in ATF Form 6 that the "Specific Purpose of Importation" for both prospective barrel imports was "Resale." *Id.* at 27, 30. In no part of the application did Bero represent that the components he sought to import were intended for use as repair or replacement parts. The ATF denied each of the two applications in two separate letters, which it sent to Bero in January 2011. *Id.* at 29, 32.

## D. Plaintiffs' Complaint
 Plaintiffs allege that the defendants have violated the APA and the Fifth Amendment. Plaintiffs' APA claims fall into two categories. First, they contend that defendants violated section 553 of the APA when they

failed to provide the public with notice and an opportunity to comment prior to the issuance of the July Open Letter. Second, plaintiffs allege that defendants acted arbitrarily and capriciously and under an erroneous interpretation of the law in violation of section 706 of the APA when they denied Bero's application to import barrels and when they promulgated the July Open Letter. *See* Compl. ¶¶ 45, 46.[12] Plaintiffs assert that their inability **10** to import repair parts as a result of this reinterpretation has harmed their businesses.[13]

[12]   Plaintiffs' articulation of this core claim is garbled at best. Although the plaintiffs do not state as much, the Court construes their claim as a challenge to the ATF's adjudication under 5 U.S.C. § 706(2)(A). Plaintiffs' cite ATF denials of Bero's two 2010 permit applications in support of their claim that the ATF's February 27, 2012 elimination of the repair and replacement exemption. *See* Compl. ¶ 214.

[13]   FAIR satisfies the requirements for associational standing because at least one member the association would have standing to sue in its own right; the interests they seek to protect are germane to FAIR'S purpose; and neither the claim asserted nor the relief requested requires that an individual member participate in this suit. *Lake Carriers' Ass'n v. E.P.A.,* 652 F.3d 1, 5 n. 3 (D.C.Cir.2011) (citing *Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C.Cir.2002)).

Plaintiffs' constitutional claims appear to take three forms. First, they allege that the GCA is "unconstitutionally vague and ambiguous for a statute with criminal implications." *Id.* ¶ 324. As well, plaintiffs assert that the statute is unconstitutionally "overbroad." *Id.* ¶ 325. Finally, they argue that defendants violated the Takings Clause of the Fifth Amendment when they eliminated plaintiffs' ability to import firearms barrels that were previously permitted.

As relief from defendants' allegedly unlawful conduct, plaintiffs ask the Court to declare that defendants violated the APA and the "rights of plaintiffs to the rule-making process" and that plaintiffs have the "legal right to import the barrels in question." *Id.* at 17. Further, they request both a "temporary and permanent injunction," against defendants which would prohibit defendants from "denying Plaintiffs permits for the importation of the disputed barrels without first having complied with the [APA]." *Id.* at 19. Finally, they ask the Court to "strike the portions of the GCA that are unconstitutionally vague" and that are being "mis-interpreted by the Defendants." *Id.* at 27.

AR005292

## II. LEGAL STANDARDS

### A. Standard of Review

In reviewing an administration action, the role of the district court is to "sit as an appellate tribunal" and review the case as a matter of law. *Marshall Cnty. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C.Cir.1993); *accord Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C.Cir.2001). When an agency's findings are at issue, the question of law is "whether [the agency] acted in an arbitrary and capricious manner." *Univ. Med. Ctr. v. Shalala,* 173 F.3d 438, 440 n. 3 (D.C.Cir.1999). Indeed, "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cnty.,* 988 F.2d at 1226. When the constitutionality of an agency's action and not the rationality of its findings is challenged, a district court determines whether the agency based its decision on the appropriate constitutional standard. 5 U.S.C. § 706; *United Space Alliance v. Solis,* 824 F.Supp.2d 68, 77–78 (D.D.C.2011) (citing *Crowell v. Benson,* 285 U.S. 22, 60, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).

### B. Subject Matter Jurisdiction

Rule 12(b)(1) addresses a court's subject matter jurisdiction to adjudicate a case. Courts have an affirmative obligation to ensure that they have subject matter jurisdiction over a case and are therefore acting within the scope of their authority in entertaining the claims before them. *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. 2d § 1350). "The plaintiff bears the burden of establishing that the court has jurisdiction." *White v. United States,* 791 F.Supp.2d 156, 159 (D.D.C.2011) (quoting *Grand Lodge,* 185 F.Supp.2d at 13).

**\*11** In deciding a Rule 12(b)(1) motion, a court need not limit itself to the allegations of the complaint. *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [sic] whether it has jurisdiction in the case." *Scolaro v. D.C. Bd. of Elections and Ethics,* 104 F.Supp.2d 18, 22 (D.D.C.2000) (citing *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C.Cir.1992)); *see also Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987).

### C. Failure to State a Claim

In contrast to Rule 12(b)(1), the Court's evaluation of a plaintiff's claims under Rule 12(b)(6) assumes all factual allegations contained in the complaint are true and gives the plaintiff the benefit of all favorable inferences that can be drawn from the facts alleged. *See Equal Em't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997). To survive a motion to dismiss, a complaint must contain " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). As well, it must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

## III. ANALYSIS

### A. The Court Declines to Consider Plaintiffs' Proposed Additions to the Administrative Record and Untimely Claims

Before considering the substance of plaintiffs' claims the Court must first delineate the administrative record and the claims that are properly before the Court. In their opposition to defendants' motion and in two separate motions, plaintiffs have sought to supplement the administrative record[14] with two additional documents: (1) an Open Letter sent on November 22, 2005 ("November Open Letter") from the ATF to firearm importers (the same audience as for the July Open Letter), which explains the requirements prospective importers must meet to import dual use barrels and (2) a letter from the

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    33

ATF to Bero on October 3, 2011 regarding his inquiry about the assembly of two prototype semiautomatic firearms. Defendants assert that the Court should not consider these submissions because they involve new allegations that were raised for the first time in plaintiffs' opposition. *See* Defs.' Reply at 3–6. Judge Amy B. Jackson granted plaintiffs' motions. *See* Order of Oct. 17, 2011; Order of November 22, 2011. Subsequently, upon leave of the Court, defendants filed an opposition to plaintiffs' two motions. After reviewing defendants' opposition paper, which was not before Judge Jackson when she initially granted plaintiffs' motions, the Court concludes that it will not consider plaintiff's submissions in resolving plaintiffs' APA claims.

[14]   Plaintiffs mistakenly titled these two filings as "motions to cite additional authority." The documents they attach do not constitute legal authority but rather purported evidence that they wish this Court to consider. The Court therefore construes plaintiffs' submissions as motions to supplement the administrative record.

   In this Circuit, courts grant motions to supplement the administrative record **\*12** in a limited set of circumstances. *See Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 698 (D.C.Cir.1991); *Holy Land Foundation for Relief and Development v. Ashcroft,* 219 F.Supp.2d 57, 65–66 (D.D.C.2002). These includes cases in which: (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review. *American Wildlands v. Kempthorne,* 530 F.3d 991, 1002 (D.C.Cir.2008) (citing *James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1095 (D.C.Cir.1996)).

   Here, no such grounds for record supplementation exist. Plaintiffs have not demonstrated—or even alleged—that either letter fits within any of the exceptions. More fundamentally, neither document is relevant to plaintiffs' claims. Their complaint challenges the ATF's elimination of the repair or replacement exception. Without amending their complaint, plaintiffs cannot now challenge other ATF policies. "It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Service,* 297 F.Supp.2d 165, 170 (D.D.C.2003) (citations omitted); *accord Roberts v. Napolitano,* 792 F.Supp.2d 67, 73 n. 3 (D.D.C.2011). Thus, plaintiffs' new assertions about the ATF's dual use barrel policy, as

expressed in the November Open letter, and its policy on assembly (not importation) of firearms, as applied in the October letter, are not properly before the Court. Accordingly, the Court will not consider the letters or the untimely allegations that plaintiffs advance in their motions to supplement the record. With the scope of the administrative record established and the plaintiffs' allegations cabined to those contained in the complaint, the Court turns to the substance of plaintiffs' claims and defendants' motion.

## B. ATF Was Not Required To Undertake Notice and Comment Before Issuing the July Open Letter

Plaintiffs argue that the July Open Letter was a legislative rule which, under the APA, must undergo notice and comment. *See* 5 U.S.C. § 553. In light of this requirement, ATF allegedly violated the APA when it failed to give notice and solicit public comment on its proposed changes to section 925(d)(3) interpretations. Defendants counter that the change articulated in the July Open Letter was an interpretative rule that is exempt from the notice and comment requirement. Defendants' arguments are well taken.

   Under the APA, an agency is required to give notice of a proposed rulemaking and provide the public with an opportunity to comment on the proposed rule unless that rule is "interpretative." 5 U.S.C. § 553(b)(3)(A), (c). "[W]ithout notice and comment" an agency may issue an interpretation that "changes a prior statutory interpretation." *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C.Cir.1997). The question here, therefore, is whether or not the July Open Letter constitutes an interpretive (as opposed to a legislative) rule.[15] Based on its reading of the letter, the GCA, and the applicable regulations, the Court concludes that it is interpretive **\*13** and therefore exempt from the APA's section 553 notice and comment requirement.

[15]   Legislative rules are also referred to as "substantive" rules. *See Cent. Tex. Tel. Co-op., Inc. v. F.C.C.,* 402 F.3d 205, 210 (D.C.Cir.2005) (noting preference for the term "legislative rule").

   In this Circuit, courts have drawn numerous lines between interpretive and legislative rules. *See, e.g., Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579, 587–88 (D.C.Cir.1997) (noting that "it is quite difficult to draw a line between substantive and interpretative rules" and citing *American Mining*

AR005294

*Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1108–09 (D.C.Cir.1993)); *American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1046 (D.C.Cir.1987). The D.C. Circuit Court of Appeals has established that a rule is legislative "only if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue." *Am. Postal Workers Union, AFL–CIO v. U.S. Postal Service,* 707 F.2d 548, 558 (D.C.Cir.1983); *accord Syncor,* 127 F.3d at 95 (concluding that the "crucial distinction" appears to be that "a [legislative] rule modifies or adds to a legal norm based on the agency's own authority," and "[t]hat authority flows from congressional delegation to promulgate [legislative] rules, to engage in supplementary lawmaking."). By contrast, an interpretive rule is a "rule[ ] or statement [ ] issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Am. Mining Cong. v. Mine Safety & Health Admin.,* 995 F.2d at 1109 (D.C.Cir.1993) (quoting ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT, 30 n. 3 (1947)).[16] In addition, a rule is legislative if it "repudiates or is irreconcilable with" a prior legislative rule or if it amends a legislative rule. *Cent. Tex. Tel. Co-op., Inc.,* 402 F.3d at 211 (internal citations omitted).

[16]   Plaintiffs' argument that the ATF's July Open Letter was legislative because it affected their rights is incorrect. "[I]nterpretative and substantive rules may both vitally affect private interests," and the "impact of agency action is not helpful in determining whether [the] action is interpretative or substantive." *Cabais v. Egger,* 690 F.2d 234, 237, 238 (D.C.Cir.1982). As the D.C. Circuit Court of Appeals found in a case in which the agency's room for interpretation was broader than the ATF's in this case: "[t]he Department's interpretation of its regulation, of course, has real consequences. But that is always true when a Department or agency selects an interpretation of an ambiguous statute or rule, and often we acknowledge a government agency's right to do so as an 'interpretative' rule without notice and comment." *Paralyzed Veterans* at 588 (citing *Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1308 (D.C.Cir.1991)). Thus, plaintiffs' proposed test must be rejected.

In this case, the July Open Letter meets neither test. In promulgating the letter, the ATF did not invoke its power to enact legislative rules under 18 U.S.C. § 926. Rather, it announced the agency's new interpretation of what it may approve under the strictures of section 925(d)(3), *see* AR at 24 ("ATF has determined that the language of 18 U.S.C. § 925(d)(3) permits no exceptions that would allow frames, receivers, or barrels for otherwise non-importable firearms to be imported into the United States.") and explained that, as a result of this revised

interpretation, the ATF "will no longer approve" import applications for prohibited frames, receivers, or barrels. *Id.* Simply put, the agency conveyed that it would permit "[n]o exceptions" to section 925(b)(3)'s prohibition. *Id.* Because the letter corrected a prior misapprehension of the statute rather than new law promulgated pursuant to the agency's rulemaking authority, declines to find the July Open Letter legislative on this basis.[17]

[17]   Plaintiff cite *Hudson v. F.A.A.,* 192 F.3d 1031 (D.C.Cir.1999) and *Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579, 583 (D.C.Cir.1997) to bolster their misguided contention that an agency must go through notice and comment if it changes its interpretation of a regulation that was enacted through that procedure. This line of argumentation is inapposite here. Those cases involved the agency's interpretation of its own regulation, rather than of a statute it was charged to administer. The D.C. Circuit Court of Appeals has noted that "[a]n interpretative rule ... typically reflects an agency's construction of a *statute* that has been entrusted to the agency to administer." *Syncor,* 127 F.3d at 94 (emphasis added). This is precisely the scenario before the Court.

**\*14** Likewise, plaintiffs argument that the July Open Letter must be considered legislative because it amends 27 C.F.R. § 478.112 and conflicts with 18 U.S.C. § 922(r) and 27 C.F.R. § 478.39 is without merit. The letter is consistent with the three provisions. With respect to section 478.112, the letter modified no part of the regulation. That regulation provides that "[n]o firearm, firearm barrel, or ammunition shall be imported or brought into the United States by a licensed importer as defined in 27 C.F.R. § 478.11 unless the Director has authorized the importation of the firearm, firearm barrel, or ammunition." 27 C.F.R. § 478.112. Both the July Open Letter and this regulation allow an individual to import a handgun barrel so long as the handgun is importable under section 925(d)(3).[18] As well, the July Open Letter does not conflict with 18 U.S.C. § 922(r) and 27 C.F.R. § 478.39, which prohibit the *assembly* of non-sporting semiautomatic rifles and shotguns from imported parts. The Court agrees with defendants that section 478.39's grant of permission to use up to ten imported parts in assembling a non-sporting semiautomatic rifle or shotgun does not grant permission to import those parts. Therefore, no inconsistency exists. ATF was not required to undertake notice and comment before publishing the July Open Letter. Accordingly, the Court dismisses plaintiffs' section 553 claim.

[18]   Plaintiffs' statement that section 478.112 "generally provide[s] for the importation of firearm barrels and only prohibit[s] the importation of certain types of handgun barrels" is false. Pls.' Opp'n at 16–17. To the

contrary, the regulation establishes a blanket *prohibition* on importation, subject to ATF Director discretion. In so doing, it does not conflict with the GCA or the July Open Letter. Further, the subsection that plaintiffs cite—27 C.F.R. § 478.112(b)(1)(vii)(F)—merely itemizes information that prospective importers must list in their permit application: "If [the application is for importation of] a firearm barrel for a handgun, [importers must include in the application] an explanation why the handgun is generally recognized as particularly suitable for or readily adaptable to sporting purposes." Under no plausible construal of this language does this provision *authorize* barrel importation.

## C. ATF's Rejections of Bero's Applications and Interpretation of Section 925(d)(3) Are Not Arbitrary, Capricious or Erroneous as a Matter of Law

Plaintiffs argue that ATF's denial of Bero's 2010 applications to import machinegun and machine pistol barrels was arbitrary and capricious because it was "opposite to the actions and stated interpretation taken by Defendants since 1968, when Congress passed the GCA." Compl. ¶ 214. They assert that "an entire industry relied upon the ATF's [prior] interpretation of Section 925(d)(3)" and that they have "effectively had the rug pulled out from under them" when the ATF changed this interpretation. Pls.' Opp'n at 27. Defendants counter that ATF's interpretation and application of section 925(d)(3) to Bero's permit application was both consistent and correct. Defendants' argument prevails.

Agency action is arbitrary and capricious if the agency, in arriving at its decision, "relied on factors which Congress **\*15** has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Air Transport Ass'n of Am., Inc. v. National Mediation Bd.,* 719 F.Supp.2d 26, 30 (D.D.C.2010) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856. Agency action under review is "entitled to a presumption of regularity" and courts must consider only whether the agency

decision was based on relevant factors and whether there has been a clear error of judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As discussed below, the ATF acted within the bounds of these broad parameters when it eliminated the repair and replacement exception.

### 1. The ATF's Adjudication of Bero's Application Was Neither Arbitrary Nor Capricious

Both of ATF's 2011 rejections of Bero's applications to import barrels were reasonable. Indeed, the GCA compelled them. The record demonstrates (and the parties do not dispute) that Bero applied to import the barrels for "Resale" not for repair or replacement. *See* AR at 27, 30. Thus, even under ATF's pre–2005 interpretation of section 925(d)(3), the agency would have denied his application. Contrary to plaintiffs' arguments, defendants acted consistent with both pre- and post–2005 ATF readings of the GCA. Because the record reveals no inconsistency of agency action with regard to Bero's application to import the barrels for resale, the Court finds no arbitrary or capricious treatment of his application. Accordingly, it dismisses this claim.

### 2. The July Open Letter is a Correct Interpretation of the GCA

#### a. The Plain Text of Section 925(d)(3) Unambiguously Prohibits a Repair and Replacement Exception

Plaintiffs argue that the GCA is ambiguous with respect to the repair or replacement exception and that the ATF has interpreted section 925(d)(3) incorrectly. They rely on the plain language as well as the fact that the agency has changed its interpretation of it on several occasions. The defendants counter that section 925(d)(3) forecloses the repair or replacement exception (thereby conceding that the ATF's prior interpretation was incorrect) and that the frequency of interpretive modifications is of no moment because the agency has sufficiently justified them. The Court agrees with defendants.

In keeping with its role as an appellate tribunal reviewing agency action, *see Marshall Cnty. Health Care Auth.,* 988 F.2d at 1226, the Court applies the "familiar

two-step framework" to the question of ATF's interpretation of the section 925(d)(3). *Sherley v. Sebelius,* 644 F.3d 388, 393 (D.C.Cir.2011) (citing *Chevron USA Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Under the *Chevron* rubric, courts must at "step one" "give effect to the unambiguously expressed intent of Congress." *Id.* If, instead, the "statute is silent or ambiguous with respect to the specific issue," then the Court continues to "step two" and defers **\*16** to the administering agency's interpretation so long as it reflects "a permissible construction of the statute." *Id.* At *Chevron* step one, the Court examines the plain meaning of the text, "looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Blackman v. District of Columbia,* 456 F.3d 167, 176 (D.C.Cir.2006) (internal quotation marks omitted). If the statute has a plain and unambiguous meaning, the court's inquiry ends "so long as the resulting statutory scheme is coherent and consistent. *Id.* (internal quotation marks omitted). In short, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778.

Here, the Court concludes that the statute is clear: no "repair or replacement" exception can be read into the text. The text is unambiguous. In full, section 925(d)(3) provides that the Attorney General "shall authorize" a firearm for import if it is:

> of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1986 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms, except in any case where the Attorney General has not authorized the importation of the firearms pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.

Plaintiffs argue that ambiguity exists as to both the scope of the prohibition and the meaning of "of such firearm." They are wrong.

To discern the text's plain meaning, the Court first turns to the scope of the FOPA amendment's treatment of component parts—i.e. the exception for "any case" where the Attorney General has not authorized the importation of firearms. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.' " *TRW Inc. v. Andrews,* 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980)). As well, "[i]n a series of cases, the Supreme Court has drawn upon the word 'any' to give the word it modifies an 'expansive meaning' when there is 'no reason to contravene the clause's obvious meaning.' " *New York v. EPA,* 443 F.3d 880, 885 (D.C.Cir.2006) (internal citations omitted).[19] It is "usually **\*17** understood to be all inclusive." *Natural Res. Def. Council,* 489 F.3d at 1257 (citing *Fin. Planning Ass'n v. SEC,* 482 F.3d 481, 488 (D.C.Cir.2007)).

[19]   To be sure, in other circumstances, "any" can be given a less expansive meaning than usual. *See e.g., Small v. United States,* 544 U.S. 385, 388–94, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005) (holding that the term "any court," as used in 18 U.S.C. § 922(g)(1), was limited to domestic courts because that Congress "ordinarily intends its statutes to have domestic, not extraterritorial, application," and because reading the statute to include foreign courts would create anomalies that Congress could not have intended); *Nixon v. Missouri Municipal League,* 541 U.S. 125, 133, 124 S.Ct. 1555, 158 L.Ed.2d 291 (2004) (reading the term "any entity" in a federal preemption to exclude public entities, since a separate reading would lead to "strange and indeterminate results" that would have raised federalism concerns over a state's authority to regulate its own political inferiors). None of these limited exceptions apply in this case. There are no analogous background considerations, such as extraterritorial application or federalism that would compel a narrower reading of "any frame, receiver, or barrel." 18 U.S.C. § 925(d)(3). In addition, as defendants notes, the interpretation plaintiffs promote would not, narrow the application of section 925(d)(3) to a subset of frames, receivers, or barrels that could have been defined in advance. Instead, their interpretation could be applied to every imported frame, receiver, or barrel, depending on its intended use for repair or replacement. As defendants rightly maintain, such a reading is untethered from the textual reference to "any frame, receiver, or barrel."

Applying this basic meaning to section 925(d)(3)'s text, the Court finds that the prohibition is expansive: "in *any* case where the Attorney General has not authorized the

AR005297

importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver or barrel of such firearm which would be prohibited if assembled." 18 U.S.C. § 925(d)(3). In effect, if the Attorney General has not authorized importation of a sporting purpose firearm, it is "unlawful to import any frame, receiver or barrel of such firearm which would be prohibited if assembled." 18 U.S.C. § 925(d)(3). Congress did not—and the ATF may not—create an additional exception. *See Natural Res. Def. Council v. EPA,* 489 F.3d 1250, 1259–60 (D.C.Cir.2007) (concluding that EPA may not create an exception for air pollutant regulation when the statute does not provide for such an exception); *Indiana Michigan Power Co. v. Dept. of Energy,* 88 F.3d 1272, 1276–77 (D.C.Cir.1996) (finding Department of Energy may not "rewrite" a statute and vacating its decision). The statute's text provides no exception for repair or replacement components.

As a rejoinder, plaintiffs contend that the statute is ambiguous as to which types of firearm components are prohibited. Specifically, they claim in their opposition brief that "barrel of such a firearm" is "speculative." Pls.' Opp'n at 29. The defendants dispute such ambiguity, arguing that the descriptor attached to "barrel of such a firearm"—i.e."would be prohibited if assembled"—refers to firearms that the section would bar from import in assembled form.[20] The Court agrees with defendants. As defendants assert, the preceding statutory language from which "barrel of such firearm" derives the limits of its meaning—a firearm that the Attorney General "has not authorized the importation of"—resolves any ambiguity. "[S]uch firearm" refers to a firearm whose importation the Attorney General has not authorized. 18 U.S.C. § 925(d)(3). Further, the language following the phrase "barrel of such firearm"—i.e., "which would be prohibited if assembled"—does not list the kinds of barrels that are prohibited from importation. Rather, it confirms that a firearm whose importation has not been authorized would be prohibited from importation if assembled. In sum, although the statute is not the model of textual clarity, the Court does not find ambiguity with respect to the repair or replacement question.

[20]    Plaintiffs also assert the fact that a barrel may be assembled into either an importable or a non-importable firearm, arguing that "it requires a total suspension of common sense to prohibit ... the importation of items with lawful commercial value." Pls.' Opp'n at 30. This argument makes no sense. As defendants point out to the extent that plaintiffs argue that a barrel imported for assembly into an importable firearm is prohibited under ATF's interpretation of § 925(d)(3), they are mistaken. Such a barrel would not be the 'barrel of [a NFA firearm, a non-sporting firearm, or a surplus military firearm] which would be

prohibited if assembled,' and there would thus be no prohibition against importing it. 18 U.S.C. § 925(d)(3). Defs.' Rep. at 14–15

In light of these findings, the Court cannot agree with plaintiffs that **\*18** ATF is "left with the unfettered discretion to decide what is importable and what is prohibited." Pls.' Opp'n at 30.[21] To the contrary, the agency is bound by the broad statutory limitation on firearm component imports. Therefore, at *Chevron* step one, the Court concludes that the GCA is unambiguous in its command that ATF cannot grant importation exceptions for repair or replacement firearms parts.

[21]    Despite plaintiffs' urging, the Court finds examination of the FOPA's legislative history is unwarranted. "While legislative history can be used to clarify congressional intent even when a statute is superficially unambiguous, the bar is high." *Consumer Elecs. Ass'n v. F.C.C.,* 347 F.3d 291, 298 (D.C.Cir.2003) (citing *Williams Cos. v. FERC,* No. 02–5056, slip. op. at 8 (D.C.Cir. Oct. 10, 2003)). Only rarely do courts rely on legislative history to constrict the otherwise broad application of a statute indicated by its text. *See, e.g., Am. Scholastic TV Programming Found. v. FCC,* 46 F.3d 1173, 1180 (D.C.Cir.1995). Indeed, the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application. *See New York v. FERC,* 535 U.S. 1, 21, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002). "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (internal citations omitted). Plaintiffs have not shown otherwise here. Moreover, their legislative history arguments are flawed in several respects (aside from entirely inaccurate citations to the Congressional Record). First, they rely on statements made out of context. For example, as defendants point out, plaintiffs have mischaracterized the context in which Sen. Kennedy made his statement. He was speaking about a provision in the FOPA to restrict the *interstate sale* of assembled handguns, and not about the importation of component parts. Second, they point to letters from Senators that post-date the enactment of FOPA. *See* Compl. ¶ 17. Defendants are correct that, in this Circuit, legislative history from the period after enactment is considered "not only oxymoronic but inherently entitled to little weight." *Cobell v. Norton,* 428 F.3d 1070, 1075 (D.C.Cir.2005); *see also Gen. Instrument Corp. v. F.C.C.,* 213 F.3d 724, 733 (D.C.Cir.2000). Thus, plaintiffs' legislative history arguments are unavailing.

Firearms Import/Export Roundtable Trade Group v. Jones, 854 F.Supp.2d 1 (2012)

#### b. ATF Provided a Reasoned Explanation for Its Altered Interpretation of Section 925(d)(3)

Plaintiffs attack the frequency of the ATF's changes in interpretation of section 925(d)(3) and allege that the agency impermissibly failed to explain the basis for these changes, in violation of the APA. This argument is also unavailing. The ATF's changing interpretation of the GCA may well be a source of uncertainty and frustration for firearms part importers. However, the law is clear that "[a]n administrative agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding." *Chisholm v. FCC,* 538 F.2d 349, 364 (D.C.Cir.1976) (citing *Automobile Club v. Commissioner of Internal Revenue,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *American Trucking v. AT & S F.R. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967)); *see also Prod. Workers Union of Chicago and Vicinity, Local 707 v. N.L.R.B.,* 793 F.2d 323, 328 (D.C.Cir.1986); *Phoenix Hydro Corp. v. F.E.R.C.,* 775 F.2d 1187, 1191 (D.C.Cir.1985). Courts consider such flexibility "commonplace" within administrative law and require only that agencies provide "a reasoned explanation for its decision." *TRT Telecommunications Corp. v. F.C.C,* 857 F.2d 1535 (D.C.Cir.1988) citing *Chisholm,* 538 F.2d at 364. An agency "is not otherwise barred from switching horses in midstream." *Id.* Indeed, it is "at liberty to depart from its longstanding interpretation of a statute."[22] *Id.* In this Circuit, an **\*19** agency meets its obligation to provide a reasoned explanation when it 1) acknowledges its change of interpretation and 2) provides an explanation of the reason for that change. *Dillmon v. Nat'l Transp. Safety Bd.,* 588 F.3d 1085, 1089–90 (D.C.Cir.2009).[23]

[22]   Plaintiffs reliance on the Supreme Court's *stare decisis* rulings is unavailing. They cite two cases for the proposition that "where the Governmental [sic] has for a lengthy period of time interpreted the law in a way that induces reliance upon that interpretation, heavy weight must be placed on the older interpretation." Pls.' Opp'n at 27 (citing *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) and *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). However, as defendants note, *Dickerson* and *Casey* say nothing about whether a federal agency is permitted to adopt a changed interpretation of a statute it is charged to administer. Rather, they dealt with the Supreme Court's ability to overrule its own prior interpretations of the Constitution. The Court rejects this attempt to extend *stare decisis* principles to administrative interpretations of federal statutes.

[23]   Plaintiffs cite cases from the Second Circuit that support this proposition. *See* Pls.' Opp'n at 24. *Huntington Hosp. v. Thompson,* 319 F.3d 74, 79–80 (2d Cir.2003) and *Mr. Sprout, Inc. v. United States,* 8 F.3d 118, 129 (2d Cir.1993), stand generally for the same principle, as does the cited D.C. Circuit Court of Appeals case *Ramaprakash v. F.A.A.,* 346 F.3d 1121, 1124–25 (D.C.Cir.2003).

As the record in this case shows, ATF met these requirements. In no uncertain terms, the agency eliminated the repair and replace exception after concluding that the GCA prohibited it. In accordance with its APA obligations, the agency then notified the firearm importers of the change in the July Open Letter and explained therein that the quoted statutory text "permits no exceptions that would allow frames, receivers or barrels for otherwise non-importable firearms to be imported into the United States." AR at 24. In so doing, ATF met its APA obligations to provide plaintiffs with a reasoned explanation for the agency's elimination of the repair or replacement exception. As a result, because this claim and plaintiffs' other APA claims are unavailing in all respects, the Court dismisses them.

#### D. Plaintiffs Lack Standing to Challenge the GCA on Vagueness Grounds

Plaintiffs allege that the GCA violates their Fifth Amendment right to due process because it is impermissibly vague.[24] Compl. ¶ 324. They do not state that ATF has taken any enforcement action against them. Instead, plaintiffs maintain that they face "possible criminal and civil penalties" for violating section 925(d)(3), *id.* ¶ 98, "possible criminal prosecution," Pls.' Opp'n at 34, and "penalties for using disputed barrels to assemble a legal firearm." *Id.* at 35. As well, plaintiffs contend that the GCA "may be applied to them in ways that cannot be foreseen" and that they "cannot determine what is illegal and what is legal." *Id.* Defendants counter that plaintiffs do not have constitutional standing to assert these claims because they have not been the subject of any enforcement action. Defendants are correct.

[24]   Plaintiffs also allege that the GCA is unconstitutionally overbroad. *See* Compl. ¶ 325. However, they did not respond to defendants' motion to dismiss this claim in any of their subsequent filings. As noted above, *see supra* n. 3, this failure to defend their pleadings amounts to a concession of defendants' arguments in support of dismissal. *See Hopkins v. Women's Div., General Bd. of Global Ministries,* 284 F.Supp.2d 15, 25

AR005299

(D.D.C.2003); *Hoffman v. District of Columbia,* 681 F.Supp.2d 86, 94 (D.D.C.2010) (granting defendant's motion to dismiss a claim because plaintiff failed to respond to its arguments for dismissal).

Article III of the Constitution limits this Court's jurisdiction to "cases and controversies," and courts have interpreted **\*20** this limitation to require adjudication of cases in which, among other requirements, plaintiffs plead that their claims spring from an "injury in fact." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In the preenforcement context, plaintiffs challenging a regulation before they have experienced its enforcement must, at the very least, plead: (1) a "credible statement of intent to commit the violative acts at issue," *Seegars v. Gonzales,* 396 F.3d 1248, 1253 (D.C.Cir.2005), and (2) harm from a credible "threat of prosecution." *Navegar, Inc. v. United States,* 103 F.3d 994, 998, 1000–01 (D.C.Cir.1997) (finding preenforcement standing for certain plaintiffs that the government singled out by name for a potential enforcement action and finding no standing for the companies that challenged portions of a statute describing prohibited weapons only by general characteristics rather than by name).

In this case, plaintiffs fail to furnish either set of facts. Bero does not assert that he intends to violate the law. To the contrary, the record before the Court indicates that he has corresponded with the ATF on numerous occasions to ensure that his imports conform to the law. *See* Defs.' Supp. Mem. in Resp. to Pls.'. Mot to Cite Add. Auth., Exs. A, C. The ATF has responded to his requests for clarification with at least partial answers to his inquiries and without asserting any threat of prosecution. *See id.,* Exs. B, D, E, F. As well, the 2011 ATF denials of Bero's applications do not rise to the level of prosecutorial threat. Indeed, the record contains no evidence of even an intent to investigate plaintiffs, much less a plan to impose criminal or civil penalties for violations of the provisions at issue in this case. In *Seegars,* the D.C. Circuit Court of Appeals found that no standing existed for gun manufacturers' vagueness challenge to a separate GCA provision even when plaintiffs had received various indications that enforcement was imminent, including visits of ATF enforcement officer to their facilities. 396 F.3d at 1248. Here, without so much as a signal of intent to enforce on the part of the ATF, the record shows that plaintiffs' risk of prosecution is far lower. Plaintiffs' some-day assertions that enforcement "may" occur, Pls.' Opp'n at 34, and that "possible" sanctions loom, Compl. ¶ 98, are insufficient. Because plaintiffs have not plead an injury in fact with respect to the allegedly unlawful

statute, they lack constitutional standing, and the Court must dismiss plaintiffs' vagueness claim for lack of subject matter jurisdiction.

**E. Plaintiffs' Takings Claim Is Premature**

Plaintiffs assert that the ATF took their private property without justly compensating them when they denied plaintiffs' ability to import the barrels. This denial, according to plaintiffs, removed "any viable economic or personal use of their property." Compl. ¶ 433. Although the meaning of plaintiffs' "property" is not clear on the face of the complaint, plaintiffs' opposition brief explains that their takings claims is "predicated upon the weapons and property owned and already, legally, imported into the United States," Pls.' Opp'n at 37, and that "[t]hese weapons and weapons parts have been rendered valueless by Defendants' decision to change their interpretation of the statute, and deny Plaintiff the ability to import parts for these weapons." *Id.* Rather than damages, plaintiffs seek only injunctive and declaratory relief. *See* Compl. ¶¶ 29–32; Pls.' Opp'n at 36. Defendants contend that any takings claim is premature because plaintiffs have not sought compensation through the appropriate procedures. Once again, defendants have the better argument.

**\*21** "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (holding that the district court improperly issued an injunction when federal law provided a monetary remedy for the taking); *cf. Turner Broadcasting v. F.C.C.,* 910 F.Supp. 734, 749 (D.D.C.1995) (finding that declaratory and injunctive relief are "a remedy rarely available for takings claims") (citing *Monsanto Co.,* 467 U.S. at 1016, 104 S.Ct. 2862). Indeed, a takings lawsuit is premature if it is brought before plaintiffs have sought compensation in the form of damages. *Preseault v. I.C.C.,* 494 U.S. 1, 11, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). This limitation derives from the principle that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (citations omitted). It follows that "so long as compensation is available for those whose property is in fact taken, the governmental action is not unconstitutional." *U.S. v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 128, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)

Firearms Import/Export Roundtable Trade Group v. Jones, 854 F.Supp.2d 1 (2012)

(citing *id.* at 194–195, 105 S.Ct. 3108).[25]

25    Even if plaintiffs had asserted a takings claim for money damages in this Court or the Court of Federal Claims, it would not survive a motion to dismiss on the current record. In *Lucas v. South Carolina Coastal Council,* the Supreme Court expressly recognized that personal property, "by reason of the State's traditionally high degree of control over commercial dealings," might be rendered "economically worthless" by new regulation without running afoul of the Takings Clause. 505 U.S. 1003, 1027–28, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The Court finds no evidence of such a rendering in this case. Section 925(d)(3) does not regulate plaintiffs' ability to sell, trade, use, or otherwise exploit firearms they already possess. Rather, it restricts the importation of firearm barrels that plaintiffs do not even own. Plaintiffs may still use domestically manufactured firearm parts, including barrels, to repair the firearms that have allegedly been rendered valueless by the import prohibition. Thus, their claim that they are entitled to compensation because their firearms have diminished in value as a result of the elimination of repair and replacement imports cannot stand. No taking has occurred. *See Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (stating that "a reduction in the value of property is not necessarily equated with a taking" and concluding that a statute's prohibition against selling lawfully acquired birds did not effect a taking in violation of the Fifth Amendment because the bird owners still retained rights to possess, transport, donate and devise the animals); *see also Morris v. Runyon,* 870 F.Supp. 362, 371–73 (D.D.C.1994) (rejecting takings claim when plaintiffs asserted diminished value in sheets of stamps they owned as a result of government printing more stamps).

Here, plaintiffs have failed to take the prerequisite step: filing of a suit for damages in the Federal Court of Claims (if they seek $10,000 or more in compensation) or in this Court (if the requested amount is anything less). *See* 28 U.S.C. § 1491(a)(1); 28 U.S.C. § 1346(a)(2).[26] Thus, plaintiffs' takings claim, which seeks only equitable relief, is premature. As a **\*22** result, the Court grants defendants' motion to dismiss it for failure to state a claim upon which this Court can grant relief.

26    The Tucker Act, 28 U.S.C. § 1491(a)(1), provides jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract, and the Little Tucker Act creates concurrent jurisdiction in the district courts for such claims not exceeding $10,000 in amount. 28 U.S.C. § 1346(a)(2); *see also Preseault,* 494 U.S. at 12, 110 S.Ct. 914; *Wisc. Valley Improvement v. FERC,* 236 F.3d 738, 743–44 (D.C.Cir.2001) (finding the Court of Federal Claims has "exclusive jurisdiction" over takings claims).

#### IV. CONCLUSION

For the foregoing reasons, the Court concludes that defendants' motion to dismiss must be granted. Accordingly, on this 12th day of March, 2012, it is hereby

**ORDERED** that [Dkt. # 7] defendants' motion to dismiss plaintiffs' complaint is **GRANTED.**

An appropriate judgment accompanies this opinion.

**All Citations**

854 F.Supp.2d 1

**End of Document**     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005301

18 F.Supp.2d 29
United States District Court,
District of Columbia.

MODERN MUZZLELOADING, INC., Plaintiff,
v.
John MAGAW, Director, Bureau of Alcohol,
Tobacco and Firearms, Defendant.

No. CIV. A. 97–2956(TAF).
|
Aug. 7, 1998.

**Synopsis**
Manufacturer of allegedly "antique rifle" sought declaratory and injunctive relief from Bureau of Alcohol, Tobacco and Firearms' (ATF) classification of rifle as firearm subject to regulation under Gun Control Act (GCA). On parties' cross-motions for summary judgment, the District Court, Flannery, J., held that: (1) arbitrary and capricious standard, rather than rule of lenity, applied to ATF determination, and (2) ATF determination was not arbitrary and capricious.

Summary judgment granted for defendant.

**Attorneys and Law Firms**

*30 Richard E. Gardiner, Fairfax, VA, for Plaintiff.

Wilma A. Lewis, United States Attorney, Kimberly N. Brown, Assistant United States Attorney, Washington, DC, Patricia W. Milgram, David C. Lieberman, Office of Chief Counsel, Bureau of Alcohol, Tobacco and Firearms, for Defendant.

*MEMORANDUM OPINION*

FLANNERY, District Judge.

This matter came before the Court at a hearing on July 24, 1998. In February, the Court considered the parties' cross-motions for summary judgment. The Court denied the motions, remanding to the ATF for further

explanation of its classification of the Knight Disc Rifle. Pending before the Court are the parties' renewed cross-motions for summary judgment. After considering the parties' written submissions, their arguments at the hearing, and the applicable law, the Court grants the defendant's motion for summary judgment and denies the plaintiff's motion.

I. Background
This case involves a challenge to the Bureau of Alcohol, Tobacco and Firearm's ("ATF") decision to classify the Knight Disc Rifle as a firearm for purposes of the Gun Control Act of 1968 ("GCA"), as amended, 18 U.S.C. §§ 921–930. The statute excludes "antique firearms" from the class subject to regulation. Modern Muzzleloading, Inc., the manufacturer of the Knight Disc Rifle, contends that the rifle is an antique firearm that should not be subject to regulation under the GCA. Acting on that view, for the fifteen-month period ending in December 1997, Modern Muzzleloading manufactured and distributed 30,000 Knight Disc Rifles without *31 a license.[1] In this action, Modern Muzzleloading has sued the Director of the ATF, seeking both (1) a declaration that the Knight Disc Rifle is not a firearm for purposes of the GCA and (2) an order enjoining ATF from enforcing its classification of the rifle. Modern Muzzleloading previously sought a preliminary injunction, which the Court denied in its February order.

[1]    Subsequent to the initiation of this lawsuit, the plaintiff did apply for a license, which ATF granted.

*The GCA*
The GCA defines the term "firearm" as "any weapon ... which will or is designed to ... expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). However, "[s]uch term does not include an antique firearm." *Id.* The GCA defines the term "antique firearm" as follows:

(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

(B) any replica of any firearm described in subparagraph (A) if such replica—

AR005302

(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

18 U.S.C. § 921(a)(16). This case turns on whether the Knight Disc Rifle is a replica within the meaning of subparagraph (B). Since it is a currently-manufactured weapon, the rifle cannot qualify directly under subparagraph (A). It is also undisputed that the rifle does not accept either rimfire or conventional centerfire ammunition and that, therefore, subparagraphs (B)(i) and (B)(ii) do not apply. Both parties agree that the term replica should or may be understood by referring to the parenthetical language found in subparagraph (A). Nevertheless, the parties disagree about the scope of this parenthetical and its affect on the determination of what constitutes a replica under subparagraph (B).

*The Knight Disc Rifle*

As this Court discussed in its February decision, the key characteristic of the Knight Disc Rifle is its use of either a percussion cap[2] or a shotgun primer[3] as an ignition system. The rifle is designed so that each of those systems is held in place by a plastic disc with a hole in its center, into which the user inserts the ignition system. Modern Muzzleloading sells two discs for use in the rifle. One, a red disc that actually comes with the rifle, is designed to accept a percussion cap. The other, an orange disc that Modern Muzzleloading sells as an accessory, is designed to accept a shotgun primer. The only difference in the discs is that the hole in the center of the orange disc is slightly larger, because the shotgun primer used in the rifle is slightly larger than a percussion cap. The use of the primer is viewed by the ATF as a defining characteristic in determining whether the Knight Disc Rifle is properly classified as an "antique."

2      A percussion cap is a hollow metallic cup containing an explosive material.

3      A primer contains a pressure sensitive compound that explodes when the primer is struck by the firing pin or striker. Primers are made in various shapes and sizes.

*ATF's Classification of the Knight Disc Rifle*

In October 1997, ATF wrote Modern Muzzleloading, stating that it had received inquiries regarding the status of the Knight Disc Rifle and requesting samples of the rifle and its accessories. After receiving those items from Modern Muzzleloading, ATF examined the rifle. The ATF official who inspected the rifle concluded that "[the Knight Disc Rifle] is designed to use shotgun primers for an ignition system. It is not an antique firearm as defined in 18 U.S.C. § 921(a)(16) and it is a firearm as defined in 18 U.S.C. § 921(a)(3)." ATF Inspection Report, Admin. Record at 16.

The conclusion reached in the report was consistent with the position expressed by the ATF in an industry circular released three weeks before the inspection of the Knight **\*32** Disc Rifle. That circular found that "[m]uzzle loading weapons with 'in line' firing mechanisms designed or redesigned to use modern conventional firearm primers do not meet the definition of antique firearms and are subject to regulation as a firearm.[4] Primers are not an antique ignition system and are ammunition for firearms subject to regulation." ATF Industry Circular, November 6, 1997, Admin. Record at 14.

4      The Knight Disc Rifle has an in-line firing system.

Subsequent to its release of the industry circular and inspection of the Knight Disc Rifle, ATF informed Modern Muzzleloading of its classification decision in a letter dated December 8, 1997. Explaining its view that the Knight Disc Rifle is a firearm, ATF noted that its examination revealed that "the rifle is designed to use # 209 shotgun primers regardless of the type of disc actually used in the rifle."[5] ATF wrote the following:

5      Modern Muzzleloading disputes the accuracy of this conclusion. Nonetheless, ATF's classification of the rifle is independent of whether the red disc can accept a primer, since it is undisputed that the rifle is designed for use with a shotgun primer (using the orange disc).

Such shotgun primers are distinctly different from percussion caps. As defined in [the GCA], the term ammunition means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm. Number 209 shotgun primers are designed for use in "firearms" and the primers are ammunition subject to the provisions of 18 U.S.C. chapter 44. Percussion caps are not ammunition as

defined.

> Based on our examination, the rifle is designed to use shotgun primers or percussion caps interchangeably and is not a replica of an antique firearm. Accordingly, the rifle is a firearm as defined in [the GCA].

Classification Decision Letter dated December 8, 1997. The Court's February 18, 1998 decision found that the ATF was essentially relying entirely on the fact that the GCA defines primers of the type used in the Knight Disc Rifle as ammunition subject to regulation. *Modern Muzzleloading v. Magaw, Inc.,* No. 97–2956, slip op. at 8 (D.D.C. Feb. 18, 1998). The Court stated that this was the only reason that the ATF asserted to support its position that primers are "distinctly different from percussion caps." *Id.* (quoting Classification Decision Letter dated December 8, 1997). Accordingly, the Court remanded to the ATF in order to allow the agency to prepare a more thorough explanation of its classification of the Knight Disc Rifle. *Id.* at 10. The Court also found the GCA ambiguous with regard to whether shotgun primers, as used in the rifle, are an antique ignition system. *Id.*

Following remand in this case, the ATF further examined the classification of the Knight Disc Rifle. By letter dated May 15, 1998, the ATF advised plaintiff that it was reaffirming its classification of the Knight Disc Rifle as a firearm. The ATF explained that the Knight Disc Rifle is not an antique firearm because it is designed to use a modern centerfire shotgun primer as an ignition system. The ATF also explained why modern centerfire shotgun primers are not similar to the matchlock, flintlock, and percussion cap ignition systems specified in the definition of an antique firearm found in 18 U.S.C. § 921(a)(16)(A).

*The Pending Motions*

On May 15, 1998 the ATF also filed a renewed motion for summary judgment in the present action. ATF contends that it has addressed the Court's earlier concerns and is now entitled to summary judgment. ATF argues that its classification of the Knight Disc Rifle is consistent with the language and purpose of the GCA. ATF argues that the Administrative Procedure Act's ("APA") deferential standard of review and the teachings of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) apply to this case and accordingly the ATF's decision should be upheld because it is not arbitrary or capricious. The plaintiff opposes this motion, arguing that

the ATF has not provided this court with any information to support its **\*33** position. Plaintiff contends that the record clearly demonstrates that a primer of the type used in the Knight Disc Rifle is an antique ignition system. Plaintiff also disputes the applicable standard of review, claiming that because a criminal statute is at issue, the deferential approach of *Chevron* is inapposite and the Court should instead apply the rule of lenity. It further argues that even if the Court applied an arbitrary and capricious standard to defendant's conduct, the ATF decision should not be sustained. The plaintiff contends that the defendant's standard for analyzing the Knight Disc Rifle as a possible antique is inconsistent with the GCA because a primer is a "similar type of ignition system" and hence a replica properly classified as an antique.

II. Discussion

A. The Applicable Standard of Review

After reviewing the parties contentions, the Court concludes that the plaintiff's position regarding the applicable standard of review lacks merit. Plaintiff asserts that because the statute is criminal in nature, the rule of lenity applies, and the defendant's decision is not sustainable. In the Court's view, this is incorrect. Although the statute is criminal in nature, the rule of lenity does not apply and the ATF's decision is entitled to deference by the Court.

As defendant's counsel ably pointed out,

> The rule of lenity is premised on the idea that 'fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.' *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 2416 n. 18, 132 L.Ed.2d 597 (1995)(quoting *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). As the Supreme Court recently noted in interpreting the GCA, however, 'this Court has never held that the rule of lenity automatically permits [the person invoking the rule] to win.' *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 1919, 141 L.Ed.2d 111 (1998).

Defendant's Reply to Plaintiff's Opposition to Defendant's Renewed Motion for Summary Judgment (Jun. 12, 1998) ("Def.Rep."), at 3–4. The fact that the

AR005304

statute is criminal in nature is simply not enough to invoke the rule of lenity. Rather, a Court must also find that there is a "grievous ambiguity or uncertainty in the statute." *Staples v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)(quoting *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)). See also *Caron v. United States,* 524 U.S. 308, 118 S.Ct. 2007, 2012, 141 L.Ed.2d 303 (1998)( "rule of lenity is not invoked by a grammatical possibility"). "That maxim of construction is reserved for cases where, after seizing everything from which aid can be derived, the Court is left with an ambiguous statute." *Staples,* 511 U.S. at 619 n. 17, 114 S.Ct. 1793 (citing *Smith v. United States,* 508 U.S. 223, 239, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (quoting *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), in turn quoting *United States v. Fisher,* 2 Cranch 358, 386, 2 L.Ed. 304 (1805))) (internal quotations and alterations omitted)(additional citations omitted).

 Defendant readily admits that the statute at issue is criminal in nature. Yet, plaintiff has failed to convince this Court that the statute contains a "grievous ambiguity." In light of the structure and language of the statute, this Court finds that although the statute may be ambiguous to some degree, this ambiguity is slight, not grievous, and deference to the agency's interpretation of the statute is still warranted. Contrary to plaintiff's assertions, judicial deference to an agency's interpretation of a statute is not foreclosed simply because the statute contains criminal penalties. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 703, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995)(finding that the "latitude" given to an agency in enforcing the statute, "together with the degree of regulatory expertise necessary to its enforcement, establishes that [the Court] ... owes some degree of deference to the Secretary's reasonable interpretation" of a statute, even when the statute contains criminal penalties)(citing **\*34** Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L.Rev. 363, 373 (1986)). The statute at issue contains a section defining an antique firearm. *See* 18 U.S.C. § 921(a)(16). The section is not devoid of guidance in terms of Congressional intent. The statute is somewhat ambiguous because it defines an antique firearm as including weapons with certain types of ignition systems as well as those using similar types of ignition systems. Nevertheless, the statute, when read as a whole, provides guidance as to an antique firearm's key criteria. Under these circumstances, it is inappropriate to apply the rule of lenity.

Plaintiff argues that *Sweet Home* is inapplicable because,

unlike the agency in *Sweet Home,* the ATF has not issued regulations setting forth its interpretation of the statute. However, it is not appropriate to so restrict *Sweet Home.* Rather, the Court is convinced that an agency's interpretation of a statute should not be ignored simply because it results from an adjudicatory rather than rulemaking process. Instead, an agency's interpretation of a statute is entitled to deference, even in the informal adjudicatory setting. *See Mountain Side Mobile Estates Partnership v. Secretary of HUD,* 56 F.3d 1243, 1247 (10th Cir.1995)(standard the same regardless of whether the agency interpretation is performed through rulemaking or informal adjudication) (citations omitted); *Arco Oil & Gas Co. v. EPA,* 14 F.3d 1431, 1433 (10th Cir.1993)(discussing Chevron deference and finding that the standard of review is the same whether the agency interpretation is performed through rulemaking or, as in *Arco,* by informal adjudication) (citations omitted); *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1496 (D.C.Cir.1988). In *Midtec,* the D.C. Circuit rejected the argument than an adjudicatory interpretation of a statute by the agency entrusted with its administration is entitled to any lesser degree of deference. *Id.* at 1496 ("With respect to the standard of review applicable to an agency's interpretation of the statutes it administers, the distinction that Midtec draws between adjudication and rulemaking is without significance"). Hence, the Court rejects plaintiff's objections to *Sweet Home* 's relevance.

As for plaintiff's concerns about fair notice, this Court finds it noteworthy that in 1994, the ATF classified the plaintiff's "Magnum Elite" rifle as a firearm. Similar to the ATF's position in this dispute, the ATF's March 24, 1994 letter to Modern Muzzleloading, Inc. noted that the Magnum Elite did not use an antique ignition system, but instead used a centerfire rifle primer to provide ignition. *See* ATF March 24, 1994 Letter, Admin. R. at 1–3. Therefore, the ATF found that the Magnum Elite was properly classified as a firearm, rather than an antique. *See id.* This episode along with the obvious and pervasive federal regulation of firearms should have put plaintiff on notice about the possibility that the Knight Disc Rifle would not be classified as an antique.[6]

[6]   The Court notes that the notice issue is also less compelling because this case is civil rather than criminal in nature. This helps alleviate some of the concerns surrounding fair notice. *See* Sanford N. Greenberg, *Who Says It's A Crime?: Chevron Deference To Agency Interpretations Of Regulatory Statutes That Create Criminal Liability,* 58 U. Pitt. L.Rev. 1, 25–26 (1996) (potential conflicts between the rule of lenity and Chevron deference can often be resolved by demanding that an agency resolve any statutory ambiguity prior to seeking *criminal enforcement* ).

AR005305

The plaintiff also cites *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990), arguing that it strongly supports plaintiff's view that the rule of lenity applies to this suit and plaintiff should win. In *Crandon,* the Supreme Court was faced with the question of whether severance payments by a private corporation to former employees entering government service violated a provision of the Criminal Code that prohibits private parties from paying, and Government employees from receiving, substantial compensation for the employee's Government service. *Id.* at 154, 110 S.Ct. 997. The corporation made these lump sum payments to "mitigate the substantial financial loss each employee expected to suffer by reason of his change in employment." *Id.* The Court faced an issue of statutory interpretation in deciding whether 18 U.S.C. § 209(a) required a recipient of funds to be employed by the government at the time of payment. *See id.* at 158, 110 S.Ct. 997. The Court of Appeals had found that Congressional *35 changes in 1962 concerning the wording of the applicable statute as well as public policy considerations counseled in favor of a broad interpretation. *Id.* at 160, 110 S.Ct. 997. The Supreme Court disagreed, finding that the wording of the applicable statute, although awkward, indicated that employment status was an element of the offense. *Id.* at 158–60, 110 S.Ct. 997. It is in this context that the Court found the rule of lenity an *additional* source of support for its conclusion that the statute required employment by the government at the time of payment. *See id.* at 158, 168, 110 S.Ct. 997.

This Court does not consider *Crandon* to have the far reaching effect that plaintiff asserts, namely resolving all issues in this case in favor of the plaintiff. Rather, after looking at the specific factual circumstances of *Crandon,* this Court is convinced that *Crandon* 's significance is more narrow. In *Crandon,* the majority only used the rule of lenity to resolve any temporal issues about the statute that *remained* after the Court had exhaustively analyzed the language and history of the statute. *See id.* at 168, 110 S.Ct. 997. Moreover, in that case, the Court found that the language and history of the statute weighed in favor of a narrow reading of the statute, thus complementing any application of the rule of lenity. *See id.* at 158–68, 110 S.Ct. 997. In contrast, in the present case, applying the rule of lenity would conflict with the intent expressed in the language of the GCA. As this Court has previously explained, the applicable section of the GCA is somewhat ambiguous, but the Court need not apply the rule of lenity, since the ambiguity is not grievous and the overall structure of the statute counsels against plaintiff's interpretation. To apply the rule of lenity in the manner

suggested by plaintiff would be contrary to the Congressional intent expressed in the statute. This rationale also illustrates the difference between this case and *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–18, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (citing *Crandon* and applying the rule of lenity to a criminal statute at issue in a civil suit because the statute remained ambiguous even after applying traditional tools of statutory interpretation).

As for the concurrence in *Crandon,* which plaintiff repeatedly cites, this Court also finds plaintiff's reliance misplaced. The opinion found that the vast body of administrative interpretation on the employment status issue was not entitled to *Chevron* deference. *See id.* at 176–83, 110 S.Ct. 997. However, unlike the present case, the administrative interpretations at issue in that case were not created by an agency charged with carrying out a legislative scheme, like the ATF with regard to the GCA. *See id.* Instead the body of administrative interpretation to which Justice Scalia referred were by the Attorney General, the Office of Legal Counsel, and the Office of Government Ethics, among others. *See id.* These interpretations more closely resemble those of an in-house counsel in a corporation, rather than those espoused by an agency administering a regulatory scheme, such as the ATF.

 Instead of applying the rule of lenity, the Court believes that the appropriate standard of review is found in the Administrative Procedure Act, which provides that "a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[7] Under this deferential standard of review, the Court is not to substitute its judgment for that of the ATF. A court need only examine whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *See also Troy Corp. v. Browner,* 120 F.3d 277, 283 (D.C.Cir.1997).

7      As defendant notes, plaintiff itself brought this action under the Administrative Procedure Act and has previously alleged that *Chevron* applies. *See* Complaint ¶ 1; Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Reply to Opposition to Motion for Preliminary Injunction at 2.

Moreover, since the ATF's classification of the Knight Disc Rifle "amounts to or involves *36 its interpretation" of the GCA, a statute administered by the ATF, we review

that interpretation under the deferential standard announced in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Troy Corp.,* 120 F.3d at 283. In *Chevron,* the Supreme Court instructed reviewing courts to determine first whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In other words this Court can only overturn ATF's decision if it "either ran athwart a clear mandate of Congress, or was an unreasonable one." *Troy,* 120 F.3d at 284.

### B. ATF's Classification of the Knight Disc Rifle

Applying the *Chevron* standards in this case, the Court concludes that it must uphold the ATF's interpretation of the GCA and its decision to classify the Knight Disc Rifle as a firearm for purposes of the GCA. As the Court's previous discussion regarding the rule of lenity reveals, the GCA does not speak directly to the question of how to classify the Knight Disc Rifle. Recall the GCA's definition of an "antique firearm":

(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

(B) any replica of any firearm described in subparagraph (A) if such replica—

(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

18 U.S.C. § 921(a)(16). The Court concludes that the GCA is somewhat ambiguous. *See supra,* discussion of GCA's slight ambiguity, at p. 8. Turning to the second step of the *Chevron* analysis, the Court must determine whether the agency's action is based on an impermissible interpretation of the statute or violates the APA's arbitrary and capricious test. As an initial matter, the Court agrees with both parties that the parenthetical in subparagraph

(A) suggests that Congress intended a currently-manufactured weapon, which uses an ignition system "similar" to a matchlock, flintlock, or percussion cap, to fall within the antique classification, even if the weapon is not a reproduction of a pre–1899 firearm.

Thus, according to the parties and in the opinion of the Court, the critical inquiry is whether the Knight Disc Rifle's use of a primer ignition system prevents its classification as an antique firearm.

The administrative record is replete with defendant ATF's arguments concerning the significance of using a primer ignition system in a weapon. According to defendant, there is a great difference between the ignition systems mentioned in subsection (A) of Section 921(a)(16) and the primer ignition system used in the Knight Disc Rifle. Defendant argues that the design of primer ignition systems differs from percussion cap systems because these primers fit into a hole or pocket in the base of a cartridge case, rather than over a nipple or cone affixed to the breech of the firearm, as is the case with the percussion cap. Remand Letter at 6 (May 15, 1998). Arguing that the primer performs differently than the percussion cap, defendant asserts that primers provide hotter and better ignition and contain more explosive material than percussion caps. *Id.* (citing United States Patent No. 5,644,861, at 1). Defendant claims that primers were conspicuously absent from the parenthetical in Section 921(a)(16) and that Congress' inclusion of primers in the definition of ammunition, *see* 18 U.S.C. § 921(a)(17)(a), indicates they are not an element of an antique weapon. Moreover, according to defendant, the **\*37** relevant inquiry is not whether primers were used in pre–1899 firearms, but rather, whether the primer ignition system resembles early matchlock, flintlock, or percussion cap ignition systems. As further support for its position, defendant asserts that the Knight Disc Rifle's Number 209 primer is a very modern version of a primer ignition system and is the same style of primer found in modern shotgun ammunition. Remand Letter at 5 (May 15, 1998).

In contrast, plaintiff argues that firearms using primer ignition systems existed prior to 1899 and that therefore the Knight Disc Rifle's ignition system is similar to the ignition systems detailed in subsection (A) of Section 921. Plaintiff apparently contends that differences between the primer ignition system used in the Knight Disc Rifle and the other ignition systems referenced are irrelevant because such differences also existed in or before 1898. Plaintiff also disputes the ATF's asserted standard for determining whether a weapon is a replica[8] and contends that the ATF's references to the inclusion of

Modern Muzzleloading, Inc. v. Magaw, 18 F.Supp.2d 29 (1998)

primers in Section 921(a)(17)(A), which defines the term ammunition as used in the GCA, are irrelevant. Furthermore, according to plaintiff, differences in design, physical characteristics, and performance are not the type of functional ignition system differences relevant to this matter or requested by the Court in its February opinion.

8    The ATF determines:
> (1) whether the weapon is designed to use only a matchlock, flintlock, or percussion cap as an ignition system; or
> (2) whether the weapon is designed to use only an ignition system used during the same time period which operates in a manner similar to those ignition systems.
> ATF Remand Letter at 3 (May 15, 1998).

This Court thinks that defendant's position is more convincing. Contrary to plaintiff's contention, the Court does not think that the standard announced by the ATF is inconsistent with the statute. Rather it seems like an entirely reasonable method of determining whether a weapon uses an ignition system similar to the matchlock, flintlock, or percussion cap ignition systems and hence whether a weapon should be classified as an antique. ATF has explained that the "standard does not preclude classification of a firearm as an antique simply because it uses interchangeable ignition systems—... consistent with the statute, the standard only allows for the use of such early ignition systems in firearms classified as antiques." Def. Reply (Jun. 12, 1998). The Court also finds the defendant's arguments concerning the differences between the matchlock, flintlock, and percussion cap ignition systems and the primer ignition system used in the Knight Disc Rifle more compelling. There are differences between the two, set forth in the Administrative Record, and the Court does not think these

differences can be pigeonholed as functional rather than design, physical characteristics, and performance. Instead the consideration of all these factors together compels the conclusion that the Knight Disc Rifle does not use an ignition system similar to those of antiques.

Moreover, defendant does not bear the burden of convincing the Court that its position is better. Instead, it merely need convince the Court that the decision was not arbitrary and capricious. After considering the parties submissions and the administrative record in the case, the Court is convinced that defendant has met this burden. The ATF's decision was not arbitrary and capricious but rather based on a consideration of relevant factors, which have been considered by the Court and included in the administrative record. Nor was the ATF's interpretation of the GCA impermissible. Deference is particularly appropriate in this case, since the ATF is presumably better able than the Court to make technical distinctions between firearm ignition systems.

III. Conclusion

For the reasons given above, the Court will grant the defendant's motion for summary judgment and deny the plaintiff's motion for summary judgment.

**All Citations**

18 F.Supp.2d 29

---

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005308

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut...., 463 U.S. 29 (1983)

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by F.C.C. v. Fox Television Stations, Inc., U.S., April 28, 2009

103 S.Ct. 2856
Supreme Court of the United States

MOTOR VEHICLE MANUFACTURERS
ASSOCIATION OF the UNITED STATES, INC., et
al., Petitioners
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY et al.
CONSUMER ALERT, et al., Petitioners
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY et al.
UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al., Petitioners
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY et al.

Nos. 82–354, 82–355 and 82–398.
|
Argued April 26, 1983.
|
Decided June 24, 1983.

**Synopsis**

Insurance companies petitioned for review of an order of the National Highway Traffic Safety Administration rescinding crash protection requirements of federal motor vehicle safety standard. The Court of Appeals, 680 F.2d 206, held that the rescission was arbitrary and capricious. On petition for writ of certiorari, the Supreme Court, Justice White, held that the National Highway Traffic Safety Administration acted arbitrarily and capriciously in revoking the requirement in motor vehicle safety standard 208 that new motor vehicles produced after September of 1982 be equipped with passive restraints to protect the safety of the occupants of the vehicle in the event of a collision; the agency failed to present an adequate basis and explanation for rescinding the passive restraint requirement, and the agency thus either had to consider the matter further or adhere to or amend standard 208 along lines which its analysis supported.

Vacated and remanded.

Justice Rehnquist filed an opinion concurring in part and dissenting in part, in which Chief Justice Burger, Justice

Powell, and Justice O'Connor joined.

**\*\*2859** *Syllabus*\*

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*29** The National Traffic and Motor Vehicle Safety Act of 1966 (Act) directs the Secretary of Transportation to issue motor vehicle safety standards that "shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." In issuing these standards, the Secretary is directed to consider "relevant available motor vehicle safety data," whether the proposed standard is "reasonable, practicable and appropriate" for the particular type of motor vehicle for which it is prescribed, and "the extent to which such standards will contribute to carrying out the purposes" of the Act. The Act authorizes judicial review, under the Administrative Procedure Act, of "all orders establishing, amending, or revoking" a motor **\*\*2860** vehicle safety standard. The National Highway Traffic Safety Administration (NHTSA), to which the Secretary has delegated his authority to promulgate safety standards, rescinded the requirement of Modified Standard 208 that new motor vehicles produced after September 1982 be equipped with passive restraints (automatic seatbelts or airbags) to protect the safety of the occupants of the vehicle in the event of a collision. In explaining the rescission, NHTSA maintained that it was no longer able to find, as it had in 1977 when Modified Standard 208 was issued, that the automatic restraint requirement would produce significant safety benefits. In 1977, NHTSA had assumed that airbags would be installed in 60% of all new cars and automatic seatbelts in 40%. But by 1981 it became apparent that automobile manufacturers planned to install automatic seatbelts in approximately 99% of the new cars and that the overwhelming majority of such seatbelts could be easily detached and left that way permanently, thus precluding the realization of the life-saving potential of airbags and requiring the same type of affirmative action that was the stumbling block **\*30** to achieving high usage of manual belts. For this reason, NHTSA concluded that there was no longer a basis for reliably predicting that Modified Standard 208 would lead to any significant increased usage of

AR005309

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut...., 463 U.S. 29 (1983)

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

restraints. Hence, in NHTSA's view, the automatic restraint requirement was no longer reasonable or practicable. Moreover, given the high expense of implementing such a requirement and the limited benefits arising therefrom, NHTSA feared that many consumers would regard Modified Standard 208 as an instance of ineffective regulation. On petitions for review of NHTSA's recission of the passive restraint requirement, the Court of Appeals held that the rescission was arbitrary and capricious on the grounds that NHTSA's conclusion that it could not reliably predict an increase in belt usage under the Standard was an insufficient basis for the rescission, that NHTSA inadequately considered the possibility of requiring manufacturers to install nondetachable rather than detachable passive belts, and that the agency failed to give any consideration to requiring compliance with the Standard by the installation of airbags. The Court found that congressional reaction to various versions of the Standard "raised doubts" that NHTSA's rescission "necessarily demonstrates an effort to fulfill its statutory mandate" and that therefore the agency was obligated to provide "increasingly clear and convincing reasons" for its action.

*Held:* NHTSA's rescission of the passive restraint requirement in Modified Standard 208 was arbitrary and capricious; the agency failed to present an adequate basis and explanation for rescinding the requirement and must either consider the matter further or adhere to or amend the Standard along lines which its analysis supports. Pp. 2865 – 2873.

(a) The rescission of an occupant crash protection standard is subject to the same standard of judicial review—the "arbitrary and capricious" standard—as is the promulgation of such a standard, and should not be judged by, as petitioner Motor Vehicle Manufacturers Association contends, the standard used to judge an agency's refusal to promulgate a rule in the first place. The Act expressly equates orders "revoking" and "establishing" safety standards. The Association's view would render meaningless Congress' authorization for judicial review of orders revoking safety standards. An agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance. While the scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action. In reviewing that explanation, a court must consider whether the decision was based on a **\*31** consideration of the relevant factors and **\*\*2861** whether

there was a clear error of judgment. Pp. 2865 – 2867.

(b) The Court of Appeals correctly found that the "arbitrary and capricious" standard of judicial review applied to rescission of agency regulations, but erred in intensifying the scope of its review based upon its reading of legislative events. While an agency's interpretation of a statute may be confirmed or ratified by subsequent congressional failure to change that interpretation, here, even an unequivocal ratification of the passive restraint requirement would not connote approval or disapproval of NHTSA's later decision to rescind the requirement. That decision remains subject to the "arbitrary and capricious" standard. Pp. 2867 – 2868.

(c) The first reason for finding NHTSA's rescission of Modified Standard 208 was arbitrary and capricious is that it apparently gave no consideration to modifying the Standard to require that airbag technology be utilized. Even if NHTSA's conclusion that detachable automatic seatbelts will not attain anticipated safety benefits because so many individuals will detach the mechanism were acceptable in its entirety, standing alone it would not justify any more than an amendment of the Standard to disallow compliance by means of one technology which will not provide effective passenger protection. It does not cast doubt on the need for a passive restraint requirement or upon the efficacy of airbag technology. The airbag is more than a policy alternative to the passive restraint requirement; it is a technology alternative within the ambit of the existing standard. Pp. 2868 – 2870.

(d) NHTSA was too quick to dismiss the safety benefits of automatic seatbelts. Its explanation for rescission of the passive restraint requirement is not sufficient to enable this Court to conclude that the rescission was the product of reasoned decisionmaking. The agency took no account of the critical difference between detachable automatic seatbelts and current manual seatbelts, failed to articulate a basis for not requiring nondetachable belts, and thus failed to offer the rational connection between facts and judgment required to pass muster under the "arbitrary and capricious" standard. Pp. 2870 – 2873.

220 U.S.App.D.C. 170, 680 F.2d 206, vacated and remanded.

**Attorneys and Law Firms**

**\*32** *Solicitor General Lee* argued the cause for petitioners in No. 82-398. With him on the briefs were *Assistant Attorney General McGrath, Deputy Solicitor General Geller, Edwin S. Kneedler, Robert E. Kopp, Michael F. Hertz, Frank Berndt, David W. Allen, Enid Rubenstein,*

and *Eileen T. Leahy. Lloyd N. Cutler* argued the cause for petitioners in No. 82-354. With him on the briefs were *John H. Pickering, William R. Perlik, Andrew B. Weissman, William R. Richardson, Jr., Milton D. Andrews, Lance E. Tunick, William H. Crabtree, Edward P. Good, Henry R. Nolte, Jr., Otis M. Smith, Charles R. Sharp,* and *William L. Weber, Jr. Raymond M. Momboisse, Sam Kazman,* and *Ronald A. Zumbrun* filed briefs for petitioners in No. 82-355.

*James F. Fitzpatrick* argued the cause for respondents in all cases. With him on the brief for respondents State Farm Mutual Automobile Insurance Co. et al. were *Michael N. Sohn, John M. Quinn,* and *Merrick B. Garland. Robert Abrams,* Attorney General of New York, *Robert S. Hammer,* Assistant Attorney General, *Peter H. Schiff, Martin Minkowitz,* and *Milton L. Freedman* filed a brief for respondent Superintendent of Insurance of the State of New York. *Raymond J. Rasenberger, Lawrence C. Merthan, Jerry W. Cox,* and *Lowell R. Beck* filed a brief for respondents National Association of Independent Insurers et al.†>>

† Briefs of *amici curiae* urging affirmance were filed by *Dennis J. Barbour* for the American College of Preventive Medicine et al.; by *Nathan Lewin* for the American Insurance Association; by *Philip R. Collins* and *Thomas C. McGrath, Jr.,* for the Automotive Occupant Protection Association; by *Alexandra K. Finucane* for the Epilepsy Foundation of America et al.; by *Katherine I. Hall* for the Center for Auto Safety et al.; by *Simon Lazarus III* for Mothers Against Drunk Drivers; and by *John H. Quinn, Jr.,* and *John Hardin Young* for the National Association of Insurance Commissioners.

## Opinion

Justice WHITE delivered the opinion of the Court.

The development of the automobile gave Americans unprecedented freedom to travel, but exacted a high price for **\*33** enhanced mobility. Since 1929, motor vehicles have been the leading cause of accidental deaths and injuries in the United States. In 1982, 46,300 Americans died in motor vehicle accidents and hundreds of thousands more were maimed and injured.[1] While a consensus exists that the current loss of life on our highways is unacceptably high, improving safety does not admit to easy solution. In 1966, Congress decided that at least part of the answer lies in improving the design and safety features of the vehicle itself.[2] But much of the technology for building safer cars was undeveloped or untested. Before changes in automobile design could be

mandated, the effectiveness of these changes had to be studied, their costs examined, and public acceptance **\*\*2862** considered. This task called for considerable expertise and Congress responded by enacting the National Traffic and Motor Vehicle Safety Act of 1966, (Act), 15 U.S.C. §§ 1381 *et seq.* (1976 and Supp. IV 1980). The Act, created for the purpose of "reduc[ing] traffic accidents and deaths and injuries to persons resulting from traffic accidents," 15 U.S.C. § 1381, directs the Secretary of Transportation or his delegate to issue motor vehicle safety standards that "shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms." 15 U.S.C. § 1392(a). In issuing these standards, the Secretary is directed to consider "relevant available motor vehicle safety data," whether the proposed standard "is reasonable, practicable and appropriate" for the particular type of motor vehicle, and the "extent to which **\*34** such standards will contribute to carrying out the purposes" of the Act. 15 U.S.C. § 1392(f)(1), (3), (4).[3]

[1]    National Safety Council, 1982 Motor Vehicle Deaths By States, (May 16, 1983).

[2]    The Senate Committee on Commerce Reported: "The promotion of motor vehicle safety through voluntary standards has largely failed. The unconditional imposition of mandatory standards at the earliest practicable date is the only course commensurate with the highway death and injury toll." S.Rep. No. 1301, 89th Cong., 2d Sess., p. 4 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2709, 2712.

[3]    The Secretary's general authority to promulgate safety standards under the Act has been delegated to the Administrator of the National Highway Traffic Safety Administration (NHTSA). 49 CFR § 1.50(a) (1979). This opinion will use the terms NHTSA and agency interchangeably when referring to the National Highway Traffic Safety Administration, the Department of Transportation, and the Secretary of Transportation.

  The Act also authorizes judicial review under the provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1976), of all "orders establishing, amending, or revoking a Federal motor vehicle safety standard," 15 U.S.C. § 1392(b). Under this authority, we review today whether NHTSA acted arbitrarily and capriciously in revoking the requirement in Motor Vehicle Safety Standard 208 that new motor vehicles produced after September 1982 be equipped with passive

AR005311

restraints to protect the safety of the occupants of the vehicle in the event of a collision. Briefly summarized, we hold that the agency failed to present an adequate basis and explanation for rescinding the passive restraint requirement and that the agency must either consider the matter further or adhere to or amend Standard 208 along lines which its analysis supports.

# I

The regulation whose rescission is at issue bears a complex and convoluted history. Over the course of approximately 60 rulemaking notices, the requirement has been imposed, amended, rescinded, reimposed, and now rescinded again.

As originally issued by the Department of Transportation in 1967, Standard 208 simply required the installation of seatbelts in all automobiles. 32 Fed.Reg. 2408, 2415 (Feb. 3, 1967). It soon became apparent that the level of seatbelt use was too low to reduce traffic injuries to an acceptable level. The Department therefore began consideration of "passive occupant restraint systems"—devices that do not depend for their effectiveness *35 upon any action taken by the occupant except that necessary to operate the vehicle. Two types of automatic crash protection emerged: automatic seatbelts and airbags. The automatic seatbelt is a traditional safety belt, which when fastened to the interior of the door remains attached without impeding entry or exit from the vehicle, and deploys automatically without any action on the part of the passenger. The airbag is an inflatable device concealed in the dashboard and steering column. It automatically inflates when a sensor indicates that deceleration forces from an accident have exceeded a preset minimum, then rapidly deflates to dissipate those forces. The life-saving potential of these devices was immediately recognized, and in 1977, after substantial on-the-road experience with both devices, it was estimated by NHTSA that passive restraints could prevent approximately 12,000 deaths and over 100,000 serious injuries annually. 42 Fed.Reg. 34,298.

In 1969, the Department formally proposed a standard requiring the installation of passive restraints, 34 Fed.Reg. 11,148 (July 2, 1969), thereby commencing a lengthy series of proceedings. In 1970, the agency revised **2863 Standard 208 to include passive protection requirements, 35 Fed.Reg. 16,927 (Nov. 3, 1970), and in 1972, the agency amended the standard to require full passive protection for all front seat occupants of vehicles

manufactured after August 15, 1975. 37 Fed.Reg. 3911 (Feb. 24, 1972). In the interim, vehicles built between August 1973 and August 1975 were to carry either passive restraints or lap and shoulder belts coupled with an "ignition interlock" that would prevent starting the vehicle if the belts were not connected.[4] On review, the *36 agency's decision to require passive restraints was found to be supported by "substantial evidence" and upheld. *Chrysler Corp. v. Dep't of Transportation,* 472 F.2d 659 (CA6 1972).[5]

[4]   Early in the process, it was assumed that passive occupant protection meant the installation of inflatable airbag restraint systems. See 34 Fed.Reg. 11,148. In 1971, however, the agency observed that "some belt-based concepts have been advanced that appear to be capable of meeting the complete passive protection options," leading it to add a new section to the proposed standard "to deal expressly with passive belts." 36 Fed.Reg. 12,858, 12,859 (July 8, 1971).

[5]   The court did hold that the testing procedures required of passive belts did not satisfy the Safety Act's requirement that standards be "objective." 472 F.2d, at 675.

In preparing for the upcoming model year, most car makers chose the "ignition interlock" option, a decision which was highly unpopular, and led Congress to amend the Act to prohibit a motor vehicle safety standard from requiring or permitting compliance by means of an ignition interlock or a continuous buzzer designed to indicate that safety belts were not in use. Motor Vehicle and Schoolbus Safety Amendments of 1974, Pub.L. 93–492, § 109, 88 Stat. 1482, 15 U.S.C. § 1410b(b). The 1974 Amendments also provided that any safety standard that could be satisfied by a system other than seatbelts would have to be submitted to Congress where it could be vetoed by concurrent resolution of both houses. 15 U.S.C. § 1410b(b)(2).[6]

[6]   Because such a passive restraint standard was not technically in effect at this time due to the Sixth Circuit's invalidation of the testing requirements, see n. 5 *supra,* the issue was not submitted to Congress until a passive restraint requirement was reimposed by Secretary Adams in 1977. To comply with the Amendments, NHTSA proposed new warning systems to replace the prohibited continuous buzzers. 39 Fed.Reg. 42,692 (Dec. 6, 1974). More significantly, NHTSA was forced to rethink an earlier decision which contemplated use of the interlocks in tandem with detachable belts. See n. 13, *infra.*

AR005312

The effective date for mandatory passive restraint systems was extended for a year until August 31, 1976. 40 Fed.Reg. 16,217 (April 10, 1975); *id.,* at 33,977 (Aug. 13, 1975). But in June 1976, Secretary of Transportation William Coleman initiated a new rulemaking on the issue, 41 Fed.Reg. 24,070 (June 9, 1976). After hearing testimony and reviewing written comments, Coleman extended the optional alternatives indefinitely and suspended the passive restraint requirement. Although he found passive **\*37** restraints technologically and economically feasible, the Secretary based his decision on the expectation that there would be widespread public resistance to the new systems. He instead proposed a demonstration project involving up to 500,000 cars installed with passive restraints, in order to smooth the way for public acceptance of mandatory passive restraints at a later date. Department of Transportation, The Secretary's Decision Concerning Motor Vehicle Occupant Crash Protection (December 6, 1976).

Coleman's successor as Secretary of Transportation disagreed. Within months of assuming office, Secretary Brock Adams decided that the demonstration project was unnecessary. He issued a new mandatory passive restraint regulation, known as Modified Standard 208. 42 Fed.Reg. 34,289 (July 5, 1977); 42 CFR § 571.208 (1977). The Modified Standard mandated the phasing in of passive restraints beginning with large cars in model year 1982 and extending to all cars by model year 1984. The two principal systems that would satisfy the Standard were airbags and passive belts; the choice of which system to install was left to the manufacturers. In **\*\*2864** *Pacific Legal Foundation v. Dep't of Transportation,* 593 F.2d 1338 (CADC), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979), the Court of Appeals upheld Modified Standard 208 as a rational, nonarbitrary regulation consistent with the agency's mandate under the Act. The standard also survived scrutiny by Congress, which did not exercise its authority under the legislative veto provision of the 1974 Amendments.[7]

[7]   No action was taken by the full House of Representatives. The Senate committee with jurisdiction over NHTSA affirmatively endorsed the standard, S.Rep. No. 481, 95th Cong., 1st Sess. (1977), and a resolution of disapproval was tabled by the Senate. 123 Cong.Rec. 33,332 (1977).

Over the next several years, the automobile industry geared up to comply with Modified Standard 208. As late as July, 1980, NHTSA reported:

**\*38** "On the road experience in thousands of vehicles equipped with airbags and automatic safety belts has confirmed agency estimates of the life-saving and injury-preventing benefits of such systems. When all cars are equipped with automatic crash protection systems, each year an estimated 9,000 more lives will be saved and tens of thousands of serious injuries will be prevented." NHTSA, Automobile Occupant Crash Protection, Progress Report No. 3, p. 4 (App. 1627).

In February 1981, however, Secretary of Transportation Andrew Lewis reopened the rulemaking due to changed economic circumstances and, in particular, the difficulties of the automobile industry. 46 Fed.Reg. 12,033 (Feb. 12, 1981). Two months later, the agency ordered a one-year delay in the application of the standard to large cars, extending the deadline to September 1982, 46 Fed.Reg. 21,172 (April 9, 1981) and at the same time, proposed the possible rescission of the entire standard. 46 Fed.Reg. 21,205 (April 9, 1981). After receiving written comments and holding public hearings, NHTSA issued a final rule (Notice 25) that rescinded the passive restraint requirement contained in Modified Standard 208.

II

In a statement explaining the rescission, NHTSA maintained that it was no longer able to find, as it had in 1977, that the automatic restraint requirement would produce significant safety benefits. Notice 25, 46 Fed.Reg. 53,419 (Oct. 29, 1981). This judgment reflected not a change of opinion on the effectiveness of the technology, but a change in plans by the automobile industry. In 1977, the agency had assumed that airbags would be installed in 60% of all new cars and automatic seatbelts in 40%. By 1981 it became apparent that automobile manufacturers planned to install the automatic seatbelts in approximately 99% of the new cars. For this reason, the life-saving potential of airbags would not be realized. Moreover, it now appeared that the overwhelming majority of passive belts **\*39** planned to be installed by manufacturers could be detached easily and left that way permanently. Passive belts, once detached, then required "the same type of affirmative action that is the stumbling block to obtaining high usage levels of manual belts." 46 Fed.Reg., at 53421. For this reason, the agency concluded that there was no longer a basis for reliably predicting that the standard would lead to any significant increased usage of restraints at all.

In view of the possibly minimal safety benefits, the automatic restraint requirement no longer was reasonable or practicable in the agency's view. The requirement

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

would require approximately $1 billion to implement and the agency did not believe it would be reasonable to impose such substantial costs on manufacturers and consumers without more adequate assurance that sufficient safety benefits would accrue. In addition, NHTSA concluded that automatic restraints might have an adverse effect on the public's attitude toward safety. Given the high expense and limited benefits of detachable belts, NHTSA feared that many consumers would regard the standard as an instance of ineffective regulation, adversely affecting the public's view of safety regulation and, in particular, "poisoning popular sentiment toward **2865 efforts to improve occupant restraint systems in the future." 46 Fed.Reg., at 53424.

State Farm Mutual Automobile Insurance Co. and the National Association of Independent Insurers filed petitions for review of NHTSA's rescission of the passive restraint standard. The United States Court of Appeals for the District of Columbia Circuit held that the agency's rescission of the passive restraint requirement was arbitrary and capricious. 680 F.2d 206 (1982). While observing that rescission is not unrelated to an agency's refusal to take action in the first instance, the court concluded that, in this case, NHTSA's discretion to rescind the passive restraint requirement had been restricted by various forms of congressional "reaction" to the passive restraint issue. It then *40 proceeded to find that the rescission of Standard 208 was arbitrary and capricious for three reasons. First, the court found insufficient as a basis for rescission NHTSA's conclusion that it could not reliably predict an increase in belt usage under the Standard. The court held that there was insufficient evidence in the record to sustain NHTSA's position on this issue, and that, "only a well-justified refusal to seek more evidence could render rescission non-arbitrary." 680 F.2d, at 232. Second, a majority of the panel[8] concluded that NHTSA inadequately considered the possibility of requiring manufacturers to install nondetachable rather than detachable passive belts. Third, the majority found that the agency acted arbitrarily and capriciously by failing to give any consideration whatever to requiring compliance with Modified Standard 208 by the installation of airbags.

[8]   Judge Edwards did not join the majority's reasoning on these points.

The court allowed NHTSA 30 days in which to submit a schedule for "resolving the questions raised in the opinion." 680 F.2d, at 242. Subsequently, the agency filed a Notice of Proposed Supplemental Rulemaking setting forth a schedule for complying with the court's mandate. On August 4, 1982, the Court of Appeals issued an order

staying the compliance date for the passive restraint requirement until September 1, 1983, and requested NHTSA to inform the court whether that compliance date was achievable. NHTSA informed the court on October 1, 1982, that based on representations by manufacturers, it did not appear that practicable compliance could be achieved before September 1985. On November 8, 1982, we granted certiorari, 459 U.S. 987, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982), and on November 18, the Court of Appeals entered an order recalling its mandate.

### III

Unlike the Court of Appeals, we do not find the appropriate scope of judicial review to be the "most troublesome *41 question" in the case. Both the Motor Vehicle Safety Act and the 1974 Amendments concerning occupant crash protection standards indicate that motor vehicle safety standards are to be promulgated under the informal rulemaking procedures of § 553 of the Administrative Procedure Act. 5 U.S.C. § 553 (1976). The agency's action in promulgating such standards therefore may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). We believe that the rescission or modification of an occupant protection standard is subject to the same test. Section 103(b) of the Motor Vehicle Safety Act, 15 U.S.C. § 1392(b), states that the procedural and judicial review provisions of the Administrative Procedure Act "shall apply to all orders establishing, amending, or revoking a Federal motor vehicle safety standard," and suggests no difference in the scope of judicial review depending upon the nature of the agency's action.

**2866   Petitioner Motor Vehicle Manufacturers Association (MVMA) disagrees, contending that the rescission of an agency rule should be judged by the same standard a court would use to judge an agency's refusal to promulgate a rule in the first place—a standard Petitioner believes considerably narrower than the traditional arbitrary and capricious test and "close to the borderline of nonreviewability." Brief of Petitioner MVMA, at 35. We reject this view. The Motor Vehicle Safety Act expressly equates orders "revoking" and "establishing" safety standards; neither that Act nor the APA suggests

that revocations are to be treated as refusals to promulgate standards. Petitioner's view would render meaningless Congress' authorization for judicial review of orders revoking safety rules. Moreover, the revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to the proper course. A "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies **\*42** committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807–808, 93 S.Ct. 2367, 2374–2375, 37 L.Ed.2d 350 (1973). Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

In so holding, we fully recognize that "regulatory agencies do not establish rules of conduct to last forever," *American Trucking Assoc., Inc. v. Atchison, T. & S.F.R. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967), and that an agency must be given ample latitude to "adapt their rules and policies to the demands of changing circumstances." *Permian Basin Area Rate Cases,* 390 U.S. 747, 784, 88 S.Ct. 1344, 1368–1369, 20 L.Ed.2d 312 (1968). But the forces of change do not always or necessarily point in the direction of deregulation. In the abstract, there is no more reason to presume that changing circumstances require the rescission of prior action, instead of a revision in or even the extension of current regulation. If Congress established a presumption from which judicial review should start, that presumption—contrary to petitioners' views—is not *against* safety regulation, but *against* changes in current policy that are not justified by the rulemaking record. While the removal of a regulation may not entail the monetary expenditures and other costs of enacting a new standard, and accordingly, it may be easier for an agency to justify a deregulatory action, the direction in which an agency chooses to move does not alter the standard of judicial review established by law.

The Department of Transportation accepts the applicability of the "arbitrary and capricious" standard. It argues that under this standard, a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. We do not disagree with **\*43** this formulation.[9] The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant **\*\*2867** factors and whether there has been a clear error of judgment." *Bowman Transp. Inc. v. Arkansas-Best Freight System, supra,* 419 U.S., at 285, 95 S.Ct., at 442; *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S., at 416, 91 S.Ct., at 823. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Arkansas-Best Freight System, supra,* 419 U.S., at 286, 95 S.Ct., at 442. See also *Camp v. Pitts,* 411 U.S. 138, 142–143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). For purposes of these cases, it is also relevant that Congress required a record of the rulemaking proceedings to be compiled **\*44** and submitted to a reviewing court, 15 U.S.C. § 1394, and intended that agency findings under the Act would be supported by "substantial evidence on the record considered as a whole." S.Rep. No. 1301, 89th Cong., 2d Sess. 8 (1966); H.R.Rep. No. 1776, 89th Cong., 2d Sess. 21 (1966).

9    The Department of Transportation suggests that the arbitrary and capricious standard requires no more than the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause. We do not view as equivalent the presumption of constitutionality afforded legislation drafted by Congress and the presumption of regularity afforded an agency in fulfilling its statutory mandate.

## IV

The Court of Appeals correctly found that the arbitrary

AR005315

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut...., 463 U.S. 29 (1983)

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

and capricious test applied to rescissions of prior agency regulations, but then erred in intensifying the scope of its review based upon its reading of legislative events. It held that congressional reaction to various versions of Standard 208 "raise[d] doubts" that NHTSA's rescission "necessarily demonstrates an effort to fulfill its statutory mandate," and therefore the agency was obligated to provide "increasingly clear and convincing reasons" for its action. 680 F.2d, at 222, 229. Specifically, the Court of Appeals found significance in three legislative occurrences:

"In 1974, Congress banned the ignition interlock but did not foreclose NHTSA's pursuit of a passive restraint standard. In 1977, Congress allowed the standard to take effect when neither of the concurrent resolutions needed for disapproval was passed. In 1980, a majority of each house indicated support for the concept of mandatory passive restraints and a majority of each house supported the unprecedented attempt to require some installation of airbags." 680 F.2d, at 228.

From these legislative acts and non-acts the Court of Appeals derived a "congressional commitment to the concept of automatic crash protection devices for vehicle occupants." *Ibid.*

 This path of analysis was misguided and the inferences it produced are questionable. It is noteworthy that in this Court Respondent State Farm expressly agrees that the post-enactment legislative history of the Motor Vehicle Safety Act does not heighten the **\*45** standard of review of NHTSA's actions. Brief for Respondent State Farm Mutual Automobile Insurance Co. 13. State Farm's concession is well-taken for this Court has never suggested that the *standard* of review is enlarged or diminished by subsequent congressional action. While an agency's interpretation of a statute may be confirmed or ratified by subsequent congressional failure to change that interpretation, *Bob Jones University v. United States,* —— U.S. ——, ——, 103 S.Ct. 2017, 2033, 75 L.Ed.2d —— (1983); *Haig v. Agee,* 453 U.S. 280, 291–300, 101 S.Ct. 2766, 2774–2778, 69 L.Ed.2d 640 (1981), in the case before us, even an unequivocal ratification—short of statutory **\*\*2868** incorporation—of the passive restraint standard would not connote approval or disapproval of an agency's later decision to rescind the regulation. That decision remains subject to the arbitrary and capricious standard.

That we should not be so quick to infer a congressional mandate for passive restraints is confirmed by examining the post-enactment legislative events cited by the Court of Appeals. Even were we inclined to rely on inchoate legislative action, the inferences to be drawn fail to

suggest that NHTSA acted improperly in rescinding Standard 208. First, in 1974 a mandatory passive restraint standard was technically not in effect, see n. 6, *supra;* Congress had no reason to foreclose that course. Moreover, one can hardly infer support for a mandatory standard from Congress' decision to provide that such a regulation would be subject to disapproval by resolutions of disapproval in both houses. Similarly, no mandate can be divined from the tabling of resolutions of disapproval which were introduced in 1977. The failure of Congress to exercise its veto might reflect legislative deference to the agency's expertise and does not indicate that Congress would disapprove of the agency's action in 1981. And even if Congress favored the standard in 1977, it—like NHTSA—may well reach a different judgment given changed circumstances four years later. Finally, the Court of Appeals read too much into floor action on the 1980 authorization bill, a bill which was not enacted into law. Other **\*46** contemporaneous events could be read as showing equal congressional hostility to passive restraints.[10]

[10] For example, an overwhelming majority of the members of the House of Representatives voted in favor of a proposal to bar NHTSA from spending funds to administer an occupant restraint standard unless the standard permitted the purchaser of the vehicle to select manual rather than passive restraints. 125 Cong.Rec. H12285, H12287 (daily ed. Dec. 19, 1979).

### V

The ultimate question before us is whether NHTSA's rescission of the passive restraint requirement of Standard 208 was arbitrary and capricious. We conclude, as did the Court of Appeals, that it was. We also conclude, but for somewhat different reasons, that further consideration of the issue by the agency is therefore required. We deal separately with the rescission as it applies to airbags and as it applies to seatbelts.

### A

 The first and most obvious reason for finding the rescission arbitrary and capricious is that NHTSA apparently gave no consideration whatever to modifying

AR005316

the Standard to require that airbag technology be utilized. Standard 208 sought to achieve automatic crash protection by requiring automobile manufacturers to install either of two passive restraint devices: airbags or automatic seatbelts. There was no suggestion in the long rulemaking process that led to Standard 208 that if only one of these options were feasible, no passive restraint standard should be promulgated. Indeed, the agency's original proposed standard contemplated the installation of inflatable restraints in all cars.[11] Automatic belts **\*47** were added as a means of complying with the standard because they were believed to be as effective as airbags in achieving the goal of occupant crash protection. 36 Fed.Reg. 12,858, 12,859 (July 8, 1971). At that time, the passive belt approved by the agency could not be detached.[12] Only later, **\*\*2869** at a manufacturer's behest, did the agency approve of the detachability feature—and only after assurances that the feature would not compromise the safety benefits of the restraint.[13] Although it was then foreseen that 60% of the new cars would contain airbags and 40% would have automatic seatbelts, the ratio between the two was not significant as long as the passive belt would also assure greater passenger safety.

[11]   While NHTSA's 1970 passive restraint requirement permitted compliance by means other than the airbag, 35 Fed.Reg. 16,927 (1970), "[t]his rule was [a] de facto air bag mandate since no other technologies were available to comply with the standard." J. Graham & P. Gorham, NHTSA and Passive Restraints: A Case of Arbitrary and Capricious Deregulation, 35 Admin.L.Rev. 193, 197 (1983). See n. 4, *supra.*

[12]   Although the agency suggested that passive restraint systems contain an emergency release mechanism to allow easy extrication of passengers in the event of an accident, the agency cautioned that "[i]n the case of passive safety belts, it would be required that the release not cause belt separation, and that the system be self-restoring after operation of the release." 36 Fed.Reg. 12,866 (July 8, 1971).

[13]   In April 1974, NHTSA adopted the suggestion of an automobile manufacturer that emergency release of passive belts be accomplished by a conventional latch—provided the restraint system was guarded by an ignition interlock and warning buzzer to encourage reattachment of the passive belt. 39 Fed.Reg. 14,593 (April 25, 1974). When the 1974 Amendments prohibited these devices, the agency simply eliminated the interlock and buzzer requirements, but continued to allow compliance by a detachable passive belt.

The agency has now determined that the detachable automatic belts will not attain anticipated safety benefits because so many individuals will detach the mechanism. Even if this conclusion were acceptable in its entirety, see *infra,* at 2871 – 2872, standing alone it would not justify any more than an amendment of Standard 208 to disallow compliance by means of the one technology which will not provide effective passenger protection. It does not cast doubt on the need for a passive restraint standard or upon the efficacy of airbag technology. In its most recent rule-making, the agency again acknowledged the life-saving potential of the airbag:

**\*48** "The agency has no basis at this time for changing its earlier conclusions in 1976 and 1977 that basic airbag technology is sound and has been sufficiently demonstrated to be effective in those vehicles in current use...." NHTSA Final Regulatory Impact Analysis (RIA) at XI–4 (App. 264).

Given the effectiveness ascribed to airbag technology by the agency, the mandate of the Safety Act to achieve traffic safety would suggest that the logical response to the faults of detachable seatbelts would be to require the installation of airbags. At the very least this alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment. But the agency not only did not require compliance through airbags, it did not even consider the possibility in its 1981 rulemaking. Not one sentence of its rulemaking statement discusses the airbags-only option. Because, as the Court of Appeals stated, "NHTSA's ... analysis of airbags was nonexistent," 680 F.2d, at 236, what we said in *Burlington Truck Lines v. United States,* 371 U.S., at 167, 83 S.Ct., at 245, is apropos here:

"There are no findings and no analysis here to justify the choice made, no indication of the basis on which the [agency] exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such ... practice.... Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.' *New York v. United States,* 342 U.S. 882, 884 [72 S.Ct. 152, 153, 96 L.Ed. 662] (dissenting opinion)." (footnote omitted).

We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner, **\*49** *Atchison, T & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37

AR005317

L.Ed.2d 350 (1973); *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 249, 92 S.Ct. 898, 907, 31 L.Ed.2d 170 (1972); *NLRB v. Metropolitan Ins. Co.,* 380 U.S. 438, 443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965); and we reaffirm this principle again today.

The automobile industry has opted for the passive belt over the airbag, but surely it is not enough that the regulated industry has eschewed a given safety device. For nearly a decade, the automobile industry waged the regulatory equivalent **2870 of war against the airbag[14] and lost—the inflatable restraint was proven sufficiently effective. Now the automobile industry has decided to employ a seatbelt system which will not meet the safety objectives of Standard 208. This hardly constitutes cause to revoke the standard itself. Indeed, the Motor Vehicle Safety Act was necessary because the industry was not sufficiently responsive to safety concerns. The Act intended that safety standards not depend on current technology and could be "technology-forcing" in the sense of inducing the development of superior safety design. See *Chrysler Corp. v. Dept. of Transp.,* 472 F.2d, at 672–673. If, under the statute, the agency should not defer to the industry's failure to develop safer cars, which it surely should not do, *a fortiori* it may not revoke a safety standard which can be satisfied by current technology simply because the industry has opted for an ineffective seatbelt design.

[14]    See, *e.g.,* Comments of Chrysler Corp., Docket No. 69–07, Notice 11 (August 5, 1971) (App. 2491); Chrysler Corp. Memorandum on Proposed Alternative Changes to FMVSS 208, Docket No. 44, Notice 76–8 (1976) (App. 2241); General Motors Corp. Response to the Dept. of Transportation Proposal on Occupant Crash Protection, Docket No. 74–14, Notice 08 (May 27, 1977). See also *Chrysler Corp. v. Dept. of Transp., supra.*

Although the agency did not address the mandatory airbags option and the Court of Appeals noted that "airbags seem to have none of the problems that NHTSA identified in passive seatbelts," petitioners recite a number of difficulties that they *50 believe would be posed by a mandatory airbag standard. These range from questions concerning the installation of airbags in small cars to that of adverse public reaction. But these are not the agency's reasons for rejecting a mandatory airbag standard. Not having discussed the possibility, the agency submitted no reasons at all. The short—and sufficient—answer to petitioners' submission is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action. *Burlington Truck Lines v. United States, supra,* 371 U.S., at 168, 83 S.Ct., at 245. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself. *Ibid.; SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *American Textile Manufacturers Inst. v. Donovan,* 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 1381 (1981).[15]

[15]    The Department of Transportation expresses concern that adoption of an airbags-only requirement would have required a new notice of proposed rulemaking. Even if this were so, and we need not decide the question, it would not constitute sufficient cause to rescind the passive restraint requirement. The Department also asserts that it was reasonable to withdraw the requirement as written to avoid forcing manufacturers to spend resources to comply with an ineffective safety initiative. We think that it would have been permissible for the agency to temporarily suspend the passive restraint requirement or to delay its implementation date while an airbags mandate was studied. But, as we explain in text, that option had to be considered before the passive restraint requirement could be revoked.

Petitioners also invoke our decision in *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), as though it were a talisman under which any agency decision is by definition unimpeachable. Specifically, it is submitted that to require an agency to consider an airbags-only alternative is, in essence, to dictate to the agency the procedures it is to follow. Petitioners both misread *Vermont Yankee* and misconstrue the nature of the remand that is in order. In *Vermont Yankee,* we held that a court may not impose additional procedural requirements upon an agency. We do not require today any specific procedures *51 which NHTSA must follow. Nor do we broadly require an agency to consider all policy alternatives in reaching decision. It is true that a rulemaking "cannot be found wanting simply because the agency failed to include every alternative device and **2871 thought conceivable by the mind of man ... regardless of how uncommon or unknown that alternative may have been...." 435 U.S., at 551, 98 S.Ct., at 1215–1216. But the airbag is more than a policy alternative to the passive restraint standard; it is a technological alternative within the ambit of the existing standard. We hold only that given the judgment made in 1977 that airbags are an effective and cost-beneficial life-saving technology, the mandatory passive-restraint rule may not be abandoned without any consideration whatsoever of an airbags-only requirement.

AR005318

**B**

Although the issue is closer, we also find that the agency was too quick to dismiss the safety benefits of automatic seatbelts. NHTSA's critical finding was that, in light of the industry's plans to install readily detachable passive belts, it could not reliably predict "even a 5 percentage point increase as the minimum level of expected usage increase." 46 Fed.Reg., at 53,423. The Court of Appeals rejected this finding because there is "not one iota" of evidence that Modified Standard 208 will fail to increase nationwide seatbelt use by at least 13 percentage points, the level of increased usage necessary for the standard to justify its cost. Given the lack of probative evidence, the court held that "only a well-justified refusal to seek more evidence could render rescission non-arbitrary." 680 F.2d, at 232.

Petitioners object to this conclusion. In their view, "substantial uncertainty" that a regulation will accomplish its intended purpose is sufficient reason, without more, to rescind a regulation. We agree with petitioners that just as an agency reasonably may decline to issue a safety standard if it is uncertain about its efficacy, an agency may also revoke a *52 standard on the basis of serious uncertainties if supported by the record and reasonably explained. Rescission of the passive restraint requirement would not be arbitrary and capricious simply because there was no evidence in direct support of the agency's conclusion. It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion. Recognizing that policymaking in a complex society must account for uncertainty, however, does not imply that it is sufficient for an agency to merely recite the terms "substantial uncertainty" as a justification for its actions. The agency must explain the evidence which is available, and must offer a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States, supra,* 371 U.S., at 168, 83 S.Ct., at 246. Generally, one aspect of that explanation would be a justification for rescinding the regulation before engaging in a search for further evidence.

In this case, the agency's explanation for rescission of the passive restraint requirement is *not* sufficient to enable us to conclude that the rescission was the product of reasoned decisionmaking. To reach this conclusion, we do not upset the agency's view of the facts, but we do appreciate the limitations of this record in supporting the agency's decision. We start with the accepted ground that if used, seatbelts unquestionably would save many thousands of lives and would prevent tens of thousands of crippling injuries. Unlike recent regulatory decisions we have reviewed, *Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980); *American Textile Manufacturers Inst., Inc. v. Donovan,* 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), the safety benefits of wearing seatbelts are not in doubt and it is not challenged that were those benefits to accrue, the monetary costs of implementing the standard would be easily justified. We move next to the fact that there is no direct evidence in support of the agency's finding that detachable automatic belts cannot be predicted *53 to yield a substantial increase in **2872 usage. The empirical evidence on the record, consisting of surveys of drivers of automobiles equipped with passive belts, reveals more than a doubling of the usage rate experienced with manual belts.[16] Much of the agency's rulemaking statement—and much of the controversy in this case—centers on the conclusions that should be drawn from these studies. The agency maintained that the doubling of seatbelt usage in these studies could not be extrapolated to an across-the-board mandatory standard because the passive seatbelts were guarded by ignition interlocks and purchasers of the tested cars are somewhat atypical.[17] Respondents insist these studies demonstrate that Modified Standard 208 will substantially increase seatbelt usage. We believe that it is within the agency's discretion to pass upon the generalizability of these field studies. This is precisely the type of issue which rests within the expertise of NHTSA, and upon which a reviewing court must be most hesitant to intrude.

[16]   Between 1975 and 1980, Volkswagen sold approximately 350,000 Rabbits equipped with detachable passive seatbelts that were guarded by an ignition interlock. General Motors sold 8,000 1978 and 1979 Chevettes with a similar system, but eliminated the ignition interlock on the 13,000 Chevettes sold in 1980. NHTSA found that belt usage in the Rabbits averaged 34% for manual belts and 84% forpassive belts. Regulatory Impact Analysis (RIA) at IV–52, App. 108. For the 1978–1979 Chevettes, NHTSA calculated 34% usage for manual belts and 71% for passive belts. On 1980 Chevettes, the agency found these figures to be 31% for manual belts and 70% for passive belts. *Ibid.*

[17]   "NHTSA believes that the usage of automatic belts in Rabbits and Chevettes would have been substantially lower if the automatic belts in those cars were not equipped with a use-inducing device inhibiting detachment." Notice 25, 46 Fed.Reg., at 53,422.

But accepting the agency's view of the field tests on passive restraints indicates only that there is no reliable

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut...., 463 U.S. 29 (1983)

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

real-world experience that usage rates will substantially increase. To be sure, NHTSA opines that "it cannot reliably predict even a 5 percentage point increase as the minimum level of **\*54** increased usage." Notice 25, 46 Fed.Reg., at 53,423. But this and other statements that passive belts will not yield substantial increases in seatbelt usage apparently take no account of the critical difference between detachable automatic belts and current manual belts. A detached passive belt does require an affirmative act to reconnect it, but—unlike a manual seat belt—the passive belt, once reattached, will continue to function automatically unless again disconnected. Thus, inertia—a factor which the agency's own studies have found significant in explaining the current low usage rates for seatbelts[18]—works in *favor* of, not *against,* use of the protective device. Since 20 to 50% of motorists currently wear seatbelts on some occasions,[19] there would seem to be grounds to believe that seatbelt use by occasional users will be substantially increased by the detachable passive belts. Whether this is in fact the case is a matter for the agency to decide, but it must bring its expertise to bear on the question.

[18]   NHTSA commissioned a number of surveys of public attitudes in an effort to better understand why people were not using manual belts and to determine how they would react to passive restraints. The surveys reveal that while 20% to 40% of the public is opposed to wearing manual belts, the larger proportion of the population does not wear belts because they forgot or found manual belts inconvenient or bothersome. RIA at IV–25; App. 81. In another survey, 38% of the surveyed group responded that they would welcome automatic belts, and 25% would "tolerate" them. See RIA at IV–37. App. 93. NHTSA did not comment upon these attitude surveys in its explanation accompanying the rescission of the passive restraint requirement.

[19]   Four surveys of manual belt usage were conducted for NHTSA between 1978 and 1980, leading the agency to report that 40% to 50% of the people use their belts at least some of the time. RIA, at IV–25 (App. 81).

The agency is correct to look at the costs as well as the benefits of Standard 208. The agency's conclusion that the incremental costs of the requirements were no longer reasonable was predicated on its prediction that the safety benefits of the regulation **\*\*2873** might be minimal. Specifically, the **\*55** agency's fears that the public may resent paying more for the automatic belt systems is expressly dependent on the assumption that detachable automatic belts will not produce more than "negligible safety benefits." 46 Fed.Reg., at 53,424. When the agency reexamines its findings as to the likely increase in seatbelt

usage, it must also reconsider its judgment of the reasonableness of the monetary and other costs associated with the Standard. In reaching its judgment, NHTSA should bear in mind that Congress intended safety to be the preeminent factor under the Motor Vehicle Safety Act:

> "The Committee intends that safety shall be the overriding consideration in the issuance of standards under this bill. The Committee recognizes ... that the Secretary will necessarily consider reasonableness of cost, feasibility and adequate leadtime." S.Rep. No. 1301, at 6, U.S.Code Cong. & Admin.News 1966, p. 2714.

> "In establishing standards the Secretary must conform to the requirement that the standard be practicable. This would require consideration of all relevant factors, including technological ability to achieve the goal of a particular standard as well as consideration of economic factors. Motor vehicle safety is the paramount purpose of this bill and each standard must be related thereto." H.Rep. No. 1776, at 16.

The agency also failed to articulate a basis for not requiring nondetachable belts under Standard 208. It is argued that the concern of the agency with the easy detachability of the currently favored design would be readily solved by a continuous passive belt, which allows the occupant to "spool out" the belt and create the necessary slack for easy extrication from the vehicle. The agency did not separately consider the continuous belt option, but treated it together with the ignition interlock device in a category it titled "option of use-compelling features." 46 Fed.Reg., at 53,424. **\*56** The agency was concerned that use-compelling devices would "complicate extrication of [a]n occupant from his or her car." *Ibid.* "To require that passive belts contain use-compelling features," the agency observed, "could be counterproductive [given] ... widespread, latent and irrational fear in many members of the public that they could be trapped by the seat belt after a crash." *Ibid.* In addition, based on the experience with the ignition interlock, the agency feared that use-compelling features might trigger adverse public reaction.

By failing to analyze the continuous seatbelts in its own right, the agency has failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary and capricious standard. We agree with the Court of Appeals that NHTSA did not suggest that the emergency release mechanisms used in nondetachable belts are any less effective for emergency egress than the buckle release system used in detachable belts. In 1978, when General Motors obtained the

AR005320

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut...., 463 U.S. 29 (1983)

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

agency's approval to install a continuous passive belt, it assured the agency that nondetachable belts with spool releases were as safe as detachable belts with buckle releases. 43 Fed.Reg. 21,912, 21,913–14 (1978). NHTSA was satisfied that this belt design assured easy extricability: "the agency does not believe that the use of [such] release mechanisms will cause serious occupant egress problems ..." 43 Fed.Reg. 52,493, 52,494 (1978). While the agency is entitled to change its view on the acceptability of continuous passive belts, it is obligated to explain its reasons for doing so.

The agency also failed to offer any explanation why a continuous passive belt would engender the same adverse public reaction as the ignition interlock, and, as the Court of Appeals concluded, "every indication in the record points the other way." 680 F.2d at 234.[20] **57** We **\*\*2874** see no basis for equating the two devices: the continuous belt, unlike the ignition interlock, does not interfere with the operation of the vehicle. More importantly, it is the agency's responsibility, not this Court's, to explain its decision.

[20]     The Court of Appeals noted previous agency statements distinguishing interlocks from passive restraints. 42 Fed.Reg., at 34,290; 36 Fed.Reg., at 8296 (1971); RIA, at II–4, App. 30.

## VI

"An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis ..." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (CADC), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). We do not accept all of the reasoning of the Court of Appeals but we do conclude that the agency has failed to supply the requisite "reasoned analysis" in this case. Accordingly, we vacate the judgment of the Court of Appeals and remand the case to that court with directions to remand the matter to the NHTSA for further consideration consistent with this opinion.[21]

[21]     Petitioners construe the Court of Appeals' order of August 4, 1982, as setting an implementation date for Standard 208, in violation of *Vermont Yankee*'s injunction against imposing such time constraints. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S., at 544–545, 98 S.Ct., at 1211–1212. Respondents maintain that the Court of Appeals simply stayed the effective date of Standard 208, which, not having been validly rescinded, would have required mandatory passive restraints for new cars after September 1, 1982. We need not choose between these views because the agency had sufficient justification to suspend, although not to rescind, Standard 208, pending the further consideration required by the Court of Appeals, and now, by us.

*So ordered.*

Justice REHNQUIST, with whom THE CHIEF JUSTICE, Justice POWELL, and Justice O'CONNOR join, concurring in part and dissenting in part.

I join parts I, II, III, IV, and V–A of the Court's opinion. In particular, I agree that, since the airbag and continuous **\*58** spool automatic seatbelt were explicitly approved in the standard the agency was rescinding, the agency should explain why it declined to leave those requirements intact. In this case, the agency gave no explanation at all. Of course, if the agency can provide a rational explanation, it may adhere to its decision to rescind the entire standard.

I do not believe, however, that NHTSA's view of detachable automatic seatbelts was arbitrary and capricious. The agency adequately explained its decision to rescind the standard insofar as it was satisfied by detachable belts.

The statute that requires the Secretary of Transportation to issue motor vehicle safety standards also requires that "[e]ach such ... standard shall be practicable [and] shall meet the need for motor vehicle safety." 15 U.S.C. § 1392(a). The Court rejects the agency's explanation for its conclusion that there is substantial uncertainty whether requiring installation of detachable automatic belts would substantially increase seatbelt usage. The agency chose not to rely on a study showing a substantial increase in seatbelt usage in cars equipped with automatic seatbelts *and* an ignition interlock to prevent the car from being operated when the belts were not in place *and* which were voluntarily purchased with this equipment by consumers. See *ante*, at 2870, n. 15. It is reasonable for the agency to decide that this study does not support any conclusion concerning the effect of automatic seatbelts that are installed in all cars whether the consumer wants them or not and are not linked to an ignition interlock system.

The Court rejects this explanation because "there would seem to be grounds to believe that seatbelt use by occasional users will be substantially increased by the detachable passive belts," *ante*, at 2872, and the agency

AR005321

**Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut...., 463 U.S. 29 (1983)**

103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

did not adequately explain its rejection of these grounds. It seems to me that the agency's explanation, while by **\*\*2875** no means a model, is adequate. The agency acknowledged that there would probably be some increase in belt usage, but concluded that the increase would be small and not worth the cost of mandatory **\*59** detachable automatic belts. 46 F.R. 53421–54323 (1981). The agency's obligation is to articulate a "rational connection between the facts found and the choice made." *Ante,* at 2866–2867, 2871, quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). I believe it has met this standard.

The agency explicitly stated that it will increase its educational efforts in an attempt to promote public understanding, acceptance, and use of passenger restraint systems. 46 F.R. 53425 (1981). It also stated that it will "initiate efforts with automobile manufacturers to ensure that the public will have [automatic crash protection] technology available. If this does not succeed, the agency will consider regulatory action to assure that the last decade's enormous advances in crash protection technology will not be lost." *Id.,* at 53426.

The agency's changed view of the standard seems to be related to the election of a new President of a different political party. It is readily apparent that the responsible members of one administration may consider public resistance and uncertainties to be more important than do their counterparts in a previous administration. A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress,[*] it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.

[*]   Of course, a new administration may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions. But in this case, as the Court correctly concludes, *ante,* at 2867 – 2868, Congress has not required the agency to require passive restraints.

## All Citations

463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443, 13 Envtl. L. Rep. 20,672

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005322

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)

83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

KeyCite Yellow Flag - Negative Treatment
Superseded by Statute as Stated in New York Shipping Ass'n, Inc. v.
Federal Maritime Com'n, D.C.Cir., August 9, 1988

83 S.Ct. 239
Supreme Court of the United States

BURLINGTON TRUCK LINES, INC., et al.,
Appellants,
v.
UNITED STATES et al.
GENERAL DRIVERS AND HELPERS UNION,
LOCAL 554, etc., Appellant,
v.
UNITED STATES et al.

Nos. 27, 28.
|
Argued Oct. 15 and 16, 1962.
|
Decided Dec. 3, 1962.

**Synopsis**
Action by interstate trunk line motor carriers and a union
to restrain enforcement of an order of the Interstate
Commerce Commission granting a limited certificate of
convenience and necessity to another motor carrier. From
an adverse judgment of the United States District Court
for the Southern District of Illinois, 194 F.Supp. 31, the
carriers and union appealed. The Supreme Court, Mr.
Justice White, held that where substantial disruption in
motor service and serious inadequacy in the service
available was caused by the illegal and discriminatory
refusals by trunk line carriers to accept and deliver traffic
from or to local motor carriers because of union's
secondary boycott against local carriers under collective
bargaining contract with trunk carriers containing a 'hot
cargo' clause, and except for such union pressure service
would have been adequate, certification of an additional
carrier could not be automatic but had to be based upon
conscious choice that in the circumstances public interests
in adequate service outbalanced public interest in
protecting existing carriers' revenues, and Interstate
Commerce Commission improvidently exercised its
discretion in granting an additional certificate rather than
issuing a cease and desist order when there was no
substantial evidence that cease and desist order would be
ineffective.

Reversed and remanded with instructions.

Mr. Justice Black dissented in part.

**Attorneys and Law Firms**

**\*\*240 \*158** David Axelrod, Chicago, Ill., for appellants
in No. 27.

David D. Weinberg, Omaha, Neb., for appellants in No.
28.

Robert W. Ginnane, Washington, D.C., for appellees
United States and Interstate Commerce Commission.

J. Max Harding, Lincoln, Neb., for appellee Nebraska
Short Line Carriers, Inc.

**Opinion**

**\*\*241** Mr. Justice WHITE delivered the opinion of the
Court.

These are direct appeals under 28 U.S.C. s 1253, 28
U.S.C.A. s 1253 from the judgment of a three-judge
District Court, 194 F.Supp. 31 (S.D.Ill.), which upheld an
order of the Interstate Commerce Commission, 79 M.C.C.
599, granting a motor common carrier application. This
Court noted probable jurisdiction because of important
questions raised as to the relationship and interplay
between remedies available under the Interstate
Commerce Act and under the National Labor Relations
Act as amended by the Labor Management Relations Act.
49 U.S.C.A. s 1 et seq.; 29 U.S.C.A. s 151 et seq., 368
U.S. 951, 82 S.Ct. 393, 7 L.Ed.2d 385.

Appellee Nebraska Short Line Carriers, Inc., is a
Nebraska corporation, organized in June 1956. All of its
stock is owned by 12 motor carriers serving eastern and
central Nebraska and interchanging interstate traffic at
**\*159** Omaha and other gateway points with over 20 larger
trunk-line carriers, among whom are the appellant
carriers, with whom throughroute, joint-rate, interline
arrangements have been established. Some of the
stockholder carriers serve Nebraska communities without
other motor carrier or rail service.
 For some time prior to May 1956, the stockholder
carriers had resisted efforts by the Teamsters Union too
unionize their operations. Eventually, the union sought to
bring economic pressure to bear upon the stockholder
carriers by a secondary boycott against their traffic
through the larger, unionized, trunk-line carriers upon
whom the stockholder carriers were dependent for

AR005323

interchanging traffic to and from points beyond Nebraska. The collective bargaining contract between the trunkline carriers and the union contained protection of rights or so-called 'hot cargo' clauses which reserved to the union and its members 'the right to refuse to handle goods from or to any firm or truck' involved in any controversy with the union and provided that it should not be a cause for discharge if an employee of the carrier refused to handle 'unfair' goods.[1]

[1]     The hot cargo clause provided, in pertinent part:
'It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from or to make pickups from, or deliveries to establishments where picket lines, strikes, walk-outs or lock-outs exist.
'The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at any of whose terminals or places of business there is a controversy between such carrier or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled or used by interchanging or succeeding carriers, whether parties to this Agreement or not, until such controversy is settled.
'The insistence by any Employer that his employee(s) handle unfair goods or go through a picket line after they have elected not to, and if such refusal has been approved in writing by the responsible officials of the Central States Drivers Council, shall be sufficient cause for an immediate strike of all such Employer's operations without any need of the Union to go through the grievance procedure herein.'

*160 In May 1956, some of the stockholder carriers began experiencing difficulties in receiving and delivering freight from and to many of their normal and logical connections at Omaha and, to some extent, at Sioux City, Lincoln, and Grand Island. The difficulty consisted primarily of the refusal on the part of many of **242 the larger carriers to accept interline traffic tendered to them by the stockholder carriers and the refusal to turn over to them inbound traffic routed over their lines or normally turned over to them for delivery to ultimate destinations in Nebraska. The stockholder carriers, shippers, and consignees thus experienced considerable delay, inconvenience, and unforeseen expense in the movement of traffic to and from interior Nebraska points. At the same time, however, some of the larger interlining carriers, particularly appellants Burlington Truck Lines, Inc., and Santa Fe Trail Transportation Company, generally maintained normal interline relationships with the stockholder carriers.

The stockholder carriers thereupon organized Short Line and on June 22, 1956, Short Line filed an application with the Interstate Commerce Commission for common carrier authority to transport commodities on a regularly scheduled basis between certain Nebraska and Iowa points and points in other States. A further application for *161 operating authority over irregular routes between Omaha and points in 32 different States was filed six months later. The applications were assigned to two different examiners, each of whom recommended that the application before him be denied. The Commission stated that 'the pertinent facts are accurately and adequately stated' in the examiners' reports and adopted the statements as its own (79 M.C.C., at 605, 608), but it concluded that the first application should be granted in part.[2] The Commission found that although service in the area was satisfactory before May 1956, after that date the union-induced boycott of the stockholder carriers caused 'a substantial disruption' and 'serious inadequacies in the service available.' 79 M.C.C., at 612, 613. Accordingly, it found that grant of Short Line's application was required by 'the present and future public convenience and necessity.' Id., at 613. The Commission declared that it was not attempting to adjudicate a labor dispute or trench upon the jurisdiction of the National Labor Relations Board, and it conceded its lack of jurisdiction to look beyond the duties of carriers to the public under the terms of the Interstate Commerce Act. Id., at 611. It strongly criticized the carrier appellants for yielding to union secondary boycott demands, however, and it declared that the carriers' failure to fulfill their duties as common carriers was particularly inexcusable since there had been no violence or imminent threats of danger to property or person. The Commission expressed the opinion that alleged 'apprehensions of certain of the organized carriers that any opposition to the demands of the union would have resulted in reprisals against them' were 'greatly exaggerated,' and it noted that some of the interlining *162 carriers had successfully continued to deal with the stockholder carriers, with at least one of them encountering no difficulties with its employees when it changed its policy and carried out its statutory duties as a common carrier and interlined with the Short Line carriers.[3] Id., at 612.

[2]     The grant was limited to an Omaha-Chicago and Omaha-Kansas City-St. Louis route, for traffic

AR005324

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)

83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

originating in or destined to Nebraska points. 79 M.C.C., at 606, 614. No appellate review has been sought for the denial of the second application.

3  Apparently, in some instances it was necessary to handle interlined traffic by officials or supervisory personnel when employees refused to touch it. See R. 82.

Finally, the Commission considered the remedy appropriate to the situation. Short Line had applied for operating authority under s 207 (certificates of public convenience and necessity). As the Commission noted, the Act provides other means of correcting deficiencies of service. Section 204(c) empowers the Commission to order carriers to comply with the transportation laws, and the Commission **243 may act upon complaint or upon its own motion without complaint, in each case after notice and hearing, and sanctions are available to enforce its orders;⁴ s 212(a) empowers the Commission to suspend certificates for failure to comply with duties under the Act. The Commission proceeded to dispose of the remedy problem in the following manner:

4  See ss 212(a) (revocation), 222(a) (fine), 222(b) (injunction). That the inadequacy in service involved here was first brought to the Commission's attention by appellee's application for a certificate in no way, of course, limited the agency's power to invoke ss 204(c), 212, 222.

'We do not agree with those of the parties who insist that the procedure here adopted; namely, the filing of the instant applications under the provisions of section 207 of the act, is in any manner inappropriate. Regardless of the injection of the labor situation into the matter, the instant applications are based upon claimed deficiencies in the motor service *163 available to the shipping public of Nebraska. Where, as here, the existing carriers are shown to have so conducted their operations as to result in serious inadequacies in the service available to a large section of the public, one effective method of correcting the situation is by the granting of authority for sufficient additional service, and, in fact, we are charged with the duty of procuring such additional facilities as may be necessary to carry out the purposes of the national transportation policy. The fact that other remedies are available, such as the suggested filing of complaints by the aggrieved carriers and shippers does not alter the situation or deprive any carrier of the right to follow the course here chosen.' Id., at 613.

The Commission therefore granted the application.⁵

5  In this connection the Commission noted that it had refused a grant in a similar case decided concurrently with the present application (Galveston Truck Line Corporation Extension, 79 M.C.C. 619). The Commission stated that the circumstances there were different because the labor difficulties which had led to Commission issuance of a cease-and-desist order against carrier obedience to hot cargo clauses (Galveston Truck Line Corp. v. Ada Motor Lines, Inc., 73 M.C.C. 617; see note 17, infra) had 'ceased to exist for some time prior to the hearing, whereas in the instant proceeding such difficulties were of more recent origin and were continuing to be experienced up to and including the time of the hearing.' 79 M.C.C., at 613. But approximately 21 months intervened between the examiner's report and the Commission's order, and over two years between hearings and order. During at least 18 months of this time the case appears to have been argued to the Commission, remaining on the docket pending decision. See 73 M.C.C., at 617, n. 1.

The protesting carriers and the affected union sought judicial review before a three-judge District Court (28 U.S.C. ss 1336, 1398, 2321—2325, 28 U.S.C.A. ss 1336, 1398, 2321—2325), which upheld the order as within the scope of the Commission's statutory *164 authority, based on adequate findings, and supported by substantial evidence. 194 F.Supp. 31. The court reviewed the evidence and concluded that although there was 'no doubt that their (the protesting carriers') ability to perform service prior to May 195(6) was adequate,' the record showed that union pressure made it inadequate thereafter. 194 F.Supp. at 45. The court recognized that a cease-and-desist order might have been utilized, but stated that additional certification was also a permissible remedy which was not made unavailable merely because the reason for inadequacy of service was that 'existing carriers (were) subordinating their public service obligations to their collective bargaining agreements.' Id., at 54.

In regard to the choice of remedy, the court rejected the contention that the passage of the Labor-Management Reporting and Disclosure Act of 1959, **244 which added s 8(e) to the National Labor Relations Act, as amended by the Labor Management Relations Act, 73 Stat. 543, 29 U.S.C. (Supp. III) s 158(e), 29 U.S.C.A. s 158(e), some four months after the entry of the order, mooted the case by making the union activities in inducing the organized carriers to boycott the Short Line stockholder carriers illegal and therefore unlikely to be resumed. The District Court expressed doubts as to whether s 8(e) 'effectively outlaws 'hot cargo' clauses,'

AR005325

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)

83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

and maintained that, even if it did, the Commission's order should still stand. Id., at 58. To the union's contention that grant of a certificate here injected the Interstate Commerce Commission into the province of the National Labor Relations Board, or at least undercut to some extent the policies of s 7 of the National Labor Relations Act, the court replied that the union's failure to organize the employees of the Short Line carriers 'effectively destroyed any jurisdiction of the National Labor Relations Board under the Act of its creation.' *165 Id., at 59.[6] The case is now before us on direct appeals from this judgment.

[6]    Compare Duplex Printing Press Co. v. Deering, 254 U.S. 443, 471—472, 41 S.Ct. 172, 178—179, 65 L.Ed. 349. But see National Labor Relations Act, ss 2(3), 9, 29 U.S.C.A. ss 152(3), 159; Norris-La-Guardia Act, s 13(c), 29 U.S.C.A. s 113(c).

We have concluded that the judgment of the District Court must be reversed and the Commission's order set aside as an improvident exercise of its discretion. The Commission found from the facts of record that the refusals to handle interchange traffic and to accept freight from certain shippers[7] caused a substantial disruption in motor service and serious inadequacies in the service available, despite the efforts of some of the larger trunk-line carriers to maintain normal interline relationships. There was ample evidence to support these findings and we do not disturb them.

[7]    There were findings that secondary boycotts were imposed not only against the stockholder carriers but against certain shippers who were engaged in their own labor disputes.

 The difficulty with the order arises in connection with the findings and conclusions relevant to the choice of remedy. The assumption of the Commission was that the deficiencies of service made either of two remedies available—additional certification or entry of a cease-and-desist order—and that it had unlimited discretion to apply either remedy simply because either might be effective. It is unmistakably clear from the opinion of the Commission and from the fact-findings it made or adopted,[8] that the disruption in service resulted solely from refusals to serve, which in turn arose from union pressure applied to obtain union objectives. It is equally clear that absent union pressure there would have been no refusals to serve and that in such normal circumstances *166 the facilities and the services of the existing carriers were adequate.[9] Moreover, the trunk-line carriers were operating below capacity,[10] were in a

position and anxious to transport additional traffic[11], and had been enjoying the previously interlined traffic which the grant would divert to Short Line.[12] In this factual context we may put aside at the outset the authority which the appellees rely upon that holds that additional certification is the normal and permissible way to deal with generalized inadequacy in service. See, e.g., Davidson Transfer Co. v. United States, 42 F.Supp. 215, 219—220 (E.D.Pa.), aff'd, 317 U.S. 587, 63 S.Ct. 31, 87 L.Ed. 481.[13] When, as here, the particular deviations from an otherwise completely adequate service (which has economic need for the traffic) consist **245 solely of illegal and discriminatory refusals to accept or deliver traffic from or to particular carriers or shippers, the powers of the Commission under ss 204, 212, and 216 bear heavily on the propriety of s 207 relief. And in such a case the choice of the certification remedy may not be automatic; *167 it must be rational and based upon conscious choice that in the circumstances the public interest in 'adequate, economical, and efficient service' outbalances whatever public interest there is in protecting existing carriers' revenues in order to 'foster sound economic conditions in transportation and among the several carriers' (National Transportation Policy, 49 U.S.C. preceding ss 1, 301, 901, 1001, 49 U.S.C.A. preceding ss 1, 301, 901, 1001),[14] and the other opposing interests.

[8]    The Commission adopted the statements of facts in both recommended reports. 79 M.C.C., at 605, 608.

[9]    R. 87—89, 95.

[10]   R. 54.

[11]   Ibid., R. 95.

[12]   R. 68—69.

[13]   And see Atchison, T. & S.F.R. Co. v. Reddish, 368 U.S. 81, 91, 82 S.Ct. 204, 210, 7 L.Ed.2d 147, where the Court rejected the argument that complaint proceedings must be resorted to before additional operating authority could be had to replace a common carrier service inadequate for the shippers' particularized physical or economic needs. This case, like the many cases appellees cite in which the

Case 2:19-cv-00037-JNP   Document 59-39   Filed 11/30/22   PageID.5795   Page 63 of 95

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)
83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

Commission granted throughroute certification to overcome inadequacy of existing joint-line service (e.g., Penn Ohio New York Exp. Corp. Ext.—N.Y., 27 M.C.C. 269; Malone Freight Lines, Inc., Ext.—Textiles, 61 M.C.C. 501; Dallas & Mavis Fwdg. Co. Ext.—Mont., 64 M.C.C. 511; Braswell Ext.—Calif., 68 M.C.C. 664; Kenosha Corp. Ext.—Kenosha, 72 M.C.C. 289), is clearly inapposite here, where there is nothing inherently wrong with the appellant carriers' service, either because of its particular nature or because of lack of capacity, infrequency of pickups, delays in delivery, or the like.

14      In this connection it should be noted that certification of Short Line would divert traffic both from delinquent trunkline carriers and from carriers who did not violate their duties by acceding to the secondary boycott, e.g., Burlington and Santa Fe. See 79 M.C.C., at 603.

  There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act[15] will not permit us to accept such adjudicatory practice. See Siegel Co. v. Federal Trade Comm'n, 327 U.S. 608, 613—614, 66 S.Ct. 758, 761, 90 L.Ed. 888. Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470. The Commission must exercise its discretion under s 207(a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id., at 91, 73 S.Ct. at 1002, 97 L.Ed. 1470. And for the courts **168** to determine whether the agency has done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. Interstate Commerce Comm'n v. J—T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488—489, 62 S.Ct. 722, 729, 86 L.Ed. 971; United States v. Chicago, M., St. P. & P.R.

Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023. Here the Commission made no findings specifically directed to the choice between two vastly **246** different remedies with vastly different consequences to the carriers and the public. Nor did it articulate any rational connection between the facts found and the choice made. The Commission addressed itself neither to the possible shortcomings of s 204 procedures, to the advantages of certification, nor to the serious objections to the latter. As we shall presently show, these objections are particularly important in the present context and they should have been taken into account.

15      Section 8(b), 5 U.S.C. s 1007(b), 5 U.S.C.A. s 1007(b), provides that all decisions shall 'include a statement of * * * findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record.'

  Appellants' position is and was that the refusals to serve could be terminated through complaint procedures and thus the need for additional service obviated. The Commission was, as indicated, unresponsive to these arguments in its order, deeming that the availability of the other remedy '(did) not alter the situation.' This was error. Commission counsel now attempt to justify the Commission's 'choice' of remedy on the ground that a cease-and-desist order would have been ineffective. The short answer to this attempted justification is that the Commission did not so find. Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995. The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that **169** an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself:

'(A) simple but fundamental rule of administrative law * * * is * * * that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action * * *.' Ibid.

For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate (see Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 197, 61 S.Ct. 845, 853, 854, 85 L.Ed. 1271), the administrative process, for the purpose of the rule is to avoid 'propel(ling) the court into the domain which Congress has set aside exclusively

AR005327

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)

83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

for the administrative agency.' 332 U.S., at 196, 67 S.Ct., at 1577, 91 L.Ed. 1995.

The second and longer answer to the attempted justification is that there is not substantial evidence of record upon which to base a finding that a cease-and-desist order would have been ineffective. There was every indication at the time that a cease-and-desist order would render the deficiencies in service purely temporary phenomena and would thus be effective in promoting adequate, economical, and efficient service and in fostering sound economic conditions among the carriers affected.

It is said that attempted compliance by the unionized carriers might in some way 'so aggravate their labor difficulties as to cause a complete cessation of operations.' But this ignores the Commission's conclusion that carrier apprehensions of teamster reprisals were exaggerated and unwarranted. It further ignores the fact that, as the Commission was aware, the National Labor Relations Board *170 had ordered the union to cease boycotting any of the stockholder carriers by appeals to the employees of any other carrier. International Brotherhood of Teamsters, Local 554, 116 N.L.R.B.1891. To be sure, the Board had not ordered the union not to make appeals directly to the trunkline carriers. The union was free to make such appeals, absent inducement of employees, and, as far as the labor laws and the collective agreement[16] were **247 concerned, the employer was free to reject or accede to such requests. But it was precisely at this point that the Sand Door case (Local 1976 v. Labor Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186) recognized the power of the Commission to enter cease-and-desist orders against the carriers' violating the transportation law and their tariffs.[17] Thus, as the appellant union argues,[18] there was no reason to have assumed that the ordinary processes of the law[19] were incapable of remedying the situation.[20]

[16] See note 1, supra, setting forth the relevant provisions, under which the employees reserved the right to refuse to handle hot cargo, but under which the employer was left to his own devices. Cf. note 3, supra.

[17] The Court cited with approval the first Galveston case (Galveston Truck Line Corp. v. Ada Motor Lines, Inc., 73 M.C.C. 617), in which the Commission entered a cease-and-desist order against carrier obedience to hot cargo clauses. 357 U.S., at 109—110, 78 S.Ct., at 1021, 2 L.Ed.2d 1186.

[18] The union contends in its brief and we agree that the s 212(a) complaint procedure, if followed by the stockholder carriers, 'would have provided a more adequate remedy' at the time the case was before the Commission in 1956—1959.

[19] It is further contended, but we need not consider it here, that the efficacy of a cease-and-desist order is severely limited by the agency's self-imposed limitation against ordering carriers to cease from discriminatorily refusing to interline at joint rates. But cf. Dixie Carriers, Inc., v. United States, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934; Interstate Commerce Comm'n v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102. The Commission did not find, nor could it have found on this record, that the protesting carriers were likely to refuse to interline with the stockholder carriers except at discriminatorily higher, combination rates.

[20] We do not imply that service deficiencies of the kind found in this record could never justify the issuance of permanent operating authority. A totally different case might be presented if other remedial action by the Commission and the Board proved fruitless, hopelessly time-consuming, or otherwise inadequate to terminate the interruptions in service. Nor do we intend to pass upon the Commission's discretion under s 210a to provide temporary authority, pending determination of an application for authority or cease-and-desist order, or as an alternative to permanent authority to remedy service deficiencies of the kind present here. See Pan-Atlantic S.S. Corp. v. Atlantic Coast Line R. Co., 353 U.S. 436, 77 S.Ct. 999, 1 L.Ed.2d 963.

*171    But discussion of the effectiveness of cease-and-desist orders in terms of the June 1959 status of hot cargo arrangements is now largely academic: Congress added s 8(e) to the Act four months after the Commission's decision in this case and over a year before the District Court sustained the Commission. Under this section Congress declared it to 'be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void. * * *.' In the absence of authoritative judicial interpretation of s 8(e), however, the District Court was unwilling to attach any significance to the new law in the present case. In this the

AR005328

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)

83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

District Court erred. The plain words of the statute at the very least raised serious questions about the legality of direct union-employer agreements to boycott another employer. Not only would the delinquent interlining carriers in this case be subject to the injunctive and other processes of the National Labor Relations Board if their conduct violated **\*172** s 8(e), but the unions themselves would be vulnerable[21] and the pressures which **\*\*248** generated the refusals to serve might well be effectively removed. These intervening facts so changed the complexion of the case that (even putting aside the considerations discussed above) the reviewing equity court, in the exercise of its sound discretion, should not have affirmed the order, as it did, but should have vacated it and remanded it to the Commission for further consideration in the light of the changed conditions. See Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373—374, 59 S.Ct. 301, 307, 83 L.Ed. 221; State of Mo. ex rel. Wabash R. Co. v. Public Serv. Comm'n, 273 U.S. 126, 130—131, 47 S.Ct. 311, 313, 71 L.Ed. 575; Gulf, C. & S.F.R. Co. v. Dennis, 224 U.S. 503, 506—509, 32 S.Ct. 542, 543—544, 56 L.Ed. 860.[22]

[21]  For the view of the National Labor Relations Board, see Amalgamated Lithographers of America (Ind.), 130 N.L.R.B. 985; Amalgamated Lithographers of America, 130 N.L.R.B. 968, aff'd, 301 F.2d 20 (C.A.5th Cir.); American Feed Co., 129 N.L.R.B. 321.

[22]  This was, of course, the District Court's, and not the Commission's, error.

 Finally, although we do not wish to fetter the Commission's expert, discretionary powers by specifically prescribing that cease-and-desist order relief be granted (if, indeed, any relief is still needed) rather than additional certification, nevertheless the Commission should be particularly careful in its choice of remedy, and should have been particularly careful, because of the possible effects of its decision on the functioning of the national labor relations policy. The Commission acts in a most delicate area here, because whatever it does affirmatively (whether it grants a certificate or enters a cease-and-desist order) may have important consequences upon the collective bargaining processes between the union and the employer. The policies of the Interstate Commerce Act and the labor act necessarily must be accommodated, one to the other. **\*173** Writing before the 1959 amendments to the labor law, this Court Court said in the Sand Door case:

'But it is said that the Board is not enforcing the Interstate Commerce Act or interfering with the Commission's administration of that statute, but simply interpreting the

prohibitions of its own statute in a way consistent with the carrier's obligations under the Interstate Commerce Act. Because of that Act a carrier cannot effectively consent not to handle the goods of a shipper. * * * But the fact that the carrier's consent is not effective to relieve him from certain obligations under the Interstate Commerce Act does not necessarily mean that it is ineffective for all purposes, nor should a determination under one statute be mechanically carried over in the interpretation of another statute involving significantly different considerations and legislative purposes.' 357 U.S., at 110, 78 S.Ct., at 1021, 2 L.Ed.2d 1186.

The Court concluded that although 'common factors may emerge in the adjudication of these questions' under the two Acts by the two different agencies, nevertheless independent consideration and resolution were possible, the National Labor Relations Board directing itself to consideration of whether the employees violated their duties under s 8(b) and the Interstate Commerce Commission directing its attention to whether the carrier 'may have failed in his obligations under the Interstate Commerce Act.'

Implicit in this analysis is a recognition that if either agency is not careful it may trench upon the other's jurisdiction, and, because of lack of expert competence, contravene the national policy as to transportation or labor relations. In such a context, choice of the sweeping relief of certification rather than the more precise and narrowly **\*174** drawn cease-and-desist order remedy was improvident, absent a compelling justification. And the fact that s 8(e) of the Act now exposes the employer as well as **\*\*249** the union to Labor Board injunctive processes only underlines the necessity for careful analysis in fashioning a remedy to terminate unlawful action by delinquent carriers. This is not to say that circumstances can never permit the Commission to authorize additional service to remedy refusals to serve, but the Commission must act with a discriminating awareness of the consequences of its action. It has not done so here.

The judgment of the District Court is reversed. The case is remanded to it with instructions to enter an order enjoining, annulling, and setting aside the order of the Interstate Commerce Commission, and remanding the case to the Commission for further proceedings consistent with this opinion. It is so ordered.

Judgment reversed and case remanded with instructions.

AR005329

Mr. Justice GOLDBERG, with whom THE CHIEF JUSTICE, Mr. Justice DOUGLAS, and Mr. Justice BRENNAN join, concurring.

I join in the opinion and add only a few words to state my conviction that the 'discriminating awareness of the consequences of its action' required of the Commission by the opinion, inevitably must lead, if any relief is now warranted (which I doubt), to a rejection of the remedy of additional certification in favor of an appropriately limited cease-and-desist order.

As the matter was presented to the Commission and to the District Court, the additional certification, as the facts here plainly demonstrate, involved the Commission in intervention in the underlying labor dispute to a degree unduly trenching upon the Labor Board's jurisdiction and the rights and duties of the affected parties. Most certainly after the 1959 amendments to the labor law, the Commission, had the case then been remanded to it by the District Court as it should have been, could have entered a cease-and-desist order under which no conflict could or would have arisen between the I.C.C. and the N.L.R.B. in the respective exercise of their powers and in the discharge of their responsibilities. Such a cease-and-desist order should have been appropriately limited to requiring the carriers to provide service in a manner and to the extent compatible with their labor agreements and with both the carriers' and the union's rights and duties under federal labor law. That such an order would have been sufficient in practical effect is demonstrated by the fact that both Burlington and Santa Fe, parties to the hot cargo agreements, were able to carry out their duties under the Motor Carrier Act without creating any serious problems under their union agreements or under the National Labor Relations Act. This being so in the absence of a cease-and-desist order, it is difficult to understand why entry of such an order against the carriers would have been ineffective.

Mr. Justice CLARK, concurring in the result.

Four months after entry of the Commission's order Congress enacted s 8(e) as an amendment to the National Labor Relations Act, 29 U.S.C. (Supp. III) s 158(e), 29 U.S.C.A. s 158(e). Since the language of that section raised serious questions as to the legality of the unions' 'hot cargo' pressures, which in turn raised questions as to any continuation of the 'substantial disruption' in service, it appears to me that the District Court should have vacated the order and remanded the case to the

Commission for reconsideration in light of the likelihood of changed circumstances. The grant of permanent certification to a new carrier in an area where there are existing certifications is a drastic remedy to which resort should not be made except in the most compelling circumstances.

**\*\*250** For this reason I concur in the Court's reversal and remand to the District Court. In view of the lapse of time and the fact that the conduct which caused the disruption of service has been outlawe[†] by Congress, however, it appears that the issue has been mooted, and the Commission may determine that further proceedings would serve no purpose.

[†]   Although the effectiveness of the s 8(e) ban on 'hot cargo' clauses may have been subject to doubt when the District Court adjudicated this case, subsequent cases tend to remove any such doubt. See, e.g., National Labor Relations Board v. Local 294, International Brotherhood of Teamsters, 298 F.2d 105 (C.A.2d Cir., 1961).

Mr. Justice BLACK, concurring in part and dissenting in part.

I concur in the Court's judgment setting aside the Commission's order granting a permanent certificate to a new carrier to compete with existing carriers who but for temporary interruptions caused by lawful labor union activities would adequately meet the needs of commerce. I do not concur, however, in the remand to the Commission for further proceedings. Congress has vested power to regulate the employer-employee relationship in the National Labor Relations Board, not in the Interstate Commerce Commission, and I think the Commission's grant of a permanent certificate here, which stems wholly from temporary transportation delays owing to a labor dispute within the Labor Board's jurisdiction and which in effect punishes carriers for honoring their then lawful **\*175** collective bargaining contracts, amounts to an impermissible encroachment on that Board's domain. We are not called upon at this time to decide whether the Commission is wholly without power under any and all circumstances to grant temporary relief from a temporary stoppage of commerce in order to remedy acute emergency situations such, for illustration, as a shortage of food or supplies urgently needed in particular localities. It will be time enough to decide what are the powers of the Commission to meet such situations when they arise; it is concluded that they are not presented in this case.

**Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962)**

83 S.Ct. 239, 51 L.R.R.M. (BNA) 2583, 9 L.Ed.2d 207, 46 Lab.Cas. P 17,945...

Since it is my view that under the facts here the Commission has no power to grant a permanent certificate to a competitor, I see no reason to direct that this matter be referred back to the Commission for further proceedings. Such a remand assumes that there is some further action by way of a cease-and-desist order the Commission can or should take. My view is that the facts in this record provide no possible basis for permitting the Commission to order the carriers to cease and desist from carrying out their agreement with the unions. Nothing in the Interstate Commerce Act gives the Commission power to prohibit carriers or unions under the circumstances shown by this record from doing that which the Labor Act permits them to do. Moreover, as the Court points out, four months after the Commission's order Congress outlawed the kind of conduct which here interfered with transportation. Since Congress has, by this enactment, so clearly taken this matter in hand in a way that does not rely for enforcement on the Interstate Commerce Commission, the old Commission proceedings have all the earmarks of mootness, whether technically moot or not. If the union or the truck lines should hereafter violate this new law the Labor Board, backed by the courts, is vested with ample power to force both carriers and unions to obey that law. **\*176** The Interstate Commerce Commission has enough to do within its congressionally appointed field without stepping over into the field of labor regulation. The Commission should no more than a State\* invade regulatory territory Congress has preempted for agencies of its own choice.

\*      Cf. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed. 775 (1959).

**All Citations**

371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207, 51 L.R.R.M. (BNA) 2583, 46 Lab.Cas. P 17,945, 46 P.U.R.3d 403

---

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005331

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Mortgage Bankers Ass'n v. Solis, D.D.C., June 6, 2012

129 S.Ct. 1800
Supreme Court of the United States

FEDERAL COMMUNICATIONS COMMISSION,
et al., Petitioners,
v.
FOX TELEVISION STATIONS, INC., et al.

No. 07–582.
|
Argued Nov. 4, 2008.
|
Decided April 28, 2009.

**Synopsis**
**Background:** Federal Communications Commission (FCC) issued notices of apparent liability against broadcaster with regard to two broadcasts for violating the FCC's indecency regime. Broadcaster petitioned for review. The United States Court of Appeals for the Second Circuit, Pooler, Circuit Judge, vacated and remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:

agency action is not subject to a heightened or more searching standard of review simply because it represents a change in administrative policy, abrogating *NAACP v. FCC*, 682 F.2d 993;

not every agency action representing a change in policy need be justified by reasons more substantial than those required to adopt a policy in the first instance abrogating *New York Council, Assn. of Civilian Technicians v. FLRA*, 757 F.2d 502; and

FCC's change in its previous policy regarding enforcement of so-called indecency ban, under which nonrepetitive use of expletive was per se nonactionable, in favor of context-based approach which allowed it to treat as actionably indecent even isolated uses of sexual and excretory words in awards show broadcasts, was neither arbitrary nor capricious.

Reversed and remanded.

Justice Thomas concurred and filed opinion.

Justice Kennedy, concurred in part and concurred in judgment and filed opinion.

Justice Stevens dissented and filed opinion.

Justice Ginsburg dissented and filed opinion.

Justice Breyer dissented and filed opinion, in which Justices Stevens, Souter and Ginsburg joined.

**\*\*1803** *Syllabus*\*

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Federal law bans the broadcasting of "any ... indecent ... language," 18 U.S.C. § 1464, which includes references to sexual or excretory activity or organs, see *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073. Having first defined the prohibited speech in 1975, the Federal Communications Commission (FCC) took a cautious, but gradually expanding, approach to enforcing the statutory prohibition. In 2004, the FCC's *Golden Globes Order* declared for the first time that an expletive (nonliteral) use of the F–Word or the S–Word could be actionably indecent, even when the word is used only once.

This case concerns isolated utterances of the F- and S–Words during two live broadcasts aired by Fox Television Stations, Inc. In its order upholding the indecency findings, the FCC, *inter alia,* stated that the *Golden Globes Order* eliminated any doubt that fleeting expletives could be actionable; declared that under the new policy, a lack of repetition weighs against a finding of indecency, but is not a safe harbor; and held that both broadcasts met the new test because one involved a literal description of excrement and both invoked the F–Word. The order did not impose sanctions for either broadcast. The Second Circuit set aside the agency action, declining to address the constitutionality of the FCC's action but finding the FCC's reasoning inadequate under the Administrative Procedure Act (APA).

*Held:* The judgment is reversed, and the case is remanded.

AR005332

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

489 F.3d 444, reversed and remanded.

Justice SCALIA delivered the opinion of the Court, except as to Part III–E, concluding:

1. The FCC's orders are neither "arbitrary" nor "capricious" within the meaning **1804 of the APA, 5 U.S.C. § 706(2)(A). Pp. 1809 – 1815.

(a) Under the APA standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443. In overturning the FCC's judgment, the Second Circuit relied in part on its precedent interpreting the APA and *State Farm* to require a more substantial explanation for agency action that changes prior policy. There is, however, no basis in the Act or this Court's opinions for a requirement that all agency change be subjected to more searching review. Although an agency must ordinarily display awareness that it *is* changing position, see *United States v. Nixon,* 418 U.S. 683, 696, 94 S.Ct. 3090, 41 L.Ed.2d 1039, and may sometimes need to account for prior factfinding or certain reliance interests created by a prior policy, it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one. It suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change adequately indicates. Pp. 1809 – 1812.

(b) Under these standards, the FCC's new policy and its order finding the broadcasts at issue actionably indecent were neither arbitrary nor capricious. First, the FCC forthrightly acknowledged that its recent actions have broken new ground, taking account of inconsistent prior FCC and staff actions, and explicitly disavowing them as no longer good law. The agency's reasons for expanding its enforcement activity, moreover, were entirely rational. Even when used as an expletive, the F–Word's power to insult and offend derives from its sexual meaning. And the decision to look at the patent offensiveness of even isolated uses of sexual and excretory words fits with *Pacifica* 's context-based approach. Because the FCC's prior safe-harbor-for-single-words approach would likely lead to more widespread use, and in light of technological advances reducing the costs of bleeping offending words, it was rational for the agency to step away from its old regime. The FCC's decision not to impose sanctions precludes any argument that it is arbitrarily punishing parties without notice of their actions' potential consequences. Pp. 1812 – 1813.

(c) None of the Second Circuit's grounds for finding the FCC's action arbitrary and capricious is valid. First, the FCC did not need empirical evidence proving that fleeting expletives constitute harmful "first blows" to children; it suffices to know that children mimic behavior they observe. Second, the Court of Appeals' finding that fidelity to the FCC's "first blow" theory would require a categorical ban on *all* broadcasts of expletives is not responsive to the actual policy under review since the FCC has always evaluated the patent offensiveness of words and statements in relation to the context in which they were broadcast. The FCC's decision to retain some discretion in less egregious cases does not invalidate its regulation of the broadcasts under review. Third, the FCC's prediction that a *per se* exemption for fleeting expletives would lead to their increased use merits deference and makes entire sense. Pp. 1813 – 1815.

(d) Fox's additional arguments are not tenable grounds for affirmance. Fox misconstrues the agency's orders when it argues that the new policy is a presumption of indecency for certain words. It reads more into *Pacifica* than is there by arguing that the FCC failed adequately to explain how this regulation is consistent **1805 with that case. And Fox's argument that the FCC's repeated appeal to "context" is a smokescreen for a standardless regime of unbridled discretion ignores the fact that the opinion in *Pacifica* endorsed a context-based approach. Pp. 1814 – 1815.

2. Absent a lower court opinion on the matter, this Court declines to address the FCC orders' constitutionality. P. 1819.

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A through III–D, and IV, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined, and an opinion with respect to Part III–E, in which ROBERTS, C.J., and THOMAS and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion, *post,* pp. 1819 – 1822. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, *post,* pp. 1822 – 1824. STEVENS, J., *post,* pp. 1824 – 1828, and GINSBURG, J., *post,* pp. 1828 – 1829, filed dissenting opinions. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post,* pp. 1829 – 1841.

**Attorneys and Law Firms**

Gregory G. Garre, Washington, DC, for Petitioners.

AR005333

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

Carter Phillips, for Respondents.

Richard Cotton, Susan Weiner, New York, NY, Miguel A. Estrada, Andrew S. Tulumello, Matthew D. McGill, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Respondents NBC Universal, Inc. and NBC Telemundo License Company.

Jonathan H. Anschell, Los Angeles, CA, Susanna M. Lowy, New York, NY, Robert Corn-Revere, Davis Wright Tremaine LLP, Washington, D.C., for Respondent CBS Broadcasting Inc.

John W. Zucker, New York, NY, Seth P. Waxman, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Respondent ABC, Inc.

Ellen S. Agress, New York, NY, Maureen A. O'Connell, Washington, DC, Carter G. Phillips, R. Clark Wadlow, James P. Young, Jennifer Tatel, David S. Petron, Quin M. Sorenson, Sidley Austin LLP, Washington, D.C., for Respondent Fox Television Stations, Inc.

Andrew Jay Schwartzman, Parul Desai, Jonathan Rintels, Washington, DC, for Center for Creative Voices in Media, Inc.

Matthew B. Berry, General Counsel, Joseph R. Palmore, Deputy General Counsel, Jacob M. Lewis, Associate General Counsel, Nandan M. Joshi, Washington, D.C., Paul D. Clement, Solicitor General, Gregory G. Katsas, Acting Assistant Attorney General, Gregory G. Garre, Deputy Solicitor General, Eric D. Miller, Assistant to the Solicitor General, Thomas M. Bondy, Anne Murphy, Washington D.C., for Petitioner.

Justice SCALIA delivered the opinion of the Court, except as to Part III–E.

**\*505** Federal law prohibits the broadcasting of "any ... indecent ... language," 18 U.S.C. § 1464, which includes expletives referring to sexual or excretory activity or organs, see *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). This case concerns the adequacy of the Federal Communications Commission's explanation of its decision that this sometimes forbids the broadcasting of indecent expletives even when the offensive words are not repeated.

**\*\*1806** I. Statutory and Regulatory Background

The Communications Act of 1934, 48 Stat. 1064, 47 U.S.C. § 151 *et seq.* (2000 ed. and Supp. V), established a system of **\*506** limited-term broadcast licenses subject to various "conditions" designed "to maintain the control of the United States over all the channels of radio transmission," § 301 (2000 ed.). Almost 28 years ago we said that "[a] licensed broadcaster is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations." *CBS, Inc. v. FCC,* 453 U.S. 367, 395, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981) (internal quotation marks omitted).

One of the burdens that licensees shoulder is the indecency ban—the statutory proscription against "utter[ing] any obscene, indecent, or profane language by means of radio communication," 18 U.S.C. § 1464—which Congress has instructed the Commission to enforce between the hours of 6 a.m. and 10 p.m. Public Telecommunications Act of 1992, § 16(a), 106 Stat. 954, note following 47 U.S.C. § 303.[1] Congress has given the Commission various means of enforcing the indecency ban, including civil fines, see § 503(b)(1), and license revocations or the denial of license renewals, see §§ 309(k), 312(a)(6).

[1]   The statutory prohibition applicable to commercial radio and television stations extends by its terms from 6 a.m. to 12 midnight. The Court of Appeals for the District of Columbia Circuit held, however, that because "Congress and the Commission [had] backed away from the consequences of their own reasoning," by allowing some public broadcasters to air indecent speech after 10 p.m., the court was forced "to hold that the section is unconstitutional insofar as it bars the broadcasting of indecent speech between the hours of 10:00 p.m. and midnight." *Action for Children's Television v. FCC,* 58 F.3d 654, 669 (1995) (en banc); cert. denied, 516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996).

The Commission first invoked the statutory ban on indecent broadcasts in 1975, declaring a daytime broadcast of George Carlin's "Filthy Words" monologue actionably indecent. *In re Citizen's Complains Against Pacifica Foundation Station WBAI (PM),* 56 F.C.C.2d 94, 1975 WL 29897. At that time, the Commission announced the definition of indecent speech that it uses to this day, prohibiting "language that describes, **\*507** in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the

AR005334

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

audience." *Id.,* at 98.

In *FCC v. Pacifica Foundation, supra,* we upheld the Commission's order against statutory and constitutional challenge. We rejected the broadcasters' argument that the statutory proscription applied only to speech appealing to the prurient interest, noting that "the normal definition of 'indecent' merely refers to nonconformance with accepted standards of morality." *Id.,* at 740, 98 S.Ct. 3026. And we held that the First Amendment allowed Carlin's monologue to be banned in light of the "uniquely pervasive presence" of the medium and the fact that broadcast programming is "uniquely accessible to children." *Id.,* at 748–749, 98 S.Ct. 3026.

In the ensuing years, the Commission took a cautious, but gradually expanding, approach to enforcing the statutory prohibition against indecent broadcasts. Shortly after *Pacifica,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073, the Commission expressed its "inten[tion] strictly to observe the narrowness of the *Pacifica* holding," which "relied in part on the repetitive occurrence of the 'indecent' words" contained in Carlin's monologue. **1807 *In re Application of WGBH Educ. Foundation,* 69 F.C.C.2d 1250, 1254, ¶ 10, 1978 WL 36042 (1978). When the full Commission next considered its indecency standard, however, it repudiated the view that its enforcement power was limited to "deliberate, repetitive use of the seven words actually contained in the George Carlin monologue." *In re Pacifica Foundation, Inc.,* 2 FCC Rcd. 2698, 2699, ¶ 12, 1987 WL 345577 (1987). The Commission determined that such a "highly restricted enforcement standard ... was unduly narrow as a matter of law and inconsistent with [the Commission's] enforcement responsibilities under Section 1464." *In re Infinity Broadcasting Corp. of Pa.,* 3 FCC Rcd. 930, ¶ 5, 1987 WL 345514 (1987). The Court of Appeals for the District of Columbia Circuit upheld this **508 expanded enforcement standard against constitutional and Administrative Procedure Act challenge. See *Action for Children's Television v. FCC,* 852 F.2d 1332 (1988) (R. Ginsburg, J.), superseded in part by *Action for Children's Television v. FCC,* 58 F.3d 654 (1995) (en banc).

Although the Commission had expanded its enforcement beyond the "repetitive use of specific words or phrases," it preserved a distinction between literal and nonliteral (or "expletive") uses of evocative language. *In re Pacifica Foundation, Inc.,* 2 FCC Rcd., at 2699, ¶ 13. The Commission explained that each literal "description or depiction of sexual or excretory functions must be examined in context to determine whether it is patently offensive," but that "deliberate and repetitive use ... is a requisite to a finding of indecency" when a complaint focuses solely on the use of nonliteral expletives. *Ibid.*

Over a decade later, the Commission emphasized that the "full context" in which particular materials appear is "critically important," but that a few "principal" factors guide the inquiry, such as the "explicitness or graphic nature" of the material, the extent to which the material "dwells on or repeats" the offensive material, and the extent to which the material was presented to "pander," to "titillate," or to "shock." *In re Industry Guidance on Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency,* 16 FCC Rcd. 7999, 8002, ¶ 9, 8003, ¶ 10, 2001 WL 332787 (2001) (emphasis deleted). "No single factor," the Commission said, "generally provides the basis for an indecency finding," but "where sexual or excretory references have been made once or have been passing or fleeting in nature, this characteristic has tended to weigh against a finding of indecency." *Id.,* at 8003, ¶ 10, 8008, ¶ 17.

In 2004, the Commission took one step further by declaring for the first time that a nonliteral (expletive) use of the F- and S–Words could be actionably indecent, even when the word is used only once. The first order to this effect dealt **509 with an NBC broadcast of the Golden Globe Awards, in which the performer Bono commented, " '[T]his is really, really, f\* \* \*ing brilliant.' " *In re Complaints Against Various Broadcast Licensees Regarding Their Airing of "Golden Globe Awards" Program,* 19 FCC Rcd. 4975, 4976, n. 4, 2004 WL 540339 (2004) *(Golden Globes Order).* Although the Commission had received numerous complaints directed at the broadcast, its enforcement bureau had concluded that the material was not indecent because "Bono did not describe, in context, sexual or excretory organs or activities and ... the utterance was fleeting and isolated." *Id.,* at 4975–4976, ¶ 3. The full Commission reviewed and reversed the staff ruling.

The Commission first declared that Bono's use of the F–Word fell within its indecency definition, even though the word was used as an intensifier rather than a literal descriptor. "[G]iven the core meaning **1808 of the 'F–Word,' " it said, "any use of that word ... inherently has a sexual connotation." *Id.,* at 4978, ¶ 8. The Commission determined, moreover, that the broadcast was "patently offensive" because the F–Word "is one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language," because "[i]ts use invariably invokes a coarse sexual image," and because Bono's use of the word was entirely "shocking and gratuitous." *Id.,* at 4979, ¶ 9.

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

The Commission observed that categorically exempting such language from enforcement actions would "likely lead to more widespread use." *Ibid.* Commission action was necessary to "safeguard the well-being of the nation's children from the most objectionable, most offensive language." *Ibid.* The order noted that technological advances have made it far easier to delete ("bleep out") a "single and gratuitous use of a vulgar expletive," without adulterating the content of a broadcast. *Id.,* at 4980, ¶ 11.

The order acknowledged that "prior Commission and staff action [has] indicated that isolated or fleeting broadcasts of the 'F–Word' ... are not indecent or would not be acted **\*510** upon." It explicitly ruled that "any such interpretation is no longer good law." *Ibid.,* ¶ 12. It "clarif [ied] ... that the mere fact that specific words or phrases are not sustained or repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent." *Ibid.* Because, however, "existing precedent would have permitted this broadcast," the Commission determined that "NBC and its affiliates necessarily did not have the requisite notice to justify a penalty." *Id.,* at 4981–4982, ¶ 15.


II. The Present Case

This case concerns utterances in two live broadcasts aired by Fox Television Stations, Inc., and its affiliates prior to the Commission's *Golden Globes Order*. The first occurred during the 2002 Billboard Music Awards, when the singer Cher exclaimed, "I've also had critics for the last 40 years saying that I was on my way out every year. Right. So f* * * 'em." Brief for Petitioners 9. The second involved a segment of the 2003 Billboard Music Awards, during the presentation of an award by Nicole Richie and Paris Hilton, principals in a Fox television series called "The Simple Life." Ms. Hilton began their interchange by reminding Ms. Richie to "watch the bad language," but Ms. Richie proceeded to ask the audience, "Why do they even call it 'The Simple Life?' Have you ever tried to get cow s* * * out of a Prada purse? It's not so f* * *ing simple." *Id.,* at 9–10. Following each of these broadcasts, the Commission received numerous complaints from parents whose children were exposed to the language.

On March 15, 2006, the Commission released "Notices of Apparent Liability" for a number of broadcasts that the Commission deemed actionably indecent, including the two described above. *In re Complaints Regarding Various Television Broadcasts Between Feb. 2, 2002 and Mar. 8,*

*2005,* 21 FCC Rcd. 2664, 2006 WL 656783 (2006). Multiple parties petitioned the Court of Appeals for the Second Circuit for judicial review of **\*511** the order, asserting a variety of constitutional and statutory challenges. Since the order had declined to impose sanctions, the Commission had not previously given the broadcasters an opportunity to respond to the indecency charges. It therefore requested and obtained from the Court of Appeals a voluntary remand so that the parties could air their objections. 489 F.3d 444, 453 (2007). The Commission's order on remand upheld the indecency findings for the broadcasts described above. See *In re* **\*\*1809** *Complaints Regarding Various Television Broadcasts Between Feb. 2, 2002, and Mar. 8, 2005,* 21 FCC Rcd. 13299, 2006 WL 3207085 (2006) *(Remand Order).*

The order first explained that both broadcasts fell comfortably within the subject-matter scope of the Commission's indecency test because the 2003 broadcast involved a literal description of excrement and both broadcasts invoked the "F–Word," which inherently has a sexual connotation. *Id.,* at 13304, ¶ 16, 13323, ¶ 58. The order next determined that the broadcasts were patently offensive under community standards for the medium. Both broadcasts, it noted, involved entirely gratuitous uses of "one of the most vulgar, graphic, and explicit words for sexual activity in the English language." *Id.,* at 13305, ¶ 17, 13324, ¶ 59. It found Ms. Richie's use of the "F–Word" and her "explicit description of the handling of excrement" to be "vulgar and shocking," as well as to constitute "pandering," after Ms. Hilton had playfully warned her to " 'watch the bad language.' " *Id.,* at 13305, ¶ 17. And it found Cher's statement patently offensive in part because she metaphorically suggested a sexual act as a means of expressing hostility to her critics. *Id.,* at 13324, ¶ 60. The order relied upon the " 'critically important' " context of the utterances, *id.,* at 13304, ¶ 15, noting that they were aired during prime-time awards shows "designed to draw a large nationwide audience that could be expected to include many children interested in seeing their favorite music stars," *id.,* at 13305, ¶ 18, 13324, ¶ 59. Indeed, **\*512** approximately 2.5 million minors witnessed each of the broadcasts. *Id.,* at 13306, ¶ 18, 13326, ¶ 65.

The order asserted that both broadcasts under review would have been actionably indecent under the staff rulings and Commission dicta in effect prior to the *Golden Globes Order*—the 2003 broadcast because it involved a literal description of excrement, rather than a mere expletive, because it used more than one offensive word, and because it was planned, 21 FCC Rcd., at 13307, ¶ 22; and the 2002 broadcast because Cher used

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

the F–Word not as a mere intensifier, but as a description of the sexual act to express hostility to her critics, *id.,* at 13324, ¶ 60. The order stated, however, that the pre-*Golden Globes* regime of immunity for isolated indecent expletives rested only upon staff rulings and Commission dicta, and that the Commission itself had never held "that the isolated use of an expletive ... was not indecent or could not be indecent," 21 FCC Rcd., at 13307, ¶ 21. In any event, the order made clear, the *Golden Globes Order* eliminated any doubt that fleeting expletives could be actionably indecent, 21 FCC Rcd., at 13308, ¶ 23, 13325, ¶ 61, and the Commission disavowed the bureau-level decisions and its own dicta that had said otherwise, *id.,* at 13306–13307, ¶¶ 20, 21. Under the new policy, a lack of repetition "weigh[s] against a finding of indecency," *id.,* at 13325, ¶ 61, but is not a safe harbor.

The order explained that the Commission's prior "strict dichotomy between 'expletives' and 'descriptions or depictions of sexual or excretory functions' is artificial and does not make sense in light of the fact that an 'expletive's' power to offend derives from its sexual or excretory meaning." *Id.,* at 13308, ¶ 23. In the Commission's view, "granting an automatic exemption for 'isolated or fleeting' expletives unfairly forces viewers (including children)" to take " 'the first blow' " and would allow broadcasters "to air expletives at all hours of a day so long as they did so one at a time." *Id.,* at 13309, ¶ 25. Although the Commission determined that Fox **\*513** encouraged the offensive language by using suggestive scripting in the 2003 broadcast, and unreasonably failed to take adequate precautions in both broadcasts, **\*\*1810** *id.,* at 13311–13314, ¶¶ 31–37, the order again declined to impose any forfeiture or other sanction for either of the broadcasts, *id.,* at 13321, ¶ 53, 13326, ¶ 66.

Fox returned to the Second Circuit for review of the *Remand Order,* and various intervenors including CBS, NBC, and ABC joined the action. The Court of Appeals reversed the agency's orders, finding the Commission's reasoning inadequate under the Administrative Procedure Act. 489 F.3d 444. The majority was "skeptical that the Commission [could] provide a reasoned explanation for its 'fleeting expletive' regime that would pass constitutional muster," but it declined to reach the constitutional question. *Id.,* at 462. Judge Leval dissented, *id.,* at 467. We granted certiorari, 552 U.S. 1255, 128 S.Ct. 1647, 170 L.Ed.2d 352 (2008).

### III. Analysis

### A. Governing Principles

The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* which sets forth the full extent of judicial authority to review executive agency action for procedural correctness, see *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 545–549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), permits (insofar as relevant here) the setting aside of agency action that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). Under what we have called this "narrow" standard of review, we insist that an agency "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). We have made clear, however, that "a court is not to substitute its judgment for that of the agency," *ibid.,* and should "uphold a decision of less than ideal clarity if the agency's path may reasonably **\*514** be discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

In overturning the Commission's judgment, the Court of Appeals here relied in part on Circuit precedent requiring a more substantial explanation for agency action that changes prior policy. The Second Circuit has interpreted the Administrative Procedure Act and our opinion in *State Farm* as requiring agencies to make clear " 'why the original reasons for adopting the [displaced] rule or policy are no longer dispositive' " as well as " 'why the new rule effectuates the statute as well as or better than the old rule.' " 489 F.3d, at 456–457 (quoting *New York Council, Assn. of Civilian Technicians v. FLRA,* 757 F.2d 502, 508 (C.A.2 1985); emphasis deleted). The Court of Appeals for the District of Columbia Circuit has similarly indicated that a court's standard of review is "heightened somewhat" when an agency reverses course. *NAACP v. FCC,* 682 F.2d 993, 998 (1982).

We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review. The Act mentions no such heightened standard. And our opinion in *State Farm* neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance. That case, which involved the rescission of a prior regulation, said only that such action requires "a reasoned analysis for the change beyond that which may

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

be required when an agency *does not act* in the first instance." 463 U.S., at 42, 103 S.Ct. 2856 (emphasis added).[2] Treating failures to act and **\*\*1811 \*515** rescissions of prior action differently for purposes of the standard of review makes good sense, and has basis in the text of the statute, which likewise treats the two separately. It instructs a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings, and conclusions found to be [among other things] ... arbitrary [or] capricious," § 706(2)(A). The statute makes no distinction, however, between initial agency action and subsequent agency action undoing or revising that action.

[2]     Justice BREYER's contention that *State Farm* did anything more, *post,* at 1830 – 1832 (dissenting opinion), rests upon his failure to observe the italicized phrase and upon a passage quoted in *State Farm* from a plurality opinion in *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). That passage referred to "a presumption that [congressional] policies will be carried out best if the settled rule is adhered to." *Id.,* at 807–808, 93 S.Ct. 2367 (opinion of Marshall, J.). But the *Atchison* plurality made this statement in the context of requiring the agency to provide *some* explanation for a change, "so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate," *id.,* at 808, 93 S.Ct. 2367. The opinion did not assert the authority of a court to demand explanation sufficient to enable it to weigh (by its own lights) the merits of the agency's change. Nor did our opinion in *State Farm.*

To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. See *United States v. Nixon,* 418 U.S. 683, 696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has

engendered serious reliance interests that must be taken into account. *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). It would be arbitrary or capricious to ignore such matters. In such cases it is not **\*516** that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

In this appeal from the Second Circuit's setting aside of Commission action for failure to comply with a procedural requirement of the Administrative Procedure Act, the broadcasters' arguments have repeatedly referred to the First Amendment. If they mean to invite us to apply a more stringent arbitrary-and-capricious review to agency actions that implicate constitutional liberties, we reject the invitation. The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts. See *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). We know of no precedent for applying it to **\*\*1812** limit the scope of authorized executive action. In the same section authorizing courts to set aside "arbitrary [or] capricious" agency action, the Administrative Procedure Act separately provides for setting aside agency action that is "unlawful," 5 U.S.C. § 706(2)(A), which of course includes unconstitutional action. We think that is the only context in which constitutionality bears upon judicial review of authorized agency action. If the Commission's action here was not arbitrary or capricious in the ordinary sense, it satisfies the Administrative Procedure Act's "arbitrary [or] capricious" standard; its lawfulness under the Constitution is a separate question to be addressed in a constitutional challenge.[3]

[3]     Justice BREYER claims that "[t]he Court has often applied [the doctrine of constitutional avoidance] where an agency's regulation relies on a plausible but constitutionally suspect interpretation of a statute." *Post,* at 1840. The cases he cites, however, set aside an agency regulation because, applying the doctrine of constitutional avoidance to the ambiguous statute under which the agency acted, *the Court* found the agency's interpretation of the statute erroneous. See *Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers,* 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001); *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 507, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). But Justice BREYER does not urge that *we* issue such a holding, evidently agreeing that we should limit our review to what the Court of Appeals decided, see Part IV, *infra*—which included only the adequacy

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

of the Commission's rulemaking procedure, and not the statutory question. Rather, Justice BREYER seeks a "remand [that] would do no more than ask the agency to reconsider its policy decision in light of" constitutional concerns. *Post,* at 1840. That strange and novel disposition would be entirely unrelated to the doctrine of constitutional avoidance, and would better be termed the doctrine of judicial arm-twisting or appellate review by the wagged finger.

#### *517 B. Application to This Case

Judged under the above described standards, the Commission's new enforcement policy and its order finding the broadcasts actionably indecent were neither arbitrary nor capricious. First, the Commission forthrightly acknowledged that its recent actions have broken new ground, taking account of inconsistent "prior Commission and staff action" and explicitly disavowing them as "no longer good law." *Golden Globes Order,* 19 FCC Rcd., at 4980, ¶ 12. To be sure, the (superfluous) explanation in its *Remand Order* of why the Cher broadcast would even have violated its earlier policy may not be entirely convincing. But that unnecessary detour is irrelevant. There is no doubt that the Commission knew it was making a change. That is why it declined to assess penalties; and it relied on the *Golden Globes Order* as removing any lingering doubt. *Remand Order,* 21 FCC Rcd., at 13308, ¶ 23, 13325, ¶ 61.

Moreover, the agency's reasons for expanding the scope of its enforcement activity were entirely rational. It was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent. As the Commission said with regard to expletive use of the F–Word, "the word's power to insult and offend derives from its sexual meaning." *Id.,* at 13323, ¶ 58. And the Commission's decision to look at the patent offensiveness of even isolated uses of sexual and excretory words fits with the context-based approach we sanctioned in *Pacifica,* 438 U.S., at 750, 98 S.Ct. 3026. Even isolated utterances can be made in "pander[ing,] ... vulgar and shocking" manners, *Remand Order,* 21 FCC Rcd., at 13305, ¶ 17, and can constitute harmful " 'first blow[s]' " to children, *id.,* at 13309, ¶ 25. It is surely **1813 rational (if not inescapable) to believe that a safe harbor for single words would "likely lead to more widespread use of the offensive language," *Golden*

*Globes Order, supra,* at 4979, ¶ 9.

When confronting other requests for *per se* rules governing its enforcement of the indecency prohibition, the commission has declined to create safe harbors for particular types of broadcasts. See *In re Pacifica Foundation, Inc.,* 2 FCC Rcd., at 2699, ¶ 12 (repudiating the view that the Commission's enforcement power was limited to "deliberate, repetitive use of the seven words actually contained in the George Carlin monologue"); *In re Infinity Broadcasting Corp. of Pa.,* 3 FCC Rcd., at 932, ¶ 17 ("reject[ing] an approach that would hold that if a work has merit, it is *per se* not indecent"). The Commission could rationally decide it needed to step away from its old regime where nonrepetitive use of an expletive was *per se* nonactionable because that was "at odds with the Commission's overall enforcement policy." *Remand Order, supra,* at 13308, ¶ 23.

The fact that technological advances have made it easier for broadcasters to bleep out offending words further supports the Commission's stepped-up enforcement policy. *Golden Globes Order, supra,* at 4980, ¶ 11. And the agency's decision not to impose any forfeiture or other sanction precludes any argument that it is arbitrarily punishing parties without notice of the potential consequences of their action.

#### C. The Court of Appeals' Reasoning

The Court of Appeals found the Commission's action arbitrary and capricious on three grounds. First, the court criticized the Commission for failing to explain why it had not previously banned fleeting expletives as "harmful 'first **519 blow[s].' " 489 F.3d, at 458. In the majority's view, without "evidence that suggests a fleeting expletive is harmful [and] ... serious enough to warrant government regulation," the agency could not regulate more broadly. *Id.,* at 461. As explained above, the fact that an agency had a prior stance does not alone prevent it from changing its view or create a higher hurdle for doing so. And it is not the Commission, but Congress that has proscribed "any ... indecent ... language." 18 U.S.C. § 1464.

There are some propositions for which scant empirical evidence can be marshaled, and the harmful effect of broadcast profanity on children is one of them. One cannot demand a multiyear controlled study, in which some children are intentionally exposed to indecent broadcasts (and insulated from all other indecency), and

others are shielded from all indecency. It is one thing to set aside agency action under the Administrative Procedure Act because of failure to adduce empirical data that can readily be obtained. See, *e.g., State Farm,* 463 U.S., at 46–56, 103 S.Ct. 2856 (addressing the costs and benefits of mandatory passive restraints for automobiles). It is something else to insist upon obtaining the unobtainable. Here it suffices to know that children mimic the behavior they observe—or at least the behavior that is presented to them as normal and appropriate. Programming replete with one-word indecent expletives will tend to produce children who use (at least) one-word indecent expletives. Congress has made the determination that indecent material is harmful to children, and has left enforcement of the ban to the Commission. If enforcement had to be supported by empirical data, the ban would effectively be a nullity.

The Commission had adduced no quantifiable measure of the harm caused by the language in *Pacifica,* and we nonetheless held that the "government's interest in the 'well-being of its youth' ... justified the regulation of otherwise protected expression." **1814 438 U.S., at 749, 98 S.Ct. 3026 (quoting *Ginsberg v. New York,* 390 U.S. 629, 640, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). If the Constitution *520 itself demands of agencies no more scientifically certain criteria to comply with the First Amendment, neither does the Administrative Procedure Act to comply with the requirement of reasoned decisionmaking.

The court's second objection is that fidelity to the agency's "first blow" theory of harm would require a categorical ban on *all* broadcasts of expletives; the Commission's failure to go to this extreme thus undermined the coherence of its rationale. 489 F.3d, at 458–459. This objection, however, is not responsive to the Commission's actual policy under review—the decision to include patently offensive fleeting expletives within the definition of indecency. The Commission's prior enforcement practice, unchallenged here, already drew distinctions between the offensiveness of particular words based upon the context in which they appeared. Any complaint about the Commission's failure to ban only some fleeting expletives is better directed at the agency's context-based system generally rather than its inclusion of isolated expletives.

More fundamentally, however, the agency's decision to consider the patent offensiveness of isolated expletives on a case-by-case basis is not arbitrary or capricious. "Even a prime-time recitation of Geoffrey Chaucer's Miller's Tale," we have explained, "would not be likely to command the attention of many children who are both old enough to understand and young enough to be adversely affected." *Pacifica, supra,* at 750, n. 29, 98 S.Ct. 3026. The same rationale could support the Commission's finding that a broadcast of the film Saving Private Ryan was not indecent—a finding to which the broadcasters point as supposed evidence of the Commission's inconsistency. The frightening suspense and the graphic violence in the movie could well dissuade the most vulnerable from watching and would put parents on notice of potentially objectionable material. See *In re Complaints Against Various Television Licensees Regarding Their Broadcast on Nov. 11, 2004 of ABC Television Network's* *521 *Presentation of Film "Saving Private Ryan,"* 20 FCC Rcd. 4507, 4513, ¶ 15, 2005 WL 474210 (2005) (noting that the broadcast was not "intended as family entertainment"). The agency's decision to retain some discretion does not render arbitrary or capricious its regulation of the deliberate and shocking uses of offensive language at the award shows under review—shows that were expected to (and did) draw the attention of millions of children.

Finally, the Court of Appeals found unconvincing the agency's prediction (without any evidence) that a *per se* exemption for fleeting expletives would lead to increased use of expletives one at a time. 489 F.3d, at 460. But even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense. To predict that complete immunity for fleeting expletives, ardently desired by broadcasters, will lead to a substantial increase in fleeting expletives seems to us an exercise in logic rather than clairvoyance. The Court of Appeals was perhaps correct that the Commission's prior policy had not yet caused broadcasters to "barrag[e] the airwaves with expletives," *ibid.* That may have been because its prior permissive policy had been confirmed (save in dicta) only at the staff level. In any event, as the *Golden Globes* order demonstrated, it did produce more expletives than the Commission (which has the first call in this matter) deemed in conformity with the statute.

### D. Respondents' Arguments

Respondents press some arguments that the court did not adopt. They claim that **1815 the Commission failed to acknowledge its change in enforcement policy. That contention is not tenable in light of the *Golden Globes Order* 's specific declaration that its prior rulings were no longer good law, 19 FCC Rcd., at 4980, ¶ 12, and the *Remand Order* 's disavowal of those staff rulings and

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

Commission dicta as "seriously flawed," 21 FCC Rcd., at 13308, ¶ 23. The broadcasters also try to recharacterize the nature of the Commission's shift, **\*522** contending that the old policy was not actually a *per se* rule against liability for isolated expletives and that the new policy is a presumption of indecency for certain words. This description of the prior agency policy conflicts with the broadcasters' own prior position in this case. See, *e.g.,* Brief in Opposition for Respondent Fox Television Stations, Inc., et al. 4 ("For almost 30 years following Pacifica, the FCC did not consider fleeting, isolated or inadvertent expletives to be indecent"). And we find no basis for the contention that the Commission has now adopted a presumption of indecency; its repeated reliance on context refutes this claim.

The broadcasters also make much of the fact that the Commission has gone beyond the scope of authority approved in *Pacifica,* which it once regarded as the farthest extent of its power. But we have never held that *Pacifica* represented the outer limits of permissible regulation, so that fleeting expletives *may not* be forbidden. To the contrary, we explicitly left for another day whether "an occasional expletive" in "a telecast of an Elizabethan comedy" could be prohibited. 438 U.S., at 748 – 750, 98 S.Ct. 3026. By using the narrowness of *Pacifica* 's holding to require empirical evidence of harm before the Commission regulates more broadly, the broadcasters attempt to turn the sword of *Pacifica,* which allowed *some* regulation of broadcast indecency, into an administrative-law shield preventing any regulation beyond what *Pacifica* sanctioned. Nothing prohibits federal agencies from moving in an incremental manner. Cf. *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 1002, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

Finally, the broadcasters claim that the Commission's repeated appeal to "context" is simply a smokescreen for a standardless regime of unbridled discretion. But we have previously approved Commission regulation based "on a nuisance rationale under which context is all-important," *Pacifica, supra,* at 750, 98 S.Ct. 3026, and we find no basis in the Administrative Procedure Act for mandating anything different.

**\*523** E. The Dissents' Arguments

Justice BREYER purports to "begin with applicable law," *post,* at 1829, but in fact begins by stacking the deck. He claims that the FCC's status as an "independent" agency sheltered from political oversight requires courts to be "all the more" vigilant in ensuring "that major policy decisions be based upon articulable reasons." *Ibid.* Not so. The independent agencies are sheltered not from politics but from the President, and it has often been observed that their freedom from Presidential oversight (and protection) has simply been replaced by increased subservience to congressional direction. See, *e.g., In re Sealed Case,* 838 F.2d 476, 507–508 (C.A.D.C.) (Silberman, J.), rev'd *sub nom. Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); Kagan, Presidential Administration, 114 Harv. L.Rev. 2245, 2271, n. 93 (2001); Calabresi & Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541, 583 (1994); Easterbrook, The State of Madison's Vision of the State: A Public Choice Perspective, 107 Harv. L.Rev. 1328, 1341 (1994). Indeed, the precise policy change at issue here was spurred by significant political pressure from Congress.[4]

[4]    A Subcommittee of the FCC's House Oversight Committee held hearings on the FCC's broadcast indecency enforcement on January 28, 2004. "Can You Say That on TV?": An Examination of the FCC's Enforcement with Respect to Broadcast Indecency, Hearing before the Subcommittee on Telecommunications and the Internet of the House Committee on Energy and Commerce, 108th Cong., 2d Sess. Members of the Subcommittee specifically "called on the full Commission to reverse [the staff ruling in the *Golden Globes* case]" because they perceived a "feeling amongst many Americans that some TV broadcasters are engaged in a race to the bottom, pushing the decency envelope in order to distinguish themselves in the increasingly crowded entertainment field." *Id.,* at 2 (statement of Rep. Upton); see also, *e.g., id.,* at 17 (statement of Rep. Terry), 19 (statement of Rep. Pitts). They repeatedly expressed disapproval of the FCC's enforcement policies, see, *e.g., id.,* at 3 (statement of Rep. Upton) ("At some point, we have to ask the FCC: How much is enough? When will it revoke a license?"); *id.,* at 4 (statement of Rep. Markey) ("Today's hearing will allow us to explore the FCC's lackluster enforcement record with respect to these violations").
    About two weeks later, on February 11, 2004, the same Subcommittee held hearings on a bill increasing the fines for indecency violations. Hearings on H. R. 3717 before the Subcommittee on Telecommunications and the Internet of the House Committee on Energy and Commerce, 108th Cong., 2d Sess. All five Commissioners were present and were grilled about enforcement shortcomings. See, *e.g., id.,* at 124 (statement of Rep. Terry) ("Chairman Powell, ... it seems like common sense that if we had ... more frequent enforcement instead of only a few examples of fines ... that would be a deterrent in itself"); *id.,* at 7

AR005341

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

(statement of Rep. Dingell) ("I see that apparently ... there is no enforcement of regulations at the FCC"). Certain statements, moreover, indicate that the political pressure applied by Congress had its desired effect. See *ibid.* ("I think our committee's work has gotten the attention of FCC Chairman Powell and the Bush Administration. And I'm happy to see the FCC now being brought to a state of apparent alert on these matters"); see also *id.,* at 124 (statement of Michael Copps, FCC Commissioner) (noting "positive" change in other Commissioners' willingness to step up enforcement in light of proposed congressional action). A version of the bill ultimately became law as the Broadcast Decency Enforcement Act of 2005, 120 Stat. 491.

The FCC adopted the change that is the subject of this litigation on March 3, 2004, about three weeks after this second hearing. See *Golden Globes Order,* 19 FCC Rcd. 4975.

**\*\*1816 \*524** Justice STEVENS apparently recognizes this political control by Congress, and indeed sees it as the manifestation of a principal-agency relationship. In his judgment, the FCC is "better viewed as an agent of Congress" than as part of the Executive. *Post,* at 1825 – 1826 (dissenting opinion). He nonetheless argues that this is a good reason for requiring the FCC to explain "why its prior policy is no longer sound before allowing it to change course." *Post,* at 1826. Leaving aside the unconstitutionality of a scheme giving the power to enforce laws to agents of Congress, see *Bowsher v. Synar,* 478 U.S. 714, 726, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), it seems to us that Justice STEVENS' conclusion does not follow from his premise. If the FCC is indeed an agent of Congress, it would seem an adequate explanation of its change of position that Congress **\*525** made clear its wishes for stricter enforcement, see n. 4, *supra.*[5] **\*\*1817** The Administrative Procedure Act, after all, does not apply to Congress and its agencies.[6]

5    Justice STEVENS accuses us of equating statements made in a congressional hearing with the intent of Congress. *Post,* at 1826, n. 3. In this opinion, we do not. The intent of the full Congress (or at least a majority of each House) is thought relevant to the interpretation of statutes, since they must be passed by the entire Congress. See U.S. Const., Art. I, § 7. It is quite irrelevant, however, to the extrastatutory influence Congress exerts over agencies of the Executive Branch, which is exerted by the congressional committees responsible for oversight and appropriations with respect to the relevant agency. That is a major reason why committee assignments are important, and committee chairmanships powerful. Surely Justice STEVENS knows this.

6    The Administrative Procedure Act defines "agency" to mean "each authority of the Government of the United States," 5 U.S.C. § 551(1), but specifically excludes "the Congress," § 551(1)(A). The Court of Appeals for the District of Columbia Circuit has "interpreted [this] exemption for 'the Congress' to mean the entire *legislative* branch," *Washington Legal Foundation v. United States Sentencing Comm'n,* 17 F.3d 1446, 1449 (1994); see also *Ethnic Employees of Library of Congress v. Boorstin,* 751 F.2d 1405, 1416, n. 15 (C.A.D.C.1985) (holding that the Library of Congress is not an "agency" under the Act).

Regardless, it is assuredly not "applicable law" that rulemaking by independent regulatory agencies is subject to heightened scrutiny. The Administrative Procedure Act, which provides judicial review, makes no distinction between independent and other agencies, neither in its definition of agency, 5 U.S.C. § 701(b)(1), nor in the standards for reviewing agency action, § 706. Nor does any case of ours express or reflect the "heightened scrutiny" Justice BREYER and Justice STEVENS would impose. Indeed, it is hard to imagine any closer scrutiny than that we have given to the Environmental Protection Agency, which is not an independent agency. See *Massachusetts v. EPA,* 549 U.S. 497, 533–535, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007); *Whitman v. American Trucking Assns., Inc.,* 531 U.S. 457, 481–486, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). There is no reason to magnify the separation-of-powers dilemma posed by the headless Fourth **\*526** Branch, see *Freytag v. Commissioner,* 501 U.S. 868, 921, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (SCALIA, J., concurring in part and concurring in judgment), by letting Article III judges—like jackals stealing the lion's kill—expropriate some of the power that Congress has wrested from the unitary Executive.

Justice BREYER and Justice STEVENS rely upon two supposed omissions in the FCC's analysis that they believe preclude a finding that the agency did not act arbitrarily. Neither of these omissions could undermine the coherence of the rationale the agency gave, but the dissenters' evaluation of each is flawed in its own right.

First, both claim that the Commission failed adequately to explain its consideration of the constitutional issues inherent in its regulation, *post,* at 1832 – 1835 (opinion of BREYER, J.); *post,* at 1826 – 1828 (opinion of STEVENS, J.). We are unaware that we have ever before reversed an executive agency, not for violating our cases, but for failure to discuss them adequately. But leave that aside. According to Justice BREYER, the agency said "next to nothing about the relation between the change it made in its prior 'fleeting expletive' policy and the

AR005342

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

First–Amendment–related need to avoid 'censorship,' " *post,* at 1832 – 1833. The *Remand Order* does, however, devote four full pages of small-type, single-spaced text (over 1,300 words not counting the footnotes) to explaining why the Commission believes that its indecency-enforcement regime (which includes its change in policy) is consistent with the First Amendment—and therefore not censorship as the term is understood. More specifically, Justice BREYER faults the FCC for "not explain[ing] why the agency changed its mind about the line that *Pacifica* draws or its policy's relation to that line," *post,* at 1834. But in fact (and as the Commission explained) this Court's holding in *Pacifica,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073, drew no constitutional line; to the contrary, it expressly declined to express any view on the constitutionality of prohibiting isolated indecency. Justice BREYER and Justice STEVENS evidently believe that when an agency has **\*527** obtained this Court's determination that a **\*\*1818** less restrictive rule is constitutional, its successors acquire some special burden to explain why a more restrictive rule is not *un*constitutional. We know of no such principle.[7]

[7]  Justice STEVENS criticizes us for "assuming that *Pacifica* endorsed" the enforcement at issue here. *Post,* at 1826. We do nothing of the sort. We rely on the fact that certain aspects of the agency's decision mirror the context-based approach *Pacifica* approved, *supra,* at 1812 – 1813, but that goes to our holding on administrative law, and says nothing about constitutionality. Justice STEVENS also argues that heightened deference should be due the FCC's prior policy because the "FCC's initial views ... reflect the views of the Congress that delegated the Commission authority to flesh out details not fully defined in the enacting statute." *Post,* at 1826. We do not believe that the dead hand of a departed congressional oversight Committee should constrain the discretion that the text of a statute confers—but the point is in any event irrelevant in this appeal, which concerns not whether the agency has exceeded its statutory mandate but whether the reasons for its actions are adequate.

Second, Justice BREYER looks over the vast field of particular factual scenarios unaddressed by the FCC's 35–page *Remand Order* and finds one that is fatal: the plight of the small local broadcaster who cannot afford the new technology that enables the screening of live broadcasts for indecent utterances. Cf. *post,* at 1834 – 1838. The Commission has failed to address the fate of this unfortunate, who will, he believes, be subject to sanction.

We doubt, to begin with, that small-town broadcasters run a heightened risk of liability for indecent utterances. In programming that they originate, their down-home local

guests probably employ vulgarity less than big-city folks; and small-town stations generally cannot afford or cannot attract foul-mouthed glitteratae from Hollywood. Their main exposure with regard to self-originated programming is live coverage of news and public affairs. But the *Remand Order* went out of its way to note that the case at hand did not involve "breaking news coverage," and that "it may be inequitable to hold a licensee responsible for airing offensive **\*528** speech during live coverage of a public event," 21 FCC Rcd., at 13311, ¶ 33. As for the programming that small stations receive on a network "feed": This *will* be cleansed by the expensive technology small stations (by Justice BREYER's hypothesis) cannot afford.

But never mind the detail of whether small broadcasters are uniquely subject to a great risk of punishment for fleeting expletives. The fundamental fallacy of Justice BREYER's small-broadcaster gloomy scenario is its demonstrably false assumption that the *Remand Order* makes no provision for the avoidance of unfairness—that the single-utterance prohibition will be invoked uniformly, in all situations. The *Remand Order* made very clear that this is not the case. It said that in determining "what, if any, remedy is appropriate" the Commission would consider the facts of each individual case, such as the "possibility of human error in using delay equipment," *id.,* at 13313, ¶ 35. Thus, the fact that the agency believed that Fox (a large broadcaster that used suggestive scripting and a deficient delay system to air a prime-time awards show aimed at millions of children) "fail[ed] to exercise 'reasonable judgment, responsibility and sensitivity,' " *id.,* at 13311, ¶ 33, and n. 91 (quoting *Pacifica Foundation, Inc.,* 2 FCC Rcd., at 2700, ¶ 18), says little about how the Commission would treat smaller broadcasters who cannot afford screening equipment. Indeed, that they would not be punished for failing to purchase equipment they cannot afford is positively suggested by the *Remand Order'* s statement **\*\*1819** that "[h]olding Fox responsible for airing indecent material in this case does not ... impose undue burdens on broadcasters." 21 FCC Rcd., at 13313, ¶ 36.

There was, in sum, no need for the Commission to compose a special treatise on local broadcasters.[8] And Justice **\*529** BREYER can safely defer his concern for those yeomen of the airwaves until we have before us a case that involves one.

[8]  Justice BREYER posits that the FCC would have been required to give more explanation had it used notice-and-comment rulemaking, which "should lead us to the same conclusion" in this review of the agency's change through adjudication. *Post,* at 1838. Even assuming the premise, there is no basis for

AR005343

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

incorporating all of the Administrative Procedure Act's notice-and-comment procedural requirements into arbitrary-and-capricious review of adjudicatory decisions. Cf. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council Inc.,* 435 U.S. 519, 545–549, 98 S.Ct. 1197 (1978).

## IV. Constitutionality

 The Second Circuit did not definitively rule on the constitutionality of the Commission's orders, but respondents nonetheless ask us to decide their validity under the First Amendment. This Court, however, is one of final review, "not of first view." *Cutter v. Wilkinson,* 544 U.S. 709, 718, n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). It is conceivable that the Commission's orders may cause some broadcasters to avoid certain language that is beyond the Commission's reach under the Constitution. Whether that is so, and, if so, whether it is unconstitutional, will be determined soon enough, perhaps in this very case. Meanwhile, any chilled references to excretory and sexual material "surely lie at the periphery of First Amendment concern," *Pacifica,* 438 U.S., at 743, 98 S.Ct. 3026 (plurality opinion of STEVENS, J.). We see no reason to abandon our usual procedures in a rush to judgment without a lower court opinion. We decline to address the constitutional questions at this time.

* * *

The Second Circuit believed that children today "likely hear this language far more often from other sources than they did in the 1970s when the Commission first began sanctioning indecent speech," and that this cuts against more stringent regulation of broadcasts. 489 F.3d, at 461. Assuming the premise is true (for this point the Second Circuit did not demand empirical evidence) the conclusion does not necessarily follow. The Commission could reasonably conclude that the pervasiveness of foul language, and the coarsening **\*530** of public entertainment in other media such as cable, justify more stringent regulation of broadcast programs so as to give conscientious parents a relatively safe haven for their children. In the end, the Second Circuit and the

broadcasters quibble with the Commission's policy choices and not with the explanation it has given. We decline to "substitute [our] judgment for that of the agency," *State Farm,* 463 U.S., at 43, 103 S.Ct. 2856, and we find the Commission's orders neither arbitrary nor capricious.

The judgment of the United States Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, concurring.

I join the Court's opinion, which, as a matter of administrative law, correctly upholds the Federal Communications Commission's (FCC) policy with respect to indecent broadcast speech under the Administrative Procedure Act. I write separately, however, to note the questionable viability of the two precedents that **\*\*1820** support the FCC's assertion of constitutional authority to regulate the programming at issue in this case. See *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). *Red Lion* and *Pacifica* were unconvincing when they were issued, and the passage of time has only increased doubt regarding their continued validity. "The text of the First Amendment makes no distinctions among print, broadcast, and cable media, but we have done so" in these cases. *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC,* 518 U.S. 727, 812, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (THOMAS, J., concurring in judgment in part and dissenting in part).

In *Red Lion,* this Court upheld the so-called "fairness doctrine," a Government requirement "that discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage." **\*531** 395 U.S., at 369, 400–401, 89 S.Ct. 1794. The decision relied heavily on the scarcity of available broadcast frequencies. According to the Court, because broadcast spectrum was so scarce, it "could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard." *Id.,* at 376, 89 S.Ct. 1794. To this end, the Court concluded that the Government should be "permitted to put restraints on licensees in favor of others whose views should be

AR005344

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

expressed on this unique medium." *Id.,* at 390, 89 S.Ct. 1794; see also *id.,* at 389, 89 S.Ct. 1794 (concluding that "as far as the First Amendment is concerned those who are licensed stand no better than those to whom licenses are refused"). Applying this principle, the Court held that "[i]t does not violate the First Amendment to treat licensees given the privilege of using scarce radio frequencies as proxies for the entire community, obligated to give suitable time and attention to matters of great public concern." *Id.,* at 394, 89 S.Ct. 1794.

*Red Lion* specifically declined to answer whether the First Amendment authorized the Government's "refusal to permit the broadcaster to carry a particular program or to publish his own views[,] ... [or] government censorship of a particular program," *id.,* at 396, 89 S.Ct. 1794. But then in *Pacifica,* this Court rejected a challenge to the FCC's authority to impose sanctions on the broadcast of indecent material. See 438 U.S., at 729–730, 750–751, 98 S.Ct. 3026; *id.,* at 742, 98 S.Ct. 3026 (plurality opinion). Relying on *Red Lion,* the Court noted that "broadcasting ... has received the most limited First Amendment protection." 438 U.S., at 748, 98 S.Ct. 3026. The Court also emphasized the "uniquely pervasive presence" of the broadcast media in Americans' lives and the fact that broadcast programming was "uniquely accessible to children." *Id.,* at 748–749, 98 S.Ct. 3026.

This deep intrusion into the First Amendment rights of broadcasters, which the Court has justified based only on the nature of the medium, is problematic on two levels. First, instead of looking to first principles to evaluate the constitutional **\*532** question, the Court relied on a set of transitory facts, *e.g.,* the "scarcity of radio frequencies," *Red Lion, supra,* at 390, 89 S.Ct. 1794, to determine the applicable First Amendment standard. But the original meaning of the Constitution cannot turn on modern necessity: "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *District of Columbia* **\*\*1821** *v. Heller,* 554 U.S. 570, 634 – 635, 128 S.Ct. 2783, 2821, 171 L.Ed.2d 637 (2008). In breaching this principle, *Red Lion* adopted, and *Pacifica* reaffirmed, a legal rule that lacks any textual basis in the Constitution. *Denver Area, supra,* at 813, 116 S.Ct. 2374 (THOMAS, J., concurring in judgment in part and dissenting in part) ("First Amendment distinctions between media [have been] dubious from their infancy"). Indeed, the logical weakness of *Red Lion* and *Pacifica* has been apparent for some time: "It is certainly true that broadcast frequencies are scarce but it is unclear why that justifies content regulation of broadcasting in a way that would be intolerable if applied to the editorial process of the print

media." *Telecommunications Research & Action Center v. FCC,* 801 F.2d 501, 508 (C.A.D.C.1986) (Bork, J.).

Highlighting the doctrinal incoherence of *Red Lion* and *Pacifica,* the Court has declined to apply the lesser standard of First Amendment scrutiny imposed on broadcast speech to federal regulation of telephone dial-in services, see *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 127–128, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), cable television programming, see *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 637, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), and the Internet, see *Reno v. American Civil Liberties Union,* 521 U.S. 844, 867–868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). "There is no justification for this apparent dichotomy in First Amendment jurisprudence. Whatever the merits of *Pacifica* when it was issued [,] ... it makes no sense now." *Action for Children's Television v. FCC,* 58 F.3d 654, 673 (C.A.D.C.1995) (Edwards, C. J., dissenting). The justifications relied on by the Court in *Red Lion* **\*533** and *Pacifica*—"spectrum scarcity, intrusiveness, and accessibility to children—neither distinguish broadcast from cable, nor explain the relaxed application of the principles of the First Amendment to broadcast." 58 F.3d, at 673; see also *In re Industry Guidance on Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency,* 16 FCC Rcd. 7999, 8021, n. 11, 2001 WL 332787 (2001) (statement of Commissioner Furchtgott–Roth) ("It is ironic that streaming video or audio content from a television or radio station would likely receive more constitutional protection, see *Reno* [*v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ], than would the same exact content broadcast over-the-air").

Second, even if this Court's disfavored treatment of broadcasters under the First Amendment could have been justified at the time of *Red Lion* and *Pacifica,* dramatic technological advances have eviscerated the factual assumptions underlying those decisions. Broadcast spectrum is significantly less scarce than it was 40 years ago. See Brief for Respondent NBC Universal et al. 37–38 (hereinafter NBC Brief). As NBC notes, the number of over-the-air broadcast stations grew from 7,411 in 1969, when *Red Lion* was issued, to 15,273 by the end of 2004. See NBC Brief 37–38; see also FCC Media Bureau Staff Research Paper, J. Berresford, The Scarcity Rationale for Regulating Traditional Broadcasting: An Idea Whose Time Has Passed 12–13 (Mar.2005) (No.2005–2). And the trend should continue with broadcast television's imminent switch from analog to digital transmission, which will allow the FCC to "stack broadcast channels right beside one another along

AR005345

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)
129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

the spectrum, and ultimately utilize significantly less than the 400 MHz of spectrum the analog system absorbs today." *Consumer Electronics Assn. v. FCC,* 347 F.3d 291, 294 (C.A.D.C.2003).

**\*\*1822** Moreover, traditional broadcast television and radio are no longer the "uniquely pervasive" media forms they once were. For most consumers, traditional broadcast media programming **\*534** is now bundled with cable or satellite services. See App. to Pet. for Cert. 106a–107a. Broadcast and other video programming is also widely available over the Internet. See Stelter, Serving Up Television Without the TV Set, N.Y. Times, Mar. 10, 2008, p. C1. And like radio and television broadcasts, Internet access is now often freely available over the airwaves and can be accessed by portable computer, cell phones, and other wireless devices. See May, Charting a New Constitutional Jurisprudence for the Digital Age, 3 Charleston L.Rev. 373, 375 (2009). The extant facts that drove this Court to subject broadcasters to unique disfavor under the First Amendment simply do not exist today. See *In re Industry Guidance, supra,* at 8020 (statement of Commissioner Furchtgott–Roth) ("If rules regulating broadcast content were ever a justifiable infringement of speech, it was because of the relative dominance of that medium in the communications marketplace of the past. As the Commission has long recognized, the facts underlying this justification are no longer true" (footnote omitted)).[*]

> [*] With respect to reliance by *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), on the ease with which children could be exposed to indecent television programming, technology has provided innovative solutions to assist adults in screening their children from unsuitable programming—even when that programming appears on broadcast channels. See NBC Brief 43–47 (discussing V-chip technology, which allows targeted blocking of television programs based on content).

These dramatic changes in factual circumstances might well support a departure from precedent under the prevailing approach to *stare decisis.* See *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (asking "whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification"); see also *American Trucking Assns., Inc. v. Scheiner,* 483 U.S. 266, 302, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) (O'Connor, J., dissenting) ("Significantly changed circumstances can make an older rule, defensible when formulated, inappropriate ..."). "In **\*535** cases involving constitutional issues" that turn on a particular set of factual assumptions, "this Court must, in order to reach sound conclusions, feel free to bring its opinions into agreement with experience and with facts newly ascertained." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 412, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting). For all these reasons, I am open to reconsideration of *Red Lion* and *Pacifica* in the proper case.

**Opinion**

Justice KENNEDY, concurring in part and concurring in the judgment.

I join Parts I, II, III–A through III–D, and IV of the opinion of the Court and agree that the judgment must be reversed. This separate writing is to underscore certain background principles for the conclusion that an agency's decision to change course may be arbitrary and capricious if the agency sets a new course that reverses an earlier determination but does not provide a reasoned explanation for doing so. In those circumstances I agree with the dissenting opinion of Justice BREYER that the agency must explain why "it now reject[s] the considerations that led it to adopt that initial policy." *Post,* at 1831.

The question whether a change in policy requires an agency to provide a more reasoned explanation than when the original policy was first announced is not susceptible, in my view, to an answer that applies **\*\*1823** in all cases. There may be instances when it becomes apparent to an agency that the reasons for a longstanding policy have been altered by discoveries in science, advances in technology, or by any of the other forces at work in a dynamic society. If an agency seeks to respond to new circumstances by modifying its earlier policy, the agency may have a substantial body of data and experience that can shape and inform the new rule. In other cases the altered circumstances may be so new that the agency must make predictive judgments that are as difficult now as when the agency's earlier policy was first announced. **\*536** Reliance interests in the prior policy may also have weight in the analysis.

The question in each case is whether the agency's reasons for the change, when viewed in light of the data available to it, and when informed by the experience and expertise of the agency, suffice to demonstrate that the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its authority. That showing may be required if the agency is to demonstrate that its action is not "arbitrary, capricious,

AR005346

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). And, of course, the agency action must not be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." § 706(2)(C).

These requirements stem from the administrative agency's unique constitutional position. The dynamics of the three branches of Government are well understood as a general matter. But the role and position of the agency, and the exact locus of its powers, present questions that are delicate, subtle, and complex. The Federal Government could not perform its duties in a responsible and effective way without administrative agencies. Yet the amorphous character of the administrative agency in the constitutional system escapes simple explanation.

If agencies were permitted unbridled discretion, their actions might violate important constitutional principles of separation of powers and checks and balances. To that end the Constitution requires that Congress' delegation of lawmaking power to an agency must be "specific and detailed." *Mistretta v. United States,* 488 U.S. 361, 374, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Congress must " 'clearly delineat[e] the general policy' " an agency is to achieve and must specify the " 'boundaries of [the] delegated authority.' " *Id.,* at 372–373, 109 S.Ct. 647. Congress must " 'lay down by legislative act an intelligible principle,' " and the agency must follow it. *Id.,* at 372, 109 S.Ct. 647 (quoting *J.W.* *537 *Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)).

Congress passed the Administrative Procedure Act (APA) to ensure that agencies follow constraints even as they exercise their powers. One of these constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation. To achieve that end, Congress confined agencies' discretion and subjected their decisions to judicial review. See Stewart & Sunstein, Public Programs and Private Rights, 95 Harv. L.Rev. 1193, 1248 (1982) (the APA was a "working compromise, in which broad delegations of discretion were tolerated as long as they were checked by extensive procedural safeguards"). If an agency takes action not based on neutral and rational principles, the APA grants federal courts power to set aside the agency's action as "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). For these reasons, **1824 agencies under the APA are subject to a "searching and careful" review by the courts. *Ibid.*

Where there is a policy change the record may be much more developed because the agency based its prior policy on factual findings. In that instance, an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.

This is the principle followed in the Court's opinion in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). There, Congress directed the agency to issue regulations that would " 'meet the need for motor vehicle safety.' " *Id.,* at 33, 103 S.Ct. 2856. The agency promulgated a regulation requiring cars to have passive-restraint systems—either airbags or automatic seatbelts. *538 *Id.,* at 37, 103 S.Ct. 2856. The agency based this regulation on its factual finding that these systems save lives. *Id.,* at 35, 103 S.Ct. 2856.

Following a change in Presidential administration, however, the agency reversed course and rescinded the regulation. In doing so, the agency did not address its prior finding that airbags save lives. *Id.,* at 47–48, 103 S.Ct. 2856. Indeed, "[n]ot one sentence" of the agency's "rulemaking statement" in support of rescinding the regulation discussed the benefits of airbags. *Id.,* at 48, 103 S.Ct. 2856. This Court found the agency's rescission arbitrary and capricious because the agency did not address its prior factual findings. See *id.,* at 49–51, 103 S.Ct. 2856.

The present case does not raise the concerns addressed in *State Farm.* Rather than base its prior policy on its knowledge of the broadcast industry and its audience, the FCC instead based its policy on what it considered to be our holding in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). See *In re Application of WGBH Educ. Foundation,* 69 F.C.C.2d 1250, 1254, ¶ 10, 1978 WL 36042 (1978) ("We intend strictly to observe the narrowness of the *Pacifica* holding"). The FCC did not base its prior policy on factual findings.

The FCC's *Remand Order* explains that the agency has changed its reading of *Pacifica.* The reasons the agency announces for this change are not so precise, detailed, or elaborate as to be a model for agency explanation. But, as the opinion for the Court well explains, the FCC's reasons for its action were the sort of reasons an agency may consider and act upon. The Court's careful and complete

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   95

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

analysis—both with respect to the procedural history of the FCC's indecency policies, and the reasons the agency has given to support them—is quite sufficient to sustain the FCC's change of course against respondents' claim that the agency acted in an arbitrary or capricious fashion.

The holding of the Court of Appeals turned on its conclusion that the agency's explanation for its change of policy was insufficient, and that is the only question presented here. I agree with the Court that as this case comes to us from the **\*539** Court of Appeals we must reserve judgment on the question whether the agency's action is consistent with the guarantees of the Constitution.

Justice STEVENS, dissenting.

While I join Justice BREYER's cogent dissent, I think it important to emphasize two flaws in the Court's reasoning. Apparently **\*\*1825** assuming that the Federal Communications Commission's (FCC or Commission) rulemaking authority is a species of executive power, the Court espouses the novel proposition that the Commission need not explain its decision to discard a longstanding rule in favor of a dramatically different approach to regulation. See *ante,* at 1810 – 1811. Moreover, the Court incorrectly assumes that our decision in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), decided that the word "indecent," as used in 18 U.S.C. § 1464,[1] permits the FCC to punish the broadcast of *any* expletive that has a sexual or excretory origin. *Pacifica* was not so sweeping, and the Commission's changed view of its statutory mandate certainly would have been rejected if presented to the Court at the time.

[1]   Section 1464 provides: "Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both."

I

"The structure of our Government as conceived by the Framers of our Constitution disperses the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 272, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991). The distinction among the branches is not always sharp, see *Bowsher v. Synar,* 478 U.S. 714, 749, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (STEVENS, J., concurring in judgment) (citing cases), a consequence of the fact that the "great ordinances of the Constitution do not establish and divide fields of black **\*540** and white," *Springer v. Philippine Islands,* 277 U.S. 189, 209, 48 S.Ct. 480, 72 L.Ed. 845 (1928) (Holmes, J., dissenting). Strict lines of authority are particularly elusive when Congress and the President both exert a measure of control over an agency. As a landmark decision involving the Federal Trade Commission (FTC) made clear, however, when Congress grants rulemaking and adjudicative authority to an expert agency composed of commissioners selected through a bipartisan procedure and appointed for fixed terms, it substantially insulates the agency from executive control. See *Humphrey's Executor v. United States,* 295 U.S. 602, 623–628, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

With the view that broadcast regulation "should be as free from political influence or arbitrary control as possible," S.Rep. No. 772, 69th Cong., 1st Sess., 2 (1926), Congress established the FCC with the same measure of independence from the Executive that it had provided the FTC. Just as the FCC's Commissioners do not serve at the will of the President, see 47 U.S.C. § 154(c) (2000 ed.), its regulations are not subject to change at the President's will. And when the Commission fashions rules that govern the airwaves, it exercises legislative power delegated to it by Congress. See *Whitman v. American Trucking Assns., Inc.,* 531 U.S. 457, 489–490, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (STEVENS, J., concurring in part and concurring in judgment); *Bowsher,* 478 U.S., at 752, 106 S.Ct. 3181 (opinion of STEVENS, J.). Consequently, the FCC "cannot in any proper sense be characterized as an arm or an eye of the executive" and is better viewed as an agent of Congress established "to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative ... aid." **\*\*1826** *Humphrey's Executor,* 295 U.S., at 628, 55 S.Ct. 869.[2]

[2]   Justice SCALIA erroneously concludes that treating the FCC's rulemaking authority as an exercise of legislative power would somehow be unconstitutional. See *ante,* at 1816 – 1817 (citing *Bowsher v. Synar,* 478 U.S. 714, 726, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)). But that is the nature of rulemaking: Rules promulgated by agencies (independent or not) carry the force of law precisely because they are exercises of such legislative authority. This may offend Justice SCALIA's theory of the "unitary Executive," *ante,* at 1817, but it does not

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

offend the Constitution. Indeed, "the Framers vested 'All legislative Powers' in the Congress, Art. I, § 1, just as in Article II they vested the 'executive Power' in the President, Art. II, § 1. Those provisions do not purport to limit the authority of either recipient of power to delegate authority to others." *Whitman v. American Trucking Assns., Inc.,* 531 U.S. 457, 489, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (STEVENS, J., concurring in part and concurring in judgment).

**\*541** The FCC, like all agencies, may revise its regulations from time to time, just as Congress amends its statutes as circumstances warrant. But the FCC is constrained by its congressional mandate. There should be a strong presumption that the FCC's initial views, reflecting the informed judgment of independent Commissioners with expertise in the regulated area, also reflect the views of the Congress that delegated the Commission authority to flesh out details not fully defined in the enacting statute. The rules adopted after *Pacifica,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073, have been in effect for decades and have not proved unworkable in the intervening years. As Justice BREYER's opinion explains, broadcasters have a substantial interest in regulatory stability; the threat of crippling financial penalties looms large over these entities. See *post,* at 1834 – 1836. The FCC's shifting and impermissibly vague indecency policy only imperils these broadcasters and muddles the regulatory landscape. It therefore makes eminent sense to require the Commission to justify why its prior policy is no longer sound before allowing it to change course.[3] **\*542** The FCC's congressional charter, 47 U.S.C. § 151 *et seq.,* the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (2006 ed.) (instructing courts to "hold unlawful and set aside ... arbitrary [or] capricious" agency action), and the rule of law all favor stability over administrative whim.

[3]   It appears that Justice SCALIA has come to the view that isolated statements by members of a congressional oversight subcommittee are sufficient evidence of Congress' intent. See *ante,* at 1816, n. 4. Delving into the details of how various lawmakers "grilled" the full slate of FCC Commissioners, Justice SCALIA concludes, quite remarkably, that this encounter "made clear [Congress'] wishes for stricter enforcement" and "would seem an adequate explanation of [the FCC's] change of position." *Ante,* at 1816. Putting to the side the question whether congressional outrage is the kind of evidence sufficient to explain the Commission's decision to adopt a thinly reasoned and unconstitutional policy, Justice SCALIA's treatment of these proceedings as evidencing the intent of Congress would make even the most ardent student of legislative history blush.

II

The Court commits a second critical error by assuming that *Pacifica* endorsed a construction of the term "indecent," as used in 18 U.S.C. § 1464, that would include any expletive that has a sexual or excretory origin. Neither the opinion of the Court, nor Justice Powell's concurring opinion, adopted such a far-reaching interpretation. Our holding was narrow in two critical respects. First, we concluded, over the dissent of four Justices, that the statutory term "indecent" was not limited to material that had prurient appeal and instead included material that was in "nonconformance with accepted standards of **\*\*1827** morality." *Pacifica,* 438 U.S., at 740, 98 S.Ct. 3026. Second, we upheld the FCC's adjudication that a 12–minute, expletive-filled monologue by satiric humorist George Carlin was indecent "as broadcast." *Id.,* at 735, 98 S.Ct. 3026. We did not decide whether an *isolated* expletive could qualify as indecent. *Id.,* at 750, 98 S.Ct. 3026; *id.,* at 760–761, 98 S.Ct. 3026 (Powell, J., concurring in part and concurring in judgment). And we certainly did not hold that any word with a sexual or scatological origin, however used, was indecent.

The narrow treatment of the term "indecent" in *Pacifica* defined the outer boundaries of the enforcement policies adopted by the FCC in the ensuing years. The Commission originally explained that "under the legal standards set forth in *Pacifica,* deliberate and repetitive use [of expletives] in a **\*543** patently offensive manner is a requisite to a finding of indecency." *In re Pacifica Foundation,* 2 FCC Rcd. 2698, 2699, ¶ 13, 1987 WL 345577 (1987). While the "repetitive use" issue has received the most attention in this case, it should not be forgotten that *Pacifica* permitted the Commission to regulate only those words that describe sex or excrement. See 438 U.S., at 743, 98 S.Ct. 3026 (plurality opinion) ("[T]he Commission's definition of indecency will deter only the broadcasting of patently offensive *references* to excretory and sexual organs and activities" (emphasis added)). The FCC minimizes the strength of this limitation by now claiming that any use of the words at issue in this case, in any context and in any form, *necessarily* describes sex or excrement. See *In re Complaints Regarding Various Television Broadcasts Between Feb. 2, 2002 and Mar. 8, 2005,* 21 FCC Rcd. 13299, 13308, ¶ 23, 2006 WL 3207085 (2006) *(Remand Order)* ("[A]ny strict dichotomy between expletives and

AR005349

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

descriptions or depictions of sexual or excretory functions is artificial and does not make sense in light of the fact that an expletive's power to offend derives from its sexual or excretory meaning" (internal quotation marks omitted)). The customs of speech refute this claim: There is a critical distinction between the use of an expletive to describe a sexual or excretory function and the use of such a word for an entirely different purpose, such as to express an emotion. One rests at the core of indecency; the other stands miles apart. As any golfer who has watched his partner shank a short approach knows, it would be absurd to accept the suggestion that the resultant four-letter word uttered on the golf course describes sex or excrement and is therefore indecent. But that is the absurdity the FCC has embraced in its new approach to indecency.[4] See *In re Complaints Against Various* **544** *Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program,* 19 FCC Rcd. 4975, 4978–4979, ¶¶ 8–9, 2004 WL 540339 (2004) (declaring that even the use of an expletive to emphasize happiness "invariably invokes a coarse sexual image").

[4]    It is ironic, to say the least, that while the FCC patrols the airwaves for words that have a tenuous relationship with sex or excrement, commercials broadcast during prime-time hours frequently ask viewers whether they too are battling erectile dysfunction or are having trouble going to the bathroom.

Even if the words that concern the Court in this case *sometimes* retain their sexual or excretory meaning, there are surely countless instances in which they are used in a manner unrelated to their origin. These words may not be polite, but that does not mean they are necessarily "indecent" under § 1464. By improperly equating the two, the Commission has adopted an interpretation of "indecency" **1828** that bears no resemblance to what *Pacifica* contemplated.[5] Most distressingly, the Commission appears to be entirely unaware of this fact, see *Remand Order,* 21 FCC Rcd., at 13308 (erroneously referencing *Pacifica* in support of its new policy), and today's majority seems untroubled by this significant oversight, see *ante,* at 1807 – 1808, 1812 – 1813. Because the FCC has failed to demonstrate an awareness that it has ventured far beyond *Pacifica* 's reading of § 1464, its policy choice must be declared arbitrary and set aside as unlawful. See *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

[5]    While Justice THOMAS and I disagree about the continued wisdom of *Pacifica,* see *ante,* pp. 1819 – 1820 (concurring opinion), the changes in technology and the availability of broadcast spectrum he identifies certainly counsel a restrained approach to indecency

regulation, not the wildly expansive path the FCC has chosen.

                                    III

For these reasons and those stated in Justice BREYER's dissenting opinion, I would affirm the judgment of the Court of Appeals.


Justice GINSBURG, dissenting.

The mainspring of this case is a Government restriction on spoken words. This appeal, I recognize, arises under the **545** Administrative Procedure Act (APA or Act).[*] Justice BREYER's dissenting opinion, which I join, cogently describes the infirmities of the Federal Communications Commission's (FCC or Commission) policy switch under that Act. The Commission's bold stride over what the Commission has done. Today's beyond the bounds of *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), I agree, exemplified "arbitrary" and "capricious" decisionmaking. I write separately only to note that there is no way to hide the long shadow the First Amendment casts over what the Commission has done. Today's decision does nothing to diminish that shadow.

[*]    The Second Circuit, presented with both constitutional and statutory challenges, vacated the remand order on APA grounds. The court therefore "refrain[ed] from deciding" the "constitutional questions." 489 F.3d 444, 462 (2007) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)). The majority, however, stated and explained why it was "skeptical" that the Commission's policy could "pass constitutional muster." 489 F.3d, at 462.


More than 30 years ago, a sharply divided Court allowed the FCC to sanction a midafternoon radio broadcast of comedian George Carlin's 12–minute "Filthy Words" monologue. *Ibid.* Carlin satirized the "original" seven dirty words and repeated them relentlessly in a variety of colloquialisms. The monologue was aired as part of a program on contemporary attitudes toward the use of language. *In re Citizen's Complaint Against Pacifica Foundation Station WBAI (FM),* 56 F.C.C.2d 94, 95, 1975 WL 29897 (1975). In rejecting the First Amendment

AR005350

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

challenge, the Court "emphasize[d] the narrowness of [its] holding." *Pacifica,* 438 U.S., at 750, 98 S.Ct. 3026. See also *ante,* at 1824 – 1825 (STEVENS, J., dissenting). In this regard, the majority stressed that the Carlin monologue deliberately repeated the dirty words "over and over again." 438 U.S., at 729, 751–755, 98 S.Ct. 3026 (appendix). Justice Powell, concurring, described Carlin's speech as "verbal shock treatment." *Id.,* at 757, 98 S.Ct. 3026 (concurring in part and concurring in judgment).

**\*546** In contrast, the unscripted fleeting expletives at issue here are neither deliberate nor relentlessly repetitive. Nor does the Commission's policy focus in on expressions used to describe sexual or excretory **\*\*1829** activities or organs. Spontaneous utterances used simply to convey an emotion or intensify a statement fall within the order's compass. Cf. *Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ("[W]ords are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated."); *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC,* 518 U.S. 727, 805, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (KENNEDY, J., concurring in part, concurring in judgment in part, and dissenting in part) (a word categorized as indecent "often is inseparable from the ideas and viewpoints conveyed, or separable only with loss of truth or expressive power").

The *Pacifica* decision, however it might fare on reassessment, see *ante,* at 1822 (THOMAS, J., concurring), was tightly cabined, and for good reason. In dissent, Justice Brennan observed that the Government should take care before enjoining the broadcast of words or expressions spoken by many "in our land of cultural pluralism." 438 U.S., at 775, 98 S.Ct. 3026. That comment, fitting in the 1970's, is even more potent today. If the reserved constitutional question reaches this Court, see *ante,* at 1819 (majority opinion), we should be mindful that words unpalatable to some may be "commonplace" for others, "the stuff of everyday conversations," 438 U.S., at 776, 98 S.Ct. 3026 (Brennan, J., dissenting).

Justice BREYER, with whom Justice STEVENS, Justice SOUTER, and Justice GINSBURG join, dissenting.

In my view, the Federal Communications Commission failed adequately to explain *why* it *changed* its indecency policy **\*547** from a policy permitting a single "fleeting use" of an expletive, to a policy that made no such exception. Its explanation fails to discuss two critical factors, at least one of which directly underlay its original policy decision. Its explanation instead discussed several factors well known to it the first time around, which by themselves provide no significant justification for a *change* of policy. Consequently, the FCC decision is "arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 41–43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420–421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). And I would affirm the Second Circuit's similar determination.

I

I begin with applicable law. That law grants those in charge of independent administrative agencies broad authority to determine relevant policy. But it does not permit them to make policy choices for purely political reasons nor to rest them primarily upon unexplained policy preferences. Federal Communications Commissioners have fixed terms of office; they are not directly responsible to the voters; and they enjoy an independence expressly designed to insulate them, to a degree, from " 'the exercise of political oversight.' " *Freytag v. Commissioner,* 501 U.S. 868, 916, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (SCALIA, J., concurring in part and concurring in judgment); see also *Morrison v. Olson,* 487 U.S. 654, 691, n. 30, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). That insulation helps to secure important governmental objectives, such as the constitutionally related objective of maintaining broadcast **\*\*1830** regulation that does not bend too readily before the political winds. But that agency's comparative freedom from ballot-box control makes it all the more important that courts review its decisionmaking to assure compliance with applicable provisions of the law—including law requiring that major policy decisions be based upon articulable reasons.

**\*548** The statutory provision applicable here is the Administrative Procedure Act's (APA) prohibition of agency action that is "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A). This legal requirement helps assure agency decisionmaking based upon more than the personal preferences of the

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

decisionmakers. Courts have applied the provision sparingly, granting agencies broad policymaking leeway. But they have also made clear that agency discretion is not " 'unbounded.' " *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167–168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In so holding, American courts have followed a venerable legal tradition, stretching back at least to the days of Sir Edward Coke and the draining of the English fens. See *Rooke's Case,* 77 Eng. Rep. 209, 210, 5 Coke Rep. 99b, 100a (C.P. 1598) (Coke, J.) (members of sewer commission with authority to act according "to their discretio[n]" are nonetheless "limited and bound with the rule of reason and law ... and [cannot act] according to their wills and private affections" (quoted in Jaffe, Judicial Review: Constitutional and Jurisdictional Fact, 70 Harv. L.Rev. 953, 954 (1957))).

The law has also recognized that it is not so much a particular set of substantive commands but rather it is a *process,* a process of learning through reasoned argument, that is the antithesis of the "arbitrary." This means agencies must follow a "logical and rational" decisionmaking "process." *Allentown Mack Sales & Service, Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998). An agency's policy decisions must reflect the reasoned exercise of expert judgment. See *Burlington Truck Lines, supra,* at 167, 83 S.Ct. 239 (decision must reflect basis on which agency "exercised its expert discretion"); see also *Humphrey's Executor v. United States,* 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (independent agencies "exercise ... trained judgment ... 'informed by experience' "). And, as this Court has specified, in determining whether an agency's policy choice was "arbitrary," a reviewing court "must consider whether the decision was based on a consideration of the **\*549** relevant factors and whether there has been a clear error of judgment." *Overton Park, supra,* at 416, 91 S.Ct. 814.

Moreover, an agency must act consistently. The agency must follow its own rules. *Arizona Grocery Co. v. Atchison, T. & S.F.R. Co.,* 284 U.S. 370, 389–390, 52 S.Ct. 183, 76 L.Ed. 348 (1932). And when an agency seeks to change those rules, it must focus on the fact of change and explain the basis for that change. See, *e.g., National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ( "*Unexplained* inconsistency" is a "reason for holding an interpretation to be an arbitrary and capricious change from agency practice" (emphasis added)).

To explain a change requires more than setting forth reasons why the new policy is a good one. It also requires

the agency to answer the question, "Why did you change?" And a rational answer to this question typically requires a more complete explanation than would prove satisfactory were change itself not at issue. An (imaginary) administrator explaining why he chose a policy that requires driving on **\*\*1831** the right side, rather than the left side, of the road might say, "Well, one side seemed as good as the other, so I flipped a coin." But even assuming the rationality of that explanation for an *initial* choice, that explanation is not at all rational if offered to explain why the administrator *changed* driving practice, from right side to left side, 25 years later.

In *State Farm,* a unanimous Court applied these commonsense requirements to an agency decision that rescinded an earlier agency policy. The Court wrote that an agency must provide an explanation for the agency's *"revocation"* of a prior action that is more thorough than the explanation necessary when it does not act in the first instance. The Court defined "revocation," not simply as *rescinding* an earlier policy, cf. *ante,* at 1810 – 1811, but as "a *reversal of the agency's former views* as to the proper course," *State Farm,* 463 U.S., at 41, 103 S.Ct. 2856 (emphasis added). See also *Verizon Communications Inc. v. FCC,* 535 U.S. 467, 502, n. 20, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) (portion of Court's **\*550** opinion joined by SCALIA, KENNEDY, and THOMAS, JJ.) (noting *State Farm* "may be read as prescribing more searching judicial review" when "an agency [is] 'changing its course' as to the interpretation of a statute"); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 524, n. 3, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (THOMAS, J., dissenting) (similar).

At the same time, the Court described the need for explanation in terms that apply, not simply to pure *rescissions* of earlier rules, but rather to changes of policy as it more broadly defined them. But see *ante,* at 1810 – 1811. It said that the law required an explanation for such a *change* because the earlier policy, representing a " 'settled course of behavior[,] embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies ... best if the settled rule is adhered to.' " *State Farm, supra,* at 41–42, 103 S.Ct. 2856. Thus, the agency must explain *why* it has come to the conclusion that it should now change direction. Why does it now reject the considerations that led it to adopt that initial policy? What has changed in the world that offers justification for the change? What other good reasons are there for departing from the earlier policy?

Contrary to the majority's characterization of this dissent, it would not (and *State Farm* does not) require a "*heightened standard*" of review. *Ante,* at 1810 – 1811

AR005352

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)
129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

(emphasis added). Rather, the law requires application of the *same standard* of review to different circumstances, namely, circumstances characterized by the fact that *change* is at issue. It requires the agency to focus upon the fact of change where change is relevant, just as it must focus upon any other relevant circumstance. It requires the agency here to focus upon the reasons that led the agency to adopt the initial policy, and to explain why it now comes to a new judgment.

I recognize that *sometimes* the ultimate explanation for a change may have to be, "We now weigh the relevant considerations differently." But at other times, an agency can and should say more. Where, for example, the agency rested its **\*551** previous policy on particular factual findings, see *ante,* at 1823 – 1824 (KENNEDY, J., concurring in part and concurring in judgment); or where an agency rested its prior policy on its view of the governing law, see *infra,* at 1832 – 1835 or where an agency rested its previous policy on, say, a special need to coordinate with another agency, one would normally expect the agency to focus upon those earlier views of fact, of law, or of policy and explain why they are no longer controlling. Regardless, to say that the agency here must answer the **\*\*1832** question "why change" is not to require the agency to provide a justification that is "*better* than the reasons for the old [policy]." *Ante,* at 1834– 1835 (majority opinion). It is only to recognize the obvious fact that *change* is sometimes (not always) a relevant background feature that sometimes (not always) requires focus (upon prior justifications) and explanation lest the adoption of the new policy (in that circumstance) be "arbitrary, capricious, an abuse of discretion."

That is certainly how courts of appeals, the courts that review agency decisions, have always treated the matter in practice. See, *e.g., Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Kempthorne,* 497 F.3d 337, 351 (C.A.3 2007); *Yale–New Haven Hosp. v. Leavitt,* 470 F.3d 71, 79 (C.A.2 2006); *Citizens Awareness Network, Inc. v. United States,* 391 F.3d 338, 352 (C.A.1 2004). But see *NAACP v. FCC,* 682 F.2d 993, 998 (C.A.D.C.1982) (using word "heightened"). The majority's holding could in this respect significantly change judicial review in practice, and not in a healthy direction. But see *ante,* at 1822 – 1824 (KENNEDY, J., concurring in part and concurring in judgment). After all, if it is *always* legally sufficient for the agency to reply to the question "why change?" with the answer "we prefer the new policy" (even when the agency *has not considered* the major factors that led it to adopt its old policy), then why bother asking the agency to focus on the fact of change? More to the point, *why* would the law exempt this and no other aspect of an agency decision from "arbitrary, capricious"

review? **\*552** Where does, and why would, the APA grant agencies the freedom to change major policies on the basis of nothing more than political considerations or even personal whim?

Avoiding the application of any *heightened* standard of review, the Court in *State Farm* recognized that the APA's "nonarbitrary" requirement affords agencies generous leeway when they set policy. 463 U.S., at 42, 103 S.Ct. 2856. But it also recognized that this leeway is not absolute. The Court described its boundaries by then listing considerations that help determine whether an explanation is adequate. Mirroring and elaborating upon its statement in *Overton Park,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, the Court said that a reviewing court should take into account whether the agency had "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm, supra,* at 43, 103 S.Ct. 2856; see also *Overton Park, supra,* at 416, 91 S.Ct. 814.

II

We here must apply the general standards set forth in *State Farm* and *Overton Park* to an agency decision that changes a 25–year–old "fleeting expletive" policy from (1) the old policy that would normally permit broadcasters to transmit a single, fleeting use of an expletive to (2) a new policy that would threaten broadcasters with large fines for transmitting even a single use (including its use by a member of the public) of such an expletive, alone with nothing more. The question is whether that decision satisfies the minimal standards necessary to assure a reviewing court that such a change of policy is not "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A), particularly as set forth in, *e.g., State Farm* and *Overton Park, supra,* at 1829 – 1832. The decision, in my view, does not satisfy those standards.

**\*\*1833 \*553** Consider the requirement that an agency at least minimally "consider ... important aspect[s] of the problem." *State Farm, supra,* at 43, 103 S.Ct. 2856. The FCC failed to satisfy this requirement, for it failed to consider two critically important aspects of the problem that underlay its initial policy judgment (one of which

AR005353

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)
129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

directly, the other of which indirectly). First, the FCC said next to nothing about the relation between the change it made in its prior "fleeting expletive" policy and the First–Amendment–related need to avoid "censorship," a matter as closely related to broadcasting regulation as is health to that of the environment. The reason that discussion of the matter is particularly important here is that the FCC had *explicitly* rested its prior policy in large part upon the need to avoid treading too close to the constitutional line.

Thirty years ago, the Court considered the location of that constitutional line. In *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Court reviewed an FCC decision forbidding the broadcast of a monologue that deliberately and repeatedly uttered the expletives here at issue more than 100 times in one hour at a time of day when children were likely to hear the broadcast. *Id.,* at 739, 98 S.Ct. 3026. The Court held that the FCC's prohibition did not violate the First Amendment. But the Court divided 5 to 4. And two Members of the majority, Justices Powell and Blackmun, explicitly noted that the Court "does not speak to cases involving *the isolated use* of a potentially offensive word ... as distinguished from the verbal shock treatment administered by respondent here." *Id.,* at 760–761, 98 S.Ct. 3026 (Powell, J., concurring in part and concurring in judgment) (emphasis added). This statement by two Members of the majority suggested that they could reach a different result, finding an FCC prohibition unconstitutional, were that prohibition aimed at the fleeting or single use of an expletive.

The FCC subsequently made clear that it thought that Justice Powell's concurrence set forth a constitutional line **554** that its indecency policy should embody. In 1978, the Commission wrote that the First Amendment "severely limit[s]" the Commission's role in regulating indecency. It added that the Court, in *Pacifica,* had "relied ... on the repetitive occurrence of the 'indecent' words in question." And it said that, in setting policy, it "intend[ed] strictly to observe the narrowness of the *Pacifica* holding." *In re Application of WGBH Educ. Foundation,* 69 F.C.C.2d 1250, 1254, ¶ 10, 1978 WL 36042.

In 1983, the Commission again wrote that it understood the Court's decision in *Pacifica* to rest on the " 'repetitive occurrence of the "indecent" words in question.' " And, again, the Commission explained that its regulation of fleeting or isolated offensive words would reflect Justice Powell's understanding of the First Amendment's scope. *In re Application of Pacifica Foundation,* 95 F.C.C.2d 750, 760, ¶¶ 17–18, 1983 WL 182971. In 1987, the Commission once more explained that its "fleeting

expletives" policy reflected the Court's decision in *Pacifica.* It said that, under its policy, "speech that is indecent *must* involve more than an isolated use of an offensive word," adding that "we believe that under the legal standards set forth in *Pacifica,* deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency." *In re Pacifica Foundation,* 2 FCC Rcd. 2698, 2699, ¶ 13, 1987 WL 345577 (emphasis added). In another order that same year, the Commission stated that "the First Amendment dictate[s] a careful and restrained approach with regard to review of matters involving broadcast programming"; it then explained, citing *Pacifica,* **1834** that "[s]peech that is indecent *must* involve more than the isolated use of an offensive word." *In re Infinity Broadcasting,* 2 FCC Rcd. 2705, 2705, ¶¶ 6–7, 1987 WL 344896 (1987) (emphasis added). And in 2001, in giving the industry guidance, the FCC once again said in respect to its regulation of indecent speech that it "must both identify a compelling interest for any regulation ... and choose the least restrictive means to further that interest." *In re Industry Guidance on Commission's Case Law Interpreting* **555** *18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency,* 16 FCC Rcd. 7999, 8000–8001, ¶¶ 3–5, 2001 WL 332787.

The FCC thus repeatedly made clear that it based its "fleeting expletive" policy upon the need to avoid treading too close to the constitutional line as set forth in Justice Powell's *Pacifica* concurrence. What then did it say, when it changed its policy, about *why* it abandoned this Constitution-based reasoning? The FCC devoted "four full pages of small-type, single-spaced text," *ante,* at 1817 – 1818 (majority opinion), responding to industry arguments that, *e.g.,* changes in the nature of the broadcast industry made *all* indecency regulation, *i.e.,* 18 U.S.C. § 1464, unconstitutional. In doing so it repeatedly *reaffirmed* its view that *Pacifica* remains good law. *In re Complaints Regarding Various Television Broadcasts Between Feb. 2, 2002, and Mar. 8, 2005,* 21 FCC Rcd. 13.299, 13.317–13.321, ¶¶ 43–52, 2006 WL 3207085 (2006) *(Remand Order).* All the more surprising then that, in respect to *why* it abandoned its prior view about the critical relation between its prior fleeting expletive policy and Justice Powell's *Pacifica* concurrence, it says no more than the following: "[O]ur decision is not inconsistent with the Supreme Court ruling in *Pacifica.* The Court explicitly left open the issue of whether an occasional expletive could be considered indecent." *In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program,* 19 FCC Rcd. 4975, 4982, ¶ 16, 2004 WL 540339 (2004) *(Golden Globe Order).* And (repeating what it already had said), "*[Pacifica]* specifically reserved

AR005354

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)
129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

the question of 'an occasional expletive' and noted that it addressed only the 'particular broadcast' at issue in that case." *Remand Order, supra,* at 13308–13309, ¶ 24.

These two sentences are not a summary of the FCC's discussion about why it abandoned its prior understanding of *Pacifica.* They *are* the discussion. These 28 words (repeated in two opinions) do not acknowledge that an entirely different understanding of *Pacifica* underlay the FCC's earlier **\*556** policy; they do not explain why the agency changed its mind about the line that *Pacifica* draws or its policy's relation to that line; and they tell us nothing at all about what happened to the FCC's earlier determination to search for "compelling interests" and "less restrictive alternatives." They do not explain the transformation of what the FCC had long thought an insurmountable obstacle into an open door. The result is not simply *Hamlet* without the prince, but *Hamlet* with a prince who, in midplay and without explanation, just disappears.

I have found one other related reference to *Pacifica,* but that reference occurs in an opinion written by a *dissenting* Commissioner. That dissenter said that the FCC had " 'fail[ed] to address the many serious [constitutional] concerns raised' " by the new policy, while adding that the new policy was "not the restrained enforcement policy encouraged by the Supreme Court in *Pacifica.*" *Remand Order, supra,* at 13331, 13334. Neither that Commissioner in his dissent, nor I in this dissent, claim that agencies must always take account of **\*\*1835** possible constitutional issues when they formulate policy. Cf. *ante,* at 1835 (majority opinion). But the FCC works in the shadow of the First Amendment, and its view of the application of that Amendment to "fleeting expletives" directly informed its initial policy choice. Under these circumstances, the FCC's failure to address this "aspect" of the problem calls for a remand to the agency. *Overton Park,* 401 U.S., at 420–421, 91 S.Ct. 814.

Second, the FCC failed to consider the potential impact of its new policy upon local broadcasting coverage. This "aspect of the problem" is particularly important because the FCC explicitly took account of potential broadcasting impact. *Golden Globe Order, supra,* at 4980, ¶ 11 ("The ease with which broadcasters today can block even fleeting words in a live broadcast is an element in our decision"). Indeed, in setting forth "bleeping" technology changes (presumably lowering bleeping costs) as justifying the policy change, it **\*557** implicitly reasoned that lower costs, making it easier for broadcasters to install bleeping equipment, made it less likely that the new policy would lead broadcasters to reduce coverage, say, by canceling coverage of public events. *Ibid.*

("[T]echnological advances have made it possible ... to prevent the broadcast of a single offending word or action without blocking or disproportionately disrupting the message of the speaker or performer").

What then did the FCC say about the likelihood that smaller independent broadcasters, including many public service broadcasters, still would not be able to afford "bleeping" technology and, as a consequence, would reduce local coverage, indeed cancel coverage, of many public events? It said nothing at all.

The FCC cannot claim that local coverage lacks special importance. To the contrary, "the concept of localism has been a cornerstone of broadcast regulation for decades." *In re Broadcast Localism,* 23 FCC Rcd. 1324, 1326, 1327, ¶¶ 3, 5, 2008 WL 216994 (2008). That policy seeks to provide "viewers and listeners ... access to locally responsive programming including, but not limited to, local news and public affairs matter" *id.,* at 1326, ¶ 3, and to ensure "diversity in what is seen and heard over the airwaves," *Ibid.* That policy has long favored local broadcasting, both as a means to increase coverage of local events and, insofar as it increases the number of broadcast voices, as an end in itself. See, *e.g., In re Reexamination of Comparative Standards for Noncommercial Educ. Applicants,* 15 FCC Rcd. 7386, 7399, ¶ 29, 2000 WL 756503 (2000) (adopting a system for selecting applicants for broadcast channels that "would foster our goal of broadcast diversity by enabling the local public to be served by differing ... licensees"); *In re 2002 Biennial Regulatory Review,* 18 FCC Rcd. 13620, 13644, ¶¶ 77, 79, 2003 WL 21511828 (2003) ("We remain firmly committed to the policy of promoting localism among broadcast outlets. ... A ... measure of localism is the quantity and quality of local news and public affairs programming").

**\*558** Neither can the FCC now claim that the impact of its new policy on local broadcasting is insignificant and obviously so. Broadcasters tell us, as they told the FCC, the contrary. See Brief for Former FCC Commissioners et al. as *Amici Curiae* 17–19; App. 235–237; Joint Comments of Fox Television Stations, Inc., et al., *In re Remand of Section III.B of Commission's Mar. 15, 2006 Omnibus Order Resolving Numerous Broadcast Television Indecency Complaints* 14–15, http://www.fcc.gov/DA06–1739/joint–networks.pdf (all Internet materials as visited Apr. 7, 2009, and available in Clerk of Court's case file). They told the FCC, for example, that the costs of bleeping/delay systems, up to **\*\*1836** $100,000 for installation and annual operation, place that technology beyond the financial reach of many smaller independent local stations. See *id.,* at 14 ("The

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)
129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

significant equipment and personnel costs associated with installing, maintaining, and operating delay equipment sufficient to cover all live news, sports, and entertainment programs could conceivably exceed the net profits of a small local station for an entire year"); *id.*, at App. XI. And they ask what the FCC thinks will happen when a small local station without bleeping equipment wants to cover, say, a local city council meeting, a high school football game, a dance contest at a community center, or a Fourth of July parade.

Relevant literature supports the broadcasters' financial claims. See, *e.g.*, Ho, Taking No Chances, Austin American–Statesman, June 18, 2006, p. J1; Dotinga, Dirty–Word Filters Prove Costly, Wired.com, July 9, 2004, http://www. wired.com/entertainment/music/news/2004/07/64127; Stations, Cable Networks Finding Indecency Rules Expensive, Public Broadcasting Report, Aug. 4, 2006. It also indicates that the networks with which some small stations are affiliated are not liable for the stations' local transmissions (unless the networks own them). Ho, *supra*, at J1; Public Stations Fear Indecency Fine Jump Means Premium Hikes, Public Broadcasting Report, July 7, 2006. The result **\*559** is that smaller stations, fearing "fleeting expletive" fines of up to \$325,000, may simply cut back on their coverage. See Romano, Reporting Live. Very Carefully, Broadcasting & Cable, July 4, 2005, p. 8; see also *ibid.* ("Afraid to take chances" of getting fined under the FCC's new policy, "local broadcasters are responding by altering—or halting altogether—the one asset that makes local stations so valuable to their communities: live TV"); Daneman, WRUR Drops Its Live Radio Programs, Rochester Democrat and Chronicle, May 27, 2004, p. 1B (reporting that a local broadcast station ceased broadcasting all local live programming altogether in response to the Commission's policy change). And there are many such smaller stations. See, *e.g.*, Corporation for Public Broadcasting, Frequently Asked Questions, available at http:// www.cpb.org/aboutpb/faq/stations.html (noting there are over 350 local public television stations and nearly 700 local public radio stations that receive support from the Corporation for Public Broadcasting).

As one local station manager told the FCC:

"To lessen the risk posed by the new legal framework ... I have directed [the station's] news staff that [our station] may no longer provide live, direct-to-air coverage" of "live events where crowds are present ... unless they affect matters of public safety or convenience. Thus, news coverage by [my station] of live events where crowds are present essentially will be limited to civil emergencies." App. 236–237

(declaration of Dennis Fisher).

What did the FCC say in response to this claim? What did it say about the likely impact of the new policy on the coverage that its new policy is most likely to affect, coverage of *local* live events—city council meetings, local sports events, community arts productions, and the like? It said nothing at all.

**\*560** The plurality acknowledges that the Commission entirely failed to discuss this aspect of the regulatory problem. But it sees "no need" for discussion in light of its, *i.e.*, the plurality's, own "doubt[s]" that "small-town broadcasters run a heightened risk of liability for indecent utterances" as a result of the change of policy. *Ante*, at 1818 – 1819. The plurality's "doubt[s]" **\*\*1837** rest upon its views (1) that vulgar expression is less prevalent (at least among broadcast guests) in smaller towns, *ibid.*, at 1818; (2) that the greatest risk the new policy poses for "small-town broadcasters" arises when they broadcast local "news and public affairs," *ibid.*; and (3) that the *Remand Order* says "little about how the Commission would treat smaller broadcasters who cannot afford screening equipment," while also pointing out that the new policy " 'does not ... impose undue burdens on broadcasters' " and emphasizing that the case before it did not involve " 'breaking news,' " *ante*, at 1818 – 1819.

As to the first point, about the prevalence of vulgarity in small towns, I confess ignorance. But I do know that there are independent stations in many large and medium sized cities. See Television & Cable Factbook, Directory of Television Stations in Operation 2008. As to the second point, I too believe that coverage of local public events, if not news, lies at the heart of the problem.

I cannot agree with the plurality, however, about the critical third point, namely, that the new policy obviously provides smaller independent broadcasters with adequate assurance that they will not be fined. The new policy removes the "fleeting expletive" exception, an exception that assured smaller independent stations that they would not be fined should someone swear at a public event. In its place, it puts a policy that places all broadcasters at risk when they broadcast fleeting expletives, including expletives uttered at public events. The *Remand Order* says that there "is *no outright news exemption from our indecency rules.*" 21 FCC Rcd., at 13327, ¶ 71 (emphasis added). The best it can provide **\*561** by way of assurance is to say that "it *may* be inequitable to hold a licensee responsible for airing offensive speech during live coverage of a public event *under some circumstances.*" *Id.*, at 13311, ¶ 33 (emphasis added). It does list those circumstances as including the "possibility of human error

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

in using delay equipment." *Id.*, at 13313, ¶ 35. But it says *nothing* about a station's *inability to afford* delay equipment (a matter that in individual cases could itself prove debatable). All the FCC had to do was to *consider* this matter and either grant an exemption or explain why it did not grant an exemption. But it did not. And the result is a rule that may well chill coverage—the kind of consequence that the law has considered important for decades, to which the broadcasters pointed in their arguments before the FCC, and which the FCC nowhere discusses. See, *e.g., Dombrowski v. Pfister,* 380 U.S. 479, 494, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ("So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression"); see also *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 556–557, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Wieman v. Updegraff,* 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring).

Had the FCC used traditional administrative notice-and-comment procedures, 5 U.S.C. § 553, the two failures I have just discussed would clearly require a court to vacate the resulting agency decision. See *ACLU v. FCC,* 823 F.2d 1554, 1581 (C.A.D.C.1987) (*per curiam*) ("Notice and comment rulemaking procedures obligate the FCC to respond to *all* significant comments, for the opportunity to comment is meaningless unless the agency responds to significant points raised by the public" (emphasis added; internal quotation **1838** marks omitted)). Here the agency did not make new policy through the medium of notice-and-comment proceedings. **562** But the same failures here—where the policy is important, the significance of the issues clear, the failures near complete—should lead us to the same conclusion. The agency's failure to discuss these two "important aspect[s] of the problem" means that the resulting decision is " 'arbitrary, capricious, an abuse of discretion' " requiring us to remand the matter to the agency. *State Farm,* 463 U.S., at 43, 103 S.Ct. 2856; *Overton Park,* 401 U.S., at 416, 91 S.Ct. 814.

### III

The three reasons the FCC did set forth in support of its change of policy cannot make up for the failures I have discussed. Consider each of them. First, as I have pointed out, the FCC based its decision in part upon the fact that "bleeping/delay systems" technology has advanced. I have already set forth my reasons for believing that that fact, without more, cannot provide a sufficient justification for its policy change. *Supra,* at 1834 – 1838.

Second, the FCC says that the expletives here in question always invoke a coarse excretory or sexual image; hence it makes no sense to distinguish between whether one uses the relevant terms as an expletive or as a literal description. The problem with this answer is that it does not help to justify the *change* in policy. The FCC was aware of the coarseness of the "image" the first time around. See, *e.g., Remand Order,* 21 FCC Rcd., at 13308, ¶ 23 (asserting that FCC has always understood the words as coarse and indecent). And it explained the first time around why it nonetheless distinguished between their literal use and their use as fleeting expletives. See, *e.g., In re Application of WGBH Educ. Foundation,* 69 F.C.C.2d, at 1254–1255, ¶¶ 10–11 (discussing First Amendment considerations and related need to avoid reduced broadcast coverage). Simply to announce that the words, whether used descriptively or as expletives, call forth similar "images" is not to address those reasons.

**563** Third, the FCC said that "perhaps" its "most importan[t]" justification for the new policy lay in the fact that its new "contextual" approach to fleeting expletives is better and more "[c]onsistent with" the agency's "general approach to indecency" than was its previous "categorica[l]" approach, which offered broadcasters virtual immunity for the broadcast of fleeting expletives. *Remand Order,* 21 FCC Rcd., at 13308, ¶ 23. This justification, however, offers no support for the change without an understanding of *why, i.e., in what way,* the FCC considered the new approach better or more consistent with the agency's general approach.

The Solicitor General sets forth one way in which the new policy might be more consistent with statutory policy. The indecency statute prohibits the broadcast of "any ... indecent ... language." 18 U.S.C. § 1464. The very point of the statute, he says, is to eliminate nuisance; and the use of expletives, even once, can constitute such a nuisance. The Solicitor General adds that the statutory word "any" indicates that Congress did not intend a safe harbor for a fleeting use of that language. Brief for Petitioners 24–25. The fatal flaw in this argument, however, lies in the fact that the Solicitor General and not the agency has made it. We must consider the lawfulness of an agency's decision on the basis of the reasons the agency gave, not on the basis of those it *might have* given.

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

*SEC v. Chenery Corp.,* 332 U.S. 194, 196–197, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *State Farm, supra,* at 50, 103 S.Ct. 2856. And the FCC did not make this **1839 claim. Hence, we cannot take it into account and need not evaluate its merits.

In fact, the FCC found that the new policy was better in part because, in its view, the new policy better protects children against what it described as " 'the first blow' " of broadcast indecency that results from the " 'pervasive' " nature of broadcast media. It wrote that its former policy of "granting an automatic exemption for 'isolated or fleeting' expletives unfairly forces viewers (including children) to take 'the first blow.' " *Remand Order, supra,* at 13309, ¶ 25.

*564 The difficulty with this argument, however, is that it does not explain the *change.* The FCC has long used the theory of the "first blow" to justify its regulation of broadcast indecency. See, *e.g., In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. § 1464,* 5 FCC Rcd. 5297, 5301–5302, ¶¶ 34–35 (1990). Yet the FCC has also long followed its original "fleeting expletives" policy. Nor was the FCC ever unaware of the fact to which the majority points, namely, that children's surroundings influence their behavior. See, *e.g., In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. § 1464,* 8 FCC Rcd. 704, 705–706, ¶ 11, 1993 WL 756823 (1993). So, to repeat the question: What, in respect to the "first blow," has changed?

The FCC points to no empirical (or other) evidence to demonstrate that it previously understated the importance of avoiding the "first blow." Like the majority, I do not believe that an agency must always conduct full empirical studies of such matters. *Ante,* at 1813 – 1814. But the FCC could have referred to, and explained, relevant empirical studies that suggest the contrary. One review of the empirical evidence, for example, reports that "[i]t is doubtful that children under the age of 12 understand sexual language and innuendo; therefore it is unlikely that vulgarities have any negative effects." Kaye & Sapolsky, Watch Your Mouth! An Analysis of Profanity Uttered by Children on Prime–Time Television, 2004 Mass Communication & Soc'y 429, 433 (Vol.7) (citing two studies). The Commission need not have accepted this conclusion. But its failure to discuss this or any other such evidence, while providing no empirical evidence at all that favors its position, must weaken the logical force of its conclusion. See *State Farm, supra,* at 43, 103 S.Ct. 2856 (explaining that an agency's failure to "examine the relevant data" is a factor in determining whether the decision is "arbitrary").

The FCC also found the new policy better because it believed that its prior policy "would as a matter of logic permit broadcasters to air expletives at all hours of a day so long as *565 they did so one at a time." *Remand Order,* 21 FCC Rcd., at 13309, ¶ 25. This statement, however, raises an obvious question: Did that happen? The FCC's initial "fleeting expletives" policy was in effect for 25 years. Had broadcasters during those 25 years aired a series of expletives "one at a time"? If so, it should not be difficult to find evidence of that fact. But the FCC refers to none. Indeed, the FCC did not even claim that a change had taken place in this respect. It spoke only of the pure "logic" of the initial policy "permitting" such a practice. That logic would have been apparent to anyone, including the FCC, in 1978 when the FCC set forth its initial policy.

Finally, the FCC made certain statements that suggest it did not believe it was changing prior policy in any major way. It referred to that prior policy as based on "staff letters and dicta" and it said that at least one of the instances before it (namely, the Cher broadcast) would have been actionably indecent under that prior policy. **1840 Id., at 13306–13307, 13324, ¶¶ 20–21, 60. As we all agree, however, in fact the FCC did change its policy in a major way. See *ante,* at 1812 (majority opinion). To the extent that the FCC minimized that fact when considering the change, it did not fully focus on the fact of change. And any such failure would make its decision still less supportable. See *National Cable,* 545 U.S., at 981, 125 S.Ct. 2688.

IV

Were the question a closer one, the doctrine of constitutional avoidance would nonetheless lead me to remand the case. See *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also *grave doubts* upon that score" (emphasis added)). That doctrine seeks to avoid unnecessary judicial consideration of constitutional questions, assumes that Congress, no less than the Judicial Branch, seeks to act within constitutional bounds, and thereby diminishes the friction between *566 the branches that judicial holdings of unconstitutionality might otherwise generate. See *Almendarez–Torres v. United States,* 523 U.S. 224, 237–238, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); see also

AR005358

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009)

129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577...

*Northern Cook Cty. v. Army Corps of Engineers,* 531 U.S. 159, 172–173, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 571, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); *Ashwander v. TVA,* 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The doctrine assumes that Congress would prefer a less-than-optimal interpretation of its statute to the grave risk of a constitutional holding that would set the statute entirely aside. See *Almendarez–Torres, supra,* at 238, 118 S.Ct. 1219 (construction of statute that avoids invalidation best reflects congressional will); cf. *United States v. Booker,* 543 U.S. 220, 249, 267, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

Unlike the majority, I can find no convincing reason for refusing to apply a similar doctrine here. The Court has often applied that doctrine where an agency's regulation relies on a plausible but constitutionally suspect interpretation of a statute. See, *e.g., Solid Waste Agency, supra,* at 172–174, 121 S.Ct. 675; *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 506–507, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). The values the doctrine serves apply whether the agency's decision does, or does not, rest upon a constitutionally suspect interpretation of a statute. And a remand here would do no more than ask the agency to reconsider its policy decision in light of the concerns raised in a judicial opinion. Cf. *Fullilove v. Klutznick,* 448 U.S. 448, 551, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (STEVENS, J., dissenting) (a holding that a congressional action implicating the Equal Protection Clause "was not adequately preceded by a consideration of less drastic alternatives or adequately explained by a statement of legislative purpose would be far less intrusive than a final determination that the substance of" that action was unconstitutional). I would not now foreclose, as the majority forecloses, our further consideration of this matter. (Of course, nothing in **\*567** the Court's decision today prevents the Commission from reconsidering its current policy in light of potential constitutional considerations or for other reasons.)

V

In sum, the FCC's explanation of its change leaves out two critically important **\*\*1841** matters underlying its earlier policy, namely, *Pacifica* and local broadcasting coverage. Its explanation rests upon three considerations previously known to the agency ("coarseness," the "first blow," and running single expletives all day, one at a time). With one exception, it provides no empirical or other information explaining why those considerations, which did not justify its new policy before, justify it now. Its discussion of the one exception (technological advances in bleeping/delay systems), failing to take account of local broadcast coverage, is seriously incomplete.

I need not decide whether one or two of these features, standing alone, would require us to remand the case. Here all come together. And taken together they suggest that the FCC's answer to the question, "Why change?" is, "We like the new policy better." This kind of answer, might be perfectly satisfactory were it given by an elected official. But when given by an agency, in respect to a major change of an important policy where much more might be said, it is not sufficient. *State Farm,* 463 U.S., at 41–42, 103 S.Ct. 2856.

For these reasons I would find the FCC's decision "arbitrary, capricious, an abuse of discretion," 5 U.S.C. § 706(2)(A), requiring remand of this case to the FCC. And I would affirm the Second Circuit's similar determination.

With respect, I dissent.

## All Citations

556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738, 77 USLW 4337, 37 Media L. Rep. 1577, 09 Cal. Daily Op. Serv. 5086, 2009 Daily Journal D.A.R. 6011, 47 Communications Reg. (P&F) 933, 21 Fla. L. Weekly Fed. S 808

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.