121 F.Supp.3d 617
United States District Court,
N.D. Texas,
Dallas Division.

Jay Aubrey Isaac HOLLIS, individually and as
Trustee of the Jay Aubrey Isaac Hollis Revocable
Living Trust, Plaintiff,
v.
Loretta E. LYNCH, Attorney General of the United
States, and Thomas E. Brandon, Director, Bureau
of Alcohol, Tobacco, Firearms & Explosives,
Defendants.

Case No. 3:14−cv−03872−M.
|
Signed Aug. 7, 2015.

**Synopsis**
**Background:** Trustee of revocable living trust brought action seeking to invalidate the ban on the transfer and possession of machine guns imposed by the Gun Control Act (GCA) and the National Firearms Act (NFA) and their implementing regulations, or for declaratory judgment that the GCA did not apply to the trustee or the trust. Government moved to dismiss or for summary judgment.

**Holdings:** The District Court, Barbara M.G. Lynn, J., held that:

allegation that GCA and NFA violated plaintiff's Second Amendment rights failed to state a claim;

allegation that GCA violated plaintiff's Commerce Clause rights failed to state a claim for relief; and

allegation that plaintiff was deprived of due process by rescission of approval of form he submitted seeking permission to manufacture a machine gun, failed to state a claim for relief.

Motions granted.

**Attorneys and Law Firms**

**\*621** Stephen Dean Stamboulieh, Stamboulieh Law PLLC, Madison, MS, Alan Alexander Beck, Law Office of Alan Beck, San Diego, CA, Elisha Michael Hollis, Law Offices of **\*622** Elisha M. Hollis PLLC, Greenville, TX, for Plaintiff.

Daniel M. Riess, Eric J. Soskin, U.S. Department of Justice, Civil Division, Washington, DC, for Defendants.

*MEMORANDUM OPINION AND ORDER*

BARBARA M.G. LYNN, District Judge.

Before the Court is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment [Dkt. No. 13]. For the reasons stated herein, Defendants' 12(b)(1) Motion to Dismiss Plaintiff's Second Amendment and Commerce Clause claims for lack of standing is **GRANTED,** and Defendants' 12(b)(6) Motion to Dismiss Plaintiff's due process, equal protection, and Plaintiff's alternative request for declaratory relief that § 922(*o* ) does not apply to Plaintiff or the Hollis Trust is **GRANTED.**

**BACKGROUND**

Plaintiff Jay Aubrey Hollis brings this action in his individual capacity and as Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust ("the Hollis Trust") to invalidate the federal ban on the transfer and possession of machine guns, imposed by the Gun Control Act ("GCA"), 18 U.S.C. § 922(*o* ), and the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.,* and their implementing regulations, 27 C.F.R. § 479.105(a).

In a March 17, 2014 letter, the Bureau of Alcohol Tobacco and Firearms ("ATF") advised a federal firearms licensee, Brandon Maddox, that, while the GCA contains an exception that permits a licensee to forego a National Instant Criminal Background Check on a previously-approved NFA transfer, that exception does not apply when the transferee is an unincorporated trust. Dkt. No. 1 ¶ 25; Dkt. No. 1–1 (Pl.'s Ex. A) ("Dakota Silencer Letter"). The relevant part of the letter stated:

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   1

Federal firearms law at 18 U.S.C. § 922(t)(1) requires federal firearms licensees (FFLs) to run a NICS check "before completion of the transfer," and verify the identity of the transferee. There is an exception under section 922(t)(3)(B) and 27 CFR 478.102(d)(2), if the Attorney General "has approved the transfer under section 5812 of the Internal Revenue Code of 1986." Subject to limited exceptions, the Gun Control Act (GCA) at section 922(b)(3) also makes it unlawful for an FFL to sell or deliver a firearm "to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located." The term "person" is defined by the GCA at 18 U.S.C. § 921(a)(1), to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company."

ATF has interpreted the GCA exception in sections 922(t)(3)(B) and 478.102(d)(2) to mean that firearms transfers are exempt from a NICS check when they have been approved under the NFA *to the person receiving the firearm*. Unlike individuals, corporations, partnerships, and associations; unincorporated trusts do not fall within the definition of "person" in the GCA.

Because unincorporated trusts are not "persons" under the GCA, a Federal firearms licensee (FFL) cannot transfer firearms to [an unincorporated trust] without complying with the GCA. Thus, when an FFL transfers an NFA firearm to a trustee or other person acting on behalf of a trust, the transfer is made *to this person as an individual (i.e., not as *623 a trust* ). As the trustee or other person acting on behalf of the trust is not the approved transferee under the NFA, [26] U.S.C. § 5812, the trustee or other person acting on behalf of a trust must undergo a NICS check. The individual must also be a resident of the same State as the FFL when receiving the firearm.

*Id.* (emphasis in original). Apparently encouraged by the ATF's construction of the GCA's definition of "person" in the Dakota Silencer Letter, on May 14, 2014, Plaintiff, on behalf of the Hollis Trust, applied to manufacture a machine gun by submitting ATF Form 5320.1 ("Form 1"), paid the $200 tax required by the NFA, and attached the Dakota Silencer Letter as support for approval. Dkt. No. 1 ¶ 37. On September 8, 2014, ATF returned Plaintiff's Form 1 with a stamp of approval. Dkt. No. 1 ¶ 38; Dkt. No. 1–3 (Pl. Ex. C).

On September 10, 2014, ATF contacted Plaintiff and informed him that his Form 1 had been approved by mistake, and Plaintiff later received another copy of his

Form 1, this time with a stamp of disapproval. Dkt. No. 1 ¶¶ 39–40; Dkt. No. 1–4 (Pl. Ex. D). A few days later, Special Agent Aaron R. Wheeler met Plaintiff and delivered a letter from ATF's Chief of the National Firearms Act Branch, which asked Plaintiff to surrender any machine gun that might have been manufactured by Plaintiff based on the mistakenly approved Form 1. Dkt. No. 1 ¶ 42; Dkt. No. 1–5 (Pl. Ex. E). The letter explained that the exclusion of an unincorporated trust from the definition of "person" in 18 U.S.C. § 921(a)(1) does not permit an individual to avoid liability under § 922(*o* ) by placing a machine gun "in trust":

> Pursuant to 26 U.S.C. §§ 5812 and 5822, an application to make a firearm shall be disapproved if the making would place the possessor in violation of the law. The GCA, 18 U.S.C. § 922(*o* ) prohibits the possession of machineguns except in limited circumstances. Specifically, pursuant to the statute and implementing regulations, 27 C.F.R. § 479.105(a), ATF may not approve any private person's application to make and register a machinegun after May 19, 1986.

> The sole exception to this exists under section 479.105(e) and allows ATF to approve such application "provided it is established by specific information" that the making of the weapon is at the request and on behalf of a Federal, State or local government entity. Please be aware that no such information has been provided, and therefore, pursuant to the disapproved application, the firearm is not registered to you or the Jay Aubrey Isaac Hollis Revocable Living Trust in the National Firearms Registry and Transfer Record. Your continued possession of such a firearm without a valid registration violates the NFA. (26 U.S.C. § 5861(d)).

> ....

> Also please note that the GCA defines the term "person" to "include any individual, corporation, company, association, firm, partnership, society, or joint stock company." *See* 18 U.S.C. § 921(a)(1). The fact that an unincorporated trust is not included in the definition of "person" under the GCA does not mean that an individual may avoid liability under section 922(*o* ) by placing a machinegun "in trust." Where a trust is not an entity recognized as a "person" under the applicable law, it cannot make or hold property and is disregarded. Consequently, in terms of an unincorporated trust, ATF must disregard such a non-entity under the GCA and consider the individual acting on behalf of the *624 trust to be the proposed maker/possessor of the machinegun.

Dkt. No. 1–5 (Pl. Ex. E).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005361

Plaintiff argues that ATF unlawfully revoked his Form 1 approval, and contends that ATF's interpretation of the GCA is contrary to the plain language of the statute. Dkt. No. 1 ¶¶ 47–48. On October 30, 2014, Plaintiff filed his Complaint for Declaratory and Injunctive Relief, individually and on behalf of the Hollis Trust, against the Attorney General and the Director of ATF in their official capacities ("Defendants"). Plaintiff requests declaratory and injunctive relief for protection from the application of 18 U.S.C. § 922(*o* ), 26 U.S.C. § 5801 *et seq.,* and the associated implementing regulations, 27 C.F.R. § 479.105(a), on the alleged basis that they "act as an unlawful *de facto* ban on the transfer or possession of a machine gun manufactured after May 19, 1986." *Id.* ¶ 1. Plaintiff alleges that the foregoing statutes and regulations violate Plaintiff's rights under the Second Amendment, and the Due Process Clause of the Fifth Amendment, including its equal protection component. *Id.* Plaintiff also requests that the GCA be held unconstitutional as an impermissible exercise of congressional power under the Commerce Clause.[1] *Id.* Alternatively, Plaintiff seeks declaratory and injunctive relief that § 922(*o* ) does not prohibit the Hollis Trust from manufacturing or possessing a machine gun manufactured after May 19, 1986, and/or that Defendants lacked authority to revoke or deny the validity of Plaintiff's approved Form 1. *Id.* ¶ 3.

[1]   Although in paragraph two of his Complaint, Plaintiff seeks relief "declaring the ban on machine guns unconstitutional under the Second, Ninth, and Tenth Amendments," he does not include his Ninth and Tenth Amendment claims as "Counts" in his Complaint, and does not otherwise argue in support of those claims in his Complaint or briefing. *See* Dkt. No. 1. In any event, claims by Plaintiff under the Ninth and Tenth Amendments would be meritless. *See United States v. Broussard,* 80 F.3d 1025, 1041 (5th Cir.1996) (explaining that the right to possess weapons is not among the rights reserved to citizens under the Ninth Amendment); *United States v. Owens,* 996 F.2d 59, 61 (5th Cir.1993) (" 'If the passage of [a federal criminal statute is] a valid exercise of [Congress' commerce] power, no violation of the Tenth Amendment can occur.' " (quoting *United States v. Lopez,* 459 F.2d 949, 951 (5th Cir.1972), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972))).

Defendants move to dismiss Plaintiff's claims under Fed.R.Civ.P. 12(b)(1) and 12(b)(6), and alternatively move for summary judgment. Dkt. No. 13.

## DISCUSSION

## I. Background on the National Firearms Act and Gun Control Act

The National Firearms Act of 1934, 26 U.S.C. Chapter 53, and the Gun Control Act of 1968, 18 U.S.C. Chapter 44, comprise the federal framework governing the firearm market. The GCA generally makes it unlawful for a person to transfer or possess a machine gun. 18 U.S.C. § 922(*o* ). The NFA makes it unlawful to manufacture a machine gun in violation of its provisions. 26 U.S.C. § 5861(f). The NFA defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," or "any combination of parts from which a machine gun can be assembled." 26 U.S.C. § 5845(b). The GCA incorporates the NFA's definition of machinegun. 18 U.S.C. § 922(a)(4). ATF is charged with administering and enforcing both the NFA and GCA, and Defendants oversee ATF. 28 C.F.R. § 0.130(a)(1)–(2).

**\*625** As initially enacted in 1934, the NFA required all sellers and owners of firearms,[2] including machine guns,[3] to register with the Collector of Internal Revenue; levied a special tax on all firearms sales; and required that all firearms transactions be conducted using written order forms. 26 U.S.C. § 5845(b). The NFA also created a "central registry of all firearms in the United States," the National Firearms Registration and Transfer Record, to be maintained by the Attorney General. 26 U.S.C. § 5841.

[2]   Not all "firearms," as that term is conventionally understood, must be registered under 26 U.S.C. § 5861; rather, the registration requirement generally applies only to those firearms "Congress has found to be inherently dangerous and generally lacking usefulness, except for violent and criminal purposes, such as sawed-off shotguns and hand grenades." *United States v. Dunn,* 946 F.2d 615, 621 (9th Cir.1991) (citing 26 U.S.C. § 5845); *see also United States v. Marquez,* 626 F.3d 214, 231 (5th Cir.2010) (citing 26 U.S.C. § 5845) ("[U]nlike a bomb or machine gun, the 'club' found in Marquez's cell—a tightly-rolled, wetted down magazine that had been allowed to dry—does not reflect an unusual measure of dangerousness."). The NFA's legislative history suggests that Congress intended the NFA to cover "only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters." H.R.Rep. No. 83–1337, at A395 (1954), 1954 U.S.C.C.A.N. 4017, 4542.

3    The NFA uses the term "machinegun," but the Court will use the ordinary spelling, "machine gun," except in specific reference to Section 5845(b). *See* 26 U.S.C. § 5845(b) (defining "machinegun"); 18 U.S.C. § 922(a)(4) (incorporating the NFA's definition of "machinegun").

The NFA requires each maker of a firearm to obtain authorization as required by Chapter 53 of the Internal Revenue Code and its implementing regulations. *Id.* Before a machine gun or any other firearm is made, the maker must (1) file a written application; (2) pay a tax; (3) identify the firearm to be made; (4) identify himself in the application; and (5) obtain the approval of ATF to make and register the firearm, as evidenced on the application form. 26 U.S.C. § 5822. The implementing regulations prohibit ATF from approving an application "if the making or possession of the firearm would place the person making the firearm in violation of law," including the provisions of the NFA. 26 U.S.C. § 5861(f); 27 C.F.R. § 479.65.

In 1968, Congress passed the Omnibus Crime Control and Safe Streets Act ("Omnibus Act"), Pub.L. No. 90–351, 82 Stat. 197 (1968). Shortly thereafter, Congress passed the GCA, intending to "regulate more effectively interstate commerce in firearms" to prevent them from "fall[ing] into the hands of the lawless or those who might misuse them," to "assist the States and their political subdivisions to enforce their firearms control laws," and to "help combat the skyrocketing increase in the incidence of serious crime in the United States." *See* 18 U.S.C. § 921 *et seq.;* S.Rep. No. 89–1866, at 1 (1966). In 1986, Congress again passed restrictions on machine guns. *See* Firearms Owners' Protection Act of 1986 ("FOPA"), Pub.L. No. 99–308, 100 Stat. 449. Congress' stated reasons for doing so were to strengthen the GCA, to enhance the ability of law enforcement to fight violent crime and narcotics trafficking. H.R.Rep. No. 99495, at 2, 7 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 1327.

FOPA added 18 U.S.C. § 922(*o* ) to the GCA, which makes it unlawful for a person to transfer or possess a machine gun, with exceptions for federal, state, and local agencies, and those machine guns lawfully possessed before the enactment of FOPA. *See* Firearms Owners' Protection Act of 1986, Pub.L. No. 99–308, § 101, 100 Stat. 449 (1986). Defendants concede that **\*626** FOPA's legislative history is sparse with respect to the amendment that added § 922(*o* ), but argue that, in construing the statute, courts refer to the general legislative history of gun regulations, finding it unnecessary for Congress to rearticulate its findings on that subject each time it adds a new provision. *See United States v. Haney,* 264 F.3d 1161, 1169 n. 3 (10th Cir.2001). The GCA defines the term "machinegun" by incorporating the NFA's definition of the term. *See* 18 U.S.C. § 921(a)(23); 26 U.S.C. § 5845(b).

The relevant differences between the NFA and GCA are as follows: (1) the GCA defines "person" to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company," 18 U.S.C. § 921(a)(1); and (2) the NFA does not define "person," which means the Internal Revenue Code supplies the definition: "an individual, a trust, estate, partnership, association, company, or corporation." 26 U.S.C. § 7701(a)(1).

Because the GCA differs from the NFA in that it does not expressly define "person" to include a trust, Plaintiff argues that, to the extent he is acting on behalf of the Hollis Trust, he is exempt from the proscriptions of the GCA. Defendants move to dismiss Plaintiff's claims for lack of standing and for failure to state a claim, and alternatively, for summary judgment on each of Plaintiff's claims.

## II. Legal Standards

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001). A court must dismiss an action if it lacks subject matter jurisdiction, and the party asserting jurisdiction bears the burden of proof for a Rule 12(b)(1) motion to dismiss. *Randall D. Wolcott, M.D., P.A. v. Sebelius,* 635 F.3d 757, 762 (5th Cir.2011) (citing *Ramming,* 281 F.3d at 161). In determining whether subject matter jurisdiction is established, a court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming,* 281 F.3d at 161.

"Federal courts have no jurisdiction unless a case or controversy is presented by a party with standing to litigate." *De Leon v. Perry,* 975 F.Supp.2d 632, 645

(W.D.Tex.2014) *aff'd sub nom. De Leon v. Abbott,* 791 F.3d 619 (5th Cir.2015). Accordingly, whether a party has proper standing is a question of subject matter jurisdiction. *Cobb v. Cent. States,* 461 F.3d 632, 635 (5th Cir.2006). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming,* 281 F.3d at 161 (citing *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir.1977)). A court's "dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id.* (citation omitted).

**B. Motion to Dismiss for Failure to State a Claim**

In ruling on a Rule 12(b)(6) motion to dismiss, well-pleaded facts are accepted as true, and the Court views "those facts in the light most favorable to the plaintiff[ ]." ***627** Gonzalez v. Kay,* 577 F.3d 600, 603 (5th Cir.2009). However, legal conclusions, couched as factual allegations, are not accepted as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The factual allegations must be sufficient "to raise a right to relief above the speculative level," and the pleadings must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). In ruling on a 12(b)(6) motion to dismiss, a court "may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Randall D. Wolcott, M.D., P.A.,* 635 F.3d at 763 (quoting *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir.2008)).

**III. Standing**

Defendants move to dismiss Plaintiff's Second Amendment and Commerce Cause claims for lack of subject matter jurisdiction, arguing that Hollis lacks standing to assert those claims; specifically, Defendants argue that the injuries Plaintiff identifies are not fairly traceable to Defendants, nor would his injuries be redressed if Hollis were to prevail on his Second Amendment or Commerce Clause claims.

Under Section 2 of Article III of the Constitution, federal courts have jurisdiction over a dispute "only if it is a case or controversy. This is a bedrock requirement." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks and citations omitted); *see also Mississippi State Democratic Party v. Barbour,* 529 F.3d 538, 544 (5th Cir.2008). To have standing, "the plaintiff must have personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts." *Doe v. Tangipahoa Parish Sch. Bd.,* 494 F.3d 494, 496–97 (5th Cir.2007). A plaintiff must prove, and not merely assert, standing to sue in order to meet the case or controversy requirement of Article III. *Id.* The Supreme Court's " 'standing inquiry has been especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.' " *Clapper v. Amnesty Int'l USA,* —— U.S. ——, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (quoting *Raines,* 521 U.S. at 819–20, 117 S.Ct. 2312). Accordingly, to establish standing for each claim, " 'a plaintiff must show: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury.' " *Barbour,* 529 F.3d at 544 (quoting *Houston Chronicle Publ'g Co. v. City of League City, Tex.,* 488 F.3d 613, 617 (5th Cir.2007)); *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).

**A. Injury–in–Fact**

An injury-in-fact means "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). Hollis argues that he has a legally protected interest in the initially approved Form 1 to manufacture a machine ***628** gun, and that his Second Amendment rights were violated by Defendants when they revoked, without authority, his approved Form 1. Defendants do not appear to contest whether Hollis suffered an injury-in-fact. For reasons that are not altogether clear from the record, Hollis sought to make a machine gun. The NFA and GCA prohibit him from doing so, and the statutes levy criminal sanctions if they are defied. Those facts are sufficient to constitute an

injury-in-fact. More specifically, Hollis faced a real and imminent threat of prosecution after receiving the letter from ATF. *See* Dkt. No. Pl. Ex. E (asking Hollis to surrender any machine gun made on the basis of the mistakenly approved Form 1).

### B. Traceability and Redressability

To confer standing, "there must be a causal connection between the injury and the conduct complained of," that is, "the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Additionally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561, 112 S.Ct. 2130 (quoting *Simon,* 426 U.S. at 38, 96 S.Ct. 1917). The causation element of standing asks whether the line of causation between a plaintiff's injury and the defendants' alleged wrongdoing is "too attenuated." *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1385 (5th Cir.1986) (citation omitted).

Defendants argue that because Texas law independently bars Hollis' possession of a machine gun, he cannot show that any alleged harm he has suffered was caused by application of the NFA and GCA provisions that prohibit him from possessing a machine gun. *See* Tex. Penal Code § 46.05(a)(2) (prohibiting the intentional or knowing possession, manufacture, transport, repair, or sale of a machine gun); *compare id.* § 46.01(9) (defining "Machine gun" as "any firearm that is capable of shooting more than two shots automatically, without manual reloading, by a single function of the trigger") *with* 26 U.S.C. § 5845(b) (defining "Machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger"). Thus, Defendants argue that the causal relationship between Defendants' conduct in enforcing the GCA and NFA, and Hollis' injury, is too attenuated, because the Texas prohibition shows that Hollis' injury is caused by a third party not before the court—the State of Texas. *See White v. United States,* 601 F.3d 545, 552 (6th Cir.2010); *San Diego Cnty. Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1130 (9th Cir.1996).

Defendants further argue that Plaintiff's decision not to challenge the Texas prohibition on machine guns means

that he cannot show redressability. Even if the Court were to hold the NFA or GCA unconstitutional as impermissible exercises of Congress' authority under the Commerce Clause and/or violative of the Second Amendment, the machine gun provision in the Texas Penal Code would still bar Plaintiff's manufacture and possession of a machine gun. *See White v. United States,* No. 08–118, 2009 WL 173509, at *5 (S.D.Ohio Jan. 26, 2009); *KH Outdoor, L.L.C. v. Clay County,* 482 F.3d 1299, 1301 (11th Cir.2007); *McConnell v. FEC,* 540 U.S. 93, 229, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). Thus, Hollis' injury would not be redressed by a favorable ruling under the NFA and GCA.

**\*629** Hollis responds that ATF, overseen by Defendants, administers and enforces the GCA and the NFA, which makes Defendants responsible for Hollis' injury. He also contends that he need not challenge the Texas prohibition on machine guns because, had ATF not rescinded the approval of Hollis' Form 1, he would have been legally entitled to possess the machine gun under federal and state law, pursuant to the safe harbor provision in the Texas law. *See* Tex. Penal Code § 46.05(c) ("It is a defense to prosecution under this section that the actor's possession was pursuant to registration pursuant to the National Firearms Act, as amended."). Hollis notes that the NFA could plausibly be upheld as constitutional, while § 922(*o* ) could be invalidated as facially unconstitutional, or unconstitutional as applied to Hollis. In such a scenario, Hollis contends, his Form 1 would be approved under the NFA, and he would have a defense to prosecution under Texas law. Hollis argues that the intent of the NFA is to legalize machine guns that are properly registered with the federal government, and even if the NFA were invalidated on Commerce Clause or Second Amendment grounds, the Texas prohibition would have to be amended accordingly. Hollis asks this Court to engage in constitutional avoidance and allow him to manufacture and possess his machine gun pursuant to an approved Form 1.

Finally, at oral argument, Plaintiff argued that Texas law defines a machine gun as being capable of firing two rounds per a single function of the trigger, while federal law defines a machine gun as being capable of firing one round per a single function of the trigger. Hr'g Tr. at 33:23–34:1. Thus, Hollis claims he could manufacture a "two-round-burst" machine gun that would be lawful under Texas law but not pass muster under the GCA and NFA, implying that striking down the federal prohibition will not necessarily mean that he would still be in violation of Texas law. Importantly, these allegations were not pled in Plaintiff's Complaint. Alternatively, as a means of undermining Defendants' standing arguments

AR005365

and avoiding dismissal, Plaintiff stated at the hearing that he would amend his pleadings to withdraw his challenges to the NFA. Hr'g Tr. at 32:21–33:22. However, to date, Plaintiff has not sought leave to amend.

Defendants reject Plaintiff's suggestion that the Court should avoid deciding the constitutional validity of the challenged laws, and note that the key element of Hollis' constitutional claims is a challenge to the absoluteness of federal law. *See* Dkt. No. 1 ¶¶ 50–62; Pl. Resp. Br. at 5–6, 14–17. Defendants argue that Hollis should not be able to have it both ways by recasting his facial challenges as as-applied challenges in order to establish standing, particularly when Hollis does not specifically challenge Congress' power to regulate *his* possession of a machine gun. *See* Pl. Resp. Br. at 15 (conceding that "ownership of machine guns can be regulated to a point").

  The Court will first address whether Hollis' Second Amendment and Commerce Clause claims regarding the GCA and NFA are facial or as-applied challenges, which is important in deciding whether Hollis can satisfy the traceability and redressability requirements. A facial challenge to the constitutionality of a statute requires the challenge to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). "[S]tatutes should be construed whenever possible so as to uphold their constitutionality." *United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). Even if **\*630** a complaint may be read as asserting a facial challenge, courts are advised to first determine the validity of the statute as-applied. *See Renne v. Geary,* 501 U.S. 312, 324, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991); *see also Bigelow v. Virginia,* 421 U.S. 809, 817, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (internal quotation marks and citations omitted) ("Declaring a statute facially unconstitutional because of overbreadth is, manifestly, strong medicine, and has been employed by the Court sparingly and only as a last resort."). This Court will endeavor to determine the validity of the NFA and GCA as applied to Hollis, individually and as trustee of the Hollis Trust, based on the following representative allegations from Plaintiff's Complaint:

  • Dkt. No. 1 ¶ 52 ("The NFA and its associated regulations violate Plaintiff's Second Amendment rights as it mandates the paying of a tax to exercise a constitutionally protected right akin to a poll tax.");

  • *id.* ¶ 61 ("As machineguns do not pose a substantial effect on interstate commerce, Congress cannot rely on the Commerce Clause to ban machineguns, and therefore 18 U.S.C. § 922(*o* ) ... is

unconstitutional.");

  • *id.* ¶ 28 ("As there is no substantial effect on interstate commerce when an individual (or trust) makes a machinegun, the complete ban on this class of weapons is unconstitutional.");

  • *id.* ¶ 31 ("Law abiding citizens, like the Plaintiff, whom [sic] desire to manufacture and own these types of arms[,] are not the type of individuals that use these arms in crimes.");

  • *id.* ¶ 51 ("The machinegun ban in § 922(*o* ) and associated regulations violate Plaintiff's Second Amendment rights.");

  • *id.* ¶ 54 ("Plaintiff's Second Amendment rights are violated by the threat of legal action by ATF subsequently disapproving an already approved Form 1 application and placing him in legal jeopardy....");

  • *id.* ¶ 55 ("Additionally, Plaintiff's Second Amendment rights are violated by the [ATF] disapproving his Form 1 to make a machinegun under his trust.");

  • *id.* ¶ 56 ("18 U.S.C. § 922(*o* ) and 26 U.S.C. § 5801 et seq. are unconstitutional or unconstitutional as applied against Plaintiff.").

Although Plaintiff's pleadings are not a model of clarity, the Supreme Court's guidance to construe ambiguous challenges as being as-applied causes the Court to interpret his Second Amendment and Commerce Clause allegations as containing both facial and as-applied challenges to the GCA and NFA.

  The next issue is whether the Texas law prohibiting the possession and manufacture of machine guns means that Hollis' injury—not being able to make, possess, or transfer a machine gun—cannot be fairly traced to Defendants, or redressed by a favorable ruling by this Court. The relevant Texas statute states:

  (a) A person commits an offense if the person intentionally or knowingly possesses, manufactures, transports, repairs, or sells ... (2) a machine gun....

  (c) It is a defense to prosecution under this section that the actor's possession was pursuant to registration pursuant to the National Firearms Act, as amended.

Tex. Penal Code §§ 46.05(a)(2), 46.05(c) (citing NFA, 26 U.S.C. § 5801 *et seq.*).

AR005366

"Machine gun" means any firearm that is capable of shooting more than two shots automatically, without manual reloading, by a single function of the trigger.

**\*631** *Id.* § 46.01(9). Thus, Defendants argue that the similar, but not identical, state law ban shows that Hollis' injury is attributable to a third-party, the State of Texas, and that his alleged injury's relationship to the federal ban, as set forth in the GCA and NFA, is not fairly traceable to Defendants, nor would a favorable ruling by this Court redress his injury.

In *White v. United States,* relied on by Defendants, the Sixth Circuit considered a pre-enforcement challenge to the Animal Welfare Act, 7 U.S.C. §§ 2131–56, which restricted cockfighting and "animal fighting ventures" that affected interstate commerce. 601 F.3d at 548. The Sixth Circuit found that the economic injuries suffered by the plaintiffs were not *only* traceable to the Animal Welfare Act, because cockfighting was banned in all fifty states and the District of Columbia. *Id.* at 552 (citing *Reno,* 98 F.3d at 1130). The court also found that the claimed injuries would not be redressed by the relief the plaintiffs sought, notwithstanding the court's ruling on the constitutional invalidity of the Animal Welfare Act, because the state prohibitions would remain in place. *Id.* at 552.

In *San Diego County Gun Rights Committee v. Reno,* the Ninth Circuit considered a pre-enforcement challenge to the constitutionality of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994) ("Crime Control Act"), which amended the GCA to prohibit the transfer and possession of certain assault weapons and imposed new requirements on federal firearms licensees. 98 F.3d at 1124. The plaintiffs, who were two unincorporated associations, a federal firearms dealer, a retired Marine Corps officer, and the president of the San Diego Militia, sought declaratory and injunctive relief under the Commerce Clause and the Second and Ninth Amendments. *Id.* The Ninth Circuit found that its precedent at that time foreclosed the plaintiffs' assertion of standing under the Second Amendment, because the court had held the Second Amendment did not protect the possession of a weapon by a private citizen. *Id.* at 1124–25 (citing *Hickman v. Block,* 81 F.3d 98, 101 (9th Cir.1996), *cert. denied,* 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996)).

In assessing the plaintiffs' alleged economic injury—the Crime Control Act had allegedly caused the price of certain firearms not subject to its provisions to increase from 40% to 100%—the *Reno* court found that the Crime Control Act was "neither the only relevant piece of legislation nor the sole factor affecting the price of grandfathered weaponry." *Id.* at 1130. "In California, the Roberti–Roos Assault Weapons Control Act of 1989 also ban[ned] the manufacture, sale and distribution of certain delineated assault weapons." *Id.* at 1130 (internal citation omitted). The court concluded it was speculative to find that it was the Crime Control Act that significantly increased the price of such firearms. *Id.* (citing *Common Cause v. Dep't of Energy,* 702 F.2d 245, 251 (D.C.Cir.1983) ("[W]here the injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses.")). The court also found it significant that it was the third-party weapons dealers and manufacturers, not the defendants, who actually raised the prices of the assault weapons; although the Crime Control Act played a role in restricting the supply of such weapons, it did not specifically direct vendors to increase the price of regulated weapons. *Id.* Consequently, the court held that the plaintiffs' economic injury was caused by the independent action of multiple third parties not before the court. *Id.* (citing **\*632** *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; *Boating Indus. Associations v. Marshall,* 601 F.2d 1376, 1380 (9th Cir.1979) ("[I]f the injury stems not from the government action disputed, but from an independent source, a federal court cannot provide the plaintiff redress by directing the government to alter its action.")).

The Texas and federal prohibitions are enforced by different sovereigns and there are differences in their provisions. For example, 18 U.S.C. § 922(*o*) and 26 U.S.C. § 5861 only prohibit the transfer, possession, receiving, or making of a machine gun, and require no culpable mental state, while Tex. Penal Code § 46.05(a) prohibits the intentional or knowing possession, manufacture, transport, repair, or sale of a machine gun. *Compare* 18 U.S.C. § 922(*o*) *with* Tex. Penal Code § 46.05(a). Moreover, "machine gun" is defined differently in each statute:

"Machine gun" means any firearm that is capable of shooting more than two shots automatically, without manual reloading, by a single function of the trigger. Tex. Penal Code § 46.01(9)

"machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and

intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. 26 U.S.C. § 5845(b).

Were the Court to invalidate the GCA and NFA, Section 46.05 of the Texas Penal Code would independently prohibit Hollis from manufacturing an M–16 machine gun.[4] *See Bishop v. Smith,* 760 F.3d 1070, 1078 (10th Cir.) *cert. denied,* —— U.S. ——, 135 S.Ct. 271, 190 L.Ed.2d 139 (2014) (citing *White,* 601 F.3d at 549) ("Courts have concluded that plaintiffs fail to establish redressability only when an unchallenged legal obstacle is enforceable separately and distinctly from the challenged provision."); *see also KH Outdoor, L.L.C. v. Clay Cnty., Fla.,* 482 F.3d 1299, 1303 (11th Cir.2007) ("Any injury KH Outdoor actually suffered from the [county ordinance] is not redressable because the applications failed to meet [unchallenged state regulations].").

[4]    Hollis noted at oral argument that Texas law defines a machine gun as being capable of firing two rounds per a single function of the trigger, while federal law defines a machine gun as being capable of firing one round per a single function of the trigger; therefore, Hollis argued that he could manufacture a "two-round-burst" machine gun that would be lawful under Texas law but not pass muster under the GCA and NFA. Hr'g Tr. at 33:23–34:1. There is no allegation or evidence before the Court that Plaintiff sought to make such a machine gun, which makes Plaintiff's argument merely academic. *See Ramming,* 281 F.3d at 161 ("Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." (citation omitted)).

Hollis argues that Tex. Penal Code § 46.05(c), a safe harbor provision for those who comply with the NFA, means that he need not necessarily challenge the Texas law. According to Hollis, this Court can either construe the GCA and NFA as allowing the Hollis Trust to make or possess a machine gun, or hold § 922(*o*) to be overbroad or unconstitutional as applied to Hollis, and either ruling would bring Hollis' conduct within the Texas safe harbor *633 provision. Hollis contends that even if the NFA were held unconstitutional, the Texas statute would be amended accordingly because the intent of the Texas ban is to make machine guns legal if properly registered with the federal government. Defendants reply that invalidating federal laws pursuant to Plaintiff's Second Amendment and Commerce Clause claims would cause this Texas safe harbor provision to simply "fall

away." The speculative nature of these potential outcomes illustrates the flaw in Plaintiff's redressability argument. A "[plaintiff] must demonstrate redressability—a *'substantial likelihood'* that the requested relief will remedy the alleged injury in fact." *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (emphasis added) (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)); *see also McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 229, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (explaining that if the Court were to strike down the federal provisions on campaign contributions, it would not remedy the plaintiffs' injury because limitations imposed by state law would remain), *overruled on other grounds by Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). To demonstrate traceability and redressability, Plaintiff must somehow prevail in his Second Amendment and Commerce Clause claims, yet still benefit from the Texas safe harbor provision, which is directly tied to the statute—the NFA—that he asks the Court to invalidate. Plaintiff's allegations, even construed as as-applied challenges, do not allow for such a potentiality.[5]

[5]    The Court is aware of a recent decision from the Eastern District of Pennsylvania, involving nearly identical facts and arguments to those in this case. *See United States v. One Palmetto State Armory PA–15 Machinegun Receiver/Frame, Unknown Caliber, Serial No. LW001804,* 115 F.Supp.3d 544, 561–62, No. CIV.A. 15–2202, 2015 WL 4461603, at *13 (E.D.Pa. July 22, 2015). In that case, the court found that the Pennsylvania analogue to the GCA and NFA "piggybacks on an existing federal statute by incorporating its requirements," and the plaintiff's substantial compliance with the NFA's requirements brought the plaintiff within the safe harbor exception, leaving no independent ground to prohibit his machine gun possession. *Id.* at 628, 2015 WL 4461603 at 12. Thus, the court held the plaintiff met the traceability requirement. *Id.* The court also found the redressability requirement was satisfied because a decision striking down the NFA would also "sweep away the Pennsylvania prohibition on machine guns." *See id.* (citing *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)). This Court notes that the differences in the Texas statute and the NFA are meaningful enough for this Court to refrain from concluding that the Texas statute merely "piggybacks" on the NFA, or that a ruling that the NFA is violative of the Second Amendment would automatically "sweep away" the Texas statute.

Hollis asks this Court to speculate about the activities of third parties not before the Court, such as whether the

AR005368

Texas Legislature would amend Tex. Penal Code § 46.05 if the NFA and GCA were held to be unconstitutional or construed to not apply to the Hollis Trust. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (explaining that a plaintiff must do more than speculate that a favorable ruling will redress his injuries). Were the Court to strike down the NFA on Second Amendment grounds, it would raise obvious questions about the validity of Section 46.05 of the Texas Penal Code. However, post-*Heller* Second Amendment cases instruct this Court that the validity of state and local regulation turns on the particular provision at issue. *See, e.g., Drake v. Filko,* 724 F.3d 426, 430 (3d Cir.2013) (upholding New Jersey handgun permit law); *Peruta v. Cty. of San Diego,* 742 F.3d 1144 (9th Cir.2014) (invalidating county requirement that person show **\*634** pressing need for self-protection to receive concealed weapon permit); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw,* 719 F.3d 338 (5th Cir.2013) (upholding Texas statutory scheme prohibiting 18–to–20 year old adults from carrying handguns in public).

While the prospect of Hollis prevailing on his Second Amendment claim raises the possibility, but not a substantial likelihood, that the Texas ban might also be invalidated, Hollis offers no argument whatsoever that a ruling invalidating the NFA under the Commerce Clause would affect the validity of the Texas ban.[6] *See United States v. Lopez,* 514 U.S. 549, 567, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (distinguishing congressional authority under the Commerce Clause from the general police power retained by the States).

[6]   Hollis also relies on *Mance v. Holder* to show traceability and redressability. In *Mance v. Holder,* another member of this court considered the constitutional validity of the federal regulatory scheme for buying, selling, and transporting handguns over state lines. 74 F.Supp.3d 795 (N.D.Tex.2015). This case is easily distinguishable from *Mance,* where the court determined that the sole cause of the customer plaintiffs' injury was the federal interstate transfer ban on handguns, and the handgun seller had third-party standing. As Defendants note, Texas has its own machine gun ban that would prohibit Hollis from making a machine gun even if the federal machine gun ban did not exist. Thus, this Court cannot say that the sole cause of Hollis' inability to make a machine gun is the federal machine gun ban. Furthermore, there is no evidence in the record, nor any allegation in Hollis' Original Complaint, that he sought to sell a machine gun. Consequently, there is no basis for Hollis to establish third-party standing by asserting the rights of customers.

Therefore, because Hollis has failed to satisfy the traceability and redressability requirements of Article III

standing with respect to his Second Amendment and Commerce Clause claims, Defendants' Rule 12(b)(1) Motion to Dismiss those claims is granted.[7]

[7]   Hollis argues that he is challenging ATF's ability to revoke an already-approved Form 1, and this Court can rule that ATF lacked the authority to revoke the approval, which would redress Hollis' injury. Hollis contends that there was no reconsideration by ATF, with the usual notice and intent to reconsider a decision. *See Dun & Bradstreet Corp. Foundation v. U.S. Postal Serv.,* 946 F.2d 189, 193–94 (2d Cir.1991). However, this argument goes to Hollis' Fifth Amendment Due Process claim, which Defendants do not move to dismiss on standing grounds.

## IV. Second Amendment

Even if the Court were to find that Hollis has standing to assert his Second Amendment Claim, Hollis' Second Amendment claim is unsustainable as a matter of law.

The Fifth Circuit has adopted a two-step framework for analyzing gun restrictions challenged on Second Amendment grounds: "the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 194 (5th Cir.2012) ("*NRA* ").

To determine whether a law impinges on a right protected by the Second Amendment, the Fifth Circuit looks to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee. *NRA,* 700 F.3d at 194. "If the challenged law burdens conduct that falls outside the Second **\*635** Amendment's scope, then the law passes constitutional muster." *Id.* at 195 (citation omitted). Defendants argue that the inquiry in this case should end at the first step because the challenged federal laws do not restrict the possession of weapons protected by the Second Amendment. In doing so, Defendants rely on the following excerpts from *District of Columbia v. Heller:*

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts

AR005369

routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms* by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms

....

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of *"dangerous and unusual weapons."*

554 U.S. 570, 626–27, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (internal citations omitted) (emphasis added). The Fifth Circuit in *NRA* noted that it was not perfectly clear whether *Heller's* "presumptively lawful regulatory measures" were deemed lawful because they fell outside the Second Amendment's scope, or because they withstood the fitting level of scrutiny. *See NRA,* 700 F.3d at 196. However, the Fifth Circuit stated "that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller's* illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *Id.* Indeed, the Fifth Circuit arguably went further:

> *Heller* demonstrates that a regulation can be deemed "longstanding" even if it cannot boast a precise founding-era analogue. After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid–20th century vintage.

*Id.* at 196–97 (citations omitted). Thus, Defendants argue that longstanding state restrictions on the purchase or possession of machine guns show that bans on fully automatic weapons are firmly and historically rooted. *Id.* at 204; *see also Morrison v. State,* 170 Tex.Crim. 218, 221, 339 S.W.2d 529 (1960) (finding a machine gun is not commonly kept for self-defense, and a law making it unlawful to possess a machine gun is not violative of the Texas constitutional right to bear arms). At least twenty-one states have enacted restrictions on the possession, acquisition, and sale of machine guns, and Defendants argue that many of those states had Second Amendment analogues in their respective State constitutions, which shows that machine guns are presumptively not protected from regulation by the Second **\*636** Amendment. *See NRA,* 700 F.3d at 196. Defendants also contend that these state laws also demonstrate that laws prohibiting an entire "class of weapons" as dangerous or unusual are not exceptional.

Hollis contends that the "dangerous and unusual" doctrine does not apply to the mere possession of a weapon, but rather only applies to the manner in which the right is exercised, and this case is not about the carrying of dangerous and unusual weapons, but rather only about the possession of a firearm. For example, Hollis argues that the Supreme Court's discussion of "dangerous and unusual weapons" is derived from the common law offense of "affray." Pl. Resp. Br. at 12–13 (citing 3 B. Wilson, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) ("[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally diffuse a terrour [sic] among the people."); J. Dunlap, THE NEW–YORK JUSTICE 8 (1815) ("It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people.")). Hollis argues that the common law's definition of "dangerous" in the context of an "affray" was any item that could be used to take human life through physical force, and "unusual" meant to use a protected arm in a manner which creates an affray. Thus, Hollis argues that it is the *manner* in which the right is exercised, not the type of weapon that is carried, that must be analyzed under the dangerous and unusual doctrine. Defendants respond, however, that the common law crime of affray cannot displace precedent by the Supreme Court that dangerous and unusual weapons fall outside the scope of the Second Amendment, and *Heller* made it clear that the scope of the modern right is not cabined by historical examples. *Heller,* 554 U.S. at 582, 627–28, 128 S.Ct. 2783; *see United States v. Marzzarella,* 614 F.3d 85, 90–91 (3d Cir.2010) (explaining that the right to bear

AR005370

arms affords no protection to weapons not typically possessed by law-abiding citizens for lawful purposes).

Thus, the first issue before the Court is whether the federal machine gun ban is constitutionally sanctioned by the Supreme Court's discussion of "dangerous and unusual weapons." That analysis must begin with *United States v. Miller,* which was the basis for the "dangerous and unusual" weapons discussion in *Heller.* 307 U.S. 174, 175, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). In *Miller,* the defendants were convicted of transporting in interstate commerce a double-barrel, sawed-off shotgun, in contravention of the NFA. *Id.* The defendants challenged the NFA as violative of the police power reserved to the States, and the Second Amendment. *Id.* at 176, 59 S.Ct. 816. The Supreme Court held that:

> In the absence of any evidence tending to show that possession or use of a shotgun having a barrel of less than eighteen inches in length at the time has some reasonable relationship to the preservation or efficiency of a well-regulated militia, we cannot say the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.* at 178, 59 S.Ct. 816 (citation omitted). In discussing the *Miller* decision, the Supreme Court in *Heller* described *Miller's* holding as an "important limitation on the right to keep and carry arms"—the weapons protected were those "in common use at the time." *Heller*, 554 U.S. at 627, 128 S.Ct. 2783 (citing **\*637** *Miller,* 307 U.S. at 179, 59 S.Ct. 816). The Court found the limitation articulated in *Miller* was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citations omitted). Importantly, the Court then considered the objection that, if a "ban on M–16 rifles and [other similar bans on military weapons]" are valid under the Second Amendment, then the right conferred—"the right of the people to keep and bear Arms"—is completely detached from the prefatory clause—"A well regulation Militia, being necessary to the security of a free State." *Id.* The Court responded:

But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change the interpretation of that right.

*Id.* at 627–28, 128 S.Ct. 2783. Thus, the Court's holding in *Miller*, read in conjunction with the Court's discussion of *Miller* and M–16 rifles in *Heller*, establishes that possessing a machine gun, and specifically an M–16 rifle, does not fall within the scope of the Second Amendment. Hollis' attempt to reargue the common law crime of "affray" does not succeed in light of the Supreme Court's discussion of the exact automatic weapon at issue in this case, the M–16 machine gun. If the Supreme Court had been limiting its discussion to the carrying of such a weapon, and not to its mere possession, as Hollis suggests, the Court would have more clearly said so. Hollis' distinction between "carrying" and "possession" of automatic weapons is unpersuasive, as the Court in *Heller* described the dangerous and unusual weapons doctrine from *Miller* as a limitation on the right to "keep and carry arms." *See Heller*, 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added). The Court's discussion of *Miller* was not ambiguous:

> We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits. Read in isolation, *Miller'* s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller* ) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller's* "ordinary

AR005371

military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed **\*638** by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

*Heller,* 554 U.S. at 622–25, 128 S.Ct. 2783 (citations omitted). Thus, *Heller* recognized that the right to keep and carry bear arms only extends to those arms in common use at the time, and the right to keep and bear arms does not include a right to possess a specific firearm or type of firearm.[8] *See Heller,* 554 U.S. at 627, 128 S.Ct. 2783. It is also worth noting that the Supreme Court clearly found startling the prospect that the machine gun ban would have been unconstitutional, thereby suggesting the constitutional validity of the machine gun restrictions in the NFA and GCA. *See id.* at 624, 128 S.Ct. 2783.

[8] Defendants contend that members of the founding-era militia were expected to procure their own firearms when called into service, and the militia would not have been well-regulated if there were no restrictions on which arms members could possess. *See Miller,* 307 U.S. at 179, 59 S.Ct. 816. As a result, government officials specified the type of weapons militia members could procure and maintain. Def. Br. at 15 n. 8. Thus, the Second Amendment's text and history show that the substantive right secured did not confer an unfettered choice of arms. *See id.* (citing Second Militia Act of 1792, which provided in detail the types of firearms and ammunition for militia members to procure when called into service).

Every federal circuit that has addressed the issue has held that there is no Second Amendment right to possess a machine gun. *See United States v. Henry,* 688 F.3d 637 (9th Cir.2012) ("We agree with the reasoning of our sister circuits that machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment."); *Marzzarella,* 614 F.3d at 94 ("[T]he the Supreme Court has made clear the Second Amendment does not protect [machine guns]."); *United States v. Fincher,* 538 F.3d 868, 874 (8th Cir.2008) ( "Machine

guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."); *Hamblen v. United States,* 591 F.3d 471, 474 (6th Cir.2009) ("[W]hatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use."); *Heller v. District of Columbia,* 670 F.3d 1244, 1270 (D.C.Cir.2011) ("[F]ully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller.*"); *Friedman v. City of Highland Park, Illinois,* 784 F.3d 406, 408 (7th Cir.2015) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid.")

Therefore, *Heller* expressly forecloses Plaintiff's Second Amendment challenge to the NFA and GCA's prohibition on the possession of a machine gun, and the Court need not engage in the means—end analysis.[9] Accordingly, were Plaintiff **\*639** have standing to assert his Second Amendment claim, his claim would nonetheless be dismissed for failure to state a claim.

[9] On June 30, 2015, Plaintiff submitted a Notice of Supplemental Authority to raise a recent decision of the Supreme Court, *Johnson v. United States,* —— U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), as support for his Second Amendment claim. In *Johnson,* the majority held that the residual clause of the Armed Career Criminal Act's definition of "violent felony" was void for vagueness under the Due Process Clause of the Fifth Amendment. *Johnson,* 135 S.Ct. at 2557. Plaintiff focuses on Justice Thomas' concurrence, in which Justice Kennedy joined, where he stated that he would have simply found that the possession of a short-barreled shotgun is not a "violent felony" under the ACCA. *Id.* at 2564. Justice Thomas rejected the government's argument that short-barreled shotguns are among "those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 2565 (citing *Heller,* 554 U.S. at 625, 128 S.Ct. 2783). Justice Thomas noted that "[u]ntil the weapon is assembled, loaded, or used ... [t]he risk of injury to others from mere possession of [such a] firearm is too attenuated" to be a violent felony under the residual clause. *Id.* at 2566. As the foregoing illustrates, Justice Thomas addressed whether possession of a dangerous firearm constitutes a violent felony under the ACCA, an altogether different question from the one before this Court, and his discussion in no way undermines the majority's discussion in *Heller* of bans on "dangerous and unusual weapons."

AR005372

## V. Commerce Clause

As is true for Plaintiff's Second Amendment claim, even if Plaintiff had standing to assert his claim under the Commerce Clause, it would fail as a matter of law. Plaintiff challenges § 922(*o* ) as exceeding Congress' constitutional authority under the Commerce Clause. He asserts that Congress has no authority to ban machine guns under § 922(*o* ) because machine guns do not substantially affect interstate commerce. More specifically, Plaintiff argues that "Congress banned an entire class of firearms that were rarely, if ever, used in crime, merely because it sounded good to ban them." Dkt. No. 1 ¶ 7.

This Court disagrees, adhering to well-established precedent, and finds that the manufacturing, possession, and trafficking of machine guns does substantially affect interstate commerce, and that Congress was well within its Commerce Clause authority in enacting § 922(*o* ). *See United States v. Kirk,* 105 F.3d 997, 998 (5th Cir.1997) (en banc) (per curiam); *United States v. Knutson,* 113 F.3d 27, 30–31 (5th Cir.1997) (per curiam) (reaffirming *Kirk,* and upholding the constitutionality of § 922(*o* ) under the commerce power).

The Commerce Clause grants Congress the power "[t]o regulate Commerce ... among the several states." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has recognized three categories under which Congress may exercise its commerce power: (1) "channels of interstate commerce," (2) "instrumentalities of interstate commerce, and persons or things in interstate commerce," and (3) "activities that substantially affect interstate commerce." *Gonzales v. Raich,* 545 U.S. 1, 16–17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Although purely local activities generally do not fall within Congress' commerce power, the Supreme Court has recognized Congress' authority to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17, 125 S.Ct. 2195 (citing *Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). Thus, this Court need not conclude that "[Plaintiff's] activities, taken in the aggregate, substantially affect interstate commerce in fact," but instead need only find that there was a rational basis for Congress to conclude that machine guns, taken in the aggregate, substantially affect interstate commerce. *See Raich,* 545 U.S. at 22, 125 S.Ct. 2195. In *Raich,* for example, the Supreme Court upheld Congress' authority to regulate locally cultivated marijuana because it found a rational basis for Congress to believe that "the failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the [Controlled Substances Act]." *Id.*

Plaintiff argues that a categorical ban on machine guns is unconstitutional, relying only on congressional testimony given by Attorney General Homer S. Cummings at the time of the NFA's enactment in 1934. Dkt. No. 1 ¶ 29. Even if the Court were to accept that testimony as unimpeachable **\*640** legal authority, which it is not, Plaintiff overlooks significant developments in Commerce Clause jurisprudence since Attorney General Cummings testified. *See Raich,* 545 U.S. at 22, 125 S.Ct. 2195; *Wickard,* 317 U.S. at 128–29, 63 S.Ct. 82. Plaintiff rests his argument on the theory that a machine gun can be manufactured without having any influence on interstate commerce. *See* Dkt. No. 1 ¶ 26. Citing Attorney General Cummings' statement that Congress lacked any "inherent police powers to ... deal with local crime," Plaintiff argues that a machine gun that has not traveled in interstate commerce cannot be regulated under the Commerce Clause. *National Firearms Act of 1934: Hearings Before the House Comm. on Ways & Means,* 73rd Cong., 2d Sess. 8 (1934); Dkt. No. 1 ¶ 29. However, as discussed above, even a purely local activity can be regulated if it is part of a greater "economic class of activities" having a substantial effect on interstate commerce. *Raich,* 545 U.S. at 16–17, 125 S.Ct. 2195 (citing *Wickard,* 317 U.S. at 128–29, 63 S.Ct. 82).

The Fifth Circuit has specifically held that § 922(*o* ) falls within Congress' commerce power. *Kirk,* 105 F.3d at 998; *see also Knutson,* 113 F.3d at 30–31. In *Kirk,* the Fifth Circuit found that Congress had a rational basis for determining that "post–1986 machineguns fall within its power to regulate interstate commerce," noting that *every court of appeals* "ha [d] determined that § 922(*o* ) does not exceed the authority granted to Congress by the Commerce Clause." 105 F.3d at 998 (involving appellant's constitutional challenge to § 922(*o* ) after the Supreme Court's decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which limited Congress' authority to regulate guns near school zones). After receiving further clarification from the Supreme Court in *Raich,* federal courts have repeatedly upheld the constitutionality of federal firearms laws, including § 922(*o* ), under *Raich. See United States v. Henry,* 688 F.3d 637, 641 (9th Cir.2012) (stating that the Ninth Circuit and "[e]very other circuit that has reached the issue" has found § 922(*o* ) constitutional under Congress' commerce power); *Montana Shooting Sports Ass'n v. Holder,* 727 F.3d 975, 982–83 (9th Cir.2013) (same).

Moreover, the NFA and GCA are components of "comprehensive legislation to regulate the interstate market in a fungible commodity," much like the

AR005373

Controlled Substances Act at issue in *Raich. See Raich,* 545 U.S. at 22, 125 S.Ct. 2195. The Sixth Circuit has explained that "[g]uns are a fungible commodity for which there is an established interstate market" and that "Section 922(d)(1) is ... part of a larger regulatory framework." *United States v. Rose,* 522 F.3d 710, 717–18 (6th Cir.2008). The failure to regulate machine guns locally would undoubtedly frustrate Congress' purpose of limiting the manufacture and possession of machine guns and other particularly dangerous firearms. *See Huddleston v. United States,* 415 U.S. 814, 825, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) (noting that Congress, in enacting the GCA, sought "to insure [sic] that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest"). Thus, Congress had a rational basis for its belief that machine guns substantially affect interstate commerce, primarily because the "failure to regulate the intrastate manufacture and possession" of machine guns "would leave a gaping hole" in comprehensive federal firearms regulation. *See Raich,* 545 U.S. at 22, 125 S.Ct. 2195.

The Supreme Court's recent holding in *National Federation of Independent Business v. Sebelius* does not undermine the conclusion that § 922(*o* ) is a valid exercise **\*641** of the commerce power. *See Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). In *Sebelius,* the Supreme Court held that it was impermissible for Congress to use the individual mandate in the Affordable Care Act to require certain individuals to purchase health insurance, finding that the statute "compel[led] individuals to *become* active in commerce by purchasing [health insurance]," and "[c]onstruing the Commerce Clause to regulate individuals *because* they are doing nothing would open a new and potentially vast domain to congressional authority." *Id.* at 2587 (emphasis in original). In contrast, § 922(*o* ) affects interstate commerce as a *prohibition* on conduct, not a means of compulsion. *See Sebelius,* 132 S.Ct. at 2587; *Henry,* 688 F.3d at 642 n. 5 (finding that *Sebelius* did not affect the constitutionality of § 922(*o* )); *see also United States v. Alcantar,* 733 F.3d 143, 146 (5th Cir.2013) *cert. denied,* —— U.S. ——, 134 S.Ct. 1570, 188 L.Ed.2d 579 (2014) ("[*Sebelius* ] did not address the constitutionality of § 922(g)(1), and it did not express an intention to overrule the precedents upon which our cases—and numerous other cases in other circuits—relied in finding statutes such as § 922(g)(1) constitutional."). The holding in *Sebelius* is therefore distinguishable and has no effect on the determination of the constitutionality of the provision at issue here.

Thus, Plaintiff has failed to state a claim for relief insofar as he claims § 922(*o* ) is an invalid exercise of Congress' authority under the Commerce Clause.

## VI. Due Process

Plaintiff next asserts that Defendants have deprived him of his property interest in the approved Form 1, in violation of the Due Process Clause of the Fifth Amendment. Because the Court finds that Plaintiff had no protected property interest, Plaintiff cannot state a claim for relief.

The Fifth Amendment provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Procedural due process challenges under the Fifth Amendment require the Court to conduct a two-step inquiry. *See Wilson v. Birnberg,* 667 F.3d 591, 601 (5th Cir.2012). First, the federal government must have "deprived a person of a liberty or property interest." *Id.* (quoting *Welch v. Thompson,* 20 F.3d 636, 639 (5th Cir.1994)). If the first step is satisfied, the Court must then "determine whether the procedures relative to that deprivation were constitutionally sufficient." *Wilson,* 667 F.3d at 601.

The Supreme Court has emphasized that "[t]he hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (citing *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 11–12, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)). Furthermore, "[p]roperty interests, of course, are not created by the Constitution. Rather they are created ... by existing rules or understandings that stem from an independent source." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Defendants argue that Plaintiff had no property interest in the mistakenly approved Form 1 and, consequently, this Court need not move beyond the first step of the due process inquiry. Defendants contend that Plaintiff cannot cite an independent source of authority that creates a cognizable property interest in an approved **\*642** Form 1, and thus Plaintiff has no "legitimate claim of entitlement" to its approval. *See Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

"Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law." 26 U.S.C. § 5822. Plaintiff, in effect,

Hollis v. Lynch, 121 F.Supp.3d 617 (2015)

asks the Court to *approve* his application, despite the fact that doing so would place Plaintiff in violation of law. As Defendants note, § 922(*o* )(1) prohibits the possession of machine guns, except, *inter alia,* guns manufactured at the request of a governmental entity. *See* 18 U.S.C. § 922(*o* )(2)(A). The facts of this case do not satisfy this exception, as Plaintiff did not seek approval to manufacture a machine gun on behalf of a governmental entity. Therefore, ATF could not approve Plaintiff's Form 1 application without violating the GCA and NFA.

 Moreover, Plaintiff has no "legitimate claim of entitlement," because he cites no independent authority that creates a property interest in an approved Form 1. For example, in *Barry v. Barchi,* a New York statute provided that a horse racing trainer's license could be suspended only for certain limited reasons. *See Barry v. Barchi* 443 U.S. 55, 64–65, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). Here, in contrast, there is no analogous independent authority that gives Plaintiff a cognizable property interest, such as a license derived from state law. In fact, the Fifth Circuit has stated that "it is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao,* 286 F.3d 822, 825–26 (5th Cir.2002) (collecting cases). An "agency, like a court, can undo what is wrongfully done by virtue of its order." *United Gas Improvement Co. v. Callery Properties,* 382 U.S. 223, 229, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965). Here, ATF had the authority to correct the erroneous approval of Plaintiff's Form 1 application, and ATF's decision to exercise that authority did not incidentally grant Plaintiff a cognizable property interest.

Defendants also argue that Plaintiff has no property interest because he voluntarily entered an area subject to pervasive government control. Defendants rely on *Dennis Melancon, Inc. v. City of New Orleans,* which states that the government's authority to regulate in an area subject to pervasive government control "means an individual 'cannot be said to possess the right to engage.' " *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 272 (5th Cir.2012) (quoting *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 216 (Fed.Cir.1993)). As discussed above, the NFA and GCA delineate such an area of pervasive government control, as demonstrated by the comprehensive scope of federal firearms regulations. *See Rose,* 522 F.3d at 717–18. Plaintiff's efforts to comply with these regulations are evidence that he voluntarily subjected himself to them by submitting his Form 1 to make an M–16 machine gun. *See* Dkt. No. 1 ¶ 37.

Defendants further note that Plaintiff's temporary approval was not accompanied by the "crucial indicia of a

property right"—namely, Plaintiff's ability to assign, sell, or transfer the Form 1 approval. *See Hearts Bluff Game Ranch, Inc. v. United States,* 669 F.3d 1326, 1330 (Fed.Cir.2012); *Gonzalez v. U.S. Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin.,* 695 F.Supp.2d 474, 504 (S.D.Tex.2010). Plaintiff responds that he could have manufactured the machine gun the moment he received approval and, had Defendants not revoked the approval, he *could have* assigned or transferred that machine gun under the NFA. However, even if Plaintiff did have an interest in the approval, such **\*643** an interest would not automatically mature into a right to transfer or assign such approval. *See* 26 U.S.C. § 5822. Plaintiff's ability to transfer the machine gun would be limited by federal firearms laws requiring the person to whom he transferred the gun to file a separate written application for approval. *Id.* Because Plaintiff could only transfer the machine gun with governmental approval, he does not possess the ability to "freely transfer" or assign the Form 1 approval, and he therefore lacks a cognizable property interest in it. *See Acceptance Ins. Companies, Inc. v. United States,* 583 F.3d 849, 857 (Fed.Cir.2009) (finding that a plaintiff who "could not freely transfer the policies at issue" without governmental approval had no protected property interest).

Nor did the mistaken approval lead to "continued possession," which may create a property interest. *See Hampton Co. Nat. Sur., LLC v. Tunica Cnty., Miss.,* 543 F.3d 221, 225 (5th Cir.2008) (citing *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)). For example, if administrative approval "becomes essential in pursuit of a livelihood," an applicant may receive procedural due process protection. *Bell,* 402 U.S. at 539, 91 S.Ct. 1586. However, Plaintiff does not allege that he intended to use the authorization for the machine gun in pursuit of his livelihood, and even if he had done so, the ATF's prompt rescission of the mistaken approval would preclude any reliance argument.[10]

[10]  The Supreme Court has recognized that the timing and nature of due process required in each case will be fact-specific and " 'will depend on appropriate accommodation of the competing interests involved,' " including the significance of the private interest at stake, the extent of the deprivation, "the likelihood of governmental error," and the importance of the competing government interests. *Logan,* 455 U.S. at 434, 102 S.Ct. 1148 (quoting *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). Here, Defendants reversed the error within approximately forty-eight hours, concluding that rapid action was necessary "to prevent Plaintiff from mistakenly manufacturing a dangerous and unusual weapon." Dkt. No. 14 at 32 n. 21.

Because the Court finds that Plaintiff had no property interest in either the machine gun or the erroneous approval of the Form 1 application, the Court does not address the issue of whether the procedures afforded were constitutionally sufficient. *See Hampton Co.,* 543 F.3d at 225 (quoting *Cabrol v. Town of Youngsville,* 106 F.3d 101, 105 (5th Cir.1997)) ("When there is no 'property interest, there is nothing subject to Due Process protections and our inquiry ends.' ").

## VII. Equal Protection Component of the Due Process Clause

Finally, Plaintiff contends that Defendants have approved post–1986 Form 1s for various individuals, and ATF's denial of Plaintiff's application violates the equal protection component of the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (finding an equal protection component under the Fifth Amendment).

A federal statute is "entitled to a 'strong presumption of validity' " unless it (1) infringes upon a fundamental right or (2) "involve[s] suspect classifications." *Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997) (quoting *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). Absent an infringement of a fundamental right, or the involvement of a suspect classification, this Court will uphold a "legislative classification or distinction" against an equal protection challenge " 'so long as it bears **\*644** some rational relation to a legitimate end.' " *Id.* (quoting *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)).

Plaintiff asserts that, "[u]pon information and belief, [ATF] has approved the manufacture and transfer of post–1986 machineguns to various individuals" and, therefore, revoking the approval of Plaintiff's Form 1 application was a denial of equal protection. Dkt. No. 1 ¶¶ 67–68. Defendants argue that Plaintiff has failed to allege facts that meet the pleading standard of *Iqbal* and *Twombly. See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court finds that Plaintiff's equal protection claim does not meet the "plausibility" threshold set by Fed.R.Civ.P. 8.

Plaintiff does not allege that he is a member of a suspect class, and his Complaint is devoid of "factual content that

allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Plaintiff's Complaint articulates no specific facts about the "various individuals" who allegedly received post–1986 approval.[11] *See* Dkt. No. 1 ¶¶ 49, 67. Plaintiff does argue that the right to own a machine gun is a fundamental right. However, as discussed above, "the challenged laws do not impermissibly interfere with Second Amendment rights." *See NRA,* 700 F.3d at 212. Therefore, because Plaintiff has not shown (1) that he is a member of a suspect class or (2) that his fundamental right was burdened, a rational-basis standard applies. In applying the rational-basis test, this Court will not invalidate the statute at issue "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [it] can only conclude that the government's actions were irrational." *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 83–84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

[11]   Plaintiff asserts in his response brief that "other individuals have been granted permission ... to manufacture and possess post–1986 machineguns, namely civilian companies and their employees ... and various individuals...." Dkt. No. 23 at 42 (Pl. Resp. Br. at 35). However, Plaintiff's assertion falls outside of this Court's purview in deciding a 12(b)(6) motion. *Lone Star Fund V (U.S.) v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir.2010) ("The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the Motion to Dismiss that are central to the claim and referenced by the complaint."). The same rule applies to Plaintiff's correspondence to the court, which includes a form letter by ATF regarding Form 4 requests for transfer of post–1986 machine guns. *See* Dkt. No. 37 at 3 (Pl.'s Correspondence to the Court, Ex. A, Stemple Letter Correspondence); *see also* Pl. Sur–Reply Br. at 9 (citing Pl. App. 69). These documents were not attached to the Complaint, or specifically referenced in the Complaint, nor were they part of Defendants' Motion to Dismiss, and thus are not to be considered by the Court.

When Congress enacted § 922(*o* ) as part of FOPA, its stated goal was "to strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking." *Knutson,* 113 F.3d at 31 (quoting H.R.Rep. No. 99–495, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1327). Congress found that limiting "the number of machine guns in private hands," including those used for intrastate activity, was necessary to address problems regarding interstate firearms trafficking. *United States v. Kenney,* 91 F.3d 884, 890–91 (7th Cir.1996) (citing S.Rep. No. 90–1097

(1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2114, 2168). This Court cannot say **\*645** that Congress' reasoning was "irrational" in differentiating between machine gun possession by law enforcement and possession by civilians. *See NRA,* 700 F.3d at 212. Furthermore, regarding the grandfather clause prohibiting possession of a machine gun *after* May 1, 1986, it is well established that Congress "need not strike at all evils at the same time." *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (citations and internal quotation marks omitted) (explaining that a "statute is not invalid under the Constitution because it might have gone farther than it did"). Consequently, Plaintiff has failed to state a plausible claim for relief under the equal protection component of the Fifth Amendment. Because the Court is granting Defendants' 12(b)(6) Motion to Dismiss, Plaintiff's request for relief under Rule 56(d) is denied as moot.

## VIII. "Person" under the GCA

Alternatively, Plaintiff requests a declaratory judgment that 18 U.S.C. § 922(*o* ) does not prohibit unincorporated trusts from manufacturing or possessing machine guns.

Section 922(*o* ) provides that:

(*o* )(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o* ). Section 921(a)(1) provides that:

(a) As used in this chapter—

(1) The term "person" and the term "whoever" include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

18 U.S.C. § 921(a)(1). Accordingly, the issue before the Court is whether the Hollis Trust is a "person" under the

GCA. Hollis relies on the plain language of the GCA, which, unlike the definition of "person" in the Internal Revenue Code that applies to the NFA, does not include "trust" as a "person."

The Hollis Trust was created and exists under the laws of the State of Texas. Dkt. No. 1 ¶ 4. "The general rule in Texas (and elsewhere) has long been that 'the term "trust" refers not to a separate legal entity but rather to the *fiduciary relationship* governing the trustee with respect to the trust property.' " *In re Guetersloh,* 326 S.W.3d 737, 739 (Tex.App.-Amarillo 2010, no pet.) (quoting *Huie v. DeShazo,* 922 S.W.2d 920, 926 (Tex.1996) (emphasis in original)); *see also Ditta v. Conte,* 298 S.W.3d 187, 191 (Tex.2009) ("A trust is not a legal entity."). For example, "suits against a trust must be brought against the trustee." *Id.* (citing *Werner v. Colwell,* 909 S.W.2d 866, 870 (Tex.1995)).

However, and importantly for the purposes of the Hollis Trust, "[t]he trustee is vested with legal title and right of possession of the trust property but holds it for the benefit of the beneficiaries, who are vested with equitable title to the trust property." *Faulkner v. Bost,* 137 S.W.3d 254, 258–59 (Tex.App.-Tyler 2004, no pet.). Accordingly, as the trustee of the Hollis Trust, only Hollis could "transfer or possess a machinegun," as is prohibited under § 922(*o* ). As an individual human being, Hollis is a "person" within the meaning of § 922(a)(1), and he is subject to the prohibitions of § 922(*o* ), which prevent him **\*646** from possessing or transferring a machine gun. *See United States v. King,* 735 F.3d 1098, 1104 (9th Cir.2013) ("King, as an individual human being, is therefore a 'person' within the meaning of § 922(a)(1)(A)."). Accordingly, the Court finds that 18 U.S.C. § 922(*o* ) prohibited Hollis, individually, and as trustee of the Hollis Trust, from possessing a machine gun, and Plaintiff's alternative request for declaratory and injunctive relief to the contrary is dismissed for failure to state a claim.

## CONCLUSION

For the reasons stated, the Defendants' 12(b)(1) Motion to Dismiss Plaintiff's Second Amendment ("Count I") and Commerce Clause ("Count II") claims for lack of standing is **GRANTED,** and those claims are **DISMISSED.** Defendants' 12(b)(6) Motion to Dismiss Plaintiff's due process ("Count III"), equal protection ("Count IV"), and Plaintiff's alternative request for declaratory relief that § 922(*o* ) does not apply to Plaintiff or the Hollis Trust (Dkt. No. 1 ¶ 3) is **GRANTED,** and

AR005377

those claims are **DISMISSED with prejudice.** Plaintiff's Motion for Discovery under Fed.R.Civ.P. 56(d) is **DENIED as moot.** The Court will enter a separate judgment dismissing Plaintiff's claims.

**SO ORDERED.**

**All Citations**

121 F.Supp.3d 617

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

U.S. v. Ferguson, 788 F.Supp. 580 (1992)

788 F.Supp. 580
United States District Court,
District of Columbia.

UNITED STATES of America
v.
Ralph Demetrius FERGUSON.

Crim. No. 91–605–01.
|
March 27, 1992.

**Synopsis**

Defendant, charged with receipt and possession of unregistered machine guns in violation of federal statute based upon his theft of guns from State Department mailroom, moved to dismiss counts on ground that registration provisions had been rendered unconstitutional by subsequent statute. The District Court, Gesell, J., held that machine guns stolen by defendant came within grandfather clause in statute which rendered meaningless registration requirement for machine guns, and thus, defendant could be held criminally liable for failing to register machine guns.

Motion denied.

**Attorneys and Law Firms**

**\*580** Thomas J. Motley, Asst. U.S. Atty., Washington, D.C., for U.S.

Robert E. Sanders, Washington, D.C., for defendant Ferguson.

MEMORANDUM AND ORDER

GESELL, District Judge.

In an indictment filed October 24, 1991, defendant Ralph Ferguson was charged with a number of counts relating to his theft from the State Department mail room of a number of guns. Counts 3 through 11 charge the defendant with receipt and possession of machineguns

that had not been registered to him in the National Firearms Registration and Transfer Record, a violation of 26 U.S.C. § 5861(d). Defendant moves to dismiss those counts on the ground that that provision has been rendered unconstitutional by a subsequent statute.

26 U.S.C. § 5861 was enacted as a revenue statute pursuant to Congress's taxing **\*581** power. *See Sonzinsky v. United States,* 300 U.S. 506, 513, 57 S.Ct. 554, 555–56, 81 L.Ed. 772 (1937). It requires firearms to be registered so that taxes may be assessed on them. In that sense, the registration requirement is valid under the Constitution only because it is an integral part of Congress's revenue scheme. *See id.* In 1986, however, Congress in large part removed the revenue rationale for the registration requirement, at least as applied to machineguns, by enacting a subsequent statute, 18 U.S.C. § 922(*o* ), that made it illegal, with certain exceptions, to possess a machinegun at all. Because possession of machineguns was no longer legal, the registration requirement was rendered meaningless, and no revenues could thereafter be derived from the registration of machineguns. To the extent section 922(*o* ) applies, therefore, the registration requirement is now unconstitutional. *See United States v. Rock Island Armory, Inc.,* 773 F.Supp. 117, 126 (C.D.Ill.1991).

In the present case, however, the machineguns that are the subject of Counts 3 through 11 are not covered by section 922(*o* ) because of that provision's grandfather clause. 18 U.S.C. § 922(*o* ) provides:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) ...

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before this subsection takes effect.

Under section 922(*o* )(2)(B), certain machineguns, namely, those that were lawfully possessed before enactment of the statute in 1986, may be legally possessed and transferred even today. Such guns have not been prohibited by section 922(*o* ), and they are thus subject to the tax—and therefore the registration—requirements of section 5861(d).

The United States has indicated that it is prepared to prove that each of the guns that is the subject of Counts 3

AR005379

U.S. v. Ferguson, 788 F.Supp. 580 (1992)

through 11 of the indictment was lawfully possessed prior to 1986. If such proof is indeed adduced, those guns fall within the grandfather clause of section 922(*o* )(2)(B), and they are thus not banned by section 922(*o* )(1). Those guns must therefore be registered pursuant to section 5861(d); and indeed, at the time of the offense, were so registered to the Department of State. *See, e.g.,* Ex. 1 to Government's Opposition (copy of current registration of one of the guns to the State Department). Anyone receiving or possessing such a gun subsequently must also register it. If defendant has failed to register the guns in compliance with the statute, he is subject to potential criminal liability under section 5861(d).[1]

1    Because defendant has not received the guns lawfully,

he also would be potentially liable under section 922(*o* ). The statutory and Guidelines penalties for the two statutes are essentially the same. *See* 26 U.S.C. § 5871; 18 U.S.C. § 924(a)(2); U.S.S.G. § 2K2.1.

Defendant's motion is denied.

**All Citations**

788 F.Supp. 580

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005380

827 F.Supp. 1468
United States District Court,
C.D. California.

UNITED STATES of America, Plaintiff,
v.
Michael James O'MARA, Defendant.

No. CV93–2320–HLH.
|
Aug. 20, 1993.

## Synopsis

Defendant was convicted of possession of unregistered firearm and he appealed. The Court of Appeals, 963 F.2d 1288, affirmed. On motion to vacate defendant's sentence, the District Court, Hupp, J., held that statute prohibiting defendant from possessing unregistered machine gun did not violate his due process rights.

Motion denied.

## Attorneys and Law Firms

**\*1469** Robert S. Scott, Asst. U.S. Atty., Los Angeles, CA, for plaintiff.

Michael James O'Mara, pro se.

ORDER DENYING PETITION UNDER § 2255

HUPP, District Judge.

Michael James O'Mara moves under 28 U.S.C. § 2255 to vacate his sentence. On October 15, 1990, O'Mara was convicted after jury trial of possessing an unregistered machine gun in violation of the National Firearms Act, 26 U.S.C. § 5861(d). He was sentenced to 21 months imprisonment. On May 8, 1992, the Ninth Circuit affirmed O'Mara's conviction. *See United States v. O'Mara,* 963 F.2d 1288 (9th Cir.1992). The court has jurisdiction to hear O'Mara's motion pursuant to 28 U.S.C. § 2255. The motion is denied for the reasons stated hereafter.

I

O'Mara urges the court to follow the Tenth Circuit and hold that his conviction is unconstitutional. *See United States v. Dalton,* 960 F.2d 121 (10th Cir.1992). In *Dalton,* the Tenth Circuit reversed a conviction under section 5861(d) for possession of an unregistered machine gun.[1] The NFA provides that an "[application to register a firearm] shall be denied if the ... possession of the firearm would place the transferee in violation of the law." 26 U.S.C. § 5812(a). After Congress enacted the NFA in 1934, and amended it in 1968, Congress passed a separate criminal statute in 1986 that prohibits the possession of any machine gun.[2] 18 U.S.C. § 922(o). Thus, the defendant in *Dalton* was convicted under section 5861(d) for failing to perform an act that is prohibited under section 5812(a)—namely, the registration of a machine gun. The Tenth Circuit concluded that such a conviction violates notions of fundamental fairness as guaranteed by the due process clause of the Fifth Amendment.[3] *Dalton,* 960 F.2d at 124.

[1]   Section 5861 provides: "It shall be unlawful for any person ... (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record...."

[2]   Section 922(o )(1) provides: "Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machine gun."

[3]   For the same reason, the court held that section 922(o) implicitly repealed section 5861(d). *See Dalton,* 960 F.2d at 126.

The Tenth Circuit also held that section 922(o) undercut the constitutional basis of section 5861(d). *Dalton* noted that Congress enacted section 5861(d) pursuant to its power to tax. Indeed, from the Supreme Court's perspective, the NFA "contains no regulation other than the mere registration provisions, which are obviously supportable as in aid of a revenue purpose. On its face, it is only a taxing measure...." *Sonzinsky v. United States,* 300 U.S. 506, 513, 57 S.Ct. 554, 555, 81 L.Ed. 772 (1937). *See also United States v. Rock Island Armory, Inc.,* 773 F.Supp. 117 (C.D.Ill.1991) (discussing

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005381

legislative history of the NFA). With the enactment of section 922(*o* ), however, Congress effectively prevented the registration of machine guns. The mandate of section 922(*o* ) was therefore held to eviscerate the constitutional legitimacy of section 5861(d) as an aid to tax collection. *See Dalton,* 960 F.2d at 124–25.

## II

The Ninth Circuit recently addressed the constitutionality of a conviction under section 5861(d), but did not decide the issue. *See United States v. Kurt,* 988 F.2d 73 (9th Cir.1993). Section 922(*o* ) contains an exception for the "lawful transfer or lawful possession of a machine gun that was lawfully possessed before [May 19, 1986]." **\*1470** 18 U.S.C. § 922(*o* ) (2)(B).[4] In *Kurt,* the Ninth Circuit noted that a defendant who fell within this exception was free from the mandate of section 922(*o* ) and thus could comply with the registration requirement of section 5812(a). The court placed the burden on the defendant to establish that he or she purchased the machine gun after the enactment of section 922(*o* ). Since the defendant failed to meet this burden, the court affirmed his conviction under section 5861(d).

[4]    Under this exception, a category of machine guns—those "lawfully possessed" before the enactment of section 922(*o* ) in 1986—may be legally possessed and transferred today. *See United States v. Ferguson,* 788 F.Supp. 580, 581 (D.D.C.1992).

Unlike the defendant in *Kurt,* O'Mara was clearly subject to section 922(*o* ). Indeed, the record establishes that the machine gun was not "lawfully possessed" before the enactment of section 922(*o* ), regardless of when it was manufactured. The government introduced evidence at trial that the machine gun was never registered to O'Mara or any other owner. (RT at 96) O'Mara also testified at trial that he received the machine gun in early 1990. (RT at 165) Thus, the court must decide the issue raised but undecided in *Kurt*—namely, the constitutionality of a conviction under section 5861(d) where the defendant is subject to the terms of section 922(*o* ).

## III

Though *Kurt* did not decide the issue before this court, its dicta suggests an answer: "[W]e note with favor the analysis in *Dalton." Kurt,* 988 F.2d at 75. While discussing *Dalton,* however, *Kurt* did not discuss two controversial assumptions underlying *Dalton's* analysis. First, *Dalton* assumes that the NFA requires every person who possesses a firearm to register the firearm. Second, it assumes that the sole constitutional basis of section 5861(d) is the power of Congress to tax. Both these assumptions were criticized by the Fourth Circuit. *See United States v. Jones,* 976 F.2d 176 (4th Cir.1992) (upholding a conviction under section 5861(d)). Indeed, the second assumption is contrary to Ninth Circuit authority. *See United States v. Evans,* 928 F.2d 858, 862 (9th Cir.1991) (holding that both sections 5861(d) and 922(*o* ) are valid regulations of interstate commerce).

## A

The Tenth Circuit held that every offense under section 5861(d) has two elements—the possession of a firearm and the failure to register the firearm. *Dalton,* 960 F.2d at 123. This holding is based on a single Supreme Court case, *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). In *Haynes,* the defendant argued that his obligation to register the firearm compelled him to provide incriminating information in violation of the Fifth Amendment. The government responded that he was convicted under the provision prohibiting possession of an unregistered firearm, not the provision requiring registration. Thus, the Court addressed whether the offense of possessing an unregistered firearm has the same elements as the offense of failing to register a firearm.

The *Haynes* Court noted that the section prohibiting the possession of an unregistered firearm referred to the NFA's registration requirement.[5] This reference "suggest[s] strongly that the perimeter of the offense which it creates is to be marked by the terms of the registration requirement imposed...." *Id.* at 93, 88 S.Ct. at 728. The pre-1968 NFA imposed a registration requirement on every person who possessed a firearm.[6] Given the scope of this registration **\*1471** requirement, the Court concluded that the gravamen of the defendant's offense was both his possession of an unregistered firearm and his failure to register the firearm.

[5]    The current version—section 5861(d)—also refers to the NFA's registration requirement. *See supra* note 1.

6    As the *Haynes* Court noted:

> [The NFA] indicates quite precisely that "[e]very person possessing a firearm" must, unless excused by the section's exception, register his possession with the Secretary or his delegate. Moreover, the Treasury regulations are essentially unequivocal; they specifically provide that "[e]very person in the United States possessing a firearm (a) not registered to *him,* ... must execute an application for the registration of such firearm...."

*Id.* 390 U.S. at 93, 88 S.Ct. at 728 (emphasis in original).

As a result of *Haynes,* Congress amended the NFA in 1968.[7] The current NFA provides that "each firearm transferred shall be registered to the transferee by the transferor." 26 U.S.C. § 5841(b). *See also* 26 U.S.C. § 5812(a)(1).[8] The NFA explicitly excludes the transferee from the registration requirement. *See United States v. Freed,* 401 U.S. 601, 603–04, 91 S.Ct. 1112, 1115, 28 L.Ed.2d 356 (1971) ("Under the present Act only possessors who lawfully make, manufacture, or import firearms can and must register them; the *transferee does not and cannot register.*") (emphasis in original). Thus, the NFA does not require—nor does it allow—the transferee to register the firearm.[9]

7    Based on its construction of the NFA, the Court held that the defendant's conviction violated his right against self-incrimination. Congress amended the NFA to eliminate the constitutional defects revealed in *Haynes.*

8    Section 5812(a)(1) prohibits the transfer of firearms "unless (1) the transferor of the firearm has filed with the Secretary a written application ... for the transfer and registration of the firearm to the transferee...."

9    *See also Cox v. Bureau of Alcohol, Tobacco & Firearms,* 571 F.2d 267, 269 (5th Cir.1978) ("[T]here is no way in which a transferee or possessor can register firearms with the national registry [except where the transferee is a government entity]."); *United States v. Mayo,* 498 F.2d 713, 717 (D.C.Cir.1974) ("The statute simply requires a purchaser (transferee) to defer taking possession of the weapon until the transaction is registered."); *United States v. Black,* 431 F.2d 524, 529 (6th Cir.1970) ("[A] possessor commits an offense only for his voluntary election to possess a firearm that is contraband because it is unregistered.").

The Tenth Circuit did not recognize that the 1968 amendments altered the elements of the offense of possessing an unregistered firearm. As amended, the NFA creates a single mandate for the transferee of the firearm. It prohibits him from accepting possession of a firearm that has not been properly registered by the transferor. Accordingly, a transferee violates section 5861(d) because he possesses an unregistered machine gun, not because he fails to register the machine gun. Any other construction would expand section 5861(d) beyond the scope of the NFA's registration requirement. *See Haynes,* 390 U.S. at 93, 88 S.Ct. at 728.

As applied to a transferee, section 5861(d) and section 922(*o* ) do not impose conflicting mandates. For instance, O'Mara did not violate section 5861(d) because he imported, manufactured, or made the machine gun. Rather, he violated section 5861(d) because he accepted possession of the machine gun.[10] Accordingly, O'Mara could have complied with both statutes by refusing to accept possession of the unregistered machine gun.[11] *See Jones,* 976 F.2d at 183. Indeed, O'Mara was convicted for the very act prohibited under section 922(*o* )—the possession of a machine gun.[12]

10    The record indicates clearly that O'Mara was a transferee of the machine gun. (RT at 165)

11    The Tenth Circuit also held that section 922(*o* ) implicitly repealed section 5861(d). *Dalton,* 960 F.2d at 126. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and the later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). Since both statutes prohibit the same conduct—possession of a machine gun—they are not irreconcilable.

12    This analysis would not apply if petitioner were a manufacturer, importer or maker of machine guns. The NFA requires such individuals to register the firearms they manufacture, import, or make. *See* 26 U.S.C. § 5841(b). Notably, the *Dalton* court reversed the conviction of a transferee of firearms, while the *Jones* court affirmed the conviction of a maker of firearms. Thus, this court declines to follow either the Tenth Circuit's or Fourth Circuit's analysis.

**B**

The Tenth Circuit notes correctly that Congress enacted section 5861(d) pursuant to its power to tax. It did not consider, however, whether section 5861(d) also has a constitutional basis in the commerce clause.[13] *1472 In most situations, courts "will not ascribe to Congress an intent to exercise its power under the commerce clause when it has invoked the taxing power in enacting the legislation." *United States v. Giannini,* 455 F.2d 147, 148 (9th Cir.1972). Yet, where the explicit constitutional basis for a statute is doubtful, a court may invoke another constitutional basis. *See Minor v. United States,* 396 U.S. 87, 98 n. 13, 90 S.Ct. 284, 289 n. 13, 24 L.Ed.2d 283 (1969) (holding that even if registration requirements are not sustainable as a revenue measure, they are "sustainable under the powers granted Congress in Art. I, § 8").

> [13]   Indeed, it seemed content to note that Congress doubted whether the NFA could have a constitutional basis in the commerce clause. *See Dalton,* 960 F.2d at 124 (citing testimony of then Attorney General Homer S. Cummings before the House Committee on Ways and Means). Since the NFA's enactment in the 1930s, however, the Supreme Court has clarified and expanded the scope of the commerce clause.

The Ninth Circuit holds that section 5861(d) is a valid exercise of the authority vested in Congress by the commerce clause. *See Evans,* 928 F.2d at 862. In *Evans,* the defendant argued that Congress lacks the power to prohibit the mere possession of an unregistered machine gun without requiring proof that the machine gun entered interstate commerce. The court did not reject the defendant's argument on the grounds that section 5861(d) is rooted in Congress' power to tax. *Cf. Giannini,* 455 F.2d at 148 (rejecting the same argument on such grounds). Instead, it rejected his argument on the merits and specifically upheld the provision under Congress' power to regulate commerce. Thus, even if section 5861(d) does not aid in the tax function after section 922(*o* ) it survives as a legitimate regulation of interstate commerce.

**IV**

The government argues that O'Mara's failure to raise the constitutionality of section 5861(d) at trial or on direct appeal constitutes a "procedural default." It concludes that O'Mara cannot raise the issue in a collateral proceeding absent showing both cause and prejudice. *See United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982) (establishing cause and prejudice standard for procedural defaults). O'Mara argues in part, however, that he was convicted under either an unconstitutional statute or a repealed statute. "If [O'Mara's] claim were correct, the indictment would fail to state an offense against the United States and the district court would be deprived of jurisdiction. Because the defect complained of is jurisdictional, [O'Mara's] claim is reviewable." *United States v. Broncheau,* 597 F.2d 1260, 1262 n. 1 (9th Cir.1979). *Accord United States v. Mitchell,* 867 F.2d 1232, 1233 n. 2 (9th Cir.1989) (citing *Broncheau* ).

The government also fails to identify a procedural default. *Cf. Frady,* 456 U.S. 152, 102 S.Ct. 1584 (failure to make a contemporaneous objection to jury instructions constitutes a procedural default). The Ninth Circuit has not held that the mere failure to raise a constitutional claim on direct review constitutes a procedural default and thus prevents consideration of the issue in a collateral proceeding absent a showing of cause and prejudice.[14] *See United States v. Schaflander,* 743 F.2d 714, 717 (9th Cir.1984) ("[C]onstitutional claims may be raised in collateral proceedings even if the defendant failed to pursue them on appeal.")

> [14]   Other courts have held that the failure to raise such an issue on direct review is a procedural default. *See Norris v. United States,* 687 F.2d 899 (7th Cir.1982).

**V**

The court holds that 26 U.S.C. § 5861(d) is constitutional as applied to O'Mara. The motion to vacate sentence is denied.

IT IS SO ORDERED.

**All Citations**

827 F.Supp. 1468

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005384

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by U.S. v. Mallory, S.D.Fla., February 13, 1995

843 F.Supp. 235
United States District Court, E.D. Michigan,
Southern Division.

UNITED STATES of America, Plaintiff,
v.
Daniel HUNTER, D. Bruce Clark, Kent Lomont,
Defendants.
UNITED STATES of America, Plaintiff,
v.
Daniel HUNTER, John Stemple, Robert Landies,
George Dodson, Defendants.

Nos. 92–CR–80769–DT, 92–CR–80770–DT.
|
Jan. 24, 1994.

**Synopsis**
In prosecution for conspiracy to violate federal statutes
regulating manufacture, transfer and possession of
machine guns, defendants moved to dismiss indictment.
The District Court, Rosen, J., held that: (1) proper
exercise of commerce power does not require Congress to
spell out nexus between regulated activity and interstate
commerce, either on face of statute or in its legislative
history; (2) statute forbidding transfer and possession of
machine guns, with certain exceptions, was consistent
with the commerce power; (3) statute restricting use of
information obtained from application, registration or
records required to be submitted or retained to comply
with any provision of the National Firearms Act did not
bar the prosecution; (4) indictment was not subject to
dismissal for failure to list regulations relied on; and (5)
defendants failed to show entitlement to dismissal of
indictment on theory of prosecutorial misconduct before
the grand jury.

Motions denied.

**Attorneys and Law Firms**

*238 Asst. U.S. Atty., Diane Donohue, Detroit, MI, for
plaintiff.

Richard O'Neill, Federal Defenders Office, Detroit, MI,
for Hunter.

Stuart Benis, Colombus, OH, for Clark.

Steven Halbrook, Fairfax, VA, for Lomont.

James Jeffries, Greensboro, NC, for Landies.

Ed Wishnow, Southfield, MI, for Dodson.

*OPINION AND ORDER*

ROSEN, District Judge.

**I.** *INTRODUCTION*

In these consolidated cases, the United States has charged
Daniel Hunter, D. Bruce Clark, Kent Lomont, John
Stemple, Robert Landies, and George Dodson with
conspiracy to violate federal statutes regulating the
manufacture, transfer, and possession of machineguns.
Defendants are gun manufacturers and dealers from
Michigan, Ohio and Indiana. They have raised a number
of pretrial motions on which the Court heard oral
argument on September 22, 1993. After careful review of
the issues raised, the Court is now prepared to rule on
these motions. This Memorandum Opinion and Order sets
forth that ruling.

**II.** *FACTUAL BACKGROUND*

**A.** *PROLOGUE.*
Before 1986, any federally licensed gun manufacturer or
dealer could make and transfer a machinegun as long as
he followed the procedures of the National Firearms Act
("NFA"), I.R.C. §§ 5801–5872, and the Gun Control Act
("GCA"), 18 U.S.C. §§ 921–930. Passed in 1934, the
NFA is a taxing statute that generated revenue for the
Government by mandating the registration and taxation of

U.S. v. Hunter, 843 F.Supp. 235 (1994)

certain types of firearms (machineguns, silencers, sawed-off shotguns, etc.). The GCA, for its part, regulates through criminal penalties the interstate flow of all firearms. The Department of Treasury's Bureau for Alcohol, Tobacco and Firearms ("ATF") is the federal agency in charge of enforcing these statutes.

In 1986, Congress enacted 18 U.S.C. § 922(*o*) as part of a series of GCA amendments known as the Firearm Owners' Protection Act (FOPA). Section 922(*o*) reads:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

> (2) This subsection does not apply with respect to—

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency or political subdivision thereof; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

Daniel Hunter, one of the Defendants in this case, registered approximately 1700 machineguns just prior to § 922(*o*)'s effective date of May 19, 1986. Both the U.S. Attorney and ATF acknowledge that he should not have been allowed to do so. In fact, an ATF agent looked at his inventory and recommended to ATF that it deny the registrations. ATF overlooked this request and approved the 1700 machinegun registrations.

The essence of the indictments is that Hunter's 1700 machinegun registrations were used to provide a paper cover for the illegal transfer and possession of machineguns. A more specific review of the counts of the indictments is set forth below.

### B. *NO. 92–80769. UNITED STATES v. HUNTER, CLARK & LOMONT.*

#### 1. *Count I: Conspiracy To Violate Federal Firearm Laws Under 18 U.S.C. § 371 (Hunter, Clark, Lomont).*[1]

[1]    18 U.S.C. § 371 reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any

agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

This count alleges that on May 5, 1986, Daniel Hunter, a federally licensed firearms **\*239** dealer in the Eastern District of Michigan d/b/a Broadhead Armory, Inc., signed and filed seven ATF Form 2s (Notice of Firearms Manufactured or Imported) showing the manufacture of 75 .45 caliber machineguns, bearing serial numbers HM 001–HM 075. Delwin Wirth, a federally licensed firearms dealer in Wisconsin, approached Defendant Kent Lomont, a federally licensed firearms manufacturer in Indiana d/b/a Lomont's Precision Bullets, in April, 1987, at the Nob Creek Machinegun Shoot in Kentucky. Wirth told Lomont that he wanted registrations for four machinegun receivers which Wirth had in his possession. Lomont directed Wirth to Defendant Daniel Hunter. Wirth spoke with Hunter that same day about the transaction. Wirth later arranged to have Gary Rasmussen listed as the transferee of the receivers; Rasmussen is a federally licensed firearms dealer in Wisconsin.

On August 28, 1987, Hunter submitted four ATF Form 3s (Application for Tax–Exempt Transfer of Firearm & Registration to Special (Occupational) Taxpayer) to ATF requesting permission to transfer four machinegun receivers bearing serial numbers HM 066–HM 069 to Rasmussen. In October, 1987, Hunter gave to Wirth the approved Form 3s. Wirth met with Defendant D. Bruce Clark, a federally licensed firearms dealer (and after July, 1989, a licensed manufacturer) in Ohio d/b/a Fort Howard, in October, 1987. Wirth arranged for Clark to manufacture four machineguns with Wirth's receivers. Wirth and Clark agreed that the machineguns would bear Hunter's serial numbers. Hunter made entries in his books on October 4, 11 and 13, 1987, showing the transfer of four machineguns with serial numbers HM 066–HM 069 to Rasmussen; Rasmussen made entries in his federally mandated bound book on October 16 showing the receipt of four machineguns from Hunter with those same serial numbers.

On November 19, 1987, Rasmussen signed and filed ATF Form 3s requesting permission to transfer four machineguns with serial numbers HM 066–HM 069 to Clark. After these were approved, Wirth shipped the receivers to Clark on December 3, 1987. On December 12, Clark made an entry in his bound book showing the receipt of four machineguns manufactured at the Broadhead Armory. According to the indictment, despite

AR005386

U.S. v. Hunter, 843 F.Supp. 235 (1994)

Hunter and Rasmussen's records, only Wirth and Clark ever had possession of the machinegun receivers. On March 8, 1989, Clark still had the four receivers with serial numbers HM 066–HM 069 in his possession. The indictment alleges that all of these acts constituted a conspiracy to violate 18 U.S.C. § 922(*o* ), and also 18 U.S.C. §§ 923(g)(1)(A)[2], 924(a)(1)(D)[3] and 924(a)(2).[4]

[2]   Section 923(g)(1)(A) reads: "Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe...."

[3]   Section 924(a)(1)(D) reads: "Except as otherwise provided ... whoever—(D) willfully violates any other provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both."

[4]   Section 924(a)(2) reads: "Whoever knowingly violates subsection ... (*o*) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."

### 2. *Count II: Possession of Machineguns in Violation of 18 U.S.C. § 922(o) (Clark).*

On or about March 8, 1989, Clark possessed four machinegun receivers with serial numbers HM 066–HM 069 in violation of 18 U.S.C. § 922(*o* ).

### 3. *Count III: False or Fraudulent Statements in Violation of 18 U.S.C. § 1001[5] (Hunter).*

[5]   Section 1001 reads: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

On or about August 28, 1987, Hunter filed false ATF Form 3s requesting permission to transfer machinegun receivers to Rasmussen.

### *240 C. *NO. 92–80770, UNITED STATES v. HUNTER, STEMPLE, LANDIES AND DODSON.*

### 1. *Count I: Conspiracy To Violate Federal Firearms Laws In Violation Of 18 U.S.C. § 371.*

Prior to 1986, George Dodson, who was neither a federally licensed firearms manufacturer or dealer, arranged for the manufacture and/or acquisition of M–2, M–10, and M–11 .30 caliber machinegun conversion kits. Before May, 1986, Dodson agreed to transfer the conversion kits to Daniel Hunter, a licensed firearm manufacturer in the Eastern District of Michigan d/b/a Broadhead Armory. Hunter, in turn, filed registration forms with ATF on May 7, 1986, showing that the Broadhead Armory manufactured the conversion kits.[6]

[6]   Specifically, Hunter filed 44 ATF Form 2s showing the manufacture of 461 conversion kits (101 M–2 carbine conversion kits with serial numbers BAV 001–BAV 101; 34 M–10 one-piece conversion kits with serial numbers BAL 001–BAL 034; and 326 M–11 one-piece conversion kits with serial numbers BAM 001–BAM 326).

On May 28, 1987, Hunter signed and forwarded twenty ATF Form 3s requesting permission to transfer twenty M–1 and M–2 .30 caliber carbine conversion kits with serial numbers BAV 082–BAV 101 to John Stemple, a federally licensed firearms manufacturer in Ohio. On August 31, 1987, Stemple made an entry in his bound book showing receipt of the twenty conversion kits listed above from Hunter, even though he allegedly received the weapons directly from Dodson. On September 2, 1987, Stemple filed and forwarded ATF Form 3s requesting permission to transfer the above twenty conversion kits to Robert Landies, a federally licensed firearms manufacturer in Ohio d/b/a Collector's Corner. The Form 3s showed the conversion kits as being .50 caliber machineguns. On September 18, 1987, Landies made an entry in his bound book showing receipt of twenty ".50 caliber full auto[s]."

On December 7, 1989, Landies still had in his possession the twenty .30 caliber conversion kits with serial numbers BAV 082–BAV 101. On December 14, 1987, Hunter had

AR005387

U.S. v. Hunter, 843 F.Supp. 235 (1994)

in his possession 328 conversion kits manufactured by Dodson but registered as being manufactured by himself. Similarly, on March 8, 1988, Stemple had in his possession some 75 conversion kits manufactured by Dodson but registered as being manufactured by Hunter. On July 10, 1989, Hunter had in his possession 299 conversion kits he received from Dodson but listed as being manufactured by himself. And, on March 21, 1990, Stemple had in his possession 87 conversion kits which he received from Dodson, but which were registered as being manufactured by Hunter.

The indictment alleges that all these acts violated 18 U.S.C. § 371. In particular, the indictment alleges that the Defendants knowingly conspired to violate 18 U.S.C. §§ 922(a)(1)(A)[7], 922(*o* ), 923(g)(1)(A), 924(a)(1)(D), and 924(a)(2).

[7]    Section 922(a)(1)(A) reads: "It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce...."

**2.** *Count II: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Landies).*
On or about December 7, 1989, Landies knowingly possessed twenty machinegun conversion kits with serial numbers BAV 082–BAV 101 in violation of § 922(*o* ).

**3.** *Count III: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Hunter).*
On or about December 14, 1987, Hunter knowingly possessed 328 machinegun conversion kits in violation of § 922(*o* ).

**4.** *Count IV: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Stemple).*
On or about March 8, 1988, Stemple knowingly possessed 75 machinegun conversion kits in violation of § 922(*o* ).

**\*241 5.** *Count V: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Hunter).*
On or about July 10, 1989, Hunter knowingly possessed 299 machinegun conversion kits in violation of § 922(*o* ).

**6.** *Count VI: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Stemple).*
On or about March 21, 1990, Stemple knowingly possessed 87 machinegun conversion kits in violation of § 922(*o* ).

**7.** *Count VII: False Or Fraudulent Statements In Violation Of 18 U.S.C. § 1001 (Stemple).*
On September 2, 1987, Stemple knowingly filed false ATF Form 3s to transfer machinegun conversion kits to Landies.

**8.** *Count VIII: Engaging In The Business Of Firearms Without A License In Violation Of 18 U.S.C. §§ 922(a)(1)(A) And (a)(2)[8] (Hunter, Stemple, Dodson).*

[8]    Section 922(a)(1)(A) is quoted *supra,* n. 7. Section 922(a)(2) reads: "It shall be unlawful for any importer, manufacturer, dealer, or collector licensed under the provision of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector...."

From on or about September, 1987, through March, 1990, Hunter, Stemple and Dodson willfully engaged in firearms dealing without a license in violation of §§ 922(a)(1)(A) and 922(a)(2).

AR005388

U.S. v. Hunter, 843 F.Supp. 235 (1994)

### III. *ANALYSIS*

#### A. *SECTION 922(o) IS CONSTITUTIONAL.*

**1.** *Introduction.*

Defendants have moved to dismiss the indictments on the ground that the Congressional enactment of § 922(*o* ) is not a valid exercise of the Commerce Clause. That provision reads: "The Congress shall have the power * * * To regulate commerce with foreign nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. Specifically, Defendants assert that for Congress to properly exercise its commerce power, two things must occur: (i) Congress must state on the face of the statute or in its legislative history the impact of the regulated activity on interstate commerce, and (ii) Congress' determination that the regulated activity falls within the Commerce Clause's grant of authority must be reasonable. For the reasons set forth below, the Court holds that § 922(*o* ) does not violate the Commerce Clause.

This is not the first case in which this Court has had reason to examine a statute challenged under the Commerce Clause. In *Michigan Protection & Advocacy Serv. v. Babin,* 799 F.Supp. 695, 742 (E.D.Mich.1992), this Court held that Congress could not regulate the private sale of a home between neighbors under the Commerce Clause. The Commerce Clause analysis in *Babin* began by noting that:

> Judicial review of Commerce Clause legislation is not exacting. A court reviewing legislation under the Commerce Clause "must defer to a congressional finding that a regulated activity affects interstate commerce 'if there is any rational basis for such a finding' " *Preseault v. ICC,* 494 U.S. 1 [17], 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264 [276], 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981)). As the Supreme Court wrote in *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964):
>
> > *Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court.* But where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.

> [379 U.S. at 303–04] 85 S.Ct. at 383. In sum, judicial review is no longer necessary once a court determines that Congress had a rational basis for believing that a particular **\*242** activity has a substantial effect on interstate commerce.

*Babin,* 799 F.Supp. at 733 (emphasis added). *Babin* thus set forth two important Commerce Clause principles. First, judicial review is deferential to Congress' interpretation of its commerce power. Second, as indicated by the excerpt from *McClung,* a court's examination of whether Congress acted within that power is independent of any Congressional findings. In other words, just because Congress has stated explicitly or implicitly in the statute or its legislative history that it believes the regulated activity falls within the commerce power, a court's responsibility for inquiry does not end. Instead, the court must conduct its own examination of the statute, its legislative history, and any other information available to Congress at the time of the enactment to determine if indeed Congress was rational in its belief that it could legislate.

In *Babin,* the Court next discussed at some length the somewhat tortured history of the Commerce Clause, and set forth its understanding of that provision's precedential evolution:

> > To be within the ambit of the Commerce Clause, an activity originally had to be commerce that moved across state lines. With time, courts began to hold that the commerce need only affect movement across state lines. Finally, courts dropped the commerce requirement and applied the Clause to any activity that affects commerce that, in turn, affects movement across state lines. The sole remaining limitation on Congress' power under the Commerce Clause is the requirement that the effect on commerce be *substantial.*

799 F.Supp. at 735 (emphasis in original).

Lastly, the Court outlined what, in its view, was an appropriate standard for determining what activities have a substantial effect on interstate commerce:

AR005389

U.S. v. Hunter, 843 F.Supp. 235 (1994)

The Court interprets the phrase "substantial effect" as having two interrelated parts. First, the regulated activity, alone or in the aggregate, must result in a significant quantity of interstate transactions. Purely isolated examples of interstate movement are insufficient to bring an activity within the scope of the Commerce Clause. Second, the regulated activity, alone or in the aggregate, must have a *direct causal nexus* to interstate commerce. It is not sufficient that the regulated activity affect another activity which, in turn, has a substantial interstate commerce effect. Rather, the interstate effect must be brought about directly by the regulated activity.

799 F.Supp. at 740 (emphasis in original).

In the context of the instant case, the Court will review pertinent precedent and integrate its analysis in *Babin* with the facts presented here.

**2. Section 922(o) Is A Lawful Exercise Of The Commerce Power.**

**a. The Supreme Court has never required Congress to explicitly state the interstate commerce nexus upon which a statute passed under the commerce power relies, either on the face of the statute or in its legislative history.**

Defendants argue first that no statute enacted under the commerce power may pass constitutional muster unless Congress, either on the face of the statute or in its legislative history, spells out the nexus between the regulated activity and interstate commerce. Defendants rely primarily on *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). That case involved a conviction under 18 U.S.C.App. § 1202(a), since repealed in 1986, which read:

Any person who has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony ... and who receives, possesses, or transports in commerce or affecting commerce ... any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.[9]

9      Congress replaced this statute with what is now 18 U.S.C. § 922(g) in 1986.

The issue in *Bass* was whether "in commerce or affecting commerce" was an element of a possession or receipt offense under the statute as well as a transport offense. The Supreme Court held that it was. A ***243** review of the statute itself and its legislative history left the Court uncertain as to whether Congress intended to ban the mere possession and receipt of firearms by felons. The Court, therefore, invoked two principles of statutory construction in holding that the interstate commerce nexus was an element of the crime. 404 U.S. at 338–48, 92 S.Ct. at 518–22.

First, the Court noted that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " 404 U.S. at 346–48, 92 S.Ct. at 522 (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). Second, and more directly applicable to an analysis of the instant case, the Court held:

There is a second principle supporting today's result: unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. This Congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines. *See, e.g., Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). As this Court emphasized only last term in *Rewis v. United States, supra,* we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced and intended to bring into issue, the critical matters involved in the judicial decision. In *Rewis,* we declined to accept an expansive

AR005390

interpretation of the Travel Act.[10] To do so, we said then, "would alter sensitive federal-state relationships [and] could overextend limited federal police resources." While we noted there that "[i]t is not for us to weigh the merits of these factors," we went on to conclude that "the fact that they are not even discussed in the legislative history ... strongly suggests that Congress did not intend that [the statute have the broad reach]." 401 U.S. at 812, 91 S.Ct. at 1059. In the instant case, the broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources. Absent proof of some interstate commerce nexus in each case, § 1202(a) dramatically intrudes upon traditional state criminal jurisdiction. As in *Rewis,* the legislative history provides scanty basis for concluding that Congress faced these serious questions and meant to affect the federal-state balance in the way now claimed by the Government. Absent a clearer statement of intention from Congress than is present here, we do not interpret § 1202(a) to reach the "mere possession" of firearms.

[10]   In *Rewis,* the Supreme Court reversed convictions under the Travel Act, which prohibited interstate travel with the intent to promote criminal activities. Defendants in *Rewis* were owners of an illegal gambling operation on the Georgia–Florida border. The government obtained their convictions on the theory that such operators "are responsible for the interstate travel of their customers" and thus fell within the class of people subject to the statute. 401 U.S. at 811–12, 91 S.Ct. at 1059. In addition to citing the principle of lenity, the Court also stated in support of its reversal of the convictions that "neither statutory language nor legislative history" supported such a theory. 401 U.S. at 811–12, 91 S.Ct. at 1059. The reasoning of *Rewis* is further discussed in the text above.

404 U.S. at 348–52, 92 S.Ct. at 523–24 (footnotes omitted). Significantly, the Court did not reach the question of "whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms." 404 U.S. at 338–39, 92 S.Ct. at 518 n. 4.[11]

[11]   The Court, therefore, did not consider how *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), discussed *infra,* might apply to *Bass.* 404 U.S. at 338–39, 92 S.Ct. at 518 n. 4.

Nowhere in *Bass,* however, did the Court state that Congress *must* make findings to support its exercise of the commerce power or that it must include an interstate commerce nexus as part of every offense enacted *244 under that power. Indeed, such a ruling would have been contrary to another Supreme Court decision issued just eight months before *Bass.*

In *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Court upheld against a Commerce Clause challenge a provision of the Consumer Credit Protection Act which prohibited loan sharking. Defendant was convicted under this provision for purely intrastate loan sharking activities. The Court affirmed his conviction with the following reasoning:

> Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power "to excise, as trivial, individual instances" of the class. *Maryland v. Wirtz,* 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020, 1029.
>
> Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce. In an analogous situation, Mr. Justice Holmes, speaking for a unanimous Court, said: "[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so." *Westfall v. United States,* 274 U.S. 256, 259, 47 S.Ct. 629 [629–30], 71 L.Ed. 1036, 1037. In that case an officer of a state bank which was a member of the Federal Reserve System issued a fraudulent certificate of deposit and paid it from the funds of the state bank. It was argued that there was no loss to the Reserve Bank. Mr. Justice Holmes replied, "But every fraud like the one before us weakens the member bank and therefore weakens the System." *Id.* at 259, 47 S.Ct. at 629. In the setting of the present case there is a tie-in between local loan sharks and interstate crime.

402 U.S. at 150–54, 91 S.Ct. at 1360–61 (emphasis in original).

The Court then analyzed the information before Congress when it considered the loan sharking provision. The Court concluded:

> The essence of all these reports and hearings was summarized and embodied in formal congressional findings. They supplied Congress with the knowledge that the loan shark racket provides organized crime with its second most lucrative source of revenue, exacts millions from the pockets of people, coerces its victims into the commission of crimes against property, and causes the takeover by racketeers of legitimate businesses. *See generally* 114 Cong.Rec. 14391, 14392, 14395, 14396.

AR005391

We have mentioned in detail the economic, financial, and social setting of the problem as revealed by Congress. *We do so not to infer that Congress need make particularized findings in order to legislate.* We relate the history of the Act in detail to answer the impassioned plea of petitioner that all that is involved in loan sharking is traditionally local activity. It appears, instead, that loan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations.

402 U.S. at 154–58, 91 S.Ct. at 1362–63 (emphasis added). *See also Katzenbach v. McClung,* 379 U.S. 294, 298–300, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964) ("As we noted in *Heart of Atlanta Motel* [*v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) ] both Houses of Congress conducted prolonged hearings on the [Civil Rights] Act. *And, as we said there, while no formal findings were made, which of course are not necessary, it is well that we make mention of the testimony at these hearings to better understand the problem before Congress and determine whether the Act is a reasonable and appropriate means toward its solution.*") (emphasis added).

*Perez* and *McClung* clearly state that Congress need not make findings of a burden on interstate commerce in order to legislate under the Commerce Clause. Moreover, *Perez* holds that Congress may bar purely intrastate activity—such as loan sharking, or, in this case, machinegun possession—if it was reasonable in believing that such activity in fact burdens interstate commerce.

The Court draws further support for its holding that there is no constitutional requirement that Congress make findings in **245** order to legislate from Justice Powell's thoughtful concurrence in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In that case, contracting associations challenged an affirmative action provision contained in § 103(f)(2) of the Public Works Employment Act of 1977. They asserted, *inter alia,* "that a reviewing court may not look beyond the legislative history of the PWEA itself for evidence that Congress believed that it was combating invidious discrimination." 448 U.S. at 502–03, 100 S.Ct. at 2787 (Powell, J., concurring). Justice Powell rejected this argument, stating "petitioners' theory would erect an artificial barrier to full understanding of the legislative process." 448 U.S. at 502–03, 100 S.Ct. at 2787. He elaborated further on this view:

Congress is not an adjudicatory body called upon to resolve specific disputes between competing

adversaries. Its constitutional role is to be representative rather than impartial, to make policy rather than to apply settled principles of law. The petitioners' contention that this Court should treat the debates on § 103(f)(2) as the complete "record" of congressional decisionmaking underlying the statute is essentially a plea that we treat Congress as if it were a lower federal court. But Congress is not expected to act as though it were duty bound to find facts and make conclusions of law. The creation of national rules for the governance of our society simply does not entail the same concept of recordmaking that is appropriate to a judicial or administrative proceeding. Congress has no responsibility to confine its vision to the facts and evidence adduced by particular parties. Instead, its special attribute as a legislative body lies in its broader mission to investigate and consider all facts and opinions that may be relevant to the resolution of an issue. One appropriate source is the information and expertise that Congress acquires in consideration and enactment of earlier legislation. After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in an area.

*Acceptance of petitioners' argument would force Congress to make specific factual findings with respect to each legislative action. Such a requirement would mark an unprecedented imposition of adjudicatory procedures upon a coordinate branch of Government. Neither the Constitution nor our democratic tradition warrants such a constraint on the legislative process.* I therefore conclude that we are not confined in this case to an examination of the legislative history of § 103(f)(2) alone. Rather, we properly may examine the total contemporary record of congressional action dealing with the problems of racial discrimination against minority business enterprises.

448 U.S. at 502–03, 100 S.Ct. at 2787 (emphasis added).

The Court agrees with Justice Powell's analysis of the differing fact-finding roles of Congress and the judiciary. The Court, therefore, declines to accept Defendants' invitation to impose the more rigorous fact-finding inquiry required of courts upon the national legislature.

The Court does not read *Bass* as reaching a contrary conclusion. Defendants place much emphasis on the fact that in that opinion, the Court stated that:

In light of our disposition of the

AR005392

U.S. v. Hunter, 843 F.Supp. 235 (1994)

case, we do not reach the question whether, *upon appropriate findings,* Congress can constitutionally punish the "mere possession" of firearms; thus, we need not consider the relevance, in that connection, of our recent decision in *Perez v. United States....*

404 U.S. at 338–39, 92 S.Ct. at 518 n. 4 (emphasis added). The Court does not believe that this dicta, on a matter not even reached by the *Bass* Court, contradicts the statements in *Perez, McClung* and Justice Powell's concurrence in *Fullilove* that Congress need not make findings to legislate. Indeed, the language in *Bass* on which Defendants rely itself states that the Court did not consider how *Perez* might affect the outcome. Absent a clearer statement from the Supreme Court that Congress must make **\*246** findings to legislate under the Commerce Clause, this Court will not impose such a requirement.[12]

[12]   Thus, this Court declines to follow *United States v. Lopez,* 2 F.3d 1342 (5th Cir.1993), cited by Defendants, which held that Congress exceeded its commerce power in enacting 18 U.S.C. § 922(q). That statute bars the possession of a firearm within 1000 feet of a schoolyard. *Lopez* ruled, in effect, that Congress bore the burden to show to a reviewing court that it acted properly under the Commerce Clause: "Here Congress surely intended to make the possession of a firearm near a school a federal crime, but it has not taken the steps necessary to demonstrate that such an exercise of power is within the scope of the Commerce Clause." 2 F.3d at 1365–66. Because this Court does not believe that the Constitution or precedent mandates that Congress make such a demonstration, it rejects the basis on which *Lopez* struck down § 922(q). *See also United States v. Edwards,* 13 F.3d 291 (9th Cir.1993) (rejecting the reasoning of *Lopez* and upholding the constitutionality of § 922(q)).

Beyond this, the Court believes that *Bass* does not control this case for another reason. *Bass* held that when a federal statute infringes on an area of traditional state regulation, such as the possession of weapons, Congress must clearly state it so intends to infringe. 404 U.S. at 348–54, 92 S.Ct. at 523–24. In *Bass,* the statute was ambiguous as to whether an interstate commerce nexus was an element of a possession offense or not. The Court therefore read the statute to require a showing of a nexus with interstate commerce because Congress did not clearly indicate whether it meant to ban mere possession. 404 U.S. at 350–54, 92 S.Ct. at 524.

In the instant case there is no such ambiguity. Section 922(*o*) bars the possession of certain machineguns, period. As Defendants have pointed out, every other provision of § 922 has interstate commerce as an element of the crime. The Court, therefore, cannot conclude that the absence of this element in § 922(*o*) was merely a drafting oversight. By passing the provision, Congress clearly stated that there now existed an outright ban on certain machineguns. The "clear statement" rule of *Bass* is therefore fulfilled by virtue of the terms of § 922(*o*) itself. *See United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 1116–1117 (1978) ("The two maxims [of lenity and clear statement as set out in *Bass* ] only apply 'when we are uncertain of the statute's meaning'....") (citation omitted).

In the end, the real problem with Defendants' argument here is that it would raise to the level of a constitutional right a requirement that Congress, in legislating, make findings upon which its constitutional authority to enact laws is based. Although such findings in legislation or legislative history may well facilitate constitutional analysis by the courts, there is no requirement of such findings under the Constitution. Concomitantly, Defendants may not be heard to claim as a constitutional defense that a statute is constitutionally infirm if it does not include such a finding. Just as a court's responsibility for inquiry into the validity of a statute under the Commerce Clause does not end just because Congress makes a finding that a regulated activity burdens interstate commerce, the fact that Congress does not make such a finding does not end a Court's inquiry into the constitutionality of a statute under the Commerce Clause. The Commerce Clause inquiry is a judicial responsibility quite independent of congressional action or inaction.

The Court will now proceed to the central question of Commerce Clause review set out in *Babin:* Is there a rational basis for finding that the mere possession and transfer of machineguns substantially affected interstate commerce?

### b. There is a rational basis for concluding that the possession and transfer of machineguns substantially affected interstate commerce.

Defendants correctly point out that the legislative record on § 922(*o*) is hardly complete. The provision was a last-second floor amendment; no hearings were

AR005393

conducted, no committee report refers to it, and there was little discussion on the floor before its passage. *See* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective,* 17 CUMB.L.REV. 585, 670–71 (1987). While this Court has held that Congress need not make findings in order to legislate, the existence of a legislative record is, as the Court has noted, nonetheless helpful in making the independent **\*247** judicial determination that Congress rationally believed its actions were consistent with its commerce power.

Despite the absence of a fully developed legislative record for § 922(*o* ), the Court believes that Congress did rationally exercise the commerce power in enacting the provision. Congress has long regulated the interstate flow of firearms under the commerce power. First, in 1938, it passed the Federal Firearms Act ("FFA"). That statute prohibited various transfers of firearms by licensed as well as unlicensed gun dealers. *See United States v. Lopez,* 2 F.3d 1342, 1349 (5th Cir.1993).

Next, in 1968, Congress replaced the FFA with the more comprehensive Omnibus Crime Control and Safe Streets Act. In the Omnibus Act itself, Congress expressly found:

> that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable States to control this traffic within their own borders through the exercise of their police power.

P.L. No. 90–351, § 901(a)(1).

Later in 1968, the Omnibus Act was superseded in its turn by the GCA. The legislative history to that statute also indicates that Congress believed that tough controls on the interstate flow of firearms were necessary to help local communities prevent violent crimes:

> The increasing rate of crime and lawlessness and the growing use of firearms in violent crime clearly attest to a need to strengthen Federal regulation of interstate firearms traffic.
>
> The subject legislation responds to widespread national concern that existing Federal control over the sale and shipment of firearms across state lines is grossly inadequate.

Handguns, rifles, and shotguns have been the chosen means to execute three-quarters of a million people in the United States since 1900. The use of firearms in violent crime continues to increase today. Statistics indicate that 50 lives are destroyed by firearms each day. In the 13 months ending in September 1967 guns were involved in more than 6,500 murders, 10,000 suicides, 2,600 accidental deaths, 43,500 aggravated assaults and 50,000 robberies. No civilized society can ignore the malignancy which this senseless slaughter reflects.

H.R.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413. A letter from the attorney general attached to this House Report added:

> By recognizing the Federal responsibility to control the indiscriminate flow of firearms and ammunition across State borders, this bill will give States and local communities the capacity and incentive to enforce effectively their own gun control laws. Once enacted into law, it will insure that strong local and State laws are not subverted by a deadly interstate traffic in firearms and ammunition.

1968 U.S.C.C.A.N. at 4425.

As of 1968, then, Congress had three times enacted statutes under its commerce power which sought to regulate the interstate flow of firearms as an aid to local law enforcement efforts. The 1986 FOPA, which included § 922(*o* ), continued in this policy. A committee report on a predecessor bill to FOPA stated:

> H.R. 4332 is designed to relieve the nation's sportsmen and firearms owners and dealers from unnecessary burdens under the Gun Control Act of 1968, *to strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking,* and to improve administration of the Act.

H.R.Rep. No. 495, 99 Cong., 2d Sess. 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1327 (emphasis added).

Turning more specifically to § 922(*o* ) itself, the language of the statute and what little legislative history does exist on it demonstrate that Congress wanted to regulate possession and transfer of machineguns as a means of stemming interstate gun trafficking. Importantly, the statute does not ban the possession and transfer of all machineguns. Indeed, it specifically excludes from **\*248** its scope of illegal activity both the transfer and possession of post–1986 machineguns under government authority *and* "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect." 18 U.S.C. § 922(*o* )(2). Thus, the intent of the statute, clear on its face, was to limit transactions in *post*–1986 machineguns. *See United States v. Ferguson,* 788 F.Supp. 580, 581 (D.D.C.1992) ("Under section 922(*o* )(2)(B), certain machineguns, namely, those that were lawfully possessed before enactment of the statute in 1986, may be legally possessed and transferred even today."). *See also United States v. O'Mara,* 827 F.Supp. 1468, 1470 n. 4 (C.D.Cal.1993) (quoting *Ferguson* ). The means Congress chose to accomplish its goal was to ban the transfer and possession of such weapons outright.

Congress' concern that future machinegun transactions not within § 922(*o* )' s exceptions would impede local law enforcement efforts does appear in the provision's legislative history. The following is a colloquy over the question of amnesty with respect to § 922(*o* ):

> MR. METZENBAUM.... Another question has been over granting amnesty to people who now possess machineguns outside of the law. As the Senator knows, this was one of the proposals offered this afternoon as part of this compromise package, but it was rejected by us, and strongly by law enforcement agencies.

> Do you believe that an amnesty period can be administratively declared by the Secretary of the Treasury by the enactment of this bill?

> MR. KENNEDY. Yes, I am aware of the discussions earlier today on the question of amnesty, and I joined the Senator in rejecting any such proposal.

> There is nothing in the bill that gives such an authority, and there is clearly no valid law enforcement goal to be achieved by such open-ended amnesty.

> *The only thing that has changed about the machinegun situation since the 1968 act, and the limited amnesty granted then, is that machineguns have become a far*

*more serious law enforcement problem.*

> So I see no new legislative authority or law enforcement purpose that would be served by such an amnesty—and that is the strongly held view of all the law enforcement groups, including the Federal Law Enforcement Officers Association.

132 Cong.Rec. S5358 (Tuesday, May 6, 1986).

When read together, then, § 922(*o* ) itself and the legislative records of the Omnibus Act, GCA, and FOPA demonstrate that Congress has sought to regulate the interstate flow of firearms, including machineguns, as a means to aid local law enforcement.[13] Congress has found in the past that firearms travel in interstate commerce and pose a threat to local law enforcement. Section 922(*o* ) merely takes Congressional regulation of this interstate flow of weapons one step further by barring most transactions involving post–1986 machineguns through a proscription against certain transfers and possessions.

[13]    Defendants protest strongly that legislative history in 1968 cannot control what the Congress did in 1986. However, the Court again agrees with Justice Powell's concurrence in *Fullilove v. Klutznick, supra:*

> After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in an area.

100 S.Ct. at 2787 (Powell, J., concurring). The Court believes, then, that because Congress has repeatedly legislated on the interstate flow of firearms under its commerce power since 1938, the Court can look to prior enactments and legislative history to determine what guided Congress in its most recent action in 1986.

Section 922(*o* ), then, is simply the latest means selected by Congress to achieve an end long regulable under the commerce power, namely, the regulation and policing of an interstate firearms market that is not capable of being addressed by purely local law enforcement efforts. Thus, although not explicitly stated in the language of the statute itself, it is evident that Congress prohibited the transfer and possession of most post–1986 machineguns not merely to ban these firearms, but, rather, to control their interstate **\*249** movement by proscribing transfer or possession. If Congress had intended simply to ban possession outright, it would not have "grandfathered" the transfer and possession of machineguns lawfully possessed on the statute's effective date.

In terms of evaluating the means Congress chose to regulate the interstate movement of machineguns, the Court finds illuminating the analysis of another district

court deciding § 922(*o* )'s constitutionality. In *United States v. Evans,* 712 F.Supp. 1435 (D.Mont.1989), *aff'd* 928 F.2d 858 (9th Cir.1991), the court stated:

> It is beyond dispute the commerce power vests Congress with the authority to regulate the interstate transportation of products, including firearms. In the exercise of its legislative judgment, Congress has, in fact, deemed it appropriate to regulate the movement of certain firearms in interstate commerce. *The plenary nature of the commerce power vests Congress with the authority to determine the means by which to effectuate that regulation. The means by which Congress chooses to regulate the interstate movement of firearms "... is within the sound and exclusive discretion of Congress. It is subject only to one caveat—that the means chosen by it must be reasonably adapted to the end permitted by the Constitution....* The Constitution requires no more." *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 261–62, 85 S.Ct. 348, 359–60, 13 L.Ed.2d 258 (1964). *The defendants present no cogent argument which persuades the court it was irrational for Congress to conclude that even mere possession of a "machinegun" is an appropriate means to the attainment of a legitimate end, i.e., the effective regulation of the movement of machineguns in interstate commerce. See Perez v. United States,* 402 U.S. at 154, 91 S.Ct. at 1361.

712 F.Supp. at 1442 (footnote omitted) (emphasis added).

The Court notes that further support for Congress' decision to ban possession and transfer of many post–1986 machineguns as part of its regulation of interstate commerce can be found in the allegations of the indictments. These allegations demonstrate that there is indeed an interstate market for machinegun registrations and parts because all of the transfers in the instant case crossed state lines. That the machineguns eventually came to rest within a single state is of no consequence; the steps leading up to their possession took place in interstate commerce. This case is thus similar to *Perez,* in which the Supreme Court held that purely intrastate activity, if tied to interstate criminality, is properly regulable under the Commerce Clause.

Nothing said here is inconsistent with the Court's statements in *Babin.* In the instant case, the intestate flow of machineguns not only has a substantial effect on interstate commerce; it *is* interstate commerce. A machinegun is a commodity which is transferred across state lines for profit by business entities. It is not at all like the private sale between neighbors of a personal residence—a structure appended to the ground that is not moving across state lines, or anywhere else—which

transaction this Court found unregulable under the Commerce Clause in *Babin.*

Given the extensive, intricate, and definitively national market for machineguns evidenced by these indictments, the Court cannot say that Congress acted irrationally in prohibiting the transfer and possession of most post–1986 machineguns as a means of regulating the interstate flow of such firearms. The motion to dismiss the indictments on the basis of § 922(*o* )'s unconstitutionality is denied.

**B. *I.R.C. § 5848 POSES NO BAR TO THESE PROSECUTIONS.***

Defendants also move to dismiss the indictments, quash search warrants and grand jury subpoenas, and to suppress evidence on the ground that the investigation was permeated by massive Government disregard of I.R.C. § 5848. That section reads:

> **(a) General rule.**—No information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person in order to comply with any provision of [the NFA] or regulations issued thereunder, **\*250** shall, except as provided in subsection (b) of this section, be used, directly or indirectly as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence.

> **(b) Furnishing false information.**—Subsection (a) of this section shall not preclude the use of any such information or evidence in a prosecution or other action under any applicable provision of law with respect to the furnishing of false information.

The parties do not dispute that this section applies to these cases. Defendants filed the ATF forms and kept the bound book records mentioned in the indictments pursuant to the dictates of the NFA.

Defendants argue that the searches of their premises grew out of Government use of filings and records protected by this section. Defendants further assert that the Government should not be able to use such filings and records in this prosecution. They ask the Court to dismiss the indictments or, in the alternative, to conduct a *Kastigar* hearing to determine if the Government has an untainted source for its evidence. *See Kastigar v. United States,* 406 U.S. 441, 460–62, 92 S.Ct. 1653, 1665, 32

U.S. v. Hunter, 843 F.Supp. 235 (1994)

L.Ed.2d 212 (1972) (holding that if the government prosecutes a person after granting him use immunity, it must show its evidence was derived from a completely independent source).

Section 5848 was passed by Congress in 1968 in response to the Supreme Court's decision in *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). In *Haynes,* the Court held that invocation of the Fifth Amendment right against self-incrimination was a complete defense to then I.R.C. § 5851, which read:

> It shall be unlawful for any person to receive or possess any firearm which has *at any time* been transferred in violation of [various provisions of the NFA] or which has *at any time* been made in violation of § 5821 [of the NFA], or to possess any firearm which has not been registered as required by § 5841 [of the NFA]. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

*Haynes,* 390 U.S. at 87 n. 3, 88 S.Ct. at 725 n. 3 (emphasis added).

The Supreme Court believed that this provision placed illegal firearm possessors in an unconstitutional catch–22. The Court noted that the NFA's registration provisions at the time were "directed principally at those persons who have obtained possession of a firearm without complying with the Act's other requirements, and who therefore are immediately threatened by criminal prosecutions...." 390 U.S. at 96, 88 S.Ct. at 730. If possessors of illegal guns registered their firearms, then, they risked criminal prosecution for their prior unlawful possession; if they did not register, they faced criminal charges under another provision of the NFA which made it an offense to keep unregistered firearms. The Court held this to be an untenable situation given the Fifth Amendment:

> We hold that a proper claim of the

constitutional privilege against self-incrimination provides a full defense to prosecution under either a failure to register a firearm ... or for possession of an unregistered firearm....

390 U.S. at 100, 88 S.Ct. at 732.

Congress responded to *Haynes* by including various amendments to the NFA, including § 5848, in the 1968 GCA. Congress' intent is clear from the following excerpt of the GCA's legislative history:

> In *Haynes v. United States* [citation omitted], the Supreme Court held the registration requirement of existing law constitutionally unenforceable because it required registration almost exclusively by those in illegal possession of a weapon and made this information available to prosecute them for illegal possession. The Senate amendment avoids this problem by extending the registration obligation to all possessors **\*251** of weapons—legitimate or otherwise—and *by providing that registration information may not be used directly or indirectly to prosecute a natural person for an offense prior to or concurrent with his registration.*

H.R.Conf.Rep. No. 1956, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4426, 4435 (emphasis added).

In *Freed v. United States,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Supreme Court upheld the revisions to the NFA as consistent with the Self–Incrimination Clause. Justice Douglas, writing for the Court, stated:

> At the time of *Haynes* "only weapons used principally by persons engaged in unlawful activities would be subjected to taxation." ... Under the Act, as amended, all possessors of firearms as defined in the Act are covered....

AR005397

U.S. v. Hunter, 843 F.Supp. 235 (1994)

At the time of *Haynes* any possessor of a weapon included in the Act was compelled to disclose the fact of his possession by registration at any time he had acquired possession, a provision which we held meant that a possessor must furnish potentially incriminating information which the Federal Government made available to state, local, and other federal officials.... Under the present Act, only possessors who lawfully make, manufacture, or import firearms can and must register them; **the transferee does not and cannot register.** It is, however unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."

At the time of *Haynes,* as already noted, there was a provision for sharing the registration and transfer information with other law enforcement officials.... The revised statute explicitly states that no information or evidence provided in compliance with the registration and/or transfer provisions of the Act can be used, directly or indirectly, as evidence against the registrant or applicant "in a criminal proceeding with respect to a violation of law occurring prior to or concurrent with the filing of the application or registration, or the compiling of the records containing the information or evidence."

401 U.S. at 603–04, 91 S.Ct. at 1115 (footnotes with citations omitted) (emphasis in bold in original; underlining emphasis added).

After reviewing these changes, the Supreme Court found no self-incrimination problems:

The transferor—not the transferee—makes any incriminating statements. True, the transferee, if he wants the firearm, must cooperate to the extent of supplying fingerprints and a photograph. But the information he supplies makes him the lawful, not the unlawful possessor of the firearm. Indeed, the only transferees who may lawfully receive a firearm are those who have not committed crimes in the past. The argument, however, is that furnishing the photograph and fingerprints will incriminate the transferee in the future. But the claimant is not confronted by "substantial and 'real' " but merely "trifling and imaginary, hazards of incrimination"—*first* by reason of the statutory barrier against use in a prosecution for prior or concurrent offenses, and *second* by reason of the unavailability of the registration data, as a matter of administration, to local, state and other federal agencies.... Since the states and other federal agencies never see the information, he is left in the same position as if he had not given it, but "had claimed his

privilege in the absence of a * * * grant of immunity." ... This, combined with the protection against use to prove prior or concurrent offenses, satisfies the Fifth Amendment requirements respecting self-incrimination.

401 U.S. at 606, 91 S.Ct. at 1116–17 (citations omitted) (emphasis in original).

Neither *Haynes* and *Freed,* nor any case interpreting § 5848 that the parties or this Court have found, give any guidance as to whether § 5848 bars the Government from using the registrations and bound book notations made by Defendants in the instant prosecutions. However, a review of the plain language of the statute and the allegations of the indictments leads this Court to reject the Defendants' arguments that the Government's **\*252** investigation—and any subsequent use of the information thereby gathered—violate § 5848.

As an initial matter, the Court notes that § 5848(a) bars the use of such records *as evidence.* The Court reads this provision to prohibit the introduction of protected records in a trial; it does not appear to proscribe the Government's utilization of the records so far in this case in order to investigate and indict Defendants.

Furthermore, and more pointedly, should the Government wish to use the records as evidence in trial, the Court believes that the "future crimes" and "furnishing false information" exceptions in § 5848 permit it to do so. A step-by-step review of each of the registrations and recordkeeping events set out in the indictments supports the Court's conclusion.

In Case No. 92–80769, the indictment alleges that Daniel Hunter registered seventy-five .45 caliber machineguns, serial numbers HM 001–HM 075, on May 5, 1986. This act of registration, while legal and protected in and of itself, set in motion the *subsequent* allegedly illegal acts charged in the indictment. Therefore, these registrations can be used against Defendants because § 5848 prohibits the use of such information only with respect to "a violation of law occurring prior to or concurrently with the filing of the application or registration...." Indeed, the Supreme Court has stressed the backward looking nature of self-incrimination analysis:

Appellees' argument assumes the existence of a periphery of the Self–Incrimination Clause which protects a person against incrimination not only against past

U.S. v. Hunter, 843 F.Supp. 235 (1994)

or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self–Incrimination Clause such an expansive interpretation.

*Freed,* 401 U.S. at 606–07, 91 S.Ct. at 1117.

It has been said that the Fifth Amendment is a "shield" and not a "sword." *United States v. Hasting,* 461 U.S. 499, 515, 103 S.Ct. 1974, 1984, 76 L.Ed.2d 96 (1983) (Stevens, J., concurring); *United States v. Rylander,* 460 U.S. 752, 757–59, 103 S.Ct. 1548, 1553, 75 L.Ed.2d 521 (1983). As the Supreme Court indicated in *Freed, supra,* to permit Defendants' argument to hold sway would be to invite the offensive use of the Fifth Amendment privilege against self-incrimination, as embodied in I.R.C. § 5848, to protect future criminal conduct.

The next recordkeeping event in 92–80769 occurred when Daniel Hunter applied to transfer four machinegun receivers bearing serial numbers HM 066–HM 069 to Gary Rasmussen. Similarly, on October 4, 11 and 13, 1987, Hunter entered the four transfers into his bound book. For his part, Rasmussen recorded receipt of the receivers and then filed forms to transfer them to Bruce Clark. According to the indictment, however, Delwin Wirth transferred the receivers directly to Clark; Hunter and Rasmussen never saw the guns and merely provided the paper cover for the transaction. Thus, all of Hunter's recording was completely false and can be used against him by the Government under § 5848(b).

Finally with respect to 92–80769, on December 12, 1987, Bruce Clark recorded the receipt of four machinegun receivers manufactured by Hunter's Broadhead Armory. This recording also was false according to the indictment. Not only did the receivers fail to originate with Hunter; the indictment alleges that Clark knew that the guns were from elsewhere and agreed with Wirth to have them marked with the Broadhead Armory registration numbers.

All of the records on which the indictment hinges, then, will be used either to show (1) subsequent criminality or (2) the furnishing of false information which allegedly furthered the charged conspiracy to make illegal firearm transactions. The Court therefore finds that § 5848 permits the Government to use these registrations and records in proving its case.

Turning to 92–80770, the Court finds that, according to the indictment, all of the registrations and record entries

made by Defendants were false when made. In the first place, the May 7, 1986 registrations made by Daniel Hunter were untrue. On that day, Hunter filed forms with ATF stating that he **253 had manufactured 461 machinegun conversion kits. The indictment, however, alleges that Hunter did not make these kits but rather that they were acquired by George Dodson, an allegedly unlicensed gun dealer. Similarly, on May 28, 1987, Hunter filed forms requesting the right to transfer twenty conversion kits to John Stemple; Dodson again, however, was the true transferor of the kits. On August 31, 1987, Stemple made false entries in his bound books when he stated that he had received the conversion kits from Hunter rather than Dodson. Stemple also filed false transfer forms to ship the conversion kits to Robert Landies. The forms were false in that they defined the conversion kits as .50 caliber machinegun conversion kits when they allegedly were only .30 caliber conversion kits. Lastly, Landies' notation of receipt of twenty .50 caliber machineguns from Stemple on September 18, 1987 was also inaccurate. What was found in his possession on December 7, 1989, were not .50 caliber machinegun conversion kits but .30 caliber conversion kits.[14] All of these entries and forms were, therefore, false when made. The Government alleges that these recordkeeping events furthered the conspiracy to circumvent federal firearms laws by providing cover for Dodson's illegal introduction of new firearms into the interstate market for these weapons. Just as in part of 92–80769, then, the Court believes that they fall within § 5848(b)'s exception for "furnishing false information."

[14]  Defendants Stemple and Landies argue that the only discrepancy in the forms and recordings of this final transfer and receipt was the caliber of the machinegun conversion kits. They argue further that such discrepancy is not material. On this record, however, the Court is not prepared to say whether or not the discrepancy was material. This matter will have to be resolved at trial.

Defendants' motion to dismiss the indictments and quash the fruits of the Government's investigation under § 5848 is therefore rejected. Trial will proceed as to all Defendants under both indictments.

**C. *OTHER MATTERS.*[15]**

[15]  At the hearing, the Court, for reasons stated on the record, denied Defendant Clark's motion to conduct a hearing on the admissibility of extrajudicial hearsay statements attributed to alleged co-conspirators and to

AR005399

determine the existence of a conspiracy. The Court will conditionally admit co-conspirators' statements at trial subject to eventual proof that a conspiracy existed.

### 1. *Defendants' Motion To Dismiss For Failure To State An Offense.*

Defendants also argue that Indictment No. 92–80769 Count 1, ¶ 18 and Indictment No. 92–80770 Count 1, ¶ 16, which allege that Defendants Hunter, Clark, Stemple and Landies "willfully and unlawfully ma[de] false entries in records required to be maintained pursuant to regulations proscribed by the Secretary," fail to state an offense against the United States. Specifically, Defendants complain that the indictments do not list the Treasury regulations on which the alleged crimes rely. *See* Fed.R.Crim.P. 7(c)(1) ("The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated.").

The Court holds that these counts should not be dismissed because the Government can charge Defendants for falsifying their own records in violation of § 923(g)(1)(A). That section states:

> Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe....

Although the indictments do not state the specific regulations on which the Government relies, it can easily remedy the problem by providing a bill of particulars to Defendants with this information.[16] The Government is hereby ordered to do just that.

[16]    The cases Defendants cite in support of dismissing the indictment because it does not specify regulations are easily distinguishable. *Russell v. United States,* 369 U.S. 749, 763–65, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) held that an indictment was inadequate for

failing to state sufficient *facts,* not law. Similarly, *United States v. Williams,* 962 F.2d 1218, 1225–26 (6th Cir.1992), *cert. denied,* 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992) holds only that a prosecutor cannot *amend* an indictment. The case does not state that the government cannot *clarify* which regulations are referenced in the indictment through a device like a bill of particulars.

**\*254**  The Court notes that the indictments did, however, fail to rely on the proper penalty provision in making their charges of falsification of dealer records against Hunter, Clark, Stemple, and Landies. The penalty provision the Government invokes in its indictments for failure to keep proper records is § 924(a)(1)(D) (emphasis added): "*Except as otherwise provided in paragraph ... [924(a)](3) ...* whoever—(D) willfully violates any other provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both." The proper penalty for licensed gun dealers like the Defendants, however, is found in § 924(a)(3), which states: "Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly ... violates subsection (m) of section 922, shall be fined not more than $1,000, imprisoned not more than one year, or both." Section 922(m), in turn, reads:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

Thus, the Government can charge the four Defendants who kept their own records—Hunter, Clark, Stemple and Landies—only with a misdemeanor for falsifying these records. *See United States v. Percival,* 727 F.Supp. 1015, 1019 (E.D.Va.1990) (imposing misdemeanor rather than felony penalty of § 924(a) upon a licensed firearm dealer), *aff'd* 932 F.2d 964 (4th Cir.1991), *cert. denied,* 502 U.S. 919, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991).

Even though the Government failed to cite the proper penalty section for falsifying gun dealer records, the

Court will permit it to amend the indictment to make the correction. *See* Fed.R.Crim.P. 7(c); *United States v. Clark,* 416 F.2d 63, 64 (9th Cir.1969) (Fed.R.Crim.P. 7 allows the government to amend citation to statute in indictment when facts alleged in the indictment support such a change).

### 2. *Defendant Lomont's Motion For Severance And Change Of Venue.*

Defendant Lomont moves this Court to sever the conspiracy charge against him and to change the venue of his case to Ohio or Kentucky. He reminds the Court that the extent of his involvement in 92–80769 was the suggestion to Wirth that the latter discuss getting registrations for his receivers from Hunter. Such speech, he argues, is protected by the First Amendment. Furthermore, Lomont alleges that the evidence will show that Hunter was an informant for the Government and that ATF allowed him to make phony registrations which he, in turn, offered for sale to "an unsuspecting group of licensed dealers and other purchasers." Lomont's Brief, p. 4.

The Government counterargues first that the First Amendment does not protect speech in furtherance of a conspiracy to violate federal firearms statutes. Second, the Government asserts that Hunter's status as an ATF informant has no bearing on this case. The Government therefore argues that Lomont has made no showing of prejudice warranting severance or a change of venue.

Lomont's reply asserts that the Government cooperated with Hunter in 1986 to register the 1700 scrap metal parts as machineguns in order to promote the crimes in these indictments. Lomont argues that tying his case to a Government informant that masterminded the crimes alleged in these indictments is undue prejudice.

Severance is a matter within the trial court's sound discretion. *United States v. Moreno,* 933 F.2d 362, 369 (6th Cir.1991), *cert. denied sub nom. Morris v. United States,* 502 U.S. 895, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). *Moreno* noted that "[a]s a general rule, persons jointly indicted should be tried together.... Without a showing of compelling prejudice, a motion for severance should not be granted." 933 F.2d at 369.

**\*255** The Court does not believe that Lomont will be unduly prejudiced by standing trial with his alleged co-conspirators. As noted by the Government, the First Amendment does not protect speech made allegedly in furtherance of a firearms crime. Similarly, a thorough *in camera* review of the ATF files on Daniel Hunter indicates that he provided no information to the Government with respect to this investigation. There is also no evidence yet of record that ATF in any way conspired with Hunter to provide him phony registrations that he could then use to trap unwary gun dealers. The fact that Hunter stands accused in both indictments in this case further undermines any argument of his collusion with the Government.

On the record before the Court, then, it cannot grant Lomont's motion for severance. He will stand trial with his alleged co-conspirators here in Michigan.

### 3. *Defendant Lomont's Motion For Dismissal Of The Indictment For Prejudicial Errors.*

Defendant Lomont moves the Court to dismiss his indictment because of alleged inconsistencies between grand jury testimony by Agent Tim Sullivan and an affidavit by witness Delwin Wirth. Such inconsistencies, Lomont contends, prejudiced the grand jury to the extent it improperly returned an indictment against him.

After reviewing the record, the Court finds no inconsistencies. Wirth stated that he met with Lomont in April, 1987, at a machinegun shoot at Nob Creek, Kentucky. He further testified:

> I mentioned to Kent Lomont that I had M–60 [machinegun] parts which could be assembled into M–60 machinegun receivers, but that I did not know how I could make the M–60 receivers legally because of the change in the federal machinegun laws. Kent Lomont told me that Daniel Hunter had "papers" for M–60s. By "papers" I understood Kent Lomont to mean ATF-approved registration forms for M–60 machinegun receivers.

Wirth Affidavit, p. 2. Agent Sullivan said the following before the grand jury:

> When [Wirth] was down [in Kentucky], what he did indicate ... [was] that he was talking to some

individuals down there, including John Stemple and Kent Lomont.

Specifically, with Kent Lomont, he indicated that he had what he called, I believe it was, some iron that he needed registrations or paper for. And Lomont directed him, he said, "The person you want to see is Daniel Hunter, doing business as the Broadhead Armory."

Grand Jury Transcript, vol. 5, p. 8.

Sullivan and Wirth's statements seem to this Court consistent. They furthermore indicate that Lomont was aware of, and directing people to, Mr. Hunter's allegedly illegal paper.

In *Bank of Nova Scotia v. United States,* 487 U.S. 250, 253–55, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988), the U.S. Supreme Court held that "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudice the defendants." In defining prejudice for alleged prosecutorial misconduct and other grand jury irregularities, the Supreme Court added "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." 487 U.S. at 255–57, 108 S.Ct. at 2374 (citation omitted).

Here the Court does not see that there was any misrepresentation of evidence by Agent Sullivan. Because there was no error, there is no prejudice to Defendant Lomont. His motion is denied.

**4. Defendants Hunter And Landies' Motion To Dismiss Indictment No. 92–80770 Because § 922(o ) Is Not Constitutional As Applied And Because of Government Misconduct.**

**a. Section 922(*o* ) as applied.**

Defendant Hunter and Landies assert that § 922(*o* ) cannot be constitutionally applied to licensed gun dealers. Their argument is essentially this: ATF approved the registrations and transfers in 92–80770 and, **\*256** therefore, these acts fall within the exception found in § 922(*o* )(2)(A): "This subsection does not apply with

respect to—(A) ... possession [of machineguns] by or under the authority of the United States...."

Defendants argument has no merit. The Government has alleged that Defendants defrauded ATF with their records and registrations in furtherance of their conspiracy to deal in Dodson's illegal machinegun conversion kits. Defendants simply cannot be allowed to defraud ATF with phony applications and records and then use the ill- or under-informed approvals of registrations and transfers by that agency as a shield against criminal prosecution.

**b. Machinegun conversion kits are firearms under Title 18.**

Defendants Hunter and Landies also contend that while conversion kits are machineguns, they are not firearms under Title 18. The Court finds this argument simply incomprehensible. 18 U.S.C. § 921(a)(3) defines "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive ..." 18 U.S.C. § 921(a)(23) states: "The term 'machinegun' has the meaning given such term in [I.R.C.] § 5845(b) of the National Firearms Act." Finally, I.R.C. § 5845(b) (emphasis added) reads:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

From these statutes, the Court concludes that § 921(a)(3)

AR005402

U.S. v. Hunter, 843 F.Supp. 235 (1994)

(definition of firearm) incorporates § 921(a)(23) (definition of machinegun) which, in turn, incorporates § 5845(b) (definition of machinegun in NFA, which includes conversion kits). The Court does not see how else one could read these provisions. If Defendants believe that conversion kits are not in and of themselves "weapons" under § 921(a)(3), they forget that that section clearly envisions machineguns as weapons. And, § 921 further defines "machinegun" with reference to § 5845(b), which includes conversion kits. Therefore, reading the statutes together it is indisputable that conversion kits are machineguns under Title 18.

**c. The Government and Agent Sullivan did not engage in any misconduct during the grand jury proceedings.**

Defendants Hunter and Landies finally argue that the Government prejudiced the grand jury against them, thus warranting a dismissal of the indictment. Defendants point to a number of incidents:

* The prosecutor, Assistant U.S. Attorney Diane Donohue, stated that ATF had jurisdiction over arson cases.

* When a juror expressed concern about safety because this was a gun case, Donohue told the grand jurors that they would have safety in anonymity.

* ATF Agent Tim Sullivan explained that the agency was the result of government efforts to crack down on gangsters in the Prohibition Era.

* When asked by a grand juror if an automatic or semi-automatic weapon was used to kill people in Texas shortly before the grand jury was impanelled, Sullivan responded "Yes, it was." In tracking the history of ATF, Sullivan also made reference to the assassinations of John and Robert Kennedy and Martin Luther King, and the use of explosives in political unrest in the 1970s.

* Sullivan referred to the Explosives Control Act and to the fact that the NFA covered silencers and destructive devices as well as machineguns, all of which "are considered ... inherently dangerous."

* AUSA Donohue incorrectly informed the grand jury that the possession of machineguns after 1986 was illegal when § 922(*o*) did not go that far.

* Agent Sullivan told the grand jury that Michigan bars the possession of machineguns *257 even though this law has no effect on federally licensed dealers or out-of-state defendants.

* Sullivan testified that there had been an unspecified increase in the use of converted machineguns in Detroit-area crime, even though the Director of ATF has testified to Congress that he did not know of any cases of registered machineguns being used in crimes.

* Sullivan expounded upon all the different kinds of weapons regulated by state and federal law, including, e.g., silencers, pen guns, aerial bombs and even tanks.

* When asked by a grand juror what a person would use a machinegun for in this country, Sullivan responded that ATF had to permit such guns because of the law and the gun lobby, and he also went on to describe the immense firepower of some machineguns.

* In describing how he conducted his investigation, Sullivan stated:

> [A]s opposed to going the subpoena route, I went the search warrant route, primarily because these individuals knew they were under investigation and a subpoena basically consists of some sort of good faith on the part of the individual you are dealing with. If you know that you are under investigation, the government gives you a subpoena saying, "We would like for you to give us these records," chances are probably real good that between the time that they get the subpoena and the time that you might get the records, there is going to be a fire, flood, theft.

* Finally, AUSA Donohue apologized to the grand jury for not being able to "spice up" her presentation of the paper filings relevant to the case. She also explained to the grand jury how a conspiracy count and substantive counts are different by using an arson example.

Defendants argue that these statements destroyed the grand jury's ability to independently evaluate probable cause for an indictment, and they ask this Court to dismiss the Indictment No. 92–80770 as a result. Their brief cites a number of cases in which statements similar to the ones above were held to prejudice defendants before petit juries. *See United States v. Norton,* 639 F.2d 427, 429 (8th Cir.1981) (prosecutor's closing argument about the purpose of the GCA to regulate the dangerous nature of sawed-off shotguns was improper; conviction reversed); *United States v. Fullmer,* 457 F.2d 447, 449 (7th Cir.1972) (prosecutor's statements that GCA was passed

to provide support for local law enforcement efforts against crime and that the jury knew about the use of guns for sniping and causing disturbances was sufficient error to reverse the conviction). *Cf. United States v. Bell,* 573 F.2d 1040, 1045 (8th Cir.1978) (permitting ATF agent's testimony about the danger of sawed-off shotguns was error, although harmless).

The Government responds that the prosecutor and agent acted properly before the grand jury. AUSA Donohue and Agent Sullivan merely answered juror questions as they arose and sketched for the grand jury how ATF operates.

 The Court does not find any evidence of prosecutorial misconduct. The Sixth Circuit standard for dismissing indictments because of prosecutorial misconduct before a grand jury is a difficult one for Defendants to meet:

> The [defendants] must demonstrate that "prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in the district." ... In addition to showing long-standing misconduct, "a defendant who seeks dismissal of an indictment ... must show he was prejudiced by the prosecutor's actions" before the grand jury.

*United States v. Azad,* 809 F.2d 291, 294 (6th Cir.1986) (holding no prosecutorial misconduct when prosecutor previewed testimony for the grand jury and noted that some of the witnesses were targets of the investigation), *cert. denied sub nom. Bigley v. United States,* 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987).

Here there is no evidence of longstanding prosecutorial misconduct, nor have Defendants shown that they were prejudiced by AUSA Donohue's statements to the grand jury. The Court's review of the record **\*258** shows AUSA Donohue's challenged comments were innocuous, with the possible exception of her statement that the 1986 Act banned the possession of machineguns. *See* Grand Jury Transcript, vol. 1, p. 12. However, any confusion this statement may have caused was cured by Agent Sullivan's testimony on that same day:

> One thing I want to make clear right from the outset is that there are legal [ ] firearms. There are legal conversion kits, there are legal machineguns, legal submachineguns, silencers and destructive devices, as long as they are registered and as long as they are properly registered.

Grand Jury Transcript, vol. 2, pp. 10–11.

Turning now to Agent Sullivan's testimony, even though he did on numerous occasions refer to historical events and to weapons other than machineguns, his statements were in the context of explaining to the grand jury what ATF does, not what Defendants allegedly did. Similarly, his comments on why search warrants were used instead of subpoenas does not refer to Defendants specifically, but rather to general ATF strategy and experience.

In *United States v. Edmonson,* 962 F.2d 1535 (10th Cir.1992), the court considered whether comments by a government agent on the stand before the grand jury were sufficiently prejudicial to warrant dismissing the indictment. The defendant faced drug-trafficking charges, and the agent testified that the defendant refused to answer questions after he received his *Miranda* warnings. 962 F.2d at 1539. The agent also speculated about the origin and the purity of drugs found with the defendant. 962 F.2d at 1539. Lastly, the agent recounted for the grand jury a conversation he had with a co-defendant about a third person who had died from bad cocaine. 962 F.2d at 1539.

In weighing the agent's comments as well as additional allegations of prosecutorial misconduct, *Edmonson* noted that "[the] 'presumption of regularity' given to all grand jury proceedings is a difficult burden to overcome and requires very significant misconduct on the part of the prosecutor or other government agents." 962 F.2d at 1539. The court went on to conclude that the alleged misconduct simply was insufficient to prejudice the defendant; even absent those comments, the court still believed that the grand jury would have come back with the indictment. 962 F.2d at 1539.

The Court holds that the same analysis applies to this case. Agent Sullivan's comments were less prejudicial than the agent's statements in *Edmonson* in that none of them directly impugned Defendants. Viewing the grand jury proceedings as a whole, then, there was insufficient prejudice to warrant dismissing the indictments because of either prosecutorial or agent misconduct.

## IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that

AR005404

U.S. v. Hunter, 843 F.Supp. 235 (1994)

Defendants' motions are DENIED.

IT IS FURTHER ORDERED that the Government shall provide to Defendants Hunter, Clark, Stemple and Landies a bill of particulars as set forth in this Opinion and Order.

**All Citations**

843 F.Supp. 235

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005405