Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

KeyCite Yellow Flag - Negative Treatment
Not Followed as Dicta Virginia Dept. of Transp. v. U.S. E.P.A., E.D.Va., January 3, 2013

590 F.2d 1011
United States Court of Appeals,
District of Columbia Circuit.
WEYERHAEUSER COMPANY, Petitioner,
v.
Douglas M. COSTLE, Administrator,
Environmental Protection Agency, Respondent.[*]

[*] Consolidated with the following in which Douglas M. Costle is the Respondent;
Finch Pruyn and Co., Inc., 76-1675; American Paper Institute, Inc., 76-1676; Boise Cascade Corp, 76-1677; Bergstrom Paper Co., 76-178; Mead Corp, 76-1679; Westvaco Corp, 76-1680; Consolidated Papers, Inc., 76-1681; Erving Paper Mills, 76-1682; Crown Simpson Pulp Co., 76-1683; Crown Zellerbach Corp., 76-1684; Hammermill Paper Co., 76-1685; Great Northern Nekoosa Corp., 76-1686; Weyerhaeuser Co., 76-1688; Internat'l Paper Co., 76-1689; ITT Rayonier, Inc., 76-1690.

No. 76-1674.
|
Argued Feb. 23, 1978.
|
Decided Sept. 5, 1978.

**Synopsis**
American pulp and paper makers filed consolidated petitions challenging the validity of Environmental Protection Agency regulations limiting the 1977-83 effluent discharges of many pulp, paper and paperboard mills. The Court of Appeals, McGowan, Circuit Judge, held, inter alia, that: (1) the EPA properly construed and rationally exercised the authority delegated to it by Congress under the aegis of the Federal Water Pollution Control Act Amendments of 1972; and, with the exception of the BOD (biochemical oxygen demand) limitation for acetate grade dissolving sulfite mills, the EPA did so according to appropriate procedures, and (2) the EPA's variance clause for "best practicable" regulations must allow consideration of economic factors, including cost in relation to effluent benefits; however, so long as that cost-benefits relation is not different for a particular operator from that which the EPA may impose on the industry, the inability of the particular operator to absorb the cost need not control the variance decision, since Congress and the EPA envisaged plant shutdowns

as a result of the regulations.

Effluent limitations upheld, with one exception.

**\*1016 \*\*314** *Syllabus by the Court*

Section 301(b) of the Federal Water Pollution Control Act Amendments of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. s 1311(b), authorizes EPA to issue two sets of industrial effluent limitation regulations: regulations effective in 1977-83 based on "the best practicable control technology currently available" (BPCTCA), and regulations effective after 1983 based on the "best available technology economically achievable" (BATEA). In a separate prior proceeding, EPA regulations for part of the American pulp and paper industry were upheld in full. American Paper Inst. v. Train, 177 U.S.App.D.C. 181, 186-89, 543 F.2d 328, 333-36, Cert. dismissed, 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976). After four periods of notice and comment in 1973-76, EPA promulgated BPCTCA regulations for the remainder of the paper industry, including 300 plants divided into 16 subcategories and 66 subdivisions. Industry representatives petitioned for review of the regulations. Held: EPA properly construed and rationally exercised the authority delegated to it by Congress, and, with one exception, it did so according to the appropriate procedures. The regulations are upheld with the exception of the "BOD" limitation for acetate grade dissolving sulfite mills.

(1) The scope of judicial review to be brought to bear upon the EPA's regulations is governed by s 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. s 706(2). The standards there set out variously relate to questions involving the reach of the statutory authority purported to be exercised, the procedural propriety of the course followed in formulating and issuing the regulations, and the rationality of the substantive determinations embodied in the regulations. In dealing with each of these questions, it is the task of the reviewing court to adhere to the particular standard or standards relevant to each with due regard for the varying functions and capacities of court and agency in differing contexts. Pp. ____ - ____ of 191 U.S.App.D.C., pp. 1024-1028 of 590 F.2d.

(2) EPA's procedures, with one exception, satisfied the statutory requirements. Pp. ____ - ____ of 191 U.S.App.D.C., pp. 1028-1031 of 590 F.2d.

AR005406

Case 2:19-cv-00037-JNP   Document 59-41   Filed 11/30/22   PageID.5875   Page 2 of 78

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)
11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

(a) In providing multiple opportunities for public comment, and in fully considering the information brought forth, EPA "bent **1017** **315** over backwards to accommodate public participation." Pp. —— - —— of 191 U.S.App.D.C., p. 1028 of 590 F.2d.

(b) In deriving an effluent limitation for the acetate grade dissolving sulfite mills, EPA made both hidden and concededly erroneous assumptions, thereby tainting the Agency's explanation of its action and denying petitioners their opportunity to comment. Accordingly, this limitation is remanded for further proceedings. Pp. —— - —— of 191 U.S.App.D.C., pp. 1028-1031 of 590 F.2d.

(3) As elaborated in In re Louisiana-Pacific, 10 E.R.C. 1841 (1977), EPA's interpretation of its variance clause satisfies the statutory requirements. Pp. —— - —— of 191 U.S.App.D.C., pp. 1031-1041 of 590 F.2d.

(a) Inclusion of a proper variance clause is necessary for valid BPCTCA regulations. E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). Because EPA's interpretation of its variance clause is no longer a "matter of speculation" after In re Louisiana-Pacific, supra, courts may no longer presume that the variance clause is proper and judicial review must be conducted in this proceeding to determine whether the variance clause is capable of the requisite degree of flexibility under DuPont, supra. Pp. —— - —— of 191 U.S.App.D.C., pp. 1031-1033 of 590 F.2d.

(b) The EPA's variance clause for BPCTCA regulations must parallel the statutory variance clause for BATEA regulations in section 301(c), 33 U.S.C. s 1311(c), DuPont, supra, 430 U.S. at 127-28, 97 S.Ct. 965, I. e., the clause must allow consideration of the factors used for setting BPCTCA for each industrial subcategory, in order to allow particular mill operators to seek a variance from regulations that, as a whole, demand more of them than EPA may demand of the industry. Pp. —— - —— of 191 U.S.App.D.C., pp. 1033-1036 of 590 F.2d.

(c) Accordingly, the variance clause must allow consideration of economic factors, including "cost in relation to effluent benefits." However, so long as that cost-benefits relation is not different for a particular operator from that which EPA may impose on the industry, the inability of the particular operator to absorb the cost need not control the variance decision, since Congress and the EPA envisaged plant shutdowns as a result of the regulations. Pp. —— - —— of —- U.S.App.D.C., pp. 1036-1037 of 590 F.2d.

(d) Under these principles, EPA's current construction of its variance clause in In re Louisiana-Pacific, supra, in contrast to earlier constructions, satisfies the statutory requirements because it allows all the relevant factors to be considered. Moreover, the clause's "fundamental difference" standard is permissible because it prevents the creation of a yawning loophole and takes into account the flexibility and liberality already reflected in the regulations. Pp. —— - —— of 191 U.S.App.D.C., pp. 1037-1041 of 590 F.2d.

(4) EPA's interpretation of its statutory authority with regard to the factors relevant to BPCTCA is correct. Pp. —— - —— of 191 U.S.App.D.C., pp. 1041-1053 of 590 F.2d.

(a) Congress ruled out consideration by the EPA in setting BPCTCA regulations of "receiving water capacity," I. e., the ability of the waters into which effluent is discharged, and especially of oceans, to absorb or dilute pollution. Pp. —— - —— of 191 U.S.App.D.C., pp. 1041-1044 of 590 F.2d.

(b) Congress made two kinds of factors relevant to BPCTCA: "comparison factors" (cost and benefit), for which Congress mandated a particular structure and weight of consideration (limited balancing), and "consideration factors" (age, process, non-water quality environmental impacts, etc.), for which Congress left the structure and weight of consideration to EPA to decide. Pp. —— - —— of 191 U.S.App.D.C., pp. 1044-1047 of 590 F.2d.

(c) EPA's comparison of cost and benefit for the industry as a whole was not challenged. Its comparison for the sulfite subcategories, which was challenged, was adequate. See **1018** **316** Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Pp. —— - —— of 191 U.S.App.D.C., pp. 1047-1049 of 590 F.2d.

(d) Policies enunciated in the legislative history and embodied in the "functional equivalence" doctrine indicate that the judicial review function for EPA's consideration of "non-water quality environmental impacts" is complete once it is found that EPA developed and considered estimates of those impacts. Pp. —— - —— of 191 U.S.App.D.C., pp. 1049-1053 of 590 F.2d .

(5) EPA did not abuse its discretion with respect to subcategorization of the industry. Pp. —— - —— of 191 U.S.App.D.C., pp. 1053-1060 of 590 F.2d.

(a) In light of its conclusions about the utility of

AR005407

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

"activated sludge" and "SSL recovery" treatment methods, EPA did not abuse its discretion in declining to subcategorize further on the basis of climate and manufacturing process. Pp. ——— - ——— of 191 U.S.App.D.C., pp. 1055-1056 of 590 F.2d.

(b) In light of its recently enunciated policy concerning excursion provisions, NPDES Decision of the General Counsel No. 57 (1977), and the congressional policies encouraging EPA to stimulate new technology and to have "swift and direct" enforcement, EPA did not abuse its discretion in denying an excursion provision. Pp. ——— - ——— of 191 U.S.App.D.C., pp. 1056-1059 of 590 F.2d.

(c) In setting effluent limitations based on average rates of flow within subcategories, EPA did not abuse its discretion because it relied on internal controls that it properly determined are in "common use." Pp. ——— - ——— of 191 U.S.App.D.C., pp. 1059-1060 of 590 F.2d.

(6) EPA did not abuse its discretion with respect to the identification of BPCTCA (a) for dewatering sludge when it relied on a diverse technological array rather than on one specific treatment method, and (b) for removing suspended solids when it relied in part on technology that has been put into use in the past primarily to meet state antipollution laws. Pp. ——— - ——— of 191 U.S.App.D.C., pp. 1060-1062 of 590 F.2d.

Petitions for Review of an Order of the Environmental Protection Agency.

**Attorneys and Law Firms**

David R. Berz and Thomas H. Truitt, Washington, D. C., for petitioners in Nos. 76-1674, 76-1676 through 76-1690.

W. Reece Bader, for petitioner in No. 76-1683.

Allan J. Topol, Washington, D. C., with whom Roberts B. Owen and Theodore L. Garrett, Washington, D. C., were on brief, for petitioner in No. 76-1675.

Burroughs B. Anderson and John M. Cary, Seattle, Wash., were on brief for petitioner in No. 76-1684.

Douglas E. Kliever and Daniel B. Silver, Washington, D. C., for petitioner in No. 76-1690.

Donald W. Fowler, Atty., Dept. of Justice, and Bruce M. Diamond, Atty., Environmental Protection Agency, Washington, D. C., with whom G. William Frick, Gen. Counsel, Environmental Protection Agency, and James W. Moorman, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C., were on brief, Peter R. Taft, Asst.

Atty. Gen., Dept. of Justice, Washington, D. C., Ray McDevitt, Atty., Environmental Protection Agency, Washington, D. C., entered an appearance for respondent. Before McGOWAN, TAMM, Circuit Judges, and RICHEY**, United States District Judge for the District of Columbia.

** Sitting by designation pursuant to Title 28 U.S.C. s 292(a).

Opinion for the Court filed by McGOWAN, Circuit Judge.

**Opinion**

McGOWAN, Circuit Judge:

 Under the aegis of the Federal Water Pollution Control Act Amendments of 1972 (the Act), Pub.L. No. 92-500, 86 Stat. 816, 33 U.S.C. ss 1251-1376, as amended, clean water act of 1977, pub.l. no. 95-217, 91 stat. 1566, the Environmental Protection Agency has embarked upon a **\*1019 \*\*317** step-by-step process of issuing effluent limitations for each industry that discharges pollutants into the waters of the United States. By these consolidated petitions, members of one such industry, American pulp and paper makers, challenge the validity of EPA regulations limiting the 1977-83 effluent discharges of many pulp, paper, and paperboard mills. See42 Fed.Reg. 1398-426 (1977). We are satisfied that EPA properly construed and rationally exercised the authority delegated to it by Congress and that, with one exception, it did so according to the appropriate procedures. Accordingly, we uphold the resulting effluent limitations in all but one instance.

I. THE STATUTE

 After several years of judicial experience with the Federal Water Pollution Control Act Amendments of 1972, and, in particular, with industry-wide challenges to effluent limitations promulgated thereunder, little further explanation of the statutory framework is necessary. See, e. g., E. I. duPont de Nemours & Co. v. Train (duPont), 430 U.S. 112, 116-21, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); American Paper Inst. v. Train, 177 U.S.App.D.C.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005408

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

181, 186-89, 543 F.2d 328, 333-36, Cert. dismissed, 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976); American Frozen Food Inst. v. Train, 176 U.S.App.D.C. 105, 113-122, 539 F.2d 107, 115-24 (1976). As now authoritatively interpreted by the Supreme Court in DuPont, supra, 430 U.S. at 126-36, 97 S.Ct. 965, section 301(b) of the Act, 33 U.S.C. s 1311(b),[1] authorizes the Environmental Protection Agency (EPA or the Agency), after orchestrating a process of study, proposal, notice, and comment, to issue two sets of progressively more stringent regulations precisely limiting the effluent discharges of every "category (or) class of (existing) point sources," I. e., generally, every industry that pollutes the Nation's waters. According to section 301(b), the first set of regulations must limit discharges between July 2, 1977 and July 1, 1983, inclusive, to levels characteristic of point sources utilizing "BPCTCA," I. e., the "best practicable control technology currently available." Section 301(b)(1)(A). The second set applies thereafter and is defined in terms of the more restricted levels of discharges from point sources using "BATEA," I. e., the "best available technology economically achievable." Section 301(b)(2)(A).

[1]    In relevant part, I. e., with reference to the 1977-83 set of limitations for private industry, s 301(b) provides:
In order to carry out the objective of this Act, there shall be achieved
(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of this Act . . . .
Section 42 of the Clean Water Act of 1977, 33 U.S.C.A. s 1311(b) (1978), replaced the 1972 Act's framework for post-1977 standards (1983 standards) with a new one. The 1972 Act's framework for post-1977 standards is well understood, and so we have used it to provide perspective. To avoid discussing issues not presented in this case, we have deliberately not attempted to describe the new Act's post-1977 framework except where necessary.

Section 304 of the Act, 33 U.S.C. s 1314,[2] establishes the minimum cross-industry criteria **1020 **318 that EPA must use in developing each of the two sets of industry-specific limitations, and requires EPA to identify other factors as well as the model technology (BPCTCA for 1977, BATEA for 1983) relevant to each affected industry. Jurisdiction to review both the 1977 and 1983 sets of industry-wide regulations is conferred upon the United States Courts of Appeals by section 509(b)(1) of the Act, 33 U.S.C. s 1369(b)(1).

[2]    Again as relevant here, See note 1 Supra, s 304(b) provides:
For the purpose of adopting or revising effluent limitations under this chapter the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of October 18, 1972, regulations, providing guidelines for effluent limitations and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall
(1)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources (other than publicly owned treatment works); and
(B) specify factors to be taken into account in determining the control measures and practices to be applicable to point sources (other than publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 301 of this Act shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.
Although, as written, s 304(b) required EPA to act with respect to all industries within a year of the statute's passage and, in particular, s (1)(A) thereunder required the agency within that period to have taken many of the steps preliminarily necessary to the promulgation of the limitations under s 301(b), See note 1 Supra, the Agency found its task too overwhelming to complete in so short a time. See E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 131-32 & n.22, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). Consequently, EPA has generally chosen to telescope into one proceeding per industry the identification of the attainable effluent reductions and the factors relevant thereto under s 304(b) and the actual establishment of the various industry-wide limitations under s 301(b). It has accomplished this goal by using traditional, if usually more exhaustive, notice-and-comment rulemaking proceedings, some of which are still in progress. See duPont, supra, 430 U.S. at 131-32 n.22, 97 S.Ct. 965. The courts have validated this exercise of EPA discretion in carrying out the Act upon a showing that the unified procedure has effectively achieved the ends of the statute's bifurcated and apparently impractical plans. E. g., American Frozen Food Inst. v. Train, 176 U.S.App.D.C. 105, 128-29, 539 F.2d 107, 130-31 (1976).

Meanwhile, the permit-issuing system established by section 402 of the Act, 33 U.S.C. s 1342, provides a procedure whereby the general effluent limitations for each class of point sources are transformed by EPA, or some EPA-approved state agency, into an authorization for a specific plant or mill to discharge effluents up to specified limits. The statute contemplates a very close correlation between the general effluent limitations promulgated by EPA and the specific discharge authorizations allowed each mill by the permit-issuing agency. The only exception to this rule is the Act's provision of a "modification" or variance procedure under which EPA may relax the general standards somewhat in individual permits under certain limited circumstances. Section 301(c), 33 U.S.C. s 1311(c). See duPont, supra, 430 U.S. at 128, 97 S.Ct. 965. These permit-related proceedings are also judicially reviewable under the Act. Section 309(b)(1)(F), 33 U.S.C. s 1369(b)(1)(F).

Finally, the regulatory circle is closed by stringent criminal and civil penalties the latter of which are enforceable both by the government and by private citizens for any effluents discharged in excess of those provided for in the permit. Sections 301(a), 309 of the Act, 33 U.S.C. ss 1311(a), 1319.

## II. THE PAPER INDUSTRY REGULATIONS

### A.

The regulations at issue in this case are the result of a rulemaking process developed by the Agency over the past six years for promulgating industry-wide effluent limitations under sections 301(b) and 304(b) of the Act. See notes 1 and 2 Supra. See generally, La Pierre, Technology-Forcing and Federal Environmental Protection Statutes, 62 Iowa L.Rev. 771, 810-13 (1977). The procedures for these regulations began in early 1973 when EPA divided the American pulp and paper industry into two segments for purposes of establishing 1977 and 1983 effluent limitations. In "Phase I" of its rulemaking effort for the industry, it proposed, received several tiers of comments on, and promulgated 1977 and 1983 limitations for the "unbleached" segment of the industry, which produces unbleached pulp and paper. 39 Fed.Reg.

18742 (1974). **\*1021 \*\*319** This Court reviewed and upheld those regulations in full in 1976, and they are not in issue here. See American Paper Inst., supra.

Promulgation of "Phase II" regulations for the apparently larger, "bleached" segment of the paper industry did not proceed with the same dispatch as in Phase I.[3] Accordingly, along with many of EPA's responsibilities under the Act, its rulemaking for Phase II of the paper industry became the subject of law suits and settlement agreements between environmental action groups and the Agency, resulting in the establishment of court-enforced time-tables for the promulgation of each industry's limitations. See Natural Resources Defense Council (NRDC) v. Train, 6 E.R.C. 1033 (D.D.C.1973), Rev'd in part & remanded, 166 U.S.App.D.C. 312, 510 F.2d 692 (1975), Timetable extended on remand, see NRDC v. Costle, 183 U.S.App.D.C. 11, 17, 561 F.2d 904, 910 n.32 (1977). These efforts apparently put EPA under a judicially enforceable obligation to issue the 1977 limitations by January 30, 1976 which it chose to accomplish by promulgating those limitations separately and more quickly than their 1983 counterparts. Consequently, it is only the 1977-related regulations that are before us.

[3]   Although unexplained in the record, we may surmise that the delay stemmed largely from the greater diversity of the Phase II segment of the industry, Compare 39 Fed.Reg. 18742 (1974) (Phase I regulations, identifying only five discrete subcategories of the affected industry) With 42 Fed.Reg. 1398 (1977) (Phase II regulations, identifying 16 such subcategories), the prudent decision of the EPA to solicit comments at several stages of an already complicated promulgation process, See Hunciker & Pagano, Federal Environmental Litigation in 1976; The Federal Water Pollution Control Act, 1 Harv.E.L.Rev. 59, 87 (1977) (usual "standard-setting procedure requir(es) twenty-seven distinct steps"), and, more generally, from the overwhelming technical and litigative burden shouldered by the Agency under the Act, See Note, Effective National Regulation of Point Sources Under the 1972 Federal Water Pollution Control Act, 10 Ga.L.Rev. 983, 1024 n.216 (1976) (as of 1975, the Agency was defending 250 court challenges to effluent regulations).

The actual promulgation procedures used in devising the challenged regulations were not unlike those used in Phase I and delineated in American Paper Inst., supra, 543 F.2d at 334-36. EPA commenced the 1977 part of the Phase II rulemaking process by commissioning two consulting firms in July 1973 to prepare a draft study suggesting possible industrial subcategories, as well as

AR005410

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

BPCTCA and achievable effluent reduction levels for each. About a year later, in August 1974, EPA made the draft study public and some 22 organizations, including many of the petitioners now before us, made it the target of comment and criticism.[4] Another year passed as the Agency responded to this new wave of solicited information by revising the draft report and by appending it, described as a "draft Development Document," to an advance notice of proposed regulations. That notice was issued in the fall of 1975, and comments were again solicited. 40 Fed.Reg. 41300 (1975). It was followed a few months later by the issuance of a third contractor's study of the economic impact of the proposed regulations ("Economic Analysis").

[4]    Rather than using the Federal Register to solicit comment at this preliminary stage, EPA circulated the draft to 450 government, industrial, and private citizen organizations. See generally 38 Fed.Reg. 21202-06 (1973).

Comments on this complete package of proposals and supporting analyses were processed and reflected in "Interim Final" regulations published on February 19, 1976 and accompanied by revised drafts of the Development Document and Economic Analysis. The Agency's obligation to comply with the January 30, 1976 deadline accounted for this quasi-final format as well as for the relatively quick turn-around time between this and the preceding public notices. See NRDC v. Train, supra, 510 F.2d at 711. This procedure also allowed petitioners in these consolidated cases to set the judicial review mechanism in motion even as they were provided and utilized one final opportunity to urge the Agency on its own to revise the limitations before their final issuance.

The Agency's efforts during these intermediate stages attracted thousands of **1022 **320 pages of public comment. The industry, moreover, was offered the opportunity to introduce further testimony at a formal hearing, but it declined. The "Final Limitations" issued on January 6, 1977, with final Development Document and Economic Analysis attached. These regulations, like each of the Agency's intermediate proposals during the rulemaking process, reflected significant changes generally favorable to industry in response to comments received.

The present litigation commenced in early 1976 with a petition for review filed in the United States Court of Appeals for the Third Circuit by petitioners in No. 76-1675. Subsequently, other review petitions were also filed in the Ninth Circuit but were transferred by that court to the Third Circuit under 28 U.S.C. s 2112(a). EPA

then convinced the Third Circuit to transfer all of the cases to this Circuit in light of its experience with the related issues raised in the Phase I litigation, American Paper Inst., supra. This court consolidated the petitions and established briefing and oral argument schedules providing for a single presentation of the issues raised in common by all of the petitioners, as well as for supplemental presentations by individual petitioners, or groups thereof, on specialized issues.

Although for ease of discourse we will generally refer collectively to the challengers before us as "petitioners", it is important to note that the limitations have somewhat different impacts on, and accordingly have elicited some separate challenges from, different segments of the industry. In order to understand the challenges as they reflect both the common concerns of all members, and the separate concerns of individual subcategories, of the American paper industry, we turn next to a brief discussion of the manufacturing and pollution control processes typical of the industry.

B.

To make paper from trees is an old art; to do it without water pollution is a new science. In papermaking, logs or wooden chips must be ground up or "cooked" in one of several processes until only cellulose pulp is left. The pulp is bleached and made into various types and grades of paper. The cooking solutions and wash water that are left contain a variety of chemicals produced during "cooking" and other processes, including acids and large quantities of dissolved cellulose-breakdown products. Indeed, in some pulping processes, more of the wood is discarded in the waste water than is used to make paper. Appendix (App.) 2116. EPA has selected three parameters for measuring the pollutant content of the industry's effluent, all of which have been used extensively in this and other industries' measurements: total suspended solids (TSS), biochemical oxygen demand (BOD), and pH.[5] TSS reflects the total amount of solids in solution, while BOD reflects the amount of biodegradable material in solution, and pH measures the acidity of the solution.[6]

[5]    Zinc is also a pollution parameter measure for industry subcategories that use it in their processes. Zinc effluent limitations have not been challenged.
    The term "parameter" has been used to describe BOD, TSS, pH, and similar measures because of their function. In mathematics, a parameter is defined as an "arbitrary constant" a variable that keeps a constant role

AR005411

in a formula as it takes on different (arbitrary) numerical values. For example, in the formula for a parabola (y = ax $^2$ b), the horizontal or "x" variable is a parameter because it keeps a constant role in the formula while different numerical values are plugged in to calculate different vertical or "y" levels. For all EPA regulations, BOD and the like keep a constant role what they are, and how they are measured, stay the same even as they take on different numerical values for the acceptable level in each industrial category depending on the available technology for that category.

6     As the Second Circuit recently noted, "Biochemical Oxygen Demand is not strictly speaking a pollutant at all." C & H Sugar Co. v. EPA, 553 F.2d 280, 282 n. 7 (2d Cir. 1977). BOD is a measure of how much oxygen is used by organisms in water that break down biodegradable pollutants. As such, it indicates how much dissolved oxygen in the water will be used in fermenting the wastes. It is important because that fermentation process is capable of depleting so much of the water's oxygen supply that fish and other life in the water asphyxiate. The BOD level is also important because it correlates with the level of harmful organic chemicals. Accordingly, effluent with high BOD can cause damage even when dumped into waters that have more than ample amounts of dissolved oxygen. The same is true of pH: effluent high in toxic acids may cause damage even when dumped into sea water, whose salts buffer its pH level. It is well recognized that EPA can use pollution parameters that are not harmful in themselves, but act as indicators of harm. See American Paper Inst. v. Train, 177 U.S.App.D.C. 181, 202, 543 F.2d 328, 349, Cert. dismissed, 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976) (color can be used as a pollution parameter).

**\*1023 \*\*321** EPA has divided this segment of the industry into 16 subcategories, and further subdivided it into 66 subdivisions, for the purposes of its rulemaking effort. As noted, some of petitioners' challenges concern all of the regulations for the whole industry, while other challenges are directed to regulations for particular industry subcategories. Actually, of the 16 subcategories in the whole industry, only three the three that use some form of the "sulfite process" have evoked particularized challenges.[7] The reaction of sulfite mill operators stems from the limitations' greater economic impact on them.[8] That impact in turn results from the fact that the sulfite process creates one of the highest pollution loads of any industrial process, and certainly the highest within the pulping industry.[9] In fact, the Act's legislative history focused in particular on injury to shellfish in rivers and bays caused by sulfite wastes. A Legislative History of the Water Pollution Control Act Amendments of 1972 718-21 (1973) (hereinafter referred to as Legislative History ). Because the sulfite process is central in this case, we describe it in greater detail.

7     Separate challenges were brought by mills using nonsulfite processes, but they raised issues common to the whole industry. Of almost 300 mills affected by these regulations, about 30 are sulfite mills.

8     Although the sulfite subcategories must invest heavily, EPA has not given them a disproportionate duty; due to the large volume of waste to be treated, investment in sulfite waste control is highly cost-efficient. Under the 1977 regulations, sulfite mills will pay \$.10 to \$.19 for each pound of BOD they remove from effluent. Of the 13 other industry subcategories, only one will pay less than \$.10 per pound of BOD removed. Of the rest, five will have comparable, and seven will have higher, costs. App. 2479.

9     Council on Economic Priorities, Paper Profits: Pollution in the Pulp and Paper Industry 16-17 (1971). This carefully documented study analyzes air and water pollution generated by 24 paper companies at 131 locations. It discusses the paper industry's unhappy record of liquid waste dumping and failure to install even minimal antipollution measures before the 1972 Act. The study determined that "in 1969, it is estimated that the industry discharged 15% Of the total industrial effluent of the United States. . . . In 1967, the paper and allied products industry used nearly 2.1 trillion gallons and discharged 1.9 trillion gallons. Only 34% Of this discharge water received any treatment to alleviate its chemical and physical adulteration." Id. at 3, 7.

In the sulfite process, wooden chips are "cooked" in hot solutions of sulphurous acid and other chemicals. The cooking dissolves the binding agent in the wood (lignin) and also a good deal of the cellulose. The end product is cellulose pulp and an acid solution called spent sulfite liquor (SSL). There are two types of sulfite processes. In the papergrade sulfite process, which produces cellulose pulp for paper, the cellulose does not need to be very pure, and moderate steps suffice for cooking and separating pulp from SSL. In the dissolving sulfite process, aimed at making the raw cellulose base for materials such as cellophane and rayon, the cellulose must be pure, so the cooking and separation of the SSL are more complete and extra bleaching of the pulp is performed.

AR005412

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

The sulfite process results in SSL and other potential pollution solutions containing acids, dissolved cellulose break-down products, and many types of organic compounds. These solutions receive various kinds of waste treatment. SSL is evaporated and burned in "SSL recovery," eliminating the water pollution potential and producing usable heat and sometimes reusable **\*1024 \*\*322** chemicals.[10] The non-SSL waste solutions are pumped into sedimentation tanks where some of the suspended solids settle out of solution. The solutions are then pumped into other tanks and lagoons for secondary or "biological" treatment, in which bacteria are grown in the solutions to feed on and break down the waste. Eventually, the water is drained from the bacteria-laden solutions by a variety of methods. After draining, the caked solid or "sludge" that is left is incinerated or used for landfill.

[10]    When the wood is "cooked," the solution uses a mixture of sulphurous acid and one of four chemicals: sodium, magnesium, ammonia, or calcium. The economics are such that it is profitable to perform SSL recovery to recover sodium and magnesium for reuse and not profitable to recover calcium. Evidence concerning the profitability of recovering ammonia is conflicting. Out of 23 sulfite mills, the six that use sodium and magnesium all perform SSL recovery, as do 14 out of the 17 that use ammonia or calcium. The latter have done so in part under the compulsion of past water pollution regulations.

### III. SCOPE OF REVIEW

Before turning to the merits of petitioners' challenges to the 1977 effluent limitations, some mention must be made of the appropriate scope of review under the circumstances of this case. Generally, informal rulemaking such as produced the regulations involved herein is reviewed under section 10(e)(2) of the Administrative Procedure Act (APA), 5 U.S.C. s 706(2). Pursuant to this provision, we must "set aside" any portion of the 1977 effluent limitations that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," is "in excess of statutory . . . authority . . . or short of statutory right," or is "without observance of procedure required by law." See American Paper Inst., supra, 543 F.2d at 338; American Frozen Food Inst., supra, 176 U.S.App.D.C. at 130-31, 539 F.2d at 132-33. See generally Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-17, 91 S.Ct. 814,

28 L.Ed.2d 136 (1971).

In form, section 10(e)(2) embodies a list of various adjectives or adjectival phrases any one of which, if found applicable, requires our disapproval of the administrative action in question. These formulations are far from being entirely discrete as a matter of the ordinary meaning of language, and, indeed, are in some respects cumulative rather than differential in their applicability. This is especially true of the words "arbitrary," " capricious," and "abuse of discretion." In its totality, at all events, section 10(e)(2) is indicative of a multifaceted review function committed to the courts. In the present context, for example, that function is divisible into three categories statutory, procedural, and substantive.

In the case before us, we first must determine whether the EPA regulations involved herein are "not in accordance with law," or, more particularly, whether they are "in excess of statutory . . . authority." APA ss 10(e)(2) (A), (C), 5 U.S.C. s 706(2)(A), (C). We must also consider whether the process used in arriving at those regulations afforded those affected in their procedural due. More specifically, in the informal rulemaking context involved herein, this inquiry asks whether the agency gave "interested persons an opportunity to participate in the rule making through submission of written (or other) data" and whether it "incorporate(d) in the rule adopted a concise general statement of their basis and purpose."[11] 5 U.S.C. s 553. **\*1025 \*\*323** See Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Finally, we are charged by section 10(e)(2) of the APA to consider whether the agency "abuse(d its) discretion" (or was "arbitrary" or "capricious") in exercising the quasi-legislative authority delegated to it by Congress, or, on the other hand, whether its "decision was based on a consideration of the relevant factors and (was not the product of) a clear error of judgment." Citizens to Preserve Overton Park, Inc., supra, 401 U.S. at 416, 91 S.Ct. at 824. See also Vermont Yankee, supra, at 1214.

[11]    We might add parenthetically that the degree of "concise(ness)" called for by the APA with respect to the Agency's explanation of its actions and, indeed, the degree of conciseness Tolerated by the courts with respect both to that explanation as well as to the opportunity for public participation may vary according the nature of the regulations. In the case of highly technical regulations, and especially regulations calling for refined scientific judgments, the reviewing court should be careful to insure that the procedures used as a vehicle for promulgation are ample enough to support their substantive cargo. E. g., Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972); Environmental Defense Fund v. Hardin, 138

AR005413

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

U.S.App.D.C. 391, 398, 428 F.2d 1093, 1100 (1970). Cf. Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc., 98 S.Ct. 1197, 1212-13 (1978). Moreover, the use in s 553 of the dyad "basis and purpose" suggests that the explanatory statement should discuss both the factual premises, if any, and the policy considerations underlying the administrative action. This requirement not only aids the reviewing court in assuring adherence to considerations appropriate under the statute, but also permits the court to decide if the agency's conclusion is "sustainable on the administrative record made." Id. at 1214, Quoting Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Due concern both for the intent of Congress in drafting the particular statute at issue, and, more generally, for the "boundaries between the legislative and the judicial function," Industrial Union Dep't v. Hodgson, 162 U.S.App.D.C. 331, 339, 499 F.2d 467, 475 (1974), often demands that we exercise certain aspects of our review function with more circumspection than is appropriate to others. Turning to the case at hand, therefore, we are initially confronted with a "complicated and lengthy statute," American Frozen Food Inst., supra, 176 U.S.App.D.C. at 111, 539 F.2d at 113, aimed at achieving the monumental "national goal" of Eliminating "the discharge of pollutants into the (nation's) navigable waters" within the short span of 13 years. Section 101(a)(1) of the Act, 33 U.S.C. s 1251. The immensity of the planning task thrust upon the Agency by Congress was heightened by the drafters' insistence upon industry-by-industry uniformity of effluent limitations and control techniques. E. g., Legislative History, at 170 (statement of Sen. Muskie). Not only would the Agency's regulations have to work almost immediately, but they also would have to achieve cross-industry applicability despite the geographical, technological, and economic diversity that characterizes almost every discrete sector of manufacturing and agriculture in this country.

Yet, ambitious as was their goal, the drafters of the Act labored under no illusions about the uncertain state of current knowledge concerning the creation, effects, and control of water pollution. E. g., Legislative History, at 1332 (remarks of Sen. Buckley). Their intent, therefore, was to rely on EPA's ingenuity, See, e. g., C & H Sugar Co. v. EPA, supra note 6,553 F.2d at 286-87 backed up by the Act's comprehensive system of administrative rulemaking and stiff penalties to force each industry on its own to develop the technology necessary to achieve the Act's aspiring goal. See generally La Pierre, Supra. Congress's commitment to that goal, as well as the severe impact its achievement may have on those immediately affected, is further illustrated by the drafters' realization that enforcement of the Act would probably shut down some plants around the nation. E. g., Legislative History, at 231 (remarks of Rep. Jones). See American Iron & Steel Inst. v. Train, 526 F.2d 1027, 1052 (3d Cir. 1976).

In light of the structure and aims of the Act, and the breadth of authority delegated by it to the EPA to identify highly sophisticated control technology in an area fraught with scientific uncertainty, our review function encounters significant limitations in the substantive aspect where the given statutory standards are "arbitrary," "capricious," or "abuse of discretion." First, it is elementary that our function is not to weigh De novo the available evidence and to substitute our judgment for that of the Agency. Second, an expansive concept and exercise of the review power in the eleven Courts of Appeals charged with that function could easily impede accomplishment of the Act's ambitious pollution-ending aspiration as well as its goal of industry-by-industry uniformity. See generally, *1026 **324 Currie, Judicial Review Under Federal Pollution Laws, 62 Iowa L.Rev. 1221, 1261-71 (1977). This problem looms larger in the substantive area of review than it does in those areas involving statutory interpretation and procedural integrity because of the technological and scientific uncertainty that EPA must overcome as best it can in making the discretionary judgments delegated to it by Congress. There are also obvious limitations upon the capacity of courts to deal meaningfully with arcane areas of knowledge of this kind.

EPA has taken its responsibility quite seriously, employing no less than three highly qualified private consulting firms to augment its own technological expertise. Accordingly, we must not be too quick to draw conclusions, differing from those of the Agency, in this necessarily imprecise area of knowledge. E. g., Industrial Union Dep't, supra, 162 U.S.App.D.C. at 338-39, 499 F.2d at 474-75 n. 18 ("Where existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys (a) broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information"). See Permian Basin Area Rate Cases, 390 U.S. 747, 811, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 396, 399, 541 F.2d 1, 24, 27 (En banc ), Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); Id. 176 U.S.App.D.C. at 438-439, 541 F.2d at 66-67 (Bazelon, C. J., concurring); Society of the Plastics Indus., Inc. v. OSHA, 509 F.2d 1301, 1308 (2d Cir.), Cert. denied, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975). Indeed, the mere fact that the counsel on both sides in this suit could draw upon the opinions of diverse experts sitting

AR005414

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

virtually at their elbows during preparation of their briefs,[12] while we are forced to decide between their resulting arguments on the basis of our "generalist" judicial backgrounds, argues for restraint on our part.[13] In sum, unless we are quite certain of our basis for doing so, we must be slow to overturn the Agency's judgment, whichever way it may incline, when Congress has required it to act quickly and decisively despite the lack of exact data.

[12]    In this regard, we note that EPA has often been compelled to devote as much as half of its rulemaking staff under the Act to in-court defense of its already-issued regulations. See Hunciker & Pagano, Supra note 3, at 61.

[13]    One of the petitioners in this case unwittingly illustrated this point. Its brief characterized One of the many claims made by it as involving "so basic and glaring (an error) that it is not necessary to have scientific and technical training in order to appreciate (it)." Supplemental Brief of Petitioners in No. 76-1675, at 42. Presumably our "scientific and technical training" enables us to cope with the others.

The likelihood of that degree of certainty on our part, we might add, almost inevitably decreases when our review is based on the record of informal rulemaking before the Agency. Because of the nature of such rulemaking, again exaggerated in this case by the complexity of the subject matter, the record's portrayal of facts is essentially unsystematic (I. e., unaffected by any rules of evidence, or by face-to-face adversarial presentation). See Vermont Yankee, supra, 98 S.Ct. at 1217. Moreover, the greater part of the record will often transcend even an eclectic collection of facts and will instead be oriented towards aiding the Agency in making "pure(ly) legislative judgments." Industrial Union Dep't, supra, 162 U.S.App.D.C. at 338, 499 F.2d at 474. As such, it is relatively unhelpful to judges who have no way of testing the veracity of its "extensive and often conflicting" contents, or of analyzing it in the light of the neutral principles in which judicial decisionmaking is grounded. Id. 162 U.S.App.D.C. at 338-340, 499 F.2d at 474-76; Accord FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 813-814, 98 S.Ct. 2096, 2121-2122, 56 L.Ed.2d 697 (1978); See Ethyl Corp. v. EPA, supra, 176 U.S.App.D.C. at 392, 541 F.2d at 20; Society of Plastics Indus., Inc., supra, 509 F.2d at 1304; Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968).

In these circumstances, therefore, we will be content in

carrying out our substantive review (that is, assuming the statute and **1027 **325 the requisite procedures have been followed) first, to insist upon an explanation of the facts and policy concerns relied on by the Agency in making its decision; second, to see if those facts have some basis in the record; and finally, to decide whether those facts and those legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made. See Citizens to Preserve Overton Park, Inc., supra, 401 U.S. at 416, 91 S.Ct. 814; Amoco Oil Co. v. EPA, 163 U.S.App.D.C. 162, 180-81, 501 F.2d 722, 740-41 (1974); Industrial Union Dep't, supra, 162 U.S.App.D.C. at 339-40, 499 F.2d at 475-76.

On the other hand, the Act its history, intent, and the nature of the duties it delegates to the Agency and the judiciary does not imply any derogation of the courts' traditional primacy in interpreting statutory directives and enforcing procedural rectitude. Although calling upon the Agency to make technical judgments, the provisions of the Act that are controlling in this case use common-sense terms that are thoroughly treated in the legislative history, so that their meaning is not inherently more accessible to the Agency than to ourselves. See Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960); Lubrizol Corp. v. EPA, 562 F.2d 807, 816-17 & n.23 (1977). Accordingly, in this statutory area of review, and particularly in the absence of some special indication that the Agency interpretation may coincide with that of Congress, Cf. Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), we are less hesitant to reject the decision of the Agency, if the latter does not comport with the conclusion dictated by established principles of statutory construction. See Adamo Wrecking Co. v. United States, 434 U.S. 275, 98 S.Ct. 566, 570 n.5, 54 L.Ed.2d 538 (1978); ASARCO, Inc. v. EPA, 188 U.S.App.D.C. 77, 83, 578 F.2d 319, 325 (1978), Discussing Train v. Natural Resources Defense Council, 421 U.S. 60, 75, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

Even more so than our review of EPA's statutory interpretations, our review of its procedural integrity in promulgating the regulations before us is the product of our independent judgment, and our main reliance in ensuring that, despite its broad discretion, the Agency has not acted unfairly or in disregard of the statutorily prescribed procedures. E. g., National Asphalt Pavement Ass'n v. Train, 176 U.S.App.D.C. 296, 304-5, 539 F.2d 775, 783-84 (1976). Our assertion of judicial independence in carrying out the procedural aspect of the review function derives from this country's historical reliance on the courts as the exponents of procedural fairness.[14] E. g.,

AR005415

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

S.Ct. 111, 28 L.Ed. 232 (1884); Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Recently, this reliance has transcended cases arising under either of the due process clauses and has infused modern notions of administrative law, in particular in the area of informal rulemaking. E. g., Rodway v. Department of Agriculture, 168 U.S.App.D.C. 387, 391-95, 514 F.2d 809, 813-18 (1975); Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 326, 486 F.2d 375, 393 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); See Independent Broker-Dealers' Trade Ass'n v. SEC, 142 U.S.App.D.C. 338, 350, 442 F.2d 132, 144, Cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971).

[14]    We use the term "exponent" in both of its nonmathematical senses. That is, the courts have not only traditionally served as "expounder(s), explainer(s and) interpreters" of due process, but also, through their own procedures as developed over the centuries, as "one(s) who . . . exemplif(y) or represent( )." Webster's Third Dictionary of the English Language 802 (3d Ed. 1963).

Our reliance on careful procedural review, moreover, derives from an expectation that if the Agency, in carrying out its "essentially legislative task," has infused the administrative process with the degree of openness, explanation, and participatory democracy required by the APA, it will **1028 **326 thereby have "negate(d) the dangers of arbitrariness and irrationality in the formulation of rules . . .," Automotive Parts & Accessories Ass'n, supra, 132 U.S.App.D.C. at 208, 407 F.2d at 338, Quoted in National Asphalt Pavement Ass'n, supra, 176 U.S.App.D.C. at 304-05, 539 F.2d at 783-84. See Ethyl Corp. v. EPA, supra, 176 U.S.App.D.C. at 438, 541 F.2d at 66 (Bazelon, C. J., concurring), Quoting International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 448, 478 F.2d 615, 652 (1973) (Bazelon, C. J., concurring). Furthermore, such procedures will maximize the susceptibility of the record to judicial review. Dry Colors Mfrs. Ass'n v. Department of Labor, 486 F.2d 98, 105-07 (3d Cir. 1973). In short, we are willing to entrust the Agency with wide-ranging regulatory discretion, and even, to a lesser extent, with an interpretive discretion vis-a-vis its statutory mandate, so long as we are assured that its promulgation process as a whole and in each of its major aspects provides a degree of public awareness, understanding, and participation commensurate with the complexity and intrusiveness of the resulting regulations.[15] See American Frozen Food Inst., supra, 176 U.S.App.D.C. at 133, 539 F.2d at 135;

note 11 Supra. Even here, however, beyond the notice, comment, and explanation requirements of section 553 of the APA, it is generally up to the Agency to select among the myriad available techniques to accomplish the goal of public understanding and participation. Vermont Yankee, supra, 98 S.Ct. at 1211-17. Cf. duPont, supra, 430 U.S. at 131-32 nn.22-23, 97 S.Ct. 965; Texaco Inc. v. FEA, 531 F.2d 1071, 1082 (Em.App.), Cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).[16]

[15]    It is important, however, for potential challengers of regulations to realize that the success of open and participatory procedures in achieving substantively sound administrative law depends as much upon them as upon the Agency. It is our responsibility, therefore, in attempting to enforce procedural fairness, not only to hold the Agency to adequate procedures but also to insist that petitioners have made substantial and good faith use thereof. To the extent that technical, factual, or policy concerns, that could have been raised earlier, are in fact raised by petitioners for the first time on appeal, the notice-comment-And-response procedures will have been deprived of much of their vitality, and the party responsible therefor will accordingly be given less latitude in complaining about the results. Cf. ASARCO, Inc. v. EPA, 188 U.S.App.D.C. at 320-79 n.1, 578 F.2d at 320-21, n.1 (1978) (sufficient that issue have been raised before Agency by someone, even if not by petitioner; greater latitude to raise Legal issues for the first time on appeal of regulations).

[16]    In general, the next three parts of the opinion will review the paper industry effluent regulations first for their procedural fairness, then for their adherence to the statute, and finally for any substantive abuse of discretion. Nonetheless, we will deal with any abuse-of-discretion challenges related to a discrete aspect of the regulations at the point where we discuss the procedural or statutory challenges thereto.

## IV. THE AGENCY'S PROCEDURES

Turning first, then, to our procedurally oriented review task, we note that in general the Agency appears to have bent over backwards to accommodate public participation in, and understanding of, the promulgation of the effluent limitations before us. No less than four opportunities for public comment on parts or all of the proposed regulations and supporting data were provided by the Agency and liberally utilized by the industry. That EPA

AR005416

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

made the hoped-for use of these procedures is evidenced by its willingness at each stage to reflect the comments in revisions of its conclusion,[17] and by the fact that members of the industry apparently exhausted most of their comments and criticisms before the Agency exhausted its procedures. Hence, the industry's trade association rejected EPA's offer to hold a formal hearing.

[17]    For example, in light of industry comments received on the Interim Final Limitations, the total suspended solids (TSS) daily limit for the dissolving sulfite subcategory was increased by 38 percent. Compare 41 Fed.Reg. 7677 (1976) With 42 Fed.Reg. 1406 (1977).

  The one procedural inadequacy attributed to EPA in this case is of very limited scope. It concerns EPA's derivation of one effluent limitation (out of three in all) for one subdivision of the industry (out *1029 **327 of 66 in all): the BOD limitation for acetate grade dissolving sulfite mills. The genesis of this challenge is complicated and somewhat obscure. It revolves around EPA's computation of the "secondary waste load"[18] that must be treated by typical acetate grade dissolving sulfite mills using BPC-TCA. To derive a typical secondary waste load, the Agency was forced to adjust the limited data available to it, See note 70 Infra, to make it representative of the appropriate mills. The dispute has arisen out of the Agency's identification and computation of the appropriate adjustments. Petitioners contend that, properly adjusted, the figures would show that these mills produce large amounts of waste that are costly to treat. Consequently, they urge that a high cost figure must be utilized in the Agency's cost-benefit balancing. EPA responds that there is not so much waste to treat at a typical mill, and thus that it justifiably used a lower cost estimate than the one argued for by petitioner.

[18]    "Raw waste load" is the total amount of waste generated by the mill before treatment. After this waste goes through primary treatment (I. e., after being pumped into a sedimentation tank where some solid waste settles out), the remaining pollution, called "secondary waste load," is subjected to secondary treatment (breakdown by bacteria) in order to cut down BOD. Accordingly, the amount of secondary waste load determines the amount and cost of secondary treatment sufficient to meet the BOD limitation.

EPA originally computed the secondary waste load for these mills at 487 pounds of waste to be treated per ton of product (lbs/ton), App. 1514, a figure to which the industry did not object.[19] Between the publication of the Interim Final Limitations and the Final Limitations, however, the Agency apparently secured new data and recalculated the waste load as lower, I. e., 404 lbs/ton.[20]

EPA purportedly arrived at the latter figure after it (1) studied two other factors that it realized would require adjusting the figure upwards and downwards respectively, but then (2) decided to disregard the two factors on the assumption that they cancelled each other out.[21] We say "purportedly" because the record includes no mention of the two factors, much less of their being considered. Finally, in making its cost calculations, EPA took the 404 lbs/ton figure and reduced it to 314 lbs/ton on a further assumption that it now admits is erroneous.[22]

[19]    The Agency, based the figure of 487 lbs/ton on data from one mill, Mill 403.

[20]    App. 2124. The Agency based the figure of 404 lbs/ton on new data for Mill 403, See note 19 Supra, and on data from another mill, Mill 402.

[21]    On the one hand, Mill 402, See note 20 Supra, utilized one type of waste treatment that mills using BPCTCA do not use, SSL neutralization, so for that reason its secondary water load would likely fall below a representative level. On the other hand, Mills 402 and 403, See notes 19 & 20 Supra, did not use another type of waste treatment, SSL recovery, as fully as mills with BPCTCA, so for that reason they could be expected to have higher secondary waste loads than at perfectly representative mills. EPA counsel inform us that during rulemaking the Agency staff estimated that these two factors would essentially cancel out, and decided not to reflect them in the record. It is now argued by the Agency that, if the two factors are fully taken into account, there should be a net adjustment downward of the data received from the two plants.

[22]    App. 1795-96. EPA assumed that Mills 402 and 403, See notes 19 & 20 Supra, lacked primary treatment. If so, their secondary waste loads would be higher than at a mill using BPCTCA, which has primary treatment, and their secondary waste load would be above a representative figure. Accordingly, in making its cost calculations EPA adjusted their figures downwards by 22% To arrive at a representative figure. In fact, the mills use primary treatment, and the adjustment should not have been made.

Because the industry had no opportunity to comment on either the 314 or 404 lbs/ton figures after the Final Limitations were issued, it made its objection to them in its brief on appeal.[23] It concluded these objections *1030 **328 by recalculating secondary waste load and arriving at a figure close to the Agency's original 487 lbs/ton

AR005417

calculation. Brief for Petitioners in Nos. 76-1688 and 76-1690, at Appendix F. Included in its recomputations were some new data that had not been placed in the record. Although counsel for EPA conceded in response that petitioners' objections to the secondary waste load figures were partly correct, they also noted that petitioners' new data were favorable to EPA's conclusions.[24] Counsel asserted that if EPA recalculated secondary waste load based on both the new data, and on the two factors previously disregarded because they were assumed to cancel out, See note 21 Supra and accompanying text, it would arrive at secondary waste load figure of 292 lbs/ton even below its earlier computations. In sum, EPA conceded some errors and deletions but urged that by remaking its computations from scratch, it could justify the figures used in the Final Limitations.[25]

[23]   Petitioners argued first that the 404 lbs/ton figure derived from the new data undervalued secondary waste load in mills using BPCTCA because the new data was facially incomplete and unrepresentative of mills using BPCTCA. See generally note 70 Infra. Further, they pointed out the erroneous assumption behind the 22% Downward adjustment to the 404 lbs/ton figure that EPA made in computing the cost of achieving the established effluent limitations. See note 22 Supra.

[24]   Petitioners' new data show that Mill 402's SSL recovery is even less full than EPA assumed. See note 21 Supra. This new data indicated that Mill 402's secondary waste load figure was even further above a representative one than EPA assumed during rulemaking, and that a larger adjustment downward to obtain a representative figure would be appropriate.

[25]   EPA's revised analysis may be summarized as follows: If EPA had taken into account that the mills actually did have primary treatment, it would not have made the downward adjustment discussed in note 22 Supra. And if it had adjusted the figures because of Mill 402's atypical use of SSL neutralization, it would have raised the secondary waste load figure obtained in order to make it more representative. See note 21 Supra. On the other hand, had EPA taken into account that both mills lacked full SSL recovery, and had it used the new data on how Far below capacity the SSL recovery was operating, it would have adjusted their secondary waste load figure significantly downwards. See notes 21 & 24 Supra. EPA counsel contended that when the adjustments upwards and downwards were aggregated, the net secondary waste load figure would fall to 292 lbs/ton, I. e., slightly below the figure of 314 lbs/ton used in EPA's calculation of the cost of BPCTCA.

The labyrinthine trail that must be followed merely to Set forth this dispute without even venturing a guess as to how to resolve it amply illustrates the inadequacy of the procedures followed by the Agency. Most obviously, the defect stems from the inadequacy of the Agency's final published explanation. That explanation includes, and we presume the Agency relied upon, computations now admitted to be erroneous. See note 22 Supra and accompanying text. Further, it deletes mention of a phantom set of not-quite-offsetting adjustments that Agency attorneys now deem crucial to the viability of the EPA's cost determination. See note 21 Supra and accompanying text.

Absent a coherent discussion in the record of the factual "basis" and legislative "purpose" underlying EPA's conclusion, See 5 U.S.C. s 553, we are unable to rely on our usual assumption that the Agency, when relying on supportable facts and permissible policy concerns and when obligated to explain itself, will rationally exercise the duties delegated to it by Congress. It is for this reason that we take no solace in the fact that the Agency's Counsel, after the fact, may be able convincingly to rationalize the Agency's decision. E. g., Dry Color Mfrs. Ass'n, supra, 486 F.2d at 106. See Vermont Yankee, supra, 98 S.Ct. at 1214, Quoting Camp. v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Moreover, the Agency's procedures in this limited instance improperly denied petitioners the opportunity to comment on a significant part of the Agency's decisionmaking process as required by section 553. See American Frozen Food Inst., supra, 539 F.2d at 135, 176 U.S.App.D.C. at 133. Thus, the 404 and 314 lbs/ton figures variously relied upon by the Agency must be validated, if at all, by reference (1) to certain data on two mills obtained by the Agency after the opportunity for public comment had lapsed; (2) other data from one mill that is not reflected in the record at all but was included by petitioners in their brief;[26] and **329 *1031** (3) calculations, also not reflected in the record, based on information scattered throughout the record. This denial of an opportunity for comment on these facts further undermines our usual assumption that notice and comment rulemaking, by virtue of its accessibility to public scrutiny, will achieve rational results.

[26]   These first two aspects of the EPA's decisionmaking process that were not subject to prepromulgation public scrutiny are factual matters. As such, they are especially subject to verification through the notice and comment process and less acceptably removed

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

therefrom.

Moreover, although both parties herein accept the validity of the data referred to in the second factor mentioned, the fact that it Nowhere appears in the record so divorces it from the notice and comment procedure as to make it suspect.

Our conclusion does not imply any dissatisfaction with the rule that the Agency need not subject every incremental change in its conclusions after each round of notice and comment to further public scrutiny before final action. E. g., International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 424, 478 F.2d 615, 632 n.51 (1973); South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir. 1974). But in this case, the Agency's final conclusions are far from the "logical outgrowth" of the preceding notice and comment process, Id., and instead are the result of a complex mix of controversial and uncommented upon data and calculations. Given the lengths that the Agency must travel to justify its revisions between the interim and final stages, we cannot be sure that further and ultimately convincing public criticism of those changes would not have been forthcoming had it been invited by the Agency. See Marathon Oil Co. v. EPA, 564 F.2d 1253, 1271-72 n.54 (9th Cir. 1977).[27]

[27]   It might be argued that whether the data and recomputations argued for by petitioners or by EPA are used, the resulting secondary waste load figure, and thus the cost of treating the same to achieve the specified BOD limitation, would not be so high as to invalidate the limitation itself as an abuse of discretion. Hence, the argument might continue, the alleged underestimation of waste load is harmless, because only that limitation is subject to review. Yet this argument misconceives our review function. Even though We might find such a limitation within the realm of discretion accorded the Agency by Congress, it is our place only to review actions actually and properly taken by the Agency. If that action is improper, and if we cannot be sure that under the correct procedures the Agency would have reached the same conclusion, we cannot characterize the defect as harmless.

For all of the foregoing reasons, therefore, we must remand the regulation setting forth the BOD limitation for acetate grade dissolving sulfite mills. On remand, the Agency should conduct notice and comment proceedings aimed at reassessing and more fully explaining its conclusions concerning that limitation's validity in light of the cost of complying therewith. See id. at 1271-72.

## V. THE AGENCY'S INTERPRETATION OF THE STATUTE

Petitioners raise two major statutorily premised arguments in challenging these effluent regulations. First, they claim that the Act, as interpreted by the Supreme Court in DuPont, requires a greater degree of flexibility to vary the general effluent limitations in individual permits than the regulations allow. Second, it is contended that EPA has too severely narrowed the group of factors relevant in determining allowable effluent limitations and in so doing has contravened the will of Congress as expressed in section 304(b)(1)(B), Quoted in note 2 Supra. These two arguments merge to the extent that EPA refuses to allow variances based on the same factors that it also refuses to consider in setting the overall limitations. We find the Agency's statutory interpretation correct in both instances.

### A.

The Act explicitly includes a variance procedure for use by the permit-granting agencies in deciding how to reflect the EPA's overall 1983 limitations in the effluent permits of specific mills. Section 301(c). No similar variance clause with reference to the 1977 limitations is explicit in the Act. Nonetheless, the Agency consistently has included variance provisions in its regulations setting 1977 limits for the various industries, See **1032 **330 United States Steel Corp. v. Train, 556 F.2d 822, 844-45 (7th Cir. 1977), and recently the Supreme Court held that under its understanding of the Act, such a variance provision is legally required:

> We conclude that the statute authorizes the 1977 limitations as well as the 1983 limitations to be set by regulation, So long as some allowance is made for variations in individual plants, as EPA has done by including a variance clause in its 1977 limitations.

DuPont, supra, 430 U.S. at 128, 97 S.Ct. at 975 (emphasis added and footnote omitted). See United States Steel Corp., supra, 556 F.2d at 844-45.

AR005419

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

Despite the Court's closing phrase, which seems to validate the Agency's actual variance practice, that question was left open in a footnote:

> We agree with the Court of Appeals, (E. I. duPont de Nemours & Co. v. Train, 541 F.2d 1018, at 1028 (4th Cir. 1976)), that consideration of whether EPA's variance provision has proper scope would be premature.

DuPont, supra, 430 U.S. at 128 n. 19, 97 S.Ct. at 975. Thus, while DuPont clearly establishes the necessity of including Some provision for variances in the 1977 limitations, it raises a question as to the justiciability of the provision's specific validity in the context of review of the general set of limitations.

Our reading of DuPont and of the cited portion of the lower court opinion in that case leads us to conclude that, while final review of the variance provision must await individual permittees' attempts to utilize it, See note 29 Infra, a threshold review of the provision is a prerequisite to validation of the general limitations.

This conclusion is mandated by the narrowness of the rationale relied upon by the Fourth Circuit, and adopted by the Supreme Court, as a basis for avoiding the specifics of the variance question in DuPont :

> The administration of these (variance) provisions in practice is a matter of speculation at the present. The question will arise when a claim for a variance is made in a permit application.

541 F.2d at 1028. Accord, Natural Resources Defense Council, Inc. v. EPA, 537 F.2d 642, 647 (2d Cir. 1976). In the three years that have now elapsed since DuPont was briefed and argued in the Fourth Circuit, however, enough indicia of the Agency's attitude toward the 1977 variance provision under the Act has accumulated so that its administration is anything but "a matter of speculation." See especially In re Louisiana-Pacific Corp., 10 E.R.C. 1841 (1977) (Decision of the Administrator of EPA).

Petitioners have alleged that these recent indicia contradict the rebuttable presumption of administrative regularity that motivated the Supreme Court and Fourth Circuit in DuPont to allow the limitations to go into effect in advance of final proof that the variance provision was meaningful. In petitioner's view, the indicia point to the complete emasculation by the Agency of its 1977 variance provision. Accordingly, because the Supreme Court premised the Agency's power to set 1977 limitations by regulation on the availability of a meaningful variance provision, See pp. —— - —— of 191 U.S.App.D.C., pp. 1033-1034 of 590 F.2d Infra, and because the presumption that its variance will be applied meaningfully is no longer necessitated by a lack of concrete information, we cannot approve the regulations without finding that they include a sufficiently flexible variance provision.[28] Since its own decision in DuPont, the Fourth Circuit has reached a similar **1033 ***331** conclusion and has undertaken to review the variance clause in certain effluent limitations for electric generating plants. Appalachian Power Co. v. Train, 545 F.2d 1351, 1358-60 & n. 22, Modified, 545 F.2d 1380 (4th Cir. 1976).

[28]   We interpret the Fourth Circuit's and Supreme Court's actions in DuPont as having proceeded under the normal assumption in cases where no other evidence is available that the Agency will apply substantive parts of its regulations in a meaningful and lawful manner. The passage quoted in text from the Fourth Circuit's opinion indicates, however, that as soon as a court is faced with a case in which the variance's application in fact is no longer "a matter of speculation," the court should abandon that assumption and proceed with its review as the circumstances of the case dictate.

We stress, however, that our view of the variance provision in the paper industry limitations before us, while indispensable in reviewing those limitations, is quite narrow. It seeks only to establish that the provision can be applied with enough flexibility to support the general rulemaking effort. We consequently take no position on its application in specific cases, or on its precise interpretation, beyond insisting that it meet this minimum-flexibility requirement.[29]

[29]   We note that EPA recently rejected a variance authorization that a California agency had included in a permit for a mill operated by one of the petitioners in this case, Crown Simpson Pulp Co. See In re Louisiana-Pacific Corp., 10 E.R.C. 1841 (1977) (Decision of the Administrator). That decision is currently under review in the Ninth Circuit, and our decision here implies no opinion on the merits of that particular petition in light of the facts relevant solely thereto.

AR005420

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

Moreover, the government conceded in oral argument that the Ninth Circuit has jurisdiction not only to decide the merits of that particular variance request under the Agency's applicable variance regulation, but also to decide the general validity of the variance provision itself under the criteria set out in the Act as interpreted in DuPont. Cf. s 509(b)(1)(E) of the Act, 33 U.S.C. s 1369(b)(1)(E) (review petition concerning "any effluent limitation or other limitation under section 301 of the Act" must be brought within 90 days of promulgation of that limitation). Since our review seeks only to decide whether, in light of the evidence we now have concerning the Agency's interpretation of its variance provision, it is Capable of having the degree of flexibility required by DuPont, our discussion does not foreclose any future explorations of whether, as interpreted hereafter and, particularly, as applied in a particular case, the variance provision has the requisite flexibility.

The limited question before us, therefore, is whether the variance provision included in the 1977 paper industry limitations now under review has a capacity for the degree of flexibility that DuPont deemed crucial to the legality of any general set of industry-wide effluent limitations under the Act. Answering that question requires an examination of the Court's analysis in DuPont.

Prior to that case, the circuits had disagreed over whether the Act even permitted EPA to bind individual point sources with general regulations under section 301 or whether the binding limits were to be set in every case by the permit-issuing agencies with jurisdiction in each of the 50 states. Compare CPC Int'l, Inc. v. Train, 515 F.2d 1032, 1038 (8th Cir. 1975), With, e. g., American Frozen Food Inst., supra. The Supreme Court upheld the Agency's assertion of authority to issue binding, general limitations. It started with the observation that as to the 1983 limitations, section 301 of the Act "leaves no doubt that these (general) limitations are to be set by regulation." DuPont, supra, 430 U.S. at 126, 97 S.Ct. at 974.

Noting, however, that "(d)ifferent language is used in s 301 with respect to the 1977 limitations," Id. at 127, 97 S.Ct. at 9741, See id. at 133-34 n. 24, 97 S.Ct. 965, the Court nonetheless decided that two sets of limitations could be established by the same procedures, "so long as some allowance is made for variations in individual plants" in the 1977 limitations. Id. at 127-28, 97 S.Ct. 965. The Court apparently insisted upon reading a variance requirement into section 301's provisions with respect to the 1977 limitations in order to make those

provisions coextensive with the section's 1983 provisions which do include a variance requirement, section 301(c) and to "unambiguously" invest the Agency with rulemaking authority. 430 U.S. at 127, 97 S.Ct. 965.

The importance that the Court assigned to a meaningful variance as a prerequisite to valid general limitations may be seen first in its use of the mandatory phrase "so long as." Moreover, in the same case the Court unequivocally refused to read a variance requirement into the Act's provisions governing effluent regulations for Newly built plants. 430 U.S. at 137-39, 97 S.Ct. 965. Here the Court found "that Congress intended these regulations to be absolute prohibitions," Id. at 138, 97 S.Ct. at 980 a *1034 **332 finding it did not make with respect to the 1977 limitations despite the Act's failure explicitly to provide for variances therefrom. Finally, the Court emphasized the need for a meaningful variance when it argued that giving EPA the power to set general regulations would not undermine the Act's intent to give the states, through the permit-granting agencies, an important role in administering the Act. The Court subscribed to the view that, by leaving the granting of variances to the state agencies in the first instance, the significance of their role would be preserved. Id. at 134 n. 24, 97 S.Ct. 965, Citing American Meat Inst. v. EPA, 526 F.2d 442, 452 (7th Cir. 1975). Accord, American Paper Inst., supra, 177 U.S.App.D.C. at 190, 543 F.2d at 337. See generally Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 78-87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Because the states can only grant variances that conform to EPA's interpretation of its variance provision, See In re Louisiana-Pacific Corp., supra, the states' role could still be severely undercut if the Agency were to interpret the variance allowance so narrowly as to remove its effect.

The motivating force in DuPont was the Court's desire to overcome the "highly anomalous" result that would attend a reading of section 301 to require a different pattern of promulgation for the 1977 limitations than the one so clearly laid out for the 1983 limitations. Hence, the Act was read, despite its nonparallel language, to establish the same promulgation procedures for both sets of limitations and, accordingly, to require a variance provision under both. At minimum, therefore, DuPont indicates that the Agency must give permittees the ability to secure variances from the 1977 limitations analogous to their statutorily provided ability to secure the same with respect to the 1983 standards.[30]

[30]    This conclusion does not require our full acceptance of the analysis in Appalachian Power Co. v. Train, 545 F.2d 1351, 1359-61, Modified, 545 F.2d 1380 (4th Cir. 1976). There, the Fourth Circuit postulated that because the 1977 limitations were to be less stringent than those in 1983, the variance allowance for the former should be at least as flexible as the one for the latter, which is

AR005421

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

found in s 301(c). Our holding is somewhat different. Noting that the Act reveals quite clearly how the factors relevant to granting a 1983 variance relate to those relevant to drawing up the general 1983 limitations, we insist only that the EPA's application of the 1977 variance allowance bear a similar relationship to the factors the statute deems crucial to the development of the general 1977 limitations.

Section 301(c) of the Act allows a modification of the general 1983 limitations in section 301(b)(2)(A)

> upon a showing . . . that (a variance) (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.[31]

[31]    This provision, in broad outline, coincides with the requirements typical to variance clauses in most local zoning ordinances governing real property. Those clauses generally require "a showing . . . that (1) enforcement of the statute as written would cause to the applicant substantial hardship typical to his land; and (2) the proposed use will not disrupt the general zoning scheme." 6 R. Powell, Real Property P 870 (1977).

The crucial language here appears to be "technology within the Economic capability of the owner." This language clearly harks back to the "best available technology Economically achievable for such category (of point sources)" language in section 301(b)(2)(A) which provides for the establishment of general 1983 limitations.[32] In **1035 **333 other words, section 301(c) (if properly invoked) authorizes the Agency to relieve a particular point source operator from any demands that the Act does not allow the Agency to make of the industry generally. That is to say, it may relieve him from the requirement of using more than the best available technology economically achievable (BATEA). Even the second qualification in section 301(c), that the variance may not halt progress toward eliminating pollution, tracks language in section 301(b)(2)(A) requiring that BATEA "result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants." See note 32 Supra.

[32]    Section 301(b), 33 U.S.C. s 1311(b) states that "there shall be achieved

(2)(A) (not later than July 1, 1983,) effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology, economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section (301 of the Act,) which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section (315 of the Act)), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section (304(b)(2) of the Act,) or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section (307 of the Act.)"

Furthermore, the Act quite explicitly lays out the minimum factors that the Agency must consider in identifying BATEA. Those factors, referred to in section 301(b)(2)(A), are found in section 304(b)(2)(B).[33] As such, it seems clear that in deciding under section 301(c) whether the variance sought by a mill owner "represent(s) the maximum use of technology within the economic capability of (that) owner," the permit-granting agency, and the EPA in supervising that agency, must consider the factors laid out in section 304(b)(2)(B).

[33]    Section 304(b)(2)(B) requires the Agency to specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 301 of the Act to be applicable to any point source (other than publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate(.)

Analogously, the 1977 variance provision must at minimum allow a petitioning mill operator to seek a dispensation from any limitation that, as a whole,

AR005422

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

demands more of him than section 301(b)(1)(A), the 1977 limitation provision, allows EPA to demand of the industry as a whole. Although this formulation ensures a meaningful variance, it should be noted that it is not a license for avoidance of the Act's strict pollution control requirements. It simply allows individual operators to argue, that, given the overall impact of an effluent limitation on their operations, they are faced with Stricter requirements than the Act authorizes EPA to place on the industry as a whole.[34]

[34]  We stress that the variance provision only need apply when the Entire impact of a limitation on an individual mill exceeds that which the EPA is Authorized to place on the industry. Merely proving that one Aspect of the impact, say fuel requirements, is extreme will not necessarily entitle an operator to a variance. He must show instead that when each aspect of the impact on his mill is aggregated, it exceeds the aggregation of impacts that the Agency may place on the industry as a whole.

Moreover, we are not insisting upon a variance requirement that hands out exceptions simply because the impact on the individual is greater than that Actually imposed by EPA on the industry. Instead, the proper referent is the impact that the Agency Could have imposed on the industry under the Act.

More specifically, section 301(b)(1)(A), as interpreted in DuPont, requires "the application of the best practicable control technology currently available" (BPCTCA) for each industrial subcategory. See note 1 Supra. Moreover, it, too, refers to a portion of section 304 that enumerates the factors relevant in setting BPCTCA. Section 304(b)(1)(B); See note 2 Supra. Under DuPont, therefore, a variance provision should allow the state agencies and EPA to excuse mill operators from making more than the maximum use of technology practicably available to them. Pursuant to section 304(b)(1)(B), the outlines of practicability in each case depend upon "the total cost (to the operator) of application of technology in **1036 **334 relation to the effluent reduction benefits to be achieved" by that technology as well as upon "the age of (the mill operator's) equipment . . . the process employed (by him), the engineering aspects of the application (at the mill) of various types of control techniques, process changes (and) non-water quality environmental impact (of the technology specified for his mill) (including energy requirements)." The precise interrelationship of these factors in making variance decisions, moreover, basically should track the scope and interrelationship that we have assigned them in developing the general, industry-wide limitations. See pp. —— - —— of 191 U.S.App.D.C., pp. 1041-1053 of 590 F.2d Infra.

As will be explained more thoroughly Infra, this approach clearly rules out the necessity of considering local receiving water quality in making variance decisions. See In re Louisiana-Pacific, supra ; pp. —— - —— of 191 U.S.App.D.C., pp. 1041-1044 of 590 F.2d Infra. A more difficult question surrounds the relevance and importance of economic hardship. This issue is crucial, of course, because those mill operators who are most hard pressed economically will be the most likely to pursue vigorous variance demands. Moreover, when faced with the ultimate threat of economic hardship plant closure, with attendant unemployment and regional economic dislocation the local permit-granting agency will find it difficult to resist a plea for a variance.

We have explored this issue carefully, and we express our conclusion emphatically: Although the "Total cost " of pollution control at the petitioning mill must be considered under a satisfactory variance provision, it is only relevant "in relation to the effluent reduction benefits to be achieved" at that mill, section 304(b)(1)(B); So long as those costs relative to the pollution reduction gains are not different from those that may be imposed on the industry as a whole, the difficulty, or in fact the inability, of the operator to absorb the costs need not control the variance decision.[35]

[35]  We turn to the legislative history for the definition of "total cost" under s 304(b)(1)(B). It

is meant to include those internal, or plant, costs sustained by the owner or operator and those external costs such as potential unemployment, dislocation, and rural area economic development sustained by the community area, or region.

Legislative History, at 231 (remarks of Rep. Jones explaining Conference Committee Report on the floor of the House). Under this definition, certain economic factors must be considered but they need not be decisive if associated with commensurate pollution-ending gains, and they do not, without more, include the fact that the operator is experiencing difficulty in, or is unable to, absorb the costs.

Before DuPont, this question of the necessary relevance of economic factors in administering a 1977 variance provision under the Act was the subject of debate among the circuits. In Appalachian Power Co. v. Train, 545 F.2d 1351, 1359-60, Modified, 545 F.2d 1380 (4th Cir. 1976), the Fourth Circuit held that all economic factors must be relevant, including, apparently, the "economic capacity of the owner" to absorb costs. Id. at 1359. This conclusion may be somewhat broader than ours and was reached by a different analysis inasmuch as it antedated DuPont. See note 30 Supra. Under that analysis, Appalachian Power rejected a variance provision in regulations limiting electric power company effluents because the provision totally precluded consideration of cost-related factors.

On the other hand, the Tenth Circuit in American Petroleum Inst. v. EPA, 540 F.2d 1023, 1033 (10th Cir.

AR005423

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

1976), Cert. denied, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977), upheld a similar variance provision, concluding that EPA could draw the 1977 variance as narrowly as it wanted (or, presumably, dispense with it altogether) because "Congress did not provide for any 1977 variance." Whatever the validity of this latter view before DuPont, the Supreme Court has now made clear that in order for EPA to retain its desired power under the Act to set binding 1977 limitations on an industry-by-industry basis, its regulations must include a meaningful variance provision. Accordingly, we find the Fourth Circuit's holding on this matter more persuasive.

We reach this conclusion under the statute only after satisfying ourselves that the legislative intent is as clear as the result is harsh. Most prominently, the Act's supporters in both Houses acknowledged and accepted the possibility that its 1977 requirements might cause individual plants to go out of business. E. g., Legislative History, **\*1037** at 231 (remarks of Rep. Jones); Id. at 1282 (remarks of Sen. Bentsen). They self-consciously made the legislative determination that the health and safety gains that achievement of the Act's aspirations would bring to future generations will in some cases outweigh the economic dislocation it causes to the present generation. See American Iron & Steel Inst., supra, 526 F.2d at 1052. They accordingly authorized EPA to impose effluent restrictions that they knew might shut down parts of regulated industries including, specifically, paper mills. See Legislative History, at 718-21 (statement of Rep. Meeds). The Agency, in turn, has projected that its limitations for the paper industry may shut down eight marginal mills, See p. 309 of 191 U.S.App.D.C., p. 1047 of 590 F.2d Infra, and the variance provision need not protect these or other individuals from impacts authorized for the industry as a whole.

Even more specifically, at least one legislator considered and rejected "giving variances to pollution controls based on (such purely) economic grounds" as

(w)hen the otherwise healthy small independent firm is forced to close, the tax base of the community is further weakened, and workers and families are forced back into already congested metropolitan areas . . ..

Legislative History, at 1355 (remarks of Sen. Nelson).

Despite the appeal of economic hardship variances in circumstances such as those described, Senator Nelson argued, they could become "a tool used by powerful political interests to obtain so many exemptions on the flimsiest of pretenses (that) tragic delay in stopping the destruction of our environment" would result. Id. Hence, he opposed such variances and chose to rely on other means of protecting businesses from effluent-control-induced bankruptcy. See id., discussing section 8 of the Act, Amending Small Business Act, s 7, 15 U.S.C. s 636, Now codified in 15 U.S.C. s 636(g) (authorizing low interest loans to aid small businesses in meeting the Act's requirements).[36]

[36]    This same rationale could suggest that Congress rejected the idea of 1977 variances altogether. This interpretation, however, which was first rejected in Natural Resources Defense Council, Inc. v. EPA, 537 F.2d 642, 645-47 (2d Cir. 1976) (EPA has discretion to establish variance provision even though not required to do so by the Act), has now firmly been laid to rest in DuPont, 430 U.S. at 128, 97 S.Ct. 965 (EPA Must establish variance provision to meet requirements of Act).

A somewhat more subtle argument would suggest that even if a variance procedure is a necessity, it need not take any account of economic factors. In addition to the legislative history just cited, this argument could draw support from other congressional statements indicating that the Agency need not undertake a plant-by-plant analysis of the "economic impact of (each) effluent limitation," but only that it must do so "on the basis of classes and categories of point sources." Legislative History at 304 (Conference Report). Accord, id. at 254 (remarks of Rep. Dingell); Id. at 170 (remarks of Sen. Muskie), Quoted in note 52 Infra.

Read in context, however, none of these statements rules out a variance procedure that allows consideration of individual mill costs associated with pollution control. Instead, they simply relieve the Agency, in issuing the general limitations, from the burden of completing a mill-by-mill study of economic effects. In the case of variances, of course, the mill Operator bears the burden of making the requisite showing so that, on the issue of economic impact, as on all others issues, the Agency is not forced to make Any showing. Thus, the Conference Report, after expressly excusing EPA from a "plant by plant determination" of the "economic impact of an effluent limitation," continues:

However, after July 1, 1977, the owner or operator of a plant may seek relief from the requirement to achieve (the 1983) effluent limitations . . .. The burden (to meet the requirements of s 301(c)) is on the owner or operator.

Id. at 304. Although this passage speaks in terms of the 1983 variance procedure in section 301(c), it clearly reveals that while Congress did not intend for EPA, in setting general limitations, to undertake a mill-by-mill economic impact study, it did expect the Agency to

AR005424

Case 2:19-cv-00037-JNP    Document 59-41    Filed 11/30/22    PageID.5893    Page 20 of 78

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

consider those undertaken by individual variance applicants. Under DuPont, this same approach is also appropriate to the 1977 variance.

We come, then, to the question of whether the actual variance provision included in the Phase II paper industry limitations, as interpreted, is capable of the minimum degree of flexibility just described. **1038 **335 **336** [37] That provision notes that the EPA was at pains to account for all available data "such as age and size of plant . . . energy requirements and Costs " relevant to effluent levels but acknowledges the inevitable possibility "that data which would affect these limitations" have not been considered (emphasis added). It accordingly allows a discharger to secure a permit containing less stringent limitations than those established by the EPA, if the discharger can show "that factors related to the equipment or facilities involved, the process applied, or Other such factors related to such discharger are Fundamentally different from the factors considered in the establishment of the guidelines (emphasis added).

[37] An identical variance provision is appended to each set of limitations for each of the 16 subcategories of the bleached paper industry. That provision, See, e. g., 42 Fed.Reg. 1402 (1977), provides as follows:

In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the (permit-granting agency) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. . . . If such fundamentally different factors are found to exist, the (permit-granting agency) should establish for the discharger effluent limitations in the . . . permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency.

Not surprisingly, EPA's likely interpretation of these terms, and particularly the parts of it italicized above,

have occasioned some dispute. The Agency itself at one point accepted public comments on this type of 1977 variance under the Act, looking toward a regulation definitively interpreting it. 39 Fed.Reg. 28926 (1974). No such regulation has been forthcoming, however.

Nonetheless, in 1974, the Agency's General Counsel instructed Agency personnel that the "other such factors" language in the typical 1977 variance provision quoted above did not envision the consideration of any Economic Factors. He accordingly limited the provision's application to cases involving fundamentally different "factors of a Technical and Engineering nature." Memorandum to Regional Administrators of EPA, 39 Fed.Reg. 30073 (1974) (emphasis added). It was this interpretation that the Fourth Circuit disapproved of in Appalachian Power Co., supra, discussed in notes 30 & 35 Supra. Because the General Counsel's 1974 opinion relied exclusively on Congress's failure to include a variance procedure for the 1977 limitations we, too, would be inclined to find the opinion inconsistent with the Act, as now authoritatively interpreted in DuPont to include a meaningful variance requirement. See Currie, Congress, The Court, and Water Pollution, 1977 S.Ct.Rev. 39, 53-56. Nonetheless, we need not reach that question in light of the Agency's recent reinterpretation and expansion of the variance provision.

As of September 13, 1977, when EPA filed its brief in this case, the Agency still adhered to its 1974 interpretation of the variance provision to exclude consideration of economic factors. Brief for Respondent at 17-20. Moreover, that brief suggested that the provision's "fundamental difference" language required that the applicant demonstrate a Qualitatively different factor than any considered by the Agency in its rulemaking before a variance could be granted. Id. at 12-17. That is to say, if the Agency had considered data relevant, for example, to climate, or to energy needs for sludge disposal, the brief indicated that no variance based on those factors could subsequently issue, even if the climate or energy situation facing the applicant was Quantitatively different from the range of such situations considered by the Agency.

**1039 **337** Nonetheless, two days after the brief was filed in this case, the Administrator of the EPA handed down a decision in In re Louisiana-Pacific, supra, which seems significantly to have liberalized the Agency's approach to the variance provision.[38] In essence, this decision tracked the analysis in DuPont and thereby expanded the range of factors recognized by EPA as relevant to the granting of a variance to include All of those factors listed in section 304(b)(1)(B):

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

38    The catalyst for the change is not explained, although we might surmise that the successive decisions in Appalachian Power and DuPont impressed the Agency with the importance the courts attach to a meaningful variance provision. See In re Louisiana-Pacific, 10 E.R.C. 1841, 1852 n. 27 (1977), Citing and harmonizing Appalachian Power Co. v. Train, 545 F.2d 1351, 1360 n. 23, Modified, 545 F.2d 1380 (4th Cir. 1976). In any case, on oral argument of this case, counsel for the Agency basically adhered to the Administrator's analysis in Louisiana-Pacific, stressing only that, in his understanding, EPA did not consider relevant an individual operator's ability to absorb the cost of pollution controls.

My authority to provide for variances from (BPCTCA) flows from, and is inherent in, my authority to promulgate effluent limitations guidelines under Sections 301(b)(1)(A) and 304(b)(1) . . .. Variances can only be based on fundamental differences in factors which are appropriate to (the general) technology-based regulations and limitations derived through the variance process must still meet the congressional definition of best practicable control technology.

. . . . This does not mean that where a fundamental difference can be shown with respect to a factor other than (one not listed in section 304(b)(1)) a variance may not be appropriate.

Id. at 1851. See also id. at 1847 (describing section 304(b) of the Act as the source of "factors which must be taken into account in developing (the general) industrial effluent limitations . . . .").

Consistent with his reliance on section 304(b), the Administrator clearly broke with the 1974 opinion of the General Counsel and cited such nontechnical factors relevant to the 1977 variances as energy requirements, Id. at 1851, raw materials, Id. at 1846 n. 9, non-water quality environmental impacts, such as land and air pollution from sludge disposal or burning, Id. at 1850-51 & n. 22, 1852-53 & n. 30, and even such economic factors as compliance costs, Id. at 1051-52 & n. 27.[39] As a matter of the potentially relevant factors, therefore, the Agency's interpretation has been brought into line with what we believe are the dictates of DuPont, and on that score we find the variance clause capable of the requisite minimum degree of flexibility.

39    With respect to cost, the Administrator stressed that the variance analysis would not be based on a "detailed cost-benefit analysis at the permit granting stage" but instead turns on "cost differentials of the particular point source" in relation to EPA's projected industry-wide costs. 10 E.R.C. at 1852 n. 27, Quoting Appalachian Power Co. v. Train, 545 F.2d 1351, 1360, n. 23, Modified, 545 F.2d 1380 (4th Cir. 1976).

It is worthy of note that while EPA's brief in this case largely toes the Agency's earlier line, See pp. 48-49 Supra, at one point it states that "(t)he variance clause was inserted in the (1977) regulations to allow for limited reconsideration of the section 304(b) factors for plants in unique circumstances." Brief for Respondents, at 46-47. This interpretation of the clause adheres to the Administrator's in Louisiana-Pacific and fortifies our view that, as presently interpreted, the variance has the flexibility necessary to allow EPA promulgation of generally applicable 1977 regulations.

The Louisiana-Pacific decision also clarifies the Agency's position with respect to the meaning of the "fundamentally different" language in the variance clause. First, it makes clear that, if an individual operator demonstrates a "substantial( )" Id. at 1851, or "fundamental" difference in a section 304(b)(1)(B) factor vis-a-vis the Agency's regulatory findings about the factor "on a national basis," a variance will be allowed. Id. at 1851 n. 25, 1852-53. Since EPA must, and claims that it did, consider all of the section 304(b)(1)(B) factors in setting the general limitations, the Administrator's decision indicates that factors already considered during rulemaking can, and in fact must, be considered during variance proceedings, so long as the requisite **1040 **338 difference is shown. Here again, the degree of flexibility necessary to justify EPA in setting general 1977 limitations is achieved, and variances are not restricted to qualitatively different circumstances from those considered by EPA during rulemaking.

The remaining question, therefore, concerns the requirement that the difference between the individual and national situations (whether qualitative or quantitative) is fundamental. None of the petitioners in this case takes issue with the "fundamental difference" language so long as it is not used to preclude consideration of any of the section 304(b)(1)(B) factors. Petitioners realize that such a requirement, along with the allocation of the burden of proof to the variance applicant, assures that the pin-hole safety valve envisioned in the Act and DuPont does not become a yawning loophole. E. g., Joint Brief for Petitioners Addressing Common Issues, at 24.

We agree with the parties to these petitions that the fundamentality requirement does not deprive the variance provision before us of the minimum potential for flexibility required by DuPont. Although the variance

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

must prevent the regulations from having a greater overall impact on an individual mill than the Act authorizes the general regulations to have on the industry, the one designed by EPA for use in its industry-wide limitations for 1977 accomplishes this goal. Because EPA, in devising the limitations, undertook a meticulous effort to obtain all relevant information from all available sources including the industry itself, and attempted to account for that information in all its diversity, the Agency has built a significant degree of flexibility into the regulations themselves. This flexibility is reflected in the 16 subcategories and 66 subdivisions thereof, as well as in the establishment of maximum single-day, and 30-day-average, limits that are much higher than the yearly-average limits that the Agency has found within the technological reach of the industry.

Thus, to a great degree, the Agency has accounted for cross-industry, and even "cross-subcategory," differences in establishing the limits. Allowing for variances based on slight or moderate differentials at individual plants would accordingly ignore the liberality that is already built into the system. It would allow for variances, when the impact on an individual did not exceed the range of impacts considered by the Agency for the industry generally.

Moreover, without the fundamentality requirement the rulemaking process could be shortcircuited. As discussed earlier, Congress has placed EPA under the burden of almost instantaneously establishing comprehensive regulations aimed at achieving a monumental goal. That effort must proceed in advance of the availability of much relevant data. If the regulations could be ignored every time a mill owner who did not produce data from his operation during rulemaking suddenly develops the facts and finds them somewhat different from the ones available to the Agency, the achievement of the congressional goals would be pushed far beyond the time periods established in the Act.

Finally, the Agency, without destroying the necessary flexibility, may insist upon a fundamental difference as to one or even several individual factors, in order to account for the fact that each limit is the product of consideration of myriad factors, each of which may be expected to vary from plant to plant. As noted earlier, a variance only need be granted when the Overall situation facing an individual operator differs from the overall situation of the industry. See note 34 Supra and accompanying text. The Agency has properly adopted an approach that focuses on only one or a few of the relevant factors but sets a high differential standard therefor in order to relieve itself of having to analyze all of the relevant factors in every variance case to achieve the Overall differential picture.

In sum, the most recent delineation by the Agency of its 1977 variance policy under the Act convinces us that its policy is Capable of sufficient flexibility to buttress its claim of authority to limit 1977 effluent **1041 ***339 discharges by way of general regulations. We emphasize, once more, however, that this conclusion is inextricably linked to the Agency's current interpretation of its variance provision, and that, while crucial to our affirmance of the regulations as a whole, it implies no opinion on the specifics of individual variance applications.

### B.

EPA's consideration of the factors bearing on "the best practicable technology currently available" (BPCTCA) has inspired several challenges from petitioners. Some of these challenges concern the Agency's refusal to consider receiving water quality, while others concern EPA's manner of assessing the factors that all agree must be considered: cost and nonwater environmental impacts. We uphold the Agency's interpretation and application of the statute against both sets of challenges.

### 1.

Some of the paper mills that must meet the effluent limitations under review discharge their effluents into the Pacific Ocean. Petitioners contend that the ocean can dilute or naturally treat effluent, and that EPA must take this capacity of the ocean ("receiving water capacity") into account in a variety of ways.[40] They urge what they term "common sense," I. e., that because the amounts of pollutant involved are small in comparison to bodies of water as vast as Puget Sound or the Pacific Ocean, they should not have to spend heavily on treatment equipment, or to increase their energy requirements and sludge levels, in order to treat wastes that the ocean could dilute or absorb.[41]

[40]    See note 6 Supra. Some petitioners contend that EPA should have taken receiving water capacity into account in setting pollutant parameters. They argue that the Agency should not have considered BOD as such a parameter because the ocean has so much dissolved oxygen that wastes with high BOD have negligible impact and that it should not have considered pH as a parameter because ocean salts buffer waste acidity.

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

Other petitioners contend that EPA should have taken receiving water capacity into account in subcategorization. They argue that ocean-discharging plants are in a wholly different stance from other plants and should be in a separate subcategory. It is also urged that EPA should be forced to give variances for ocean-discharging plants. Finally, the argument for taking receiving water capacity into account is sometimes couched in terms of an environmental balancing test: since there is no environmental "credit" for preventing discharges that the oceans could treat, and there is an environmental "debit" for the air pollution and sludge disposal problems incident to treatment, the balance should tilt in favor of ocean-discharging plants. We regard all the contentions as equivalent in their crucial component that Congress intended to let EPA take receiving water capacity into account.

[41]   Apart from this simple "common sense" version of the argument, there is a more sophisticated economic version called the "optimal pollution" theory. This economic theory contends that there is a level or type of pollution that, while technologically capable of being controlled, is uneconomic to treat because the benefit from treatment is small and the cost of treatment is large. See generally W. Baxter, People or Penguins: The Case for Optimal Pollution (1974); B. Ackerman, S. Rose-Ackerman, J. Sawyer & D. Henderson, The Uncertain Search for Environmental Quality (1974). These economic theories are premised on a view that we have both adequate information about the effects of pollution to set an optimal test, and adequate political and administrative flexibility to keep polluters at that level once we allow any pollution to go untreated. As discussed in this section, it appears that Congress doubted these premises.

EPA's secondary response to this claim was that pollution is far from harmless, even when disposed of in the largest bodies of water. As congressional testimony indicated, the Great Lakes, Puget Sound, and even areas of the Atlantic Ocean have been seriously injured by water pollution.[42] Even if the ocean can handle ordinary wastes, ocean life may be vulnerable to toxic compounds that typically accompany those wastes.[43] In the main, however, EPA simply asserted that the issue of receiving water capacity could not be raised in setting effluent limitations because Congress **1042 **340 had ruled it out. We have examined the previous legislation in this area, and the 1972 Act's wording, legislative history, and policies, as underscored by its 1977 amendments. These sources, which were thoroughly analyzed in a recent opinion of the administrator of the Agency, fully support EPA's construction of the Act.[44] They make clear that

based on long experience, and aware of the limits of technological knowledge and administrative flexibility, Congress made the deliberate decision to rule out arguments based on receiving water capacity.

[42]   See, e. g., Legislative History, at 493-94 (Great Lakes); Id. at 133 (Atlantic Ocean), Id. at 500 (Atlantic Ocean); Id. at 718-23 (Puget Sound).

[43]   See note 6 Supra.

[44]   See In re Louisiana-Pacific Corp., 10 E.R.C. 1841 (1977). This opinion exhaustively discusses the Act's legislative history. Rather than repeat that discussion here, we have taken a step back and looked at the issue in its broad context.

The earliest version of the Federal Water Pollution Control Act was passed in 1948 and amended five times before 1972. Throughout that 24 year period, Congress attempted to use receiving water quality as a basis for setting pollution standards. W. Rodgers, Environmental Law 355-57 (1977). At the end of that period, Congress realized not only that its water pollution efforts until then had failed, but also that reliance on receiving water capacity as a crucial test for permissible pollution levels had contributed greatly to that failure. EPA v. State Water Resources Control Board, 426 U.S. 200, 202, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).[45]

[45]   Only one violator of the water quality regulatory acts was brought to court in the first 22 years of regulation. Note, Supra note 3, at 985. This period of regulation, and the causes of its failure have been canvassed thoroughly. See D. Zwick, Water Wasteland (1971); Parentau & Tauman, The Effluent Limitations Controversy, 6 Ecology L.Q. 1, 8-12 (1976); Note, Supra note 3, at 984-87.

Based on this experience, Congress adopted a new approach in 1972. Under the Act, "a discharger's performance is . . . measured against strict technology-based effluent limitations specified levels of treatment to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform." Id. at 204-05, 96 S.Ct. at 2024 (footnotes omitted). See Save the Bay, Inc. v. EPA, 556 F.2d 1282, 1284 (5th Cir. 1977); American Frozen Foods Inst., supra, 176 U.S.App.D.C. at 113, 539 F.2d at 115.

AR005428

This new approach reflected developing views on practicality and rights. Congress concluded that water pollution seriously harmed the environment, and that although the cost of control would be heavy, the nation would benefit from controlling that pollution. Yet scientific uncertainties made it difficult to assess the benefits to particular bodies of receiving water. Even if the federal government eventually could succeed at the task at which had failed for 24 years and thus could determine benefits and devise water quality standards, Congress concluded that the requisite further delay was too long for the nation to wait. Note, The Federal Water Pollution Control Act Amendments of 1972: Ambiguity as A Control Device, 10 Harv.J.Legis. 565, 571-72 (1973).

Moreover, by eliminating the issue of the capacity of particular bodies of receiving water, Congress made nationwide uniformity in effluent regulation possible. Congress considered uniformity vital to free the states from the temptation of relaxing local limitations in order to woo or keep industrial facilities.[46] In addition, national uniformity made pollution clean-up possible without engaging in the divisive task of favoring some regions of the country over others.

[46]   "(T)he greatest political barrier to effective pollution control is the threat by industrial polluters to move their factories out of any State that seriously tries to protect its environment." Legislative History, at 577 (remarks of Rep. Reuss). "Varying local revenue capabilities, economic pressures, and citizen interest have often stagnated community and State initiative." Id. at 156 (remarks of EPA Administrator Ruckelshaus). See American Frozen Food Inst. v. Train, 176 U.S.App.D.C. 105, 127, 539 F.2d 107, 129 (1976).

**\*1043 \*\*341** More fundamentally, the new approach implemented changing views as to the relative rights of the public and of industrial polluters. Hitherto, the right of the polluter was pre-eminent, unless the damage caused by pollution could be proven. Henceforth, the right of the public to a clean environment would be pre-eminent, unless pollution treatment was impractical or unachievable. The Senate Committee declared that "(t)he use of any river, lake, stream or ocean as a waste treatment system is unacceptable" regardless of the measurable impact of the waste on the body of water in question. Legislative History at 1425 (Senate Report). The Conference Report stated that the Act "specifically bans pollution dilution as an alternative to waste treatment." Id. at 284. This new view of relative rights was based in part on the hard-nosed assessment of our scientific ignorance: "we know so little about the ultimate

consequences of injection of new matter into water that (the Act requires) a presumption of pollution. . . ." Id. at 1332 (remarks of Sen. Buckley). It also was based on the widely shared conviction that the nation's quality of life depended on its natural bounty, and that it was worth incurring heavy cost to preserve that bounty for future generations.

The Act reflects the new approach in a number of provisions. As noted, its goal was Zero discharge of pollutants by 1985, section 101(a)(1), 33 U.S.C. s 1251(a)(1), Not discharges at acceptable or tolerable levels for receiving water. The rest of the statute "authorize(s) a series of steps to be taken to achieve (that) goal," DuPont, supra, 430 U.S. at 116, 97 S.Ct. at 969. It defines "pollution," "pollutant," "discharge of a pollutant," and "effluent limitation" in terms of any addition to water that alters its "chemical, physical, biological, (or) radiological integrity;" it does not specify additions that diminish the quality of the receiving water.[47] In only one limited instance, thermal pollution, is receiving water capacity to be considered in relaxing standards, and the section allowing such consideration was drafted as a clear exception. Section 316(a) of the Act, 33 U.S.C. s 1326(a). Otherwise, receiving water quality was to be considered only in setting "More stringent" standards than effluent limitations otherwise would prescribe. Section 301(b)(1)(C) of the Act, 33 U.S.C. s 1311(b)(1)(C) (emphasis added).

[47]   Section 502(6), (12), (19) of the Act, 33 U.S.C. s 1362(6), (12), (19). Under these definitions, each pollutant parameter is generic for an industry rather than specific to a site of pollution. Furthermore, EPA need only be satisfied that the alleged pollutant affects the "integrity" of water, not that it Harms it. FMC Corp. v. Train, 539 F.2d 973, 983 (4th Cir. 1976).

The Act was passed with an expectation of "mid-course corrections," Legislative History, at 175 (statement of Sen. Muskie), and in 1977 Congress amended the Act, although generally holding to the same tack set five years earlier. Pub.L. No. 95-217, 91 Stat. 1584. Notably, during those five years, representatives of the paper industry had appeared before Congress and urged it to Change the Act and to incorporate receiving water capacity as a consideration. See, e. g., Hearings before the Subcomm. on Environmental Pollution of the Senate Comm. on Environment and Public Works, 95th Cong., 1st Sess., pt. 3, at 193, 195, 540. Nonetheless, Congress was satisfied with this element of the statutory scheme. Except for a provision specifically aimed at discharges from "publicly owned treatment plants," section 301(h) of the Act, 33 U.S.C. s 1311(h),[48] it resolved in the recent amendments **\*1044 \*\*342** to continue regulating discharges into all

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

receiving waters alike.[49]

[48]    The 1977 amendment for publicly-owned treatment plants actually emphasizes Congress' reluctance to allow discharge into the ocean as a substitute for treatment. It spells out eight distinct factors that a publicly owned treatment facility must demonstrate to receive a permit that raises its allowable pollution levels based on water quality. Congress felt that publicly owned facilities deserved special treatment not accorded industrial facilities because of the practical difficulties facing the former. While 90% Of the major industrial dischargers will meet the 1977 requirements of the Act, S.Rep. No. 370, 95th Cong., 1st Sess. 7, Reprinted in (1977) U.S.Code Cong. & Admin.News, pp. 4326, 4333, only 50% Of municipal dischargers will do so. It would be highly anomalous for Congress to recognize the special needs of these public polluters by giving them this carefully narrowed right to relaxed limitations based on receiving water capacity and on an 8-factor test, if all other polluters had an unconditional right to laxer treatment based on receiving water capacity. See also H.Rep. No. 830, 95th Cong., 1st Sess. 113, Reprinted in (1977) U.S.Code Cong. & Admin.News, pp. 4424, 4487 (EPA directed to study whether "rum distillers might safely dispose of certain natural wastes untreated in the marine environment").

[49]    Further support for this interpretation may be found in section 304 of the Act. This provision requires EPA in setting limitations to balance cost and "effluent reduction benefits." Although the section specifies other factors to be considered as well, none relates to the effect of regulation on the treated or receiving waters. The phrase "effluent reduction benefits" avoids any suggestion that receiving water quality is an issue. Effluent reduction occurs whenever less effluent is discharged, I. e., whenever a plant treats its wastes before discharge, and the same degree of reduction occurs whether the discharge is into a small stream or the Pacific Ocean.

Our experience with litigation under the Act, and particularly with this case, emphasizes the weight of Congress' policies. Even without receiving water capacity as an issue to delay it, EPA was late in promulgating these regulations. See pp. —— - —— of —- U.S.App.D.C., pp. 1020-1024 of 590 F.2d Supra. We have wrestled with the problems of weighing technological imponderables and can understand the greater difficulties that would have arisen if the receiving water issues involving even greater imponderables had also been involved. Historically, the paper industry itself, and particularly the sulfite process sector, avoided the impact of regulation because of the difficulty of proving that its discharges adversely affected receiving water.[50]

[50]    See Legislative History, supra at 1255 (remarks of Sen. Muskie) (criticizing "useless two million dollar studies proving that sulfite waste liquor harms oysters"); Council on Economic Priorities, Supra note 9, at 40. Under the pre-1970's legislation, federal pollution regulation relied principally but unsuccessfully on the "conference" with polluters. Of the 50 federal water pollution abatement conferences held by 1971, 15 directly involved pulp and paper mills. Twenty-eight of the 50 conferences, including several involving the paper industry, failed to produce satisfactory improvement. Id.

Under the new statutory scheme, Congress clearly intended us to avoid such problems of proof so that a set of regulations with enforceable impact is possible. The dangers of ignoring this congressional mandate are clearly revealed by the one experiment in the Act with allowing consideration of receiving water capacity. As we have noted, thermal pollution regulation is the only area where the 1972 Act explicitly allowed receiving water capacity to continue as an issue. In reviewing the results of that experiment during consideration of the recent amendments to the Act, Congress found that the water capacity issue had led to a regulatory breakdown. "Heat has thus become an unregulated pollutant, clearly not the intent of the Congress. . . . That limited exemption has been turned into a gaping loophole." S.Rep. No. 370, 95th Cong., 1st Sess. 8, Reprinted in (1977) U.S.Code Cong. & Admin.News, pp. 4326, 4334. Given the clarity of Congress' desire not to allow the receiving water capacity loophole to engulf its overall regulatory efforts in this area, we affirm the Agency's refusal to consider water quality in setting its limitations.

2.

Petitioners also challenge EPA's manner of assessing two factors that all parties agree must be considered: cost and non-water quality environmental impacts. They contend that the Agency should have more carefully balanced costs versus the effluent reduction benefits of the regulations, and that it should have also balanced those benefits against the non-water quality environmental impacts to arrive at a "net" environmental benefit conclusion. Petitioners base their arguments on certain comments made by the Conferees for the Act, See notes 52 & 67 Infra, and on the fact that the Act lists non-water quality environmental impacts as a factor the Agency

AR005430

  
Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

must "take into account."

**\*1045 \*\*343** In order to discuss petitioners' challenges, we must first identify the relevant statutory standard. Section 304(b)(1)(B) of the Act, 33 U.S.C. s 1314(b)(1)(B), identifies the factors bearing on BPCTCA in two groups.[51] First, the factors shall

[51]    Although its meaning is clear, this section's diction is confusing. In substance, it states that "(F )Actors " relating to BPTCA (a) "shall include consideration" of cost and benefit and (b) shall "Take into account" other specified and unspecified "Factors " (emphasis added).

include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application,

and second, they

shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate(.)

See note 2 Supra.

 The first group consists of two factors that EPA must compare: total cost versus effluent reduction benefits. We shall call these the "comparison factors." The other group is a list of many factors that EPA must "take into account:" age, process, engineering aspects, process changes, environmental impacts (including energy), and any others EPA deems appropriate. We shall call these the "consideration factors." Notably, section 304(b)(2)(B) of the Act, 33 U.S.C. s 1314(b)(2)(B), which delineates the factors relevant to setting 1983 BATEA limitations, tracks the 1977 BPCTCA provision before us except in one regard: in the 1983 section, All factors, including costs and benefits, are consideration factors, and no factors are separated out for comparison.

Based on our examination of the statutory language and the legislative history, we conclude that Congress mandated a particular structure and weight for the 1977

comparison factors, that is to say, a "limited" balancing test.[52] In contrast, Congress did not mandate any particular structure or weight for the many consideration factors. Rather, it left EPA with discretion to decide how to account for the consideration factors, and how much weight to give each factor. In response to these divergent congressional approaches, we conclude that, on the one hand, we should examine EPA's treatment of cost and benefit under the 1977 standard to assure that the Agency complied with Congress' "limited" balancing directive. See note 52 Supra. On the other hand, our scrutiny of the Agency's treatment of the several consideration factors seeks to assure that the Agency informed itself as to their magnitude, and reached its own express and considered conclusion about their bearing. More particularly, we do not believe that EPA is required to use any specific structure such as a balancing test in assessing the consideration factors, nor do we believe that EPA is required to give each consideration factor any specific weight.

[52]    Senator Muskie described the "limited" balancing test:
        The modification of subsection 304(b)(1) is intended to clarify what is meant by the term "practicable". The balancing test between total cost and effluent reduction benefits is intended to limit the application of technology only where the additional degree of effluent reduction is Wholly out of proportion to the costs of achieving such marginal level of reduction for any class or category of sources.
        The Conferees agreed upon this limited cost-benefit analysis in order to maintain uniformity within a class and category of point sources subject to effluent limitations, and to avoid imposing on the Administrator any requirement to consider the location of sources within a category or to ascertain water quality impact of effluent controls, or to determine the economic impact of controls on any individual plant in a single community.
        Legislative History, at 170 (emphasis added).

Our conclusions are based initially on the section's wording and apparent logic. By singling out two factors (the comparison factors) for separate treatment, and by requiring that they be considered "in relation to" each other, Congress elevated them to a **\*1046 \*\*344** level of greater attention and rigor. Moreover, the comparison factors are a closed set of two, making it possible to have a definite structure and weight in considering them and preventing extraneous factors from intruding on the balance.

By contrast, the statute directs the Agency only to "take into account" the consideration factors, without prescribing any structure for EPA's deliberations. As to

AR005431

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

this latter group of factors, the section cannot logically be interpreted to impose on EPA a specific structure of consideration or set of weights because it gave EPA authority to "upset" any such structure by exercising its discretion to add new factors to the mix. Instead, the listing of factors seems aimed at noting all of the matters that Congress considered worthy of study before making limitation decisions, without preventing EPA from identifying other factors that it considers worthy of study. So long as EPA pays some attention to the congressionally specified factors, the section on its face lets EPA relate the various factors as it deems necessary.

The legislative history reveals that clear congressional policies support the section's facial structure. The original House and Senate versions of the section differed significantly. A major point of contention between the two versions involved the House's stronger concern over the economic effects of imposing stringent effluent limitations. Ultimately a compromise was reached at Conference and accepted by both houses. It provided, first, that the Agency must use "limited" cost-benefit balancing in deriving 1977 standards, but not in arriving at the 1983 standards. Legislative History, at 170 (statement of Sen. Muskie). A "mid-course" evaluation was then to occur in the mid- to late-1970's, after the Act had been in effect for several years but before full implementation of the 1983 standards. Id. at 175. The latter step was designed to allow Congress to rewrite the 1983 standards in order to continue the cost-benefit balancing during that period as well, if Congress found after early experience that such a course was necessary. Section 315 of the Act, 33 U.S.C. s 1325 (establishing a National Study Commission to consider mid-course changes).

Thus the fact that Congress indicated its greater concern for cost-benefit calculation in the short run by making cost and benefit "comparison factors" for 1977, but only "consideration factors" for 1983, demonstrates the more relaxed view it took of EPA's treatment of consideration factors relevant to both the 1977 and 1983 standards. Indeed, after studying the need for mid-course correction, Congress decided to retain the 1972 arrangement, which, except for limited modifications not germane here, gives the Agency more complete discretion in considering the relevant factors in the future.[53]

[53]    When the mid-course study by the National Study Commission was completed and congressional hearings were held, Congress concluded that "(l)ittle contained in the study of the Commission could be construed as justifying major change in the direction established in 1972. . . . With respect to the industrial program (which includes the regulations at issue in this case), the committee recognizes and applauds the significant success that most of the Nation's major industries have

attained." S.Rep. No. 370, 95th Cong., 1st Sess. 1, Reprinted in (1977) U.S.Code Cong. & Admin.News pp. 4326, 4327. Accordingly, the 1977 amendments did not change the factors involved in s 304(b)(2), 33 U.S.C.A. s 1314(b)(2) (1977).

Judicial decisions have carefully observed that the cost and benefit factors require more rigorous EPA consideration of cost versus benefit in the 1977 standards than in the 1983 standards. American Paper Inst., supra, 177 U.S.App.D.C. at 191, 543 F.2d at 338 (cost-benefit balancing in 1977, not in 1983); Accord American Frozen Food Inst., supra, 176 U.S.App.D.C. at 117, 539 F.2d at 119; American Meat Inst., supra, 526 F.2d at 462-63; See W. Rodgers, Supra at 466. But see Appalachian Power Co., supra, 545 F.2d at 1361, Criticized in La Pierre, supra, 62 Iowa L.Rev. at 819-20. Since the consideration factors specified in the 1977 provision track the language of all of the factors including cost and benefit in the 1983 provision, these cases support a lower level of administrative rigor and judicial review with respect to the 1977 consideration **1047** **345** factors than with respect to the costs and benefit factors relevant to that year's limitations. We are fortified in this view by its coincidence with the Agency's interpretation. As the Supreme Court held last year, the EPA's construction of this Act is entitled to some deference. DuPont, supra, 430 U.S. at 134-35, 97 S.Ct. 965.

Consequently, we must review the comparison factors to determine if EPA weighed them through the "limited" balancing test as intended by Congress. On the other hand, we may review the consideration factors only to determine if EPA was fully aware of them and reached its own express conclusions about them. Since the two types of factors are separate, we divide our discussion accordingly.

a.

Petitioners do not challenge the cost-benefit analysis for the whole industry. They do, however, challenge the analysis for the sulfite sector, contending that EPA used an "overall" instead of an "incremental" method of balancing, and that its figures on the cost of BPCTCA for the dissolving sulfite subcategory were underestimates. We uphold EPA's determination against both contentions.

AR005432

EPA's approach was similar to the one we upheld in American Paper Inst., supra, 177 U.S.App.D.C. at 191-92, 543 F.2d at 338-39. The Agency assessed the costs of internal and external effluent treatment measures, not only for the industry, but also for each subcategory. This included a separate cost assessment for the sulfite subcategories. App. 2380-83. An economic analysis was prepared to determine the impact of the costs on the industry. App. 1211-448. It found that the industry as a whole would readily absorb the cost of compliance with the 1977 standards, estimated at.$1.6 billion. Out of 270 mills employing 120,000 people, eight mills would likely be closed and 1800 people laid off. The Agency noted that the impact on the three heavily polluting sulfite subcategories would be the greatest. Of less than 30 sulfite mills, three would probably close, resulting in 550 people being laid off.

Against these costs, EPA balanced the main effluent reduction benefit: overall 5,000 fewer tons per day of BOD discharged into the nation's waters.[54] EPA refined this balance by calculating the cost per pound of BOD removed for each subcategory. App. 2478-79. Although sulfite mills must make large investments in waste treatment facilities, the cost-benefit balance is favorable for the limitations on these mills, because of the large volume of waste they produce and thus the greater treatment efficiency. See note 8 Supra.

[54]    Besides the main benefit of reduced BOD, there were also benefits from reduced TSS and more neutral pH. Petitioners do not challenge EPA's manner of balancing cost versus these other benefits.

Petitioners' first contention is that EPA not only should have calculated the overall cost-benefit balance, but also should have made an "incremental" calculation of that balance. More precisely, they contend that EPA must undertake to measure the costs and benefits of each additional increment of waste treatment control, from bare minimum up to complete pollution removal. In support of this contention, they point to Senator Muskie's description of cost-benefit balancing, which suggests a focus on the "additional degree" or "marginal" amount of effluent reduction. See note 52 Supra. Petitioners concede that we accepted EPA's calculation of the overall cost-benefit balance, without any further marginal or incremental analysis, in American Paper Inst., supra, 177 U.S.App.D.C. at 191, 543 F.2d at 338. Nonetheless, they suggest that the present case can be distinguished, because in these proceedings, unlike in American Paper Inst., industry representatives submitted an incremental breakdown of costs and benefits to the Agency.[55]

[55]    Petitioners provided EPA with a graph showing the cost

per pound of BOD removed for each increment of waste treatment. The starting point was the cost of a minimal level of treatment: primary treatment (sedimentation) plus SSL recovery. See pp. ——— - ——— of 191 U.S.App.D.C., pp. 1022-1024 of 590 F.2d Supra. Successive increments showed the cost of secondary or biological treatment of each of a series of increasingly dilute waste solutions: hot caustic extract, evaporator condensate, unbleached white water and fines, and the remaining waste solutions. As one would expect from the law of diminishing returns, each successive increment of waste treatment was less cost efficient. The first steps treated a pound of BOD most cheaply; each successive step removed a pound of BOD in a more costly manner than the previous step.

**\*1048  \*\*346** The failure of American Paper Inst. to require EPA to perform its own incremental analysis is justified for a number of reasons beyond some oversight on the part of paper industry petitioners in that case. While EPA has no discretion to avoid cost-benefit balancing for its 1977 standards, it does have some discretion to decide how it will perform the cost-benefit balancing task. "(E)ven with th(e) 1977 standard, the cost of compliance was not a factor to be given primary importance," American Iron & Steel Inst., supra, 526 F.2d at 1051, and, as such, cost need not be balanced against benefits with pinpoint precision. A requirement that EPA perform the elaborate task of calculating incremental balances would bog the Agency down in burdensome proceedings on a relatively subsidiary task. Hence, the Agency need not on its own undertake more than a net cost-benefit balancing to fulfill its obligation under section 304.

However, when an incremental analysis has been performed by industry and submitted to EPA, it is worthy of scrutiny by the Agency, for it may "avoid the risk of hidden imbalances between cost and benefit." Id. at 1076 n. 19 (Adams, J., concurring). If such a "hidden imbalance" were revealed here, and if the Agency had ignored it, we might remand for further consideration. But in this case the incremental analysis proffered by industry showed that the last and most expensive increment of BOD treated in sulfite mills cost less than $.15 per pound of BOD removed, which is below the average cost of treatment in most of the industry's subcategories. App. 3545-51B. See note 8 Supra. We would be reluctant to find that EPA had ignored a "hidden imbalance" when the most unfavorable incremental cost-benefit balance that is challenged falls well within the range of averages for the industry as a whole.[56]

[56]    One petitioner urges that we remand on the basis of a different incremental analysis for one mill (the Scott

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)
11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

Everett mill). The analysis shows that the last increment of treatment at that mill costs $.65 per pound of BOD removed. The record support for this assertion consists of extracts from testimony at a State of Washington effluent permit hearing on the mill. EPA notes in its brief, without contradiction from petitioners, that the Washington testimony "which occupies almost four thousand pages in the record (Rec. at 41609-45596), was submitted to EPA with a brief cover letter explaining that Scott Paper Company believed it relevant to the rulemaking. Until cited in their brief, the particular items of information now relied upon so heavily by petitioners were never specifically brought to the Agency's attention." Brief for Respondents at 72 n. 125. Generally, we are reluctant to consider matter presented to EPA in bulk without meaningful explanation of its significance. Such presentation certainly does not aid, and may well impede, the process of notice-and-comment rulemaking aimed at ensuring informed agency action. See note 15 Supra. Were we inclined to consider the matter, we doubt that the last incremental cost of $.65, which is only four times the Average of the subcategory and not much above the Averages for some other subcategories, would be considered "wholly out of proportion" to the benefits derived the test set forth by Senator Muskie. See note 52 Supra. Even if it were the case that a mill's last incremental cost was "wholly out of proportion" to benefits such mill-specific matters are more appropriately considered in permit-granting proceedings.

Petitioners' next contention is that EPA underestimated the cost of BPCTCA for the dissolving sulfite subcategory, by misfiguring the cost of SSL recovery.[57] We have examined petitioners' contention, bearing in **\*1049 \*\*347** mind that we do not review EPA's cost figuring De novo, but accord EPA discretion to arrive at a cost figure within a broad zone of reasonable estimate. See Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Petitioners' complaint revolves around the Agency's refusal to include the capital cost of installing SSL recovery in some of its cost calculations.[58] As EPA notes, five out of six dissolving sulfite mills have already installed SSL recovery. Where, as here, most of a cost element has been incurred already, or will be incurred for a purpose other than meeting federal effluent limitations, EPA may exclude that element from the cost of BPCTCA.[59] Accordingly, we uphold EPA's estimate of the cost of BPCTCA.

[57]    Concerning SSL recovery, see pp. —— - —— of 191 U.S.App.D.C., pp. 1020-1024 of 590 F.2d Supra, petitioners also claim that EPA underestimated BPCTCA costs for the dissolving sulfite category by underestimating (a) the size of the waste load to be

treated and (b) the cost of sludge disposal. The former argument was discussed earlier in light of the procedural problem involved therein. Inasmuch as the latter claim is merely a different version of petitioners' challenge concerning sludge dewatering technology, it is treated Infra in our discussion of that challenge.

[58]    Petitioners' reply brief reshapes this same argument into a fusillade of charges about EPA's accounting, intending to show that SSL recovery cost should have been figured at $17.26/ton of product. EPA has argued that SSL incineration pays for itself once the equipment is installed because energy and chemicals are recovered. Petitioners' own study from which the $17.26 figure is derived clearly confirms EPA's contention: the $17.26 figure results from subtracting profits of operation of SSL recovery from the capitalized cost of installation. App. 3549. The issue thus becomes the one discussed in text, I. e., whether to count the cost of SSL installation as a cost of BPCTCA.

[59]    Petitioners also assert that EPA's economic impact analysis was invalid because it used lower cost figures than did EPA's BPCTCA cost analysis. There were two reasons for this difference. BPCTCA cost treatment may or may not include costs that have already been incurred, while the economic impact analysis definitely has no reason to include such costs. Also, the length of the rulemaking necessarily meant that although some costs were not yet incurred when some calculations were made, they had been incurred and were subject to consideration by the time of other calculations. We accordingly find EPA's accounting practices within the range of reasonableness.

b.

"(N)on-water quality environmental impact(s) (including energy requirements)" are among the "consideration factors" listed in section 304, and are the sole factors of that kind on which petitioners premise a challenge to the limitations. We have already seen that the Act does not specify a particular structure for EPA's treatment of the consideration factors but instead leaves the Agency with discretion in deciding how they will be "taken into account." In exercising that discretion, it is clear that EPA devoted considerable attention to assessing environmental impact and adequately set forth its conclusions with

AR005434

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

respect thereto. App. 2360-467 (Development Document). Most crucially, in view of the Act's emphasis in listing "energy requirements" as part of environmental impacts, EPA developed estimates of the new energy demands for the industry as a whole about 2.4% Of the industry's total energy use and for each industry subcategory. For the sulfite subcategories, with their higher waste loads requiring greater waste treatment, the figure was an 18% Increase in energy demand.[60] EPA also developed estimates of the sludge disposal problem, which is the reverse side of effluent reduction benefit, **\*1050 \*\*348** because the waste that is removed from effluent must be disposed of as sludge.[61] We are consequently convinced that EPA took adequately into account the environmental impacts of its regulations.[62]

[60]    App. 2408. The parties dispute the method of calculating energy use in the sulfite subcategory. The sulfite waste treatment process involves taking spent sulfite liquor (SSL), and evaporating and burning it. Many steps in that process require energy, See App. 238, 717, although, as EPA points out, the burning of SSL also recovers some usable energy. App. 2418. Petitioners do not seriously contest EPA's assessment of the increased energy requirement for the sulfite subcategories. They attempt only to show by dramatic example how much energy is involved. For example, they emphasize that at one mill the demand for electricity will rise 47%. As the Agency notes, this method of statement exaggerates the effect on "energy requirements," the statutory term, since electricity is only part of the energy used by mills. Much additional energy is generated at the mills by burning coal for steam. App. 2418. Similarly, petitioners emphasize that the amount of energy, although relatively small in percentage terms compared to the energy used for non-waste treatment purposes, is large in absolute terms. As they detail, many homes and schools could run on that energy. Nonetheless, although pollution treatment for immense paper mills could not be expected to run on small energy outlays, Congress has insisted upon such treatment. Hence, we are not persuaded by the industry's presentation of the figures but instead agree with EPA that a percentage comparison is a meaningful way to present and analyze energy use.

[61]    Petitioners vividly describe the land area that will be covered by the sludge to be disposed of. Admittedly, the amounts of sludge involved are impressive. Yet, the same waste would be discharged into the water if not dealt with as sludge, and Congress has made the choice between effluent and land disposal.

[62]    Petitioners also contend that EPA should have assessed

various vaguely specified "offsite" environmental impacts, E. g., those involved in transporting waste treatment equipment and supplies. They have presented no hard data showing that any environmental impacts EPA failed to assess are comparable in magnitude to those impacts that EPA did assess.

Petitioners assert, however, that we must impose on EPA a further and special requirement to engage in environmental balancing. They cite allegedly dramatic examples of negative environmental impacts from the air pollution and sludge disposal incident to waste treatment, and contend that EPA failed to give these enough "weight" in the balance. As we have discussed, we believe Congress entrusted the manner of deliberation about all of the "consideration factors" to EPA's discretion, and we are prepared to uphold EPA on that basis alone. Nonetheless, the special policies in the Act with respect to environmental protection warrant some additional comments.

Our consideration begins with the history of the Act, which shows that Congress developed a willingness to entrust EPA with more latitude than other agencies in carrying out programs that affect the environment. In the years immediately prior to the passage of the Act, the federal government had mounted a campaign to control water pollution by a permit program under the Rivers and Harbors Act of 1899, 33 U.S.C. s 407. During that period, Congress also had enacted the National Environmental Policy Act (NEPA), 42 U.S.C. s 4321 Et seq., which was designed to force federal decisionmakers to consider the environmental effects of their decisions. Because the water pollution permit program under the Rivers and Harbors Act was aimed at enhancing the environment, some of NEPA's legislative history suggested that the permit program officials might be exempt from the duty under NEPA to prepare environmental impact statements (EIS's). Nevertheless, in December 1971, a court required EIS's for water permits under the Rivers and Harbors Act, Kalur v. Resor, 335 F.Supp. 1 (D.D.C.1971), and in so doing severely impeded the permit program's administrability. It is not surprising, therefore, that Congress became aware of this threat to the regulation of water pollution and that the legislators took it into account the following year in formulating the successor to that permit program the 1972 Act. See, e. g., Legislative History, at 260 (remarks of Rep. Dingell).

Accordingly, section 511(d) of the House version of the Act, H.R. 11896, 93d Cong., 1st Sess., excused EPA from complying with NEPA in issuance of water permits. Nonetheless, the House imposed environmental balancing

Case 2:19-cv-00037-JNP   Document 59-41   Filed 11/30/22   PageID.5904   Page 31 of 78

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

duties on EPA in a different way. Section 101(g) of H.R. 11896 provided generally that "(i) n the implementation of this Act, agencies responsible therefor shall consider all potential impacts relating to the water, land, and air to insure that other significant environmental degradations and damage to the health and welfare of man does not result."[63] The House also included "environmental impact" in the particular section listing the many factors to be "tak(en) into account" in setting effluent **1051 **349 limitations. Id. s 304. The Senate version of the Act had No corresponding provisions.

[63]  Taken at face value, the provision appears highly restrictive, prohibiting water pollution programs that have significant air or land pollution side-effects even if those were outweighed by benefits to the water. The legislative history indicates, however, that more of a balancing test was intended. The House committee reporting on the provision explained that it "believes that there is little gained in stopping water pollution if the preventive actions cause more environmental damage than it eliminates. . . ." Legislative History, at 766.

After lengthy deliberations,[64] the Conference Committee knitted the two versions of the Act in a combination that minimized, without entirely omitting, EPA's obligation thereunder explicitly to consider the non-water environment. Like the House bill, the Conference version excused EPA from preparing EIS's.[65] Unlike the House bill, the Conference version completely deleted section 101(g), with its general duty to avoid all significantly adverse environmental impacts. Only section 304 was retained, in a modified and limited form, See note 68 Infra, which simply made "non-water quality environmental impacts" one of the many listed factors for EPA to "take into account," along with such other factors as engineering aspects, age, and process changes.

[64]  For a discussion of the unusual length and difficulty of the conference on this Act, and the notable contributions it made, see Note, The Federal Water Pollution Control Act Amendments of 1972: Ambiguity as a Control Device, 10 Harv.J.Legis. 565, 569-70 (1976).

[65]  Section 511(c)(1) of the Act, 33 U.S.C. s 1371(c)(1). The exemption from NEPA was the focus of sharp debate in both houses of Congress, and the ultimate version of the exemption is ambiguous in one respect. Besides requiring agencies to carry out the procedural duty of preparing EIS's, NEPA apparently requires agencies to carry out the substantive duty of balancing environmental costs against benefits. See Calvert

Cliffs' Coordinating Comm., Inc. v. AEC, 146 U.S.App.D.C. 33, 37, 449 F.2d 1109, 1113 (1971), Quoted in Alaska v. Andrus, 188 U.S.App.D.C. 202, 211, 580 F.2d 465, 474 (1978). It is unclear whether s 511(c)(1) exempted EPA from engaging in this substantive NEPA duty. The House version of the provision had broadly exempted EPA from all NEPA duties, procedural and substantive, and it survived a vote on the House floor attempting to delete it. Legislative History, at 536-42. The conference version changed the wording of the House provision considerably, addressing itself to "major federal actions," a phrase that refers simply to NEPA's procedural duties. See 42 U.S.C. s 4332(2)(C). This change led to debate about the provision on the floor of the Senate. Senator Muskie maintained that s 511(c) eliminated all NEPA duties, procedural and substantive. Legislative History, at 179-83, 206. Other Congressmen contended that s 511(c) was phrased to eliminate only procedural, not substantive, NEPA duties. Legislative History, at 105-08 (Rep. Dingell), Id. at 202-06 (Sen. Jackson), Id. at 210-11 (Sen. Hart).

A number of difficulties surround any attempt to interpret EPA's NEPA duties. The law on substantive NEPA duties is still developing, so that an attempt to construe s 511(c) must wrestle with a possible exemption at a time when the general rule is not firmly fixed. Moreover, section 511(c)'s interpretation has been rendered increasingly complex and significant by the passage of a parallel provision for EPA's Clean Air Act duties. Energy Supply and Environmental Coordination Act of 1974, s 7(c)(1), 15 U.S.C. s 793(c)(1). Accordingly, we continue to deem it appropriate to refrain from deciding the scope of s 511(c) until a case, unlike the present one which is based entirely on s 304, squarely presents the issue. Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 317, 486 F.2d 375, 384 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). It is enough for our purposes in interpreting s 304 to note that EPA's duties under NEPA are far more attenuated than any other agency's, based on stronger congressional willingness to trust EPA in such matters.

Congress' intent in passing this legislation was obviously not to minimize the importance of protecting the environment. The late 1960's and early 1970's saw the passage of a number of statutes aimed at dramatically increasing the protection given the environment, and the Act involved herein is among the most important. Rather, Congress was resolved to rely on EPA's own internal structure and personnel attitudes to ensure that the net result of all of its programs would be a substantially enhanced natural environment. In essence, Congress was convinced that EPA's internal dynamics and procedures

were the "functional equivalent" of the NEPA duties imposed on other agencies.[66] As Senator Muskie declared, "(t)he whole concept of EPA is that environmental considerations *1052 **350 are to be determined in one place by an agency whose sole mission is protection of the environment."[67] Based on this conviction about EPA's commitment to environmental goals, the legislators apparently felt that a judicially reviewable environmental balancing duty would serve no purpose except to establish a NEPA duty "as a tactic of litigation and delay" and thus make the EPA program unworkable. Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 317, 486 F.2d 375, 384 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

[66]   The "functional equivalence" doctrine was first elaborated by this Court in Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). As courts have developed confidence in EPA's commitment to the environment, that doctrine has become widely accepted. See Maryland v. Train, 415 F.Supp. 116, 121-22 (D.Md.1976) (collecting cases).

[67]   Legislative History, at 198. Senator Muskie was "the principal author of the (1972 Act), (the) sponsor and floor manager in the Senate, and the Senate leader at conference negotiations." Save the Bay, Inc. v. EPA, 556 F.2d 1282, 1286 (5th Cir. 1977).
    Petitioners have relied upon comments on the floor of the House by Congressman Jones:
    The managers believe That it would be foolhardy to credit one environmental account and debit another by the same action. Their intent is that the assessment of "best practicable control technology currently available" shall be such that the Net effect on water and other environmental needs will be positive and beneficial, and that other impacts of water quality environmental efforts would not negate the overall benefit of the achievement of higher water quality.
    Legislative History, at 26 (emphasis added). In light of the structure of the Act and the rest of its legislative history, we are not persuaded that this statement indicates a congressional intent to impose mandatory environmental balancing duties on EPA. Representative Jones' statement was not paralleled in the Conference Report, nor, extended to its fullest implications, would it comport with the language and structure of the Act that the Conference Committee produced. Were it taken to mean that EPA had to balance environmental impacts, it would indicate that the House's original views had prevailed despite the Conference's action in deleting section 101(g) and in simply including environmental impact as one apparently equal factor in a long list of concerns relevant to EPA's regulatory mission. We believe, therefore, that this statement

expressed a hope as to how entrusting EPA with its mission would ultimately work out, rather than a mandate as to EPA's specific means of carrying out that mission.

That Section 304 requires EPA to "take into account" non-water quality environmental impacts, therefore, reflects several concerns apart from a fear that the Agency will have an inadequate commitment to protection of the air and land. Perhaps most important, if these factors were not listed, EPA arguably would have no authority to temper its effluent regulations when its own conclusion was that such tempering was needed to protect the land and air.[68] While committing the Agency to lead a comprehensive attack on water pollution, Congress did not intend that attack to prevent the Agency from realizing its other environmental goals. Furthermore, there are some environmental considerations, such as wildlife conservation, that are not *1053 **351 within EPA's expertise, but that Congress wanted considered in EPA's deliberations on water pollution. See Legislative History, at 883-84 (letter from Reps. Reuss, Pelly, Et al.). Thus, it included a reference to All non-water quality environmental impacts to assure the proper broadening of EPA's environmental impact deliberations. Cf. Sun Enterprises, Ltd. v. Train, 532 F.2d 285, 289-90 (2d Cir. 1976) (EPA required under the Fish and Wildlife Coordination Act to consult with the Interior Department about relevant actions taken under the 1972 Act).

[68]   The House version of s 304 used the bare term "environmental impacts." The conference version's shift to "non-water quality environmental impacts (including energy requirements)" reflected a carefully crafted alternative to two unacceptable formulations. On the one hand, as we have discussed, the Act intended to exclude consideration of receiving water quality completely. See pp. —— - —— of 191 U.S.App.D.C., pp. 1041-1044 of 590 F.2d Supra. If the House provision had been retained, it would have been natural to construe "environmental impacts" as including impacts on water quality. That construction would have suggested that receiving water quality was relevant, since environmental impact on water varies with the nature of the receiving water. By specifying "non-water quality environmental impacts," Congress kept receiving water quality considerations from being brought into play. On the other hand, if the House's "environmental impacts" language had been excised entirely, it would have appeared that non-water impacts, as well as water impacts, were off limits as a relevant consideration. This possibility was especially serious at the time because the Act was drafted during a period when a parallel uncertainty was troubling the interpretation of the Clean Air Act, a statute that "does

AR005437

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

not obviously authorize EPA consideration of the adverse environmental consequences of emission controls." Stewart, The Development of Administrative and Quasi-Constitutional Law in Judicial Review of Environmental Decisionmaking: Lessons from the Clean Air Act, 62 Iowa L.Rev. 713, 735 (1977) (footnote omitted). Not until the year after the Water Act's passage was it held that the Clean Air Act implicitly gave EPA authority to consider environmental impacts in tempering its regulations. Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (D.C. Cir. 1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Here again, Congress employed careful language to avoid an unfortunate ambiguity in the Act.

Finally, the requirement of some advertence on the Agency's part to non-water environmental impacts provided a mechanism for assuring that EPA's internal structure and procedures will evolve as expected. The Act's listing of environmental impacts as a factor encourages the Agency, if more incentive is necessary, to seek information from relevant sources outside the Agency and from personnel in sections of the Agency devoted to non-water matters. Once that communication is assured, the likelihood that the expected inter- and intra-agency sensitivity to environmental benefits and impacts will not occur is slight indeed.[69]

[69]   In the course of EPA's internal review of its effluent limitations, personnel with non-water environmental responsibilities presumably have a part in assessing the limitations and their impacts. It will assist review if these personnel are identified in the record, and if they indicate their reasons, in light of their own concerns and expertise, for accepting the non-water impacts of the limitations. Such indications will reassure Congress, the courts, industry, and the public that the internal EPA structure that is relied upon to ensure proper environmental consideration is functioning as expected. See generally Gaines, Decisionmaking Procedures at the Environmental Protection Agency, 62 Iowa L.Rev. 839 (1977).

Thus, since Congress intended EPA's internal structure to protect the non-water environment, the judicial function is completed when we have assured ourselves that EPA expressly considered the probable environmental impacts of its regulations. As we have noted, EPA fully investigated the environmental impacts, and thereby fulfilled this aspect of its statutorily mandated duty.

## VI. THE AGENCY'S EXERCISE OF DISCRETION

Petitioners' remaining challenges to the effluent limitations involve attacks solely on the rationality of the Agency's discretionary decisionmaking in various areas. Although we have examined all of petitioners' attacks on the Agency's exercise of discretion and found them wanting, several of them deserve further discussion. Those challenges fall into two major categories: whether EPA has responded adequately to the diversity of the industry in its subcategorization and limit-setting decisions, and whether it has identified "practicable" technology capable of achieving those limitations.

### A.

In setting effluent limitations, EPA had to take into account the great diversity among the almost 300 mills subject to Phase II regulation. It did so by two methods: subdivision and averaging. EPA began by subcategorizing the industry on the basis of the major differences in industrial processes and other factors. Further distinctions were made within many subcategories. Industry commented on the earlier subdivision proposals, and EPA accommodated many of industry's concerns, eventually identifying 16 subcategories, divided into 66 subdivisions. On average, that is, EPA tailored one set of limitations to every five mills. This extensive subdivision safeguarded against overzealous standards, increased the confidence that can be placed in the practicability of the regulations, and diminished the need to handle variation through the variance process.

Of course, differences still exist among mills within the same subcategories and subdivisions. EPA took these differences into account by basing its limitations on BPCTCA, I. e., the pollution control achieved at the "Average of the best mills." For its averages, EPA drew on the best **1054 **352 available data base.[70] That the limitations still impose greater burdens on some mills than others, I. e., on those with below average treatment facilities, is an unavoidable consequence of Congress' goal of uniformity in effluent limitations rather than in treatment expenditures.

[70]   The papergrade sulfite petitioners also argue that the BOD and TSS limitations set for them are too stringent because the data used by EPA in determining those levels were unrepresentative of papergrade sulfite mills. The upshot of petitioners' argument is that because of

AR005438

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

the absence of extensive pollution control data from the actual mills to be regulated, or at least from some mills exactly like them, there can be no proof that "practicable" technology exists to achieve those goals. Hence, so it is argued, EPA may not impose any 1977 regulations and must rely completely on the 1983 regulations to achieve the 1985 goal of ending pollution. See, e. g., Brief for Petitioners in No. 76-1675, at 44.

We begin our analysis of this claim by noting that while the sulfite subcategories produce the highest level of pollution in the industry, See Council on Economic Priorities, Supra note 9, at 16-17, they have generally lagged behind other subcategories in putting pollution controls in place. See 42 Fed.Reg. 1419 (1977) (final regulations); App. 2493 (Development Document). Consequently, the Agency embarks upon the urgent task of regulating this segment of the industry with the least amount of directly relevant information to guide it. Congress and the courts have recognized that data-gathering problems faced by the Agency, and have allowed it to make a practicability finding based on "transfer technology," that is, technology used solely in other industries but reasonably found to be transferable to the industry in question. See, e. g., Legislative History, at 169-70 (statement of Sen. Muskie); C & H Sugar Co. v. EPA, 553 F.2d 280, 286 (2d Cir. 1977). Adopting this "transfer technology" analysis, we will be satisfied if the EPA's exercise of discretion in making use of imperfectly representative data passes muster under the general abuse of discretion standard identified earlier.

In this instance, that standard is easily met. The Agency readily acknowledged the thinness of its data bases, and explained the reasons and its efforts to compensate therefor. E. g., 42 Fed.Reg. 1419-20 (1977) (final regulations); App. 2307-15, 2493-96 (Development Document). Thus, there is no claim that EPA failed either to explain its conclusions or to base that explanation on facts before it. Cf. Tanners' Council v. Train, 540 F.2d 1188, 1193 (4th Cir. 1976); FMC Corp. v. Train, 539 F.2d 973, 985 (4th Cir. 1976); CPC Int'l, Inc. v. Train, 515 F.2d 1032, 1048-50 (8th Cir. 1975). Petitioners simply take issue with the explanation, and under the circumstances, we feel that EPA could reasonably reach the conclusion it did based on the information it cited. See C & H Sugar Co. v. EPA, supra, 553 F.2d at 287-89.

With respect to BOD, for example, the use of dissolving sulfite mill data to establish typical effluent levels for papergrade sulfite mills probably redounded to the benefit of papergrade mill operators because they can expect to have lower effluent levels than their dissolving sulfite counterparts. See 30 Fed.Reg. 1419 (1977). Similarly, the Agency has demonstrated to our satisfaction that the pilot plants that produced data were designed to reflect full-scale results, and that the small amount of data (11% Of data from 4 of 24 mills used) derived from mixed-grade plants that were not then using the papergrade sulfite process did not

significantly undermine the validity of the data. This conclusion is especially supportable in that an Agency comparison demonstrated that the limitations derived from the challenged data required papergrade sulfite mills to achieve a lesser degree of treatment than was demanded on average from nonsulfite mills. App. 2312 (Development Document). Finally, the record reveals that two papergrade sulfite mills can and have achieved the BOD limitations established by EPA, demonstrating even more directly that the technology identified as BPCTCA by the Agency is practicable. See App. 84-106, 2405. As to the TSS limit, petitioners' complaint about the representativeness of the data stems from a technological dispute over the positive or negative effect that one pollution control mechanism (secondary treatment) aimed at controlling one pollutant parameter (BOD) will have on the level of another type of pollutant (TSS) when both mechanisms are in place at a mill, as they were not at the data-producing mills. EPA has offered evidence tending to support its side of this dispute, and we find the evidence sufficient to convince a reasonable person. See Brief for Respondents, Appendix C.

Petitioners' specific challenges to EPA's treatment of variability focus on four sources of variability: cold climate,[71] the **\*1055 \*\*353** profitability of SSL recovery, "upset" conditions, and hydraulic flow. At the outset, we note that petitioners have a heavy burden in challenging EPA's treatment of variability. That treatment involves a host of administrative, technical, and statistical considerations as to which we lack the mandate to second-guess the Agency. For the reasons discussed below, we uphold EPA's limitations against all four challenges.

[71]    Although petitioners portray the Agency's treatment of climate as indicative of its underconsideration of several other process-related factors, they only seriously rely on the climate challenge. In fact, this challenge was made twice: once as a general complaint about a lack of subcategorization based on climate and once as a cost argument that the sludge treatment specified for colder climates is unduly expensive. Petitioners also make a brief claim that EPA failed to consider adequately certain factors peculiar to Alaskan paper mills. Brief of Petitioners in No. 76-1690, at 2 n. 1. The effluent limitations were based on a record that included data from two Alaskan mills, and we do not find their application to Alaskan mills arbitrary or capricious.

AR005439

1.

 Petitioners argue that EPA inadequately accounted for temperature differences in setting effluent limitations. As all parties agree, cold climates affect biological waste treatment. Bacteria break waste down more slowly at low temperatures, and different populations of bacteria predominate at different temperatures,[72] so that mills in cold regions have greater difficulty in using biological treatment. See Tanners' Council v. Train, 540 F.2d 1188, 1194 (4th Cir. 1976); American Meat Inst., supra, 526 F.2d at 455.

[72]    Bacterial breakdown of paper waste is not very different from bacterial fermentation of foodstuff. Cold climates interfere with biological treatment the same way that refrigeration slows food decay.

EPA considered the climate problem and concluded that northern paper mills could practicably use activated sludge systems as their method of biological treatment. Under this method, waste is treated before it can cool significantly even in cold climates.[73] Although petitioners counter that activated sludge has many drawbacks, including a susceptibility to "shocks" and higher cost,[74] EPA took those drawbacks into account in its deliberations. Thus, it included equalization basins in activated sludge BPCTCA to insulate against "shocks" and, more importantly, it determined that the effluent benefits were worth the extra cost. In light of this latter determination, subcategorization on the basis of climate would be a fruitless act, since the subcategory incurring the higher cost (mills in colder areas) could justifiably be held to the same effluent limitations as the one incurring the lower cost (those in warmer climes). Nor is disapproval of the regulations mandated by prior cases that have discussed temperature subcategorization. The critical issue in those cases has been whether EPA compiled a full record on which it based its decision, and here we find adequate record support for EPA's determination.[75]

[73]    The activated sludge method recycles and aerates the active biological culture continually to keep biological activity high, allowing treatment to be completed within 6-8 hours. The alternative treatment method is the aerated sludge basin (ASB) method. ASB does not recycle concentrated bacterial cultures, and therefore takes longer, I. e., around 10 days per batch of waste. This latter method is cheaper and more reliable, but takes more time and space. Both methods have been extensively used in various industries.

[74]    Petitioners also argue that other federal and state laws

often force mills in northern climates to discharge effluent at a reduced temperature to prevent destruction of the ice-covering on the receiving water and to protect coldwater fish, and that activated sludge systems, unlike the ASB method, cannot accommodate these temperature requirements. Thus, some mills in northern climates will have to install costly cooling towers or ponds. See App. 779.

Although petitioners' record citations in support of this argument do not show that they apprised EPA about the permit problem during rulemaking, See note 15, Supra, we would uphold activated sludge treatment as BPCTCA even had the issue been raised properly. Activated sludge treatment does not create the hot waste problem; it merely leaves that pre-existing problem intact. EPA may properly choose as BPCTCA a method that does not solve other pollution problems besides those regulated by the effluent limitation statute. Cf. United States Steel Corp. v. Train, 556 F.2d 822, 846-47 (7th Cir. 1977) (state pollution requirements do not affect the duty to meet federal effluent limitations).

[75]    Compare Tanners' Council v. Train, 540 F.2d 1188, 1194 (4th Cir. 1976) (inadequate record; remanded) With American Meat Inst. v. EPA, 526 F.2d 442, 454-56 (7th Cir. 1975) (record support; affirmed). Petitioners contend the record is inadequate because while EPA listed five plants that met the effluent limitations year round, it listed none in the coldest regions of the country that used BPCTCA. Here again, EPA has been hampered by a lack of data. See note 70 Supra. As in many industries, the most advanced plants in the paper industry have been built in warmer climes, so that much of the Agency's data also come from those areas. It suffices, however, that EPA established the eight-hour operability of activated sludge systems, and demonstrated that such short detention times make the system relatively immune to cold. App. 2261.

*1056 **354 2.

Petitioners next contend that EPA acted arbitrarily in refusing to create a separate subcategory for sulfite mills lacking a profitable process for "SSL recovery." As previously noted, the "cooking" of wood with chemicals in the sulfite process leaves behind a waste-laden solution called spent sulfite liquor (SSL). See pp. —— - —— of 191 U.S.App.D.C., pp. 1022-1024 of 590 F.2d Supra. SSL can be recovered by collecting, evaporating, and/or

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

burning it. When sodium and magnesium are used in the cooking solution, SSL recovery is profitable because those expensive chemicals may be economically recovered for reuse rather than discharged. When two less expensive chemicals, ammonia and calcium, are used, SSL recovery is less profitable or unprofitable, and SSL recovery is simply useful as a waste treatment method for disposing of SSL without water pollution. See note 10 Supra. Petitioners assert that the difference between mills at which SSL is profitable, and those at which it is not, is a more basic process difference than some other such differences that Were used as the basis for EPA subcategorization. As such, they assert, the Agency acted arbitrarily in refusing to establish separate subcategories in this instance.

We believe that EPA acted within its broad discretion in regulating all sulfite mills without regard to the profitability of SSL recovery. Process is only one of several factors relevant to subcategorization. Other factors may be influential or decisive. Here, subcategorization would have had a negative effect on the cost and effluent benefit balance, because, then, SSL recovery a highly cost-efficient pollution-control technique could have been foregone.[76] By contrast, the other process differences pointed to by petitioners as less drastic but nonetheless the basis for EPA subcategorization do not require that techniques as cost-efficient as SSL recovery be abandoned as BPCTCA.[77]

[76]   Petitioners claim that they are not asking EPA to exempt mills that have not installed SSL recovery facilities from doing so but only to give such mills their own subcategory. The distinction is illusory. Subcategorization is decisive in determining whether mills will have to meet the high standards of superior plants, such as those using SSL recovery, or will only have to meet their own much lower standards that are achievable without that control technique.

[77]   Petitioners point to EPA's subcategorization based on the process difference between two methods of SSL recovery: blow pits (the technology installed at older mills, which only recovers 85% Of SSL) and vacuum drums (the newer technology, which recovers 95% Of SSL). This process choice only makes a difference of 10% Of SSL in the waste streams, while the one urged by petitioners would involve a difference of 85%. Put most simply, EPA need not accept a slightly less efficient method of SSL recovery.

Looked at from another angle, EPA viewed SSL recovery as an internal control measure that could be included in BPCTCA because it is in common use in the industry. Of the 23 papergrade sulfite mills, only three or four lack SSL recovery. See pp. ——— - ——— of 191 U.S.App.D.C., pp. 1059-1061 of 590 F.2d Infra.

3.

Waste treatment facilities occasionally release excess pollutants due to such unusual events as plant start-up and shut-down, equipment failures, human mistakes, and natural disasters. EPA accounted for this type of performance variability by using a careful statistical approach. In setting daily and monthly effluent limitations based on performance data from many plants, it made allowance for more than 99% Of all the variability in performance. Petitioners contend that this degree of accuracy is insufficient in that the statute's civil and criminal penalties are based on an absolute liability standard. They note that the 99% Figure shows that, in the past, fully adequate mill treatment systems have occasionally exceeded the proposed effluent limitations, *1057 **355 and they ask the Agency to promulgate an "excursion" or "upset" regulation specifying circumstances in which exceeding the limitations will be excused.

The excursion issue has troubled EPA and the courts.[78] On the one hand, denying such provisions seemingly asks plants to do the impossible to handle the most unusual upsets in plant conditions. On the other hand, there are strong policy reasons for denying such provisions and leaving the handling of upsets to EPA's enforcement discretion. Last year, EPA reviewed and elaborated its position on the matter. NPDES Decision of the General Counsel No. 57 (March 16, 1977). Henceforth, EPA will identify "upset conditions" and allow excursion provisions in some industries. In other industries, it will not promulgate such provisions. Instead, it will take variability into account by setting generous daily and monthly effluent limitations and by exercising its discretion not to enforce when appropriate. The proceeding involved in the present case was one of the latter kind. EPA refused to promulgate an excursion provision, stating that it "expects that the performance of the worst cases (I. e., plants that exceed limitations) will be improved by proper controls and that the effluent limitations can be achieved by properly operated and maintained plants." 42 Fed.Reg. 1420 (1977) (final regulations).

[78]   Three courts reviewing effluent limitations have considered industry demands for excursions. One

AR005441

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

decision, the first, overruled EPA and granted an excursion provision, but the others have not followed this approach. Compare FMC Corp. v. Train, 539 F.2d 973, 986 (4th Cir. 1976) (granting excursions), With CPC Int'l, Inc. v. Train, 540 F.2d 1329, 1336-38 (8th Cir. 1976) (denying excursions), And American Petroleum Inst. v. EPA, 540 F.2d 1023, 1035-36 (10th Cir. 1976), Cert. denied, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977) (same). Two courts reviewing individual mill permits have also considered industry demands for excursions. One court, reviewing permits for offshore drilling platforms in the infamously variable climate of Cook Inlet, Alaska, concluded that upset provisions had to be allowed. Marathon Oil Co. v. EPA, 564 F.2d 1253, 1272-74 (9th Cir. 1977). The other denied excursions. United States Steel Corp. v. Train, 556 F.2d 822, 841-42 (7th Cir. 1977).

We believe that EPA's position in Decision No. 57 is sound, and we uphold its denial of excursion provisions in this case. A contrary decision might hamper the Agency's ability to "force technology" and hence could impede enforcement. Congress intended effluent limitations to compel plants to improve their performance, even when innovation was required. See pp. —— - —— of 191 U.S.App.D.C., pp. 1061-1062 of 590 F.2d Infra. In this "technology forcing" context, denial of an excursion provision justifiably compels plants to develop monitoring, repair, and back-up capabilities to avoid excessive discharges.[79]

[79]   See United States Steel Corp. v. Train, 556 F.2d 822, 842 (7th Cir. 1977). See also Legislative History, at 431: "(M)anufacturers of control equipment do not generally produce new equipment until there is a market demand for it, and industrial polluters do not install improved equipment until forced to do so. . . . Therefore, the success of the new strategy depends on success in developing and marketing the necessary technology."

Moreover, depriving EPA of discretion to refuse excursions would interfere with the congressional goal of "swift and direct" enforcement.[80] Excursion provisions cannot be framed in simple numerical terms, as, say, an allowance of four excessive discharges per year, without giving mills a license to dump wastes at will on several occasions annually. American Petroleum Inst. v. EPA, 540 F.2d 1023, 1036 (10th Cir. 1976) (denying excursions). Thus, such provisions must be stated in complex terms, E. g., by specifying plant incidents justifying excessive discharges.[81]

[80]   "(I)f the timetables established throughout the Act are to be met, the threat of sanction must be real, and

enforcement provisions must be swift and direct." Legislative History, at 1483 (Senate Report).

[81]   This scheme was proposed in Marathon Oil Co. v. EPA, 564 F.2d 1253, 1273-74 (9th Cir. 1977).

As the Supreme Court has recognized recently, however, there is a major difference in pollution regulation enforcement between simple numerical standards and *1058 **356 complex requirements.[82] Once excursion provisions are promulgated, an enforcement case no longer turns on the sharply defined issue of whether the plant discharged more pollutant than it was allowed to, but instead depends on murky determinations concerning the sequence of events in the plant, whether those events would have been avoidable if other equipment had been installed, and whether the discharge was within the intent of the excursion provision. Consequently, what Congress planned as a simple proceeding suitable for summary judgments would become a form of inquest into the nature of system malfunction.

[82]   Adamo Wrecking Co. v. United States, 434 U.S. 275, 98 S.Ct. 566, 573, 54 L.Ed.2d 538 (1978). In Adamo, the Supreme Court refused to permit criminal enforcement of a complex nonnumerical regulation under the Clean Air Act that specified proper "work techniques" for asbestos handling.

We consequently reject the argument that EPA must promulgate excursion provisions so that the effluent limitations will reflect BPCTCA technology that is effective 100 percent of the time. But see Marathon Oil Co., supra, 564 F.2d at 1273-74. In the nature of things, no general limit, individual permit, or even any upset provision can anticipate all upset situations. After a certain point, the transgression of regulatory limits caused by "uncontrollable acts of third parties," such as strikes, sabotage, operator intoxication or insanity, and a variety of other eventualities, must be a matter for the administrative exercise of case-by-case enforcement discretion, not for specification in advance by regulation. See CPC Int'l, Inc., supra, 540 F.2d at 1338 (denying excursions). A line must be drawn as to what is treated in the general rule and what is handled case-by-case, and we believe it appropriate to defer when EPA, in the interest of preserving an enforcement system based on straightforward numbers, establishes a general rule with better than 99 percent accuracy and leaves the rest to prosecutorial discretion.

We are likewise unpersuaded by an analogy to excursions under the Clean Air Act,[83] and by the threat of citizen suits,[84] and/or of a lack of good faith on the part of government prosecutors. Accordingly, we uphold EPA's decision to deny excursion provisions.[85]

[83]   EPA has included excursions in the ambient standard regulations it promulgated under the Clean Air Act. See 40 C.F.R. ss 50.4-.10 (1977), Discussed in Marathon Oil Co. v. EPA, 564 F.2d 1253, 1273 (9th Cir. 1977); FMC Corp. v. Train, 539 F.2d 973, 986 (4th Cir. 1976). However, the section of the Clean Air Act under which those standards are issued is not parallel to the effluent limitations section of the 1972 Water Act. Ambient air standards are based on public health considerations, and they apply to entire air quality regions with large numbers of polluters who together produce the air pollution health threat in a region. See 42 U.S.C. s 1857c-4 (standards). Excursions are allowed because the public health can stand occasional brief exposures, and because the statistical circumstances are such that large numbers of air polluters cannot be readily orchestrated to avoid relatively frequent and severe collective upsets. In contrast, effluent limitations are based on technology considerations, and apply to individual water polluters. Whether the public health (or even receiving water quality) can take occasional exposures is irrelevant under the Act, and there are no collective circumstances to orchestrate because each polluter is individually responsible for adhering to the limitation. See also Essex Chem. Corp. v. Ruckelshaus, 158 U.S.App.D.C. 360, 486 F.2d 427 (1973), Cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (if, unlike here, EPA ignores possibility of upsets in setting clean air standards, it must take them into account separately).

[84]   Under s 505, 33 U.S.C. s 1365, citizens can sue polluters for excessive discharges. Petitioners contend at oral argument that even if EPA exercised good faith prosecutorial discretion in upset situations, it could not bind citizens to do so. We find this argument speculative at this time especially in light of the rarity of citizen enforcement. See 8 BNA Envir.Rep. 1649-50 (Aug. 24, 1977) (remarks of Assistant Attorney General). If and when a pattern of harassing citizen suits develops, EPA can consider requests to revise its regulations.

[85]   In this case, Weyerhaeuser Co. argued that it was unreasonable to require plants that shift the grade of product they produce to adhere to the effluent limitations for one particular grade. It was assured by EPA that the effluent limitations did not foreclose the issue: "In the situation posed by Weyerhaeuser, the precise form the effluent limitations take in the mill's NPDES permit is not specified in the regulations; that is left for the permit-issuing authority to decide." Brief for Respondent, at 107-08.

*1059 **357 4.

The Agency typically expresses its effluent limitations in terms of pounds of pollutants per ton of goods produced. That figure, in turn, is arrived at by multiplying water flow times pollution concentration that is to say, by deriving the product of (1) the gallons of water used per ton of goods and (2) the pounds of pollutant per gallon of water:

This approach is designed with the commendable purpose of avoiding limitations expressed in terms, such as pounds of pollution per gallon of water, that would allow mills to avoid the regulatory impact by diluting their effluent. See Marathon Oil Co., supra, 564 F.2d at 1269. Nonetheless, it places the Agency partially in the position of regulating water flow, which tends to vary from mill to mill. That is, in promulgating its limitations, the Agency first reached a conclusion about the normal flow in given segments of the industry and then directed its technology search at finding means to extract the likely pollution from that amount of water. It is true that if a mill has a higher than average flow, it will probably have a lower than average concentration of pollutants. Nonetheless, to treat that higher amount of water, despite its lower concentration of pollutants, might take more facilities or more time, and hence might cost more. As such, those mills that utilize higher levels of flows than those deemed normal by EPA may be at some disadvantage in achieving the effluent limitations.

It is important to note, however, that EPA does not Require operators to achieve any specific level of flow, but only that the pollution content in that flow as a whole be below a constant level set relative to tons of product. Hence, EPA does leave industry the option of utilizing a somewhat higher flow but building pollution control technology capable of accommodating it. In light of the nonmandatory nature of the flow determinations made by EPA, we may easily dispose of one of petitioners' contentions. The industry appears to argue that by setting limitations and identifying practicable technology with a given flow in mind, EPA has failed adequately to identify the cost of the required pollution control (or, stated

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

differently, to identify practicable technology) for those plants with higher than average flows.[86] The simple answer to this argument is that EPA studied mills with varying levels of flow and set limitations that it deemed within reach of all of those mills, so long as they installed "practicable" (I. e., in part, not overly costly) technology. Having found none of the limitations themselves or the practicable technology determinations unreasonable, therefore, the fact that some mills use flows different from those considered normal for the purposes of some of EPA's calculations seems irrelevant.

[86]   Because petitioners' primary complaint seems to be that EPA's limits may force them to utilize costly or impracticable internal controls to cut Down on flow, there seems to be no claim that those mills with below average flow would be disadvantaged by EPA's methodology.

Petitioners further claim, however, that even if reasonable under the normal analysis, the limitations are unsatisfactory because they force any plant with higher than average flows to add Internal controls to reduce water usage. In support of their position, petitioners point to the legislative history suggesting that Congress expected most pollution controls to require end-of-pipe, or external, technology, and they repeat the well established rule derived therefrom that internal controls that are not in common use in the regulated industry may not be required by EPA in the 1977 standards. See American Paper Inst., supra, 177 U.S.App.D.C. at 194, 543 F.2d at 341 (citing cases); American Iron & Steel Inst., supra, 526 F.2d at 1060-61. Although this rule requires the Agency to make a "common use," rather than "practicability" finding whenever the control technology it identifies is internal, we review its decision *1060 **358 for abuse of discretion exactly as we review its other findings.

In this instance, as in most others, EPA has fully explained its methodology so that the bases for its decision on average flow for each subcategory are visible. App. 2073-177, 2478-81 (Development Document). The Agency achieved this series of figures by a careful process. Initially many of its subcategorization divisions were based on characteristic flows within segments of the industry, so that the mills to be compared with each other were fairly uniform to begin with. Next, the Agency measured the average flow within each subcategory discarding unusually high and, more often unusually low ones. Notably, the Agency based its decision on the average of All mills rather than on the "average of the best," which is its usual and unchallenged method of determining practicability. Hence, EPA made a conscious

effort to distinguish internal flow controls, which require a "common usage" finding, from other technological requirements, which may be less industrially prevalent so long as they are "practicable."

Moreover, beyond these measurements, the Agency also undertook a detailed study of flow control methods and the cost thereof for each subcategory and found them available and used to one degree or another in all subcategories. App. 2195-242, 2364-97 (Development Document). In fact, it showed, as in American Paper Inst., supra, 177 U.S.App.D.C. 194, 543 F.2d at 341, that some of all internal pollution control measures identified as useful by the Agency are used by no less than 75% Of the mills studied within any given subcategory. App. 2214 (Development Document). And, although not all of these controls are aimed at reducing flow, the Agency determined that, overall, more than 50% Of all of the mills studied achieved the subcategory flow rate utilized by EPA in setting the limits, which we find sufficiently indicative of the normality of internal flow controls.[87] Accordingly, the Agency's determination of common flow is within the authorized bounds of discretion.

[87]   See American Iron & Steel Inst. v. EPA, 526 F.2d 1027, 1060-61 (3d Cir. 1975). "Common use" does not mean universal use. We accordingly reject petitioners' argument that a "common use" finding may not coexist even with a small degree of cross-subcategory variability in flow. See Joint Brief Addressing Common Issues at 36. Nor do we read the Dicta in FMC Corp. v. Train, 539 F.2d 973, 980 (4th Cir. 1976), to require "uniform water usage per unit of product" before flow may be taken into account. In FMC, effluent limitations were remanded on the basis of variability in flow. Nonetheless, that case is clearly distinguishable on its facts, because there EPA's own experts had found cross-subcategory variability in flow so "drastic" that they had not even attempted to identify and use flows characteristic of plants using common internal controls. That those flows were indeed drastic is indicated by the fact that in a subcategory example discussed in FMC, the flow figure used by the Agency in establishing the limits was four times lower than the maximum flow among the plants in that subcategory. Id. By contrast, the relevant figures in the present case show that for 13 of the 16 subcategories the maximum flow was no more than one and one-half times the average flow used by EPA, and that in the most variable subcategory the differential factor was still only slightly greater than two.

B.

AR005444

Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (1978)

11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

### 1.

Some of the petitioners have strongly challenged EPA's choice of BPCTCA for the dissolving sulfite subcategory. As discussed above, the intense "cooking" process used in the dissolved sulfite process dissolves most of the wood's cellulose in waste solutions. See pp. —— - —— of 191 U.S.App.D.C., pp. 1022-1024 of 590 F.2d Supra. During "biological" treatment this dissolved matter is taken up by bacteria. Disposing of the watery mass of these bacteria, I. e., sludge, is a serious problem, for their tough cell walls make it difficult to drain the water from, I. e., "dewater," them. Moreover, without draining, sludge is difficult to incinerate or use as landfill.[88]

[88]   All secondary waste treatment systems have the problem of disposing of biological waste. The problem is acute for dissolving sulfite mills because, compared to other mills, they have less primary (nonbacterial) waste which is easier to drain to mix with and thus help dewater the larger amount of bacterial waste.

**\*1061 \*\*359** It has long been recognized that the dewatering problem is difficult and that all the available approaches have certain drawbacks. See App. 1515-30 (1969 study). EPA began its consideration of the problem in 1973 with a "state of the art" review of treatment technology, which devoted much attention to alternative dewatering approaches. App. 3693-711. It has since amassed considerable other material on the problem, including the industry's own data and criticism of EPA's dewatering proposals, culminating in discussions in its final Development Document of dewatering technology and the estimated cost and environmental impact thereof. App. 2262-64, 2346-59, 2382-83, 2406-08.

Recognizing the difficulty of the problem, EPA has not promoted a single dewatering technology, but instead has offered diverse approaches some sequential, some alternative indicating that each particular dissolving sulfite mill might choose a different approach. In its model, the bacterial solution is chemically prethickened and then mixed with nonbacterial waste, which is easier to dewater and further thickens the mass. The resulting mixture is chemically conditioned and subjected to vacuum filtration, a process in which rotating filters suck a soggy "cake" out of the prethickened waste. This cake, which may still be 20% Or less solid, can be used for landfill, either at this point or later after pressing to remove even more water. Alternatively, the sludge can be dried using special boilers, and then burned in those same boilers, with the heat of incineration used to dry more sludge.

Industry pointed out problems and drawbacks with all these proposed steps and alternatives.[89] The Agency responded by pointing to its record support, including the fact that one out of the six dissolving sulfite mills covered by the regulations has already implemented dewatering technology.[90] Although perhaps a closer question than the others reviewed herein, we do not find EPA's choice of BPCTCA in this instance to be an abuse of its broad discretion. EPA has clearly devoted much attention to the problem and has explained its conclusions. In major part it seems to have been motivated by a congressionally mandated policy concern: the determination to push pollution control technology rapidly and decisively forward to the limits of practicability after 1977 and to the limits of achievability after 1983. See Legislative History, at 1460 (Senate Report) (Administrator given 1977 "mandate to press technology and economics to achieve those levels of effluent reduction which he believes to be practicable . . .."). Indeed, even in the earlier set of regulations, Congress expected EPA to press sometimes beyond the most advanced technology currently being used: "In those industrial categories where present practices are uniformly inadequate," Congress has admonished the Administrator to interpret " 'best practicable' to require higher levels of control than any currently in place if he determines that the technology to achieve those higher levels can be practically applied." Id. at 169-70 (statement of Sen. Muskie).

[89]   For example, petitioners noted correctly that landfill of material with solids content of 20% Or less may not be legal in some states since such moist landfill generates pernicious leachates. App. 2410. They assert further that even if bacterial wastes are prethickened and filtered to 20% Solid, they still cannot be pressed successfully, so that the wastes inevitably will make poor landfill. Moreover, although some dissolving sulfite mills currently burn their primary, nonbacterial wastes, App. 26-27, 108-09, petitioners contended that the prethickening chemicals, and infeasibility of pressing, would prevent secondary sludge from being burned in existing sludge incineration equipment. App. 1519.

[90]   App. 1638-706. Petitioners apparently did not object during rulemaking to the Agency's reliance on this mill, and, despite its greater progress toward effective effluent treatment, we do not find it fatally unrepresentative of dissolving sulfite mills.

AR005445

To force industry implementation of pollution control technology, EPA has used a number of approaches upheld by the courts. EPA has based its 1977 standards on exemplary facilities, including foreign ones, **\*1062 \*\*360** American Frozen Food Inst., supra, 176 U.S.App.D.C. at 138, 539 F.2d at 140, and has utilized "transfer technology." See note 70 Supra. In this case, EPA has used yet another approach specification of a diverse technological array as BPCTCA[91] which we uphold in light of the lack of effluent treatment that has traditionally characterized sulfite mills. Under this diversified approach, the Agency has identified a number of Alternative dewatering techniques with the expectation that, if several techniques are available, one or another will work at all of the regulated mills. Even if each technique has some drawbacks, together all of them constitute a "practicable technology" suitable to BPCTCA. In sum, because we find that the dewatering methods identified by EPA have had some success in the past and because the judgment as to whether an array of diverse approaches is sufficient in this instance "is best left in the hands of the Agency," Tanners' Council, supra, 540 F.2d at 1192, we accept the Agency's conclusions.

[91]    Such reliance on a diverse array of promising approaches is common in industry, which often achieves goals by having independent research teams test the available alternatives to find the best one among them.

2.

Petitioners also make a broad challenge to all the TSS

limitations for the industry. They contend that there are certain "non-settleable solids" that will not be removed by BPCTCA, and the EPA failed to rely on actual treatment performance data in setting TSS limitations that require removing those solids. We considered and rejected a similar challenge in American Paper Inst., supra, 177 U.S.App.D.C. at 198, 543 F.2d at 345, and we are inclined to do likewise here. Petitioners admit that in the particular subcategory it chose as an example, the bleached kraft subcategory, 10 out of the 32 mills already meet all of EPA's effluent limitations, and even more meet just the TSS limitations. Nonetheless, they complain that these conforming mills, as well as others relied on by EPA, utilize advanced internal and external control technologies that were installed solely to meet stringent state and local water quality standards for particular receiving waters. App. 764. This observation is largely correct but it does not present a cognizable grievance. The mills on which EPA has modeled BPCTCA are without question capable of meeting EPA's effluent limitations, and the Agency accordingly is justified in insisting that all other mills come up to this undoubtedly "practicable" standard.

For all of the foregoing reasons, the 1977 effluent limitations for the bleached segment of the American paper industry are upheld, and the petitions denied, except that the BOD limitation for acetate grade dissolving sulfite mills is remanded to the Agency for further proceedings consistent herewith.

It is so ordered.

**All Citations**

590 F.2d 1011, 11 ERC 2149, 191 U.S.App.D.C. 309, 9 Envtl. L. Rep. 20,284

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005446

58 ERC 1945, 362 U.S.App.D.C. 74, 34 Envtl. L. Rep. 20,039

372 F.3d 441
United States Court of Appeals,
District of Columbia Circuit.

HONEYWELL INTERNATIONAL, INC. and
Edgewater Working Group, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY and
Michael O. Leavitt, Administrator, United States
Environmental Protection Agency, Respondents.

Nos. 02-1371 and 02-1372.
|
Argued April 7, 2004.
|
Decided June 29, 2004.

**Synopsis**
**Background:** Challenges were brought to Environmental
Protection Agency's (EPA) inclusion of industrial parcel
on National Priorities List (NPL) of contaminated sites
eligible for "Superfund"-financed cleanup under
Comprehensive Environmental Response, Compensation,
and Liability Act (CERCLA).

**Holdings:** The Court of Appeals, Tatel, Circuit Judge,
held that:

EPA's listing of parcel on NPL did not obligate agency to
discuss or give notice of potential remedial actions;

agency's finding that fishery existed in section of river
bordering contaminated site was not arbitrary or
capricious; and

EPA provided sufficient notice to landowner adjoining
contaminated site that landowner's parcel might be
included in NPL listing, precluding judicial review of
landowner's objection.

Petitions denied.

**\*443 \*\*76** On Petitions for Review of an Order of the
Environmental Protection Agency.

**Attorneys and Law Firms**

Norman W. Bernstein argued the cause and filed the
briefs for petitioners Honeywell International, Inc. and
Edgewater Working Group.

Peter J. Fontaine argued the cause for petitioner Three Y,
LLC. With him on the briefs was Douglas W.
Frankenthaler.

Natalia T. Sorgente, Attorney, U.S. Department of
Justice, argued the cause for respondents. With her on the
brief were John C. Cruden, Deputy Assistant Attorney
General, and Sheila Igoe, Counsel, U.S. Environmental
Protection Agency.

Before: GINSBURG, Chief Judge, and EDWARDS and
TATEL, Circuit Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In these consolidated cases, we consider two separate
challenges to the Environmental Protection Agency's
decision to include an industrial site bordering the Hudson
River on the National Priorities List—a list of
contaminated sites considered priorities for environmental
cleanup. One group of petitioners, several companies
potentially responsible for cleaning up the site, claims that
EPA's notice of the proposed listing was deficient and
that the decision to list the site is unsupported by the
record. The other petitioner, an adjoining landowner
whose property EPA considers part of the site, argues that
EPA failed to give fair notice that the parcel might be
included and that the inclusion of its land was arbitrary
and capricious. Finding each of these challenges either
without merit or forfeited, we deny the petitions for
review.

I.

Known as "Superfund," the Comprehensive
Environmental Response, Compensation, and Liability

AR005447

58 ERC 1945, 362 U.S.App.D.C. 74, 34 Envtl. L. Rep. 20,039

Act of 1980, 42 U.S.C. §§ 9601–9675 (CERCLA), requires the federal government to compile a "National Priorities List" (NPL) of known or threatened releases of hazardous substances that are priorities for remedial action, i.e., long-term cleanup activities designed to address the environmental dangers associated with a contaminated site. *Id.* § 9605(a)(8)(B) (2000). We have described "'the modest and limited purposes' of the NPL within the Superfund scheme" in previous cases, *Wash. State Dep't of Transp. v. U.S. EPA,* 917 F.2d 1309, 1310 (D.C.Cir.1990) (quoting *Eagle-Picher Indus. v. U.S. EPA,* 759 F.2d 922, 932–33 (D.C.Cir.1985) (*Eagle-Picher II*)); *accord Eagle-Picher Indus. v. U.S. EPA,* 759 F.2d 905, 919–21 (D.C.Cir.1985) (*Eagle-Picher I*), noting that "Congress intended the EPA to employ the NPL as a tool for identifying quickly and inexpensively those sites meriting closer environmental scrutiny," *Wash. State,* 917 F.2d at 1310. Only sites placed on the NPL are eligible for Superfund-financed remedial action, *see* 40 C.F.R. § 300.425(b)(1) (2004), though listing a site does not mean that such funds will actually be forthcoming, for EPA may "pursue other appropriate authorities to remedy the release, including enforcement actions under CERCLA and other laws," *id.* § 300.425(b)(2). Listing a site, moreover, neither requires the owner or operator to take any action nor assigns liability to any party. *See Anne Arundel County v. U.S. EPA,* 963 F.2d 412, 413 (D.C.Cir.1992). Once a site is listed, EPA determines cleanup responsibilities in other proceedings. *See* 42 U.S.C. § 9607 (2000).

The principal tool EPA uses for determining whether to list a site on the NPL is known as the Hazard Ranking System, or **444 **77 HRS. *See* 40 C.F.R. pt. 300, App. A (HRS). The HRS evaluates four "pathways," i.e., routes, through which hazardous substances can migrate—ground water, surface water, soil exposure, and air. HRS § 2.1. For each pathway, EPA considers, among other factors, the likelihood that hazardous substances will be released, the waste characteristics of those substances (e.g., toxicity, mobility), and the potentially threatened population or environmental targets (e.g., wells, animal habitats). *Id.* § 2.1.3. Employing HRS formulas and assumptions, EPA evaluates the relevant factors and then assigns each site a value from 0 to 100. *Id.* § 2.1.1. Sites scoring 28.5 or higher may be added to the NPL. *Eagle-Picher I,* 759 F.2d at 910 n. 17.

This case involves EPA's listing of an industrial site in Edgewater, New Jersey. *See* National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 35, 66 Fed.Reg. 2380 (Jan. 11, 2001) (Proposed Rule); National Priorities List for Uncontrolled Hazardous Waste Sites, 67 Fed.Reg. 56,757 (Sept. 5, 2002) (Final Rule).

Known as the Quanta Resources site, the property lies on the western shore of the Hudson River, directly across from New York City at 96th Street. Until 1974, Allied Signal (and its predecessors), later acquired by petitioner Honeywell International, used the property for coal tar processing. As the successor to the coal tar facility operator, Honeywell is potentially responsible for cleaning up the site. *See* 42 U.S.C. §§ 9604(a)(1) (2000), 9607(a). In the late 1970s, the Quanta facility was used for oil storage and recycling, housing over sixty storage tanks. In 1981, after discovering contaminated oil and other hazardous substances in the area, the New Jersey Department of Environmental Protection closed the facility. Although EPA supervised a series of removal actions to clean and decontaminate the area, later sampling revealed the continued presence of hazardous substances. A Removal Site Investigation (RSI), conducted pursuant to an EPA administrative consent order, discovered that ground water, soil, and river sediments contained arsenic, chromium, lead, polynuclear aromatic hydrocarbons, and other compounds. The investigation also documented an observed release of heavy end coal tar product (consisting of hard, solid coal tar pitch, sticky coal tar roofing pitch, and viscous, oil-like coal tar) both on the property and in the Hudson.

Using the HRS, EPA scored the site and reported its findings in the HRS Documentation Package. Among other things, EPA determined that the portion of the Hudson River adjacent to the site contained a fishery, the contamination of which posed a threat to the human food chain. EPA assigned a score of forty-five to this threat—a component of the surface water pathway score. *See* HRS § 4.1.3.3.1. EPA scored none of the other pathways, explaining that they would have had no effect on the overall site score. Hazardous Ranking System Documentation Package: Quanta Resources (Dec.2000), J.A. 360 [hereinafter HRS Documentation Package]. After additional calculations, the surface water pathway score produced an overall score of fifty, making the site eligible for placement on the NPL.

In a Proposed Rule published in the *Federal Register* in January 2001, EPA announced its intention to list the Quanta site on the NPL. 66 Fed.Reg. at 2385. After considering comments opposing the listing and finding no basis for changing the HRS score, EPA published a Final Rule that added the site to the NPL. 67 Fed.Reg. at 56,760. Although neither the Proposed Rule nor the Final Rule provided a precise geographical description of the site, the HRS Documentation Package identified the site as located at "163 River **445 **78 Road" and "bordered to the north by the Celotex Industrial Park, to the south by the former Spencer-Kellogg Industrial Park, to the west

AR005448

by River Road, and to the east by the Hudson River."
HRS Documentation Package, J.A. 359.

This case involves two separate challenges to the Quanta
Resources NPL listing. The first, brought by Honeywell
International and the Edgewater Working Group, several
companies connected to the site's waste oil recycling
operations, claims that (1) EPA failed to provide proper
notice and a meaningful opportunity to comment on the
proposed listing, and (2) the agency's fishery
determination is unsupported by substantial evidence.
Throughout this opinion, we shall refer to petitioners
Honeywell and the Edgewater Working Group
collectively as "Honeywell." The other petition for review
comes from Three Y, LLC, which owns an adjoining
parcel of land that EPA included as part of the Quanta
NPL site. Three Y argues that (1) the Proposed Rule and
associated documents failed to give fair notice that the
company's property might be included, and (2) EPA's
final decision to include the property was arbitrary and
capricious. We consider each petition in turn.

## II.

Under the Administrative Procedure Act, a notice of
proposed rulemaking must "provide sufficient factual
detail and rationale for the rule to permit interested parties
to comment meaningfully." *Fla. Power & Light Co. v.
United States,* 846 F.2d 765, 771 (D.C.Cir.1988); *see* 5
U.S.C. § 553(b) (2000). Honeywell argues that the
Proposed Rule fails this test because it nowhere
mentioned what the company suspects is EPA's primary
reason for listing the site, i.e., to obtain Superfund monies
to dredge the Hudson, a remedial action that Honeywell
claims could pose serious environmental risks. EPA's
failure to reveal its real objective, Honeywell contends,
deprived the company of a "public outcry" that "almost
certainly would have occurred" had the public known that
EPA planned to dredge the Hudson. Honeywell's Reply
Br. at 3.

Honeywell's argument fails for a simple reason: under the
law of this circuit, EPA has no obligation to discuss
potential response actions—like dredging—when listing
a site on the NPL. In *Eagle-Picher Industries v. U.S. EPA,*
we explained that "[t]he NPL is simply the first step in a
process—nothing more, nothing less" and credited EPA's
assertion that "the NPL is not in itself remedial
action—inclusion on the NPL requires no cleanup nor any
other action by site owners." *Eagle-Picher II,* 759 F.2d at

932. As we recognized in a related case bearing the same
name, "[t]he major purpose of the NPL and the HRS ... is
narrowly focused. It is to identify, quickly and
inexpensively, sites that may warrant further action under
CERCLA. Listing does not represent a determination that
action is necessary, or that the EPA will take action."
*Eagle-Picher I,* 759 F.2d at 911. EPA explained the
limited function of an NPL listing in its response to
Honeywell's comments on the Proposed Rule: "EPA's
exploration of response options is unrelated to the HRS
site score. The HRS documentation package does not
necessarily include an evaluation of every possible
concern at a site nor does it make any suggestion as to
response actions to be taken at a site." Support Document
for the Revised National Priorities List: Final Rule–2002,
J.A. 1208 [hereinafter Support Document]. In other
words, listing a site does nothing more than identify it as
sufficiently contaminated to warrant potential remedial
action. *See Wash. State,* 917 F.2d at 1310. Because the
notice did just that, it complied with the APA.

**\*446 \*\*79** Honeywell calls our attention to *Anne Arundel
County v. U.S. EPA,* in which we vacated and remanded
an NPL listing because EPA failed to provide certain
information in the proposed rule. 963 F.2d at 413. In that
case, however, we found the notice deficient because it
omitted information that could have altered the HRS
site score. *Id.* at 418–19. Here, the omitted information about
a potential remedial action would have had no effect on
the HRS score.

Not only did EPA have no obligation to disclose remedial
options at this stage, but even if, as Honeywell alleges,
the agency listed the site because it eventually plans to
dredge the Hudson, the company has suffered no
prejudice. Before dredging or undertaking any other
remedial action, CERCLA requires EPA to publish its
proposed plans for comment. *See* 42 U.S.C. § 9613(k)(2)
(2000). So if EPA ultimately decides to dredge the river,
Honeywell and other interested parties will have an
opportunity to raise their concerns.

Honeywell next challenges the HRS score. Specifically,
it contends that EPA's finding that the section of the
Hudson bordering the Quanta site contains a fishery is
unsupported by the record and thus arbitrary and
capricious. *See* 5 U.S.C. § 706(2)(A) (2000) (providing
that a court will set aside an agency finding that is
"arbitrary, capricious, an abuse of discretion, or otherwise
not in accordance with law").

When evaluating the surface water pathway, as it did
here, EPA considers (among other things) whether a
threat to the human food chain exists. HRS § 4.1.3. That

inquiry focuses not on whether water is contaminated, but on whether contamination is present in aquatic organisms that humans consume. To answer that question, EPA determines whether a fishery exists in the area, and if so, assigns a score according to (1) whether the fishery is "subject to actual or potential ... contamination" and (2) whether "a portion of the fishery is within the boundaries of the observed release" of hazardous substances. *Id.* § 4.1.3.3.

Although the HRS regulations explain how contamination will be assessed, they neither define "fishery" nor specify what evidence is needed to determine whether a fishery actually exists. EPA's HRS Guidance Manual answers both questions. The Manual defines fishery as "[a]ny area of a surface water body from which human food chain organisms are taken or could be taken for human consumption." Hazardous Ranking System Guidance Manual 294 (Nov.1992) [hereinafter HRS Guidance Manual], Resp't's Br. Ex. B, *available at* http://www.epa.gov/superfund/sites/npl/hrsres/hrsgm/ch8b.pdf. A fishery exists if "[h]uman food chain organisms are present in the surface water body; and [s]ome attempt has been made to catch those human food chain organisms." *Id.* (emphasis omitted). To make these determinations, "[u]seful sources of information include state and local fish and wildlife agencies, local bait and tackle shops, visual observation during the [site investigation] of individuals fishing or of past fishery activity (e.g., fishing lines and hooks left behind near the surface water body)." *Id.* at 295. If such evidence demonstrates the existence of a fishery, then EPA determines whether the fishery is subject to "actual or potential ... contamination." HRS § 4.1.3.3. "Actual contamination" exists if a hazardous substance is present in the observed release and—the issue in this case—"at least a portion of the fishery is within the boundaries of the observed release (that is, it is located either at the point of direct observation or at or between the probable point of entry and the most distant sampling point establishing the observed release)." *Id.*

**\*447 \*\*80** In this case, EPA relied on two sources of information to conclude that a fishery exists in the area of the river where the heavy end coal tar product release had been observed. First, the contractor performing the HRS evaluation spoke with Bill Andrews, a biologist employed by the New Jersey Department of Environmental Protection's Bureau of Marine Fisheries. Andrews informed the contractor that "the area of the Hudson River bordering Edgewater, NJ (which includes the Quanta Resources site) is fished for human consumption." Phone Conversation Record (Sept. 5, 2000), J.A. 905. Also, Andrews's records indicated that "a gillnetter ... fishes this area for American Shad," and that several other

species are "fished for human consumption from the area adjacent to the Quanta Resources site," including "striped bass, white perch, white catfish, blue crab, tomcod, American eel, and winter flounder." *Id.* Second, the contractor spoke with Jorge Quinones who worked at the Quanta site as a representative of a Superfund technical assessment and response team. Quinones reported that he had "observed people fishing off the pier immediately north of the site." Interview Log (Aug. 24, 2000), J.A. 906. He marked the location on a map—a location that, according to EPA, lies approximately fifty feet from the contaminated waters.

Honeywell argues that the information Andrews and Quinones provided amounts to hearsay and is therefore insufficient to demonstrate the existence of a fishery within the boundaries of the observed release. In particular, it claims that EPA should have verified Andrews's statements by obtaining his records, the frequency and dates of fishing in the area, and the name of the gillnetter. Circuit law, however, makes abundantly clear that "administrative agencies may consider hearsay evidence as long as it 'bear[s] satisfactory indicia of reliability.' " *EchoStar Communications Corp. v. FCC,* 292 F.3d 749, 753 (D.C.Cir.2002) (alteration in original) (quoting *Crawford v. U.S. Dep't of Agric.,* 50 F.3d 46, 49 (D.C.Cir.1995)). Furthermore, "hearsay can constitute substantial evidence if it is reliable and trustworthy." *Id.* Because Honeywell points to nothing suggesting that the information provided by either Andrews or Quinones was unreliable, and given Andrews's and Quinones's positions (a biologist working for New Jersey's Bureau of Marine Fisheries and a member of a Superfund technical assessment and response team), EPA's reliance on their statements was neither arbitrary nor capricious. As we said of a different agency in another case, EPA was "entitled to rely on ... representations by parties who were uniquely in a position to know the [relevant information]." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095, 1125 (D.C.Cir.1984); *see also EchoStar,* 292 F.3d at 752–53 (rejecting petitioner's claim that an uncorroborated and untested statement upon which the agency relied cannot constitute substantial evidence where the statement was given under oath, the affiant had personal knowledge of the facts, and the petitioner submitted no contradictory evidence).

Honeywell argues that nothing in the record indicates that Andrews was aware of the boundaries of the observed release. The contractor's notes, however, expressly refer to "the area of the Hudson River bordering Edgewater, NJ (which includes the Quanta Resources site)." Phone Conversation Record, J.A. 905. True, the notes do not indicate whether the contractor actually gave this

AR005450

description to Andrews, but absent evidence to the contrary, we cannot imagine that an EPA contractor investigating whether a fishery exists within the boundaries of the observed release would have failed to inform Andrews of the release's boundaries.

**\*448 \*\*81** Honeywell has two specific objections to the information Quinones supplied. The company claims first that his observation fails to support EPA's determination regarding the species of fish caught for human consumption. But given Honeywell's concession that Andrews's statement, if reliable, supports the HRS documentation regarding the specific species of fish, *see* Honeywell's Br. at 21, and because we have concluded that Andrews's statement is in fact reliable, *see supra* p. 9, we need not address this concern.

Second, Honeywell argues that Quinones's observation fails to demonstrate that fishing occurred *within the boundaries* of the observed release. This is true, but EPA rules require only that fish "could be taken for human consumption," which the agency can demonstrate by documenting the presence of fish in the contaminated area and "[s]ome attempt" to catch them. HRS Guidance Manual at 294, Resp't Br. Ex. B. EPA documented both. Relying on the Andrews interview, EPA concluded, properly as we have indicated, that fish were present in the contaminated area. EPA also found "some attempt" to catch the fish, relying on (1) Quinones's observation, together with the hardly unreasonable assumption that fish can travel the fifty feet from the contaminated area to the pier where Quinones observed fishing activity, and (2) Andrews's statement that a gillnetter fished in the area. Honeywell offers no basis for questioning either conclusion. The company asserts that in responding to its comments, EPA failed to explain the assumption regarding the movement of fish from the contaminated waters to the area of observed fishing. We see no reason to disturb EPA's rule, however, because although we "may not supply a reasoned basis for the agency's action that the agency itself has not given," we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citations and internal quotation marks omitted); *see also Domtar Me. Corp. v. FERC,* 347 F.3d 304, 312 (D.C.Cir.2003). That is the situation here.

Our decision in *National Gypsum Co. v. U.S. EPA,* 968 F.2d 40 (D.C.Cir.1992), on which Honeywell relies, presented a situation very different from the one we face here. In that case, EPA based an HRS score on the presence of a highly toxic boron compound. Because a study showed that the site contained only a low toxicity boron compound, we vacated the NPL listing. *See id.* at 42–43. Here, Honeywell points to nothing in the record that calls into question EPA's conclusion that a fishery exists within the boundaries of the observed release. Although the evidence supporting EPA's fishery determination is admittedly thin, the agency made the specific findings required by its rules and regulations, and it offered a "satisfactory explanation for its inference" that the site contains a fishery within the contaminated waters. *Id.* at 44; *see also Burlington N.R.R. Co. v. Surface Transp. Bd.,* 114 F.3d 206, 210 (D.C.Cir.1997) (denying a petition for review when "[the agency's] findings rest on such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and the agency has articulated a rational connection between the facts found and the [decision] made" (citations and internal quotation marks omitted)).

## III.

In its petition, Three Y challenges the inclusion of its parcel of land as part of the Quanta site, arguing that "EPA failed to give fair notice to interested parties that it intended to include the Parcel **\*449 \*\*82** as part of the Site and the data that EPA relied upon to list the Site indicates that Site-related contaminants do not extend to the Parcel." Three Y's Br. at 7. Acknowledging that it submitted no comments during the rulemaking process, Three Y urges us to excuse its failure because the Proposed Rule gave no indication that the property might be included. *See Fla. Power & Light,* 846 F.2d at 771 (stating that agency notice must " provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully"); *cf. Fertilizer Inst. v. U.S. EPA,* 935 F.2d 1303, 1311–12 (D.C.Cir.1991) (remanding an agency rule for a new round of notice and comment where the proposed rule failed to provide notice of a provision in the final rule). For its part, EPA insists that the proposed listing was adequate to put Three Y on notice that its property might be included, and that by failing to comment, Three Y forfeited its substantive challenge to the listing. *See Dep't of Transp. v. Public Citizen,* 541U.S. 752, ——, 124 S.Ct. 2204, 2213, 159 L.Ed.2d 60 (2004) (noting that petitioner forfeited particular challenges to an agency action when it failed to object to the action on those particular grounds); *cf. Wash. State,* 917 F.2d at 1312 (denying a petition for review as untimely when a petitioner who was "on notice that its property *might be considered* part of the [NPL] listing"

had not filed a petition for judicial review within the ninety-day statutory period (emphasis added)). On the merits, EPA argues that including Three Y's parcel was well supported by record evidence. We begin with the notice issue, for if EPA is correct, we will have no need to address Three Y's substantive challenge. *See Appalachian Power Co. v. EPA,* 251 F.3d 1026, 1036 (D.C.Cir.2001) (noting that "[a]bsent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue" (citation and internal quotation marks omitted)).

Before delving into the relevant documents and the parties' arguments, we think a little geography will be helpful. Recall that the Quanta site is bounded on the east by the Hudson River, on the north by the Celotex Industrial Park, and on the south by the former Spencer-Kellogg Industrial Park. The dispute regarding whether Three Y should have known that its property might be included in the Quanta site centers on the western boundary, and in particular, on two north-south running roads—each at one time or another known as River Road—that lie on the NPL site's western side. The original River Road, previously known as "River Road" and now officially known as "Old River Road," lies immediately west of Three Y's parcel. In the mid–1990s, a new River Road, officially known as "River Road," was built east of the original River Road. Three Y's parcel lies between these two River Roads—a Mesopotamia of sorts—bordered on the west by the old road and on the east by another parcel known as Lot 3 which abuts the new River Road. Both parties agree that Lot 3 is part of the Quanta NPL site.

Although the Support Document for the Final Rule identifies the site's western border as "Old River Road," Support Document, J.A. 1197, thus clearly encompassing Three Y's parcel, Three Y contends that the Proposed Rule and related documents indicate that the site's western boundary lies just west of the *new* River Road. This, Three Y argues, led it to believe that its property would not be included and that it therefore had no reason to comment on the proposed listing. EPA reads the same documents very differently. It argues that like the Support Document, these documents make clear that Old River Road serves as the site's western **\*450 \*\*83** boundary, thereby putting Three Y on notice that its property could be included.

We start with the Proposed Rule. In addition to listing "Quanta Resources" as the "Site name" and identifying the city and state as Edgewater, New Jersey, 66 Fed.Reg. at 2385, the Proposed Rule explains that NPL site boundaries are not precisely defined:

When a site is listed, the approach generally used to describe the relevant release(s) is to delineate a geographical area (usually the area within an installation or plant boundaries) and identify the site by reference to that area. As a legal matter, the site is not coextensive with that area, and the boundaries of the installation or plant are not the "boundaries" of the site.... In other words, while geographic terms are often used to designate the site (e.g., the "Jones Co. plant site") in terms of the property owned by a particular party, the site properly understood is not limited to that property (e.g., it may extend beyond the property due to contaminant migration), and conversely may not occupy the full extent of the property (e.g., where there are uncontaminated parts of the identified property, they may not be, strictly speaking, part of the "site").

*Id.* at 2381.

Other documents provide more detail. Both the HRS Documentation Package and the "Listing Notice," a narrative summary of the proposed NPL site, describe the site as "located at 163 River Road" and bordered "to the west by River Road." HRS Documentation Package, J.A. 359; National Priorities List Proposed Rule #35: Narrative Summaries (Jan.2001), J.A. 992 [hereinafter Listing Notice]. Although Three Y could well have understood the reference to "River Road" to mean the new River Road, both documents go on to describe the "heavy end coal tar product" discharge as extending "from the area west of where the *new* River Road exists to approximately 750 feet into the Hudson River." HRS Documentation Package, J.A. 368 (emphasis added); Listing Notice, J.A. 992 (emphasis added). According to EPA, this demonstrates that it used the label "new River Road" when it wished to refer to the new road, so when it used the name "River Road" in the same document, it meant Old River Road. Even though EPA (for whatever reason) did not use the roads' official names, we think this explanation makes sense, particularly since Three Y's interpretation would mean that EPA called the new River Road by two different names in the same document.

AR005452

The RSI Report supports EPA's position. Describing the Quanta Resources area, that document states that "the (old) River Road borders the property to the west. The new River Road is located east of the former location, bisecting the Quanta Property." Removal Site Investigation Report—Revision 1: Quanta Resources Site (June 2000), J.A. 51. Like both the HRS Documentation Package and the Listing Notice, the RSI Report uses the term "new River Road" rather than the official name "River Road" when referring to the new road. It also clearly indicates that the property's western border is "(old) River Road," thus encompassing Three Y's parcel.

Pointing to a different part of the RSI Report, Three Y argues that the identified contamination west of the new River Road extends only to Lot 3, the portion of the land lying between the two River Roads that it does not own. Although EPA characterizes the RSI Report differently, even were Three Y correct, the Report's description of the western boundary as "(old) River Road" put Three Y on notice that its parcel might nevertheless be considered part of the site.

**\*451 \*\*84** In a motion to supplement the administrative record, Three Y calls our attention to a letter from EPA which, according to Three Y, shows that EPA itself did not consider the Three Y property to be part of the Quanta site. The letter, however, is dated April 10, 2001, nearly one month after the comment period closed, so it could

not have given Three Y any reason for believing that its parcel might not be included.

In sum, the Listing Notice, the HRS Documentation Package, and the RSI Report, taken together, put Three Y on notice that its parcel might be included within the Quanta NPL site. Because Three Y failed to submit comments challenging the inclusion of its property, it has forfeited that challenge here.

### IV.

We have considered all petitioners' remaining arguments and, finding them without merit, we deny the petitions for review.

*So ordered*.

### All Citations

372 F.3d 441, 58 ERC 1945, 362 U.S.App.D.C. 74, 34 Envtl. L. Rep. 20,039

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005453

KeyCite Yellow Flag - Negative Treatment
Distinguished by Shands Jacksonville Medical Center v. Burwell,
D.D.C., September 21, 2015

673 F.2d 525
United States Court of Appeals,
District of Columbia Circuit.

The CONNECTICUT LIGHT AND POWER
COMPANY, et al., Petitioners,
v.
NUCLEAR REGULATORY COMMISSION,
Respondent,
Carolina Power and Light Company, Intervenor.

No. 81-1050.
|
Argued Jan. 29, 1982.
|
Decided March 16, 1982.

**Synopsis**
Power company brought a petition for review of an order
of the Nuclear Regulatory Commission adopting a
stringent fire protection program for nuclear power plants
in service before January 1, 1979. The Court of Appeals,
Mikva, Circuit Judge, held that: (1) the notice proposing
the fire protection program sufficiently identified the
technical background of the rules to allow for meaningful
comment during the rule-making process; (2) NRC was
not obligated to renotice the fire protection program on
basis that final rules differed significantly from the rules
announced in the notice of proposed rule making; (3) the
30-day comment period provided by NRC was not
unreasonable; and (4) in light of the fact that the
exemption procedure would allow power plants to show
that alternative measures provided equivalent safety
protection, the record provided sufficient support for
adoption of the fire protection program.

Affirmed.

**\*526 \*\*135** Petition for Review of an Order of the
Nuclear Regulatory commission.

**Attorneys and Law Firms**

James Michael McGarry, III, Washington, D. C., with
whom McNeill Watkins II, Washington, D. C., was on the
brief for appellant, and entered appearances for
intervenor.

Sheldon L. Trubatch, Atty., Nuclear Regulatory Com'n,
Washington, D. C., with whom Anne S. Almy and Martin
Green, Attys. Dept. of Justice, and Stephen F. Eilperin,
Sol., Nuclear Regulatory Com'n, Washington, D. C., were
on the brief for **\*527 \*\*136** respondent. Harvey J.
Shulman and G. Paul Bollwerk, III, Washington, D. C.,
also entered appearances for respondent.

Before WALD, MIKVA and GINSBURG, Circuit
Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Connecticut Light and Power Company ("Connecticut
Light" or "Company") challenges a decision by the
Nuclear Regulatory Commission ("NRC" or
"Commission") to adopt a stringent fire protection
program for nuclear power plants in service before
January 1, 1979, 10 C.F.R. s 50.48, App. A, App. R
(1980). In the wake of a damaging fire at the Browns
Ferry Nuclear Power Plant, a 1976 Commission report
recommended improved fire protection standards for
operating nuclear power plants.[1] Based on the Browns
Ferry Report, the Commission developed technical
guidelines for evaluating the fire safety of both new and
operating nuclear plants.[2] Because of the extensive
problems involved in redesigning a nuclear plant already
built and in service, the guidelines for operating plants
differed from those for plants not completed. For several
years after the promulgation of the guidelines,
Commission staff pursued the approach of evaluating the
safety of operating plants by applying the guidelines on a
plant by plant basis. In a number of cases, the evaluation
process resulted in fire protection programs acceptable to
both Commission staff and the plants in question.
Disagreements persisted, however, on some issues that
were common to a number of plants. As a result, some
five years after the Browns Ferry fire the Commission
decided to embark on the rule-making challenged here.
Notice of Proposed Rule-Making, 45 Fed.Reg. 36,082
(May 29, 1980).

[1]   Nuclear Regulatory Commission, Recommendations
Related to Browns Ferry Fire (1976), Joint Appendix

(J.A.) 13 (hereinafter Browns Ferry Report). The Browns Ferry fire was ignited by a candle that a workman was using to inspect for air leaks. The fire caused considerable damage to the plant, and rendered the emergency core coolant system for one of the plant units temporarily inoperable. Danger to the public was averted because back up systems were able to shut down the unit safely. Nonetheless, the fire raised serious concerns about the adequacy of fire prevention practices and fire control measures at nuclear power plants.

[2]    Auxiliary Power Conversion Systems Branch, Nuclear Regulatory Commission, Branch Technical Position 9.5-1, Appendix A (1976), J.A. 74-96 (hereinafter Branch Technical Position 9.5-1 ).

Connecticut Light and Power Company, licensed by the Commission to operate nuclear generating plants, objects to a number of features of the Commission's adoption of the fire protection program. First, Connecticut Light contends that the notice of proposed rule-making was inadequate because it gave no indication of the technical basis on which the Commission had relied in formulating the proposed rules and because the rules as adopted differed in major respects from the rules proposed in the notice. In this connection, Connecticut Light also complains that the Commission allowed only thirty days for comment, the statutory minimum for notice and comment rule-making, 5 U.S.C. s 553(d) (1976), a period Connecticut Light contends was inadequate given the complexity and relatively innovative character of the rules at issue here. Second, Connecticut Light argues that the Commission failed to offer an adequate technical justification for the fire protection rules in the form in which they were ultimately adopted. Finally, Connecticut Light claims that the Commission failed to comply with its own regulations governing the imposition of new requirements for nuclear plants already in service.[3]

[3]    Connecticut Light also makes the blanket contention that the NRC should not have employed notice and comment rule-making at all for the fire protection program, but should have continued to treat the problem of fire protection for plants already in service on a plant by plant basis. This contention does not merit separate treatment. The NRC's authority to engage in notice and comment rule-making to set safety standards for nuclear power plants is clear. 42 U.S.C. ss 2201(i), 5841(f) (1976); 10 C.F.R. ss 2.800 to 2.808 (1980). If indeed the NRC has presented adequate justification for applying the fire protection program to all operating nuclear power plants, its decision to employ rule-making cannot be regarded as an abuse of

discretion, particularly given the fact that safety issues common to a number of plants remained unresolved more than five years after the Browns Ferry Fire.

**\*528 \*\*137** We affirm the fire protection regulations as adopted by the Commission. The administrative record contains adequate support for the Commission's determination that adoption of the rules was urgently needed to protect the public safety. We cannot conceal, however, our concerns about some of the procedures followed by the Commission in the rule-making process by which the program was adopted. The Commission complied but barely with the procedures mandated by the Administrative Procedure Act for notice and comment rule-making, 5 U.S.C. s 553 (1976).

The process of notice and comment rule-making is not to be an empty charade. It is to be a process of reasoned decision-making. One particularly important component of the reasoning process is the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules. Ethyl Corp. v. Environmental Protection Agency, 541 F.2d 1, 48 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The procedures followed by the NRC here came perilously close to foreclosing any useful participation whatsoever during the rule-making process itself.

An equally important component of the process of reasoned decision-making is the agency's own explanation for the rules it adopts. While an agency need not justify the rules it selects in every detail, it should explain the general bases for the rules chosen. Such explanations help assure public confidence in the rule-making process. Disclosure of the agency's rationale is particularly important in order that a reviewing court may fulfill its statutory obligation to determine whether the agency's choice of rules was arbitrary or capricious, 5 U.S.C. s 706(2)(A) (1976); Ethyl Corp., 541 F.2d at 34. The NRC has not made our task on review easy. If the Commission had provided any less in the way of reasoned explanation for the fire protection program selected, we would be compelled to remand the program to the NRC.

## I. THE FIRE PROTECTION PROGRAM

The NRC proposed and adopted a comprehensive program to prevent, detect, control, and extinguish fires in

operating nuclear power plants. Although the program includes a number of specific requirements debated in the plant evaluations that followed the Browns Ferry fire, three specific parts of the program are challenged in this appeal. They are the methodology mandated for protecting duplicate systems to shut down reactor units safely in case of fire, the requirements for the design of alternative shutdown mechanisms when needed as a substitute for duplicate systems, and the method stipulated for protecting the lubrication system for the reactor's coolant pump.

In most cases in a nuclear power plant, it is possible to design duplicate systems for shutting down reactor units in case of an emergency such as a fire. The duplicate system is provided as a back-up, in case the primary shutdown system should be damaged or destroyed. It is thus especially important to ensure that the duplicate shutdown system cannot be damaged by whatever emergency disables the primary shutdown system.

In the plant by plant evaluations after the Browns Ferry fire, and in the notice of proposed rule-making, the Commission followed a "postulated hazards" approach to the protection of duplicate safe shutdown capacity. On this approach, a plant's protection of such redundant shutdown capacity is tested by reference to a number of factors. In the fire protection program as proposed, these factors included the likely area within which a fire might spread, the fire extinguishing system used in the area, the accessibility of the area to fire fighters and equipment, the relative fire danger in the area, the availability of alternative methods for shutting down the reactor unit *529 **138 safely, and the fire retardant capacity of protective devices such as fire retardant coatings. 45 Fed.Reg. 36,087 (1980). Pursuant to these guidelines, NRC staff had approved the methods used to protect duplicate shutdown capacity in a number of nuclear plants in service before January 1979. The final rule adopted by the Commission, however, abandoned the postulated hazards approach. In its stead, the Commission stipulated three approved methods for protecting duplicate shutdown capacity. These are: separation of the redundant system by a barrier able to withstand fire for at least three hours; separation of the redundant system by a distance of twenty feet containing no intervening combustible material, together with fire detectors and an automatic fire suppression system; and enclosure of the redundant system in a fire barrier able to withstand fire for one hour, coupled with fire detectors and an automatic fire suppression system. 10 C.F.R. s 50, App. R, III.G.2 (1980). These methods give no credit for fire retardant coatings and do not consider the relative fire danger of the area in which the redundant shutdown system is located.

In some cases, it is also necessary to provide alternative shutdown capacity in order to protect the reactor unit in case of fire. For example, it may be impossible to redesign an operating plant in order to protect a duplicate shutdown system adequately. To protect the public safety, alternative shutdown systems must be protected against damage, just as redundant shutdown systems must be. The Commission proposed a postulated hazards approach to the evaluation of alternative shutdown capacity, under which a plant was to be required to show it could protect at least one means for shutting down the plant from damage for at least seventy-two hours following a fire. Notice of Proposed Rule-Making, 45 Fed.Reg. 36,089 (May 29, 1980).

The final rules adopted by the Commission, however, abandoned the postulated hazards approach to the protection of alternative shutdown capacity. Instead, the final rules stipulated that alternative shutdown capacity must be protected by one of the methods acceptable for the protection of redundant shutdown capacity. 10 C.F.R. s 50, App. R, III.G.2 (1980). In addition, the Commission continued to require that one back up method for ensuring safe shutdown in case of fire should be able to remain operable for at least seventy-two hours following a fire. Id. s 50, App. R. III.L.1. One important aspect of this requirement is that the back up method should be sufficiently isolated from associated electrical circuitry to prevent damaged circuits from spreading a continuing fire into the back up system. Id. s 50, App. R. III.L.7. It may be especially difficult and expensive to redesign operating nuclear power plants to meet this last provision.

The third aspect of the fire protection program challenged here concerns the protection of lubricant for the reactor's coolant system. The lubrication oil in the reactor's coolant system must be protected in order to protect the coolant system, and ultimately the reactor itself. Because the oil is flammable, however, it poses a significant fire hazard. The NRC originally proposed two acceptable methods for protecting the lubricant: an oil collection system, which drains the pump lubricant away from the reach of the fire; and an automatic fire suppression system, which attempts to put out the fire before it can reach the lubricant. Notice of Proposed Rule-Making, 45 Fed.Reg. 36,090 (May 29, 1980). During the process of plant by plant evaluation that preceded the rule-making, NRC staff had approved fire suppression systems for protecting the lubricant in a number of plants.[4] The Commission, however, concluded that only an oil collection system could sufficiently protect the coolant pump lubricant *530 **139 from fire. The final rule, therefore, stipulates only one method for protecting the lubrication oil: an oil collection system. 10

C.F.R. s 50, App.R, III.O (1980).

4      An example is the Robinson 2 unit, owned by Carolina Power & Light Company. Carolina Power and Light is an intervenor in this lawsuit. Its brief explains in great detail how the fire protection program as finally adopted by the NRC may require operating plants to make changes beyond those already undertaken at the direction of NRC staff during the plant by plant evaluation process.

This rule-making followed an extensive process of plant by plant evaluations that had culminated in NRC staff approval of entire fire protection programs at many nuclear power plants and of important portions of such programs at others. Even so, the original notice of proposed rule-making contained no indication of whether plants would be required to alter approved features to comply with the new regulations. The final rule specified that most of the particular requirements would not be imposed upon plants that had received staff approval of features before the effective date of the new rule. 10 C.F.R. s 50.48(b) (1980). Three particular requirements, however, were to be applied to all nuclear plants operating before January 1, 1979, regardless of whether they had received staff approval of these aspects of their fire protection program. Id. These include the portions of the fire protection program challenged here: the standards for protecting duplicate and alternative safe shutdown capacity and the method for protecting the reactor coolant pump lubricant.[5]

5      They also include an emergency lighting requirement not challenged here. 10 C.F.R. s 50.48(b) & App.R, III.J (1980).

The final rules, however, contain an additional, critical element of flexibility. Within thirty days of the rules' effective date, licensees were allowed to apply for exemptions from any aspect of the fire protection program, including those requirements applied to plants in spite of prior staff approval of protection systems that did not conform to the new rules. Id. s 50.48(c) (6). Implementation of the new rules is tolled pending final Commission action on the exemption request. Id. Exemptions are to be granted by the Commission upon a showing by the licensee that the required plant modification "would not enhance fire protection safety in the facility or that such modifications may be detrimental to overall facility safety." Id. Apparently a number of such exemption requests were filed within the time provided and are now under consideration by the NRC. Final decisions by the NRC on the exemption requests will themselves be subject to judicial review, 5 U.S.C. s

702 (1976).

## II. THE ADEQUACY OF THE NOTICE OF PROPOSED RULE-MAKING

A. Disclosure of the Technical Basis for the Proposed Rules. The Administrative Procedure Act requires an agency engaged in informal rule-making to publish a notice of proposed rule-making in the Federal Register that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. s 553(b)(3) (1976). Connecticut Light's most serious complaint about the notice of proposed rule-making here is that it failed to indicate or explain the technical basis on which the Commission had relied in selecting the proposed rules.

The purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticisms to the agency during the rule-making process. If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals. As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making. In order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules. To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport. An agency commits serious procedural error when it fails to reveal **\*531 \*\*140** portions of the technical basis for a proposed rule in time to allow for meaningful commentary.[6]

6      Sierra Club v. Costle, 657 F.2d 298, 397 n.484 (D.C.Cir.1981); National Crushed Stone Association v. EPA, 601 F.2d 111, 117 (4th Cir. 1979), reversed on other grounds, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); United States v. Nova Scotia Food Products Corp., 568 F.2d 240 (2d Cir. 1977); Home Box Office, Inc. v. FCC, 567 F.2d 9, 55 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); Portland Cement Association v. Ruckelshaus, 486 F.2d 375, 392 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). See

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005457

Connecticut Light and Power Co. v. Nuclear Regulatory Commission, 673 F.2d 525 (1982)

218 U.S.App.D.C. 134

also Aqua Slide 'N' Dive Corp. v. Consumer Product Safety Commission, 569 F.2d 831, 838 (5th Cir. 1978) (failure to subject technical material to adversarial comment affects weight that may be accorded the material by reviewing court). Cf. FCC v. WNCN Listeners Guild, 450 U.S. 582, 591 n.22, 101 S.Ct. 1266, 1272 n.22, 67 L.Ed.2d 521 (1981) (failure to disclose a staff study on the effectiveness of market allocation mechanisms in accommodating diversity "even if a procedural lapse, (not) ... a sufficient ground for reopening the proceeding before the Commission.") Because we find that the Commission did provide minimally sufficient indication of the technical materials upon which it relied here, we need not reach the issue of whether a given set of omissions is a procedural lapse serious enough to warrant a remand to the agency.

 The notice proposing the fire protection program made little reference to technical material. It referred only to the Browns Ferry Report and to the guidelines laid down in Branch Technical Position 9.5-1 and employed in the plant by plant safety evaluations. 45 Fed.Reg. 36,082 (May 29, 1980). Otherwise the Commission asserted that "(t)he position of the staff and the licensees regarding the provisions of this rule is documented and well known." Id.

Connecticut Light contends to the contrary that the Commission's position was not well-known at all. Some technical papers relied upon by the Commission, Connecticut Light asserts, were either not public or were not identified as relevant by the Commission until long after the comment period had closed.[7] Utilities wishing to comment on these technical studies, the Company argues, would thus have either been unable to review some relevant documents, or would have faced the situation of having to guess which of a myriad of entries in the Commission's public documents room has played an important role in the development of the fire protection program.

[7]    Connecticut Light's position here is fueled by the NRC itself. In an opinion denying a motion by several nuclear power plant licensees for a stay of the portions of the fire protection program challenged here, the NRC justified the fire protection program by reference to a range of technical material and staff documents. Memorandum and Order No. CLI-81-11 (NRC June 12, 1980). At oral argument, NRC counsel specifically represented to the court that the experience accumulated during the plant by plant evaluations, together with the Sandia test results listed in note 8 infra, were the most important bases of the rule as proposed. Both final safety reports and the communications that took place during their development are in the NRC public documents room. So are the relevant Sandia reports. In this opinion, therefore, we consider only whether the accumulated experience of the safety evaluations of individual plants, the Sandia reports, the Browns Ferry Report, Branch Technical Position No. 9.5-1, and the comments submitted to the Commission during the comment period, provide adequate justification for the rules as finally adopted by the Commission.

The Commission's belief that its position was well-known was not entirely unreasonable. It was based in the first instance on the wide circulation of the Browns Ferry Report and Branch Technical Position 9.5-1. Indeed, Connecticut Light does not contest the availability or importance of these documents in this appeal. The Commission also contends that it relied heavily on the safety evaluations that had been prepared by NRC staff during the plant by plant evaluation process. These safety reports were on file in the NRC public documents room during the comment period. Of course, it would be unfair to charge one utility with knowledge of the details of what went on during a safety review of another utility's nuclear power plants. The NRC, however, did not assume that the utility companies had or should have shared information developed in individualized safety reviews. Instead, it relied on the utilities' common knowledge of problems that had recurred in plant after plant and of reports that had been publicly **532 **141 filed. There was in fact a common store of experience on which the NRC drew, that had been developed and accumulated in interaction with the utilities during the five-year period that followed the Browns Ferry fire.

Finally, the Commission did rely on some technical studies that were not mentioned in the notice of proposed rule-making. Two sets of studies made by Sandia Laboratories, both important to the development of the proposals for protecting duplicate and alternative shutdown capacity, are paramount examples of this.[8] These studies concerning the effectiveness of separation distances in preventing fire from spreading from one set of cables to another and the usefulness of fire retardant coatings, however, had already been subject to widespread public comment. The separation distance studies were part of the basis of a petition by the Union of Concerned Scientists (UCS) to require the NRC to alter its fire protection standards.[9] They were subject to public comment during the review of the UCS petition and a public memorandum by the NRC staff responded specifically to criticisms of the separations tests submitted during that review.[10] The fire retardant coatings studies, also public, formed part of the basis for a petition for reconsideration by the UCS.

AR005458

8    Sandia Laboratories, A Preliminary Report on Fire Protection Research Program (July 6, 1977 Test), No. SAND 77-1424 (October, 1977), J.A. 123; Sandia Laboratories, A Preliminary Report on Fire Protection Research Program-Fire Retardant Coatings Tests (December 7, 1977-January 31, 1978), No. SAND 78-0518 (March 1978), J.A. 287; Sandia Laboratories, A Preliminary Report on Fire Protection Research Program Fire Barriers and Fire Retardant Coatings Tests, No. NUREG-CR-0381 (Sept. 1978), J.A. 349.

9    See J.A. 153, 258.

10   NRC Staff Report on Union of Concerned Scientists' Petition for Emergency and Remedial Action (December 15, 1977), J.A. 260.

During the comment period, the utilities repeatedly asked the NRC to identify the technical studies upon which the proposed rules were based. The NRC was unhelpful and the comments submitted are noticeably general.[11] Certainly, it would have been better practice for the NRC to have identified these technical materials specifically in the notice of proposed rule-making. Nonetheless, this rule-making process took place against a background of five years during which the Commission explored safety proposals in a public forum and exposed the important technical studies to adversarial comment.[12] Given this context, we conclude that the technical background of the rules was sufficiently identified to allow for meaningful comment during the rule-making process.

11   See, e.g., Comments of Northeast Utilities, J.A. 538; Comments of Edison Electric Institute, J.A. 563; Comments of Baltimore Gas & Electric Company, J.A. 591.

12   At oral argument, counsel for the Commission conceded that it would have been reasonable for the Commission to include references to technical data in the notice of proposed rule-making. He contended only that the Commission's failure to do so here should not be fatal to this rule-making because of the extensive background of interaction between licensees of nuclear plants and the Commission in the five years between the Browns Ferry fire and the notice of proposed rule-making itself.

B. Differences Between the Fire Protection Program as Proposed and as Adopted. Connecticut Light's second

major challenge to the NRC procedures here is that the Commission adopted final rules that differed significantly from the rules announced in the notice of proposed rule-making. Connecticut Light contends that because of the differences the NRC should have renoticed the changed rules and set a new comment period. Connecticut Light regards three particular changes as crucial: the change from the postulated hazards approach to a list of three acceptable methods for protecting duplicate and alternative shutdown capacity, the decision to give no credit for fire retardant coatings, and the determination that a collection system is the only acceptable means for protecting the coolant pump lubrication oil. We find that the rules as adopted were sufficiently similar to the rules as proposed that renoticing **533 **142 was not required. An important factor in our decision, however, is that with the exemption provision the practical impact of the final rules is very similar to what it would have been if the proposed rules had gone into effect.

An agency adopting final rules that differ from its proposed rules is required to renotice when the changes are so major that the original notice did not adequately frame the subjects for discussion. The purpose of the new notice is to allow interested parties a fair opportunity to comment upon the final rules in their altered form. The agency need not renotice changes that follow logically from or that reasonably develop the rules it proposed originally. Otherwise, the comment period would be a perpetual exercise rather than a genuine interchange resulting in improved rules. Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1031 (D.C.Cir.1978); Ethyl Corp. v. Environmental Protection Agency, 541 F.2d 1, 48 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).[13]

13   The authorities cited by Connecticut Light in support of its argument that new notice was required in this case all involved major failures to indicate the nature or scope of the final rule adopted. In Kollett v. Harris, 619 F.2d 134 (1st Cir. 1980), the notice announced the general subject of income and exclusions from income of persons eligible for Supplemental Security Income benefits, but not the particular topic of the challenged rule, the implementation of the statutory provision concerning the attribution of parental income to children, 42 U.S.C. s 1382c(f)(2) (1976). In American Standards, Inc. v. United States, 602 F.2d 256 (Ct.Cl.1979), the court held that a proposal to compute a deduction for certain trade corporations by the consolidation of taxable incomes did not adequately warn the public that the Treasury intended to include the case in which a corporation had a net loss. American Iron & Steel Institute v. Environmental Protection Agency, 568 F.2d 284 (3d Cir. 1977), involved a notice of proposed rule-making that completely failed to indicate that the regulations

AR005459

proposed would apply to a subcategory of the steel industry, the specialty steel segment.

Here, the final rules were a "logical outgrowth" of the rules as proposed. Weyerhaeuser Co. v. Costle, 590 F.2d at 1031. The NRC had proposed two methods for protecting coolant pump lubrication oil; the final rule mandated one of these methods, a collection system, because of concern about the flammability of the lubrication oil. The NRC had proposed a method for protecting alternate and duplicate shutdown capacity that included consideration of the effects of fire retardant coatings; the final rule ignored the coatings because of concern about their reliability. With respect to both of these changes, the notice of proposed rule-making clearly revealed both the precise "subject matter" and the "issues" involved as required by the APA, 5 U.S.C. s 553(b)(3) (1976). The final rules were simply more stringent versions of the proposed rules.

The question is somewhat closer with respect to the change in methods of protecting duplicate shutdown capacity from the postulated hazards approach to the stipulation of the three acceptable alternatives. Connecticut Light contends that it did not have a fair opportunity to comment on the latter approach, because the approach was entirely novel. The NRC replies that it adopted the stipulated alternatives approach because of criticism about the complexity of the postulated hazards approach.[14] It also points out that with the exemption procedure the stipulated alternatives approach is not a major shift in NRC policy.

[14]   A number of power companies commented unfavorably upon the "excessive detail" of the proposed postulated hazards approach. See Comments of Northeast Utilities, J.A. 539; Comments of Yankee Power Company, J.A. 558-59; Comments of Edison Electric Institute, J.A. 576; Comments of Consumers' Power Company, J.A. 587; Comments of Florida Power & Light Company, J.A. 590.

In explaining the interplay between the adoption of the stipulated alternatives approach and the exemption procedure, the Commission stated:

> Requirements that account for all of the parameters that are important to fire protection and consistent with safety requirements for all plant-unique configurations have not yet been developed. In light of

the experience gained in fire *534 **143 protection evaluations over the past four years, the Commission believes that the licensees should reexamine those previously approved configurations of fire protection that do not meet the requirements as specified in Section III.G. to Appendix R. Based on this reexamination the licensee must either meet the requirements of Section III.G. of Appendix R or apply for an exemption that justifies alternatives by a fire hazard analysis.

45 Fed.Reg. 76,603 (Nov. 19, 1980). The practical effect of the exemption procedure is thus to give utilities a fourth alternative: if the company can prove that another method works as well as one of the three stipulated by the NRC, in light of the identified fire hazards at its plant, it may continue to employ that method. The NRC at oral argument characterized the final rule as adopted with the exemption provision as "functionally ... the same" as the postulated hazards approach. As counsel for the NRC explained at oral argument in response to a question about whether the difference between the proposed and final rules was merely one of nomenclature:

> As it works out practically, yes, (the difference is one of nomenclature) because we now have in house these at least forty-four exemption requests for just the one redundant separation part of the rule and the staff will be doing the same kind of review of analyses and the utilities will be doing the same kind of analysis that they would have done under the proposed rule.

Counsel further explained that the postulated hazards approach placed the burden on the utility to show how its protection program could meet likely fire hazards, and the exemption procedure similarly placed the burden on the utility to show that safety would not be enhanced by installing one of the alternatives stipulated in the rule.

Certainly, a rule that continues to allow a proposed

approach as an alternative to other stipulated methods may be regarded as the logical successor to the proposed approach. On this basis, we conclude that the NRC was not obligated to renotice the fire protection program when it shifted from reliance on the postulated hazards approach to the stipulated alternatives approach in conjunction with the exemption procedure.

C. The Thirty-Day Comment Period. Connecticut Light's final objection to the notice and comment procedures followed by the NRC is that the NRC allowed but a thirty-day comment period, without extension. Notice of Proposed Rule-Making, 45 Fed.Reg. 36,082 (May 29, 1980). This is the statutory minimum, 5 U.S.C. s 553(d) (1976). The NRC justified thus limiting the comment period because of the extensive background of public comment and open meetings that preceded the rule-making concerning the fire protection program. Connecticut Light, however, objects that the provision requiring the separation of associated circuits in particular was a novel proposal and that members of the industry therefore should have been granted a longer comment period.

We cannot say that the NRC's choice of a comment period was unreasonable. Neither statute nor regulation mandates that the agency do more. While the technical complexity of the regulations is such that a somewhat longer comment period might have been helpful, the NRC had been exploring without complete success the problem of fire protection at nuclear plants with members of the industry for over five years. We shall not gainsay the Commission's conclusion that "it is timely and necessary ... to state what the minimum fire protection requirements will be in each of these contested areas of concern." 45 Fed.Reg. 36,083 (May 29, 1980).

III. THE NRC'S JUSTIFICATION FOR THE FINAL RULES

Under the Administrative Procedure Act, an agency adopting rules by notice and comment rule-making must provide "a concise general statement of (the rules') basis and purpose." 5 U.S.C. s 553(c) (1976). This statement need not be comprehensive, but it must indicate sufficiently the agency's reasons for the rules selected, so that the reviewing court is not faced with the **535 **144 task of "rummaging" through the record to elicit a rationale on its own. United States ex rel. Checkman v. Laird, 469 F.2d 773, 783 (2d Cir. 1972) (Leventhal, J.);

See also American Public Transit Association v. Lewis, 655 F.2d 1272, 1278 (D.C.Cir.1981); Harborlite Corp. v. ICC, 613 F.2d 1088, 1093 n.9 (D.C.Cir.1979). In this case, the Commission has come close indeed to requiring this court to search dusty attic corners of the record to bring to light an adequate rationale for the Commission's action.

We are asked here to consider three aspects of the final rule: the methods stipulated for protecting duplicate and alternate shutdown capacity, the refusal to consider fire retardant coatings as protective devices, and the decision to allow only a collection system to protect the reactor coolant pump lubrication oil. As justification for stipulating the three methods of protecting shutdown capacity, 10 C.F.R. s 50, App.R, III.G.2 (1980), the Commission referred to the extreme importance of ensuring safe shutdown capacity in case of fire. It found the postulated hazards approach insufficiently protective because "it is not possible to predict the specific conditions under which fires may occur and propagate." Instead, the Commission decided to proceed on a known basis, the design features of the three protective methods selected. 45 Fed.Reg. 76,606 (Nov. 19, 1980). Finally, the Commission noted that comments had suggested the need to simplify the rule and that adoption of the three methods would certainly provide "clarification" of what was acceptable. Id.

The Commission's assertions about the protective capacities of the stipulated methods were not supported by specific reference to technical materials. Such technical guidance would have simplified this court's task on review considerably. Nonetheless, it is fairly clear that the Commission intended to refer generally to the tests of fire propagation among cable systems conducted by Sandia Laboratories.[15] These tests are far from conclusive proof that the three methods stipulated are the only methods capable of protecting safe shutdown capacity. They do, however, provide some record support for the effectiveness of the methods chosen. In light of the fact that the exemption procedure will allow power plants to show that alternative measures provide equivalent safety protection, we find that the record provides sufficient support for that aspect of the fire protection program applying to shutdown capacity.

[15]    See note 8, supra.

The Commission's refusal to include fire retardant coatings as devices for protecting cable systems was based on "some separate effects tests." 45 Fed.Reg. 76,603 (Nov. 19, 1980). These appear to have been the Sandia tests of fire retardant coatings.[16] Once again, the

AR005461

technical material is insufficient to support the conclusion that a protective system including fire retardant coatings could never be as effective as the three methods allowed by the Commission for the protection of safe shutdown capacity in App.R, III.G.2. The Sandia tests conclude that retardant coatings offer varying amounts of cable protection. Moreover, it is by no means clear that the Sandia tests evaluated all of the coatings that are now available.

16    Sandia Laboratories, A Preliminary Report on Fire Protection Research Program-Fire Retardant Coatings Tests (December 7, 1977-January 31, 1978), No. SAND 78-0518 (March 1978), J.A. 287; Sandia Laboratories, A Preliminary Report on Fire Protection Research Program Fire Barriers and Fire Retardant Coatings Tests, No. NUREG-CR-0381 (Sept. 1978), J.A. 349.

The exemption procedure, however, indicates that the Commission did not intend to limit protective measures to the three methods stipulated in the rule, 10 C.F.R. s 50, App.R, III.G.2 (1980). If the utility can show that some combination of protective measures provides protection equivalent to that afforded by one of the Commission's three stipulated methods, it will be entitled to an exemption, regardless of whether the combination of measures includes fire retardant coatings. The statement that "based on present information, the Commission does not expect to be able to approve exemptions **145 *536 for fire-retardant coatings used as fire barriers," 45 Fed.Reg. 76,609 (Nov. 19, 1980), must therefore be regarded as mere mischievous dictum. Whatever the Commission's present expectations, it must remain open to power companies to show in individual exemption applications that fire retardant coatings in conjunction with other protective means can provide adequate levels of fire protection.

Finally, the Commission allowed only one method for protecting coolant pump lubrication oil, a collection system, 10 C.F.R. s 50, App.R, III.0 (1980). This limitation was justified because of the possibility that uncollected oil might come in contact with hot surfaces, igniting a dangerous and inaccessible fire. 45 Fed.Reg. 76,708 (Nov. 19, 1980). Another inadequacy of the alternative initially proposed by the Commission, a water system for putting out fires in the lubricant, was that such a suppression system might not withstand an earthquake, a possible cause of a power plant fire. Id. at 76,609. But the Commission's rationale does not mandate the conclusion that a suppression system could never be as effective as a collection system; it does not, for example, take into account differences in seismic danger for different nuclear plants. Once again, however, the

exemption procedure is crucial. Companies such as the intervenor Carolina Power and Light, which had installed a suppression system with approval of the Commission staff, will have an opportunity to show that their system is as protective of the public safety as the system chosen by the Commission.

## IV. THE COMMISSION'S BACKFIT REGULATIONS

An agency is bound by its own regulations and commits procedural error if it fails to abide by them. Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120, 1135 & n.84 (D.C.Cir.1979), cert. denied, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). The NRC has adopted a specific regulation governing the imposition of structural changes upon nuclear plants for which construction permits have been issued, 10 C.F.R. s 50.109 (1980). Connecticut Light contends that the NRC failed to honor its regulation governing backfitting in promulgating the fire protection program.

We disagree. The NRC's regulations allow backfitting only if the Commission "finds that such action will provide substantial, additional protection which is required for the public health and safety or the common defense and security." Id. s 50.109(a). The regulation further provides, "Nothing in this section shall be deemed to relieve a holder of a construction permit or a license from compliance with the rules, regulations, or orders of the Commission." Id. s 50.109(b). The NRC interprets the complete regulation to require the additional public safety finding when backfitting is not imposed on power plants through the rule-making process. For example, NRC staff reviews sometimes require backfitting; at oral argument, counsel for the NRC indicated that s 50.109(a) was designed to protect power plants from precipitous staff recommendations. This interpretation of the regulations is sensible. During the rule-making process, the NRC is forced to justify the need for regulations involving backfitting by virtue of the rule-making itself. A further finding on the impact of the regulations on the public safety would be otiose. We therefore adhere to the NRC's construction of its backfit regulations and reject Connecticut Light's contention that the NRC failed to honor the regulations. See Belco Petroleum Corp. v. FERC, 589 F.2d 680, 685 (D.C.Cir.1978) ("When construction of an agency regulation is in issue, courts owe great deference to the interpretation adopted by the agency and will uphold that interpretation if it is reasonable and consistent with the regulation.")

AR005462

Connecticut Light and Power Co. v. Nuclear Regulatory Commission, 673 F.2d 525 (1982)
218 U.S.App.D.C. 134

### V. CONCLUSION

Our decision to uphold the NRC's adoption of the fire protection program is reluctant. At almost every step of the way, the NRC's procedures were less than exemplary. The notice of proposed rule-making was cursory and gave the industry the minimum **\*537 \*\*146** acceptable opportunity to respond. The agency's statement of the basis for the program in its final form provided limited technical guidance indeed. Surely, the NRC is entitled to use its discretion to err on the side of protecting the public safety when it regulates nuclear power plants. If the NRC treats the safeguards of the administrative process in too cavalier a fashion, however, it may be impossible for the reviewing court to discern that its action has indeed furthered the public safety.

Nonetheless, this is a case in which the rule as tempered by the exemption procedure must be upheld. The fire protection program with the exemption procedure is not a radical departure from the program as it was developed after the Browns Ferry fire and as it was originally proposed. With the exemption procedure, power plants will be able to show that alternative fire protection systems protect the public safety at the same high level as the system chosen by the Commission. Their failure to make such showings will only be further proof that the Commission was indeed correct that the public safety urgently required a stringent fire protection program for nuclear power plants.

**All Citations**

673 F.2d 525, 218 U.S.App.D.C. 134

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005463

U. S. v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972)
92 S.Ct. 1941, 32 L.Ed.2d 453

KeyCite Yellow Flag - Negative Treatment
Distinguished by Alaka"i Na Keiki, Inc. v. Hamamoto, Hawai'i, January 22, 2007

92 S.Ct. 1941
Supreme Court of the United States

UNITED STATES et al., Appellants,
v.
ALLEGHENY-LUDLUM STEEL CORPORATION
et al.

No. 71—227.
|
Argued March 27, 1972.
|
Decided June 7, 1972.

**Synopsis**
Action to enjoin enforcement of two 'car service rules' that were promulgated by Interstate Commerce Commission and that would have general effect of requiring that unloaded freight cars be returned in direction of the owning railroads. A Three-Judge United States District Court for the Western District of Pennsylvania, 325 F.Supp. 352, held the Commission's order invalid and Supreme Court noted probable jurisdiction. The Supreme Court, Mr. Justice Rehnquist, held that where existing practices tended to destroy incentive of railroads to acquire new cars and resulting failure to do so contributed to nationwide shortage that prevented railroad industry from adequately serving shippers, the car service rules that tended to restore incentive to railroads to augment their supply of freight cars, even at temporary expense of optimum utilization of existing fleet, were 'reasonable' within Esch Car Service Act empowering Commission to establish reasonable rules, regulations and practices with respect to car service.

Reversed.

**\*\*1943** Syllabus[*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*742** 1. Two 'car service rules' promulgated by the Interstate Commerce Commission (ICC), requiring generally that unloaded freight cars be returned in the direction of the owning railroad, are 'reasonable' under the Esch Car Service Act of 1917, in view of the ICC's finding, for which there is substantial record support, of a national freight car shortage, and its conclusion that the shortage could be alleviated by mandatory observance of the rules, which would give the railroads greater use of their cars and provide an incentive for the purchase of new equipment. Pp. 1944—1950.

2. The ICC proceeding in this case was governed by, and fully complied with, s 553 of the Administrative Procedure Act. Pp. 1950—1951.

D.C., 325 F.Supp. 352, reversed.

**Attorneys and Law Firms**

Samuel Huntington, Washington, D.C., for appellants.

Max O. Truitt, Jr., and William M. Moloney, Washington, D.C., for appellees.

**Opinion**

Mr. Justice REHNQUIST delivered the opinion for a unanimous Court.

**\*\*1944** In 1969 the Interstate Commerce Commission promulgated two 'car service rules' that would have the **\*743** general effect of requiring that freight cars, after being unloaded, be returned in the direction of the lines of the road owning the cars. Several railroads and shippers instituted two separate suits under 28 U.S.C. ss 2321—2325 to enjoin enforcement of these rules. In Florida East Coast R. Co. v. United States, 327 F.Supp. 1076 (MD Fla.1971), the action of the Commission was sustained by a three-judge court, but in the case now before us a similar court for the Western District of Pennsylvania held the Commission's order invalid. 325 F.Supp. 352 (WD Pa.1971). We noted probable jurisdiction, 404 U.S. 937, 92 S.Ct. 275, 30 L.Ed.2d 249, and for the reasons hereinafter stated we conclude that the Commission's action here challenged was within the scope of the authority conferred upon it by Congress and conformed to procedural requirements.

The country's railroads long ago abandoned the custom of shifting freight between the cars of connecting roads, and

AR005464

U. S. v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972)
92 S.Ct. 1941, 32 L.Ed.2d 453

adopted the practice of shipping the same loaded car over connecting lines to its ultimate destination. The freight cars of the Nation thus became in essence a single common pool, used by all roads. This practice necessarily required some arrangements for eventual return of a freight car to the lines of the road which owned it, and in 1902 the railroads through their trade association dealt with this and related problems in a code of car-service rules with which the roads agreed among themselves to comply. The effect of the Commission's order now under review is to promulgate two of these rules[1] as the Commission's own, with the result that sanctions attach to their violation by the railroads.

[1]   'Rule 1. Foreign cars, empty at a junction with the home road, must be:
'(a) Loaded at that junction to or via home rails, or,
'(b) Delivered empty at that junction to home road, except in instances where Rule 6 has been invoked, or unless otherwise agreed by roads involved.
'Rule 2. Foreign empty cars other than those covered in Rule 1 shall be:
'(a) Loaded to or via owner's rails.
'(b) Loaded to a destination closer to owner's rails than is the loading station or delivered empty to a short line or switch loading road for such loading. (Car Selection Chart is designed to aid in so selecting cars for loading.)
'(c) Delivered empty to the home road at any junction subject to Rule 6.
'(d) Delivered empty to the road from which originally received under load, at the junction where received, Except that when handled in road haul service, cars of direct connection ownership may not be delivered empty to a road which does not have a direct connection with the car owner.
'(e) Returned empty to the delivering road when handled only in switching service.'   Jurisdictional Statement 64.

*744 Because of critical freight-car shortages experienced during World War I, Congress enacted the Esch Car Service Act of 1917, which empowered the Commission to establish reasonable rules and practices with respect to car service by railroads. 40 Stat. 101, 49 U.S.C. s 1(14)(a). The pertinent language of that Act provides:

> 'The Commission may . . . establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter . . ..'

No party to this proceeding has questioned that the rules promulgated by the Commission are 'rules, regulations, and practices with respect to car service,' and therefore the issue before us is whether these rules are 'reasonable' as that term is used in the Esch Act. The court below concluded, and the appellees here contend, that for a number of reasons the rules in question do not meet the statutory requirement of reasonableness. Appellees also contend that the findings jof the Commission *745 are insufficient findings of the Commission are insufficient Act, 5 U.S.C. s 551 et seq.

The record of proceedings before the Commission establishes that the Commission has been increasingly concerned with recurring shortages of freight cars **1945 available to serve the Nation's shippers. It found that shortages of varying duration and severity occur both as an annual phenomenon at peak loading periods and also during times of national emergency. The result of these shortages has been that roads were unable to promptly supply freight cars to shippers who had need of them.

Underlying these chronic shortages of available freight cars, the Commission found, was an inadequate supply of freight cars owned by the Nation's railroads. The Commission concluded that one of the principal factors causing this inadequate supply of freight cars was the operation of the national car-pool system. In practice this system resulted in freight cars being on lines other than those of the owning road for long periods of time, since the rules providing for the return of unloaded freight cars in the direction of the lines of the owning road were observed more often than not in the breach. Since the owning road was deprived of the use of its own freight cars for extended periods of time, the Commission found, there was very little incentive for it to acquire new freight cars. In addition, since a road which owned a supply of freight cars inadequate to serve its own on-line shippers could generally, by hook or by crook, arrange to utilize cars owned by other roads, the national car-pool system significantly reduced the normal incentive for a railroad to acquire sufficient equipment to serve its customers. The rules promulgated by the Commission are intended to make those railroads whose undersupply of freight cars contributes to the national shortage more directly feel the *746 pinch resulting from the shortage that they have helped to cause. By thus requiring each road to face up to any inadequacies in its ownership of freight cars, the rules are intended in the long run to correct the nationwide short supply of freight cars that the Commission has found to exist.

 Central to the justification for the Commission's promulgation of these rules is its finding that there was a nationwide shortage of freight car ownership. The court below assumed the correctness of that finding, and we

AR005465

U. S. v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972)
92 S.Ct. 1941, 32 L.Ed.2d 453

conclude that it was supported by substantial evidence.

Shortly after the Second World War, the Commission conducted an investigation into the adequacy of freight car supply and utilization by the Nation's railroads. The Commission in that proceeding concluded that there was 'an inadequacy in freight car ownership by rail carriers as a group.' Recognizing that this inadequacy was caused at least in part by the inability of the railroads to acquire new equipment, first during an era of wartime demand and then during an era of post-war boom, the Commission at that time imposed no obligation on the railroads except to require them to file with it their rules and regulations with respect to car service.

In 1963 the Commission began this investigation into the adequacy of car ownership, distribution, and utilization. At the conclusion of the investigatory phase of the proceeding in 1964, the Commission determined that there was a shortage of freight cars in general service. 323 I.C.C. 48 (1964). Formal notification of proposed rulemaking was then issued, and a questionnaire was submitted to the various railroads for the purpose of compiling data on car ownership and use. After these data were gathered, railroads, shippers, and other interested parties were permitted to file verified statements providing further factual material and to adduce **\*747** legal arguments. The Commission, through its Bureau of Operations, presented to the Hearing Examiner tabular collations of the freight car ownership and use data, and suggested a formula by which a railroad might compute the sufficiency of its freight car ownership. The Bureau also proposed that the entire Code of Car Service Rules adopted by the Association of American Railroads be promulgated by the Commission for mandatory observance.

**\*\*1946** Many railroads and shippers opposed mandatory enforcement of the rules. Some roads and shippers appeared in favor of at least some mandatory enforcement of the rules, arguing that unless some compulsion were used in enforcing them, cars purchased by a railroad for use by its shippers would continue to be detained for inordinately long periods of time by other roads.

After 50 days of hearings, the Trial Examiner issued his report, recommending against mandatory enforcement of the car-service rules. Although the Commission, prior to referring the matter to him, had previously made a definitive finding that a shortage of freight cars existed, the Examiner's report stated that there was no competent evidence in the record developed before him upon which such a determination could be made. The Examiner assigned several reasons for recommending against

mandatory enforcement of the rules.

The Commission issued a comprehensive opinion disagreeing with the trial examiner in many respects, and ordering that two of the car-service rules be promulgated as rules of the Commission with sanctions attaching to noncompliance. Finding that '(t)he continuing relocation of cars on owner's lines is of major importance to the maintenance of an adequate car supply,'[2] the Commission **\*748** concluded that the inconveniences feared by the shippers were outweighed by the long term benefit that would accrue from the mandatory enforcement of the two car service rules.

2      335 I.C.C. 264, 293 (1969).

After its first order adopting the two rules was issued, the Commission considered claims that there was need for some procedure for exceptions to the mandatory enforcement of the rules. A supplemental order then established another rule that permitted the railroads to seek exception from the Commission's Bureau of Operations, in order to alleviate inequities and hardships.[3]

3      'Rule 19—Exceptions
       'Exceptions to the rules (prescribed by the Interstate Commerce Commission for mandatory observance) for the purpose of further improving car supply and utilization, increasing availability of cars to their owners, improving the efficiency of railroad operations, or alleviating inequities or hardships, may be authorized by the Director or Assistant Director of the Bureau of Operations, Interstate Commerce Commission, Washington, D.C.' Jurisdictional Statement 172.

The court below held that the rules were not 'reasonable,' as that term is used in the Esch Act, for three reasons. First, although there was a general finding of a nationwide freight car shortage, the court said that a specific shortage on owner lines should have been found in order to justify the promulgation of these rules. Second, it said there should have been a finding as to the financial effects upon the railroads and shippers who would be affected by the rules. Finally, it supported its conclusion that the rules were not 'reasonable' by the fact that even though violation of the rules could be enforced by monetary penalties, the Commission nonetheless conceded that obtaining complete compliance with them would be impossible.

 The standard of judicial review for actions of the Interstate Commerce Commission in general, Western Paper Makers' Chemical Co. v. United States, 271 U.S.

AR005466

268, 46 S.Ct. 500, 70 L.Ed. 941 (1926), **\*749** and for actions taken by the Commission under the authority of the Esch Act in particular, Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204 (1927), is well established by prior decisions of this Court. We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported. In judicially reviewing these particular rules promulgated by the Commission, we must be alert to the differing standard governing review of the Commission's exercise of its rulemaking authority, on the one **\*\*1947** hand, and that governing its adjudicatory function, on the other:

'In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general.' Assigned Car Cases, supra, at 583, 47 S.Ct., at 734.

The finding of the Commission as to a nationwide shortage of freight cars was based primarily on data submitted by the railroads themselves covering the years 1955 through 1964. Over this 10-year period total freight car ownership of Class I railroads dropped 12.4%, and aggregate carrying capacity of those railroads dropped 5%. Over the same period revenue tons originated **\*750** dropped 2.9%. The decline in ownership of plain box cars, as opposed to more sophisticated types of cars, was even more dramatic; ownership of cars over the 10-year period in question dropped 22.1%, while aggregate carrying capacity of such cars dropped 18.9%. Testimony of witnesses for the National Industrial Traffic League, the Western Wood Products Association, the American Plywood Association, and the Vulcan Materials Association also supported the finding of a car shortage. These statistics, taken together with the Commission's post-war determination of a car shortage, portray a gradually worsening ratio of carrying capacity to revenue tons originated.

The Commission further found that freight car shortages, in the sense that a particular road was unable to promptly supply freight cars to particular shippers who needed them, have occurred chronically, both during peak loading seasons each year and during times of national emergency. It is quite true, as appellees suggest, that inability of the roads to supply cars to shippers at particular times is not conclusive evidence that there is a national shortage of freight car ownership. Conceivably, freight car ownership could be adequate, yet poor utilization of the supply could result in shortages. Nonetheless, the Commission may fairly rely on these chronic shortages in availability of freight cars as one factor upon which to base its conclusion that there was an overall shortage of ownership of freight cars.

The Commission also found that a surprisingly low percentage of freight cars was actually on the tracks of the roads owning the cars at any given time, and that this percentage had been decreasing during the period in question. In March 1966, less than 30% of the railroads' plain box cars were on the line of their owner, and during the preceding year that percentage **\*751** remained mostly in the low thirties. The Commission summarized the factual situation it found in these words:

'From the evidence adduced and the data collected, it is obvious that an adequate freight car supply is as much a problem today as it was during the period considered in our last proceeding in 1947. Car service which involves a shortage of approximately one out of every ten cars ordered or even one out of every fifteen cars ordered demands that every available means be marshalled to eliminate such deficiencies.' 335 I.C.C., at 285.

One of the means marshaled by the Commission to eliminate such deficiencies was the promulgation of the two rules under attack here. The thrust of these rules is to require that freight cars after unloading be dispatched in the direction of the lines of the owning road.

Thus, the Commission concluded after investigation that the railroads were frequently **\*\*1948** unable to supply shippers with freight cars. It reasoned from this fact, and from statistics showing a significantly more rapid decline in aggregate carrying capacity than in revenue tons originated, that an underlying and important cause of the unavailability of box cars to shippers was that the Nation's railroads simply did not jointly own a sufficient number of freight cars to adequately serve shippers of goods over their lines. Because of the existence of the national pool of freight cars, whereby roads may service on-line shippers with foreign cars, it was difficult, if not impossible, to relate inadequate ownership statistically to any particular road or roads. The Commission therefore chose to make mandatory two of the car-service rules that would have the effect of aligning more closely than at

AR005467

present the ownership of freight cars on the part of the road with the availability of those freight cars to the owning *752 road for use of its on-line shippers. The result of these rules, over the long term, the Commission reasoned, would be to bring home to those roads which themselves had an inadequate supply of cars to serve their on-line shippers that fact, and also without doubt to supply incentive to such roads to augment their supply of freight cars in order to adequately serve their on-line shippers. The national supply of freight cars would thereby be augmented, and the railroads as a result would be better able to supply the needs of shippers.

Appellees' fundamental substantive contention is that the short-term consequences of the enforcement of these rules will so seriously disrupt established industry practices as to outweigh any possible long-term benefits in service that might accrue from them, and that therefore the rules are not 'reasonable' as that term is used in the Esch Act.[4] While, of course, conceding that the railroads themselves originally promulgated the rules for voluntary compliance, appellees argue that because the rules have been observed largely in the breach, usages and practices have grown up that permit far more efficient utilization of the existing fleet of freight cars than would be permitted if the two rules in question were enforced by the Commission. Appellees state that in reliance on the existence of a national pool of freight cars, and on the consequent availability to shippers of cars not owned by the line originating the shipment, manufacturing plants have been located and enlarged. *753 They claim that enforcement of the rules now would seriously hamper the movement of freight traffic from these and other shipping points.

[4]   Three separate briefs have been filed here in support of appellees, each of which understandably presents the case for affirmance in slightly differing form, and no one of which completely adopts the reasoning of the District Court. We have not found it necessary in deciding the case to deal with each separate argument in support of affirmance, since we believe all of them to be generally subsumed under those claims with which we deal.

It may be conceded that the immediate effect of the Commission's order will be to disrupt some established practices with respect to the handling and routing of freight cars, and on occasion to cause serious inconvenience to shippers and railroads alike. If the Commission were thrusting these regulations upon an admittedly smoothly functioning transportation industry, well supplied with necessary rolling stock and adequately serving all shippers, the rationality of its action might well

be open to question.

But such is not the case. The Commission's finding that there are recurring periods of significant length when there is not an adequate freight car supply to service shippers is supported by substantial evidence. While the flexible system of routing freight cars presently in existence may well have shortterm advantages both for some shippers and some roads, the Commission could quite reasonably conclude that it has long-term drawbacks as well. The otherwise adverse effect on a road's ability to serve shippers that would result from its **1949 owning too few cars is cushioned; the beneficial effect on a road's ability to serve shippers that would result from its owning a sufficient supply of cars is dissipated. The Commission undoubtedly felt that rules designed only to most efficiently utilize the existing inadequate fleet of freight cars would have little or no effect on the nationwide shortage of such cars. Indeed, the appellees stress the concession by the Commission that these rules 'are designed to improve the utilization of freight cars, except insofar as return loading is compatible with the primary objective of increasing availability of cars to the owner.' 335 I.C.C., at 294.

But only if we were to hold that Congress, in enacting *754 the Esch Car Service Act, intended that the only criterion that the Commission might consider in establishing 'reasonable rules, regulations, and practices with respect to car service' was the optimum utilization of an existing fleet of freight cars, however numerically inadequate that fleet might be, could this argument be sustained. Neither the language that Congress used nor the legislative history of the Act supports such a narrow reading of its grant of authority to the Commission. On the record before it, the Commission was justified in deciding that the railroads and the shippers were afflicted with an economic illness that might have to get worse before it got better. Existing practices respecting car service tended to destroy any incentive on the part of railroads to acquire new cars, and the resulting failure to acquire new equipment contributed to an overall nationwide shortage of freight cars that prevented the railroad industry from adequately serving shippers. Carservice rules that would tend to restore incentive to the various roads to augment their supply of freight cars, even at the temporary expense of optimum utilization of the existing fleet of freight cars, conform under these circumstances to the statutory requirement of reasonableness.

Appellees support their claim that the Commission's promulgation of these rules is not 'reasonable' under the Esch Act on two grounds not directly related to the rules' claimed adverse effect on the ability of the roads to serve

U. S. v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972)
92 S.Ct. 1941, 32 L.Ed.2d 453

shippers. They attack the absence of a Commission finding as to the financial ability of roads inadequately supplied with freight cars to purchase new ones, and they cite the conceded impossibility of obtaining complete compliance with the rules as additional evidence of their unreasonableness.

The Commission's order does not require any road to purchase any freight cars. It abridges to some extent **\*755** the existing practice among railroads of treating the freight cars that they own as a pool, and for that reason may ultimately cause roads that do not have an adequate supply of freight cars to serve online shippers to be less able to serve such shippers than they are now. If, as a result of this fact, such roads are placed under economic and competitive pressure to acquire additional freight cars, there is certainly no principle of law we know of that would require the Commission to permit them to avoid this economic pressure by continuing to borrow freight cars acquired and owned by other lines.

The Commission, acceding to the arguments of shippers and railroads on rehearing, agreed that mandatory total compliance with the rules promulgated would be impossible in view of the tremendous number of units involved, and, accordingly a procedure by which exceptions might be applied for was established. How the provision for exceptions will be administered in practice is a matter about which we could only speculate at present. It is well established that an agency's authority to proceed in a complex area such as car-service regulation by means of rules of general application entails a concomitant authority to provide exemption procedures in order to allow for special circumstances. Permian Basin Area Rate Cases, 390 U.S. 747, 784—786, 88 S.Ct. 1344, 1368—1370, 20 L.Ed.2d 312 (1968). What bearing any of these factors might have on an action under the provisions of 49 U.S.C. **\*\*1950** s 1(17) for the collection of penalties for a violation of the rules in question is a question best decided in such a proceeding. The fact that violation of a rule promulgated under the Esch Car Service Act may be the basis for a proceeding to collect a penalty does not either expand or contract the statutory definition of 'reasonable' found in that Act.

What we have said thus far is enough to indicate our view that there is sufficient relationship between the **\*756** Commission's conclusions and the factual bases in the record upon which it relied to substantively support this exercise of its authority under the Esch Act. Appellees press on us an additional claim that the Commission failed to comply with the provisions of the Administrative Procedure Act, 5 U.S.C. s 551 et seq., citing Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), and Secretary of Agriculture v.

United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954). Burlington Truck Lines is clearly inapposite, however, since in that case the Court was dealing with adjudication, not rule-making. In criticizing the Commission's action there, the Court said that 'the Administrative Procedure Act will not permit us to accept such adjudicatory practice,' 371 U.S., at 167, 83 S.Ct., at 245. In Secretary of Agriculture v. United States, supra, the Court reviewed the Commission's action, not under the Administrative Procedure Act, but on the basis of its prior cases establishing the standard for judicial review of agency action. Commenting that '(i)n dealing with technical and complex matters like these, the Commission must necessarily have wide discretion in formulating appropriate solutions,' the Court went on to conclude that the Commission 'has not adequately explained its departure from prior norms and has not sufficiently spelled out the legal basis of its decision.' 347 U.S., at 652—653, 74 S.Ct., at 831. For the reasons previously stated, we find no such infirmaties here.

This Court has held that the Administrative Procedure Act applies to proceedings before the Interstate Commerce Commission. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 192, 80 S.Ct. 229, 240, 4 L.Ed.2d 223 (1959). Appellees claim that the Commission's procedure here departed from the provisions of 5 U.S.C. ss 556 and 557 of the Act. Those sections, however, govern a rule-marking proceeding only when 5 U.S.C. s 553 so requires. The latter section, dealing generally with rulemaking, **\*757** makes applicable the provisions of ss 556 and 557 only '(w)hen rules are required by statute to be made on the record after opportunity for an agency hearing . . ..' The Esch Act, authorizing the Commission 'after hearing, on a complaint or upon its own initiative without complaint, (to) establish reasonable rules, regulations, and practices with respect to car service . . .,' 49 U.S.C. s 1(14)(a), does not require that such rules 'be made on the record.' 5 U.S.C. s 553. That distinction is determinative for this case. 'A good deal of significance lies in the fact that some statutes do expressly require determinations on the record.' 2 K. Davis. Administrative Law Treatise s 13.08, p. 225 (1958). Sections 556 and 557 need be applied 'only where the agency statute, in addition to providing a hearing, prescribes explicitly that it be 'on the record.'' Siegel v. Atomic Energy Comm'n, 130 U.S.App.D.C. 307, 314, 400 F.2d 778, 785 (1968); Joseph E. Seagram & Sons Inc. v. Dillon, 120 U.S.App.D.C. 112, 115 n. 9, 344 F.2d 497, 500 n. 9 (1965). Cf. First National Bank of McKeesport v. First Federal Savings & Loan Assn., 96 U.S.App.D.C. 194, 225 F.2d 33 (1955). We do not suggest that only the precise words 'on the record' in the applicable statute will suffice to make ss 556 and 557 applicable to rule-making proceedings, but we do hold

AR005469

**U. S. v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972)**

92 S.Ct. 1941, 32 L.Ed.2d 453

that the language of the Esch Car Service Act is insufficient to invoke these sections.

Because the proceedings under review were an exercise of legislative rulemaking power rather than adjudicatory hearings as in **\*\*1951** Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), and Ohio Bell Telephone Co. v. Public Utilities Comm'n, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937), and because 49 U.S.C. s 1(14)(a) does not require a determination 'on the record,' the provisions of 5 U.S.C. ss 556 and 557 were inapplicable.

**\*758**  This proceeding, therefore, was governed by the provisions of 5 U.S.C. s 553 of the Administrative Procedure Act, requiring basically that notice of proposed rulemaking shall be published in the Federal Register, that after notice the agency give interested persons an opportunity to participate in the rulemaking through appropriate submissions, and that after consideration of the record so made the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.[5] The 'Findings' and 'Conclusions' embodied

in the Commission's report fully comply with these requirements, and nothing more was required by the Administrative Procedure Act.

5      49 U.S.C. s 1(14)(a) likewise requires the Commission to conduct a hearing before promulgating rules.

We conclude that the Commission's action in promulgating these rules was substantively authorized by the Esch Act And procedurally acceptable under the Administrative Procedure Act. The judgment of the District Court must therefore be reversed.

Judgment reversed.

**All Citations**

406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005470

KeyCite Yellow Flag - Negative Treatment
Distinguished by U.S. v. Spruill, 5th Cir.(Tex.), May 15, 2002

93 S.Ct. 810
Supreme Court of the United States

UNITED STATES et al., Appellants,
v.
FLORIDA EAST COAST RAILWAY COMPANY et
al.

No. 70—279.
|
Argued Dec. 7, 1972.
|
Decided Jan. 22, 1973.

**Synopsis**

Action to set aside incentive per diem rates established by
Interstate Commerce Commission in a rule-making
proceeding. The United States District Court for the
Middle District of Florida, 322 F.Supp. 725, set aside
order and appeal was taken. The Supreme Court, Mr.
Justice Rehnquist, held that under 1966 amendment of
Interstate Commerce Act enlarging Commission's
authority to prescribe per diem charges for use by one
railroad of freight cars owned by another, language of
provision authorizing Commission to act 'after hearing'
was not equivalent of a requirement that a rule be made
'on the record after opportunity for an agency hearing,'
did not trigger stricter requirements of other provisions
of Administrative Procedure Act in rule-making proceedings
and did not make improper Commission's determination
to receive submissions only in written form, and further
held that requirement of a 'hearing' contained in the
provision did not by its own force require Commission
either to hear oral testimony, to permit cross-examination
of Commission witnesses or to hear oral argument.

Judgment reversed and case remanded.

Mr. Justice Powell took no part in consideration or
decision of case.

Mr. Justice Douglas, with whom Mr. Justice Stewart
concurred, dissented and filed opinion.

**Attorneys and Law Firms**

**\*\*811 \*224** Samuel Huntington, Washington, D.C., for

appellants.

A. Alvis Layne, Washington, D.C., for appellee Florida
East Coast Railway Co.

**\*225** Richard A. Hollander, Richmond, Va., for appellee
Seaboard Coast Line Railroad Co.

**Opinion**

Mr. Justice REHNQUIST delivered the opinion of the
Court.

Appellees, two railroad companies, brought this action in
the District Court for the Middle District of Florida to set
aside the incentive per diem rates established by appellant
Interstate Commerce Commission in a rule-making
proceeding. Incentive Per Diem Charges—1968, Ex parte
No. 252 (Sub.-No. 1), 337 I.C.C. 217 (1970). They
challenged the order of the Commission on both
substantive and procedural grounds. The District Court
sustained appellees' position that the Commission had
failed to comply with the applicable provisions of the
Administrative Procedure Act, 5 U.S.C. s 551 et seq., and
therefore set aside the order without dealing with the
railroads' other contentions. The District Court held that
the language of s 1(14)(a)[1] of the Interstate Commerce
**\*226** Act, 24 Stat. 379, as amended, 49 U.S.C. s 1(14)(a),
required the Commission in a proceeding such as this to
act in accordance with the Administrative Procedure Act,
5 U.S.C. s 556(d), and that the Commission's
determination to receive submissions from the appellees
only in written form was a violation of that section **\*\*812**
because the respondents were 'prejudiced' by that
determination within the meaning of that section.

[1]     Section 1(14)(a) provides:
       'The Commission may, after hearing, on a complaint or
       upon its own initiative without complaint, establish
       reasonable rules, regulations, and practices with respect
       to car service by common carriers by railroad subject to
       this chapter, including the compensation to be paid and
       other terms of any contract, agreement, or arrangement
       for the use of any locomotive, car, or other vehicle not
       owned by the carrier using it (and whether or not
       owned by another carrier), and the penalties or other
       sanctions for nonobservance of such rules, regulations,
       or practices. In fixing such compensation to be paid for
       the use of any type of freight car, the Commission shall
       give consideration to the national level of ownership of
       such type of freight car and to other factors affecting
       the adequacy of the national freight car supply, and
       shall, on the basis of such consideration, determine

whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest.'

Following our decision last Term in United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), we noted probable jurisdiction, 407 U.S. 908, 92 S.Ct. 2431, 32 L.Ed.2d 682 (1972), and requested the parties to brief the question of whether the Commission's proceeding was governed by 5 U.S.C. s 553,[2] *227 or by 556[3] **813 and 557,[4] of the Administrative Procedure Act. We here decide that the Commission's proceeding was governed only by s 553 of that Act, *228 and that appellees received the 'hearing' required by s 1(14)(a) of the Interstate Commerce Act. **814 We, therefore, reverse the judgment of the District Court and *229 remand the case to that court for further consideration of appellees' other contentions that were raised there, but which we do not decide.

[2]    's 553. Rule making.
'(a) This section applies, according to the provisions thereof, except to the extent that there is involved—
'(1) a military or foreign affairs function of the United States; or
'(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
'(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
'(1) a statement of the time, place, and nature of public rule making proceedings;
'(2) reference to the legal authority under which the rule is proposed; and
'(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except when notice or hearing is required by statute,

this subsection does not apply—
'(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
'(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
'(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
'(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
'(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
'(2) interpretative rules and statements of policy; or
'(3) as otherwise provided by the agency for good cause found and published with the rule.
'(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.'

[3]    's 556. Hearings; presiding employees; powers and duties; burden of proof; evidence; record as basis of decision.
'(a) This section applies, according to the provisions thereof, to hearings required by section 553 or 554 of this title to be conducted in accordance with this section.
'(b) There shall preside at the taking of evidence—
'(1) the agency;
'(2) one or more members of the body which comprises the agency; or
'(3) one or more hearing examiners appointed under section 3105 of this title. 'This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

AR005472

U.S. v. Florida East Coast Ry. Co., 410 U.S. 224 (1973)
93 S.Ct. 810, 35 L.Ed.2d 223

'(c) Subject to published rules of the agency and within its powers, employees presiding at hearings may—

'(1) administer oaths and affirmations;

'(2) issue subpenas authorized by law;

'(3) rule on offers of proof and receive relevant evidence;

'(4) take depositions or have depositions taken when the ends of justice would be served;

'(5) regulate the course of the hearing;

'(6) hold conferences for the settlement or simplication of the issues by consent of the parties;

'(7) dispose of procedural requests or similar matters;

'(8) make or recommend decisions in accordance with section 557 of this title; and

'(9) take other action authorized by agency rule consistent with this subchapter.

'(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

'(e) The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.'

4       's 557. Initial decisions; conclusiveness; review by agency; submissions by parties; contents of decisions; record.

'(a) This section applies, according to the provisions thereof, when a hearing is required to be conducted in accordance with section 556 of this title.

'(b) When the agency did not preside at the reception of the evidence, the presiding employee or, in cases not subject to section 554(d) of this title, an employee qualified to preside at hearings pursuant to section 556 of this title, shall initially decide the case unless the agency requires, either in specific cases or by general rule, the entire record to be certified to it for decision.

When the presiding employee makes an initial decision, that decision then becomes the decision of the agency without further proceedings unless there is an appeal to, or review on motion of, the agency within time provided by rule. On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule. When the agency makes the decision without having presided at the reception of the evidence, the presiding employee or an employee qualified to preside at hearings pursuant to section 556 of this title shall first recommend a decision, except that in rule making or determining applications for initial licenses—

'(1) instead thereof the agency may issue a tentative decision or one of its responsible employees may recommend a decision; or

'(2) this procedure may be omitted in a case in which the agency finds on the record that due and timely execution of its functions imperatively and unavoidably so requires.

'(c) Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions—

'(1) proposed findings and conclusions; or

'(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

'(3) supporting reasons for the exceptions or proposed findings or conclusions. 'The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—

'(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record; and

'(B) the appropriate rule, order, sanction, relief, or denial thereof.'

**\*230** I. BACKGROUND OF CHRONIC FREIGHT CAR SHORTAGES

This case arises from the factual background of a chronic freight-car shortage on the Nation's railroads, which we described in United States v. Allegheny-Ludlum Steel Corp., supra. Judge Simpson, writing for the District Court in this case, noted that '(f)or a number of years portions of the nation have been plagued with seasonal shortages of freight cars in which to ship goods.' 322

F.Supp. 725, 726 (MD Fla.1971). Judge Friendly, writing for a three-judge District Court in the Eastern District of New York in the related case of Long Island R. Co. v. United States, 318 F.Supp. 490, 491 (EDNY 1970), described the Commission's order as 'the latest chapter in a long history of freight-car shortages in certain regions and seasons and of attempts to ease them.' Congressional concern for the problem was manifested in the enactment in 1966 of an amendment to s 1(14)(a) of the Interstate Commerce Act, enlarging the Commission's authority to prescribe per diem charges for the use by one railroad of freight cars owned by another. Pub.L. 89—430, 80 Stat. 168. The Senate *231 Committee on Commerce stated in its report accompanying this legislation:

'Car shortages, which once were confined to the Midwest during harvest seasons, have become increasingly more frequent, more severe, and nationwide in scope as the national freight car supply has plummeted.' S.Rep.No.386, 89th Cong., 1st Sess., 1—2.

The Commission in 1966 commenced an investigation, Ex parte No. 252, Incentive Per Diem Charges, 'to determine whether information presently available warranted the establishment of an incentive element increase, on an interim basis, to apply pending further study and investigation.' 332 I.C.C. 11, 12 (1967). Statements of position were received from the Commission staff and a number of railroads. Hearings were conducted at which witnesses were examined. In October 1967, the Commission rendered a decision discontinuing the earlier proceeding, but announcing a program of further investigation into the general subject.

In December 1967, the Commission initiated the rulemaking procedure giving rise to the order that appellees here challenge. It directed Class I and Class II line-haul railroads to compile and report detailed information with respect to freight-car demand and supply at numerous sample stations for selected days of the week during 12 four-week periods, beginning January 29, 1968.

Some of the affected railroads voiced questions about the proposed study or requested modification in the study procedures outlined by the Commission in its notice of proposed rulemaking. In response to petitions setting forth these carriers' views, the Commission staff held an informal conference in April 1968, at which the objections and proposed modifications were discussed. *232 Twenty railroads, including appellee Seaboard, were represented at this conference, at which the Commission's staff sought to answer questions about reporting methods to accommodate individual circumstances of particular railroads. The conference adjourned on a note that undoubtedly left the impression that hearings would be

held at some future date. A detailed report of the conference was sent to all parties to the proceeding before the Commission.

The results of the information thus collected were analyzed and presented to Congress by the Commission during a hearing before the Subcommittee on Surface Transportation of the Senate Committee on Commerce in May 1969. Members of the Subcommittee expressed dissatisfaction with the Commission's slow **815 pace in exercising the authority that had been conferred upon it by the 1966 Amendments to the Interstate Commerce Act. Judge Simpson in his opinion for the District Court said:

'Members of the Senate Subcommittee on Surface Transportation expressed considerable dissatisfaction with the Commission's apparent inability to take effective steps toward eliminating the national shortage of freight cars. Comments were general that the Commission was conducting too many hearings and taking too little action. Senators pressed for more action and less talk, but Commission counsel expressed doubt respecting the Commission's statutory power to act without additional hearings.' 322 F.Supp., at 727.

Judge Friendly, describing the same event in Long Island R. Co. v. United States, supra, said:

'To say that the presentation was not received with enthusiasm would be a considerable understatement. Senators voiced displeasure at the Commission's *233 long delay at taking action under the 1966 amendment, engaged in some merriment over what was regarded as an unintelligible discussion of methodology . . . and expressed doubt about the need for a hearing . . .. But the Commission's general counsel insisted that a hearing was needed . .. and the Chairman of the Commission agreed . . ..' 318 F.Supp., at 494.

The Commission, now apparently imbued with a new sense of mission, issued in December 1969 an interim report announcing its tentative decision to adopt incentive per diem charges on standard boxcars based on the information compiled by the railroads. The substantive decision reached by the Commission was that so-called 'incentive' per diem charges should be paid by any railroad using on its lines a standard boxcar owned by another railroad. Before the enactment of the 1966 amendment to the Interstate Commerce Act, it was generally thought that the Commission's authority to fix per diem payments for freight car use was limited to setting an amount that reflected fair return on investment for the owning railroad, without any regard being had for the desirability of prompt return to the owning line or for the encouragement of additional purchases of freight cars

by the railroads as a method of investing capital. The Commission concluded, however, that in view of the 1966 amendment it could impose additional 'incentive' per diem charges to spur prompt return of existing cars and to make acquisition of new cars financially attractive to the railroads. It did so by means of a proposed schedule that established such charges on an across-the-board basis for all common carriers by railroads subject to the Interstate Commerce Act. Embodied in the report was a proposed rule adopting the Commission's tentative conclusions and a notice **\*234** to the railroads to file statements of position within 60 days, couched in the following language:

'That verified statements of facts, briefs, and statements of position respecting the tentative conclusions reached in the said interim report, the rules and regulations proposed in the appendix to this order, and any other pertinent matter, are hereby invited to be submitted pursuant to the filing schedule set forth below by an interested person whether or not such person is already a party to this proceeding.

'That any party requesting oral hearing shall set forth with specificity the need therefor and the evidence to be adduced.' 337 I.C.C. 183, 213.

Both appellee railroads filed statements objecting to the Commission's proposal and requesting an oral hearing, as did numerous other railroads. In April 1970, the Commission, without having held further 'hearings,' issued a supplemental report making some modifications in the tentative conclusions earlier reached, **\*\*816** but overruling in toto the requests of appellees.

The District Court held that in so doing the Commission violated s 556(d) of the Administrative Procedure Act, and it was on this basis that it set aside the order of the Commission.

## II. APPLICABILITY OF ADMINISTRATIVE PROCEDURE ACT

In United States v. Allegheny-Ludlum Steel Corp., supra, we held that the language of s 1(14)(a) of the Interstate Commerce Act authorizing the Commission to act 'after hearing' was not the equivalent of a requirement that a rule be made 'on the record after opportunity for an agency hearing' as the latter term is used in s 553(c) of the Administrative Procedure Act. Since the 1966 amendment to s 1(14)(a), under which **\*235** the Commission was here proceding, does not by its terms

add to the hearing requirement contained in the earlier language, the same result should obtain here unless that amendment contains language that is tantamount to such a requirement. Appellees contend that such language is found in the provisions of that Act requiring that:

> '(T)he Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed . . ..'

While this language is undoubtedly a mandate to the Commission to consider the factors there set forth in reaching any conclusion as to imposition of per diem incentive charges, it adds to the hearing requirements of the section neither expressly nor by implication. We know of no reason to think that an administrative agency in reaching a decision cannot accord consideration to factors such as those set forth in the 1966 amendment by means other than a trial-type hearing or the presentation of oral argument by the affected parties. Congress by that amendment specified necessary components of the ultimate decision, but it did not specify the method by which the Commission should acquire information about those components.[5]

[5]    The Court of Appeals for the Ninth Circuit reached a result similar to that which we reach, in Pacific Coast European Conference v. United States, 350 F.2d 197 (1965). Construing the authority of the Federal Maritime Commission under s 14b of the Shipping Act, 1916, as amended, 46 U.S.C. s 813a, that court observed that '(t)he authority of the Commission to permit such contracts was limited by requiring that the contracts in eight specified respects meet the congressional judgment as to what they should include.' 350 F.2d, at 201. Notwithstanding these explicit directions that particular factors be considered by the Commission in reaching its decision, the court held that the statute's requirements of 'notice and hearing' were not sufficient to bring into play the provisions of ss 556 and 557 of the Administrative Procedure Act.

**\*236** Both of the district courts that reviewed this order of the Commission concluded that its proceedings were

AR005475

governed by the stricter requirements of ss 556 and 557 of the Administrative Procedure Act, rather than by the provisions of s 553 alone.[6] The conclusion of the **817 District Court for the Middle District of Florida, which we here review, was based on the assumption that the language in s 1(14)(a) of the Interstate Commerce Act requiring rulemaking under that section to be done 'after hearing' was the equivalent of a statutory requirement that the rule 'be made on the record after opportunity for an agency hearing.' Such an assumption *237 is inconsistent with our decision in Allegheny-Ludlum, supra.

[6]   Both district court opinions were handed down before our decision in United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), and it appears from the record before us that the Government in those courts did not really contest the proposition that the Commission's proceedings were governed by the stricter standards of ss 556 and 557.
   The dissenting opinion of Mr. Justice DOUGLAS relies in part on indications by the Commission that it proposed to apply the more stringent standards of ss 556 and 557 of the Administrative Procedure Act to these proceedings. This Act is not legislation that the Interstate Commerce Commission, or any other single agency, has primary responsibility for administering. An agency interpretation involving, at least in part, the provisions of that Act does not carry the weight, in ascertaining the intent of Congress, that an interpretation by an agency 'charged with the responsibility' of administering a particular statute does. See United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). Moreover, since any agency is free under the Act to accord litigants appearing before it more procedural rights than the Act requires, the fact that an agency may choose to proceed under ss 556 and 557 does not carry the necessary implication that the agency felt it was required to do so.

The District Court for the Eastern District of New York reached the same conclusion by a somewhat different line of reasoning. That court felt that because s 1(14)(a) of the Interstate Commerce Act had required a 'hearing,' and because that section was originally enacted in 1917, Congress was probably thinking in terms of a 'hearing' such as that described in the opinion of this Court in the roughly contemporaneous case of ICC v. Louisville & Nashville R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431 (1913). The ingredients of the 'hearing' were there said to be that '(a)ll parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, and to inspect

documents and to offer evidence in explanation or rebuttal.' Combining this view of congressional understanding of the term 'hearing' with comments by the Chairman of the Commission at the time of the adoption of the 1966 legislation regarding the necessity for 'hearings,' that court concluded that Congress had, in effect, required that these proceedings be 'on the record after opportunity for an agency hearing' within the meaning of s 553(c) of the Administrative Procedure Act.

Insofar as this conclusion is grounded on the belief that the language 'after hearing' of s 1(14)(a), without more, would trigger the applicability of ss 556 and 557, it, too, is contrary to our decision in Allegheny-Ludlum, supra. The District Court observed that it was 'rather hard to believe that the last sentence of s 553(c) was directed only to the few legislative spots where the words 'on the record' or their equivalent had found their way into the statute book.' 318 F.Supp., at 496. This is, however, the language which Congress used, and since there are statutes on the books that do use these *238 very words, see, e.g., the Fulbright Amendment to the Walsh-Healey Act, 41 U.S.C. s 43a, and 21 U.S.C. s 371(e)(3), the regulations provision of the Food and Drug Act, adherence to that language cannot be said to render the provision nugatory or ineffectual. We recognized in Allegheny-Ludlum that the actual words 'on the record' and 'after .. . hearing' used in s 553 were not words of art, and that other statutory language having the same meaning could trigger the provisions of ss 556 and 557 in rulemaking proceedings. But we adhere to our conclusion, expressed in that case, that the phrase 'after hearing' in s 1(14)(a) of the Interstate Commerce Act does not have such an effect.

### III. 'HEARING' REQUIREMENT OF S 1(14)(A) OF THE INTERSTATE COMMERCE ACT

Inextricably intertwined with the hearing requirement of the Administrative Procedure Act in this case is the meaning to be given to the language 'after hearing' in s 1(14)(a) of the Interstate Commerce Act. Appellees, both here and in the court below, contend that the Commission procedure here fell short of that mandated by the 'hearing' requirement of s 1(14)(a), even though it may have satisfied s 553 of the Administrative Procedure Act. The Administrative Procedure Act states that none of its provisions 'limit or repeal additional requirements imposed by statute **818 or otherwise recognized by law.' 5 U.S.C. s 559. Thus, even though the Commission

was not required to comply with ss 556 and 557 of that Act, it was required to accord the 'hearing' specified in s 1(14)(a) of the Interstate Commerce Act. Though the District Court did not pass on this contention, it is so closely related to the claim based on the Administrative Procedure Act that we proceed to decide it now.

**\*239** If we were to agree with the reasoning of the District Court for the Eastern District of New York with respect to the type of hearing required by the Interstate Commerce Act, the Commission's action might well violate those requirements, even though it was consistent with the requirements of the Administrative Procedure Act.

The term 'hearing' in its legal context undoubtedly has a host of meanings.[7] Its meaning undoubtedly will vary, depending on whether it is used in the context of a rulemaking-type proceeding or in the context of a proceeding devoted to the adjudication of particular disputed facts. It is by no means apparent what the drafters of the Esch Car Service Act of 1917, 40 Stat. 101, which became the first part of s 1(14)(a) of the Interstate Commerce Act, meant by the term. Such an intent would surely be an ephemeral one if, indeed, Congress in 1917 had in mind anything more specific than the language it actually used, for none of the parties refer to any legislative history that would shed light on the intended meaning of the words 'after hearings.' What is apparent, though, is that the term was used in granting authority to the Commission to make rules and regulations of a prospective nature.

[7]    See 1 K. Davis, Administrative Law Treatise, s 6.05 (1958).

Appellees refer us to testimony of the Chairman of the Commission to the effect that if the added authority ultimately contained in the 1966 amendment were enacted, the Commission would proceed with 'great caution' in imposing incentive per diem rates, and to statements of both Commission personnel and Members of Congress as to the necessity for a 'hearing' before Commission action. Certainly, the lapse of time of more than three years between the enactment of the 1966 amendment and the Commission's issuance of its tentative **\*240** conclusions cannot be said to evidence may lack of caution on the part of that body. Nor do generalized references to the necessity for a hearing advance our inquiry, since the statute by its terms requires a 'hearing'; the more precise inquiry of whether the hearing requirements necessarily include submission of oral testimony, cross-examination, or oral arguments is not resolved by such comments as these.

Under these circumstances, confronted with a grant of substantive authority made after the Administrative Procedure Act was enacted,[8] we think that reference to that Act, in which Congress devoted itself exclusively to questions such as the nature and scope of hearings, is a satisfactory basis for determining what is meant by the term 'hearing' used in another statute. Turning to that Act, we are convinced that the term 'hearing' as used therein does not necessarily embrace either the right to present evidence orally and to cross-examine opposing witnesses, or the right to present oral argument to the agency's decisionmaker.

[8]    The Interstate Commerce Act was amended in May 1966; the 1946 Administrative Procedure Act was repealed by Act of Sept. 6, 1966, 80 Stat. 378, which revised, codified, and enacted Title 5 of the United States Code, but the section detailing the procedures to be used in rulemaking is substantially similar to the original provision in the 1946 Administrative Procedure Act. See s 4(b), 60 Stat. 238.

Section 553 excepts from its requirements rulemaking devoted to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice,' and rulemaking 'when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, **\*\*819** or contrary to the public interest.' This exception does not apply, however, 'when notice or hearing is required by statute'; in those cases, even though interpretative rulemaking be involved, the requirements of s 553 apply. But since these requirements **\*241** themselves do not mandate any oral presentation, see Allegheny-Ludlum, supra, it cannot be doubted that a statute that requires a 'hearing' prior to rulemaking may in some circumstances be satisfied by procedures that meet only the standards of s 553. The Court's opinion in FPC v. Texaco Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), supports such a broad definition of the term 'hearing.'

Similarly, even where the statute requires that the rulemaking procedure take place 'on the record after opportunity for an agency hearing,' thus triggering the applicability of s 556, subsection (d) provides that the agency may proceed by the submission of all or part of the evidence in written form if a party will not be 'prejudiced thereby.' Again, the Act makes it plain that a specific statutory mandate that the proceedings take place on the record after hearing may be satisfied in some circumstances by evidentiary submission in written form only.

We think this treatment of the term 'hearing' in the Administrative Procedure Act affords sufficient basis for concluding that the requirement of a 'hearing' contained in s 1(14)(a); in a situation where the Commission was acting under the 1966 statutory rulemaking authority that Congress had conferred upon it, did not by its own force require the Commission either to hear oral testimony, to permit cross-examination of Commission witnesses, or to hear oral argument. Here, the Commission promulgated a tentative draft of an order, and accorded all interested parties 60 days in which to file statements of position, submissions of evidence, and other relevant observations. The parties had fair notice of exactly what the Commission proposed to do, and were given an opportunity to comment, to object, or to make some other form of written submission. The final order of the Commission indicates that it gave consideration to the statements of the two appellees here. *242 Given the 'open-ended' nature of the proceedings, and the Commission's announced willingness to consider proposals for modification after operating experience had been acquired, we think the hearing requirement of s 1(14)(a) of the Act was met.

Appellee railroads cite a number of our previous decisions dealing in some manner with the right to a hearing in an administrative proceeding. Although appellees have asserted no claim of constitutional deprivation in this proceeding, some of the cases they rely upon expressly speak in constitutional terms, while others are less than clear as to whether they depend upon the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution, or upon generalized principles of administrative law formulated prior to the adoption of the Administrative Procedure Act.

Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), is cited in support of appellees' contention that the Commission's proceedings were fatally deficient. That opinion describes the proceedings there involved as 'quasijudicial,' id., at 14, 58 S.Ct., at 774, and thus presumably distinct from a rulemaking proceeding such as that engaged in by the Commission here. But since the order of the Secretary of Agriculture there challenged did involve a form of ratemaking, the case bears enough resemblance to the facts of this case to warrant further examination of appellees' contention. The administrative procedure in Morgan was held to be defective primarily because the persons who were to be affected by the Secretary's order were found not to have been adequately apprised of what the Secretary proposed to do prior to the time that he actually did it. Illustrative of the Court's reasoning is the following passage from the opinion:

'The right to a hearing embraces not only the right to present evidence, but **820 also a reasonable opportunity to know the claims of the opposing party *243 and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.' Id., at 18—19, 58 S.Ct., at 776.[9]

[9]   This same language was cited with approval by the Court in Willner v. Committee on Character, 373 U.S. 96, 105, 83 S.Ct. 1175, 1181, 10 L.Ed.2d 224 (1963), in which it was held that an applicant for admission to the bar could not be denied such admission on the basis of ex parte statements of others whom he had not been afforded an opportunity to crossexamine.

The proceedings before the Secretary of Agriculture had been initiated by a notice of inquiry into the reasonableness of the rates in question, and the individuals being regulated suffered throughout the proceeding from its essential formlessness. The Court concluded that this formlessness denied the individuals subject to regulation the 'full hearing' that the statute had provided.

Assuming, arguendo, that the statutory term 'full hearing' does not differ significantly from the hearing requirement of s 1(14)(a), we do not believe that the proceedings of the Interstate Commerce Commission before us suffer from the defect found to be fatal in Morgan. Though the initial notice of the proceeding by no means set out in detail what the Commission proposed to do, its tentative conclusions and order of December 1969, could scarcely have been more explicit or detailed. All interested parties were given 60 days following the issuance of these tentative findings and order in which to make appropriate objections. Appellees were 'fairly advised' of exactly what the Commission proposed to do sufficiently in advance of the entry of the final order to give them adequate time to *244 formulate and to present objections to the Commission's proposal. Morgan, therefore, does not aid appellees.

ICC v. Louisville & Nashville R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913), involved what the Court there described as a 'quasi-judicial' proceeding of a quite different nature from the one we review here. The provisions of the Interstate Commerce Act, 24 Stat. 379, as amended, and of the Hepburn Act, 34 Stat. 584, in

effect at the time that case was decided, left to the railroad carriers the 'primary right to make rates,' 227 U.S., at 92, 33 S.Ct., at 187, but granted to the Commission the authority to set them aside, if after hearing, they were shown to be unreasonable. The proceeding before the Commission in that case had been instituted by the New Orleans Board of Trade complaint that certain class and commodity rates charged by the Louisville & Nashville Railroad from New Orleans to other points were unfair, unreasonable, and discriminatory. 227 U.S., at 90, 33 S.Ct., at 186. The type of proceeding there, in which the Commission adjudicated a complaint by a shipper that specified rates set by a carrier were unreasonable, was sufficiently different from the nationwide incentive payments ordered to be made by all railroads in this proceeding so as to make the Louisville & Nashville opinion inapplicable in the case presently before us.

The basic distinction between rulemaking and adjudication is illustrated by this Court's treatment of two related cases under the Due Process Clause of the Fourteenth Amendment. In Londoner v. Denver, cited in oral argument by appellees, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), the Court held that due process had not been accorded a landowner who objected to the amount assessed against his land as its share of the benefit resulting from the paving of a street. Local procedure had accorded him the right to file a written complaint and objection, **821 but not to be heard orally. This Court held that due process *245 of law required that he 'have the right to support his allegations by argument, however brief; and, if need be, by proof, however informal.' Id., at 386, 28 S.Ct., at 714. But in the later case of Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), the Court held that no hearing at all was constitutionally required prior to a decision by state tax officers in Colorado to increase the valuation of all taxable property in Denver by a substantial percentage. The Court distinguished Londoner by stating that there a small number of persons 'were exceptionally affected, in each case upon individual grounds.' Id., at 446, 36 S.Ct., at 142.

Later decisions have continued to observe the distinction adverted to in BiMetallic Investment Co., supra. In Ohio Bell Telephone Co. v. Public Utilities Comm'n, 301 U.S. 292, 304—305, 57 S.Ct. 724, 730—731, 81 L.Ed. 1093 (1937), the Court noted the fact that the administrative proceeding there involved was designed to require the utility to refund previously collected rate charges. The Court held that in such a proceeding the agency could not, consistently with due process, act on the basis of undisclosed evidence that was never made a part of the record before the agency. The case is thus more akin to Louisville & Nashville R. Co., supra, than it is to this

case. FCC v. WJR, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949), established that there was no across-the-board constitutional right to oral argument in every administrative proceeding regardless of its nature. While the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.

Here, the incentive payments proposed by the Commission in its tentative order, and later adopted in its *246 final order, were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act. No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances. Indeed, one of the objections of appellee Florida East Coast was that it and other terminating carriers should have been treated differently from the generality of the railroads. But the fact that the order may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature. Though the Commission obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order of December 1969. The factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts.

The Commission's procedure satisfied both the provisions of s 1(14)(a) of the Interstate Commerce Act and of the Administrative Procedure Act, and were not inconsistent with prior decisions of this Court. We, therefore, reverse the judgment of the District Court, and remand the case so that it may consider those contentions of the parties that are not disposed of by this opinion.

It is so ordered.

Reversed and remanded.

Mr. Justice POWELL took no part in the consideration or decision of this case.

Mr. Justice DOUGLAS, with whom Mr. Justice STEWART concurs, dissenting.

The present decision makes a sharp break with traditional concepts of procedural due process. The Commission

AR005479

order under attack is tantamount to a rate order. Charges are fixed that nonowning railroads must pay **247** owning railroads for boxcars of the latter that are on the tracks of the former. These charges are effective only during the ****822** months of September through February, the period of greatest boxcar use. For example, the charge for a boxcar that costs for $15,000 to $17,000 and that is five years of age or younger amounts to $5.19 a day. Boxcars costing between $39,000 and $41,000 and that are five years of age or younger cost the nonowning railroad $12.98 a day. The fees or rates charged decrease as the ages of the boxcars lengthen. 49 CFR s 1036.2. This is the imposition on carriers by administrative fiat of a new financial liability. I do not believe it is within our traditional concepts of due process to allow an administrative agency to saddle anyone with a new rate, charge, or fee without a full hearing that includes the right to present oral testimony, cross-examine witnesses, and present oral argument. That is required by the Administrative Procedure Act, 5 U.S.C. s 556(d); s 556(a) states that s 556 applies to hearings required by s 553. Section 553(c) provides that s 556 applies '(w)hen rules are required by statute to be made on the record after opportunity for an agency hearing.' A hearing under s 1(14) (a) of the Interstate Commerce Act fixing rates, charges, or fees is certainly adjudicatory, not legislative in the customary sense.

The question is whether the Interstate Commerce Commission procedures used in this rate case 'for the submission of . . . evidence in written form' avoided prejudice to the appellees so as to comport with the requirements of the Administrative Procedure Act.[1] The Government appeals from the District Court's order **248** remanding this case to the Commission for further proceedings on the incentive per diem rates to be paid by the appellee railroads for the standard boxcars they use.

[1]   5 U.S.C. s 556(d) provides that a 'sanction may not be imposed' without a full hearing, including cross-examination. But s 556(d) makes an exception, which I submit is not relevant here. It provides: 'In rule making . . . an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.' (Emphasis added.)

In 1966, Congress amended s 1(14)(a) of the Interstate Commerce Act to require that the Commission investigate the use of methods of incentive compensation to alleviate any shortage of freight cars 'and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense.' 49 U.S.C. s 1(14)(a). While the Commission was given the

discretion to exempt carriers from incentive payments 'in the national interest,' it was denied the power to 'make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate . . ..' Ibid.

The Commission's initial investigation under this authority (31 Fed.Reg. 9240) was terminated without action because it 'produced no reliable information respecting the quantum of interim incentive charge necessary to meet the statutory standards.' 332 I.C.C. 11, 16. A subsequent study of boxcar supply-and-demand conditions (32 Fed.Reg. 20987) yielded data that were compiled in an interim report containing tentative charges and that were submitted to the railroads for comment. 337 I.C.C. 183. Although the Commission was admittedly uncertain whether its proposed charges would accomplish the statutory objective, id., at 191, and even though 'the opportunity to present evidence and arguments' was contemplated,' Id., at 183, congressional impatience militated against further delay in implementing s 1(14)(a).[2] Consequently, the Commission ejected the requests of the appellees and other railroads for further hearings and promulgated an incentive **249** per diem rate schedule for standard boxcars. 337 I.C.C. 217.

[2]   See Hearing before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, 91st Cong., 1st Sess. (1969).

Appellees then brought this action in the District Court alleging that they **823** were 'prejudiced' within the meaning of the Administrative Procedure Act by the Commission's failure to afford them a proper hearing. 322 F.Supp. 725 (MD Fla.1971). Seaboard argued that it had been damaged by what it alleged to be the Commission's sudden change in emphasis from specialty to unequipped boxcars and that it would lose some.$1.8 million as the result of the Commission's allegedly hasty and experimental action. Florida East Coast raised significant challenges to the statistical validity of the Commission's data,[3] and also contended that its status as a terminating railroad left it with a surfeit of standard boxcars which should exempt it from the requirement to pay incentive charges.

[3]   Florida East Coast argues, for example, that the Commission's finding of a boxcar shortage may be attributable to a variety of sampling or definitional errors, asserting that it is unrealistic to define boxcar deficiencies in such a manner as 'to show as a 'deficiency' the failure to supply a car on the day requested by the shipper no matter when the request was received.' The Government's contention that a

AR005480

24-hour standard was not used seems unresponsive to this argument. See 337 I.C.C. 217, 221.

Appellees, in other words, argue that the inadequacy of the supply of standard boxcars was not sufficiently established by the Commission's procedures. Seaboard contends that specialty freight cars have supplanted standard boxcars and Florida East Coast challenges the accuracy of the Commission's findings.

In its interim report, the Commission indicated that there would be an opportunity to present evidence and arguments. See 337 I.C.C. 183, 187. The appellees could reasonably have expected that the later hearings would give them the opportunity to substantiate and elaborate the criticisms they set forth in their *250 initial objections to the interim report. That alone would not necessarily support the claim of 'prejudice'. But I believe that 'prejudice' was shown when it was claimed that the very basis on which the Commission rested its finding was vulnerable because it lacked statistical validity or other reasoned basis. At least in that narrow group of cases, prejudice for lack of a proper hearing has been shown.

Both Long Island R. Co. v. United States, 318 F.Supp. 490 (EDNY 1970), and the present case involve challenges to the Commission's procedures establishing incentive per diem rates. In Long Island, however, the railroad pointed to no specific challenges to the Commission's findings (Id., at 499), and the trial was conducted on stipulated issues involving the right to an oral hearing. Id., at 491 n. 2. Since Long Island presented no information which might have caused the Commission to reach a different result,[4] there was no showing of prejudice, and a fortiori no right to an oral hearing. In the *251 present case, by contrast, there are specific factual disputes and the issue is the narrow one of whether written submission of evidence without oral argument was prejudicial.

[4]   In the Long Island case the court, speaking through Judge Friendly, said:
   'Whether there was to be an oral hearing or not, the Long Island's first job was to examine the basic data and find this out. Nothing stood in its way. . . . If, on examining the data, the Long Island had pointed to specifics on which it needed to cross-examine or present live rebuttal testimony and the Commission had declined to grant an oral hearing, we would have a different case. Instead the Long Island's request for an oral hearing was silent as to any respect in which the Commission's disclosure of greater detail or cross-examination of the Commission's staff was needed to enable it to mount a more effective argument

against the Commission's proposal. The last sentence of s 556(d) would be deprived of all meaning if this were held sufficient to put the agency on notice that 'prejudice' would result from the denial of an oral hearing. Even taking into account the further representations that have been made to us, we fail to see that prejudice has been established.' 318 F.Supp. 490, 499.

The more exacting hearing provisions of the Administrative Procedure Act, 5 U.S.C. ss 556—557, are only applicable, of course, if the 'rules are required by statute to be made on the record after **824 opportunity for an agency hearing.' Id., s 553(c).

United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453, was concerned strictly with a rulemaking proceeding of the Commission for the promulgation of 'car service rules' that in general required freight cars, after being unloaded, to be returned 'in the direction of the lines of the road owning the cars.' Id., at 743, 92 S.Ct., at 1944. We sustained the Commission's power with respect to these two rules on the narrow ground that they were wholly legislative. We held that s 1(14)(a) of the Interstate Commerce Act, requiring by its terms a 'hearing,' 'does not require that such rules 'be made on the record'' within the meaning of s 553(c). Id., at 757, 92 S.Ct., at 1950. We recognized, however, that the precise words 'on the record' are not talismanic, but that the crucial question is whether the proceedings under review are 'an exercise of legislative rulemaking' or 'adjudicatory hearings.' Ibid. The 'hearing' requirement of s 1(14)(a) cannot be given a fixed and immutable meaning to be applied in each and every case without regard to the nature of the proceedings.

The rules in question here established 'incentive' per diem charges to spur the prompt return of existing cars and to make the acquisition of new cars financially attractive to the railroads.[5] Unlike those we considered in *252 Allegheny-Ludlum, these rules involve the creation of a new financial liability. Although quasi-legislative, they are also adjudicatory in the sense that they determine the measure of the financial responsibility of one road for its use of the rolling stock of another road. The Commission's power to promulgate these rules pursuant to s 1(14)(a) is conditioned on the preliminary finding that the supply of freight cars to which the rules apply is inadequate. Moreover, in fixing incentive compensation once this threshold finding has been made, the Commission 'shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car

U.S. v. Florida East Coast Ry. Co., 410 U.S. 224 (1973)
93 S.Ct. 810, 35 L.Ed.2d 223

supply . . . .'[6]

[5]   Title 49 CFR s 1036.1 provides:
‘Application.—Each common carrier by railroad subject to the Interstate Commerce Act shall pay to the owning railroads, including the owning railroads of Canada, the additional per diem charges set forth in s 1036.2 on all boxcars shown below, . . . while in the possession of nonowning railroads and subject to per diem rules. These charges are in addition to all other per diem charges currently in effect or prescribed. Mexican-owned cars are exempt from the operation of these rules. The rules of this part shall apply regardless of whether the foregoing boxcars are in intrastate, interstate, or foreign commerce.’
As I have noted, s 1036.2 contains a schedule of per diem rates or fees for the use of another’s boxcars which have been shunted onto its tracks, the rates or fees being definite or precise and controlled by two variables: the cost of the boxcars and the ages of the boxcars. These rates or fees, according to the record, amount to millions of dollars a year.

[6]   The Commission discusses the critical factual issues to be resolved in fixing incentive compensation rates under s 1(14)(a) in Incentive Per Diem Charges, 332 I.C.C. 11, 14—15:
‘Before an incentive element, either interim or long-term, can be added to the per diem charge for the use of any particular type of freight car, we are required to give consideration to the national level of ownership of that type of car and to other factors affecting the adequacy of the national freight car supply. We have observed that the adequacy of the national freight car fleet depends upon the interplay of a number of factors, none of which can be said to be of superior importance. Further, since the effect of an incentive charge must be produced over a future period, consideration must be given to possible changes in these factors. In recent years many innovations and improvements have taken place in car design and operation. In the transportation of many commodities the standard boxcar has been replaced by cars capable of transporting greater loads with substantially less damage. In the transportation of grains, railroads are converting more and more to the use of large covered hopper cars. Shippers or lumber and plywood have found modern cars designed to facilitate transportation of their products increasingly desirable. At the same time, many of these cars are adaptable to the transportation of other commodities when not needed in the particular trade for which they were designed. In large part, the special service boxcars, covered hoppers and flatcars of various types handle traffic which formerly moved in general service boxcars. The same is true to some extent with respect to refrigerator cars. Their larger size and, with respect to the flatcars in trailer-on-flatcar (TOFC) service, their more rapid turnaround, enables them to provide service which would require many more of the general service

boxcars which they replaced.
‘Valid conclusions as to the types of cars, the construction of which for future use is to be encouraged by application of either an interim or long-range incentive charge, and which must be found to be in inadequate supply pursuant to the statutory requirement, necessarily require consideration of the extent to which the transportation service they perform is or can also be provided by cars of other types. Such consideration requires a thorough analysis of the services currently desired by the shipping public and those reasonably to be anticipated in the future. An overall, nationwide review of traffic and service demands and trends must precede any valid determination of the existing or prospective national requirements for freight cars of particular types. It is quite obvious that application of an incentive charge which served to encourage the acquisition of cars not adaptable to efficient provision of needed service over their normal lifetime would not be in the national interest. Shipper need, demand and acceptance with respect to future equipment is a significant factor.’

**825 *253 The majority finds ICC v. Louisville & Nashville R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431, ‘sufficiently different’ as to make the opinion in that case inapplicable to the case now before us. I would read the case differently, finding a clear mandate that where, as here, ratemaking must be *254 based on evidential facts, s 1(14)(a) requires that full hearing which due process normally entails. There we considered Commission procedures for setting aside as unreasonable, after a hearing, carriermade rates. The Government maintained that the Commission, invested with legislative ratemaking power, but required by the Commerce Act to obtain necessary information, could act on such information as the Congress might. The Government urged that we presume that the Commission’s findings were supported by such information, ‘even though not formally proved at the hearing.’ Id., at 93, 33 S.Ct., at 187. We rejected the contention, holding that to infer to a hearing included ‘an opportunity to test, explain, or refute. . . . All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal.’ Ibid. I would agree with the District Court in Long Island R. Co., supra, 318 F.Supp. at 497, that Congress was fully cognizant of our decision in Louisville & Nashville R. Co. when it first adopted the hearing requirement of s 1(14)(a) in 1917. And when Congress debated the 1966 amendment that empowered the Commission to adopt incentive per diem rates, it had not lost sight of the importance of hearings. Questioned about the effect that incentive compensation

AR005482

U.S. v. Florida East Coast Ry. Co., 410 U.S. 224 (1973)

93 S.Ct. 810, 35 L.Ed.2d 223

might have on terminating lines, Mr. Staggers, Chairman of the House Committee on Interstate and Foreign Commerce and floor manager of the bill, responded: 'I might say to the gentleman that this will not be put into practice until there have been full hearings before the Commission and all sides have had an opportunity to argue and present their facts on the question.' 112 Cong.Rec. 10443 (emphasis added). Nor should we overlook the Commission's own interpretation of the hearing requirement in s 1(14)(a) as it applies to this case. The Commission's order initiating *255 the rulemaking proceeding notified the parties that it was acting 'under authority of Part I of the Interstate Commerce Act (49 U.S.C. s 1 et seq.); more particularly, section 1(14)(a) and the Administrative Procedure Act (5 U.S.C. ss 553, 556, and 557).' Clearly, the Commission believed that it was required to **826 hold a hearing on the record.[7] This interpretation, not of the Administrative Procedure Act, but of s 1(14)(a) of the Commission's own Act, is 'entitled to great weight.' United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796.

[7]  In its final report, the Commission apparently still believed that its proceedings had to comply with the provisions of s 556 of the Administrative Procedure Act. The report stated that the parties had been granted a hearing in accordance with those provisions. 337 I.C.C., at 219.

The majority, at one point, distinguishes Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (Morgan II), on the ground that the proceedings there involved were 'quasi-judicial,' 'and thus presumably distinct from a rulemaking proceeding such as that engaged in by the Commission here.' It is this easy categorization and pigeonholing that leads the majority to find Allegheny-Ludlum of controlling significance in this case. Morgan II dealt with the 'full hearing' requirement of s 310 of the Packers and Stockyards Act, 42 Stat. 166, as it related to ratemaking for the purchase and sale of livestock.[8] It is true that the Court characterized the proceedings as 'quasi- *256 judicial.' But, the first time the case was before the Court, Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, Mr. Chief Justice Hughes noted that the 'distinctive character' of the proceeeding was legislative: 'It is a proceeding looking to legislative action in the fixing of rates of market

agencies.' Id., at 479, 56 S.Ct. at 911. Nevertheless, the Secretary of Agriculture was required to establish rates in accordance with the standards and under the limitations prescribed by Congress. The Court concluded: 'A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of quasi-judicial character. The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings . . ..' Id., at 480, 56 S.Ct., at 911.

[8]  Morgan II considered in some depth the parameters of a 'full hearing.' The majority takes the position that the case is inapposite because the hearings provided in this case do not 'suffer from the defect found to be fatal in Morgan'—i.e., the parties were 'fairly advised' of the scope and substance of the Commission proceedings. In Morgan II, however, there was no question that a 'full hearing' included the right to present oral testimony and argument. 304 U.S. 1, 18—20, 58 S.Ct. 773, 776—777.

Section 1(14)(a) of the Interstate Commerce Act bestows upon the Commission broad discretionary power to determine incentive rates. These rates may have devastating effects on a particular line. According to the brief of one of the appellees, the amount of incentive compensation paid by debtor lines amounts to millions of dollars each six-month period. Nevertheless, the courts must defer to the Commission as long as its findings are supported by substantial evidence and it has not abused its discretion. 'All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' . . . of a fair and open hearing be maintained in its integrity.' Ohio Bell Telephone Co. v. Public Utilities Comm'n of Ohio, 301 U.S. 292, 304, 57 S.Ct. 724, 730, 81 L.Ed. 1093.

Accordingly, I would hold that appellees were not afforded the hearing guaranteed by s 1(14)(a) of the Interstate Commerce Act and 5 U.S.C. ss 553, 556, and 557, and would affirm the decision of the District Court.

**All Citations**

410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR005483