276 F.Supp.3d 576
United States District Court, E.D. Louisiana.

Malcolm J. BEZET
v.
UNITED STATES

CIVIL ACTION CASE NO. 16−2545
|
Signed 03/17/2017

**Synopsis**

**Background:** Pro se gun owner, who sought to perform series of modifications to his lawfully-possessed semiautomatic pistol to convert it into fully automatic silenced rifle, brought action against United States, challenging provisions of Gun Control Act (GCA) and National Firearms Act (NFA) under Second Amendment, Necessary and Proper Clause, and Tenth Amendment. United States moved to dismiss for lack of subject matter jurisdiction and for failure to state claim, and gun owner moved for partial preliminary injunction to allow him to "exercise his Second Amendment rights" pending trial.

**Holdings:** The District Court, Nannette Jolivette Brown, J., held that:

gun owner failed to establish that he suffered injury-in-fact from provisions of NFA, which set application and tax requirements on transfers of certain weapons;

provisions of GCA, banning importation of firearms and ammunition and prohibiting use of imported parts to assemble firearm, did not burden central core of the Second Amendment guarantee;

there was reasonable fit between GCA provisions and important government objective;

provisions of NFA, which imposed tax and application requirement on making firearms, did not threaten core right of Second Amendment;

there was reasonable fit between NFA provisions and important government objective;

GCA provisions were properly enacted pursuant to Congress's authority under Commerce Clause; and

NFA provisions were properly enacted pursuant to Congress's taxing power.

United States' motion granted; gun owner's motion denied.

**Attorneys and Law Firms**

**\*579** Malcolm J. Bezet, New Orleans, LA, pro se.

Gary Daniel Feldon, U.S. Department of Justice, Washington, DC, Peter M. Mansfield, U.S. Attorney's Office, New Orleans, LA, for United States.

SECTION: "G"(1)

ORDER

NANNETTE JOLIVETTE BROWN, UNITED STATES DISTRICT JUDGE

In this litigation, Plaintiff Malcolm Bezet ("Plaintiff"), proceeding *pro se*, alleges that certain provisions of the Gun Control Act of 1968 ("GCA") and the National Firearms Act ("NFA") are unconstitutional under the Second Amendment, the Necessary and Proper Clause, and the Tenth Amendment.[1] Pending before the Court is Defendant United States of America's ("the Government") "Motion to Dismiss."[2] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court will grant the Government's "Motion to Dismiss."[3] Also pending before the Court is Plaintiff's "Motion for Partial Preliminary Injunction."[4] Because the Court finds that the Government's motion to dismiss should be granted, the Court will deny as moot Plaintiff's motion for a partial preliminary injunction.[5]

1    Rec. Doc. 1 at 16; Rec. Doc. 8–1 at 1.

2    Rec. Doc. 8.

3    *Id.*

4    Rec. Doc. 15.

5    *Id.*

## I. Background

### A. Plaintiff's Complaint

In this litigation, Plaintiff, proceeding *pro se*, contends that he wants to perform a series of modifications to a semiautomatic pistol he lawfully possesses in order to convert the weapon into a fully automatic, silenced rifle.[6] However, Plaintiff avers that he is prevented from doing so by certain provisions of the Gun Control Act of 1968 and the National Firearms Act.[7] With regard to the GCA, Plaintiff argues the following provisions are unconstitutional: (1) 18 U.S.C. § 922(*l*), which bans the importation of firearms and ammunition regulated under the GCA unless authorized by the Attorney General; (2) 18 U.S.C. § 922(r), which forbids assembling such weapons from imported parts; and (3) 18 U.S.C. § 922(*o*), which makes it unlawful to transfer or possess any machine gun manufactured after May 19, 1986.[8] With regard to the NFA, Plaintiff contends the following provisions are also unconstitutional: (1) 26 U.S.C. § 5811, which taxes the transfer of such weapons as machine guns, silencers, short barreled rifles, and short barreled shotguns; (2) 26 U.S.C. § 5821, which taxes the making of such weapons; and (3) 26 U.S.C. § 5812, which establishes the registration and application requirements for transfers of such weapons.[9] Additionally, the Court notes that in his final "prayer for relief" section of his complaint, Plaintiff requests for the first time the additional relief of an injunction against 26 U.S.C. § 5822, which establishes registration and application requirements **\*580** for the making of such weapons.[10]

6    Rec. Doc. 1 at 16; Rec. Doc. 8–1 at 4.

7    Rec. Doc. 1 at 16.

8    *Id.* at 16–17.

9    *Id.* at 17–19.

10   *Id.* at 19–20.

In sum, Plaintiff argues that these provisions of the GCA and NFA are unconstitutional under the Second Amendment, the Necessary and Proper Clause, and the Tenth Amendment, as they deny him access to weapons that are "part of the ordinary military equipment and whose use could contribute to the common defense of the State of Louisiana or his own personal defense" and because they exceed the scope of Congress's enumerated powers.[11] In particular, Plaintiff avers that he is currently in lawful possession of a 5.56x45

caliber semiautomatic pistol (commonly referred to as a "Draco"), which is a derivative of a Romanian AIMR, a "short-barreled rifle" capable of both semiautomatic and automatic fire that is banned from importation by the GCA (18 U.S.C. § 922(*l*)).[12] Plaintiff contends that he wishes to restore his semiautomatic pistol to its rifle configuration.[13] Plaintiff also seeks to add a firearm muffler (referred to under the law as a "silencer") to protect his hearing and a shoulder stock to increase his firearm's long range accuracy.[14]

11   Rec. Doc. 1 at 16; Rec. Doc. 8–1 at 1.

12   Rec. Doc. 1 at 7.

13   *Id.*

14   *Id.*

However, Plaintiff argues that to legally add a stock and silencer to his weapon, he must: (1) register both the short-barreled rifle and silencer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); (2) pay a $200 tax on each pursuant to NFA (26 U.S.C. § 5811); and (3) replace key parts of the Draco pistol with American-made parts to comply with the GCA (18 U.S.C. § 922(r)).[15] Additionally, Plaintiff seeks to restore his Draco pistol to a fully automatic AIMR configuration, but avers that, because it was manufactured after May 19, 1986, the GCA prohibits him from doing so (18 U.S.C. § 922(*o*)).[16] Plaintiff further avers that the GCA also prohibits him from importing certain types of weapons, *e.g.*, machine guns and selective fire military assault rifles, or assembling them from imported parts unless authorized by the Attorney General.[17] Plaintiff represents that failing to comply with these provisions in the GCA or NFA would subject him, upon conviction, to imprisonment for up to ten years and/or fines of up to $10,000.[18]

15   *Id.*

16   *Id.*

17   *Id.* at 10.

18   *Id.* at 7.

Plaintiff seeks a permanent injunction against these provisions of the GCA and NFA.[19] Plaintiff asserts that, pursuant to *District of Columbia v. Heller*,[20] the Second Amendment confers an individual right to keep and bear arms capable of contributing to the common defense of the states

and an individual's self-defense.[21] Plaintiff argues that this right, "[a]t a minimum," encompasses the small arms that "compose ordinary military equipment, including machine guns, fully automatic assault rifles, semi-automatic assault rifles, short-barreled rifles, short-barreled shotguns, pistols, and firearm silencers."[22] Additionally, Plaintiff alleges that the GCA and NFA violate the Tenth Amendment[23] **581** and exceed the United States' powers under the Necessary and Proper Clause, as the sale, transfer, and possession of firearms are wholly intrastate commerce, and thus may only be regulated by the states.[24] Accordingly, Plaintiff asserts six causes of action seeking permanent injunctive relief against provisions of the GCA and NFA.[25]

| 19 | *Id.* at 9. |
| 20 | 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). |
| 21 | Rec. Doc. 1 at 8. |
| 22 | *Id.* |
| 23 | *Id.* at 9. |
| 24 | *Id.* |
| 25 | Rec. Doc. 1 at 16–21. |

### B. Procedural History

On March 29, 2016, Plaintiff filed a complaint in this matter.[26] On June 24, 2016, the Government filed the instant motion to dismiss.[27] On July 5, 2016, Plaintiff filed an opposition.[28] With leave of Court, the Government filed a reply on July 22, 2016.[29] On July 28, 2016, with leave of Court, Plaintiff filed a sur-reply.[30] On July 26, 2016, Plaintiff filed a motion for a partial preliminary injunction.[31] On August 9, 2016, the Government filed an opposition.[32]

| 26 | Rec. Doc. 1. |
| 27 | Rec. Doc. 8. |
| 28 | Rec. Doc. 9. |
| 29 | Rec. Doc. 13. |
| 30 | Rec. Doc. 17. |
| 31 | Rec. Doc. 15. |
| 32 | Rec. Doc. 19. |

## II. Parties' Arguments

### A. Defendant's Arguments in Support of the Motion to Dismiss

In this motion, the Government asserts that Plaintiff's claims should be dismissed because: (1) Plaintiff lacks standing to assert three of his six claims pursuant to Federal Rule of Civil Procedure 12(b)(1); and (2) Plaintiff has failed to state any claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[33]

| 33 | Rec. Doc. 8–1 at 1. |

### 1. Whether Plaintiff Lacks Standing to Assert Three of His Six Claims

The Government asserts that Plaintiff lacks standing to assert three of his six claims.[34] First, the Government argues that Plaintiff cannot show injury-in-fact for his challenge to the NFA under 26 U.S.C. §§ 5811, 5812.[35] The Government avers that Plaintiff is challenging portions of the NFA that require individuals who wish *to transfer* a firearm to register the transfer and pay a tax.[36] The Government argues, however, that Plaintiff does not allege he wishes to transfer a firearm, but instead wants to have a firearm transferred to him.[37] According to the Government, the NFA does not require the transferee to register the firearm transfer or pay the tax, and Plaintiff has not alleged otherwise.[38] Moreover, the Government points out that Plaintiff has not alleged that the requirements on transferors would affect him as a potential transferee.[39] Thus, the Government contends that because Plaintiff has not alleged injury-in-fact with regard to the registration and tax requirements of the NFA (28 U.S.C. §§ 5811, 5812), his claims should be dismissed for lack of standing.[40]

| 34 | *Id.* at 6. |
| 35 | *Id.* |
| 36 | *Id.* |
| 37 | *Id.* |
| 38 | *Id.* |
| 39 | *Id.* at 7. |

40      *Id.* at 6–7.

**\*582** Second, the Government avers that Plaintiff cannot show redressability or traceability on his claims seeking to invalidate provisions of the Gun Control Act of 1968 ("GCA") banning possession of a fully automatic weapon (commonly referred to as a "machine gun") because Louisiana law also bars him from having one.[41] The Government asserts that traceability is present when a plaintiff's injury-in-fact is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[42] The Government also contends that redressability requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[43] The Government argues that neither standing requirements of traceability or redressability are met because Louisiana law also bans machine guns.[44] The Government points to *Hollis v. Lynch*, a Northern District of Texas case that held that a plaintiff lacked standing to challenge the NFA and GCA when Texas state law independently prohibited the plaintiff from manufacturing a machine gun as well.[45] Likewise, the Government asserts that the Supreme Court has also held that a plaintiff lacks standing when similar limitations imposed by state law would remain unchanged even if the plaintiff were to receive a favorable ruling.[46]

41      *Id.* at 7 (citing La. Rev. Stat. § 40:1752 ("No person shall ... possess ... any machine gun within this state ....")).

42      *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

43      *Id.* (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

44      *Id.* (citing La. Rev. Stat. Ann. § 40:1752 ("No person shall ... possess ... any machine gun within this state ....")).

45      *Id.* at 7–8 (citing 121 F.Supp.3d 617 (N.D. Tex. 2015)).

46      *Id.* at 8 (quoting *McConnell v. FEC*, 540 U.S. 93, 229, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010)).

**2. Whether All Six of Plaintiff's Claims Should be Dismissed Under Rule 12(b)(6)**

Next, the Government alleges that all six of Plaintiff's claims under the Second Amendment, Necessary and Proper Clause,

and Tenth Amendment fail because the NFA and GCA do not infringe on the Second Amendment, and because Congress acted within its proper authority when it passed the two statutes.[47]

47      *Id.* at 9.

**a. Plaintiff's Claims under the Second Amendment**

According to the Government, the Fifth Circuit applies a two-step analysis developed in *NRA v. Bureau of Alcohol, Tobacco, Firearms & Explosives* to determine whether a law violates the Second Amendment.[48] The Government avers that the "first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment."[49] If the challenged law falls within the scope of the Second Amendment, the Government contends, then "the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny."[50]

48      *Id.*

49      *Id.* (quoting *NRA v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194–95 (5th Cir. 2012)).

50      *Id.*

First, the Government argues that the challenged provisions of the GCA and NFA fall outside the scope of the Second Amendment, **\*583** and thus Plaintiff has failed to satisfy the first prong of the Fifth Circuit's two-step *NRA* analysis.[51] The Government represents that the Supreme Court held in *District of Columbia v. Heller* that the Second Amendment right "extends only to certain types of weapons."[52] According to the Government, the Supreme Court made clear that the only weapons protected under the Second Amendment are those "in common use" and "typically possessed by law-abiding citizens for lawful purposes."[53] Thus, the Government asserts that, as numerous courts have held, the Second Amendment does not protect the possession of silencers, short-barreled rifles, or machine guns.[54] The Government represents that both statutes were passed by Congress for the constitutional purpose of reducing the use of a certain set of especially dangerous weapons by criminals or those who might misuse them.[55] The Government argues that because there is no right to possess

a silenced, short-barreled machine gun, then Plaintiff cannot have a constitutional right to transfer, make, or import such a weapon either.[56]

51    *Id.* at 9–10.

52    *Id.* at 10 (citing *District of Columbia v. Heller*, 554 U.S. 570, 623, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)).

53    *Id.* (citing *Heller*, 554 U.S. at 625, 627, 128 S.Ct. 2783).

54    *Id.* (citing *United States v. One (1) Palmetto State Armory P4–15 Machinegun Receiver/Frame, Unknown Caliber Serial Number: LW0011804*, No. 15-2859, 2016 WL 2893670, at *7, 2016 U.S. App. LEXIS 9050, at *17 (3d Cir. May 18, 2016); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *United States v. Chafin*, 423 Fed.Appx. 342, 344 (4th Cir. 2011); *United States v. McCartney*, 357 Fed.Appx. 73, 76 (9th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976); *United States v. Gonzalez*, No. 2:10–cr–00967 CW, 2011 U.S. Dist. LEXIS 127121, at *18–20 (D. Utah Nov. 2, 2011); *United States v. Tanis*, Nos. 03:05–cr–117, 03:09–cv–1832, 03:07–cr–090, 3:09–cv–01833, 2010 WL 2196445, at *9-10, 2010 U.S. Dist. LEXIS 51848, at *23 (M.D. Pa. May 26, 2010); *United States v. Perkins*, 4:08CR 3064, 2008 WL 4372821, at *4, 2008 U.S. Dist. LEXIS 72892, at *10 (D. Neb. Sept. 12, 2008); *United States v. Garnett*, 05–CR–20002–3, 2008 WL 2796098, at *4-5, 2008 U.S. Dist. LEXIS 112728, at *14 (E.D. Mich. July 17, 2008); *Gilbert Equip. Co. v. Higgins*, 709 F.Supp. 1071, 1080–81 (S.D. Ala. 1989)).

55    *Id.* at 2–3 (citing *Thompson/Center Arms Co.*, 504 U.S. at 517, 112 S.Ct. 2102; H.R. Rep. No. 83–1337, at A395, 1954 U.S.C.C.A.N. at 4552).

56    *Id.* at 11.

Moreover, the Government avers that the "longstanding nature" of the NFA and GCA challenged by Plaintiff supports the holding that they do not implicate Second Amendment rights.[57] The Government points out that the Fifth Circuit has previously held that a "longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework."[58] The Government contends that Congress first began placing restrictions on machine guns, silencers, and short-barreled rifles when it passed the NFA in 1934, making the challenged regulations

"longstanding."[59] The Government further asserts that no court has found these statutes facially invalid for any reason.[60]

57    *Id.*

58    *Id.* (citing *NRA*, 700 F.3d at 196).

59    *Id.* (citing *NRA*, 700 F.3d at 196; *Silveira v. Lockyer*, 312 F.3d 1052, 1058 (9th Cir. 2002)).

60    *Id.* at 11–12 (citing *United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *United States v. Marzzarella*, 614 F.3d 85, 94–95 (3d Cir. 2010); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008)).

Second, the Government avers that, even if the Court found that the NFA and **\*584** GCA did implicate Plaintiff's Second Amendment rights, they would be upheld under the second step of the *NRA* analysis.[61] The Government contends that regulations that do not encroach on the core of the Second Amendment, *i.e.* "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," receive intermediate scrutiny.[62] Here, the Government argues that intermediate scrutiny would apply, as Plaintiff already has access to a handgun for the purpose of self-defense and there is no similar tradition for using silenced, short-barreled machine guns for self-defense in one's home.[63] In fact, the Government asserts, Congress passed the NFA and GCA "to regulate ... certain unusually dangerous weapons ... for which Congress saw no legitimate uses."[64] The Government represents that the Fifth Circuit has previously held that "machine guns, shortbarreled shotguns, and short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection."[65] Therefore, the Government argues that there are reasonable fits between the challenged laws and the important government objectives they serve, and thus they pass intermediate scrutiny.[66]

61    *Id.* at 12.

62    *Id.* (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783) (citing *NRA*, 700 F.3d at 195).

63    *Id.*

64    *Id.* (quoting *United States v. Posnjak*, 457 F.2d 1110, 1111 (2d Cir. 1972) (citing *United States v. Dunn*, 946 F.2d 615, 621 (9th Cir. 1991))).

65     *Id.* at 12–13 (quoting *United States v. Jennings*, 195 F.3d 795, 799 n. 4 (5th Cir. 1999) (quoting S. Rep. No. 90–151, at 28 (1968)).

66     *Id.* at 13.

### b. Plaintiff's Necessary and Proper Clause and Tenth Amendment Claims

The Government further contends that binding precedent forecloses all of Plaintiff's claims under the Necessary and Proper Clause and the Tenth Amendment, as it is clear that Congress had the constitutional authority to enact the GCA and NFA. [67] According to the Government, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact [or apply] a particular federal statute, [courts] look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." [68] Likewise, the Government asserts that Congress does not exceed the limits of the Tenth Amendment when it acts within the scope of the powers delegated by the Constitution. [69] Thus, a law that is found to be a "necessary and proper exercise of a delegated power," by definition, does not violate the Tenth Amendment. [70]

67     *Id.*

68     *Id.* at 13–14 (quoting *United States v. Comstock*, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010)) (alterations in the original).

69     *Id.* (quoting *Sperry v. Florida*, 373 U.S. 379, 403, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963); *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010)).

70     *Id.* at 14.

Here, the Government avers that a "multitude of cases" have held that the NFA and GCA were valid exercises of the United States' delegated powers. [71] First, **\*585** the Government argues that the NFA's taxation and registration requirements were passed pursuant to Congress's taxing power. [72] The Government points out that both the Supreme Court and the Fifth Circuit have held that the taxing power gives Congress the authority to impose taxes on the making and transferring of firearms. [73] Thus, the Government avers, the NFA does not violate the Tenth Amendment or the Necessary and Proper Clause. [74]

71     *Id.*

72     *Id.* (citing *Sonzinsky v. United States*, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772 (1937); *United States v. Lim*, 444 F.3d 910, 912–13 (7th Cir. 2006); *United States v. Gresham*, 118 F.3d 258, 262 (5th Cir. 1997); *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994); *United States v. Dalton*, 960 F.2d 121, 124–25 (10th Cir. 1992)).

73     *Id.*

74     *Id.*

Second, the Government asserts that the GCA was constitutionally enacted pursuant to the Commerce Clause. [75] According to the Government, the Fifth Circuit has previously held that the GCA's prohibition on transferring or owning a machine gun is a valid exercise of Congress's Commerce Clause powers, as the provision regulates conduct with a substantial effect on interstate commerce. [76] Likewise, the Government argues that the same rationale applies to Congress's ban on importing or assembling firearms from imported parts, as it directly involves regulations on foreign commerce. [77] Therefore, the Government contends that because Congress acted within its authority in enacting the NFA and GCA, and because those acts are rationally related to Congress's enumerated powers, Plaintiff's Tenth Amendment and Necessary and Proper Clause challenges fail. [78]

75     *Id.* (citing *Gillespie v. City of Indianapolis*, 185 F.3d 693, 704 (7th Cir. 1999)).

76     *Id.* at 15 (citing *United States v. Knutson*, 113 F.3d 27, 31 (5th Cir. 1997)).

77     *Id.*

78     *Id.* at 15–16.

### B. Plaintiff's Arguments in Opposition to the Motion to Dismiss

In response, Plaintiff argues that he only wishes to convert his pistol into a version of a Romanian AIMR because the allegedly unconstitutional regulations under the GCA and NFA prevent him from acquiring an actual AIMR. [79] However, Plaintiff asserts that the primary intent of his complaint is not to make an AIMR, but to "obtain weapons that are part of the ordinary military equipment and whose use could contribute to the common defense of the State of

Louisiana or his own personal defense as is his right under the Second Amendment." [80]

[79]   Rec. Doc. 9 at 2.

[80]   *Id.*

### 1. Whether Plaintiff has Standing to Assert Three of his Six Claims

Plaintiff contends that the plain language of the NFA's taxation and registration requirements for transfers of certain firearms (18 U.S.C. §§ 5811, 5812) apply to Plaintiff. [81] According to Plaintiff, in order to transfer a firearm covered by the NFA, a written application must be filed with the Secretary of the Treasury that identifies the transferee and includes the transferee's fingerprints and photograph. [82] Plaintiff states that the application must also show that the Secretary of the Treasury has approved the transfer and the registration of the firearm to the transferee. [83]   **\*586** Moreover, Plaintiff points out that the statute simply requires the tax to be paid and a tax stamp affixed to the original application form, and Plaintiff argues that such costs would be ultimately passed on to the transferee. [84]

[81]   *Id.* at 2–3.

[82]   *Id.* (citing 26 U.S.C. § 5812).

[83]   *Id.*

[84]   *Id.* at 3.

Plaintiff further avers that if he succeeds in striking down the GCA's ban on machine guns (18 U.S.C. § 922(*o* )) on Second Amendment grounds, "he can then immediately move to strike down" Louisiana's state law ban on machine guns (Louisiana Revised Statute § 40:1752) on the same grounds. [85]   Moreover, Plaintiff avers that Louisiana's state ban only applies within Louisiana; if he succeeds in striking down the federal ban, Plaintiff contends, he can then lawfully possess and maintain machine guns in areas outside of Louisiana. [86]   Thus, Plaintiff asserts that the Government's traceability and redressability arguments are without merit. [87]

[85]   *Id.*

[86]   *Id.* at 3–4.

[87]   *Id.* at 4.

### 2. Whether All of Plaintiff's Claims Should be Dismissed Under Rule 12(b)(6)

#### *a. Plaintiff's Claims under the Second Amendment*

Plaintiff avers that in *Heller* and *Caetano*, the Supreme Court held that the rights provided by the Second Amendment extend to "all instruments that constitute bearable arms." [88] Plaintiff represents that the term "arms" is defined by the Supreme Court as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." [89]   Plaintiff argues that the Government's definition of "arms" protected by the Second Amendment as weapons that are in common use or typically possessed by law-abiding citizens for lawful purposes is contrary to controlling Supreme Court precedent. [90]   Plaintiff asserts that the fact that he already possesses a handgun is irrelevant to this constitutional analysis. [91]

[88]   *Id.* (citing *Caetano v. Massachusetts*, —— U.S. ——, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016); *Heller*, 554 U.S. at 582, 128 S.Ct. 2783).

[89]   *Id.* (quoting *Heller*, 554 U.S. at 581, 128 S.Ct. 2783.).

[90]   *Id.* at 5.

[91]   *Id.* at 6 (citing *Heller*, 554 U.S. at 629, 128 S.Ct. 2783).

According to Plaintiff, the Supreme Court held in *Miller* that the Second Amendment protects the right to keep arms used as "ordinary military equipment" or ones that "could contribute to the common defense." [92]   Plaintiff alleges that this is because the Second Amendment aims to preserve the citizens' militia in each state to counter a potential oppressive military force or threats from the federal government. [93] Plaintiff argues that, contrary to the Government's claim that shortbarreled machine guns are not in "common use," the Government "has issued millions of" these types of weapons to members of the military and law enforcement officers as standard issue equipment. [94]   Plaintiff asserts that the Government is attempting to do exactly what the Second Amendment seeks to prevent: the elimination of citizens' militia by taking   **\*587** away the people's arms. [95]   Plaintiff contends that questions regarding whether certain weapons are in common use or typically possessed by law-abiding citizens for lawful purposes are questions of fact to be determined at trial. [96]

92 *Id.* at 7 (quoting *United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)).

93 *Id.* (citing *Heller*, 554 U.S. at 599, 624, 128 S.Ct. 2783).

94 *Id.* at 9.

95 *Id.*

96 *Id.* at 5.

Plaintiff further avers that silenced, short-barreled machine guns are the "most effective weapons for defense of hearth and home," because: (1) the silencer protects the shooter's hearing from permanent damage; (2) the short barrel makes the weapon more maneuverable in confined spaces such as hallways; and (3) fully automatic fire allows a shooter to more quickly address any threat. [97] Plaintiff alleges that these weapons thus have personal protection uses, which Plaintiff contends is supported by the fact that the GCA and NFA provisions do not apply to law enforcement personnel who face the same criminals that law-abiding citizens do. [98] Plaintiff argues that the GCA and NFA place Plaintiff at a disadvantage compared to criminals who do not follow the law and can easily arm themselves with the types of weapons Plaintiff seeks. [99]

97 *Id.* at 10.

98 *Id.* at 10–11.

99 *Id.* at 11.

Plaintiff avers that the Supreme Court rejected the Government's arguments that "longstanding" provisions are constitutional in *Heller*, where the Supreme Court held that "nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment." [100] Plaintiff argues that the Government's laws restricting the use of certain arms that would be used in defense of hearth and home are subject to strict scrutiny. [101] However, Plaintiff asserts that, under any standard of scrutiny that the Court may apply, these provisions cannot pass constitutional muster. [102]

100 *Id.* (quoting *Heller*, 554 U.S. at 625–26, 128 S.Ct. 2783).

101 *Id.* at 13.

102 *Id.* at 12–13.

### b. Plaintiff's Necessary and Proper Clause and Tenth Amendment Claims

Next, Plaintiff contends that the Government lacks an enumerated power in the Constitution to infringe on Plaintiff's right to keep and bear arms. [103] Plaintiff argues that because Congress has no general police power or specific power to enact gun control, these laws are neither "necessary and proper" nor within the bounds of the federal government's authority under the Tenth Amendment. [104] Additionally, Plaintiff avers that the Commerce Clause does not permit Congress to regulate intrastate commerce, which is reserved to the states under the Tenth Amendment. [105] According to Plaintiff, the GCA was passed to control the possession and trafficking of arms "*within* the Several States." [106] Plaintiff points to *United States v. Lopez*, where the Supreme Court struck down 18 U.S.C. § 922(q), a provision of the GCA criminalizing the possession of a firearm in a school zone. [107] Plaintiff represents that the Supreme Court held in *Lopez* that the statute had "nothing to do with 'commerce' or any sort of economic enterprise," and it **\*588** was not "an essential part of a larger regulation of economic activity[.]" [108] Plaintiff asserts that the same logic applies here to 18 U.S.C. § 922(*o* ), as the possession of a silenced, shortbarreled machine gun in his home is not an economic activity and does not have a substantial effect on any interstate commerce. [109]

103 *Id.* at 14.

104 *Id.* at 14–15.

105 *Id.* at 16.

106 *Id.* at 16–17 (emphasis in original).

107 *Id.* at 17 (citing *United States v. Lopez*, 514 U.S. 549, 560–61, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)).

108 *Id.*

109 *Id.* at 18–19 (citing *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624).

Plaintiff likewise argues that the Government's taxation power cannot be used to regulate the possession of firearms. [110] Plaintiff contends that Congress's taxation power is a revenue raising power, and not a general police power. [111] Plaintiff asserts that the NFA's tax on transfers of certain firearms is a pretext to regulate weapons, not

raise revenue, and thus violates the Necessary and Proper Clause and the Tenth Amendment. [112] Plaintiff points out that the Government admits in its own motion to dismiss that the NFA was passed to regulate weapons, and that the ATF's National Firearms Act Handbook explicitly states that the NFA "had an underlying purpose unrelated to revenue collection." [113] Plaintiff avers that allowing the Government to tax the type of arms a citizen can keep and bear under the Second Amendment is the equivalent of allowing the Government to tax the content of speech protected by the First Amendment. [114] Plaintiff argues that the Government does not have the power to tax what it cannot otherwise impede, burden, or control through an enumerated power. [115]

[110]     *Id.* at 20.

[111]     *Id.*

[112]     *Id.*

[113]     *Id.* at 21 (quoting *National Firearms Act Handbook*, Bureau of Alcohol, Tobacco, Firearms and Explosives, at I, ATF E–Publication 5320.8 (Revised April 2009)).

[114]     *Id.* at 22.

[115]     *Id.* at 22–23 (citing *McCulloch v. Maryland*, 17 U.S. 316, 317, 4 Wheat. 316, 4 L.Ed. 579 (1819)).

### C. Defendant's Reply in Further Support of its Motion to Dismiss

The Government contends that Plaintiff lacks standing to assert his three claims challenging the NFA transfer requirements, as the NFA only imposes requirements on the transferors, not transferees. [116] The Government asserts that Plaintiff's argument that there is injury in fact here because the transfer application must include Plaintiff's name, photograph, and fingerprints and a transferor might pass on the cost of the $200 tax to Plaintiff is insufficient in light of existing case law. [117] The Government points out that in *Lane v. Holder*, the Fourth Circuit Court of Appeals found that the plaintiffs lacked standing to challenge the GCA's "requirement that interstate transfers of firearms take place through federal firearms licensees" because the plaintiffs were not federal firearm licensees, and thus the challenged laws and regulations did not apply to them. [118] According to the Government, Plaintiff's claims are even weaker, as he has not articulated how providing identifying information would appreciably burden his rights under the

Second Amendment. [119] Likewise, the Government argues that Plaintiff's "unsupported assertion" that the tax on transferors would be passed on to him fails as a matter of law. [120]

[116]     Rec. Doc. 13 at 2.

[117]     *Id.*

[118]     *Id.* (citing *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012)).

[119]     *Id.* at 3.

[120]     *Id.* (citing *Lane*, 703 F.3d at 672; *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996)).

**\*589** The Government also asserts that Plaintiff has not shown redressability or traceability for his challenge to the GCA's machine gun ban because Plaintiff did not seek to strike down Louisiana state law ban on machine guns in his complaint. [121] The Government avers that Plaintiff's argument that, if the federal law is invalidated, he could possess a machine gun outside Louisiana fails, as his complaint makes clear that he is a Louisiana citizen who seeks to exercise his Second Amendment rights "in his home" and as a member of the Louisiana militia. [122] Thus, the Government argues that Plaintiff's claims clearly contemplate conduct within Louisiana. [123]

[121]     *Id.* at 4.

[122]     *Id.*

[123]     *Id.*

### D. Plaintiff's Sur–Reply in Opposition to the Motion to Dismiss

Plaintiff asserts that the Supreme Court in *Heller* expanded the constitutional protections provided by the Second Amendment beyond *Miller*'s limited holding that the Second Amendment extends only to certain types of weapons. [124] Plaintiff notes that *Heller* explicitly stated that the Second Amendment extends to all instruments that constitute bearable arms, even if they did not exist at the time of the founding. [125] Plaintiff points out that the Supreme Court has found handguns and stun guns to be protected under the Second Amendment. [126] Plaintiff argues that there is "no doubt" that short-barreled machine guns are "ordinary military equipment" capable of contributing to the "common

defense" similar to the standard issue M–4 carbine rifle used in the United States military. [127]

128 | Rec. Doc. 17 at 2–3 (citing *Heller*, 554 U.S. at 623, 128 S.Ct. 2783; *Miller*, 307 U.S. at 178, 59 S.Ct. 816).

125 | *Id.* at 3.

126 | *Id.* at 4 (citing *Heller*, 554 U.S. at 623, 128 S.Ct. 2783; *Caetano*, 577 U.S. ——, 136 S.Ct. 1027 (2016)).

127 | *Id.*

Plaintiff avers that the Government's citation to the Fourth Circuit's decision in *Lane v. Holder* is inapplicable to Plaintiff's standing to challenge the NFA's registration and taxation requirements, as *Lane* dealt with the GCA's separate requirements and a Virginia state law. [128] Moreover, Plaintiff contends that in *Carey v. Population Services International*, the Supreme Court held that "[a] plaintiff who alleges an injury based on restriction of distribution channels may be able to show standing if the defendant's actions directly affect that plaintiff." [129] Here, Plaintiff argues that the NFA's registration and taxation requirements on the transfer of certain firearms directly affects Plaintiff. [130] In addition, Plaintiff represents that, according to the ATF's website, it takes an average of nine months to obtain permission to add a stock or a silencer to a pistol, which Plaintiff contends shows he is directly affected by the law. [131] Plaintiff asserts that paying a $200 tax, waiting an average of nine months, and requiring the approval of the federal government transforms his individual Second Amendment right "into a privilege subject to the whim and denial of Defendant." [132] Plaintiff further avers that the fact that he can be prosecuted under the NFA for unknowingly possessing an unregistered firearm if the transferor fails **\*590** to register the weapons shows he has standing to challenge the requirements. [133]

128 | *Id.* at 6 (citing *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012)).

129 | *Id.* at 7 (citing *Carey v. Pop. Servs. Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)).

130 | *Id.*

131 | *Id.* at 8.

132 | *Id.* at 9.

133 | *Id.* at 16–18.

Plaintiff also asserts that there is no requirement that he must attempt to invalidate both Louisiana's and the federal separate bans on machine guns to have standing. [134] Plaintiff avers that the Fifth Circuit has rejected that argument, because finding a federal law unconstitutional under the Second Amendment would apply equally to state bans. [135] Moreover, Plaintiff argues that the GCA's ban on machine guns is ineffective, as it only prevents law-abiding citizens from acquiring such weapons while criminals have the ability to easily construct such a weapon. [136] Likewise, Plaintiff asserts that the NFA's requirements only apply to lawful transactions by law-abiding citizens. [137]

134 | *Id.* at 10–11.

135 | *Id.* at 12–13 (citing *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)).

136 | *Id.* at 14–15.

137 | *Id.* at 15.

### III. Law and Analysis

#### A. Legal Standing for Motion to Dismiss Pursuant to Rule 12(b)(1)

Motions to dismiss pursuant to Federal Rule of Procedure 12(b)(1) seek to challenge the subject matter jurisdiction of the district court to hear a case. [138] Courts may find they lack subject matter jurisdiction by considering: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." [139] Ultimately, a court should dismiss a case for lack of subject matter jurisdiction "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." [140] The burden to prove that jurisdiction exists is on the party asserting jurisdiction. [141] When a Rule 12(b)(1) motion is filed alongside other Rule 12 challenges, the district court "should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." [142]

138 | Fed. R. Civ. P. 12(b)(1); *see Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

139 | *Ramming*, 281 F.3d at 161 (*Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

140    *Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998)).

141    *Id.* (citing *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (plaintiff bears burden of establishing standing).

142    *Ramming*, 281 F.3d at 161 (citing *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

Under Article III of the United States Constitution, federal courts only have jurisdiction over "cases" or "controversies." [143] One requirement for a "case" or "controversy" is that the plaintiff must have standing to sue. [144] "The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit[.]" [145] **\*591** The plaintiff must show that he has a "personal stake" in the dispute, and that the injury alleged in the complaint is particularized as to him. [146] To establish standing, the plaintiff must show: (1) he suffered an "injury in fact," which is a "concrete and particularized invasion of a legally protected interest" that is actual or imminent, and not conjectural or hypothetical; (2) there is a causal connection between the alleged harm and the defendant's conduct, such that the injury is fairly traceable to the challenged action rather than the result of a third party's independent action; and (3) it is likely, rather than merely speculative, that a favorable decision will redress the injury. [147]

143    U.S. Const. art. III, § 2, cl. 1; *see Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); *Hollis v. Lynch*, 827 F.3d 436, 441 (5th Cir. 2016).

144    *Hollis*, 827 F.3d at 441.

145    *Raines*, 521 U.S. at 818, 117 S.Ct. 2312 (*Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

146    *Id.* at 819, 117 S.Ct. 2312 (citing *Lujan,* 504 U.S. at 560–561, 112 S.Ct. 2130); *see also Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 543–544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (holding that a member of the school board who "has no personal stake in the outcome of the litigation" had no standing).

147    *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130; *Hollis*, 827 F.3d at 441.

## B. Legal Standard for Motion to Dismiss Pursuant to Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted." [148] To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " [149] A claim "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [150] A complaint need not contain "detailed factual allegations," but rather "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " [151] In resolving a motion to dismiss, this Court "draw[s] all reasonable inferences in the Plaintiff[s'] favor." [152] Motions to dismiss under Rule 12(b)(6) are "viewed with disfavor and [are] ... rarely granted." [153]

148    Fed. R. Civ. P. 12(b)(6).

149    *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

150    *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

151    *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).

152    *Id.*

153    *Id.*

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and all facts pleaded are taken as true. [154] However, although required to accept all "well-pleaded facts" as true, a court is not required to accept legal conclusions as true. [155] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." [156] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice. [157] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal **\*592** conclusions, or formulaic recitals of the elements of a cause of action. [158] That is, the complaint must offer more than an "unadorned, the

defendant-unlawfully-harmed-me accusation." [159] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims. [160] If factual allegations are insufficient to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed. [161]

[154]   *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

[155]   *Iqbal*, 556 U.S. at 677–78, 129 S.Ct. 1937.

[156]   *Id.* at 679, 129 S.Ct. 1937.

[157]   *Id.* at 678, 129 S.Ct. 1937.

[158]   *Id.*

[159]   *Id.*

[160]   *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[161]   *Moore v. Metro. Human Serv. Dist.*, No. 09-6470, 2010 WL 1462224, at *2 (E.D. La. Apr. 8, 2010) (Vance, J.) (citing *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)); *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007).

In evaluating a complaint under Rule 12(b)(6), the district court should confine itself to the pleadings. [162] "If the district court considers information outside of the pleadings, the court must treat the motion [to dismiss] as a motion for summary judgment. Although the court may not go outside the complaint, the court may consider documents attached to the complaint." [163]

[162]   *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004).

[163]   *Id.*

### C. Analysis

In this litigation, Plaintiff seeks to convert a pistol into a silenced, short-barreled machine gun and to generally acquire weapons that he contends are part of the "ordinary military equipment and whose use could contribute to the common defense of the State of Louisiana or his own personal defense." [164] However, Plaintiff asserts that he is prevented or hindered from doing so by certain provisions of the Gun Control Act of 1968 ("GCA") and the National Firearms Act ("NFA"), which Plaintiff contends are unconstitutional under the Second Amendment, the Necessary and Proper Clause, and the Tenth Amendment. [165]

[164]   Rec. Doc. 1 at 1.

[165]   *Id.* at 16–19.

With regard to the GCA, Plaintiff argues that the following provisions are unconstitutional: (1) 18 U.S.C. § 922(*l*), which bans the importation of firearms and ammunition regulated under the GCA unless authorized by the Attorney General; (2) 18 U.S.C. § 922(r), which forbids assembling such weapons from imported parts; and (3) 18 U.S.C. § 922(*o*), which makes it unlawful to transfer or possess any machine gun manufactured after May 19, 1986. [166] With regard to the NFA, Plaintiff contends the following provisions are also unconstitutional: (1) 26 U.S.C. § 5811, which taxes the transfer of such weapons as machine guns, silencers, short barreled rifles, and short barreled shotguns; (2) 26 U.S.C. § 5812, which establishes the registration and application requirements for transfers of such weapons; and (3) 26 U.S.C. § 5821, which taxes the making of such weapons. [167]

[166]   *Id.* at 16–17.

[167]   *Id.* at 17–19.

Additionally, the Court notes that in the final "prayer for relief" section of his complaint, Plaintiff requests for the first time the additional relief of an injunction against 26 U.S.C. § 5822, which establishes registration and application requirements for the making of such weapons. [168]  **\*593** While Plaintiff did not directly assert a cause of action challenging 26 U.S.C. § 5822, because Plaintiff is proceeding *pro se*, the Court will assume Plaintiff intended to bring a claim challenging 26 U.S.C. § 5822. Moreover, because the Government has argued that "none of [Plaintiff's] claims have legal merit ... [and] [t]he Court should therefore dismiss this case in its entirety," the Court will consider whether Plaintiff has failed to state a claim challenging 26 U.S.C. § 5822 pursuant to Rule 12(b)(6) as well.

[168]   *Id.* at 19–20.

The Government asserts that Plaintiff's claims should be dismissed on two grounds: first, because Plaintiff lacks standing to assert three of his claims pursuant to Federal Rule of Civil Procedure 12(b)(1); and second, because Plaintiff has failed to state any claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). [169]

[169]    Rec. Doc. 8–1 at 1, 6, 9.

### 1. Whether Plaintiff has standing to bring three of his six claims

First, the Government argues that Plaintiff lacks standing to bring three of his six claims. [170] In particular, the Government asserts that: (1) Plaintiff cannot show redressability or traceability to challenge 18 U.S.C. § 922(*o*), the GCA's ban on machine guns, because Louisiana law also prohibits the possession of machine guns; and (2) Plaintiff cannot show an injury-in-fact for his challenges to 26 U.S.C. § 5811 and § 5812, the NFA's application and tax requirements on transfers of certain weapons, as Plaintiff has not alleged that he wishes to transfer a firearm. [171] In response, Plaintiff argues: (1) that if he succeeds in striking down the federal ban on machine guns on Second Amendment grounds, he can then possess a machine gun in areas outside Louisiana and immediately move to strike down the Louisiana ban on the same grounds; [172] and (2) that, even though Plaintiff has not alleged that he wants to transfer a firearm, he has still suffered an injury-in-fact because a transferee must be identified in the transfer application, must provide a photograph and fingerprints, and must wait until the application is approved, and because the costs of the $200 tax paid by the transferor will ultimately be paid for by the transferee. [173]

[170]    *Id.* at 6.

[171]    *Id.* at 6–8.

[172]    Rec. Doc. 9 at 4.

[173]    *Id.* at 3; Rec. Doc. 17 at 7–8.

#### a. Plaintiff's standing to challenge Section 922(o)

As stated *supra*, 18 U.S.C. § 922(*o*) makes it unlawful to transfer or possess any machine gun manufactured after May 19, 1986. [174] In addition, Louisiana Revised Statute § 40:1752 makes it unlawful for any person to "sell, keep or offer for sale, loan or give away, purchase, possess, carry,

or transport any machine gun within this state," with limited exceptions. Here, the Government does not appear to contest that Plaintiff can establish the first element of standing, injury-in-fact, to challenge Section 922(*o*), as it is undisputed that he is barred from possessing a machine gun. [175] Rather, the Government avers **\*594** that, because Louisiana law prohibits the same conduct that federal law prohibits, Plaintiff cannot prove traceability (the second standing element) or redressability (the third standing element). [176] In *Hollis v. Lynch*, the Fifth Circuit reviewed a district court's finding that a plaintiff lacked standing to challenge 18 U.S.C. § 922(*o*) because an existing Texas statute prohibiting the possession or manufacture of a machine gun would also bar the plaintiff's claim. [177] There, Texas Penal Code § 46.05(a)(1)(A)–(B) provided:

> (a) A person commits an offense if the person intentionally or knowingly possesses, manufactures, transports, repairs, or sells:
>
> (1) any of the following items, unless the item is registered in the National Firearms Registration and Transfer Record maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives ...:
>
> (A) an explosive weapon; [or]
>
> (B) a machine gun. [178]

[174]    *See generally United States v. Ardoin*, 19 F.3d 177, 182 (5th Cir. 1994) ("Section 922(o) of the Firearm Owners' Protection Act (FOPA) prohibits a private citizen from possessing or transferring a machine gun that was not made and registered before May 19, 1986, unless such transfer or possession is authorized by federal or state governments or their departments or agencies.").

[175]    *Hollis*, 827 F.3d at 442 (noting that the district court found an injury where the plaintiff was barred from possessing a machine gun).

[176]    Rec. Doc. 8–1 at 7–8.

[177]    *Hollis*, 827 F.3d at 442.

[178]    *Id.* (quoting Tex. Penal Code § 46.05(a)(1)(A)–(B)).

The Fifth Circuit "disagree[d] with the district court that the Texas statute moots the federal claim." [179] The Fifth Circuit noted that the Second Amendment applies with equal force to the states, and held that, if Section 922(*o*) was found to be unconstitutional, "it is likely that Section 46.05,

a state law, would also be unconstitutional." [180] The Fifth Circuit further acknowledged that striking down the federal ban would likely put plaintiff in compliance with Texas state law, as it is contingent on whether the plaintiff could obtain federal approval of an application to make a machine gun. [181]

179     *Id.*

180     *Id.*

181     *Id.*

Here, unlike the Texas state law in *Hollis*, the Louisiana state law banning possession of machine guns is not contingent on the federal application process. [182] However, because a ruling that finds Section 922(*o*) to be unconstitutional under the Second Amendment would mean that Louisiana's state ban would "likely" also be unconstitutional, [183] the Court finds that, under the Fifth Circuit's reasoning in *Hollis*, Plaintiff has standing to challenge 18 U.S.C. § 922(*o*).

182     *See* La. Rev. Stat. § 40:1752.

183     *Hollis*, 827 F.3d at 442.

### b. Plaintiff's standing to challenge 26 U.S.C. § 5811 and § 5812

Next, the Government argues that Plaintiff has failed to show injury-in-fact to establish standing to challenge 26 U.S.C. § 5811 and § 5812. [184] The Government asserts that these federal statutes only impose registration requirements and the payment of a $200 tax on prospective *transferors* on certain firearms, whereas Plaintiff has only alleged that he seeks to have certain firearms be transferred to him. [185] Moreover, the Government avers that Plaintiff has not pointed to any basis for his assertion that the tax paid by transferors would be passed on to him, and that Plaintiff has not alleged how providing identifying information for a firearm transfer application would burden his Second Amendment rights. [186] In response, Plaintiff argues that he has sufficiently alleged an injury-in-fact, as: (1) he must provide a photograph and fingerprints for the transfer **\*595** application; (2) the cost of the $200 tax will be passed on to him as the transferee; (3) he is directly affected because he cannot obtain a transferred firearm unless and until he receives approval from the federal government, thus restricting his access to firearms and his rights under the Second Amendment; and (4)

the significant delay between submitting an application and receiving approval further burdens his Second Amendment rights. [187]

184     Rec. Doc. 8–1 at 6.

185     *Id.*

186     Rec. Doc. 13 at 3.

187     *See* Rec. Doc. 9 at 2–3; Rec. Doc. 17 at 6–8.

Title 26 U.S.C. § 5811 provides that for every firearm transferred, a $200 tax must be paid "by the transferor." Title 26 U.S.C. § 5812(a) establishes that a firearm shall not be transferred unless: (1) "the transferor of the firearm" files a written application for the transfer and registration of the firearm to the transferee; (2) the application must include evidence that any tax payable on the transfer has been paid by affixing the proper stamp to the application form; (3) the transferee is identified in the application, and the identification must include the transferee's fingerprints and photograph; (4) the transferor is identified in the application; (5) the firearm is identified in the application; and (6) the application form shows that the Secretary of the Treasury has approved the transfer and the registration of the firearm to the transferee. Title 26 U.S.C. § 5812(b) further provides that the transferee of a firearm may not take possession of the firearm unless the Secretary has approved the transfer and registration of the firearm to the transferee as required by Section 5812(a).

Here, Plaintiff does not allege that he wishes to transfer a firearm to another individual or that any application to transfer a firearm to him has been filed. Instead, Plaintiff only argues that, as a prospective transferee seeking to obtain a firearm via transfer in the future, he has standing to challenge 26 U.S.C. § 5811 and § 5812. However, neither statute imposes any obligations or requirements on the recipient of a transferred weapon; rather, both statutes clearly state that the "transferor" must pay a $200 tax and file a written application to transfer and register the firearm. [188] In order to have standing under Article III, the plaintiff must show he has a "personal stake" in the dispute, and that the injury alleged in the complaint is concrete and particularized as to him, rather than merely conjectural or hypothetical. [189] As stated *supra*, the burden to prove that jurisdiction exists is on Plaintiff. [190] Here, Plaintiff has not sufficiently alleged how these laws directed to transferors impose an obligation on *potential transferees*, and Plaintiff has not articulated how the requirements that another individual pay a tax and provide

information about Plaintiff violate his Second Amendment rights or otherwise impose a concrete and particularized injury on him.

188    26 U.S.C. § 5811; 26 U.S.C. § 5812.

189    *Id.* at 819 (citing *Lujan,* 504 U.S. at 560–561, 112 S.Ct. 2130); *see also Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 543–544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (holding that a member of the school board who "has no personal stake in the outcome of the litigation" had no standing).

190    *Ramming,* 281 F.3d at 161 (citing *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980)); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (plaintiff bears burden of establishing standing).

Moreover, the Court notes that neither 26 U.S.C. § 5811 or § 5812 act as an absolute prohibition on transferring firearms as Plaintiff desires, but rather establish an approval and taxation process which would allow transfers of firearms to Plaintiff once **\*596** the requirements are satisfied by the transferor. In *National Rifle Association of America, Inc. v. McCraw,* the Fifth Circuit considered whether 18–to–20–year–old plaintiffs had standing to challenge a concealed handgun licensing law and the accompanying criminal law banning carrying a handgun in public. [191] There, the Fifth Circuit held that the plaintiffs had standing, as the criminal statute "forbids them from carrying a handgun altogether" and the licensing program "declines to grant their age group, specifically, a limited exception in the form of a concealed handgun license from this alleged burden on their Second Amendment rights." [192] "Thus, both laws, as part of a statutory scheme, combine to deprive plaintiffs of their alleged constitutional rights." [193] Here, by contrast, the challenged statutes do not forbid Plaintiff from being transferred a firearm altogether, but instead establish a regulatory application and taxation scheme to oversee the lawful transfer of firearms between individuals.

191    719 F.3d 338, 345 (5th Cir. 2013).

192    *Id.*

193    *Id.*

The Fourth Circuit's reasoning in *Lane v. Holder* provides additional support for the Court's analysis here. In *Lane v. Holder,* the Fourth Circuit considered whether plaintiffs who desired to acquire handguns out-of-state had standing to challenge the GCA's provision requiring interstate transfers of firearms to take place through federal firearm licensees ("FFLs"). [194] The Fourth Circuit rejected the plaintiffs' argument that restricting the range of retailers available was sufficient to establish an injury-in-fact, and instead held that the plaintiffs lacked standing because the laws applied to the FFLs rather than to the handgun purchasers. [195] The Fourth Circuit noted that the plaintiffs were not prevented from obtaining the handguns, and "[a]t worst, they are burdened by additional costs and logistical hurdles." [196] The Fourth Circuit held that "minor inconveniences are distinct" from those cases where plaintiffs were "prevented outright from obtaining or possessing firearms." [197] Thus, unlike the Fifth Circuit's holding in *National Rifle Association of America, Inc.,* where a 20–year–old was found to have standing because he was absolutely barred from buying firearms from FFLs, the plaintiffs in *Lane* were able to obtain out-of-state firearms, as long as they went through an FFL to do so. Similarly here, Plaintiff is not absolutely barred from being transferred a firearm, but may receive a firearm if the transferor satisfies the provisions' requirements.

194    703 F.3d 668, 671–72 (4th Cir. 2012).

195    *Id.* at 672.

196    *Id.* at 672–73.

197    *Id.* at 673.

Finally, the Court notes that Plaintiff has not alleged that an application to transfer a firearm to him was filed or rejected, or that Plaintiff faces any imminent threat of prosecution for failing to comply with either statute. [198] In *Westfall v. Miller,* the Fifth Circuit considered whether **\*597** a plaintiff had standing to challenge an ATF requirement that a local law enforcement official must certify that the official has no knowledge that the firearm will be used for an unlawful purpose. [199] The district court found that, because the plaintiff had not pursued certification from all specified persons after being denied approval by some of them, the plaintiff lacked standing. [200] The Fifth Circuit agreed, and held that "[j]ust because [the plaintiff] does not like the firearms regulation does not give him standing to complain about its legality." [201] The Fifth Circuit determined that the plaintiff "made no effort to obtain certifications from" other acceptable local officials, and therefore it "can only conclude that his inaction has caused any injury he has suffered." [202] Here, Plaintiff's claims are even more

attenuated, as Plaintiff has not alleged that any application was ever filed or denied. [203]

[198]   While Plaintiff mentions that transferring a firearm in violation of the GCA provisions could subject him to criminal penalties, the mere fact that a statute is enforced through criminal sanctions is insufficient to establish standing. *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)); *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538, 547 (5th Cir. 2008) ("Although a plaintiff need not expose himself to actual arrest or prosecution in order to challenge a statute for infringing constitutional rights, the plaintiff must be seriously interested in disobeying the statute."); *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006) ("Standing to challenge the constitutionality of a penal statute or the like requires 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there [must be] a credible threat of prosecution thereunder.' ") (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301).

[199]   77 F.3d 868, 869 (5th Cir. 1996).

[200]   *Id.* at 870–71.

[201]   *Id.* at 870.

[202]   *Id.* at 872.

[203]   Additionally, the Court notes that, in a *per curium* opinion, the Fifth Circuit addressed the question of whether a plaintiff who sought a concealed handgun permit and submitted an incomplete application had standing to assert that the underlying Louisiana statute was unconstitutional. *Osterweil v. Edmonson*, 424 Fed.Appx. 342, 343–44 (5th Cir. 2011). In *Osterweil*, the plaintiff challenged certain state law provisions requiring the applicant to pay a $100 application fee and an additional $50 fee for individuals who had resided outside Louisiana in the past fifteen years, as well as a provision requiring applicants to hold harmless and indemnify the state for any liability arising out of issuing the permit. *See Osterweil v. Edmondson*, No. 10-398, 2010 WL 4056310, at *1 (M.D. La. Oct. 13, 2010). The district court found that the plaintiff lacked standing, because he had not enclosed the applicable $50 fee and was not denied a permit, but rather had his application returned for incompleteness. *Id.* at *2. The Fifth Circuit

affirmed the district court's decision in an unpublished opinion, as "Louisiana has not yet applied its regulations to deny [the plaintiff] the right to possess a concealed handgun." *Osterweil*, 424 Fed.Appx. at 343. The Fifth Circuit noted that the plaintiff had only submitted an incomplete permit application and did not pursue the matter further, and that he had not alleged that he carried a concealed weapon or was threatened with prosecution. *Id.* The Fifth Circuit further held that the plaintiff had not shown a credible threat of prosecution to confer standing, as the record "does not allow Osterweil's bald claim to rise above the level of speculation or conjecture." *Id.* at 344. Pursuant to Fifth Circuit Rule 47.5.4, unpublished opinions are not precedent.

Likewise, the Second Circuit has held that, "[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." [204] For example, in *United States v. Decastro*, the Second Circuit held that a plaintiff who fails to apply for a gun license lacks standing to challenge those state licensing laws. [205] According to the Second Circuit, a plaintiff may only challenge licensing laws without first submitting an application if he can make a "substantial showing" that submitting an application "would have been futile." [206]

[204]   *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012).

[205]   *Id.*

[206]   *Id. See generally Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1098 (2d Cir. 1997) (finding that an inmate who failed to register his religion as required lacked standing to bring a First Amendment claim "because registration is a reasonable standing threshold and because Jackson–Bey failed to register and has not made a substantial showing that registration would be futile.").

**\*598**   In support of this interpretation, the Second Circuit in *Decastro* pointed out that in *Moose Lodge No. 107 v. Irvis*, the Supreme Court held that an African–American who never actually applied for membership to the Moose Lodge lacked standing to challenge the club's all-white membership requirement. [207] In *Moose Lodge No. 107*, the Supreme Court clearly stated that the plaintiff "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others." [208] Similarly, in *Allen v. Wright*, the Supreme Court held that plaintiffs, parents of children who had never applied for admission to private schools with

allegedly racially discriminatory admissions policies, had no standing to challenge the tax-exempt status of those private schools. [209] This Court further notes that the Eighth Circuit, Ninth Circuit, and the D.C. Circuit have also concluded that a plaintiff who failed to submit required applications or filings in other contexts lacked standing to challenge the requirements. [210]

| | |
|---|---|
| 207 | 407 U.S. 163, 167–68, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). |
| 208 | *Id.* at 166, 92 S.Ct. 1965. |
| 209 | 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). |
| 210 | *See, e.g., Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) ("There is a long line of cases, however, that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."); *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 56 (D.C. Cir. 1991) (plaintiffs lacked standing to challenge failure to extend Indian hiring preferences into job categories for which they never formally applied); *Oil, Chemical & Atomic Workers Int'l Union v. Gillette Co.,* 905 F.2d 1176, 1177 (8th Cir. 1990) (employee who has not filed benefits claim lacks standing to challenge employer's retirement policy); |

Here, Plaintiff challenges two federal laws that only impose obligations on transferors of firearms, whereas Plaintiff seeks to have a firearm transferred to him. Moreover, Plaintiff has not alleged an application to transfer was ever filed or rejected. The Court finds that such speculative and conjectural allegations of injury are insufficient to establish a case or controversy under Article III. The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." [211] As the Fifth Circuit has made clear, "[t]he requirements of Article III are not satisfied merely because a party requests a court of the United States to declare its legal rights." [212] Accordingly, the Court concludes that Plaintiff has not sufficiently alleged the injury-in-fact requirement and lacks standing under Article III of the United States Constitution to pursue this claim challenging the NFA's registration and taxation requirements for transfers of firearms. [213] Therefore,

the Court will grant **\*599** the Government's motion to dismiss Plaintiff's challenges to 26 U.S.C. § 5811 and § 5812 for lack of standing pursuant to Rule 12(b)(1). [214]

| | |
|---|---|
| 211 | *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). |
| 212 | *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). |
| 213 | *See generally Oster v. City of New Orleans, By & Through Morial*, 631 F.2d 71, 72 (5th Cir. 1980) (holding that plaintiffs who did not have criminal charges pending against them did not have standing to attack a provision denying licenses to applicants with criminal charges pending against them); *Pollard v. Cockrell*, 578 F.2d 1002, 1006 (5th Cir. 1978) (concluding that plaintiffs who did not show they intended to patronize a massage parlor in the future lacked standing to challenge ordinances regulating such establishments). |
| 214 | Moreover, the Court notes that its analysis and findings discussed *infra* regarding Plaintiff's challenge to 26 U.S.C. § 5821 and § 5822's nearly identical taxation and registration requirements on the making of certain firearms would equally apply to these provisions establishing taxation and registration requirements on the transfers of certain firearms. Thus, even if Plaintiff had standing to challenge 26 U.S.C. § 5811 and § 5812, his claims would be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). |

### 2. Whether the challenged provisions of the GCA and NFA violate the Second Amendment

The Government argues that this Court should dismiss Plaintiff's claims under the Second Amendment against certain provisions of the GCA and NFA pursuant to Rule 12(b)(6), because, the Government avers, the provisions do not infringe on Plaintiff's Second Amendment rights. [215] According to the Government, the Fifth Circuit applies a two-step analysis for Second Amendment challenges. [216] The Government argues that Plaintiff's challenge fails at the first step of the analysis because it is clear that the longstanding, presumptively lawful regulations of the GCA and NFA do not fall within the scope of the Second Amendment. [217] The Government asserts that the Second Amendment does not confer the right to possess a silenced, short-barreled machine gun. [218] Even if the GCA and NFA provisions did implicate

AR005500

Second Amendment rights, the Government contends that the law should still be upheld under the second step of the analysis, as the Court should only apply intermediate scrutiny and find that there is a reasonable fit between the challenged regulation and an important government objective.[219]

[215]   Rec. Doc. 8–1 at 1–2.

[216]   *Id.* at 9 (citing *NRA v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194–95 (5th Cir. 2012)).

[217]   *Id.* at 9–12.

[218]   *Id.*

[219]   *Id.* at 12–13.

Plaintiff argues in response that the Second Amendment extends to all instruments that constitute bearable arms.[220] Plaintiff avers that the Supreme Court held in *Miller* that the Second Amendment protects those arms that are used as "ordinary military equipment" or ones that "could contribute to the common defense."[221] Plaintiff argues that short-barreled machine guns are in "common use," as the Government uses them to equip law enforcement officers and members of the military.[222] Plaintiff further avers that silenced, short-barreled machine guns are the "most effective weapons for defense of hearth and home."[223] Plaintiff argues that the GCA and NFA place Plaintiff at a disadvantage to criminals who do not follow the law and can easily arm themselves with the types of weapons Plaintiff seeks.[224] Plaintiff argues that the Government's **\*600** laws restricting the use of certain arms that would be used in defense of hearth and home are subject to strict scrutiny.[225] However, Plaintiff asserts that, under any standard of scrutiny that the Court may apply, these provisions under the GCA and NFA cannot pass constitutional muster.[226]

[220]   Rec. Doc. 9 at 5–6.

[221]   *Id.* at 7 (quoting *United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)).

[222]   *Id.* at 9.

[223]   *Id.* at 10.

[224]   *Id.* at 11.

[225]   *Id.* at 13.

[226]   *Id.* at 12–13.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[227] The Fifth Circuit employs a two-step inquiry to analyze challenges under the Second Amendment:

> [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.[228]

Thus, the first question the Court must consider is whether the challenged provisions of the GCA and NFA regulate conduct that falls within the scope of the rights protected by the Second Amendment. If the Court finds in the affirmative, the Court must then address the second step in the Fifth Circuit's two-step inquiry: "whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny."[229] The appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."[230] When a regulation "threatens a right at the core of the Second Amendment," such as the right to possess and use a handgun to defend the home, courts should apply strict scrutiny.[231] Less severe regulations that do not encroach on the core of the Second Amendment are reviewed under the more lenient "intermediate" scrutiny, which requires the government to demonstrate that there is a "reasonable fit" between the regulation and an "important" government objective.[232]

[227]   U.S. Const. amend. II.

[228]   *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 194.

229    *Id.*

230    *Id.* at 195 (citations omitted).

231    *Id.* (citations omitted).

232    *Id.* (citations omitted).

### a. Whether Title 18 U.S.C. § 922(o) violates the Second Amendment

First, Plaintiff argues that 18 U.S.C. § 922(*o* )'s ban on machine guns violates his rights pursuant to the Second Amendment. [233] In *United States v. Miller*, the Supreme Court held that the NFA's prohibition on transporting unregistered "sawed-off shotguns" was constitutional under the Second Amendment. [234] The Supreme Court noted that there was no evidence that possession or use of a sawed-off shotgun "has some reasonable relationship to the preservation or efficiency of a well regulated militia" or "that this weapon is any part of the ordinary military equipment or ... could contribute to the common defense." [235]

233    Rec. Doc. 1 at 16–17.

234    *Miller*, 307 U.S. at 174, 59 S.Ct. 816.

235    *Id.* at 178, 59 S.Ct. 816.

Nearly 70 years after *Miller*, the Supreme Court explored the scope and **\*601** meaning of the Second Amendment in greater depth in *District of Columbia v. Heller*. [236] In *Heller*, the Supreme Court held that the Second Amendment was intended to protect a pre-existing individual right to keep and bear arms. [237] As the Fifth Circuit has noted, the Supreme Court made clear in *Heller* that, while preserving the effectiveness of militias was one goal of the Framers, the primary purpose of the Second Amendment was to "guarantee the individual right to possess and carry weapons in case of confrontation" and establish "an individual right to bear arms for defensive purposes." [238] In *Heller*, the Supreme Court reasoned that because the Second Amendment was focused on the right to defend one's "hearth and home," and because "the American people have considered the handgun to be the quintessential self-defense weapon[,] ... a complete prohibition of their use" was unconstitutional. [239] However, *Heller* also established that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." [240] The Supreme Court acknowledged that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions" of certain "presumptively lawful" prohibitions and limitations on the possession of firearms. [241]

236    *District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

237    *Id.*

238    *Id.* at 592, 599, 602, 128 S.Ct. 2783. *See Hollis v. Lynch*, 827 F.3d 436, 444 (5th Cir. 2016).

239    *Heller*, 554 U.S. at 629, 635, 128 S.Ct. 2783.

240    *Id.* at 626, 128 S.Ct. 2783.

241    *Id.* at 626–27 & n.26, 128 S.Ct. 2783.

In *Hollis v. Lynch*, the Fifth Circuit considered whether, pursuant to the Supreme Court's reasoning in *Heller*, the GCA's prohibition on possessing machine guns (Title 18 U.S.C. § 922(o)) unconstitutionally infringed on the Second Amendment. [242] In *Hollis*, the Fifth Circuit rejected the plaintiff's argument that *Miller* stands for the proposition that the Second Amendment establishes a right to possess weapons that are part of the modern day ordinary military equipment, such as an M–16. [243] The Fifth Circuit held that *Heller* rejected this interpretation of *Miller*, as machine guns were being used in warfare in 1939 when the Supreme Court upheld the NFA's restrictions on such weapons in *Miller*. [244] The Fifth Circuit noted that the Supreme Court had acknowledged that a "traditional militia" was "a pool of men bringing arms in common use at the time for lawful purposes like self-defense" using "the sorts of lawful weapons that they possessed at home." [245]

242    *Hollis*, 827 F.3d at 436.

243    *Id.* at 445.

244    *Id.* (citing *Heller*, 554 U.S. at 624, 128 S.Ct. 2783).

245    *Id.* (citing *Heller*, 554 U.S. at 625, 128 S.Ct. 2783).

Accordingly, in *Hollis*, the Fifth Circuit interpreted the Supreme Court's holdings in *Miller* and *Heller* to mean that the individual right established by the Second Amendment only protects the category of weapons that are "possessed at home" and are in "common use at the time for lawful purposes like self-defense," and not those weapons that may be useful for military service. [246] The Fifth Circuit pointed out that the Supreme Court held that there was a historical tradition of

prohibiting "dangerous and unusual weapons," and noted that modern militias, such as the National Guard, would require "sophisticated **\*602** arms that are highly unusual in society at large."[247] Therefore, the Fifth Circuit held that protected weapons are "those in common use at the time," and that, if a weapon is dangerous and unusual, it is not in common use and is not protected.[248] Likewise, the Fifth Circuit pointed to the Supreme Court's decision in *Caetano v. Massachusetts*, where the Supreme Court rejected the argument that stun guns are not protected by the Second Amendment because they are not commonly used in the military.[249] Thus, the Fifth Circuit found that "whether a weapon has a nexus to military utility is not the test as to whether that weapon receives Second Amendment protection."[250]

246    *Id.*

247    *Id.*

248    *Id.* at 446 (citing *Heller*, 554 U.S. at 627, 128 S.Ct. 2783).

249    *Id.* (citing *Caetano v. Massachusetts*, ––– U.S. ––––, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016)).

250    *Id.*

The Fifth Circuit, applying its two-step inquiry for Second Amendment challenges, ultimately held in *Hollis* that bearing an M–16 machine gun did not fall within the scope of the Second Amendment right, and thus Section 922(*o*) was constitutional.[251] The Fifth Circuit found that a "dangerous and unusual" firearm is not "in common use," and that both the majority and dissent in *Heller* had identified the M–16 as a dangerous and unusual weapon.[252] Accordingly, the Fifth Circuit in *Hollis* found that machine guns do not receive Second Amendment protection, and thus upheld 18 U.S.C. § 922(*o*) at step one of its framework, affirming the district court's decision to grant a motion to dismiss.[253]

251    *Id.* at 447.

252    *Id.*

253    *Id.* at 451.

Similarly, in *United States v. Golding*, the Fifth Circuit held that violating Section 922(*o*) by possessing a machine gun was a "crime of violence," as it "constitutes conduct that presents a serious risk of physical injury to another" due to the "inherently dangerous nature of machine guns."[254] Likewise, in *United States v. Jennings*, the Fifth Circuit noted

that machine guns and pipe bombs were both "primarily weapons of war and have no appropriate sporting use or use for personal protection."[255]

254    *United States v. Golding*, 332 F.3d 838, 840 (5th Cir. 2003); *see also Hollis*, 827 F.3d at 448 (discussing *Golding*).

255    *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999); *see also Hollis*, 827 F.3d at 448 (discussing *Jennings*).

Here, Plaintiff argues that Section 922(*o*)'s ban on machine guns is unconstitutional.[256] However, Plaintiff has not identified any rationale to distinguish his case from *Hollis* or articulated any new argument as to why the Fifth Circuit's decision in *Hollis* upholding 18 U.S.C. § 922(*o*) does not apply here. Rather, Plaintiff relies in large part on the very same argument that the *Heller* and *Hollis* courts rejected: that, because machine guns are used by military and law enforcement, private citizens must also have a right to possess such weapons.[257] The Court finds this argument unpersuasive pursuant to the Fifth Circuit's analysis in *Hollis*, where the Fifth Circuit explicitly determined that "dangerous and unusual" weapons such as machine guns are not in common use and thus not protected by the Second Amendment.[258]

256    Rec. Doc. 1 at 16.

257    *See* Rec. Doc. 9 at 6–11.

258    *See Hollis*, 827 F.3d at 446 ("If a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment.").

**\*603** Plaintiff appears to further argue that Section 922(*o*) is unconstitutional because its ban on machine guns places him at a disadvantage when defending his home against criminals who do not follow the law and can easily arm themselves with the types of weapons that Plaintiff seeks.[259] However, the Court notes that this legislation was passed to prevent any person from obtaining these weapons, and criminals who have machine guns banned under 18 U.S.C. § 922(*o*) do not have them lawfully.[260] Moreover, Plaintiff has pointed to no authority to support the proposition that the scope of the Second Amendment is determined by the existence of violations against the challenged law regulating firearms, or that an otherwise "dangerous and unusual" firearm can receive Second Amendment protection if it could be used by

criminals. Indeed, the Fifth Circuit in *Hollis* noted that it has considered weapons such as machine guns, pipe bombs, and hand grenades to be "dangerous," and thus likely unprotected under the Second Amendment,[261] despite the fact that criminals could acquire each of those weapons in violation of the law.

259    *Id.* at 11.

260    *See* Pub. L. 90–618, 82 Stat. 1213–14 (stating that an objective of the GCA was "to provide support of Federal, State, and local law enforcement officials in their fight against crime and violence.").

261    *Id.* at 448.

Finally, Plaintiff avers that Title 922(o) is unconstitutional under the Second Amendment because silenced, short-barreled machine guns are the most effective weapons for self-defense of the home.[262] However, neither *Heller* nor *Hollis* stands for the proposition that the effectiveness of a weapon determines whether there is a right to bear it under the Second Amendment. Indeed, the Fifth Circuit determined in *Hollis* that the dangerousness of a firearm weighs *against* finding that the Second Amendment establishes a right to bear such weapons appears to undercut Plaintiff's argument.[263] The *Hollis* court made clear that courts must consider whether the weapon is one "in common use at the time" to determine if it receives Second Amendment protections, not whether it is the most efficient means of eliminating targets indoors.[264] As previously stated, the Fifth Circuit concluded that a firearm is not "in common use" if it is "dangerous and unusual," and that machine guns thus do not receive Second Amendment protections.[265] Moreover, the Court notes that in *Heller*, the Supreme Court considered and rejected the argument that effective, sophisticated arms are required for a militia to be as effective as militias in the 18th century. Plaintiff has not articulated any rationale or cited any authority to differentiate his claim here from the *Hollis* or *Heller* courts' decisions.[266]

262    Rec. Doc. 9 at 10.

263    *See Hollis*, 827 F.3d at 448. In particular, the Court notes that, if Plaintiff were correct that the Second Amendment protects the most effective or efficient means of self-defense or defense of the home, it could result in greater protections for "effective" but highly dangerous weapons that have long been considered beyond the scope of the Second Amendment, such as certain bombs and explosives.

264    *Id.* at 447.

265    *Id.* at 447–451.

266    *Heller*, 554 U.S. 570, 627, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

Accordingly, considering the first step in the Fifth Circuit's two-step analysis for Second Amendment claims and in light of the Fifth Circuit's analysis in *Hollis*, this Court finds that 18 U.S.C. § 922(*o*) does **\*604** not "impinge[ ] upon a right protected by the Second Amendment."[267] That is, because "a law that regulates a class of weapons that are not in common use will be upheld at step one," such as machine guns, the Court finds that Section 922(*o*) "passes constitutional muster."[268] Thus, the Court will grant the Government's motion to dismiss Plaintiff's Second Amendment challenges to 18 U.S.C. § 922(*o*) pursuant to Federal Rule of Civil Procedure 12(b)(6).

267    *Id.* at 446–47.

268    *Id.*

### b. Whether Title 18 U.S.C. § 922(l) and § 922(r) violate the Second Amendment

Plaintiff also brings a Second Amendment challenge to two other provisions of the GCA: 18 U.S.C. § 922(*l*), which bans the importation of any firearm or ammunition, subject to certain exceptions listed under 18 U.S.C. § 925(d);[269] and (2) 18 U.S.C. § 922(r), which forbids assembling any semiautomatic rifle or shotgun from imported parts, with limited exceptions. The Government argues that Plaintiff's claims challenging Sections 922(*l*) and (r) should be dismissed because there is no right to possess a silenced, short-barreled machine gun, and thus there cannot be a right to transfer, make, or import such a weapon.[270] The Government points out that the GCA is a longstanding, presumptively lawful measure, which supports the holding that it does not implicate Second Amendment rights.[271] In response, Plaintiff asserts the same arguments discussed *supra*: that *Heller* established that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, and that silenced, short-barreled machine guns are the most effective weapons for defense of hearth and home.[272]

269    18 U.S.C. § 925(d) permits the Attorney General to authorize the importation of a firearm or ammunition for certain private uses, including scientific, research, and sporting purposes, as well as to use as museum pieces.

270    Rec. Doc. 8–1 at 11.

271    *Id.*

272    Rec. Doc. 9 at 9–10.

As a preliminary matter, the Court notes that, while the Government focuses on Plaintiff's desire to obtain or create a silenced, short-barreled machine gun, Plaintiff also alleges in his complaint that he "wishes to obtain weapons that are part of the ordinary military equipment" for use in the militia or for personal defense that is prevented or hindered by the challenged provisions of the GCA and NFA.[273] Therefore, while the Court found *supra* that Plaintiff does not have a Second Amendment right to machine guns, the Court will now consider whether Sections 922(*l*) and (r)'s broader prohibitions on imported firearms and ammunition violate the Second Amendment.

273    Rec. Doc. 1 at 1.

Using the Fifth Circuit's two-step inquiry, the Court will first determine "whether the challenged law[s] impinge[ ] upon a right protected by the Second Amendment—that is, whether the law[s] regulate[ ] conduct that falls within the scope of the Second Amendment's guarantee."[274] To decide if a law implicates a Second Amendment right, courts must look to "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee."[275] As discussed above, the Supreme Court held in *Heller* that, while there is a pre-existing **\*605** individual right to keep and bear arms, the "right secured by the Second Amendment is not unlimited."[276] The Supreme Court further noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill ... or *laws imposing conditions and qualifications on the commercial sale of arms*."[277]

274    *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012).

275    *Id.*

276    *D.C. v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

277    *Id.* at 626–27, 128 S.Ct. 2783 (emphasis added).

It is unclear if, under existing Fifth Circuit precedent, federal laws banning the importation of firearms and ammunition and prohibiting the use of imported parts to assemble a firearm would be considered "longstanding" and, if so, whether it would pass step one of the Fifth Circuit's two-step analysis. As the Fifth Circuit previously noted, it is ambiguous from the holding in *Heller* whether those "longstanding" and "presumptively lawful regulatory measures" either (1) "presumptively fail to burden conduct protected by the Second Amendment," and thus do not proceed beyond step one; or if (2) they "presumptively trigger and pass constitutional muster under a lenient level of scrutiny" under step two of the analysis.[278] The Court notes that 18 U.S.C. § 922(*l*) and § 922(r) were first enacted as part of the GCA in 1968, and neither party has identified any earlier known provision completely prohibiting the importation of firearms.[279] As the Fifth Circuit has clarified, a regulation can be "longstanding" even if it was not in existence during the founding era, as *Heller* considered modern laws passed in the mid–20th century that banned felons and mentally ill persons from possessing firearms to be "longstanding."[280] Moreover, the Second Circuit has opined that the Supreme Court in *Heller* identified these regulations as presumptively lawful because "time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose no appreciable burden on Second Amendment rights."[281]

278    *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012).

279    As discussed *infra*, prior to the enactment of the GCA, federal agencies had at least some discretionary authority to limit firearm imports, but appear to have not regularly exercised it. *See* 114 Cong. Rec. 23,072 (1968) (statement of Rep. Frank J. Horton) (noting that agencies already had the power to prevent the importation of foreign weapons, but that agencies failed to exercise their discretion). Additionally, the Court notes that the NFA, passed in 1934, included a ban on importing certain firearms, but excluded such weapons as pistols, revolvers, and rifles with a barrel of more than eighteen inches in length. *See* H.R. 9741, 73d Cong. (1934); H.R. Rep. No. 1444 (1934).

280    *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 196–97.

281     *United States v. Decastro*, 682 F.3d 160, 165 (2d Cir. 2012).

However, as the Third Circuit has held, *Heller* should not be interpreted to stand for the proposition that all commercial regulations on the sale of firearms are outside the scope of the Second Amendment. [282] Thus, the Court notes that, although these federal laws only restrict the importation of firearms or the use of imported parts to assemble a firearm, such restrictions likely impinge on the rights of law-abiding, responsible citizens under the Second Amendment to possess and carry firearms because they inhibit the ability to acquire such weapons. [283] Accordingly, the Court will proceed to step two of the Fifth Circuit's two-step analysis.

282     *United States v. Marzzarella*, 614 F.3d 85, 92 & n.8 (3d Cir. 2010).

283     *See, e.g., Teixeira v. Cty. of Alameda*, 822 F.3d 1047, 1059 (9th Cir. 2016), *reh'g en banc granted*, 854 F.3d 1046 (9th Cir. 2016) (holding that there is "no question" that an ordinance limiting where a gun store may be located and "restricting the commercial sale of firearms would burden "he right of a law-abiding, responsible citizen to possess and carry a weapon, because it would inhibit his ability to acquire weapons") (citations and quotation marks omitted).

**\*606** Under the second step in the Fifth Circuit's two-step inquiry, the Court must consider "whether to apply intermediate or strict scrutiny to the law," and then "determine whether the law survives the proper level of scrutiny." [284] The appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." [285] When a regulation "threatens a right at the core of the Second Amendment," such as the right to possess and use a handgun to defend the home, courts should apply strict scrutiny. [286] Less severe regulations that do not encroach on the core of the Second Amendment are reviewed under the more lenient "intermediate" scrutiny, which requires the government to demonstrate that there is a "reasonable fit" between the regulation and an "important" government objective. [287]

284     *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 194.

285     *Id.* at 195 (citations omitted).

286     *Id.* (citations omitted).

287     *Id.* (citations omitted).

Here, the challenged federal laws banning the importation of firearms and ammunition and prohibiting the use of imported parts to assemble a firearm do not burden the central core of the Second Amendment guarantee, but instead limit one particular source to obtain firearms, *i.e.* imported parts and weapons. [288] Moreover, laws imposing conditions and qualifications on the commercial sale of arms generally were identified as longstanding presumptively lawful regulatory measures in *Heller*, [289] which the Fifth Circuit has held should merit, at most, intermediate scrutiny. [290] Other circuits have noted that strict scrutiny should only be applied to those restrictions that operate as a "substantial burden" on the core purposes of the rights established by the Second Amendment. [291] Accordingly, this Court will apply intermediate scrutiny here.

288     *See Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 205 (finding that a law prohibiting the commercial handgun sales to 18–to–20–year–olds only triggers intermediate scrutiny, as the ban "does not disarm an entire community" and was narrowly aimed at a discrete category of individuals).

289     *See Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783; *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 196.

290     *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 196 ("Thus, even if such a [longstanding] measure advanced to step two of our framework, it would trigger our version of "intermediate" scrutiny.").

291     *See, e.g., United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) ("Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller* ) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)."); *Nordyke v. King*, 644 F.3d 776, 786 (9th Cir.) ("[O]nly regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment."), *reh'g en banc granted*, 664 F.3d 774 (9th Cir. 2011); *Heller v. District of Columbia*, 670 F.3d 1244, 1253, 1260 (D.C. Cir. 2011) (laws that have only a "de minimis" effect on the right to bear arms or that do not "meaningfully affect individual self-defense" do not impinge on the Second Amendment right and therefore do not warrant heightened scrutiny (internal quotation marks omitted)); *United States v. Marzzarella*, 614 F.3d 85, 94–95 (3d Cir. 2010) (suggesting that a "*de minimis*

" burden on the right to keep arms for self-defense might not warrant heightened scrutiny).

**\*607** As stated *supra*, a challenged law may survive intermediate scrutiny if there is a "reasonable fit" between the regulation and an "important" government objective.[292] Courts routinely look to the legislative history of a law challenged under the Second Amendment to aid their intermediate scrutiny inquiry.[293] According to the GCA's legislative history, the objective of the law was "to provide support of Federal, State, and local law enforcement officials in their fight against crime and violence," while avoiding "any undue or unnecessary" burdens on law-abiding citizens' ability to acquire, possess, or use firearms for lawful activities.[294] The legislative history reveals that Congress was centrally concerned with buttressing the states' individual efforts to curb "crime, delinquency, and violence"[295] and "keep firearms out of the hands of those not legally entitled to possess them" through a uniform firearm regulatory scheme at the federal level.[296] As the Supreme Court has recognized, the GCA "did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. These persons are comprehensively barred by the Act from acquiring firearms by any means."[297] Congress noted that the existing federal firearm controls at the time were "not sufficient to enable the States to effectively cope with the firearms traffic within their own borders," especially in light of the "ease with which any person can anonymously acquire firearms."[298]

292    *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 195.

293    *See id* at 207–08 (looking to the legislative record and history of a challenged law to determine what the government objectives were and whether a reasonable means-end fit exists); *see also Barrett v. United States*, 423 U.S. 212, 220, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976) (determining Congress's objectives in adopting 18 U.S.C. § 922(h) by looking to the legislative history); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 348 (5th Cir. 2013) (considering the legislative record and a historical analysis to determine Texas's objectives in passing a gun control law); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (considering legislative intent to determine that 18 U.S.C. § 922(k) was constitutional under the Second Amendment). *See generally McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 861, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (considering the "text, structure,

purpose, and history" of a statute to determine if the government had a secular purpose in passing a law challenged under the First Amendment); *United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015) (considering legislative history on a motion to dismiss to determine the meaning of a law when its plain text was ambiguous); *United States v. Richards*, 755 F.3d 269, 277 (5th Cir. 2014) (determining whether substantial government interests exist by considering the "plain language and the history and revisions" of a federal statute in a First Amendment challenge).

294    Pub. L. 90–618, 82 Stat. 1213–14.

295    *See* 114 Cong. Rec. 6,713 (1968) (statement of Senator Thomas J. Dodd).

296    *See* S. Rep. 1501, at 22 (1968) (discussing purpose of the GCA).

297    *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976).

298    *See* S. Rep. 1501, at 22 (1968).

The Court further notes that an additional objective of Congress in imposing a complete ban on importing firearms was that, prior to the enactment of the GCA, executive agencies had the discretionary authority to limit certain firearm imports, but Congress determined that they had failed to effectively exercise it to limit the flow of imported firearms.[299] As one member **\*608** of the House of Representatives stated at the time,[300] Congress's solution was to ban imported weapons entirely: "Because the discretionary measures given [to] the agencies have not been acted upon by them, we must take the steps of barring the weapons outright."[301] The representative further noted that stopping the "flood of inexpensive foreign weapons, most of which have little or no value to the sportsman," would allow Congress to "cut off a major source of weapons available to criminals."[302] Moreover, members of Congress opined that a complete ban was necessary to support a comprehensive national response: "Without stiff import controls that are strictly enforced, weapons which are even now illegal to import will continue to trickle in."[303] As the Government further points out, the GCA's prohibition on importing firearms was also necessary to "ensure that criminals cannot bypass the NFA's registration requirements."[304]

299    *See* 114 Cong. Rec. 23,072 (1968) (statement of Rep. Frank J. Horton) (noting that agencies already had the

power to prevent low-priced foreign weapons from being "dumped on the American market, available for purchase by practically anyone-criminal dissident or psychopath," but that agencies failed to exercise their discretion).

300  Contemporaneous remarks of individual legislators are not controlling in analyzing legislative history, but may be useful to aid in the Court's inquiry here. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (considering a single senator's statements on a federal statute but finding it ultimately unpersuasive); *Rogers v. Frito–Lay, Inc.*, 611 F.2d 1074, 1080 (5th Cir. 1980) ('In trying to learn Congressional intent by examining the legislative history of a statute, we look to the purpose the original enactment served, the discussion of statutory meaning in committee reports, the effect of amendments whether accepted or rejected and the remarks in debate preceding passage."); *Dunn McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 964 F.Supp. 1125, 1137 (S.D. Tex. 1995) ("Although, these statements are not controlling, the Court may consider their relevance in determining legislative intent."), *aff'd sub nom. Dunn– McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283 (5th Cir. 1997).

301  *Id.*

302  *Id.*

303  *See* 114 Cong. Rec. 23,072 (1968) (statement of Rep. Frank J. Horton) (also noting that his propose to impose import controls was aimed at halting "the influx of guns which have obvious suitability for crime" and had "no legitimate purpose, recreational or otherwise.").

304  Rec. Doc. 8–1 at 13.

Based on the above, the Court finds that important government objectives underlie Congress's decision to impose strict controls on the importation of firearms or the use of imported parts to assemble firearms. [305] Moreover, the Court finds that banning the importation of firearms and use of imported parts has a "reasonable fit" with Congress's important government objectives. [306] Unlike in *Heller*, where the Supreme Court found that D.C.'s challenged regulation requiring handguns to be disabled made it "impossible for citizens to use them for the core lawful purpose of self-defense," [307] the challenged provisions here restrict only one commercial **\*609** avenue to acquire firearms. The laws do not prevent someone from acquiring firearms through alternative means, such as purchasing a firearm domestically or acquiring firearms through transfers. [308]

Members of Congress also recognized that previous efforts to grant executive agencies the discretionary authority to impose import controls were not successful. [309] Moreover, the challenged provisions establish some exceptions to the import ban for those lawful purposes for which an imported firearm may be required. [310] In other words, the "practical impact" and burden of the laws on the core purposes and rights of the Second Amendment are minimal, [311] and the laws are reasonably fitted to accomplish the Government's purpose. [312] Accordingly, the Court finds that 18 U.S.C. § 922(*l*) and § 922(r) do not violate the Second Amendment. Thus, the Court will grant the Government's motion to dismiss Plaintiff's Second Amendment challenges to these provisions pursuant to Federal Rule of Civil Procedure 12(b)(6).

305  *See, e.g.*, *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) ("[W]e find that reducing crime is a substantial government interest"); *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993) ("Important government interests include effective crime detection and prevention, and minimizing the risk of harm to officers and the public."); *United States v. Gonzales*, No. 10-967, 2011 WL 5288727, at *7 (D. Utah Nov. 2, 2011) ("In this case, the government has advanced several general interests, including public safety, crime prevention, and the need to keep firearms favored by criminals off the streets. These are all important objectives." (citations omitted)).

306  *See Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 195.

307  *Heller*, 554 U.S. at 630, 128 S.Ct. 2783. *See also United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012).

308  *See Decastro*, 682 F.3d at 168 (noting that, "[i]n light of the ample alternative means of acquiring firearms for self-defense purposes, a law prohibiting transporting into one's state of residence a firearm acquired outside the state "does not impose a substantial burden on the exercise of Decastro's Second Amendment rights.").

309  *See* 114 Cong. Rec. 23,072 (1968) (statement of Rep. Frank J. Horton).

310  Title 18 U.S.C. § 922(*l*), which bans the importation of any firearm or ammunition, allows imports for certain purposes listed under 18 U.S.C. § 925(d), including scientific, research, and sporting purposes, as well as to use as museum pieces.

311     *See Decastro*, 682 F.3d at 166 (noting that *Heller* "emphasized the practical impact of a challenged regulation on the ability of citizens to possess and use guns for the core lawful purpose of self-defense.").

312     *See Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 195 ("This more lenient level of scrutiny could be called 'intermediate' scrutiny, but regardless of the label, this level requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective.").

### c. Whether the challenged provisions of the NFA violate the Second Amendment

Next, Plaintiff argues that several provisions of the NFA imposing taxation and application requirements on transferring and making certain weapons violate the Second Amendment. [313] In particular, Plaintiff challenges the following provisions: (1) 26 U.S.C. § 5811, which taxes the transfer of such weapons as machine guns, silencers, short barreled rifles, and short barreled shotguns; (2) 26 U.S.C. § 5812, which establishes the registration and application requirements for transfers of such weapons; and (3) 26 U.S.C. § 5821, which taxes the making of such weapons. [314] Additionally, construing Plaintiff's *pro se* complaint liberally, it appears that Plaintiff also seeks to challenge 26 U.S.C. § 5822, which establishes registration and application requirements for the making of certain weapons. [315] As discussed *supra*, the Court found that Plaintiff lacks standing to **\*610** challenge 26 U.S.C. § 5811 and 26 U.S.C. § 5812. Accordingly, the Court will now consider Plaintiff's Second Amendment challenges to 26 U.S.C. § 5821 and § 5822.

313     Rec. Doc. 1 at 17.

314     *Id.* at 17–19.

315     The Court notes that, in the final "prayer for relief" section of his complaint, Plaintiff requests for the first time the additional relief of an injunction against 26 U.S.C. § 5822. *See* Rec. Doc. 1 at 19–20. While Plaintiff did not directly assert a cause of action against 26 U.S.C. § 5822 when listing his six causes of action, because Plaintiff is proceeding *pro se*, the Court will assume Plaintiff intended to bring a claim against 26 U.S.C. § 5822. Accordingly, because Defendant has argued that "none of [Plaintiff's] claims have legal merit ... [and] [t]he Court should therefore dismiss this case in its entirety," the Court will consider whether Plaintiff has

failed to state a claim challenging 26 U.S.C. § 5822 pursuant to Rule 12(b)(6). *See* Rec. Doc. 8–1 at 1–2.

Pursuant to Section 5821, a person making a firearm must pay a tax of $200 for each firearm made, while Section 5822 establishes application and registration requirements for the making of a firearm analogous to the requirements of 26 U.S.C. § 5812. [316] The Government asserts that Plaintiff's Second Amendment challenge to these provisions fails because the provisions are a longstanding, presumptive lawful measure and because there is no constitutional right to make a firearm without paying taxes on it. [317] Plaintiff argues that the Government's registration and taxation scheme was passed to discourage or eliminate firearm sales and that it violates his individual right to keep and bear arms guaranteed by the Second Amendment. [318] Plaintiff avers that the Government "does not have the power to tax, and therefore destroy, what it has been forbidden by the Second Amendment to infringe." [319]

316     Title 26 U.S.C. § 5822 provides:

> No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

317     Rec. Doc. 8–1 at 11.

318     Rec. Doc. 1 at 17; Rec. Doc. 9 at 21–22.

319     Rec. Doc. 9 at 23.

To determine whether 26 U.S.C. § 5821 and § 5822 violate Plaintiff's rights as established by the Second Amendment, the Court will again employ the Fifth Circuit's two-step analysis. Thus, the Court will first consider whether either section "impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct

that falls within the scope of the Second Amendment's guarantee."[320] First, the Court notes that Section 5821's $200 tax and Section 5822's application requirements for making a firearm do not effect a ban on firearms, but only impose certain tax and registration requirements on the making of a firearm. Additionally, the Court notes that, similar to its discussion of the GCA provisions, under the Fifth Circuit's holding in *National Rifle Association of America, Inc.*, regulations provided for by the NFA of 1934 may constitute a "longstanding" and presumptively lawful measure.[321] Based on the foregoing, the Court finds that 26 U.S.C. § 5821 and § 5822's requirements on making a firearm impose only a minimal burden on Plaintiff's Second Amendment rights. However, the provisions do, in some measure, inhibit a law-abiding, responsible citizen from making a firearm without first paying the $200 tax and obtaining government approval prior to making the firearm. Accordingly, the Court will proceed to step two of the Fifth Circuit's two-step analysis.

[320]  *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 194.

[321]  *See id.* at 196–97 (discussing how laws passed in the mid–20th century may be considered "longstanding").

**\*611**  Under the second step of the Fifth Circuit's two-step inquiry, the Court must consider "whether to apply intermediate or strict scrutiny to the law," and then "determine whether the law survives the proper level of scrutiny."[322] The appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."[323] When a regulation "threatens a right at the core of the Second Amendment," such as the right to possess and use a handgun to defend the home, courts should apply strict scrutiny.[324] Less severe regulations that do not encroach on the core of the Second Amendment are reviewed under the more lenient "intermediate" scrutiny, which requires the government to demonstrate that there is a "reasonable fit" between the regulation and an "important" government objective.[325] Here, the challenged provisions of the NFA pose even less of a burden on Plaintiff's rights under the Second Amendment than the ban on importation of firearms considered *supra*, as they do not absolutely prohibit making one's own firearms and merely imposes a tax and application requirement prior to making the firearm. Thus, because it cannot be said that the tax threatens a core right of the Second Amendment, the Court finds that intermediate scrutiny is the appropriate level of review to apply here.[326]

[322]  *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 194.

[323]  *Id.* at 195 (citations omitted).

[324]  *Id.* (citations omitted).

[325]  *Id.* (citations omitted).

[326]  *See, e.g.*, *United States v. Gonzales*, No. 2:10-CR-00967 CW, 2011 WL 5288727, at *7 (D. Utah Nov. 2, 2011) (applying intermediate scrutiny to a Second Amendment challenge to the NFA's taxation and registration requirements, as the NFA "only regulates, and does not ban, the firearms at issue, [and thus] it does not substantially burden constitutional rights.").

As stated *supra*, a challenged law may survive intermediate scrutiny if there is a "reasonable fit" between the regulation and an "important" government objective.[327] Prior to the enactment of the NFA, Congress recognized that the country struggled to control the violence wrought by "gangsters, racketeers, and professional criminals."[328] As the D.C. Circuit has pointed out, "[t]he emergence of organized crime as a major national problem led to the enactment of the National Firearms Act of 1934."[329] Similarly to the GCA, the NFA was adopted by Congress to establish a nationwide system to regulate the sale, transfer, license, and manufacturing of certain "dangerous weapons"[330] such as "machine guns, sawed-off shotguns, sawed-off rifles, and other firearms, other than pistols and revolvers, which may be concealed on the persons, and silencers."[331] Congress recognized that the states had only a limited ability to address the "growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons," and that the federal government had the power to more **\*612** effectively respond to the crisis.[332] Thus, a collective response was needed to target "the roaming groups of predatory criminals who know ... they are safer if they pass quickly across a state line."[333] As the Government points out, the NFA targets "certain weapons likely to be used for criminal purposes."[334] Based on the foregoing, the Court finds that important government objectives support Congress's decision to impose taxation and registration requirements on the making of a firearm pursuant to 26 U.S.C. § 5821 and § 5822.[335]

[327]  *Id.* at 195 (citations omitted).

[328]  *See* 78 Cong. Rec. 11,400 (1934) (statement of Rep. Robert L. Doughton) ("For some time this country has

been at the mercy of the gangsters, racketeers, and professional criminals."); Nat'l Firearms Act Hearings, 73d Cong. 4 (1934) (Statement of Homer. S. Cummings, Att'y Gen. of the United States) ("[T]here are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined").

329   *Lomont v. O'Neill,* 285 F.3d 9 (D.C. Cir. 2002).

330   *See* H. R. Rep. No. 1780 (1934).

331   H.R. Rep. No. 75–2457, at 1 (1938).

332   *Id.*

333   Nat'l Firearms Act Hearings, 73d Cong. 4 (1934) (Statement of Homer. S. Cummings, Att'y Gen. of the United States).

334   Rec. Doc. 8–1 at 2 (quoting *United States v. Thompson/ Ctr. Arms Co.,* 504 U.S. 505, 517, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992)).

335   *See, e.g., Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) ("[W]e find that reducing crime is a substantial government interest"); *United States v. Griffin,* 7 F.3d 1512, 1517 (10th Cir. 1993) ("Important government interests include effective crime detection and prevention, and minimizing the risk of harm to officers and the public."); *United States v. Gonzales,* No. 10-967, 2011 WL 5288727, at *7 (D. Utah Nov. 2, 2011) ("In this case, the government has advanced several general interests, including public safety, crime prevention, and the need to keep firearms favored by criminals off the streets. These are all important objectives." (citations omitted)).

Moreover, the Court finds that levying a $200 tax and imposing a registration requirement for the making of a firearm both have a "reasonable fit" with Congress's important government objectives. The requirements on making a firearm were passed as part of a broader regulatory scheme to control the flow of firearms needed to restrict certain dangerous or irresponsible individuals from obtaining those firearms. The NFA requires every importer, manufacturer, and dealer to register with the Secretary of Treasury (26 U.S.C. § 5802) and pay a special occupational tax (26 U.S.C. § 5801).[336] Likewise, a tax of $200 is imposed on each firearm made (26 U.S.C. § 5821), and upon each subsequent transfer (26 U.S.C. § 5811).[337] Makers and transferors of firearms are further required to file a written application with the Secretary of the Treasury and obtain prior

approval before a "firearm" may be made (26 U.S.C. § 5822) or transferred (26 U.S.C. § 5812). The challenged provisions, whether considered alone or in conjunction with the broader scheme established by the NFA, do not prevent a law-abiding citizen from acquiring or making a firearm, but rather are part of a broader regulatory scheme passed to control the flow of certain firearms. The law does not prevent someone from acquiring certain firearms through alternative means, such as purchasing a firearm domestically or acquiring firearms through transfers, or from acquiring or making weapons that fall outside the regulations established by the NFA.[338] Thus, the Court finds that the "practical impact" and burden of the laws on the core purposes and rights of the Second Amendment are minimal,[339] and the laws are reasonably fitted to the Government's **\*613** purpose.[340] Accordingly, the Court will grant the Government's motion to dismiss Plaintiff's Second Amendment challenges to 26 U.S.C. § 5821 and 26 U.S.C. § 5822 pursuant to Federal Rule of Civil Procedure 12(b)(6).

336   *See United States v. Oba*, 448 F.2d 892, 896 (9th Cir. 1971) (discussing the NFA's taxation and regulatory scheme).

337   *Id.*

338   *See Decastro,* 682 F.3d at 168 (noting that, "[i]n light of the ample alternative means of acquiring firearms for self-defense purposes, a law prohibiting transporting into one's state of residence a firearm acquired outside the state "does not impose a substantial burden on the exercise of Decastro's Second Amendment rights.").

339   *See id.* at 166 (noting that *Heller* "emphasized the practical impact of a challenged regulation on the ability of citizens to possess and use guns for the core lawful purpose of self-defense").

340   *See Nat'l Rifle Ass'n of Am., Inc.,* 700 F.3d at 195 ("This more lenient level of scrutiny could be called 'intermediate' scrutiny, but regardless of the label, this level requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective.").

### 3. Whether the challenged provisions of the GCA violate the Necessary and Proper Clause or the Tenth Amendment

Next, the Government argues that Plaintiff's claim that certain provisions of the GCA violate the Necessary and Proper Clause and the Tenth Amendment should be dismissed

pursuant to Rule 12(b)(6). [341] The Government avers that Congress had the constitutional authority to enact the GCA through the use of its taxing power and Commerce Clause powers. [342] In response, Plaintiff asserts that the Necessary and Proper Clause prohibits Congress from using its delegated powers to enact pretext laws to infringe on Plaintiff's Second Amendment rights or to enact laws beyond the federal government's enumerated powers. [343] Plaintiff argues that the Constitution does not provide the federal government with a general police power or a specific power to regulate firearms ownership. [344] Moreover, Plaintiff cites to *United States v. Lopez* to support his contention that the Commerce Clause does not empower Congress to regulate intrastate activity or non-economic activity such as the possession of certain firearms. [345]

[341]   Rec. Doc. 8–1 at 13.

[342]   *Id.* at 14–15.

[343]   Rec. Doc. 9 at 15.

[344]   *Id.*

[345]   *Id.* at 18–19 (citing *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)).

Pursuant to Article I, Section 8, Clause 18 of the United States Constitution, Congress has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." [346] "In determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, [courts] look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." [347]

[346]   U.S. Const. art. I, § 8, cl. 18.

[347]   *United States v. Thompson*, 811 F.3d 717, 724 (5th Cir. 2016) (quoting *United States v. Comstock*, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010)) (quotation marks omitted).

Likewise, the Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." As the Supreme Court has previously observed, the Tenth Amendment "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." [348] The Fifth Circuit has held that "[w]hen Congress properly exercises its authority under an enumerated constitutional power, the Tenth Amendment is not implicated." [349] "As stated previously, the Tenth **\*614** Amendment's reservation to the states of power not conferred on the federal government in no way inhibits the activities of the federal government in situations in which a power has been so conferred." [350]

[348]   *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

[349]   *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010) (citing *N.Y.*, 505 U.S. at 156, 112 S.Ct. 2408; *Deer Park Indep. Sch. Dist. v. Harris County Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998)).

[350]   *Deer Park Indep. Sch. Dist. v. Harris Cty. Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998) (citing *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 549–50, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

Accordingly, the Court will first consider whether Congress properly exercised its authority under an enumerated power when it passed the challenged provisions of the GCA. As discussed *supra*, Plaintiff asserts in his complaint that three provisions of the GCA are unconstitutional under the Necessary and Proper Clause and the Tenth Amendment: (1) 18 U.S.C. § 922(*l* ), which bans the importation of firearms and ammunition regulated under the GCA unless authorized by the Attorney General; (2) 18 U.S.C. § 922(r), which forbids assembling such weapons from imported parts; and (3) 18 U.S.C. § 922(*o* ), which makes it unlawful to transfer or possess any machine gun manufactured after May 19, 1986. [351]

[351]   *Id.* at 16–17.

### a. Title 18 U.S.C. § 922(o)

The Government asserts that the challenged provisions of the GCA were each passed pursuant to Congress's authority under the Commerce Clause. [352] The Commerce Clause provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." [353] In *United States v. Lopez*, the Supreme Court held that 18 U.S.C. § 922(q), which banned the possession of firearms in school zones,

exceeded Congress's authority under the Commerce Clause and was unconstitutional. [354] The *Lopez* Court held that Congress could regulate three types of activity under the Commerce Clause: (1) the "use of the channels of interstate commerce;" (2) "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) activities which have "a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." [355] Noting that the first two categories did not apply, the Supreme Court considered whether banning firearms in school zones fit under the third category, *i.e.* whether "a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." [356] The Court found that it did not, as "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." [357] The Supreme Court additionally noted that the legislative history did not include congressional findings that would otherwise demonstrate an effect upon interstate commerce. [358]

352   Rec. Doc. 8–1 at 14.

353   U.S. Const. art. I, § 8, cl. 3.

354   514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

355   *Id.* at 558–89, 115 S.Ct. 1624.

356   *Id.* at 557, 115 S.Ct. 1624.

357   *Id.* at 567, 115 S.Ct. 1624.

358   *Id.* at 562–63, 115 S.Ct. 1624.

Two years later, in *United States v. Knutson*, the Fifth Circuit considered whether, in light of the Supreme Court's rationale in *Lopez*, Congress had the authority under the Commerce Clause to enact 18 U.S.C. § 922(*o* ), which bans the **\*615** transfer or possession of a machine gun that was not already lawfully possessed before May 19, 1986. [359] The Fifth Circuit held that "much of the conduct covered by § 922(*o* ) fits comfortably within Constitutional bounds under either of the first two *Lopez* categories," as machine gun possessions are often the result of a series of interstate commercial transactions. [360] Moreover, the Fifth Circuit found that regulating the transfer and possession of machine guns also fit under the third category, as "[i]t is obvious 'to the naked eye' " that it has a substantial effect on interstate commerce. [361] The Fifth Circuit found that the legislative history of the GCA cited "convincing evidence" of machine guns' substantial effect on interstate commerce and noted that several other courts of appeals had also upheld Section 922(*o*) under the Commerce Clause. [362]

359   113 F.3d 27, 27 (5th Cir. 1997).

360   *Id.* at 29 & n.15 (citing *United States v. Hunter*, 843 F.Supp. 235, 249 (E.D. Mich. 1994) (finding that the interstate flow of machine guns "not only has a substantial effect on interstate commerce; it is interstate commerce.")).

361   *Id.* at 30.

362   *Id.* (citing *United States v. Kirk*, 105 F.3d 997, 1000 (5th Cir. 1997); *United States v. Rybar*, 103 F.3d 273, 283 (3d Cir. 1996); *United States v. Kenney*, 91 F.3d 884, 889 (7th Cir. 1996)).

Here, Plaintiff has not identified any rationale to differentiate his claims from the claims rejected by the Fifth Circuit in *Knutson*, which made clear that Congress had the authority under the Commerce Clause to enact 18 U.S.C. § 922(*o* ). [363] Accordingly, the Court concludes that, because Congress has "properly exercise[d] its authority under an enumerated constitutional power," [364] Plaintiff's Tenth Amendment challenge to Section 922(*o* ) fails. Moreover, the Court finds that Section 922(*o* ) is "rationally related to the implementation of" Congress's power under the Commerce Clause. [365] Thus, Plaintiff's Necessary and **\*616** Proper Clause challenge to Section 922(*o* ) also fails. Therefore, the Court will grant the Government's motion to dismiss Plaintiff's Necessary and Proper Clause and Tenth Amendment challenges to 18 U.S.C. § 922(*o* ) pursuant to Rule 12(b)(6).

363   *Id. See also Kirk*, 105 F.3d at 998 ("Every circuit that has examined 18 U.S.C. § 922(*o* )—both before and after *United States v. Lopez* ...—has determined that § 922(*o* ) does not exceed the authority granted to Congress by the Commerce Clause."); *Rybar*, 103 F.3d at 273 (upholding § 922(o) under the third category of activity that Congress may regulate under the Commerce Clause, as it regulated activities having a substantial effect on interstate commerce); *United States v. Beuckelaere*, 91 F.3d 781 (6th Cir. 1996) (upholding § 922(*o* ) under all three *Lopez* categories); *Kenney*, 91 F.3d at 891 (holding that "both the nature of the statute and the history of federal firearms legislation" suggest that Section 922(*o*

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

) was a valid exercise of Congress's Commerce Clause power to regulate activity that has a substantial effect on interstate commerce, *i.e.* the third category in *Lopez* ); *United States v. Rambo*, 74 F.3d 948 (9th Cir. 1996) (holding that Section 922(*o* ) may be upheld under *Lopez*'s first category of valid regulation under the Commerce Clause, which permits Congress to regulate the use or misuse of the channels of commerce); *United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) (upholding § 922(o) under the second category, as a regulation of a thing in interstate commerce)

364     *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010) (citing *New York*, 505 U.S. at 156, 112 S.Ct. 2408; *Deer Park Indep. Sch. Dist. v. Harris County Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998)).

365     *United States v. Thompson*, 811 F.3d 717, 724 (5th Cir. 2016) (quoting *United States v. Comstock*, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010)) (quotation marks omitted). *See, e.g.*, *Knutson*, 113 F.3d at 31 ("We hold that Congress could have had a rational basis for concluding that § 922(*o* ) regulates conduct that has a substantial effect on interstate commerce, and that § 922(*o* ) is not unconstitutional."); *United States v. Kirk*, 70 F.3d 791, 797 (5th Cir. 1995) (finding that there is "a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession [of machine guns] is essential to effective control of the interstate incidents of such traffic" and holding that Section 922(*o* ) "is a rational exercise of the authority granted Congress under the Commerce Clause"), *on reh'g en banc*, 105 F.3d 997 (5th Cir. 1997).

### b. Title 18 U.S.C. §§ 922(l) and (r)

Next, the Government argues that 18 U.S.C. §§ 922(*l* ) and (r) of the GCA were also passed pursuant to Congress's authority under the Commerce Clause.[366] The Commerce Clause provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[367] Thus, Congress has "plenary authority" over both interstate and foreign commerce.[368] "No sort of trade can be carried on between this country and any other, to which this power does not extend."[369] As such, the Supreme Court has held that "Congress may determine what articles may be imported into this country and the terms upon which importation is permitted."[370] This includes the power to "close[ ]the channels of commerce entirely"[371] and

"to lay an embargo or to prohibit altogether the importation of specified articles."[372]

366     Rec. Doc. 8–1 at 14.

367     U.S. Const. art. I, § 8, cl. 3.

368     *See Calif. Bankers Ass'n v. Shultz*, 416 U.S. 21, 46, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) ("The plenary authority of Congress over both interstate and foreign commerce is not open to dispute.")

369     *Bd. of Trustees of Univ. of Illinois v. United States*, 289 U.S. 48, 56, 53 S.Ct. 509, 77 L.Ed. 1025 (1933).

370     *Id.* at 57, 53 S.Ct. 509.

371     *California Bankers Ass'n*, 416 U.S. at 47, 94 S.Ct. 1494.

372     *Bd. of Trustees of Univ. of Illinois*, 289 U.S. at 57, 53 S.Ct. 509.

Title 18 U.S.C. § 922(*l* ) bans the importation of firearms and ammunition unless authorized by the Attorney General, while 18 U.S.C. § 922(r) prohibits assembling certain firearms from imported parts. The Court determines that both provisions of the GCA regulating the importation and use of foreign firearms and firearm parts were properly enacted pursuant to Congress's authority under the Commerce Clause. The Court finds that the analysis employed by the Fifth Circuit in *Knutson* to uphold the ban on possessing machine guns as a valid exercise of Congress's authority under the Commerce Clause applies equally to the importation, possession, and use of foreign firearms and firearm parts. In particular, the Court finds that the conduct covered by Sections 922(*l* ) and (r) "fits comfortably within Constitutional bounds under" all three *Lopez* categories, as imported parts and firearms are the direct result of a series of foreign and interstate commercial transactions that have a substantial effect on interstate commerce.[373]

373     *Knutson*, 113 F.3d at 29–31.

Accordingly, the Court concludes that, because Congress has "properly exercise[d] its authority under an enumerated constitutional power,"[374] Plaintiff's Tenth Amendment challenges to Sections 922(*l* ) and (r) fail. Moreover, the Court finds that **\*617** Sections 922(*l* ) and (r) are "rationally related to the implementation of" Congress's power under the Commerce Clause.[375] Thus, Plaintiff's Necessary and Proper Clause challenge to Sections 922(*l* ) and (r) also fail. Therefore, the Court will grant the Government's motion to

dismiss Plaintiff's Necessary and Proper Clause and Tenth Amendment challenges to 18 U.S.C. § 922(*l* ) and 18 U.S.C. § 922(r) pursuant to Rule 12(b)(6).

374    *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010) (citing *N.Y.*, 505 U.S. at 156, 112 S.Ct. 2408; *Deer Park Indep. Sch. Dist. v. Harris County Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998)).

375    *United States v. Thompson*, 811 F.3d 717, 724 (5th Cir. 2016) (quoting *United States v. Comstock*, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010)) (quotation marks omitted). *See, e.g.*, *Knutson*, 113 F.3d at 31 ("We hold that Congress could have had a rational basis for concluding that § 922(*o* ) regulates conduct that has a substantial effect on interstate commerce, and that § 922(*o* ) is not unconstitutional."); *United States v. Kirk*, 70 F.3d 791, 797 (5th Cir. 1995) (finding that there is "a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession [of machine guns] is essential to effective control of the interstate incidents of such traffic" and holding that Section 922(*o* ) "is a rational exercise of the authority granted Congress under the Commerce Clause."), *on reh'g en banc,* 105 F.3d 997 (5th Cir. 1997).

### 4. Whether the challenged provisions of the NFA violate the Necessary and Proper Clause or the Tenth Amendment

Finally, the Government asserts that Plaintiff's challenges under the Necessary and Proper Clause and the Tenth Amendment to certain provisions of the NFA should also be dismissed. [376] As stated *supra*, the Court has found that Plaintiff lacks standing to challenge 26 U.S.C. § 5811 and 26 U.S.C. § 5812's taxation and registration requirements for transfers of firearms. Accordingly, the Court will only consider whether 26 U.S.C. § 5821's tax on the making of certain firearms and 26 U.S.C. § 5822's registration requirements on the making of certain firearms violate either the Necessary and Proper Clause or the Tenth Amendment.

376    Rec. Doc. 8–1 at 13–16.

The Government contends that the taxation and registration requirements of the NFA were both passed pursuant to the taxing power of Congress. [377] The United States Constitution grants Congress the power to lay and collect taxes. [378] In *Sonzinsky v. United States*, the Supreme Court considered the analogous question of whether the NFA's $200 tax on dealers in firearms was a constitutional exercise of Congress's

enumerated powers. [379] Similar to Plaintiff here, the criminal defendant in *Sonzinsky* argued that the levy was not a true tax, "but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms, the local regulation of which is reserved to the states because not granted to the national government." [380] The Supreme Court noted that the defendant was asking the Court to say that a taxing measure, by virtue of its deterrent effect on the activities taxed, is a regulation that is beyond Congress's taxing power. [381] The Supreme Court declined to do so, holding that "a tax is not any the less a tax because it has a regulatory effect." [382] The Court held that, since the measure operates as a tax, it is within the national taxing power, and courts should not "speculate as to the motives which moved Congress to impose it." [383] Likewise, in *United States v. Ardoin*, the Fifth **\*618** Circuit confirmed that the taxing provisions of the NFA can be upheld under Congress's taxing authority. [384]

377    *Id.* at 14.

378    U.S. Const. art. I, § 8, cl. 1.

379    300 U.S. 506, 511, 57 S.Ct. 554, 81 L.Ed. 772 (1937).

380    *Id.* at 512, 57 S.Ct. 554.

381    *Id.* at 512–13, 57 S.Ct. 554.

382    *Id.*

383    *Id.* at 514, 57 S.Ct. 554.

384    19 F.3d 177, 180 (5th Cir. 1994).

Here, 26 U.S.C. § 5821 is on its face only a taxing measure, as it merely imposes a $200 tax on the making of certain firearms. Moreover, contrary to Plaintiff's suggestions, the tax does not completely prohibit Plaintiff from exercising his rights. Thus, based on the foregoing, this Court finds that Congress validly exercised its constitutional authority under its taxing power when it enacted the challenged provision. [385] Similarly, the Fifth Circuit and other courts have upheld Congress's ability to enforce a tax through the promulgation of firearm registration requirements. [386] As the Fifth Circuit held in *United States v. Gresham*, a requirement to register pipe bombs was "not a mere pretext for police power, but is 'part of the web of regulation aiding enforcement of the transfer tax provision' ... [and], therefore, the registration requirement is plainly constitutional." [387] Moreover, as the Fifth Circuit determined in *Ardoin*, requirements to register

**Bezet v. United States, 276 F.Supp.3d 576 (2017)**

weapons can be constitutionally premised on Congress's taxing power. [388] Here, the Court notes that 26 U.S.C. § 5822 requires Plaintiff to file an application to make a firearm with a proper stamp affixed demonstrating that Plaintiff has paid the required tax and include identifying information such as fingerprints and photographs, and is thus related to Section 5821's taxing provision. Thus, based on the foregoing, this Court determines that Congress validly exercised its constitutional authority under its taxing power when it enacted the challenged provision. Accordingly, the Court concludes that, because Congress has "properly exercise[d] its authority under an enumerated constitutional power," [389] Plaintiff's Tenth ***619** Amendment challenge to Section 5821 and Section 5822 fail. Moreover, the Court finds that Section 5821 and Section 5822 are "rationally related to the implementation of" Congress's taxing power. [390] Thus, Plaintiff's Necessary and Proper Clause challenge to Section 5821 and Section 5822 also fail. Therefore, the Court will grant the Government's motion to dismiss Plaintiff's Necessary and Proper Clause and Tenth Amendment challenges to 18 U.S.C. § 5821 and 18 U.S.C. § 5822 pursuant to Rule 12(b)(6).

[385]    *See, e.g., Sonzinsky*, 300 U.S. at 511, 57 S.Ct. 554 (upholding other NFA taxation provisions as a valid exercise of Congress's taxation power); *Ardoin*, 19 F.3d at 180 (same); *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992) (stating that the provision of the NFA making possession of an unregistered firearm unlawful was "part of the web of regulation aiding enforcement of the transfer tax provision in 26 U.S.C. section 5811 and the constitutional bedrock for the statute is the power to tax rather than the commerce power.") (quotation marks omitted).

[386]    *See United States v. Gresham*, 118 F.3d 258, 263 (5th Cir. 1997) ("Congress may still tax the illegal possession of such machine guns and may still assess criminal penalties for failure to comply with the registration requirements promulgated to enforce the tax."); *Ardoin*, 19 F.3d at 180 (holding that the NFA's taxation and registration requirements can be upheld under Congress's taxing power, regardless of whether the ATF chooses to allow tax payments or registration for illegal weapons); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) ("Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons. Such a penalty imposed on transferees ultimately discourages the transferor on whom the tax is levied from transferring

a firearm without paying the tax."); *see also United States v. Bournes*, 105 F.Supp.2d 736, 738 (E.D. Mich. 2000) ("[N]umerous courts have held that the registration provisions of the NFA, including § 5861(d), are permissible incidents to the legislative taxing power, because registration facilitates the collection of taxes on the making and transfer of firearms."), *aff'd*, No. 01-2416, 2003 WL 21675537 (6th Cir. 2003) (citing *United States v. Birmley*, 529 F.2d 103, 106–07 (6th Cir. 1976); *United States v. Dodge*, 61 F.3d 142, 145–46 (2d Cir. 1995); *United States v. Ross,* 458 F.2d 1144, 1145 (5th Cir. 1972)).

[387]    *Gresham*, 118 F.3d at 263.

[388]    *Ardoin*, 19 F.3d at 180

[389]    *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010) (citing *New York*, 505 U.S. at 156, 112 S.Ct. 2408; *Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998)).

[390]    *United States v. Thompson*, 811 F.3d 717, 724 (5th Cir. 2016) (quoting *United States v. Comstock*, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010)) (quotation marks omitted).

### 3. Plaintiff's Pending Motion for Partial Preliminary Injunction

Finally, the Court notes that after the Government filed its motion to dismiss on June 24, 2016, [391] Plaintiff filed a motion for a partial preliminary injunction on July 26, 2016, to "allow[ ] Plaintiff to exercise his Second Amendment rights pending a trial on the merits." [392] Both parties agree that no oral argument or evidentiary hearing was required on either motion filed. [393] The Court further notes that no factual disputes were raised in the parties' motions that would otherwise merit an evidentiary hearing. [394] Moreover, because the Court has granted the Government's motion to dismiss, the Court will not consider Plaintiff's pending motion for preliminary injunction or require a hearing on the motion. Accordingly, the Court will deny Plaintiff's motion for a partial preliminary injunction as moot.

[391]    Rec. Doc. 8.

[392]    Rec. Doc. 15–1 at 2.

[393]    *See* Rec. Doc. 22 at 2 (both parties agreeing that "[o]ral argument was not and shall not be requested on the motion[s], nor is an evidentiary hearing required.").

394   The Fifth Circuit has repeatedly held that no evidentiary hearing on a motion for preliminary injunction is required when there are no genuine factual disputes at issue. *See Heil Trailer Int'l Co. v. Kula*, 542 Fed.Appx. 329, 334 & n.15 (5th Cir. 2013); *Commerce Park at DFW Freeport v. Mardian Const. Co.*, 729 F.2d 334, 341 (5th Cir. 1984) (upholding a district court's decision to rule on a motion for preliminary injunction without a hearing when there were no disputed versions of fact and the parties "were given ample opportunity to present their respective views of the legal issues involved."). Here, the issues before the Court in both of the parties' pending motions involve only questions of law, *i.e.* whether certain provisions of the GCA and NFA are constitutional, and neither party has offered any evidence or affidavits creating a factual dispute. Thus, because there are no factual disputes between the parties, a Rule 65 evidentiary hearing was not required. Moreover, because the Court first considers and grants the Government's motion to dismiss, and the Court will deny as moot Plaintiff's motion for a partial preliminary injunction without addressing the parties' arguments.

## IV. Conclusion

Based on the foregoing, the Court finds that Plaintiff lacks standing to challenge 26 U.S.C. § 5811 and 26 U.S.C. § 5812. The provisions only impose requirements on the transferor, but Plaintiff has not alleged that he seeks to transfer a firearm or that an application to transfer a firearm was ever filed or rejected. The Court also finds that, pursuant to the Fifth Circuit's holding in *Hollis v. Lynch*, [395] Plaintiff has

standing to challenge 18 U.S.C. § 922(*o*). However, the Court finds that the Government's motion to dismiss should be granted as to Plaintiff's challenges to 18 U.S.C. § 922(*l*), 18 U.S.C. § 922(*o*), 18 U.S.C. § 922(r), 26 U.S.C. § 5821, and 26 U.S.C. § 5822. The Court finds that none of these challenged provisions of the GCA or NFA **\*620** violate the Second Amendment, Tenth Amendment, or the Necessary and Proper Clause. Thus, all of Plaintiff's claims are dismissed. Accordingly,

395   827 F.3d 436 (5th Cir. 2016).

**IT IS HEREBY ORDERED** that Defendant United States of America's "Motion to Dismiss" [396] is **GRANTED** to the extent that Plaintiff's claims challenging the constitutionality of 26 U.S.C. § 5811 and 26 U.S.C. § 5812 are dismissed pursuant to Rule 12(b)(1) for lack of standing and Plaintiff's claims challenging 18 U.S.C. § 922(*l*), 18 U.S.C. § 922(o), 18 U.S.C. § 922(r), 26 U.S.C. § 5821, and 26 U.S.C. § 5822 are dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

396   Rec. Doc. 8.

**IT IS FURTHER ORDERED** that Plaintiff's "Motion for Partial Preliminary Injunction" [397] is **DENIED AS MOOT.**

397   Rec. Doc. 15.

## All Citations

276 F.Supp.3d 576

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

714 Fed.Appx. 336
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Malcolm J. BEZET, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 17-30303
|
Summary Calendar
|
Filed October 27, 2017

**Synopsis**
**Background:** Firearm owner brought action against the
federal government, alleging that provisions of the Gun
Control Act of 1968 (GCA) and National Firearms Act (NFA)
that prevented him from converting a semiautomatic pistol
into a fully automatic silenced rifle were unconstitutional.
The United States District Court for the Eastern District
of Louisiana, The District Court, Nannette Jolivette Brown,
J., 2017 WL 5642507, granted the government's motion to
dismiss. Owner appealed.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit
Judge, held that:

owner lacked standing to challenge NFA provisions
concerning transfer of firearms;

GCA did not violate the Second Amendment;

NFA did not violate the Second Amendment;

GCA provisions prohibiting transfer or possession of
machineguns were valid exercises of Commerce Clause
power;

GCA provisions banning importation of firearms were valid
exercises of Commerce Clause power; and

NFA provisions establishing taxes and registration
requirements for firearms manufacturing were valid exercises
of Commerce Clause power.

Affirmed.

Appeal from the United States District Court for the Eastern
District of Louisiana, No. 2:16-CV-2545

**Attorneys and Law Firms**

Malcolm J. Bezet, Pro Se

Tyce R. Walters, U.S. Department of Justice Civil Division,
Appellate Section, Washington, DC, for Defendant-Appellee

Before HIGGINBOTHAM, JONES, and SMITH, Circuit
Judges.

**Opinion**

JERRY E. SMITH, Circuit Judge: [*]

[*]   Pursuant to 5th Cir. R. 47.5, the court has determined that
      this opinion should not be published and is not precedent
      except under the limited circumstances set forth in 5th
      Cir. R. 47.5.4.

Malcolm Bezet appeals the dismissal of his claims that certain
provisions of the Gun Control Act of 1968 ("GCA") and
National Firearms Act ("NFA") are unconstitutional under
the Second Amendment, the Tenth Amendment, and the
Necessary and Proper Clause. The district court concluded
that Bezet lacks standing to challenge 26 U.S.C. §§ 5811 and
5812 and has failed to state a claim upon which relief can be
granted as to 18 U.S.C. § 922(*l*), (o), and (r) and 26 U.S.C. §§
5821 and 5822. Finding no error, we affirm.

I.

Bezet wants to convert a semiautomatic pistol he lawfully
owns into a fully automatic, silenced rifle. He avers that he
is prevented from doing so by certain provisions of the GCA
and NFA. He seeks a permanent injunction.

Specifically, Bezet asserts that the following provisions of
the GCA are unconstitutional: Section 922(*l*), which bans the
importation of firearms regulated under the GCA; § 922(r),
which forbids assembling weapons from such imported parts;

and § 922(o), which prohibits transferring or possessing any machinegun manufactured after the GCA's enactment. Bezet alleges that the following provisions of the NFA are unconstitutional: Section § 5811, which taxes the transfer of firearms; § 5812, which establishes registration and application requirements for transferring firearms; § 5821, which taxes the making of **\*339** firearms; and § 5822,[1] which establishes registration and application requirements for making firearms.

[1]   We are mindful that Bezet is proceeding *pro se* and that we should liberally construe his arguments. *See Davis v. Fernandez*, 798 F.3d 290, 293 (5th Cir. 2015). As the district court noted, although Bezet did not directly assert a cause of action challenging § 5822, we assume he intended to bring such a claim insofar as he requested relief as to § 5822 in the "prayer for relief" section of his complaint.

Bezet maintains that, to convert his pistol, he would need to register the completed rifle with the Bureau of Alcohol, Tobacco, Firearms and Explosives, pay a $200 tax on the parts, and use only American-made rather than imported parts. Even then, Bezet notes that he would be prohibited by the GCA from converting the pistol into a fully automatic rifle. *See* § 922(o).

The government moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6). The district court granted the motion and dismissed Bezet's claims as to §§ 5811 and 5812 under Rule 12(b)(1) for lack of standing and his claims as to § 922(*l*), (o), and (r) and §§ 5821 and 5822 under Rule 12(b)(6) for failing to state a claim upon which relief could be granted.

II.

We review *de novo* the dismissal of a complaint under Rule 12(b)(1) and (6), applying the same standards used by the district court. *See Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017); *Spotts v. United States*, 613 F.3d 559, 565 (5th Cir. 2010). We address whether Bezet has standing to challenge §§ 5811 and 5812. Then we examine whether he has stated a claim upon which relief can be granted as to § 922(*l*), (o), and (r) and §§ 5821 and 5822.

A.

Rule 12(b)(1) allows a party to challenge the district court's subject-matter jurisdiction. *Spotts*, 613 F.3d at 565. Federal courts have jurisdiction only over "cases" or "controversies." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). One element of the case-or-controversy requirement is that Bezet must have standing, which "focuses on whether the plaintiff is the proper party to bring this suit." *Id.* Bezet must show that (1) he suffered an injury in fact, which is "a concrete and particularized invasion of a legally protected interest;" (2) his "injury is traceable to the challenged action of the Government;" and (3) "it is likely, rather than merely speculative, [that] the injury will be redressed by a favorable decision." *Hollis v. Lynch*, 827 F.3d 436, 441 (5th Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

"At the pleading stage," we "liberally" construe allegations of injury, *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009), but the plaintiff bears the "burden of proof that jurisdiction does in fact exist," *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Bezet has failed to demonstrate that he has standing to challenge §§ 5811 and 5812. As the district court correctly noted, both deal exclusively with the transfer of firearms: Section 5811 levies a tax on the transfer of a firearm, and § 5812 imposes registration requirements on the transferor of a firearm. Bezet has not alleged that he wishes to transfer a firearm. Accordingly, he is not directly subject to those provisions and suffers no immediate injury.

Furthermore, any indirect injuries that Bezet may incur are insufficient to establish standing. Regarding the first prong of injury-in-fact, he claims that any taxes levied **\*340** on the transferor will eventually be passed on to the transferee, and he observes that § 5812 requires that a transferee be photo-graphed and fingerprinted. But such allegations do not establish the "concrete and particularized" injury of "a legally protected interest" that standing requires. *Defs. of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. Rather, they are merely "additional costs and logistical hurdles" that all citizens bear as ancillary to living under a government. *Lane v. Holder*, 703 F.3d 668, 673 (4th Cir. 2012).

Moreover, Bezet fails on the causality prong of standing. A plaintiff wishing to challenge certification laws must generally exhaust his certification options before suing in federal court. *Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996). Otherwise, his "inaction" caused his own injury. *Id.* Bezet challenges the registration requirements of § 5812 yet has made no attempt to comply with them. Accordingly, "his

inaction has caused any injury he has suffered." *Id.* And regarding § 8211, Bezet has not explained why the $200 tax paid by the transferor of a firearm would necessarily be passed on to him. *See San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (noting multiple factors that affect the price of firearm sales.) Accordingly, the district court was correct in holding that Bezet lacks standing to challenge §§ 5811 and 5812.

B.

We turn to whether Bezet has stated a claim as to § 922(*l*), (o), and (r) and §§ 5821 and 5822. "To survive a Rule 12(b)(6) motion to dismiss," the complaint "must provide the plaintiff's grounds for entitlement to relief." *Taylor v. City of Shreveport*, 798 F.3d 276, 279 (5th Cir. 2015). We accept all well-pleaded factual allegations as true and review the constitutionality of a statute *de novo. See Hollis v. Lynch*, 827 F.3d 436, 442 (5th Cir. 2016).

1.

Bezet claims that the NFA and GCA violate the Second Amendment. We use a two-step inquiry. *Id.* at 447. First, we "determine whether the challenged law impinges upon a right protected by the Second Amendment." *Id.* (quoting *Nat'l Rifle Ass'n of Am. Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("*NRA*")). The Second Amendment protects the ownership only of weapons that are "in common use at the time." *Id.* at 446 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)). Moreover, "longstanding, presumptively regulatory measure[s]" likely implicate no Second Amendment rights. *Id.* If no Second Amendment right is implicated, then the inquiry ends. *Id.* at 447.

If a Second Amendment right is implicated, "we proceed to the second step[, which] is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *Id.* (internal quotations omitted). To identify which level of scrutiny applies, we look at whether the law burdens "the core of the Second Amendment guarantee"—that is, the right to use firearms in defense of the home. *NRA*, 700 F.3d at 205. And we examine "the degree to which the challenged law burdens the right." *Id.* at 194. If a core right is burdened, strict

scrutiny applies; less severe regulations on more peripheral rights trigger intermediate scrutiny. *Id.*

a.

Bezet has failed to show that § 922(o) violates the Second Amendment. Indeed, we upheld that very provision in **\*341** *Hollis*, 827 F.3d at 451, as regulating only firearms that fall outside the scope of the Second Amendment—i.e., machineguns. Because Bezet provides no reason to distinguish his case from *Hollis*, he cannot show that § 922(o) violates the Second Amendment.

b.

For similar reasons, Bezet has failed to show that § 922(*l*) and (r) violate the Second Amendment. The former prohibits the importation of firearms and firearm parts; the latter makes it illegal to assemble certain semiautomatic rifles or shotguns from such imported parts. As noted above, the Second Amendment confers no right to possess a machinegun. *Hollis*, 827 F.3d at 451. Thus, to the extent Bezet claims that § 922(*l*) and (r) are unconstitutional because they prohibit importing a machinegun or assembling a machinegun from imported parts, his challenge must fail.

The district court went further, noting that Bezet also claimed a desire to obtain weapons that are part of the ordinary military equipment. We need not discern how broadly that claim reaches or whether it sweeps in firearms that are protected by the Second Amendment. That is because those provisions satisfy the second prong of our inquiry, under which we determine whether to apply strict or intermediate scrutiny. *Id.* at 447. Because those subsections regulate only the importation of firearms, they do not substantially burden the core Second Amendment guarantee of acquiring firearms to protect one's hearth and home. *See NRA*, 700 F.3d at 205. Thus, they trigger only intermediate scrutiny—and, as the district court recognized, there is a "reasonable fit" between these regulations and "important" government objectives, such as cutting off weapons to criminals. *Id.* at 195.

c.

Our analysis for §§ 5821 and 5822 is much the same. Section 5821 taxes the making of weapons such as machineguns and

silencers, and § 5822 establishes registration and application requirements for making them. Again, we need not decide whether, under a liberal construction of Bezet's complaint, the statutes burden his Second Amendment rights. Maybe he only seeks to make a machinegun—in which case his challenge is squarely foreclosed by *Hollis,* 827 F.3d at 451. Or he may wish to make firearms that receive Second Amendment protection and has rights that are burdened by the challenged provisions. But even under this latter supposition, these laws survive the second step of our Second Amendment analysis. As above, they do not substantially burden a core Second Amendment right, so they trigger intermediate scrutiny. *See NRA,* 700 F.3d at 205. And, as the district court correctly explained, there is a reasonable fit between these relatively light burdens and the important government objective of curbing gun violence. Accordingly, Bezet has failed to show that any of the above provisions violate the Second Amendment.

### 2.

Bezet claims that the same provisions violate the Necessary and Proper Clause. When "determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Thompson,* 811 F.3d 717, 724 (5th Cir.), *cert. denied,* —— U.S. ——, 136 S.Ct. 2398, 195 L.Ed.2d 770 (2016).

#### a.

The district court properly concluded that § 922(*l*), (o), and (r) are rationally **\*342** related to implementing Congress's power under the Commerce Clause. To refute that finding, Bezet relies on *United States v. Lopez,* 514 U.S. 549, 558−59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which held that Congress could regulate only three types of activity under the Commerce Clause: (1) the "channels of interstate commerce"; (2) the "instrumentalities of interstate commerce"; and (3) activities with "substantial relation to interstate commerce." The district court was correct, however, in concluding that each challenged provision falls within a *Lopez* category.

First, § 922(o) is a permissible exercise of the commerce power. *United States v. Knutson,* 113 F.3d 27, 28 (5th Cir.

1997). The vast majority of machinegun possessions involve the channels or instrumentalities of interstate commerce, and the remainder have a substantial effect on interstate commerce. *Id.* at 29−30. Insofar as Bezet fails to distinguish *Knutson,* his challenge to § 922(o) as exceeding the scope of the Commerce Clause fails. [2]

[2] Although Bezet repeatedly attacks the reasoning and holding of *Knutson,* we are bound to follow this circuit's precedents. Moreover, every circuit to reach this issue has also held that § 922(o) is a valid exercise of the commerce power. *See United States v. Henry,* 688 F.3d 637, 641 & n.4 (9th Cir. 2012) (collecting cases).

Second, § 922(*l*) and (r) are plainly related to Congress's power to "regulate commerce with foreign nations." U.S. CONST. art. I, § 8, cl. 3. These statutes ban the importation of firearms and ammunition unless authorized by the Attorney General and prohibit assembling certain firearms from such imported parts. Such laws directly regulate foreign commerce and activities with a substantial relation to foreign commerce. Thus, each challenged provision of the GCA falls within the commerce power.

#### b.

The district court was also correct in finding that §§ 5821 and 5822 are rationally related to Congress's taxing powers. *See* U.S. CONST. art. I, § 8, cl. 1. Indeed, the Supreme Court upheld similar provisions of the NFA under the taxing power in *Sonzinsky v. United States,* 300 U.S. 506, 514, 57 S.Ct. 554, 81 L.Ed. 772 (1937). And we have repeatedly upheld other sections of the NFA as valid exercises of the taxing power. *See United States v. Gresham,* 118 F.3d 258, 262 (5th Cir. 1997); *United States v. Ardoin,* 19 F.3d 177, 180 (5th Cir. 1994). Though Bezet claims that the NFA's taxes and regulations are merely a pretext for a general police power, his theories are unavailing. A registration requirement—such as § 5822—is "part of the web of regulation aiding enforcement of the ... tax provision." *Gresham,* 118 F.3d at 263. Because Bezet offers no other way to distinguish the provisions upheld in *Sonzinsky, Gresham,* and *Ardoin,* [3] his challenge to §§ 5821 and 5822 fails.

[3] For the first time in his reply brief, Bezet attempts to distinguish *Sonzinsky.* Even if his arguments were not waived, they cannot succeed. The fact that the defendant in *Sonzinsky* was a firearms dealer does nothing to

distinguish the case. And the fact that § 5822 imposes some regulations in addition to the taxes levied by § 5821 cannot help Bezet, given that we have repeatedly upheld similar regulatory provisions as ancillary to the taxing power. *See Gresham*, 118 F.3d at 262.

### 3.

For the same reasons as discussed above, Bezet's claims under the Tenth Amendment are unavailing. "When Congress properly exercises its authority under **\*343** an enumerated constitutional power, the Tenth Amendment is not implicated." *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010). As stated above, each provision that Bezet has standing to challenge was validly enacted under the commerce power or the taxing power. Therefore, the district court was correct to reject Bezet's claims under the Tenth Amendment.

In summary, Bezet lacks standing to challenge 26 U.S.C. §§ 5811 and 5812 and has failed to state a claim upon which relief can be granted as to 18 U.S.C. § 922(*l*), (o), and (r) and 26 U.S.C. §§ 5821 and 5822. The judgment of dismissal is AFFIRMED.

### All Citations

714 Fed.Appx. 336

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

822 F.3d 136
United States Court of Appeals,
Third Circuit.

UNITED STATES of America
v.

ONE (1) PALMETTO STATE ARMORY
PA–15 MACHINEGUN RECEIVER/
FRAME, UNKNOWN CALIBER SERIAL
NUMBER: LW001804; Watson Family Gun
Trust, Claimant (D.C. No. 15–cv–02202).
Ryan S. Watson, Individually and as
Trustee of the Watson Family Gun Trust
v.

Attorney General United States of America;
Director Bureau of Alcohol, Tobacco, Firearms,
and Explosives (D.C. No. 14–cv–06569)
Ryan S. Watson, Individually and as Trustee
of the Watson Family Gun Trust, Appellant.

No. 15–2859.
|
Argued April 4, 2016.
|
Opinion filed: May 18, 2016.

**Synopsis**
**Background:** Natural person, individually and on behalf of family gun trust as its sole trustee, brought action against federal government for declaratory and injunctive relief after denial of trust's application to make and possess a machine gun, claiming that Gun Control Act violated Second Amendment. The United States District Court for the Eastern District of Pennsylvania, Stewart Dalzell, J., 115 F.Supp.3d 544, granted in part and denied in part government's motion to dismiss. Gun maker appealed, and district court entered final judgment.

**Holdings:** The Court of Appeals, Anne E. Thompson, District Judge, sitting by designation, held that:

application to make and possess a firearm could not be granted to trust, and

Second Amendment does not protect the possession of machine guns.

Affirmed.

**Attorneys and Law Firms**

*137 Alan A. Beck, Esq., San Diego, CA, David R. Scott, Esq., Law Offices of J. Scott Watson, Glen Mills, PA, Stephen D. Stamboulieh, Esq. [Argued], Madison, MS, Counsel for Appellant.

Patrick Nemeroff, Esq. [Argued], Michael S. Raab, Esq., United States Department of Justice, Washington, DC, Jacqueline C. Romero, Esq., J. Alvin Stout, III, *138 Esq., Office of United States Attorney, Philadelphia, PA, Counsel for Appellee.

Robert J. Olson, Esq., William J. Olson, Vienna, VA, Counsel for Amicus–Appellants.

Joran Eth, Esq., James R. McGuire, Esq., Morrison & Foerster, San Francisco, CA, Adam M. Regoli, Esq., Morrison & Foerster, Denver, CO, Counsel for Amicus–Appellee.

Before: AMBRO and KRAUSE, Circuit Judges, and THOMPSON, * District Judge.

*        The Honorable Anne E. Thompson, District Judge for the United States Court for District of New Jersey, sitting by designation.

OPINION OF THE COURT

THOMPSON, District Judge.

Appellant Ryan S. Watson ("Watson"), individually and on behalf of the Watson Family Gun Trust, filed this action claiming that the de facto ban on the possession of a machine gun [1] found in 18 U.S.C. § 922(*o*) is unconstitutional facially and as-applied to him under the Second Amendment to the U.S. Constitution. Alternatively, Watson argues that § 922(*o*) does not apply to the Watson Family Gun Trust because it only applies to "persons" and a trust is not a "person" under the statute's definition. The District Court granted the government's motion to dismiss, explaining that under the Supreme Court's opinion in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and this Court's opinion in *United States v. Marzzarella,* 614 F.3d

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

85 (3d Cir.2010), the Second Amendment does not protect the possession of machine guns. Moreover, the Court found that a trust is not exempt from § 922(*o* ) because a trust is not an entity distinct from its trustees, and therefore it cannot own property. Because we agree that the Second Amendment does not protect the possession of machine guns, and because trustees, and by extension trusts, are not exempt from § 922(*o* ), we affirm.

1      Federal statutes and caselaw alternate between the spellings "machinegun" and "machine gun." We will use "machine gun" except when quoting materials that spell the term otherwise.

## I. BACKGROUND

The National Firearms Act provides that prior to manufacturing a firearm, any prospective maker must apply for permission from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 26 U.S.C. §§ 5822, 5841. ATF will deny the application if making or possessing the firearm would place the person applying in violation of any law. *See* 26 U.S.C. § 5822; 27 C.F.R. § 479.65. Although a machine gun qualifies as a firearm under the National Firearms Act, 26 U.S.C. § 5845(a), a separate federal law, the Gun Control Act, prohibits the private manufacture of machine guns in most instances by making it unlawful for any person "to transfer or possess a machine gun," with narrow exceptions for certain government entities and machine guns lawfully possessed before 1986. 18 U.S.C. § 922(*o* ). The Gun Control Act defines a "person" as an "individual, corporation, company, association, firm, partnership, society, or joint stock company." 18 U.S.C. § 921(a)(1).

Watson is the sole trustee of the Watson Family Gun Trust ("the Trust"). On May 23, 2014 and June 24, 2014, Watson submitted applications on behalf of the Trust for permission to make and register an M–16–style machine gun. On August 5, 2014, an ATF examiner mistakenly approved one of Watson's applications. Shortly thereafter, Watson had a machine gun **\*139** manufactured pursuant to that approval. However, on or about September 10, 2014, ATF informed Watson that the approval had been a mistake and that his application had been "disapproved." ATF explained in a letter that Watson's application was denied because he was prohibited by law from possessing a machine gun. Watson claimed to be exempt from the prohibition on possessing machine guns because he had applied on behalf of a trust, which he argued was not a "person" covered by the Gun Control Act. ATF explained that although a trust is not a "person" under the Act, a trust cannot

legally make or hold property. Therefore, ATF considers the individual acting on behalf of the trust to be the proposed maker and possessor of the machine gun.

Watson received a telephone call from an ATF agent on October 10, 2014 inquiring whether a machine gun had been made pursuant to the initial application approval. The ATF agent indicated that if any machine gun had been made, the gun must be surrendered to ATF. On November 14, 2014, Watson met with an ATF agent and surrendered his machine gun under protest. That same day, he filed suit against the U.S. Attorney General and the ATF Director (collectively, "the government"), seeking declaratory and injunctive relief from 18 U.S.C. § 922(*o* ), 26 U.S.C. § 5801 *et seq.,* and the implementing regulations found in 27 C.F.R. § 479.1 *et seq.* Watson alleged that these statutory and regulatory provisions act as a de facto ban on an entire class of arms in violation of the Commerce Clause and the Second, Ninth, and Tenth Amendments to the Constitution. Additionally, Watson alleged violations of his due process rights under the Fifth Amendment and his equal protection rights under the Fourteenth Amendment, as well as a claim for detrimental reliance based on the ATF's initial approval of his application. The government separately initiated a forfeiture action for Watson's machine gun, which was later consolidated with his challenge.

On January 16, 2015, the government moved to dismiss Watson's action for lack of standing and failure to state a claim. On July 22, 2015, the District Court ruled that Watson did have standing, but that he failed to state a claim upon which relief can be granted.[2] Among other holdings, the Court held that Watson failed to state a claim under the Second Amendment because the Second Amendment does not protect the possession of machine guns. He appeals that decision as well as the District Court's finding that a trust is incapable of owning a machine gun under § 922(*o* ). Because these are the only issues briefed by Watson on appeal, we will not discuss the District Court's other holdings. *See Laborers' Int'l Union of N. Am., AFL–CIO v. Foster Wheeler Energy Corp.,* 26 F.3d 375, 398 (3d Cir.1994) (issues not briefed on appeal are waived). However, we note that all of Watson's claims against the government were dismissed.

2      On appeal, the government continued to argue that Watson lacked standing, but based on Watson's position at oral argument that he is challenging the Gun Control Act and not the National Firearms Act, the government essentially conceded this point.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

The government's consolidated forfeiture claims are still pending, which led us to question whether the decision being appealed was a final order, and thus whether we had jurisdiction. But on August 13, 2015, the District Court issued a certification of entry of final judgment. This cured any jurisdictional defect in the case. *See In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II),* 751 F.3d 150, 156 (3d Cir.2014).

**\*140  II. JURISDICTION AND STANDARD OF REVIEW**

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1346. We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Foglia v. Renal Ventures Mgmt., LLC,* 754 F.3d 153, 154 n. 1 (3d Cir.2014); *Ballentine v. United States,* 486 F.3d 806, 808 (3d Cir.2007). We "are required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Foglia,* 754 F.3d at 154 n. 1 (citations omitted).

**III. DISCUSSION**

As a matter of constitutional avoidance, we will first turn to Watson's argument that § 922(*o* ) of the Gun Control Act does not apply to a trust. *See Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). Watson argues that § 922(*o* ) of the Gun Control Act does not apply to a trust because § 922(*o* ) applies only to "persons" and a trust is not a "person" under the terms of the statute.

With certain narrow exceptions, the provision states that "it shall be unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(*o* ). The Gun Control Act defines a person as "any individual, company, association, firm, partnership, society, or joint stock company." 18 U.S.C. § 922(a)(1). As Watson notes, a "trust" is not one of the listed entities. However, this does not mean that a trust is therefore entitled to possess a machine gun.

As the District Court stated, a trust is not an entity distinct from its trustees, nor is it capable of legal action on its own

behalf. 76 Am. Jur. 2d Trusts § 3 (citing Restatement (Third) of Trusts § 2 (2003)). Indeed, Watson himself does not dispute that he is the "individual human being" seeking to possess a gun on behalf of the Trust. He argues, however, that because trusts are not "persons" under the statute, he may act on behalf of the Trust in his capacity as a trustee without triggering the prohibition on natural persons transferring or possessing a machine gun. Appellant's Br. 55–56. But nothing in the Gun Control Act supports such a reading. Irrespective of whether Watson is a trustee, he is also a natural person and therefore prohibited from performing any of the acts forbidden by natural persons under the Gun Control Act. His inability to comply with the Gun Control Act, in turn, prevents ATF from granting his application under the National Firearms Act. *See* 26 U.S.C. § 5822; 27 C.F.R. § 479.65.

Moreover, this holding is necessarily correct because to interpret the Gun Control Act as Watson suggests would allow any party—including convicted felons, who are expressly prohibited from possessing firearms under 18 U.S.C. § 922(g)(1)—to avoid liability under this section simply by placing a machine gun "in trust." Any "individual, company, association, firm, partnership, society, or joint stock company" could lawfully possess a machine gun using this method. 18 U.S.C. § 921(a)(1). Interpreting the statute so as to include this exception would thereby swallow the rule. We refuse to conclude that with one hand Congress intended to enact a statutory rule that would restrict the transfer or possession of certain firearms, but with the other hand it created an exception that **\*141** would destroy that very rule. *Abdul–Akbar v. McKelvie,* 239 F.3d 307, 315 (3d Cir.2001) (rejecting an interpretation of a statute that would allow the exception to swallow the rule); *In re New York City Shoes, Inc.,* 880 F.2d 679, 685 n. 6 (3d Cir.1989) (same); *see also Elrod v. Burns,* 427 U.S. 347, 359 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (same).

We turn next to Watson's argument that § 922(*o* ) is unconstitutional facially and as-applied to Watson under the Second Amendment. We agree with the District Court that Watson offers no facts to distinguish why the challenged laws should not apply to him. Therefore, we will treat Watson's claim as a facial challenge. The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. To determine whether § 922(*o* ) impermissibly burdens the Second Amendment right, we must begin with *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

In *Heller,* the Supreme Court struck down several statutes in the District of Columbia prohibiting the possession of handguns and requiring lawfully owned firearms to be kept inoperable. 554 U.S. at 635, 128 S.Ct. 2783. Grounding its inquiry in historical analysis, the Court found that the Second Amendment protects an individual's right to possess firearms, at least for purposes of self-defense in the home. *Id.* at 576, 636, 128 S.Ct. 2783. However, the Court warned that "the right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626, 128 S.Ct. 2783; *see also McDonald v. City of Chicago,* 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion). The Court recognized that "the Second Amendment right, whatever its nature, extends only to certain types of weapons," *Heller,* 554 U.S. at 623, 128 S.Ct. 2783 (citing *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)), and specified that it was referring to those weapons "in common use" and not "those weapons not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, 627, 128 S.Ct. 2783. Turning to the handgun ban at issue in the case, the Court struck down the ban because it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for the "lawful purpose" of self-defense in the home, "where the need for defense of self, family, and property is most acute." *Id.* at 628, 128 S.Ct. 2783.

Based on *Heller,* we adopted a two-pronged approach to Second Amendment challenges. *Marzzarella,* 614 F.3d at 89. "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If it does not, the inquiry ends. *Id.* If it does, we move on to the second step: "[W]e evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

*Heller* and subsequent decisions in our Court make clear that the de facto ban on machine guns found in § 922(*o*) does not impose a burden on conduct falling within the scope of the Second Amendment. Turning first to *Heller,* we note that that opinion discusses machine guns on several occasions, and each time suggests that these weapons may be banned without burdening Second Amendment rights. *See Heller,* 554 U.S. at 627–28, 128 S.Ct. 2783 ("It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be **\*142** banned, then the Second Amendment right is completely detached from the prefatory clause.... But

the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right."); *id.* at 624, 128 S.Ct. 2783 (suggesting that it would be a "startling" reading of *Miller* that restrictions on machine guns are unconstitutional).

Next, we turn to our Circuit's caselaw. We examined this question in *Marzzarella. Marzzarella* concerned whether Appellant Michael Marzzarella's conviction under 18 U.S.C. § 922(k) for possession of a handgun with an obliterated serial number violated his Second Amendment rights. 614 F.3d at 87. We reiterated that "[a]t its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home," and thus, under *Heller,* "restrictions on the possession of dangerous and unusual weapons are not constitutionally suspect because these weapons are outside the ambit of the amendment." *Id.* at 91, 92 (citing *Heller,* 554 U.S. at 625, 635, 128 S.Ct. 2783). Marzzarella argued that because he possessed the unlawful weapon in his home, the challenged statute regulated protected conduct. However, we found that "it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances." *Id.* at 94. If this were the case, "[p]ossession of machine guns or short-barreled shotguns—or any other dangerous and unusual weapon—so long as they were kept in the home, would then fall within the Second Amendment. But the Supreme Court has made clear that the Second Amendment does not protect those types of weapons." *Id.* (citing *Miller,* 307 U.S. at 178, 59 S.Ct. 816; *United States v. Fincher,* 538 F.3d 868, 874 (8th Cir.2008), *cert. denied,* 555 U.S. 1174, 129 S.Ct. 1369, 173 L.Ed.2d 591 (2009)).

In case *Marzzarella* left any doubt, we repeat today that the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes. *See, e.g., Haynes v. United States,* 390 U.S. 85, 87, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (describing machine guns as "weapons used principally by persons engaged in unlawful activities"); *United States v. Jennings,* 195 F.3d 795, 799 n. 4 (5th Cir.1999) (noting "machine guns ... are primarily weapons of war and have no appropriate sporting use or use for personal protection") (quoting S. Rep No. 90–1501, at 28 (1968)); H.R. Rep. No. 99–495, at 4 (1986) (noting that machine guns are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime"); H.R. Rep. No. 90–1956, at 34 (1968) (Conf. Rep.), *as reprinted in* 1968 U.S.C.C.A.N. 4426, 4434 (describing machine guns as "gangster-type weapons"). They

are also exceedingly dangerous weapons. *See, e.g., United States v. O'Brien,* 560 U.S. 218, 230, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010) (noting "[t]he immense danger posed by machineguns"); *United States v. Henry,* 688 F.3d 637, 640 (9th Cir.2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 996, 184 L.Ed.2d 773 (2013) ("A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns.") (internal citation omitted); *United States v. Kirk,* 105 F.3d 997, 1001 (5th Cir.1997) (en banc) (per curiam) (Higginbotham, J., concurring) ("Machine guns possess a firepower that outstrips any other kind of gun."). As such, *Heller* **\*143** dictates that they fall outside the protection of the Second Amendment.

Our sister circuits have consistently come to similar conclusions. In *Fincher,* the Eighth Circuit found that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." 538 F.3d at 874. We previously quoted this very sentence in our opinion in *Marzzarella.* In *Henry,* the Ninth Circuit ruled that "machine guns are highly 'dangerous and unusual weapons' that are not 'typically possessed by law-abiding citizens for lawful purposes.' " 688 F.3d at 640. And in *Heller v. District of Columbia* ("*Heller II* "), the D.C. Circuit noted that "*Heller* suggests that 'M–16 rifles and the like' may be banned because they are 'dangerous and unusual.' " 670 F.3d 1244, 1263 (D.C.Cir.2011); *cf. Hamblen v. United States,* 591 F.3d 471, 474 (6th Cir.2009), *cert. denied,* 559 U.S. 1115, 130 S.Ct. 2426, 176 L.Ed.2d 939 (2010) (the Second Amendment does not protect the possession of unregistered machine guns); *Friedman v. City of Highland Park, Illinois,* 784 F.3d 406, 408 (7th Cir.), *cert. denied sub nom. Friedman v. City of Highland Park, Ill.,* ––– U.S. ––––, 136 S.Ct. 447, 193 L.Ed.2d 483 (2015) (upholding a ban on semi-automatic assault weapons against a Second Amendment challenge).

Watson nonetheless argues that the District Court misapplied *Heller's* "dangerous and unusual" language because the doctrine does not pertain to "the mere *possession* of a firearm," but only applies to "the *manner* in which that right is exercised." Appellant's Br. 18. As the above discussion suggests, Watson's unconventional reading contradicts the interpretation adopted by all of the federal circuits that have considered this language. *See, e.g., Friedman,* 784 F.3d at 409; *New York State Rifle & Pistol Ass'n v. Cuomo,* 804 F.3d

242, 256 (2d Cir.2015); *Henry,* 688 F.3d 637; *Heller II,* 670 F.3d 1244; *Marzzarella,* 614 F.3d 85; *United States v. Chester,* 628 F.3d 673, 679 (4th Cir.2010); *Fincher,* 538 F.3d 868. Watson himself concedes that "a majority of courts" interpret the "dangerous and unusual" language in *Heller* to describe possession of a weapon, Appellant's Reply Br. 12, but in fact no case was found adopting the alternative analysis proposed by Watson.

This is likely because *Heller* plainly states that mere possession of certain weapons may be prohibited. *See, e.g., Heller,* 554 U.S. at 626, 128 S.Ct. 2783 (noting that the Second Amendment is "not a right to *keep* and carry any weapon whatsoever") (emphasis added); *id.* at 627, 128 S.Ct. 2783 (suggesting that the possession of "M–16 rifles and the like" may be banned); *id.* at 624, 128 S.Ct. 2783 (same); *see also Miller,* 307 U.S. at 178, 59 S.Ct. 816 (holding that short-barreled shotguns are unprotected under the Second Amendment). And looking at the "dangerous and unusual" phrase in context, the most logical reading is that "dangerous and unusual" describes certain categories of weapons, and not the manner in which the weapons are used. The Court discusses "dangerous and unusual" weapons immediately after discussing what "sorts of weapons" *Miller* protects, and just before the Court discusses why certain types of weapons, even those "that are most useful in military service—M–16 rifles and the like—" may be banned. *See Heller,* 554 U.S. at 627, 128 S.Ct. 2783. We therefore decline to adopt Watson's interpretation of *Heller's* "dangerous and unusual" language.

Similarly, Watson's arguments against categorical bans on certain firearms fail to **\*144** persuade. *Heller* limits its holding to bans on "handguns held and used for self-defense in the home." *Heller,* 554 U.S. at 636, 128 S.Ct. 2783. *Heller* gives special consideration to the District of Columbia's categorical ban on handguns because they "are the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 629, 128 S.Ct. 2783. This does not mean that a categorical ban on any particular type of bearable arm is unconstitutional. As explained above, *Heller* contains clear statements to the contrary.

Nor does our opinion in *Marzzarella* support Watson's argument, as he suggests. When *Marzzarella* discusses categorical decisions, the opinion objects to the idea of categorically *protecting* certain weapons, not categorically *banning* them. *See Marzzarella,* 614 F.3d at 94 ("[I]t also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to

their utility."). In fact, *Marzzarella* specifically recognizes that there are particular categories of weapons that fall outside the protection of the Second Amendment. *See, e.g., id.* at 90–91 (noting that "the right to bear arms, as codified in the Second Amendment, affords no protection to weapons not typically possessed by law-abiding citizens for lawful purposes"); *id.* at 92 (noting that "the Second Amendment affords no protection for the possession of dangerous and unusual weapons"). When discussing machine guns and short-barreled shotguns, the opinion states that "the Supreme Court made clear the Second Amendment does not protect those types of weapons." *Id.* at 94–95. Nothing in *Heller* or *Marzzarella* supports Watson's argument.

Because we find that under *Heller* and *Marzzarella* the possession of a machine gun is not protected under the Second Amendment, our inquiry is at an end. These cases make clear that § 922(*o*) does not burden conduct falling within the scope of the Second Amendment, and thus, Watson's facial challenge to § 922(*o*) must fail.

## IV. CONCLUSION

Since the Supreme Court's opinion in *Heller,* courts nationwide have debated the parameters of that decision, and the extent to which government regulation may be reconciled with the Second Amendment. However, on at least one issue the courts are in agreement: governments may restrict the possession of machine guns. This finding follows from prior caselaw and the plain language provided by the Supreme Court. We decline to depart from this standard today. Further, we decline to reinterpret the Gun Control Act to allow an individual to circumvent the law through the use of a trust. For these reasons, the District Court's opinion will be affirmed.

## All Citations

822 F.3d 136

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.5997   Page 46 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

115 F.Supp.3d 544
United States District Court,
E.D. Pennsylvania.

UNITED STATES of America
v.
ONE PALMETTO STATE ARMORY
PA–15 MACHINEGUN RECEIVER/
FRAME, UNKNOWN CALIBER, SERIAL
NUMBER LW001804, defendant
and
Watson Family Gun Trust, claimant.

Civil Action No. 15–2202 (consolidated)[1].

[1]   On June 22, 2015 we consolidated the Government's
forfeiture action at C.A. No. 15–2202 with *Ryan Watson
v. Loretta Lynch and Thomas E. Brandon,* respectively
Attorney General and Acting Director of the Bureau of
Alcohol, Tobacco, Firearms & Explosives, which was
assigned C.A. No. 14–6569. We substituted the names of
these officeholders pursuant to Fed.R.Civ.P. 25(d).

|

Signed July 22, 2015.

**Synopsis**
**Background:** Gun maker whose application to make a
possess a machine gun was denied brought action against
the federal government for declaratory and injunctive
relief, claiming that the National Firearms Act (NFA)
unconstitutionally banned the transfer or possession of
machine guns, was unconstitutional under the Commerce
Clause, and violated his Second, Fifth, and Fourteenth
Amendment rights. Government moved for dismissal or,
alternatively, summary judgment.

**Holdings:** The District Court, Dalzell, J., held that:

government's motion to dismiss claim for lack of subject-
matter jurisdiction was a facial attack on gun maker's claim;

gun maker's alleged injuries were traceable to NFA;

gun maker's alleged injuries were redressable by a favorable
decision;

possession of machine guns did not fall within scope of
Second Amendment's guarantee of right to bear arms;

possession of machine guns fell within purely intrastate
activities that effect interstate commerce;

gun maker's argument that Trust acted to file application to
make and possess machine gun was a legal nullity; and

gun maker had no legally protected interest in application or
the machine gun itself.

Motion denied in part and granted in part.

**Attorneys and Law Firms**

**\*549**  J. Alvin Stout, III, Jacqueline Christine Romero, U.S.
Atty's Office, Philadelphia, PA, for United States of America.

David Ryan Scott, J. Scott Watson PC, Glen Mills, PA, for
Claimant.

*MEMORANDUM*

DALZELL, District Judge.

**I. *Introduction***
Ryan S. Watson applied to the ATF to make and possess a
machine gun[2], but his application was ultimately denied for
violating several Federal statutes. He therefore brings this
action for declarative and injunctive relief, claiming that 18
U.S.C. § 922(*o* ), 26 U.S.C. § 5801 *et seq.,* which codifies
the National Firearms Act ("NFA"), and the implementing
regulations 27 C.F.R. § 479.1 *et seq.* unconstitutionally
ban the transfer or possession of **\*550** machine guns,
impermissibly tramples upon the Commerce Clause under
Article I of the United States Constitution, and violate
his Second, Fifth and Fourteenth Amendment rights.[3] He
challenges the constitutionality of the statutes facially and as-
applied.

[2]     We adopt the parties' spelling for the firearm at issue
except when citing the National Firearms Act of
1934 ("NFA"), which uses the single word spelling,
"machinegun."

[3]     18 U.S.C. § 922(*o* ) provides that

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.5998   Page 47 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [1986].

The NFA is codified at 26 U.S.C. § 5801 *et seq.,* and is part of the Internal Revenue Code of 1986. *See* https://www.atf.gov/file/58141/download (last accessed on July 8, 2015).

Defendants Lynch and Brandon (collectively, "the Government") seek dismissal under Rule 12(b)(1) and 12(b)(6) or, in the alternative, move for summary judgment. The Government contends we lack subject matter jurisdiction over Watson's constitutional claims because he lacks standing to assert them. It also maintains that the challenged laws are consistent with the Second Amendment and the Due Process Clause, were enacted under Congress's Commerce Clause power. The Government urges that we dismiss Watson's Equal Protection and detrimental reliance claims because it contends he has failed to establish the necessary elements.

We have jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346 because Watson's claims arise under the U.S. Constitution and the laws of the United States and the Government is the defendant.

For the reasons detailed below, we will deny the Government's motion in part and grant it in part. We conclude that Watson has standing to challenge Section 922(*o* ) and the NFA prohibitions on the manufacture and possession of machine guns. But we also hold that his Second Amendment challenge to those statutes fails facially and as applied to him under well-established principles from our Court of Appeals, as does his claim that Congress exceeded its power under the Commerce Clause in enacting those laws. We also find his due process and equal protection challenges fail for the reasons detailed below, and his claim of detrimental reliance has no merit.

Accordingly, we will grant the Government's motion to dismiss Watson's complaint, but will await definitive action from the Government as to its forfeiture action against the machine gun.

## II. *Standard of Review*

The Government filed a motion to dismiss pursuant to both Rule 12(b)(1) and Rule 12(b)(6) or, in the alternative, for summary judgment, and we will therefore discuss the legal standards as they apply to the arguments before us.

### A. *Motion to Dismiss Under Rule 12(b)(1)*

A district court considering a motion pursuant to Rule 12(b)(1) must first determine whether that motion presents a "facial" attack or a "factual" attack on the claim at issue "because that distinction determines how the pleading must be reviewed." *Constitution Party of Pennsylvania v. Aichele,* 757 F.3d 347, 357 (3d Cir.2014). A facial challenge contests the sufficiency of the complaint because of a defect on its face —such as lack of diversity among the parties or the absence of a federal question. *See* **\*551** *Mortensen v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). In a facial challenge, we must consider the allegations of the complaint as true and consider only those allegations in the complaint, and the documents attached thereto, in the light most favorable to the plaintiff to see whether the plaintiff has sufficiently alleged a basis for subject-matter jurisdiction. *See Gould Electronics Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000); *see also United States ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 514 (3d Cir.2007) (terming a facial attack as "an alleged pleading deficiency"). Thus we apply the identical standard of review that we use in considering a motion to dismiss under Rule 12(b)(6).

A factual attack, on the other hand, challenges the actual failure of the plaintiff's claims to "comport with the jurisdictional prerequisites." *Pa. Shipbuilding,* 473 F.3d at 514. Such an evaluation may occur at any stage of the proceeding, but only once the defendant has filed an answer. *Mortensen,* 549 F.2d at 891. When a Court is confronted with a factual attack, "[it] is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and the plaintiff bears the burden of showing that jurisdiction does in fact exist. *Id.* Thus, a district court may consider evidence outside the pleadings, *Gould Elecs. Inc.,* 220 F.3d at 176 (internal citation omitted), and no presumptive truthfulness attaches to the plaintiff's allegations, such that the existence of disputed material facts does not preclude a Court from evaluating the merits of jurisdictional claims. *Mortensen,* 549 F.2d at 891.

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.5999   Page 48 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

 A motion to dismiss for want of standing is properly brought pursuant to Rule 12(b)(1) because standing is a jurisdictional matter. *Aichele,* 757 F.3d at 357 (internal citation omitted).

### B. *Motion to Dismiss Under Rule 12(b)(6)*

A defendant moving to dismiss under Fed.R.Civ.P. 12(b)(6) bears the burden of proving that a plaintiff has failed to state a claim for relief. *See* Fed.R.Civ.P. 12(b)(6); *see also, e.g., Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005). A Rule 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint and "[t]he question, then, is whether the facts alleged in the complaint, even if true, fail to support the claim." *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993) (internal citation and quotation marks omitted). As the Supreme Court held in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), in order to survive a Rule 12(b)(6) motion "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

Our Court of Appeals obliges district courts considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6) to engage in a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'

 **\*552** *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009) (quoting *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937).

In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiff, and all inferences must be drawn in his favor. *See McTernan v. City of York, PA.,* 577 F.3d 521, 526 (3d Cir.2009) (internal quotation marks omitted). To survive a motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact)." *Victaulic Co. v. Tieman,* 499 F.3d 227, 234 (3d Cir.2007) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

### C. *Motion for Summary Judgment*

 Summary judgment is warranted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). A party moving for summary judgment bears the burden of proving no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To that end, the movant must inform the district court of the basis for its argument by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the movant is the defendant or the party that does not have the burden of proof on the underlying claim, it "has no obligation to produce evidence negating its opponent's case," *National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1582 (3d Cir.1992). The movant need only point to the lack of evidence supporting the non-movant's claim. *Id.*

The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.,* 470 F.3d 535, 538 (3d Cir.2006). A factual dispute is "genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. That is, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude" summary judgment. *Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir.1998) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6000   Page 49 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

> [T]he plain language of Rule 56[ ] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Id.* The nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. It is well-established that Rule 56 obliges the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine **\*553** for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(c). Specifically, Rule 56(e) provides in relevant part that "[i]f a party fails to properly ... address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

### III. *Factual and Procedural Background*

We need only recite the facts pertinent to the resolution of the motions before us. We draw our recitation primarily from plaintiff Watson's complaint. However, as the Government has moved for summary judgment, in addition to its facial attack on our subject matter jurisdiction and its motion to dismiss, we may consider matters outside the pleadings, which here encompasses the legislative history of the statutes at issue and other archival material appended to the pleadings.

Watson is a Pennsylvania citizen and the Trustee of the Watson Family Gun Trust, an unincorporated Pennsylvania Trust. Compl. at ¶¶ 4, 44. On or about May 23, 2014, Watson, as Trustee of the Watson Family Gun Trust, submitted an application in paper form to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE" or "ATF") on ATF Form 5320.1 (the Application to Make and Register a Firearm) ("Form 1"), to make a machine gun. *Id.* at ¶ 37 and Ex. B. He also submitted the required $200 making tax. *Id.* at ¶ 37. On or about June 24, 2014, he electronically submitted a second application to make another machine gun and paid the $200 making tax. *Id.* at ¶ 38. On August 5, 2014, the BATFE approved the second application, affixing the stamp and authorizing Watson to make a machine gun. *Id.* at ¶ 39. Watson made a machine gun. *Id.* at ¶ 40. [4]

[4]  Watson made his machine gun by modifying an AR–15 lower receiver into an automatic capable M–16 receiver, an irreversible modification as a result of which the firearm is permanently designated a machine gun. Br. in Opp. at 3 and n. 2. ATF regulations define a "receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11.

Around September 10, 2014, Watson received an email from the BATFE stating it had changed the status of the Form 1 from "Approved" to "Disapproved." *Id.* at ¶ 41. Watson alleges the BATFE's own policies and procedures state that an approved Form 1 can only be cancelled if "the firearm[ ] ha[s] not been made or modified," *id.* at Ex. B at 4, ¶ 5, and there is no statutory or regulatory authority for it to revoke an issued tax stamp. *Id.* at ¶ 41.

The first Form 1 application was subsequently returned with a whited-out signature box, approval box, and date box, and marked "Disapproved" in two places on the application. *Id.* at ¶ 43. Watson contends these alterations show "the first application had been approved, and the BATFE subsequently unlawfully revoked (or attempted to revoke) the approval." *Id.* The application was accompanied by a letter from William J. Boyle, III, Chief of the National Firearms Act Branch, which stated in relevant part:

> Except for the possession of machineguns by or for governmental entities, the Gun Control Act of 1968(GCA), as amended, prohibits any person from possessing a machinegun not lawfully possessed and registered prior to May 19, 1986. *See* 18 U.S.C. § 922(*o* ). The GCA defines the term "person" to "include any individual, corporation, company, **\*554** association, firm, partnership, society, or joint stock company." *See* 18 U.S.C. § 921(a)(1). Pursuant to the [National Firearms Act] ... ATF may not approve

AR005532

4

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6001   Page 50 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

any private person's application to make and register a machinegun after May 19, 1986.

The fact that an unincorporated trust is not included in the definition of "person" under the GCA does not mean that an individual may avoid liability under section 922(*o*) by placing a machinegun "in trust." Where a trust is not an entity recognized as a "person" under the applicable law, it cannot make or hold property and is disregarded. Consequently, in terms of an unincorporated trust, ATF must disregard such a non-entity under the GCA and consider the individual acting on behalf of the trust to be the proposed maker/possessor of the machinegun.

*Id.* at Ex. D.

Watson alleges that there is no prohibition on Trusts making or possessing machine guns under Section 922(*o*) because the statute's plain language does not include a Trust in the definition of "person." *Id.* at ¶ 45. He also contends that the BATFE's contention that it "must disregard such a non-entity under the GCA and consider the individual acting on behalf of the trust to be the proposed maker/possessor of the machine gun" is a novel interpretation that upends long-time common practice. *Id.* at ¶ 46. For example, Watson maintains that when a Trust manufactures a short barreled rifle "on a Form 1," it is required to engrave on the firearm the name of the Trust as the manufacturer, not the name of the trustee who physically makes the firearm on behalf of the Trust. *Id.* (citing 26 U.S.C. § 5842(a)).

On or about October 10, 2014, a BATFE Field Agent contacted Watson to ask whether a machine gun had in fact been made pursuant to the approved Form 1 and informing him such a firearm would have to be surrendered to the BATFE. *Id.* at ¶ 48. Watson also spoke with a BATFE attorney on or about October 15, 2014 who also told him that the firearm, if made, would have to be surrendered. *Id.* at ¶ 49. Thereafter, Watson expressed his concern to the BATFE Agent that he would face criminal charges if he surrendered his machine gun. *Id.* at ¶ 50.

On or about November 3, 2014, Watson received a certified letter from Essam Rabach, Special Agent in Charge of the Philadelphia BATFE Field Division, which stated in relevant part:

> If you ha[ve], in fact, already made a machine gun in reliance on ATF's

erroneous approval of your ATF Form 1, you should make arrangements ... to abandon or otherwise surrender it. This is critical not only as a matter of public safety, but because possession of this unregistered machine gun is a Federal Felony ... Special Agent Kovach assured you that ATF is only interested in recovering the illegal and unregistered machine gun and has absolutely no interest in using your surrender of this machine gun to further a criminal prosecution....

*Id.* at ¶ 51; *see also* Ex. E.

On or about November 14, 2014, Watson under protest surrendered his machine gun to BATFE Special Agent Kovach "without waiving any rights to contest the illegal mandate by the BATFE that he surrender that firearm." *Id.* at ¶ 52.

Watson contends that machine guns come under Second Amendment protection as the Supreme Court described the Amendment's ambit in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), and are not inherently dangerous. *Id.* at ¶¶ 12, 13. "Prior to 1986, registered machine guns were involved in so few crimes that the then [BATFE director]  **\*555**  stated during congressional hearings that 'machine guns which are involved in crimes as so minimal so as not to be considered a law enforcement problem.' " *Id.* at ¶ 25 (internal citation omitted). He also contends that there is no evidence machine guns have any effect on interstate commerce. *Id.* at ¶¶ 22, 25, 26. "Even if Congress had the power to regulate machine guns under the Commerce Clause," Watson alleges that the ban imposed on machine guns after 1986 "is not 'regulating' under the meaning of the Commerce Clause, especially in light of the protected Second Amendment rights." *Id.* at ¶ 27. He also maintains that the term "person" as defined in the Gun Control Act ("GCA") does not include an unincorporated Trust, which the BATFE acknowledged in an opinion letter to another entity. *Id.* at ¶¶ 28, 29. He alleges that the BATFE's "new interpretation" that unincorporated trusts are prohibited from manufacturing or possessing machine guns means the agency violated the law by approving his application in the first place. *Id.* at ¶ 54. Watson also alleges that he made the firearm in detrimental reliance on the BATFE's "guarantee ... that such manufacture

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6002   Page 51 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

would not be in violation of any law." *Id.* at ¶ 55. Finally, he claims that he as Trustee may make and possess a machine gun "under the plain language of 18 U.S.C. § 922(*o* )," which exempts from its prohibition on the transfer or possession of a machine gun the "possession by or under the authority of[ ] the United States or any department or agency thereof." *Id.* at ¶ 56 (quoting 18 U.S.C. § 922(*o* )(2)(A)).

Watson claims five grounds for relief. He seeks declaratory and injunctive relief that 18 U.S.C. § 922(*o* ) is unconstitutional or unconstitutional as applied to him in violation of the Commerce Clause and asks that we bar the defendants from revoking his issued stamp. *Id.* at ¶ 61. He also claims Section 922's machine gun ban and the BATFE's disapproval of his first Form 1 violate the Second Amendment and he seeks a declaration that 26 U.S.C. § 5801 *et seq.* is also unconstitutional or unconstitutional as-applied to him *Id.* at ¶ 69. He further claims that the defendants deprived him of his property interest in his machine gun and approved application in violation of the Fifth Amendment. *Id.* at ¶¶ 71, 72. Watson claims the BATFE violated his right to Equal Protection under the Fourteenth Amendment by permitting others, but not him, to manufacture machine guns post–1986. *Id.* at ¶ 76. Watson urges that the Agency be enjoined from enforcing Section 922(*o* ) and Section 5801 in a manner that would result in him losing "his property interest in his Form 1 or manufactured machine gun" or being charged criminally. *Id.* at ¶ 79. And, finally, he seeks to estop BATFE from revoking the Form 1 on which he claims to have detrimentally relied. *Id.* at ¶ 79.

Watson filed his complaint on November 14, 2014. The Government filed its motion to dismiss or, in the alternative, for summary judgment on January 16, 2015. On January 23, 2015, Watson filed an uncontested motion for an Order of preservation of the machine gun, which we granted three days later. On June 12, 2015, Watson moved to consolidate this matter with the Government's later-filed forfeiture action. We granted Watson's motion to consolidate on June 22, 2015. [5]

[5]    By the time we closed C.A. No. 14–6569, the Government had, as rehearsed, filed the motion that we address at length here. To avoid confusion, we dispose of it notwithstanding the consolidation.

## IV. *Discussion*

### A. *Overview of the Statutory Scheme*
Congress regulates the interstate firearms market through the GCA, as amended,  **\*556**  18 U.S.C. Chapter 44, and the NFA,

26 U.S.C. Chapter 53. MTD at 2. The BATFE is charged with the administration and enforcement of those statutes and the defendants oversee that enforcement. *Id.* The NFA requires, *inter alia,* that all who are engaged in the business of firearms, including machine guns, and all firearm owners register with the Collector of Internal Revenue, and also subjects firearms sales to a special tax and requires firearm transactions to be conducted using written forms. *Id.* at 2, 3. The NFA also requires a firearm maker to obtain authorization, prior to manufacturing a firearm, "in such manner as required" by the statute. *Id.* at 3 (quoting 26 U.S.C. § 5841(c)). With respect to machine guns, "[d]ecades of federal laws and regulations" restrict their manufacture and possession to protect from their use as "lethal weapons [that] could be used readily and efficiently by criminals or gangsters in furtherance of criminal activity." *Id.* at 1 (quoting *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (internal quotation marks omitted)); *see also* Ex. 1.

The NFA defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" or parts thereof, including "any combination of parts from which a machinegun can be assembled." *Id.* at 3 (quoting 26 U.S.C. § 5845). The NFA requires a would-be firearms maker to (1) file a written application to make and register the firearm, (2) pay any applicable tax, (3) identify the firearm to be made, (4) identify himself on the form, and (5) obtain the ATF's approval with the application showing such approval. *Id.* (citing 26 U.S.C. § 5822). The Government states that Section 5822 and the ATF's implementing regulation provide that the ATF will not approve an application to make a firearm if its making or possession "would place the person making the firearm in violation of law," including in violation of the NFA. *Id.* at 4; *see also* 27 C.F.R. § 479.65 and 26 U.S.C. § 5861(f).

The GCA supplants earlier firearms regulations, including the Federal Firearms Act of 1938, adopted under the Commerce Clause. MTD at 4; *see also* Ex. 2. In 1986, Congress enacted the Firearms Owners' Protection Act, adding Section 922(*o* ) to the GCA. *Id.* at 5. Section 922(*o* )(1) makes it "unlawful for any person to transfer or possess a machinegun," except with respect to

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6003   Page 52 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [1986].

*Id.* (quoting 18 U.S.C. § 922(*o* )(2)). The GCA defines "machinegun" by incorporating the NFA's definition. *Id.; see also* 18 U.S.C. § 921(a)(23).

The Government observes that this litigation "arise[s] in part from different definitions of the term 'person' employed by the NFA and GCA." MTD at 5. The GCA defines "person" to "include any individual, corporation, company, association, firm, partnership, society, or joint stock company." *Id.; see also* 18 U.S.C. § 921(a)(1). The NFA does not specifically define "person." The Government states that in the absence of a definition, the general definition in the Revenue Code controls: "an individual, trust, estate, partnership, association, company, or corporation," *see* 26 U.S.C. § 7701(a)(1); *see also* Br. in Opp. at 30. Accordingly, the Government contends that the definition of "person" under **\*557** the NFA includes "Trust", but the GCA definition does not. MTD at 5.

### B. *Threshold Inquiry: Whether Watson's Challenges Are Facial or As–Applied*

The difference between a facial challenge and an as-applied challenge is significant.

A plaintiff asserting a facial challenge "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). Thus, the plaintiff succeeds in a facial challenge only by showing that "no set of circumstances" exists under which the statute at issue would be valid, *Heffner v. Murphy,* 745 F.3d 56, 65 (3d Cir.2014)—a particularly demanding standard.

The Supreme Court disfavors facial challenges for several reasons. As the Court explained in *Washington State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008), "Claims of facial invalidity often rest on speculation" about the reach of a statute and "run contrary to the fundamental principle of judicial restraint" by anticipating a constitutional rule before it can be decided. Because the remedy for a successful facial challenge is the complete invalidation of the law, "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.*

By contrast, as our Court of Appeals has held, "[a]n as-applied attack ... does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage,* 609 F.3d 264, 273 (3d Cir.2010). The distinction, then, between a facial challenge and an as-applied challenge goes to the scope of the statute's claimed constitutional infirmity and the breadth of the remedy sought. *See Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). The remedy for a facial challenge is the broad invalidation of the statute in question, but the remedy for an as-applied challenge bars its enforcement against a particular plaintiff alone under narrow circumstances. *See CMR D.N. Corp. v. City of Philadelphia,* 703 F.3d 612, 624 (3d Cir.2013). Our Court of Appeals has also cautioned that district courts granting injunctions in such cases should craft remedies "no broader than necessary to provide full relief to the aggrieved plaintiff." *McLendon v. Continental Can Co.,* 908 F.2d 1171, 1182 (3d Cir.1990) (internal citation omitted).

Watson's Commerce Clause claim seeks "declaratory and injunctive relief barring defendants from attempting to unilaterally revoke an issued stamp on his Form 1 and further," a determination that Section 922(*o* ) is "unconstitutional or unconstitutional as applied against" him, *see* Compl. at ¶ 61. He similarly frames his Second Amendment challenge to Section 922(*o* ) and 26 U.S.C. § 5801 *et seq., see id.* at ¶ 69. The Government does not address whether Watson's claim is properly facial or as-applied. But we conclude that Watson asserts his Commerce Clause and Second Amendment as both facially and as-applied.

While the "usual judicial practice" is to address an as-applied challenge before a facial challenge, *United States v. Mitchell,* 652 F.3d 387, 406 (3d Cir.2011) (internal citations omitted), our Court of Appeals has reversed that order in the case of "presumptively lawful" prohibitions—as here. *See United States v. Barton,* 633 F.3d 168, 172 (3d Cir.2011).

### **\*558 C.** *Watson's Standing to Bring This Suit*

The "irreducible constitutional minimum" of standing contains three elements: "(1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6004   Page 53 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

(3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Blunt v. Lower Merion School Dist.,* 767 F.3d 247, 278 (3d Cir.2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The Government argues that we must dismiss Watson's Second Amendment and Commerce Clause claims because he fails to satisfy the traceability and redressability requirements for standing. MTD at 8. It argues that Pennsylvania law independently bars Watson's possession of a machine gun. *Id.* at 9. Pursuant to 18 Pa. Cons.Stat. Ann. § 908(a), "[a] person commits a misdemeanor of the first degree if, except as authorized by law, he ... possesses any offensive weapon," and where subsection (c) defines an "offensive weapon" to include a "machine gun". As a result, the Government maintains, Watson cannot show that the harm he alleges "is caused by the NFA and GCA provisions that likewise prohibit him from making or acquiring" a machine gun. MTD at 9. The Government contends that Watson cannot show "traceability" because the Commonwealth's prohibition undercuts his argument that his alleged Second Amendment and Commerce Clause injuries are "traceable to federal law and not the result of the independent action of some third party not before the court." *Id.* at 9, 10 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130) (internal quotation marks and alterations omitted). In a like vein, the Government argues that granting Watson's request for declaratory relief would not redress these two claimed injuries because "the limitations imposed by [state law] would remain unchanged." *Id.* at 10 (quoting *McConnell v. FEC,* 540 U.S. 93, 229, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003)).

Pennsylvania provides an exception to the machine gun prohibition when the possessor "complied with the National Firearms Act." *Id.* at 10 n. 7 (quoting 18 Pa. Cons.Stat. Ann. § 908(b)(1)). The Government maintains this safe harbor does not affect its standing analysis because, should Watson succeed on his two claims, "there would be no NFA regulation available for him to comply with, leaving him subject to the Pennsylvania prohibition." *Id.*

Watson responds in opposition that the Government's argument mischaracterizes Pennsylvania law "as independently forbidding [his] possessing a machine gun" and forestalling him from showing that the NFA and GCA caused him any harm. Br. in Opp. at 6, 7. He points us to the defendants' communications with him that cite those

federal statutes as the reason for revoking his applications and confiscating his firearm. *Id.* at 7.

> Quite simply, the [d]efendants used the NFA and GCA as a basis to violate [p]laintiff's constitutionally protected rights and accordingly, [his] injury is directly traceable to the [d]efendants and the challenged laws, and a favorable ruling will redress the injury.

*Id.* He observes that the Pennsylvania statute's exception means the state statute presents no bar to his machine gun possession because he claims to be in full compliance with the NFA. *Id.* He further argues that, were we to declare machine guns protected under the Second Amendment, **\*559** striking down Section 922(*o* ) and the NFA, "any theoretical Pennsylvania prohibition on machine guns would also be unconstitutional" because the Second Amendment right to bear arms validated in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), was incorporated against the States in *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). *Id.* at 8. Finally, Watson contends that the defendants' argument at best attacks his standing to challenge the NFA, but has no merit with respect to his other claims for relief. *Id.*

The Government replies that Watson's response is limited to his Second Amendment claim and "does not address in any way" its contention that his Commerce Clause claim, Count I of his complaint, "cannot be redressed in this action." Reply at 2. The Government contends that by Watson's failure to reply to its argument that he lacks standing as to this cause of action, he thereby waives his opportunity to demonstrate standing. *Id.* The Government also contests Watson's argument that the future invalidation of the Pennsylvania statute could demonstrate redressability. "Plaintiff has not sued Pennsylvania, and redressability for [his] purported Second Amendment 'injury' is therefore lacking." *Id.*

In his surreply, Watson maintains that the Government seeks to mislead the Court into believing that Pennsylvania law prohibits the possession of machine guns—a contention he claims would be readily refuted through discovery of the records of the National Firearms Registration and Transfer

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6005   Page 54 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

Record of registered machine guns owned by civilians in Pennsylvania. Sur. at 1.

As we stated above, a motion to dismiss for want of standing is properly brought pursuant to Rule 12(b)(1) because standing constitutes a jurisdictional threshold. *Aichele,* 757 F.3d at 357 (internal citation omitted). Our standing inquiry must be "especially rigorous when reaching the merits of the dispute as it would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd,* 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Each element of the standing inquiry "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Hayes v. Wal–Mart Stores, Inc.,* 725 F.3d 349, 361 n. 11 (3d Cir.2013) (quoting *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130). Nonetheless, we are mindful of Justice Scalia's admonition that "when an individual who is the very *object* of a law's requirement or prohibition seeks to challenge it, he always has standing." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881, 894 (1983) (emphasis in original) (cited with approval in *Aichele,* 757 F.3d at 362.)

Our first step is to determine whether the movant proffers a facial or factual attack. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235, 243 (3d Cir.2012). As the Government filed its motion to dismiss before filing an answer, its motion constitutes a facial attack on Watson's claims and we apply the identical standard of review that we use in considering a motion to dismiss under Rule 12(b)(6), that is to say, we consider only the allegations of Watson's complaint in the light most favorable to him. *See Gould Elec. Inc.,* 220 F.3d at 176. Here, Watson points to the disapproval of his Form 1 and the Government's letter from William J. Boyle, III, Chief of the National Firearms Act Branch, in which Boyle cites both the GCA's prohibition against possessing a machine gun and the NFA's ban on the **\*560** ATF approving any application to make a machine gun after May of 1986, *see* Boyle letter, Compl. at Ex. D. Watson also alleges that he complied with the NFA's requirements to (1) file a written application to make and register the firearm, (2) pay any applicable tax, (3) identify the firearm to be made, (4) identify himself on the form, and (5) obtain the ATF's approval as shown on the application. *See* Compl. at ¶¶ 37, 38, 39.

Turning first to the traceability requirement, a federal court may "act only to redress injury that fairly can be traced to

the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Aichele,* 757 F.3d at 366 (internal citation omitted). But, as our Court of Appeals has explained, this causation inquiry is not cognate with tort proximate cause: "there is room for concurrent causation in the analysis of standing." *Id.* (citing with approval *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 316 (4th Cir.2013) (holding that if a petition witness residency requirement was "at least in part responsible for frustrating [plaintiff's] attempt to fully assert his First Amendment rights in Virginia, the causation element of *Lujan* is satisfied")). Indeed, our Court of Appeals has held that an indirect causal relationship will suffice, so long as there is "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant[s]." *Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131, 142 (3d Cir.2009) (internal citation omitted).

The Government urges us to rely on decisions from other Courts of Appeals that found no standing where activity was banned by both state and federal statute, and thus the alleged injury could not be traced to a federal statute alone. *See, e.g. White v. United States,* 601 F.3d 545 (6th Cir.2010) (no standing for gamefowl sellers to challenge Animal Welfare Act provisions banning animal fighting because alleged injuries not traceable to AWA alone); *see also San Diego Cty. Gun Rights Committee v. Reno,* 98 F.3d 1121, 1130 (9th Cir.1996) (injury not traceable to federal statute banning assault weapons where a separate state law "also bans the manufacture, sale and distribution of certain delineated assault weapons").

Our Court of Appeals has not considered in a precedential opinion whether the existence of a state statute banning activities similar to those prohibited in a challenged federal statute undercuts traceability. But *White* and *Reno* do not persuade us. The state statutes in each of these cases are not cognate with what is before us. In *White,* for example, where the Sixth Circuit concluded that gamefowl sellers' alleged injuries were not traceable to only the AWA, the AWA restricted various activities associated with animal fighting but did not prohibit animal fighting or cockfighting, whereas "[c]ockfighting is banned to a greater or lesser degree in all fifty states." *White,* 601 F.3d at 552. Thus, the Sixth Circuit concluded that plaintiffs' alleged injury was not traceable to the challenged law alone because state laws independently banned certain comparable activity. And, in *Reno,* the Ninth Circuit pointed to an earlier enacted California statute, the Roberti–Roos Assault Weapons Control Act of 1989, to

Case 2:19-cv-00037-JNP Document 59-42 Filed 11/30/22 PageID.6006 Page 55 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

conclude plaintiff's allegation of economic injury due to the federal assault weapon ban must fail because the challenged federal statute "is neither the only relevant piece of legislation nor the sole factor affecting the price of grandfathered weaponry." *Reno,* 98 F.3d at 1130.

Unlike the state statutes at issue before the Sixth and Ninth Circuits, the Commonwealth statute at issue here does not supply freestanding grounds to forbid machine gun use or possession, if the maker **\*561** or owner "complie[s] with the National Firearms Act," 18 Pa. Cons.Stat. Ann. § 908(b)(1). Rather, Pennsylvania does not independently ban such firearms but rather piggybacks on an existing federal statute by incorporating its requirements. Watson claimed that he complied with the NFA's five requirements, *see* Compl. at ¶¶ 37, 38, 39, which we take as true and interpret in the light most favorable to him, as we must in this posture. Such compliance brings him under the Commonwealth's safe harbor exception and therefore leaves no independent ground to prohibit his machine gun possession. Equally persuasive is Watson's argument that, should he prevail in his NFA challenge, the Commonwealth statute would also fail. We do not agree with the Government that Watson has failed to show that his alleged injuries are traceable to the federal statutes he challenges. As the Government points to no other Commonwealth statute that undercuts Watson's claim that his alleged Commerce Clause injury is also traceable to the federal statutes he challenges, we conclude that he has met the second prong of the standing requirement and can assert both constitutional challenges.

Our Court of Appeals teaches that redressability is "closely related" to traceability: "[W]hile traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)." *Toll Bros.,* 555 F.3d at 142 (internal citation omitted) (parenthetical remarks in original). This element requires a showing that the injury will be redressed by a favorable decision but it is also "sufficient for the plaintiff to establish a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Id.* at 143 (internal citation and quotation marks omitted). The Government points us to a nonprecedential decision from our Court of Appeals to argue that granting Watson the relief he seeks would not redress his alleged Second Amendment and Commerce Clause injuries because the limitations imposed by state law would remain in place. *See Coastal Outdoor Adver. Grp. LLC v. Twp. of E. Hanover, NJ,* 397 Fed.Appx. 794, 795 (3d Cir.2010).

We do not agree that our Court of Appeals's decision in *Coastal Outdoor* compels the conclusion that Watson fails to meet the standing requirement's third prong. There, our Court of Appeals concluded that, although the billboard company suffered an injury traceable to a Township ordinance, the injury the plaintiff suffered was nonetheless not redressable because unchallenged zoning restrictions would still prevent it from erecting billboards "even if the Township's superseded prohibition on billboards were unconstitutional." *Id.*

That is not the case here. Although Watson does not challenge the Commonwealth statute, he points out that its reliance on the framework of the NFA means a decision striking down that federal statute would also sweep away the Pennsylvania prohibition on machine guns. We agree. *See McDonald,* 561 U.S. at 791, 130 S.Ct. 3020 ("We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller.*").

We conclude that Watson satisfies all aspects of standing to challenge the NFA and GCA and will therefore deny the Government's motion to dismiss for want of subject matter jurisdiction.

### D. *Watson's Second Amendment Challenge*

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

### **\*562 1.** *The Government's Motion to Dismiss*

The Government offers a series of arguments as to why Watson's machine gun is properly excluded from Second Amendment protection.

First, the Government points to the Supreme Court's recognition that the rights secured by the Second Amendment are not unlimited to argue that longstanding prohibitions against certain types of weapons impose continued ineligibility for Second Amendment protection after *Heller.* MTD at 13, 14 (quoting *Heller,* 554 U.S. at 626, 621–22, 128 S.Ct. 2783). "Consistent with the view expressed in *Heller,* the Third Circuit and every other federal circuit to subsequently address the issue has determined there is no Second Amendment right to possess a machine gun." MTD at 15. The Government argues further that the Second

Case 2:19-cv-00037-JNP Document 59-42 Filed 11/30/22 PageID.6007 Page 56 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

Amendment right upheld in *Heller* was a right to bear arms in self-defense, not an individual's right to possess any specific firearm or type of firearm. *Id.* at 16 (citing *Heller,* 554 U.S. at 627, 128 S.Ct. 2783 and *United States v. Marzzarella,* 614 F.3d 85, 94–95 (3d Cir.2010), *cert. denied,* 562 U.S. 1158, 131 S.Ct. 958, 178 L.Ed.2d 790 (2011)). At the same time, the Government rejects as foreclosed by *Heller,* Watson's argument that defense of country is a "new central purpose of the Second Amendment." Reply at 3.

Our Court of Appeals in *Marzzarella* "adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds." MTD at 12.

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

614 F.3d at 89 (internal citation omitted). The Government contends that analysis requires Watson's claim to be resolved only at *Marzzarella's* Step One, because *Heller's* "presumptively lawful regulatory measures" against certain longstanding prohibitions are "exceptions to the right to bear arms." MTD at 17 (quoting *Marzzarella,* 614 F.3d at 91 (citing *Heller,* 554 U.S. at 627, 128 S.Ct. 2783)); *see also* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L.Rev. 375, 413 (2009) ("*Heller* categorically excludes certain types of 'people' and 'Arms' from Second Amendment coverage, denying them any constitutional protection whatsoever") (cited with approval in *Marzzarella,* 614 F.3d at 91 n. 6). The Government urges that restrictions on machine gun possession are longstanding and presumptively lawful restrictions derived from historical regulation of machine guns. MTD at 17, 18; *see also Drake v. Filko,* 724 F.3d 426, 432 (3d Cir.2013), *cert. denied sub nom. Drake v. Jerejian,* —— U.S. ——, 134 S.Ct. 2134, 188 L.Ed.2d 1124 (2014). "Historical State restrictions likewise demonstrate that ... laws prohibiting an entire class of weapons as dangerous or unusual are not anomalous." MTD at 19 (citing state statutes); *see also* Exs. 4 (Founding–Era state militia laws [6] governing permitted weapons) and 6

**\*563** (selected 19th and 20th century state laws prohibiting possession of certain categories of weapons).

6      Indeed, Congress in 1792 in the Second Militia Act, § 1, 1 Stat. 271–72, provided that:

> every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each carriage to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutered and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned [O]fficers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound.

Should we nevertheless hold that the machine gun ban burdens Watson's Second Amendment rights, the level of scrutiny remains unresolved under *Heller.* The Government presses the Supreme Court's reasoning in *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) that "not every limitation or incidental burden on the exercise of a constitutionally protected right is subject to a stringent standard of review," to argue that the Second Amendment triggers more than a single standard of review. MTD at 21 (internal quotation marks omitted); *see also Marzzarella,* 614 F.3d at 97.

The Government argues that the burden here is minimal and, as such, does not require heightened scrutiny. *Id.* A machine gun prohibition, the Government contends, does not substantially burden the self-defense right central to the Second Amendment. *Id.* at 22 (quoting *Heller,* 554 U.S. at 628, 128 S.Ct. 2783). While the Government contends that the challenged provisions would satisfy strict scrutiny because they are "presumptively lawful," *id.* at 24 n. 16 (quoting *Heller,* 554 U.S. at 627 n. 26, 128 S.Ct. 2783), it maintains the statutes "readily withstand" the Third Circuit's three-part intermediate scrutiny test. *Id.* at 24. [7]

7      The Government describes the requirements of our Court of Appeals's test for intermediate scrutiny as showing

Case 2:19-cv-00037-JNP Document 59-42 Filed 11/30/22 PageID.6008 Page 57 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

(1) a reasonable fit between the challenged law and the governmental interest, (2) the Court's "substantial deference to the legislature's predictive judgments," *Drake,* 724 F.3d at 436–37 (alteration's omitted), and (3) empirical evidence "needed to satisfy heightened judicial scrutiny of legislative judgments" which varies with "the novelty and plausibility of the justification raised." MTD at 24 (quoting *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)).

The Government points, *inter alia,* to the NFA's legislative history where Congress found "there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, [but] there is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun." *Id.* at 23 and Ex. 7 (quoting H.R. Rep. No. 73–1780, at 1 (1934)).

> Because other categories of firearms are equally useful—if not more so—for self-defense than machine guns, the burden on the Second Amendment right is at most "marginal [and] incremental" and therefore does not warrant significantly heightened scrutiny.

MTD at 23 (quoting *United States v. Decastro,* 682 F.3d 160, 166 (2d Cir.2012)). While our Court of Appeals has adopted certain First Amendment approaches for Second Amendment cases, the Government maintains that our Circuit has repeatedly rejected adopting the First Amendment's distinctions between content-based, and time, place, and manner regulation. Reply at 6. *See Barton,* 633 F.3d at 172 n. 3; *see also Drake,* 724 F.3d at 435.

**\*564** Finally, the Government rejects Watson's assertion claiming that there is *no* statistical support regarding the criminal use of machine guns, and it relies on data from the National Crime Information Center concerning machine gun theft and a 1991 study finding 35% of juvenile inmates had owned "a military style automatic or semi-automatic rifle" prior to their confinement. Reply at 9. "[I]f the eight decades of federal legislation regulating machine guns ... have succeeded in limiting [their] use for criminal purposes, such success would hardly cast doubt on previous findings about the criminal utility of machine guns or their other dangers. *Id. See also Drake,* 724 F.3d at 436–37 ("When reviewing the constitutionality of statutes, courts accord substantial deference to the legislature's predictive judgments.") (internal citation and alteration omitted).

### 2. *Watson's Brief in Opposition*

Watson responds with several arguments.

He observes that the Second Amendment recognizes valid justifications besides self-defense—such as hunting and resistance to tyranny, Br. in Opp. at 9. He argues first that machine guns "are overwhelmingly chosen by militaries throughout the world for defense of [country], ... a lawful purpose of firearm ownership" and one recognized by the Supreme Court in *Heller, id.* at 11. And he maintains further that the Second Amendment also protects military use, Surreply at 2, and that machine guns have "self-defense value." *Id.* at 3. He urges that we distinguish between machine guns and "destructive devices" (such as "anti-personnel mines, rocket-propelled grenades ... [and] surface-to-air missiles.") *Id.*

Thus, he contends, we should not apply the *Marzzarella* two-step test because 18 U.S.C. § 922(*o* )'s prohibition on machine guns manufactured after 1986 "amounts to a categorical ban similar to those struck down in *Heller* and *McDonald.*" Br. in Opp. at 10.

Nonetheless, were we to apply the *Marzzarella* test, Watson next contends, we should still find Section 922(*o* ) unconstitutional. Watson argues that we should adopt traditional means-end scrutiny from First Amendment analysis to find that Section 922(*o* ) is a content-based prohibition that must be analyzed under strict scrutiny. *Id.* at 21, 22. He contends that the "dangerous and unusual" standard pertains only to the way in which a firearm is carried —that is, the common law crime of affray [8]—and not, as here, to the mere possession of a firearm, *id.* at 13, 14. Therefore, so his argument goes, *Heller's* prohibition against "dangerous and unusual" weapons is akin to a time, place, manner restriction under the First Amendment, not a categorical prohibition on the possession of certain weapons not covered under the Second Amendment. *Id.* at 17. Accordingly, Watson argues that we must evaluate the machine gun prohibition under "the appropriate form of means-end [ ] scrutiny, and not simply stop the test at the first step." *Id.*

8      Without the slightest citation to judicial authority, Watson cabins *Heller's* "dangerous and unusual weapons", 554 U.S. at 627, 128 S.Ct. 2783, to that common law crime.

Watson also contests the Government's argument that longstanding prohibitions on machine gun possession or purchase are "derived from historical regulations," *id.* at 17, 18. He contends that, for the most part, the state statutes on which the Government relies do not support a machine gun ban. *Id.* at 19.

Finally, Watson maintains that Section 922(*o* ) cannot survive the strict scrutiny requirement that a statute serve a "compelling governmental interest and be narrowly **\*565** drawn to achieve that end." *Id.* at 22 (internal citation and alterations omitted). Watson argues that the Government fails to detail how the machine gun ban advances its stated interest in "promoting public safety and combatting crime" and disputes that its regulations serve either end. *Id.* at 25. He also argues the prohibition is not narrowly tailored. *Id.* at 22, 23. He contends the facts show that machine guns are held by collectors and only rarely figure in violent crime, whereas constitutionally-protected handguns are at the root of "nearly 90% of all violent crimes involving firearms." *Id.* at 25, 26. Nor can Section 922(*o* ) survive under the more deferential intermediate scrutiny test he urges that we borrow from First Amendment jurisprudence. *Id.* at 24 (quoting *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). Ultimately, he asserts that the Government has presented no evidence of machine guns' dangers because (1) the Government fails to detail when machine gun thefts occurred, whether the weapons were recovered or to link them to crimes, and (2) its data on juveniles inmates confuses automatic with semi-automatic weapons. Surreply at 7.

### 3. *Applicable Law*

The Supreme Court reached *Heller's* holding that the District of Columbia's comprehensive ban on handguns violated the Second Amendment by parsing the Amendment's text, reviewing analogous state statutes and constitutions, and tracking the Amendment's historical understanding. *Heller,* 554 U.S. at 576–620, 128 S.Ct. 2783. "[T]he inherent right of self-defense has been central to the Second Amendment right," the Court concluded, *id.* at 628, 128 S.Ct. 2783, holding the Amendment protects at its core "the right of law-

abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635, 128 S.Ct. 2783.

Justice Scalia, writing for the majority, gave rough shape to the contours of the Second Amendment. "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626, 128 S.Ct. 2783. [9] Without undertaking "an exhaustive historical analysis ... of the full scope of the Second Amendment," *id.,* the Court carved out from its protections a nonexhaustive list of "presumptively lawful regulatory measures" governing certain classes of people and categories of weapons. *Id.* at 627 n. 26, 128 S.Ct. 2783.

9      As our Court of Appeals observed, "There is some dispute over whether the language from *Heller* limiting the scope of the Second Amendment is dicta." *Marzzarella,* 614 F.3d at 90 n. 5. Nonetheless, our Court adopted the Supreme Court's guidance on the Amendment's limitations, reasoning, "There is dicta and then there is dicta, and then there is Supreme Court dicta." *Id.* (internal citation omitted). We take our Court of Appeals's point.

[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Id.* at 626–27, 128 S.Ct. 2783 (internal citations omitted). Reaffirming *Miller,* which upheld an NFA ban on transporting short- **\*566** barreled shotguns, the Court described protected weapons as those with "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Id.* at 622, 128 S.Ct. 2783 (quoting *Miller,* 307 U.S. at 178, 59 S.Ct. 816). *Heller* reasoned that Second Amendment protection for weapons deemed "part of ordinary military equipment" under *Miller* must be read "in tandem with what comes after," that able-bodied men called for militia service would supply themselves with arms "in common use at the time," *id.* at 624, 128 S.Ct. 2783 (quoting *Miller,* 307 U.S. at 179, 59 S.Ct. 816).

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6010   Page 59 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

Without that limitation, Justice Scalia explained, *Miller* would define the Second Amendment's ambit to protect "only those weapons useful in warfare.... That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller* ) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* Thus, the Court limited the Second Amendment to only include those weapons "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, 128 S.Ct. 2783, dovetailed with the historical prohibition on "dangerous and unusual weapons." [10] *Id.* at 627, 128 S.Ct. 2783.

[10]    Citing G. Heumann, *Swords and Blades of the American Revolution* (1973), Justice Scalia noted that militias brought weapons "used in defense of person and home [which] were one and the same." *Heller, id.* at 624–25, 128 S.Ct. 2783.

Our Court of Appeals has several times considered the post-*Heller* scope of the Second Amendment and we rely on its guidance here.

In *Marzzarella,* a defendant indicted for possessing a handgun with an obliterated serial number challenged his Indictment as-applied under the Second Amendment. 614 F.3d at 88. Our Court of Appeals devised the two-part test to determine whether an individual's asserted right falls within the Amendment's ambit. As stated above,

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

614 F.3d at 89 (internal citation omitted). Our Court of Appeals held that by linking "presumptively lawful regulators" with restrictions on dangerous and unusual weapons, "the [Supreme] Court intended to treat them equivalently—as exceptions to the Second Amendment guarantee." *Id.* at 91. Countering the argument that any weapon possessed in the home for self-defense was protected

under all circumstances, our Court of Appeals explained that "the Supreme Court has made clear the Second Amendment does not protect" possession of machine guns in the home. *Id.* at 94 (citing *Miller,* 307 U.S. at 178, 59 S.Ct. 816, and *United States v. Fincher,* 538 F.3d 868, 874 (8th Cir.2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied,* 555 U.S. 1174, 129 S.Ct. 1369, 173 L.Ed.2d 591 (2009)). A weapon is dangerous and unusual in part "because of its heightened capability to cause damage." *Marzzarella,* 614 F.3d at 95 (internal citations omitted).

In *Barton,* our Court of Appeals rejected the defendant's facial and as-applied Second Amendment challenge to the federal statute prohibiting firearm possession **\*567** by a felon. "The Supreme Court has twice stated that felon gun dispossession statutes are 'presumptively lawful,' " our Court of Appeals reasoned. 633 F.3d at 172 (citing *Heller,* 554 U.S. at 627 n. 26, 128 S.Ct. 2783 and *McDonald,* 561 U.S. at 786, 130 S.Ct. 3020). Because *Heller* created a presumption that the prohibition lawfully placed the felon's conduct outside the scope of the Second Amendment's coverage, the Court held that the defendant's "facial challenge must fail." *Id. Barton* also considered whether the defendant could rebut that presumption by "present[ing] facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." *Id.* at 174. Our Court of Appeals held that Barton failed to do so. *Id.; cf. Britt v. State,* 363 N.C. 546, 681 S.E.2d 320 (2009) (past conviction for minor non-violent crime no bar to firearm possession under North Carolina Constitution).

Finally, our Court of Appeals held constitutional a New Jersey law requiring individuals wanting a permit to carry handguns in public to show a "justifiable need to carry a handgun." *Drake,* 724 F.3d at 428 (*quoting* New Jersey's Handgun Permit Law, N.J.S.A. § 2C:58–4(c)). There, our Court of Appeals held the "justifiable need" requirement qualified as a "presumptively lawful," "longstanding" regulation because it had been in effect in some form for nearly ninety years and therefore "d[id] not burden conduct within the scope of the Second Amendment." *Id.* at 429, 432. As a result, the majority reached only the first prong of *Marzzarella's* two-step test. Nonetheless, "because of the important constitutional issues presented" by a handgun regulation that might burden conduct deemed within the Amendment's scope, our Court of Appeals "believe[d] it to be beneficial and appropriate

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6011   Page 60 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

to consider whether the 'justifiable need' standard" would withstand the applicable level of scrutiny, which it deemed to be intermediate. *Id.* at 430. [11] "If the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of the Amendment." *Id.* at 436 (internal citation omitted). Our Court of Appeals held the State of New Jersey successfully met all three prongs of intermediate scrutiny. *Id.* at 436, 440 ("[U]nder intermediate scrutiny the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary.").

[11]   Our Court of Appeals observed that *Heller* "makes clear that we may not apply rational basis review to a law that burdens protected Second Amendment conduct." *Drake,* 724 F.3d at 436. At the other end of the spectrum, the Court considered that strict scrutiny offered an inappropriate scope of review when a regulation did not burden the core right of handgun possession for self-defense in the home. *Id.* (internal citation and quotation marks omitted).

Reading our Court of Appeals's decisions together, we hold that Watson's Second Amendment challenge fails both facially and as-applied. The ban on machine guns outside the purely military context, like the felon dispossession statutes, is "presumptively lawful," as *Heller* held and as our Court of Appeals made pellucid in *Marzzarella.* We agree with the Government that there is *no* support in *Heller* for Watson's argument that the machine gun ban is an unconstitutional categorical prohibition because the weapon's military use "is a lawful purpose of firearm ownership." Br. in Opp. at 11. Whatever line divides machine guns from other destructive devices (such as anti-personnel mines, rocket-propelled grenades, and the **\*568** like) is not of Second Amendment consequence. Rather, we return to Justice Scalia's distinction between arms "in common use" under Second Amendment protection and "those weapons useful in warfare"—including machine guns—which fall outside the Amendment's protection. *Heller,* 554 U.S. at 624, 128 S.Ct. 2783. Neither Section 922(*o* ) nor the NFA burden conduct covered under the Second Amendment's guarantee. Because the Second Amendment does not protect machine gun possession, Watson's facial challenge to Section 922(*o* ) and the NFA must fail.

Because Watson offers no facts to distinguish *why* this presumptively lawful measure should not apply to him

and his machine gun and Watson fails to distinguish his circumstances from conduct falling outside Second Amendment protection, his as-applied challenge must also fail.

Our inquiry ends at step one of the *Marzzarella* analysis and so we will grant the Government's motion as to Watson's Second Amendment claim. The difference between Watson's case and our Court of Appeals's reasoning in *Drake* confirms this reasoning. Here, as there, the existence of a long-established "presumptively lawful" statute confines our inquiry at *Marzzarella's* step one. But there, our Court of Appeals deemed means-end scrutiny an appropriate alternative because the extent of Second Amendment protection over a legitimate class of firearms (handguns) carried outside the home has as yet not been fully defined. By contrast, the class of firearms at issue here is presumptively unlawful, whether carried inside or outside the home. We find unpersuasive Watson's arguments that the post–1986 ban is not longstanding enough within the meaning of *Heller* when our Court of Appeals held that the Supreme Court made clear seventy-six years ago that the Second Amendment does not protect possession of machine guns in the home. Watson's contention that *Heller* limits "dangerous and unusual" weapons only to a threatening manner of carrying them ("affray") finds no support under *Heller* and, in any case, cannot overcome *Heller's* clear language placing machine guns among the "dangerous and unusual" firearms outside the Second Amendment's scope. We therefore need not reach beyond step one of *Marzzarella* to engage in means-end analysis in order to find Watson's machine gun lies well outside the scope of the Second Amendment's coverage.

Our conclusion is fortified by the reasoning of other Courts of Appeals that have considered the machine gun ban. In *Fincher,* the defendant contested his conviction for machine gun and shotgun possession by arguing that he had the right to possess the weapons under the Second Amendment "because his possession had some reasonable relationship to the maintenance of a well regulated militia." 538 F.3d at 870. The Eighth Circuit disagreed. Applying the recent *Heller* decision, the Court held:

> Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual

weapons that the government can prohibit for individual use.

*Id.* at 874.

Similarly, in *United States v. Henry,* 688 F.3d 637 (9th Cir.2012), a defendant appealed his conviction for illegal possession of a homemade machine gun under Section 922(*o* )—one of the provisions Watson contests. The Ninth Circuit observed that "*Heller* did not specify the types of weapons that qualify as 'dangerous and unusual,' but that Court held that it would be 'startling' for the Second Amendment to protect machine guns." *Henry,* 688 F.3d at 640. Reviewing the roots of the machine **\*569** gun in World War I combat, the capacity of modern machine guns to fire more than 1,000 rounds per minute, and the fact that private possession has been banned since 1986, the Ninth Circuit "agreed with the reasoning of [its] sister circuits that machine guns are 'dangerous and unusual weapons' " outside the Second Amendment's protection. *Id.* (citing cases).

We will therefore grant the Government's motion to dismiss as to Watson's Second Amendment claim.

### E. *Watson's Commerce Clause Challenge*

We turn next to Watson's argument that, because machine guns have no substantial effect on interstate commerce, Congress lacked constitutional power to enact Section 922(*o* ) and its accompanying regulations. Compl. at ¶ 60.

The Government argues that the Supreme Court, our Court of Appeals and other Courts of Appeal that have considered the issue have repeatedly held that this prohibition falls within the "purely intrastate activities" that affect interstate commerce and are therefore within Congress's power to regulate. MTD at 27 (citing *United States v. Rybar,* 103 F.3d 273 (3d Cir.1996) (affirming conviction for machine-gun possession against Commerce Clause challenge)). Most recently, the Supreme Court held that Congress may regulate "purely local activities" that are part of a "class of activities" that have a substantial effect on interstate commerce. *Id.* (citing *Gonzales v. Raich,* 545 U.S. 1, 17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (internal citation and quotation marks omitted)). Any such regulation need meet only a rational basis test. *Id.* at 28 (quoting *Raich,* 545 U.S. at 22, 125 S.Ct. 2195). The Government points us to several Court of Appeals decisions applying *Raich* to uphold federal firearms laws. *Id. See United*

*States v. Stewart,* 451 F.3d 1071 (9th Cir.2006); *see also Montana Shooting Sports Ass'n v. Holder,* 727 F.3d 975 (9th Cir.2013); *accord United States v. Rene E.,* 583 F.3d 8 (1st Cir.2009), *United States v. Rose,* 522 F.3d 710 (6th Cir.2008).

Watson responds in opposition that *Raich* rests on Congress's rational basis for regulating intrastate manufacture and possession of marijuana as part of its larger regulatory goal to prohibit the interstate drug trade as enacted in the Controlled Substances Act ("CSA"). Br. in Opp. at 27. In contrast, he contends that "*Heller* declared beyond a doubt that Congress cannot outright prohibit firearms." *Id.* He contests the Government's assertion that Section 922(*o* ) is part of a larger regulatory scheme to keep firearms out of the hands of those not legally entitled to possess them because Congress has made no such findings and the Government's briefs fail to show how machine gun possession by law-abiding citizens undermines Congressional efforts with respect to proscribed persons. *Id.* at 28. He also asserts that Congressional findings before the 1986 ban fail to include any facts bearing on interstate commerce—except for the then-ATF Director's statement that "machine guns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." *Id.* at 29 (quoting *Armor Piercing Ammunition and the Criminal Misuse and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related Bills Before the Subcomm. On Crime of the House Com. on the Judiciary,* 98th Cong. 208 (1986)).

Watson treads a path others have taken before and reached the same end: There is no doubt, under our Court of Appeals's twenty year-old *Rybar* decision and the Supreme Court's *Raich* decision since, that Congress acted well within its Commerce **\*570** Clause powers when prohibiting machine gun manufacture and possession.

In *Rybar,* a machine gun dealer sought to challenge Section 922(*o* ) in the wake of *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which limited Congress's Commerce Clause power. Our Court of Appeals applied a two-part test, determining first that "Congress could rationally conclude that the regulated activity substantially affects interstate commerce," and, next, that Congress's means are "reasonably adapted to the end permitted by the Constitution." *Rybar,* 103 F.3d at 278. Surveying the extensive history of Congressional firearm regulation from the NFA in 1934, to the 1968 enactment of the Omnibus Crime Control and Safe Streets Act incorporating the Federal Firearms Act, to the GCA later that year—statutes Watson

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6013   Page 62 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

also challenges—our Court of Appeals observed of the 1986 legislative focus on machine guns that

> [b]y the time Congress passed the [Act] of which § 922(*o* ) is a part[,] it had already passed three firearm statutes under its commerce power based on its explicit connection of the interstate flow of firearms to the increasing serious violent crime in this country, which Congress saw as creating a problem of national concern.

*Id.* at 281 (internal quotation marks omitted). Against that legislative backdrop, our Court of Appeals found no obligation that Congress must make specific findings linking machine guns to interstate commerce because Congress could have reasonably concluded that a general ban would meaningfully impact interstate commerce. Contrary to Watson's argument that Congress may not ban machine guns because it failed to make specific findings identifying indicia of interstate commerce, our Court of Appeals concluded that "Congress' intent to regulate possession and transfer of machine guns as a means of stemming interstate gun trafficking is manifest." *Id.* at 282.

Rejecting the appellant's view, which Watson also advances, that the non-commercial intrastate manufacture of machine guns would not undercut Congress's goal, our Court of Appeals also observed, "Supreme Court cases have long sustained the authority of Congress to regulate singular instances of intrastate activity when the cumulative effect of a collection of such events might ultimately have substantial effect on interstate commerce." *Id.* at 283. [12] Our Court of Appeals thereby joined five other Circuits in rejecting the Commerce Clause challenge to Section 922(*o* ).

[12]   *Accord United States v. Kenney,* 91 F.3d 884 (7th Cir.1996). *See also United States v. Beuckelaere,* 91 F.3d 781 (6th Cir.1996); *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996); *United States v. Kirk,* 70 F.3d 791 (5th Cir.1995); and *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995), sustaining Section 922(*o* ) as a proper exercise of Congress' commerce power.

The prohibition upheld in *Raich* only reinforces that holding. In that case, the Supreme Court held that under the Commerce Clause Congress may criminalize the production and consumption of home-grown marijuana under the Controlled Substances Act even when states approve it for medicinal use. The Supreme Court identified three broad areas where Congress may regulate under its expansive Commerce Clause power.

> First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities  **\*571**  that substantially affect interstate commerce.

*Raich,* 545 U.S. at 16–17, 125 S.Ct. 2195 (internal citation omitted). Applying the third prong, the Supreme Court held that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18, 125 S.Ct. 2195 (citing *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). *Raich* reaffirmed that "the absence of particularized findings does not call into question Congress' authority to legislate." *Id.* at 21, 125 S.Ct. 2195. More to the point here, the Supreme Court rejected any argument that Congress lacks power to prohibit commerce in a particular commodity, which is important in view of Watson's claim that "*Heller* declared beyond a doubt that Congress cannot outright prohibit firearms." Br. in Opp. at 27. To the contrary, "[i]t has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity." *Raich* at 19 n. 29, 125 S.Ct. 2195 (citing *Lopez,* 514 U.S. at 571, 115 S.Ct. 1624 (Kennedy, J., concurring)). *Heller* does not change that.

Although our Court of Appeals has not revisited *Rybar* in light of *Raich,* other Courts of Appeals have concluded that *Raich* upholds Congress's power to ban machine guns. The Ninth Circuit sustained Section 922(*o* ) against a Commerce Clause challenge concluding that "Congress had a rational basis for concluding that in the aggregate, possession of homemade machineguns could substantially affect interstate commerce

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6014   Page 63 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

in machineguns because [they] ... can enter the interstate market and affect supply and demand." *Henry,* 688 F.3d at 641 (quoting *Stewart,* 451 F.3d at 1078) (internal quotation marks omitted). "Every other circuit that has reached the issue has similarly held that § 922(*o* ) is constitutional under the Commerce Clause." *Id.* (citing cases).

In light of the well-established holdings by our Court of Appeals and other circuits that Congress did *not* exceed its Commerce Clause power when it prohibited machine gun manufacture and possession, both Watson's facial and as-applied challenges to the NFA and Section 922(*o* ) must fail. We therefore grant the Government's motion to dismiss as to this Count.

### F. *Watson's Due Process Challenge*

We consider next Watson's claim that the BATFE violated his Due Process rights by revoking the issued tax stamp and approval of ATF Form 1 and then requiring him to surrender the machine gun.

The Due Process Clause of the Fifth Amendment states no one shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Procedural due process inquiries proceed in two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (internal citations omitted). As the Supreme Court has long held, "Property interests ... are not created by the Constitution. Rather they are created ... by existing rules or understandings that stem from an independent source." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Abbott v. Latshaw,* 164 F.3d 141, 146 (3d Cir.1998) ("[P]rocedural due process is implicated only where someone has claimed that there has been a **\*572** taking or deprivation of a legally protected liberty or property interest.")

The Government argues that there is no need for us to go beyond the first step because Watson had no property interest in his illegal machine gun that he "manufactured after ATF's erroneous approval of [his] ATF Form 1." MTD at 30. The ministerial error that led to that approval, the Government maintains, does not create a property interest. *Id.* The Government contends that the GCA's prohibition on machine guns not lawfully possessed or registered before 1986 is fatal to Watson's claim because a protected property interest requires a "legitimate claim of entitlement." *Id.* at 31 (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. 2701). "[B]ecause a machine gun constitutes obvious contraband under Federal law, [Watson] cannot seriously argue that he had a protected property interest in the weapon he manufactured." *Id.* (internal citations and quotation marks omitted). Nor does Watson's machine gun bear any property interest commonly associated with property, as federal firearms laws prohibit Watson from selling, assigning, or transferring his machine gun. *Id.* at 33.

By the same token, the Government argues, Watson cannot establish a protected property interest in an erroneously approved application. *Id.* The Government concedes that issuance of an administrative approval can create a protected property interest, but only when the "continued possession" of that approval "become[s] essential in the pursuit of a livelihood." *Id.* at 33 (quoting *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)). But Watson does not here allege he intended his machine gun making to constitute any "livelihood." *Id.* The Government contends that because Section 922(*o* ) prohibits possession of machine guns, only governmental entities' applications may be approved pursuant to the NFA, 26 U.S.C. § 5861(f). *Id.* at 32.

Finally, the Government states that (1) counter to Watson's allegation that the ATF lacks the authority to revoke authorization, that Agency may, of its own initiative, undo what has been improvidently done, *id.* at 32 n. 20, and (2) even if Watson had a cognizable property interest, his post-deprivation remedy was not "constitutionally inadequate" because the ATF reversed its approval quickly, thereby preventing the mistaken manufacture of an additional weapon and giving Watson the chance to reapply if he believed the decision to be in error. *Id.* at 34 n. 21.

Watson responds in opposition that the Government overlooks the fact that the Trust, also a party to this action, received approval to make the machine gun. Br. in Opp. at 30. He argues that the Trust "is not subject to the provisions of [Section] 922(*o* ) under the plain language of the law," and is thus "permitted to manufacture or possess a machine gun manufactured after 1986, so long as the Trust complies with the provisions of the NFA." *Id.* at 31. Watson maintains that the Trust has a "legitimate claim of entitlement" to the machine gun and the Government had no legal basis on which to deny the Form 1 once approved. *Id.* He also argues that

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6015   Page 64 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

his ability to "possess and use the machine gun and exclude others from its use" without the Government's intervention creates a protectable property interest in both the firearm and the approved Form 1. *Id.* at 32.

Watson also scoffs at the idea that the Government provided any post-deprivation remedy. *Id.* He contends that he has adequately pled a Fifth Amendment claim for relief because the Trust had a property interest in the confiscated firearm and the Form 1. *Id.* at 32, 33.

**\*573** In reply, the Government argues that the plaintiff's Trustee status is beside the point because Watson's constitutional claims rest on the statutory text of Section 922(*o* ) and his pleadings do not identify anyone who was treated differently. Reply at 9. Watson's "attempt[ ] to construe the NFA's definition of 'person' to place the trustees of unincorporated trusts beyond the scope of firearms regulations" is an "idiosyncratic interpretation" that cannot prevail when machine guns are "obvious contraband." *Id.* at 10. As the ATF explained in its letter to Watson, attached to his Complaint, "transfer of an NFA firearm to a trustee ... is made to this person as an individual (i.e. not as a trust)." *Id.; see also* Compl. at Ex. A. The Government contends the Agency's authoritative interpretation governs because it is consistent both with the Restatement (3d) of Trusts § 2 (2003)—which states that a Trust is not a legal person capable of owning property—and with "Congress's intent to prohibit the post–1986 manufacture of machine guns" except as specifically permitted. *Id.* at 10.

We address first Watson's contention that the Trust's exclusion from Section 922(*o* )'s definition of a "person" must limit that statute's reach. It is well-established that a trust is *not* a legal "person" but rather a legal term for a *relationship* having certain characteristics. *See* 1 Restatement (Third), Trusts § 2 (2003); *see also* G. Bogert & A. Hess, 1 Trusts and Trustees (3d ed.2007) § 1. A Trust "is not an entity distinct from its trustees and capable of legal action on its own behalf" but merely represents "a fiduciary relationship with respect to property." 76 Am.Jur.2d Trusts § 3 (2015). It cannot contract or own property. *Id.* Watson's contention that the Trust acted to file the Form 1 and has possession of the machine gun is neither legal fact nor legal fiction, but legal nullity. Thus, we disregard Watson's argument that the Trust had any property interest in either the Form 1 or the machine gun. It did not because it could not.

As to Watson himself, we agree with the Government that Watson has no legally protected interest in either the Form 1 or the machine gun. As the Supreme Court explained in *Roth,* to have a protected property interest, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. 2701. But no legitimate entitlement can arise when possession of the property at issue is expressly forbidden. Despite Watson's assertion of certain property rights, such as his ability to use the machine gun and exclude others from using it, the most basic right—to possess the machine gun—remains illegal.

Likewise, Watson has no legitimate claim of entitlement to his Form 1. The Supreme Court in *Burson* considered a Georgia law under which an uninsured motorist's driver's license would be suspended unless he could post security for the amount of damages claimed by another party to the accident. The pre-suspension procedures excluded considerations of fault or responsibility, yet "[o]nce licenses are issued, ... their continued possession may become essential in the pursuit of a livelihood." 402 U.S. at 539, 91 S.Ct. 1586. The Court held that

> Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

*Id.* We agree with the Government that Watson has no entitlement to procedural due process on the revocation of the Form **\*574** 1. Contrary to *Burson,* where pre-deprivation due process is needed to protect a legitimate interest, Watson has *no* legitimate "important interests" in the Form 1. While the Supreme Court held that procedural due process was needed to safeguard an important, perhaps essential, right, Watson cannot claim his alleged entitlement to the Form 1 constitutes such a right when only governmental entities' applications for machine guns may be approved pursuant to the NFA. That the agency charged with administering the firearms statutes erred in approving the Form 1 is of no moment because the GCA and NFA expressly prohibit making or possessing such a firearm in all instances save in

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6016   Page 65 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

an approved official capacity. *See* 18 U.S.C. § 922(*o* )(2)(A) and (B); *see also* 26 U.S.C. § 5822(e) ("Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law."). Watson manifestly also did not rely on the Form 1 for his livelihood.

Because Watson has no cognizable interest in either the Form 1 or the machine gun, we conclude the procedural due process inquiry at the first step and so need not examine whether the procedures before or after the deprivation were constitutionally sufficient.

We will therefore grant the Government's motion to dismiss Watson's Due Process claim.

### G. Watson's Equal Protection and Detrimental Reliance Claims

Lastly, we consider Watson's Equal Protection and detrimental reliance claims.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held this protection is encompassed in the Fifth Amendment's Due Process Clause and therefore applies to the federal government. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

The Government contends, first, that Watson's claim upon "information and belief" that the ATF "approved the manufacture and transfer of post–1986 machine guns to various individuals"—which he characterized as a denial of equal protection—fails to meet the pleading standards *Iqbal* and *Twombly* impose because it does not include "factual content that allows the court to draw the reasonable inference that [the Government] is liable for the misconduct alleged." MTD at 35 (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937). The Government next contends that we draw upon our "judicial experience and common sense," *id.* (quoting *Iqbal,* 556 U.S. at 678–79, 129 S.Ct. 1937), to hold that Watson has not begun to make a legitimate equal protection claim by not alleging that any distinction between him and those allegedly permitted to make machine guns rests on his membership in a suspect class. *Id.* "Absent such an allegation," we must evaluate an equal protection claim under rational basis scrutiny. *Id.* (citing *Mabey Bridge & Shore, Inc. v. Schoch,* 666 F.3d 862, 876 (3d Cir.2012)). The Government argues that it may permissibly distinguish between Watson and other applicants "unless the varying treatment of different

groups or persons is so unrelated to the achievement of any combination of legitimate purposes" that the Government's actions must be irrational. *Id.* (quoting *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)).

As to Watson's claim that the ATF should be estopped from revoking its approval of his Form 1—which the Government characterizes as equitable estoppel or detrimental reliance—it contends that no such claim can "lie against private litigants." *Id.* at 36 (quoting *Office of Pers. Mgmt. (OPM) v. Richmond,* 496 U.S. 414, 419, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990)). Obedience to the rule of law would be undermined if the Government were unable to enforce a law because its agents' action gave rise to an estoppel. *Id. See also Heckler v. Cmty. Health Servs.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

An estoppel claim requires a plaintiff to "prove (1) misrepresentation by the other party, (2) on which he reasonably relied, (3) to his detriment." MTD at 37; *see also United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987). In claims against the Government, a plaintiff must also prove "affirmative misconduct." *Id.* (citing *Asmar,* 827 F.2d at 912). The Government contends that Watson can at best show the ATF examiner who approved the application acted in error, under a mistaken belief Watson presented valid grounds to modify the machine gun—a mistake that falls well short of affirmative misconduct. *Id.* It also claims "it is questionable whether" Watson can show *any* legitimate reliance. *Id.* at 37 n. 22. [13]

[13]    The Government also cites *F.J. Vollmer Co. v. Higgins,* 23 F.3d 448 (D.C.Cir.1994), where the D.C. Circuit rejected a machine gun maker's detrimental reliance contention that he erroneously relied on an ATF letter advising him that he could legally modify a gun to make it into a machine gun. *Id.* at 37. The Court held the letter's "general statements" did not represent "the sort of affirmative misconduct required to estop the government from enforcing its laws." *Higgins,* 23 F.3d at 450 (quoted in MTD at 38).

Watson responds in opposition that the proper standard for evaluating his Equal Protection claim is strict scrutiny, not rational basis, because the right to keep and bear arms is a fundamental right. Br. in Opp. at 33 (citing *McDonald,* 561 U.S. at 778, 130 S.Ct. 3020). Therefore, he argues, the Government must show that it had a compelling interest to treat him differently than those who he alleges were approved.

AR005548

Case 2:19-cv-00037-JNP   Document 59-42   Filed 11/30/22   PageID.6017   Page 66 of 95

U.S. v. One Palmetto State Armory PA-15 Machinegun..., 115 F.Supp.3d 544...

*Id.* He contends he has met the *Iqbal/Twombly* pleading standard and should therefore survive the Government's motions to dismiss and for summary judgment. *Id.*

As to his detrimental reliance claim, Watson rejects the Government's description of the Form 1 approval as "mistake" or "error," because (1) his second Form 1 had been approved then disapproved and (2) a plaintiff in another matter also received approval. *Id.* at 35. "Quite clearly, [the Government] had [an imagined] concerted plan ... to approve Form 1 applications" such as his "which were submitted by trusts ... and later changed course." *Id.* He argues that the Agency's claimed approvals, which put the Government in violation of federal law and its own regulations, constitutes the requisite "affirmative misconduct." *Id.* at 35, 36. [14] He contends that granting him relief would not undermine the rule of law because the Government has explicit authority to register even an unlawfully possessed machine gun. *Id.* at 37 (citing 27 C.F.R. § 479.101(b)).

14    Watson argues *Higgins* is readily distinguishable because unlike Higgins's reliance on his own interpretation of the ATF's statements in a letter, Watson relied on official approval. Br. in Opp. at 36.

In reply, the Government states that its established interpretation of regulations prohibiting private possession of machine guns precludes Watson's detrimental reliance claim. Reply at 11. [15]

15    The Government also draws our attention to Exhibit A of Watson's Complaint (a March 17, 2014 letter to another entity, not a party to this litigation, which sets forth the Government's interpretation of "person" to exclude unincorporated trusts) and Watson's submission of his second Form 1 on June 24, 2014—more than three months later—which received the erroneous Agency approval on August 5, 2014. Reply at 11 (citing Compl. at ¶ 38, 39).

**\*576** We will not tarry over the Government's argument that Watson's Equal Protection's claim falls short of pleading standards by relying upon "information and belief." "[A]llegations in this form have been held to be permissible, even after the *Twombly* and *Iqbal* decisions." 5 Wright, Miller & Kane, *Federal Practice & Procedure* § 1224 (3d ed.2015). This form of pleading finds its parallel in Rule 8(b)'s provision that a responding party may state he is "without knowledge or information" concerning the truth of an averment. *Id.; see also* Fed.R.Civ.P. 8(b)(5). [16]

16    "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." 5 Wright, Miller & Kane, *Federal Practice & Procedure* § 1224 (3d ed.2015). It bears mention that certain fraud allegations that have a heightened pleading standard may not be pled on information and belief. *See United States ex rel. Knisely v. Cintas Corp., Inc.,* 298 F.R.D. 229, 241 (E.D.Pa.2014) (Dalzell, J.)

As to the substance of Watson's Equal Protection claim, he alleges, without bothering to elaborate or identify anyone, that others received permission to make or possess machine guns. Compl. at ¶ 76. To prevail, Watson must show that any classification at issue "proceeds along suspect lines" or "infringes fundamental constitutional rights." *FCC v. Beach Commc'ns,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Watson argues that permitting [unnamed] others to possess post–1986 machine guns infringes on his fundamental constitutional right to bear arms. As we have already disposed of that constitutional claim, we hold it cannot support Watson's Equal Protection claim. He does not and cannot allege that any distinction rested on a suspect class. Thus, the Government may treat others more favorably than Watson "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *Mabey Bridge,* 666 F.3d at 876. We agree with the Government that Watson has not explained *who* has been treated more favorably.

Finally, we consider Watson's detrimental reliance claim. As stated above, he must show (1) the Government's misrepresentation, (2) on which he reasonably relied, (3) to his detriment, and the Government's "affirmative misconduct" caused him cognizable legal harm. *Mudric v. Attorney General of the United States,* 469 F.3d 94, 99 (3d Cir.2006).

We agree that Watson cannot make out a detrimental reliance claim because he cannot show that his reliance on the approval of his Form 1 was to his detriment. To begin with, "[w]hen a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position." *Heckler,* 467 U.S. at 62, 104 S.Ct. 2218. But here, as in *Heckler* (where a health care provider challenged the attempted recoupment of Medicare overpayments), Watson "lost no rights," *id.,* because, as

AR005549

shown at length above, Watson has *no* right to make or own a machine gun. He "cannot raise an estoppel" claim without showing he is "significantly worse off" than he would have been if he had never received the BATFE approval. *Id.* at 63, 104 S.Ct. 2218. And we agree with the Government that the erroneous approval does not rise to the level of "affirmative misconduct." Our Court of Appeals has held that "affirmative misconduct" requires something far more than mere negligence. *Mudric,* 469 F.3d at 99. *See also Schweiker v.* **\*577** *Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) ("Lower federal courts have ... consistently refus[ed] to estop the Government where an eligible applicant has lost Social Security benefits because of possibly erroneous replies to oral inquiries.") (citing cases).

We will therefore grant the Government's motion to dismiss Watson's Equal Protection and detrimental reliance claims.

## V. Conclusion

For the reasons articulated above, we hold that Watson has standing to bring his constitutional challenges to the NFA and GCA. But we will nevertheless grant the Government's motion to dismiss his complaint because (1) the Second Amendment does not protect the manufacture and possession of machine guns, and (2) Congress acted well within its established Article I Commerce Clause power to enact the machine gun bans, as we hold above. Additionally, Watson's Due Process claim must also be dismissed because he cannot show that he had a legitimate claim of entitlement in either the machine gun or an approved application. Finally, we also grant the Government's motion to dismiss Watson's Equal Protection and detrimental reliance claims.

An appropriate Order follows.

*ORDER*

AND NOW, this 22nd day of July, 2015, upon consideration of defendants Loretta Lynch and Thomas E. Brandon's (collectively, "the Government") motion to dismiss, or in the alternative, motion for summary judgment (docket entry # 10) and plaintiff Watson's response thereto, it is hereby ORDERED that:

1. Defendants' motion for leave to file a reply is GRANTED;

2. Plaintiff's motion for leave to file a surreply is GRANTED;

3. Defendants' motion to dismiss or, in the alternative, for summary judgment is GRANTED IN PART and DENIED IN PART;

4. Defendants' motion to dismiss Watson's Second Amendment and Commerce Clause claims for lack of subject matter jurisdiction is DENIED;

5. Defendants' motion to dismiss Watson's complaint pursuant to 12(b)(6) is GRANTED; and

6. By noon on August 10, 2015, the parties shall FILE any motions, not to exceed ten pages, in the forfeiture action concerning the disposition of the Palmetto State Armory PA–15 machine gun receiver/frame.

**All Citations**

115 F.Supp.3d 544

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

906 F.3d 1170
United States Court of Appeals, Tenth Circuit.

UNITED STATES of America, Plaintiff - Appellee,
v.
Shane COX, Defendant - Appellant.
State of Kansas, Intervenor - Appellant.
United States of America, Plaintiff - Appellee,
v.
Jeremy Kettler, Defendant - Appellant.
State of Kansas, Intervenor - Appellant.

No. 17-3034, No. 17-3035
|
FILED October 16, 2018

**Synopsis**
**Background:** Defendant charged with unlawful possession of unregistered firearm, conspiracy, unlawful transfer of unregistered firearm, unlawfully making firearm in violation of National Firearms Act (NFA), and unlawfully engaging in business as dealer and manufacturer of firearms, and another defendant charged with unlawful possession of unregistered firearm and related offenses, filed motions to dismiss indictment, which were denied by the United States District Court for the District of Kansas, J. Thomas Marten, J., 187 F.Supp.3d 1282 and 235 F.Supp.3d 1221. Defendants were subsequently convicted of majority of offenses charged, and they appealed.

**Holdings:** The Court of Appeals, Phillips, Circuit Judge, held that:

National Firearms Act (NFA) is valid exercise of Congress' taxing power, as well as of its authority to enact any laws "necessary and proper" to carry out that power;

short-barreled rifles fall outside the Second Amendment's guarantee of the right to keep and carry arms;

silencer is firearm accessory, and not a weapon in itself, and is not a "bearable arm" protected by the Second Amendment;

National Firearm Act (NFA) taxes on the possession, transfer, and manufacture of items, short-barreled rifles and silencers, that were outside the scope of Second Amendment protection

did not constitute charges for the enjoyment of a right granted by the federal constitution;

defendants' alleged reliance on Kansas statute that purported to exempt any personal firearm, firearm accessory, or ammunition manufactured, owned, and remaining within Kansas borders from "any federal law" was no defense to federal charges;

Kansas legislature's enactment of the Second Amendment Protection Act (SAPA) would not support entrapment-by-estoppel defense; and

the Court of Appeals did not have authority to order the executive branch to grant criminal defendant clemency.

Affirmed.

**\*1174** Appeal from the United States District Court for the District of Kansas (D.C. No. 6:15-CR-10150-JTM)

**Attorneys and Law Firms**

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Topeka, Kansas, for Defendant–Appellant Shane Cox.

Joseph W. Miller of Law Offices of Joseph Miller, LLC, Fairbanks, Alaska (Robert J. Olson, William J. Olson, Jeremiah L. Morgan, Herbert W. Titus of William J. Olson, P.C., Vienna, Virginia, with him on the briefs) for Defendant–Appellant Jeremy Kettler.

Derek Schmidt, Attorney General of Kansas, Jeffrey A. Chanay, Chief Deputy Attorney General, Toby Crouse, Solicitor General of Kansas, Dwight R. Carswell and Bryan C. Clark, Assistant Solicitors General, Topeka, Kansas, for Intervenor–Appellant.

Elizabeth H. Danello, Attorney, Appellate Section, Criminal Division, Department of Justice, Washington, D.C. (Stephen R. McAllister, United States Attorney, District of Kansas, Jared S. Maag, Assistant United States Attorney, District of Kansas, Kenneth A. Blanco, Acting Assistant Attorney General, and Trevor N. McFadden, Deputy Assistant Attorney General, Department of Justice, Washington, D.C., with her on the brief) for Plaintiff–Appellee.

Before HARTZ, SEYMOUR, and PHILLIPS, Circuit Judges.

**Opinion**

PHILLIPS, Circuit Judge.

This is a tale of two laws: the National Firearms Act (NFA), 26 U.S.C. §§ 5801–5872, which requires the registration of statutorily defined firearms, and Kansas's Second Amendment Protection Act (SAPA), ch. 100, 2013 Kan. Sess. Laws vol. 1 500–03 (codified at Kan. Stat. Ann. §§ 50-1201 to -1211 (2014) ), which purports to exempt any personal firearm, firearm accessory, or ammunition manufactured, owned, and remaining within Kansas's borders from "any federal law, ... including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce." Kan. Stat. Ann. § 50-1204(a). In 2014, these two laws intersected when the government prosecuted two Kansas men, Shane Cox and Jeremy Kettler, for violating the NFA by manufacturing (in Kansas), transferring (in Kansas), and possessing (in Kansas) several unregistered firearms. A jury found them guilty of most (though not all) of the charges.

Now, Cox and Kettler appeal their convictions, though they don't dispute that their actions ran afoul of the NFA.[1] First, they challenge the NFA's constitutionality, **\*1175** alleging that the statute is an invalid exercise of congressional power and an invasion of the Second Amendment right to bear arms. Second, they challenge the district court's ruling that their reliance on the SAPA, which they understood to shield Kansas-made and -owned firearms from federal regulation, provided no defense to charges that they violated the NFA. Kettler further asks us to see his prosecution as the product of a dispute between Kansas and the federal government over the SAPA, a dispute that unjustly swept him up (along with Cox, though Cox hasn't joined this argument). We also granted Kansas's request to participate in these appeals as needed to defend the SAPA from a Supremacy Clause challenge.

[1]   Cox and Kettler each appealed individually (in cases nos. 17-3034 and 17-3035, respectively), but because their appeals raise overlapping issues, we granted the government leave to file a single response brief. We consider Cox's and Kettler's appeals companioned cases (though we never formally consolidated them), separately submitted to the same panel for oral argument and decision.

We reject Cox's and Kettler's challenges to their convictions (without addressing the SAPA's constitutionality). Exercising

jurisdiction under 28 U.S.C. § 1291, we therefore affirm the district court's judgments.

## BACKGROUND

In 2014, Shane Cox ran Tough Guys, an army-surplus store in Chanute, Kansas. Inside the store, near a glass display case filled with homemade silencers, Cox had posted a copy of the SAPA (which the Kansas legislature passed a year earlier) for his customers to read. *See* Kan. Stat. Ann. §§ 50-1201 to -1211. Drawing on the Second, Ninth, and Tenth Amendments to the U.S. Constitution, as well as the Kansas Constitution's bill of rights, the SAPA purports to protect from federal interference the availability of all firearms, firearm accessories (including silencers[2] ), and ammunition made, sold, and kept "within the borders of Kansas." Kan. Stat. Ann. §§ 50-1202, 50-1203(b), 50-1204(a), 50-1206 to -1208; *see also* Kan. Const. Bill of Rights § 4 (guaranteeing an individual right to bear arms).

[2]       The Kansas law uses the term "sound suppressors" instead of "silencers." *See, e.g.*, Kan. Stat. Ann. § 50-1203(b). Kettler, too, prefers "suppressor" to "the more colloquial term 'silencer,' " explaining that "while such a device will 'suppress' the noise of a gunshot to below a level that would cause hearing damage," it "come[s] nowhere close to 'silencing' the sound of a gunshot, as is depicted in television and movies." Kettler's Opening Br. at 10 n.5. But the NFA uses "silencer," as does Cox. 26 U.S.C. § 5845(a)(7); *see also, e.g.*, Cox's Opening Br. at 2. So for consistency's sake (and without expressing an opinion on either term's accuracy), we adopt "silencer" throughout this opinion.

The display caught the attention of Jeremy Kettler, an army veteran from neighboring Humboldt who'd walked into Tough Guys to look around. Cox was in the store, so Kettler asked him about the law and the silencers. Neither Cox nor Tough Guys held a federal firearms license, but Cox believed that as a result of the SAPA, he could avoid the "red tape" of federal firearms regulations as long as the silencers never left Kansas. Cox R. vol. 3 at 292:9–11. Kettler bought one of Cox's silencers and later praised it (and Tough Guys) in a Facebook post.

In December 2014, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) learned that Tough Guys was selling unregistered silencers and started an investigation. Within a year, federal prosecutors secured a grand jury indictment

against Cox and Kettler, charging them with thirteen crimes linked to Cox's firearms-manufacturing venture, Kettler's patronage of it, and the ensuing investigation. Count 1 alleged that Kettler had knowingly and willfully made false statements "[d]uring a [f]ederal [i]nvestigation," in violation of 18 U.S.C. § 1001. Cox R. **\*1176** vol. 1 at 28. Counts 2, 3, and 4 each charged Cox with possessing an unregistered firearm—a destructive device, a short-barreled rifle, and another destructive device,[3] respectively—in violation of 26 U.S.C. § 5861(d). Count 5 accused both Cox and Kettler of conspiring, under 18 U.S.C. § 371, to violate the NFA by building and selling an unregistered silencer. Counts 6, 7, 8, 9, and 11 charged Cox with five violations of 26 U.S.C. § 5861(e) for transferring five silencers—four to recipients identified by their initials plus a fifth to "an undercover law enforcement officer." Cox R. vol. 1 at 34. Count 10 accused Cox of making a silencer in violation of 26 U.S.C. § 5861(f). Count 12 alleged that between June 20, 2014, and February 4, 2015, Cox had "engaged in the business of manufacturing and dealing in" silencers in violation of 26 U.S.C. § 5861(a). Cox R. vol. 1 at 34. And count 13 charged Kettler with possessing a silencer in violation of 26 U.S.C. § 5861(d).

3 The NFA defines a destructive device as "any explosive, incendiary, or poison" gas, bomb, grenade, rocket, mine, or similar device, as well as "any combination of parts either designed or intended" to be converted into such a device. 26 U.S.C. § 5845(f). Prosecutors alleged that Cox had kept some "grenade husks," accelerant, and other components in his workshop. Cox R. vol. 3 at 221:14.

Cox and Kettler each pleaded not guilty and moved to dismiss the NFA-based charges,[4] claiming—for slightly different reasons—that the SAPA shielded them from criminal liability for running afoul of federal firearms regulations.[5] Cox argued that because of the SAPA, enforcing the NFA against him would exceed the federal government's constitutional authority and usurp "powers reserved to the States" in violation of the Tenth Amendment. Cox R. vol. 1 at 39. Kettler, in turn, asserted entrapment by estoppel. By enacting the SAPA, argued Kettler, the Kansas legislature had "specifically" told him that federal laws didn't apply to his Kansas-made and -owned suppressor, and his reasonable reliance on Kansas's promise rendered the federal prosecution unjust. *Id.* at 69.

4 Kettler didn't contest count 1, the false-statement charge.

5 Cox and Kettler also each moved "to join in any and all motions and memoranda" filed by the other. Cox R. vol.

1 at 62; Kettler R. vol. 1 at 65. The district court granted their motions.

The district court rejected both arguments in one written order. *See United States v. Cox* (*Cox I*), 187 F.Supp.3d 1282, 1285–88 (D. Kan. 2016). First it ruled, based on Supreme Court and circuit precedent, that the NFA was a valid exercise of Congress's taxing power. *Id.* at 1285–87. Next the court threw out Kettler's entrapment-by-estoppel defense, reasoning that because state officials lack the power to construe or enforce federal law, it wasn't reasonable for Kettler to rely on the Kansas legislature's representations about the reach of federal law. *Id.* at 1287–88. The court therefore denied the motions to dismiss the indictment. *Id.* at 1288.

A few months later, the government submitted a pre-trial motion asking the court to "find that any defense based on Kansas' enactment of the [SAPA] is not a valid legal defense." Cox R. vol. 1 at 106. And to keep the Kansas statute from confusing matters for the jury, the government sought "a prohibition on any mention" of the SAPA. *Id.* vol. 3 at 16:21–22. The court initially granted the government's request, but then tempered that ruling in response to Kettler's offer of proof, which convinced the court that "references to [the] SAPA [we]re interwoven with the evidence of the alleged offenses."[6] **\*1177** *Id.* vol. 1 at 194. The court maintained that the SAPA "provide[d] no defense" to the charged offenses, *id.* at 193, but it declined to "excise" the SAPA from the evidence and predicted that some mention of the law would be admissible to contextualize the charged offenses, *id.* at 194. And if (as the court assumed) the SAPA surfaced at trial, the court promised to instruct jurors on how to consider the law.

6 Kettler's proffer of SAPA-related evidence included: (1) that Cox handed out copies of the SAPA to customers, including Kettler, who bought silencers; (2) that Kettler knew about the SAPA and relied on it; (3) that an ATF agent who'd talked to Kettler on the phone learned that Kettler "was confused as to the investigation into Cox and his silencers because of the existence of the State law"; and (4) that Cox had informed Kettler of the SAPA when the two discussed silencers. Cox R. vol. 1 at 133.

The state of Kansas, meanwhile, moved to intervene. Federal law gives a state the right to intervene "[i]n any action, suit, or proceeding in a court of the United States ... wherein the constitutionality of any statute of that State affecting the public interest is drawn in question." 28 U.S.C. § 2403(b). So far in this case, the district court had neither ruled nor been

asked to rule on the SAPA's constitutionality. Yet considering the breadth of the words "drawn into question," the court decided to grant Kansas's motion to intervene. Cox R. vol. 1 at 197 (quoting 28 U.S.C. § 2403(b) ). Kansas couldn't present evidence or directly participate in the trial, but the court's order allowed the state "to be heard on any subsequent rulings that implicate[d] the constitutionality of [the] SAPA." *Id.*

The cases proceeded to a joint trial in November 2016. After Cox rested on the third day, and again after Kettler rested on the fourth, both moved for judgments of acquittal. The court ultimately dismissed the conspiracy charge against both defendants, having seen "no evidence ... of a conspiracy between Mr. Cox and Mr. Kettler," and the false-statement charge against Kettler. Cox R. vol. 3 at 565. Yet it found that the government had presented sufficient evidence to send the remaining counts to the jury.

The jury began deliberating on the fourth day, and it returned a verdict later the same day, finding Cox not guilty of the destructive-device-possession counts (2 and 4) but guilty of the remaining eight counts: unlawfully possessing a short-barreled rifle in count 3; unlawfully transferring silencers in counts 6, 7, 8, 9, and 11; unlawfully making a silencer in count 10; and unlawfully engaging in business as a dealer or manufacturer of silencers in count 12. The jury also found Kettler guilty of the remaining count against him, unlawfully possessing a silencer in count 13.

The day before the court submitted the case to the jury, Kettler (joined by Cox) filed a motion "to dismiss the present prosecution." Cox R. vol. 1 at 218. They argued that because the NFA provisions at issue—26 U.S.C. §§ 5861 and 5871, which lay out prohibitions and penalties—had "become merely regulatory punishment," the provisions exceeded Congress's power to tax and, in fact, usurped power that the Tenth Amendment reserved to the states. *Id.* at 220. The motion doesn't mention the Second Amendment, but after Kansas submitted a response defending the SAPA on Second Amendment grounds, Kettler filed a reply relying almost exclusively on that amendment and urging the court to find that the NFA unconstitutionally infringed the right to bear arms.

The district court addressed both arguments in a January 2017 written order. *United States v. Cox (Cox II )*, 235 F.Supp.3d 1221, 1222–23 (D. Kan. 2017). The court reiterated its conclusion, based on Supreme Court precedent, that the NFA is a valid exercise of Congress's taxing power. *Id.* at

1225; *accord Cox I*, 187 F.Supp.3d at 1285, 1287. And "if the NFA **\*1178** is otherwise consistent with the Constitution and constitutes a valid exercise of Congress's taxing power," the court reasoned, "then it does not run afoul of the Tenth Amendment." *Cox II*, 235 F.Supp.3d at 1225. Next, the court concluded that none of the NFA provisions that applied to Cox and Kettler infringed their Second Amendment rights. *Id.* at 1227–28. The court therefore denied the motion to dismiss. *Id.* at 1229.

The following month, the district court held a sentencing hearing. At that hearing, the court took into account Cox's and Kettler's reliance on the SAPA and gave them the benefit of that reliance. In lieu of prison time, the court sentenced Cox to two years' probation and Kettler to one year's.

Cox and Kettler appealed their convictions, and Kansas "move[d] to participate as a party" in Cox's appeal, citing 28 U.S.C. § 2403(b) and Fed. R. App. P. 44(b). State of Kan.'s Mot. to Participate as Party at 1–2, *United States v. Cox*, No. 17-3034 (10th Cir. May 9, 2017). The SAPA "ha[d] played a prominent role in [Cox's] case," Kansas noted, and the federal government had "argued at every turn that the [SAPA] is 'clearly preempted by federal law' and 'invalid.' " *Id.* at 2 (quoting Cox R. vol. 1 at 87, 108). Kansas therefore asked to submit briefs, on the same schedule as Cox, defending the SAPA's constitutionality. No one opposed the motion, so we granted it, and Kansas filed two briefs.

## DISCUSSION

Though Cox and Kettler challenge their convictions, neither denies that he failed to abide by the NFA's rules: Kettler possessed an unregistered silencer; Cox possessed an unregistered short-barreled rifle and dealt in unregistered silencers. They strike instead at the NFA itself, arguing that the Act exceeds the constitutional bounds of Congress's power and violates their Second Amendment rights. In the alternative, even if the NFA passes constitutional muster, they contend that their reliance on the SAPA mitigates their culpability for violating the NFA—a defense that, they claim, the district court erroneously kept from the jury. [7] We address the NFA's constitutionality first; then we turn to the SAPA and how (if at all) it affected Cox's and Kettler's culpability.

7  Kansas, in turn, briefed these issues:

1. Does the National Firearms Act, specifically 26 U.S.C. § 5861, preempt the Second Amendment Protection Act?

2. Did the District Court err in holding that the Second Amendment does not protect possession of silencers?

Br. of Intervenor State of Kan. at 1 (Br. of Kan.). As for the first issue, though, preemption isn't relevant here, and we needn't address the SAPA's constitutionality. And as for the second issue, it's not clear how the Second Amendment's protection of silencers would advance the SAPA's constitutionality. As a result, we don't directly engage any of Kansas's arguments.

## A. The Constitutionality of the National Firearms Act

Cox and Kettler claim that the NFA—at least as applied to their conduct[8] **\*1179** —suffers two constitutional infirmities, both fatal. We review each challenge de novo. *United States v. Reese*, 627 F.3d 792, 799 (10th Cir. 2010) (quoting *United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000) ).

[8]  Kettler isn't clear about whether he's mounting a facial or an as-applied challenge to the NFA, while Cox specifically claims that the NFA "as applied" exceeds Congress's powers and violates the Second Amendment. Cox's Opening Br. at 36, 52. It's harder to prevail on a facial challenge—unlike an as-applied challenge, a facial challenge fails if "at least some" constitutional applications of the challenged statute exist. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting *Schall v. Martin*, 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ). And Kettler focuses on the NFA's transfer provisions, such as 26 U.S.C. § 5811, rather than take on the statute as a whole. So, in the absence of an indication that we should do otherwise, we treat both Cox's and Kettler's constitutional challenges as challenges to the NFA as it applied to them. (We also note that the failure of an as-applied challenge shows that the statute has "at least some" constitutional applications, spelling the end of any facial challenge.)

### 1. Is the National Firearms Act a Valid Exercise of Congressional Power?

Cox and Kettler argue that the NFA exceeds Congress's power. We agree with the government, though: the NFA is a valid exercise of Congress's taxing power, as well as its authority to enact any laws "necessary and proper" to carry out that power. U.S. Const. art. I, § 8, cls. 1, 18.

Among other enumerated powers, Article I of the Constitution gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," *id.* cl. 1, and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Power[ ]," *id.* cl. 18.

And on its face, the NFA is a taxing scheme. The statute collects occupational and excise taxes from businesses and transactions involving listed firearms—which include short-barreled rifles, silencers, and destructive devices. *See* 26 U.S.C. § 5845(a) (defining "firearm"). Importers, manufacturers, and dealers of these firearms must pay a yearly tax of $500 to $1,000. *Id.* § 5801. And each time one of these firearms is made or transferred, the statute levies a $200 tax. *Id.* § 5811 ("Transfer tax"); *id.* § 5821 ("Making tax"). But the NFA does more than lay taxes. To carry out the taxing scheme, it also mandates the registration of every importer, manufacturer, and dealer, *see id.* § 5802, and of every firearm made, *see id.* § 5822, or transferred, *see id.* § 5812. And to ensure compliance, the statute has teeth: the failure to abide by any of its rules is a crime punishable by up to ten years in prison (or a fine, or both). *Id.* §§ 5861 ("Prohibited acts"), 5871 ("Penalties").

The Supreme Court addressed Congress's taxing-clause authority to enact the NFA eighty-one years ago, when a firearms dealer indicted for failing to pay the (then $200) annual dealer tax challenged the statute's constitutional basis with an argument similar to Cox and Kettler's. *See Sonzinsky v. United States*, 300 U.S. 506, 511, 57 S.Ct. 554, 81 L.Ed. 772 (1937). The dealer conceded that the taxing power allowed Congress to tax firearms dealers, yet he "insist[ed]" that the tax at issue was "not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms." *Id.* at 512, 57 S.Ct. 554. But the Constitution, according to the dealer, had reserved regulation of these firearms to the states, not to the federal government. *Id.* He concluded that the NFA revealed its "penal and prohibitive character" by cumulatively taxing importers, manufacturers, dealers, and transferors. *Id.*

The Supreme Court rejected the dealer's challenge, refusing to conclude that the NFA—on its face a taxing measure—exceeded congressional power "by virtue of its deterrent effect on the activities taxed." *Id.* at 513–14, 57 S.Ct. 554. "Every tax is in some measure regulatory," explained the Court, and "a tax is not any the less a tax because it has a

regulatory effect." *Id.* at 513, 57 S.Ct. 554. Unlike the child-labor tax struck down in the **\*1180** *Child Labor Tax Case*, the NFA tax wasn't "a penalty resorted to as a means of enforcing [other] regulations." *Id.* (citing *Bailey v. Drexel Furniture Co.* (*The Child Labor Tax Case*), 259 U.S. 20, 35, 42 S.Ct. 449, 66 L.Ed. 817 (1922) ). Rather, though the NFA contained registration provisions, those provisions were "obviously supportable as in aid of a revenue purpose." *Id.* And because the $200-per-year dealer tax produced "some revenue," the Court refused to ponder Congress's motives in imposing it or to estimate its regulatory effect. *Id.* at 514, 57 S.Ct. 554. In sum, since "it [wa]s not attended by an offensive regulation, and since it operate[d] as a tax," the Court concluded that the NFA's taxing scheme was "within the national taxing power." *Id.*

Cox and Kettler urge us to limit *Sonzinsky*'s holding to the NFA of 1937, a statute that they claim no longer exists, and to reconsider the constitutional premise for today's NFA. According to Cox and Kettler, the statute that *Sonzinsky* upheld "has morphed, over more than eight decades, to the point that the current NFA registration system bears virtually no resemblance to a measure designed to collect revenue." Kettler's Opening Br. at 11–12.

Today, Cox and Kettler contend, the NFA is "far more of a gun-*control* measure than a gun-*tax* measure." Cox's Opening Br. at 53. They point out that since 2003, the ATF has administered the NFA from the Justice Department instead of the Treasury Department, where the ATF and its predecessor agencies spent the preceding 200 years. They note that as a result, the NFA—alone in the Internal Revenue Code—now falls outside the purview of the Treasury Secretary. And with this shift in oversight, they argue, today's NFA resembles the regulatory scheme struck down in the *Child Labor Tax Case*, which subjected employers "to inspection at any time not only by the taxing officers of the Treasury, the Department normally charged with the collection of taxes, but also by the Secretary of Labor and his subordinates, whose normal function is the advancement and protection of the welfare of the workers." 259 U.S. at 37, 42 S.Ct. 449. Cox and Kettler thus conclude that the NFA, like that "so-called tax" on child labor, is really a penalty, outside Congress's taxing power. *The Child Labor Tax Case*, 259 U.S. at 37, 42 S.Ct. 449.

Which agency or agencies administer a tax, however, is but one indicator among several in the "functional approach" to whether that tax is really—for constitutional purposes—a tax. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519,

565, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). And on that score, the child-labor "tax" in the *Child Labor Tax Case* had two more strikes against it: first, the tax imposed "a heavy exaction" on violators, equal to one tenth of a business's yearly net income; and second, the law included a scienter requirement, meaning that only knowing violators had to pay the tax. *The Child Labor Tax Case*, 259 U.S. at 36, 42 S.Ct. 449; *see also Sebelius*, 567 U.S. at 565–66, 132 S.Ct. 2566. The sum of all three characteristics made "palpable" the law's "prohibitory and regulatory effect" and convinced the Court that the so-called tax was really a penalty, meant to stop child labor, and fell outside Congress's taxing-clause authority. *The Child Labor Tax Case*, 259 U.S. at 37, 39, 42 S.Ct. 449.

Yet Cox and Kettler don't contend that today's NFA exhibits either of the other penalty-like features of the child-labor "tax" in the *Child Labor Tax Case*. Nor need we assess which way those features point in this case, for we aren't starting from a blank slate in determining whether the NFA is a constitutional tax; we're starting from *Sonzinsky*. In upholding the NFA, *Sonzinsky* expressly distinguished **\*1181** the *Child Labor Tax Case* and similar decisions, in which "the [challenged] statute contain[ed] regulatory provisions related to a purported tax in such a way ... that the latter [wa]s a penalty resorted to as a means of enforcing the regulations." *Sonzinsky*, 300 U.S. at 513, 57 S.Ct. 554. The NFA, according to *Sonzinsky*, regulates only "in aid of a revenue purpose." *Id.*

Only six years ago, *Sebelius* reaffirmed the NFA's constitutional legitimacy, touting the statute's "obviously regulatory" tax on sawed-off shotguns as proof that "taxes that seek to influence conduct are nothing new" and remain valid exercises of the taxing power. 567 U.S. at 567, 132 S.Ct. 2566 (citing *Sonzinsky*, 300 U.S. at 513, 57 S.Ct. 554); *see also id.* (explaining that even though the Affordable Care Act's individual mandate "seeks to shape decisions about whether to buy health insurance," it's still a valid exercise of the taxing power). And by itself, moving the NFA's administration from the Treasury Department to the Justice Department didn't so alter the balance between the statute's taxes and its regulatory provisions as to unmoor today's NFA from the statute deemed constitutional in *Sonzinsky* and cited with approval in *Sebelius*.

But Cox and Kettler's taxing-power argument has another angle. Noting that *Sonzinsky* upheld the NFA's dealer tax in large part because the tax produced "some revenue," they dispute that the administration of today's NFA raises *any* net

revenue. *See* 300 U.S. at 514, 57 S.Ct. 554. Citing our decision in *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992), they claim that a statute that doesn't raise net revenue can't "be justified under Congress' power to **raise revenue**." Kettler's Opening Br. at 24.

The current registration process, they argue, is "structured to avoid generating revenue in as many instances as possible." *Id.* at 19. They claim that increasingly complex registration applications, background checks, and swelling (now months-long) delays likely discourage many from even trying to register and pay NFA taxes. As for those willing to run that gantlet, Cox and Kettler note that the ATF denies the applications of would-be registrants whom federal law prohibits from buying firearms, meaning that "literally tens of millions of Americans are deemed ineligible to pay the NFA tax." Kettler's Opening Br. at 18 (citing 18 U.S.C. § 922(d), which makes it unlawful "for any person to sell or otherwise dispose of any firearm" to someone who falls into any of nine categories, including felons, *see id.* § 922(d)(1), and fugitives from justice, *see id.* § 922(d)(2) ). And what's more, Congress hasn't raised the $200 transfer fee for silencers and short-barreled rifles since 1934—not even to keep pace with inflation [9] —so, argue Cox and Kettler, "it could be said that" the NFA's taxes are now "**productive of no net revenue**." *Id.* at 22.

[9]     Cox and Kettler recognize that Congress has raised the occupational taxes that importers, manufacturers, and dealers must pay.

But *Dalton* doesn't stand for the proposition that Cox and Kettler attribute to it: that "the taxing power can no longer be the constitutional basis for the NFA when the $5 [10] and $200 NFA fees no longer ***1182** raise net revenue." Kettler's Opening Br. at 24.

[10]     The NFA imposes a transfer tax of $5 "on any firearm classified as any other weapon under [26 U.S.C.] section 5845(e)." 26 U.S.C. § 5811(a). But the weapons listed in Cox's and Kettler's indictment—silencers, a short-barreled rifle, destructive devices—don't fall under § 5845(e)'s definition of "any other weapon." 26 U.S.C. § 5845. They are "firearms" taxed at $200 per transfer, *see* § 5811(a), so the $5 rate is irrelevant to Cox's and Kettler's as-applied challenges to the NFA.

That case addressed whether due process permitted Dalton's convictions for violating the NFA by possessing (26 U.S.C. § 5861(d) ) and transferring (§ 5861(e) ) an unregistered

machinegun, when a separate law, 18 U.S.C. § 922(*o*), banned the possession and transfer of machineguns. *Dalton*, 960 F.2d at 122. To avoid running afoul of 26 U.S.C. § 5861(d) and (e), the NFA's transfer provision (§ 5812) required the transferor to pay a tax and apply to register the machinegun. *Dalton*, 960 F.2d at 122. But the transfer provision also required that applications to register illegal weapons be denied. *Id.* at 123. Section 922(*o*) thus made compliance with § 5861(d) and (e)'s registration requirements impossible, and we agreed with Dalton "that it violate[d] fundamental fairness to convict him for failing to do an act which everyone agree[d] he could not perform." *Dalton*, 960 F.2d at 123. Weakening the premise for Dalton's convictions still further, we reasoned that § 922(*o*) had "undercut the constitutional basis" of the NFA's machinegun-registration requirement. *Id.* at 124–25 (quoting *United States v. Rock Island Armory, Inc.*, 773 F.Supp. 117, 125 (C.D. Ill. 1991), *rejected by United States v. Ross*, 9 F.3d 1182, 1194 (7th Cir. 1993), *vacated*, 511 U.S. 1124, 114 S.Ct. 2129, 128 L.Ed.2d 860 (1994) ). [11] We noted that *Sonzinsky* had upheld the NFA's registration requirements as "solely in aid of collecting the tax," so when § 922(*o*) ended the registration and taxation of machineguns, it also removed "the constitutional base for those requirements —*i.e.,* the power to tax." *Id.* at 124. Dalton's convictions for possessing and transferring an unregistered machinegun in violation of § 5861(d) and (e), we concluded, were therefore "constitutionally infirm." *Id.* at 126.

[11]     The Supreme Court returned *Ross* to the Seventh Circuit for reconsideration in light of the Court's intervening decision in *Staples v. United States*, 511 U.S. 600, 602, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), which interpreted 26 U.S.C. § 5861(d) to require a defendant to know that the weapon that he possessed exhibited features making it a "firearm" for NFA purposes. *Ross v. United States*, 511 U.S. 1124, 114 S.Ct. 2129, 128 L.Ed.2d 860 (1994); *see also United States v. Ross*, 40 F.3d 144, 145 (7th Cir. 1994) (concluding, on remand, that failing to instruct the jury on this knowledge requirement warranted a new trial).

As later decisions have made clear, the constitutional infirmity in Dalton's convictions resulted from 18 U.S.C. § 922(*o*)'s prohibition of the firearm at issue, which removed 26 U.S.C. § 5861's constitutional footing by making registration "a literal and legal impossibility." *United States v. McCollom*, 12 F.3d 968, 971 (10th Cir. 1993). Unless a separate statute criminalizes possession of a firearm, though, a due-process or taxing-power challenge to a § 5861(d) conviction is doomed to fail. *See id.* at 970–71 (concluding that, because no statute

bans the registration of short-barreled shotguns, due process didn't bar McCollum's § 5861(d) conviction for possessing an unregistered sawed-off shotgun). That's so regardless of the practical difficulty or unlikelihood of registering the firearm —and regardless of how little revenue the tax generates. *See, e.g., United States v. Berres*, 777 F.3d 1083, 1088 (10th Cir. 2015) (reasoning that the registration of flash bangs isn't a legal impossibility, and so rejecting a due-process challenge to Berres's § 5861(d) conviction for possessing one); *United States v. Eaton*, 260 F.3d 1232, 1236 (10th Cir. 2001) (reaching the same conclusion regarding Eaton's possession of a pipe bomb). And because Cox and Kettler point to no federal statutory ban on the possession or transfer of the firearms at issue—silencers and short-barreled **\*1183** rifles—*Dalton* doesn't control this case.

Nevertheless, Cox and Kettler urge us to extend *Dalton* to this case by treating a lack of net revenue from NFA taxes on a weapon like a statutory ban on that weapon. As net revenue falls to zero, they argue, the NFA's taxing purpose disappears, leaving only its regulatory effect, and the statute's constitutional legitimacy crumbles.

They're correct that revenue mattered in *Dalton*, which reasoned that because of § 922(*o*)'s machinegun ban, the government collected none from the possession or transfer of machineguns. 960 F.2d at 125. Revenue also mattered in *Sonzinsky*, 300 U.S. at 514, 57 S.Ct. 554, which upheld the NFA because its dealer tax was "productive of some revenue," and in *Sebelius*, 567 U.S. at 564, 132 S.Ct. 2566, which noted that the ACA's shared-responsibility payment bore "the essential feature of any tax: It produce[d] at least some revenue for the Government."

But in each case, the constitutional question hinged on *gross* revenue, and it set the bar low—"some" gross revenue. *See Minor v. United States*, 396 U.S. 87, 98 n.13, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969) ("A statute does not cease to be a valid tax measure ... because the revenue obtained is negligible ...."). Cox and Kettler direct us to no authority where a tax's *net* revenue (i.e., what's left after deducting expenses) affects its constitutional validity. Plus, as the government pragmatically puts it, "If the focus were on net revenue, then the Executive Branch could negate the constitutionality of a tax imposed by Congress simply through spendthrift enforcement." Br. for the United States at 21. While Cox and Kettler contend that the $200 transfer tax on silencers "no longer raise[s] net revenue," they do not dispute that it raises *some* revenue.

Kettler's Opening Br. at 24. That's all that *Sonzinsky* and *Sebelius* require (and what we deemed impossible in *Dalton*).

Accordingly, though times may have changed since the Court decided *Sonzinsky* in 1937, Cox and Kettler point to no differences, either in the NFA or in courts' understanding of the national taxing power, that justify departing from *Sonzinsky*'s conclusion that the NFA is a valid exercise of Congress's power. *See Citizens United v. FEC*, 530 F.Supp.2d 274, 278 (D.D.C. 2008) ("Only the Supreme Court may overrule its decisions."); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (explaining that courts of appeals should follow Supreme Court precedent that "has direct application in a case" even if that precedent "appears to rest on reasons rejected in some other line of decisions" and should "leav[e] to th[e] Court the prerogative of overruling its own decisions"). We therefore conclude that the NFA falls within Congress's power to tax. [12]

[12]    Other circuits uniformly agree. *See, e.g., United States v. Spoerke*, 568 F.3d 1236, 1245–46 (11th Cir. 2009); *United States v. Vill. Ctr.*, 452 F.3d 949, 950 (8th Cir. 2006); *United States v. Lim*, 444 F.3d 910, 913–14 (7th Cir. 2006); *United States v. Thompson*, 361 F.3d 918, 921 (6th Cir. 2004); *United States v. Grier*, 354 F.3d 210, 215 (3d Cir. 2003); *United States v. Gresham*, 118 F.3d 258, 261–62 (5th Cir. 1997); *United States v. Dodge*, 61 F.3d 142, 145–46 (2d Cir. 1995); *United States v. Aiken*, 974 F.2d 446, 449–50 (4th Cir. 1992); *United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972).

### 2. Does the National Firearms Act Comport with the Second Amendment?

Cox and Kettler next challenge the NFA on the ground that it violates the Second Amendment. Both contend that their NFA convictions stem from activities that the Second Amendment protects—possessing **\*1184** short-barreled rifles and making, selling, transferring, and possessing silencers—yet their challenges then diverge. While Cox urges us to follow *District of Columbia v. Heller*, 554 U.S. 570, 595, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and to apply means–end scrutiny to the NFA, Kettler argues that under *Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), and *Murdock v. Pennsylvania*, 319 U.S. 105, 113, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the NFA impermissibly taxes the exercise of his constitutional right to bear arms.

We begin, as Cox suggests, with *Heller*, tracing the scope of the Second Amendment and asking whether it permits the NFA regulations at issue. Then we turn to Kettler's argument and consider the impact of the *Cox–Murdock* rule on our analysis.

**a. The Scope of the Second Amendment under *Heller***

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This amendment confers an individual right to keep and carry arms, but that doesn't mean that it gives everyone the absolute right to carry any weapon, in any manner, for any purpose. *Heller*, 554 U.S. at 595, 626, 128 S.Ct. 2783.

The right to keep and carry arms, like other constitutional guarantees, has limits, and in *Heller*, the Court identified two venerable ones. *See id.* at 595, 626–27, 128 S.Ct. 2783. First, since the nineteenth century, the Second Amendment has coexisted with a range of firearms regulations. *Id.* at 627 & n.26, 128 S.Ct. 2783. *Heller* refused "to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27, 128 S.Ct. 2783. Second, the Court reasoned that "the historical tradition of prohibiting the carrying of dangerous and unusual weapons" supported limiting the Second Amendment's protection to weapons "in common use at the time" of ratification. *Id.* at 627, 128 S.Ct. 2783 (internal quotation marks and citations omitted) (quoting *United States v. Miller*, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) ). That means, according to *Heller*, that "those weapons not typically possessed by law-abiding citizens for lawful purposes"— short-barreled shotguns, for instance—fall outside the scope of the amendment. *Id.* at 625, 128 S.Ct. 2783; *see also Miller*, 307 U.S. at 178, 59 S.Ct. 816 ("[W]e cannot say that the Second Amendment guarantees the right to keep and bear [a short-barreled shotgun].").

Yet within these limits, the Second Amendment takes some firearm regulations "off the [constitutional] table." *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. The law at issue in *Heller*, the District of Columbia's total ban on handgun possession in the home, represents the archetype of an unconstitutional firearm regulation. *See id.* at 628–29, 128 S.Ct. 2783. The

law not only prohibited "an entire class of 'arms' " that Americans "overwhelmingly" choose to keep and to use for "the core lawful purpose of self-defense," but it extended that prohibition "to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628, 630, 128 S.Ct. 2783. Such a ban, *Heller* concluded, "would fail constitutional muster" no matter what level of scrutiny the Court applied. *Id.* at 628–29 & 628 n.27, 128 S.Ct. 2783. *Heller* thus highlighted some traits of an unconstitutional regulation, but it left **\*1185** open how future courts should sort the constitutional from the unconstitutional.

As Cox points out though, our decision in *United States v. Reese* interpreted *Heller* to " 'suggest[ ] a two-pronged approach to Second Amendment challenges' to federal statutes." 627 F.3d 792, 800 (10th Cir. 2010) (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), and citing *United States v. Skoien*, 614 F.3d 638, 641–42 (7th Cir. 2010) (en banc) ). Under the two-pronged approach, the reviewing court first asks: Does the challenged law burden conduct within the scope of the Second Amendment's guarantee? *Id.* (quoting *Marzzarella*, 614 F.3d at 89). If not, then the inquiry ends there. *Id.* at 800–01 (quoting *Marzzarella*, 614 F.3d at 89). But if the law burdens protected conduct, then "[the court] must evaluate the law under some form of means-end scrutiny." *Id.* at 801 (alteration in original) (quoting *Marzzarella*, 614 F.3d at 89). The law is constitutional only if it survives that scrutiny. *Id.* (quoting *Marzzarella*, 614 F.3d at 89).

We agree with Cox that *Reese*'s two-pronged approach provides a workable means of evaluating his Second Amendment challenges to the NFA's regulation of (1) short-barreled rifles, (2) silencers, and (3) the making and selling of firearms. We thus begin by asking whether each regulated activity falls within the scope of the Second Amendment's guarantee. *See Reese*, 627 F.3d at 800–01. (If we answer "yes," then we will address whether the NFA's regulation of that activity survives means–end scrutiny. *Id.* at 801.)

*i. Short-barreled rifles*

Cox argues that because short-barreled rifles are neither unusual nor especially dangerous, possessing them falls within the Second Amendment's ambit. He asserts that legal uses of short-barreled rifles include "collecting, hunting, and home defense." Cox's Opening Br. at 48. And when it comes to the risk of violence, Cox claims that compared to *all* rifles

(short- or long-barreled), "non-restricted pistols are far more commonly used in firearm-related crime." *Id.* at 49 (quoting James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 518 & n.161 (May 2017) ).

That handguns may bear a higher correlation to crime than rifles do, however, implies nothing about whether short-barreled rifles, in particular, are dangerous and unusual. More telling is *Heller*'s conclusion that short-barreled shotguns —close analogues to short-barreled rifles—belong in that category of weapons not typically possessed by law-abiding citizens for lawful purposes and, therefore, not protected by the Second Amendment. 554 U.S. at 624–25, 128 S.Ct. 2783 (discussing *Miller*, 307 U.S. at 178, 59 S.Ct. 816); *accord United States v. Artez*, 290 F. App'x 203, 208 (10th Cir. 2008) (noting that *Heller* expressly foreclosed Artez's argument that the Second Amendment protected his possession of a sawed-off shotgun). And since *Heller*, many courts have explained that a long gun with a shortened barrel is both dangerous, because "its concealability fosters its use in illicit activity," and unusual, "because of its heightened capability to cause damage." *Marzzarella*, 614 F.3d at 95; *see also, e.g.*, *United States v. Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting) ("[A] sawed-off shotgun can be concealed under a large shirt or coat. ... [T]he combination of low, somewhat indiscriminate accuracy, large destructive power, and the ability to conceal ... makes a sawed-off shotgun useful for only violence against another person, rather than, for example, against sport game.").

**\*1186** Though these cases dealt with short-barreled shotguns, rather than short-barreled rifles, Cox has offered no meaningful distinction between the two. We need not opine on whether a sufficient factual record could be developed to distinguish short-barreled rifles from short-barreled shotguns. On the record and argument before us, we take our cue from *Heller* and conclude that the possession of short-barreled rifles falls outside the Second Amendment's guarantee.

### ii. Silencers

Next, we turn to silencers, which both Cox and Kettler contend merit Second Amendment protection. They argue that silencers are in common use (more common, says Kettler, than handguns were in the District of Columbia when the Court decided *Heller*) and that they're very rarely used to commit crimes—"except on television and in the movies."

Kettler's Opening Br. at 34. Further, they claim that silencers protect the shooter's (and bystanders') hearing and, "by reducing muzzle flinch and the disorientation that can follow a loud shot," can improve accuracy. Cox's Opening Br. at 45. And because the alternative—donning earmuffs—takes up precious time and suppresses surrounding sounds, they argue that these hearing-protection and accuracy benefits make silencers particularly valuable for "the core lawful purpose of home defense." *See Heller*, 554 U.S. at 630, 128 S.Ct. 2783.

But a more basic question remains: Even if silencers are commonly used by law-abiding citizens for lawful purposes, are they a type of instrument protected by the Second Amendment? According to *Heller*, "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*." 554 U.S. at 582, 128 S.Ct. 2783 (emphasis added). An instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an "Arm[ ]." *Id.* at 581, 128 S.Ct. 2783 (citing two dictionaries from the eighteenth, and one from the nineteenth, century). Then and now, that means, the Second Amendment covers "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581, 128 S.Ct. 2783 (alteration in original) (citations omitted). A silencer is a firearm accessory; it's not a weapon in itself (nor is it "armour of defence"). Accordingly, it can't be a "bearable arm" protected by the Second Amendment. [13]

13    Though we needn't decide the issue, we note that the government cites authority concluding that silencers are dangerous and unusual, the type of "arm" traditionally excluded from the Second Amendment's protection. *See, e.g.*, *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (finding silencers even more dangerous than machineguns, for "[s]ilencers ... are not 'typically possessed by law-abiding citizens for lawful purposes,' and are less common than either short-barreled shotguns or machine guns" (quoting *Heller*, 554 U.S. at 625, 128 S.Ct. 2783) ); *United States v. Garnett*, 2008 WL 2796098, at \*4 (E.D. Mich. 2008) (concluding that "nothing in [*Heller*] ... casts doubt on the constitutionality of" the NFA's regulation of silencers); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1489 & n.187 (2009) ("Bans on silencers ... would ... likely be constitutional because they don't materially burden self-defense." (citing *People v.*

*Brown*, 253 Mich. 537, 235 N.W. 245, 246–47 (1933) (upholding a ban on silencers, among other weapons, because the ban focused on "a partial inventory of the arsenal of the 'public enemy,' the 'gangster' "; it didn't include "weapons usually relied upon by good citizens for defense or pleasure") ).

Thus, because silencers are not "bearable arms," they fall outside the Second Amendment's guarantee.

### *1187 *iii. Making and selling firearms*

Finally, Cox argues that the Second Amendment protects the making and selling of silencers. For two reasons, however, we disagree.

As a threshold matter, *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of arms" as one of the limitations on the right to bear arms. 554 U.S. at 626–27, 128 S.Ct. 2783. The NFA's requirements that firearms dealers and manufacturers register and pay taxes annually fit neatly into that category of "presumptively lawful regulatory measures." *Id.* at 627 n.26, 128 S.Ct. 2783; *see* 26 U.S.C. §§ 5801 (imposing an annual tax of $500 to $1,000 on "every importer, manufacturer, and dealer in firearms"), 5802 (requiring "each importer, manufacturer, and dealer in firearms" to register every year with the Secretary of the Treasury). Those requirements, therefore, don't infringe the right to bear arms.

More importantly, though, the indictment charged Cox with, and the jury found him guilty of, engaging in business as a dealer or manufacturer of *silencers* in violation of the NFA. And as we've already concluded, the right to bear arms doesn't extend to silencers. Even if the Second Amendment covers the right to buy and sell arms in the abstract, it can't in practice protect the right to buy and sell instruments, such as silencers, that fall outside its ambit. Thus, as they apply to Cox in particular, the NFA's taxation and registration requirements for firearms manufacturers and dealers don't burden protected conduct.

\* \* \*

In sum, the Second Amendment protects neither (1) short-barreled rifles, nor (2) silencers, nor (3) the business of manufacturing and dealing in silencers, so the NFA's regulation of these activities doesn't burden protected conduct. Our analysis thus ends at its first step, and we needn't

test the challenged regulations under any form of means–end scrutiny. *See Reese*, 627 F.3d at 800–01.

### b. Applying the Rule of *Cox v. New Hampshire* and *Murdock v. Pennsylvania* to Second Amendment Rights

For the first time on appeal, Cox and Kettler urge us to find that NFA taxes violate the Second Amendment by "impos[ing] a charge for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113, 63 S.Ct. 870. Under *Murdock* and *Cox*, seminal cases in the Court's "fee jurisprudence," the government may collect a fee to defray administrative and maintenance costs associated with the exercise of a constitutional (usually First Amendment) right, but it can't impose a general revenue tax on the exercise of such a right. *Compare Murdock*, 319 U.S. at 113, 63 S.Ct. 870 (striking down a license tax on the exercise of the First Amendment right to free speech), *with Cox*, 312 U.S. at 576–77, 61 S.Ct. 762 (upholding a parade-licensing fee that the state charged "to meet the expense incident to the administration of [the parade] and to the maintenance of the public order").

When they raised the Second Amendment in the district-court proceedings, neither Cox nor Kettler cited the Court's fee jurisprudence, so the government urges us to review this argument for plain error. But it doesn't matter whether we review for plain error or not, because the district court didn't err (plainly or otherwise) in not applying the framework of *Murdock* and *Cox*.

As the government notes, neither this court nor the Supreme Court has applied *Murdock* or *Cox* in the Second Amendment context. To analyze Second Amendment challenges to federal statutes, we have used *Reese*'s two-step test, borrowed *1188 from the Third Circuit, which does not incorporate the Court's fee jurisprudence. *See Reese*, 627 F.3d at 800–01 (concluding that *Heller* "suggests a two-pronged approach to Second Amendment challenges," which asks whether the challenged law burdens protected conduct and, if so, whether it passes muster "under some form of means-end scrutiny" (quoting *Marzzarella*, 614 F.3d at 89) ).

We recognize that other circuits have imported fee-jurisprudence principles to their Second Amendment analyses. *See, e.g., Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017) (applying the fee-jurisprudence framework and concluding that fees supporting an extended background-

check program "can fairly be considered an 'expense[ ] of policing the activities in question,' or an 'expense incident to ... the maintenance of public order in the matter licensed' " (alterations in original) (quoting *Murdock*, 319 U.S. at 113–14, 63 S.Ct. 870, and *Cox*, 312 U.S. at 577, 61 S.Ct. 762) ); *Kwong v. Bloomberg*, 723 F.3d 160, 166 (2d Cir. 2013) (deciding that "the Supreme Court's First Amendment fee jurisprudence provides the appropriate foundation for addressing" the plaintiffs' challenge to a handgun-licensing fee). But this appeal isn't the right vehicle to test that approach in our circuit, given our conclusion that the Second Amendment covers neither silencers nor short-barreled rifles. NFA taxes on the possession, transfer, and manufacture of these items do not constitute "charge[s] for the enjoyment of a right granted by the federal constitution," so they need not be measured against administrative costs or the expense of maintaining public order. *Murdock*, 319 U.S. at 113, 63 S.Ct. 870.

\* \* \*

For these reasons, we conclude that the NFA comports with Cox's and Kettler's Second Amendment right to bear arms.

**B. Kansas's Second Amendment Protection Act**

The validity of the Second Amendment Protection Act has never been at issue in this case, yet the statute has played an outsized role since the case began. Now on appeal, Cox and Kettler both contend—albeit through differing theories—that the district court reversibly erred in ruling that they couldn't use their reliance on the SAPA as a defense to breaking federal firearms laws. Separately and additionally, Kettler claims that the SAPA caused a clash between the Governor of Kansas and the U.S. Attorney General, which led, unjustly, to his prosecution.

The availability and scope of any defense based on the SAPA present legal questions that we review de novo. *Cf. United States v. Hernandez-Urista*, 9 F.3d 82, 83, 84 (10th Cir. 1993) (reviewing de novo whether a good-faith defense required that the defendant's good-faith belief be reasonable). We start our analysis with an overview of the SAPA, and then turn to Cox's and Kettler's arguments.

The SAPA spans about three pages of the *Kansas Register*, but its most oft-quoted section in this appeal is § 4(a), which states,

> A personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce. It is declared by the legislature that those items have not traveled in interstate commerce. This section applies to a firearm, a firearm accessory or ammunition that is manufactured commercially **\*1189** or privately and owned in the state of Kansas.

Second Amendment Protection Act § 4(a) (codified at Kan. Stat. Ann. § 50-1204(a) ). The SAPA also:

- declares "[a]ny act, law, treaty, order, rule or regulation of the government of the United States" that violates the Second Amendment "null, void and unenforceable in the state of Kansas," Kan. Stat. Ann. § 50-1206(a);

- prohibits Kansas officials from enforcing, or attempting to enforce, "any act, law, treaty, order, rule or regulation of the government of the United States regarding any personal firearm, firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas," Kan. Stat. Ann. § 50-1206(b); and,

- subjects any federal official who enforces, or tries to enforce, "any act, law, treaty, order, rule or regulation of the government of the United States regarding a firearm, a firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas" to prosecution for "a severity level 10 nonperson felony," Kan. Stat. Ann. § 50-1207.

**1. Is Reliance on the Second Amendment Protection Act a Defense?**

Cox and Kettler both claim (and the government doesn't dispute) that they understood the SAPA to insulate from federal regulation the making, possession, and transfer of firearms within Kansas's borders. That was a mistake—the NFA's taxes and registration requirements apply to all statutorily defined firearms—yet Cox and Kettler argue that their reliance on the SAPA still provided a defense to the charges that they violated the NFA.

The district court permitted mention of the SAPA during trial "as part of the *res gestae* of the offenses," but it didn't let Cox and Kettler claim reliance on the SAPA as a defense. Cox R. vol. 1 at 194–95. [14] In doing so, it relied on settled law.

[14]   Cox specifically notes that the court: (1) denied his request to introduce a copy of the SAPA displayed in his store; (2) refused to instruct the jury that he was raising, "as a complete defense[,] ... that he acted in 'good faith' in his belief he was following State law [the SAPA] that superseded application of the federal law" charged in the indictment, Cox R. vol. 1 at 207; (3) instructed the jury, over his and Kettler's objections, that to establish the offenses of possession (26 U.S.C. § 5861(d) ) or transfer (§ 5861(e) ) of an unregistered firearm, "[t]he government [wa]s not required to prove that the defendant knew that the firearm was not registered or had to be registered," Cox R. vol. 1 at 287, 290; and (4) instructed the jury, over Cox's and Kettler's objections, that because the government needn't prove a defendant's knowledge of the NFA's registration requirements, "it [wa]s not a defense to a charge under [26 U.S.C.] § 5861 that a defendant may have believed, based on Kansas law, that the National Firearms Act did not require registration of a firearm," Cox R. vol. 1 at 295.

The NFA's list of "[p]rohibited acts" in 26 U.S.C. § 5861 is silent regarding violators' mental state; the statute just makes it "unlawful for any person" to be a firearms dealer; or to make, receive, possess, or transfer a firearm in violation of the NFA's registration or other provisions. Silence, though, doesn't necessarily mean "that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal." *Staples v. United States*, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (citing **\*1190** *United States v. Balint*, 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922) ). In the context of § 5861(d) in particular, which makes it unlawful "to receive or possess" an unregistered firearm, the government must prove that a defendant knew the features of the firearm that made it a "firearm" under the NFA. *Id.* at 619, 114 S.Ct. 1793. A defendant need not, however, know

that the firearm was unregistered. *Id.* at 609, 114 S.Ct. 1793 (citing *United States v. Freed*, 401 U.S. 601, 607–09, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) ). "Knowledge of whether the gun was registered is so closely related to knowledge of the registration requirement that requiring the Government to prove the former would in effect require it to prove knowledge of the law." *Id.* at 622 n.3, 114 S.Ct. 1793 (Ginsburg, J., concurring). And as a general rule, ignorance of the law or a mistake of law is no defense to criminal prosecution. *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); *accord Staples*, 511 U.S. at 622 n.3, 114 S.Ct. 1793 (Ginsburg, J., concurring) (citing *Freed*, 401 U.S. at 612–14, 91 S.Ct. 1112 (Brennan, J., concurring) ).

That general mistake-of-law rule forecloses Cox and Kettler's proposed defense—that they wrongly believed, in reliance on the SAPA, that federal firearms regulations didn't reach their Kansas-centric activities. To be criminally liable, Cox and Kettler didn't need to know that their acts were "illegal, wrong, or blameworthy." *Freed*, 401 U.S. at 612, 91 S.Ct. 1112 (Brennan, J., concurring). But Cox and Kettler urge us not to apply the general rule here. Something about the SAPA, they claim, changes things. Their arguments differ enough that we address them separately.

#### a. Cox's Argument: A Due Process Problem

Cox grounds his argument in the due-process principle that a defendant deserves "a meaningful opportunity to present a complete defense." Cox's Opening Br. at 23–24 (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ). He argues for a limited exception, in cases like his, to the rule that ignorance of the law isn't a defense. If (1) "the accused's conduct is subject to facially conflicting state and federal laws," and if (2) "the state law has not (yet) been held inapplicable, inferior, or illegitimate by any court," then, he claims, "the accused's good-faith reliance on the state law is a complete defense to criminal charges brought under the federal law." *Id.* at 24.

Cox asserts that in prior cases, the Supreme Court has endorsed similar defenses based on notions of due process, notice, and fairness. In an appeal brought by a different Mr. Cox, for example, the Court concluded that the Due Process Clause prevented the government from "convicting a citizen for exercising a privilege which the [government] had clearly told him was available to him." *Cox v. Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (quoting *Raley*

*v. Ohio*, 360 U.S. 423, 426, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) ). In *Cox*, "the highest police officials of the city, in the presence of the Sheriff and Mayor," had told demonstrators, including Mr. Cox, that they could meet at a spot about 101 feet from the courthouse steps, but after the demonstration (at that spot), the state prosecuted Cox for violating a statute banning picketing "in or near" a courthouse. *Id.* at 560, 571, 85 S.Ct. 476. Based on the public officials' actions, the Court struck Cox's conviction, reasoning that to sustain it "would be to sanction an indefensible sort of entrapment by the State." *Id.* at 571, 85 S.Ct. 476 (quoting *Raley*, 360 U.S. at 426, 79 S.Ct. 1257); *see also United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 657, 673–74, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) (allowing a corporation to assert, as **\*1191** a defense to a charge of polluting a river in violation of the Rivers and Harbors Act, that it had relied on the Army Corps of Engineers'—the administrative agency responsible for interpreting the Act—"longstanding administrative construction of [the Act] as limited to water deposits that impede or obstruct navigation").

In this circuit, courts treat such due-process challenges as claims of entrapment by estoppel. *See United States v. Hardridge*, 379 F.3d 1188, 1192 (10th Cir. 2004) (citing *Raley*, 360 U.S. at 426, 79 S.Ct. 1257, and *Cox*, 379 U.S. at 571, 85 S.Ct. 476). To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was "responsible for interpreting, administering, or enforcing the law defining the offense"; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was "reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* (quoting *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1167 (10th Cir. 1999), and *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) ).

Here, Cox wouldn't be able to prove either (1) that the misleading government agent (the Kansas legislature) was responsible for interpreting, administering, or enforcing the law defining the offense (the NFA) or (2) that his reliance on the misleading pronouncement (the SAPA) was reasonable in light of the circumstances. First, unlike the police in *Cox*, who enforced the anti-picketing law, or the Army Corps of Engineers in *Pennsylvania Industrial Chemical*, which administered the Rivers and Harbors Act, the Kansas legislature (which wrote the SAPA) isn't responsible for

administering or enforcing the NFA (or any other federal law). Second, irrespective of the government agent's identity, the substance of the SAPA's misrepresentation made Cox's reliance on it unreasonable. Section 4(a) of the SAPA expressly states that certain firearms and accessories, if kept in Kansas, aren't "subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress *to regulate interstate commerce*. It is declared by the legislature that those items have *not traveled in interstate commerce*." Kan. Stat. Ann. § 50-1204(a) (emphases added). But the SAPA says nothing about laws, such as the NFA, passed under Congress's authority *to tax*.

Cox counters that this reading of the SAPA "ignores provisions in the Act that prohibit both state and federal actors from enforcing 'any' federal firearms laws or regulations with respect to local firearms." Cox's Reply Br. at 2–3 (citing Kan. Stat. Ann. §§ 50-1206(b), 1207). But Cox is wrong that "[n]o Commerce Clause limit appears" in these provisions, which prohibit state officials from, and subject federal officials to prosecution for, enforcing or attempting to enforce federal laws against any firearm, accessory, or ammunition "that is manufactured commercially or privately and owned *in the state of Kansas* and that remains *within the borders of Kansas*." Cox's Reply Br. at 3; Kan. Stat. Ann. §§ 50-1206(b), 1207 (emphases added). These provisions protect only homegrown, local firearms, so the Kansas legislature didn't need to utter the magic words, "Commerce Clause," to make clear its intent to preserve constitutional limits on the federal government's power over intrastate activity. Kansas wasn't considering, and didn't purport to limit, Congress's taxing-clause authority. Any other interpretation ignores the SAPA's emphasis on **\*1192** the local nature of the firearms' (and accessories') manufacture and ownership.

Cox, therefore, can't use the SAPA to establish an entrapment-by-estoppel defense in this case. *Cf. Hardridge*, 379 F.3d at 1192–96 (rejecting representations about the application of federal firearms laws made (1) by the Kansas City Police Department, (2) by the defendant's state-court sentencing judge, and (3) by a licensed federal firearms dealer as bases for an entrapment-by-estoppel defense); *Gutierrez-Gonzalez*, 184 F.3d at 1168–69 (denying an entrapment-by-estoppel defense based on alleged misrepresentations made (1) by a private entity that assisted deported, indigent aliens, because the entity wasn't a government agency and because the defendant's reliance on its misrepresentations wasn't reasonable given the defendant's admission that he was in the

country illegally, and (2) by an immigration official, because the defendant couldn't reasonably form the belief that he was in the U.S. legally merely from the official's failure to arrest him "on the spot").

Nor do notions of due process warrant expanding entrapment by estoppel and creating a new, estoppel-like defense to fit situations in which "the accused's conduct is subject to facially conflicting state and federal laws" and the accused acts in good-faith reliance on the state law. Cox's Opening Br. at 24. Nothing about a statute makes reliance on its pronouncements more consequential than reliance on a government agent's non-statutory statements. [15] And before we apply the doctrine of estoppel against the government, due process requires us to weigh the needs of society against the "natural sympathy" that we may feel toward defendants like Cox and Kettler, who have been prosecuted for conduct that, based on a state statute's assurances, they believed was lawful. *Hardridge*, 379 F.3d at 1194. Application of the estoppel doctrine is justified only if it doesn't "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation." *United States v. Browning*, 630 F.2d 694, 702 (10th Cir. 1980) (citing 27 A.L.R. Fed. 702 (1976) ). Here, though, allowing state legislatures to estop the federal government from prosecuting its laws would upset the balance of powers between states and the federal government and contravene the Supremacy Clause. *See* U.S. Const. art. VI. We can't countenance that result, so we decline to adopt Cox's proposed defense.

[15] According to Cox, "[t]he collective judgment of an entire state legislature, regardless of jurisdiction, is surely more trustworthy than the advice of an extra-jurisdictional individual official." Cox's Opening Br. at 30. But the superiority of collective judgments is beside the point. State legislatures have no special expertise in, and aren't charged with enforcing, federal law. State legislators are more likely to consider their duty to promote their constituents' policy preferences than to expound on the reach of federal law.

Nor is Cox's analogy to the Fourth Amendment context persuasive. There, the Court has often deemed it reasonable for law-enforcement officers to rely on legislative pronouncements in forming probable cause. *See, e.g.*, *Michigan v. DeFillippo*, 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality— with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable

prudence would be bound to see its flaws."). But whether an officer's belief was reasonable for probable-cause purposes is a very different question, with very different consequences, than whether a defendant's reliance was reasonable for estoppel purposes. So different, in fact, that answering the former doesn't help answer the latter.

Accordingly, we reject Cox's argument that due process required that he be able **\*1193** to present his reliance on the SAPA as a defense.

### b. Kettler's Argument: Mens Rea and the Model Penal Code's Approach

Kettler, in turn, focuses on the mens rea element of possessing an unregistered firearm (in his case, a silencer) in violation of 26 U.S.C. § 5861(d). He claims that the "jurisdictional dispute between sovereigns" over the SAPA "demands a more thoughtful analysis of the *mens rea* element of 26 U.S.C. § 5861 than given by the court below." Kettler's Opening Br. at 50. Because possession of an unregistered silencer is a "morally indifferent" act ("*malum prohibitum*, not *malum in se*"), he contends, the mens rea element should yield to a mistake-of-law defense premised on the Model Penal Code's approach. *Id.* at 53. [16]

[16] Cox also mentions the Model Penal Code, claiming that it's consistent with his proposed good-faith defense. And Cox, too, argues that NFA offenses aren't inherently immoral, a trait that, he claims, "weighs in favor of recognizing his [good-faith] defense." Cox's Opening Br. at 34. To avoid duplicating any analysis, we address both points only once, here.

Section 2.04(3) of the Model Penal Code, titled "Ignorance or Mistake," provides,

A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:

...

(b) [the actor] acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) *a statute or other enactment*; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation,

administration or enforcement of the law defining the offense.

Model Penal Code § 2.04(3) (Am. Law Inst. 2017) (emphasis added).

According to the explanatory note, this subsection "establishes a limited exception to the principle ... that culpability is not generally required as to the illegality of the actor's conduct." *Id.* § 2.04 Explanatory Note. But the drafters delineated this exception "narrowly ... so as to induce fair results without undue risk of spurious litigation." *Id.* Thus, for instance, § 2.04(3)(b)(iv) permits reliance on an "official statement of the law" contained in an "official interpretation of the public officer or body" only if the interpreting officer or body is "charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."

Yet unlike paragraph (b)(iv) of § 2.04(3), paragraph (b)(i) does not expressly limit the "statute[s] or other enactment[s]" on whose pronouncements a defendant may "act in reasonable reliance." Model Penal Code § 2.04(3)(b)(i). So, Kettler contends, paragraph (b)(i) permits reliance on a statute (like the SAPA) regardless of the enacting legislature's jurisdiction, "suppl[ying] a defense directly supporting [his] case." Kettler's Opening Br. at 54.

We disagree. The drafters of the Model Penal Code's ignorance-or-mistake-of-law defense intended only a narrow exception in the interest of fair results. *See* Model Penal Code § 2.04(3) Introductory Note. Thus, the code's failure to restrict reliance on statutes to those passed under the same authority as the law defining the offense probably reflects that the drafters weren't considering our circumstance, not that they intended to allow state governments to estop the federal government from enforcing its laws. After all, the plain language **\*1194** of the code requires "*reasonable* reliance upon an *official* statement of the law." *Id.* § 2.04(3)(b) (emphases added). A state legislature's statement about the reach of federal law is hardly an "official" statement of federal law, and to rely on such a statement is not reasonable.

Ultimately, however, the Model Penal Code isn't the law in this circuit. Like Cox's, Kettler's claim sounds in this circuit's doctrine of entrapment by estoppel. *See Gutierrez-Gonzalez*, 184 F.3d at 1166–68. And we've already concluded, in resolving Cox's claim, that reliance on the SAPA can't sustain an entrapment-by-estoppel defense in these cases. *See supra* Section B.1.a. It's fatal to their proposed defense

that "in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation," Cox's and Kettler's reliance on the SAPA was not reasonable. *Nichols*, 21 F.3d at 1018.

Nor does Kettler's characterization of an NFA offense as "*malum prohibitum*," or wrong only because of a statutory proscription, justify broadening the entrapment-by-estoppel doctrine's (or the Model Penal Code's) exception to the rule that a mistake of law generally provides no defense to a criminal prosecution. Kettler's Opening Br. at 52. Kettler claims that "everyone knows the laws of the Creator, as they are written in the created order and imprinted by the Creator on every man" and that, as a result, the general mistake-of-law rule applies only to offenses that are mala in se (inherently wrong), not mala prohibita. *Id.* (citing *Romans* 1:18–20). But he cites no legal precedent carving out such an exception.

In *Cheek*, the Court explained the general mistake-of-law rule's provenance: "[b]ased on the notion that the law is definite and knowable, the common law presumed that every person knew the law." 498 U.S. at 199, 111 S.Ct. 604. That presumption might not always hold true anymore given the "proliferation of statutes and regulations," especially in the tax context, so Congress has "softened" its impact "by making specific intent to violate the law an element of certain federal criminal tax offenses." *Id.* at 199–200, 111 S.Ct. 604 (citing *United States v. Murdock*, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933) ). Accordingly, *Cheek* recognized that since the 1930's, the Court has interpreted the term "willfully" in federal criminal tax statutes "as carving out an exception to the traditional rule." *Id.* at 200, 111 S.Ct. 604. "Willfulness," *Cheek* explained, means "the 'voluntary, intentional violation of a known legal duty.' " *Id.* at 201, 111 S.Ct. 604 (quoting *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976) ). *Cheek*, however, didn't suggest that the general mistake-of-law rule disappears whenever an offense may be categorized as malum prohibitum.

Moreover, Congress didn't put a "willfulness" requirement in the NFA. *See* 26 U.S.C. § 5861. As explained above, the NFA is silent about mens rea. The Court filled the gap, based on the presumption that criminal liability should attach only when a defendant knows the facts that make his conduct illegal, by requiring that the defendant know the characteristics of a firearm that bring it within the NFA's ambit. *Staples*, 511 U.S. at 619, 114 S.Ct. 1793. The Court took the mens-rea presumption no further, however, "lest it conflict with the related presumption, 'deeply rooted in the American legal

system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.' " *Id.* at 622, 114 S.Ct. 1793 n.3 (Ginsburg, J., concurring) (quoting *Cheek*, 498 U.S. at 199, 111 S.Ct. 604). Under *Staples*, then, certain factual mistakes (e.g., that a firearm isn't a "firearm" for NFA purposes) may provide a defense to a charge of violating the NFA, but legal **\*1195** mistakes (e.g., that the NFA doesn't apply to locally made firearms) do not.

Accordingly, we reject Kettler's argument that the mens rea element of 26 U.S.C. § 5861 should be subject to a mistake-of-law defense like the Model Penal Code's.

\* \* \*

Finally, we note that Cox's and Kettler's reliance on the SAPA did, in the end, mitigate their sentences, if not their guilt. At the sentencing hearing, the court reasoned that even though the SAPA wasn't available as a defense at trial, the court could "take [it] into account" in deciding to impose probationary, instead of prison, sentences. Cox R. vol. 3 at 716:14–15. Speaking to Cox and Kettler, the court said, "I believe that you both honestly felt that you were protected by [the SAPA] and I believe that to be so[.]" *Id.* at 716:15–17. Thus, the court continued, "I am giving you what benefit I can of that statute here at sentencing." *Id.* at 717:12–13. That benefit turned out to be two years' probation for Kettler and one year's for Cox. (The NFA allows for a penalty of up to ten years in prison, a fine of up to $10,000, or both for violating any of its provisions. 26 U.S.C. § 5871.)

For all these reasons, we conclude that the district court was correct to prohibit Cox and Kettler from introducing their reliance on the SAPA as a defense to their NFA charges. Cox and Kettler received a fair trial and, at sentencing, the benefit of their good-faith reliance on the SAPA, so we see no reason —be it grounded in notions of due process or premised on presumptions about mens rea—either to create a new defense out of whole cloth (as Cox suggests) or to borrow one from the Model Penal Code (as Kettler suggests).

**2. Was Kettler "Snared in a Constitutional Dispute Between Two Independent but Interrelated Civil Sovereigns"?**

In a related argument, Kettler contends that the political rumpus following the SAPA's enactment "snared [him] in a constitutional dispute between two independent but interrelated civil sovereigns." Kettler's Opening Br. at 36. Citing the Declaration of Independence and its protection

of unalienable rights, he argues that "[w]henever any government becomes destructive of those rights, it is the duty of the people—through their lower civil magistrates—to resist the misuse of power even to the point of taking up arms against tyranny as America's founders did in 1776." *Id.* at 44–45 (footnote omitted). Contrary to the founders' federalist ideals, Kettler claims that after passing the SAPA, Kansas's resolve weakened. "In a deferential, not confrontational, letter," he notes, the Kansas Attorney General asked the U.S. Attorney General either to order the dismissal of the indictment or to support a presidential pardon. *Id.* at 46. But Kettler claims that he deserves more than clemency or a pardon—"[h]e deserves the protection of the republican form of government established in Kansas at the time of its admission to the union so that he is not punished for being caught between the two sovereigns to which he oversees allegiance." *Id.* at 47.

We're unable to give Kettler either as an appellate remedy. The Constitution created the "judicial Power" to resolve cases and controversies, U.S. Const. art. III, § 2, cl. 1, and to do so, we have jurisdiction "of appeals from all final decisions of the district courts," 28 U.S.C. § 1291. As Chief Justice Marshall wrote, "the essential criterion of appellate jurisdiction" is "that it revises and corrects the proceedings in a cause already instituted, **\*1196** and does not create that cause." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175, 2 L.Ed. 60 (1803). Yet in making his argument, Kettler points to no error in the district-court proceedings. Without such a claim, we can't simply order the executive branch to grant Kettler clemency or demand that Kansas grant him the protection of a republican form of government. Stated otherwise, to fulfill the judiciary's duty "to say what the law is," we need a legal question. *Id.* at 177.

Accordingly, we decline to grant Kettler relief for being "snared in a constitutional dispute" between Kansas and the federal government. Kettler's Opening Br. at 36.

## CONCLUSION

For these reasons, we affirm the judgments of the district court.

HARTZ, Circuit Judge, concurrence
I join Judge Phillips's opinion in full. I add this comment solely to caution against overreading our holding regarding

silencers. In determining that silencers are not protected by the Second Amendment, we explain that they are not "bearable arms." We had no occasion to consider whether items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition) are also protected.

**All Citations**

906 F.3d 1170

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

187 F.Supp.3d 1282
United States District Court, D. Kansas.

UNITED STATES of America, Plaintiff,
v.
Shane COX, and Jeremy Kettler, Defendants.

6:15-cr-10150-JTM-01,02
|
Signed May 10, 2016

**Synopsis**

**Background:** Defendant charged with unlawful possession of an unregistered firearm, conspiracy, unlawful transfer of an unregistered firearm, unlawfully making a firearm in violation of the National Firearms Act (NFA), and unlawfully engaging in business as a dealer and manufacturer of firearms, and another defendant charged with making false statements on a matter within the jurisdiction of the executive branch of the federal government, conspiracy, and unlawful possession of an unregistered firearm filed motions to dismiss the indictments against them.

**Holdings:** The District Court, J. Thomas Marten, J., held that:

NFA provision making it a federal crime for any person to possess unregistered firearm was valid exercise of Congress' taxing authority, and

defendant was not actively misled by federal government official, as required to support affirmative defense of entrapment by estoppel.

Motions denied.

**Attorneys and Law Firms**

**\*1283** Debra L. Barnett, Office of United States Attorney, Wichita, KS, for Plaintiff.

## MEMORANDUM AND ORDER

J. THOMAS MARTEN, JUDGE

This matter is before the court on a motion to dismiss the indictment by defendant Shane Cox (Dkt. 29), and a motion to dismiss counts 5 and 13 by defendant Jeremy Kettler (Dkt. 32). For the reasons set forth herein, the court finds that the motions should be denied.

### I. Summary

A first superseding indictment filed March 9, 2016, contains thirteen counts. Dkt. 27. Shane Cox, who is named in all but two counts, is charged with three counts of unlawful possession of an unregistered firearm (26 U.S.C. § 5861(d)), one count of conspiracy (18 U.S.C. § 371), five counts of unlawful transfer of an unregistered firearm (26 U.S.C. § 5861(e)), one count of unlawfully making a firearm in violation of the National Firearms Act (26 U.S.C. § 5861(f)), and one count of unlawfully engaging in business as a dealer and manufacturer of firearms (26 U.S.C. § 5861(a)). Jeremy Kettler is charged in three counts: one count each of making false statements on a matter within the jurisdiction of the U.S. Government (18 U.S.C. § 1001), conspiracy (18 U.S.C. § 371), and unlawful **\*1284** possession of an unregistered firearm (26 U.S.C. § 5861(d)).

The "firearms" identified in the foregoing counts include silencers, destructive devices, and a short-barreled rifle. *See* 26 U.S.C. § 5845(a) (defining "firearm" under the National Firearms Act (NFA) to include the foregoing devices). The NFA generally requires individuals who make or transfer these types of firearms to register them and to pay a special tax. *See Johnson v. United States*, —— U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). Section 5861 of the Act makes it unlawful to possess, make, receive, or transfer a firearm covered by the Act without having registered or paid the tax required by the Act.

In his motion to dismiss, defendant Cox argues that 26 U.S.C. § 5861 is unconstitutional because it is an invalid exercise of Congress' power to tax: "Congress has used the power to tax as a subterfuge to regulate the possession of certain weapons, and to punish severely the possession of those weapons not brought within the federal regulation scheme, thus the statute is unconstitutional." Dkt. 29 at 5. Defendant claims that "[o]n its face, and as applied, the statute... is much more than a taxing measure," because the NFA "gives the government the discretion to decide who can register a firearm, prohibits the registration of weapons the government determines may not be legally made, transferred, or possessed, and then criminally punishes the failure to register the weapon." *Id.* at

11. Defendant claims this is unconstitutional "because it goes beyond the power to tax." *Id.*

Cox additionally argues that 26 U.S.C. § 5861(d) is not valid under Congress' power to regulate interstate commerce. Dkt. 29 at 13. Defendant argues that criminalizing the intrastate possession of a firearm does not implicate any of the three areas of interstate commerce that Congress may properly regulate—i.e., the channels of interstate commerce; the instrumentalities of interstate commerce (including persons and things in interstate commerce); and activities that substantially affect interstate commerce. *Id.* at 15-18 (*citing, inter alia, United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (prohibition on possession of a firearm in a school zone exceeded Congress' authority to regulate interstate commerce)). [1]

[1]  Cox opened and closed his brief with assertions that he did not intend to violate the law. *See* Dkt. 29 at 2 ("Cox relied on State of Kansas representatives and did not believe he was violating the law") and at 25 ("defendant had reason to believe in and rely on the law of Kansas"). These assertions about Cox's subjective intent are not otherwise argued in the briefs. To the extent Cox is arguing that he did not have the intent necessary to commit the offense, that is a question for the jury to decide based upon the evidence and the instructions given at trial. To the extent Cox is raising a defense of entrapment by estoppel, that argument is rejected for the same reasons set forth herein pertaining to defendant Kettler.

Defendant Jeremy Kettler moves to dismiss Counts 5 and 13 on grounds of entrapment by estoppel. Kettler contends that he relied in good faith on the Kansas Second Amendment Protection Act, which declares in part that any firearm or "firearm accessory," including a silencer, which is made in Kansas and which remains in Kansas, "is not subject to any federal law... under the authority of congress to regulate interstate commerce." *See* K.S.A. § 50-1204. Kettler argues that 26 U.S.C. § 5861 "require[s] knowledge that someone is possessing a 'firearm' in violation of the federal prohibition in order to be found guilty," and that he "could not have known that any attribute of the 'firearm' brought it within federal regulation because the Kansas legislature ... explicitly told the **\*1285** citizens of the State of Kansas that a sound suppressor did not fall within federal regulation." Dkt. 32 at 4. Kettler argues that this amounts to a defense of entrapment by estoppel, which can arise from a person's reasonable reliance upon the misleading representations of a government agent.

*Id.* at 4 (*citing United States v. Hardridge*, 379 F.3d 1188 (10th Cir.2004)).

## II. Discussion

A.  <u>Whether 26 U.S.C. § 5861 is a valid exercise of Congress' taxing authority</u>. The National Firearms Act imposes strict regulatory requirements on certain statutorily defined "firearms." *Staples v. United States*, 511 U.S. 600, 602, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Under the Act, the term "firearm" includes, among other things, a rifle having a barrel of less than 16 inches in length, a silencer, and a destructive device. 26 U.S.C. § 5845(a). Under the Act, all such firearms must be registered in the National Firearms Registration and Transfer Record maintained by the Secretary of the Treasury. § 5841. Section 5861(d) makes it a federal crime, punishable by up to 10 years in prison, for any person to possess a firearm that is not properly registered. *Staples*, 511 U.S. at 602–03, 114 S.Ct. 1793.

Among other things, the Act imposes a tax upon dealers in these firearms (§ 5801); requires registration of dealers (§ 5802); imposes a tax of $200 per firearm on the maker of the firearm (§ 5821); imposes a $200 tax on each firearm transferred, with the tax to be paid by the transferor (§ 5811); and prohibits transfers unless a number of conditions are met, including that the transferor must file an application with the Secretary, the transferor must pay the required tax and identify the transferee and the firearm, and the Secretary must approve the transfer (§ 5812).

As Cox concedes, the Supreme Court long ago rejected the argument that the Act was not a valid exercise of Congress' authority to levy taxes because it was allegedly designed as a penalty to suppress trafficking in certain firearms. *See Sonzinsky v. United States*, 300 U.S. 506, 512–14, 57 S.Ct. 554, 81 L.Ed. 772 (1937) ("a tax is not any the less a tax because it has a regulatory effect"). Since then, the Tenth Circuit, like all other circuits to address the issue, has found that § 5861 represents a valid exercise of Congress' taxing authority. *See United States v. Houston*, 103 Fed.Appx. 346, 349–50 (10th Cir.2004) ("Mr. Houston fails to establish 26 U.S.C. § 5861(d) and its parent act are beyond Congress' enumerated power to either regulate commerce through firearms registration requirements, or impose a tax thereon."); *United States v. Roots*, 124 F.3d 218 (Table), 1997 WL 465199 (10th Cir.1997) ("*Lopez* does not undermine the constitutionality of § 5861(d) because that provision was promulgated pursuant to Congress's power to tax"). *See also United States v. Village Center*, 452 F.3d 949, 950

(8th Cir.2006) ("irrespective of whether § 5861(c) is a valid exercise of Congress's commerce clause authority... it is a valid exercise of Congress's taxing authority"); *United States v. Lim*, 444 F.3d 910, 914 (7th Cir.2006) ("Section 5861(d), as applied to Lim's possession of the sawed-off shotgun, is a valid use of Congress's taxing power"); *United States v. Pellicano*, 135 Fed.Appx. 44 (9th Cir.2005) (valid exercise of taxing power); *United States v. Oliver*, 208 F.2d 211 Table), 2000 WL 263954 (4th Cir.2000) (the weapon need not have traveled in interstate commerce because § 5861 "has been held to be a valid exercise of the power of Congress to tax"); *United States v. Gresham*, 118 F.3d 258, 261–62 (5th Cir.1997) ("Gresham charges that Congress has used the taxing power as a **\*1286** pretext to prohibit the possession of certain disfavored weapons, without any rational relationship to the revenue-raising purposes of the Internal Revenue Code. ... To the contrary, it is well-settled that § 5861(d) is constitutional because it is 'part of the web of regulation aiding enforcement of the transfer tax provision in § 5811.' "); *United States v. Dodge*, 61 F.3d 142, 145 (2nd Cir.1995) (the registration requirement "bears a sufficient nexus to the overall taxing scheme of the NFA and, therefore, assists the government in collecting revenues.").

Defendant tries to get around these cases by relying on *United States v. Dalton*, 960 F.2d 121 (10th Cir.1992). In that case the Tenth Circuit held it was unconstitutional to convict a defendant for possessing an unregistered machine gun when there was a separate criminal ban on possession of machine guns. The ban made registration of such weapons a legal impossibility. In that circumstance, the Tenth Circuit found, the § 5861 could not reasonably be viewed as an aid to the collection of tax revenue. *See Dalton*, 960 F.2d at 125 ("a provision which is passed as an exercise of the taxing power no longer has that constitutional basis when Congress decrees that the subject of that provision can no longer be taxed."). But the Tenth Circuit soon made clear that *Dalton* applied only if there was a statutory ban on possession of the particular firearm. Thus, § 5861 was constitutionally applied to possession of a sawed-off shotgun, a weapon as to which there was no separate ban. *United States v. McCollom*, 12 F.3d 968 (10th Cir.1993). *See also United States v. Berres*, 777 F.3d 1083 (10th Cir.2015) (rejecting due process challenge to conviction for possession of unregistered flash-bang device). The *McCollom* rule applies equally to the firearms identified in the indictment in this case—silencers, short-barreled rifles, and destructive devices—because it was legally possible to register and pay the required tax on such items. *Berres*, 777 F.3d at 1088; *McCollom*, 12 F.3d at 971 ("[d]ifferent

from *Dalton*, the registration of this weapon was not a legal impossibility."); *United States v. Eaton*, 260 F.3d 1232, 1236 (10th Cir.2001) (defendant's conviction for possessing unregistered pipe bombs did not violate due process; there was no statute criminalizing possession of pipe bombs and defendant was not precluded by law from registering them).

Finally, Cox contends that because the government retains some authority to deny an application for registration of a firearm, that fact somehow renders the Act unconstitutional. Dkt. 29 at 8-9. As an initial matter, the court notes defendant has not alleged that an application for registration of these particular firearms was in fact denied. Moreover, the Tenth Circuit has made clear that it is only when registration is a legal impossibility that application of § 5861 constitutes a due process violation. *See McCollom*, 12 F.3d at 971 ("Even if it is unlikely that the firearm would have been accepted for registration, the defendant has cited no statute which makes the possession of short-barreled shotguns illegal."); *Eaton*, 260 F.3d at 1236 ("[w]hether the ATF would have accepted the pipe bomb for registration does not bear on the issue of legal impossibility."). *See also United States v. Shepardson*, 167 F.3d 120, 123 (2nd Cir.1999) (same); *United States v. Aiken*, 974 F.2d 446, 449 (4th Cir.1992) ("The fact that not everyone might be able to obtain a short-barreled shotgun, since the BATF must first approve the reasonable necessity and public safety declarations, does not invalidate the NFA as a taxing statute."). *See also Dist. of Columbia v. Heller*, 554 U.S. 570, 624, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ("the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

**\*1287** Defendant has not alleged or made any showing that registration of the firearms identified in the indictment was a legal impossibility. Under these circumstances, Tenth Circuit law compels a finding that application of § 5861(d) rationally furthers the NFA scheme for collecting taxes and constitutes a valid exercise of Congress' taxing authority. *McCollom, supra*. *See also* U.S. CONST. art. I, § 8 ("The Congress shall have Power To lay and collect Taxes"); *Sonzinsky*, 300 U.S. at 514, 57 S.Ct. 554 ("an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed."). Accordingly, defendant Cox's motion to dismiss the indictment must be denied. In view of this finding, the court need not address Cox's additional argument that § 5861 exceeds Congress' power to regulate interstate commerce.

B. Entrapment by estoppel. "The defense of entrapment by estoppel is implicated where an agent of the government affirmatively misleads a party as to the state of the law and that party proceeds to act on the misrepresentation so that criminal prosecution of the actor implicates due process concerns under the Fifth and Fourteenth Amendments." *United States v. Bradley*, 589 Fed.Appx. 891, 896 (10th Cir.2014) (*quoting United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir.1994), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 1511, 191 L.Ed. 2d 445 (2015)).

To establish the defense, a defendant must show: (1) an active misleading by a government agent who is responsible for interpreting, administering, or enforcing the law defining the offense; and (2) actual reliance by the defendant, which is reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation. *Bradley*, 589 Fed.Appx. at 896 (*citing United States v. Rampton*, 762 F.3d 1152, 1156 (10th Cir.2014)).

Defendant Kettler's assertion of this defense fails to satisfy the first element. He contends he was misled by the State of Kansas (or its legislature), because it represented through adoption of K.S.A. § 50-1204 that possession of a silencer that was made in and remained in Kansas was not subject to any federal law. [2] But Kansas officials and representatives are not responsible for interpreting or enforcing the law defining this offense—26 U.S.C. § 5861—which is a federal statute adopted by Congress, interpreted by the courts of the United States, and enforced by the executive branch of the United States. Kansas officials have authority to declare the laws of Kansas, but they have no responsibility for construing or enforcing federal laws such as this. The defense of entrapment by estoppel is not available to defendant in these circumstances. *See U.S. v. Gutierrez–Gonzalez*, 184 F.3d 1160, 1167 (10th Cir.1999) ("the 'government agent' must be a government official or agency responsible for enforcing the law defining the offense"); *United States v. Stults*, 137 Fed.Appx. 179, 184 (10th Cir.2005) (advice given by state probation and state judge was not the advice of a federal official and did not give rise to entrapment by estoppel); *United States v. Hardridge*, 379 F.3d 1188, 1195 (10th Cir.2004) (Kansas City Police Department was not responsible for interpretation or enforcement of federal firearms law). *See also* **\*1288** *United States v. Miles*, 748 F.3d 485, 489 (2nd Cir.2014) (citing "unanimous" rule that state and local officials cannot bind the federal government to an erroneous interpretation of federal law).

2  K.S.A. § 50-1204 declares that a firearm accessory which is made in Kansas and which remains in Kansas "is not subject to any federal law, ... *under the authority of congress to regulate interstate commerce.*" [emphasis added]. The provision does not mention Congress' power to levy taxes.

Kettler nonetheless argues that the representation in this instance came from "a governing body of such character [as] to render reliance reasonable." Dkt. 32 at 6. But the above cases demonstrate that it is not reasonable to rely upon representations about the validity of federal law from officials who have no authority over federal law.

Kettler contends the *mens rea* for an offense under § 5861 could not possibly have been present. Dkt. 32 at 4. In so arguing, he mistakenly asserts that § 5861 requires proof that he knew possession of an unregistered silencer was a violation of the federal law. *Id.* But in *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), where the defendant was charged with possession of an unregistered machine gun, the Court held only that the government must prove the defendant knew *of the characteristics of his weapon* that made it a firearm under the NFA, not that he knew the NFA required its registration. *See Staples*, 511 U.S. at 622, n. 3, 114 S.Ct. 1793 (Ginsburg, J., concurring) ("The *mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.' "); *United States v. Michel*, 446 F.3d 1122, 1130 (10th Cir.2006) ("Although the government was required to prove Mr. Michel knew the gun was a sawed-off shotgun, it was not required to further prove he knew it was supposed to be registered or that it lacked a serial number.").

As such, under § 5861 the government must prove the defendant knew that the device in question was "for silencing, muffling, or diminishing the report of a portable firearm," not that he knew possession of such an unregistered item violated the NFA. *See* 26 U.S.C. § 5845(a)(7) and 18 U.S.C. § 921(a) (24). Whether or not defendant had the requisite knowledge for commission of that offense is a question for the jury to determine from the evidence.

**IT IS THEREFORE ORDERED** this 10th day of May, 2016, that the defendants' motions to dismiss the indictment

(Dkts. 29 and 32) are DENIED. Defendants' motions to join in each other's motions (Dkts. 30 and 31) are GRANTED.

**All Citations**

187 F.Supp.3d 1282

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

63-2 USTC P 15,518

321 F.2d 174
United States Court of Appeals Eighth Circuit.

Norman Gene SIPES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17221.
|
July 17, 1963.
|
Certiorari Denied Nov. 12, 1963.

See 84 S.Ct. 208.

## Synopsis

Prosecution for possession of firearm having a barrel less than 16 inches in length in violation of National Firearms Act. The United States District Court for the Eastern District of Missouri, James H. Meredith, J., entered a judgment of conviction and the defendant appealed in forma pauperis with leave of the District Court. The Court of Appeals, Blackmun, Circuit Judge, held that defendant's conviction was not in violation of his rights under the Fifth, Sixth, and Tenth Amendments.

Affirmed.

## Attorneys and Law Firms

**\*175** Roger Milo Hibbits (court-appointed) St. Louis, Mo., for appellant.

William C. Martin, Asst. U.S. Atty., St. Louis, Mo., made oral argument for appellee and filed brief with Richard D. FitzGibbon, Jr., U.S. Atty., St. Louis, Mo.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and YOUNG, district judge.

## Opinion

BLACKMUN, Circuit Judge.

Norman Gene Sipes, 18 years of age, was charged by information with having in his possession in St. Louis on July 13, 1962, in violation of 26 U.S.C. § 5851, a certain firearm, with a barrel less than 16 inches in length, made in violation of § 5821. Sipes has been represented by court appointed

counsel since the issuance of that information. In the manner prescribed by Rules 7(b) and 23(a), F.R.Cr.P., he waived indictment and trial by jury. He entered a plea of not guilty. He was convicted by the court and sentenced for treatment and supervision under the Federal Youth Corrections Act, 18 U.S.C. § 5010(b). Defense motions to dismiss the information and for judgment of acquittal were appropriately made but were denied by the court.

With leave of the district court, the defendant appeals in forma pauperis. The complete transcript has been provided at government expense. The defense asserts here, as it did in the trial court, that § 5851 is violative of rights guaranteed by the Tenth, Fifth, and Sixth Amendments to the Constitution, and that the evidence is insufficient to show that the weapon in question was a firearm within the meaning of the statute.

The statute. The National Firearms Act, 26 U.S.C.A. §§ 5801-5862, as amended, is a part of the Internal Revenue Code of 1954. The original Act, that of June 26, 1934, Pub.L. 73-474, ch. 757, 48 Stat. 1236, was similarly codified as §§ 2720-2733 of the 1939 Code. The present Act includes in its definition of a firearm 'a rifle having a barrel * * * less than 16 inches in length'; a rifle is defined to mean 'a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder'. § 5848. Except for stated exemptions, a license tax is imposed annually upon each importer, manufacturer and dealer in firearms, § 5801, and an excise tax is imposed 'on firearms transferred in the United States', § 5811, and 'upon the making in the United States of any firearm (whether by manufacture, putting together, alteration, any combination thereof, or otherwise)', § 5821. Unless certain other provisions of the Act have been complied with, every person 'possessing a firearm' is required to register its number or other identifying mark and certain personal information. § 5841. Section 5851, which is vital here, reads:

'It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of sections 5811 * * * or which has at any time been made in violation of section 5821, or to posses any firearm which has not been registered as required by section 5841. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearms, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains **\*176** such possession to the satisfaction of the jury.'

The phrase 'or to posses any firearm which has not been registered as required by section 5841' was added to the statute in 1958 by Pub.L. 85-859, § 203(h)(2), 72 Stat. 1428.

The facts. The facts, except possibly with respect to scienter, are not in dispute. Young Sipes was seen about 11:15 P.M. on July 13, 1962, by two officers of the St. Louis Police Department. He was running and had the weapon in question in his possession. It was a .22 of Stevens manufacture. It possessed a cocking lever which was not in the condition in which it was originally manufactured. The weapon had a cartridge in its chamber when it was taken from Sipes. Its barrel measured no more than 14 1/2 inches. An officer of the St. Louis police laboratory testified that he fired the gun successfully on his first attempt; that its lever pin and spring were missing; that the weapon was not in its normal condition; that it nevertheless could be operated by pulling back on the hammer; that 'there would certainly be no problem in firing it'; that there were no front or rear sights on the weapon; that he assumed 'there (had been) a sight on the end of the barrel'; that there was no advantage in firing the weapon from the shoulder; and that it could be fired from the hand as well as from the shoulder. Sipes had not filed a declaration of intent to make this firearm, as contemplated by § 5821(e), and the weapon had not been registered.

Sipes testified that he had had possession of a weapon which looked like the one the prosecution introduced in evidence; that he found it 'when it was buried'; that this was on July 8 or 9, 1962; that he did not know it was an 'illegal weapon' or that he was violating the law when he had it or that there was a tax or registration which was required or that the gun was made in violation of any statute; that he had attempted to fire it but was not successful because it had no firing pin; that he put a shell in the gun and pulled the trigger but the gun did not fire; that he did not attempt to fire it again; that the firing pin 'would be here where the nail is'; and that the nail in the weapon 'as it is now * * * is as the firing pin'.

The Tenth Amendment. The defense position as to the reservation of powers clause is not an unfamiliar one. It is argued that the Act, and particularly § 5851 with its reference to § 5821, is an unconstitutional attempt by Congress to regulate under the guise of a revenue measure an activity, namely, the regulation of firearms, which is reserved to the states; that the Act was not meant to raise revenue; that the tax imposed upon 'the making' of a firearm is greater than the cost of a .22 rifle; that this demonstrates that the tax is an absolute prohibition against the owner 'from making

the highly penal modification' of sawing off the barrel; that the motives of Congress with respect to this legislation are not hidden; that in 1960, in connection with Pub.L. 86-478, 74 Stat. 149, which amended the Act, Congress clearly acknowledged its motives and primary purpose:

'The primary purpose of (the original 1934 Act) was to make it more difficult for the gangster element to obtain certain types of weapons. The type of weapon with which these provisions are concerned are the types which it was thought would be used primarily by the gangster-type element. * * * The purpose of this was, of course, to include within the category of weapons subject to these taxing and control provisions the sawed-off shot guns and sawed-off rifles likely to be used by the gangster element. * * *' Senate Report No. 1303, 86th Cong., 2d Sess., 1960-1 C.B. 848, 849-50, U.S.Code Congressional & Administrative News, 1960, pp. 2111, 2112-13; and House Report No. 914, 86th Cong., 2d Sess.;

that the carrying of concealed weapons is a matter the states have controlled through legislation for many years (see, for example, V.A.M.S. § 546.610); that **177** amendments to the statute indicate that revenue is not a consideration; that there was no way for this appellant to pay the 'making 'tax; and that the statutory provisions are 'extraneous to any tax need'.

So far as this issue is concerned, we find ourselves again in the not uncommon situation where this court, as an inferior federal court and at a late date, has little room in which to move. The same arguments have already been made to the Supreme Court and have been decided adversely to the defense. In Sonzinsky v. United States, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772 (1937), the Court passed upon a challenge to the 1934 Act. The report, pp. 507-10, discloses the presence of all the Tenth Amendment, purpose, nonrevenue, proportion-of-tax-to-value, and prohibitive-character arguments. The Court upheld the statute, noted that on its face it was a taxing measure, and said, pp. 513-514 of 300 U.S., p. 556 of 57 S.Ct.:

'Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. But a tax is not any less a tax because it has a regulatory effect * * * and it has long been established that an Act of Congress which on it face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed. * * *

'Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts. * * * They will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution.'

This approach was reaffirmed in United States v. Miller, 307 U.S. 174, 177-178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), and with respect to a tax on wagers, in United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953). That there is now an outright manifestation of legislative purpose is not a factor sufficient in itself for a holding of invalidity under the Tenth Amendment. United States v. Kahriger, supra, pp. 27-28 of 345 U.S., pp. 512-513 of 73 S.Ct. 'So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power'. Barenblatt v. United States, 360 U.S. 109, 132, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Communist Party of U.S. v. Subversive Activities Control Board, 367 U.S. 1, 86, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

We therefore must hold that the statute challenged here continues not to be violative of the Tenth Amendment.

Self-incrimination and the Fifth Amendment. The defense argument is that § 5841 (the registration section) violates the Fifth Amendment's guaranty against self-incrimination; that this section was held unconstitutional in Russell v. United States, 306 U.S. 402 (9 Cir. 1962); that the present form of the statute, in contrast to § 16 of the 1934 Act, contains no separability provision; that only in 1958 was § 5851 amended to include a reference to § 5841; that this addition is necessarily invalid if Russell is to be followed; that the purpose of that amendment was to clarify the law, citing Senate Report No. 2090, 85th Cong., 2d Sess., U.S.Code Congressional & Administrative News, 1958, pp. 4395, 4604; and that Congress is obviously not content with § 5851 when the invalid reference to § 5841 is eliminated.

In the Russell case the Ninth Circuit held (a) that the information there, in alleging a violation of § 5851 by failing to register, did not charge a crime because that section, as it read in 1956 at the time of that alleged offense, made no reference to § 5841; (b) that it did charge a crime under § 5841; and (c) that § 5841 abridged the privilege against self-incrimination because it forced one **\*178** to admit that he was in unlawful possession of a firearm transferred or

made in violation of the Act. The Kahriger case, supra, and another wagering case, Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), were distinguished on the ground that he registration provisions of the wagering tax statute were not unconstitutional because the privilege against self-incrimination has no relation 'to future acts that may or may not be committed', p. 32 of 345 U.S., p. 515 of 73 S.Ct. It was said, p. 410 of 306 F.2d, that, on the contrary, § 5841 required the defendant 'to provide information as to past conduct (or present status) which was actually or presumptively unlawful'.

We need not pass, as the Ninth Circuit was compelled to do, upon the constitutionality of § 5841. Cf. Page v. United States, 282 F.2d 807, 810-811 (8 Cir.1960). No violation of that section is charged by the information against Sipes. What is charged here is a violation of § 5851 in the possession of a firearm made in violation § 5821. The sufficiency of this charge is intimated in Russell itself, pp. 406-407 of 306 F.2d, and footnote 11, and it certainly may be said that the court in that case did not hold that there could be no conviction under § 5851 without a violation of the Fifth Amendment. Furthermore, the Ninth Circuit, since Russell and since the conviction in the present case, now has twice upheld a conviction under § 5851 for possession of an unregistered firearm and has concluded that there was no Fifth Amendment violation. Frye v. United States, 315 F.2d 491, 492, 494 (9 Cir.1963), and Starks v. United States, 316 F.2d 45 (9 Cir. 1963). In the latter case it was said, p. 46 of 316 F.2d. 'It is the possession of an gun that no one has registered, not the failure by appellant to register, that is the essence of the offense with which appellant was charged in this case'. The author of both of these opinions, Judge Duniway, was a member of the court which decided Russell.

If the Ninth Circuit is correct in this analysis— and it seems to us that it is— it follows, a fortiori, that any defect which might be present in § 5841 does not render a charge under § 5851 and directed to § 5821 violative of the Fifth Amendment. We so held.

The suggestion as to the absence of a separability clause is answered by the presence of the general clause in § 7852(a) applicable to the entire 1954 Code. The historical note appended to 26 U.S.C.A. § 7852(a) contains a specific reference to § 16 of the 1934 Act. In any event, various sections of the Act specify separate and distinct offenses. United States v. Hardgrave, 214 F.2d 673 (7 Cir.1954); Crapo v. Johnston, 144 F.2d 863 (9 Cir.1944), cert. denied 323 U.S. 785, 65 S.Ct. 267, 89 L.Ed. 626; Fleish v. Johnston, 145 F.2d

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

16 (9 Cir.1944), cert. denied 324 U.S. 840, 65 S.Ct. 587, 89 L.Ed. 1402; Montgomery v. United States, 146 F.2d 142 (4 Cir.1944). Cf. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

The sufficiency of the evidence. The defense argues here that the information charges possession of a rifle; that 'rifle' is defined by § 5848(3) to mean a weapon 'designed or redesigned, made or remade, and intended to be fired from the shoulder * * *'; that this weapon had no sight at either end of its barrel; that there was no advantage in firing it from the shoulder; that the recoil of a .22 is not sufficient to require placing against the shoulder; and that it could be fired from the hand.

This argument does not convince us. The weapon itself was in evidence and revealed its true nature. That it had no sights or that it could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition. It has been said that a weapon without a firing pin is not a firearm. United States v. Thompson, 202 F.Supp. 503, 507 (N.D.Cal., 1962). We do not decide that question. Although Sipes testified that when he found the weapon it had no firing pin, he also conceded that the nail in the weapon at the time of trial was the firing pin. And there is **\*179** testimony that the weapon at the trial was in the same condition as when it was taken from Sipes and that it was successfully fired in that condition. It qualifies as a rifle and as a firearm.

Scienter and the Fifth and Sixth Amendments. The defense points out that § 5851 sets forth no exemptions from its description of unlawful possession other than what may be included in the section's last sentence. It is then argued that that sentence constitutes an improper delegation to the jury of the power to determine which type of possession is criminal; that the statute is vague and does not enable a defendant to know the nature of the charge against him; that there was no showing of knowledge on the part of Sipes; that scienter is a vital element in our criminal law; and that, if the statute does not require scienter, we have a situation where rights guaranteed under the Fifth and Sixth Amendments are violated.

The government's response is that the gist of the crime is possession; that intent to possess is the vital element; that intent to possess and knowing possession are established by the evidence here; that any broader intent is not an element of the crime; and that, in any event, the fact of conversion of the weapon into a firearm by the insertion of the nail as a firing pin while the weapon was in Sipe's possession provides sufficient proof here of scienter.

We had occasion recently, in Holdridge v. United States, 282 F.2d 302, 308-310 (8 Cir.1960), to consider criminal intent as a necessary factor in federal crime. That discussion need not be repeated here. We note it has been said flatly that 'scienter is not involved' with respect to §§ 5851 and 5841. United States v. Decker, 292 F.2d 89, 90 (6 Cir.1961), cert. denied 368 U.S. 834, 82 S.Ct. 58, 7 L.Ed.2d 36. To the same effect is United States v. Wost, 148 F.Supp. 202, 204 (N.D.Ohio, 1957). But we need not go so far. What is charged by the information against Sipes is possession of a firearm made in violation of § 5821. There can be no question that the defendant's possession of the weapon was a knowing one. Hill v. United States, 294 F.2d 562 (8 Cir.1961). He said he found it and possessed it for several days. It was in his hands when the arresting officers took it from him. He knew it was a gun. His possession therefore was a knowing possession. This is all the scienter which the statute requires. It is not necessary that, in addition to knowing possession, there also be knowledge on the defendant's part that it was made in violation of § 5821. Hazelwood v. United States, 208 F.Supp. 622 (N.D.Cal.1962); United States v. Mares, 208 F.Supp. 550 (D.Colo.1962). In any event, the inference that Sipes inserted the nail is proper and creates a knowing 'making' on his part.

This leaves only the last sentence of § 5851 which merits further comment. Admittedly, the presence of language of this kind in a criminal statute is likely to raise questions in a lawyer's mind. The courts, however, have held that this sentence does not relieve the government of proving all the elements of the claimed offense, and that it encompasses no more than a rule of evidence which comes into effect once possession has been shown. Frye v. United States, supra, p. 494 of 315 F.2d; Starks v. United States, supra, p. 46 of 316 F.2d; United States v. Decker, supra, p. 91 of 292 F.2d.

This statutory presumption has its counterpart in other statutes. These have been upheld against constitutional attack where there is a rational connection between the facts proved and the fact presumed. See, for example, § 2(c), (f) and (h) of the Narcotic Drugs Import and Export Act, 21 U.S.C.A. §§ 174, 176a, upheld in such cases as Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925); United States v. Gibson, 310 F.2d 79, 81 (2 Cir.1962); and Vick v. United States, 113 U.S.App.D.C. 12, 304 F.2d 379, 380 (D.C.Cir.1962), and § 4704(a) of the Internal Revenue Code of 1954, upheld in an earlier form in **\*180** Casey v. United States, 276 U.S. 413, 418, 48 S.Ct. 373, 72 L.Ed. 632 (1928), and in Gonzales v. United States, 162 F.2d 870 (9 Cir. 1947).

Sipes v. U.S., 321 F.2d 174 (1963)
63-2 USTC P 15,518

However, in Tot v. United States, 319 U.S. 463, 467-468, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), similar language in § 2(f) of the Federal Firearms Act, 15 U.S.C.A. § 902(f), was held unconstitutional because of the absence of such rational connection 'in common experience'. Among other instances of statutory language of this type are 21 U.S.C.A. § 176b (sale of heroin to juveniles); 21 U.S.C.A. §§ 178, 181 and 188m (opium); 26 U. S.C.A. § 4744(a) (possession of marihuana); 26 U.S.C.A. § 5681(d) (posting liquor business signs); 26 U.S.C.A. § 5691(b) (sale of liquors in excess of given quantity); 26 U.S.C.A. § 5601(b) (presence at illegal liquor production site).

We agree with the conclusions reached by the Ninth and Sixth Circuits in the Frye, Starks and Decker cases, supra, and conclude that § 5851 in this respect is controlled by Yee Hem and Casey, rather than by Tot.

While, as the trial court noted, questions may possibly be posed as to the constitutional uncertainty of § 5851, we are not inclined upon our foregoing analysis of the statute, any more than the district court was, to conclude that the section on its face is clearly unconstitutional. Some of the questions which bothered the trial court here, in the light of the Russell case, have perhaps been set at rest by the Frye and Starks cases, decided since Sipes was convicted. In Page v. United States, supra, in a somewhat different context, this court observed that sawed-off shotguns were 'useless for any lawful purpose'. The same observation applies to a sawed-off rifle of the kind possessed by Sipes. We say again, as we said in Page, p. 811 of 282 F.2d, 'If the Act, in so far as applicable here, is to be declared invalid, that should, we think, be done by the Supreme Court on certiorari * * *.'

We are grateful to Mr. Roger Milo Hibbits of the St. Louis bar who was appointed by the district court to represent the defendant at his trial and on his appeal. Mr. Hibbits has given the defendant most adequate representation and has been of great assistance to us.

Affirmed.

**All Citations**

321 F.2d 174, 63-2 USTC P 15,518

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.