## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

WILLIAM AKINS,

        Plaintiff,

v.                               CASE NO:  8:08-cv-988-T-26TGW

UNITED STATES OF AMERICA,

        Defendant.

_____/

### O R D E R

      This cause comes before the Court on Defendant's Motion to Dismiss or in the

Alternative Motion for Summary Judgment, which is accompanied by the administrative

record of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or

"BATFE") (Dkt. 19) and Plaintiff's Response in Opposition, which is accompanied by a

Statement of Disputed Facts and exhibits (Dkt. 25).  Defendant has also filed a Reply to

the Response.  (Dkt. 28.)

### Summary Judgment Standard

      The parties have submitted many exhibits for the Court's consideration in these

proceedings and, thus, Defendant's instant Motion will be treated as a motion for

summary judgment.  See Poole v. Rich, 2008 WL 185527, at *2 (11th Cir. 2008)

(reaffirming the general rule that whenever a judge considers matters outside the

pleadings in a 12(b)(6) motion, that motion is converted to Rule 56 motion for summary

judgment).  Summary judgment is appropriate where there is no genuine issue of material

fact. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no genuine issue for trial. See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (citation

omitted). On a motion for summary judgment, the court must review the record, and all

its inferences, in the light most favorable to the nonmoving party. See United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962). Having done so, the Court finds that

Defendant's Motion for Summary Judgment is due to be granted. Defendant's

memoranda are thorough and well-reasoned and, therefore, portions of them will be

incorporated herein.

## **Case Background**

The Gun Control Act ("GCA") prohibits any person from "possess[ing] a

machinegun" manufactured after May 19, 1986, subject to a limited exception for law

enforcement agencies. 18 U.S.C. § 922(o). Congress drew upon the definition of

"machinegun" as found in the National Firearms Act ("NFA"), Internal Revenue Code of

1954, 26 U.S.C. § 5845, which defines the term as follows:

> any weapon which shoots, is designed to shoot, or can be readily restored to
> shoot, automatically more than one shot, without manual reloading, by a
> single function of the trigger. The term shall also include the frame or
> receiver of any such weapon, any part designed and intended solely and
> exclusively, or combination of parts designed and intended, for use in
> converting a weapon into a machinegun, and any combination of parts from
> which a machinegun can be assembled, if such parts are in the possession or
> under the control of a person.

AR005580

See 18 U.S.C. §§ 921(a)(23), 922(b); 26 U.S.C. § 5845; see also 27 C.F.R. 478.11;

479.11. Manufacturers of machineguns are required to register in accordance with 26

U.S.C. § 5822 and may only manufacture them for the use of a Federal or state

department or agency. See 18 U.S.C. § 922(o). Congress has delegated the authority to

regulate under the NFA to ATF. See 27 C.F.R. § 479; U.S. v. One Sentinel Arms Striker-

12 Shotgun Serial No. 001725, 416 F.3d 977 (9th Cir. 2005) (recognizing delegation of

authority to ATF).

    In 1998, Plaintiff developed an "apparatus for accelerating the cyclic firing rate of

a semi-automatic firearm," and applied for a patent from the United States Patent and

Trademark Office. (Dkt. 12, Ex A.) On August 15, 2000, Plaintiff received Patent No.

6,101,918 for his device, which he subsequently named the "Akins Accelerator." (Id. at

Ex. B; Dkt. 12, ¶ 7.) Plaintiff wrote to the Firearms Technology Branch ("FTB") of ATF

on March 31, 2002, enclosing a copy of his patent abstract, to inquire as to whether the

device would be classified as a machinegun. (Dkt. 12, Ex. B.)

    On July 28, 2003, FTB asked that Plaintiff submit a sample of the device and on

August 21, 2003, Thomas Bowers ("Bowers"), Plaintiff's business associate, submitted a

prototype to FTB. (Dkt. 1, ¶ 15.) FTB examined the Akins Accelerator prototype,

installed it in an SKS-type rifle, and test-fired it. (Dkt. 12, Ex. E.) On the second test-

firing, the prototype broke. (Id.) Notwithstanding, FTB determined that "the submitted

stock assembly does not constitute a machinegun . . . [nor] a part or parts designed and

intended for use in converting a weapon into a machinegun." (Id.) FTB informed Mr.

AR005581

Bowers of its conclusion in a November 17, 2003 letter, noting that the "weapon did not
fire more than one shot by a single function of the trigger." (Id.)

On January 21, 2004, Bowers submitted a second letter, wherein he expressed
"confusion" over the meaning of the November 17, 2003 letter and asked FTB to "clearly
state[]" its opinion on the "application of the principle of operation" of the Akins
Accelerator, not just on the physical prototype itself. (Dkt. 12, Ex. F.) FTB replied to
Mr. Bowers' letter on January 29, 2004, describing the device's "proposed theory of
operation" as "the application of the movement of the counter recoiling rifle to initiate a
rapid succession of semiautomatic fire." (Dkt. 12, Ex. G.) The letter then stated that the
"classification of the stock assembly was rendered despite the breakage of the prototype,"
noting that "[t]he theory of operation was clear even though the rifle/stock assembly did
not perform as intended." (Id.) The letter emphasized, however, that its conclusions were
"valid provided that when the stock is assembled with an otherwise unmodified SKS
semiautomatic rifle, the rifle does not discharge more than one shot by a single function
of the trigger." (Id.) Based on FTB's classification that the Akins Accelerator was not a
machinegun, Plaintiff began mass production and distribution of the devices through
Plaintiff's predecessor in interest, Akins Group, Inc.

On August 18, 2006, a website that Plaintiff was using to sell the Akins
Accelerator came to the attention of ATF. (Dkt. 19, R. 25.)[1] The website advertised the

---

[1] Citations to pages in the administrative record (Dkt. 19) are signaled throughout this
Order with "R."

AR005582

device as "Evaluated by FTB/USDOJ/BATFE" and quoted from FTB's letters and the

NFA. (R. 25-26.) Shortly thereafter, an Akins Accelerator customer wrote the FTB and

requested "a written determination" of whether the device, "assembled with a standard

Ruger 10/22 semiautomatic carbine as described by the manufacturer," would constitute a

machinegun within the NFA.[2] (R. at 27-28.) The letter expressed concern that the earlier

letters to Mr. Bowers did not "specifically include the use of the device with a standard

Ruger 10/22 semiautomatic carbine." (Id.) Around the same time, FTB received requests

to evaluate other devices designed to accelerate the rate of fire of a semiautomatic

firearm, including one to be used in conjunction with an AK-47 type semiautomatic rifle.

(R. 50-52.)

On September 22, 2006, ATF opened an investigation into the then being sold

Akins Accelerator. (Id. at R. 54.) ATF obtained a retail-model device on October 6,

2006, and forwarded it to FTB on October 11, 2006. (Id.) Following a test-firing of the

retail-model device, FTB wrote to Bowers on November 22, 2006, and advised him that it

had tested the device with a Ruger 10/22 rifle and "demonstrated that a single pull of the

trigger initiates an automatic firing cycle that continues until the finger is released, the

weapon malfunctions, or the ammunition supply is exhausted." (Dkt. 12, Ex. H.) The

letter also noted that "[t]he Akins device assembled with a Ruger 10/22 is advertised to

fire approximately 650 rounds per minute," and concluded that the device must be

---

[2] See 26 U.S.C. § 5845(a) (defining "firearm").

AR005583

classified as a machinegun. (Id.) FTB stated that its prior letters "are hereby overruled" and advised Plaintiff to either register its Akins Accelerators on hand as machineguns in accordance with 26 U.S.C. § 5822 or surrender them. (Id.)

Then, on December 13, 2006, ATF issued a new policy statement, ATF Ruling 2006-2, out of concern for the public safety implications of other, similar devices. (Dkt. 12, Ex. I.) In that statement, ATF explained that "conversion parts that, when installed in a semiautomatic rifle, result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger, are a machinegun as defined in the National Firearms Act and the Gun Control Act." (Id.) In addition, ATF provided a description of the Akins Accelerator, and held that such a device would be classified as a machinegun. (Id.)

On January 19, 2007, ATF required Plaintiff to remove recoil springs from his personal Akins Accelerators and surrender them. (Dkt. 1, ¶ 35.) On February 6, 2007, Plaintiff, through counsel, requested that FTB reconsider its classification of the Akins Accelerator as a machinegun. (Dkt. 12, Ex. J.) The request for reconsideration asserted that... "[i]f . . . the trigger finger remains in contact with the trigger, only one shot can result until the trigger is released and then pressed again." (Id.) It also observed that a number of other devices have not been classified as machineguns, including devices that fire two or three shots with a single pull of the trigger. (Id.; R. 132.) The request for reconsideration emphasized that the agency's original classification of the Akins Accelerator was "consistent" with "long-standing agency interpretations." (Id.; R. 135.)

6

AR005584

In conjunction with his request that ATF reconsider Ruling 2006-2, Plaintiff requested the opportunity "to present [his] case orally" to ATF. (R. 147.) On September 24, 2007, ATF issued a letter upholding that the machine gun classification without a hearing. (Dkt. 12, Ex. K.)

On February 18, 2008, Akins Group, Inc., assigned all rights and interests in claims it may have against the Government to Plaintiff. (Dkt. 1, ¶ 37.) On March 6, 2008, Akins filed a lawsuit in the Court of Federal Claims, requesting compensation under the Takings Clause of the Fifth Amendment, as well as declaratory and injunctive relief reversing ATF's classification of the Akins Accelerator. See Akins v. United States, No. 08-136C (Ct. Fed. Cl. 2008) (No. 1). On May 2, 2008, the United States moved to dismiss the case, arguing with respect to Akins' declaratory and injunctive relief claims that the Court of Federal Claims lacked jurisdiction to: (1) hear Plaintiff's due process claim; (2) conduct Administrative Procedures Act (APA") review of ATFs ruling; (3) declare 18 U.S.C. § 922(o) unconstitutional; or (4) issue the requested declaratory and injunctive relief. See Akins v. United States, No. 08-136C (Ct. Fed. Cl. 2008) (No. 5). In response, Akins withdrew those claims. See Akins v. United States, No. 08-136C (Ct. Fed. Cl. 2008) (No. 6).

Plaintiff filed the instant action on May 21, 2008, claiming that ATF/FTB's actions were arbitrary and capricious and a violation of due process. (Dkt. 1.) Plaintiff seeks relief in the form of: (1) a declaration that the Akins Accelerator is not a machinegun; (2) an injunction prohibiting Defendant from treating the Akins Accelerator as a machinegun

AR005585

for any purpose; (3) an alternative declaratory ruling that 26 U.S.C. § 5845(b) is

unconstitutionally vague on its face and as applied to Plaintiff; (4) alternative injunctive

relief prohibiting Defendant from applying 26 U.S.C. § 5845(b) so as to treat the Akins

Accelerator as a machinegun; and (5) costs and attorney's fees.  (Dkt. 1.)

On July 24, 2008, the Court of Federal Claims dismissed Akins' remaining claims,

holding that Akins' takings claims were "barred under the police power doctrine," and

further holding that Akins "voluntarily entered an area subject to pervasive federal

regulation, in which he could not have an "expectation interest . . . protected by the Fifth

Amendment.  See Akins v. United States, 82 Fed. Cl. 619, 622-24 (Ct. Fed. Cl. 2008).

## **Standard of Review**

This case is a challenge to ATF's interpretation of 26 U.S.C. § 5845 and its

application to the Akins Accelerator.  Such final agency actions may be challenged as

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"

under the Administrative Procedure Act ("APA").  See 5 U.S.C. § 706(2); 5 U.S.C. § 704.

If that challenge is successful, the court may "hold [the action] unlawful and set aside

agency action, findings, and conclusions."  Sierra Club v. Flowers, 526 F.3d 1353, 1360

(11th Cir. 2008).  "This standard of review is highly deferential, and presumes the

validity of the agency action."  Florida Manufactured Housing Ass'n, Inc. v. Cisneros, 53

F.3d 1565, 1572 (11th Cir. 1995); see also Sierra Club v. Van Antwerp, 526 F.3d 1353,

1360 (11th Cir. 2008) (holding that "this standard is exceedingly deferential").

AR005586

It is well established that this Court should confine its review to the administrative record.  See Garcia v. United States, 2002 U.S. Dist. LEXIS 22704, at *18 (S.D. Fla. May 8, 2002) (holding that "[i]n an APA case, judicial review is based on an administrative record provided by the defendant agency to the Court"); see generally Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985) (holding that "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").  A complete administrative record does not include privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and  work product privilege.  In this case, Defendant has provided the Court with the complete administrative record and Plaintiff with a privilege log explaining the reasons for any redactions.

Ultimately, the reviewing court should only "ensure that the agency came to a rational conclusion, not [] conduct its own investigation and substitute its own judgment for the administrative agency's decision."  Van Antwerp, 526 F.3d at 1360.  Although the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," the Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

9

AR005587

**Discussion**

ATF concluded that the Akins Accelerator is a machinegun based on its testfiring of a retail-model Akins Accelerator, installed in a Ruger 10/22 rifle, in accordance with the manufacturer's instructions. Federal law defines a "machinegun" as any weapon which shoots "automatically more than one shot, without manual reloading, by a single function of the trigger." 28 U.S.C. § 5845(b). The definition includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." Id. (emphasis added). In the test-firing, FTB determined that "the person firing has to make one initial conscious effort to pull the trigger . . . [and] once the triggering cycle is initiated, the firearm continues to fire without interruption until a second, conscious releasing of the trigger stops the firing sequence." (R. 157). Thus, the Akins Accelerator fires "more than one shot, automatically, without manual reloading, and without any additional conscious action to manipulate the trigger," as set out in 28 U.S.C. § 5845(b).

Plaintiff does not dispute that the purpose of the Akins Accelerator is to make it possible for the shooter to act once and cause the rifle to fire repeatedly until its ammunition is exhausted or until the shooter takes an action to remove hid finger from the device. (See Dkt. 25, Statement of Disputed Facts, ¶¶ 3-8.) In fact, Plaintiff acknowledged that the Akins Accelerator "bounces" the rifle back and forth, repeatedly causing the weapon to discharge by "push[ing] it into the finger." (Id. at ¶¶ 6-7.) As

10

AR005588

Defendant asserts, the reasonableness of ATF's common-sense determination is supported by judicial precedent, legislative history, and the need to protect public safety.

The Supreme Court has adopted the view that "single function of the trigger" is synonymous with "single pull of the trigger."  See Staples v. United States, 511 U.S. 600, 603 n.1 (1994).  In Staples, the Supreme Court interpreted the NFA definition and concluded that "any fully automatic weapon is a 'firearm' within the meaning of the Act." Id. at 602.  As the Court further explained, an automatic weapon is one "that fires repeatedly with a single pull of the trigger.  That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.  Such weapons are 'machineguns' within the meaning of the Act."  Id. at 603, n.1.  In contrast, the Court "use[d] the term 'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger . . ."  Id.  Similarly, in analyzing a weapon that "required only one action-pulling [a user-installed] switch . . . to fire multiple shots," the Fifth Circuit concluded that a "single function of the trigger" should be interpreted as a single action -- the trigger pull.  United States v. Camp, 343 F.3d 743, 745 (5th Cir. 2003).

The legislative history of the NFA also confirms that ATF, like the above-cited courts, reasonably reads the phrase "single function of the trigger" as encompassing any "single pull of the trigger."  In testimony leading up to the passage of the NFA, the then president of the National Rifle Association equated the phrase "single function of the trigger" with a "single pull of the trigger."  As he explained:

11

> The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine. Other guns require a separate pull of the trigger for every shot fired, and such guns are not properly designated as machine guns. A gun, however, which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun.

National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No. 9066, 73rd Cong., 2nd Sess., at 40 (1934).

Furthermore, ATF possesses the authority "to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration." Gun South Inc. v. Brady, 877 F.2d 858, 862 (11th Cir. 1989). At the same time, however, when "[a]n agency's view of what is in the public interest" changes, it "must supply a reasoned analysis . . . ."). Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983). Without such a reasoned analysis, "[s]udden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion." Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 742 (1996).

In this case, ATF presents such a "reasoned analysis," demonstrating that its new interpretation of the phrase "single function of the trigger" is necessary to protect the public from dangerous firearms. In Ruling 2006-2, ATF explains that the motivation for its reconsideration of the earlier letters to Plaintiff came from requests by "several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm." (Dkt. 12, Ex. I.) The Ruling then

12

sets forth a mechanical description of how such a device works (using the Akins
Accelerator as an example) and reaches the important conclusion: "a single pull of the
trigger initiates an automatic firing cycle."  (Id.)  Next, it outlines the new policy,
equating a "single function of the trigger" with a "single pull of the trigger," and
connecting the new interpretation to the legislative history of the NFA.  (Id.)  Finally,
Ruling 2006-2 recognizes that this interpretation represents a policy change and states "to
the extent that previous ATF rulings are inconsistent with this determination, they are
hereby overruled."  Id.

    Plaintiff claims to have had "legitimate reliance on [ATF's] prior interpretation;"
however, Plaintiff did make changes to the practical operation of the device and its
marketing that contributed to ATF's reconsideration, even if the "theory of operation" of
the Akins Accelerator did not change after Plaintiff submitted his prototype .  Plaintiff
decided to retail a device intended for mounting on a different rifle model than that
submitted for testing (the Ruger 10/22 instead of the SKS-type).  In conjunction with
requests that ATF review similar devices designed for other rifle models, this change
highlighted the need for ATF to consider whether its interpretation of "single function of
the trigger" remained appropriate.  (See R. 159.)  This factor certainly diminishes the
weight of Plaintiff's detrimental reliance argument.  Notwithstanding, Plaintiff's reliance
interest cannot prevent agency reconsideration where the agency's original opinion
proves erroneous.  See Belville Mining Co. v. United States, 999 F.2d 989, 999 (6th Cir.
1993).

<center>13</center>

The Court agrees with Defendant that in the face of technological innovation of the
Akins Accelerator and similar devices, ATF's change of position is appropriate. ATF
"must consider varying interpretations and the wisdom of its policy on a continuing
basis." Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837,
863-64 (1984). It is clear to this Court that ATF adopted its new position on the phrase
"single function of the trigger" based on its experience and a reasoned analysis and
because "[t]he court need only be satisfied that the bureau's policy change . . . [was] not
the result of arbitrary and capricious action," ATF's new position is entitled to deference
and "it is not [the] court's role[] to determine that the bureau's prior practice was the better
position." Gilbert Equip. Co., Inc. v. Higgins, 709 F. Supp. 1071, 1078 (S.D. Ala. 1989)
(upholding ATF's classification of a semiautomatic shotgun as "not particularly suitable
for or readily adaptable to sporting purposes"); see also Springfield, Inc. v. Buckles, 292
F.3d 813, 819 (D.C. Cir. 2002) (finding that "agency views may change . . . [and] courts
may require only a reasoned analysis indicating that prior policies and standards are being
deliberately changed, not casually ignored.").

Although Plaintiff urges that Defendant's actions violate the Fifth Amendment's
Due Process Clause, the APA does not require that ATF provide him with a formal
hearing. In considering a procedural due process claim, the "Supreme Court's balancing
test essentially requires [the Court] to weigh three factors: (1) the nature of the private
interest; (2) the risk of an erroneous deprivation of such interest; and (3) the government's
interest in taking its action . . . ." Id. (citing Mathews v. Eldridge, 424 U.S. 319, 335

14

(1976)). Because of the important interests in regulating Plaintiff's device and Plaintiff's

actual presentation of his arguments in written form to the agency (see R. 123-R. 136),

the Court is convinced after a balancing of interests that Plaintiff has not been deprived

of due process. First, although Plaintiff identifies an important interest affected by the

reclassification -- his ability to manufacture and sell the Akins Accelerator without

registering under 26 U.S.C. § 5822 -- that interest is limited by the pervasive federal

regulation of the manufacture and sale of firearms. See Akins v. United States, 82 Fed.

Cl. 619, 624 (Ct. Fed. Cl. 2008). As the Court of Federal Claims noted, a business owner

beginning manufacture of rapidly-repeating firearms "ought to be aware of the possibility

that new regulation might even render his property economically worthless." Id. As

Defendant asserts, Plaintiff's interest -- though important -- is lessened by the regulatory

environment.

Given the second Eldridge factor, there is little risk of an erroneous deprivation of

Plaintiff's interest in this case. The cornerstone of procedural due process is notice and a

meaningful opportunity to be heard, and when those conditions are satisfied, there is "no

absolute due process right to an oral hearing." See Forjan v. Leprino Foods, Inc., 209

Fed. Appx. 8 (2nd Cir. 2006); see also Raditch v. U.S. , 929 F.2d 478, 480 (9th Cir. 1991)

(holding that due process principles may be satisfied through "notice and an opportunity

to respond," but response may be written or oral). After receiving notice of ATF's new

position, Plaintiff presented a lengthy memorandum requesting that the agency reconsider

its decision, a process for which he retained representation from two outside counsels.

15

AR005593

(See Dkt. 12, Ex. J.) Plaintiff presented 14 pages of supporting legal arguments in his brief. (Id.) In his brief, Plaintiff included most of the legal arguments which he raises now supporting his position. It should also be pointed out that a new hearing before the agency is not the relief Plaintiff seeks for the agency's alleged violation of his procedural due process. Cf. Ray v. Foltz, 370 F.3d 1079, 1085 n.8 (11th Cir. 2004) (observing that the ordinary remedy for a denial of due process is "the grant of the procedures due"). Instead, he seeks a reversal of the agency's classification of the Akins Accelerator altogether. (Dkt. 1, ¶ 9.)

Plaintiff fails to even argue how an oral hearing would have made a difference in the outcome. Despite Plaintiff's urging to the contrary, his memorandum presented only questions of law and statutory interpretation, not factual disputes of the sort that require an oral hearing. See Dredge Corp. v. Penny, 338 F.2d 456 (9th Cir. 1964) (stating that "[t]he opportunity to be heard orally on questions of law is not an inherent element of procedural due process, even where substantial questions of law are involved"). He is disputing the FTB's legal interpretations of what constitutes a "trigger function." He fails to identify any mistake of fact in the FTB's understanding of the operation of the Akins Accelerator. In a follow-up letter to the FTB, Plaintiff noted that he sought oral argument "because the public policy implications involved in this case will have long-term effects on the NFA community," not because he needed an opportunity to dispute the facts on which ATF based its decision. (R. 147.) However, inasmuch as Plaintiff had a meaningful chance to present his case to ATF in writing and there is little chance the

AR005594

agency's decision proved erroneous, the second Eldridge factor supports ATF's

determination.

 While the Complaint describes Plaintiff's due process claim only as Defendant's

alleged failure to provide him with a hearing, he asserts in his Response to Defendant's

Motion that "Defendant was required to provide a notice of proposed rulemaking via

publication in the Federal Register" before issuing ATF Ruling 2006-2.  (Dkt. 25, 6.)

However, "the APA's notice and comment requirements apply to substantive rules

established through agency rulemaking, but do not apply to interpretive rules."  Hi-Tech

Pharms., Inc. v. Crawford, 505 F. Supp. 2d 1341, 1351 (N.D. Ga. 2007) (citing 5 U.S.C. §

553(b)).  "Interpretive rules are 'issued by an agency to advise the public of the agency's

construction of the statutes and rules which it administers.'"  Id. (quoting Chrysler Corp.

v. Brown, 441 U.S. 281, 302 n.31 (1979)).  As has been discussed, Ruling 2006-2

explains how ATF interprets the definition of "machinegun" contained in 26 U.S.C. §

5845(b) in the context of a device like the Akins Accelerator, and it is, therefore, an

interpretive rule to which the APA's notice and comment requirements do not apply.

 Finally, the third Eldridge factor weighs strongly in favor of ATF's action.  The

protection of the public's health and safety is a paramount government interest which

justifies summary administrative action . . . [i]ndeed, deprivation of property to protect

the public health and safety is 'one of the oldest examples' of permissible summary

action."  Gun South, 877 F.2d at 867 (quoting Hodel v. Virginia Surface Mining and

Reclamation Assoc., 452 U.S. 264, 300 (1981)).  Weapons with a high rate of fire are

AR005595

extremely desirable to criminals, increasing the government's interest in summary action to close off a loophole by which they could be acquired.  See generally United States v. Kirk, 1997 U.S. App. LEXIS 12670,  at *n.2 (5th Cir. 1997).  As Plaintiff correctly observed in his briefing to the Court of Federal Claims, if the Akins Accelerator is not classified as a "machinegun," it would "not fall under any federal regulatory scheme of any kind."  See Akins v. United States, No. 08-136C (Ct. Fed. Cl. 2008) (No. 6).  This unhindered capability would be wholly inconsistent with the strict regulation of machineguns imposed by the NFA and the prohibition on post-1986 machineguns imposed by the GCA.  See United States v. Golding, 332 F.3d 838, 840 (5th Cir. 2003) (discussing the "risk . . . presented by the inherently dangerous nature of machineguns," as shown by "Congress's decision to regulate the possession and transfer of this specific type of firearm"); United States v. Haney, 264 F.3d 1161, 1168 (10th Cir. 2001) ("banning possession of post 1986 machine guns is an essential part of the federal scheme to regulate interstate commerce in dangerous weapons").  Thus, the Court agrees with Defendant that ATF has a powerful interest in correctly interpreting the statute to close the loophole created by its earlier interpretation of the machinegun definition and preserve the integrity of the system regulating dangerous weapons.

Finally, Plaintiff argues that the definition of machinegun found in 26 U.S.C. § 5845(b) "is unconstitutionally vague."  (Dkt. 1, ¶ 43.)  Although Plaintiff alleges that the statute is vague both "on its face" and "as applied to Plaintiff," Defendant is correct that this Court need only review the statute as-applied, because "[v]agueness challenges to

18

statutes not threatening First Amendment interests are examined in light of the facts of the case at hand." United States v. Awan, 966 F.2d 1415, 1424 (11th Cir. 1992) (quoting Maynard v. Cartwright, 486 U.S. 356 (1988)). A statute is unconstitutionally vague "only where no standard of conduct is outlined at all; when no core of prohibited activity is defined." Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493, 509 (5th Cir. 2001). On the other hand, a statute is not unconstitutionally vague unless it is "substantially incomprehensible," and "men of common intelligence must necessarily guess at its meaning." Cotton States Mut. Ins. Co. v. Anderson, 749 F.2d 663, 669 (11th Cir. 1984); United States v. Wilson, 175 Fed. Appx. 294, 297 (11th Cir. 2006).

Plaintiffs' own allegations support the well-established precedent that 26 U.S.C. § 5845(b), although permitting multiple interpretations, does not fall within this realm of incomprehensibility. Plaintiff's own actions in communicating repeatedly with ATF suggest that the statute gave him fair notice that Akins Accelerators might well fall within the prohibited standard of conduct. He sufficiently understood the section 5845(b) definition to submit the device to FTB for classification. (Dkt. 12, Exs. B, C.) When Plaintiff began to offer the device for sale, he used ATF's original opinion as a marketing tool. (See, e.g., R. 196) (noting that "especially important was that the Accelerator™ had received not one, but two approval letters from BATFE through their Firearms Technical Branch").) The fact that ATF's initial classification was later deemed in error does not render the statute invalid for vagueness. Lawful statutes may be susceptible of multiple interpretations, and the mere fact that "there may be some 'close cases' or difficult

19

decisions does not render a policy unconstitutionally vague." <u>Hills v. Scottsdale Unified School Dist. No. 48</u>, 329 F.3d 1044, 1056 (9th Cir. 2003); <u>see also</u> <u>Ford Motor Co. v. Texas Dep't of Transp.</u>, 264 F.3d 493, 509 (5th Cir. 2001) (holding that "[a] statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case").

    **ACCORDINGLY**, it is **ORDERED AND ADJUDGED**:

    Defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment (Dkt. 19) is granted. The Clerk is directed to enter judgment for Defendant, terminate any pending motions, and close this case.

    **DONE AND ORDERED** at Tampa, Florida, on September 23, 2008.

                __s/*Richard A. Lazzara*_____
                **RICHARD A. LAZZARA**
                **UNITED STATES DISTRICT JUDGE**

<u>COPIES FURNISHED TO</u>:
Counsel of Record

AR005598

**18 U.S.C. 922(o):  Transfer or possession of machinegun**
**26 U.S.C. 5845(b):  Definition of machinegun**
**18 U.S.C. 921(a)(23):  Definition of machinegun**

*The definition of machinegun in the National Firearms Act and the Gun Control Act includes a part or parts that are designed and intended for use in converting a weapon into a machinegun.  This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.*

**ATF Rul. 2006-2**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has been asked by several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm.  These devices, when attached to a firearm, result in the firearm discharging more than one shot with a single function of the trigger.  ATF has been asked whether these devices fall within the definition of machinegun under the National Firearms Act (NFA) and Gun Control Act of 1968 (GCA).  As explained herein, these devices, once activated by a single pull of the trigger, initiate an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted.  Accordingly, these devices are properly classified as a part "*designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*" and therefore machineguns under the NFA and GCA.

The National Firearms Act (NFA), 26 U.S.C. Chapter 53, defines the term "firearm" to include a machinegun.  Section 5845(b) of the NFA defines "machinegun" as *"any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."*  The Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44, defines machinegun identically to the NFA.  18 U.S.C. 921(a)(23).  Pursuant to 18 U.S.C. 922(o), machineguns manufactured on or after May 19, 1986, may only be

AR005599

transferred to or possessed by Federal, State, and local government agencies for official use.

ATF has examined several firearms accessory devices that are designed and intended to accelerate the rate of fire for semiautomatic firearms.  One such device consists of the following components:  two metal blocks; the first block replaces the original manufacturer's V-Block of a Ruger 10/22 rifle and has attached two rods approximately ¼ inch in diameter and approximately 6 inches in length; the second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, has been machined to allow the two guide rods of the first block to pass through.  The second block supports the guide rods and attaches to the stock.  Using ¼ inch rods, metal washers, rubber and metal bushings, two collars with set screws, one coiled spring, C-clamps, and a split ring, the two blocks are assembled together with the composite stock.  As attached to the firearm, the device permits the entire firearm (receiver and all its firing components) to recoil a short distance within the stock when fired.  A shooter pulls the trigger which causes the firearm to discharge.  As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock.  The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed.  Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger.  Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed.  The assembled device is advertised to fire approximately 650 rounds per minute.  Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

As noted above, a part or parts designed and intended to convert a weapon into a machinegun, *i.e.*, a weapon that will shoot automatically more than one shot, without manual reloading, by a single function of the trigger, is a machinegun under the NFA and GCA.  ATF has determined that the device constitutes a machinegun under the NFA and GCA.  This determination is consistent with the legislative history of the National Firearms Act in which the drafters equated "single function of the trigger" with "single pull of the trigger."  *See, e.g., National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066,* 73rd Cong., at 40 (1934).  Accordingly, conversion parts that, when installed in a semiautomatic rifle, result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger, are a machinegun as defined in the National Firearms Act and the Gun Control Act.

*Held*, a device (consisting of a block replacing the original manufacturer's V-Block of a Ruger 10/22 rifle with two attached rods approximately ¼ inch in diameter and approximately 6 inches in length; a second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, machined to allow the two guide rods of the first block to pass through; the second block supporting the guide rods and attached to the stock; using ¼ inch rods; metal washers; rubber and metal bushings; two collars with set screws; one coiled spring; C-clamps; a split ring; the two blocks assembled together with the

AR005600

- 3 -

composite stock) that is designed to attach to a firearm and, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, is a machinegun under the National Firearms Act, 26 U.S.C. 5845(b), and the Gun Control Act, 18 U.S.C. 921(a)(23).

*Held further*, manufacture and distribution of any device described in this ruling must comply with all provisions of the NFA and the GCA, including 18 U.S.C. 922(o).

To the extent that previous ATF rulings are inconsistent with this determination, they are hereby overruled.

Date approved:  December 13, 2006

Michael J. Sullivan
Director

AR005601

# FEDERAL REGISTER

VOLUME 33 • NUMBER 243

Saturday, December 14, 1968 • Washington, D.C.

Pages 18551–18602

JAN 2 3 1969

Agencies in this issue—

Agricultural Research Service
Agricultural Stabilization and
  Conservation Service
Civil Aeronautics Board
Coast Guard
Consumer and Marketing Service
Customs Bureau
Federal Power Commission
Federal Trade Commission
Food and Drug Administration
Health, Education, and Welfare
  Department
Indian Affairs Bureau
Interior Department
Internal Revenue Service
Interstate Commerce Commission
Land Management Bureau
National Aeronautics and Space
  Administration
National Commission on Product
  Safety
National Park Service
Public Health Service
Securities and Exchange Commission
Social Security Administration
Treasury Department
Veterans Administration
Wage and Hour Division

Detailed list of Contents appears inside.



# Volume 81

# UNITED STATES
# STATUTES AT LARGE

[90th Cong., 1st Sess.]

Contains laws and concurrent resolutions enacted by the Congress during 1967, reorganization plans, the twenty-fifth amendment to the Constitution, and Presidential proclamations. Also included are: a subject index, tables of prior laws affected, a numerical listing of bills enacted into public and private law, and a guide to the legislative history of bills enacted into public law.

### Price: $9.00

Published by Office of the Federal Register, National Archives and Records Service, General Services Administration

Order from Superintendent of Documents, U.S. Government Printing Office Washington, D.C. 20402


FEDERAL REGISTER

Area Code 202          Phone 962-8626

Published daily, Tuesday through Saturday (no publication on Sundays, Mondays, or on the day after an official Federal holiday), by the Office of the Federal Register, National Archives and Records Service, General Services Administration (mail address National Archives Building, Washington, D.C. 20408), pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500, as amended; 44 U.S.C., Ch. 15), under regulations prescribed by the Administrative Committee of the Federal Register, approved by the President (1 CFR Ch. I). Distribution is made only by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

The FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.50 per month or $15 per year, payable in advance. The charge for individual copies varies in proportion to the size of the issue (15 cents for the first 80 pages and 5 cents for each additional group of 40 pages, as actually bound). Remit check or money order, made payable to the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

The regulatory material appearing herein is keyed to the CODE OF FEDERAL REGULATIONS, which is published, under 50 titles, pursuant to section 11 of the Federal Register Act, as amended (44 U.S.C. 1510). The CODE OF FEDERAL REGULATIONS is sold by the Superintendent of Documents. Prices of books and pocket supplements are listed in the first FEDERAL REGISTER issue of each month.

There are no restrictions on the republication of material appearing in the FEDERAL REGISTER or the CODE OF FEDERAL REGULATIONS.

AR005603

# Contents

**AGRICULTURAL RESEARCH SERVICE**

Rules and Regulations
Overtime services related to imports and exports; commuted travel time allowances (2 documents) _____ 18573, 18580

**AGRICULTURAL STABILIZATION AND CONSERVATION SERVICE**

Rules and Regulations
Wheat; farm marketing quotas and acreage allotments; correction _____ 18580

**AGRICULTURE DEPARTMENT**

See Agricultural Research Service; Agricultural Stabilization and Conservation Service; Consumer and Marketing Service.

**CIVIL AERONAUTICS BOARD**

Proposed Rule Making
Classification and exemption of air taxi operators; interairport air taxi service in Washington/ Baltimore area between points which certified helicopter carrier provides regular service___ 18589

Notices
Allegheny Airlines, Inc., et al.; applications for amendment of certificates _____ 18592

**COAST GUARD**

Rules and Regulations
Great Lakes; drawbridge operation regulations_____ 18579

**CONSUMER AND MARKETING SERVICE**

Rules and Regulations
Avocados grown in South Florida; shipment limitations _____ 18581
Lemons grown in California; handling limitations _____ 18581

Proposed Rule Making
Milk in Red River Valley marketing area; decision_____ 18582
Oranges, grapefruit, tangerines and tangelos grown in Florida; proposed expenses and rate of assessment _____ 18582

**CUSTOMS BUREAU**

Rules and Regulations
Motor vehicles and items of motor vehicle equipment; importation__ 18577

**FEDERAL POWER COMMISSION**

Notices
Hearings, etc.:
Natural Gas Pipeline Company of America_____ 18593
Sunray DX Oil Co., et al_____ 18593

**FEDERAL TRADE COMMISSION**

Rules and Regulations
Prohibited trade practices:
Associated Schools, Inc., et al__ 18575
Child's World, Inc., et al_____ 18575

**FOOD AND DRUG ADMINISTRATION**

Rules and Regulations
Color additives; cochineal extract _____ 18577
Pesticide chemicals; tolerances__ 18578

**HEALTH, EDUCATION, AND WELFARE DEPARTMENT**

See also Food and Drug Administration; Public Health Service; Social Security Administration.

Notices
Federal percentages; promulgation _____ 18593

**INDIAN AFFAIRS BUREAU**

Proposed Rule Making
General grazing regulations_____ 18582

Notices
Alaska; application for withdrawal of unreserved lands_____ 18591

**INTERIOR DEPARTMENT**

See also Indian Affairs Bureau; Land Management Bureau; National Park Service.

Rules and Regulations
Procurement regulations; other irregularities in bids_____ 18579

Notices
Hall, Elmer S.; statement of changes in financial interests__ 18592

**INTERNAL REVENUE SERVICE**

Rules and Regulations
Commerce in firearms and ammunition _____ 18555

Notices
Fixing periods of limitations on assessment or collection; delegation of authority to execute certain documents _____ 18591

**INTERSTATE COMMERCE COMMISSION**

Proposed Rule Making
Motor carriers of household goods; stay of effective date_____ 18590

Notices
Certain railroads; car distribution (12 documents) _____ 18598–18600
Motor carrier temporary authority applications_____ 18598

**LABOR DEPARTMENT**

See Wage and Hour Division.

**LAND MANAGEMENT BUREAU**

Rules and Regulations
California; public land order_____ 18580

Notices
New Mexico; land classification; correction _____ 18592

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**

Rules and Regulations
Inventions and contributions; awards for reported technical and scientific contributions; NASA and contractor employees _____ 18574

**NATIONAL COMMISSION ON PRODUCT SAFETY**

Notices
Household products presenting health and safety risk; notice of hearing _____ 18600

**NATIONAL PARK SERVICE**

Notices
George Washington Memorial Parkway; notice of intention to issue concession permit_____ 18592

**PUBLIC HEALTH SERVICE**

Proposed Rule Making
Biological products; additional standards; Anthrax vaccine, absorbed _____ 18586

**SECURITIES AND EXCHANGE COMMISSION**

Rules and Regulations
Interpretative releases; filing of supplements to investment company prospectuses_____ 18576

Notices
Hearings, etc.:
Dumont Corp_____ 18594
Majestic Capital Corp_____ 18594

**SOCIAL SECURITY ADMINISTRATION**

Proposed Rule Making
Federal credit union operations__ 18587
Health insurance for the aged; correction _____ 18587

**TRANSPORTATION DEPARTMENT**

See Coast Guard.

**TREASURY DEPARTMENT**

See also Customs Bureau; Internal Revenue Service.

Notices
Color television picture tubes; notice of tentative negative determination _____ 18591

(Continued on next page)

18553

AR005604

18554

# CONTENTS

### VETERANS ADMINISTRATION
Rules and Regulations
General provisions; copies of records and papers; schedule of
fees _____ 18579

### WAGE AND HOUR DIVISION
Rules and Regulations
Laundry and cleaning industry in
Puerto Rico; wage order_____ 18578

Notices
Certificates authorizing employment of full-time students working outside of school at special minimum wages in retail or service establishments or in agriculture _____ 18594

# List of CFR Parts Affected

The following numerical guide is a list of the parts of each title of the Code of Federal Regulations affected by documents published in today's issue. A cumulative list of parts affected, covering the current month to date, appears at the end of each issue beginning with the second issue of the month.

A cumulative guide is published separately at the end of each month. The guide lists the parts and sections affected by documents published since January 1, 1968, and specifies how they are affected.

**7 CFR**
354 _____ 18580
728 _____ 18580
910 _____ 18581
915 _____ 18581
Proposed Rule Making
905 _____ 18582
1104 _____ 18582

**9 CFR**
97 _____ 18573

**14 CFR**
1240 _____ 18574
Proposed Rules:
298 _____ 18589

**16 CFR**
13 (2 documents) _____ 18575

**17 CFR**
231 _____ 18576
271 _____ 18576

**19 CFR**
12 _____ 18577

**20 CFR**
Proposed Rules:
405 _____ 18587

**21 CFR**
8 _____ 18577
120 _____ 18578

**25 CFR**
Proposed Rules:
151 _____ 18582

**26 CFR**
178 _____ 18555

**29 CFR**
723 _____ 18578

**33 CFR**
117 _____ 18579

**38 CFR**
1 _____ 18579

**41 CFR**
14-2 _____ 18579
14-7 _____ 18579

**42 CFR**
Proposed Rules:
73 _____ 18586

**43 CFR**
Public Land Orders:
4543 _____ 18580

**45 CFR**
Proposed Rules:
300 _____ 18587
301 _____ 18587
307 _____ 18587
350 _____ 18587

**49 CFR**
Proposed Rules:
1056 _____ 18590

AR005605

# Rules and Regulations

## Title 26—INTERNAL REVENUE

### Chapter I—Internal Revenue Service, Department of the Treasury

SUBCHAPTER E—ALCOHOL, TOBACCO, AND OTHER EXCISE TAXES

### PART 178—COMMERCE IN FIRE- ARMS AND AMMUNITION

On November 6, 1968, a notice of proposed rule making and hearing to issue 26 CFR Part 178, with respect to commerce in firearms and ammunition, was published in the FEDERAL REGISTER (33 F.R. 16285). In accordance with the notice, interested persons were afforded an opportunity to submit written comments or suggestions, or to be heard at a hearing held on November 21, 1968. After consideration of all written and oral comments, the regulations as published, including the correction published in the FEDERAL REGISTER (33 F.R. 16647) are hereby adopted, subject to the changes set forth below:

PARAGRAPH 1. § 178.1 is changed as follows:

(A) By striking in paragraph (a) "(82, Stat. 236)" and by inserting in lieu thereof "(82 Stat. 236; 18 U.S.C. Appendix)".

(B) By striking the word "of" after the word "business" in paragraph (b) (3) and inserting in lieu thereof the words "or activity by".

PAR. 2. Section 178.2 is changed by striking the word "traffic" and inserting in lieu thereof the word "commerce".

PAR. 3. Section 178.11 is changed as follows:

(A) The definition of "Ammunition" is changed by striking the period at the end thereof and inserting in lieu thereof "other than an antique firearm. The term shall not include (a) any shotgun shot or pellet not designed for use as the single, complete projectile load for one shotgun hull or casing, nor (b) any unloaded nonmetallic shotgun hull or casing not having a primer."

(B) The definition of "Antique firearm" is changed by striking the designations "(1)", "(2)", "(1)", "(ii)", and "(ii)" and inserting in lieu thereof "(a)", "(b)", "paragraph (a)", "(1)", and "(2)", respectively.

(C) Immediately after the definition of "Business premises" there is inserted a new definition.

(D) The definition of "Crime punishable by imprisonment for a term exceeding 1 year" is revised to reflect editorial changes.

(E) The definition of "Customs officer" is changed.

(F) The definition of "Date of importation" is deleted.

(G) The definition of "Destructive device" is changed by striking the word

"clauses" in paragraph (a)(6) and inserting in lieu thereof the words "subparagraphs of this definition"; and by inserting in paragraph (c) the word "paragraph" immediately before the designations "(a) or (b)".

(H) The definition of "Firearm frame or receiver" is changed by striking the word "breechlock" and inserting in lieu thereof the word "breechblock.".

(I) The definitions of "Licensed dealer", "Licensed importer", and "Licensed manufacturer" are changed by striking the words "Public Law 90–351" and inserting in lieu thereof the words "the Omnibus Crime Control and Safe Streets Act of 1968".

(J) The definition of "Replica", immediately following the definition of Regional Commissioner, is deleted.

(K) Immediately following the definition of "State" there is inserted a new definition.

PAR. 4. Section 178.23 is revised to provide clarifying changes.

PAR. 5. Section 178.26 is changed by striking the word "testing" in each place it appears and inserting in lieu thereof the word "evaluation".

PAR. 6. Section 178.27 is changed by striking from the second sentence thereof the words "to the Assistant Regional Commissioner for transmittal"; by striking from the fourth sentence thereof the words ", or to an officer designated by him,"; by striking from the fourth sentence the words "or testing." and by inserting in lieu thereof the words "and evaluation."; by striking from the fifth sentence the word "impracticable" and the word "testing.", and inserting in lieu thereof the word "impracticable" and the word "evaluation.", respectively.

PAR. 7. Section 178.28 is changed as follows:

(A) The first sentence of paragraph (a) is changed to read as follows: "(a) The Assistant Regional Commissioner for the internal revenue region in which a person resides may authorize that person to transport in interstate or foreign commerce any destructive device, machine gun, short-barreled shotgun, or short-barreled rifle, if he finds that such transportation is reasonably necessary and is consistent with public safety and applicable State and local law."

(B) Paragraph (c) is changed.

PAR. 8. Section 178.30 is changed by inserting after the word "give" in the first sentence thereof a ".".

PAR. 9. Immediately after § 178.34 there is inserted a new § 178.35.

PAR. 10. Paragraph (b) of § 178.41 is revised to make editorial changes; paragraph (c) is redesignated as paragraph (d); and a new paragraph (c) is added.

PAR. 11. Section 178.43 is changed by adding a new sentence at the end thereof to read as follows: "However, the license fee submitted with an application for a

license shall be refunded if that application is denied."

PAR. 12. Section 178.44 is changed by striking from the first sentence of paragraph (b) the words "engage in such activity" and inserting in lieu thereof the words "maintain his collection premises"; and by inserting in the second sentence of paragraph (c) the word "Firearms" immediately following the word "Federal".

PAR. 13. Section 178.46 is changed.

PAR. 14. Paragraphs (b)(6) and (c) of § 178.47 are changed.

PAR. 15. Section 178.48 is changed by striking the words ", and the copy thereof furnished with the license," from each place they appear; by striking the words "and the copy thereof" and ", and the copy thereof," from each place they appear; and by striking the word "may" in the last sentence of paragraph (b) and inserting in lieu thereof the word "shall".

PAR. 16. Section 178.52 is changed by revising the first sentence thereof to read: "A licensee may during the term of his current license remove his business or activity to a new location at which he intends regularly to carry on such business or activity, without procuring a new license."

PAR. 17. Immediately after § 178.58 there are inserted two new sections, §§ 178.59 and 178.60.

PAR. 18. The first sentence of § 178.78 is changed by striking the words "If, after" and inserting in lieu thereof the word "After".

PAR. 19. Section 178.81 is changed by striking the words "such as meets the needs of the parties:" and inserting in lieu thereof the words "at a location convenient to the aggrieved party:".

PAR. 20. The first sentence of § 178.82 is changed by adding a ":" immediately following the words "has expired"; and by adding a proviso immediately following the words "licensee has passed" to read as follows: ": Provided, That under the condition of paragraph (a) of this section, the licensee has timely filed an application for the renewal of his license".

PAR. 21. Section 178.92 is changed (A) by striking the designation "(a)"; (B) by striking the designation "(b)" and inserting in lieu thereof the words "and by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame, receiver, or barrel thereof in a manner not susceptible of being readily obliterated, altered or removed;"; (C) by striking the designation ", (c)" and inserting in lieu thereof ":"; (D) by striking the words "guage, (d)" and inserting in lieu thereof the word "gauge;"; (E) by striking the designation ", (e)" and inserting in lieu thereof ";" and (F) by striking the words

", and (f)" and inserting in lieu thereof the word "; and".

PAR. 22. Section 178.93 is changed by striking the word "shipments" in paragraph (a) thereof and inserting in lieu thereof the word "shipment"; and by striking the text following "and (b)" and inserting in lieu thereof "any transaction with a nonlicensee involving any firearm or ammunition other than a curio or relic. (See also § 178.50.)"

PAR. 23. Section 178.94 is changed.

PAR. 24. Section 178.95 is changed as follows:

(A) by changing paragraph (b) thereof to read: "(b) Make a reproduction of his license, enter upon such reproduction the statement: 'I certify that this is a true copy of a license issued to me to engage in the business specified in Item 5,' and sign his name adjacent thereto, or"; and

(B) by striking the word "additional" in the first sentence of paragraph (c) thereof and inserting in lieu thereof the word "certified".

PAR. 25. Paragraphs (b), (c), and (d) of § 178.96 are changed.

PAR. 26. Sections 178.97 and 178.98 are changed.

PAR. 27. Paragraphs (a) and (c) of § 178.99 are changed.

PAR. 28. Section 178.100 is changed by adding the words "and ammunition" immediately following the word "firearms".

PAR. 29. Paragraph (b) (1) of § 178.111 is changed, and paragraph (c) is added.

PAR. 30. Section 178.112 is changed as follows:

(A) Paragraph (a) is changed by striking ") unless (1) if a firearm, it is identified as required by this part, and (2)" and by deleting "(3)" immediately following "ammunition, or".

(B) Paragraphs (b) and (d) are changed by striking "(if ammunition)" immediately following the word "size".

PAR. 31. Section 178.113 is changed as follows:

(A) Paragraph (b) is changed by deleting "(if ammunition)" immediately following the word "size" in subparagraph (2), by inserting the word "and" following existing text of subparagraph (5), by deleting all of subparagraph (6), and by renumbering subparagraph "(7)" as "(6)".

(B) Paragraph (c) is changed by revising the second sentence to read "In obtaining the release of the firearm or ammunition from Customs custody, the licensee importing same shall furnish a Form 6A (Firearms) to the Customs officer releasing the firearm or ammunition."

(C) Paragraphs (d) and (e) are deleted.

PAR. 32. Section 178.114 is changed by deleting paragraph (a); redesignating paragraphs (b) and (c) as paragraphs (a) and (b), respectively, and revising such redesignated paragraphs; and adding a new paragraph (c).

PAR. 33. Section 178.115 is changed by adding at the end of paragraph (a), "Registration on Customs Form 4457 or on any other registration document available for this purpose may be completed before departure from the United

States at any U.S. customhouse or any office of an Assistant Regional Commissioner. A bill of sale or other commercial document showing transfer of the firearm or ammunition in the United States to such person also may be used to establish proof that the firearm or ammunition was taken out of the United States by such person. Firearms and ammunition furnished under the provisions of section 925(a) (3) of the Act to military members of the U.S. Armed Forces on active duty outside of the United States also may be imported into the United States or any possession thereof by such military members upon establishing to the satisfaction of Customs that such firearms and ammunition were so obtained."; and by adding a new paragraph (d).

PAR. 34. Section 178.116 is changed by adding, in the last sentence and immediately following the words "released from Customs custody" the words "upon the payment of customs duties, if applicable, and".

PAR. 35. A new section, § 178.117, is added immediately following § 178.116.

PAR. 36. Paragraph (a) of § 178.121 is changed.

PAR. 37. Paragraphs (a), (b), and (d) of §§ 178.122 and 178.123 are changed.

PAR. 38. Sections 178.124 and 178.125 are changed.

PAR. 39. Paragraph (b) of § 178.144 is changed by revising the last sentence to read "The application shall be filed, in triplicate, with the Assistant Regional Commissioner for the internal revenue region wherein the applicant resides."

PAR. 40. Section 178.166 is changed by striking "5845(a)" and by inserting in lieu thereof "5845(a)".

Because these regulations implement Title I, State Firearms Control Assistance (18 U.S.C., chapter 44) of the Gun Control Act of 1968 (82 Stat. 1213) which becomes effective December 16, 1968, it is found that it is impracticable and contrary to the public interest to publish these regulations subject to the effective date limitation of 5 U.S.C. 553(d). Accordingly, these regulations shall become effective on December 16, 1968.

SHELDON S. COHEN,
*Commissioner of Internal Revenue.*

Approved: December 12, 1968.

JAMES POMEROY HENDRICK,
*Special Assistant to the Secretary (for Enforcement).*

In order to implement the provisions of Title I, State Firearms Control Assistance (18 U.S.C., chapter 44), of the Gun Control Act of 1968 (82 Stat. 1213), and Title VII, Unlawful Possession or Receipt of Firearms (82 Stat. 236; 18 U.S.C., Appendix), of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 197), as amended by Title III of the Gun Control Act of 1968 (82 Stat. 1236), the following regulations are hereby prescribed as Part 178 of Title 26 of the Code of Federal Regulations:

*Preamble.* 1. These regulations, 26 CFR Part 178, "Commerce in Firearms and Ammunition," supersede regula-

tions 26 CFR Part 177 issued under the Federal Firearms Act (U.S.C., title 15, chapter 18).

2. These regulations shall not affect any act done or any liability or right accuring, or accrued, or any suit or proceeding had or commenced before the effective date of these regulations.

3. These regulations shall be effective on and after December 16, 1968.

## PART 178—COMMERCE IN FIRE-ARMS AND AMMUNITION

**Subpart A—Introduction**

Sec.
178.1    Scope of regulations.
178.2    Relation to other provisions of law.

**Subpart B—Definitions**

178.11    Meaning of terms.

**Subpart C—Administrative and Miscellaneous Provisions**

178.21    Forms prescribed.
178.22    Emergency variations from requirements.
178.23    Right of entry and examination.
178.24    Published ordinances.
178.25    Disclosure of information.
178.26    Curio and relic determination.
178.27    Destructive device determination.
178.28    Transportation of destructive devices and certain firearms.
178.29    Out-of-State acquisition of firearms by nonlicensees.
178.30    Out-of-State disposition of firearms by nonlicensees.
178.31    Delivery by common or contract carrier.
178.32    Prohibited shipment, transportation, or receipt of firearms and ammunition by certain persons.
178.33    Stolen firearms and ammunition.
178.34    Removed, obliterated, or altered serial number.
178.35    Skeet, trap, target, and similar shooting activities.

**Subpart D—Licenses**

178.41    General.
178.42    License fees.
178.43    License fee not refundable.
178.44    Original license.
178.45    Renewal of license.
178.46    Procedure by District Director.
178.47    Issuance of license.
178.48    Correction of error on license.
178.49    Duration of license.
178.50    Locations covered by license.
178.51    License not transferable.
178.52    Change of address.
178.53    Change in trade name.
178.54    Change of control.
178.55    Continuing partnerships.
178.56    Right of succession by certain persons.
178.57    Discontinuance of business.
178.58    State or other law.
178.59    Abandoned application.
178.60    Certain continuances of business.

**Subpart E—License Proceedings**

178.71    Denial of an application for license.
178.72    Hearing after application denial.
178.73    Notice of contemplated revocation.
178.74    Request for hearing after notice of contemplated revocation.
178.75    Hearing after notice of revocation.
178.76    Recommended decision of hearing examiner.
178.77    Certification and transmittal of record and recommended decision to Director.
178.78    Decision of Director.
178.79    Service on applicant or licensee.
178.80    "Representation at a hearing.
178.81    Designated place of hearing.
178.82    Operations by licensees after notice.

AR005607

RULES AND REGULATIONS 18557

Subpart F—Conduct of Business

Sec.
178.91    Posting of license.
178.92    Identification of firearms.
178.93    Authorized operations by a licensed collector.
178.94    Sales or deliveries between licensees.
178.95    Certified copy of license.
178.96    Out-of-State and mail order sales.
178.97    Loan or rental of firearms.
178.98    Sales or deliveries of destructive devices and certain firearms.
178.99    Certain prohibited sales or deliveries.
178.100   Record of transactions.

Subpart G—Importation

178.111   General.
178.112   Importation by a licensed importer.
178.113   Importation by other licensees.
178.114   Importation by members of the U.S. Armed Forces.
178.115   Exempt importation.
178.116   Conditional importation.
178.117   Function outside a customs territory.

Subpart H—Records

178.121   General.
178.122   Records maintained by importers.
178.123   Records maintained by manufacturers.
178.124   Firearms transaction record.
178.125   Record of receipt and disposition.
178.126   Furnishing transaction information.
178.127   Discontinuance of business.

Subpart I—Exemptions

178.141   General.
178.142   Effect of Presidential pardon.
178.143   Relief from disabilities incurred by indictment.
178.144   Relief from disabilities incurred by conviction.
178.145   Research organizations.
178.146   Deliveries by mail to certain persons.
178.147   Repair of firearm.
178.148   Ammunition loading for personal use.

Subpart J—Penalties, Seizures, and Forfeitures

178.161   False statement or representation.
178.162   Transportation or receipt to commit a crime.
178.163   Commission of a Federal crime.
178.164   Receipt, etc., of firearms by certain persons.
178.165   Receipt, etc., of firearms by certain employees.
178.166   Seizure and forfeiture.

Subpart K—Exportation

178.171   Exportation.

AUTHORITY: The provisions of this Part 178 issued under 82 Stat. 1213–1226, 18 U.S.C. 921–928, 82 Stat. 236, as amended, unless otherwise noted.

## Subpart A—Introduction

### § 178.1  Scope of regulations.

(a) *In general.* The regulations contained in this part relate to commerce in firearms and ammunition and are promulgated to implement Title I, State Firearms Control Assistance (18 U.S.C. Chapter 44), of the Gun Control Act of 1968 (82 Stat. 1213), and Title VII, Unlawful Possession or Receipt of Firearms (82 Stat. 236; 18 U.S.C. Appendix) of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 197) as amended by Title III of the Gun Control Act of 1968 (82 Stat. 1236).

(b) *Procedural and substantive requirements.* This part contains the procedural and substantive requirements relative to:

(1) The interstate or foreign commerce in firearms and ammunition;

(2) The licensing of manufacturers, importers, and collectors of, and dealers in, firearms and ammunition;

(3) The conduct of business or activity by licensees;

(4) The importation of firearms and ammunition;

(5) The records and reports required of licensees;

(6) Relief from disabilities under this part; and

(7) Exempt interstate and foreign commerce in firearms and ammunition.

(c) *Federal Firearms Act licenses.* This part fully applies to operations by persons licensed under the Federal Firearms Act and Part 177 of this chapter who are continuing their operations under such license pursuant to section 907 of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 235). Any reference in this part to "license," "licensee," licensed dealer," "licensed importer," "licensed manufacturer," etc., shall apply equally as the case may be to licenses and persons licensed under the Federal Firearms Act who are continuing operations pursuant to a license issued under that Act.

### § 178.2   Relation to other provisions of law.

The provisions in this part are in addition to, and are not in lieu of, any other provision of law, or regulations, respecting commerce in firearms or ammunition. For regulations applicable to traffic in machine guns, destructive devices, and certain other firearms, see Part 179 of this chapter. For statutes applicable to the registration and licensing of persons engaged in the business of manufacturing, importing or exporting arms, ammunition, or implements of war, see section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), and regulations thereunder. For statutes applicable to nonmailable firearms, see 18 U.S.C. 1715 and regulations thereunder.

## Subpart B—Definitions

### § 178.11   Meaning of terms.

When used in this part and in forms prescribed under this part, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, terms shall have the meanings ascribed in this section. Words in the plural form shall include the singular, and vice versa, and words importing the masculine gender shall include the feminine. The terms "includes" and "including" do not exclude other things not enumerated which are in the same general class or are otherwise within the scope thereof.

*Act.* Chapter 44 of title 18 of the United States Code.

*Ammunition.* Ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm other than an antique firearm. The term shall not include (a) any shotgun shot or pellet not designed for use as the single, complete projectile load for one shotgun hull or casing, nor (b) any unloaded, non-metallic shotgun hull or casing not having a primer.

*Antique firearm.* (a) Any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and (b) any replica of any firearm described in paragraph (a) of this definition if such replica (1) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or (2) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

*Assistant Regional Commissioner.* An Assistant Regional Commissioner, Alcohol and Tobacco Tax, who is responsible for, and functions under the direction and supervision of, a Regional Commissioner of Internal Revenue.

*Business premises.* The property on which firearms or ammunition importing, manufacturing or dealing business is or will be conducted. A private dwelling, no part of which is open to the public, shall not be recognized as coming within the meaning of the term.

*Collection premises.* The premises described on the license of a collector as the location at which he maintains his collection of curios and relics.

*Collector.* Any person who acquires, holds, or disposes of firearms or ammunition as curios or relics.

*Commerce.* Travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

*Commissioner.* The Commissioner of Internal Revenue.

*Crime punishable by imprisonment for a term exceeding 1 year.* Any offense for which the maximum penalty, whether or not imposed, is capital punishment or imprisonment in excess of 1 year. The term shall not include (a) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulations of business practices excluded from the meaning of the term under provisions contained in this part, or (b) any State offense (other than one involving a firearm or explosive) classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of 2 years or less.

*Curios or relics.* Firearms or ammunition which are of special interest to collectors by reason of some quality other than is ordinarily associated with firearms intended for sporting use or as offensive or defensive weapons. To be recognized as curios or relics, firearms and ammunition must fall within one of the following categories:

AR005608

(a) Firearms and ammunition which were manufactured at least 50 years prior to the current date, but not including replicas thereof;

(b) Firearms and ammunition which are certified by the curator of a municipal, State, or Federal museum which exhibits firearms to be curios or relics of museum interest; and

(c) Any other firearms or ammunition which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event. Proof of qualification of a particular firearm or item of ammunition under this category may be established by evidence of present value and evidence that like firearms or ammunition are not available except as collector's items, or that the value of like firearms or ammunition available in ordinary commercial channels is substantially less.

*Customs officer.* Any officer of the Bureau of Customs or any agent or other person authorized by law or by the Secretary of the Treasury, or appointed in writing by a Regional Commissioner of Customs, or by another principal customs officer under delegated authority, to perform the duties of an officer of the Bureau of Customs.

*Dealer.* Any person engaged in the business of selling firearms or ammunition at wholesale or retail; any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms; or any person who is a pawnbroker.

*Destructive device.* (a) Any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding subparagraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this definition and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; or any other device which the Director finds is not likely to

be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting purposes.

*Director.* The Director, Alcohol and Tobacco Tax Division, Internal Revenue Service, Treasury Department, Washington, D.C. 20224.

*Discharged under dishonorable conditions.* Separation from the U.S. Armed Forces resulting from a Bad Conduct Discharge or a Dishonorable Discharge.

*District Director.* A District Director of Internal Revenue.

*Executed under penalties of perjury.* Signed with the prescribed declaration under the penalties of perjury as provided on or with respect to the return, form, or other document or, where no form of declaration is prescribed, with the declaration: "I declare under the penalties of perjury that this—(insert type of document, such as, statement, application, request, certificate), including the documents submitted in support thereof, has been examined by me and, to the best of my knowledge and belief, is true, correct, and complete."

*Federal Firearms Act.* Chapter 18 of title 15, United States Code, as in effect on December 15, 1968.

*Felony.* Any offense punishable by imprisonment for a term exceeding 1 year. The term shall not include any offense (other than one involving a firearm or explosive) classified as a misdemeanor under the laws of a State and punishable by a term of imprisonment of 2 years or less.

*Firearm.* Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics.

*Firearm frame or receiver.* That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.

*Fugitive from justice.* Any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

*Importation.* The bringing of a firearm or ammunition into the United States; except that the bringing of a firearm or ammunition from outside the United States into a foreign-trade zone for storage pending shipment to a foreign country or subsequent importation into this country, pursuant to this part, shall not be deemed importation.

*Importer.* Any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution.

*Indictment.* Includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding 1 year may be prosecuted.

*Internal Revenue Code of 1954.* Title 26, United States Code.

*Internal revenue district.* An internal revenue district under the jurisdiction of a District Director of Internal Revenue.

*Internal revenue region.* An internal revenue region under the jurisdiction of a Regional Commissioner of Internal Revenue.

*Interstate or foreign commerce.* Includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia. The term shall not include commerce between places within the same State but through any place outside of that State.

*Licensed collector.* A collector of curios and relics only and licensed under the provisions of this part.

*Licensed dealer.* A dealer licensed under the provisions of this part, and a dealer licensed under the Federal Firearms Act if such license is deemed valid under section 907 of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 235).

*Licensed importer.* An importer licensed under the provisions of this part, and a manufacturer (as that term was defined in the Federal Firearms Act) licensed under the Federal Firearms Act if such license is deemed valid under section 907 of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 235).

*Licensed manufacturer.* A manufacturer licensed under the provisions of this part, and a manufacturer (as that term was defined in the Federal Firearms Act) licensed under the Federal Firearms Act if such license is deemed valid under section 907 of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 235).

*Machine gun.* Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination or parts designed and intended for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

*Manufacturer.* Any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution.

*National Firearms Act.* Chapter 53 of the Internal Revenue Code of 1954.

*Pawnbroker.* Any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

*Person.* Any individual, corporation, company, association, firm, partnership, society, or joint stock company.

*Published ordinance.* A published law of any political subdivision of a State which the Director determines to be relevant to the enforcement of this part and which is contained on a list compiled by the Director, which list is published in the FEDERAL REGISTER, revised annually, and

AR005609

furnished to each licensee under this part.

*Regional Commissioner.* A Regional Commissioner of Internal Revenue.

*Rifle.* A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

*Short-barreled rifle.* A rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

*Short-barreled shotgun.* A shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

*Shotgun.* A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

*State.* A State of the United States. The term shall include the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

*State of residence.* The State in which an individual regularly resides, or maintains his home, or if such person is on active duty as a member of the United States Armed Forces, the State in which his permanent duty station is located; *Provided,* That an alien who is legally in the United States shall be considered to be a resident of the State in which (a) he is residing and has so resided for a period of at least 90 days prior to the date of sale or delivery of a firearm or ammunition, or (b) his embassy or consulate is located if the principal officer of such embassy or consulate issues a written statement to such alien authorizing his acquisition of a firearm or ammunition. Temporary sojourn in a State does not make the State of temporary sojourn the State of residence.

Example 1. A maintains his home in State X. He travels to State Y on a hunting, fishing, business or other type of trip. He does not become a resident of State Y by reason of such trip.

Example 2. A maintains a home in State X and a home in State Y. He resides in State X except for the summer months of the year and in State Y for the summer months of the year. During the time that he actually resides in State X he is a resident of State X, and during the time that he actually resides in State Y he is a resident of State Y.

*Unserviceable firearm.* A firearm which is incapable of discharging a shot by means of an explosive and is incapable of being readily restored to a firing condition.

*U.S.C.* The United States Code.

## Subpart C—Administrative and Miscellaneous Provisions

### § 178.21  Forms prescribed.

The Director is authorized to prescribe all forms required by this part. All of the information called for in each form shall be furnished, as indicated by the headings on the form and the instructions thereon or issued in respect thereto, and as required by this part.

### § 178.22  Emergency variations from requirements.

(a) The Director may approve variations from the requirements of this part when he finds that an emergency exists and that the proposed variations from the specific requirements (1) are necessary, (2) will not hinder the effective administration of this part, and (3) will not be contrary to any provisions of law.

(b) Variations from requirements granted under this section are conditioned on compliance with the procedures, conditions, and limitations with respect thereto set forth in the approval of the application. Failure to comply in good faith with such procedures, conditions, and limitations shall automatically terminate the authority for such variations, and the licensee thereupon shall fully comply with the prescribed requirements of regulations from which the variations were authorized. Authority for any variation may be withdrawn whenever in the judgment of the Director the effective administration of this part is hindered by the continuation of such variation. A licensee who desires to employ such variation shall submit a written application so to do, in triplicate, to the Assistant Regional Commissioner for transmittal to the Director. The application shall describe the proposed variation and set forth the reasons therefor. A variation shall not be employed until the application has been approved. The licensee shall retain, as part of his records, available for examination by internal revenue officers, any application approved by the Director under the provisions of this section.

### § 178.23  Right of entry and examination.

Any internal revenue officer may enter during business hours the premises, including places of storage, of any licensed importer, licensed manufacturer, licensed dealer, or licensed collector for the purpose of inspecting or examining any records or documents required to be kept by such importer, manufacturer, dealer, or collector under this part, and any firearms or ammunition kept or stored by such importer, manufacturer, dealer, or collector at such premises.

### § 178.24  Published ordinances.

The Director is authorized to compile, publish in the FEDERAL REGISTER, annually revise, and furnish to each licensee, a list of published ordinances which are relevant to the enforcement of this part.

### § 178.25  Disclosure of information.

Upon receipt of written request of any State or any political subdivision there-

of, the Assistant Regional Commissioner may make available to such State or any political subdivision thereof, any information which the Assistant Regional Commissioner may obtain by reason of the provisions of the Act with respect to the identification of persons within such State or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition.

### § 178.26  Curio and relic determination.

A licensed collector who desires to obtain a determination whether a particular firearm or ammunition is a curio or relic shall submit a written request, in duplicate, for a ruling thereon to the Assistant Regional Commissioner. Each such request shall be executed under the penalties of perjury and shall contain a complete and accurate description of the firearm or ammunition, and such photographs, diagrams, or drawings as may be necessary to enable the Assistant Regional Commissioner to make his determination. The Assistant Regional Commissioner may require the submission to him, or to an officer designated by him, of the firearm or ammunition for examination and evaluation. If the submission of the firearm or ammunition is impractical, the licensed collector shall so advise the Assistant Regional Commissioner and designate the place where the firearm or ammunition will be available for examination and evaluation.

### § 178.27  Destructive device determination.

The Director shall determine in accordance with 18 U.S.C. 921(a)(4) whether a device is excluded from the definition of a destructive device. A person who desires to obtain a determination under that provision of law for any device which he believes is not likely to be used as a weapon shall submit a written request, in triplicate, for a ruling thereon to the Director. Each such request shall be executed under the penalties of perjury and contain a complete and accurate description of the device, the name and address of the manufacturer or importer thereof, the purpose of and use for which it is intended, and such photographs, diagrams, or drawings as may be necessary to enable the Director to make his determination. The Director may require the submission to him, of a sample of such device for examination and evaluation. If the submission of such device is impracticable, the person requesting the ruling shall so advise the Director and designate the place where the device will be available for examination and evaluation.

### § 178.28  Transportation of destructive devices and certain firearms.

(a) The Assistant Regional Commissioner for the internal revenue region in which a person resides may authorize that person to transport in interstate or foreign commerce any destructive device, machine gun, short-barreled shotgun, or short-barreled rifle, if he finds that such transportation is reasonably necessary

AR005610

and is consistent with public safety and applicable State and local law. A person who desires to transport in interstate or foreign commerce any such device or weapon shall submit a written request so to do, in duplicate, to the Assistant Regional Commissioner. The request shall contain:

(1) A complete description and identification of the device or weapon to be transported;

(2) A statement whether such transportation involves a transfer of title;

(3) The need for such transportation;

(4) The approximate date such transportation is to take place;

(5) The present location of such device or weapon and the place to which it is to be transported;

(6) The mode of transportation to be used (including, if by common or contact carrier, the name and address of such carrier); and

(7) Evidence that the transportation or possession of such device or weapon is not inconsistent with the laws at the place of destination.

(b) No person shall transport any destructive device, machine gun, short-barreled shotgun, or short-barreled rifle in interstate or foreign commerce under the provisions of this section until he has received specific authorization so to do from the Assistant Regional Commissioner. Authorization granted under this section does not carry or import relief from any other statutory or regulatory provision relating to firearms.

(c) This section shall not be construed as requiring licensees to obtain authorization to transport destructive devices, machine guns, short-barreled shotguns, and short-barreled rifles in interstate or foreign commerce: *Provided*, That in the case of a licensed importer, licensed manufacturer, or licensed dealer, such a licensee is qualified under the National Firearms Act (see Part 179 of this chapter) and this part to engage in the business with respect to the device or weapon to be transported, and that in the case of a licensed collector, the device or weapon to be transported is a curio or relic.

§ 178.29 Out-of-State acquisition of firearms by nonlicensees.

No person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, shall transport into or receive in the State where he resides (or if a corporation or other business entity, where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State: *Provided*, That the provisions of this section (a) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (b) shall not apply to the transportation or receipt of a rifle or shotgun obtained in conformity with the provisions of §§ 178.30, 178.96, and 178.97, and (c)

shall not apply to the transportation of any firearm acquired in any State prior to the effective date of the Act.

§ 178.30 Out-of-State disposition of firearms by nonlicensees.

No nonlicensee shall transfer, sell, trade, give, transport, or deliver any firearm to any other nonlicensee, who the transferor knows or has reasonable cause to believe resides in any State other than that in which the transferor resides (or if a corporation or other business entity, where it maintains a place of business): *Provided*, That the provisions of this section shall not apply to (a) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or any acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (b) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

§ 178.31 Delivery by common or contract carrier.

(a) No person shall knowingly deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped: *Provided*, That any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of that trip without violating any provision of this part.

(b) No common or contract carrier shall transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of any provision of this part: *Provided, however*, That the provisions of this paragraph shall not apply in respect to the transportation of firearms or ammunition in in-bond shipment under Customs laws and regulations.

§ 178.32 Prohibited shipment, transportation, or receipt of firearms and ammunition by certain persons.

(a) No person may ship or transport any firearm or ammunition in interstate or foreign commerce, or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, who (1) is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year, (2) is a fugitive from justice, (3) is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v)

of the Federal Food, Drug, and Cosmetic Act), or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954), or (4) has been adjudicated as a mental defective or who has been committed to a mental institution.

(b) A firearm may not be received, possessed, or transported in commerce or affecting commerce by any person who (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, (2) has been discharged from the Armed Forces under dishonorable conditions, (3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or (4) having been a citizen of the United States has renounced his citizenship, or (5) being an alien is illegally in the United States.

(c) Any individual who to his knowledge and while being employed by any person coming within a classification contained in paragraph (b) of this section, may not in the course of such employment receive, possess, or transport a firearm in commerce or affecting commerce.

(d) The provisions of paragraph (b) of this section shall not apply to any prisoner who by reason of duties connected with law enforcement has expressly been entrusted with a firearm by competent authority of the prison, and the provisions of paragraphs (b) and (c) of this section shall not apply to any person, or any employee employed by such person, who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm.

§ 178.33 Stolen firearms and ammunition.

No person shall transport or ship in interstate or foreign commerce any stolen firearm or stolen ammunition knowing or having reasonable cause to believe that the firearm or ammunition was stolen, and no person shall receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition which is moving as, which is a part of, or which constitutes interstate or foreign commerce, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

§ 178.34 Removed, obliterated, or altered serial number.

No person shall knowingly transport, ship, or receive in interstate or foreign commerce any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered.

§ 178.35 Skeet, trap, target, and similar shooting activities.

Licensing and recordkeeping requirements, including permissible alternate records, for skeet, trap, target, and similar organized activities shall be determined by the Assistant Regional Commissioner on a case by case basis.

AR005611

RULES AND REGULATIONS                                                                 18561

## Subpart D—Licenses

### § 178.41   General.

(a) Each person intending to engage in business as an importer or manufacturer of, or a dealer in, firearms or ammunition shall, before commencing such business, obtain the license required by this subpart for the business to be operated. Each person who desires to obtain the privileges granted by the Act and this part to a licensed collector may obtain such a license under the provisions of this subpart.

(b) Each person intending to engage in business as a firearms or ammunition importer, manufacturer, or dealer shall file an application, with the required fee (see § 178.42), with the District Director for the internal revenue district in which his premises are to be located, and, pursuant to § 178.47, receive the license required for such business from the Assistant Regional Commissioner. A separate license must be obtained for each business and each place at which the applicant is to do business. Such license shall, subject to the provisions of the Act and other applicable provisions of law, entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce, and to engage in the business specified by the license, at the location described on the license, and for the period stated on the license: *Provided,* That it shall not be necessary for a licensed importer or a licensed manufacturer to also obtain a dealer's license in order to engage in business on his licensed premises as a dealer in the same type of firearms or ammunition authorized by his license to be imported or manufactured: *Provided further,* That the payment of the license fee as an importer or manufacturer of, or a dealer in, destructive devices and ammunition for destructive devices includes the privilege of importing, manufacturing, or dealing in, as the case may be, firearms other than destructive devices and ammunition for other than destructive devices by such a licensee at his licensed premises.

(c) Each person seeking the privileges of a collector licensed under this part shall file an application, with the required fee (see § 178.42), with the District Director for the internal revenue district in which his collection premises are to be located, and, pursuant to § 178.47, receive from the Assistant Regional Commissioner the license covering the collection of curios and relics. A separate license may be obtained for each collection premises, and such license shall, subject to the provisions of the Act and other applicable provisions of law, entitle the licensee to transport, ship, receive, and acquire curios and relics in interstate or foreign commerce, and to make disposition of curios and relics in interstate or foreign commerce to any other person licensed under the provisions of this part, for the period stated on the license.

(d) The collector license provided by this part shall apply only to transactions related to a collector's activity in acquiring, holding or disposing of curios and relics. A collector's license does not authorize the collector to engage in a business required to be licensed under the Act or this part. Therefore, if the acquisitions and dispositions of curios and relics by a collector bring the collector within the definition of a manufacturer, importer, or dealer under this part, he shall qualify as such. (See also § 178.93 of this part.)

### § 178.42   License fees.

Each applicant shall pay a fee for obtaining a license, a separate fee being required for each business or collecting activity at each place of such business or activity, as follows:

(a) For a manufacturer:

(1) Of destructive devices or ammunition for destructive devices—$1,000 per year.

(2) Of firearms other than destructive devices—$50 per year.

(3) Of ammunition for firearms other than destructive devices—$10 per year.

(b) For an importer:

(1) Of destructive devices or ammunition for destructive devices—$1,000 per year.

(2) Of firearms other than destructive devices or ammunition for firearms other than destructive devices—$50 per year.

(c) For a dealer:

(1) In destructive devices or ammunition for destructive devices—$1,000 per year.

(2) Who is a pawnbroker dealing in firearms other than destructive devices or ammunition for firearms other than destructive devices—$25 per year.

(3) Who is not a dealer in destructive devices or a pawnbroker—$10 per year.

(d) For a collector of curios and relics—$10 per year.

### § 178.43   License fee not refundable.

No refund of any part of the amount paid as a licensee fee shall be made where the operations of the licensee are, for any reason, discontinued during the period of an issued license. However, the license fee submitted with an application for a license shall be refunded if that application is denied.

### § 178.44   Original license.

(a) Any person who intends to engage in business as a firearms or ammunition importer, manufacturer, or dealer on or after the effective date of this part, or who has not previously been licensed under the provisions of this part to so engage in business, or who has not timely submitted application for renewal of his previous license issued under this part, shall, except as provided in paragraph (c) of this section, file with the District Director for the internal revenue district in which the applicant is to do business an application, Form 7 (Firearms), in duplicate. The application, Form 7 (Firearms), shall include information as to the ownership of the business, the type of firearms or ammunition to be dealt in, the type of business premises, the business hours, the business history, and the identity of the responsible persons in the business. The application must be executed under the penalties of perjury

and the penalties imposed by 18 U.S.C. 924. The application shall be accompanied by the appropriate fee in the form of (1) cash, or (2) money order or check made payable to the Internal Revenue Service. Forms 7 (Firearms) may be obtained from any Assistant Regional Commissioner or from any District Director.

(b) Any person who desires to obtain the privileges granted to a licensed collector under the Act and this part on or after the effective date of this part, or who has not timely submitted application for renewal of his previous license issued under this part, shall file with the District Director for the internal revenue district in which the applicant is to maintain his collection premises an application, Form 7 (Firearms), in duplicate. The application, Form 7 (Firearms), shall include information as to the ownership of the activity, the type of premises to be maintained by the applicant for the activity, and the identity of the responsible persons in the activity. The application must be executed under the penalties of perjury and the penalties imposed by 18 U.S.C. 924. The application shall be accompanied by a $10 fee in the form of (1) cash, or (2) money order or check made payable to the Internal Revenue Service. Forms 7 (Firearms) may be obtained from any Assistant Regional Commissioner or from any District Director.

(c) Any person holding a valid license issued pursuant to the provisions of the Federal Firearms Act to manufacture, import or deal in firearms or ammunition for pistols or revolvers may continue to conduct such business under such license until that license expires according to its terms, unless that license be sooner terminated pursuant to applicable provisions of law. If the holder of a license issued pursuant to the Federal Firearms Act intends to continue his firearms or ammunition business following the expiration of such license, he shall comply with the provisions contained in paragraph (a) of this section prior to the expiration of the period covered by the license, and upon compliance with those provisions such an applicant may continue such operations as were authorized by his expired license under this part until his application is finally acted upon.

### § 178.45   Renewal of license.

If a licensee intends to continue the business or activity described on a license issued under this part during any portion of the ensuing year, he shall, unless otherwise notified in writing by the Assistant Regional Commissioner, execute and file prior to the expiration of his license an application for license renewal, Form 8 (Firearms) (Part 5), accompanied by the required fee, with the District Director for the internal revenue district in which the business or activity is operated. The Assistant Regional Commissioner may, in writing, require an applicant for license renewal to also file completed Form 7 (Firearms) in the manner required by § 178.44. In the event the licensee does not timely file a

AR005612

Form 8 (Firearms) (Part 3), he must file a Form 7 (Firearms) as required by § 178.44, and obtain the required license before continuing business or collecting activity. If a Form 8 (Firearms) (Part 3) is not timely received through the mails, the licensee should so notify his Assistant Regional Commissioner.

§ 178.46 Procedure by District Director.

Upon receipt of an application for an original license on Form 7 (Firearms) or an application for renewal of a license on Form 8 (Firearms) (Part 3) or a required Form 7 (Firearms) the District Director shall deposit the fee accompanying the license application and forward the application to the Assistant Regional Commissioner. Where an application is filed with an insufficient fee, the application and any fee submitted shall be returned.

§ 178.47 Issuance of license.

(a) Upon receipt of a properly executed application for a license on Form 7 (Firearms), or Form 8 (Firearms) (Part 3), the Assistant Regional Commissioner may, upon finding through further inquiry or investigation, or otherwise, that the applicant is entitled thereto, issue the appropriate license and a copy thereof. Each license shall bear a serial number and such number may be assigned to the licensee to whom issued for so long as he maintains continuity of annual renewal in the same internal revenue district.

(b) The Assistant Regional Commissioner shall approve a properly executed application for license on Form 7 (Firearms), or Form 8 (Firearms) (Part 3), if:

(1) The applicant is 21 years of age or over;

(2) The applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of the Act;

(3) The applicant has not willfully violated any of the provisions of the Act or this part;

(4) The applicant has not willfully failed to disclose any material information required, or has not made any false statement as to any material fact, in connection with his application;

(5) The applicant has in a State (1) premises from which he conducts business subject to license under the Act or from which he intends to conduct such business within a reasonable period of time, or (ii) in the case of a collector, premises from which he conducts his collecting subject to license under the Act or from which he intends to conduct such collecting within a reasonable period of time; and

(6) The applicant is not prohibited by the provisions of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, as amended (82 Stat. 236; 18 U.S.C. Appendix) from receiving, possessing or

transporting firearms in commerce or affecting commerce, if the application is for a license relating to firearms.

(c) The Assistant Regional Commissioner shall approve or deny an application for license within the 45-day period beginning on the date the application was received by the District Director: Provided, That when an applicant for license renewal is a person who is, pursuant to the provisions of § 178.82, § 178.143, or § 178.144, conducting business or collecting activity under a previously issued license, action regarding the application will be held in abeyance pending the completion of the proceedings against the applicant's existing license or license application, final determination of the applicant's criminal case, or final action by the Commissioner of an application for relief submitted pursuant to § 178.144, as the case may be.

(d) When the Assistant Regional Commissioner fails to act on an application for license within the 45-day period prescribed by paragraph (c) of this section, the applicant may file an action under section 1361 of title 28, United States Code, to compel the Assistant Regional Commissioner to act.

§ 178.48 Correction of error on license.

(a) Upon receipt of a license issued under the provisions of this part, each licensee shall examine same to ensure that the information contained thereon is accurate. If the license is incorrect, the licensee shall return the license to the Assistant Regional Commissioner with a statement showing the nature of the error. The Assistant Regional Commissioner shall correct the error, if the error was made in his office, and return the license. However, if the error resulted from information contained in the licensee's application for the license, the Assistant Regional Commissioner shall require the licensee to file an amended application setting forth the correct information and a statement explaining the error contained in the application. Upon receipt of the amended application and a satisfactory explanation of the error, the Assistant Regional Commissioner shall make the correction on the license and return same to the licensee.

(b) When the Assistant Regional Commissioner finds through any means other than notice from the licensee that an incorrect license has been issued, the Assistant Regional Commissioner may require the holder of the incorrect license to (1) return the license for correction, and (2) if the error resulted from information contained in the licensee's application for the license, the Assistant Regional Commissioner shall require the licensee to file an amended application setting forth the correct information, and a statement explaining the error contained in the application. The Assistant Regional Commissioner then shall make the correction on the license and return same to the licensee.

§ 178.49 Duration of license.

A license shall not be issued for a period of less than 1 year. The license

shall entitle the person to whom issued to engage in the business or activity specified on the license, within the limitations of the Act and the regulations contained in this part, for the period stated on the license, unless sooner terminated.

§ 178.50 Locations covered by license.

The license covers the class of business or the activity specified in the license at the address described therein. Accordingly, a separate license must be obtained for each location at which a firearms or ammunition business or activity requiring a license under this part is conducted; however, no license is required to cover a separate warehouse used by the licensee solely for storage of firearms or ammunition if the records required by this part are maintained at the licensed premises served by such warehouse: Provided, That a licensed collector may acquire curios and relics at any location, and dispose of curios or relics to any licensee, or to other persons who are residents of the State where the collector's license is held and the disposition is made.

§ 178.51 License not transferable.

Licenses issued under this part are not transferable. In the event of the lease, sale, or other transfer of the operations authorized by the license, the successor must obtain the license required by this part prior to commencing such operations. However, for rules on right of succession, see § 178.56.

§ 178.52 Change of address.

A licensee may during the term of his current license remove his business or activity to a new location at which he intends regularly to carry on such business or activity, without procuring a new license. However, in every case, whether or not the removal is from one internal revenue region to another, notification of the new location of the business or activity must be given not less than 10 days prior to such removal to the Assistant Regional Commissioner for the internal revenue region from which or within which the removal is to be made, and the Assistant Regional Commissioner for the internal revenue region to which the removal is to be made. In each instance, the license and the copy thereof furnished with the license must be submitted for endorsement to the Assistant Regional Commissioner having jurisdiction over the internal revenue region to which or within which removal is to be made. After endorsement of the license and the copy thereof to show the new address, and the new license number, if any, the Assistant Regional Commissioner will return same to the licensee.

§ 178.53 Change in trade name.

A licensee continuing to conduct business at the location shown on his license is not required to obtain a new license by reason of a mere change in trade name under which he conducts his business: Provided, That such licensee furnishes his license for endorsement of such

AR005613

change to the Assistant Regional Commissioner for the internal revenue region in which the licensee conducts his business within 30 days from the date the licensee begins his business under the new trade name.

§ 178.54   Change of control.

In the case of a corporation or association holding a license under this part, if actual or legal control of the corporation or association changes, directly or indirectly, whether by reason of change in stock ownership or control (in the licensed corporation or in any other corporation), by operations of law, or in any other manner, the licensee shall, within 30 days of such change, give written notification thereof, executed under the penalties of perjury, to the Assistant Regional Commissioner. Upon expiration of the license, the corporation or association must file a Form 7 (Firearms) as required by § 178.44.

§ 178.55   Continuing partnerships.

Where, under the laws of the particular State, the partnership is not terminated on death or insolvency of a partner, but continues until the winding up of the partnership affairs is completed, and the surviving partner has the exclusive right to the control and possession of the partnership assets for the purpose of liquidation and settlement, such surviving partner may continue to operate the business under the license of the partnership. If such surviving partner acquires the business on completion of the settlement of the partnership, he shall obtain a license in his own name from the date of acquisition, as provided in § 178.44. The rule set forth in this section shall also apply where there is more than one surviving partner.

§ 178.56   Right of succession by certain persons.

(a) Certain persons other than the licensee may secure the right to carry on the same firearms or ammunition business at the same address shown on, and for the remainder of the term of, a current license. Such persons are:

(1) The surviving spouse or child, or executor, administrator, or other legal representative of a deceased licensee; and

(2) A receiver or trustee in bankruptcy, or an assignee for benefit of creditors.

(b) In order to secure the right provided by this section, the person or persons continuing the business shall furnish the license for that business for endorsement of such succession to the Assistant Regional Commissioner for the internal revenue region in which the business is conducted within 30 days from the date on which the successor begins to carry on the business.

§ 178.57   Discontinuance of business.

Where a firearm or ammunition business is either discontinued or succeeded by a new owner, the owner of the business discontinued or succeeded shall within 30 days thereof furnish to the Assistant Regional Commissioner for the internal revenue region in which his

business was located notification of the discontinuance or succession. (See also § 178.127.)

§ 178.58   State or other law.

A license issued under this part confers no right or privilege to conduct business or activity contrary to State or other law. The holder of such a license is not by reason of the rights and privileges granted by that license immune from punishment for operating a firearm or ammunition business or activity in violation of the provisions of any State or other law. Similiarly, compliance with the provisions of any State or other law affords no immunity under Federal law or regulations.

§ 178.59   Abandoned application.

Upon receipt of an incomplete or improperly executed application on Form 7 (Firearms), or Form 8 (Firearms) (Part 3), the applicant shall be notified of the deficiency. If the application is not corrected and returned within 30 days following the date of notification, the application shall be considered as having been abandoned and the license fee returned.

§ 178.60   Certain continuances of business.

A licensee who furnishes his license to the Assistant Regional Commissioner for correction or endorsement in compliance with the provisions contained in this subpart may continue his operations while awaiting its return.

Subpart E—License Proceedings

§ 178.71   Denial of an application for license.

Whenever the Assistant Regional Commissioner has reason to believe that an applicant is not eligible to receive a license under the provisions of § 178.47, he may issue a notice of denial, on Form 4498, to the applicant. The notice shall set forth the matters of fact and law relied upon in determining that the application should be denied, and shall afford the applicant 15 days from the date of receipt of the notice in which to request a hearing to review the denial. If no request for a hearing is filed within such time, the application shall be disapproved and a copy, so marked, shall be returned to the applicant.

§ 178.72   Hearing after application denial.

If the applicant for an original or renewal license desires a hearing to review the denial of his application, he shall file a request therefor, in duplicate, with the Assistant Regional Commissioner within 15 days after receipt of the notice of denial. The request should include a statement of the reasons therefor. On receipt of the request, the Assistant Regional Commissioner shall, as expeditiously as possible, make the necessary arrangements for the hearing and advise the applicant of the date, time, location, and the name of the officer before whom the hearing will be held. Such notification shall be made not less than 10 days in advance of the date set for the hear-

ing. On conclusion of the hearing and consideration of all relevant facts and circumstances presented by the applicant or his representative, the Assistant Regional Commissioner shall render his decision confirming or reversing the denial of the application. If the decision is that the denial should stand, a certified copy of the Assistant Regional Commissioner's findings and conclusions shall be furnished to the applicant with a final notice of denial, Form 4501. A copy of the application, marked "Disapproved," will be returned to the applicant. If the decision is that the license applied for should be issued, the applicant shall be so notified, in writing, and the license shall be issued as provided by § 178.47.

§ 178.73   Notice of contemplated revocation.

Whenever the Assistant Regional Commissioner has reason to believe that a licensee has violated any provision of the Act or this part, he may issue a notice, on Form 4499, of contemplated revocation of the license. The notice shall set forth the matters of fact constituting the violations specified, dates, places, and the sections of law and regulations violated. The Assistant Regional Commissioner shall afford the licensee 15 days from the date of receipt of the notice in which to request a hearing prior to revocation of the license. If the licensee does not file a timely request for a hearing, the Assistant Regional Commissioner shall issue a notice of revocation, Form 4500, as provided in § 178.74.

§ 178.74   Request for hearing after notice of contemplated revocation.

If a licensee desires a hearing pursuant to receipt of a notice of contemplated revocation of his license, he shall file a request therefor, in duplicate, with the Assistant Regional Commissioner within 15 days after receipt of the notice of contemplated revocation. On receipt thereof, the Assistant Regional Commissioner shall, as expeditiously as possible, make the necessary arrangements for the hearing and advise the licensee of the date, time, location and the name of the officer before whom the hearing will be held. Such notification shall be made not less than 10 days in advance of the date set for the hearing. On conclusion of the hearing and consideration of all relevant presentations made by the licensee or his representative, the Assistant Regional Commissioner shall render his decision and shall prepare a brief summary of the findings and conclusions on which the decision is based. If the decision is that the license should be revoked, a certified copy of the summary shall be furnished to the licensee with the notice of revocation on Form 4500. If the decision is that the license should not be revoked, the licensee shall be so notified in writing.

§ 178.75   Hearing after notice of revocation.

(a) No hearing held prior to notice of revocation. If the licensee did not request a hearing on receipt of the notice of contemplated revocation of his license,

AR005614

RULES AND REGULATIONS

Form 4499, but does file a timely request for a hearing after being served the notice of revocation, Form 4500, the Assistant Regional Commissioner shall arrange for, and conduct, a hearing in the manner prescribed in § 178.74, except that the place of hearing will be determined as provided by § 178.81. If, after hearing, the Assistant Regional Commissioner is still of the opinion that the license should be revoked, he will serve final notice of revocation, Form 4501, on the licensee, with a copy of his findings and conclusions. If he decides that the license should not be revoked, he will so notify the licensee, in writing.

(b) *Hearing held prior to notice of revocation.* If a hearing was held prior to notice of revocation, Form 4500, and the licensee files a timely request for a hearing after receipt of a notice of revocation, the Assistant Regional Commissioner shall refer the matter to the hearing examiner, appointed under 5 U.S.C. 3105, designated to preside over such hearing. The examiner shall set a time and place for the hearing and shall serve notice thereof on the licensee and the Assistant Regional Commissioner at least 10 days in advance of the hearing date. Such hearing shall be conducted under the applicable provisions of Part 200 of this chapter, including those with respect to stipulations at hearings, evidence, and closing of hearings.

§ 178.76   Recommended decision of hearing examiner.

Within a reasonable time after the conclusion of a hearing held as provided in § 178.75, and as expeditiously as possible, the examiner shall render a recommended decision. Such decision shall become a part of the record and, if proposed findings and conclusions have been filed, shall show the examiner's ruling upon each of such proposed findings and conclusions. Decisions shall consist of (a) a brief statement of the issues of fact involved in the proceeding; (b) the examiner's findings and conclusions, as well as the reasons and basis therefor, upon all the material issues of fact, law or discretion presented on the record; and (c) the examiner's recommended determination on the record.

§ 178.77   Certification and transmittal of record and recommended decision to Director.

After reaching his decision, the examiner shall certify to the complete record of the proceeding before him and shall immediately forward it, together with two copies of his recommended decision, to the Director, and will forward two copies of his recommended decision to the Assistant Regional Commissioner for his files.

§ 178.78   Decision of Director.

After consideration of the record and the recommended decision of the examiner, the Director shall approve or disapprove the findings, conclusion, and recommended decision of the examiner, and he shall direct the Assistant Regional Commissioner to issue a final

notice of revocation on Form 4501; or to inform the licensee that the license shall remain in effect. Any decision of the Director for the revocation of a license shall include a statement of the findings and conclusions upon which it is based, including his ruling on each proposed finding, conclusion, and exception to the examiner's recommended decision, together with a statement of his findings and conclusions, and reasons or basis therefor, upon all material issues of fact, law, or discretion presented on the record. A signed duplicate original of the decision shall be served on the licensee and a copy containing certificate of service shall be retained by the Assistant Regional Commissioner for his files, and the original shall be placed in the official record of the proceeding.

§ 178.79   Service on applicant or licensee.

All notices and other formal documents required to be served on an applicant or licensee under this subpart shall be served by certified mail or by personal delivery. Where service is by certified mail, a signed duplicate original copy of the formal document shall be mailed, with return receipt requested, to the applicant or licensee at the address stated in his application or license, or at his last known address. Where service is by personal delivery, a signed duplicate original copy of the formal document shall be delivered to the applicant or licensee, or, in the case of a corporation, partnership, or association, by delivering it to an officer, manager, or general agent thereof, or to its attorney of record.

§ 178.80   Representation at a hearing.

An applicant or licensee may be represented by an attorney or other person recognized to practice before the Internal Revenue Service as provided in 31 CFR Part 10 (Treasury Department Circular No. 230), if he has otherwise complied with the applicable requirements of §§ 601.521–601.527 of this chapter. The Assistant Regional Commissioner may be represented in proceedings under § 178.76(b) by an attorney in the office of the regional counsel who is authorized to execute and file motions, briefs and other papers in the proceeding, on behalf of the Assistant Regional Commissioner, in his own name as "Attorney for the Government."

§ 178.81   Designated place of hearing.

The designated place of hearing shall be at a location convenient to the aggrieved party: *Provided,* That any hearing held after notice of contemplated revocation but prior to the notice of revocation shall be at the office of the Assistant Regional Commissioner.

§ 178.82   Operations by licensees after notice.

In any case where denial or revocation proceedings are pending before the Internal Revenue Service, or notice of denial or revocation has been served on the licensee and he has filed timely request for a hearing; the license in the possession of the licensee shall remain in effect even though (a) such license

has expired, or (b) the revocation date specified in the notice of revocation on Form 4500 served on the licensee has passed: *Provided,* That under the condition of paragraph (a) of this section, the licensee has timely filed an application for the renewal of his license. If a licensee is dissatisfied with a posthearing decision revoking the license or denying the application, as the case may be, he may, pursuant to 18 U.S.C. 923(f)(3), within 60 days after receipt of the final notice denying the application or revoking the license, file a petition for judicial review of such action. Such petition shall be filed with the U.S. district court for the district in which the applicant or licensee resides or has his principal place of business. In such case, when the Assistant Regional Commissioner finds that justice so requires, he may (1) postpone the effective date of revocation of a license or (2) authorize continued operations under the expired license, as applicable, pending judicial review.

## Subpart F—Conduct of Business

§ 178.91   Posting of license.

Any license issued under this part shall be kept posted and kept available for inspection on the premises covered by the license.

Each licensed manufacturer or licensed importer of any firearm manufactured or imported on or after the effective date of this part shall legibly identify each such firearm by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof in a manner not susceptible of being readily obliterated, altered, or removed, an individual serial number not duplicating any serial number placed by the manufacturer or importer on any other firearm, and by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame, receiver, or barrel thereof in a manner not susceptible of being readily obliterated, altered or removed, the model, if such designation has been made; the caliber or gauge; the name (or recognized abbreviation of same) of the manufacturer and also, when applicable, of the importer; in the case of a domestically made firearm, the city and State (or recognized abbreviation thereof) wherein the licensed manufacturer maintains his place of business; and in the case of an imported firearm, the name of the country in which manufactured and the city and State (or recognized abbreviation thereof) of the importer: *Provided,* That the Director may authorize other means of identification of the licensed manufacturer or licensed importer upon receipt of letter application, in duplicate, from same showing that such other identification is reasonable and will not hinder the effective administration of this part: *Provided, further,* That in the case of a destructive device, the Director may authorize other means of identifying that weapon upon receipt of letter applica-

AR005615

tion, in duplicate, from the licensed manufacturer or licensed importer showing that engraving, casting, or stamping (impressing) such a weapon would be dangerous or impracticable. A firearm frame or receiver which is not a component part of a complete weapon at the time it is sold, shipped, or otherwise disposed of by a licensed manufacturer or licensed importer, shall be identified as required by this section.

### § 178.93   Authorized operations by a licensed collector.

The license issued to a collector of curios or relics under the provisions of this part shall cover only transactions by the licensed collector in curios and relics. The collector's license is of no force or effect and a licensed collector is of the same status under the Act and this part as a nonlicensee with respect to (a) any acquisition or disposition of firearms or ammunition other than curios or relics, or any transportation, shipment, or receipt of firearms or ammunition other than curios or relics in interstate or foreign commerce, and (b) any transaction with a nonlicensee involving any firearm or ammunition other than a curio or relic. (See also § 178.50.)

### § 178.94   Sales or deliveries between licensees.

A licensed importer, licensed manufacturer, or licensed dealer selling or otherwise disposing of firearms or ammunition, and a licensed collector selling or otherwise disposing of curios or relics, to another licensee shall verify the identity and licensed status of the transferee prior to making the transaction. On and after February 14, 1969, such verification shall be established by the transferee furnishing to the transferor a certified copy of the transferee's license and by such other means as the transferor deems necessary: *Provided*, That it shall not be required (a) for a transferee who has furnished a certified copy of his license to a transferor to again furnish such certified copy to that transferor during the term of the transferee's current license, and (b) for licensees of multilicensed business organizations to furnish certified copies of their licenses to other licensed locations operated by such organization: *Provided further*, That a multilicensed business organization may furnish to a transferor, in lieu of a certified copy of each license, a list, certified to be true, correct and complete, containing the name, address, license number, and the date of license expiration of each licensed location operated by such organization, and the transferor may sell or otherwise dispose of firearms and ammunition as provided by this section to any licensee appearing on such list without requiring a certified copy of a license therefrom. A transferor licensee who has the certified information required by this section may sell or dispose of firearms or ammunition to a licensee for not more than 45 days following the expiration date of the transferee's license.

### § 178.95   Certified copy of license.

Each person licensed under the provisions of this part shall be furnished together with his license a copy thereof for his certification. If such a person desires an additional copy of his license for certification and for use pursuant to § 178.94, he shall:

(a) Make a reproduction of the copy of his license and execute same, or

(b) Make a reproduction of his license, enter upon such reproduction the statement: "I certify that this is a true copy of a license issued to me to engage in the business specified in Item 5" and sign his name adjacent thereto, or

(c) Submit a request, in writing, for certified copies of his license to the Assistant Regional Commissioner for the internal revenue region in which the license was issued. The request shall set forth the name, trade name (if any) and address of the licensee, and the number of copies of the license desired. There shall be imposed a fee of $1 for each copy of a license issued by the Assistant Regional Commissioner under the provisions of this paragraph. Fee payment shall accompany each such request for additional copies of a license. Such fee shall be paid by (1) cash, or (2) money order or check made payable to the Internal Revenue Service.

### § 178.96   Out-of-State and mail order sales.

(a)  The provisions of this section shall apply in any case where a firearm purchased by or delivered to the person so receiving the firearm is not otherwise prohibited by the Act or this part.

(b)  A licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a nonlicensee who does not appear in person at the licensee's business premises if the nonlicensee is a resident of the same State in which the licensee's business premises are located, and the nonlicensee furnishes to the licensee the firearms transaction record, Form 4473, required by § 178.124. The nonlicensee shall attach to such record a true copy of any permit or other information required pursuant to any statute of the State and published ordinance applicable to the locality in which he resides. The licensee shall prior to shipment or delivery of the firearm, forward by registered or certified mail (return receipt requested) a copy of the record, Form 4473, to the chief law enforcement officer named on such record, and delay shipment or delivery of the firearm for a period of at least 7 days following receipt by the licensee of the return receipt evidencing delivery of the copy of the record to such chief law enforcement officer, or the return of the copy of the record to him due to the refusal of such chief law enforcement officer to accept same in accordance with U.S. Post Office Department regulations. The original Form 4473, and evidence of receipt or rejection of delivery of the copy of the Form 4473 sent to the chief law enforcement officer shall be retained by the licensee as a part of the records required

of him to be kept under the provisions of Subpart H of this part.

(c)  A licensed importer, licensed manufacturer, or licensed dealer may sell or deliver a rifle or shotgun, and (a licensed collector may sell or deliver a rifle or shotgun which is a curio or relic), to a nonlicensed resident of a State contiguous to the State in which the licensee's place of business is located if the purchaser's State of residence has enacted legislation, currently in force, specifically authorizing a resident of that State to purchase a rifle or shotgun in a contiguous State, the sale fully complies with the legal conditions of sale in both such contiguous States, and the purchaser and the licensee have, prior to the sale or delivery for sale, of the rifle or shotgun, complied with all the requirements of paragraph (b) of this section applicable to intrastate transactions occurring on other than the licensee's business premises.

(d)  A licensed dealer may sell to any nonlicensee who is a resident of a State other than the State in which the licensed dealer's premises are located, and who is participating in any organized rifle or shotgun match or contest, or is engaged in hunting, in the State in which the licensed dealer's premises are located, and whose rifle or shotgun has been lost or stolen or has become inoperative in the State in which the licensed dealer's premises are located, if the nonlicensee presents to the licensed dealer a sworn statement, in duplicate, (1) that his rifle or shotgun was lost or stolen or became inoperative while participating in such a match or contest, or while engaged in hunting, in the State in which the licensed dealer's business premises are located, (2) setting forth the name and address of the organized rifle or shotgun match or contest, or the nature and location of the hunting, and the circumstances surrounding the firearm's loss or theft, or the reason why the firearm has become inoperative, and (3) identifying the chief law enforcement officer (sheriff, chief of police, or police precinct captain) of the locality in which the nonlicensee resides. Immediately upon delivery of the rifle or shotgun to the nonlicensee, the licensed dealer shall forward a copy of the sworn statement, by registered mail, to the chief law enforcement officer named by the nonlicensee. The licensee shall retain the original sworn statement, and evidence of delivery of the copy thereof to the chief law enforcement officer, as a part of the records required of him under Subpart H of this part.

### § 178.97   Loan or rental of firearms.

A licensee may loan or rent a firearm to any person for temporary use off the premises of the licensee for lawful sporting purposes: *Provided*, That the delivery of the firearm to such person is not prohibited by § 178.99(b) or § 178.99(c), and the licensee records such loan or rental in the records required to be kept by him under Subpart H of this part. A club, association, or similar organization temporarily furnishing firearms

AR005616

18566

**RULES AND REGULATIONS**

(whether by loan, rental, or otherwise) to participants in a skeet, trap, target, or similar shooting activity for use at the time and place such activity is held does not, unattended by other circumstances, cause such club, association, or similar organization to be engaged in the business of a dealer in firearms or as engaging in firearms transactions. Therefore, the licensing and recordkeeping requirements contained in this part pertaining to firearms transactions would not apply to this temporary furnishing of firearms for use on premises on which such an activity is conducted.

**§ 178.98   Sales or deliveries of destructive devices and certain firearms.**

The sale or delivery by a licensee of any destructive device, machinegun, short-barreled shotgun, or short-barreled rifle, to any person other than another licensee who is licensed under this part to deal in such device or firearm, is prohibited unless the person to receive such device or firearm furnishes to the licensee a sworn statement, in triplicate, setting forth (a) the reasons why there is a reasonable necessity for such person to purchase or otherwise acquire the device or weapon, and (b) that such person's receipt or possession of the device or weapon would be consistent with public safety. Such sworn statement shall be attached to the application to transfer and register the firearm required by Part 179 of this chapter. The sale or delivery of the device or weapon shall not be made until the application for transfer is approved by the Director and returned to the licensee (transferor) as provided in Part 179 of this chapter.

**§ 178.99   Certain prohibited sales or deliveries.**

(a) A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part, or the Federal Firearms Act, and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: *Provided,* That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State contiguous to the State in which the licensee's place of business or collection premises is located if the requirements of § 178.96(c) are fully met, (2) shall not preclude any person who is participating in any organized rifle or shotgun match or contest, or is engaged in hunting, in a State other than his State of residence and whose rifle or shotgun has been lost or stolen or has become inoperative in such other State, from purchasing a rifle or shotgun in such other State from a licensed dealer if the requirements of § 178.96(d) are fully met, and (3) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes (see § 178.97).

(b) A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver (1) any firearm or ammunition to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 18 years of age, and, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age, or (2) any firearm or ammunition to any person in any State where the purchase or possession by such person of such firearm or ammunition would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the importer, manufacturer, dealer or collector knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance.

(c) A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person (1) is except as provided under § 178.143, under indictment for, or except as provided under § 178.144, has been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year, (2) is a fugitive from justice, (3) is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act; 21 U.S.C. 321(v)), or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954), or (4) has been adjudicated as a mental defective or has been committed to any mental institution.

**§ 178.100   Record of transactions.**

Every licensee shall maintain firearms and ammunition records in such form and manner as is prescribed by Subpart H of this part.

**Subpart G—Importation**

**§ 178.111   General.**

(a) Section 922(a)(3) of the Act makes it unlawful, with certain exceptions not pertinate here, for any person other than a licensee, to transport into or receive in the State where he resides any firearm purchased or otherwise obtained by him outside of that State. However, section 925(a)(4) provides a limited exception for the transportation, shipment, receipt or importation of certain firearms and ammunition by certain members of the United States armed forces. Section 922(1) of the Act makes it unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition except as provided by section 925(d) of the Act, which section provides standards for importing or bringing firearms or ammunition into the United States. Accordingly, no firearm or am-

munition may be imported or brought into the United States except as provided by this part.

(b) Where a firearm or ammunition is imported and the authorization for importation required by this subpart has not been obtained by the person importing same, such person shall:

(1) Store, at his expense, such firearm or ammunition at a facility designated by U.S. Customs or the Assistant Regional Commissioner to await the issuance of the required authorization or other disposition; or

(2) Abandon such firearm or ammunition to the U.S. Government; or

(3) Export such firearm or ammunition.

(c) Any inquiry relative to the provisions or procedures under this subpart, other than that pertaining to the payment of customs duties or the release from Customs custody of firearms or ammunition authorized by the Director to be imported, shall be directed to the Assistant Regional Commissioner for reply.

**§ 178.112   Importation by a licensed importer.**

(a) No firearm or ammunition shall be imported or brought into the United States by a licensed importer (as defined in § 178.11) unless the Director has authorized the importation of the firearm or ammunition, or the firearm or ammunition is listed on the Importation List compiled by the Director as provided by paragraph (c) of this section.

(b) An application for a permit, Form 6 (Firearms), to import or bring a firearm or ammunition into the United States or a possession thereof under this section shall be filed, in triplicate, with the Director. The application shall contain (1) the name, address, and license number of the importer, (2) a description of the firearm or ammunition to be imported, including type (e.g.: rifle, shotgun, pistol, revolver), model, caliber, size or gauge, barrel length (if a firearm), country of manufacture and name of the manufacturer, (3) the unit cost of the firearm to be imported, (4) the country from which to be imported, (5) the name and address of the foreign seller and the foreign shipper, (6) verification that if a firearm, it will be identified as required by this part, and (7)(i) if imported or brought in for scientific or research purposes, a statement describing such purposes, or (ii) if for use in connection with competition or training pursuant to chapter 401 of title 10, U.S.C., a statement describing such intended use, or (iii) if an unserviceable firearm (other than a machine gun) being imported as a curio or museum piece, a description of how it was rendered unserviceable and an explanation of why it is a curio or museum piece, or (iv) if a firearm, other than a surplus military firearm, of a type that does not fall within the definition of a firearm by section 5845(a) of the Internal Revenue Code of 1954, and is for sporting purposes, an explanation of why the applicant believes the firearm is generally recognized as particularly suitable

AR005617

RULES AND REGULATIONS

18567

for or readily adaptable to sporting purposes, or (v) if ammunition being imported for sporting purposes, a statement why the applicant believes it is generally recognized as particularly suitable for or readily adaptable to sporting purposes. In determining whether a firearm or ammunition is particularly suitable for or readily adaptable to sporting purposes, the Director may seek the recommendation of the advisory board authorized by paragraph (c) of this section. If the Director approves the application, such approved application shall serve as the permit to import the firearms or ammunition described therein, and importation of such firearms or ammunition may continue to be made by the licensed importer under the approved application (permit) during the period specified thereon. The Director shall furnish the approved application (permit) to the applicant and retain two copies thereof for administrative use. If the Director disapproves the application, the licensed importer shall be notified of the basis for the disapproval.

(c) The Director may compile an Importation List of firearms and ammunition which he determines to be generally recognized as particularly suitable for or readily adaptable to sporting purposes. The determination of the Director that a firearm or ammunition is generally recognized to be particularly suitable for or readily adaptable to sporting purposes may be made with the assistance of an advisory board to be appointed by the Commissioner. Such board may be composed of persons from within and without governmental agencies who are recognized as being particularly knowledgeable in the use and classification of firearms and ammunition. No firearm shall be placed on the Importation List unless it is found that (1) the caliber or gauge of the firearm is suitable for use in a recognized shooting sport, (2) the type of firearm is generally recognized as particularly suitable for or readily adaptable to such use, and (3) the use of the firearm in a recognized shooting sport will not endanger the person using it due to deterioration through such use or because of inferior workmanship, materials or design. No ammunition shall be placed on the Importation List unless it is found that (1) the caliber, size or gauge of the ammunition is suitable for use in a recognized shooting sport, (ii) the type of ammunition is generally recognized as particularly suitable for or readily adaptable to such use, and (iii) the use of the ammunition in a recognized shooting sport will not endanger the person using it.

(d) A firearm or ammunition imported or brought into the United States by a licensed importer may be released from Customs custody to the licensed importer upon his showing that he has obtained a permit from the Director for the importation of the firearm or ammunition to be released, or that the firearm or ammunition appears on the Importation List. In obtaining the release from Customs custody of a firearm or ammunition authorized by this section to be imported through use of a permit or be-

cause the firearm or ammunition appears on the Importation List, the licensed importer shall prepare Form 6A (Firearms), in duplicate, and furnish the original Form 6A (Firearms) to the Customs officer releasing the firearm or ammunition. The Customs officer shall, after certification, forward the Form 6A (Firearms) to the Assistant Regional Commissioner for the region wherein the licensed importer maintains his place of business. The Form 6A (Firearms) shall show the name, address, and license number of the importer, the name of the manufacturer of the firearm or ammunition, the country of manufacture, the type, model, and caliber, size or gauge, and the number of firearms or rounds of ammunition released.

(e) Within 15 days of the date of release from Customs custody, the licensed importer shall (1) forward to the Assistant Regional Commissioner a copy of Form 6A (Firearms) on which shall be reported any error or discrepancy appearing on the Form 6A (Firearms) certified by Customs, (2) pursuant to § 178.-92, place all required identification data on each imported firearm if same did not bear such identification data at the time of its release from Customs custody, and (3) post in the records required to be maintained by him under Subpart H of this part, all required information regarding the importation.

§ 178.113  Importation by other licensees.

(a) No person other than a licensed importer (as defined in § 178.11) shall engage in the business of importing firearms or ammunition. Therefore, no firearm or ammunition shall be imported or brought into the United States or a possession thereof by any licensee other than a licensed importer unless the Director issues a permit authorizing the importation of the firearm or ammunition.

(b) An application for a permit, Form 6 (Firearms), to import or bring a firearm or ammunition into the United States or a possession thereof by a licensee, other than a licensed importer, shall be filed, in triplicate, with the Director. The application shall contain (1) the name, address, and the license number of the applicant, (2) a description of the firearm or ammunition to be imported, including type (e.g.: rifle, shotgun, pistol, revolver), model, caliber, size or gauge, barrel length (if a firearm), country of manufacture, and name of the manufacturer, (3) the unit cost of the firearm or ammunition to be imported, (4) the name and address of the foreign seller and the foreign shipper, (5) the country from which the firearm or ammunition is to be imported, and (6) (i) if the firearm or ammunition is being imported or brought in for scientific or research purposes, a statement describing such purposes, or (ii) if for use in connection with competition or training pursuant to chapter 401 of title 10, U.S.C., a statement describing such intended use, or (iii) if an unserviceable firearm (other than a machine gun) being imported as a curio or museum piece,

a description of how it was rendered unserviceable and an explanation of why it is a curio or museum piece, or (iv) if a firearm, other than a surplus military firearm, of a type that does not fall within the definition of a firearm under 5845(a) of the Internal Revenue Code of 1954, and is for sporting purposes, an explanation of why the applicant believes the firearm is generally recognized as particularly suitable for or readily adaptable to sporting purposes, or (v) if ammunition being imported for sporting purposes, a statement why the applicant believes it is generally recognized as particularly suitable for or readily adaptable to sporting purposes. If the Director approves the application, such approved application shall serve as the permit to import the firearm or ammunition described therein. The Director shall furnish the approved application (permit) to the applicant and retain two copies thereof for administrative use. If the Director disapproves the application, the applicant shall be notified of the basis for the disapproval.

(c) A firearm or ammunition imported or brought into the United States or a possession thereof under the provisions of this section may be released from Customs custody to the licensee importing the firearm or ammunition upon his showing that he has obtained a permit from the Director for the importation. In obtaining the release of the firearm or ammunition from Customs custody, the licensee importing same shall furnish a Form 6A (Firearms) to the Customs officer releasing the firearm or ammunition. The Customs officer shall, after certification, forward the Form 6A (Firearms) to the Assistant Regional Commissioner for the region wherein the licensee importing the firearm or ammunition maintains his licensed premises. The Form 6A (Firearms) shall show the name, address, and the license number of the licensee, the name of the manufacturer, the country of manufacture, and the type, model, and caliber, size (if ammunition) or gauge of the firearm or ammunition so released, and, if applicable, the number of firearms or rounds of ammunition released.

§ 178.114  Importation by members of the U.S. Armed Forces.

(a) The Director may issue a permit authorizing the importation of a firearm or ammunition into the United States to the place of residence of any military member of the U.S. Armed Forces who is on active duty outside the United States, or who has been on active duty outside the United States within the 60-day period immediately preceding the intended importation: Provided, That such firearm or ammunition is generally recognized as particularly suitable for or readily adaptable to sporting purposes and is intended for the personal use of such member. An application for such a permit, Form 6 (Firearms), shall be filed, in triplicate, with the Director. The application shall contain (1) the name and current address of the applicant, (2) certification that the transportation, receipt, or possession of the firearm or

AR005618

ammunition to be imported would not constitute a violation of any provision of the Act, Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, as amended (82 Stat. 236; 18 U.S.C. Appendix), or of any State law or local ordinance at the place of the applicant's residence, (3) a description of the firearm or ammunition to be imported, including type (e.g.: rifle, shotgun, pistol, revolver), model, caliber, size or gauge, barrel length (if a firearm), country of manufacture, and the name of the manufacturer, (4) the unit cost of the firearm or ammunition to be imported, (5) the name and address of the foreign seller (if applicable) and the foreign shipper, (6) the country from which the firearm or ammunition is to be imported, (7) (i) that the firearm or ammunition being imported is for the personal use of the applicant, and (ii) if a firearm, a statement that it is not a surplus military firearm, that it does not fall within the definition of a firearm under section 5845(a) of the Internal Revenue Code of 1954, and an explanation of why the applicant believes the firearm is generally recognized as particularly suitable for or readily adaptable to sporting purposes, or (iii) if ammunition, a statement why the applicant believes it is generally recognized as particularly suitable for or readily adaptable to sporting purposes, and (8) the applicant's date of birth, his rank or grade, his place of residence, his present foreign duty station or his last foreign duty station, as the case may be, the date of his reassignment to a duty station within the United States, if applicable, and the military branch of which he is a member. If the Director approves the application, such approved application shall serve as the permit to import the firearm or ammunition described therein. The Director shall furnish the approved application (permit) to the applicant and shall retain the two copies thereof for administrative purposes. If the Director disapproves the application, the applicant shall be notified of the basis for the disapproval.

(b) Upon receipt of an approved application (permit) to import the firearm or ammunition, the applicant may obtain the release of same from Customs custody upon his showing that he has obtained a permit from the Director for the importation. In obtaining the release of the firearm or ammunition from Customs custody, the military member of the U.S. Armed Forces importing same shall furnish a Form 6A (Firearms) to the Customs officer releasing the firearm or ammunition. The Customs officer shall, after certification, forward the Form 6A (Firearms) to the Assistant Regional Commissioner for the region wherein the State of residence of the military member of the U.S. Armed Forces is located. The Form 6A (Firearms) shall show the name and address of such military member, the name of the manufacturer, the country of manufacture, and the type, model, and caliber, size or gauge of the firearm or ammuni-

tion so released, and, if applicable, the number of firearms or rounds of ammunition released. However, when such military member is on active duty outside the United States, he may appoint, in writing, an agent to obtain the release of the firearm or ammunition from Customs custody for him. Such agent shall present sufficient identification of himself and the written authorization to act on behalf of such military member to the Customs officer who is to release the firearm or ammunition.

(c) Firearms determined by the Department of Defense to be war souvenirs may be imported into the United States by the military members of the U.S. Armed Forces under such provisions and procedures as the Department of Defense may issue.

§ 178.115   Exempt importation.

(a) Firearms and ammunition may be brought into the United States or any possession thereof by any person who can establish to the satisfaction of Customs that such firearm or ammunition was previously taken out of the United States or any possession thereof by such person. Registration on Customs Form 4457 or on any other registration document available for this purpose may be completed before departure from the United States at any U.S. customhouse or any office of an Assistant Regional Commissioner. A bill of sale or other commercial document showing transfer of the firearm or ammunition to the United States to such person also may be used to establish proof that the firearm or ammunition was taken out of the United States by such person. Firearms and ammunition furnished under the provisions of section 925(a) (3) of the Act to military members of the U.S. Armed Forces on active duty outside of the United States also may be imported into the United States or any possession thereof by such military members upon establishing to the satisfaction of Customs that such firearms and ammunition were so obtained.

(b) Firearms and ammunition may be imported or brought into the United States by or for the United States or any department or agency thereof, or any State or any department, agency, or political subdivision thereof. A firearm or ammunition imported or brought into the United States under this paragraph may be released from Customs custody upon a showing that the firearm or ammunition is being imported or brought into the United States by or for such a governmental entity.

(c) The provisions of this subpart shall not apply with respect to the importation into the United States of any antique firearm.

(d) Firearms and ammunition are not imported into the United States, and the provisions of this subpart shall not apply, when such firearms and ammunition are brought into the United States by:

(1) A nonresident of the United States

for legitimate hunting or lawful sporting purposes, and such firearms and such ammunition as remains following such shooting activity are to be taken back out of the territorial limits of the United States by such person upon conclusion of the shooting activity;

(2) Foreign military personnel on official assignment to the United States who bring such firearms or ammunition into the United States for their exclusive use while on official duty in the United States;

(3) Official representatives of foreign governments who are accredited to the U.S. Government or are en route to or from other countries to which accredited;

(4) Officials of foreign governments and distinguished foreign visitors who have been so designated by the Department of State; and

(5) Foreign law enforcement officers of friendly foreign governments entering the United States on official law enforcement business.

§ 178.116   Conditional importation.

The Director may permit the conditional importation or bringing into the United States or any possession thereof of any firearm or ammunition for the purpose of examining and testing the firearm or ammunition in connection with making a determination as to whether the importation or bringing in of such firearm or ammunition will be authorized under this part. An application for such conditional importation shall be filed, in duplicate, with the Director. The Director may impose conditions upon any importation under this section including a requirement that the firearm or ammunition be shipped directly from Customs custody to the Director and that the person importing or bringing in the firearm or ammunition must agree to either export the firearm or ammunition or destroy same if a determination is made that the firearm or ammunition may not be imported or brought in under this part. A firearm or ammunition imported or brought into the United States or any possession thereof under the provisions of this section shall be released from Customs custody upon the payment of customs duties, if applicable, and in the manner prescribed in the conditional authorization issued by the Director.

§ 178.117   Function outside a customs territory.

In the insular possessions of the United States outside customs territory, the functions performed by U.S. Customs officers under this subpart within a customs territory may be performed by the appropriate authorities of a territorial government or other officers of the United States who have been designated to perform such functions. For the purpose of this subpart, the term customs territory means the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

AR005619

18569

## Subpart H—Records

### § 178.121  General.

(a) The records pertaining to firearms transactions prescribed by this part shall be in permanent form, and shall be retained on the licensed premises in the manner prescribed by this subpart. The records pertaining to ammunition prescribed by this part shall be retained on the licensed premises in the manner prescribed by § 178.125.

(b) Internal revenue officers may enter the premises of any licensed importer, licensed manufacturer, licensed dealer, or licensed collector for the purpose of examining or inspecting any record or document required by or obtained under this part (see § 178.23). Section 923(g) of the Act requires licensed importers, licensed manufacturers, licensed dealers, and licensed collectors to make such records available for such examination or inspection at all reasonable times.

(c) Each licensed importer, licensed manufacturer, licensed dealer, and licensed collector shall maintain such records of importation, production, shipment, receipt, sale, or other disposition, whether temporary or permanent, of firearms and ammunition as the regulations contained in this part prescribe. Section 923(m) of the Act makes it unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain any such record.

(c) Notwithstanding the provisions of paragraph (b) of this section, the Assistant Regional Commissioner may authorize alternate records to be maintained by a licensed importer to record his disposal of firearms and ammunition when it is shown by the licensed importer that such alternate records will accurately and readily disclose the information required by paragraph (b) of this section. A licensed importer who proposes to use alternate records shall submit a letter application, in duplicate, to the Assistant Regional Commissioner and shall describe the proposed alternate records and the need therefor. Such alternate records shall not be employed by the licensed importer until approval in such regard is received from the Assistant Regional Commissioner.

(d) Each licensed importer shall maintain separate records of the sales or other dispositions made of firearms and ammunition to nonlicensees. Such records shall be maintained in the form and manner as prescribed by § 178.125 in regard to ammunition transactions, and by §§ 178.124 and 178.125 in regard to firearms transaction records and records of acquisition and disposition of firearms.

### § 178.122  Records maintained by importers.

(a) Each licensed importer shall, within 15 days of the date of importation or other acquisition, record the type, model, caliber or gauge, manufacturer, country of manufacture, and the serial number of each firearm he imports or otherwise acquires, and the date such importation or other acquisition was made. Each licensed importer shall, within 15 days of the date of release from Customs custody or other acquisition, record the type, caliber, size or gauge manufacturer, and country of manufacture of the ammunition he imports or otherwise acquires, and the date such importation or other acquisition was made.

(b) A record of firearms and a separate record of ammunition disposed of by a licensed importer to another licensee shall be maintained by the licensed importer on his licensed premises and shall show the quantity, type, manufacturer, country of manufacture, caliber, size or gauge, serial number (in the case of firearms only), of the firearms or ammunition so transferred, the name, address, and license number of the licensee to whom the firearms or ammunition were transferred, and the date of the transaction. The information required by this paragraph shall be entered in the proper record book not later than the seventh day following the date of the transaction, and such information shall be recorded under the following format:

| Quantity | Type | Manufacturer | Country of manufacture | Caliber, size or gauge | Model | Serial No. | Name, address, and license No. of licensee to whom transferred | Date of the transaction |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

### § 178.123  Records maintained by manufacturers.

(a) Each licensed manufacturer shall record the type, model, caliber or gauge, and serial number of each complete firearm he manufactures or otherwise acquires, and the date such manufacture or other acquisition was made. Each licensed manufacturer shall record the type, caliber, size or gauge of the ammunition he manufactures or otherwise acquires. The information required by this paragraph shall be recorded not later than the seventh day following the date such manufacture or other acquisition was made.

(b) A record of firearms and a separate record of ammunition disposed of by a licensed manufacturer to another licensee shall be maintained by the licensed manufacturer on his licensed premises and shall show the quantity, type, caliber, size or gauge, serial number (in the case of firearms only) of the firearms or ammunition so transferred, the name, address, and license number of the licensee to whom the firearms or ammunition were transferred, and the date of the transaction. The information required by this paragraph shall be entered in the proper record book not later than

the seventh day following the date of the transaction, and such information shall be recorded under the format prescribed by § 178.122 except that the name of the manufacturer and the country of manufacture need not be recorded if the firearm or ammunition is of the manufacturer's own manufacture.

(c) Notwithstanding the provisions of paragraph (b) of this section, the Assistant Regional Commissioner may authorize alternate records to be maintained by a licensed manufacturer to record his disposal of firearms and ammunition when it is shown by the licensed manufacturer that such alternate records will accurately and readily disclose the information required by paragraph (b) of this section. A licensed manufacturer who proposes to use alternate records shall submit a letter application, in duplicate, to the Assistant Regional Commissioner and shall describe the proposed alternate records and the need therefor. Such alternate records shall not be employed by the licensed manufacturer until approval in such regard is received from the Assistant Regional Commissioner.

(d) Each licensed manufacturer shall maintain separate records of the sales or other dispositions made of firearms and ammunition to nonlicensees. Such records shall be maintained in the form and manner as prescribed by § 178.125 in regard to ammunition transactions, and by §§ 178.124 and 178.125 in regard to firearms transaction records and records of acquisition and disposition of firearms.

### § 178.124  Firearms transaction record.

(a) A licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, and a licensed collector shall not sell or otherwise dispose of any curio or relic to any person, other than another licensee, unless he records the transaction on a firearms transaction record, Form 4473: *Provided*, That a firearms transaction record, Form 4473, shall not be required to record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm is returned to the person from whom received.

(b) A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall retain in alphabetical (by name of purchaser), chronological (by date of disposition), or numerical (by transaction serial number) order, and as a part of his permanent records, each Form 4473 he obtains in the course of transferring custody of his firearms.

(c) Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee maintains his business or collection premises, the licensed importer, licensed manufacturer, licensed dealer, or licensed collector so transferring the firearm shall obtain a Form 4473 from the transferee showing the name, address, date and place of

AR005620

18570

## RULES AND REGULATIONS

birth, height, weight, and race of the transferee, and certification by the transferee that he is not prohibited by the Act or Title VII of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 236; 18 U.S.C. Appendix) from receiving a firearm in interstate or foreign commerce. The licensee shall identify the firearm to be transferred by listing in the Form 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm. Before transferring the firearm described in the Form 4473, the licensee (1) shall cause the transferee to identify himself in any manner customarily used in commercial transactions (e.g., a driver's license), and shall note on the form the method used, and (2) if satisfied that the transferee is lawfully entitled to receive the firearm, shall sign and date the form.

(d) Prior to making an over-the-counter transfer of a shotgun or rifle to a nonlicensee who is not a resident of the State in which the licensee maintains his business or collection premises, and such nonlicensee is acquiring the shotgun or rifle under the provisions contained in § 178.96(d), the licensed dealer so transferring the shotgun or rifle, and such transferee, shall comply with the requirements of paragraph (c) of this section. In addition, the sworn statement requirements imposed upon the transferee and the licensee by § 178.96(d) also shall be fully met.

(e) Prior to making a transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee maintains his business or collection premises, and such nonlicensee is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes, the licensed importer, licensed manufacturer, licensed dealer, or licensed collector so furnishing the firearm, and such transferee, shall comply with the requirements of paragraph (c) of this section.

(f) Form 4473 shall be submitted, in duplicate, to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, by a transferee who; (1) is purchasing or otherwise acquiring a firearm by other than an over-the-counter transaction, and who is a resident of the State in which the licensee maintains his business or collection premises, or (2) is purchasing or otherwise acquiring a shotgun or rifle, and who is a resident of a State contiguous to the State in which the licensee maintains his business or collection premises. The Form 4473 shall show the name, address, date and place of birth, height, weight, and race of the transferee; and the title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered. The transferee also must date and execute the sworn statement contained on the form showing that, in case the firearm to be transferred is a firearm other than a shotgun or rifle, he is 21 years or more of age; that, in case the firearm to be transferred is a shotgun or rifle, he is 18 years or more of age; that he is not prohibited by the provisions of the Act from receiving a firearm in interstate or foreign commerce; and that his receipt of the firearm would not be in violation of any statute of the State and published ordinance applicable to the locality in which he resides. Upon receipt of such Forms 4473, the licensee shall identify the firearm to be transferred by listing in the Forms 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm to be transferred. The licensee shall prior to shipment or delivery of the firearm to such transferee, forward by registered or certified mail (return receipt requested) a copy of the Form 4473 to the chief law enforcement officer named in the Form 4473 by the transferee, and shall delay shipment or delivery of the firearm to the transferee for a period of at least 7 days following receipt by the licensee of the return receipt evidencing delivery of the copy of the Form 4473 to such chief law enforcement officer, or the return of the copy of the Form 4473 to the licensee due to the refusal of such chief law enforcement officer to accept same in accordance with U.S. Post Office Department regulations. The original Form 4473, and evidence of receipt or rejection of delivery of the copy of the Form 4473 sent to the chief law enforcement officer, shall be retained by the licensee as a part of the records required of him to be kept under this subpart.

(g) A licensee who sells or otherwise disposes of a firearm to a nonlicensee, who is other than an individual, shall obtain from the transferee the information required by this section from an individual authorized to act on behalf of the transferee. In addition, the licensee shall obtain from the individual acting on behalf of the transferee a written statement, executed under the penalties of perjury, that the firearm is being acquired for the use of and will be the property of the transferee, and showing the name and address of that transferee.

(h) The requirements of this section shall be in addition to any other recordkeeping requirement contained in this part.

(i) A licensee may obtain, upon request, a supply of Form 4473 from any Assistant Regional Commissioner or any District Director.

§ 178.125   Record of receipt and disposition.

(a) Each licensed dealer shall maintain records of all ammunition he receives for the purposes of sale or distribution. Such record may consist of invoices or other commercial records which shall be filed in an orderly manner separate from other commercial records he maintains, and be readily available for inspection. Such record shall; (1) show the name of the manufacturer and the transferor, and the type, caliber or gauge, and the quantity of the ammunition acquired in the transaction, and the date of such acquisition, and (2) be retained on the licensed premises of the dealer for a period of not less than two years following the date of the acquisition.

(b) Each licensed collector shall maintain records of all ammunition he acquires as curios or relics for his collection. Such record may consist of invoices or other commercial records which shall be filed in an orderly manner separate from other commercial records he maintains, and be readily available for inspection. Such records shall show the information required by paragraph (a) of this section and be retained in the same manner.

(c) The sale or other disposition of ammunition, or of an ammunition curio or other commercial records which shall be recorded in a bound record at the time such transaction is made. The bound record entry shall show; (1) the date of the transaction, (2) the name of the manufacturer, the caliber, gauge or type of component, and the quantity of the ammunition transferred, (3) the name, address, and date of birth of the purchaser (transferee), and (4) the method used by the licensee to establish the identity of the purchaser (transferee). The bound record shall be maintained in chronological order by date of sale or disposition of the ammunition, and shall be retained on the licensed premises of the licensee for a period of not less than two years following the date of the sale or disposition of the ammunition recorded therein. The format required for the bound record is as follows:

| Date | Manufacturer | Caliber, gauge, or type of component | Quantity | Name | Address | Date of birth | Mode of Identification | |
|------|-------------|-------------------------------------|----------|------|---------|--------------|------------------------|--|
| | | | | | | | Driver's license (√) | Other (specify) |

(d) When a commercial record is made at the time of sale or other disposition of ammunition, or of an ammunition curio or relic, and such record contains all information required by the bound record prescribed by paragraph (c) of this section, the licensed dealer or licensed collector transferring the ammunition, or ammunition curio or relic, may, for a period not exceeding 7 days following the date of such transfer, delay making the required entry into such bound record: *Provided*, That the commercial record pertaining to the transfer is; (1) maintained by the licensed dealer or licensed collector separate from other commercial documents maintained by such licensee, and (2) is readily available for inspection

AR005621

RULES AND REGULATIONS 18571

FIREARMS ACQUISITION AND DISPOSITION RECORD

| Description of firearm | | | | | Receipt | | | Disposition | |
|---|---|---|---|---|---|---|---|---|---|
| Manufacturer and/or Importer | Model | Serial No. | Type of action | Caliber and gauge | Date | From whom (name and address or name and license number) | Date | Name | Address or license No. if licensee, or Form 4473 Serial No. if Forms 4473 filed numerically |

on the licensed premises until such time as the required entry into the bound record is made.

(e) Each licensed dealer and each licensed collector shall on and after the effective date of this part enter into a permanent record each receipt and disposition of firearms or firearms curios or relics. In addition, before commencing or continuing firearms business or firearms curio and relic collection, each licensed dealer and licensed collector shall inventory the firearms or firearms curios and relics possessed for such business or in such collection and shall record same in the record required by this paragraph: Provided, That when a licensed dealer or licensed collector has records maintained under the Federal Firearms Act which readily disclose his inventory of firearms or firearms curios and relics, such inventory need not be recorded in the record required by this paragraph. The record required by this paragraph shall be maintained in bound form under the format prescribed below. The purchase or other acquisition of a firearm by a licensed dealer, or of a firearm curio or relic by a licensed collector, shall, except as provided in paragraph (f) of this section, be recorded not later than the close of the next business day following the date of such purchase or acquisition. The record shall show the date of receipt, the name and address or the name and license number of the person from whom received, the name of the manufacturer and importer (if any), the model, serial number, type of action, and the caliber or gauge of the firearm or firearm curio or relic. The sale or other disposition of a firearm or of a firearm curio or relic shall be recorded by the licensed dealer or the licensed collector not later than seven days following the date of such transaction. When such disposition is made to a nonlicensee, the firearms transaction record, Form 4473, obtained by the licensed dealer or the licensed collector shall be retained, until the transaction is recorded, separate from his Form 4473 file and be readily available for inspection. When such disposition is made to a licensee, the commercial record of the transaction shall be retained, until the transaction is recorded, separate from other commercial documents maintained by the licensed dealer or licensed collector, and be readily available for inspection. The record shall show the date of the disposition of each firearm or firearm curio or relic, the name of the person to whom the firearm curio or relic is transferred, and the address or license number of the person to whom transferred if such person is a licensee, or the firearms transaction record, Form 4473, serial number if the licensed dealer or the licensed collector transferring the firearm or curio or relic serially numbers his Forms 4473 and files them numerically. The format required for the record of receipt and disposition of firearms or firearms curios and relics is as follows:

(f) When a commercial record is held by a licensed dealer or licensed collector showing his acquisition of a firearm or firearm curio or relic, and such record contains all acquisition information required by the bound record prescribed by paragraph (e) of this section, the licensed dealer or licensed collector acquiring such firearm or curio or relic, may, for a period not exceeding seven days following the date of such acquisition, delay making the required entry into such bound record: Provided, That the commercial record is, until such time as the required entry into the bound record is made, (1) maintained by the licensed dealer or licensed collector separate from other commercial documents maintained by such licensee, and (2) is readily available for inspection on the licensed premises; Provided, further, That when disposition is made of a firearm or firearm curio or relic not entered in the bound record under the provisions of this paragraph, the licensed dealer or licensed collector making such disposition shall enter all required acquisition information regarding the firearm or firearm curio or relic in the bound record at the time such transfer or disposition is made.

(g) Notwithstanding the provisions of paragraphs (c) and (e) of this section, the Assistant Regional Commissioner may authorize alternate records to be maintained by a licensed dealer or a licensed collector to record his acquisition and disposal of firearms and ammunition, or curios and relics, when it is shown by the licensed dealer or the licensed collector that such alternate records will accurately and readily disclose the required information. A licensed dealer or licensed collector who proposes to use alternate records shall submit a letter application, in duplicate, to the Assistant Regional Commissioner and shall describe the proposed alternate records and the need therefor. Such alternate records shall not be employed by the licensed dealer or the licensed collector until approval in such regard is received from the Assistant Regional Commissioner.

(h) Each licensed importer and licensed manufacturer selling or otherwise disposing of firearms or ammunition to nonlicensees shall maintain such records of such transactions as are required of licensed dealers and licensed collectors by this section.

§ 178.126   Furnishing transaction information.

(a) Each licensee shall, when required by letter issued by the Assistant Regional Commissioner, and until notified to the contrary in writing by such officer, submit on Form 4483, Report of Firearms Transactions, for the periods and at the times specified in the letter issued by the Assistant Regional Commissioner, all record information required by this subpart, or such lesser record information as the Assistant Regional Commissioner in his letter may specify.

(b) The Assistant Regional Commissioner may authorize the information to be submitted in a manner other than that prescribed in paragraph (a) of this section when it is shown by a licensee that an alternate method of reporting is reasonably necessary and will not unduly hinder the effective administration of this part. A licensee who proposes to use an alternate method of reporting shall submit a letter application, in duplicate, to the Assistant Regional Commissioner and shall describe the proposed alternate method of reporting and the need therefor. An alternate method of reporting shall not be employed by the licensee until approval in such regard is received from the Assistant Regional Commissioner.

§ 178.127   Discontinuance of business.

Where a firearms or ammunition business is discontinued and succeeded by a new licensee, the records prescribed by this subpart shall appropriately reflect such facts and shall be delivered to the successor. Where discontinuance of the business is absolute, the records prescribed by this subpart shall be delivered within 30 days following the business discontinuance to the Assistant Regional Commissioner for the internal revenue region in which the business was operated: Provided, however, Where State law or local ordinance requires the delivery of records to other responsible authority, the Assistant Regional Commissioner may arrange for the delivery of the records required by this subpart to such authority.

Subpart I—Exemptions

§ 178.141   General.

The provisions of this part shall not apply with respect to:

(a) The transportation, shipment, receipt, or importation of any firearm or

AR005622

ammunition imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof.

(b) The shipment or receipt of firearms or ammunition when sold or issued by the Secretary of the Army pursuant to section 4308 of title 10, U.S.C., and the transportation of any such firearm or ammunition carried out to enable a person, who lawfully received such firearm or ammunition from the Secretary of the Army, to engage in military training or in competitions.

(c) The shipment, unless otherwise prohibited by the Act or any other Federal law, by a licensed importer, licensed manufacturer, or licensed dealer to a member of the U.S. Armed Forces on active duty outside the United States or to clubs, recognized by the Department of Defense, whose entire membership is composed of such members of the U.S. Armed Forces, and such members or clubs may receive a firearm or ammunition determined by the Director to be generally recognized as particularly suitable for sporting purposes and intended for the personal use of such member or club. Before making a shipment of firearms or ammunition under the provisions of this paragraph, a licensed importer, licensed manufacturer, or licensed dealer may submit a written request, in duplicate, to the Director for a determination by the Director whether such shipment would constitute a violation of the Act or any other Federal law, or whether the firearm or ammunition is considered by the Director to be generally recognized as particularly suitable for sporting purposes.

(d) The transportation, shipment, receipt, or importation of any antique firearm.

§ 178.142   Effect of Presidential pardon.

A pardon granted by the President of the United States regarding a conviction for a crime punishable by imprisonment for a term exceeding 1 year shall remove any disability which otherwise would be imposed by the provisions of this part in respect to that conviction.

§ 178.143   Relief from disabilities incurred by indictment.

A licensed importer, licensed manufacturer, licensed dealer, or licensed collector who is indicted for a crime punishable by imprisonment for a term exceeding 1 year may, notwithstanding any other provision of the Act, continue operations pursuant to his existing license during the term of such indictment and until any conviction pursuant to the indictment becomes final: Provided, That if the term of the license expires during the period between the date of the indictment and the date the conviction thereunder becomes final, such importer, manufacturer, dealer, or collector must file a timely application for the renewal of his license in order to continue operations. Such application shall show that the applicant is under indictment for a crime punishable by imprisonment for a term exceeding 1 year.

§ 178.144   Relief from disabilities incurred by conviction.

(a) Any person may make application for relief from the disabilities under Federal law incurred by reason of a conviction of a crime punishable by imprisonment for a term exceeding 1 year if such conviction was not of a crime involving the use of a firearm or other weapon or a violation of the Act or the National Firearms Act.

(b) An application for such relief shall be addressed to the Commissioner and shall include such supporting data as the applicant deems appropriate. In the case of a corporation, the supporting data should include information as to the absence of culpability in the offense of which the corporation was convicted, or of any person having the power to direct or control the management of the corporation, if such be the fact. The application shall be filed, in triplicate, with the Assistant Regional Commissioner for the internal revenue region wherein the applicant resides.

(c) The Commissioner may grant relief to an applicant if it is established to the satisfaction of the Commissioner that the circumstances regarding the conviction, and the applicant's record and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety, and that the granting of the relief would not be contrary to the public interest.

(d) Whenever the Commissioner grants relief to any person pursuant to this section, he shall promptly publish in the FEDERAL REGISTER notice of such action, together with the reasons therefor.

(e) A person who has been granted relief under this section shall be relieved of any disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, or possession of firearms and incurred by reason of such conviction.

(f) (1) A licensee who is convicted of a crime punishable by imprisonment for a term exceeding 1 year during the term of a current license or while he has pending a license renewal application, and who qualifies under this section to file an application for removal of disabilities resulting from such conviction, shall not be barred from licensed operations for 30 days after the date upon which his conviction becomes final, and if he files his application for relief as provided by this section within such 30-day period, he may further continue licensed operations during the pendency of his application. A licensee who is not qualified under this section to file an application for relief or, if so qualified, does not file such application within 30 days from the date his conviction becomes final shall not continue licensed operations beyond 30 days from the date his conviction becomes final.

(2) In the event the term of a license of a person qualified to seek relief under this section expires during the 30-day period following the date upon which his conviction becomes final or during the pendency of his application for relief, he must file a timely application for renewal

of his license in order to continue licensed operations. Such license application shall show that the applicant has been convicted of a crime punishable by imprisonment for a term exceeding 1 year.

(3) A license shall not continue licensed operations beyond 30 days following the date the Commissioner issues notification that the licensee's application for removal of disabilities resulting from a conviction has been denied.

(4) When as provided in this section a licensee may no longer continue licensed operations, any application for renewal of license filed by the licensee during the term of his indictment or the pendency of his application for removal of disabilities resulting from such conviction, shall be denied by the Assistant Regional Commissioner.

§ 178.145   Research organizations.

The provisions of this part with respect to the sale or delivery of destructive devices, machine guns, short-barreled shotguns, and short-barreled rifles shall not apply to the sale or delivery of such devices and weapons to any research organization designated by the Director to receive same. A research organization desiring such designation shall submit a letter application, in duplicate, to the Director. Such application shall contain the name and address of the research organization, the names and addresses of the persons directing or controlling, directly or indirectly, the policies and management of such organization, the nature and purpose of the research being conducted, a description of the devices and weapons to be received, and the identity of the person or persons from whom such devices and weapons are to be received.

§ 178.146   Deliveries by mail to certain persons.

The provisions of this part shall not be construed as prohibiting a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of title 18, U.S.C., is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duties.

§ 178.147   Repair of firearm.

A person not otherwise prohibited by Federal, State or local law may ship a firearm to a licensed importer, licensed manufacturer, or licensed dealer for the sole purpose of repair or customizing, and notwithstanding any other provision of this part, the licensed importer, licensed manufacturer, or licensed dealer may return in interstate or foreign commerce to that person the repaired firearm or a replacement firearm of the same kind and type.

§ 178.148   Ammunition loading for personal use.

The licensing provisions of this part shall not apply to any person who engages only in hand loading, reloading,

AR005623

or custom loading ammunition for his own firearm, and who does not hand load, reload, or custom load ammunition for others.

## Subpart J—Penalties, Seizures, and Forfeitures

### § 178.161  False statement or representation.

Any person who knowingly makes any false statement or representation with respect to any information required by the provisions of the Act or this part to be kept in the records of a person engaged in firearms or ammunition business, or in applying for any license, exemption, or relief from disability, under the provisions of the Act, shall be fined not more than $5,000 or imprisonment not more than 5 years, or both.

### § 178.162  Transportation or receipt to commit a crime.

Any person who ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year, or with knowledge and reasonable cause to believe that an offense punishable by imprisonment for a term exceeding 1 year is to be committed therewith, shall be fined not more than $10,000, or imprisoned not more than 10 years, or both.

### § 178.163  Commission of a Federal crime.

Any person who uses a firearm to commit any felony which may be prosecuted in a court of the United States, or carries a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States, shall be sentenced to a term of imprisonment for not less than 1 year nor more than 10 years. In the case of a person's second or subsequent conviction under this section, such person shall be sentenced to a term of imprisonment for not less than 5 years nor more than 25 years, and notwithstanding any other provision of law, the court shall not suspend the sentence of such person or give him a probationary sentence.

### § 178.164  Receipt, etc., of firearms by certain persons.

Any person who (a) has been convicted of a felony, (b) has been discharged from the Armed Forces under dishonorable conditions, (c) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, (d) having been a citizen of the United States has renounced his citizenship, or (e) being an alien is illegally or unlawfully in the United States, who receives, possesses, or transports in commerce or affecting commerce, any firearm shall be fined not more than $10,000 or imprisoned for not more than 2 years, or both: *Provided, however,* That the provisions of this section shall not apply to

any prisoner who by reason of duties connected with law enforcement has expressly been entrusted with a firearm by competent authority of the prison, or to any person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive as the case may be, to receive, possess, or transport in commerce a firearm.

### § 178.165  Receipt, etc., of firearms by certain employees.

Any individual who to his knowledge and while being employed by any person who (a) has been convicted of a felony, (b) has been discharged from the Armed Forces under dishonorable conditions, (c) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, (d) having been a citizen of the United States has renounced his citizenship, or (e) being an alien is illegally or unlawfully in the United States, and who, in the course of such employment, receives, possesses, or transports in commerce or affecting commerce, any firearm shall be fined not more than $10,000 or imprisoned for not more than 2 years, or both: *Provided, however,* That the provisions of this section shall not apply to an employee employed by a person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm.

### § 178.166  Seizure and forfeiture.

Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of the Act or of this part, or in violation of any other criminal law of the United States, shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of the Act.

## Subpart K—Exportation

### § 178.171  Exportation.

Firearms and ammunition shall be exported in accordance with the applicable provisions of section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934) and regulations thereunder. However, licensed manufacturers, licensed importers, and licensed dealers exporting firearms and ammunition shall maintain records showing the manufacture or acquisition of the firearms and ammunition as required by this part and records showing the name and address of the foreign consignee of the firearms and ammunition and the date the firearms and ammunition were exported.

[F.R. Doc. 68-14996; Filed, Dec. 13, 1968; 8:49 a.m.]

# Title 9—ANIMALS AND ANIMAL PRODUCTS

Chapter I—Agricultural Research Service, Department of Agriculture

SUBCHAPTER C—INTERSTATE TRANSPORTATION OF ANIMALS AND POULTRY

PART 97—OVERTIME SERVICES RELATING TO IMPORTS AND EXPORTS

Administrative Instructions Prescribing Commuted Traveltime Allowances

Pursuant to the authority conferred upon the Director of the Animal Health Division by § 97.1 of the regulations concerning overtime services relating to imports and exports, effective July 31, 1966, (9 CFR 97.1), administrative instructions (9 CFR 97.2) effective July 30, 1963, as amended May 18, 1964 (29 F.R. 6318), December 7, 1964 (29 F.R. 16316), April 12, 1965 (30 F.R. 4609), June 18, 1965 (30 F.R. 7893), June 7, 1966 (31 F.R. 8020), October 11, 1966 (31 F.R. 13114), November 1, 1966 (31 F.R. 13939), November 23, 1966 (31 F.R. 14826), February 14, 1967 (32 F.R. 20843), April 15, 1967 (32 F.R. 6021), August 26, 1967 (32 F.R. 12441), September 29, 1967 (32 F.R. 13650), February 9, 1968 (33 F.R. 2756), March 7, 1968 (33 F.R. 4248), July 13, 1968 (33 F.R. 10085), July 31, 1968 (33 F.R. 10839), August 15, 1968 (33 F.R. 11587), September 25, 1968 (33 F.R. 14399), and November 8, 1968 (33 F.R. 16382), prescribing the commuted traveltime that shall be included in each period of overtime or holiday duty, are hereby amended by adding to or deleting from the respective "lists" therein as follows:

OUTSIDE METROPOLITAN AREA

FOUR HOURS

Delete: Anacortes, Wash. (served from Blaine or Seattle, Wash.)

THREE HOURS

Add: Anacortes, Wash. (served from Blaine, Wash.)

FOUR HOURS

Add: Anacortes, Wash. (served from Seattle, Wash.)

These commuted traveltime periods have been established as nearly as may be practicable to cover the time necessarily spent in reporting to and returning from the place at which the employee performs such overtime or holiday duty when such travel is performed solely on account of such overtime or holiday duty. Such establishment depends upon facts within the knowledge of the Animal Health Division.

It is to the benefit of the public that these instructions be made effective at the earliest practicable date. Accordingly, pursuant to 5 U.S.C. 553, it is found upon good cause that notice and public procedure on these instructions are impracticable, unnecessary, and contrary to the public interest, and good cause is found for making these instructions ef-

AR005624

made in accordance with applicable revenue procedures or publications (see § 601.601(d)(2)(ii)(*b*) of this chapter). Pursuant to these procedures, a request for waiver should be filed at least 45 days before the due date of the information return in order for the Service to have adequate time to respond to the request for waiver. The waiver will specify the type of information return and the period to which it applies and will be subject to such terms and conditions regarding the method of reporting as may be prescribed by the Commissioner.

(ii) The Commissioner may prescribe rules that supplement the provisions of paragraph (c)(2)(i) of this section.

(d) *Paper form returns.* Returns submitted on paper forms (whether or not machine-readable) permitted under paragraph (c) of this section shall be in accordance with applicable Internal Revenue Service or Social Security Administration procedures.

\* \* \* \* \*

(f) *Failure to file.* If a person fails to file an information return on magnetic media when required to do so by this section, the person is deemed to have failed to file the return. In addition, if a person making returns on a paper form under paragraph (c) of this section fails to file a return on machine-readable paper form when required to do so by this section, the person is deemed to have failed to file the return. See sections 6652, 6693, and 6721 for penalties for failure to file certain returns. See also section 6724 and the regulations under section 6721 for the specific rules and limitations regarding the penalty imposed under section 6721 for failure to file on magnetic media.

(g) *Effective dates.* \* \* \*

(2) Paragraphs (a)(1), (b)(1), (b)(2), (c)(1)(i), (c)(1)(iii), (c)(1)(iv), (c)(2), (d), (e), and (f) of this section are effective for information returns required to be filed after December 31, 1996. For information returns required to be filed after December 31, 1989, and before January 1, 1997, see section 6011(e).

§ 301.6011–2T   [Removed].

**Par. 7.** Section 301.6011–2T is removed.

**Michael P. Dolan,**

*Deputy Commissioner of Internal Revenue.*

Approved: May 22, 1998.

**Donald C. Lubick,**

*Assistant Secretary of the Treasury.*

[FR Doc. 98–16411 Filed 6–29–98; 8:45 am]

**BILLING CODE 4830–01–P**

## DEPARTMENT OF THE TREASURY

**Bureau of Alcohol, Tobacco and Firearms**

**27 CFR Part 178**

**(T.D. ATF–401; Ref: Notice No. 862)**

**RIN: 1512–AB64**

## Implementation of Public Law 104208, Omnibus Consolidated Appropriations Act of 1997 (96R–034P)

**AGENCY:** Bureau of Alcohol, Tobacco and Firearms (ATF), Department of the Treasury.

**ACTION:** Temporary Rule (Treasury decision).

**SUMMARY:** This temporary rule implements the provisions of Public Law 104–208, the Omnibus Consolidated Appropriations Act of 1997, which amended the Gun Control Act of 1968. Specifically, the new law makes it unlawful for individuals who have been convicted of a ''misdemeanor crime of domestic violence'' to ship, transport, receive or possess firearms and ammunition, and prohibits sales or other dispositions of firearms and ammunition to such individuals. Further, the law requires individuals acquiring handguns from Federal firearms licensees under the Brady law to certify that they have not been convicted of such a crime. Additionally, it allows all Federal firearms licensees to engage in the business of dealing in curio or relic firearms with another licensee away from their licensed premises. This temporary rule will remain in effect until superseded by final regulations.

In the Proposed Rules section of this **Federal Register**, ATF is also issuing a notice of proposed rulemaking inviting comments on the temporary rule for a 90-day period following the publication date of this temporary rule.

**EFFECTIVE DATE:** The temporary regulations are effective June 30, 1998.

**ADDRESS:** Send written comments to: Chief, Regulations Division, Bureau of Alcohol, Tobacco and Firearms, P.O. Box 50221, Washington, DC 20091–0221.

**FOR FURTHER INFORMATION CONTACT:** Barry Fields, Regulations Division, Bureau of Alcohol, Tobacco and Firearms, 650 Massachusetts Ave., NW, Washington, DC 20226; (202–927–8210).

**SUPPLEMENTARY INFORMATION:**

### Background

On September 30, 1996, The Omnibus Consolidated Appropriations Act of 1997 (hereinafter, ''the Act''), Pub. L.

104–208 (110 Stat. 3009), was enacted. The Act amended the Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44. The amendments became effective upon the date of enactment. The new statutory provisions and the regulation changes necessitated by the Act are as follows:

(1) *Misdemeanor crime of domestic violence.* The Act amended 18 U.S.C. 922(g) to make it unlawful for any person convicted of a ''misdemeanor crime of domestic violence'' to ship, transport, possess, or receive in or affecting commerce firearms or ammunition. It also amended 18 U.S.C. 922(d) to make it unlawful for any person to sell or otherwise dispose of a firearm or ammunition to any person knowing or having reasonable cause to believe that the recipient has been convicted of such a misdemeanor.

As defined in the GCA, a ''misdemeanor crime of domestic violence'' means an offense that: (1) Is a misdemeanor under Federal or State law; (2) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon; and (3) was committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

This definition includes any offense that is classified as a misdemeanor under Federal or State law. (An example of a Federal misdemeanor is a conviction in an Indian Court established pursuant to 25 CFR part 11. Misdemeanor convictions in other Indian courts are not Federal misdemeanors because these courts are not considered Federal or State courts.) In addition, in States that do not classify offenses as misdemeanors, the definition includes any State or local offense punishable by imprisonment for a term of one year or less.

Accordingly, if State A has an offense classified as a State ''domestic violence misdemeanor'' that is punishable by up to five years imprisonment, it would be a misdemeanor crime of domestic violence as defined in the GCA.

If State B does not characterize offenses as misdemeanors, but has a domestic violence offense that is punishable by no more than one year imprisonment, this offense would be a misdemeanor crime of domestic violence as defined in the GCA. Therefore, a person convicted of such an offense would be subject to firearms disabilities under 18 U.S.C. 922(g)(9).

AR005625

Moreover, the definition includes offenses that are punishable only by a fine, as well as offenses that are punishable by a term of imprisonment. Nothing in the language of the statute limits the term misdemeanor crime of domestic violence to offenses punishable by imprisonment. The legislative history of the statute illustrates that the prohibition on firearm possession by persons convicted of such offenses was to be as broad as possible, for example, covering individuals who plead guilty to minor offenses.

The prohibition also applies to persons convicted of such misdemeanors at any time, even if the conviction occurred prior to the new law's effective date, September 30, 1996. As of the effective date of the new law, such a person may no longer lawfully possess a firearm or ammunition.

Whether a person has been "convicted" of a misdemeanor crime of domestic violence is determined by the law of the jurisdiction where the proceedings were held. In addition, a conviction would not be disabling if it has been expunged, set aside, pardoned, or the person has had his or her civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights upon conviction for such an offense) *AND* the person is not otherwise prohibited by the law of the jurisdiction in which the proceedings were held from receiving or possessing any firearms.

In addition, a person shall not be considered to have been convicted of such an offense, unless (1) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel; and (2) if the person was entitled to a jury trial, the case was tried by a jury or the person knowingly and intelligently waived the right to a jury trial by guilty plea or otherwise.

The definition of misdemeanor crime of domestic violence includes all offenses that have as an element the use or attempted use of physical force (*e.g.*, assault and battery) if the offense is committed by one of the defined parties. This is true whether or not the State statute specifically defines the offense as a domestic violence misdemeanor. For example, a person convicted of misdemeanor assault and battery against his or her spouse would be prohibited from receiving or possessing firearms or ammunition.

A misdemeanor crime of domestic violence includes an offense that is committed by a current or former spouse, parent or guardian of the victim, by a person with whom the victim

shares a child in common, by a person who is cohabiting with or has cohabitated with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

The statute does not define the phrase "a person who is cohabiting with the victim as a spouse" or a "person similarly situated to a spouse." "Cohabit" is commonly defined as "to live together as husband and wife, especially when not legally married." Webster's New World Dictionary of the American Language, 2nd College Edition, 1974. Therefore, for purposes of these regulations the phrase "cohabiting as a spouse" means two persons living together in an intimate relationship who hold themselves out as husband and wife.

Further, the regulations interpret the phrase "similarly situated to a spouse" to mean two persons who share the same domicile in an intimate relationship. A "domicile" is defined as "one's fixed place of dwelling, where one intends to reside more or less permanently." Webster's New World Dictionary of the American Language, 2nd College Edition, 1974. Unlike persons "cohabiting with a spouse," persons "similarly situated" do not necessarily have to hold themselves out as husband and wife.

The regulation also implements the Act's amendments to 18 U.S.C. 922(s) to require individuals who intend to acquire handguns from licensees to state on the Brady Form, ATF Form 5300.35, whether they have been convicted of a "misdemeanor crime of domestic violence."

Prior to the Act, employees of government agencies with firearms disabilities were allowed to receive and possess firearms for official duties under the exemption in 18 U.S.C. 925(a)(1). However, the Act amended section 925(a)(1) to prohibit the possession of firearms and ammunition by any individual convicted of a misdemeanor crime of domestic violence. Accordingly, the regulations provide that employees of government agencies convicted of disqualifying misdemeanors would not be exempt from this new disability with respect to their receipt or possession of firearms or ammunition. Thus, law enforcement officers and other government officials who have been convicted of a disqualifying misdemeanor may not lawfully possess or receive firearms or ammunition for any purpose, including performance of their official duties. This disability applies to firearms and ammunition issued by government agencies, firearms and ammunition

purchased by government employees for use in performing their official duties, and government employees' personal firearms and ammunition.

The regulations are also being amended to provide that dealers may continue to sell firearms to law enforcement officers, including out-of-State officers, for official use without requiring them to fill out a Form 4473 or a Form 5300.35. Prior to the Act, law enforcement officers could establish their exemption from these requirements if they presented a certification letter on their agency's letterhead, signed by a person in authority within the agency, and stating that the firearm would be used in the performance of official duties. This procedure is now being incorporated into the regulations.

To ensure that law enforcement officers who purchase firearms for official use are not subject to the misdemeanor crime of domestic violence disability, the regulations provide that the certification letter must also state that a records check does not disclose any convictions of the officer for a misdemeanor crime of domestic violence. This new requirement allows for an effective method of determining whether the officer is prohibited from purchasing firearms and provides safeguards equivalent to those afforded by the Form 4473 and Form 5300.35. Disposition of the firearm to the officer must still be entered into the licensee's permanent records and the certification letter must be retained in the licensee's files.

(2) *Disposition of Curio or Relic Firearms by Licensed Importers, Manufacturers, and Dealers Away From Their Licensed Premises.* The Act amended 18 U.S.C. 923(j) to allow licensed importers, manufacturers, and dealers to engage in the business of selling or transferring curio or relic firearms to other licensees away from their licensed premises. Prior to the amendment, licensed importers, manufacturers, and dealers were restricted to conducting business from their licensed premises and temporarily at gun shows away from the licensed premises if the gun show was in the same State as that specified on the license. The regulation at § 178.50 is being amended to reflect this amendment. In addition, § 178.100 is being amended to require licensees to record in their acquisition and disposition records the location of the sale or disposition.

Licensed importers, manufacturers, and dealers are still subject to all recordkeeping requirements in the

regulations concerning the sale or other disposition of curios or relics.

### Executive Order 12866

It has been determined that this temporary rule is not a significant regulatory action as defined in E.O. 12866, because any economic effects flow directly from the underlying statute and not from this temporary rule. Therefore, a regulatory assessment is not required.

### Administrative Procedure Act

Because this document merely implements the law and because immediate guidance is necessary to implement the provisions of the law, it is found to be impracticable to issue this Treasury decision with notice and public procedure under 5 U.S.C. § 553(b), or subject to the effective date limitation in section 553(d).

### Regulatory Flexibility Act

The provisions of the Regulatory Flexibility Act relating to an initial and final regulatory flexibility analysis (5 U.S.C. 604) are not applicable to this temporary rule because the agency was not required to publish a notice of proposed rulemaking under 5 U.S.C. § 553 or any other law. Accordingly, a regulatory flexibility analysis is not required.

### Paperwork Reduction Act

This regulation is being issued without prior notice and public procedure pursuant to the Administrative Procedure Act (5 U.S.C. 553). For this reason, the collection of information contained in this regulation has been reviewed under the requirements of the Paperwork Reduction Act (44 U.S.C. 3507(j)) and, pending receipt and evaluation of public comments, approved by the Office of Management and Budget (OMB) under control number 1512–0520. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by OMB.

The collection of information in this regulation is in §§ 178.130(a)(1) and 178.134. This information is required to prevent the purchase of handguns by persons convicted of a misdemeanor crime of domestic violence. The likely respondents are individuals.

For further information concerning this collection of information, and where to submit comments on the collection of information, refer to the preamble of the cross-referenced notice of proposed rulemaking published

elsewhere in this issue of the **Federal Register**.

Drafting Information: The author of this document is Barry Fields, Regulations Division, Bureau of Alcohol, Tobacco and Firearms.

### List of Subjects in 27 CFR Part 178

Administrative practice and procedure, Arms and ammunition, Authority delegations, Customs duties and inspection, Domestic violence, Exports, Imports, Law enforcement personnel, Military personnel, Penalties, Reporting requirements, Research, Seizures and forfeitures, and Transportation.

### Authority and Issuance

27 CFR part 178 is amended as follows:

### PART 178—COMMERCE IN FIREARMS AND AMMUNITION

**Paragraph 1.** The authority citation for 27 CFR part 178 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 847, 921–930; 44 U.S.C. 3504(h).

**Par. 2.** Section 178.1(a) is revised to read as follows:

### § 178.1   Scope of regulations.

(a) *General.* The regulations contained in this part relate to commerce in firearms and ammunition and are promulgated to implement Title I, State Firearms Control Assistance (18 U.S.C. Chapter 44), of the Gun Control Act of 1968 (82 Stat. 1213) as amended by Pub. L. 99–308 (100 Stat. 449), Pub. L. 99–360 (100 Stat. 766), Pub. L. 99–408 (100 Stat. 920), Pub. L. 103–159 (107 Stat. 1536), Pub. L. 103–322 (108 Stat. 1796), and Pub. L. 104–208 (110 Stat. 3009).

\*     \*     \*     \*     \*

**Par. 3.** Section 178.11 is amended by adding the definition for ''misdemeanor crime of domestic violence'' to read as follows:

### § 178.11   Meaning of terms.

\*     \*     \*     \*     \*

*Misdemeanor crime of domestic violence.* (a) Is a Federal, State or local offense that:

(1) Is a misdemeanor under Federal or State law or, in States which do not classify offenses as misdemeanors, is an offense punishable by imprisonment for a term of one year or less, and includes offenses that are punishable only by a fine. (This is true whether or not the State statute specifically defines the offense as a ''misdemeanor'' or as a ''misdemeanor crime of domestic violence.'' The term includes all such misdemeanor convictions in Indian

Courts established pursuant to 25 CFR part 11.);

(2) Has, as an element, the use or attempted use of physical force (e.g., assault and battery), or the threatened use of a deadly weapon; and

(3) Was committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, (i.e., the equivalent of a ''common law'' marriage even if such relationship is not recognized under the law), or a person similarly situated to a spouse, parent, or guardian of the victim (e.g., two persons who are residing at the same location in an intimate relationship with the intent to make that place their home would be similarly situated to a spouse).

(b) A person shall not be considered to have been convicted of such an offense for purposes of this part unless:

(1) The person is considered to have been convicted by the jurisdiction in which the proceedings were held.

(2) The person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

(3) In the case of a prosecution for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

(i) The case was tried by a jury, or

(ii) The person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

(c) A person shall not be considered to have been convicted of such an offense for purposes of this part if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the jurisdiction in which the proceedings were held provides for the loss of civil rights upon conviction for such an offense) unless the pardon, expunction, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms, and the person is not otherwise prohibited by the law of the jurisdiction in which the proceedings were held from receiving or possessing any firearms.

\*     \*     \*     \*     \*

**Par. 4.** Section 178.32 is amended by removing the word ''or'' at the end of paragraph (a)(7), by removing the period at the end of paragraph (a)(8)(iii)(B) and adding in its place '', or'', by removing the word ''or'' at the end of paragraph (d)(7), by removing the period at the end

of paragraph (d)(8)(ii)(B) and adding in its place '', or'', and by adding new paragraphs (a)(9) and (d)(9) to read as follows:

### §178.32   Prohibited shipment, transportation, possession, or receipt of firearms and ammunition by certain persons.

(a) * * *

(9) Has been convicted of a misdemeanor crime of domestic violence.

\*     \*     \*     \*     \*

(d) * * *

(9) Has been convicted of a misdemeanor crime of domestic violence.

**Par. 5.** Section 178.50 is amended by removing the word ''or'' at the end of paragraph (b), by removing the period at the end of paragraph (c) and adding in its place ''; or'', and by adding new paragraph (d) to read as follows:

### §178.50   Locations covered by license.

\*     \*     \*     \*     \*

(d) A licensed importer, manufacturer, or dealer may engage in the business of dealing in curio or relic firearms with another licensee at any location pursuant to the provisions of § 178.100.

**Par. 6.** Section 178.99 is amended by removing the word ''or'' at the end of paragraph (c)(7), by removing the period at the end of paragraph (c)(8)(ii)(B) and adding in its place '', or'', and by adding new paragraph (c)(9) to read as follows:

### §178.99   Certain prohibited sales or deliveries.

\*     \*     \*     \*     \*

(c) * * *

(9) Has been convicted of a misdemeanor crime of domestic violence.

\*     \*     \*     \*     \*

**Par. 7.** Section 178.100 is amended by redesignating paragraph (a) as (a)(1), by adding new paragraph (a)(2), and by revising paragraph (c) to read as follows:

### §178.100   Conduct of business away from licensed premises.

(a)(1) * * *

(2) A licensed importer, manufacturer, or dealer may engage in the business of dealing in curio or relic firearms with another licensee at any location.

\*     \*     \*     \*     \*

(c) Licensees conducting business at locations other than the premises specified on their license under the provisions of paragraph (a) of this section shall maintain firearms records in the form and manner prescribed by Subpart H of this part. In addition, records of firearms transactions

conducted at such locations shall include the location of the sale or other disposition, be entered in the acquisition and disposition records of the licensee, and retained on the premises specified on the license.

**Par. 8.** Section 178.130(a)(1) is amended by revising the last sentence to read as follows:

### §178.130   Statement of intent to obtain a handgun after February 27, 1994, and before November 30, 1998.

(a)(1) * * * The transferee must date and execute the sworn statement contained on the form showing that the transferee is not under indictment for a crime punishable by imprisonment for a term exceeding 1 year; has not been convicted in any court of such a crime; is not a fugitive from justice; is not an unlawful user of or addicted to any controlled substance; has not been adjudicated as a mental defective or been committed to a mental institution; is not an alien who is illegally or unlawfully in the United States; has not been discharged from the Armed Forces under dishonorable conditions; is not a person who, having been a citizen of the United States, has renounced such citizenship; and has not been convicted of a misdemeanor crime of domestic violence.

\*     \*     \*     \*     \*

**Par. 9.** Section 178.134 is added to Subpart H to read as follows:

### §178.134   Sale of firearms to law enforcement officers.

(a) Law enforcement officers purchasing firearms for official use who provide the licensee with a certification on agency letterhead, signed by a person in authority within the agency (other than the officer purchasing the firearm), stating that the officer will use the firearm in official duties and that a records check reveals that the purchasing officer has no convictions for misdemeanor crimes of domestic violence are not required to complete Form 4473 or Form 5300.35. The law enforcement officer purchasing the firearm may purchase a firearm from a licensee in another State, regardless of where the officer resides or where the agency is located.

(b)(1) The following individuals are considered to have sufficient authority to certify that law enforcement officers purchasing firearms will use the firearms in the performance of official duties:

(i) In a city or county police department, the director of public safety or the chief or commissioner of police.

(ii) In a sheriff's office, the sheriff.

(iii) In a State police or highway patrol department, the superintendent or the supervisor in charge of the office to which the State officer or employee is assigned.

(iv) In Federal law enforcement offices, the supervisor in charge of the office to which the Federal officer or employee is assigned.

(2) An individual signing on behalf of the person in authority is acceptable, provided there is a proper delegation of authority.

(c) Licensees are not required to prepare a Form 4473 or Form 5300.35 covering sales of firearm made in accordance with paragraph (a) of this section to law enforcement officers for official use. However, disposition to the officer must be entered into the licensee's permanent records, and the certification letter must be retained in the licensee's files.

**Par. 10.** Section 178.141 is amended by revising the introductory text to read as follows:

### §178.141   General.

With the exception of §§ 178.32(a)(9) and (d)(9) and 178.99(c)(9), the provisions of this part shall not apply with respect to:

\*     \*     \*     \*     \*

**Par. 11.** Section 178.144 is amended by removing the word ''and'' at the end of paragraph (c)(6), by removing the period at the end of paragraph (c)(7) and by adding in its place ''; and'', and by adding paragraph (c)(8) to read as follows:

### §178.144   Relief from disabilities under the Act.

\*     \*     \*     \*     \*

(c) * * *

(8) In the case of an applicant who has been convicted of a misdemeanor crime of domestic violence, a copy of the indictment or information on which the applicant was convicted, the judgment of conviction or record of any plea of nolo contendere or plea of guilty or finding of guilt by the court, and any pardon, expunction, setting aside or other record purporting to show that the conviction was rendered nugatory or that civil rights were restored.

\*     \*     \*     \*     \*

Signed: February 18, 1998.

**John W. Magaw,**

*Director.*

Approved: April 24, 1998.

**John P. Simpson,**

*Deputy Assistant Secretary (Regulatory, Tariff and Trade Enforcement).*

[FR Doc. 98–17288 Filed 6–29–98; 8:45 am]

**BILLING CODE 4810–31–U**

81 FR 2658-01, 2016 WL 163942(F.R.)
RULES and REGULATIONS
DEPARTMENT OF JUSTICE
Bureau of Alcohol, Tobacco, Firearms, and Explosives
27 CFR Part 479
[Docket No. ATF 41F; AG Order No. 3608-2016]
RIN 1140-AA43

Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of
a Trust or Legal Entity With Respect To Making or Transferring a Firearm

Friday, January 15, 2016

AGENCY: Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice.

**\*2658** ACTION: Final rule.

SUMMARY: The Department of Justice is amending the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) regarding the making or transferring of a firearm under the National Firearms Act (NFA). This final rule defines the term "responsible person," as used in reference to a trust, partnership, association, company, or corporation; requires responsible persons of such trusts or legal entities to complete a specified form and to submit photographs and fingerprints when the trust or legal entity files an application to make an NFA firearm or is listed as the transferee on an application to transfer an NFA firearm; requires that a copy of all applications to make or transfer a firearm, and the specified form for responsible persons, as applicable, be forwarded to the chief law enforcement officer (CLEO) of the locality in which the applicant/transferee or responsible person is located; and eliminates the requirement for a certification signed by the CLEO. These provisions provide a public safety benefit as they ensure that responsible persons undergo background checks. In addition, this final rule adds a new section to ATF's regulations to address the possession and transfer of firearms registered to a decedent. The new section clarifies that the executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate may possess a firearm registered to a decedent during the term of probate without such possession being treated as a "transfer" under the NFA. It also specifies that the transfer of the firearm to any beneficiary of the estate may be made on a tax-exempt basis.

DATES: This rule is effective July 13, 2016.

FOR FURTHER INFORMATION CONTACT: Brenda Raffath Friend, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Avenue NE., Washington, DC 20226; telephone: (202) 648-7070.

SUPPLEMENTARY INFORMATION:

I. Executive Summary

A. Purpose of the Regulatory Action

B. Summary of the Major Provisions of This Rule

C. Costs and Benefits

II. Background

A. Application To Make a Firearm

B. Application for Transfer of a Firearm

C. Transfer Tax Exemption Available

AR005629

III. Notice of Proposed Rulemaking

A. Petition
B. Amendment of 27 CFR 479.11
C. Amendment of 27 CFR 479.62 and 479.63
D. Amendment of 27 CFR 479.84 and 479.85
E. Amendment of 27 CFR 479.90

F. Addition of 27 CFR 479.90a, Estates

G. Transfer of Unserviceable Firearm

H. Miscellaneous

IV. Analysis of Comments and Department Responses for Proposed Rule ATF 41P

A. Comments Supporting the Rule

B. Comments Generally Opposing the Rule

C. Comments Addressing Specific Portions of the Rule

D. Comments on Proposed Rule's Statutory and Executive Order Reviews

E. Comments on Costs and Benefits

F. Comments on Rulemaking Process

G. Comments on NFA Registration and Processing

H. Comments on Efficiencies and Priorities

I. New Responsible Persons and Form 5320.23

V. Final Rule

VI. Statutory and Executive Order Review

A. Executive Order 12866 and Executive Order 13563—Regulatory Review
B. Executive Order 13132
C. Executive Order 12988

D. Regulatory Flexibility Act

E. Small Business Regulatory Enforcement Fairness Act of 1996

F. Unfunded Mandates Reform Act of 1995

G. Paperwork Reduction Act

**I. Executive Summary**

*A. Purpose of the Regulatory Action*
The current regulations at 27 CFR 479.63 and 479.85, which require fingerprints, photographs, and a law enforcement certification for individual applicants to make or transfer National Firearms Act (NFA) firearms, do not apply to trusts or legal entities. On September 9, 2013, the Department of Justice ("the Department" or DOJ) published in the Federal Register a notice of proposed rulemaking titled "Machine Guns, Destructive Devices and Certain Other Firearms; Background Checks

for Responsible Persons of a Corporation, Trust or Other Legal Entity with Respect to Making or Transferring a Firearm," 78 FR 55014 (ATF 41P). The proposed rulemaking amended the regulations in §§ 479.11, 479.62-479.63, 479.84-479.85, and 479.90. The proposed regulations responded to a petition for rulemaking, dated December 3, 2009, filed on behalf of the National Firearms Act Trade and Collectors Association (NFATCA). The petitioner requested that the Department amend §§ 479.63 and 479.85, as well as corresponding Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Forms 1 and 4. 78 FR at 55016-55017. The proposed regulations were intended to conform the identification and background check requirements applicable to certain trusts and legal entities to those that apply to individuals.

The goal of this final rule is to ensure that the identification and background check requirements apply equally to individuals, trusts, and legal entities. To lessen potential compliance burdens for the public and law enforcement, DOJ has revised the final rule to eliminate the requirement for a certification signed by a chief law enforcement officer (CLEO) and instead require CLEO notification. DOJ has also clarified that the term "responsible person" for a trust or legal entity includes those persons who have the power and authority to direct the management and policies of the trust or legal entity to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust or entity. In the case of a trust, those with the power or authority to direct the management and policies of the trust include any person who has the capability to exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for or on behalf of the trust.

## B. Summary of the Major Provisions of This Rule

With respect to trusts, partnerships, associations, companies, or corporations, this final rule defines the term "responsible person" as an individual in the organization that has the power and authority to direct the management and policies of the entity insofar as they pertain to firearms. This final rule requires that each responsible person complete a specified form and submit photographs and fingerprints when the trust or legal entity either files an application to make an NFA firearm, or is listed as the transferee on an application to transfer an NFA firearm. **\*2659** The Department has also reassessed the need for CLEO certification and is implementing a new approach that focuses on notifying CLEOs. The final rule only requires that the applicant maker or transferee, including each responsible person for a trust or legal entity, provide a notice to the appropriate State or local official that an application is being submitted to ATF. An "appropriate State or local official" is the local chief of police, county sheriff, head of the State police, or State or local district attorney or prosecutor of the locality in which the applicant, transferee, or responsible person is located. In addition, this final rule requires responsible persons of a trust or legal entity to submit fingerprint cards and other identifying information to ATF and undergo a background check. It also adds a new section to ATF's regulations to address the possession and transfer of firearms registered to a decedent. The new section clarifies that the executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate may possess a firearm registered to a decedent during the term of probate without such possession being treated as a "transfer" under the NFA. It also specifies that the transfer of the firearm to any beneficiary of the estate may be made on a tax-exempt basis.

## C. Costs and Benefits

This rule requires that trusts and legal entities (e.g., partnerships, companies, associations, and corporations) applying to make or receive an NFA firearm submit information for each of their responsible persons to ATF to allow ATF to verify that such persons are not prohibited from possessing or receiving firearms. ATF estimates a total additional cost of $29.4 million annually for trusts and legal entities to gather, procure, and submit such information to ATF and for ATF to process the information and conduct background checks on responsible persons. These provisions have public safety benefits because they will enable ATF to better ensure that the approximately 231,658 responsible persons within trusts and legal entities—an estimate based on the number of NFA applications processed by trusts or legal entities in calendar year 2014 multiplied by an average of two responsible persons per trust or legal entity—applying to make or receive NFA firearms each year are not prohibited from possessing or receiving such firearms.

This final rule also requires that all those who apply to make or receive an NFA firearm, as well as all responsible persons for each trust or legal entity applicant or transferee, notify their local CLEO that an application has been filed with ATF before the applicant or transferee is permitted to make or receive an NFA firearm. Current regulations require individuals, but not trusts or legal entities, to obtain CLEO certification before making or receiving an NFA firearm. ATF estimates that the total cost of the CLEO notification requirement will be approximately $5.8 million annually ($0.5 million for individuals; $5.3

million for legal entities). The current cost of CLEO certification for individuals is approximately $2.26 million annually. Consequently, the final rule's estimated net cost increase is approximately $3.6 million annually. This increase, however, primarily involves costs to responsible persons for trusts and legal entities that had not previously been required to register, and will be offset by cost savings to individuals. ATF estimates the change in the final rule to a notice requirement will save individuals approximately $1.8 million annually. This rule is not an "economically significant" rulemaking under Executive Order 12866.

## II. Background

The Attorney General is responsible for enforcing the provisions of the NFA, 26 U.S.C. Chapter 53.[FN1] The Attorney General has delegated that responsibility to the Director of ATF (Director), subject to the direction of the Attorney General and the Deputy Attorney General. 28 CFR 0.130(a). ATF has promulgated regulations that implement the provisions of the NFA set forth in 27 CFR part 479, which contains procedural and substantive requirements relating to the importation, making, exportation, transfer, taxing, identification, registration of, and the dealing in machineguns, destructive devices, and certain other firearms.

### A. Application To Make a Firearm

Section 5822 of the NFA, 26 U.S.C. 5822, provides that no person shall make a firearm unless the person has: (1) Filed with the Attorney General a written application, in duplicate, to make and register the firearm; (2) paid any tax payable on the making and evidenced such payment by affixing the proper stamp to the original application form; (3) identified the firearm to be made in the application form in such manner as prescribed by regulation; (4) identified the applicant in the application form, in such manner as prescribed by regulation, except that, if such person is an individual, the identification must include the individual's fingerprints and photograph; and (5) obtained the approval of the Attorney General to make and register the firearm and shows such approval on the application form. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law. For purposes of title 26, United States Code, the term "person" means "an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. 7701(a)(1).

Regulations implementing section 5822 are set forth in 27 CFR part 479, subpart E. Section 479.62 provides, in pertinent part, that no person may make a firearm unless the person has filed with the Director a written application on ATF Form 1 (5320.1), Application to Make and Register a Firearm, in duplicate, and has received the approval of the Director to make the firearm. Approval of the application will effectuate registration of the firearm to the applicant. The application must identify the firearm to be made by serial number and other specified markings and information. In addition, the applicant must be identified on the form by name and address and, if other than an individual (e.g., a trust or legal entity), by the name and address of the principal officer or authorized representative of the trust or legal entity, as well as the employer identification number of the trust or legal entity, if applicable. If an individual, the identification must also include certain information prescribed in § 479.63.

Section 479.63 states that if the applicant is an individual, such person must securely attach to each copy of the Form 1, in the space provided on the form, a 2 x 2-inch photograph of the applicant taken within 1 year prior to the date of the application. The regulation also provides that a completed Federal Bureau of Investigation (FBI) Form FD-258 (Fingerprint Card), containing the fingerprints of the applicant, must be submitted in duplicate with the application.

In addition, § 479.63 provides that the law enforcement certification located on Form 1 must be completed and signed by the local chief of police or county **2660** sheriff, the head of the State police, the State or local district attorney or prosecutor, or such other person whose certification may be acceptable to the Director. The certifying official must state, inter alia, that the certifying official has no information indicating that possession of the firearm by the maker would be in violation of State or local law or that the maker will use the firearm for other than lawful purposes. The certifying official must have jurisdiction over the area within which the maker resides. The purpose of this requirement is to ensure that the official will have access to criminal records concerning the maker, and knowledge of the State and local laws governing the transfer, receipt, and possession of the firearm by the maker.

Under the current regulations, the requirements for fingerprints, photographs, and law enforcement certification specified in § 479.63 are not applicable to an applicant who is not an individual, e.g., a trust or legal entity.

Section 479.64 sets forth the procedure for approval of an application to make a firearm. As specified, the Form 1 application must be forwarded, in duplicate, by the maker of the firearm to the Director, in accordance with the instructions on the form. If the application is approved, the Director will return the original to the maker of the firearm and retain the duplicate. Upon receipt of the approved application, the maker is authorized to make the firearm described therein. The maker of the firearm may not, under any circumstances, make the firearm until the application has been forwarded to the Director and has been approved and returned by the Director with the NFA stamp affixed. If the application is disapproved, the original Form 1 and the remittance submitted by the applicant for the purchase of the stamp will be returned to the applicant with the reason for disapproval stated on the form.

### B. Application for Transfer of a Firearm

Section 5812(a) of the NFA, 26 U.S.C. 5812(a), which applies to applications to transfer a firearm, is substantively similar to NFA section 5822 (described above in section II.A of this final rule). Regulations implementing section 5812 are set forth in 27 CFR part 479, subpart F. In general, § 479.84 provides that no firearm may be transferred in the United States unless an application, ATF Form 4 (5320.4), Application for Tax Paid Transfer and Registration of Firearm, has been filed in duplicate with, and approved by, the Director. The Form 4 application must be filed by the transferor and must identify the firearm to be transferred by type, serial number, and other specified markings and information. The application must identify the transferor by name and address and must include the transferor's Federal firearms license, if any, and special (occupational) tax stamp, if applicable. If the transferor is other than an individual, the title or status of the person executing the application must be provided. The application must identify the transferee by name and address and, if the transferee is an individual not qualified as a manufacturer, importer, or dealer under part 479, the person must be further identified in the manner prescribed in § 479.85.

Section 479.85 states that if the transferee is an individual, such person must securely attach to each copy of the Form 4, in the space provided on the form, a 2 x 2-inch photograph of the transferee taken within 1 year prior to the date of the application. The transferee must also attach to the application two properly completed FBI Forms FD-258 (Fingerprint Card). In addition, a certification by the local chief of police, county sheriff, head of the State police, State or local district attorney or prosecutor, or such other person whose certification may in a particular case be acceptable to the Director, must be completed on each copy of the Form 4. The certifying official must state, inter alia, that the certifying official has no information indicating that the receipt or possession of the firearm would place the transferee in violation of State or local law or that the transferee will use the firearm for other than lawful purposes. The certifying official must have jurisdiction over the area within which the transferee resides. The purpose of this requirement is to ensure that the official will have access to criminal records concerning the transferee, and knowledge of the State and local laws governing the transfer, receipt, and possession of the firearm by the transferee.

Under the current regulations, the requirements for fingerprints, photographs, and law enforcement certification specified in § 479.85 do not apply to individuals qualified as a manufacturer, importer, dealer, or Special (Occupational) Taxpayer (SOT) under part 479; nor do they apply to a transferee who is not an individual, e.g., a trust or legal entity.

### C. Transfer Tax Exemption Available

Section 5852(e) of the NFA, 26 U.S.C. 5852(e), provides that an unserviceable firearm may be transferred as a curio or ornament without payment of the transfer tax imposed by section 5811, under such requirements as the Attorney General may by regulations prescribe.

Section 5853(a) of the NFA, 26 U.S.C. 5853(a), provides that a firearm may be transferred without the payment of the transfer tax imposed by section 5811 to any State, possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

Regulations implementing sections 5852(e) and 5853(a) are set forth in 27 CFR 479.90 and 479.91. These sections provide, in pertinent part, that the exemption from the transfer tax for the transfer of an unserviceable firearm as a curio or ornament or for a transfer to or from certain government entities may be obtained by the transferor of the firearm by filing with the Director an application, ATF Form 5 (5320.5), Application for Tax Exempt Transfer and Registration of Firearm, in duplicate. The application must: (1) Show the name and address of the transferor and of the transferee; (2) identify the Federal firearms license and special (occupational) tax stamp, if any, of the transferor and of the transferee; (3) show the

name and address of the manufacturer and the importer of the firearm, if known; (4) show the type, model, overall length (if applicable), length of barrel, caliber, gauge or size, serial number, and other marks of identification of the firearm; and (5) contain a statement by the transferor that the transferor is entitled to the exemption because either the transferor or the transferee is a governmental entity coming within the purview of § 479.90(a) or the firearm is unserviceable and is being transferred as a curio or ornament. In the case of the transfer of a firearm by a governmental entity to a transferee who is an individual who is not qualified as a manufacturer, importer, dealer, or SOT under part 479, the transferee must be further identified in the manner prescribed in § 479.85.

### III. Notice of Proposed Rulemaking

On September 9, 2013, ATF published in the Federal Register a notice of proposed rulemaking (NPRM) titled "Machine Guns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Corporation, Trust or Other Legal Entity with Respect to Making or Transferring a Firearm," 78 FR 55014 (ATF 41P), amending the regulations in §§ 479.11, 479.62-479.63; 479.84-479.85; and 479.90.

### *2661 A. Petition

The proposed regulations were in response to a petition for rulemaking, dated December 3, 2009, filed on behalf of the National Firearms Act Trade and Collectors Association (NFATCA). The petitioner requested that the Department amend §§ 479.63 and 479.85, as well as corresponding ATF Forms 1 and 4. 78 FR at 55016-55017. The petition requested amendments as numbered and discussed below.

### 1. Request To Amend §§ 479.63 and 479.85

The NFATCA expressed concern that persons who are prohibited by law from possessing or receiving firearms may acquire NFA firearms without undergoing a background check by establishing a trust or legal entity such as a corporation or partnership. It contended that the number of applications to acquire NFA firearms via a trust or corporation, partnership, and other legal entity had increased significantly over the years, increasing the potential for NFA firearms to be accessible to those prohibited by law from having them. Therefore, for cases in which a trust, corporation, partnership, or other legal entity applies to make or receive an NFA firearm, the petitioner requested amendments to §§ 479.63 and 479.85 requiring photographs and fingerprint cards for individuals who are responsible for directing the management and policies of the entity so that a background check of those individuals may be conducted.

The proposed rule set forth ATF's finding that the number of Forms 1, 4, and 5 received from legal entities that are neither individuals nor Federal Firearms Licensees (FFLs) increased from approximately 840 in 2000 to 12,600 in 2009 and to 40,700 in 2012, resulting in a substantial increase in the number of individuals who have access to NFA firearms but who have not undergone a background check in connection with obtaining that access. The proposed rule stated that the Department agreed with the concerns underlying petitioner's requests, and believed that responsible persons for a trust or legal entity should not be excluded from background checks and other requirements of the regulations that seek to ensure that prohibited persons do not gain access to NFA firearms. The proposed rule also discussed an application ATF had recently denied after recognizing that the trust name and firearm were the same as those on a prohibited individual's recently denied application. The proposed rule noted that the application might have been approved if the trust name had been different from that of the prior transferee or if the application had included a different firearm.

### 2. Request To Amend Certification of Citizenship

When filing an ATF Form 1, 4, or 5, the applicant also must submit ATF Form 5330.20, Certification of Compliance with 18 U.S.C. 922(g)(5)(B). Under section 922(g)(5)(B) of the Gun Control Act, it is generally unlawful for an alien admitted to the United States under a nonimmigrant visa to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce. Section 922(y)(2) provides for certain exceptions. If an alien who was admitted under a nonimmigrant visa falls within one of the specified exceptions, or has obtained a waiver from the Attorney General pursuant to 18 U.S.C. 922(y)(3), appropriate documentation must be provided on Form 5330.20.

The proposed rule accommodated the petitioner's request that the information required on Form 5330.20 be incorporated into

AR005634

the requirements of 27 CFR 479.63 and 479.85 and the corresponding forms. According to the petitioner, "[e]limination of the ATF Form 5330.20 by adding a citizenship statement to the transfer [and making] forms would reduce human effort for both the public and ATF while reducing funds expenditures for printing, copying, and handling the form."

The proposed rule stated that the Department supports the elimination of unnecessary forms and is committed to reducing the paperwork burden for individuals and businesses. Accordingly, the Department proposed amending 27 CFR 479.62 and 479.84 and the corresponding forms to incorporate information currently required in Form 5330.20.

**3. Request To Revise Instructions on Forms 1, 4, and 5**

The proposed rule also accommodated the petitioner's request that the instructions on applications to make or transfer a firearm be revised so that they are consistent with those on ATF Form 7 (5310.12), Application for Federal Firearms License. This request appeared to be referring to the Form 7 instruction regarding the submission of photographs and fingerprint cards for responsible persons (e.g., in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the legal entity, insofar as they pertain to firearms).

The proposed rule stated that the Department agreed that proposed changes to the regulations would require modifications to corresponding Forms 1, 4, and 5, including changes to the instructions on the forms, and proposed to go forward with those changes.

**4. Law Enforcement Certification**

Finally, the proposed rule accepted in part petitioner's request that the law enforcement certification requirement be eliminated and that ATF "adopt a CLEO [chief law enforcement officer] process that will include a full NICS [National Instant Criminal Background Check System] check for principal officers of a trust or corporation receiving such firearms for the trust or corporation." The petitioner articulated several reasons in support of its request. In addition, the petitioner stated that "[s]ome CLEOs express a concern of perceived liability; that signing an NFA transfer application will link them to any inappropriate use of the firearm." See 78 FR at 55016-55017 for full discussion.

The Department agreed in principle with some of petitioner's assertions (for example, that ATF independently verifies whether receipt or possession of an NFA firearm would place the applicant or transferee in violation of State or local law). Id. However, ATF did not propose to eliminate the CLEO certification requirement. Rather, ATF proposed extending the CLEO certification requirement to responsible persons of a trust or legal entity, but also proposed amending the language of the certification to omit the requirement that the certifying official state that the certifying official has no information that the applicant or transferee will use the firearm for other than lawful purposes.

**B. Amendment of 27 CFR 479.11**

In addition to the issues raised in NFATCA's 2009 petition, the Department proposed amending 27 CFR 479.11 to add a definition for the term "responsible person." The proposed term included specific definitions in the case of a trust, partnership, association, company (including a Limited Liability Company (LLC)), or corporation. Depending on the context, the proposed term included any individual, including any grantor, trustee, beneficiary, partner, member, officer, director, board **\*2662** member, owner, shareholder, or manager who possesses, directly or indirectly, the power or authority under any trust instrument, contract, agreement, article, certificate, bylaw, or instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust or entity.

To ensure that responsible persons, as so defined, were subject to penalties under 26 U.S.C. 5871 for committing unlawful acts under the NFA (see 26 U.S.C. 5861) to the same extent as are the trusts or legal entities with which they are associated, the Department also proposed amending the definition of "person" in 27 CFR 479.11 to clarify that a "person" is a partnership, company, association, trust, or corporation, including each responsible person associated with such an entity; an estate; or an individual.

Although the definition of "person" in § 479.11 includes the word "estate," ATF traditionally has treated estates differently from business entities. Therefore, the Department did not propose defining the term "responsible person" to include estates.

The Department explained that estates are temporary legal entities created to dispose of property previously possessed by a decedent with the estate's term typically defined by the law of the State in which the decedent resided, whereas partnerships, trusts, associations, companies, and corporations are formed for a specific purpose and remain in existence until action is taken to dissolve them. The Department further explained that, historically, ATF has treated the transfer of a registered NFA firearm held by an estate differently from other transfers under the NFA. ATF has allowed the executor—or other person authorized under State law to dispose of property in an estate—to convey firearms registered to the decedent without being treated as a voluntary transfer under the NFA. ATF has also allowed such transfers to be made on a tax-exempt basis when an ATF Form 5 is submitted and approved in accordance with 27 CFR 479.90. When the transfer of the firearm is to persons who are not lawful heirs, however, the executor is required to file an ATF Form 4 and to pay any transfer tax in accordance with 27 CFR 479.84.

### C. Amendment of 27 CFR 479.62 and 479.63

With respect to an application to make a firearm, the Department proposed several amendments to 27 CFR 479.62 ("Application to make") and 479.63 ("Identification of applicant").

Amendments to § 479.62 proposed to:

1. Provide that if the applicant is a partnership, company, association, trust, or corporation, all information on the Form 1 application must be furnished for each responsible person of the applicant;

2. Specify that if the applicant is a partnership, company, association, trust, or corporation, each responsible person must comply with the identification requirements prescribed in the proposed § 479.63(b); and

3. Require the applicant (including, if other than an individual, any responsible person), if an alien admitted under a nonimmigrant visa, to provide applicable documentation demonstrating that the applicant falls within an exception to 18 U.S.C. 922(g)(5)(B) or has obtained a waiver of that provision.

Amendments to § 479.63, where the applicant is an individual, proposed to maintain the CLEO certification but omit the requirement for a statement about the use of a firearm for other than lawful purposes. This section proposed to require, instead, that the certification state that the official is satisfied that the fingerprints and photograph accompanying the application are those of the applicant and that the official has no information indicating that possession of the firearm by the maker would be in violation of State or local law.

The Department stated that the CLEO's certification that the CLEO "is satisfied that the fingerprints and photograph accompanying the application are those of the applicant," is an existing requirement for an individual applicant (see 27 CFR 479.63); however, this certification was not reflected on the current form. ATF proposed to modify the Form 1 to include this certification for individuals and include the same certification on Form 5320.23 for responsible persons within a trust or legal entity.

Additionally, amendments to § 479.63, where the applicant is a partnership, company, association, trust, or corporation, proposed to:

1. Provide that the applicant must be identified on the Form 1 application by the name and exact location of the place of business, including the name of the county in which the business is located or, in the case of a trust, the address where the firearm is located. In the case of two or more locations, the address shown must be the principal place of business (or principal office, in the case of a corporation) or, in the case of a trust, the principal address at which the firearm is located;

2. Require the applicant to attach to the application:

• Documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, declarations of trust, with any trust schedules, attachments, exhibits, and enclosures; however, if the entity had an application approved as a maker or transferee within the preceding 24 months, and there had been no change to the documentation previously provided, the entity may provide a certification that the information has not changed since the prior approval and must identify the application for which the

documentation had been submitted by form number, serial number, and date approved;

• A completed ATF Form 5320.23 for each responsible person. Form 5320.23 would require certain identifying information for each responsible person, including each responsible person's full name, position, Social Security number (optional), home address, date and place of birth, and country of citizenship;

• In accordance with the instructions provided on Form 5320.23, a 2 x 2-inch photograph of each responsible person, clearly showing a full front view of the features of the responsible person with head bare, with the distance from the top of the head to the point of the chin approximately 1¼ inches, and which must have been taken within 1 year prior to the date of the application;

• Two properly completed FBI Forms FD-258 (Fingerprint Card) for each responsible person. The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them; and

• In accordance with the instructions provided on Form 5320.23, a certification for each responsible person completed by the local chief of police, sheriff of the county, head of the State police, State or local district attorney or prosecutor, or such other person whose certification may in a particular case be acceptable to the Director. The certification for each responsible person must be completed by the CLEO who has jurisdiction over the area in which the responsible person resides. The certification must state that the official is satisfied that the fingerprints and photograph accompanying the application are those of the responsible person and that the certifying official has no information indicating that possession of the firearm by the **2663** responsible person would be in violation of State or local law.

ATF also sought public comments regarding the feasibility of asking CLEOs to certify that they are satisfied that the photographs and fingerprints match those of the responsible person and whether changes were needed to this proposal.

### *D. Amendment of 27 CFR 479.84 and 479.85*
With respect to an application to transfer a firearm, the Department proposed several amendments to 27 CFR 479.84 ("Application to transfer") and 479.85 ("Identification of transferee").

Amendments to § 479.84 proposed to provide that:

1. The Form 4 application, in duplicate, must be filed by the transferor. If the transferee is a partnership, company, association, trust, or corporation, all information on the Form 4 application must be furnished for each responsible person of the transferee; and

2. The type of firearm being transferred must be noted on the Form 4. If the firearm is other than one classified as "any other weapon," the applicant must submit a remittance in the amount of $200 with the application in accordance with the instructions on the form. If the firearm is classified as "any other weapon," the applicant must submit a remittance in the amount of $5.

Where the transferee is an individual, the proposed amendments to § 479.85 retained the certification requirement but eliminated the requirement for a CLEO statement about the use of a firearm for other than lawful purposes. In addition, the proposal required the certification to state that the official is satisfied that the fingerprints and photograph accompanying the application are those of the applicant and that the certifying official has no information indicating that receipt or possession of the firearm by the transferee would be in violation of State or local law.

The Department stated that the CLEO's certification that the CLEO "is satisfied that the fingerprints and photograph accompanying the application are those of the applicant," if an individual applicant, is an existing requirement (see 27 CFR 479.85) but was not reflected on the current Forms 4 and 5. The Department proposed having ATF amend Forms 4 and 5 to include certification to that effect by the CLEO for individuals, and include the same certification on Form 5320.23 for responsible persons of a legal entity.

Amendments to § 479.85, where the transferee is a partnership, company, association, trust, or corporation, proposed to:

AR005637

1. Provide that the transferee must be identified on the Form 4 application by the name and exact location of the place of business, including the name of the county in which the business is located or, in the case of a trust, the address where the firearm is to be located. In the case of two or more locations, the address shown must be the principal place of business (or principal office, in the case of a corporation) or, in the case of a trust, the principal address at which the firearm is to be located;

2. Require the transferee to attach to the application:

• Documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, declarations of trust, with any trust schedules, attachments, exhibits, and enclosures; however, if the entity has had an application approved as a maker or transferee within the preceding 24 months, and there had been no change to the documentation previously provided, including the responsible person information, the entity may provide a certification that the information has not changed since the prior approval and must identify the application for which the documentation had been submitted by form number, serial number, and date approved;

• A completed ATF Form 5320.23 for each responsible person. Form 5320.23 would require certain identifying information, including the responsible person's full name, position, Social Security number (optional), home address, date and place of birth, and country of citizenship;

• In accordance with the instructions provided on Form 5320.23, a 2 x 2-inch photograph of each responsible person, clearly showing a full front view of the features of the responsible person with head bare, with the distance from the top of the head to the point of the chin approximately 1¼ inches, and which must have been taken within 1 year prior to the date of the application;

• Two properly completed FBI Forms FD-258 (Fingerprint Card) for each responsible person. The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them; and

• In accordance with the instructions provided on Form 5320.23, a certification for each responsible person completed by the local chief of police, sheriff of the county, head of the State police, State or local district attorney or prosecutor, or such other person whose certification may in a particular case be acceptable to the Director. The certification for each responsible person must be completed by the CLEO who has jurisdiction over the area in which the responsible person resides. The certification must state that the official is satisfied that the fingerprints and photograph accompanying the application are those of the responsible person and that the certifying official has no information indicating that receipt or possession of the firearm by the responsible person would be in violation of State or local law.

ATF also sought public comments concerning the feasibility of asking CLEOs to certify that they are satisfied that the photographs and fingerprints match those of the responsible person, or whether changes were needed to this proposal.

### E. Amendment of 27 CFR 479.90

Section 5853(a) of the NFA, 26 U.S.C. 5853(a), provides that a firearm may be transferred to any State, possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations, without the payment of the transfer tax. Regulations implementing section 5853(a) are set forth in 27 CFR 479.90. That section provides, in pertinent part, that the transfer tax exemption may be obtained by the transferor of the firearm by filing with the Director an application on ATF Form 5 (5320.5), Application for Tax Exempt Transfer and Registration of Firearm, in duplicate. The application must provide certain information, including the name and address of the transferor and the transferee. In the case of a transfer of a firearm by a governmental entity to a transferee who is an individual not qualified as a manufacturer, importer, or dealer under 27 CFR part 479, the transferee must be further identified in the manner prescribed in § 479.85.

The Department proposed amending § 479.90(b) to remove the word "natural." Removing the word "natural" leaves the term "person," which was defined in proposed § 479.11 to include a partnership, company, association, trust, or corporation (including each responsible person of such entity), an estate, or an individual. Under this proposal, each transferee (including all responsible persons) would be subject to the requirements prescribed in proposed § 479.85 when a governmental entity

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.        10

transfers a firearm to a partnership, **\*2664** company, association, trust, or corporation that is not qualified as a manufacturer, importer, dealer, or SOT under part 479.

### F. Addition of 27 CFR 479.90a, Estates

The Department also proposed adding a new section to part 479 to address the possession and transfer of firearms registered to a decedent.[FN2] The proposed new section provided that the executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate (collectively "executor") may lawfully possess the decedent's NFA firearm during the term of probate without such possession being treated as a transfer from the decedent. The proposed section also sought to clarify that the executor may transfer firearms held by the estate on a tax-free basis when the transfer is to a beneficiary of the estate; however, when the transfer is to persons who are not lawful heirs, the executor must pay the appropriate transfer tax.

### G. Transfer of Unserviceable Firearm

Section 479.91 provides that an unserviceable firearm, defined in § 479.11 as a firearm that is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition, may be transferred as a curio or ornament without payment of the transfer tax. This section also provides that the procedures set forth in § 479.90 must be followed for the transfer of an unserviceable firearm, with the exception that a statement must be entered on the application that the transferor is entitled to the exemption because the firearm is unserviceable and is being transferred as a curio or ornament. The Department proposed no changes to this section. However, the Department noted that § 479.91 references the procedures in § 479.90, which in turn references § 479.85, thereby providing notice that changes to § 479.85 would apply to transfers governed by § 479.91.

### H. Miscellaneous

In the proposed rule, ATF recognized that the composition of the responsible persons associated with a trust, partnership, association, company, or corporation may change over time. As a result, ATF stated that it was considering a requirement that new responsible persons submit Form 5320.23 within 30 days of such a change. ATF sought comments on this option and solicited recommendations for other approaches.

The comment period for the proposed rule closed on December 9, 2013.

### IV. Analysis of Comments and Department Responses for Proposed Rule ATF 41P

In response to the proposed rule, ATF received over 9,500 comments. Comments were submitted by citizens; individuals associated with trusts, corporations, and other legal entities; individuals associated with estates; FFLs; SOTs; silencer manufacturers; nonprofit and other organizations; trade associations; lawyers; collectors; hunters; and others.

Several commenters supported the entire proposed rule, while the majority opposed the entire proposed rule. The majority of commenters also opposed the proposed expansion of the CLEO certification requirement and the new definition for a "responsible person" for a trust or legal entity. Some of the commenters who opposed the proposed expansion of the CLEO certification requirement and the new "responsible person" definition, however, supported other portions of the proposed rule. The commenters' support and opposition, along with specific concerns and suggestions, are discussed below.

### A. Comments Supporting the Rule

### 1. General Support for the Entire Rule

### Comments Received

More than a dozen commenters stated that they supported the proposed rule in its entirety. This support was based on a variety of reasons, including that: (1) The current regulations create a "loophole," through which prohibited persons can use a trust to circumvent the background check and CLEO certification requirements; (2) the benefit of ensuring felons and others could no longer circumvent background checks by submitting applications as representatives of a corporation or trust

AR005639

outweighed the "small inconvenience" the proposed rule would involve; (3) the current system of background checks only for individuals is inadequate to do the job of keeping guns out of the wrong hands; and (4) identification of and background checks on responsible persons would increase accountability for firearms regulated under the NFA.

**Department Response**

The Department acknowledges the commenters' support for the proposed rule, which generally focuses on the importance of conducting background checks, particularly for individuals acquiring NFA firearms. This rule will require all responsible persons to provide the necessary information, including fingerprints, to allow ATF to conduct background checks through the various criminal record databases. In addition, individuals, as well as any responsible person associated with a trust or legal entity, will be required to provide notification to the local CLEO of the intent of the individual, trust, or legal entity with which the responsible person is associated, to make or acquire the NFA firearm identified on the form. This notification will provide the CLEO an opportunity to conduct any inquiries required by State law, and provide ATF with appropriate input regarding the lawfulness of the individual's or responsible person's acquisition or possession of a firearm.

Regarding the commenters who desired greater accountability for NFA weapons, the Department notes that the NFA requires inclusion of those weapons in the National Firearms Registration and Transfer Record (NFRTR), and that the NFRTR includes firearm identification information, as well as the name and address of the registrant. Moreover, by allowing for background checks on individuals who will possess and control firearms on behalf of trusts or legal entities, the rule will deter persons who are prohibited from possessing firearms from attempting to use such trusts or legal entities to unlawfully acquire firearms.

**2. Particular Support for Portions of the Rule**

**a. Comments Relative to Forms 5330.20, 1, 4, and 5**

**Comments Received**

Two commenters stated that the proposal to incorporate the information currently required on ATF Form 5330.20 into Forms 1, 4, and 5 is beneficial, will reduce unnecessary paperwork, and increase efficiency. Another two commenters, including an FFL who is an SOT, supported the proposed changes eliminating the Form 5330.20 and incorporating the information from that form into Forms 1, 4, and 5. One of these commenters based his support on guidance provided by Executive Order 13610 of May 10, 2012 ("Identifying and Reducing Regulatory Burden"). Another commenter, a member of the NFATCA, stated that he supports the part of the proposed rule that would incorporate the certification of an applicant's status as a U.S. citizen, immigrant alien, or **\*2665** exempt nonimmigrant alien into Forms 1, 4, and 5, and eliminate the requirement to attach a separate certification of compliance. Another commenter stated that the elimination of the Form 5330.20 by adding a citizenship statement to the transfer forms would reduce the "human effort" expended by both the public and ATF, and reduce the expenditure of public funds to print, copy, and handle that form.

**Department Response**

The Department acknowledges the commenters' support for incorporating the certificate of compliance required to obtain the exemption provided by 18 U.S.C. 922(g)(5)(B) into ATF Forms 1, 4, and 5. This change will reduce the burden on the applicant by reducing the number of forms the applicant must complete to acquire an NFA firearm. The change will also reduce the cost burden on the Department as the Form 5330.20 will no longer have to be printed and separately processed by ATF.

**b. Addition of 27 CFR 479.90a, Estates**

**Comments Received**

Several commenters agreed with the addition of a new section in ATF's regulations addressing firearm transfers by estates, and supported the provisions regarding when a transfer occurs, and when a transfer tax must be paid. These commenters supported the additions because they increase clarity and provide specific direction for transfers through estates.

Other commenters supported the proposed changes related to estates and transfers, but suggested that the proposed rule did not go far enough. One commenter recommended expanding regulations to cover all involuntary transfers, including transfers at the dissolution of a corporation or other entity, liquidation in bankruptcy, and forced transfers during divorce proceedings, not just those involving the death of the owner. Other commenters argued that although they supported the treatment of estates, the proposal ran afoul of the Department's stated purpose to require the same identification and background checks of individuals and legal entities, and created a "fundamental internal inconsistency." Similarly, another commenter suggested that trusts should be treated the same as estates, and not subject to the same requirements as apply to individuals. That commenter further stated that § 479.90a should expressly address the role of attorneys, because issues may arise that require an attorney to take possession of a firearm to effectuate distribution to beneficiaries. This commenter also stated that a copy of the obituary in a recognized newspaper should be an acceptable alternative to the death certificate.

**Department Response**

The Department acknowledges supporters' comments regarding the addition of § 479.90a to address the possession and transfer of firearms registered to a decedent. The addition of this section clarifies that an executor, administrator, personal representative, or others recognized under State law may possess the firearm during the term of probate, which is often a concern for individuals dealing with the NFA firearms as part of an estate. Additionally, the rule provides clarification as to when a transfer tax must be paid.

The Department does not agree that its positions with regard to estates should be expanded to include other types of involuntary transfers as part of this rulemaking. Other types of involuntary transfers were not addressed in the proposed rule. The Department has exercised its discretion to decline to expand the scope of the rulemaking to encompass involuntary transfers not addressed in the proposed rule. Should the Department determine that its position with regard to estates should be extended to other involuntary transfers, it will do so in a separate rulemaking.

Transfers of NFA firearms from an estate to a lawful heir are necessary because the deceased registrant can no longer possess the firearm. For this reason, ATF has long considered any transfer necessitated because of death to be involuntary and tax-free when the transfer is made to a lawful heir as designated by the decedent or State law. However, when an NFA firearm is transferred from an estate to a person other than a lawful heir, it is considered a voluntary transfer because the decision has been made to transfer the firearm to a person who would not take possession as a matter of law. Such transfers cannot be considered involuntary and should not be exempt from the transfer tax. Other tax-exempt transfers—including those made by operation of law—may be effected by submitting Form 5. Instructions are provided on the form.

The Department disagrees that § 479.90a should expressly address the role of attorneys to effectuate distribution to beneficiaries. Clear rules are provided that establish who can make the necessary distributions and how those distributions should occur. The Department also disagrees with the assertion that a copy of an obituary in a "recognized newspaper" should be recognized as equivalent to a death certificate for purposes of the new section addressing estate transfers, as anyone can pay to have an obituary published in a newspaper. However, a death certificate is an official document issued by a government agency; a newspaper obituary has no equivalent guarantee of authenticity.

When an individual heir is named in a will, the executor of the estate would file a Form 5 to effect the transfer. The heir would be listed on the Form 5 as the transferee and an individual heir would be required to submit photographs and fingerprints and be subject to a background check. Similarly, if the trust expires upon the death of the grantor, then the trustee, as the administrator of the trust, would file Form 5 to transfer the firearm to the individual named as the beneficiary. Like the heir, the beneficiary would be required to submit photographs and fingerprints and be subject to a background check. Transfers to trusts and legal entities from estates will require that responsible persons at those trusts and legal entities identify themselves in the same manner as they would in circumstances involving a taxable transfer. If there is no beneficiary or the beneficiary does not wish to possess the registered firearm, the trustee would dispose of the property to a person other than a trust beneficiary on an ATF Form 4. If, however, the trust remains a valid trust after the death of the grantor, the trustee would continue to administer the trust property according to the terms of the trust as there would be no transfer under the NFA.

**c. Background Checks for Responsible Persons**

**Comments Received**
Seventy-two commenters, including members of a trade organization, stated in a form letter that they agree that requiring fingerprint cards and photographs of all adult applicants or responsible persons of a trust or LLC acquiring NFA firearms would ensure that NFA firearms are not acquired by prohibited persons. These same commenters stated that they oppose any expansion of the CLEO requirement. Thirty-six other commenters stated in a form letter that by eliminating the CLEO signoff and narrowing the definition of responsible persons, ATF could still require fingerprints and background checks on the person primarily **\*2666** responsible for a legal entity application without exposing law-abiding citizens to what they consider to be the arbitrary and capricious CLEO signoff ban. Another commenter expressed the belief that the regulations need to be changed to expand the requirements for fingerprints and photographs, but only as to one responsible person, not every responsible person who is part of a trust or legal entity. A few other commenters stated that they did not oppose fingerprints, photographs or background checks of responsible persons, but are opposed to the expansion of the CLEO signoff. Several other commenters, including an owner of a company that manufactures firearms and firearms accessories, an FFL/SOT, and employees of an FFL/SOT company, stated that requiring background checks for trust members is appropriate, but that ATF should remove the CLEO signature component. Another commenter stated that requiring background checks, fingerprints, and photographs for responsible persons "is sufficient" and makes more sense than the CLEO certification requirement that nullifies the right to acquire firearms for personal protection. Another commenter stated that he supports background checks, but is unequivocally opposed to the CLEO signoff requirement for any NFA transfer. Another commenter stated that the CLEO requirement is too time consuming and outdated, but it is reasonable for people associated with legal entities to be subject to the same fingerprint-based background checks that individuals go through before they can obtain some of the most dangerous weapons.

**Department Response**
The Department acknowledges support regarding the requirement for responsible persons of trusts or legal entities to submit fingerprints and photographs and undergo background checks. The Department agrees that responsible persons of trusts or legal entities should be subject to the same requirements as individuals acquiring an NFA firearm.

The Department acknowledges comments regarding expansion of the CLEO certification requirement. The Department has changed the CLEO certification in the proposed rule to a CLEO notification requirement in the final rule for all transferees, whether individuals, trusts, or legal entities. See discussion infra in section IV.C.1. The Department also acknowledges comments regarding those who would be considered a responsible person for a trust or legal entity. The Department has changed the definition of responsible person to provide that responsible persons are generally those individuals in the organization who have the power and authority to direct the management and policies of the entity insofar as they pertain to firearms.

### B. Comments Generally Opposing the Rule
A few commenters disagreed with all proposed changes without providing any specifics. The majority of commenters who were opposed to the proposed rule provided specific reasons as discussed below.

### 1. Current Regulations Are Sufficient

**Comments Received**
Many commenters stated that there are already stringent Federal regulations in place for the firearms covered by the proposed rule; for example, prohibited persons who receive or possess an NFA firearm through a legal entity are already violating current laws. A few commenters stated that these existing laws work, as shown by ATF's examples in the proposed rule. A few commenters objected to any additional firearm regulations.

Many commenters stated that this rule only creates more "red tape" for lawful citizens. Another commenter believed that the "filings" for corporations, trusts, and legal entities already identify a legally responsible person, and, as a result, maintained that the burdens of the proposed rule outweighed its benefits. Another commenter argued that a corporation or a trust was not a person, and should not be treated as one.

**Department Response**

The Department acknowledges that there are existing Federal laws and regulations that pertain to NFA firearms and firearms more generally. Requiring background checks for responsible persons of trusts and legal entities helps to enforce those laws by keeping firearms out of the hands of persons who are prohibited from possessing them. The efficacy of background checks is evident in the statistics. The most recent statistics released by the Department of Justice, Bureau of Justice Statistics, reflect that through the end of December 2012, background checks run through the NICS by either the FBI or State point-of-contact agencies resulted in about 2.4 million denials. See Karberg, Frandsen & Durso, Background Checks for Firearms Transfers, 2012—Statistical Tables, at 1 (December 2014). And given that there is not an abundant number of NFA firearms readily accessible without going through the transfer process, background checks in this area should be expected to be highly effective in keeping NFA weapons out of the hands of those prohibited by law from possessing them.

In addition, requiring background checks for responsible persons of trusts and legal entities conforms the requirements applicable to those entities to those that apply to individuals. It also maintains consistency with the way ATF processes applications for Federal firearms licenses, where responsible persons for legal entities are subject to background checks. See 27 CFR 478.47(b)(2).

**a. Allegations That the Proposed Changes Were Motivated by Politics**

**Comments Received**

Many commenters stated their view that this rulemaking is motivated by politics and not driven by legitimate concerns. Some argued that the proposal was an executive "overreach," represented an "end run" around Congress, and was beyond the scope of ATF's regulatory authority. Some commenters expressed concern that the proposed regulation was intended to disarm law abiding citizens.

**Department Response**

The Department acknowledges that the regulation of firearms provokes strong feelings on all sides and that any form of firearm regulation is often a topic of substantial debate. The Department initiated this rulemaking after ATF received a petition from the NFATCA, a non-profit association. ATF agreed with the petitioner that by not requiring background checks for trusts and legal entities, the existing regulations created the potential for abuse. The goal—as stated in both the proposed rule and here—is to ensure that the rules regarding NFA applications that apply to individuals apply equally to trusts and corporate entities. By ensuring background checks are run on certain persons who may have access to NFA weapons, the rule is intended to help enhance public safety. Put simply, this rule will not prevent a person who can lawfully possess firearms from receiving or possessing NFA firearms; it was designed to prevent persons who are prohibited from receiving or possessing firearms from obtaining them through the use of trusts or legal entities not currently subject to the same procedures applicable to individuals. The rule will not disarm law abiding citizens. However, it will help ensure that persons who are prohibited by law from **\*2667** possessing firearms are not able to acquire them.

The Department also does not agree that the rule is outside of ATF's authority. ATF has regulated the circumstances under which NFA firearms are manufactured, transferred, and acquired for decades. This authority is based upon the authority to implement the law that Congress has both expressly and implicitly delegated to the Department. Specifically, the authority to implement the regulations requiring a CLEO certification have withstood challenge. See Lomont v. O'Neill, 285 F.3d 9 (D.C. Cir. 2002). The Court, in upholding the CLEO certification requirement, noted that sections 5812 and 5822 of the NFA give "the Secretary broad authority to promulgate regulations governing application forms, including regulations pertaining to the identification of the transferee, the transferor and the firearm," and "broad authority over the form of applications for permission to make firearms." Id. at 16. Similarly, in upholding ATF's authority to make destructive device determinations, another court noted that Congress may lawfully leave "a certain degree of discretion to executive or judicial actors." The court noted that ATF acted lawfully in implementing the statutory definition, utilizing the authority delegated to it by Congress and the Secretary of the Treasury. Demko v. United States, 216 F.3d 1049, 1054 (Fed. Cir. 2000). Such authority was also recognized when, in construing the Gun Control Act (GCA), a court found that the Secretary of the Treasury was authorized to promulgate regulations to facilitate its enforcement. This responsibility was delegated within the Department of the Treasury to ATF. National Rifle Ass'n v. Brady, 914 F.2d 475, 477 (4th Cir. 1990).

**b. Changes Are Not Necessary if Current Regulations Are Enforced**

**Comments Received**

Many commenters stated that it is not necessary for the Department to add additional rules and that the current rules are sufficient to ensure NFA firearms are not acquired by unauthorized individuals. Many commenters felt that the proposed rule fails to address crime, and instead simply makes it more difficult for law-abiding citizens to legally obtain NFA registered firearms. Many commenters stated that someone who wishes to obtain a firearm for criminal purposes would not go through the NFA application process for a legal entity, a process that entails expense and efforts to register such firearms with the Federal Government.

One commenter noted that the proposed rule would alter the timing of the background check, and asserted that the timing would have a negative effect on safety. Currently, background checks are performed at the time the weapon is physically transferred; the proposed change would require the background check be performed at the beginning of the application process. This commenter stated that it currently takes transfer applications a year for approval, and with the proposed change, any arrests, convictions, or restraining orders that occur during this year would not be discovered and restricted persons could potentially obtain possession of the NFA items. Several commenters questioned why it takes ATF months to approve NFA applications if it does not currently run checks on trusts and legal entities.

Many commenters stated that there is no "loophole" to close, arguing that nothing in the current system allows felons or otherwise prohibited persons to possess NFA items through trusts, corporations, or individually. Several commenters further added that their trust was constructed in a manner such that prohibited persons may not have a role in the trust. Other commenters noted existing requirements that the person picking up the NFA item must still fill out ATF Form 4473, Firearms Transaction Record, and pass the required NICS background checks at the point of sale before taking possession. Other commenters noted generally that it is already illegal to let unauthorized persons be in possession of firearms and NFA items. Others stated specifically that an individual who takes possession (i.e., the responsible person), is prohibited by State and Federal law from transferring or making that weapon available to anyone with a firearm restriction. In addition, a few commenters stated that there is not an "underground black-market conspiracy" or "underworld entity" circumventing NFA gun laws by using trusts. Several commenters stated that trusts are used by law-abiding citizens to prevent unintentional illegal transfers; people creating an NFA trust are not trying to game or cheat the system or pass through a loophole.

Many commenters noted that ATF's three examples provided in the proposed rule fail to illustrate that there is a problem to be solved (i.e., that a prohibited person ever gained actual possession of an NFA firearm by virtue of an association with a legal entity, much less committed a crime with that weapon). Those same commenters also observed that these three examples just as strongly argue that prohibitions and safeguards, under current law, are entirely sufficient. A few of these commenters asked ATF for access to the details of the three situations and stated that without such access, there are many unanswered questions and no evidence of any problem that existing law does not address.

Many commenters requested ATF to leave the current regulations in place. Instead of proposing new rules and regulations, many commenters asked ATF to enforce the rules, laws, and penalties already on the books, and noted the small number of prosecutions resulting from NICS denials. A few of these commenters also requested that ATF give longer sentences and harsher penalties to those who break the rules. Another commenter noted that the current regulations are unenforceable due to an already "over-taxed and under-funded and under-staffed system." Another commenter stated that ATF makes so many "gun laws" that the public cannot possibly understand them, and asked how ATF proposes to enforce them.

**Department Response**

While the Department acknowledges that most individuals who apply to register and transfer an NFA firearm are not prohibited from possessing or receiving firearms, there have been a significant number of instances in which prohibited persons have submitted NFA applications. Information received from the ATF NFA Branch disclosed that from 2010 to 2014 there were approximately 270 NFA applications by individuals, out of 115,842 applications, that were disapproved due to background check denials. The NFA Branch also tracked the number of applications received from trusts and legal entities during the same period. The Department believes that the disapprovals would have been higher if background checks would have been conducted on responsible persons associated with the 217,996 applications received from trusts or legal entities during this time. This belief is based on the FBI's denial rate on NICS background checks between November 30, 1998, and December 31, 2014, which is approximately 1.24 percent. Additionally, the Department believes that the background check

requirement has an important deterrent effect as a prohibited person would be less likely to try and acquire an NFA firearm knowing that the person would be subject to a background check.

As a result of the increased use of trusts or legal entities to acquire NFA **\*2668** firearms, the number of qualifying firearms acquired without a background check has greatly increased. Between 2004 and 2014, the number of NFA applications received from trusts or legal entities increased from 1,938 to 90,726. In 2013 and 2014, ATF received a combined total of 162,759 applications from trusts or legal entities.

The Department does not agree that the proposed regulations are unnecessary. Background checks required under the Brady Act (18 U.S.C. 922(t) and 27 CFR 478.102), as part of the licensing process (18 U.S.C. 923(d)(1)(B) and 27 CFR 478.47(b)(2)), and the application process for individuals submitting applications to make or receive an NFA firearm (26 U.S.C. 5812 and 5822, 27 CFR 479.63 and 479.85) are in place to prevent prohibited persons from unlawfully acquiring firearms. The proposed rule is similarly intended to prevent prohibited persons from acquiring firearms by closing down an avenue that can be exploited.

The Department acknowledges that there is a backlog of NFA applications, and notes that the backlog has decreased over the last year. ATF processes applications as quickly as its resources allow.

The Department agrees with the commenters that the existing laws should be enforced, and the Department is committed to focusing its limited prosecutorial resources on the most significant violent crime problems facing our communities. That said, enforcement must be paired with common-sense regulatory efforts to help limit access to firearms by persons prohibited from possessing them. This rule is intended to do just that.

The Department acknowledges that the person picking up the NFA item must still fill out ATF Form 4473, Firearms Transaction Record, and pass a NICS background check at the point of sale before taking possession. Such a background check on the person picking up the firearm would verify that that individual is not a prohibited person, but it would not verify that other people who are responsible persons of a trust or legal entity are not prohibited.

The Department does not regard time-of-transfer background checks as sufficient to comply with the transfer provision of the NFA. The Department interprets that provision to require that background checks precede the transfer of NFA firearms. Specifically, the statute provides that a firearm "shall not be transferred unless" the Secretary has approved the application, and that an application "shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law." 26 U.S.C. 5812(a). The Department construes that language to mean that background checks for individuals and responsible persons must be conducted before the application is approved. Additionally, this provision requires that an individual's "identification must include his fingerprints and his photograph." Id. A NICS background check does not satisfy the statute's biometric language (fingerprint cards) requirement. The submission of fingerprints allows a more robust check of criminal history databases and provides a means of eliminating false negative and false positive matches. For example, the relevant individual may have a disqualifying criminal record under another name.

The Department does not agree that the proposed rule would alter the timing of the background check. Background checks under the statute's transfer provision are not currently performed at the time the weapon is physically transferred, as the commenter suggested. Rather, background checks are currently performed before an application is approved and will continue to be performed in the same manner. With respect to the commenter's concern that delay in processing applications might mean that an individual will become a prohibited person while awaiting a background check, the agency has two responses. First, because nothing about the Department's method of processing applications will change because of this rule, the Department believes the commenter's concern is outside the scope of this rulemaking. Second, processing times for applications reflect the delay between the time an application is received by the NFA Branch and the time the application is entered into the NFRTR and processed. As the background check is not conducted until after the information is entered into the NFRTR, any prohibitions that may have occurred after the applicant mailed the application will be disclosed when the background check is conducted.

### c. Criminal Activity Assertions Are Not True

### i. The NFA and Impact on Crime

**Comments Received**

Many commenters stated that these restrictions will not reduce crime and questioned whether violent crimes have been committed with registered NFA items, or by responsible persons of a trust or legal entity. Several commenters asked if ATF could provide the statistics demonstrating the need for the regulations and direct link between the proposed rule and enhanced public safety.

Many other commenters observed that NFA items are expensive, already heavily regulated, and "virtually unheard of" in the hands of criminals. Although commenters disagreed on the number of crimes they believe have been committed with registered NFA weapons, those addressing the subject agreed that the number was small, and argued that the proposed rule would accordingly have little to no effect on public safety.

**Department Response**

The Department disagrees that it must show a direct link between the proposed rule and enhanced public safety. Congress has directed the Department to ensure that individuals who are prohibited from possessing NFA firearms do not obtain them, even if those individuals have no intention of using them in an unlawful manner. See 26 U.S.C. 5812(a) ("Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law"); 26 U.S.C. 5822 ("Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law."). The Department regards the appropriate question to be whether the rule will better ensure that prohibited individuals do not unlawfully possess NFA firearms, not whether individuals who possess firearms are likely to use them to commit crimes.

Additionally, the Department notes that some individuals who own NFA firearms do in fact commit crimes. A review of trace data and criminal records from 2006 to 2014 disclosed twelve incidents in which owners of NFA firearms were convicted of crimes; however, there is no evidence that these crimes were committed with NFA firearms. Convictions include attempted homicide, conspiracy to commit felony offenses of firearms laws, operating a drug involved premises, possession of unlawful firearms, possession of marijuana, intent to distribute methamphetamine, possession of a firearm during commission of drug trafficking, domestic violence, theft, dealing firearms without a license, and possession of an unregistered NFA firearm.

In one instance the purchaser was arrested 9 days after the purchase of the firearm. In another instance the purchaser was arrested within 3 months of the purchase of the firearm. Both purchasers were convicted of drug related charges.

**\*2669** The Department acknowledges that the majority of firearms traced are handguns. However, between 2006 and 2013, local or Federal law enforcement recovered and ATF traced 5,916 NFA firearms. ATF is authorized to trace a firearm for a law enforcement agency involved in a bona fide criminal investigation. There were also at least seven instances in which the possessor of the firearm at the time it was traced was not the person it was registered to in the NFRTR. Under Federal law, possession of an NFA firearm by a person to whom it is not registered is unlawful (26 U.S.C. 5861(d)).

The Department also emphasizes that NFA weapons are dangerous weapons that can empower a single individual to take many lives in a single incident. Therefore, a low incidence of the use of NFA firearms in crimes does not reflect the threat to public safety that they pose. A low usage of NFA firearms in crime may also bespeak the success of the NFA in preventing such weapons from reaching the hands of prohibited persons in the past. The large increase in transfers in which no background check takes place, however, increases the risk that NFA firearms will reach prohibited persons. The Department does not believe it is reasonable to wait for an NFA firearm to be used in a significant criminal incident before crafting procedures reasonably calculated to carry out its regulatory mandate to prevent prohibited persons from obtaining NFA firearms.

**ii. The NFA and Associated Background Checks for Transactions Involving a Trust or Legal Entity**

**Comments Received**

Many commenters stated that the proposed rule is misleading because it suggests that there are no background checks currently required for trusts or legal entities when, in fact, the person who picks up an NFA item from a licensed dealer on behalf of a trust or legal entity must complete a Form 4473 and undergo an individual NICS background check prior to taking

possession of the NFA item. Some of these commenters provided specific language from ATF's NFA Handbook as support for their point.

**Department Response**

The Department acknowledges that ATF procedures currently require that FFLs run a background check on any person picking up a firearm on behalf of a trust or legal entity. However, this ensures only that the direct recipient from the FFL is not a prohibited person. It does not verify the status of the other responsible persons associated with a trust or legal entity who will have access to the firearm. Thus, this rule will help ensure that many persons with access to the firearm are neither prohibited possessors nor otherwise ineligible for such access. With the implementation of the rule, responsible persons for trusts and legal entities will undergo a background check as part of the application process. Therefore, a responsible person will not have to undergo a background check at the time of the transfer from the FFL.

### d. Individuals Do Not Create Trusts or Legal Entities to Avoid Background Checks

**Comments Received**

Many commenters stated that the proposed rule mistakenly contends that individuals create trusts or legal entities solely to avoid background checks when acquiring NFA items. These commenters offered other valid reasons (e.g., for estate planning; to comply with laws and regulations associated with the NFA, especially by preventing accusations or criminal charges involving constructive possession; as the only available mechanism for acquiring NFA items for individuals who reside in a locale where CLEO certification is unobtainable).

**Department Response**

The Department is unable to assess the reason(s) for the recent exponential growth in the use of trusts, in particular, to acquire NFA firearms, and the proposed rule made no claim about the extent to which such trusts are being used predominantly to circumvent the background check requirement for individuals, as opposed to for other reasons. But the use of trusts has grown exponentially, and as a result so have the number of persons gaining access to NFA firearms without undergoing a background check. Regardless of their motive, the Department does not believe that responsible persons of trusts or legal entities should be excluded from the background check and other requirements that seek to ensure prohibited persons do not gain access to NFA firearms.

Additionally, the Department notes that it believes that even if individuals are not frequently exploiting the potential loophole in the statute, the existence of the loophole invites future exploitation. The Department regards it as wise to close the loophole to eliminate the opportunity for future evasion of the individual background check requirement, even if the tactic has not yet come into common use.

### 2. Rule Differs From NFATCA Petition

**Comments Received**

Some commenters noted that NFATCA's petition asked ATF to amend §§ 479.63 and 479.85 to, among other things, require photographs and fingerprints of persons responsible for directing the legal entity, eliminate the requirement for CLEO approval of Forms 1 and 4 for natural persons, and require notification to CLEOs for all Form 1 and Form 4 applicants. One commenter noted that the proposed rule differed from the petitioner's request by adding CLEO certification requirements, not removing them. Another commenter observed that the proposed rule did largely what the petitioner requested by expanding requirements for all responsible persons involved with corporations and trusts; however, the proposed rule lessened—but did not entirely eliminate—CLEO certification requirements. Several commenters referenced NFATCA's letter, dated August 31, 2013, in which NFATCA said that it supports the elimination of the CLEO certification requirement, but does not support the proposed rule in its current form. The NFATCA letter states, in part, that "[t]he Executive Branch proposals unduly burden the law-abiding public, will restrain lawful commerce and bury an already overwhelmed agency with an administrative infrastructure that will not serve the public safety interest."

NFATCA also submitted a public comment to the rulemaking, stating that the proposed rule bears little resemblance to its

AR005647

petition, or to changes that NFATCA discussed with ATF and that were published in "ATF's Unified Agenda repeatedly over the past several years" [FN3] for Regulation Identification Number (RIN) 1140-AA43.

**Department Response**

The Department acknowledges that in proposing to extend CLEO certification rather than notification requirements, and not eliminating all CLEO involvement, the proposed rule differed not only from material contained in the published abstracts of RIN 1140-AA43 in the 2011 and 2012 Unified Agendas, but also from what the petition **\*2670** requested. See supra note 3. However, the Department notes that the intent of the Unified Agenda is to provide data on regulatory and deregulatory activities under development throughout the Federal Government. The activities included in individual agency agendas are primarily those currently planned to have a proposed rule or a final rule issued within the next 12 months. This does not mean that ATF, or any other agency, cannot change the direction of a proposed rulemaking if circumstances warrant. In addition, when ATF issued the proposed rule, ATF believed that the proposed requirements to extend CLEO certification would enhance public safety without overly burdening the public. However as is discussed infra in section IV.C.1, the Department has reassessed the need for CLEO certification and has implemented a new approach that focuses on notifying CLEOs, and requires responsible persons of a trust or legal entity to submit fingerprint cards and undergo a background check. See section IV.C.1 for discussion of the reasons for this change.

The Department agrees that a change from a CLEO certification to CLEO notification will require a change to the Forms 1, 4, and 5. See section IV.C.1 for further discussion.

### 3. Constitutional and Statutory Arguments

#### a. Violates the Second Amendment

**Comments Received**

Hundreds of commenters stated that the proposed rule violated and infringed their Second Amendment rights. Many commenters stated the proposed rule further eroded and encroached on such rights as they believe that the NFA—with some also adding the GCA—is unconstitutional and already unconstitutionally infringes the rights protected by the Second Amendment. Many commenters referenced the Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570 (2008), which found that the Second Amendment protects an individual—not a collective—right to keep and bear firearms.

Numerous commenters specifically connected the perceived Second Amendment infringement to the CLEO certification requirement, as some CLEOs are represented as being unwilling to sign off on applications, regardless of the applicant's background, or the legality of the NFA item in the applicant's jurisdiction. See infra section IV.C.1.c for a detailed discussion of this issue. These same commenters pointed out that the proposed rule, by extending the CLEO certification requirement to responsible persons of trusts or corporations and legal entities, removes the "gun trust" option, which does not require CLEO certification and thereby effectively bans law abiding citizens from exercising their Second Amendment rights, i.e., constitutes a de facto ban.

A commenter focused particularly on silencers, which are included in the definition of firearm under the NFA. 26 U.S.C. 5845(a). This commenter provided data showing the benefits of silencers (e.g., hearing protection), and that the situation is different from when the NFA was enacted—that is, silencers are no longer dangerous or unusual and are typically possessed by law-abiding citizens—and accordingly, merit constitutional protection under the Second Amendment. This commenter stated that 39 States permit private citizens to own and possess silencers, and more than 30 States permit their use in some form of hunting. This same commenter argued that short-barreled shotguns (SBSs), short-barreled rifles (SBRs), and any other weapons (AOWs) should not be controlled under the NFA because they are no more dangerous than conventional shotguns and rifles, they are commonly used by law enforcement and the military, and are favorably suited for law-abiding citizens to use in self-defense.

**Department Response**

The Department notes that the NFA regulates weapons such as machineguns, short-barreled rifles, short-barreled shotguns, silencers, destructive devices, which include such items as grenade launchers, as well as firearms meeting the definition of

"any other weapon," which include disguised devices such as penguns, cigarette lighter guns, knife guns, cane guns and umbrella guns. See 26 U.S.C. 5845.

The Department does not believe that the proposed regulation violates, erodes, or otherwise infringes any rights protected by the Second Amendment. The Supreme Court and several Courts of Appeal have recognized, "the right to keep and bear arms has never been unlimited." Nat'l Rifle Ass'n (NRA) v. ATF, 700 F.3d 185, 200 (5th Cir. 2012) (quoting Heller, 554 U.S. at 626). The Supreme Court noted explicitly in Heller that the Second Amendment did not extend to "dangerous and unusual weapons" not in "common use." 554 U.S. at 627; see also United States v. Miller, 307 U.S. 174, 178-79 (1939) (regarding short-barreled shotguns). Courts of Appeals have consistently found NFA weapons to be "dangerous and unusual." See United States v. Henry, 688 F.3d 637, 640 (9th Cir. 2012); Heller v. District of Columbia ("Heller II") 670 F.3d 1244, 1263 (D.C. Cir. 2011); United States v. Marzzarella, 614 F.3d 85, 94 (3d Cir. 2010); Hamblen v. United States, 591 F.3d 471, 473-74 (6th Cir. 2009); United States v. Tagg, 572 F.3d 1320, 1326 (11th Cir. 2009); United States v. Fincher, 538 F.3d 868, 874 (8th Cir. 2008). Moreover, even if one assumes that NFA weapons are of the type protected by the Second Amendment, the Department believes that NFA statutory requirements imposed on the these weapons would be considered longstanding presumptively lawful regulations or restrictions and permissible under the Second Amendment given the Supreme Court's rulings in Heller, 554 U.S. 570, and Miller, 307 U.S. 174, and circuit court rulings, such as in NRA, 700 F.3d 185. Finally, even if the NFA's statutory requirements—or the requirements imposed by this regulation—are not considered longstanding, the Department believes that they would withstand constitutional scrutiny.

The Department's position is that the Second Amendment, properly construed, allows for reasonable regulation of firearms. Heller emphasized the importance of "prohibiting the carrying of 'dangerous and unusual weapons' " in defining the limitation on the Second Amendment right, explaining that the Second Amendment would not prevent the ban of the "weapons that are most useful in military service—M-16 rifles and the like. . . ." Heller, 554 U.S. at 627; id. at 627-28.

In addition, although the Court did not purport to define the full scope of the Second Amendment right in Heller, the Court did consider United States v. Miller, 307 U.S. 174, which "upheld against a Second Amendment challenge two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act." Heller, 554 U.S. at 621-22 (citation omitted). Heller explained that the Miller Court's "basis for saying that the Second Amendment did not apply" was that the type of weapon at issue was not eligible for Second Amendment protection.

In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly . . . it is not within judicial notice that this weapon is any part *2671 of the ordinary military equipment or that its use could contribute to the common defense.

Id. at 622 (quoting Miller, 307 U.S. at 178) (emphasis in Heller). Of particular import to this rulemaking, the Heller Court further stated:
We may as well consider at this point (for we will have to consider eventually) what types of weapons Miller permits. Read in isolation, Miller's phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in Miller) might be unconstitutional, machineguns being useful in warfare in 1939. We think that Miller's "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

Id. at 624-25 (emphasis added) (internal citations and quotations omitted). Heller thus explicitly recognized an "important limitation on the right to keep and carry arms . . . the sorts of weapons protected [are] those 'in common use at the time.' " Id.

at 627 (quoting Miller, 307 U.S. at 179).

In NRA, the Fifth Circuit acknowledged Heller's "non-exhaustive list" of "presumptively lawful regulatory measures," 700 F.3d 185, 197 (5th Cir. 2012) (citing 554 U.S. at 626-27). The Fifth Circuit held that firearm restrictions that are longstanding, like the NFA, are not likely to burden a person's rights under the Second Amendment. See id. at 196; see also Heller II, 670 F.3d at 1253 ("[A] regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment.").

Like the restrictions on machineguns, the Department believes that other longstanding Federal restrictions on making and transferring SBSs, SBRs, silencers, and AOWs are "firmly historically rooted" and will not burden Second Amendment rights given the Court's holding in Heller regarding presumptively lawful regulatory measures. See NRA, 700 F.3d at 204; United States v. One Palmetto State Amory PA-15 Machinegun, No. 15-2202, 2015 U.S. Dist. LEXIS 95302 (E.D. Penn. 2015) (holding that the Second Amendment does not create a right to possess a machinegun), and Hollis v. Lynch, No. 3:14-CV-03872-M, 2015 U.S. Dist. LEXIS 103656 (N.D. Tex. 2015) (holding that the Second Amendment does not create a right to make machineguns).

Finally, even if a court were to conclude that the NFA and its implementing regulations are not "presumptively lawful," they would nevertheless pass constitutional muster under existing Second Amendment jurisprudence. The NFA and this final rule are not a ban on NFA items, as some commenters suggest. Rather they are reasonable regulations on the possession of such weapons that the Department believes are consistent with the Second Amendment.

In response to those commenters who seek the repeal of the NFA and a different treatment for certain NFA weapons, like silencers, the Department cannot repeal the NFA, nor can it choose to ignore provisions of the act for certain weapons, or minimize the burden of the statutory language for certain weapons, such as, silencers, SBSs, SBRs, and AOWs. The statute neither requires nor is best read as permitting disparate treatments of NFA firearms in the manner suggested by the comments.

Assuming, arguendo, that silencers are within the protection of the Second Amendment in the first place, they do not qualify for heightened Second Amendment protection. To the contrary, silencers were included in the original draft of the NFA in 1934, and have a long regulatory history. See United States v. Gonzales, No. 2:10-CR-00967 CW, 2011 U.S. Dist. LEXIS 127121 (D. Utah 2011) (describing legislative history surrounding 1934 enactment of the NFA). Because silencers, SBSs, and SBRs are statutorily defined as NFA firearms, they are regulated in the same manner as the other NFA weapons.

Although the CLEO certification process has been upheld by courts as a reasonable regulation (see, e.g., Lomont, 285 F.3d 9), the Department is not requiring such a certification in this final rule. Instead, the final rule contains a CLEO notification provision, requiring applicants to provide notification to the CLEO. Thus, the concern expressed by many commenters that the CLEO certification provision in the rulemaking will effectively ban the transfer and making of NFA weapons is moot; likewise, commenters' concerns about the alleged arbitrary and capricious nature of the CLEO certification process in some jurisdictions are also moot.

## b. Violates the Fourth Amendment

### Comments Received

One commenter stated that the wait time for ATF to approve NFA transfers is excessive, and that the proposed rule imposes additional restrictions. The commenter stated that these restrictions deprive him of the use of his legally obtained property, and violate the Fourth Amendment as they are a "de facto seizure." Another commenter provided an example in which a county sheriff publicly stated that he would possibly provide CLEO certification, on the condition that the applicant "pass a background check" and "allow the Sheriffs (sic) Department to inspect the home where the weapon will be stored." This commenter stated that this "safety inspection" blatantly violated the Fourth Amendment protection against unreasonable searches.

### Department Response

The Department believes that the law provides that applicants do not have a property interest in the NFA firearm sought

AR005650

during the application period. Therefore, an NFA firearm is not the property of a transferee until the transferor receives a properly approved NFA Form 4.

The Department takes the view that individuals, trusts, and legal entities do not obtain a property interest in an NFA firearm until the Department has approved an application to make or transfer one. A "protected property interest simply 'cannot arise in an area voluntarily entered into . . . which, from the start, is subject to pervasive Government control.'" Dennis Melancon, Inc. v. City of New Orleans, 703 F.3d 262, 272 (5th Cir. 2012); see also Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (same). In light of the comprehensive scope of Federal firearms regulation, the NFA and GCA delineate such an area of pervasive control when it comes to the acquisition or manufacture of such firearms. See Mitchell Arms, Inc. v. United States, 7 F.3d 212, 216 (Fed. Cir. 1993). Moreover, several courts have held that a property interest is lacking where the alleged property is not accompanied by the "crucial indicia of property rights," *2672 such as the right to assign, sell, or transfer the property at issue. Gonzalez v. NOAA, 695 F. Supp. 2d 474, 504 (S.D. Tex. 2010) (finding no legally cognizable property interest in Federal shrimping permits); see also Melancon, 703 F.3d at 269 (describing these indicia as "the right to possess, use, and dispose"); Hearts Bluff Game Ranch, 669 F.3d at 1330 (identifying "the ability to sell, assign, transfer, or exclude" as the crucial indicia of a property right). Because the statutory language in the NFA makes it clear that applicants do not have the right to make or transfer an NFA firearm until a properly approved Form 1 or 4 is issued, the applicant does not have a property interest in the NFA firearm until a properly approved Form 1 or 4 is issued. See 26 U.S.C. 5812 and 5822. See Hollis, 2015 U.S. Dist. LEXIS 103656 (holding "that Plaintiff had no property interest in either the machine gun or the erroneous approval of the Form 1 application").

The Department therefore disagrees that delaying or preventing the transfer of an NFA firearm constitutes a "seizure" under the Fourth Amendment. As explained above, individuals, trusts, and legal entities do not have a property interest in an NFA firearm until a properly approved Form 1 or 4 is issued. They therefore lack standing to assert a Fourth Amendment claim because they cannot assert "an interest in the property seized." Rakas v. Illinois, 439 U.S. 128, 148 (1978).

As to the comment regarding the home inspection that one CLEO purportedly required of citizens before granting a CLEO certification, the Department notes that the final rule will not include a CLEO certification requirement so there will be no further need to consent to such home inspections. Instead, the final rule will contain a CLEO notification provision, which should ease commenters' concerns.

### c. Violates the Fifth Amendment

### i. Due Process Clause

**Comments Received**
Several commenters expressed a concern that local CLEOs would refuse to certify applications for little or no reason, amounting to a violation of due process under the Fifth Amendment. Several commenters also stated that applicants primarily use "gun trusts" due to their CLEOs' arbitrary and capricious refusal to provide certification, and expressed concern that the proposal essentially removes this option.

In addition, a few commenters noted that Federal appellate courts have recognized the validity of trusts established with a prohibited person as the settlor, which allows the prohibited person to maintain the prohibited person's "ownership" interest in the property while surrendering the prohibited person's right to the "possessory" interest to a trustee, see United States v. Zaleski, 686 F.3d 90, 93 (1st Cir. 2012); United States v. Miller, 588 F.3d 418, 419-20 (7th Cir. 2009); Cooper v. City of Greenwood, 904 F.2d 302, 305-06 (5th Cir. 1990). One of these commenters also stated that trusts provide a well-established method to maintain regulatory compliance without exercising possession, and provided the common example of beneficiaries who are minors. This commenter predicted that the proposed rule, if finalized, would most certainly be challenged as a "taking" under the Fifth Amendment.

**Department Response**
The Department believes that most of the commenters' concerns are addressed with the change from CLEO certification to CLEO notification. Moreover, this rule does not eliminate or significantly burden the use of trusts or legal entities by persons who may wish to employ them as part of the NFA firearm acquisition process.

The Department disagrees with commenters asserting that the proposed regulations would lead to a violation of an applicant's due process rights under the Fifth Amendment. Recently, at least two courts considered whether a denied NFA applicant had a property interest in the denied Form 1 application or in the NFA weapons he sought to make. Both district courts ruled that the applicant had no property interest in the ATF Form 1 or firearm at issue. Hollis, 2015 U.S. Dist. LEXIS 103656; and One Palmetto State Armory PA-15 Machinegun, 2015 U.S. Dist. LEXIS 95302.

Procedural due process challenges must demonstrate that the " 'state has deprived a person of a liberty or property interest.' " Wilson v. Birnberg, 667 F.3d 591, 601 (5th Cir. 2012) (quoting Welch v. Thompson, 20 F.3d 636, 639 (5th Cir. 1994)). If it has, then the Court "must determine whether the procedures relative to that deprivation were constitutionally sufficient." Id. As explained in the preceding section regarding whether this rule will effect a "seizure" in violation of the Fourth Amendment, individuals do not have a property interest in an NFA firearm until a properly approved Form 1 or 4 is issued.

Moreover, most, if not all, NFA applicants who will be impacted by the proposed change in the definition of a "person," which requires "responsible persons" for a trust or legal entity to undergo a background check, will have no legally cognizable property interest in either the NFA firearm sought or the NFA application form. Several courts have held that a property interest is lacking where the alleged property is not accompanied by the "crucial indicia of property rights," such as the right to assign, sell, or transfer the property at issue. Gonzalez v. NOAA, 695 F. Supp. 2d at 504 (finding no legally cognizable property interest in Federal shrimping permits). Further, the fact that it is unlawful to possess a firearm before ATF approves the relevant form reinforces the Department's conclusion that there is no property interest in such firearms until such forms are properly issued. See Hollis, 2015 U.S. Dist. LEXIS 103656.

As for the comments expressing concerns about protecting the property interest of minors, the proposed regulation will allow trusts to possess the NFA weapon until the minor comes of age. Once the minor is of age, the minor can then complete the transfer application and background check and, if not otherwise prohibited from possessing an NFA firearm, take possession of the NFA weapon. The only change the rule makes is that it requires that responsible persons in trusts undergo background checks and not be prohibited persons. If anything, therefore, the rule will provide trust beneficiaries with an added measure of protection by ensuring that trust property is held in the hands of a law-abiding person who is not prohibited from possessing firearms under Federal or State law.

Moreover, to the extent that courts have recognized a felon's ability to employ a trust or other device to maintain an ownership interest, so long as there is no ability to physically possess or control the firearm, those cases have no application here. Trust beneficiaries who cannot physically possess or control firearms held in trust for them will not typically be responsible persons under the rule. Additionally, this rule pertains to the acquisition of a firearm, not the disposition of a firearm already owned by someone who later becomes prohibited.

### ii. Self-Incrimination

**Comments Received**

The Fifth Amendment provides a right against self-incrimination, which **\*2673** permits an individual to refuse to disclose information that could be used against such individual in a criminal prosecution. One commenter argued that a criminal who desired to obtain an NFA weapon would not go through the appropriate routes of submitting to ATF the required forms, paying the associated tax, and waiting for the forms to be approved. This commenter cited case law, Haynes v. United States, 390 U.S. 85 (1968), as support for the proposition that felons and other prohibited individuals are not required to register NFA weapons due to the Fifth Amendment and self-incrimination.

**Department Response**

This comment has no relevance to the rule. Haynes does not stand for the proposition that a felon is entitled to obtain an NFA weapon without undergoing a background check because to do so would violate the felon's rights under the Fifth Amendment. While individuals cannot be compelled to give incriminating information against themselves during the NFA application process, they do not have the right to opt out of the background check process. Nor do they have the right to provide false information during the process. Further, they do not have a right to an approval of their application or to possess the firearm without an approved application.

Commenters should be aware that Haynes was based on an earlier version of the NFA where transferees were required to notify ATF of their possession of firearms regardless of whether possession was legal. The pre-1968 version of the NFA was "repeatedly . . . attacked on self-incrimination grounds," United States v. Gullett, 322 F. Supp. 272, 273 (D. Colo. 1971). "In Haynes the Supreme Court ruled that a timely assertion of the privilege was a defense to a prosecution for violation of former section 5851, which forbade the possession of certain classes of firearms not registered with the Secretary of the Treasury or the Secretary's delegate. The court found that the crime created by section 5851 was not meaningfully distinguishable from the section 5841 crime of failure to register possession of certain firearms and that compliance with the registration provision would have compelled petitioner to provide evidence facilitating his prosecution for violation of either the making or transfer clauses of section 5851." Id.

In response to Haynes, Congress amended the NFA and enacted, among other provisions, 26 U.S.C. 5848, which provides that registration information may not be used, directly or indirectly, against a registrant in a criminal proceeding for an offense occurring prior to, or concurrent with, the registrant's registration. Because Congress specifically drafted the legislation to protect a registrant from criminal prosecution due to the registrant's act of registration, it follows that registration information cannot be used in a Federal or State prosecution for illegal acquisition of a registered firearm, a past crime involving the use of a registered firearm, or illegal possession of a registered firearm. 26 U.S.C. 5848(a). However, if the government obtains independent evidence of the offense, there is no immunity from prosecution. Also, section 5848 does not preclude the use of registration information in a false statements prosecution under 26 U.S.C. 5848(b). The Supreme Court approved the current statute on Fifth Amendment grounds in United States v. Freed, 401 U.S. 601, 604-07 (1971).

### d. Violates the 14th Amendment

**Comments Received**
The 14th Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Many commenters stated that CLEOs categorically or arbitrarily refuse to sign any ATF forms, even though the NFA firearm is completely legal in their jurisdiction. Further, according to other commenters some CLEOs impose additional burdensome and arbitrary conditions not consistent with the law, or even common sense, to obtain their signature. A few commenters believed that, as written, the proposed rule allows CLEOs to exercise an "administrative veto" in a selective and arbitrary, and not uniform, manner across the United States, thereby violating the 14th Amendment's Equal Protection Clause, as well as the Due Process Clause.

**Department Response**
As previously stated, the final rule will not require CLEO certification or approval, but will instead require CLEO notification. This change moots the concerns—whether valid or not—that a CLEO's refusal to grant an individual a certification would violate the 14th Amendment.

### e. Federalism Concerns

**Comments Received**
A few commenters argued that the proposed rule unnecessarily interferes with State law in several ways, including by: (1) Undermining State law by granting CLEOs de facto arbitrary power to establish policies directly contrary to State law; (2) intruding on State law governing corporations, trusts, and LLCs by defining "responsible persons" of such entities; (3) undermining State laws limiting disclosure of information regarding ownership of firearms by mandating that an applicant share such information with a CLEO to obtain CLEO certification; and (4) imposing an unfunded mandate on CLEOs by expanding the CLEO certification requirement.

**Department Response**
Given that the final rule will not require CLEO certification but rather only CLEO notification, the Department believes that any Federalism concerns raised by this rule are moot.

Moreover, this rule defines "responsible person" for purposes of NFA registration, and for no other purpose. Nor does this rule purport to impose any dissemination obligations or restrictions upon CLEOs with respect to the notifications they receive. Accordingly, this rule does not infringe upon legitimate State prerogatives in those areas.

### f. Exceeding Statutory Purpose Concerns

**Comments Received**

A few commenters asserted that the original purpose of the NFA was to use the tax code solely to provide a basis for prosecuting "gangsters" who possessed untaxed, unregistered firearms, and not to prohibit NFA firearms, or eliminate the ability to transfer them to law-abiding citizens who paid the tax and followed the registration procedures. One of these commenters further asserted that by passing the Firearm Owners' Protection Act (FOPA), Public Law 99-308, 110 Stat. 449 (1986), Congress made clear that "ATF's regulations and enforcement activities of legal owners of firearms—like those who seek to register firearms under the NFA—had already gone too far." Specifically, this commenter quoted section 1(b) of FOPA, as prohibiting the Department from placing "undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" when implementing the GCA. These commenters asserted that the proposed rule exceeds the statutory purpose as it is not a provision to ensure the payment of NFA tax, and it imposes additional undue and unnecessary burdens on law-abiding citizens.

**\*2674** Another commenter, citing the Supreme Court's decision in Mistretta v. United States, 488 U.S. 361 (1989), asserted that the proposed rule represented an "aggrandizement of executive power" and a violation of the separation of powers doctrine because it would function as an amendment to existing legislation.

Another commenter stated that ATF lacked statutory authority to promulgate a regulation creating a new class of persons (i.e., responsible persons)—and to require that a transferee provide additional information (i.e., for the purposes of background checks) to be submitted by principal, agents, or employees of the transferee. This commenter maintained that Congress is familiar with the term "responsible person" and cited two statutory sections where the term was used (i.e., 18 U.S.C. 841, where "responsible person" means "an individual who has the power to direct the management and policies of the applicant pertaining to explosive materials," and 21 U.S.C. 379aa, which refers to the "responsible person" as "the manufacturer, packer, or distributor whose name . . . appears on the label of a nonprescription drug marketed in the United States."). This commenter maintained that Congress has debated, on numerous occasions, background checks for firearms and has chosen, "through its act of omission," not to create a responsible person definition for the NFA or firearms. This commenter argued that the proposed rule was an "end run" around Congress.

**Department Response**

The Department does not agree with comments that this rulemaking exceeds its authority to issue regulations for administration of the NFA. Congress granted the Attorney General [FN4] express authority to establish, by regulation, the procedures to be used for the transfer of NFA weapons, including the manner in which transferees and transferors are identified on NFA application forms. See 26 U.S.C. 5812(a). The Attorney General has, in turn, delegated that authority to ATF. See 28 CFR 0.130(a) (delegation of authority to ATF to administer laws related to firearms under 18 U.S.C. chapters 44 and 53). This rulemaking is being undertaken by ATF under its authority delegated by Congress and the Attorney General. See 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A)(i), 7805(a); 28 CFR 0.130(a).

To the extent commenters assert that the proposed rule is inconsistent with the purpose underlying the NFA, the Department respectfully disagrees. The history of the NFA makes clear that Congress intended to use its tax authority to ensure the transfer of certain firearms was subject to a transfer tax and registration requirement to help prevent violent criminals from obtaining those firearms.

During the Great Depression, the Nation faced the difficulty of controlling violence by gangsters. Representative Robert L. Doughton noted that "for some time this country has been at the mercy of the gangsters, racketeers, and professional criminals." 78 Cong. Rec. 11,400 (1934). The Attorney General, Homer Cummings, warned Congress that "there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined." Nat'l Firearms Act Hearings on H.R. 9066 Committee on Ways and Means, 73d Cong. 4 (1934). In reviewing the legislative history, modern courts have noted, for example, that "the emergence of organized crime

as a major national problem led to the enactment of the National Firearms Act of 1934." Lomont, 285 F.3d at 11. In 1934, Congress passed the NFA requiring everyone, including criminals, to register NFA firearms or face prosecution for failing to do so. In this way, Congress intended to keep criminals from obtaining NFA firearms or, if they obtained these firearms, to provide a powerful tool with which to prosecute them. When questioned about the impact of the tax and registration requirements on law-abiding citizens, the Attorney General testified that the requirement is "not an irrational request to make of the honest citizen who wants the criminal class stamped out." Nat'l Firearms Act Hearings on H.R. 9066 Committee on Ways and Means, 73d Cong. 25 (1934).

The proposed rule's definition of "responsible person," and its requirement that such persons undergo a background check prior to making or receiving an NFA firearm, are fully consistent with this legislative history and with the intended purpose of the NFA. The proposed rule serves Congress's intent in passing the NFA because it further denies criminals the ability to obtain NFA firearms. The proposed rule does not meaningfully limit the availability of firearms to the law-abiding public.

A similar response applies to the comments asserting that the proposed rule's requirement that responsible persons undergo a background check is inconsistent with Congressional intent underlying FOPA. The Department is certainly aware that, in passing FOPA, Congress expressed that it was not its intent to place undue or unnecessary restrictions or burdens on law abiding citizens with respect to the lawful private possession of firearms for lawful purposes. FOPA, Public Law 99-308, 100 Stat 449 (1986). However, this expression of intent was set out in a section of FOPA amending the GCA, not the NFA. In the context of the dangerous class of weapons regulated by the NFA, the Department's assessment is that the background check requirement is within its statutory authority, and the regulatory burden is proportionate and appropriate.

In any event, the rule in no way places undue or unnecessary Federal restrictions or burdens on law abiding citizens, but rather imposes regulations reasonably designed to fulfill the purposes of the NFA. The proposed rule is crafted to ensure consistent application of the law and effectuate Congress's preference that criminal background checks be conducted on unlicensed persons to whom firearms are transferred, including those who exert control over NFA firearms on behalf of trusts and legal entities. By defining many individuals affiliated with trust and legal entities who exert control over NFA firearms as "responsible persons" and requiring them to undergo background checks, the proposed rule helps achieve the Congressional objective of preventing the transfer of firearms to those who are prohibited or otherwise ineligible to possess or receive them.

### g. Miscellaneous
One commenter challenged the adequacy of the industry impact disclosures in the proposed rule, asserting they were inaccurate and incomplete. Another commenter generally asserted that the proposed rule violated the constitutional rights of corporations.

### Department Response
The Department has undertaken its best efforts to accurately calculate the rule's benefits and costs. The Department believes the financial impact information contained in the NPRM refutes the commenter's challenge to the adequacy of the financial impact disclosures. The Department fully and accurately assessed the financial impact of the cost **\*2675** of this rulemaking on all interested parties, including various segments of the firearms industry; businesses that depend on the firearms industry; firearm purchasers; State and local police; trust attorneys, and its own resource costs in administering the proposed rule. The information set forth in the NPRM with respect to financial impact meets or exceeds the thresholds required for the proposed rule to become a final rule.

The NPRM included the required statutory and executive order review, which fully addressed the financial impact of the proposed rule. These reviews concluded that the annual effect of the proposed rule on the economy will not exceed $100 million and that the proposed rule would not adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. Accordingly, the proposed rule did not reach the threshold of an economically significant rulemaking under Executive Order 12866.

Moreover, because the statutory and executive order reviews in the NPRM included the costs of CLEO certification in their assessments, the cost estimates included in each of those reviews significantly overstate the cost that will be associated with the final rule. As noted, the final rule has eliminated the CLEO certification requirement and replaced that requirement with a

less burdensome notice requirement. Thousands of commenters agreed that CLEO certification was the most expensive and cumbersome aspect of the proposed rule, and asserted that the elimination of the CLEO certification provision would result in substantial cost savings to the public and law enforcement. Examples of savings suggested in the comments included: (1) would-be applicants intended to create trust entities solely for the purpose of avoiding the CLEO certification process will now save the cost of that trust creation; (2) applicants who opt not to create a trust or cannot afford a trust will no longer have to expend time and resources obtaining CLEO certification; and (3) State and local law enforcement will not be required to expend the time and resources needed to complete certifications.

The Department does not agree that requiring responsible persons of trusts and legal entities to provide identification information and submit to a background check violates the constitutional rights of those entities. Background checks are lawful as applied to individuals, and the Department believes they are similarly lawful when applied to the responsible persons behind corporate entities. In fact, responsible persons of FFLs are subject to a background check, as are responsible persons of corporate entities that wish to obtain explosives permits or licenses. There is no reason to believe that because NFA weapons are involved, that same approach violates the Constitution in this context.

### 4. Consequences of Implementing Rule

**Comments Received**
Many commenters stated that the CLEO certification requirement makes the proposed rule "unworkable" and demonstrates the need to eliminate this requirement for individuals as well. A few other commenters foresaw the proposed rule exposing ATF to potential lawsuits filed by law-abiding citizens who could not obtain NFA weapons because some CLEOs refuse to certify NFA applications, and protested that the proposed rule would eliminate the option of obtaining NFA items without a CLEO certification through a trust. See section IV.C.4.c, on general applicability, for additional information. Others added that that the certification requirement was an unworkable burden on both NFA applicants and State law enforcement agencies and that nothing in the proposed rule suggests that ATF has any intention to expand the size or funding of the NFA Branch to handle the increased workload as the number of individuals and Forms to check would drastically expand.

Several commenters stated generally that the proposed rule would cause "unintended consequences" and have "negative repercussions." Many commenters stated that the proposed rule has the potential to dramatically increase the processing times and further burden what they regard as ATF's already overwhelmed NFA Branch, which they assert presently takes 8 to 10 months—with some commenters stating even longer times, (e.g., 6-15 months)—to process an application. One commenter stated that the NFA Branch would come to rely more on CLEO signoffs and would fail to thoroughly vet transferees as it would struggle to maintain an acceptable rate of transfer approvals. The commenter asserted that the CLEO process in its current form is marred by corruption (e.g., bribery; cronyism) in many jurisdictions, and feared that a prohibited person could exploit the corruption created by the expanded CLEO requirement to obtain and misuse a NFA firearm, as the ATF would be forced to rely upon the CLEO certification to keep pace with review of the number of forms submitted. A few commenters stated that the proposed rule would impact trustees' abilities to manage trusts with the proposed requirement for new responsible persons to submit a Form 5320.23 as well as obtain a CLEO sign-off within 30 days of the new responsible person's appointment. Another commenter alluded to potential State actions whereby States may enact legislation and put in place systems to obtain and sell or transfer machineguns to their citizens—nullifying ATF's authority—since individual gun rights have been afforded greater respect in a number of States after Heller, 554 U.S. 570. The commenter stated that, under 18 U.S.C. 922(o), a State has a clear congressionally-granted power to transfer machineguns to any individual if authorized by State law. Still other commenters stated that the proposed rule would have negative economic effects, including damage to the suppressor [FN5] industry and related small businesses, increased costs to local law enforcement agencies, and potential loss in tax revenue and funding to ATF. See section IV.E.1.g.i for full discussion of lost tax revenue.

Several commenters expressed concern that the proposed rule would impact an applicant's ability to file applications electronically.

**Department Response**
As previously stated, in response to the concerns expressed by commenters, the final rule will no longer include a CLEO certification provision; instead, the final rule will include a CLEO notification provision that will require applicants simply to notify the CLEO in writing of the application in accordance with the language of the final regulation. Thus, the many

concerns expressed by commenters regarding the CLEO certification are moot. The Department also believes that with the shift to CLEO notification, there will be cost and time-saving benefits for all applicants.

Likewise, concerns about the Department's reliance on CLEO certification to complete background checks on NFA applicants are moot. The Department will continue to conduct background checks in accordance with established procedures.

**\*2676** The Department believes it has considered all reasonably foreseeable consequences and possible repercussions arising from the rule. As with most meaningful changes to regulations or laws, the new rule may cause some operational or procedural changes, and may alter the workload and costs for industry members and Government workers. The Department acknowledges that this final rule may increase the time required to process applications received from trusts and legal entities, as well as for individuals, as an increased number of applications undergo more complete checks. The Department estimates that this final rule initially will increase processing times of these applications from the current four months processing time to six to eight months for processing. The Department anticipates that this time will be reduced once the NFA Branch adjusts to the new process. In addition, ATF will work to increase its resources and staffing to process the applications. Of course, continued increases in the number of applications submitted may correspondingly continue to place pressure on processing times. The Department has done its best to consider all possible consequences arising out of the final rule and has considered, among other things, the increased operational cost for the Government and industry members; the increased cost associated with additional fingerprint cards and photographs for responsible persons; and the increased labor cost associated with the time it takes for applicants and industry members to complete the required forms. Having considered all of the reasonably foreseeable costs and benefits, the Department has determined that the benefits of ensuring NFA weapons are less easily obtained by persons prohibited from possessing them outweigh the cost of implementing the rule.

In response to commenters who believe that this rulemaking may "goad" States into passing firearm laws that attempt to "nullify ATF's authority" in this area, the Department has two responses. First, the Department does not believe that State efforts to interfere with the rule's effectiveness lessen the need for it. The Department believes that the rule will help to fulfill the purposes of the NFA and help to ensure public safety even if State efforts might make it somewhat less effective than it would otherwise be.

Second, the Department believes that, to be valid, State firearms laws must be consistent with Federal law. The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Since McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427 (1819), it has been settled that State law that conflicts with Federal law is "without effect." Maryland v. Louisiana, 451 U.S. 725, 746 (1981). When determining if such a conflict exists, the "purpose of Congress" is the ultimate touchstone. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992). The purpose of the NFA is to enhance public safety and ensure that prohibited persons do not obtain firearms. State laws that conflict with the NFA's purpose may therefore be preempted.

### 5. General Alternatives to Rule
Many commenters stated the proposed rule failed to consider more cost effective and practical alternatives that would enhance public safety and enable ATF to better meet administrative obligations under the NFA, and suggested other mechanisms that ATF should consider. The majority of commenters suggested that ATF eliminate the CLEO certification requirement for all NFA transactions, for reasons discussed in section IV.C.1. Many commenters also proposed general alternatives. These proposed alternatives included eliminating the NFA altogether; removing some categories of items subject to NFA regulation (such as silencers); varying the regulatory requirements depending on the nature of the NFA item; amending NFA transaction forms to more strongly emphasize criminal liability for possession by a prohibited person; developing and improving enforcement efforts; and improving the administrative process.

### a. Eliminate the NFA Altogether

**Comments Received**
Several commenters suggested that the NFA transfer procedures be repealed. Some of these commenters suggested replacing NFA transfer procedures with the issuance of "NFA cards," that would allow the card-holder to purchase any NFA weapon. One of these commenters recommended that card applicants be required to undergo background checks and submit

fingerprints and photographs.

Several commenters, including FFLs, who urged repeal of the NFA, suggested that transfer of NFA firearms should be handled in the same manner as GCA transfers, with either the $200 tax and registration requirements being abolished or having the tax collected at the point of sale by the FFL. One of these commenters asserted that a simple and effective background check by the FBI's National Crime Information Center would serve the same function as the current NFA procedure at greatly reduced cost. Another commenter characterized NFA regulations as "archaic" and argued that they should be repealed and changed in light of "advances in technology and linked NICS databases." Another commenter urged that ATF abolish the requirements for fingerprints, photographs, and CLEO certification for all NFA transfers and add a requirement that the NFA Branch process and return all new applications in no more than 10 business days from date of receipt.

**Department Response**
The Department does not have the authority to repeal the NFA or any of its provisions; the NFA is a statute that only Congress may repeal or alter. Only Congress can remove a weapon from the purview of the NFA, or alter, increase or decrease, the making or transfer tax on a NFA weapon. ATF does not have the authority to change any of the requirements mandated in the statute. The NFA provides very limited authority to permit exemptions from the transfer tax, and commenters' requested exemptions do not fall within that authority.

Specifically, the NFA provision governing the making of an NFA firearm, 26 U.S.C. 5822, requires that a person who seeks to make an NFA firearm (a) apply to make and register "the firearm," (b) pay applicable taxes on such firearm, (c) identify the firearm to be made, (d) identify himself, and if an individual, "include his fingerprints and his photograph" and (e) obtain "approval of the Secretary to make and register the firearm." 26 U.S.C. 5822. The statutory provision governing the transfer of NFA weapons, 26 U.S.C. 5812(a), is substantively similar to section 5822, requiring (a) an application for the specific firearm, (b) the payment of relevant taxes, (c) identification of the firearm, (d) identification of the applicant (with fingerprints and a photograph required for individuals), and (e) approval of the transfer of the firearm. The Department therefore cannot abolish the fingerprint and photograph identification requirements, nor issue blanket permits to individuals to make or transfer NFA firearms.

To the extent commenters would like the Department to change how it conducts its background checks, or not require fingerprints and photographs for applicants that are not individuals, the **\*2677** Department believes that its current procedures for background checks are the best means of ensuring that prohibited individuals do not obtain NFA firearms, and that it would be administratively burdensome and encourage circumvention to create different application requirements for individuals, on the one hand, and trusts and legal entities on the other.

**b. Remove Certain Categories of Items Subject to NFA Regulation or Subject Them to Minimal Regulation Within the NFA Framework**
Many commenters suggested that certain categories of NFA-regulated items should be removed. A few commenters stated that silencers, short-barreled rifles, short-barreled shotguns, and weapons falling within the NFA's "any other weapon" (AOW) definition should be regulated in the same manner as non-NFA firearms—requiring only a NICS background check when transferred from an FFL. Another commenter suggested that there be a more nuanced approach to regulating NFA items—not a one-size-fits-all approach—and that some could have fewer regulatory requirements than others. The suggestions for treatment of the particular categories are separately addressed.

**i. SBRs, SBSs, and AOWs**

**Comments Received**
Many commenters argued that SBRs and SBSs are functionally no different than handguns. The same commenters noted that a criminal could easily make an SBR or SBS by cutting down a long gun, and stated that SBRs and SBSs should be treated the same as handguns. Several commenters argued that SBRs and SBSs are less accurate than handguns. These commenters asked how SBRs and SBSs are more deadly or more dangerous than AR-15-style pistols and other handguns that are more readily concealable.

A few commenters stated that ATF should deregulate SBRs and SBSs and remove them from the NFA. These commenters suggested that ATF allow FFLs to sell SBRs and SBSs in over-the-counter transactions, in the same manner as GCA long guns (rifles and shotguns). A few commenters stated that there is no reason to regulate SBRs and SBSs when these items are not normally used in crimes. A few other commenters stated that continuing to regulate these items will have no impact on crime.

Many commenters also believed that AOWs do not warrant NFA classification, and should also be handled under GCA transfer standards. These commenters noted that AOWs generally pique the interest of collectors—not criminals—and are therefore owned by law-abiding citizens for lawful purposes. Another commenter suggested that ATF increase taxes on machineguns, and remove SBRs and SBSs from NFA regulations. Another commenter suggested that ATF direct its investigative energies toward AOW and machinegun applications, and apply lesser treatment for SBRs and silencers (i.e., NICS check only). Other comments pertaining to silencers are addressed in section IV.B.5.b.ii, below.

**Department Response**

As noted, only Congress can bring a weapon under the purview of the NFA, and only Congress can repeal or remove a weapon from the purview of the NFA. All of the weapons referenced in these comments (SBSs, SBRs, silencers, AOWs, and machineguns) have been designated NFA weapons since the statute was enacted in 1934. With the exception of the reduced transfer tax on AOWs, no statutory provision in the NFA specifically provides for differing treatment of NFA firearms. While ATF has the authority to remove some firearms from the purview of the NFA due to certain factors that make them primarily a collector's item and not likely to be used as a weapon, ATF does not have the authority to change the definition of "firearm" under 26 U.S.C. 5845(a). To the extent that commenters would like the agency to take a more flexible approach to regulating NFA firearms, for example, by reducing or eliminating background checks, the Department takes the position that uniform measures best fulfill the NFA's statutory purposes and benefit public safety.

**ii. Silencers**

**Comments Received**

The Department received a number of comments concerning silencers (commonly known as "suppressors," see supra note 5). Many commenters pointed out that silencers do not measurably contribute to gun violence and are important and popular safety devices within the hunting and shooting sports communities to protect from hearing loss and reduce noise pollution, and may also be used for home protection. A few commenters stated that multiple studies have clearly shown that earmuffs, even when used together with earplugs, do not adequately protect against hearing loss when firing most calibers of weapons. A few commenters pointed out that silencers do not make a gun silent, and provided information showing the silencers' goal is simply to reduce the sound to a certain decibel level to avoid hearing damage. One commenter provided in-depth research and data on noise-reducing benefits and superiority of silencers to ear-level devices. This commenter asserted that the proposed rule represents a step backward in protecting against hearing loss. Many commenters stated that several other countries with much stricter gun regulation than the United States (e.g., United Kingdom, Finland) sell silencers without restriction and directly "off the shelf." Another commenter stated that many countries encourage the use of silencers to keep noise down and improve hearing safety. Many commenters observed that silencers are legal in several States (e.g., North Carolina, Washington, Texas). Many commenters advocated that silencers should only require a NICS check. Another commenter suggested that if ATF retains the CLEO certification requirement, silencers be exempted from such a requirement. Another commenter suggested that ATF reduce the tax stamp cost for silencers to $5.00 or to remove silencers from the NFA altogether. Another commenter stated that silencers should not need a tax stamp in States that permit silencers.

**Department Response**

The NFA defines silencers as firearms. 26 U.S.C. 5845(a)(7). The NFA defines the word "silencer" by reference to section 921 of title 18, see id., which defines the terms "firearm silencer" and "firearm muffler" to mean "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. 921(a)(24). Thus it is the NFA statute, and not the Department, that defines silencers (or "suppressors") as firearms for purposes of the NFA. And because silencers are "firearms" for purposes of the NFA, they are

Machineguns, Destructive Devices and Certain Other Firearms;..., 81 FR 2658-01

subject to the restrictions on making and transferring firearms in the NFA. See 26 U.S.C. 5812(a), 5822.

As noted, only Congress can remove a class of weapons from the purview of the NFA. ATF does not have the authority to remove silencers from the NFA and does not believe it would be prudent to make different types of firearms subject to different background check requirements. The NFA provides very limited authority to permit exemptions from the transfer tax, and **\*2678** commenters' requested exemptions do not fall within that authority. ATF also lacks the authority to reduce tax stamp costs associated with NFA firearms, as those costs are fixed by statute. Finally, given that the Department is not requiring CLEO certification for any items covered by the NFA, the comments relating to removing the CLEO certification requirement for silencers are moot.

### c. Ways for ATF To Stress Criminal Liability for Possession by a Prohibited Person

**Comments Received**
A commenter suggested that ATF amend all forms associated with NFA transactions to add warnings indicating that any individual or any member of a legal entity that permits a prohibited person access to any NFA item has committed a criminal act. The added language should also state that for a legal entity, the criminal responsibility for permitting such access rests with the legal entity and all of its individual members. The commenter further asserted that legal entities are not widely used by prohibited persons to acquire or possess NFA items because the NFA forms submitted to ATF identify all members of the legal entity involved in the transfer, and a prohibited person would likely fear being identified from the form and prosecuted. The commenter asserted that no evidence exists that ATF actually uses these names to identify, investigate, and prosecute criminal acts, and he suggested that ATF should do more to develop efforts to identify, investigate, and prosecute possession of NFA items by prohibited persons. If ATF were to institute such efforts, ATF could establish an information baseline to show the extent of any illegal practices, which could support any necessary regulatory or legislative changes.

**Department Response**
The Department believes that current NFA transfer forms (ATF Forms 1, 4, and 5) adequately convey information about the penalties for unlawful possession of an NFA weapon. With respect to the assertion that legal entities are not widely used by prohibited persons to circumvent background checks, the absence of background checks for transfers involving trusts or legal entities renders it extremely difficult to assess how often prohibited persons have obtained NFA firearms through such transfers. Finally, ATF enforces the criminal laws within its jurisdiction, and if it becomes aware of any firearm—including NFA firearms—in the possession of persons prohibited from having it, it will take appropriate actions.

### d. Miscellaneous General Comments

**Comments Received**
A few commenters requested that ATF reopen the NFRTR to permit the legal ownership of machineguns manufactured after 1986 (post-1986 machineguns). A few other commenters suggested revising the requirements by simply eliminating the "cut off" date in the NFA to allow for newly manufactured NFA weapons (e.g., machineguns, automatic rifles) as the current stock is very limited, and to replace worn and unsafe weapons with new guns when "old weapons become nothing more than high-priced collector items." A commenter stated that this change would reduce the purchase price due to increased market availability and would increase tax revenue. This same commenter supported a higher cost tax stamp for the post-1986 machineguns, and for these guns to continue to be heavily regulated. Another commenter stated that having new firearms available would greatly increase the income of both government and private firearms manufacturers, which benefits local governments through sales tax.

A commenter stated that ATF needs to rewrite the proposed rule to comply with the Plain Language Act of 2010. Another commenter suggested that, prior to drafting regulations, ATF should start a dialogue to enable "sound and rational" regulations to promote safety without the "animosity and conflict" that has divided the country on so many issues. Another commenter expressed his willingness to work with ATF to conduct geographic information system research to help devise a common sense approach to crime reduction. One commenter suggested that ATF delay the final rule's effective date to allow ATF to process its backlog of NFA applications.

A few commenters asked general questions and for additional information about other terms used in the proposed rule. For example, a commenter requested that ATF define the term "make" and asked if the proposed rule applied to all firearms or only to fully automatic weapons. Another commenter stated that the term "certain other firearms" was so vague that most semi-auto cartridge firing mechanisms would be considered illegal. Another commenter asked about a "destructive device." This commenter asked what "constitutes" a destructive device, and for guidance to ensure that this term is not open-ended.

**Department Response**

ATF does not have the authority to remove the general prohibition on the transfer and possession of machineguns that were not lawfully possessed on May 19, 1986. This is a statutory prohibition and therefore only Congress has the authority to remove this prohibition. 18 U.S.C. 922(o). Further, the statute requires that any machinegun be lawfully possessed by May 19, 1986. ATF does not have the authority to permit nongovernmental entities the ability to possess machineguns or other NFA firearms that are not lawfully registered in the NFRTR.

With respect to commenters who believe that the Department should engage in additional dialogue or gather more data before issuing this rule, the Department disagrees. The Department has complied with the notice and comment procedures in the Administrative Procedure Act, other requirements imposed by statute, and relevant procedures required by the President for the promulgation of rules. The Department invited public comment to improve and refine the proposed rule and it has used public comments to do so. But the Department is not persuaded that further delay in promulgating the rule is likely to improve it or is otherwise in the public interest.

The Department does not agree with the comment asserting that the final rule's effective date should be delayed until the backlog of NFA applications has been cleared. ATF's capacity to process NFA applications during a given timeframe is limited by resource constraints; absent a dramatic reduction in the number of applications ATF receives, it will likely continue to have some number of applications that await processing (i.e., a "backlog"). That said, ATF has substantially reduced the backlog of pending applications over the course of the past year.

The terms in the proposed rule about which the commenters sought clarification, such as "make" and "destructive device," are defined by the NFA and in its supporting regulations. The definitions may be found in 26 U.S.C. 5845 and 27 CFR 479.11.

*2679 *C. Comments Addressing Specific Portions of the Rule*

**1. CLEO Certification**

**a. CLEO Certification Is Unnecessary and Unreasonable**

**Comments Received**

Several commenters stated that ATF's access to NICS and other databases provides a more accurate background check than a CLEO certification. These commenters stated the CLEO signoff is "worthless," as the CLEO's signing or refusing to sign is in most cases based on the CLEO's personal political preferences; the CLEO signature has potential for abuse with the signature given for political support or other compensation; and that even on the limited occasions CLEOs perform background checks, they use NICS or the State equivalent for this type of check. Many commenters, noting that the CLEO certification requirement predated NICS, asserted that the CLEO certification no longer serves its original purpose. One commenter described the certification as "antiquated and a gross waste of resources." Another described it as "outdated, redundant, and superfluous," and urged ATF to eliminate it under the guidance provided in Executive Order 13610 of May 10, 2012, "Identifying and Reducing Regulatory Burdens."

Several other commenters noted that ATF acknowledged in the proposed rule that even without CLEO certification, ATF already has a "fuller picture of any individual than was possible in 1934." Many commenters also generally noted that technological and societal changes have made it less likely that a CLEO is the best source for information indicating an individual may be prohibited from firearm possession. One commenter observed that many applicants never previously interacted with their local CLEOs, and, consequently, CLEOs do not serve the function they once did to assess the character or potential of an individual to misuse an NFA item. Many commenters agreed with this assessment as they personally never

had any interactions with their local CLEOs.

Many commenters asserted that the sign-off creates an insurmountable challenge and an unreasonable burden on applicants and CLEOs. Hundreds of commenters agreed that the consequence of retaining CLEO certifications for individuals and extending this requirement to responsible persons associated with legal entities would result in a de facto ban of NFA firearms, because they report that some CLEOs will not provide the necessary certification.

Several commenters raised privacy concerns with the CLEO certification requirement, and asserted it should be completely eliminated in the interest of protecting personal tax information. These commenters considered the $5 or $200 tax paid to manufacture or transfer a NFA firearm or device to be "protected" or "confidential" tax information, and stated that the mere application before paying the tax should not be reported to or involve any local CLEO or other government official. Another commenter questioned why his private tax information must be subject to law enforcement inspection and approval. This commenter worried that his personal, nonpublic information might become public record if the local law enforcement agency received a Freedom of Information Act request. The commenter stated that ATF has a "well structured system for protecting [his] applications;" however, he did not know of any Federal or State guidelines applicable to local law enforcement protecting his personal tax information. A few other commenters also raised concerns with some CLEOs retaining copies of the forms they sign. These commenters stated that they cannot object to such retention or they would never receive signoff from the CLEOs. A few commenters believed that sharing Federal tax information involuntarily with local agencies was against the law. Another commenter expressed concern that his personal privacy was also invaded by permitting local government officials to know what firearms are in his home.

In addition, several commenters asked general questions about why CLEO certification was needed at all or why CLEO certifications are not required on all firearm transfers. Another commenter noted that there is no CLEO certification requirement for SOT-licensed manufacturers of NFA items to obtain their licenses, and such manufacturers merely need to send an "intent letter" informing local police agencies of their intent to manufacture NFA items in their local areas. This commenter asked how ATF determines SOT manufacturers are "trusted" persons with no CLEO certification. Further, this commenter opined that manufacturers of NFA items "pose greater risk" and should have "considerably more scrutiny" than an individual or legal entity desiring to possess a few items.

**Department Response**
The Department acknowledges that some trusts and legal entities would be unable to obtain a CLEO certification, for reasons other than a responsible person being prohibited or local ordinances prohibiting such firearms, which would result in those trusts and legal entities being unable to obtain an NFA firearm. As the proposed rule was not intended to deny those trusts and legal entities the opportunity to acquire such firearms where permitted by law, the Department has changed the CLEO certification to a CLEO notification. Additionally, the Department believes that with the shift to CLEO notification, there will be cost and time-saving benefits for all applicants, including those who find the current CLEO certification process daunting.

The Department disagrees with the concern that providing the application to make or transfer NFA items to local law enforcement as part of CLEO notification is an unlawful release of tax information. Since the application has not been received by ATF at the time of CLEO notification, it does not constitute "return information." See Lomont, 285 F.3d at 15. Additionally, while it is unlawful for employees of the Federal Government to release an individual's tax information, see 26 U.S.C. 6103(a), in this instance it is the individual that shares the information. Therefore, even if such information were "return information," no employee of the Federal Government would be disclosing it. Lomont, 285 F.3d at 15.

The Department does not agree with commenters that ATF does not have the authority to formulate regulations enforcing the provisions of the NFA. Congress expressly delegated authority to the Attorney General in section 5812 and 5822, among other sections. Congress provided the Attorney General with the authority to require certain identification procedures for transferors and transferees. See 26 U.S.C. 5812(a) (providing, inter alia, that "[a] firearm shall not be transferred unless . . . the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph . . . ." (emphasis added)); 26 U.S.C. 5822 (same with respect to making firearms). These sections require fingerprints and photographs for individuals at a minimum, but the information that the Attorney General can seek is not limited to these things. Finally, the Attorney General has delegated the authority to the Director of ATF to investigate, administer, and enforce the Federal firearms laws. See 28 CFR 0.130.

**\*2680** Finally, the Department has the authority to require CLEO notification for the same reason that it has the authority to require CLEO certification. Sections 5812 and 5822 give the Department broad authority to promulgate regulations governing application forms, including regulations pertaining to the identification of a firearm and its maker or, in the case of a transfer, its transferee and transferor. See 26 U.S.C. 5812(a), 5822. Both sections provide that applications "shall be denied" if the transfer, receipt, making, or possession of the firearm would place the transferee or person making the firearm in violation of law. See id. Neither, however, "restricts the Secretary's broad power to grant or deny applications in any other respect." Lomont, 285 F.3d at 17. The notification requirement thus falls within the Department's authority to request information from individuals who seek to make or transfer NFA firearms that helps it to fulfill its statutory mandate to prevent prohibited individuals from obtaining NFA firearms.

### b. Authority To Require CLEO Certification

**Comments Received**

Many commenters stated that the proposed extension of the CLEO certification requirement exceeds ATF's statutory authority. A few commenters noted that ATF cites to 26 U.S.C. 5812 and 5822 of the NFA as the statutory authority for the proposed rule, but disputed that these statutory provisions provided ATF with authority to impose a CLEO certification requirement on individuals, much less a responsible person of a legal entity. These commenters argued that section 5812 authorizes ATF to prescribe the form of NFA applications with the limited purpose of identifying the transferor, transferee and firearm, and that seeking opinions from local CLEOs goes beyond establishing the actual identity of the applicant.

One commenter asserted that the Attorney General cannot delegate the duties of the office to a CLEO—a non-Federal agency—as a CLEO's arbitrary or capricious actions, or failure to act, are not subject to review under the Administrative Procedure Act (5 U.S.C. 551-559). Other commenters stated that ATF cannot delegate this authority arbitrarily to itself or to a third party without authorization from Congress and that requiring CLEO certification gives "absolute and unchecked discretion" to local CLEOs. Another commenter stated that no provision in the NFA provides ATF the authority to refuse to issue a "stamped application form" when the applicant can be identified by a method other than CLEO certification. This commenter stated that section 5812(a)(3) only requires that an individual be identified by fingerprints and photographs, not by CLEO certification. All these commenters contended that the local CLEO certification should be eliminated not expanded.

**Department Response**

Although the Department does not agree with the assertions that ATF lacks statutory authority to require CLEO certifications, for other reasons described herein at section IV.C.1.a-d, the Department has removed the CLEO certification requirement from the final rule. Since removal of the CLEO certification requirement is the ultimate result advocated by these commenters, in-depth discussion of their assertions is not necessary to the final rule.

In addressing the comments, it must be noted that Congress provided the Attorney General with the authority to require certain identification procedures for transferors and transferees. See 26 U.S.C. 5812(a). These sections require fingerprints and photographs for individuals at a minimum, but the information that the Attorney General can seek is not limited to these things. CLEO certification and CLEO notification are also identification procedures authorized by section 5812(a).

Under the proposed regulation, ATF would not have delegated the application process to the CLEO. ATF merely proposed to extend to the responsible persons of trusts and legal entities the CLEO certification requirement, which was the same process that had been in place for many years with individuals. A certification was just one step involved in the process of determining if an application could be approved. These issues are moot, however, as ATF will adopt a CLEO notification process instead.

### c. CLEO Issues With Certifying

**Comments Received**

Numerous commenters, including trade associations and individuals, discussed the reasons some CLEOs refused to approve NFA applications. These commenters disputed ATF's statement in the proposed rule that liability concerns are a primary

reason some CLEOs refuse to approve NFA applications. A commenter stated that ATF was wrong to rely on this "false premise," and requested that ATF perform a "systematic study and survey of CLEOs to develop a solution to the actual problem at hand rather than disrupt established procedures for entities developed over the past 80 years." Many commenters stated that CLEOs often refuse to sign based on personal or political concerns, not civil liability concerns. Some of the stated political reasons include that the transferee did not donate to their political campaigns; general political liability—as opposed to civil liability— concerns; and the CLEO's personal disagreement with the policy choices of the CLEO's States and Congress to permit private ownership of NFA firearms. Another commenter stated that there are jurisdictions where CLEOs collectively refuse to sign, exercising their "personal fiat." Many commenters related personal experiences purporting to show that CLEOs in certain regions and jurisdictions refuse to sign due to political party affiliation and ideological beliefs. Several commenters urged ATF to place time limits within which CLEOs would be required to act on certifications requests; if the CLEO failed to act on the certification request within the time limit, ATF would be required to proceed as if the certification had been approved. Many commenters referenced newspaper articles and other sources that provide quoted statements from local CLEOs regarding their reasons for refusal and their publicly announced policies to no longer consider applications for silencers, short-barreled shotguns, explosives, etc. Another commenter asked if ATF has proposed guidelines that CLEOs must follow to ensure no discrimination. This commenter also asked if ATF will establish a system to prosecute and reprimand CLEOs who refuse to provide certification when there are no issues preventing such certification.

NFATCA's comment noted that in the NPRM ATF had accurately cited a quote from NFATCA's 2009 petition regarding CLEO concerns over liability ("[s]ome CLEOs express a concern of perceived liability; that signing an NFA transfer application will link them to any inappropriate use of the firearm"), but asserted that this point was secondary to its primary concern that the CLEO certification requirement was unlawful. NFATCA further asserted that in focusing on liability, ATF had failed to acknowledge that many CLEOs would not sign NFA certifications for reasons other than liability, such as budgetary concerns and opposition to private ownership of NFA firearms, or firearms in general.

**\*2681** NFATCA, the American Silencer Association (ASA),[FN6] and a majority of other commenters, all advocated complete elimination of the CLEO certification requirement.

### Department Response
The Department acknowledges that there are many reasons why a CLEO may not sign an NFA application. Taking these concerns and other factors into consideration, the Department has removed the CLEO certification requirement from the final rule.

The Department notes, however, that its decision to remove the certification requirement from the final rule does not reflect agreement with assertions, such as those put forward by NFATCA in the comments, that the CLEO certification requirement is unlawful.

### d. Alternatives to CLEO Certification

### Comments Received
The majority of commenters were opposed to the expanded CLEO certification requirement, and many suggested alternatives to this requirement. The most commonly cited alternative was to completely eliminate the requirement for all NFA transfers. Many commenters suggested that instead of CLEO certification, ATF could require notification whereby the individual or the responsible person executing the form in the name of the legal entity must provide the local CLEO with a copy of Form 1, 4, or 5 submitted to ATF, and provide the CLEO a reasonable time for review. If, by the end of that time period, the CLEO has not provided ATF with information showing cause for denial, ATF should consider the application cleared at the CLEO level and proceed with the application. The commenters believed this alternative would meet the statutory requirements of sections 5812 and 5822 of the NFA without allowing CLEOs to arbitrarily deny applications. The time period that commenters considered "reasonable" varied, with suggestions for periods of 7, 15, 30, and 60 business days. A commenter noted that a similar process is already used with Form 7. Several commenters noted that NFATCA had recommended this alternative in its petition (i.e., eliminating the CLEO certification requirement and replacing it with notification to the CLEO of the pending transfer, combined with ATF conducting a NICS check of an individual and principle officers of a trust or legal entity). Several commenters noted that ATF previously indicated its intent—per published abstracts in the Unified Regulatory Agenda in 2011 and 2012—to propose notification instead of CLEO certification and eliminate such certification

altogether.[FN7] At least one of these commenters requested that ATF provide a reasoned explanation for changing course from a regulatory alternative that would be more "cost effective, serve legitimate statutory objectives, and avoid legal vulnerabilities."

A few commenters suggested ways to amend §§ 479.63 and 479.85, as well as Forms 1, 4, and 5, to provide for a notification process similar to the one the Department has chosen to adopt. One commenter provided specific language to replace the CLEO certification on Form 1. Another commenter suggested replacing the CLEO certification language on Form 4 with a certified statement—under penalty of perjury or falsification of an official government form—by the individual or the responsible person of the legal entity executing the form. This statement would indicate that such individual or responsible person has "conferred with their attorney and/or the local law enforcement officials and that the individual or the entity and each 'responsible person' in the entity are not prohibited by local or state law from owning or possessing the items being transferred to them on the form and that they are not a prohibited 'alien' who cannot own or possess the items."

Many commenters supported eliminating CLEO certification and instead requiring all members of a trust, once the application is returned "approved" from ATF, to undergo a NICS check prior to the transfer of the NFA firearm. One commenter suggested that ATF keep the NICS check requirement for the individual or responsible person completing Form 4473 to obtain the transferred item. This commenter also suggested that ATF keep the current process where only the individual or one of the responsible party(s) of a legal entity complete and sign the transfer form.

Many commenters suggested that if the objective is to prevent restricted persons from owning NFA items, a simpler solution would be to substitute fingerprinting and background checks for the CLEO certification requirement for all NFA transfers. Many other commenters concurred with eliminating CLEO certification and making NFA weapons point-of-sale items as they saw no difference between the background checks performed by ATF's NFA Branch and those performed by FFLs.

A commenter stated that the best alternative is to either keep the status quo—requiring CLEO certification for individual applicants—or eliminate the CLEO certification requirement for trusts while retaining the need for a standard "NFA-style" background check for each individual. Other commenters requested that ATF consider either no change to ATF's stance on trusts and legal entities regarding CLEO certification or remove the CLEO certification requirement for all NFA items. Other commenters urged ATF to eliminate the CLEO certification requirement for all transfers, replacing it with various forms of automated background checks. Another commenter suggested an "equitable solution" would be to have an applicant's local police department provide a "letter of good conduct," which states that "you are who you say you are and provides a list of any criminal offenses you may have had." This commenter named a local police department that issued these letters quite regularly.

Many commenters questioned the intention of CLEO certification. If the objective is to verify the applicant's identity (i.e., that the applicant is the one signing the form and is the person in the provided photograph), these commenters maintained that any Notary Public could accomplish this objective. Other commenters supported methods used by other Federal agencies to verify identification, such as local police departments, State police, or fingerprinting companies. Another commenter suggested that instead of CLEO certification, that local ATF offices take the applicants' photographs and fingerprints, perform background checks, and approve applications on the spot. This commenter suggested that the local ATF offices could additionally perform a NICS check as required by Form 4473.

Many other commenters suggested alternatives under which ATF could require individual applicants and responsible persons to provide various forms of government-issued identification with photographs to verify identity. One commenter suggested revising the application forms to include a page for individuals and all responsible persons of legal entities to attach photograph(s) showing the front and back of a currently valid State-issued identification or driver's license. Another commenter stated that ATF only needs a full name, date of birth, **\*2682** and Social Security number to perform background checks. Another commenter suggested that instead of having CLEOs verify fingerprints and photographs, there be a database containing an approved set of fingerprints and photograph of each applicant. Another commenter questioned the rationale for relying on CLEO approval for Federal law, and suggested for improving efficiency to either make the entire process Federal or have the entire process rely on "local/state" law.

Another commenter suggested that ATF reform the process to have the $200 tax either be an "excise tax" payable at the point of sale or, with the advances in technology, have the retailer print out a tax stamp at the point of sale. This would enable the

purchaser to complete a Form 4473, enable a NICS check to be performed, and enable remittance of the taxes through the retailer.

Although many commenters preferred that the CLEO certification requirement be completely eliminated, they also provided compromise positions if ATF were set on keeping and expanding the CLEO certification requirement. These commenters suggested that ATF make the CLEO certification a "shall issue" and require CLEOs to decide based on legal restrictions and obligations, and sign off on the certification, if the background check is "clean" unless there is a valid reason not to sign (e.g., criminal or mental health history).

If ATF were to maintain the certification, a few commenters suggested changing the sequence of CLEO review by requiring ATF to provide the application information to the CLEO only after conducting a review. Many commenters suggested that ATF provide for judicial review of instances where CLEOs would not sign off on the certification; others requested that the CLEO be required to state the reason for the denial and provide "real tangible evidence" and state "specific, objective and legally relevant reasons" for the non-concurrence or denial.

Several commenters suggested that Forms 1, 4, and 5 be revised to provide an area indicating that the local CLEO would not sign off on the form, and in such instances ATF could require more information or perform a more extensive background check. For example, one commenter suggested adding three signature lines on the forms: (1) First line—for the CLEO to sign and state "no disqualifying information;" (2) second line—for the CLEO to sign and state "information indicating disqualification" and for the CLEO to explain the disqualification; and (3) third line—for the applicant to certify "I certify I submitted this to this CLEO (name address) over 30 days ago and received no response."

Many commenters recommended that ATF broaden the list of officials who could provide certifications, to include local district attorneys, judges, officials in local ATF offices, or a designated official in each State, among others.

Many commenters suggested that individual applicants and responsible persons of legal entities who hold a concealed carry permit or license in the State where they reside—authorizing them to purchase, obtain, or carry weapons—should be exempt from the CLEO certification requirement, as well as the photograph and fingerprint requirements, since State and Federal background checks have already been performed and verified.

One commenter requested that ATF consider not requiring CLEO certification for active and retired law enforcement officers, active and retired military officers, including Guard and Reserve officers, and any government employee with a security clearance, as well as FFLs. Other commenters suggested that the CLEO certification requirement be removed for silencer ownership. Another commenter recommended requiring CLEOs to sign off on forms in States where SBRs, machineguns, and silencers were legal. Another commenter recommended that ATF require differing levels of CLEO certification per NFA item, and that silencers and "any other weapons"should not be subject to CLEO certification.

Another commenter suggested simply that a large red "F" be placed on the driver's license of a convicted felon to ensure that criminals do not obtain or use firearms, and proprietors of gun ranges and sellers of ammunition could easily ascertain who is permitted to do business with them and who is not.

**Department Response**

Although the Department does not agree with all of the concerns expressed or suggestions made in the above-summarized comments, it does concur with the conclusion of many commenters that the benefits of CLEO certification do not outweigh the costs of the CLEO certification requirement, and that alternate procedures will satisfy the statutory requirements of section 5812 and 5822. Consequently, as previously noted, the Department has removed the CLEO certification requirement from the final rule. As an alternative to certification, the final rule adopts a CLEO notification requirement that is similar to that suggested by many commenters. In conjunction with the mandatory background check required of all applicants, including responsible persons of trusts and legal entities, the requirement of CLEO notice fulfills the primary objectives that have supported the certification requirement: It provides the CLEO awareness that a resident of the CLEO's jurisdiction has applied to make or obtain an NFA weapon and affords the CLEO an opportunity to provide input to the ATF of any information that may not be available during a Federal background check indicating the applicant is prohibited from possessing firearms. As noted in the NPRM, although the NICS provides access to a substantial number of records to verify if an individual is prohibited from possessing firearms, CLEOs often have access to records or information that has not been

made available to NICS. Providing notice to the CLEO of a prospective NFA transfer with instructions on how to relay relevant information to ATF will help fill possible information gaps in NICS by affording the CLEO a reasonable opportunity to provide relevant information to ATF.

To effectuate the CLEO notice requirement, the Department is revising the regulations in §§ 479.63 and 479.85 to require the applicant or transferee, and all responsible persons, to provide a notice to the appropriate State or local official that an application is being submitted to ATF, and conforming changes will be made to ATF Forms 1, 4, and 5. In addition, responsible persons for trusts or legal entities will be required to provide CLEO notification on ATF Form 5320.23, NFA Responsible Person Questionnaire.

Consistent with the recommendation of many commenters, the changes to Forms 1, 4, and 5 will also include a certification requirement by the applicant or transferee under penalty of perjury, that the applicant or transferee has provided notification to the CLEO; a corresponding change will be made to Form 5320.23 for certification by responsible persons of trusts and legal entities. Applicants will also be required to provide the name and location of the CLEO to whom the form was sent, and date the form was sent. Removal of the CLEO certification requirement also means that CLEOs will no longer need to attest to the authenticity of the applicant's or transferee's photographs and fingerprints. To ensure verification of identity, however, the official taking the applicant/transferee's fingerprints must sign the fingerprint card to certify the official has verified identity of the applicant/transferee. In reaching the decision to substitute CLEO notification for certification, the Department **\*2683** determined that the proposal to have local ATF offices process NFA applications and conduct background checks was neither efficient nor feasible due to other mission requirements and resource constraints. For a discussion of other suggested alternatives the Department has elected not to implement, see section IV.C.3.c (addressing recommendations that background checks be conducted only at time of transfer) and section IV.B.1.b (addressing recommendations that NICS checks alone are sufficient for NFA transfers).

The Department recognizes comments received suggesting that the Department (1) require that CLEOs certify forms, (2) require that CLEOs provide reason for not certifying forms, (3) make judicial review available when a CLEO does not certify a form, and (4) expand the number and types of officials who may provide certifications. As the certification has been replaced with a notification, the suggested changes are no longer a necessary part of the process. Additionally, the Department rejects comments proposing that ATF, rather than the applicant, provide a copy of the application to the CLEO; ATF is prohibited from releasing an individual's tax return information.

The Department rejects the suggestion of collecting the "excise tax" and printing out the tax stamp at the point of sale. The Department believes that allowing nongovernmental entities to issue tax stamps could lead to fraud and abuse.

The Department has not adopted suggestions that the fingerprints and photograph requirement be replaced by State permitting or licensing because such State-issued documents may not meet the biometric fingerprint check requirements of 26 U.S.C. 5812 and because the background check process for each State-issued concealed carry permit or license is different and not all permits or licenses qualify as an exception to a background check. Additionally, it is unclear to what extent the Department has the legal authority to require local and State officials to aid it in implementing Federal firearms regulations.

The Department recognizes comments regarding exempting certain categories of persons and certain types of NFA firearms from CLEO certification. While CLEO certification has been replaced with a CLEO notification, all applicants, including active and retired law enforcement, active and retired military officers, and government employees with security clearances, and all types of NFA firearms, including silencers, will be subject to the notification requirement.

The Department does not adopt the suggestion of special markings on a driver's license for convicted felons. The Department does not have the authority to require this information on State-issued identification documents.

## 2. Fingerprints and Photographs for Background Checks

### a. Authority To Require Submission of Fingerprints and Photographs of Responsible Persons for Trusts and Legal Entities

### Comments Received

Many commenters stated that the proposed rule exceeds ATF's statutory authority to require photographs or fingerprints of responsible persons. One of these commenters, NFATCA, acknowledged that its 2009 petition requested a requirement that responsible persons of legal entities submit photographs and fingerprints, but advised that it has changed its conclusion as to the statutory authority of ATF to impose this requirement, and was withdrawing its 2009 recommendation. A few commenters argued that the provision of the NFA that ATF cited as authority for extending the photograph and fingerprint requirement to responsible persons of legal entities, section 5812, does not support ATF's position because the text of that section extends the photograph and fingerprint requirement only to individuals, and not to legal entities.[FN8] Because section 5812 of the statute specifically names only one class of transfers covered by this requirement (i.e., individuals), they argue, ATF is without statutory authority to extend it to any other type of transfer (i.e., those involving legal entities).

**Department Response**

The Department does not agree with comments that this rulemaking exceeds its authority by requiring photographs or fingerprints of responsible persons. Information that the Attorney General can seek is not limited to fingerprints and photographs for individuals. The inclusion of individual transfers as a specific category that requires the submission of fingerprints and photographs in 26 U.S.C. 5812 does not equate to a limitation on the authority of ATF to extend that requirement to transfers involving trusts or legal entities. See 26 U.S.C. 5812.

The Department believes it may require trusts and legal entities to submit identifying information regarding their responsible persons as a component of the identifying information it requires a trust or legal entity to submit prior to obtaining authorization to receive or make an NFA firearm. Sections 5812 and 5822 provide broad authority for the Department to require the identifying information of any applicant to make or transfer an NFA firearm. Section 5812 prohibits the transfer of a firearm "unless . . . the transferee is identified in the application form in such manner as ATF may by regulations prescribe." Similarly, section 5822 prohibits the making of any firearm unless the maker has "identified himself in the application form in such manner as ATF may prescribe." The Department views the identities of responsible persons associated with trusts and legal entities as a vital aspect of the identities of those entities themselves. The very purpose of the NFA would be undermined if a criminal could use a trust or legal entity the criminal controls to obtain an NFA firearm without submitting any personally identifying information to the Department.

**b. Alternatives To Requiring All Responsible Persons To Provide Fingerprints and Photographs**

**Comments Received**

Many commenters asserted that all NFA applicants, including legal entities, should be required to undergo background checks and submit fingerprints and photographs. Some of these commenters differed, however, as to which individuals associated with a legal entity should be subject to these requirements. Several commenters supported background checks for trustees only. A few commenters asserted that successor trustees and other members of trust (other than the original trustee) should be excluded. Many commenters stated that beneficiaries do not have actual possession and should also be excluded. Another commenter suggested requiring all responsible persons to submit a background check annually to the "head of the trust" to be maintained on file, and to make that head person responsible for all law enforcement approvals. A few commenters supported background checks on the "main person" in the trust or legal entity. Other commenters supported background checks on a single responsible person only. Several **\*2684** commenters supported background checks only on the person in the legal entity picking up the firearm.

A few commenters suggested requiring a one-time fingerprinting and background check of responsible persons associated with a trust at the creation of the trust, not on every transfer of regulated items contained in the trust. Another commenter suggested requiring only the executor to provide fingerprints and photographs and undergo a background check one time, and that this process be repeated whenever the executor dies or forfeits the executor's position to the next person appointed as executor or owner of the corporation. Another commenter suggested only requiring fingerprints and photographs from trustees once, or perhaps once every ten years upon a new NFA item form. This commenter urged that ATF also adopt the "once every ten years rule" for individuals, too.

In addition to recommendations specific to trusts and legal entities, several commenters suggested that ATF devise alternative methods to identify individuals. Some commenters recommended the use of digital technology to submit photographs and fingerprints, citing as examples other Federal agencies such as the Securities and Exchange Commission

(which uses a digital fingerprinting service) and the Transportation Security Agency (which uses a digital service to perform background checks on its employees).

**Department Response**

The Department agrees with comments that beneficiaries should not generally be included in the definition of responsible person and has removed beneficiaries from the definition in the final rule. The Department does not agree with comments that background checks should only be conducted on the "main person" in the trust or legal entity, a single responsible person for the trust or legal entity, or only the person picking up the firearm. These recommendations fail to account for multiple individuals within a trust or legal entity that will exercise control over NFA firearms. The "responsible person" definition in the final rule accounts for such individuals, and requires them to meet the same requirements that apply to all other individuals who apply to make or possess an NFA firearm.

The Department concludes that proposals involving one-time or periodic background checks and submission of fingerprints and photographs—for example at the creation of a trust or legal entity or only once every ten years—do not meet the NFA's requirement that each NFA transaction must be accompanied by an individual application and registration. See 27 CFR 479.62 and 479.84. Moreover, such proposals do not adequately ensure that an applicant is not prohibited at the time each NFA weapon is made or acquired; a background check in conjunction with each application is needed to ensure no change in status has occurred. With respect to allowing a single-submission of fingerprints and photographs, the NFRTR is a tax registry that does not have the technical capacity or statutory authorization to track such documents. The Department acknowledges that other Federal agencies utilize electronic fingerprinting technology. However, ATF does not currently have the resources to utilize this technology.

**3. Legal Entities**

**a. Purposes of Trusts and Legal Entities**

**Comments Received**

Many commenters stated that the proposed rule ignored or misunderstood the common circumstances surrounding the creation of an NFA trust, and did not account for the "myriad of innocuous and legitimate" reasons why a trust would own an NFA item, for example to pass the NFA item to one's heirs. Several commenters stated that the proposed rule, by naming a beneficiary as a "responsible person," deprived individuals from common estate planning techniques (e.g., using living trusts and naming their minor children as beneficiaries). In addition, a few commenters stated that the proposed rule intruded upon the traditional uses of trusts and upon the rights of settlors to manage their estate plans by proposing that any new responsible person must submit a Form 5320.23 as well as a CLEO signoff within 30 days of the responsible person's appointment.

Many commenters stated that trust use is on the increase as many people live in areas where the CLEO simply will not sign an NFA certification, causing law-abiding citizens to use trusts and corporations to bypass the CLEO certification requirement in order to lawfully make or obtain an NFA weapon. One of these commenters added, "[t]he simple truth is, corporations and trusts are formed NOT to circumvent background checks, but to take power away from an antiquated unfair system of CLEO signoff."

Many commenters stated that a trust's main purpose is to hold assets, property, and expensive collector investments for inheritance, and as such is a critical estate planning and management tool. Other commenters stated that trusts are being used to lawfully permit multiple people and families to share access to, and use, legally owned and registered NFA items. These commenters noted that without a trust, only the person who directly purchased the NFA item can lawfully possess it. Another commenter asserted that absent ownership by a trust the NFA item must always be in the registered individual's possession when it is out of the safe. Several commenters noted that the NFA makes it unlawful for any person "to possess a firearm that is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. 5861(d). Hence, if the item is registered only to an individual, and not a trust or legal entity, then family members of the registrant who possess or use the NFA item are exposing themselves to serious criminal charges. See 26 U.S.C. 5871, 5872. Several commenters provided personal examples where trusts prevented legal complications by allowing possession of the NFA item by individuals named in a trust during life changing events (e.g., military deployment or death).

Many commenters stated that a trust eases the burden of transferring NFA items upon the death of the grantor/settlor. Other commenters stated that a trust prevents the need to pay a $200 transfer tax, amounting to a "double tax," and file another Form 4 to transfer and retain the property, should one of the family members die before the other family member. Other commenters stated that trusts are used to ensure that remaining family members could not be prosecuted for being in possession of an illegal firearm upon death of the person who obtained the NFA tax stamp. Several other commenters stated that another benefit to a trust is that a settlor can list the settlor's children as beneficiaries, and after the settlor's death, a trustee will continue to oversee the items until the children are of legal age to possess the items. Many commenters also stated that these beneficiaries should not have to submit to their civil liberties being violated simply because they inherited private property.

Two commenters stated that most (NFA) trusts are being used to lawfully obtain silencers. These commenters stated that if ATF really desired to reduce the use of trusts, it should remove silencers from the NFA "list." Several commenters noted that trusts are established in a variety of contexts (e.g., voluntary or mandated by law; by a decedent's will or during the lifetime of a settlor), and some of the contexts **\*2685** should "amelioriate" concerns regarding potential misuse. These commenters, and others, noted that many trusts are specialized and designed as "gun trusts" with safeguards, pertinent to the settlor, trustees, and beneficiaries, to ensure compliance with the regulation of NFA firearms.

A commenter noted that the Seventh Circuit Court of Appeals held that a trust is a proper legal entity for holding a firearm where the settlor was prohibited, provided that the trust included proper safeguards to ensure that a prohibited person did not possess the firearm. Miller, 588 F.3d 418. Some commenters noted that trust agreements may exclude prohibited persons. Several commenters provided examples of language and provisions in trusts designed specifically to hold NFA items that required full compliance by all members and trustees with laws governing possession of NFA firearms. For example, one commenter cited to provisions in her trust stating that "any trustee that is or becomes an ineligible person as defined by Federal law or State law must be deemed as to have immediately resigned and must immediately surrender all NFA items held on behalf of the trust." Several commenters asserted that ATF should set a wide variety of requirements necessary for a trust to hold NFA items.

Another commenter stated that, if necessary, ATF could add additional language to the transferee's certification, similar to that already found in Forms 1, 4, and 5, to ensure that the responsible person understands that it is unlawful to make the firearms available to prohibited persons, and could add a definition of "prohibited person" consistent with 18 U.S.C. 922(g) in the "Definitions" section of the application. This commenter proposed specific language for this purpose.

**Department Response**
The Department is aware of the legitimate reasons individuals may choose to utilize a trust or legal entity to acquire an NFA item. These include facilitating the transfer of an NFA item to a decedent's heirs and providing a mechanism that allows several individuals to lawfully possess the same NFA item. To the extent that courts have recognized a felon's ability to employ a trust or other device to maintain an ownership interest, so long as there is no ability to physically possess or control the firearm, trusts have been employed. The Department also recognizes that some trusts created to hold NFA assets contain provisions seeking to ensure that Federal, State, and local laws regarding possession and transfer of NFA firearms are not violated.

The final rule that the Department is promulgating is not designed or intended to reduce the use of trusts for estate planning or other lawful purposes. Instead, provisions of the final rule are intended to facilitate the ability of trusts and legal entities to comply with the statutory requirements of the NFA through the establishment of tailored mechanisms that help ensure prohibited persons are not able to misuse such entities to illegally obtain NFA firearms. The final rule accomplishes this objective by defining as responsible persons those individuals associated with a trust or legal entity who are able to control firearms, and requiring those individuals to undergo the background checks and submit fingerprints and photographs required by statute and ATF's regulations.

With respect to the concerns voiced by many commenters regarding the impact a new rule may have on estate planning, the provisions of the final rule do not materially alter long-existing procedures ATF has established to facilitate the registration of NFA firearms to legal heirs. Those procedures take into account that a decedent's registered NFA firearm(s) must be managed by the executor or administrator of the estate, and provide for a reasonable amount of time to arrange for the transfer of the firearms to the lawful heir. They further provide that a decedent's registered NFA firearm(s) may be conveyed

tax-exempt to lawful heirs as an "involuntary transfer" resulting from the death of the registrant.

In promulgating the final rule, the Department has also evaluated the assertions by several commenters that:

• New Federal regulations are not necessary because many trusts designed to hold NFA assets contain voluntary, self-imposed, provisions designed to preclude prohibited persons from acquiring NFA weapons through the trust

• ATF should set requirements mandating provisions in trust agreements for trusts that acquire NFA weapons

With respect to the assertion that trust self-regulation renders new regulation unnecessary, the Department notes that ATF has no authority to enforce private trust agreements, nor may private trusts have the authority to obtain NICS background checks of associated individuals. Hence, self-regulation does not adequately ensure statutory compliance. With respect to suggestions ATF should regulate the terms of trust agreements for trust holding NFA firearms, ATF believes it is more efficient and effective simply to require responsible persons to submit to background checks than to dictate the language in trust documents.

Finally, the Department does not agree with commenters' assertions that additional language needs to be added to the certification in ATF Forms 1, 4, and 5 regarding firearm possession by prohibited persons. The instructions on these Forms already include specific information on who is considered a prohibited person.

## b. Number of Trust and Legal Entity Form 1, 4, and 5 Applications

**Comments Received**

A commenter desired more information and clarification concerning the number of legal entities that file Form 1, 4, and 5 applications. This commenter stated that the NFATCA petition—as described by the NPRM, section II. Petition—contends that the number of applications to acquire NFA firearms via a legal entity has increased significantly. This commenter noted that this same section of the NPRM also provided ATF research data showing that the number of Form 1, 4, and 5 applications submitted to ATF by legal entities that are not FFLs have increased from "approximately 840 in 2000 to 12,000 in 2009 and to 40,700 in 2012." This commenter could not determine ATF's statistical methodologies, as they were "neither stated nor explained" in the NPRM, and ATF's analyses did not seem to allow for the same legal entity filing multiple Form 1, 4, and 5 applications during the reporting periods CY 2000, CY 2009, and CY 2012. The commenter contended that it was not uncommon for a legal entity (or an individual) to file multiple Form 1, 4, and 5 applications during a single calendar year. In addition, this commenter noted that ATF did not provide corresponding data to show how many non-legal entities or natural persons submitted to ATF Form 1, 4, and 5 applications during the same reporting periods (i.e., CY 2000, CY 2009, and CY 2012). As a result, this commenter maintained that ATF's methodologies used in the NPRM left many important questions unanswered, including:

(1) What are the actual number of separate and distinct Legal Entities that submitted ATF Form 1, 4, and 5 applications during these same reporting periods, including CY 2000, CY 2009, and CY 2012?

(2) What are the actual number of separate and distinct non-Legal Entities or natural **\*2686** persons that submitted ATF Form 1, 4, and 5 applications during these same reporting periods, including CY 2000, CY 2009, and CY 2012?

(3) What is the increase (or decrease) in the actual number of separate and distinct Legal Entities that submitted ATF Form 1, 4, and 5 applications during these same reporting periods, including CY 2000, CY 2009, and CY 2012?

(4) What is the increase (or decrease) in the actual number of separate and distinct non-Legal Entities or natural persons that submitted ATF Form 1, 4, and 5 applications during these same reporting periods, including CY 2000, CY 2009, and CY 2012?

(5) How does the increase (or decrease) in the actual number of separate and distinct Legal Entities that submitted ATF Form 1, 4, and 5 applications compare with the increase (or decrease) in the actual number of separate and distinct non-Legal Entities or natural persons that submitted ATF Form 1, 4, and 5 applications during these same reporting periods, including CY 2000, CY 2009, and CY 2012?

AR005671

Another commenter also desired information regarding parties that file multiple applications, and asked how many of the applications received during the CY 2012 represent parties who have applied for more than one NFA-registered item.

Another commenter stated that there was an "unexplained discrepancy" between the numbers that ATF used in Table A of the NPRM for the number of applications for legal entities received in 2012 and the numbers ATF used in its "Firearms Commerce in the United States Annual Statistical Update 2013" (ATF's 2013 Statistical Update), available at https://www.atf.gov/sites/default/files/assets/pdf-files/052013-firearms-commerce-in-the-us-annual-update.pdf.          This commenter provided statistics from Exhibit 7 of this statistical update, which showed the number of applications for CY 2012 as totaling 230,937 with the number of applications of a Form 1 as 7,886; Form 4 as 52,490; and Form 5 as 170,561. This commenter noted that ATF's 2013 statistical update did not break down the application numbers for legal entities, individuals, or qualified FFLs (Gov/FFLs) so the commenter did not have any numbers to compare with the breakdown done in the NPRM, Table A. However, this commenter compared the numbers provided in Table A of the NPRM with those in ATF's 2013 Statistical Update Exhibit 7 as follows:

| Table A CY 2012 1B applications | Statistical Update CY 2012 1B applications |
| --- | --- |
| Part VI | |
| ATF Form 1: 9,662 | ATF Form 1: 7,886. |
| ATF Form 4: 65,085 | ATF Form 4: 52,490. |
| ATF Form 5: 9,688 | ATF Form 5: 170,561. |
| Total: 84,435 | Total: 230,937. |

This commenter stated that ATF has not explained why it excluded over 146,500 legal entity applications in its basis for rationalizing the proposed rule change, as well as its cost and economic impact analyses. As a result, this commenter stated that ATF's inaction called into question the "validity and integrity of the assumptions, arguments, analyses, and conclusions" in the proposed rule. Therefore, this commenter asked ATF to clarify and revise, if needed, its statistical methodology.

**Department Response**

The Department has carefully considered all commenters' concerns relating to the number of legal entities that file Form 1, 4, and 5 applications. For purposes of the NPRM, ATF conducted an analysis of all applications actually received in the NFA Branch in CY 2012.

The total number of transfers to trusts, corporations, governmental entities, and individuals cited in the NPRM were taken from the total number of all applications received. When an application is received in the NFA Branch it is counted one time. Additionally, each application covers the transfer of a separate firearm with a separate and unique serial number. Thus, the transfer or making of an NFA firearm is counted each and every time an application is submitted. There is no system in place that counts the number of applications received at different times from the same applicant. However, such a system would have been irrelevant for purposes of the NPRM. The key fact is the number of transfers made by legal entities without a background check. The fact that legal entities may have made more than one transfer does not lessen the concern. Also, for purposes of the final rule, new numbers for CY 2014 have been compiled. Those new numbers will cover only those applications that have been processed with a final determination, as opposed to all applications received regardless of a final

determination.

The Department did not prepare an analytical impact statement concerning non-legal entities as the definition of "Person" in section 479.11 does not use the term. Applicants who submit Forms 1, 4, and 5 are identified as trusts, legal entities, governmental entities, FFLs and individuals. Further, as some commenters noted, the NPRM did not reflect any increase or decrease in the number of individuals (natural persons), government entities, or FFLs who submitted Form 1, 4, or 5 applications for CY 2000 or 2009 because the NPRM in part was a response to inquiries on legal entities as identified in the petition from NFATCA. The NPRM in Table A does reflect a breakdown of the type of forms received by corresponding categories in order to compare the costs to those applicants who are currently required to submit fingerprints, photographs, and CLEO certifications with the costs reflected in the final rule that will require each responsible persons of a trust or legal entity to submit the same personal information to ATF before a trust or legal entity is allowed to make or have transferred to it an NFA firearm.

Some comments noted a possible discrepancy between ATF's 2013 Statistical Update and Table A of the 2012 NPRM. The difference appears to be attributable to the fact that the NPRM counted the number of applications received in CY 2012, whereas the Statistical Update counted the number of firearms processed in CY 2012. ATF processed fewer Forms 1 and 4 than it received in CY 2012, which is why there are fewer firearms processed than applications received in those categories. The 170,561 number used in relation to Form 5 in ATF's 2013 Statistical Update reflects the total number of firearms processed on Form 5 applications for CY 2012 from all applicants to make or transfer firearms, i.e., trusts, individuals, government entities, etc. The total does not reflect an actual number of separate and distinct legal entities or "non-legal entities"; however, the NFRTR contains each registered NFA firearm by serial number. As an example, the NFA Branch may receive one Form 5 from a transferor (FFL) to transfer 20-40 NFA firearms at one time to a large governmental entity, i.e., a police department, at one time. Each individual firearm that is transferred is counted. See section VI.A.2 for additional details about the numbers of persons who submit ATF Forms 1, 4, and 5.

### c. Alternative Approach to Legal Entities

**Comments Received**

Several commenters stated that ATF's "one-size-fits-all solution" failed to consider that trusts and legal entities vary widely and differ in purposes and structure. These commenters asserted that ATF should engage in a proactive assessment of each trust and legal entity, first reviewing the **\*2687** documentation establishing each trust or legal entity and determine whether the creators and operators of a particular trust or legal entity have taken appropriate safeguards to prevent prohibited persons from using the trust or legal entity to acquire NFA firearms. If ATF finds that the particular trust or legal entity did not take appropriate safeguards, only then should ATF subject that trust or legal entity to additional scrutiny and impose default requirements such as "specially designed provisions addressing firearms issues."

Another commenter recommended excluding specific trust roles from the "responsible person" definition, including successor trustees, beneficiaries, and contingent beneficiaries and that successor trustees should be expressly excluded until they become a trustee. Another commenter described the types of individuals who are generally trust beneficiaries (e.g., children), which, although not specifically stated by the commenter, leads one to the conclusion that beneficiaries should not be deemed responsible persons.

Some commenters recommended exemptions or clarifications for trust members and executors. For instance, a commenter suggested exempting members of the trust that are related by lawful marriage and adoption, and through the commonplace definitions of family. Another commenter suggested that if ATF removes the option for a trust that ATF "amend the classification of individual to include immediate family" as he would "love to pass down [his] NFA items to [his] children." Another commenter suggested clarifying wording to allow the executor or an estate temporary possession and that would not be considered a transfer, which according to the commenter is much needed for those with trusts.

Another commenter suggested requiring that trust members include their Social Security numbers when submitting a Form 1 or Form 4. In addition, when a new member is added to a trust, the trust must include that new member's Social Security number when a new Form 1 or Form 4 is submitted.

Another commenter believes that only the main person in the trust should be held responsible for the others named in the

trust. This same commenter also supported doing a background check on the main person in the trust when the trust is formed but was against having to recheck background checks every single time they get an NFA item. Another commenter suggested only requiring photographs and fingerprints for the settlor/grantor of the trust. This commenter stated that the settlor/grantor is the person who completes the Form 4473, undergoes the background check at the time of transfer, and is ultimately responsible for how the trust items are disposed of and used.

A few commenters suggested other alternative processes for legal entities. A commenter suggested that ATF automate Form 1 and Form 4 transactions to tie them into the Form 4473 background check process, and that all listed trustees or legal entities be included in this process. Another commenter suggested that if the issue is with trusts and having all trust members submit their information to ATF, that ATF create a new FFL classification and follow the "well established and functioning process" of the FFL system. Another commenter suggested that ATF could achieve its goals through establishing an NFA equivalent of U.S. Customs and Border Protection's Global Entry System. Such a system would enable ATF to perform a "single extensive" background check on each trust member and would simplify background checks for future trust purchases.

Another commenter suggested that ATF allow corporations or trusts to file the necessary information separately, and not be included in the Form 1 or Form 4 submission. The legal entity could then electronically file (e-file) the tax stamp request. Another commenter suggested that, for any NFA item that a trust or legal entity purchases, the transaction include either a NICS check or the presentation of a State-issued carry permit to complete a Form 4473.

Another commenter recommended that for trust applications, ATF accept the Affidavit of Trust instead of requiring the full trust document be submitted. This commenter contended that the full trust document is not relevant for firearm approval, and would lessen the paperwork for the applicant and improve the processing times and reduce the burden for ATF. Another commenter asked that ATF consider requiring members of trusts to be issued a license similar to the process for a concealed carry weapon license.

Another commenter suggested that ATF permit trusts, partnerships, and other corporate entities to transfer any NFA items to an individual on a tax-free basis for a one year period.

**Department Response**
The Department is aware that there are differences in purpose and structure among various trusts and legal entities; these differences, however, do not provide an appropriate basis to apply different standards when applying the provisions of the NFA.

The Department rejects the suggestion that it review the documentation establishing each trust or legal entity and determine whether the creators and operators of that trust or legal entity took appropriate safeguards to prevent prohibited persons from using the trust or legal entity to acquire NFA firearms. The Department believes that it is more efficient and effective to ensure, at a minimum, that all trusts and legal entities do not have any responsible persons who are prohibited from possessing NFA firearms. The Department believes that it is the responsibility of those trusts and legal entities to take all other appropriate measures to ensure that they comply with State and Federal law. Additionally, requiring that the Department determine whether trusts and legal entities had sufficient safeguards in place to prevent NFA firearms from coming into the possession of prohibited persons would be costly and time consuming.

The Department does not agree with the suggestion that it should require only the acting trustee to submit fingerprints and photographs and receive a CLEO signature. Depending on the terms of the trust, additional people beyond the acting trustee may have the power and authority, directly or indirectly, to direct the management and policies of the entity insofar as they pertain to firearms.

The Department also does not agree with performing the background check at the time of the NFA transfer, as this would necessarily take place after the application is approved. Such a process is not consistent with the statutory requirements of section 5812(a) (providing that applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of the law) and section 5822 (providing that applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law). Prior to approving the application, ATF must verify that the person is not prohibited from making, receiving, or possessing the firearm. This cannot be accomplished by having the FFL conduct the background check at the time of the transfer. See section IV.C.4 for responses

relating to the definition of "responsible persons."

The Department rejects the suggestion that it exempt family members from the definition of "responsible persons" as these are the individuals most likely to be named as grantors, trustees, or **2688** beneficiaries in the trust, and family members may be prohibited persons. However, the Department agrees that certain individuals associated with trusts should not generally be considered responsible persons, including beneficiaries. As previously stated, the final rule includes an amended definition of responsible person to make clear that beneficiaries and certain other individuals typically fall outside the definition.

The Department has chosen not to require Social Security numbers on the Form 5320.23 for responsible persons, nor on Forms 1, 4, and 5. The Department believes such information is not necessary to be included on these forms because the information is already requested on the FBI Form FD-258 (fingerprint card) used for conducting the necessary background checks.

The Department rejects the suggestion that it only require the Affidavit of Trust to verify that an applicant is a genuine trust. That document does not contain all the information necessary to verify that it is a valid trust and may not contain all the information necessary to verify who is a responsible person for the trust.

Regarding alternate means of conducting background checks, the Department believes that using NICS in conjunction with a fingerprint-based background check provides the best option. The NICS has access to several Federal databases that contain information relevant to determining whether a person is prohibited from possessing a firearm, and since its inception has identified over two million prohibited persons attempting to purchase firearms and denied transfers to those individuals. Additionally, the fingerprint-based background check may identify a disqualifying criminal record under another name.

The transfer tax is fixed by statute, see 26 U.S.C. 5811(a), and ATF does not have the authority to waive transfer taxes except in very limited circumstances not applicable to the types of transfers commenters wish to see exempted.

### 4. Definition of "Responsible Person"

#### a. Ambiguous and Poorly Reasoned Definition

##### i. Definition Is Overly Broad and Includes, by Title, Many Individuals Associated With Trusts and Legal Entities That May Have No Power or Authority

**Comments Received**

A few commenters stated that the interpretation of the definition of responsible person could mean that any person who has possession of a firearm could be required to get CLEO certification. The commenters also stated that "nowhere in the law is every member of an organization held accountable for every action of the organization." A few other commenters stated that every employee of an FFL is not required to be listed as a responsible person on the license, so there is no reason to require everyone associated with a legal entity to be designated as a responsible person. Two other commenters stated that by requiring fingerprints, photographs, and CLEO signature for each responsible person, it increases the burden to both applicants and CLEOs, and could become an administrative nightmare. One of the two commenters also asked, since ATF anticipates a requirement for notification in changes of responsible persons, "[w]ill trustees be aware of such a requirement and practically able to comply?" Another commenter, an attorney, stated that every corporation has shareholders and that extending the definition of responsible person to include all shareholders defeats the purpose of the corporation and "overrides well developed statutory case law relating to corporate governance and property ownership rights." The commenter also stated that the proposed rule eliminates the advantages of corporations and their ability to exercise their right to own property. Another commenter asked whether beneficiaries who are under the age of 21 years old, who may live in different States, and who do not have any authority to possess, transport, or acquire NFA firearms, would be required to obtain photographs, fingerprints, and the CLEO signature. Another commenter, a licensed NFA dealer, stated that given the broad definition of responsible person as related to trusts, and the possible criminal consequence of non-compliance, entities have no choice but to err on the side of over-inclusion, which places a burden on both the entity and ATF. The commenter suggested that there might be hundreds or thousands of responsible persons for a single entity, and gave the example of a corporation with headquarters in Maryland with over 4000 employees located in 38 States. A few commenters, including a licensed manufacturer, stated that the definition is too broad and exceeds both what is reasonable and the definition of

responsible person currently used for FFLs.

Other commenters noted that the definition for responsible person appears to extend to beneficiaries of a trust holding NFA firearms, and even to successor trustees, remainder beneficiaries, and trust protectors. The commenter noted, however, that in a typical trust document, the trustee is the only person with legal title to any items in such a trust, and that the "beneficial interest" of the beneficiary does not vest until the time specified in the trust.

Another commenter stated that the proposed definition for responsible person exceeds the definition of responsible person used for handling explosives. This commenter asked if ATF intended to extend the CLEO's "veto" to explosives workers. Another commenter stated that the proposed definition was very vague on which "entity" could decide who would be a responsible person. This commenter expressed concern that any government agency could be capable of making that decision. Another commenter recognized the need to define responsible person; however, this commenter expressed concern that if the government alone defined the term that it might allow them more power over which persons could exercise their right to bear arms.

**Department Response**
The Department has reviewed the definition in the proposed rule and amended it to address concerns about its breadth while maintaining the important objective of ensuring background checks for relevant parties associated with a trust or legal entity. As in the definition of "responsible person" in the NPRM, the definition of "responsible person" in this final rule applies to those who possess the power or authority to direct the management and policies of an entity insofar as they pertain to firearms. This addresses commenters' concerns that shareholders and others who are associated with an entity are not always in a position to possess the entity's firearms. It should be noted that if an individual has the power or authority to direct the management and policies for a legal entity, that individual would fall within the definition of "responsible person." Trusts differ from legal entities in that those possessing the trust property—trustees—are also the individuals who possess the power and authority to direct the management and policies of the trust insofar as they pertain to trust property, including firearms.[FN9] As it applies to trusts, the definition of "responsible person" in this final rule **\*2689** serves the dual purpose of requiring these individuals to undergo background checks while also addressing the commenters' concerns about unnecessarily requiring background checks of individuals who would not, or could not, possess the firearms. Depending on how the trust is set up, the identity of trust beneficiaries may remain uncertain for a period of time or may include individuals who will not possess the firearms. Therefore, the Department believes that it is not necessary to positively identify a beneficiary as a "responsible person" within the definition.[FN10] However, under the amended definition, beneficiaries and other individuals will be considered responsible persons if they meet the criteria for designation as responsible persons because of their capacity to control the management or disposition of a relevant firearm on behalf of a trust or legal entity.

The Department believes that the definition of "responsible person" in this final rule appropriately addresses concerns that the necessary individuals receive background checks before receiving NFA firearms, and that the potentially large number of individuals who are merely associated with the trust or legal entity, but will not possess firearms, are not required to submit applications. Further, the Department notes that under 18 U.S.C. 922(g), it remains unlawful for a prohibited person to possess firearms. Similarly, under section 922(d) it remains unlawful for any person to sell or deliver a firearm to any prohibited person if that person knows or has reasonable cause to believe the person is prohibited. For responses to comments on CLEO certification see section IV.C.1. As noted previously, ATF Forms 1, 4, and 5 will be updated to reflect the definition of responsible persons in the final rule.

The Department does not agree that including shareholders in the definition of "responsible person" defeats the purpose of a corporation, as a shareholder will only be a responsible person if the shareholder possesses, directly or indirectly, the power or authority to direct the management and policies of the entity insofar as they pertain to firearms.

### ii. Beneficiaries Are Often Minors or Not Yet Born, Presenting a Challenge to Proposal That Beneficiaries Submit Fingerprints, Photographs and a CLEO Certification

#### Comments Received
Many commenters stated in a form letter that the proposed rule interferes with the lawful use of trusts for estate planning. These same commenters stated that the overly broad definition of a responsible person means contemplating the "absurd

possibility of fingerprinting, photographing, and securing CLEO sign-offs for unborn children." Another commenter, who holds a trust, stated that the proposed rule places a hardship on his family and trust by possibly requiring fingerprints of his elderly grandmother and his two-year-old and five-year-old children. Another commenter, a trust holder, asked how the definition of responsible persons applies to minor beneficiaries in a trust, and asked if ATF is proposing the fingerprinting and photographing of minor children who lawfully cannot possess a firearm. Other commenters also asked about the need for CLEO certification, as well as fingerprints and photographs, for children and minors. At least one commenter specifically argued that his CLEO would not provide a certification for beneficiaries. Many commenters questioned the practicality of requiring fingerprints and photographs for minors, and wondered how this would be done, in particular on babies and young children. Many commenters stated that a background check for beneficiaries is more appropriately conducted at the time an item in the NFA trust is actually transferred to them from the trust. Another commenter questioned whether doing a background check on a minor beneficiary would have any benefit, and asked if a background check would show the chances of committing a felony or domestic violence in the future. Another commenter asked if the requirements for photographs, fingerprints, and CLEO certification do not apply to minors, would the minor upon turning 18 need to submit these required items?

**Department Response**
As noted, the Department agrees that beneficiaries should not generally be included in the definition of responsible person. The definition of responsible person has been amended and no longer includes beneficiaries as a typical example of a "responsible person."

### iii. Challenge in Determining Who Qualifies as a Responsible Person

**Comments Received**
Many commenters, most of whom have trusts, and an FFL, noted in a form letter that the Department's definition of responsible persons is different for different types of entities. They stated that based on the Department's general definition of a responsible person, and the complexity of trust laws, they would need to speak to a lawyer to determine who in their trust would be considered a responsible person. Ninety-eight of the same commenters, all of whom have trusts, also stated that their trust includes beneficiaries who are under 18 years old and that they would need to speak to a lawyer to get a clear answer about whether they fall under the responsible person definition.

Other commenters asked various questions concerning companies that own NFA firearms and how they are to determine who counts as responsible persons. A commenter asked if such companies would have to "photograph, fingerprint, and complete a favorable background check" on each individual before accepting that individual as an employee or partner. This commenter also asked if a stockholder would be viewed as having ownership of the corporate assets such that they would need to be fingerprinted. Another commenter stated that the proposed rule left many unanswered questions concerning its definition of a responsible person, including whether and when minor trust beneficiaries would qualify.

**Department Response**
The final rule incorporates a new definition of "responsible person" that addresses many of the questions and concerns raised by these comments, including the concerns about trust beneficiaries who are minors. That said, the Department agrees that in some cases persons may need to seek legal counsel to determine who is a responsible person for purposes of this rule. The Department notes, however, that many of the trust applications it currently reviews were prepared with the advice or assistance of a lawyer. As a result, it is not clear whether the overall need for legal counsel will increase or decrease because of this rule. The Department anticipates, for example, that persons who have used a trust in the past to avoid the CLEO certification requirement may well choose to acquire future NFA firearms as individuals once the CLEO certification requirement has been modified to a notification requirement, **\*2690** thereby diminishing the overall need for legal counsel among makers and transferees.

### b. Proof of Citizenship for Responsible Persons

**Comments Received**

Several hundred commenters objected to the proposed requirement that any responsible person of a legal entity prove citizenship as part of submitting an application to transfer or possess NFA items. The bases for this objection varied from an ideological opposition to ever having to prove citizenship to an observation that not all aliens are prohibited from possessing firearms under Federal law. Other commenters approved of the requirement to demonstrate citizenship, even though they were otherwise opposed to the rule.

**Department Response**

Under Federal law (18 U.S.C. 922(g)(5)(B)) it is generally unlawful for any alien admitted to the United States under a nonimmigrant visa to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce. This prohibition extends to NFA firearms. Federal law (18 U.S.C. 922(y)(2)) also provides certain exceptions to this prohibition. As a result, before ATF can approve an NFA registration request it must determine if the applicant or transferee is a U.S. citizen, and if the applicant or transferee is not a citizen, whether the applicant or transferee falls within the prohibition or exceptions described above. This requirement is not unique to NFA transfers. For example, the ATF Form 4473 requires the transferee or buyer to respond to questions to determine if the transferee or buyer is an alien admitted under a nonimmigrant visa, and if so, whether the transferee or buyer qualifies for an exception to the section 922(g)(5)(B) prohibition. On the ATF Form 7 (5310.12), Application for Federal Firearms License, the applicant is required to provide the applicant's country of citizenship and nonimmigrant aliens are required to certify compliance with 18 U.S.C. 922(g)(5)(B). This rule simply applies the same requirement to NFA registration documents in order to assure compliance with Federal law.

**c. General Applicability Questions**

**Comments Received**

Many commenters stated that the proposed rule gave rise to many unanswered questions, especially about the operation of the CLEO certification requirement in jurisdictions where CLEOs were reluctant or refused to provide the certification, regardless of the applicant's background. Another commenter asked how the rule would apply when, following the transfer, some or all of the responsible persons are replaced, and whether the answer would be different based upon the type of legal entity involved.

**Department Response**

As indicated in section IV.C.1 the Department has replaced the CLEO certification requirement with a CLEO notification requirement. This change renders moot many of the hypothetical questions submitted by commenters, including those that focus on jurisdictions in which obtaining CLEO certification is hindered for "political" reasons.

With respect to issues raised by the prospect of a post-transfer change in responsible parties, this rule does not require that ATF be notified of such changes. In the NPRM, the Department indicated that it was considering a requirement that new responsible persons submit Form 5320.23 within 30 days of a change in responsible persons at a trust or legal entity. After receiving several public comments on this issue, the Department is not requiring in this final rule that new responsible persons submit a Form 5320.23 within 30 days of any change in responsible persons.

**d. Alternatives to Definition**

**Comments Received**

A number of commenters took issue with the proposed definition of "responsible person." Some found it vague and overly broad. Others argued for a more finite definition, with some suggesting specific alternative definitions. Quite a few argued that, depending on the nature of the trust or legal entity, and the roles performed by persons associated with the trust or legal entity, ATF should permit designation of a sole or primary responsible person, thereby minimizing the burden associated with processing the application.

AR005678

**Department Response**

The Department acknowledges that whether an individual meets the definition of a responsible person will depend on the structure of the trust or legal entity acquiring the firearm and who within that structure has the power and authority to direct the management or policy of the trust or legal entity pertaining to firearms. The final rule provides guidance to persons seeking to acquire an NFA firearm for a trust or legal entity about who qualifies as a responsible person under most routine circumstances. For example, under the terms of a trust, if a minor child does not have the power and authority to direct the management and policy of the trust, and is not authorized under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust, the minor child would not meet the definition of a responsible person. Additionally, beneficiaries do not appear in the non-exclusive list of possible "responsible persons" in the definition and will not be considered responsible persons unless they meet the definition set out in the final rule.

The Department agrees that trusts and legal entities may have complex structures. However it is the responsibility of each trust, association, partnership, LLC, or corporation to determine which individuals within its structure are responsible persons under this rule. The Department does not agree with comments limiting the responsible person to only one individual per trust or legal entity because multiple individuals may have the power and authority to make decisions for the trust or legal entity, or otherwise meet the definition of "responsible person." This includes co-trustees, members of the board of directors, or controlling members of an LLC.

The Department has amended the originally proposed definition of "responsible person," see supra section IV.C.4.a, and the Department believes those revisions provide the clarity that many of the commenters requested, albeit without accepting some of their specific suggestions.

The Department further believes that it is the duty of individuals having the power or authority to direct the management and policies of the trust or legal entity to ensure that prohibited persons do not have access to firearms.

### D. Comments on Proposed Rule's Statutory and Executive Order Reviews

### 1. Executive Order 12866

Several commenters argued that the proposed rule violated or failed to comply with Executive Order 12866, an order which a few of these commenters noted was "revived by" Executive Order 13497. In general, these commenters took issue with ATF's cost-benefit *2691 analysis of the rule, finding that analysis to be lacking for a host of reasons including that ATF (1) failed to identify the existence of a problem the proposed rule was intended to solve; (2) failed to credibly assess costs and benefits of the proposed rule or consider more cost effective alternatives; (3) failed to properly estimate the full economic costs; (4) failed to properly weigh those costs against the expected benefits; (5) relied upon "spurious and anecdotal incidents" and "speculative logic" to justify the proposed rule; and, (6) by failing to conduct a proper cost-benefit analysis, improperly considered the rule not to be a significant regulatory action. Several commenters requested that ATF conduct an "in-depth," "detailed" financial impact study to assess the rule's costs and "actual, tangible benefits."

In addition, a few commenters argued that, in particular, the rule's extension of the CLEO certification requirement violated sections 1(b)(9) and (11) of Executive Order 12866 by failing to adopt the least burdensome effective alternative.

A commenter supported the estimates in the proposed rule, and concluded that the public safety benefits—expanding background checks to legal entities and ensuring fewer firearms would be possessed by prohibited persons—were "massive" and far outweighed any minor monetary or time costs to potential makers or acquirers of NFA firearms.

Another commenter stated that the proposed regulations extending the CLEO certification requirements would increase the processing workload for the NFA Branch by nine times, and that this would further add to the NFA Branch's backlog of one year. The commenter thus concluded that wait times would approach a decade.

**Department Response**

The Department believes it has thoroughly considered the costs and benefits of the rule. Commenters have not provided the Department with data or information that would alter or refine the Department's estimates of the rule's costs and benefits.

The Department has done its best to consider all relevant costs and benefits traceable to the rule, including, among other things, the benefits to public safety that will stem from the rule; the increased operational cost for the Government and industry members; the increased cost associated with additional fingerprint cards and photographs for responsible persons; and the increased labor cost associated with the time it takes for applicants and industry members to complete the required forms. Having considered all of the reasonably foreseeable costs and benefits, the Department has determined that the benefits of ensuring NFA weapons are less easily obtained by persons prohibited from possessing them outweighs the cost of implementing the rule.

The Department acknowledges the commenters' concerns with the Department's assessment of costs and benefits of the proposed rule in the NPRM. The final rule reflects that after careful consideration of all comments, the Department has elected to eliminate the CLEO certification and replace it with a CLEO notification that will lessen the burden to CLEOs and applicants for registration. See section IV.C.1 for the in-depth discussion of the Department's decision to adopt a CLEO notification requirement in lieu of CLEO certification.

This final rule also identifies important benefits to public safety and security that will be achieved by the rule. For example, by conducting background checks on persons who meet the new definition of a "responsible person," ATF will be better able to ensure that responsible persons within trusts and legal entities are not prohibited from possessing NFA firearms. Presently, only individuals are required to submit fingerprint cards and undergo background checks to ensure that they are allowed to possess and receive an NFA firearm.

Further, the CLEO notification will ensure that CLEOs are aware of NFA firearm acquisitions in their jurisdictions and have an opportunity to provide input to ATF, but will reduce costs because they will no longer be responsible for signing certifications or conducting background checks for individual applicants. This final rule will require all applicants and responsible persons within trusts and legal entities to notify their local CLEO by either forwarding a completed copy of Form 1, 4, or 5, or a completed copy of Form 5320.23, if applicable. ATF estimates that the time for a CLEO to review the notification is 15 minutes per applicant/responsible person. Because not all responsible persons within a trust or legal entity may live in the same location as the applicant trust or legal entity, a different CLEO may review the ATF Form 1, 4, or 5 from the CLEO that reviews a Form 5320.23 for each responsible person. However, if a CLEO determines that there is any reason why an applicant or transferee should not have an NFA firearm, the CLEO should notify ATF. While there will be additional costs to ATF, the Department has determined that the benefits will significantly outweigh any costs.

The NPRM identified a few instances when a prohibited person nearly erroneously acquired an NFA firearm; however, the transaction did not occur because the responsible person within the particular trust or legal entity had undergone a background check. Those examples show that there is a tangible risk of a prohibited person acquiring an NFA firearm through a trust or legal entity. The Department has not relied on those instances to conclude that there are presently a large number of erroneous transfers. However, the fact that some individuals have been prevented from obtaining firearms supports the Department's position that a risk exists that should be addressed.

The Department stands by its determination that this rule will neither have a significant annual effect on the economy of $100 million or more, nor adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities.

The Department recognizes that the final rule will affect processing times and is implementing processes to keep the impact to a minimum.

## 2. Executive Order 13132

A commenter quoted text that ATF used in section IV.B of the NPRM (78 FR at 55023), from which the Attorney General concluded that the NRPM did not have sufficient federalism implications to warrant ATF's preparing a federalism summary impact statement, and accordingly complied with section 6 of Executive Order 13132 (Federalism). This commenter noted that ATF acknowledged that the proposed expansion of the CLEO certification requirement to all responsible persons of a legal entity had the potential for increased utilization of State and local agencies' resources for processing CLEO certifications. This commenter questioned ATF's statement that such utilization would be "voluntary" and was "expected to be minimal." This commenter stated ATF needs to further clarify this "voluntary" utilization, and perform proper cost-benefit analyses to clarify its "claim" of minimal impact, or else abandon its proposal to extend the CLEO certification requirement

to responsible persons of a legal entity.

**Department Response**

After considering the objections of numerous commenters concerning the extension of the CLEO certification **\*2692** requirement to trusts and legal entities, the Department has decided not to expand the CLEO certification requirement to include responsible persons of trusts and legal entities. Instead, the Department has elected to remove the CLEO certification requirement entirely—for both responsible persons and individuals—and adopt CLEO notification in its place. This decision will lessen the burden on State and local agencies' resources in preparation and review of applications for responsible persons and individuals. Regardless of whether the rule might have required a federalism summary impact statement before, the decision to eliminate the CLEO certification requirement means that there is no need for one now. Because CLEOs will continue to be informed about the NFA firearms present within their jurisdictions, the Department also believes that this change will not materially degrade public safety.

The Department continues to maintain that the proposed rule did not have sufficient federalism implications to warrant a federalism summary impact statement. The Department noted in the proposed rule that the impact on resources used by State and local agencies would be "voluntary" and was "expected to be minimal." As many commenters have observed, CLEOs voluntarily decide to sign or not to sign off on any particular application, and would have continued to be able to do so under the proposed rule.

**3. Regulatory Flexibility Act**

Numerous commenters stated that ATF did not comply with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601-612. According to most of these commenters, there was no indication in the proposed rule that ATF adequately considered the needs of small businesses and the costs that were likely to be associated with the rule, especially the costs imposed on small businesses directly and indirectly associated with the manufacture, distribution, purchase, and use of NFA firearms. Numerous commenters suggested that the proposed rule would dramatically increase the cost of acquiring NFA firearms, especially silencers. They also suggested that the proposed rule would likely force a number of small businesses out of business, resulting in job loss and economic turmoil. Many of these commenters focused on the proposed requirement that CLEO certification be obtained for all acquisitions, regardless of the nature of the trust or legal entity, but some also identified the burden that would be imposed by requiring responsible persons for trusts and legal entities to have background checks run as part of the acquisition process. In addition, many commenters argued that ATF's estimated increased costs to legal entities were too low, as ATF estimated the number of responsible persons as two, a figure commenters regarded as an underestimate. Further, a commenter requested that ATF clarify the research and methodology it used to determine that the proposed rule complied with the RFA and perform further research, analyses, and clarification before implementing the final rule.

A few commenters explained that under the RFA and (as amended by) SBREFA, when "promulgating a rule, an agency must perform an analysis of the impact of the rule on small businesses, or certify, with support, that the regulation will not have a significant economic impact on them." Nat'l Mining Assoc. v. Mine Safety and Health Admin., 512 F.3d 696, 701 (D.C. Cir. 2008). According to these commenters, the regulatory flexibility analysis must "describe the impact of the proposed rule on small entities" and, among other things, must contain (1) "a description of the reasons why action by the agency is being considered;" (2) "a succinct statement of the objectives of, and legal basis for, the proposed rule;" (3) "a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;" and (4) "identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule." 5 U.S.C. 603. The commenters continued that the "analysis must also include discussion of alternatives to the proposed rule," and, although an agency head may certify that the rule will not "have a significant economic impact on a substantial number of small entities," such certification must be supported by "a statement providing the factual basis for such certification." 5 U.S.C. 605. Using this legal framework, these commenters argued that ATF did not follow its obligations under the RFA.

Another commenter stated that ATF should clarify the research and methodology it used to determine that the NPRM complied with RFA, and that further research, analyses, and clarification is required regarding the proposed rule's economic impact. Another commenter disagreed with ATF's estimated cost increase per legal entity being only $293.93, and believed this was far too low. The commenter attributed that result to ATF underestimating the average number of responsible persons as two.

**Department Response**

The Department believes it has thoroughly considered whether the rule will have a significant impact on small businesses and has reasonably concluded that it will not have such an impact. Commenters have pointed to no flaws in the Department's analysis that would call into question the reasonableness of its conclusion that the rule will minimally impact small businesses. Commenters have identified only two specific issues with the Department's analysis—namely, (1) that the Department underestimated the average number of responsible persons for trusts and legal entities, and (2) that the Department failed to consider potential secondary market impacts on small businesses that sell NFA firearms to trusts and legal entities covered by the rule. As to the first objection, the Department disagrees that its estimate of two responsible persons per entity was unreasonable. As to the second, the Department believes that any secondary market impacts will be negligible. The Department thus rejects the suggestion that it failed to give careful consideration to the full effect the proposed rule would have had on small businesses. In any event, this final rule has been revised to eliminate or ameliorate many of the concerns reflected in the comments about the RFA, and the rule remains fully compliant with that Act.

This final rule primarily affects trusts and legal entities that seek to make or acquire NFA firearms and are not making or acquiring them as qualified FFLs. The Department believes that the increased cost of implementing the regulations will not be significant on trusts or legal entities. ATF has estimated that the cost of implementing the regulation will increase the cost for 115,829 trusts and legal entities with an average of two responsible persons by $25,333,317 (identification costs for background checks: $23,846,679; CLEO notification costs: $1,487,244) per year.[FN11] Accordingly, the estimated cost increase per trust or legal entity is $218.71 (cost of increase ($25,333,317) / number of trusts and legal entities (115,829)).

In reaching this estimate the Department was quite specific in the proposed rule in allowing 10 minutes for each responsible person to complete Form 5320.23 and considered this a reasonable amount of time for **\*2693** responsible persons at any business, large or small, to allocate for compliance with regulatory requirements. However, after further consideration, the Department has adjusted this time estimate to 15 minutes. See section IV.E.1.f for additional discussion. Similarly, ATF projected that it would take only 50 minutes to procure needed photographs—a generous allocation considering the range of photo-taking technology available in this era of mobile and virtual technologies. See also section IV.C.1 for details concerning the shift from CLEO certification requirements to CLEO notification requirements.

By developing Table B(1)—Cost Estimates of the Time to Comply with the Proposed Rule's Requirements and Table B(2)—Cost Estimates of Procuring Photographs, Fingerprints, and Documentation, the Department complied with the requirement that it analyze the impact of the rule on small businesses and documented the anticipated effect of the regulation.

In section IV.A.2 of the proposed rule, ATF reported that "[i]n calendar year (CY) 2012, ATF received 84,435 applications that were either ATF Forms 1, 4, or 5. Of these, 40,700 applications were for unlicensed trusts or legal entities (e.g., corporations, companies) to make or receive an NFA firearm; 29,448 were for individuals to make or receive an NFA firearm; and 14,287 were for government agencies or qualified Federal firearms licensees (Gov/FFLs) to make or receive an NFA firearm." 78 FR at 55020-21. This data taken from actual applications received provided accurate data as to the number of trusts and legal entities to which the rule applies. Further, the Department believes that an average of two responsible persons per trust or legal entity is appropriate, especially in light of modifications to the responsible person definition in the final rule. See infra section IV.E.1.a. As explained there, ATF's estimate that each trust or legal entity has an average of two responsible persons is based on ATF's review of 454 randomly selected applications for corporations, LLCs, and trusts processed during CY 2014.

The Department disagrees with the comments indicating that the proposed rule would impose substantial recordkeeping obligations and increase the costs to ensure regulatory compliance, thereby resulting in small businesses being driven from the field. This final rule incorporates information required on ATF Form 5330.20 into the existing Forms 1, 4, and 5 that will reduce the burden upon the applicant or transferee by eliminating an additional form to be completed and filed. The current estimated time to complete the form is 3 minutes. Because the information requested on the forms is the same, savings will result from the applicant not having to attach a separate form. Further, these forms are not kept by the FFL and therefore will result in no increase in small business recordkeeping obligations.

Several commenters argued that ATF's RFA statement considered only the NFA purchasers and their estimated additional costs of compliance, but ignored the proposed rule's significant effect on manufacturers and distributors/sellers, and the fact

that business' customers would have a difficult time obtaining certification via a CLEO, therefore hurting sales. The Department notes again that it has changed the certification requirement to a notification requirement. See supra section IV.C.1. Further, the Department notes that the rule's primary focus relates to those responsible persons who have authority to direct firearms policy. The Department believes that because the rule is unlikely to significantly burden trusts and legal entities that wish to acquire NFA firearms, small businesses that sell or distribute NFA firearms and components to such trusts or legal entities will see a negligible or non-existent impact on their sales.

Finally, the Department emphasizes that this rule will primarily affect trusts and legal entities that are seeking to make or acquire NFA firearms and are not making or acquiring them as qualified FFLs. Many commenters have observed that the increased use of trusts during the last decade has been in response to increased CLEO refusals to provide the certification required for individual NFA acquisition applications. If that is true, the Department's revision of that requirement can be expected to dramatically decrease the use of trusts to acquire NFA firearms in the future, meaning that the rule's impact on small businesses may be even less than it estimates. In any event, the increased cost of implementing the rule will not be significant on trusts or legal entities, even if the number of trusts and legal entities remains the same. The Department has estimated that the cost of implementing the regulation will increase the cost for 115,829 entities with an average of 2 responsible persons by $25,333,317 per year (identification costs: $23,846,679; notification costs: $1,487,244).[FN12] Accordingly, the estimated cost increase per trust or legal entity is $218.71 (cost of increase ($25,333,317) / number of trusts and legal entities (115,829)).


**4. Small Business Regulatory Enforcement Fairness Act of 1996**
Although the proposed rule stated that it did not constitute a "major rule" as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 804, several commenters disagreed. In addition, while the proposal stated that it would not result in "an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effect on . . . employment . . .," 78 FR at 55024, several commenters disagreed with these assertions as well. One commenter requested that ATF clarify the research and methodology it used to determine that the proposed rule complied with SBREFA.

One commenter asserted that extending the CLEO certification requirement to responsible persons of trusts and legal entities would effectively destroy the market for NFA firearms because "99% of 'legal entity' transfers" stemmed from the CLEO's refusal to sign an individual application. According to the commenter, the proposed rule would thus eliminate "approximately $54 million dollars of tax generating commerce," with a corresponding impact on jobs, with zero value gained in terms of public safety, and, thus would constitute a "major rule" under SBREFA. Other commenters made similar points concerning the proposed rule's impact under the assumption that CLEO certification would be a larger hindrance to conducting commerce in NFA firearms. Several commenters noted that this would also collaterally impact the Federal fiscal budget through a decreased payment of the Special Occupational Tax. Another commenter proposed that the economic impact of the proposed rule would have a "chilling" effect on NFA items' sales (especially lower-cost sound suppressors) due to the cost increase incurred by transferees under the proposed rule.


**Department Response**
The Department maintains that it complied with the SBREFA in the proposed rule. Nonetheless, for this final rule, the Department has reassessed burdens and costs to **2694** applicants, responsible persons, and CLEOs.

In preparing this final rule, the Department looked at the additional impact on licensed manufacturers, dealers, legal entities, applicants, and responsible persons and determined that the changes would not exceed a threshold greater than $100 million or more on the economy. The impact on small businesses should remain minimal.

Based upon concerns from commenters that the Department underestimated the number of responsible persons in the NPRM, the Department revisited the definition of "responsible person" and has amended it in this final rule. See supra section IV.C.4.a.i. Beneficiaries are no longer specified as typical responsible persons in the definition, though they may still be required to submit to a background check if they otherwise meet the definition of "responsible person." ATF has also has reassessed the number of responsible persons and the number of pages of supporting documentation per legal entity. See section IV.E.1.b for the methodology used. This reassessment reflects that the estimated number of responsible persons per trust or legal entity application remains at two, and the number of pages for the supporting documentation is averaged at 16

pages. See section IV.E.1.a and IV.E.1.b. See section VI.A.3 for additional details about the cost to State and local entities.

As discussed in section IV.C.1, the Department is eliminating the CLEO certification requirement and implementing a CLEO notification requirement; this will lessen the burden to CLEOs. The CLEOs will have the discretion and flexibility to review, manage, and maintain this information in the manner that they believe is most appropriate to the public safety concerns in their respective jurisdictions.

In addressing commenters' concerns that the CLEO extension requirement could force many FFLs out of business, ATF did not assess the indirect costs to FFLs, such as manufacturers or dealers, but concentrated on the direct costs to applicants, responsible persons and CLEOs, who have the greatest investment in the making or transfer process. However, as stated, CLEO notification will diminish, if not eliminate, the economic impact on small businesses, including FFLs, that CLEO certification may have imposed.

### 5. Unfunded Mandates Reform Act of 1995

A few commenters expressed concerns that the proposed rule did not comply with the Unfunded Mandates Reform Act of 1995 (UMRA), with two commenters identifying certain areas that they contended called for additional study and justification by ATF to ensure compliance with UMRA. One commenter stated that the proposal to extend the CLEO certification requirement shifts a "significant regulatory burden" onto State and local agencies, causing them to have to undertake additional expenditures, hire new staff, and engage in additional training. This commenter stated that UMRA (2 U.S.C. 1532) requires that an analysis be performed to determine whether additional government funding is needed for State and local agencies to comply with the mandate. Many other commenters questioned or disagreed with ATF's statement that the proposed rule did not impose any "unfunded mandates," again focusing on the proposal to extend the CLEO certification requirement to responsible persons of trusts and legal entities, which, they noted, would significantly burden CLEOs and divert local law enforcement resources from other criminal justice priorities. Numerous commenters referenced the U.S. Supreme Court case, Printz v. United States, 521 U.S. 898 (1997), which articulated an "anti-commandeering principle" and held invalid a Federal regulatory regime that mandated that CLEOs perform background checks for handgun transfers. These commenters stated that the proposed rule effectively imposed on CLEOs the burden of conducting background investigations as part of a Federal regulatory regime, in violation of Printz. These commenters also reiterated their view that ATF's estimate of the costs imposed by its proposed rule, especially the costs imposed on CLEOs, were too low, both with respect to the time it would take to perform a certification and the direct costs associated with the process. For example, one commenter calculated that for an average legal entity with four responsible persons, certification would involve four hours of CLEO time, equating to $123.20 per entity (4 x $30.80 = $123.20). Extrapolating further, this commenter calculated that the total costs to CLEOs around the country would be at least $5,014,240.

### Department Response

The Department acknowledges commenters' concerns that the proposed extension of the CLEO certification would place additional burdens on CLEOs for processing and reviewing additional responsible persons' forms, and for taking and reviewing fingerprints. The Department, however, complied with UMRA in the proposed rule. In any event, for this final rule, the Department reexamined the burdens and costs to CLEOs.

In preparing this final rule, the Department based the costs and expenditures upon direct costs to State and local agencies, licensees, and ATF. While it acknowledges that there may be several indirect costs or resources that may be associated with complying with the rule, the Department believes that the amount would still not be greater than $100 million or more.

For this final rule, the Department prepared an additional analysis of approved applications in response to several comments that it provided a "low estimate" of the number of responsible persons per applicant, and the number of pages of chartering documents at those entities, which directly affects the time and resources required by the CLEO to review applications. As discussed in section IV.C.1, the Department is eliminating the CLEO certification requirement and replacing it with a CLEO notification requirement that will significantly lessen the burden to CLEOs. The CLEOs will have the flexibility and discretion to review and maintain the information they obtain as a result of this rule in the manner that best enhances public safety in their respective jurisdictions.

Regarding the commenters who referenced Printz v. United States, 521 U.S. 898 (1997), the Department notes that current

Federal regulations do not require CLEOs to provide a CLEO certification for an applicant, a fact that many commenters pointed out as the primary reason for the proliferation of the use of NFA trusts. Unlike in Printz, this final rule imposes no obligations on CLEOs but does provide them with the ability to obtain information that is potentially useful to accomplishing their missions and the opportunity to provide relevant information to ATF. Historically, the CLEO certification was designed to assist in maintaining public safety and was established to gather any information on the local level that might require denial of an application to make or receive an NFA firearm. Prior to the advent of comprehensive criminal history databases, CLEO certification was critically important. That role is less important today, and public safety concerns can still be addressed with CLEO notification without imposing unnecessary burdens upon local CLEOs.

As a result of ATF's review of public comments received in response to the proposed rule, the Department will remove the CLEO certification and replace it with a notification obligation upon the applicant/transferee, including **\*2695** responsible persons of a trust or legal entity. This notification will reduce the burden on State and local agencies because notification does not involve signing off on applications. This will also simplify the process for CLEOs as the same criteria will apply to both unlicensed trust, legal entity, and individual applicants/transferees. Finally, ATF will continue to receive fingerprint cards along with applications for the purpose of conducting background checks to ensure that responsible persons of an applicant or transferee are not prohibited from possessing an NFA firearm. ATF will continue to conduct these activities and therefore these activities will impose no additional costs on CLEOs.

Because CLEO notifications will require only those resources that the CLEOs themselves decide to devote to notification management, additional funding to assist State, local, and tribal governments in complying with this rule is unnecessary.

The Department has determined that this rule is not an unfunded mandate because it does not meet the criteria under UMRA. Specifically, it does not result in the expenditure of funds by State, local, and tribal governments, in the aggregate, or by the private sector of $100 million or more in any one year. See section VI.A.3 for additional details about the Department's estimate of costs to State and local entities.

## 6. Paperwork Reduction Act

Many commenters stated that the proposed rule, with its proposal to expand the CLEO certification requirement to responsible persons, imposed an increased information collection burden (i.e., additional paperwork) on the public, and violated the Paperwork Reduction Act (PRA). Some commenters mentioned the impact in terms of the PRA generally; others focused on the PRA of 1980 (Pub. L. 96-511, 94 Stat. 2812, codified at 44 U.S.C. 3501-3521) as an Act designed to reduce the "total amount" of the paperwork burden the Federal Government imposes on private businesses and citizens. Others mentioned the PRA of 1995, which confirmed that the authority of the Office of Information and Regulatory Affairs (OIRA) at the Office of Management and Budget (OMB) "extended over not only agency orders to provide information to the government, but also agency orders to provide information to the public." A few commenters argued that the CLEO certification requirement, regardless of the proposed expansion, places an "unnecessary burden" of paperwork on the public as there is no "just reason" for CLEO certification given ATF's access to the FBI's national criminal history databases. Others observed that the rule would complicate and perhaps degrade applicants' opportunities to submit their NFA applications by electronic means, thereby increasing the paperwork burden. Some commenters observed, however, that eliminating the CLEO certification requirement for individuals and legal entities, and instead requiring a NICS check with a Form 4473 at the time of physical transfer of the NFA firearm, would enable applicants to e-file all NFA transfer forms, greatly reducing paperwork and streamlining the approval process at ATF. A number of commenters offered additional suggestions designed to increase application processing efficiency and speed; for example, having ATF maintain a database of approved applicants, having ATF permit electronic payments, and reducing the redundancy in ATF's processing system associated with multiple applications.

One commenter suggested further ways to decrease paperwork and reduce the redundancy in ATF's processing system associated with multiple applications submitted by the same person or legal entity. This commenter suggested that ATF consolidate applications from repeat applicants, maintain and use a database of approved applicants, and perform background checks on new applications from the date of the last approval. In this way, the commenter contended, the process would be shortened but maintain its integrity.

## Department Response

The Department acknowledges the commenters' concerns that the proposed expansion of the CLEO certification requirement, as well as the CLEO certification requirement for individuals, imposed paperwork burdens on the public and on ATF. The Department also acknowledges that the proposed expansion may have limited the use of the ATF eForms system for many NFA applications because of the manual submission of fingerprint cards, etc. As discussed in section IV.C.1, the Department is removing the CLEO certification requirement for individuals, and replacing it with a notification requirement for both individuals and trusts or legal entities. This change will help reduce paperwork and increase efficiency for the public and ATF. Section VI.G of this rule fully discusses the paperwork burdens.

Regarding commenters' other suggestions for streamlining the process (e.g., permitting electronic payments and reducing redundancy with multiple applications), the Department addresses those comments in section IV.G. The Department continues to maintain that requiring background checks for responsible persons, which includes a requirement that they submit photographs and fingerprint cards to ATF, increases public safety. See section IV.C.4 for discussion of benefits.

### E. Comments on Costs and Benefits

### 1. Implementation Costs of Rule are Underestimated

### a. Number of Responsible Persons per Legal Entity

**Comments Received**
In the proposed rule, ATF estimated an average of two responsible persons associated with a legal entity. Many commenters stated that ATF grossly underestimated this number and that having more than two responsible persons was not calculated into the cost. A number of objections were raised as to the sample size ATF used to obtain its estimate, which commenters argued was too small and not determined through statistically rigorous analysis. One of these commenters stated that if ATF's estimate of two responsible persons was inaccurate, it should propose another comment period with a revised number of responsible persons and associated costs.

Numerous commenters also noted that given the breadth of the definition of "responsible person" in the proposed rule, it was likely that the average number per legal entity was much higher than two. Commenters, including persons with experience preparing NFA trusts, opined that two was more likely to be the minimum number per legal entity, not the average. For corporations or LLCs, in particular, commenters observed that the number could be higher still, potentially in the "hundreds to thousands."

Commenters noted that if, as they believed, ATF's estimated average number of responsible persons was unreasonably low, its cost estimate was equally unreliable. One commenter opined that the total annual direct implementation costs to citizens involved in NFA transactions should be at least three times higher than ATF's estimate (i.e., $35,889,261 instead of $11,963,087). This commenter stated that the estimated annual costs to ATF and local law enforcement agencies also should be adjusted (i.e., ATF annual costs: $5,423,682 instead of $1,807,894; **\*2696** local law enforcement annual costs: $3,790,680 instead of $1,263,560). Therefore, this commenter estimated the total implementation costs at $45,103,623 ($35,889, 261 + $5,423,682 + $3,790,680 = $45,103,623), three times higher than ATF's total implementation costs of $15,007,541 ($11,963,087 + $1,807,894 + $1,263,560 = $15,007,541).

**Department Response**
For this final rule, the Department reviewed a random sampling of 454 forms to determine the average number of responsible persons per legal entity. The random sample was pulled from the 115,825 Forms 1, 4, and 5 processed in CY 2014. The forms to be reviewed were generated using established sampling methods based on ATF criteria of a 95 percent confidence level with a 2 percent sampling error, and represented a mixture of legal entities including trusts, corporations, and LLCs. The random sample showed that the average number of responsible persons was approximately two. Additionally, the random sample showed that the most frequent number of responsible persons was one (with 226 instances), followed by two (with 124 instances). This represents 78 percent of the forms reviewed. The highest number of responsible persons in the sample was 11. Based on its random sample, the Department continues to estimate that each trust or legal entity has an average of two responsible persons. Moreover, the criteria used for determining who would be a responsible person in the most recent random sample review was based on a definition of "responsible person" materially similar to the revised

definition of responsible person in this rule. See supra section IV.C.4.a. The Department acknowledges that the cost estimates for this final rule are based on an estimated average number of two responsible persons, but that individual experiences may vary.

To be considered a responsible person, the individual must possess, directly or indirectly, the power or authority to direct the management and policies of the entity insofar as they pertain to firearms. This power or authority will be limited by the terms of the trust or the structure of a legal entity. Therefore, not every individual named in a trust document will be considered a responsible person, but any person who has the capability to exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust, will be considered a responsible person of the trust.

With respect to the definition of responsible person that was used to determine the average number of responsible persons at trusts and legal entities, the definition used was materially similar to the definition that appears in this final rule. The Department has thus concluded that, under the definition of responsible person that appears in this final rule, the best estimate of the average number of responsible persons at trusts and legal entities is two. The Department notes that none of the trust documents reviewed in the sampling gave beneficiaries the power or authority to direct the management and policies of the trust, including the capability to exercise such power and possess, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust.

### b. Number of Pages of Supporting Documents

**Comments Received**

A few commentators questioned the sampling methodology ATF used to determine that the documents chartering a legal entity averaged 15 pages in length and thought it was "highly suspect." These commenters noted that ATF reviewed a different sample size to determine the average length of documentation than it used to compute the average number of responsible persons per legal entity (i.e., ATF reviewed 50 applications to determine the average number of constitutive documents for trusts and legal entities and 39 applications to determine the average number of responsible persons). Without access to ATF's methodology, these commenters believe that the unexplained difference strongly suggests sampling or selection bias. One of these commenters stated that ATF has not addressed his request—through counsel—for information about the methodology used. In addition, these commenters, and a few others, alleged that the sample size was too small. Another commenter stated that for the average length to be 15 pages, that would mean, statistically, that half of the trusts have fewer than 15 pages of trust documents, which the commenter did not consider believable.

Another commenter stated that his own experiences as the owner and founder of Gun Trust Lawyer™, a nationwide network of lawyers, confirm what many other commenters observed, namely, that ATF underestimated the document length and other costs associated with the proposed rule. This commenter and several other commenters stated that the document length of a sample revocable trust used by Gun Trust Lawyer™, including exhibits and attachments, is almost double the length that ATF estimated when the trust has four to six trustees, a typical number of trustees. These commenters stated that the sample revocable trust, used by this network includes a 19-page trust document, with additional pages for assignment of property and recording contributions, witnessed statements from each trustee and the settlor, and the signed "Trustee Declaration" and notarized signature page. Another commenter stated that documents associated with sophisticated estate plans or complicated trusts can be quite lengthy with trust instruments and entity formation documents ranging from a few pages to hundreds of pages when their schedules, exhibits, and attachments—all of which must be filed with ATF—are included. Another commenter stated that the gun trusts he creates are at least 65 pages long, and that he knows a substantial number of other attorneys who also create trusts of this length. Another commenter stated that his trust comprises 18 articles and over 70 pages. This commenter stated that ATF needed to reevaluate the sample and revise the cost assumptions.

Another commenter stated that ATF did not consider corporations and LLCs when estimating the average document length, and asked about the average length of document pages that a corporate entity and its shareholders would submit. Another commenter stated that the type of documents needed to evidence the existence and validity of partnerships, companies, associations, corporations, and trusts is governed by "formation and continuation" rules, which vary among the 50 States and are "complex, state-specific, and diverse in purpose." This commenter stated that it is highly unlikely that ATF will be able to examine "hundreds or perhaps thousands of pages of trust or entity documents" due to lack of time and expertise.

**Department Response**

For this final rule, the Department reviewed a random sampling of 454 applications to determine the average number of pages in the corporate or trust documents. The random sample was derived from 115,825 Forms 1, 4, and 5 processed in CY 2014. The forms **\*2697** to be reviewed were generated using established sampling methods based on criteria of a 95 percent confidence level with a 2 percent sampling error and represented a mixture of trusts and corporations, LLCs, and other legal entities. Based on its review of the random sample, ATF now estimates an average length of sixteen pages. Thirty-eight percent of the random sample had between six and ten pages. Twenty-nine percent of the random sample had between eleven and twenty pages. The highest number of pages in the random sample was fifty-five. Only two percent of the random sample had more than 50 pages and only three percent of the random sample had more than 40 pages. The Department acknowledges that the cost estimates are based on an average number of pages, including attachments, and that individual experiences may vary.

The Department acknowledges that each State is specific in the documentation required for partnerships, companies, associations, corporations, and trusts. ATF examines all submitted documents when trusts and legal entities apply for a Federal firearms license.

**c. Costs for Photographs and Fingerprints**

**Comments Received**

ATF estimated that photographs would cost $8.00 and take an average of 50 minutes to obtain, and that fingerprints would cost $24.00 and take 60 minutes to obtain. Many commenters stated that ATF's estimates for photographs and fingerprints were unrealistically low, and, in their experiences, the costs and times were "higher" and even "significantly higher." The costs and times provided by the commenters for photographs ranged from $8.00 to $125 and 5 minutes to two weeks, respectively. The costs and times provided by the commenters for fingerprints ranged from no cost—complimentary service—to $120, and from 10 minutes to three weeks. A commenter stated that since ATF did not provide any supporting documentation for the estimated costs and times, it was not clear whether ATF surveyed only service providers in "highly-competitive, urban markets." This commenter referenced the experiences of another commenter, who lived in a rural area and had to contact six police departments, taking several hours, before finding someone willing to fingerprint him. Other commenters mentioned additional costs in obtaining photographs and fingerprints that they believed ATF did not take into consideration such as work time missed, drive time, "fuel, wear and tear on my personal vehicle," and "value of my time." Another commenter stated that the stores offering in-house photography are dwindling and that applicants will spend 15 minutes locating a store, an average of at least 40 minutes for travel to and from the store, 20 minutes waiting for copy machines to warm up at the store, and additional time getting pictures taken and printed, totaling 75 minutes. This commenter referenced a nationwide chain's price for passport photographs at $11.99 plus tax, totaling $12.71, plus an $11.30 cost of driving to the store, computed by estimating an average roundtrip of 20 miles at the Federal mileage rate. This commenter summed up costs and time at $24.01 and 75 minutes, respectively, to obtain photographs. This commenter accepted ATF's estimate of $24.00 to obtain fingerprints but considered ATF's estimate of the associated time as 60 minutes to be low. This commenter estimated the time at 100 minutes (70 minutes total travel time plus 30 minutes on site to obtain fingerprints) plus an average round trip of 40 miles costing $22.60, determined at the Federal mileage rate. This commenter tallied the fingerprint costs and time at $46.60 ($24.00 + 22.60 = 46.60) and 100 minutes, equating to $97.93 per responsible person. As support for his position that ATF underestimated the fingerprint costs, another commenter provided a link to the Department of Homeland Security's Transportation Security Administration Web page [FN13] to show listed fingerprint service costs.

**Department Response**

Fingerprints may be taken by anyone who is properly equipped to take them (see instructions on ATF Form 1, Form 4, Form 5, and Form 5320.23). Therefore, applicants may utilize the service of any business or government agency that is properly equipped to take fingerprints. Depending on where the fingerprints are taken, the service may require an appointment, and appointment availability may be limited. Some businesses provide evening and weekend appointments and a number of private companies provide mobile fingerprinting services at a location chosen by the customer to be fingerprinted. Additionally, some mobile fingerprinting services offer special pricing to groups of individuals who need to be fingerprinted.

ATF reviewed 254 Web sites that published the cost of fingerprint service. Information was obtained from businesses and government agencies located throughout the United States, in both urban and rural areas. The review disclosed a cost from zero to $75.00 for two fingerprint cards. One hundred thirty-eight of the Web sites listed a cost between $10.00 and $20.00. Based on its review, ATF estimates the average cost to be $18.66.

The estimated time to obtain fingerprints set forth in the proposed rule was 60 minutes. This estimate was derived from information ATF submitted to OMB as part of the renewal approval process for ATF Forms 1, 4, and 5. The time estimate has been accepted by OMB as an appropriate estimate of the time needed to obtain fingerprints. A review of twenty-two Web sites that published an approximate amount of time to obtain fingerprints disclosed time estimates ranging from 5 minutes to 120 minutes, with the average time being 22 minutes. As not all the Web site estimates include wait time to obtain fingerprints, the Department believes the estimate of 60 minutes is a reasonable time approximation. The Department recognizes that individual experiences may vary from the estimated time.

Photographs must be a size of 2 inches x 2 inches of a frontal view taken within one year of the date of the application (see 27 CFR 479.63 and 479.85). There is no requirement that the applicant/transferee use a professional photographer to acquire the photographs, provided that they meet the stated requirements. The photographs may be taken at home with a digital camera and printed out in the required size using a color printer or the applicant/transferee may use a Web site that provides this service. In addition, the applicant/transferee may choose to obtain passport photographs, which meet the required specifications.

Numerous businesses offer passport photograph services including national chain stores. Generally, there is no appointment necessary to obtain passport photographs from these types of businesses.

ATF reviewed 57 Web sites that published the cost of passport photographs. Information was obtained from businesses located throughout the United States, in both urban and rural areas. The review disclosed a cost for two passport photographs that ranged from zero to $25.00. Thirty-five of the Web sites listed a cost between $10.00 and $15.00. Based on its review, ATF estimates the average cost is $11.32. The Department recognizes that the costs associated with individual experiences may vary from the estimated cost.

**\*2698** The estimated time of 50 minutes to obtain photographs was obtained from information ATF submitted to the OMB as part of the renewal approval process for ATF Forms 1, 4, and 5. The time estimate has been accepted by OMB as an appropriate estimate of time to obtain photographs. A review of fifteen Web sites that published an approximate amount of time to obtain photographs disclosed time estimates ranging from 5 to 15 minutes with the average time being 10 minutes. As the Web site estimates include only the time necessary to have the photograph taken and printed, ATF believes the estimate of 50 minutes (accounting for travel time and possible wait time) is a more accurate time approximation. The Department recognizes that individual experiences may vary from the estimated time.

### d. Time To Obtain CLEO Certification

**Comments Received**

ATF estimated that the time needed for a responsible person to procure the CLEO certification was 100 minutes (70 minutes travel time and 30 minutes review time with the CLEO). Several commentators stated that in their experiences, ATF's estimate was inaccurate, too low, "way off-base," and did not include additional associated costs. A few of those commenters stated that ATF did not consider the large number of instances where multiple CLEOs were unwilling to sign and an applicant needed additional time to "hunt" for a CLEO willing to sign the certification, which may have included visiting several different government offices, making appointments with multiple CLEOs, and educating and persuading the CLEO to sign the certification. A commenter stated that his CLEO would not review the form with him, and instead advised the commenter to mail in the form with an estimated wait of over 30 days for the CLEO to decide whether to sign the form. Another commenter expressed knowledge of many CLEOs who require that the applicant leave the form with their offices, and return later to pick it up, doubling ATF's estimated travel time of 70 minutes to 140 minutes. This commenter also stated that a typical process is for the CLEO's assistant to first review the form—taking 30 minutes—and then for the CLEO to review the form—taking 15 minutes—so that the total CLEO review time is 45 minutes. This commenter also estimated applicants' drive time to average 40 miles, twice, to obtain the CLEO certification with a total mileage cost of $45.20 at the Federal mileage rate. This commenter tallied the costs at $140.17 per responsible person. Another commenter estimated that

he spent over 240 minutes calling and writing letters to try and obtain CLEO certification to no avail, far exceeding ATF's estimated 100 minutes.

Another commenter stated that ATF did not justify or substantiate its estimate of 100 minutes. This commenter requested that ATF sample a statistically relevant number of NFA item owners to determine how long it actually takes to obtain CLEO certification. This commenter also requested that ATF consider the additional costs that some CLEOs arbitrarily impose on applicants as a condition to providing certification. According to the commenter, these conditions may include acquisition of an FFL03 Curio and Relic license or Concealed Weapons Permit, attendance at police fundraisers, volunteer service with the CLEO's department, or contributions to political campaigns.

**Department Response**
The Department acknowledges that individual experiences to obtain CLEO certification have varied from the time estimate. However, the time estimate is no longer relevant as the CLEO certification has been replaced with a CLEO notification requirement. See supra section IV.C.1.

**e. Time Valuation Costs on Civilian Workers**

**Comments Received**
A trade organization commenter stated that by basing all of its time valuations on $30.80—the current average hourly compensation for all civilian workers in the United States—ATF failed to consider that NFA firearms are often very costly, and that even the least expensive ones are discretionary purchases and unlikely to be made by low-income individuals. This commenter also noted that these items typically have a $200 making or transfer tax, and that people using legal entities to make or acquire NFA firearms will already have incurred other expenses to create the legal entities, such as legal fees and corporate filing fees. This commenter suggested that ATF base its cost burden estimates on the actual characteristics of those who would be considered responsible persons. Other commenters stated that an individual purchasing NFA firearms would have higher than average disposable income and is not an average civilian worker.

**Department Response**
The Department does not have access to confidential information such as the salary or disposable income for individuals purchasing NFA firearms. Commenters have not suggested a methodology or dataset that would permit the Department to more accurately estimate the time-value of responsible persons than the one it has adopted. The Department thus continues to believe that it is appropriate to base the time valuations for individuals and responsible persons of trusts and legal entities on the civilian hourly rate, as determined by the U.S. Department of Labor, Bureau of Labor Statistics. In June 2015, the hourly earnings for civilians was $33.19. See section VI.A.1 of this rule for further discussion and the U.S. Department of Labor, Bureau of Labor, Web site at http://www.bls.gov/news.release/pdf/ecec.pdf.

**f. Other Incorrect Costs**
A commenter stated that ATF's time estimate of 10 minutes for a responsible person to complete Form 5320.23 was too optimistic. This commenter thought that ten minutes might be reasonable if the person completing it was familiar with the form, but that additional costs would be incurred to learn how to complete the form. This commenter asserted 15 minutes would be a more accurate estimate, equating to $7.70 per responsible person. Another commenter asked how ATF could accurately estimate a "mere" 10 minutes, on average, per responsible person to complete Form 5320.23, when the form had not yet been created. This commenter disagreed with ATF's statement that there would be no increased costs associated with mailing the application package to ATF, and called such a statement "either willfully false, or woefully ignorant." This commenter argued that the proposed rule would add weight and increased cost to mail an application, which now must contain a "significant" number of paper pages (i.e., forms 5320.23, fingerprint samples, photograph samples, and CLEO certifications). This commenter also noted that the U.S. Postal Service recently announced a rate increase, which ATF did not factor into its cost calculations. This commenter also questioned how ATF could maintain that it would incur no additional costs to review this new paperwork when the proposed rule would result in more CLEO certifications, fingerprints, and photographs with each application.

**\*2699** Another commenter considered ATF's estimate of cost to copy documents, associated with a legal entity, at $0.10 per page, a fair estimate; however, this commenter stated that the average trust, if properly drafted, would have 20 pages, not the estimated 15 pages. Additionally, this commenter stated that ATF's time estimate of 5 minutes to make copies was low. This commenter stated that many legal entities do not have a copy machine on site and would need to travel to a commercial facility to make copies. This commenter estimated such a round trip to be 30 minutes and cover 15 miles on average, costing the applicant $8.48 (using the Federal mileage rate). This commenter stated that making copies and paying for those copies would take 10 minutes. Tallying the total times and costs, this commenter estimated that the entity would spend "$16.95 to travel, $2.00 on copies, and 40 minutes to travel and acquire the copies. In dollars, this equates to $39.48 per entity."

A commenter questioned ATF's estimated cost of $14.50 to process fingerprints. This commenter stated that $14.50 is the cost ATF pays but may not be the actual cost to the FBI. This commenter expressed interest in hearing from the FBI on the "true" cost transfer from ATF to the FBI.

### Department Response

The Department agrees with the suggestion that allowing 15 minutes to complete Form 5320.23, 5 minutes more than the estimate in the proposed rule (78 FR at 55022), is a fair estimate. With respect to mailing costs, the addition of a CLEO notification requirement will result in the mailing of an additional form to the CLEO (if the applicant/transferee or responsible person(s) opts to use mail delivery) but the associated costs are minimal. Moreover, any additional mailing costs will be offset by cost and time savings resulting from the elimination of the CLEO certification requirement. Further, postage costs are already included in the costs of completing and mailing Forms 1, 4, or 5 to ATF. As discussed in the proposed rule (78 FR at 55022), individuals, trusts, and legal entities must complete and mail Forms 1, 4, or 5 to ATF. This final rule should not change the costs associated with that process. Even if there are multiple responsible persons associated with a trust or legal entity, the trust or legal entity still will be completing and mailing one Form 1, 4, or 5. Similarly, because CLEO notifications have replaced CLEO certifications, ATF's internal costs will remain as discussed in the proposed rule (78 FR at 55022).

The Department agrees with the commenter who referenced ATF's estimate of cost to copy documents "at $0.10 per page a fair estimate." Further, a more recent analysis of 454 random samples available to ATF suggests that 16 pages approximates the mean length for properly drafted trust documentation. In addition, the Department concurs with the estimate of ten minutes to make and pay for copies. Current data indicates that ATF pays the FBI $12.75 to process fingerprints, which is the appropriate cost for inclusion in this final rule.

### g. Costs Not Considered

### i. Lost Tax Revenue

### Comments Received

Many commenters stated that ATF failed to account for the significant loss of tax revenue by ATF from fewer NFA transfers, and on the income tax lost on the sale of NFA firearms by manufacturers, distributors, and dealers. Several of these commenters noted that ATF estimated 40,565 ATF Forms 1 or 4 were submitted in 2012 for non-FFL legal entities (78 FR at 55021). Several commenters stated that the proposed rule would "discourage" or "scare off" individuals from purchasing or making NFA firearms because the rule will make the application process for legal entities more difficult. These commenters stated that for every Form 1 and Form 4 that is not submitted to ATF, a $200 tax payment loss will result (unless the application is submitted for an "Any Other Weapons" weapon, in which case the tax payment loss would only be $5). Several commenters provided estimates of the decreased volume in NFA applications that they asserted would result from implementation of the proposed rule, and corresponding losses in NFA tax stamp revenue. These estimates of reduced applications ranged from a 50 percent reduction (attributed primarily to predicted refusal of CLEOs to sign certifications for legal entity responsible persons) to a 75 percent reduction (attributed primarily to a decrease in legal entity applications), with corresponding estimated losses in NFA tax stamp revenue of $6.1 to $8.1 million. Several commenters stated that the proposed rule would make it harder for people to legally purchase silencers, and asked, "is ATF trying to eliminate $12,000,000+ in annual tax revenue?" Several commenters asserted tax revenue losses would occur in addition to lost NFA tax stamp revenue. They stated that if the business of selling NFA firearms declined and caused small FFL dealers and custom manufacturers to cease dealing in NFA firearms, such dealers and manufacturers would surrender their SOT status

and stop paying at least $500 annually to the U.S. Treasury. If small custom manufacturers determined it was no longer profitable to stay in business and were forced to shut their doors, such manufacturers would stop annual payments of at least $2,400 to the U.S. Treasury under the International Traffic in Arms Regulations. See 22 CFR 122.3. There would also be a less direct effect, as the entity operating the FFL, as well as the individual owners and employees, would lose income, which would result in a reduction in income tax revenue.

**Department Response**

As noted, the final rule eliminates the CLEO certification requirement. Consequently, comments asserting tax revenue losses resulting from the refusal of CLEOs to sign certifications for legal entities are now moot. Moreover, the Department does not anticipate a decline in Form 4 applications. The Department has not observed, and does not anticipate, reduced demand for NFA firearms or a decline in the filing of applications (Forms 1 and 4). Applications have generally increased each year and the Department expects this trend to continue as more States loosen restrictions on the use, in particular, of silencers for hunting or target shooting.

Moreover, because the CLEO notification requirement and the requirements for fingerprint and photograph submission will be the same under the final rule for individual applicants and trusts and legal entities, applicants may choose to forgo the formation of a trust or legal entity and acquire firearms as individuals. A number of commenters have observed that the proliferation of NFA trusts is a direct result of the CLEO certification requirement for individual applicants. It is therefore fair to predict that eliminating the certification requirement will reverse that trend. Applications submitted by an individual are less complex because they do not require documentation evidencing the existence and validity of a trust or legal entity, such as articles of incorporation.

Contrary to the assertions of several commenters, the Department does not anticipate that implementation of the final rule will result in an increase in the number of FFLs or FFL/SOTs going out of business. The number of FFLs that also paid SOT to manufacture, import, or deal in NFA firearms increased 117 percent between 2009 and 2014. The Department estimates that the **\*2700** number of FFLs that also pay SOT will increase an additional 30 percent by the end of 2015.

**ii. Hearing Loss**

**Comments Received**

Many commenters stated that the proposed rule completely overlooked the cost of hearing loss due to the unavailability of silencers. Many commenters stated that many citizens desire to make or acquire silencers to protect their hearing while engaged in lawful, recreational shooting, as well as in self-defense situations. These commenters stated that the proposed rule imposed obstacles to making and acquiring silencers, and a significant number of shooters who desire to use silencers will be unable to do so. Several commenters provided data and statistics showing: The level of impulse noise generated from unsuppressed firearm discharge; that firearm discharge is a leading cause of noise induced hearing loss; the efficacy of silencers at protecting hearing; and the impracticality of using means other than silencers in certain situations (e.g., ear protectors in a home-defense situation). These commenters also provided data estimating that a 7 percent hearing loss may result for every five years spent hunting. These commenters stated that over time many recreational shooters, who are continually exposed to the noise, will have permanent hearing loss. A few commenters stated that those impacted hunters will bear "substantial medical costs and partial disability resulting in lost productivity." Another commenter provided data from a specialist who put a specific dollar estimate on firearm related hearing-loss costs (the commenter stated the estimate was supported by the "Value of a Statistical Life" method). This specialist estimated a minimum cost of $15 million, considering only the direct costs of medical care, testing, and hearing aids, and stated that the estimate is likely to exceed $100 million when one adds disability to the direct medical costs. A few commenters generally mentioned a National Shooting Sports Foundation study that showed that in 2011 there were 14,630,000 paid hunting license holders and that total recreational shooters exceeded 30 million.

**Department Response**

The Department recognizes that the use of a silencer while shooting a firearm may help to reduce hearing loss. Neither the proposed rule nor the final rule prohibit the manufacture or sale of silencers; the primary premise of the comments is that silencers will become less available as a result of the proposed rule, thereby increasing societal costs from shooting related

hearing loss. The Department disagrees that the final rule will significantly reduce the availability of silencers. The final rule no longer requires CLEO certification, the aspect of the proposed rule most commonly cited by commenters as an impediment to consumers obtaining silencers and other NFA weapons (from either retailers or private transfers). With the elimination of the CLEO certification requirement for all NFA applications, including individuals, the process for individuals who wish to purchase a silencer to protect from hearing loss becomes less, not more, burdensome. Moreover, as is noted in several sections of this final rule, the silencer industry has experienced significant growth largely as the result of several States legalizing the ownership of silencers for hunting and other purposes under State law. This legalization trend among the States is likely to continue, strengthening demand for silencers, thus driving additional industry growth and increased product availability. Finally, with respect to assessing the societal costs of firearms-related hearing loss, the Department is unaware of any peer reviewed study calculating an average value for hearing loss attributable only to the use of firearms without silencers.

### iii. Attorney Costs

#### Comments Received

Many commenters stated that ATF failed to consider the costs that individuals associated with trusts or legal entities would incur to consult with attorneys to accurately determine the number of individuals associated with their trusts or legal entities that would fall under the proposed "responsible person" definition. Another commenter stated that the proposed rule did not address the interstate nature of corporations, and that an individual would need to consult an attorney—at $150 per hour—to determine what jurisdiction the CLEO certification would be required to be obtained in. A few commenters provided their total attorney fees to consult with lawyers specializing in NFA legal matters and to form an NFA trust that complied with all the relevant laws; these fees ranged from $200 to over $1,500. Another commenter stated that if the proposed rule were implemented, applicants would need to obtain revised trust documents from a licensed attorney. This commenter, a licensed attorney, conservatively estimated the average cost and time at $200 per trust and at least two hours of the applicant's time, respectively. After assuming that 20 percent of the approximately 100,000 NFA related trusts or other entities would require revision, this commenter estimated the costs to trusts for legal fees to be $4,000,000 plus 40,000 client hours.

This same commenter stated that ATF did not estimate the costs for attorneys to revise forms, attend continuing legal education, and perform other uncompensated work needed to comply with the proposed changes. This commenter estimated five hours for each attorney to perform these activities. After assuming 1000 attorneys are involved nationwide in NFA matters and a conservative hourly rate of $200, this commenter estimated the total cost at $1 million.

Another commenter stated that ATF did not estimate the cost to ATF for a State licensed attorney to review the submitted trust documentation to ensure the trust's validity and that all responsible persons are included. This commenter estimated the annual cost to ATF at $1,628,000 after assuming 40,700 trust documents, half an hour of the attorney's time to review each trust, and an $80 hourly rate.

#### Department Response

There is no requirement to form a trust or legal entity to acquire an NFA firearm. In fact, all of the legal fees included in the comments may be avoided if the NFA firearm is acquired by an individual. Therefore, when an applicant voluntarily decides to register a firearm to a trust or legal entity, the applicant assumes all responsibilities for determining the responsible persons—including legal fees associated with making that determination. Additionally, as noted, the final rule no longer requires CLEO certification; the final rule requires only CLEO notification. Moreover, both the text of the final rule (when incorporated into a regulation) and instructions on revised ATF forms will provide specific directions as to who must provide notification to the CLEO. Therefore, it may not be necessary to consult an attorney to determine this information.

As the attorney-commenter did not specify why trust documents would need to be revised, the Department cannot directly address this concern. There is no requirement, existing or proposed, to form a trust or legal entity to acquire an NFA firearm or to satisfy any CLE requirement. The cost of CLE is therefore outside the scope of the cost of this final rule.

### *2701 iv. Costs To Update Publications/Resources

**Comments Received**

A commenter stated that ATF did not estimate the costs to revise various publications, informational brochures, industry Web pages, and other miscellaneous resources relied upon by NFA applicants and potential applicants for NFA information such as those published by hobbyists, industry, retailers, local law enforcement, and Federal agencies. The commenter could not estimate such costs but imagined that such costs could easily be $1,000,000 or more nationally.

Another commenter stated that ATF's cost analysis did not address the cost of implementing the forms and applications in the NFA Branch that have a "pending" status when the rule changes are implemented.

**Department Response**

ATF updates its publications, Web site, and forms on an ongoing basis and will continue to do so each time there are changes to Federal firearms laws or regulations. FFLs, other law enforcement agencies, trade associations, and other entities are not required under Federal law or regulation to provide information on the NFA or on how to acquire an NFA firearm. Therefore, these comments are outside the scope of this rulemaking. Additionally, such costs are difficult to estimate, and informational resources provided by other entities are routinely updated as a matter of course, making it difficult to trace what update costs are specifically attributable to ATF's new rule. The commenter did not suggest a methodology by which ATF could readily quantify such costs, and ATF believes any such costs directly traceable to the promulgation of this final rule will be negligible.

With regard to the comment regarding applications that have a "pending" status when the rule is implemented, all applications postmarked prior to the effective date of the rule will be processed under the current regulations. The same is the case for any applications that have a pending status at the time the rule is implemented. Consequently, no additional costs will be incurred by ATF to process pending applications.

**v. Litigation Costs**

**Comments Received**

Several commenters stated that ATF omitted the costs to ATF, DOJ, and local law enforcement of litigation that could potentially arise if the proposed rule were implemented. These commenters stated that ATF must expect significant judicial challenges to the proposed CLEO certification requirements for responsible persons as many law abiding citizens will no longer have a "work-around" or mechanism to avoid CLEO certification, will consequently face arbitrary refusal by CLEOs, and will be unable to own or possess otherwise legal NFA items. A few of these commenters stated that citizens who live in jurisdictions where every local CLEO refuses to sign off on the NFA paperwork would have no recourse other than to sue ATF or DOJ. Another commenter referenced Lomont, 285 F.3d 9, and stated that ATF's proposal to extend the CLEO certification would survive a "facial challenge" under the Administrative Procedure Act. However, this commenter predicted that in cases where every qualified CLEO refuses to provide the certification even though the applicant is not prohibited by State or local law from making or receiving the firearm, such an applicant could bring an "as-applied challenge" and win.

Another commenter expressed the opinion that the rule was too vague to withstand legal scrutiny and would result in expensive litigation. Another commenter stated that DOJ will spend millions of taxpayer dollars "in vain" trying to defend this rule in various courts. Another commenter agreed that taxpayers would "foot the bill" for the litigation that citizens allegedly denied their constitutional rights would bring against local and State governments, and the Federal Government, and that this would place a huge burden on local departments and agencies.

**Department Response**

The change from CLEO certification to notification addresses the substance of the concerns expressed in these comments and will reduce the likelihood of litigation.

Additionally, the Department regards the possible costs of potential future legal challenges as difficult to quantify. Commenters did not suggest a methodology by which the Department could accurately measure such costs. Moreover, the Department already must maintain a legal staff to defend its rules that it must fund whether or not any particular legal challenge is brought. It would thus be difficult to determine the extent to which litigation about the rule would add to the

Department's legal costs.

Finally, the Department does not regard the potential cost of defending the lawfulness of its rule as appropriate to include in an assessment of the costs and benefits of the rule. Such costs are imposed by third parties that choose to file suit regardless of the potential legal merit of their claims. If the costs of defending suits formed part of the cost of a rule, opponents could claim that they would file suit, regardless of the merits of their claims, and thereby drive up the estimated cost of the rule. If an agency were required to factor litigation threats into the cost of a rule, opponents threatening litigation could exercise a sort of veto over agency rulemaking by artificially increasing the rule's costs.

### vi. Miscellaneous Costs

#### Comments Received
A commenter stated that ATF severely underestimated the time and costs to trust participants arising from the rule. This commenter stated that the proposed rule would take trust participants an additional 30 days to properly coordinate and submit the required documentation for each NFA item requiring approval by the NFA Branch.

Another commenter stated that neither ATF nor any other component within DOJ provided "credible information, studies, or analysis" showing details of the estimated annual fiscal costs and the feasibility of implementing the proposed rule. This commenter asked that the Government Accountability Office (GAO) perform an "independent, non-partisan review" of the proposed rule and its current and potential fiscal impact, as well as its feasibility, and submit the findings to Congress so Congress could review to determine if the proposed rule complied with the "policies, rules, and standards" governing ATF.

One commenter noted that ATF calculated the costs of the proposed rule based on the number of legal entity applications from previous years, and further noted that ATF listed a large increase in legal entity applications from 2000 to 2012 as evidence, in the commenter's words, that these applications "are serving as a mask for individuals who otherwise would be prohibited from owning guns." This commenter stated that if the proposed rule's purpose is to target and reduce such activity, then ATF's cost calculations should reflect a reduction in the number of applications by legal entities.

#### Department Response
The Department does not agree with the commenter that the proposed rule would add an additional 30 days to the process of acquiring an NFA firearm. The commenter provided no empirical evidence or analysis supporting this **\*2702** assertion, and the Department is unaware of any aspect of the final rule that would lead to an increase in time expended by applicants on this scale. Under the revised definition of responsible person, the average number of responsible persons is estimated at two. Those two responsible persons may reside in the same household (e.g., husband and wife) or work in close proximity to each other, which would ease coordination of the collection of fingerprints and photographs required for the application. Furthermore, because responsible persons are no longer required to obtain CLEO certification, no delay will result from that issue.

Proposed changes to ATF regulations, including the proposals set forth in the NPRM and this final rule, undergo a rigorous review process by both the Department and the Office of Management and Budget. These reviews include close scrutiny of the estimated annual fiscal costs associated with the proposed and final rules. Finally, the proposed rule and this final rule have been published for public comment and scrutiny. In light of all these review procedures, the Department does not believe additional review of this rule by the GAO, as requested by a commenter, is necessary or warranted.

The Department also does not agree with the commenter who asserts that the purpose of the proposed rule is to target and reduce NFA applications filed by trusts. The objective of the final rule is instead to ensure all applicants, regardless of whether they are an individual applying in an individual capacity or applying in a representative capacity on behalf of a trust or legal entity, are subject to the same approval process to help ensure that prohibited persons do not obtain NFA firearms.

Moreover, the Department's decision to base its estimate of the costs of the rule on the number of trusts and legal entities that currently apply to make and transfer NFA firearms is appropriate because it likely accurately estimates the overall number of background checks and information submissions that will need to be undertaken as a result of the rule. To the extent individuals presently create single-person trusts and legal entities to circumvent background check requirements, they may

now choose simply to submit individual applications. To be sure, that would result in a decrease in the number of applications from trusts and legal entities. But it would be accompanied by a concomitant increase in the average number of responsible persons at the trusts and legal entities that remain. The overall number of information submissions and background checks is therefore likely to remain roughly equivalent to the Department's estimate. Commenters have not suggested a method of estimating the costs of the final rule that is superior to the methodology the Department has chosen.

## 2. Financial Impact on Firearms Industry

### a. Impact on the NFA and General Firearm Industry, Specific Types of NFA Manufacturers, and Related Businesses (Including Law Firms)

#### Comments Received

A large percentage of commenters asserted that the proposed rule will negatively impact NFA industry participants (including manufacturers, dealers, and employees) as well as related businesses such as suppliers. The commenters characterized their assessments of the financial impact on business in a number of different ways: The impact on NFA manufactures; the impact on specific NFA manufacturers such as silencer manufacturers; the impact on firearm dealers; the impact on related industries such as suppliers to manufacturers; the impact on general lawful commerce in firearms; the impact on "small businesses;" the impact on employees of various businesses in the form of lost jobs and wages; and general claims of "reduced revenue" for industry and affiliated business.

Most of the commenters focused their assessment of the proposed rule's negative impact on the provision in the proposed rule extending the CLEO certification requirement to trusts and legal entities. These commenters emphasized that, for numerous reasons, some CLEOs will not sign the NFA certifications even if the applicant is not prohibited by law from acquiring a firearm, freezing the application approval process. Because no process exists to override a CLEO's refusal to sign a certification, the refusal to sign functions as a denial of the application, preventing the applicant from purchasing the NFA item, and thereby depriving NFA manufacturers and dealers of law-abiding customers. A second recurring theme in the comments was that the proposed rule would decrease demand for NFA firearms, and thereby negatively impact businesses, because the rule will require a greater number of NFA applicants to undergo background checks (i.e., individuals affiliated with trusts and legal entities who fall within the proposed rule's definition of "responsible persons").

Examples of comments from the various categories of characterization used by the commenters include the following:

#### i. Manufacturers and Dealers

Several commenters reasoned that the proposed rule would make it more difficult to obtain NFA items and as a result would drive manufacturers out of business; one such commenter characterized the impact as jeopardizing the entire, booming "cottage industry" of NFA manufacturers. Similarly, an employee of a silencer manufacturer, that has been in business for more than 20 years, commented that the proposed rule would "cripple" his employer's business. One commenter listed multiple negative impacts he predicted the proposed rule would have on NFA manufacturers: (1) Lost investment in machines; (2) lost investment in unsellable inventory; (3) lay-offs of manufacturing and sales staff; and (4) no market for their product. Several commenters argued that the proposed regulation would make wait times for customers to obtain ATF approval even longer, resulting in frustrated customers and reduced sales.

Many commenters directly linked predictions that the proposed rule would negatively impact NFA manufacturers and dealers to the CLEO certification requirement. They asserted that extending the certification requirement to legal entities will drastically inhibit sales of NFA items, particularly silencers, causing reductions in business, business closure, and loss of employees. Several FFL commenters asserted that the proposed rule would "destroy" their businesses because CLEO certification was difficult or impossible to obtain in their counties. One of these FFLs stated he had researched the impact of CLEO certification in his State, Texas, and determined that approximately "70% of Texans" will not be able to obtain a CLEO signature; therefore, he predicted, "70% of his customer base" would be eliminated by the proposed rule. Another FFL asserted that he anticipated a 75 percent loss in sales due to the CLEO requirement, and two other FFLs stated that they anticipated a 20 percent loss in revenue due to the CLEO certification requirement.

Several commenters opined that the proposed rule would place significant financial burdens on firearm dealers by prolonging

the transfer process for trusts and legal entities because under the responsible person definition the trust or legal entity will need to obtain the fingerprints and photographs of all members of the trust or legal entity. **\*2703** These commenters maintained that the proposed rule will require dealers to reserve inventory without payment until the transfer process is complete—which currently takes in excess of nine months. Several other commenters stated that further delays encountered in the transfer process place NFA dealers at a significant financial disadvantage, noting that by the time a transfer is approved, often the item being transferred is a previous production model. Finally, a number of commenters focused on their belief that the proposed rule would negatively impact employment in the firearms industry, causing lay-offs and increased unemployment among employees of firearm manufacturers and sellers.

### ii. Small Businesses

Many commenters stated generally that the proposed rule will hurt, hinder, or make it harder for small business owners, particularly firearm related businesses, by increasing transaction costs and transaction times. Several commenters emphasized that small firearms related businesses are engaged in lawful commerce, and expressed the view the government was seeking to unfairly target such businesses with regulations increasing the cost of doing business. Other commenters hypothesized that the proposed rule will destroy small businesses because it would limit or prevent law-abiding citizens from acquiring NFA items.

### iii. Specific Types of NFA Manufacturers and Markets

Several commenters focused on the proposed rule's negative effect on specific NFA market segments such as the markets for silencers, short-barreled rifles, machineguns, and military surplus firearms. A large number of commenters claimed the proposed rule would significantly reduce the sale of silencers, driving silencer manufacturers out of business and potentially causing the entire silencer industry segment to collapse. Another commenter predicted the proposed rule would cause the collapse of the military surplus firearms market. Some commenters expressed concerns that the proposed rule could harm technical innovations for silencers, with one commenter asserting that advancements in silencer technology will grind to a halt, affecting the military firearms supplied to "our troops overseas who deserve and require the best we have to offer." One commenter reasoned that the proposed rule will limit the availability of NFA items, thus making the value of silencers, machineguns, and short-barreled rifles increase for those who own them. This commenter anticipated that this effect would make current owners "happy."

### iv. Impact on Related Businesses (Including Law Firms)

Several commenters expressed concerns that the proposed rule will negatively impact firearms related-industries, not only those businesses directly involved in the sale and manufacture of firearms. Many of these commenters asserted that the proposed rule's CLEO certification requirement will have the effect of halting the sale of all NFA items in many areas (because, they assert, certain CLEOs will not sign certifications), which, they assert, will have a cascading effect: Reduced sales will result in substantial losses for NFA manufacturers and dealers (particularly those involved in the silencer market), which, in turn, will negatively impact businesses that contribute to the manufacturing process or derive business from firearms dealers and manufacturers. One commenter stated that the proposed regulation will cause well paying, American jobs to be lost in machining, manufacturing, marketing, and retail sales. Examples provided of related businesses that commenters believe would be negatively impacted also included: Ranges, materials suppliers, computer numerical control and milling operations and manufacturers, third party processors (such as Cerakote coating, powder-coating, anodizing, black oxide, metal sales, tooling, laser marking, and engraving), office supply stores, trade shows, and various NFA shooting events (such as machinegun shoots).

Other commenters asserted that the proposed rule will negatively impact law firms that handle trust matters involving NFA items because demand for creation of trusts solely used to obtain and hold NFA firearms will decrease as a result of the proposed rule's provision defining responsible persons for legal entities and requiring such persons to undergo background checks. These commenters asserted that the decreased demand for firearm trusts will cause a loss of revenue to law firms and layoffs of law firm employees.

### Department Response

The Department acknowledges that this rulemaking will have some modest impact on the firearms industry; the Department

does not agree, however, with the assessment of the many commenters who assert that this rulemaking will have a substantial negative economic impact on NFA industry participants (including manufacturers, dealers, and employees), and on related businesses such as suppliers. The comments asserting that the proposed rule will have substantial negative (and even catastrophic) impacts on the industry are primarily premised on two conclusions, neither of which, in the Department's view, are supported by the facts and circumstances underlying this final rule. The first conclusion is that the CLEO certification requirement in the proposed rule will deter potential purchasers who previously would have chosen to obtain an NFA firearm through a trust or legal entity because they could do so without the need for CLEO certification. This conclusion is largely based on assertions that many CLEOs (1) refuse to sign NFA certifications even when the applicant is not prohibited from possessing a firearm; (2) too slowly process certification requests due to resource constraints; or (3) seek to extract political or economic favors from applicants in exchange for signing a certification. As a result of the impediments posed by CLEO certification, the commenters assert, the proposed rule would have resulted in a drastic reduction in the sale of NFA weapons (particularly silencers), thus decimating the NFA industry and greatly harming related industries. The second conclusion is that the demand for NFA firearms will dramatically decrease if a greater number of NFA applicants are required to undergo background checks and to submit fingerprints and photographs. This conclusion is directly linked to the rule's definition of "responsible persons" affiliated with trusts and legal entities; persons meeting that definition will be required under this final rule to undergo background checks and submit fingerprints and photographs when the trust or legal entity they are affiliated with files an NFA application or is a transferee.

The conclusion regarding the impact of CLEO certification has been rendered moot by this final rule. In response to the concerns expressed by commenters relating to CLEO certification, the Department has eliminated that requirement, and replaced it with a less burdensome CLEO notification requirement. Hence, obtaining CLEO certification is no longer a hurdle for individuals, trusts, or legal entities acquiring an NFA firearm, and therefore the problems identified by the commenters with respect to the CLEO certification process are no longer a factor threatening the economic health **2704** of NFA manufacturers, dealers, and related businesses.

With respect to the commenters' conclusion regarding background checks, the Department believes the reality of the firearms marketplace refutes the conclusion that background checks will deter individuals from acquiring NFA firearms. Background checks, a vital law enforcement tool that ensures prohibited persons will not unlawfully obtain firearms, are already conducted on virtually all non-licensed individual persons who purchase either a GCA or NFA firearm from an FFL or FFL/SOTs. Notwithstanding these checks, both the GCA and NFA firearms markets are flourishing. Background checks do not significantly deter non-prohibited individuals from purchasing firearms from licensed dealers, including NFA dealers and manufacturers.

Other market conditions also refute the concerns about the proposed or final rule threatening the viability of NFA dealers and manufactures. Many States have been relaxing prohibitions on ownership of silencers, SBRs, and SBSs, thus expanding the market for these NFA firearms. In addition, the firearms industry is constantly introducing new and improved models. As evidence of this, the Shooting, Hunting and Outdoor Trade (SHOT) Show is attended annually by more than 62,000 industry professionals from the United States and many foreign countries, seeking information on new firearms and shooting products. This is a clear market signal that demand for innovation and development of new firearms and shooting products, including NFA products, is strong, and will continue to support NFA manufacturers and dealers regardless of whether or when the final rule is implemented. Additionally, demand for silencers has continued to increase as several States have recently legalized ownership of silencers for hunting and self-defense; the trend of States legalizing silencer ownership appears likely to continue. Consequently, the Department anticipates demand for silencers will continue to rise. Finally, some States have recently relaxed laws restricting the possession of SBRs and SBSs, thereby increasing the potential market and demand for these NFA items.

The Department also disagrees with comments that FFLs will be hurt because they reserve inventory without payment during the application process. An FFL may choose, as part of its business practice, to require payment in full on an NFA firearm before an application may be submitted. Additionally, ATF posts the processing time for NFA items on its Web site so a purchaser may determine the approximate time necessary to process the application. Due to the nature of the application process, some risk that a new model will be introduced prior to the approval of a customer's purchase is inherent; the new rule, however, does not materially increase that risk.

The Department also rejects comments asserting that this rulemaking is intended to limit or prevent ownership of NFA items

by persons who are not prohibited from receiving or possessing them. This final rule is intended to ensure only that persons acquiring and having access to NFA firearms are not prohibited from receiving or possessing them. Furthermore, in response to commenters who asserted that the decreased demand for firearm trusts will cause a loss of revenue to law firms and layoffs of law firm employees, a formation of a trust or other legal entity is not required to acquire an NFA firearm. Therefore, comments on the loss of income for attorneys who draft these documents is outside the scope of this rulemaking.

**b. Burden of Implementation**

**Comments Received**

Several commenters took issue with ATF's assertion that the proposed rule would cause only a minimal burden to industry. In sum, these commenters explained that the proposed rule will be more than minimally financially burdensome to the industry because it will cause customers to stop buying NFA items due to the extended wait times and increased regulatory burdens created by the rule, thus making it less profitable for licensees to hold their SOT status.

According to some commenters, as a result of the proposed regulation, some retailers are facing shutdowns, others face employee lay-offs, and all licensees and related-industries are bracing for revenue reduction. Some commenters stated the proposed rule unreasonably burdens commerce because of the cost of fingerprinting and passport photographs for every purchase. A commenter stated the proposed rule will make it more difficult for local businesses to sell items that are already difficult to obtain. Finally, a commenter argued that the proposed rule is so burdensome it will deter citizens from acquiring NFA items through the approved government process, and encourage the rise of a black market in NFA items. Several commenters claimed it will take about two or three additional hours of customer service assistance per transaction to handle the additional fingerprint cards, photographs, and application paperwork should the NPRM be implemented. One commenter estimated three additional customer service hours would be needed while others estimated two hours would be needed.

**Department Response**

Applicants who purchase NFA firearms in an individual capacity have long paid the costs of fingerprints and photographs; the final rule equitably extends these costs to trust and legal entity applicants, and reasonably limits the photograph and fingerprint requirements to responsible persons of the trust and legal entity applicants. The Office of Management and Budget, when granting the renewal of the ATF Forms 1, 4, and 5, has determined that the cost of fingerprints and photographs is not an unreasonable burden. To the extent commenters have asserted that requiring responsible persons to submit fingerprints and photographs is more burdensome than the requirement for individuals because a trust or legal entity may have multiple responsible persons, the option exists for the applicants who have formed trusts or legal entities for the express purpose of acquiring NFA firearms to forego use of a trust or legal entity and acquire the NFA firearm in an individual capacity. The formation of a trust or legal entity is not required to purchase an NFA firearm. For corporate applicants, the costs associated with submitting fingerprints and photographs for responsible persons is a reasonable cost of doing business; for trusts or legal entities that acquire NFA firearms to allow multiple individuals to possess and use the same firearm (each of whom will therefore be a responsible person), the cost of submitting fingerprints and photographs for each of those persons is directly related to the statutory goal of ensuring prohibited persons do not possess and use NFA firearms.

The Department also notes that, as has been explained elsewhere, the Department predicts that the rule's impacts on demand for NFA firearms will be minimal and the costs to trusts and legal entities will be low.

The final rule also simplifies the process of acquiring an NFA firearm by eliminating the CLEO certification requirement for all applicants or transferees and replacing it with a less burdensome notification requirement. Similarly, the final rule has clarified the "responsible person" definition to ensure it does not extend to all members of a trust or legal entity (e.g., by excluding from the definition corporate **\*2705** shareholders who do not control the management or policies of the entity with respect to firearms).

**c. Assessment of the NPRM Implementation Cost**

**Comments Received**

A commenter observed that the proposed rule will be expensive to implement for the firearms industry. Another commenter

warned that ATF failed to take into account the fact that the proposed rule will also have an adverse financial impact on those who manufacture and sell or transfer NFA firearms. At least one commenter stated ATF failed to consider the significant revenue losses the proposed rule would impose on small businesses. Another commenter disagreed with ATF's assertion that the proposed rule will not affect small businesses. A commenter who works for a firearms business stated, "[I] manage a small business that holds an FFL and deals in NFA devices. . . . All (100%) of our customers utilize legal entities to lawfully obtain NFA firearms. Since the proposed rule change our business in selling NFA firearms has dropped to zero as our customers do not want to spend money with the risk that they may not be able to take delivery of the NFA item. That drop translates into loss of revenue for my small business, distributors I buy from, manufacturers of the devices and manufacturers of related equipment." A commenter who is an employee of a silencer manufacturer stated that the proposed regulation will "surely cripple if not disable our business." Finally, another commenter asked the question, "what about the manufacturers and vendor of these controlled items who would inevitably lose a substantial amount of business?" That commenter argued that it is foreseeable that businesses involved in the manufacturing and selling of NFA items will suffer from the implementation of the proposed regulation.

**Department Response**
The Department believes that any impact on the firearms industry arising from the proposed rule will be insignificant. As noted, the CLEO certification requirement has been changed to a notification requirement, and the definition of responsible person has been clarified. These changes will ensure that the impact on the firearms industry is minimal. Applications postmarked prior to the implementation of the final rule will be processed under the current regulations. Only those applications postmarked on or after the implementation of the final rule will be subject to the new regulations. Therefore, individuals who refuse to purchase NFA items on the basis of their belief that the rule will interfere with their ability to complete the transfer process are mistaken.

**d. Commenters' Assessments of Implementation Cost**

**Comments Received**
A commenter challenged ATF's assessment of the implementation cost of the proposed regulation, saying that ATF failed to assess the loss of revenue from several sources; this commenter continued that ATF failed to consider all of the monetary loss manufacturers, wholesalers, dealers, individuals, and "corporate/trust" entities will incur as a result of the proposed rule. This commenter argued that there will be "perceptional monetary loss" as well. According to this commenter, when law abiding buyers perceive that the transaction will require CLEO certification that cannot be obtained in their area, the potential buyers will not attempt to buy the NFA items because they will believe the CLEO will not approve the sale. The commenter continued that this perception will ultimately lower the number of purchasers, thus creating a monetary loss for the NFA industry.

A commenter stated that the proposed regulation does not adequately address the economic impact to small and medium businesses. This commenter stated that no assessment of this type could be valid without conservative assumptions on the number of lost sales due to these increased restrictions; these restrictions will have a significant and material impact on the number of silencers and other NFA items sold in the United States. This commenter stated that this is likely to cause many businesses (including large, medium, and small businesses) to close and would have a "downstream ripple effect to their suppliers and local communities." At least one commenter asked the following questions: "can you imagine the damage this will cause to the NFA market? What happens to the value of our items when you indirectly prohibit 90 percent of potential customers from obtaining the item? What happens to the R&D budget for our arms manufacturers when they don't sell anywhere near the volume to their most abundant customer base?"

Another commenter noted that ATF failed to identity the cost associated with lost time from the backlog of applications for both existing and future employees of any company. Another commenter stated the proposed rule will have a considerable and obvious negative impact on the industry by stifling sales and adding significant burdens relating to long term secure storage of pending NFA items. Another commenter stated that the proposed rule will decimate the industry that makes these NFA products for the military and the police because the NPRM will put these companies out of business, making product warranties that the military and police rely on invalid.

**Department Response**

The Department agrees that CLEO certification for all responsible persons of trusts or legal entities is not necessary; consequently that requirement has been eliminated in this final rule and replaced with a less burdensome notification requirement. The change from certification to notification will reduce the impact on the firearms industry. The Department believes that the impact on demand for NFA firearms arising from the rule will be slight. Please see section IV.E.2.a above for additional detail regarding the Department's response to claims this rule will negatively impact NFA manufacturers, dealers, and related businesses.

The Department does not agree with the commenters who assert that the proposed rule would have a negative effect on NFA firearms suppliers to the military and police. Government entities are exempt from the requirements in the rule and therefore neither the NPRM nor the final rule affects this industry. Moreover, because the impact of the rule on the market for NFA firearms will be slight, the Department does not anticipate that military and police suppliers will go out of business as a result of the rule.

The Department recognizes that the final rule will affect processing times and is implementing processes to keep the impact to a minimum. However, processing times do not appear to reduce the demand for NFA firearms. ATF received more than ninety thousand applications in 2014 when processing times were approximately nine months.

### 3. Quantification of the Rule's Expected Benefits

**Comments Received**

Several commenters noted that the proposed rule provided only three "anecdotal" examples occurring over the 80-year life of the NFA to support the need for the proposed rule; they asserted that these examples failed to quantify any expected benefits, raised many questions, and could just as **\*2706** strongly justify a claim that the current procedures are working. Two commenters stated that ATF likely did not quantify any benefits or assign an economic value to such benefits because the NPRM predominantly addressed conduct already criminalized and prohibited by statute and regulations, and also noted that none of ATF's examples illustrated or supported the problem that ATF speculated existed. Many commenters stated that the proposed rule presented no benefit to public safety or to ATF's ability to execute its responsibilities relating to the NFA. Several commenters stated that the overall benefits were inconclusive, nonexistent, and insignificant. A few commenters stated that simply speculating as to some "marginal" benefit without estimating the size or value of that benefit made a "charade" of the rulemaking process, and asserted that a "rather unlikely combination of circumstances" would need to exist for the rule to produce any benefits at all. Another commenter believed changes were needed to the current regulations; however, this commenter stated that the changes should actually balance implementation costs with the desired effect. Another commenter wanted more specifics, and asked, "[w]hat are the metrics of success for this proposed rule? How many lives will it save for the cost of actual implementation using the numbers I provided [for responsible persons] rather than the (no offense) ludicrous number of '2' propounded by ATF?" Another commenter asked if ATF could show how these proposed changes would improve public safety, and how the NFA's current rules are unsafe.

Other commenters stated that the problems with the proposed rule far outweigh any perceived benefits. One commenter acknowledged the benefit of increasing public safety by preventing prohibited persons from obtaining firearms, but requested that ATF expand its explanation of the benefits the proposed revisions would deliver. This commenter stated that this additional information on benefits would be useful when considering and offsetting the increase in costs from the proposed rule.

Several commenters stated that ATF's assumptions lacked statistical validity. Other commenters stated that the proposed rule lacked evidence to support the proposition that the proposed changes were needed to enhance safety by preventing criminal use of highly regulated NFA items. A commenter asked ATF to provide statistical evidence that the proposed rule would reduce violent crime, and to provide a list of all violent crimes committed with registered NFA weapons by the actual owner of the firearm where these proposed changes would have deterred the crime. Another commenter similarly asked for current statistics on crimes committed by NFA weapons, and how the proposed rule would make citizens safer. This commenter also asked for the studies that ATF did "in conjunction with this legislation," and asked ATF to provide the studies and specific statistics that support the proposed regulations. Another commenter asked if ATF's three provided examples represent the only examples that ATF has identified since the origin of the NFA in 1934. This commenter requested that ATF clarify its analyses used to support a public safety benefit for the proposed rule since this commenter, and many others, contend that

there is no documented violent criminal activity associated with NFA firearms. These commenters noted that the proposed rule would not have applied to the few rare occurrences of violent crime with legally owned NFA registered firearms, as those activities were committed by a non-prohibited person in possession of a properly registered NFA item. Another commenter asked ATF to have "an unbiased third party" show a real risk to public safety through past harms from the use of NFA items acquired via a living trust or legal entity, as well as project future risk trends from the use of such items.

Another commenter referenced a 2001 survey of inmates that showed that less than two percent of inmates used semi-automatic or fully automatic rifles to commit their crimes. This commenter contended that the proposed rule's effect of "tightening restrictions on law abiding citizens" would not reduce this rate, and that ATF did not need to "pass greater legislation to reduce the access of law abiding citizens to weapons and accessories which are registered, carefully monitored, and taxed."

**Department Response**
Between 2006 and 2014, there were over 260,000 NFA firearms acquired by trusts or legal entities where no individual associated with the trust or legal entity was subject to a NFA background check as part of the application process. NFA firearms have been singled out for special regulation by Congress because they are particularly dangerous weapons that can be used by a single individual to inflict mass harm. The Department does not agree that a mass shooting involving an NFA firearm obtained by a prohibited person through a legal entity must occur before these persons must be subject to a background check.

The GCA, at 18 U.S.C. 922(t)(1), requires FFLs to run a NICS check "before the completion of the transfer" of a firearm, and verify the identity of the transferee. There is a limited exception under 18 U.S.C. 922(t)(3)(B) when a firearm is transferred "between a licensee and another person . . . if the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986." The purpose of this exception is to avoid multiple background checks on the same individual by exempting a person from a NICS check at the point of transfer when that same person has already been the subject of a background check during the NFA registration process. Congress did not intend for NFA firearms to be transferred to individuals who avoided the background check process altogether. Between November 30, 1998, and August 31, 2015, the FBI's Criminal Justice Information Services Division conducted 216,349,007 background checks using NICS. Of the background checks conducted during this time period, 1,229,653 resulted in a denial. The 99.4 percent "proceed" rate does not negate the public safety associated with the 0.6 percent denied. While the number of NFA applications that are denied due to the background check is small, because even one prohibited individual with an NFA firearm poses an enormous risk to the lives of others, that small number does not negate the public safety associated with denying a prohibited person access to an NFA firearm. Furthermore, requiring a background check on responsible persons of trusts and legal entities during the application process is consistent with Congressional intent for these individuals to undergo a background check to be eligible for the limited exception under 18 U.S.C. 922(t)(3)(B).

Additionally, even though 70 percent of all crime gun traces are on handguns, Federal law (18 U.S.C. 922(t)) requires FFLs to conduct background checks prior to the transfer of long guns (rifles and shotguns) as well as handguns (pistols and revolvers) to unlicensed persons. Thus, Congress did not intend to exclude certain types of firearms from background checks simply because those firearms may be less frequently involved in criminal activity. The Department does not agree that further research is needed to show that a responsible person for a legal entity purchasing a machinegun should be subject to a background check. There is a tangible risk to public safety whenever **\*2707** a prohibited individual has the power to exercise control over an NFA firearm. For additional responses to comments on public safety see section IV.B.1, which specifically addresses the sufficiency of current regulations.

See sections IV.E.1.a and E.1.b for responses to comments on the methodology for determining the number of responsible persons and number of pages of supporting documents. See section IV.D.1 regarding responses to comments on Executive Order 12866.

*F. Comments on Rulemaking Process*

**1. Availability of Background Information**

**Comments Received**
A commenter stated that ATF did not make the NFATCA petition available for public inspection at any time before or during the public comment period for ATF 41P. This commenter noted that ATF cited the NFATCA petition as its basis for the NPRM, and that the petition formed the "central and critical foundation" of ATF's argument for the proposed changes. Noting that ATF did not explain why it withheld this vital information, this commenter called ATF's lack of transparency inexcusable, and stated this inaction warrants further investigation and clarification by ATF.

Another commenter stated that the NPRM indicated that the proposal rested on certain studies and other underlying information, but that such underlying documents (seven categories, including the rulemaking petition; alleged "numerous statements" from CLEOs that ATF received regarding "purported reasons" for denying CLEO certifications, details regarding the instances that prompted the decision that the regulation was needed; and the methodology employed in random samples to estimate the number of responsible persons and the documentation pages) were not placed in the rulemaking docket and, thus, the commenter had requested such documents (and any other documents that ATF replied upon when preparing the NPRM) "[i]n order to ensure an adequate opportunity to comment on the ATF proposal." The commenter asserted that ATF declined to make public the requested information, and that ATF neither posted materials to the eRulemaking site, nor made them available in ATF's reading room. The commenter also requested the documents via a Freedom of Information Act (FOIA) request without receiving such documents. The commenter stated its concern that omitting these items raised the question of what other pertinent materials may have been excluded. The commenter quoted several legal cases explaining that interested parties should be able to participate in a meaningful way in the final formulation of rules, which would require an accurate picture of the agency's reasoning, which should be done with the agency providing the data used and the methodology of tests and surveys relied upon to develop the NPRM. The commenter continued that case law provides that an agency commits serious procedural error when it fails to reveal the basis for a proposed rule in time to allow for meaningful commentary. Thus, the commenter reasoned that providing access to materials like those it requested has long been recognized as essential to a meaningful opportunity to participate in the rulemaking process. The commenter concluded that the lack of access to the requested materials hindered the ability of interested persons to address the assertions in the NPRM, and that if ATF intends to revise part 479 in the manner proposed, ATF should first lay the foundation for a proposal and then expose that foundation to meaningful critique.

**Department Response**
In response to the assertion that the Department withheld the NFATCA petition, the Department references section II of the NPRM that details each of NFATCA's four categories of concern—amending §§ 479.63 and 479.85; certifying citizenship; providing instructions for ATF Forms, 1, 4, and 5; and eliminating the CLEO certification requirement. 78 FR at 55016-55017.

The NPRM explained those aspects of the NFATCA petition that were relevant to the rulemaking. The Department provides the following excerpt from section II.A of the NPRM:

The NFATCA expressed concern that persons who are prohibited by law from possessing or receiving firearms may acquire NFA firearms through the establishment of a legal entity such as a corporation, trust, or partnership. It contends that the number of applications to acquire NFA firearms via a corporation, partnership, trust, or other legal entity has increased significantly over the years. ATF has researched the issue and has determined that the number of Forms 1, 4, and 5 involving legal entities that are not Federal firearms licensees increased from approximately 840 in 2000 to 12,600 in 2009 and to 40,700 in 2012.

This passage illustrates, with complete transparency, how ATF approached and researched the rulemaking process. Such detail not only lays "the foundation for a proposal" but also exposes "that foundation to meaningful critique." Moreover, the NFATCA petition was readily available through the internet. Thus, all relevant aspects of the NFATCA petition that were used in the development of the proposed rule were available to commenters and clearly discussed in the NPRM.
In response to the commenter who indicated that ATF did not provide certain documents related to seven categories of information that the commenter deemed essential to meaningfully commenting on the rule, the Department acknowledges that ATF received requests for disclosure of the information from the commenter. Those requests were processed by ATF's Disclosure Division and a copy of the NPRM was provided to the commenter in response to the commenter's request. The response did not include the requested seven categories of information. The Department believes, however, that all of the

requested information was discussed and addressed in the NPRM to a degree sufficient to provide the commenter with the opportunity to participate in a meaningful way in the discussion and final formulation of the final rule. The Department did not rely on any data, methodologies, predictions, or analysis that it did not clearly explain in the NPRM. The Department provided commenters "an accurate picture of the reasoning that . . . led the agency to the proposed rule" and "identif[ied] and ma[de] available technical studies and data that it . . . employed in reaching" its decisions. Connecticut Light & Power Co. v. NRC, 673 F.2d 525, 530-31 (D.C. Cir. 1982).

For example, the Department explained the source and number of samples it used to determine the average number of constitutive documents and responsible persons at trusts and legal entities. The Department cited and relied upon the NFATCA petition that prompted the rulemaking. The Department gave examples of instances in which background check requirements were nearly evaded to show that a risk of circumvention existed. The Department openly discussed the benefits and drawbacks of the CLEO certification requirement and its proposed expansion. Further, specific details about public safety concerns, including specific instances, were included in the NPRM. The Department believes that the details provided in the NPRM were sufficient and, as such, no additional information needed to be placed in the docket.

With respect to CLEO certification specifically, the Department believes that the NPRM amply conveyed ATF's **\*2708** knowledge of various reasons that CLEOs deny CLEO certifications. This is knowledge gained from the field and interactions that the NFA Branch has had with CLEOs, as well as with applicants and transferees, during the application process and at other times. In any event, the Department notes that any failure in this regard caused commenters' no prejudice, as the Department was persuaded to change the CLEO certification requirement to a notice requirement. See Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 236-37 (D.C. Cir. 2008).

Finally, the Department emphasizes that it remained open to persuasion throughout the rulemaking. In response to comments critical of the CLEO certification requirement, the Department adopted a CLEO notification requirement. In response to comments critical of various aspects of its statutory and regulatory review and its cost-benefit analysis, the Department expanded and strengthened its analysis and revised its estimates where appropriate. The Department believes that the analysis and responses to comments in this preamble conclusively show that commenters were provided a meaningful opportunity to support, challenge, and critique the proposed rule and help to shape the Department's decision.

## 2. Public Submissions

### a. ATF Posted Unrelated Materials to the Docket During the Public Comment Period

**Comments Received**

A commenter noted that ATF posted an unrelated final rule in the docket for this NPRM at www.regulations.gov, and asked ATF to remove it. This same commenter noted that two weeks after the comment period opened for this NPRM, ATF's Web site entitled "ATF Submissions for Public Comments" also contained references to two unrelated matters, and requested this be clarified. This commenter expressed concern that this "extraneous material" confused the public to think that the comment period for ATF 41P had ended, and referenced MCI Telecommunications Corp v. FCC, 57 F.3d 1136 (D.C. Cir. 1995).

**Department Response**

The Department is unaware of any "extraneous material" in the docket. A Department review of the www.regulations.gov site reveals that there are no documents to support this comment included in this docket. The only document available is the subject NPRM. The Department also notes that on its public Web site, ATF's link to "ATF's Submissions for Public Comment" directs users to the Bureau's FOIA library, with resources appropriate to a full array of regulatory and policy issues.

### b. ATF Failed To Accept or Post Public Comments

### i. ATF Failed To Include "Pertinent" Submissions to the Docket

**Comments Received**

A commenter stated that "ATF has a statutory duty to provide public access to members of the public and where . . . access is denied during the very period when the public are supposed to be able to investigate matters as a basis for submitting comments on a proposed rule, ATF has denied a meaningful opportunity to participate in the notice and comment rulemaking process." The commenter expressed concern regarding the closure of the reading room from November 8, 2013, until November 15, 2013, while ATF was open. The commenter questioned how such a closing was consistent with ATF's duty under FOIA. The commenter also expressed concern that ATF mandated that counsel for commenter submit documentation regarding race, ethnicity, employment history, and other matters before ATF would permit access to its reading room.

This same commenter stated that it physically inspected the docket at ATF's reading room, but that it appeared that only the public comments were available for review. The commenter expressed concern that the physical inspection of the docket also revealed that ATF had "selectively excluded correspondence clearly related to the rulemaking proceeding." The commenter stated that it identified six items that had not been entered into the docket and requested that all pertinent material be placed in the docket. One such item was posted, but the other five referenced items were not added to the docket prior to commenter's second physical inspection of the docket. The commenter stressed concern that ATF either delayed posting items or ignored its requests.

**Department Response**
The Department notes that on September 12, 2013, ATF posted the first comment relative to this NPRM on www.regulations.gov. ATF posted the final comment on February 7, 2014. In total, ATF posted 8,433 comments out of 9,479 received. Given the volume of comments and the resources available to ATF, the Department contends that ATF strived to post all comments that met the criteria in the Public Participation section of the NPRM (78 FR at 55025) in the order they were received and reviewed. For this final rule, all comments received are included in the final rule's administrative record.

Regarding the commenter's portrayal of ATF's reading room being closed November 8, 2013, until November 15, 2013, this is not accurate. The Department acknowledges that a few days elapsed between the commenter's request and his counsel gaining access to ATF's reading room. Regarding the commenter's concern that ATF requested that his counsel provide certain documentation before gaining access to the reading room, ATF notes that this documentation is part of its standard procedures that have been implemented to address public safety concerns and does not meaningfully interfere with access to all of the materials available in the ATF reading room.

**ii. ATF Failed To Permit a 90-Day Public Comment Period**

**Comments Received**
A commenter pointed out problems inhibiting access to public to public comments through, for example, (1) the reading room being unavailable, (2) the www.regulations.gov site malfunctioning, (3) the government closure, (4) ATF's slowness to post submitted comments, and (5) ATF's staffing. This commenter previously requested that ATF extend the comment period, and noted that other commenters made similar requests to ATF. This same commenter also noted that others raised concerns about ATF's delay in posting comments to the docket. This same commenter stated that other agencies granted extensions of comment periods due to the government shutdown. Several commenters requested an extension for public comment by at least one day for each day that either ATF was closed or the www.regulations.gov site was inaccessible.

**Department Response**
The Department determined that an extension of the 90-day comment period was not warranted because it had received a large volume of diverse comments and additional time was unlikely to result in the submission of comments identifying new concerns. Many of the comments ATF received were a repetition or duplication of previous comments. Further, using all resources available, ATF followed the guidelines for public participation that appeared in the NPRM and posted "All comments [that referenced] the docket **2709** number (ATF 41P), [were] legible, and [included] the commenter's name and complete mailing address." The www.regulations.gov Web site is maintained by the Environmental Protection Agency. Neither the Department nor ATF has control of the functionality of an external agency's Web site.

**iii. ATF Selectively Delayed Reviewing and Posting Comments Received**

**Comments Received**
A commenter noted ATF's delays in posting comments and that the delays were not uniform. This commenter contended that ATF "conveniently" delayed the posting of the comment the commenter prepared for another individual, which critiqued flaws in the NPRM, while ATF simultaneously "apparently seeded the docket with submissions from proxies." The commenter stated that once the comment it prepared for another individual was posted, the cause for delays in posting comments, in general, was ameliorated and that comments were continually posted. This commenter also expressed concern that ATF continued to exclude its submissions or delayed posting them to the docket while processing correspondence and comments from other interested persons, which raised a question regarding "what other material submitted for the docket by other interested persons was not properly posted." The commenter stated that its communications to ATF regarding the rulemaking only occasionally received a reply, only sometimes were placed in the docket, and only sometimes were posted promptly. Despite commenter's inquiries, ATF declined to provide any explanation for the "seemingly arbitrary management of the docket."

Another commenter stated that ATF repeatedly delayed posting comments, and that this significantly impacted his ability to meaningfully participate in the comment process. This commenter observed that well past the government shutdown, 25-50 percent of the comments received had not been posted; during other periods when the government was not shutdown, four or five days passed without ATF posting any comments even though the total comments received increased every day.

**Department Response**
The Department stresses that it posted all comments that followed the public participation guidelines in the NPRM. ATF followed its processes for reviewing and posting comments.

## iv. ATF "Distorted" the Public Comment Process by "Apparently Submitting Hearsay Information via Proxies"

**Comments Received**
A commenter stated that ATF had proxies submit comments "in an effort to bolster the suggestion of prior misuse of legal entities" and listed examples of comments from ATF Special Agent Gregory Alvarez and John Brown, President of NFATCA. This commenter stated that ATF did not disclose its relationship with John Brown or reveal that the only information John Brown offered in his public comment is "what ATF leaked to him."

**Department Response**
Neither the Department nor ATF uses or recruits "proxies." Both the Department and ATF are committed to a robust, candid rulemaking process and have an interest only in authentic public comments.

## v. ATF's Previous "Lack of Candor" Shows a Heightened Need for Procedural Regularity

**Comments Received**
A commenter stated that ATF has a well-documented record of "spinning" facts and engaging in outright deception of the courts, Congress, and the public. As a result, this commenter believes there is even more reason for ATF to provide the documentation showing its basis for characterizing the issues in the NPRM, that it fairly considered alternatives, that it only inadvertently provided potentially misleading information or omitted pertinent information from the docket, that it only accidentally failed to consider requests for extension of the comment period, and that it had no knowledge that commenters with a connection to ATF would act to bolster "ATF's unsupported assertions."

The commenter purported to provide instances where: (1) ATF committed blatant "institutional perjury" in the context of criminal prosecutions and in support of probable cause showings for search warrants; (2) ATF delayed answering questions or provided deceptive answers to congressional inquiries about NFRTR inaccuracies and the "Fast and Furious" gun-walking operation, for example, and published proposed rules in flagrant disregard to limitations on appropriations; and (3) ATF misled the public about the accuracy of the NFRTR.

**Department Response**
The Department notes that ATF has committed available resources to develop this NPRM and respond to comments as part of the rulemaking process. In developing this rulemaking and responding to comments, ATF has followed all established regulatory procedures and complied with all relevant policies and requirements.

### 3. Timetable for Final Rule

**Comments Received**
A commenter identified prior communications with ATF employees in August 2013, prior to the proposed rule's publication in September 2013, regarding whether a rule finalizing the proposed changes in the NPRM would only apply to applications submitted after the effective date of the regulation, and stated that these communications indicated that such would be the case. However, this commenter stated that the text of the proposed rule was not clear on this matter and ATF had "needlessly confused the public" and potentially falsely reassured persons interested in filing comments. This commenter noted that several commenters expressed concern with the "grandfathering" or transition issues. A few commenters specifically asked whether ATF would grandfather any trusts or legal entities where the applications have been sent in, the $200 tax stamp check has been cashed, and the application is "pending" prior to the effective date of the final rule. A few commenters asked what would happen to pending or "in limbo" applications, and if the applications would be sent back to the applicants. Several commenters suggested—or would want to ensure—that ATF "grandfather in" (i.e. not apply the requirements of the final rule to) all applications already submitted. A commenter stated that ATF could just as likely grandfather the pending applications as reject them on the grounds that they were not submitted on a new form. If ATF does not grandfather these applications, another commenter asked how ATF would handle them, and about the involved costs. Another commenter asked if the pending applications would have to be resubmitted, and if so, whether they would go to the back of the line for processing. Another commenter specifically asked whether ATF would refund the transfer tax for the applications pending approval. A few commenters asked about retroactive changes to previously completed transfers. Another commenter urged ATF to publish a notice clarifying that ATF has no intent to return pending applications to applicants for resubmission to conform with any new regulation.

**\*2710** A few commenters asked if existing legal entities and trusts holding NFA items must submit to ATF fingerprints, photographs, and CLEO certifications for each responsible person or if they would be grandfathered. Another commenter pointed out that the proposed rule did not provide a cost estimate to bring the "many thousands" of existing trusts and corporations into compliance with the new rule, and therefore surmised that past transfers would be grandfathered. If this is not the case, this commenter suggested that ATF publicly disclose such a cost estimate. This commenter stated that it could take months for a large corporation, which routinely purchases and sells NFA weapons, to establish policies and bring the entire workforce into compliance. This commenter asked whether employees who have been approved as responsible persons could continue conducting business while other employees were pending approval as responsible persons, and presumed that ATF would answer affirmatively. Finally, this commenter asked if ATF has estimated, even internally, the ATF staffing level and expansion of staff required to implement these new rules considering that the current wait time for Form 4 transfers and Form 3 (dealer to dealer) transfers is six to nine months, and three months, respectively, and the proposed rule, if finalized, would result in a "likely substantial" additional workload for ATF.

**Department Response**
The final rule is not retroactive and therefore the final rule will not apply to applications that are in "pending" status, or to previously approved applications for existing legal entities and trusts holding NFA items. The Department has considered the additional costs to ATF as a result of this rule, which are detailed in section VI.A below.

### 4. Commenters Urge ATF To Withdraw Proposed Rule and Request a Public Hearing

Several trade association commenters, as well as individuals, encouraged ATF to withdraw the proposal. One of these commenters, a trade association, suggested that ATF work with makers, sellers, and users of NFA firearms to develop a rule that is more realistic and addresses the real needs of all those concerned. Another trade association urged ATF to withdraw or substantially rewrite the rule. Both trade associations requested that ATF hold a public hearing to ensure that all views and comments are fully heard. An individual commenter requested a hearing, or series of hearings around the country. In addition, another of these commenters advised ATF to focus on streamlining the NFA application process and reducing the

stress on local law enforcement.

**Department Response**

The Department does not believe that soliciting additional information and views from the public, either through informal meetings to further refine the scope of the rulemaking, or through public hearings, are necessary or appropriate.

The Department notes that the proposed rule included four direct, clear objectives:

1. Defining the term "responsible person," as used in reference to a trust, partnership, association, company, or corporation;

2. Requiring responsible persons of such legal entities to submit, inter alia, photographs and fingerprints, as well as a law enforcement certification, when filing an application to make an NFA firearm or function as the transferee on an application to transfer an NFA firearm;

3. Modifying the information required in a law enforcement certification to relieve the certifying official from certifying that the official has no information indicating that the maker or transferee of the NFA firearm will use the firearm for other than lawful purposes; and

4. Adding a new section to ATF's regulations stipulating that the executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate may possess a firearm registered to a decedent during the term of probate without such possession being treated as a "transfer" under the NFA, and specifying that the transfer of the firearm to any estate beneficiary may be made on a tax-exempt basis.

ATF received nearly 9,500 responses from diverse public commenters, including professional associations, lobbying groups, and individuals, and the Department has afforded full consideration to these comments in formulating this final rule. Further, the Department's receipt and review of this volume of comments provides the Department with a complete array of comments likely to arise in a public hearing, making additional public events redundant. A public hearing, or even a series of them, will only serve to provide the Department information it has already collected without delivering new insights.

*G. Comments on NFA Registration and Processing*

**Comments Received**

Many commenters stated that there is nothing wrong with the current system, and believed that the only change needed is to speed up the NFA approval process. Many remarked on the huge backlog of pending NFA applications and that it takes months to well over a year for the NFA Branch to process Form 1 and Form 4 applications. A commenter thought that speeding up the process was especially essential for a person trying to register a second item. Several commenters stated that if ATF and the Department really wanted to improve the NFA process, they should modernize the current process and upgrade their systems to permit electronic forms that need to be filled out only once, and "upgrade systems" and utilize technology so that after the initial NFA approval, ATF could access and use "data" and "background checks" already on file to further speed up the process for subsequent transfer requests.

Several commenters stated that ATF needed to hire more people (e.g., agents, inspectors, examiners, processors) to process the applications more efficiently. A few other commenters requested that more funding be given to ATF to hire additional staff; another commenter suggested that ATF figure out how to use the tax stamp money for this purpose. Several commenters believed that the NFA Branch is already overworked and understaffed, and that the proposed rule change would exponentially increase its workload and cause approval wait times to further increase. A commenter stated that the proposed rule's requirements would cause a "912% increase in the number of papers and forms" the NFA Branch has to process, and that increasing its workload more than nine times translates to wait times approaching a decade. One of these commenters stated that, at one time, Form 1 and Form 4 applications took less than 3 months from submission to approval; however, in the past several years, the workload has increased resulting in dramatically slower approval times. Another of these commenters noted that ATF's own Web site shows that "NFA applications increased 250% from 2005 to 2011, while the number of NFA examiners decreased 25%." This commenter contended that ATF is not meeting its "customer service" goals. Another commenter stated that ATF should address and correct its internal deficiencies before proposing regulatory changes

that will only exacerbate **2711** administrative challenges, without enhancing public safety at all.

Another commenter stated that the process should only take a few days at most to process instead of the current "months" processing time. Another commenter suggested that ATF implement a maximum approval time of 30 days, and that if ATF has taken no action in that time, the application should be automatically approved. Another commenter suggested that the process be no longer than three months by default.

In addition to their suggestions on speeding up the process, a few commenters suggested that ATF decrease the tax stamp costs. A commenter asked, "if I have an individual tax stamp why do I have to pay again to move it to a trust that I set up?" Another commenter suggested that ATF draft new regulations to change the tax stamp costs for all NFA items from $200 to $5. Another commenter suggested that ATF either reduce the $200 tax stamp cost to $50 or eliminate it altogether. Another commenter added that a reduction of the tax stamp cost would increase ATF's revenues and the "tax basis" of the firearms industry.

**Department Response**

The Department and ATF are committed to processing NFA forms as efficiently and expediently as possible considering that an ever-increasing number of forms are submitted. In FY 2010, ATF's NFA Branch processed almost 92,000 forms (Forms 1, 2, 3, 4, 5, 9, 10, and 5320.20). In FY 2014, the number of forms processed increased to over 236,000, an increase of 250 percent. As a result of this increase, ATF has dedicated more staffing to the NFA Branch, increasing the number of legal instruments examiners from 9 to 27. Research assistants were provided to the examiners to research and resolve problems. Data entry staffing has been increased. Similarly, customer service representative staffing has been increased so that examiners are not pulled away from their tasks, and can respond quickly to the public and industry.

ATF has approved overtime in an effort to increase the forms processing rate and has brought in staffing on detail to process forms. In February 2014, the forms backlog was over 81,000 forms. As of October 7, 2015, the backlog has been reduced to just over 51,000. The time frame for the processing of each type of form has also decreased (note: since each form has a different purpose, the processing times vary). Processing times for Forms 1 and 4, for example, have been reduced from nine months to approximately five months.

ATF has used technology to help make the process quicker and more efficient. In 2013, ATF introduced an electronic filing system (eForms) designed to allow forms to be filed more accurately, and more quickly, with immediate submission into the NFA system for processing. This reduces data entry demands otherwise required with paper forms. The eForms system, however, was not designed to allow the filing of forms where fingerprints, photographs, and the law enforcement certification were required. However, it did allow the filing of forms by trusts or legal entities, such as LLCs. After several months of operation, the system encountered complications. It was taken out of service for a brief period and then brought back up over a period of time. To preclude further complications, the highest volume forms submitted, Forms 3 and 4, have been kept out of service while ATF seeks to implement a new system with a more robust platform to process these forms and others in the existing eForms system. This process continues at the present time.

Some commenters stated that ATF should modernize the process and utilize technology so that data and background checks can be used for subsequent transfer requests. The Department agrees and, resources permitting, will look to design systems that will utilize information on file.

Budget allowing, the Department and ATF anticipate a staffing increase for the NFA Branch in FY 2016. As stated above, over the past two years, ATF has committed additional resources to address the increase in applications submitted to the NFA Branch. The legal instrument examiner staffing has been tripled to 27 positions. However, the rate of submission continues to increase from almost 164,000 forms in CY 2013, to 236,000 in CY 2014 and a projected total of 322,000 in CY 2015.

Because the tax rate is set by statute, ATF has no authority to change it. The NFA provides very limited authority to permit exemptions from the transfer tax, but commenters' requested exemptions do not fall within that authority. ATF is also precluded by law from utilizing the taxes generated, as the making, transfer, and special (occupational) tax revenues are deposited into a general Treasury fund. In regard to a transfer between an individual and a trust, the NFA imposes a tax on the transfer of an NFA firearm. A trust is a separate "person" and, thus, the transfer from the individual to a trust is a taxable "transfer" under the statute and is subject to tax.

### H. Comments on Efficiencies and Priorities

**Comments Received**

The majority of commenters thought that the proposed rule would do nothing to lessen crime and gun violence and suggested that ATF first focus its efforts in other directions. A few commenters stressed educating children about gun safety, and stated that this could be done by parents and not on a Federal level. A few commenters urged the reduction or elimination of gun-free zones. A few commenters suggested that gangs are a problem for gun violence and crime, and that more time be spent addressing the causes of gang violence. Other commenters mentioned "Operation Fast and Furious" and suggested that ATF focus on "clean[ing] up [its] own house before attacking lawful gun owners."

Several commenters believed that mental health issues greatly needed more attention, including more accessible and affordable resources and better screening, with commenters calling the mental health system "crippled" and a "failure." A few commenters noted that the problem in the most recent mass gun murders has been mental health, and that the focus of prevention efforts should be on the "unrestricted mental capacity" of citizens who cannot understand and obey laws, not the tool (firearms) used in the crime. A commenter suggested that the Department devote time and efforts to enact regulations for mental health; another commenter suggested working on the "mental health aspect" of people obtaining firearms. Another commenter suggested that gun purchasers take a mental exam. Another commenter suggested spending money to educate people about the signs of severe mental illness. Another commenter desired a national database, consisting of criminal offenders and mental health patients, released to each State's police force and the FBI.

Many commenters also stated that the administration, the Department, and ATF should better enforce the laws already on the books, modify the current NICS instant check system to include mental health mandatory reporting, stiffen penalties, and stop handing out plea deals to people who violate the laws. Another commenter noted the items listed in the NFA constitute less than one percent of all firearm felonies, and questioned why ATF would go after the "smallest portion of a problem." This commenter suggested that ATF go after the criminals and not law-abiding citizens. Another commenter suggested that ATF focus on repeated felonies. **\*2712** Another commenter questioned where ATF would obtain the funding for the additional checks of NFA applications, and suggested applying this funding source toward improving efficiency and reducing the six- to eight-months-plus backlog of existing applications.

Another commenter suggested that an NFA passport book be issued to each individual or trust that has completed an NFA background check. This passport book would be presented after paying the tax, at the time of the item's purchase. A stamp would immediately be placed in the passport book and the customer could leave with the purchased item. This commenter added that the check would then be mailed to ATF, and ATF could conduct yearly audits to regulate the passport books.

**Department Response**

The Department's ultimate objective in the promulgation of this final rule is to enhance public safety by ensuring prohibited persons do not possess and use NFA weapons— the primary statutory goal of the NFA. Contrary to the comments submitted suggesting otherwise, the objective of this final rule complements, rather than detracts from, the numerous other public safety efforts that the Department and ATF engage in every day.

With the numbers of transactions involving trusts or legal entities increasing, the Department believes the possibility of a prohibited person obtaining an NFA firearm also increases. For example, currently, it is possible that one or more responsible persons at a trust or legal entity are prohibited persons, yet that person could obtain access to an NFA firearm by having someone at the trust or legal entity who is not a prohibited person serve as the subject of the point-of-transfer background check. As noted above, the costs to ATF are detailed in section VI.A, below. ATF is dedicating resources to the processing of the forms currently submitted, and will continue to apply resources to ensure improvements in the process.

The Department considered alternatives, such as the implementation of "passport books" or similar systems, but determined that implementing them would require a statutory change.

### I. New Responsible Persons and Form 5320.23

**Comments Received**

In the NPRM, ATF stated that it was considering a requirement that new responsible persons submit Form 5320.23 within 30 days of a change in responsible persons at the trust or legal entity, and sought opinions and recommendations. See 78 FR at 55020. A commenter provided three reasons why this change is unnecessary, unworkable, and would lead to chaos within legal entities. First, ATF only has authority under the NFA to identify applicants, which applies to responsible persons before the transfer has occurred, and is not an ongoing obligation once the transfer has occurred. Second, companies today face many situations that would make it very difficult and overly burdensome to determine who is a responsible person and submit the required information (e.g., high employee turnover, shifting management responsibilities and roles, temporary management changes, overlaps in manager authority). In addition, many small legal entities would not have the administrative personnel to handle this required process. Third, this requirement would create much confusion and raise many questions if a potential new responsible person could not obtain the CLEO certification.

This commenter further stated that a continuing obligation to obtain approval from ATF to add each new responsible person would magnify the burdens related to the proposed CLEO certification requirement and the "responsible person" definition, particularly because legal entities have less control over managerial structure changes than they do over a decision about whether and when to acquire or make a new NFA firearm. This commenter believes that non-firearm related factors overwhelmingly dictate changes in personnel and managerial structure, and that complications relating to ensuring compliance with an ongoing designation obligation under the implementing regulations should not impact the personnel and managerial structure of a legal entity.

A few commenters did not recognize that ATF was only considering this change, and thought that this change was being proposed; they included their comments on the issue with comments on the proposed change to CLEO certification for responsible persons. For example, a few commenters stated that the NPRM would impact trustees' abilities to manage trusts because of the proposed requirement that new responsible persons submit a Form 5320.23 and obtain a CLEO sign-off within 30 days of their appointment. A few other commenters stated that, by proposing that any new responsible person submit a Form 5320.23 and obtain a CLEO signoff within 30 days of the new responsible person's appointment, the proposed rule intruded upon the traditional uses of trusts and upon the rights of settlors to manage their estate plans.

Another commenter, noting ATF's long-held position that certain activities, such as the sale of a company, hiring new employees, or adding new trustees are not "transfers" of firearms, stated that the rule change would improperly extend ATF's authority. This commenter stated that ATF and DOJ incorrectly relied on their authority under 26 U.S.C. 5812(a) for the proposed change, because that section only authorizes ATF to collect information on the transferee during a transfer, not to continue collecting information on the transferee (or persons who act on behalf of the transferee) after the application is approved. This commenter asserted that the 30-day rule requirement would enable CLEOs and ATF to veto private decisions that are not the business of the government, and that Congress has not authorized such veto rights. This commenter asked ATF to consider the negative unintended consequences of the 30-day rule requirement, because its imposition would effectively mean a CLEO has to approve the sale of a company where buyers reside, the addition of trustees where trustees reside, the hiring of employees where employees reside, and the membership of an association. Further, this commenter stated that if ATF implemented this change, ATF would be violating First and Second Amendment rights, as well as rights of privacy, when ATF's objective could be achieved by any licensed FFL performing a "discreet, confidential NICS check." Further, this commenter stated that requiring a legal entity to request and receive permission for all personnel changes would be cumbersome, impacting personnel decisions and greatly increasing hiring costs.

Another commenter stated that a requirement for all responsible persons to submit Form 5320.23 and comply with the CLEO certification within 30 days would be a "radical" departure from trust law and estate planning. As a result, this commenter cautioned ATF to expect long and costly court battles, that ATF would lose, as the proposed requirements would infringe property rights and the ability to pass trust property to legal heirs.

**Department Response**

The Department notes that it did not propose to make any changes on this issue in the proposed rule. Rather the Department requested input and guidance relative to identification of **\*2713** new responsible persons who receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, an entity. The Department is not requiring, in this final rule, that new responsible persons submit a Form 5320.23 within 30 days of any change of responsible persons at a trust or legal entity.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

The Department further notes that nothing in this rulemaking has altered the requirement for trusts and legal entities to submit new applications to make or transfer (as applicable) if the trust or legal entity intends to possess additional NFA items, or if there is a sufficient change in control or ownership of the trust or legal entity such that it is considered a new or different entity under relevant law. In either case, at the time of such application, the trust or legal entity will need to identify current responsible persons, who will submit photographs and fingerprints, and undergo a background check.

Refer to section IV.C.1 in this document to review ATF's shift from CLEO certification to CLEO notification—a process that alleviates the potential for administrative backlogs as a result of personnel changes, and any concerns that a CLEO may dictate the operation of an entity.

## V. Final Rule

For the reasons discussed above, this final rule has been revised from the proposed rule to eliminate the requirement for a certification signed by a CLEO and instead add a CLEO notification requirement. The final rule also clarifies that the term "responsible person" for a trust or legal entity includes those persons who possess the power or authority to direct the management and policies of an entity to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust or entity. In the case of a trust, those with the power or authority to direct the management and policies of the trust includes any person who has the capability to exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust. The Department has removed "beneficiaries" from the final non-exclusive list in the definition of "responsible person." However, a beneficiary or any other individual actually meeting the definition of a "responsible person" in the final rule shall be considered one.

Accordingly, because the law enforcement certification will no longer be required, the regulations in §§ 479.63 and 479.85 are being revised to require the applicant maker or transferee, as well as each responsible person, to provide a notice to the appropriate State or local official that an application is being submitted to ATF. The Department also agrees that a change from a CLEO certification to CLEO notification will require a change to the Forms 1, 4, and 5.

This final rule clarifies proposed § 479.62(b)(2) to denote that the required employer identification number for an applicant, other than an individual, may be "if any." This final rule makes a minor change to proposed §§ 479.63(b)(2)(ii) and 479.85(b)(2)(ii) by removing "Social Security number (optional)" and "place of birth" from the "certain identifying information" required to be submitted on the Form 5320.23 in both of these sections, and clarifying that the "country of citizenship" must only be provided if other than the United States. In addition, this final rule removes "place of birth" from proposed § 479.62(b)(2) for the required Form 1 applicant identity information. This final rule adopts all other proposed changes in the NPRM.

## VI. Statutory and Executive Order Review

### A. Executive Order 12866 and 13563—Regulatory Review

This regulation has been drafted and reviewed in accordance with section 1(b) of Executive Order 12866 ("Regulatory Planning and Review") and with section 1(b) of Executive Order 13563 ("Improving Regulation and Regulatory Review"). The Department of Justice has determined that this final rule is a significant regulatory action under section 3(f) of Executive Order 12866, and, accordingly, this final rule has been reviewed by the Office of Management and Budget.

This final rule will not have an annual effect on the economy of $100 million or more; nor will it adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. Accordingly, the final rule is not an economically significant rulemaking under Executive Order 12866. The estimated costs and benefits of the final rule are discussed below.

### 1. Summary of Costs and Benefits

This rule requires certain trusts and legal entities (partnerships, companies, associations, and corporations) applying to make or receive an NFA firearm to submit information for each of its responsible persons to ATF in order for ATF to ensure that

such persons are not prohibited from possessing or receiving firearms. ATF estimates a total additional cost of approximately $29.4 million annually for trusts and legal entities to gather, procure, and submit such information to ATF and for ATF to process the information and conduct a background check on responsible persons. These provisions have public safety benefits in that they will enable ATF to ensure that the estimated 231,658 responsible persons within trusts or legal entities that request to make or receive NFA firearms each year are not prohibited from possessing such firearms.

The Department acknowledges that this final rule may increase the time required to process applications received from trusts and legal entities, as well as for individuals, as an increased number of applications undergo more complete checks. The Department estimates that this final rule initially will increase processing times of these applications from four months to six to eight months. However, the Department anticipates that this time will be reduced once the NFA Branch adjusts to the new process. In addition, ATF will work to increase its resources and staffing to process the applications. Of course, continued increases in the numbers of applications submitted may correspondingly continue to place pressure on processing times.

This final rule eliminates the current requirement that all individual applicants obtain a certification from the CLEO for the locality. Instead, under the final rule, applicants seeking to make or receive an NFA firearm are required to notify their local CLEO before they submit the ATF application to make or receive an NFA firearm. Similarly, the final rule does not adopt a requirement that responsible persons obtain a CLEO certification, as was discussed in the proposed rule; instead, the final rule extends the same notification requirement to all responsible persons for each trust and legal entity applicant. ATF estimates the total cost of the CLEO notification requirement in this final rule to be approximately $5.8 million annually ($0.5 million for individuals; $5.3 million for legal entities), as compared to the approximate costs of $2.26 million annually for the current **2714** requirement that individuals obtain a certification from their local CLEO. Therefore, the estimated net cost increase of this final rule relating to CLEO notification is approximately $3.6 million annually. However, the final rule's estimated cost reduction for individual applicants is approximately $1.8 million annually.

## 2. Costs and Benefits of Ensuring Responsible Persons Within Trusts and Legal Entities Are Not Prohibited From Possessing NFA Firearms

### a. Methodology for Determining Costs

ATF estimated the cost of the provisions to ensure responsible persons within trusts and legal entities are not prohibited from possessing NFA firearms by: (1) Estimating the time and other resources that would be expended by legal entities to complete paperwork, obtain photographs and fingerprints, and send this information to ATF; and (2) estimating the time and other resources that would be expended by ATF to process and review the materials provided by the trusts and legal entities and to conduct background checks of responsible persons.

ATF estimated the cost of the time for trusts and legal entities to complete these tasks using employee compensation data for June 2015 as determined by the U.S. Department of Labor, Bureau of Labor Statistics (BLS). See http://www.bls.gov/news.release/pdf/ecec.pdf.[FN14] The BLS determined the hourly compensation (which includes wages, salaries, and benefits) for civilian workers to be $33.19, and for State and local government workers to be $44.22. In addition, ATF estimates that each trust or legal entity has an average of two responsible persons, an estimate that is based on ATF's review of 454 randomly selected applications for corporations, LLCs, and trusts processed during calendar year CY 2014.

ATF used data from CY 2014 to estimate the number of trusts, legal entities, and individuals that would be affected by the final rule. In CY 2014, ATF processed 159,646 applications that were either ATF Forms 1, 4, or 5. Of these, 115,829 applications were for unlicensed trusts or legal entities (e.g., corporations, companies) to make or receive an NFA firearm; 29,191 were for individuals to make or receive an NFA firearm; and 14,626 were for government agencies or qualified Federal Firearms Licensees (Gov/FFLs) to make or receive an NFA firearm. The numbers of applications, by Form and submitting individual or entity, are set forth in Table A.

Table A—Numbers of Applications Processed

| CY 2014 | Trust & | Individual | Gov/FFL | Total |
|---|---|---|---|---|

AR005713

| | legal entity | | | |
|---|---|---|---|---|
| Form 1 | 21,879 | 3,360 | 477 | 25,716 |
| Form 4 | 93,739 | 25,343 | 4,257 | 123,339 |
| Form 5 | 211 | 488 | 9,892 | 10,591 |
| Total | 115,829 | 29,191 | 14,626 | 159,646 |

ATF estimated the cost of complying with the final rule's requirements by estimating the cost of undertaking each of the steps necessary to complete an application. Under this final rule, a trust or legal entity is required to complete the following steps in addition to completing the applicable Form 1, 4, or 5 before it is permitted to make or receive an NFA firearm:

1. Complete and submit Form 5320.23 for each responsible person;

2. Submit fingerprints and photographs for each responsible person; and

3. Submit a copy of the documentation that establishes the legal existence of the legal entity.

In addition, under the final rule, information required on the existing ATF Form 5330.20 would be incorporated into the ATF Forms 1, 4, and 5.

**b. Cost to Trusts and Legal Entities of Applying To Make or Transfer**

**i. Time Cost of Completing a Responsible Person Form**
The final rule requires trusts and legal entities to complete and submit to ATF a new form (Form 5320.23), photographs, and fingerprint cards for each responsible person before the trust or legal entity is permitted to make or receive an NFA firearm. The information required on Form 5320.23 includes the responsible person's name, position, home address, and date of birth. The identifying information for each responsible person is necessary for ATF to conduct a background check on each individual to ensure the individual is not prohibited from possessing an NFA firearm under Federal, State, or local law.

ATF estimates the time for each responsible person to complete Form 5320.23 to be 15 minutes. Based on an estimate of 2 responsible persons per trust or legal entity and 115,829 entities, the estimated time cost to complete Form 5320.23 is $1,922,182 (15 minutes at $33.19 per hour x 115,829 x 2).

**ii. Cost of Photographs**
ATF estimates that:

• The cost of the photographs is $11.32 (based on the average of the costs determined for 60 Web sites); and

• The time needed to procure photographs is 50 minutes.

Currently, only individuals must obtain and submit photographs to ATF. Based on an estimate of 29,191 individuals, the current estimated cost is $1,137,816 (Cost of Photographs = $11.32 x 29,191 = $330,442; Cost to Procure Photographs = 50 minutes at $33.19 per hour x 29,191 = $807,374). Under the final rule, costs for individuals would remain the same, but trusts and legal entities would incur new costs. Each responsible person of a trust or legal entity would be required to obtain and submit photographs. Based on an estimate of 2 responsible persons per entity and 115,829 entities, the estimated cost for trusts and legal entities to obtain and submit photographs is $9,029,642 (Cost of Photographs = $11.32 x 115,829 x 2 = $2,622,368; Cost to Procure Photographs = 50 minutes at $33.19 per hour x 115,829 x 2 = $6,407,274).

### iii. Cost of Fingerprints

ATF has reviewed various fingerprinting services. At the present time, ATF is only able to accept **\*2715** fingerprints on hard copy fingerprint cards. Thus, the cost estimates are based on the submission of two hard copy fingerprint cards for each responsible person.

• The estimated cost of the fingerprints is $18.66 (cost based on the average of the costs determined for 275 Web sites); and

• The estimated time needed to procure the fingerprints is 60 minutes.

Currently, only individuals must obtain and submit fingerprints. Based on an estimate of 29,191 individuals, the current estimated cost is $1,513,553 (Cost of Fingerprints = $18.66 x 29,191 = $544,704; Cost to Procure Fingerprints = 60 minutes at $33.19 per hour x 29,191 = $968,849). Under the final rule, costs for individuals would remain the same, but trusts and legal entities would incur new costs. Each responsible person of a trust or legal entity would be required to obtain and submit fingerprints to ATF. Based on an estimate of 2 responsible persons per entity and 115,829 entities, the estimated cost for trusts and legal entities to obtain and submit fingerprints is $12,011,467 (Cost of Fingerprints = $18.66 x 115,829 x 2 = $4,322,738; Cost to Procure Fingerprints = 60 minutes at $33.19 per hour x 115,829 x 2 = $7,688,729).

### iv. Cost of Documents To Establish Existence of Trust or Legal Entity

A trust or legal entity that is applying to make or receive an NFA firearm must provide to ATF documentation evidencing the existence and validity of the entity—e.g., copies of partnership agreements, articles of incorporation, corporate registration, declarations of trust with any trust schedules, attachments, exhibits, and enclosures. Currently, trusts and legal entities may submit this documentation with their application package, although they are not required to do so. Therefore, ATF is treating the costs for documentation as new costs. ATF accepts, and will continue to accept, photocopies of the documents without notarization. ATF made the cost estimate by determining the average number of pages in the corporate or trust documents for 454 recent randomly selected submissions processed during CY 2014, which was 16 pages.

ATF estimates that:

• The cost of the copied documentation is $1.60 ($.10 per page at 16 pages); and

• The time needed to copy attachments is 10 minutes.

Assuming 115,829 entities would provide ATF this documentation each year, the estimated annual cost to submit the documentation is $826,053 (Cost of documentation = $1.60 x 115,829 = $185,326; Cost to copy attachments = 10 minutes at $33.19 per hour x 115,829 = $640,727). This cost is not dependent on the number of responsible persons associated with a legal entity. ATF notes that the estimated cost is likely to be lower if the entity has already filed the documents with ATF as part of a recent making or transfer application and the information previously provided has not changed. Under these circumstances, the entity can certify to ATF that the documentation is on file and is unchanged.

### v. Cost of Completing and Mailing Form 1, 4, or 5

Currently, individuals, trusts, and legal entities must complete and mail Form 1, 4, or 5. This final rule should not change the costs to individuals, trusts, or legal entities to complete such forms. Even if there are multiple responsible persons associated with a trust or legal entity, the trust or legal entity still will be completing and mailing one Form 1, 4, or 5. However, ATF estimates that trusts and legal entities will incur increased postage costs to mail Forms 1, 4, and 5 applications to ATF. Currently, for trusts and legal entities, these applications only contain the completed form itself; ATF estimates postage costs at $56,756 (115,829 x $.49). However, under the final rule, trusts and legal entities must also include Form 5320.23, photographs, and fingerprint cards for each responsible person, as well as documentation evidencing the existence and validity of the trust or entity. ATF estimates postage costs for this complete application package at $113,512 ($115,829 x $.98). Therefore, ATF estimates the new mailing costs for trusts and legal entities, under this final rule, to be $56,756 ($113,512-$56,756).

The estimated costs to legal entities that are discussed above are summarized in Tables B(1) and B(2). The total estimated new cost of the final rule for legal entities to provide to ATF identification information for each of its responsible persons is $23,846,679 annually.

**Table B(1)—Cost Estimates of the Time To Comply With the Final Rule's Requirements**

| Process | Estimated time (minutes) | Number of entities | 2 Responsible persons |
|---|---|---|---|
| Completion of Form 5320.23 | 15 | 115,829 | $1,922,182 |
| Procure Photographs | 50 | 115,829 | 6,407,274 |
| Procure Fingerprints | 60 | 115,829 | 7,688,729 |
| Copy Attachments | 10 | 115,829 | 640,727 |
| Total | ............................................. | | 16,658,885 |

**Table B(2)—Cost Estimates of Procuring Photographs, Fingerprints, Documentation, and Mailing**

| Process-related item | Estimated cost | Number of entities | 2 Responsible persons |
|---|---|---|---|

AR005716

| | | | |
|---|---|---|---|
| Photographs | $11.32 | 115,829 | $2,622,368 |
| Fingerprints | 18.84 | 115,829 | 4,322,738 |
| Documentation of Legal Entity | 1.60 | 115,829 | 185,326 |
| Increased Application Postage | .49 | 115,829 | 56,756 |
| Total | | ............................................. | 7,187,188 |

**\*2716 c. Cost to ATF**

ATF incurs costs to process forms, fingerprint cards, photographs, and to conduct and review background checks. Currently, ATF incurs these costs for the 29,191 applications for individuals to make or receive NFA firearms. Under the final rule, ATF would incur these costs for applications for trusts and legal entities to make or receive NFA firearms. ATF estimates that:

• ATF's cost for the FBI to process a set of fingerprints is $12.75. (The cost is based on the FBI's current fee, which is set by statute on a cost recovery basis.)

• The estimated cost for an examiner at ATF's NFA Branch to conduct and review the results of a background check is $11.06 (15 minutes at $44.22 per hour); and

• The estimated cost to print the new 5320.23 forms is $.0747 per form.

Based on an estimate of 2 responsible persons per legal entity and 115,829 entities, the estimated cost for ATF to process forms, fingerprint cards, photographs, and to conduct and review background checks for applications for legal entities to make or receive firearms is $5,533,082 annually (Cost for processing fingerprints = $12.75 x 115,829 x 2 = $2,953,640; Cost for background checks = $11.06 x 115,829 x 2 = $2,562,137; Cost to print forms = $.0747 x 115,829 x 2 = $17,305).

### Table C—Costs to ATF Under Final Rule

| Process | Estimated cost or time | Number of entities | 2 Responsible persons |
|---|---|---|---|
| ATF's costs for Processing Fingerprints | $12.75 | 115,829 | $2,953,640 |

*Machineguns, Destructive Devices and Certain Other Firearms;..., 81 FR 2658-01*

| | | | |
|---|---|---|---|
| Time Needed to Conduct and Review Background Check by ATF | 15 minutes | 115,829 | 2,562,137 |
| Cost of Form 5320.23 | $.0747 | 115,829 | 17,305 |
| Total | | ...................................... | 5,533,082 |

The estimated total additional cost of the final rule for trusts and legal entities to gather, procure, and submit to ATF responsible person forms, fingerprints, photographs, documents to establish existence of trust or legal entity, and Form 1, 4, or 5, and for ATF to process the information and conduct a background check on responsible persons is $29,379,155 annually (Sum of tables B(1), B(2), and C: $16,658,885 + $7,187,188 + $5,533,082 = $29,379,761).

**d. Benefits of Background Checks for Responsible Persons**
The background check requirement for responsible persons provides at least two important benefits. First, it provides important public safety and security benefits by helping ATF to prevent individuals who are prohibited from possessing firearms from obtaining them. Second, by requiring responsible persons to submit the same information and meet same requirements as individuals who seek permission to make or transfer a firearm, the final rule closes a potential loophole that might otherwise allow individuals to form trusts or legal entities for the purpose of obtaining a firearm they are prohibited from possessing.

This final rule provides important public safety and security benefits by enabling ATF to ensure that individuals who are prohibited from possessing firearms do not obtain them. Existing regulations do not require the identification of responsible persons of a trust or legal entity. Therefore, ATF lacks the necessary information to perform a background check on a person who meets the rule's definition of "responsible person" to determine if that person is prohibited from possessing an NFA firearm. This final rule provides important public safety and security benefits by enabling ATF to identify and perform background checks on such persons.

For example, there may be a number of responsible persons associated with a corporation, LLC, or trust. As noted above, based on a recent review of applications for corporations, LLCs, and trusts, ATF estimates that there are 2 responsible persons associated with such legal entities. One or more of these persons could be a prohibited person, e.g., a convicted felon. These prohibited persons could be establishing trusts or legal entities as a means of avoiding a fingerprint-based background check. Therefore, requiring the responsible parties of a trust or legal entity to follow the same requirements as individuals will close this loophole. Currently, when an NFA transfer application is approved, a corporate officer or trustee arranges for the receipt of the firearm. If the seller is an FFL, the officer or trustee must complete ATF Form 4473 (5300.9), Firearms Transaction Record. On the Form 4473, the officer or trustee must answer questions that determine if the officer or trustee is a prohibited person. If one of the officers or trustees is prohibited, then one of the other officers or trustees may pick up the firearm and complete the Form 4473. Once the firearm is picked up by the officer or trustee, it then becomes corporate or trust property and can be possessed by any of the officers or trustees. As discussed in the NPRM, ATF has encountered situations in which it lacked the necessary information to conduct any background checks to determine whether the responsible person at an LLC or trust was a prohibited person. See 78 FR at 55023 for more detailed discussion. As discussed in section IV.B.1.c, there are more recent examples. Between 2006 and 2014 there were over 260,000 NFA firearms acquired by trusts or legal entities where no individual associated with the trust or entity was subject to a NFA background check as part of the application process. As a result, under current regulations, prohibited persons can circumvent the statutory prohibitions and receive firearms.

**3. Costs and Benefits of Final Rule To Notify CLEOs Before Making or Transferring an NFA Firearm**

**a. Cost of Current Requirement To Obtain Law Enforcement Certification**
Under current regulations, the maker or transferee of an NFA firearm typically will bring a Form 1, 4, or 5 to the maker or

transferee's local CLEO to obtain the CLEO certification as required on the form and therefore may need to meet with the CLEO. The maker or transferee may need to return to pick up the certified form. ATF estimates that the time needed for the maker or transferee to procure the CLEO certification is 100 minutes (70 minutes travel time and 30 minutes review time with the CLEO).

For CY 2014, of the 159,646 Form 1, Form 4, and Form 5 applications processed by ATF, 115,829 were for trusts or legal entities to make or receive NFA firearms. Trusts and legal entities **2717** are not currently required to obtain CLEO certification. However, certification is required for the 29,191 applications for individuals to make or receive NFA firearms. The current cost to obtain CLEO certification is estimated as follows:

• The estimated cost for the individual to obtain the CLEO certification is $1,614,749 (100 minutes at $33.19 per hour x 29,191)

• The estimated cost for the CLEO to review and sign the certification is $645,413 (30 minutes at $44.22 per hour x 29,191)

The total estimated cost of the certification requirement is $2,260,162 (individuals $1,614,749; CLEOs: $645,413).

**Table D—Current CLEO Certification Process Costs**

| Current CLEO process | Estimated time (minutes) | Number of respondents | Cost |
|---|---|---|---|
| Procure Certification from CLEO | 100 | 29,191 | $1,614,749 |
| Agency Review and Sign Certification | 30 | 29,191 | 645,413 |
| Total | | .................................................... | 2,260,162 |

**b. Cost of Requirement To Notify CLEOs**

The final rule replaces the existing requirement to obtain certification by the local CLEO before submitting an application to make or receive an NFA firearm with a requirement to notify the local CLEO before submitting an application to make or receive an NFA firearm. The notification requirement requires the maker or transferee to mail a copy of the application to the CLEO with jurisdiction over the area of the applicant's residence or, in the case of a trust or legal entity, the CLEO with jurisdiction over the business or trust. In addition, the notification requirement requires all responsible persons for trusts and legal entities to mail a copy of Form 5320.23 to the CLEO for their area of residence, principal office, or business. The effect of this provision is that trusts and legal entities, as well as their responsible persons, are required to provide notification of the proposed making or transfer to their local CLEOs, whereas currently trusts and legal entities and their responsible persons are not required to notify or obtain certification from their local CLEOs. Individuals must only notify their local CLEOs under the final rule, whereas currently they are required to obtain certification from their local CLEOs.

In CY 2014, ATF processed 115,829 applications from trusts and legal entities and 29,191 application from individuals. Under the final rule, each of these applications require CLEO notification. For individuals, the CLEO notification will include a copy of the Form 1, 4, or 5 application, which contains 3 pages for each application. For trusts and legal entities, the CLEO notification will include: (1) For the applicant, a copy of the Form 1, 4, or 5 application, which contains 3 pages for each application; (2) for responsible persons, a copy of Form 5320.23, which contains 2 pages. Form 5320.23 will contain a "copy 1" page for ATF and a "copy 2" page for the CLEO. This means that trusts and legal entities will not need to make copies of Form 5320.23 when mailing Form 5320.23 to the CLEO. All applicants will need to make copies of the application to mail the application to the CLEO.

ATF estimates the cost of CLEO notification for individuals as follows:

• The estimated cost to copy an application to send as a notification to the CLEO is $.30 for each Form 1, Form 4, and Form 5 ($.10 per page for 3 pages). Cost is $8,757 ($.30 x 29,191).

• The estimated cost to mail an application to the CLEO is $.49 (current postage cost). Cost is $14,304 ($.49 x 29,191).

• The estimated cost of the time to copy and mail the application to the CLEO is $5.53 (10 minutes at $33.19 per hour). Cost is $161,426 ($5.53 x 29,191).

• The estimated cost of the time for the CLEO to review the notification is $11.06 (15 minutes at $44.22 per hour). Cost is $322,852 ($11.06 x 29,191).

ATF estimates the cost of CLEO notification for trusts and legal entities as follows:

**Applicants**
• The estimated cost to copy an application to send as a notification to the CLEO is $.30 for each Form 1, Form 4, and Form 5 ($.10 per page for 3 pages). Cost is $34,749 ($.30 x 115,829).

• The estimated cost to mail an application to the CLEO is $.49 (current postage cost). Cost is $56,756 ($.49 x 115,829).

• The estimated cost of the time to copy and mail the application to the CLEO is $5.53 (10 minutes at $33.19 per hour). Cost is $640,534 ($5.53 x 115,829).

• The estimated cost of the time for the CLEO to review the notification is $11.06 (15 minutes at $44.22 per hour). Cost is $1,281,069 ($11.06 x 115,829).

**Responsible Persons**
• The estimated cost to mail Form 5320.23 to the CLEO is $113,512 ($.49 x 115,829 x 2 (number of responsible persons)).

• The estimated cost of the time to mail Form 5320.23 to the CLEO is $2.77 (5 minutes at $33.19 per hour). Cost is $641,693 ($2.77 x 115,829 x 2 (number of responsible persons)).

• The estimated cost of the time for the CLEO to review the notification is $11.06 (15 minutes at $44.22 per hour). Cost is $2,562,137 ($11.06 x 115,829 x 2 (number of responsible persons) = $2,562,137).

**Table E(1)—CLEO Notification Process Costs for Individuals**

| Process | Estimated cost or time | Number of | Cost |
|---|---|---|---|

Machineguns, Destructive Devices and Certain Other Firearms;..., 81 FR 2658-01

| | | individuals | |
|---|---|---|---|
| Provide Copy of Application for Notification to CLEO | $.10/page for 3 pages | 29,191 | $8,757 |
| Mailing of CLEO Notification to Agency | $.49 for stamp | 29,191 | 14,304 |
| Copy and Mail Notification | 10 minutes | 29,191 | 161,426 |
| Agency Process CLEO Notification | 15 minutes | 29,191 | 322,852 |
| Total | | ................................................. | 507,339 |

**Table E(2)—CLEO Notification Process Costs for Trusts and Legal Entities (Applicants)**

| Process | Estimated cost or time | Number of trusts & legal entities | Cost |
|---|---|---|---|
| Provide Copy of Application for Notification to CLEO | $.10/page for 3 pages | 115,829 | $34,749 |
| Mailing of CLEO Notification to Agency | $.49 for stamp | 115,829 | 56,756 |
| Copy and Mail Notification | 10 minutes | 115,829 | 640,534 |
| Agency Process CLEO Notification | 15 minutes | 115,829 | 1,281,069 |
| Total | | ................................................. | 2,013,108 |

**Table E(3)—CLEO Notification Process Costs for Trusts and Legal Entities (Responsible Persons)**

AR005721

Machineguns, Destructive Devices and Certain Other Firearms;..., 81 FR 2658-01

| Process | Estimated cost or time | Number of trusts & legal entities persons | 2 Responsible |
|---|---|---|---|
| Mailing of Form 5320.23 to Agency | $.49 for stamp | 115,829 | $113,512 |
| Mail Form 5320.23 to Agency | 5 minutes | 115,829 | 641,693 |
| Agency Process CLEO Notification | 15 minutes | 115,829 | 2,562,137 |
| Total | | .................................................... | 3,317,342 |

The estimated total cost of the final rule to require notification to the CLEO is $5,837,789 annually (sum of Tables E1, E2, and E3). As shown in Table D, the estimated cost of the current requirement to obtain CLEO certification is $2,260,162. Therefore, the final rule notification requirement results in an estimated cost increase of approximately $3.6 million per year. However, for individuals, the final rule notification requirement results in an estimated reduction of approximately $1.8 million per year ($2,260,162-$507,339 = $1,752,823).

**c. Benefits of Requirement To Notify CLEOs**

The new law enforcement notification requirement provides at least two important benefits. First, by changing the certification requirement to a notification requirement, the final rule reduces the burdens on individuals and entities who seek to possess firearms in jurisdictions whose chief law enforcement officers either process certifications slowly or refuse to process them at all. Second, by making the same notification requirement applicable to individuals and responsible persons of trusts and legal entities the rule closes a loophole that incentivized individuals to form trusts and legal entities to circumvent the certification requirement.

Under current regulations, individuals must obtain a certification from a CLEO in their jurisdiction stating, inter alia, that the certifying official has no information indicating that possession of the firearm by the individual would be in violation of State or local law, or no information that the individual will use the firearm for other than lawful purposes. Some applicants have found the process of obtaining a CLEO certification burdensome. Additionally, local and State officials have the option of participating or not, and some CLEOs have refused to issue certifications, thereby making it more difficult for applicants and transferees to obtain the needed certification. Requiring only notice, rather than a certification, will benefit applicants and transferees by removing a potentially burdensome impediment to furnishing ATF with a completed application.

Under the current rule, the certification requirement does not apply to trusts and legal entities. Some individuals have therefore created trusts and legal entities to circumvent the certification requirement. This final rule makes the requirements for background checks the same for trusts and legal entities as they now are for individuals. The Department believes the incentive for makers and transferees to create corporations and trusts solely to avoid the CLEO certification requirement will

decrease once the certification is no longer required. As noted in the comments above, some CLEOs are reluctant to issue certifications for a variety of reasons. As a result, an individual may decide to establish a trust or legal entity because trusts and legal entities are not required to provide CLEO certifications under current regulations. By eliminating the CLEO certification requirement, this rulemaking will reduce the burden imposed on such individuals. Certainly, there are legal reasons to create a corporation or a trust unrelated to the desire to avoid the certification. The Department therefore believes creation of these trusts and legal entities will continue.

### 4. Consolidation of Forms

The incorporation of the information required on ATF Form 5330.20 into the existing Forms 1, 4, and 5 reduces the burden upon the applicant or transferee by eliminating an additional form to be completed and filed. The current estimated time to complete the form is 3 minutes. Because the information requested on the forms is the same, any savings result from the applicant not having to attach a separate form. ATF estimates the elimination of the form will reduce the industry costs by $240,661 (145,020 transactions for individuals, trusts, and legal entities x 3 minutes per form saved x $33.19 per **2719** hour) and ATF's printing costs by $1,451 (145,020 forms x .01 cents per form) for a total reduction in costs of $242,112.

### B. Executive Order 13132

This regulation will not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. The elimination of the CLEO certification reduces the burden on State and local agencies, and its replacement with the notification of the pending application still provides the agency with knowledge of a controlled firearm in its area of jurisdiction. As noted in the benefits section, ATF estimates that the cost of the notification to the agencies will be less than the cost to the agencies of completing the certification. ATF discussed this change with State and local agencies. While agencies will no longer be able to "deny" an application by not completing the law enforcement certification, the agencies will receive a notification and can contact ATF with any issues.

While there would be an increase in the paperwork filed with ATF and an increase in ATF's processing workload, that is balanced by ATF being able to conduct background checks on persons who do not receive background checks under the current regulations. The overall impact on the States will be positive. Therefore, in accordance with section 6 of Executive Order 13132 ("Federalism"), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### C. Executive Order 12988

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 ("Civil Justice Reform").

### D. Regulatory Flexibility Act

The Regulatory Flexibility Act requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. See 5 U.S.C. 605(b). Small entities include small businesses, small not-for-profit enterprises, and small governmental jurisdictions. See 5 U.S.C. 601. The Attorney General has reviewed and approved this rule, thereby certifying that it will not have a significant economic impact on a substantial number of small entities.

This rule primarily affects trusts and legal entities that seek to make or acquire NFA firearms and are not making or acquiring them as a qualified FFL. This rule requires responsible persons of trusts or legal entities to undergo background checks and comply with CLEO notification requirements. For CY 2014, ATF processed 115,829 applications from trusts and legal entities that were not qualified FFLs. ATF estimates the cost of implementing the rule will increase the cost for 115,829 trusts and legal entities with an average of 2 responsible persons by $25,333,317 (identification costs for background checks: $23,846,073; CLEO notification costs: $1,487,244) per year.[FN15] In addition, in a revision to the NPRM, this rule requires that individuals comply with CLEO notification requirements rather than CLEO certification procedures, resulting in a compliance cost reduction of $1,430,262 from the costs estimated in the NPRM.[FN16] Accordingly, the estimated compliance cost per entity is estimated to be $218.71 (cost of increase ($25,333,317) / number of entities (115,829)).

### E. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996. See 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

### F. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act, a Federal agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by OMB. This final rule revises several existing information collections and creates a new information collection. The existing information collections that are revised are in 27 CFR 479.62, 479.63, 479.84, 479.85, 479.90, 479.90a, and 479.91, which are associated with ATF Forms 1, 4, and 5. Forms 1, 4, and 5 have been approved by the OMB under control numbers 1140-0011, 1140-0014, and 1140-0015, respectively. The new information collection that is being created is associated with ATF Form 5320.23, and is currently in review for approval by OMB prior to the effective date of this final rule. Form 5320.23 requires certain identifying information for each responsible person within a trust or legal entity requesting to make or receive an NFA firearm, including the responsible person's full name, position, home address, date of birth, and country of citizenship if other than the United States. Form 5320.23 also requires a proper photograph of each responsible person, and two properly completed FBI Forms FD-258 (Fingerprint Card) for each responsible person. In addition, Form 5320.23 requires each responsible person to list the full name and complete address of the chief law enforcement officer in the responsible person's locality to whom the responsible person has forwarded the responsible person's completed copy of Form 5320.23.

The estimated total annual burden hours and related information (number of respondents, frequency of responses, costs, etc.) for the revisions to Forms 1, 4, and 5, as well as the new Form 5320.23, appear below.

The current estimated total annual burden hours and related information for Forms 1, 4, and 5 are based upon the current CLEO certification requirements, and the number of applications processed in CY 2012. As this final rule eliminates CLEO certification and adds CLEO notification, the estimated submission times for Forms 1, 4, and 5 for individuals, trusts, legal entities, and Gov/FFL have changed. For example, the revised estimated submission times associated with Form 1 are:

• 140 minutes for submission to or by an individual (50 minutes to procure **\*2720** photographs; 60 minutes to procure fingerprints, 10 minutes to copy and mail notification; and 20 minutes to complete and mail the form)

• 260 minutes for submission to or by a trust or legal entity (for 2 responsible persons) (100 minutes to procure photographs; 120 minutes to procure fingerprints; 10 minutes to procure the attachments; 10 minutes to copy and mail notification; and 20 minutes to complete and mail the form)

• 20 minutes (to complete and mail the form) for a submission to or by a government agency or to a qualified FFL
The above estimated times do not reflect that a trust or legal entity must also submit to ATF, as part of each Form 1, Form 4, or Form 5 application, a completed Form 5320.23 for each responsible person, and must provide a copy of completed Form 5320.23 to the CLEO of the jurisdiction for each responsible person. Those times are separately reflected in the estimated submission time of 40 minutes for submission to or by a trust or legal entity of Form 5320.23 (for 2 responsible persons) (30 minutes to complete and include "copy 1" of Form 5320.23 in the Form 1, Form 4, or Form 5 application, and 10 minutes to mail "copy 2" of Form 5320.23 for notification.

With respect to ATF Form 1:

Estimated total annual reporting and/or recordkeeping burden: 102,808 hours (current estimated total annual reporting and/or recordkeeping burden from OMB Information Collection Number 1140-0011: 16,374 hours). Note: 477 Gov/FFL responders will take 20 minutes (159 hours); 21,879 trust and legal entity responders will take 260 minutes (94,809 hours); and 3,360 individual responders will take 140 minutes (7,840 hours). (The numbers of responders by type are estimated based on the data in Table A.)

Estimated average burden hours per respondent and/or recordkeeper: 3.86 hours (current estimated average burden hours per respondent or recordkeeper from OMB Information Collection Number 1140-0011: 1.69 hours).

Estimated number of respondents and/or recordkeepers: 25,716 (current estimated number of respondents and/or recordkeepers from OMB Information Collection Number 1140-0011: 9,662).

Estimated annual frequency of responses: 1 (current estimated annual frequency of responses from OMB Information Collection Number 1140-0011: 1).

Estimated total costs: $1,472,570.95

$1,412,597 (fingerprints and photographs ($29.98 x 3,360 (individuals) = $100,732; $29.98 x 43,758 (2 responsible persons) = $1,311,865))

$35,006 (copies of legal entity documents ($1.60 x 21,879))

$24,967.95 (mailing ($.98 each for 25,239 respondents = $24,734.22; $.49 for 477 respondents = $233.73) (current estimated total costs from OMB Information Collection Number 1140-0011: $146,766).

With respect to ATF Form 4:

Estimated total annual reporting and/or recordkeeping burden: 466,755 hours (current estimated total annual reporting and/or recordkeeping burden from OMB Information Collection Number 1140-0014: 109,552 hours). Note: 4,257 Gov/FFL respondents will take 20 minutes (1,419 hours), 93,739 trust and legal entity respondents will take 260 minutes (406,202 hours), and 25,343 individual respondents will take 140 minutes (59,134 hours). (The numbers of responders by type are estimated based on the data in Table A.)

Estimated average burden hours per respondent and/or recordkeeper: 3.66 hours (current estimated average burden hours per respondent and/or recordkeeper from OMB Information Collection Number 1140-0014: 1.68 hours).

Estimated number of respondents and/or recordkeepers: 123,339 (current estimated number of respondents and/or recordkeepers from OMB Information Collection Number 1140-0014: 65,085).

Estimated annual frequency of responses: 1 (current estimated annual frequency of responses from OMB Information Collection Number 1140-0014: 1).

Estimated total costs: $6,649,141.29

$6,380,373 (fingerprints and photographs ($29.98 x 25,343 (individuals) = $759,783; $29.98 x 187,478 (2 responsible persons) = $5,620,590))

$149,982 (copies of trust or legal entity documents ($1.60 x 93,739))

$118,786.29 (mailing ($.98 each for 119,082 respondents = $116,700.36; $.49 for 4,257 respondents = $2,085.93) (current estimated total costs from OMB Information Collection Number 1140-0014: $979,645).

With respect to ATF Form 5:

Estimated total annual reporting and/or recordkeeping burden: 5,350 hours (current estimated total annual reporting and/or recordkeeping burden from OMB Information Collection Number 1140-0015: 5,287 hours). Note: 9,892 Gov/FFL respondents will take 20 minutes (3,297 hours); 211 trusts or legal entity respondents will take 260 minutes (914 hours); and 488 individual respondents will take 140 minutes (1,139 hours). (The numbers of responders by type are estimated based on the data in Table A.)

Estimated average burden hours per respondent and/or recordkeeper: .51 hours (current estimated average burden hours per respondent and/or recordkeeper from OMB Information Collection Number 1140-0015: 33 minutes).

Estimated number of respondents and/or recordkeepers: 10,591 (current estimated number of respondents and/or recordkeepers from OMB Information Collection Number 1140-0015: 9,688).

Estimated annual frequency of responses: 1 (current estimated annual frequency of responses from OMB Information Collection Number 1140-0015: 1).

Estimated total costs: $33,152.10

$27,282 (fingerprints and photographs ($29.98 x 488 (individuals) = $14,630; $29.98 x 422 (2 responsible persons) = $12,652))

$338 (copies of trust or legal entity documents ($1.60 x 211))

$5,532.10 (mailing ($.98 each for 699 respondents = $685.02; $.49 for 9,892 respondents = $4,847.08)) (current estimated total costs from OMB Information Collection Number 1140-0015: $25,844).

With respect to ATF Form 5320.23:

Estimated total annual reporting and/or recordkeeping burden: 57,914.50 hours (based on 2 responsible persons)

Estimated average burden hours per respondent and/or recordkeeper: .25 hours.

Estimated number of respondents and/or recordkeepers: 115,829.

Estimated annual frequency of responses: 1.

Estimated total costs: $113,512 (mailing to CLEO ($.49 x 231,658 (2 responsible persons)). All other estimated costs are associated with the submission package for Forms 1, 4, and 5.

Comments concerning the accuracy of these burden estimates for Form 5320.23 and suggestions for reducing the burden should be directed to the Chief, Materiel Management Branch, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Avenue NE., Washington, DC 20226, and to the Office of Management and Budget, Attention: Desk Officer for the Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Information and Regulatory Affairs, Washington, DC 20503.

The current estimated costs provided above for Forms 1, 4, and 5 are being revised. ATF has provided OMB with **\*2721** the revised cost estimates for these forms.

**Disclosure**
Copies of the final rule, proposed rule, and all comments received in response to the proposed rule will be available for public inspection through the Federal eGovernment portal, http://www.regulations.gov, or by appointment during normal business hours at: ATF Reading Room, Room 1E-062, 99 New York Avenue NE., Washington, DC 20226; telephone: (202) 648-8740.

**Drafting Information**
The author of this document is Brenda Raffath Friend, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives.


**List of Subjects in 27 CFR Part 479**
Administrative practice and procedure, Arms and munitions, Excise taxes, Exports, Imports, Military personnel, Penalties, Reporting and recordkeeping requirements, Seizures and forfeitures, and Transportation.


**Authority and Issuance**
Accordingly, for the reasons discussed in the preamble, 27 CFR part 479 is amended as follows:


**PART 479—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS**
1. The authority citation for 27 CFR part 479 is revised to read as follows:

Authority: 26 U.S.C. 5812; 26 U.S.C. 5822; 26 U.S.C. 7801; 26 U.S.C. 7805.
 27 CFR § 479.11
2. In § 479.11, revise the definition for "Person" and add a new definition for the term "Responsible person" to read as follows:
 27 CFR § 479.11

**§ 479.11 Meaning of terms.**
* * * * *
Person. A partnership, company, association, trust, corporation, including each responsible person associated with such an entity; an estate; or an individual.
 * * * * *
Responsible person. In the case of an unlicensed entity, including any trust, partnership, association, company (including any Limited Liability Company (LLC)), or corporation, any individual who possesses, directly or indirectly, the power or authority to direct the management and policies of the trust or entity to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust or legal entity. In the case of a trust, those persons with the power or authority to direct the management and policies of the trust include any person who has the capability to exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of, the trust. Examples of who may be considered a responsible person include settlors/grantors, trustees, partners, members, officers, directors, board members, or owners. An example of who may be excluded from this definition of responsible person is the beneficiary of a trust, if the beneficiary does not have the capability to exercise the powers or authorities enumerated in this section.
 * * * * *27 CFR § 479.62
3. Section 479.62 is revised to read as follows:
 27 CFR § 479.62

**§ 479.62 Application to make.**
(a) General. No person shall make a firearm unless the person has filed with the Director a completed application on ATF Form 1 (5320.1), Application to Make and Register a Firearm, in duplicate, executed under the penalties of perjury, to make and register the firearm and has received the approval of the Director to make the firearm, which approval shall effectuate registration of the firearm to the applicant. If the applicant is not a licensed manufacturer, importer, or dealer qualified under this part and is a partnership, company (including a Limited Liability Company (LLC)), association, trust, or corporation, all information on the Form 1 application shall be furnished for each responsible person of the applicant

(b) Preparation of ATF Form 1. All of the information called for on Form 1 shall be provided, including:

(1) The type of application, i.e., tax paid or tax exempt. If the making of the firearm is taxable, the applicant shall submit a remittance in the amount of $200 with the application in accordance with the instructions on the form;

AR005727

(2) The identity of the applicant. If an individual, the applicant shall provide the applicant's name, address, and date of birth, and also comply with the identification requirements prescribed in § 479.63(a). If other than an individual, the applicant shall provide its name, address, and employer identification number, if any, as well as the name and address of each responsible person. Each responsible person of the applicant also shall comply with the identification requirements prescribed in § 479.63(b);

(3) A description of the firearm to be made by type; caliber, gauge, or size; model; length of barrel; serial number; other marks of identification; and the name and address of the original manufacturer (if the applicant is not the original manufacturer);

(4) The applicant's Federal firearms license number (if any);

(5) The applicant's special (occupational) tax stamp (if applicable); and

(6) If the applicant (including, if other than an individual, any responsible person) is an alien admitted under a nonimmigrant visa, applicable documentation demonstrating that the nonimmigrant alien falls within an exception to 18 U.S.C. 922(g)(5)(B) under 18 U.S.C. 922(y)(2), or has obtained a waiver of that provision under 18 U.S.C. 922(y)(3).

(c) Notification of chief law enforcement officer. Prior to the submission of the application to the Director, all applicants and responsible persons shall forward a completed copy of Form 1 or a completed copy of Form 5320.23, respectively, to the chief law enforcement officer of the locality in which the applicant or responsible person is located. The chief law enforcement officer is the local chief of police, county sheriff, head of the State police, or State or local district attorney or prosecutor. If the applicant is not a licensed manufacturer, importer, or dealer qualified under this part and is a partnership, company, association, or corporation, for purposes of this section, it is considered located at its principal office or principal place of business; if a trust, for purposes of this section, it is considered located at the primary location at which the firearm will be maintained.

(d) Approval of Form 1. If the application is approved, the Director will affix a National Firearms Act stamp to the original application in the space provided therefor and properly cancel the stamp (see § 479.67). The approved application will then be returned to the applicant.
 27 CFR § 479.63
4. Section 479.63 is revised to read as follows:
 27 CFR § 479.63

## § 479.63 Identification of applicant.
(a) If the applicant is an individual, the applicant shall:

(1) Securely attach to each copy of the Form 1, in the space provided on the form, a 2 x 2-inch photograph of the applicant, clearly showing a full front view of the features of the applicant with head bare, with the distance from the top of the head to the point of the chin approximately 1¼ inches, and **\*2722** which shall have been taken within 1 year prior to the date of the application; and

(2) Attach to the application two properly completed FBI Forms FD-258 (Fingerprint Card). The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them.

(b) If the applicant is not a licensed manufacturer, importer, or dealer qualified under this part and is a partnership, company (including a Limited Liability Company (LLC)), association, trust, or corporation, the applicant shall:

(1) Be identified on the Form 1 by the name and exact location of the place of business, including the name and number of the building and street, and the name of the county in which the business is located or, in the case of a trust, the primary location at which the firearm will be maintained. In the case of two or more locations, the address shown shall be the principal place of business (or principal office, in the case of a corporation) or, in the case of a trust, the primary location at which the firearm will be maintained;

(2) Except as provided in paragraph (c) of this section, attach to the application—

(i) Documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, and declarations of trust, with any trust schedules, attachments, exhibits, and enclosures;

(ii) A completed ATF Form 5320.23 for each responsible person. Form 5320.23 requires certain identifying information, including each responsible person's full name, position, home address, date of birth, and country of citizenship if other than the United States;

(iii) In the space provided on Form 5320.23, a 2 x 2-inch photograph of each responsible person, clearly showing a full front view of the features of the responsible person with head bare, with the distance from the top of the head to the point of the chin approximately 1¼ inches, and which shall have been taken within 1 year prior to the date of the application;

(iv) Two properly completed FBI Forms FD-258 (Fingerprint Card) for each responsible person. The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them.

(c) If the applicant entity has had an application approved as a maker or transferee within the preceding 24 months, and there has been no change to the documentation previously provided, the entity may provide a certification that the information has not been changed since the prior approval and shall identify the application for which the documentation had been submitted by form number, serial number, and date approved.
 27 CFR § 479.84
5. Section 479.84 is revised to read as follows:
 27 CFR § 479.84

## § 479.84 Application to transfer.
(a) General. Except as otherwise provided in this subpart, no firearm may be transferred in the United States unless an application, Form 4 (5320.4), Application for Tax Paid Transfer and Registration of Firearm, in duplicate, executed under the penalties of perjury, to transfer the firearm and register it to the transferee has been filed with and approved by the Director. The application shall be filed by the transferor. If the transferee is not a licensed manufacturer, importer, or dealer qualified under this part and is a partnership, company (including a Limited Liability Company (LLC)), association, trust, or corporation, all information on the Form 4 application shall be furnished for each responsible person of the transferee.

(b) Preparation of ATF Form 4. All of the information called for on Form 4 shall be provided, including:

(1) The type of firearm being transferred. If the firearm is other than one classified as "any other weapon," the applicant shall submit a remittance in the amount of $200 with the application in accordance with the instructions on the form. If the firearm is classified as "any other weapon," the applicant shall submit a remittance in the amount of $5;

(2) The identity of the transferor by name and address and, if the transferor is other than a natural person, the title or legal status of the person executing the application in relation to the transferor;

(3) The transferor's Federal firearms license number (if any);

(4) The transferor's special (occupational) tax stamp (if any);

(5) The identity of the transferee by name and address and, if the transferee is a person not qualified as a manufacturer, importer, or dealer under this part, the transferee shall be further identified in the manner prescribed in § 479.85;

(6) The transferee's Federal firearms license number (if any);

(7) The transferee's special (occupational) tax stamp (if applicable); and

(8) A description of the firearm to be transferred by name and address of the manufacturer or importer (if known); caliber, gauge, or size; model; serial number; in the case of a short-barreled shotgun or a short-barreled rifle, the length of the barrel; in the case of a weapon made from a rifle or shotgun, the overall length of the weapon and the length of the barrel; and any

other identifying marks on the firearm. In the event the firearm does not bear a serial number, the applicant shall obtain a serial number from ATF and shall stamp (impress) or otherwise conspicuously place such serial number on the firearm in a manner not susceptible of being readily obliterated, altered, or removed.

(9) If the transferee (including, if other than an individual, any responsible person) is an alien admitted under a nonimmigrant visa, applicable documentation demonstrating that the nonimmigrant alien falls within an exception to 18 U.S.C. 922(g)(5)(B) under 18 U.S.C. 922(y)(2), or has obtained a waiver of that provision under 18 U.S.C. 922(y)(3).

(c) Notification of chief law enforcement officer. Prior to the submission of the application to the Director, all transferees and responsible persons shall forward a completed copy of Form 4 or a completed copy of Form 5320.23, respectively, to the chief law enforcement officer of the locality in which the transferee or responsible person is located. The chief law enforcement officer is the local chief of police, county sheriff, head of the State police, State or local district attorney or prosecutor. If the transferee is not a licensed manufacturer, importer, or dealer qualified under this part and is a partnership, company, association, or corporation, for purposes of this section, it is considered located at its principal office or principal place of business; if the transferee is not a licensed manufacturer, importer, or dealer qualified under this part and is a trust, for purposes of this section, it is considered located at the primary location at which the firearm will be maintained.

(d) Approval of Form 4. If the application is approved, the Director will affix a National Firearms Act stamp to the original application in the space provided therefor and properly cancel the stamp (see § 479.87). The approved application will then be returned to the transferor.

27 CFR § 479.85

6. Section 479.85 is revised to read as follows:

27 CFR § 479.85

## § 479.85 Identification of transferee.

(a) If the transferee is an individual, such person shall:

**\*2723** (1) Securely attach to each copy of the Form 4, in the space provided on the form, a 2 x 2-inch photograph of the applicant, clearly showing a full front view of the features of the applicant with head bare, with the distance from the top of the head to the point of the chin approximately 1¼ inches, and which shall have been taken within 1 year prior to the date of the application; and

(2) Attach to the application two properly completed FBI Forms FD-258 (Fingerprint Card). The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them.

(b) If the transferee is not a licensed manufacturer, importer, or dealer qualified under this part and is a partnership, company, association, trust, or corporation, such person shall:

(1) Be identified on the Form 4 by the name and exact location of the place of business, including the name and number of the building and street, and the name of the county in which the business is located or, in the case of a trust, the primary location at which the firearm will be maintained. In the case of two or more locations, the address shown shall be the principal place of business (or principal office, in the case of a corporation) or, in the case of a trust, the primary location at which the firearm will be maintained;

(2) Except as provided in paragraph (c) of this section, attach to the application—

(i) Documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, and declarations of trust, with any trust schedules, attachments, exhibits, and enclosures;

(ii) A completed ATF Form 5320.23 for each responsible person. Form 5320.23 requires certain identifying information, including the responsible person's full name, position, home address, date of birth, and country of citizenship if other than the United States;

(iii) In the space provided on Form 5320.23, a 2 x 2-inch photograph of each responsible person, clearly showing a full front

view of the features of the responsible person with head bare, with the distance from the top of the head to the point of the chin approximately 1¼ inches, and which shall have been taken within 1 year prior to the date of the application; and

(iv) Two properly completed FBI Forms FD-258 (Fingerprint Card) for each responsible person. The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them.

(c) If the applicant entity has had an application approved as a maker or transferee within the preceding 24 months, and there has been no change to the documentation previously provided, the entity may provide a certification that the information has not been changed since the prior approval and shall identify the application for which the documentation had been submitted by form number, serial number, and date approved.
 27 CFR § 479.89

**§ 479.90 [Amended]**
27 CFR § 479.90
7. Section 479.90(b) is amended by removing the word "natural" in the third sentence.
 27 CFR § 479.90a
8. Section 479.90a is added to subpart F to read as follows.
 27 CFR § 479.90a

**§ 479.90a Estates.**
(a) The executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate (collectively "executor") may possess a firearm registered to a decedent during the term of probate without such possession being treated as a "transfer" as defined in § 479.11. No later than the close of probate, the executor must submit an application to transfer the firearm to beneficiaries or other transferees in accordance with this section. If the transfer is to a beneficiary, the executor shall file an ATF Form 5 (5320.5), Application for Tax Exempt Transfer and Registration of Firearm, to register a firearm to any beneficiary of an estate in accordance with § 479.90. The executor will identify the estate as the transferor, and will sign the form on behalf of the decedent, showing the executor's title (e.g., executor, administrator, personal representative, etc.) and the date of filing. The executor must also provide the documentation prescribed in paragraph (c) of this section.

(b) If there are no beneficiaries of the estate or the beneficiaries do not wish to possess the registered firearm, the executor will dispose of the property outside the estate (i.e., to a non-beneficiary). The executor shall file an ATF Form 4 (5320.4), Application for Tax Paid Transfer and Registration of Firearm, in accordance with § 479.84. The executor, administrator, personal representative, or other authorized person must also provide documentation prescribed in paragraph (c) of this section.

(c) The executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate shall submit with the transfer application documentation of the person's appointment as executor, administrator, personal representative, or as an authorized person, a copy of the decedent's death certificate, a copy of the will (if any), any other evidence of the person's authority to dispose of property, and any other document relating to, or affecting the disposition of firearms from the estate.

Dated: January 4, 2016.

Loretta E. Lynch,

Attorney General.


[FR Doc. 2016-00192 Filed 1-14-16; 8:45 am]

BILLING CODE 4410-FY-P


Footnotes

AR005731

1   Provisions of the NFA discussed below refer to the "Secretary" rather than the "Attorney General"; however, the relevant functions of the Secretary of the Treasury have been transferred to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). For ease of reference, we will substitute "Attorney General" for "Secretary" when discussing these statutes.

2   Although the NPRM proposed to add § 479.90a, see 78 FR at 55020, as a result of a clerical error, parts of the proposed rule styled the addition of the new section governing estates as a revision to § 479.90, see, e.g., id. at 55028-29. The Department believes it nonetheless clearly conveyed its intention to add a new section to 27 CFR part 479 and not replace § 479.90. Commenters did not appear to be confused by the mistake.

3   This commenter's footnote stated "See Unified Agenda, RIN [Regulation Identifier Number] 1140-AA43 (Fall 2011); RIN 1140-AA43 (2012)." The Department notes that these published abstracts stated that this rulemaking proposed to require, among other things, "that a copy of all applications to make or transfer a firearm be forwarded to the [CLEO] of the locality in which the maker or transferee is located" and to eliminate "the requirement for a certification signed by the [CLEO]."

4   Congress originally delegated the authority to promulgate NFA regulations to the Secretary of the Treasury; Congress re-delegated that authority to the Attorney General. See 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1).

5   "Suppressor" is a term commonly used by the firearms industry and the general public to refer to firearms that are defined in the NFA as "silencers." The Department generally uses the word "silencer" in this preamble because that is the statutory term. See 26 U.S.C. 5845(a)(7) (defining silencer for purposes of the NFA by cross-reference to 18 U.S.C. 921(a)(24)).

6   Now known as the American Suppressor Association.

7   Fall 2011 Unified Regulatory Agenda (http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201110&RIN=1140-AA43) and 2012 Unified Regulatory Agenda (http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201210&RIN=1140-AA43).

8   The commenters limited their discussion to the text of 26 U.S.C. 5812 but noted that 26 U.S.C. 5822 provided substantively similar language in the context of an application to manufacture an NFA firearm.

9   Restatement (Third) of Trusts § 3 (2003) (defining "trustee" as "the person who holds property in trust").

10   See id. (defining beneficiary as "a person for whose benefit property is held in trust").

11   This total does not include the cost of agency processing time for notification, but is instead based upon the costs to entities for notification. Based on 115,829 trusts and legal entities, the notification cost is $1,487,244 ($5,330,450 less $3,843,206).

12   This increased cost total does not include the cost of agency processing time for notification. Based on 115,829 trusts and legal entities, the notification cost is $1,487,244 ($5,330,450 less $3,843,206).

13   The Department notes that this link was a nonfunctioning link.

14   In the 2013 NPRM, the Department relied on BLS employee compensation data from September 2012. In this final rule, the Department has used the more recent BLS data from June 2015 because it believes that the more recent data more accurately reflects the actual benefits and costs of the final rule. The more recent BLS data does not meaningfully change the Department's estimates of the rule's costs and benefits.

15   This increased cost does not include cost of agency processing time for notification. Based on 115,829 entities, the notification cost is $1,487,244 ($5,330,450 less $3,843,206).

16   Individual CLEO certification cost, excluding agency processing cost, is $1,614,749. Individual CLEO notification cost, excluding agency processing cost, is $184,487 ($507,339 less $322,852). Notification decreases costs by $1,430,262 ($1,614,749 less $184,487).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:16-cv-243-RLY-MPB |
| | ) |
| THOMAS E. BRANDON, Director, | ) |
| Bureau of Alcohol Tobacco Firearms | ) |
| and Explosives, | ) |
| | ) |
|     Defendant. | ) |

**BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a firearms manufacturer headquartered in Chandler, Indiana.   In this case, Freedom challenges a decision by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that a device Freedom seeks to manufacture and market is a "machinegun" as defined under the National Firearms Act, 26 U.S.C. § 5845(b).   ATF's decision is not arbitrary and capricious, but is supported by the administrative record.   Based on the foregoing, ATF is entitled to summary judgment.

1

AR005733

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a federally-licensed firearms manufacturer with its principle place of business in Chandler, Indiana.   (Docket No. 1 ¶ 2.) Freedom designed an Electronic Reset Assist Device ("ERAD") for commercial sale to the general public.   (Docket No. 1 ¶ 9.)   The purpose of the ERAD, as described by Freedom, is to "improve firearm design" to assist the firearm user's "ability to continually pull the trigger in a rapid manner when a high rate of fire is desired."   (Administrative Record ("AR") 0025; Patent documents.)

The Firearms and Ammunition Technology Division ("FATD") of ATF, through its Firearms Technology Industry Services Branch ("FTISB"), provides expert technical support to ATF, other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general public.   ATF, Firearms Ammunition and Technology (2017), available at https://www.atf.gov/firearms/firearms-and-ammunition-technology.   FTISB is responsible for technical determinations concerning types of firearms approved for importation into the United States and for rendering opinions regarding the classification of suspected illegal firearms and newly designed firearms.   *Id.*

There is no requirement in the law or regulations for a manufacturer to seek an ATF classification of its product prior to manufacture.   *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook 7.2.4 (2017), available at

---

[1] As discussed in Legal Background, Section D, the typical Fed. R. Civ. P. 56 standard and procedural structure does not apply in an APA review case.   Accordingly, the Defendant is not required to marshal evidence showing material issues of fact in dispute and the typical "Statement of Material Facts Not In Dispute" does not apply, but is offered for factual context. Specific sections of the Record are cited in the relevant portions of the Argument section.

AR005734

https://www.atf.gov/firearms/national-firearms-act-handbook.    ATF, however, encourages

firearms manufacturers to submit devices for classification before they are offered for sale to

ensure that the sale of such devices would not violate the Federal firearms laws and regulations.

*Id.*    ATF responds to classification requests with letter rulings that represent "the agency's

official position concerning the status of the firearms under Federal firearms laws."    *Id*. at

7.2.4.1.

### A.    The November 2015 Submission

In November 2015, Freedom submitted a request to FTISB to examine a "trigger reset

device."    (AR 0002; 0005 – 17 (photos of submission).)    Freedom submitted a prototype of the

device, along with correspondence, and a Bushmaster Model XM15-E2S AR-type firearm to be

used in testing the prototype.    (*Id.*)

FTISB closely examined and tested the prototype.    (AR 0003.)    As part of the

examination, FTISB staff fired an AR-type rifle[2] with the prototype attached.    (*Id.*)    FTISB

staff noted two instances of machinegun function with the prototype device attached.    (*Id.*)

Specifically, FTISB found that trigger reset device, when attached to the test weapon, converted

it into a weapon that fired automatically – "firing more than one shot without manual reloading

by a single function of the trigger."    (*Id.*)    Based on the examination and testing conducted,

FTISB determined that the trigger reset device was a "machinegun" as defined in 26 U.S.C. §

5845(b), and notified Freedom in a letter dated March 23, 2016.    (AR 0002 – 4.)

### B.    The April 2016 Submission and October 27, 2016 Classification Decision

---

[2] FTISB ended up using an ATF AR-type firearm to field test the prototype device because it
noted a deformity in the Bushmaster Model XM15-E2S AR-type firearm submitted by Freedom.
(AR 0003.)

AR005735

In April 2016, Freedom submitted a new sample prototype of its trigger reset assist device (referred to as the "ERAD").   (AR 0001.)   According to Freedom, the new sample prototype "is a total redesign" of the initial prototype.   (AR 0001.)   In the submission, Freedom included two sample prototypes of the device, along with 9-volt lithium batteries, and DVDs showing demonstrations of live firing and disassembly of the device.   (*Id.*)   Although Freedom did not explicitly request a classification from FTISB on its prototype, FTISB treated the submission as such because the letter referred back to the Agency's March 23, 2016, classification and stated that Freedom "worked very hard to correct" the issues identified in the March 23, 2016, letter.   (*Id.*)

On or about September 7, 2016, Freedom submitted a supplemental letter to FTISB in support of its April 2016 request for classification of the ERAD.   (AR 0018 – 24.)   The supplemental materials included a letter from Freedom's counsel setting forth Freedom's position that the ERAD should not be classified as a machinegun.   (AR 0018 – 24.)   The supplemental materials also included a sixteen minute demonstration video of the ERAD, and written materials, including Freedom's purported patent application for the ERAD.   (AR 0018; AR0025 – 46.)   In the video, Freedom states that the ERAD permits the shooter to discharge 450 to 500 rounds per minute.   (AR 0047.)

FTISB examined that submission and supplemental materials, including the demonstration video.   (AR 0070 – 71.)   Specifically, FTISB disassembled and examined the two sample ERAD prototypes.   (*Id.*)   FTISB examined each component part of the ERAD and its design features and characteristics.   (AR 0071 – 72.)   FTISB staff also conducted field testing of the ERAD by attaching it to and firing from commercially-available Remington and

4

PMC rifles and a Bushmaster Model XM15-E2S AR-type firearm.   (AR 0072.)   During the test-fire portion of the examination, staff observed machinegun function six times.   (*Id.*)   Specifically, FTISB personnel observed that a single pull of the ERAD trigger - designated as the "primary trigger" - initiated the firing sequence, which caused firing until the trigger finger was removed.   (AR 0073.)

By letter dated October 27, 2016, FTISB issued a classification on Freedom's ERAD trigger system.   (AR 0070 - 82.)   In the eleven-page letter, FTISB described (1) the composition of the trigger and grip assembly, including its several constituent parts; (2) FTISB's process for examining and testing the ERAD trigger system; (3) its observations of the ERAD trigger system functionality and the firing effect that was produced when the ERAD was applied to a firearm (*i.e.*, the prototype sent by Freedom) and test-fired; and (4) a breakdown of the firing sequence with and without the ERAD, including several accompanying illustrations.   (*Id.*)

FTISB concluded that the ERAD is properly classified as a machinegun.   Significantly, FTISB found that "the firing sequence is initiated by a pull of the primary trigger and perpetuated *automatically* by shooter's constant pull and the reciprocating, battery-powered metal lobe repeatedly forcing the primary trigger forward."   (AR 0073.)   Thus, "[a] single pull of the trigger by the shooter therefore starts a firing sequence in which *semiautomatic* operation is made *automatic* by an electric motor."   (*Id.*)   FTISB found that because the shooter does not have to release the trigger for subsequent shots to be fired, the firing sequence is continually engaged as long as the shooter maintains constant rearward pressure (a pull) on the trigger and the motor continues to push the shooter's finger forward.   (*Id.*)   In other words, as long as the trigger is depressed, the firearm continues to fire until either the trigger finger is removed, the

5

firearm malfunctions, or it runs out of ammunition.   (*Id.*)

FTISB therefore concluded that the installation of an ERAD on a semiautomatic firearm causes that firearm to shoot automatically (through the automatic functioning made possible by the electric motor), more than one shot, by a single function (a single constant pull) of the trigger.   FTISB therefore properly concluded that the ERAD is classified as a combination of parts designed and intended for use in converting a semiautomatic rifle into a machinegun under 26 U.S.C. § 5845(b).   (AR at 79-80; 80-82.)

<div align="center">

**THE COURT MUST STRIKE AND DISREGARD
FREEDOM'S EXTRA-RECORD EVIDENCE**

</div>

Freedom brings its claim under the Administrative Procedure Act, 5 U.S.C. § 704, challenging ATF's decision that Freedom's ERAD device be classified as a machinegun. (Docket No. 1; Docket No. 24.)   As discussed further below, review of the agency's decision under the APA is conducted using an arbitrary and capricious standard, and the Court's review is limited to the administrative record lodged by the agency.   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("That review is to be based on the full administrative record that was before the Secretary at the time he made his decision."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Highway J Citizens Grp. v. Mineta,* 349 F.3d 938, 952 (7th Cir. 2003) ("the reviewing court considers only the administrative record already in existence, not some new record made initially [in that court].").

In support of its motion for summary judgment, Freedom submitted the declarations of

<div align="center">6</div>

Michael Winge (Pl.'s Ex. D, Docket No. 24-4) and Richard Vasquez (Pl.'s Ex. E, Docket No. 24-5).   Mr. Winge is one of the owners of Freedom Manufacturing.   (Pl.'s Ex. D, Docket No. 24-4.)   Several paragraphs of his declaration recount correspondence between FTISB and Freedom, which is already contained in the Administrative Record and which is the best evidence of its contents.   (See Pl.'s Ex. D, Docket No. 24-4, ¶¶ 18 – 20.)   The remaining paragraphs contain Mr. Winge's opinions about the ERAD and his arguments regarding why the ERAD should not be classified as a machinegun.   Mr. Winge's opinions are merely that – his opinions – and are not part of the official record containing the information upon which ATF relied in issuing its decision.   The Court should strike and disregard these opinions because the Court's review is limited to the administrative record lodged by ATF.   Freedom did not challenge or move to supplement that administrative record; therefore, it is complete.   *Highway J Citizens Grp.,* 349 F.3d at 952; *see also United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to [g]overnment agencies' actions."); *Spiller v. Walker*, No. A-98-CA-255-SS, 2002 U.S. Dist. Lexis 13194, *26-27 (W.D. Tex. July 19, 2002) ("any legal conclusions and post-[decision] evidence within the declarations and argumentation offered simply to contest the agencies' experts are not admissible.").

Richard Vasquez appears to be a witness who was retained by Freedom to provide his expert opinion regarding the ERAD's classification.   (Pl.'s Ex. E, Docket No. 24-5.)   Expert reports are generally not permitted in an APA review case.   *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555 (1978) ("the role of a court in reviewing the sufficiency of an agency's consideration . . . is a limited one, limited both by the time at which the decision was made and by the statute mandating review.").   Both the Supreme Court and the Seventh Circuit

7

have emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Cronin v. USDA*, 919 F.2d 439, 443 (7th Cir. 1990) ("it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency."); *see also Airport Cmtys Coal. v. Graves*, 280 F. Supp.2d 1207, 1213 (W.D. Wash. 2003) (holding that APA was intended to preclude "Monday morning quarterbacking").

The Vasquez Declaration simply criticizes the agency's analysis, but under the APA the Court must allow the agency to rely on its own experts' opinions even if a plaintiff has other expert opinions. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if as an original matter, a court might find contrary views more persuasive."). Therefore, even if a so-called "expert" conclusion would contradict the agency's expert's conclusions, this Court can give it no force. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992).

Based on the foregoing, the Court must strike and disregard the Winge and Vasquez Declarations.

## LEGAL BACKGROUND

### A.  The National Firearms Act and Gun Control Act

The National Firearms Act of 1934, 26 U.S.C. Chapter 53, and the Gun Control Act of 1968, 18 U.S.C. Chapter 44, comprise the relevant federal framework governing the firearm

AR005740

market.   The Gun Control Act generally makes it unlawful for a person to transfer or possess a machinegun manufactured on or after May 19, 1986.   18 U.S.C. § 922(o).   ATF is charged with administering and enforcing both the National Firearms Act and the Gun Control Act.   28 C.F.R. § 0.130(a)(1)–(2).

18 U.S.C. § 922(a)(4) states that it shall be unlawful –

(4) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

Accordingly, with the limited exception of State, Federal and local law enforcement agencies, it is unlawful for any person to transfer or possess a machinegun manufactured on or after May 19, 1986.   Moreover, machineguns must be registered in the National Firearms Registration and Transfer Record and may only be transferred upon the approval of an application.   26 U.S.C. § 5812.   The National Firearms Act makes it unlawful to manufacture a machine gun in violation of its provisions.   26 U.S.C. § 5861(f).   Specifically, the National Firearms Act requires that a person shall obtain approval from ATF to make a National Firearms Act firearm, which includes a machinegun. 26 U.S.C. §§ 5922, 5845(a).   Similarly, licensed manufacturers are required to notify ATF by the end of the business day following manufacture of a NFA firearm.   26 U.S.C. § 5841(c), 27 CFR 479.103.

**B.  The Definition of a Machinegun**

The National Firearms Act, 26 U.S.C. § 5845(b), defines a machinegun[3]  as

---

[3] Although more commonly spelled "machine gun," the applicable statutes use the spelling "machinegun."

AR005741

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

*See also* 27 C.F.R. § 478.11 (stating same).

The Gun Control Act incorporates the National Firearms Act's definition of machinegun and defines machinegun identically to the National Forearms Act.   18 U.S.C. § 922(a)(4). Both statutory definitions of a machinegun therefore include a combination of parts designed and intended for use in converting a weapon into a machinegun.   *Id.*   This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.   *See* ATF Rule 2006-2 (AR at 630-32.)

### C.  The Administrative Procedure Act

The Administrative Procedure Act (APA) requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   The Court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43).   The agency's decisions

10

are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the

ultimate standard of review is a narrow one," *id*. at 416.

Federal courts are particularly deferential towards the "'scientific determinations'" of the

agency, which are "presumed to be the product of agency expertise."   *Franks v. Salazar*, 816

F.Supp.2d 49, 55 (D. D.C. 2011) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council,*

*Inc.*, 462 U.S. 87, 103 (1983)).   The Court's review is confined to the administrative record,

subject to limited exceptions not at issue here.   *See Camp v. Pitts*, 411 U.S. 138, 142 (1973)

("[T]he focal point for judicial review should be the administrative record already in existence,

not some new record made initially in the reviewing court.").   *See also Sig Sauer, Inc. v. Jones*,

133 F. Supp. 3d 364, 371 (D.N.H. 2015), *aff'd sub nom. Sig Sauer, Inc. v. Brandon*, 826 F.3d

598 (1st Cir. 2016) (recognizing that classification determinations "require expertise that is well

within the ATF's grasp" and that "its conclusions are entitled to substantial deference from a

reviewing court.") (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

### D.  Summary Judgment in APA Cases

Under the APA, "courts are to decide, on the basis of the record the agency provides,

whether the action passes muster under the appropriate APA standard of review." *Fla. Power &*

*Light Co.*, 470 U.S. at 743-44.   Because extra-record evidence and trials are inappropriate in

APA cases, courts decide APA claims via summary judgment based on the administrative record

the agency compiles.   *Cronin*, 919 F.2d at 445 ("Because the plaintiffs are not entitled to present

evidence in court to challenge the [decision-maker's] decision . . . , there will never be an

evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir.

11

1994).

Although summary judgment is the procedural mechanism by which the Government is presenting its case, the limited role federal courts play in reviewing such administrative decisions means that the typical Federal Rule 56 summary judgment standard does not apply. *See Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1228 (S.D. Ind. March 31, 2014) (Barker, J.) (citing *Cronin*, 919 F.2d at 445); *see also Sierra Club v. Mainella*, 459 F.Supp.2d 76, 89–90 (D. D.C. 2006). Instead, in APA cases, "[t]he factfinding capacity of the district court is thus typically unnecessary to judicial review of agency factfinding . . . . [C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Florida Power & Light Co.*, 470 U.S. at 744–74.

## ARGUMENT

Plaintiff raises several challenges to FTISB's classification decision. As discussed below, FTISB conducted a thorough examination of the ERAD, and fully disclosed the findings supporting its decision. FTISB's decision was not arbitrary and capricious, but is supported by the facts as presented in the administrative record, and is a reasonable interpretation of the statute. Defendant is entitled to judgment in its favor on all of the Plaintiff's claims.

### A. ATF's Decision Is Not Arbitrary and Capricious.

A machinegun is defined in part as any weapon that shoots "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The term also includes any "combination of parts designed and intended, for use in converting a weapon into a machinegun." *Id.* In the definition of machinegun, neither the National

12

Firearms Act nor the Gun Control Act further define the phrase "single function of the trigger." The test firing of Plaintiff's prototype—an AR-15 semi-automatic rifle (Bushmaster Model XMI150E2S) with an integrated ERAD grip—demonstrated that, once the grip button was pulled (activating the motor) concurrent with constant rearward pressure being applied to the trigger extension (which Plaintiffs refer to as the "reset bar"), the weapon fired more than one shot without manual reloading and without any additional action on the shooter's part.   Indeed, the weapon fired continuously until the shooter stopped applying rearward pressure to the trigger extension, or the ERAD's ammunition supply was exhausted.   (AR at 79, 47 (demonstration video).)   Additionally, when equipped with the ERAD, the weapon fired at a very high rate of speed, discharging up to 500 rounds per minute.   (AR 0047.)   Thus, the nature and mechanics of the ERAD support FTISB's finding that it converted the semiautomatic firearm to a machinegun.

FTISB's conclusion is consistent with the National Firearm's Act's legislative history, in which the drafters equated "single function of the trigger" with "single pull of the trigger."   *See* National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No. 9066, 73rd Cong., 2nd Sess., at 40 (1934) ("Mr. Frederick.[ ] The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine.   Other guns require a separate pull of the trigger for every shot fired, and such guns are not properly designated as machine guns.   A gun, however, which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun."); *see also* George C. Nonte, Jr., Firearms Encyclopedia 13 (1973) (the term "automatic" is defined to include "any firearm in

13

which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device – in other words, a machinegun").

FTISB's decision is also consistent with the ordinary meaning of the term "function," which includes "any of a group of related actions contributing to a larger action." Webster's Ninth New Collegiate Dictionary, 498 (1986); *see also* Random House Thesaurus College Edition, 297 (1984) (a synonym of function is "act"). Here, the action, or act, is pulling the trigger, which leads to the automatic firing.

Courts have also interpreted "function" as the action of pulling the trigger. *See Staples v. United States*, 511 U.S. 600, 600 (1994) ("The National Firearms Act criminalizes possession of an unregistered 'firearm,' 26 U.S.C. § 5861(d), including a 'machinegun,' § 5845(a)(6), which is defined as a weapon that automatically fires more than one shot with a single pull of the trigger, § 5845(b)."); *see also id*. at 602 n.1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act.").

In *United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit held that a "minigun" was a machinegun even though it was "activated by means of an electronic on-off switch rather than a more traditional mechanical trigger." Despite Fleischli's arguments that the minigun was not a machinegun because it was not fired by pulling a traditional trigger, but rather was fired using an electronic switch, the court found to the contrary: "Fleischli's

14

electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted.   The minigun was therefore a machine gun as defined in the National Firearms Act."   *Id*. (superseded by statute on other grounds); *see also United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (rejecting defendant's argument that because he had constructed a weapon with two triggers, it would not fire by a single function of the trigger, finding "it is undisputed that the shooter could, by fully pulling the trigger, and it only, at the point of maximum leverage, obtain automation with a single trigger function.   We are satisfied the gun was a machine gun within the statutory definition both in law and fact.")

Similarly here, the ERAD is a component that, when attached to a rifle, causes the rifle to function automatically.   The ERAD allows the firing sequence to be initiated by a single pull of the primary trigger, which is continually engaged as long as the shooter maintains rearward pressure on the trigger and the motor continues to push the shooter's finger forward.   (AR 0073; 79-80.)   Because the ERAD is a combination of parts designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun.   ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

**B.  ATF's Classification is Consistent with Public Policy.**

Because of their rapid rate of fire, machineguns have long been considered inherently dangerous and are therefore strictly regulated and generally unlawful to possess.   *See* 18 U.S.C. § 922(o); *United States v. Brock*, 724 F.3d 817, 824 (7th Cir. 2013) ("Congress has grouped together sawed-off shotguns, machineguns, and a variety of dangerous explosive devices for

15

stringent restrictions on possession and strict registration requirements for those that can be possessed lawfully."); *United States v. Brazeau*, 237 F.3d 842, 845 (7th Cir. 2001) ("The point is that most firearms do not have to be registered-only those that Congress found to be inherently dangerous."); *United States v. Kruszewski*, No. 91-0031P, 1991 WL 268684, at *1 (N.D. Ind. Dec. 10, 1991) ("The categories of firearms covered by U.S.C. Title 26 include only particularly dangerous weapons such as machineguns . . . . In *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008), the Supreme Court discussed a machinegun (M-16), and recognized a "limitation on the right to keep and carry arms" that includes "dangerous and unusual weapons."   *See also United States v. Spires*, 755 F.Supp. 890, 892 (C.D. Cal. 1991) ("Congress believed these particular weapons, as opposed to firearms in general, are extremely dangerous and serve virtually no purpose other than furtherance of illegal activity.").

The device at issue in this case – the ERAD grip – enables a firearm to produce automatic fire with a single pull of the trigger, and therefore makes an otherwise semiautomatic firearm into one of the "dangerous and unusual weapons" recognized by the *Heller* court..   A rifle with the ERAD will continue to fire automatically once the trigger is pulled and remains depressed, with no further action by the shooter required.   The widely-available Bushmaster Model XMI150E2S fires at a rate of one shot per trigger pull and up to 120 rounds per minute.[4]   When

---

[4] Although there are no official documents establishing a maximum firing rate, it is thought that 120 rounds per minute would be a ceiling. Obviously, the rate of fire depends on how fast the shooter can pull and release the trigger. The Department of the Army has published 45 rounds per minute as the maximum effective rate of fire for AR-type weapons, meaning the number of shots that allow the shooter to effectively engage the intended target. *See* Department of the Army, Field Manual (FM) 3-22.9, Rifle Marksmanship M16-/M4-Series Weapons, Ch. 2-1 (Characteristics of M16-/M4-Series Weapons), Aug. 2008, available at http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0ahUKEwixkfTIrPzTAhUKwiYKHf9iA30QFggnMAA&url=http%3A%2F%2Fusacac.army.m

16

the ERAD device is attached to it, however, the same rifle is capable of firing at a rate of up to 500 rounds per minute.   (AR 0047.)   This unhindered automatic firing capability is the very danger that the National Firearms Act was intended to protect against.   *See* 149 Cong. Rec. H2944-02, H2950 (Apr. 9, 2003) ("these weapons … are inherently dangerous"); *United States v. Newman*, 134 F.3d 373 (6th Cir. Jan. 21, 1998) (unpublished) ("Although the National Firearms Act is ostensibly a revenue-generating statute enacted under Congress's taxation power, it is clearly designed to regulate the manufacture, transfer, and possession of dangerous weapons. Although the means by which Congress advanced its objectives are somewhat roundabout, close analysis of the relevant provisions reveals an unmistakable intent to prohibit possession of any machine gun the manufacture or importation of which was not explicitly authorized by the Bureau of Alcohol, Tobacco, and Firearms.").   Nor is such easy transformation to an automatic firearm consistent with the prohibition imposed by section 922(o) of the Gun Control Act.   *See United States v. Haney*, 264 F.3d 1161, 1168 (10th Cir. 2001) ("banning possession of post 1986 machine guns is an essential part of the federal scheme to regulate interstate commerce in dangerous weapons.").   Accordingly, ATF's assessment of the functionality of the ERAD grip, including its ability to convert a firearm into an automatic weapon, support ATF's finding that the ERAD is properly classified as a machinegun.

### C.  Freedom's "Reset Bar" Terminology Does Not Alter the Outcome

Freedom argues that FTISB's analysis is flawed because the ERAD's "reset bar" is not a "trigger."   Freedom specifically claims that, "the trigger finger reset bar is not the trigger, nor

---

il%2Fsites%2Fdefault%2Ffiles%2Fmisc%2Fdoctrine%2FCDG%2Fcdg_resources%2Fmanuals
%2Ffm%2Ffm3_22x9.pdf&usg=AFQjCNEzIuwG-XuAHAhI5HSuun3SGVrZxg&sig2=5AF-
YguyuZCKe4rELoibbQ.

AR005749

can it activate the firing sequence.   Only the shooter's conscious and deliberate pull of the reset

bar that subsequently engages the trigger that causes the weapon to fire and the ERAD cannot be

made to function any other way."   (Docket No. 24 at 8.)   To this end, Freedom admits it has

created a device that incorporates the traditional firearm trigger as another intermediate

component in the firing mechanism.

Nevertheless, Freedom's position has been rejected by ATF before, and this rejection has

been upheld in court.   As discussed above, in *United States v. Fleischli,* 305 F.3d 643 (7th Cir.

2002), the Seventh Circuit rejected the appellant's argument that an electronic switch did not

meet the traditional definition of a trigger, holding as follows:

> This is a puerile argument, based on hyper-technical adherence to literalism.   We
> are not surprised to learn that Fleischli is not the first defendant to make such a
> brazen argument, although he appears to be the first to do so in this circuit.   We
> join our sister circuits in holding that a trigger is a mechanism used to initiate a
> firing sequence.   *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992)
> (commonsense understanding of trigger is mechanism used to initiate firing
> sequence); *United States v. Evans*, 978 F.2d 1112, 1113–14 n. 2 (9th Cir.1992),
> *cert. denied*, 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (trigger is
> anything that releases the bolt to cause the weapon to fire).   Fleischli's definition
> "would lead to the absurd result of enabling persons to avoid the NFA simply by
> using weapons that employ a button or switch mechanism for firing."   *Evans*, 978
> F.2d at 1113–14 n. 2.   The dictionary definition of "trigger" includes both the
> traditional ("a small projecting tongue in a firearm that, when pressed by the
> finger, actuates the mechanism that discharges the weapon") and the more general
> ("anything, as an act or event, that serves as a stimulus and initiates or precipitates
> a reaction or series of reactions.").   *See* Webster's Unabridged Dictionary Of The
> English Language (2001).   Fleischli's electronic switch served to initiate the
> firing sequence and the minigun continued to fire until the switch was turned off
> or the ammunition was exhausted.   The minigun was therefore a machine gun as
> defined in the National Firearms Act.

*Id.* at 655–56.

Similarly, in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006), the Sixth Circuit

opined on the definition of a "trigger" under the National Firearms Act.   There, Carter appealed

18

a conviction for illegal possession of a machine gun and other parts designed or intended for use in converting a weapon into a machinegun.   *Id*. at 660.   Carter argued that the jury instruction on the definition of "trigger" was faulty because the indictment "did not mention a trigger mechanism among the parts he was alleged to have possessed" and thus the indictment failed to state a charge pursuant to the Federal Rule of Criminal Procedure 7(c)(1) because "the definition of 'machinegun' given at 26 U.S.C. § 5845 specifically includes a trigger."   *Id*. at 661. According to the testifying expert, the weapon was complete except for a trigger mechanism. Thus "[a]fter inserting a magazine with three rounds of ammunition, he said, he was able to make the gun fire all three rounds consecutively by pulling the bolt back and releasing it by hand."   *Id*. at 661-62.   The court held that, even in the absence of a traditional trigger, the weapon fell within the definition of a "machinegun."

> The reasoning adopted by other circuits, as well as simple logic, compels the conclusion that the district court's instruction was proper and not an abuse of discretion.   A trigger is generally "anything, as an act or event, that serves as a stimulus and initiates or precipitates a reaction."   Webster's Unabridged Dictionary 2021 (2nd ed.1997).   Within the realm of firearms, it is commonly understood as "a small projecting tongue in a firearm that, when pressed by the finger, actuates the mechanism that discharges the weapon."   *Id*.   However, the latter definition is obviously a context-specific articulation of the former. According to the testimony of the government's expert, the manipulation of his hands on the assembled weapon initiated a reaction, namely the firing of the gun and two automatic successive firings.   This manual manipulation constituted a trigger for purposes of the weapon's operation.   The district court's "trigger" instruction to the jury was not an abuse of discretion.

*Id.* at 665.

Finally, in *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003), the defendant modified a semiautomatic rifle by adding an electrically operated trigger mechanism, which operated as follows:

AR005751

When an added switch behind the original trigger was pulled, it supplied electrical power to a motor connected to the bottom of a fishing reel that had been placed inside the weapon's trigger guard; the motor caused the reel to rotate; and that rotation caused the original trigger to function in rapid succession. The weapon would fire until either the shooter released the switch or the loaded ammunition was expended.

*Id*. at 744.

An ATF expert testified that a true trigger activating devices, although giving the impression of functioning as a machinegun, are not classified as machineguns because the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like.   To this end, the court stated:

We reject Camp's contention that the switch on . . . his firearm was a legal "trigger activator".   As discussed, those activators described by the ATF Agent require a user to separately pull the activator each time the weapon is fired. Camp's weapon, however, required only one action – pulling the switch he installed – to fire multiple shots.

*Camp*, 343 F.3d at 745.

Similarly here, even though Freedom refers to its ERAD as a "trigger reset assistance device," a firearm fitted with the ERAD does not require separate, mechanical pulls of the trigger (*i.e.*, pull and release) to discharge more than a single round.   The trigger is moving at such a rapid rate that the shooter's finger does not pull the trigger each time to fire each shot, but instead pulls the trigger once and then remains stationary, resisting forward pressure, as the motor causes the weapon to function automatically, and continue to fire rounds.   It is undisputed that when the shooter's finger remains connected to the "reset bar," and an electric motor is activated, the "reset bar" functions as a trigger in and of itself, and controls the pace of the firing sequence.   The only action required by the shooter is that of continued rearward pressure.   To this end, the ERAD is capable of firing at a rate of 500 rounds per minute and does not require

20

AR005752

any additional act by the shooter after the motor is turned on and the shooter pulls the "reset bar" (or what FTISB describes as the "primary trigger") once without releasing pressure.   (AR 0047.)

Accordingly, in spite of its branding and terminology, the ERAD meets the definition of a machinegun.

### D.  The ERAD Is Not The Same As "Bump Fire" or "Slide Fire" Stock.

Freedom also argues that its ERAD is similar to "bump fire" or "slide fire" stock, which has been found not to be machinegun technology.   (Pl.'s Br. at 24 (citing AR at 231 and Pl.'s Exhibits A, B, and C, Docket Nos. 24-1, 24-2, 24-3).)   "Bump firing" is the process of using the recoil of a semi-automatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when performed with a high level of skill and precision by the shooter.   Bump firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.   (*See* Pl.'s Ex. A, Docket No. 24-1 at 3-4; Pl.'s Ex. B, Docket No. 24-3 at 4-5.)   The shooter must use both hands to pull the trigger rearward - and the other to push the firearm forward to counteract the recoil - to fire in rapid succession.   While the shooter receives an assist from the natural backfire of the weapon to accelerate subsequent discharge, the rapid fire sequence in bump firing is contingent on shooter input, rather than mechanical input, and thus cannot shoot "automatically."   (Pl.'s Ex. A, Docket No. 24-1 at 3-4; Pl.'s Ex. B, Docket No. 24-3 at 4-5.)

Conversely, the ERAD does not require any such skill or input from the shooter.   A rifle equipped with the ERAD will utilize a battery-powered motor to continue to fire automatically once the trigger is pulled and remains depressed, with no other action by the shooter required. Indeed, in its classification letter, FTISB noted that the AR-type trigger functions as a

AR005753

"secondary trigger" in that "it merely becomes a part of the firing sequence."   (AR at 0071.)

Freedom argues that the ERAD allows the shooter to make a "conscious decision to apply or not

apply rearward pressure to fire the weapon by initiating a trigger function," (AR at 47

(demonstration video)).   This argument is technically correct to the extent the shooter may make

a purposeful choice to cease applying rearward pressure to the reset bar/primary trigger.   In fact,

this is true of any machinegun—a shooter makes a conscious decision to pull and release the

trigger.   What is misleading, however, is any assertion that the shooter may make a conscious

choice to pull and release the trigger for *each individual, subsequent shot*.   In accepting this

argument, the shooter would presumably be able to control the precise number of shots he

intends to fire.   For example, he could intend to fire a precise number of rounds of ammunition,

such as 263 rounds, and actually expel that exact number of rounds.   With the ERAD engaged,

however, the number of rounds fired is the result of automatic functioning so long as the shooter

is applying pressure on the "reset bar," and therefore the number of rounds expelled cannot

accurately be characterized as conscious or deliberate.   (AR 0047; 0073.)

In contrast, bump firing requires the shooter to manually pull and push the firearm in

order for it to continue firing.   Generally, the shooter must use both hands—one to push forward

and the other to pull rearward—to fire in rapid succession.   While the shooter receives an assist

from the natural recoil of the weapon to accelerate subsequent discharge, the rapid fire sequence

in bump firing is contingent on shooter input in pushing the weapon forward, rather than

mechanical input, and is thus not an automatic function of the weapon.

Freedom also argues that FTISB's decision regarding the ERAD is inconsistent with its

decision regarding the Akins Accelerator, which was an accessory attached to firearm that

AR005754

accelerated rate of fire. *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009). On the contrary, ATF's decision is entirely consistent with its decision regarding the Akins Accelerator and ATF Ruling 2006-2.[5]

To operate the Akins Accelerator, the shooter pulled the trigger one time, initiating an automatic firing sequence, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset (move forward). *Akins*, 312 F. App'x at 199. Springs then forced the rifle forward in the stock, forcing the trigger against the finger, which caused the weapon to discharge the ammunition until the shooter released the constant pull or the ammunition is exhausted. Put another way, the recoil and the spring-powered device caused the firearm to cycle back and forth, impacting the trigger finger, which remained rearward in a constant pull, without further input by the shooter, thereby creating an automatic firing effect. *Id.* The advertised rate of fire for a weapon with the Akins Accelerator was 650 rounds per minute. *Id.*

The Eleventh Circuit found that ATF properly classified the Akins Accelerator as a machinegun because:

> [a] machinegun is a weapon that fires "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The interpretation by the Bureau that the phrase "single function of the trigger" means a "single pull of the trigger" is consonant with the statute and its legislative history. After a single application of the trigger by a gunman, the Accelerator uses its internal spring and the force of recoil to fire continuously the rifle cradled inside until the gunman releases the trigger or the ammunition is exhausted. Based on the operation of the Accelerator, the Bureau had authority to "reconsider and rectify" what it considered to be a classification error. That decision was not

---

[5] Initially ATF classified the Akins Accelerator as a non-machinegun, but after a subsequent test fire, it was determined the Akins Accelerator converts a semiautomatic rifle into a weapon capable of firing automatically by a single function of the trigger and was therefore in fact a machinegun. Thus, ATF overruled its earlier classification.

arbitrary and capricious.

*Id*. at 200.

Pursuant to ATF Ruling 2006-2, any device that is truly analogous to the Akins Accelerator - *i.e.*, a device that allows a weapon to fire automatically when the shooter pulls the trigger - is properly classified as a machinegun.  (AR at 630-32.)  Specifically, the Rule provides that a firearm with the following functionality constitutes a machinegun:

> A shooter pulls the trigger which causes the firearm to discharge.  As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock.  The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed.  Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger.  Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed.  The assembled device is advertised to fire approximately 650 rounds per minute. Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

(AR at 631.)

Like the Akins Accelerator, the ERAD requires a single pull of the trigger to activate the firing sequence, which continues until the shooter's finger is released, or the firearm depletes its ammunition supply.  (AR at 354-68, 395-97.)  Because the ERAD is a part designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun.  Thus, ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

With regard to Plaintiff's Exhibit B (Docket No. 24-3), the 3MR reset trigger device submitted to ATF was an internal mechanism, which operated to push the shooter's finger

24

forward.   It does not run on a motor, and although the mechanism assists in manually resetting the trigger, the shooter is still required to release the trigger to fully reset the trigger.   Thus, during inspection, ATF determined that the weapon could not be fired automatically.   The item was tested by seven individuals at ATF prior to the classification, and no individual was able to generate automatic fire.   Because the reset trigger required a release of the trigger and subsequent pull before another round was expelled, the 3MR was not classified as a machinegun.

Based on the foregoing, FTISB has not rendered inconsistent decisions, but has inspected and analyzed each prototype or device presented to it by Freedom for classification, and has issued its decisions based on the unique characteristics of each.   Accordingly, ATF's classification of the ERAD device as a machinegun is not arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with the applicable law.

## CONCLUSION

Based on the foregoing, the Court must enter judgment in favor of the Bureau of Alcohol, Tobacco, Firearms, and Explosives as to all of Plaintiff's claims against it.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:      *s/ Shelese Woods*
Shelese Woods
Assistant United States Attorney

25

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing upon the Plaintiff herein by electronically filing a copy thereof through the Court's CM/ECF system, which will transmit a copy electronically to the following on the 27th day of July, 2017:

> Brent R. Weil
> KIGHTLINGER & GRAY, LLP
> bweil@k-glaw.com

> Timothy R. Rudd
> Scott Braum
> SCOTT L. BRAUM & ASSOCIATES, LTD.
> trr@braumlaw.com

<div style="margin-left:40%">

_s/ Shelese Woods_

Shelese Woods
Assistant United States Attorney
10 West Market Street
Suite 2100
Indianapolis, Indiana 46204

</div>

26

AR005758

**26 U.S.C. § 5845(f)(2):  DESTRUCTIVE DEVICE**

**(Nonsporting shotgun having a bore of more than one-half inch in diameter)**

*The USAS-12 shotgun has a bore of more than one-half inch in diameter and is not generally recognized as particularly suitable for sporting purposes.  Therefore, it is classified as a destructive device for purposes of the National Firearms Act, 26 U.S.C. Chapter 53.*

**ATF Rul. 94-1**

**[Status of ruling:  Active]**

The Bureau of Alcohol, Tobacco and Firearms (ATF) has examined a firearm identified as the USAS-12 shotgun to determine whether it is a destructive device as that term is used in the National Firearms Act (NFA), 26 U.S.C. Chapter 53.

The USAS-12 is a 12-gauge, gas-operated, autoloading semiautomatic shotgun which is chambered for 12-gauge 2 3/4-inch ammunition.  It has an 18 1/4-inch barrel, is approximately 38 inches long, and weighs 12.4 pounds unloaded and approximately 15 pounds with a loaded magazine, depending on the capacity of the magazine.  The USAS-12 is equipped with a 12-round detachable box magazine, but a 28-round detachable drum magazine is also available.  The shotgun is approximately 11 inches deep with a box magazine.  There is an integral carrying handle on top of the receiver, which houses a rifle-type aperture rear and adjustable post-type front sight.  The USAS-12 has a separate combat-style pistol grip located on the bottom of the receiver, forward of the buttstock.  An optional telescopic sight may be attached to the carrying handle.  The barrel is located below the operating mechanism in such fashion that the barrel is in a straight line with the center of the buttstock.

Section 5845(f), Title 26, U.S.C., classified certain weapons as "destructive devices" which are subject to the registration and tax provisions of the NFA.  Section 5845(f)(2) provides as follows:

> (f)  *Destructive device.*--The term "destructive device" means * * * (2)  any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; . . .

A "sporting purposes" test which is almost identical to that in section 5845(f)(2) appears in 18 U.S.C. § 925(d)(3).  This provision of the Gun Control Act of 1968 (GCA) provides that the Secretary shall authorize a firearm to be imported into the United States if the firearm is "generally recognized as particularly suitable for or readily adaptable to sporting purposes."  With the exception of the "readily adaptable" language, this provision is identical to the sporting shotgun exception to the destructive device definition.  The definition of "destructive device" in the GCA (18 U.S.C. § 921(a)(4)) is identical to that in the NFA.

In determining whether shotguns with a bore of more than one-half inch in diameter are "generally recognized as particularly suitable for sporting purposes" and thus are not destructive devices under the NFA, we believe it is appropriate to use the same criteria used for evaluating shotguns under the "sporting purposes" test of section 925(d)(3).  Congress used virtually identical language in describing the weapons subject to the two statutory schemes and the language was added to the GCA and NFA at the same time.

In connection with the determination of importability, ATF determined that the USAS-12 shotgun was not eligible for importation under the sporting purposes test in section 925(d)(3).  In reaching this determination, ATF evaluated the weight, size, bulk, designed magazine capacity, configuration, and other characteristics of the USAS-12.  It was determined that the weight of the USAS-12, 12.4 pounds, made it much heavier than traditional 12-gauge sporting shotguns, which made it awkward to carry for extended periods, as in hunting, and cumbersome to fire at multiple small moving targets, as in skeet and trap shooting.  The width of the USAS-12 with drum magazine, approximately 6 inches, and the depth with box magazine, in excess of 11 inches, far exceeded that of traditional sporting shotguns, which do not exceed 3 inches in width or 4 inches in depth.  The large size and bulk of the USAS-12 made it extremely difficult to maneuver quickly enough to engage moving targets as is necessary in hunting, skeet, and trap shooting.  The detachable box magazine with 12-cartridge capacity and the detachable drum magazine with 28-cartridge capacity were of a larger capacity than traditional repeating sporting shotguns, which generally contain tubular magazines with a capacity of 3-5 cartridges.  Additionally, detachable magazines permit more rapid reloading than do tubular magazines.  Finally, the combat-style pistol grip, the barrel-to-buttstock configuration, the bayonet lug, and the overall appearance and general shape of the weapon were radically different from traditional sporting shotguns and strikingly similar to shotguns designed specifically for or modified for combat and law enforcement use.

Section 7805(b), Title 26, U.S.C., provides that the Secretary may prescribe the extent, if any, to which any ruling relating to the internal revenue laws shall be applied without retroactive effect.  Accordingly, all rulings issued under the Internal Revenue Code are applied retroactively unless they specifically provide otherwise.  Pursuant to section 7805(b), the Director, as the delegate of the Secretary, may prescribe the extent to which any ruling will apply without retroactive effect.

*Held:*  The USAS-12 is a shotgun with a bore of more than one-half inch in diameter which is not particularly suitable for sporting purposes.  The weight, size, bulk, designed magazine capacity, configuration, and other factors indicate that the USAS-12 is a semiautomatic version of a military-type assault shotgun.  Accordingly, the USAS-12 is a destructive device as that term is used in 26 U.S.C. § 5845(f)(2).  Pursuant to section 7805(b), this ruling is applied prospectively effective March 1, 1994, with respect to the making, transfer, and special (occupational) taxes imposed by the NFA.  All other provisions of the NFA apply retroactively effective March 1, 1994.

**26 U.S.C. § 5845(f)(2):  DESTRUCTIVE DEVICE**
(Nonsporting shotgun having a bore of more than one-half inch in diameter)

*The Striker-12/Streetsweeper shotgun has a bore of more than one-half inch in diameter and is not generally recognized as particularly suitable for sporting purposes.  Therefore, it is classified as a destructive device for purposes of the National Firearms Act, 26 U.S.C. Chapter 53.*

**ATF Rul. 94-2**

**[Status of ruling:  Active]**

The Bureau of Alcohol, Tobacco and Firearms (ATF) has examined a firearm identified as the Striker-12/Streetsweeper shotgun to determine whether it is a destructive device as that term is used in the National Firearms Act (NFA), 26 U.S.C. Chapter 53.

The Striker-12 and Streetsweeper shotguns are virtually identical 12-gauge shotguns with a spring-driven revolving magazine.  The magazine has a 12-round capacity.  The shotgun has a fixed stock or folding shoulder stock and may be fired with the folding stock collapsed.  The shotgun with an 18-inch barrel is 37 inches in length with the stock extended, and 26.5 inches in length with the stock folded.  The shotgun is 5.7 inches in width and weighs 9.24 pounds unloaded.  The Striker/Streetsweeper has two pistol grips, one in the center of the firearm below the buttstock, and one on the forearm.  The Striker/Streetsweeper was designed and developed in South Africa as a military, security, and anti-terrorist weapon.  Various types of 12-gauge cartridge can be fired from the shotgun, and a rapid indexing procedure allows various types of ammunition to be loaded into the cylinder and selected for firing.  All 12 rounds can be fired from the shotgun in 3 seconds or less.

Section 5845(f), Title 26, U.S.C., classifies certain weapons as "destructive devices" which are subject to the registration and tax provisions of the NFA.  Section 5845(f)(2) provides as follows:

(f)  *Destructive device.*--The term "destructive device" means * * * (2)  any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; . . ."

A "sporting purposes" test which is almost identical to that in section 5845(f)(2) appears in 18 U.S.C. § 925(d)(3).  This provision of the Gun Control Act of 1968 (GCA) provides that the Secretary shall authorize a firearm to be imported into the United States if the firearm is "generally recognized as particularly suitable for or readily adaptable to sporting purposes."  With the exception of the "readily adaptable" language, this provision is identical to the sporting shotgun exception to the destructive devices definition.  The definition of "destructive device" in the GCA (18 U.S.C. § 921(a)(4)) is identical to that in the NFA.

AR005761

In determining whether shotguns with a bore of more than one-half inch in diameter are "generally recognized as particularly suitable for sporting purposes" and thus are not destructive devices under the NFA, we believe it is appropriate to use the same criteria used for evaluating shotguns under the "sporting purposes" test of section 925(d)(3). Congress used virtually identical language in describing the weapons subject to the two statutory schemes, and the language was added to the GCA and NFA at the same time.

In 1984, ATF ruled that the Striker-12 was not eligible for importation under section 925(d)(3) since it is not particularly suitable for sporting purposes. In making this determination, the 1984 letter-ruling notes that the Striker was being used in a number of "combat" shooting events. In a letter dated June 30, 1986, ATF again denied importation to the Striker-12, on the basis that it did not meet the "sporting purposes" test of section 925(d)(3). This letter states that, "We believe the weapon to have been specifically designed for military and law enforcement uses."

In evaluating the physical characteristics of the Striker 12/Streetsweeper, ATF concludes that the weight, bulk, designed magazine capacity, configuration, and other features indicate that it was designed primarily for military and law enforcement use and is not particularly suitable for sporting purposes.

The weight of the Striker-12/Streetsweeper, 9.24 pounds unloaded, is on the high end for traditional 12-gauge sporting shotguns, which generally weigh between 7 and 10 pounds. Thus, the weight of the Striker-12/Streetsweeper makes it awkward to carry for extended periods, as in hunting, and cumbersome to fire at multiple small moving targets, as in skeet and trap shooting. The width of the Striker-12/Streetsweeper, 5.7 inches, far exceeds that of traditional sporting shotguns, which do not exceed three inches in width or four inches in depth. The large size and bulk of the Striker-12/Streetsweeper make it extremely difficult to maneuver quickly enough to engage moving targets as is necessary in hunting, skeet, and trap shooting. The spring driven revolving magazine with 12-cartridge capacity is a much larger capacity than traditional repeating sporting shotguns, which generally contain tubular magazines with a capacity of 3-5 cartridges. The folding shoulder stock and the two pistol grips are not typical of sporting-type shotguns. Finally, the overall appearance and general shape of the weapon are radically different from traditional sporting shotguns and strikingly similar to shotguns designed specifically for or modified for combat and law enforcement use.

Section 7805(b), Title 26, U.S.C., provides that the Secretary may prescribe the extent, if any, to which any ruling relating to the internal revenue laws shall be applied without retroactive effect. Accordingly, all rulings issued under the Internal Revenue Code are applied retroactively unless they specifically provide otherwise. Pursuant to section 7805(b), the Director, as the delegate of the Secretary, may prescribe the extent to which any ruling will apply without retroactive effect.

*Held:* The Striker-12/Streetsweeper is a shotgun with a bore of more than one-half inch in diameter which is not particularly suitable for sporting purposes. The weight, size, bulk, designed magazine capacity, configuration, and other factors indicate that the Striker-12/Streetsweeper is a military-type shotgun, as opposed to a shotgun particularly suitable for sporting purposes. Accordingly, the Striker-12/Streetsweeper is a destructive device as that term is used in 26 U.S.C. § 5845(f)(2). Pursuant to section 7805(b), this ruling is applied

AR005762

prospectively effective March 1, 1994, with respect to the making, transfer, and special (occupational) taxes imposed by the NFA.  All other provisions of the NFA apply retroactively effective March 1, 1994.

AR005763