

**66514**   **Federal Register** / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

## DEPARTMENT OF JUSTICE

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

**27 CFR Parts 447, 478, and 479**

[Docket No. 2018R–22F; AG Order No. 4367–2018]

**RIN 1140–AA52**

**Bump-Stock-Type Devices**

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives; Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Department of Justice is amending the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to clarify that bump-stock-type devices—meaning "bump fire" stocks, slide-fire devices, and devices with certain similar characteristics—are "machineguns" as defined by the National Firearms Act of 1934 and the Gun Control Act of 1968 because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. With limited exceptions, the Gun Control Act, as amended, makes it unlawful for any person to transfer or possess a machinegun unless it was lawfully possessed prior to the effective date of the statute. The bump-stock-type devices covered by this final rule were not in existence prior to the effective date of the statute, and therefore will be prohibited when this rule becomes effective. Consequently, under the final rule, current possessors of these devices will be required to destroy the devices or abandon them at an ATF office prior to the effective date of the rule.

**DATES:** This rule is effective March 26, 2019.

**FOR FURTHER INFORMATION CONTACT:** Vivian Chu, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE,

Washington, DC 20226; telephone: (202) 648–7070.

**SUPPLEMENTARY INFORMATION:**
I. Executive Summary
   A. Summary of the Regulatory Action
   B. Summary of Costs and Benefits
II. Background
   A. Regulatory Context
   B. Las Vegas Shooting
   C. Advance Notice of Proposed Rulemaking
III. Notice of Proposed Rulemaking
   A. Prior Interpretations of "Single Function of the Trigger" and "Automatically"
   B. Re-Evaluation of Bump-Stock-Type Devices
   C. Proposed Definition of "Single Function of the Trigger"
   D. Proposed Definition of "Automatically"
   E. Proposed Clarification That the Definition of "Machinegun" Includes Bump-Stock-Type Devices
   F. Amendment of 27 CFR 479.11
   G. Amendment of 27 CFR 478.11
   H. Amendment of 27 CFR 447.11
IV. Analysis of Comments and Department Responses for Proposed Rule
   A. Comments Generally Supporting the Rule
   B. Particular Reasons Raised in Support of the Rule
   C. Comments Generally Opposing the Rule
   D. Specific Issues Raised in Opposition to the Rule
   E. ATF Suggested Alternatives
   F. Other Alternatives
   G. Proposed Rule's Statutory and Executive Order Review
   H. Affected Population
   I. Costs and Benefits
   J. Regulatory Flexibility Act
   K. Miscellaneous Comments
   L. Comments on the Rulemaking Process
V. Final Rule
VI. Statutory and Executive Order Review
   A. Executive Orders 12866, 13563, and 13771
   B. Executive Order 13132
   C. Executive Order 12988
   D. Regulatory Flexibility Act
   E. Small Business Regulatory Enforcement Fairness Act of 1996
   F. Congressional Review Act
   G. Unfunded Mandates Reform Act of 1995
   H. Paperwork Reduction Act of 1995

## I. Executive Summary

### A. Summary of the Regulatory Action

The current regulations at §§ 447.11, 478.11, and 479.11 of title 27, Code of Federal Regulations (CFR), contain definitions for the term "machinegun." [1] The definitions used in 27 CFR 478.11 and 479.11 match the statutory definition of "machinegun" in the National Firearms Act of 1934 (NFA), as amended, and the Gun Control Act of 1968 (GCA), as amended. Under the

---

[1] Regulations implementing the relevant statutes spell the term "machine gun" rather than "machinegun." E.g., 27 CFR 478.11, 479.11. For convenience, this notice uses "machinegun" except when quoting a source to the contrary.

NFA, the term "machinegun" means "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The term "machinegun" also includes "the frame or receiver of any such weapon" or any part or combination of parts designed and intended "for use in converting a weapon into a machinegun," and "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.* This definition uses the key terms "single function of the trigger" and "automatically," but these terms are not defined in the statutory text.

The definition of "machinegun" in 27 CFR 447.11, promulgated pursuant to the portion of section 38 of the Arms Export Control Act (AECA) (22 U.S.C. 2778) delegated to the Attorney General by section 1(n)(ii) of Executive Order 13637 (78 FR 16129), is similar. Currently, the definition of "machinegun" in § 447.11 provides that a "'machinegun', 'machine pistol', 'submachinegun', or 'automatic rifle' is a firearm originally designed to fire, or capable of being fired fully automatically by a single pull of the trigger."

In 2006, ATF concluded that certain bump-stock-type devices qualified as machineguns under the NFA and GCA. Specifically, ATF concluded that a device attached to a semiautomatic firearm that uses an internal spring to harness the force of a firearm's recoil so that the firearm shoots more than one shot with a single pull of the trigger is a machinegun. Between 2008 and 2017, however, ATF also issued classification decisions concluding that other bump-stock-type devices were not machineguns, primarily because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy. Decisions issued during that time did not include extensive legal analysis relating to the definition of "machinegun." ATF undertook a review of its past classifications and determined that those conclusions did not reflect the best interpretation of "machinegun" under the NFA and GCA.

ATF decided to promulgate a rule that would bring clarity to the definition of "machinegun"—specifically with respect to the terms "automatically" and "single function of the trigger," as those terms are used to define "machinegun." As an initial step in the process of promulgating a rule, on December 26, 2017, the Department of Justice (Department) published in the **Federal**

AR005764

Register an advance notice of proposed rulemaking titled "Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices." 82 FR 60929. Subsequently, on March 29, 2018, the Department published in the **Federal Register** a notice of proposed rulemaking (NPRM) titled "Bump-Stock-Type Devices." 83 FR 13442.

The NPRM proposed to amend the regulations at 27 CFR 447.11, 478.11, and 479.11 to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. 83 FR at 13447–48.

The NPRM proposed regulatory definitions for the statutory terms "single function of the trigger" and "automatically," and amendments of the regulatory definition of "machinegun" for purposes of clarity. Specifically, the NPRM proposed to amend the definitions of "machinegun" in §§ 478.11 and 479.11, define the term "single function of the trigger" to mean "single pull of the trigger," and define the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 FR at 13447–48. The NPRM also proposed to clarify that the definition of "machinegun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as bump-stock-type devices). *Id.* at 13447. Finally, the NPRM proposed to harmonize the definition of "machinegun" in § 447.11 with the definitions in 27 CFR parts 478 and 479, as those definitions would be amended. *Id.* at 13448.

The goal of this final rule is to amend the relevant regulatory definitions as

described above. The Department, however, has revised the definition of "single function of the trigger" to mean "single pull of the trigger" and analogous motions, taking into account that there are other methods of initiating an automatic firing sequence that do not require a pull. This final rule also informs current possessors of bump-stock-type devices of the proper methods of disposal, including destruction by the owner or abandonment to ATF.

### B. Summary of Costs and Benefits

ATF estimates the total undiscounted cost of this rule at $312.1 million over 10 years. The total 7% discount cost is estimated at $245.5 million, and the discounted costs would be $32.8 million and $35.0 million, annualized at 3% and 7% respectively. The estimate includes costs to the public for loss of property ($102.5 million); costs of forgone future production and sales ($198.9 million); costs of disposal ($9.4 million); and government costs ($1.3 million). Unquantified costs include potential loss of wages for employees of bump-stock-type device manufacturers, notification to bump-stock-type device owners of the need to destroy the devices, and loss of future usage by the owners of bump-stock-type devices. ATF did not calculate any cost savings for this final rule.

This final rule clarifies that bump-stock-type devices are machineguns that are subject to the NFA and GCA. The provisions of those statutes addressing machineguns are designed to increase public safety by, among other things, limiting legal access to them. Consistent with the NFA and GCA, therefore, a desired outcome of this final rule is increased public safety.

## II. Background

### A. Regulatory Context

The Attorney General is responsible for enforcing the NFA, as amended, and the GCA, as amended.[2] This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the NFA and GCA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a). The Attorney General has delegated the responsibility for administering and enforcing the NFA and GCA to the Director of ATF,

subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 CFR 0.130(a)(1)–(2) Accordingly, the Department and ATF have promulgated regulations implementing both the NFA and the GCA. *See* 27 CFR parts 478, 479. In particular, ATF for decades promulgated regulations governing "the procedural and substantive requirements relative to the importation, manufacture, making, exportation, identification and registration of, and the dealing in, machine guns." 27 CFR 479.1; *see, e.g., United States v. Dodson,* 519 F. App'x 344, 348–49 & n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the NFA's definition of "machinegun"); *F.J. Vollmer Co. v. Higgins,* 23 F.3d 448, 449–51 (D.C. Cir. 1994) (upholding an ATF determination regarding machinegun receivers). Courts have recognized ATF's leading regulatory role with respect to firearms, including in the specific context of classifying devices as machineguns under the NFA. *See, e.g., York v. Sec'y of Treasury,* 774 F.2d 417, 419–20 (10th Cir. 1985).

The GCA defines "machinegun" by referring to the NFA definition,[3] which includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The term "machinegun" also includes "the frame or receiver of any such weapon" or any part, or combination of parts, designed and intended "for use in converting a weapon into a machinegun," and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. *Id.* With limited exceptions, the GCA prohibits the transfer or possession of machineguns under 18 U.S.C. 922(o).

In 1986, Congress passed the Firearms Owners' Protection Act (FOPA), Public Law 99–308, 100 Stat. 449, which included a provision that effectively froze the number of legally transferrable machineguns to those that were registered before the effective date of the statute. 18 U.S.C. 922(o). Due to the fixed universe of "pre-1986" machineguns that may be lawfully transferred by nongovernmental entities, the value of those machineguns has steadily increased over time. This price premium on automatic weapons has spurred inventors and manufacturers to develop firearms, triggers, and other devices that permit shooters to use semiautomatic rifles to replicate

---

[2] NFA provisions still refer to the "Secretary of the Treasury." 26 U.S.C. ch. 53. However, the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, for ease of reference, this notice refers to the Attorney General.

[3] 18 U.S.C. 921(a)(23).

AR005765

**66516**   **Federal Register** / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

automatic fire without converting these rifles into "machineguns" under the NFA and GCA. ATF began receiving classification requests for such firearms, triggers, and other devices that replicate automatic fire beginning in 1988. ATF has noted a significant increase in such requests since 2004, often in connection with rifle models that were, until 2004, defined as "semiautomatic assault weapons" and prohibited under the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. 921(a)(30) (sunset effective Sept. 13, 2004).

ATF received classification requests pertaining to bump-stock-type devices. Shooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearms' cyclic firing rate to mimic automatic fire. These devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's recoil either through a mechanism like an internal spring or in conjunction with the shooter's maintenance of constant forward pressure (typically constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger).

In 2006, ATF concluded that certain bump-stock-type devices qualified as machineguns under the NFA and GCA. Specifically, ATF concluded that devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns. Between 2008 and 2017, however, ATF also issued classification decisions concluding that other bump-stock-type devices were not machineguns, including a device submitted by the manufacturer of the bump-stock-type devices used in the 2017 Las Vegas shooting discussed below. Those decisions indicated that semiautomatic firearms modified with these bump-stock-type devices did not fire "automatically," and thus were not "machineguns," because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy. (For further discussion of ATF's prior interpretations, see Part III.A.) Because ATF has not regulated these certain types of bump-stock-type devices as machineguns under the NFA or GCA, they have not been marked with a serial number or other identification markings. Individuals, therefore, have been able to legally purchase these devices without undergoing background checks or

complying with any other Federal regulations applicable to firearms.

*B. Las Vegas Shooting*

On October 1, 2017, a shooter attacked a large crowd attending an outdoor concert in Las Vegas, Nevada. By using several AR-type rifles with attached bump-stock-type devices, the shooter was able to fire several hundred rounds of ammunition in a short period of time, killing 58 people and wounding approximately 500. The bump-stock-type devices recovered from the scene included two distinct, but functionally equivalent, model variations from the same manufacturer. These types of devices were readily available in the commercial marketplace through online sales directly from the manufacturer, and through multiple retailers.

The Las Vegas bump-stock-type devices, as well as other bump-stock-type devices available on the market, all utilize essentially the same functional design. They are designed to be affixed to a semiautomatic long gun (most commonly an AR-type rifle or an AK-type rifle) in place of a standard, stationary rifle stock, for the express purpose of allowing "rapid fire" operation of the semiautomatic firearm to which they are affixed. They are configured with a sliding shoulder stock molded (or otherwise attached) to a pistol-grip/handle (or "chassis") that includes an extension ledge (or "finger rest") on which the shooter places the trigger finger while shooting the firearm. The devices also generally include a detachable rectangular receiver module (or "bearing interface") that is placed in the receiver well of the device's pistol-grip/handle to assist in guiding and regulating the recoil of the firearm when fired. Bump-stock-type devices, including those with the aforementioned characteristics, are generally designed to channel recoil energy to increase the rate of fire of a semiautomatic firearm from a single trigger pull. Accordingly, when a bump-stock-type device is affixed to a semiautomatic firearm, the device harnesses and directs the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary finger without additional physical manipulation of the trigger by the shooter.

Following the mass shooting in Las Vegas, ATF received correspondence from members of the United States Congress, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices available on the market

constitute machineguns under the statutory definition. Consistent with its authority to "reconsider and rectify" potential classification errors, *Akins v. United States,* 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam), ATF reviewed its earlier determinations for bump-stock-type devices issued between 2008 and 2017 and concluded that those determinations did not include extensive legal analysis of the statutory terms "automatically" or "single function of the trigger." The Department decided to move forward with the rulemaking process to clarify the meaning of these terms, which are used in the NFA's statutory definition of "machinegun."

*C. Advance Notice of Proposed Rulemaking*

On December 26, 2017, the Department, as an initial step in the process of promulgating a Federal regulation interpreting the definition of "machinegun" with respect to bump-stock-type devices, published an advance notice of proposed rulemaking (ANPRM) in the **Federal Register.** Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 FR 60929. The ANPRM solicited comments concerning the market for bump-stock-type devices and manufacturer and retailer data. Specifically, the Department asked a series of questions of consumers, retailers, and manufacturers of bump-stock-type devices regarding the cost of bump-stock-type devices, average gross receipts of sales, and the volume and cost of manufacturing, as well as input on the potential effect of a rulemaking affecting bump-stock-type devices, including viable markets or the cost of disposing of inventory. Public comment on the ANPRM concluded on January 25, 2018. While ATF received over 115,000 comments, the vast majority of these comments were not responsive to the ANPRM.

On February 20, 2018, the President issued a memorandum to the Attorney General concerning "bump fire" stocks and similar devices. Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 83 FR 7949. The memorandum noted that the Department of Justice had already "started the process of promulgating a Federal regulation interpreting the definition of 'machinegun' under Federal law to clarify whether certain bump stock type devices should be illegal." *Id.* The President then directed the Department of Justice, working within established legal protocols, "to dedicate all

AR005766

available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.*

### III. Notice of Proposed Rulemaking

On March 29, 2018, the Department published in the **Federal Register** a notice of proposed rulemaking (NPRM) titled "Bump-Stock-Type Devices," 83 FR 13442 (ATF Docket No. 2017R–22), proposing changes to the regulations in 27 CFR 447.11, 478.11, and 479.11. The comment period for the proposed rule concluded on June 27, 2018.

*A. Prior Interpretations of "Single Function of the Trigger" and "Automatically"*

In the NPRM, the Department reviewed ATF's history of classifying bump-stock-type devices through agency rulings and relevant litigation. In particular, it described how ATF published ATF Ruling 2006–2, "Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm." The ruling explained that ATF had received requests from "several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm." ATF Ruling 2006–2, at 1. Prior to issuing ATF Ruling 2006–2, ATF had examined a device called the "Akins Accelerator." To operate the device, the shooter initiated an automatic firing sequence by pulling the trigger one time, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset. Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger, which caused the weapon to discharge the ammunition. The recoil and the spring-powered device thus caused the firearm to cycle back and forth, impacting the trigger finger without further input by the shooter while the firearm discharged multiple shots. The device was advertised as able to fire approximately 650 rounds per minute. *See id.* at 2.

ATF initially reviewed the Akins Accelerator in 2002 and determined it not to be a machinegun because ATF interpreted the statutory term "single function of the trigger" to refer to a single movement of the trigger. But ATF undertook further review of the device based on how it actually functioned when sold and later determined that the Akins Accelerator should be classified as a machinegun. ATF reached that

conclusion because the best interpretation of the phrase "single function of the trigger" includes a "single pull of the trigger." The Akins Accelerator qualified as a machinegun because ATF determined through testing that when the device was installed on a semiautomatic rifle (specifically a Ruger Model 10–22), it resulted in a weapon that "[with] a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted." *Akins* v. *United States,* No. 8:08–cv–988, slip op. at 5 (M.D. Fla. Sept. 23, 2008) (internal quotation marks omitted).

When issuing ATF Ruling 2006–2, ATF set forth a detailed description of the components and functionality of the Akins Accelerator and devices with similar designs. The ruling determined that the phrase "single function of the trigger" in the statutory definition of "machinegun" was best interpreted to mean a "single pull of the trigger." ATF Ruling 2006–2, at 2 (citing *National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066,* 73rd Cong., at 40 (1934)). ATF further indicated that this interpretation would apply when the agency classified devices designed to increase the rate of fire of semiautomatic firearms. Thus, ATF concluded in ATF Ruling 2006–2 that devices exclusively designed to increase the rate of fire of semiautomatic firearms were machineguns if, "when activated by a single pull of the trigger, [such devices] initiate[ ] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." *Id.* at 3. Finally, because the "single pull of the trigger" interpretation constituted a change from ATF's prior interpretations of the phrase "single function of the trigger," ATF Ruling 2006–2 concluded that "[t]o the extent previous ATF rulings are inconsistent with this determination, they are hereby overruled." *Id.*

Following its reclassification of the Akins Accelerator as a machinegun, ATF determined and advised owners of Akins Accelerator devices that removal and disposal of the internal spring—the component that caused the rifle to slide forward in the stock—would render the device a non-machinegun under the statutory definition. Thus, a possessor could retain the device by removing and disposing of the spring, in lieu of destroying or surrendering the device.

In May 2008, the inventor of the Akins Accelerator filed a lawsuit challenging ATF's classification of his device as a machinegun, claiming the

agency's decision was arbitrary and capricious under the Administrative Procedure Act (APA). *Akins* v. *United States,* No. 8:08–cv–988, slip op. at 7– 8 (M.D. Fla. Sept. 23, 2008). The United States District Court for the Middle District of Florida rejected the plaintiff's challenge, holding that ATF was within its authority to reconsider and change its interpretation of the phrase "single function of the trigger" in the NFA's statutory definition of "machinegun." *Id.* at 14. The court further held that the language of the statute and the legislative history supported ATF's interpretation of the statutory phrase "single function of the trigger" as synonymous with "single pull of the trigger." *Id.* at 11–12. The court concluded that in ATF Ruling 2006–2, ATF had set forth a "reasoned analysis" for the application of that new interpretation to the Akins Accelerator and similar devices, including the need to "protect the public from dangerous firearms." *Id.* at 12.

The United States Court of Appeals for the Eleventh Circuit affirmed the district court's decision, holding that "[t]he interpretation by the Bureau that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Akins,* 312 F. App'x at 200. The Eleventh Circuit further concluded that "[b]ased on the operation of the Accelerator, the Bureau had the authority to 'reconsider and rectify' what it considered to be a classification error." *Id.*

In ten letter rulings between 2008 and 2017, ATF applied the "single pull of the trigger" interpretation to other bump-stock-type devices. Like the Akins Accelerator, these other bump-stock-type devices allowed the shooter to fire more than one shot with a single pull of the trigger. However, ATF ultimately concluded that these devices did not qualify as machineguns because, in ATF's view, they did not "automatically" shoot more than one shot with a single pull of the trigger. ATF also applied its "single pull of the trigger" interpretation to other trigger actuators, two-stage triggers, and other devices submitted to ATF for classification. Depending on the method of operation, some such devices were classified to be machineguns that were required to be registered in the National Firearms Registration and Transfer Record (NFRTR) and could not be transferred or possessed, except in

AR005767

limited circumstances, under 18 U.S.C. 922(o).[4]

In the NPRM, the Department also noted that prior ATF rulings concerning bump-stock-type devices did not provide substantial or consistent legal analysis regarding the meaning of the term "automatically," as it is used in the NFA and GCA. For example, ATF Ruling 2006–2 concluded that devices like the Akins Accelerator initiated an "automatic" firing cycle because, once initiated by a single pull of the trigger, "the automatic firing cycle continues until the finger is released or the ammunition supply is exhausted." ATF Ruling 2006–2, at 1. In contrast, other ATF letter rulings between 2008 and 2017 concluded that bump-stock-type devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter do not fire "automatically." Of the rulings issued between 2008 and 2017, ATF provided different explanations for why certain bump-stock-type devices were not machineguns, but none of them

extensively examined the meaning of "automatically." For instance, some letter rulings concluded that certain devices were not machineguns because they did not "initiate[ ] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted," without further defining the term "automatically." *E.g.,* Letter for Michael Smith from ATF's Firearm Technology Branch Chief (April 2, 2012). Other letter rulings concluded that certain bump-stock-type devices were not machineguns because they lacked any "automatically functioning mechanical parts or springs and perform[ed] no mechanical function[s] when installed," again without further defining the term "automatically" in this context. *E.g.,* Letter for David Compton from ATF's Firearm Technology Branch Chief (June 7, 2010).

### B. Re-Evaluation of Bump-Stock-Type Devices

In the NPRM, the Department reviewed the functioning of semiautomatic firearms, describing that ordinarily, to operate a semiautomatic firearm, the shooter must repeatedly pull and release the trigger to allow it to reset, so that only one shot is fired with each pull of the trigger. 83 FR at 13443. It then explained that bump-stock-type devices, like the ones used in Las Vegas, are designed to channel recoil energy to increase the rate of fire of semiautomatic firearms from a single trigger pull. *Id.* Shooters can maintain a continuous linear firing cycle after a single pull of the trigger by directing the recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths. *Id.* These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's ledge with constant rearward pressure. *Id.* The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire. *Id.*

In light of its reassessment of the relevant statutory terms "single function of the trigger" and "automatically," the NPRM stated ATF's conclusion that bump-stock-type devices are "machineguns" as defined in the NFA because they convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-

acting or self-regulating mechanism that, after a single pull of the trigger, harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger.

### C. Proposed Definition of "Single Function of the Trigger"

The Department proposed to interpret the phrase "single function of the trigger" to mean "a single pull of the trigger," as it considered it the best interpretation of the statute and because it reflected ATF's position since 2006. The Supreme Court in *Staples v. United States,* 511 U.S. 600, 602 n.1 (1994), indicated that a machinegun within the NFA "fires repeatedly with a single pull of the trigger." This interpretation is also consistent with how the phrase "single function of the trigger" was understood at the time of the NFA's enactment in 1934. For instance, in a congressional hearing leading up to the NFA's enactment, the National Rifle Association's then-president testified that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066,* 73rd Cong., 2nd Sess., at 40 (1934). Furthermore, and as noted above, the Eleventh Circuit in *Akins* concluded that ATF's interpretation of "single function of the trigger" to mean a "single pull of the trigger" "is consonant with the statute and its legislative history." 312 F. App'x at 200. No other court has held otherwise.[5]

---

[4] Examples of recent ATF classification letters relying on the "single pull of the trigger" interpretation to classify submitted devices as machineguns include the following:

• On April 13, 2015, ATF issued a classification letter regarding a device characterized as a "positive reset trigger," designed to be used on a semiautomatic AR-style rifle. The device consisted of a support/stock, secondary trigger link, pivot toggle, shuttle link, and shuttle. ATF determined that, after a single pull of the trigger, the device utilized recoil energy generated from firing a projectile to fire a subsequent projectile. ATF noted that "a 'single function of the trigger' is a single pull," and that the device utilized a "single function of the trigger" because the shooter need not release the trigger to fire a subsequent projectile, and instead "can maintain constant pressure through a single function of the trigger."

• On October 7, 2016, ATF issued a classification letter regarding two devices described as "LV-15 Trigger Reset Devices." The devices, which were designed to be used on an AR-type rifle, were essentially identical in design and function and were submitted by the same requester (per the requester, the second device included "small improvements that have come as the result of further development since the original submission"). The devices were each powered by a rechargeable battery and included the following components: A self-contained receiver mechanism with an electrical connection, a modified two-position semiautomatic AR-15 type selector lever, a rechargeable battery pack, a grip assembly/trigger guard with electrical connections, and a piston that projected forward through the lower rear portion of the trigger guard and pushed the trigger forward as the firearm cycled. ATF held that "to initiate the firing . . . a shooter must simply pull the trigger." It explained that although the mechanism pushed the trigger forward, "the shooter never releases the trigger. Consistent with [the requester's] explanation, ATF demonstrated that the device fired multiple projectiles with a 'single function of the trigger' because a single pull was all that was required to initiate and maintain a firing sequence.

[5] The NPRM also explained that the term "pull" can be analogized to "push" and other terms that describe activation of a trigger. For instance, ATF used the term "pull" in classifying the Akins Accelerator because that was the manner in which the firearm's trigger was activated with the device. But the courts have made clear that whether a trigger is operated through a "pull," "push," or some other action such as a flipping a switch, does not change the analysis of the functionality of a firearm. For example, in *United States v. Fleischli,* 305 F.3d 643, 655–56 (7th Cir. 2002), the Seventh Circuit rejected the argument that a switch did not constitute a trigger for purposes of assessing whether a firearm was a machinegun under the NFA, because such an interpretation of the statute would lead to "the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *See also United States v. Camp,* 343 F.3d 743, 745 (5th Cir. 2003) ("'To construe 'trigger' to mean only a small lever moved by a finger would be to impute to Congress the intent to restrict the term to apply only to one kind of trigger, albeit a

### D. Proposed Definition of "Automatically"

The Department also proposed to interpret the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." That interpretation reflects the ordinary meaning of that term at the time of the NFA's enactment in 1934. The word "automatically" is the adverbial form of "automatic," meaning "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Webster's New International Dictionary* 187 (2d ed. 1934); *see also* 1 *Oxford English Dictionary* 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself.").

Relying on these definitions, the United States Court of Appeals for the Seventh Circuit interpreted the term "automatically" as used in the NFA as "delineat[ing] how the discharge of multiple rounds from a weapon occurs: As the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." *United States* v. *Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). So long as the firearm is capable of producing multiple rounds with a single pull of the trigger until the trigger finger is removed, the ammunition supply is exhausted, or the firearm malfunctions, the firearm shoots "automatically" irrespective of why the firing sequence ultimately ends. *Id.* ("[T]he reason a weapon ceased firing is not a matter with which § 5845(b) is concerned."). *Olofson* thus requires only that the weapon shoot multiple rounds with a single function of the trigger "as the result of a self-acting mechanism," not that the self-acting mechanism produces the firing sequence without any additional action by the shooter. This definition accordingly requires that the self-acting or self-regulating mechanism allows the firing of multiple rounds through a single function of the trigger.

### E. Proposed Clarification That the Definition of "Machinegun" Includes Bump-Stock-Type Devices

The Department also proposed, based on the interpretations discussed above, to clarify that the term "machinegun"

includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. The Department explained that when a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And that firing sequence is "automatic" because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed). Accordingly, these devices are included under the definition of "machinegun" and, therefore, come within the purview of the NFA.

### F. Amendment of 27 CFR 479.11

The regulatory definition of "machine gun" in 27 CFR 479.11 matches the statutory definition of "machinegun" in the NFA. The definition includes the terms "single function of the trigger" and "automatically," but those terms are not defined in the statutory text. The NPRM proposed to define these terms in order to clarify the meaning of "machinegun." Specifically, the Department proposed to amend the definition of " machine gun" in 27 CFR 479.11 by:

1. Defining the term "single function of the trigger" to mean "single pull of the trigger";

2. defining the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger"; and

3. adding a sentence to clarify that a "machine gun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as a bump-stock-type device).

### G. Amendment of 27 CFR 478.11

The GCA and its implementing regulations in 27 CFR part 478 reference the NFA's definition of machinegun. Accordingly, the NPRM proposed to make the same amendments in 27 CFR 478.11 that were proposed for § 479.11.

### II. Amendment of 27 CFR 447.11

The Arms Export Control Act (AECA), as amended, does not define the term "machinegun" in its key provision, 22 U.S.C. 2778.[6] However, regulations in 27 CFR part 447 that implement the AECA include a similar definition of "machinegun," and explain that machineguns, submachineguns, machine pistols, and fully automatic rifles fall within Category I(b) of the U.S. Munitions Import List when those defense articles are permanently imported. *See* 27 CFR 447.11, 447.21. Currently, the definition of "machinegun" in § 447.11 provides that "[a] 'machinegun', 'machine pistol', 'submachinegun', or 'automatic rifle' is a firearm originally designed to fire, or capable of being fired fully automatically by a single pull of the trigger." The NPRM proposed to harmonize the AECA's regulatory definition of machinegun with the definitions in 27 CFR parts 478 and 479, as those definitions would be amended by the proposed rule.

### IV. Analysis of Comments and Department Responses for Proposed Rule

In response to the NPRM, ATF received over 186,000 comments. Submissions came from individuals, including foreign nationals, lawyers, and government officials, as well as various interest groups. Overall, 119,264 comments expressed support for the proposed rule, 66,182 comments expressed opposition, and for 657 comments, the commenter's position could not be determined. The commenters' grounds for support and opposition, along with specific concerns and suggestions, are discussed below.

### A. Comments Generally Supporting the Rule

#### Comments Received

Of the 119,264 comments received in support of the rule, 14,618 used one form letter in support of the proposed rule; 51,454 were petitions or petition signatures compiled by an organization and individuals; and 53,192 were unique comments. Many of the 53,192 unique comments used repetitious declarations of support or a single sentence or phrase, declaring, in essence, (1) ban bump stocks now or 1

---

very common kind. The language [in 18 U.S.C. 922(o)] implies no intent to so restrict the meaning[.]" (quoting *United States* v. *Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (emphasis removed)]]. Examples of machineguns that operate through a trigger activated by a push include the Browning design, M2 .50 caliber, the Vickers, the Maxim, and the M134 hand-fired Minigun.

[6] Under the AECA, the President has the authority to designate which items are controlled as defense articles for purposes of importation and exportation. 22 U.S.C. 2778(a)(1). The President has, in turn, delegated to the Attorney General the authority to promulgate regulations designating the defense articles controlled for permanent importation, including machineguns.

AR005769

**66520**   Federal Register / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

support a ban; (2) common sense gun reform or gun control now; (3) bump stocks should be outlawed; or (4) I fully support this proposed rule. Others supporting the rule expressed disbelief as to how such devices were legal and that it seemed to be a "no brainer," especially after Las Vegas, to prevent anyone from possessing an item that allows the shooter to inflict mass carnage. Several commenters stated that they were present at or knew people who were directly affected by the Las Vegas shooting and urged finalization of the proposed rule on bump-stock-type devices. Some commenters identified as active or former military, while other individuals noted their support for a prohibition on bump-stock-type devices while identifying as gun owners and gun enthusiasts, strong supporters of the Second Amendment, or members of a particular pro-gun interest group. For instance, one commenter wrote, "As an FFL [Federal firearms license] dealer, gun owner and collector, I am writing to support the ban on the sale of bump stocks." Another explained that he has been a member of the National Rifle Association (NRA) for over 30 years and loves hunting and shooting but believes "there is zero justification for bump stocks," because the "only thing bump stocks are good for is creating a kill zone."

**Department Response**

The Department acknowledges the commenters' support for the proposed rule. The rule clarifies the regulatory definition of "machinegun" to include bump-stock-type devices, and, therefore, subjects them to the restrictions imposed by the NFA and GCA. As 18 U.S.C. 922(o), with limited exceptions, prohibits the possession of machineguns that were not lawfully possessed before the effective date of the statute, current possessors of bump-stock-type devices will be obligated to cease possessing these devices.

*B. Particular Reasons Raised in Support of the Rule*

1. Threat to Public Safety

**Comments Received**

Over 36,000 of the supporting comments expressly cited public safety, saving lives (or specifically children's lives), reducing gun deaths and future mass shootings, or protecting law enforcement as the reason for supporting a rule that would restrict possession of bump-stock-type devices. A majority of these comments, including submissions from professional medical associations, declared that allowing persons to

modify semiautomatic rifles with bump-stock-type devices so that they operate with a similar rate of fire as fully automatic rifles poses a substantial risk to public safety and that the continued presence of these devices puts all communities at risk. Some commenters said that research shows that nations that have reasonable gun restrictions experience fewer mass shootings. Additionally, many students and numerous individuals identified as former or current teachers expressed support for the rule, with some citing fear that their school could be the next site of a mass shooting or stating that they do not want to continue seeing their students in constant fear of the next active shooter.

Several commenters also noted that bump-stock-type devices are a danger to police forces, with one commenter, a retired law enforcement officer, declaring that regulating bump-stock-type devices is an issue of public safety and will save the lives of those who are in law enforcement. Similarly, other commenters, including a former military physician, stated that the rapid fire enabled by bump-stock-type devices significantly increases the casualties in an attack and puts police officers who respond at greater risk. In light of the Las Vegas shooting, many commenters argued that, given that bump-stock-type devices are easily attainable and inexpensive items, prohibiting these devices is a needed step to reduce gun deaths or prevent future mass shootings. Many individuals, including several State and local government officials and gun safety or public health groups, expressed the urgent need for ATF to finalize the proposed rule in order to protect the public and children, especially given the frequency of mass shootings in recent months and the likelihood that a potential perpetrator will seek out these devices.

**Department Response**

The Department acknowledges that a bump-stock-type device combined with a semiautomatic firearm can empower a single individual to take many lives in a single incident. The reason for the Department's classification change is that ATF, upon review (discussed in Part III), believes that bump-stock-type devices must be regulated because they satisfy the statutory definition of "machinegun" in the NFA and GCA. By making clear that these devices are subject to the restrictions that the NFA and GCA place on machineguns, this rule reflects the public safety goals of those statutes. Indeed, the NPRM stated that the Las Vegas tragedy made "individuals aware that these devices

exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious." 83 FR at 13447. For further discussion of benefits, see Part VI.A.

2. Unnecessary for Civilians to Own

**Comments Received**

Of the total supporting comments, at least 25,135 of the commenters opined that bump-stock-type devices have no place in civil society and are unnecessary for ordinary persons to own. One of the primary reasons thousands expressed support for the regulation was their view that bump-stock-type devices have no legitimate uses for hunting or sporting purposes, target shooting, or self-protection. Many of these commenters emphasized that the devices cause a decrease in shooter accuracy, and therefore are not useful for hunting and target shooting, and are inappropriate for use in self or home defense. For example, one commenter rhetorically stated, "[W]hat law abiding gun owner who is responsible for every bullet they shoot would want to reduce their accuracy?" Some of these commenters further asserted that because the devices enable rapid but inaccurate fire, they pose a particular risk to large-scale public events, such as the Las Vegas concert. Many commenters, including those identifying as former or active military members, commented that only the military or law enforcement should have access to bump-stock-type devices or that there was no need for civilians to have access to them.

**Department Response**

The Department acknowledges supporters' comments on limiting the possession of bump-stock-type devices to military or law enforcement. Such a limitation is consistent with the Firearms Owners' Protection Act (FOPA), Public Law 99–308, 100 Stat. 449, which makes it unlawful for any person to transfer or possess a machinegun that was not lawfully possessed before the effective date of the statute. FOPA made an exception for governmental entities, allowing for the "transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." 18 U.S.C. 922(o)(2)(A). Congress provided this exemption because it recognized the necessity for the military and law enforcement to continue to use and possess these types of weapons. This final rule is consistent with

implementing the requirements of the NFA and GCA provisions that regulate possession of machineguns.

### 3. Consistent With the Intent of the National Firearms Act

#### Comments Received

More than 27,000 of the supporting comments urged issuance of the final rule because bump-stock-type devices and other similar conversion devices were meant to circumvent the restrictions of the NFA and GCA, as bump-stock-type devices enable shooters to transform their guns into automatic weapons. Some commenters asserted that it is useless to have a law against automatic weapons yet allow manufacturers to legally produce and sell an item with the sole purpose of turning a firearm into an automatic weapon. Many of these commenters also stated that bump-stock-type devices violate the spirit of the law and that this loophole should be closed by ATF as quickly as possible. Further, at least 1,675 of the supporting comments stated that the proposed rule is consistent with the purposes of the NFA and the intent of Congress. Specifically, these commenters opined that the regulation "enforces machinegun laws that date back many decades" and that "it will have the same dramatic benefit originally intended by those foundational laws."

#### Department Response

The Department acknowledges supporters' comments that bump-stock-type devices were meant to circumvent the restrictions of the NFA and GCA. Prior to this rule, ATF issued classification letters that determined that some bump-stock-type devices were not "machineguns" as defined by the NFA. Those decisions, however, did not include extensive legal analysis as described in Part III. Upon reexamining these classifications, this final rule promulgates definitions for the terms "single function of the trigger" and "automatically" as those terms are used in the statutory definition of "machinegun." ATF believes these definitions represent the best interpretation of the statute. Therefore, recognizing that a bump-stock-type device used with a semiautomatic firearm enables a shooter to shoot automatically more than one shot by a single function of the trigger, the purpose of this rule is to clarify that such devices are machineguns under the NFA.

### 4. Constitutional Under the Second Amendment

#### Comments Received

More than 2,100 commenters in support of the rule argued that a rule prohibiting possession of bump-stock-type devices does not conflict with the Second Amendment. Many opined that the Framers of the Constitution did not intend for these types of devices, which can inflict mass carnage, to be protected by the Second Amendment. Commenters expressed the view that because persons living in the 18th century used muskets capable of firing only one shot before requiring a long reloading process, our forefathers would not have wanted bump-stock-type devices to be readily available. Other commenters, including those who declared themselves to be strong supporters of the Second Amendment, stated that prohibiting bump-stock-type devices was consistent with the Second Amendment.

Several commenters noted language from the majority opinion in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). There, the Supreme Court declared that the Second Amendment protects an individual right to bear arms for traditional lawful purposes such as self-defense and hunting. However, the Court also stated, "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Commenters further summarized the Court's conclusions that limitations on the right to keep and carry arms are supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." *Id.* at 627. Commenters argued that the Supreme Court's Second Amendment decisions support the proposed rule.

#### Department Response

The Department acknowledges supporters' concerns and agrees that regulation of bump-stock-type devices is permissible under the Second Amendment. For discussion of the Department's position on the constitutionality of this final rule under the Second Amendment, see Part IV.D.1.a.

### 5. Absence of Congressional Action

#### Comments Received

Over 1,500 comments in support urged action on this final rule by invoking popular support for responsible gun limitations. Many of these commenters stated this measure would be a sensible first step for gun safety and that ATF should act where Congress has not acted. One gun safety organization noted that while congressional measures have stalled, ATF is doing what it can to refine rules. At least 1,300 commenters indicated that ATF should choose saving children and the public welfare over the interests of the gun industry and pro-gun organizations, naming in particular the NRA. One commenter wrote, "It's time we quit cow-towing [sic] to the NRA and considered all the rest of us and our children especially. Being afraid to go to school is unAmerican which is what the insistence by the NRA on no gun control is—unAmerican." Many supporting commenters echoed these sentiments.

#### Department Response

In light of the legal analysis of the term "machinegun" set forth above, the Department agrees with commenters that it is necessary to clarify that the term "machinegun" includes bump-stock-type devices. Congress granted the Attorney General authority to issue rules to administer the NFA and GCA, and the Attorney General has delegated to ATF the authority to administer and enforce these statutes and to implement the related regulations accordingly. The Department and ATF have initiated this rulemaking to clarify the regulatory interpretation of the NFA and GCA.

### C. Comments Generally Opposing the Rule

#### Comments Received

A total of 66,182 comments were received that opposed the rule. Approximately 40,806 of those comments were form submissions by the National Association for Gun Rights (NAGR) on behalf of its members, with 25,874 submitted on paper petitions and 14,932 submitted by facsimile. The remaining 25,376 opposing comments were individually submitted. Many of the commenters identified as lawyers, judges, industry groups, or members of law enforcement or the military. There were several commenters who stated they did not own or had no interest in owning a bump-stock-type device but still objected to the rule on various grounds, including that it is unconstitutional and only punishes law-abiding owners of bump-stock-type devices. Of the 25,376 comments individually submitted, 12,636 used one of three form letters; the remaining 12,740 were unique comments. A majority of these commenters raised

AR005771

specific, detailed objections to the agency's proposal and the premise upon which the regulation is based, whereas several hundred of the unique comments were limited to a few sentences opposing the regulation without further detail. For example, these types of comments simply declared, in essence, (1) no ban, or a ban is unnecessary; (2) individuals' Second Amendment rights should not be infringed; or (3) I oppose any additional gun regulations.

Department Response

The Department acknowledges the commenters' objections to the proposed rule but disagrees with assertions that the rule infringes on the constitutional right to keep and bear arms and punishes law-abiding gun owners. The Department believes that bump-stock-type devices satisfy the definition of "machinegun" under the NFA and GCA and that this final rule reflects the public safety goals of the NFA and GCA. The Department thoroughly considered the various issues raised in opposition to the rule, which are discussed below.

*D. Specific Issues Raised in Opposition to the Rule*

1. Constitutional and Statutory Arguments

a. Violates the Second Amendment

Comments Received

A total of 16,051 of the commenters opposed the rule on the ground that it violates the Second Amendment. Of these, 11,753 used a form letter stating that the "regulations dismiss Second Amendment protections, by appealing to the *Heller* court decision. But the Constitution trumps the Supreme Court—so when the Second Amendment says the right to keep and bear arms shall not be infringed, any limitation of the right for law-abiding citizens should be treated as unconstitutional[.]" Many commenters, including those identifying as former or active law enforcement or military members, echoed these sentiments by declaring that the proposed rule infringes on the rights of law-abiding gun owners, and that the phrasing of the Second Amendment—"shall not be infringed"—strictly limits or negates the ability of Government to impose any regulations on firearms. One commenter, for instance, argued that the Second Amendment's reference to a "well-regulated Militia" includes unorganized militia, which the commenter interpreted to mean any person who owns a gun. Because the military has automatic weapons, the

commenter reasoned that the people—as the unorganized militia—are likewise constitutionally entitled to access such weapons.

Numerous commenters cited the Supreme Court's decision in *Heller*, 554 U.S. 570, which declared that the Second Amendment protects an individual right to bear arms. Commenters also referred to the Supreme Court's decision in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam), stating that this decision makes clear that weapons in "common use" cannot be banned. One commenter pointed out that if bump-stock-type devices are now machineguns, then there are an additional 519,927 machineguns that are currently owned typically by law-abiding citizens for lawful purposes. This amount, the commenter argued, surpasses the 200,000 stun guns found to trigger a "common use" analysis in *Caetano*, meaning that such items cannot be banned unless they are both dangerous and unusual. Further, commenters said that *Caetano* stands for the proposition that any advancement in weaponry is still protected under the Second Amendment. They argued that the Court declared "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding" and that its protection is not limited to only those weapons useful in warfare. *Id.* at 1027 (internal quotation marks omitted).

Department Response

The Department does not believe that the proposed regulation violates the Second Amendment. The Supreme Court has indicated, and several lower courts have squarely held, that the Second Amendment does not protect a right to possess a machinegun. Because bump-stock-type devices are machinegun conversion devices that qualify as "machineguns" under Federal law, *see supra* Part III.E., prohibiting them does not violate the Second Amendment.

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *accord McDonald v. City of Chi.*, 561 U.S. 742, 786 (2010). In *Heller*, for example, the Supreme Court recognized an "important limitation on the right to keep and carry arms": "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. More specifically, and importantly for purposes of this rulemaking, the Court explicitly described machineguns as the kind of dangerous and unusual weapons not

protected by the Second Amendment. In the course of explaining the Court's holding in *United States v. Miller*, 307 U.S. 174 (1939) (upholding Federal prohibition of short-barreled shotguns), the Court noted that a portion of *Miller* could be "[r]ead in isolation" to "mean that only those weapons useful in warfare are protected" by the Second Amendment. *Heller*, 554 U.S. at 624. But "[t]hat would be a startling reading of the opinion," the Court continued, "since it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939." *Id. Heller* thus made clear that machineguns, like short-barreled shotguns, are "weapons not typically possessed by law-abiding citizens for lawful purposes," and thus fall outside the scope of the Second Amendment as historically understood. *Id.* at 625; *see also id.* at 627 (accepting that M–16 rifles are dangerous and unusual weapons that may be banned).

In the decade since *Heller* was decided, lower courts have consistently upheld prohibitions of machineguns. *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (upholding Federal statute banning possession of machineguns because they are "dangerous and unusual and therefore not in common use"); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *see also Heller v. Dist. of Columbia* (*Heller II*), 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller*"); *United States v. Marzzarella*, 614 F.3d 85, 94–95 (3d Cir. 2010) ("the Supreme Court has made clear the Second Amendment does not protect" machineguns and short-barreled shotguns).

This body of precedent, in addition to *Heller*, strongly supports the Department's view that a bump-stock-type device, as a machinegun conversion device qualifying as a "machinegun" under Federal law, is not protected by the Second Amendment. What makes a machinegun a "dangerous and unusual weapon" unprotected by the Second Amendment is its capacity to fire automatically, *see, e.g., Henry*, 688 F.3d at 640, which "puts the machine gun on a different plane" than other firearms, *United States v. Kirk*, 105 F.3d 997, 1002 (5th Cir. 1997) (en banc) (opinion of Higginbotham, J.). Bump-stock-type devices qualify as machineguns, as discussed above,

because they enable an otherwise semiautomatic firearm to fire automatically. Since they bear the same key characteristic that makes traditional machineguns "dangerous and unusual," bump-stock-type devices are unprotected by the Second Amendment for the same reason.

This conclusion is fully consistent with *Caetano* v. *Massachusetts*, 136 S. Ct. 1027. In *Caetano*, the Supreme Judicial Court of Massachusetts had upheld a State prohibition of stun guns on the grounds that stun guns were not in common use when the Second Amendment was ratified and are not useful in military operations. *See id.* at 1027–28. The Supreme Court summarily vacated this ruling because neither of the State court's premises was valid: *Heller* made a "clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding,'" and "rejected the proposition 'that only those weapons useful in warfare are protected.'" *Id.* at 1028 (quoting *Heller*, 554 U.S. at 582, 624–25). The Department's conclusion in this rulemaking that the Second Amendment does not protect bump-stock-type devices rests on neither of the propositions rejected by *Caetano*. As discussed above, the Department believes that this rule comports with the Second Amendment because bump-stock-type devices qualify as machineguns, which are not constitutionally protected—not because bump-stock-type devices did not exist in 1791 or are not useful in warfare. Moreover, although the Supreme Judicial Court of Massachusetts ultimately held that stun guns are protected under the Second Amendment in *Ramirez* v. *Commonwealth*, 94 NE3d 809 (2018), the court did not suggest that more dangerous weapons, like machineguns and machinegun conversion devices, are also protected. The court acknowledged that a stun gun is even "less lethal than a handgun," *id.* at 817, the weapon that the Supreme Court expressly held to be protected in *Heller*, 554 U.S. at 635.

b. Violates the Fifth Amendment

i. Violates Due Process Clause—Entrapment

Comments Received

At least one commenter, a gun-rights nonprofit organization, argued that ATF's change of position constitutes unconstitutional entrapment. It maintained that ATF's past classification letters, which informed the public that certain bump-stock-type devices were not subject to the NFA or GCA, invited the public to rely on its consistent decisions and acquire such items. With the sudden change of position, the organization asserted, ATF seeks to entrap citizens who have simply purchased a federally approved firearm accessory. Citing *Sherman* v. *United States*, 356 U.S. 367, 376 (1958), the organization argued that it is "unconstitutional for the Government to beguile an individual 'into committing crimes which he otherwise would not have attempted.'" Further, it argued that at least some 520,000 law-abiding citizens could be criminals who could face up to ten years' imprisonment "without even receiving individual notice of ATF's reversal of position."

Department Response

The Department disagrees that the final rule amounts to entrapment. Entrapment is a complete defense to a criminal charge on the theory that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson* v. *United States*, 503 U.S. 540, 548 (1992). A valid entrapment defense has two related elements: (1) Government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal conduct. *Mathews* v. *United States*, 485 U.S. 58, 63 (1988).

As described above, ATF has now concluded that it misclassified some bump-stock-type devices and therefore initiated this rulemaking pursuant to the requirements of the APA. An agency is entitled to correct its mistakes. *See Williams Gas Processing-Gulf Coast Co.* v. *FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) ("[I]t is well understood that [a]n agency is free to discard precedents or practices it no longer believes correct. Indeed we expect that an [ ] agency may well change its past practices with advances in knowledge in its given field or as its relevant experience and expertise expands. If an agency decides to change course, however, we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."). This rulemaking procedure is specifically designed to notify the public about changes in ATF's interpretation of the NFA and GCA and to help the public avoid the unlawful possession of a machinegun. It is important to note that at no time did ATF induce any member of the public to commit a crime. The ANPRM, NPRM, and this final rule have followed the statutory process for ensuring that the public is aware of the correct classification of bump-stock-type devices under the law, and that continued possession of such devices is prohibited. Anyone currently in possession of a bump-stock-type device is not acting unlawfully unless they fail to relinquish or destroy their device after the effective date of this regulation.

ii. Violates Takings Clause and Due Process Clause

Comments Received

Over 1,200 commenters objected that the rule will violate the Takings Clause of the Fifth Amendment, which provides "private property [shall not] be taken for public use, without just compensation." Some commenters said that the Takings Clause requires the Government to compensate manufacturers for their present and future loss of revenues. Many other commenters further indicated that the Government would owe compensation to owners of bump-stock-type devices because the Government would effectively be taking personal property for public safety, which is a form of public use. They cited *Horne* v. *Department of Agriculture*, 135 S. Ct. 2419, 2428 (2015), for the proposition that mandating relinquishment of property constitutes a physical taking and requires compensation. One commenter contrasted this rule with the regulation at issue in *Andrus* v. *Allard*, 444 U.S. 51 (1979), which prohibited the commercial sale of eagle body parts gathered before 1940. The commenter observed that the Supreme Court held the eagle-part regulation was not a regulatory taking because it did not compel the surrender of the body parts and imposed no physical invasion or restraint upon them. *Id.* at 65–66. By contrast, the commenter noted, owners of bump-stock-type devices under the regulation would be compelled to surrender their devices or face criminal penalties.

Several commenters also stated that "for this regulation to be Constitutional each and every owner of a bump stock, or other devices captured in this regulation not yet named, must be given their day in court to present evidence and an argument as to why their property shouldn't be taken without compensation at a minimum."

Many commenters separately opined that the Department did not include the cost of compensation in its cost-benefit analysis and several proposed estimated costs of such compensation. Those comments are addressed in Part IV.I.1.

AR005773

Department Response

The Department does not agree that classifying bump-stock-type devices as machineguns results in the unlawful taking of property "for public use, without just compensation." U.S. Const. amend. V. It is well established that "the nature of the [government's] action is critical in takings analysis." *Keystone Bituminous Coal Ass'n* v. *DeBenedictis*, 480 U.S. 470, 488 (1987); *accord Penn Cent. Transp. Co.* v. *City of New York*, 438 U.S. 104, 124 (1978) ("character of the government action" has "particular significance"). The Department's action here, classifying bump-stock-type devices as machineguns subject to the NFA and GCA, does not have the nature of a taking.

A restriction on "contraband or noxious goods" and dangerous articles by the government to protect public safety and welfare "has not been regarded as a taking for public use for which compensation must be paid." *Acadia Tech., Inc.* v. *United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006); *see also United States* v. *$7,990.00 in U.S. Currency*, 170 F.3d 843, 845 (8th Cir. 1999) ("forfeiture of contraband is an exercise of the government's police power" and does not qualify as a taking).[7] The Takings Clause was "not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments. It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given." *Chi., Burlington & Quincy Ry. Co.* v. *Illinois*, 200 U.S. 561, 594 (1906) (internal quotation marks omitted); *see, e.g., Holliday Amusement Co. of Charleston* v. *South Carolina*, 493 F.3d 404, 409–11 (4th Cir. 2007) (upholding State prohibition of video gaming machines without compensation).

In *Mugler* v. *Kansas*, 123 U.S. 623, 668–69 (1887), for example, the Supreme Court rejected a distiller's argument that a State constitutional amendment prohibiting the manufacture and sale of intoxicating liquors was an unconstitutional taking. The Court explained that the government's power to prohibit the "use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Id.* at 669. Similarly, the Supreme Court held in *Miller* v. *Schoene*, 276 U.S. 272, 280 (1928), that Virginia was not required to compensate owners of red cedar trees for the value of trees that the State had ordered destroyed to prevent the spread of a disease that threatened local apple orchards. "[W]here the public interest is involved," the Court observed, "preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Id.* at 279–80. Lower courts have likewise deemed the Takings Clause inapplicable to governmental regulation of dangerous personal property for public-safety reasons. *See, e.g., Garcia* v. *Vill. of Tijeras*, 767 P.2d 355 (N.M. Ct. App. 1988) (village ordinance banning possession of pit bulls was "a proper exercise of the Village's police power" and not a taking).

Consistent with these cases, courts have rejected arguments that restrictions on the possession of dangerous firearms, like machineguns, are takings requiring just compensation. In *Akins* v. *United States*, 82 Fed. Cl. 619 (2008), for example, the Court of Federal Claims held that ATF's ultimate classification of the Akins Accelerator as a machinegun, *see supra* Part III, was not a taking. The court reasoned that ATF had acted "pursuant to the police power conferred on it by Congress" rather than by exercising eminent domain, and that the plaintiff lacked a sufficient property interest because he had "voluntarily entered an area subject to pervasive federal regulation—the manufacture and sale of firearms." *Id.* at 623–24; *see also Bennis* v. *Michigan*, 516 U.S. 442, 452 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."). Similar reasoning led the District of Columbia Court of Appeals to hold that a DC law

prohibiting machineguns and requiring their disposal or removal was not a taking. *Fesjian* v. *Jefferson*, 399 A.2d 861, 865–66 (1979). These precedents support the Department's conclusion that the prohibition of bump-stock-type devices as machineguns does not have the character of a compensable taking within the meaning of the Fifth Amendment.

The Department acknowledges that a panel of the U.S. Court of Appeals for the Ninth Circuit recently upheld a preliminary injunction against the Attorney General of California that relied in part on the Takings Clause in prohibiting the State from implementing restrictions on firearm magazines that hold more than 10 rounds. *Duncan* v. *Becerra*, No. 17–56081, 2018 WL 3433828 (9th Cir. July 17, 2018). The Ninth Circuit's order essentially adopted the district court's analysis of the Takings Clause question. *See id.* at *3. The district court's reasoning on the takings question was closely intertwined with the Second Amendment inquiry, and rested on the conclusion that it was "dubious" for California to deem large-capacity magazines a public nuisance given the Supreme Court's observation that "[g]uns in general are not deleterious devices or products or obnoxious waste materials." *Duncan* v. *Becerra*, 265 F. Supp. 3d 1106, 1137 (S.D. Cal. 2017) (internal quotation marks omitted) (quoting *Staples* v. *United States*, 511 U.S. 600, 610 (1994)). But regulation of bump-stock-type devices is fundamentally distinguishable from California's prohibition on possessing such magazines. As discussed, and as *Heller* indicates, dangerous and unusual weapons are not entitled to Second Amendment protection, and may indeed qualify as deleterious devices or contraband. Other district courts have followed the reasoning of cases like *Akins* and *Fesjian* and rejected takings challenges to California firearm restrictions. *See Rupp* v. *Becerra*, 2018 WL 2138452, at *8–9 (C.D. Cal. May 9, 2018) (restrictions on "assault weapons"); *Wiese* v. *Becerra*, 263 F. Supp. 3d 986, 995 (E.D. Cal. 2017) (prohibition of large-capacity gun magazines).

Finally, the Department does not agree that each owner of a bump-stock-type device has a due-process right to a hearing in connection with the promulgation of this rule. The rule clarifies the scope of the NFA and GCA, general legislative enactments, with respect to bump-stock-type devices. "Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process

---

[7] In the takings context, the use of the term "police power" in connection with Federal regulation does not posit the existence of a "plenary police power" of the Federal level. *Cf. United States* v. *Lopez*, 514 U.S. 549, 566 (1995). Rather, it refers to "the power of the federal government to engage" in activities not unlike those engaged in by the states under their inherent sovereign powers "to protect the public welfare. *Fla. Rock Indus., Inc.* v. *United States*, 18 F.3d 1560, 1568 n.17 (Fed. Cir. 1994).

clause." *Interport Pilots Agency, Inc.* v. *Sammis*, 14 F.3d 133, 142 (2d Cir. 1994); *see also, e.g., Bi-Metallic Inv. Co.* v. *State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard."). Furthermore, the Department's conclusion that bump-stock-type devices are machineguns under the NFA and GCA means that owners lack a cognizable property interest in these devices for due-process purposes. As the Fifth Circuit held in *Cooper* v. *City of Greenwood*, firearms covered by the NFA are "contraband *per se*," and "[c]ourts will not entertain a claim contesting the confiscation of contraband *per se* because one cannot have a property right in that which is not subject to legal possession." 904 F.2d 302, 305 (1990).

**c. Violates Ex Post Facto Clause and Bill of Attainder Clause**

Comments Received

Numerous commenters asserted that the proposed rule would violate article I, section 9, clause 3 of the Constitution, which states, "No Bill of Attainder or ex post facto Law shall be passed." One gun-rights nonprofit organization, quoting *United States* v. *O'Neal*, 180 F.3d 115, 122 (4th Cir. 1999), stated that even though this is a regulatory action, the "sanction or disability it imposes is 'so punitive in fact' that the law 'may not legitimately be viewed as civil in nature.'"

Another commenter, the Maryland Shall Issue organization, argued that ATF's reliance on 18 U.S.C. 922(o) creates an impermissible ex post facto law because current owners and manufacturers of bump-stock-type devices "became felons as of the date and time they took possession of a bump stock, even though such possession and manufacture was then expressly permitted by prior ATF interpretations." The commenter cited *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386, 390 (1798), and *Peugh* v. *United States*, 569 U.S. 530 (2013), to support its arguments. It argued that the ex post facto issue can be avoided by holding that the exemption in 18 U.S.C. 922(o)(2)(A) applies where bump-stock-type devices are possessed under "the authority" of prior ATF rulings. Furthermore, the commenter, citing *Bowen* v. *Georgetown University Hospital*, 488 U.S. 204, 208 (1988), stated that the Supreme Court has held that an agency cannot engage in retroactive rulemaking without specific congressional authorization. Relying on *Fernandez-Vargas* v. *Gonzales*, 548 U.S. 30, 36 (2006), the commenter stated there is no question that the proposed rule has a retroactive effect because the rule would "affect" existing rights and impose new liabilities on the past and continued possession of bump-stock-type devices.

At least one commenter argued the rule is an unconstitutional bill of attainder because the rule restricts particular brands of stocks, per the Department's definition, while not at the same time restricting all brands of stocks. Similarly, another commenter stated the regulation appears punitive in nature, and abusively narrow in targeting Slide Fire, a seller of bump-stock-type devices that has already announced the close of its business.

Department Response

The Department disagrees that the proposed rule violates the Ex Post Facto or Bill of Attainder Clauses. The rule would criminalize only future conduct, not past possession of bump-stock-type devices that ceases by the effective date of this rule. In *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386 (1798), the Supreme Court set out four types of laws that violate the Ex Post Facto Clause:

1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390. Citing *Calder*, the Supreme Court has explained that "[t]o fall within the *ex post facto* prohibition, a law must be retrospective—that is, it *must apply to events occurring before its enactment*—and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce* v. *Mathis*, 519 U.S. 433, 441 (1997) (emphasis added; citations and internal quotation marks omitted). The Federal courts have thus been careful to distinguish statutes and regulations that violate the Ex Post Facto Clause from those that criminalize only future conduct and are therefore not "retrospective," including in the firearms possession context. For example, following passage of the Lautenberg Amendment (18 U.S.C. 922(g)(9)), which made it unlawful for persons convicted of a misdemeanor crime of domestic violence to possess a firearm, several defendants argued that the law violated the Ex Post Facto Clause. One defendant argued that he had a prior conviction for a misdemeanor crime of domestic violence, but lawfully possessed a firearm before 18 U.S.C. 922(g)(9) became law. *United States* v. *Mitchell*, 209 F.3d 319 (4th Cir. 2000). The defendant argued that, as applied to him, the statute violated the Ex Post Facto Clause because the new law penalized him for his previous domestic violence conviction. However, the Fourth Circuit disagreed, noting that "[i]t is immaterial that Mitchell's firearm purchase and domestic violence conviction occurred prior to § 922(g)(9)'s enactment because the conduct prohibited by § 922(g)(9) is the *possession* of a firearm." *Id.* at 322; *see also United States* v. *Pfeifer*, 371 F.3d 430, 436–37 (8th Cir. 2004); *United States* v. *Meade*, 986 F. Supp. 66, 69 (D. Mass. 1997), *aff'd*, 175 F.2d 215 (1st Cir. 1999); *United States* v. *Brady*, 26 F.3d 282, 290–91 (2d Cir. 1994); *United States* v. *Gillies*, 851 F.2d 492, 495–96 (1st Cir. 1988) (Breyer, J.); *United States* v. *D'Angelo*, 819 F.2d 1062, 1065–66 (11th Cir. 1987).

This rule brings clarity to the meaning of "machinegun," and makes clear that individuals are subject to criminal liability only for possessing bump-stock-type devices *after* the effective date of regulation, not for possession before that date. No action taken before the effective date of the regulation is affected under the rule. Although regulating past possession of a firearm may implicate the Ex Post Facto Clause, regulating the continued or future possession of a firearm that is already possessed does not. *See Benedetto* v. *Sessions*, No. CCB–17–0058; 2017 WL 4310089, at *5 (D. Md. Sept. 27, 2017) ("Whether a gun was purchased before the challenged law was enacted . . . is immaterial to whether the challenged law regulates conduct that occurred before or after its enactment."); *see also Samuels* v. *McCurdy*, 267 U.S. 188, 193 (1925) (rejecting Ex Post Facto Clause challenge to statute that prohibited the post-enactment possession of intoxicating liquor, even when the liquor was lawfully acquired before the statute's enactment). For this reason, the Department disagrees with commenters' assertions that the rule violates the Ex Post Facto Clause.

Relatedly, the Department also disagrees with the view that 18 U.S.C. 922(o)(2)(A) provides the authority to permit continued possession of bump-stock-type devices "under the

AR005775

authority" of prior ATF rulings. Section 922(o)(2)(A) is inapplicable because, among other reasons, ATF's letter rulings regarding bump-stock-type devices did not purport to authorize the possession of devices qualifying as machineguns under section 922(o)(1); instead, ATF advised individuals that certain devices did not qualify as machineguns in the first place, a position that ATF has now reconsidered. Furthermore, section 922(o)(2)(A) does not empower ATF to freely grant exemptions from section 922's general prohibition of machineguns.

The Department also disagrees that the proposed rule constitutes a bill of attainder. The Supreme Court has highlighted the fact that the Bill of Attainder Clause applies only to Congress, noting that "[t]he distinguishing feature of a bill of attainder is the substitution of a *legislative* for a judicial determination of guilt." *De Veau* v. *Braisted*, 363 U.S. 144, 160 (1960) (emphasis added). The Court has also described a bill of attainder as "a law that *legislatively* determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon* v. *Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) (emphasis added). Accordingly, the Bill of Attainder Clause does not apply "to regulations promulgated by an executive agency." *Paradissiotis* v. *Rubin*, 171 F.3d 983, 988–89 (5th Cir. 1999) (citing *Walmer* v. *U.S. Dep't of Defense*, 52 F.3d 851, 855 (10th Cir. 1995) ("The bulk of authority suggests that the constitutional prohibition against bills of attainder applies to legislative acts, not to regulatory actions of administrative agencies.")); *see also Korte* v. *Office of Personnel Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986); *Marshall* v. *Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966). Even if the proposed rule were subject to the Bill of Attainder Clause, it would pass constitutional muster. The fact that Slide Fire announced the close of its business does not make this rule a bill of attainder; that company is not being singled out, as the proposed rule applies to all similar devices. Further, the regulation of all machineguns of this type is not a "punishment" as is required for an enactment to be unlawful bill of attainder. *See Nixon*, 433 U.S. at 473.

d. Violates Fourth Amendment

Comments Received

Many commenters also raised objections on grounds that the proposed rule violates the Fourth Amendment's

guarantee against unreasonable searches and seizures. Commenters believed that because bump-stock-type devices essentially would become contraband under the rule, "mandating [their] surrender to authorities would violate the 4th Amendment protection from seizure without due process."

Department Response

Although commenters cite the Fourth Amendment, it is unclear how a "search" or "seizure" would result from this rule. The Department is unaware of any precedent supporting the view that a general regulatory prohibition of possession of certain contraband can violate the Fourth Amendment. A seizure is "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," *Brower* v. *Cty. of Inyo*, 489 U.S. 593, 596 (1989), and the final rule makes clear that current possessors of bump-stock-type devices are not required to surrender the devices to the authorities. Instead, current possessors may lawfully dispose of their devices in other ways, as discussed below in Part IV.D.7.

e. Violates Ninth and Tenth Amendments

Comments Received

Various commenters opposed to the rule stated that it would violate the Ninth and Tenth Amendments of the Constitution. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." One commenter said, "The BATF is another agency whose existence violates the 10th Amendment." Another commenter argued, "as an accessory, the federal government cannot ban [bump-stock-type devices], because only the states can ban them." A handful of other commenters stated that the rule violates States' rights under the Tenth Amendment because it violates the "right to keep and bear arms" provisions of 44 State constitutions.

Department Response

The Department disagrees that the proposed rule violates the commenters' rights under the Ninth Amendment. The Ninth Amendment "does not confer substantive rights in addition to those conferred by other portions of our governing law. The Ninth Amendment 'was added to the Bill of Rights to ensure that the maxim *expressio unius*

*est exclusio alterius* would not be used at a later time to deny fundamental rights merely because they were not specifically enumerated in the Constitution.'" *Gibson* v. *Matthews*, 926 F.2d 532, 537 (6th Cir. 1991) (citing *Charles* v. *Brown*, 495 F. Supp. 862, 863–64 (N.D. Ala. 1980)). Federal "circuit courts across the country have consistently held that the Ninth Amendment does not impinge upon Congress's authority to restrict firearm ownership." *United States* v. *Finnell*, 256 F. Supp. 2d 493, 498 (E.D. Va. 2003).

The Department also disagrees that the rule violates the Tenth Amendment. Commenters seemingly argued that the powers exercised by the Department in issuing the rule were "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." However, Federal courts have long held that the NFA, GCA, and implementing regulations do not violate the Tenth Amendment. The NFA does not "usurp[ ] police power reserved to the States." *United States* v. *Miller*, 307 U.S. 174, 176 (1939). Further, "[b]ecause § 922(o) was a proper exercise of Congress's enumerated authority under the Commerce Clause, and because it does not compel, let alone commandeer, the states to do anything, the statute does not violate the Tenth Amendment." *United States* v. *Kenney*, 91 F.3d 884, 891 (7th Cir. 1996).

f. Lack of Statutory Authority

Comments Received

A total of 47,863 commenters, most of whom sent form submissions opposed to the proposed rule, argued that ATF lacks statutory authority to regulate bump-stock-type devices. Many commenters said that ATF, by its own admission, repeatedly stated it could not regulate such devices. Commenters generally expressed the view that because bump-stock-type devices are not firearms, ATF has no authority under the NFA or GCA to regulate them. Some commenters contended that 6 U.S.C. 531 gives ATF only narrow statutory authority and does not provide ATF general authority to regulate the safety of firearms, accessories, or parts.

In addition, numerous commenters argued that, as the term "machinegun" is already clearly defined in the NFA, only Congress can make changes to the definition and regulate bump-stock-type devices. Furthermore, commenters stated that the agency's interpretation of the term "machinegun" would not be entitled to deference under *Chevron U.S.A.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984).

AR005776

Department Response

The Attorney General is responsible for enforcing the NFA, as amended, and the GCA, as amended. This includes the authority to promulgate regulations necessary to enforce the provisions of these statutes. *See* 18 U.S.C. 926(a), 26 U.S.C. 7801(a)(2)(A), 7805(a). The statutory provision cited by some commenters, 6 U.S.C. 531, is the provision of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, that transferred the powers the Secretary of the Treasury had with respect to ATF to the Attorney General when ATF was transferred to the Department of Justice. Accordingly, the Attorney General is now responsible for enforcing the NFA and GCA, and he has delegated the responsibility for administering and enforcing the NFA and GCA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 CFR 0.130(a)(1)–(2).

"Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). In the original GCA implementing regulations, ATF provided regulatory definitions of the terms that Congress did not define in the statute. 33 FR 18555 (Dec. 14, 1968). Since 1968, ATF has occasionally added definitions to the implementing regulations. *See, e.g.*, 63 FR 35520 (June 30, 1998). Similarly, 26 U.S.C. 7805(a) states that "the [Attorney General] shall prescribe all needful rules and regulations for the enforcement of this title." As is the case with the GCA, ATF has provided regulatory definitions for terms in the NFA that Congress did not define, such as "frame or receiver" and "manual reloading." *See, e.g.*, 81 FR 2658 (Jan. 15, 2016). These definitions were necessary to explain and implement the statute, and do not contradict the statute. Federal courts have recognized ATF's authority to classify devices as "firearms" under Federal law. *See, e.g.*, *Demko v. United States*, 44 Fed. Cl. 83, 93 (1999) (destructive device); *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009) (per curiam) (machinegun).

This rule is based upon this authority. Further, ATF has provided technical and legal reasons why bump-stock-type devices enable automatic fire by a single function of the trigger, and thus qualify as machinegun conversion devices, not mere "accessories." ATF has regularly classified items as machinegun

"conversion devices" or "combinations of parts," including auto sears (ATF Ruling 81–4) and the Akins Accelerator (ATF Ruling 2006–2).

The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes. However, the Department disagrees that the rule conflicts with the statutes or is in contravention of administrative-law principles. The rule merely defines terms used in the definition of "machinegun" that Congress did not— the terms "automatically" and "single function of the trigger"—as part of implementing the provisions of the NFA and GCA.

When a court is called upon to review an agency's construction of the statute it administers, the court looks to the framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). The first step of the *Chevron* review is to ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 842–43 (footnote omitted).

The Department believes that this rule's interpretations of "automatically" and "single function of the trigger" in the statutory definition of "machinegun" accord with the plain meaning of those terms. Moreover, even if those terms are ambiguous, this rule rests on a reasonable construction of them. Although Congress defined "machinegun" in the NFA, 26 U.S.C. 5845(b), it did not further define the components of that definition. *See, e.g.*, *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 419 (6th Cir. 2006) (noting that the NFA does not define the phrases "designed to shoot" or "can be readily restored" in the definition of "machinegun"). Congress thus implicitly left it to the Department to define "automatically" and "single function of the trigger" in the event those terms are ambiguous. *See Chevron*, 467 U.S. at 844. Courts have appropriately recognized that the Department has the authority to interpret elements of the definition of "machinegun" like "automatically" and "single function of the trigger." *See York v. Sec'y of Treasury*, 774 F.2d 417, 419–20 (10th Cir. 1985); *United States v.*

*Dodson*, 519 F. App'x 344, 348–49 & n.4 (6th Cir. 2013); *cf., e.g., Firearms Import/Export Roundtable Trade Grp v. Jones*, 854 F. Supp. 2d 1, 18 (D.D.C. 2012) (upholding ATF's interpretation of 18 U.S.C. 925(d) to ban importation of certain firearm parts under *Chevron* "step one"); *Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29, 35–36 (D.D.C. 1998) ("since the ATF's classification of [a firearm as not antique] 'amounts to or involves its interpretation' of the GCA, a statute administered by the ATF, we review that interpretation under the deferential standard announced in *Chevron*").

Second, the Department's construction of those terms is reasonable under *Chevron*. As explained in more detail in Part III, the Department is clarifying its regulatory definition of "automatically" to conform to how that word was understood and used when the NFA was enacted in 1934. *See Olofson*, 563 F.3d at 658. And the Department is reaffirming that a single pull of the trigger is a single function of the trigger, consistent with the NFA's legislative history, ATF's previous determinations, and judicial precedent. *See, e.g., Akins*, 312 F. App'x at 200. This rule is therefore lawful under the NFA and GCA even if the operative statutory terms are ambiguous.

g. Violation of the Americans With Disabilities Act

Comments Received

A few commenters indicated that bump-stock-type devices are assistive devices for people with nerve damage or a physical disability. A few commenters further stated that the regulation could be a violation of the Americans with Disabilities Act (ADA), 42 U.S.C. ch. 126. In particular, one commenter claimed that under the ADA, an individual can establish coverage under the law by "showing that he or she has been subjected to *an action* prohibited under the Act because of an actual or *perceived physical* [condition] that is not transitory and minor." The commenter asserted that this regulation constitutes such "an action" and would violate the civil rights of a diverse group of persons with disabilities, including homeowners, veterans, target shooters, and hunters.

Department Response

The Department disagrees with commenters that the final rule would violate the ADA. While the ADA applies to State and local governments, it does not apply to the Executive Branch of the Federal Government. *See* 42 U.S.C. 12131(1) (defining "public entity" as

AR005777

**66528** **Federal Register** / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

any State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government; and the National Railroad Passenger Corporation, and any commuter authority). Accordingly, because ATF is a Federal agency that is not subject to the ADA, the commenters' assertion that ATF's regulation would violate the ADA is incorrect.

While not mentioned by commenters, ATF is covered by section 504 of the Rehabilitation Act of 1973, which prohibits discrimination, solely by reason of disability, in Federally conducted programs and activities. 29 U.S.C. 794(a) (stating that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency"). As detailed above, the sole purpose of this rulemaking is to clarify that bump-stock-type devices satisfy the statutory definition of "machinegun," as defined by Congress in the NFA and GCA. While a few commenters made general assertions that bump-stock-type devices can be used as assistive devices for people with disabilities, none submitted any specific information to suggest that this rule would cause qualified individuals with disabilities, solely by reason of their disability, to be excluded from the participation in, subjected to discrimination under, or denied the benefits of any program or activity of ATF. Accordingly, there is nothing in the record to suggest that this rule would raise concerns under the Rehabilitation Act.

2. Politically Motivated and Emotional Response

Comments Received

At least 41,954 commenters opposed to the rule, including the 40,806 comments submitted through the NAGR petition, asserted that the proposed rule is a political or knee-jerk response to a tragic incident. Many commenters suggested that the proposed rule reflected political pressure and would be a hasty response that would not achieve real benefits and could lead to confiscating all guns. A handful of commenters even asserted they would support the elimination of ATF. Petitions submitted through NAGR portray the rule as a response to "the anti-gun left . . . so they can turn millions of commonly owned firearms into 'illegal guns' with the stroke of a pen." They cautioned that this rule

unfairly capitalizes on the misfortunes of others to push political agendas and that facts should not be thrown aside. Another commenter said that this rule will be tainted because from the beginning the President made clear he had no intention of instructing the Department to abide by the public comments, having declared that bump-stock-type devices "will soon be out" after the "mandated comment period" notwithstanding possible congressional action.

Department Response

While the Las Vegas tragedy brought attention to bump-stock-type devices and requests from Congress and nongovernmental organizations prompted ATF to review its classification of bump-stock-type devices, the Department disagrees that this rulemaking is an unreasoned reaction to recent events. As discussed in the NPRM, see *Part III* above, ATF recognized that its prior classifications determining only some bump-stock-type devices to be machineguns did not include extensive legal analysis of certain terms that are significant to defining "machinegun" under the NFA and were not always consistent. This final rule defines the terms "automatically" and "single function of the trigger" to clarify the meaning of machinegun and to make clear that bump-stock-type devices are machineguns under the meaning of the statute. The Department further notes that the President specifically directed it to clarify the legal status of bump-stock-type devices through the administrative "procedures the law prescribes," including notice and comment. 83 FR 7949 (Feb. 23, 2018).

3. Not Used in Criminal Activity

Comments Received

Numerous commenters expressed that besides the shooting in Las Vegas, there is no evidence that bump-stock-type devices have been used in the commission of crimes. Several commenters stated that, pursuant to a Freedom of Information Act request, they asked ATF and the Federal Bureau of Investigation (FBI) for any records on whether bump-stock-type devices have been used in crimes and that they received no confirmation affirming the existence of any such records. Moreover, some commenters stated that ATF provided no evidence or justification that bump-stock-type devices will be used more frequently in future crimes. They argued that if the agency cannot show what materials it relied on to regulate bump-stock-type

devices for purposes of public safety, then the rulemaking is arbitrary and capricious under the APA. Commenters cited judicial decisions such as *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 52 (1983), in which the Supreme Court held that when an agency rescinds or changes its stance on a regulation, it must explain the evidence underlying its decision and offer a rational connection between the facts found and the choice made.

Many commenters also noted that there is still no confirmation or documentation, despite requests, from Federal agencies confirming that bump-stock-type devices were actually used in the Las Vegas incident, and that ATF has not issued a "Report of Technical Examination" (ATF Form 3311.2) for any of the firearms used in the incident. With questions remaining about the Las Vegas criminal investigation and doubts as to whether bump-stock-type devices were actually used, commenters argued that ATF has no basis to promulgate a regulation that, as ATF declared in the NPRM, "would affect the criminal use of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident." 83 FR at 13454.

These arguments were frequently raised alongside concerns that the cost-benefit analysis did not address the fact that there would be few benefits to the rule given that bump-stock-type devices have supposedly been used in only one crime. These concerns are addressed in Part IV.I.5.

Department Response

The Department disagrees that ATF seeks to regulate bump-stock-type devices merely because they were, or have the potential to be, used in crime. The NPRM stated that the Las Vegas shooting made "individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious." 83 FR at 13447. But the NRPM also provided a detailed analysis explaining that bump-stock-type devices must be regulated because they satisfy the statutory definition of "machinegun" as it is defined in the NFA and GCA. *Id.* at 13447–48.

Commenters conflate the legal basis for ATF's regulation of bump-stock-type devices with the background information that was provided as context for the reason ATF revisited its previous classifications. In the NPRM, ATF explained that the tragedy in Las Vegas gave rise to requests from Congress and nongovernmental organizations that ATF examine its past

classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition. *Id.* at 13446. While part of the Department's mission is to enhance public safety, the impetus for the change in classification was not, as commenters argued, that the device may potentially pose a public safety threat but because, upon review, ATF believes that it satisfies the statutory definition of "machinegun." This rule reflects the public safety objectives of the NFA and GCA, but the materials and evidence of public safety implications that commenters seek have no bearing on whether these devices are appropriately considered machineguns based on the statutory definition.

In *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), the Supreme Court wrote that an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc.* v. *United States*, 371 U.S. 156, 168 (1962)). However, that case involved a Federal agency that rescinded a final rule—based on data and policy choices—shortly after publication, arguing that that rule was no longer necessary for a multitude of reasons, including that the costs outweighed the safety benefits. *See id.* at 38–39. The Supreme Court recognized that any change requires a reasoned basis, noting that "[i]f Congress established a presumption from which judicial review should start, that presumption—contrary to petitioners' views—is not *against* safety regulation, but *against* changes in current policy that are not justified by the rulemaking record." *Id.* at 42. However, the revocation in that case involved a discretionary policy decision, and did not depend solely upon statutory construction. The bump-stock-type device rule is not a discretionary policy decision based upon a myriad of factors that the agency must weigh, but is instead based only upon the functioning of the device and the application of the relevant statutory definition. Therefore, the Department does not believe that this rule conflicts with *State Farm.*

### 4. Will Not Enhance Public Safety

#### Comments Received

More than 1,100 commenters indicated that a regulation on bump-stock-type devices would have no measurable effect on the current rate of crime or enhance public safety. One

commenter argued that the use of bump-stock-type devices by mass shooters might actually save lives based on his experience that using the device can result in a rifle jamming, misfeeding, or misfiring, which would be the best time to disrupt a shooter. Other commenters noted that bump-stock-type devices actually impede a shooter's ability to fire accurately. Commenters stated that there is currently no empirical evidence that further firearms regulations would reduce crime or safeguard people more effectively. One commenter, for example, estimated that out of the tens of thousands of gun deaths per year, most of which he stated are suicides, the proposed rule would only impact a minute percentage, while another commenter opined that crime rate data from the FBI show that areas with more firearms restrictions have more crime. A handful of commenters pointed to Chicago as having some of the most stringent gun restrictions yet continuing to have high rates of homicide and gun-related deaths that "surpass[] war zones."

Many commenters opposed to the regulation maintained that neither this rule nor any new gun laws will prevent criminals or people with malicious intent from proceeding to commit crimes. Several voiced the opinion that people determined to kill many people will find other means, such as cars, knives, toxic substances, homemade explosives, or any other object. The problem, they argued, is not the object, but the person who controls it—and that criminals will do whatever they can to accomplish unlawful ends. One commenter, identifying as a law enforcement officer, wrote that he frequently encounters prohibited possessors who still somehow obtain a firearm and do not care about the consequences. Another commenter stated that the fact that the shooter in Las Vegas was well aware that murder is unlawful but chose to ignore the law only serves as proof that laws do not stop evildoers.

Additionally, several hundred commenters stated that ATF should focus its time and energy on enforcing existing gun laws and regulations rather than issuing a new one. One commenter, a former corrections officer from Baltimore, suggested that time would be better spent prosecuting criminals for crimes on the books. Similarly, another commenter noted that "[w]hen the courtrooms are revolving doors that push gang members right back out," the problem is not the lack of laws but rather a lack of tools and resources devoted to enforcing the existing laws. Some commenters

remarked that had there been better policing, certain mass shootings could have been avoided.

#### Department Response

The Department agrees with the commenters that the existing laws should be enforced, and the Department is committed to addressing significant violent crime problems facing our communities. No law or regulation entirely prevents particular crimes, but the Las Vegas shooting illustrated the particularly destructive capacity of bump-stock-type devices when used in mass shooting incidents. In any event, the impetus for this rule is the Department's belief, after a detailed review, that bump-stock-type devices satisfy the statutory definition of "machinegun." Through the NFA and GCA, Congress took steps to regulate machineguns because it determined that machineguns were a public safety threat. ATF must therefore classify devices that satisfy the statutory definition of "machinegun" as machineguns. The proposed rule is thus lawful and necessary to provide public guidance on the law.

### 5. Punishes Law-Abiding Citizens

#### Comments Received

At least 2,103 commenters opposed the rule on the ground that it would punish law-abiding citizens and would turn them instantly into potential felons. They asserted that hundreds of thousands of law-abiding citizens are being punished for the acts of one evil person and that the overwhelming majority use bump-stock-type devices lawfully and for fun. Many commenters, some of whom do not own a bump-stock-type device, objected that owners of these devices would become felons overnight just for owning a piece of plastic that is not needed to achieve bump firing. They further pointed out that because there is no grandfathering provision, law-abiding gun owners would have to surrender any bump-stock-type devices after having spent money to buy them. Many raised these objections in connection with concerns that the rule is unconstitutional under the Ex Post Facto Clause and the Takings Clause of the Constitution, as already discussed in this preamble. Moreover, some commenters, concerned that the rule's proposed language could later apply to other trigger assemblies, stated that thousands of law-abiding citizens may eventually become criminals overnight for simply owning a non-factory trigger.

AR005779

### Department Response

The Department disagrees that law-abiding citizens would instantly become felons under this rule. This final rule provides specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o). Current possessors of bump-stock-type devices who properly destroy or abandon their devices will avoid criminal liability. As described in Part IV.D.1.b, this is not a compensable "taking" of property under the Constitution.

### 6. Other Priorities and Efficiencies

#### Comments Received

Hundreds of commenters who oppose the rule suggested that the focus should not be on any new gun regulation but rather on an array of other issues, including addressing mental health, drug addiction, education, civility, and the decline of parenting and morals. Many argued that more resources should be devoted to treating the mentally ill or to the opioid epidemic, including ensuring that law enforcement and mental health agencies have the power to incarcerate and institutionalize people who are a danger to themselves or others. Several others suggested that resources should be devoted to securing public spaces, observing that the U.S. Capitol and all Federal buildings have armed security but many schools and workplaces do not. Numerous commenters noted that other improvements are needed before any new gun restriction is pursued, such as improving records in the National Instant Criminal Background Check System (NICS), properly charging persons with crimes that would bar them from owning firearms, or addressing bullying and teaching morals and the Bible in schools. One commenter suggested the Government investigate the social changes that are turning men into killers, while another said that to make a difference, one needs to go after the videogame industry and Hollywood movies that glorify carnage, body counts, murder, and violence. Commenters argued that only once these issues are tackled can discussion of new gun regulations begin.

#### Department Response

The Department acknowledges comments regarding treatment of mental health and drug addiction, securing schools and workplaces, improving records in the NICS system, and various social issues. The Department agrees that these are important issues, but they are outside the scope of this rulemaking.

Several of these matters were raised as alternatives for the Department to consider. See Part IV.F for further discussion of alternatives.

### 7. Enforcement and Compliance

#### Comments Received

Some commenters questioned how ATF will enforce this regulation, and a few stated that they or people they know of will not comply with this rule should it go into effect. Several questioned whether the agency would send armed agents to visit homes and confiscate bump-stock-type devices, while others pointed out that because bump-stock-type devices have not been tracked in any way, confiscation will depend on volunteers. Commenters highlighted the lack of success that certain States, such as Massachusetts, have had in collecting bump-stock-type devices after passing laws restricting their possession. Many commenters suggested it would be a waste of ATF employees' time and public funds for ATF to implement the rule. Several others remarked that confiscation or enforcement would be easily circumvented because new technology like 3D printing and CNC (Computer Numeric Control) equipment (computerized milling machines), or even traditional manufacturing methods, will facilitate a black market in homemade bump-stock-type devices. One commenter submitted to ATF "a fully functional" bump-stock equivalent that was created "using super glue, 2-part epoxy, an AR–15 A2 pistol grip, threaded steel rods, and small ABS plastic bricks [*i.e.*, Legos]."

#### Department Response

The Department acknowledges comments on enforcement of and compliance with the rule. As stated in the NPRM, current possessors of bump-stock-type devices will be obligated to dispose of these devices. Acceptable methods of destruction include completely melting, shredding, or crushing the device. If the device is made of metal, an alternative acceptable method of destruction is using an oxy/acetylene torch to make three angled cuts that completely severs design features critical to the functionality of the bump-stock-type device. Each cut should remove at least ¼ inch of metal per cut. Any method of destruction must render the device so that it is not readily restorable to a firing condition or is otherwise reduced to scrap. However, as the majority of bump-stock-type devices are made of plastic material, individuals may use a hammer to break them apart so that the device is not

readily restorable to a firing condition or is otherwise reduced to scrap, and throw the pieces away.

Current possessors are encouraged to undertake destruction of the devices. However, current possessors also have the option to abandon bump-stock-type devices at the nearest ATF office.

Current possessors of bump-stock-type devices will have until the effective date of the rule (90 days from the date of publication in the **Federal Register**) to comply. Additional information on the destruction of bump-stock-type devices will be available at *www.atf.gov*.

### 8. Lack of Consistency

#### Comments Received

Hundreds of commenters indicated that ATF's reversal of position from its earlier determinations and insistence that a bump-stock-type device now qualifies as a machinegun under the NFA "hurts [the agency's] credibility." As one commenter remarked, the perpetual state of inconsistencies, whereby products are approved and then later ruled to be illegal by ATF, "creates an air of fear and distrust in the gunowning public," and moreover, "calls into question the validity and competence of the very agency charged with making these determinations." Several commenters argued that ATF's lack of consistency only serves to increase distrust of the agency, the Government, and the legal process.

#### Department Response

The Department acknowledges comments regarding the inconsistency in ATF's previous classifications of some bump-stock-type devices as machineguns and others as non-machineguns. As described in Part III, upon review, ATF recognized that the decisions issued between 2008 and 2017 did not provide consistent or extensive legal analysis regarding the term "automatically" as that term applies to bump-stock-type devices. Consistent with its authority to reconsider and rectify its past classifications, the Department accordingly clarifies that the definition of "machinegun" in the NFA and GCA includes bump-stock-type devices because they convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. The Supreme Court has made clear that this sort of regulatory correction is permissible. An agency

AR005780

may change its course as long as it "suppl[ies] a reasoned analysis for the change," which the Department has done at length in the NPRM and this final rule. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). And the agency bears no heightened burden in prescribing regulations that displace inconsistent previous regulatory actions. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).

### 9. Earlier Determinations Correct

#### Comments Received

Over 1,500 commenters opposed to the rule maintained that ATF's earlier classifications determining certain bump-stock-type devices not to be subject to the NFA or GCA were correct and should not be reversed. These commenters stated that reversing this position is unnecessary and unlawful. To make the point that ATF is bound by its prior determinations, many commenters submitted ATF's own classification letters and highlighted the Department's arguments made in litigation as evidence that the rule on bump-stock-type devices is an arbitrary decision. In particular, commenters cited the Department's arguments made in litigation with Freedom Ordnance Manufacturing, Inc. ("Freedom Ordnance"), No. 3:16–cv–243 (S.D. Ind. filed Dec. 13, 2016). There, the Department defended its decision to classify Freedom Ordnance's Electronic Reset Assistant Device (ERAD) as a machinegun. In responding to Freedom Ordnance's argument that the ERAD was a bump-stock-type device and not subject to regulation, the Department stated such stocks were not machineguns because "[b]ump firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing." Brief for ATF in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 28, at 21 (July 27, 2017). These prior decisions and admissions, commenters argued, preclude the Department from suddenly reversing its decision.

#### Department Response

The Department acknowledges that ATF previously determined that certain bump-stock-type devices were not "machineguns" under the law. The Department notes, however, that a great deal of its analysis in the Freedom Ordnance litigation was fully consistent with its position in this rule. For example, the Department adhered to its view that a single pull is a "single

function" of the trigger, *see id.* at 13–14, and it argued that a device that relieves the shooter from having to "pull and release the trigger for *each individual, subsequent shot*" converts the firearm into a machinegun, *id.* at 22. While the Department accepted the previous classification of some bump-stock-type devices as non-machineguns, it relied on the mistaken premise that the need for "shooter input" (*i.e.*, maintenance of pressure) for firing with bump-stock-type devices means that such devices do not enable "automatic" firing, *see id.* at 21—even though Freedom Ordnance's ERAD also required maintenance of pressure by the shooter, *see id.* at 20.

In any event, as explained in the NPRM, the Department believes that ATF clearly has authority to "reconsider and rectify" its classification errors. *Akins*, 312 F. App'x at 200; *see also Fox*, 556 U.S. at 514–15; *Hollis v. Lynch*, 121 F. Supp. 3d 617, 642 (N.D. Tex. 2015) (no due process violation in ATF's revocation of mistaken approval to manufacture a machinegun). In the NPRM, the Department noted that "ATF has reviewed its original classification determinations for bump-stock-type devices from 2008 to 2017 in light of its interpretation of the relevant statutory language, namely the definition of 'machinegun.' " 83 FR at 13446. The NPRM explained that "ATF's classifications of bump-stock-type devices between 2008 and 2017 did not include extensive legal analysis of these terms in concluding that the bump-stock-type devices at issue were not 'machineguns.' " *Id.* Specifically, some of these rulings concluded that such devices were not machineguns because they did not "'initiate [ ] an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted,' " but did not provide a definition or explanation of the term "automatically." *Id.* at 13445. This is precisely the purpose of this rule. As explained in more detail in Part III, the Department has determined that bump-stock-type devices enable a shooter to initiate an automatic firing sequence with a single pull of the trigger, making the devices machineguns under the NFA and GCA. Consistent with the APA, this rule is the appropriate means for ATF to set forth its analysis for its changed assessment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983).

### 10. Bump Firing and Bump-Stock-Type Device Operation

#### a. Bump-Stock-Type Device Operation

#### Comments Received

More than 17,000 commenters argued that ATF cannot proceed because its description of how bump-stock-type devices operate is inaccurate and that the proposed rule is based on a false premise. Commenters emphatically argued that bump-stock-type devices do not make a semiautomatic firearm shoot automatically by a single function of the trigger. They stated: (1) No part of the bump-stock-type device touches the trigger itself, but rather touches only the shooter's trigger finger, and (2) if bump-stock-type devices made semiautomatic rifles fully automatic, then holding the gun with only the trigger finger hand while depressing the trigger should cause the gun to repeatedly fire, which does not happen when a rifle is affixed with a bump-stock-type device. One commenter said that should ATF be asked to demonstrate the firing of a rifle equipped with a bump-stock-type device with the shooter only using his trigger hand, and no coordinated input from the other hand, it could not be done, as it requires two hands, skill, and coordination. Similarly, another commenter asserted that while various manual bump-firing techniques "vary in difficulty and are arguably more difficult to master than the use of a bump-stock-type device, the fact is that they use exactly the same principle as a bump-stock-type device *without* the use of such a device, and thus the device itself cannot be the 'primary impetus for a firing sequence' as described."

Several commenters raised specific objections to ATF's description in the NPRM that a bump-stock-type device "harnesses the recoil energy [of a firearm] to slide the firearm back and forth so that the trigger automatically re-engages by 'bumping' the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter" and that the device is "a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed)." 83 FR at 13443. These commenters disputed these descriptions, stating that a bump-stock-type device does not harness any recoil energy and there is nothing that makes it an energy sink (such as a spring) that stores recoil

AR005781

energy to move the firearm forward. Further, they argued that further physical manipulation is required to operate a firearm equipped with a bump-stock-type device—specifically, the shooter must physically manipulate the trigger after every shot fired by pushing the firearm forward to re-engage the trigger.

The bump-stock firing sequence is not automatic, commenters argued, because trigger reset is not caused by a mechanical device, part, or combination of parts associated with pulling the trigger. Reset occurs, they said, only if continuous forward motion and pressure is applied by the non-trigger hand or arm of the shooter, not the device. As described by some commenters, "[t]he trigger of a semiautomatic firearm in a bump-stock type device is being repeatedly actuated, functioned, pulled (take your pick) by the non trigger hand of the shooter pushing the firearm forward. That actuation, function, [or] pull can and often does occur entirely independent of recoil. Recoil is incidental to the firing sequence of a bump-stock type device equipped semiautomatic firearm, not intrinsic." In challenging ATF's proposed rule and description of how these devices operate, one commenter asked ATF to provide the history of the machinegun and semiautomatic firearms, along with a discussion of the differences between the mechanical and legal definitions.

In sum, commenters argued that because ATF's premise of how bump-stock-type devices operate is inaccurate, there is no basis for ATF to regulate them as machineguns.

Department Response

The Department disagrees that ATF's description of how bump-stock-type devices operate is inaccurate. ATF explained that bump-stock-type devices "are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure." 83 FR at 13443. The Department believes that this accurately describes the operation of these devices. Further, ATF explained that bump-stock-type devices "are designed to allow the shooter to maintain a continuous firing cycle after a single pull of the trigger by directing the recoil energy of the discharged rounds into the space created by the sliding stock

(approximately 1.5 inches) in constrained linear rearward and forward paths." *Id.* This is a distinctive feature of bump-stock-type devices and enables the unique functioning and operation of these devices. The bump-stock-type device captures and harnesses the firearm's recoil to maintain a continuous firing sequence, and thus is properly described as "a self-acting or self-regulating mechanism." The very purpose of a bump-stock-type device is to eliminate the need for the shooter to manually capture, harness, or otherwise utilize this energy to fire additional rounds, as one would have to do to "bump fire" without a bump-stock-type device. Further, this mechanism "allows the firing of multiple rounds through a single function of the trigger" because, as explained in the NPRM, ATF's interpretation that the phrase "single function of the trigger" includes a "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins* v. *United States,* 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam).

The Department agrees with the commenters that "[n]o part of the bump stock touches the trigger, only the shooter[']s trigger finger." However, this is neither legally nor technically determinative. The fact that a bump-stock-type device does not touch the trigger does not mean that the device has not acted automatically (by directing and utilizing recoil energy) or that anything other than a single pull of the trigger occurred. That is, the bump-stock-type device remains "a self-acting or self-regulating mechanism" for the reasons described in this section. The fact that bump-stock-type devices do not touch the trigger does not mean that they do not qualify as machineguns within the meaning of the NFA and GCA. ATF has provided a thorough explanation of their functioning, showing that a semiautomatic firearm utilizing a bump-stock-type device "shoots automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b).

Additionally, the Department disagrees that to be classified as a "machinegun" under the NFA, a firearm must fire "repeatedly" when a shooter holds and fires the gun with only the trigger-finger hand. Any such argument misconstrues the meaning of "automatically." As explained above, bump-stock-type devices operate automatically because their design eliminates the requirement that a shooter manually capture and direct recoil energy to fire additional rounds. In this way, semiautomatic firearms

shoot "automatically" when equipped with bump-stock-type devices in that their recoil energy is channeled through these "self-acting or self-regulating mechanisms." The commenters' positions reflect previous analysis that ATF is now correcting. ATF explained above that "[p]rior ATF rulings concerning bump-stock-type devices have not provided substantial legal analysis regarding the meaning of the terms 'automatically' as it is used in the GCA and NFA." 83 FR at 13445.

The Department disagrees that a shooter repeatedly actuates, functions, or pulls the trigger of a semiautomatic firearm using a bump-stock-type device with the non-trigger hand by "pushing the firearm forward." In fact, the shooter "pulls" the trigger once and allows the firearm and attached bump-stock-type device to operate until the shooter releases the trigger finger or the constant forward pressure with the non-trigger hand. The non-trigger hand never comes in contact with the trigger and does not actuate, function, or pull it. By maintaining constant forward pressure, a shooter relies on the device to capture and direct recoil energy for each subsequent round and requires no further manipulation of the trigger itself.

In this way, the Department also disagrees that "[r]ecoil is incidental to the firing sequence of a bump-stock type device equipped semiautomatic firearm, not intrinsic." Without recoil and the capture and directing of that recoil energy, a bump-stock-type device would be no different from a traditional shoulder stock. As numerous commenters acknowledged, bump-stock-type devices allow shooters to fire semiautomatic firearms at a faster rate and in a different manner than they could with traditional shoulder stocks. Bump-stock-type devices do this by capturing and directing recoil mechanically, enabling continuous fire without repeated manual manipulation of the trigger by a shooter.

b. Bump-Stock-Type Device Firing Technique

Comments Received

Thousands of commenters objected to the proposed rule on grounds that bump-stock-type devices are novelty items that assist with bump firing, which is a technique that any shooter can perform with training or with everyday items such as a rubber band or belt loop. Many commenters stated that all semiautomatic firearms can be bump fired by a shooter simply holding the trigger finger stationary and pushing the weapon forward until the trigger is depressed against it to the point of

firing, and that use of bump-stock-type devices makes using the bump-fire shooting technique safer for the shooter and those around the device. Some commenters also gave examples of extremely skilled and fast shooters who do not need any assistive device or item to fire a semiautomatic firearm at a rapid rate. Commenters therefore argued that if the Department proceeds to prohibit possession of bump-stock-type devices they must also ban rubber bands, belt loops, string, or even people's fingers.

### Department Response

The Department disagrees with commenters' assessments and believes that bump-stock-type devices are objectively different from items such as belt loops that are designed for a different primary purpose but can serve an incidental function of assisting with bump firing. To bump fire a firearm using a belt loop or a similar method without a bump-stock-type device, a shooter must put his thumb against the trigger and loop that thumb through a belt loop. With the non-trigger hand, the shooter then pushes the firearm forward until the thumb engages the trigger and the firearm fires. The recoil pushes the firearm backwards as the shooter controls the distance of the recoil, and the trigger resets. The constant forward pressure with the non-trigger hand pushes the firearm forward, again pulling the firearm forward, engaging the trigger, and firing a second round.

This rule defines the term "automatically" to mean "functioning as the result of a self-acting or self-regulating mechanism." Bump-stock-type devices enable semiautomatic firearms to operate "automatically" because they serve as a self-acting or self-regulating mechanism. An item like a belt loop is not a "self-acting or self-regulating mechanism." When such items are used for bump firing, no device is present to capture and direct the recoil energy; rather, the shooter must do so. Conversely, bump-stock-type devices are specifically designed to capture the recoil energy, a force that initiates a firing sequence that ultimately produces more than one shot. That firing sequence is "automatic" because the device harnesses the firearm's recoil energy as part of a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger.

Bump firing utilizing a belt loop or similar method of maintaining tension on the firearm is thus more difficult than using a bump-stock-type device. In fact, the belt-loop method provides a stabilizing point for the trigger finger

but relies on the shooter—not a device—to harness the recoil energy so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger. Unlike a bump-stock-type device, the belt loop or a similar manual method requires the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils.

ATF's previous bump-stock-type device classifications determined that these devices enable continuous firing by a single function of the trigger. Other firing techniques may do the same because they rely on a single "pull." However, as ATF has made clear, a determining factor is whether the device operates or functions automatically. The proposed and final rules make clear that if a device incorporates a self-acting or self-regulating component for the firing cycle, the firearm equipped with the device operates automatically. Again, this differs from traditional semiautomatic firearms because the trigger must be repeatedly manipulated by the shooter to fire additional rounds, whereas a bump-stock-type device allows for a single pull, and the self-acting or self-regulating device automatically re-engages the trigger finger.

Further, while skilled shooters may be able to fire more rapidly than a shooter employing a bump-stock-type device on a semiautomatic firearm, they do so by pulling and releasing the trigger for each shot. This is a fundamental distinction between skilled shooters and those employing bump-stock-type devices. Bump-stock-type devices require that a shooter pull the trigger to fire the first round and merely maintain the requisite pressure to fire subsequent rounds. This is the purpose of a bump-stock-type device—to make rapid firing easier without the need to pull and release the trigger repeatedly. This shows that skilled shooters would be unaffected by the proposed rule and counters commenters' arguments that the rule is "arbitrary and capricious" on these grounds.

### 11. Proposed Definitions

#### a. Vagueness—Rate of Fire

##### Comments Received

Many commenters focused on the increased rate of fire associated with bump-stock-type devices and objected to the proposed regulation being "based, at least in part, on the idea that bump stocks are machineguns because they 'allow[ ] "rapid fire" of the semiautomatic firearm,' 'increase the rate of fire of semiautomatic firearms,' and 'mimic automatic fire' " (quoting 83

FR at 13443–44). Commenters objected to classifying bump-stock-type devices as machineguns because "a high rate of fire alone does not transform a semi-automatic weapon into an automatic weapon under the NFA."

Additionally, other commenters objected to classifying other "rate-increasing devices" as machineguns because doing so would require a standard rate of fire to be defined, which some said is impossible, or would capture certain semiautomatic firearms and firearms accessories. A few commenters pointed out that "[t]rue machine guns do not require freedom to oscillate fore and aft to increase their rate of fire. The rate of fire of a machine gun is intrinsic to the weapon and completely independent of the shooter's manual dexterity, the firing position, the number of hands holding the firearm, and any degree of freedom of motion. . . . Bump stocks do not increase the rate of fire when the semiautomatic firearm is operated with only one hand—even when shouldered. The human element is indispensable to any firing rate increase achieved with a bump stock."

### Department Response

The Department has neither proposed the rate of fire as a factor in classifying machineguns, nor utilized this as the applicable standard in the proposed rule. The Department disagrees with any assertion that the rule is based upon the increased rate of fire. While bump-stock-type devices are intended to increase the rate at which a shooter may fire a semiautomatic firearm, this rule classifies these devices based upon the functioning of these devices under the statutory definition. The Department believes that bump-stock-type devices satisfy the statutory definition of "machinegun" because bump-stock-type devices utilize the recoil energy of the firearm to create an automatic firing sequence with a single pull of the trigger. The rate of fire is not relevant to this determination.

The Department also agrees with commenters that the standard rate of fire of a semiautomatic firearm or machinegun is a characteristic that is not dependent upon the individual shooter. Any reference to the "increased" rate of fire attributable to bump-stock-type devices refers only to the increased rate of fire that a particular shooter may achieve. Further, the Department agrees that there is no rate of fire that can identify or differentiate a machinegun from a semiautomatic firearm. This is because the statutory definition alone determines whether a firearm is a

AR005783

66534   Federal Register / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

machinegun. The Department believes that the final rule makes clear that a bump-stock-device will be classified as a machinegun based only upon whether the device satisfies the statutory definition.

b. Vagueness—Impact on Semiautomatic Firearms and Other Firearm Accessories

Comments Received

More than 56,000 commenters, including those submitting through the three main form letters opposing the rule and the NAGR submission, indicated that the proposed rule would set a dangerous precedent because a future "anti-gun Administration" will use it to confiscate millions of legally owned semiautomatic firearms as well as firearm components and accessories.

Commenters opposed to the rule broadly argued that by classifying bump-stock-type devices as machineguns, AR–15s and other semiautomatic firearms also may be classified as machineguns. In particular, commenters stated that under the GCA, rifles and shotguns are defined using a "single pull of the trigger" standard, in contrast to machineguns, which are defined by a "single function of the trigger" standard under the NFA. Commenters argued that by defining "single function of the trigger" to mean "single pull of the trigger," the rule will bring all semiautomatic rifles and shotguns currently regulated under the GCA under the purview of the NFA. Commenters also argued that the proposed regulatory text encompasses a number of commercially available items, such as Gatling guns, competition triggers, binary triggers, Hellfire trigger mechanisms, or even drop-in replacement triggers. One commenter pointed out that the language "firing without additional physical manipulation of the trigger by shooter" would apply, for instance, to Model 37 pump shotguns made by Ithaca.

Several commenters said that the proposed rule should be more narrowly tailored so that it applies to bump-stock-type devices only. For instance, one commenter proposed that the following be added to the definition of bump-stock-type device: "A single accessory capable of performing the roles of both a pistol grip and a shoulder stock." Another commenter suggested that, at most, one sentence could be added at the end of the definition of "machinegun":

For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means a device that—(1) attaches to a semiautomatic rifle (as defined in section 921(a)(28) of title 18, United States Code); (2) is designed and intended to repeatedly activate the trigger without the deliberate and volitional act of the user pulling the trigger each time the firearm is fired; and (3) functions by continuous forward pressure applied to the rifle's fore end in conjunction with a linear forward and backward sliding motion of the mechanism utilizing the recoil energy when the rifle is discharged.

One commenter suggested that, instead of trying to define a bump-stock-type device, it would be better to issue a rule stating that one cannot modify or replace the current style of stock with one that contains other features, with exceptions for adjusting the length of the stock or having a cheek rest.

Department Response

The Department disagrees that other firearms or devices, such as rifles, shotguns, and binary triggers, will be reclassified as machineguns under this rule. Although rifles and shotguns are defined using the term "single pull of the trigger," 18 U.S.C. 921(a)(5), (7), the statutory definition of "machinegun" also requires that the firearm "shoots automatically more than one shot, without manual reloading," by a single function of the trigger, 26 U.S.C. 5845(b). While semiautomatic firearms may shoot one round when the trigger is pulled, the shooter must release the trigger before another round is fired. Even if this release results in a second shot being fired, it is as the result of a separate function of the trigger. This is also the reason that binary triggers cannot be classified as "machineguns" under the rule—one function of the trigger results in the firing of only one round. By contrast, a bump-stock-type device utilizes the recoil energy of the firearm itself to create an automatic firing sequence with a single pull of the trigger. The Department notes that ATF has already described a "single pull of the trigger" as a "single function of the trigger." See ATF Ruling 2006–2.

Further, while the phrase "firing without additional physical manipulation of the trigger by the shooter" would apply to firearms like the Model 37 pump shotguns made by Ithaca, that firearm could not be classified as a machinegun under the rule. The Model 37 permits a shooter to pull the trigger, hold it back, and pump the fore-end. The pump-action ejects the spent shell and loads a new shell that fires as soon as it is loaded. While this operates by a single function of the trigger, it does not shoot "automatically," and certainly does not shoot "without manual reloading." 26 U.S.C. 5845(b). In fact, the pump-action

design requires that the shooter take action to manually load the firearm for each shot fired.

The Department disagrees that "automatically" should be defined using the more extensive definition quoted above. Whereas analysis as to what constitutes a "single function of the trigger" is separate from whether a firearm shoots automatically, the commenter's proposed definition merges the two issues. The Department believes that this may lead to confusion, further complicate the issue, and result in further questions that require clarification.

c. Concerns Raised by Equating "Function" and "Pull"

Comments Received

One commenter said drafters of the NFA chose the term "function" intentionally and that by proposing to equate "function" with "pull," a whole new fully automatic non-machinegun market will be opened because "fire initiated by voice command, electronic switch, swipe on a touchscreen or pad, or any conceivable number of interfaces [does] not requir[e] a pull." The commenter suggested that "single function of a trigger" be defined to include but not be limited to a pull, as that would include bump-stock-type devices without opening a "can of worms."

Department Response

The proposed addition to the regulatory definition of machinegun includes this statement: "For purposes of this definition, the term 'single function of the trigger' means a 'single pull of the trigger.'" The Department believes that the commenter is correct— this proposed definition may lead to confusion. The proposed definition suggests that *only* a single *pull* of the trigger will qualify as a single function. However, it is clear that a push or other method of initiating the firing cycle must also be considered a "single function of the trigger." Machineguns such as the M134 Minigun utilize a button or an electric switch as the trigger. See 83 FR at 13447 n.8 (explaining that other methods of trigger activation are analogous to pulling a trigger).

Therefore, the Department concurs with the commenters and has modified the proposed definition so that in this final rule the regulatory text will state that "single function of the trigger" means a "single pull of the trigger" and analogous motions rather than a "single pull of the trigger." Although the case law establishes that a "single pull" is a

"single function," those cases were addressing devices that relied on a single pull of the trigger, as opposed to some other single motion to activate the trigger. The term "single function" is reasonably interpreted to also include other analogous methods of trigger activation.

### E. ATF Suggested Alternatives

#### 1. General Adequacy of ATF Alternatives

#### Comments Received

One commenter opposed to the rule suggested that the alternatives discussed in the NPRM were not in compliance with Office of Management and Budget (OMB) Circular A–4 guidance, and that ATF failed to consider available alternatives and the impact on innovation. In addition, the commenter stated that ATF failed to show a need for the rule and argued that ATF did not make a good-faith attempt to meet its statutory mandate to identify, analyze, and rule out feasible alternatives. One commenter suggested that the analysis of alternatives should include alternatives provided under OMB Circular A–4, which include tort liability, criminal statutes, and punishments for violating statutes.

#### Department Response

OMB Circular A–4 requires the consideration of "possible alternatives" to regulation.[8] ATF considered possible alternatives that it could legally employ under the NFA, as many of the suggested alternatives from commenters—e.g., grandfathering and reimbursement policies—are not possible given the legal constraints of existing ATF authority. OMB Circular A–4 stipulates, "The number and choice of alternatives selected for detailed analysis is a matter of judgment. There must be some balance between thoroughness and the practical limits on [the agency's] analytical capacity." [9] Circular A–4 adds that "analyzing all possible combinations is not practical when there are many options (including possible interaction effects)." [10] In these cases, the agency is to use its judgment to choose reasonable alternatives for careful consideration. During formulation of the NPRM, ATF considered various alternatives, including examples provided under OMB Circular A–4, and deemed them inappropriate. ATF believes that bump-stock-type devices satisfy the definition

of "machinegun" under the NFA, so regulatory action is necessary to implement the NFA and GCA.

#### 2. First ATF Alternative—No Regulatory Action

#### Comments Received

Commenters opposed to the regulation implicitly agreed with the first alternative listed by ATF, which is for the Department not to take any action. They argued that attention should be devoted to improving the background check system, that ATF should concentrate on enforcing the existing gun laws, or that if there is to be change, that change should be made by Congress or the States. One commenter argued ATF failed to properly analyze this alternative.

#### Department Response

As explained above, Part IV.D.4, the Department has concluded that the NFA and GCA require regulation of bump-stock-type devices as machineguns, and that taking no regulatory action is therefore not a viable alternative to this rule.

#### 3. Second ATF Alternative—Shooting Ranges

#### Comments Received

Commenters who suggested that bump-stock-type devices be used in a controlled setting, or be available only at shooting ranges, were largely in support of the rule rather than viewing it as a complete alternative to taking no regulatory action.

#### Department Response

The Department acknowledges comments on the potential use of bump-stock-type devices in a controlled setting, such as a shooting range. As stated above, the Department believes that such items satisfy the statutory definition of "machinegun," and therefore it is promulgating this rule to clarify the definition. ATF has previously held that the on-premises rental of NFA firearms is permitted. However, whereas machineguns that are currently available for rental at shooting ranges are lawfully registered in the NFRTR if they may be lawfully possessed under 18 U.S.C. 922(o)(2)(B), bump-stock-type devices cannot be registered because none were in existence when section 922(o) was enacted in 1986.

#### 4. Third ATF Alternative—Use Other Means

#### Comments Received

Many commenters opposed to the rulemaking pointed out that bump firing

can be accomplished by using other everyday items such as belt loops or rubber bands. See Part IV.10.b. No commenter said that solely using rubber bands or other items would be a satisfactory alternative if the proposed rule went into effect. Rather, these commenters made the point that if bump firing is possible with or without bump-stock-type devices, then the Department would be obliged to also prohibit possession of rubber bands and belt loops under the NFA.

#### Department Response

The Department has detailed in the NPRM and this rule the distinction between bump firing with a bump-stock-type device and using belt loops or rubber bands. See Part IV.10.b. Although a shooter using a belt loop, string, or other manual method utilizes recoil energy to bump fire, the shooter is responsible for constraining the firearm, maintaining the correct finger pressure, and regulating the force necessary to fire continuously. This is clearly distinguishable from a bump-stock-type device, as ATF has explained that such a device functions "as a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge." 83 FR at 13443. Based on the clear differences between bump-stock-type devices and manual means of bump firing, the Department disagrees with the commenters that manual means of bump firing are factually or technically equivalent to bump-stock-type devices.

### F. Other Alternatives

#### 1. Allow Registration or Grandfathering of Bump-Stock-Type Devices Under NFA

#### Comments Received

Several hundred commenters argued that ATF should announce an amnesty period, allowing time for current owners of bump-stock-type devices to register them as NFA firearms in the NFRTR. These commenters argued that pursuant to section 207(d) of the GCA, the Attorney General has power to establish amnesty periods for up to 90 days. Further, they argued there is precedent for an amnesty period, pointing to the seven-year amnesty/registration period that was allowed for the Striker-12/Streetsweeper and USAS–12 shotguns. See ATF Rulings 94–1, 94–2. Doing so, they argued, would save the Government from having to compensate

---

[8] OMB Circular A–4, Regulatory Analysis, at 2 (Sept. 17, 2003), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf

[9] Id. at 7.

[10] Id. at 11.

current owners of bump-stock-type devices and also even generate money for the Government, as individuals would be required to pay a $200 tax on the devices. *See* 26 U.S.C. 5821.

### Department Response

The Department disagrees that an amnesty period is possible in this scenario. While in 1968 Congress left open the possibility of future amnesty registration of firearms subject to the NFA, ATF has long held that it eliminated any possible amnesty for machineguns in 1986. Following passage of 18 U.S.C. 922(o), ATF advised the industry and the public that amnesty registration of machineguns was not legally permissible. For example, in 1996 and 1997, ATF advised an industry member that

18 U.S.C. 922(o) would preclude the registration of machineguns during an amnesty period. Section 922(o) prohibits possession of machineguns which were not lawfully possessed prior to its effective date of May 19, 1986 . . . . Since 922(o) [was enacted after the amnesty provision of the NFA], its provisions would prevail over any earlier enactment in conflict. This means that any future amnesty period could not permit the lawful possession and registration of machineguns prohibited by section 922(o).

Letter for C. Michael Shyne from ATF's National Firearms Act Branch Chief (March 10, 1997). Section 922(o) does not ban the private possession and transfer of all machineguns because it specifically excludes "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date [section 922(o)] takes effect." 18 U.S.C. 922(o)(2)(B). The intent of the statute was to limit transactions in post-1986 machineguns. *See United States v. Ferguson,* 788 F. Supp. 580, 581 (D.D.C. 1992) ("Under section 922(o)(2)(B), certain machineguns, namely, those that were lawfully possessed before enactment of the statute in 1986, may be legally possessed and transferred even today."); *see also United States v. O'Mara,* 827 F. Supp. 1468, 1470 n.4 (C.D. Cal. 1993) (citing *Ferguson*). Congress's goal was to ban the transfer and possession of such weapons outright. *United States v. Hunter,* 843 F. Supp. 235, 247–48 (E.D. Mich. 1994). The legislative history supports this proposition. When asked whether an amnesty period could "be administratively declared by the Secretary of the Treasury by the enactment of this bill," Senator Kennedy responded that "[t]here is nothing in the bill that gives such an authority, and there is clearly no valid law enforcement goal to be achieved by

such open-ended amnesty." *See id.* at 248.

Some commenters pointed to ATF Rulings 94–1 and 94–2 as precedent for an amnesty period; however, section 922(o) applies only to machineguns, and there was no similar restriction on the destructive devices at issue in ATF Rulings 94–1 and 94–2. Therefore, these rulings cannot serve as precedent in the present case.

### 2. Licensing and Background Checks

#### Comments Received

Numerous commenters suggested other methods for how bump-stock-type devices should be regulated, including methods involving background checks. Some commenters broadly suggested that these devices should be sold like firearms under the GCA, meaning that the purchaser would undergo a background check when acquiring one from a retailer. One commenter suggested a new "2.5 firearms class" that would cover "grey area" guns and accessories, like bump-stock-type devices. Possessors of items falling under the "2.5 firearms class" would undergo background checks and, as with State-issued concealed-carry permits, local law enforcement would be able to cancel privileges if necessary. Other commenters suggested that bump-stock-type devices should not be available to the public unless the possessor is licensed, passes a background check, or provides a valid reason for needing a bump-stock-type device. Another commenter suggested bump-stock-type devices should be regulated like "any other weapon" under the NFA, 26 U.S.C. 5845(e), so that current owners could register them by paying a $5 fee, allowing a waiting period to elapse, and establishing a paper trail of ownership.

#### Department Response

The Department acknowledges these suggested alternatives but does not have the authority to add a new class of firearms to the statutory scheme or impose licensing requirements to acquire a firearm. Such changes would require legislation. Further, the definition of "any other weapon" in the NFA does not apply to bump-stock-type devices. Because bump-stock-type devices are properly classified as "machineguns" under the NFA and GCA, the Department believes that ATF must regulate them as such, and that the recommended alternatives are not possible unless Congress amends the NFA and GCA.

### 3. Remuneration

#### Comments Received

Over 1,000 commenters opposed to the rule argued that compensation should be provided to owners of bump-stock-type devices. Several supporters of the rule also suggested there should be a buy-back program in order to reduce the number of bump-stock-type devices. One commenter more specifically stated that manufacturers or retailers should be required to buy back all such devices and make full refunds to all purchasers. Another supporter suggested a one-time tax credit to owners who surrender their bump-stock-type devices or provide proof of destruction.

#### Department Response

The Department acknowledges comments on compensation for current owners of bump-stock-type devices. While ATF has the authority to implement the NFA and GCA, the Department does not have the necessary Federal appropriations to implement a buy-back program or offer monetary compensation. To implement a buy-back program or provide a tax credit would require congressional action.

### 4. Medical Exemption

#### Comments Received

Some commenters suggested that Department amend the proposed rule so it would provide an exemption for "medical necessity," thereby allowing certain individuals, such as those with nerve damage or one functional arm, to possess bump-stock-type devices. Similarly, commenters suggested bump-stock-type devices should only be available for people who are physically unable to pull a trigger for hunting or target practice.

#### Department Response

The Department does not have authority to create a medical exemption for the possession of machineguns. Pursuant to the NFA and GCA, for private possession of machineguns to be lawful, they must have been lawfully possessed before the effective date of 18 U.S.C. 922(o).

### 5. Allow Removal of Trigger Ledge

#### Comments Received

One commenter suggested that "ATF could find that bump-stock-type devices with the ledge/rest removed are *not* affected by any additional regulation." The commenter argued that this would make the proposed rule "logically consistent with the notion that operators may 'bump fire' with or without a

Case 2:19-cv-00037-JNP   Document 59-44   Filed 11/30/22   PageID.6255   Page 24 of 41

bump-stock-type device, as long as they do not utilize a device allowing a fixed trigger finger."

Department Response

The Department does not believe that removing the trigger ledge is sufficient to affect a bump-stock-type device's classification as a machinegun. While the trigger ledge makes it easier to utilize the device, removing the ledge does nothing to prevent the directing of the "recoil energy of the discharged rounds into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." 83 FR at 13443. Therefore, even without the trigger ledge, the bump-stock-type device will operate as designed if the shooter simply holds his or her finger in place. As such the bump-stock-type device remains a "machinegun" under the NFA and GCA.

6. Miscellaneous Alternatives To Regulate Bump-Stock-Type Devices

Comments Received

Other miscellaneous comments included suggesting a ban only on future production and commercial sale of such items; enacting a quota on the number of devices that can be produced or possessed; enacting a Pigouvian tax, which is a tax imposed on a good that is calculated to reduce market quantity (and increase market price) in order to achieve the socially optimal level of the good; deferring action until Congress takes action; leaving the matter for State legislative action; improving security at mass-attended events; and improving law enforcement capabilities.

Department Response

The Department acknowledges comments on alternative suggestions for the regulation of bump-stock-type devices, but it does not have authority to implement many of the suggested alternatives. The Department does not have the authority to restrict only the future manufacture or sale of bump-stock-type devices, nor does it have the authority to remove the general prohibition on the transfer and possession of machineguns that were not lawfully possessed on the effective date of 18 U.S.C. 922(o). In addition, the Department lacks the authority to enact an excise tax on bump-stock-type devices.

As mentioned above, the Department does not agree with commenters that any change needs to be enacted by Congress or should be left to State legislatures. Congress passed both the NFA and GCA, delegating enforcement authority to the Attorney General.

Accordingly, the Attorney General has the authority to promulgate regulations necessary to enforce the provisions of the NFA and GCA, and the Department determined that notice-and-comment rulemaking was the appropriate avenue to clarify the definition of "machinegun." In the interest of public safety and in light of the statutory definition of "machinegun," the Department has determined that Federal regulation of bump-stock-type devices is necessary. However, this action does not prevent Congress from taking action on bump-stock-type devices in the future.

The Department acknowledges comments on improving security at mass-attended events and agrees that it is important to improve law enforcement capabilities. The Department actively works with State and local law enforcement agencies to provide security at mass-attended events, as well as training and equipment for their departments.

G. Proposed Rule's Statutory and Executive Order Review

Comments Received

A few commenters suggested that ATF failed to comply with Executive Orders 12866, 13563, and 13771, including failing to identify and repeal two regulations for every new regulation issued. Commenters argued that ATF did not quantify the benefits of the rule, and it did not explain why those benefits were unquantifiable as required by OMB Circular A–4. Commenters stated that ATF did not identify the need for the proposed rule, in that ATF cited no evidence to support that the Las Vegas shooter used a bump-stock-type device. One commenter asked that ATF demonstrate how the cost-benefit analysis shows that the proposed rule is in the interests of gun owners, business owners, and the Federal Government. The commenter further suggested that ATF did not provide any citations or peer-reviewed research as evidence of the need for Federal regulatory action. Lastly, some commenters questioned how ATF determined the negative externalities that were presented in the NPRM.

Department Response

Executive Order 12866 and OMB Circular A–4 acknowledge that regulatory agencies should comply with them wherever possible or feasible. The Department interprets and adheres to the existing Executive Orders and OMB Circular A–4 to the extent that it is possible, using the best available information, and to the extent quantified information was available.

Alternatively, wherever quantifiable means were not available, the Department considered qualitative costs, benefits, concerns, and justifications.

This rule is a significant regulatory action that clarifies the statutory definition of machinegun. By clarifying that bump-stock-type devices are machineguns subject to the restrictions of the NFA and GCA, the rule in effect removes those devices from the civilian marketplace. This final rule is an Executive Order 13771 regulatory action. See OMB, Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs" (Apr. 5, 2017).

As for the need for Federal regulation, agencies are allowed to consider public safety as a compelling need for a Federal rulemaking. Executive Order 12866 expressly recognizes as appropriate exercises of agency rulemaking authority that "are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American people." 58 FR 51735 (Oct. 4, 1993). As explained in the NPRM, the purpose of this rule is to amend ATF regulations to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA, with a desired outcome of increasing public safety. In accordance with OMB Circular A–4, the Department has provided information wherever possible regarding the costs, benefits, and justification of this rule.

As further requested by one commenter, this rule not only considers the implications of this rule on gun owners in the United States, business owners, and the Federal Government, but also considers the risk of criminal use of bump-stock-type devices and the general safety of the public to justify the issuance of this final rule.

H. Affected Population

Comments Received

There were a number of commenters who stated this rule will affect between 200,000 and 500,000 owners. Some commenters suggested that the estimated number of bump-stock-type devices should be higher, potentially over a million, than the estimated amount stated in the NPRM. Some commenters indicated that this would incorporate homemade devices, 3D-printed devices, or other devices made by personal means.

AR005787

## Department Response

In the NPRM, ATF did not estimate the number of owners. 83 FR at 13449. The 280,000–520,000 range in the Executive Order 12866 section of the NPRM is the estimated number of bump-stock-type devices in circulation, not the number of owners. While the Department does not know the total number of bump-stock-type devices currently extant, nor the number of owners, the Department's high estimate of 520,000 is still the primary estimate only for devices sold on the market. While it may be possible to make homemade devices, the Department cannot calculate the number of such devices or the likelihood of these devices circulating among the public. The Department is using the best available information, and there is no known information that would allow ATF to estimate such a number, much less achieve the level of accuracy that the public is requesting. Therefore, the estimates provided continue to be based upon the best available information.

### I. Costs and Benefits

#### 1. Costs to Purchasers

#### Comments Received

One commenter stated that some models of bump-stock-type devices never sold for less than $425 plus taxes. Another commenter stated that the Department's regulatory analysis did not account for the individual cost in purchasing bump-stock-type devices, only manufacturers' and retailers' expenses. Other commenters suggested that the analysis did not account for taxes. One commenter suggested that the costs should incorporate the cost of purchasing a pre-1986 machinegun. One commenter suggested that many owners have bump-stock-type devices as the only stocks that they own and that purchasing a standard stock will need to be incorporated into the analysis.

Some commenters stated that the cost analysis does not include compensation for bump-stock-type devices and that the cost could be more than $50 trillion. Other commenters indicated that the rule did not account for lost lives, treatment costs, decreased tourism, and costs of criminal investigations. Other commenters argued that ATF failed to consider other costs, such as loss of faith in ATF by the regulated industry and resentment for not being reimbursed for bump-stock-type devices.

#### Department Response

The Department concurs that certain models sold at the $425.95 rate (a rate also included in ATF's range of costs

published in the NPRM), representing the high end of the range of rates. 83 FR at 13451. However, bump-stock-type devices also sold for as low as $100. *Id.* In order to account for the full range of prices, the Department used the average of the full range of prices; therefore, the average price of $301 was used in the NPRM to account for the full range of market prices for these bump-stock-type devices. *Id.* As for the payment of taxes, the Department concurs that an unknown number of bump-stock-type devices were sold, and individuals paid local taxes on them at time of purchase. For the purposes of this final rule, the Department maintains the average price used in the NPRM but incorporates the average cost of combined State and local taxes. For the purposes of this final rule, the Department estimates that the national average of taxes is 6.47% and attributed this tax rate to the price of all bump-stock-type devices that were sold on the market.[11]

The Department disagrees that the regulatory analysis did not account for the individual cost in purchasing bump-stock-type devices. The market price of bump-stock-type devices sold to the public represents the public price of these devices, which also accounts for the manufacturer and retail prices and does not double-count costs. While it may be possible for the public to purchase a pre-1986 machinegun, these amounts are not used to purchase bump-stock-type devices, so the market prices for these pre-1986 machineguns are not considered for purposes of this rule.

The Department reached out to the commenter who discussed the population of gun owners who will need to replace their bump-stock-type devices with standard stocks. The commenter was unable to provide a source establishing the existence of such gun owners and only speculated that this was a possibility. Having determined that this was speculation, the Department declined to incorporate this information into the analysis.

The Department does not propose compensation for bump-stock-type devices, so these costs were not included in the rule. *See Part* IV.D.1.b for a discussion of the Fifth Amendment's Takings Clause. Further, costs associated with victims, criminal investigations, loss of tourism, loss of faith in ATF by the regulated industry, and resentment for not being reimbursed for bump-stock-type devices

---

[11] *See* Jared Walczak & Scott Drenkard, *State and Local Tax Rates in 2017*, Tax Found. (Jan. 31, 2017), https://taxfoundation.org/state-and-local-sales-tax-rates-in-2017/.

are all indirect or unquantifiable costs of the rule and are not considered in the cost-benefit analysis.

#### 2. Costs to Manufacturers, Employees, and Communities

#### Comments Received

Commenters suggested that this rule will cost manufacturers, employees, and families of manufacturers their livelihood. In particular, one commenter suggested that three additional manufacturers would have entered or re-entered the market after the lapse of the patent for the main manufacturer of bump-stock-type devices. Additionally, public comments suggested that the Department overlooked the capital expenses required to start a company.

#### Department Response

The Department has considered the effect that this rule will have on these manufacturers, employees, and families and acknowledges that they will no longer be able to manufacture bump-stock-type devices. The Department acknowledges that there will be a potential loss of wages from employees losing jobs from loss of manufacturing; however, the extent to which they are unable to find replacement jobs is speculative. The Department considered the capital expenses for manufacturers, including patents and equipment to start production. However, in light of the Las Vegas shooting and the estimated time it would have taken for the patents to expire, the Department has determined that there could be potential crowding of additional manufacturers and saturation of the market for bump-stock-type devices. Therefore, the viability of these businesses is speculative and the capital expenses that they incurred are a sunk cost for those who put in the expense. While the Department does not include capital expenses for manufacturing in the economic analysis, the Department had already considered the overall potential for return on investment for any manufacturers who would have remained in the market from the existing estimate of foregone production. Accounting for capital expenses would be double counting of expenditures. Therefore, the economic analysis for this portion remains the same.

#### 3. Costs of Litigation

#### Comments Received

Commenters suggested that the Department did not account for the cost of litigation regarding the rule.

AR005788

## Department Response

Litigation costs are not a direct cost of the rule because such costs do not result from compliance with the rule. Additionally, any estimate of litigation expenses would be highly speculative and would not inform the Department's decision regarding the implementation of this final rule. However, the Department acknowledges that to the extent parties choose to enter into litigation regarding this final rule, there are indirect costs associated with that litigation.

## 4. Government Costs

### Comments Received

Commenters suggested that this rule would cost the Government approximately $297 million, including the disposal cost of the bump-stock-type devices. Other commenters indicated that confiscation costs were not included in the cost of the rule. One commenter provided estimates on the cost to house bump-stock-type device owners in prison as felons, particularly if a large number of owners opt not to destroy such devices. Lastly, one commenter suggested that ATF consider foregone sales taxes associated with ammunition used to fire bump-stock-type devices.

### Department Response

In the NPRM, the Department estimated that the total cost of the rule for the general public (e.g., owners and manufacturers of bump-stock-type devices) would be about $326.2 million over a 10-year period, not that the rule would cost the Federal Government that amount. 83 FR at 13454. The Department's estimate that Government costs are de minimis still stands for this final rule because the costs identified by these commenters are not Government expenditures. Further, costs associated with administering the option of current possessors of bump-stock-type devices abandoning their devices at their local ATF offices will be de minimis. The Department also disagrees that this rule will turn owners of bump-stock-type devices into felons. This final rule provides an effective date that allows ample time for current owners to destroy or abandon such devices. To the extent that owners timely destroy or abandon these bump-stock-type devices, they will not be in violation of the law or incarcerated as a result. However, if prohibited bump-stock-type devices are possessed after the effective date of the final rule, the person in possession of the bump-stock-type device will be in violation of Federal law.

While the usage of bump-stock-type devices may boost ammunition sales, the Department did not consider the loss of tax revenue collected from additional ammunition sales because they are speculative and are not a direct cost of the rule. Additionally, any estimate of tax revenue generated would not inform the Department's decision regarding the implementation of this final rule.

## 5. Benefits

### Comments Received

Commenters stated that there are no quantifiable benefits to justify the costs of this rule, nor will it prevent criminal use of firearms. One commenter also stated that ATF did not explain why the benefits were unquantifiable as required by OMB Circular A–4. Some commenters suggested that ATF is required "by law" to quantify and monetize benefits. Commenters stated that the benefits do not outweigh the costs and ATF failed to conduct any analysis of the benefits of the rule and did not quantify the benefits. Further, commenters argued that ATF did not substantiate its assertion that bump-stock-type devices will be used more frequently in future crimes if this rule is not promulgated.

One commenter argued that the Department needed to separate the effects of using a bump-stock-type device from other factors that might have incremental effects on criminal activity, such as crowd density and angle of fire. The commenter stated that benefits must be reduced accordingly and must take into account a reduction in violence instead of elimination of the threat of violence from bump-stock-type devices. Many commenters argued that ATF cannot rely on the Las Vegas shooting as the measure of benefits for this rule.

Commenters discussed means of monetizing shooting incidents or comparing the death rates related to other items like motor vehicles, opiates, knives, and rocks. Other commenters in support of the rule suggested that ATF incorporate the financial and societal benefits of this rule.

### Department Response

The Department declines to quantify benefits because OMB Circular A–4 requires quantifying and monetizing benefits only "if possible." OMB Circular A–4 at 45. One commenter provided descriptions on how to determine quantitative benefits of this rule and specifics on using a break-even analysis; however, due to limitations on data, the Department has considered the qualitative benefits for this rulemaking.

The Department did not account for the cost of deaths and injuries unrelated to bump-stock-type devices, as these are unrelated to this rule. This rule does not prohibit the use of firearms that could be used in shootings, or other items or devices. Furthermore, it is unclear how risk associated with other devices such as motor vehicles should influence ATF's decision-making. ATF has provided a cost-benefit analysis in both the NPRM and this final rule that fulfills the requirements of Executive Order 12866, OMB Circular A–4, the Regulatory Flexibility Act (RFA), and the Unfunded Mandates Reform Act.

## J. Regulatory Flexibility Act

### Comments Received

Some commenters suggested that the RFA requires examination of the future impact of the rule on innovation and of making a lawful product into an unlawful one.

### Department Response

The Department disagrees that the RFA requires an examination of those specific factors. The RFA "requires agencies to consider the impact of their regulatory proposals on small entities, analyze effective alternatives that minimize small entity impacts, and make their analyses available for public comment." [12] The RFA "does not seek preferential treatment for small entities, nor does it require agencies to adopt regulations that impose the least burden on them, or mandate exemptions for them. Rather, it requires agencies to examine public policy issues using an analytical process that identifies barriers to small business competitiveness and seeks a level playing field for small entities, not an unfair advantage." [13]

The Department found that this rule significantly impacts small businesses related to bump-stock-type devices. The Department interprets the RFA to mean that small businesses should not be prevented from using innovations to compete with other businesses, and to account for small businesses when determining alternative approaches with respect to small businesses in the field. [14] At this time, there are only small businesses that manufacture bump-stock-type devices; therefore, no regulatory alternative was considered to

---

[12] U.S. Small Business Administration, Office of Advocacy, *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act*, at 1 (Aug. 2017), https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf.
[13] Id.
[14] Id.

AR005789

alleviate the regulatory burden on small businesses with respect to competition with businesses that are not small.

### K. Miscellaneous Comments

Commenters both in support of and in opposition to the proposed rule raised additional miscellaneous issues. These are discussed below.

### 1. Improve Background Checks

#### Comments Received

Separate from the suggested alternative, discussed above, that bump-stock-type devices be sold like firearms, many commenters voiced their general support for various enhancements to the existing Federal background check requirement. Commenters said the "gun show loophole" should be closed, and many called for universal background checks. At least one commenter suggested there should be psychiatric evaluations for firearms purchasers. Commenters making these points were largely supporters of the proposed rule, but at least a few commenters opposed to the rule also supported background checks. One opposed commenter said better communication between the relevant government agencies and tighter background checks were needed. A few opposed commenters suggested it would be more effective to have a more in-depth background check along with a minimum age of 21 or 25 and a five-day waiting period because they observed that young, alienated people have frequently been the perpetrators of mass shootings.

#### Department Response

The Department acknowledges comments on enhanced or expanded background checks, an increase in minimum age requirements, and waiting periods. The Department is aware of the importance of having accurate and complete information available to the NICS, which is managed by the FBI; further, the Department works with Federal and State agencies to ensure that necessary information is submitted to the system. The Department does not, however, have the authority to increase the minimum-age requirement or enact a mandatory waiting period to purchase a firearm.

### 2. Increase Criminal Penalties

#### Comments Received

Commenters on both sides of the issue suggested that there be more stringent criminal penalties for firearms offenses. Some commenters in support of the rule said there should be severe penalties for possessing a bump-stock-type device, or for manufacturing one through digital

printing, or simply for anyone who manufactures or distributes bump-stock-type devices. Another commenter supporting the rule said that bump-stock-type devices should be prohibited from all public spaces where there is the potential for mass murder, but did not object to persons who wanted to use bump-stock-type devices on their own property or on hunting or shooting grounds. Some commenters opined that generally there should be more severe penalties for anyone using guns illegally or irresponsibly. A few commenters opposed to the rule suggested that in lieu of a rule prohibiting possession, a more effective deterrent would be severe penalties for the manufacture and sale of bump-stock-type devices, and that there should instead be swift and severe punishment, such as the death penalty for persons who commit or attempt to commit a mass shooting, or, more generally, that the law should be written to include mandated, nondiscretionary sentences.

#### Department Response

The Department does not have the authority to increase criminal penalties. Only Congress can increase, amend, or add new criminal penalties for Federal crimes.

### 3. Repeal the NFA and Hughes Amendment, and Remove Silencers

#### Comments Received

Numerous commenters opposed to the regulation viewed the proposed rule as an infringement on their rights. As part of their opposition to the proposed rule, some commented that the NFA itself is inherently unconstitutional and declared that it should be repealed. Commenters similarly questioned the constitutionality of the Hughes Amendment (18 U.S.C. 922(o)), which was enacted as a part of the Firearms Owners' Protection Act in 1986 and prohibits possession by individuals of any post-1986 machinegun. These commenters declared it should be repealed. A majority of these commenters simply objected to any further firearms restrictions and insisted these laws be repealed in order to restore freedoms they believe to have been steadily eroded by the Government. Some commenters noted that bump-stock-type devices evolved as a workaround to the NFA and Hughes Amendment restrictions so that shooters could have an affordable alternative to shoot in a manner that is close to a machinegun. Some opined that that a rule prohibiting bump-stock-type devices would be acceptable so long as these other restrictions are lifted to give

individuals affordable access to machineguns. A few commenters also added that silencers should be removed from the NFA's coverage or be made available like any other firearm device, with at least one commenter stating that the Hearing Protection Act or Sportsmen's Heritage and Recreational Enhancement (SHARE) Act should be passed.

#### Department Response

The Department does not have the authority to repeal or amend provisions of the NFA, such as by removing silencers from the NFA. The NFA is a statute, which only Congress may repeal or alter. ATF does not have the authority to remove the general prohibition on the transfer and possession of machineguns that were not lawfully possessed before the date 18 U.S.C. 922(o) became effective, nor does it have the authority to permit nongovernmental entities to possess machineguns or other NFA firearms that are not lawfully registered in the NFRTR. Only Congress can alter these provisions. However, as stated, ATF does have the authority to implement the existing statute and has utilized the rulemaking process to do so.

### 4. Focus on Mental Health and Other Gun Control Measures

#### Comments Received

Supporters argued that in addition to finalizing the rule, more attention needs to be paid to improving mental health care. Generally, these commenters suggested there should be more spending on the mental health system so as to increase access.

Numerous commenters in support of the rule also listed several other proposals pertaining to gun safety or gun control measures that should be implemented. Almost 5,000 commenters expressed that "other conversion devices" along with bump-stock-type devices should be banned. And more than 1,500 commenters also called for a ban on "assault weapons" or firearms altogether, while several others specifically stated that there should be restrictions on high-capacity magazines. Some commenters provided many other suggestions, including a higher age limit to acquire a firearm, written tests for firearm access, mandatory gun safety classes, proper storage inspections, a nationwide gun registry, licensure and gun ownership insurance requirements, ammunition limits, and protocols for removing firearms from domestic abusers and the mentally ill through protective orders.

AR005790

Department Response

The Department acknowledges the importance of improving mental health care. However, mental health treatment does not fall under the Department's authority.

Although this rulemaking specifically addresses bump-stock-type devices, any item that meets the definition of a "machinegun" will be regulated as such and cannot be possessed unless legally registered. But only Congress can add additional requirements that must be met in order to purchase a firearm.

The Department does not have the authority to remove firearms from persons who are not prohibited from receiving or possessing them under Federal law. Only Congress can amend or add new categories of prohibited persons.

*L. Comments on the Rulemaking Process*

1. Availability of Supporting Documentation

Comments Received

A handful of commenters argued that the procedures of the APA were not properly followed, in part because ATF did not include any supporting documentation on how it formulated its decision to regulate bump-stock-type devices. In particular, commenters stated that although they submitted Freedom of Information Act requests, ATF did not make available its own prior letter determinations that classified various bump-stock-type devices as firearm parts not subject to the NFA or GCA, nor did ATF make available any evidence suggesting that there have been other instances of criminal use of a bump-stock-type device. This kind of documentation, they argued, would provide the basis upon which the agency justified its proposed rule and therefore should be made public in order to allow for meaningful comment under the APA.

Department Response

Contrary to the commenters' arguments, the Department believes that it provided all of the background information necessary to allow meaningful public participation. The APA, 5 U.S.C. 553(b), provides that "[g]eneral notice of proposed rule making shall be published in the **Federal Register**," and that this notice shall include, *inter alia*, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Federal courts have recognized that they must determine whether regulations are consistent with statutes, and "whether the process used in arriving at those regulations afforded

those affected . . . their procedural due. More specifically, in the informal rulemaking context . . . , this inquiry asks whether the agency gave 'interested persons an opportunity to participate in the rule making through submission of written (or other) data' and whether it 'incorporate(d) in the rule adopted a concise general statement of their basis and purpose.' " *Weyerhaeuser Co.* v. *Costle,* 590 F.2d 1011, 1024 (D.C. Cir. 1978) (quoting 5 U.S.C. 553). A "notice of proposed rulemaking must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Honeywell Int'l, Inc.* v. *EPA,* 372 F.3d 441, 445 (D.C. Cir. 2004) (internal quotation marks omitted).

The Department agrees with commenters that interested parties will not be able to make meaningful comments upon an agency's proposed regulation if the notice "fails to provide an accurate picture" of the agency's reasoning. *Conn. Light & Power Co.* v. *NRC,* 673 F.2d 525, 528 (D.C. Cir. 1982). Commenters fail, however, to recognize that the text of the NPRM set out the facts necessary to "provide an accurate picture" of the Department's reasoning. In the NPRM, the Department articulated the reasons for its proposed change in the classification of bump-stock-type devices, provided detailed descriptions and explanations of its prior classifications, and offered thorough explanations of its past and current analysis. Accordingly, the Department believes that it provided notice to the public, in sufficient factual detail, to permit interested parties to comment meaningfully on the proposed rule.

2. Previous "Lack of Candor"

Comments Received

One commenter also included an extensive description of ATF's "prior lack of candor," including instances where ATF purportedly (1) committed "institutional perjury" before the courts in the context of criminal prosecutions and supporting probable-cause showings for search warrants; (2) committed deception and delayed responding with respect to congressional inquiries regarding NFRTR inaccuracies as well the "Fast and Furious" investigation; and (3) misled the public about the accuracy of the NFRTR. According to the commenter, these episodes highlight a pattern of procedural irregularities that should draw further scrutiny of this rulemaking.

Department Response

These comments are beyond the scope of this rulemaking, but the Department notes that ATF has committed available resources to develop the NPRM and respond to comments as part of the rulemaking process. In developing this rulemaking and responding to comments, ATF has followed all established procedures and complied with all relevant policies and requirements.

3. 90-Day Public Comment Period

Comments Received

One commenter asserted that the agency failed to provide the statutorily mandated 90-day public comment period. The commenter relied on an online article that "detail[ed] the trials and tribulations of trying to find the appropriate docket," given that some commenters indicated that they encountered a "Comment Period Closed" notification on the *FederalRegister.gov* website when the NPRM was published on March 29, 2018. The author of the online article said that he submitted an inquiry to ATF asking why the comment period appeared closed when it should have been open through June 27, 2018, and why the website, at various times, depicted different numbers for the amount of comments ATF received. The author's description of events concluded by noting that he received a response from ATF with a specified weblink to *Regulations.gov* where he could submit a comment but that none of his comments submitted were visible on the website. Relying primarily on this online account, the commenter asserts that ATF did not disclose this weblink to the public and that numerous people believed that the comment period was closed from the very beginning of the comment period and were therefore precluded from submitting comments. The commenter therefore believes that the comment period should be extended because ATF did not permit the statutorily mandated 90-day comment period.

Department Response

The Department acknowledges that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal (*www.Regulations.gov*), which is managed and maintained by a third-party host. ATF was in touch with the managers of the Federal eRulemaking portal, and relayed an explanation of these technical issues to the author of

AR005791

the online article in two subsequent emails dated April 2 and April 3, 2018. However, there is no evidence that the proposed rule was not available for public comment for the 90-day comment period. On the contrary, ATF received numerous comments from the very beginning of the comment period.

ATF explained to the author of the article that on March 29, 2018, when the comment period opened for the NPRM, the link for submitting comments to the NPRM had been inadvertently connected to the *Regulations.gov* Docket ID number 2018–0001–0001, which had been used by the *Regulations.gov* website for the ANPRM comment period, December 26, 2017, through January 25, 2018. On March 29, 2018, the same day the proposed rule was published in the **Federal Register**, individuals were able to and did submit comments for the NPRM even though it was linked to the Docket ID used for the ANPRM. Realizing that the link for the NPRM should not have been listed under the ANPRM Docket ID, a new Docket ID number (2018–0002–0001) was created for the NPRM. These Docket ID numbers are created by the third-party managers of *Regulations.gov* for purposes of the website. ATF uses its own docket number, 2017R–22, as seen in the text of the ANPRM and NPRM.

Once the third-party managers of *Regulations.gov* created a new Docket ID number for the NPRM with a "Comment Now" feature, they eliminated the ability to submit NPRM comments under the old ANPRM Docket ID. The Department acknowledges that there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018–0001–0001) was prominently situated on the homepage of the *Regulations.gov* website even though that link was no longer able to accept comments for the NPRM. Despite the brief prominence of the old ANPRM Docket ID on the *Regulations.gov* website, the public had the ability to submit comments through the Federal eRulemaking Portal for the NPRM at all times, as a simple search for "bump stock" in the main search bar on *Regulations.gov* during this time would have displayed the link for the new NPRM Docket ID, which was active and accepting comments. Moreover, some individuals confused about how to comment on *Regulations.gov* called ATF's Office of Regulatory Affairs, which was able to assist them.

ATF also responded to the author's inquiry about the discrepancy in the numbers showing the amount of comments received. Over the weekend of March 31, 2018, the third-party managers of *Regulations.gov* transferred

all comments submitted for the NPRM through the ANPRM Docket ID to the new NPRM Docket ID. ATF was informed that the number of comments displayed on *Regulations.gov* updated only once a day and therefore would harmonize over the next few days as ongoing system maintenance occurred. Ultimately, the website depicting the amount of comments received reflects all comments received since March 29, 2018, the beginning of the comment period.

To answer the author's inquiry as to why his comments submitted were not visible on *Regulations.gov*, ATF reminded the online author that Part VII.C of the NPRM, which described the three methods for submitting public comments, informed the public that comments submitted through *Regulations.gov* "will be posted within a few days of being submitted. However, if large volumes of comments are being processed simultaneously, . . . comment[s] may not be viewable for up to several weeks." Since the beginning of the comment period, ATF received a high volume of comments and, as forewarned, there was a delay between the time comments were submitted and when they became viewable on the website, assuming the comment met the posting guidelines stated in Part VII.A of the NPRM. By April 3, 2018, two of the online author's comments were visible on *Regulations.gov*, and the agency provided him with direct weblinks to his comments.

Accordingly, the Department disagrees that the agency failed to provide the statutorily mandated 90-day public comment period. Moreover, the Department notes that the Federal eRulemaking Portal is one of the three methods available for the public to submit comments during the 90-day comment period. Therefore, the public also had the ability to submit comments via mail or facsimile during the entire 90-day period.

The Department believes the numerous examples provided by the commenter of cases in which Federal agencies extended comment periods are inapplicable to this rulemaking. The specific scenarios the commenter listed were apparently all the result of the lapse in government funding that occurred in October 2013. At that time, agencies were largely unstaffed, and insufficient personnel were available to process the comments. This rulemaking has not involved similar difficulties.

### 4. Request for Public Hearing

Comments Received

A few commenters requested a hearing pursuant to the NPRM because they want the opportunity to be heard before ATF prescribes any rule. One commenter stated that 18 U.S.C. 926(b) requires ATF to hold a public hearing when such is requested because the statute provides that the Attorney General "shall afford interested parties opportunity for hearing, before prescribing . . . rules and regulations [under 18 U.S.C. ch. 44]."

Department Response

The Department is not persuaded that a public hearing is necessary or appropriate in connection with this rulemaking. The Department believes that a comprehensive public record has already been established through the comment process, which generated over 186,000 comments, some of which included substantial discussions of the rulemaking. The Department does not believe that a public hearing would meaningfully add data or information germane to the examination of the merits of the proposal or would provide substantive factual information that would assist the Department in improving the rule in material ways. Furthermore, the Department believes that it has made changes to this rule and included clarifications in the preamble that address the important issues raised by parties who requested a hearing. In light of all the circumstances, a public hearing is unnecessary.

The Supreme Court has held that it is not necessary for an agency to hold a public hearing on a rulemaking simply because it receives a request for one. In both *United States* v. *Allegheny-Ludlum Steel Corp.*, 406 U.S. 742 (1972), and *United States* v. *Florida East Coast Railway*, 410 U.S. 224 (1973), the Court established the rule that it is necessary to examine the particular statute involved when determining whether notice-and-comment procedures under 5 U.S.C. 553 are available or, alternatively, whether there is a right to a formal hearing. In general, unless a statute specifically provides for rules to be made on the record after a hearing, the Federal courts have held that the informal rulemaking procedure is applicable. Thus, even statutory language such as "due notice and opportunity for a public hearing," and "opportunity for hearing," have been held to mandate only informal procedures under 5 U.S.C. 553. *See* 3 Administrative Law 16.03 (2018).

One Federal court specifically addressed the language in 18 U.S.C.

926(b), on which one commenter relied, and rejected the commenter's position. In that case, the plaintiff contended "that all of the regulations must be invalidated because the Secretary failed to follow the procedures mandated in FOPA by refusing to afford interested parties an opportunity for an oral hearing." However, the court held that the agency provided an "opportunity" for a hearing even though it decided against an oral hearing. The court wrote:

FOPA contains no provision guaranteeing interested parties the right to an oral hearing . . . It is well-settled that the requirement of a hearing does not necessitate that the hearing be oral. Here, the Secretary, pursuant to regulation, reserved for himself the right to determine whether an oral hearing should be held. He ultimately determined that an oral hearing was unwarranted, but did provide interested parties with the opportunity to submit written comments. This is all the hearing requirement in § 926(b) demands.

*Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 485 (4th Cir. 1990) (citations omitted). Here, the Department has made the same determination that an oral hearing is unnecessary.

## V. Final Rule

This final rule adopts, with minor changes, the proposed amendments to the definition of "machine gun" in 27 CFR 447.11, 478.11, and 479.11, which include clarification of the meaning of "automatically" and "single function of the trigger" and clarification that bump-stock-type devices are machineguns. The Department accordingly determined that persons in possession of bump-

stock-type devices must destroy or abandon the devices.

In response to comments received and discussed in Part IV, the Department added employees of manufacturers and one additional manufacturer to the populations potentially affected by this rule, and incorporated sales tax of $19.00 per bump-stock-type device as part of the economic analysis. Also, the Department considered additional alternatives and inserted an OMB Circular A–4 Accounting Statement for clarity.

## VI. Statutory and Executive Order Review

### A. Executive Orders 12866, 13563, and 13771

Executive Orders 13563 (Improving Regulation and Regulatory Review) and 12866 (Regulatory Planning and Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs) directs agencies to reduce regulation and control regulatory costs. This final rule is expected to have an impact of over $100 million in the first year of this regulatory action. Details on the

estimated costs of this final rule can be found in the rule's economic analysis below.

The Attorney General has determined this rule is a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866 because, as discussed, the rule will have an annual effect on the economy of $100 million or more. Accordingly, the rule has been reviewed by the Office of Management and Budget. This rule is a significant regulatory action that clarifies the meaning of the statutory definition of machinegun and reflects the public safety goals of the NFA and GCA. Further, this rule is a regulatory action subject to Executive Order 13771. *See* OMB, *Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs"* (Apr. 5, 2017).

This final rule is intended to interpret the definition of "machinegun" within the NFA and GCA such that it includes a bump-stock-type device, *i.e.*, a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

### Accounting Statement

Table 1 provides the annualized and unquantified costs and benefits to this final rule. These costs are annualized and discounted at 3% and 7%.

TABLE 1—OMB CIRCULAR A–4 ACCOUNTING STATEMENT

| Category | Primary estimate | | Minimum estimate | | Midrange estimate | | Source |
|---|---|---|---|---|---|---|---|
| **Benefits** | | | | | | | |
| Annualized monetized benefits (discount rate in parentheses) | (7%) | N/A | (7%) | N/A | (7%) | N/A | Final Rule |
| | (3%) | N/A | (3%) | N/A | (3%) | N/A | |
| Unquantified Benefits | • Limit access to bump-stock-type devices • Prevents usage of bump-stock-type devices for criminal purposes. • Intended to reduce casualties in mass shootings. • Intended to help protect first responders when responding to shooting incidents | | | | | | Final Rule |
| **Costs** | | | | | | | |
| Annualized monetized costs (discount rate in parentheses) | (7%) | $35.0 mil | (7%) | $28.9 mil | (7%) | $32.0 mil | Final Rule |
| | (3%) | $32.8 mil | (3%) | $27.6 mil | (3%) | $31.2 mil | Final Rule |
| Qualitative costs (unquantified) | • Potential loss of wages for employees of bump-stock-type device manufacturers • Costs of advertising to inform owners of the need to dispose of their bump-stock-type devices • Lost consumer surplus to users of bump-stock-type devices | | | | | | Final Rule |
| **Transfers** | | | | | | | |
| Annualized monetized transfers: "on budget" | 0 | | 0 | | 0 | | Final Rule |
| From whom to whom? | N/A | | N/A | | N/A | | None |
| Annualized monetized transfers: "off-budget" | 0 | | 0 | | 0 | | Final Rule |
| From whom to whom? | N/A | | N/A | | N/A | | None. |

AR005793

TABLE 1—OMB CIRCULAR A–4 ACCOUNTING STATEMENT—Continued

| Category | Primary estimate | Minimum estimate | Midrange estimate | Source |
|---|---|---|---|---|
| Miscellaneous analysis/category | | Effects | | Source citation |
| Effects on State, local, and/or tribal governments | None | | | None |
| Effects on small businesses | Significant effect on small businesses. Prepared FRFA | | | RFA |
| Effects on wages | None | | | None |
| Effects on growth | None | | | None |

### Need for Federal Regulatory Action

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning regulatory action is the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This final rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that they could be used for criminal purposes. This poses a public safety issue that the Department is trying to address.

### Summary of Affected Population, Costs, and Benefits

Table 2 provides a summary of the affected population and anticipated costs and benefits to promulgating this rule.

TABLE 2—SUMMARY OF AFFECTED POPULATION, COSTS, AND BENEFITS

| Category | Affected populations, costs, and benefits |
|---|---|
| Applicability | • Manufacturers of bump-stock-type devices.<br>• Employees of bump-stock-type device manufacturers.<br>• Retail sellers of bump-stock-type devices.<br>• Gun owners who own bump-stock-type devices or would have purchased them in the future. |
| Affected Population | • 1 manufacturer of bump-stock-type devices.<br>• 2,281 retailers of bump-stock-type devices.<br>• Owners and future consumers of bump-stock-type devices. |
| Total Quantified Costs to Industry, Public, and Government (7% Discount Rate). | • $245.5 million present value over 10 years.<br>• $35.0 million annualized. |
| Unquantified Costs | • Potential loss of wages for employees of bump-stock-type device manufacturers.<br>• Costs of advertising to inform owners of the need to dispose of their bump-stock-type devices.<br>• Lost consumer surplus to users of bump-stock-type devices. |
| Unquantified Benefits | • Limits access to bump-stock-type devices.<br>• Prevents usage of bump-stock-type devices for criminal purposes.<br>• Intended to reduce casualties in mass shootings.<br>• Intended to help protect first responders when responding to shooting incidents. |

### Changes from the NPRM to FR

Table 3 presents a summary of the changes to economic effects from NPRM to final rule.

TABLE 3—CHANGES IN BUMP-STOCK-TYPE DEVICES FROM NPRM TO THE FINAL RULE

| Variables | NPRM | Final Rule | Difference | Description of Changes |
|---|---|---|---|---|
| Applicability | N/A | Employees of bump-stock-type device manufacturers. | Adding employees of bump-stock-type device manufacturers. | Per public comment, ATF included employees of manufacturers qualitatively. |
| | 2 manufacturers | 1 manufacturer | Subtracted 1 | Based on publicly available information. |
| Cost of Bump-Stock-Type Devices. | $301 | $320 | $19 | Per public comment, ATF included State and local taxes. |
| Destruction | $5.4 million | $9.4 million | $3.9 million | Change in policy. |
| Future Sales | $213.0 million | $198.9 million | $14.1 million | Change from 2 large retailers selling bump-stock-type devices to 1. |
| Government Cost | $0 | $1.3 million | $1.3 million | Change in policy. |

AR005794

TABLE 3—CHANGES IN BUMP-STOCK-TYPE DEVICES FROM NPRM TO THE FINAL RULE—Continued

| Variables | NPRM | Final Rule | Difference | Description of Changes |
|---|---|---|---|---|
| | | **Alternatives** | | |
| Amnesty or "grandfathering". | This alternative was rejected because since the passage of 18 U.S.C. 922(o), amnesty registration of machineguns is not legally permissible | | | Per public comment. |
| Licensing and background checks. | This alternative was rejected because only Congress can add a new class of firearm and impose licensing or acquisition requirements on them. | | | Per public comment. |
| Remuneration ................... | This alternative was rejected because only Congress has the authority to offer monetary compensation. | | | Per public comment. |
| Medical exemption ............ | This alternative was rejected because neither the NFA nor the GCA provides for medical exemptions to acquire a firearm. Only Congress can add medical exemptions | | | Per public comment. |
| Future production and sales | This alternative was rejected because ATF does not have the authority to restrict only the future manufacture or sale of bump-stock-type devices | | | Per public comment. |
| Quota ................................ | This alternative was rejected because ATF lacks authority to implement it, as all devices determined to be machineguns are prohibited across the board | | | Per public comment. |
| Instituting a tax ................. | This alternative was rejected because excise tax is regulated by statute and only Congress can determine the amount of excise tax on an item | | | Per public comment. |
| Improved security at mass events. | This alternative was rejected because improved security must be paired with reasonable regulations to increase public safety and reduce violent crime | | | Per public comment. |
| Congressional legislation .. | This alternative was rejected because ATF has been delegated authority to issue rules to implement the NFA and GCA. This action will not prevent Congress from taking action on bump-stock-type devices | | | Per public comment. |
| Leave to States to regulate | This alternative was rejected because ATF prioritizes public safety and preventing crime. This action will not prevent States from taking action on bump-stock-type devices | | | Per public comment. |
| Improved law enforcement | This alternative was rejected because training and equipment must be paired with reasonable regulatory efforts to increase public safety and reduce violent crime | | | Per public comment. |

## Affected Population

The populations affected by this rule are manufacturers of bump-stock-type devices, employees of bump-stock-type device manufacturers, retailers who sell them either in brick-and-mortar stores or online, and individuals who have purchased or would have wanted to purchase bump-stock-type devices. The number of entities and individuals affected are as follows:

- 1 manufacturer
- 2,281 retailers
- An uncertain number of individuals who have purchased bump-stock-type devices or would have purchased them in the future [15]
- An estimated 22 employees who were employed by one manufacturer, based on public comments [16]

[15] Note that many commenters assumed that each person who owns a bump-stock-type device owns one device. This overestimates the number of owners because owners of such devices may own more than one, as evidenced by the Las Vegas shooter, who allegedly owned at least 12.

[16] *Regulations.gov, Docket ID: ATF-2018-0002-16668,* available at *https://www.regulations.gov/document?D=ATF-2018-0002-16668* (last visited Nov. 16, 2018).

Because many bump-stock-type devices—including those ATF addressed in classification letters between 2008 and 2017—have not been subject to regulation under the GCA, ATF does not keep track of manufacturers or retailers of bump-stock-type devices, nor does ATF keep track or maintain a database of individuals who have purchased bump-stock-type devices. Therefore, the affected population of manufacturers and retailers is an estimate and based on publicly available information and, with respect to retailers who are also Federal firearms licensees (FFLs), is also based on ATF's records in the Federal Firearms Licensing System.

Based on publicly available information and comments on the NPRM, ATF estimates that since 2010, as many as seven domestic bump-stock-type device manufacturers have been in the marketplace, but due to patent infringement litigation, only three remained in the market. However, it appears two have ceased manufacturing bump-stock-type devices since publication of the NPRM due their inability to obtain liability insurance.

For the estimate of the number of retailers, ATF filtered all FFLs for a list of potential sellers. While there are approximately 80,000 FFLs currently licensed, only certain types of FFLs sell firearms to the public. ATF first removed FFLs that do not sell firearms to the public. Next, since not all FFLs sell firearm accessories, ATF needed to estimate the number that do sell accessories. ATF assumed that FFLs that are likely to sell bump-stock-type devices also have websites. ATF ran a query on the FFL database and found that of those that sell firearms to the public, 2,270 have websites. Because sellers of firearm accessories do not necessarily sell firearms, ATF also performed an online search and found an additional 11 retailers who sell firearm accessories, but not firearms. Adding these two totals together, ATF estimates that there are 2,281 retailers of bump-stock-type devices.

Because there are no records of individuals who have purchased firearm accessories, ATF does not have an estimated number of individuals who will be affected by this final rule. Although ATF lacks data on the number

AR005795

of individuals who have purchased bump-stock-type devices, ATF has some information from one manufacturer and four retailers on the volume of sales of such devices. Based on these reported amounts, ATF estimates that the number of bump-stock-type devices that were purchased during the 8-year period beginning in 2010 ranges from 35,000 per year as a low estimate to 75,000 per year as the high and primary estimate. ATF used a public commenter's estimate of 400,000 total devices in circulation as a third estimate. For further information on the methodology of these estimates, please review the analysis regarding "Costs" below.

### Costs

There are four primary sources of costs from this rule. First, for owners of bump-stock-type devices, there will be a lost value from no longer being able to possess or use the devices. Second, there will be a lost value from future sales of the devices. Third, there is a disposal cost associated with the need to destroy the devices or abandon them at the nearest ATF office. Finally, there will be a potential loss of wages from employees losing jobs from loss of manufacturing; however, the extent to which they will be unable to find replacement jobs is speculative.

### Manufacturing and Startup Cost

Commenters suggested that ATF overlooked the capital expenses to start up a company to manufacture bump-stock-type devices. The Department considered the capital expenses for manufacturers. However, in light of the Las Vegas shooting and potential crowding of additional manufacturers, the Department determined that the potential for manufacturers to continue business in a potentially saturated market was doubtful. Furthermore, the Department has already calculated the foregone return on investment when the Department considered foregone production, so accounting for capital expenses would be double counting of expenditures. Therefore, the viability that these businesses will be successful is speculative and the capital expenses that they incurred are a sunk cost for those who put in the expense.

### Cost to the Public for Loss of Property

One reason individuals purchase bump-stock-type devices is so that they can simulate automatic firing on a semiautomatic firearm. Commenters noted a variety of purposes for which bump-stock-type devices have been advertised and used, including for recreation and fun, assisting persons

with mobility issues in firing quickly, self-defense, killing invasive pig species, and target practice (although, as some commenters observed, bump-stock-type devices impede firing accuracy). After implementation of this final rule, bump-stock-type devices that meet the definition of "machinegun" under the NFA and GCA cannot be lawfully possessed because the pertinent provision of the GCA, 18 U.S.C. 922(o), prohibits persons from possessing a machinegun unless it was lawfully possessed before the effective date of section 922(o). Bump-stock-type devices currently possessed by individuals will have to be destroyed or abandoned prior to the effective date of this regulation.

The lost value from no longer being able to use or purchase bump-stock-type devices will depend on the volume of sales in the market and the value that consumers place on the devices. ATF has limited information about the market for bump-stock-type devices. ATF first developed an estimate of the number of bump-stock-type devices in the marketplace based on information on retail sales provided in response to the ANPRM. One ANPRM commenter estimated that more than 400,000 bump-stock-type devices may have been sold. Based on publicly available information, ATF estimates that in the first two years that bump-stock-type devices were in the market, approximately 35,000 were sold per year.[17] However, after 2011, other manufacturers entered the market and there is no available information regarding the total number of bump-stock-type devices manufactured. ATF is using publicly available information on manufacturing and combining it with the information on retail sales to estimate a range of the number of bump-stock-type devices in the marketplace.

One retailer stated that it sold an average of 4,000 to 5,000 bump-stock-type devices per year.[18] One commenter indicated that one retailer sold 3,800 bump-stock-type devices annually, one sold 60 per year, and one sold approximately 5–10 per year.[19] For the purposes of this regulatory analysis (RA), ATF assumes that a large retailer

has sold 4,400, a midrange retailer has sold 60, and a small retailer has sold 8.[20] For the purposes of this analysis, ATF assumes the number of retailers by size are as follows:

- 4 large * 4,400 annual sales
- 755 midrange * 60 annual sales
- 1,511 small * 8 annual sales

The number of large retailers is a known number. As stated in the Affected Population section above, based on ATF's internal database and online research, the remaining number of retailers is 2,270. For the purposes of this RA, ATF estimated that one-third of the remaining retailer population are midrange retailers, and the remaining 1,511 are small retailers. Using these estimated numbers of retailers and annual sales by size of retailer, ATF estimated annual sales of about 75,000 [(4 * 4,400) + (755 * 60) + (1,511 * 8)].

ATF next developed an estimate of the number of bump-stock-type devices in the United States based on information about the number of bump-stock-type devices manufactured. Based on publicly available information, ATF estimates that approximately 35,000 bump-stock-type devices were sold in 2010.[21] Only in 2012 did other manufacturers enter the marketplace. For the purposes of this RA, ATF assumes that in the first two years of production, the one manufacturer produced the same 35,000 in years 2010 and 2011. ATF has two sets of production estimates. Because no information is otherwise known about the production of bump-stock-type devices, ATF assumes that the low estimate of annual bump-stock-type device production is a constant 35,000, based on the one data point. As stated earlier, a public commenter provided an estimate of 400,000 bump-stock-type devices currently in circulation. To account for how these were purchased over the last 8 years, ATF also assumed the same 35,000 production in the first 2 years, but spread out the remaining 330,000 over the remaining 6 years, or about 55,000 per year. However, there were public comments that stated how many bump-stock-type devices were sold by that retailer. Using the retail sales information, ATF developed a third, higher estimate reflecting that when the other manufacturers entered the market, the number of bump-stock-type devices sold on the market annually could have been 75,000.

The high estimate is ATF's primary estimate because ATF knows that there

[17] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011), http://www.theolbanynews.net/archives/2443.

[18] Based on an internal survey of large retailers.

[19] *Regulations.gov, Docket ID: ATF-2018-0001–27509, https://www.regulations.gov/document?D=ATF-2018-0001-27509* (last visited on Nov. 16, 2018); *Regulations.gov, Docket ID: ATF-2018-0001-0433, https://www.regulations.gov/document?D=ATF-2018-0001-0433* (last visited on Nov. 16, 2018); *Regulations.gov, Docket ID: ATF-2018-0001-0128, https://www.regulations.gov/document?D=ATF-2018-0001-0128* (last visited on Nov. 16, 2018).

[20] For a large retailer the average sales were 4,400 = (3,800 + 5,000)/2. For a small retailer, the average sales were 8 = (5 + 10)/2.

[21] Lucas, *supra* note 17.

was an increase in production starting in 2012. In 2012, there were other manufacturers who entered the market, and the first manufacturer increased production at some point thereafter. Furthermore, the primary estimate includes information provided by retailers as a more comprehensive outlook on the overall production numbers. For the purposes of this analysis, ATF assumes that both the increase in production and the market entry of other manufacturers all occurred in 2012. Table 4 provides the breakdown of production for the low estimate, public comment estimate, and primary estimate.

TABLE 4—NUMBER OF BUMP-STOCK-TYPE DEVICES PRODUCED, BASED ON MANUFACTURER AND RETAIL SALES

| Year | Low estimate | Public comment estimate | Primary estimate |
|---|---|---|---|
| 2010 | 35,000 | 35,000 | 35,000 |
| 2011 | 35,000 | 35,000 | 35,000 |
| 2012 | 35,000 | 55,000 | 75,000 |
| 2013 | 35,000 | 55,000 | 75,000 |
| 2014 | 35,000 | 55,000 | 75,000 |
| 2015 | 35,000 | 55,000 | 75,000 |
| 2016 | 35,000 | 55,000 | 75,000 |
| 2017 | 35,000 | 55,000 | 75,000 |
| Total | 280,000 | 400,000 | 520,000 |

In other words, the number of bump-stock-type devices held by the public could range from about 280,000 to about 520,000.

ATF does not know the production cost of bump-stock-type devices, but for the purposes of this RA, ATF uses the retail sales amounts as a proxy for the total value of these devices. For devices that have already been sold, there are two countervailing effects that affect the value of the devices. There may have been some depreciation of the devices since they were originally purchased, resulting in a value somewhat reduced from the retail price. On the other hand, some consumers may have been willing to pay more than the retail price for a bump-stock-type device, and for these individuals the devices would have a higher valuation than the retail price. Both of these effects are difficult to estimate, and here ATF assumes that the retail sales price is a reasonable proxy for the value of the devices.

The primary manufacturer of bump-stock-type devices sells them at a price of $179.95 to $425.95.[22] For the purposes of this RA, ATF estimates that the average sale price, including State and local taxes, for these bump-stock-type devices was $320.00 during the first two years they were sold. In 2012, at least one other manufacturer entered the market and started selling its devices at the rate of $99.99, making the overall prices for these devices lower.[23] For the purposes of this RA, ATF assumes that the average sale price, including State and local taxes, for bump-stock-type devices from 2012 to 2017 was $213.00. Based on these costs, multiplied by the number of bump-stock-type devices in the market, Table 5 provides the sales value that the public has spent on these devices over the course of the last eight years.

TABLE 5—AMOUNT SPENT ON BUMP-STOCK-TYPE DEVICES

[Undiscounted]

| Year | Low estimate | Midrange estimate | Primary |
|---|---|---|---|
| 2011 | $11,214,896 | $11,214,896 | $11,214,896 |
| 2012 | 11,214,896 | 11,214,896 | 11,214,896 |
| 2013 | 7,470,511 | 11,739,374 | 16,008,237 |
| 2014 | 7,470,511 | 11,739,374 | 16,008,237 |
| 2015 | 7,470,511 | 11,739,374 | 16,008,237 |
| 2016 | 7,470,511 | 11,739,374 | 16,008,237 |
| 2017 | 7,470,511 | 11,739,374 | 16,008,237 |
| Total | 59,782,345 | 81,126,661 | 102,470,977 |

ATF estimates that the total, undiscounted amount spent on bump-stock-type devices was $102.5 million. While the retail prices of these bump-stock-type devices remained constant over the eight years of sales, these purchases occurred over time; therefore, ATF presents the discounted value at 3% and 7% in Table 6 to account for the present value of these purchases.

---

[22] Slide Fire AR–15 Bump Fire Stocks (archived page on Jan. 28, 2017), *https://web.archive.org/web/20170128085532/http://www.slidefire.com/products/ar-platform* (last visited Nov. 28, 2018).

[23] Bump Fire Systems (archived page on Feb. 21, 2015), *https://web.archive.org/web/20150221050224/http://bumpfiresystems.com/* (last visited Nov. 28, 2018).

AR005797

66548    **Federal Register** / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

TABLE 6—THE AMOUNT SPENT PURCHASING BUMP-STOCK-TYPE DEVICES, DISCOUNTED AT 3% AND 7%

| Year | Undiscounted | 3% | 7% |
|------|--------------|-----|-----|
| 2011 | $11,214,896 | $13,001,138 | $15,729,472 |
| 2012 | 11,214,896 | 12,622,464 | 14,700,441 |
| 2013 | 16,008,237 | 17,492,633 | 19,610,779 |
| 2014 | 16,008,237 | 16,983,139 | 18,327,831 |
| 2015 | 16,008,237 | 16,488,484 | 17,128,814 |
| 2016 | 16,008,237 | 16,008,237 | 16,008,237 |
| 2017 | 16,008,237 | 15,541,978 | 14,960,969 |
| Total | 102,470,977 | 108,138,073 | 116,466,542 |
| Annualized Cost | | 15,404,959 | 19,504,391 |

Because these purchases occurred in the past, ATF's discount years start at -5 and increase to 0 to account for the Executive Order 13771 standard that costs be presented in 2016 dollars. With these assumptions, ATF estimates that the annualized, discounted amount spent on bump-stock-type devices was $15.4 million and $19.5 million at 3% and 7%, respectively.

Based on the same discounting formula, ATF estimates that the total undiscounted cost for the low estimate is $59.7 million, and the total discounted values are $64.1 million and $70.6 million at 3% and 7%, respectively. The annualized values for the low estimates of the total number of bump-stock-type devices sold are $9.1 million and $11.8 million at 3% and 7%, respectively. For the 400,000-unit estimate provided by the public commenter, the total undiscounted amount is $81.1 million, and the total discounted values would be $86.1 million and $93.5 million at 3% and 7%, respectively. The annualized values for the 400,000-unit sales estimate are $12.3 million and $15.7 million at 3% and 7%, respectively.

*Forgone Future Production and Sales*

ATF has estimated the lost production and lost sales that will occur in the 10 years after the implementation of this final rule. These estimates take into account lost revenue from manufacturers and retailers. ATF does not parse out manufacturing and retail sales, in order to limit double counting.

In order to do this, ATF needed to predict the number of devices that would have been sold in the future in the absence of a rule. Such a prediction should take account of recent expected changes in the demand for and supply of bump-stock-type devices. For example, based on a survey, three of the four known, large former retailers of bump-stock-type devices no longer sell bump-stock-type devices as a result of the Las Vegas shooting, nor do they intend to sell them in the future. Moreover, while ATF has estimated the number of bump-stock-type devices manufactured since 2010, ATF is without sufficient information to estimate the number of individuals who were interested in acquiring bump-stock-type devices prior to the Las Vegas shooting but would no longer want them due to the shooting.

Another recent change affecting individuals' future purchases of bump-stock-type devices is that certain States have already banned such devices. These States are California, Connecticut, Delaware, Florida, Hawaii, Maryland, Massachusetts, New Jersey, Rhode Island, Vermont, and Washington.[24] The effect of States' bans on individuals' future purchases of bump-stock-type devices should not be attributed to this final rule since these reductions in purchases will happen with or without the rule. However, ATF was unable to quantify the impact of States' bans and thus was unable to account for the future effects of these bans in the estimate of the effects of the final rule.

Based on previously mentioned comments from large retailers, ATF expects that, even in the absence of this rule, some retailers would not sell bump-stock-type devices in the future. In order to estimate the expected future reduction in demand for bump-stock-type devices as a result of the Las Vegas shooting, ATF assumes that the reduction of sales by large retailers that has already occurred would be a reasonable estimate of the future reduction of sales overall that would occur in the absence of this rule. In the NPRM, ATF estimated that two of the four large retailers would remain in the market to sell bump-stock-type devices. 83 FR at 13452. Since then, one of these remaining retailers merged with one of the large retailers that opted not to sell bump-stock-type devices, resulting in only one large retailer remaining in the market. For the purposes of this regulatory analysis, it is estimated that the one large retailer that would otherwise intend to keep selling bump-stock-type devices sells 4,400 of such devices annually. Removing the effects of these three large retailers from the future market reduces ATF's primary estimate of 74,988 in past annual production to an estimate of 62,084 (= 75,284 − 13,200) in annual sales that would have occurred in the future in the absence of this rule. Table 7 provides the estimated breakdown of lost production and sales forgone due to this rule.

TABLE 7—FORGONE PRODUCTION AND SALES OF FUTURE BUMP-STOCK-TYPE DEVICES

| Year | Number of bump-stock-type devices | Undiscounted | 3% | 7% |
|------|-----------------------------------|--------------|-----|-----|
| 2018 | 62,084 | $19,893,303 | $19,313,886.10 | $18,591,871.67 |
| 2019 | 62,084 | 19,893,303 | 18,751,345.73 | 17,375,581.00 |
| 2020 | 62,084 | 19,893,303 | 18,205,190.03 | 16,238,860.74 |

[24] Cal. Penal Code sections 16930, 32900 (2018); 2018 Conn. Acts 18–29 (Reg. Sess.); Del. Code Ann. tit. 11, section 1444(a)(6) (2018); Fla. Stat. section 790.222 (2018); Haw. Rev. Stat. section 134–8.5 (2018); Md. Code. Ann., Crim. Law section 4–305.1 (2018); Mass. Gen. Laws ch. 140, section 121, 131 (2018); N.J. Stat. Ann. sections 2C:39–3(f), 2C:39–9(l); 11 R.I. Gen. Laws section 11–47–8(d) (2018). Vt. Stat. Ann. tit. 13, section 4022 (2018); 2018 Wash. Sess. Laws ch. 7, pp. 196–220.

AR005798

TABLE 7—FORGONE PRODUCTION AND SALES OF FUTURE BUMP-STOCK-TYPE DEVICES—Continued

| Year | Number of bump-stock-type devices | Undiscounted | 3% | 7% |
|---|---|---|---|---|
| 2021 | 62,084 | 19,893,303 | 17,674,941.77 | 15,176,505.37 |
| 2022 | 62,084 | 19,893,303 | 17,160,137.64 | 14,183,649.88 |
| 2023 | 62,084 | 19,893,303 | 16,660,327.81 | 13,255,747.55 |
| 2024 | 62,084 | 19,893,303 | 16,175,075.54 | 12,388,549.11 |
| 2025 | 62,084 | 19,893,303 | 15,703,956.84 | 11,578,083.28 |
| 2026 | 62,084 | 19,893,303 | 15,246,560.04 | 10,820,638.58 |
| 2027 | 62,084 | 19,893,303 | 14,802,485.47 | 10,112,746.34 |
| Total | | 198,933,027 | 169,693,906.98 | 139,722,233.51 |
| Annualized Cost | | | 24,173,981.19 | 23,398,969.82 |

Based on these estimates, ATF estimates that the undiscounted value of forgone future sales over 10 years is $198.9 million, undiscounted, or $24.2 million and $23.4 million, annualized and discounted at 3% and 7%.

### Disposal

This final rule requires the destruction of existing bump-stock-type devices. The cost of disposal has several components. For individuals who own bump-stock-type devices, there is a cost for the time and effort to destroy the devices or ensure that they are destroyed by another party. For retailers, wholesalers, and manufacturers, there is a cost of the time and effort to destroy or ensure the destruction of any devices held in inventory. In addition, this final rule incorporates the option of abandoning bump-stock-type devices at an ATF office. Based on the response from commenters, this cost is taken into consideration under the foregone sales section.

Individuals who have purchased bump-stock-type devices prior to the implementation of this rule must destroy the devices themselves prior to the effective date of the rule or abandon them at their local ATF office. Options for destroying the devices include melting, crushing, or shredding in a manner that renders the device

incapable of ready restoration. Since the majority of bump-stock-type devices are made of plastic material, individuals can use a hammer to break apart the devices and throw the pieces away. Other destruction options that ATF has historically accepted include torch cutting or sawing the device in a manner that removes at least ¼ inch of material for each cut and completely severs design features critical to the functionality of the device as a bump-stock-type device.

Current possessors are encouraged to undertake destruction of the devices. However, current possessors also have the option to abandon bump-stock-type devices at the nearest ATF office. Current possessors of bump-stock-type devices will have until the effective date of the rule (90 days from date of publication in the **Federal Register**) to comply. Additional information on the destruction of bump-stock-type devices will be available on *www.atf.gov.*

Based on comments received on the ANPRM, unsellable inventory could be worth approximately $35,000 per large retailer. One commenter, assumed to be a large retailer, stated that its gross sales were $140,000. Another commenter assumed to be a midrange retailer had gross sales of $18,000. No known sales were reported for a small retailer. Based on the proportion of sales among the large, midrange, and small retailers,

ATF estimates that the amounts in existing inventory for each type of retailer are as follows:

- Large retailer: $35,000;
- midrange retailer: $4,500; and
- small retailer: $74.[25]

There were no comments on the NPRM about these assumptions or the methodology used based on the ANPRM comments. Therefore, the analysis used to determine the cost of unsellable inventory remains the same for this final rule.

The commenter assumed to be a large retailer also commented that the opportunity cost of time needed to destroy existing inventory will be approximately $700. ATF's subject matter experts estimate that a retailer could use a maintenance crew to destroy existing inventory. To determine the hourly time needed to destroy existing inventory, ATF used the $700 reported amount, divided by the loaded wage rate of a building cleaning worker. ATF subject matter experts also suggest that existing packers would be used for a midrange retailer and the minimum wage would be used for a small retailer. A multiplier of 1.43 was applied to unloaded wage rates to account for fringe benefits.[26] Table 9 provides the wages used for this analysis.

TABLE 9—WAGE SERIES TO DESTROY EXISTING INVENTORY

| Wage series | Series code | Unloaded wage rate | Loaded wage rate | Source |
|---|---|---|---|---|
| Individual | | $13.60 | $13.60 | https://www.transportation.gov/sites/dot.gov/files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf |
| Minimum Wage Rate | Min Wage | 7.25 | 10.40 | https://www.bls.gov/opub/reports/minimum-wage/2016/home.htm. |
| Packers, Packagers, and Handlers. | 53–7064 | 11.74 | 16.84 | https://www.bls.gov/oes/2016/may/oes537064.htm. |
| Retail Salespersons | 41–2031 | 13.07 | 18.75 | https://www.bls.gov/oes/2016/may/oes412031.htm. |

[25] Midrange $4,500 = ($18,000/$140,000) * $35,000. Small $74 = ($0/3,800) * $35,000.

[26] BLS Series ID CMU2010000000000D, CMU2010000000000P (Private Industry Compensation = $32.35)/(Private Industry Wages

and Salaries = $22.55) = 1.43  BLS average 2016 U.S. Bureau of Labor Statistics, https://beta.bls.gov/dataQuery/find?fq=survey-[cu]&s=popularity:D

**66550**   **Federal Register** / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

TABLE 9—WAGE SERIES TO DESTROY EXISTING INVENTORY—Continued

| Wage series | Series code | Unloaded wage rate | Loaded wage rate | Source |
|---|---|---|---|---|
| Building Cleaning Workers, All Other. | 37–2019 ......................... | 14.88 | 21.34 | https://www.bls.gov/oes/2016/may/oes372019.htm. |

Based on the estimated wages and reported opportunity cost of time, ATF estimates that it will take a large retailer

32.8 hours, a midrange retailer 0.45 hours, and a small retailer 0.25 hours to destroy existing inventory. Table 10

provides the per-retailer estimated opportunity cost of time.

TABLE 10—OPPORTUNITY COST OF TIME TO DESTROY EXISTING INVENTORY

| Population | Incremental cost | Hourly burden | Opportunity cost of time |
|---|---|---|---|
| Individual ................................................................................................................................... | $13.60 | 0.25 | $3.40 |
| Retailer (Large) ......................................................................................................................... | 21.34 | 32.8 | 699.95 |
| Retailer (Midrange) .................................................................................................................... | 16.84 | 0.45 | 7.58 |
| Retailer (Small) ......................................................................................................................... | 19.51 | 0.25 | 4.88 |

As stated earlier, ATF estimates that there are 520,000 bump-stock-type devices already purchased by the public. For the purposes of this analysis, we estimate the following calculations to destroy bump-stock-type devices:

• Individual: $1.3 million = (1.8 million * 75%)

• Retailer (Large): 3 retailers * $699.95 opportunity cost of time + ($35,000 inventory * 75%)
• Retailer (Midrange): 569 retailers * $7.58 opportunity cost of time + ($4,500 inventory * 75%)
• Retailer (Small): 1139 retailers * $4.88 opportunity cost of time + ($74 inventory * 75%)

Based on the opportunity cost of time per bump-stock-type device, and the estimated opportunity cost of time per retailer, ATF provides the cost to destroy all existing bump-stock-type devices in Table 11.

TABLE 11—COST OF EXISTING INVENTORY AND OPPORTUNITY COST OF TIME TO DESTROY EXISTING DEVICES BY INDIVIDUAL AND RETAILER SIZE

| | Original cost | Reduced cost | Net change |
|---|---|---|---|
| Individual ................................................................................................................. | $1,768,000 | $1,326,000 | $442,000 |
| Retailer (Large) ...................................................................................................... | 142,800 | 80,850 | 61,950 |
| Retailer (Midrange) ................................................................................................. | 3,421,252 | 1,924,687 | 1,496,565 |
| Retailer (Small) ...................................................................................................... | 116,279 | 66,176 | 50,103 |
| Total Disposal Cost ......................................................................................... | 5,448,330 | 3,397,713 | 2,050,618 |

For those abandoning bump-stock-type devices, we estimate that 130,000 individuals, 1 large retailer, 138

midrange retailers, and 139 small retailers will abandon them at their nearest ATF office. Table 12 provides

the cost of gas, travel time, and mileage to abandon them.

TABLE 12—COST OF GAS, TRAVEL TIME, AND MILEAGE

| Cost item | Rate | Source |
|---|---|---|
| Gas Consumption ..................................................................... | $0.545 | https://www.gsa.gov/travel-resources. |
| Hours of Weekend Travel Time ............................................... | 1.556 | https://nhts.ornl.gov/2009/pub/stt.pdf. |
| Miles Traveled .......................................................................... | 7 | https://nhts.ornl.gov/2009/pub/stt.pdf. |

Assuming these devices will be abandoned during leisure hours, ATF uses the leisure wage rate of $13.60. ATF estimates that the cost to travel to ATF offices will be $24.98 per trip = ($13.60 leisure wage * 1.556 hours of weekend travel time) + ($0.545 gas consumption * 7 miles traveled). For the purposes of this analysis, we estimate the following calculations to destroy bump-stock-type devices.

• Individual: 520,000 bump-stock-type devices * 25% * $24.98
• Retailer (Large): (1 retailer * $24.98 travel cost) + ($35,000 inventory * 25%)
• Retailer (Midrange): (190 retailers *$24.98 travel cost) + ($4,500 inventory * 25%)
• Retailer (Small): (379 retailers * $24.98 travel cost) + ($74 inventory * 75%)

Table 13 provides the additional cost of abandoning bump-stock-type devices at ATF offices.

TABLE 13—DISPOSAL COST TO ABANDON BUMP-STOCK-TYPE DEVICES AT ATF OFFICES

| | |
|---|---|
| Individual ....................................... | $3,247,400 |
| Retailer (Large) ............................. | 8,775 |
| Retailer (Midrange) ........................ | 1,375,025 |
| Retailer (Small) ............................. | 1,373,974 |
| Total Cost to Abandon .. | 6,005,174 |

AR005800

We treat all costs of disposal of existing devices owned by individuals or held in inventory by retailers or manufacturers as if they occur in 2018. Therefore, the disposal costs of the rule in 2018 would include the total undiscounted value of existing stock of bump-stock-type devices and the total cost of disposal from Tables 11 and 13 for the total disposal cost of $9.4 million.

## Government Costs

Because ATF allows bump-stock-type device owners to abandon these devices at ATF offices, ATF incorporates the government cost to dispose of these devices. ATF estimates that an agent at a GS-13 level will dispose of the device in 0.25 hours at a loaded wage rate of $41.07 per hour.[27] ATF anticipates that

it will cost $1.3 million to destroy these devices in-house.

Overall, ATF estimates that the total cost of this final rule would be $312.1 million over a 10-year period of future analysis. This cost includes the first-year cost to destroy all existing bump-stock-type devices, including unsellable inventory and opportunity cost of time. Table 14 provides the 10-year cost of this final rule.

### TABLE 14—10-YEAR COST OF FINAL RULE

| Year | Undiscounted | 3% | 7% |
|---|---|---|---|
| 2018 | 133,101,942 | 129,225,186 | 124,394,338 |
| 2019 | 19,893,303 | 18,751,346 | 17,375,581 |
| 2020 | 19,893,303 | 18,205,190 | 16,238,861 |
| 2021 | 19,893,303 | 17,674,942 | 15,176,505 |
| 2022 | 19,893,303 | 17,160,138 | 14,183,650 |
| 2023 | 19,893,303 | 16,660,328 | 13,255,748 |
| 2024 | 19,893,303 | 16,175,076 | 12,388,549 |
| 2025 | 19,893,303 | 15,703,957 | 11,578,083 |
| 2026 | 19,893,303 | 15,246,560 | 10,820,639 |
| 2027 | 19,893,303 | 14,802,485 | 10,112,746 |
| Total | 312,141,666 | 279,605,207 | 245,524,700 |
| Annualized Cost | | 32,778,260 | 34,957,194 |

The total 7% discounted cost is $249.6 million, and the annualized discounted costs would be $32.8 million and $35.0 million annualized at 3% and 7% respectively.

## Cost Savings

ATF did not calculate any cost savings for this final rule.

## Benefits

As reported by commenters, the purpose of this rule is to amend ATF regulations to clarify that bump-stock-type devices are "machineguns" as defined by the NFA and GCA. Additionally, a desired outcome of this rule is increased public safety. While there has been only one known shooting involving bump-stock-type devices, banning such devices could result in reduced casualties as a consequence of reducing incidents of shootings involving a weapon fitted with a bump-stock-type device. A ban also could result in less danger to first responders when responding to incidents, because it prevents shooters from using devices that allow them to shoot semiautomatic firearms automatically.

## Alternatives

Alternative 1—No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes

to regulations, there would be no cost, savings, or benefits to this alternative.

Alternative 2—Patronizing a shooting range. Individuals wishing to experience shooting a "full-auto" firearm could go to a shooting range that provides access to lawfully registered "pre-1986" machineguns to customers, where the firearm remains on the premises and under the control of the shooting range. ATF does not have the information to determine which, where, or how many gun ranges provide such a service and is therefore not able to quantify this alternative.

Alternative 3—Opportunity alternatives. Based on public comments, individuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger finger to fire more rapidly. To the extent that individuals are capable of doing so, this would be their alternative to using bump-stock-type devices.

Public comments from the NPRM suggested other alternatives:

1. Provide amnesty or "grandfathering." This alternative was rejected because since the passage of 18 U.S.C. 922(o), amnesty registration of machineguns is not legally permissible; all devices determined to be machineguns are prohibited except as provided by exceptions established by statute.

2. Provide licensing and background checks. This alternative was rejected because

only Congress can add a new class of firearm to the GCA and impose licensing or acquisition requirements on it.

3. Provide compensation for the destruction of the devices. This alternative was rejected because only Congress has the authority to offer monetary compensation.

4. Provide a medical exemption. This alternative was rejected because neither the NFA nor the GCA provides for medical exemptions to acquire an otherwise prohibited firearm. Only Congress can add medical exemptions.

5. Prohibit only future manufacture and sales. This alternative was rejected because ATF does not have the authority to restrict only the future manufacture or sale of bump-stock-type devices.

6. Provide a quota. This alternative was rejected because ATF lacks authority to implement it, as all devices determined to be machineguns are prohibited across the board.

7. Institute a tax. This alternative was rejected because ATF lacks authority to establish excise taxes.

8. Improve security at mass events. This alternative was rejected because improved security must be paired with reasonable regulations to increase public safety and reduce violent crime.

9. Congressional legislation. This alternative was rejected because issuance of this rule will not prevent Congress from taking action on bump-stock-type devices.

10. Leave the issue to the States. This alternative was rejected because ATF is responsible for implementing the NFA and GCA, Federal laws designed to maintain public safety. Issuance of this rule will not

27 Office of Personnel Management. Salary Table 2018–GS. https://www.opm.gov/policy-data-

oversight/pay-leave/salaries-wages/salary-tables/pdf/2018GS_h.pdf.

AR005801

prevent States from taking action on bump-stock-type devices.

11. Improved law enforcement capabilities. This alternative was rejected because while training and equipment may assist law enforcement efforts, they are not a substitute for the Department's exercise of its public safety responsibility of interpreting the NFA and GCA appropriately.

### B. Executive Order 13132

This regulation will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132 (Federalism), the Attorney General has determined that this regulation does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### C. Executive Order 12988

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 (Civil Justice Reform).

### D. Regulatory Flexibility Act (RFA)

Summary of Findings

ATF performed a Final Regulatory Flexibility Analysis of the impacts on small businesses and other entities from the final rule. Based on the information from this analysis, ATF found:

• It is estimated that the remaining manufacturer will go out of business.
• There are 2,281 retailers, of which most are estimated to be small;
• There are no relevant government entities.

Final Regulatory Flexibility Analysis

The Regulatory Flexibility Act (RFA) establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." Pub. L. 96–354, section 2(b), 94 Stat. 1164 (1980).

Under the RFA, the agency is required to consider if this rule will have a significant economic impact on a substantial number of small entities. Agencies must perform a review to determine whether a rule will have such an impact. If the agency determines that it will, the agency must prepare a

regulatory flexibility analysis as described in the RFA.

Under the RFA (5 U.S.C. 604(a)), the final regulatory flexibility analysis must contain:

• A statement of the need for, and objectives of, the rule;
• A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
• The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;
• A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;
• A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and
• A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency that affect the impact on small entities was rejected.

The RFA covers a wide range of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. 5 U.S.C. 601(3)–(6). ATF determined that the rule affects a variety of large and small businesses (see the section below titled "A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available"). Based on the requirements above, ATF prepared the following regulatory flexibility analysis assessing the impact on small entities from the rule.

### A Statement of the Need for, and Objectives of, the Rule

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to prohibit machineguns. Another reason underpinning this regulatory action is

the failure of the market to compensate for negative externalities caused by commercial activity. A negative externality can be the byproduct of a transaction between two parties that is not accounted for in the transaction. This final rule is addressing a negative externality. The negative externality of the commercial sale of bump-stock-type devices is that they could be used for criminal purposes. This poses a public safety issue, which the Department is trying to address.

### A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

Several commenters suggested that this rule will devastate companies that manufacture bump-stock-type devices and the local communities that they employ. The Department concurs that this rule will prevent manufacturers of bump-stock-type devices from producing and selling them. Based on publicly available information, the Department estimates that there is only one manufacturer actively producing and selling such devices. For the purposes of this rule, it is considered a small business. Due to the requirements of the NFA, there are no alternatives that are scalable by business size for this rule.

Some commenters suggested that the RFA requires agencies to consider the innovative impacts that small businesses have on the firearms market. ATF interprets the RFA's usage of "innovation" in terms of regulatory approaches that the agency could use to allow for small businesses to compete against non-small businesses. As there are no non-small businesses that manufacture bump-stock-type devices, ATF was unable to determine any regulatory approaches that would allow small manufacturers to compete with non-small businesses with respect to manufacturing bump-stock-type devices.

### The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

There were no comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule. Therefore, no

changes were made to the proposed rule in the final rule as a result of comments.

**A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available**

This rule would affect primarily manufacturers of bump-stock-type devices, FFLs that sell bump-stock-type devices, and other small retailers of firearm accessories that have invested in the bump-stock-type device industry. Based on publicly available information, there is one manufacturer affected. Of the known retailers, the large retailers do not intend to continue selling bump-stock-type devices. There may be some small retailers that would have intended to continue selling these devices had this final rule not been promulgated and would thus be affected by this final rule. Based on the information from this analysis, ATF found:

• There is 1 manufacturer who is likely to be a small entity;
• There are 2,270 retailers who are likely to be small entities;
• There are no government jurisdictions affected by this final rule; and
• There are no nonprofits found in the data.

**A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record**

There are no reporting or recordkeeping requirements for this final rule. The only relevant compliance requirement consists of disposing of all existing inventory of bump-stock-type devices for small entities that carry them. There would not be any professional skills necessary to record or report in this final rulemaking.

**A Description of the Steps the Agency Has Taken to Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected**

Alternatives were considered in this final rule. Alternatives include making no regulatory changes. ATF rejected this alternative because it would not be consistent with ATF's interpretation of

the statutory term "machinegun." There were no other regulatory alternatives to this proposal that ATF has been able to identify that accomplish the objective of this final rule.

*E. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 804. This rule is likely to be considered major as it is economically significant and is projected to have an effect of over $100 million on the economy in at least the first year of the rule.

*F. Congressional Review Act*

This rule is a major rule as defined by the Congressional Review Act, 5 U.S.C. 804. This rule is likely to be considered major as it is economically significant and is projected to have an effect of over $100 million on the economy in at least the first year of the rule's existence.

*G. Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48.

*H. Paperwork Reduction Act of 1995*

This final rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act, 44 U.S.C. 3501–3521.

**Disclosure**

Copies of the final rule, proposed rule, and comments received in response to the proposed rule will be available for public inspection through the Federal eRulemaking portal, *http://regulations.gov*, or by appointment during normal business hours at: ATF Reading Room, Room 1E–062, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648–8740.

**List of Subjects**

*27 CFR Part 447*

Administrative practice and procedure, Arms and munitions, Chemicals, Customs duties and inspection, Imports, Penalties, Reporting and recordkeeping requirements, Scientific equipment, Seizures and forfeitures.

*27 CFR Part 478*

Administrative practice and procedure, Arms and munitions, Customs duties and inspection, Exports, Imports, Intergovernmental relations, Law enforcement officers, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

*27 CFR Part 479*

Administrative practice and procedure, Arms and munitions, Excise taxes, Exports, Imports, Military personnel, Penalties, Reporting and recordkeeping requirements, Seizures and forfeitures, Transportation.

**Authority and Issuance**

Accordingly, for the reasons discussed in the preamble, 27 CFR parts 447, 478, and 479 are amended as follows:

**PART 447—IMPORTATION OF ARMS, AMMUNITION AND IMPLEMENTS OF WAR**

■ 1. The authority citation for 27 CFR part 447 continues to read as follows:

**Authority:** 22 U.S.C. 2778, E.O. 13637, 78 FR 16129 (Mar. 8, 2013).

■ 2. In § 447.11, revise the definition of "Machinegun" to read as follows:

**§ 447.11  Meaning of terms.**

\* \* \* \* \*

*Machinegun.* A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machinegun" includes a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot

AR005803

**66554**    **Federal Register** / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations

with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

*    *    *    *    *

**PART 478—COMMERCE IN FIREARMS AND AMMUNITION**

■ 3. The authority citation for 27 CFR part 478 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 921–931; 44 U.S.C. 3504(h).

■ 4. In § 478.11, revise the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

**§ 478.11    Meaning of terms.**

*    *    *    *    *

*Machine gun.* * * * For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single

function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, *i.e.,* a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

*    *    *    *    *

**PART 479—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS**

■ 5. The authority citation for 27 CFR part 479 continues to read as follows:

**Authority:** 26 U.S.C. 5812; 26 U.S.C. 5822; 26 U.S.C. 7801; 26 U.S.C. 7805.

■ 6. In § 479.11, revise the definition of "Machine gun" by adding two sentences at the end of the definition to read as follows:

**§ 479.11    Meaning of terms.**

*    *    *    *    *

*Machine gun.* * * * For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, *i.e.,* a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

*    *    *    *    *

Dated: December 18, 2018.

**Matthew G. Whitaker,**

*Acting Attorney General.*

[FR Doc. 2018–27763 Filed 12–21–18; 8:45 am]

**BILLING CODE 4410–FY–P**

AR005804