IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| W. CLARK APOSHIAN,<br><br>    Plaintiff,<br><br><br>    v.<br><br><br>MERRICK GARLAND, Attorney General of the United States, *et al.*,<br><br>    Defendants. | Case No. 2:19-cv-00037-JNP<br><br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION**<br><br>District Judge Jill N. Parrish |

Pursuant to Fed. R. Civ. P. 56 and this Court's scheduling order, ECF 57, Defendants hereby respond to Plaintiff's motion for summary judgment, ECF 61, and cross-move for summary judgment in their favor.  In support of this motion, Defendants rely on the administrative record submitted in this matter and the following brief.

Dated:  February 13, 2023    Respectfully submitted,

           BRIAN M. BOYNTON
           Principal Deputy Assistant Attorney
           General

           BRIGHAM J. BOWEN
           Assistant Branch Director
           Federal Programs Branch

           */s/ Alexander V. Sverdlov*
           ALEXANDER V. SVERDLOV
           (NY Bar 4918793)
           Trial Attorney
           United States Department of Justice
           Civil Division, Federal Programs Branch
           1100 L Street, N.W.
           Washington, DC 20005
           Tel: (202) 305-8550
           alexander.v.sverdlov@usdoj.gov

           *Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| W. CLARK APOSHIAN,<br><br>             Plaintiff,<br><br><br><br>      v.<br><br><br>MERRICK GARLAND, Attorney General of the United States, *et al.*,<br><br>             Defendants. | Case No. 2:19-cv-00037-JNP<br><br><br><br><br><br><br><br>District Judge Jill N. Parrish |

**BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ................................................ 2

I.      Statutory Framework for Regulation of Firearms .................................... 2

II.     Past Regulation of Bump Stocks .............................................................. 4

III.    Development and Issuance of the Rule ..................................................... 6

IV.     The Current Action. .................................................................................. 8

V.      Other Litigation Over the Rule ................................................................. 9

STANDARD OF REVIEW ........................................................................................ 10

ARGUMENT .............................................................................................................. 12

I.      The Bureau's Rule Properly Interprets and Applies the Language of 26 U.S.C.
        § 5845(b). ............................................................................................... 12

        A.      The Rule Gives the Relevant Statutory Terms their Ordinary, Accepted
                Meanings ....................................................................................... 13

        B.      The Rule Correctly Classifies Bump Stocks as Machine Guns ..... 17

        C.      The Rule Reasonably Distinguishes Between Bump Stocks and Other
                Methods of Bump Firing a Weapon ............................................... 21

II.     The Rule of Lenity Is Inapplicable ........................................................ 22

III.    The Bureau's Construction of § 5845 Does Not Contravene the Non-Delegation
        Doctrine or Violate the Separation of Powers. ...................................... 23

CONCLUSION ........................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*American Power & Light Co. v. SEC,*
   329 U.S. 90 (1946) ................................................................ 23

*Akins v. United States,*
   82 Fed. Cl. 619 (2008) ........................................................... 5

*Aposhian v. Barr,*
   374 F. Supp. 3d 1145 (D. Utah 2019), *aff'd,* 958 F.3d 969 (10th Cir. 2020) ............ *passim*

*Aposhian v. Garland,*
   143 S. Ct. 84 (2022) ............................................................. 9

*Aposhian v. Garland,*
   214 L. Ed. 2d 12, 143 S. Ct. 84 (2022) ........................................ 1

*Aposhian v. Wilkinson,*
   989 F.3d 890 (10th Cir. 2021) ............................................... 1, 9

*Cargill v. Garland,*
   20 F.4th 1004 (5th Cir. 2021) ................................................. 10

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) ........................................... 10, 18, 20

*Chevron U.S.A., Inc. v. Nat. Res. Def. Counsel,*
   467 U.S. 837 (1984) ............................................................. 8

*City of Portland v. EPA,*
   507 F.3d 706 (D.C. Cir. 2007) ................................................ 21

*Edelman v. Lynchburg Coll.,*
   535 U.S. 106 (2002) ............................................................ 12

*FPC v. Hope Natural Gas Co.,*
   320 U.S. 591 (1944) ............................................................ 24

*Guedes v. ATF,*
   356 F. Supp. 3d 109 (D.D.C. 2019) ..................................... *passim*

*Guedes v. ATF,*
   920 F.3d 1 (D.C. Cir. 2019) ........................................... 9, 21, 25

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   45 F.4th 306 (D.C. Cir. 2022) .......................................... *passim*

*Gun Owners of Am. v. Barr,*

363 F. Supp. 3d 823 (W.D. Mich. 2019) ..................................................... 9

*Gun Owners of Am., Inc. v. Garland*,
19 F.4th 890 (6th Cir. 2021) .......................................................... 10, 16, 19

*Gun Owners of Am., Inc. v. Garland*,
992 F.3d 446 (6th Cir. 2021), *reh'g en banc granted, opinion vacated,* 2 F.4th 576 (6th Cir. 2021) ................................................................................................................ 10

*Gundy v. United States*,
139 S. Ct. 2116 (2019).......................................................................... 23, 24

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*,
702 F.3d 1156 (10th Cir.2012) .................................................................. 11

*Loving v. United States*,
517 U.S. 748 (1996) ................................................................................... 25

*Maracich v. Spears*,
570 U.S. 48, 133 S.Ct. 2191, 186 L.Ed.2d 275 (2013) ............................... 22

*Mistretta v. U.S.*,
488 U.S. 361 (1989) ................................................................................... 25

*Morris v. U.S. Nuclear Regulatory Comm'n*,
598 F.3d 677 (10th Cir.2010) .................................................................... 11

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ..................................................................................... 11

*Muscarello v. United States*,
524 U.S. 125 (1998) ................................................................................... 22

*Nat'l Broad. Co. v. U.S.*,
319 U.S. 190 (1943) ................................................................................... 24

*New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*,
946 F.3d 1138 (10th Cir. 2019) ................................................................. 10

*New York Central Securities Corp. v. United States*,
287 U.S. 12 (1932) ..................................................................................... 24

*NFA. Akins v. U.S.*,
312 F. App'x 197 (11th Cir. 2009) (per curiam) ....................................... 4, 5

*Sig Sauer, Inc. v. Brandon*,
826 F.3d 598 (1st Cir. 2016) ....................................................................... 4

*Staples v. U.S.*,
511 U.S. 600 (1994) .......................................................................... 14, 15, 22

*Touby v. United States,*
    500 U.S. 160 (1991) ................................................................. 25

*U.S. v. Oakes,*
    564 F.2d 384 (10th Cir. 1977) ................................................. 15

*United States v. Blake,*
    59 F.3d 138 (10th Cir. 1995) ................................................... 22

*United States v. Carter,*
    465 F.3d 658 (6th Cir. 2006) (per curiam) ............................. 15

*United States v. Evans,*
    978 F.2d 1112 (9th Cir. 1992) ................................................. 15

*United States v. Fleischli,*
    305 F.3d 643 (7th Cir. 2002) ................................................... 15

*United States v. Gay,*
    240 F.3d 1222 (10th Cir. 2001) ............................................... 22

*United States v. Jokel,*
    969 F.2d 132 (5th Cir. 1992) (per curiam) ............................. 15

*United States v. Olofson,*
    563 F.3d 652 (7th Cir. 2009) ............................................. 13, 18

*Utah Envtl. Congress v. Bosworth,*
    443 F.3d 732 (10th Cir.2006) ................................................. 11

*W. Watersheds Project v. Bureau of Land Mgmt.,*
    721 F.3d 1264 (10th Cir. 2013) ............................................... 11

*Whitman v. American Trucking Assns., Inc.,*
    531 U.S. 457 (2001) ................................................................. 24

*Wisconsin Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) ............................................................. 13

*Yakus v. United States,*
    321 U.S. 414 (1944) ................................................................. 24

**U.S. Constitution**

Article I, § 1 of the U.S. Constitution ..................................... 25, 26

**Statutes**

5 U.S.C. § 706 ............................................................................. 10

18 U.S.C. ch. 44 ........................................................................... 2

18 U.S.C. § 921 ............................................................................. 3, 8

18 U.S.C. § 922 ................................................................. 2, 4, 8, 24

26 U.S.C. ch. 53 ................................................................................ 2

26 U.S.C. § 5822 ............................................................................... 3

26 U.S.C. § 5845 ....................................................................... *passim*

**State Statutes**

Ohio Rev. Code Ann.(West 2017) ................................................... 8

**Rules**

Fed. R. Civ. P. 56 .......................................................................... 10

**Other**

27 C.F.R. § 447.11 ............................................................................ 1

27 C.F.R. §§ 447.11, 478.11 ......................................................... 7, 8

83 Fed. Reg. 66,514 (Dec. 26, 2018)........................................ *passim*

ATF, NFA Handbook § 7.2.4 (2009),
  *available at*: https://go.usa.gov/xpwp5 ....................................... 4

Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*,
  4 J. Legal Studies 133 (1975) ...................................................... 3

H. R. Rep. No. 99-495, 1986 U.S.C.C.A.N. at 1327 ......................... 4

Julian Davis Mortenson, Nicholas Bagley, *Delegation at the Founding*,
  121 Colum. L. Rev. 277 (2021) .................................................. 25

## **INTRODUCTION**

Plaintiff's summary judgment brief marks the fifth time he has asked a court to enjoin or invalidate the bump stock rule promulgated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives (the Bureau or ATF) after the 2017 massacre at an outdoor music festival in Las Vegas. *See Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (the Rule). This Court, the Tenth Circuit, and the Supreme Court all turned down Plaintiff's request for preliminary relief, determining that the Rule properly classified bump stocks as machine guns prohibited under federal firearms statutes.[1] *See Aposhian v. Barr*, 374 F. Supp. 3d 1145 (D. Utah 2019) (*Aposhian I*), *aff'd*, 958 F.3d 969 (10th Cir. 2020) (*Aposhian II*), *vacated sub nom. Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021), and *opinion reinstated sub nom. Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021); *certiorari denied*, *Aposhian v. Garland*, 214 L. Ed. 2d 12, 143 S. Ct. 84 (2022). Those determinations were made in a different procedural posture, before the filing of the underlying administrative record. But Plaintiff's substantive arguments have changed little, and do not entitle him to any different relief.

As the evidence before the Bureau showed—and as this Court and others around the country have correctly concluded—a bump stock has all the hallmarks of a machine gun under federal law, because it allows a shooter to fire a weapon automatically, discharging hundreds of rounds a minute, with a single pull of the trigger. *See Aposhian I*, 374 F. Supp. 3d at 1153. Plaintiff argues that this conclusion violates the Administrative Procedure Act (APA)

---

[1] Except where directly quoting the statute or derivative interpretations, Defendants will use the ordinary spelling of "machine gun" as two words, rather than the single-word spelling used in federal statutes and regulations: "machinegun." *See, e.g.*, 26 U.S.C. § 5845(b); 27 C.F.R. § 447.11.

because the Bureau did not properly consider how a bump stock operates, nor distinguish bump stocks from other devices. *See, e.g.*, Pl. Br., ECF 61 at 17-22 (Pl. Br.). But Plaintiff fails to appreciate how the Bureau's analysis follows the text, structure, and purpose of the firearms statutes. And his efforts to undermine the Bureau's application of the statutory provision to bump stocks collapse under their own weight.

Plaintiff separately contends that he should benefit from the rule of lenity and argues that, in promulgating the Rule, the Department has exercised authority that the Constitution places in Congress and that has not properly been delegated to the Executive Branch. But these arguments are likewise foreclosed by precedent, and fail to engage with the structure of the underlying statutes which authorize the Bureau's Rule.

Accordingly, to the extent this Court's and the Tenth Circuit's earlier decisions are not already controlling, this Court should once again reject Plaintiff's claims, deny his motion for summary judgment, and enter judgment for Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### I.   Statutory Framework for Regulation of Firearms

Machine guns are strictly regulated through an interconnected array of federal laws dating back to the 1930s: the National Firearms Act of 1934 (NFA), Pub. L. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. ch. 53; the Gun Control Act of 1968 (GCA), Pub. L. 90-351, 18 U.S.C. ch. 44; and the Firearm Owners Protection Act of 1986, (FOPA), Pub. L. 99-308. Together, these statutes generally prohibit the possession by members of the public of newly-manufactured machine guns and closely regulate the possession of machine guns manufactured prior to the effective date of the FOPA. *See* 18 U.S.C. § 922(o).

These statutes share a common statutory and regulatory definition of machine guns, which is set forth in the NFA as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun . . .

26 U.S.C. § 5845(b).  At the time of its enactment, the NFA was "popularly known as an 'anti-machine gun' law."  Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Studies 133, 138 n.29 (1975).  The NFA regulated machine guns (and other "firearms")[2] as an exercise of Congress's taxing authority, and the NFA continues to be codified in the Internal Revenue Code and imposes taxes on the lawful manufacturers of firearms.  *See* 26 U.S.C. § 5822.

In 1968, Congress passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime."  *See* 18 U.S.C. § 921 *et seq.*; S. Rep. No. 89-1866, at 1 (1966).  The GCA supplanted some prior firearms regulations, but exists alongside the NFA.  *See* Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968).  The GCA generally established the current framework under which gun dealers and purchases are regulated, and limited the sale of

---

[2] The term "firearms" in 26 U.S.C. § 5845 includes machine guns, short-barreled shotguns, short barreled rifles, and several disparate items such as silencers, rockets, and grenades, but not standard length shotguns, semi-automatic rifles, or non-automatic handguns.

machine guns to those who could obtain a supportive, sworn statement from local law enforcement.  *See* GCA, 82 Stat. 197, 230.

Congress subsequently enacted the FOPA "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime."  H. R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. at 1327.  Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA. Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject to certain exceptions not relevant here.  18 U.S.C. § 922(o)(2).

## II.    Past Regulation of Bump Stocks

After the FOPA barred the manufacture and sale to the public of new machine guns, the price of machine guns lawfully possessed pursuant to subsection (B) "steadily increased over time" due to continuing interest by firearms owners in the automatic-fire capability of such weapons and a static supply of earlier-manufactured machine guns.  83 Fed. Reg. at 66,515-16.  This rising price spurred innovation as manufacturers sought to devise ways to simulate automatic weapons fire while remaining compliant with 18 U.S.C. § 922(o).  *See, e.g.*, AR002664; AR00232.

In 2002 and 2004, one weapons developer asked the Bureau whether a device called the Akins Accelerator would be classified as a machine gun under the NFA.[3]  *Akins v. U.S.*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam); AR 000007-AR000021.[4]  The Bureau

---

[3]   The Bureau encourages manufacturers and owners to seek the Bureau's view regarding the correct classification of a firearm, accessory, or other item, and in response, the agency may provide a classification letter indicating its current position on a particular device. *See* ATF, NFA Handbook § 7.2.4 (2009), *available at*: https://go.usa.gov/xpwp5; *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016).

[4]   "AR __" refers to the corresponding page number in the administrative record Defendants filed in this case.  *See* ECF 59.

tested a prototype of the device and, after initially concluding it did not constitute a machine gun, reversed its view and classified the weapon as a machine gun. *Id.* at 198-99; *see* AR000075-AR000077. To implement its revised view of the Akins Accelerator, the Bureau issued a policy statement explaining that the Akins device and similar attachments that use an internal spring to harness the force of recoil so that a weapon shoots more than one shot with a single pull of the trigger are machine guns. AR005600; *see also* 83 Fed. Reg. at 66,516. The Bureau also determined that the phrase "single function of the trigger" should be interpreted as a "single pull of the trigger" by the shooter, not a single trigger motion. AR005599. The Bureau then ordered the manufacturer "to register the devices he possessed or to surrender them," *Akins*, 312 F. App'x 199, and instructed existing owners of bump stocks to disable their devices by removing and disposing of the internal spring. *See* AR000090-AR000092. The inventor brought suit to challenge the reclassification of the device, as well as a takings claim seeking compensation, and courts rejected both claims. *See Akins*, 312 F. App'x at 198; *Akins v. United States*, 82 Fed. Cl. 619 (2008).

The Department soon received classification requests for other bump stocks that, unlike the Akins Accelerator, did not include internal springs. In a series of classification decisions between 2008 and 2017, the Department concluded that some such devices were not machine guns. *See* AR000103; AR000278. Under the analysis used, although the bump stocks acted with a "single pull of the trigger," the bump stocks did not fire "automatically" because they lacked internal springs or other mechanical parts that channeled recoil energy. 83 Fed. Reg. at 66,517. The conclusion that some bump stocks were not machine guns placed those devices outside the scope of federal firearms regulations altogether, *see id.*, and

these weapons became popular for recreation among those seeking inexpensive substitutes for machine guns grandfathered by the FOPA.  *See, e.g.*, AR001455; AR001500; AR001752.

### III.    Development and Issuance of the Rule

The Las Vegas massacre brought into sharp relief the shortcomings of the previous treatment of bump stocks.  Fifty-eight concertgoers were killed, hundreds more wounded, and when investigators entered the shooter's hotel room, they discovered that the majority of the shooter's rifles were equipped with bump stocks.  AR000325-AR000328; *see also* AR3314.  The Las Vegas attack, and the public attention given to bump stocks in the wake of that crime, led the Department to revisit its prior treatment of bump stocks, as well as its interpretations of the terms used to define machinegun in 26 U.S.C. § 5845(b).  *See* 83 Fed. Reg. at 66,516-17.  As an initial step, the Department published an advance notice of proposed rulemaking (ANPRM) in the Federal Register.  *See* AR000773 (*Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017)).  The ANPRM solicited comments concerning the market for bump stocks.  *See id.* Specifically, the ANPRM asked a set of questions of manufacturers, consumers, and retailers regarding the cost of bump stocks, the number of sales, the cost of manufacturing, and input on the potential effect of a rulemaking prohibiting bump stocks.  *See* 83 Fed. Reg. 60930-31. Public comment on the ANPRM concluded on January 25, 2018, yielding 115,916 comments.  *Id.* at 60929; *see* AR00198.

On February 20, 2018, then-President Trump issued a memorandum to the Attorney General concerning bump stocks.  *See* AR000790 (*Definition of Machinegun*, 83 Fed. Reg. 7949).  The memorandum instructed the Department, working "within established legal protocols," "to dedicate all available resources to complete the review of the comments

received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  *Id.*  Carrying out that directive, DOJ published a notice of proposed rulemaking (NPRM), setting forth changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 that clarify the meaning of the terms "single function of the trigger" and "automatically."  *See* AR001239 (*Bump-Stock-Type Devices*, 83 Fed. Reg. 13442 (Mar. 29, 2018)).  DOJ received "over 186,000 comments" on the NPRM, 83 Fed. Reg. at 66,519; *see* AR002121, reviewed those comments, and drafted the Rule, addressing the comments raised.  *See generally* 83 Fed. Reg. at 66,519-43.

DOJ published the Rule in its final form in the Federal Register on December 26, 2018.  *See* 83 Fed. Reg. at 66,514.  The Rule sets forth DOJ's interpretations of the terms "automatically" and "single function of the trigger."  Consistent with the Bureau's position since 2006, the Rule explains that the Department is interpreting the phrase "single function of the trigger" to mean a "single pull of the trigger" as well as "analogous motions."  *Id.* at 66,515.  As to "automatically," the Rule states that, in the context of the statutory definition of machine gun, the term means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger."  *Id.* at 66,554.  The Rule explains that these definitions are being adopted because they "represent the best interpretation of the statute."  *Id.* at 66,521.

Relying on these definitions, the Rule clarifies for members of the public that "[t]he term 'machine gun' includes a [bump stock]."  *Id.* at 66,554.  As the Rule describes, by pulling the trigger once, resting the trigger finger on the device's finger ledge, and maintaining pressure on the barrel shroud or fore-grip of the rifle with the other hand, a shooter is able to

harness the firearm's recoil energy in a continuous back-and-forth cycle that continues until the shooter releases his pull, the weapon malfunctions, or the ammunition is exhausted. *Id.* at 66,532. This "self-regulating" or "self-acting" mechanism that allows continuous firing after a single pull of the trigger thus functions "automatically" after a "single function of the trigger." *Id.* Because bump stocks convert otherwise semiautomatic firearms into machine guns, the devices are prohibited under 18 U.S.C. § 922(o).[5] The Department instructed "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office." *Id.* at 66,549. The Rule explained that DOJ would not take enforcement action for 90 days to give possessors of bump stocks time to destroy the devices or to abandon them at the nearest ATF office. *Id.* at 66,530, 66,549.

## IV.    The Current Action.

Plaintiff filed this case on January 16, 2019, and moved for a preliminary injunction the next day. *See* ECF 2; ECF 10. After full briefing and a motions hearing, the Court denied the preliminary injunction, finding because "that each component of the Final Rule represents the best interpretation of" 26 U.S.C. § 5845(b), Plaintiff was not likely "to succeed on the merits of his challenge." *Aposhian I*, 374 F. Supp. 3d at 1153. Plaintiff appealed, and the Tenth Circuit affirmed this Court's holding, albeit on different grounds. *Aposhian II*, 958

---

[5] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." 18 U.S.C. § 921(a)(28). The term "semi-automatic firearm" is not specifically defined in federal law, but generally refers to any weapon that after a round of ammunition is fired, chambers the next round of ammunition and can then be fired with a separate pull of the trigger. *See, e.g.*, Ohio Rev. Code Ann. § 2923.11 (West 2017) ("'Semi-automatic firearm' means any firearm designed or specially adapted to fire a single cartridge and . . . chamber a succeeding cartridge ready to fire, with a single function of the trigger").

F.3d 969.  Specifically, the Tenth Circuit concluded that, contrary to Defendants' contention, the Rule was legislative in nature and should be analyzed under the framework set forth in *Chevron U.S.A., Inc. v. Nat. Res. Def. Counsel*, 467 U.S. 837 (1984).  *Aposhian II*, 958 F.3d at 979-89.  Applying that framework, the Court concluded that the Bureau's construction of the terms "automatic" and "single function of the trigger" was reasonable, and therefore entitled to deference.  *Id.*  The Court did not consider whether the Bureau had provided the best interpretation of the statute.  *Id.* at 984-85.

Plaintiff subsequently petitioned for rehearing *en banc*; the Tenth Circuit granted that petition and vacated the panel's decision.  973 F.3d 1151 (10th Cir. 2020).  However, after full briefing and oral argument the Court vacated the order granting rehearing and reinstated the panel opinion.  *Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021).  Plaintiff then petitioned the United States Supreme Court for *certiorari*.  The Court ultimately denied the petition in October 2022.  *Aposhian v. Garland*, 143 S. Ct. 84 (2022).

V.     **Other Litigation Over the Rule**

In addition to the cases in this Court, the Rule has been subject to several other challenges across the country.  Notably, the district court for the District of Columbia denied a preliminary injunction, finding that plaintiffs lacked a likelihood of success on challenges similar to the ones raised in this case, and the D.C. Circuit affirmed applying a similar analysis to what was employed by the Tenth Circuit in this matter.  *See Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019) (*Guedes I*); *Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) (*Guedes II*).  The district court in that case thereafter entered final judgment for Defendants, and the D.C. Circuit again affirmed, concluding, *inter alia*, that the Bureau's Rule reflected the "best

interpretation" of the statutory provision. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 310 (D.C. Cir. 2022) (*Guedes IV*).

Similarly, a district court in Michigan denied a preliminary injunction against the Rule. *Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 825 (W.D. Mich. 2019). The Sixth Circuit initially reversed and remanded, but subsequently granted Defendant's petition for rehearing *en banc* and vacated the panel decision. *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446 (6th Cir. 2021), *reh'g en banc granted, opinion vacated*, 2 F.4th 576 (6th Cir. 2021). The *en banc* Court eventually split evenly, which resulted in the Court affirming the denial of the injunction. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890 (6th Cir. 2021).

The Fifth Circuit has recently charted a different path. A panel of that Court initially affirmed a district court's denial of a preliminary injunction against the Rule, finding "that bump stocks qualify as machine guns under the best interpretation of the statute." *Cargill v. Garland*, 20 F.4th 1004, 1006 (5th Cir. 2021). However, the Court subsequently granted rehearing *en banc* and vacated the opinion. *Cargill v. Garland*, 37 F.4th 1091 (5th Cir. 2022). And on January 6, 2023, the *en banc* court issued an opinion and judgment reversing and remanding the matter back to district court. *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023). The time for seeking any further review from that decision has not yet run. *See* SUP. CT. R. 13(1)–(3) (providing 90 days from the entry of judgment to petition for a writ of certiorari).

## STANDARD OF REVIEW

Under Rule 56, summary judgment is to be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an APA case like this one, the Court "employs summary judgment to decid[e], as a matter of law, whether the agency action is supported

by the administrative record and otherwise consistent with the APA standard of review." *New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019) (internal quotes and citation omitted).  The Court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The Court's "inquiry under the APA must be thorough, but the standard of review is very deferential to the agency." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers,* 702 F.3d 1156, 1165 (10th Cir.2012) (quotations omitted).   The Court "is not to substitute its judgment for that of the agency."   *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).  Rather, review is limited to whether the agency "entirely failed to consider an important aspect of the problem, . . . offered an explanation . . . [that] runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, [] failed to base its decision on consideration of the relevant factors, or [] made a clear error of judgment." *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (internal quotes and citation omitted).

The Court's "deference is most pronounced in cases where, as here, the challenged decision involves 'technical or scientific matters within the agency's area of expertise.'" *Id.* at 1273 (quoting *Utah Envtl. Congress v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006)).  "A presumption of validity attaches to the agency action and the burden of proof rests with" plaintiff.  *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010) (quotations omitted).

**ARGUMENT**

I.    **The Bureau's Rule Properly Interprets and Applies the Language of 26 U.S.C.
§ 5845(b).**

Both this Court and the Tenth Circuit have already rejected Plaintiff's challenge to the

Rule in denying Plaintiff's request for a preliminary injunction, finding that the Bureau's Rule

offers a reasonable interpretation of the statutory definition.  The Tenth Circuit reached this

result by applying *Chevron*, having concluded that the Rule was legislative and the statute

ambiguous.  *Aposhian II*, 958 F.3d at 979.  But this Court need not follow suit.  As the Supreme

Court has explained, resort to deference is unnecessary where an agency has adopted "the

position [the court] would adopt" when "interpreting the statute from scratch"—a standard

the Tenth Circuit did not consider.  *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002); *see

also Guedes IV*, 45 F.4th at 313 (concluding that "there is no need to decide what deference, if

any, [the Bureau's] regulation should receive where we can conclude that the agency's

interpretation of the statute is the best one.").  Because, as this Court correctly concluded in

its prior decision, the Bureau's Rule offers the "best" interpretation of the relevant terms in §

5845(b) and correctly applies those terms to bump stocks, this Court can and should grant

summary judgment to the government on that basis.  *See Aposhian I*, 374 F. Supp. 3d at 1151

& n.8; *see also Guedes IV*, 45 F.4th at 313, 314-15 ("The Bureau offers the best reading of the

statutory phrase in light of the plain language and purpose of the statute, particularly as

compared to Plaintiffs' unworkable definition.").[6]

---

[6]  Adopting this approach would be consistent with Plaintiff's assertion that "he is *not*
taking any position regarding Chevron's applicability or how the case should be resolved if
analyzed under the Chevron framework."  Pl. Br. at 27 (emphasis in original).

If, however, the Court concludes that application of deference is appropriate, then the Court of Appeals has already held that Plaintiffs could not establish a substantial likelihood of success on many of his claims. *Aposhian II*, 958 F.3d at 979. Those conclusions would be equally applicable here, and Defendants are therefore entitled to summary judgment on Plaintiff's challenges to the Rule.

### A.    The Rule Gives the Relevant Statutory Terms their Ordinary, Accepted Meanings

Congress defined a "machinegun" as any weapon that shoots "automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). Breaking this definition down into its subset components, the Bureau interpreted "automatic" to mean as a "result of a self-acting or self-regulating mechanism," and construed a "single function of the trigger" as a "single pull of the trigger" and "analogous motions." 83 Fed. Reg. at 66,514. These definitions best reflect the words' "ordinary meaning . . . at the time Congress enacted the statute," *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018), as well as the text, structure, purpose, and legislative history of the National Firearms Act and Gun Control Act. *Aposhian I*, 374 F. Supp. 3d at 1153; *see also Guedes IV*, 45 F.4th at 317.

*First*, consider the term "automatic:" as this Court observed, the Bureau's construction "is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment." *Aposhian I*, 374 F. Supp. 3d at 1153 (citing 83 Fed. Reg. at 66,519); *see also* "automatic," *Webster's New International Dictionary* 157 (1933); "automatic," 1 Oxford English Dictionary 574 (1933)). Unlike the Bureau's prior interpretations, which focused exclusively "on the 'self-acting'" element, by incorporating the "self-regulating" portion of the dictionary definition the Bureau accounted for "mechanized process[es] that requires less human exertion than an activity 'usually done by hand.'" *Guedes IV*, 45 F.4th at 316. Further,

it aligned the definition of "automatic" with past judicial opinions.  *See, e.g.*, *Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (concluding that "'automatically . . . delineates how the discharge of multiple rounds from a weapon occurs:  as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading").

_Second_, the Bureau followed an analogous approach with the phrase "single function of the trigger."  As courts have repeatedly observed, the phrase is something of a term of art, which dictionaries do not define directly.  *Aposhian I*, 374 F. Supp. 3d at 1151 n.9 (quoting *Guedes I*, 356 F.Supp.3d at 130).  However, the Bureau could draw on legislative history, which reflected that Congress intended to capture the manner in which most personal guns are fired—*i.e.* by a shooter pulling a curved metal trigger.  *See, e.g.*, *Guedes IV*, 45 F.4th at 315-16 (explaining that when "Congress began discussing restrictions on machine guns through the National Firearms Act, a 'single function of the trigger' was understood to mean a 'single pull'").  Indeed, in explaining the definition of "machinegun" in the bill that ultimately became the National Firearms Act, *see* H.R. 9741, 73d Cong. (1934), the House Committee on Ways and Means report stated that bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  H.R. Rep. No. 73-1780, at 2 (1934); *see* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions).

This interpretation accords with common references in dictionaries and other sources both before and since the enactment of the NFA, including the time in which Congress incorporated the NFA's definition of machine gun into the GCA and the FOPA.  *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); *Nightline: Biting the Bullet at the NRA*

-14-

*[National Rifle Association]*, (ABC television broadcast, June 8, 1990) (NRA President Joe Foss: "[semi-automatic] guns are like any other gun . . . they're a single-shot, every time you pull the trigger it shoots").  Further, it mirrors how courts have "instinctively reached for the word 'pull' when discussing the statutory definition of 'machinegun.'"  *Guedes I*, 356 F. Supp. 3d 130; *see, e.g., Staples v. U.S.*  511 U.S. 600, 602 n.1 (1994) (describing a machine gun within the NFA's definition as "a weapon that fires repeatedly with a single pull of the trigger"); *U.S. v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (explaining that automatic fire was achieved "with a single trigger function" by means of "the shooter . . . fully pulling the trigger").  And it is consistent with how the Bureau itself defined "single function of the trigger" since 2006. *See* 83 Fed. Reg. at 66,517 (noting that the Bureau's ruling on the "Akins Accelerator and devices with similar designs . . . determined that the phrase 'single function of the trigger' in the statutory definition of 'machinegun' was best interpreted to mean a 'single pull of the trigger.'" (citations omitted)).

Yet Congress did not limit the statute to a specific method of making a trigger function—or even to a specific kind of "trigger" mechanism.  As this Court observed, the statute uses the more general term "function" rather than the colloquial and more limited "pull" in description a trigger's operation.  *Aposhian I*, 374 F. Supp. 3d at 1152.  Consistent with this drafting, courts have repeatedly recognized that creative or innovative designs lacking a traditional "trigger" can still satisfy the definition of machinegun.  *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam); *accord United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002) (holding that a minigun fired by "an electronic switch" was a machinegun); *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam) (applying the statutory definition to a modified weapon that, although lacking a traditional

"trigger," fired automatically when a shooter put a magazine in the weapon, "held it at the magazine port, pulled the bolt back and released it"). Contrary to Plaintiff's passing remarks, Pl. Br. at 23-24, these cases are highly relevant. They establish that, as a legal matter, "'a single function of the trigger' describes the *action* that enables the weapon to 'shoot . . . automatically . . . without manual reloading,' not the 'trigger' mechanism" itself. *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992) (emphasis added).

The Bureau's Rule reflects this principle by concluding that "single function of the trigger" means a "single pull of the trigger" *as well as* "analogous motions" that "initiat[e] an automatic firing sequence"—such as pressing a button, flipping a switch, or exerting some other force. 83 Fed. Reg. at 66,515. This Court correctly concluded that this construction properly avoids "zero[ing] in on the mechanistic movement of the trigger" when Congress's evident purpose was to regulate devices that "drastically increase a weapon's rate of fire, not the precise mechanism by which that capability is achieved." *Aposhian I*, 374 F. Supp. 3d at 1152; *see also Guedes IV*, 45 F.4th at 315-16 (analyzing the legislative history of the NFA and holding that the Bureau's interpretation "aligns with Congress's purpose in enacting federal legislation on machine guns").

In sum, given the language of § 5845 and the legislative history of Congress's gun regulation, the "best interpretation of § 5845(b) is that Congress . . . intended to prohibit weapons capable of discharging multiple rounds continuously by means of a self-regulating mechanism initiated by a single human input on the trigger." *Gun Owners of Am.*, 19 F.4th at 909. That "is precisely the interpretation the Rule provides." *Id.*

### B.    The Rule Correctly Classifies Bump Stocks as Machine Guns

Plaintiff's summary judgment brief does not directly contest the Rule's interpretation of the operative statutory terms.  Indeed, although Plaintiff pointedly calculates the number of judges who have disagreed with the Bureau's construction, Pl. Br. at 21-22, he explicitly states that he "finds" the Bureau's "statutory constructions . . . unobjectionable," *id.* at 17. But, contrary to Plaintiff's assertions, applying the Rule's definitions of "automatically" and "single function of the trigger" to bump stocks unequivocally demonstrates that they are machineguns under federal law.  *See Guedes IV*, 45 F.4th at 317-18 (explaining that "a bump stock is a machine gun under the best interpretation of the statute").

As the Tenth Circuit explained, a bump stock "replaces the standard stationary stock of a semiautomatic rifle—the part of the rifle that generally rests against the shooter's shoulder—with a sliding, non-stationary stock." *Aposhian II*, 958 F.3d at 975–76 (citing Final Rule at 66,516).  The movement of the stock "channel[s] the recoil energy from each shot 'into the space created by the slid[e] . . . (approximately 1.5 inches) in constrained linear rearward and forward paths.'"  *Id.* (quoting Final Rule at 55,518).  By "'harness[ing] the firearm's recoil energy as part of a continuous back-and-forth cycle' . . . following a single pull of the trigger," the bump stock thus transforms the gun's triggering and operation, enabling a shooter "to fire bullets continuously and at a high rate of fire" so long as he "maintain[s] constant rearward pressure on the device's extension ledge with the trigger finger as well as forward pressure on the front of the gun."  *Id.* (quoting 83 Fed. Reg. at 66,518, 66,533).  In this way, "a bump stock is a self-regulating mechanism that allows a shooter to shoot more than one shot through a single pull of the trigger" without manual reloading—and thus,

"under the best interpretation of the statute . . . it is a machine gun under the National Firearms Act and Gun Control Act." *Guedes IV*, 45 F.4th at 319.

Plaintiff objects to this conclusion on the ground that it does not adequately account for the "extraneous" forward pressure that a shoot must apply to the gun barrel. Pl. Br. at 16, 19-20. But, as courts have correctly recognized, "the definition of 'automatically' does not mean that an automatic device must operate spontaneously without any manual input" beyond the initial trigger pull. *Guedes I*, 356 F. Supp. 3d at 132. And, as noted above, the Bureau's definition of "automatic" expressly incorporates the idea of a "self-*regulating*" mechanism—meaning that, contrary to plaintiff's suggestion, a bump stock can still satisfy that definition regardless of whether the user must apply some force beyond the initial trigger activation. Pl. Br. at 19-20; *United States v. Olofson,* 563 F.3d 652, 658 (7th Cir. 2009) (interpreting the term "automatically" as used in the NFA as "delineat[ing] how the discharge of multiple rounds from a weapon occurs: As the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading."); *see also* FR at 66,519 (noting that "*Olofson* [] requires only that the weapon shoot multiple rounds with a single function of the trigger 'as the result of a self-acting mechanism,' not that the self-acting mechanism produces the firing sequence without any additional action by the shooter"); *Guedes I*, 356 F. Supp. 3d at 131 (analogizing this usage of "automatic" to "[a]n automatic sewing machine . . . [which] still requires the user to press a pedal and direct the fabric"). Indeed, there is nothing remarkable about a shooter having to exert some continuous force to maintain automatic fire: numerous guns require a shooter to keep applying pressure during the firing sequence, yet do not evade the statutory definition. *See, e.g.*, *Guedes IV*, 45 F.4th at 317 ("[R]ather than reading the phrase 'by a single function of the trigger' to mean

'by *only* a single function of the trigger,' the phrase can naturally be read to establish only the preconditions for setting off the 'automatic' mechanism, without foreclosing some further degree of manual input.").

Plaintiff separately contends that gun with a bump stock cannot satisfy the statutory definition of "single function of the trigger" because the gun's trigger blade resets between each shot.  Pl. Br. at 18 n.7, 24.  The Fifth Circuit adopted a similar approach in its recent *en banc* decision in *Cargill*, reasoning the grammar of § 5845 deals with the mechanics of the firearm itself.  *See Cargill*, 57 F.4th at 459-60.  This mechanistic focus on the firearm's trigger was properly rejected by this Court as contrary to the best interpretation of the statute. *Aposhian I*, 374 F. Supp. 3d at 1152 (noting that the "ill sought to be captured by" the statutory "definition was the ability to drastically increase a weapon's rate of fire, not the precise mechanism by which that capability is achieved").  But even if focusing on the "mechanical act of the trigger" lever—to the exclusion of the shooter's act of "pull[ing]" it—were proper, *Aposhian II*, 958 F.3d at 985, the Plaintiff's and the Fifth Circuit's analysis would still fail on its terms.

Plaintiff himself "agrees with ATF that the word 'trigger,' as used in § 5845(b), refers" not to any particular piece of the gun but rather to anything "that initiates a weapon's firing sequence."  Pl. Br. at 24.  And a bump stock is specifically designed to supplant the operation of the gun's traditional trigger blade.  *See Gun Owners of Am.*, 19 F.4th at 908–09 (noting that "the trigger is depressed by the operation of the bump stock").  To wit, the bump stock requires only a *single* action—the initial pull of the trigger blade and coordinated push of the rifle forward—to begin the shooting sequence.  After that initial activation, the bump stock puts the gun into a "continuous cycle of fire-recoil-bump-fire

[which] lasts until the shooter releases the trigger by removing his finger from the extension ledge, the weapon malfunctions, or the ammunition is exhausted." *Aposhian I*, 958 F.3d at 976 (citing 83 Fed. Reg. at 66,519); *see also Gun Owners of Am.*, 19 F.4th at 909 (noting that with a bump stock "a single pull of the trigger by the shooter initiates a sequence in which the bump stock harnesses and directs the firearms' recoil energy so that the firearm fires continuously without additional physical manipulation of the trigger by the shooter or any manual reloading").  In other words, the bump stock itself acts as an automated triggering device for successive shots, firing multiple rounds through only one initiating "function." Such a device fits squarely within the statutory definition of a machine gun.

Notably, neither plaintiff nor the Fifth Circuit dispute the Bureau's determination that *certain* types of bump stocks—namely, those that are mechanically-assisted such as the Akins Accelerator—are properly classified as machine guns.  *See* Pl. Br. at 16; *Cargill*, 57 F.4th at 462 & n.8.  Yet those mechanical bump stocks work on the exact same principle as their sliding counterparts:  they both harnesses the gun's recoil to create a self-regulating mechanism that rapidly cycles the gun's conventional trigger.  *See, e.g.*, 83 Fed. Reg. at 66,517 (explaining that to "operate the device, the shooter . . . pull[ed] the trigger one time" and then "[t]he recoil and the spring-powered device [] caused the firearm to cycle back and forth, impacting the trigger finger without further input by the shooter while the firearm discharged multiple shots").  The only difference between a sliding bump stock and a mechanical one like the Akins Accelerator is that the latter adds a spring to facilitate the gun's rapid movement forward.  *See id*.  But both devices achieve rapid fire by bumping the gun's trigger blade against the shooter's finger.  *See, e.g.*, Pl. Br. at 16 (noting that with the Akins accelerator "the rifle's trigger continued to reset after each shot").  Classifying the

Akins accelerator as a machine gun thus compels the same result for sliding bump stocks as well.[7]

### C.    The Rule Reasonably Distinguishes Between Bump Stocks and Other Methods of Bump Firing a Weapon.

The Plaintiff separately claims that the Rule does not adequately address why a sliding bump stock constitutes a machine gun, while other methods of bump firing—such as using rubber bands, belt loops, or manual recoil control—are not.  Pl. Br. at 24-25.  This is incorrect. The Bureau engaged with this and similar comments in the Rule, explaining that the "constrained linear rearward and forward paths" provided by a bump stock are what make such stocks "different from a traditional shoulder stock" and other firing methods.  83 Fed. Reg. at 66,532; *see also* AR002240; AR002273; AR002320; AR003951.  This distinction is legally significant.  As the Bureau detailed, "the belt loop or similar manual method requires the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils."  83 Fed. Reg. at 66,533.  So, "[u]nlike a bump stock, a rubber band or belt loop is not automatic because it is not self-regulating."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 321 (D.C. Cir. 2022).

Put another way, a bump stock constitutes a machine gun because it is a mechanical device that regulates—indeed, automates—the operation of the gun's traditional trigger.  Belt loops and rubber bands do not do so.  And, as courts considering this argument have explained, the Bureau "'clearly thought about [their] objections and provided reasoned

---

[7]   The Fifth Circuit in *Cargill* noted that, when it comes to the Akins Accelerator, a "switch activating [the] mechanical bump stock [could] be the legal trigger," but noted that "the definition of 'trigger' is not in dispute."  *Cargill*, 57 F.4th 447, 462.  Both the Fifth Circuit and Plaintiff are, of course, correct that the Bureau's Rule does not seek to define the term "trigger" separate from the rest of the statutory phrase.  *See generally Aposhian I*, 374 F. Supp. 3d at 1152.  But focusing on the statutory terms in isolation is not helpful to Plaintiff because, as this discussion demonstrates, that type of analysis collapses under its own weight.

replies,' which is 'all the APA requires.'" *Guedes I*, 356 F. Supp. 3d at 135 (quoting *City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007)); *see Guedes II*, 920 F.3d at 32 ("belt loops, unlike bump stocks, do not transform semiautomatic weapons into statutory 'machineguns[,]' [o]r so [Defendants] reasonably concluded in the Rule").

\* \* \*

The Bureau's careful analysis demonstrates that sliding bump stocks, like their automatic counterparts, constitute machine guns under § 5485(b) because they operate in a manner that satisfies the best construction of the statutory definition.  Given that Plaintiff "finds" the Bureau's "statutory construction . . . unobjectionable," his efforts to tally up the judges who have rejected the Bureau's interpretation is for naught.  Pl. Br. at 17, 21-22.  This Court, along with the D.C. Circuit, correctly concluded that the Bureau's interpretation constitutes the "best" reading of the statute.  *Aposhian I*, 374 F. Supp. 3d at 1153; *Guedes IV*, 45 F.4th at 317.  Plaintiff offers no rebuttal to that finding.  The Court should therefore reach the same result again.

## II.    The Rule of Lenity Is Inapplicable.

As an alternative to his primary APA claim, Plaintiff urges the Court to invoke the "rule of lenity" to reject the Bureau's conclusion that bump stocks are machine guns under the statutory definition.  Like his other challenges, this argument has been repeatedly rejected previously.  *See Aposhian II*, 958 F.3d at 984; *Guedes IV*, 45 F.4th at 321–22.  It should be rejected again.

The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute that the Court must simply guess at what Congress intended."  *Maracich v. Spears*, 570 U.S. 48, 76 (2013); *see*

*also Staples*, 511 U.S. at 619 n.17 (applying rule of lenity was unnecessary where meaning could be derived through interpretive tools).  As courts have emphasized, the "rule of lenity 'is a rule of last resort [and] the mere assertion of an alternative interpretation is not sufficient to bring the rule into play.'"  *United States v. Gay*, 240 F.3d 1222, 1232 (10th Cir. 2001) (quoting *United States v. Blake*, 59 F.3d 138, 140 (10th Cir. 1995)).  Rather, it is only where the Court has exhausted "everything from which aid can be derived" that lenity plays a role.  *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (internal quotation marks and citations omitted);

Here, for all the reasons articulated above, the Rule's application of the terms used to define "machinegun" in the NFA constitutes the "best interpretation" of the statute, so there is no ambiguity—let alone a "grievous" one—that would justify applying the lenity doctrine. 83 Fed. Reg. at 66,517, 66,518.  As the D.C. Circuit explained in agreeing with the Bureau's construction, the Court is "not left to 'guess at' the meaning of the text at issue here . . . given the array of tools at our disposal, including the statute's plain language, prior case law, contemporaneous understandings, and congressional purpose."  *Guedes IV*, 45 F.4th at 321–22.  Accordingly, Plaintiff's invocation of the rule of lenity fails on its own terms.  Pl. Br. at 27-28.

### III.   The Bureau's Construction of § 5845 Does Not Contravene the Non-Delegation Doctrine or Violate the Separation of Powers.

As a last-ditch measure, Plaintiff attempts to impugn the Bureau's Rule on constitutional grounds, claiming that "[i]nterpreting 26 U.S.C. § 5845(b) to permit ATF to classify non-mechanical bump stocks as machineguns would constitute" a violation of the nondelegation doctrine.  Pl. Br. at 13, 29; Compl. ¶ 185.  This argument is even further afield. "Only twice in this country's history (and that in a single year)" has the Supreme Court

"found a delegation excessive." *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality).   Since 1935, the Supreme Court has consistently upheld varied and "broad delegations" of rulemaking power, requiring only that "Congress [] ma[ke] clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" *Id.* (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

These standards "are not demanding." *Id.*  In *Gundy*, for instance, the Supreme Court sustained a grant of authority to the Attorney General "to specify the applicability of the requirements of [the statute] to sex offenders convicted before the [statute's] enactment . . . and to prescribe rules for [their] registration." *Id.* at 2122.  "Yes," Justice Gorsuch's dissent noted, "that's it." *Id.* at 2132 (Gorsuch, J., dissenting).   And, as the plurality observed in sustaining that delegation, before that the Court had "approved delegations to various agencies to regulate in the 'public interest'"; *id.* at 2129 (quoting *National Broadcasting Co.*, 319 U.S. 190, 216 (1943); *New York Central Securities Corp. v. United States*, 287 U.S. 12, 24 (1932)); "to set 'fair and equitable' prices and 'just and reasonable' rates;" *id.* (quoting *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)); and "to issue whatever air quality standards are 'requisite to protect the public health.'" *Id.* (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 472 (2001)).

Compared to these delegations, § 5845 is in a different league entirely.  Congress has provided a detailed definition of the term "machinegun," attached criminal consequences to the unlawful possession of such a weapon, *see* 18 U.S.C. § 922(o); 26 U.S.C. § 5845(b), and Defendants have explained "the best interpretation of the statute" that Congress itself enacted. 83 Fed. Reg. at 66,521.  Applying the text as written in no sense "divests" Congress of its

authority.  Rather, Congress has left the Bureau with the limited task of interpreting two words and applying them to specific factual contexts.  That is entirely appropriate.

The Supreme Court has repeatedly noted that the non- delegation doctrine does not require that Congress anticipate all application of statutory terms or draft statutes in exhaustive detail.  *See, e.g.* , *Gundy*, 139 S. Ct. at 2123 ("[T]he Constitution does not 'deny[ ] to the Congress necessary resources of flexibility and practicality to perform its function[s].'" (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)).  To the contrary, when analyzing "congressional delegations," the courts' "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also* Julian Davis Mortenson, Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 281 (2021) ("[E]arly Congresses adopted dozens of laws that broadly empowered executive and judicial actors to adopt binding rules of conduct.").  This is no less true when the delegation occurs in the criminal context.  *See, e.g., Loving v. United States*, 517 U.S. 748, 768 (1996) (noting that the Supreme Court has regularly "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").  Even a statute matching Plaintiff's distorted caricature—namely, one that allowed the Bureau to "ban any weapon it deems too dangerous," Pl. Br. at 31—would satisfy this standard.  *See Gundy*, 139 S. Ct. at 2129 (discussing analogous delegations).  And the actual version of the statute comes nowhere close to vesting that kind of discretion.  As the D.C. Circuit noted in an analogous case, a non-delegation challenge to the Final Rule is "difficult to square with the Supreme Court's" precedent.  *Guedes II*, 920 F.3d at 26 (discussing *Touby v. United States*,

500 U.S. 160 (1991)).  Simply put, "the separation of powers 'does not prevent Congress from seeking assistance" of the sort involved in the Rule and in Defendants' classification of bump stocks as machine guns.  *Id.* at 26-27 (quoting *Touby*, 500 U.S. at 165).

Plaintiff's complaint makes several other structural constitutional arguments alongside his non-delegation claims.  *See* Compl. ¶¶ 135 (alleging that the "Rule was issued without any statutory authority and therefore violates Article I, § 1 of the U.S. Constitution"); ¶¶ 149-51 (arguing that, by promulgating the Rule, Defendants violated "Article I, § 7 of the U.S. Constitution" because they made a legislative change without bicameralism and presentment, and violated their duties under Article II to faithfully execute the laws).  However, Plaintiff presents no independent argument in support of those counts in his summary judgment brief, seemingly subsuming them under the non-delegation doctrine.  Pl. Br. at 29.  Regardless, all of Plaintiff's constitutional claims come down to his assertion that the statute does not authorize the classification of bump stocks as machine guns.  *See* Compl. ¶¶ 135, 149-51.  But, as explained above, the Bureau's Rule offers the "best" construction of the statute—meaning it is, by definition, consistent with Congressional authorization and therefore raises no separation-of-power concerns.  The Court should therefore grant summary judgment to the Defendants on all of Plaintiff's claims.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for summary judgment and enter judgment for Defendants.

Dated:  February 13, 2023                Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney
                                         General

                                         BRIGHAM J. BOWEN
                                         Assistant Branch Director
                                         Federal Programs Branch

                                         */s/ Alexander V. Sverdlov*
                                         ALEXANDER V. SVERDLOV
                                         (NY Bar 4918793)
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, DC 20005
                                         Tel: (202) 305-8550
                                         alexander.v.sverdlov@usdoj.gov

                                         *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 13th day of February, 2023, a copy of the foregoing was filed electronically.  This filing was served electronically to all parties by operation of the Court's electronic filing system.

<u>  /s/ Alexander V. Sverdlov </u>