## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| W. CLARK APOSHIAN,<br><br>  Plaintiff,<br><br>v.<br><br>MERRICK GARLAND, Attorney General of the United States, *et al.*,<br><br>  Defendants. | **MEMORANDUM DECISION & ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT & GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00037-JNP-CMR<br><br>District Judge Jill N. Parrish |

Through this action, Plaintiff W. Clark Aposhian ("Plaintiff" or "Mr. Aposhian") seeks (i) a declaration that a 2018 regulation promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is unenforceable against him and all similarly situated persons within this court's jurisdiction; and (ii) the issuance of an injunction prohibiting Defendants from enforcing the regulation. *See* ECF No. 2 at 20-36. Before the court at this time are cross-motions for summary judgment. ECF Nos. 61, 64.

Although the parties suggest that the court ought to engage once again in best-interpretation analysis of the underlying statute, this court follows the Tenth Circuit's directive to apply *Chevron* in reviewing the ATF regulation. And because this court concludes that the regulation is an appropriate exercise of the agency's discretion to fill gaps implicitly left by Congress, it declines to declare the rule unlawful or enjoin its enforcement. For this reason, and for the reasons set out below, the court hereby **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 61, and **GRANTS** Defendants' Cross-Motion. ECF No. 64.

**BACKGROUND**

The court considers the parties' motions against the backdrop of the significant appellate history outlined below. Likewise, the court acknowledges that other matters related to the regulation at issue here are pending in courts across the country. But rather than await the resolution of out-of-circuit matters on related (but distinct) issues of law, this court finds it appropriate to resolve the motions filed by the parties according to the standards announced by the Tenth Circuit at an earlier stage of this litigation.

The court's decision to promptly resolve the parties' motions is ultimately a reflection of this court's subordinate relationship to the Tenth Circuit and a recognition of its obligation to dutifully apply existing law as directed by the judicial hierarchy rather than read tea leaves and prognosticate out-of-circuit doctrinal developments.

## I.  Statutory Framework for Machine Gun Regulation and the Final Rule

This case centers on the appropriate interpretive boundaries of the term "machinegun"[1] as defined by a constellation of federal statutes that regulate the public's access to certain firearms, particularly whether a bump stock falls within the statutory definition of a machine gun. Congress began regulating machine guns through the National Firearms Act of 1934, codified at 26 U.S.C. § 5845 ("NFA"). The NFA regulates the production, dealing in, possession, transfer, import, and export of covered firearms, and defines "machinegun[s]" in the following manner:

> [A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts

---

[1] The relevant statutes spell "machinegun" as one word. Except when quoting these statutes, the court generally uses the contemporary two-word spelling of machine gun.

designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

NFA § 5845(b). The Gun Control Act of 1968 (the "GCA") incorporated this definition into the criminal code. *See* 18 U.S.C. § 921(a)(21) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act[.]"); *id*. § 922(o) (providing that, except under limited circumstances, "it shall be unlawful for any person to transfer or possess a machinegun"). While the Attorney General has been statutorily charged with the power and duty to administer and enforce these provisions, he has delegated this authority to the ATF. *See* 26 U.S.C. § 7801(a); 28 C.F.R. § 0.130(a).

Bump stocks are devices that replace the standard, stationary stock of a semiautomatic rifle with a sliding, non-stationary stock that permits the shooter to increase the firearm's rate of fire, approximating that of an automatic weapon. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,516 (Dec. 26, 2018) ("Final Rule"). In 2006, the ATF concluded that a species of bump stock, the Akins Accelerator, fell within the ambit of the NFA's ban on machine guns. This is so, ATF reasoned, because that device, unlike some other forms of bump stocks, "employed internal springs to harness [a] weapon's recoil energy to repeatedly force the rifle forward into the operator's finger." *Aphosian v. Barr*, 374 F. Supp. 3d 1145, 1148 (D. Utah 2019) ("*Aphosian I*").

In other words, the Akins Accelerator's internal spring, coupled with the force of the weapon's recoil, repositioned and effectively reinitiated the firearm's firing cycle. *Akins v. United States*, 312 F. App'x 197, 199 (11th Cir. 2009). ATF later clarified that although Akins Accelerators were machine guns as defined by federal statute, manual bump stocks (i.e., non-mechanical bump

stocks), because they lacked such internal spring mechanisms, were not. *See* Final Rule at 66,514. ATF maintained this position on manual bump stocks until 2017. *See id*. at 66,530.

ATF changed course, however, when a single shooter used semiautomatic weapons equipped with manual bump stocks to perpetrate the October 1, 2017 mass shooting in Las Vegas, Nevada, killing 58 people and injuring approximately 500 more. *Id*. at 66,516. As a result of the Las Vegas shooting, ATF published an advance notice of proposed rulemaking ("ANPRM") inviting comments regarding the applicability of the machine gun statutes to non-mechanical bump stocks. *See* 82 Fed. Reg. 60,929 (December 19, 2017).

Subsequently, then-President Donald Trump "direct[ed] the Department of Justice to dedicate all available resources to complete the review of the comments received, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns," including "bump stock type devices." 83 Fed. Red. 7949, 7949-50 (Feb. 20, 2018). On March 29, 2018, the ATF published a notice of proposed rulemaking ("NPRM"). *See* Bump-Stock-Type Devices, 83 Fed. Reg. 13,442 (Mar. 29, 2018). Through the rulemaking, ATF proposed to clarify the statutory terms "automatically" and "single function of the trigger" in the NFA and apply the revised definitions to the classification of weapons as machine guns. *Id*.

ATF promulgated the Final Rule on December 26, 2018. *See* Final Rule at 66,514. The Final Rule purported to formalize ATF's longstanding interpretation of "single function of the trigger" to mean "single pull of the trigger," interpret "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger," thereby generally proscribing bump stock type devices. *Id*. at 66,514-15. The Final Rule stated that its proposed interpretation of the statutory text is the "best interpretation" of

the terms at issue and, if nothing else, a "reasonable construction of them," *id*. at 66,527, expressly claiming an entitlement to *Chevron* deference. *Id*. Anyone then in possession of a bump stock type device was given 90 days to destroy or surrender such devices before being subject to criminal liability. *Id.* at 66,526, 66,530.

## II.   Procedural History

### A.   *Aposhian I*

Prior to the promulgation of the Final Rule, Mr. Aposhian lawfully owned a Slide Fire bump stock for use in recreational shooting and target practice. ECF No. 2 ¶¶ 3-4. Three weeks after the Final Rule was published, on January 16, 2019, Mr. Aposhian filed suit against the Defendants under seven claims for relief, pleading that the Defendants acted in excess of their constitutional authority and in violation of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*., by promulgating the Final Rule. *See generally* ECF No. 2.

The next day, on January 17, 2019, Mr. Aposhian moved this court to preliminarily enjoin the Defendants from enforcing the Final Rule pending resolution of his suit on the merits. ECF No. 10. In his Motion for Preliminary Injunction, *id*., Mr. Aposhian argued that the express language of the NFA clearly defines "machinegun" in such a way that excludes manual bump stocks, therefore rendering the Final Rule arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Id*. at 3.

This court, however, declined to issue a preliminary injunction. *See Aposhian I*, 374 F. Supp. 3d at 1147. In denying Mr. Aposhian's motion, this court concluded that the Final Rule was interpretive, rather than legislative, in character, *id*. at 1150, and that the ATF's given interpretation of the terms "automatically" and "single function of the trigger" constituted the best interpretations

5

of those terms. *Id.* at 1151–53. Accordingly, the court was persuaded that Plaintiff had not met his burden of demonstrating sufficient likelihood of success on the merits. *Id*. at 1153.

### B.  *Aposhian II* and the *Chevron* Doctrine

On appeal, the Tenth Circuit affirmed the outcome reached in *Aposhian I*—that is, denial of preliminary injunction—but offered doctrinal course-correction to this court regarding the issue of "what standard we are to apply in addressing the Final Rule[.]" *Aposhian v. Barr*, 958 F.3d 969, 979 (10th Cir. 2020) ("*Aposhian II*"), *vacated by Aposhian v. Barr*, 973 F.3d 1151 (10th Cir. 2020) ("*Aposhian III*"), *reinstated sub nom. Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) ("*Aposhian IV*"), *and cert. denied*, 143 S. Ct. 84 (2022).

The Tenth Circuit noted that this court, in *Aposhian I*, did not apply the test established by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), but elected instead to declare what it concluded was the best interpretation of the statute in question. 374 F. Supp. 3d at 1151 n.8. However, the Tenth Circuit made clear that, although the parties contested the applicability of *Chevron*, "the Final Rule warrants consideration under the *Chevron* framework." *Aposhian II*, 958 F.3d at 979.[2]

Mr. Aposhian offered argument before the Tenth Circuit injunction panel that *Chevron* deference was inapplicable or otherwise inappropriate (i) because such deference had been "waived" by the government as a result of the government's disavowal of any such entitlement to deference in the action; and (ii) because *Chevron* deference would be inappropriate in instances of regulations carrying criminal implications. *Id*. at 981. The Tenth Circuit, however, concluded that

---

[2] This is so, the Tenth Circuit held, because the Final Rule is a legislative rule, contrary to this court's conclusion in *Aposhian I. See Aposhian II*, 958 F.3d at 980.

neither argument was likely to succeed on the merits in the context of the Final Rule, particularly because the government relied on *Chevron* "when the Final Rule was promulgated." *Id*. at 981.

However, *Aposhian II* declined to squarely resolve the precise nature of the party-presentation doctrine under *Chevron*—that is, whether a court must be invited to apply *Chevron* before doing so, or whether parties must otherwise invoke the doctrine before regulations such as this one can be afforded any part of *Chevron* deference. However, the Tenth Circuit stated that "[t]o the extent that *Chevron* is a standard of review, we would need no invitation to apply it." *Id*. at 982 n.6. *Aposhian II* also held that even oblique invocations of *Chevron* (including, for example, a plaintiff's citation to the doctrine as part of an argument that a statute is *not* ambiguous) are likely sufficient to satisfy this party-presentation rule to whatever extent such a rule exists. *Id*. at 981-82.

Similarly, *Aposhian II* considered past Supreme Court and Tenth Circuit precedent to reach the conclusion that Mr. Aposhian was unlikely to succeed on his argument that *Chevron* deference could not be applied to agency interpretations "with criminal law implications," *id*. at 984, given the numerous instances in which these courts had previously invoked *Chevron* notwithstanding the criminal implications carried by agency regulations. *See, e.g.*, *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 & n.18 (1995); *NLRB v. Oklahoma Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir. 2003) (en banc); *United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004); *United States v. Hubenka*, 438 F.3d 1026, 1032-34 (10th Cir. 2006).

"Because the precedents cited call for the application of *Chevron*," *Aposhian II*, 958 F.3d at 984, the Tenth Circuit then considered the Final Rule under *Chevron*'s two-step framework to determine Mr. Aposhian's likelihood of success on the merits. *Id*. Upon detailed analysis of the relevant statutory terms and the text of the Final Rule, the Tenth Circuit held that "[b]ecause ATF's Final Rule sets forth a reasonable interpretation of the statute's ambiguous definition of

7

'machinegun,' it merits our deference." *Id*. at 989. The panel then noted that "[a]lthough [it] could affirm the district court's denial of preliminary injunction relief solely on the ground that Mr. Aposhian has failed to demonstrate a substantial likelihood of success on the merits," *id*., the panel nonetheless continued to consider the other elements of preliminary relief, concluding that Mr. Aposhian did not meet any of the other prerequisites for such relief. *Id*.

### C.  *Aposhian III & IV* and Subsequent History

Following the injunction panel's opinion in *Aposhian II*, Mr. Aposhian filed a petition for rehearing en banc, which was granted on September 4, 2020. *See Aposhian III*, 973 F.3d at 1151. *Aposhian III* invited determination of, *inter alia*, whether *Chevron* operates as a standard of review, a tool of statutory interpretation, or an analytical framework that applies where a government agency has interpreted an ambiguous statute; whether one or both parties must invoke the doctrine under a party-presentation rule; and whether *Chevron* is properly applicable in the interpretation of statutes with criminal implications.

However, following consideration of the parties' supplemental briefs and oral argument, the Tenth Circuit vacated *Aposhian III* as improvidently granted and reinstated the injunction panel's opinion in *Aposhian II*. *See Aposhian IV*, 989 F.3d at 890. That same day, the Tenth Circuit's mandate in this matter issued. *See* ECF No. 46-1. Mr. Aposhian subsequently petitioned the Supreme Court for a writ of certiorari, and his petition was denied on October 3, 2022. 143 S. Ct. at 84.

On January 5, 2023, Mr. Aposhian filed a motion for summary judgment, ECF No. 61, to which the government responded with a cross-motion. ECF No. 64. There are no disputed facts at issue in the administrative record provided by the parties, ECF No. 59, and both parties agree that

the question before this court is purely one of statutory interpretation. Oral argument was held on September 28, 2023. *See* ECF No. 70.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Statutory interpretation is a matter of law appropriate for resolution on summary judgment." *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011). The Administrative Procedure Act "governs judicial review of agency actions." *Citizens' Comm. To Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).

Courts "may only set aside agency action[s] that [are] 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Aposhian II*, 958 F.3d at 979 (quoting 5 U.S.C. § 706(2)(C)).

Courts "apply the test established by *Chevron*[] when asking whether an agency has acted within its authority." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015). Under step one of *Chevron*, courts consider "whether Congress has directly spoken to the precise question at issue." *Id.* at 684 (quoting *Chevron*, 467 U.S. at 842). If the statute is clear, courts apply the clear meaning of the statute. *Id*.

If, however, the statute does not address the question, courts ask "whether the [regulation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If the interpretation of the statute offered by the agency is reasonable, courts must defer to the agency interpretation even if it is not "one that this court would have reached had the question initially arisen in a judicial proceeding." *Aposhian II*, 958 F.3d at 988 (quoting *Anderson v. Dep't of Labor*, 422 F.3d 1155, 1181 (10th Cir. 2005)).

9

## ANALYSIS

### I.      The Applicability of *Chevron* as a Threshold Matter

### A.  The Parties' Proposed Interpretive Path Forward

The Tenth Circuit has offered extensive analysis of the standards to be applied in this case and has weighed in on the probability of Mr. Aposhian's success on the merits as to his contentions regarding statutory interpretation.[3] This court has already attempted once to offer the best interpretation of the relevant statutory text, and the Tenth Circuit saw fit to intervene and declare that binding "precedents [] call for the application of *Chevron*," *Aposhian II*, 958 F.3d at 984, and that "the Final Rule warrants consideration under the *Chevron* framework." *Id*. at 979. As a result, this court believes it would be inappropriate and insubordinate to disregard *Aposhian II* and re-engage in best-interpretation analysis.

*Aposhian II* notwithstanding, the parties' arguments on summary judgment focus almost exclusively on triangulating the best interpretation of the statutory text. In fact, Plaintiff asserts that *Aposhian II* does "not bind" this court, and that this court therefore writes "on a clean slate." ECF No. 61 at 14. Plaintiff bases these assertions both on its interpretation of the law-of-the-case doctrine and his understanding that "the Tenth Circuit's affirmance of denial of preliminary injunction can equally well be attributed to its findings on the other three preliminary injunction requirements." *Id*.[4] Although Plaintiff acknowledges that the Tenth Circuit disagreed with this

---

[3] Additionally, it is this court's view that the injunction panel's conclusions in *Aposhian II* carry the implicit blessing of the Tenth Circuit as a whole given the vote to reinstate *Aposhian II* following full briefing and oral argument. *Aposhian II* is clear that the Final Rule is properly considered under *Chevron*.

[4] While the issue of the doctrinal nuance of the law-of-the-case doctrine is discussed at greater length below, Plaintiff's second rationale for waving away *Aposhian II* can be dismissed out of hand by simple reference to *Aposhian II*'s holding that this court could be affirmed "*solely* on the

court's earlier decision to declare the "best interpretation" of the statutory text, ECF No. 61 at 8, he argues that the now-available Administrative Record ("AR") ought to change this court's interpretive calculus and lead to the conclusion that his is the best reading of the statute. *See id.* at 26. Mr. Aposhian also represents that "[t]he factual underpinnings for the Tenth Circuit's deference finding no longer exist," *id.* at 26, because "ATF has repeatedly stated that its construction of the statute is not entitled to deference and that it does not want the courts to defer to [its] construction [] set out in the Final Rule." *Id.* at 26-27.[5] In short, Mr. Aposhian argues that *Chevron*'s invitation to the case at hand "has disappeared." *Id.*

The government, in response, hedges its position on *Chevron*, arguing that it is entitled to summary judgment on *Chevron* grounds only briefly and in the alternative:

> If, however, the Court concludes that application of deference is appropriate, then the Court of Appeals has already held that Plaintiffs could not establish a substantial likelihood of success on many of his claims. Aposhian II, 958 F.3d at 979. Those conclusions would be equally applicable here, and Defendants are therefore entitled to summary judgment on Plaintiff's challenges to the Rule.

ECF No. 64 at 13. This statement by the government is significant insofar as this court is, in fact, bound by a party-presentation rule in applying *Chevron*, and it certainly defeats Mr. Aposhian's contention that the government has wholly disclaimed *Chevron*. However, the court nonetheless notes that Defendants, like Plaintiff, generally focus their argument on determining the best

---

ground that Mr. Aposhian has failed to demonstrate a substantial likelihood of success on the merits." *Aposhian II*, 958 F.3d at 989 (emphasis added). Just because Mr. Aposhian failed to carry his burden in preliminary injunction as to the other elements does not mean that this court will discard the Tenth Circuit's clear statement that he certainly also failed as to his arguments regarding *Chevron* and statutory interpretation.

[5] Mr. Aposhian, in his motion, thus attempts to make clear that he is not taking "any position" regarding *Chevron*'s applicability or how the case should be resolved if analyzed under the *Chevron* framework[.]" *Id.* at 27.

interpretation of the statute, even suggesting that this court "need not" follow the *Chevron*-centered interpretive analysis set out in *Aposhian II*, ECF No. 64 at 12, and that this court should instead interpret the statute "from scratch." *Id*. (quotation omitted).[6]

The parties' shared aversion to *Chevron* is notable. As a result, this court considers it appropriate to clarify (i) in what ways it is bound by the standard-of-review framework outlined in *Aposhian II*; (ii) that the *Chevron* party-presentation rule in the Tenth Circuit does not foreclose reliance on *Chevron* at this stage of the litigation; and (iii) that, even to the extent that this court must be invited to employ *Chevron*, the parties have sufficiently cited, invoked, and invited the use of *Chevron* through their arguments on summary judgment.

In summary, despite the parties' arguments to the contrary, this court considers itself bound by the unambiguous directives of the Tenth Circuit, and the proposed end runs around appellate authority ultimately fall flat when subjected to serious scrutiny. In the end, the parties' contentions rest on misstatements of the law-of-the-case doctrine and the Tenth Circuit's pronouncements on the party-presentation rule under *Chevron*.

---

[6] Defendants argue that interpreting the statute from scratch to find the best interpretation—the one the court itself would adopt—would obviate the need for *Chevron* deference and constitutes "a standard the Tenth Circuit did not consider." *Id*. This court, however, is puzzled by Defendants' suggestion that the Tenth Circuit did not consider a from-scratch, best-interpretation reading of the relevant statutory text. It is true that the Tenth Circuit did not conduct its own from-scratch analysis, but it certainly *considered* such a standard of best interpretation when it reviewed this court's own best interpretation offered at the preliminary injunction stage and affirmed on alternative grounds. Thus, not only did the Tenth Circuit consider such a standard, it expressly rejected it when it stated that the "standard we are to apply" is *Chevron*. *Aposhian II*, 958 F.3d at 979. Defendants also suggest that dodging *Chevron* by following a best-interpretation framework would "be consistent with Plaintiff's assertion" that he is not taking any position regarding *Chevron*. ECF No. 64 at 12 n.6. But it is not clear why this court would not be obliged to take an interpretive position consistent with the Tenth Circuit's precedential assertions in *Aposhian II* instead.

**B.  *Aposhian II* and the Law-of-the-Case Doctrine**

As a general matter, "[t]he law of the case doctrine provides that once an appellate court decides an issue[,] the decision will be binding on all subsequent proceedings in the same case." *Mitchell v. Maynard*, 80 F.3d 1433, 1448 (10th Cir. 1996); *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995); *see also United States v. Wittig*, 575 F.3d 1085, 1097 (10th Cir. 2009) ("Absent certain exceptional circumstances, we of course adhere to our prior resolution of particular issues as the law of the case."). "The law of the case doctrine obligates every court to honor the decisions of courts higher in the judicial hierarchy." *Stifel, Nicolaus & Co. v. Woolsey & Co.*, 81 F.3d 1540, 1543 (10th Cir. 1996). "[T]rial court[s] may not reconsider a question decided by an appellate court." *Id.*; *accord United States v. Dutch*, 978 F.3d 1341, 1345 (10th Cir. 2020) (reiterating that district courts must "comply with any mandate rendered by [the Tenth Circuit] on remand.").

As Plaintiff observes, the difference between the *current* posture of the case (that is, resolution of cross-motions for summary judgment) as opposed to the posture of the case when *Aposhian II* was decided on interlocutory appeal (that is, resolution of a motion for preliminary injunction) is, of course, significant. *See* ECF No. 61 at 32-33 (citing *Homans v. City of Albuquerque*, 366 F.3d 900, 904-05 (10th Cir. 2004)); *see also Stifel, Nicolaus & Co. v. Woolsey & Co.*, 81 F.3d 1540, 1543-44 (10th Cir. 1996). Most importantly, "the *findings* of fact and *conclusions* of law made by a court granting a preliminary injunction are not binding at trial on the merits," *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added), insofar as the analysis at the preliminary injunction stage is probabilistic.

But Plaintiff appears to take this proposition from *Camenisch* and stretch it out of proportion. It is certainly true that the distinction between the probabilistic inquiry at preliminary

13

injunction and final resolution at the merits stage means that injunction panels' conclusion *as to the probability of litigants' success* should not be relied on to avoid independent and searching merits analysis. *See Fish v. Schwab*, 957 F.3d 1105, 1140 (10th Cir. 2020).[7] "This rule exists because the court of appeals must often consider such preliminary relief without the benefit of a fully developed record and often on briefing and argument abbreviated or eliminated by time considerations." *Id.* (quotation omitted).

But the fact that *conclusions* of law—that is, an injunction panel's probabilistic predictions as to case *outcome*—are not binding[8] certainly does not mean that the district court ought to ignore the appellate authority's determination of the proper threshold standards to be applied or the appropriate point of analytical entry into the case. *Fish* makes this clear through its express holding that "an opinion that robustly addresses legal issues at the preliminary-injunction stage of the litigation will provide the district court with the *appropriate legal framework* within which to view the case." 957 F.3d at 1141 (cleaned up and emphasis added). In other words, even though *Aposhian II* might not be able to tell this court where to *end* its inquiry at the summary-judgment stage, it certainly can tell it where to *begin* by providing the appropriate legal framework. And *Aposhian II* did exactly that by squarely stating that "the precedents cited call for the application of *Chevron*," 958 F.3d at 984, and that *Chevron* is "the standard we are to apply." *Id.* at 979.

---

[7] The court wishes to emphasize that *Fish* makes clear that, as a preliminary matter, deviation from the law-of-the-case doctrine in the transition between the preliminary injunction stage and merits stage *generally* as the exception rather than the rule, even as to outcomes. *See Fish v. Schwab*, 957 F.3d 1105, 1141 (10th Cir. 2020).

[8] This being the case particularly where an appeals court makes a probabilistic inquiry on an abbreviated record and under strict time considerations. *See Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012); *accord Homans v. City of Albuquerque*, 366 F.3d 900, 904-905 (10th Cir. 2004). But the court is convinced that such is not the case here.

14

In short, although this court, upon consideration of the Administrative Record and the parties' briefing, might reach a different conclusion than the Tenth Circuit on the other side of the *Chevron* crucible, *Aposhian II* and its robust analysis of the relevant legal issues, at the very least, signal that *Chevron*'s gate is open.

## C. The Party-Presentation Doctrine Under *Chevron*

That being said, this court understands *Chevron*, as a matter of law, to provide a standard of review, as *Aposhian II* states. *Id.*; *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 58 (2011) ("In [] *Long Island Care*[, 551 U.S. 158, 173 (2007),] we found that Chevron provided the appropriate standard of review" for reviewing legislative rules); *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1187 (10th Cir. 2016) (describing Chevron as a "two-part standard of review").[9] As a result, it is of the view that it does not need *any* "invitation" to apply the *Chevron* framework in the first place. *See Aposhian II*, 958 F.3d at 982 n.6 ("To the extent that Chevron is a standard of review, we would need no invitation to apply it."); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("[T]he court is not limited to the particular legal

---

[9] The Tenth Circuit has also referred to the *Chevron* doctrine as a standard of review in *Renewable Fuels Ass'n v. United States EPA*, 948 F.3d 1206, 1244 (10th Cir. 2020); *Pub. Serv. Co. v. United States EPA*, 949 F.2d 1063, 1065 (10th Cir. 1991); *Colo. ex rel. Colo. State Banking Bd. v. Resolution Tr. Corp.*, 926 F.2d 931, 949 (10th Cir. 1991); and *Envtl. Def. Fund v. United States Nuclear Regulatory Com.*, 866 F.2d 1263, 1268 (10th Cir. 1989). Additionally, this characterization of *Chevron* as providing a standard of review seems to reflect significant historical accord among the circuit courts. *See, e.g.*, *Glob. Tel*Link v. FCC*, 432 U.S. App. D.C. 1, 11, 866 F.3d 397, 407 (2017); *Boston v. United States Dep't of Hous. & Urban Dev.*, 898 F.2d 828, 831 n.5 (1st Cir. 1990); *N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 70 (2d Cir. 2011); *Pa., Dep't of Pub. Welfare v. United States HHS*, 647 F.3d 506, 510 (3d Cir. 2011); *Amaya v. Rosen*, 986 F.3d 424, 430 & n.4 (4th Cir. 2021) (also collecting cases); *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 904 (6th Cir. 2021); *United Transp. Union-Illinois Legislative Bd. v. Surface Transp. Bd.*, 169 F.3d 474, 477 (7th Cir. 1999); *Ragsdale v. Wolverine Worldwide, Inc.*, 218 F.3d 933, 936 (8th Cir. 2000); *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 990 (9th Cir. 2018); *Alloy Piping Prods. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1291 (Fed. Cir. 2003).

theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("It is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard[.]"); *see also Guedes v. BATFE*, 920 F.3d 1, 22 (D.C. Cir. 2019) ("The independent power to identify and apply the correct law presumably includes application of the *Chevron* framework when determining the meaning of a statute.") (quotation omitted).

But even if, as the Tenth Circuit leaves open, the application *Chevron* might depend in any way on party presentation, invitation, or invocation, *see Aposhian II*, 958 F.3d at 982 n.6, and even if, as Plaintiff suggests, such party-presentation rule is a vanishing act, and prior invitations "disappear[]" at each new stage of the litigation, ECF No. 61 at 27,[10] this court is satisfied that the party-presentation rule at the present juncture has been satisfied under any fair articulation of the rule.

In *Aposhian II*, the Tenth Circuit held that the Supreme Court's statement in *Estate of Cowart v. Niklos Drilling Co.*, 505 U.S. 469, 477 (1992), that the court "need not" resolve the issue of *Chevron* deference given the government's failure to claim an entitlement to the same does not translate to a requirement that the government (or any other party) must ask for *Chevron* before it can be applied. *Aposhian II*, 958 F.3d at 981. This is because, as the Tenth Circuit clarified, "'need

---

[10] This despite the fact, of course, that the Final Rule itself invokes *Chevron* to justify the interpretation of the operative statutory terms interpreted therein, *see* Final Rule at 66,527, which the Tenth Circuit considered of great significance in the application of *Chevron*. *Aposhian II*, 958 F.3d at 981. Overall, Mr. Aposhian's proposed stage-by-stage *Chevron* party-presentation rule is a rococo restatement of the doctrine in the Tenth Circuit, and is ultimately unsupported by circuit law, including as under *Aposhian II*, discussed below.

not' does not mean 'may not'." *Id*. *Aposhian II* reiterates the Tenth Circuit's prior determination, over the dissent of then-Judge Gorsuch, that both steps of *Chevron* may be applied even where *Chevron* enters the picture through mention by the Plaintiff (rather than the government) "only in a footnote . . . and [] only as part of an argument that the statute is *not* ambiguous." *Id*. (quoting *TransAm Trucking, Inc. v. Admin. Review Bd., United States DOL*, 833 F.3d 1206, 1216 (10th Cir. 2016) (Gorsuch, J., dissenting)). In *Aposhian II*, the Tenth Circuit held that because Mr. Aposhian "cited *Chevron*," *id*. at 982, even "as part of an argument that the statute is *not* ambiguous" (being directed only to *Chevron* Step One) *id*., he provided sufficient "invitation" to apply both steps of *Chevron*.

That is, *Aposhian II* stands for the proposition that, at least in the Tenth Circuit, the party-presentation rule under *Chevron* is, at most, one of "cit[ation]" and "invo[cation]," *id*., rather than a matter of true invitation. And so, under the *Chevron* party-presentation rule as outlined in controlling Tenth Circuit precedent, this court concludes that both parties have sufficiently "cited" and "invoked" *Chevron* to justify this court's application of the doctrine at this stage, as well. *Id*. For example, Plaintiff's motion for summary judgment cites and invokes *Chevron* by name 18 times. *See* ECF No 61 at 9, 22, 26, 27.[11] Although Mr. Aposhian seems to understand *Aposhian II* to mean that he must "invit[e]" this court to apply *Chevron*, he misreads the majority's clear statements on the matter in *Aposhian II*. *See id*. at 27.[12] Even though he attempts to take no position

_____

[11] And such citations are certainly more than "perfunctory and fleeting." *See Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 n.18 (10th Cir. 2020).

[12] It is also not entirely clear why the court would be obliged to await the *Plaintiff's* invocation of *Chevron* before applying it. That the court couldn't apply a deferential standard of review under circuit authority until a non-governmental plaintiff invites it to do so (certainly against his own

regarding *Chevron* "in order to avoid any further findings that he is inviting courts to analyze this case" under its framework, *id.*, it is simply a matter out of his control—and to the extent it was necessary, he certainly cited and invoked that doctrine to a much greater extent than the plaintiff in *TransAm*.[13]

But even more on point, the government not only cites and invokes *Chevron* in its cross-motion, *see* ECF No. 64 at 9, 12, but it affirmatively invites application of *Chevron* as a ground on which it is entitled to summary judgment. *Id.* at 12-13.[14] In the passage quoted in full above, the government argues that, should this court conclude that *Chevron* deference is applicable, the Tenth Circuit's conclusions as set forward in *Aposhian II* "would be equally applicable here, and Defendants are therefore entitled to summary judgment[.]" *Id.*[15] Thus, even if this court were to read far past the language of *Aposhian II* in search of an express invitation from the government,

---

interest) defies reason. Even to the extent that *Chevron* is waivable, as a matter of deference to the government, it would be the government's to disclaim.

[13] Judge Tymkovich's satirization of such a party-presentation rule for *Chevron* as "the-case-which-must-not-be-named" is well taken, *see Aposhian IV*, 989 F.3d at 896 (Tymkovich, J., dissenting), but this simply reflects the conclusion reached by the injunction panel in *Aposhian II* and sanctioned by a majority of the Tenth Circuit in *Aposhian IV*.

[14] At multiple points during oral argument on the cross-motions, *see* ECF No. 70, the government reaffirmed that, although it does not *urge* the application of *Chevron*, its position is that it remains entitled to judgment on *Chevron* grounds. The court finds it unnecessary to search for talismanic words—the government's claim to entitlement of judgment on *Chevron* grounds is as clear of an invitation to apply the standard as one could reasonably expect.

[15] During oral argument, ECF No. 70, Plaintiff suggested that the reference to "deference" at ECF No. 64 at 13 does not refer to *Chevron* deference. However, this suggestion is plainly incorrect. ECF No. 64 at 12 discusses the Tenth Circuit's *Chevron*-based result and says that this court "need not" follow suit, and instead invites best-interpretation analysis. However, the government continues, even if the court does not grant judgment to the government "on that basis" (being best-interpretation grounds), and the court concludes that "the application of deference is appropriate" (referring to the Tenth Circuit *Chevron* grounds discussed in the previous paragraph), "Defendants are [] entitled to summary judgment." *Id.*

it has found one in the government's cross-motion. As a result, under any rational formulation of the *Chevron* party-presentation rule in the Tenth Circuit, this court is satisfied that it has been invited to apply *Chevron* (to whatever extent such an invitation is necessary in the first place). If *Chevron* were appropriate at the preliminary-injunction stage, as the Tenth Circuit held in *Aposhian II*, it is certainly appropriate here, given the government's election to avail itself of the standard of review it provides as a grounds on which it is entitled to summary judgment.

## II.    *Chevron* Applied

For the reasons discussed in the foregoing sections, this court concludes that deviation from *Aposhian II* would be inappropriate. Thus, rather than re-engage in the fraught enterprise of calculating the best interpretation of the machine gun statute, this court now considers whether, under *Chevron*, the Final Rule is a reasonable interpretation of the relevant statutory language. And while, as is discussed above, this court does not consider itself bound as to the *outcome* reached by *Aposhian II* upon that court's traversal of the *Chevron* two-step, this court ultimately concludes, as did the Tenth Circuit, that the Final Rule is a reasonable interpretation of the machine gun statute.

### A.  *Chevron* Step One

In reviewing an agency's legal determinations, federal courts "generally appl[y] the analysis set out by the Supreme Court in *Chevron*[,]" 467 U.S. 837, which consists of a two-step test. *Sinclair Wyo. Ref. Co. v. United States EPA*, 874 F.3d 1159, 1163 (10th Cir. 2017). At *Chevron* Step One, the court considers "whether Congress has directly spoken to the precise question at issue." *Id.* (quotation omitted). Courts determine Congress's intent by employing the traditional tools of statutory interpretation, beginning with an examination of the statute's text. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1223-24 (10th Cir. 2017). *Chevron* Step One, in other

19

words, searches for ambiguity in statutory text, which suggests congressional intent to leave unanswered questions to an agency's discretion and expertise. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1057 (10th Cir. 2015); *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 35, 387 U.S. App. D.C. 20 (D.C. Cir. 2009). "Ambiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

Like the Tenth Circuit injunction panel, this court is satisfied that the relevant statutory text is ambiguous as to bump stocks, meaning that the enacting Congress failed to speak to the precise question at issue. Both the NFA and GCA define "machinegun" to mean "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(23), including also "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

The parties' arguments in this case centered on two features of this statutory definition— the meaning of the phrase "single function of the trigger" and the boundaries of the term "automatically." Their conflicting arguments concerning the "statute's text, structure, purpose, history, and relationship to other statutes," *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004), reveal two thoughtful and plausible interpretative frameworks, and demonstrate profound contextual ambiguity. Both perspectives are briefly restated below in discussing *Chevron* Step Two. However, it suffices to say for purposes of *Chevron* Step One that the key statutory language, "by a single function of the trigger" can be interpreted from either a firearm-focused view or a shooter-focused view, and that the degree of assistance required by the

20

term "automatically" is not precisely answered by the plain text of the statute. Thus, the definition of machine guns in the GCA and NFA is amenable to multiple non-objectionable interpretations, and "[i]n light of those competing, available interpretations, the statute contains a gap for the agency to fill." *Aposhian II*, 958 F.3d at 986 (quotation omitted). Thus, it is appropriate to continue to *Chevron* Step Two.

### B. *Chevron* Step Two

At *Chevron* Step Two, given such an implicit statutory gap, the court asks "whether the [regulation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Here, "the task that confronts us is to decide, not whether [the agency's interpretation is] the best interpretation of the statute, but whether it represents a reasonable one." *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 389 (1998); *Aposhian II*, 958 F.3d at 984-85. Although ATF has characterized its interpretation of the statutory text as the best interpretation of the statute both in the Final Rule itself, Final Rule at 66,521, and in this litigation, ECF No. 64 at 16, this court declines to so hold. However, because the Final Rule represents a reasonable interpretation, it passes muster under the deferential *Chevron* standard.

### 1) The Parties' Competing Interpretations of "Automatically . . . By a Single Function of the Trigger"

It is the position of the government that the term "automatically . . . by a single function of the trigger" can be broken down "into its subset components," ECF No. 64 at 13, those components being (1) "automatically" and (2) "by a single function of the trigger." Under the first textual component, the government argues that the Final Rule gives "automatic" a definition of the term consonant with "dictionary definitions contemporaneous to the NFA's enactment," *id.*, and which is sufficiently capacious so as to include merely "requir[ing] less human exertion than an activity

21

usually done by hand." *Id.* (quotation omitted). Second, the government argues that "single function of the trigger" should be functionally re-read as "single pull" of the trigger, *id.* at 14, thus implicitly defining "single function of the trigger" to center on the shooter's perceived "volitional actions," *Aposhian II*, 958 F.3d at 988, in pulling his finger.[16] As a result, it is the "human input" (as the shooter perceives it), as mediated by the machinery of the firearm and its parts, that constitutes a "function" of the trigger. ECF No. 64 at 16.[17] Under this reading of the term, "single function of the trigger" is read to mean "a single pull of the trigger *as well as* analogous motions that initiate an automatic firing sequence[.]" ECF No. 64 at 16 (cleaned up; emphasis in original); *accord id.* at 19 (arguing that bump stocks themselves are properly included within the definition of "trigger," meaning their operation constitutes the function of a "trigger").

Mr. Aposhian, on the other hand, interprets "single function of the trigger" not to focus on how many times the shooter perceives acting on the trigger by pulling it, but rather (at least in part) by the mechanical operation of the firearm itself—that is, the firing cycle of the trigger being engaged and subsequently resetting, together constituting a single "function" of the trigger, ECF No. 61 at 24; *cf. Cargill v. Garland*, 57 F.4th 447, 459-60 (5th Cir. 2023) (adopting a similar,

---

[16] To support its reading of "single function of the trigger," the government points to a House Committee report explaining that the bill contains "the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single *pull* of the trigger," *Id.* (quoting H.R. Rep. No. 73-1780 (1934)) (emphasis added), and argues that courts "instinctively" reach for the term "pull" in discussing the statutory definition of machinegun.

[17] Thus, the government argues that the term "function" in statutory context operates as substitute for an "*action* to begin and sustain a firing sequence," which action is the shooter's functioning of the trigger through "pulling" and holding the trigger. *See* ECF No. 66 at 3. And when the shooter pulls and holds the trigger, because the shooter does not re-pull his trigger finger (instead allowing the operation of the bump stock to operate as intended), it is a "single function" or "single function[ing]" of the firearm because it is captured by a single action of the shooter.

firearm-focused interpretation), where "trigger" is defined by its plain meaning (the lever or trigger blade) and necessarily exclusive of the bump stock. Under this reading, such "analogous motions," additional processes (including the shooter's own physical or manual actions enabling bump firing), and extraneous components (other than the trigger blade itself) could not be fairly included in the statutory definition of "single function of the trigger."

As to "automatically," Plaintiff would similarly take a narrower interpretation that would exclude merely "requir[ing] less human exertion," *see* ECF No. 64 at 13, and would instead require *nothing more* than a "single function of the trigger" to effectuate automatic firing. ECF No. 65 at 1-2. In other words, because slide fire bump stocks such as the one owned by Mr. Aposhian require a shooter to "us[e] his non-trigger hand to push forward on the rifle's fore-end, while simultaneously applying rearward pressure with the trigger hand," ECF No. 61 at 11, they do not enable "automatic" automatic firing insofar as "something more" is required by the shooter. *Id*. Although a non-mechanical bump stock "may assist a shooter in managing the weapon's recoil," because "something more" is required, the bump-stock is not "a mechanism that performs a required act," and is therefore neither self-acting nor self-regulating, and therefore not "automatic." ECF No. 65 at 6-8.

### 2) The Reasonableness of the Final Rule

While Mr. Aposhian's argument regarding the term "automatically" is rational, this court agrees with the Tenth Circuit that it is not the only reading of an unambiguous statute, and that the interpretation of the statute offered by the Final Rule is permissible if afforded *Chevron* deference:

> The shooter's positioning of the trigger finger on the extension ledge and application of forward pressure on the front of the gun provide the conditions necessary for the bump stock to repeatedly perform its purpose: to eliminate the need for the shooter to manually capture the recoil energy to fire additional rounds. We therefore disagree

> with the dissent's contention that a bump stock cannot be "automatic" because it will not work without constant forward pressure. . . The bump stock performs *part* of the work usually done by hand at a predetermined point in the operation, under conditions fixed for it by the shooter.

*Aposhian II*, 958 F.3d at 989 (emphasis in original); *accord Guedes*, 920 F.3d at 31-33 (similarly finding the government's interpretation of "automatically" permissible); *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009).

Although something more is required from the shooter to bump fire the firearm, the bump stock, insofar as it "harness[es] the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter," Final Rule at 66,543 (emphasis added), can *reasonably* be said to automate the firing process and constitute the sort of automatic firing proscribed by the NFA and GCA. Whether or not such a view of automation of the firing process can be said to be the *best* interpretation of the term "automatically," the legislative rule's decision to frame "automatically" in the limited terms of the effort of the shooter to reengage *the trigger itself* (thereby de-emphasizing the additional effort and manual forces necessary to bump fire) is sufficiently reasonable as to merit deference under *Chevron*.

Similarly, with regard to "single function of the trigger," this court takes the position set forward by the Tenth Circuit in *Aposhian II* that the Final Rule's focus on "a shooter's volitional actions," rather than the functioning of a firearm's firing cycle, is reasonable and justified by prior courts' interpretations of that language, *id.* at 988; *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977), reflecting one reasonable way in which the term may have been understood at the time of the enactment of the NFA. *Aposhian II*, 958 F.3d at 988; *accord Guedes*, 920 F.3d at 31

(similarly analyzing and interpreting the term "single pull of the trigger," including as it may have been understood at the time of statutory enactment). Although there are at least two feasible interpretations of the term as described above, the Final Rule's election to construe "single function of the trigger" to mean the movement of the trigger finger, rather than the trigger, is reasonable and therefore merits deference under *Chevron*.

### 3) The Line-Drawing Problem Posed by the Final Rule

Mr. Aposhian also argues that the Final Rule is invalid because ATF cannot articulate why manual bump stocks are classified as machine guns under the Final Rule while rubber bands, belt loops, and manual recoil control methods that might simulate the function of a bump stock are not. *See* ECF No. 61 at 24-26. Thus, Mr. Aposhian suggests a problem in which the government's ability to regulate items or methods facilitating more rapid firing lacks clear boundaries and risks absurd interpretive outcomes. This suggestion is partially correct—bump stocks fall on a spectrum of user effort and control requisite to effectuate bump firing somewhere *between* long-forbidden devices such as the Akins Accelerator *and*, for example, the still-legal belt-loop method.

The government responds that rubber bands, belt loops, and manual recoil control are not prohibited because these manual methods "require[] the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils," Final Rule at 66,533, and that such devices are not "self-regulating." ECF No. 64 at 21. Such shooter effort and control are thus sufficient to constitute a non-automatic process, even if some effort or control is nonetheless required for bump firing using bump stocks lacking springs. The purpose of the bump stock is "to eliminate the need for the shooter to manually capture recoil energy to fire additional rounds," *Aposhian II*, 958 F.3d at 989, which it does, according to the Final Rule, *to such an extent*

as to be self-regulating and therefore automatic. While this line-drawing problem[18] is not clearly answered by the statutory text, the ATF was empowered to provide a reasonable answer to the question through a legislative rule, and the distinction provided by the government "is based on a permissible construction of the statute." *Chevron*, 457 U.S. at 843.[19]

In summary, both parties' arguments as to the best interpretation of the statutory definition of machine guns, including the key operative phrase "automatically . . . by a single function of the trigger," reveal Congress's failure to speak to the precise question of the statute's application to bump stocks. As a result, the key statutory language is ambiguous, and a properly empowered government agency has employed its authority to fill the definitional gap by promulgating a legislative rule. Because the Final Rule is a reasonable interpretation of the statute, it is entitled to deference under *Chevron*.

### III.    Plaintiff's Secondary Arguments

In addition to his argument regarding the best interpretation of the GCA and NFA, Mr. Aposhian presents two related arguments as to why the Final Rule is unlawful, and why he is entitled to summary judgment as a result. Plaintiff argues that (a) even if the statutory language is ambiguous, he is entitled to operation of the rule of lenity rather than *Chevron* deference; and (b)

---

[18] Characterized, for example, by questions such as "how much effort and control is enough, how much assistance is too much assistance, and how automatic is automatic enough?"

[19] Again, "[t]he agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding." *Aposhian II*, 958 F.3d at 988 (quotation omitted); *accord Guedes*, 920 F.3d at 32 (similarly holding that the ATF's decision to include bump stocks within the scope of the regulated conduct under the Final Rule, while excluding belt loops et cetera was "reasonable").

that the Final Rule raises or reveals a nondelegation problem. These arguments are each considered briefly in turn.

### A.  The Rule of Lenity

"Under the rule of lenity, courts 'interpret ambiguous statutes . . . in favor of criminal defendants,'" *Aposhian II*, 958 F.3d at 978 n.4 (quoting *United States v. Gay*, 240 F.3d 1222, 1232 (10th Cir. 2001)), or those otherwise facing severe punishment by the government. The doctrine is deeply rooted in the Anglo-American juridical tradition. *See, e.g.*, 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 88 (1765) (Blackstone); 2 M. HALE, THE HISTORY OF THE PLEAS OF THE CROWN 335 (1736); *United States v. Wiltberger*, 18 U.S. 76, 95-96 (1820). However, today, the substantive canon of lenity is invoked only as "a rule of last resort," *Gay*, 240 F.3d at 1232 (quoting *United States v. Blake*, 59 F.3d 138, 140 (10th Cir. 1995)), given "grievous ambiguity or uncertainty in the statute[.]" *Shaw v. United States*, 580 U.S. 63, 71 (2016) (citing *Muscarello v. United States*, 524 U.S. 125, 138-139 (1998)); *see also Wooden v. United States*, 142 S. Ct. 1063, 1083-85 (2022) (Gorsuch, J., concurring in the judgment) (discussing the history and development of the "grievous ambiguity" standard).

Mr. Aposhian argues that, to the extent that the GCA and NFA definition of "machinegun" is ambiguous,[20] this court should resolve such ambiguity in favor of Mr. Aposhian by virtue of the

---

[20] Mr. Aposhian argues that the substantive canon of lenity could be invoked by this court "even if one concludes that the statute is *somewhat* ambiguous." ECF No. 61 at 26 (emphasis added). But this misstates the threshold level of ambiguity required by the Supreme Court to trigger reference to the canon. Wise or unwise, the Supreme Court has declared that the rule of lenity is called to action by "grievous[ly]" ambiguous statutory language, not merely "somewhat" ambiguous language. *See Shaw v. United States*, 580 U.S. 63, 71 (2016). Although the GCA and FNA may bear markings of such grievous ambiguity, because *Chevron* fills the interpretive gap under Tenth Circuit law, as discussed below, the rule of lenity is not determinative.

rule of lenity. ECF No. 61 at 26. But as Mr. Aposhian notes in his motion for summary judgment, the Tenth Circuit, in *Aposhian II*, has already determined that he was unlikely to prevail on his lenity argument because *Chevron* exerts countervailing force in favor of deference. 958 F.3d at 982-83. Thus, Mr. Aposhian's argument comes down to a renewed invitation to disclaim *Aposhian II*, disregard *Chevron*, and begin anew the task of constructing the best interpretation of the statute and, if grievous ambiguity is encountered, apply the rule of lenity "in the absence of a competing canon of statutory construction[.]" ECF No. 61 at 27.

Because this instead applies the background principles of *Chevron* review pursuant to *Aposhian II*, Mr. Aposhian's lenity argument is effectively mooted. This is because there is a competing canon of statutory construction at play, and because binding precedent confirms that *Chevron* simply cuts ahead of lenity in line. *See Aposhian II*, 958 F.3d at 982-84 (discussing cases in which *Chevron*, not the rule of lenity, is applied to the interpretation of regulations where the agency has both civil and criminal enforcement authority, as the ATF does here); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 703-04 (1995) (applying *Chevron* even though the regulation at issue carried criminal implications); *NLRB v. Oklahoma Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir. 2003) (en banc) (same); *United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004) (same); *United States v. Hubenka*, 438 F.3d 1026, 1032-34 (10th Cir. 2006) (same). And so, for the reasons discussed by the injunction panel in *Aposhian II*, this court concludes that the rule of lenity does not trump *Chevron* deference in the construction of regulations such as the Final Rule.

## B.  The Nondelegation Doctrine

Alternatively, Mr. Aposhian argues that the nondelegation doctrine ought to come into play to his benefit. With due respect, the court understands this argument to be something of a "Hail

28

Mary" toss. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1282 n.17 (2023); *Saddozai v. Davis*, 35 F.4th 705, 709 (9th Cir. 2022). Generally, the non-delegation doctrine arises from Article I of the Constitution, which provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States. U.S. CONST. art I., § 1. "The non-delegation doctrine provides 'that Congress may not constitutionally delegate its legislative power to another branch of government.'" *United States v. Brown*, 348 F.3d 1200, 1216 (10th Cir. 2003) (quoting *Touby v. United States*, 500 U.S. 160, 165 (1991)).

But not all delegations of authority are prohibited. In fact, most are upheld. *See Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)) ("Only twice in this country's history (and that in a single year) have we found a delegation excessive—in each case because Congress had failed to articulate *any* policy or standard to confine discretion. By contrast, we have over and over upheld even very broad delegations.") (quotation omitted). In analyzing delegations of authority, courts are instructed to adopt a "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. "[T]he Constitution does not 'deny[] to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s]." *Gundy*, 139 S. Ct at 2123 (*quoting Yakus v. United States*, 321 U.S. 414, 425 (1944)). The nondelegation test is thus limited to a search for an "intelligible principle" laid down by Congress guiding agency enforcement and interpretation. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001).

In advancing his nondelegation argument, Mr. Aposhian admittedly relies on something of a strawman. He characterizes the NFA and GCA, if interpreted so as to allow the Final Rule, to be

a "statute that does no more than instruct ATF to ban any weapon it deems too dangerous—without defining 'dangerous' or explaining when a lethal weapon should be deemed too dangerous." ECF No. 61 at 31. He posits that "[t]hose who support banning non-mechanical bump stocks" would support a line of reasoning that "Congress adopted the NFA and [GCA] for the purpose of granting the Attorney General and ATF broad authority to regulate dangerous weapons." *Id*. If the Final Rule is permissible under the statute, Mr. Aposhian argues, then the statute must lack an intelligible principle and thereby fail the nondelegation test. But these statements are instances of infirm *argumentum ad absurdum*.

At a conceptual level, this court is skeptical of Mr. Aposhian's conditional nondelegation argument in the first place—that is, that the doctrine can be invoked to say that *if* a statute is interpreted so as to allow a certain result, then the nondelegation rule has been violated. *See* ECF No. 65 at 19 ("But if § 5845(b) were interpreted as specifying nothing more than ATF should use its best judgment . . . the statute would run afoul of Article I, Section I[.]"); *id*. ("As so interpreted, the statute would supply no intelligible principle[.]"). Rather, statutes either provide an intelligible principle or they do not. If certain agency interpretations of statutes are absurd, then it is not a nondelegation problem facing the court, but rather one of arbitrary, capricious, or otherwise unlawful interpretation properly cured, for example, by the remedial provisions of the Administrative Procedure Act.

That Mr. Aposhian's nondelegation argument isn't really a nondelegation argument at all is evidenced by his argument that "[t]he actual text of [the definition of 'machineguns' in the NFA and GCA] sets out an 'intelligible principle' to guide ATF in determining which weapons should be classified as 'machineguns.'" ECF No. 65 at 19. According to Aposhian, the "statutory language [of the NFA] cuts so strongly against the ATF" that any contradicting interpretation violates the

30

nondelegation doctrine. ECF No. 61 at 36. But the NFA cannot simultaneously provide a principle that clearly delineates the scope of a machine gun (when it results in Aposhian's preferred outcome) *and also* lack an intelligible principle that explains which weapons are prohibited (when it results in Aposhian's disfavored outcome). This, by itself, implodes Mr. Aposhian's nondelegation argument.

In any case, the statute does not present a nondelegation problem. As black-letter law now stands, the nondelegation doctrine is a tremendously low hurdle for Congress to clear. The Supreme Court has approved delegations to "regulate in the public interest," "set fair and reasonable prices," "set just and equitable rates," and "issue whatever air quality standards are requisite to protect the public health." *Gundy*, 139 S. Ct at 2123 (cleaned up) (collecting cases). Compared with these constitutional delegations, even an instruction to ban *any* unreasonably dangerous weapon (as Mr. Aposhian reductively characterizes the NFA and GCA) might very well clear the nondelegation bar.

Compare that, of course, with what the relevant statutory language *actually* proscribes, and at what level of detail. To be a machinegun, the NFA requires that the weapon be "designed . . . or readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845. While ATF has the power to interpret ambiguous terms in the NFA, there are clear, intelligible limits on what the ATF can classify as a machinegun. Some discretion is undoubtedly left for ATF,[21] but that discretion is channeled within a defined spectrum

---

[21] For example, regarding where to draw the line of acceptable shooter assistance or automation on the spectrum between Akins Accelerators and rubber bands, as discussed above.

and along coherent interpretive dimensions. As a result, this court declines to find that the NFA and GCA raise a nondelegation issue.

## IV.    A Note on Related Out-of-Circuit Proceedings

The court acknowledges that a circuit split has developed as to whether the Final Rule is the best interpretation of the statutory text. In *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), the Fifth Circuit concluded that the Final Rule was not the best reading of the NFA and GCA, and that a "plain reading of the statutory language . . . reveals that a bump stock is excluded from the definition of 'machinegun[.]'" *Id.* at 451. The Fifth Circuit then declared that such was not only the *best* reading of the statutory language, but that the statutory language is, in fact, unambiguous. *Id.* at 464. The D.C. Circuit, on the other hand, came to the opposite conclusion—namely, that "the [Final Rule] is consistent with the best interpretation of 'machine gun' under the governing statutes." *Guedes v. BATFE*, 45 F.4th 306, 310 (D.C. Cir. 2022), *rehearing en banc denied*, 66 F.4th 1019, 1019 (D.C. Cir. 2023). Because the Final Rule offered the best interpretation of the statute, the D.C. Circuit determined that *Chevron* need not apply. *Id.* at 312-13.

As of the time of this order, the losing parties in both *Cargill* and *Guedes* have petitions for certiorari pending before the Supreme Court. One week before oral argument was heard on the parties' cross-motions, the government moved this court to reschedule the hearing and delay issuance of any order pending the resolution of the two petitions. ECF No. 68. But the court concluded that delaying resolution of the cross-motions was not in the interests of justice or judicial economy. Even if the court were to grant certiorari in one of the two cases, both petitions would have the Court determine the "best interpretation" of "machinegun." But this case is not about the best interpretation of the definition of "machinegun," despite the parties' best efforts to make it so. As the Tenth Circuit made clear in *Aposhian II*, this is a case about *Chevron*. And, of course, district

courts within the Tenth Circuit "must follow the precedent of this circuit, regardless of [their] views concerning the advantages of the precedent of our sister circuits." *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990).

And so, unless the Supreme Court determines that the statutory text is unambiguous *and* that the precise question at issue under *Chevron* Step One was spoken to by Congress in the NFA and GCA, this court's order need not be affected. In other words, the Court could very well determine that the best reading of the statute aligns with, for example, Mr. Aposhian's, without undermining the conclusion tentatively reached by the Tenth Circuit that the Final Rule represents a "reasonable interpretation" of the statutory language for purposes of *Chevron*.[22] Because of the somewhat remote conceptual relationship between the pending petitions for certiorari and the grounds upon which this court rests its order, and the court's hesitance to delay the resolution of fully briefed cross-motions for summary judgment, the court elects to resolve the motions. Perhaps most importantly, the Tenth Circuit (both by panel and en banc), *and even* the Supreme Court, through a denied petition for certiorari, have already fairly considered Mr. Aposhian's arguments, and the court finds it appropriate to resolve this case and render judgment.

Putting all of this to the side, this court is neither naïve nor ignorant of the possible fate facing *Chevron* in the Supreme Court. But as it stands now, *Chevron* is the law of the land, and the Tenth Circuit has declared that *Chevron* and its progeny provide the proper standard for the determination of the legality of the Final Rule. Whether or not it is the best such interpretation, the

---

[22] Alternatively, the Court could conclude that the Final Rule is, in fact, the best interpretation of the statute. Or, of course, it could do nothing at all. In any case, this court deems it prudent to promptly resolve the motions before it according to the standards provided by controlling circuit precedent.

Final Rule is a reasonable interpretation of the statutory definition of "machinegun," and it therefore suffices under *Chevron*.

## CONCLUSION & ORDER

For the foregoing reasons, the court hereby **DENIES** Plaintiff's motion for summary judgment, ECF No. 61, and **GRANTS** summary judgment in favor of Defendants pursuant to their motion, ECF No. 64.

DATED September 29, 2023.

BY THE COURT

Jill N. Parrish
United States District Court Judge